UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                                Plaintiff,

                -against-                                    22-cv-10016 (LAK)

DONALD J. TRUMP,

                                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-21-2022

## PRETRIAL AND SCHEDULING ORDER

LEWIS A. KAPLAN, *District Judge.*

The Court has received a joint proposed discovery plan from and conducted a pretrial and scheduling conference with counsel for both parties. The following reflects the determinations made as a result of those consultations.

1.      No discovery taken in *Carroll v. Trump*, 20-cv-7311 (LAK) (hereinafter "*Carroll I*") shall be inadmissible in this action on the basis that it was taken in *Carroll I* and not in this action. Each of the parties may object to the admissibility in this action of discovery derived from *Carroll I* on any other independent basis.

2.      The discovery taken in *Carroll I,* which has been completed, fully explored the question whether the defendant sexually assaulted the plaintiff as she alleges. That is the central issue both in *Carroll I* and in this case. Recognizing that there might be issues raised by this case that were not presented by *Carroll I,* this Court's order of December 2, 2022 (Dkt 10) directed the parties to provide "[a] detailed statement of what specific discovery that was not conducted in *Carroll I* is needed for the prosecution or defense of this case and the basis for the contention that

it is needed." The Court explored that subject with counsel at the conference as well. On the basis of the parties' written and oral submissions, the Court has concluded that the only such issues are damages, including emotional or psychological damages, allegedly suffered by plaintiff as a result of the alleged sexual assault as distinguished from the defamation alleged in *Carroll I*, and the defendant's October 12, 2022 statement. Unless otherwise ordered, discovery will be limited to those subjects.

3.      Unless otherwise ordered, plaintiff's discovery is limited to (a) furnishing defendant with the report of a forensic psychologist who, plaintiff states, will offer expert testimony regarding plaintiff's damages from the alleged sexual assault and a second report from plaintiff's original damages expert, who plaintiff states will offer expert testimony regarding the damages allegedly resulting from defendant's October 12, 2022 statement, and (b) appropriate Rule 26(b)(4) discovery with respect to newly proposed testimony of any expert witnesses whom defendant proposes to call.

4.      Unless otherwise ordered, defendant's discovery is limited to (a) conducting an independent psychological or psychiatric examination of plaintiff with respect to any emotional or psychological damages as a result of the alleged sexual assault and defendant's October 12, 2022 statement, (b) furnishing plaintiff with the reports of (i) defendant's expert who will offer testimony with respect to plaintiff's alleged emotional or psychological damages as a result of the alleged sexual assault and defendant's October 12, 2022 statement, and  (ii) defendant's damages expert, Robert Fisher, who defendant states will offer expert testimony demonstrating that plaintiff was not damaged by defendant's October 12, 2022 statement, (c) conducting an additional deposition of the plaintiff, not to exceed three hours absent agreement of all counsel or leave of court, only on the subject of damages, including any emotional or psychological damage, allegedly suffered by her as

3

a result of the alleged sexual assault and the publication of defendant's October 12, 2022 statement, and (d) appropriate Rule 26(b)(4) discovery with respect to newly proposed testimony of any expert witnesses whom plaintiff proposes to call.

     5.    Nothing in paragraphs 3 and 4 forecloses interrogatories and requests for production of documents consistent with the limitation set forth in paragraph 2.

     6.    In the event defendant moves to dismiss the complaint in this action, he may move simultaneously for a stay of discovery pending determination of the motion. Absent a specific, further order of the Court to the contrary, however, the parties shall commence discovery and proceed notwithstanding the pendency of any motion.

     7.    The following schedule shall govern further proceedings in this case:

| Deadline | Date |
|---|---|
| Rule 26(a) initial disclosures<br><br>Service of interrogatories, document production requests, and any request for independent psychological or psychiatric examination of the plaintiff.<br><br>Service of plaintiff's new or supplemental expert reports | January 9, 2023 |
| Responses to any written discovery requests | January 23, 2023 |
| Completion of additional deposition of plaintiff<br><br>Service of defendant's new or supplemental rebuttal expert reports | January 30, 2023 |
| Completion of expert discovery | February 6, 2023 |
| Exchange of premarked trial exhibits | February 9, 2023 |
| Filing of joint pretrial order | February 16, 2023 |
| Filing of any motions for summary judgment and motions *in limine* | February 23, 2023 |
| Filing of any oppositions to motions for summary judgment and motions *in limine* | March 9, 2023 |

4

| Filing of any replies in support of motions for summary judgment and motions *in limine* | March 16, 2023 |
| Filing of joint proposed special verdict form, proposed jury instructions, and proposed *voir dire* examinations | March 30, 2023 |
| Commencement of trial | April 17, 2023 |

8.      The Court will resolve the question whether to consolidate or jointly try *Carroll I* with this case at a later date.

SO ORDERED.

Dated:       December 21, 2022

_____
Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

       Plaintiff,

   -against-            22-cv-10016 (LAK)

DONALD J. TRUMP,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/13/2023

## MEMORANDUM OPINION

Appearances:

    Roberta Kaplan
    Joshua Matz
    Shawn Crowley
    Matthew Craig
    KAPLAN HECKER & FINK LLP
    *Attorneys for Plaintiff*

    Alina Habba
    Michael T. Madaio
    HABBA MADAIO & ASSOCIATES LLP
    *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

    Plaintiff E. Jean Carroll alleges that businessman Donald J. Trump, as he then was, raped her in a dressing room at the New York department store, Bergdorf Goodman, more than two decades ago. Mr. Trump denies the allegation. These circumstances have given rise to two lawsuits now before me.

The first (*"Carroll I"*) originally began in a state court, but it later was removed to this one.  It accuses Mr. Trump only of libeling Ms. Carroll in a series of statements he issued in June 2019, shortly after Ms. Carroll went public with her account of the alleged rape.[1]  It does not include any claim based on the alleged rape itself.  That doubtless is so because such a claim almost certainly would have been barred by the statute of limitations at the time the case was filed.[2]  But the law then changed.

In 2022, New York enacted the Adult Survivors Act (the "ASA").[3]  Under the ASA, persons who allegedly were abused sexually as adults were given a new one-year period within which to sue their alleged abusers.  Ms. Carroll then brought this action (*"Carroll II"*) to recover damages and other relief for (1) the alleged rape, and (2) additional libels allegedly committed by Mr. Trump in a statement he made on October 12, 2022.

As is obvious, the central issue in both *Carroll I* and *Carroll II* is exactly the same – whether Mr. Trump raped Ms. Carroll.  If he did not, then Ms. Carroll's sexual assault claim in *Carroll II* and her libel claims in both cases likely would fail.  If he did, then little would remain in either case except perhaps a few  minor issues related to Mr. Trump's statements and determination

---

[1]

*Carroll v. Trump,* 20-cv-7311 (LAK).

[2]

Both sides appear to assume that this claim would have been barred by the statute of limitations.  This decision so assumes for ease of expression.  Nevertheless, the question of whether the claims asserted in this case would be time-barred in the absence of the ASA is not before me, and I do not now decide it.  In view of my ruling on the constitutionality of the ASA, the issue is immaterial.

[3]

N.Y. CPLR § 214-j.

of damages.[4]

Carroll II – this case – now is before me on Mr. Trump's motion to dismiss the complaint.[5]  He contends that the sexual abuse claim must be dismissed because the ASA violates the Due Process Clause of the New York State Constitution.  He argues also that the libel claim is legally insufficient because Ms. Carroll's complaint fails to allege what New York law refers to as "special damages."  Both of his arguments are without merit.

### Facts

As this is a motion to dismiss the complaint, the plaintiff's well-pleaded factual allegations and all inferences that reasonably may be drawn from them are deemed true.  The fact that Mr. Trump denies Ms. Carroll's allegations does not enter into the analysis at this stage of the case.  What, if anything, actually occurred must await further proceedings if the complaint withstands the present motion.

---

[4] The ultimate viability of Carroll I ultimately remains subject, for reasons having nothing to do with the inherent merits of the libel claim, to further determinations by appellate courts.  In Carroll v. Trump, 49 F.4th 759 (2d Cir. 2022), the Second Circuit determined that Mr. Trump  was an "employee" of the United States within the meaning of the Westfall Act when he allegedly libeled Ms. Carroll but certified the question whether his alleged libel was within the scope of his employment to the District of Columbia Court of Appeals.  That court heard argument on January 10, 2023.  If either of those questions ultimately were resolved in favor of Ms. Carroll, Carroll I would be viable.  If both ultimately were resolved in favor of Mr. Trump, Carroll I almost certainly would be dismissed pursuant to the Federal Tort Claims Act.  Carroll I, 498 F. Supp. 3d 422, 427 (S.D.N.Y. 2020) (hereinafter "Carroll I").

[5] Also before me is a motion by Mr. Trump to stay this action pending a decision on this motion. Dkt 22.

4

*The Alleged Rape*

As I wrote in *Carroll I:*

"According to the complaint [(in *Carroll I*, which in these respects is identical to that in this case)], Mr. Trump, then a private citizen, encountered Ms. Carroll at the Bergdorf Goodman department store in Manhattan some time between the fall of 1995 and the spring of 1996. Ms. Carroll, who was an advice columnist appearing on television, alleges that Mr. Trump recognized her and asked her to help him select a present for a woman who was not with him at the store. The two eventually went to the lingerie department, where, according to the complaint, Mr. Trump insisted that the plaintiff try on a bodysuit. Ms. Carroll alleges next that what she first perceived as playful banter took a dark turn when Mr. Trump closed the door of a dressing room, pushed her against a wall, and began kissing her without her consent. She claims that she pushed Mr. Trump away and laughed at him, and that he then pressed her against the wall once more, pulled down her tights, and forcibly raped her for several minutes until she managed to push him off and flee the store."[6]

*The Story Comes Out*

"Ms. Carroll asserts that she immediately told one friend about the alleged rape and told another friend in the coming days. She did not, however, make the

---

[6]

*Carroll I,* 498 F. Supp. 3d at 430.

allegations public at that time.  They remained private for many years."[7]
The reasons they remained private are spelled out in the *Carroll II* complaint, the truth of which must be assumed for purposes of this motion.

   Initially, according to the complaint, Ms. Carroll was in shock and did not wish to think of herself as a rape victim.[8]  The two friends in whom she confided gave her conflicting advice about reporting the event.[9]  Ultimately, she was persuaded by the advice of the friend who advised her to keep quiet.  That friend stressed that Mr. Trump was powerful and would "bury" Ms. Carroll if she came forward.[10]  Ms. Carroll says she "knew how brutal and dangerous Trump could be," feared "being dragged through the mud if she reported the rape," "was convinced that nobody would believe her if she came forward," and "like so many other survivors of sexual assault, [she] also blamed herself" for her stupidity in  "agreeing to go lingerie shopping with Trump."[11]  She "also considered that, in our society, women who have been raped are looked at as 'spoiled goods,' and she resented the fact that practically every woman who courageously came forward with their stories of abuse was subjected to questions like 'why didn't you scream' and 'why didn't you come forward

---

[7]    *Id.*

[8]    Cpt. ¶ 44.

[9]    *Id.* ¶¶ 44, 46-47.

[10]    *Id.* ¶¶ 47-48.

[11]    *Id.* ¶¶ 48-49.

immediately.'"[12] "She thus chose silence" and kept still for years.[13]

*Ms. Carroll Goes Public in 2019*

In the fullness of time, the Harvey Weinstein revelations in *The New York Times* and their *sequelae,* including the public reaction to women coming forward with accounts of prior sexual abuse, triggered for Ms. Carroll a process that resulted in a decision to begin writing a book.[14]  Her book told of her experiences with "twenty-one men who had, each in his own way, left indelible and ugly marks on her story."[15]  One of those men was Donald Trump.

On June 21, 2019, *New York* magazine published an excerpt from the plaintiff's then forthcoming book.  The excerpt tells a more detailed version of the allegations outlined above.  The book was published on July 2, 2019."[16]

*Mr. Trump's 2019 Reaction*

As described elsewhere, Mr. Trump, at that time President, responded to the emergence of Ms. Carroll's allegations with a number of demeaning, insulting and allegedly

---

[12]

    *Id.* ¶ 51.

[13]

    *Id.* ¶ 52.

[14]

    *Id.* ¶¶ 67-75.

[15]

    *Id.* ¶ 75.

[16]

    *Carroll I,* 498 F. Supp. 3d at 431.

defamatory remarks about Ms. Carroll.[17]  As Ms. Carroll's claims regarding those remarks are at issue in *Carroll I* and not in this case, there is no need to elaborate upon them here.

*Carroll I*

> Ms. Carroll commenced *Carroll I* against Mr. Trump in 2019 for making allegedly libelous statements about her in the wake of the rape allegation made public by Ms. Carroll.  As noted, she could not then sue him for the alleged rape because the New York statute of limitations for such an action had expired.[18]  In any case, the details of *Carroll I* are not relevant to the present motion and need not be discussed here.

*The New York Adult Survivors Act*

> In the midst of all this, New York in May 2022 enacted the ASA which, in relevant part, created a one-year revival period, starting November 24, 2022, during which adult survivors of sexual assault could sue their abusers despite  the expiration of the previously applicable statutes of limitation.[19]

*Ms. Carroll Announces Intent to Sue Under the ASA, and Mr. Trump Responds*

> On August 8, 2022, more than three months before the effective date of the ASA, Ms.

---

[17]  *Id.*

[18]  *See supra* note 2.

[19]  N.Y. CPLR § 214-j.

Carroll's counsel announced privately to her adversaries and to the Court that Ms. Carroll would sue Mr. Trump for damages for the alleged rape once the ASA became effective on November 24.[20] Mr. Trump on October 12, 2022 responded by posting this statement on his social media outlet:

> "This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks.  *   *   *  I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years.  And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost

---

[20] That announcement was filed publicly on September 20, 2022.

everything else in our Country."

He then continued:

> "In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a
> woman who I had nothing to do with, didn't know, and would have no interest in
> knowing her if I ever had the chance. Now all I have to do is go through years more
> of legal nonsense in order to clear my name of her and her lawyer's phony attacks on
> me. This can only happen to 'Trump'!"[21]

*Carroll II*

    A bare nine minutes after the ASA became effective on Thanksgiving morning, Ms.
Carroll brought the present lawsuit – *Carroll II* – against Mr. Trump.  The complaint contains two
claims for relief.

    The first seeks compensatory and punitive damages and other relief for Mr. Trump's
alleged rape and groping of Ms. Carroll in the Bergdorf dressing room years ago.  The timeliness of
that claim depends directly upon the newly enacted revival statute, the ASA.

    The second claim is for common law defamation based on allegedly false and
defamatory statements about Ms. Carroll contained in Mr. Trump's October 12, 2022 statement.  It
too seeks compensatory and punitive damages and other relief.

---

[21] Cpt. ¶ 92.

*The Pending Motion*

As noted, Mr. Trump seeks dismissal of this case. He argues that the ASA is unconstitutional and that the first claim for relief therefore is barred by the statute of limitations. He contends also that the second claim is legally insufficient because it fails to plead "special damages" as supposedly required by New York law.

## *Discussion*

*The ASA*

It is undisputed that the ASA by its terms would make Ms. Carroll's sexual assault claim against Mr. Trump timely despite the fact that the statute of limitations otherwise would have expired long ago.[22] So Mr. Trump now contends that the ASA is unconstitutional under the Due Process Clause of the New York State Constitution.[23]

---

[22]

*See supra* note 2.

[23]

N.Y. CONST. art. 1, § 6.

Despite representing to this Court shortly before making this motion that he would seek dismissal of the ASA on the ground that it violates the Due Process Clause of the United States Constitution, Dkt 15, at 7, he has not done so. Indeed, he now admits that "[c]laim-revival statutes generally pose no issue under the Fourteenth Amendment to the United States Constitution." Dkt 21, at 7 (quoting *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.,* 30 N.Y.3d 377, 394 (2017) (hereinafter *"World Trade Ctr."*) (internal quotation marks omitted)). He contends only that it violates the Due Process Clause of the New York State Constitution.

*The ASA Is Constitutional As A Matter of New York Law*

   "[T]he New York Court of Appeals recently made clear that the test for whether a claim-revival statute is consistent with the New York Due Process Clause is simply whether the revival statute is 'a reasonable measure to address an injustice.'"[24] The answer is obvious.

   As an initial matter, the New York Legislature long has recognized the problem created by what it characterized as a "culture of silence" and the existence of comparatively short limitations periods for bringing civil and criminal actions for sexual assaults and other sexual offenses. In 2019, it substantially extended the limitations periods for both types of actions. The bill jacket contained the Senate sponsors' statement, which said:

    "Statutes of limitations on sexual offense cases impose a ticking clock on how long victims are able to come forward if they want to seek charges. For crimes of sexual violence in particular, the clock ticks against the trauma and culture of silence that prevents victims from speaking out.

    "Over the last year, victims who have suffered in silence for decades have bravely spoken about their abuse, and have also laid bare the state's limited ability to prosecute their abusers due to the passage of time. In recognition of this fact, states, across the country are lengthening or eliminating the statutes of limitations on crimes of sexual violence. While New York removed the statute of limitations for rape or criminal sexual act in the first degree, a five year statute of limitations remains for

---

[24] *Giuffre v. Prince Andrew*, 579 F. Supp.3d 429, 453 (S.D.N.Y. 2022) (rejecting state due process challenge to statute reviving otherwise time-barred claims for childhood sexual abuse) (quoting *World Trade Ctr.*, 30 N.Y.3d at 400).

12

rape in the second and third degree and criminal sexual act in the second and third

degree.

"This bill would extend the statute of limitations to twenty years for rape in

the second degree and criminal sexual act in the second degree, to ten years for rape

in the third degree and criminal sexual act in the third degree, and would make

conforming changes to incest in the first and second degrees. *Further, this bill would*

*increase the time period in which the victim could bring a civil suit for these offenses*

*to twenty years*."[25]

But the amendment of the civil statute of limitations did not fully solve the problem the Legislature

sought to address with respect to civil claims. The extension applied only with respect to claims

arising from "acts or omissions occurring on or after [the] effective date" of the statute, September

18, 2019.[26]

Recognizing that the 2019 amendment – as articulated by an Assembly member –

"left so many survivors who had already missed their chance out in the cold with no opportunity for

justice,"[27] the Legislature took up that situation in 2022 when it passed the ASA. The legislative

committee report that accompanied Senate Bill 66, which ultimately became the ASA, stated:

"In 2019, the New York State Legislature enacted the Child Victims Act

(S.2440/A.2683), prospectively increasing the criminal and civil statutes of

---

[25]

New York Bill Jacket, 2019 S.B. 6574, Ch. 315 (emphasis added).

[26]

*Id.*, 2019 S.B. 6574 § 4; *see also* N.Y. CPLR § 213-c.

[27]

Sen. Bill No. 66A, 2022 N.Y. Assemb., Reg. Sess. (May 23, 2022) at 35.

limitations for child sexual offenses, and creating a one-year window for the revival of otherwise time-barred child sexual abuse-re- lated lawsuits. The Legislature also enacted legislation (S.6574/A.8412) to prospectively increase the criminal and civil statutes of limitations for a subset of sexual offenses committed against adults. *Both bills were predicated on the widespread recognition that New York's existing statutes of limitations were insufficient in giving survivors of these heinous crimes enough time to pursue justice through criminal charges or filing a civil lawsuit.* * * *

"This legislation, the Adult Survivors Act, would create a one-year window for the revival of otherwise time-barred civil claims arising out of sexual offenses committed against people who were 18 or older at the time of the conduct. *Those who have had justice denied them as a result of New York's formerly insufficient statutes of limitations should be given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law.*"[28]

In addition, one of the proponents of the ASA, against the background of the 2019 legislation, said on the floor of the State Senate in support of the enactment of what became the ASA:

"*[W]e see* child abuse survivors, young adults and *older survivors [of sexual abuse] often either suppressing memories of their abuse or they are afraid to come forward right away. And by the time that adult survivors get the help that they need and finally can take action against their abusers, it's too late to do anything about*

---

[28] N.Y. Comm. Rept., 2021 NY S.B. 66 (NS) (emphasis added).

> *it legally.*

> "It is time to enact commonsense legislation that would do away with New
> York's vague statute of limitations, which denies many justice."[29]

And the Legislature agreed. The bill passed the New York Senate unanimously (62-0) and the New

York Assembly by a vote of 140 to 3.[30] Thus, the creation of a revival period for otherwise time-

barred claims based on sexual assaults against adults was aimed at what New York reasonably and

permissibly regarded as an injustice.

Mr. Trump nevertheless argues that the ASA is unconstitutional because, he claims,

the Justification section of what he refers to as the "legislative memorandum" accompanying the bill

that became the ASA did not explicitly sufficiently articulate the injustice the legislation was

intended to remedy.[31] Regrettably, that assertion is demonstrably incorrect. The Justification section

of the legislative memorandum submitted with Assembly Bill 648A stated:

> "In 2019, the New York State Legislature enacted the Child Victims Act
> (S.2440/A.2683), prospectively increasing the criminal and civil statutes of
> limitations for child sexual offenses, and creating a one-year window for the revival
> of otherwise time-barred child sexual abuse-related lawsuits. The Legislature also

---

[29]

  N.Y. SENATE, *Stenographic Record* 2705 (Apr. 26, 2022) (emphasis added). *See also* Sen.
  Bill No. 66A, 2022 N.Y. Assemb., Reg. Sess. (May 23, 2022) at 35 (Statement of Assembly
  member Judy Griffin) ("We must do all we can to empower those who have been harmed
  by others, *no matter their age*, so they may hold their perpetrators accountable if they
  choose. This bill is focused on those survivors who have yet to be heard.") (emphasis
  added).

[30]

  NY S.B. 66 (NS), bill tracking (May 24, 2022).

[31]

  Dkt 34, Def.'s Reply Mem., at 1-2.

enacted legislation (S.6574/A.8412) to prospectively increase the criminal and civil statutes of limitations for a subset of sexual offenses committed against adults. Both bills were predicated on the widespread recognition that New York's existing statutes of limitations were insufficient in giving survivors of these heinous crimes enough time to pursue justice through criminal charges or filing a civil lawsuit.

"New Jersey similarly enacted legislation in 2019 that prospectively increased the civil statute of limitations for both child and adult survivors of sexual offenses, as well as created a two-year window for the revival of otherwise time-barred lawsuits alleging conduct constituting specified sexual offenses. Unlike New York's revival window, however, which applies only to survivors of sexual offenses who were minors at the time of the abuse, the New Jersey window also applies to survivors of sexual offenses who were adults (i.e. 18 or older) at the time of the alleged conduct.

*"This legislation, the Adult Survivors Act, would create a one-year window for the revival of otherwise time-barred civil claims arising out of sexual offenses committed against people who were 18 or older at the time of the conduct. Those who have had justice denied them as a result of New York's formerly insufficient statutes of limitations should be given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law."*[32]

---

[32] Legislative memorandum accompanying A 648A (available at https://nysassembly.gov/leg/?default_fld=&leg_video=&bn=A00648&term=2021&Summary=Y&Memo=Y (last visited Jan. 13, 2023).

Even if the factual premise of defendant's argument were correct, and it is not, defendant's position would reflect a disregard of the wealth of additional evidence of the Legislative purpose in enacting the ASA well as a parsimonious approach to determining the purpose of the ASA that is inconsistent with New York law.

As an initial matter,

"In construing statutes, courts [applying New York law] are permitted to consider extrinsic sources—legislative reports, for example, and petitions to the legislature requesting that some piece of legislation be passed to aid in statutory interpretation. Reports and recommendations of public bodies submitted to the legislature for its remedial action also help to shed light on the legislative intent."[33]

Moreover, as the New York Court of Appeals long ago wrote, "[a]s bearing upon the intention of the Legislature of this state in the enactment of a statute, we may consider such historical or other facts as are reasonably within the scope of judicial cognizance."[34]  That includes statements by bill sponsors,[35] as we have in this case.

The materials appropriate for consideration here all point in one direction.  The Legislature in 1999 identified the injustice inflicted on child victims of sexual abuse as a result of the interaction between their difficulties in coming to grips with and seeking remedies against their

---

[33]

97 N.Y. JUR.2D, *Statutes* § 164 (2d ed 2022) (collecting New York cases) (footnotes omitted).

[34]

*In re Hamlin,* 226 N.Y. 407, 413 (1919); 97 N.Y. JUR.2D, *Statutes* § 170.

[35]

*E.g., Civil Serv. Employees Ass'n, Inc.  v. Oneida Cty.,* 78 A.D.2d 1004, 1005 (4th Dept. 1980).

abusers and the relevant preexisting limitations period. It created a revival window for otherwise time-barred claims. Just three years later – using almost precisely the same statutory language – it came to the same view and the same result as to adult survivors, the ASA. In doing so, it recognized that adult survivors of sexual abuse unjustly have encountered very much the same difficulties in pursuing legal remedies as have child victims. Indeed, as already noted, the Justification section of the committee report on S.B. No. 66, the bill that became the ASA, explicitly referred to the fact that adult survivors of sexual abuse had been subjected to injustice by "New York's formerly insufficient statutes of limitations" and "should be given the opportunity to seek civil redress against their abuser[s] . . . in a court of law." The Legislature gave that opportunity by enacting the ASA with a unanimous vote in the State Senate and an overwhelming majority of 140 to 3 in the Assembly.

To suggest that the ASA violates the State Due Process Clause because the Legislature supposedly did not describe that injustice to the defendant's entire satisfaction in a particular paragraph of a particular type of legislative document – itself a dubious premise – is absurd. There is not a single word in the New York Due Process Clause to support that suggestion. Moreover, the historical context, literally all of the indicia of legislative intent available to us, and the precise words of the statute laid alongside the words to the CVA undeniably demonstrate the precise injustice that moved the Legislature to act. In any case, under New York law, it is not the function of courts to second guess the Legislature as to the existence of a serious injustice in determining the constitutionality of a revival statute.

The New York Court of Appeals made clear in *World Trade Ctr.* that the existence of an injustice is a determination fundamentally committed to the Legislature and the governor. It stated that, in each of its prior cases upholding claim revival statutes, "there existed an identifiable

18

injustice that moved the legislature to act."[36]  It rejected "[a] more heightened standard" as "too strict," saying:

> "In the context of a claim-revival statute, there is no principled way for a court to test whether a particular injustice is 'serious' or whether a particular class of plaintiffs is blameless; *such moral determinations are left to the elected branches of government.*"[37]

Thus, in adopting the ASA, the New York Legislature, virtually unanimously, identified what it regarded as an injustice – the fact that even adult victims of sexual abuse too often have no legal remedies because they "suppress[] memories of their abuse or they are afraid to come forward" until it is too late to sue.  The governor did as well when she signed the bill that the Legislature passed.  Mr. Trump has suggested no convincing reason why the judgment of the New York Legislature and governor – that this indeed is an "identifiable injustice" – is not precisely the sort of "moral determination" that the New York Court of Appeals has held is "left to the elected branches of government" by New York's Due Process Clause.

Nor can the claim revival provision of the ASA be distinguished from that in the Child Victims Act on that basis that adult survivors – unlike child victims, who are not permitted to bring lawsuits until they reach adulthood – are not legally disabled from suing immediately following the alleged sexual abuse.  The New York Court of Appeals long ago rejected just such a

---

[36]
     *World Trade Ctr.,* 30 N.Y.3d at 399.

[37]
     *Id.* at 400 (emphasis added).

contention in *Hymowitz v. Eli Lilly and Co.*[38]

 *Hymowitz* involved the constitutionality of the revival of DES[39] products liability claims that had become barred under the former rule that such claims accrued upon exposure to a toxic substance and thus could be time-barred before a plaintiff even knew that she had been exposed.  The court upheld that revival statute, writing:

  "We need not light upon a precise test here . . . because the Legislature's revival of DES claims meets the highest standard. For at least 25 years this court maintained an exposure rule for toxic substances, because it was felt that change in this area was the responsibility of the Legislature (*see, e.g., Schwartz v Heyden Newport Chem. Corp.,* 12 NY2d 212, 220; *Fleishman v Lilly & Co., supra,* at 890). Indeed, in *Fleishman v Lilly & Co. (supra)* the Legislature's attention was drawn specifically to DES by the majority, which stated that any change in the exposure rule was the Legislature's role.

  "The Legislature has now revived DES actions that were time barred under the exposure rule, while also instituting a discovery rule for future application (L 1986, ch 682, § 4; CPLR 214-c). The latent nature of DES injuries is well known, and it is clear that in the past the exposure rule prevented the bringing of timely actions for recovery. Thus we believe that exceptional circumstances are presented, that an injustice has been rectified, and that the requirements of *Gallewski v Hentz*

---

[38]   73 N.Y.2d 487 (1989).

[39]   DES is an acronym for a particular pharmaceutical product that allegedly proved carcinogenic in some people.

20

*& Co. (supra)* have been met.

"Defendants argue further that, even if the statute is generally valid, it may be unconstitutionally applied in cases in which the plaintiff could have sued originally, but did not. It does seem that some plaintiffs may have known of their injuries a day, or a week, a month, or perhaps longer, before the original limitations period ran. Some may have known of their exposure, but did not develop injuries during the limitations period. Others may have known of some effect upon them of DES exposure, which became cancerous only after any action would have been time barred. Under these circumstances, the Legislature properly determined that it would be more fair for all plaintiffs to uniformly now have one year to bring their actions, rather than for the courts to begin drawing arbitrary lines transecting this area's shades of gray."[40]

The fact that adult victims of sexual abuse are legally and in some respects practically capable of instituting civil litigation against their abusers from the moment the abuse occurs thus is constitutionally immaterial. The elected branches of the New York State government have determined that many such victims are unable to do so, sometimes for long periods of time. They

---

[40]
*Id.* at 514-15.

*Hymowtiz*'s reference to "exceptional circumstances, even if it was meant as more than an illustration or description of the facts before it in that case," has not survived *World Trade Ctr. World Trade Ctr.* construed *Hymowitz* together with other claim-revival cases as "express[ing] one and the same rule: a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in order to remedy an injustice." 30 N.Y.3d at 400. Moreover, as discussed above, *World Trade Ctr.* left the determination of the existence of the necessary injustice at least substantially, and perhaps entirely, to the judgment of the elected branches of government.

are prevented by suppression of awful memories or deterred by fear and a "culture of silence" – just as Ms. Carroll claims she was dissuaded from reporting or suing Mr. Trump.

As to whether the ASA constitutes a "reasonable measure" to address an injustice, Mr. Trump's objections again fail to persuade. Mr. Trump contends first that the ASA's claim revival provision is unreasonably broad in comparison to the Child Victims Act because "[a]s opposed to the one-year lookback window of [the Child Victims Act ("CVA")]—which was passed in conjunction with, and as a supplement to, the extension of the CVA's statute of limitations to age 55—[the ASA's] look-back window was not passed in connection with any other durational provisions under the ASA."[41] Second, he argues that "the scope" of the ASA "would not be a reasonable response because the lookback window does not align with—and vastly exceeds—the extended twenty-year statute of limitations of period under the revised 2019 amendment."[42]

Both protests are grounded in inappropriate juxtapositions of the ASA and the Child Victims Act and, in any case, are immaterial. As discussed above, the ASA was enacted against the backdrop of the 2019 amendment's extension of the statutes of limitations for civil and criminal actions for sexual assaults. The scope of the lookback window in the ASA also does not differ from that in the Child Victims Act, which also "applies broadly to *any* [victim of child sexual abuse] and revives *any* qualifying claim."[43] Mr. Trump has not offered any meritorious reason to reject the one-year revival period in the ASA as unreasonable when the nearly identical two-year revival period in

---

[41] Dkt 21 at 12.

[42] *Id.* at 13.

[43] *Id.* at 12.

22

the Child Victims Act has been accepted as reasonable by all courts to consider it.[44]

The one year ASA revival statute is a constitutional means of addressing that inability just as the similar revival provision of the Child Victims Act has passed constitutional muster by every court to consider the question.[45]

## Libel Per Se

With respect to Ms. Carroll's defamation claim in relation to Mr. Trump's October 12, 2022 statement, Mr. Trump contends Ms. Carroll has failed to state a claim because she did not plead "special damages" as he claims is required by New York law. Mr. Trump's argument falls short because he fails to appreciate the distinction in New York law between libel *per se* and slander *per se*.

## Ms. Carroll's Defamation Claim Is for Libel, Not Slander, Per Se

There are two categories of defamation under New York law: *libel*, for written

---

[44]

When the Child Victims Act was enacted, it had a one-year revival window, which the Legislature subsequently extended by another year during the global COVID-19 pandemic. *Giuffre*, 579 F. Supp. 3d at 454.

[45]

*See, e.g.*, *Giuffre*, 579 F. Supp. 3d at 455; *Farrell v. United States Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378, 393 (N.D.N.Y. 2021)*; PC-41 Doe v. Poly Prep Country Day Sch.*, 20-cv-03628 (DG) (SJB), 2021 WL 4310891, at *7 (E.D.N.Y. Sept. 22, 2021)*; PC-41 Doe v. Poly Prep Country Day Sch.*, No. 20-cv-3628-DG-SJB, 2021 WL 791834, at *1 (E.D.N.Y. Mar. 1, 2021); *Torrey v. Portville Cent. Sch.*, 66 Misc. 3d 1225(A), 125 N.Y.S.3d 531 (N.Y. Sup. Ct. 2020); *ARK3 Doe v. Diocese of Rockville Ctr.*, No. 9000010/2019 (N.Y. Sup. Ct. Nassau Co. May 11, 2020); *Giuffre v. Dershowitz*, No. 19-cv-3377 (LAP), 2020 WL 2123214, at *2-3 (S.D.N.Y. Apr. 8, 2020).

statements, and *slander*, for spoken statements.[46]  Written statements actionable as libel include statements published on social media outlets and on the Internet.[47]

Ms. Carroll alleges that Mr. Trump's October 12, 2022 statement was "defamatory *per se*" and caused her "to suffer reputational, emotional, and professional harm."[48]  The October 12 statement "appeared on Trump's personal account on Truth Social, a social media platform."[49]  Mr. Trump allegedly "had his statement distributed to reporters, including reporters at publications headquartered in New York such as Fox News and the New York Times, and emailed to a listserv of supporters," and the statement "was widely reported in the press."[50]

Ms. Carroll's defamation claim, as presented in her complaint, therefore properly is categorized as a claim for libel *per se*.

*Libel Per Se Does Not Require Direct Aim at a Person's Occupation*

A written statement is libelous *per se* if it "*tends* to disparage a person in the way of

---

[46]

*E.g.*, 43A N.Y. Jur. 2d, *Defamation and Privacy* § 2 (2022).

[47]

*Torati v. Hodak*, 147 A.D.3d 502, 504 (1st Dept. 2017) (Facebook message actionable as libel); *Valley Electronics AG, et al., v. Polis*, No. 20-cv-2133ARRLB, 2021 WL 3919244, at *6 (E.D.N.Y. Aug. 6, 2021) ("'An action for defamation that is expressed in writing or print,' including on the Internet, 'constitutes the common law cause of action for libel.'") (quoting *Murawski v. Pataki*, 514 F. Supp. 2d 577, 589 (S.D.N.Y. 2007); citing *Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 88 (2d Cir. 2003)).

[48]

Cpt. ¶¶ 131, 135.

[49]

*Id.* ¶ 93.

[50]

*Id.* ¶¶ 94-95.

his [or her] office profession or trade."[51]  A writing also is libelous *per se* if it "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her]."[52]

In the October 12 statement, Mr. Trump accused Ms. Carroll of lying about her rape allegation against him:

"This 'Ms. Bergdorf Goodman case' is a complete con job. . . . She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie .... She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. . . . In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance."[53]

---

[51] *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) (quoting *Nichols v. Item Publishers*, 309 N.Y. 596, 601 (1956)) (emphasis in original).

[52] *Nichols*, 309 N.Y. at 600–01.

[53] *Id.* ¶ 92.

Ms. Carroll is a "writer, advice columnist, and journalist."[54]  Honesty and credibility

are critical to these professions, which rely heavily on the trust and confidence of their audiences.

A writer who writes about his or her own experiences, as Ms. Carroll did, depends on his or her

readers believing the writer, which they may be less inclined to if the writer is called dishonest.[55]

The October 12 statement – in addition to accusing Ms. Carroll of "completely ma[king] up a story"

about Mr. Trump – states that Ms. Carroll "changed her story from beginning to end" during an

interview "where she was promoting a . . . book."[56]  Drawing all reasonable inferences in favor of

plaintiff, the October 12 statement on the whole can be construed as Ms. Carroll falsely accusing Mr.

Trump of rape in order to promote her book and increase its sales.[57]  Based on the facts alleged in

---

[54]

*Id.* ¶ 120.

[55]

Mr. Trump argues that the "attack[] [on] Plaintiff's honesty" in the October 12 statement "does not pass muster" because "most professions are predicated on dealing with others honestly." Dkt 34 at 10.  This proposition is irrelevant to the test at issue, which assesses the tendency of the specific written statement to disparage a person in their particular trade or profession.  A statement accusing a librarian of lying on the librarian's tax returns does not create the same tendency to disparage a person in the way of his or her profession as does a statement accusing a writer of making up a story that is included in the writer's book.

[56]

*Id.* ¶ 92.

[57]

Mr. Trump's remaining arguments related to the October 12 statement fail to persuade. First, contrary to Mr. Trump's assertion that his statement was non-actionable opinion because he "was simply disputing the merits of [Ms. Carroll's] prior lawsuit" (Dkt 34 at 7), the October 12 statement accused Ms. Carroll of "completely ma[king] up a story" about meeting Mr. Trump, a factual statement actionable as defamation  Second, Mr. Trump's contention that a statement cannot be defamatory *per se* if it requires reference to extrinsic facts is inapposite.  The October 12 statement expressly references Ms. Carroll's book and connects Ms. Carroll's promotion of the book to his accusations of her lying about meeting Mr. Trump.  Moreover, the connection between Mr. Trump's alleged rape of Ms. Carroll and Ms. Carroll's book is "presumably known to [the] readers" of Mr. Trump's statement given the extensive media coverage of Ms. Carroll's first lawsuit. *See Alvarado v. K-III Mag. Corp.*, 203 A.D.2d 135, 137 (1st Dept. 1994).

the complaint, Ms. Carroll has sufficiently pleaded a claim of libel *per se* because the October 12

statement may have affected her in her profession by "imputing to [her] . . . fraud, dishonesty,

[and/or] misconduct . . . ."[58]

Mr. Trump's argument to dismiss this claim is premised on his mistaken conflation

of the higher standard applied to slander *per se* with the lower standard for libel *per se*. Mr. Trump

argues that there are "four narrowly defined categories of statements which are considered to be

defamatory *per se*," and that Ms. Carroll has failed to state a claim for defamation *per se* "because

it does not, on its face, defame [P]laintiff in her trade, business or profession," one of the four

categories.[59] However, nearly every authority Mr. Trump cites, including the case identifying those

four categories and the cases describing the category of injury in one's profession are *slander per*

*se*, not libel, cases.[60] Unlike a libelous *per se* statement, a slanderous *per se* statement "must be

made with reference to a matter of significance and importance for that purpose [(of defaming a

person in his or her trade, business, or profession)], rather than a more general reflection upon the

plaintiff's character or qualities."[61] Moreover, if a complaint fails to allege sufficient facts to state

---

[58]

*Grimaldi v. Schillaci*, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

[59]

Dkt 21 at 14-15 (citation omitted).

[60]

The few cases cited by Mr. Trump that concern written statements cite to slander *per se* precedents for their discussion of the applicable standard.

[61]

*Liberman v. Gelstein*, 80 N.Y.2d 429, 436 (1992); *see also Van Lengen v. Parr*, 136 A.D.2d 964 (4th Dept.1988) (noting in a slander *per se* context that there must be "some reference, direct or indirect, in words or in circumstances attending their utterance, which connects charge of incompetence of dishonesty to particular profession or trade engaged in by plaintiff"); *Tacopina v. Kerik*, No. 14-cv-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) ("The allegedly defamatory statement must be targeted at specific standards of performance that are directly relevant to the plaintiff's business, and must impute conduct

a claim for slander *per se*, "the plaintiff must show . . . that the statement complained of caused him or her special harm" – generally "the loss of something having economic or pecuniary value."[62]  The more stringent standard for slander *per se* is grounded in sound logic: "What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and perpetuates the scandal."[63]

  Mr. Trump's contention that the October 12 statement does not include "language aimed at a particular skill or trait that reflects upon Plaintiff's competency as a writer, advice columnist, and journalist" is inapposite to Ms. Carroll's libel *per se* claim.[64]  Nor was Ms. Carroll required to plead special damages because she has sufficiently pleaded the requirements of a libel *per se* claim.

---

[62]
  that is of a kind incompatible with the proper conduct of the business, trade, profession or office itself.") (internal quotation marks and citation omitted).

  *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001) (quoting *Liberman*, 80 N.Y.2d at 435 (internal quotation marks omitted).

[63]
  *Ostrowe v. Lee*, 256 N.Y. 36, 39 (1931); *see also Davis*, 754 F.2d at 85 ("[S]lander is generally considered less actionable than libel, because a written publication of a defamatory statement is more lasting and has the likelihood of a wider audience than an oral communication."); ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 2:8.3 (4th ed. 2011) ("Statements that are libelous per se when written often are not slanderous per se when spoken."); 43A N.Y. JUR. 2D, *Defamation and Privacy* § 3 (2022) ("What gives the sting to the writing is its permanence of form; the spoken word dissolves, but the written one abides and perpetuates the scandal.").

[64]
  Dkt 21 at 16.

28

### *Conclusion*

Mr. Trump's arguments as to both of Ms. Carroll's claims for relief are without merit.

Accordingly, the motion to dismiss [Dkt 20] is denied. The motion to stay [Dkt 22] is denied as

moot.

SO ORDERED.

Dated:         January 13, 2023

_____

Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                     Plaintiff,

         -against-                          22-cv-10016 (LAK)

DONALD J. TRUMP,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AMENDMENT TO PRETRIAL AND SCHEDULING ORDER**

LEWIS A. KAPLAN, *District Judge.*

        The defendant has requested adjustments to the Pretrial and Scheduling Order (Dkt 19) (the "PSO"). The Court has conducted a pretrial and scheduling conference with counsel for both parties. Accordingly,

        1.     Paragraph 7 of the PSO is amended in the following respects only:

        (a)     Notwithstanding the otherwise applicable January 30, 2023 and February 6, 2023 deadlines for service of defendant's new or supplemental rebuttal expert reports and the completion of expert discovery, respectively,

        (i)     Defendant's time to serve the report of Dr. Edgar Nace or any substitute expert in place of Dr. Nace is extended until February 28, 2023.

        (ii)     All discovery of and with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be completed on or before March 14, 2023.

        (b)     Notwithstanding the otherwise applicable February 23, 2023, March 9, 2023, and March 16, 2023 deadlines to file motions *in limine*, oppositions to

2

motions *in limine*, and replies in support of motions *in limine*, respectively,

       (i)      Any motions *in limine* with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before March 21, 2023.

       (ii)      Any oppositions to motions *in limine* with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before April 4, 2023.

       (iii)      Any replies in support of the motions *in limine* with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before April 11, 2023.

       (c)      Trial will commence on April 25, 2023.

       2.      The Court will resolve the question whether to consolidate or jointly try *Carroll I* with this case at a later date.

       SO ORDERED.

Dated:       February 7, 2023

                                            Lewis A. Kaplan
                                   United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                        Plaintiff,

                -against-                                 22-cv-10016 (LAK)

DONALD J. TRUMP,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

                    Roberta Kaplan
                    Joshua Matz
                    Shawn Crowley
                    Matthew Craig
                    Trevor Morrison
                    KAPLAN HECKER & FINK LLP

                    *Attorneys for Plaintiff*

                    Joseph Tacopina
                    Matthew G. DeOreo
                    Chad Derek Seigel
                    TACOPINA SEIGEL & DEOREO, P.C.

                    Alina Habba
                    Michael T. Madaio
                    HABBA MADAIO & ASSOCIATES LLP

                    *Attorneys for Defendant*

2

L<small>EWIS</small> A. K<small>APLAN</small>,  *District Judge.*

Donald J. Trump is accused in this and a second very closely related civil case of having raped E. Jean Carroll in the mid 1990s.  Ms. Carroll claims that the dress she wore on that occasion (and allegedly has preserved) bears stains that have tested positive for male DNA, albeit male DNA from an unidentified source.  She provided Mr. Trump with the DNA test report, absent an appendix, over three years ago.  At the same time, she demanded a DNA sample from Mr. Trump for the obvious purpose of seeing whether it is possible to tell whether Mr. Trump's DNA is on the dress.

Until February 10, 2023, about ten weeks before this case is set to be tried, Mr. Trump has refused to provide his DNA.  Moreover, he has employed litigation tactics the effect and probable purpose of which have been to delay Ms. Carroll's actions against him – an object that is significant in view of the fact that Ms. Carroll now is 79 years old.  Now –

- after the time for pretrial discovery of evidence in both cases has expired,

- three days after Mr. Trump's latest request for a multi-week trial postponement was substantially denied,

- one day after the parties filed a joint pretrial order in the first of these cases that makes clear that neither Ms. Carroll nor Mr. Trump intends to call any DNA experts as witnesses in the trial of that case, and

- on the eve of trial of at least the second-filed of these cases –

Mr. Trump suddenly has proposed a deal.  He has offered to provide a DNA sample *but only on the condition* that I require Ms. Carroll first to turn over to him a previously undisclosed appendix to the DNA report – the report that Ms. Carroll obtained and provided to Mr. Trump years ago.

There is no justification for any such deal.  Either Ms. Carroll is obliged to supply the

omitted appendix or she is not.  Either Mr. Trump is obliged to provide a DNA sample or he is not.

Neither is a *quid pro quo* for the other.  And the short answer to Mr. Trump's request is clear.

Mr. Trump is not entitled to the undisclosed appendix.  The time for pretrial discovery

in both cases is over, and Mr. Trump never previously asked for it.

To be sure, that is not to say that Mr. Trump could not have obtained it had he acted

differently.  He and his numerous counsel have had Ms. Carroll's DNA report and its conclusions,

albeit without the appendix he now seeks, since January 2020.  The copy of the report they have had

since then shows on its face that there was an appendix and that the appendix was not attached to

it.  That is clear (1) because the body of the report refers to the appendix that was not included with

the copy turned over and (2) from the pagination.  Despite this obvious omission, Mr. Trump never

in three years asked a court to require its production.  Indeed, the record discloses no request for the

appendix even to Ms. Carroll's counsel until February 9, 2023.  Moreover, at the outset of this case

in late 2022, the Court directed both parties to submit "[a] detailed statement of what specific

discovery that was not conducted in *Carroll I* [(the first of the two  related cases)] is needed for the

prosecution or defense of this case [(*Carroll II*)] and the basis for the contention that it is needed."[1]

But Mr. Trump's written statement made no reference to the appendix he now seeks.  Nor did his

counsel mention it at the scheduling conference in open court.

The patently untimely request for the appendix thus reflects either a tactical shift or

just an afterthought.  One possible explanation is that it is an attempt to reverse a deliberate tactical

---

[1]    Dkt 10.  Unless otherwise indicated, Dkt references are to the docket in *Carroll II*, 22-cv-10016 (LAK).

decision by Mr. Trump's counsel not to raise the question of the appendix over the past three years, a decision perhaps the product of a belief that asking for the appendix might well have resulted in renewed demands for Mr. Trump's DNA. Another possible explanation is a negligent failure to read the report with any care over the entire three-year period and thus the failure to notice the lack of the appendix. But whatever the explanation, the effort comes too late.

Nor would Ms. Carroll now be entitled to a DNA sample from Mr. Trump. Her counsel have had plenty of opportunities in both of the two related cases to move to compel Mr. Trump to submit a DNA sample. Had they done so, they almost certainly would have gotten it. But Ms. Carroll's counsel never moved to compel Mr. Trump to submit a DNA sample. They obviously decided to go to trial without it. And there is no justification for imposing Mr. Trump's new proposal on Ms. Carroll now that she has prepared for trial on the entirely justified basis that there will be no DNA evidence.

Both sides have had years in which to make DNA an issue in this case. For their own reasons, each did not do so. Starting down the DNA road at this point almost inevitably would lead to further delay for sampling, testing, expert report writing, and depositions of experts. It almost surely would delay the trial again. And Mr. Trump has given the Court no reason to believe that pursuing that course would be likely to yield any admissible evidence, let alone a guarantee that anything important would come of it. Indeed, as is discussed in greater detail below, further proceedings with respect to the DNA on the dress cannot prove or disprove Ms. Carroll's claim that Mr. Trump raped her and could well prove entirely inconclusive in all respects.

In these circumstances, there is no case for relieving the parties of their obligations to have completed their pretrial discovery by the dates fixed by the Court.

*Facts*

*Carroll I*, the first of Ms. Carroll's two cases against Mr. Trump, originally began in November 2019 in a state court in New York and later was removed to this court. It alleges that Mr. Trump defamed Ms. Carroll in a series of statements he issued in June 2019 in relation to her rape accusation against him. This, the second action ("*Carroll II*"), was brought three years later, in November 2022, to recover damages and other relief for the alleged rape pursuant to a newly-enacted New York law, the Adult Survivors Act, which created a "window" within which adult survivors of sexual assaults could sue their assaulters without regard to the otherwise applicable statute of limitations. *Carroll II* includes also a claim against Mr. Trump for defamation in a statement he issued in October 2022.[2]

*Carroll I* and *Carroll II,* at least for the moment, are two distinct lawsuits involving the same parties. But make no mistake, although only *Carroll II* includes a claim for damages for the alleged rape itself, as distinct from the alleged defamation, the question whether Mr. Trump in fact raped Ms. Carroll is central to both cases.

*The DNA Report About the Dress*

Unsurprisingly, Ms. Carroll requested a DNA sample from Mr. Trump shortly after *Carroll I* was commenced and her lawyers learned that there was unidentified male DNA on the

---

[2]  The Court assumes familiarity with its prior opinions, which describe the facts and procedural histories of the two actions involving these parties. *See* Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll I*, 20-cv-7311 (LAK) (hereinafter "*Carroll I*"), Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); *Carroll I*, Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); *Carroll I*, Dkt 96, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022).

6

dress.

In a notice that Ms. Carroll served on January 30, 2020 and filed a few weeks later in state court in *Carroll I*, Ms. Carroll sought Mr. Trump's DNA pursuant to Section 3121 of the New York Civil Practice Law and Rules.[3]  The Section 3121 notice stated that Mr. Trump was required to submit to a physical examination to "obtain a buccal, blood or skin cell sample . . . sufficient for DNA analysis and comparison against unidentified male DNA present on the dress that [Ms. Carroll] wore during the sexual assault at issue."[4]

Ms. Carroll's 3121 notice attached a laboratory report concerning an examination of the dress and shoes Ms. Carroll allegedly wore at the time of the alleged assault by Mr. Trump which, she claimed, she had kept in her closet until 2019, when she wore them for a photoshoot for *New York* magazine.[5]  The purpose of the examination was "to determine if male biology, specifically semen, is present" on the dress Ms. Carroll allegedly wore at the time of the alleged assault and whether any of the five individuals who might have come into contact with the dress at a photo shoot, allegedly the only subsequent occasion on which she wore that dress, "can be eliminated as contributors to any biology foreign to [Ms.] Carroll."[6]

---

[3]

    *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 56.  The notice is dated January 30, 2020, but it was docketed in the state court's electronic case filing system on February 18, 2020.

[4]

    *Id.*

[5]

    That issue included an excerpt from Ms. Carroll's then-forthcoming book that described Mr. Trump's alleged assault of Ms. Carroll.

[6]

    *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 56, Ex. A at 1-2.

    Examination of the shoes did not detect any "acid phosphatase activity," the presence of

Examination of the dress did not detect any "acid phosphate activity" which, had it been detected, would have been "a presumptive indication of the presence of semen."[7] But the examination included also swabbing of different surface areas of the dress for DNA.

The report stated that the swabs taken from the dress that were processed for DNA analysis and examined microscopically consisted of skin cells and, for some areas that were swabbed, nucleated epithelial cells.[8] There was no evidence of any sperm cells. Nevertheless, the DNA recovered from the outside right sleeve of the dress "was determined to be a mixture of at least four contributors: three significant contributors, of whom at least one is male, and at least one minor/trace-level contributor."[9] The DNA recovered from the outside left sleeve of the dress "was determined to be a mixture of at least four contributors: two significant contributors and at least two minor/trace-level contributors, of whom at least one is male."[10] For both, there was "very strong support that [an individual present at the photo shoot] is a significant contributor," and four other individuals present at the photo shoot were "all eliminated as potential contributors to the mixture of DNA from the dress outside right sleeve swabs."[11] The "male DNA recovered from the combined

---

which, the report stated, would be "a presumptive indication of the presence of semen." The shoes accordingly were not pursued further. *Id.*, Ex. A at 16.

[7]

*Id.*, Ex. A at 9.

[8]

*Id.*, Ex. A at 14.

[9]

*Id.*, Ex. A at 22.

[10]

*Id.*, Ex. A at 23.

[11]

*Id.*, Ex. A at 22-23.

DNA extracts from the dress shoulder/neck area swabs and front skirt swabs revealed a low-level mixture of at least three contributors," but further individualized analyses were not feasible.[12]  The report further stated that "[a]dditional reference specimens may be submitted for comparison" to the DNA results from the swabs of the dress shoulder/neck area, outside left sleeve, and outside right sleeve.[13]

The DNA report attached to Ms. Carroll's served and filed notice specifically referred to an "Appendix I" said to contain certain "electropherograms."[14]  The last page of the report attached to the notice was numbered page 24 of 37.  Pages 25 to 37 of the report were not included.  Thus, the absence of Appendix I and its general nature were obvious to a reader.

*Proceedings in Carroll I After the DNA Report Was Filed*

On February 4, 2020, five days after Ms. Carroll served her request for Mr. Trump's DNA sample, Mr. Trump moved in the state court to stay the proceedings in *Carroll I* pending a decision by the New York Court of Appeals in a different lawsuit against Mr. Trump.[15]  The state

---

It is unclear whether it is the same individual in the analyses of the swabs of the outside right and left sleeves for whom there was "very strong support" that he or she was a significant contributor.

[12]     *Id.*, Ex. A at 24.

[13]     *Id.*

[14]     *Id.*

An electropherogram is a chart used to plot the results of electrophoresis, a laboratory procedure commonly used to analyze DNA, as it was here.  *Id.*, Ex. A at 21.

[15]     *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 43.

court denied that motion on August 3, 2020.[16]  Ms. Carroll states, and Mr. Trump does not dispute, that "[a]s soon as that stay motion was denied, [she] renewed her DNA request."[17]

On September 8, 2020, the U.S. Department of Justice intervened, reportedly on Mr. Trump's instruction, and filed a notice to remove *Carroll I* from the state court to this Court.  The government then moved to substitute the United States in place of Mr. Trump on the theory that Mr. Trump was an "employee" of the United States within the meaning of the Westfall Act[18] who acted within the scope of his employment in making the allegedly defamatory statements in June 2019.[19]

I denied the government's motion to substitute.[20]  Mr. Trump and the government appealed and Mr. Trump moved to stay all proceedings in *Carroll I* pending appeal.  But the motion to stay was denied, and *Carroll I* never was stayed pending appeal.[21]  The parties thus were free to

---

[16]

*Id.*, Dkt 110.

In a letter jointly submitted by the parties on February 24, 2022 in response to a question raised by this Court during an oral argument, the parties explained that Mr. Trump's February 4, 2020 letter "effectively stayed the proceedings" in state court pursuant to New York's procedural rules, "but did not operate as the entry of a formal stay." *Carroll I*, Dkt 70.

[17]

Dkt 52, Plaintiff's letter response to Defendant's letter motion requesting full DNA report, at 2; *see also Carroll I*, Dkt 70 ("Immediately following the denial of that motion, the parties engaged in negotiations concerning the scope of discovery, although no discovery was actually produced.").

[18]

28 U.S.C. § 2670(d)(2).

[19]

*Carroll I*, Dkt 3.

[20]

*Id.*, Dkt 32 at 59; *Carroll*, 498 F. Supp. 3d at 457.

[21]

*Id.*, Dkt 56.

10

pursue discovery while the appeal was pending.

A year later, the Second Circuit determined that Mr. Trump was an "employee" within the meaning of the Westfall Act when he allegedly defamed Ms. Carroll but certified the question whether he was acting within the scope of his employment to the District of Columbia Court of Appeals.[22] The appeal to the Second Circuit thus remains unresolved.

On January 11, 2022, Mr. Trump moved for leave to amend his answer to assert an affirmative defense and counterclaim New York's "anti-SLAPP" law to the effect that Ms. Carroll's claim is baseless and intended for harassment.[23] I denied that motion in an opinion dated March 10, 2022 on two grounds. The first was that the proposed amendment would be futile.[24] In the alternative, I denied it on the additional grounds that Mr. Trump's motion was delayed unduly and made at least in part for a dilatory purpose and that granting the motion would prejudice Ms. Carroll unfairly.[25]

On May 5, 2022, the parties jointly submitted a proposed discovery schedule.[26] I approved their proposed schedule in an order that directed the parties to substantially complete their

---

[22]

*Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022).

The District of Columbia Court of Appeals heard argument on January 10, 2023, and as of this date, it has not issued its decision yet.

[23]

*Carroll I*, Dkt 63.

[24]

*Id.*, Dkt 73 at 23; *Carroll*, 590 F. Supp. 3d at 589.

[25]

*Id.*

[26]

*Carroll I*, Dkt 75.

written discovery and requests for inspection or examination by August 3, 2022, and to substantially complete all fact discovery by October 19, 2022.[27]  In a supplemental scheduling order, I set a deadline of November 16, 2022 to complete all discovery and set a trial date of February 6, 2023, later adjourned until April 10, 2023.[28]

Undaunted, Mr. Trump again moved to substitute the United States in his place and to stay all proceedings in *Carroll I*.  I denied both requests.[29]  In doing so, I noted that "discovery in this case has virtually concluded" and that "discovery and evidence relating to whether or not the alleged rape occurred is relevant to both" *Carroll I* and *Carroll II*.[30]

*Mr. Trump's Refusals to Provide a DNA Sample in Discovery in Carroll I*

During oral argument on February 22, 2022 on Mr. Trump's motion for leave to add the anti-SLAPP counterclaim, Mr. Trump's counsel admitted that discovery had not yet been

---

[27]
  *Id.*, Dkt 76.

[28]
  *Id.*, Dkt 77, 102.

  The Court has reserved decision on whether to consolidate or jointly try *Carroll I* with *Carroll II* against the possibility that the District of Columbia Court of Appeals will decide the scope of employment issue certified to it by the Second Circuit in order to permit a fully informed judgment by this Court.

[29]
  *Carroll I*, Dkt 96 at 16; *Carroll*, 2022 WL 6897075, at *7.

[30]
  *Carroll I*, Dkt 96 at 12, 15; *Carroll*, 2022 WL 6897075, at *6-7.

  Of course, *Carroll II* had not yet been filed because the window for filing such an action pursuant to the Adult Survivors Act did not become effective until November 2022.  But Ms. Carroll alerted Mr. Trump and the Court in August 2022 that she would file *Carroll II* once she could.  It therefore was obvious that Ms. Carroll would file her second case against Mr. Trump in November 2022.

exchanged.[31]  Ms. Carroll's attorney renewed the request for Mr. Trump's DNA sample:

> "[W]e'd like to get on with discovery. So, and we think discovery in this case is very, very fast. We do not seek to depose President Trump. He can depose our client. He can depose the other two women who she told contemporaneously when it happened. And we'd like his DNA. That's it."[32]

Ms. Carroll's counsel implicitly renewed that request on August 8, 2022, writing that Mr. Trump "has barely participated in the discovery process at all."[33]  One week later, on August 15, 2022, Mr. Trump's counsel continued the refusal of the requested DNA sample. She stated that Mr. Trump "wholly object[ed] to [the] request for a DNA sample."[34]  She went on:

> "Plaintiff has not demonstrated a reasonable basis for such an intrusive request, nor does it reasonably relate to her claims and defences [sic] in this matter. Further, the request is highly prejudicial given chain of custody concerns and violates Defendant's privacy rights, which are especially sensitive given that he is a former President. In the event that Plaintiff files a Motion to Compel, we will adamantly oppose it and seek a protective order to prevent its enforcement."[35]

---

[31] *Carroll I*, Dkt 71 at 4.

[32] *Id.* at 28.

[33] *Id.*, Dkt 89 at 2.

[34] Dkt 52 at 3.

[35] *Id.*

The August 15, 2022 letter by Mr. Trump's counsel has not been filed, but is quoted in Ms.

*Limited Additional Discovery Authorized in Carroll II*

Ms. Carroll filed this case, *Carroll II*, in November 2022, minutes after the Adult

Survivors Act became effective. On December 2, 2022, I directed the parties to submit a discovery

plan that would contain, *inter alia*:

> "a. Any contention that any of the discovery taken in [*Carroll I*], is not
>
> admissible in this action and the basis, item-by-item, for that contention.

> "b. A detailed statement of what specific discovery that was not conducted in
>
> *Carroll I* is needed for the prosecution or defense of this case and the basis for the
>
> contention that it is needed."[36]

Neither the parties' written submissions nor their oral arguments referred either to the

appendix to the years-old DNA report nor to the still unfulfilled request for Mr. Trump's DNA.  In

an order dated December 21, 2022, I concluded that "[t]he discovery taken in *Carroll I*, which ha[d]

been completed, fully explored the question whether the defendant sexually assaulted [Ms. Carroll]

as she alleges."[37]  The only issues for which additional discovery was authorized in *Carroll II* were

"damages, including emotional or psychological damages, allegedly suffered by [Ms. Carroll] as a

result of the alleged sexual assault . . . and [Mr. Trump's] October 12, 2022 statement."[38]  The order

---

[  ] Carroll's response letter to Mr. Trump's February 10, 2023 application for the remainder
of the DNA report. Mr. Trump has not disputed the accuracy of the quoted portions of
the letter.

[36] Dkt 10.

[37] Dkt 19 at 1.

[38] *Id.* at 2.

enumerated the permissible discovery, the last of which was required to be completed by February 6, 2023.[39]  Neither Mr. Trump nor Ms. Carroll objected to that order.

This trial initially was scheduled to start on April 17, 2023.  As a personal accommodation for Mr. Trump's new trial counsel, I moved the trial date to April 25, 2023.[40]

*Mr. Trump's February 10, 2023 Request for the Appendix*

On February 9, 2023, Mr. Trump's counsel "emailed [Ms. Carroll's] counsel requesting [(for the first time)] a copy for the missing pages of the [DNA] report."[41]  Ms. Carroll's counsel declined to produce the appendix. So, on February 10, 2023, Mr. Trump for the first time requested the Court to direct Ms. Carroll to provide Mr. Trump the appendix to the DNA report she already had provided.

Mr. Trump's letter stated that he "is indeed willing to provide a DNA sample for the sole purpose of comparing it to the DNA found on the dress at issue, *so long as the missing pages of the DNA [r]eport [(i.e., the appendix)] are promptly produced prior to [Mr. Trump] producing*

---

[39]

     *Id.* at 3.

     The February 6, 2023 deadline was adjourned to a later date for one of Mr. Trump's experts only.  During a scheduling conference held on February 7, 2023, Mr. Trump's new counsel – attorneys from Tacopina Seigel & DeOreo P.C. – requested more time for service of the report of Mr. Trump's proposed psychiatric expert, Dr. Edgar Nace, due to certain personal circumstances of Dr. Nace. I granted that request, and adjusted the expert discovery deadlines and motions *in limine* deadlines with respect to Dr. Nace, or any substitute expert in place of Dr. Nace, only.  All other deadlines in the original scheduling order remained unaffected. Dkt 49.

[40]

     *See* Dkt 54, Tr., Feb. 7, 2023, at 19.

[41]

     Dkt 51 at 1.

*his* DNA."[42]

Ms. Carroll opposes Mr. Trump's request. She argues that the request is made in bad faith, pointing to the history of Mr. Trump's continuous refusal to provide a DNA sample.[43] She opposes Mr. Trump's request also on the grounds that it is "untimely" and that granting it would be "prejudicial" given that fact discovery in *Carroll I* and *Carroll II* has closed and because Mr. Trump's request, if accepted, "would inevitably delay the trial."[44] In support of the latter, Ms. Carroll outlined a number of further steps that she contends would be required. Importantly, these steps include "a report by [Ms.] Carroll's expert," "a report by [Mr. Trump's] rebuttal expert," "depositions of both experts," and "motion practice regarding any requested *in limine* rulings" related to the DNA evidence.[45]

Mr. Trump, for his part, has made clear that he expects expert discovery on this issue, not merely a copy of the appendix to the old DNA report. Indeed, his counsel claimed that they "already [had] conferred with a DNA expert" and asserted that they will have "a relevant report generated."[46]

Thus, it is entirely clear that granting Mr. Trump's request would be only the first step

---

42

     *Id.* at 2 (emphasis added).

43

     Dkt 52 at 2-3.

44

     *Id.* at 3-4.

45

     *Id.* at 4.

46

     Dkt 53 at 1.

in introducing a complicated new subject into this case that both sides elected not to pursue over a period of years.

## Discussion

*Legal Standard*

"A district court has broad discretion in deciding whether to re-open discovery."[47] Federal Rule of Civil Procedure 16 provides that "[a] schedule may be modified only for good cause and with the judge's consent."[48] District courts in this Circuit generally consider six factors in deciding whether good cause to re-open discovery exists:

> "(1) whether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to relevant evidence."[49]

"A significant consideration is whether there has already been adequate opportunity

---

[47]
Iacovacci v. Brevet Holdings, LLC, No. 1:18-cv-08048 (MKV), 2022 WL 540658, at *1 (S.D.N.Y. Feb. 23, 2022); *see also Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004) ("Recognizing the district court's broad discretion to direct and manage the pre-trial discovery process, we . . . review a district court's discovery rulings for abuse of discretion.").

[48]
Fed. R. Civ. P. 16(b)(4).

[49]
*Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011).

for discovery."[50]  Courts have also placed importance on the moving party's diligence in obtaining the discovery within the deadlines set by the court's scheduling order.[51]

### Trial is Imminent and the Request is Opposed

Trial of this case is imminent.  Ms. Carroll objects to any postponement.  And, as noted above, she opposes Mr. Trump's request for the appendix to the DNA report.  Accordingly, both of these factors weigh against granting Mr. Trump's application.

### The Discovery Now Belatedly Sought Was Foreseeable and Mr. Trump Was Not Diligent in Seeking It

The procedural histories of *Carroll I* and *Carroll II* described above demonstrate that Mr. Trump was anything but diligent in seeking the appendix to the DNA report.  His counsel of course either (1) knew of the omission of the appendix and decided not to ask for it or (2) were grossly negligent in failing to read the report.  If the former, he is not now entitled to change his mind.  If the latter, he was not diligent by any stretch of the imagination.  He has not provided any satisfactory justification for the current request.

---

[50]  *Id.*

[51]  *Iacovacci*, 2022 WL 540658, at *1 ("As a general rule, discovery should only be re-opened if the movant can show that 'despite its having exercised diligence, the applicable deadline set in the court's scheduling order could not reasonably have been met.'") (quoting *Forte v. City of New York*, No. 16-cv-560 (VSB), 2021 WL 878559, at *2 (S.D.N.Y. Mar. 8, 2021)); *see also Tatintsian v. Vorotyntsev*, No. 1:16-cv-7203 (GHW), 2021 WL 780139, at *5 (S.D.N.Y. Jan. 27, 2021) ("Because they were not diligent in seeking the discovery at issue, Defendants failed to demonstrate the good cause necessary to modify the [scheduling order] to re-open discovery.").

*Granting Mr. Trump's Request Would Prejudice Plaintiff Unduly*

This Court previously observed that "Mr. Trump has litigated this case [(*Carroll I*)] since it began in 2019 with the effect and probably the purpose of delaying it."[52]  As the Court noted in a previous opinion:

> "As plaintiff contends, defendant's actions have been dilatory throughout the litigation. As she aptly puts it, he 'has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails.' . . .

> "Taken together, these actions [(the history of defendant's motions to stay and conduct, described above)] demonstrate that defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him. That conclusion draws further support from the facts that (1) the plaintiff is the only percipient witness (other than the defendant) to the alleged rape, and (2) she is 78 [(now, 79)] years of age. The relevance of these facts is obvious."[53]

I assume that producing the appendix to the DNA report would not be at all burdensome for Ms. Carroll.  But Mr. Trump has made clear that he wants far more than that document alone.  He not only has expressed a willingness to provide a DNA sample "so long  as" he first is provided the appendix to the report, but also an interest in conducting his own DNA analysis to be followed by a report by his expert.  That likely would lead to additional expert analysis

---

[52]     *Carroll I*, Dkt 96 at 2*; Carroll*, 2022 WL 6897075, at *1.

[53]     *Carroll I*, Dkt 73 at 19, 21; *Carroll*, 590 F. Supp. 3d at 587-88.

by an expert for Ms. Carroll and expert discovery including depositions of the DNA experts for each side. All this would occur as a result of Mr. Trump's refusal to produce a DNA sample in response to any of the prior requests made by Ms. Carroll coupled with his failure either to read the DNA report and note the absence of the appendix or of a deliberate decision not to ask for it.

Mr. Trump's offer to provide a DNA sample as a *quid pro quo* for production of the appendix and then to begin a process of new expert analyses inevitably leading to further reports and discovery almost certainly would delay the trial. More than that, his conditional invitation to open a door that he kept closed for years threatens to change the nature of a trial for which both parties now have been preparing for years. Whether Mr. Trump's application is intended for a dilatory purpose or not, the potential prejudice to Ms. Carroll is apparent.

*The Discovery May Not Lead to Relevant Evidence*

It is important to bear in mind also that Mr. Trump has had the body of the DNA report and its conclusions for over three years. The appendix he now seeks simply contains the electropherograms that were generated in reaching the report's conclusions. And Mr. Trump has not explained the specific relevance, if any, of the electropherograms.[54] Moreover, I have considered Mr. Trump's surmise that Ms. Carroll has not produced the appendix to the report because "she knows [that Mr. Trump's] . . . DNA is not on the dress because the alleged sexual assault never

---

[54] Nor has Mr. Trump explained how there could be any possible "due process" concern related to his receipt of the appendix to the DNA report. Dkt 51 at 3. He had every opportunity to seek it during the discovery period he allowed to expire without even asking for it.

occurred."[55]  That of course is factually impossible for a simple reason: Mr. Trump never provided

a DNA sample for the purpose of comparing it to the DNA on her dress.  No one knows whether his

DNA is on the dress.

Nor is it clear that injecting a DNA issue into the case at this late date would be likely

to produce any important evidence for several reasons:

*First*, even if there were a "match" between Mr. Trump's DNA sample and the

mixture of DNA recovered on Ms. Carroll's dress, that would tend only to show that there was some

encounter between Mr. Trump and Ms. Carroll on at least one occasion when she wore that dress.

But it would not prove or disprove Ms. Carroll's rape allegation.

*Second*, even if a DNA analysis were to determine that Mr. Trump could be

eliminated as a potential contributor to the mixture of DNA found on Ms. Carroll's dress, the

probative value of such a determination would be very far from conclusive.  It would not disprove

Ms. Carroll's accusation.  The alleged rape could have occurred without a sufficient quantity or

quality of Mr. Trump's DNA to have remained on the dress since the mid 1990s.

*Third*, it is possible that the results of further DNA analysis using Mr. Trump's DNA

sample would be entirely inconclusive.[56]

---

[55]
    Dkt 51 at 3.

[56]
    *See* National Institute of Justice, *DNA Evidence Basics: Possible Results from Testing*, Aug. 8, 2012, https://nij.ojp.gov/topics/articles/dna-evidence-basics-possible-results-testing ("Results may be interpreted as inconclusive for several reasons. These include situations where no results or only partial results are obtained from the sample due to the limited amount of suitable human DNA or where results are obtained from an unknown crime scene sample but there are no samples from known individuals available for comparison. In the latter case, the results would be suitable for comparison once an appropriate sample for comparison is tested.").

### Conclusion

Mr. Trump has offered "no persuasive reason to relieve [him] of the consequences of [his] own failure to seek [the appendix] in a timely fashion."[57] He has failed to demonstrate good cause to reopen discovery for the purpose of obtaining these pages of the DNA report. Nor is there any legitimate basis for this Court to accept Mr. Trump's offer to provide his DNA sample made contingent on the Court granting his application, which it does not. Accordingly, Mr. Trump's letter application (Dkt 51) is denied.

SO ORDERED.

Dated:          February 15, 2023

_____
Lewis A. Kaplan
United States District Judge

---

[57] *Kelly v. Wright Med. Tech., Inc.*, No. 00-cv-8808 (LAK), 2003 WL 40473, at *1 (S.D.N.Y. Jan. 3, 2003).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                     Plaintiff,

         -against-                               22-cv-10016 (LAK)

DONALD J. TRUMP,

                     Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM AND ORDER ON
## DEFENDANT'S *IN LIMINE* MOTION

LEWIS A. KAPLAN, *District Judge.*

         Donald J. Trump is accused in this case ("*Carroll II*") and a second very closely

related case ("*Carroll I*") of having raped E. Jean Carroll in the mid 1990s.[1]  In both cases, plaintiff

E. Jean Carroll claims Mr. Trump defamed her in public statements in response to Ms. Carroll's rape

accusation against him. In this action, Ms. Carroll seeks also to recover damages and other relief for

the alleged rape pursuant to a newly-enacted New York law, the Adult Survivors Act, which created

a "window" within which adult survivors could sue their assaulters without regard to the otherwise

---

[1]
         The Court assumes familiarity with its decisions in both actions. Doc. No. 20-cv-7311
(*Carroll I*), Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part,
vacated in part*, 49 F.4th 759 (2d Cir. 2022); *Carroll I*, Dkt 73, *Carroll v. Trump*, 590 F.
Supp. 3d 575 (S.D.N.Y. 2022); *Carroll I*, Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK),
2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); *Carroll I*, Dkt 145, *Carroll v. Trump*, No.
20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Dkt 56, *Carroll v. Trump*,
No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023); Dkt 38, *Carroll v.
Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023).

         Except where preceded by *"Carroll I"*, "Dkt" references are to the docket in this case.

applicable statute of limitations.

The matter now is before the Court on Mr. Trump's *in limine* motion to exclude from evidence and/or preclude at the trial of this case:

(1)     evidence relating to Mr. Trump's alleged interactions with Mss. Natasha Stoynoff and Jessica Leeds;

(2)     short excerpts of videos of remarks by Mr. Trump during the 2016 presidential campaign;

(3)     evidence relating to the so-called *Access Hollywood* tape, including the tape itself; and

(4)     the testimony of two of Ms. Carroll's proposed witnesses, Ms. Cheryl Lee Beall and Mr. Robert Salerno.[2]

Mr. Trump moved also to exclude (1) through (3) in *Carroll I*. This Court denied Mr. Trump's motion as to (1) and (3) and deferred ruling on (2) until trial.[3] The evidentiary rulings made in *Carroll I* as to (1) through (3) are entirely applicable here. There is no reason, and Mr. Trump has made no persuasive argument, for me to rule differently.[4]

---

[2]

Dkt 69.

Mr. Trump moved also to exclude evidence of emotional and psychological harm at the trial of this case, but subsequently withdrew that request. Dkt 89 at 8.

[3]

*Carroll*, 2023 WL 2441795 at *8-9.

[4]

Mr. Trump in this motion adds to his *Carroll I* position the argument that Ms. Stoynoff's testimony is not admissible because in *Rapp v. Fowler*, No. 20-cv-9586 (LAK), 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022), this Court determined that a witness's proposed testimony that the defendant's "hand was on [the witness's] leg . . . about two inches above [his] knee" was not evidence of an "other sexual assault" under Rule 415 "regardless of any question

Mr. Trump's only remaining claim – which he did not raise in *Carroll I* – is that Ms. Beall and Mr. Salerno should be precluded from testifying at trial. These witnesses formerly were employed at Bergdorf Goodman, the New York department store where Ms. Carroll alleges Mr. Trump sexually assaulted her. Mr. Trump argues that they should be excluded pursuant to Federal Rule of Civil Procedure 37(c)(1) because they are "'surprise' witnesses" who were not timely disclosed.[5] His claim fails as to both proposed witnesses.

*Ms. Beall*

Ms. Beall was an employee at Bergdorf Goodman at the time Mr. Trump allegedly raped Ms. Carroll in the store. She is expected to give "testimony regarding the Bergdorf Goodman store in the relevant time period, including the store's operations and layout, as well as Mr. Trump's presence at the store."[6] Ms. Beall first was disclosed to Mr. Trump on October 14, 2022 in Ms. Carroll's Rule 26(a) disclosures in *Carroll I*. She again was disclosed to Mr. Trump in *Carroll II* before the January 9, 2023 deadline set in *Carroll II* by this Court.

---

of intent." *Rapp*, 2022 WL 5243030 at *2; Dkt 89 (Def. Reply Mem.) at 9. Mr. Trump's equation of the two cases fails for two reasons. First, the evidence and circumstances of Mr. Trump's alleged encounter with Ms. Stoynoff – including her testimony that he "groped" her – are materially different from the proposed testimony in *Rapp*. Second, in *Rapp*, the Court determined that the testimony was not evidence of an other sexual assault under the definitions in 18 U.S.C. chapter 109A. That analysis was unnecessary with respect to Ms. Stoynoff because the Court determined that a jury reasonably could conclude that Mr. Trump's alleged conduct toward Ms. Stoynoff was an other sexual assault within the meaning of Rules 415 and 413 and would constitute a crime under Florida law. *See Carroll I*, Dkt 145 at 13-15; *Carroll*, 2023 WL 2441795 at *5-6.

[5]

Dkt 70 (Def. Mem. of Law) at 2.

[6]

Dkt 77 (Pl. Mem. of Law) at 3.

Mr. Trump seeks to preclude Ms. Beall from testifying pursuant to Rule 37(c)(1). Rule 37(c)(1) provides that:

> "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[7]

> "The party seeking Rule 37 sanctions bears the burden of showing that the opposing party failed to timely disclose information."[8] So the logical starting point is Ms. Carroll's obligations under Rules 26(a) and (e).

Rule 26(a)(1)(A) in relevant part provides that "a party must, without awaiting a discovery request, provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."[9] The timing of the required disclosure is fixed by Rule 26(a)(1)(C), which in relevant part states that "[a] party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court

---

[7]
    Fed. R. Civ. P. 37(c)(1).

[8]
    *A.V.E.L.A., Inc. v. Est. of Monroe*, No. 12-cv-4828 (KPF)(JCF), 2014 WL 715540, at *4 (S.D.N.Y. Feb. 24, 2014), *adhered to on reconsideration*, No. 12-cv-4828(KPF)(JCF), 2014 WL 1408488 (S.D.N.Y. Apr. 11, 2014); *see also In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) ("The moving party bears the burden of showing that its adversary failed timely to disclose information required by Rule 26.").

[9]
    Fed. R. Civ. P. 26(a)(1)(A).

order."[10] In this case, the Court fixed the deadline for Rule 26(a) disclosures in *Carroll II* as January

9, 2023.[11] It is undisputed that Ms Carroll disclosed Ms. Beall in her Rule 26(a) disclosures on that

date.[12]

Mr. Trump nevertheless contends, in a somewhat convoluted argument, that the

January 9 disclosure was untimely. The contention is that "the operative deadlines [in this case,

*Carroll II*] are those set forth in *Carroll I*."[13] Mr. Trump points to the fact that Ms. Carroll disclosed

Ms. Beall in *Carroll I* in her second supplemental disclosures pursuant to Rule 26(e) merely five

days before the close of discovery in that case, which Mr. Trump argues was "untimely and long

delayed."[14] "[D]iscovery in *Carroll II* [(the argument continues)] [was] 'limited to' 'damages . . .

allegedly suffered by plaintiff as a result of the alleged sexual assault as distinguished from the

defamation alleged in *Carroll I,* and the October 12, 2022 statement'" that is the subject of the

alleged defamation at issue in this case, *Carroll II*.[15] Therefore, he contends, Ms. Carroll's January

9 disclosure in this case of Ms. Beall was untimely. But Mr. Trump's argument entirely ignores how

---

[10]

    Fed. R. Civ. P. 26(a)(1)(C).

[11]

    Dkt 19 ¶ 7.

[12]

    Dkt 78 (Crowley Decl.) ¶ 7, Dkt 78-1 (Ex. 1) at 4; *see also* Dkt 89 (Def. Reply Mem.) at 1-2.

[13]

    Dkt 70 (Def. Mem. of Law) at 3.

[14]

    *Id.*

    Rule 26(e) requires a party to "supplement or correct its disclosure [under Rule 26(a)] . . . in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect." Fed. R. Civ. P. 26(e).

[15]

    *Id.* (quoting Dkt 19 (Pretrial and Scheduling Order)).

6

the limitation of discovery in *Carroll II* came about and ignores the actual extent of the limitation.

The scheduling orders in *Carroll I* imposed deadlines for the completion of depositions and of all discovery of October 19 and November 16, 2022, respectively.[16] Both dates preceded the filing of this action, *Carroll II,* on November 24, 2022. From the outset of *this* case, it thus appeared that all discovery concerning the core issue in this case – whether Mr. Trump sexually assaulted Ms. Carroll – had been completed in *Carroll I* because that issue is common to *Carroll II* and discovery in *Carroll I* had been concluded. The Court therefore set a scheduling conference and directed the parties to submit a discovery plan for *Carroll II* containing "[a] detailed statement of what specific discovery that was not conducted in *Carroll I* is needed for the prosecution or defense of this case and the basis for the contention that it is needed."[17] The parties' written submission diverged as to the scope of additional discovery need for *Carroll II.*

Ms. Carroll took the position that discovery should be limited to the new issues first raised in *Carroll II* – essentially to damages attributable to the alleged sexual assault as well as the circumstances of and damages attributable to the new defamation claim.[18] She contended that "[a]ny further discovery into whether Defendant sexually assaulted Plaintiff, the defamatory statements at issue in *Carroll I,* or the damages caused by those statements, should not be permitted since those topics were fully explored in both fact and expert discovery."[19]

---

[16]

        *Carroll I*, Dkts 76, 77; *Carroll I,* Dkt 100 (reiterating discovery deadlines).

[17]

        Dkt 10.

[18]

        Dkt 16 at 3-4.

[19]

        *Id.* at 3.

Mr. Trump agreed with Ms. Carroll's position as to discovery concerning new issues raised by *Carroll II*, but contended that he should be permitted to take "further discovery into the purported facts of the alleged incident."[20] His written submission, however, did not specify any additional discovery he sought with respect to the occurrence of the alleged sexual assault as opposed to the damages claimed as a result.[21] And while the Court pressed Mr. Trump's counsel at the conference in an effort to determine what if any additional discovery was sought concerning the alleged sexual assault itself, his counsel identified none.[22] Accordingly, the pretrial and scheduling order issued on December 21, 2022 provided in relevant part:

> "2.      *   *   *   On the basis of the parties' written and oral submissions, the Court has concluded that the only such issues [(i.e., new issues raised by *Carroll II*)] are damages, including emotional or psychological damages, allegedly suffered by plaintiff as a result of the alleged sexual assault as distinguished from the defamation alleged in *Carroll I*, and the defendant's October 12, 2022 statement.

---

[20] *Id.* at 4-5.

[21] *Id.*, *id* at 5 n.3 ("Specifically, Defendant's additional discovery efforts shall include, but not be limited to, (1) written discovery regarding the newly-raised issues; (2) conducting an Independent Medical Examination of Plaintiff in accordance with Federal Rule 35, as Plaintiff has plainly put her physical and/or mental condition 'in controversy' in this action. *See* FRCP 35; (3) the report of Defendant's own forensic expert; (4) a report from Defendant's original damages expert, who will offer expert testimony demonstrating that Plaintiff was not damaged by Defendant's October 12,2022 statement; and (5) conducting additional depositions of Plaintiff and potential additional non-party witnesses *with respect to the new issues raised in Carroll II*.") (second emphasis added). No mention was made of any additional non-party witnesses with respect to the occurrence of the alleged sexual assault.

[22] Dkt 24 (Tr., Dec. 21, 2022) at 4:24-9:20.

*Unless otherwise ordered*, discovery will be limited to those subjects."[23]

In these circumstances, Mr. Trump's argument is without merit. First of all, even if he first had learned of Ms. Beall as a prospective witness on January 9, 2023, the date of Ms. Carroll's Rule 26(a) disclosure in this case, he could have sought an order under paragraph 2 of the pretrial and scheduling order permitting him to take her deposition. But he did not do so. Instead, he waited and then, on February 23, 2023, moved to preclude her from testifying.

Even more striking, Mr. Trump learned of Ms. Beall as a prospective witness months before January 9, 2023. The fact that Ms. Beall was a potential witness on the subjects of the Bergdorf store and of Mr. Trump's presence there concededly has been know to Mr. Trump's counsel at least since October 14, 2022.[24] They elected not to take her deposition in *Carroll I,* which they almost certainly could have done.[25] And when asked in *Carroll II* what if any additional discovery they wished to take in this action, they never even mentioned Ms. Beall despite a court order

---

[23]

      Dkt 19 (emphasis added).

[24]

      This was revealed to him on that date by the service of Ms. Carroll's supplemental disclosures in *Carroll I*, as mentioned above. Dkt 71 (Habba Decl.) ¶ 6, Dkt 71-3 (Ex. C) at 2-4. *Accord,* Dkt 78 (Crowley Decl.) ¶¶ 3-4.

[25]

      Mr. Trump claims that the October 14 disclosure of Ms. Beall in *Carroll I* came only five days before the fact discovery cutoff in that case, which he argues "provided [him] with little to no opportunity to subpoena her deposition within the relevant discovery time frame." Dkt 70 at 2-3, Dkt 89 at 3. Although his first claim is accurate literally, the conclusion he drew from it is not. For one thing, he could have sought Ms. Beall's deposition short notice. Moreover, while fact depositions were to have been completed by October 19, 2022, the overall discovery deadline was November 16, 2022, and expert depositions were permitted to continue during the intervening period. *Carroll I*, Dkts 76, 77. Had Mr. Trump applied to take Ms. Beall's deposition after October 19 on the basis that he first had learned of her existence on October 14, his application almost certainly would have been granted. In any case, responsibility for Mr. Trump's failure to take Ms. Beall's deposition in *Carroll I* lies with Mr.Trump.

requiring "[a] detailed statement of what specific discovery that was not conducted in *Carroll I* is needed for the prosecution or defense of this case and the basis for the contention that it is needed."[26] Moreover, in making the present argument based on the limitation of discovery in *Carroll II,* they fail to mention that the pretrial and scheduling order permitted them to seek leave to take her deposition notwithstanding the limitation.  But they did not do so.

In sum, the Rule 26(a) disclosure of Ms. Beall in *Carroll II* was timely.  Even if it were not, Mr. Trump would not have been prejudiced.

*Mr. Salerno*

Mr. Salerno, who also was an employee at Bergdorf Goodman, is expected to testify on similar subjects as Ms. Beall. As with Ms. Beall, Ms. Carroll timely disclosed Mr. Salerno in her Rule 26(a) initial disclosures in *Carroll II* on January 9, 2023, the deadline set by the Court.[27]

Mr. Trump nevertheless argues that Mr. Salerno should be precluded from testifying because (1) he was disclosed after the close of fact discovery in *Carroll I*, and (2) his proposed testimony falls outside of the scope of discovery permitted in *Carroll II*.[28]

---

26

　　Dkt 10.

27

　　Dkt 78 (Crowley Decl.) ¶¶ 6-7, Dkt 78-1 (Ex. 1) at 2-4. That disclosure, moreover, was made approximately two weeks after Ms. Carroll's counsel's initial telephone call with Mr. Salerno and only three days after her counsel learned that he was willing to testify. *Id.*

　　She disclosed Mr. Salerno as a potential witness in *Carroll I* in her third supplemental disclosures pursuant to Rule 26(e) on January 6, 2023.  That disclosure was timely in that case under Rule 26(e) because of the aforementioned speed with which it was made.

28

　　Dkt 70 at 3-4.

The first argument clearly is without merit because the issue here is whether Ms. Carroll failed to discharge her disclosure obligations in this case, not *Carroll I*. As already stated, the disclosure in this case was timely made on January 9, 2023.

Mr. Trump's second argument is essentially a reprise of part of his argument with respect to Ms. Beall – a deposition of Mr. Salerno would not have been within the limited the scope of discovery set out in the pretrial and scheduling order and he therefore could not have deposed Mr. Salerno. But that order, as discussed above, did not absolutely prohibit a deposition of Mr. Salerno (or, for that matter, any other) witness with respect to the alleged sexual assault. It limited the scope of discovery to the new issues raised by *Carroll II "unless otherwise ordered."*[29] But at no point after Mr. Trump learned of Mr. Salerno as a potential witness did Mr. Trump seek relief from this Court prior to moving *in limine* to preclude Mr. Salerno from testifying at trial.[30] As evidenced by Mr. Trump's discovery-related requests in this action after that order, he has not been reticent in seeking leave to amend this Court's discovery schedule in matters purportedly important to him.[31] Yet he made no such attempt with respect to Mr. Salerno. Any prejudice Mr. Trump claims he would suffer therefore would be a product of his own failure to seek a deposition of Mr. Salerno

---

[29]      Dkt 19 at 2 (emphasis added).

[30]      According to Ms. Carroll's counsel, the only actions Mr. Trump appears to have taken with respect to Ms. Beall and Mr. Salerno were on February 17, 2023, when "two men visited [Ms.] Beall at her home, indicating that they were there to investigate on [Mr.] Trump's behalf, and . . . [Mr.] Salerno receive[d] a telephone call from someone purporting to investigate the case around the same time." Dkt 77 at 4, n.1. Mr. Trump's counsel did not address these alleged interactions in their briefs.

[31]      *E.g.*, Dkt 48 (Mr. Trump's motion to adjourn deadline with respect to Mr. Trump's psychiatric expert); Dkt 51 (Mr. Trump's motion to compel production of an appendix to a DNA report obtained by Ms. Carroll in January 2020).

since early January, when Ms. Carroll timely made her Rule 26(a) disclosure in this case.

*Conclusion*

      Mr. Trump's *in limine* motion (Dkt 69) is denied in all respects. This ruling is without prejudice to Mr. Trump renewing his objection to the campaign speech excerpts in the event they are offered at trial. Unless otherwise ordered, those excerpts shall not be mentioned in opening statements.

      SO ORDERED.

Dated:      March 20, 2023

                                Lewis A. Kaplan
                             United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                 Plaintiff,

    -against-                               22-cv-10016 (LAK)

DONALD J. TRUMP,

                 Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM AND ORDER ON
PLAINTIFF'S *IN LIMINE* MOTION**

LEWIS A. KAPLAN, *District Judge.*

         Plaintiff moves *in limine* for an order (1) adopting the evidentiary rulings recently

made in *Carroll v. Trump,* 20-cv-7311 (LAK) (*"Carroll I"*), (2) precluding the testimony of Mr.

Trump's purported rebuttal expert, Robert J. Fisher, and (3) ruling on two contested and a number

of uncontested requests made in *Carroll I* and incorporated by reference in this case. The motion is

granted in part and denied in part.

*Carroll I Evidentiary Rulings*

         The analysis of the evidentiary issues resolved in *Carroll I*[1] is entirely applicable here

---

[1]
         *Carroll I,* Dkt 145; *Carroll v. Trump,* No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023).

         Except where preceded by *"Carroll I"*, "Dkt" references are to the docket in this case.

with one minor exception. The exception is the issue of whether *Carroll I* is based on an alleged

sexual assault because *Carroll I* asserts only a defamation claim. But this case, unlike *Carroll I*,

contains a claim for what, if it occurred, undeniably was a sexual assault. Hence, the "based on"

analysis in the *Carroll I* decision[2] has no bearing here. Accordingly, all of the evidentiary rulings

previously made in *Carroll I* apply here.


*Mr. Fisher*

    *The Proposed Testimony*

        Ms. Carroll intends to call as an expert witness Professor Ashlee Humphreys, Ph.D.

Dr. Humphreys intends to testify principally on the extent of the dissemination of Mr. Trump's

allegedly defamatory statement of October 12, 2022, the damage, if any, of Mr. Trump's statement

to Ms. Carroll's reputation and "person brand,"[3] and the means and costs of repairing that damage.[4]

Mr. Trump seeks to call Robert J. Fisher as an expert witness, purportedly to rebut Dr. Humphreys's

conclusions. Ms. Carroll seeks the exclusion of Mr. Fisher's testimony on the grounds that (1) it

would not be proper rebuttal testimony, (2) defendant has failed to establish that Mr. Fisher's

methods in arriving at his opinions are reliable and, in any case, (3) each portion of his proposed

---

[2]     *Carroll I*, Dkt 145 at 6-7; *Carroll*, 2023 WL 2441795 at *2-3.

[3]     According to Dr. Humphreys, "[p]erson brands are well-known people who also possess a set of brand meanings and associations that have value." Dkt 74-3 (Humphreys Rep.) at 4.

[4]     Dkt 74-3 (Humphreys Rep.) at 2-5 and *passim.*

testimony is inadmissible for other reasons.[5]

### Is Mr. Fisher a Rebuttal Expert?

The dispute regarding whether Mr. Fisher would be a proper witness to rebut Dr. Humphreys's opinions, or something else instead, is significant because there are procedural differences between principal and rebuttal experts. These are spelled out in Ms. Carroll's motion papers, not disputed by Mr. Trump, and need not be discussed here in detail.[6] Ms. Carroll's point is essentially that Mr. Fisher's deposition testimony and his report make very clear that he was not hired to rebut Dr. Humphreys's proposed testimony and did not view that as his assignment. Moreover, the vast bulk of Mr. Fisher's report, Ms. Carroll's argument goes, has nothing to do with

---

[5]

Ms. Carroll moved *in limine* also to exclude Mr. Fisher's testimony in *Carroll I*, where he was hired by Mr. Trump also purportedly to rebut Dr. Humphreys's conclusions with respect to the harm, if any, to Ms. Carroll's reputation caused by Mr. Trump's June 2019 statements. Although the two sets of reports -- like the two cases – are closely related, this case concerns only Mr. Fisher's and Dr. Humphreys's reports and testimony submitted in *Carroll II* with respect to Mr. Trump's October 12, 2022 statement.

[6]

Dkt 73 (Pl. Mem.) at 4-7.

It suffices to say here that (1) a party is not obligated to identify a rebuttal expert and to disclose information concerning that witness and the proposed testimony until closer to trial compared to when it is obliged to disclose such information regarding experts called on its case-in-chief, and (2) the party against whom a rebuttal witness is called has less opportunity to respond to a rebuttal witness than it would have had if the witness were called on the calling party's case-in-chief. Fed. R. Civ. P. 26(a)(2)(D) (providing that a party must disclose expert testimony "(i) at least 90 days before the date set for trial or for the case to be ready for trial; or (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure"); *Ebbert v. Nassau Cnty.*, No. 05-cv-5445 (FB) (AKT), 2008 WL 4443238, at *14 (E.D.N.Y. Sept. 26, 2008) ("The Court finds that [p]laintiff is prejudiced by the very fact that [her expert] did not have an opportunity to respond to the new material contained in [defendant's expert's] [r]ebuttal [r]eport and [d]efendants took no steps to cure this prejudice.").

Dr. Humphreys's opinions.

There is a great deal of merit to Ms. Carroll's argument. Indeed, Mr. Fisher testified at his deposition, to cite but one example, as follows:

"Q. Are there any parts of Professor Humphreys' *Carroll II* report that you sought to rebut in connection with your *Carroll II* report?

"A. No, not at all. But I did – I do have a section in this report . . . that does discuss Ms. Carroll's expert, but most of that is information derived from the first report, is basically on her views and opinions. I did put one paragraph into this report. The only thing I picked out of that report in skimming it was a statistic that she had related to the number of people that might be influenced by Mr. Trump's comments. And that's near the end of the report. You know, I just made a reference[.]"[7]

Federal Rule of Civil Procedure 26 defines rebuttal expert testimony as testimony "intended solely to contradict or rebut evidence on the same subject matter identified [in the expert testimony offered] by another party."[8] "[T]he [rebuttal] expert's testimony should be to 'explain, repel, counteract or disprove evidence' presented by the expert to whom he or she is responding."[9]

Mr. Fisher addresses Dr. Humphreys's findings and conclusions in the last few pages

---

[7] Dkt 74-1 (Fisher Dep.) at 52:9-25.

[8] Fed. R. Civ. P. 26(a)(2)(D)(ii).

[9] *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir.2006)).

of his report.[10]  He (1) opines that Dr. Humphreys is not qualified to testify as to reputation damage

or repair, (2) evaluates and critiques Dr. Humphreys's proposal for reputational repair, specifically

her emphasis on social media, (3) comments on Dr. Humphreys's finding that only approximately

21.42 percent of those people exposed to Mr. Trump's October 12, 2022 statement, the alleged

defamation in *Carroll II*, would have been receptive to it, and (4) concludes that Ms. Carroll

"benefitted from this public dispute in terms of increased positive exposure for her as a professional

and positive enhancement of her personal character and reputation."[11]  With the exception of Mr.

Fisher's views of Dr. Humphreys's qualifications, which are not proper subjects of expert testimony

at all,[12] these aspects of Mr. Fisher's proposed testimony would be proper rebuttal to the extent that

they rest on reliable methodology.[13]

   That said, the rest of Mr. Fisher's report is not rebuttal of Dr. Humphreys.  It contains

a mixture of legal opinions – including his views as to the elements of defamation and whether the

---

[10]

    Dkt 87-4 (Fisher Rep.) at 22-24.

    The testimony Mr. Fisher offers in rebuttal responds to findings and conclusions common to Dr. Humphreys's reports in both cases. Although the citations to certain statements in his report are to Dr. Humphreys's report in *Carroll I*, the same statements – with one exception – appear also in Dr. Humphreys's report in *Carroll II*. As a result, Mr. Fisher's admissions in his deposition that he did not seek to rebut Dr. Humphreys's report in this case is not dispositive of whether any of his proposed testimony properly constitutes rebuttal testimony.

[11]

    *Id.*

[12]

    *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 142 (S.D.N.Y. 2022), *motion to certify appeal denied*, No. 19-cv-1422(PAE)(VF), 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022) ("[A]t trial, [defendant's expert] may not opine on the qualification of another expert to testify on a particular subject. . . . That . . . is a judicial function . . . .").

[13]

    As the issue of Mr. Fisher's qualifications have not been raised on this motion, I do not now address that question.

6

alleged false statements are defamatory under New York law,[14] that his proposed testimony satisfies

Federal Rule of Evidence 702[15] and that one of the allegedly defamatory statements "was clearly an

opinion"[16] – as well as arguments about the evidence (including that there is no evidence that Mr.

Trump knew the falsity of his statements[17] or that "[Mr. Trump and Ms. Carroll] met at

[Bergdorf]"[18]), and sundry other things. None of these is a proper subject of expert testimony either

on a party's case-in-chief or in rebuttal. Hence, I turn to the small part of the proposed testimony

that in substance is arguably proper rebuttal testimony to determine whether it is inadmissible on

other grounds.

### *Standard for Reliability of Expert Testimony*

Trial courts are required to ensure that any expert testimony that is admitted is

relevant and reliable.[19] Under Federal Rule of Evidence 702, expert testimony is admissible if:

"(a) the expert's scientific, technical, or other specialized knowledge will help the

---

[14]

Dkt 87-4 (Fisher Rep.) at 14, 24.

[15]

*Id.* at 13.

[16]

*Id.* at 16.

[17]

*Id.* at 14-16.

[18]

*Id.* at 16.

[19]

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 42 (S.D.N.Y. 2016) ("Trial courts serve as gatekeepers for expert evidence and are responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'") (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

trier of fact to understand the evidence or to determine a fact in issue;

"(b) the testimony is based on sufficient facts or data;

"(c) the testimony is the product of reliable principles and methods; and

"(d) the expert has reliably applied the principles and methods to the facts of the case."[20]

"When evaluating the reliability of an expert's testimony, the court must 'undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'"[21] A district court "must focus on the 'principles and methodology' employed by the expert, not on the conclusions reached."[22] Where the expert's testimony does not rely on scientific methods, "the court may permit testimony 'where a proposed expert witness bases her testimony on practical experience rather than scientific analysis.'"[23] Courts have excluded rebuttal testimony where the rebuttal expert "failed to employ a reliable methodology or illustrate how [the expert's] experience informed [his or her] analysis"[24] or where the rebuttal expert "was unable to articulate a specific process or

---

[20] Fed. R. Evid. 702.

[21] *Scott*, 315 F.R.D. at 43 (quoting *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002)).

[22] *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 595).

[23] *Scott*, 315 F.R.D. at 43 (quoting *Davis v. Carroll*, 937 F.Supp.2d 390, 412 (S.D.N.Y.2013)).

[24] *Scott*, 315 F.R.D. at 44 (citing *Cospelich v. Hurst Boiler & Welding Co., Inc.*, 08-cv-46(LG)(JMR), 2009 WL 8599064, at *2 (S.D. Miss. July 7, 2009)).

8

methodology by which [the expert] reached [his or her] conclusions."[25]

*Reliability of Mr. Fisher's Proposed Rebuttal Testimony*

Mr. Fisher's conclusion that Ms. Carroll "benefitted from this public dispute in terms of increased positive exposure for her as a professional and positive enhancement of her personal character and reputation,"[26] if received in evidence, would contradict Dr. Humphreys's conclusion that Mr. Trump's October 12 statement "caused short- and long-term harm to Ms. Carroll's person brand" and that her "reputational value has been diminished due to [Mr. Trump's] [s]tatement."[27] His purported explanation of this conclusion discusses Ms. Carroll's preexisting "positive public profile," certain public perceptions of Mr. Trump and his "perceived public reputation for inappropriate sexual contact with women," the Me Too movement, and Ms. Carroll's public exposure and her "[p]ositive [m]edia [e]xposure" following her public rape accusation against Mr. Trump."[28] And while Mr. Fisher is entitled to his personal opinion, the question here is whether that personal opinion reflects the application of a reliable methodology, as it must be in order for him to be permitted to express that opinion to the jury. And Mr. Fisher has made clear that it does not.

Mr. Fisher states in his report that "the methodology [he] used in this case is

---

[25]

    *Id.* (citing *Rondor Music Int'l Inc. v. TVT Records LLC*, 05-cv-2909(JTL), 2006 WL 5105272, at *3 (C.D. Cal. Aug. 21, 2006)).

[26]

    Dkt 87-4 (Fisher Rep.) at 24.

[27]

    Dkt 74-3 (Humphreys Rep.) at 5.

[28]

    Dkt 87-4 (Fisher Rep.) at 18-21.

consistent with that which is standard operating procedure that public relations and communications professionals as well as expert witnesses use when addressing issues and situations for clients like those in this case . . . ."[29] This methodology purportedly includes, *inter alia*, "[a]pplying the principles of negative communications to this case as appropriate" and "follow[ing] peer accepted procedures in both the public relations and expert witness professions as to how to analyze and assess situations which negatively impact reputations as well as devise strategies, plans and actions to restore them."[30]  Nowhere, however, does he explain what the "peer accepted procedures" or "principles of negative communications" are, let alone how his application of those procedures and principles led him to his conclusion. He states also that his "input in this report [is] based on the information [he] obtained and reviewed in this case," which consists of (1) litigation documents in *Carroll I* and *Carroll II*, (2) a total of *six* media articles about Ms. Carroll and/or these cases, and (3) whatever he saw in his "[i]nternet [r]esearch," on which he testified he spent "at most an hour" and apparently simply "Googled" Ms. Carroll.[31]  In short, there is no reliable basis for Mr. Fisher's conclusion.  Indeed, when asked during his deposition how he reached his conclusion that Ms. Carroll experienced a "net benefit" from her dispute with Mr. Trump, he testified:

> "A. * * *  I think that factoring in common sense and logic, a lot of positive things would have come out from his, for lack of a better word, tirade against her based on her comments that he raped her.

---

[29]  *Id.* at 12.

[30]  *Id.* at 13.

[31]  *Id.*; Dkt 74-1 (Fisher Dep.) at 47:1, 148:10-11.

"Q.    Is there any data that supports that conclusion?

"A.    Not data, no. There are no data. It's just -- you know, it's just basic in my assessment based on my background and expertise and experience in the field of communications particularly as it relates to * * * "[32]

He further explained:

"Q.    So besides that sort of personal experience you had [], did you -- is there any data to quantify the media coverage that Ms. Carroll received after Mr. Trump's defamation as compared to before?

"A.    Well, I think, yes. I think if you're just doing an analysis or Google or something like that, you can see that there weren't hardly any articles on her prior to the Trump incident, for lack of a better word, and now -- exponentially her visibility has risen tremendously. I mean, the bottom line -- I just used myself as an example because I had never heard of her before I started reading articles about Trump being accused of rape and whatever. And most of those articles, and I did analysis in this report which is in the next section, by the way, on 20 here is that the

* * *

"A. [Question omitted from record filed with the Court] . . . No. From looking online and looking at the first ten pages of her Google presence, it was clear that there was a tremendous increase in articles about her or exposure than there was prior to that.

---

[32]    Dkt 74-1 (Fisher Dep.) at 130:14-25.

11

       "Q.     By looking -- by your reference to looking at the first ten pages of Google, you just mean the nature of the search results that you would see if you put in E. Jean Carroll's name in Google?

       "A.     Yeah, in other words, you know, each page has 10 to 12 things on it and you go through pages 2, 3, 4, 5. You know, I saw other references to Ms. Carroll but not nearly the weight of the exposure she received after she came forward to accuse Mr. Trump of rape."[33]

Mr. Fisher's blanket invocation of his experience in the communications field to justify his conclusion does not suffice. Instead, an "expert must 'show how his or her experience . . . led to his conclusion,'"[34] which Mr. Fisher has not. His observation that he saw more Google search results mentioning Ms. Carroll after she publicly accused Mr. Trump of rape and his discussion in his report of four news articles with positive comments on Ms. Carroll after her public accusation, in the perhaps one hour he spent on his Googling, also do not make his methodology reliable.[35] The number of Google hits in a brief search, without any investigation of the nature of those results or the full extent of the relevant universe of results, says nothing about whether Ms. Carroll has had more positive compared to negative or neutral media coverage after her public accusation against Mr. Trump. Four news articles with positive comments, or even the six news

---

[33]      *Id.* at 195:7-25, 197:1-17.

[34]      *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, No. 1:00-1898, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008) (quoting *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props.*, LLC, 467 F.3d 107, 132 (2d Cir.2006)).

[35]      Dkt 87-4 (Fisher Rep.) at 20-21 (discussion of four news articles).

articles in total cited in his report, are insufficient to support a conclusion that Ms. Carroll has experienced a "net benefit" from her dispute with Mr. Trump. The other elements of his analysis fare no better. The gist of his reasoning – essentially that more people think favorably of Ms. Carroll than they do of Mr. Trump, and therefore she has benefitted more than she has suffered from Mr. Trump's remarks – lacks the kind of foundation in facts, evidence, and/or experience that is demanded of expert witnesses. It is also unresponsive to the key issue on which he purportedly would be called – whether and to what extent Ms. Carroll was harmed by Mr. Trump's allegedly defamatory statement.

Mr. Fisher's other rebuttal testimony similarly is unreliable. Mr. Fisher does not explain how his experience informs his criticisms of Dr. Humphreys's proposal for reputation repair. Nor does he rely on any specific facts, data, or evidence. Indeed, his entire analysis of Dr. Humphreys's proposal for reputation repair contains no citation other than to Dr. Humphreys's report.[36] As a result, it is unclear how he reached his conclusions that "[t]he most successful type of communications program features dissemination of information through multiple communications channels giving each sufficient budget to effectively ensure all bases are covered in terms of reaching the target audiences," the "relatively small size of the audience that can be impacted or influenced by [Dr. Humphreys's proposal]," that "there is no need for a massive online and social media campaign . . . when the mass media would give coverage for free . . . .," or that, if Ms. Carroll wins, "the positive outcome of the litigation would significantly repair her reputation and a program would

---

[36]     *Id.* at 21-24.

only be needed to build on that news and lessen the need for such a major program."[37]  Although one could hypothesize that his opinions were informed by his experience in the communications and reputation management fields, how exactly that experience leads to those opinions remains unknown and would be nothing more than speculation. Moreover, almost all of Mr. Fisher's "analysis" with respect to Dr. Humphreys's proposal consists of potential discrepancies or shortcomings in Dr. Humphreys's background and report that can be observed readily by jurors and/or brought out in cross examination without benefitting from any aid by an expert.[38]  The same is true of Mr. Fisher's comment – which he characterizes as a "reference" in his deposition – that Dr. Humphreys is "reporting that less than one in four people might possibly have given any credence to [Mr. Trump's] alleged false statements."[39]  His opinions as to Dr. Humphreys's report and proposal therefore must be excluded.

*Contested Issues First Raised in Carroll I But Not Yet Ruled Upon*

*Reference to Ms. Carroll's Public Statements Concerning DNA Evidence*

Ms. Carroll testified at her deposition in *Carroll I* as follows:

"Q.     *  *  *  [Y]ou stated in the public that you had DNA from the former president; is that correct?

"A.     Yes.

---

[37]     *Id.* at 23-24.

[38]     *Id.* at 21-24 (purporting to point out inconsistencies or "admissions" by Dr. Humphreys in her report).

[39]     *Id.* at 24.

14

"Q.    Why did you say that?

"A.    Because we sent the dress to be examined and then we got back a report. Robbie published it.

"Q.    What did that report say that you recall? And don't divulge anything that's privileged, please, so conversations between you and your attorney I don't want to know.

"Q.    It is so far above my head. The reports about DNA are so detailed and so much scientific rigor is required to understand even the opening paragraph, I can't really -- I can't say."[40]

Ms. Carroll seeks to preclude any testimony or commentary regarding DNA evidence.[41] Mr. Trump responds that "Defendant is entitled to cross-examine Plaintiff with respect to the fact that she publicly, and falsely, proclaimed that she was in possession of Defendant's DNA."[42] Cross-examination on that point, he argues, would be relevant to Ms. Carroll's credibility

---

[40]     *Carroll I*, Dkt 137 (Habba Decl.), *Carroll I*, Dkt 137-5 (Ex. E) at 217:23-218:16.

[41]     *Carroll I*, Dkt 134 (Pl. Mem.) at 27-30; *see also Carroll II*, Dkt 86 at 3.

[42]     *Carroll I*, Dkt 136 (Def. Mem.) at 19; *see also* Dkt 75 (Def. Mem.) at 1 (incorporating by reference his arguments in opposition to Ms. Carroll's motion *in limine* in *Carroll I*).

Mr. Trump argues that Ms. Carroll made "numerous public assertions that she *obtained* Defendant's DNA." *Carroll I*, Dkt 136 at 20-21 (emphasis added). None of Ms. Carroll's posts on social media that he cited, however, refer to her having "obtained" his DNA. Instead, as she did also in her deposition testimony, her posts all refer to his DNA being on her dress. Indeed, in one of the posts, she wrote that she is "STILL waiting for Trump to provide his DNA sample to be tested against the dress." E. Jean Carroll, TWITTER, May 1, 2020, *available at* https://twitter.com/ejeancarroll/status/1256301599426785280.

and Mr. Trump's contention that she fabricated her defamation claim to garner publicity.[43] But the probative value of such examination – if it would have any at all – would be extremely modest, and it would be outweighed substantially by the likelihood of unfair prejudice coupled with the risk of confusion of the issues and a waste of time that would be caused by permitting it. This is apparent when one considers both the deposition testimony and the whole story of DNA in this case.

Of course, if Ms. Carroll simply and knowingly had made a false claim that Mr. Trump's DNA is on the dress, that would be a fit subject for cross examination. But the record in fact suggests something else. There is evidence before the Court that there is male DNA on the dress in question but that the identity of the source could not be established.[44] It might be Mr. Trump's DNA; it might be someone else's. The lab could not reach such a conclusion at least in part because Mr. Trump refused to allow the taking of a sample of his DNA for comparison despite a request that had been outstanding for years.[45] As a result, neither party intends to adduce any scientific evidence concerning the recovery of male DNA from the dress or the laboratory analysis that was done. And

---

[43]  *Carroll I*, Dkt 136 at 20.

[44]  *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 56, Ex. A (DNA test report attached to Ms. Carroll's notice in which she sought Mr. Trump's DNA) at 22-24.

[45]  This is detailed in another opinion in this case. Dkt 56; *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023).

About ten weeks before this case is set to be tried, Mr. Trump proposed a "deal" in which he offered to provide a DNA sample but only on the condition that this Court require Ms. Carroll first to turn over to him a previously undisclosed appendix to the DNA test report. The Court denied Mr. Trump's application in part because "Mr. Trump [gave] the Court no reason to believe that pursuing that course would be likely to yield any admissible evidence, let alone a guarantee that anything important would come of it." Dkt 56 at 4; *Carroll*, 2023 WL 2006312 at *2.

16

several things follow from these facts.

First, the premise of Mr. Trump's argument is incorrect, as Ms. Carroll's statement has not been proven either true or false. She might have been right. She might have been wrong. Or it might be impossible to determine whether she was right or wrong. In any case, the failure of Mr. Trump to allow a DNA sample prevented the laboratory from even trying to determine whether the male DNA found on Ms. Carroll's dress is his.

Second, as indicated, there will be no scientific DNA evidence at this trial. Cross-examination of Ms. Carroll about her statement, while potentially relevant to her credibility,[46] in these circumstances would be susceptible to an inference (and the risk of an argument by Mr. Trump) that would be unfairly prejudicial – namely, that the reason that Ms. Carroll did not adduce scientific DNA evidence at the trial is that Mr. Trump's DNA is not on the dress and, perhaps, that this proves her sexual assault allegation false.[47] The unfairly prejudicial nature of such an inference, let alone the possible argument, is apparent – there is no such evidence, at least in part due to Mr. Trump's

---

[46] There are a number of possible reasons Ms. Carroll made public statements implying that Mr. Trump's DNA was on her dress. She may have leapt to an incorrect conclusion about the meager laboratory findings that do exist. She may have understood the laboratory conclusion but exaggerated based upon the fact that she allegedly knew that Mr. Trump had been in contact with the dress, and believed that once she obtained his DNA to test against the dress, there would be a match. Or perhaps she knowingly lied. There may be other explanations. But whatever the reason, the fact that the statement may have been inaccurate has at least some relevance.

[47] Indeed, Mr. Trump in his motion to compel production of an appendix to a DNA report obtained by Ms. Carroll in January 2020 "surmise[d] that the answer to [why Ms. Carroll did not produce previously the appendix] is that she knows [Mr. Trump's] DNA is not on the dress because the alleged sexual assault never occurred." Dkt 51 at 3. The Court explained that his surmise "of course is factually impossible for a simple reason: Mr. Trump never provided a DNA sample for the purpose of comparing it to the DNA on her dress. No one knows whether his DNA is on the dress." Dkt 56 at 20, *Carroll*, 2023 WL 2006312 at *8.

17

failure to allow the DNA sample.

Third, that unfair prejudice to Ms. Carroll could be avoided by placing before the jury the facts concerning Mr. Trump's failure to allow collection of his own DNA. But to do so would require (1) scientific evidence concerning the testing of the dress stains as well as the fact that the DNA on the dress could not be tied to or eliminate Mr. Trump as its source without Mr. Trump's DNA, and (2) evidence of Mr. Trump's refusal to provide it. It would require evidence also as to why the presence or absence of Mr. Trump's DNA on the dress would go only to whether Mr. Trump was in Ms. Carroll's presence or touched her, but would not in either case be dispositive of her sexual assault claim.[48] Thus, any questioning of Ms. Carroll about the statement upon which Mr. Trump relies would lead to consumption of a good deal of trial time, would be distracting and needlessly confusing for the jury, and ultimately would not contribute materially to a fair result in this case.

Rule 403 of the Federal Rules of Evidence permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time . . . ."[48] In these circumstances, the Court finds that pursuit of such cross-examination or argument touches heavily upon each of the quoted bases for exclusion. Those considerations substantially outweigh whatever probative value might be obtained by going down that path. Accordingly, the Court excludes any evidence or argument by either party concerning DNA.

---

[48] The laboratory findings did not find semen on the dress. Dkt 56 at 7; *Carroll*, 2023 WL 2006312, at *3.

[48] Fed. R. Evid. 403.

*Preclusion of Five of Mr. Trump's Proposed Witnesses*

Mr. Trump lists in the joint pretrial order five witnesses he may call at trial – namely, David Haskell, Elizabeth Dyssegaard, Erin Hobday, Laurie Abraham, and Sarah Lazin – whom Ms. Carroll seeks to preclude from testifying. She seeks to exclude them on the grounds that Mr. Trump was obliged under Rule 26(a) and (e) to have disclosed them and that he might call them as witnesses far earlier in the case and that his delay was prejudicial because it prevented Ms. Carroll from taking their depositions.

Ms. Carroll herself disclosed four of the five witnesses – all except Ms. Hobday – in response to Mr. Trump's interrogatory in June 2022 in *Carroll I*, which asked her to "[i]dentify all [p]ersons who have any knowledge or information about any of the allegations in the [c]omplaint, and . . . the subject matter of the knowledge that each [p]erson possesses."[49] Ms. Carroll discussed Ms. Hobday during her deposition on October 14, 2022.[50] Mr. Trump accordingly argues that he was not obliged to disclose them under Rule 26 because "they were known to—in fact, disclosed by—Plaintiff" and even if he was, his violation was harmless because they already were known to Ms. Carroll.[51] Ms. Carroll contends that her knowledge of these witnesses is immaterial because Mr. Trump was obliged to inform her that he intended to call these witnesses at trial.[52] There is case law

---

[49]     *Carroll I*, Dkt 137-6 at 5.

[50]     *Carroll I*, Dkt 137-5 (Ex. E, Carroll Dep.) at 178:12-25, 188:25-189:19.

[51]     *Carroll I*, Dkt 136 (Def. Mem.) at 21.

[52]     Dkt 86 (Pl. Reply Mem.) at 2.

19

in favor of both positions.[53]

The fundamental purpose of Rule 37(c)(1) – which permits courts to preclude testimony if a party fails to satisfy its disclosure obligations under Rule 26 – is "to prevent the practice of 'sandbagging' an opposing party with new evidence."[54]  With this principle in mind, the Court agrees with Mr. Trump that he was not obliged to disclose under Rule 26 the four witnesses whom Ms. Carroll disclosed in her June 2022 interrogatory responses as persons knowledgeable of the allegations in the complaint, or, if he was, his violation would be harmless. Each of the four witnesses, as identified by Ms. Carroll, were individuals who she informed about Mr. Trump's alleged assault prior to the publication of the article with an excerpt with Ms. Carroll's account of the alleged rape from her then-forthcoming book in *New York* magazine.[55]  Each was involved in

---

[53]

> *E.g., Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011), *aff'd in part, vacated in part sub nom.*, 726 F.3d 119 (2d Cir. 2013) ("Because [plaintiff] became aware of [witnesses] at . . . depositions, the [defendants] did not have a duty to supplement their Rule 26 initial disclosures."); *Howard Univ. v. Borders*, No. 20-cv-04716 (LJL), 2022 WL 3568477, at *2 (S.D.N.Y. Aug. 17, 2022) (concluding that the plaintiff was not obligated to supplement its initial disclosures and that even if it was, the violation would be harmless, where "[d]efendants were well aware of [witness's] identity and her role from the beginning of the litigation and that it was possible that [plaintiff] might choose to use her as a witness."). *But see, e.g., Pal v. New York Univ.*, No. 06-cv-5892 (PAC) (FM), 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008) ("[Plaintiff's] knowledge of the existence of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if [defendant] informed [plaintiff] that it might call the witness in support of its claims or defenses."); *Lebada v. New York City Dep't of Educ.*, No. 14-cv-758 (LAK) (GWG), 2016 WL 626059, at *5 (S.D.N.Y. Feb. 8, 2016), *objections overruled*, No. 14-cv-0758 (LAK), 2016 WL 8453417 (S.D.N.Y. May 16, 2016) ("[T]he mere discussion of an individual in documents or deposition testimony is insufficient to create a duty on defendants to assume that such an individual is a witness that plaintiffs 'may use to support [their] claims' under Rule 26(a)(1)(A)(i).").

[54]

> *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) (internal quotation marks in original) (quoting *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y.2004)).

[55]

> *Carroll I*, Dkt 137-6 at 5.

some way with Ms. Carroll's book and/or the *New York* magazine article, both of which are relevant to issues in this case. These witnesses (as well as the fifth witness, Ms. Hobday) received notices of subpoenas by Mr. Trump, although it is not clear which, if any, was served.[56]  In these circumstances, there was sufficient notice – albeit just barely – to Ms. Carroll that there was a possibility they would be called as witnesses by Mr. Trump and sufficient time for Ms. Carroll to have deposed them. Mr. Trump's failure to disclose them does not equate to him "sandbagging" Ms. Carroll.

A different conclusion is appropriate with respect to Ms. Hobday. Unlike the other four witnesses, neither Ms. Carroll nor Mr. Trump disclosed Ms. Hobday as a person with relevant knowledge. Ms. Hobday was mentioned only in Ms. Carroll's deposition in October 2022, during which Ms. Carroll identified her as the managing editor of *Elle* magazine who advised Ms. Carroll that her contract with the magazine was being terminated.[57]  Nothing about the context in which Ms. Hobday was mentioned, nor her actual role as discussed in the excerpts of Ms. Carroll's deposition that were provided, demonstrate that Ms. Carroll should have expected she might be called as a witness by Mr. Trump. He therefore was obligated to disclose Ms. Hobday in his Rule 26 disclosures.  His failure to do so prejudiced Ms. Carroll by preventing her from deposing her or even knowing that she perhaps should depose her. The circumstances with respect to Ms. Hobday justify the drastic but occasionally warranted sanction of precluding her from testifying at trial.

---

[56]     Dkt 86 (Pl. Reply Mem.) at 3, 3 n.3.

[57]     *Carroll I*, Dkt 137-5 (Ex. E, Carroll Dep.) at 178:12-25.

*Uncontested Issues First Raised in Carroll I But Not Yet Ruled Upon*

Ms. Carroll has incorporated in her motion in *Carroll II* several requests for *in limine* relief on which the Court has not yet ruled but that Mr. Trump has not opposed. Accordingly, those requests are granted.

*Conclusion*

Plaintiff's motion *in limine* (Dkt 72) is granted to the extent that:

(1) plaintiff's prior consistent statements to Mss. Birnbach and Martin about defendant's alleged sexual assault are admissible;

(2) the testimony of Mss. Stoynoff and Leeds regarding their experiences involving the defendant come within Federal Rules of Evidence 413 and 415 and will not be excluded under Rule 403;

(3) defendant is precluded from giving or eliciting testimony concerning information allegedly known to persons whom he has not disclosed under Rules 26(a) and (e);

(4) both parties are precluded from any testimony, argument, commentary or reference concerning DNA evidence;

(5) defendant is precluded from cross-examination or eliciting evidence regarding Stephanie Grisham's prior misdemeanor convictions, her unrelated pending lawsuit, and her use of a prescription medication;

(6) defendant is precluded from commenting upon or eliciting any evidence regarding plaintiff's choice of counsel or her counsel's activities outside the

litigation between plaintiff and defendant;

(7) Mr. Fisher is precluded from testifying at trial as a rebuttal expert witness; and

(8) defendant is precluded from calling Ms. Hobday to testify at trial.

Plaintiff's motion *in limine* (Dkt 72) is denied to the extent that defendant is not precluded from calling Mss. Dyssegaard, Abraham, Lazin, and Mr. Haskell at trial.

SO ORDERED.

Dated:         March 27, 2023

_____/s/ Lewis A. Kaplan_____
Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                        Plaintiff,

           -against-                                 22-cv-10016 (LAK)

DONALD J. TRUMP,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Roberta Kaplan
> Joshua Matz
> Shawn Crowley
> Matthew Craig
> Trevor Morrison
> Michael Ferrara
> KAPLAN HECKER & FINK LLP
>
> *Attorneys for Plaintiff*
>
> Joseph Tacopina
> Matthew G. DeOreo
> Chad Derek Seigel
> TACOPINA SEIGEL & DEOREO, P.C.
>
> Alina Habba
> Michael T. Madaio
> HABBA MADAIO & ASSOCIATES LLP
>
> *Attorneys for Defendant*

2

LEWIS A. KAPLAN, *District Judge.*

Plaintiff E. Jean Carroll alleges in this case ("*Carroll II*") and a second very closely related case ("*Carroll I*") that businessman Donald J. Trump, as he then was, raped her in a New York department store in the mid 1990s. In *Carroll I*, she accuses Mr. Trump only of defaming her in a series of statements he issued in June 2019, shortly after Ms. Carroll publicly accused him of rape. In this action, Ms. Carroll brings two other closely related claims. First, she seeks to recover damages and other relief for the alleged rape pursuant to a newly-enacted New York law, the Adult Survivors Act ("ASA"), which created a one-year period within which persons who allegedly were sexually assaulted as adults could sue their alleged assaulters. Second, she alleges that Mr. Trump libeled her in a statement he published on October 12, 2022 on Truth Social, his social media platform.

The matter now is before the Court on Mr. Trump's motion for partial summary judgment dismissing only the libel claim based on Mr. Trump's October 12, 2022 statement. He contends that it is barred by the "absolute litigation privilege" which he mistakenly locates in Section 74 of the New York Civil Rights Law and which in relevant part provides:

> "A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."[1]

For the reasons discussed below, Mr. Trump's motion is denied.

---

[1] N.Y. Civ. Rights Law § 74.

*Facts*

*Mr. Trump's Allegedly Defamatory June 2019 Statements*

Ms. Carroll's rape allegation first became public on June 21, 2019, when *New York* magazine published an excerpt from her then-forthcoming book that described Mr. Trump's alleged assault of her.[2] That same day, Mr. Trump issued a statement that was published on Twitter by the press:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

> "Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

---

[2]

The Court assumes familiarity with its prior opinions, which describe in detail the facts and procedural histories of both actions involving these parties. Doc. No. 20-cv-7311 (*Carroll I*), Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); *Carroll I*, Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); *Carroll I*, Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); *Carroll I*, Dkt 145, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Dkt 95, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); Dkt 92; Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023); Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023).

Except where preceded by *"Carroll I"*, "Dkt" references are to the docket in this case.

4

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[3]

On the following day, June 22, 2019, Mr. Trump made other statements to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

"[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

"[Reporter]: You were in a photograph with her.

"[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going

---

[3] *Carroll I*, Dkt 6-1 (Cpt.) at 15, ¶ 82.

on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

"And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

"New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

"It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

"You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

"But here's a case, it's an absolute disgrace that she's allowed to do that."[4]

Finally, on June 24, 2019, Mr. Trump stated in an interview with *The Hill*: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[5]

*Carroll I*

*The Complaint*

In November 2019, approximately five months after Mr. Trump's statements, Ms. Carroll sued Mr. Trump for defamation in the case now referred to as *Carroll I*. Her complaint, filed originally in a state court in New York, in relevant part alleges:

"11. When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the rape. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of rape. For good measure, he insulted her physical appearance.

"85. In the June 21 statement, Trump falsely stated that he did not rape

---

[4] *Id.* at 17, ¶ 91.

[5] *Id.* at 19, ¶ 97.

Carroll.

"86. In the June 21 statement, Trump falsely stated that he had never met Carroll.

"87. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.

"88. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales.

"89. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation to carry out a political agenda.

"90. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation as part of a conspiracy with the Democratic Party.

\* \* \*

"93. In the June 22 statement, Trump falsely stated that he did not rape Carroll.

"94. In the June 22 statement, Trump falsely stated that he had no idea who Carroll was.

"95. In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

"96. In the June 22 statement, Trump falsely implied and affirmatively

intended to imply that Carroll had been paid money to invent the rape accusation against him.

* * *

"100. In the June 24 statement, Trump falsely stated that he did not rape Carroll.

* * *

"116. Trump's other defamatory statements about Carroll in June 2019 – that she had fabricated the rape accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment-rested on the express or deliberately – rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false."[6]

*Mr. Trump's Answer*

Mr. Trump served an answer, meaning a responsive court pleading, in *Carroll I.* His response to each of the complaint's allegations quoted above was that he "[d]enies the allegations contained in [the corresponding paragraph of the complaint]."[7] He asserted also an affirmative

---

[6]      *Id.* at 3,¶ 11, 16-17, ¶¶ 85-90, 18, ¶¶ 93-96, 20, ¶ 100, 22, ¶ 116.

[7]      *Carroll I*, Dkt 14-69 (Def. Answer), 1 ¶ 11, 6 ¶¶ 85-90, 7, ¶¶ 93-96, 100, 9 ¶ 116.

9

defense that "[t]he alleged [June 2019] defamatory statements are true."[8]  He did not elaborate on his denials of Ms. Carroll's allegations or on his affirmative defense in his answer.  He said nothing more in his answer in *Carroll I* about Ms. Carroll's allegations.

*Mr. Trump's October 12, 2022 Statement*

On August 8, 2022, more than three months before the effective date of the ASA, Ms. Carroll's counsel announced privately to her adversaries and to the Court that Ms. Carroll would sue Mr. Trump for damages for the alleged rape itself, as distinguished from the allegedly defamatory statements of June 2019, once the ASA became effective on November 24, 2022. That announcement was filed publicly on September 20, 2022.

On the morning of October 12, 2022, this Court denied for the second time Mr. Trump's motion to substitute the United States for him as the defendant in *Carroll I* and it denied his motion to stay the action.[9]  That night, Mr. Trump issued the following statement on his social media outlet:

"This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. This decision is from the Judge who was just overturned on my same case. I don't know this woman, have no idea who

---

[8]

*Id.* at 11, ¶ 150.

[9]

*Carroll I*, Dkt 96; *Carroll*, 2022 WL 6897075 at *7.

she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years.  And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country. Her lawyer is a political operative and Cuomo crony who goes around telling people that the way to beat Trump is to sue him all over the place. She is suing me on numerous frivolous cases, just like this one, and the court system does nothing to stop it. In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me.

This can only happen to 'Trump'!"[10]

*Carroll II*

Within ten minutes after the ASA became effective, on November 24, 2022, Ms. Carroll filed *Carroll II* against Mr. Trump. In addition to her claim under the ASA for damages for the alleged rape, Ms. Carroll sued for common law defamation based on allegedly false and defamatory statements about her contained in Mr. Trump's October 12, 2022 statement.[11]

*The Pending Motion*

Mr. Trump seeks dismissal on summary judgment of Ms. Carroll's defamation claim based on his October 12, 2022 statement. He argues that the alleged defamatory statements in his October 12 statement "are protected by the absolute litigation privilege under N.Y. Civ. Rights Law § 74" because "in the October 12, 2022 [s]tatement, [he] was merely writing about Plaintiff's pending lawsuit against him (*Carroll I*), while referencing Carroll's claims in *Carroll I*, his positions taken in *Carroll I*, and background information concerning *Carroll I*."[12]

---

[10] Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

[11] The portions of Mr. Trump's October 12, 2022 statement that are not statements of or about Ms. Carroll are not part of her defamation claim. Mr. Trump's statement is reproduced above in full for purposes of resolving this motion.

[12] Dkt 67 (Def. Mem.) at 1.

### *Discussion*

Mr. Trump's argument fails for two reasons. First, his October 12 statement is not a "report of any judicial proceeding." Second, *even if* his October 12 statement were a report of a judicial proceeding within the meaning of Section 74 of the New York Civil Rights Law, he has not demonstrated that it was a "fair and true report of any judicial proceeding."

*The Absolute Litigation Privilege Under Section 74 of the New York Civil Rights Law*

"New York law recognizes certain privileges that shield an individual from liability for defamation."[13]  At common law, the "litigant's privilege" shields "one who publishes libelous statements *in a pleading or in open court* for the purpose of protecting litigants' zeal in furthering their causes."[14]  "[A] statement made in the course of a judicial proceeding is absolutely privileged under New York common law so long as it is considered material and pertinent to the litigation."[15] This absolute litigation privilege does not extend to out-of-court statements. Out-of-court statements instead are dealt with by Section 74 of the New York Civil Rights Law, which creates what often is called the "fair report privilege." And it is important to note that "[t]he [absolute litigation] privilege for in-court statements is considerably broader in scope than that for out-of-court reports

---

[13]

    *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 629 (S.D.N.Y. 2022).

[14]

    *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 217 (E.D.N.Y. 2012) (emphasis added) (quoting *Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear Inc.*, 608 F. Supp. 1187, 1195 (S.D.N.Y. 1985)).

[15]

    *Id.*

relating to the proceedings."[16]

As stated above, Section 74 in pertinent part provides that "[a] civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding . . . ."[17] "The purpose of providing immunity to fair and true reports of judicial proceedings is said to be to encourage the dissemination of information concerning the judicial branch of government and thereby to serve the public interest 'in having proceedings of courts of justice public, not secret, for the greater security thus given for the proper administration of justice.'"[18] Originally "a qualified privilege for newspapers publishing 'a fair and true report' of 'any judicial, legislative, or other public official proceedings,'" the law was amended in 1930 "to make the privilege absolute" and ten years later "was extended from newspapers to 'any person, firm or corporation.'"[19]

*Mr. Trump's Statement Is Not a "Report of a Judicial Proceeding"*

Mr. Trump argues that his October 12 statement is privileged under Section 74

---

[16] *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 294 (S.D.N.Y. 2005).

[17] N.Y. Civ. Rights Law § 74.

[18] *D'Annunzio*, 876 F. Supp. 2d at 217 (citation omitted); *see also Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 328 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, No. 21-2068-CV, 2022 WL 1013982 (2d Cir. Apr. 5, 2022) ("The New York legislature enacted this statute in order to avoid stifling 'an active, thriving, and untrammeled press' and to ensure that the press receive 'broad protection.'") (quoting *Idema v. Wagner*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citation omitted), *aff'd*, 29 F. App'x 676 (2d Cir. 2002)).

[19] *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (2d Dept. 2009) (citations omitted).

because it was nothing more than a summary and/or restatement of the allegations he made and positions he asserted in his *Carroll I* answer.[20]  Specifically, he contends that his statement merely summarized and/or repeated his denials and affirmative defense in relation to Ms. Carroll's allegations that he (1) falsely stated he did not rape her, (2) falsely stated he did not know who she was, and (3) falsely implied that she invented the rape accusation in order to increase her book sales.[21]  Mr. Trump contends also that his statement was about *Carroll I* because of two references it contains: (1) a portion of the first sentence of his statement that "[t]his 'Ms. Bergdorf Goodman case' is a complete con job", and (2) the third sentence of his statement that "[t]his decision is from the Judge who was just overturned on my same case."[22]  Neither of these references, considered individually or together, nor his statement as a whole, brings the statement within the meaning of "report of any judicial proceeding" under Section 74.

The standard to determine "whether a report qualifies for the fair report privilege is whether 'the ordinary viewer or reader' can 'determine from the publication itself that the publication is reporting on [a judicial] proceeding.'"[23]  "In other words, '[i]f the context in which the statement [is] made make[s] it impossible for the ordinary viewer [or reader] to determine whether

---

[20]     Dkt 67 (Def. Mem.) at 4-5.

[21]     *Id.* at 4.

[22]     Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

[23]     *Kinsey v. New York Times Co.*, 991 F.3d 171, 178 (2d Cir. 2021) (alteration in original) (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 216 (N.D.N.Y. 2014)).

[the publication] was reporting on a judicial proceeding, the absolute privilege does not apply.'"[24] As another court in this Circuit explained:

> "An overlap between the subject matter of the report and the subject matter of a proceeding does not suffice; the ordinary viewer or reader must be able to determine from the publication itself that the publication is reporting on the proceeding. . . . Thus, there must be some perceptible connection between the challenged report and the[] proceeding. . . . How 'direct' this connection must be has not been clearly defined. . . . And, in light of the broad construction of § 74, . . . reports that bear a more attenuated relationship to a proceeding have been deemed sufficiently connected. [(citing cases)]

> "However, a report's mere mention of [a judicial] proceeding does not automatically extend the privilege to an entire publication; the privilege may apply to some portions of a report and not others. . . . If context indicates that a challenged portion of a publication focuses exclusively on underlying events, rather than [a judicial] proceeding relating to those events, that portion is insufficiently connected to the proceeding to constitute a report of that proceeding.. . . Furthermore, [t]he privilege does not extend to commentary on the proceeding or to additional facts not established in the proceedings."[25]

Nothing about the content or context of Mr. Trump's statement made it a "report" of

---

[24] *Id.* (alterations in original) (quoting *Cholowsky*, 69 A.D.3d at 114-15).

[25] *Fine*, 11 F. Supp. at 216-18 (internal quotation marks and citations omitted).

16

a judicial proceeding. The statement as a whole "does not even purport to be a report of [a judicial proceeding]."[26]  Instead, it is an amalgamation of Mr. Trump's personal views and comments on a wide range of subjects, including the legal system of the United States and of New York, this Court, Ms. Carroll and her rape accusation against him, CNN and its journalist Anderson Cooper, and Ms. Carroll's counsel. "[T]he way [it] is stylized . . . belies the notion that [Mr. Trump] was even attempting to provide a fair and true report of a judicial proceeding."[27]

As noted, the entire statement contains only two references to any judicial proceeding: (1) a statement that "[t]his 'Ms. Bergdorf Goodman' case is a complete con job", and (2) the reference to a decision of this Court, without specifying which decision or stating anything more about it other than that it came "from the Judge who was just overturned on my same case."[28]  When viewed in the context of the statement as a whole, these two references do not qualify his statement as a report of either *Carroll I* or of this Court's (unidentified) decision. The rest of the statement (1) expresses Mr. Trump's views on the legal system in the United States and in New York, (2) contains

---

[26]

    *Corp. Training Unlimited, Inc. v. Nat'l Broad. Co.*, 868 F. Supp. 501, 508-09 (E.D.N.Y. 1994).

[27]

    *Id* at 509.

[28]

    Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

    Based on the date of Mr. Trump's statement, his reference to "[t]his decision" ("*This decision* is from the Judge who was just overturned on my same case." *Id.* (emphasis added)) possibly refers to this Court's decision issued earlier that day in which the Court denied for the second time Mr. Trump's motion to substitute the United States for him as the defendant in *Carroll I* and denied his motion to stay the action. *Carroll I*, Dkt 96; *Carroll*, 2022 WL 6897075 at *7.  The reference to being "overturned on my same case" likely refers to the Second Circuit's reversal in September 2022 of this Court's decision on whether Mr. Trump was an "employee" of the United States within the meaning of the Westfall Act. *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022).

17

statements about Ms. Carroll and the substance of her rape accusation, including, *inter alia*, that "[s]he completely made up a story that [he] met her at the doors of this crowded New York City [d]epartment [s]tore" and that "[i]f you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam", and (3) makes accusations against Ms. Carroll's counsel.[29]  The passing references in Mr. Trump's statement to *Carroll I* and an unidentified decision of this Court would not give an ordinary reader the impression that the statement is a report of a judicial proceeding.[30]

      Mr. Trump nonetheless contends that these two references suffice to demonstrate that he "was clearly speaking of the *Carroll I* case when he made the October 12, 2022 [s]tatement."[31] He overlooks, however, that his comments about Ms. Carroll, the allegedly defamatory portions of his statement, "focus[] exclusively on underlying events" – namely, the substance of Ms. Carroll's rape accusation – "rather than a[] [judicial] proceeding relating to those events."[32]  It is unclear, for

---

[29]

    *Id.*

[30]

    *Corp. Training Unlimited, Inc.*, 868 F. Supp. at 509 (determining that the Section 74 privilege did not apply to a televised report broadcast where "the references to the . . . court proceedings occur mostly in passing and only towards the end of the [b]roadcast").

[31]

    Dkt 67 (Def. Mem.) at 15.

[32]

    *Fine*, 11 F. Supp. 3d at 217; *see also Easton v. Pub. Citizens, Inc.*, No. 91-cv-1639 (JSM), 1991 WL 280688, at *7 (S.D.N.Y. Dec. 26, 1991), *aff'd sub nom.*, 969 F.2d 1043 (2d Cir. 1992) ("This part of the sentence [(in the report)] indicates the conclusion to be drawn based on the facts presented in the case studies. Because it is clearly the author's analysis and commentary it is not protected by Section 74."); *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360, 363 (S.D.N.Y. 1986) ("[Defendant's] one word assessment of the Second Circuit's opinion does not publish that opinion, or otherwise expose the public to the workings of the judicial system. Rather, it conclusionally evaluates the circuit court's opinion. The Civil Rights Law does not protect such bald-faced commentary about the judicial branch and the proceedings therein.").

18

example, whether his statement that Ms. Carroll "completely made up a story that [he] met her" at a New York department store "and, within minutes, 'swooned' her," refers to Ms. Carroll's allegations in her complaint in *Carroll I*, or to a source separate from any judicial proceeding.[33] The disconnect between the references to *Carroll I* and his allegedly defamatory statements about Ms. Carroll make it impossible for an ordinary reader "to determine from the publication itself that the publication is reporting on the proceeding."[34]

*Summary Judgment Would be Inappropriate Even if Mr. Trump's Statement Were a Report of a Judicial Proceeding*

Even if Mr. Trump's statement were a report of a judicial proceeding within the meaning of Section 74, Mr. Trump has failed to establish as a matter of law that his statement is a "fair and true" report of a judicial proceeding.

"A report may be considered 'fair and true' under Section 74 if its substance is substantially accurate. . . . A report cannot be said to be 'substantially accurate,' however, if it would have a 'different effect' on the mind of the recipient than the 'actual truth.' In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[ ] more serious conduct than

---

[33]

      *See Corp. Training Unlimited, Inc.*, 868 F. Supp. at 510 n.6 ("So long as the format of a program makes it impossible for the ordinary viewer to determine whether defendant was reporting on a trial or simply from interviews and independent research, the absolute statutory privilege does not attach.").

[34]

      *Fine*, 11 F. Supp. 3d at 216.

19

that actually suggested in the official proceeding.'"[35]

"When a report of a pleading is the subject of a request for immunity under section 74, a comparison of the pleading and the subsequent report of that pleading is the starting point for the analysis."[36]  Mr. Trump argues that his statement is a "fair and true" report because "all that he was doing [in his statement] was summarizing and/or restating his allegations (*i.e.*, his denials and affirmative defenses) asserted in his [a]nswer filed in *Carroll I*."[37]  A comparison of his comments about Ms. Carroll in his October 12 statement and his assertions in his answer in *Carroll I,* however, reveals that "a reasonable jury could find that [his October 12] statement had a different effect on [a] reader than [Mr. Trump's answer filed in *Carroll I*]"[38] and/or that his statement "go[es] well beyond anything reasonably suggested by [his answer]."[39]

Mr. Trump's answer consists of summary denials of Ms. Carroll's allegations and an affirmative defense that his allegedly defamatory statements issued in June 2019 are true. His comments about Ms. Carroll in his October 12 statement, by contrast, state much more than that he denies Ms. Carroll's allegations. For instance, Mr. Trump in his *Carroll I* answer "[d]enies the

---

[35]

> *Calvin Klein Trademark Tr. v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001) (alteration in original) (quoting *Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 436 (1st Dept.1995)) (citing *Holy Spirit Assn. v. New York Times Co.*, 49 N.Y.2d 63, 67 (1979); *Wenz v. Becker*, 948 F.Supp. 319, 324 (S.D.N.Y.1996)).

[36]

> *Karp*, 631 F. Supp. at 363.

[37]

> Dkt 67 (Def. Mem.) at 15-16.

[38]

> *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 177–78 (E.D.N.Y. 2006).

[39]

> *Calvin Klein Trademark Tr.*, 129 F. Supp. at 253.

allegation" that he "had recognized Carroll on sight at [a New York department store]."[40]  In his

October 12 statement, he does not just deny recognizing or knowing Ms. Carroll.  Instead, he states:

> "I don't know this woman, have no idea who she is, other than it seems she got a
>
> picture of me many years ago, with her husband, shaking my hand on a reception line
>
> at a celebrity charity event. She completely made up a story that I met her at the doors
>
> of this crowded New York City Department Store and, within minutes, 'swooned'
>
> her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me
>
> for the past seven years. . . . She has no idea what day, what week, what month, what
>
> year, or what decade this so-called 'event' supposedly took place. The reason she
>
> doesn't know is because it never happened, and she doesn't want to get caught up
>
> with details or facts that can be proven wrong."[41]

As another example, Mr. Trump in his *Carroll I* answer "[d]enies the allegation" that

"[i]n [his] June 21[, 2019] statement, [he] falsely implied and affirmatively intended to imply that

Carroll had invented the rape accusation as a ploy for increased book sales."[42]  In his October 12

statement, he does not simply deny the allegation that he falsely implied that Ms. Carroll invented

---

[40]      *Carroll I*, Dkt 14-69 (Def. Answer), 2 ¶ 13.  *See also* Dkt 67 (Def. Mem.) at 16 (citing Mr. Trump's other denials in his answer of Ms. Carroll's allegations that he recognized and/or knew Ms. Carroll and/or that he falsely stated in his June 2019 statements that he had no idea who Ms. Carroll was).

[41]      Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

[42]      *Carroll I*, Dkt 14-69 (Def. Answer), 6 ¶ 88. *See also* Dkt 67 (Def. Mem.) at 16 (citing Mr. Trump's other denials in his answer of Ms. Carroll's allegations related to Mr. Trump's allegedly defamatory June 2019 statements that Ms. Carroll fabricated the rape accusation to increase her book sales).

the accusation to increase her book sales. Nor does he merely repeat or summarize his affirmative

defense that his statement in June 2019 that Ms. Carroll "is trying to sell a new book" is true.[43]

Instead, he states that "[i]f you watch Anderson Cooper's interview with [Ms. Carroll], where she

was promoting a really crummy book, you will see that it is a complete Scam. She changed her story

from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper."[44]

      The contrasts between Mr. Trump's assertions in his *Carroll I* answer and his October

12 statement show that a reasonable juror could find that his statement had a different effect on a

reader than his denials and affirmative defense in his answer. For one, "a reasonable juror could find

that [Mr.] Trump was complaining of a far broader and more corrosive conspiracy than anything that

---

[43]     *Carroll I*, Dkt 6-1 (Cpt.) at 15, ¶ 82.

[44]     Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

    Mr. Trump contends that his reference to Ms. Carroll's interview with Anderson Cooper in his October 12 statement does not prohibit the application of the § 74 privilege because (1) Ms. Carroll does not allege this statement to be defamatory as she "does not attribute any falsity to Trump's reference to this interview", and (2) "the Anderson Cooper interview was inextricably intertwined with the *Carroll I* [c]omplaint" and therefore "at the very least, was a description of background material regarding his positions taken in *Carroll I*." Dkt 67 (Def. Mem.) at 8, 16. *See also Riel v. Morgan Stanley*, No. 06-cv-524 (TPG), 2007 WL 541955, at *10 (S.D.N.Y. Feb. 16, 2007), *aff'd sub nom.*, 299 F. App'x 91 (2d Cir. 2008) ("The protections of section 74 extend to pleadings, transcripts, live proceedings and the release by the parties of background material regarding their positions in the case."). The Court need not and does not now address this argument in light of its determination that summary judgment is inappropriate regardless of the reference to the Anderson Cooper interview. It bears mention, however, that the allegedly defamatory aspect of Mr. Trump's reference to that interview comes not from the reference to the interview itself, but from his statement that Ms. Carroll "changed her story from beginning to end" during the interview where she was promoting her book. Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2); *see also* Dkt 38 (Motion to Dismiss Op.) at 25, *Carroll*, 2023 WL 185507, at *11 ("Drawing all reasonable inferences in favor of plaintiff, the October 12 statement on the whole can be construed as Ms. Carroll falsely accusing Mr. Trump of rape in order to promote her book and increase its sales.").

was at issue in *Carroll I* in October 2022,"[45] including based on his statements that Ms. Carroll "completely made up a story" that is a "Hoax" and "changed her story from beginning to end [(in an interview where she was promoting her book)]. . . to suit the purposes of CNN and And[erson] Cooper," along with his comments about the judiciary and Ms. Carroll's counsel.[46]

       The Court need not and does not now decide the ultimate issue of whether Mr. Trump's statement is or is not a "fair and true" report of a judicial proceeding as a matter of law. It suffices for the purpose of denying summary judgment that a reasonable jury could find so as a matter of fact.[47]

### *Conclusion*

       For the foregoing reasons, Mr. Trump's motion for partial summary judgment (Dkt 66) is denied.

       SO ORDERED.

Dated:      March 28, 2023

                                Lewis A. Kaplan
                        United States District Judge

---

[45]      Dkt 79 (Pl. Mem.) at 16.

[46]      Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

[47]      *Pisani*, 440 F. Supp. 2d at 178 ("[B]ecause the Court finds that a reasonable jury could decide that the Hospital statement was not a fair and true report, the Court cannot conclude that, as a matter of law, the Hospital statement is protected by the judicial proceeding privilege."); *Calvin Klein Trademark Tr.*, 129 F. Supp. 2d at 253 ("The Court therefore finds that Section 74 immunity is, at best, a jury question and cannot support summary judgment in plaintiffs' favor.").

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                       Plaintiff,

            -against-                                   22-cv-10016 (LAK)

DONALD J. TRUMP,

                       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM AND ORDER DENYING JOINT REQUEST FOR
THE PARTIES' "LEGAL TEAMS" TO HAVE ACCESS TO JUROR NAMES**

LEWIS A. KAPLAN, *District Judge*.

This Court recently found, without objection by either party, as follows:

"If jurors' identities [in this case] were disclosed, there would be a strong

likelihood of unwanted media attention to the jurors, influence attempts, and/or

harassment or worse of jurors by supporters of Mr. Trump. Indeed, Mr. Trump

himself has made critical statements on social media regarding the grand jury

foreperson in Atlanta, Georgia, and the jury foreperson in the Roger Stone criminal

case. And this properly may be viewed in the context of Mr. Trump's many

statements regarding individual judges, the judiciary in general, and other public

officials, as well as what reports have characterized as 'violent rhetoric' by Mr.

Trump including before his presidency."[1]

The likelihood of such difficulties since the Court made those findings only has increased.  That is so in view of Mr. Trump's public statements, characterized by the media as attacks against the New York State judge presiding over the recently filed New York State criminal case against Mr. Trump and the threats reportedly then made, presumably by Mr. Trump's supporters, against that judge and members of his family.[2]  Nevertheless, despite never having objected to the use of a fully anonymous jury despite ample opportunity to do so, both parties now seek to raise that subject for the first time.  They move to modify the Court's order to "allow each party's legal team," whatever exactly that means, to "access . . . the names of the prospective jurors, subject of course to a court order prohibiting the disclosure of those names to anyone else."[3]  The motion is denied.

---

[1]

Dkt. 94, at 7-8; *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2612260, at *4 (S.D.N.Y. Mar. 23, 2023).

[2]

*E.g.,* Ewan Palmer, *Trump Accused of Threatening Judge Hours After 'Incite Violence' Warning*, NEWSWEEK, Apr. 5, 2023, https://www.newsweek.com/trump-threaten-judge-incite-violence-1792620; Isaac Stanley-Becker and Jacqueline Alemany, *Judge asks Trump not to incite violence amid volley of online attacks*, THE WASHINGTON POST, updated Apr. 4, 2023, https://www.washingtonpost.com/national-security/2023/04/04/trump-judge-threats-violence/; Olivia Land, *Trump Jr. shares article with photo of judge's daughter — who allegedly worked on Biden campaign*, NEW YORK POST, Apr. 5, 2023, https://nypost.com/2023/04/05/donald-trump-jr-shares-photo-of-judges-daughter-online/; Josh Marcus, *Judge warns Trump about social media posts as legal team defends baseball bat picture*, THE INDEPENDENT, Apr. 4, 2023, https://www.independent.co.uk/news/world/americas/us-politics/trump-twitter-truth-social-indictment-court-b2314200.html; Rebecca Rosenberg, *New York Judge Presiding Over Donald Trump Criminal Case Gets Death Threats*, FOX NEWS, Apr. 6, 2023, https://www.foxnews.com/us/new-york-judge-presiding-donald-trump-criminal-case-death-threats; Jonathan Dienst, Rebecca Shabad, Ben Kamisar and Laura Jarrett, *Trump judge and his family receive threats after New York arrest*, NBC NEWS, updated Apr. 5, 2023, https://www.nbcnews.com/politics/donald-trump/judge-merchan-family-receive-threats-trumps-arrest-rcna78401.

[3]

Dkt 103, at 1.

First, the parties had ample opportunity to seek access for their "legal teams" to the names of prospective jurors when the Court on March 11, 2023 directed that any objections to the use of an anonymous jury in this case be filed by March 17, 2023.[4] They filed no objections. The present request therefore is untimely, and that alone is a sufficient basis for its denial. But there are alternative grounds as well.

Even if the request were timely, which it is not, it would be unpersuasive because it would ignore the most important reason for a fully anonymous jury in this particular – and unique – case.

The overriding goal is the selection of fair and impartial jurors who can perform their duties free of unwanted media attention, free of inappropriate influence attempts, and free of any fear of harassment or retaliation, regardless of the outcome of the case. In light of that preeminent goal, I cannot in good conscience grant the request that these parties' "legal teams" – or even their attorneys of record only – should have the names of the otherwise anonymous jurors.

In so stating, I do not wish to be misunderstood. I have great respect for the Bar generally. I do not imply that any of those who would be granted access to jurors' names under the parties' proposal would betray the trust reposed in them. But I cannot ignore the fact that the public – of which the jurors ideally will be a broad cross-section – does not have the same confidence. There are empirical studies indicating that the public in general does not have a high regard for the trustworthiness of lawyers.[5] And it is not speculation to conclude, as I do, that at least some

---

[4] Dkt 84.

[5] *E.g., Can You Trust a Lawyer?*, RASMUSSEN REPORTS, Aug. 17, 2022, https://www.rasmussenreports.com/public_content/business/general_business/can_you_tr

4

members of the jury in this case, if told that their identities would be confidential from everyone except the lawyers for (let alone "legal teams" of) these parties, likely would not feel confidence that their identities would remain known only to the lawyers or legal teams.

Second, providing prospective jurors' names to counsel would not materially aid, and might even hinder, the empaneling of a fair and impartial jury. The Court will conduct a thorough *voir dire* to uncover prospective jurors' potential biases. The parties already have suggested areas of inquiry for the Court's *voir dire*,[6] and will have a further opportunity to suggest additional questions should the Court's questioning seem to them inadequate. Yet they have failed to explain the usefulness, if any, of access to prospective jurors' names despite the careful and searching *voir dire* examination to which the venire will be subject.[7]

---

ust_a_lawyer; Debra Cassens Weiss, *How are lawyers viewed by the public? Envy may account for glee in attorney mishaps, study says*, ABA JOURNAL, Sep. 25, 2014, https://www.abajournal.com/news/article/how_are_lawyers_viewed_by_the_public_envy _may_account_for_glee_in_attorney; Leo J. Shapiro & Associates, *Public Perceptions of Lawyers Consumer Research Findings*, AMERICAN BAR ASSOCIATION SECTION OF LITIGATION, Apr. 2002, https://www.americanbar.org/content/dam/aba/administrative/mar ket_research/public_perception_of_lawyers_2002.pdf.

[6] Dkt 97 (Def. Proposed Voir Dire Questions); 99-3 (Pl. Proposed Voir Dire Questions).

[7] *E.g.*, *United States v. Prado*, No. 10-cr-74 (JFB), 2011 WL 3472509, at *10 (E.D.N.Y. Aug. 5, 2011) ("[Defendant] also objects to the use of an anonymous jury on the ground that it will prevent him from meaningfully exercising his peremptory challenges during jury selection. In particular, [defendant] contends that '[i]n light of counsel's access to the internet and its many tools of investigation and research, not having the name or address of the prospective jurors is a distinct disadvantage to counsel in analyzing the jurors' suitability for a case of this nature.' . . .The Court, however, finds this argument to be without merit and, instead, finds that the defendants' right to a fair and impartial jury will be sufficiently protected by a careful and searching *voir dire*, which will be designed to uncover bias and consequently will allow defendants to meaningfully exercise their challenges."); *United States v. Griffin*, No. 94-cr-631 (S-6) (AGS), 1996 WL 140073, at *2 (S.D.N.Y. Mar. 27, 1996) ("Courts have long held that a thorough voir dire examination of potential jurors is a sufficient device to eliminate from jury service both (1) those so affected by exposure to pre-trial publicity and (2) those with some knowledge of the facts and circumstances of the case that they cannot

5

Third, counsel on both sides seem to be laboring under the misunderstanding that they would have a list of prospective jurors for this case – and could investigate the prospective jurors and/or speculate as to their ethnic backgrounds, religions, and various other appropriate and inappropriate subjects – but for the anonymous jury order. But they are mistaken. With unusual exceptions,[8] counsel in jury cases in this district first hear the names of prospective jurors when the deputy clerk calls out the name of a prospective juror and invites that person to take a seat for *voir dire* examination. In other words, the availability of prospective juror names in ordinary cases and the final selection of trial jurors typically occur in a single proceeding that includes the *voir dire*. That would be no different in this case save that the lawyers will hear only a juror number rather than a name. In any case, I see no benefit to the proposed disclosure of juror names, and certainly none that would outweigh the benefit to be achieved by a fully anonymous jury, the members of which could be confident that their identities would remain confidential.

Finally, for the sake of completeness, the Court appreciates the fact that learned counsel have brought to its attention a few cases in which other courts have allowed lawyer access

---

fairly decide issues of guilt or innocence.") (citing cases).

[8]

These have occurred especially where a non-anonymous jury has been selected and a questionnaire has been employed in doing so. The Court finds a jury questionnaire unnecessary in this case, and will not employ one. The Second Circuit has "expressly declined to 'hold that district judges are ever obligated to make use of this procedure in selecting juries.'" *United States v. Treacy*, 639 F.3d 32, 46 (2d Cir. 2011) (quoting *United States v. Quinones*, 511 F.3d 289, 300 n.8 (2d Cir. 2007)). *See also United States v. Salameh*, 152 F.3d 88, 121 (2d Cir. 1998) (holding that the district court did not abuse its discretion in declining to use jury questionnaire); *United States v. Tomero*, 486 F. Supp. 2d 320, 325 (S.D.N.Y. 2007) (denying request to use a jury questionnaire as unnecessary in case involving an anonymous jury).

to juror names in otherwise anonymized cases,[9] and it is aware also of other cases in which courts have not done so.[10]  I have alluded already to the broad discretion reposed in the trial court on subjects such as this. Suffice it to say that the Court is confident that the denial of the parties' joint application lies comfortably within the scope of that discretion.

*Conclusion*

For the foregoing reasons, the parties' request that each party's "legal team" be granted access to the names of prospective jurors (Dkt 103) is denied.

SO ORDERED.

Dated:        April 10, 2023

Lewis A. Kaplan
United States District Judge

---

[9]     Dkt 103 at 1 (citing cases).

[10]     *E.g.*, *United States v. Al Fawwaz*, 57 F. Supp. 3d 307, 311 (S.D.N.Y. 2014); *United States v. Mayes*, No. 12-cr-385 (ARR), 2013 WL 6175824, at *6 (E.D.N.Y. Nov. 25, 2013); *United States v. Price*, No. 05-cr-492 (S-3)(NGG), 2008 WL 4682408, at *5 (E.D.N.Y. Oct. 21, 2008); *Tomero*, 486 F. Supp. at 325; *United States v. Scala*, 405 F. Supp. 2d 450, 454 (S.D.N.Y. 2005); *United States v. Gotti*, No. 02-cr-743 (S-8) (RCC), 2004 WL 2274712, at *6 (S.D.N.Y. Oct. 7, 2004); *United States v. Bellomo*, 954 F. Supp. 630, 655-56 (S.D.N.Y. 1997).



**MEMO ENDORSED**

HABBA MADAIO
& Associates LLP

Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

April 13, 2023

**VIA ECF**
The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007



Re:     *E. Jean Carroll v. Donald J. Trump*
        *1:22-cv-10016 (LAK)*

Dear Judge Kaplan:

    We write on behalf of the defendant, Donald J. Trump ("Defendant"), with respect to the recent, belated disclosure of material information by the plaintiff, E. Jean Carroll ("Plaintiff"), which raises significant concerns as to Plaintiff's bias and motive in commencing the instant lawsuit, and necessitates that discovery be re-opened for the limited purpose of addressing this issue.

    For background, on October 14, 2022, Plaintiff sat for her deposition in the parallel proceeding of *Carroll v. Trump*, No. 1:20-cv-7311 (LAK) ("*Carroll I*").[1] At that time, she was asked about a pertinent issue that looms large over this case – whether her legal fees are being funded by a third-party benefactor, particularly one with political ties. She answered, unequivocally, in the negative:

> Q: Are you presently paying your counsel's fees?
>
> A: This is a contingency case.
>
> Q: So you're not paying expenses or anything out of pocket to date;
> is that correct?
>
> A: I'm not sure about expenses. I have to look that up.
>
> Q. Is anyone else paying your legal fees, Ms. Carroll?
>
> A: No.

*See* **Exhibit A** at tr. 209:11-21.

---

[1] Pursuant to the Court's Order dated December 21, 2022 (ECF No. 19), Plaintiff's October 14, 2022 deposition has, for all intents and purposes, been incorporated into the instant action and serves as the operative deposition with respect to all substantive issues aside from a particular subset of Plaintiff's damages claim.

1430 U.S. Highway 206, Suite 240, Bedminster, NJ 07921 • Tel. 908.869.1188

Memorandum Endorsement                                    Carroll v. Trump, 22-cr-10016 (LAK)

On April 10, 2023, plaintiff's counsel disclosed to the defendant that plaintiff -- who had testified at her deposition on October 14, 2022 that (a) no one else was paying her legal fees as "[t]his is a contingency fee case," and that (b) she was "not sure about expenses" (Dkt 108-1, Dep. Tr., at 209: 11-21) -- "now [i.e., Apr. 10, 2023] recall[ed]" that at some point her counsel secured additional funding from a nonprofit organization to offset certain expenses and legal fees." Dkt 108-2 at 1. Plaintiff's counsel now advises that this assistance was secured in September 2020, well after the commencement of the first to the two closely related actions of which this is the later.

In subsequent discussions between the parties' respective counsel, plaintiff disclosed the identity of the financial backer, said to be a prominent funder of Democratic causes, and of the not-for-profit entity through which he apparently provided such funding. Plaintiff's counsel further represented that plaintiff "has never met and has never been party to any communications (written or oral) with anyone associated with the nonprofit." Dkt 108-3 at 1. On this basis, defendant moves for "(i) a limited re-opening of the discovery period restricted to investigation into the narrow source of funding issue, and (ii) a one-month continuance of the trial date . . . ; or (iii) in the alternative, that the Court permit an adverse inference instruction against Plaintiff with respect to her willful defiance of her discovery obligations." Dkt 108 at 4.

The question whether and when plaintiff or her counsel have obtained financial support in this action has nothing directly to do with the ultimate merits of the case. *See, e.g., Benitez v. Lopez*, No. 7-CV-3827-SJ-SJB, 2019 WL 1578167, at *1-*2 (E.D.N.Y. Mar. 14, 2019). Although I do not now decide the question, it perhaps might prove relevant to the question of plaintiff's credibility, in view of the deposition testimony referred to above. Accordingly, I will permit a brief and carefully circumscribed examination of that narrow question without prejudging the question of whether and to what extent examination on this matter may be permitted at trial. Accordingly, defendant's application is granted, but only to the extent that (1) plaintiff shall furnish the defendant, no later than April 16, 2023, with documents sufficient to establish that the inception of the financing assistance for the Carroll litigation in fact occurred in or after mid-2020, (b) any documents concerning the state of plaintiff's knowledge, if any, of the financing assistance as of the date of her deposition and as of the present, and (2) defendant may conduct an additional deposition of Ms. Carroll not to exceed 60 minutes in duration, unless otherwise ordered by the Court, which shall be (1) limited to the subject of Ms. Carroll's knowledge of the financing assistance as of the date of her deposition and as of the present, and (2) completed no later than April 19, 2023. The motion is denied in all other respects save that the Court reserves for determination at trial the matter of any requested adverse inference instruction. Trial shall begin as scheduled on April 25, 2023 unless otherwise ordered.

SO ORDERED.

Dated:        April 13, 2023

                                                   _____
                                                         Lewis A. Kaplan
                                                   United States District Judge

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

April 14, 2023

**MEMO ENDORSED**

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-14-2023

Re:     *E. Jean Carroll v. Donald J. Trump*, 22-cv-10016 (LAK)

Dear Judge Kaplan,

President Donald J. Trump, by and through his undersigned counsel, respectfully submits this Letter Motion requesting that the Court (1) conduct jury selection using the procedures outlined herein, including the use of a written juror questionnaire;[1] and (2) reconsider and modify its April 10, 2023 ruling, such that the attorneys for the parties are permitted access to the names of prospective jurors.[2]  As set out more fully below, the relief sought by this Motion is necessary in light of the exceptional circumstances of this case and will increase the chance that President Trump receives a fair trial.

---

[1] Counsel for President Trump has submitted a proposed questionnaire at ECF No. 98, which is attached hereto as **Exhibit A**.

[2] Counsel is aware that the Court has noted any objections to the use of anonymous jury be filed by March 17, 2023, counsel filed "no objections" by that date, and has held that the joint letter (which was filed April 7, 2023) requesting modification of this Court's order on an anonymous jury dated March 23, 2023 was "untimely." ECF No. 105 at 3.  However, the unsealing of President Trump's indictment, and subsequent media frenzy that was unleashed, occurred well after the Court's initial March 17 deadline.  Moreover, that March 17, 2023 deadline did not specifically address the use of a jury questionnaire or the protocol proposed here, and President Trump has not filed briefing on that issue until this present letter brief.

Memorandum Endorsement                    Carroll v. Trump, 22-cv-10016 (LAK)

        Mr. Trump's motion to employ a written juror questionnaire in selecting the jury in this case is denied. The Court makes only these points as matters of emphasis:

        1.    This motion has been made without regard to the fact that the Court on April 10, 2023 stated that it would not use a jury questionnaire in this case. Dkt 105, at 5 n.8.

        2.    As the Court made clear in the April 10, 2023 decision, the law in this circuit is abundantly clear that the use of written jury questionnaires is entirely optional with the trial judge. What is required is that an appropriate *voir dire* by whatever means be used. That will be done.

        3.    This motion proposes the use of a juror questionnaire that – notwithstanding the Court's ruling that an anonymous jury will be employed – seeks to require prospective jurors to give their names, their employment, and the employment of all of their immediate family members. The Court denied the parties' request for their legal teams to access the jurors' names in its April 10, 2023 decision. Nothing between then and now has occurred to warrant revisiting that ruling.

        SO ORDERED.

Dated:    April 14, 2023

                                  Lewis A. Kaplan
                              United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                          Plaintiff,


              -against-                                          22-cv-10016 (LAK)


DONALD J. TRUMP,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM AND ORDER DENYING
## DEFENDANT'S REQUEST TO ADJOURN TRIAL


LEWIS A. KAPLAN, *District Judge.*

      Mr. Trump seeks a month-long postponement of the April 25, 2023 trial.[1]  He does so

on the theory that such a "cooling off" period following the media coverage of Mr. Trump's indictment

on New York State charges of falsification of business records is essential in order to select a fair and

impartial jury in this civil case for alleged rape and libel.

      There is no justification for an adjournment. This case is entirely unrelated to the state

prosecution. The suggestion that the recent media coverage of the New York indictment – coverage

significantly (though certainly not entirely) invited or provoked by Mr. Trump's own actions – would

preclude selection of a fair and impartial jury on April 25 is pure speculation.  So too is his suggestion

---

[1]      Mr. Trump requested in early February 2023 "an extension of all deadlines [in this case] by 6 weeks, including the commencement of trial." Dkt 48 at 4.  The Court denied that request, but moved the trial date from April 17, 2023 to April 25, 2023 as a personal accommodation to Mr. Trump's then newly engaged trial counsel. Dkt 54, Tr., Feb. 7, 2023, at 19. On April 13, 2023, it denied another recent motion for a month-long postponement.  Dkt 108, Dkt 110.

that a month's delay of the start of this trial would "cool off" anything, even if any "cooling off" were necessary. And "it is quite important to remember [also] that postponements in circumstances such as this are not necessarily unmixed blessings from the standpoint of a defendant who is hoping for the dissipation of what he regards, or says he regards, as negative publicity. Events happen during postponements. Sometimes they can make matters worse."[2]

*Legal Standard*

The decision whether or not to adjourn a trial date is entrusted to the discretion of the trial court.[3] The "[Second Circuit's] precedent instructs [the court] to be 'particularly solicitous of a

---

[2]

*United States v. Al Fawwaz*, No. S10 98-1023 LAK, 2015 WL 400621, at *6 (S.D.N.Y. Jan. 23, 2015).

Mr. Trump faces a number of criminal and civil investigations and litigation including (1) the United States Department of Justice special counsel's investigations of matters relating to the possible mishandling of classified documents as well as matters relating to the 2020 presidential election and the events of January 6, 2021, (2) a criminal investigation by the district attorney of Fulton County, Georgia, and (3) the New York Attorney General's civil lawsuit against Mr. Trump, his family, and the Trump Organization for alleged financial wrongdoing. *See* Laura Italiano and Jacob Shamsian, *Donald Trump's docket: All the legal cases and investigations Trump faces including felony charges in New York*, Apr. 4, 2023, BUSINESS INSIDER, https://www.businessinsider.com/donald-trump-key-cases-civil-criminal -investigations-lawsuits-updates-2022-7. Developments in at least one of these matters, as well as actions and statements by Mr. Trump in relation to any, may well give rise to intense publicity that, in some respects, Mr. Trump might claim to be prejudicial in this case. Mr. Trump's suggestion that a one-month trial postponement in this case would ensure the absence of any such developments in the period immediately preceding jury selection is not realistic.

[3]

*E.g.*, *United States v. Cusack*, 229 F.3d 344, 349 (2d Cir. 2000) ("A district court has broad discretion to grant or deny a motion for a continuance."); *Sanusi v. Gonzales*, 445 F.3d 193, 199 (2d Cir. 2006) ("The largely unfettered discretion of a district judge to deny or to grant a continuance is evidenced in our deferential review of challenges to such decisions."); *United States v. Al Fawwaz*, 116 F. Supp. 3d 194, 209 (S.D.N.Y. 2015) ("Whether a continuance is appropriate is a case-specific determination entrusted to the discretion of the trial court.").

district court's ruling on a motion to adjourn the scheduled start of a trial proceeding.' . . . [The court] will not disturb such a ruling absent a showing of 'clear abuse.' . . . '[T]o make that showing, the complaining party must establish both that the denial of the adjournment was arbitrary, and that it substantially impaired the presentation of his case.'"[4]  As the Second Circuit explained:

> "Trial courts 'necessarily require a great deal of latitude in scheduling trials' because trials are difficult to administer from a logistical and organizational standpoint. *Morris v. Slappy*, 461 U.S. 1, 11 . . . (1983). 'Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time. . . .' *Id.* The Supreme Court has recognized that the existence of all these complexities 'counsels against continuances except for compelling reasons.'  *Id.* Because continuances can be highly disruptive to the courts and the parties, especially when granted close to the start of trial, *see, e.g.*, *United States v. Rivera*, 900 F.2d 1462, 1475 (10th Cir.1990) ('[A]ny continuance granted practically on the eve of trial inevitably will disrupt the schedules of the court, the opposing party, and the witnesses who have been subpoenaed or who have voluntarily arranged their schedules to attend the trial. When, as here, a jury trial is involved, there is additional potential inconvenience to jurors and to the court.'); *cf. Moffitt v. Ill. State Bd. of Educ.*, 236 F.3d 868, 873 (7th Cir.2001) (' . . . [T]rial dates—particularly civil trial dates—are an increasingly precious commodity in our nation's courts.'), trial courts are entrusted with broad discretion to decide whether the stated purpose of a continuance warrants the

---

[4]

*Lewis v. Rawson*, 564 F.3d 569, 577 (2d Cir. 2009) (fourth alteration in original) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 147-48 (2d Cir.1998)).

disruption and delay of granting one, *see Slappy*, 461 U.S. at 12 . . . ."[5]

In determining whether a continuance is warranted, courts also have taken into account whether there

is a "reasonable concern that the request [for an adjournment] [is] a delay tactic."[6]

*Recent Media Coverage of Mr. Trump's New York State Criminal Case*

The essence of Mr. Trump's argument for a postponement is simple enough. His recent

indictment and arraignment in New York on charges of falsification of business records was attended

by a wave of media coverage. That "coverage," according to Mr. Trump, "pertain[ed] to alleged

sexual misconduct, [(which, Mr. Trump argues, is)] the same issue at the heart of this litigation."[7] This

trial, he says, therefore must be postponed to allow that coverage to cool down and hence to permit

selection of a fair and impartial jury in this case. Although there was a great deal of media coverage

of the expected New York charges and then of the indictment and of Mr. Trump's arraignment, Mr.

Trump's argument breaks down at every subsequent step.

First, the premise that the "heart[s] of this litigation" and of New York indictment (as

well as media coverage of the latter) are the same is just wrong. The "heart of this litigation" is

whether Mr. Trump did or did not rape or sexually assault Ms. Carroll in a dressing room at a New

York department store. The apparent "heart" of the New York State indictment is whether Mr. Trump

---

[5]

*Payne v. Jones*, 711 F.3d 85, 92–93 (2d Cir. 2013). *See also Al Fawwaz*, 116 F. Supp. 3d at 209-11 (discussion of Supreme Court and Second Circuit precedents on standard governing requests to adjourn trial).

[6]

*United States v. Liounis*, 639 F. App'x 731, 733 (2d Cir. 2016) (citing *United States v. Pascarella*, 84 F.3d 61, 68–69 (2d Cir.1996)).

[7]

Dkt 106 at 2.

falsified business records to cover up an alleged payment of "hush money" to "Woman 2" (presumably an adult movie performer, Stormy Daniels), to induce Woman 2 to keep quiet about an apparently consensual and adulterous sexual relationship she claims to have had with Mr. Trump and that Mr. Trump denies. To be sure, at a certain level of generality, both cases do indeed have something to do with "sex." But the "something" that each has to do with it is dramatically different.

In the New York State case, the sex (if there was any) was between consenting adults. Its significance to the New York indictment, to whatever extent it has any, is only that a desire to conceal the consensual relationship allegedly was a motive for the alleged hush money payment and the alleged falsification of the business records. In this case, on the other hand, the sex (if there was any) was rape. And while both adultery and rape are offenses in New York, they are offenses that the Legislature regards as quite remarkably different in seriousness. Adulterous consensual sex, which is what allegedly occurred between Mr. Trump and Woman 2, while technically a (probably rarely if ever prosecuted) offense in New York, is a misdemeanor[8] punishable by a maximum sentence of three months imprisonment and/or a fine of $500.[9] Rape, which is what Mr. Trump allegedly did to Ms. Carroll, in contrast, is a serious felony[10] punishable by a substantial term of imprisonment.[11] Thus, the suggestion that a postponement is required in this case because the plaintiff's allegations in this case

---

[8]   N.Y. Penal Law § 255.17.

[9]   *Id.* §§ 70.15(2), 80.05(2).

[10]   *Id.* § 130.35(1).

[11]   Of course, Mr. Trump is sued in this case only civilly. He is not here being prosecuted criminally for rape. The rape, if rape occurred, took place years ago and was not reported to law enforcement or made public for over two decades.

6

are also "the heart" of those in the New York indictment – i.e., both involve "sexual misconduct"[12] – is of very limited persuasiveness.[13] And, much more to the point, the likelihood that some prospective jurors in this case might be prejudiced against Mr. Trump by knowledge of the indictment gleaned from media coverage – in other words, that they would be more likely to find that Mr. Trump forcibly raped Ms. Carroll due to media coverage of Mr. Trump's indictment that discussed his alleged payment of hush money to Woman 2 in order to buy her silence about their alleged adulterous and

---

[12]    Dkt 111 (Def. Reply Letter) at 2.

[13]    Mr. Trump points out that a search of Google News for "Jean Carroll Donald Trump" "yield[ed] 1,440 results in the seven days [after] news of the indictment broke" compared to "355 results during the week before the news of the indictment broke." Dkt 106 at 2. But comparison of Google News search results alone reveals nothing meaningful. Many of the recent news articles about this case – even if they mentioned also Mr. Trump's indictment – reported developments in this case or explained "what to know about [this] upcoming trial." *E.g.*, Becky Sullivan, *What to know about the Trump-E. Jean Carroll trial that is set to begin this month*, NPR, Apr. 9, 2023, https://www.npr.org/2023/04/09/1168664355/trump-e-jea n-carroll-lawsuit-trial; Mark Berman and Shayna Jacobs, *What to know about the Trump-E. Jean Carroll case set for an April trial*, THE WASHINGTON POST, Apr. 1, 2023, https://www.washingtonpost.com/national-security/2023/04/01/trump-e-jean-carroll-rape-l awsuit/; Megan Sheets, Clémence Michallon, Graeme Massie, Ariana Baio, *What we know about E Jean Carroll's rape allegations against Donald Trump*, THE INDEPENDENT, Apr. 12, 2023, https://www.independent.co.uk/news/world/americas/trump-rape-trial-e-jean-carroll -indictment-b2318564.html; Larry Neumeister, *Will Trump attend his rape trial? Judge wants to know*, AP NEWS, Apr. 10, 2023, https://apnews.com/article/trump-rape-lawsuit-columnist -f8918262ef228775a7a7918549d305c1; Jane Wester, *Lawyers for Trump, E. Jean Carroll Ask for Attorney-Only Disclosure of Jurors' Identities Before Civil Trial*, NEW YORK LAW JOURNAL, Apr. 7,2023, https://www.law.com/newyorklawjournal/2023/04/07/lawyers-for-tru mp-e-jean-carroll-ask-for-attorney-only-disclosure-of-jurors-identities-before-civil-trial/; David Knowles, *Trump's next April court date in N.Y. is on rape allegations*, YAHOO! NEWS, Apr. 5, 2023, https://news.yahoo.com/trumps-next-april-court-date-in-ny-is-on-rape-allegatio ns-193009519.html; Ashley Collman, *Trump's attorneys want to sniff out potential jurors in the E. Jean Carroll rape case who '#believewomen' about sexual abuse*, BUSINESS INSIDER, Mar. 31, 2023, https://www.businessinsider.com/trump-wants-to-question-rape-case-jurors -about-metoo-2023-3.

The increase in searches to which Mr. Trump points likely is explained as a product of the imminence of its start rather than Mr. Trump's indictment.

consensual sexual relationship or even of Mr. Trump's "alleged treatment of women [that] [(Mr. Trump argues)] pervades that publicity"[14] – is a matter readily handled by a proper examination of prospective jurors. Mr. Trump has failed to show any likely prejudice as a result of proceeding on the current schedule.

Second, even if there were a meaningful likelihood of prejudicial "rub off" from the media coverage of the New York State falsification of business records charges among those prospective jurors aware of those charges to Ms. Carroll's rape claim, and there is not, Mr. Trump's assertion that the media coverage of his indictment and arraignment was so overwhelming that a "cooling off" period is needed before selecting a jury in this case, and that it would be effective, is unproven and speculative, not to mention illogical. There was, of course, a great deal of media coverage – some of it invited and, indeed, provoked by Mr. Trump – first of the apparently impending indictment, then the indictment itself, and finally the arraignment. But the connection that Mr. Trump seeks to draw between that coverage and either the need for or the effectiveness of a "cooling off" period is unsupported by any evidence. The relevant inquiry is not whether "prospective jurors will have the criminal allegations top of mind when judging [Mr.] Trump's defense against Ms. Carroll's allegations."[15] Rather, the relevant question is whether they will be able to render a fair and impartial judgment regardless of whether they have his criminal allegations in mind at all. As the Second Circuit has written:

> "Although often appearing unfair in the eyes of the public, pretrial publicity,

---

[14] Dkt 111 at 2.

[15] Dkt 106 at 1.

8

'even pervasive, adverse publicity—does not inevitably lead to an unfair trial.' . . . It should not be overlooked that a jury need not consist of persons entirely ignorant of the case they are about to hear; all that the Constitution requires is a jury that is impartial, one that is capable of fairly deciding on the evidence before it whether defendants are innocent or guilty."[16]

There is no reason to assume that a sufficient number of fair and impartial jurors cannot be found on April 25, 2023 or that it would be materially easier to find such jurors on May 23, 2023. And it is important to recognize that the *voir dire* of prospective jurors in this case, whenever it occurs, quite likely will include inquiry into prospective jurors' awareness, if any, of Mr. Trump's various legal troubles – past, present and perhaps future – and jurors' ability and willingness to render a fair and impartial verdict in this case, regardless of any prior knowledge or attitudes. Indeed, both Mr. Trump's and Ms. Carroll's proposed examinations of prospective jurors include such questions.[17] Thus, the effect of granting Mr. Trump's requested postponement would not be to take the New York State charges off the table with respect to jury selection. It would be only to postpone that discussion.

Finally, it bears emphasis that at least some portion of the recent media coverage of Mr. Trump's indictment was of his own doing. There has been no shortage of recent news articles focused on Mr. Trump's own public statements on his social media platform and in press conferences and

---

[16]

    *Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 609 (2d Cir. 1988) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)).

[17]

    Dkt 112-1 (Def. Prop. Jury Questionnaire) ¶¶ 11-16; Dkt 97 (Def. Prop. Voir Dire Questions) ¶ 9; Dkt 100-1 (Pl. Prop. Jury Questionnaire) ¶¶ 9-11; Dkt 99-3 (Pl. Prop. Voir Dire Questions) ¶¶ 24-25.

interviews he has given about his indictment.[18]  It does not sit well for Mr. Trump to promote pretrial publicity and then to claim that coverage that he promoted was prejudicial to him and should be taken into account as supporting a further delay.  At bottom, Mr. Trump has failed to show that there is anything about the media coverage of his indictment or about the supposed efficacy of a "cooling off" period that would warrant an adjournment of this trial.

*Other Considerations*

The Court takes into account also (1) the difficulties that would ensue for the Court, the plaintiff, witnesses, and jurors should this trial be adjourned, and (2) its concern that the request to adjourn this trial is another delay tactic by Mr. Trump.

A jury panel for this trial was summoned over three weeks ago. The Court and those concerned with related issues including security, among others, have invested time and resources.  The requested adjournment, if granted, would "disrupt the schedules of the [C]ourt, the opposing party, and the witnesses who have been subpoenaed or who have voluntarily arranged their schedules to attend the trial" and cause "additional potential inconvenience to jurors."[19]

It is difficult also to ignore the possibility that this latest eve-of-trial request for a

---

18  *See, e.g.*, Dkt 105 at 2 n.2 (collecting recent news articles on Mr. Trump's statements against the New York State judge presiding over his criminal case and threats reportedly made by his supporters); Dkt 107 (Pl. Opposition to Def.'s Adjournment Request) at 4-5 (providing as an example Mr. Trump's interview on a Fox News show less than two hours before his counsel filed this request for a postponement).

19  *Payne*, 711 F.3d at 92–93 (quoting *Rivera*, 900 F.2d at 1475).

postponement is a delay tactic by Mr. Trump, a concern the Court has discussed in previous rulings.[20]
It now has been more than three years since Ms. Carroll filed her first lawsuit against Mr. Trump
alleging that he raped her in the mid 1990s. She now is over 79 years of age and is entitled to her day
in court just as both parties are entitled to a fair trial. "The . . . delay caused by adjournments and
other dilatory tactics[] not only hobbles justice but causes the public to mistrust the entire judicial
process."[21] In consideration of the ages of both parties and extensive pretrial litigation that has
occurred in both of Ms. Carroll's actions, it would not be in the interest of justice to permit further
delay absent a strong justification. Mr. Trump has not provided any such justification.

*Conclusion*

For the foregoing reasons, Mr. Trump's request to adjourn the trial (Dkt 106) is denied.
The trial will commence on April 25, 2023.

SO ORDERED.

Dated:        April 17, 2023

_____
Lewis A. Kaplan
United States District Judge

---

[20]

    *E.g.*, Docket No. 20-cv-7311 (*Carroll I*), Dkt 73 at 19, 21; *Carroll v. Trump*, 590 F. Supp.
3d 575, 587-88 (S.D.N.Y. 2022)).

[21]

    *Davis v. United Fruit Co.*, 402 F.2d 328, 330 (2d Cir. 1968).

# MEMO ENDORSED
## tacopina seigel trial lawyers
TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

April 17, 2023

The Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

USDC SDNY
DOCUMENT
ELECTRON...
DOC #:
DATE FILED: 4-18-2023

Re: *E. Jean Carroll v. Donald J. Trump*, 22-cv-10016 (LAK)

Dear Judge Kaplan,

As counsel for Defendant Donald J. Trump, we write to inquire as to the Court's plan for conducting jury selection in this case. On March 29, 2023, counsel were generally advised by the Deputy Clerk that Your Honor planned to assemble approximately one hundred potential jurors in the Jury Assembly Room and then explain to them what this case is about. The Deputy Clerk then indicated that Your Honor would ask whether the jurors could be impartial, with a view that only about fifteen prospective jurors might be struck. The Deputy Clerk also indicated that Your Honor would not ask that many questions during the *voir dire* in the courtroom, and that the entire jury selection process would take only one to two hours.

It was unclear from this discussion whether counsel would be present during this jury selection process in the Jury Assembly Room, or would have any input into the Court's description of the case, or would have any input into the questions being asked, or would have their own opportunity to ask questions. Therefore, we seek clarification on these points. Also, given the parties involved in this case, the attendant publicity surrounding it, the sensitivity of the issues involved, as well as the possibility of political bias, we believe that a robust jury selection process — one in which counsel is involved at each step — is necessary in the interests of justice.

Rule 47 of the Federal Rules of Civil Procedure governs jury selection in civil cases. It is clear that counsel must be involved:

Rule 47. Selecting Jurors.

(a) Examining Jurors. The court may permit the parties or their attorneys to examine prospective jurors or may itself do so. If the court examines the jurors, it *must* permit the parties or their attorneys to make any further inquiry it considers proper, or *must* itself ask any of their additional questions it considers proper. (emphasis added)

Memorandum Endorsement                          Carroll v. Trump, 22-cv-10016 (LAK)

I take what I understand to be material inaccuracies in Mr. Tacopina's letter to be misunderstandings attributable to the fact that Mr. Tacopina was not present at the meeting attended by the Deputy Clerk, Mr. Mohan, and other counsel. The Court nevertheless provides the following information concerning the proceedings on Tuesday.

1. The entire jury selection process will take place in the Courtroom scheduled for trial in the presence of counsel for both sides. As it would be inconvenient to accommodate the entire panel in that room at one time, part of the panel will be held in a reserve room under appropriate court supervision and will see and hear all jury-related proceedings (save any sidebars) that occur in the Courtroom over closed circuit video. From time to time, it may be appropriate to bring prospective jurors from the reserve room to replace other prospective jurors who have been excused during proceedings in the Courtroom. The replacement prospective jurors will be *voir dired* appropriately in the presence of all counsel once they are brought to the Courtroom and seated. This is identical in substance to the manner in which juries were selected in this Court during the COVID pandemic.

2. Counsel for both sides have been requested to submit proposed *voir dire* questions, and both have done so. The Court naturally is taking those requests into account in formulating its examination of prospective jurors. Moreover, at the completion of the examinations of the panel in general and of specific individual jurors, counsel will have a further opportunity to suggest questions.

SO ORDERED.

Dated:          April 18, 2023

Lewis A. Kaplan
United States District Judge

# MEMO ENDORSED
## tacopina seigel trial lawyers
TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

April 19, 2023

The Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-20-2023

Re:   *E. Jean Carroll v. Donald J. Trump*, 22-cv-10016 (LAK)

Your Honor:

In light of the Court's Order requesting counsel to advise whether their respective clients intend to be present throughout the trial, we think it necessary to bring the following concern to Your Honor's attention given the unique status of our client, Defendant Donald J. Trump ("Trump"), as a former president.

Specifically, as counsel who appeared with Defendant Trump during his recent arraignment in New York Supreme Court, in *People v. Trump*, Indictment No. 7145/2023, I have personal knowledge of the logistical burdens associated with his appearance in a courtroom, much of which was witnessed during televised broadcasts. As a former president, the defendant was always accompanied by approximately a dozen secret service agents, the FDR Drive was shut down for a significant amount of time while he traveled to the courthouse, the courthouse itself was frozen while he was present, and the streets, within a three block radius of the courthouse, were blocked off while he was there. Defendant Trump's appearance in the Southern District of New York in connection with this matter would result in similar logistical and financial burdens upon New York City, its residents, and the Court itself. With respect to the latter, in order for Defendant Trump to appear, his movement would need to be coordinated preliminarily by a Secret Service advance team hours beforehand each day that he is present, so that a tactical plan may be developed. As part of that plan, according to Secret Service, courthouse floors would need to be locked down, elevators shut down, courthouse personnel confined to their offices, and members of the public restricted from the area.

Although Defendant Trump wishes to appear at trial, in order to avoid the burdens outlined above, if he does not do so, we respectfully request that the Court issue to the jury the following preliminary instruction: "While no litigant is required to appear at a civil trial, the absence of the defendant in this matter, by design, avoids the logistical burdens that his presence, as the former president, would cause the courthouse and New York City. Accordingly, his presence is excused unless and until he is called by either party to testify."

Memorandum Endorsement                                    Carroll v Trump, 22-cv-10016 (LAK)

        Mr. Trump's lead counsel expresses Mr. Trump's alleged desire to testify at trial but seeks an order from the Court excusing his presence unless either party calls him as a witness and, in the event he does not testify, instructing the jury that his "absence . . . by design, avoids the logistical burdens that his presence, as the former president, would cause the courthouse and New York City." Dkt 118.

        First, the Court neither excuses nor declines to excuse Mr. Trump from attending the trial or from testifying in this case.  As far as the Court is aware, Mr. Trump is under no legal obligation to be present or to testify.  The plaintiff has made clear that she does not intend to call him as a witness.   The decision whether to attend or to testify is his alone to make.  There is nothing for the Court to excuse.

        Second, the Court notes but does not accept Mr. Trump's counsel's claims concerning alleged burdens on the courthouse or the City were Mr. Trump to attend or testify.  Mr. Trump is entitled by law to the protection of the United States Secret Service, which he now has enjoyed as a former president for more than two years. He has a right to testify in this case.  As it would do for any person with business before the Court, the Court will do everything within its power to enable Mr. Trump to exercise that right.  Moreover, it is entirely confident that the United States Marshals Service and the City of New York will do their parts in securing that right to Mr. Trump, just as they repeatedly have done in other cases involving security concerns.[1]  Moreover, the Court notes from Mr. Trump's campaign web site and media reports that he announced earlier this week that he will speak at a campaign event in New Hampshire on April 27, 2023, the third day of the scheduled trial in this case.[2]  If the Secret Service can protect him at that event, certainly the Secret Service, the Marshals Service, and the City of New York can see to his security in this very secure federal courthouse.

        Finally, Mr. Trump has been on notice of the April 25 trial date in this case since on or about February 7, 2023.  Dkt 49, ¶ 1(c).  There has been quite ample time within which to make whatever logistical arrangements should be made for his attendance, and certainly quite a bit more time than the five or six days between his recent indictment on state criminal charges and his arraignment on that indictment approximately one block from the location of the trial of this case.

        The question of the requested jury instruction is premature.  Mr. Trump is free to attend, to testify, or both.  He is free also to do none of those things. Should he elect not to appear or testify, his counsel may renew the request.  In the meantime, there shall be no reference by counsel for Mr. Trump in the presence of the jury panel or the trial jury to Mr. Trump's alleged desire to testify or to the burdens that any absence on his part allegedly might spare, or might have spared, the Court or the City of New York.

        SO ORDERED.

Dated:          April 20, 2023

                                                    _____
                                                    Lewis A. Kaplan
                                                    United States District Judge

---

[1]     This included, in the case of the City and the State of New York, providing security for the recent arrest and arraignment of Mr. Trump, which occurred after Mr. Trump issued a post on Truth Social in which he urged people to protest the arrest and to "take our nation back."  Maggie Haberman, et al., *Trump Claims His Arrest Is Imminent and Calls for Protests, Echoing Jan. 6*, N.Y. TIMES, https://www.nytimes.com/2023/03/18/us/politics/trump-indictment-arrest-protests.html.

[2]     https://www.donaldjtrump.com/events (last visited Apr. 20, 2023).

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**MEMO ENDORSED**

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

April 22, 2023

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-24-2023

**FILED BY ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  **Carroll v. Trump**, 22 Civ. 10016 (LAK) ("Carroll II")

Your Honor:

We write on behalf of Defendant Donald J. Trump to request clarification of Your Honor's March 10, 2023 Memorandum Opinion on one issue relating to Natasha Stoynoff's testimony, along with a proposed solution to an evidentiary issue.

You will recall that Ms. Stoynoff testified in her deposition that Defendant escorted her into a room, and then grabbed her shoulders and pushed her against a wall and started kissing her. Then someone allegedly came into the room and the incident ceased. Defendant's motion *in limine* sought to exclude this testimony under Federal Rule of Evidence 413(d). Your Honor denied our Motion; however, we request clarification with a proposed solution.

Your Honor correctly observed that Trump, according to Ms. Stoynoff, did not touch Ms. Stoynoff's genitals. Also, Your Honor correctly observed that Defendant's merely kissing Ms. Stoynoff (according to Ms. Stoynoff) would not satisfy Rule 413(d). Your Honor did, however, note Ms. Stoynoff's testimony that Defendant lied when he denied groping her, which perhaps implied that he did grope her. However, Your Honor correctly observed that "the portion of Ms. Stoynoff's deposition does not specify what part of her anatomy she claims Mr. Trump groped or attempted to grope." Your Honor then observed that " . . . if Ms. Stoynoff's account of the parts of her body that Mr. Trump allegedly touched were the only relevant evidence, it would be debatable whether that conduct alone would satisfy Rule 413(d) and 415." Your Honor then performed additional analysis of other evidence which might be suggestive of a plan by Defendant to go further towards touching

<u>Memorandum Endorsement</u>                                   <u>Carroll v. Trump, 22-cv-10016 (LAK)</u>

Although defendant characterizes his application as one for clarification, the characterization is mistaken.  The application in fact is a request that the Court reconsider a previous ruling and, on reconsideration, to reach the opposition result.

The application is untimely because any motion for reconsideration should have been filed well before this request.

Even if the application were timely, the defendant has failed to show, as would be necessary to warrant reconsideration, that the Court's original decision overlooked matters or controlling decisions.

And even if the defendant had made such a showing, nothing he has put forward warrants any relief from the prior decision or any *voir dire* examination.

The application is denied.

SO ORDERED.

Dated:          April 24, 2023

_____
Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                Plaintiff,

        -against-                          22-cv-10016 (LAK)

DONALD J. TRUMP,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

        On April 20, 2023, plaintiff moved *in limine* to preclude defendant from offering any evidence or making an argument with respect to litigation funding. This morning, defendant filed extensive papers in opposition to which plaintiff may wish to reply. Accordingly, plaintiff's reply, if any, shall be filed no later than April 26, 2023.

        Neither party shall make any reference to litigation funding in the presence of prospective jurors or the petit jury pending decision on the plaintiff's motion.

        SO ORDERED.

Dated:      April 24, 2023

                                    Lewis A. Kaplan
                              United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-24-23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                    Plaintiff,

         -against-                                22-cv-10016 (LAK)

DONALD J. TRUMP,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER

LEWIS A. KAPLAN, *District Judge.*

        On April 19, 2023, plaintiff moved *in limine* to preclude defendant from offering evidence or making arguments prohibited by Fed. R. Evid. 412. She argues that defendant should be so precluded because he failed to follow the procedural requirements of Rule 412 and because he proposes to introduce evidence that falls within the proscriptions of that rule. Defendant responds that Rule 412 has no bearing because plaintiff's alleged inability to form intimate relationships after she allegedly was raped by the defendant goes to the issue of damages. Moreover, he goes on to argue that plaintiff to some extent discussed her sexual history in her book, *What Do We Need Men For?: A Modest Proposal,* and thus has opened the door to matters that, at first blush, seem to have no conceivable relevance to this case. Dkt. 146, at 11-14. But defendant has offered nothing approaching a definitive description of the evidence he proposes to elicit and the arguments he proposes to make, thus leaving the Court significantly uninformed.

        In these circumstances, the motion to preclude defendant from offering evidence or making arguments prohibited by Fed. R. Evid. 412 (Dkt 121) is granted for the obvious reason that defendant should not be permitted to violate the rule. Given the manner in which this motion has been briefed, however, determination of what evidence and argument is precluded by Rule 412 will have to be determined at trial. Both sides might be well advised to exercise judgment about the content of their opening statements to avoid objections from opposing counsel.

        SO ORDERED.

Dated:      April 24, 2023

                                        Lewis A. Kaplan
                                  United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                Plaintiff,

    -against-                            22-cv-10016 (LAK)

DONALD J. TRUMP,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

        The Court's rulings on the objections noted by the parties to the designations and counter-designations of certain portions of Mr. Trump's deposition are set forth in the attached schedule. The notation "deferred" means that the Court reserves decision on the objection until it is raised, if it is raised, by counsel at trial.

        With respect to Ms. Carroll's objections to Mr. Trump's counter-designations, the Court has sustained those objections it has determined are inadmissible under Federal Rule of Civil Procedure 32. Rule 32(a)(6) provides that "[i]f a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts." "This rule represents an attempt to preclude the selective use of deposition testimony that might convey a misleading impression,"[1] and permits an adverse party to "supplement [portions of a deposition designated by the offering party] in the interest of completeness."[2] Mr. Trump's argument that Rule 32(a)(6) authorizes a party to use "any other parts" of a deposition of which parts are offered by its adversary is unsupported by the great weight of authority.[3] Such an interpretation of the rule also would render

---

[1]       *Farr Man Coffee Inc. v. Chester*, No. 88-cv-1692 (DNE), 1993 WL 248799, at *19 (S.D.N.Y. June 28, 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994).

[2]       *In re Sims*, 534 F.3d 117, 141 (2d Cir. 2008).

[3]       *See* Dkt 152 (Pl. Opposition Letter) at 1-3 (citing cases).

its first part, which reflects the purported policy objective of the rule, superfluous.[4]

        With respect to those objections noted by Ms. Carroll which the Court has overruled, the Court has determined that those counter-designations serve the interest of completeness and therefore are permitted pursuant to Rule 32(a)(6). As to the other grounds on which Ms. Carroll has objected to the counter-designations that the Court has marked "overruled" in the attached ruling, the basis for objecting on those other grounds is not now clear based on the parties' submissions. Any such objections therefore are overruled subject to renewal at trial only on any non-Rule 32(a)(6) grounds noted in Dkt 129.

        SO ORDERED.

Dated:      April 25, 2023

                                Lewis A. Kaplan
                           United States District Judge

---

[4]

    *See* Rule 1-07 and accompanying Note, PRELIMINARY DRAFT OF PROPOSED RULES OF EVIDENCE FOR THE UNITED STATES DISTRICT COURTS AND MAGISTRATES, 21-22 (March, 1969) ("The rule is an expression of the rule of completeness. . . . The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial."); Fed. R. Civ. P. 32(a)(6), Advisory committee's note to 1970 amendment ("The new standard is contained in a proposal made by the Advisory Committee on Rules of Evidence. See Rule 1-07 and accompanying Note, *Preliminary Draft of Proposed Rules of Evidence for the United States District Courts and Magistrates* 21-22 (March, 1969).").

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP,<br><br>*Defendant.* | No. 22 Civ. 10016 (LAK) |

## DEPOSITION DESIGNATIONS AND OBJECTIONS

The parties, having conferred among themselves, designate and counter-designate the below portions of the October 19, 2022 Deposition of Donald J. Trump ("Defendant's Deposition"), and note their objections for the Court.

**A.** **Plaintiff's Designations of Defendant's Deposition and Defendant's Objections**

| Plaintiff's Designations | Defendant's Objections |
|---|---|
| 12:21 - 13:9 | No objection |
| 13:13 - 13:15 | No objection |
| 13:17 - 14:6 | No objection |
| 16:24 - 17:11 | No objection |
| 22:15 - 22:24 | No objection |
| 23:21 - 24:2 | No objection |
| 31:23 - 32:12 | No objection |
| 37:11 - 37:22 | No objection |
| 38:4 - 38:20     **Deferred** | FRE 402 (Defendant will file a letter brief on this issue) |
| 42:6 - 42:8 | No objection |
| 43:4 - 43:10 | No objection |
| 44:10 - 44:16 | No objection |

| Plaintiff's Designations | Defendant's Objections |
|---|---|
| 44:20 - 45:4 | No objection |
| 45:9 - 45:11 | No objection |
| 45:16 - 46:7 | No objection |
| 46:15 - 47:10 | No objection |
| 50:9 - 50:12 | No objection |
| 54:9 - 55:3 | No objection |
| 55:7 - 55:18 | No objection |
| 56:8 - 56:13 | No objection |
| 57:6 - 57:11 | No objection |
| 57:15 - 57:18 | No objection |
| 61:6 - 61:14 | No objection |
| 61:22 - 62:18 | No objection |
| 67:22 - 68:21 | No objection |
| 69:7 - 69:23 | No objection |
| 78:6 - 78:18 | No objection |
| 79:4 - 79:7 | No objection |
| 80:17 - 80:23 | No objection |
| 80:25 - 83:2 | No objection |
| 87:6 - 88:3 | No objection |
| 88:7 - 88:17 | No objection |
| 89:18 - 90:11 | No objection |
| 93:19 - 94:20 | No objection |
| 95:4 - 95:5 | No objection |
| 95:8 - 95:8 | No objection |
| 125:22 - 126:3 | No objection |
| 127:5 - 127:20 | No objection |
| 131:11 - 131:13 | No objection |
| 131:16 - 131:20 | No objection |
| 131:24 - 132:5 | No objection |

| Plaintiff's Designations | Defendant's Objections |
|---|---|
| 136:24 - 137:3 | No objection |
| 137:9 - 137:17 | No objection |
| 138:4 - 139:6 | No objection |
| 140:17 - 141:2 | No objection |
| 141:21 - 142:14 | No objection |
| 146:16 - 146:21 | No objection |
| 147:3 - 147:17 | No objection |
| 147:20 - 148:7 **Deferred** | FRE 402 & 403 (Defendant will file a letter brief on this issue) |
| 148:14 - 148:20 **Deferred** | FRE 402 & 403 (Defendant will file a letter brief on this issue) |
| 148:22 - 149:2 **Deferred** | FRE 402 & 403 (Defendant will file a letter brief on this issue) |
| 149:4 - 149:6 **Deferred** | FRE 402 & 403 (Defendant will file a letter brief on this issue) |
| 158:4 - 158:12 **Sustained** | FRE 402 & 403 (Defendant will file a letter brief on this issue) |
| 158:14 - 158:21 **Sustained** | FRE 402 & 403 (Defendant will file a letter brief on this issue) |
| 168:20 - 168:25 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 169:4 - 169:21 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 170:2 - 170:4 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 173:3 - 173:22 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 174:5 - 174:21 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 176:8 - 176:11 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 180:23 - 181:14 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 182:23 - 183:2 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 183:25 - 184:9 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 184:13 - 184:22 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 193:4 - 193:20 **Overruled** | FRE 402 & 403 (preserving objection for appeal) |
| 194:11 - 194:14 **Sustained** | FRE 402 (Defendant will file a letter brief on this issue) |
| 209:4 - 209:21 | No objection |

## B. Defendant's Counter-Designations of Defendant's Deposition and Plaintiff's Objections

| Defendant's Counter-Designations | Plaintiff's Objections |
|---|---|
| 50:25 - 51:6     **Sustained** | FRCP 32(a)(6); FRE 106[1] |
| 51:8 - 51:12     **Sustained** | FRCP 32(a)(6); FRE 106 |
| 55:20 (starting with "it was") - 56:5     **Sustained** | FRCP 32(a)(6); FRE 106 |
| 58:5 - 58:6     **Overruled** | FRCP 32(a)(6); FRE 106, 403, 611 |
| 58:14 - 59:23     **Overruled** | FRCP 32(a)(6); FRE 106, 403, 611 |
| 60:3 - 60:18     **Sustained** | FRCP 32(a)(6); FRE 106 |
| 71:4 - 71:24     **Sustained** | FRCP 32(a)(6); FRE 106 |
| 72:6 - 72:10     **Sustained** | FRCP 32(a)(6); FRE 106, 402, 403, 602; Memorandum and Order on Plaintiff's *in Limine* Motion, *Carroll v. Trump*, No. 22 Civ. 10016 (Mar. 27, 2023), ECF 95 |
| 72:14 - 73:16     **Sustained** | FRCP 32(a)(6); FRE 106, 402, 403, 602; Memorandum and Order on Plaintiff's *in Limine* Motion, *Carroll v. Trump*, No. 22 Civ. 10016 (Mar. 27, 2023), ECF 95 |
| 73:18 - 73:20     **Sustained** | FRCP 32(a)(6); FRE 106, 402, 403, 602; Memorandum and Order on Plaintiff's *in Limine* Motion, *Carroll v. Trump*, No. 22 Civ. 10016 (Mar. 27, 2023), ECF 95 |
| 77:14 (starting with "And if") - 78:5     **Sustained** | FRCP 32(a)(6); FRE 106, 403, 602, 802[2] |

[1] Plaintiff objects under Federal Rule of Civil Procedure 32(a)(6) and Federal Rule of Evidence 106 to the extent Defendant designates portions of Defendant's testimony that are not made "in the interest of completeness." *In re Sims*, 534 F.3d 117, 141 (2d Cir. 2008) (citing Fed. R. Civ. P. 32(a)(6)). Federal Rule of Civil procedure 32(a)(6) "represents an attempt to preclude the selective use of deposition testimony that might convey a misleading impression." *Farr Man Coffee Inc. v. Chester*, No. 88 Civ. 1692, 1993 WL 248799, at *19 (S.D.N.Y. June 28, 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994); *see also Great Am. Ins. Co. v. Moye*, No. 10 Civ. 00330, 2010 WL 2889665, at *2 (M.D. Fla. July 19, 2010) ("Rule [32(a)(6)] is similar to Rule 106 of the Federal Rules of Evidence, and differences between the two are largely semantic."). Where Defendant's counter-designations seek to "introduce new material" and "do not serve to 'give the whole picture' of a portion" of the deposition that Plaintiff designated, they "are inadmissible." *Farr Man Coffee Inc.*, 1993 WL 248799, at *19; *accord In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & PMF Prod. Liab. Litig.*, No. 09 Civ. 10012, 2011 WL 6740391, at *19 (S.D. Ill. Dec. 22, 2011); *Chaudhry v. Angell*, No. 173-182, 2021 WL 4461667, at *7-8 (E.D. Cal. Sept. 29, 2021). Defendant will respond to this by Letter Brief.

[2] Plaintiff objects under Federal Rule of Evidence 802 where Defendant omits questions from the designated testimony or designates incomplete portions of an answer. A deposition may be used only "to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying." Fed. R. Civ. P. 32(a)(1)(B). Where an answer is designated without a question and where only portions of an answer are designated, the designation material no longer constitutes "testimony" that might be admissible pursuant to Federal Rule of Civil Procedure 32

| Defendant's Counter-Designations | Plaintiff's Objections |
|---|---|
| 80:4 - 80:16 | No objection |
| 103:6 - 103:19 **Sustained** | FRCP 32(a)(6); FRE 106 |
| 116:22 - 117:4 **Sustained** | FRCP 32(a)(6); FRE 106 |
| 119:5 - 119:22 **Sustained** | FRCP 32(a)(6); FRE 106 |
| 119:24 - 120:15 **Sustained** | FRCP 32(a)(6); FRE 106 |
| 130:6 - 130:16 (ending with "would happen") **Sustained** | FRCP 32(a)(6); FRE 106 |
| 131:5 - 131:9 **Sustained** | FRCP 32(a)(6); FRE 106, 403 |
| 132:9 - 134:13 **Overruled** | FRCP 32(a)(6); FRE 106, 403, 611 |
| 134:19 - 134:24 **Sustained** | FRCP 32(a)(6); FRE 106, 602, 802 |
| 137:18 - 138:3 **Overruled** | FRCP 32(a)(6); FRE 106, 403 |
| 139:8 - 139:24 **Overruled** | FRCP 32(a)(6); FRE 106, 602, 802 |
| 141:3 - 141:20 **Overruled** | FRCP 32(a)(6); FRE 106, 403, 602 |
| 146:22 -147:2 | No objection |
| 148:9 - 148:13 **Overruled** | FRCP 32(a)(6); FRE 106, 402, 403, 602, 802 |
| 172:3 - 172:10 (Defendant designates only because of *in limine* ruling on this issue and Plaintiff's designations on this issue, and reserves all rights on appeal) **Overruled** | FRCP 32(a)(6); FRE 106, 402, 403, 802 |
| 174:22 - 175:4 (ending with "people talk") (Defendant designates only because of *in limine* ruling on this issue and Plaintiff's designations on this issue, and reserves all rights on appeal) **Overruled** | FRCP 32(a)(6); FRE 106 |
| 176:12 - 176:17 (ending with "remember it) | FRCP 32(a)(6); FRE 106, 403, 602, 802 |

and, here, instead constitutes inadmissible hearsay under Federal Rule of Evidence 802. *Compare* Fed. R. Evid. 801(d)(2) (excluding from the definition of hearsay an opposing party's statement only where the statement is offered *against* that opposing party). Defendant will respond to this by Letter Brief.

| Defendant's Counter-Designations | Plaintiff's Objections |
|---|---|
| (Defendant designates only because of *in limine* ruling on this issue and Plaintiff's designations on this issue, and reserves all rights on appeal) **Overruled** | |
| 176:19 (starting with "a long time") – 177:4 (ending with "phony charge")<br><br>(Defendant designates only because of *in limine* ruling on this issue and Plaintiff's designations on this issue, and reserves all rights on appeal) **Overruled** | FRCP 32(a)(6); FRE 106, 403, 602, 802 |
| 183:13 – 183:23 (ending with "disgrace, also.")<br><br>(Defendant designates only because of *in limine* ruling on this issue and Plaintiff's designations on this issue, and reserves all rights on appeal) **Overruled** | FRCP 32(a)(6); FRE 106 |
| 185:3 – 187:3<br><br>(Defendant designates only because of *in limine* ruling on this issue and Plaintiff's designations on this issue, and reserves all rights on appeal) **Sustained** | FRCP 32(a)(6); FRE 106, 402, 403, 602, 802 |
| 191:25 – 192:22 **Overruled** | FRCP 32(a)(6); FRE 106, 403 |
| 210:17 - 210:19 **Sustained** | FRCP 32(a)(6); FRE 106 |
| 210:22 - 210:25 **Sustained** | FRCP 32(a)(6); FRE 106 |
| 215:3 - 215:19 **Sustained** | FRCP 32(a)(6); FRE 106, 602 |

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   E. JEAN CARROLL,
3
                    Plaintiff,           New York, N.Y.
4
            v.                           22 Civ.10016 (LAK)
5
   DONALD J. TRUMP,
6
                    Defendant.
7  ------------------------------x       Jury Trial

8                                        April 26, 2023
                                         10:10 a.m.
9
   Before:
10
                      HON. LEWIS A. KAPLAN,
11
                                         District Judge
12                                          and a Jury

13
                         APPEARANCES
14
   KAPLAN HECKER & FINK LLP
15       Attorneys for Plaintiff
   BY:  ROBERTA A. KAPLAN
16       MICHAEL J. FERRARA
         SHAWN G. CROWLEY
17       MATTHEW J. CRAIG

18
   TACOPINA SEIGEL & DeOREO
19       Attorneys for Defendant
   BY:  JOSEPH TACOPINA
20       CHAD D. SEIGEL
         MATTHEW G. DeOREO
21

22 HABBA MADAIO & ASSOCIATES, LLP
         Attorneys for Defendant
23 BY:  MICHAEL T. MADAIO

24
   W. PERRY BRANDT
25       Attorney for Defendant

1    The Court ruled on that.  DNA will not be uttered in this

2    courtroom.

3              THE COURT:  What seems to be the case is that your

4    client is basically endeavoring certainly to speak to his

5    "public," but, more troublesome, to the jury in this case about

6    stuff that has no business being spoken about.

7              MR. TACOPINA:  The jury has been instructed not to

8    read any media or press in this case, right, your Honor, so we

9    have to assume the jury is not going to violate the Court's

10   order.

11             I will do this.  First of all, let's also just put

12   things in context.  A week ago, before this trial started,

13   there was an article which I read again yesterday in reference

14   to -- that was a leak -- not certainly Ms. Kaplan or her

15   office, but somebody leaked the fact that two mock juries had

16   come to a conclusion finding liability.  You talk about

17   prejudicial a week before a trial.  I think that pretty much is

18   the pinnacle of prejudicial.

19             THE COURT:  But you say you are not accusing the

20   plaintiff's team of having done that.

21             MR. TACOPINA:  I'm not accusing Ms. Kaplan, Ms.

22   Crowley, or any of the lawyers on that team.  Somebody from the

23   plaintiff's side did that, whether it was a jury consultant,

24   one of the jurors that they use.  Somebody from that side

25   leaked it.  Certainly it wasn't us.  I'm being consistent with

1    the Court's desires here, and I have a great deal of respect

2    for Ms. Kaplan and I like Ms. Kaplan.  I'm not suggesting she

3    would have done that.  But someone from that world leaked that.

4            THE COURT:  Someone from that world may have been

5    somebody that was picked up off the street and offered whatever

6    they offered these days to sit for a day and give an opinion

7    and leave.  Now, you know how those things work, and you are

8    trying to pin it on the plaintiff.

9            MR. TACOPINA:  No, your Honor.  It's impossible

10   because they knew about the other juries and the other juries.

11   It was not a person that was on the jury who didn't sign a

12   protective order, by the way, and just left.  This individual,

13   if you read the article, which I have read --

14           THE COURT:  I have too.  It says that there were 37,

15   if I have the number right, people brought in and the 37 were

16   all, as I understood the article, in one place at one time and

17   then they were divided into three groups.

18           MR. TACOPINA:  Correct.

19           THE COURT:  Every person in there knew there were

20   three groups.

21           MR. TACOPINA:  Yes.  But every person in there, if

22   they were provided three groups, would have known what the

23   other jurors came to as a conclusion, I would imagine.

24   Hopefully, that was protected, right?

25           THE COURT:  Mr. Tacopina, I have a good imagination

1    too and I can imagine that you are right, and I can imagine the

2    facts are entirely different.

3              MR. TACOPINA:  OK.  I never complained about --

4              THE COURT:  What you are trying to do is to get away

5    from a statement by your client, a public statement that, on

6    the face of it, seems entirely inappropriate.

7              MR. TACOPINA:  Your Honor, I will address that with my

8    client today.  I will.  I assure you.  I will try and prevent,

9    to the degree I have the ability to, any posts regarding that.

10             I'm sorry, your Honor.  I just can't accept the fact

11   that that is inappropriate and a leak about results in a

12   confidential, protective-order, governed mock jury was leaked

13   to the press.

14             THE COURT:  You don't know that it was a leak by

15   anybody who had any obligation to anything in this case.  It

16   may have been, I acknowledge that.  But you could not put a

17   witness on the stand to establish what you are assuming is the

18   case, unless I don't know something.

19             MR. TACOPINA:  You are right.  I'm relying on common

20   sense.  There was information regarding exhibits in there and

21   everything else, but whatever.

22             Again, your Honor, I am just trying to say, there has

23   been things on both sides, if the jury wants to violate the

24   Court's order, that could affect their fair and impartial

25   deliberations.  I will assure you.  There was a protective

1   Q.  Here's my question.  Given the proximity from the fitting

2   room to the main area, if somebody, let's say, screamed from

3   inside a dressing room, would they be heard out in the main

4   area?

5   A.  If they screamed, I guess, depending on the volume, sure.

6   Q.  And if somebody's head was --

7           THE COURT:  Counselor, if a tree falls in the forest

8   and there is no one there to hear, right?  It depends whether

9   somebody is there, doesn't it?

10          MR. BRANDT:  I got an answer, your Honor.

11          THE COURT:  I know you did, but let's not play this

12  kind of game.

13          MR. BRANDT:  I'm not playing a game, your Honor.  I'm

14  trying to ask the witness questions.

15          THE COURT:  You know where I'm coming from.

16  BY MR. BRANDT:

17  Q.  Let me ask you this question.

18  A.  Okay.

19  Q.  Where did you have security cameras located in Bergdorf in

20  general?

21  A.  The only thing that I can tell you for certain, I know we

22  had them at the -- at all of the doors, but I don't actually

23  know where they would have been in the store.

24  Q.  Let's start with the doors.  So talking about the main

25  entrances and exits to the store?

1                    A F T E R N O O N   S E S S I O N

2                             2:05 p.m.

3            (Jury not present)

4            THE COURT:  Good afternoon.  Unfinished business

5     before lunch.  Defense can go into the Moonves question, not

6     the dentist.

7            Anything else.

8            MR. FERRARA:  Just one other thing, your Honor.  We

9     had briefed --

10           THE COURT:  Can't hear you.

11           MR. FERRARA:  I am so sorry.

12           THE COURT:  You are not the one who scraped the chair.

13           MR. FERRARA:  We have briefed the funding issue for

14    your Honor and that, again, it's not imminent in my direct, but

15    if your Honor will -- we of course think it is wholly

16    inadmissible, but if your Honor would allow it I would, again,

17    elicit some direct.  So we would just ask for a ruling.  We

18    think funding is inadmissible, irrelevant, etc., and those

19    papers have been in front of your Honor but it's something we

20    would like to get into if your Honor says it is coming in.

21           THE COURT:  Do you expect to finish the direct this

22    afternoon?

23           MR. FERRARA:  There is a chance.

24           THE COURT:  Well, sufficient unto the day.  We will

25    see where we get.  But it's precluded unless and until I rule

1          (Jury not present)

2          THE COURT:  Give me one minute.

3          Before we bring the jury in, the whole subject of

4    litigation funding is precluded.  I'll make a brief remark

5    about it now.

6          In general, litigation funding is not relevant.  Here

7    I allowed very limited discovery against what seemed to me a

8    remote but plausible argument that maybe something to do with

9    litigation funding arguably was relevant to the credibility of

10   one or two answers by this witness in her deposition.  I gave

11   the defense an additional deposition of the plaintiff, and I

12   gave the defense limited document discovery.

13         On the basis of all that, I have concluded that there

14   is virtually nothing there as to credibility.  And even if

15   there were, the unfair prejudicial effect of going into the

16   subject would very substantially outweigh any probative value

17   whatsoever.

18         I may at some point write in more detail, but I don't

19   promise to do so.  That's the ruling.  The subject is closed.

20         MS. KAPLAN:  One quick matter, your Honor.

21         THE COURT:  Yes.

22         MS. KAPLAN:  It seems highly relevant to what your

23   Honor just said.  I had spoken this morning about the Truth

24   Social post from Mr. Trump.  There were actually at least two

25   of them which I will provide to your Honor after court.

```
 1                 Mr. Tacopina.

 2                 MR. TACOPINA:  Your Honor --

 3                 THE COURT:  I am not asking for a response.  I was

 4      addressing you.  I am not offended.  Don't worry.  I'm

 5      addressing you.

 6                 I said something this morning about your client,

 7      perhaps now sailing in harm's way, conceivably with his son, if

 8      the report I just heard is true.

 9                 Remedies that might be available from this Court may

10      not be the only relevant remedies.  If I were in your shoes,

11      I'd be having a conversation with the client.

12                 MR. TACOPINA:  Can I just respond now.  You did

13      address me.  We discussed the earlier post this morning.  I

14      heard you and I made my response and my record on that.  I

15      don't need to expound on that further.

16                 As far as the tweet from Eric Trump, his son, I will

17      address everything with the appropriate parties.

18                 Let me just say this.  This was before your ruling

19      about five minutes ago.  In that tweet there is absolutely

20      nothing offensive or anything even remotely prejudicial.  It

21      was stating a fact that there is -- he actually used the word

22      alleged funding by Reid Hoffman, who hates his father.  That's

23      a fact.  All those things are a fact.  Reid Hoffman posted it

24      himself.  Eric Trump didn't do anything wrong.  Everything he

25      said was true.  I am just pointing out, it was before your
```

1   ruling.

2           THE COURT:  Eric Trump isn't before me, so you don't

3   have to defend Eric Trump.  I am simply suggesting to you that

4   there are some relevant United States statutes here and

5   somebody on your side ought to be thinking about them.

6           MR. TACOPINA:  I've been thinking about them.

7           THE COURT:  Good.

8           MR. TACOPINA:  Since our chat this morning.

9           THE COURT:  Good.

10          Let's get the jury.

11          (Jury present)

12          THE COURT:  Thank you.  The witness is reminded she is

13  still under oath.

14          You may continue, counselor.

15          MR. FERRARA:  Thank you, your Honor.

16  Q.  We were talking before we broke, Ms. Carroll, about Donald

17  Trump winning the 2016 presidential race.

18          Do you recall where you were when you learned that he

19  had won?

20  A.  Yes.  I was at Lisa Birnbach's apartment.

21  Q.  That's the same Ms. Birnbach we spoke about earlier?

22  A.  Yes.

23  Q.  What, if anything, did the two of you discuss that night

24  regarding the assault?

25  A.  Well, she -- it was -- Lisa had thrown a big party, and

N4RMCAR2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                    Plaintiff,              New York, N.Y.
 4
               v.                           22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                    Defendant.
 7   ------------------------------x        Jury Trial

 8                                          April 27, 2023
                                            10:50 a.m.
 9
     Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                            and a Jury

13
                              APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant
```

N4r2Car3                    Carroll - Cross

1    a nuisance.  That's sort of the premise of your book, right?

2    A.  It's -- my premise is the women who write to me at Ask

3    E. Jean are finding men to be a nuisance.

4    Q.  Okay.  At one point I think in your book you propose we

5    should dispose of all men?

6    A.  Into Montana.

7    Q.  Into Montana?

8    A.  Yeah, and retrain them.

9    Q.  So retrain.  So all the men here in this courtroom, in this

10   country, all get shuffled off to Montana and get retrained.

11   A.  You understand that that was said as a satire.

12   Q.  Ah.  Okay.

13            THE COURT:  It comes from Jonathan Swift's *A Modest*

14   *Proposal* 700 years ago, right?

15            THE WITNESS:  Yes.

16            THE COURT:  Let's move on.

17            MR. TACOPINA:  Thank you, your Honor.

18   BY MR. TACOPINA:

19   Q.  So the book premise talks about the purpose of -- the

20   premise that in order to support your position you drove to

21   these towns that you said were named after women and you asked

22   people in each town what do we need men for, right?

23   A.  Yes, I had --

24   Q.  Okay.  As part of that road trip, you would only eat in

25   cafés named after women?

N4RMCAR4                    Carroll - Cross

1   street in traffic?

2   A.  Yes.

3   Q.  And it's your sworn testimony that Donald Trump waved at

4   you across traffic, even though he only met you briefly at a

5   party eight or nine years earlier and hadn't had any

6   interactions with you since, correct?

7           MR. FERRARA:  Objection.

8           THE COURT:  Sustained.  Argumentative.

9   Q.  Well, you testified that the party was 1987, so that's

10  eight or nine years earlier than '94 or '95, right?

11          THE COURT:  We can all do the math.

12  A.  Yes.

13          Let's move it along.  Everybody can subtract 84 from

14  93, or whatever it is.

15          MR. TACOPINA:  Thanks, your Honor.

16  Q.  Other than that, math that we can all do, you hadn't any

17  other interactions with him since, correct?

18  A.  Yes.

19  Q.  And you are not even sure really if he was waving at you,

20  right, Ms. Carroll?

21  A.  I turned around to see if anyone was standing behind me.  I

22  didn't see anyone.  So I waved back.

23  Q.  It seemed to you that he was waving at you, but, as you

24  have said previously, you can't say with certainty whether he

25  was waving at you or someone else, right?

N4RMCAR4                    Carroll - Cross

1    A.  Yes.

2    Q.  He was a man about town who could make television

3    appearances and was entertaining?

4    A.  Yes.

5    Q.  And you yourself called him one of New York's most famous

6    men?

7    A.  Oh, absolutely.

8    Q.  It's your story that the people in the store recognized him

9    at the time?

10   A.  Yes.  Two people in the store.

11   Q.  One was a customer who was sort of gaping at him, correct?

12   A.  Yes.

13   Q.  And, according to you, a sales attendant recognized Donald

14   Trump also?

15   A.  Yes.

16   Q.  It's your story that no sales attendant at Bergdorf tried

17   to help him?

18   A.  No.  That is -- no sales assistant tried to help him.

19   Q.  According to you, after Donald Trump saw you through a

20   door, stopped you, supposedly recognized you after speaking to

21   you for a few minutes eight or nine years earlier, he asked you

22   to help him buy a present?

23        MR. FERRARA:  Objection to the argumentative portion

24   of the question, your Honor.

25        THE COURT:  Sustained.  Rephrase.

1    A.  Yes.

2    Q.  And it's your story while on the sixth floor you didn't see

3    any customers there?

4    A.  No, I didn't see any customers.

5    Q.  It is your claim you didn't see a single person in any of

6    the departments you walked through on that floor?

7    A.  I didn't see anybody.  We went past cruise wear.  Could

8    have been bathing suits.  I think it was cruise wear.  I didn't

9    see any people.

10   Q.  It's your story that you didn't see any customers on the

11   entire sixth floor?

12   A.  Didn't see any.

13   Q.  Aside from customers, you also didn't see any sales

14   attendants?

15   A.  Did not see any.

16   Q.  It's your testimony that in one of New York's most

17   prestigious department stores, there was not a salesperson or a

18   customer or employee on the sixth floor?

19            MR. FERRARA:  I am going to object.

20            THE COURT:  Objection sustained.

21            You get to make a closing argument in this case,

22   counselor, and this isn't the time for it.

23   Q.  Because Bergdorf Goodman is such an attentive, upscale

24   store, you would agree it doesn't make sense that a sales

25   attendant would not be present in the lingerie department when

N4RMCAR4                    Carroll - Cross

1   you were supposedly there with Donald Trump?

2              MR. FERRARA:  Objection.

3              THE COURT:  Sustained.

4              MR. TACOPINA:  Can I understand the basis of that,

5   your Honor.

6              THE COURT:  Yes.  It's argumentative.  It's repetitive

7   and it's inappropriate.

8              MR. TACOPINA:  I never asked if she thought it ever

9   made sense.

10             THE COURT:  I'm sorry, Mr. Tacopina.  We are going to

11  move on.  In this courtroom, the ruling is the ruling, not the

12  start of an argument.

13  Q.  You'd agree that story about no one being on the sixth

14  floor is inconceivable, correct?

15  A.  It's hard to imagine that there would not be a sales

16  attendant in Bergdorf's.  It's surprising.

17  Q.  The word you used to describe that lack of sales attendants

18  or anyone close was inconceivable, correct?

19  A.  Yes.

20  Q.  Inconceivable --

21  A.  Cannot be imagined.

22  Q.  Unbelievable, correct?

23  A.  Yes, that's what it means.

24  Q.  Now, the quality of merchandise and the cost of merchandise

25  at Bergdorf Goodman is relatively expensive compared to a

N4r2Car5                    Carroll - Cross

1    Q.  And at that time she certainly wasn't your closest friend.

2    A.  She was a close friend, not my closest.

3    Q.  Prior to this alleged incident at Bergdorf, you didn't

4    speak to her overly often.

5    A.  Not overly often, that is correct.

6    Q.  In fact, you can't even name another personal matter you

7    confided in with -- in with her prior to this alleged incident.

8    A.  Oh, no.  We had many conversations.  We discussed her

9    breaking up with a certain person.

10   Q.  That's her talking to you, confiding in you, right?

11   A.  Yes.

12   Q.  My question was, you can't name another personal matter of

13   yours that you confided in her prior to this alleged incident?

14   A.  Well, I believe when she was confiding in me, I would

15   return the confidence with -- confiding with her with whatever

16   I was going through.  I just don't remember it.

17   Q.  Okay.

18          You certainly can't say definitively that prior to

19   this alleged incident at Bergdorf you ever shared any other

20   instances with Ms. Birnbach in which you felt abused in your

21   past either sexually or otherwise?

22   A.  I don't think I did.

23   Q.  So to be clear, it's your testimony that even though at the

24   time she wasn't your closest friend and you never confided

25   anything like this to her before, you thought your first call

N4r2Car5                    Carroll - Cross

1   when you left Bergdorf Goodman should be to her?

2           MR. FERRARA:  Objection.  Argumentative.  Asked and

3   answered.

4           THE COURT:  Sustained.

5   BY MR. TACOPINA:

6   Q.  You thought your first call when you left Bergdorf Goodman

7   should be to Ms. Birnbach?

8   A.  She was exactly the person I needed to talk to.

9   Q.  And in your story it's because Ms. Birnbach was supposedly

10  hilarious?

11  A.  And still is the funniest person I know.

12  Q.  Okay.  And according to you, if Lisa Birnbach had laughed

13  after you told her you had been sexual assaulted, you would be

14  okay, home free?

15  A.  I thought it would put -- I had thought it would let me

16  know it was not as bad as I probably knew it was.  I would feel

17  better if Lisa laughed and said, that is funny, then I would

18  have felt better.

19  Q.  So it was a possibility in your mind that you were going to

20  describe a violent sexual assault to your good friend against

21  you that had just taken place and Lisa would have laughed and

22  said, oh, that is funny?

23  A.  I was going to tell her the story, which I thought was

24  hilarious, and then I got to the point where I had to tell Lisa

25  that he pulled down my tights, and before I said that, Lisa had

N4r2Car5                    Carroll - Cross

1   A.  I don't -- no, I did not want to tell my story.  I did not

2   want to -- I was ashamed of myself.

3   Q.  But one of the reasons Carol Martin told you not to tell

4   the story to anyone and one of the reasons you have testified

5   that you never told the story to anyone was because of Donald

6   Trump's power.

7   A.  I was afraid Donald Trump would retaliate, which exactly is

8   what he did.  That's exactly.  One of my biggest fears came

9   absolutely true.

10  Q.  Okay.

11  A.  He has two tables full of lawyers here today.  It came

12  absolutely true.

13  Q.  We have about the same amount of lawyers.  Not everyone is

14  a lawyer, Ms. Carroll, but regardless of that --

15          THE COURT:  Come on, Mr. Tacopina, let's move along.

16          MR. TACOPINA:  Yes, sir.

17  BY MR. TACOPINA:

18  Q.  So instead you waited for Donald Trump to become arguably

19  the most powerful man in the world, president of the

20  United States of America, to tell your story to everybody.

21  A.  I waited until other women -- I was not a pioneer.  I'm a

22  follower.  I saw other women coming forward after Harvey

23  Weinstein and I thought who am I?  Who am I not to stay silent?

24  Also, I was 78 or 79.  I just thought I've been silent too

25  long.

N4r2Car5                              Carroll - Cross

1   Q.  In the decades preceding your lawsuit, you certainly never

2   told any doctors ever about the supposed incident?

3   A.  No.

4   Q.  And after supposedly being raped by Donald Trump you never

5   saw a medical doctor or got an evaluation?

6   A.  No, no.

7   Q.  Never went to a psychiatrist?

8   A.  No.

9   Q.  Never went to a psychologist?

10  A.  No.

11  Q.  No doctors whatsoever.

12  A.  No.

13  Q.  And as a result, you have no medical records showing

14  physical injuries from this colossal battle you have described?

15  A.  I have --

16          MR. FERRARA:  Objection, your Honor.

17          THE COURT:  Sustained.  Argumentative.  The answer is

18  stricken.

19  BY MR. TACOPINA:

20  Q.  As a result, do you have any medical records showing

21  physical injuries from the story?

22  A.  No.

23  Q.  You have no photographs of any physical injuries.

24  A.  No, I never took any photographs.

25  Q.  You are not aware of anyone who saw any physicals injuries

N4RMCAR6                        Carroll - Cross

1    A.  I am not sure what the context was.  Was I talking about

2    childhood events?

3              MR. TACOPINA:  You guys have that clip?

4              MR. FERRARA:  I don't think we do.  I apologize if I'm

5    wrong, but I don't have it here.

6              Apologies.  One moment, your Honor.

7              MR. TACOPINA:  We will come back to it, your Honor, if

8    need be.  We will straighten this out.

9    Q.  You said that you think about what Cam did every day?

10   A.  In some form it glances through my mind.  Maybe not

11   absolutely every day, but it's frequent.

12   Q.  And you acknowledged in that podcast that Cam, you came to

13   learn, was arrested years later?

14   A.  Yes.

15   Q.  And you recognize that after Cam supposedly abused you he

16   may have abused other girls prior to his arrest, correct?

17             MR. FERRARA:  Objection.

18             THE COURT:  Sustained.

19   Q.  According to you, Donald Trump is a brutal and dangerous

20   man?

21   A.  Yes, he is.

22   Q.  But, according to you, you wouldn't bring a criminal charge

23   against him because that would be disrespectful to women being

24   raped by the border and around the world?

25             MR. FERRARA:  Objection.

N4RMCAR6                    Carroll - Cross

1          THE COURT:  You already asked that question.

2          MR. TACOPINA:  I did not ask this question.  I read --

3     played what she said.  I am asking a question about what she

4     said.

5          MR. FERRARA:  This is not a criminal case, your Honor.

6          THE COURT:  Sustained.

7     Q.  Let me ask you this.  How would you -- it's not a criminal

8     case.  How would you bringing criminal charges be disrespectful

9     to some people at the border?

10         MR. FERRARA:  Objection.

11         THE COURT:  Sustained.  Correct me if I'm wrong,

12    counsel, but I believe in the State of New York private

13    individuals can't bring criminal charges and probably have not

14    been able to do that in at least a century or two.

15         MR. TACOPINA:  No, they can't.  They could go to the

16    police department.

17         THE COURT:  That's not what you said, counselor.  We

18    have been up and down the mountain on the question of whether

19    she went to the police, so let's move on.

20         MR. TACOPINA:  We have not been up and down the

21    mountain of what we just heard.

22         Can I ask one question?

23         THE COURT:  Move on.

24         MR. TACOPINA:  I guess not.

25    Q.  According to you, security cameras must have picked you and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. TACOPINA:  Sure.

2    Q.  When you were allegedly assaulted in Bergdorf Goodman by

3    Donald Trump and on the first floor with Donald Trump and on

4    the escalators with Donald Trump, you never thereafter, that

5    day, the next day, the next week or ever tried to get the

6    videos that could have existed to support your claim?

7          MR. FERRARA:  I object to the breadth of the question.

8          THE COURT:  Sustained.

9          MR. TACOPINA:  The breadth.  OK.

10   Q.  Did you go back the next day to get -- ask for the video

11   camera footage?

12         THE COURT:  Sustained.  It assumes there is such a

13   thing.

14         MR. TACOPINA:  Ms. Carroll in fact testified, as did

15   the Bergdorf Goodman witness, that on the main floor there are

16   security cameras, your Honor.

17         THE COURT:  Ms. Carroll testified she guessed, and we

18   have had the testimony from the witness who was at Bergdorf at

19   the time, and she said what she said.  We are not going to ask

20   questions based on this kind of statement.

21         MR. TACOPINA:  Can I ask this question?

22         THE COURT:  I don't know yet.  I have not heard it.

23         MR. TACOPINA:  I know you don't know it, so I am going

24   to ask it, and you will let me know.

25   Q.  Did you ever attempt to ascertain whether there is any

1   video footage of you and Donald Trump at Bergdorf Goodman?

2          MR. FERRARA:  Objection.

3          THE COURT:  Sustained.  I sustained the objection to

4   that question within the last three minutes.

5   Q.  You are a writer, Ms. Carroll?

6   A.  Yes.

7   Q.  And you wrote every day for 18 years at a period of time

8   when you were married to Steve Byers?

9   A.  I was still in the -- I was pitching to magazines, and I

10  refused -- everybody said no, no, no, and nobody wanted my

11  work.  They didn't like my ideas.  And I kept at it until I got

12  my foot in the door.

13  Q.  You, early on in life, dedicated yourself to becoming a

14  writer?

15  A.  Yes.

16  Q.  And writing was important to you?

17  A.  Yes.  It's the way I process my life.

18  Q.  And you kept a diary?

19  A.  I've always diaries.

20  Q.  Despite the fact that you're clearly an avid writer who

21  kept a diary, you never made a diary entry contemporaneously

22  memorializing this alleged rape by Donald Trump in your diary?

23  A.  No.  I don't write about negative.

24  Q.  You would put in your diary things like, threw the ball for

25  the dog?

N512car1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
E. JEAN CARROLL,

                    Plaintiff,              New York, N.Y.

            v.                              22 Civ.10016 (LAK)

DONALD J. TRUMP,

                    Defendant.
-------------------------------x           Jury Trial

                                           May 1, 2023
                                           9:30 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                           District Judge
                                             and a Jury

                        APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant

N512car1

1   "Q  You didn't burn it.

2   "A   No, I would never burn a beautiful item of clothing."

3           And at that point your Honor concluded the day.

4           THE COURT:  Okay.  It's closed.

5           MR. TACOPINA:  Okay, your Honor.  No problem.  That's

6   fine.

7           THE DEPUTY CLERK:  Shall I get the jury, Judge?

8           THE COURT:  One more second.  The motion that I found

9   on my desk from the defense this morning, has that been filed

10  yet or no?

11          MR. TACOPINA:  Mr. Seigel will be dealing with that.

12          MR. SEIGEL:  It has, your Honor.

13          THE COURT:  It is now denied.

14          Okay.  Get the jury.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
E. Jean Carroll,

|                     |                        |
|---------------------|------------------------|
| Plaintiff,          | 22 **CIVIL** 10016 (LAK) |
| -against-           | **JUDGMENT**           |
| Donald J. Trump,    |                        |
| Defendant.          |                        |

-------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That after a Jury Trial before the Honorable Lewis A. Kaplan, United States District Judge, Plaintiff E. Jean Carroll has judgment against the defendant Donald J. Trump in the sum of $2,000,000.00 for injuries; $20,000.00 in punitive damages; $1,000,000.00 for damages other than the reputation repair program; $1,700,000.00 for damages for the reputation repair program; and $280,000.00 in punitive damages; accordingly, the case is closed.

**DATED:** New York, New York
         May      11      , 2023

**So Ordered:**

_____
**U.S.D.J.**

**RUBY J. KRAJICK**

_____
**Clerk of Court**

BY:      K. Mango

_____
**Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                      Plaintiff,

      -against-                           22-cv-10016 (LAK)

DONALD J. TRUMP,

                      Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## VERDICT FORM

### Battery

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

    1.    Mr. Trump raped Ms. Carroll?

              YES _____          NO __✓__

              *[If you answered "Yes," skip to Question 4. If you answered "No," continue to Question 2.]*

    2.    Mr. Trump sexually abused Ms. Carroll?

              YES __✓__         NO _____

              *[If you answered "Yes," skip to Question 4. If you answered "No," continue to Question 3.]*

    3.    Mr. Trump forcibly touched Ms. Carroll?

              YES _____          NO _____

              *[If you answered "Yes," continue to Question 4. If you answered "No," skip to Question 6.]*

    4.    Ms. Carroll was injured as a result of Mr. Trump's conduct?

              YES __✓__         NO _____

              If "Yes," insert a dollar amount that would fairly and adequately compensate her for that injury or those injuries.

              $ _2,000,000_ — ( 2 million)

If "No," insert $1.

$ _____

*[Continue to Question 5, whether you answered "Yes" or "No."]*

5.  Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to such disregard?

YES ___✓___        NO _____

If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$ 20,000 — (twenty thousand)

*[Continue to Question 6, whether you answered "Yes" or "No."]*

## Defamation

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

6.  Mr. Trump's statement was defamatory?

YES ___✓___        NO _____

*[If you answered "Yes," continue to Question 7. If you answered "No," stop here and return your verdict.]*

**Did Ms. Carroll prove, by clear and convincing evidence, that**

7.  Mr. Trump's statement was false?

YES ___✓___        NO _____

*[If you answered "Yes," continue to Question 8.  If you answered "No," stop here and return your verdict.]*

8.  Mr. Trump made the statement with actual malice?

YES ___✓___        NO _____

*[If you answered "Yes," continue to Question 9.  If you answered "No," stop here and return your verdict.]*

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

9. Ms. Carroll was injured as a result of Mr. Trump's publication of the October 12, 2022 statement?

YES ✓        NO _____

If "Yes," insert a dollar amount for any damages other than the reputation repair program.

$ 1,000,000. — (1 million)

If "Yes," insert a dollar amount for any damages for the reputation repair program only.

$ 1,700,000. — (1.7 million)

If "No," insert $1.

$ _____

*[Continue to Question 10, whether you answered "Yes" or "No."]*

10. In making the statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another?

YES ✓        NO _____

If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$ 280,000. — (two hundred eighty thousand)

*[Please write your juror number (not you seat number or name) in the space provided below, fill in the date, and inform the officer that you have reached a verdict.]*

Dated: _____5/9_____, 2023

Juror numbers:

| | |
|---|---|
| 10 | 58 |
| 37 | 77 |
| 39 | 80 |
| 44 | 81 |
| 48 | |