# 23-0793-cv

## United States Court of Appeals

*for the*

## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES .....................................................................1

STATEMENT OF THE CASE..................................................................2

A.    Background on Plaintiff's Politically Motivated Lawsuits: *Carroll I* and *Carroll II* ...........................................................................2

B.    Pretrial Litigation .........................................................................3

C.    Trial ...............................................................................................6

D.    Verdict ...........................................................................................9

E.    Post-Trial Rulings ........................................................................9

SUMMARY OF ARGUMENT ...............................................................9

STANDARD OF REVIEW ..................................................................12

ARGUMENT .........................................................................................13

I.    The District Court Erred In Admitting Other-Acts Evidence .....................13

    A.    Relevant Facts .................................................................13

        1.    Jessica Leeds .................................................14

        2.    Natasha Stoynoff ...........................................15

        3.    The *Access Hollywood* Recording ...........................................16

    B.    Applicable Law .................................................................17

        1.    *Modus Operandi*: Rule 404(b) .................................17

        2.    Sexual Assault Evidence: Rules 413 and 415...........................18

        3.    Rule 403 Balancing.................................................19

    C.    Discussion .........................................................................20

        1.    Plaintiff's Defamation Claim Was Not "Based On" Alleged Sexual Assault .........................................................20

i

2.      The District Court Misinterpreted The Rule 413(d)(1) Definition of "Sexual Assault" ...................................................22

3.      Leeds' Testimony Was Not Admissible Pursuant to Rule 415(a)..................................................................................24

4.      Stoynoff's Testimony Was Not Admissible Pursuant to Rule 415(a)..................................................................................26

5.      The *Access Hollywood* Recording Was Not Admissible Pursuant to Rule 415(a) ........................................................28

6.      The *Access Hollywood* Recording Was Not A "Confession" .......................................................................................29

7.      The District Court Erred In Admitting Additional Evidence Relating to Leeds and Stoynoff.................................31

8.      The District Court Abused Its Discretion Under Rule 403 ............................................................................................34

        a.      Rule 415 Testimony By Leeds and Stoynoff .................34

        b.      Rule 404(b) Evidence .......................................................38

II.     The District Court Unreasonably Restricted President Trump's Defense ..............................................................................................40

A.      Politically Motivated Litigation Funding ............................................41

        1.      Background ......................................................................41

        2.      Discussion ........................................................................43

B.      Plaintiff's Coaching of Stoynoff ..........................................................44

        1.      Background ......................................................................44

        2.      Discussion ........................................................................46

C.      Plaintiff's False Claim Regarding President Trump's DNA ..............48

        1.      Background ......................................................................48

        2.      Discussion ........................................................................49

D.      Plaintiff's Intentional Decision Not To File A Police Report.............50

E.      Plaintiff's Intentional Decision Not to Seek Surveillance Video ..................................................................................................52

III.    The Cumulative Impact Of Evidentiary Errors Requires Reversal ............... 54

      A.    Applicable Law ........................................................................ 54

      B.    Discussion ............................................................................... 55

CONCLUSION ........................................................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Amatucci v. Delaware & Hudson Ry. Co.*,
745 F.2d 180 (2d Cir. 1984)................................................................56

*Berkovich v. Hicks*,
922 F.2d 1018 (2d Cir. 1991).............................................................17

*Bernard v. East Stroudsburg University*,
700 F. App'x 159 (3d Cir. 2017).........................................................35

*Boyce v. Weber*,
2021 WL 2821154 (S.D.N.Y. July 7, 2021)......................................21

*Carroll v. Trump*,
49 F.4th 759 (2d Cir. 2022)........................................................ *passim*

*Carroll v. Trump*,
66 F.4th 91 (2d Cir. 2023).......................................................... *passim*

*Condit v. Dunne*,
225 F.R.D. 100 (S.D.N.Y. 2004).........................................................43

*Costantino v. Herzog*,
203 F.3d 164 (2d Cir. 2000)................................................................54

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
232 F.3d 1258 (9th Cir. 2000)...................................................... 35-36

*Fuentes v. Griffin*,
829 F.3d 233 (2d Cir. 2016)................................................................40

*Greene v. McElroy*,
360 U.S. 474 (1959).............................................................................41

*Huddleston v. United States*,
485 U.S. 681 (1988)..................................................................... 29, 35

*Hynes v. Coughlin*,
79 F.3d 285 (2d Cir. 1996)..................................................................55

*Iverson v. Surber*,
800 F. App'x 50 (2d Cir. 2020)..........................................................36

iv

*Johnson v. Elk Lake School Dist.*,
  283 F.3d 138 (3d Cir. 2002) .................................................................... 19, 36

*Judicial Conference of the United States*,
  159 F.R.D. 51 (1995) ...................................................................... 18, 19, 24

*Kotteakos v. United States*,
  328 U.S. 750 (1946) ................................................................................ 39, 54

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ...............................................................39

*Oklahoma v. Castro-Huerta*,
  142 S. Ct. 2486 (2022) ........................................................................23

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Col, Ltd.*,
  484 U.S. 97 (1987) ..............................................................................23

*Pitasi v. Stratton Corp.*,
  968 F.2d 1558 (2d Cir. 1992) ..............................................................58

*Rapp v. Fowler*,
  2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022) .................................. 25-26

*Rotolo v. Digital Equip. Corp.*,
  150 F.3d 223 (1998) .............................................................................56

*Silivanch v. Celebrity Cruises, Inc.*,
  171 F. Supp. 2d 241 (S.D.N.Y. 2001) .................................................30

*United States v. Abel*,
  469 U.S. 45 (1984) ...............................................................................43

*United States v. Barker*,
  723 F.3d 315 (2d Cir. 2013) ................................................................21

*United States v. Benedetto*,
  571 F.2d 1246 (2d Cir. 1978) ....................................................... 17, 33

*United States v. Bird*,
  372 F.3d 989 (8th Cir. 2004) ..............................................................25

*United States v. Bonomolo*,
  566 F. App'x 71 (2d Cir. 2014) ...........................................................12

*United States v. Certified Envtl. Servs.*,
  753 F.3d 72 (2d Cir. 2014) ............................................................. 54-55

v

*United States v. Cummings*,
　858 F.3d 763 (2d Cir. 2017) .........................................................58

*United States v. Gleason*,
　616 F.2d 2 (2d Cir. 1979) ..............................................................30

*United States v. Guardia*,
　135 F.3d 1326 (10th Cir. 1998) .....................................................35

*United States v. Harvey*,
　547 F.2d 720 (2d Cir. 1976) ..........................................................47

*United States v. Hayward*,
　359 F.3d 631 (3d Cir. 2004) ..........................................................25

*United States v. Jacques*,
　684 F.3d 324 (2d Cir. 2012) ..........................................................37

*United States v. Kaplan*,
　490 F.3d 110 (2d Cir. 2007) ..........................................................39

*United States v. King*,
　560 F.2d 122 (2d Cir. 1977) ..........................................................36

*United States v. Larson*,
　112 F.3d 600 (2d Cir. 1997) ..........................................................37

*United States v. Mound*,
　149 F.3d 799 (8th Cir. 1998) .........................................................36

*United States v. O'Connor*,
　650 F.3d 839 (2d Cir. 2011) ............................................... 19, 36, 37

*United States v. Schaffer*,
　851 F.3d 166 (2d Cir. 2017) ...................................................... 18, 19

*United States v. Sliker*,
　751 F.2d 477 (2d Cir. 1984) ...................................................... 17, 33

*United States v. Spoor*,
　904 F.3d 141 (2d Cir. 2018) ............................................... 36, 37, 38

*United States v. Stout*,
　509 F.3d 796 (6th Cir. 2007) .........................................................35

*Wray v. Johnson*,
　202 F.3d 515 (2d Cir. 2000) ............................................... 54, 55, 56

**Statutes & Other Authorities:**

U.S. Const., amend. I ..................................................................................4

18 U.S.C. § 7 ...........................................................................................22

18 U.S.C. § 7(5) ......................................................................................23

18 U.S.C. § 2241(a) .................................................................................22

18 U.S.C. § 2241(a)(1) ....................................................................... 24, 25

18 U.S.C. § 2244(a) .................................................................................22

18 U.S.C. § 2244(a)(1) ....................................................................... 24, 25

18 U.S.C. § 2246(2) .................................................................................25

18 U.S.C. § 2246(2)(B) ............................................................................25

18 U.S.C. § 2246(3) .................................................................................25

18 U.S.C. § 2252A(b)(1) ..........................................................................21

18 U.S.C. § 2261(b)(4) .............................................................................23

18 U.S.C. § 2262(b)(4) .............................................................................23

18 U.S.C. Chapter 109A ..................................................................... *passim*

28 U.S.C. § 1332 .......................................................................................1

49 U.S.C. § 46506 ...................................................................................25

23 Wright & Miller, Fed. Prac. & Proc. Evid. § 5403 (2d ed. 2021)......................20

140 Cong. Rec. S12990-01, 1994 WL 513353 ........................................22

David Karp, *Evidence of Propensity and Probability in Sex Offense Cases and Other Cases*, 70 CHI. KENT LAW REV. 15 (1994)...........................................22

Fed. R. Civ. P. 59.................................................................................1, 9

Fed. R. Evid. 104 ....................................................................................49

Fed. R. Evid. 403 ............................................................................. *passim*

Fed. R. Evid. 404(b) ......................................................................... *passim*

Fed. R. Evid. 413 ............................................................................. *passim*

Fed. R. Evid. 413(d) ......................................................................... *passim*

Fed. R. Evid. 413(d)(1) ................................................................ *passim*

Fed. R. Evid. 413(d)(2) ................................................................ *passim*

Fed. R. Evid. 413(d)(3) ......................................................... 26, 28

Fed. R. Evid. 413(d)(4) ...................................................................26

Fed. R. Evid. 413(d)(5) ........................................................ 25, 27

Fed. R. Evid. 414 ........................................................... 18, 19, 21

Fed. R. Evid. 415 ....................................................... *passim*

Fed. R. Evid. 415(a) ...................................................... *passim*

Fed. R. Evid. 608 .............................................................................46

Fed. R. Evid. 801(d)(2)(A) ...........................................................47

Pub. L. No. 103-322, 108 Stat. 2135 (1994)..........................................18

## JURISDICTIONAL STATEMENT

President Donald J. Trump appeals from a final judgment entered in the Southern District of New York on May 11, 2023, which disposed of all parties' claims, and a July 19, 2023 opinion denying President Trump's motion pursuant to Rule 59 of the Federal Rules of Civil Procedure. The district court had jurisdiction pursuant to 28 U.S.C. § 1332. President Trump timely appealed on May 11, 2023, as amended on July 20, 2023. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1332.

## STATEMENT OF ISSUES

1.      Whether the district court erred by admitting evidence relating to alleged acts in the late 1970s and 2005, and other-acts evidence not connected to those alleged incidents, as propensity evidence in support of Plaintiff's false claim that she was sexually assaulted on a date she does not remember sometime in the 1990s?

2.      Whether the district court erred by precluding defense evidence and cross-examination regarding perjury during Plaintiff's deposition and other matters relevant to the bias and motive to lie of Plaintiff and other witnesses?

3.      Whether the cumulative effect of the district court's errors violated President Trump's substantial rights and requires a new trial, as Plaintiff emphasized the improperly admitted evidence during jury addresses, the erroneous rulings

hamstrung President Trump's ability to respond, and the court failed to administer appropriate limiting instructions?

## STATEMENT OF THE CASE

President Trump appeals from an unjust and erroneous jury verdict that was based on a series of flawed and prejudicial evidentiary rulings during a spring 2023 trial on defamation and battery claims by Plaintiff E. Jean Carroll. The entire case is based on an account of purported acts by President Trump at some point in the 1990s, the day of the week unknown, the month unknown, and the year unknown. *E.g.*, A.1747-1749.[1] But for Plaintiff's testimony, propped up by two of her lifelong friends with vague recollections of years gone by, there was absolutely zero evidence against President Trump. *E.g.*, A.1746.

To improperly bolster Plaintiff's case, the district court allowed unduly prejudicial testimony from two other women, one of whom testified about an alleged incident on a plane *in the late 1970s*, and the other about a supposed incident nearly a decade after Plaintiffs allegation, and nearly two decades prior to her testimony. A.2097-2098, A.2348. The district court also allowed into evidence a highly prejudicial and irrelevant recording that had no bearing on the alleged conduct. SPA.180 n.20. The improper verdict in this case is a gross miscarriage of justice,

---

[1] Citations to "A.\_" are to pages of the Joint Appendix. Citations to "SPA.\_" are to the Special Appendix.

backed by political operatives long opposed to President Trump and his politics, based on false and unsupported claims by Plaintiff—a woman President Trump has never known and has had no interaction with, other than during a momentary meeting many decades ago captured by a photograph depicting Plaintiff and her then-husband in a receiving line with hundreds of people. Despite admitting the photograph from the 1980s and permitting Plaintiff to testify about domestic violence incidents involving her ex-husband, the district court wrongfully precluded cross-examination on the reasons for the disputes, including Plaintiff's use of abusive and racially based language toward her husband.[2] A.1626-1628.

## A. Background on Plaintiff's Politically Motivated Lawsuits: *Carroll I* and *Carroll II*

In 2016, Plaintiff "watched in horror" as President Trump won the election. A.514 ¶ 5. In June 2019, *New York* magazine published an excerpt from a book in which Plaintiff claimed falsely that President Trump assaulted her at Bergdorf Goodman, a crowded luxury department store in Manhattan. A.1669. Plaintiff presented this allegation for the first time as part of an effort to harm President Trump's campaign for the 2020 election and to profit from selling the book. The original proposal for Plaintiff's book did mention rape or sexual harassment at all,

---

[2] Plaintiff's use of such language includes calling her husband an "ape." A.1626-1628.

instead whimsically telling a tale of meeting one of the most famous figures in world history. A.1756-1757. Plaintiff claimed the incident occurred on a date she does not remember. *E.g.*, A.1582-1583. At times during the litigation she barely managed to specify a decade, but then she somehow miraculously narrowed it down to 1995 or 1996. A.1748-1749. There being no exception to the First Amendment for the Commander in Chief, and far from it, President Trump publicly denied Plaintiff's allegation, which was a made-up story.

In November 2019—at the urging of an extremely vocal and troubled critic of President Trump, George Conway, and later with funding from a wealthy donor to the Democratic Party and critic of President Trump, Reid Hoffman—Plaintiff initiated her first politically motivated lawsuit. A.1177, A.1705-1706. That case, referred to herein as *Carroll I*, has been the subject of separate proceedings before this Court and has not yet been tried.[3] In *Carroll I*, Plaintiff claimed that President Trump defamed her in 2019 when, as President, he merely denied her false allegations.

Plaintiff initiated this case, *Carroll II*, minutes after the passage of an unfair and controversial New York law that provided temporary relief from the applicable statute of limitations for certain claims, no matter how dated, such as in this case

---

[3] *See, e.g.*, *Carroll v. Trump*, 66 F.4th 91 (2d Cir. 2023); *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022).

where the Plaintiff does not know the date because the event in question did not occur. In *Carroll II*, Plaintiff brought a claim for battery based on rape and sexual abuse theories under New York law, and she added a new defamation claim based on President Trump's October 12, 2022 social media post again denying the false allegation of a purported decades-old event. A.513-541.

## B. Pretrial Litigation

Prior to trial in *Carroll II*, as discussed in more detail below, the district court denied President Trump's motion to preclude three pieces of extremely prejudicial evidence that Plaintiff sought to offer as otherwise-impermissible propensity proof pursuant to Rule 415(a). The court ruled that Plaintiff could offer testimony from Jessica Leeds regarding an alleged interaction with President Trump on a commercial aircraft in the late 1970s, as well as testimony from Natasha Stoynoff regarding an alleged interaction with President Trump at Mar-a-Lago in 2005. Neither woman had filed a lawsuit or a police report relating to President Trump. *See, e.g.*, A.2143, A.2355. The court also wrongly authorized Plaintiff to offer a recorded conversation from 2005 that purported to include statements by President Trump concerning a journalist, a separate publicist, and certain acts (the "*Access Hollywood* recording").

**C. Trial**

The district court conducted a jury trial on the claims in *Carroll II* in April and May 2023, after denying newly appointed defense counsel's requests for a reasonable adjournment to allow him to properly prepare for trial and for various personal reasons. Portions of President Trump's deposition were played for the jury, but President Trump himself did not attend the trial given the fact there was absolutely no physical evidence in support of Plaintiff's claims and the only direct evidence of liability was the incredible testimony from Plaintiff who failed to provide a month or even year when this supposed event took place.

Plaintiff testified at length in support of her false allegations relating to purported events in the 1990s. Plaintiff filed no complaints or police reports about this alleged incident, she offered no surveillance video, and she presented no physical evidence to corroborate her claims. Having claimed publicly that she possessed President Trump's DNA from the dress she allegedly wore on the day she does not remember, Plaintiff did not litigate her entitlement to a DNA sample from President Trump and she presented no DNA evidence. However, the district court wrongfully precluded defense counsel from raising these issues. SPA.127-130. Plaintiff's story was filled with inconsistencies about the theory of her allegations, and there was overwhelming evidence of clear improper political motivation against President Trump. For example, as Plaintiff acknowledged, the plot of a 2012 *Law*

6

*& Order* episode included a story nearly identical to Plaintiff's. A.1955. During her testimony, she acknowledged having stated during an interview that "most people think of rape as sexy." A.1704. Despite claiming with fervor at trial that she had been harmed by President Trump's public statements, she was confronted with a private text message sent after those statements, in which she wrote: "I have been walking these great New York streets the last six days alone and at night, all day long, and receive nothing but thanks and thumbs up. It is the opposite of concern." A.1951.

There was overwhelming evidence of clear improper political motivation against President Trump. Without a legal basis, the district court improperly restricted President Trump's ability to challenge the testimony and to present his truth defense in response to the defamation claim. For example, the court precluded defense counsel from cross-examining Plaintiff regarding certain lies during her deposition, clear evidence of politically motivated litigation funding, her efforts to improperly influence Natasha Stoynoff's story during a 2020 interview, and her false public claim regarding President Trump's DNA. To bolster her manufactured allegations, Plaintiff offered testimony from her friends, Lisa Birnbach and Carol Martin, who coincidentally claimed that Plaintiff told them versions of her story around the time that Plaintiff said the events occurred, although neither supposed

witness was able to add any clarity to the day, month, or year of the supposed sexual assault.

Plaintiff played the *Access Hollywood* recording for the jury multiple times, notwithstanding the fact that the recording was made about a decade after the claimed sexual assault and involved discussion of two specific non-party females— who never claimed to have been sexually assaulted by President Trump. *E.g.*, A.2362-2363, A.2587. In addition to the video, incredibly, 81-year-old Leeds was permitted to testify regarding alleged sexual contact with President Trump on a plane, which she said occurred when she was in her 30s, approximately 44 years before the trial. A.2098. This was on top of Stoynoff's testimony regarding alleged sexual contact at Mar-a-Lago in 2005, approximately 18 years before the trial. A.2346-2353. As if this highly prejudicial testimony from decades past was not improper enough on its own, plaintiff also offered improper Rule 404(b) testimony from both witnesses, including regarding President Trump's denials of their false claims and an interaction with President Trump's wife. The witnesses were also permitted to offer inadmissible lay opinions, such as Leeds' view on President Trump's claimed untruthfulness during a 2016 presidential debate. A.2109.

Finally, Plaintiff offered expert testimony from Dr. Leslie Lebowitz regarding trauma issues, and from Dr. Ashlee Humphreys regarding damages. A.2247-2248, A.2501-2502.

## D. Verdict

The jury rejected Plaintiff's rape allegation, but, despite the lack of evidence, returned a verdict for Plaintiff on the sexual abuse theory of her battery claim. A.3095. The jury also found for Plaintiff on the defamation claim. A.3096. For the battery claim, the jury awarded $2 million in compensatory damages and $20,000 in punitive damages. A.3095-3096. For the defamation claim, the jury awarded $2.7 million in compensatory damages and $280,000 in punitive damages. A.3097.

## E. Post-Trial Rulings

Following the trial, the district court denied President Trump's motion pursuant to Rule 59 for a reduction in the jury's damages award. SPA.163. In that ruling, apparently for the first time, the court informed the parties that the *Access Hollywood* recording had been admitted pursuant to Rule 404(b) rather than Rule 415—a ruling Plaintiff does not appear to have sought and which calls into question all of Plaintiff's propensity arguments based on that evidence. SPA.180 n.20.

## SUMMARY OF ARGUMENT

The verdict against President Trump must be vacated. Because propensity evidence is typically prohibited, and in light of the patent unreliability of the remote-in-time and vague evidence at issue, Plaintiff's reliance on Rules 415 and 404(b) presented grave risks to the integrity of these proceedings. The district court failed in its obligation to guard against those risks and further prejudiced the defense by

preventing President Trump from informing the jury of the politically motivated bias that permeated this case and Plaintiff's lies.

The district court committed legal error subject to *de novo* review by finding that Plaintiff could rely on Rule 415 to support her defamation claim, and that the Rule 413(d) definition of "sexual assault" could reach an alleged late-1970s incident on a commercial aircraft. As a factual matter, the trial testimony from Leeds and Stoynoff did not establish the elements of the "sexual assault" definition and was therefore inadmissible under Rule 415(a). The *Access Hollywood* recording did not meet the Rule 413(d) definition, either, which is a conclusion the district court seemed to reach on its own when it ruled after the trial that the recording had actually been admitted pursuant to Rule 404(b). The court's late change of course resulted in a ripple effect of errors, including that there was no Rule 404(b) limiting instruction and that the court had relied on the *Access Hollywood* recording for a propensity inference in support of its erroneous pretrial ruling that Stoynoff's testimony was admissible by reasoning that the recording made it more likely that Stoynoff's account described a "sexual assault" for purposes of admissibility under Rule 415. This was all error.

The district court permitted additional improper testimony from Leeds and Stoynoff, such as the prejudicial and improper lay opinion on President Trump's truthfulness, testimony regarding other interactions with President Trump and his

wife, and testimony regarding other people who Stoynoff and Leeds claimed to have told about their interactions with President Trump. The court also erred by ruling that evidence relating to President Trump's public denials of the allegations from Leeds and Stoynoff was admissible as evidence of a *modus operandi*. This ruling was wrong and unduly prejudicial. It is not at all unique for a public figure to deny false allegations, and denying such accusations certainly does not show a *modus operandi*. Moreover, even if this evidence was relevant to a permissible issue—and it was not—the evidence should have been precluded under Rule 403 because it was equivocal, uncorroborated, and related to remote events.

The prejudice arising from those erroneous rulings was exacerbated by repeated and consistent improper restrictions placed on President Trump's defense— of which there were many. President Trump was unfairly prevented from offering concrete proof of Plaintiff's politically motivated bias to lie, including that a political critic of President Trump suggested she file the lawsuits and the litigation was funded by a like-minded politically motivated billionaire, and that Plaintiff coached Stoynoff and influenced her story. The court also improperly restricted President Trump's cross-examination of Plaintiff regarding her public lie about possessing President Trump's DNA as well as on topics relating to security footage, and her failure to file a police report, which would have supported the defense argument that

Plaintiff intentionally declined to take obvious steps because she knew her story was false.

These errors were not harmless. Just the opposite. President Trump does not know Plaintiff and, apart from what has transpired in *Carroll I* and *Carroll II*, knows nothing about her. She made no formal complaints against him and never filed a police report. She presented no physical evidence or contemporaneous witnesses from the crowded department store where the incident in question allegedly took place. Plaintiff barely offered a rough estimate of the date of her politically motivated allegations, knowing full well that the lack of specificity would make her claims nearly impossible to specifically refute. In order to prevail despite the paucity of evidence, Plaintiff offered and repeatedly emphasized inadmissible evidence to the jury—which was wrongly admitted by the district court—and made other arguments that President Trump was prevented from addressing through improperly precluded questioning and evidence. For all of these reasons, the jury's verdict must be vacated and the case remanded for a new trial.

## STANDARD OF REVIEW

Evidentiary rulings are generally subject to review for abuse of discretion, but this Court reviews "legal interpretation of the Federal Rules of Evidence *de novo*." *United States v. Bonomolo*, 566 F. App'x 71, 73 (2d Cir. 2014).

# ARGUMENT

## I. The District Court Erred In Admitting Other-Acts Evidence

The district court committed several legal and factual errors regarding the admissibility of other-acts evidence relating to the false claims by Leeds and Stoynoff and the *Access Hollywood* recording. Collectively, these errors were deeply prejudicial to President Trump and require that the verdict be set aside.

### A. Relevant Facts

Prior to trial, President Trump moved to preclude testimony from Leeds and Stoynoff, excerpts from President Trump's 2016 campaign rallies that Plaintiff argued related to Leeds and Stoynoff, and the *Access Hollywood* recording. A.753. Incorporating rulings on similar issues in *Carroll I*, the district court found that testimony from Leeds and Stoynoff was admissible pursuant to Rule 415. SPA.114-115; *see also* SPA.26-36. The court deferred its decision on the campaign-rally evidence, and ruled incorrectly that the *Access Hollywood* recording was admissible pursuant to Rule 415. *See* SPA.20-25, SPA.36-38. Following the trial, however, perhaps recognizing the error in admitting the *Access Hollywood* recording under Rule 415, the court ruled for the first time that the *Access Hollywood* recording had been instead admitted pursuant to Rule 404(b) based on an argument that Plaintiff made for the first time during her rebuttal summation. SPA.180 n.20.

**1. Jessica Leeds**

Jessica Leeds testified at trial that she met President Trump for the first time "on an airplane in I think 1979 or '8." A.2098. She was approximately 37 at the time of the flight, and 81 at the time of her testimony. A.2097-2098. Plaintiff interviewed Leeds in approximately 2019—four decades following the purported incident—"about an article [Plaintiff] was writing." A.2121; *see also* A.1692.

At trial, Leeds did not remember where she departed from on the flight that allegedly occurred some 44 or 45 years prior. A.2098. But she claimed that "one of the stewardesses came down the aisle and asked me if I would like to come up to first class." A.2099. Although the rest of the flight was "full," she testified that she "shook hands" with President Trump after being seated next to him at the front of the plane. A.2100. Leeds did not "remember anything substantial" about her conversation with President Trump, and she asserted at one point that "[t]here was no conversation." A.2101.

Leeds testified that "all of a sudden," after a "very nice meal," President Trump "decided to kiss me and grope me." A.2101. She elaborated:

> Well, it was like a tussle. He was – his hands and – he was trying to kiss me, he was trying to pull me towards him. He was grabbing my breasts, he was – it's like he had 40 zillion hands, and it was a tussling match between the two of us. And it was when he started putting his hand up my skirt that that kind of gave me a jolt of strength, and I managed to wiggle out of the seat and I went storming back to my seat in the coach.

A.2101-2102.  According to Leeds, a nearby passenger watched these events, which lasted "just a few seconds."  A.2103.

Leeds did not tell anyone about the supposed incident until "it became apparent to me that [President Trump] wanted to run for president."  A.2104. Approximately 37 years later, following an October 2016 presidential debate in which President Trump denied having had non-consensual contact with women, she contacted the *New York Times* to tell this story.  A.2105.

Over an objection, Plaintiff offered a video and transcript of a 2016 speech in which President Trump stated:

> [T]he only way they figure they can slow it down is to come up with people that are willing to Say, Oh I was with Donald Trump in 1980, I was sitting with him on an airplane and he went after me on the plane.  Yeah, I'm gonna go after. Believe me, she would not be my first choice.

A.2890; *see also* A.2119.  Leeds was also permitted to testify about statements that she claimed President Trump made when she allegedly encountered him "in '81." A.2122.

## 2. Natasha Stoynoff

Natasha Stoynoff testified at trial about an alleged encounter with President Trump in December 2005.  A.2346.  Stoynoff was "friends" with Plaintiff and, much like Leeds, she met Plaintiff in connection with an interview in 2020.  A.2361. Stoynoff told the jury that she considered President Trump to be "terribly unfit" and that she was "happy" after the 2020 election.  A.2360.

In 2005, Stoynoff, then a reporter, traveled to President Trump's Florida residence, Mar-a-Lago, to interview him and his wife. A.2348. She claimed that, during a "break" in the interviews, President Trump offered to show her "this really great room we've got." A.2348-2349. According to Stoynoff, President Trump took her to the room, shut the door, and then: "he has his hands on my shoulders and he pushes me against the wall and starts kissing me, holding me against the wall." A.2350. Stoynoff said that she did not say anything but "tried to push him away." *Id.* She said the episode lasted a "few minutes" and ended when a "butler came into the room." A.2351.

Incredibly, Stoynoff proceeded to write a glowing story about President Trump and his family. A.2367-2368. Stoynoff was permitted to testify—without corroboration—that that she told a professor, a friend, and co-workers this story. A.2355-2358. She was also permitted to testify that she believed, wrongly, that President Trump "does this to a lot of women," based on the *Access Hollywood* video. A.2365. She said that she wrote an essay about her story in October 2016 after hearing the *Access Hollywood* recording and President Trump's comments during a presidential debate. A.2362-2363.

### 3. The *Access Hollywood* Recording

The district court admitted two irrelevant and unduly prejudicial aspects of the *Access Hollywood* recording, which Plaintiff played for the jury during

Stoynoff's testimony and while publishing designations from President Trump's deposition.

First, the court admitted a segment referencing "Nancy," which included: "I moved on her, and I failed. I'll admit it. I did try and fuck her." A.2883.

Second, the court admitted a segment referencing a publicist who was about to join the meeting, which included:

> Yeah that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful – I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star they let you do it. You can do anything.
>
> [. . .]
>
> Grab them by the pussy. You can do anything.

A.2883.

## B. Applicable Law

### 1. *Modus Operandi*: Rule 404(b)

In order to be admissible under Rule 404(b) on a *modus operandi* theory, "the extrinsic acts must share 'unusual characteristics' with the act charged or represent a 'unique scheme.'" *Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir. 1991) (quoting *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir. 1978)). "[T]he characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence." *United States v. Sliker*, 751 F.2d 477, 487 (2d Cir. 1984).

**2. Sexual Assault Evidence: Rules 413 And 415**

Rules 413 and 415 permit other-acts evidence of a "sexual assault" for any purpose, including as "propensity evidence." *United States v. Schaffer*, 851 F.3d 166, 180 (2d Cir. 2017). Under Rule 415, evidence of "any other sexual assault" is relevant "in a civil case involving a claim for relief based on a party's alleged sexual assault . . . ." Fed. R. Evid. 415(a). The term "sexual assault" is defined in Rule 413. The definition includes "a crime under federal law or under state law," if that offense involved either "any conduct prohibited by 18 U.S.C. chapter 109A," or "contact, without consent, between any part of the defendant's body . . . and another person's genitals or anus." Fed. R. Evid. 413(d)(1)-(2).

There was "serious opposition" when Congress included these rules in the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 2135 (1994), and that criticism "continued" after President Clinton signed the law in September 1994. *Schaffer*, 851 F.3d at 180-81. For example, in February 2015, pursuant to § 320935 of the Act, the Judicial Conference of the United States submitted a report that "opposed new Evidence Rules 413, 414, and 415." 159 F.R.D. 51, 51 (1995). Describing "overwhelming opposition," the Judicial Conference noted that the Rules were "not supported by empirical evidence," "would permit the admission of unfairly prejudicial evidence and contained numerous drafting problems not intended by their authors." *Id*. at 52-53; *see also*

*id.* at 53 (noting "the highly unusual unanimity of the members of the Standing Advisory Committees . . . in taking the view that Rules 413–415 are undesirable"). Congress did not address these concerns, and the Rules became effective on July 9, 1995.

### 3. Rule 403 Balancing

"Where in a particular instance the admission of evidence of prior sexual assaults would create 'undue prejudice' and threaten due process, district courts can and should, by operation of Rule 403, exclude that evidence and ensure the defendant's right to a fair trial." *Schaffer*, 851 F.3d at 180. Rule 403 gatekeeping is particularly important in light of "severe social stigma" associated with sexual assault evidence; "evidence of these [alleged] past acts poses a higher risk, on the whole, of influencing the jury to punish the defendant for the similar act rather than the charged act . . . ." *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 153 n.8 (3d Cir. 2002).

"[R]emote-in-time evidence" offered under these Rules requires a "fact-specific and case-specific analysis." *United States v. O'Connor*, 650 F.3d 839, 853 (2d Cir. 2011).

> Exclusion of proof of other acts that are too remote in time caters principally to the dual concerns for relevance and reliability. The evaluation of the proffered evidence in light of these concerns must be made on a case-by-case basis to determine whether the significance of the prior acts has become too attenuated and whether the memories of the witnesses has likely become too frail.

*Id.* (cleaned up).

**C. Discussion**

**1. Plaintiff's Defamation Claim Was Not "Based On" Alleged Sexual Assault**

The district court committed legal error by concluding in *Carroll I* that Plaintiff's defamation claim was a "a claim for relief based on a party's alleged sexual assault" under Rule 415(a), and then finding that its "'based on' analysis" had "no bearing" on *Carroll II* because Plaintiff had added a battery claim. SPA.22, SPA.115. Rule 415(a) did not apply to the defamation claim. Even if there had been admissible evidence of other sexual assaults, which there was not, the jury should not have been permitted to consider evidence admitted pursuant to Rule 415(a) when evaluating that cause of action.

A leading treatise prescribes a "categorical approach" for this issue: a "court is confronted with a claim 'based on' a sexual offense only when the elements of that offense are also elements of the civil claim itself." 23 Wright & Miller, Fed. Prac. & Proc. Evid. § 5403 (2d ed. 2021). This approach makes good sense. Because of the sea change that Rule 415 represents with respect to propensity inferences, the Rule's application should be limited to the specific sexual misconduct claims that Congress focused on when promulgating this controversial rule in such an unorthodox fashion.

Consistent with the categorial approach, when evaluating sex crimes under 18 U.S.C. § 2252A(b)(1), which calls for analysis of state offenses "relating to" sexual abuse and other misconduct, courts look to the "elements and nature" of the offense. *E.g.*, *United States v. Barker*, 723 F.3d 315, 321 (2d Cir. 2013). Neither the elements nor the nature of the defamation claim was "based on" sexual assault under Rule 415(a). The district court found this standard to be met because, in its view, "[u]nless [Plaintiff] proves . . . sexual assault, she cannot establish that Mr. Trump's charge that her story was a lie and a hoax was false." SPA.23. However, several aspects of the October 2022 statement did not require proof of a sexual assault, which did not happen, in order to establish the defamation claim. Plaintiff should not have been granted recourse to Rule 415(a) to bolster an otherwise-weak claim.

The district court "agree[d]" with the analysis in *Boyce v. Weber*, 2021 WL 2821154, at *8 (S.D.N.Y. July 7, 2021), to conclude that a claim is "based on" sexual assault under Rule 415 "if a sexual assault is a premise" of the claim. SPA.23. In *Boyce*, however, the claims were for "sexual harassment and discrimination" and "sex trafficking." 2021 WL 2821154, at *1. Noting a "relative dearth of precedent addressing this inquiry," the *Boyce* court found a "fact-specific approach is more faithful to Congress's intent in promulgating Rule 415." *Id.* at *9. The relevant legislative history, however, states that Rules 413-415 relate to "sex offense cases" and were "justified by the distinctive characteristics of the cases to which it applies,"

and goes on to discuss "child molestation" and "sexual assault" cases rather than defamation claims. 140 Cong. Rec. S12990-01, 1994 WL 513353.[4] Whatever the merit of the reference to congressional intent in *Boyce*, it did not support the district court's expansion of Rule 415(a) to reach Plaintiff's defamation claim.

## 2. The District Court Misinterpreted The Rule 413(d)(1) Definition Of "Sexual Assault"

The district court committed legal error by misinterpreting the term "sexual assault" to cover Leeds' story about her flight from an unknown location at some point in the late 1970s.

The district court relied on Rule 413(d)(1), which, as pertinent here, applies to "any conduct prohibited by 18 U.S.C. chapter 109A." The court reasoned that Leeds' testimony adequately described violations of 18 U.S.C. §§ 2241(a) and 2244(a), which are part of chapter 109A. SPA.27 n.12. The fatal flaw in this reasoning is that those provisions are limited to conduct undertaken in the "special maritime and territorial jurisdiction of the United States," as defined in 18 U.S.C. § 7, and prisons. Airspace is not part of the "special maritime and territorial jurisdiction" unless the plane is "in flight over the high seas, or over any other waters

---

[4] Senator Robert J. Dole's statement incorporated by reference an article by an employee of the Department of Justice. *See* David Karp, Evidence of Propensity and Probability in Sex Offense Cases and Other Cases, 70 Chi. Kent Law Rev. 15 (1994). The article similarly limits its discussion of the applicability of Rules 413-415 to "sex offense cases." *See, e.g.*, *id.*

within the admiralty and maritime jurisdiction of the United States. . . . ." 18 U.S.C. § 7(5). The district court did not address this requirement, and the record does not support it because Leeds testimony was so vague that she could not even recall her embarkation point. A.2098. Thus, the district court's decision to admit Leeds' testimony was erroneous as a matter of law because the alleged activity was not "conduct prohibited by 18 U.S.C. chapter 109A" under Rule 413(d)(1).

The district court appears to have incorrectly assumed that Rules 413 and 415 apply to actions that violate chapter 109A irrespective of where those actions occurred. That is not what Rule 413(d)(1) says. *See, e.g.*, *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) ("The Court may not replace the actual text with speculation as to Congress' intent.") (cleaned up). Moreover, Congress has demonstrated in several other provisions that it is aware of the location requirements in chapter 109A and knows how to make explicit what is omitted from Rule 413(d)(1).[5] *See, e.g.*, *Omni Capital Int' v. Rudolf Wolff & Co.*, 484 U.S. 97, 106 (1987) (rejecting statutory interpretation where "[i]t would appear that Congress knows how to authorize nationwide service of process when it wants to provide for

---

[5] *See* 18 U.S.C. § 2261(b)(4) (referring to "an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison)"); 18 U.S.C. § 2262(b)(4) (referring to "an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison)").

it," and "fail[ure] to do so here argues forcefully that such authorization was not its intention"). Finally, prior to the enactment of Rule 413, the Judicial Conference brought this issue to the attention of Congress. *See* 159 F.R.D. at 54. In order to "clarify drafting ambiguities and eliminate possible constitutional infirmities," the Conference included a series of "Recommendations." 159 F.R.D. at 52, 54-56. As part of these Recommendations, the Conference proposed adding the following language in relation to references to Chapter 109A: "regardless of whether that conduct would have subjected the actor to federal jurisdiction." *Id.* at 55.[6] Congress did not implement this proposal, and there is no basis for the district court's decision to write it in to Rule 413(d)(1). Accordingly, the district court committed legal error by admitting Leeds' testimony under Rule 415(a).

## 3. Leeds' Testimony Was Not Admissible Pursuant To Rule 415(a)

The district court erred factually by finding that Leeds' testimony met the definition of "sexual assault" under Rule 413(d) and was thus admissible under Rule 415(a).

As noted above, the district court relied on 18 U.S.C. §§ 2241(a)(1) and 2244(a)(1), and found that violations of those statutes on board an aircraft—

---

[6] Although the Judicial Conference suggested the change would result in "no change in meaning," it is clear from the very next sentence of the Report that the proposal was intended to expand the scope of Congress's draft: "Conduct committed outside the United States ought equally to be eligible for admission." 159 F.R.D. at 57.

"attempted or completed"—violated 49 U.S.C. § 46506.  SPA.27 n.12.  Sections 2241(a)(1) and 2244(a)(1) require proof of a "sexual act," as defined in 18 U.S.C. § 2246(2).  While Leeds' claim regarding alleged contact with her breast, which never happened, may have supported an evidentiary ruling relating to a "sexual contact" under § 2246(3), the physical contact she described at trial did not rise to the level of a "sexual act" under § 2246(2).  Moreover, Leeds' false allegation that President Trump "started putting his hand up my skirt," during an encounter that lasted "just a few seconds," was not a sufficient basis to find a "sexual act" under § 2246(2).  A.2102-2103.

Nor was Leeds' testimony sufficient to support an attempt theory under Rule 413(d)(5).  *See United States v. Hayward*, 359 F.3d 631, 640 (3d Cir. 2004) ("The ambiguous and equivocal act of pushing a victim's head toward one's clothed penis does not meet any definition of a 'sexual act' as defined in 18 U.S.C. § 2246(2) and does not constitute a substantial step toward achieving 'contact between the mouth and the penis' under 18 U.S.C. § 2246(2)(B)."); *United States v. Bird*, 372 F.3d 989, 992-93 (8th Cir. 2004) (reversing Rule 413 admission).  In another case, the same district court judge found that a defendant having put his "hand on" a non-party's "knee for 'maybe 30 or 45 seconds'" was inadmissible under Rules 404(b) and 403 and not a "sexual assault" for purposes of Rule 415(a)—in essence, rejecting the same attempt theory advanced by Plaintiff in this case.  *Rapp v. Fowler*, 2022 WL

25

5243030, at \*2 (S.D.N.Y. Oct. 6, 2022). Therefore, in addition to the legal error relating to the scope of Rule 413(d)(1), there was not a sufficient factual basis to admit Leeds' false allegations regarding a flight that she said occurred in the last 1970s.

## 4. Stoynoff's Testimony Was Not Admissible Pursuant To Rule 415(a)

The district court erred factually by finding that Stoynoff's testimony regarding an alleged encounter at Mar-a-Lago in 2005 established a "sexual assault."

The district court focused on claimed violations of Florida law, and erroneously found that Stoynoff's allegations were sufficient to meet the parts of Rule 413(d) that require contact with an individual's "genitals or anus." *See* Fed. R. Evid. 413(d)(2)-(3).[7] The district court acknowledged that "kissing [Stoynoff] without her consent . . . would not satisfy any part of Rule 413(d)," and instead focused on Stoynoff's use of the word "grope" during her deposition. SPA.31-32, SPA.32 n.25, SPA.95 n.4. The court recognized that, absent more, "Rule 413(d) is not that broad" so as to reach alleged "groping" by itself. SPA.32. But the court then strained to bring Stoynoff's story within the ambit of the "sexual assault" definition by reasoning that the *Access Hollywood* recording, which should not have

_____

[7] There was no basis to conclude, and no one suggested in the district court proceedings, that Stoynoff's story involved "conduct prohibited by 18 U.S.C. chapter 109A," or conduct "involving . . . deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person." Fed. R. Evid. 413(d)(1), (d)(4).

been admitted, and testimony from Leeds, which also should not have been admitted, could support an inference that there was an "ultimate goal" of making contact with "Ms. Stoynoff's most private parts" in an "unoccupied room" at Mar-a-Lago. SPA.33. Because the district court ruled after the trial that the *Access Hollywood* recording had been admitted pursuant to Rule 404(b), the court's pretrial reliance on the recording for a Rule 415(a) propensity inference was error.

Perhaps recognizing the limits of the term "grope," the district court improperly invited Plaintiff to "lay a better foundation" at trial by "adducing evidence concerning the particular parts of Ms. Stoynoff's anatomy" that she claimed were "groped." SPA.32 n.25. Before trial, the court incorrectly denied President Trump's request for a *voir dire* examination of Stoynoff outside the presence of the jury so that he could establish that Plaintiff would not, and could not, lay a better foundation for the testimony. SPA.160-161; *see also* A.3036 (defense counsel explaining that "Stoynoff will testify only that Defendant kissed her, which . . . does not satisfy the requirements for her testimony under Fed. R. Evid. 413(d)(2&5)."). Consistent with President Trump's unheeded warning, Stoynoff's trial testimony did not address any of the gaps that were clear from her deposition.

In fact, Stoynoff did not even use the word "grope," or any similar term, during her testimony. Rather, she falsely claimed that "by the time I turn[ed] around, he has his hands on my shoulders and he pushes me against the wall and starts kissing

me, holding me against the wall." A.2350. Accordingly, by the very terms of the district court's *in limine* ruling—that "kissing her without her consent" was not a "sexual assault" under Rule 413(d)—Plaintiff failed to establish that Stoynoff's claim was admissible pursuant to Rule 415(a). The court therefore erred by admitting the testimony.

### 5. The *Access Hollywood* Recording Was Not Admissible Pursuant To Rule 415(a)

The district court erred in its pretrial ruling by concluding that segments of the *Access Hollywood* recording were admissible pursuant to Rule 415(a). SPA.23-25.

First, there was no evidence that the portion of the recording relating to "Nancy" involved a "sexual assault" as defined by Rule 413(d). No part of the recording supported an inference of non-consensual contact, as required by Rule 413(d)(2) and (d)(3). Consistent with public reports, the district court suggested that it was aware of the identity of "Nancy." SPA.24 n.7. Plaintiff even acknowledged that President Trump "was describing a specific incident." A.2764. Yet Plaintiff never presented any evidence to support a funding that "Nancy" was the victim of a "sexual assault."

Second, the other aspects of the recording related to a female publicist who was expected to participate in the upcoming meeting discussed on the recording, whose name has also been publicly reported, and who has never claimed that

President Trump sexually assaulted her. On the recording, President Trump referred to "her." A.2883. The district court suggested that the recording could be interpreted as suggesting that "he does not first obtain consent." SPA.24. That reasoning is in significant tension with the statement on the recording that "they let you do it." SPA.21. The comments involved abstract speculation, such as "in case I start kissing her" and things that one "can do." *Id.* There was no statement attributed to President Trump on the recording indicating that he "had done" any of those things, and no evidence of a sexual assault of the publicist referenced in that portion of the recording.

These statements were not sufficient to support a finding of admissibility under Rule 415(a). To the contrary, the admission of the *Access Hollywood* recording violated the Supreme Court's admonition that parties may not "parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo." *Huddleston v. United States*, 485 U.S. 681, 689 (1988).

## 6. The *Access Hollywood* Recording Was Not A "Confession"

After the trial, the district court appears to have announced for the first time—in a footnote—that the *Access Hollywood* recording had been admitted "for a purpose other than to show the defendant's propensity to commit sexual assault"

because "one of the women he referred to in the video could have been Ms. Carroll." SPA.180 n.20. That was fanciful, untrue, and a bridge too far.

The district court based this erroneous conclusion on the argument from Plaintiff's rebuttal summation that the *Access Hollywood* recording was a "confession." *Id.*, A.2763, A.2765. The second time counsel used that term, he suggested that President Trump's "confession" related to Stoynoff instead of Plaintiff. A.2765. If counsel was claiming that President Trump had "confessed" to assaulting Plaintiff, it is telling that counsel did not present that claim to the jury until rebuttal, at a point in the proceedings when President Trump could not respond. *Cf. United States v. Gleason*, 616 F.2d 2, 26 (2d Cir. 1979) (reasoning that a reversal might be required," absent corrective measures, based on a "surprise reply summation"); *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 271 (S.D.N.Y. 2001) ("It is conceivable that a trial judge might commit an abuse of discretion . . . where the party with the final word raises an argument that could not have been anticipated."). In fact, during opening statements, Plaintiff's counsel was careful not to suggest that President Trump was referring to Plaintiff on the *Access Hollywood* recording. There, counsel overbroadly and incorrectly asserted that the recording reflected President Trump "bragging" about doing "*almost* the same thing he did to Ms. Carroll to *other women*." A.1446 (emphasis added).

The only way that a juror could infer, as the district court claimed, that "one of the women" referenced during the discussion of two other specific women on the *Access Hollywood* recording "could have been" Plaintiff was based on a propensity inference. But the court disclaimed reliance on Rule 415, which permits such an inference (where the Rule's other conditions are satisfied), and cited caselaw relating to Rule 404(b), which does not. SPA.180 n.20. This was evidentiary error without support in the record.

## 7. The District Court Erred In Admitting Additional Evidence Relating To Leeds And Stoynoff

The district court erred by admitting additional testimony from Leeds and Stoynoff regarding President Trump's alleged public responses to their allegations in 2016, as well as testimony regarding other events and lay opinions that were not a part of the alleged "sexual assaults" that were erroneously admitted pursuant to Rule 415. Rule 404(b) provided the only pathway to admissibility for this evidence, and its requirements were not met.

The district court permitted Leeds and Stoynoff to testify regarding President Trump's responses to their 2016 public allegations against him and to the *Access Hollywood* recording. A.2105-2110, A.2118-2120, A.2362-2368. For example, Leeds testified that she was "furious," and she opined that President Trump "was lying," in response to a question relating to the *Access Hollywood* recording during a 2016 presidential debate. A.2109. Leeds also testified about her reaction to

statements by President Trump during an October 2016 campaign rally, and she was permitted to opine that President Trump was referring to her. A.2118-2120. Similarly, Stoynoff testified about her reaction to the *Access Hollywood* recording and President Trump's statements at the 2016 presidential debate, opined that she believed President Trump "does this to a lot of women," and asserted that a separate recording from an October 2016 campaign rally included "what he said about me." A.2363, A.2365-2367.

In a pretrial ruling, the district court correctly found that excerpts from President Trump's 2016 campaign speeches were not admissible under Rules 413 and 415 because the "excerpts do not allege sexual assault." SPA.37. The court also observed that "it is not now clear that Ms. Leeds and Ms. Stoynoff were the only subjects of these remarks," and deferred ruling on Plaintiff's argument that the recordings were admissible under Rule 404(b) as evidence of a *modus operandi*. SPA.38.

At trial, Plaintiff argued that the campaign-rally recordings, A.2888 and A.2890, were admissible because they rebut "[President Trump's] denial of Ms. Carroll because he is doing it the same way multiple times." A.2117. Although that sounds like the propensity inference the court had foreclosed, the district court issued a brief ruling: "I will allow it." *Id.* Thus, the court appeared to adopt Plaintiff's *modus operandi* theory under Rule 404(b). As a public figure successfully

campaigning for the presidency, however, President Trump's public denials of false allegations against him by Leeds and Stoynoff were not sufficiently "idiosyncratic" to constitute *modus operandi* evidence. *Sliker*, 751 F.2d at 487; *see also Benedetto*, 571 F.2d at 1249 (finding "the passing of folded bills by way of a handshake" to be "about as unique as using glassine envelopes to package heroin" and therefore inadmissible under Rule 404(b)). President Trump's denials were a reasonable response to be expected of anyone facing such false claims, whether or not the untrue allegations are levied in the midst of a national campaign. Accordingly, the district court erred by admitting this testimony and the recordings pursuant to Rule 404(b).

The district court also erroneously admitted additional Rule 404(b) evidence—for which there was no *modus operandi* argument—during the testimony of Leeds and Stoynoff. The district court permitted Plaintiff to attempt to bolster the credibility of these witnesses by eliciting testimony regarding what they supposedly told others about their allegations. *E.g.*, A.2104 (Leeds' testimony that "when it became apparent to me that he wanted to run for president, I started telling everybody"), A.2354-2355 (Stoynoff's testimony that she told her story to a "journalism professor," a "film producer," and a "superior"). The district court also permitted Leeds and Stoynoff to testify regarding claims relating to President Trump and his family that were not part of the alleged incidents. At trial, Leeds claimed that President Trump remarked to her at a public event in 1981: "I remember you.

You're that cunt from the airplane." A.2122. Stoynoff alleged that President Trump later told her that "we are going to have an affair," that she "stayed away from him" at a funeral a "few months later," and that Stoynoff's absence from Mar-a-Lago was apparently "noticeable" to President Trump's wife based on a conversation that Stoynoff had with her in 2006. A.2352, A.2357-2359. This testimony was not admissible pursuant to Rule 404(b) and should have been excluded.

## 8. The District Court Abused Its Discretion Under Rule 403

The district court also abused its discretion by failing to exclude testimony from Leeds and Stoynoff, as well as the *Access Hollywood* recording, pursuant to Rule 403.

### a. Rule 415 Testimony By Leeds And Stoynoff

The district court's Rule 403 balancing with respect to the Rule 415 evidence, which was limited to alleged "sexual assault" testimony from Leeds and Stoynoff, proceeded from the premise that this was "a 'he said, she said' case." SPA.34. Plaintiff emphatically disclaimed that characterization at the start of the trial, but the court never revisited its finding regarding the claimed need for the evidence. A.1445.

Assuming, *arguendo*, that the testimony was admissible under Rule 415(a), the jury should not have been permitted to consider it with respect to Plaintiff's defamation claim. Moreover, the discussion in the preceding sections illustrates that

the evidence strongly points against the supposition that the alleged Leeds and Stoynoff incidents related to admissible "sexual assaults." Consequently, the testimony had little probative value with respect to the specific type of propensity inference that is only permissible under Rule 415. *See Bernard v. E. Stroudsburg Univ.*, 700 F. App'x 159, 169 (3d Cir. 2017) (affirming Rule 403 preclusion of testimony "describing touching 'near' or 'towards' the proscribed areas" because it was "equivocal"); *United States v. Stout*, 509 F.3d 796, 802 (6th Cir. 2007) ("These rules are tightly tailored in their treatment of these often incendiary acts: in cases where Congress did not specifically provide for its admission, the 'unique stigma' of this evidence might sometimes tip the scale, and the evidence will be suppressed."). The tenuous nature of the testimonial evidence was by itself a basis for preclusion under Rule 403. *See Huddleston*, 485 U.S. at 689 n.6 (reasoning that the "strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balancing"); *see also United States v. Guardia*, 135 F.3d 1326,1330 (10th Cir. 1998) (finding it "illogical" to require a "restrained 403 analysis because of the belief that Rule 413 embodies a legislative judgment that propensity evidence regarding sexual assaults is never too prejudicial or confusing and generally should be admitted").

In any event, the extremely limited probative value of the Rule 415 evidence was greatly outweighed by the prejudice to President Trump. *See Doe v. Glanzer*,

232 F.3d 1258, 1268 (9th Cir. 2000) (noting "the strong prejudicial qualities" of Rule 415 evidence); *see also Johnson*, 283 F.3d at 153 n.8 (reasoning that Rule 415 evidence is associated with "severe social stigma" and poses a "higher risk of unfair prejudice"). Testimony from Leeds and Stoynoff was not adequate to address the reliability concerns that can, in some cases, be overcome by documented convictions or a defendant's admissions. *See United States v. Spoor*, 904 F.3d 141, 155 (2d Cir. 2018) ("[T]he District Court admitted only a sanitized version of [defendant's] 2013 conviction and excluded . . . testimony of [defendant's] alleged victims."); *O'Connor*, 650 F.3d at 854 (noting that admitted evidence consisted of "acts described in [defendant's] autobiography"); *United States v. Mound*, 149 F.3d 799, 802 (8th Cir. 1998) ("[The court] evaluated both this testimony and the prior conviction under Rule 403: though both were admissible evidence under Rule 413, only the conviction survived the Court's Rule 403 balancing."). Here, in contrast, testimony from Leeds and Stoynoff was the type of "disputable evidence" that was "too remote and too far down the road" to survive reasoned scrutiny under Rule 403. *United States v. King*, 560 F.2d 122, 134 (2d Cir. 1977); *see also Iverson v. Surber*, 800 F. App'x 50, 52 (2d Cir. 2020) (affirming Rule 403 preclusion where "probative value of the uncorroborated complaints was low in relation to the prejudice those accusations would create").

Both witnesses testified about "remote-in-time" events. *O'Connor*, 650 F.3d at 853-54; *see also United States v. Jacques*, 684 F.3d 324, 327 (2d Cir. 2012) ("[R]emoteness reduces the reliability of testimony as to the events' occurrences."). Leeds purported to recall only some details of an alleged incident that occurred at least 44 years earlier—though she was not certain about the year or the particulars of her flight—and, even on her telling, lasted "just a few seconds." A.2103. Stoynoff claimed that she remembered an incident from 18 years ago, which even on her telling lasted only a "few minutes." A.2351.

These claims involved allegations long before and longer after the incident that Plaintiff claimed occurred in the 1990s. *See Spoor*, 904 F.3d at 154 (reasoning that Rule 403 considerations include "closeness in time of the prior acts to the acts charged"). The remoteness of the alleged events that Leeds and Stoynoff described undercut the "relevance" and "reliability" of this evidence. *United States v. Larson*, 112 F.3d 600, 605 (2d Cir. 1997). The only way in which the acts could be described as "similar," as the district court did, was by raising the level of abstraction beyond the facts involved. *Spoor*, 904 F.3d at 154. There was no "frequency" to these false claims. *Id.* Indeed, Stoynoff testified that she was on the "Trump beat" and had interviewed him numerous times without incident. A.2344-2345.

There were also "intervening circumstances" that further reduced the reliability of Leeds' and Stoynoff's testimony. *Spoor*, 904 F.3d at 154. Specifically,

President Trump won the 2016 election, which apparently infuriated both Leeds and Stoynoff. *See, e.g.*, A.2109, A.2360. Plaintiff contacted both witnesses in 2019 and 2020 while he was campaigning for the 2020 election, A.2121, A.2361, and a major critic of President Trump and donor to the Democrat party later agreed to fund the whole litigation, A.1176.

Finally, the district court erred by treating Leeds and Stoynoff as a package deal. The court conceded that Leeds' story "differs in an important particular" because it occurred in public. SPA.35. Thus, for Leeds in particular, the lack of "similarity of the prior acts to the acts charged," *Spoor*, 904 F.3d at 154, is yet another reason that the evidence should have been precluded under Rule 403.

**b. Rule 404(b) Evidence**

The evidence that the district court erroneously admitted pursuant to Rule 404(b)—the *Access Hollywood* recording, the campaign speeches, and other testimony from Leeds and Stoynoff—also violated Rule 403.

Having previously informed the parties that the *Access Hollywood* recording was admissible under Rule 415(a), the district court retracted that ruling after the trial. SPA.180 n.20. Even if the recording was admissible pursuant to Rule 404(b), which it was not, there was an unacceptable risk that the jury would rely on that evidence for the very same propensity inference that the court credited before the trial began. That inference was no longer permissible in light of the district court's

ruling, and no one told the jury. Thus, the recording should have been precluded under Rule 403.

The same risks arose, to an even greater extent, with respect to testimony relating to denials by President Trump, which were not sufficiently unique or idiosyncratic to constitute Rule 404(b) evidence and therefore created an unacceptable risk that the jury would draw an impermissible propensity inference.

Finally, lay opinion testimony from Leeds and Stoynoff lacked any probative value and was outweighed entirely by the risk of prejudice. *See United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007) (reasoning that "it is clear that . . . lay opinion testimony may have 'substantially swayed' . . . the jury's verdict . . . because it was not 'unimportant in relation to everything else the jury considered on the issue in question'") (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). This testimony included Stoynoff's opinion that President Trump "does this to a lot of women," A.2365, and Leeds' opinion that President Trump was "lying" when he denied nonconsensual contact with women, A.2109. *See Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("We also believe that the credibility assessments to which Dawson was allowed to testify should have been excluded by the trial court under Rule 403.")

\*     \*     \*

Here, Plaintiff manufactured a sexual assault that she alleged took place decades prior with no physical evidence to support her claim, and her testimony, alone, was incredible and inconsistent with reality or anything a reasonable juror could accept as true. However, the court allowed two women to testify about similarly fanciful and vague allegations from almost 50 years prior, and 18 years prior, to bolster and prop up Plaintiff's story, which was patently unreliable. This is untenable and requires a reversal and new trial. In sum, the district court's evidentiary rulings were erroneous and highly prejudicial, including legal error in interpreting the Rule 413(d) definition of "sexual assault" and factual error in finding evidence admissible at trial pursuant to Rules 415(a), 404(b), and 403.

## II. The District Court Unreasonably Restricted President Trump's Defense

Having wrongfully authorized Plaintiff's use of inadmissible other-acts evidence to bolster her claims, the district court compounded those errors by unfairly restricting President Trump's defense. The court precluded admissible evidence and cross-examination of witnesses on core issues relating to credibility, bias, motive, and President Trump's truth defense on Plaintiff's defamation claim. *See Fuentes v. Griffin*, 829 F.3d 233, 248 (2d Cir. 2016) ("Cross-examination is especially 'important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by

malice, vindictiveness, intolerance, prejudice, or jealousy.'") (emphasis omitted) (quoting *Greene v. McElroy*, 360 U.S. 474, 496 (1959)).

## A. Politically Motivated Litigation Funding

The district court improperly precluded President Trump from offering powerful bias and motive evidence—proof that a billionaire critic of President Trump had paid Plaintiff's legal fees, and that Plaintiff lied about the funding during her deposition—and unduly restricted President Trump's arguments regarding the relevance of political opponent George Conway having pushed Plaintiff to initiate the case.

## 1. Background

In October 2022, Plaintiff testified at her deposition that no one was paying her legal fees. A.1175. That was a lie. In April 2023, two weeks prior to trial, Plaintiff disclosed through counsel that she "now recalls that at some point her counsel secured additional funding from a nonprofit organization to offset certain expenses and legal fees." A.1176. Plaintiff subsequently informed defense counsel that the nonprofit was Reid Hoffman's American Future Republic. A.1177. Hoffman is the billionaire founder of LinkedIn, a leading donor to Democrats, and a vocal opponent of President Trump. A.1177.

The district court granted President Trump's application for discovery on this issue, reasoning that it "might prove relevant to the question of plaintiff's

credibility." SPA.159. However, after President Trump proved the bias and presented the obvious challenge to Plaintiff's credibility because of the funding, the court incredibly ruled at trial that "the whole subject of litigation funding is precluded." A.1659. The court ignored bias and motive, wrongly asserted that there was "virtually nothing there as to credibility," and found the evidence inadmissible under Rule 403. A.1659.

At trial, Plaintiff admitted that a conversation with George Conway, who "does not like [President] Trump," had "crystallized" the idea to sue President Trump. A.1705-1706. However, the court sustained objections to portions of President Trump's opening statement regarding this critical context establishing the politically motivated bias that led Plaintiff to file the lawsuit and served as yet another reason to doubt her credibility. A.1487. Outside the presence of the jury, the district court claimed to defense counsel, "You got your George Conway story." A.1494. Later, however, the court foreclosed meaningful cross-examination and claimed incorrectly that counsel had represented "that there will be no such argument for the rest of this case about Mr. Conway and how the lawyer got together with Ms. Carroll." A.2032.

**2. Discussion**

The district court improperly restricted questioning and argument regarding Conway, understated the probative value of the Hoffman-related evidence, abused its discretion under Rule 403, and failed to adequately explain its reasoning.

Plaintiff lied at her deposition regarding who was paying for her case. After a long delay, Plaintiff's counsel sheepishly corrected the record on the eve of trial. Plaintiff's false statement had significant probative value because a lie about the events at issue was relevant not only to Plaintiff's credibility but also President Trump's truth defense. *See Condit v. Dunne*, 225 F.R.D. 100, 111 (S.D.N.Y. 2004). Telling lies while bearing the burden of establishing a falsehood should have been devastating to the case, and President Trump was wrongly prevented from demonstrating that to the jury.

Evidence of a third-party benefactor had additional independent value as evidence of bias and motive. Plaintiff, Leeds, and Stoynoff each expressed hostility toward President Trump and his politics, but none of them was willing to subject their claims to adversarial testing until a wealthy political ally agreed to foot the bill in connection with an operation that was initiated just prior to the 2020 election. *Cf. United States v. Abel*, 469 U.S. 45, 52 (1984) ("A witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias."). The involvement of

Conway and Hoffman was concrete evidence demonstrating that Plaintiff and others had manufactured their claims for political reasons. In a trial that also included testimony regarding a late-1970s flight, there was no basis for concluding—and the district court did not explain itself—that such evidence would have been unduly prejudicial.

## B. Plaintiff's Coaching Of Stoynoff

The district court also improperly precluded evidence of a transcript that Plaintiff created from an interview of Stoynoff in 2020. The transcript was a party-opponent admission, admissible as proof of motive and bias because it suggested that Plaintiff influenced Stoynoff's story to advance their political agenda and personal interests.

## 1. Background

Plaintiff conducted a video interview of Stoynoff in June 2020 and created an annotated transcript of the conversation. A.1370-1415; *see also* A.1700-1701. The transcript demonstrated that Plaintiff pushed Stoynoff to stretch the limits of her memory. For example, at several points during the interview, Plaintiff suggested through her questions that President Trump "grind[ed]" on Stoynoff. *E.g.*, A.1390, A.1392. When Stoynoff told Plaintiff, "I don't recall," Plaintiff urged her to "[s]top and think about it." A.1391. Plaintiff added the following note at that point in the

transcript, which was highly probative of her corrupt intent: "Trying to climb through screen, leaning so far in—like Alice through the looking glass." A.1391.

Plaintiff returned to the topic a second time during the interview when she asserted to Stoynoff: "You shook your head and pushed back. *Now think. Did he grind against you?*" A.1392 (emphasis added). Stoynoff responded: "I don't remember if he did. And the reason I don't think he did is because I feel as though if he had done anything more serious---more sexual, that had to do with sex parts— I would have told my superiors." A.1392-1393.

Later in the interview, Plaintiff got even more aggressive with her attempts to convince Stoynoff to add detail to her claim. For example, Plaintiff reminded Stoynoff, "You don't remember him chasing you, but the professor does." A.1407. Plaintiff kept pushing: "But when he pushed you up against the door, *are you quite sure he didn't grind against you*. If his tongue was going down your throat, *I think his pelvis was against you*." A.1407 (emphasis added). Plaintiff urged Stoynoff, "I don't think he would be able to try and thrust his tongue unless he was pressing his hips against you." A.1407.

At trial, Plaintiff objected when President Trump sought to offer excerpts from Plaintiff's transcript. A.1902, A.1910. Defense counsel explained that he was offering the excerpts to demonstrate Plaintiff's "effort to influence Ms. Stoynoff's testimony, specifically that sexual contact occurred," *i.e.*, the dispositive issue of

admissibility under Rule 415(a).  A.1900.  The district court incorrectly construed President Trump's argument as relying on impeachment alone, in which case extrinsic evidence arguably would have been barred pursuant to Rule 608.  *See, e.g.*, A.1905.  Counsel clarified that the document was a "party admission," and reiterated that the transcript excerpts supported the argument that Plaintiff had tried to "influence the answers of Ms. Stoynoff."  A.1906; *see also* A.1911 (defense counsel arguing that "Ms. Carroll's statements go to Ms. Carroll's intent").

The district court sustained Plaintiff's objection:

> You are not going to do it this way.  I think the way to do this is by questions to Ms. Carroll, and if you have to use the document to refresh and maybe even to impeach on a very targeted way, we will cope with it.  But this is no more than a five-minute proposition.

A.1914.   On cross-examination, defense counsel confronted Plaintiff through questions using language from the transcript but, pursuant to the court's ruling, the document was not admitted.  A.1918-1921.

## 2. Discussion

The district court abused its discretion by not admitting excerpts from Plaintiff's transcript.  Plaintiff's documented coaching of Stoynoff occurred after Plaintiff had filed a defamation claim against President Trump in *Carroll I*, at a time when Plaintiff was searching in vain for evidence to support her position, and prior to the October 2022 deposition testimony by Stoynoff that led the district court to (erroneously) admit her trial testimony pursuant to Rule 415.

Plaintiff's written statements in the transcript were admissible for their truth pursuant to Rule 801(d)(2)(A), and the document was probative of bias and motive. *See United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976) ("The law is well settled in this Circuit, as in others, that bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely."). Thus, President Trump was entitled to use the transcript as extrinsic evidence in support of his arguments to the jury, including that Plaintiff was so intent on pressing her politically motivated false claim that she coached the testimony of others to make her story sound more credible. The district court's preclusion of the transcript limited the force and effect of President Trump's cross-examination of Plaintiff on this critical issue. The document should also have been in evidence and available to defense counsel, as well as the jury, for purposes of cross-examining Stoynoff regarding her motive to testify as consistently as possible with the coaching from her "friend," the Plaintiff. A.2361. Finally, the transcript would have added force to President Trump's argument that Plaintiff used an interview of Leeds for a similar improper purpose. *See* A.2142. For all of these reasons, the district court abused its discretion by refusing to admit the excerpts of the transcript proffered by defense counsel.

## C. Plaintiff's False Claim Regarding President Trump's DNA

The district court improperly precluded cross-examination of Plaintiff regarding her false, public claim that she possessed President Trump's DNA.

## 1. Background

Around the time that Plaintiff commenced *Carroll I* in New York Supreme Court, Plaintiff requested a DNA sample from President Trump. SPA.78. President Trump did not provide his DNA in response to the request. Instead, he pursued a stay of *Carroll I*, removal of the case to the district court, and appellate litigation, *see Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022). SPA.80-82.

At a February 2022 conference, Plaintiff's counsel renewed the DNA request. SPA.83-84. As explained at an August 2022 hearing, President Trump objected to the request because it was unduly intrusive. SPA.84. In a joint submission to the district court in December 2022, Plaintiff did not describe the DNA request as part of the "specific discovery that was not conducted in *Carroll I* [and] is needed for the prosecution or defense of this case." SPA.85.

In February 2023, defense counsel requested an appendix to Plaintiff's DNA report that had not been provided and offered to provide a DNA sample from President Trump if the document was provided. SPA.86. Because the DNA sample would have been exonerating, Plaintiff declined to provide the appendix, and the

district court denied President Trump's motion to compel its production. SPA.87-88, SPA.93.

Plaintiff confirmed in a deposition that she had "stated in public that [she] had DNA" from President Trump. SPA.126. Although that claim was unfounded and completely false, the district court granted Plaintiff's motion to preclude "any testimony, argument, commentary or reference concerning DNA evidence" at the trial in *Carroll II*. SPA.134. The court acknowledged that there was probative value to President Trump's proposed line of cross-examination seeking to establish that Plaintiff's claim was false. The court incorrectly precluded the questioning under Rule 403, reasoning that Plaintiff "might have been right," "[t]here are a number of possible reasons" she might have said that, and "there will be no scientific DNA evidence at this trial." SPA.129 & n.46. The court also wrongfully suggested that it could only alleviate prejudice by "placing before the jury the facts concerning Mr. Trump's failure to allow collection of his own DNA." SPA.130.

## 2. Discussion

The court's ruling was an abuse of discretion. The court routinely, if not exclusively, resolved questions regarding inferences sought by Plaintiff in her favor. But here the court rejected a conclusion that any reasonable juror could reach in a manner consistent with Rule 104: Plaintiff lied when she said she had President Trump's DNA. As with Plaintiff's demonstrable lie about litigation funding, her

false DNA claim was relevant to both impeachment and President Trump's truth defense. Thus, the DNA-related impeachment had much more probative force than the district court suggested in its Rule 403 balancing.

The district court's erroneous Rule 403 analysis was also inconsistent with the record. The court indicated that President Trump had "refused" to provide a DNA sample, when in fact he had lodged a valid objection to Plaintiff's request during *Carroll I. E.g.*, SPA.128. Plaintiff did not move to compel or otherwise litigate the objection. Nor did Plaintiff identify the DNA request as an outstanding discovery issue in response to an order by the district court. SPA.85. Thus, the reason that there was no expert testimony regarding DNA at the *Carroll II* trial is that Plaintiff declined to rely on her existing DNA report and did not litigate her entitlement to a DNA sample. It is difficult to fathom, given the resources and sophistication of Plaintiff's counsel, that these decisions were anything but intentional and strategic because Plaintiff had lied about the DNA evidence. Plaintiff's failure to obtain this evidence should not have been held against President Trump as a basis for precluding an important and legally valid line of impeachment.

## D. Plaintiff's Intentional Decision Not To File A Police Report

The district court improperly prevented President Trump from questioning Plaintiff regarding her failure to file a police report or complain to authorities regarding her allegations. The permissible purpose of the questioning was to

establish that Plaintiff failed to take obvious and readily available steps because her claims were false.

This line of cross-examination was based in part on a June 2019 interview, in which Lawrence O'Donnell asked Plaintiff if she "would consider bringing a rape charge" against President Trump. A.3028. Plaintiff said she would not consider doing so because it would have been "disrespectful" to women being raped at the border. A.3027.

At trial, defense counsel admitted the interview, played it during cross-examination of Plaintiff, and asked whether she "[stood] by what you said there." A.1837-1838. Plaintiff responded that she "said this out of sympathy" because she "had read a news story that day about hundreds of women at the border who had no protection who are being attacked by men." A.1838. Defense counsel later asked, "How would you bringing criminal charges be disrespectful to some people at the border?" A.1839. The district court sustained an objection and added: "Correct me if I'm wrong, counsel, but I believe in the State of New York private individuals can't bring criminal charges and probably have not been able to do that in at least a century or two." A.1840. The court then ordered defense counsel to "[m]ove on." A.1840.

This line of questioning was admissible to establish that Plaintiff did not pursue other formal options for reporting her allegations against President Trump

because she knew that making false claims to the police or other public authorities could expose her to criminal penalties. The district court's formalistic rationale was not a valid basis for preventing defense counsel from exploring this topic. The court's explanation in front of the jury incorrectly suggested that Plaintiff was powerless to do so, thereby adding credence to her position.

**E. Plaintiff's Intentional Decision Not to Seek Surveillance Video**

President Trump sought to establish at trial that Plaintiff made an affirmative decision not to seek surveillance footage from Bergdorf Goodman because she knew the footage would refute her false claim against him. Plaintiff's own witness, Cheryl Beall, was a manager at Bergdorf Goodman during the period when Plaintiff alleged the incident occurred. On cross-examination, Beall testified that she was "certain" that the store had security cameras at "all of the doors." A.1557.

Plaintiff later confirmed on cross-examination that she had written in her book that surveillance cameras captured President Trump entering Bergdorf Goodman. A.1840. She testified: "I was guessing that they must have picked – got a shot of us, yes." A.1841. Subsequently, the district court sustained an objection to the "breadth of a question" regarding whether Plaintiff sought to obtain the footage:

> Q. When you were allegedly assaulted in Bergdorf Goodman by Donald Trump and on the first floor with Donald Trump and on the escalators with Donald Trump, you never thereafter, that day, the next day, the next week or ever tried to get the videos that could have existed to support your claim?
>
> [Plaintiff's Counsel]: I object to the breadth of the question.

THE COURT: Sustained.

A.1842. The district court then "sustained," *sua sponte*, a non-existent objection to defense counsel's follow-up question: "Did you go back the next day to . . . ask for the video camera footage?" A.1842. The court asserted that the question "assumes there is such a thing." *Id*. Defense counsel explained that "Ms. Carroll in fact testified, as did the Bergdorf Goodman witness, that on the main floor there are security cameras . . . ." *Id*. The district court responded: "Ms. Carroll testified she guessed, and we have had the testimony from the witness who was at Bergdorf at the time, and she said what she said. We are not going to ask questions based on this kind of statement." *Id*.

There was no basis, much less a reasonable one, for the district court's ruling. While it is true that Beall "said what she said," defense counsel was correct that she testified that there were security cameras at the store's entrances during the period at issue in Plaintiff's claims. In support of his argument that Plaintiff did not try to collect evidence from obvious sources because her claims about him were false, defense counsel should have been permitted to cross-examine Plaintiff regarding whether she ever tried to obtain the videos described by her own witness.

### III. The Cumulative Impact Of Evidentiary Errors Requires Reversal

The district court's errors prejudiced President Trump's substantial rights, particularly in light of the instructions to the jury, and were not harmless. Therefore, a new trial is necessary.

### A. Applicable Law

An evidentiary error that impacts "a substantial right" requires reversal. *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000). "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos*, 328 U.S. at 765. It must be "likely that in some material respect the factfinder's judgment was swayed by the error." *Constantino*, 203 F.3d at 174 (cleaned up).

> In assessing the wrongly admitted testimony's importance, we consider such factors as whether the testimony bore on an issue that is plainly critical to the jury's decision, whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, and whether the wrongly admitted evidence was emphasized in arguments to the jury.

*Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) (cleaned up). The Court must consider whether reversal is appropriate based on "the record as a whole," even if the Court might "hesitate . . . based on any one of the errors discussed above in isolation, or perhaps even any one category of those errors." *United States v.*

*Certified Envtl. Servs.*, 753 F.3d 72, 96 (2d Cir. 2014); *see also Wray*, 202 F.3d at 526 ("We analyze all of these issues in light of the record as a whole.").

## B. Discussion

The erroneously admitted evidence from Leeds, Stoynoff, and the *Access Hollywood* recording was not simply cumulative of other proof. Because it was erroneously admitted, Plaintiff's emphasis on this evidence in jury addresses was extremely prejudicial. *See Hynes v. Coughlin*, 79 F.3d 285, 293 (2d Cir. 1996) (finding no harmless error due to "counsel's relentless emphasis on this evidence in the opening statement, in cross-examining [plaintiff], and in summation"). The district court's erroneous restrictions on defense evidence and cross-examination improperly limited President Trump's ability to defend himself in this unfair setting. Further, the district court's instructions exacerbated this prejudice in several respects. Accordingly, as explained below, the errors were not harmless.

Plaintiff's lack of evidence is demonstrated by the fact that the jury rejected her core theory of the alleged encounter with President Trump. Plaintiff's counsel used the word "rape" more than 30 times during arguments to the jury.[8] The jury rejected that claim. A.2832. The jury's decision to credit Plaintiff's sexual abuse

---

[8] A.1453, A.1465, A.2603, A.2609 (two times), A.2611, A.2616, A.2617 (three times), A.2618 (three times), A.2740, A.2749, A.2756, A.2757, A.2760, A.2765, A.2767 (15 times).

claim, which required factual findings that were closer to the improperly admitted and false accounts of Stoynoff and Leeds, is an illustration of the extent to which that improperly admitted evidence was central to the verdict. *See Amatucci v. Del. & Hudson Ry. Co.*, 745 F.2d 180, 184 (2d Cir. 1984) ("Because of the strong possibility that this testimony . . . influenced the jury, we cannot conclude that the testimony did not affect the substantial rights of the [defendant].") (cleaned up).

Plaintiff's arguments to the jury also made clear that the inadmissible evidence was central to her presentation. *See Wray*, 202 F.3d at 526 ("[W]here the prosecution has emphasized the wrongly admitted evidence, it may well have been important in the minds of the jurors."); *see also Rotolo v. Digital Equip. Corp.*, 150 F.3d 223, 225 (1998) ("[E]mphasis is a crucial factor in determining whether the hearsay error was harmless."). Plaintiff's counsel repeatedly emphasized the wrongly admitted testimony from Stoynoff and Leeds. *E.g.*, A.1446, A.2623-25, A.2630, A.2739, A.2767-2768. For example, in the opening statements counsel falsely argued that Leeds and Stoynoff would "testify that Donald Trump assaulted them in very much the same way he assaulted Ms. Carroll, because that is his MO." A.1446. In fact, the false allegations in the testimony from Leeds and Stoynoff did not rise to the level of an admissible "sexual assault" under Rule 413(d), and neither witness presented the manufactured rape theory that the jury ultimately rejected.

Later in the opening, counsel spent two pages of the transcript describing anticipated testimony from Leeds and Stoynoff, which ended with the following contention: "Three women, one clear pattern." A.1461-1462. Part of the "pattern" described by counsel was to "[c]all them liars." A.1462; *see also* A.2631 (arguing that part of the *modus operandi* was, "he lies about it"). In that regard, counsel emphasized that the impermissible *modus operandi* theory was not sufficiently idiosyncratic to establish admissibility. This is preposterous because, of course, denying politically motivated and egregiously false claims is not a *modus operandi*.

Even more problematic, Plaintiff urged the jury during summations to draw an unmitigated propensity inference from the recording: "on the *Access Hollywood* tape, he told you what he automatically does when he sees women he finds attractive . . . Trump followed this same playbook when he attacked [Plaintiff]." A.2586-2587. The recording had not been admitted pursuant to Rule 415 and, as such, the propensity inference sought by Plaintiff was impermissible.

The district court's instructions to the jury did little to address the prejudice from the erroneous rulings. Although any Rule 415(a) evidence was not admissible on the defamation claim, the instructions on evidence of other alleged sexual assaults did not differentiate between the two causes of action. *See* A.2800-2803. The court also instructed the jury that it could consider the inadmissible testimony from Leeds and Stoynoff on the issue of damages. *See* A.2787.

Moreover, the court's instructions regarding the Rule 415(a) evidence unfairly limited Plaintiff's burden. A.2802-2803. Here, for the jury to conclude that Plaintiff had presented evidence of other "sexual assaults," it was not enough to conclude that there was prohibited contact as defined in Rule 413(d)(2). *See* A.2573-2574 (defense objection to the instruction). Plaintiff was also required to demonstrate that the incidents involved a "crime under federal law or under state law." Fed. R. Evid. 413(d). The district court did not instruct the jury regarding the elements of those alleged crimes. *See Pitasi v. Stratton Corp.*, 968 F.2d 1558, 1563 (2d Cir. 1992) ("A new trial must be granted where it is clear that the jury was not adequately instructed on issues essential to the case.").

There was also no instruction whatsoever relating to evidence that was (erroneously) admitted pursuant to Rule 404(b), such as Leeds' claim regarding an encounter with President Trump in 1981, Stoynoff's story about a conversation with President Trump's wife, or the reactions of these witnesses to President Trump's statements during his 2016 campaign. The "absence of a limiting instruction" created "the distinct possibility that the jury would use such testimony as impermissible propensity evidence" and must "loom[] large in considering the potential unfair prejudice." *United States v. Cummings*, 858 F3d 763, 774-75, 776 (2d Cir. 2017).

Plaintiff repeatedly capitalized on the district court's preclusion of defense evidence and argument in a manner that magnified the prejudice resulting from those errors. The improper exclusion of impeachment relating to Plaintiff's false statements during her deposition was particularly prejudicial in light of Plaintiff's false trial contention that President Trump "told lie after lie in this case, and those lies are even more evidence that Ms. Carroll's sworn testimony will be the truth." A.1463; *see also* A.2625 ("Let me give you just a few examples of Donald Trump's clear lies."). The preclusion of Plaintiff's coaching of Stoynoff on the interview transcript unfairly limited President Trump's ability to address Plaintiff's argument that, in order for jurors to believe she was lying, they would have to find that "she somehow was able to convince Natasha Stoynoff and Jessica Leeds to travel here to New York City and commit perjury on the witness stand." A.2628.

Finally, because the district court improperly precluded evidence and argument regarding the late-disclosed fact that a wealthy political opponent of President Trump was funding the litigation, Plaintiff could argue in rebuttal without fear of a forceful response that:

> Trump needs you to believe that everyone is lying because they're in this grand conspiracy to take him down and there is just no evidence of that. Yeah, many of our witnesses are registered democrats and they have no love for Donald Trump. It's true. That doesn't make them unique and that's not evidence of a conspiracy.

A.2740-2741; *see also* A.2759 (arguing that a "[R]epublican lawyer" had "crystallized the idea of a lawsuit"). Accordingly, for all of the foregoing reasons, the evidentiary errors at trial were not harmless.

## CONCLUSION

For the foregoing reasons, the judgment should be vacated and the case remanded for a new trial.

*/s/ Emil Bove*
Emil Bove
Todd Blanche
Blanche Law
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for*
*President Donald J. Trump*

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 32(e) and the type-volume limitation of Local Rule 32.1(a)(4) because this brief contains 13,820 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

*/s/ Emil Bove*
Emil Bove

*Attorney for*
*President Donald J. Trump*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2023, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Second Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

Dated: November 20, 2023

*/s/ Emil Bove*
Emil Bove

*Attorney for*
*President Donald J. Trump*