# 23-0793-CV

# United States Court of Appeals

*for the*

# Second Circuit

---

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## SPECIAL APPENDIX

---

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
– and –
JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

**i**

## TABLE OF CONTENTS FOR SPECIAL APPENDIX

**Page**

**Opinions and Orders Submitted in *Carroll I***

Memorandum Opinion of the Honorable Lewis A.
    Kaplan, dated October 12, 2022 ............................ SPA-1

Memorandum Opinion of the Honorable Lewis A.
    Kaplan, dated March 10, 2023 ............................... SPA-17

Memorandum and Order on Plaintiff's Motion *in
    Limine* of the Honorable Lewis A. Kaplan, dated
    October 5, 2023 ..................................................... SPA-40

**Opinions and Orders Submitted in *Carroll II***

Order of the Honorable Lewis A. Kaplan, dated
    December 2, 2022 .................................................. SPA-43

Memorandum Opinion of the Honorable Lewis A.
    Kaplan, dated January 13, 2023 ............................ SPA-45

Memorandum Opinion of the Honorable Lewis A.
    Kaplan, dated February 15, 2023 .......................... SPA-73

Memorandum and Order on Defendant's Motions
    *in Limine* of the Honorable Lewis A. Kaplan,
    dated March 20, 2023 ............................................ SPA-94

Memorandum and Order Regarding Anonymous
    Jury of the Honorable Lewis A. Kaplan, dated
    March 23, 2023 ..................................................... SPA-105

Memorandum and Order on Plaintiff's Omnibus
    Motion *in Limine* of the Honorable Lewis A.
    Kaplan, dated March 27, 2023 .............................. SPA-114

Memorandum Opinion of the Honorable Lewis A.
    Kaplan, dated March 28, 2023 .............................. SPA-136

**ii**

                                                              **Page**

Memo-Endorsed Letter, so-ordered April 13, 2023 ...  SPA-158

Memo-Endorsed Letter, so-ordered April 24, 2023 ...  SPA-160

Judgment Appealed From, dated May 11, 2023 ........  SPA-162

Memorandum Opinion Denying Defendant's
   Rule 59 Motion of the Honorable Lewis A.
   Kaplan, dated July 19, 2023, Appealed From ........  SPA-163

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/12/2022
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                                        Plaintiff,

        -against-                                        20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


        Appearances:

                Roberta Kaplan
                Joshua Matz
                Shawn Crowley
                Matthew Craig
                KAPLAN HECKER & FINK LLP
                *Attorneys for Plaintiff*

                Alina Habba
                HABBA MADAIO & ASSOCIATES LLP
                *Attorney for Defendant*


LEWIS A. KAPLAN, *District Judge*.

        This is a defamation action against Donald J. Trump.  The question whether Mr.

Trump defamed the plaintiff depends largely upon whether Mr. Trump, as plaintiff claims, raped

her in a department store fitting room.  The matter is before the Court on a motion by Mr. Trump

to substitute the United States for him as the defendant and to stay the action.  A previous motion

2

by the United States to substitute itself for Mr. Trump was denied, so this is a second bite at that apple.

*Facts*

As this Court previously has observed, Mr. Trump has litigated this case since it began in 2019 with the effect and probably the purpose of delaying it.[1] Among the actions with this effect was this. After litigating the case in the state court for almost a year without any suggestion that the government of the United States had anything whatever to do with it, Mr. Trump "reportedly instructed William Barr, then [Mr. Trump's appointee as] Attorney General, to cause the United States to intervene and remove the case to this Court under the Westfall Act."[2] The Department of Justice ("DOJ") then moved "to substitute the United States as the defendant in place of Mr. Trump."[3] It did so on the basis of a DOJ certification (the "DOJ Certification") that (1) then President Trump was an "employee" of the United States as defined in the Westfall Act, and (2) the conduct of which the plaintiff complained was within the scope of that employment. Under the relevant statute, the DOJ certification "conclusively establish[es] scope of employment *for purposes of removal*"[4] – i.e., only for the purpose of effecting transfer of such a case from a state to a federal

---

[1]     *Carroll v. Trump,* No. 20-cv-7311 (LAK), 2022 WL 748128, at *8-10 (S.D.N.Y. Mar. 11, 2022).

[2]     *Id.* at *9 & n.75.

[3]     *Id.* at *9.

[4]     28 U.S.C. § 2679(d)(2) (emphasis added).

SPA-3

3

court. The legal correctness of the DOJ Certification was and remains subject to judicial review and ultimate determination of the courts.

This Court denied the government's motion to substitute on two independent grounds.  First, it held that Mr. Trump was not an "employee" of the United States within the meaning of the Westfall Act, a prerequisite to the substitution sought by the government.  Second, even if he were such an "employee," the alleged defamation was not committed within the scope of his employment – also a prerequisite to that substitution.[5]  Neither Mr. Trump nor DOJ suggested that the DOJ Certification *ipso facto* substituted the United States for Mr. Trump as the defendant.

Both the government and Mr. Trump appealed from that ruling.  Neither contended before the Court of Appeals that the DOJ Certification *ipso facto* substituted the United States for Mr. Trump as the defendant.  Mr. Trump, but not the government, moved in this Court for a stay pending appeal, but did not make the *ipso facto* substitution argument.  That motion was denied on September 15, 2021.[6]  Mr. Trump did not seek a stay from the Court of Appeals.

Since the denial of the government's substitution motion, this action has proceeded for more than a year without any claim that the government was substituted for Mr. Trump as the defendant simply by fact that the DOJ filed the DOJ Certification.  For example:

---

[5]   *See Carroll v. Trump*, 498 F. Supp.3d 422 (S.D.N.Y. 2020).

[6]   Dkt. 56.  All docket citations are to 20-cv-7311 (LAK) unless otherwise specified.

4

- Mr. Trump, in his individual capacity, caused his private attorneys to move, unsuccessfully, for leave to amend to assert a so-called SLAPP counterclaim against the plaintiff.[7]

- Mr. Trump, in his individual capacity, stipulated to a scheduling order pursuant to which he and his adversary obligated themselves, *inter alia*, to complete all depositions and fact discovery by agreed and court-ordered dates.[8]

- Mr. Trump, in his individual capacity, made no objection to the Court setting the case for trial, unless it were disposed of previously, for February 6, 2023.

These and other actions by Mr. Trump all were flatly inconsistent with any suggestion that the United States had been substituted as the party defendant. *If the DOJ Certification had the effect he now claims, Mr. Trump no longer was a party to this case and had no standing to do any of those things.*

On September 27, 2022, a divided panel of the Court of Appeals reversed this Court's holding that the president of the United States is not an "employee" of the government under the Westfall Act. While the Circuit vacated this Court's holding that Mr. Trump had not acted within the scope of employment, it did not do so on the merits. Instead, it certified that question to the Court of Appeals of the District of Columbia (the "D.C. Court of Appeals"), as the scope of

---

[7]    Dkt. 63 (mtn.); *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2022 WL 748128 (S.D.N.Y. Mar. 11, 2022).

[8]    Dkt. 76.

SPA-5

5

employment issue is governed by the local law of the District.[9]  The question whether this Court's scope of employment holding was correct therefore remains open.

On the following day – 22 days before Mr. Trump's scheduled deposition in this case – Mr. Trump abruptly reversed course.  He moved before this Court to substitute the United States as defendant and immediately stay all proceedings in light of the Court of Appeals' decision.[10]  He now claims that the DOJ Certification, in and of itself, substituted the government for Mr. Trump as the defendant.  He contends that this action – and certainly his deposition – should be stayed because the resolution of the scope of employment issue might result in dismissal of this case.

The premise upon which Mr. Trump's motion rests – that the DOJ Certification, in and of itself, substituted the government for Mr. Trump as the defendant – is inconsistent with Mr. Trump's own actions, the actions of the government, the statute upon which Mr. Trump relies, and the case law.  He nevertheless asserts it with such certitude that he characterizes his adversary's contrary argument as "asinine."[11]

---

[9]

See Carroll v. Trump, ____ F.4th ___, 2022 WL 4475079 (2d Cir. Sept. 27, 2022).

[10]

Letter Mtn. to Substitute and Stay Proceedings [Dkt. 92], at 1.

Defendant incorrectly persists in referring to the Court of Appeals' decision as "case dispositive."  It is nothing of the sort.  A case dispositive issue is one that will resolve a case, one way or the other, regardless of how it is decided.  The Court of Appeals decision resolving the "employee" question was not "case dispositive" at least because the scope of employment question remains unresolved.

[11]

Reply [Dkt. 94], at 1.

The Court will not tolerate by counsel such inappropriate language again.

6

*Discussion*

A.     *Substitution*

Mr. Trump contends that the Second Circuit's decision means that "the United States must automatically be substituted as the party defendant in this case."[12] He relies on Section 2679(d)(1) of the Federal Tort Claims Act which, in relevant part, reads:

> "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action . . . commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."[13]

But he ignores Section 2679(d)(2) which, in relevant part, provides:

> "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action . . . commenced upon such claim in a State court shall be removed . . . to the [appropriate] district court of the United States . . . . Such action or proceeding shall be deemed to be an action . . . brought against the United States . . . , and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment *for purposes of removal.*"[14]

Taken as a whole, the statute makes clear that the DOJ Certification is conclusive only for purposes of removal and that it is subject to judicial review.

The consequences of reading the relevant provisions of the statute together are clear. As plaintiff responded to Mr. Trump's argument:

---

12      Dkt. 92, at 2 (internal quotation marks and citation omitted).

13      28 U.S.C. § 2679(d)(1).

14      *Id.* § 2679(d)(2) (emphasis added).

"Defendant is mistaken that substitution must occur '[b]y virtue of the Second Circuit's Decision.' ECF 92 at 1. Although the language of the Westfall Act refers to what 'shall' happen '[u]pon certification' by the Attorney General, 28 U.S.C. § 2679(d)(2), that language does not leave judges with the sole job of 'rubber-stamp[ing]' the Attorney General's scope-of-employment certification. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429 [] (1995). In holding that such certifications are subject to judicial review, the Supreme Court disagreed that '[u]pon certification . . . the United States would automatically become the defendant.' *Id.* In so ruling, the Supreme Court emphasized that 'shall' [the word upon which Mr. Trump's entire argument depends] does not always mean 'must', and it sometimes means 'should, will, or even may.' *Id.* at 432 n.9 [internal quotation marks omitted]. Accounting for statutory text and purpose, the Supreme Court held that certification 'does not conclusively establish as correct the substitution of the United States as defendant.' *Id.* at 434.

"Indeed, many cases (including several cited by Defendant on appeal) demonstrate that when certification is contested, it occurs *after* the United States prevails on a motion to substitute. In *Council on American Islamic Relations v. Ballenger*, for example, the D.C. Circuit stated that '*[o]nce a court determines* that the federal employee acted within the scope of employment, the case is, *inter alia*, restyled as an action against the United States that is governed by the Federal Tort Claims Act.' 444 F.3d 659, 662 (D.C. Cir. 2006) (emphasis added). The D.C. Circuit similarly explained in *Wuterich v. Murtha* that '*where a plaintiff fails* to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant because the federal employee is absolutely immune from suit.' 562 F.3d 375, 381 (D.C. Cir. 2009) (emphasis added).

"Tellingly, the United States followed that exact procedure here. On September 8, 2020, the United States filed a motion requesting 'an order substituting the United States as defendant for President Donald J. Trump.' ECF 3 at 1. It reiterated its 'request[]' in its reply, ECF 21 at 15, and, in seeking adjournment of oral argument, referred to its 'pending motion to substitute,' ECF 25. In Defendant's view, the United States never had to file any motion at all, and apparently seasoned Department of Justice lawyers misunderstood Westfall Act procedure. But the record is clear: the United States still has not obtained the relief it expressly requested, and the Second Circuit has not resolved the motion in its favor. Instead, it vacated (rather than reversed) this Court's ruling on the United States'[s] motion to substitute, which at most reverts the status of that motion to 'pending.' *See, e.g.*, *Halebian v. Berv*, 869 F. Supp. 2d 420, 424 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 641 (2d Cir. 2013) (upon vacatur of original decision, issues raised by underl[y]ing

8

motion remained to be decided).  In these circumstances, the United States has not been substituted in lieu of Defendant."[15]

Plaintiff's argument is correct.  At least where, as here, the correctness of a DOJ certification is disputed, the government need not be substituted for Mr. Trump unless *two* conditions are satisfied, viz. that the courts hold that defendant was an employee of the government and he is found to have acted within the scope of that employment.

The Second Circuit recently concluded that the answer to the first question in this case is "yes."[16]  But it did not resolve the second question, certifying it instead for decision by the D.C. Court of Appeals because "the District's law regarding vicarious liability is sufficiently unclear that [the Second Circuit is] unable to predict with any confidence how the District's highest court . . . would resolve this issue."[17]  The D.C. Court of Appeals may refuse to accept the certification, in which case the question would return to the Second Circuit for decision.  It may decide the question, one way or another.[18]  How the question ultimately will be resolved remains unknown. In the meantime, substitution would be premature, as judicial review of the DOJ Certification has not concluded.

Mr. Trump nevertheless quibbles with the procedure through which the Court took up the substitution issue when this case was removed to federal court.  He now – for the first time

---

[15]    Opp. [Dkt. 93], at 2-3.

[16]    Of course, even that decision is subject to the possibility of review.

[17]    *Carroll*, 2022 WL 4475079, at *6.

[18]    It conceivably might conclude that the scope of employment issue raises issues of fact requiring further district court proceedings.

SPA-9

9

– contends that the United States automatically was substituted as the party defendant on a "provisional" basis by virtue of the DOJ Certification. If the courts ultimately were to decide that he did not act within the scope of his employment, Mr. Trump then should be "resubstituted" as the defendant for the United States.[19]

To be sure, Mr. Trump has identified at least one case in which a district court apparently followed such a procedure.[20] But the appellate decision in that case did not deal with the issue. Moreover, as explained by plaintiff in the passage quoted above, the United States here did not argue that it already had been substituted, provisionally or otherwise, for Mr. Trump. It instead made a motion to be substituted, a motion that required the Court's disposition.[21] Nor did it make an *ipso facto* substitution argument in its reply to plaintiff's opposition to its motion. Instead, it responded to the substance of plaintiff's arguments in opposition to substitution.[22] Mr. Trump took

---

[19]     Dkt. 94, at 2 (quoting *Aversa v. United States*, 99 F.3d 1200, 1208 (1st Cir. 1996)).

[20]     In that case, *Aversa v. United States*, the First Circuit reviewed *de novo* the district court's scope of employment determination. 99 F.3d at 1210. It observed that the district court had "provisionally substituted [the United States] as party defendant" and then permitted plaintiff to contest substitution with the aid of special discovery. *Id.* at 1206. The Circuit did not comment on the procedure beyond a conclusory reference to the potential for "the employee [to] be resubstituted" after judicial review. *Id.* at 1208. But the court's authority in support of the resubstitution mechanism is inapposite. The Circuit cited *Gutierrez de Martinez* but, in that very case – which stands for the proposition that scope of employment certification must be subject to judicial review – the Supreme Court noted that, "to avoid the consequences of *unrecallable substitution of the United States as the party defendant*, petitioners asked the District Court to review certification." 515 U.S. at 422 (emphasis added). In *Gutierrez de Martinez* of course, as in this case, substitution likely would "cause the demise of the action" because the claims at issue "fell within an exception to the FTCA's waiver of . . . sovereign immunity." *Id.*

[21]     Dkt. 3.

[22]     Reply in Support of Mtn. to Substitute [Dkt. 21].

10

no issue with the government's position or with the Court's determination that the government's

motion required the Court's leave for substitution of the United States for the defendant.  As noted,

neither the United States nor Mr. Trump made such an argument on appeal.[23]

In all the circumstances, the Court concludes that Mr. Trump's argument that the

government automatically was substituted for him as the defendant in this case, or even now must

be substituted for him, simply by virtue of the DOJ Certification is incorrect.  Moreover, even if

there were greater merit to his substantive contention, it would not lie with him to advance that

argument in the unusual circumstances of this case.


B.      *Stay of Proceedings*

Next, defendant urges the Court to issue an immediate stay of the proceedings for the

principal reason that "a dispositive issue" – namely, whether defendant was acting within the scope

of his employment – "remains pending and unresolved before the D.C. Court of Appeals . . . ."[24]

In so doing, he does not directly address the standard that governs this application.

In general, the question whether to stay proceedings is addressed to the trial court's

discretion:

> "[T]he power to stay proceedings is incidental to the power inherent in every court
> to control the disposition of causes on its docket with economy of time and effort for
> itself, for counsel, and for the litigants.  How this can best be done calls for the

---

[23]
See No. 20-3977, Dkts. 45 (Brief of Appellant United States of America), 48 (Brief and
Special Appendix for Defendant-Appellant [Donald J. Trump]).

[24]
Dkt. 94, at 4.

SPA-11

11

exercise of judgment, which must weigh competing interests and maintain an even balance."[25]

In this case, the factors relevant to the grant or denial of a motion for a stay pending appeal provide guidance as to relevant considerations. In ruling on such an application, a court considers four "well known" factors "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[26] Read generously, defendant contends that he would be injured irreparably – through completing discovery and conceivably an eventual trial – unless the Court stays the proceedings. We consider each factor in turn.

First, Mr. Trump has not shown the requisite strong likelihood of success. His bare assertion that "a dispositive issue remains pending"[27] is not a "strong showing that he is likely to succeed on the merits."[28] The question that has been certified to the D.C. Court of Appeals obviously could go either way, either in that forum or elsewhere. Indeed, the fact that the District of Columbia law on scope of employment was unclear to the Circuit is the precise reason that two members of the Circuit concluded that they could not predict how it would be resolved and therefore would not itself decide the entire appeal. And Mr. Trump has offered no reason for this Court to

---

[25] *Landis v. North Am. Corp.*, 299 U.S. 248, 254-55 (1936).

[26] *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

[27] Dkt. 94, at 4.

[28] *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d at 170.

SPA-12

12

conclude that the D.C. Court of Appeals or the Second Circuit will rule in his favor on scope of employment. Indeed, as Mr. Trump is aware from my prior decision, my view is that he did not act within the scope of his employment within the meaning of the law of the District of Columbia.

The bulk of Mr. Trump's arguments that are relevant to the stay question go to the second relevant factor, whether he would suffer irreparable injury if a stay were denied. He contends that the Westfall Act protection extended to many government employees sued for actions within the scope of their employment is intended to protect covered employees from both liability and the burdens of defending lawsuits, including those associated with pretrial discovery and trial.[29] That of course is true. But it begs the question.

Westfall Act protection requires both that the individual in question have been an "employee" of the government, an issue on which Mr. Trump thus far as prevailed, and also that he have acted within the scope of his employment. The latter issue remains unresolved. If it were resolved in his favor, any proceedings from now until such a determination, those proceedings – subject to the important comments made below – might prove to have been unnecessary. But any threat of "injury" as a result of further proceedings depends entirely on whether Mr. Trump prevails on the scope of employment issue, which at this juncture cannot be said to be likely. So the threat of any injury is quite uncertain. And that uncertainty is magnified by view of other circumstances.

As an initial matter, discovery in this case has virtually concluded. Mr. Trump has conducted extensive discovery of the plaintiff, yet produced virtually none himself. The principal open items, as the Court understands it, are the depositions of Ms. Carroll and Mr. Trump, scheduled

---

[29] Dkt. 92, at 2 (collecting cases).

13

for October 14 and 19, respectively. Completing those depositions – which already have been delayed for years – would impose no undue burden on Mr. Trump, let alone any irreparable injury.

In any case, even Mr. Trump's contention that denial of a stay irreparably would injure what he characterizes as his immunity from suit – an "immunity" that would apply only if he prevails on the scope of employment – does not remedy the failure to show a meaningful threat of irreparable injury.

In *In re World Trade Center Disaster Site Litigation*, the Second Circuit held that the prospect that "any proceedings in the District Court pending appeal will irreparably impair, at least to some extent, [defendants'] alleged claim to immunity from suit" was to be balanced against the other factors under consideration.[30] And, in that case, the Court of Appeals vacated the stay of proceedings in the district court pending appeal in light of its conclusions on the other factors and their relevant weights.[31]

Given his conduct so far in this case, Mr. Trump's position regarding the burdens of discovery is inexcusable. On December 10, 2020, he moved for a stay pending appeal.[32] His arguments then in support of that motion were almost identical to those advanced here. This Court denied the motion on September 15, 2021.[33] And since that motion was denied, he has taken discovery against plaintiff when the circumstances were not materially different.

---

[30]      *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d at 170.

[31]      *Id.* at 171.

[32]      Letter Mtn. for Stay [Dkt. 47].

[33]      Text Order [Dkt. 56] (denying without prejudice defendant's motion for stay).

SPA-14

14

Third, a stay would cause substantial injury to plaintiff. As the Court noted in an earlier opinion in this case, "defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him."[34] Delay is a more serious concern in this case than usual for several reasons. First, the appeal from my order denying substitution already has consumed 20 months from the day it was noticed and it is not over yet. The remaining question has been certified to the D.C. Court of Appeals, a process that reasonably may be expected to be lengthy. Perhaps most significant, both plaintiff and defendant – and perhaps other witnesses – already are of advanced age. The defendant should not be permitted to run the clock out on plaintiff's attempt to gain a remedy for what allegedly was a serious wrong.

Finally, as noted at the outset, plaintiff claims that the defendant raped her years ago. As the statute of limitations had long since expired when she brought this action, the claim she asserts here is that which still was timely when this case was filed – a claim for defamation that allegedly occurred in the context of Mr. Trump's far more recent denial that he raped the plaintiff. That was the only remaining timely claim. But the world has changed since this case began.

New York has enacted a revival statute, the Adult Survivors Act. Effective November 24, 2022, a claim for damages for the alleged rape will be revived, free of the existing bar of the statute of limitations. And plaintiff intends to sue Mr. Trump for the alleged rape itself.

---

[34] *Carroll v. Trump*, 2022 WL 748128, at *10.

The question whether Mr. Trump in fact raped Ms. Carroll is central to this case.[35] But it will be central also to the new case that almost certainly will be filed on November 24, 2022 or soon thereafter.  Accordingly, discovery and evidence relating to whether or not the alleged rape occurred is relevant to both cases.  Mr. Trump has pointed to no discovery or other proceedings that would occur in this case absent a stay that would not be relevant also to the imminent new case.

Mr. Trump argues that the Court should not consider the imminent new case in its analysis because plaintiff "has no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."[36] But the argument, in this context, is both incorrect and beside the point.  It is incorrect because calling the imminent new case a "new claim" blinks reality. The question whether Mr. Trump raped Ms. Carroll is the paramount issue in both cases.  And it is beside the point because discovery here would not "develop" evidence for a "new claim," even if the anticipated suit for damages for the alleged rape properly were so characterized, because the discovery that would occur here would go directly to the claim in *this* case.  Staying discovery in this case on the ground that it might be of use in a future litigation would make no sense.

---

[35]

*Carroll*, 498 F. Supp. 3d at 426.

[36]

Dkt 94, at 4.

SPA-16

16

For all of the foregoing reasons, Mr. Trump has not established that he has a strong likelihood of success. In any event, the balance of the equities tips decidedly against him.

*Conclusion*

The defendant's letter motion [Dkt. 92] is denied.

SO ORDERED.

Dated: October 12, 2022

_____

Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

       Plaintiff,

  -against-            20-cv-7311 (LAK)

DONALD J. TRUMP,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-10-2023

## MEMORANDUM OPINION

Appearances:

    Roberta Kaplan
    Joshua Matz
    Shawn Crowley
    Matthew Craig
    Trevor Morrison
    KAPLAN HECKER & FINK LLP
    *Attorneys for Plaintiff*

    Alina Habba
    Michael T. Madaio
    HABBA MADAIO & ASSOCIATES LLP
    *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

    Donald J. Trump is accused in this and a second very closely related civil case of

having raped E. Jean Carroll in the mid 1990s. Ms. Carroll claims, in this action, that Mr. Trump

2

defamed her in 2019 in a series of public responses to the first public appearance of her accusation.[1]
Her claim in the second case is for damages for the alleged rape as well as for a different allegedly
defamatory statement.

  The matter now is before the Court on Mr. Trump's motion to exclude from evidence
at the trial of this case an excerpt from the so-called *Access Hollywood* tape that was broadcast
nationwide repeatedly during the 2016 presidential campaign, the testimony of two witnesses – Mss.
Leeds and Stoynoff – who previously have claimed that Mr. Trump sexually assaulted them, and
extremely short excerpts of videos of campaign remarks by Mr. Trump. He seeks also to exclude any
evidence regarding emotional harm that Ms. Carroll may have suffered as a result of the underlying
incident.

  Before proceeding to the analysis, it is appropriate to set out the legal framework that
applies at this stage of the case to the bulk of the motion and the Court's limited role in ruling on Mr.
Trump's principal evidentiary objections.


*The Framework and the Court's Limited Role*

  Most of the evidence that Mr. Trump seeks to keep from the trial jury is to the effect
that Mr. Trump allegedly has abused or attempted to abuse women *other than Ms. Carroll* in ways

---

[1]  The Court assumes familiarity with its decisions in both actions. *See* Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); Dkt 96, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); Doc. No. 22-cv-10016 (*Carroll II*), Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023). Unless otherwise indicated, Dkt references are to the docket in 20-cv-7311 (*Carroll I*).

3

that are the comparable to what he allegedly did to Ms. Carroll. In other words, Ms. Carroll offers

the evidence to show that Mr. Trump has a propensity for such behavior.

Mr. Trump correctly points out that the Federal Rules of Evidence ordinarily preclude

propensity evidence. In 1994, however, Congress enacted Rule 415, which created an important

exception to that principle. In a civil case "based on a party's alleged sexual assault," as that term

is defined in the rules, "evidence that the [defendant] committed any other sexual assault" may be

admitted in such cases.[2] So the initial questions presented by Mr. Trump's motion are (a) whether

this is a case "based on [an] alleged sexual assault," (b) whether the evidence Mr. Trump seeks to

---

[2]

The exception created in Rule 415 applies also in civil child molestation cases. Fed. R. Evid. 414. There is a comparable exception for criminal cases. Fed. R. Evid. 413.

The purpose of these amendments to the Federal Rules of Evidence was to make it easier to convict and hold civilly liable alleged perpetrators of such assaults. *See* 140 Cong. Rec. S12990-01, S12990 (1994) (statement of Sen. Robert Dole) ("The reform effected by these rules is critical to the protection of the public from rapists and child molesters, and is justified by the distinctive characteristics of the cases to which it applies. . . . In child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant-a sexual or sado-sexual interest in children-that simply does not exist in ordinary people. . . . Similarly, sexual assault cases, where adults are the victims, often turn on difficult credibility determinations. . . . The practical effect of the new rules is to put evidence of uncharged offenses in sexual assault and child molestation cases on the same footing as other types of relevant evidence that are not subject to a special exclusionary rule."); *United States v. Schaffer*, 851 F.3d 166, 181 n.81 (2d Cir. 2017) ("[David J. Karp's article] explain[s] that one of the primary arguments in favor of Rule 413 was that 'the past conduct' of '[a] person with a history of rape or child molestation . . . provides evidence that he has the combination of aggressive and sexual impulses that motivates the commission of such crimes, that he lacks effective inhibitions against acting on these impulses, and that the risks involved do not deter him. A charge of rape or child molestation has greater plausibility against a person with such a background.'") (quoting David J. Karp, *Evidence of Propensity and Probability in Sex Offense Cases and Other Cases*, 70 CHI.-KENT L. REV. 15, 20 (1994)); *id.* (noting that "Sen. Robert Dole, principal sponsor of Rule 413, referr[ed] to David Karp's work as 'provid[ing] a detailed account of the views of the legislative sponsors and the administration concerning the proposed reform, and should also be considered an authoritative part of its legislative history'") (quoting 140 Cong. Rec. at S12990).

4

exclude is evidence of "other sexual assault[s]," and, even if both are so, (c) whether Rule 403 warrants exclusion of that evidence.

Moreover, it is relevant to emphasize that the Court's role with respect to evidence of prior sexual assaults in a case like this is limited. The Court does not itself decide what Mr. Trump meant in making his various statements. It does not decide whether Mr. Trump or Mss. Leeds and Stoynoff are more credible. All of that is for the trial jury. The Court's role is to determine whether the evidence regarding these alleged prior incidents and Mr. Trump's statements would permit a jury reasonably to find that Mr. Trump has a history of sexual assaults that could be probative of whether he committed the alleged attack on Ms. Carroll.

*The Access Hollywood Tape*

Mr. Trump first seeks to exclude from evidence an excerpt from (a) the so-called *Access Hollywood* tape, an excerpt that records an exchange among Mr. Trump and others as the group arrived for the shooting of a television episode, as well as (b) a brief taped excerpt from a question to and response by Mr. Trump during a 2016 presidential debate regarding his statements on the *Access Hollywood* tape. He contends that his statements on the *Access Hollywood* video could be taken to support the allegation that he committed the alleged sexual attack on Ms. Carroll and therefore should not be heard by the jury.

The audio of the excerpt offered by Ms. Carroll reads as follows:

**Unknown:** "She used to be great. She's still very beautiful."

**Trump:** "You know and I moved on her actually. You know she was down on Palm Beach. *I moved on her and I failed. I'll admit it. I did try and fuck her. She was*

5

*married.*"

**Unknown**: "That's huge news."

**Trump**: "No, no, Nancy. No this was [(inaudible)]. And I moved on her very heavily in fact I took her out furniture shopping. She wanted to get some furniture. I said I'll show you where they have some nice furniture. I took her out furniture [sic]. *I moved on her like a bitch*, but I couldn't get there, and she was married. Then all of a sudden I see her, she's now got the big phony tits and everything. She's totally changed her look."

**Bush**: "Sheesh, your girl's hot as shit. In the purple."

**Multiple voices**: "Whoa! Yes! Whoa!"

**Bush**: "Yes! The Donald has scored. Whoa, my man!"

[Crosstalk]

**Trump**: "Look at you. You are a pussy."

[Crosstalk]

**Trump**: "Maybe it's a different one."

**Bush**: "It better not be the publicist. No, it's her. It's"

**Trump**: *"Yeah that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful – I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star they let you do it. You can do anything."*

**Bush**: *"Whatever you want."*

**Trump**: *"Grab them by the pussy. You can do anything."*

6

. . .

*Ms. Carroll's Case is "Based On" An Alleged Sexual Assault*

As previously stated, Mr. Trump almost certainly is correct in arguing that the quoted statements on the *Access Hollywood* tape are offered by plaintiff for "only one purpose: to suggest to the jury that Defendant has a propensity for sexual assault and therefore the alleged incident [with Ms. Carroll] must have in fact occurred."[3]  He is correct also that the Federal Rules of Evidence ordinarily preclude propensity evidence.  As noted above, however, Rule 415 provides that "evidence that the [defendant] committed any other sexual assault" may be admitted in "a civil case involving a claim for relief based on a party's alleged sexual assault," as that term is defined in Rule 413(d).[4]

Mr. Trump nevertheless claims that this is not a case *"based on* a party's alleged sexual assault" because Ms. Carroll's claim in this case – as distinguished from *Carroll II*, which asserts both battery and defamation claims – is exclusively for defamation, not rape or some other form of sexual assault.  He contends that there are two schools of legal thought as to the meaning of "based on" as used in Rule 415 and that the narrower and, in his submission, better view – referred to as the "categorical approach" – is that a case is "based on" a sexual assault only if proof of the sexual assault is an element of the claim for relief.  Proof of defamation, he says, does not require proof of a sexual assault. But there is no need in this case to debate the preferable interpretation of the phrase "based on" as used in Rule 415. For whatever the theoretical merits of the categorical approach as applied in other cases, this particular case is "based on" an alleged sexual

---

[3]     Def. Mem. (Dkt 131) at 15.

[4]     Fed. R. Evid. 415(a).

7

assault under either approach for a very simple reason: proof of sexual assault is an essential element of Ms. Carroll's defamation claim given the nature of the alleged defamation.

The core of the alleged defamation in this case, although it is broader, is that Mr. Trump's statements in words and in substance included the assertions that Ms. Carroll lied in claiming that Mr. Trump raped her, that her accusation is a "hoax." Thus, in order to prevail on her libel claim, Ms. Carroll must prove that Mr. Trump sexually assaulted her.[5] Unless she proves that sexually assault, she cannot establish that Mr. Trump's charge that her story was a lie and a hoax was false. In consequence, this indeed is a case "based on" a sexual assault even under the categorical approach. In any event, as Judge Furman recently explained in a thoughtful opinion, the alternative view of the meaning of "based on" – a view under which a case is "based on" a sexual assault if a sexual assault is a premise of a plaintiff's claim – is preferable to the categorical approach,[6] an analysis with which I agree. And under that test there is no serious question that Ms. Carroll's claim is "based on" an alleged sexual assault.

*The Access Hollywood Tape Satisfies Rule 415*

The next question is whether the *Access Hollywood* tape contains evidence of one or more other "sexual assaults" by Mr. Trump. This requires further consideration of the definition of

---

5

> *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) ("Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) *falsity of the defamatory statement*, and (5) special damages or *per se* actionability.") (emphasis added) (citation omitted). For Ms. Carroll to establish the "falsity of [Mr. Trump's allegedly] defamatory statement," she must prove that Mr. Trump sexually assaulted her.

6

> *Boyce v. Weber,* 19-cv-3825, 2021 WL 2821154, at *8 (S.D.N.Y. July 7, 2021).

SPA-24

8

"sexual assault" in Rule 413(d).

Rule 413(d) defines "sexual assault" as "a crime under federal law or under state law . . . involving" any of five categories of conduct, the relevant portions of at least two of which have a bearing here:

- "contact, without consent, between any part of the defendant's body — or an object — and another person's genitals or anus" - Rule 413(d)(2).

- "an attempt . . . to engage in conduct described in subparagraph[]"(2) - Rule 413(d)(5).

The first italicized portion of the *Access Hollywood* tape excerpt evidences Mr. Trump stating that he "moved on" a woman named Nancy[7] "like a bitch," that he "tried to fuck her." The second italicized portion evidences Mr. Trump said that he just starts kissing beautiful women, he does not first obtain consent, that the women just let one do it when one is a "star," and that a "star" can "grab" beautiful women by their genitals or do anything the "star" wants. Moreover, he testified in his deposition:

"Q      And you consider yourself to be a star?

A      I think you can say that, yeah."[8]

The Court acknowledges that Mr. Trump has claimed that his statements were "locker room talk" – presumably meaning that they were not true – and that he has denied that he has behaved in the manner described by his statements.  Although he has not so argued, some of the

---

[7]      Possibly Nancy O'Dell, then a television personality.

[8]      Trump Dep. (Dkt 135-3) at 174:20-21.

9

statements perhaps may be susceptible of varying interpretations – including in some respects interpretations that may be inconsistent with sexual misconduct by Mr. Trump. Possibly, for example, he may claim that he was speaking of what other "stars" have done, not his own conduct. But that is not what is required to justify exclusion for failure to satisfy Rule 415.

While Rules 413 and 415 do not articulate the standard for the admission of evidence of sexual assaults, those courts that have addressed the question have held that "a trial court considering evidence offered under Rule 415 must decide under Rule 104(b) *whether a reasonable jury could find* by a preponderance of the evidence that the past act was an 'offense of sexual assault' under Rule 413(d)'s definition and that it was committed by the defendant."[9] It simply is not the Court's function in ruling on the admissibility of this evidence to decide what Mr. Trump meant or how to interpret his statements.

In this case, a jury reasonably could find, even from the *Access Hollywood* tape alone, that Mr. Trump admitted in the *Access Hollywood* tape that he in fact has had contact with women's genitalia in the past without their consent, or that he has attempted to do so. And that conclusion is supported by the other evidence discussed below. Accordingly, the tape satisfies Rule 415 by virtue of Rule 413(d)(2) and (d)(5).

---

[9]        *E.g., Johnson v. Elk Lake School District,* 283 F.3d 138, 154-55 (3d Cir. 2002) (emphasis added). *Accord, United States v. Keen,* No. 4:21-CR-00052, 2023 WL 2226796, at *3 (M.D. Pa. Feb. 24, 2023); *A.R. v. Pohlman,* Civ. No. 16-17865, 2019 WL 468528, at *1 (E.D. La. Feb. 6, 2019); *McMahon v. Valenzuela,* Case No. 2:14-cv-02085-CAS(AGRx), 2015 WL 7573620, at *4 (C.D. Cal. Nov. 25, 2015); *United States v. Levinson,* No. 10–80166–CR, 2011 WL 1102841, at *3 (S.D. Fla. Jan. 31, 2011) (in the context of Rule 414, whether the defendant committed a prior child molestation offense); CHRISTOPHER MUELLER AND LAIRD KIRKPATRICK, FEDERAL EVIDENCE § 4:84, at 346-37 (3d ed. 2007).

10

*The Two Alleged "Other Victim" Witnesses*

*Jessica Leeds*

Ms. Leeds testified at her deposition that she was seated beside Mr. Trump on a flight from Texas to New York in 1979.  After they finished eating the served airline meal, Mr. Trump assaulted her:

"[H]e was with his hands grabbing me, trying to kiss me, grabbing my breasts, pulling me towards him, pulling himself on me.  It was kind of a struggle going on.  *  *  *  That went on for what seemed like a terribly long time, but it probably was just a few seconds.

"It was when he started putting his hand up my skirt that I realized that nobody was going to save me but me, and I was on the aisle, I managed to wheel my way out of the chair, and grabbed my purse, and I went back to my seat in the back."[10]

Some time later, Ms. Leeds testified, she was at prominent retail store in New York for an event at which guests were seated at tables. Ms. Leeds was working at a table distributing "chits" (table assignments) to those attending. Mr. Trump and his wife came up to the table.  Ms. Leeds handed him his "chit" whereupon "he looked at [her] and[, according to Ms. Leeds,] he said, 'I remember you.  You're the cunt from the airplane."[11]

Mr. Trump has claimed that Ms. Leeds is a liar and that no such event ever occurred.

---

[10]     Leeds Dep. (Dkt 135-5)  at 19:3-18.

[11]     *Id.* at 22.

11

And he will be entitled to make that argument to the jury.  But that is not now the issue.  Even considered alone, Ms. Leeds' account, if credited by the jury, reasonably could be regarded as describing unconsented-to sexual contact by Mr. Trump and also as an attempt by Mr. Trump to bring at least his hands, and perhaps other parts of his body, into contact with Ms. Leeds' genitalia, in each case in violation of federal law.[12]  It therefore satisfies at least Rule 413(d)(2) and 413(d)(5) and thus Rule 415.

---

[12] In order to be admissible under Rule 415, evidence of a sexual assault of a person other than the plaintiff must also have been a federal or state crime.  That requirement is satisfied here.

49 U.S.C. §§ 46506 and 46501(2) make it a crime to commit an act on an "aircraft in the United States" that would violate any provision of chapter 109A of title 18 of the United States Code if the act had been committed in the special maritime and territorial jurisdiction of the United States.

18 U.S.C. 2246(3), which is part of chapter 109A, defines "sexual contact" in relevant part as "the intentional touching, either directly or through the clothing, of the genitalia, . . . groin, breast, [or] inner thigh . . . of any person with an intent to . . . arouse or gratify the sexual desire of any person."  Mr. Trump's alleged non-consensual grabbing of Ms. Leeds' breasts and putting his hand up her skirt, if it occurred, therefore would have been forced "sexual contact" or, at least, an attempt to make such contact, under chapter 109A.

That takes us to 18 U.S.C. § 2244(a)(1), which makes it unlawful knowingly to cause another person to engage in a "sexual contact" by force, or to attempt to do so, in the special maritime and territorial jurisdiction of the United States if so to do would violate section 2241(a) or (b) had the "sexual contact" been a "sexual act."  18 U.S.C. § 2241(a)(1) makes it a crime knowingly to engage in a "sexual act" with another within the special maritime jurisdiction of the United States.2241(a).

Accordingly, the alleged assault on Ms. Leeds while on an "aircraft in the United States," attempted or completed, if it occurred, thus would have been a federal crime under 49 U.S.C. § 46506 and 46501(2).

*Natasha Stoynoff*

Ms. Stoynoff, then a writer for *People* magazine, traveled to Mar-a-Lago, Mr. Trump's residence in Florida, to interview him and his wife, Melania. Mr. Trump offered to show Ms. Stoynoff a painting that he said was hanging in a certain room, and took her there. As she began looking around, she heard him close the door behind her. Then, she testified:

> "I turn around and he's right here (indicating), and he grabs my shoulders and pushes me against this wall and starts kissing me.

Q   Did he say anything before?

A   Not that I recall.

Q   And what was going through your mind when Donald Trump did this?

A   Complete shock. Thank you. Complete shock because it was very fast and I was taken – taken by surprise.

Q   And do you recall how you reacted?

A   I do recall pushing him back twice. I recall trying to say something, but not really being able to. I was so flustered.

Q   And when you pushed him back the first time do you recall how Donald Trump reacted?

A   Yes. He just came toward me again.

Q   And what about after the second time?

A   He started coming toward me again, but then someone came into the room.

Q   Do you recall who came into the room?

A   Yes. It was the butler.

13

\* \* \*

Q  And did you see the butler have any reaction to what Mr. Trump was doing?

A  Yes, I did.

Q  And how would you describe that?

A  Well, all I know is that when I looked at his face, to me he had the look on his face like thank God I got in here, like he's done this before, like he knew that he saw a shut door and he had to get in there. That's my perception of his . . ."[13]

Later in the deposition, she further testified:

Q  [earlier portion of question not in record] there a particular piece of the video you're referring to?

A  Lying about never groping or kissing women without their consent and how he had the utmost respect for women.

Q  You consider what he did to you lying and groping women without their consent?

A  I consider that he lied about kissing and groping me without consent."[14]

Ms. Stoynoff's deposition presents a different factual situation that Ms. Leeds'. Nevertheless, the legal analysis is similar.

Rule 413(d)(5) defines as "sexual assault" for purposes of Rule 415 an attempt to

---

[13]  Stoynoff Dep. (Dkt 135-4) at 21:5-22:25.

[14]  *Id.* at 38:2-10.

14

engage in conduct described in Rule 413(d)(2), among other provisions.  Rule 413(d) requires also that any such attempt to constitute a crime under federal or state law.  There are at least two ways that Mr. Trump's conduct as described by Ms. Stoynoff, if it occurred, would have been a crime under the law of Florida, where the incident allegedly took place.

First, under Florida law, "[t]o establish an attempt to commit a specific intent crime, the State must prove a specific intent to commit that crime and an overt act toward the commission of the crime."[15]  It is a crime under Florida law "[a]ctually and intentionally [to] touch[] or strike[] another person against the will of the other."[16]  This clearly covers Mr. Trump's alleged kissing and groping of Ms. Stoynoff, as Mr. Trump tacitly concedes.[17]  Rule 415 therefore is satisfied if (1) Mr. Trump's conduct included an "overt act" toward the commission of a state crime (2) taken for the purpose of committing a state crime "involving" "contact, without consent, between any part of [Mr. Trump]'s body . . . and [Ms. Stoynoff]'s genitals or anus . . . ."[18]

Second, in the alternative, Florida law makes it a crime for "[a] person 18 years of age or older [to] commit[] sexual battery upon a person 18 years of age or older, without that person's consent, and in the process does not use physical force and violence likely to cause serious

---

15

*Neal v. State*, 854 So. 2d 666, 670 (Fla. Dist. Ct. App. 2003).

16

Fla. Stat. § 784.03(1)(a)1.

17

*See, e.g., Stockett v. Tolin*, 791 F. Supp. 1536, 1555-56 (S.D. Fla. 1992) (groping and kissing).

18

Fed. R. Evid. 413(d)(2).

personal injury . . . ."[19]   Florida law defines "sexual battery" as "oral, anal, or female genital penetration by, or union with, the sexual organ of another or the anal or female genital penetration of another by any other object,"[20] and that definition "makes no mention of intent at all."[21]   For a crime that does not have an intent requirement, "[a]ttempt under Florida law requires the defendant to commit 'any act toward the commission of such [crime], but fails in the perpetration or is intercepted or prevented in the execution thereof.'"[22]   As a result, Rule 415 also is satisfied if Mr. Trump's conduct included "an[] act toward the commission" of a state crime "involving" "contact, without consent, between any part of [Mr. Trump]'s body . . . and [Ms. Stoynoff]'s genitals or anus . . . ."[23]

Ms. Stoynoff described Mr. Trump kissing her without her consent and against her will.  That alone would not satisfy any part of Rule 413(d).  But Ms. Stoynoff, however, testified also that Mr. Trump was lying when he denied "groping" her without her consent – in other words, that he "groped" her.

The word "grope" in the context of human contact means "[t]o touch or fondle (a person or part of the body) clumsily or forcefully for one's sexual gratification, (in later use) esp.

---

19
    Fla. Stat. § 794.011(5)(b).

20
    Fla. Stat. § 794.011(1)(j).

21
    *United States v. Bemis*, No. 8:19-CR-458-T-33AAS, 2020 WL 1046827, at *3 (M.D. Fla. Mar. 4, 2020).

22
    *United States v. Lockley*, 632 F.3d 1238, 1245 n.6 (11th Cir. 2011) (quoting Fla. Stat. § 777.04(1)) (alteration in original).

23
    Fed. R. Evid. 413(d)(2).

without consent."[24]   And while "groping" anyone without consent is sexual misconduct, and colloquially might be referred to as sexual assault, Rule 413(d) is not that broad.  It defines "sexual assault" as unwanted contact, or attempted unwanted contact, only with particular parts of the anatomy.  The portion of Ms. Stoynoff's deposition now before the Court does not specify what part of her anatomy she claims that Mr. Trump groped or attempted to grope.  And if Ms. Stoynoff's account of the parts of her body that Mr. Trump allegedly touched were the only relevant evidence, it would be debatable whether that conduct alone would satisfy Rules 413(d) and 415.[25] But it is not alone.

As an initial matter, the circumstances of the alleged encounter are relevant.  Mr. Trump, she says, invited Ms. Stoynoff – who was at Mar-a-Lago to interview Mr. Trump and his wife – to an unoccupied room and closed the door behind her, actions indicative of a desire for privacy.  She went on to say that he immediately, and without her consent, began kissing Ms. Stoynoff and pressed on as she resisted his advances. These actions are suggestive of a plan, formed

---

[24]   "Grope." OXFORD ENGLISH DICTIONARY (available at https://www.oed.com/view/Entry/81745?rskey=awTI5c&result=3&isAdvanced=false#eid) (last visited Feb. 28, 2023); *see also* "Grope." MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY (available at https://unabridged.merriam-webster.com/unabridged/grope) ("to pass the hands over (the person of another) for the sake of sexual pleasure") (last visited Feb. 28, 2023).

[25]   In any case, the Court may not assume for purposes of Mr. Trump's motion that the plaintiff could not lay a better foundation for admissibility of Ms. Stoynoff's account by adducing evidence concerning the particular parts of Ms. Stoynoff's anatomy Mr. Trump groped or attempted to grope.  Mr. Trump therefore would not have satisfied his burden, on the *in limine* motion, to establish that "the evidence is clearly inadmissible on all potential grounds." *Jean–Laurent v. Hennessy*, 840 F. Supp.2d 529, 536 (E.D.N.Y. 2011) (internal quotation marks and citation omitted). It is worth noting that Mr. Trump concedes that this is the applicable standard. Def. Mem. (Dkt 131) at 1 (citing *Highland Capital Mgmt. v. Schneider*, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) ("Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds.") (citation omitted).

before Mr. Trump invited Ms. Stoynoff to the unoccupied room and closed the door behind her, to take advantage of that privacy and to do so without regard to Ms. Stoynoff's wishes. Moreover, the *Access Hollywood* tape and the testimony of Ms. Leeds are additional evidence that a jury would be entitled to consider in deciding whether to infer that the ultimate goal of Mr. Trump's alleged actions with Ms. Stoynoff was to bring his hands or other parts of his anatomy into contact with Ms. Stoynoff's most private parts.

To be sure, the Court does not now draw any such inference. And Mr. Trump has denied publicly any such occurrence ever happened. He of course will be entitled to do so before the jury. And the jury could credit Mr. Trump's testimony in preference to Ms. Stoynoff's. But that is for another day. The Court's only function at this stage is to decide whether the evidence of record is sufficient for a jury reasonably to conclude that Mr. Trump at least attempted to have contact with Ms. Stoynoff that, if it had occurred, would have met the requirements of Rule 413(d). That standard has been satisfied.[26]

### Rule 403

Mr. Trump contends that the testimony of Mss. Leeds and Stoynoff, even if otherwise admissible under Rules 415 and 413(d), should be excluded under Rule 403. He argues that the circumstances of the alleged assaults on these two women are "vastly different" from those on Ms. Carroll, that the events allegedly involving these women were not close in time to the alleged incident with Ms. Carroll, that each was the only alleged assault on the alleged victim, and that the testimony of Mss. Leeds and Stoynoff is unnecessary because it "is relevant only to the extent

---

26

SPA-34

18

Plaintiff lacks sufficient evidence to independently establish the merit of her claims."[27]

Rule 403, upon which Mr. Trump relies, provides:

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[28]

And Mr. Trump correctly points out that courts considering Rule 403 objections to relevant evidence consider a number of factors, including

"(1) the similarity of the prior acts to the acts charged, (2) the closeness in time of the prior acts to the acts charged, (3) the frequency of the prior acts, (4) the presence or lack of intervening circumstances, and (5) the necessity of the evidence beyond the testimonies already offered at trial." [29]

But, as the text of the rule itself makes clear, the probative value of the evidence that the movant seeks to exclude weighs heavily in the equation. And that is the appropriate starting point here.

This is, in the vernacular, is a "he said, she said" case, and it is one that turns on an alleged event more than two decades ago. There will be no physical evidence supporting either side at trial. Mr. Trump repeatedly has denounced Ms. Carroll as a liar and the perpetrator of a hoax, and he has done so on national television and with the benefit of his status in the public and political

---

27

Def. Mem. (Dkt 131) at 9-11.

28

Fed. R. Evid. 403.

29

*United States v. Spoor*, 904 F.3d 141, 153-55 (2d Cir. 2018).

spheres. Ms. Carroll's case, absent these witnesses, likely will depend upon her personal credibility in the courtroom, the credibility of two witnesses whom she allegedly told of the alleged rape contemporaneously, and the jury's assessment of Mr. Trump's personal credibility. Mr. Trump's alleged sexual assaults on Mss. Leeds and/or Stoynoff, if the jury is permitted to hear their testimony and believes it, is likely to weigh heavily in the jury's determination. In consequence, their testimony, if received, could prove quite important. Indeed, that surely is why Mr. Trump seeks to exclude it. So it is in that context that the usual Rule 403 factors warrant attention.

Mr. Trump's attempt to minimize the similarity between his alleged actions with respect to Ms. Leeds and Ms. Stoynoff, on the one hand, and Ms. Carroll on the other is not very persuasive. The alleged acts are far more similar than different in the important aspects. In each case, the alleged victim claims that Mr. Trump suddenly attacked her sexually. In the cases of Ms. Carroll and Ms. Stoynoff, he allegedly did so in a location after closing a door behind him, which gave him privacy. In all three cases, he allegedly did so without consent. So it is only Ms. Leeds' case that differs in an important particular -- the fact that the alleged assault occurred on an airplane in circumstances in which, despite the fact that both she and Mr Trump were in bulkhead seats, afforded little privacy.

Mr. Trump effectively concedes that there were no intervening circumstances here that weigh in his favor.[30] Nor is the fact that Mr. Trump did not allegedly assault either Ms. Leeds or Ms. Stoynoff more than once each of any significance. There is no reason to suppose that he encountered either of them with sufficient frequency for repeated assaults on either to have been

---

[30]     Def. Mem. (Dkt 131) at 11.

20

within realm of possibility.

His best argument is that these three alleged incidents were widely separated in time: Ms. Leeds in 1979, Ms. Carroll in the mid-1990s, and Ms. Stoynoff in 2005. And that weighs in his favor. On the other hand, Rule 415, unlike other provisions of the Rules of Evidence, contains no temporal limits on the admissibility of evidence of other sexual assaults in a sexual assault case. The legislative history makes clear that this was no accident.[31] So, while the limitations of Rule 403 certainly apply with respect to sexual assault evidence in cases like this, they perhaps must be applied with due regard for Congress's deliberate failure to impose temporal limits.

In all the circumstances, Mr. Trump has not demonstrated persuasive reason to believe that there is any risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," let alone any risks that would substantially outweigh the probative value of the evidence of Mss. Leeds and Stoynoff.

*The Campaign Excerpts*

Ms. Carroll seeks to offer in evidence seven excerpts from statements by Mr. Trump during the 2016 presidential campaign. The excerpts vary in length and average 47 seconds each. And all of them share similar characteristics – assertions by Mr. Trump that women who have accused him of sexual assaults were lying and, in several of the cases, words or implications that the women's looks are not appealing to Mr. Trump. In short, he spoke of these other women essentially

---

[31] 140 Cong. Rec. at S12990 (statement of Sen. Robert Dole) ("No time limit is imposed on the uncharged offenses for which evidence may be admitted; as a practical matter, evidence of other sex offenses by the defendant is often probative and properly admitted, notwithstanding substantial lapses of time in relation to the charged offense or offenses.").

21

in the same terms as he allegedly defamed Ms. Carroll.  Mr. Trump seeks to exclude them as irrelevant and under Rule 403.

These excerpts do not allege sexual assault, so Rules 413 and 415 are irrelevant.  And, except under Evidence Rules 413 through 415,  "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[32]  But Rule 404(b) provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[33]  And that is where Ms. Carroll hangs her hat.  She argues that these excerpts are appropriate

> "to establish Trump's *modus operandi* of categorically denying accusations and his intent and knowledge when making those statements.  Indeed, this *modus operandi* is plain to see.  When a woman accuses Trump, he unconditionally denies the allegations, accuses the woman of fabricating her story, and declares that she was too ugly for him to have sexually assaulted in the first place. [citations omitted]  This is the exact pattern Trump followed when he first responded to Carroll's accusations in June 2019 . . ."[34]

She goes on to contend that this evidence is "highly relevant" because, "[g]iven the similarities between how Trump responded to all three women, the pattern makes it more likely that Trump lied

---

[32]     Fed. R. Evid. 404(b)(1).

[33]     Fed. R. Evid. 404(b)(2).

[34]     Pl. Mem. (Dkt 138) at 14.

when he denied assaulting Carroll."[35]

       The problem with Ms. Carroll's argument, even assuming sufficient similarities, is that these speech excerpts would not tend to make it more likely that Mr. Trump lied when he denied assaulting Ms. Carroll *unless* perhaps the evidence establishes that he lied when he denied assaulting each of the other women to whom he responded. The jury might or might not so find with respect to Ms. Leeds and Ms. Stoynoff, who are the obvious subjects of some of the excerpts. But it is not now clear that Ms. Leeds and Ms. Stoynoff were the only subjects of these remarks. Nor is it clear that the jury could make similar findings with respect to any others.[36]

       In the circumstances, the Court will defer any ruling on the admissibility of these excerpts until trial.

*Emotional Harm*

       This action is exclusively for defamation allegedly committed in 2019. Ms. Carroll here seeks damages solely for that defamation. In *Carroll II*, in contrast, the alleged rape itself as well as for a different allegedly defamatory statement allegedly made in October 2022. Mr. Trump seeks to preclude in this case, the case limited to alleged defamation, "any evidence of purported emotional harm related to the alleged incident," referring to the sexual assault.[37] On this point, the

---

[35]   *Id.* at 15.

[36]   Ms. Carroll's fallback position – *i.e.*, that the excerpts are "evidence of Trump's knowledge regarding the falsity of his statements about Carroll, and his intent to lie and act with malice when making those statements", *id.* -- amounts to the same argument

[37]   Dkt 131 at 10.

23

parties are speaking past each other.

"To the extent that Trump seeks only to preclude Carroll from claiming as *compensatory damages*, the emotional and psychological harm that the sexual assault caused her, Carroll does not disagree."[38]  Compensatory damages for the sexual assault are available, if at all, only in Carroll II, which is brought under New York's Adult Survivors Act.  But evidence of emotional and psychological harm allegedly caused by the alleged sexual assault may be relevant in this action, as it may go to why Ms. Carroll did not report or speak out about the alleged sexual assault earlier than she did and perhaps for other reasons.  Mr. Trump does not suggest any reason that such evidence should be excluded.

*Conclusions*

For the foregoing reasons, Mr. Trump's *in limine* motion (Dkt 130) is denied in all other respects.  This ruling is without prejudice to renewing his objection to the campaign speech excerpts in the event they are offering at trial.  Unless otherwise ordered, those excerpts shall not be mentioned in opening statements.

SO ORDERED.

Dated:        March 10, 2023

_____
Lewis A. Kaplan
United States District Judge

---

[38]    Pl. Mem. (Dkt 138) at 17 (emphasis in original).

SPA-40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                                            Plaintiff,


                    -against-                                        20-cv-7311 (LAK)


DONALD J. TRUMP, in his personal capacity,

                                            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-5-2023

## MEMORANDUM AND ORDER ON
## PLAINTIFF'S MOTION *IN LIMINE*

LEWIS A. KAPLAN, *District Judge.*

       Plaintiff, E. Jean Carroll, moves *in limine* for an order ruling on six requests. Five of

those requests pertain to the issue of liability – *i.e.*, whether the defendant, Donald Trump, defamed

Ms. Carroll in certain statements he made while he was president in 2019 in response to Ms.

Carroll's public accusation that he sexually assaulted ("raped") her.[1] On September 6, 2023, this

Court determined that the trial in this case shall be limited to the issue of damages only for the

reasons discussed in its decision granting Ms. Carroll's motion for partial summary judgment.[2]

---

[1]

       Those five requests are: (1) "admitting [Ms.] Carroll's prior consistent statements to Lisa
Birnbach and Carol Martin about Defendant Donald J. Trump's attack", (2) "admitting the
testimony of Natasha Stoynoff and Jessica Leeds regarding their own experiences with [Mr.]
Trump", (3) "excluding testimony from witnesses whom [Mr.] Trump has not disclosed,
precluding Trump from testifying to undisclosed information, and precluding any testimony
or commentary concerning DNA evidence", (4) "precluding cross-examination or evidence
regarding Stephanie Grisham's prior misdemeanor convictions, her unrelated pending lawsuit,
and her use of a prescription medication", and (5) "precluding comments and
cross-examination regarding [Ms.] Carroll's choice of counsel." Dkt 133.

[2]

       Dkt 214.

2

Those five requests accordingly have been rendered moot by the Court's previous decision.

The matter now is before the Court on Ms. Carroll's sixth request, to preclude the testimony of Mr. Trump's proposed rebuttal expert, Robert J. Fisher. Ms. Carroll intends to call as an expert witness Professor Ashlee Humphreys, Ph.D. Professor Humphreys intends to testify on the "dissemination of [Mr.] Trump's defamatory statements, their impact [(if any)], and the cost [(if any)] to counteract the damage to [Ms.] Carroll's reputation through a reputation repair campaign."[3] Mr. Trump seeks to call Mr. Fisher as an expert witness, purportedly to rebut Professor Humphreys's conclusions. Ms. Carroll moves to exclude Mr. Fisher's testimony principally on the ground that Mr. Fisher's analysis is unreliable.

The Court previously confronted the admissibility of Mr. Fisher's proposed rebuttal expert testimony in a closely related second case, *Carroll v. Trump*, 22-cv-10016 ("*Carroll II*"). In *Carroll II*, Court determined that there was no reliable basis for Mr. Fisher's conclusions in his report that was submitted in *Carroll II* that purported to rebut Professor Humphreys's conclusions. Specifically, it stated that:

> "Mr. Fisher does not explain how his experience informs his criticisms of [Professor] Humphreys's proposal for reputation repair. Nor does he rely on any specific facts, data, or evidence. Indeed, his entire analysis of [Professor] Humphreys's proposal for reputation repair contains no citation other than to [Professor] Humphreys's report. . . . Although one could hypothesize that his opinions were informed by his experience in the communications and reputation management fields, how exactly that experience leads to those opinions remains unknown and would be nothing more than speculation. Moreover, almost all of Mr. Fisher's 'analysis' with respect to [Professor] Humphreys's proposal consists of potential discrepancies or shortcomings in [Professor] Humphreys's background and

---

The Court did not grant Ms. Carroll's motion for partial summary judgment with respect to one of Mr. Trump's 2019 statements, the statement he made on June 24, 2019.

[3]     Dkt 134 (Pl. Mem.) at 10.

report that can be observed readily by jurors and/or brought out in cross examination without benefitting from any aid by an expert. . . . His opinions as to [Professor] Humphreys's report and proposal therefore must be excluded."[4]

Mr. Fisher's report in this case suffers from the same inadequacies.  The first six and a half pages of his twelve-page report contain "a mixture of legal opinions . . . as well as arguments about the evidence[,] . . . and sundry other things", none of which is a proper subject of expert testimony.[5]  In the last few pages of his report, he discusses Professor Humphreys's conclusions with respect to the harm to Ms. Carroll's reputation and her proposed reputation repair program.  As in *Carroll II*, Mr. Fisher does not explain how his experience or any other data or facts inform his criticisms of Professor Humphreys's proposal.  His conclusion that "[Ms.] Carroll's long standing positive image would possibly offset most of [Mr. Trump's] derogatory remarks"[6] "lacks the kind of foundation in facts, evidence, and/or experience that is demanded of expert witnesses."[7]

Plaintiff's motion *in limine* (Dkt 133) insofar as it seeks to exclude Mr. Fisher's testimony is granted.  It is denied as moot in all other respects.

SO ORDERED.

Dated:        October 5, 2023

_____
Lewis A. Kaplan
United States District Judge

---

[4]   *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2652636, at *5 (S.D.N.Y. Mar. 27, 2023).

[5]   *Id.* at *3.

[6]   Dkt 135-9 (Fisher Report) at 11.

[7]   *Carroll*, 2023 WL 2652636, at *4.

SPA-43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

        Plaintiff,

      -against_              22-cv-10016 (LAK)

DONALD J. TRUMP,

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

     1.   The Court will hold a scheduling conference on December 21, 2022 in Courtroom 21B at 10:00 a.m.

     2.   On or before December 19, 2022, the parties shall submit a discovery plan containing the information required by Fed. R. Civ. P. 26(f) as well as the following:

         a.   Any contention that any of the discovery taken in *Carroll v. Trump,* 20-cv-7311 (LAK) (*"Carroll I"*), is not admissible in this action and the basis, item-by-item, for that contention.

         b.   A detailed statement of what specific discovery that was not conducted in *Carroll I* is needed for the prosecution or defense of this case and the basis for the contention that it is needed.

         c.   The parties' proposed scheduling orders for this case and the bases for their proposals.

     SO ORDERED.

Dated:    December 2, 2022

              /s/  Lewis A. Kaplan
            _____
               Lewis A. Kaplan
            United States District Judge

SPA-44

SPA-45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                            Plaintiff,


                            -against-                                    22-cv-10016 (LAK)


DONALD J. TRUMP,

                            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


            Appearances:


                            Roberta Kaplan
                            Joshua Matz
                            Shawn Crowley
                            Matthew Craig
                            KAPLAN HECKER & FINK LLP
                            *Attorneys for Plaintiff*


                            Alina Habba
                            Michael T. Madaio
                            HABBA MADAIO & ASSOCIATES LLP
                            *Attorney for Defendant*


LEWIS A. KAPLAN, *District Judge.*

            Plaintiff E. Jean Carroll alleges that businessman Donald J. Trump, as he then was,

raped her in a dressing room at the New York department store, Bergdorf Goodman, more than two

decades ago. Mr. Trump denies the allegation. These circumstances have given rise to two lawsuits

now before me.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/13/2023

SPA-46

2

The first (*"Carroll I"*) originally began in a state court, but it later was removed to this one.  It accuses Mr. Trump only of libeling Ms. Carroll in a series of statements he issued in June 2019, shortly after Ms. Carroll went public with her account of the alleged rape.[1]  It does not include any claim based on the alleged rape itself.  That doubtless is so because such a claim almost certainly would have been barred by the statute of limitations at the time the case was filed.[2]  But the law then changed.

In 2022, New York enacted the Adult Survivors Act (the "ASA").[3]  Under the ASA, persons who allegedly were abused sexually as adults were given a new one-year period within which to sue their alleged abusers.  Ms. Carroll then brought this action (*"Carroll II"*) to recover damages and other relief for (1) the alleged rape, and (2) additional libels allegedly committed by Mr. Trump in a statement he made on October 12, 2022.

As is obvious, the central issue in both *Carroll I* and *Carroll II* is exactly the same – whether Mr. Trump raped Ms. Carroll.  If he did not, then Ms. Carroll's sexual assault claim in *Carroll II* and her libel claims in both cases likely would fail.  If he did, then little would remain in either case except perhaps a few  minor issues related to Mr. Trump's statements and determination

---

[1]

*Carroll v. Trump,* 20-cv-7311 (LAK).

[2]

Both sides appear to assume that this claim would have been barred by the statute of limitations.  This decision so assumes for ease of expression.  Nevertheless, the question of whether the claims asserted in this case would be time-barred in the absence of the ASA is not before me, and I do not now decide it.  In view of my ruling on the constitutionality of the ASA, the issue is immaterial.

[3]

N.Y. CPLR § 214-j.

SPA-47

3

of damages.[4]

      *Carroll II* – this case – now is before me on Mr. Trump's motion to dismiss the complaint.[5]  He contends that the sexual abuse claim must be dismissed because the ASA violates the Due Process Clause of the New York State Constitution.  He argues also that the libel claim is legally insufficient because Ms. Carroll's complaint fails to allege what New York law refers to as "special damages."  Both of his arguments are without merit.

### Facts

      As this is a motion to dismiss the complaint, the plaintiff's well-pleaded factual allegations and all inferences that reasonably may be drawn from them are deemed true.  The fact that Mr. Trump denies Ms. Carroll's allegations does not enter into the analysis at this stage of the case.  What, if anything, actually occurred must await further proceedings if the complaint withstands the present motion.

---

[4]     The ultimate viability of *Carroll I* ultimately remains subject, for reasons having nothing to do with the inherent merits of the libel claim, to further determinations by appellate courts.  In *Carroll v. Trump,* 49 F.4th 759 (2d Cir. 2022), the Second Circuit determined that Mr. Trump was an "employee" of the United States within the meaning of the Westfall Act when he allegedly libeled Ms. Carroll but certified the question whether his alleged libel was within the scope of his employment to the District of Columbia Court of Appeals.  That court heard argument on January 10, 2023.  If either of those questions ultimately were resolved in favor of Ms. Carroll, *Carroll I* would be viable.  If both ultimately were resolved in favor of Mr. Trump, *Carroll I* almost certainly would be dismissed pursuant to the Federal Tort Claims Act.  *Carroll I,* 498 F. Supp. 3d 422, 427 (S.D.N.Y. 2020) (hereinafter "*Carroll I*").

[5]     Also before me is a motion by Mr. Trump to stay this action pending a decision on this motion. Dkt 22.

SPA-48

4

*The Alleged Rape*

As I wrote in *Carroll I:*

"According to the complaint [(in *Carroll I*, which in these respects is identical to that in this case)], Mr. Trump, then a private citizen, encountered Ms. Carroll at the Bergdorf Goodman department store in Manhattan some time between the fall of 1995 and the spring of 1996.  Ms. Carroll, who was an advice columnist appearing on television, alleges that Mr. Trump recognized her and asked her to help him select a present for a woman who was not with him at the store.  The two eventually went to the lingerie department, where, according to the complaint, Mr. Trump insisted that the plaintiff try on a bodysuit.  Ms. Carroll alleges next that what she first perceived as playful banter took a dark turn when Mr. Trump closed the door of a dressing room, pushed her against a wall, and began kissing her without her consent.  She claims that she pushed Mr. Trump away and laughed at him, and that he then pressed her against the wall once more, pulled down her tights, and forcibly raped her for several minutes until she managed to push him off and flee the store."[6]

*The Story Comes Out*

"Ms. Carroll asserts that she immediately told one friend about the alleged rape and told another friend in the coming days.  She did not, however, make the

---

[6]

*Carroll I,* 498 F. Supp. 3d at 430.

SPA-49

5

allegations public at that time.  They remained private for many years."[7]

The reasons they remained private are spelled out in the *Carroll II* complaint, the truth of which

must be assumed for purposes of this motion.

Initially, according to the complaint, Ms. Carroll was in shock and did not wish to

think of herself as a rape victim.[8]  The two friends in whom she confided gave her conflicting advice

about reporting the event.[9]  Ultimately, she was persuaded by the advice of the friend who advised

her to keep quiet.  That friend stressed that Mr. Trump was powerful and would "bury" Ms. Carroll

if she came forward.[10]  Ms. Carroll says she "knew how brutal and dangerous Trump could be,"

feared "being dragged through the mud if she reported the rape," "was convinced that nobody would

believe her if she came forward," and "like so many other survivors of sexual assault, [she] also

blamed herself" for her stupidity in  "agreeing to go lingerie shopping with Trump."[11]  She "also

considered that, in our society, women who have been raped are looked at as 'spoiled goods,' and

she resented the fact that practically every woman who courageously came forward with their stories

of abuse was subjected to questions like 'why didn't you scream' and 'why didn't you come forward

---

[7]      *Id.*

[8]      Cpt. ¶ 44.

[9]      *Id.* ¶¶ 44, 46-47.

[10]     *Id.* ¶¶ 47-48.

[11]     *Id.* ¶¶ 48-49.

SPA-50

6

immediately.'"[12] "She thus chose silence" and kept still for years.[13]

*Ms. Carroll Goes Public in 2019*

In the fullness of time, the Harvey Weinstein revelations in *The New York Times* and their *sequelae,* including the public reaction to women coming forward with accounts of prior sexual abuse, triggered for Ms. Carroll a process that resulted in a decision to begin writing a book.[14]  Her book told of her experiences with "twenty-one men who had, each in his own way, left indelible and ugly marks on her story."[15]  One of those men was Donald Trump.

On June 21, 2019, *New York* magazine published an excerpt from the plaintiff's then forthcoming book.  The excerpt tells a more detailed version of the allegations outlined above.  The book was published on July 2, 2019."[16]

*Mr. Trump's 2019 Reaction*

As described elsewhere, Mr. Trump, at that time President, responded to the emergence of Ms. Carroll's allegations with a number of demeaning, insulting and allegedly

---

[12]
    *Id.* ¶ 51.

[13]
    *Id.* ¶ 52.

[14]
    *Id.* ¶¶ 67-75.

[15]
    *Id.* ¶ 75.

[16]
    *Carroll I,* 498 F. Supp. 3d at 431.

7

defamatory remarks about Ms. Carroll.[17]  As Ms. Carroll's claims regarding those remarks are at issue in *Carroll I* and not in this case, there is no need to elaborate upon them here.

*Carroll I*

Ms. Carroll commenced *Carroll I* against Mr. Trump in 2019 for making allegedly libelous statements about her in the wake of the rape allegation made public by Ms. Carroll.  As noted, she could not then sue him for the alleged rape because the New York statute of limitations for such an action had expired.[18]  In any case, the details of *Carroll I* are not relevant to the present motion and need not be discussed here.

*The New York Adult Survivors Act*

In the midst of all this, New York in May 2022 enacted the ASA which, in relevant part, created a one-year revival period, starting November 24, 2022, during which adult survivors of sexual assault could sue their abusers despite  the expiration of the previously applicable statutes of limitation.[19]

*Ms. Carroll Announces Intent to Sue Under the ASA, and Mr. Trump Responds*

On August 8, 2022, more than three months before the effective date of the ASA, Ms.

---

[17]     *Id.*

[18]     *See supra* note 2.

[19]     N.Y. CPLR § 214-j.

SPA-52

8

Carroll's counsel announced privately to her adversaries and to the Court that Ms. Carroll would sue Mr. Trump for damages for the alleged rape once the ASA became effective on November 24.[20] Mr. Trump on October 12, 2022 responded by posting this statement on his social media outlet:

> "This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. * * * I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost

---

[20] That announcement was filed publicly on September 20, 2022.

everything else in our Country."

He then continued:

> "In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a
> woman who I had nothing to do with, didn't know, and would have no interest in
> knowing her if I ever had the chance. Now all I have to do is go through years more
> of legal nonsense in order to clear my name of her and her lawyer's phony attacks on
> me. This can only happen to 'Trump'!"[21]

*Carroll II*

 A bare nine minutes after the ASA became effective on Thanksgiving morning, Ms.
Carroll brought the present lawsuit – *Carroll II* – against Mr. Trump.  The complaint contains two
claims for relief.

 The first seeks compensatory and punitive damages and other relief for Mr. Trump's
alleged rape and groping of Ms. Carroll in the Bergdorf dressing room years ago.  The timeliness of
that claim depends directly upon the newly enacted revival statute, the ASA.

 The second claim is for common law defamation based on allegedly false and
defamatory statements about Ms. Carroll contained in Mr. Trump's October 12, 2022 statement.  It
too seeks compensatory and punitive damages and other relief.

---

[21]  Cpt. ¶ 92.

SPA-54

10

*The Pending Motion*

As noted, Mr. Trump seeks dismissal of this case.  He argues that the ASA is unconstitutional and that the first claim for relief therefore is barred by the statute of limitations.  He contends also that the second claim is legally insufficient because it fails to plead "special damages" as supposedly required by New York law.

### Discussion

*The ASA*

It is undisputed that the ASA by its terms would make Ms. Carroll's sexual assault claim against Mr. Trump timely despite the fact that the statute of limitations otherwise would have expired long ago.[22]  So Mr. Trump now contends that the ASA is unconstitutional under the Due Process Clause of the New York State Constitution.[23]

---

[22]

*See supra* note 2.

[23]

N.Y. CONST. art. 1, § 6.

Despite representing to this Court shortly before making this motion that he would seek dismissal of the ASA on the ground that it violates the Due Process Clause of the United States Constitution, Dkt 15, at 7, he has not done so. Indeed, he now admits that "[c]laim-revival statutes generally pose no issue under the Fourteenth Amendment to the United States Constitution." Dkt 21, at 7 (quoting *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.,* 30 N.Y.3d 377, 394 (2017) (hereinafter *"World Trade Ctr."*) (internal quotation marks omitted)). He contends only that it violates the Due Process Clause of the New York State Constitution.

11

*The ASA Is Constitutional As A Matter of New York Law*

"[T]he New York Court of Appeals recently made clear that the test for whether a claim-revival statute is consistent with the New York Due Process Clause is simply whether the revival statute is 'a reasonable measure to address an injustice.'"[24]   The answer is obvious.

As an initial matter, the New York Legislature long has recognized the problem created by what it characterized as a "culture of silence" and the existence of comparatively short limitations periods for bringing civil and criminal actions for sexual assaults and other sexual offenses.  In 2019, it substantially extended the limitations periods for both types of actions.  The bill jacket contained the Senate sponsors' statement, which said:

"Statutes of limitations on sexual offense cases impose a ticking clock on how long victims are able to come forward if they want to seek charges. For crimes of sexual violence in particular, the clock ticks against the trauma and culture of silence that prevents victims from speaking out.

"Over the last year, victims who have suffered in silence for decades have bravely spoken about their abuse, and have also laid bare the state's limited ability to prosecute their abusers due to the passage of time. In recognition of this fact, states, across the country are lengthening or eliminating the statutes of limitations on crimes of sexual violence. While New York removed the statute of limitations for rape or criminal sexual act in the first degree, a five year statute of limitations remains for

---

[24]   *Giuffre v. Prince Andrew*, 579 F. Supp.3d 429, 453 (S.D.N.Y. 2022) (rejecting state due process challenge to statute reviving otherwise time-barred claims for childhood sexual abuse) (quoting *World Trade Ctr.*, 30 N.Y.3d at 400).

SPA-56

12

rape in the second and third degree and criminal sexual act in the second and third degree.

"This bill would extend the statute of limitations to twenty years for rape in the second degree and criminal sexual act in the second degree, to ten years for rape in the third degree and criminal sexual act in the third degree, and would make conforming changes to incest in the first and second degrees. *Further, this bill would increase the time period in which the victim could bring a civil suit for these offenses to twenty years.*"[25]

But the amendment of the civil statute of limitations did not fully solve the problem the Legislature sought to address with respect to civil claims.  The extension applied only with respect to claims arising from "acts or omissions occurring on or after [the] effective date" of the statute, September 18, 2019.[26]

Recognizing that the 2019 amendment – as articulated by an Assembly member – "left so many survivors who had already missed their chance out in the cold with no opportunity for justice,"[27] the Legislature took up that situation in 2022 when it passed the ASA.  The legislative committee report that accompanied Senate Bill 66, which ultimately became the ASA, stated:

"In 2019, the New York State Legislature enacted the Child Victims Act (S.2440/A.2683), prospectively increasing the criminal and civil statutes of

---

[25]    New York Bill Jacket, 2019 S.B. 6574, Ch. 315 (emphasis added).

[26]    *Id.*, 2019 S.B. 6574 § 4; *see also* N.Y. CPLR § 213-c.

[27]    Sen. Bill No. 66A, 2022 N.Y. Assemb., Reg. Sess. (May 23, 2022) at 35.

SPA-57

13

limitations for child sexual offenses, and creating a one-year window for the revival of otherwise time-barred child sexual abuse-re- lated lawsuits. The Legislature also enacted legislation (S.6574/A.8412) to prospectively increase the criminal and civil statutes of limitations for a subset of sexual offenses committed against adults. *Both bills were predicated on the widespread recognition that New York's existing statutes of limitations were insufficient in giving survivors of these heinous crimes enough time to pursue justice through criminal charges or filing a civil lawsuit.*   *   *   *

"This legislation, the Adult Survivors Act, would create a one-year window for the revival of otherwise time-barred civil claims arising out of sexual offenses committed against people who were 18 or older at the time of the conduct. *Those who have had justice denied them as a result of New York's formerly insufficient statutes of limitations should be given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law*." [28]

In addition, one of the proponents of the ASA, against the background of the 2019 legislation, said on the floor of the State Senate in support of the enactment of what became the ASA:

"*[W]e see* child abuse survivors, young adults and *older survivors [of sexual abuse] often either suppressing memories of their abuse or they are afraid to come forward right away.  And by the time that adult survivors get the help that they need and finally can take action against their abusers, it's too late to do anything about*

---

[28]   N.Y. Comm. Rept., 2021 NY S.B. 66 (NS) (emphasis added).

SPA-58

14

*it legally.*

> "It is time to enact commonsense legislation that would do away with New
>
> York's vague statute of limitations, which denies many justice."[29]

And the Legislature agreed. The bill passed the New York Senate unanimously (62-0) and the New

York Assembly by a vote of 140 to 3.[30]   Thus, the creation of a revival period for otherwise time-

barred claims based on sexual assaults against adults was aimed at what New York reasonably and

permissibly regarded as an injustice.

Mr. Trump nevertheless argues that the ASA is unconstitutional because, he claims,

the Justification section of what he refers to as the "legislative memorandum" accompanying the bill

that became the ASA did not explicitly sufficiently articulate the injustice the legislation was

intended to remedy.[31]  Regrettably, that assertion is demonstrably incorrect.  The Justification section

of the legislative memorandum submitted with Assembly Bill 648A stated:

> "In 2019, the New York State Legislature enacted the Child Victims Act
>
> (S.2440/A.2683), prospectively increasing the criminal and civil statutes of
>
> limitations for child sexual offenses, and creating a one-year window for the revival
>
> of otherwise time-barred child sexual abuse-related lawsuits. The Legislature also

---

[29]

  N.Y. SENATE, *Stenographic Record* 2705 (Apr. 26, 2022) (emphasis added). *See also* Sen.
  Bill No. 66A, 2022 N.Y. Assemb., Reg. Sess. (May 23, 2022) at 35 (Statement of Assembly
  member Judy Griffin) ("We must do all we can to empower those who have been harmed
  by others, *no matter their age*, so they may hold their perpetrators accountable if they
  choose. This bill is focused on those survivors who have yet to be heard.") (emphasis
  added).

[30]

  NY S.B. 66 (NS), bill tracking (May 24, 2022).

[31]

  Dkt 34, Def.'s Reply Mem., at 1-2.

15

enacted legislation (S.6574/A.8412) to prospectively increase the criminal and civil statutes of limitations for a subset of sexual offenses committed against adults. Both bills were predicated on the widespread recognition that New York's existing statutes of limitations were insufficient in giving survivors of these heinous crimes enough time to pursue justice through criminal charges or filing a civil lawsuit.

"New Jersey similarly enacted legislation in 2019 that prospectively increased the civil statute of limitations for both child and adult survivors of sexual offenses, as well as created a two-year window for the revival of otherwise time-barred lawsuits alleging conduct constituting specified sexual offenses. Unlike New York's revival window, however, which applies only to survivors of sexual offenses who were minors at the time of the abuse, the New Jersey window also applies to survivors of sexual offenses who were adults (i.e. 18 or older) at the time of the alleged conduct.

"*This legislation, the Adult Survivors Act, would create a one-year window for the revival of otherwise time-barred civil claims arising out of sexual offenses committed against people who were 18 or older at the time of the conduct. Those who have had justice denied them as a result of New York's formerly insufficient statutes of limitations should be given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law.*"[32]

---

[32]  Legislative memorandum accompanying A 648A (available at https://nysassembly.gov/leg/?default_fld=&leg_video=&bn=A00648&term=2021&Summary=Y&Memo=Y (last visited Jan. 13, 2023).

SPA-60

16

Even if the factual premise of defendant's argument were correct, and it is not, defendant's position would reflect a disregard of the wealth of additional evidence of the Legislative purpose in enacting the ASA well as a parsimonious approach to determining the purpose of the ASA that is inconsistent with New York law.

As an initial matter,

"In construing statutes, courts [applying New York law] are permitted to consider extrinsic sources—legislative reports, for example, and petitions to the legislature requesting that some piece of legislation be passed to aid in statutory interpretation. Reports and recommendations of public bodies submitted to the legislature for its remedial action also help to shed light on the legislative intent."[33]

Moreover, as the New York Court of Appeals long ago wrote, "[a]s bearing upon the intention of the Legislature of this state in the enactment of a statute, we may consider such historical or other facts as are reasonably within the scope of judicial cognizance."[34]  That includes statements by bill sponsors,[35] as we have in this case.

The materials appropriate for consideration here all point in one direction.  The Legislature in 1999 identified the injustice inflicted on child victims of sexual abuse as a result of the interaction between their difficulties in coming to grips with and seeking remedies against their

---

[33] 97 N.Y. Jur.2d, *Statutes* § 164 (2d ed 2022) (collecting New York cases) (footnotes omitted).

[34] *In re Hamlin,* 226 N.Y. 407, 413 (1919); 97 N.Y. Jur.2d, *Statutes* § 170.

[35] *E.g., Civil Serv. Employees Ass'n, Inc.  v. Oneida Cty.,* 78 A.D.2d 1004, 1005 (4th Dept. 1980).

SPA-61

17

abusers and the relevant preexisting limitations period.  It created a revival window for otherwise time-barred claims.  Just three years later – using almost precisely the same statutory language – it came to the same view and the same result as to adult survivors, the ASA.  In doing so, it recognized that adult survivors of sexual abuse unjustly have encountered very much the same difficulties in pursuing legal remedies as have child victims.  Indeed, as already noted, the Justification section of the committee report on S.B. No. 66, the bill that became the ASA, explicitly referred to the fact that adult survivors of sexual abuse had been subjected to injustice by "New York's formerly insufficient statutes of limitations" and "should be given the opportunity to seek civil redress against their abuser[s] . . . in a court of law."  The Legislature gave that opportunity by enacting the ASA with a unanimous vote in the State Senate and an overwhelming majority of 140 to 3 in the Assembly.

To suggest that the ASA violates the State Due Process Clause because the Legislature supposedly did not describe that injustice to the defendant's entire satisfaction in a particular paragraph of a particular type of legislative document – itself a dubious premise – is absurd.  There is not a single word in the New York Due Process Clause to support that suggestion.  Moreover, the historical context, literally all of the indicia of legislative intent available to us, and the precise words of the statute laid alongside the words to the CVA undeniably demonstrate the precise injustice that moved the Legislature to act.  In any case, under New York law, it is not the function of courts to second guess the Legislature as to the existence of a serious injustice in determining the constitutionality of a revival statute.

The New York Court of Appeals made clear in *World Trade Ctr.* that the existence of an injustice is a determination fundamentally committed to the Legislature and the governor. It stated that, in each of its prior cases upholding claim revival statutes, "there existed an identifiable

SPA-62

18

injustice that moved the legislature to act."[36]  It rejected "[a] more heightened standard" as "too strict," saying:

> "In the context of a claim-revival statute, there is no principled way for a court to test whether a particular injustice is 'serious' or whether a particular class of plaintiffs is blameless; *such moral determinations are left to the elected branches of government.*"[37]

Thus, in adopting the ASA, the New York Legislature, virtually unanimously, identified what it regarded as an injustice – the fact that even adult victims of sexual abuse too often have no legal remedies because they "suppress[] memories of their abuse or they are afraid to come forward" until it is too late to sue.  The governor did as well when she signed the bill that the Legislature passed.  Mr. Trump has suggested no convincing reason why the judgment of the New York Legislature and governor – that this indeed is an "identifiable injustice" – is not precisely the sort of "moral determination" that the New York Court of Appeals has held is "left to the elected branches of government" by New York's Due Process Clause.

Nor can the claim revival provision of the ASA be distinguished from that in the Child Victims Act on that basis that adult survivors – unlike child victims, who are not permitted to bring lawsuits until they reach adulthood – are not legally disabled from suing immediately following the alleged sexual abuse.  The New York Court of Appeals long ago rejected just such a

---

[36]  *World Trade Ctr.,* 30 N.Y.3d at 399.

[37]  *Id.* at 400 (emphasis added).

19

contention in *Hymowitz v. Eli Lilly and Co.*[38]

    *Hymowitz* involved the constitutionality of the revival of DES[39] products liability

claims that had become barred under the former rule that such claims accrued upon exposure to a

toxic substance and thus could be time-barred before a plaintiff even knew that she had been

exposed.  The court upheld that revival statute, writing:

        "We need not light upon a precise test here . . . because the Legislature's

revival of DES claims meets the highest standard. For at least 25 years this court

maintained an exposure rule for toxic substances, because it was felt that change in

this area was the responsibility of the Legislature (*see, e.g., Schwartz v Heyden*

*Newport Chem. Corp.,* 12 NY2d 212, 220; *Fleishman v Lilly & Co., supra,* at 890).

Indeed, in *Fleishman v Lilly & Co. (supra)* the Legislature's attention was drawn

specifically to DES by the majority, which stated that any change in the exposure rule

was the Legislature's role.

        "The Legislature has now revived DES actions that were time barred under

the exposure rule, while also instituting a discovery rule for future application (L

1986, ch 682, § 4; CPLR 214-c). The latent nature of DES injuries is well known,

and it is clear that in the past the exposure rule prevented the bringing of timely

actions for recovery. Thus we believe that exceptional circumstances are presented,

that an injustice has been rectified, and that the requirements of *Gallewski v Hentz*

---

[38]    73 N.Y.2d 487 (1989).

[39]    DES is an acronym for a particular pharmaceutical product that allegedly proved
carcinogenic in some people.

SPA-64

20

*& Co. (supra)* have been met.

"Defendants argue further that, even if the statute is generally valid, it may be unconstitutionally applied in cases in which the plaintiff could have sued originally, but did not. It does seem that some plaintiffs may have known of their injuries a day, or a week, a month, or perhaps longer, before the original limitations period ran. Some may have known of their exposure, but did not develop injuries during the limitations period. Others may have known of some effect upon them of DES exposure, which became cancerous only after any action would have been time barred. Under these circumstances, the Legislature properly determined that it would be more fair for all plaintiffs to uniformly now have one year to bring their actions, rather than for the courts to begin drawing arbitrary lines transecting this area's shades of gray."[40]

The fact that adult victims of sexual abuse are legally and in some respects practically capable of instituting civil litigation against their abusers from the moment the abuse occurs thus is constitutionally immaterial.   The elected branches of the New York State government have determined that many such victims are unable to do so, sometimes for long periods of time.   They

---

[40]     *Id.* at 514-15.

*Hymowtiz*'s reference to "exceptional circumstances, even if it was meant as more than an illustration or description of the facts before it in that case, " has not survived *World Trade Ctr.   World Trade Ctr.* construed *Hymowitz* together with other claim-revival cases as "express[ing] one and the same rule: a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in order to remedy an injustice." 30 N.Y.3d at 400.  Moreover, as discussed above, *World Trade Ctr.* left the determination of the existence of the necessary injustice at least substantially, and perhaps entirely, to the judgment of the elected branches of government.

SPA-65

21

are prevented by suppression of awful memories or deterred by fear and a "culture of silence" – just as Ms. Carroll claims she was dissuaded from reporting or suing Mr. Trump.

As to whether the ASA constitutes a "reasonable measure" to address an injustice, Mr. Trump's objections again fail to persuade. Mr. Trump contends first that the ASA's claim revival provision is unreasonably broad in comparison to the Child Victims Act because "[a]s opposed to the one-year lookback window of [the Child Victims Act ("CVA")]—which was passed in conjunction with, and as a supplement to, the extension of the CVA's statute of limitations to age 55—[the ASA's] look-back window was not passed in connection with any other durational provisions under the ASA."[41] Second, he argues that "the scope" of the ASA "would not be a reasonable response because the lookback window does not align with—and vastly exceeds—the extended twenty-year statute of limitations of period under the revised 2019 amendment."[42]

Both protests are grounded in inappropriate juxtapositions of the ASA and the Child Victims Act and, in any case, are immaterial. As discussed above, the ASA was enacted against the backdrop of the 2019 amendment's extension of the statutes of limitations for civil and criminal actions for sexual assaults. The scope of the lookback window in the ASA also does not differ from that in the Child Victims Act, which also "applies broadly to *any* [victim of child sexual abuse] and revives *any* qualifying claim."[43] Mr. Trump has not offered any meritorious reason to reject the one-year revival period in the ASA as unreasonable when the nearly identical two-year revival period in

---

[41]     Dkt 21 at 12.

[42]     *Id.* at 13.

[43]     *Id.* at 12.

SPA-66

22

the Child Victims Act has been accepted as reasonable by all courts to consider it.[44]

      The one year ASA revival statute is a constitutional means of addressing that inability just as the similar revival provision of the Child Victims Act has passed constitutional muster by every court to consider the question.[45]

*Libel Per Se*

      With respect to Ms. Carroll's defamation claim in relation to Mr. Trump's October 12, 2022 statement, Mr. Trump contends Ms. Carroll has failed to state a claim because she did not plead "special damages" as he claims is required by New York law.  Mr. Trump's argument falls short because he fails to appreciate the distinction in New York law between libel *per se* and slander *per se*.

*Ms. Carroll's Defamation Claim Is for Libel, Not Slander, Per Se*

      There are two categories of defamation under New York law: *libel*, for written

---

[44]
    When the Child Victims Act was enacted, it had a one-year revival window, which the Legislature subsequently extended by another year during the global COVID-19 pandemic. *Giuffre*, 579 F. Supp. 3d at 454.

[45]
    *See, e.g.*, *Giuffre*, 579 F. Supp. 3d at 455; *Farrell v. United States Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378, 393 (N.D.N.Y. 2021)*; PC-41 Doe v. Poly Prep Country Day Sch.*, 20-cv-03628 (DG) (SJB), 2021 WL 4310891, at *7 (E.D.N.Y. Sept. 22, 2021)*; PC-41 Doe v. Poly Prep Country Day Sch.*, No. 20-cv-3628-DG-SJB, 2021 WL 791834, at *1 (E.D.N.Y. Mar. 1, 2021)*; Torrey v. Portville Cent. Sch.*, 66 Misc. 3d 1225(A), 125 N.Y.S.3d 531 (N.Y. Sup. Ct. 2020); *ARK3 Doe v. Diocese of Rockville Ctr.*, No. 9000010/2019 (N.Y. Sup. Ct. Nassau Co. May 11, 2020); *Giuffre v. Dershowitz*, No. 19-cv-3377 (LAP), 2020 WL 2123214, at *2-3 (S.D.N.Y. Apr. 8, 2020).

SPA-67

23

statements, and *slander*, for spoken statements.[46]  Written statements actionable as libel include statements published on social media outlets and on the Internet.[47]

Ms. Carroll alleges that Mr. Trump's October 12, 2022 statement was "defamatory *per se*" and caused her "to suffer reputational, emotional, and professional harm."[48]  The October 12 statement "appeared on Trump's personal account on Truth Social, a social media platform."[49]  Mr. Trump allegedly "had his statement distributed to reporters, including reporters at publications headquartered in New York such as Fox News and the New York Times, and emailed to a listserv of supporters," and the statement "was widely reported in the press."[50]

Ms. Carroll's defamation claim, as presented in her complaint, therefore properly is categorized as a claim for libel *per se*.

*Libel Per Se Does Not Require Direct Aim at a Person's Occupation*

A written statement is libelous *per se* if it "*tends* to disparage a person in the way of

---

[46]

*E.g.*, 43A N.Y. Jur. 2d, *Defamation and Privacy* § 2 (2022).

[47]

*Torati v. Hodak*, 147 A.D.3d 502, 504 (1st Dept. 2017) (Facebook message actionable as libel); *Valley Electronics AG, et al., v. Polis*, No. 20-cv-2133ARRLB, 2021 WL 3919244, at *6 (E.D.N.Y. Aug. 6, 2021) ("'An action for defamation that is expressed in writing or print,' including on the Internet, 'constitutes the common law cause of action for libel.'") (quoting *Murawski v. Pataki*, 514 F. Supp. 2d 577, 589 (S.D.N.Y. 2007); citing *Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 88 (2d Cir. 2003)).

[48]

Cpt. ¶¶ 131, 135.

[49]

*Id.* ¶ 93.

[50]

*Id.* ¶¶ 94-95.

SPA-68

24

his [or her] office profession or trade."[51]   A writing also is libelous *per se* if it "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her]."[52]

In the October 12 statement, Mr. Trump accused Ms. Carroll of lying about her rape allegation against him:

> "This 'Ms. Bergdorf Goodman case' is a complete con job. . . . She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie .... She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. . . . In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance."[53]

---

[51]   *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) (quoting *Nichols v. Item Publishers*, 309 N.Y. 596, 601 (1956)) (emphasis in original).

[52]   *Nichols*, 309 N.Y. at 600–01.

[53]   *Id.* ¶ 92.

25

Ms. Carroll is a "writer, advice columnist, and journalist."[54]  Honesty and credibility

are critical to these professions, which rely heavily on the trust and confidence of their audiences.

A writer who writes about his or her own experiences, as Ms. Carroll did, depends on his or her

readers believing the writer, which they may be less inclined to if the writer is called dishonest.[55]

The October 12 statement – in addition to accusing Ms. Carroll of "completely ma[king] up a story"

about Mr. Trump – states that Ms. Carroll "changed her story from beginning to end" during an

interview "where she was promoting a . . . book."[56]  Drawing all reasonable inferences in favor of

plaintiff, the October 12 statement on the whole can be construed as Ms. Carroll falsely accusing Mr.

Trump of rape in order to promote her book and increase its sales.[57]  Based on the facts alleged in

---

[54]

   *Id.* ¶ 120.

[55]

   Mr. Trump argues that the "attack[] [on] Plaintiff's honesty" in the October 12 statement
   "does not pass muster" because "most professions are predicated on dealing with others
   honestly." Dkt 34 at 10.  This proposition is irrelevant to the test at issue, which assesses the
   tendency of the specific written statement to disparage a person in their particular trade or
   profession.  A statement accusing a librarian of lying on the librarian's tax returns does not
   create the same tendency to disparage a person in the way of his or her profession as does
   a statement accusing a writer of making up a story that is included in the writer's book.

[56]

   *Id.* ¶ 92.

[57]

   Mr. Trump's remaining arguments related to the October 12 statement fail to persuade. First,
   contrary to Mr. Trump's assertion that his statement was non-actionable opinion because
   he "was simply disputing the merits of [Ms. Carroll's] prior lawsuit" (Dkt 34 at 7), the
   October 12 statement accused Ms. Carroll of "completely ma[king] up a story" about
   meeting Mr. Trump, a factual statement actionable as defamation  Second, Mr. Trump's
   contention that a statement cannot be defamatory *per se* if it requires reference to extrinsic
   facts is inapposite.  The October 12 statement expressly references Ms. Carroll's book and
   connects Ms. Carroll's promotion of the book to his accusations of her lying about meeting
   Mr. Trump.  Moreover, the connection between Mr. Trump's alleged rape of Ms. Carroll
   and Ms. Carroll's book is "presumably known to [the] readers" of Mr. Trump's statement
   given the extensive media coverage of Ms. Carroll's first lawsuit. *See Alvarado v. K-III
   Mag. Corp.*, 203 A.D.2d 135, 137 (1st Dept. 1994).

SPA-70

26

the complaint, Ms. Carroll has sufficiently pleaded a claim of libel *per se* because the October 12 statement may have affected her in her profession by "imputing to [her] . . . fraud, dishonesty, [and/or] misconduct . . . ."[58]

Mr. Trump's argument to dismiss this claim is premised on his mistaken conflation of the higher standard applied to slander *per se* with the lower standard for libel *per se*.  Mr. Trump argues that there are "four narrowly defined categories of statements which are considered to be defamatory *per se*," and that Ms. Carroll has failed to state a claim for defamation *per se* "because it does not, on its face, defame [P]laintiff in her trade, business or profession," one of the four categories.[59]  However, nearly every authority Mr. Trump cites, including the case identifying those four categories and the cases describing the category of injury in one's profession are *slander per se*, not libel, cases.[60]  Unlike a libelous *per se* statement, a slanderous *per se* statement "must be made with reference to a matter of significance and importance for that purpose [(of defaming a person in his or her trade, business, or profession)], rather than a more general reflection upon the plaintiff's character or qualities."[61]  Moreover, if a complaint fails to allege sufficient facts to state

---

[58]

      *Grimaldi v. Schillaci*, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

[59]

      Dkt 21 at 14-15 (citation omitted).

[60]

      The few cases cited by Mr. Trump that concern written statements cite to slander *per se* precedents for their discussion of the applicable standard.

[61]

      *Liberman v. Gelstein*, 80 N.Y.2d 429, 436 (1992); *see also Van Lengen v. Parr*, 136 A.D.2d 964 (4th Dept.1988) (noting in a slander *per se* context that there must be "some reference, direct or indirect, in words or in circumstances attending their utterance, which connects charge of incompetence of dishonesty to particular profession or trade engaged in by plaintiff"); *Taccpina v. Kerik*, No. 14-cv-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) ("The allegedly defamatory statement must be targeted at specific standards of performance that are directly relevant to the plaintiff's business, and must impute conduct

SPA-71

27

a claim for slander *per se*, "the plaintiff must show . . . that the statement complained of caused him or her special harm" – generally "the loss of something having economic or pecuniary value."[62]  The more stringent standard for slander *per se* is grounded in sound logic: "What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and perpetuates the scandal."[63]

Mr. Trump's contention that the October 12 statement does not include "language aimed at a particular skill or trait that reflects upon Plaintiff's competency as a writer, advice columnist, and journalist" is inapposite to Ms. Carroll's libel *per se* claim.[64]  Nor was Ms. Carroll required to plead special damages because she has sufficiently pleaded the requirements of a libel *per se* claim.

---

     that is of a kind incompatible with the proper conduct of the business, trade, profession or office itself.") (internal quotation marks and citation omitted).

[62]

     *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001) (quoting *Liberman*, 80 N.Y.2d at 435 (internal quotation marks omitted).

[63]

     *Ostrowe v. Lee*, 256 N.Y. 36, 39 (1931); *see also Davis*, 754 F.2d at 85 ("[S]lander is generally considered less actionable than libel, because a written publication of a defamatory statement is more lasting and has the likelihood of a wider audience than an oral communication."); ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 2:8.3 (4th ed.2011) ("Statements that are libelous per se when written often are not slanderous per se when spoken."); 43A N.Y. JUR. 2D, *Defamation and Privacy* § 3 (2022) ("What gives the sting to the writing is its permanence of form; the spoken word dissolves, but the written one abides and perpetuates the scandal.").

[64]

     Dkt 21 at 16.

28

### *Conclusion*

Mr. Trump's arguments as to both of Ms. Carroll's claims for relief are without merit.

Accordingly, the motion to dismiss [Dkt 20] is denied.  The motion to stay [Dkt 22] is denied as

moot.

SO ORDERED.

Dated:       January 13, 2023

Lewis A. Kaplan
United States District Judge

SPA-73

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                          Plaintiff,


              -against-                                          22-cv-10016 (LAK)


DONALD J. TRUMP,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


          Appearances:


                    Roberta Kaplan
                    Joshua Matz
                    Shawn Crowley
                    Matthew Craig
                    Trevor Morrison
                    KAPLAN HECKER & FINK LLP

                    *Attorneys for Plaintiff*

                    Joseph Tacopina
                    Matthew G. DeOreo
                    Chad Derek Seigel
                    TACOPINA SEIGEL & DEOREO, P.C.


                    Alina Habba
                    Michael T. Madaio
                    HABBA MADAIO & ASSOCIATES LLP

                    *Attorneys for Defendant*

SPA-74

2

LEWIS A. KAPLAN, *District Judge.*

        Donald J. Trump is accused in this and a second very closely related civil case of having raped E. Jean Carroll in the mid 1990s.  Ms. Carroll claims that the dress she wore on that occasion (and allegedly has preserved) bears stains that have tested positive for male DNA, albeit male DNA from an unidentified source.  She provided Mr. Trump with the DNA test report, absent an appendix, over three years ago.  At the same time, she demanded a DNA sample from Mr. Trump for the obvious purpose of seeing whether it is possible to tell whether Mr. Trump's DNA is on the dress.

        Until February 10, 2023, about ten weeks before this case is set to be tried, Mr. Trump has refused to provide his DNA.  Moreover, he has employed litigation tactics the effect and probable purpose of which have been to delay Ms. Carroll's actions against him – an object that is significant in view of the fact that Ms. Carroll now is 79 years old.  Now –

> •    after the time for pretrial discovery of evidence in both cases has expired,
>
> •    three days after Mr. Trump's latest request for a multi-week trial postponement was substantially denied,
>
> •    one day after the parties filed a joint pretrial order in the first of these cases that makes clear that neither Ms. Carroll nor Mr. Trump intends to call any DNA experts as witnesses in the trial of that case, and
>
> •    on the eve of trial of at least the second-filed of these cases –

Mr. Trump suddenly has proposed a deal.  He has offered to provide a DNA sample *but only on the condition* that I require Ms. Carroll first to turn over to him a previously undisclosed appendix to the DNA report – the report that Ms. Carroll obtained and provided to Mr. Trump years ago.

3

There is no justification for any such deal.  Either Ms. Carroll is obliged to supply the omitted appendix or she is not.  Either Mr. Trump is obliged to provide a DNA sample or he is not.  Neither is a *quid pro quo* for the other.  And the short answer to Mr. Trump's request is clear.

Mr. Trump is not entitled to the undisclosed appendix.  The time for pretrial discovery in both cases is over, and Mr. Trump never previously asked for it.

To be sure, that is not to say that Mr. Trump could not have obtained it had he acted differently.  He and his numerous counsel have had Ms. Carroll's DNA report and its conclusions, albeit without the appendix he now seeks, since January 2020.  The copy of the report they have had since then shows on its face that there was an appendix and that the appendix was not attached to it.  That is clear (1) because the body of the report refers to the appendix that was not included with the copy turned over and (2) from the pagination.  Despite this obvious omission, Mr. Trump never in three years asked a court to require its production.  Indeed, the record discloses no request for the appendix even to Ms. Carroll's counsel until February 9, 2023.  Moreover, at the outset of this case in late 2022, the Court directed both parties to submit "[a] detailed statement of what specific discovery that was not conducted in *Carroll I* [(the first of the two  related cases)] is needed for the prosecution or defense of this case [(*Carroll II*)] and the basis for the contention that it is needed."[1] But Mr. Trump's written statement made no reference to the appendix he now seeks.  Nor did his counsel mention it at the scheduling conference in open court.

The patently untimely request for the appendix thus reflects either a tactical shift or just an afterthought.  One possible explanation is that it is an attempt to reverse a deliberate tactical

---

[1]    Dkt 10.  Unless otherwise indicated, Dkt references are to the docket in *Carroll II*, 22-cv-10016 (LAK).

SPA-76

4

decision by Mr. Trump's counsel not to raise the question of the appendix over the past three years, a decision perhaps the product of a belief that asking for the appendix might well have resulted in renewed demands for Mr. Trump's DNA. Another possible explanation is a negligent failure to read the report with any care over the entire three-year period and thus the failure to notice the lack of the appendix. But whatever the explanation, the effort comes too late.

Nor would Ms. Carroll now be entitled to a DNA sample from Mr. Trump. Her counsel have had plenty of opportunities in both of the two related cases to move to compel Mr. Trump to submit a DNA sample. Had they done so, they almost certainly would have gotten it. But Ms. Carroll's counsel never moved to compel Mr. Trump to submit a DNA sample. They obviously decided to go to trial without it. And there is no justification for imposing Mr. Trump's new proposal on Ms. Carroll now that she has prepared for trial on the entirely justified basis that there will be no DNA evidence.

Both sides have had years in which to make DNA an issue in this case. For their own reasons, each did not do so. Starting down the DNA road at this point almost inevitably would lead to further delay for sampling, testing, expert report writing, and depositions of experts. It almost surely would delay the trial again. And Mr. Trump has given the Court no reason to believe that pursuing that course would be likely to yield any admissible evidence, let alone a guarantee that anything important would come of it. Indeed, as is discussed in greater detail below, further proceedings with respect to the DNA on the dress cannot prove or disprove Ms. Carroll's claim that Mr. Trump raped her and could well prove entirely inconclusive in all respects.

In these circumstances, there is no case for relieving the parties of their obligations to have completed their pretrial discovery by the dates fixed by the Court.

SPA-77

5

### Facts

Carroll I, the first of Ms. Carroll's two cases against Mr. Trump, originally began in November 2019 in a state court in New York and later was removed to this court. It alleges that Mr. Trump defamed Ms. Carroll in a series of statements he issued in June 2019 in relation to her rape accusation against him. This, the second action ("Carroll II"), was brought three years later, in November 2022, to recover damages and other relief for the alleged rape pursuant to a newly-enacted New York law, the Adult Survivors Act, which created a "window" within which adult survivors of sexual assaults could sue their assaulters without regard to the otherwise applicable statute of limitations. Carroll II includes also a claim against Mr. Trump for defamation in a statement he issued in October 2022.[2]

Carroll I and Carroll II, at least for the moment, are two distinct lawsuits involving the same parties. But make no mistake, although only Carroll II includes a claim for damages for the alleged rape itself, as distinct from the alleged defamation, the question whether Mr. Trump in fact raped Ms. Carroll is central to both cases.

*The DNA Report About the Dress*

Unsurprisingly, Ms. Carroll requested a DNA sample from Mr. Trump shortly after Carroll I was commenced and her lawyers learned that there was unidentified male DNA on the

---

[2]   The Court assumes familiarity with its prior opinions, which describe the facts and procedural histories of the two actions involving these parties. *See* Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll I*, 20-cv-7311 (LAK) (hereinafter "*Carroll I*"), Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); *Carroll I*, Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); *Carroll I*, Dkt 96, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022).

6

dress.

In a notice that Ms. Carroll served on January 30, 2020 and filed a few weeks later in state court in *Carroll I*, Ms. Carroll sought Mr. Trump's DNA pursuant to Section 3121 of the New York Civil Practice Law and Rules.[3]   The Section 3121 notice stated that Mr. Trump was required to submit to a physical examination to "obtain a buccal, blood or skin cell sample . . . sufficient for DNA analysis and comparison against unidentified male DNA present on the dress that [Ms. Carroll] wore during the sexual assault at issue."[4]

Ms. Carroll's 3121 notice attached a laboratory report concerning an examination of the dress and shoes Ms. Carroll allegedly wore at the time of the alleged assault by Mr. Trump which, she claimed, she had kept in her closet until 2019, when she wore them for a photoshoot for *New York* magazine.[5]   The purpose of the examination was "to determine if male biology, specifically semen, is present" on the dress Ms. Carroll allegedly wore at the time of the alleged assault and whether any of the five individuals who might have come into contact with the dress at a photo shoot, allegedly the only subsequent occasion on which she wore that dress, "can be eliminated as contributors to any biology foreign to [Ms.] Carroll."[6]

---

[3]      *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 56.  The notice is dated January 30, 2020, but it was docketed in the state court's electronic case filing system on February 18, 2020.

[4]      *Id.*

[5]      That issue included an excerpt from Ms. Carroll's then-forthcoming book that described Mr. Trump's alleged assault of Ms. Carroll.

[6]      *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 56, Ex. A at 1-2.

Examination of the shoes did not detect any "acid phosphatase activity," the presence of

Examination of the dress did not detect any "acid phosphate activity" which, had it been detected, would have been "a presumptive indication of the presence of semen."[7] But the examination included also swabbing of different surface areas of the dress for DNA.

The report stated that the swabs taken from the dress that were processed for DNA analysis and examined microscopically consisted of skin cells and, for some areas that were swabbed, nucleated epithelial cells.[8] There was no evidence of any sperm cells. Nevertheless, the DNA recovered from the outside right sleeve of the dress "was determined to be a mixture of at least four contributors: three significant contributors, of whom at least one is male, and at least one minor/trace-level contributor."[9] The DNA recovered from the outside left sleeve of the dress "was determined to be a mixture of at least four contributors: two significant contributors and at least two minor/trace-level contributors, of whom at least one is male."[10] For both, there was "very strong support that [an individual present at the photo shoot] is a significant contributor," and four other individuals present at the photo shoot were "all eliminated as potential contributors to the mixture of DNA from the dress outside right sleeve swabs."[11] The "male DNA recovered from the combined

---

which, the report stated, would be "a presumptive indication of the presence of semen." The shoes accordingly were not pursued further. *Id.*, Ex. A at 16.

[7]    *Id.*, Ex. A at 9.

[8]    *Id.*, Ex. A at 14.

[9]    *Id.*, Ex. A at 22.

[10]    *Id.*, Ex. A at 23.

[11]    *Id.*, Ex. A at 22-23.

8

DNA extracts from the dress shoulder/neck area swabs and front skirt swabs revealed a low-level

mixture of at least three contributors," but further individualized analyses were not feasible.[12]  The

report further stated that "[a]dditional reference specimens may be submitted for comparison" to the

DNA results from the swabs of the dress shoulder/neck area, outside left sleeve, and outside right

sleeve.[13]

The DNA report attached to Ms. Carroll's served and filed notice specifically referred

to an "Appendix I" said to contain certain "electropherograms."[14]  The last page of the report attached

to the notice was numbered page 24 of 37.  Pages 25 to 37 of the report were not included.  Thus,

the absence of Appendix I and its general nature were obvious to a reader.

*Proceedings in Carroll I After the DNA Report Was Filed*

On February 4, 2020, five days after Ms. Carroll served her request for Mr. Trump's

DNA sample, Mr. Trump moved in the state court to stay the proceedings in *Carroll I* pending a

decision by the New York Court of Appeals in a different lawsuit against Mr. Trump.[15]  The state

---

[12]   It is unclear whether it is the same individual in the analyses of the swabs of the outside right and left sleeves for whom there was "very strong support" that he or she was a significant contributor.

   *Id.*, Ex. A at 24.

[13]   *Id.*

[14]   *Id.*

   An electropherogram is a chart used to plot the results of electrophoresis, a laboratory procedure commonly used to analyze DNA, as it was here.  *Id.*, Ex. A at 21.

[15]   *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 43.

court denied that motion on August 3, 2020.[16] Ms. Carroll states, and Mr. Trump does not dispute, that "[a]s soon as that stay motion was denied, [she] renewed her DNA request."[17]

On September 8, 2020, the U.S. Department of Justice intervened, reportedly on Mr. Trump's instruction, and filed a notice to remove *Carroll I* from the state court to this Court. The government then moved to substitute the United States in place of Mr. Trump on the theory that Mr. Trump was an "employee" of the United States within the meaning of the Westfall Act[18] who acted within the scope of his employment in making the allegedly defamatory statements in June 2019.[19]

I denied the government's motion to substitute.[20] Mr. Trump and the government appealed and Mr. Trump moved to stay all proceedings in *Carroll I* pending appeal. But the motion to stay was denied, and *Carroll I* never was stayed pending appeal.[21] The parties thus were free to

---

[16]

    *Id.*, Dkt 110.

    In a letter jointly submitted by the parties on February 24, 2022 in response to a question raised by this Court during an oral argument, the parties explained that Mr. Trump's February 4, 2020 letter "effectively stayed the proceedings" in state court pursuant to New York's procedural rules, "but did not operate as the entry of a formal stay." *Carroll I*, Dkt 70.

[17]

    Dkt 52, Plaintiff's letter response to Defendant's letter motion requesting full DNA report, at 2; *see also Carroll I*, Dkt 70 ("Immediately following the denial of that motion, the parties engaged in negotiations concerning the scope of discovery, although no discovery was actually produced.").

[18]

    28 U.S.C. § 2670(d)(2).

[19]

    *Carroll I*, Dkt 3.

[20]

    *Id.*, Dkt 32 at 59; *Carroll*, 498 F. Supp. 3d at 457.

[21]

    *Id.*, Dkt 56.

SPA-82

10

pursue discovery while the appeal was pending.

A year later, the Second Circuit determined that Mr. Trump was an "employee" within the meaning of the Westfall Act when he allegedly defamed Ms. Carroll but certified the question whether he was acting within the scope of his employment to the District of Columbia Court of Appeals.[22]  The appeal to the Second Circuit thus remains unresolved.

On January 11, 2022, Mr. Trump moved for leave to amend his answer to assert an affirmative defense and counterclaim New York's "anti-SLAPP" law to the effect that Ms. Carroll's claim is baseless and intended for harassment.[23]  I denied that motion in an opinion dated March 10, 2022 on two grounds. The first was that the proposed amendment would be futile.[24]  In the alternative, I denied it on the additional grounds that Mr. Trump's motion was delayed unduly and made at least in part for a dilatory purpose and that granting the motion would prejudice Ms. Carroll unfairly.[25]

On May 5, 2022, the parties jointly submitted a proposed discovery schedule.[26]  I approved their proposed schedule in an order that directed the parties to substantially complete their

---

[22]

Carroll v. Trump, 49 F.4th 759 (2d Cir. 2022).

The District of Columbia Court of Appeals heard argument on January 10, 2023, and as of this date, it has not issued its decision yet.

[23]

Carroll I, Dkt 63.

[24]

Id., Dkt 73 at 23; Carroll, 590 F. Supp. 3d at 589.

[25]

Id.

[26]

Carroll I, Dkt 75.

SPA-83

11

written discovery and requests for inspection or examination by August 3, 2022, and to substantially complete all fact discovery by October 19, 2022.[27]  In a supplemental scheduling order, I set a deadline of November 16, 2022 to complete all discovery and set a trial date of February 6, 2023, later adjourned until April 10, 2023.[28]

Undaunted, Mr. Trump again moved to substitute the United States in his place and to stay all proceedings in *Carroll I*.  I denied both requests.[29]  In doing so, I noted that "discovery in this case has virtually concluded" and that "discovery and evidence relating to whether or not the alleged rape occurred is relevant to both" *Carroll I* and *Carroll II*.[30]

*Mr. Trump's Refusals to Provide a DNA Sample in Discovery in Carroll I*

During oral argument on February 22, 2022 on Mr. Trump's motion for leave to add the anti-SLAPP counterclaim, Mr. Trump's counsel admitted that discovery had not yet been

---

[27]    *Id.*, Dkt 76.

[28]    *Id.*, Dkt 77, 102.

        The Court has reserved decision on whether to consolidate or jointly try *Carroll I* with *Carroll II* against the possibility that the District of Columbia Court of Appeals will decide the scope of employment issue certified to it by the Second Circuit in order to permit a fully informed judgment by this Court.

[29]    *Carroll I*, Dkt 96 at 16; *Carroll*, 2022 WL 6897075, at *7.

[30]    *Carroll I*, Dkt 96 at 12, 15; *Carroll*, 2022 WL 6897075, at *6-7.

        Of course, *Carroll II* had not yet been filed because the window for filing such an action pursuant to the Adult Survivors Act did not become effective until November 2022.  But Ms. Carroll alerted Mr. Trump and the Court in August 2022 that she would file *Carroll II* once she could.  It therefore was obvious that Ms. Carroll would file her second case against Mr. Trump in November 2022.

12

exchanged.[31] Ms. Carroll's attorney renewed the request for Mr. Trump's DNA sample:

> "[W]e'd like to get on with discovery. So, and we think discovery in this case is very, very fast. We do not seek to depose President Trump. He can depose our client. He can depose the other two women who she told contemporaneously when it happened. And we'd like his DNA. That's it."[32]

Ms. Carroll's counsel implicitly renewed that request on August 8, 2022, writing that Mr. Trump "has barely participated in the discovery process at all."[33] One week later, on August 15, 2022, Mr. Trump's counsel continued the refusal of the requested DNA sample. She stated that Mr. Trump "wholly object[ed] to [the] request for a DNA sample."[34] She went on:

> "Plaintiff has not demonstrated a reasonable basis for such an intrusive request, nor does it reasonably relate to her claims and defences [sic] in this matter. Further, the request is highly prejudicial given chain of custody concerns and violates Defendant's privacy rights, which are especially sensitive given that he is a former President. In the event that Plaintiff files a Motion to Compel, we will adamantly oppose it and seek a protective order to prevent its enforcement."[35]

---

[31]

    *Carroll I*, Dkt 71 at 4.

[32]

    *Id.* at 28.

[33]

    *Id.*, Dkt 89 at 2.

[34]

    Dkt 52 at 3.

[35]

    *Id.*

    The August 15, 2022 letter by Mr. Trump's counsel has not been filed, but is quoted in Ms.

SPA-85

13

*Limited Additional Discovery Authorized in Carroll II*

Ms. Carroll filed this case, *Carroll II*, in November 2022, minutes after the Adult Survivors Act became effective. On December 2, 2022, I directed the parties to submit a discovery plan that would contain, *inter alia*:

> "a. Any contention that any of the discovery taken in [*Carroll I*], is not admissible in this action and the basis, item-by-item, for that contention.

> "b. A detailed statement of what specific discovery that was not conducted in *Carroll I* is needed for the prosecution or defense of this case and the basis for the contention that it is needed."[36]

Neither the parties' written submissions nor their oral arguments referred either to the appendix to the years-old DNA report nor to the still unfulfilled request for Mr. Trump's DNA. In an order dated December 21, 2022, I concluded that "[t]he discovery taken in *Carroll I*, which ha[d] been completed, fully explored the question whether the defendant sexually assaulted [Ms. Carroll] as she alleges."[37] The only issues for which additional discovery was authorized in *Carroll II* were "damages, including emotional or psychological damages, allegedly suffered by [Ms. Carroll] as a result of the alleged sexual assault . . . and [Mr. Trump's] October 12, 2022 statement."[38] The order

---

Carroll's response letter to Mr. Trump's February 10, 2023 application for the remainder of the DNA report. Mr. Trump has not disputed the accuracy of the quoted portions of the letter.

[36]  Dkt 10.

[37]  Dkt 19 at 1.

[38]  *Id.* at 2.

14

enumerated the permissible discovery, the last of which was required to be completed by February 6, 2023.[39]  Neither Mr. Trump nor Ms. Carroll objected to that order.

This trial initially was scheduled to start on April 17, 2023.  As a personal accommodation for Mr. Trump's new trial counsel, I moved the trial date to April 25, 2023.[40]

*Mr. Trump's February 10, 2023 Request for the Appendix*

On February 9, 2023, Mr. Trump's counsel "emailed [Ms. Carroll's] counsel requesting [(for the first time)] a copy for the missing pages of the [DNA] report."[41]  Ms. Carroll's counsel declined to produce the appendix. So, on February 10, 2023, Mr. Trump for the first time requested the Court to direct Ms. Carroll to provide Mr. Trump the appendix to the DNA report she already had provided.

Mr. Trump's letter stated that he "is indeed willing to provide a DNA sample for the sole purpose of comparing it to the DNA found on the dress at issue, *so long as the missing pages of the DNA [r]eport [(i.e., the appendix)] are promptly produced prior to [Mr. Trump] producing*

---

[39]

     *Id.* at 3.

     The February 6, 2023 deadline was adjourned to a later date for one of Mr. Trump's experts only.  During a scheduling conference held on February 7, 2023, Mr. Trump's new counsel – attorneys from Tacopina Seigel & DeOreo P.C. – requested more time for service of the report of Mr. Trump's proposed psychiatric expert, Dr. Edgar Nace, due to certain personal circumstances of Dr. Nace. 1 granted that request, and adjusted the expert discovery deadlines and motions *in limine* deadlines with respect to Dr. Nace, or any substitute expert in place of Dr. Nace, only.  All other deadlines in the original scheduling order remained unaffected. Dkt 49.

[40]

     *See* Dkt 54, Tr., Feb. 7, 2023, at 19.

[41]

     Dkt 51 at 1.

15

*his DNA.*"[42]

       Ms. Carroll opposes Mr. Trump's request.  She argues that the request is made in bad faith, pointing to the history of Mr. Trump's continuous refusal to provide a DNA sample.[43]  She opposes Mr. Trump's request also on the grounds that it is "untimely" and that granting it would be "prejudicial" given that fact discovery in *Carroll I* and *Carroll II* has closed and because Mr. Trump's request, if accepted, "would inevitably delay the trial."[44]  In support of the latter, Ms. Carroll outlined a number of further steps that she contends would be required.  Importantly, these steps include "a report by [Ms.] Carroll's expert," "a report by [Mr. Trump's] rebuttal expert," "depositions of both experts," and "motion practice regarding any requested *in limine* rulings" related to the DNA evidence.[45]

       Mr. Trump, for his part, has made clear that he expects expert discovery on this issue, not merely a copy of the appendix to the old DNA report.  Indeed, his counsel claimed that they "already [had] conferred with a DNA expert" and asserted that they will have "a relevant report generated."[46]

       Thus, it is entirely clear that granting Mr. Trump's request would be only the first step

---

[42]    *Id.* at 2 (emphasis added).

[43]    Dkt 52 at 2-3.

[44]    *Id.* at 3-4.

[45]    *Id.* at 4.

[46]    Dkt 53 at 1.

SPA-88

16

in introducing a complicated new subject into this case that both sides elected not to pursue over a period of years.

## Discussion

*Legal Standard*

"A district court has broad discretion in deciding whether to re-open discovery."[47] Federal Rule of Civil Procedure 16 provides that "[a] schedule may be modified only for good cause and with the judge's consent."[48]   District courts in this Circuit generally consider six factors in deciding whether good cause to re-open discovery exists:

"(1) whether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to relevant evidence."[49]

"A significant consideration is whether there has already been adequate opportunity

---

[47] *Iacovacci v. Brevet Holdings, LLC*, No. 1:18-cv-08048 (MKV), 2022 WL 540658, at *1 (S.D.N.Y. Feb. 23, 2022); *see also Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004) ("Recognizing the district court's broad discretion to direct and manage the pre-trial discovery process, we . . . review a district court's discovery rulings for abuse of discretion.").

[48] Fed. R. Civ. P. 16(b)(4).

[49] *Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011).

for discovery."[50]  Courts have also placed importance on the moving party's diligence in obtaining

the discovery within the deadlines set by the court's scheduling order.[51]

*Trial is Imminent and the Request is Opposed*

   Trial of this case is imminent.  Ms. Carroll objects to any postponement.  And, as

noted above, she opposes Mr. Trump's request for the appendix to the DNA report.  Accordingly,

both of these factors weigh against granting Mr. Trump's application.

*The Discovery Now Belatedly Sought Was Foreseeable and Mr. Trump Was Not Diligent in Seeking It*

   The procedural histories of *Carroll I* and *Carroll II* described above demonstrate that

Mr. Trump was anything but diligent in seeking the appendix to the DNA report.  His counsel of

course either (1) knew of the omission of the appendix and decided not to ask for it or (2) were

grossly negligent in failing to read the report.  If the former, he is not now entitled to change his

mind.  If the latter, he was not diligent by any stretch of the imagination.  He has not provided any

satisfactory justification for the current request.

---

[50]
   *Id.*

[51]
   *Iacovacci*, 2022 WL 540658, at *1 ("As a general rule, discovery should only be re-opened if the movant can show that 'despite its having exercised diligence, the applicable deadline set in the court's scheduling order could not reasonably have been met.'") (quoting *Forte v. City of New York*, No. 16-cv-560 (VSB), 2021 WL 878559, at *2 (S.D.N.Y. Mar. 8, 2021)); *see also Tatintsian v. Vorotyntsev*, No. 1:16-cv-7203 (GHW), 2021 WL 780139, at *5 (S.D.N.Y. Jan. 27, 2021) ("Because they were not diligent in seeking the discovery at issue, Defendants failed to demonstrate the good cause necessary to modify the [scheduling order] to re-open discovery.").

18

*Granting Mr. Trump's Request Would Prejudice Plaintiff Unduly*

This Court previously observed that "Mr. Trump has litigated this case [(*Carroll I*)] since it began in 2019 with the effect and probably the purpose of delaying it."[52]  As the Court noted in a previous opinion:

> "As plaintiff contends, defendant's actions have been dilatory throughout the litigation. As she aptly puts it, he 'has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails.' . . .

> "Taken together, these actions [(the history of defendant's motions to stay and conduct, described above)] demonstrate that defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him. That conclusion draws further support from the facts that (1) the plaintiff is the only percipient witness (other than the defendant) to the alleged rape, and (2) she is 78 [(now, 79)] years of age. The relevance of these facts is obvious."[53]

I assume that producing the appendix to the DNA report would not be at all burdensome for Ms. Carroll.  But Mr. Trump has made clear that he wants far more than that document alone.  He not only has expressed a willingness to provide a DNA sample "so long as" he first is provided the appendix to the report, but also an interest in conducting his own DNA analysis to be followed by a report by his expert.  That likely would lead to additional expert analysis

---

[52]     *Carroll I*, Dkt 96 at 2*; Carroll*, 2022 WL 6897075, at \*1.

[53]     *Carroll I*, Dkt 73 at 19, 21; *Carroll*, 590 F. Supp. 3d at 587-88.

SPA-91

19

by an expert for Ms. Carroll and expert discovery including depositions of the DNA experts for each side. All this would occur as a result of Mr. Trump's refusal to produce a DNA sample in response to any of the prior requests made by Ms. Carroll coupled with his failure either to read the DNA report and note the absence of the appendix or of a deliberate decision not to ask for it.

Mr. Trump's offer to provide a DNA sample as a *quid pro quo* for production of the appendix and then to begin a process of new expert analyses inevitably leading to further reports and discovery almost certainly would delay the trial. More than that, his conditional invitation to open a door that he kept closed for years threatens to change the nature of a trial for which both parties now have been preparing for years. Whether Mr. Trump's application is intended for a dilatory purpose or not, the potential prejudice to Ms. Carroll is apparent.

*The Discovery May Not Lead to Relevant Evidence*

It is important to bear in mind also that Mr. Trump has had the body of the DNA report and its conclusions for over three years. The appendix he now seeks simply contains the electropherograms that were generated in reaching the report's conclusions. And Mr. Trump has not explained the specific relevance, if any, of the electropherograms.[54] Moreover, I have considered Mr. Trump's surmise that Ms. Carroll has not produced the appendix to the report because "she knows [that Mr. Trump's] . . . DNA is not on the dress because the alleged sexual assault never

---

[54]  Nor has Mr. Trump explained how there could be any possible "due process" concern related to his receipt of the appendix to the DNA report. Dkt 51 at 3. He had every opportunity to seek it during the discovery period he allowed to expire without even asking for it.

20

occurred."[55]  That of course is factually impossible for a simple reason: Mr. Trump never provided

a DNA sample for the purpose of comparing it to the DNA on her dress.  No one knows whether his

DNA is on the dress.

      Nor is it clear that injecting a DNA issue into the case at this late date would be likely

to produce any important evidence for several reasons:

      *First*, even if there were a "match" between Mr. Trump's DNA sample and the

mixture of DNA recovered on Ms. Carroll's dress, that would tend only to show that there was some

encounter between Mr. Trump and Ms. Carroll on at least one occasion when she wore that dress.

But it would not prove or disprove Ms. Carroll's rape allegation.

      *Second*, even if a DNA analysis were to determine that Mr. Trump could be

eliminated as a potential contributor to the mixture of DNA found on Ms. Carroll's dress, the

probative value of such a determination would be very far from conclusive.  It would not disprove

Ms. Carroll's accusation.  The alleged rape could have occurred without a sufficient quantity or

quality of Mr. Trump's DNA to have remained on the dress since the mid 1990s.

      *Third*, it is possible that the results of further DNA analysis using Mr. Trump's DNA

sample would be entirely inconclusive.[56]

---

[55]    Dkt 51 at 3.

[56]    *See* National Institute of Justice, *DNA Evidence Basics: Possible Results from Testing*, Aug. 8, 2012, https://nij.ojp.gov/topics/articles/dna-evidence-basics-possible-results-testing ("Results may be interpreted as inconclusive for several reasons. These include situations where no results or only partial results are obtained from the sample due to the limited amount of suitable human DNA or where results are obtained from an unknown crime scene sample but there are no samples from known individuals available for comparison. In the latter case, the results would be suitable for comparison once an appropriate sample for comparison is tested.").

SPA-93

21

### *Conclusion*

Mr. Trump has offered "no persuasive reason to relieve [him] of the consequences of [his] own failure to seek [the appendix] in a timely fashion."[57] He has failed to demonstrate good cause to reopen discovery for the purpose of obtaining these pages of the DNA report. Nor is there any legitimate basis for this Court to accept Mr. Trump's offer to provide his DNA sample made contingent on the Court granting his application, which it does not. Accordingly, Mr. Trump's letter application (Dkt 51) is denied.

SO ORDERED.

Dated:        February 15, 2023

_____

Lewis A. Kaplan
United States District Judge

---

[57] *Kelly v. Wright Med. Tech., Inc.*, No. 00-cv-8808 (LAK), 2003 WL 40473, at *1 (S.D.N.Y. Jan. 3, 2003).

SPA-94

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                        Plaintiff,

         -against-                               22-cv-10016 (LAK)

DONALD J. TRUMP,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM AND ORDER ON
DEFENDANT'S *IN LIMINE* MOTION**

LEWIS A. KAPLAN, *District Judge.*

        Donald J. Trump is accused in this case ("*Carroll II*") and a second very closely

related case ("*Carroll I*") of having raped E. Jean Carroll in the mid 1990s.[1]  In both cases, plaintiff

E. Jean Carroll claims Mr. Trump defamed her in public statements in response to Ms. Carroll's rape

accusation against him. In this action, Ms. Carroll seeks also to recover damages and other relief for

the alleged rape pursuant to a newly-enacted New York law, the Adult Survivors Act, which created

a "window" within which adult survivors could sue their assaulters without regard to the otherwise

---

[1]     The Court assumes familiarity with its decisions in both actions. Doc. No. 20-cv-7311
(*Carroll I*), Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part,
vacated in part*, 49 F.4th 759 (2d Cir. 2022); *Carroll I*, Dkt 73, *Carroll v. Trump*, 590 F.
Supp. 3d 575 (S.D.N.Y. 2022); *Carroll I*, Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK),
2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); *Carroll I*, Dkt 145, *Carroll v. Trump*, No.
20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Dkt 56, *Carroll v. Trump*,
No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023); Dkt 38, *Carroll v.
Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023).

Except where preceded by *"Carroll I"*, "Dkt" references are to the docket in this case.

SPA-95

2

applicable statute of limitations.

The matter now is before the Court on Mr. Trump's *in limine* motion to exclude from evidence and/or preclude at the trial of this case:

(1)     evidence relating to Mr. Trump's alleged interactions with Mss. Natasha Stoynoff and Jessica Leeds;

(2)     short excerpts of videos of remarks by Mr. Trump during the 2016 presidential campaign;

(3)     evidence relating to the so-called *Access Hollywood* tape, including the tape itself; and

(4)     the testimony of two of Ms. Carroll's proposed witnesses, Ms. Cheryl Lee Beall and Mr. Robert Salerno.[2]

Mr. Trump moved also to exclude (1) through (3) in *Carroll I*. This Court denied Mr. Trump's motion as to (1) and (3) and deferred ruling on (2) until trial.[3] The evidentiary rulings made in *Carroll I* as to (1) through (3) are entirely applicable here. There is no reason, and Mr. Trump has made no persuasive argument, for me to rule differently.[4]

---

[2]    Dkt 69.

       Mr. Trump moved also to exclude evidence of emotional and psychological harm at the trial of this case, but subsequently withdrew that request.  Dkt 89 at 8.

[3]    *Carroll*, 2023 WL 2441795 at *8-9.

[4]    Mr. Trump in this motion adds to his *Carroll I* position the argument that Ms. Stoynoff's testimony is not admissible because in *Rapp v. Fowler*, No. 20-cv-9586 (LAK), 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022), this Court determined that a witness's proposed testimony that the defendant's "hand was on [the witness's] leg . . . about two inches above [his] knee" was not evidence of an "other sexual assault" under Rule 415 "regardless of any question

SPA-96

3

Mr. Trump's only remaining claim – which he did not raise in *Carroll I* – is that Ms. Beall and Mr. Salerno should be precluded from testifying at trial. These witnesses formerly were employed at Bergdorf Goodman, the New York department store where Ms. Carroll alleges Mr. Trump sexually assaulted her. Mr. Trump argues that they should be excluded pursuant to Federal Rule of Civil Procedure 37(c)(1) because they are "'surprise' witnesses" who were not timely disclosed.[5] His claim fails as to both proposed witnesses.

*Ms. Beall*

Ms. Beall was an employee at Bergdorf Goodman at the time Mr. Trump allegedly raped Ms. Carroll in the store. She is expected to give "testimony regarding the Bergdorf Goodman store in the relevant time period, including the store's operations and layout, as well as Mr. Trump's presence at the store."[6] Ms. Beall first was disclosed to Mr. Trump on October 14, 2022 in Ms. Carroll's Rule 26(a) disclosures in *Carroll I*. She again was disclosed to Mr. Trump in *Carroll II* before the January 9, 2023 deadline set in *Carroll II* by this Court.

---

of intent." *Rapp*, 2022 WL 5243030 at *2; Dkt 89 (Def. Reply Mem.) at 9. Mr. Trump's equation of the two cases fails for two reasons. First, the evidence and circumstances of Mr. Trump's alleged encounter with Ms. Stoynoff – including her testimony that he "groped" her – are materially different from the proposed testimony in *Rapp*. Second, in *Rapp*, the Court determined that the testimony was not evidence of an other sexual assault under the definitions in 18 U.S.C. chapter 109A. That analysis was unnecessary with respect to Ms. Stoynoff because the Court determined that a jury reasonably could conclude that Mr. Trump's alleged conduct toward Ms. Stoynoff was an other sexual assault within the meaning of Rules 415 and 413 and would constitute a crime under Florida law. *See Carroll I*, Dkt 145 at 13-15; *Carroll*, 2023 WL 2441795 at *5-6.

[5]    Dkt 70 (Def. Mem. of Law) at 2.

[6]    Dkt 77 (Pl. Mem. of Law) at 3.

4

Mr. Trump seeks to preclude Ms. Beall from testifying pursuant to Rule 37(c)(1).

Rule 37(c)(1) provides that:

> "If a party fails to provide information or identify a witness as required by Rule 26(a)
> or (e), the party is not allowed to use that information or witness to supply evidence
> on a motion, at a hearing, or at a trial, unless the failure was substantially justified or
> is harmless."[7]

> "The party seeking Rule 37 sanctions bears the burden of showing that the opposing
> party failed to timely disclose information."[8] So the logical starting point is Ms. Carroll's obligations

under Rules 26(a) and (e).

Rule 26(a)(1)(A) in relevant part provides that "a party must, without awaiting a

discovery request, provide to the other parties: (i) the name and, if known, the address and telephone

number of each individual likely to have discoverable information—along with the subjects of that

information—that the disclosing party may use to support its claims or defenses, unless the use

would be solely for impeachment."[9]  The timing of the required disclosure is fixed by Rule

26(a)(1)(C), which in relevant part states that "[a] party must make the initial disclosures at or within

14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court

---

[7]

Fed. R. Civ. P. 37(c)(1).

[8]

*A.V.E.L.A., Inc. v. Est. of Monroe*, No. 12-cv-4828 (KPF)(JCF), 2014 WL 715540, at *4
(S.D.N.Y. Feb. 24, 2014), *adhered to on reconsideration*, No. 12-cv-4828(KPF)(JCF), 2014
WL 1408488 (S.D.N.Y. Apr. 11, 2014); *see also In re Sept. 11th Liab. Ins. Coverage Cases*,
243 F.R.D. 114, 125 (S.D.N.Y. 2007) ("The moving party bears the burden of showing that
its adversary failed timely to disclose information required by Rule 26.").

[9]

Fed. R. Civ. P. 26(a)(1)(A).

SPA-98

5

order."[10]  In this case, the Court fixed the deadline for Rule 26(a) disclosures in *Carroll II* as January

9, 2023.[11]  It is undisputed that Ms Carroll disclosed Ms. Beall in her Rule 26(a) disclosures on that

date.[12]

        Mr. Trump nevertheless contends, in a somewhat convoluted argument, that the

January 9 disclosure was untimely.  The contention is that "the operative deadlines [in this case,

*Carroll II*] are those set forth in *Carroll I*."[13]  Mr. Trump points to the fact that Ms. Carroll disclosed

Ms. Beall in *Carroll I* in her second supplemental disclosures pursuant to Rule 26(e) merely five

days before the close of discovery in that case, which Mr. Trump argues was "untimely and long

delayed."[14]  "[D]iscovery in *Carroll II* [(the argument continues)] [was] 'limited to' 'damages . . .

allegedly suffered by plaintiff as a result of the alleged sexual assault as distinguished from the

defamation alleged in *Carroll I,* and the October 12, 2022 statement'" that is the subject of the

alleged defamation at issue in this case, *Carroll II*.[15]  Therefore, he contends, Ms. Carroll's January

9 disclosure in this case of Ms. Beall was untimely.  But Mr. Trump's argument entirely ignores how

---

10

    Fed. R. Civ. P. 26(a)(1)(C).

11

    Dkt 19 ¶ 7.

12

    Dkt 78 (Crowley Decl.) ¶ 7, Dkt 78-1 (Ex. 1) at 4; *see also* Dkt 89 (Def. Reply Mem.) at 1-2.

13

    Dkt 70 (Def. Mem. of Law) at 3.

14

    *Id.*

    Rule 26(e) requires a party to "supplement or correct its disclosure [under Rule 26(a)] . . .
in a timely manner if the party learns that in some material respect the disclosure . . . is
incomplete or incorrect." Fed. R. Civ. P. 26(e).

15

    *Id.* (quoting Dkt 19 (Pretrial and Scheduling Order)).

SPA-99

6

the limitation of discovery in *Carroll II* came about and ignores the actual extent of the limitation.

The scheduling orders in *Carroll I* imposed deadlines for the completion of depositions and of all discovery of October 19 and November 16, 2022, respectively.[16] Both dates preceded the filing of this action, *Carroll II,* on November 24, 2022. From the outset of *this* case, it thus appeared that all discovery concerning the core issue in this case – whether Mr. Trump sexually assaulted Ms. Carroll – had been completed in *Carroll I* because that issue is common to *Carroll II* and discovery in *Carroll I* had been concluded. The Court therefore set a scheduling conference and directed the parties to submit a discovery plan for *Carroll II* containing "[a] detailed statement of what specific discovery that was not conducted in *Carroll I* is needed for the prosecution or defense of this case and the basis for the contention that it is needed."[17] The parties' written submission diverged as to the scope of additional discovery need for *Carroll II.*

Ms. Carroll took the position that discovery should be limited to the new issues first raised in *Carroll II* – essentially to damages attributable to the alleged sexual assault as well as the circumstances of and damages attributable to the new defamation claim.[18] She contended that "[a]ny further discovery into whether Defendant sexually assaulted Plaintiff, the defamatory statements at issue in *Carroll I,* or the damages caused by those statements, should not be permitted since those topics were fully explored in both fact and expert discovery."[19]

---

[16]   *Carroll I*, Dkts 76, 77; *Carroll I,* Dkt 100 (reiterating discovery deadlines).

[17]   Dkt 10.

[18]   Dkt 16 at 3-4.

[19]   *Id.* at 3.

7

Mr. Trump agreed with Ms. Carroll's position as to discovery concerning new issues raised by *Carroll II*, but contended that he should be permitted to take "further discovery into the purported facts of the alleged incident."[20]   His written submission, however, did not specify any additional discovery he sought with respect to the occurrence of the alleged sexual assault as opposed to the damages claimed as a result.[21]   And while the Court pressed Mr. Trump's counsel at the conference in an effort to determine what if any additional discovery was sought concerning the alleged sexual assault itself, his counsel identified none.[22]   Accordingly, the pretrial and scheduling order issued on December 21, 2022 provided in relevant part:

> "2.      *   *   *  On the basis of the parties' written and oral submissions,
> the Court has concluded that the only such issues [(i.e., new issues raised by *Carroll*
> *II*)] are damages, including emotional or psychological damages, allegedly suffered
> by plaintiff as a result of the alleged sexual assault as distinguished from the
> defamation alleged in *Carroll I*, and the defendant's October 12, 2022 statement.

---

[20]

     *Id.* at 4-5.

[21]

     *Id.*, *id* at 5 n.3 ("Specifically, Defendant's additional discovery efforts shall include, but not be limited to, (1) written discovery regarding the newly-raised issues; (2) conducting an Independent Medical Examination of Plaintiff in accordance with Federal Rule 35, as Plaintiff has plainly put her physical and/or mental condition 'in controversy' in this action. *See* FRCP 35; (3) the report of Defendant's own forensic expert; (4) a report from Defendant's original damages expert, who will offer expert testimony demonstrating that Plaintiff was not damaged by Defendant's October 12, 2022 statement; and (5) conducting additional depositions of Plaintiff and potential additional non-party witnesses *with respect to the new issues raised in Carroll II*.") (second emphasis added).  No mention was made of any additional non-party witnesses with respect to the occurrence of the alleged sexual assault.

[22]

     Dkt 24 (Tr., Dec. 21, 2022) at 4:24-9:20.

SPA-101

8

*Unless otherwise ordered*, discovery will be limited to those subjects."[23]

In these circumstances, Mr. Trump's argument is without merit. First of all, even if he first had learned of Ms. Beall as a prospective witness on January 9, 2023, the date of Ms. Carroll's Rule 26(a) disclosure in this case, he could have sought an order under paragraph 2 of the pretrial and scheduling order permitting him to take her deposition. But he did not do so. Instead, he waited and then, on February 23, 2023, moved to preclude her from testifying.

Even more striking, Mr. Trump learned of Ms. Beall as a prospective witness months before January 9, 2023. The fact that Ms. Beall was a potential witness on the subjects of the Bergdorf store and of Mr. Trump's presence there concededly has been know to Mr. Trump's counsel at least since October 14, 2022.[24] They elected not to take her deposition in *Carroll I,* which they almost certainly could have done.[25] And when asked in *Carroll II* what if any additional discovery they wished to take in this action, they never even mentioned Ms. Beall despite a court order

---

[23]    Dkt 19 (emphasis added).

[24]    This was revealed to him on that date by the service of Ms. Carroll's supplemental disclosures in *Carroll I,* as mentioned above. Dkt 71 (Habba Decl.) ¶ 6, Dkt 71-3 (Ex. C) at 2-4. *Accord,* Dkt 78 (Crowley Decl.) ¶¶ 3-4.

[25]    Mr. Trump claims that the October 14 disclosure of Ms. Beall in *Carroll I* came only five days before the fact discovery cutoff in that case, which he argues "provided [him] with little to no opportunity to subpoena her deposition within the relevant discovery time frame." Dkt 70 at 2-3, Dkt 89 at 3. Although his first claim is accurate literally, the conclusion he drew from it is not. For one thing, he could have sought Ms. Beall's deposition short notice. Moreover, while fact depositions were to have been completed by October 19, 2022, the overall discovery deadline was November 16, 2022, and expert depositions were permitted to continue during the intervening period. *Carroll I,* Dkts 76, 77. Had Mr. Trump applied to take Ms. Beall's deposition after October 19 on the basis that he first had learned of her existence on October 14, his application almost certainly would have been granted. In any case, responsibility for Mr. Trump's failure to take Ms. Beall's deposition in *Carroll I* lies with Mr.Trump.

9

requiring "[a] detailed statement of what specific discovery that was not conducted in *Carroll I* is needed for the prosecution or defense of this case and the basis for the contention that it is needed."[26] Moreover, in making the present argument based on the limitation of discovery in *Carroll II,* they fail to mention that the pretrial and scheduling order permitted them to seek leave to take her deposition notwithstanding the limitation.  But they did not do so.

In sum, the Rule 26(a) disclosure of Ms. Beall in *Carroll II* was timely.  Even if it were not, Mr. Trump would not have been prejudiced.

*Mr. Salerno*

Mr. Salerno, who also was an employee at Bergdorf Goodman, is expected to testify on similar subjects as Ms. Beall.  As with Ms. Beall, Ms. Carroll timely disclosed Mr. Salerno in her Rule 26(a) initial disclosures in *Carroll II* on January 9, 2023, the deadline set by the Court.[27]

Mr. Trump nevertheless argues that Mr. Salerno should be precluded from testifying because (1) he was disclosed after the close of fact discovery in *Carroll I*, and (2) his proposed testimony falls outside of the scope of discovery permitted in *Carroll II*.[28]

---

[26]

Dkt 10.

[27]

Dkt 78 (Crowley Decl.) ¶¶ 6-7, Dkt 78-1 (Ex. 1) at 2-4. That disclosure, moreover, was made approximately two weeks after Ms. Carroll's counsel's initial telephone call with Mr. Salerno and only three days after her counsel learned that he was willing to testify. *Id.*

She disclosed Mr. Salerno as a potential witness in *Carroll I* in her third supplemental disclosures pursuant to Rule 26(e) on January 6, 2023.  That disclosure was timely in that case under Rule 26(e) because of the aforementioned speed with which it was made.

[28]

Dkt 70 at 3-4.

SPA-103

10

The first argument clearly is without merit because the issue here is whether Ms. Carroll failed to discharge her disclosure obligations in this case, not *Carroll I.* As already stated, the disclosure in this case was timely made on January 9, 2023.

Mr. Trump's second argument is essentially a reprise of part of his argument with respect to Ms. Beall – a deposition of Mr. Salerno would not have been within the limited the scope of discovery set out in the pretrial and scheduling order and he therefore could not have deposed Mr. Salerno.  But that order, as discussed above, did not absolutely prohibit a deposition of Mr. Salerno (or, for that matter, any other) witness with respect to the alleged sexual assault.  It limited the scope of discovery to the new issues raised by *Carroll II "unless otherwise ordered."*[29]  But at no point after Mr. Trump learned of Mr. Salerno as a potential witness did Mr. Trump seek relief from this Court prior to moving *in limine* to preclude Mr. Salerno from testifying at trial.[30]  As evidenced by Mr. Trump's discovery-related requests in this action after that order, he has not been reticent in seeking leave to amend this Court's discovery schedule in matters purportedly important to him.[31]  Yet he made no such attempt with respect to Mr. Salerno.  Any prejudice Mr. Trump claims he would suffer therefore would be a product of his own failure to seek a deposition of Mr. Salerno

---

29    Dkt 19 at 2 (emphasis added).

30    According to Ms. Carroll's counsel, the only actions Mr. Trump appears to have taken with respect to Ms. Beall and Mr. Salerno were on February 17, 2023, when "two men visited [Ms.] Beall at her home, indicating that they were there to investigate on [Mr.] Trump's behalf, and . . . [Mr.] Salerno receive[d] a telephone call from someone purporting to investigate the case around the same time."  Dkt 77 at 4, n.1.  Mr. Trump's counsel did not address these alleged interactions in their briefs.

31    *E.g.*, Dkt 48 (Mr. Trump's motion to adjourn deadline with respect to Mr. Trump's psychiatric expert); Dkt 51 (Mr. Trump's motion to compel production of an appendix to a DNA report obtained by Ms. Carroll in January 2020).

11

since early January, when Ms. Carroll timely made her Rule 26(a) disclosure in this case.


*Conclusion*

        Mr. Trump's *in limine* motion (Dkt 69) is denied in all respects.   This ruling is

without prejudice to Mr. Trump renewing his objection to the campaign speech excerpts in the event

they are offered at trial.   Unless otherwise ordered, those excerpts shall not be mentioned in opening

statements.

        SO ORDERED.

Dated:        March 20, 2023

                                        Lewis A. Kaplan
                                United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                              Plaintiff,


              -against-                                          22-cv-10016 (LAK)


DONALD J. TRUMP,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### MEMORANDUM OPINION RE ANONYMOUS JURY


              Appearances:


                              Roberta Kaplan
                              Joshua Matz
                              Shawn Crowley
                              Matthew Craig
                              Trevor Morrison
                              Michael Ferrara
                              KAPLAN HECKER & FINK LLP

                              *Attorneys for Plaintiff*

                              Joseph Tacopina
                              Matthew G. DeOreo
                              Chad Derek Seigel
                              TACOPINA SEIGEL & DEOREO, P.C.

                              Alina Habba
                              Michael T. Madaio
                              HABBA MADAIO & ASSOCIATES LLP

                              *Attorneys for Defendant*

                              Matthew A. Leish
                              MILLER KORZENIK SOMMERS RAYMAN LLP

                              *Attorney for Non-Parties Daily News, L.P. and Associated Press*

SPA-106

LEWIS A. KAPLAN, *District Judge.*

Donald J. Trump is accused in this and a second very closely related civil case of having raped E. Jean Carroll in the mid 1990s and having defamed her in public statements in response to her rape accusation against him. He has denied the rape charge and disputes whether his statements are actionable.

The trial of this case will begin on April 25, 2023.[1]  On March 11, 2023, the Court directed the parties to file any objections to trying the case before an anonymous jury.[2]  Neither objected. Non-parties Daily News, L.P. (the "News"), and the Associated Press (the "AP") oppose it. The matter is ripe for decision.

*Facts*

This is a unique case.

The defendant is a former president of the United States. He has been impeached twice although convicted on neither occasion. He now is a candidate for election to a second term. He has inspired strong opinions, both highly favorable and highly unfavorable. As will appear in more detail below, some individuals charged with crimes in connection with the January 6, 2020 events at the United States Capitol have argued that their actions were attributable to what the individuals perceived, rightly or wrongly, as incitement by Mr. Trump,[3] a subject on which the Court

---

[1]     The other case, which was set for trial on April 10, 2023, has been adjourned *sine die.*

[2]     Dkt 84.

[3]     *E.g.*, Ryan J. Reilly, *Jan. 6 rioter who said he wanted Trump's 'approval' found guilty by jury*, NBC NEWS, Apr. 14, 2022, https://www.cnbc.com/2022/04/14/jan-6-rioter-who-said -he-wanted-trumps-approval-found-guilty-by-jury.html ("A Donald Trump supporter who

SPA-107

3

expresses no view.  The Final Report issued by the Select Committee to investigate the January 6th

attack on the U.S. Capitol concluded that "the central cause of January 6th was one man, former

President Donald Trump, whom many others followed."[4]

Mr. Trump's quite recent reaction to what he perceived as an imminent threat of

indictment by a grand jury sitting virtually next door to this Court was to encourage "protest" and

to urge people to "take our country back."[5]  That reaction reportedly has been perceived by some as

_____

told jurors that he was 'following presidential orders' when he stormed the U.S. Capitol on Jan. 6 was found guilty on Thursday after he admitted that he stole a coat rack and a bottle of liquor from the building."); Shawna Chen, *Judge: Jan. 6 rioter who broke into Capitol followed "Trump's instructions"*, AXIOS, Jan. 17, 2023, https://www.axios.com/2023/01/18/jan6-capitol-riot-trump-instructions ("A federal judge said Tuesday that a California woman who breached the U.S. Capitol during the Jan. 6 insurrection 'followed then-President Trump's instructions' in breaking the law."); Sabrina Willmer, *Proud Boys Vowed 'Any Means Necessary' to Keep Trump in Power, Jury Told*, BLOOMBERG, Jan. 12, 2023, https://www.bloomberg.com/news/articles/2023-01-12/proud-boys-pledged-any-means-necessary-to-keep-trump-in-power-jury-told?leadSource=uverify%20wall (defense attorney in Proud Boys trial "claimed it was Trump who 'unleashed the mob' that breached the Capitol with his fiery speech to supporters earlier that morning"); Kyle Cheney, *Jan. 6 defendant wants jurors to blame Trump, not him, for decision to breach Capitol*, POLITICO, Apr. 13, 2022, https://www.politico.com/news/2022/04/13/january-6-defendant-donald-trump-00025019 ("Though dozens of defendants have argued in court filings that they believed Trump had authorized the assault on the Capitol, judges have largely rejected that contention and said rioters should be held to account for their own actions. But whether a jury sees that argument differently will be an important test that could reverberate across hundreds of other cases.").

4

Final  Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. H.R. Rep. 117-663 (Dec. 22, 2022).

This Court expresses neither agreement nor disagreement with that conclusion.

5

*E.g.*, Josh Dawsey, Shayna Jacobs, Carol D. Leonnig, Justine McDaniel, *Trump calls for protests of what he claims is his imminent arrest*, WASHINGTON POST, Mar. 18, 2023, https://www.washingtonpost.com/nation/2023/03/18/trump-protest-arrest-new-york/.

SPA-108

4

incitement to violence.[6] And it bears mention that Mr. Trump repeatedly has attacked courts, judges, various law enforcement officials and other public officials, and even individual jurors in other matters.[7]

---

[6] *E.g.*, James Bickerton, *Donald Trump's Protest Call to Arms Sparks Jan. 6 Comparisons*, NEWSWEEK, Mar. 18, 2023, https://www.newsweek.com/donald-trumps-protest-call-arms-sparks-jan-6-comparisons-1788702 ("A number of political commentators condemned Trump's call for protest on social media, with several suggesting he was inciting violence and making an explicit comparison with the January 6 unrest.").

To be clear, I do not make any finding or express any view as to the accuracy of any of the reports and allegations referenced herein. For purposes of this order, it matters not whether Mr. Trump incited violence in either a legal or a factual sense. The point is whether jurors will perceive themselves to be at risk.

[7] *E.g.*, Lauren Sforza, *Trump attacks Georgia grand jury forewoman over media tour*, THE HILL, Feb. 22, 2023, https://thehill.com/policy/national-security/3869576-trump-attacks-georgia-grand-jury-forewoman-over-media-tour/ (quoting Mr. Trump's social media post, "Now you have an extremely energetic young woman, the (get this!) 'foreperson' of the Racist D.A.'s Special Grand Jury, going around and doing a Media Tour revealing, incredibly, the Grand Jury's inner workings & thoughts"); Peter Wade, *Trump Has Roger Stone Jurors Fearing for Their Safety: 'It Seems Like Danger Is Coming to Me'*, ROLLING STONE, Apr. 16, 2020, https://www.rollingstone.com/politics/politics-news/trump-roger-stone-jurors-fear-for-their-safety-985571/ ("All 12 of the jurors in the Roger Stone case have expressed fear in court filings on Wednesday. They worry they will continue to be harassed and they fear for the safety of themselves and their families if their identities are revealed. According to The National Law Journal, jurors cited tweets from President Trump and remarks from conspiracy theorist Alex Jones as the reason 'the threats to the jurors' safety and privacy persist' after the trial ended in November."); Brennan Center for Justice, *In His Own Words: The President's Attacks on the Courts* (last updated Feb. 14, 2020), https://www.brennancenter.org/our-work/research-reports/his-own-words-presidents-attacks-courts; Jason Szep and Linda So, *Trump campaign demonized two Georgia election workers – and death threats followed*, REUTERS, Dec. 1, 2021, https://www.reuters.com/investigates/special-report/usa-election-threats-georgia/ ("Desperate to overturn his election loss, Donald Trump and his team spun a sprawling voter-fraud fiction, casting two rank-and-file election workers, a mother and her daughter, as the main villains. The women endured months of death threats and racist taunts – and one went into hiding."); Stuti Mishra, *Trump's fresh attacks on Georgia election workers could land him in legal trouble, expert says*, THE INDEPENDENT, Jan. 5, 2023, https://www.independent.co.uk/news/world/americas/us-politics/trump-georgia-election-ruby-freeman-b2256377.html ("Mr Trump has used his social media platform, Truth Social, to fuel conspiracy theories aimed at Georgia official Ruby Freeman – who has been a repeated subject of the former president's attacks since the 2020 election.").

SPA-109

5

In addition to Mr. Trump's past words and actions together with perceptions of them by many people, it is highly relevant that this case already has been the subject of widespread media coverage. Even the most modest developments have attracted a good deal of attention.[8] That coverage is likely only to increase once the trial is imminent or in process.

In these circumstances, this Court is obliged to consider the likely effect on jurors of the matters just described, similar events in the relatively recent past, and the likely future course of events, including the inevitable extensive media coverage. And it cannot properly ignore the significant risk that jurors selected to serve in this case will be affected by concern that they could be targeted for unwanted media attention, outside pressure, and retaliation and harassment from persons unhappy with any verdict that might be returned. Accordingly, the Court *sua sponte* raised the question whether protection of jurors' identities and addresses would be appropriate. As noted, the parties do not object to an anonymous jury. Only the News and the AP have done so on the

---

[8] *E.g.*, Dan Berman, *Trial in one of E. Jean Carroll's rape defamation cases against Trump is delayed*, CNN, Mar. 20, 2023, https://www.cnn.com/2023/03/19/politics/e-jean-carroll-trump-defamation-trial/index.html; Erik Larson, *Trump May Face Anonymous Jury in High-Profile Defamation Trial*, BLOOMBERG, Mar. 11, 2023, https://www.bloomberg.com/news/articles/2023-03-11/donald-trump-e-jean-carroll-trial-may-get-anonymous-jury#xj4y7vzkg; Gustaf Kilander, *Two other Trump accusers can testify in E Jean Carroll rape defamation case as Access Hollywood tape admitted*, THE INDEPENDENT, Mar 10, 2023, https://www.independent.co.uk/news/world/americas/us-politics/trump-e-jean-carroll-rape-lawsuit-b2298323.html; Chris Pandolfo, Marta Dhanis, *Judge allows Trump Access Hollywood tape in E. Jean Carroll lawsuit*, FOX NEWS, Mar 10, 2023, https://www.foxnews.com/politics/judge-allows-trump-access-hollywood-tape-e-jean-carroll-lawsuit; Nina Pullano, *In Trump rape lawsuit, judge weighs 'quid pro quo' DNA offer*, COURTHOUSE NEWS SERVICE, Feb. 10, 2023, https://www.courthousenews.com/in-trump-rape-lawsuit-judge-weighs-quid-pro-quo-dna-offer/; Dan Mangan, *Trump mistook rape accuser E. Jean Carroll for ex-wife Marla Maples in deposition about photo*, CNBC, Jan. 18, 2023, https://www.cnbc.com/2023/01/19/trump-believed-rape-accuser-e-jean-carroll-was-wife-in-photo.html; Jared Gans, *Judge rejects Trump's motion to dismiss E. Jean Carroll sexual assault lawsuit*, THE HILL, Jan. 13, 2023, https://thehill.com/regulation/court-battles/3812997-judge-rejects-trumps-motion-to-dismiss-e-jean-carroll-sexual-assault-lawsuit/.

6

ground that the identities of individual jurors is within the presumption of public access to court proceedings and that they must be provided to the media and the public.

*Discussion*

Anonymous juries historically have been ordered in criminal cases in which the risk of tampering with or violent retaliation against jurors by criminal defendants or their confederates was palpable, most often in terrorism and organized crime cases. The impetus for the use of anonymous juries invariably or, at least, almost always has arisen in the prosecution of such cases. And this case does not fit that mold.  But that is only the beginning of the discussion, not the end.

A court in an appropriate case has "broad discretion to take such steps as may be necessary and appropriate to permit the jury to concentrate on the trial proceedings and to evaluate the evidence in an atmosphere free from apparent threat or danger, so long as those steps do not violate the defendant's fundamental rights."[9]  It may order an anonymous jury "[w]hen genuinely called for and when properly used"[10] – that is, "'upon (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'"[11]  It may do so on

---

[9]  *United States v. Maldonado-Rivera*, 922 F.2d 934, 971 (2d Cir. 1990).

[10]  *United States v. Kadir*, 718 F.3d 115, 120 (2d Cir. 2013) (quoting *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012)).

[11]  *Id*. (quoting *Pica*, 692 F.3d at 88); *see also United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991); *United States v. Thomas,* 757 F.2d 1359, 1364-65 (2d Cir. 1985).

7

its own motion.[12]   And where there is a genuine need for an anonymous jury and reasonable

precautions are taken, its use does not violate either the common law or the Constitution, even in a

criminal case.[13]

As the lack of any objection from either Ms. Carroll or Mr. Trump suggests, this is

such a case. If jurors' identities were disclosed, there would be a strong likelihood of unwanted

media attention to the jurors, influence attempts, and/or of harassment or worse of jurors by

supporters of Mr. Trump.[14]   Indeed, Mr. Trump himself has made critical statements on social media

regarding the grand jury foreperson in Atlanta, Georgia, and the jury foreperson in the Roger Stone

criminal case.[15]   And this properly may be viewed in the context of Mr. Trump's many statements

---

[12]   Indeed, in what reportedly was the first case in the United States to require jury anonymity, the judge, a former member of this Court, ordered anonymity on his own motion. Abraham Abramovsky and Jonathan I. Edelstein, *Anonymous Juries: In Exigent Circumstances Only*, 13 ST. JOHN'S J. LEGAL COMMENT 457, 457-58 (1999). His action was upheld on appeal. *United States v. Barnes,* 604 F.2d 121, 140-43 (2d Cir. 1979).

[13]   *E.g., Thomas,* 757 F.2d at 1364-65; *Barnes,* 604 F.2d at 141-43.

[14]   During a previous investigation of Mr. Trump, law enforcement officials prepared for potentially violent demonstrations by his supporters. *E.g.*, David Klepper, *Trump's angry words spur warnings of real violence*, AP, Aug. 16, 2022, https://apnews.com/article/ghis laine-maxwell-social-media-donald-trump-mar-a-lago-31741bb13f708ee68b5235926233 41eb ("A growing number of ardent Donald Trump supporters seem ready to strike back against the FBI or others who they believe go too far in investigating the former president. Law enforcement officials across the country are warning and being warned about an increase in threats and the potential for violent attacks on federal agents or buildings in the wake of the FBI's search of Trump's Mar-a-Lago home.").

[15]   *E.g.*, Sforza, *supra* n.6 (quoting Mr. Trump's social media post,  "Now you have an extremely energetic young woman, the (get this!) 'foreperson' of the Racist D.A.'s Special Grand Jury, going around and doing a Media Tour revealing, incredibly, the Grand Jury's inner workings & thoughts"); Wade, *supra* n.6 ("All 12 of the jurors in the Roger Stone case have expressed fear in court filings on Wednesday. They worry they will continue to be harassed and they fear for the safety of themselves and their families if their identities are revealed. According to The National Law Journal, jurors cited tweets from President Trump

8

regarding individual judges, the judiciary in general, and other public officials, as well as what reports have characterized as "violent rhetoric" by Mr. Trump including before his presidency.[16] In these circumstances, the common law and constitutional arguments made by the News and the AP are unpersuasive.

To be sure, as the News and the AP argue, there is a presumptive right of access by the public to civil proceedings. The Court assumes, without deciding, that the right of access usually extends to the identities of jurors. But the presumption of access, even assuming it applies to jurors' names, is not an unqualified *right* to that information. And the reliance by the objectors on a quotation from *United States v. Paccione*,[17] in which the Second Circuit described some past cases in which anonymous juries have been appropriate, is unpersuasive as it omits the Circuit's statement

---

and remarks from conspiracy theorist Alex Jones as the reason 'the threats to the jurors' safety and privacy persist' after the trial ended in November. . . . [A]round the time of Stone's guilty verdict, Trump and others latched on to a Facebook post written by the jury's forewoman, where she expressed kind words for the prosecutors in the case, bashed Trump, and called his supporters racists. Trump called her biased in his tweets and said at a rally that Stone's verdict was a 'miscarriage of justice.'"); Dan Mangan, *Trump slams Roger Stone juror right before she testifies at retrial request hearing*, CNBC, Feb. 26, 2020, https://www.cnbc.com/2020/02/25/roger-stone-judge-cites-trump-tweet-on-juror-in-hearing-on-new-trial.html ("[T]he judge barred the public from the courtroom for that hearing [for a new trial], saying that tweets by Trump and others may have raised the risk of harassment to jurors who might be testifying there.").

[16]    *See supra* n.7. *See also* Ivana Saric, *The times Trump has advocated for violence*, AXIOS, May 2, 2022, https://www.axios.com/2022/05/02/trump-call-violence-presidency; John Cassidy, *Trump's Threats of Violence Are Too Dangerous to Disregard*, THE NEW YORKER, Oct. 4, 2022, https://www.newyorker.com/news/our-columnists/trumps-threats-of-violence-are-too-dangerous-to-disregard; Fabiola Cineas, *Donald Trump is the accelerant: A comprehensive timeline of Trump encouraging hate groups and political violence*, VOX, Jan. 9, 2021, https://www.vox.com/21506029/trump-violence-tweets-racist-hate-speech.

The Court expresses no view, one way or another, as to whether Mr. Trump's statements and/or actions constitute "violent rhetoric."

[17]    949 F.2d 1183 (2d Cir. 1991).

of the overriding principle. The controlling standard is this: "In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected."[18]

On the basis of the unprecedented circumstances in which this trial will take place, including the extensive pretrial publicity and a very strong risk that jurors will fear harassment, unwanted invasions of their privacy, and retaliation by virtue of the matters referred to above, the Court finds that there is strong reason to believe that the jury needs the protection prescribed below. No less restrictive alternative has even been suggested. The presumption of access to juror names is overcome by this risk.

*Conclusion*

For the foregoing reasons, (1) the names, addresses, and places of employment of prospective jurors on the *voir dire* panel, as well as jurors who ultimately are selected for the petit jury, shall not be revealed, (2) petit jurors shall be kept together during recesses and the United States Marshal Service ("USMS") shall take the petit jurors to, or provide them with, lunch as a group throughout the pendency of the trial, and (3) at the beginning and end of each trial day, the petit jurors shall be transported together or in groups from one or more undisclosed location or locations at which the jurors can assemble or from which they may return to their respective residences.

SO ORDERED.

Dated:        March 23, 2023

Lewis A. Kaplan
United States District Judge

---

[18]    *Id.* at 1192.

SPA-114

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                                    Plaintiff,

            -against-                                              22-cv-10016 (LAK)

DONALD J. TRUMP,

                                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### MEMORANDUM AND ORDER ON
### PLAINTIFF'S *IN LIMINE* MOTION

LEWIS A. KAPLAN, *District Judge.*

            Plaintiff moves *in limine* for an order (1) adopting the evidentiary rulings recently

made in *Carroll v. Trump,* 20-cv-7311 (LAK) (*"Carroll I"*), (2) precluding the testimony of Mr.

Trump's purported rebuttal expert, Robert J. Fisher, and (3) ruling on two contested and a number

of uncontested requests made in *Carroll I* and incorporated by reference in this case. The motion is

granted in part and denied in part.


*Carroll I Evidentiary Rulings*

            The analysis of the evidentiary issues resolved in *Carroll I*[1] is entirely applicable here

---

[1]         *Carroll I,* Dkt 145; *Carroll v. Trump,* No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y.
            Mar. 10, 2023).

            Except where preceded by *"Carroll I"*, "Dkt" references are to the docket in this case.

2

with one minor exception. The exception is the issue of whether *Carroll I* is based on an alleged

sexual assault because *Carroll I* asserts only a defamation claim. But this case, unlike *Carroll I*,

contains a claim for what, if it occurred, undeniably was a sexual assault. Hence, the "based on"

analysis in the *Carroll I* decision[2] has no bearing here. Accordingly, all of the evidentiary rulings

previously made in *Carroll I* apply here.

*Mr. Fisher*

 *The Proposed Testimony*

   Ms. Carroll intends to call as an expert witness Professor Ashlee Humphreys, Ph.D.

Dr. Humphreys intends to testify principally on the extent of the dissemination of Mr. Trump's

allegedly defamatory statement of October 12, 2022, the damage, if any, of Mr. Trump's statement

to Ms. Carroll's reputation and "person brand,"[3] and the means and costs of repairing that damage.[4]

Mr. Trump seeks to call Robert J. Fisher as an expert witness, purportedly to rebut Dr. Humphreys's

conclusions. Ms. Carroll seeks the exclusion of Mr. Fisher's testimony on the grounds that (1) it

would not be proper rebuttal testimony, (2) defendant has failed to establish that Mr. Fisher's

methods in arriving at his opinions are reliable and, in any case, (3) each portion of his proposed

---

[2]

 *Carroll I*, Dkt 145 at 6-7; *Carroll*, 2023 WL 2441795 at *2-3.

[3]

 According to Dr. Humphreys, "[p]erson brands are well-known people who also possess a set of brand meanings and associations that have value." Dkt 74-3 (Humphreys Rep.) at 4.

[4]

 Dkt 74-3 (Humphreys Rep.) at 2-5 and *passim*.

SPA-116

3

testimony is inadmissible for other reasons.[5]

### *Is Mr. Fisher a Rebuttal Expert?*

The dispute regarding whether Mr. Fisher would be a proper witness to rebut Dr. Humphreys's opinions, or something else instead, is significant because there are procedural differences between principal and rebuttal experts. These are spelled out in Ms. Carroll's motion papers, not disputed by Mr. Trump, and need not be discussed here in detail.[6] Ms. Carroll's point is essentially that Mr. Fisher's deposition testimony and his report make very clear that he was not hired to rebut Dr. Humphreys's proposed testimony and did not view that as his assignment. Moreover, the vast bulk of Mr. Fisher's report, Ms. Carroll's argument goes, has nothing to do with

---

[5]    Ms. Carroll moved *in limine* also to exclude Mr. Fisher's testimony in *Carroll I*, where he was hired by Mr. Trump also purportedly to rebut Dr. Humphreys's conclusions with respect to the harm, if any, to Ms. Carroll's reputation caused by Mr. Trump's June 2019 statements. Although the two sets of reports – like the two cases – are closely related, this case concerns only Mr. Fisher's and Dr. Humphreys's reports and testimony submitted in *Carroll II* with respect to Mr. Trump's October 12, 2022 statement.

[6]    Dkt 73 (Pl. Mem.) at 4-7.

It suffices to say here that (1) a party is not obligated to identify a rebuttal expert and to disclose information concerning that witness and the proposed testimony until closer to trial compared to when it is obliged to disclose such information regarding experts called on its case-in-chief, and (2) the party against whom a rebuttal witness is called has less opportunity to respond to a rebuttal witness than it would have had if the witness were called on the calling party's case-in-chief. Fed. R. Civ. P. 26(a)(2)(D) (providing that a party must disclose expert testimony "(i) at least 90 days before the date set for trial or for the case to be ready for trial; or (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure"); *Ebbert v. Nassau Cnty.*, No. 05-cv-5445 (FB) (AKT), 2008 WL 4443238, at *14 (E.D.N.Y. Sept. 26, 2008) ("The Court finds that [p]laintiff is prejudiced by the very fact that [her expert] did not have an opportunity to respond to the new material contained in [defendant's expert's] [r]ebuttal [r]eport and [d]efendants took no steps to cure this prejudice.").

4

Dr. Humphreys's opinions.

There is a great deal of merit to Ms. Carroll's argument. Indeed, Mr. Fisher testified at his deposition, to cite but one example, as follows:

"Q.    Are there any parts of Professor Humphreys' *Carroll II* report that you sought to rebut in connection with your *Carroll II* report?

"A.    No, not at all.  But I did – I do have a section in this report . . . that does discuss Ms. Carroll's expert, but most of that is information derived from the first report, is basically on her views and opinions.  I did put one paragraph into this report. The only thing I picked out of that report in skimming it was a statistic that she had related to the number of people that might be influenced by Mr. Trump's comments.  And that's near the end of the report.  You know, I just made a reference[.]"[7]

Federal Rule of Civil Procedure 26 defines rebuttal expert testimony as testimony "intended solely to contradict or rebut evidence on the same subject matter identified [in the expert testimony offered] by another party."[8]  "[T]he [rebuttal] expert's testimony should be to 'explain, repel, counteract or disprove evidence' presented by the expert to whom he or she is responding."[9]

Mr. Fisher addresses Dr. Humphreys's findings and conclusions in the last few pages

---

[7]    Dkt 74-1 (Fisher Dep.) at 52:9-25.

[8]    Fed. R. Civ. P. 26(a)(2)(D)(ii).

[9]    *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir.2006)).

SPA-118

5

of his report.[10]  He (1) opines that Dr. Humphreys is not qualified to testify as to reputation damage

or repair, (2) evaluates and critiques Dr. Humphreys's proposal for reputational repair, specifically

her emphasis on social media, (3) comments on Dr. Humphreys's finding that only approximately

21.42 percent of those people exposed to Mr. Trump's October 12, 2022 statement, the alleged

defamation in *Carroll II*, would have been receptive to it, and (4) concludes that Ms. Carroll

"benefitted from this public dispute in terms of increased positive exposure for her as a professional

and positive enhancement of her personal character and reputation."[11]  With the exception of Mr.

Fisher's views of Dr. Humphreys's qualifications, which are not proper subjects of expert testimony

at all,[12] these aspects of Mr. Fisher's proposed testimony would be proper rebuttal to the extent that

they rest on reliable methodology.[13]

That said, the rest of Mr. Fisher's report is not rebuttal of Dr. Humphreys.  It contains

a mixture of legal opinions – including his views as to the elements of defamation and whether the

---

[10]    Dkt 87-4 (Fisher Rep.) at 22-24.

The testimony Mr. Fisher offers in rebuttal responds to findings and conclusions common to Dr. Humphreys's reports in both cases. Although the citations to certain statements in his report are to Dr. Humphreys's report in *Carroll I*, the same statements – with one exception – appear also in Dr. Humphreys's report in *Carroll II*. As a result, Mr. Fisher's admissions in his deposition that he did not seek to rebut Dr. Humphreys's report in this case is not dispositive of whether any of his proposed testimony properly constitutes rebuttal testimony.

[11]    *Id.*

[12]    *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 142 (S.D.N.Y. 2022), *motion to certify appeal denied*, No. 19-cv-1422(PAE)(VF), 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022) ("[A]t trial, [defendant's expert] may not opine on the qualification of another expert to testify on a particular subject. . . . That . . . is a judicial function . . . .").

[13]    As the issue of Mr. Fisher's qualifications have not been raised on this motion, I do not now address that question.

6

alleged false statements are defamatory under New York law,[14] that his proposed testimony satisfies

Federal Rule of Evidence 702[15] and that one of the allegedly defamatory statements "was clearly an

opinion"[16] – as well as arguments about the evidence (including that there is no evidence that Mr.

Trump knew the falsity of his statements[17] or that "[Mr. Trump and Ms. Carroll] met at

[Bergdorf]"[18]), and sundry other things.  None of these is a proper subject of expert testimony either

on a party's case-in-chief or in rebuttal.  Hence, I turn to the small part of the proposed testimony

that in substance is arguably proper rebuttal testimony to determine whether it is inadmissible on

other grounds.

### Standard for Reliability of Expert Testimony

Trial courts are required to ensure that any expert testimony that is admitted is

relevant and reliable.[19]  Under Federal Rule of Evidence 702, expert testimony is admissible if:

"(a) the expert's scientific, technical, or other specialized knowledge will help the

---

[14]  Dkt 87-4 (Fisher Rep.) at 14, 24.

[15]  *Id.* at 13.

[16]  *Id.* at 16.

[17]  *Id.* at 14-16.

[18]  *Id.* at 16.

[19]  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 42 (S.D.N.Y. 2016) ("Trial courts serve as gatekeepers for expert evidence and are responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'") (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

trier of fact to understand the evidence or to determine a fact in issue;

"(b) the testimony is based on sufficient facts or data;

"(c) the testimony is the product of reliable principles and methods; and

"(d) the expert has reliably applied the principles and methods to the facts of the case."[20]

"When evaluating the reliability of an expert's testimony, the court must 'undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'"[21] A district court "must focus on the 'principles and methodology' employed by the expert, not on the conclusions reached."[22] Where the expert's testimony does not rely on scientific methods, "the court may permit testimony 'where a proposed expert witness bases her testimony on practical experience rather than scientific analysis.'"[23] Courts have excluded rebuttal testimony where the rebuttal expert "failed to employ a reliable methodology or illustrate how [the expert's] experience informed [his or her] analysis"[24] or where the rebuttal expert "was unable to articulate a specific process or

---

[20]    Fed. R. Evid. 702.

[21]    *Scott*, 315 F.R.D. at 43 (quoting *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002)).

[22]    *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 595).

[23]    *Scott*, 315 F.R.D. at 43 (quoting *Davis v. Carroll*, 937 F.Supp.2d 390, 412 (S.D.N.Y.2013)).

[24]    *Scott*, 315 F.R.D. at 44 (citing *Cospelich v. Hurst Boiler & Welding Co., Inc.*, 08-cv-46(LG)(JMR), 2009 WL 8599064, at *2 (S.D. Miss. July 7, 2009)).

8

methodology by which [the expert] reached [his or her] conclusions."[25]

*Reliability of Mr. Fisher's Proposed Rebuttal Testimony*

Mr. Fisher's conclusion that Ms. Carroll "benefitted from this public dispute in terms of increased positive exposure for her as a professional and positive enhancement of her personal character and reputation,"[26] if received in evidence, would contradict Dr. Humphreys's conclusion that Mr. Trump's October 12 statement "caused short- and long-term harm to Ms. Carroll's person brand" and that her "reputational value has been diminished due to [Mr. Trump's] [s]tatement."[27] His purported explanation of this conclusion discusses Ms. Carroll's preexisting "positive public profile," certain public perceptions of Mr. Trump and his "perceived public reputation for inappropriate sexual contact with women," the Me Too movement, and Ms. Carroll's public exposure and her "[p]ositive [m]edia [e]xposure" following her public rape accusation against Mr. Trump."[28] And while Mr. Fisher is entitled to his personal opinion, the question here is whether that personal opinion reflects the application of a reliable methodology, as it must be in order for him to be permitted to express that opinion to the jury. And Mr. Fisher has made clear that it does not.

Mr. Fisher states in his report that "the methodology [he] used in this case is

---

25

    *Id.* (citing *Rondor Music Int'l Inc. v. TVT Records LLC*, 05-cv-2909(JTL), 2006 WL 5105272, at *3 (C.D. Cal. Aug. 21, 2006)).

26

    Dkt 87-4 (Fisher Rep.) at 24.

27

    Dkt 74-3 (Humphreys Rep.) at 5.

28

    Dkt 87-4 (Fisher Rep.) at 18-21.

9

consistent with that which is standard operating procedure that public relations and communications professionals as well as expert witnesses use when addressing issues and situations for clients like those in this case . . . ."[29] This methodology purportedly includes, *inter alia*, "[a]pplying the principles of negative communications to this case as appropriate" and "follow[ing] peer accepted procedures in both the public relations and expert witness professions as to how to analyze and assess situations which negatively impact reputations as well as devise strategies, plans and actions to restore them."[30] Nowhere, however, does he explain what the "peer accepted procedures" or "principles of negative communications" are, let alone how his application of those procedures and principles led him to his conclusion. He states also that his "input in this report [is] based on the information [he] obtained and reviewed in this case," which consists of (1) litigation documents in *Carroll I* and *Carroll II*, (2) a total of *six* media articles about Ms. Carroll and/or these cases, and (3) whatever he saw in his "[i]nternet [r]esearch," on which he testified he spent "at most an hour" and apparently simply "Googled" Ms. Carroll.[31] In short, there is no reliable basis for Mr. Fisher's conclusion. Indeed, when asked during his deposition how he reached his conclusion that Ms. Carroll experienced a "net benefit" from her dispute with Mr. Trump, he testified:

> "A. * * * I think that factoring in common sense and logic, a lot of positive things would have come out from his, for lack of a better word, tirade against her based on her comments that he raped her.

---

[29] *Id.* at 12.

[30] *Id.* at 13.

[31] *Id.*; Dkt 74-1 (Fisher Dep.) at 47:1, 148:10-11.

"Q.    Is there any data that supports that conclusion?

"A.    Not data, no. There are no data. It's just -- you know, it's just basic in my assessment based on my background and expertise and experience in the field of communications particularly as it relates to * * * "[32]

He further explained:

"Q.    So besides that sort of personal experience you had [], did you -- is there any data to quantify the media coverage that Ms. Carroll received after Mr. Trump's defamation as compared to before?

"A.    Well, I think, yes. I think if you're just doing an analysis or Google or something like that, you can see that there weren't hardly any articles on her prior to the Trump incident, for lack of a better word, and now -- exponentially her visibility has risen tremendously. I mean, the bottom line -- I just used myself as an example because I had never heard of her before I started reading articles about Trump being accused of rape and whatever. And most of those articles, and I did analysis in this report which is in the next section, by the way, on 20 here is that the

* * *

"A. [Question omitted from record filed with the Court] . . . No. From looking online and looking at the first ten pages of her Google presence, it was clear that there was a tremendous increase in articles about her or exposure than there was prior to that.

―――――――――――――

[32]    Dkt 74-1 (Fisher Dep.) at 130:14-25.

11

"Q.      By looking -- by your reference to looking at the first ten pages of

Google, you just mean the nature of the search results that you would see if you put

in E. Jean Carroll's name in Google?

"A.      Yeah, in other words, you know, each page has 10 to 12 things on

it and you go through pages 2, 3, 4, 5. You know, I saw other references to Ms.

Carroll but not nearly the weight of the exposure she received after she came forward

to accuse Mr. Trump of rape."[33]

Mr. Fisher's blanket invocation of his experience in the communications field to

justify his conclusion does not suffice.  Instead, an "expert must 'show how his or her experience

. . . led to his conclusion,'"[34] which Mr. Fisher has not.  His observation that he saw more Google

search results mentioning Ms. Carroll after she publicly accused Mr. Trump of rape and his

discussion in his report of four news articles with positive comments on Ms. Carroll after her public

accusation, in the perhaps one hour he spent on his Googling, also do not make his methodology

reliable.[35]  The number of Google hits in a brief search, without any investigation of the nature of

those results or the full extent of the relevant universe of results, says nothing about whether Ms.

Carroll has had more positive compared to negative or neutral media coverage after her public

accusation against Mr. Trump. Four news articles with positive comments, or even the six news

---

[33]

     *Id.* at 195:7-25, 197:1-17.

[34]

     *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, No. 1:00-1898, 2008 WL
1971538, at *6 (S.D.N.Y. May 7, 2008) (quoting *SR Int'l Bus. Ins. Co., Ltd. v. World Trade
Ctr. Props.*, LLC, 467 F.3d 107, 132 (2d Cir. 2006)).

[35]

     Dkt 87-4 (Fisher Rep.) at 20-21 (discussion of four news articles).

12

articles in total cited in his report, are insufficient to support a conclusion that Ms. Carroll has

experienced a "net benefit" from her dispute with Mr. Trump. The other elements of his analysis fare

no better. The gist of his reasoning – essentially that more people think favorably of Ms. Carroll than

they do of Mr. Trump, and therefore she has benefitted more than she has suffered from Mr. Trump's

remarks – lacks the kind of foundation in facts, evidence, and/or experience that is demanded of

expert witnesses. It is also unresponsive to the key issue on which he purportedly would be called

– whether and to what extent Ms. Carroll was harmed by Mr. Trump's allegedly defamatory

statement.

   Mr. Fisher's other rebuttal testimony similarly is unreliable. Mr. Fisher does not

explain how his experience informs his criticisms of Dr. Humphreys's proposal for reputation repair.

Nor does he rely on any specific facts, data, or evidence. Indeed, his entire analysis of Dr.

Humphreys's proposal for reputation repair contains no citation other than to Dr. Humphreys's

report.[36] As a result, it is unclear how he reached his conclusions that "[t]he most successful type

of communications program features dissemination of information through multiple communications

channels giving each sufficient budget to effectively ensure all bases are covered in terms of reaching

the target audiences," the "relatively small size of the audience that can be impacted or influenced

by [Dr. Humphreys's proposal]," that "there is no need for a massive online and social media

campaign . . . when the mass media would give coverage for free . . . .," or that, if Ms. Carroll wins,

"the positive outcome of the litigation would significantly repair her reputation and a program would

---

[36] *Id.* at 21-24.

13

only be needed to build on that news and lessen the need for such a major program."[37] Although one could hypothesize that his opinions were informed by his experience in the communications and reputation management fields, how exactly that experience leads to those opinions remains unknown and would be nothing more than speculation. Moreover, almost all of Mr. Fisher's "analysis" with respect to Dr. Humphreys's proposal consists of potential discrepancies or shortcomings in Dr. Humphreys's background and report that can be observed readily by jurors and/or brought out in cross examination without benefitting from any aid by an expert.[38] The same is true of Mr. Fisher's comment – which he characterizes as a "reference" in his deposition – that Dr. Humphreys is "reporting that less than one in four people might possibly have given any credence to [Mr. Trump's] alleged false statements."[39] His opinions as to Dr. Humphreys's report and proposal therefore must be excluded.


*Contested Issues First Raised in Carroll I But Not Yet Ruled Upon*

    *Reference to Ms. Carroll's Public Statements Concerning DNA Evidence*

        Ms. Carroll testified at her deposition in *Carroll I* as follows:

            "Q.    \* \* \*  [Y]ou stated in the public that you had DNA from the former

president; is that correct?

            "A.    Yes.

---

[37]    *Id.* at 23-24.

[38]    *Id.* at 21-24 (purporting to point out inconsistencies or "admissions" by Dr. Humphreys in her report).

[39]    *Id.* at 24.

14

"Q.    Why did you say that?

"A.    Because we sent the dress to be examined and then we got back a

report. Robbie published it.

"Q.    What did that report say that you recall? And don't divulge anything

that's privileged, please, so conversations between you and your attorney I don't want

to know.

"Q.    It is so far above my head. The reports about DNA are so detailed and

so much scientific rigor is required to understand even the opening paragraph, I can't

really -- I can't say."[40]

Ms. Carroll seeks to preclude any testimony or commentary regarding DNA

evidence.[41] Mr. Trump responds that "Defendant is entitled to cross-examine Plaintiff with respect

to the fact that she publicly, and falsely, proclaimed that she was in possession of Defendant's

DNA."[42] Cross-examination on that point, he argues, would be relevant to Ms. Carroll's credibility

---

[40]

*Carroll I,* Dkt 137 (Habba Decl.), *Carroll I,* Dkt 137-5 (Ex. E) at 217:23-218:16.

[41]

*Carroll I,* Dkt 134 (Pl. Mem.) at 27-30; *see also Carroll II,* Dkt 86 at 3.

[42]

*Carroll I,* Dkt 136 (Def. Mem.) at 19; *see also* Dkt 75 (Def. Mem.) at 1 (incorporating by
reference his arguments in opposition to Ms. Carroll's motion *in limine* in *Carroll I*).

Mr. Trump argues that Ms. Carroll made "numerous public assertions that she *obtained*
Defendant's DNA." *Carroll I,* Dkt 136 at 20-21 (emphasis added). None of Ms. Carroll's
posts on social media that he cited, however, refer to her having "obtained" his DNA.
Instead, as she did also in her deposition testimony, her posts all refer to his DNA being on
her dress. Indeed, in one of the posts, she wrote that she is "STILL waiting for Trump to
provide his DNA sample to be tested against the dress." E. Jean Carroll, TWITTER, May 1,
2020, *available at* https://twitter.com/ejeancarroll/status/1256301599426785280.

15

and Mr. Trump's contention that she fabricated her defamation claim to garner publicity.[43] But the probative value of such examination – if it would have any at all – would be extremely modest, and it would be outweighed substantially by the likelihood of unfair prejudice coupled with the risk of confusion of the issues and a waste of time that would be caused by permitting it. This is apparent when one considers both the deposition testimony and the whole story of DNA in this case.

Of course, if Ms. Carroll simply and knowingly had made a false claim that Mr. Trump's DNA is on the dress, that would be a fit subject for cross examination. But the record in fact suggests something else. There is evidence before the Court that there is male DNA on the dress in question but that the identity of the source could not be established.[44] It might be Mr. Trump's DNA; it might be someone else's. The lab could not reach such a conclusion at least in part because Mr. Trump refused to allow the taking of a sample of his DNA for comparison despite a request that had been outstanding for years.[45] As a result, neither party intends to adduce any scientific evidence concerning the recovery of male DNA from the dress or the laboratory analysis that was done. And

---

[43]     *Carroll I*, Dkt 136 at 20.

[44]     *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 56, Ex. A (DNA test report attached to Ms. Carroll's notice in which she sought Mr. Trump's DNA) at 22-24.

[45]     This is detailed in another opinion in this case. Dkt 56; *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023).

About ten weeks before this case is set to be tried, Mr. Trump proposed a "deal" in which he offered to provide a DNA sample but only on the condition that this Court require Ms. Carroll first to turn over to him a previously undisclosed appendix to the DNA test report. The Court denied Mr. Trump's application in part because "Mr. Trump [gave] the Court no reason to believe that pursuing that course would be likely to yield any admissible evidence, let alone a guarantee that anything important would come of it." Dkt 56 at 4; *Carroll*, 2023 WL 2006312 at *2.

16

several things follow from these facts.

      First, the premise of Mr. Trump's argument is incorrect, as Ms. Carroll's statement has not been proven either true or false. She might have been right. She might have been wrong. Or it might be impossible to determine whether she was right or wrong. In any case, the failure of Mr. Trump to allow a DNA sample prevented the laboratory from even trying to determine whether the male DNA found on Ms. Carroll's dress is his.

      Second, as indicated, there will be no scientific DNA evidence at this trial. Cross-examination of Ms. Carroll about her statement, while potentially relevant to her credibility,[46] in these circumstances would be susceptible to an inference (and the risk of an argument by Mr. Trump) that would be unfairly prejudicial – namely, that the reason that Ms. Carroll did not adduce scientific DNA evidence at the trial is that Mr. Trump's DNA is not on the dress and, perhaps, that this proves her sexual assault allegation false.[47] The unfairly prejudicial nature of such an inference, let alone the possible argument, is apparent – there is no such evidence, at least in part due to Mr. Trump's

---

[46] There are a number of possible reasons Ms. Carroll made public statements implying that Mr. Trump's DNA was on her dress. She may have leapt to an incorrect conclusion about the meager laboratory findings that do exist. She may have understood the laboratory conclusion but exaggerated based upon the fact that she allegedly knew that Mr. Trump had been in contact with the dress, and believed that once she obtained his DNA to test against the dress, there would be a match. Or perhaps she knowingly lied. There may be other explanations. But whatever the reason, the fact that the statement may have been inaccurate has at least some relevance.

[47] Indeed, Mr. Trump in his motion to compel production of an appendix to a DNA report obtained by Ms. Carroll in January 2020 "surmise[d] that the answer to [why Ms. Carroll did not produce previously the appendix] is that she knows [Mr. Trump's] DNA is not on the dress because the alleged sexual assault never occurred." Dkt 51 at 3. The Court explained that his surmise "of course is factually impossible for a simple reason: Mr. Trump never provided a DNA sample for the purpose of comparing it to the DNA on her dress. No one knows whether his DNA is on the dress." Dkt 56 at 20, *Carroll*, 2023 WL 2006312 at *8.

failure to allow the DNA sample.

Third, that unfair prejudice to Ms. Carroll could be avoided by placing before the jury the facts concerning Mr. Trump's failure to allow collection of his own DNA. But to do so would require (1) scientific evidence concerning the testing of the dress stains as well as the fact that the DNA on the dress could not be tied to or eliminate Mr. Trump as its source without Mr. Trump's DNA, and (2) evidence of Mr. Trump's refusal to provide it.  It would require evidence also as to why the presence or absence of Mr. Trump's DNA on the dress would go only to whether Mr. Trump was in Ms. Carroll's presence or touched her, but would not in either case be dispositive of her sexual assault claim.[48] Thus, any questioning of Ms. Carroll about the statement upon which Mr. Trump relies would lead to consumption of a good deal of trial time, would be distracting and needlessly confusing for the jury, and ultimately would not contribute materially to a fair result in this case.

Rule 403 of the Federal Rules of Evidence permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time . . . ."[48]  In these circumstances, the Court finds that pursuit of such cross-examination or argument touches heavily upon each of the quoted bases for exclusion.  Those considerations substantially outweigh whatever probative value might be obtained by going down that path.  Accordingly, the Court excludes any evidence or argument by either party concerning DNA.

---

[48]    The laboratory findings did not find semen on the dress. Dkt 56 at 7; *Carroll*, 2023 WL 2006312, at *3.

[48]    Fed. R. Evid. 403.

18

*Preclusion of Five of Mr. Trump's Proposed Witnesses*

Mr. Trump lists in the joint pretrial order five witnesses he may call at trial – namely, David Haskell, Elizabeth Dyssegaard, Erin Hobday, Laurie Abraham, and Sarah Lazin – whom Ms. Carroll seeks to preclude from testifying. She seeks to exclude them on the grounds that Mr. Trump was obliged under Rule 26(a) and (e) to have disclosed them and that he might call them as witnesses far earlier in the case and that his delay was prejudicial because it prevented Ms. Carroll from taking their depositions.

Ms. Carroll herself disclosed four of the five witnesses – all except Ms. Hobday – in response to Mr. Trump's interrogatory in June 2022 in *Carroll I*, which asked her to "[i]dentify all [p]ersons who have any knowledge or information about any of the allegations in the [c]omplaint, and . . . the subject matter of the knowledge that each [p]erson possesses."[49] Ms. Carroll discussed Ms. Hobday during her deposition on October 14, 2022.[50] Mr. Trump accordingly argues that he was not obliged to disclose them under Rule 26 because "they were known to—in fact, disclosed by—Plaintiff" and even if he was, his violation was harmless because they already were known to Ms. Carroll.[51] Ms. Carroll contends that her knowledge of these witnesses is immaterial because Mr. Trump was obliged to inform her that he intended to call these witnesses at trial.[52] There is case law

---

[49]     *Carroll I*, Dkt 137-6 at 5.

[50]     *Carroll I*, Dkt 137-5 (Ex. E, Carroll Dep.) at 178:12-25, 188:25-189:19.

[51]     *Carroll I*, Dkt 136 (Def. Mem.) at 21.

[52]     Dkt 86 (Pl. Reply Mem.) at 2.

19

in favor of both positions.[53]

The fundamental purpose of Rule 37(c)(1) – which permits courts to preclude testimony if a party fails to satisfy its disclosure obligations under Rule 26 – is "to prevent the practice of 'sandbagging' an opposing party with new evidence."[54] With this principle in mind, the Court agrees with Mr. Trump that he was not obliged to disclose under Rule 26 the four witnesses whom Ms. Carroll disclosed in her June 2022 interrogatory responses as persons knowledgeable of the allegations in the complaint, or, if he was, his violation would be harmless. Each of the four witnesses, as identified by Ms. Carroll, were individuals who she informed about Mr. Trump's alleged assault prior to the publication of the article with an excerpt with Ms. Carroll's account of the alleged rape from her then-forthcoming book in *New York* magazine.[55] Each was involved in

---

[53]     *E.g.*, *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011), *aff'd in part, vacated in part sub nom.*, 726 F.3d 119 (2d Cir. 2013) ("Because [plaintiff] became aware of [witnesses] at . . . depositions, the [defendants] did not have a duty to supplement their Rule 26 initial disclosures."); *Howard Univ. v. Borders*, No. 20-cv-04716 (LJL), 2022 WL 3568477, at *2 (S.D.N.Y. Aug. 17, 2022) (concluding that the plaintiff was not obligated to supplement its initial disclosures and that even if it was, the violation would be harmless, where "[d]efendants were well aware of [witness's] identity and her role from the beginning of the litigation and that it was possible that [plaintiff] might choose to use her as a witness."). *But see, e.g.*, *Pal v. New York Univ.*, No. 06-cv-5892 (PAC) (FM), 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008) ("[Plaintiff's] knowledge of the existence of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if [defendant] informed [plaintiff] that it might call the witness in support of its claims or defenses."); *Lebada v. New York City Dep't of Educ.*, No. 14-cv-758 (LAK) (GWG), 2016 WL 626059, at *5 (S.D.N.Y. Feb. 8, 2016), *objections overruled*, No. 14-cv-0758 (LAK), 2016 WL 8453417 (S.D.N.Y. May 16, 2016) ("[T]he mere discussion of an individual in documents or deposition testimony is insufficient to create a duty on defendants to assume that such an individual is a witness that plaintiffs 'may use to support [their] claims' under Rule 26(a)(1)(A)(i).").

[54]     *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) (internal quotation marks in original) (quoting *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y.2004)).

[55]     *Carroll I*, Dkt 137-6 at 5.

some way with Ms. Carroll's book and/or the *New York* magazine article, both of which are relevant to issues in this case. These witnesses (as well as the fifth witness, Ms. Hobday) received notices of subpoenas by Mr. Trump, although it is not clear which, if any, was served.[56] In these circumstances, there was sufficient notice – albeit just barely – to Ms. Carroll that there was a possibility they would be called as witnesses by Mr. Trump and sufficient time for Ms. Carroll to have deposed them. Mr. Trump's failure to disclose them does not equate to him "sandbagging" Ms. Carroll.

A different conclusion is appropriate with respect to Ms. Hobday. Unlike the other four witnesses, neither Ms. Carroll nor Mr. Trump disclosed Ms. Hobday as a person with relevant knowledge. Ms. Hobday was mentioned only in Ms. Carroll's deposition in October 2022, during which Ms. Carroll identified her as the managing editor of *Elle* magazine who advised Ms. Carroll that her contract with the magazine was being terminated.[57] Nothing about the context in which Ms. Hobday was mentioned, nor her actual role as discussed in the excerpts of Ms. Carroll's deposition that were provided, demonstrate that Ms. Carroll should have expected she might be called as a witness by Mr. Trump. He therefore was obligated to disclose Ms. Hobday in his Rule 26 disclosures. His failure to do so prejudiced Ms. Carroll by preventing her from deposing her or even knowing that she perhaps should depose her. The circumstances with respect to Ms. Hobday justify the drastic but occasionally warranted sanction of precluding her from testifying at trial.

---

[56]     Dkt 86 (Pl. Reply Mem.) at 3, 3 n.3.

[57]     *Carroll I*, Dkt 137-5 (Ex. E, Carroll Dep.) at 178:12-25.

*Uncontested Issues First Raised in Carroll I But Not Yet Ruled Upon*

      Ms. Carroll has incorporated in her motion in *Carroll II* several requests for *in limine* relief on which the Court has not yet ruled but that Mr. Trump has not opposed.  Accordingly, those requests are granted.

*Conclusion*

      Plaintiff's motion *in limine* (Dkt 72) is granted to the extent that:

      (1) plaintiff's prior consistent statements to Mss. Birnbach and Martin about defendant's alleged sexual assault are admissible;

      (2) the testimony of Mss. Stoynoff and Leeds regarding their experiences involving the defendant come within Federal Rules of Evidence 413 and 415 and will not be excluded under Rule 403;

      (3) defendant is precluded from giving or eliciting testimony concerning information allegedly known to persons whom he has not disclosed under Rules 26(a) and (e);

      (4) both parties are precluded from any testimony, argument, commentary or reference concerning DNA evidence;

      (5) defendant is precluded from cross-examination or eliciting evidence regarding Stephanie Grisham's prior misdemeanor convictions, her unrelated pending lawsuit, and her use of a prescription medication;

      (6) defendant is precluded from commenting upon or eliciting any evidence regarding plaintiff's choice of counsel or her counsel's activities outside the

SPA-135

22

litigation between plaintiff and defendant;

(7) Mr. Fisher is precluded from testifying at trial as a rebuttal expert witness; and

(8) defendant is precluded from calling Ms. Hobday to testify at trial.

Plaintiff's motion *in limine* (Dkt 72) is denied to the extent that defendant is not precluded from calling Mss. Dyssegaard, Abraham, Lazin, and Mr. Haskell at trial.

SO ORDERED.

Dated:          March 27, 2023

                                        /s/ Lewis A. Kaplan
                                        Lewis A. Kaplan
                                        United States District Judge

SPA-136

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                            Plaintiff,


            -against-                                                22-cv-10016 (LAK)


DONALD J. TRUMP,

                            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


        Appearances:


                            Roberta Kaplan
                            Joshua Matz
                            Shawn Crowley
                            Matthew Craig
                            Trevor Morrison
                            Michael Ferrara
                            KAPLAN HECKER & FINK LLP

                            *Attorneys for Plaintiff*

                            Joseph Tacopina
                            Matthew G. DeOreo
                            Chad Derek Seigel
                            TACOPINA SEIGEL & DEOREO, P.C.

                            Alina Habba
                            Michael T. Madaio
                            HABBA MADAIO & ASSOCIATES LLP

                            *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

Plaintiff E. Jean Carroll alleges in this case ("*Carroll II*") and a second very closely related case ("*Carroll I*") that businessman Donald J. Trump, as he then was, raped her in a New York department store in the mid 1990s. In *Carroll I*, she accuses Mr. Trump only of defaming her in a series of statements he issued in June 2019, shortly after Ms. Carroll publicly accused him of rape. In this action, Ms. Carroll brings two other closely related claims. First, she seeks to recover damages and other relief for the alleged rape pursuant to a newly-enacted New York law, the Adult Survivors Act ("ASA"), which created a one-year period within which persons who allegedly were sexually assaulted as adults could sue their alleged assaulters. Second, she alleges that Mr. Trump libeled her in a statement he published on October 12, 2022 on Truth Social, his social media platform.

The matter now is before the Court on Mr. Trump's motion for partial summary judgment dismissing only the libel claim based on Mr. Trump's October 12, 2022 statement. He contends that it is barred by the "absolute litigation privilege" which he mistakenly locates in Section 74 of the New York Civil Rights Law and which in relevant part provides:

> "A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."[1]

For the reasons discussed below, Mr. Trump's motion is denied.

---

[1]  N.Y. Civ. Rights Law § 74.

SPA-138

3

### *Facts*

*Mr. Trump's Allegedly Defamatory June 2019 Statements*

Ms. Carroll's rape allegation first became public on June 21, 2019, when *New York* magazine published an excerpt from her then-forthcoming book that described Mr. Trump's alleged assault of her.[2]  That same day, Mr. Trump issued a statement that was published on Twitter by the press:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

> "Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

---

[2]    The Court assumes familiarity with its prior opinions, which describe in detail the facts and procedural histories of both actions involving these parties. Doc. No. 20-cv-7311 (*Carroll I*), Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); *Carroll I*, Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); *Carroll I*, Dkt 96, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022); *Carroll I*, Dkt 145, *Carroll v. Trump*, No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Dkt 95, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); Dkt 92; Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023); Dkt 38, *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023).

Except where preceded by *"Carroll I"*, "Dkt" references are to the docket in this case.

SPA-139

4

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[3]

On the following day, June 22, 2019, Mr. Trump made other statements to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

"[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

"[Reporter]: You were in a photograph with her.

"[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going

---

[3]  *Carroll I*, Dkt 6-1 (Cpt.) at 15, ¶ 82.

on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

"And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

"New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

"It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

"You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

6

"But here's a case, it's an absolute disgrace that she's allowed to do that."[4]

Finally, on June 24, 2019, Mr. Trump stated in an interview with *The Hill*: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[5]

*Carroll I*

*The Complaint*

In November 2019, approximately five months after Mr. Trump's statements, Ms. Carroll sued Mr. Trump for defamation in the case now referred to as *Carroll I*. Her complaint, filed originally in a state court in New York, in relevant part alleges:

> "11. When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the rape. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of rape. For good measure, he insulted her physical appearance.

> "85. In the June 21 statement, Trump falsely stated that he did not rape

---

[4]    *Id.* at 17, ¶ 91.

[5]    *Id.* at 19, ¶ 97.

Carroll.

"86. In the June 21 statement, Trump falsely stated that he had never met Carroll.

"87. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.

"88. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales.

"89. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation to carry out a political agenda.

"90. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation as part of a conspiracy with the Democratic Party.

* * *

"93. In the June 22 statement, Trump falsely stated that he did not rape Carroll.

"94. In the June 22 statement, Trump falsely stated that he had no idea who Carroll was.

"95. In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

"96. In the June 22 statement, Trump falsely implied and affirmatively

SPA-143

8

intended to imply that Carroll had been paid money to invent the rape accusation against him.

* * *

"100. In the June 24 statement, Trump falsely stated that he did not rape Carroll.

* * *

"116. Trump's other defamatory statements about Carroll in June 2019 – that she had fabricated the rape accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment-rested on the express or deliberately – rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false."[6]

*Mr. Trump's Answer*

Mr. Trump served an answer, meaning a responsive court pleading, in *Carroll I*. His response to each of the complaint's allegations quoted above was that he "[d]enies the allegations contained in [the corresponding paragraph of the complaint]."[7]  He asserted also an affirmative

---

[6]

    *Id.* at 3,¶ 11, 16-17, ¶¶ 85-90, 18, ¶¶ 93-96, 20, ¶ 100, 22, ¶ 116.

[7]

    *Carroll I*, Dkt 14-69 (Def. Answer), 1 ¶ 11, 6 ¶¶ 85-90, 7, ¶¶ 93-96, 100, 9 ¶ 116.

9

defense that "[t]he alleged [June 2019] defamatory statements are true."[8]  He did not elaborate on

his denials of Ms. Carroll's allegations or on his affirmative defense in his answer.  He said nothing

more in his answer in *Carroll I* about Ms. Carroll's allegations.

*Mr. Trump's October 12, 2022 Statement*

On August 8, 2022, more than three months before the effective date of the ASA, Ms.

Carroll's counsel announced privately to her adversaries and to the Court that Ms. Carroll would sue

Mr. Trump for damages for the alleged rape itself, as distinguished from the allegedly defamatory

statements of June 2019, once the ASA became effective on November 24, 2022. That

announcement was filed publicly on September 20, 2022.

On the morning of October 12, 2022, this Court denied for the second time Mr.

Trump's motion to substitute the United States for him as the defendant in *Carroll I* and it denied

his motion to stay the action.[9]  That night, Mr. Trump issued the following statement on his social

media outlet:

"This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in

this Country, but especially in New York State (just look at Peekaboo James), is a

broken disgrace. You have to fight for years, and spend a fortune, in order to get your

reputation back from liars, cheaters, and hacks. This decision is from the Judge who

was just overturned on my same case. I don't know this woman, have no idea who

---

[8]     *Id.* at 11,¶ 150.

[9]     *Carroll I*, Dkt 96; *Carroll*, 2022 WL 6897075 at *7.

Case 23-793, Document 75, 11/20/2023, 3592057, Page148 of 224

10

she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years.  And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country. Her lawyer is a political operative and Cuomo crony who goes around telling people that the way to beat Trump is to sue him all over the place. She is suing me on numerous frivolous cases, just like this one, and the court system does nothing to stop it. In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me.

11

This can only happen to 'Trump'!"[10]

*Carroll II*

Within ten minutes after the ASA became effective, on November 24, 2022, Ms. Carroll filed *Carroll II* against Mr. Trump. In addition to her claim under the ASA for damages for the alleged rape, Ms. Carroll sued for common law defamation based on allegedly false and defamatory statements about her contained in Mr. Trump's October 12, 2022 statement.[11]

*The Pending Motion*

Mr. Trump seeks dismissal on summary judgment of Ms. Carroll's defamation claim based on his October 12, 2022 statement. He argues that the alleged defamatory statements in his October 12 statement "are protected by the absolute litigation privilege under N.Y. Civ. Rights Law § 74" because "in the October 12, 2022 [s]tatement, [he] was merely writing about Plaintiff's pending lawsuit against him (*Carroll I*), while referencing Carroll's claims in *Carroll I*, his positions taken in *Carroll I*, and background information concerning *Carroll I*."[12]

---

[10]
    Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

[11]
    The portions of Mr. Trump's October 12, 2022 statement that are not statements of or about Ms. Carroll are not part of her defamation claim. Mr. Trump's statement is reproduced above in full for purposes of resolving this motion.

[12]
    Dkt 67 (Def. Mem.) at 1.

12

### *Discussion*

Mr. Trump's argument fails for two reasons. First, his October 12 statement is not a "report of any judicial proceeding." Second, *even if* his October 12 statement were a report of a judicial proceeding within the meaning of Section 74 of the New York Civil Rights Law, he has not demonstrated that it was a "fair and true report of any judicial proceeding."

### *The Absolute Litigation Privilege Under Section 74 of the New York Civil Rights Law*

"New York law recognizes certain privileges that shield an individual from liability for defamation."[13]   At common law, the "litigant's privilege" shields "one who publishes libelous statements *in a pleading or in open court* for the purpose of protecting litigants' zeal in furthering their causes."[14]   "[A] statement made in the course of a judicial proceeding is absolutely privileged under New York common law so long as it is considered material and pertinent to the litigation."[15] This absolute litigation privilege does not extend to out-of-court statements. Out-of-court statements instead are dealt with by Section 74 of the New York Civil Rights Law, which creates what often is called the "fair report privilege." And it is important to note that "[t]he [absolute litigation] privilege for in-court statements is considerably broader in scope than that for out-of-court reports

---

[13]    *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 629 (S.D.N.Y. 2022).

[14]    *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 217 (E.D.N.Y. 2012) (emphasis added) (quoting *Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear Inc.*, 608 F. Supp. 1187, 1195 (S.D.N.Y. 1985)).

[15]    *Id.*

relating to the proceedings."[16]

As stated above, Section 74 in pertinent part provides that "[a] civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding . . . ."[17]  "The purpose of providing immunity to fair and true reports of judicial proceedings is said to be to encourage the dissemination of information concerning the judicial branch of government and thereby to serve the public interest 'in having proceedings of courts of justice public, not secret, for the greater security thus given for the proper administration of justice.'"[18] Originally "a qualified privilege for newspapers publishing 'a fair and true report' of 'any judicial, legislative, or other public official proceedings,'" the law was amended in 1930 "to make the privilege absolute" and ten years later "was extended from newspapers to 'any person, firm or corporation.'"[19]

*Mr. Trump's Statement Is Not a "Report of a Judicial Proceeding"*

Mr. Trump argues that his October 12 statement is privileged under Section 74

---

[16]

  *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 294 (S.D.N.Y. 2005).

[17]

  N.Y. Civ. Rights Law § 74.

[18]

  *D'Annunzio*, 876 F. Supp. 2d at 217 (citation omitted); *see also Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 328 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, No. 21-2068-CV, 2022 WL 1013982 (2d Cir. Apr. 5, 2022) ("The New York legislature enacted this statute in order to avoid stifling 'an active, thriving, and untrammeled press' and to ensure that the press receive 'broad protection.'") (quoting *Idema v. Wagner*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citation omitted), *aff'd*, 29 F. App'x 676 (2d Cir. 2002)).

[19]

  *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (2d Dept. 2009) (citations omitted).

14

because it was nothing more than a summary and/or restatement of the allegations he made and

positions he asserted in his *Carroll I* answer.[20]  Specifically, he contends that his statement merely

summarized and/or repeated his denials and affirmative defense in relation to Ms. Carroll's

allegations that he (1) falsely stated he did not rape her, (2) falsely stated he did not know who she

was, and (3) falsely implied that she invented the rape accusation in order to increase her book

sales.[21]  Mr. Trump contends also that his statement was about *Carroll I* because of two references

it contains: (1) a portion of the first sentence of his statement that "[t]his 'Ms. Bergdorf Goodman

case' is a complete con job", and (2) the third sentence of his statement that "[t]his decision is from

the Judge who was just overturned on my same case."[22]  Neither of these references, considered

individually or together, nor his statement as a whole, brings the statement within the meaning of

"report of any judicial proceeding" under Section 74.

The standard to determine "whether a report qualifies for the fair report privilege is

whether 'the ordinary viewer or reader' can 'determine from the publication itself that the

publication is reporting on [a judicial] proceeding.'"[23]  "In other words, '[i]f the context in which the

statement [is] made make[s] it impossible for the ordinary viewer [or reader] to determine whether

---

[20]
     Dkt 67 (Def. Mem.) at 4-5.

[21]
     *Id.* at 4.

[22]
     Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

[23]
     *Kinsey v. New York Times Co.*, 991 F.3d 171, 178 (2d Cir. 2021) (alteration in original)
(quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 216 (N.D.N.Y. 2014)).

15

[the publication] was reporting on a judicial proceeding, the absolute privilege does not apply.'"[24]
As another court in this Circuit explained:

> "An overlap between the subject matter of the report and the subject matter
> of a proceeding does not suffice; the ordinary viewer or reader must be able to
> determine from the publication itself that the publication is reporting on the
> proceeding. . . . Thus, there must be some perceptible connection between the
> challenged report and the[] proceeding. . . . How 'direct' this connection must be has
> not been clearly defined. . . . And, in light of the broad construction of § 74, . . .
> reports that bear a more attenuated relationship to a proceeding have been deemed
> sufficiently connected. [(citing cases)]

> "However, a report's mere mention of [a judicial] proceeding does not
> automatically extend the privilege to an entire publication; the privilege may apply
> to some portions of a report and not others. . . . If context indicates that a challenged
> portion of a publication focuses exclusively on underlying events, rather than [a
> judicial] proceeding relating to those events, that portion is insufficiently connected
> to the proceeding to constitute a report of that proceeding.. . . Furthermore, [t]he
> privilege does not extend to commentary on the proceeding or to additional facts not
> established in the proceedings."[25]

Nothing about the content or context of Mr. Trump's statement made it a "report" of

---

[24]     *Id.* (alterations in original) (quoting *Cholowsky*, 69 A.D.3d at 114-15).

[25]     *Fine*, 11 F. Supp. at 216-18 (internal quotation marks and citations omitted).

16

a judicial proceeding. The statement as a whole "does not even purport to be a report of [a judicial proceeding]."[26]  Instead, it is an amalgamation of Mr. Trump's personal views and comments on a wide range of subjects, including the legal system of the United States and of New York, this Court, Ms. Carroll and her rape accusation against him, CNN and its journalist Anderson Cooper, and Ms. Carroll's counsel. "[T]he way [it] is stylized . . . belies the notion that [Mr. Trump] was even attempting to provide a fair and true report of a judicial proceeding."[27]

      As noted, the entire statement contains only two references to any judicial proceeding: (1) a statement that "[t]his 'Ms. Bergdorf Goodman' case is a complete con job", and (2) the reference to a decision of this Court, without specifying which decision or stating anything more about it other than that it came "from the Judge who was just overturned on my same case."[28]  When viewed in the context of the statement as a whole, these two references do not qualify his statement as a report of either *Carroll I* or of this Court's (unidentified) decision. The rest of the statement (1) expresses Mr. Trump's views on the legal system in the United States and in New York, (2) contains

---

[26]
    *Corp. Training Unlimited, Inc. v. Nat'l Broad. Co.*, 868 F. Supp. 501, 508-09 (E.D.N.Y. 1994).

[27]
    *Id* at 509.

[28]
    Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

    Based on the date of Mr. Trump's statement, his reference to "[t]his decision" ("*This decision* is from the Judge who was just overturned on my same case." *Id.* (emphasis added)) possibly refers to this Court's decision issued earlier that day in which the Court denied for the second time Mr. Trump's motion to substitute the United States for him as the defendant in *Carroll I* and denied his motion to stay the action. *Carroll I*, Dkt 96; *Carroll*, 2022 WL 6897075 at *7.  The reference to being "overturned on my same case" likely refers to the Second Circuit's reversal in September 2022 of this Court's decision on whether Mr. Trump was an "employee" of the United States within the meaning of the Westfall Act. *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022).

17

statements about Ms. Carroll and the substance of her rape accusation, including, *inter alia*, that "[s]he completely made up a story that [he] met her at the doors of this crowded New York City [d]epartment [s]tore" and that "[i]f you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam", and (3) makes accusations against Ms. Carroll's counsel.[29]  The passing references in Mr. Trump's statement to *Carroll I* and an unidentified decision of this Court would not give an ordinary reader the impression that the statement is a report of a judicial proceeding.[30]

Mr. Trump nonetheless contends that these two references suffice to demonstrate that he "was clearly speaking of the *Carroll I* case when he made the October 12, 2022 [s]tatement."[31] He overlooks, however, that his comments about Ms. Carroll, the allegedly defamatory portions of his statement, "focus[] exclusively on underlying events" – namely, the substance of Ms. Carroll's rape accusation – "rather than a[] [judicial] proceeding relating to those events."[32]  It is unclear, for

---

[29]

    *Id.*

[30]

    *Corp. Training Unlimited, Inc.*, 868 F. Supp. at 509 (determining that the Section 74 privilege did not apply to a televised report broadcast where "the references to the . . . court proceedings occur mostly in passing and only towards the end of the [b]roadcast").

[31]

    Dkt 67 (Def. Mem.) at 15.

[32]

    *Fine*, 11 F. Supp. 3d at 217; *see also Easton v. Pub. Citizens, Inc.*, No. 91-cv-1639 (JSM), 1991 WL 280688, at *7 (S.D.N.Y. Dec. 26, 1991), *aff'd sub nom.*, 969 F.2d 1043 (2d Cir. 1992) ("This part of the sentence [(in the report)] indicates the conclusion to be drawn based on the facts presented in the case studies. Because it is clearly the author's analysis and commentary it is not protected by Section 74."); *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360, 363 (S.D.N.Y. 1986) ("[Defendant's] one word assessment of the Second Circuit's opinion does not publish that opinion, or otherwise expose the public to the workings of the judicial system. Rather, it conclusionally evaluates the circuit court's opinion. The Civil Rights Law does not protect such bald-faced commentary about the judicial branch and the proceedings therein.").

18

example, whether his statement that Ms. Carroll "completely made up a story that [he] met her" at a New York department store "and, within minutes, 'swooned' her," refers to Ms. Carroll's allegations in her complaint in *Carroll I*, or to a source separate from any judicial proceeding.[33]  The disconnect between the references to *Carroll I* and his allegedly defamatory statements about Ms. Carroll make it impossible for an ordinary reader "to determine from the publication itself that the publication is reporting on the proceeding."[34]

*Summary Judgment Would be Inappropriate Even if Mr. Trump's Statement Were a Report of a Judicial Proceeding*

Even if Mr. Trump's statement were a report of a judicial proceeding within the meaning of Section 74, Mr. Trump has failed to establish as a matter of law that his statement is a "fair and true" report of a judicial proceeding.

"A report may be considered 'fair and true' under Section 74 if its substance is substantially accurate. . . . A report cannot be said to be 'substantially accurate,' however, if it would have a 'different effect' on the mind of the recipient than the 'actual truth.' In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[ ] more serious conduct than

---

[33]   *See Corp. Training Unlimited, Inc.*, 868 F. Supp. at 510 n.6 ("So long as the format of a program makes it impossible for the ordinary viewer to determine whether defendant was reporting on a trial or simply from interviews and independent research, the absolute statutory privilege does not attach.").

[34]   *Fine*, 11 F. Supp. 3d at 216.

19

that actually suggested in the official proceeding.'"[35]

"When a report of a pleading is the subject of a request for immunity under section 74, a comparison of the pleading and the subsequent report of that pleading is the starting point for the analysis."[36]  Mr. Trump argues that his statement is a "fair and true" report because "all that he was doing [in his statement] was summarizing and/or restating his allegations (*i.e.*, his denials and affirmative defenses) asserted in his [a]nswer filed in *Carroll I*."[37]  A comparison of his comments about Ms. Carroll in his October 12 statement and his assertions in his answer in *Carroll I,* however, reveals that "a reasonable jury could find that [his October 12] statement had a different effect on [a] reader than [Mr. Trump's answer filed in *Carroll I*]"[38] and/or that his statement "go[es] well beyond anything reasonably suggested by [his answer]."[39]

Mr. Trump's answer consists of summary denials of Ms. Carroll's allegations and an affirmative defense that his allegedly defamatory statements issued in June 2019 are true. His comments about Ms. Carroll in his October 12 statement, by contrast, state much more than that he denies Ms. Carroll's allegations. For instance, Mr. Trump in his *Carroll I* answer "[d]enies the

---

[35]

     *Calvin Klein Trademark Tr. v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001) (alteration in original) (quoting *Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 436 (1st Dept.1995)) (citing *Holy Spirit Assn. v. New York Times Co.*, 49 N.Y.2d 63, 67 (1979); *Wenz v. Becker*, 948 F.Supp. 319, 324 (S.D.N.Y.1996)).

[36]

     *Karp*, 631 F. Supp. at 363.

[37]

     Dkt 67 (Def. Mem.) at 15-16.

[38]

     *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 177–78 (E.D.N.Y. 2006).

[39]

     *Calvin Klein Trademark Tr.*, 129 F. Supp. at 253.

20

allegation" that he "had recognized Carroll on sight at [a New York department store]."[40]  In his

October 12 statement, he does not just deny recognizing or knowing Ms. Carroll.  Instead, he states:

> "I don't know this woman, have no idea who she is, other than it seems she got a
> picture of me many years ago, with her husband, shaking my hand on a reception line
> at a celebrity charity event. She completely made up a story that I met her at the doors
> of this crowded New York City Department Store and, within minutes, 'swooned'
> her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me
> for the past seven years. . . . She has no idea what day, what week, what month, what
> year, or what decade this so-called 'event' supposedly took place. The reason she
> doesn't know is because it never happened, and she doesn't want to get caught up
> with details or facts that can be proven wrong."[41]

As another example, Mr. Trump in his *Carroll I* answer "[d]enies the allegation" that

"[i]n [his] June 21[, 2019] statement, [he] falsely implied and affirmatively intended to imply that

Carroll had invented the rape accusation as a ploy for increased book sales."[42]  In his October 12

statement, he does not simply deny the allegation that he falsely implied that Ms. Carroll invented

---

[40]   *Carroll I*, Dkt 14-69 (Def. Answer), 2 ¶ 13.  *See also* Dkt 67 (Def. Mem.) at 16 (citing Mr. Trump's other denials in his answer of Ms. Carroll's allegations that he recognized and/or knew Ms. Carroll and/or that he falsely stated in his June 2019 statements that he had no idea who Ms. Carroll was).

[41]   Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

[42]   *Carroll I*, Dkt 14-69 (Def. Answer), 6 ¶ 88. *See also* Dkt 67 (Def. Mem.) at 16 (citing Mr. Trump's other denials in his answer of Ms. Carroll's allegations related to Mr. Trump's allegedly defamatory June 2019 statements that Ms. Carroll fabricated the rape accusation to increase her book sales).

the accusation to increase her book sales. Nor does he merely repeat or summarize his affirmative

defense that his statement in June 2019 that Ms. Carroll "is trying to sell a new book" is true.[43]

Instead, he states that "[i]f you watch Anderson Cooper's interview with [Ms. Carroll], where she

was promoting a really crummy book, you will see that it is a complete Scam. She changed her story

from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper."[44]

   The contrasts between Mr. Trump's assertions in his *Carroll I* answer and his October

12 statement show that a reasonable juror could find that his statement had a different effect on a

reader than his denials and affirmative defense in his answer. For one, "a reasonable juror could find

that [Mr.] Trump was complaining of a far broader and more corrosive conspiracy than anything that

---

[43]
  *Carroll I*, Dkt 6-1 (Cpt.) at 15, ¶ 82.

[44]
  Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

  Mr. Trump contends that his reference to Ms. Carroll's interview with Anderson Cooper in
his October 12 statement does not prohibit the application of the § 74 privilege because (1)
Ms. Carroll does not allege this statement to be defamatory as she "does not attribute any
falsity to Trump's reference to this interview", and (2) "the Anderson Cooper interview was
inextricably intertwined with the *Carroll I* [c]omplaint" and therefore "at the very least, was
a description of background material regarding his positions taken in *Carroll I*." Dkt 67
(Def. Mem.) at 8, 16. *See also Riel v. Morgan Stanley*, No. 06-cv-524 (TPG), 2007 WL
541955, at *10 (S.D.N.Y. Feb. 16, 2007), *aff'd sub nom.*, 299 F. App'x 91 (2d Cir. 2008)
("The protections of section 74 extend to pleadings, transcripts, live proceedings and the
release by the parties of background material regarding their positions in the case."). The
Court need not and does not now address this argument in light of its determination that
summary judgment is inappropriate regardless of the reference to the Anderson Cooper
interview. It bears mention, however, that the allegedly defamatory aspect of Mr. Trump's
reference to that interview comes not from the reference to the interview itself, but from his
statement that Ms. Carroll "changed her story from beginning to end" during the interview
where she was promoting her book. Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2); *see also*
Dkt 38 (Motion to Dismiss Op.) at 25, *Carroll*, 2023 WL 185507, at *11 ("Drawing all
reasonable inferences in favor of plaintiff, the October 12 statement on the whole can be
construed as Ms. Carroll falsely accusing Mr. Trump of rape in order to promote her book
and increase its sales.").

22

was at issue in *Carroll I* in October 2022,"[45] including based on his statements that Ms. Carroll "completely made up a story" that is a "Hoax" and "changed her story from beginning to end [(in an interview where she was promoting her book)]. . . to suit the purposes of CNN and And[erson] Cooper," along with his comments about the judiciary and Ms. Carroll's counsel.[46]

The Court need not and does not now decide the ultimate issue of whether Mr. Trump's statement is or is not a "fair and true" report of a judicial proceeding as a matter of law. It suffices for the purpose of denying summary judgment that a reasonable jury could find so as a matter of fact.[47]

### Conclusion

For the foregoing reasons, Mr. Trump's motion for partial summary judgment (Dkt 66) is denied.

SO ORDERED.

Dated:        March 28, 2023

_____
Lewis A. Kaplan
United States District Judge

---

[45]    Dkt 79 (Pl. Mem.) at 16.

[46]    Dkt 81 (Kaplan Decl.) ¶ 4, Dkt 81-2 (Ex. 2).

[47]    *Pisani*, 440 F. Supp. 2d at 178 ("[B]ecause the Court finds that a reasonable jury could decide that the Hospital statement was not a fair and true report, the Court cannot conclude that, as a matter of law, the Hospital statement is protected by the judicial proceeding privilege."); *Calvin Klein Trademark Tr.*, 129 F. Supp. 2d at 253 ("The Court therefore finds that Section 74 immunity is, at best, a jury question and cannot support summary judgment in plaintiffs' favor.").



**MEMO ENDORSED**

HABBA MADAIO
& Associates LLP

Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

April 13, 2023

**VIA ECF**
The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007



DC SDNY
CUMENT
CTRONICALLY FILED
OC #:
ATE FILED: 4-13-2023

Re:     *E. Jean Carroll v. Donald J. Trump*
        *1:22-cv-10016 (LAK)*

Dear Judge Kaplan:

We write on behalf of the defendant, Donald J. Trump ("Defendant"), with respect to the recent, belated disclosure of material information by the plaintiff, E. Jean Carroll ("Plaintiff"), which raises significant concerns as to Plaintiff's bias and motive in commencing the instant lawsuit, and necessitates that discovery be re-opened for the limited purpose of addressing this issue.

For background, on October 14, 2022, Plaintiff sat for her deposition in the parallel proceeding of *Carroll v. Trump*, No. 1:20-cv-7311 (LAK) ("*Carroll I*").[1] At that time, she was asked about a pertinent issue that looms large over this case – whether her legal fees are being funded by a third-party benefactor, particularly one with political ties. She answered, unequivocally, in the negative:

> Q: Are you presently paying your counsel's fees?
>
> A: This is a contingency case.
>
> Q: So you're not paying expenses or anything out of pocket to date; is that correct?
>
> A: I'm not sure about expenses. I have to look that up.
>
> Q. Is anyone else paying your legal fees, Ms. Carroll?
>
> A: No.

*See* **Exhibit A** at tr. 209:11-21.

---

[1] Pursuant to the Court's Order dated December 21, 2022 (ECF No. 19), Plaintiff's October 14, 2022 deposition has, for all intents and purposes, been incorporated into the instant action and serves as the operative deposition with respect to all substantive issues aside from a particular subset of Plaintiff's damages claim.

Memorandum Endorsement                         Carroll v. Trump, 22-cr-10016 (LAK)

        On April 10, 2023, plaintiff's counsel disclosed to the defendant that plaintiff -- who had testified at her deposition on October 14, 2022 that (a) no one else was paying her legal fees as "[t]his is a contingency fee case," and that (b) she was "not sure about expenses" (Dkt 108-1, Dep. Tr., at 209: 11-21) -- "now [i.e., Apr. 10, 2023] recall[ed] that at some point her counsel secured additional funding from a nonprofit organization to offset certain expenses and legal fees." Dkt 108-2 at 1. Plaintiff's counsel now advises that this assistance was secured in September 2020, well after the commencement of the first to the two closely related actions of which this is the later.

        In subsequent discussions between the parties' respective counsel, plaintiff disclosed the identity of the financial backer, said to be a prominent funder of Democratic causes, and of the not-for-profit entity through which he apparently provided such funding. Plaintiff's counsel further represented that plaintiff "has never met and has never been party to any communications (written or oral) with anyone associated with the nonprofit." Dkt 108-3 at 1. On this basis, defendant moves for "(i) a limited re-opening of the discovery period restricted to investigation into the narrow source of funding issue, and (ii) a one-month continuance of the trial date . . . ; or (iii) in the alternative, that the Court permit an adverse inference instruction against Plaintiff with respect to her willful defiance of her discovery obligations." Dkt 108 at 4.

        The question whether and when plaintiff or her counsel have obtained financial support in this action has nothing directly to do with the ultimate merits of the case. *See, e.g., Benitez v. Lopez*, No. 7-CV-3827-SJ-SJB, 2019 WL 1578167, at *1-*2 (E.D.N.Y. Mar. 14, 2019). Although I do not now decide the question, it perhaps might prove relevant to the question of plaintiff's credibility, in view of the deposition testimony referred to above. Accordingly, I will permit a brief and carefully circumscribed examination of that narrow question without prejudging the question of whether and to what extent examination on this matter may be permitted at trial. Accordingly, defendant's application is granted, but only to the extent that (1) plaintiff shall furnish the defendant, no later than April 16, 2023, with documents sufficient to establish that the inception of the financing assistance for the Carroll litigation in fact occurred in or after mid-2020, (b) any documents concerning the state of plaintiff's knowledge, if any, of the financing assistance as of the date of her deposition and as of the present, and (2) defendant may conduct an additional deposition of Ms. Carroll not to exceed 60 minutes in duration, unless otherwise ordered by the Court, which shall be (1) limited to the subject of Ms. Carroll's knowledge of the financing assistance as of the date of her deposition and as of the present, and (2) completed no later than April 19, 2023. The motion is denied in all other respects save that the Court reserves for determination at trial the matter of any requested adverse inference instruction. Trial shall begin as scheduled on April 25, 2023 unless otherwise ordered.

        SO ORDERED.

Dated:      April 13, 2023

                                               Lewis A. Kaplan
                                   United States District Judge

Case 23-793, Document 75, 11/20/2023, 3592057, Page163 of 224

SPA-160

Case 1:22-cv-10016-LAK   Document 153   Filed 04/24/23   Page 1 of 2
Case 1:22-cv-10016-LAK   Document 142   Filed 04/22/23   Page 1 of 3

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

## MEMO ENDORSED

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

April 22, 2023

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 4-24-2023

**FILED BY ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   **Carroll v. Trump, 22 Civ. 10016 (LAK) ("Carroll II")**

Your Honor:

We write on behalf of Defendant Donald J. Trump to request clarification of Your Honor's March 10, 2023 Memorandum Opinion on one issue relating to Natasha Stoynoff's testimony, along with a proposed solution to an evidentiary issue.

You will recall that Ms. Stoynoff testified in her deposition that Defendant escorted her into a room, and then grabbed her shoulders and pushed her against a wall and started kissing her. Then someone allegedly came into the room and the incident ceased. Defendant's motion *in limine* sought to exclude this testimony under Federal Rule of Evidence 413(d). Your Honor denied our Motion; however, we request clarification with a proposed solution.

Your Honor correctly observed that Trump, according to Ms. Stoynoff, did not touch Ms. Stoynoff's genitals. Also, Your Honor correctly observed that Defendant's merely kissing Ms. Stoynoff (according to Ms. Stoynoff) would not satisfy Rule 413(d). Your Honor did, however, note Ms. Stoynoff's testimony that Defendant lied when he denied groping her, which perhaps implied that he did grope her. However, Your Honor correctly observed that "the portion of Ms. Stoynoff's deposition does not specify what part of her anatomy she claims Mr. Trump groped or attempted to grope." Your Honor then observed that "... if Ms. Stoynoff's account of the parts of her body that Mr. Trump allegedly touched were the only relevant evidence, it would be debatable whether that conduct alone would satisfy Rule 413(d) and 415." Your Honor then performed additional analysis of other evidence which might be suggestive of a plan by Defendant to go further towards touching

SPA-161

<u>Memorandum Endorsement</u>                                   <u>Carroll v. Trump, 22-cv-10016 (LAK)</u>

        Although defendant characterizes his application as one for clarification, the characterization is mistaken.  The application in fact is a request that the Court reconsider a previous ruling and, on reconsideration, to reach the opposition result.

        The application is untimely because any motion for reconsideration should have been filed well before this request.

        Even if the application were timely, the defendant has failed to show, as would be necessary to warrant reconsideration, that the Court's original decision overlooked matters or controlling decisions.

        And even if the defendant had made such a showing, nothing he has put forward warrants any relief from the prior decision or any *voir dire* examination.

        The application is denied.

        SO ORDERED.

Dated:     April 24, 2023

                                  Lewis A. Kaplan
                          United States District Judge

SPA-162

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
E. Jean Carroll,

|                                | |                           |
|--------------------------------|-|---------------------------|
|                     Plaintiff, | | 22 **CIVIL** 10016 (LAK)  |
|        -against-               | | **JUDGMENT**              |
| Donald J. Trump,               | |                           |
|                     Defendant. | |                           |

------------------------------------------------------------X

     It is hereby **ORDERED, ADJUDGED AND DECREED:**  That after a Jury

Trial before the Honorable Lewis A. Kaplan, United States District Judge, Plaintiff E. Jean

Carroll has judgment against the defendant Donald J. Trump in the sum of $2,000,000.00 for

injuries; $20,000.00 in punitive damages; $1,000,000.00 for damages other than the reputation

repair program; $1,700,000.00 for damages for the reputation repair program; and $280,000.00

in punitive damages; accordingly, the case is closed.

**DATED:**  New York, New York
        May      *11*     , 2023

                                                           **RUBY J. KRAJICK**

So Ordered:                                     **Clerk of Court**

                                             **BY:**   K. Mango

**U.S.D.J.**                                       **Deputy Clerk**

SPA-163

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

     Plaintiff,

   -against-           22-cv-10016 (LAK)

DONALD J. TRUMP,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   7-19-2023

## MEMORANDUM OPINION DENYING
## DEFENDANT'S RULE 59 MOTION

Appearances:

Roberta Kaplan
Joshua Matz
Shawn Crowley
Matthew Craig
Trevor Morrison
Michael Ferrara
KAPLAN HECKER & FINK LLP

*Attorneys for Plaint₍ⱼf*

Joseph Tacopina
Matthew G. DeOreo
Chad Derek Seigel
TACOPINA SEIGEL & DEOREO, P.C.

Alina Habba
Michael T. Madaio
HABBA MADAIO & ASSOCIATES LLP

*Attorneys for Defendant*

2

LEWIS A. KAPLAN, *District Judge.*

  In 2019, E. Jean Carroll first publicly claimed that businessman Donald J. Trump, as he then was, sexually assaulted ("raped") her in the mid-1990s. Mr. Trump responded almost immediately by charging that Ms. Carroll's claim was entirely false, that no such thing ever had happened, and that Ms. Carroll falsely accused Mr. Trump for ulterior and improper purposes. He repeated that contention in 2022 and yet again more recently. Ms. Carroll consequently sued Mr. Trump twice.

  Ms. Carroll's first lawsuit (*"Carroll I"*), commenced in 2019, alleges that Mr. Trump's 2019 statements were defamatory. While that case was delayed for years for reasons that need not be recapitulated here, it now is scheduled for trial in January 2024.

  This, the second case (*"Carroll II"*), also contains a defamation claim, albeit one based on Mr. Trump's comparable 2022 statement. But *Carroll II* made an additional claim – one for damages for the sexual assault. That claim could not have been made in 2019 because the statute of limitations almost doubtless would have expired long before. But the claim was made possible in 2022 by the enactment that year of New York's Adult Survivors Act (the "ASA"), which temporarily revived the ability of persons who were sexually assaulted as adults to sue their alleged assaulters despite the fact that an earlier statute of limitations had run out.

  This case, *Carroll II,* was tried in April and May 2023. Ms. Carroll contended that Mr. Trump had assaulted her in a dressing room at a New York department store where, among other things, he forcibly penetrated her vagina with his fingers and his penis. She testified in person for most of three days and was cross-examined intensively. Her sexual assault claim was corroborated by two "outcry" witnesses in whom Ms. Carroll had confided shortly after the attack, and was supported by six other fact witnesses. Mr. Trump's defense – based exclusively on an

3

attempt to discredit Ms. Carroll and her other witnesses – in substance was that no assault ever had

occurred, that he did not even know Ms. Carroll, and that her accusations were a "Hoax." Mr.

Trump, however, did not testify in person or even attend the trial despite ample opportunity to do

so.

The jury's unanimous verdict in *Carroll II* was almost entirely in favor of Ms.

Carroll. The only point on which Ms. Carroll did not prevail was whether she had proved that Mr.

Trump had "raped" her within the narrow, technical meaning of a particular section of the New York

Penal Law – a section that provides that the label "rape" as used in criminal prosecutions in New

York applies only to vaginal penetration by a penis. Forcible, unconsented-to penetration of the

vagina or of other bodily orifices by fingers, other body parts, or other articles or materials is not

called "rape" under the New York Penal Law. It instead is labeled "sexual abuse."[1]

As is shown in the following notes, the definition of rape in the New York Penal Law

is far narrower than the meaning of "rape" in common modern parlance, its definition in some

dictionaries,[2] in some federal and state criminal statutes,[3] and elsewhere.[4]  The finding that Ms.

---

[1]

"Sexual abuse" involving sexual contact by forcible compulsion (sexual abuse in the first
degree) nevertheless is a felony punishable by a term of imprisonment and requiring sex
offender registration. N.Y. Penal Law §§ 70.02(1)(c) (sexual abuse in the first degree is a
Class D violent felony), 3(c) ("For a class D felony, the term must be at least two years and
must not exceed seven years . . .."); N.Y. Correct. Law §§ 168-a(3)(a)(i) (defining
"[s]exually violent offense" to include a conviction of sexual abuse in the first degree), 7(b)
(defining "[s]exually violent offender" as "a sex offender who has been convicted of a
sexually violent offense defined in subdivision three of this section").

[2]

One dictionary, for example, defines rape as "unlawful sexual intercourse *or any other
sexual penetration* of the vagina, anus, or mouth of another person, with or without force,
*by a sex organ, other body part, or foreign object*, without the consent of the person
subjected to such penetration."  "[R]ape," Dictionary.com, https://www.dictionary.com/br
owse/rape (last accessed July 14, 2023) (emphasis added). The most recent edition of Black's
Law Dictionary defines rape in part as "[u]nlawful sexual activity (esp. intercourse) with a
person (usu[ally] a female) without consent and usu[ally] by force or threat of injury" and

4

Carroll failed to prove that she was "raped" within the meaning of the New York Penal Law does

---

it defines "intercourse" in the sexual sense as "*[p]hysical sexual contact*, esp. involving the penetration of the vagina by the penis." Black's Law Dictionary 966, 1511 (11th ed. 2019).

[3]

*E.g.,* 10 U.S.C. § 920(g)(1)(C) (Uniform Code of Military Justice) (defining "sexual act" for purposes of rape and sexual assault as, *inter alia*, "the penetration, however slight, of the vulva or penis or anus of another *by any part of the body or any object*, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person") (emphasis added); WAYNE R. LAFAVE, SUBST. CRIM. L., § 17.2(a) & n. 43 (3d ed.) ("In recent years, revision of rape laws have often brought about coverage of a broader range of conduct than is encompassed within the common law term 'carnal knowledge.'... As for the acts covered, the new statutes 'fall into three categories: those that continue the narrow notion that rape should punish only genital copulation; those that agree with the Model Code that rape laws should be expanded to include anal and oral copulation; and *those that go beyond the Model Code to include digital or mechanical penetration* as well as genital, anal, and oral sex.") (emphasis added) (citing state statutes).

In fact, "rape" as defined in the relevant part of the New York Penal Law – forcible, unconsented-to penetration of the vagina by a penis – constitutes "sexual assault" under the Code of Criminal Justice of the State of New Jersey.  N.J. Stat. Ann. §§ 2C:14-2c.(1) ("[a]n actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person" and does so "using coercion or without the victim's affirmative and freely-given permission") and 2C:14-1c ("'Sexual penetration' means vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the actor or upon the actor's instruction."). New Jersey, like some other states, does not statutorily define any crime as "rape."  As indicated by the foregoing, New Jersey's penal code – unlike New York's – treats digital and other modes of penetration in the same manner as penile penetration.

[4]

The American Psychological Association, for example, defines rape as "the nonconsensual oral, anal, or vaginal penetration of an individual by another person *with a part of the body or an object*, using force or threats of bodily harm or taking advantage of the individual's inability to give or deny consent. U.S. laws defining rape vary by state, but the crime of rape is no longer limited to . . . vaginal penetration . . . ." APA Dictionary of Psychology, "Rape," AMERICAN PSYCHOLOGICAL ASSOCIATION, https://dictionary.apa.org/rape (last accessed July 14, 2023) (emphasis added).

The United States Attorney General announced in January 2012 a new definition of rape for the purpose of the Federal Bureau of Investigation's Uniform Crime Report Summary Reporting System by, among other changes, "recogniz[ing] that rape with an object can be as traumatic as penile/vaginal rape." U.S. Department of Justice, *An Updated Definition of Rape*, Jan. 6, 2012, https://www.justice.gov/archives/opa/blog/updated-definition-rape (new definition of "rape" as "[t]he penetration, no matter how slight, of the vagina or anus *with any body part or object*, or oral penetration by a sex organ of another person, without the consent of the victim") (emphasis added).

5

not mean that she failed to prove that Mr. Trump "raped" her as many people commonly understand the word "rape." Indeed, as the evidence at trial recounted below makes clear, the jury found that Mr. Trump in fact did exactly that.

So why does this matter? It matters because Mr. Trump now contends that the jury's $2 million compensatory damages award for Ms. Carroll's sexual assault claim was excessive because the jury concluded that he had not "raped" Ms. Carroll.[5] Its verdict, he says, could have been based upon no more than "groping of [Ms. Carroll's] breasts through clothing or similar conduct, which is a far cry from rape."[6] And while Mr. Trump is right that a $2 million award for such groping alone could well be regarded as excessive, that undermines rather than supports his argument. His argument is entirely unpersuasive.

This jury did not award Ms. Carroll more than $2 million for groping her breasts through her clothing, wrongful as that might have been. There was no evidence at all of such behavior. Instead, the proof convincingly established, and the jury implicitly found, that Mr. Trump deliberately and forcibly penetrated Ms. Carroll's vagina with his fingers, causing immediate pain and long lasting emotional and psychological harm. Mr. Trump's argument therefore ignores the bulk of the evidence at trial, misinterprets the jury's verdict, and mistakenly focuses on the New York Penal Law definition of "rape" to the exclusion of the meaning of that word as it often is used in everyday life and of the evidence of what actually occurred between Ms. Carroll and Mr. Trump.

There is no basis for disturbing the jury's sexual assault damages. And Mr. Trump's

---

[5] The jury awarded Ms. Carroll $20,000 in punitive damages, in addition to the $2 million in compensatory damages.

[6] Dkt 205 (Def. Mem.) at 1.

6

arguments with respect to the defamation damages are no stronger.

## *Facts*

### *The Evidence at Trial*

Ms. Carroll's case in chief constituted all of the evidence at trial. Mr. Trump neither testified nor called any witnesses. Apart from portions of his deposition that came in on Ms. Carroll's case, there was no defense evidence at all. The defense consisted entirely of (1) an attempt to discredit Ms. Carroll's proof on cross-examination, and (2) Mr. Trump's testimony during his deposition that Ms. Carroll's account of the alleged events at the department store was a hoax.

### *Sexual Battery*

#### *Liability*

The principal evidence as to Mr. Trump's liability for the sexual assault was the testimony of Ms. Carroll, of the two "outcry" witnesses and of two other women who claimed to have been sexually assaulted by Mr. Trump, the so-called *Access Hollywood* video, and Mr. Trump's remarkable comments about that video during his deposition.

#### *Ms. Carroll*

In her first public accusation of sexual assault – "rape" – against Mr. Trump, which was published in June 2019 as an excerpt of her then-forthcoming book, Ms. Carroll described the assault in relevant part as follows:

> "The moment the dressing-room door [(at Bergdorf Goodman, a department
> store in New York)] is closed, he lunges at me, pushes me against the wall, hitting

SPA-169

7

my head quite badly, and puts his mouth against my lips. I am so shocked I shove him back and start laughing again. He seizes both my arms and pushes me up against the wall a second time, and, as I become aware of how large he is, he holds me against the wall with his shoulder and jams his hand under my coat dress and pulls down my tights. . . . The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, *unzips his pants, and, forcing his fingers around my private area, thrusts his penis ha.fway — or completely, I'm not certain — inside me.* It turns into a colossal struggle.[7]

At trial, Ms. Carroll testified:

- "He [(Mr. Trump)] immediately shut the [(dressing room)] door and shoved me up against the wall and shoved me so hard my head banged."

- "I pushed him back, and he thrust me back against the wall again, banging my head again."

- "He put his shoulder against me and hold [*sic*] me against the wall."

- "I remember him being -- he was very large, and his whole weight came against my chest and held me up there, and he leaned down and pulled down my tights."

- "I was pushing him back. . . . I pushed him back. This arm was pinned down. This arm had my purse. Trying to get him back."

- "His head was beside mine breathing. First, he put his mouth against me."

---

[7]     E. Jean Carroll, *Hideous Men: Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list cf awful men in my life*, THE CUT, NEW YORK MAGAZINE, Jun. 21, 2019, https://www.thecut.com/2019/06/donald-trump -assault-e-jean-carroll-other-hideous-men.html (emphasis added).

8

- "[I was] [s]tamping and trying to wiggle out from under him. *But he had pulled down my tights and his hand went -- his fingers went into my vagina, which was extremely painful, extremely painful. It was a horrible feeling because he curved, he put his hand inside of me and curved his finger. As I'm sitting here today, I can still feel it.*"

- "Then he inserted his penis."

- "He was against me, his whole shoulder -- I couldn't see anything. I couldn't see anything that was happening. *But I could certainly feel it. I could certainly feel that pain in the finger jamming up.*"[8]

After a day and a half of direct testimony, Ms. Carroll was subjected to a lengthy cross examination during which she testified:

"Q. It's your story that at some point you felt his penis inside of you?

A. Yes.

Q. But before that, *it's your sworn testimony that you felt his fingers, what you said was rummaging around your vagina*?

A. *It's an unforgettable feeling.*

Q. Now, when you say rummaging around your vagina, that's different than inserting a finger inside your vagina.

A. *At first he rummaged around and then he put his finger inside me.*

Q. In your book you wrote that he was forcing his fingers around my private area and then thrust his penis halfway completely, I'm not certain, inside me. Is that accurate?

---

[8] Dkt 187 (Trial Tr.) at 177:22-181:23 (emphasis added).

9

A. Yes."[9]

*The Outcry Witnesses*

Ms. Carroll confided in two of her friends, Lisa Birnbach and Carol Martin (the "outcry" witnesses), about the attack shortly after it occurred. Almost immediately after Ms. Carroll escaped from Mr. Trump and exited the store, she called Ms. Birnbach. Ms. Carroll testified that during that call:

"A. I said, you are not going to believe what just happened. I just needed to tell her. I said I met Donald Trump in Bergdorf's. We went lingerie shopping and I was so dumb I walked in a dressing room and he pulled down my tights."

. . .

Q. What else did you say?

A. Well, she asked me, she said, after she heard he had pulled down my tights, she asked me, did he insert his penis? I said yes. And then Lisa said the words: Probably why I called her. She said he raped you. He raped you, E. Jean. You should go to the police. I said: No way. Then she said: I will go with you."[10]

The next day, or the day after that, Ms. Carroll told Ms. Martin about the attack. Ms. Carroll testified:

"I said [(to Ms. Martin)]: Carol, you are not going to believe it. I had a run-in with Donald Trump at Bergdorf's. She said -- she saw my face. She said: We can't talk

---

[9]     Dkt 189 (Trial Tr.) at 406:5-18 (emphasis added).

[10]    Dkt 187 (Trial Tr.) at 186:4-19.

here. We were back behind the studio. She said: Let's talk tonight at my house.

. . .

I took her through step by step what happened. And Carol is a very unjudgmental, open-hearted friend. But she was -- she gave me the exact -- her concern was very different than Lisa's. Carol's concern was, do not go to the police."[11]

Both Ms. Birnbach and Ms. Martin testified about their conversations with Ms. Carroll. Ms. Birnbach testified in relevant part:

"Q. What was the first thing that Ms. Carroll said when you picked up the phone?

A. She said, Lisa, you are not going to believe what happened to me.

. . .

Q. What did she say after she said, Lisa, you are not going to believe what just happened?

A. E. Jean said that she had, after work that day, she had gone to Bergdorf's to look around, and she was on her way out -- and I believe it was a revolving door -- and she said on the other side of the glass from her going in, as she was going out, Donald Trump said to her, *Hey, you're the advice lady*. And she said, *You're the real estate guy*. And he said, *You're so good at advice, you are so smart, why don't you help me pick out a present for a friend*? So she thought she would, it sounded like a funny thing, this guy, who is famous. And she went back in the store and tried to, in my -- in my memory tried to show him things[.] . . . They went upstairs, eventually finding themselves in the lingerie department, and there was no one behind the

---

[11]   *Id.* at 190:5-20.

11

counter but there was a little bodysuit --

. . .

Q. What did she say happened after they got to the lingerie department?

A. He said, *Why don't you try this on?* And she, continuing sort of the jokey banter that they had, she said, *Why don't you try it on?* And then the next thing that happened is they were both in the dressing room and he slammed her against the wall. And then, as she was trying to move, he -- he slammed his whole arm, pinned her against the wall with his arm and shoulders, and with his free hand pulled down her tights. And E. Jean said to me many times, *He pulled down my tights. He pulled down my tights.* Almost like she couldn't believe it. She was still processing what had just happened to her. It had just happened to her. *He pulled down my tights.* And then he penetrated her.

Q. Did she say how he penetrated her?

A. Yes. She said with his penis.

Q. What did you say after Ms. Carroll described this to you?

A. As soon as she said that . . . and I said, I whispered, *E. Jean, he raped you. . . . *"[12]

Two days later, Ms. Martin testified in pertinent part:

"Q. And what did she say -- again, taking this piece by piece, what did she say what happened?

A. She introduced it by saying, *You won't believe what happened to me the other*

---

[12] Dkt 193 (Trial Tr.) at 688:5-690:9 (emphases in original).

12

*night*. As I recall. And I didn't know what to expect and so, I just turned to her and she said, *Trump attacked me.*

. . .

Q. Now, Ms. Carroll says to you that *Trump attacked me.* Do you recall what you said next, if anything?

A. Yeah. I was completely floored. I didn't quite know what was coming next. She is leaning in to me, and I'm saying, *What are you talking about?* But the next thing that came to my mind was if she was OK and that's what I asked her. So I said, *Are you OK?* Because she seemed -- her affect was, I would say, anxious and excitable, but she could be that way sometimes but that part was different in her affect. But what she was saying didn't make any sense at first.

Q. And when you asked her was she OK, did she respond?

A. She said -- she probably said I don't know. She kept telling me what happened, *that he attacked me.* I think she said 'pinned me' is what she said and I still didn't know what that meant.

Q. So, to the best of your recollection -- I understand it would be crazy if you could remember every word, but what did she tell you that day about what had happened to her at Bergdorf Goodman?

A. Basically, she backtracked. I kept asking her to backtrack. It wasn't a linear conversation, as you would expect, because it was news, it was I didn't know what I am hearing here, and she was clearly agitated, anxious. And she said she was at Bergdorf's the night before -- probably two nights, if I recall -- and that she ran into Mr. Trump going in one of the revolving doors. And she said that they started up a

SPA-175

13

conversation. My sense is that she engaged him, or vice versa, because that's not uncommon for E. Jean. He recognized her, she recognized him.

. . .

Q. And what else did she tell you about what happened once they were inside Bergdorf Goodman?

A. So, she related that they sort of started kibbitzing or talking back and forth, it was apparently friendly, and she said that he was looking for a gift. And so, she engaged him that way suggesting certain things. I don't remember all of the things. But this must have gone on for a few minutes and then, somehow, they started up the stairs -- escalator, she said.

Q. And did she tell you what happened after they got off the escalator?

A. Yeah. And again, this was disjointed because I would stop and ask her, *What do you mean? What do you mean?* And she was explaining as she's going that once they reached a level -- and I don't know Bergdorf's that well, but once they reached a level where there was -- there were dressing rooms, and she said at that point that he attacked her. Those were the words that I remember but I still said, *What do you mean? You look OK. You look* -- and she had been at work so I couldn't put it together. And she didn't use the word 'rape,' that I recall. I have said that before. But she said it was a frenzy. She said, *I was fighting. I was fighting.* She kept saying that."[13]

---

[13]

Dkt 197 (Trial Tr.) at 1028:22-1032:6 (emphases in original).

14

*Other Alleged Survivors*

The jury heard also from two other women who allegedly were sexually assaulted by Mr. Trump: Jessica Leeds and Natasha Stoynoff.[14]  Ms. Leeds claims she was seated beside Mr. Trump on a flight to New York in 1978 or 1979 when he allegedly assaulted her. She testified:

> "A. Well, what happened was they served a meal, and it was a very nice meal, as Braniff was -- was -- reputation to do, and it was cleared and we were sitting there when all of a sudden Trump decided to kiss me and grope me.
>
> Q. What led to that? Was there conversation?
>
> A. There was no conversation. It was like out of the blue.
>
> . . .
>
> Q. What did you -- so describe, if you would, what he did exactly.
>
> A. Well, it was like a tussle. He was -- his hands and -- he was trying to kiss me, he was trying to pull me towards him. He was grabbing my breasts, he was -- it's like he had 40 zillion hands, and it was a tussling match between the two of us. And *it was when he started putting his hand up my skirt* that that kind of gave me a jolt of strength, and I managed to wiggle out of the seat and I went storming back to my seat in the coach."[15]

---

[14]

The testimony of Mss. Leeds and Stoynoff was received pursuant to Federal Rule of Evidence 415, which provides that "evidence that the [defendant] committed any other sexual assault" may be admitted in "a civil case involving a claim for relief based on a party's alleged sexual assault." Fed. R. Evid. 415(a).  The Court's analysis is contained in a prior decision and need not be repeated here. *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023).

[15]

Dkt 193 (Trial Tr.) at 741:13-742:6 (emphasis added).

15

On cross examination, she testified also:

> "Q. And it is your story that after you were done eating, the flight attendant cleared
> your tray tables and this man suddenly attacked you?
>
> A. Correct.
>
> Q. It is your story this man grabbed you with his hands, tried to kiss you, grabbed
> your breasts, and pulled you towards him?
>
> A. Correct.
>
> Q. And pulled himself onto you?
>
> A. It's not -- no, not onto me but he was leaning-in to me, pushing me against the
> back of the seat.
>
> Q. OK. And then according to you he, at one point, put his hand on your knee?
>
> A. *He started putting his hand up my skirt.*
>
> Q. *OK, on your leg and up your skirt?*
>
> A. *Correct.*"[16]

Ms. Leeds confirmed that "if the man had just stuck with the upper part of [her] body, [she] might

not have gotten that upset" and that "it is only when he eventually started putting his hands up

[her] skirt that [she] said I don't need this[.]"[17]  On re-direct she explained:

> "Q. Why did you find it less upsetting when he had his hands above your skirt than
> when they went into your skirt, when his hand went into your skirt?
>
> A. That's sort of the demarcations -- I mean, people -- men -- would frequently pat

---

[16]     *Id.* at 771:19-772:8 (emphasis added).

[17]     *Id.* at 774:24-775:2, 775:13-16.

SPA-178

16

you on the shoulder and grab you or something like that and you just -- it is not serious and you don't -- you don't -- *but when somebody starts to put their hand up your skirt, you know they're serious and this is not good*."[18]

Ms. Stoynoff, then a reporter for a magazine, encountered Mr. Trump in 2005 at Mar-a-Lago, his residence in Florida, on an assignment to interview him and his wife, Melania. Ms. Stoynoff testified:

"Q. So where did you go with Mr. Trump after he said, I want to show you this room?

A. So we -- I followed him, and we went in through these back doors and down a hall, as I recall it, and turned right into a room.

Q. Who was with you at that point?

A. As I recall, just he and I.

Q. So what happened next?

A. So we -- we walked into a room, and I'm looking in this room, and I went in first and I'm looking around, I'm thinking, wow, really nice room, wonder what he wants to show me, and he -- I hear the door shut behind me. And by the time I turn around, he has his hands on my shoulders and he pushes me against the wall and starts kissing me, holding me against the wall.

Q. Was anyone else in the room at this time?

A. Nobody else.

Q. What did you -- how did you react?

A. I started -- I tried to push him away.

---

[18]   *Id.* at 787:6-14 (emphasis added).

17

Q. Had you -- had anything been said up until that point when you walked into the room? Did he say anything or did you say anything?

A. No, not that I recall.

. . .

Q. So what -- I think you said you tried to shove him away. What happened?

A. He came toward me again, and I tried to shove him again.

Q. What was he doing sort of -- what was he doing with, let's say, the rest of his face or body?

A. Well, he was kissing me and, you know, he was against me and just holding my shoulders back.

Q. Did you -- what, if anything, did you say while this was happening?

A. I didn't say words. I couldn't. I tried. I mean, I was just flustered and sort of shocked and I -- no words came out of me. I tried, though. I remember just sort of mumbling.

. . .

Q. How long -- do you recall how long that went on for?

A. A few minutes.

Q. How did it end?

A. A butler came into the room.

. . .

Q. How did Mr. Trump react when the butler came in?

A. He stopped doing what he was doing.

Q. Were you able to perceive whether the butler saw what had been happening?

18

A. I don't know if he saw, but to my mind, I gave him a kind of a 'get me out of here' look, and I felt like he understood.

Q. So what happened, what happened next?

A. The butler led us back to the couch area, and Melania was on her way, and Trump said a few things to me.

Q. What did he say to you?

A. *He said, Oh, you know we are going to have an affair, don't you? You know, don't forget what -- don't forget what Marla said, best sex she ever had. We are going to go for steak, we are going to go to Peter Luger's. We're going to have an affair.*

. . .

Q. . . . Before the butler came into the room, *did Mr. Trump do anything to you that suggested he was going to stop on his own*?

A. *No.*"[19]

*The Access Hollywood Tape*

The so-called *Access Hollywood* tape, a recorded exchange among Mr. Trump and others as they arrived for the shooting of a television episode that was broadcast nationwide repeatedly during the 2016 presidential campaign, was played twice for the jury.[20] In that video, Mr.

---

[19]    Dkt 195 (Trial Tr.) at 989:24-996:7 (emphasis added).

[20]    Like the testimony of Mss. Leeds and Stoynoff, the Court initially determined that the *Access Hollywood* tape was admissible on the ground that a jury reasonably could find it was evidence that Mr. Trump "committed any other sexual assault" pursuant to Rule 415. *Carroll*, 2023 WL 2441795 at *3-4. At trial, however, it became clear that reliance on Rule 415 was unnecessary because the video was offered for a purpose other than to show the

Trump stated that he previously had "moved on [a woman] like a bitch, but [he] couldn't get there." He said also in the following exchange:

> Trump: "Maybe it's a different one."
>
> Billy Bush: "It better not be the publicist. No, it's, it's her."
>
> Trump: "Yeah that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful -- I just start kissing them. It's like a magnet. Just kiss. I don't even wait. *And when you're a star they let you do it. You can do anything.*"
>
> Bush: "Whatever you want."
>
> Trump: "*Grab them by the pussy. You can do anything.*"

In the following excerpt of his deposition, which was played for the jury, Mr. Trump testified that:

> "*Q. And you say -- and again, this has become very famous -- in this video, 'I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything, grab them by the pussy. You can do*

---

defendant's propensity to commit sexual assault. Instead, it was offered – as Ms. Carroll's counsel argued in rebuttal summation – as "a confession." Dkt 199 (Trial Tr.) at 1403:24. Given that Mr. Trump states in the video that he "just start[s] kissing" women without "even wait[ing]" and that a "star" (such as himself) could "grab [women] by the pussy," it "has the tendency to make [the] fact [of whether he sexually assaulted Ms. Carroll] more or less probable than it would be without the evidence" because one of the women he referred to in the video could have been Ms. Carroll. Fed. R. Evid. 401. *See also, e.g., United States v. Cordero*, 205 F.3d 1325 (2d Cir. 2000) (unpublished opinion) ("Proof of similar acts may be admitted so long as such evidence is offered 'for any purpose other than to show a defendant's criminal propensity.'") (citation omitted); *Woolfolk v. Baldcfsky*, No. 19-CV-3815(WFK) (ST), 2022 WL 2600132, at *2 (E.D.N.Y. July 8, 2022) ("Evidence of prior crimes, wrongs, or acts, however, may be admissible if offered 'for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403.'") (citation omitted). Accordingly, the Court did not include the *Access Hollywood* tape in its instructions to the jury on the evidence of Mr. Trump's alleged sexual assaults of other women, and neither party objected to its exclusion from that portion of the charge.

*anything. That's what you said; correct?"*

*A. Well, historically, that's true with stars.*

*Q. True with stars that they can grab women by the pussy?*

*A. Well, that's what -- if you look over the last million years, I guess that's been largely true. Not always, but largely true. Unfortunately or fortunately.*

Q. And you consider yourself to be a star?

A. I think you can say that, yeah.

Q. And -- now, you said before, a couple of minutes ago, that this was just locker room talk?

A. It's locker room talk.

Q. And so does that mean that you didn't really mean it?

A No. It's locker room talk. I don't know. It's just the way people talk."[21]

*Damages for Sexual Assault (Battery) Claim*

The damages evidence at trial consisted primarily of Ms. Carroll's own testimony as well as the testimony of Dr. Leslie Lebowitz, a clinical psychologist with expertise in trauma and in sexual trauma who evaluated Ms. Carroll for this case. Dr. Lebowitz testified in detail on the psychological harm of the assault by Mr. Trump on Ms. Carroll. She explained that:

"There were three dominant ways that I felt that she [(Ms. Carroll)] had been harmed. She has suffered from painful, intrusive memories for many years; she endured a diminishment in how she thought and felt about herself; and, perhaps most

---

[21]    Dkt 138-1 (Def. Dep. Designations) at 174:5-175:4 (emphasis added).

prominently, she manifests very notable avoidance symptoms which have curtailed her romantic and intimate life and caused profound loss."[21]

Dr. Lebowitz testified also that, although Ms. Carroll did not meet the full criteria to have been diagnosed with post-traumatic stress disorder ("PTSD"), Ms. Carroll exhibited symptoms in at least some of the four categories that are necessary for a diagnosis of PTSD, including "avoidance symptoms, . . . alterations in her thoughts and feelings about herself, and ... intrusions."[22] She explained that Ms. Carroll blamed herself for the assault and that the assault "made her feel like she was worth less than she had been before" and "[s]he felt degraded and diminished."[23] As an example of an intrusive memory, which Dr. Lebowitz defined as "when some part of the traumatic experience, either what it felt like or it felt like in your body or in your emotions, just pierces your consciousness and lands in the middle of your experience and essentially hijacks your attention," Dr. Lebowitz testified that at one point during her interview with Ms. Carroll, she "began to squirm in her seat because she was actually reexperiencing Mr. Trump's fingers inside of her, what she alleges to be Mr. Trump's fingers inside of her."[24] She explained also Ms. Carroll's comment that she felt she had died and somehow still was alive as a manifestation of "what it feels like psychologically" because "what rape does is it so violates that sense of humanity and independence and selfhood than people feel psychologically that they are being killed. They feel

---

[21]     Dkt 193 (Trial Tr.) at 829:22-830:2.

[22]     Dkt 195 (Trial Tr.) at 853:13-15.

[23]     *Id.* at 876:2-4.

[24]     *Id.* at 861:8-19.

22

at risk. They feel like their personhood is being murdered . . . ."[25]  Dr. Lebowitz summarized the psychological impact of Mr. Trump's assault on Ms. Carroll as follows:

> "Because she was frightened and rendered helpless in a way that had never happened to her before and because she blamed herself and because the meaning of that event and the feelings associated with it were simply too big for her to cope with in her usual ways, *it became a stuck point in her life*, something that she had to walk around in her day-to-day basis; and, in doing that, in working so hard to stay away from those feelings of helplessness and vulnerability, she gave up one of the great sources of joy and connection in her life, which was the opportunity to be intimate with a man, and that was a huge loss for her."[26]

*Defamation*

*Liability*

Most of the evidence of Mr. Trump's liability for the defamation claim based on his 2022 statement was coextensive with the evidence of his liability for the sexual assault. The crux of Mr. Trump's 2022 statement was that Ms. Carroll lied about him sexually assaulting her and that her entire accusation was a "Hoax" concocted to increase sales of her then-forthcoming book. To prove that Mr. Trump defamed her, Ms. Carroll needed to prove that his statement was false (i.e., not substantially true), that he knew the statement was false when he made it or acted in reckless

---

[25]

> *Id.* at 864:19-865:12.

[26]

> *Id.* at 888:10-20 (emphasis added).

SPA-185

23

disregard of whether or not it was true (actual malice), and that the statement tended to disparage Ms. Carroll in the way of her profession or expose her to hatred or contempt in the minds of a substantial number of people in the community.

The evidence that Mr. Trump sexually assaulted Ms. Carroll proved also the falsity of his statement, which contended that Ms. Carroll's entire account – not any particular sexual act – was a fabrication. With respect to its defamatory import, in addition to showing the jury examples of Internet hate messages Ms. Carroll received from people she did not know, Ms. Carroll testified:

"Q. How, if at all, do you believe this statement affected your reputation?

A. I really thought I was gaining back a bit of ground. I thought, it's starting to go and I felt, you know, happy that, you know, I was back on my feet, had garnered some readers, and feeling pretty good, and then, boom, he knocks me back down again.

. . .

Q. What, if any, I'll call it sort of public response did you experience after Mr. Trump made his October 2022 statement?

A. It was not very nice.

Q. What do you recall?

A. Just a wave of slime. It was very seedy comments, very denigrating. Almost an endless stream of people repeating what Donald Trump says, I was a liar and I was in it for the money, can't wait for the payoff, working for the democrats, over and over. But the main thing was way too ugly. It is very hard to get up in the morning and face the fact that you're receiving these messages you are just too ugly to go on

living, practically."[28]

Ms. Carroll further testified that in comparison to the "tweets or messages [she] received after Mr. Trump made his first remarks in June of 2019," the messages that came after October 2022 "were equally, equally disparaging and hurtful, but these particularly hurt because I thought I had made it through and here they are again."[29]

In excerpts of Mr. Trump's deposition that were played for the jury, Mr. Trump confirmed that he wrote the statement "all myself"[30] and testified that:

"I still don't know this woman. I think she's a wack job. I have no idea. I don't know anything about this woman other than what I read in stories and what I hear. I know nothing about her."[31]

*Damages for Defamation Claim*

The damages evidence consisted primarily of Ms. Carroll's testimony as to the harm she suffered, which is described above, plus the testimony of Professor Ashlee Humphreys with respect to a "reputation repair program" to correct the harm to Ms. Carroll's reputation caused by Mr. Trump's statement.

" . . . [T]he nature of the work [(for Professor Humphreys)] was to look at a

---

[28]   Dkt 189 (Trial Tr.) at 322:6-324:5.

[29]   *Id.* at 329:2-7.

[30]   Dkt 138-1 (Def. Dep. Designations) at 134:13.

[31]   *Id.* at 137:14-17.

statement that was posted on social media and to understand the spread of that statement, how many people saw it, how broadly did it spread, then to look at the impact that statement might have had on Ms. Carroll's reputation, if any, and finally to estimate, well, how much would it cost to repair that reputation."[32]

Professor Humphreys testified about her process and various calculations. She used an "impression model" to determine approximately how many people saw Mr. Trump's 2022 statement. She determined that across various forms of media, including on the Internet, social media, print media, and television, "the final estimate . . . was between 13.7 million and 18 million impressions," which she explained likely "was an undercount."[33] She stated that "after June 2019 . . . of course there was a lot more volume of statements about her [(Ms. Carroll)] and they contained pretty negative associations including that she was a liar, the perpetrator of a scam, a hoax. Things like that."[34] With respect to Ms. Carroll's reputation before and after the 2022 statement, she testified:

> "So, what I noticed is that those meetings [*sic*] existed after June 2019, but the frequency of the posting with those associations had started to decline. However, after the statement on October 12th, the frequency of the negative associations, the volume of them again escalated."[35]

Professor Humphreys accordingly "concluded that there was a relationship" between Mr. Trump's

---

[32]  Dkt 197 (Trial Tr.) at 1114:2-8.

[33]  *Id.* at 1127:24-25, 1128:16-19.

[34]  *Id.* at 1130:9-12.

[35]  *Id.* at 1130:18-22.

SPA-188

26

2022 statement and Ms. Carroll's reputation "given the timing and the fact that they [(posts with negative associations)] were in kind of direct response to his [(Mr. Trump's)] statement, as well as the particular language, words like 'liar' etc."[36]  She looked at approximately how many people likely believed Mr. Trump's statement, and determined that "between 3.7 million and 5.6 million people saw Mr. Trump's statement and likely believed it."[37]  Finally, she explained that to repair Ms. Carroll's reputation, there would need to be "a campaign to put out positive message" about her (a "reputational repair campaign" or "reputation repair program").[38]  In total, Professor Humphreys calculated that the cost of such a campaign to repair Ms. Carroll's reputation on the low end would be $368,000 and on the high end would be $2.7 million.[39]

*The Structure of the Verdict*

            Both parties submitted proposed "special verdict" forms to distribute to the jury. Pursuant to Federal Rule of Civil Procedure 49, which governs jury verdict forms and questions, "[t]he court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact."[40]  A special verdict stands in contrast to a general verdict form, which typically asks jurors to answer only the ultimate questions of liability and the damages amounts, if

---

[36]      *Id.* at 1130:25-1131:3.

[37]      *Id.* at 1134:16-19.

[38]      *Id.* at 1136:10-13.

[39]      *Id.* at 1142:11-20.

[40]      Fed. R. Civ. P. 49(a)(1).

SPA-189

27

any.

The Court here used a special verdict form that was substantially similar to the parties' proposed forms, consisting of factual questions going to liability and damages, organized by the two claims.  Neither party raised any objection to the Court's verdict form nor demanded that any specific questions other than those on the special verdict form be submitted to the jury. In accordance with Rule 49, the Court "g[a]ve the instructions and explanations necessary to enable the jury to make its findings on each submitted issue" contained in the verdict form.[41]  Accordingly, the meaning of the jury's answers to each question on the verdict form depends upon the instructions given as to what it had to conclude in order to answer the questions.

*Sexual Battery Instructions*

The liability questions for Ms. Carroll's sexual battery claim were whether Ms. Carroll proved by a preponderance of the evidence that (1) "Mr. Trump raped Ms. Carroll?", (2) "Mr. Trump sexually abused Ms. Carroll?", (3) "Mr. Trump forcibly touched Ms. Carroll?".[42] These three theories of liability (rape, sexual abuse, and forcible touching) were the same three proposed by both parties. As the Court instructed the jury:

> "Ms. Carroll claims that Mr. Trump is liable to her for battery on three
> different and alternative bases, each of which corresponds to a criminal law
> definition of a different sex crime. Mr. Trump denies that he is liable to her for
> battery on any of these three different and alternative bases. . . . Accordingly, the first

---

[41]     Fed. R. Civ. P. 49(a)(2).

[42]     Dkt 174 (Verdict) at 1.

set of questions in the verdict form has to do with whether or not Ms. Carroll has

established that Mr. Trump's conduct, if any, came within any of those criminal law

definitions."[43]

The Court then instructed the jury on the definitions of the three different sex crimes.

On the first question – whether Ms. Carroll proved that Mr. Trump "raped" her – the

Court instructed the jury in accordance with the New York Penal Law's definition of rape:[44]

> "In order to establish that Mr. Trump raped her, Ms. Carroll must prove each
>
> of two elements by a preponderance of the evidence.
>
> The first element is that Mr. Trump engaged in *sexual intercourse* with her.
>
> The second element is that Mr. Trump did so without Ms. Carroll's consent
>
> by the use of forcible compulsion. . . .
>
> 'Sexual intercourse' means any penetration, however slight, *of the penis* into
>
> the vaginal opening. In other words, *any penetration of the penis* into the vaginal
>
> opening, regardless of the distance of penetration, constitutes an act of sexual
>
> intercourse. Sexual intercourse does not necessarily require erection *of the penis*,
>
> emission, or an orgasm.
>
> . . .
>
> I also used the phrase 'forcible compulsion,' and what that means is
>
> intentionally to compel by the use of physical force.

---

[43]   Dkt 201 (Trial Tr.) at 1416:1-9.

[44]   It was necessary to obtain findings under the New York Penal Law definitions because the
timeliness of the battery claim under the Adult Survivors Act depended on such findings.
N.Y. CPLR § 214-j.

29

. . .

If you find that Ms. Carroll has proved by a preponderance of the evidence both of those two elements, you will answer Question 1 'yes.' If you answer Question 1 'yes,' I instruct you that Mr. Trump thus committed battery against Ms. Carroll. There would be no need to consider whether he committed battery on either of the other two alternative bases. . . . If you find that Ms. Carroll has not proven either of the two elements of rape by a preponderance of the evidence, you must answer 'no' to Question 1 and go on to Question 2, which deals with the second of the three alternative bases for the battery claim."[45]

Thus, the instructions required the jury to answer Question 1 "No" unless it found that Ms. Carroll had proved that Mr. Trump penetrated her vagina *with his penis*. Penetration by any other body part did not suffice.

With respect to the second question, whether Ms. Carroll proved that Mr. Trump "sexually abused" her within the meaning of the New York Penal Law, the Court instructed the jury:

"The second theory of battery corresponds to something called sexual abuse. Sexual abuse has two elements. In order to establish that Mr. Trump sexually abused her, Ms. Carroll must prove each of two elements by a preponderance of the evidence.

The first element is that Mr. Trump subjected Ms. Carroll to sexual contact.

The second element is that he did so without Ms. Carroll's consent by the use of forcible compulsion.

---

[45] Dkt 201 (Trial Tr.) at 1416:18-1418:2 (emphasis added).

. . . Sexual contact for this purpose means *any touching of the sexual or other intimate parts* of a person for the purpose of gratifying the sexual desire of either person. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, and the touching may be either directly or through clothing.

. . . For this purpose, *a 'sexual part' is an organ of human reproduction*. So far as intimate part is concerned, the law does not specifically define which parts of the body are intimate. Intimacy, moreover, is a function of behavior and not just anatomy. Therefore, if any touching occurred, the manner and circumstances of the touching may inform your determination whether Mr. Trump touched any of Ms. Carroll's intimate parts. You should apply your common sense to determine whether, under general societal norms and considering all the circumstances, any area or areas that Mr. Trump touched, if he touched any, were sufficiently personal or private that it would not have been touched in the absence of a close relationship between the parties.

. . .

If you find that Ms. Carroll has proved by a preponderance of the evidence both of the two elements that I just referred to, the two elements of sexual abuse, then you will answer 'yes' to Question 2. If you answer yes to Question 2, I instruct you that Mr. Trump thus committed battery against Ms. Carroll. There would be no need to consider whether he committed battery on the third alternative test. . . . If you find that Ms. Kaplan [*sic*] has not proven either of the two elements of sexual abuse by a preponderance of the evidence, you must answer 'no' to Question 2 and proceed to Question 3, which deals with the third of the three alternative bases for the battery

claim."[46]

Thus, if the jury found that Mr. Trump penetrated Ms. Carroll's vagina with his fingers, it was obliged to answer Question 2 "Yes" assuming the other element was satisfied.

Questions 4 and 5 dealt with compensatory and punitive damages, respectively, for Ms. Carroll's battery claim. Question 4 asked whether Ms. Carroll proved that she was injured as a result of Mr. Trump's conduct, and if so, to insert a dollar amount that would fairly and adequately compensate her for that injury or those injuries.  The Court instructed the jury:

> "My instructions to you on the law of damages should not be taken by you as a hint that you should find for the plaintiff. That is for you to decide by answering the questions I have put to you based on the evidence presented. But if you answer 'yes' to any of Question 1, Question 2, or Question 3, you will have determined that Ms. Carroll has prevailed on her claim of battery. In that event, it will be your task to determine from the evidence a dollar amount, if any, that would justly and adequately compensate Ms. Carroll for any physical injury, pain and suffering, and mental anguish, as well as emotional distress, fear, personal humiliation, and indignation that she has suffered, or will suffer in the future, as a result of Mr. Trump's alleged rape, sexual abuse, or forcible touching as the case may be.

> You may award damages only for those injuries that you find Ms. Carroll has proved by a preponderance of the evidence. Compensatory damages may not be based on speculation or sympathy. They must be based on the evidence presented at trial and only on that evidence.

---

[46] *Id.* at 1418:3-1420:8 (emphasis added).

SPA-194

32

Now, if you answer 'yes' to Question 4 . . . she [(Ms. Carroll)] would be entitled to a dollar amount to compensate her adequately and fairly for any physical injury, pain and suffering, mental anguish, emotional distress, and the other things I just mentioned a moment ago, that she suffered by virtue of Mr. Trump's alleged battery, in other words, his alleged rape, sexual abuse, or forcible touching, as the case may be. Damages may be awarded based on a plaintiff's subjective testimony of pain, but the plaintiff's proof must satisfactorily establish that the injury is more than minimal."[47]

*Defamation Instructions*

The factual questions for the defamation liability issue were (1) whether Ms. Carroll proved by a preponderance of the evidence that Mr. Trump's statement was defamatory and (2) whether Ms. Carroll proved by clear and convincing evidence his statement was (a) false and (b) made with actual malice.  As relevant to Mr. Trump's arguments in this motion, the Court instructed the jury that:

"Question 7, as you see on the verdict form, asks whether Ms. Carroll has proved by something called clear and convincing evidence that Mr. Trump's

---

[47]  *Id.* at 1422:17-1423:25.

Question 5 on punitive damages asked whether Ms. Carroll proved by a preponderance of the evidence that Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to such disregard.  If so, it asked how much Mr. Trump should pay to Ms. Carroll in punitive damages. Given that Mr. Trump does not dispute the jury's $20,000 award in punitive damages for Ms. Carroll's battery claim, the Court's instructions on this question need not be reproduced here.

SPA-195

33

statement was false. . . . A statement is false if it is not substantially true. You will

determine from the evidence presented what the truth was and then compare that

with Mr. Trump's October 12 statement, taking that statement according to its

ordinary meaning, the ordinary meaning of its words.

As you probably already have guessed, *whether Mr. Trump's statement is*

*false or true depends largely or entirely on whether you find that Mr. Trump raped*

*or sexually abused or forcibly touched or otherwise sexually attacked Ms. Carroll.*

. . .

Question 8, in substance, asks you to determine whether Ms. Carroll has

proved by clear and convincing evidence that Mr. Trump made the statement with

what the law calls actual malice. Actual malice for this purpose . . . means that Mr.

Trump made the statement knowing that it was false or acted in reckless disregard

of whether or not it was true. Reckless disregard means that when he made the

October 12 statement, he had serious doubts as to the truth of the statement or made

the statement with a high degree of awareness that it was probably false. So Question

8 asks you to decide whether Ms. Carroll proved by clear and convincing evidence

that Mr. Trump, when he made his October 12 statement, knew that it was false, had

serious doubts as to its truth, or had a high degree of awareness that the statement

probably was false."[48]

The question on compensatory damages was broken down into several parts.  First,

it asked whether Ms. Carroll proved by a preponderance of the evidence that Ms. Carroll was injured

---

[48]  *Id.* at 1430:17-1432:3 (emphasis added).

SPA-196

34

as a result of Mr. Trump's publication of the October 12, 2022 statement. If so, it asked that the jury (1) insert a dollar amount for any damages other than the reputation repair program, and (2) insert a dollar amount for any damages for the reputation repair program only.  The Court instructed the jury that:

> "In the event Mr. Trump is liable for defamation, you will award an amount that, in the exercise of your good judgment and common sense, you decide is fair and just compensation for the injury to the plaintiff's reputation and the humiliation and mental anguish in her public and private life which you decide was caused by the defendant's statement. In fixing that amount, if you fix one, you should consider the plaintiff's standing in the community, the nature of Mr. Trump's statement made about Ms. Carroll, the extent to which the statement was circulated, the tendency of the statement to injure a person such as Ms. Carroll, and all of the other facts and circumstances in the case. These damages can't be proved with mathematical certainty. Fair compensation may vary, ranging from one dollar, if you decide that there was no injury, to a substantial sum if you decide that there was substantial injury.
>
> Now, in this case, Question 9, I have divided the damages determination into two parts . . . . The first part of Question 9, right at the top, the yes/no question asks you to decide whether Ms. Carroll has proved by a preponderance of the evidence that she was injured in any of the respects I just described. . . . If the answer is 'yes,' you first will fill in the amount you award for all defamation damages, excluding the reputation repair program. You will leave that out if you put in a figure in the first blank. That was of course the testimony of Professor Humphreys. Second, you will

SPA-197

35

fill in the amount, if any, that you award for the reputation repair program only."[49]

The last question on the form, on punitive damages for the defamation claim, asked whether in making the 2022 statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another.  If so, it asked how much, if any, Mr. Trump should pay to Ms. Carroll in punitive damages.  The Court instructed the jury:

> "In addition to the claim for punitive damages for the defamation, Ms. Carroll asks also that you award punitive damages for the defamation. Similar to my earlier instructions to you regarding punitive damages on the battery claim, punitive damages in relation to a libel claim – the defamation claim – may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same. Now, this is where that difference between 'actual malice,' which I already talked about, and 'malice' or 'maliciously' comes into play. . . . A statement is made with malice or it's made maliciously for the purpose of Question 10 if it's made with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights.
>
> If you answer 'yes' to the first part of Question 10 – in other words, if you find that Mr. Trump acted with malice, as I have just defined that term for you, in making the October 12 statement about Ms. Carroll – you will write down an amount, if any, that you find Mr. Trump should pay to Ms. Carroll in punitive damages for the defamation. If you answer 'no' to that first part of Question 10 – that is, you find that Mr. Trump's statement was not made maliciously – you may not

---

[49] *Id.* at 1432:25-1434:7.

award punitive damages. . . .

In arriving at your decision as to the amount of punitive damages, you should

consider here with respect to the defamation punitive damage claim:

The nature and reprehensibility of what Mr. Trump did if he defamed her;

that would include the character of the wrongdoing and Mr. Trump's awareness of

what harm the conduct caused or was likely to cause. In considering the amount of

punitive damages to award, you should weigh that factor heavily;

You should consider the actual and potential harm created by Mr. Trump's

conduct; and

You should consider Mr. Trump's financial condition and the impact of your

award of punitive damages, if any, on Mr. Trump."[50]

This concluded the Court's substantive instructions on the law, as relevant to Mr. Trump's motion.

*The Jury's Decision*

In accordance with the Court's instructions, which the jury is presumed to have

followed,[51] the jury made the following explicit findings based on its answers to the verdict form.

On the sexual battery claim, the jury found that:

- Mr. Trump *sexually abused* Ms. Carroll.

- Mr. Trump *injured her* in doing so.

- "Mr. Trump's conduct was *wilfully or wantonly negligent, reckless, or done*

---

[50]

 *Id.* at 1434:17-1436:10.

[51]

 *E.g.*, *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998).

37

> *with a conscious disregard of the rights of Ms. Carroll*, or was so reckless as to amount to such disregard".[50]

- Ms. Carroll was entitled to compensatory and punitive damages on the sexual battery claim of *$2.02 million* ($2 million in compensatory damages and $20,000 in punitive damages).

On the defamation claim, it found that:

- Mr. Trump's October 12, 2022 statement was *defamatory* and *false* (*i.e.*, "not substantially true").

- Mr. Trump made that statement "with actual malice" – that is, that when he made the statement, Mr. Trump *"knew that it was false", "had serious doubts as to its truth",* or *"had a high degree of awareness that the statement probably was false."*[51]

- "Ms. Carroll was *injured* as a result of Mr. Trump's publication of the October 12, 2022 statement."[52]

- "Mr. Trump *acted maliciously, out of hatred, ill will, spite or wanton, reckless, or wilful disregard* of the rights of another."[53]

- Ms. Carroll was entitled to *$2.98 million* in compensatory and punitive

---

[50]      Dkt 174 (Verdict) at 2 (emphasis added).

[51]      Dkt 201 (Trial Tr.) at 1432:1-3 (emphasis added).

[52]      Dkt 174 (Verdict) at 3 (emphasis added).

[53]      *Id.* (emphasis added).

damages on the defamation claim relating to the October 12, 2022 statement ($1.7 million in compensatory damages for the "reputation repair program" only, $1 million in compensatory damages for damages other than the reputation repair program, and $280,000 in punitive damages).

### Discussion

Mr. Trump's motion is addressed only to the jury's damages awards, specifically its compensatory damages award for Ms. Carroll's sexual battery claim, and its compensatory and punitive damages awards for the defamation claim. He does not challenge the Court's instructions or the jury's liability verdict. All of his arguments are unpersuasive.

### The Legal Standard

A "trial judge enjoys 'discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence,' and . . . '[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'"[56] "In considering motions for a new trial and/or remittitur, '[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.'"[57]

---

[56] *Lore v. City of Syracuse*, 670 F.3d 127, 176–77 (2d Cir. 2012) (alterations in original) (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996)).

[57] *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Gasperini*, 518 U.S. at 435).

SPA-201

39

"Ordinarily, a court should not grant a new trial 'unless it is convinced that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.' . . . Nevertheless, the standard for granting a new trial under Rule 59 is less stringent than the standard under Rule 50."[58]  Specifically, unlike the standard on a Rule 50 motion, on a Rule 59 motion: "(1) a new trial . . . may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."[59]  "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility."[60]

With respect to determining whether the jury's damages awards come within the confines of state law, "[u]nder New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'"[61]  "To

---

[58]

*Mono v. Peter Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 475 (S.D.N.Y. 1998) (quoting *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988)).

In *Mono*, the Court identified "an unresolved *Erie* issue – whether the state or federal standard of review applies in a motion for a new trial in a diversity action. New York law does not distinguish between a motion for a new trial and a motion for a judgment notwithstanding the verdict. . . . Thus, if state law applies to defendants' Rule 59 motion, the standard of review would be whether the jury could have reached its verdict on 'any fair interpretation of the evidence.'" *Id.* at 475, n.2 (citations omitted). However, as in *Mono*, "[b]ecause the evidence presented at trial [in *Carroll II*] satisfies both the federal and state standards, I need not determine which jurisdiction's law controls [Mr. Trump's] motion for a new trial." *Id.*

[59]

*Iverson v. Surber*, No. 13-CV-633 (RA), 2018 WL 6523176, at *1 (S.D.N.Y. Nov. 13, 2018), *aff'd*, 800 F. App'x 50 (2d Cir. 2020) (citation omitted).

[60]

*Id.* (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).

[61]

*Stampf*, 761 F.3d at 204 (quoting N.Y. CPLR § 5501(c)).

40

determine whether a jury award is excessive within the meaning of [New York Civil Practice Law and Rules] § 5501(c), New York courts compare it with awards in similar cases."[62]   The relevant standard "is not whether an award deviates *at all* from past awards – it is whether an award deviates *materially* from *reasonable compensation*."[63]

*Compensatory Damages - Sexual Battery Claim*

   *Mr. Trump Digitally and Forcibly Penetrated Ms. Carroll's Vagina*

   Mr. Trump argues that the Court should grant a new trial or remittitur with respect to the jury's award of compensatory damages for Ms. Carroll's sexual battery claim chiefly on the ground that "the [j]ury found that [Ms. Carroll] was not raped but was sexually abused by [Mr. Trump] during the 1995/96 Bergdorf Goodman incident."[64]   According to Mr. Trump, "[s]uch abuse could have included groping of Plaintiff's breasts through clothing or similar conduct, which is a far cry from rape. Therefore, an award of $2 million for such conduct, which admittedly did not cause any diagnosed mental injury to Plaintiff, is grossly excessive under the applicable case law."[65] Mr. Trump's argument is incorrect at every step.

   First, the definition of "rape" in the New York Penal Law – which the jury was obliged to apply in responding to Question 1 on the verdict form – requires forcible penetration of

---

[62]

   *Id.*

[63]

   *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008) (emphasis in original).

[64]

   Dkt 205 (Def. Mem.) at 1.

[65]

   *Id.*

41

the victim's vagina *by the accused's penis.*[66]  Accordingly, the jury's negative answer to Question

1 means *only* that the jury was unpersuaded that Mr. Trump's penis penetrated Ms. Carroll's vagina.

It does not mean that he did not forcibly insert his fingers into her – that he "raped" her in the

broader sense of that word which, as discussed above, includes any penetration by any part of an

accused's body (including a finger or fingers) or any other object.[67]

      Second, Mr. Trump's argument ignores the fact that the verdict in this case was a

---

[66]

The New York Penal Law states that "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . 1. By forcible compulsion . . . ." N.Y. Penal Law § 130.35.  It provides also that "'[s]exual intercourse' has its ordinary meaning and occurs upon any penetration, however slight." *Id.* § 130.00. New York courts have interpreted "sexual intercourse" as involving *penile* penetration. *E.g.*, *People v. Berardicurti*, 167 A.D.2d 840, 841 (4th Dept. 1990) ("The trial court properly instructed the jury that, to constitute sexual intercourse, penetration 'need not be deep' and that '[a]ny penetration of the penis into the vaginal opening, regardless of the distance or amount of penetration' constitutes sexual intercourse.") (citation omitted); *People v. Peet*, 101 A.D.2d 656, 656 (3d Dept. 1984), *aff'd*, 64 N.Y.2d 914 (1985) ("[T]he use of one's finger has already been sufficiently proscribed by section 130.65 of the Penal Law  [(sexual abuse in the first degree)] . . . ."); *Williams v. McCoy*, 7 F. Supp. 2d 214, 220-21 (E.D.N.Y. 1998) (rejecting petitioner's argument that "the trial judge erred in instructing the jury on the elements of rape because he neglected to explain that rape requires penile – as opposed to digital – penetration" because "[a] jury of competent adults surely understood the 'ordinary meaning' of 'sexual intercourse' to require penile penetration"). This Court accordingly instructed the jury that sexual intercourse required penile penetration of the vagina, and neither party objected to that definition.

[67]

It is not entirely surprising that the jury did not find penile penetration but, as discussed below, implicitly found digital penetration.  Ms. Carroll testified about the specific physical memory and excruciating pain of the digital penetration at great length and in greater detail than the penile penetration. She acknowledged that she could not see exactly what Mr. Trump inserted but testified on the basis of what she felt. Dkt 187 (Trial Tr.) at 181:20-23 ("I couldn't see anything. I couldn't see anything that was happening. But I could certainly feel it. *I could certainly feel that pain in the finger jamming up.*") (emphasis added). Moreover, the jury might have been influenced by defense counsel's ardent summation in which he virtually begged the jury not to answer the "rape" question against Mr. Trump. Dkt 199 (Trial Tr.) at 1370:5-10 ("To condemn someone as a rapist is a decision you would have to live with for the rest of your lives. Don't let her throw that burden on you. Don't let her throw her burden on you to have to carry forever. You know this didn't happen, that Donald Trump raped E. Jean Carroll in a Bergdorf Goodman changing room. You know it didn't happen.").

special verdict governed by Rule 49 of the Federal Rules of Civil Procedure. The form of the

verdict, including the fact that it did not ask the jury to decide exactly what conduct Mr. Trump

committed in the event it found for Ms. Carroll as to sexual abuse – was approved by Mr. Trump

as well as by Ms. Carroll.[68]  In these circumstances,

> "A party waives the right to a jury trial on any issue of fact raised by the
> pleadings or evidence but not submitted to the jury unless, before the jury retires, the
> party demands its submission to the jury. *If the party does not demand submission,
> the court may make a finding on the issue. If the court makes no finding, it is
> considered to have made a finding consistent with its judgment on the special
> verdict.*"[69]

Neither party made any such demand here. So the jury (or the Court) is deemed to have made a

finding in accord with the judgment on the special verdict unless the Court makes a contrary

finding.[70]  In other words, the jury is deemed to have found that the specific conduct in which Mr.

---

[68]
    Dkt 199 (Trial Tr.) at 1208:12-21 (Both Ms. Carroll's counsel and Mr. Trump's counsel
    stating that they have no objection to the verdict form).

[69]
    Fed. R. Civ. P. 49(a)(3).

[70]
    *Roberts v. Karimi,* 251 F.3d 404, 407 (2d Cir. 2001) ("When a jury is specially instructed,
    and 'an issue [is] omitted' without objection, it 'shall be deemed' that a finding was made
    'in accord with the judgment on the special verdict,' *unless* the court makes a finding to the
    contrary.") (alterations and emphasis in original) (citation omitted); *Marbellite Co. v.
    Naitonal Sign & Signal Co.,* 2 Fed. App'x 118, 120 (2d Cir. 2001) ("If the court fails to
    make a finding on the issue, it will be deemed to have made a finding that is harmonious
    with the judgment entered on the special verdict."); *Getty Petroleum Corp. v. Island
    Transp.p. Corp.,* 878 F.2d 650, 655-56 (2d Cir. 1989) (in special verdict case, affirming on
    basis of implicit jury finding or, in the alternative, on basis of implicit finding in statement
    of the trial court).

    As the jury's response to Question 2 was an implicit finding that Mr. Trump forcibly
    digitally penetrated Ms. Carroll's vagina, no explicit independent finding by the Court is

43

Trump actually engaged was such that the damages award was justified provided the evidence permitted such a finding.[71] And for reasons discussed in greater detail below, the evidence of the attack generally coupled with forcible digital penetration of Ms. Carroll justified the damages awarded regardless of the jury's finding adverse to Ms. Carroll on the New York Penal Law rape question.

Ms. Carroll testified that the sexual assault – the "rape" – of which she accused Mr. Trump involved especially painful, forced digital penetration, which as recounted above she described graphically and emphatically to the jury. The testimony of the outcry witnesses, Mss. Birnbach and Martin, corroborated the essence of Ms. Carroll's account of a violent, traumatic sexual assault.  Ms. Leeds's testimony that Mr. Trump attacked her, culminating in putting his hand on her leg and up her skirt, suggests that Mr. Trump has a propensity for attempting forcibly to get his hands on and into women's sexual organs. Mr. Trump's own words from the *Access Hollywood* tape and from his deposition – that (a) stars "[u]nfortunately or fortunately" "c[ould] do anything" they wished to do to women, including "grab[bing] them by the pussy" and (b) he considers himself

---

necessary. Nevertheless, the Court alternatively finds that he did so.

[71]     As the Second Circuit has put it:

> "A district court has a duty to reconcile the jury's answers on a special verdict form with any reasonable theory consistent with the evidence, and to attempt to harmonize the answers if possible under a fair reading of those answers. . . . The court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, . . . and if there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another, the court must resolve the answers that way even if the interpretation is strained. . . . The district court should refer to the entire case and not just the answers themselves." *McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1311 (2d Ci. 1993) (citations omitted).

Thus, the Court is obliged to construe the jury's answer to Question 2 with reference to the entire case and in a manner that renders it consistent with the $2 million award for sexual assault.

to be a "star" – could have been regarded by the jury as a sort of personal confession as to his behavior. Thus, there was ample, arguably overwhelming evidence, that Mr. Trump forcibly digitally penetrated Ms. Carroll, thus fully supporting the jury's sexual abuse finding.

Mr. Trump's attempt to minimize the sexual abuse finding as perhaps resting on nothing more than groping of Ms. Carroll's breasts through her clothing is frivolous. There was no evidence whatever that Mr. Trump groped Ms. Carroll's breasts, through her clothing or otherwise. The only evidence of bodily contact between Mr. Trump and Ms. Carroll other than the digital and alleged penile penetration was Ms. Carroll's testimony that Mr. Trump (a) "shoved" and "thrust" her against the wall, (b) "put his shoulder against [her] and h[eld] [her] against the wall," (c) "his whole weight came against [her] chest and held [her] up there," (d) he "pulled down [her] tights," (e) her "arm was pinned down" while she pushed him back, and (f) "he put his mouth against [hers]." The jury was instructed that one of the essential elements of sexual abuse under the New York Penal Law is "sexual contact," defined as "touching of the sexual or intimate parts." None of these actions, other than putting his mouth against hers and perhaps pulling down her tights, was sexual contact.[72] The jury's finding of sexual abuse therefore necessarily implies that it found that

---

[72]
Mr. Trump does not argue that the jury's sexual abuse finding was based on Ms. Carroll's testimony that he put his mouth against hers (or any of the other actions listed above). Even assuming this non-consensual kiss was "touching of [a] sexual or intimate part[]," there is no basis to assume that the jury found Mr. Trump sexually abused her based on that contact but not on digital penetration. Ms. Carroll testified that "it was a shocking thing for him to suddenly put his mouth against [hers]," Dkt 187 (Trial Tr.) at 179:22-23, and that she thinks she "laughed pretty consistently after the kiss to absolutely throw cold water on anything he thought was about to happen," Dkt 189 (Trial Tr.) at 405:22-24. She did not testify as to any physical pain and lasting trauma of the non-consensual kiss, or of any other bodily contact between her and Mr. Trump, as she did repeatedly of the digital penetration. A determination that this jury found Mr. Trump sexually abused Ms. Carroll solely on the basis of a non-consensual kiss would require ignoring all this testimony and accepting a far less malign, albeit still wrongful, version of events that is contradicted by the overwhelming weight of the evidence.

Mr. Trump forcibly penetrated her vagina. And since the jury's answer to Question 1 demonstrates that it was unconvinced that there was penile penetration, the only remaining conclusion is that it found that Mr. Trump forcibly penetrated her vagina with his fingers – in other words, that he "raped" her in the sense of that term broader than the New York Penal Law definition.  And this conclusion is fully supported by Ms. Carroll's repeated and clear testimony on the digital penetration (more than the penile penetration), Dr. Lebowitz specifically mentioning Ms. Carroll squirming in response to an intrusive memory of Mr. Trump's fingers in her vagina, and the evidence at trial taken as a whole. It also is bolstered by the amount of the jury's verdict.

*The Jury's $2 Million Damages Award Is Not Excessive*

The trial evidence of the harm to Ms. Carroll as a result of being assaulted and digitally raped supports the jury's $2 million award as reasonable compensation for her pain and suffering. Ms. Carroll testified in detail with respect to the physical, emotional, and psychological injury she suffered after the incident with Mr. Trump. She expressed that in "the seconds, the minutes following [the assault] . . . my overwhelming thought was I had died and was somehow still alive."[73]  She testified that when she called Ms. Birnbach immediately after the assault, "I had not processed it. I had not processed what was going on. I felt the hand jammed, and I felt the back of my head hurting."[74]  The night of the assault, she testified "[m]y head hurt, my vagina felt pain ... ."[75]  In relation to the specific act of being digitally raped, Ms. Carroll testified that it was

---

[73]     Dkt 191 (Trial Tr.) at 635:23-636:1.

[74]     Dkt 187 (Trial Tr.) at 185:15-17.

[75]     *Id.* at 188:18.

46

"extremely painful," "a horrible feeling," "unforgettable," and that the day after the assault she "felt

[her] vagina still hurt from his fingers."[76]  She testified also about not being able to maintain a

romantic relationship or have sex for the past two decades since the "very violent" incident with Mr.

Trump and about experiencing "visions" or "sudden intrusions" which she has "had . . . ever since

the attack" and that "would absolutely take over [her] brain."[77]  These visions included her "feel[ing]

Donald Trump again on top of [her] . . . [she] thought for a minute [she] was going to die because

[she] couldn't breathe" and while going about her day "in would slide just a picture of him going

like this into the dressing room or hitting [her] head or feeling his fingers jammed up inside of

[her]."[78]  Ms. Carroll's testimony and Dr. Lebowitz's testimony, which is summarized above, of the

long-lasting emotional and psychological trauma that Ms. Carroll experienced as a result of the

incident with Mr. Trump demonstrate that the jury's $2 million award was motivated not by

sympathy, but by competent evidence of harm to Ms. Carroll.

      In view of the jury's implicit finding that Mr. Trump digitally raped Ms. Carroll, Mr.

Trump's argument and references to examples of damages awards "in the 'low six-figure range'"

where a plaintiff's "intimate parts were groped by a defendant" plainly are irrelevant.[79]  Many of the

---

[76]

    *Id.* at 180:24-25; Dkt 189 (Trial Tr.) at 406:10, 432:7-8.

[77]

    Dkt 187 (Trial Tr.) at 225:3, 225:19-226:7.

[78]

    *Id.* at 226:14-21.

[79]

    Dkt 205 (Def. Mem.) at 14-16.

    Mr. Trump's argument that Ms. Carroll's "alleged damages are identical to plaintiffs in other
cases asserting . . . a [loss of consortium claim], namely that Plaintiff argued to the Jury that
she should be compensated for living a life since early 1996 without companionship," also
is unavailing.  Dkt 211 (Def. Reply Mem.) at 1; *see also* Dkt 205 (Def. Mem.) at 13. His
theory ignores all of the other types of harm to Ms. Carroll that were discussed in her and

47

cases Mr. Trump cites are distinguishable also for the reasons identified by Ms. Carroll.[80]  To be

sure, there are New York cases in which plaintiffs who were sexually assaulted and/or raped were

awarded lower damages than was Ms. Carroll.[81]  There also, however, are cases with facts and

injuries comparable to those here in which plaintiffs were awarded similar or higher compensatory

damages.[82]  "Although a review of comparable cases is appropriate," the Court "need not average

---

Dr. Lebowitz's testimony, and in any case mistakenly conflates the loss of companionship in the context of a loss of consortium claim with the inability to form a romantic connection and have sex as a result of trauma arising from sexual assault.

[80]

Dkt 207 (Pl. Opp. Mem.) at 15-16 ("In some [of Mr. Trump's 'comparator'] cases, the plaintiff was awarded the exact amount of compensatory damages that the plaintiff herself had requested, often as part of a damages inquest conducted by a magistrate judge during default judgment proceedings. . . . As a result, those cases obviously have little to nothing to say about the damages that a jury might have awarded on a full evidentiary record developed at trial, as occurred here. Other cases cited by Trump involved evidentiary issues not present in this case. . . . And not one of the cases Trump cites involved evidence of injury covering a 25-year-plus period. That distinguishes Carroll's case from all of the cases on which Trump relies, and it was entirely reasonable for the jury to account for the harm that Carroll has experienced ever since the assault in 1996 in determining compensatory damages.") (citations omitted).

[81]

See Dkt 205 (Def. Mem.) at 15-16 (citing cases).

[82]

E.g., Ortiz v. New York City Hous. Auth., 22 F. Supp. 2d 15, 39 (E.D.N.Y. 1998), aff'd, 198 F.3d 234 (2d Cir. 1999) (jury's $3 million compensatory damages award for plaintiff who was raped at gunpoint, diagnosed with PTSD, and suffered "dramatic[] change[s]" to the quality of her life did not deviate materially from reasonable compensation) (citing cases).

Ms. Carroll cites to three cases, one of which is Ortiz, in which the plaintiffs were awarded more than Ms. Carroll was. Breest v. Haggis, No. 161137/2017, 2023 WL 374404 (N.Y. Sup. Ct., N.Y. Cty. Jan. 24, 2023) ($7.5 million); Egan v. Gordon, No. 904231-20 (N.Y. Sup. Ct., Albany Cty., Nov. 10, 2022) ($13.8 million). Mr. Trump correctly observes certain differences between those cases and this one, including in the details of the rapes and in the fact that the plaintiffs in those cases were diagnosed with PTSD whereas Ms. Carroll was not. Those differences, however, do not render these cases of no value in determining the appropriate range of reasonable compensation. Indeed, the greater severity of the harm in those cases might explain why the awards were greater than the amount awarded to Ms. Carroll, while still demonstrating that $2 million is not outside the bounds in circumstances such as these.

48

the high and low awards; [it may] focus instead on whether the verdict lies within the reasonable range."[83]  It accordingly suffices for present purposes that the jury's award of $2 million falls within a reasonable range of the amounts awarded to plaintiffs in comparable sexual assault and rape cases.

In these circumstances, and based on all of the evidence presented at trial, the jury's compensatory damages award to Ms. Carroll for her sexual battery claim did not deviate materially from reasonable compensation so as to make it excessive under New York law.

*Compensatory Damages - Defamation Claim*

Mr. Trump argues that "the general compensatory damages for the defamation claim should be no more than $100,000, and no more than $368,000 (the low estimate provided by Professor Humphreys) for the reputation repair campaign."[84]  He contends that the jury's awards should be reduced to these amounts because "the jury awards in this case for these categories of damages were speculative and based upon alleged harms caused by the June 2019 statements."[85]  He makes eleven specific arguments, at least seven of which are based on challenges to the testimony of Professor Humphreys, Ms. Carroll's defamation damages expert.  None ultimately is persuasive.

*Professor Humphreys's Testimony*

Mr. Trump makes the following challenges to Professor Humphreys's testimony:

---

[83]     *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017).

[84]     Dkt 205 (Def. Mem.) at 18.

[85]     *Id.*

1. "Professor Humphreys testified about the purported harm arising from the June 2019 Statements and even compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, but did not do a comparison between her reputational harm before and after the October 12, 2022 Statement. . . . Therefore, Professor Humphreys must have included the alleged harm from the June 2019 Statements as part of her damages analysis."

2. "Professor Humphreys testified that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social [(Mr. Trump's social media platform)] and Twitter to anything more specific than somewhere 'between 1.5 million and 5.7 million times,' which is an error rate of 74%. . . . Such an analysis is thus pure speculation."

3. "Professor Humphreys testified that the people who read and believed the October 12, 2022 Statement were 'republicans [who] typically believe Mr. Trump.' . . . Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of the October 12, 2022 Statement, and that Plaintiff's reputation with such supporters would not have changed due to such statement."

4. "Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is 'a campaign to put out positive messages about' Plaintiff. . . . However, Professor Humphreys did not

50

explain how existing Trump supporters would have changed their minds about Plaintiff from merely seeing positive messages about Plaintiff. Professor Humphreys also testified that she has never done a reputation repair campaign before, and thus, her opinion on this issue should be given little weight."

5.   "Professor Humphreys testified that (a) the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement . . . and (b) she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiffs rape allegation from reading the June 2019 Statements. . . . Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation. Additionally, her testimony only supports the argument that the October 2022 Statement did not cause Plaintiff any harm in addition to any harm that was caused by the June 2019 Statements, because people already had made up their minds as to the veracity of Plaintiffs accusations as of the June 2019 Statements."

6.   "Professor Humphreys's cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million . . . , which is an error rate of 86 percent. This is especially troublesome since Professor Humphreys testified that she has never done a reputation repair campaign before."

7.    "Professor Humphreys also testified that she did not analyze any of Plaintiffs
numerous media appearances where Plaintiff enhanced her reputation with
regard to her allegations against Defendant. . . . In fact, Plaintiff conceded
that she received a vast amount of positive support from the public after
making her accusation against Defendant. . . . Even though Professor
Humphreys admitted that Plaintiff received positive support from the public
after the rape allegation, she did not factor such support into her analysis of
the harm allegedly caused by the October 12, 2022 Statement. . . .
Accordingly, her analysis of reputational harm is pure speculation."[86]

Ms. Carroll points out that Mr. Trump's arguments concerning Professor Humphreys
"get at the core of Professor Humphreys's reliability as an expert, something Trump could have
challenged under Federal Rule of Evidence 702 [(which governs the admissibility of expert
testimony)] or raised on cross-examination."[87] His failure to do so, she contends, waived his present
complaints. Mr. Trump counters, however, that his challenges are timely because they go to the
weight, not the admissibility, of Professor Humphreys's testimony and because he preserved the
issues by raising them on cross examination at trial.[88] Thus, there is a threshold question with

---

[86]    Dkt 205 (Def. Reply Mem.) at 19-21.

[87]    Dkt 207 (Pl. Opp. Mem.) at 19.

[88]    Dkt 205 (Def. Reply Mem.) at 3. *See Disability Advocs., Inc. v. Paterson*, No. 03-CV-3209
(NGG) (MDG), 2009 WL 1312112, at *7 (E.D.N.Y. May 8, 2009) ("Thus, while Defendants
are free to conduct vigorous cross-examine of Plaintiff's experts at trial and may argue in
their post-trial briefing that the court should accord the opinions of those experts little or no
weight, they may not renew their challenge to the admissibility of those opinions.");
*Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 446 (S.D.N.Y. 2007) ("[E]ven
where a post-trial challenge to the admissibility of expert evidence is barred, a trial court

SPA-214

52

respect to whether Mr. Trump waived those arguments in relation to Professor Humphreys's testimony by failing to raise them previously, as a Rule 59 motion generally is not a proper vehicle to raise new arguments or legal theories.[89]

On reflection, the Court concludes that Mr. Trump's arguments listed above go primarily to the weight, rather than the admissibility, of Professor Humphreys's testimony. "Generally, arguments that the assumptions relied on by an expert are unfounded go to the weight rather than the admissibility of the evidence."[90] Most of Mr. Trump's arguments concern certain assumptions Professor Humphreys made or did not make in forming her expert opinion (*e.g.*, whether she included the alleged harm from the 2019 statements in her analysis, whether and how she considered Mr. Trump's supporters who viewed his 2022 statement, and whether she took into account Ms. Carroll's media appearances). The Court therefore considers Mr. Trump's challenges

---

remains free to grant a new trial if it weighs the prevailing party's scientific proof and finds it wanting.").

[89]   *MJAC Consulting, Inc. v. Barrett*, No. 04-cv-6078 (WHP), 2006 WL 2051129, at *3 (S.D.N.Y. July 24, 2006) (citing cases).

[90]   *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 270 (S.D.N.Y. 2001). *See also AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW) (SN), 2019 WL 1254763, at *3 (S.D.N.Y. Mar. 19, 2019), *objections overruled*, No. 1:15-CV-3411(GHW), 2019 WL 2992016 (S.D.N.Y. July 8, 2019) ("Any contentions that the expert's 'assumptions are unfounded go to the weight, not the admissibility, of the testimony.'") (citation omitted); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9480448, at *1 (S.D.N.Y. Dec. 29, 2015) ("'Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'") (citation omitted); *Colombo v. CMI Corp.*, 26 F. Supp. 2d 574, 576 (W.D.N.Y. 1998) ("Although a district court 'may ... inquire into the reliability and foundation of any expert opinion to determine admissibility,' *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987), '[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.' *Id.*") (ellipsis and alteration in original).

SPA-215

53

to Professor Humphreys's testimony as having been timely raised.[91]   Nevertheless, Mr. Trump's

arguments are unavailing on the merits.

His contention that Professor Humphreys "did not do a comparison between [Ms.

Carroll's] reputational harm before and after the October 12, 2022 Statement" and she therefore

"must have included the alleged harm from the June 2019 Statements as part of her damages

analysis" is contradicted by the record. Professor Humphreys testified that in her analysis, although

she "noticed . . . that those meetings [(public statements of negative associations with Ms. Carroll)]

existed after June 2019, . . . the frequency of the posting with those associations had started to

decline. However, after the statement on October 12th, the frequency of the negative associations,

the volume of them again escalated."[92]   She testified also that she "only looked at the reputational

harm from the October 12[, 2022] statement" and that the cost she estimated to repair Ms. Carroll's

reputation following Mr. Trump's 2019 statements – the subject of *Carroll I* – was "higher" than

---

[91]
      Mr. Trump's two "error" rate arguments arguably go more to the admissibility of Professor Humphreys's testimony and therefore would be waived. *E.g., AU New Haven, LLC*, 2019 WL 1254763, at *23 (stating that a high error rate "would be a valid basis to exclude an expert with scientific knowledge under *Daubert*"). But there is a vast difference between an error rate, on the one hand, and an expert opining that a quantity falls within a certain range, on the other.  For example, an appraiser who values a piece of real state as falling in the range of $12 million to $14 million has not made an "error"; the expert is merely giving an opinion that a willing buyer and a willing seller would conclude a sale within that range. In any event, Mr. Trump's arguments that there were high error rates in Professor Humphreys's calculations fail to demonstrate that the jury's compensatory damages award was erroneous or against the weight of the evidence. Indeed, it is plausible that the jury took the so-called error rates, along with any other purported weaknesses in Professor Humphreys's testimony, into account in awarding damages well below the high end of Professor Humphreys's estimated range. Dkt 197 (Trial Tr.) at 1142:14-16 ("[O]n the low, low end it would be [$368,000], and on the high end it would be 2.7 million.").

[92]
      Dkt 197 (Trial Tr.) at 1130:18-22.

SPA-216

54

the cost she estimated to repair Ms. Carroll's reputation following the 2022 statement.[93]  Moreover,
to remove any doubt, the Court specifically instructed the jury that "the question of whether there
was any adverse effect by virtue of the 2019 statements and, if there was, how much adverse effect
is not at issue in this case. It is not for you to determine."[94]  There accordingly is no basis to assume
that the jury award for the 2022 statement improperly included damages for the 2019 statements.

Mr. Trump's remaining challenges to Professor Humphreys's testimony similarly fail
to support his argument for a new trial on or a reduction in the damages. Professor Humphreys's
testimony was not "pure speculation" because she "did not analyze any of Plaintiffs numerous media
appearances where Plaintiff enhanced her reputation with regard to her allegations against
Defendant."  Professor Humphreys testified that "in terms of reputation," the "positive responses
or comments [do not] offset negative responses."[95]  She explained: "if you imagine, like, at the place
where you work, if 20 percent of your colleagues think that you stole money where you work, let's
say you have a hundred colleagues and 20 of them think that you stole money, that still has an
impact on your work life and your day-to-day reputation, and so I think that 20 percent is still
important."[96]

Nor are his arguments that Professor Humphreys "did not take into consideration the
fact that Trump's supporters [who read and believed the 2022 statement] likely would never have

---

[93]      *Id.* at 1158:12-23.

[94]      *Id.* at 1158:3-6.

[95]      *Id.* at 1135:9-11.

[96]      *Id.* at 1135:11-17.

SPA-217

55

supported or believed Plaintiff regardless of the [2022 statement]" and "did not explain how existing Trump supporters [or people who had made up their minds already based on the 2019 statements] would have changed their minds about Plaintiff" through her proposed reputation repair program grounds to minimize the weight of her testimony. Mr. Trump's counsel cross examined Professor Humphreys on these points. Professor Humphreys explained that in her view, it is "very likely that [the 2022 statement] was seen by some new people."[97]

The jury considered all of Professor Humphreys's testimony, including the purported flaws Mr. Trump's counsel attempted to draw out on cross examination and in summation, and determined that her testimony still was worthy of sufficient weight to reach the $1.7 million it awarded for the reputation repair program. None of Mr. Trump's challenges to that testimony, considered separately or collectively, supports a determination that the jury's compensatory damages award was seriously erroneous, egregious, or against the weight of the evidence.

*Mr. Trump's Other Arguments and Awards in Comparable Defamation Cases*

Mr. Trump's other objections to the jury's compensatory damages award for Ms. Carroll's defamation claim are without merit.  He contends that the jury's award was excessive because:

"[T]he overall essence of Plaintiff's defamation claim was that Defendant allegedly defamed Plaintiff when he denied her rape allegation. . . . [T]he Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim based upon an alleged rape failed. Accordingly, all that was left of Plaintiff's

---

[97]     *Id.* at 1135:10-11.

56

> defamation claim was that Defendant defamed Plaintiff by stating that 'he has no
>
> idea who Carroll was[,]' . . . which is far less damaging to Plaintiff's reputation than
>
> accusing Plaintiff of lying about the alleged rape."[98]

His argument is grounded entirely on false premises.

The crux of Ms. Carroll's defamation claim was that Mr. Trump defamed her by stating that she lied about him sexually assaulting her in order to increase sales of her new book or for other inappropriate purposes. Her claim, as noted above, never was limited to the specific definition of "rape" in the New York Penal Law, which requires penile penetration. Nor was any specific "portion[] of the defamation claim based upon an alleged rape." Mr. Trump did not deny specifically "raping" Ms. Carroll or specifically penetrating her with his penis as opposed to with another body part in his 2022 statement. He instead accused her of lying about the incident as a whole, of "completely ma[king] up a story" that was a "Hoax and a lie."[99] There is thus no factual or legal support for Mr. Trump's made-up version of Ms. Carroll's defamation claim.[100]

---

[98]    Dkt 205 (Def. Mem.) at 18-19.

[99]    Dkt 1 (Compl.) at 18, ¶ 92.

[100]    Mr. Trump's remaining arguments similarly lack merit. His contention that the jury "clearly must have [awarded compensatory damages for the June 2019 statements]" because Ms. Carroll "did not even attempt the separate the harm caused by the June 2019 Statements and the October 12, 2022 Statement" in her testimony fails for the same reasons discussed above with respect to his "double recovery" argument based on Professor Humphreys's testimony. Dkt 205 (Def. Mem.) at 19. It also is inaccurate because, as noted above, Ms. Carroll in fact did compare the post-2022 messages she received to the post-2019 messages and stated that the post-2022 messages were "equally disparaging and hurtful, but these particularly hurt because [she] thought [she] had made it through and there they are again." Dkt 189 (Trial Tr.) at 329:5-7. Moreover, even if Ms. Carroll had not clearly separated the harm from the 2019 statements from the 2022 statement, it would not demonstrate that the jury's award was against the weight of the evidence. The same is true for Mr. Trump's argument that in summation, Ms. Carroll's counsel stated "public statements" as opposed to the singular 2022 "statement." Dkt 205 (Def. Mem.) at 19. As noted above, the Court's instruction to the jury

57

Mr. Trump argues also that the jury's damages award deviates materially from the compensatory damages awards in other defamation cases in New York. Similar to the review of damages awards in sexual assault and rape cases, there certainly are cases – including those cited by Mr. Trump – in which plaintiffs in defamation cases in New York received compensatory damages awards considerably lower than the amount awarded to Ms. Carroll.[101]  The facts of those cases, however, were materially different from the facts and evidence in this case.  In many of those cases, the defamatory statements were published in far less public forums (*e.g.*, a "local newspaper"),[102] and none involved the scale of attention and influence commanded when the defendant in this case chooses to speak publicly. The cases Mr. Trump cites "do not compare in the slightest to being defamed by one of the loudest voices in the world, in a statement read by millions and millions of people, which described you as a liar, labeled your account of a forcible sexual assault a 'hoax,' and accused you of making up a horrific accusation to sell a 'really crummy book.'"[103] And, as Ms. Carroll cites, there are cases in New York in which defamation plaintiffs have been awarded compensatory damages higher than the amount awarded to Ms. Carroll, demonstrating that the jury's award here is not excessive and falls within the range of reasonable compensation.[104]

---

to ignore any harm arising from the 2019 statements overrides Mr. Trump's concern in this respect. Finally, his argument that Ms. Carroll testified she made more money after leaving *Elle* magazine and therefore suffered no financial harm from the 2022 statement is irrelevant. Ms. Carroll did not argue that she was owed compensatory damages for financial harm resulting from the 2022 statement.

[101]  Dkt 205 (Def. Mem.) at 16-17.

[102]  *Strader v. Ashley*, 61 A.D.3d 1244, 1247 (N.Y. App. Div. 3d Dep't 2009).

[103]  Dkt 207 (Pl. Opp. Mem.) at 24.

[104]  *Id.* at 23-25.

58

Mr. Trump accordingly has failed to meet his burden of demonstrating that a new trial or remittitur is warranted on the jury's compensatory damages award for Ms. Carroll's defamation claim.

*Punitive Damages - Defamation Claim*

Lastly, Mr. Trump argues that the jury's $280,000 punitive damages award for Ms. Carroll's defamation claim violated due process principles. He principally argues that the punitive damages award for Ms. Carroll's defamation claim should be no more than $5,000 because his conduct with regard to the 2022 statement is "barely reprehensible, if at all, because he was defending himself against a false accusation of rape."[105] "The Supreme Court [has] outlined three 'guideposts' to facilitate its review of state court punitive damage awards: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'"[106] Mr. Trump's argument plainly is foreclosed by the analysis set forth above and by the Court's determination that the jury implicitly found Mr. Trump did in fact digitally rape Ms. Carroll.

Moreover, the evidence presented at trial and the jury's findings that Mr. Trump made the 2022 statement knowing that it was false (or with reckless disregard of its truth or falsity) and with deliberate intent to injure or out of hatred, ill will, or spite or with willful, wanton or reckless disregard of another's rights firmly establish the high reprehensibility of Mr. Trump's

---

[105]    Dkt 205 (Def. Mem.) at 23.

[106]    *Stampf*, 761 F.3d at 209 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

SPA-221

59

defamatory statement. In these circumstances, the jury's $280,000 punitive damages award was not excessive and did not violate due process.

I have considered Mr. Trump's other arguments and found them all unpersuasive.

### Conclusion

The jury in this case did not reach "a seriously erroneous result." Its verdict is not "a miscarriage of justice." Mr. Trump's motion for a new trial on damages or a remittitur (Dkt 204) is denied.

SO ORDERED.

Dated:        July 19, 2023

_____
Lewis A. Kaplan
United States District Judge