# 23-0793-cv

## United States Court of Appeals

*for the*

## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 1 of 12 (Pages A-1 to A-280)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

**i**

## TABLE OF CONTENTS FOR JOINT APPENDIX

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*").........................................  A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") ......................................  A-32

### **Documents Submitted in *Carroll I***

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

    Exhibit A to Kaplan Declaration -
    Letter from Roberta A. Kaplan to Marc E.
    Kasowitz, dated August 10, 2020, with Enclosure  A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023.........  A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 .......................................  A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 .......................................  A-89

    Exhibit 1 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Lisa
    Birnbach, dated September 21, 2022 ....................  A-92

    Exhibit 2 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Carol
    Martin, dated October 18, 2022 ...........................  A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 ............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 ................................................. A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 .............................................. A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ........................................ A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ............................................... A-405

iii

**Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................ A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 .......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ...................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ........................ A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 .......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ............................ A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 .................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 .......................... A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 .................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ........................................................ A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023 ...................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 ........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

                                                                    **Page**

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated March 17, 2023 ............... A-509

    Annexed to Letter -
    Proposed Order ....................................... A-511

### **Documents Submitted in *Carroll II***

Complaint and Demand for a Jury Trial, dated
    November 24, 2022 ................................. A-513

Answer, dated January 27, 2023 ............................. A-542

First Amended Answer, dated February 10, 2023...... A-556

Defendant's Letter Motion for Discovery, dated
    February 10, 2023 ................................. A-571

    Exhibit A to Defendant's Letter Motion -
    DNA Report, dated January 8, 2020 ..................... A-574

    Exhibit B to Defendant's Letter Motion -
    Twitter Post, dated February 25, 2021 ................. A-602

Plaintiff's Letter Response in Opposition to
    Defendant's Motion for Discovery, dated
    February 10, 2023 ................................. A-607

Defendant's Letter Reply in Further Support of
    Motion for Discovery, dated February 10, 2023.... A-612

Transcript of Conference, dated February 7, 2023 .... A-614

Notice of Motion, by Defendant, for an Order
    Granting Partial Summary Judgment, dated
    February 23, 2023 ................................. A-635

Declaration of Matthew G. DeOreo, for Defendant,
    in Support of Motion for Partial Summary
    Judgment, dated February 23, 2023..................... A-637

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020 .. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ....................................... A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023 ......... A-747

vii

**Page**

Declaration of Alina Habba, for Defendant,
  in Support of Motions *in Limine*, dated
  February 23, 2023 .................................................. A-773

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-775

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 ............................. A-779

Exhibit C to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022
(Reproduced herein at pp. A-487-A-492)

Exhibit D to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023
(Reproduced herein at pp. A-493-A-499)

Plaintiff's Notice of Omnibus Motion *in Limine*,
  dated February 23, 2023 ........................................ A-783

Declaration of Roberta A. Kaplan, for Plaintiff,
  in Support of Omnibus Motion *in Limine*,
  dated February 23, 2023 ........................................ A-785

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-786

Exhibit 2 to Kaplan Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023 ..................................................... A-863

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ......................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................. A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)................................................................ A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)................................................................ A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 .................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 ......................... A-1065

x

**Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
    Opposition to Defendant's Motions *in Limine*,
    dated March 9, 2023 ............................................. A-1080

Exhibit 1 to Crowley Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
Video of Deposition of Natasha Stoynoff, taken
October 13, 2022
(All parties are already in possession of video
exhibit) ................................................................... A-1089

Exhibit 3 to Crowley Declaration -
Video of Deposition of Jessica Leeds, taken
October 13, 2022
(All parties are already in possession of video
exhibit) ................................................................... A-1091

Plaintiff's Response to Defendant's Local Civil
    Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
    Opposition to Defendant's Motion for Partial
    Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1110

Exhibit 2 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023
(Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 16, 2023 .......................... A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 .......................... A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................ A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 ......................... A-1153

Reply Declaration of Alina Habba, for Defendant,
in Further Support of Motions *in Limine*, dated
March 16, 2023 ...................................................... A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022 ................................................ A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
dated April 13, 2023 ............................................... A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 .............................................. A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023.............................................. A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 .............................. A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-1207

Plaintiff's Letter Response to Defendant's Motion
to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022   A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ...................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023........................ A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 ............................... A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................. A-1416

Trial Transcript, dated April 25, 2023........................ A-1420

Trial Transcript, dated April 26, 2023........................ A-1524

Trial Transcript, dated April 27, 2023........................ A-1697

Trial Transcript, dated May 1, 2023........................... A-1851

Trial Transcript, dated May 2, 2023........................... A-2036

Trial Transcript, dated May 3, 2023........................... A-2210

Trial Transcript, dated May 4, 2023........................... A-2375

Trial Transcript, dated May 8, 2023........................... A-2567

Trial Transcript, dated May 9, 2023........................... A-2771

Parties' Trial Exhibits:

PX-1        Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2    "Remarks by President Trump before
        Marine One Departure" (Office of the
        Press Secretary, June 22, 2019) ............... A-2840

PX-3    "EXCLUSIVE: Trump vehemently
        denies E. Jean Carroll allegation, says
        'she's not my type'" (*The Hill*,
        June 24, 2019).......................................... A-2853

PX-4    Truth Social Post, dated
        October 12, 2022...................................... A-2858

PX-6    "Donald Trump assaulted me in a
        Bergdorf Goodman dressing room 23
        years ago. But he's not alone on the list
        of awful men in my life." (New York
        Magazine, June 21, 2019) ........................ A-2859

PX-12   Photograph ................................................ A-2879

PX-22   Sixth Floor Construction Plan of
        Bergdorf Goodman ................................... A-2880

PX-24   Sixth Floor Construction Plan of
        Bergdorf Goodman ................................... A-2881

PX-25   Video Excerpt from Defendant's
        Interview with Billy Bush
        (All parties are already in possession of
        video exhibit) ........................................... A-2882

PX-25-T Transcript of Video Excerpt from
        Defendant's Interview with Billy Bush ... A-2883

PX-26   Video Excerpt from Presidential Debate
        (All parties are already in possession of
        video exhibit) ........................................... A-2885

xvi

**Page**

| | | |
|---|---|---|
| PX-26-T | Transcript of Video Excerpt from Presidential Debate ................................. | A-2886 |
| PX-29 | Video Excerpt from Defendant's Speech at Campaign Rally (All parties are already in possession of video exhibit) ........................................... | A-2887 |
| PX-29-T | Transcript of Video Excerpt from Defendant's Speech at Campaign Rally... | A-2888 |
| PX-31 | Video Excerpt from Defendant's Speech (All parties are already in possession of video exhibit) ........................................... | A-2889 |
| PX-31-T | Transcript of Video Excerpt from Defendant's Speech................................. | A-2890 |
| PX-46 | Twitter Post, dated November 15, 2022... | A-2891 |
| PX-48 | Twitter Post, dated December 12, 2022 ... | A-2893 |
| PX-51 | Twitter Post, dated January 29, 2023 ....... | A-2896 |
| PX-53 | Twitter Post, dated January 29, 2023 ....... | A-2898 |
| PX-57 | Email, dated October 13, 2022 ................ | A-2901 |
| PX-112 | Video Excerpt from Defendant's Interview with Roger Ailes (All parties are already in possession of video exhibit) ........................................... | A-2902 |
| PX-112-T | Transcript of Video Excerpt from Defendant's Interview with Roger Ailes.. | A-2903 |
| PX-200 | Video Excerpt from Deposition of Donald J. Trump, taken October 19, 2022 ......................................................... | A-2904 |

xvii

**Page**

PX-200-T  Transcript of Video Excerpt from
          Deposition of Donald J. Trump, taken
          October 19, 2022...................................... A-2905

DX-CK     Email Regarding Law & Order SVU,
          dated July 23, 2019 .................................. A-2986

Court Exhibits:

C         Timeline of Events..................................... A-2987

D         WordPerfect Document Compare
          Summary of Jury Instructions.................. A-2988

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 1, 2023 .................... A-3024

    Exhibit A to Letter -
    Excerpts of Trial Transcripts.................................. A-3042

    Exhibit B to Letter -
    LinkedIn Post.......................................................... A-3081

    Exhibit C to Letter -
    "One of the Democratic Party's biggest donors is
    exploring a new anti-Trump boycott" (*Vox*,
    July 2, 2020) ........................................................... A-3083

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated May 5, 2023 .................... A-3088

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 6, 2023 .................... A-3091

Verdict Form, dated May 9, 2023 .............................. A-3095

Notice of Appeal, dated May 11, 2023 ...................... A-3099

Notice of Motion, by Defendant, for an Order
    Granting a New Trial or Remittitur, dated
    June 8, 2023 ........................................................... A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
Motion for a New Trial or Remittitur, dated
June 8, 2023 ............................................................  A-3103

Declaration of Matthew G. DeOreo, for Defendant,
in Support of Motion for a New Trial or
Remittitur, dated June 8, 2023 ..............................  A-3134

Exhibit A to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit B to DeOreo Declaration -
Excerpts of Trial Transcripts...................................  A-3136

Exhibit C to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019
(Reproduced herein at pp. A-639-A-667)

Exhibit D to DeOreo Declaration -
Verdict Form, dated May 9, 2023
(Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
Opposition to Defendant's Motion for a New
Trial or Remittitur, dated June 22, 2023 ................  A-3219

Exhibit 1 to Kaplan Declaration -
Excerpts of Trial Transcripts...................................  A-3221

Exhibit 2 to Kaplan Declaration -
Twitter Post, dated June 21, 2019
(Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 .................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 .................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
    Second Circuit, dated July 19, 2023 ..................... A-3339

A-1

Query    Reports    Utilities    Help    Log Out

APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:20-cv-07311-LAK

Carroll v. Trump, et al.                                    Date Filed: 09/08/2020
Assigned to: Judge Lewis A. Kaplan                          Jury Demand: None
Related Case: 1:22-cv-10016-LAK                             Nature of Suit: 360 P.I.: Other
Case in other court:  State Court - Supreme, 160694-2019    Jurisdiction: U.S. Government Defendant
Cause: 28:2679(d)(2) Federal Tort Claims Act - Employee of
U.S.A.

**Plaintiff**

**E. Jean Carroll**                        represented by    **Roberta Ann Kaplan**
                                                             Kaplan Hecker & Fink LLP
                                                             350 Fifth Avenue
                                                             63rd Floor
                                                             10118
                                                             New York, NY 10118
                                                             212-763-0883
                                                             Fax: 212-564-0883
                                                             Email: rkaplan@kaplanhecker.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Joshua Adam Matz**
                                                             Kaplan Hecker & Fink LLP
                                                             1050 K Street NW
                                                             Suite 1040
                                                             Washington, DC 20001
                                                             929-294-2537
                                                             Email: jmatz@kaplanhecker.com
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew J. Craig**
                                                             Kaplan Hecker & Fink LLP
                                                             350 Fifith Avenue, Suite 7110
                                                             New York, NY 10118
                                                             (212)-763-0883
                                                             Fax: (212)-564-0883
                                                             Email: mcraig@kaplanhecker.com
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Michael Ferrara**
                                                             Kaplan Hecker & Fink LLP
                                                             350 5th Ave.
                                                             Ste 63rd Floor
                                                             New York, NY 10118

A-2

929-294-2529
Email: mferrara@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Shawn Geovjian Crowley**
Kaplan, Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212-763-0883
Email: scrowley@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Trevor Morrison**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212-763-0883
Email: tmorrison@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**United States of America**          represented by  **William Kerwin Lane , III**
DOJ-Civ
950 Pennsylvania Avenue, NW
Ste Main 3138
Washington, DC 20530
202-305-7920
Email: william.lane2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Stephen Terrell**
DOJ-Enrd
Civl Division, Torts Branch
P.O. Box 888
Washington, DC 20044
202-353-1651
Email: stephen.terrell2@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Donald J. Trump**          represented by  **Alina Habba**
*in his personal capacity*          Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908-869-1188
Email: ahabba@habbalaw.com

A-3

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine A. Montenegro**
Kasowitz, Benson, Torres LLP (NYC)
1633 Broadway
New York, NY 10019
(212) 506-1700
Fax: (212) 506-1800
Email: cmontenegro@kasowitz.com
*TERMINATED: 11/22/2021*
*LEAD ATTORNEY*

**Marc E. Kasowitz**
Kasowitz, Benson, Torres LLP (NYC)
1633 Broadway
New York, NY 10019
212-506-1710
Fax: 212-506-1800
Email: MEKcourtnotices@kasowitz.com
*TERMINATED: 11/22/2021*
*LEAD ATTORNEY*

**Paul J. Burgo**
Kasowitz, Benson, Torres LLP (NYC)
1633 Broadway
New York, NY 10019
(212)-506-1700
Fax: (212)-506-1800
Email: pburgo@kasowitz.com
*TERMINATED: 11/22/2021*
*LEAD ATTORNEY*

**Michael T Madaio**
Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908-869-1188
Email: mmadaio@habbalaw.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Government Accountability Project**      represented by   **John A. Kolar**
1612 K Street, N.W,                                         Government Accountability Project, Inc.
Suite 1100                                                 1612 K Street, NW
Washington, DC 20006                                       Ste 1100
202-457-0034 X197                                          Washington, DC 20006
                                                           202-457-0034
                                                           Email: jackk@whistleblower.org
                                                           *LEAD ATTORNEY*

**Counter Claimant**

A-4

| | | |
|---|---|---|
| **Donald J. Trump**<br>*in his personal capacity* | represented by | **Alina Habba**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Christine A. Montenegro**<br>(See above for address)<br>*TERMINATED: 11/22/2021*<br>*LEAD ATTORNEY* |
| | | **Marc E. Kasowitz**<br>(See above for address)<br>*TERMINATED: 11/22/2021*<br>*LEAD ATTORNEY* |
| | | **Paul J. Burgo**<br>(See above for address)<br>*TERMINATED: 11/22/2021*<br>*LEAD ATTORNEY* |
| | | **Michael T Madaio**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Counter Defendant**

| | | |
|---|---|---|
| **E. Jean Carroll** | represented by | **Roberta Ann Kaplan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Joshua Adam Matz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Matthew J. Craig**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Ferrara**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Shawn Geovjian Crowley**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Trevor Morrison**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 09/08/2020 | 1 | **FILING ERROR - EXHIBITS NOT CLEARLY TITLED -** NOTICE OF REMOVAL from Supreme Court of the State of New York, County of New York. Case Number: 160694/2019..Document filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D (Part 1), # 5 Exhibit D (Part 2), # 6 Exhibit D (Part 3), # 7 Certificate of Service).(Terrell, Stephen) Modified on 9/9/2020 (pne). (Entered: 09/08/2020) |
| 09/08/2020 | 2 | **FILING ERROR - PDF ERROR -**CIVIL COVER SHEET filed..(Terrell, Stephen) Modified on 9/9/2020 (pne). (Entered: 09/08/2020) |
| 09/08/2020 | 3 | MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America . Document filed by UNITED STATES OF AMERICA. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Affidavit, # 3 Exhibit A, # 4 Exhibit B, # 5 Certificate of Service).(Terrell, Stephen) (Entered: 09/08/2020) |
| 09/08/2020 | 4 | NOTICE OF APPEARANCE by Roberta Ann Kaplan on behalf of E. Jean Carroll.. (Kaplan, Roberta) (Entered: 09/08/2020) |
| 09/08/2020 | 5 | NOTICE OF APPEARANCE by Joshua Adam Matz on behalf of E. Jean Carroll..(Matz, Joshua) (Entered: 09/08/2020) |
| 09/09/2020 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Lewis A. Kaplan. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pne) (Entered: 09/09/2020) |
| 09/09/2020 | | Magistrate Judge James L. Cott is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pne) (Entered: 09/09/2020) |
| 09/09/2020 | | Case Designated ECF. (pne) (Entered: 09/09/2020) |
| 09/09/2020 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Stephen Terrell. The party information for the following party/parties has been modified: Donald J. Trump. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party text was omitted. (pne) (Entered: 09/09/2020) |
| 09/09/2020 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT CIVIL COVER SHEET. Notice to attorney Stephen Terrell to RE-FILE Document No. 1 Notice of Removal,. The filing is deficient for the following reason(s): caption entered on civil cover sheet does not match pleading caption. Re-file the document using the event type Civil Cover Sheet found under the event list Other Documents and attach the corrected PDF. (pne) (Entered: 09/09/2020) |
| 09/09/2020 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Stephen Terrell to RE-FILE Document No. 1 Notice of Removal,. The filing is deficient for the following reason(s): As per Rule 13.3, each attachment to the pleading must be clearly titled in the ECF entry so the subject of the exhibit is clear; do not put only "Exhibit A, B, etc.". Re-file the pleading using the event type Notice of Removal found under the event list Complaints and Other Initiating Documents - |

| | | **attach the PDF(s) - select the individually named filer/filers - select the individually named party/parties the pleading is against. (pne)** (Entered: 09/09/2020) |
|---|---|---|
| 09/09/2020 | 6 | NOTICE OF REMOVAL from Supreme Court of the State of New York, County of New York. Case Number: 160694/2019..Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - State Court Complaint, # 2 Exhibit B - Westfall Act Certification, # 3 Exhibit C - State Court Docket Index, # 4 Exhibit D (Part 1) - State Court Process, Pleadings, and Orders (less exhibits), # 5 Exhibit D (Part 2) - State Court Process, Pleadings, and Orders (less exhibits), # 6 Exhibit D (Part 3) - State Court Process, Pleadings, and Orders (less exhibits)).(Terrell, Stephen) (Entered: 09/09/2020) |
| 09/09/2020 | 7 | CIVIL COVER SHEET filed..(Terrell, Stephen) (Entered: 09/09/2020) |
| 09/10/2020 | 8 | LETTER MOTION for Conference re: Schedule addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated September 10, 2020. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 09/10/2020) |
| 09/10/2020 | 9 | ORDER granting in part and denying in part 8 Letter Motion for Conference. (Signed by Judge Lewis A. Kaplan on 9/10/2020) (Kaplan, Lewis) (Entered: 09/10/2020) |
| 09/11/2020 | 10 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated September 11, 2020 re: Court's Order of September 10, 2020 (ECF 9). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 09/11/2020) |
| 09/11/2020 | 11 | MEMO ENDORSEMENT on re: 10 Letter filed by E. Jean Carroll. ENDORSEMENT: SO ORDERED. (Responses due by 10/5/2020, Replies due by 10/19/2020.) (Signed by Judge Lewis A. Kaplan on 9/11/2020) (jca) (Entered: 09/11/2020) |
| 09/14/2020 | 12 | NOTICE of Lodging State Court Process, Pleadings, and Orders. Document filed by Donald J. Trump. (Attachments: # 1 Process, Pleadings, and Orders Part 1, # 2 Process, Pleadings, and Orders Part 2, # 3 Process, Pleadings, and Orders Part 3, # 4 Process, Pleadings, and Orders Part 4, # 5 Process, Pleadings, and Orders Part 5, # 6 Process, Pleadings, and Orders Part 6, # 7 Process, Pleadings, and Orders Part 7, # 8 Process, Pleadings, and Orders Part 8, # 9 Process, Pleasings and Orders Part 9, # 10 Process, Pleadings, and Orders Part 10, # 11 Process, Pleadings, and Orders Part 11, # 12 Process, Pleadings, and Orders Part 12).(Terrell, Stephen) (Entered: 09/14/2020) |
| 09/15/2020 | 13 | ORDER: Accordingly, the United States, nor before September 18, 2020, shall file the entire state court record as of the time of removal. Each separate paper shall be filed as a separate numbered attachment, shall be clearly titled so hat the subject of the attachment is clear, and shall show the date of the attachment. Attachments hall be listed in chronological order. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 9/14/2020) (jca) (Entered: 09/15/2020) |
| 09/15/2020 | 14 | NOTICE of Lodging State Court Process, Pleadings, and Orders. Document filed by Donald J. Trump. (Attachments: # 1 Summons (11/04/2019), # 2 Complaint (11/04/2019), # 3 Affirmation re Identification of Related Case (11/08/2019), # 4 RJI Ex Parte Application (11/08/2019), # 5 Orioised Ex Oarte Order (11/08/2019), # 6 Affidavit in Supoport of Ex Parte Application (11/08/2019), # 7 Exhibit (Summons and Complaint) (11/08/2019), # 8 Exhibit (Trump Voter Registration ) (11/08/2019), # 9 Exhibit (Nov 4 Service Attempt) (11/08/2019), # 10 Exhibit (Nov 5 Service Attempt) (11/08/2019), # 11 Exhibit (Nov 6 Service Attempt) (11/08/2019), # 12 Exhibit (Nov 6 Service Attempt) (11/08/2019), # 13 Exhibit (Nov 6 at White House) (11/08/2019), # 14 Exhibit (E-mail) (11/08/2019, # 15 Ex Parte Order (11/13/2019), # 16 Notice of Appearance (11/13/2019), # 17 Affirmation of Service (11/13/2019), # 18 Notice of Appearance (11/13/2019), # 19 Notice of Appearance (11/25/2019), # 20 Stipulation - Briefing Schedule (11/26/2019), # 21 Notice of Appearance (11/26/2019), # 22 Letter/Correspondence - So Ordered (12/03/2019), # 23 Letter to Judge (12/03/2019), # 24 Exhibit (Affirmation re |

Identification of Related Case) (12/03/2019), # 25 Letter Application to Administrative Judge (12/05/2019), # 26 Letter to Judge (12/05/2019), # 27 Order - Preliminary Conference (12/12/2019), # 28 Proposed OSC (01/03/2020), # 29 Affidavit in Support (01/03/2020), # 30 Exhibit (Complaint) (01/03/2020), # 31 Exhibit (11-13-19 Ex Parte order) (01/03/2020), # 32 Exhibit (Preliminary Conference Order) (01/03/2020), # 33 Memorandum of Law (01/03/2020), # 34 Affirmation in Opposition to OSC (01/06/2020), # 35 OSC - Decline/Withdrawn (01/08/2020), # 36 Decision + Order of Motion (01/10/2020), # 37 Notice of Entry (01/13/2020), # 38 Stipulation (Briefing Schedule) (02/03/2020), # 39 Stipulation - So Ordered (02/04/2020), # 40 Notice of Appearance (02/04/2020), # 41 Notice of Appearance (02/04/2020), # 42 Notice of Appearance (02/04/2020), # 43 Notice of Motion to Stay (02/04/2020), # 44 Affidavit in Support of Motion (02/04/2020), # 45 Exhibit (RJI Submissions) (02/04/2020), # 46 Exhibit (Preliminary Conference Order) (02/04/2020), # 47 Exhibit (Letter from Ct of Appeals) (02/04/2020), # 48 Exhibit (So-Ordered Stipulation) (02/04/2020), # 49 Memorandum of Law (02/04/2020), # 50 Stipulation - Briefing Schedule (02/06/2020), # 51 Stipulation - So Ordered (02/10/2020), # 52 Stipulation - Adjournment of Motion (02/11/2020), # 53 Notice of Appearance (02/18/2020), # 54 Memorandum of Law in Opposition (02/18/2020), # 55 Affiavit in Opposition to Motion (02/18/2020), # 56 Exhibit (First Notice of Submit to Physical Examination (02/18/2020) (PART 1), # 57 Exhibit (First Notice of Submit to Physical Examination (02/18/2020) (PART 2), # 58 Exhibit (Discovery Stipulation) (02/18/2020), # 59 Exhibit (Letter) (02/18/2020), # 60 Exhibit (Notice of Motion) (02/18/2020), # 61 Exhibit (Order) (02/18/2020), # 62 Exhibit (Letter) (02/18/2020), # 63 Exhibit (Letter) (02/18/2020), # 64 Exhibit (Letter) (02/18/2020), # 65 Exhibit (Email) (02/18/2020), # 66 Exhibit (Memorandum of Law) (02/18/2020), # 67 Affidavit in Reply (02/28/2020), # 68 Exhibit (Article) (02/28/2020), # 69 Exhibit (Answer) (02/28/2020), # 70 Exhibit (Decision Granting Leave to Appeal) (02/28/2020), # 71 Memorandum of Law in Reply (02/28/2020), # 72 Letter to Judge (03/02/2020), # 73 Exhibit (Complaint in Trump for President v. NYT Co.) (03/02/2020), # 74 Letter to Judge (03/06/2020), # 75 Exhibit (Complaint in Trump for President v. WP Co.) (03/06/2020), # 76 Exhibit (Complaint in Trump for President v. CNN) (03/06/2020), # 77 Letter to Judge (03/11/2020), # 78 Letter to Judge (03/11/2020), # 79 Letter to Judge (03/11/2020), # 80 Court Appearance Update (03/20/2020), # 81 Notice (04/14/2020), # 82 Notice of Appearance (06/15/2020), # 83 Notice of Motion (06/15/2020), # 84 Affirmation in Support of Motion (06/15/2020), # 85 Exhibit (Logo for The Apprentice) (06/15/2020), # 86 Exhibit (Entry information page) (06/15/2020), # 87 Exhibit (Entry information page) (06/15/2020), # 88 Exhibit (FEC filing) (06/15/2020), # 89 Exhibit (Report titled Expenditures) (06/15/2020), # 90 Exhibit (Certified transcript of phone call) (06/15/2020), # 91 Exhibit (Florida Voter Registration Applications) (06/15/2020), # 92 Exhibit (Declaration of Use Agreement) (06/15/2020), # 93 Memorandum of Law in Support (06/15/2020), # 94 Letter to Judge (06/29/2020), # 95 Letter to Judge (06/29/2020), # 96 Exhibit (Correspondence Between Counsel) (06/29/2020), # 97 Decision + Order on Motion (07/01/2020), # 98 Letter to Judge (07/10/2020), # 99 Letter to Judge (Trump v. Vance Opinion) (07/10/2020), # 100 Letter to Judge (07/14/2020), # 101 Exhibit (Brief for Appellant in Zervos) (07/14/2020), # 102 Letter to Judge (07/15/2020), # 103 Exhibit (Trump v. Mazars Opinion) (07/16/2020), # 104 Letter to Judge (07/16/2020), # 105 Exhibit (Reply Brief of Appellant in Zervos) (07/16/2020), # 106 Letter to Judge (07/17/2020), # 107 Exhibit (Submission to Court of Appeals) (07/17/2020), # 108 Substitution of Attoeney (07/24/2020), # 109 Letter to Judge (07/28/2020), # 110 Exhibit (Letetr response to Court of Appeals) (07/28/2020), # 111 Decision + Order on Motion (08/06/2020), # 112 Notice of Entry (08/08/2020)).(Terrell, Stephen) (Entered: 09/15/2020)

| 10/05/2020 | 15 | MOTION for Leave to File Amicus Brief *IN SUPPORT OF PLAINTIFFS OPPOSITION TO THE MOTION OF THE UNITED STATES TO SUBSTITUTE ITSELF AS THE* |

| | | |
|---|---|---|
| | | *DEFENDANT.* Document filed by Government Accountability Project. (Attachments: # 1 Exhibit Amicus Brief).(Kolar, John) (Entered: 10/05/2020) |
| 10/05/2020 | 16 | MEMORANDUM OF LAW in Opposition re: 3 MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America . . Document filed by E. Jean Carroll. (Attachments: # 1 Affidavit of Roberta A. Kaplan In Support of Plaintiff's Opposition to Defendant's Motion to Substitute, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H).(Kaplan, Roberta) (Entered: 10/05/2020) |
| 10/09/2020 | 17 | LETTER MOTION for Leave to File Excess Pages *re: Reply in support of Motion to Substitute* addressed to Judge Lewis A. Kaplan from Stephen Terrell dated 10/09/2020. Document filed by Donald J. Trump..(Terrell, Stephen) (Entered: 10/09/2020) |
| 10/09/2020 | 18 | ORDER SCHEDULING ORAL ARGUMENT with respect to 3 MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America. The Court will hear oral argument in the Ceremonial Courtroom on the motion of the United States to substitute the United States for President Donald J. Trump in his individual capacity on Wednesday, October 21, 2020 at 3:30 p.m. Thirty minutes are allocated to each of the plaintiff and the United States. Counsel for each of the plaintiff the defendant, and the United States each shall inform the deputy clerk on or before October 16, 202 of the number of attorneys and their assistants whom that party wishes to have present in the courtroom. The undersigned prohibits the bringing of any Personal Electronic Device or General Purpose Computing Device into courtrooms, witness rooms, robing rooms,jury rooms and associated spaces, and judicial chambers used by him absent written permission granted by him as provided by standing order of the Court. See In the Matter of Personal Electronic Devices and General Purpose Computing Devices, Standing Order Ml0-468 (revised), 14-mc-0047 (filed Feb. 27, 2014). That prohibition shall apply to the oral argument an any other proceedings in this case scheduled hereby notwithstanding In re Coronavirus/COVID-19 pandemic, Standing Order Ml0-468 (revised), 20-mc-316 (filed Sept. 9, 2020). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/9/2020) (jca) (Entered: 10/09/2020) |
| 10/09/2020 | | Set/Reset Hearings: Oral Argument set for 10/21/2020 at 03:30 PM before Judge Lewis A. Kaplan. (jca) (Entered: 10/09/2020) |
| 10/11/2020 | 19 | ORDER granting 17 Letter Motion for Leave to File Excess Pages (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 10/11/2020) |
| 10/15/2020 | 20 | ORDER: The argument of the pending motion on October 21 shall take place in Courtroom 21B rather than the ceremonial courtroom. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/14/2020) (jca) (Entered: 10/15/2020) |
| 10/19/2020 | 21 | REPLY MEMORANDUM OF LAW in Support re: 3 MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America . . Document filed by Donald J. Trump..(Terrell, Stephen) (Entered: 10/19/2020) |
| 10/19/2020 | 22 | MEMORANDUM OF LAW in Opposition re: 15 MOTION for Leave to File Amicus Brief *IN SUPPORT OF PLAINTIFFS OPPOSITION TO THE MOTION OF THE UNITED STATES TO SUBSTITUTE ITSELF AS THE DEFENDANT.* . Document filed by Donald J. Trump..(Terrell, Stephen) (Entered: 10/19/2020) |
| 10/20/2020 | 23 | NOTICE OF APPEARANCE by William Kerwin Lane, III on behalf of Donald J. Trump..(Lane, William) (Entered: 10/20/2020) |
| 10/20/2020 | 24 | ORDER granting 15 Motion for Leave to File Document (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 10/20/2020) |

| 10/21/2020 | 25 | LETTER MOTION to Continue *Hearing* addressed to Judge Lewis A. Kaplan from Stephen R. Terrell dated 10/21/2020. Document filed by Donald J. Trump..(Terrell, Stephen) (Entered: 10/21/2020) |
|---|---|---|
| 10/21/2020 | 26 | ORDER with respect to 25 Letter Motion to Continue. Denied. The Court will hear the government's argument (a) in person if offered by an attorney who is permitted entry to the courthouse under existing rules and orders pertaining to COVID, or (b) by telephone from outside the courthouse if offered by any attorney not eligible to enter the courthouse. Alternatively, the Court will take the motion on submission without oral argument. The undersigned is not authorized to vary the existing restrictions on entry into the courthouse. The government shall advice the Courtroom deputy as promptly as possible what it intends to do.. (Signed by Judge Lewis A. Kaplan on 10/21/2020) (Mohan, Andrew) (Entered: 10/21/2020) |
| 10/21/2020 | 27 | CORRECTED ORDER denying 25 Letter Motion to Continue. Denied. The Court will hear the government's argument (a) in person if offered by an attorney who is permitted entry to the courthouse under existing rules and orders pertaining to COVID, or (b) by telephone from outside the courthouse if offered by any attorney not eligible to enter the courthouse. Alternatively, the Court will take the motion on submission without oral argument. The undersigned is not authorized to vary the existing restrictions on entry into the courthouse. It notes further that, contrary to the government's suggestion, it appears that Virginia was added to the list of Restricted States over a week ago. New York State, Governor Cuomo Announces Three States Added to Travel Advisory (Oct. 13, 2020), available at https://www.govenor.ny.gov/news/govenor-cuomo-announces-three-states-added-travel-advisory (last visited Oct. 21, 2020). The government shall advise the courtroom deputy as promptly as possible what it intends to do. So ordered. (Signed by Judge Lewis A. Kaplan on 10-21-2020) (Mohan, Andrew) (Entered: 10/21/2020) |
| 10/21/2020 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Motion Hearing held on 10/21/2020 re: 3 MOTION to Substitute Party. Old Party: Donald J. Trump, New Party: United States of America . filed by Donald J. Trump. Argument on submission. (Court Reporter Andrew Walker) (Mohan, Andrew) (Entered: 10/21/2020) |
| 10/26/2020 | 28 | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/21/2020 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/16/2020. Redacted Transcript Deadline set for 11/27/2020. Release of Transcript Restriction set for 1/24/2021..(McGuirk, Kelly) (Entered: 10/26/2020) |
| 10/26/2020 | 29 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/21/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 10/26/2020) |
| 10/26/2020 | 31 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 9/17/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 10/26/2020) |

A-10

| | | |
|---|---|---|
| 10/26/2020 | | ***DELETED DOCUMENT. Deleted document number 30 TRANSCRIPT. The document was incorrectly filed in this case as per email of 12/7/2020. (rro) Modified on 12/7/2020 (rro). (Entered: 12/07/2020) |
| 10/27/2020 | 32 | Opinion and Order denying 3 Motion to Substitute Party. The President of the United States is not an employee of the Government within the meaning of the relevant statutes. Even if he were such an employee, President Trumps allegedly defamatory statements concerning Ms. Carroll would not have been within the scope of his employment. Accordingly, the motion to substitute the United States in place of President Trump [Dkt. 3] is denied.. (Signed by Judge Lewis A. Kaplan on 10/26/2020) (Mohan, Andrew) (Entered: 10/27/2020) |
| 10/27/2020 | 33 | RAJ PATEL'S (PRO SE)MOTION FOR PERMISSIVE INTERVENTION. Document filed by Raj Patel.(sc) (Entered: 10/27/2020) |
| 10/27/2020 | 34 | NOTICE OF PRO SE APPEARANCE. Document filed by Raj K. Patel, applicant to intervene in this action. (sc) (Entered: 10/27/2020) |
| 10/27/2020 | 35 | MEMORANDUM OF LAW in Opposition re: 33 MOTION to Intervene. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 10/27/2020) |
| 10/28/2020 | 36 | MEMO ENDORSEMENT denying 33 Motion to Intervene. ENDORSEMENT: Denied. See Doe v. Trump, No. 19-9936 (LGS), Dkt. 272 (Mag 26, 2020). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/28/2020) (jca) (Entered: 10/28/2020) |
| 10/28/2020 | 37 | MOTION FOR COURT-APPOINTED COUNSEL.Document filed by intervenor-plaintiff applicant , Raj K. Patel.(sc) Modified on 10/28/2020 (sc). (Entered: 10/28/2020) |
| 11/05/2020 | 38 | ORDER denying as moot 37 MOTION FOR COURT-APPOINTED COUNSEL. Denied as moot and on true merits. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 11/5/2020) (jca) (Entered: 11/05/2020) |
| 11/09/2020 | 39 | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/21/2020 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/30/2020. Redacted Transcript Deadline set for 12/10/2020. Release of Transcript Restriction set for 2/8/2021..(McGuirk, Kelly) (Entered: 11/09/2020) |
| 11/09/2020 | 40 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/21/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 11/09/2020) |
| 11/11/2020 | 41 | Initial Conference Order: The initial conference by telephone is set for 12/11/2020 at 09:30 AM before Judge Lewis A. Kaplan. Counsel for all parties are directed to confer regarding an agreed scheduling order. If counsel are able to agree on a schedule and the agreed schedule calls for filing of the pretrial order not more than six (6) months from the date of this order, counsel shall sign and file within twenty-one (21) days from the date hereof a consent order in the form annexed for consideration by the Court. If such a consent order is not filed within the time provided, a teleconference will be held on 12/11/2020 at 9:30 AM. The teleconference can be reached by calling 888-363-4749 and |

A-11

| | | using access code 7664205. (Signed by Judge Lewis A. Kaplan on 11/11/2020) (Mohan, Andrew) (Entered: 11/11/2020) |
|---|---|---|
| 11/11/2020 | 42 | ORDER RE SCHEDULING AND INITIAL PRETRIAL CONFERENCE: It is hereby, ORDERED as follows: Counsel receiving this order shall promptly mail copies hereof to all other counsel of record or, in the case of parties for which no appearance has been made, to such parties. Counsel for all parties are directed to confer regarding an agreed scheduling order. If counsel are able to agree on a schedule and the agreed schedule calls for filing of the pretrial order not more than six (6) months from the date of this order, counsel shall sign and file within twenty-one (21) days from the date hereof a consent order in the form annexed for consideration by the Court. If such a consent order is not filed within the time provided, a teleconference will be held on 12/11/2020 at 9:30 AM. The teleconference can be reached by calling 888-363-4749 and using access code 7664205.( Initial Conference set for 12/11/2020 at 09:30 AM before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 11/11/20) (yv) (Entered: 11/12/2020) |
| 11/16/2020 | 43 | CERTIFICATE OF SERVICE of the Court's Order dated November 11, 2020 (Doc. No. 41) served on Donald J. Trump, in his personal capacity on November 13, 2020 and November 14, 2020. Document filed by E. Jean Carroll..(Matz, Joshua) (Entered: 11/16/2020) |
| 11/20/2020 | 44 | ORDER: This action was commenced against Donald J. Trump in his individual (not his official) capacity in New York State court. By substitution for the original private counsel for Mr. Trump, Mark E. Kasowitz, Christine A. Montenegro, and Paul J. Burgo of the firm of Kasowitz Benson Torres LLP appeared on defendant's behalf on July 24, 2020. Dkt. 14-108. On September 8, 2020, the United States of America - represented by Stephen Terrell and other attorneys at the Department of Justice (the "DOJ") - removed the action to this Court and later moved to substitute the United States as defendant in place of Mr. Trump. Dkt. 1. On October 27, 2020, I denied that motion. Dkt. 33. Section 1450 of the Judicial Code, 28 U.S.C. § 1450, provides in relevant part that "[a]ll injunctions, orders, and other proceedings had in such action [i.e., any removed action] prior to its removal shall remain in full force and effect until dissolved or modified by the district court." Accordingly, by virtue of their appearance on behalf of Mr. Trump in the state court, Messrs. Kasowitz and Burgo and Ms. Montenegro represent Mr. Trump in this removed action unless and until directed by this Court. Nevertheless, the docket sheet erroneously lists Mr. Terrell and another attorney as counsel for defendant Trump. That is incorrect. They represent only the United States. The Clerk shall correct the docket sheet to reflect that (1) Messrs. Terrell and his colleagues at the DOJ represent only the United States of America and (2) Messrs. Kasowitz and Burgo and Ms. Montenegro represent Mr. Trump. The Clerk shall mail copies of this order, all others entered by this Court subsequent to removal, and the Court's opinion to counsel for Mr. Trump. Attorney Marc E. Kasowitz, Christine A. Montenegro, Paul J. Burgo for Donald J. Trump added. United States of America added. (Signed by Judge Lewis A. Kaplan on 11/18/2020) (tro) Transmission to Docket Assistant Clerk for processing. (Entered: 11/20/2020) |
| 11/20/2020 | | Mailed a copy of 36 Order on Motion to Intervene, 27 Order on Motion to Continue, 20 Order, 38 Order on Application for the Court to Request Counsel, 26 Order on Motion to Continue, 41 Scheduling Order, Set Hearings, 32 Order on Motion to Substitute Party, 13 Order, 11 Memo Endorsement, Set Deadlines, 42 Order for Initial Pretrial Conference, 19 Order on Motion for Leave to File Excess Pages, 9 Order on Motion for Conference, 44 Order, Add and Terminate Attorneys, Add and Terminate Parties, 24 Order on Motion for Leave to File Document, 18 Order on Motion to Substitute Party, to Christine A. Montenegro, Marc E. Kasowitz, Paul J. Burgo at Kasowitz, Benson, Torres LLP (NYC), 1633 Broadway, New York, NY 10019 Via UPS Tracking Number: 1Z E22 E53 37 1005 148 0.(dsh) (Entered: 11/20/2020) |

A-12

| 11/25/2020 | 45 | NOTICE OF INTERLOCUTORY APPEAL from 32 Order on Motion to Substitute Party,,. Document filed by United States of America. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Terrell, Stephen) (Entered: 11/25/2020) |
| --- | --- | --- |
| 11/25/2020 | 46 | NOTICE OF INTERLOCUTORY APPEAL from 32 Order on Motion to Substitute Party,,. Document filed by Donald J. Trump. Filing fee $ 505.00, receipt number ANYSDC-22753482. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A - Order Denying Motion to Substitute).(Kasowitz, Marc) (Entered: 11/25/2020) |
| 11/30/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 45 Notice of Interlocutory Appeal..(nd) (Entered: 11/30/2020) |
| 11/30/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 45 Notice of Interlocutory Appeal filed by United States of America were transmitted to the U.S. Court of Appeals..(nd) (Entered: 11/30/2020) |
| 11/30/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 46 Notice of Interlocutory Appeal..(nd) (Entered: 11/30/2020) |
| 11/30/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 46 Notice of Interlocutory Appeal, filed by Donald J. Trump were transmitted to the U.S. Court of Appeals..(nd) (Entered: 11/30/2020) |
| 12/10/2020 | 47 | LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. Document filed by Donald J. Trump..(Kasowitz, Marc) (Entered: 12/10/2020) |
| 12/11/2020 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Telephone Conference held on 12/11/2020. Plaintiff's opposition to defendants motion to stay is due 12/17/2020 and Defendant's reply is due 12/21/2020. (Court Reporter Andrew Walker) (Mohan, Andrew) (Entered: 12/11/2020) |
| 12/14/2020 | 48 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/11/2020 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2021. Redacted Transcript Deadline set for 1/14/2021. Release of Transcript Restriction set for 3/15/2021..(McGuirk, Kelly) (Entered: 12/14/2020) |
| 12/14/2020 | 49 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/11/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 12/14/2020) |
| 12/17/2020 | 50 | MEMORANDUM OF LAW in Opposition re: 47 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 12/17/2020) |
| 12/21/2020 | 51 | LETTER REPLY to Response to Motion addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 21, 2020 re: 47 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. . Document filed by Donald J. Trump. (Attachments: # 1 Exhibit 1 - Mar. 9, 2007 LEXIS Decision, In re World Trade Ctr. Disaster Site Litig. (2d Cir.)).(Kasowitz, Marc) (Entered: 12/21/2020) |

| 01/15/2021 | 52 | MOTION for Joshua Matz to Withdraw as Attorney . Document filed by E. Jean Carroll. (Attachments: # 1 Declaration of J. Matz in Support).(Matz, Joshua) (Entered: 01/15/2021) |
| 01/18/2021 | 53 | MOTION for William Kerwin Lane III to Withdraw as Attorney . Document filed by United States of America..(Lane, William) (Entered: 01/18/2021) |
| 01/18/2021 | 54 | ORDER granting 52 Motion to Withdraw as Attorney. Attorney Joshua Adam Matz terminated (Kaplan, Lewis) (Entered: 01/18/2021) |
| 01/18/2021 | 55 | ORDER granting 53 Motion to Withdraw as Attorney.. (Signed by Judge Lewis A. Kaplan on 1/18/2021) (Kaplan, Lewis) (Entered: 01/18/2021) |
| 09/15/2021 | 56 | ORDER denying without prejudice 47 Letter Motion to Stay re: 47 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 09/15/2021) |
| 11/22/2021 | 57 | PROPOSED ORDER FOR SUBSTITUTION OF ATTORNEY. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 11/22/2021) |
| 11/22/2021 | 58 | CONSENT ORDER GRANTING SUBSTITUTION OF ATTORNEY, The substitution of attorney is hereby approved and SO ORDERED. (Attorney Alina Habba for Donald J. Trump added. Attorney Christine A. Montenegro; Paul J. Burgo and Marc E. Kasowitz terminated.) (Signed by Judge Lewis A. Kaplan on 11/22/21) (yv) (Entered: 11/22/2021) |
| 12/01/2021 | 59 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION to Amend/Correct *Notice of Defendant's Motion for Leave to Amend his Answer*. Document filed by Donald J. Trump. (Attachments: # 1 Affirmation of Alina Habba, Esq. with Exhibits, # 2 Memorandum of Law, # 3 Proposed Order).(Habba, Alina) Modified on 1/10/2022 (kj). (Entered: 12/01/2021) |
| 12/01/2021 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Alina Habba to RE-FILE Document 59 MOTION to Amend/Correct *Notice of Defendant's Motion for Leave to Amend his Answer*.. ERROR(S): Supporting Documents are filed separately, each receiving their own document #. (Supporting Documents are found under the Event Type - Replies, Opposition and Supporting Documents; Rule 56.1 Statement is found under Other Answers). Proposed Order(s) and/or Certificate of Service(s) can be filed with the Motion.. (kj)** (Entered: 01/10/2022) |
| 12/06/2021 | 60 | NOTICE OF APPEARANCE by Joshua Adam Matz on behalf of E. Jean Carroll..(Matz, Joshua) (Entered: 12/06/2021) |
| 12/15/2021 | 61 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MEMORANDUM OF LAW in Opposition re: 59 MOTION to Amend/Correct *Notice of Defendant's Motion for Leave to Amend his Answer*. . Document filed by E. Jean Carroll..(Kaplan, Roberta) Modified on 1/10/2022 (kj). (Entered: 12/15/2021) |
| 12/15/2021 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Roberta Kaplan to RE-FILE Document 61 Memorandum of Law in Opposition to Motion,. ERROR(S): Supporting and or Opposing/Response Document(s) linked to a deficient entry.. (kj)** (Entered: 01/10/2022) |
| 12/22/2021 | 62 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** REPLY MEMORANDUM OF LAW in Support re: 59 MOTION to Amend/Correct *Notice of Defendant's Motion for* |

| | | |
|---|---|---|
| | | *Leave to Amend his Answer.* . Document filed by Donald J. Trump..(Habba, Alina) Modified on 1/10/2022 (kj). (Entered: 12/22/2021) |
| 12/22/2021 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Alina Habba to RE-FILE Document 62 Reply Memorandum of Law in Support of Motion,. ERROR(S): Supporting and or Opposing/Response Document(s) linked to a deficient entry.. (kj)** (Entered: 01/10/2022) |
| 01/11/2022 | 63 | MOTION to Amend/Correct *Defendant's Answer.* Document filed by Donald J. Trump. (Attachments: # 1 Affirmation of Alina Habba, Esq. with Exhibits, # 2 Text of Proposed Order).(Habba, Alina) (Entered: 01/11/2022) |
| 01/11/2022 | 64 | MEMORANDUM OF LAW in Support re: 63 MOTION to Amend/Correct *Defendant's Answer.* . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 01/11/2022) |
| 01/11/2022 | 65 | MEMORANDUM OF LAW in Opposition re: 63 MOTION to Amend/Correct *Defendant's Answer.* . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/11/2022) |
| 01/28/2022 | 66 | REPLY MEMORANDUM OF LAW in Support re: 63 MOTION to Amend/Correct *Defendant's Answer.* . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 01/28/2022) |
| 02/11/2022 | 67 | ORDER, The Court will hear argument on defendant's motion for leave to file an amended answer on February 17, 2022 at 4:00 p.m. SO ORDERED. ( Oral Argument set for 2/17/2022 at 04:00 PM before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 2/11/22) (yv) (Entered: 02/11/2022) |
| 02/11/2022 | | Dial in re Oral Argument set for 2/22/2022 at 04:00 PM in Courtroom 21B, 500 Pearl Street, New York, NY 10007 before Judge Lewis A. Kaplan. Public seating in the gallery of courtroom 21B will be limited due to Covid-19 social distancing requirements. However, the public and press may dial in to listen to the oral argument as scheduled at 1-888-363-4749 and entering conference code 7664205#. Please be aware that Court rules prohibit listeners from recording or rebroadcasting the hearing in whole or in part. (Mohan, Andrew) Modified on 2/14/2022 (Mohan, Andrew). (Entered: 02/11/2022) |
| 02/14/2022 | 68 | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba, Esq. dated 2/14/2022 re: rescheduling oral arguments on Defendant's Motion to amend the answer. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/14/2022) |
| 02/14/2022 | 69 | MEMO ENDORSEMENT on the 2/14/2022 letter of Ms. Alina Habba requesting an adjournment of the 2/17/2022 oral argument date. Adjourned until 2/22/22 at 4:00 PM. (Signed by Judge Lewis A. Kaplan on 2/14/2022) (Mohan, Andrew) (Entered: 02/14/2022) |
| 02/22/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan in courtroom 21B: Oral Argument held on 2/22/2022 re: 63 MOTION to Amend/Correct *Defendant's Answer.* filed by Donald J. Trump. Public dial-in line was active. Court's decision reserved. (Court Reporter Rebecca Forman) (Mohan, Andrew) (Entered: 02/23/2022) |
| 02/24/2022 | 70 | JOINT LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated February 24, 2022 re: response to the Court's request concerning previous stays. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/24/2022) |
| 02/24/2022 | 71 | TRANSCRIPT of Proceedings re: CONFERENCE held on 2/22/2022 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that |

| | | |
|---|---|---|
| | | date it may be obtained through PACER. Redaction Request due 3/17/2022. Redacted Transcript Deadline set for 3/28/2022. Release of Transcript Restriction set for 5/25/2022..(Moya, Goretti) (Entered: 02/24/2022) |
| 02/24/2022 | 72 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 2/22/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/24/2022) |
| 03/11/2022 | 73 | MEMORANDUM OPINION re: 63 MOTION to Amend/Correct *Defendant's Answer*. filed by Donald J. Trump. Defendant's motion, in his personal capacity, for leave to amend (Dkt. 63) is denied on the ground that the proposed amendment would be futile. In the alternative, it is denied in the exercise of discretion on the grounds that the defendant delayed unduly in seeking leave to amend, that the motion for leave is made at least in part for a dilatory purpose and thus at least in part in bad faith, and that granting the motion would prejudice the plaintiff unduly. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/10/22) (yv) (Entered: 03/11/2022) |
| 03/11/2022 | 74 | ENDORSED LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 3/10/22 re: notify the Court of the attached decision issued by a unanimous panel of the Appellate Division, First Department this afternoon. ENDORSEMENT: The Appellate Division of the New York Supreme Court yesterday held the 2020 amendment to N.Y. Civ. Rts. L. § 76-a has only prospective effect. Gottwald v. Sebert, _ A.D. 3d _, Index No. 653118/2014 (1st Dep't filed Mar. 10, 2021). Its logic applies equally to the all of the 2020 amendments to the anti-SLAPP law. In the absence of compelling reasons to believe that the New York Court of Appeals would reach a different result, this Court is obliged under Erie to follow it. E.g., Hicks on Behalf of Feiockv. Feiock, 485 U.S. 624, 629-30 & n.3 (1988) (quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940)); AEI Life LLC v. Lincoln Benfit Life Co., 892 F.3d 126, 138-39 & n.15 (2d Cir. 2018) (quoting Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 134 (2d Cir. 1999); Pentech Int'l, Inc. v. Wall Street Clearing Co., 983 F.2d 441, 445 (2d Cir.1993); Deeper Life Christian Fellowship, Inc. v. Sobol, 948 F.2d 79, 84 (2d Cir.1991). Nevertheless, contrary to plaintiff's suggestion, this does not moot the issues addressed in the opinion dated March 10, 2021 (Dkt. 73), as N.Y. Civ. Rts. L. § 70-a applies not only to the commencement of a covered action, but also to its continuation. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/11/22) (yv) (Entered: 03/11/2022) |
| 05/05/2022 | 75 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated May 5, 2022 re: Agreed discovery schedule. Document filed by E. Jean Carroll. (Attachments: # 1 Text of Proposed Order / [Proposed] Scheduling Order).(Kaplan, Roberta) (Entered: 05/05/2022) |
| 05/05/2022 | 76 | SCHEDULING ORDER: It is hereby ORDERED as follows: 1. The parties shall serve any and all written discovery requests on each other on or before May 27, 2022. 2. The parties shall substantially complete their productions of written discovery and requests for inspection or examination on or before August 3, 2022. 3. Depositions to take place between August 3, 2022, to October 19, 2022. 4. The parties shall make any and all expert disclosures under Rule 26(a)(2) on or before September 16, 2022. 5. The parties shall substantially complete any and all fact discovery on or before October 19, 2022. 6. The parties shall complete any and all expert discovery on or before November 16, 2022. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 5/4/2022) Deposition due by 10/19/2022. Fact Discovery due by 10/19/2022. Expert Discovery due by 11/16/2022. Discovery due by 5/27/2022. (ks) (Entered: 05/05/2022) |

A-16

| 07/19/2022 | 77 | SUPPLEMENTAL SCHEDULING ORDER:The existing scheduling order (Dkt 76) is supplemented as follows: 1. All discovery shall be completed on or before November 16, 2022. 2. Any summary judgment motions and a joint pretrial order in the form attached as Annex A to the individual practices of the undersigned (which are posted on the Court's web site) shall be filed on or before December 1, 2022. 3. Absent prior disposition of the case by motion or otherwise, the trial will commence on February 6, 2023 at 9:30 a.m. 4. The parties shall exchange premarked trial exhibits no later than December 8, 2022. 5. Any motions in limine and oppositions thereto shall be filed no later than December 8 and December 15, 2022, respectively. SO ORDERED. Motions due by 12/8/2022. Responses due by 12/15/2022 Discovery due by 11/16/2022. Pretrial Order due by 12/1/2022. Ready for Trial by 2/6/2023. (Signed by Judge Lewis A. Kaplan on 7/19/2022) (tg) (Entered: 07/19/2022) |
| 07/20/2022 | 78 | LETTER MOTION for Conference addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated July 20, 2022. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 07/20/2022) |
| 07/21/2022 | 79 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated July 21, 2022 re: Supplemental Scheduling Order (ECF 77) and Plaintiff's Letter Motion (ECF 78). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 07/21/2022) |
| 07/26/2022 | 80 | NOTICE OF APPEARANCE by Shawn Geovjian Crowley on behalf of E. Jean Carroll..(Crowley, Shawn) (Entered: 07/26/2022) |
| 07/26/2022 | 81 | NOTICE OF APPEARANCE by Matthew J. Craig on behalf of E. Jean Carroll..(Craig, Matthew) (Entered: 07/26/2022) |
| 08/01/2022 | 82 | LETTER MOTION for Discovery / *Discovery Dispute* addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated August 1, 2022. Document filed by E. Jean Carroll. (Attachments: # 1 Text of Proposed Order [Proposed] Protective and Confidentiality Order).(Kaplan, Roberta) (Entered: 08/01/2022) |
| 08/03/2022 | 83 | ORDER: Counsel are advised as follows: 1. Shawn G. Crowley, Esq., who filed a notice of appearance in the first captioned case on July 26, 2022, is a former law clerk to the undersigned. The undersigned co-officiated (with another judge) at the marriage of Ms. Crowley approximately seven years ago. 2. Assistant United States Attorney Jeffrey W. Coyle, who appears for the United States in the second captioned case, which was assigned to the undersigned on August 2, 2022, is a former law clerk to the undersigned. (Signed by Judge Lewis A. Kaplan on 8/3/2022) (rro) (Entered: 08/03/2022) |
| 08/11/2022 | 84 | PROTECTIVE AND CONFIDENTIALITY ORDER...regarding procedures to be followed that shall govern the handling of confidential material...SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/11/22) (yv) (Entered: 08/11/2022) |
| 08/17/2022 | 85 | ORDER denying 78 Letter Motion for Conference re: 78 LETTER MOTION for Conference addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated July 20, 2022. (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 08/17/2022) |
| 08/17/2022 | 86 | ORDER terminating 82 Letter Motion for Discovery (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 08/17/2022) |
| 08/23/2022 | 87 | PROPOSED STIPULATION AND ORDER. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/23/2022) |
| 08/24/2022 | 88 | STIPULATION AND ORDER. IT IS ACCORDINGLY STIPULATED AND AGREED that the parties' deadline for making their expert disclosures under Rule 26(a)(2) is |

| | | |
|---|---|---|
| | | extended until October 14, 2022. IT IS SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/24/22) (yv) Modified on 9/13/2022 (yv). (Entered: 08/24/2022) |
| 09/20/2022 | 89 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 8/8/22 re: providing the Court a brief update on discovery; and (2) informing the Court of a case that Plaintiff plans to file against Defendant pursuant to New York's Adult Survivors Act as soon as that statute authorizes us to do so on November 24, 2022. Document filed by E. Jean Carroll.(yv) (Entered: 09/20/2022) |
| 09/20/2022 | 90 | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba dated 8/11/22 re: response to the letter submitted by the plaintiff, E. Jean Carroll ("Plaintiff"), on August 8, 2022. Document filed by Donald J. Trump.(yv) (Entered: 09/20/2022) |
| 09/27/2022 | 91 | USCA OPINION (Certified) as to 46 Notice of Interlocutory Appeal, filed by Donald J. Trump, 45 Notice of Interlocutory Appeal filed by United States of America. USCA Case Number 20-3977-cv (L), 20-3978-cv (Con). Defendant-Appellant Donald J. Trump and Movant-Appellant the United States of America appeal from a judgment of the United States District Court for the Southern District of New York (Kaplan, J.) denying their motion to substitute the United States in this action pursuant to the Westfall Act of 1988. On appeal, appellants argue that substitution is warranted because the President of the United States is a covered government employee under the Westfall Act, and because Trump had acted within the scope of his employment when he made the allegedly defamatory statements denying Plaintiff-Appellee E.Jean Carroll's 2019 sexual1 assault allegations. We REVERSE the District Court's holding that the President of the United States is not an employee of the government under the Westfall Act. And we VACATE the District Court's judgment that Trump did not act within the scope of his employment, and CERTIFY that question to the D.C. Court of Appeals. Judge Calabresi concurs in a separate opinion, and Judge Chin dissents in a separate opinion.. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 9/27/2022. (Attachments: # 1 Concurring by Judge CALABRESI, # 2 Dissenting by Judge Chin).(nd) (Entered: 09/27/2022) |
| 09/27/2022 | | Transmission of USCA Mandate to the District Judge re: 91 USCA Order,,,,,,.(nd) (Entered: 09/27/2022) |
| 09/28/2022 | 92 | LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 09/28/2022) |
| 09/30/2022 | 93 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated September 30, 2022 re: 92 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 09/30/2022) |
| 10/03/2022 | 94 | LETTER REPLY to Response to Motion addressed to Judge Lewis A. Kaplan from Alina Habba dated 10/3/2022 re: 92 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. . Document filed by Donald J. Trump.. (Habba, Alina) (Entered: 10/03/2022) |
| 10/04/2022 | 95 | LETTER MOTION for Conference re: 92 LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. addressed to Judge Lewis A. Kaplan from Alina Habba, Esq. dated 10/4/22. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 10/04/2022) |
| 10/04/2022 | | Set Hearings: Status Conference via-video conference is set for 10/7/2022 at 03:45 PM before Judge Lewis A. Kaplan. Counsel have been sent video-conference invites by email. Public and press may listen in via audio-only by dialing 1-888-363-4749 and entering access code 7664205# Participants and listeners are reminded that recording or |

| | | |
|---|---|---|
| | | re-broadcasting of the conference in whole or in part is prohibited by Court rules. (Mohan, Andrew) (Entered: 10/04/2022) |
| 10/06/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Video-Conference held on 10/6/2022. (Court Reporter Andrew Walker) (Mohan, Andrew) (Entered: 10/06/2022) |
| 10/07/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Interim Pretrial Conference held via video-conference on 10/7/2022. AT&T Line was active for public and press to listen. (Court Reporter Lisa Franko) (Mohan, Andrew) (Entered: 10/07/2022) |
| 10/12/2022 | 96 | MEMORANDUM OPINION: re: 92 LETTER MOTION to Stay. addressed to Judge Lewis A. Kaplan from Alina Habba dated 9/28/2022. filed by Donald J. Trump. The defendant's letter motion [Dkt. 92] is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/12/2022) (ama) (Entered: 10/12/2022) |
| 11/10/2022 | 97 | CONSENT LETTER MOTION for Conference addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated November 10, 2022. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - D.C. Court of Appeals Order).(Kaplan, Roberta) (Entered: 11/10/2022) |
| 11/17/2022 | 98 | SUPPLEMENTAL LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated November 17, 2022 re: November 11, 2022 LETTER MOTION for Scheduling Conference 97 . Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Correspondence Between Counsel, # 2 Exhibit B - Color-Coded Complaint in Second Action, # 3 Exhibit C - Complaint in Second Action).(Kaplan, Roberta) (Entered: 11/17/2022) |
| 11/18/2022 | | Set/Reset Hearings: Status video-conference set for 11/22/2022 at 03:00 PM to be held by video-conference with audio access for public and press to listen to the proceeding held before Judge Lewis A. Kaplan. Counsel will appear by video. Listeners may dial-in for audio at 1-888-363-4749 and enter conference ID 7664205# Recording or re-broadcasting of the hearing is prohibited by Court rules. (Mohan, Andrew) Modified on 11/20/2022 (Mohan, Andrew). (Entered: 11/18/2022) |
| 11/21/2022 | 99 | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba dated 11/21/2022 Document filed by Donald J. Trump..(Habba, Alina) (Entered: 11/21/2022) |
| 11/22/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan via video-conference: Status Conference held on 11/22/2022. Public dial-in by AT&T conference line was active. (Court Reporter Pam Utter) (Mohan, Andrew) (Entered: 11/22/2022) |
| 11/29/2022 | 100 | ORDER re: Plaintiffs consent letter motion (Dkt 97), as supplemented (Dkt 98), is granted to the extent that (1) the trial of this action is postponed until April 10, 2023, and (2) the Court adopts, for this action only, the proposed schedule for in limine motions and exchange of premarked exhibits. Except as modified by the preceding sentence, the scheduling and supplemental scheduling orders (Dkt 76, Dkt 77) remain in effect. Insofar as plaintiffs motion, as supplemented, relates to the subsequently filed action Carroll v Trump, 22-cv-10016 (LAK), the Court does not now make any rulings. (Signed by Judge Lewis A. Kaplan on 11/29/2022) (Mohan, Andrew) (Entered: 11/29/2022) |
| 11/29/2022 | 101 | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba dated 11/29/2022 re: modified schedule. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 11/29/2022) |
| 11/30/2022 | 102 | MEMO ENDORSEMENT on re: 101 Letter modified schedule filed by Donald J. Trump. ENDORSEMENT: Counsel's understanding is incorrect. As the November 29, 2022 order (Dkt 100) makes quite clear, the scheduling and supplemental scheduling orders remain in effect except to the extent that (I) the trial date has been adjourned until April 10, 2023 |

A-19

| | | and (2) the Court adopted the proposed schedule for in limine motions and exchange of premarked exhibits. It did not adopt the proposal to delay the briefing and filing of any summary judgment motions and the filing of a joint pretrial order for more than two months, which would threaten to delay even the April 10 trial date, should a trial prove necessary. In the circumstances, the Court treats defendant's letter (Dkt 101) as an application for an extension of time for the filing of any summary judgment motions and the joint pretrial order and grants it to the extent that (1) any summary judgment motions shall be filed on or before December 22, 2022, (2) any papers in opposition to any summary judgment motions shall be filed on or before January 12, 2023, (3) any reply papers shall be filed on or before January 19, 2023, and (4) the joint pretrial order shall be filed on or before February 9, 2023. The application is otherwise denied. SO ORDERED., ( Motions due by 12/22/2022., Pretrial Order due by 2/9/2023., Responses due by 1/12/2023, Replies due by 1/19/2023.) (Signed by Judge Lewis A. Kaplan on 11/30/22) (yv) Modified on 12/28/2022 (yv). (Entered: 11/30/2022) |
|---|---|---|
| 12/02/2022 | 103 | TRANSCRIPT of Proceedings re: CONFERENCE held on 11/22/2022 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/23/2022. Redacted Transcript Deadline set for 1/3/2023. Release of Transcript Restriction set for 3/2/2023.. (McGuirk, Kelly) (Entered: 12/02/2022) |
| 12/02/2022 | 104 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 11/22/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 12/02/2022) |
| 12/05/2022 | 105 | ORDER. If she has not already done so, counsel of record for the defendant in this case shall transmit to the defendant and to any counsel who may have been engaged to represent defendant in Carroll v. Trump, 22-cv-10016 (LAK) ( "Carroll II"), for delivery no later than December 6, 2022, a copy of this Court's order, dated December 2, 2022, in Carroll II Counsel is directed to do so as an officer of the Court. The Court does not imply that she has been or will be engaged to represent the defendant in Carroll II SO ORDERED. (Signed by Judge Lewis A. Kaplan on 12/5/22) (yv) (Entered: 12/05/2022) |
| 12/20/2022 | 106 | PROTECTIVE AND CONFIDENTIALITY ORDER....regarding procedures to be followed that shall govern the handling of confidential material... SO ORDERED. (Signed by Judge Lewis A. Kaplan on 12/20/2022) (vfr) (Entered: 12/20/2022) |
| 12/22/2022 | 107 | MOTION for Summary Judgment . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 12/22/2022) |
| 12/22/2022 | 108 | DECLARATION of Alina Habba in Support re: 107 MOTION for Summary Judgment .. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 12/22/2022) |
| 12/22/2022 | 109 | MEMORANDUM OF LAW in Support re: 107 MOTION for Summary Judgment . . Document filed by Donald J. Trump. (Attachments: # 1 Supplement Statement of Material Facts).(Habba, Alina) (Entered: 12/22/2022) |
| 01/09/2023 | 110 | MOTION for Trevor W. Morrison to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27180100. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by E. Jean Carroll. (Attachments: # 1 Affidavit of |

A-20

| | | |
|---|---|---|
| | | Trevor W. Morrison, # [2](#) Exhibit - Certificate of Good Standing, # [3](#) Text of Proposed Order for Admission Pro Hac Vice).(Morrison, Trevor) (Entered: 01/09/2023) |
| 01/10/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 110 MOTION for Trevor W. Morrison to Appear Pro Hac Vice . Filing fee S 200.00, receipt number ANYSDC-27180100. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 01/10/2023) |
| 01/12/2023 | [111](#) | LETTER MOTION to Seal addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated January 12, 2023. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | [112](#) | MEMORANDUM OF LAW in Opposition re: [107](#) MOTION for Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | [113](#) | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: [107](#) MOTION for Summary Judgment . . Document filed by E. Jean Carroll, Donald J. Trump. Motion or Order to File Under Seal: [111](#) .(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | [114](#) | RULE 56.1 STATEMENT. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | [115](#) | ***SELECTED PARTIES***RULE 56.1 STATEMENT. Document filed by E. Jean Carroll, Donald J. Trump. Motion or Order to File Under Seal: [111](#) .(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | [116](#) | DECLARATION of Roberta A. Kaplan in Opposition re: [107](#) MOTION for Summary Judgment .. Document filed by E. Jean Carroll. (Attachments: # [1](#) Exhibit 1 - Excerpts of Deposition of E. Jean Carroll, # [2](#) Exhibit 2 - New York Magazine Article (Online Version), # [3](#) Exhibit 3 - June 21, 2019 Statement, # [4](#) Exhibit 4 - June 22, 2019 Statement, # [5](#) Exhibit 5 - June 24, 2019 Statement, # [6](#) Exhibit 6 - Excerpts of Deposition of Donald J. Trump, # [7](#) Exhibit 7 - Photograph of E. Jean Carroll and Donald Trump, # [8](#) Exhibit 8 - Excerpts of Deposition of Lisa Birnbach, # [9](#) Exhibit 9 - Excerpts of Deposition of Carol Martin, # [10](#) Exhibit 10 - New York Magazine Article (Print Version), # [11](#) Exhibit 11 - Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, # [12](#) Exhibit 12 - Excerpts of Deposition of Roberta Myers, # [13](#) Exhibit 13 - Appendix H to Expert Report of Ashlee Humphreys, # [14](#) Exhibit 14 - Appendix I to Expert Report of Ashlee Humphreys).(Kaplan, Roberta) (Entered: 01/12/2023) |
| 01/12/2023 | [117](#) | ***SELECTED PARTIES***DECLARATION of Roberta A. Kaplan in Opposition re: [107](#) MOTION for Summary Judgment .. Document filed by E. Jean Carroll, Donald J. Trump. (Attachments: # [1](#) Exhibit 1 - Excerpts of Deposition of E. Jean Carroll, # [2](#) Exhibit 2 - New York Magazine Article (Online Version), # [3](#) Exhibit 3 - June 21, 2019 Statement, # [4](#) Exhibit 4 - June 22, 2019 Statement, # [5](#) Exhibit 5 - June 24, 2019 Statement, # [6](#) Exhibit 6 - Excerpts of Deposition of Donald J. Trump, # [7](#) Exhibit 7 - Photograph of E. Jean Carroll and Donald Trump, # [8](#) Exhibit 8 - Excerpts of Deposition of Lisa Birnbach, # [9](#) Exhibit 9 - Excerpts of Deposition of Carol Martin, # [10](#) Exhibit 10 - New York Magazine Article (Print Version), # [11](#) Exhibit 11 - Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, # [12](#) Exhibit 12 - Excerpts of Deposition of Roberta Myers, # [13](#) Exhibit 13 - Appendix H to Expert Report of Ashlee Humphreys, # [14](#) Exhibit 14 - Appendix I to Expert Report of Ashlee Humphreys)Motion or Order to File Under Seal: [111](#) .(Kaplan, Roberta) (Entered: 01/12/2023) |

| 01/13/2023 | 118 | ORDER granting 110 Motion for Trevor W. Morrison to Appear Pro Hac Vice. (Signed by Judge Lewis A. Kaplan on 1/13/2023) (Mohan, Andrew) (Entered: 01/13/2023) |
|---|---|---|
| 01/13/2023 | 119 | MEMO ENDORSEMENT Granting the 1/12/2023 letter from Roberta A. Kaplan to Hon. Lewis A. Kaplan requesting provisional approval to file certain materials under seal. (Signed by Judge Lewis A. Kaplan on 1/13/2023) (Mohan, Andrew) (Entered: 01/13/2023) |
| 01/17/2023 | 120 | LETTER addressed to Judge Lewis A. Kaplan from Michael Madaio dated 1/17/2023 re: withdrawing request to seal documents. Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 01/17/2023) |
| 01/18/2023 | 121 | MEMO ENDORSEMENT: on re: 120 Letter filed by Donald J. Trump. ENDORSEMENT: The Clerk Shall unseal the requested portions of defendant's deposition transcript attach by ECF #117. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 1/18/2023) (ama) (Entered: 01/18/2023) |
| 01/19/2023 | 122 | REPLY MEMORANDUM OF LAW in Support re: 107 MOTION for Summary Judgment . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 01/19/2023) |
| 01/20/2023 | 123 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated January 20, 2023 re: Summary Judgment Reply Brief. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/20/2023) |
| 01/20/2023 | 124 | MEMO ENDORSEMENT on re: 123 Letter Summary Judgment Reply Brief filed by E. Jean Carroll. ENDORSEMENT: Sur-reply due by 1/24/23. No argument. SO ORDERED., ( Surreplies due by 1/24/2023.) (Signed by Judge Lewis A. Kaplan on 1/20/23) (yv) (Entered: 01/20/2023) |
| 01/24/2023 | 125 | SUPPLEMENTAL REPLY MEMORANDUM OF LAW in Opposition re: 107 MOTION for Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/24/2023) |
| 02/02/2023 | 126 | LETTER addressed to Judge Lewis A. Kaplan from Cory Gnazzo dated 1/31/23 re: request that the Clerk of Court file a public, unredacted version of ECF No. 112. (yv) (Entered: 02/02/2023) |
| 02/07/2023 | 127 | MEMO ENDORSEMENT: on re: 126 Letter. ENDORSEMENT: The redacted portions of the plaintiffs opposition brief and plaintiffs response to the defendant's Rule 56.1 statement are information drawn from the defendant's deposition transcript,which already has been unsealed pursuant to this Court's order on January 18, 2023 (Dkt 121). The designated portions of plaintiffs opposition filings accordingly no longer need to be sealed. The Clerk shall unseal the designated portions of plaintiffs opposition brief (Dkt 113) and plaintiffs response to defendant's Rule 56.1 statement (Dkt 115). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 2/07/2023) (ama) (Entered: 02/07/2023) |
| 02/09/2023 | 128 | PROPOSED PRE-TRIAL ORDER. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/09/2023) |
| 02/13/2023 | 129 | JOINT PRETRIAL ORDER. The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein as further set forth in this Order. Carroll and Trump both request that this action be tried by jury. The parties estimate that the trial will take between 5 and 7 days. IT IS SO ORDERED. (Signed by Judge Lewis A. Kaplan on 2/13/23) (yv) (Entered: 02/13/2023) |

A-22

| 02/16/2023 | 130 | MOTION in Limine . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/16/2023) |
|---|---|---|
| 02/16/2023 | 131 | MEMORANDUM OF LAW in Support re: 130 MOTION in Limine . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/16/2023) |
| 02/16/2023 | 132 | DECLARATION of Alina Habba in Support re: 130 MOTION in Limine .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - Deposition of Natasha Stoynoff, # 2 Exhibit B - Deposition of Jessica Leeds).(Habba, Alina) (Entered: 02/16/2023) |
| 02/16/2023 | 133 | MOTION in Limine . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/16/2023) |
| 02/16/2023 | 134 | MEMORANDUM OF LAW in Support re: 133 MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/16/2023) |
| 02/16/2023 | 135 | DECLARATION of Roberta A. Kaplan in Support re: 133 MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 Excerpts of Deposition of Lisa Birnbach, # 2 Exhibit 2 Excerpts of Deposition of Carol Martin, # 3 Exhibit 3 Excerpts of Deposition of Donald J. Trump, # 4 Exhibit 4 Excerpts of Deposition of Natasha Stoynoff, # 5 Exhibit 5 Excerpts of Deposition of Jessica Leeds, # 6 Exhibit 6 Excerpt of Deposition of E. Jean Carroll, # 7 Exhibit 7 Exhibit 33 from the Deposition of Donald J. Trump, # 8 Exhibit 8 Expert Report of Ashlee Humphreys, PhD, # 9 Exhibit 9 Rebuttal Expert Report of Robert J. Fisher, # 10 Exhibit 10 Excerpts of Deposition of Robert J. Fisher, # 11 Exhibit 11 Trumps Initial Disclosures, # 12 Exhibit 12 Trumps Supplemental Expert Disclosures, # 13 Exhibit 13 Trumps Initial Disclosures in Carroll II, # 14 Exhibit 14 - Trumps Supp. Responses to Interrogatories, # 15 Exhibit 15 Aug. 24, 2022 Email from M. Madaio, # 16 Exhibit 16 Exhibit 20 from the Deposition of Donald J. Trump, # 17 Exhibit 17 - Excerpts of Deposition of Stephanie Grisham).(Kaplan, Roberta) (Entered: 02/16/2023) |
| 02/23/2023 | 136 | MEMORANDUM OF LAW in Opposition re: 133 MOTION in Limine . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/23/2023) |
| 02/23/2023 | 137 | DECLARATION of Alina Habba in Opposition re: 133 MOTION in Limine .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - Deposition of Natasha Stoynoff, # 2 Exhibit B - Deposition of Jessica Leeds, # 3 Exhibit C - Expert Report of Robert Fisher, # 4 Exhibit D - Deposition of Robert Fisher, # 5 Exhibit E - Deposition of E. Jean Carroll, # 6 Exhibit F- Deposition of E. Jean Carroll, # 7 Exhibit G - Plaintiff's Second Supplemental Disclosure, # 8 Exhibit H - Plaintiff's Third Supplemental Disclosure). (Habba, Alina) (Entered: 02/23/2023) |
| 02/23/2023 | 138 | MEMORANDUM OF LAW in Opposition re: 130 MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/23/2023) |
| 02/23/2023 | 139 | DECLARATION of Roberta A. Kaplan in Opposition re: 130 MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Deposition of Natasha Stoynoff, # 2 Exhibit 2 - Excerpts of Deposition of Jessica Leeds, # 3 Exhibit 3 - Access Hollywood Video, # 4 Exhibit 4 - Excerpts of Deposition of Donald J. Trump, # 5 Exhibit 5 - Sept. 26, 2016 Debate Video, # 6 Exhibit 6 - Excerpts of Deposition of E. Jean Carroll, # 7 Exhibit 7 - Oct. 13, 2016 Campaign Video 1, # 8 Exhibit 8 - Oct. 13, 2016 Campaign Video 2, # 9 Exhibit 9 - Oct. 13, 2016 Campaign Video 3, # 10 Exhibit 10 - Oct. 14, 2016 Campaign Video 1, # 11 Exhibit 11 - Oct. 14, 2016 Campaign Video 2, # 12 Exhibit 12 - Oct. 21, 2016 Campaign Video, # 13 Exhibit 13 - June 21, 2019 Statement, # 14 Exhibit 14 - June 22, 2019 Statement, # 15 Exhibit 15 - June 24, 2019 Statement, # 16 Exhibit 16 - Oct. 12, 2022 Statement).(Kaplan, Roberta) (Entered: 02/23/2023) |

| 03/02/2023 | 140 | REPLY MEMORANDUM OF LAW in Support re: 130 MOTION in Limine . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 03/02/2023) |
| 03/03/2023 | 141 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated March 3, 2023 re: Defendants Unauthorized Reply Brief. Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 03/03/2023) |
| 03/03/2023 | 142 | MEMO ENDORSEMENT on re: 141 Letter Defendants Unauthorized Reply Brief filed by E. Jean Carroll. ENDORSEMENT : Reply brief not to exceed 5 pages due by March 9, 2023. SO ORDERED., ( Replies due by 3/9/2023.) (Signed by Judge Lewis A. Kaplan on 3/3/23) (yv) (Entered: 03/03/2023) |
| 03/09/2023 | 143 | REPLY MEMORANDUM OF LAW in Support re: 133 MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 03/09/2023) |
| 03/09/2023 | 144 | DECLARATION of Roberta A. Kaplan in Support re: 133 MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Deposition of Robert J. Fisher in Carroll I, # 2 Exhibit 2 - Excerpt of Deposition of Robert J. Fisher in Carroll II).(Kaplan, Roberta) (Entered: 03/09/2023) |
| 03/10/2023 | 145 | MEMORANDUM OPINION re: 130 MOTION in Limine , filed by Donald J. Trump. For the foregoing reasons, Mr. Trump's in limine motion (Dkt. 130) is denied in all respects. This ruling is without prejudice to renewing his objection to the campaign speech excerpts in the event they are offering at trial. Unless otherwise ordered, those excerpts shall not be mentioned in opening statements. (Signed by Judge Lewis A. Kaplan on 3/10/2023) (tro) (Entered: 03/10/2023) |
| 03/10/2023 | 146 | NOTICE OF APPEARANCE by Michael Ferrara on behalf of E. Jean Carroll..(Ferrara, Michael) (Entered: 03/10/2023) |
| 03/17/2023 | 147 | LETTER MOTION to Consolidate Cases 1:22-cv-10016 *for Trial* addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated March 17, 2023. Document filed by E. Jean Carroll. (Attachments: # 1 Text of Proposed Order / Stipulation and [Proposed] Order).(Kaplan, Roberta) (Entered: 03/17/2023) |
| 03/20/2023 | 148 | ORDER denying 147 Letter Motion to Consolidate Cases. The letter motion to consolidate these cases for trial, filed in the first captioned case as Dkt 14 7, is denied. The parties overestimate both the judicial economy benefits that would be achieved and the risk of inconsistent rulings that would be eliminated by consolidation. Issue preclusion appears to the Court adequate to achieve appropriate conservation of judicial resources and avoidance of inconsistent rulings even if the two cases were tried separately. Moreover, a trial in 20-cv-7311 conceivably could prove unnecessary. In addition, approval of the consolidation proposal would be in tension with the deference to the Second Circuit and the District of Columbia Court of Appeals that this Court believes appropriate in the circumstances. 2.The trial of 20-cv-7311, previously scheduled tentatively to begin on April 10, 2023, is adjourned sine die. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/20/23) (yv) (Entered: 03/20/2023) |
| 04/21/2023 | 149 | OPINION of USCA (Certified Copy) as to 46 Notice of Interlocutory Appeal, filed by Donald J. Trump, 45 Notice of Interlocutory Appeal filed by United States of America USCA Case Number 20-3977-cv (L), 20-3978-cv (Con). Having vacated in our prior opinion the District Court's judgment that Trump did not act within the scope of his employment, Carroll I, 49 F.4th at 761, we now REMAND to the district court for further proceedings consistent with the detailed guidance provided by the D.C. Court of Appeals. The Clerk is directed to issue the mandate forthwith. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 4/21/2023. (tp) Modified on 4/21/2023 (tp). (Entered: 04/21/2023) |

| | | |
|---|---|---|
| 04/21/2023 | 150 | MANDATE of USCA (Certified Copy) as to 46 Notice of Interlocutory Appeal, filed by Donald J. Trump, 45 Notice of Interlocutory Appeal filed by United States of America USCA Case Number 20-3977-cv (L), 20-3978-cv (Con). IT IS HEREBY ORDERED, ADJUDGED and DECREED that the cause is REMANDED to the district court for further proceedings consistent with the detailed guidance provided by the D.C. Court of Appeals. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 4/21/2023. (Attachments: # 1 Appendix Supporting Document). (tp) (Entered: 04/21/2023) |
| 05/11/2023 | 151 | LETTER addressed to Judge Lewis A. Kaplan from Susan S. Harmon, Esq. dated 5/1/2023 re: Alleged 1996 Rape at Bergdorf Goodman. I have some exculpatory evidence and material to offer in this case in favor of defendant.(Mohan, Andrew) (Entered: 05/11/2023) |
| 05/11/2023 | 152 | MOTION to Intervene. Document filed by Reuben Larson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Certificate of Service.(vba) (Entered: 05/12/2023) |
| 05/15/2023 | 153 | ORDER. Reuben Larson, appearing prose, has petitioned to "address" and "remonstrance" this Court in relation to the above-captioned matter. Applying a liberal interpretation of his pro se filing, the Court construes his petition as a motion to intervene. That motion is denied both as a matter of law and in the Court's discretion. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 5/11/23) (yv) (Entered: 05/15/2023) |
| 05/22/2023 | 154 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated May 22, 2023 re: Proposed Schedule. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 05/22/2023) |
| 05/22/2023 | 155 | MOTION to Amend/Correct . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 05/22/2023) |
| 05/22/2023 | 156 | MEMORANDUM OF LAW in Support re: 155 MOTION to Amend/Correct . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 05/22/2023) |
| 05/22/2023 | 157 | DECLARATION of Roberta A. Kaplan in Support re: 155 MOTION to Amend/Correct .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Amended Complaint, # 2 Exhibit B - Redline Comparison).(Kaplan, Roberta) (Entered: 05/22/2023) |
| 05/24/2023 | | ORDER terminating 152 Motion to Intervene (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 05/24/2023) |
| 05/24/2023 | 158 | ORDER, 1.Any response to plaintiff's letter of May 22, 2023 shall be filed on or before May 26, 2023. Unless otherwise ordered, any opposition to plaintiff's motion to amend, and any reply in support thereof, under the Rules of this Court, is due on or before June 5, 2023 and June 12, 2023, respectively. 3. Government counsel promptly should begin their review of deposition and other discovery material and such other material as may be appropriate that the United States has not previously considered and that the patties have suggested may be relevant "to the substitution issue." SO ORDERED. ( Replies due by 6/12/2023.) (Signed by Judge Lewis A. Kaplan on 5/24/23) (yv) (Entered: 05/24/2023) |
| 05/26/2023 | 159 | LETTER addressed to Judge Lewis A. Kaplan from Stephen Terrell dated 05/26/2023 re: May 22, 2023, Letter; Order of May 24, 2023. Document filed by United States of America..(Terrell, Stephen) (Entered: 05/26/2023) |
| 05/26/2023 | 160 | LETTER addressed to Judge Lewis A. Kaplan from Alina Habba dated May 26, 2023 re: Response to Plaintiff's Letter. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 05/26/2023) |

| 05/31/2023 | 161 | AFFIDAVIT IN SUPPORT OF MOTION TO INTERVENE(MOTION to Intervene).Document filed by James H. Brady, proposed intervenor. (Attachments: # 1 Exhibit 1, # 2 Certificate of Service)(sc) Modified on 6/1/2023 (sc). (Entered: 06/01/2023) |
|---|---|---|
| 06/01/2023 | 162 | MEMO ENDORSED ORDER denying 161 Motion to Intervene. ENDORSEMENT: There are only two bases on which one may intervene in a civil action. The first is intervention as of right, which is available only to one who "is given an unconditional right to intervene by a federal statute" or "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless the existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). The second is intervention by permission of the court, which in an appropriate case may be granted if the putative intervenor "is given a conditional right to intervene by a federal statute" or "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Mr. Brady does not satisfy any of these criteria. Accordingly, this motion is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 6/1/23) (yv) (Entered: 06/01/2023) |
| 06/01/2023 | 163 | ORDER: The government shall advise the Court on or before June 9, 2023, whether it is the government's position that the filing of an amended complaint in this case would render the government's previous Westfall Act certification ineffective and moot the government's motion to substitute itself for Mr. Trump under that Act. The Court implies no determination or view as to whether plaintiff's motion for leave to amend the complaint should be granted or denied. (Signed by Judge Lewis A. Kaplan on 6/1/2023) (ate) (Entered: 06/01/2023) |
| 06/05/2023 | 164 | MEMORANDUM OF LAW in Opposition re: 155 MOTION to Amend/Correct . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 06/05/2023) |
| 06/05/2023 | 165 | DECLARATION of Alina Habba in Opposition re: 155 MOTION to Amend/Correct .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A- New York Magazine Article, # 2 Exhibit B - Complaint, # 3 Exhibit C - Carroll II Complaint, # 4 Exhibit D - Relevant Portion of Plaintiff's Trial Testimony, # 5 Exhibit E - Carroll II Jury Verdict, # 6 Exhibit F - Notice of Appeal, # 7 Exhibit G - Defendant's CNN Town Hall Transcript, # 8 Exhibit H - Deposition of E. Jean Carroll).(Habba, Alina) (Entered: 06/05/2023) |
| 06/09/2023 | 166 | LETTER addressed to Judge Lewis A. Kaplan from Stephen Terrell dated June 9, 20203 re: Order of June 1, 2023. Document filed by United States of America..(Terrell, Stephen) (Entered: 06/09/2023) |
| 06/09/2023 | 167 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 06/09/2023 re: Department of Justice Letter. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 06/09/2023) |
| 06/12/2023 | 168 | REPLY MEMORANDUM OF LAW in Support re: 155 MOTION to Amend/Correct . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 06/12/2023) |
| 06/13/2023 | 169 | ORDER granting 155 Motion to Amend/Correct 155 MOTION to Amend/Correct ., 6 Notice of Removal. The plaintiff's motion for leave to amend [Dkt 155] is granted. A memorandum opinion may follow. The amended complaint is deemed served and filed today. Defendant has requested that the Court, "[s]hould the Court... deny Plaintiff's Motion to Amend" [Dkt 164, at 19], grant defendant permission to file a supplemental motion for summary judgment. As the Court has granted plaintiff's motion, that request is moot. In all the circumstances, any further submission by the United States (including any new or amended certification and/or motion to substitute) and/or the defendant with respect to substitution of the United States for the defendant shall be served and filed no |

A-26

| | | |
|---|---|---|
| | | later than July 13, 2023. Any response by the plaintiff shall be served and filed no later than July 27, 2023. Any reply(ies) by the United States and/or the defendant shall be served and filed no later than August 3, 2023. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 6/13/23) (yv) (Entered: 06/13/2023) |
| 06/13/2023 | | Set/Reset Deadlines: Motions due by 7/13/2023. Responses due by 7/27/2023. Replies due by 8/3/2023. (yv) (Entered: 06/13/2023) |
| 06/15/2023 | 170 | ORDER, Unless this case previously has been entirely disposed of, trial of this action shall commence on January 15, 2024 absent contrary order of the Court. ( Jury Trial set for 1/15/2024 at 09:30 AM before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 6/15/2023) (Mohan, Andrew) (Entered: 06/15/2023) |
| 06/27/2023 | 171 | AMENDED ANSWER to., COUNTERCLAIM against E. Jean Carroll. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 06/27/2023) |
| 06/29/2023 | 172 | MEMORANDUM OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT re: 107 MOTION for Summary Judgment . filed by Donald J. Trump. For the foregoing reasons, Mr. Trump's motion for summary judgment dismissing the complaint (Dkt 107) and his alternative request for leave to amend his answer to assert the absolute presidential immunity defense are denied. (Signed by Judge Lewis A. Kaplan on 6/29/2023) (tro) (Entered: 06/29/2023) |
| 07/05/2023 | 173 | MEMORANDUM OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (CORRECTED): For the foregoing reasons, Mr. Trump's motion for summary judgment dismissing the complaint (Dkt 107) and his alternative request for leave to amend his answer to assert the absolute presidential immunity defense are denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 7/5/2023) (tg) (Entered: 07/05/2023) |
| 07/11/2023 | 174 | MOTION to Dismiss *and Motion to Strike*. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 07/11/2023) |
| 07/11/2023 | 175 | MEMORANDUM OF LAW in Support re: 174 MOTION to Dismiss *and Motion to Strike*. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 07/11/2023) |
| 07/11/2023 | 176 | DECLARATION of Roberta A. Kaplan in Support re: 174 MOTION to Dismiss *and Motion to Strike*.. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Excerpts of Carroll II Trial Transcript, # 2 Exhibit B - Video Recording of Carroll Interview on CNN, # 3 Exhibit C - Transcript of Carroll Interview on CNN).(Kaplan, Roberta) (Entered: 07/11/2023) |
| 07/11/2023 | 177 | LETTER addressed to Judge Lewis A. Kaplan from James G. Touhey, Jr. dated July 11, 2023 re: Westfall Act Certification. Document filed by United States of America. (Attachments: # 1 Exhibit July 11, 2023, Ltr from Boynton to Counsel).(Terrell, Stephen) (Entered: 07/11/2023) |
| 07/19/2023 | 178 | ORDER, The Court hereby establishes the following procedure. I. On or before August 2, 2023, each party shall file a motion setting forth precisely each fact or proposition of law, if any, as to which the moving party claims Carroll II has preclusive effect in this action. The motion shall be supported by a memorandum of law setting forth the bases for the moving party's claim.No fact or proposition of law not identified in such a motion shall be regarded as having been established by Carroll II 2. Answering and reply papers with respect to any such motion shall be filed on or before August 16, 2023 and August 23, 2023, respectively. SO ORDERED. ( Motions due by 8/2/2023., Replies due by 8/23/2023., Responses due by 8/16/2023) (Signed by Judge Lewis A. Kaplan on 7/19/23) (yv) (Entered: 07/19/2023) |

| 07/19/2023 | [179](#) | NOTICE OF INTERLOCUTORY APPEAL from [173](#) Memorandum & Opinion,. Document filed by Donald J. Trump. Filing fee $ 505.00, receipt number ANYSDC-28020542. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # [1](#) Exhibit Memorandum Opinion Denying Defendant's Motion for Summary Judgment (Corrected)).(Madaio, Michael) (Entered: 07/19/2023) |
|---|---|---|
| 07/19/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: [179](#) Notice of Interlocutory Appeal. (km) (Entered: 07/19/2023) |
| 07/19/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for [179](#) Notice of Interlocutory Appeal, filed by Donald J. Trump were transmitted to the U.S. Court of Appeals. (km) (Entered: 07/19/2023) |
| 07/25/2023 | [180](#) | MEMORANDUM REGARDING PLAINTIFF'S MOTION TO FILE AN AMENDED COMPLAINT. There accordingly is no merit to any of Mr. Trump's arguments in opposition to Ms. Carroll's motion for leave to amend her complaint. (Signed by Judge Lewis A. Kaplan on 7/25/23) (yv) (Entered: 07/25/2023) |
| 07/25/2023 | [181](#) | MEMORANDUM OF LAW in Opposition re: [174](#) MOTION to Dismiss *and Motion to Strike*. . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 07/25/2023) |
| 07/26/2023 | [182](#) | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 7/25/2023 re: We write on behalf of Plaintiff E. Jean Carroll with respect to Your Honor's July 19, 2023 Order directing each party to "file a motion setting forth precisely each fact or proposition of law, if any, as to which the moving party claims Carroll II has preclusive effective in this action." ECF 178. We understand this Order as directing the parties to submit any targeted summary judgment motions they may wish to make in Carroll I raising preclusion arguments based on Carroll II. Document filed by E. Jean Carroll. (Mohan, Andrew) (Entered: 07/26/2023) |
| 07/27/2023 | [183](#) | LETTER addressed to Judge Lewis A. Kaplan from Susan Hoffinger dated 7/26/23 re: equest that Your Honor apprise us as to whether Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena or if the Protective and Confidentiality Order in Carroll v. Trump precludes such compliance.(yv) (Entered: 07/27/2023) |
| 07/27/2023 | [184](#) | NOTICE OF APPEARANCE by Michael T Madaio on behalf of Donald J. Trump.. (Madaio, Michael) (Entered: 07/27/2023) |
| 07/27/2023 | [185](#) | MOTION to Stay *Pending Appeal*. Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 07/27/2023) |
| 07/27/2023 | [186](#) | MEMORANDUM OF LAW in Support re: [185](#) MOTION to Stay *Pending Appeal*. . Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 07/27/2023) |
| 07/28/2023 | [187](#) | ORDER Any response to the District Attorneys letter shall be filed on or before August 2, 2023. (Signed by Judge Lewis A. Kaplan on 7/28/2023) (Mohan, Andrew) (Entered: 07/28/2023) |
| 08/01/2023 | [188](#) | REPLY MEMORANDUM OF LAW in Support re: [174](#) MOTION to Dismiss *and Motion to Strike*. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/01/2023) |
| 08/02/2023 | [189](#) | MOTION for Partial Summary Judgment . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/02/2023) |
| 08/02/2023 | [190](#) | MEMORANDUM OF LAW in Support re: [189](#) MOTION for Partial Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/02/2023) |
| 08/02/2023 | [191](#) | RULE 56.1 STATEMENT. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/02/2023) |

| 08/02/2023 | 192 | DECLARATION of Roberta A. Kaplan in Support re: 189 MOTION for Partial Summary Judgment .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - New York Magazine Article (Online Version), # 2 Exhibit 2 - Excerpts of Deposition of Donald J. Trump, # 3 Exhibit 3 - Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission, # 4 Exhibit 4 - June 21, 2019 Statement, # 5 Exhibit 5 - June 22, 2019 Statement, # 6 Exhibit 6 - June 24, 2019 Statement, # 7 Exhibit 7 - Excerpt of Deposition of E. Jean Carroll, # 8 Exhibit 8 - Photograph of E. Jean Carroll and Donald Trump, # 9 Exhibit 9 - Expert Report of Ashlee Humphreys, # 10 Exhibit 10 - October 12, 2022 Statement, # 11 Exhibit 11 - Excerpts of Carroll II Trial Transcript, # 12 Exhibit 12 - Carroll II Jury Charge).(Kaplan, Roberta) (Entered: 08/02/2023) |
|---|---|---|
| 08/02/2023 | 193 | MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/02/2023) |
| 08/02/2023 | 194 | MEMORANDUM OF LAW in Support re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/02/2023) |
| 08/02/2023 | 195 | DECLARATION of Alina Habba in Support re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - Expert Report of Professor Ashlee Humphreys, PhD, dated January 9, 2023, # 2 Exhibit B - Expert Report of Professor Ashlee Humphreys, PhD, dated October 14, 2022).(Habba, Alina) (Entered: 08/02/2023) |
| 08/03/2023 | 196 | MEMO ENDORSEMENT on re: (215 in 1:22-cv-10016-LAK, 183 in 1:20-cv-07311-LAK) Letter request that Your Honor apprise us as to whether Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena. ENDORSEMENT: Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena. SO ORDERED., (Signed by Judge Lewis A. Kaplan on 8/3/23) (yv) (Entered: 08/03/2023) |
| 08/03/2023 | 197 | LETTER addressed to Judge Lewis A. Kaplan from Michael T. Madaio dated 8/3/2023 Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 08/03/2023) |
| 08/03/2023 | 198 | MEMO ENDORSEMENT on re: 197 Letter requests 21 days to file an opposition to Plaintiff's motion. filed by Donald J. Trump. ENDORSEMENT: To the extent, if any, defendant seeks an extension of time to respond to plaintiff's motion insofar as it seeks a determination with respect to facts established by the Carroll II verdict, the application is denied. To the extent that defendant seeks an extension to respond to plaintiff's motion insofar as it seeks partial summary judgment, the application is granted. Plaintiffs time to file a reply to defendant's submission on that issue is extended by an equal period of time. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/3/23) (yv) (Entered: 08/03/2023) |
| 08/03/2023 | 199 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated August 3, 2023 re: proposed briefing in connection with Defendant's collateral estoppel motion. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/03/2023) |
| 08/07/2023 | 200 | MEMORANDUM OPINION GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM AND CERTAIN PURPORTED AFFIRMATIVE DEFENSES re: 174 MOTION to Dismiss *and Motion to Strike*. filed by E. Jean Carroll. For the foregoing reasons, Ms. Carroll's motion to dismiss Mr. Trump's counterclaim (Dkt 174) is granted. Her motion to strike Mr. Trump's affirmative defenses (Dkt 174) is granted in part and denied in part as follows: (1)Mr. Trump's first and twelfth affirmative defenses are stricken in their entirety. (2)Mr. Trump's fifth and fifteenth affirmative defenses are stricken except to the extent, if any, that they relate to Mr. Trump's June 24, |

A-29

| | | |
|---|---|---|
| | | 2019 statement. (3) Mr. Trump's third affirmative defense is stricken to the extent it asserts an absolute presidential immunity defense, and is not stricken in any other respect, if there is any. It is denied in its remaining respects. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/7/23) (yv) (Entered: 08/07/2023) |
| 08/08/2023 | 201 | MEMO ENDORSEMENT on re: 199 Letter proposed briefing in connection with Defendant's collateral estoppel motion filed by E. Jean Carroll. ENDORSEMENT : Denied as moot by Court's decision on plaintiff's motion to dismiss (Dkt 200). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/8/23) (yv) (Entered: 08/08/2023) |
| 08/10/2023 | 202 | MEMORANDUM OF LAW in Opposition re: 185 MOTION to Stay *Pending Appeal*. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/10/2023) |
| 08/10/2023 | 203 | NOTICE OF INTERLOCUTORY APPEAL from 200 Memorandum & Opinion,,,,,. Document filed by Donald J. Trump. Filing fee $ 505.00, receipt number ANYSDC-28132521. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit).(Madaio, Michael) (Entered: 08/10/2023) |
| 08/10/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 203 Notice of Interlocutory Appeal.(km) (Entered: 08/10/2023) |
| 08/10/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 203 Notice of Interlocutory Appeal, filed by Donald J. Trump were transmitted to the U.S. Court of Appeals.(km) (Entered: 08/10/2023) |
| 08/16/2023 | 204 | MEMORANDUM OF LAW in Opposition re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/16/2023) |
| 08/16/2023 | 205 | DECLARATION of Roberta A. Kaplan in Opposition re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Carroll II Trial Transcript).(Kaplan, Roberta) (Entered: 08/16/2023) |
| 08/16/2023 | 206 | MEMORANDUM OF LAW in Opposition re: 189 MOTION for Partial Summary Judgment . *With Respect to Facts Established by the Verdict in Carroll II*. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/16/2023) |
| 08/17/2023 | 207 | REPLY MEMORANDUM OF LAW in Support re: 185 MOTION to Stay *Pending Appeal*. . Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 08/17/2023) |
| 08/18/2023 | 208 | MEMORANDUM OPINION DENYING DEFENDANT'S MOTION TO STAY re: 185 MOTION to Stay *Pending Appeal*, filed by Donald J. Trump. For the foregoing reasons, Mr. Trump's motion for a stay pending appeal (Dkt 185) is denied. This Court certifies that the appeal itself is frivolous. (Signed by Judge Lewis A. Kaplan on 8/18/2023) (tro) (Entered: 08/18/2023) |
| 08/23/2023 | 209 | REPLY MEMORANDUM OF LAW in Support re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/23/2023) |
| 08/23/2023 | 210 | REPLY MEMORANDUM OF LAW in Support re: 189 MOTION for Partial Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/23/2023) |
| 08/23/2023 | 211 | MEMORANDUM OF LAW in Opposition re: 189 MOTION for Partial Summary Judgment . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/23/2023) |

| 08/23/2023 | 212 | RESPONSE in Opposition to Motion re: 189 MOTION for Partial Summary Judgment . *Response to Local Rule 56.1 Statement*. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 08/23/2023) |
|---|---|---|
| 08/30/2023 | 213 | REPLY MEMORANDUM OF LAW in Support re: 189 MOTION for Partial Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 08/30/2023) |
| 09/06/2023 | 214 | MEMORANDUM OPINION re: 193 MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON THE GROUNDS OF COLLATERAL ESTOPPEL . filed by Donald J. Trump, 189 MOTION for Partial Summary Judgment . filed by E. Jean Carroll. For the foregoing reasons, Ms. Carroll's motion for partial summary judgment (Dkt 189) is granted except with respect to Mr. Trump's June 24, 2019 statement. Mr. Trump's motion with respect to the issue preclusive effect of the Carroll II verdict in this action (Dkt 193) is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 9/6/2023) (tg) (Entered: 09/06/2023) |
| 09/13/2023 | 215 | ORDER of USCA (Certified Copy) as to 203 Notice of Interlocutory Appeal, filed by Donald J. Trump USCA Case Number 23-1045; 23-1146. Upon due consideration of these factors, the parties' submissions, and our own careful and independent review of the record, it is hereby ORDERED that Appellant's motions for a stay pending appeal are DENIED as further set forth. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 9/13/2023. (tp) (Entered: 09/13/2023) |
| 09/13/2023 | 216 | ORDER of USCA (Certified Copy) as to 179 Notice of Interlocutory Appeal, filed by Donald J. Trump USCA Case Number 23-1045; 23-1146. Upon due consideration of these factors, the parties' submissions, and our own careful and independent review of the record, it is hereby ORDERED that Appellant's motions for a stay pending appeal are DENIED as further set forth. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 9/13/2023. (tp) (Entered: 09/13/2023) |
| 10/05/2023 | 217 | MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION IN LIMINE granting in part and denying in part 133 Motion in Limine. Plaintiff's motion in limine (Dkt 133) insofar as it seeks to exclude Mr. Fisher's testimony is granted. It is denied as moot in all other respects. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 10/5/23) (yv) (Entered: 10/05/2023) |
| 10/10/2023 | 218 | ORDER In recognition of the January 15, 2024 federal holiday, the trial of this case will commence at 9:30 A.M. on January 16, 2024.( Jury Trial set for 1/16/2024 at 09:30 AM before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 10/9/2023) (Entered: 10/10/2023) |
| 10/11/2023 | 219 | ORDER, The Court hereby establishes the following procedure. 1.On or before October 19, 2023, each party shall file a memorandum of law setting forth its position with respect to whether Mr. Trump defamed Ms. Carroll in his June 24, 2019 statement and the bases for its claim. Any response to any such memorandum shall be filed no later than October 26, 2023. Any reply shall be filed no later than November 2, 2023. 2.Any party objecting to the use of an anonymous jury in the trial of this case shall file any objections no later than October 13, 2023. Any response to any such objection shall be filed no later than October 18, 2023. 3.Any updated joint pretrial order shall be filed no later than November 10, 2023. 4.The parties shall file their proposed special verdict forms and jury instructions no later than November 15, 2023. SO ORDERED. ( Pretrial Order due by 11/10/2023.) (Signed by Judge Lewis A. Kaplan on 10/11/23) (yv) (Entered: 10/11/2023) |
| 10/17/2023 | 220 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated October 17, 2023 re: Response to Court's October 11, 2023 Order. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 10/17/2023) |

A-31

| 11/02/2023 | 221 | LETTER MOTION for Discovery *to Substitute a New Rebuttal Expert* addressed to Judge Lewis A. Kaplan from Michael T. Madaio dated November 2, 2023. Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 11/02/2023) |
|---|---|---|
| 11/03/2023 | 222 | ORDER. In view of Mr. Trump's repeated public statements with respect to the plaintiff and court in this case as well as in other cases against him, and the extensive media coverage that this case already has received and that is likely to increase once the trial is imminent or underway, the Court finds that there is strong reason to believe the jury requires the protections prescribed below. No less restrictive alternative has been suggested. The presumption of access to juror names is overcome by the risks identified herein and in the Court's previous decision. Accordingly, (1) The names, addresses, and places of employment of prospective jurors on the voir dire panel, as well as jurors who ultimately are selected for the petit jury, shall not be revealed, (2) petit jurors shall be kept together during recesses and the United States Marshal Service ("USMS") shall take the petit jurors to, or provide them with, lunch as a group throughout the pendency of the trial, and (3) at the beginning and end of each trial day, the petit jurors shall be transported together or in groups from one or more undisclosed location or locations at which the jurors can assemble or from which they may return to their respective residences. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 11/3/23) (yv) (Entered: 11/03/2023) |
| 11/06/2023 | 223 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Shawn Crowley dated November 6, 2023 re: 221 LETTER MOTION for Discovery *to Substitute a New Rebuttal Expert* addressed to Judge Lewis A. Kaplan from Michael T. Madaio dated November 2, 2023. . Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Email Correspondence).(Crowley, Shawn) (Entered: 11/06/2023) |
| 11/10/2023 | 224 | LETTER RESPONSE in Support of Motion addressed to Judge Lewis A. Kaplan from Michael T. Madaio dated November 10, 2023 re: 221 LETTER MOTION for Discovery *to Substitute a New Rebuttal Expert* addressed to Judge Lewis A. Kaplan from Michael T. Madaio dated November 2, 2023. . Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 11/10/2023) |
| 11/10/2023 | 225 | PROPOSED PRE-TRIAL ORDER. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 11/10/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/13/2023 18:06:21 | | |
| **PACER Login:** | cpwashington16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-07311-LAK |
| **Billable Pages:** | 29 | **Cost:** | 2.90 |

**A-32**

CLOSED,APPEAL,ECF,RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:22-cv-10016-LAK

| | |
|---|---|
| Carroll v. Trump | Date Filed: 11/24/2022 |
| Assigned to: Judge Lewis A. Kaplan | Date Terminated: 05/11/2023 |
| Related Case: 1:20-cv-07311-LAK | Jury Demand: Both |
| Case in other court: U.S. Court of Appeals, 2nd Circ., 23-00793 | Nature of Suit: 360 P.I.: Other |
| Cause: 28:1332 Diversity Action | Jurisdiction: Diversity |

**Plaintiff**

**E. Jean Carroll**                    represented by **Joshua Adam Matz**
Kaplan Hecker & Fink LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
929-294-2537
Email: jmatz@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Matthew J. Craig**
Kaplan Hecker & Fink LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
(212)-763-0883
Fax: (212)-564-0883
Email: mcraig@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Michael Ferrara**
Kaplan Hecker & Fink LLP
350 5th Ave.
Ste 63rd Floor
New York, NY 10118
929-294-2529
Email: mferrara@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Shawn Geovjian Crowley**
Kaplan, Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212-763-0883
Email: scrowley@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Trevor Morrison**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212-763-0883
Email: tmorrison@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

**Roberta Ann Kaplan**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
63rd Floor
10118
New York, NY 10118
212-763-0883
Fax: 212-564-0883
Email: rkaplan@kaplanhecker.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Donald J. Trump**                    represented by  **Chad Derek Seigel**
Tacopina & Seigel , P.C.
275 Madison Avenue,
, Fl 35
New York, NY 10016
(212) 227-8877
Fax: (212)619-1028
Email: cseigel@tacopinalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Tacopina**
Tacopina Seigel & DeOreo
275 Madison Ave.
35th Floor
New York, NY 10016
212-227-8877
Fax: 212-619-1028
Email: info@tacopinalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew G. DeOreo**
Tacopina Seigel & DeOreo
275 Madison Avenue
Fl 35
10016-1133, Ste 35th Floor
New York, NY 10016
212-227-8877
Fax: 212-619-1028

**A-34**

Email: mdeoreo@tacopinalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alina Habba**
Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908-869-1188
Email: ahabba@habbalaw.com
*ATTORNEY TO BE NOTICED*

**Michael T Madaio**
Habba Madaio & Associates LLP
1430 US Highway 206
Suite 240
Bedminster, NJ 07921
908-869-1188
Email: mmadaio@habbalaw.com
*ATTORNEY TO BE NOTICED*

**W. Perry Brandt**
W. Perry Brandt
P.O. Box 45081
Kansas City, MO 64111
816-305-7377
Email: wpbkc838@gmail.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Matthew Russell Lee**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/24/2022 | 1 | COMPLAINT against Donald J. Trump. (Filing Fee $ 402.00, Receipt Number ANYSDC-27003355)Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 11/24/2022) |
| 11/24/2022 | 2 | CIVIL COVER SHEET filed..(Kaplan, Roberta) (Entered: 11/24/2022) |
| 11/24/2022 | 3 | STATEMENT OF RELATEDNESS re: that this action be filed as related to 20-cv-7311 (LAK). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 11/24/2022) |
| 11/24/2022 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to Donald J. Trump, re: 1 Complaint. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 11/24/2022) |
| 11/24/2022 | 5 | NOTICE OF APPEARANCE by Shawn Geovjian Crowley on behalf of E. Jean Carroll.. (Crowley, Shawn) (Entered: 11/24/2022) |
| 11/24/2022 | 6 | NOTICE OF APPEARANCE by Joshua Adam Matz on behalf of E. Jean Carroll..(Matz, Joshua) (Entered: 11/24/2022) |
| 11/24/2022 | 7 | NOTICE OF APPEARANCE by Matthew J. Craig on behalf of E. Jean Carroll..(Craig, Matthew) (Entered: 11/24/2022) |

| 11/28/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Unassigned. .(pc) (Entered: 11/28/2022) |
|---|---|---|
| 11/28/2022 | | Case Designated ECF. (pc) (Entered: 11/28/2022) |
| 11/28/2022 | | CASE REFERRED TO Judge Lewis A. Kaplan as possibly related to 20cv7311. (pc) (Entered: 11/28/2022) |
| 11/28/2022 | 8 | ELECTRONIC SUMMONS ISSUED as to Donald J. Trump..(pc) (Entered: 11/28/2022) |
| 11/29/2022 | | CASE ACCEPTED AS RELATED. Create association to 1:20-cv-07311-LAK. Notice of Assignment to follow. (laq) (Entered: 11/29/2022) |
| 11/29/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Lewis A. Kaplan. Judge Unassigned is no longer assigned to the case. (laq) (Entered: 11/29/2022) |
| 11/29/2022 | | Magistrate Judge James L. Cott is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (laq) (Entered: 11/29/2022) |
| 12/01/2022 | 9 | SUMMONS RETURNED EXECUTED Summons and Complaint served. Donald J. Trump served on 11/30/2022, answer due 12/21/2022. Service was accepted by "John Doe" (Refused Name). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 12/01/2022) |
| 12/02/2022 | 10 | ORDER, 1.The Court will hold a scheduling conference on December 21, 2022 in Courtroom 21B at 10:00 a.m. 2.On or before December 19, 2022, the parties shall submit a discovery plan containing the information required by Fed. R. Civ. P. 26(f) as well as the following: a.Any contention that any of the discovery taken in Carroll v. Trump, 20-cv-7311 (LAK) (Carroll I), is not admissible in this action and the basis, item-by-item, for that contention.b.A detailed statement of what specific discovery that was not conducted in Carroll I is needed for the prosecution or defense of this case and the basis for the contention that it is needed. c.The parties proposed scheduling orders for this case and the bases for their proposals.( Scheduling Conference set for 12/21/2022 at 10:00 AM in Courtroom 21B, 500 Pearl Street, New York, NY 10007 before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 12/2/2022) (Mohan, Andrew) (Entered: 12/02/2022) |
| 12/08/2022 | 11 | NOTICE OF APPEARANCE by Alina Habba on behalf of Donald J. Trump..(Habba, Alina) (Entered: 12/08/2022) |
| 12/08/2022 | 12 | NOTICE OF APPEARANCE by Michael T Madaio on behalf of Donald J. Trump.. (Madaio, Michael) (Entered: 12/08/2022) |
| 12/09/2022 | 13 | ORDER. Counsel are advised that Shawn G. Crowley, Esq., who appears for the plaintiff in the first captioned case and for the defendant in the second, is a former law clerk to the undersigned. The undersigned co-officiated (with another judge) at the marriage of Ms. Crowley approximately seven years ago. (Signed by Judge Lewis A. Kaplan on 12/9/22) (yv) (Entered: 12/09/2022) |
| 12/19/2022 | 14 | LETTER MOTION to Seal *Exhibit to Joint Proposed Discovery Plan* addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated December 19, 2022. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 12/19/2022) |
| 12/19/2022 | 15 | PROPOSED CASE MANAGEMENT PLAN. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Discovery Completed in Carroll I, # 2 Exhibit B - Excerpts of Depositions of Plaintiff and Defendant, # 3 Exhibit C - Excerpts of Deposition of |

| | | |
|---|---|---|
| | | Plaintiff, # 4 Exhibit D - [Proposed] Protective and Confidentiality Order).(Kaplan, Roberta) (Entered: 12/19/2022) |
| 12/19/2022 | 16 | ***SELECTED PARTIES***PROPOSED CASE MANAGEMENT PLAN. Document filed by E. Jean Carroll, Donald J. Trump. (Attachments: # 1 Exhibit A - Discovery Completed in Carroll I, # 2 Exhibit B - Excerpts of Depositions of Plaintiff and Defendant, # 3 Exhibit C - Excerpts of Deposition of Plaintiff, # 4 Exhibit D - [Proposed] Protective and Confidentiality Order) Motion or Order to File Under Seal: 14 .(Kaplan, Roberta) (Entered: 12/19/2022) |
| 12/20/2022 | 17 | ORDER granting 14 Letter Motion to Seal. Granted without prejudice to any contention by plaintiff that sealing of the excerpts from defendant's deposition should not be sealed. (Signed by Judge Lewis A. Kaplan on 12/20/22) (yv) (Entered: 12/20/2022) |
| 12/20/2022 | 18 | PROTECTIVE AND CONFIDENTIALITY ORDER...regarding procedures to be followed that shall govern the handling of confidential material... SO ORDERED. (Signed by Judge Lewis A. Kaplan on 12/20/2022) (vfr) (Entered: 12/20/2022) |
| 12/21/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Scheduling Conference held on 12/21/2022. (Court Reporter Andrew Walker) (Mohan, Andrew) (Entered: 12/21/2022) |
| 12/21/2022 | 19 | PRETRIAL AND SCHEDULING ORDER: The Court has received a joint proposed discovery plan from and conducted a pretrial and scheduling conference with counsel for both parties. The following reflects the determinations made as a result of those consultations. No discovery taken in Carroll v. Trump, 20-cv-7311 (LAK) (hereinafter "Carroll I") shall be inadmissible in this action on the basis that it was taken in Carroll I and not in this action. Each of the parties may object to the admissibility in this action of discovery derived from Carroll I on any other independent basis and as further set forth in this Order. The following schedule shall govern further proceedings in this case: Motions due by 2/23/2023. Responses due by 3/9/2023 Replies due by 3/16/2023. Deposition due by 1/30/2023. Expert Discovery due by 2/6/2023. Pretrial Order due by 2/16/2023. The Court will resolve the question whether to consolidate or jointly try Carroll I with this case at a later date. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 12/21/22) (yv) (Entered: 12/21/2022) |
| 12/21/2022 | 20 | MOTION to Dismiss . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 12/21/2022) |
| 12/21/2022 | 21 | MEMORANDUM OF LAW in Support re: 20 MOTION to Dismiss . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 12/21/2022) |
| 12/21/2022 | 22 | MOTION to Stay . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 12/21/2022) |
| 12/21/2022 | 23 | MEMORANDUM OF LAW in Support re: 22 MOTION to Stay . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 12/21/2022) |
| 12/27/2022 | 24 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/21/2022 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/17/2023. Redacted Transcript Deadline set for 1/27/2023. Release of Transcript Restriction set for 3/27/2023..(McGuirk, Kelly) (Entered: 12/27/2022) |
| 12/27/2022 | 25 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/21/2022 has been filed by |

A-37

| | | the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 12/27/2022) |
|---|---|---|
| 01/04/2023 | 26 | MEMORANDUM OF LAW in Opposition re: 20 MOTION to Dismiss . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/04/2023) |
| 01/04/2023 | 27 | MEMORANDUM OF LAW in Opposition re: 22 MOTION to Stay . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/04/2023) |
| 01/09/2023 | 28 | **Vacated as per Judge's Order dated 1/9/2023, Doc. #32** ORDER UNSEALING PREVIOUSLY SEALED PORTION OF DEFENDANT'S DEPOSITION. The Clerk shall unseal all previously redacted portions of Exhibit B to the Proposed Case Management Plan (Dkt 15-2) and place them on the unrestricted public record. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 1/9/23) (yv) Modified on 1/9/2023 (yv). Modified on 1/10/2023 (jca). (Entered: 01/09/2023) |
| 01/09/2023 | 29 | LETTER addressed to Judge Lewis A. Kaplan from Michael Madaio dated 1/9/2023 re: court order dated 1/9/2023. Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 01/09/2023) |
| 01/09/2023 | 30 | MEMO ENDORSEMENT on re: 29 Letter court order dated 1/9/2023 filed by Donald J. Trump. ENDORSEMENT: Granted. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 1/9/23) (yv) (Entered: 01/09/2023) |
| 01/09/2023 | 31 | MOTION for Trevor W. Morrison to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27180128. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by E. Jean Carroll. (Attachments: # 1 Affidavit of Trevor W. Morrison, # 2 Exhibit - Certificate of Good Standing, # 3 Text of Proposed Order for Admission Pro Hac Vice).(Morrison, Trevor) (Entered: 01/09/2023) |
| 01/09/2023 | 32 | ORDER The unsealing order dated today (Dkt 28) is vacated. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 1/9/2023) (jca) (Entered: 01/10/2023) |
| 01/10/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 31 MOTION for Trevor W. Morrison to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27180128. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 01/10/2023) |
| 01/11/2023 | 33 | ORDER granting 31 Motion for Trevor W. Morrison to Appear Pro Hac Vice (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 01/11/2023) |
| 01/11/2023 | 34 | REPLY MEMORANDUM OF LAW in Support re: 20 MOTION to Dismiss . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 01/11/2023) |
| 01/11/2023 | 35 | REPLY MEMORANDUM OF LAW in Support re: 22 MOTION to Stay . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 01/11/2023) |
| 01/12/2023 | 36 | LETTER addressed to Judge Lewis A. Kaplan from Michael Madaio dated 1/12/2023 re: Letter in Opposition to Motion to Seal. Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 01/12/2023) |
| 01/12/2023 | 37 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated January 12, 2023 re: response to Defendant's 1/12/23 letter re sealing (ECF 36). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 01/12/2023) |

| 01/13/2023 | 38 | Memorandum Opinion denying 20 Motion to Dismiss; denying as moot 22 Motion to Stay re: 20 MOTION to Dismiss ., 22 MOTION to Stay . (Signed by Judge Lewis A. Kaplan on 1/13/2023) (Mohan, Andrew) (Entered: 01/13/2023) |
|---|---|---|
| 01/13/2023 | 39 | ORDER UNSEALING FILED PORTION OF DEFENDANT'S DEPOSITION. Defendant's application (Dkt 36) is denied. The Clerk shall make the entirety of Dkt 16 available for unrestricted public access. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 1/13/23) (yv) (Entered: 01/13/2023) |
| 01/17/2023 | 40 | ORDER: Any application to adopt measures to prevent or minimize the risk of any events that could inappropriately influence jurors that may be empaneled in this case, as well as prospective jurors, whether by enpaneling the jury, anonymously or otherwise, shall be filed on or before February 7, 2023. Any response to such a motion shall be filed on or before February 14, 2023. Any reply in support thereof shall be filed on or before February 17, 2023. ( Motions due by 2/7/2023., Replies due by 2/17/2023., Responses due by 2/14/2023) (Signed by Judge Lewis A. Kaplan on 1/16/2023) (tro) (Entered: 01/17/2023) |
| 01/27/2023 | 41 | ANSWER to 1 Complaint with JURY DEMAND. Document filed by Donald J. Trump.. (Habba, Alina) (Entered: 01/27/2023) |
| 01/31/2023 | 42 | NOTICE OF APPEARANCE by Joseph Tacopina on behalf of Donald J. Trump.. (Tacopina, Joseph) (Entered: 01/31/2023) |
| 01/31/2023 | 43 | NOTICE OF APPEARANCE by Matthew G. DeOreo on behalf of Donald J. Trump.. (DeOreo, Matthew) (Entered: 01/31/2023) |
| 01/31/2023 | 44 | NOTICE of Notice of Appearance by Chad Derek Seigel on behalf of Donald J. Trump. Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 01/31/2023) |
| 01/31/2023 | 45 | NOTICE OF APPEARANCE by Chad Derek Seigel on behalf of Donald J. Trump.. (Seigel, Chad) (Entered: 01/31/2023) |
| 01/31/2023 | 46 | LETTER MOTION for Conference addressed to Judge Lewis A. Kaplan from Alina Habba dated 01/31/2023. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 01/31/2023) |
| 02/01/2023 | | Set Hearings regarding DI 46, a letter motion requesting a conference: Status Conference set for 2/7/2023 at 11:00 AM in Courtroom 21B, 500 Pearl Street, New York, NY 10007 before Judge Lewis A. Kaplan. (Mohan, Andrew) (Entered: 02/01/2023) |
| 02/07/2023 | 47 | LETTER addressed to Judge Lewis A. Kaplan from Robert A. Kaplan dated 2/06/2023 re: several scheduling issues. Document filed by Robert A. Kaplan.(ama) (Entered: 02/07/2023) |
| 02/07/2023 | 48 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 2/06/2023 re: Response to today's letter submitted this morning by counsel for Plaintiff..(ama) (Entered: 02/07/2023) |
| 02/07/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Status Conference held on 2/7/2023. (Court Reporter Alena Lynch) (Mohan, Andrew) (Entered: 02/07/2023) |
| 02/07/2023 | 49 | AMENDMENT TO PRETRIAL AND SCHEDULING ORDER: The defendant has requested adjustments to the Pretrial and Scheduling Order (Dkt 19) (the "PSO"). The Court has conducted a pretrial and scheduling conference with counsel for both parties. Accordingly, Defendant's time to serve the report of Dr. Edgar Nace or any substitute expe1i in place of Dr. Nace is extended until February 28, 2023.(ii) All discovery of and with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be completed on or before March 14, 2023. (b) Notwithstanding the otherwise applicable February 23, |

| | | |
|---|---|---|
| | | 2023, March 9, 2023, aud March 16, 2023 deadlines to file motions in limine, oppositions to motions in limine, and replies in support of motions in limine, respectively, (i) Any motions in limine with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before March 21, 2023. (ii) Any oppositions to motions in limine with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before April 4, 2023. (iii) Any replies in support of the motions in limine with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before April 11, 2023. (c) Trial will commence on April 25, 2023. The Court will resolve the question whether to consolidate or jointly try Carroll I with this case at a later date. And as set forth herein. SO ORDERED. Motions due by 3/21/2023. Responses due by 4/4/2023 Replies due by 4/11/2023. Discovery due by 3/14/2023. Ready for Trial by 4/25/2023. (Signed by Judge Lewis A. Kaplan on 2/07/2023) (ama) (Entered: 02/07/2023) |
| 02/10/2023 | 50 | AMENDED ANSWER to 1 Complaint with JURY DEMAND. Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 02/10/2023) |
| 02/10/2023 | 51 | LETTER MOTION for Discovery addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 02/10/2023. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A: Discovery Request with DNA Report, # 2 Exhibit B: Tweet by Plaintiff). (DeOreo, Matthew) (Entered: 02/10/2023) |
| 02/10/2023 | 52 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated February 10, 2023 re: 51 LETTER MOTION for Discovery addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 02/10/2023. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/10/2023) |
| 02/10/2023 | 53 | LETTER REPLY to Response to Motion addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 02/10/2023 re: 51 LETTER MOTION for Discovery addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 02/10/2023. . Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 02/10/2023) |
| 02/14/2023 | 54 | TRANSCRIPT of Proceedings re: CONFERENCE held on 2/7/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/7/2023. Redacted Transcript Deadline set for 3/17/2023. Release of Transcript Restriction set for 5/15/2023..(McGuirk, Kelly) (Entered: 02/14/2023) |
| 02/14/2023 | 55 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 2/7/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 02/14/2023) |
| 02/15/2023 | 56 | ORDER denying 51 Letter Motion for Discovery. Mr. Trump has offered no persuasive reason to relieve [him] of the consequences of [his] own failure to seek [the appendix] in a timely fashion. He has failed to demonstrate good cause to reopen discovery for the purpose of obtaining these pages of the DNA report. Nor is there any legitimate basis for this Court to accept Mr. Trumps offer to provide his DNA sample made contingent on the Court granting his application, which it does not. Accordingly, Mr. Trumps letter application (Dkt 51) is denied. (Signed by Judge Lewis A. Kaplan on 2/15/2023) (Mohan, Andrew) (Entered: 02/15/2023) |

| 02/15/2023 | 57 | LETTER MOTION for Discovery addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated February 15, 2023. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Email Correspondence re Experts, # 2 Exhibit B - Email re Consent Form, # 3 Exhibit C - Email re Recording, # 4 Exhibit D - Proposed Consent Form, # 5 Exhibit E - CV of Dr. Ian Lamoureux, # 6 Exhibit F - Expert Report of Dr. Leslie Lebowitz, PhD). (Kaplan, Roberta) (Entered: 02/15/2023) |
|---|---|---|
| 02/16/2023 | 58 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated February 16, 2023 re: 57 LETTER MOTION for Discovery addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated February 15, 2023. . Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 02/16/2023) |
| 02/16/2023 | 59 | ORDER granting in part and denying in part 57 Letter Motion for Discovery. Plaintiff's application is disposed of as follows: 1. Defendant has represented that "the scope of Plaintiff's IME will be... confined to the issues of whether Plaintiff was emotionally harmed by the alleged sexual assault, and if so, to what degree and whether she is pretending or exaggerating her injuries. The scope of the IME will not include an analysis as to whether the alleged sexual assault occurred in the first place." Dkt 58, at 3. Accordingly, plaintiff's first request for relief is denied as moot. 2. Plaintiff's second and third requests for relief are unjustified and hence denied. The Court assumes that defendant's expert will administer only psychological tests that are appropriate to the purpose of the examination. 3.The fourth and fifth requests for relief are granted. 4.The IME shall take place on Februaiy 21 and 22 at the offices of plaintiff's counsel. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 2/16/23) (yv) (Entered: 02/16/2023) |
| 02/16/2023 | 60 | PROPOSED PRE-TRIAL ORDER. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/16/2023) |
| 02/20/2023 | 61 | LETTER MOTION for Extension of Time *to complete expert discovery* addressed to Judge Lewis A. Kaplan from Joseph Tacopina, Esq. dated February 20, 2023. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - email correspondence, # 2 Exhibit B - letter from expert).(Tacopina, Joseph) (Entered: 02/20/2023) |
| 02/20/2023 | 62 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated February 20, 2023 re: 61 LETTER MOTION for Extension of Time *to complete expert discovery* addressed to Judge Lewis A. Kaplan from Joseph Tacopina, Esq. dated February 20, 2023. . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/20/2023) |
| 02/21/2023 | 63 | LETTER REPLY to Response to Motion addressed to Judge Lewis A. Kaplan from Joseph Tacopina, Esq. dated February 21, 2023 re: 61 LETTER MOTION for Extension of Time *to complete expert discovery* addressed to Judge Lewis A. Kaplan from Joseph Tacopina, Esq. dated February 20, 2023. . Document filed by Donald J. Trump.. (Tacopina, Joseph) (Entered: 02/21/2023) |
| 02/21/2023 | | Set Hearings: Teams Video Conference set for 2/21/2023 at 12:00 PM is cancelled. Memo endorsement regarding Docket Item 61 to follow. (Entered: 02/21/2023) |
| 02/21/2023 | 64 | Memo endorsed ORDER denying as moot 61 Letter Motion for Extension of Time. Motion denied as moot in light of the attached notification. (Signed by Judge Lewis A. Kaplan on 2/21/2023) (Mohan, Andrew) (Main Document 64 replaced on 2/21/2023) (Mohan, Andrew). (Entered: 02/21/2023) |
| 02/21/2023 | 65 | PRETRIAL ORDER (Signed by Judge Lewis A. Kaplan on 2/21/2023) (Mohan, Andrew) (Entered: 02/21/2023) |
| 02/23/2023 | 66 | MOTION for Partial Summary Judgment . Document filed by Donald J. Trump. (Attachments: # 1 Affidavit Declaration of Matthew G. DeOreo, # 2 Exhibit A: Carroll I |

| | | |
|---|---|---|
| | | Complaint, # 3 Exhibit B: Carroll I Answer, # 4 Exhibit C: Carroll II Complaint, # 5 Exhibit D: Carroll II First Amended Answer, # 6 Exhibit E: Transcript of Anderson Cooper Interview, # 7 Exhibit F: Hill Article).(DeOreo, Matthew) (Entered: 02/23/2023) |
| 02/23/2023 | 67 | MEMORANDUM OF LAW in Support re: 66 MOTION for Partial Summary Judgment . . Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 02/23/2023) |
| 02/23/2023 | 68 | RULE 56.1 STATEMENT. Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 02/23/2023) |
| 02/23/2023 | 69 | MOTION in Limine . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/23/2023) |
| 02/23/2023 | 70 | MEMORANDUM OF LAW in Support re: 69 MOTION in Limine . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 02/23/2023) |
| 02/23/2023 | 71 | DECLARATION of Alina Habba in Support re: 69 MOTION in Limine .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - Deposition of Natasha Stoynoff, # 2 Exhibit B - Deposition of Jessica Leeds, # 3 Exhibit C - Plaintiff's Second Supplemental Disclosure, # 4 Exhibit D - Plaintiff's Third Supplemental Disclosure).(Habba, Alina) (Entered: 02/23/2023) |
| 02/23/2023 | 72 | MOTION in Limine . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/23/2023) |
| 02/23/2023 | 73 | MEMORANDUM OF LAW in Support re: 72 MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 02/23/2023) |
| 02/23/2023 | 74 | DECLARATION of Roberta A. Kaplan in Support re: 72 MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Deposition of Robert J. Fisher, # 2 Exhibit 2 - Expert Report of Robert J. Fisher, # 3 Exhibit 3 - Expert Report of Ashlee Humphreys, PhD).(Kaplan, Roberta) (Entered: 02/23/2023) |
| 03/09/2023 | 75 | MEMORANDUM OF LAW in Opposition re: 72 MOTION in Limine . . Document filed by Donald J. Trump..(Tacopina, Joseph) (Entered: 03/09/2023) |
| 03/09/2023 | 76 | DECLARATION of Matthew G. DeOreo in Opposition re: 72 MOTION in Limine .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit 1- Defendant's Memorandum of Law in support of his Motion In Limine in Carroll v Trump No. 1:20-cv-7311-LAK-JLC ("Carroll I"), # 2 Exhibit 2 - February 16, 2023 Declaration of Alina Habba filed in support of Defendant's Motion to Liimine in Carroll I, # 3 Exhibit 3 - Exhibit A to Habba Declaration, # 4 Exhibit 4 - Exhibit B to Habba Declaration, # 5 Exhibit 5 - Defendant's Memorandum of Law in opposition to Plaintiff's Motion in Limine in Carroll I, # 6 Exhibit 6 - February 23, 2023 Declaration of Alina Habba filed in opposition to Plaintiff's Motion in Limine in Carroll I, # 7 Exhibit 7 - Exhibit A to Habba Opposition Declaration, # 8 Exhibit 8 - Exhibit B to Habba Opposition Declaration, # 9 Exhibit 9 - Exhibit D to Habba Opposition Declaration, # 10 Exhibit 10 - Exhibit E to Habba Opposition Declaration, # 11 Exhibit 11 - Defendant's Memorandum of Law in further support of his Motion in Limine in Carroll I).(Tacopina, Joseph) (Entered: 03/09/2023) |
| 03/09/2023 | 77 | MEMORANDUM OF LAW in Opposition re: 69 MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 03/09/2023) |
| 03/09/2023 | 78 | DECLARATION of Shawn G. Crowley in Opposition re: 69 MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Carroll's Initial Disclosures in Carroll II, # 2 Exhibit 2 - Video of Natasha Stoynoff's Deposition, # 3 Exhibit 3 - Video of Jessica Leeds' Deposition).(Crowley, Shawn) (Entered: 03/09/2023) |

| 03/09/2023 | 79 | MEMORANDUM OF LAW in Opposition re: 66 MOTION for Partial Summary Judgment . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 03/09/2023) |
|---|---|---|
| 03/09/2023 | 80 | COUNTER STATEMENT TO 68 Rule 56.1 Statement. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 03/09/2023) |
| 03/09/2023 | 81 | DECLARATION of Roberta A. Kaplan in Opposition re: 66 MOTION for Partial Summary Judgment .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Deposition of Donald J. Trump, # 2 Exhibit 2 - October 12, 2022 Statement, # 3 Exhibit 3 - Expert Report of Ashlee Humphreys, PhD).(Kaplan, Roberta) (Entered: 03/09/2023) |
| 03/10/2023 | 82 | NOTICE OF APPEARANCE by Michael Ferrara on behalf of E. Jean Carroll..(Ferrara, Michael) (Entered: 03/10/2023) |
| 03/11/2023 | 83 | ORDER TO SHOW CAUSE Plainff and Defendant shall show cause as to why anonymous jury should not be used. Show Cause Response due by 3/17/2023. (Signed by Judge Lewis A. Kaplan on 3/11/2023) (Kaplan, Lewis) (Entered: 03/11/2023) |
| 03/11/2023 | 84 | ORDER (Signed by Judge Lewis A. Kaplan on 3/11/2023) (Kaplan, Lewis) (Entered: 03/11/2023) |
| 03/16/2023 | 85 | REPLY MEMORANDUM OF LAW in Support re: 66 MOTION for Partial Summary Judgment . . Document filed by Donald J. Trump..(Tacopina, Joseph) (Entered: 03/16/2023) |
| 03/16/2023 | 86 | REPLY MEMORANDUM OF LAW in Support re: 72 MOTION in Limine . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 03/16/2023) |
| 03/16/2023 | 87 | DECLARATION of Roberta A. Kaplan in Support re: 72 MOTION in Limine .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Trump's Initial Disclosures in Carroll II, # 2 Exhibit 2 - Excerpts of Deposition of E. Jean Carroll in Carroll I, # 3 Exhibit 3 - Excerpts of Deposition of Robert J. Fisher in Carroll II, # 4 Exhibit 4 - Expert Report of Robert J. Fisher, # 5 Exhibit 5 - Excerpts of Deposition of Robert J. Fisher in Carroll I).(Kaplan, Roberta) (Entered: 03/16/2023) |
| 03/16/2023 | 88 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE 89 Reply Memorandum) -** REPLY MEMORANDUM OF LAW in Support re: 69 MOTION in Limine . . Document filed by Donald J. Trump. (Habba, Alina) Modified on 3/17/2023 (db). As per ECF-ERROR Email Correspondence Received on 3/17/2023 @ 9:49am. (Entered: 03/16/2023) |
| 03/16/2023 | 89 | REPLY MEMORANDUM OF LAW in Support re: 69 MOTION in Limine . . Document filed by Donald J. Trump..(Habba, Alina) (Entered: 03/16/2023) |
| 03/16/2023 | 90 | DECLARATION of Alina Habba in Support re: 69 MOTION in Limine .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - Joint Proposed Discovery Plan, # 2 Exhibit B - Plaintiff's Initial Disclosures).(Habba, Alina) (Entered: 03/16/2023) |
| 03/20/2023 | 91 | ORDER denying (147 in 20cv7311) Letter Motion to Consolidate Cases. The letter motion to consolidate these cases for trial, filed in the first captioned case as Dkt 14 7, is denied. The parties overestimate both the judicial economy benefits that would be achieved and the risk of inconsistent rulings that would be eliminated by consolidation. Issue preclusion appears to the Court adequate to achieve appropriate conservation of judicial resources and avoidance of inconsistent rulings even if the two cases were tried separately. Moreover, a trial in 20-cv-7311 conceivably could prove unnecessary. In addition, approval of the consolidation proposal would be in tension with the deference to the Second Circuit and the District of Columbia Court of Appeals that this Court believes appropriate in the circumstances. 2.The trial of 20-cv-7311, previously scheduled |

| | | tentatively to begin on April 10, 2023, is adjourned sine die. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/20/23) (yv) (Entered: 03/20/2023) |
|---|---|---|
| 03/20/2023 | 92 | MEMORANDUM AND ORDER ON DEFENDANT'S IN LIMINE MOTION denying 69 Motion in Limine. Mr. Trump's in limine motion (Dkt 69) is denied in all respects. This ruling is without prejudice to Mr. Trump renewing his objection to the campaign speech excerpts in the event they are offered at trial. Unless otherwise ordered, those excerpts shall not be mentioned in opening statements. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/20/23) (yv) (Entered: 03/20/2023) |
| 03/21/2023 | 93 | LETTER addressed to Judge Lewis A. Kaplan from Matthew A. Leish dated 3/17/23 re: objecting to the potential empaneling of an anonymous jury in this case. (yv) (Entered: 03/21/2023) |
| 03/23/2023 | 94 | MEMORANDUM OPINION RE ANONYMOUS JURY. For the foregoing reasons, (I) the names, addresses, and places of employment of prospective jurors on the voir dire panel, as well as jurors who ultimately are selected for the petit jury, shall not be revealed, (2) petit jurors shall be kept together during recesses and the United States Marshal Service ("USMS") shall take the petit jurors to, or provide them with, lunch as a group throughout the pendency of the trial, and (3) at the beginning and end of each trial day, the petit jurors shall be transported together or in groups from one or more undisclosed location or locations at which the jurors can assemble or from which they may return to their respective residences. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/23/23) (yv) (Entered: 03/23/2023) |
| 03/27/2023 | 95 | MEMORANDUM AND ORDER ON PLAINTIFF'S IN LIMINE MOTION granting in part and denying in part 72 Motion in Limine. The motion is granted in part and denied in part. Ms. Carroll has incorporated in her motion in Carroll II several requests for in limine relief on which the Court has not yet ruled but that Mr. Trump has not opposed. Accordingly, those requests are granted. Plaintiff's motion in limine (Dkt 72) is granted to the extent that: (1) plaintiff's prior consistent statements to Mss. Birnbach and Martin about defendant's alleged sexual assault are admissible; (2) the testimony of Mss. Stoynoff and Leeds regarding their experiences involving the defendant come within Federal Rules of Evidence 413 and 415 and will not be excluded under Rule 403; (3) defendant is precluded from giving or eliciting testimony concerning information allegedly known to persons whom he has not disclosed under Rules 26(a) and (e); (4) both parties are precluded from any testimony, argument, commentary or reference concerning DNA evidence; (5) defendant is precluded from cross-examination or eliciting evidence regarding Stephanie Grisham's prior misdemeanor convictions, her unrelated pending lawsuit, and her use of a prescription medication; (6) defendant is precluded from commenting upon or eliciting any evidence regarding plaintiff's choice of counsel or her counsel's activities outside the litigation between plaintiff and defendant; (7) Mr. Fisher is precluded from testifying at trial as a rebuttal expert witness; and (8) defendant is precluded from calling Ms. Hobday to testify at trial. Plaintiff's motion in limine (Dkt 72) is denied to the extent that defendant is not precluded from calling Mss. Dyssegaard, Abraham, Lazin, and Mr. Haskell at trial. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/27/23) (yv) (Entered: 03/27/2023) |
| 03/28/2023 | 96 | MEMORANDUM OPINION re: 66 MOTION for Partial Summary Judgment . filed by Donald J. Trump. For the foregoing reasons, Mr. Trump's motion for partial sunnnary judgment (Dkt 66) is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/28/23) (yv) (Entered: 03/28/2023) |
| 03/30/2023 | 97 | PROPOSED VOIR DIRE QUESTIONS. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 03/30/2023) |

| | | |
|---|---|---|
| 03/30/2023 | 98 | PROPOSED VOIR DIRE QUESTIONS. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 03/30/2023) |
| 03/30/2023 | 99 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated March 30, 2023 re: Jury Instructions, Verdict Form, and Voir Dire. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Plaintiff's Proposed Jury Instructions, # 2 Exhibit B - Plaintiff's Proposed Special Verdict Form, # 3 Exhibit C - Plaintiff's Proposed Voir Dire).(Kaplan, Roberta) (Entered: 03/30/2023) |
| 03/30/2023 | 100 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated March 30, 2023 re: Application for Jury Questionnaire. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Plaintiff's Proposed Jury Questionnaire).(Kaplan, Roberta) (Entered: 03/30/2023) |
| 03/30/2023 | 101 | PROPOSED ORDER. Document filed by Donald J. Trump. Related Document Number: 97 ..(Habba, Alina) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 03/30/2023) |
| 03/30/2023 | 102 | PROPOSED JURY INSTRUCTIONS. Document filed by Donald J. Trump..(Habba, Alina) (Entered: 03/30/2023) |
| 03/31/2023 | | **\*\*\*NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 101 Proposed Order was reviewed and approved as to form. (km)** (Entered: 03/31/2023) |
| 04/07/2023 | 103 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 4/6/23 re: request that the Court allow each party's legal team-but not the parties themselves-access to the names of the prospective jurors, Document filed by E. Jean Carroll, Donald J. Trump.(yv) (Entered: 04/07/2023) |
| 04/10/2023 | 104 | ORDER REGARDING ATTENDANCE OF PARTIES DURING TRIAL: Each party is requested to inform the Court, in writing, no later than April 20, 2023, of whether that party intends to be present throughout the trial until completion and, if not, the dates on which he or she intends to be absent from the trial proceedings for all or part of the day. This request does not intend, and is not to be construed as suggesting, anything whatsoever with respect to whether either party is legally obliged to be present throughout the trial or, in any case, with respect to any legal consequences that might or might not flow from any decision not to be present throughout. (Signed by Judge Lewis A. Kaplan on 4/10/2023) (rro) (Entered: 04/10/2023) |
| 04/10/2023 | 105 | MEMORANDUM AND ORDER DENYING JOINT REQUEST FOR THE PARTIES' "LEGAL TEAMS" TO HAVE ACCESS TO JUROR NAMES: For the foregoing reasons, the parties' request that each party's "legal team" be granted access to the names of prospective jurors (Dkt 103) is denied. (Signed by Judge Lewis A. Kaplan on 4/10/2023) (rro) (Entered: 04/10/2023) |
| 04/11/2023 | 106 | LETTER MOTION to Continue *Trial for Four-Week Cooling $C_i f$ Period Regarding Media Attention* addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/11/2023. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A: Transcript).(DeOreo, Matthew) (Entered: 04/11/2023) |
| 04/12/2023 | 107 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 12, 2023 re: 106 LETTER MOTION to Continue *Trial for Four-Week Cooling $C_i f$ Period Regarding Media Attention* addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/11/2023. . Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 04/12/2023) |
| 04/13/2023 | 108 | LETTER MOTION to Reopen *Discovery* addressed to Judge Lewis A. Kaplan from Alina Habba dated April 13, 2023. Document filed by Donald J. Trump. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit A - Excerpt of E Jean Carroll's Deposition, # 2 Exhibit B - Letter from Roberta Kaplan dated April 10, 2023, # 3 Exhibit C - Letter from Roberta Kaplan dated April 11, 2023, # 4 Exhibit D - Defendant's First Set of Interrogatories, # 5 Exhibit E - Plaintiff's Responses and Objections to Defendant's Interrogatories, # 6 Exhibit F - Excerpt of Donald J. Trump's Deposition).(Habba, Alina) (Entered: 04/13/2023) |
| 04/13/2023 | 109 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 13, 2023 re: 108 LETTER MOTION to Reopen *Discovery* addressed to Judge Lewis A. Kaplan from Alina Habba dated April 13, 2023. . Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Letter from R. Kaplan to A. Habba dated April 10, 2023, # 2 Exhibit B - Letter from R. Kaplan to C. Seigel dated April 11, 2023, # 3 Exhibit C - Excerpt from the Deposition of E. Jean Carroll, # 4 Exhibit D - Defendant's Request for Production in State Court, # 5 Exhibit E - Plaintiff's Responses and Objections to Defendant's Request for Production in State Court, # 6 Exhibit F - Defendant's Request for Production in Carroll I, # 7 Exhibit G - Defendant's Interrogatories in Carroll I, # 8 Exhibit H - Plaintiff's Responses and Objections to Defendant's Request for Production in Carroll I, # 9 Exhibit I - Plaintiff's Responses and Objections to Defendant's Interrogatories in Carroll I, # 10 Exhibit J - Plaintiff's Responses and Objections to Defendant's Request for Production in Carroll II, # 11 Exhibit K - Excerpts from the Deposition of Dr. Edgar Nace).(Kaplan, Roberta) (Entered: 04/13/2023) |
| 04/13/2023 | 110 | ORDER granting in part and denying in part 108 Letter Motion to Reopen re: 108 LETTER MOTION to Reopen *Discovery* addressed to Judge Lewis A. Kaplan from Alina Habba dated April 13, 2023. On April 10, 2023, plaintiffs counsel disclosed to the defendant that plaintiff-- who had testified at her deposition on October 14, 2022 that (a) no one else was paying her legal fees as "[t]his is a contingency fee case," and that (b) she was "not sure about expenses" (Dkt 108-1, Dep. Tr., at 209: 11-21) -- "now [i.e., Apr. 10, 2023] recall[ed] that at some point her counsel secured additional funding from a nonprofit organization to offset certain expenses and legal fees." Dkt 108-2 at 1. Plaintiffs counsel now advises that this assistance was secured in September 2020, well after the commencement of the first to the two closely related actions of which this is the later. In subsequent discussions between the parties' respective counsel, plaintiff disclosed the identity of the financial backer, said to be a prominent funder of Democratic causes, and of the not-for profit entity through which he apparently provided such funding. Plaintiffs counsel further represented that plaintiff "has never met and has never been party to any communications (written or oral) with anyone associated with the nonprofit." Dkt 108-3 at 1. On this basis, defendant moves for "(i) a limited re-opening of the discovery period restricted to investigation into the narrow source of funding issue, and (ii) a one-month continuance of the trial date... ; or (iii) in the alternative, that the Court permit an adverse inference instruction against Plaintiff with respect to her willful defiance of her discovery obligations." Dkt 108 at 4. SO ORDERED The question whether and when plaintiff or her counsel have obtained financial supportin this action has nothing directly to do with the ultimate merits of the case. See, e.g., Benitez v. Lopez,No. 7-CV-3827-SJ-SJB, 2019 WL 1578167, at *1-*2 (E.D.N.Y. Mar. 14, 2019). Although I do not nowdecide the question, it perhaps might prove relevant to the question of plaintiffs credibility, in view ofthe deposition testimony referred to above. Accordingly, I will permit a brief and carefullycircumscribed examination of that narrow question without prejudging the question of whether and towhat extent examination on this matter may be permitted at trial. Accordingly, defendant's applicationis granted, but only to the extent that (I) plaintiff shall furnish the defendant, no later than April 16, 2023,with documents sufficient to establish that the inception of the financing assistance for the Carrolllitigation in fact occurred in or after mid-2020, (b) any documents concerning the state of plaintiffsknowledge, if any, of the financing assistance as of the date of her deposition and as of the present, and(2) defendant may conduct an additional deposition of Ms. Carroll |

| | | |
|---|---|---|
| | | not to exceed 60 minutes in duration,unless otherwise ordered by the Court, which shall be (1) limited to the subject of Ms. Carroll'sknowledge of the financing assistance as of the date of her deposition and as of the present, and (2)completed no later than April 19, 2023. The motion is denied in all other respects save that the Courtreserves for determination at trial the matter of any requested adverse inference instruction. Trial shallbegin as scheduled on April 25, 2023 unless otherwise ordered. SO ORDERED.. (Signed by Judge Lewis A. Kaplan on 4/13/2023) (ks) (Entered: 04/13/2023) |
| 04/14/2023 | 111 | LETTER REPLY to Response to Motion addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/14/2023 re: 106 LETTER MOTION to Continue *Trial for Four-Week Cooling $C_i f$ Period Regarding Media Attention* addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/11/2023. . Document filed by Donald J. Trump.. (Tacopina, Joseph) (Entered: 04/14/2023) |
| 04/14/2023 | 112 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/14/2023 re: Jury Selection. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A: Proposed Jury Questionnaire).(Tacopina, Joseph) (Entered: 04/14/2023) |
| 04/14/2023 | 113 | MEMO ENDORSEMENT on re: 112 Letter filed by Donald J. Trump ENDORSEMENT: Mr. Trump's motion to employ a written juror questionnaire in selecting the jury in this case is denied. The Court makes only these points as matters of emphasis: 1. This motion has been made without regard to the fact that the Court on April 10, 2023 stated that it would not use a jury questionnaire in this case. Dkt 105, at 5 n.8. 2. As the Court made clear in the April 10, 2023 decision, the law in this circuit is abundantly clear that the use of written jury questionnaires is entirely optional with the trial judge. What is required is that an appropriate voir dire by whatever means be used. That will be done. 3. This motion proposes the use of a juror questionnaire that- notwithstanding the Court's ruling that an anonymous jury will be employed- seeks to require prospective jurors to give their names, their employment, and the employment of all of their immediate family members. The Court denied the parties' request for their legal teams to access the jurors' names in its April 10, 2023 decision. Nothing between then and now has occurred to warrant revisiting that ruling. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/14/2023) (ks) (Entered: 04/14/2023) |
| 04/17/2023 | 114 | MEMORANDUM AND ORDER DENYING DEFENDANTS REQUEST TO ADJOURN TRIAL denying 106 Letter Motion to Continue. For the foregoing reasons, Mr. Trump's request to adjourn the trial (Dkt 106) is denied.The trial will commence on April 25, 2023. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/17/23) (yv) (Entered: 04/17/2023) |
| 04/17/2023 | 115 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/17/2023 re: Requesting Clarification of Jury Selection Process. Document filed by Donald J. Trump.. (Tacopina, Joseph) (Entered: 04/17/2023) |
| 04/18/2023 | 116 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 18, 2023 re: Plaintiff's attendance at trial (pursuant to the Court's April 10, 2023 Order). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 04/18/2023) |
| 04/18/2023 | 117 | MEMO ENDORSEMENT on re: 115 Letter Requesting Clarification of Jury Selection Process filed by Donald J. Trump. ENDORSEMENT: I take what I understand to be material inaccuracies in Mr. Tacopina's letter to be misunderstandings attributable to the fact that Mr. Tacopina was not present at the meeting attended by the Deputy Clerk, Mr. Mohan, and other counsel. The Court nevertheless provides the following information concerning the proceedings on Tuesday. 1. The entire jury selection process will take place in the Courtroom scheduled for trial in the presence of counsel for both sides. As it would be inconvenient to accommodate the entire panel in that room at one time, part of the panel will be held in a reserve room under appropriate court supervision and will see |

A-47

| | | and hear all jury-related proceedings (save any sidebars) that occur in the Courtroom over closed circuit video. From time to time, it may be appropriate to bring prospective jurors from the reserve room to replace other prospective jurors who have been excused during proceedings in the Courtroom. The replacement prospective jurors will be voir dired appropriately in the presence of all counsel once they are brought to the Courtroom and seated. This is identical in substance to the manner in which juries were selected in this Court during the COVID pandemic. 2. Counsel for both sides have been requested to submit proposed voir dire questions, and both have done so. The Court naturally is taking those requests into account in formulating its examination of prospective jurors. Moreover, at the completion of the examinations of the panel in general and of specific individual jurors, counsel will have a further opportunity to suggest questions. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/18/23) (yv) (Entered: 04/18/2023) |
|---|---|---|
| 04/19/2023 | 118 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/19/2023 re: Request for preliminary jury charge. Document filed by Donald J. Trump..(Tacopina, Joseph) (Entered: 04/19/2023) |
| 04/19/2023 | 119 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 19, 2023 re: response to Defendant's request for preliminary jury charge. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 04/19/2023) |
| 04/19/2023 | 120 | LETTER MOTION to Seal addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 19, 2023. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 04/19/2023) |
| 04/19/2023 | 121 | ***SELECTED PARTIES*** MOTION in Limine . Document filed by E. Jean Carroll, Donald J. Trump.Motion or Order to File Under Seal: 120 .(Kaplan, Roberta) (Entered: 04/19/2023) |
| 04/19/2023 | 122 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Support re: 121 MOTION in Limine . . Document filed by E. Jean Carroll, Donald J. Trump. Motion or Order to File Under Seal: 120 .(Kaplan, Roberta) (Entered: 04/19/2023) |
| 04/19/2023 | 123 | ***SELECTED PARTIES***DECLARATION of Roberta A. Kaplan in Support re: 121 MOTION in Limine .. Document filed by E. Jean Carroll, Donald J. Trump. (Attachments: # 1 Exhibit 1 - Excerpts of 10/14/22 Carroll deposition transcript)Motion or Order to File Under Seal: 120 .(Kaplan, Roberta) (Entered: 04/19/2023) |
| 04/19/2023 | 124 | ORDER granting 120 Letter Motion to Seal. Granted. So Ordered. (Signed by Judge Lewis A. Kaplan on 4/19/23) (yv) (Entered: 04/20/2023) |
| 04/20/2023 | 125 | MEMO ENDORSEMENT on re: 118 Letter Request for preliminary jury charge filed by Donald J. Trump. ENDORSEMENT : Mr. Trump's lead counsel expresses Mr. Trump's alleged desire to testify at trial but seeks an order from the Court excusing his presence unless either party calls him as a witness and, in the event he does not testify, instructing the jury that his "absence.,. by design, avoids the logistical burdens that his presence, as the former president, would cause the courthouse and New York City." Dkt 118. First, the Court neither excuses nor declines to excuse Mr. Trump from attending the trial or from testifying in this case. As far as the Court is aware, Mr. Trump is under no legal obligation to be present or to testify. The plaintiff has made clear that she does not intend to call him as a witness. The decision whether to attend or to testify is his alone to make. There is nothing for the Court to excuse. Second, the Court notes but does not accept Mr. Trump's counsel's claims concerning alleged burdens on the courthouse or the City were Mr. Trump to attend or testify. Mr. Trump is entitled by law to the protection of the United States Secret Service, which he now has enjoyed as a former president for more than two years. He has a right to testify in this case. As it would do for any person with business before the Court, the Court will do everything within its power to enable Mr. Trump to |

| | | |
|---|---|---|
| | | exercise that right. Moreover, it is entirely confident that the United States Marshals Service and the City of New York will do their parts in securing that right to Mr. Trump, just as they repeatedly have done in other cases involving security concerns. Moreover, the Court notes from Mr. Trump's campaign web site and media reports that he announced earlier this week that he will speak at a campaign event in New Hampshire on April 27, 2023, the third day of the scheduled trial in this case. If the Secret Service can protect him at that event, certainly the Secret Service, the Marshals Service, and the City of New York can see to his security in this very secure federal courthouse. Finally, Mr. Trump has been on notice of the April 25 trial date in this case since on or about February 7, 2023. Dkt 49, ¶ l(c). There has been quite ample time within which to make whatever logistical arrangements should be made for his attendance, and certainly quite a bit more time than the five or six days between his recent indictment on state criminal charges and his arraignment on that indictment approximately one block from the location of the trial of this case. The question of the requested jury instruction is premature. Mr. Trump is free to attend, to testify, or both. He is free also to do none of those things. Should he elect not to appear or testify, his counsel may renew the request. In the meantime, there shall be no reference by counsel for Mr. Trump in the presence of the jury panel or the trial jury to Mr. Trump's alleged desire to testify or to the burdens that any absence on his part allegedly might spare, or might have spared, the Court or the City of New York. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/20/23) (yv) (Entered: 04/20/2023) |
| 04/20/2023 | 126 | ORDER RE TRIAL CONDUCT. In order to facilitate the efficient presentation of the trial, it is hereby ORDERED, as follows: 1. Prior to any reference to a deposition or deposition transcript in the presence of the jury with a witness on the stand, the Court shall be furnished with a complete copy of the transcript of the deposition. 2. If counsel for either side wishes to offer in evidence or use for impeachment or otherwise any portion of a deposition, that counsel shall identify the deposition by name of witness and date, state on the record the page( s) and lines( s) of the transcript ( or corresponding video) to be used, and afford the adverse party sufficient time to find the reference and to make any objection before reading from or playing the portion of the transcript or video to which reference has been made. 3. In using depositions to interrogate a witness, examining counsel shall refrain from asking such superfluous questions as "Was your deposition taken in this case?," "Do you remember testifying that... ", and so on. Examining counsel instead shall indicate the page( s) and line(s) to which counsel wishes to refer, pause as indicated in paragraph 2 to permit any objection to be made and resolved, and-assuming that no objection is made or that any objection is overruled -read or play the testimony referred to following which counsel may put an appropriate question about the testimony- such as "Was that testimony true?" - to the witness.4.Counsel shall cooperate with each other in advising their opposite numbers as to the order of their witnesses and the expected duration of direct examinations or deposition read backs. 5. Each party shall have one or more witnesses in the courthouse ready to testify immediately after the conclusion of the testimony of the preceding witness. The failure to have a witness on hand to take the stand may result in an order that an offending party has rested his or her case. 6. There shall be no reference before the jury or the jury panel to any matters as to which admissible evidence has not previously been received or, in the case of opening statements, as to which the attorney lacks a good faith belief that admissible evidence will be received. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/20/23) (yv) (Entered: 04/20/2023) |
| 04/20/2023 | 127 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/20/2022 re: in response to the Court's request of April 10, 2023. Document filed by Donald J. Trump.. (DeOreo, Matthew) (Entered: 04/20/2023) |
| 04/20/2023 | 128 | MOTION for W. Perry Brandt to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27634526. **Motion and supporting papers to be reviewed by** |

| | | |
|---|---|---|
| | | **Clerk's Office staff.** Document filed by Donald J. Trump. (Attachments: # 1 Affidavit Declaration of Matthew G. DeOreo, # 2 Affidavit Affidavit of W. Perry Brandt, # 3 Appendix Certificate of Good Standing, # 4 Text of Proposed Order For Pro Hac Vice Admission of W. Perry Brandt).(DeOreo, Matthew) (Entered: 04/20/2023) |
| 04/20/2023 | 129 | Exhibit List - *Deposition Designations and Objections for Trial*. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 04/20/2023) |
| 04/20/2023 | 130 | PROPOSED PRE-TRIAL ORDER. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 04/20/2023) |
| 04/20/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 128 MOTION for W. Perry Brandt to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27634526. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 04/20/2023) |
| 04/20/2023 | 131 | LETTER MOTION to Seal addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated April 20, 2023. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 04/20/2023) |
| 04/20/2023 | 132 | ***SELECTED PARTIES*** MOTION in Limine . Document filed by E. Jean Carroll, Donald J. Trump.Motion or Order to File Under Seal: 131 .(Kaplan, Roberta) (Entered: 04/20/2023) |
| 04/20/2023 | 133 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Support re: 132 MOTION in Limine . . Document filed by E. Jean Carroll, Donald J. Trump. Motion or Order to File Under Seal: 131 .(Kaplan, Roberta) (Entered: 04/20/2023) |
| 04/20/2023 | 134 | ***SELECTED PARTIES***DECLARATION of Roberta A. Kaplan in Support re: 132 MOTION in Limine .. Document filed by E. Jean Carroll, Donald J. Trump. (Attachments: # 1 Exhibit 1 - April 19, 2023 Deposition of E. Jean Carroll, # 2 Exhibit 2 - Document #1 dated September 3, 2020, # 3 Exhibit 3 - Document #2 dated September 22, 2020, # 4 Exhibit 4 - Document #3 dated September 22, 2020, # 5 Exhibit 5 - Document #4 dated September 23, 2020, # 6 Exhibit 6 - Document #5 dated September 23, 2020, # 7 Exhibit 7 - Document #6 dated April 17, 2023, # 8 Exhibit 8 - Excerpts from October 14, 2022 Deposition of E. Jean Carroll, # 9 Exhibit 9 - Document #7 dated April 18, 2023)Motion or Order to File Under Seal: 131 .(Kaplan, Roberta) (Entered: 04/20/2023) |
| 04/21/2023 | 135 | ORDER granting 128 Motion for W Perry Grant to Appear Pro Hac Vice (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 04/21/2023) |
| 04/21/2023 | 136 | ORDER granting 131 Letter Motion to Seal (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 04/21/2023) |
| 04/21/2023 | 137 | MEMO ENDORSEMENT on re: 131 LETTER MOTION to Seal addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated April 20, 2023. filed by E. Jean Carroll. ENDORSEMENT: Granted. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/21/23) (yv) (Entered: 04/21/2023) |
| 04/21/2023 | 138 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/21/2023 re: Objections to the Parties Deposition Designations as to Defendant's Deposition. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A: Deposition Designations).(DeOreo, Matthew) (Entered: 04/21/2023) |
| 04/21/2023 | 139 | MOTION, Re: for Leave to File a Motion to Intervene as an interested party. Document filed by Towaki Komatsu, proposed intervenor. (sc) Modified on 4/21/2023 (sc). |

A-50

| | | (Entered: 04/21/2023) |
|---|---|---|
| 04/21/2023 | 140 | NOTICE OF APPEARANCE by W. Perry Brandt on behalf of Donald J. Trump..(Brandt, W.) (Entered: 04/21/2023) |
| 04/21/2023 | 141 | ORDER denying 139 Letter Motion for Leave to File Document (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis) (Entered: 04/21/2023) |
| 04/22/2023 | 142 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/22/2023 re: Requesting limited voir dire of Natasha Stoynoff. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A: Plaintiff interview of Natasha Stoynoff).(DeOreo, Matthew) (Entered: 04/22/2023) |
| 04/23/2023 | 143 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan, dated April 23, 2023 re: opposition to defendants letter motion.. Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 04/23/2023) |
| 04/24/2023 | 144 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 24, 2023 re: joint request for jury instruction re: Carroll I. Document filed by E. Jean Carroll.. (Kaplan, Roberta) (Entered: 04/24/2023) |
| 04/24/2023 | 145 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/24/2023 re: to withdraw Defendants objections to the admission of Plaintiffs trial exhibit PX-5. Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 04/24/2023) |
| 04/24/2023 | 146 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR -** ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 121 MOTION in Limine . . Document filed by Donald J. Trump. Motion or Order to File Under Seal: 124 .(Habba, Alina) Modified on 4/25/2023 (kj). **As Per Email Dated 4/24/2023 11:05 AM -** (Entered: 04/24/2023) |
| 04/24/2023 | 147 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR -** ***SELECTED PARTIES***DECLARATION of Alina Habba in Opposition re: 121 MOTION in Limine .. Document filed by All Defendants. (Attachments: # 1 Exhibit Complaint, # 2 Exhibit Carroll I Transcript, # 3 Exhibit Carroll II Transcript, # 4 Exhibit Expert Report of Lebowitz, # 5 Exhibit Lebowitz Transcript, # 6 Exhibit Book Excerpts, # 7 Exhibit Rapp v. Fowler Unreported Decision)Motion or Order to File Under Seal: 124 .(Habba, Alina) Modified on 4/25/2023 (kj). **As Per Email Dated 4/24/2023 11:05 AM -** (Entered: 04/24/2023) |
| 04/24/2023 | 148 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 121 MOTION in Limine . . Document filed by Donald J. Trump, E. Jean Carroll. Motion or Order to File Under Seal: 124 .(Habba, Alina) (Entered: 04/24/2023) |
| 04/24/2023 | 149 | ***SELECTED PARTIES***DECLARATION of Alina Habba in Opposition re: 121 MOTION in Limine .. Document filed by Donald J. Trump, E. Jean Carroll. (Attachments: # 1 Exhibit Complaint, # 2 Exhibit Carroll I Transcript, # 3 Exhibit Carroll II Transcript, # 4 Exhibit Expert Report of Lebowitz, # 5 Exhibit Lebowitz Transcript, # 6 Exhibit Book Excerpts, # 7 Exhibit Rapp v. Fowler Unreported Decision)Motion or Order to File Under Seal: 124 .(Habba, Alina) (Entered: 04/24/2023) |
| 04/24/2023 | 150 | ***SELECTED PARTIES***DECLARATION in Opposition re: 132 MOTION in Limine .. Document filed by Donald J. Trump, E. Jean Carroll. (Attachments: # 1 Exhibit A: 4/10/23 Letter, # 2 Exhibit B: Vox Article, # 3 Exhibit C: Plaintiff's website, # 4 Exhibit D: Plaintiff's tweets, # 5 Exhibit E: Order, # 6 Exhibit F: Emails, # 7 Exhibit G: 4/15/23 Letter)Motion or Order to File Under Seal: 137 .(DeOreo, Matthew) (Entered: 04/24/2023) |

A-51

| 04/24/2023 | 151 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 132 MOTION in Limine . . Document filed by Donald J. Trump, E. Jean Carroll. Motion or Order to File Under Seal: 137 .(DeOreo, Matthew) (Entered: 04/24/2023) |
|---|---|---|
| 04/24/2023 | 152 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 24, 2023 re: opposition to Defendant's 4/21/23 letter regarding counter-designations (ECF No. 138). Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 04/24/2023) |
| 04/24/2023 | 153 | MEMO ENDORSEMENT on re: 142 Letter Requesting limited voir dire of Natasha Stoynoff, filed by Donald J. Trump. ENDORSEMENT: Although defendant characterizes his application as one for clarification, the characterization is mistaken. The application in fact is a request that the Court reconsider a previous ruling and, on reconsideration, to reach the opposition result. The application is untimely because any motion for reconsideration should have been filed well before this request. Even if the application were timely, the defendant has failed to show, as would be necessary to warrant reconsideration, that the Court's original decision overlooked matters or controlling decisions. And even if the defendant had made such a showing, nothing he has put forward warrants any relief from the prior decision or any voir dire examination. The application is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/24/23) (yv) (Entered: 04/24/2023) |
| 04/24/2023 | 154 | ***SELECTED PARTIES*** LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 24, 2023 re: response to Defendant's opposition to Plaintiff's motion in limine (ECF No. 151). Document filed by E. Jean Carroll, Donald J. Trump.Motion or Order to File Under Seal: 137 .(Kaplan, Roberta) (Entered: 04/24/2023) |
| 04/24/2023 | 155 | ORDER, Plaintiff's reply, if any, shall be filed no later than April 26, 2023. Neither party shall make any reference to litigation funding in the presence of prospective jurors or the petit jury pending decision on the plaintiff's motion. SO ORDERED. ( Replies due by 4/26/2023.) (Signed by Judge Lewis A. Kaplan on 4/24/23) (yv) (Entered: 04/24/2023) |
| 04/24/2023 | 156 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 04/24/2023 re: request for use of (a) 1 soundboard; (b) 7 headphones; and (c) Accompanying cables. Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 04/24/2023) |
| 04/24/2023 | 157 | ORDER terminating 121 Motion in Limine. In these circumstances, the motion to preclude defendant from offering evidence or making arguments prohibited by Fed. R. Evid. 412 (Dkt 121) is granted for the obvious reason that defendant should not be permitted to violate the rule. Given the manner in which this motion has been briefed, however, determination of what evidence and argument is precluded by Rule 412 will have to be determined at trial. Both sides might be well advised to exercise judgment about the content of their opening statements to avoid objections from opposing counsel.. (Signed by Judge Lewis A. Kaplan on 04/24/2023) (Mohan, Andrew) (Entered: 04/24/2023) |
| 04/25/2023 | 158 | ORDER. With respect to Ms. Carroll's objections to Mr. Trump's counter-designations, the Court has sustained those objections it has determined are inadmissible under Federal Rule of Civil Procedure 32. Rule 32(a)(6) provides that "[i]f a party offers in evidence only party of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts." "This rule represents an attempt to preclude the selective use of deposition testimony that might convey a misleading impression," and permits an adverse party to "supplement [portions of a deposition designated by the offering party] in the interest of completeness.'" Mr. Trump's argument that Rule 32(a)(6) authorizes a party to use "any other parts" of a deposition of which parts are offered by its adversary is unsupported by the great weight of authority. Such an interpretation of the rule also would |

A-52

| | | |
|---|---|---|
| | | render its first part, which reflects the purported policy objective of the rule, superfluous. With respect to those objections noted by Ms. Carroll which the Court has overruled, the Court has determined that those counter-designations serve the interest of completeness and therefore are permitted pursuant to Rule 32(a)(6). As to the other grounds on which Ms. Carroll has objected to the counter-designations that the Court has marked "overruled" in the attached ruling, the basis for objecting on those other grounds is not now clear based on the parties' submissions. Any such objections therefore are overruled subject to renewal at trial only on any non-Rule 32(a)(6) grounds noted in Dkt 129. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/25/23) (yv) (Entered: 04/25/2023) |
| 04/25/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial begun on 4/25/2023. Jury of 9 selected and sworn. Opening arguments heard. (Court Reporter Steven Greenblum and Kristen Caranannte) (Mohan, Andrew) (Entered: 04/26/2023) |
| 04/26/2023 | 159 | ORDER. Due to the circumstances of the case, the Clerk of the Court shall provide lunches to the prospective jurors summoned to appear for jury selection on April 25, 2023, and thereafter provide lunches and light refreshments for the petite jury until the conclusion of the trial. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/26/23) (yv) (Entered: 04/26/2023) |
| 04/26/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial held on 4/26/2023. (Court Reporter Steven Greenblum and Kristen Caranannte) (Mohan, Andrew) (Entered: 04/26/2023) |
| 04/27/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial held on 4/27/2023. Trial continued to Monday, 5/1/2023 at 10:00 AM. (Court Reporters Kristen Carannante and Steven Greenblum) (Mohan, Andrew) (Entered: 04/28/2023) |
| 04/30/2023 | 160 | LETTER MOTION to Seal addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated April 30, 2023. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 04/30/2023) |
| 04/30/2023 | 161 | ***SELECTED PARTIES*** MOTION re: April 27 conference . Document filed by E. Jean Carroll, Donald J. Trump.Motion or Order to File Under Seal: 160 .(Kaplan, Roberta) (Entered: 04/30/2023) |
| 04/30/2023 | 162 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Support re: 161 MOTION re: April 27 conference . . Document filed by E. Jean Carroll, Donald J. Trump. Motion or Order to File Under Seal: 160 .(Kaplan, Roberta) (Entered: 04/30/2023) |
| 04/30/2023 | 163 | ***SELECTED PARTIES***DECLARATION of Roberta A. Kaplan in Support re: 161 MOTION re: April 27 conference .. Document filed by E. Jean Carroll, Donald J. Trump. (Attachments: # 1 Exhibit A)Motion or Order to File Under Seal: 160 .(Kaplan, Roberta) (Entered: 04/30/2023) |
| 05/01/2023 | 164 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 05/01/2023 re: Request for Mistrial. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A: Portions of Trial Transcript, # 2 Exhibit B: LinkedIn Post, # 3 Exhibit C: Vox Article). (DeOreo, Matthew) (Entered: 05/01/2023) |
| 05/01/2023 | 165 | ORDER granting 160 Letter Motion to Seal. Granted. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 5/1/23) (yv) (Entered: 05/01/2023) |
| 05/01/2023 | 166 | ORDER that the Clerk of Court for the Southern District of New York furnish the jurors, empanelled and sworn in the above entitled case, with the necessary transportation to and from the U.S. Courthouse unless otherwise directed by the Court, for the dates of 4-25-2023 through the end of trial, and shall pay all invoices. (Signed by Judge Lewis A. Kaplan on 5/2/2023) (Mohan, Andrew) (Entered: 05/01/2023) |

| 05/01/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial held on 5/1/2023. DI 164, a letter requesting a mistrial, filed by Matthew DeOreo on behalf of Donald J. Trump, was denied by the Court.(Court Reporter Pam Utter & Kristen Carannante)(Mohan, Andrew) (Entered: 05/04/2023) |
|---|---|---|
| 05/02/2023 | 167 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 161 MOTION re: April 27 conference . . Document filed by Donald J. Trump, E. Jean Carroll. Motion or Order to File Under Seal: 165 .(DeOreo, Matthew) (Entered: 05/02/2023) |
| 05/02/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial held on 5/2/2023. (Court Reporter Pam Utter & Kristen Carannante) (Mohan, Andrew) (Entered: 05/04/2023) |
| 05/03/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial held on 5/3/2023. (Court Reporter Pam Utter & Kristen Carannante) (Mohan, Andrew) (Entered: 05/04/2023) |
| 05/04/2023 | 168 | LETTER addressed to Judge Lewis A. Kaplan from Victoria Bekiempis, NYC Courts Media LLC, dated 5/4/2023 re: I am writing today to request that both plaintiff and defense exhibits in Carroll v. Trump, 1:22-cv-10016-LAK, be provided to media organizations once they are entered into evidence, including the video deposition of Donald Trump.(Mohan, Andrew) (Entered: 05/04/2023) |
| 05/04/2023 | 169 | LETTER addressed to Judge Lewis A. Kaplan from Matthew Russell Lee, Inner City Press dated 5/4/2023 re: Press Application to for access to exhibits in Carroll v. Trump, 22-cv-10016 (LAK) and/or to intervene, if deemed necessary. (Mohan, Andrew) (Entered: 05/04/2023) |
| 05/04/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial held on 5/4/2023. Concerning the making trial exhibits available to the Press, trial counsel shall file any responses to Docket Items 168 and 169 by 12:00 PM on 5/6/2023. Members of the Press should submit replies to any filings by counsel by 5:00 PM on 5/7/2023. Plaintiff rested. Defendant moved under Rule 50 for judgment as a matter of law, which was DENIED by the Court. Defendant rested. The Court is granting defendant Trump until 5:00 PM on 5/7/2023 to file a motion to re-open his case for the sole purpose of testifying as a witness in this case. Trial continued until Monday, 5/8/2023. Unless otherwise directed by the Court, counsel shall report for the charging conference at 9:00 AM and closings will begin at 10:00 AM. (Court Reporter Pam Utter & Kristen Carannante) (Mohan, Andrew) (Entered: 05/04/2023) |
| 05/05/2023 | 170 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated May 5, 2023 re: request for jury instruction. Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 05/05/2023) |
| 05/06/2023 | 171 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 05/06/2023 re: response to Plaintiff's letter motion (ECF No. 170). Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 05/06/2023) |
| 05/07/2023 | 172 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated May 7, 2023 re: Truth Social posts. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit A - Post One, # 2 Exhibit B - Post Two).(Kaplan, Roberta) (Entered: 05/07/2023) |
| 05/07/2023 | 173 | LETTER addressed to Judge Lewis A. Kaplan from Matthew Russell Lee dated May 7, 2023 re: Press filing pursuant to Court's Minute Order of May 4, 2023. Document filed by Matthew Russell Lee..(Lee, Matthew) (Entered: 05/07/2023) |
| 05/08/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial held on 5/8/2023. Charge conference held. Closing arguments heard. Jury to be charged at 10:00 |

| | | |
|---|---|---|
| | | AM on 5/9/2023. (Court Reporter Pam Utter & Kristen Carannante) (Mohan, Andrew) (Entered: 05/08/2023) |
| 05/09/2023 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Jury Trial held on 5/9/2023. Jury charged. Deliberations begun and concluded. Special verdict returned. (Court Reporter Kristen Carannante) (Mohan, Andrew) (Entered: 05/09/2023) |
| 05/09/2023 | 174 | Verdict.(Mohan, Andrew) (Entered: 05/09/2023) |
| 05/10/2023 | 175 | ORDER UNSEALING CERTAIN MATTERS: Docket items 161 through 163 and 167, and all sealed portions of the trial transcript, are unsealed. The Clerk shall unrestrict remote public access to docket items 161 through 163 and 167. The formerly sealed portions of the trial transcript shall be publicly available under the usual rules and procedures applicable to trial transcripts. (Signed by Judge Lewis A. Kaplan on 5/10/2023) (Mohan, Andrew) (Entered: 05/10/2023) |
| 05/11/2023 | 176 | LETTER addressed to Judge Lewis A. Kaplan from Roberta A. Kaplan dated 4/27/23 re: potential issue with Juror No. 77. Document filed by E. Jean Carroll.(yv) (Entered: 05/11/2023) |
| 05/11/2023 | 177 | LETTER addressed to Judge Lewis A. Kaplan from Susan S. Harmon, Esq. dated 5/1/2023 re: Alleged 1996 Rape at Bergdorf Goodman. I have some exculpatory evidence and material to offer in this case in favor of defendant.(Mohan, Andrew) (Entered: 05/11/2023) |
| 05/11/2023 | 178 | JUDGMENT. It is hereby ORDERED, ADJUDGED AND DECREED: That after a Jury Trial before the Honorable Lewis A. Kaplan, United States District Judge, Plaintiff E. Jean Carroll has judgment against the defendant Donald J. Trump in the sum of $2,000,000.00 for injuries; $20,000.00 in punitive damages; $1,000,000.00 for damages other than the reputation repair program; $1,700,000.00 for damages for the reputation repair program; and $280,000.00 in punitive damages; accordingly, the case is closed. So Ordered. (Signed by Judge Lewis A. Kaplan on 5/11/23) (yv) (Entered: 05/11/2023) |
| 05/11/2023 | 179 | NOTICE OF APPEAL from 178 Judgment,,. Document filed by Donald J. Trump. Filing fee $ 505.00, receipt number ANYSDC-27729258. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(DeOreo, Matthew) (Entered: 05/11/2023) |
| 05/11/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 179 Notice of Appeal. (tp) (Entered: 05/11/2023) |
| 05/11/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 179 Notice of Appeal filed by Donald J. Trump were transmitted to the U.S. Court of Appeals. (tp) (Entered: 05/11/2023) |
| 05/11/2023 | 180 | MOTION to Intervene. Document filed by Reuben Larson (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Certificate of Service.(vba) (Entered: 05/12/2023) |
| 05/12/2023 | | USCA Case Number 23-0793 from the U.S. Court of Appeals, 2nd Circ. assigned to 179 Notice of Appeal filed by Donald J. Trump..(nd) (Entered: 05/12/2023) |
| 05/15/2023 | 181 | ORDER. Reuben Larson, appearing prose, has petitioned to "address" and "remonstrance" this Court in relation to the above-captioned matter. Applying a liberal interpretation of his pro se filing, the Court construes his petition as a motion to intervene. That motion is denied both as a matter of law and in the Court's discretion. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 5/11/23) (yv) (Entered: 05/15/2023) |
| 05/17/2023 | 182 | LETTER addressed to Judge Lewis A. Kaplan from Margaret Interlandi dated 5/9/2023 re: I am writing this to you as I was once in the 90s an avid shopper in Bergdorf |

| | | Goodmans, Bloomingdales, Lord and Taylor and other high-end stores. At that time if you went into any fitting room in any one of those stores there was always a salesperson right outside the door. inquiring about the fit, etc. and if you needed further help. I believe salespeople were working on commissions and they tried very hard to provide as much service as possible to get their commissions. If anyone was doing anything like E. Jean Carroll stated, that is a frivolous lie. There was also much more security in these stores at that time. For the record, I am not a Trump advocate, but I am an 87-year-old woman, and these types of accusations are without a doubt, lies and dishonest. I personally wrote this for your information so when you listen to the fabrications from the plaintiff you can have a better idea of what could and did occur in the fitting rooms of the 90s. (tg) (Entered: 05/17/2023) |
|---|---|---|
| 06/08/2023 | 183 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for New Trial . Document filed by Donald J. Trump. (Attachments: # 1 Affidavit Declaration of Matthew G. DeOreo, # 2 Exhibit A. Carroll II Complaint, # 3 Exhibit B. Trial Transcript Pages, # 4 Exhibit C. Carroll I Complaint, # 5 Exhibit D. Jury Verdict Form).(DeOreo, Matthew) Modified on 6/21/2023 (db). (Entered: 06/08/2023) |
| 06/08/2023 | 184 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MEMORANDUM OF LAW in Support re: 183 MOTION for New Trial . . Document filed by Donald J. Trump.. (DeOreo, Matthew) Modified 6/21/2023 (db). (Entered: 06/08/2023) |
| 06/15/2023 | 185 | TRANSCRIPT of Proceedings re: TRIAL held on 4/25/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 186 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 4/25/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 187 | TRANSCRIPT of Proceedings re: TRIAL held on 4/26/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 188 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 4/26/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 189 | TRANSCRIPT of Proceedings re: TRIAL held on 4/27/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted |

| | | Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
|---|---|---|
| 06/15/2023 | 190 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 4/28/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 191 | TRANSCRIPT of Proceedings re: TRIAL held on 5/1/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 192 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 5/1/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 193 | TRANSCRIPT of Proceedings re: TRIAL held on 5/2/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 194 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 5/2/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 195 | TRANSCRIPT of Proceedings re: TRIAL held on 5/3/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 196 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 5/3/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 197 | TRANSCRIPT of Proceedings re: TRIAL held on 5/4/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be |

| | | |
|---|---|---|
| | | viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 198 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 5/4/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 199 | TRANSCRIPT of Proceedings re: TRIAL held on 5/8/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 200 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 5/8/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 201 | TRANSCRIPT of Proceedings re: TRIAL held on 5/9/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/13/2023..(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/15/2023 | 202 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 5/9/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/15/2023) |
| 06/16/2023 | 203 | INITIAL NOTICE OF STAY OF APPEAL re: 179 Notice of Appeal. A notice of appeal was filed in this case on 5/11/2023. Since at least one motion cited in F.R.A.P. 4(a)(4) has been filed in the district court, this appeal is stayed pending resolution of the motion(s). USCA Case No. 23-0793-cv..(nd) (Entered: 06/16/2023) |
| 06/21/2023 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Matthew G. DeOreo to RE-FILE Document 183 MOTION for New Trial . ERROR(S): Supporting documents are filed separately, each receiving their own document #. (db) (Entered: 06/21/2023) |
| 06/21/2023 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Matthew G. DeOreo to RE-FILE Document 184 Memorandum of Law in Support of Motion. ERROR(S): Document linked to filing error. (db) (Entered: 06/21/2023) |

**A-58**

| 06/21/2023 | 204 | MOTION for New Trial . Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 06/21/2023) |
|---|---|---|
| 06/21/2023 | 205 | MEMORANDUM OF LAW in Support re: 204 MOTION for New Trial . . Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 06/21/2023) |
| 06/21/2023 | 206 | DECLARATION of Matthew G. DeOreo in Support re: 204 MOTION for New Trial .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A - Carroll II Complaint, # 2 Exhibit B - Trial Transcript Pages, # 3 Exhibit C - Carroll I Complaint, # 4 Exhibit D - Jury Verdict Form).(DeOreo, Matthew) (Entered: 06/21/2023) |
| 06/22/2023 | 207 | MEMORANDUM OF LAW in Opposition re: 204 MOTION for New Trial . . Document filed by E. Jean Carroll..(Kaplan, Roberta) (Entered: 06/22/2023) |
| 06/22/2023 | 208 | DECLARATION of Roberta A. Kaplan in Opposition re: 204 MOTION for New Trial .. Document filed by E. Jean Carroll. (Attachments: # 1 Exhibit 1 - Excerpts of Trial Transcript, # 2 Exhibit 2 - Trial Exhibit PX-1, # 3 Exhibit 3 - Trial Exhibit PX-2, # 4 Exhibit 4 - Trial Exhibit PX-3, # 5 Exhibit 5 - Trial Exhibit PX-4, # 6 Exhibit 6 - Excerpt of the Defendant's Deposition Designations, # 7 Exhibit 7 - Excerpts of Breest v. Haggis Trial Transcript, # 8 Exhibit 8 - Trial Exhibits PX-45, 46, 48, 51, 53, 57).(Kaplan, Roberta) (Entered: 06/22/2023) |
| 06/23/2023 | 209 | LETTER addressed to Judge Lewis A. Kaplan from Joseph Tacopina dated 6.23.2023 re: Stipulation and Proposed Order concerning cash deposit into court in lieu of supersedeas bond.. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit Stipulation and Proposed Order).(Tacopina, Joseph) (Entered: 06/23/2023) |
| 06/23/2023 | 210 | STIPULATION AND ORDER REGARDING THE USE OF A CASH DEPOSIT IN COURT AS SECURITY IN LIEU OF A SUPERSEDEAS BOND: NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between the Plaintiff and Defendant, that: As further set forth by this Order. TSO, on behalf of Defendant, shall make a cash deposit into the registry of the Court in the sum of $5,550,000.00, within five (5) business days of the entry of this Order, pursuant to Federal Rule of Civil Procedure 67(a); The Clerk shall deduct from the income on the investment a fee consistent with that authorized by the Judicial Conference of the United States and set by the Director of the Administrative Office, see Local Civil Rule 67.1(b)(2). SO ORDERED. (Signed by Judge Lewis A. Kaplan on 6/23/2023) (tg) Transmission to Finance Unit (Cashiers) for processing. (Entered: 06/23/2023) |
| 06/28/2023 | | CASHIERS OFFICE CRIS DEPOSIT as per 210 Stipulation and Order, dated 06/23/2023, from Judge Lewis A. Kaplan, $5,550,000.00 deposited on 6/28/2023, Receipt Number NYSCCA23-00337 and placed into CRIS as of 6/29/2023..(bwi) (Entered: 06/28/2023) |
| 06/29/2023 | 211 | REPLY MEMORANDUM OF LAW in Support re: 204 MOTION for New Trial . . Document filed by Donald J. Trump..(Tacopina, Joseph) (Entered: 06/29/2023) |
| 07/19/2023 | 212 | MEMORANDUM OPINION DENYING DEFENDANT'S RULE 59 MOTION re: 204 MOTION for New Trial . filed by Donald J. Trump. The jury in this case did not reach "a seriously erroneous result." Its verdict is not "a miscarriage of justice." Mr. Trump's motion for a new trial on damages or a remittitur (Dkt 204) is denied. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 7/19/23) (yv) (Entered: 07/19/2023) |
| 07/19/2023 | 213 | AMENDED NOTICE OF APPEAL re: 179 Notice of Appeal, 212 Memorandum & Opinion,. Document filed by Donald J. Trump..(DeOreo, Matthew) (Entered: 07/19/2023) |
| 07/19/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 213 Amended Notice of Appeal. (km) (Entered: 07/19/2023) |

| 07/19/2023 | | Supplemental ROA Sent to USCA (Electronic File). Certified Supplemental Indexed record on Appeal Electronic Files for 213 Amended Notice of Appeal filed by Donald J. Trump were transmitted to the U.S. Court of Appeals. (km) (Entered: 07/19/2023) |
|---|---|---|
| 07/20/2023 | 214 | ORDER of USCA (Certified Copy) as to 213 Amended Notice of Appeal filed by Donald J. Trump, 179 Notice of Appeal filed by Donald J. Trump USCA Case Number 23-0793. IT IS ORDERED that the stay of this appeal is hereby lifted. Appellant must file a scheduling notification or transcript status update letter within 14 days of the date of this order. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 7/19/2023. (tp) (Entered: 07/20/2023) |
| 07/27/2023 | 215 | LETTER addressed to Judge Lewis A. Kaplan from Susan Hoffinger dated 7/26/23 re: equest that Your Honor apprise us as to whether Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena or if the Protective and Confidentiality Order in Carroll v. Trump precludes such compliance.(yv) (Entered: 07/27/2023) |
| 07/28/2023 | 216 | ORDER re: 215 Letter, Any response to the District Attorneys letter shall be filed on or before August 2, 2023. (Signed by Judge Lewis A. Kaplan on 7/28/2023) (Mohan, Andrew) (Entered: 07/28/2023) |
| 08/02/2023 | 217 | LETTER addressed to Judge Lewis A. Kaplan from Michael T. Madaio dated 8/2/2023 re: Response to Order dated 7-28-2023. Document filed by Donald J. Trump..(Madaio, Michael) (Entered: 08/02/2023) |
| 08/03/2023 | 218 | MEMO ENDORSEMENT on re: (215 in 1:22-cv-10016-LAK, 183 in 1:20-cv-07311-LAK) Letter request that Your Honor apprise us as to whether Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena. ENDORSEMENT: Kaplan Hecker & Fink, LLP may comply with the People's trial subpoena. SO ORDERED., (Signed by Judge Lewis A. Kaplan on 8/3/23) (yv) (Entered: 08/03/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/09/2023 12:30:10 | | | |
| **PACER Login:** | cpwashington16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-10016-LAK |
| **Billable Pages:** | 26 | **Cost:** | 2.60 |

A-60

# EXHIBIT A

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883  |  FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0854
DIRECT EMAIL   rkaplan@kaplanhecker.com

August 10, 2020

**VIA EMAIL**

Marc E. Kasowitz, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019

   *Re:* *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Marc:

   We write on behalf of Plaintiff E. Jean Carroll in the above-referenced action following the Court's decision denying Defendant's motion for a stay of proceedings pending the Court of Appeals' adjudication of *Zervos v. Trump*. *See* Doc. No. 110. As a result of that decision, the relevant deadlines in the Court's Preliminary Conference Order dated December 12, 2019 are no longer "temporarily stayed." Doc. No. 39 at 2. This letter sets forth our understanding of the current status of this case and discovery in this case as a result of the Court's recent decision.

   As you might recall, the Order and Stipulated Briefing Schedule that the Court entered on February 3, 2020, adjourned all discovery and extended the deadlines in paragraphs 1, 2, 5, and 6 of the Preliminary Conference Order "by the amount of time from January 31 to the date of the Court's decision on Defendant's motion to stay, plus five business days." Doc. No. 39 at 2. According to our calculations, the period from January 31 to August 7, 2020, represents a total of 190 days.

   As a result, Defendant's deadline to respond to Plaintiff's Second Set of Document Requests (originally January 30, 2020) is now August 14, 2020, and the date set by Plaintiff's First Notice to Submit to Physical Examination (originally March 2, 2020) is now September 15, 2020. We can be flexible with respect to the location and method for obtaining Defendant's DNA sample in order to accommodate security needs or other issues. Please let us know if you would like to discuss. The other relevant upcoming dates are as follows:

KAPLAN HECKER & FINK LLP                                                                    2

- The parties shall furnish insurance coverage on or before August 21, 2020.

- The parties shall (a) exchange names and addresses of all eye witnesses and notice witnesses, statements of opposing parties, and photographs, or, if none, provide an affirmation to that effect on or before August 21, 2020; (b) serve demands for discovery and inspection on or before August 21, 2020, objections to which shall be stated on or before September 18, 2020.

- The parties shall serve: (a) any demand for a bill of particulars on or before August 21, 2020; and (b) any bill of particulars on or before September 18, 2020.

- A telephonic compliance conference with Judge Saunders shall be held on September 30, 2020 at 11:00 a.m.

- The parties shall complete all depositions on or before October 20, 2020.

- The end date of all pre-trial disclosure is November 9, 2020.

- Plaintiff shall file a note of issue/certificate of readiness on or before November 10, 2020.

- The parties shall make any dispositive motion(s) on or before 60 days from the filing of the note of issue.

We recognize that Defendant's prior counsel served us with a notice to take Plaintiff's deposition on January 23, 2020, with a date for her deposition of February 13, 2020. Please let us know when you would like to take Plaintiff's deposition. We assume that you would also like to take the depositions of Plaintiff's friends Lisa Birnbach and Carol Martin—in whom Plaintiff confided shortly after President Trump sexually assaulted her—and are happy to get their availability so that you do not have to issue subpoenas and send a process server to their homes during the COVID pandemic. In light of COVID, we are operating under the assumption that all depositions will be taken remotely by video. Other than the individuals mentioned above, we are not aware of any other fact witness who needs to be deposed, but are happy to discuss further if you disagree.

Given that the deadline for depositions will soon be upon us, we attach as Exhibit A Plaintiff's Notice of Deposition to Defendant Donald J. Trump. Although the deposition notice specifies September 21, 2020 as the date for Defendant's deposition, we are happy to work with you to identify a date, method, and location that accommodates Defendant's schedule. We propose that Defendant first provide us with a DNA sample, so that our experts can have an opportunity to test it before we take his deposition.[1]

To be sure, we fully recognize your client's unique position and will "accommodate the President's needs." *Clinton v. Jones*, 520 U.S. 681, 709 (1997); *see also id.* at 691-92 ("We assume

---

[1] We assume that you will want to take the deposition of someone at the Forensic Analytical Crime Lab, but since we don't want to have to do that twice, it makes sense to do so only after we have received and analyzed Defendant's DNA sample.

KAPLAN HECKER & FINK LLP                                                                    5

that the testimony of the President, both for discovery and for use at trial, may be taken at the White House at a time that will accommodate his busy schedule."). At the same time, "several Presidents . . . have given testimony," *id.* at 709, and have "responded to written interrogatories, given depositions, and provided videotaped trial testimony," *id.* at 692 n.14. Because the United States Supreme Court has made it clear that Presidents are not exempt from giving testimony in civil cases, we fully expect that Defendant will testify in a timely manner. President Clinton made time to testify under oath about allegations of sexual harassment, and so President Trump can surely make time to testify about allegations of sexual assault and defamation. His testimony about what he did (and what he said) will strike to the very heart of the case and offer evidence that cannot be obtained from any other sources. He is obviously required to provide it.

Finally, out of an abundance of caution, we note that the parties previously stipulated that they would "meet and confer regarding the timing of [an appeal of any adverse ruling on Defendant's motion to stay] prior to taking any action before the Appellate Division, First Department." Doc. No. 39 at 2. We are hopeful that Defendant now recognizes, as did Judge Saunders, that *Trump v. Vance*, 140 S. Ct. 2412 (2020), leaves no doubt that his claim to presidential immunity necessarily fails. If you intend to appeal Judge Saunders' decision to the First Department, however, please let us know when you would like to meet and confer about such an appeal.

Very truly yours,

Roberta A. Kaplan, Esq.

cc:     Counsel of Record (via email)

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------

E. JEAN CARROLL,

                                    *Plaintiff*,

     -against-

DONALD J. TRUMP, in his personal capacity,

                                    *Defendant*.

--------------------------------------------------------------

Index No. 160694/2019

Hon. Verna L. Saunders

## PLAINTIFF'S NOTICE OF DEPOSITION TO DEFENDANT DONALD J. TRUMP

PLEASE TAKE NOTICE THAT, pursuant to CPLR § 3107, Defendant Donald J. Trump

is required to appear for a deposition upon oral examination before a notary public or other person

who is authorized by law to administer oaths. The deposition will take place on September 21,

2020, either remotely by video, at the White House, or at the offices of Kaplan Hecker & Fink

LLP, 350 Fifth Avenue, Suite 7110, New York, New York 10118, or at such other location, date,

and time as may be mutually agreed upon by the parties. The deposition will be recorded by

stenographic means and may be recorded by video means.

Dated: New York, New York
       August 10, 2020

By: _____
    Roberta A. Kaplan
    Joshua Matz
    Matthew J. Craig
    KAPLAN HECKER & FINK LLP
    350 Fifth Avenue, Suite 7110
    New York, New York 10118
    Tel: (212) 763-0883
    Fax: (212) 564-0883
    rkaplan@kaplanhecker.com
    jmatz@kaplanhecker.com
    mcraig@kaplanhecker.com

    *Counsel for Plaintiff E. Jean Carroll*

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| *Plaintiff,* | |
| v. | |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant.* | |

<div align="center">

**MEMORANDUM OF LAW IN SUPPORT OF MOTIONS *IN LIMINE***

</div>

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. i

LEGAL STANDARD ........................................................................................................1

ARGUMENT .....................................................................................................................1

    I.    *Motion In Limine No. 1:* Evidence Relating to Defendant's Alleged
           Encounters With Natasha Stoynoff And Jessica Leeds Must Be Precluded
           Under Rule 404 ....................................................................................................2

           a.   Rule 415 Is Not Applicable .........................................................................4

               i. The Instant Action Is Not "Based On" A Sexual Assault............................5

               ii. The Alleged Encounters Described By Ms. Stoynoff and Ms. Leeds
               Do Not Fit Within Rule 413's Definition of "Sexual Assault" ......................6

           b.   The Probative Value of Ms. Stoynoff and Ms. Leeds' Testimony
              Is Substantially Outweighed By The Risk of Unfair Prejudice ......................8

           c.   The Testimony of Ms. Leeds And Ms. Stoynoff Is Irrelevant........................12

    II.   *Motion In Limine No. 2:* Video of Defendant's Campaign Speeches
           Must Be Deemed Inadmissible ............................................................................12

    III.  *Motion In Limine No. 3:* The Access Hollywood Tape Must Be Excluded .........14

    IV.  *Motion In Limine No. 4*: Evidence Concerning Any Purported Emotional
           Harm Stemming From The Alleged Incident Must Be Precluded........................15

CONCLUSION...................................................................................................................16

## TABLE OF AUTHORITIES

*Cases*

*Alexander v. Hanson,*
   66 F. Supp. 3d 162, 167 (N.D.N.Y. 2021)...........................................................................15

*Boyce v. Weber,*
   19-CV-3825 (JMF), 2021 WL 2821154, at *8 (S.D.N.Y. July 7, 2021)................................5

*Carroll v. Trump,*
   22-CV-10016 (LAK) (S.D.N.Y. 2022)................................................................................15

*Doe v. Glanzer,*
   232 F.3d 1258, 1268 (9th Cir. 2000) ....................................................................................4

*Highland Capitol Management LP v. Schneider,*
   370 F.Supp.2d 461 (S.D.N.Y. 2005). ...................................................................................1

*Huddleston v. United States,*
   85 U.S. 681, 691-92 (1988) .....................................................................................2, 8, 10

*Hynes v. Coughlin,*
   9 F.3d 285, 290 (2d Cir.1996) ..............................................................................................2

*Johnson v. Elk Lake Sch. Dist.,*
   283 F.3d 138, 155-56 (3d Cir. 2002) .........................................................................4, 7, 10

*Lewis v. Sch. Dist. No. 70,*
   05-CV-776-WDS, 2009 WL 928874, at *5 (S.D. Ill. Apr. 6, 2009) ..............................11, 12

*Montanez v. City of Syracuse,*
   019 WL 4328872, at *4 (N.D.N.Y. Sept. 12, 2019).............................................................3

*Palmieri v. Defaria,*
   88 F.3d 136, 141 (2d Cir. 1996) ...........................................................................................1

*Rapp v. Fowler,*
   20-CV-9586 (LAK), 2022 WL 5243030, at *1 (S.D.N.Y. Oct. 6, 2022)................................2

*Richman v. Burgeson,*
   98 C 7350, 2008 WL 2567132, at *8 (N.D. Ill. June 24, 2008) ...........................................12

*United States v. Aboumoussallem,*
   726 F.2d 906, 911–12 (2d Cir. 1984) ..................................................................................14

*United States v. Aminy,*
    15 F.3d 258, 260 (2d Cir. 1994) ...........................................................3

*United States v. Curley,*
    639 F.3d 50, 56 (2d Cir. 2011) ...........................................................1, 2

*United States v. Dupree,*
    06 F.3d 131, 135 (2d Cir. 2013) ...........................................................1

*United States v. Gordon,*
    987 F.2d 902, 908 (2d Cir. 1993) ...........................................................3

*United States v. Guardia,*
    135 F.3d 1326, 1328, 1332 (10th Cir. 1998) ...........................................4

*United States v. Foley,*
    740 F.3d 1079 (7th Cir. 2014) ...........................................................5

*United States v. Larson,*
    112 F.3d 600, 604 (2d Cir. 1997) ...........................................................8, 9

*United States v. LeMay,*
    260 F.3d 1018, 1028 (9th Cir. 2001). ...................................................8

*United States v. McCallum,*
    584 F.3d 471, 475 (2d Cir. 2009). ...................................................2, 15

*United States v. Rogers,*
    587 F.3d 816, 822 (7th Cir. 2009) ...................................................4

*United States v. Spoor,*
    904 F.3d 141, 154 (2d Cir. 2018) ...................................................4, 8, 10

*Wynne v. Renico,*
    606 F.3d 867, 871 (6th Cir. 2010) ...................................................14

## Rules and Statutes

§ 5403 Scope, 23 Fed. Prac. & Proc. Evid. § 5403 (2d ed.) ...........................5

18 U.S.C. chapter 109A ...........................................................................6

Fed. R. Evid. 403 ...................................................................................8, 11

Fed. R. Evid. 404(b)(1)-(2) ...........................................1, 2, 3, 8, 13, 14, 15

Fed. R. Evid 413(d)...........................................................................................4, 7, 8

Fed. R. Evid 414 ....................................................................................................8

Fed. R. Evid 415(a)...................................................................................3, 4, 5, 6, 8, 10

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motions *in limine* seeking to: (1) preclude Plaintiff from presenting any evidence relating to Defendant's purported interactions with non-party witnesses Natasha Stoynoff and Jessica Leeds; (2) preclude Plaintiff from presenting evidence relating to speeches and statements made by Defendant while he was campaigning for President; (3) preclude Plaintiff from introducing any evidence relating to the "Access Hollywood" tape, including the tape itself; and (4) preclude Plaintiff from introducing any evidence relating to emotional damages Plaintiff purports to have sustained as a result of the alleged incident. For the reasons set forth herein, Defendant's motions *in limine* should be granted in their entirety.

## **LEGAL STANDARD**

It is well-established that a district court may determine evidentiary issues in motions *in limine* prior to the commencement of trial. *See, e.g., United States v. Dupree*, 706 F.3d 131, 135 (2d Cir. 2013). "The purpose of an *in limine* motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). In deciding a motion *in limine*, the Court should exclude evidence that is clearly inadmissible on all potential grounds. *Highland Capitol Management LP v. Schneider*, 370 F.Supp.2d 461 (S.D.N.Y. 2005); *see also* Fed. R. Evid. 402. Further, under Rule 403, even otherwise relevant evidence should be found inadmissible where it "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

1

## ARGUMENT

**I.**   *Motion In Limine No. 1:* **Evidence Relating to Defendant's Alleged Encounters With Natasha Stoynoff And Jessica Leeds Is Inadmissible Propensity Evidence.**

Rule 404(b) of the Federal Rules of Evidence governs the admissibility of evidence of "crimes, wrongs, or acts" other than those charged in the indictment. *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (quoting Fed. R. Evid. 404(b)). Rule 404(b) states, in relevant part:

> (1) Prohibited Uses. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b)(1)-(2).

For other act evidence to be admissible under Rule 404(b), (1) it must be offered for a proper purpose, (2) it must be relevant to a disputed issue, and (3) the probative value of the evidence cannot be substantially outweighed by its potential for unfair prejudice pursuant to Rule 403; in addition, (4) at defendant's request, the district court should give the jury an appropriate limiting instruction. *See United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). Critically, "'[o]ther act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense." *Curley*, 639 F.3d at 57 (citing Fed. R. Evid. 404(b)); *see also Hynes v. Coughlin,* 79 F.3d 285, 290 (2d Cir. 1996) (character evidence is inadmissible for the purpose of showing "propensity"); *Rapp v. Fowler*, 20-CV-9586 (LAK), 2022 WL 5243030, at *1 (S.D.N.Y. Oct. 6, 2022) ("Evidence to show propensity in most circumstances is precluded by the Federal Rules of Evidence.")

2

In the instant matter, Plaintiff seeks to offer testimony at trial from two witnesses, Natasha Stoynoff and Jessica Leeds, both of whom claim to have had previous sexual encounters with Defendant. While Defendant adamantly denies the veracity of the allegations made by these witnesses, the question of whether Ms. Leeds' and Ms. Stoynoff's claims are credible is ultimately immaterial. Indeed, the testimony of both witnesses is patently barred by Rule 404(b) since Plaintiff seeks to offer such evidence as a means of showing that Defendant is more likely to have engaged in the wrongful conduct alleged by Plaintiff, by virtue of the purported wrongful conduct claimed by Ms. Stoynoff and Ms. Leeds. Such evidence is clearly impermissible propensity and/or character evidence under Rule 404(b)(1).

Further, none of the "permitted uses" under Rule 404(b)(2) apply here since any evidence surrounding the alleged encounters described by Ms. Stoynoff and Ms. Leeds does not inform Defendant's alleged motive or intent during Plaintiff's claimed encounter, nor does it have any bearing on Defendant's opportunity, preparation, plan, or knowledge of the incident alleged by the Plaintiff in the matter *sub judice.* The claims made by Ms. Stoynoff and Ms. Leeds are markedly different than the accusation which lies at the heart of this action. Indeed, the accusations put forth by these witnesses are wholly disconnected from, and irrelevant to, Plaintiff's claim for defamation and the underlying sexual assault, which Plaintiff claims occurred in the mid-1990s inside the changing room of a Bergdorf Goodman and involve accusations of a violent rape. The claims of Ms. Stoynoff and Ms. Leeds, on the other hand, involve substantially different circumstances and far different, less severe alleged acts. Fed. R. Evid. 404(b)(2). *See, e.g., United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("[E]vidence of another act should not be admitted as proof of the defendant's knowledge or intent unless the other act is sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated

3

by the proponent of the evidence. . . Similarity - being a matter of relevancy - is judged by the degree in which the prior act approaches near identity with the elements of the offense charge[d]. There is no necessity for synonymity but there must be substantial relevancy....") (internal quotation and citations omitted); *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (stating Rule 404(b) evidence requires "close parallel" to charged offense to warrant consideration for admission); *Montanez v. City of Syracuse*, 2019 WL 4328872, at *4 (N.D.N.Y. Sept. 12, 2019) ("The proffering party must show more than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature.").

Moreover, while Plaintiff will likely argue that the evidence is covered under Rule 415's exception to the prohibition on propensity evidence for civil cases involving sexual assault, that exception clearly does not apply in the instant scenario for the reasons set forth below. Even if it did, the admission of any such testimony would be barred by Rule 403, as the probative value of the testimony of both Ms. Stoynoff and Ms. Leeds does not outweigh the significant prejudice that would result to Defendant by allowing their inclusion.

**A. Rule 415 is Not Applicable**

Rule 415(a) states, in pertinent part, that: "In a civil case involving a claim for relief based on a party's alleged sexual assault or child molestation, the court may admit evidence that the party committed any other sexual assault. The evidence may be considered as provided in Rule 413 and 414." *See* Fed. R. Evid. 415(a). In determining whether evidence of an unrelated sexual assault is admissible under Rule 415, "courts adopt a three-step inquiry. . . . First, the defendant must be accused of an offense of sexual assault []; second, the evidence being proffered must relate to the commission of another offense of sexual assault []; and last, the evidence has to be relevant." *Doe*

*v. Glanzer*, 232 F.3d 1258, 1268 (9th Cir. 2000), *citing United States v. Guardia*, 135 F.3d 1326, 1328, 1332 (10th Cir. 1998).

Although Rule 415 "reflects an exception . . . to the common law practice of excluding propensity evidence," in particular instances involving "evidence that the defendant committed any other sexual assault," the Rule "does not require district courts to evaluate such evidence with a 'thumb on the scale in favor of admissibility,' but merely 'alters the category of permissible inferences available to the jury.'" *United States v. Spoor*, 904 F.3d 141, 154 (2d Cir. 2018) (citing *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 155-56 (3d Cir. 2002); *United States v. Rogers*, 587 F.3d 816, 822 (7th Cir. 2009)); Fed. R. Evid. 415.

In the instant action, the evidence that Plaintiff seeks to introduce with respect to Defendant's alleged encounters with Ms. Stoynoff and Ms. Leeds plainly does not qualify for inclusion under the Rule 415 exception to propensity evidence because the instant does not involve a "claim for relief based on a party's alleged sexual assault" as is required under Rule 415, and because the alleged encounters described by Ms. Leeds and Ms. Stoynoff do not qualify as "sexual assault" under Rule 413(d).

### i.   The Instant Action Is Not "Based On" A Sexual Assault

The application of Rule 415 is limited to a "civil case involving a claim for relief based on a party's alleged sexual assault." Fed. R. Evid. 415. Although there is a "dearth of precedent" addressing what qualifies as a claim "based on" an alleged sexual assault, courts have recognized "two distinct approaches" in how to assess this issue. *Boyce v. Weber*, 19-CV-3825 (JMF), 2021 WL 2821154, at *8 (S.D.N.Y. July 7, 2021). The first, the 'categorical approach,' is derived from the Wright & Miller treatise and provides that a "court is confronted with a claim 'based on' a sexual offense only when the elements of that offense are also elements of the civil claim itself."

*Id.* (citing § 5403 Scope, 23 Fed. Prac. & Proc. Evid. § 5403 (2d ed.)). The second, the 'alternative approach,' permits a court to broadly consider "whether an alleged sexual assault constitutes a factual premise of the plaintiff's claim." *Boyce*, 2021 WL 2821154 at *9 (citing *United States v. Foley*, 740 F.3d 1079 (7th Cir. 2014)).

In weighing the validity of these two approaches, the Wright & Miller treatise endorsed the 'categorical approach' and found it to be the more suitable test, noting that "[i]t is clear that the drafters intended by the 'based on' language in Rule 415 to refer to cases where defendant is sued by a victim for injuries inflicted by a sexual assault or child molestation." § 5403 Scope, 23 Fed. Prac. & Proc. Evid. § 5403 (2d ed.). In coming to this conclusion, the treatise expounds upon several hypothetical scenarios and cautions against expanding the reach of Rule 415 to such drastic lengths. Of particular note, one of the hypothetical scenarios raised by the treatise seems to directly reference the facts of the instant action and argues that applying Rule 415 in this way would create significant ambiguity in the application of the Rule and conflict with the Congressional intent. *See* § 5403 Scope, 23 Fed. Prac. & Proc. Evid. § 5403 (2d ed.) ("[I]magine an action for defamation in publishing an accusation that the plaintiff, a politician, had committed sexual assaults and the defense of truth is raised . . . once one starts down that path it is difficult to know where one could reasonably draw the line."). This reasoning is persuasive and raises the legitimate concern that applying Rule 415 to the instant action will broaden the scope of the Rule to a significant degree and risk upending Rule 404 in a manner that was never intended by Congress.

Therefore, this Court should adopt the 'categorical approach' and find that Rule 415 is not applicable to the instant action since Plaintiff's sole claim is not "based on" a claim for sexual assault, but, rather, a claim for defamation.

ii.     **The Alleged Encounters Described By Ms. Stoynoff and Ms. Leeds Do Not Fit Within Rule 413's Definition of "Sexual Assault"**

Assuming *arguendo* that Rule 415 can be applied to actions that sounds in defamation, the Rule still has no bearing here because neither of the alleged events described by Ms. Stoynoff and Ms. Leeds qualify as a 'sexual assault' subject to Rule 415.

The term 'sexual assault' is defined in Rule 413(d), which provides that it encompasses conduct that is "a crime under federal law or under state law" and which also involves: "(1) any conduct prohibited by 18 U.S.C. chapter 109A; (2) contact, without consent, between any part of the defendant's body — or an object — and another person's genitals or anus; (3) contact, without consent, between the defendant's genitals or anus and any part of another person's body; (4) deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or (5) an attempt or conspiracy to engage in conduct described in subparagraphs (1)–(4)." *See* Fed. R. Evid. 413(d).

The alleged encounters described by Ms. Stoynoff and Ms. Leeds do not fit within any of the above-stated categories. Subparagraph (d)(1) plainly does not apply since neither witness alleges any conduct that occurred within a "special maritime [or] territorial jurisdiction of the United States or in a Federal prison[.]"[1] *See* 18 U.S.C. 109A § 2241-2248; *see also* 18 U.S.C. § 7 (defining "special maritime and territorial jurisdiction of the United States").

Likewise, subparagraphs (2) through (4) are inapplicable since neither witness alleges any contact involving the genitals or anus of either party nor that they were forced to suffer any bodily injury or physical pain in their alleged interactions with Defendant. In sum, Ms. Stoynoff testified

---

[1] The alleged incident involving Ms. Stoynoff occurred in Florida and the purported claim by Ms. Leeds took place on a domestic flight from Dallas to New York. As such, these two incidents did not involve any type of purported conduct that transpired on an international flight, travel over the "high seas," or any other type of activity that would remotely fit within the parameters of this statute.

that Defendant "grabb[ed] [her] shoulders and pushe[d] her against this wall and start[ed] kissing her," *see* Affirmation of Alina Habba, Esq. ("Habba Aff."), Exhibit A, while Ms. Leeds claimed that Defendant "tri[ed] to kiss [her]" and "grabb[ed] [her] breasts," *see* Habba Aff., Ex. B.. Even accepting these statements as true—which, again, Defendant resolutely denies the veracity of said claims—the conduct described by Ms. Stoynoff and Ms. Leeds simply does not fit within the definition of "sexual assault" under Rule 413, which requires forcible contact with either party's genitalia or the derivation of sexual gratification from inflicting bodily harm upon another. Fed. R. Evid 413(d). None of these elements are present here.

Plaintiff will likely argue that subparagraph (5)—the catchall provision which encompasses any 'attempt' to engage in any of the conduct enumerated in subparagraphs (2) through (4)—is applicable here. However, this is simply not the case. With respect to Ms. Stoynoff, it is indisputable that her testimony does not involve any allegation of conduct, or attempted conduct, that is covered by subparagraphs (2) through (4). As for Ms. Leeds, Plaintiff will presumably argue that Ms. Leeds' testimony reflects an alleged attempt by Defendant to non-consensually contact her genitals since she stated that Defendant "started putting his hand up [her] skirt." Habba Aff., Ex. B. However, this single, ambiguous statement, without more, is not sufficient to evince that Defendant intended to touch Ms. Leeds' genitals, and Ms. Leeds has not even alleged as much. Rather, she testified that the touching stopped almost immediately after it "started," and failed to even indicate how far Defendant's hands were from her genitals, what direction his hands were moving, how quickly they were moving, or any other relevant details that would provide a basis to infer that Defendant intended to non-consensually contact her genitals. *See, e.g., Johnson v. Elk Lake School Dist.*, 283 F. 3d 138, 156 (3d Cir. 2002) ("Where a past act cannot be shown with reasonable certainty, its probative value is reduced and it may prejudice the

defendant unfairly, confuse the issues, mislead the jury, and result in undue delay and wasted time."). Thus, the vagueries of Ms. Leeds' unsubstantiated and uncharged incident—which allegedly took place in 1979, more than 40 years ago—is simply not sufficient to bring it within the purview of Rule 413(d)(5).

Therefore, since neither Ms. Leeds nor Ms. Stoynoff have alleged any conduct that can be qualified as a "sexual assault," Rule 415 has no bearing on the instant matter.

### B. The Probative Value Of Ms. Stoynoff And Ms. Leeds' Testimony Is Substantially Outweighed By The Risk Of Unfair Prejudice

Even if Rule 415 could hypothetically be applied in the instant scenario, evidence of Defendant's alleged encounters with Ms. Stoynoff and Ms. Leeds would nonetheless be inappropriate because it is irrelevant and the probative value of such evidence is substantially outweighed by its potential for unfair prejudice.

It is well-established that courts must consider the Rule 403 balancing test in determining whether to allow evidence of other sexual assaults under Rule 415. *See United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) ("An item of evidence that would be admissible under [Rules 413, 414, and 415] may nonetheless be excluded pursuant to Fed.R.Evid. 403 if the trial judge determines that its probative value is substantially outweighed by its potential for unfair prejudice.") (citing *Huddleston v. United States,* 485 U.S. 681, 687-88, 108 S.Ct. 1496, 1500-01 (1988); Fed. R.Evid. 404(b) Advisory Committee Note (1972)). Indeed, even when Rule 415 applies, a court is required to "to determine the probative value of this inference and to weigh whether the prior act evidence will be unfairly prejudicial." *United States v. Spoor*, 904 F.3d 141, 154 (2d Cir. 2018). In making that determination, courts consider factors such as "(1) the similarity of the prior acts to the acts charged, (2) the closeness in time of the prior acts to the acts charged, (3) the frequency of the prior acts, (4) the presence or lack of intervening circumstances, and (5)

the necessity of the evidence beyond the testimonies already offered at trial." *Id.* at 154-155 (internal quotation omitted), *citing United States v. LeMay*, 260 F.3d 1018, 1028 (9th Cir. 2001).

As to the first point, as explained in Paragraph I *supra*, the circumstances surrounding the accusations made by Ms. Stoynoff and Ms. Leeds are vastly different from those involved in the alleged incident at issue in this matter.. As a result, recounting these alleged encounters will offer no relevant or meaningful insight into the central question of whether the subject incident occurred in the mid-1990s. In other words, there is simply no relation between the testimony of Ms. Stoynoff and Ms. Leeds and the facts at issue in this case.

Regarding the second factor, the lack of closeness in time between the events alleged by Ms. Stoynoff and Ms. Leeds cuts heavily against the inclusion of such evidence. Ms. Stoynoff claims that her encounter took place in 2005, approximately ten years after Plaintiff's claimed incident in the mid-1990s. Meanwhile, Ms. Leeds claims that her encounter with Defendant took place in 1979, nearly twenty years prior to the alleged incident at issue herein. Given the ten and twenty year gaps on each end, these events are so detached in time that they simply have no relevance to the subject incident. Further, since the alleged events occurred so long ago (particularly Ms. Leeds' incident, which purportedly occurred more than 40 years ago), additional caution is warranted since these events are highly attenuated and subject to memory distortion. *See*, *Larson*, 112 F.3d at 605 ("Exclusion of proof of other acts that are too remote in time caters principally to the dual concerns for relevance and reliability . . . [t]he evaluation of the proffered evidence in light of these concerns must be made on a case-by-case basis to determine whether the significance of the prior acts has become too attenuated and whether the memories of the witnesses has likely become too frail.").

10

As for the third factor, the frequency of the prior acts, both Ms. Stoynoff and Ms. Leeds claim that their encounters were a single, isolated incident. Neither alleges that Defendant ever did, or made any attempt to, repeat any of the purported acts. Given the solitary nature of their claims, the accounts of Ms. Leeds and Ms. Stoynoff offer no support for the proposition that the subject incident was in line with a continuing pattern of similar alleged behavior. Therefore, this factor weighs heavily in favor of exclusion of the proposed evidence.

The fourth factor, the presence of intervening factors, is largely irrelevant here, as there are no discernible intervening factors at play. In fact, if anything, there is but one intervening factor that ties together the allegations of Ms. Leeds, Ms. Stoynoff, and Plaintiff – their allegations were made publicly only *after* Defendant became a leading presidential candidate, despite their alleged incidents having supposedly occurred decades earlier. As a result, the timing of their accusations undercuts the trustworthiness of their accounts and raises serious questions as to their credibility. Therefore, this factor weighs in favor of precluding their testimony.

Finally, the fifth factor, the necessity of the evidence beyond the testimonies already offered at trial, is relevant only to the extent Plaintiff lacks sufficient evidence to independently establish the merit of her claims. Yet, Plaintiff has frequently and profusely proclaimed that she has 'overwhelming' evidence to substantiate her claim that the alleged incident did, in fact, occur. Thus, by Plaintiff's own admission, there is no necessity for additional, extrinsic evidence. Her claim should be permitted to stand or fall on its own merits, without the the inclusion of uncharged, uncorroborated claims from other women, spanning several decades, which are entirely disconnected from the facts of this case. *See, e.g., Johnson v. Elk Lake School Dist.*, 283 F.3d at 152 (recognizing that limits need to be placed on admissibility of Rule 415 evidence "to ensure that the plaintiff may not 'parade past the jury a litany of potentially prejudicial similar acts that

11

have been established or connected to the defendant only by unsubstantiated innuendo'") (*quoting Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496 (1988)). Simply put, Plaintiff has the burden of establishing that the incident alleged in the Complaint occurred, and she has consistently declared that she has sufficient evidence to do so. Thus, she should not be permitted to look towards other unrelated and uncorroborated allegations as a means of impermissibly bolstering her claim.

In short, evidence pertaining to the alleged events described by Ms. Stoynoff and Ms. Leeds offers little to no probative value but poses an immense risk of unfair prejudice. *See, e.g., Spoor*, 904 F. 3d at 155 ("The district court should also consider the potential for unfair prejudice, including the possibility that prior act evidence will lead the jury to convict out of passion or bias or because they believe the defendant is a bad person deserving of punishment – a particular risk with this sort of evidence."). Therefore, even if found to be otherwise admissible under Rules 404(b) and 415, evidence regarding Ms. Leeds and Ms. Stoynoff's alleged encounters with Defendant must be excluded under Rule 403 due its overwhelmingly prejudicial effect.

**C.  The Testimony of Ms. Leeds and Ms. Stoynoff Is Irrelevant**

Rule 402 states, unambiguously, that "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. As set forth in Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probably than it would be without the evidence[] and the fact is of consequence in determining the action." Fed. R. Evid. 401.

Here, for the same reasons detailed in Paragraph I(B) above, Ms. Stoynoff and Ms. Leeds must be precluded from testifying because the subject matter of their testimony is irrelevant to the facts of this matter and is of no consequence in determining this action. Therefore, such evidence is barred by Rule 402.

12

II.     *Motion In Limine No. 2:* **Video of Defendant's Campaign Speeches Must Be Deemed Inadmissible**

In accordance with the Rules and applicable case law, Plaintiff should be precluded from arguing and from introducing evidence and testimony relating to Defendant's campaign speeches, which she presumably intends to include for the purpose of demonstrating the manner in which Defendant has denied other, unrelated allegations of sexual assault. Such evidence is not only irrelevant and prejudicial to Defendant, but also constitutes inadmissible character evidence.

First, the campaign speech videos must be excluded under Rule 402 due to lack of relevance. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."); *see also* Fed. R. Evid. 401 (providing that evidence is relevant if it "has any tendency to make a fact more or less probably than it would be without the evidence[] and the fact is of consequence in determining the action."). Indeed, evidence purporting to show the manner in which Defendant addressed other allegations of sexual assault is extraneous to the factual issues involved this particular action, as it has no bearing on the central question the jury will be asked to address in this case – namely, whether or not the alleged incident occurred in the mid 1990s at Bergdorf Goodman. None of the campaign videos that Plaintiff seeks to introduce reference Plaintiff, nor do they even remotely relate to the alleged incident at issue herein. In fact, each and every one of the campaign videos that Plaintiff has marked as exhibits (PX-26 through PX-32) are from speeches that Defendant gave in 2016, several years *before* Plaintiff even went public with her allegations. Statements made in these speeches, therefore, are entirely irrelevant to questions that will be presented to the jury at trial.

Second, the introduction of the campaign videos must be excluded under Rule 403, since a significant danger of jury confusion and unfair prejudice to Defendant may result. There is no question that Defendant—a former President of the United States and current 2024 presidential candidate—is a preeminent political figure who evokes strong feelings of emotion from both his

13

supporters and his detractors alike. Thus, inclusion of videos taken from his campaign speeches would threaten to unnecessarily politicize the trial, enflame the passions of the jury, and confuse the issues that are in their exclusive province to decide. It is crucial that the jury's deliberations are focused solely on whether the incident occurred, and not a general referendum on Defendant's political career or ideologies. Any reference to Defendant's political career, his political views, or statements he made and actions he took while in office are immaterial and will not aid Plaintiff in proving her case-in-chief at trial. Therefore, the campaign-related videos that Plaintiff intends to produce, marked PX-26 through PX-32, have no probative value as they bear no relation to the alleged incident, and carry a significant risk of causing unfair prejudice and jury confusion.

Third, the subject exhibits constitute impermissible character evidence. As stated above, Rule 404(b) of the Federal Rules of Evidence specifically precludes evidence which attempts to prove that "on a particular occasion the person acted in accordance with the character or trait." To the extent that these exhibits are presented to give credence to past allegations of sexual assault, they must be excluded for the reasons set forth *supra*.

### III.   *Motion In Limine No. 3:* The *Access Hollywood* Tape Must Be Excluded

Per the Pre-Trial Order, Plaintiff intends to submit the "Access Hollywood video recording of Donald J. Trump speaking to Billy Bush in September 2005" marked as PX-25 (the "Access Hollywood Tape"), and a segment of the September 26, 2016 Presidential debate discussing same marked as PX-26. The proposed evidence, however, is not being offered for any proper purpose. As stated above, FRE 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The Second Circuit has long recognized that this excludes evidence of prior acts by the defendant. *United States v.*

14

*Aboumoussallem*, 726 F.2d 906, 911–12 (2d Cir. 1984); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) ("Federal Rule 404(b) applies to all propensity evidence, whether used to show that the defendant or another individual acted in conformity with their prior misconduct.")

While Rule 404(b) bars all propensity evidence, the Rule does permit evidence of prior acts introduced for a non-propensity purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" as to the defendant. Fed. R. Evid. 404(b)(2). The Second Circuit has cautioned, however, that even when used for a permitted purpose, such evidence presents a special danger of prejudice to the defense. Thus, in the Second Circuit, "[t]o determine whether to admit Rule 404(b) evidence, the court should consider whether: '(1) the prior [act] evidence [is being] 'offered for a proper purpose'; (2) the evidence [is] relevant to a disputed issue; (3) the probative value of the evidence [is] substantially outweighed by its potential for unfair prejudice pursuant to Rule 403; and (4) [there is] an appropriate limiting instruction." *Alexander v. Hanson*, 566 F. Supp. 3d 162, 167 (N.D.N.Y. 2021) (citing *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009)).

Here, Defendant expects that Plaintiff will attempt to introduce this evidence to demonstrate that Defendant is 'predisposed' to committing sexual assault. However, Plaintiff's desire to introduce this evidence can serve only one purpose: to suggest to the jury that Defendant had a propensity for sexual assault and therefore the alleged incident must have in fact occurred. Evidence offered to prove such allegations would be precisely the type of propensity evidence precluded by Rule 404(b). Furthermore, as is plainly evident, the contents of the Access Hollywood Tape, and Defendant's comments concerning them, do not even tangentially relate to the core of Plaintiff's claim. Accordingly, as the proposed evidence constitutes improper propensity evidence and is also irrelevant and highly prejudicial, it must be precluded.

15

IV.    *Motion In Limine No. 4:* **Evidence Concerning Any Purported Emotional Harm Stemming From The Alleged Incident Must Be Precluded**

At trial, Plaintiff may attempt to reference purported emotional or psychological pain she claims to have suffered as the result of the alleged underlying incident. However, any such evidence or statements must be precluded because Plaintiff did not allege to have sustained any such harm in her pleadings, nor is it a relevant aspect of her claim for defamation. Indeed, this Court expressly held in the companion case to this action, *Carroll v. Trump*, 22-CV-10016 (LAK) (S.D.N.Y. 2022) ("*Carroll II*") that "emotional or psychological damages, allegedly suffered by plaintiff as a result of the alleged sexual assault" are not a part of this case and only relevant in *Carroll II*. Therefore, reference to any such damages must be excluded from the trial in *Carroll I*.

## CONCLUSION

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests that the Court grant the above-referenced motions *in limine* and rule that: (1) Plaintiff is precluded from presenting any evidence relating to Defendant's purported interactions with non-party witnesses Natasha Stoynoff and Jessica Leeds; (2) Plaintiff is precluded from presenting evidence relating to speeches and statements made by Defendant while he was campaigning for President; (3) Plaintiff is precluded from introducing any evidence relating to the "Access Hollywood" tape; and (4) Plaintiff is precluded from introducing any evidence relating to emotional damages Plaintiff purports to have sustained as a result of the alleged incident.

Dated: February 16, 2023        Respectfully submitted,
      New York, New York

                                Alina Habba, Esq.
                                Michael T. Madaio, Esq.
                                HABBA MADAIO & ASSOCIATES LLP

A-87

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff,*

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant.*

No. 20 Civ. 7311 (LAK) (JLC)

### NOTICE OF PLAINTIFF E. JEAN CARROLL'S OMNIBUS MOTION IN LIMINE

PLEASE TAKE NOTICE that Plaintiff E. Jean Carroll hereby moves this Court, before the Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, located at 500 Pearl Street, New York, NY 10007, on a date to be set by the Court, for an order in limine (1) admitting Carroll's prior consistent statements to Lisa Birnbach and Carol Martin about Defendant Donald J. Trump's attack; (2) admitting the testimony of Natasha Stoynoff and Jessica Leeds regarding their own experiences with Trump; (3) precluding Robert J. Fisher from testifying as a rebuttal expert witness; (4) excluding testimony from witnesses whom Trump has not disclosed, precluding Trump from testifying to undisclosed information, and precluding any testimony or commentary concerning DNA evidence; (5) precluding cross-examination or evidence regarding Stephanie Grisham's prior misdemeanor convictions, her unrelated pending lawsuit, and her use of a prescription medication; and (6) precluding comments and cross-examination regarding Carroll's choice of counsel.

This motion is supported by the annexed memorandum of law and the declaration of Roberta A. Kaplan and accompanying exhibits.

A-88

Dated: New York, New York
      February 16, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br><div align="center">*Plaintiff,*</div><br>v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br><div align="center">*Defendant.*</div> | No. 20 Civ. 7311 (LAK) (JLC) |

### DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF
### PLAINTIFF E. JEAN CARROLL'S OMNIBUS MOTION IN LIMINE

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action.

2.      I respectfully submit this declaration in support of Carroll's omnibus motion in limine.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the official transcript of Lisa Birnbach's deposition, which was taken in this action on September 21, 2022.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the official transcript of Carol Martin's deposition, which was taken in this action on October 18, 2022.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the official transcript of Donald J. Trump's deposition, which was taken in this action on October 19, 2022.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the official transcript of Natasha Stoynoff's deposition, which was taken in this action on October 13, 2022.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the official transcript of Jessica Leeds' deposition, which was taken in this action on October 13, 2022.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of an excerpt from the official transcript of Carroll's deposition, which was taken in this action on October 14, 2022.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the document that was marked as Exhibit 33 during Trump's deposition in this action.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of the Expert Report of Ashlee Humphreys, PhD, dated October 14, 2022.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of the Rebuttal Expert Report of Robert J. Fisher, dated November 14, 2022.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of excerpts from the official transcript of Robert J. Fisher's deposition, which was taken in this action on December 14 and 20, 2022.

13.     Attached hereto as **Exhibit 11** is a true and correct copy of Trump's Rule 26(a)(1) Initial Disclosures in this action, dated June 8, 2022.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of Trump's Supplemental Rule 26(a)(1) Initial Disclosures in this action, dated September 19, 2022.

15.     Attached hereto as **Exhibit 13** is a true and correct copy of Trump's Rule 26(a)(1) Initial Disclosures in the related action, *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.) (LAK) (JLC), dated January 9, 2023.

16.     Attached hereto as **Exhibit 14** is a true and correct copy of Trump's Supplemental Responses to Carroll's First Set of Interrogatories in this action, dated August 23, 2022.

A-91

17.     Attached hereto as **Exhibit 15** is a true and correct copy of an email from Michael Madaio to Carroll's counsel, dated August 24, 2022.

18.     Attached hereto as **Exhibit 16** is a true and correct copy of a tweet containing the statement that Trump made about Carroll on June 21, 2019, which was marked as Exhibit 20 during Trump's deposition in this action.

19.     Attached hereto as **Exhibit 17** is a true and correct copy of excerpts from the official transcript of Stephanie Grisham's deposition, which was taken in this action on October 6, 2022.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:     New York, New York
           February 16, 2023


                                                    Roberta A. Kaplan

3

A-92

# EXHIBIT 1

Page 1

```
 1

 2    UNITED STATES DISTRICT COURT

 3    FOR THE SOUTHERN DISTRICT OF NEW YORK

 4    ----------------------------------x

 5    E. JEAN CARROLL,

 6                          Plaintiff,

 7    -against-     No. 20 Civ. 7311 (LAK)(JLC)

 8    DONALD J. TRUMP, in his personal

      capacity

 9

                          Defendant.

10

      ----------------------------------x

11

              CONFIDENTIAL

12

              DEPOSITION OF

13            LISA BIRNBACH

           New York, New York

14         September 21, 2022

15

16

      Reported By:

17

      ERIC J. FINZ

18

19

20

21

22

23

24

25
```

Page 31

```
1              LISA BIRNBACH - CONFIDENTIAL
2                 MR. MADAIO:  At any time.
3                 MR. CELLI:  At any time from
4          the beginning of time to today, has
5          she ever discussed that topic with
6          you.  Is that the question that
7          you're asking, Mike?
8                 MR. MADAIO:  Let's stick with
9          the '90s right now.
10                 MR. CELLI:  In the mid-'90s
11          period.  Ask your question, sorry.
12          Q.     In the mid-'90s, did
13     Ms. Carroll ever discuss with you any
14     instances where she claimed she was
15     sexually assaulted?
16          A.     Yes.
17          Q.     And how many different
18     instances did she discuss with you?
19          A.     One.
20          Q.     Okay.  And what was the -- who
21     was the person that she claimed had
22     assaulted her?
23          A.     Donald Trump.
24          Q.     Okay.  And how did this
25     conversation take place?
```

Page 32

1              LISA BIRNBACH - CONFIDENTIAL

2                   MR. CELLI:  Objection to the

3         form.

4                   You can answer.

5         A.    I received a phone call one

6    night around the time I was feeding my

7    kids dinner.  And --

8                   MR. CELLI:  The question was

9         how did the conversation take

10        place.

11                  THE WITNESS:  On the phone.

12                  MR. CELLI:  You received a

13        phone call?

14                  THE WITNESS:  Phone call.

15        Sorry.

16        Q.    You received a phone call.

17    And what was the date that you received

18    the phone call?

19        A.    I don't know.

20        Q.    Do you recall the year?

21        A.    I believe it was 1996.

22        Q.    Do you know what month in

23    1996?

24        A.    I don't.

25        Q.    Do you know the season?

Page 34

1             LISA BIRNBACH - CONFIDENTIAL
2                  Just to clarify, that's the
3     apartment that you previously said you
4     moved into around 1995.  Correct?
5          A.    Mm-hmm.  Yes.
6          Q.    Okay.  And -- okay.  And can
7     you describe the sum and substance of the
8     conversation that you had with
9     Ms. Carroll?
10                 MR. CELLI:  Objection to the
11            form.  Describe the sum and
12            substance of the conversation.  If
13            you can understand that question.
14         A.    E. Jean was very agitated,
15    very hyperventilating.  Emotional.  And
16    she told me about what happened to her
17    just really moments before she made the
18    phone call.
19         Q.    Okay.  Actually I want to step
20    back for one second.
21                 Was anyone else in the room
22    with you when the phone call -- when you
23    answered the phone call?
24         A.    Yes, my two older children.
25         Q.    And what were their ages at

Page 35

```
 1          LISA BIRNBACH - CONFIDENTIAL
 2    the time, approximately?
 3          A.    5 and 2.
 4          Q.    And what type of phone was it
 5    that you answered it on?  Was it like
 6    a --
 7          A.    A landline.
 8          Q.    A landline?
 9          A.    Mm-hmm.
10          Q.    And how would you describe --
11    I believe you already gave a couple
12    descriptors.  But how would you describe
13    Ms. Carroll's demeanor at the beginning
14    of the call?
15          A.    Upset, hyperventilating --
16    well, that's not her demeanor.  Agitated.
17    She wanted to vent.
18          Q.    Was she laughing early on in
19    the call?
20          A.    There was a moment that she
21    was laughing.  But she was not laughing
22    funny.  She was laughing excited.  Highly
23    reactive.
24          Q.    And can you describe what E.
25    Jean told you during the call had just
```

Page 36

```
 1        LISA BIRNBACH - CONFIDENTIAL
 2   happened to her?
 3           MR. CELLI:  Objection to the
 4        form.  You want her to describe
 5        what was told to her or you want
 6        her to testify about what she
 7        remembers she was told, or
 8        something else?
 9        Q.   Can you explain what
10   Ms. Carroll told you during the phone
11   call.
12           MR. CELLI:  Objection to the
13        form.
14           You can answer.
15        A.   So what she said to me.
16        Q.   Right.
17        A.    Lisa, you'll never believe
18   what happened to me.  I had gone to
19   Bergdorf Goodman to look around after my
20   show, because she was hosting a live show
21   five days a week.  And I was leaving from
22   the north door on 58th Street, which is a
23   revolving door.  Guess who was going in
24   the store.  It was Donald Trump.  And he
25   said to me, oh, hi TV advice lady.  And I
```

Page 37

```
 1        LISA BIRNBACH - CONFIDENTIAL
 2   said hi, Mr. Real Estate Mogul.  And then
 3   I guess they met on in -- she went back
 4   in.  And he said you're so smart, why
 5   don't you help me pick out a present for
 6   someone.
 7              So she said I thought that was
 8   fun.  So I walked around the ground floor
 9   of Bergdorf's with him and suggested
10   would she like a hat, would she like a
11   belt, would she like this.
12              Eventually they went upstairs.
13   They arrived to the lingerie department.
14   He pulled a body suit, and said, try this
15   on.  She said no, you try this on.
16              And the next thing was they
17   were both in the dressing room together.
18              Should I continue?
19         MR. CELLI:  The question was
20      what do you remember her telling in
21      that that phone call.
22         THE WITNESS:  Right.
23         MR. CELLI:  Have you completed
24      everything you recall from that
25      phone call?
```

Page 38

1        LISA BIRNBACH - CONFIDENTIAL

2              THE WITNESS:  No.

3              MR. CELLI:  Do you remember

4        other things that she said?

5              THE WITNESS:  Yes, I do.

6              MR. CELLI:  So if you need to

7        supplement that answer with what

8        you remember her saying to you,

9        that's fine.

10             THE WITNESS:  She said, Donald

11       Trump pushed her against the wall.

12       She hit her head.  He pinned her --

13       she tried to get free.  He pinned

14       her with his body.  And she said

15       many times over, he pulled down my

16       tights, he pulled down my tights.

17       She said it like she still couldn't

18       believe it.  He pulled down my

19       tights, he pulled down my tights.

20             And I remember that she told

21       me that he entered her.  And I

22       remember not really understanding

23       how she got free and got to the

24       street.

25   BY MR. MADAIO:

A-101

Page 39

```
 1            LISA BIRNBACH - CONFIDENTIAL
 2         Q.    And did she say how long after
 3   that had allegedly happened that it was
 4   that she called you?
 5         A.    It had just happened.
 6         Q.    And after she -- after she
 7   recounted what had allegedly occurred in
 8   Bergdorf, did you advise her on how she
 9   should proceed?
10         A.    Yes.
11         Q.    And what did you tell her?
12         A.    I said, E. Jean, you've been
13   raped.
14         Q.    Did you tell her she should go
15   to the police?
16         A.    I did.
17         Q.    To your knowledge, did she
18   follow your advice, did she ever report
19   the incident to the police?
20         A.    No, she did not.
21         Q.    Did you ever consider
22   reporting the alleged incident to the
23   police yourself?
24         A.    Oh, no.
25         Q.    Why not?
```

Page 51

```
1            LISA BIRNBACH - CONFIDENTIAL
2        it was with MeToo in mind.
3            MR. MADAIO:   Okay.
4    BY MR. MADAIO:
5        Q.    And at that time did you have
6    any conversations about the incident
7    itself or did she simply disclose that it
8    was going to be -- I guess, how did she
9    describe what was going to be in the
10   book?
11           MR. CELLI:   I'm going to
12       object to the form.
13           You can answer that if you
14       understand it.
15       A.    She sent me a draft of the
16   excerpt in New York Magazine.
17       Q.    Oh, she sent you an excerpt.
18   Okay.
19           And did you read the excerpt
20   at or around that time?
21       A.    Yes.
22       Q.    And what was your impression
23   of it?
24       A.    My impression was that it was
25   very -- it was how I remembered it too.
```

Page 52

1            LISA BIRNBACH - CONFIDENTIAL
2     You know, very close.  Maybe, you know,
3     it was there.
4                   And, it was -- you know.  It
5     was her story.
6        Q.    Did it align with your
7     recollection at that time of what the
8     conversation had been in 1996?
9                   MR. CELLI:  Objection to the
10           form.
11                  You can answer.
12       A.    I think so, yeah.
13       Q.    How -- so you previously
14     stated that you hadn't thought about that
15     phone call since it took place in 1996.
16     So how confident are you that you, in
17     your recollection at the time when you
18     received the phone call from E. Jean in
19     2019, that you had remembered the details
20     of that call?
21                  MR. CELLI:  Objection to the
22           form.  I don't know what that
23           question means, Mike.  But you're
24           entitled to ask it.
25       Q.    How confident were you that

A-104

# EXHIBIT 2

Page 1

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      - - - - - - - - - - - - - - - - - - - -x

5      E. JEAN CARROLL,

6                          Plaintiff,

7              -against-

8      DONALD J. TRUMP, in his personal capacity,

                           Defendant.

9

10     - - - - - - - - - - - - - - - - - - - -x

11

12                  *** CONFIDENTIAL ***

13

14          Remote deposition of CAROL MARTIN, taken

15     pursuant to Notice, was held via videoconference,

16     commencing October 18, 2022, at 10:01 a.m., on the

17     above date, before Amanda McCredo, a Court Reporter

18     and Notary Public in the State of New York.

19

20

21

22

23

24

25

Page 27

```
 1            C. Martin - Confidential
 2  BY MR. SWIFT:
 3      Q    You can answer, Ms. Martin.
 4      A    It was about personal issues.  We weren't
 5  working together.
 6      Q    Did Ms. Carroll ever contact you to discuss
 7  any instances where she alleged she was sexually
 8  assaulted?
 9           MS. CROWLEY:  Objection to form.
10           Ever?  What's the time period?
11           MR. SWIFT:  Yes, ever.
12      A    I'm sorry, can you repeat?
13  BY MR. SWIFT:
14      Q    Sure.
15           Did Ms. Carroll ever contact you at any
16  time to discuss whether she was sexually assaulted?
17           MR. BIALE:  Objection to form.
18           Can you clarify what you mean by "contact
19      you"?
20           MR. SWIFT:  I don't know how to -- how else
21      to phrase that question.
22  BY MR. SWIFT:
23      Q    Has she -- did she ever --
24           MS. CROWLEY:  Are you trying to ask did
25      Ms. Carroll ever tell Ms. Martin that she had
```

Page 28

1                    C. Martin - Confidential

2        been sexually assaulted?

3             MR. SWIFT:  Yes, I guess that's a better

4        way of phrasing it.  Let me make it clear for

5        the record.

6    BY MR. SWIFT:

7        Q    Ms. Martin, did Ms. Carroll ever tell you

8    that she was sexually assaulted?

9        A    Yes.

10       Q    Did she tell you on how many occasions she

11   was sexually assaulted?

12       A    Only one time.  That de-minimized it.  Only

13   one time.

14       Q    Did she provide a name of the person that

15   she believed sexually assaulted her?

16       A    Yes, she did.

17       Q    Who was that person?

18       A    Donald Trump.

19       Q    Do you recall the specific date of the

20   conversation that Ms. Carroll told you -- withdrawn.

21            Was there a specific date that Ms. Carroll

22   told you that she believed she was sexually

23   assaulted by Donald Trump?

24            MR. BIALE:  Objection to form.

25            MS. CROWLEY:  Are you asking her for the

Page 32

                    C. Martin - Confidential

1

2            And she said -- she went ahead to explain

3      the events.

4      Q    Did she go over the events at that point?

5      A    Yes.  Yes, she did.

6      Q    What exactly -- can you describe in detail

7      the events that Ms. Carroll explained to you at that

8      point?

9      A    Conversation went for a while.  But

10     basically she said that Mr. Trump had assaulted her

11     at Bergdorf's.  And needless to say, it was shocking

12     to hear.  My first words to her were was she okay.

13     Q    Do you recall what Ms. Carroll's general

14     demeanor was when she told you this story in the

15     kitchen of your house?

16     A    She was, I'll call it, as shocked as I was,

17     as she explained.

18     Q    And how long, if you recall, did this

19     conversation in your kitchen take place?

20     A    Hard to say.  Maybe half hour.

21     Q    What happened after -- withdrawn.

22            Did you believe Ms. Carroll's account of

23     the purported incident at the time she shared it

24     with you?

25     A    Yes, I did.

Page 33

C. Martin - Confidential

1

2      Q    Did you have any reason to doubt

3 Ms. Carroll at that time?

4      A    I did not.

5      Q    At the conclusion of this half hour

6 meeting, approximately, did you advise Ms. Carroll

7 as to what your opinion -- withdrawn.

8           At the conclusion of this half hour

9 meeting, did you advise Ms. Carroll on how you think

10 she should proceed at that point?

11     A    I did.

12     Q    What was your advice?

13     A    Because she had said she felt physically

14 okay that day and she wasn't sure what to do, I

15 advised her not to do anything.

16     Q    Was there any other reason you advised her

17 not to do anything at that point?

18     A    Yes.

19          MR. BIALE:  Objection to form.

20 BY MR. SWIFT:

21     Q    Go ahead.  Please answer, Ms. Martin.

22     A    It was my belief that -- and I said to

23 her -- that Mr. Trump had many lawyers and he would

24 bury her from her allegation.

25     Q    When you had this conversation in the

Page 34

1              C. Martin - Confidential

2     kitchen, did Ms. Carroll tell you when this alleged

3     sexual assault occurred?

4         A    My recollection was it was a few days

5     before the conversation.  Maybe a day or two.  I'm

6     not sure.

7         Q    I know you testified that you advised

8     Ms. Carroll not to report this or go to the police;

9     is that correct?

10             MR. BIALE:   Objection; misstates the

11         testimony.

12    BY MR. SWIFT:

13        Q    Let me rephrase then.

14             Did you ever consider reporting this

15    alleged incident to the police yourself?

16        A    I did not.

17        Q    Was there a reason you did not?

18        A    Primarily because she had already been

19    advised to do that by another friend to whom she had

20    spoken about it.  She had declined.

21             And on the day we spoke, she seemed not

22    inclined to want to go to the police.  I respected

23    her opinion.  I respected her decision.

24        Q    Who is this other friend that you're

25    referring to?

Page 40

```
1                 C. Martin - Confidential
2      information about Ms. Carroll's account of the
3      alleged sexual assault by Mr. Trump?
4          A    It did have details, yes.
5          Q    I said before "approximately" 2019.
6               Was it your recollection that the book came
7      out in approximately July 2019?
8          A    I think that's right.
9          Q    Do you know approximately when you -- you,
10     yourself, actually read the book?
11         A    On or about the publication date, there
12     were -- I think it was around then.
13         Q    Do you think that Ms. Carroll's
14     recollection of the incident described in the book,
15     did that align with your memory of what she told you
16     back in the mid-1990s?
17              MR. BIALE:  Objection to form.
18              You can answer the question.
19         A    Yes, it did.
20     BY MR. SWIFT:
21         Q    Ms. Martin, did you have any involvement or
22     input in the book published by Ms. Carroll entitled
23     What Do We Need Men for?
24              MR. BIALE:  Objection to form.
25              Can you clarify what you mean by that?
```

A-112

# EXHIBIT 3

Confidential

Page 1

2                UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK

3                CASE No. 20 CIV. 7311 (LAK)(JLC)

5    E. JEAN CARROLL,

6              Plaintiff,

7    -vs-

8    DONALD J. TRUMP,
     in his personal capacity,

9              Defendant.

10    _____/

13                     =  =  =

14                  CONFIDENTIAL

15                     =  =  =

17        VIDEOTAPED DEPOSITION OF DONALD J. TRUMP

19                Wednesday, October 19, 2022
                 10:22 a.m. - 3:50 p.m.

20                 The Mar-a-Lago Club
                1100 South Ocean Boulevard

21              Palm Beach, Florida, Florida

23   Stenographically Reported By
     Pamela J. Pelino, RPR, FPR, CLR

24   Notary Public, State of Florida
     TSG REPORTING

25   JOB NO. 218342

                     -  -  -

A-114

Confidential

Page 58

```
 1                        D. J. TRUMP

 2          A.    Other people in the press, yes.

 3          Q.    If you could read -- if you're able to --

 4   and I apologize for the size of the text.

 5                If you could read that statement into the

 6   record.

 7          A.    You want me to read the whole thing?

 8          Q.    Please.

 9          A.    It's a very unclear copy.  Do you have a

10   better copy of it?

11          Q.    I think this is the best we have.  I

12   could read it in.  I'll read it in.

13          A.    Yeah, why don't you read it in.

14          Q.    It says:  "Statement from President

15   Donald J. Trump.  Regarding the 'story' by

16   E. Jean Carroll claiming she once encountered me at

17   Bergdorf Goodman 23 years ago, I've never met this

18   person in my life.  She's trying to sell a new book.

19   That should indicate her motivation.  It should be

20   sold in the fiction section.  Shame on those who

21   make up false stories of assault, who try to get

22   publicity for themselves or sell a book or carry out

23   a political agenda like Julie Swetnick, who falsely

24   accused Justice Brett Kavanaugh.  It's just as bad

25   for people to believe it, particularly when there is
```

Case 1:20-cv-07311-LAK   Document 135-3   Filed 02/16/23   Page 4 of 28
Confidential

Page 59

1                    D. J. TRUMP

2    zero evidence.  Worse still for a dying publication

3    to try to prop itself up by pedaling fake news.

4    It's an epidemic.  Ms. Carroll in New York Magazine:

5    No pictures, no surveillance, no videos, no reports,

6    no sales attendants around???  I would like to thank

7    Bergdorf Goodman for confirming they have no video

8    footage of any such incident because it never

9    happened.  False accusations diminish the severity

10   of real assault.  All should condemn false

11   accusations and any actual assault in the strongest

12   possible terms.  If anyone has information that the

13   Democratic party is working with Ms. Carroll or

14   New York Magazine, please notify us as soon as

15   possible.  The world should know what's really going

16   on.  It's a disgrace, and people should pay dearly

17   for such false accusations."  Do you see that?

18   That's what you have in front of you?

19        A.    Yeah.

20        Q.    And I think you've already confirmed that

21   this is a statement that you gave to someone on your

22   staff to give to the press?

23        A.    Yeah.

24        Q.    And that's how it ended up in

25   Laura Littman's tweets?

Confidential

Page 60

```
 1                    D. J. TRUMP

 2        A.    Perhaps, yes.

 3        Q.    Sitting here today, do you stand by this

 4   statement?

 5        A.    Yes.

 6        Q.    Sitting here today, are there any

 7   inaccuracies in this statement that you now know of?

 8        A.    Not that I can see, no.  The only thing

 9   that I would say is -- and I've just heard this --

10   that she has no idea when this event took place, and

11   somehow 23 years is mentioned, 23 years ago.  It's a

12   long time.  But she has no idea supposedly when this

13   took place, what season, what year, what month, what

14   day.  She knows nothing.  And for some reason, it's

15   put down here 23 years ago.  So, you know, at one

16   point I was told 23 years.  But I've heard since she

17   really has no clue when this took place supposedly,

18   which -- it didn't take place.

19        Q.    So is it your testimony that when

20   Ms. Carroll made her allegations, she had -- putting

21   aside what day it happened that she had no idea

22   whatsoever of what year it took place?

23        A.    My lawyers told me that.

24        Q.    Okay.  I don't want to know what your

25   lawyers told you.
```

A-117

Confidential

Page 73

                              D. J.  TRUMP

1

2       took place because it didn't take place.

3    BY MS. KAPLAN:

4       Q.    So your answer to my question is, no, you

5    don't have any witnesses?

6       A.    If you could give me a date, I could

7    check on security because I traveled with security

8    quite a bit, and I would have somebody from security

9    confirm a statement that it never happened.

10      Q.    Is it your testimony, sir, that you

11   always walked around New York City during the period

12   late 1995 and early 1996 with security?  Is that

13   your statement?

14      A.    Pretty much, yes.

15      Q.    Pretty much isn't always.  Is that your

16   testimony?

17           MS. HABBA:  Objection.

18           THE WITNESS:  I would say pretty much to

19       always, yeah.  I always have a security person

20       with me.

21   BY MS. KAPLAN:

22      Q.    Okay.  Who would have been your security

23   person in late 1995, early 1996?

24      A.    Well, I had many.  I had many people.  So

25   I would go with many, but if you could give me a

Confidential

Page 75

```
 1                        D. J. TRUMP

 2          clarify for the record.  If we can read from

 3          the complaint the actual record.  I believe it

 4          says fall of 1995 --

 5               MS. HABBA:  It says fall of 1995 and the

 6          spring of 1996.

 7    BY MS. KAPLAN:

 8          Q.    Yeah.  Do you know who your security

 9    people were from the fall of 1995 through the spring

10    of 1996?

11               MS. HABBA:  Objection.  Asked and

12          answered.

13    BY MS. KAPLAN:

14          Q.    You can answer again.

15          A.    I'll find out.  I'll check.  If I can,

16    I'll find out.  I'll have people ask.

17          Q.    That information should have been

18    provided long ago, but if you have it, we would like

19    to see it.

20               When you made your statements that

21    Ms. Carroll's accusation was false and that it never

22    happened, do you recall you or anyone working for

23    you looking at any documents before those statements

24    were made?

25          A.    No.  They wouldn't be in documents.  It
```

Page 76

                              D. J. TRUMP

1
2    wouldn't be because it never happened, number one.
3    But there wouldn't be documents.
4         Q.    Just so the record is clear, other than
5    the possibility of security guards, can you think of
6    any other persons who would be witnesses to -- who
7    could confirm your account that Ms. Carroll's
8    allegation was false?
9         A.    That could confirm my account that
10   nothing happened?
11        Q.    Correct.  Anyone other than security?
12        A.    I would have to look for people, but, you
13   know, you're asking them to confirm that something
14   didn't happen.  In other words, you're asking them
15   to confirm that they never saw anything happen, and
16   they didn't because it didn't happen.  It's a lie.
17        Q.    Again, I'm just trying --
18        A.    It's a made-up story.  It's a fairy tale.
19        Q.    I'm trying to get the answer.  If you
20   could answer my question, the question I asked, we'd
21   get through this quicker.
22             MS. HABBA:  I think I'm just going to
23        object and state for the record that the
24        client's made clear that he can't find people
25        to say something that didn't happen didn't

Confidential

Page 78

```
 1                        D. J. TRUMP

 2   Smith or by somebody within minutes; okay?  So there

 3   were no complaints.  There were no stories.  There

 4   was no anything because it never happened.  It's all

 5   fiction.  It's a con job.

 6        Q.    So before you made your statements that

 7   it never happened in 2019, did you or anyone on your

 8   staff reach out to anyone at Bergdorf Goodman?

 9        A.    I didn't have to reach out to anybody

10   because it didn't happen.  And by the way, if it did

11   happen, it would have been reported within minutes.

12   You're talking about going to a major floor

13   probably.  I assume the most important floor, a

14   major floor in a major department stores that's a

15   very busy store, by the way, and checkout counters

16   and everything else.  And I would be in there?  I

17   mean, it's the most ridiculous -- it's the most

18   ridiculous, disgusting story.  It was just made up.

19             MS. HABBA:  Just to clarify, the question

20        is if he reached out to Bergdorf?

21             MS. KAPLAN:  If he or anyone before he

22        made the statement in June 2019.

23             MS. HABBA:  If he directed anyone?

24             MS. KAPLAN:  Did he or anyone working for

25        him reach out to Bergdorf Goodman.
```

A-121

Confidential

Page 88

```
1                        D. J. TRUMP

2   book sales?

3        A.    No idea.

4        Q.    Before you made this statement, do you

5   know if you or anyone working for you went on to --

6   withdrawn.

7              Before you made this statement that

8   appears in DJT 20, do you know whether you or anyone

9   working for you did any research on Ms. Carroll?

10       A.    I just don't know.  It's possible

11  somebody -- when they heard this horrible

12  accusation, it's possible that somebody did a little

13  quick research but not that I know of.

14       Q.    Another thing that you say in your June

15  21 statement is that Ms. Carroll was trying to carry

16  out a political agenda?

17       A.    Yeah.

18       Q.    How did you know she had a political

19  agenda if you didn't know who she was?

20       A.    Somebody told me early on that she was

21  somehow aligned with Hillary Clinton.  She was

22  either aligned with her or -- I thought aligned with

23  her.

24       Q.    Who told you that?

25       A.    I think you're aligned with her too
```

Confidential

Page 89

```
1                          D. J. TRUMP

2   actually.

3        Q.    Who told you that?

4        A.    Somebody had mentioned it.

5        Q.    Do you recall who?

6        A.    I don't know.  I don't know who said it,

7   but somebody had mentioned it since, that she was

8   somehow into that whole world.

9        Q.    And you just said "I don't know who -- I

10  don't know who said it, but somebody has mentioned

11  it since"?

12       A.    No.  I meant since the accusation.

13       Q.    Oh, since the accusation.

14             Do you remember what that person told you

15  if you don't --

16       A.    Just mentioned that they thought she was

17  somewhat political and aligned with Hillary Clinton.

18       Q.    Before issuing your statement on June 21,

19  did you learn what political party Ms. Carroll

20  belonged to?

21       A.    No, I didn't know that.

22       Q.    Before you issued your June 21 statement,

23  did you have any documents indicating that she was

24  pursuing a political agenda?

25       A.    No.
```

Confidential

Page 108

```
 1                    D. J. TRUMP

 2   with something that's called an interrogatory?

 3        A.    Go ahead.  Give me a definition.

 4        Q.    An interrogatory are written questions

 5   that attorneys ask the other side, and then written

 6   answers are provided.

 7              Are you familiar with that general

 8   concept?

 9        A.    Yes.

10        Q.    Okay.  I'm going to show you your

11   interrogatory responses in this case.

12              MS. KAPLAN:  We're going to mark it as

13        25.

14              (DJT Exhibit 25 was marked for

15   identification.)

16              THE WITNESS:  Okay.  Go ahead.

17   BY MS. KAPLAN:

18        Q.    So if you turn to page 2, you'll see

19   about a quarter of the way down it says Number 2

20   under the header "Supplemental Responses and

21   Objections to Interrogatories," and 2 reads:

22   "Identify all individuals with whom you have

23   communicated by any means concerning the plaintiff

24   or this action."  And I'll represent to that you

25   that's E. Jean Carroll or this case, and then
```

Confidential

Page 109

```
 1                      D. J. TRUMP

 2   there's a lot of objections.  And then subject to

 3   those objections, there's names listed, and it

 4   starts with Dan Scavino.

 5             You had told me a few minutes ago that

 6   you couldn't remember, but it's possible that you

 7   spoke to Mr. Scavino.  Does this refresh your

 8   recollection?

 9        A.    No.  I mean, it is possible.

10        Q.    Okay.  Nicholas Luna.  You had said I

11   doubt it, but he appears in these interrogatories?

12        A.    It's possible.

13        Q.    Molly Michael I think you told me you

14   spoke to.  So that checks.

15        A.    Yeah.

16        Q.    Hope Hicks.  You had said no, and she

17   appears in this interrogatory.

18        A.    I'd say less likely.

19        Q.    Less likely --

20        A.    I mean, I would say no, but her name is

21   here.  So they put the name, but I would say

22   anything is possible with any of these people.

23   These are the people that I deal with.

24        Q.    Derek Lyons.  You said pretty sure no and

25   then --
```

Confidential

Page 110

1                      D. J. TRUMP

2          A.    Derek Lyons I think -- I'm fairly sure,

3     but, again, it's possible that I did.  But I

4     think -- I think no.

5          Q.    And then Jared Kushner.  I think your

6     answer to me was I don't think so, and then his name

7     appears?

8          A.    I don't think so, but it's possible that

9     I spoke to him.

10         Q.    Did you review this document prepared by

11    your attorneys before it was submitted?  This was on

12    August 23rd.

13         A.    Yes, very quickly.  I don't know if I

14    signed it.  Did I sign it?

15         Q.    No.  It's signed by --

16         A.    No.  I didn't sign it, but I reviewed it,

17    I guess, in concept.  I didn't sign it.  When I sign

18    something, I guess maybe I look at it more closely.

19    But I didn't sign this.  I'm not sure.  I was told

20    about the document.

21         Q.    And so --

22         A.    It was just a refutation.  That's --

23    because this was something that never happened, as

24    you know very well.

25         Q.    Well, this question isn't about whether

Confidential

Page 111

1                          D. J. TRUMP

2    or not it happened or not, sir.  It's a question

3    about --

4         A.    Let's go.  Let's go.

5         Q.    Well, again, this interrogatory is about

6    who you spoke to, and your answers have been

7    somewhat inconsistent --

8         A.    Yeah.

9         Q.    -- between this interrogatory and what I

10   heard today, so what I'm trying to understand is

11   what's your position as of today.

12              And I take it -- and you can correct me

13   if I'm wrong -- that your position as of today is

14   what you've said here at this deposition; correct?

15        A.    The deposition rules.  That's correct.

16   Because this is not signed by me.  This is signed by

17   somebody else.

18        Q.    Okay.  Okay.  Now, a woman by the name of

19   Stephanie Grisham served as your press secretary and

20   communications director from July 1, 2019, to April

21   7, 2020; correct?

22        A.    Yeah.

23        Q.    And before that she had served as the

24   press secretary for the First Lady?

25        A.    Yes.

Confidential

Page 114

```
                            D. J. TRUMP
 1
 2         Q.     Does that refresh your recollection that
 3    Stephanie Grisham's promotion was announced on or
 4    about June 25th --
 5         A.     Yeah.  Sure.
 6         Q.     Now, the reason I ask is because June
 7    25th was one day after the statements that you made
 8    to The Hill reporters, which is DJT 22.  So it's
 9    fair to say that at the time of the promotion, the
10    issue of E. Jean Carroll and her allegations was
11    front of mind; fair?
12         A.     Well, I had many other things happening,
13    too, in case you're not aware.  So the
14    E. Jean Carroll thing was so false and so ridiculous
15    that I put out a statement, and that was it.  I want
16    people to know that it never happened.
17                But we had a lot of other things
18    happening like China, like Russia, like Ukraine,
19    like inflation, like a lot of other things that we
20    did a great job on.  This was not the only thing on
21    my mind.
22         Q.     I certainly understand that, sir, but --
23         A.     I'm sure you do.
24         Q.     -- you'll agree with me, will you not,
25    that the third statement you made, which was on June
```

Confidential

Page 130

1                       D. J. TRUMP

2    reporters by email, there's a designated group, and

3    it always goes to the same --

4         A.    I don't know how they do that, but it

5    goes to the press.

6         Q.    Why did you decide to issue the statement

7    on Truth Social on October 12th?

8         A.    Because I was offended at this woman's

9    lie.  Because I was offended that she could just

10   make up a story out of cold air, refuted by her

11   testimony on CNN, but that she could make up a story

12   just out of nowhere and that I get a phone call

13   asking me about this ridiculous situation.  The

14   woman -- there's something wrong with her in my

15   opinion.  Okay.  But it's a false accusation.  Never

16   happened, never would happen.  And I posted and I

17   will continue to post until such time as -- and then

18   I will sue her after this is over, and that's the

19   thing I really look forward to doing.  And I'll sue

20   you too because this is -- how many cases do you

21   have?  Many, many cases, and I know the statements

22   that were made -- that you made.  Keep Trump busy

23   because this is the way you defeat him, to keep him

24   busy with litigation.  So I will be suing you also,

25   but I'll be suing her very strongly as soon as this

A-129

Confidential

Page 131

1                           D. J.  TRUMP

2    case ends.  But I'll be suing you also.

3          Q.    Are you done?

4          A.    Yeah.

5          Q.    Is there anything in particular that

6    prompted you to make this statement last week?

7          A.    Yeah.  Her false story and that I have to

8    waste a whole day doing these ridiculous questions

9    with you.

10         Q.    Okay.

11               MS. KAPLAN:  Let's look at the statement.

12         Let's mark it as -- what's my next number?

13               MR. MADAIO:  DJT 28.

14               (DJT Exhibit 28 was marked for

15    identification.)

16               THE WITNESS:  I can't read this.

17               MS. KAPLAN:  Well, we have a blown-up

18         version.

19    BY MS. KAPLAN:

20         Q.    Let's mark it as 28 and 28A.

21               Oh, so you have a document that's got --

22    let me back up.  I'm not following my own rules that

23    it's not a conversation.

24               So what we have in front of you as DJT

25    28, sir, is the post as it appeared on Truth Social

Confidential

Page 142

1                          D. J. TRUMP

2     type?  Yeah.  Because it's not politically correct

3     to say it, and I know that, but I'll say it anyway.

4     She's accusing me of rape, a woman that I have no

5     idea who she is.  It came out of the blue.  She's

6     accusing me of rape -- of raping her, the worst

7     thing you can do, the worst charge.

8              And you know it's not true too.  You're a

9     political operative also.  You're a disgrace.  But

10    she's accusing me and so are you of rape, and it

11    never took place.  And I will tell you I made that

12    statement, and I said, while it's politically

13    incorrect, she's not my type.  And that's

14    100 percent true.  She's not my type.

15        Q.    And when you say "not my type," you want

16    people -- your intention of saying -- withdrawn.

17              The point of saying she's not my type is

18    to persuade people that you didn't rape her because

19    she wasn't attractive enough; correct?

20              MR. MADAIO:  Object to the form.

21              MS. HABBA:  Objection to the form.

22              THE WITNESS:  When I say she's not my

23         type, I say she is not a woman I would ever be

24         attracted to.  There is no reason for me to be

25         attracted to her.  I just -- it's not even

Page 144

1                           D. J. TRUMP

2    you talk about the justice system being broken;

3    correct?

4         A.    Yeah.  The system in our country is

5    broken, and the system in New York City is broken,

6    in New York and New York State.  It's a broken

7    system.

8         Q.    And isn't the reason, sir, that you

9    issued this statement in the evening of October 12th

10   because the judge in this case denied your motion to

11   stay discovery that day?

12        A.    I have no idea.  It could be.  I mean, it

13   could be a factor, but, no, I just issued this

14   because I knew it was coming up.  I knew that we'd

15   be wasting a day doing this, a whole day doing this.

16   I don't know how you do it.  You've got to be

17   connected to get this kind of a time.  But a whole

18   day doing this stuff on something that never

19   happened.

20        Q.    So is it your testimony that it's just a

21   coincidence that you issued this on the same day

22   that Judge Kaplan denied the stay?

23        A.    I don't know what day he issued it, but

24   he issued something that was, I guess, somewhat

25   negative.  No.  He's not a fan of mine obviously,

A-132

Confidential

Page 169

```
 1                      D. J. TRUMP

 2            And I apologize.  I'm hoping the

 3       technology works better.

 4            (DJT Exhibit 35 was marked for

 5  identification.)

 6            (Video played.)

 7  BY MS. KAPLAN:

 8       Q.   That's you in that video, speaking?

 9       A.   Yes, correct.

10       Q.   And am I correct that video was recorded

11  in January -- withdrawn.

12            Am I correct that that video was recorded

13  September of 2005?

14       A.   I guess that would -- don't know the

15  date.  But whatever date it was is fine with me.

16       Q.   And am I correct that you were engaged to

17  your current wife sometime in 2004?

18       A.   I don't know.

19       Q.   Am I correct that you married your

20  current wife in January 2005?

21       A.   I don't know relative to that tape, no.

22       Q.   Well, relative to that tape, isn't it

23  true you were married to your current wife?

24       A.   I don't know.  I don't know when the tape

25  was done.
```

Confidential

Page 171

```
 1                          D. J. TRUMP

 2              Isn't it true that -- withdrawn.

 3              When you say in this tape you moved on

 4   her heavily, what you're trying to say is that you

 5   tried to have sex with her; correct?

 6              MS. HABBA:  Objection.  Form.

 7              THE WITNESS:  Well, no, actually, I said

 8         I didn't.  And I said I didn't succeed with it.

 9              And this was very heavily litigated

10         during the campaign, and as you probably heard,

11         I won.  I beat your friend pretty badly and got

12         more votes, got -- we did a good job.

13              But this was very heavily litigated.  In

14         fact, it was the first question of one of the

15         debates, and it went on for a while.  And at

16         the end, the public said that's the one we want

17         for the president.

18              And they made the right decision,

19         obviously, based on what you're looking at

20         today and what you were looking at two years

21         ago.

22   BY MS. KAPLAN:

23         Q.   Okay.  But this isn't a debate or a

24   presidential debate --

25         A.   No, but this was litigated already by the
```

Page 174

```
 1                    D. J. TRUMP

 2        Q.    Did you pay for the furniture?

 3        A.    No, I didn't.  I didn't buy her anything,

 4   actually.

 5        Q.    And you say -- and again, this has become

 6   very famous -- in this video, "I just start kissing

 7   them.  It's like a magnet.  Just kiss.  I don't even

 8   wait.  And when you're a star, they let you do it.

 9   You can do anything, grab them by the pussy.  You

10   can do anything."

11              That's what you said; correct?

12        A.    Well, historically, that's true with

13   stars.

14        Q.    True with stars that they can grab women

15   by the pussy?

16        A.    Well, that's what -- if you look over the

17   last million years, I guess that's been largely

18   true.  Not always, but largely true.  Unfortunately

19   or fortunately.

20        Q.    And you consider yourself to be a star?

21        A.    I think you can say that, yeah.

22        Q.    And -- now, you said before, a couple of

23   minutes ago, that this was just locker room talk?

24        A.    It's locker room talk.

25        Q.    And so does that mean that you didn't
```

Confidential

Page 184

```
 1                        D. J. TRUMP

 2    Ms. Leeds' allegations at campaign events in 2016?

 3           A.    I might have.  I thought it was so like

 4    your client, I thought it was so ridiculous.

 5           Q.    Let's take a look at the next video,

 6    which is DJT 38.

 7                 (DJT Exhibit 38 was marked for

 8    identification.)

 9                 (Video played.)

10    BY MS. KAPLAN:

11           Q.    When you said --

12           A.    Is that finished now?

13           Q.    When you said in that video that

14    Ms. Leeds would not be your first choice, you were

15    referring to her physical looks; correct?

16           A.    Just the overall, not -- I looked at her.

17    I see her.  I hear what she says.  Whatever.  You

18    wouldn't be a choice of mine, either, to be honest

19    with you.  I hope you're not insulted.  I wouldn't

20    under any circumstances have any interest in you.

21    I'm honest when I say it.

22                 She, I would not have any interest in.

23           Q.    Well, other than her looks, did you know

24    anything about -- withdrawn.

25                 I'm an attorney in cases suing you.
```

Confidential

Page 185

```
 1                    D. J. TRUMP
 2        A.    Yeah.
 3        Q.    But with respect to Ms. Leeds, did you
 4   know anything about what she did or what her past
 5   life was?
 6        A.    Even if you weren't suing me, I would
 7   have no interest.  Okay?
 8             And with Ms. Leeds, I watched her.  I
 9   guess I saw her interview.
10             I mean, the whole concept of it.  I'm
11   sitting on a plane.  I'm very well known.  Very,
12   very well known even then.  It was a long time ago.
13             And all of a sudden -- and I think she
14   said this making out with her went on for quite a
15   while.  So why didn't she leave?  Why didn't she
16   scream?  Why didn't she do something?
17             And she wasn't able -- as I remember
18   it -- I'm going -- I haven't read this again,
19   because I haven't seen this in years, but I believe
20   she said she didn't know where the plane was, where
21   the flight was, because I don't remember ever
22   sitting next to her.  I don't think I did ever sit
23   next to her.  I think she made that up, too.
24             But she couldn't find tickets.  She
25   couldn't find anything.  She didn't know where the
```

A-137

Confidential

Page 197

1                          D. J.  TRUMP

2              (DJT Exhibit 39 was marked for

3    identification.)

4              (Video played.)

5    BY MS. KAPLAN:

6         Q.    So in that video, you're talking about

7    the women who had accused you of sexual impropriety;

8    correct?

9         A.    Yeah.

10        Q.    And you say, "These are lies being pushed

11   by the media and the Clinton campaign"; correct?

12        A.    Yeah.  Not in all cases, but in some,

13   yeah.  I think that's what's happening with you and

14   your client.  I don't know if it's Clinton or if

15   it's the Democrat party.  It's probably not Clinton

16   anymore.

17        Q.    Let's watch --

18        A.    But the Democrat party.  That's you.

19        Q.    I apologize.

20              Let's watch another video, tab 86.

21              (DJT Exhibit 40 was marked for

22   identification.)

23              MS. KAPLAN:  This is from the West Palm

24        Beach event on October 13, 2016.

25              (Video played.)

Confidential

Page 202

1                        D. J. TRUMP

2    there was nothing -- I think the Anderson Cooper is

3    very big.  But I think in addition to that, there

4    were no complaints.  There was nothing lodged.  Your

5    client doesn't have any idea what time, when, what

6    year, what decade, I guess.  I don't know if they

7    even know the decade.  I think you have it boiled

8    down to two or three years now.

9              No, it's -- I think it's a whole big

10   scam.  And I think you're doing this for the

11   Democrat party, okay, your friends over in the

12   Democrat party.

13        Q.   I think we looked at this earlier.  At

14   the end of your statement, the first statement you

15   made about E. Jean Carroll on June 21, which has

16   been marked as DJT 20, you say, "If anyone has

17   information that the Democratic party is working

18   with Ms. Carroll or New York Magazine, please notify

19   me as soon as possible."

20              Did anyone ever notify you --

21        A.   Well, I'll let you know.

22              MS. HABBA:  Objection.

23              MR. MADAIO:  Objection.  That was already

24        asked.

25              THE WITNESS:  You'll hear.  We'll let you

Confidential

Page 205

1                    D. J.  TRUMP

2        A.    I heard this case and I said this is one

3   of the most ridiculous cases I've ever heard.

4              And I guess -- was that just before or

5   just after the Anderson Cooper interview?  But both

6   ways, it was ridiculous when I heard it.  After

7   listening to the interview, it became even more

8   ridiculous.

9        Q.    Did you ask anyone at the

10  Trump Organization to preserve any documents?

11       A.    No.

12       Q.    Did you ask anyone at your presidential

13  campaign to preserve any documents?

14       A.    No.

15       Q.    Do you know if anyone did that on your

16  behalf?

17       A.    Nobody.  I don't think anybody took this

18  seriously.

19             When they heard this case, most people,

20  without even seeing Anderson Cooper, thought it was

21  a scam.

22       Q.    In the other case, in which I deposed you

23  last week, you testified when talking about

24  documents that Norma Foerderer filed that you said,

25  "We keep documents, yeah.  We keep everything."

A-140

# EXHIBIT 4

Page 1

1                    NATASHA STOYNOFF

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4    -----------------------------------    )

5    E. JEAN CARROLL,                        )

6                   Plaintiff,               ) Case No.

7         vs.                                ) 20-Civ-7311

8    DONALD J. TRUMP, in his personal capacity) (LAK)(JLC)

9                   Defendants.              )

10   -----------------------------------    )

11

12

13              DEPOSITION OF NATASHA STOYNOFF

14                   NEW YORK, NEW YORK

15                   OCTOBER 13, 2022

16

17

18

19

20

21

22

23

24   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25   JOB NO. 218341

Page 14

```
 1              NATASHA STOYNOFF

 2       Q.  You spoke before about interviewing in

 3  connection with stories.  Are there -- did you ever

 4  attend events as part of covering Donald Trump?

 5       A.  I remember attending The Apprentice finale,

 6  which was some live recorded event where I guess

 7  they announced live who the winner was or something.

 8  I remember that event.  I can't recall any other

 9  event-like thing I recovered -- I covered.  I can't

10  recall any.

11       Q.  Okay.

12           Did there -- did you ever travel to

13  Mar-a-Lago?

14       A.  Yes.

15       Q.  And when did you travel there?

16       A.  So I was there for their wedding, to do the

17  wedding story, and then I went back at the end of

18  that year to do their one-year anniversary story.

19       Q.  And you testified that they were married

20  in -- I guess withdrawn.

21           What year did you -- when did you travel

22  back to do the one-year anniversary story?

23       A.  It was like the final week of December

24  2005.  So we were getting together the one-year

25  anniversary story, but I had to interview them ahead
```

A-143

Page 20

```
1                    NATASHA STOYNOFF

2    interview.

3         Q.  Did you -- what happened -- withdraw.

4              Did you ever leave the pool area with

5    Donald Trump or Melania Trump?

6         A.  Yes.

7         Q.  With whom?

8         A.  With Donald.

9         Q.  And how did that happen?

10        A.  He -- Melania was going upstairs to

11   change -- excuse my emotions -- and Donald said,

12   Have you seen the so-and-so room?  Have you seen the

13   painting in the whatever room.  He wanted to show me

14   a painting or a room.  I said no.  He goes, I'd like

15   to show you.  So he took me to this room.

16        Q.  Do you recall what room it was at

17   Mar-a-Lago?

18        A.  I mean, I don't know how to -- I don't know

19   that it had a number on it, but all I remember is we

20   came in the back door, walked down the hallway, and

21   turned right into a room.  That's as I recall it,

22   but I haven't really seen pictures to know -- I

23   haven't really seen a layout of Mar-a-Lago to know

24   exactly what door.

25        Q.  And what happened when you got to the room?
```

Page 21

```
 1                     NATASHA STOYNOFF

 2        A.   I walked in and he -- I walked into the

 3   room first and I'm looking around the room wondering

 4   what does he want to show me.  Nice room, what does

 5   he want to show me.  Then I hear the door close

 6   behind me and I turn around and he's right here

 7   (indicating), and he grabs my shoulders and pushes

 8   me against this wall and starts kissing me.

 9        Q.   And did he say anything when he started

10   kissing you?

11        A.   No.

12        Q.   Did he say anything before?

13        A.   Not that I recall.

14        Q.   And what was going through your mind when

15   Donald Trump did this?

16        A.   Complete shock.  Thank you.  Complete shock

17   because it was very fast and I was taken -- taken by

18   surprise.

19        Q.   And do you recall how you reacted?

20        A.   I recall pushing him back twice.  I recall

21   trying to say something, but not really being able

22   to.  I was so flustered.

23        Q.   And when you pushed him back the first time

24   do you recall how Donald Trump reacted?

25        A.   Yes.  He just came toward me again.
```

Page 22

```
 1                   NATASHA STOYNOFF

 2        Q.   And what about after the second time?

 3        A.   He started coming toward me again, but then

 4   someone came into the room.

 5        Q.   Do you recall who came into the room?

 6        A.   Yes.  It was the butler.

 7        Q.   And had you seen the butler before?

 8        A.   Yes.  The butler was my contact for the

 9   entire day, as a matter of fact.  He was on my call

10   sheet.  He's the one who took me where I needed to

11   go.  He's the one I checked in with when I got

12   there.  Tony.

13        Q.   And do you recall how long you had been in

14   the room with Donald Trump before the butler came

15   in?

16        A.   Just a few minutes.

17        Q.   And did you see the butler have any

18   reaction to what Donald Trump was doing?

19        A.   Yes, I did.

20        Q.   And how would you describe that?

21        A.   Well, all I know is that when I looked at

22   his face, to me he had the look on his face like

23   thank God I got in here, like he's done this before,

24   like he knew that he saw a shut door and he had to

25   get in there.  That's my perception of his
```

Page 38

```
 1                    NATASHA STOYNOFF
 2    there a particular piece of the video you're
 3    referring to?
 4         A.  Lying about never groping or kissing women
 5    without their consent and how he had the utmost
 6    respect for women.
 7         Q.  You consider what he did to you lying and
 8    groping women without their consent?
 9         A.  I consider that he lied about kissing and
10    groping me without consent.
11         Q.  You testified previously that you decided
12    to write your essay after this presidential debate;
13    is that correct?
14         A.  Yes.
15         Q.  And just in general, what did that process
16    look like?
17         A.  The writing process?
18         Q.  Yes.
19         A.  So after the debate my editor knew I was
20    waiting to see what he would say at the debate
21    because I felt if he came clean or apologized to
22    women -- the women, I wouldn't do anything.
23    Obviously he did not do that.  So I said to the
24    editor, all right, we can -- I'll write something.
25    And I wrote a draft and I think it went back and
```

Page 39

1               NATASHA STOYNOFF

2    forth once or twice with this one editor and we held

3    it a little bit.  I was still unsure, you know, they

4    were waiting for me to give the final okay, and then

5    when I saw Jessica give her interview -- Jessica's

6    New York Times interview, it gave me strength to say

7    to my editor, okay, let's go ahead.

8          Q.  By "Jessica" are you referring to Jessica

9    Leeds?

10         A.  Yes.

11         Q.  After People published your article, did

12   Donald Trump respond?

13         A.  Yes.

14         Q.  Do you recall what he said?

15         A.  Well, he and/or his people sent a statement

16   denying it, I believe, and then he, himself at a

17   rally, which I think was maybe the next day, I'm not

18   exactly sure the date, said -- mentioned the

19   reporter and he told his people at the rally look at

20   her, go take a look at her.  I can't remember

21   exactly what he said, but he disparaged me.  He also

22   tweeted about it, which I didn't see at the time but

23   I saw later.  Why didn't that People Magazine

24   reporter come out at the time about it is what he

25   said in his tweet.

# EXHIBIT 5

Page 1

1                    JESSICA LEEDS

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4   -----------------------------------     )

5   E. JEAN CARROLL,                        )

6                    Plaintiff,             ) Case No.

7           vs.                             ) 20-Civ-7311

8   DONALD J. TRUMP, in his personal capacity) (LAK)(JLC)

9                    Defendants.            )

10  -----------------------------------     )

11

12

13              DEPOSITION OF JESSICA LEEDS

14                 NEW YORK, NEW YORK

15                 OCTOBER 13, 2022

16

17

18

19

20

21

22

23

24  REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25  JOB NO. 218341

Page 17

```
 1                    JESSICA LEEDS

 2   Trump?

 3        A.   Yes.

 4        Q.   When was that?

 5        A.   Well, the first time I met him was on an

 6   airplane coming back from I believe Dallas, it was a

 7   Brandiff flight.  I was asked by the stewardess -- I

 8   was flying coach.  I was asked by the stewardess if

 9   I would like to come up and sit in first class.

10   Well, Brandiff had great meals.  Absolutely, I went

11   up to first class, and it was the first seat behind

12   the bulkhead.  And there was a gentleman sitting at

13   the window seat and he introduced himself, and we

14   shook hands and we chatted for a while.  He

15   introduced himself as Donald Trump.

16        Q.   And do you recall where you were traveling

17   on this flight?

18        A.   I was coming into New York, to Laguardia

19   because that's where my car was.

20        Q.   Okay.  And do you recall what year this

21   took place?

22        A.   I think it was '79.

23        Q.   Okay.  And you testified that the man

24   sitting in the window seat introduced himself as

25   Donald Trump.  Were you familiar with Donald Trump
```

Page 18

```
 1                    JESSICA LEEDS

 2   at the time?

 3        A.  Not at that time.  I was living in

 4   Connecticut -- flying out of the New York airports,

 5   but living in Connecticut and was totally unaware of

 6   Trump and his goings and comings.

 7        Q.  And what happened after Donald Trump

 8   introduced himself?

 9        A.  We had the meal and then it was cleared,

10   and then after the meal he suddenly turned and

11   started assaulting me.

12        Q.  Just before we get to that, what happened

13   while you were eating?

14        A.  Nothing.  We ate.

15        Q.  Did you speak?

16        A.  No.  We were eating.

17        Q.  Okay.

18        A.  We chatted before the meal was served.

19   There was some conversation before the meal was

20   served, but after that I don't remember any

21   conversation during the meal.

22        Q.  Do you recall what you chatted about?

23        A.  No.

24        Q.  So you testified that after the meal was

25   cleared he started assaulting you.  What did you
```

Page 19

                          JESSICA LEEDS

1       mean by that?

2            A.   Well, he was with his hands grabbing me,

3       trying to kiss me, grabbing my breasts, pulling me

4       towards him, pulling himself on to me.  It was kind

5       of a struggle going on.  Part of my brain was

6       wondering why the people in the back -- in the seat

7       behind me weren't noticing that the seat was

8       jiggling around and why wasn't the guy that was

9       sitting across the aisle saying something or where

10      in hell was the stewardess.  That went on for what

11      seemed like a terribly long time, but it probably

12      was just a few seconds.

13                It was when he started putting his hand up

14      my skirt that I realized that nobody was going to

15      save me but me, and I was on the aisle, I managed to

16      wheel my way out of the chair, and grabbed my purse

17      and I went back to my seat in the back.

18           Q.   And did Donald Trump say anything while

19      this was happening?

20           A.   Not a word.  There was never any sound that

21      I can recall.

22           Q.   Did you say anything while this was

23      happening?

24           A.   Nope.

Page 22

```
 1                    JESSICA LEEDS
 2   me would I man the table that distributed the chits
 3   for the people to go to their table.
 4            So I'm at Saks 5th Avenue, I'm all dolled
 5   up, it's one of these sparkly evenings.  I get to
 6   meet Bill Blass and Oscar De Le Renta and Mary
 7   McFadden who recognized her address.  It was just
 8   magical.  And up comes Trump with his wife, who is
 9   hugely pregnant, and I'm thinking I remember you,
10   but I didn't say anything.  I just handed him his
11   chit.  And he looked at me and he said "I remember
12   you, you're the cunt from the airplane."  It was
13   like a bucket of cold water had been poured over me,
14   and it was like the room suddenly cleared and I was
15   all by myself and he went on.  I left very shortly
16   after that.
17            All right.  That's 1981, '80, '81.  So I
18   watch Trump in the news, and in the years prior to
19   2016 he makes noises that he's going to run for
20   President.  I don't take him seriously, but when it
21   becomes apparent that he's going to run for
22   President I started telling -- well, I started off
23   telling my children because I have a Republican son
24   and my book club, my neighbors, anybody who would be
25   patient and listen to my stories, you know, we don't
```

Page 27

```
 1                    JESSICA LEEDS
 2   and news media people who did interviews for me, and
 3   then it was -- then it calmed down.
 4        Q.  And were you ever paid for any of your
 5   interviews?
 6        A.  No.
 7        Q.  Did Donald Trump ever respond to your
 8   story?
 9        A.  As I recall, he made the remark that I was
10   not his type, and, of course, he was also looking at
11   a picture of a 78-year-old woman and in his mind he
12   would never make a pass at somebody that old.
13        Q.  And do you recall anything else from what
14   he said about you?
15        A.  Not really.
16        Q.  And did anyone from Donald Trump's
17   presidential campaign ever reach out to you about
18   what you had said?
19        A.  I got a report from a reporter that he was
20   going to sue me, but I never heard anything from any
21   Trump representative.
22        Q.  And do you recall ever being accused of
23   fabricating a story as part of a conspiracy with the
24   Democratic party?
25        A.  No.
```

# EXHIBIT 6

Page 1

1

2            UNITED STATES DISTRICT COURT

3            SOUTHERN DISTRICT OF NEW YORK

4

5   E. JEAN CARROLL,            )
              Plaintiff,        )
6                               )
          -against-            )20-cv-7311(LAK)
7                               )
    DONALD J. TRUMP, in his    )
8   personal capacity,         )
              Defendant.        )
9   _____    )

10

11

12            ***CONFIDENTIAL***

13        VIDEOTAPED DEPOSITION OF

14            E. JEAN CARROLL

15          New York, New York

16        Friday, October 14, 2022

17

18

19

20   Reported By:

21   CATHI IRISH, RPR, CRR, CLVS

22

23

24

25

Page 123

```
 1              CARROLL - CONFIDENTIAL
 2    BY MS. HABBA:
 3         Q.    Okay.  So what happened?
 4         A.    Pulled them down.
 5         Q.    And then what happened?
 6         A.    And then I felt his fingers
 7    rummaging around my vagina and this huge
 8    weight against me.  My head hurt, this
 9    huge weight, I'm in a situation where I
10    can't -- I can't -- at one point I
11    remember saying this is Donald Trump, what
12    the heck is going on?  And then I felt his
13    penis inside of me.
14         Q.    So sorry to get into details
15    but --
16         A.    No, I understand.
17         Q.    If you're against the wall, it
18    was his right shoulder that you are
19    describing was pushing into you?
20         A.    Left, I think.
21         Q.    His left shoulder, sorry, because
22    you did touch your left side so I assumed
23    it was the right.  So it was his left
24    shoulder and he used his right hand?
25         A.    I don't know.  I couldn't see his
```

A-158

# EXHIBIT 7

A-159

Message
_____

| | |
|---|---|
| **From:** | Daniel Bucheli [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9CC9507C55244B1A970B4A290A18B866-DBUCHELI] |
| **Sent:** | 7/8/2019 3:16:24 PM |
| **To:** | Tim Murtaugh [tmurtaugh@donaldtrump.com]; Erin Perrine [eperrine@donaldtrump.com]; Sarah Matthews [smatthews@donaldtrump.com]; Kayleigh McEnany [kmcenany@donaldtrump.com] |
| **Subject:** | Women questions.EP1 |
| **Attachments:** | Women questions.EP1.docx |

Doc w/Tim's + Erin's requested edits.

Daniel

EXHIBIT

PENGAD 800-631-6989

DJT 33
10·19·22

1. ~~Twenty-four~~ Twenty-four women have accused President Trump of sexual misconduct. Most recently, Trump said he didn't engage in the alleged behavior with a certain woman because she was "not his type." Do you believe them? Do you take concern with the President saying he wouldn't assault a woman because of her looks?

~~The people of this country, in a decisive election, supported President Trump, and we feel like these allegations have been answered through that process. While sexual~~ Sexual assault claims should be taken seriously ~~but~~, false accusations diminish the severity of real assault. As for E. Jean Carroll, this is a ~~completely false~~completely false and President Trump himself has said this ~~never happened. It's~~ and unrealistic story surfacing 25 years after allegedly taking place and was created simply to make the President look bad. ~~It's really disheartening the attacks people make against President Trump. It's a real low in American discourse. She's trying to sell a book. If that gives you any indication of her motivation.~~

2. How can you work for someone who has publicly defended people accused of sexual harassment?

I work for the campaign to re-elect the President of the United States, whom has delivered on his promises of a stronger economy, bringing back manufacturing jobs, rebuilding our military, among many other achievements. ~~I work for a President who puts America first, who is putting the forgotten men and women of this country first, and who hasn't backed down from any challenge in his pursuit to keep moving American forward. Everything else is just political noise to me. There are many in this town, and in the media, that would love to relitigate the 2016 election because it didn't fit their narrative, but that is something I am not going to do. Instead, let us highlight his irrefutable successes with our economy, our military, and our international relations.~~

3. Why would you work for someone who has been accused of not only harassing women, but has also been caught on tape making sexual grabbing references? [Access Hollywood Tape]?

The President has acknowledged the references made on the Access Hollywood Tape were ~~inappropriate~~wrong ~~and we are not going to relitigate it___. h~~He has apologized and I as a woman have accepted it. ~~I don't like hearing such "locker room talk" among my friends or family —much less at the workplace.~~

4. The President has a history of making misogynistic and offensive comments about women (fat pigs, dogs, slobs, nasty woman, etc.). Do you support this?

This President doesn't use a politician's filter. When the President is attacked, he will punch back 10 times harder. While some may not agree with his strong personality, when they look at what he has done for this country his record of success is undeniable.

5. What are your thoughts on the President paying adult film actress Stormy Daniels $130,000 in hush money to keep her quiet about an affair she had with him prior to the 2016 election? Aren't you morally opposed to paying hush money?

Let's remember the facts here – Stormy Daniels said she signed false statements and said she told a mistruth to the public. She has no credibility. Again, the media seems a bit obsessed with trying to take President Trump down. I am not going to re-litigate the 2016 election, much less what someone did as a private person before they were a public figure. I think time has given the President reason and the American people can decide for themselves what they think about Ms. Daniels and company.

What I can tell you is that the President has set a standard of excellence among his 2020 team, and I am proud to be part of such great talented team of professionals.

6. **What do people say to you when you tell them you are working to reelect the President? [Follow-up] Why are you working here?**

I explain to them what the job entails and why it is I chose to take on this job. My main reason for accepting this position is because I believe in the President, I believe in his bold vision for our country, and most importantly because I really believe the 2020 election will be a battle for the soul of our nation. I am humbled every day to be able to come to work with some of the most talented people in the business, all of whom share the President's vision of a better tomorrow for our nation. I truly believe that everyone on our team, to include~~including~~ the President, could be elsewhere working in a different role elsewhere and under less scrutiny~~something less stressful, under less scrutiny and for far more money~~ – yet we don't because we believe in our mission of helping better this country through the President's agenda.

7. **Even after Brett Kavanaugh was accused of sexual assault, President Trump stuck by his nominee for the Supreme Court. What was your reaction to this?**

We fortunately live in a country where you are innocent until proven guilty, not the other way around. What was done to now Justice Kavanaugh was not only unacceptable, but we believe the American people saw it for what it was… politic~~al showmanship~~ at its worst. It's unfortunate that ~~someone with~~ a good man like Justice Kavanaugh with a prestigious legal background ~~and with a lovely family~~ had to endure ~~what they did~~that kind of anger, but the President never wavered on supporting him, because he fully backs those who support ~~and are loyal to him~~. Loyalty in politics is the most precious currency, and this President at times has been faulted for being too loyal to those who don't reciprocate. We are proud to stand by this President.

8. **Recently, states like Alabama have passed very restrictive abortion laws. What do you say to critics who think the President is denying women access to a basic health care need?**

There is no doubt that the President protects life and ~~has made no secret of such~~has a record to back that up. ~~He does however believe in certain situations (rape, incest, medical reasons) were exceptions are necessary.~~ He has stated that he thinks the Alabama law went a step too far, ~~but~~ he nevertheless is a believer in protecting life and the sanctity of such. President Trump believes in the sanctity of life and protecting it. He does however believe in certain situations ~~(rape, incest, medical reasons) were exemptions are necessary.~~

Confidential

MP-007963

Democrats have moved the abortion conversation so far to the left they are teetering on the edge of infanticide and celebrate that. What happened to the Democrat party of "rare, safe, and legal?"

9. **Do you believe women should have a choice over their body?**

I, myself, am pro-life. I support protecting all human life from conception as do millions of Americans across this country. ~~Democrats, however, are now supporting radical ideas like infanticide or taxpayer funded abortions.~~ I'm proud to work for a President who protects life and defend the rights of those who can't yet defend themselves.

~~Democrats, however, are now supporting radical ideas like infanticide or taxpayer funded abortions.~~

~~11.~~10.   **Do you support the Trump Administration's policy of separating children from their parents at the border? [If you are a mother, what do you think of that?]**

Let's remember – these are Obama era laws on the books. These are Obama era immigration shelters. These are Obama era disasters that President Trump called out as candidate Trump and now he has made it the biggest topic of conversation in America. He has shined a light on a deeply flawed immigration system, but Democrats in Congress aren't willing to step up and have the tough discussion on how to fix it.

The Trump Administration believes in enforcing the rule of law, and if Congress doesn't like the laws, ~~let them rewrite them~~ they should follow President Trump's lead and try to make a difference in our broken immigration system. He has since day one stated that our immigration system is broken, and the situation with the children are just another example of why we need to reform this broken system.

~~12.~~11.   **Conditions at the border facilities have been reported to lack adequate food, water, and sanitation. What's your reaction to these conditions?**

Hundreds of thousands of people flooding our country's border overwhelms our legal system and our social safety nets. ~~America's ability to provide proper care while maintaining the rule of law~~ Democrats in Congress took over 90 days to provide supplemental funding to address humanitarian needs at the border. It's disgraceful.

Democrats are promising to decriminalize illegal immigration and are offering free healthcare and citizenship to anyone who makes it here. That open borders strategy only encourages more migrants to make the dangerous journey. They need to face the facts and come to the table to figure out a solution to the illegal immigration problem. ~~The President asked for months for billions of dollars in humanitarian aid to provide the necessary resources for these facilities, but Democrats only recently agreed to approve the funding.~~

~~13.~~12.   **School shootings continue to be a massive issue for our country, but the President hasn't acted. What do you say to critics? [If a mother, how does it make you feel?]**

MP-007964

Last year, the President signed the STOP School Violence Act into law, which provides grants to schools to improve safety. He also, unilaterally, banned bump stocks. President Trump has also stated his supports for legislation and reforms to strengthen strengthening background checks and signed FIX NICS into law to help fix some of the background check issues that could let firearms get into the wrong hands and law enforcement operations. It's no secret the President is a strong supporter of the second amendment, and law-abiding citizens should not be punished.

13. 13.     What do you think this President has done for women across the country? What has his presidency personally meant for you?

The President's policies have delivered for every demographic and especially for women. Under President Trump, the unemployment rate for women has reached historic lows with the rate falling to its lowest point in 65 years in April and over 3 million women have entered the workforce. This also falls under the President's 'American Working Families' portfolio, which is being led by Ivanka Trump to legislatively push for items like paid family leave, workforce development and vocational training.

As a woman, I'm proud to work for a President whose policies are empowering women and protecting families across this country.

15. 14.     How can you support/work for someone whose policies have negatively affected women not only across our country, but across the world?

I think if one you looks at what this administration has meant for women across the country and across the world, they will be pleasantly surprised. A stronger economy and the highest women participation in the workforce in our country's history means that women have not only been empowered to pursue their dreams, regardless of what those might be, but also have the necessary resources to do just that. As a woman I can say we care about the same things everyone else does – safe communities, being able to pay their bills, and the chance to get ahead. I can tell you from numerous women I know that this President has positively impacted their lives.

16. 15.     Do you think it's petty for the President to attack women either in person or via Twitter? Just recently it was Megan Rapinoe (soccer player) but going back to 2016 it was Rosie O'Donnell. Aren't you tired of it?

When someone hits this President, he hits back ten times harder. That is who he is. It doesn't matter if it is a man or woman and it shouldn't matter to you either. The President is his own communicator and the best advocate of his agenda this campaign has. It's no secret that he uses Twitter to take his message without filter directly to the American people, as we all know the mainstream media tends to "add" their commentary to the news. While many may not agree with his strong personality, when they look at what he has done in his policies, not to mention the economy, empowering women, and empowering parents school choices for their kids, many tend to side or at least agree with him.

Confidential

That honest and unvarnished approach is part of what Americans appreciate this President. He isn't willing to hide himself by some fake cover of political correctness.

17.16.      **If the culture of a campaign reflects on that of the moral character of the candidate, how would you categorize your workplace? Have you ever felt out of place because you are a woman?**

President Trump has a history of hiring and elevating women to high positions – both in business and in politics. The president wants to help empower women and there's no better example of that than the way he empowers the ones within his own campaign. The campaign has assembled a female forward staff with many women serving in highly public positions and female voices are crucial in our ideas and strategy.

18.17.      **Looking further than the campaign, how would you describe the culture in the GOP towards women? Has it improved or deteriorated under this President?**

I think the This is a culture of women empowerment in D.C. is in full swing. I mean when you When you take a look around the room and who is in some of the the highest places in levels of this administration government, corporations, lobbyists, and even RNC staff, the RNC you will see that women occupy many of these posts. The President himself even tapped a woman, tapped Chairwoman Ronna McDaniel, to lead the RNC.

I am a firm believer that those who work hard, achieve their goals and help others in the process are due to reach success – hard work pays off, regardless if they are men or women of gender. The President has further set the tone by surrounding himself by some of the most talented and dedicated professional women in the GOP, and GOP and was something he did long before he entered politics – just look at his businesses prior to being President.

19.18.      **The President could face off in 2020 against another woman. Don't you feel personally attacked when he 'punches back' on the trail/debates? Do you treat women like that?**

Regardless of who the President faces in 2020, it will be a stark comparison of visions between a proven and established list of success records by this President, versus radical, socialist ideals brought forward by the Democratic party. As we saw, the President will treat his opponent based on the ideas they bring to the table, and keep the conversation based on the merits of each proposal – for the benefit of the American people. As we saw in 2016, he is not afraid to "punch back" (regardless of whether the attacks come from a man/woman) when attacked, the only difference is that he does so from a position of strength already having already delivered for the American people for the past four years come 2020. We must not confuse attacking a policy with attacking a person.

20.19.      **Donald Trump has a history of his horrible treatment of women, from his pageant days days at the Miss Universe organization to his time on reality television. How does that translate to his campaign?**

MP-007966

It doesn't and everything you have just mentioned have been allegations — ~~none of which have ever been proven~~ all of which are false. The team the President has put together is a talented one, and none of us would put up ~~with such behavior regardless of who it comes from~~ with being mistreated. Everyone on our team is a true professional and know that when we walk through those doors we are representatives of the President's re-elections efforts and conduct ourselves in such manner. ~~Are there tough days? Sure, like in any other workplace. Does that equate to mistreatment of anyone? Never.~~

~~21.~~20.     **You've told me nothing but great things about being a woman, working on the campaign, and how everything is great.... There must be something you wish you could change, either about 1) The President or 2) the campaign, what would that be?**

First and foremost, we ~~are not here to change or alter~~ none of us want to change the President or the environment of this campaign. ~~'s success record and message, but to amplify it and make sure it reaches the most people as possible.~~ The President has been clear that his success is based on ~~how many Americans we can help~~ putting America first, and that is what I am doing here—it's our job to get that message out there. We are all part of a team, ~~and where we all offer our unique~~ are encouraged suggestions and talents to lead and engage and, ~~out at the end of the day it's the President and his agenda who is on the ticket and who we serve.~~ we serve at the pleasure of the President. ~~I also like to say that "selling" lower taxes, a rebuilt military, a booming economy and so many more successes we've witnessed under this President is the easiest job in the world, with the media and their bias being one of the biggest challenges we will face in 2020.~~

~~22.~~21.     **You say the President hires and elevates qualified people regardless of their gender, but how do you feel about the nepotism he has displayed in the hiring of his daughter Ivanka?**

It is sad, but not shocking that people choose to attack Ivanka Trump, a senior adviser to the president, when she is promoting U.S. efforts to empower women through strategic partnerships with world leaders. Ivanka is the driving force behind the White House's Global Women's Empowerment Initiative, which aims to help 50 million women in developing countries realize their economic potential by 2025 - something that should be celebrated. And let's be honest. Ivanka Trump gets this kind of criticism because of her last name. ~~If it was Chelsea Clinton working as an adviser to her mother, I doubt she would face the same criticism from the mainstream media.~~

~~23.~~22.     **Women are generally paid less than men in this country, but this President has done nothing to address the pay gap. In fact, President Trump attempted to stop an Obama-era rule, requiring big companies to disclose employee pay categories by gender, race and ethnicity, to the government. Do you think women deserve equal pay?**

Of course, I believe women deserve equal pay for equal work. ~~Ultimately, while I believe the intention of the Obama-era rule was good and agree that pay transparency is important, the proposed policy would not yield the intended results. That regulation would have imposed on~~

Confidential

~~incredible amount of burden with no utility.~~ Look, the President and what has been reflected in both his administration and campaign likes to have team members and judge them on their individual performance. If you see whom he has surrounded himself with on both the official and campaign side of things, you will see a diverse group of men, ~~women, and~~ and women with diverse backgrounds. At the end of the day all that matters ~~is~~ are: 'are we delivering for the American people the better tomorrow we promised them?'

~~24.~~23.         What about the latest allegation against the President by ~~E.~~ Jean Carroll that she was allegedly assaulted by the President in the mid-90's?

The President has been clear on this... it never happened. Every allegation of an assault by a woman should be taken seriously and investigated as it happens, but in this case its clear there are a lot of questions regarding this accusation. For one, it's been almost two decades, then there is a question of the timing (as she is pushing her book sales) and third, not a thread of proof or evidence has been presented. One must ask themselves, why now, what has changed? The Democrats are even leery about pursuing this, as the questions surrounding this case are many and not very much detail has been provided.

~~25. If Donald Trump did not exist, would you still be pushing a similar agenda by another candidate? Who would you like that other person to be?~~

~~Fortunately, he does exist and the agenda he is pushing at the end of the day is for the bettering of not only America, but for all Americans. I am proud to be part of this team, work with some of the most talented people in the business and help in a small way, my country. There are a lot of ways to serve your country, this is just one more~~ ~~way~~ of doing just that.

~~27.~~24.         There are some powerful women in the campaign who seem to capture all the 'glam light,' while others are never seen or heard from. Do you feel the President shows favoritism towards some over others? How does that make you feel?

~~There is no one on this team who is doing this for the "glam light." We are doing this to serve our country.~~ / We are all on a team, and regardless of what positions ~~or "glam light" we get,~~ we all have one goal: re-elect the President of the United States and reassure a continuation of successful policies for the American people like low unemployment, higher wages, low taxes, ~~etc. We all work as a team and have different talents and networks we bring to the table in support of the President~~ and more.

Confidential

A-167

# EXHIBIT 8

A-168

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff,*<br><br><br>v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>*Defendant.* | No. 20 Civ. 7311 (LAK) (JLC) |

**EXPERT REPORT OF PROFESSOR ASHLEE HUMPHREYS, PHD**

October 14, 2022

**A-169**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I. INTRODUCTION ......................................................................................... 1

   A. Qualifications ...................................................................................... 1

   B. Assignment ......................................................................................... 2

   C. Summary of Opinions ........................................................................ 3

II. CASE BACKGROUND ............................................................................... 6

   A. The Parties ......................................................................................... 6

      i. E. Jean Carroll .............................................................................. 6

      ii. Donald J. Trump ......................................................................... 6

   B. Allegedly Defamatory Statements ..................................................... 8

III. THEORETICAL BACKGROUND ............................................................ 11

   A. Reputation and Reputational Damage ............................................... 11

      i. Reputational Repair .................................................................... 12

      ii. Person Brands and Brand Value ................................................. 13

   B. Reputational Damage in a Complex Media System .......................... 15

      i. The Media System ...................................................................... 15

      ii. Social Media Impressions .......................................................... 17

      iii. Traditional Media Impressions .................................................. 21

   C. Assessing Damages for Defamation Online: Adapting Traditional Approaches to the Sphere of Social Media ........................................ 22

      i. Rectifying Harm to Reputation Online ...................................... 22

   D. Media Exposure and Counter-Attitudinal Attitude Change ............. 24

IV. IMPRESSIONS MODEL ........................................................................... 26

   A. Web Impressions ............................................................................... 26

   B. Social Media Impressions .................................................................. 27

   C. Television Impressions ...................................................................... 31

   D. Print Impressions ............................................................................... 33

   E. Total Impressions .............................................................................. 34

      i. Other Impressions Not Calculated into Model .......................... 35

Expert Report of Professor Humphreys

A-170

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

V.   IMPACT ASSESSMENT ................................................................ 40

   A. Qualitative Impact Assessment ................................................ 41

      i.   Reception to Ms. Carroll's Professional Work ...................... 42

      ii.   Elle's Readership ................................................................ 44

      iii.   Search Interest ................................................................... 46

      iv.   Engagement Analysis ......................................................... 49

   B. Quantitative Impact Assessment ............................................. 58

      i.   Readership Analysis ........................................................... 59

VI.   MODELING THE COSTS FOR REPUTATION REPAIR IN SOCIAL MEDIA.... 64

   A. Modeling Reputation Repair on Social Media ......................... 64

      i.   Campaign Goals, Platforms, and Measurements ................. 65

      ii.   Media Mix .......................................................................... 66

      iii.   Attitude Change Multiplier ................................................. 68

      iv.   Potential Overlap in Impressions ....................................... 69

   B. Costs of the Corrective Campaign ........................................... 70

VII.   CONCLUSION ......................................................................... 72

APPENDIX A.   PROFESSOR HUMPHREYS' CV AND PRIOR TESTIMONY ............. 74

APPENDIX B.   MATERIALS CONSIDERED ..................................................... 75

APPENDIX C.   GLOSSARY OF TERMS ........................................................... 87

APPENDIX D.   WEB IMPRESSIONS MODEL .................................................... 90

APPENDIX E.   SOCIAL MEDIA IMPRESSIONS MODEL ................................. 100

APPENDIX F.   TV IMPRESSIONS MODEL ..................................................... 105

APPENDIX G.   PRINT IMPRESSIONS MODEL ............................................... 115

APPENDIX H.   EXAMPLES OF NEGATIVE COMMENTS AND POSTS ABOUT MS CARROLL ............................................................................ 116

APPENDIX I.   EXAMPLES OF DIRECT MESSAGES AND EMAILS TO MS. CARROLL ............................................................................ 117

APPENDIX J.   IMPACT MODEL ................................................................... 118

APPENDIX K.   DAMAGES MODEL ............................................................... 126

APPENDIX L.   LIST OF CONSERVATIVE STEPS TAKEN ............................... 133

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## I.  INTRODUCTION

### A.  Qualifications

I am a Professor of Integrated Marketing Communications at Medill School of Journalism and Professor of Marketing at the Kellogg School of Management, Northwestern University. I hold a Doctorate in Marketing from the Kellogg School of Management with a concentration in Cultural Sociology and a Bachelor of Arts degree in Economics and Philosophy from Northwestern University.

I have been on the faculty at Northwestern University for 14 years, regularly teaching classes on Social Media, Consumer Research, and Marketing Research. I instruct students on both the strategic and analytical tasks of Marketing, which include assessing the impact of social media campaigns and strategically directing a portfolio of social media tools to pursue managerial goals involving persuasion, advertising, market growth, and branding.

My current research focuses on social media and online communities. I am the author of *Social Media: Enduring Principles* (Oxford University Press, 2016), a review and synthesis of the empirical social science research on social media. My research on social media includes a project looking at the development of norms and institutions on social media platforms like Wikipedia and YouTube. I also have conducted recent research in the area of online search and search engine optimization, including a project in which I use text analysis to identify consumer goals that, when matched, can optimize advertising spending and increase click-through rates. In this work, I have developed and refined the method of automated text analysis, which I use to analyze textual data—a method I helped introduce to Marketing.

**A-172**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

My broader research agenda concerns the role of institutions in markets. My dissertation research examined how markets are created through shifts in social structure using the case of casino gambling in America. This research ("Megamarketing: The Creation of Markets as a Social Process, *Journal of Marketing*, 2010) was selected as a lead article in the *Journal of Marketing*.

I have received several accolades for my research. I was runner up for the Maynard Award for best paper in Marketing. I have also won the Sidney J. Levy award in 2010 for the contribution of my dissertation research to Consumer Culture Theory. In addition, I was named an MSI Young Scholar in 2012 and have been selected as an MSI Scholar in 2020, one of a select group of 35 Marketing Scholars who are counted "amongst the most prominent marketing scholars in the world," according to Barbara Kahn, MSI's Executive Director.

My full CV and list of matters in which I have testified is attached as Appendix A.

**B. Assignment**

I was engaged by Kaplan Heckler & Fink LLP on behalf of E. Jean Carroll to create an analytic model to (1) estimate the number of impressions for the allegedly defamatory statements ("Statements") that were made by Donald Trump on June 21, 22, and 24, 2019, and circulated on social and traditional media ("Impressions Model"), (2) analyze the impact, if any, of these Statements by estimating the percentage of people who may have been receptive to these Statements and assess the damage to Ms. Carroll's reputation and person brand ("Impact Model"), and (3) provide a model to estimate costs for reputational repair based on the impact of those impressions ("Damages Model") on behalf of Ms. Carroll in connection with the above-

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

captioned case.[1, 2]

The analysis detailed in this report provides an estimate of the impressions across social and traditional media channels and their reputational impact in order to assess reputational harm based on the information provided to me by Counsel and my independent research. Specifically, it takes into account the multi-channel dissemination of the Statements across social media like Twitter, traditional media like the *New York Times* and CNN, and websites like the *Huffington Post* and the *Washington Examiner*.

My analysis is presented as of October 14, 2022. On October 12, 2022, Mr. Trump made a new statement regarding Ms. Carroll, reiterating many of the defamatory claims against Ms. Carroll.[3] Given the recency of this statement, and that the extent of its dissemination is not yet known, it has not been incorporated into the models used to calculate damages to Ms. Carroll's reputation. I reserve the right to amend or supplement my opinions in consideration of this new information or if other new information becomes available to me.

### C. Summary of Opinions

After reviewing the data provided in this case, performing independent research and analysis, and based on my own professional background, prior research, education, and more

---

[1] I was assisted in the preparation of this report by a team of research assistants at Voluble Insights, whom I supervised. Throughout my report, I use the word "I" to refer to work conducted by myself or work Voluble implemented under my direction.

[2] For the purposes of writing this report, I am being compensated at a rate of $600 per hour, subject to a 15 percent discount. I will be compensated at a rate of $1,000 per hour for deposition testimony, and at a rate of $1,000 per hour for trial testimony, subject to the same 15 percent discount. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in this report or subsequent testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

[3] https://truthsocial.com/@realDonaldTrump/posts/109158644496040450;
https://truthsocial.com/@realDonaldTrump/posts/109158586745522514.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

than a decade of experience in the field of digital communication and marketing, I conclude the

following with a reasonable degree of certainty:

A. Person brands are well-known people who also possess a set of brand meanings and associations that have value. Person brands are formed through exposure in a media system. They have social and cultural capital and can become devalued when an unpredictable event occurs, or if a negative claim is made about the person. A person brand that has a general popular following can be especially harmed by negative claims, even if only a subset of the public believes the claims. Their reputation relies on a "generalized perception" among the public, and public opinions and individual beliefs can shift when people take cues from their surroundings, including what they learn in the media. The damage to a person brand can be severe and lasting, no matter if the person at issue is at fault or whether their primary followers believe the claims.

B. Once a popular advice columnist at *Elle* Magazine, Ms. Carroll had invested many years in forming and maintaining a person brand as a wise, personable, and insightful truth-seeker. As a celebrated writer, she had a broad readership, reaching about 4.5 million *Elle* readers.

C. Mr. Trump made the at-issue Statements on June 21, 22, and 24, 2019, about Ms. Carroll in response to her allegation that Mr. Trump had sexually assaulted her in the mid-1990s in the dressing room of a Bergdorf Goodman department store in New York City. These Statements made by Mr. Trump, an extraordinarily high-profile person, have received wide and sustained dissemination and media coverage.

D. A measure of the dissemination of the Statements is possible using an information cascade model to estimate impressions on social media and with ratings, circulation, and web traffic data to estimate impressions on traditional media. I have identified between **142,334,424 and 188,155,507 impressions** generated by Mr. Trump's Statements ("Impressions Model"). This very high number of impressions reflects the prominence of Mr. Trump, but nonetheless is a conservative estimate for the reasons I detail in the description of the Impressions Model.

E. The impressions Mr. Trump's Statements generated across online and traditional media impacted Ms. Carroll's person brand. It is possible to quantify some, but not all, of the negative impact. Through a qualitative analysis of media coverage, search trends, and comments about Ms. Carroll, it is clear that there was a significant shift in the nature of Ms. Carroll's person brand. Associations with her shifted from her role as an advice columnist to her association with Mr. Trump. A high volume of negative and vicious messages has continued to be posted up to the present, indicating that her person brand has been, and continues to be harmed.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

F.   In an attempt to quantify at least a portion of the impact these Statements had on Ms.
Carroll's brand, I applied academic research and industry estimates related to audience
composition to estimate that, of the impressions collected, an average of 25.45% of the
impression recipients were likely receptive to Mr. Trump's message, resulting in an
estimated range of **34,075,512 to 42,936,354 receptive impressions** that should be
corrected (*i.e.,* impressions that may have been received by those who likely found those
Statements credible; "Impact Model").

G.   The utterance and circulation of Mr. Trump's Statements caused short- and long-term
harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand
with the general public and specific perceptions amongst a group of people receptive to
the claims. Ms. Carroll's reputational value has been diminished due to the Statements.
This kind of reputational harm has long-lasting effect on her ability to capitalize on her
person brand in the future because Ms. Carroll has lost control of her brand, which she
worked for decades to develop.

H.   A holistic, integrated campaign is needed to effectively create attitudinal change and in
turn repair reputational damage. In such a campaign, the corrective message would need
to come from a trusted source and would need to ensure that the audience is exposed to
the message multiple times. For example, one such solution to reputation repair is to
enlist the help of multiple online intermediaries and sources that consumers trust. The
campaign would need to take into account where the target audience gets their news.
Using my estimates for the quantifiable impact of Mr. Trump's Statements (*i.e.,* the
**34,075,512 to 42,936,354** receptive impressions that should be corrected) and research
related to exposures required and media considerations costs, I estimate that the cost to
counteract the impact of the defamatory claims is between **$3,333,058.72 and
$20,998,861.18** ("Damages Model"). Given the above-stated needs of the campaign, I
believe the minimum appropriate corrective campaign to run would be the middle range,
from $9,999,176.17 to $12,599,316.71.

I.   My estimates of the impressions generated by the Statements, the quantification of the
receptive impressions, and the costs of the corrective campaign are all conservative.
Among other things, I consider only a subset of the impressions generated by Mr.
Trump's Statements and do not attempt quantify the significant impact of Mr. Trump's
status as then-President. Therefore, I undercount the receptive impressions and the costs
needed to correct the receptive impressions.

   The materials I considered are noted in this report, provided as appendices or native files,

and/or listed in Appendix B. A glossary of technical terms used throughout my report can be

found in Appendix C.

**A-176**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## II.  CASE BACKGROUND

### A.  The Parties

#### i.    E. Jean Carroll

Elizabeth Jean (E. Jean) Carroll is a journalist, author, former writer for *Saturday Night Live*, and former advice columnist for *Elle* Magazine.[4]  Ms. Carroll wrote for *Saturday Night Live* in the 1980s and hosted her own show called *Ask E. Jean* on MSNBC's predecessor, America's Talking, from 1994 to 1996.[5]  Her work was featured in numerous major publications including *Rolling Stone*, *GQ*, and *Playboy*. Ms. Carroll's column for *Elle* Magazine, "Ask E. Jean," was at the time it was published, the longest running advice column in the United States.[6]

Ms. Carroll is also the author of numerous books including *Female Difficulties: Sorority Sisters*, *Rodeo Queens*, *Frigid Women*, *Smut Stars*, *and Other Modern Girls*, *Hunter: The Strange and Savage Life of Hunter S. Thompson*, *A Dog in Heat Is a Hot Dog and Other Rules to Live By*, *Mr. Right, Right Now*, and *What Do We Need Men For?: A Modest Proposal*.[7]

#### ii.    Donald J. Trump

Donald John Trump is an American businessman, media personality, and politician who served as the 45th president of the United States from 2017 to 2021.[8]  He was a real estate developer who owned and/or had his name on numerous hotels, casinos, golf courses, and other buildings in New York and around the world.[9]  In 2004, Mr. Trump starred in "The Apprentice"

---

[4]    https://www.elle.com/author/4913/e-jean/
[5]    https://www.usatoday.com/story/money/2019/07/03/e-jean-carroll-new-york-circuit-donald-trump-assault-accusation/1584135001/
[6]    https://www.amazon.com/E-Jean-Carroll/e/B000AP7CJM
[7]    https://www.goodreads.com/author/show/30738.E_Jean_Carroll
[8]    https://www.britannica.com/biography/Donald-Trump
[9]    https://www.britannica.com/biography/Donald-Trump

A-177

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(later known as "The Celebrity Apprentice"), a reality television competition series where he judged aspiring business people based on his business experience.[10] He hosted for 14 seasons until 2015.[11]

In July 2016, Mr. Trump was nominated as the Republican presidential candidate and ultimately won the 2016 U.S. presidential election.[12] Throughout his time as president, Mr. Trump enjoyed significant support from Republican voters, with an average of 87% of Republicans saying they approved his handling of the job from 2017 through 2020.[13] After serving one term as president, Mr. Trump lost his bid for re-election and officially left the White House in January 2021.[14]

Since leaving office, there have been a number of investigations into Mr. Trump, his business dealings, and his handling of classified information.[15] Despite these investigations, polls show that support for Mr. Trump has remained consistent. Polls tracked by FiveThirtyEight show that Mr. Trumps maintained a favorability rating of around 40% from February 2021 through October 2022.[16] Favorability among Republican voters is even higher. A September 2022 New York Times-Siena College poll found that 90% of Republican respondents had either a very favorable or somewhat favorable impression of Mr. Trump.[17] Further, the same poll found

---

[10]   https://www.nytimes.com/2020/09/28/arts/television/trump-taxes-apprentice.html
[11]   https://www.cbsnews.com/news/donald-trump-officially-fired-from-the-celebrity-apprentice/
[12]   https://www.cnn.com/2016/07/19/politics/donald-trump-republican-nomination-2016-election
[13]   https://www.pewresearch.org/fact-tank/2020/08/24/trumps-approval-ratings-so-far-are-unusually-stable-and-deeply-partisan/
[14]   https://time.com/5907973/donald-trump-loses-2020-election/;
       https://www.nytimes.com/2021/01/20/us/politics/biden-president.html
[15]   https://time.com/6212677/donald-trump-investigations-explained/
[16]   https://projects.fivethirtyeight.com/polls/favorability/donald-trump/
[17]   https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html

Expert Report of Professor Humphreys                                              7

A-178

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

that 91% of Republican respondents indicated they would vote for Mr. Trump, assuming he were the Republican nominee and President Biden were the Democratic nominee in the 2024 election.[18] In an August 2022 Ipsos poll, 59% of Republicans indicated that Mr. Trump should be the Republican party nominee for the 2024 election.[19]

### B. Allegedly Defamatory Statements

Mr. Trump made a series of three Statements in which he made allegedly defamatory claims about Ms. Carroll.[20] These Statements were made in response to the allegation by Ms. Carroll in an excerpt from her forthcoming book that Mr. Trump sexually assaulted her in the mid-1990s in the dressing room of a Bergdorf Goodman department store in New York City.[21]

The first of the three Statements was released by Mr. Trump on June 21, 2019:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

> "Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

> "Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident,

---

[18]   https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html
[19]   https://www.ipsos.com/en-us/news-polls/Republican-voters-continue-to-view-Trump-as-the-partys-leader
[20]   Throughout this report, when I use the phrase "defamatory statements," I mean "allegedly defamatory statements" and am basing my opinion on the assumption that these statements are defamatory.
[21]   https://www.cnbc.com/2019/06/21/e-jean-carroll-says-donald-trump-sexually-assaulted-her.html

A-179

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[22]

The second Statement was made to reporters at the White House on June 22:

[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But

---

[22]    Complaint, ¶82

Expert Report of Professor Humphreys                                                    9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.[23]

The final Statement was published in an interview with *The Hill* on June 24, 2019: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[24]

I understand that these three Statements contained several allegedly defamatory claims about Ms. Carroll, including: (1) that Mr. Trump did not rape Ms. Carroll, (2) that he had never met Ms. Carroll, (3) that he had no idea who Ms. Carroll was, (4) that she had made up the allegation to increase the sales of her book, (5) that she made up the allegation to carry out a political agenda, (6) that she made up the allegation as part of a conspiracy against him by the Democratic Party, (7) that she had falsely accused other men of sexual assault, and (8) that she had been paid money to invent the rape accusation against him.[25]

As discussed below, these three Statements received widespread circulation across print,

---

[23]    Complaint, ¶¶ 91
[24]    Complaint, ¶97
[25]    Complaint, ¶¶81-100

Expert Report of Professor Humphreys                    10

**A-181**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

web, social, and traditional media outlets and directly impacted Ms. Carroll's brand.

## III. THEORETICAL BACKGROUND

### A. Reputation and Reputational Damage

Reputation is fundamentally a social concept; one's reputation is determined by the social esteem held among a bounded group of people, up to and including the public sphere at large.[26] It has value in the sense that it gives someone social standing and respect in society. Reputation has been conceptualized as property—something that has economic value—and as dignity—something that has moral value.[27]

Reputation is determined in the sphere of generalized public opinion, which encompasses individual beliefs but is more than the sum of them, a "generalized perception."[28] What people think their friends, family, coworkers, and other members of their community think is an important determinate of an individual's belief, particularly if one does not have strong opinions about an issue or person. Over time, the beliefs of a subset of society, including what is represented in the media, can shift in public opinion and generalized associations as people take cues from those around them who believe differently.[29] If someone is receptive to a claim—if it is congruent with their other beliefs and/or if the claim comes from a source they trust—they

---

[26]   Weber, Max (1922/1978), *Economy and Society: An Outline of Interpretive Sociology*, Vol. 2: University of California Press.

[27]   Ardia, David S. (2010) "Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law," *Harvard Civil Rights-Civil Liberties Law Review*, 45(2), 261-328, p. 261.

[28]   Weber, Max (1922/1978), *Economy and Society: An Outline of Interpretive Sociology*, Vol. 2: University of California Press. Sharman, Jason C. (2007) "Rationalist and constructivist perspectives on reputation." *Political Studies* 55, no. 1: 20-37.

[29]   Dewenter, Ralf, Melissa Linder, and Tobias Thomas (2019), "Can Media Drive the Electorate? The Impact of Media Coverage on Voting Intentions," *European Journal of Political Economy*, 58, 245-61. Huang, J., *et al.* (2021). "Large-scale quantitative evidence of media impact on public opinion toward China," *Humanities and Social Sciences Communications,* 8(1), 1-8.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

may only need to be exposed to it once to form a belief.[30] If they are less receptive to the claim,

mere exposure, again from a trusted source, can eventually change attitudes through repetition.[31]

An individual's receptivity to a claim is based on the process through which people process new

information, form beliefs, and integrate beliefs with prior knowledge.[32] According to the balance

theory of attitudes,[33] when people do not have a belief about a person, it is relatively easy to

create a belief, particularly when it is congruent with their other beliefs.[34] However, once people

have a belief, it is harder to change that belief and requires multiple exposures, often from

several different, trusted sources.[35]

### i.   Reputational Repair

Reputational repair is a matter of public good and must occur in relation to the public

sphere and the sphere in which it was originally damaged. To quantify the damage to one's

reputation, one must look to the *cost to repair* rather than the *cost to inflict* reputational harm. I

---

[30]   Heider, Fritz (1946), "Attitudes and Cognitive Organization," *The Journal of Psychology*, 21(1), 107-12, Hummon, Norman P and Patrick Doreian (2003), "Some Dynamics of Social Balance Processes: Bringing Heider Back into Balance Theory," *Social Networks*, 25 (1), 17-49.

[31]   Cialdini, Robert B (1987), *Influence*, Vol. 3: A. Michel Port Harcourt, Sterrett, David, Dan Malato, Jennifer Benz, Liz Kantor, Trevor Tompson, Tom Rosenstiel, Jeff Sonderman, and Kevin Loker (2019), "Who Shared It?: Deciding What News to Trust on Social Media," *Digital Journalism*, 7 (6), 783-801.

[32]   Ajzen, I. (1985). From intentions to actions: a theory of planned behavior. In J. Kuhl & J. Beckmann (Eds.), Action control: From cognition to behavior. Berlin, Heidelberg, New York: Springer-Verlag. (pp. 11-39).; Heider (1946); Cacioppo, J. T. and R. E. Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," *Current Issues and Research in Advertising*, 3 (1), 97-122.

[33]   Heider, Fritz (1946), "Attitudes and Cognitive Organization," *The Journal of Psychology*, 21 (1), 107-12.

[34]   Kunda Z. (1990), The case for motivated reasoning. Psychological Bulletin, 108(3):480-98.; Housholder and LaMarre (2014), Facebook Politics: Toward a Process Model for Achieving Political Source Credibility Through Social Media, *Journal of Information Technology & Politics*, 11:368–382; Festinger, L. (1962), "Cognitive dissonance." *Scientific American* 207(4): 93-106.; Kahneman and Tversky (1974), Judgment under Uncertainty: Heuristics and Biases, Vol. 185, No. 4157, pp. 1124-1131.

[35]   Cacioppo, John & Petty, Richard. (1979). Effects of message repetition and position on cognitive response, recall, and persuasion. Journal of Personality and Social Psychology. 37. 97-109.; Housholder and LaMarre (2014); Weiss, Robert Frank (1969), "Repetition of Persuasion," *Psychological Reports*, 25 (2), 669-70.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

therefore provide three models: a model that estimates the impressions that initially created the reputational beliefs, a model to estimate the percentage of readers or viewers who were receptive to those claims, and a model of damages that estimates the cost to repair reputational damage.

### ii.    Person Brands and Brand Value

Human, or person, brands are "well-known persona[e] who [are] the subject of marketing communications efforts," and have been shown to enhance consumers' feelings of autonomy and relatedness to the brand and others.[36] Starting from attachment theory, scholars have researched the ways in which consumers and audiences form attachments to people—who themselves become brands—through exposure in a media system.[37] Human brands are both biographical people and brands—constellations of meaning—and these two elements form interdependences as the actions of biographical people can affect their brand value.[38] Brand value is the aggregate of associations with a brand.[39] If those associations change, brand value can be diminished.

Person brands can become devalued when unpredictable or unforeseen events occur to them.[40] Fournier and Eckhardt (2019), for example, find that mortality, hubris, unpredictability, and social embeddedness underlie the value of human brands and have the potential to build or

---

[36]    Thomson, M. (2006). Human Brands: Investigating Antecedents to Consumers' Strong Attachments to Celebrities. *Journal of Marketing*, 70(3), 104–119, p. 104.

[37]    Dyer (1979) Heavenly Bodies: Film Stars and Society; Thomson (2006); Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," Journal of the Academy of Marketing Science, 41 (3), 373-87; Fournier, S., & Eckhardt, G. M. (2019). Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand. Journal of Marketing Research, 56(4), 602–619.

[38]    Fournier and Eckhardt (2019).

[39]    Keller, K.L. (1993) Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, Journal of Marketing, 57:1, 1-22.

[40]    Dyer (1979) *Heavenly Bodies: Film Stars and Society*; Gamson (1994) *Claims to Fame: Celebrity in Contemporary America*.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

diminish brand value. As Fournier and Eckhardt say, "the meaning and daily manifestations of person-brands are inherently socially embedded in a web of relationships that the person-brand cannot control, escape, or ignore."[41] That is, if an unpredictable event or claim is made about the person, it affects their brand because of their embeddedness within a social system.[42] The damage to a person brand can be severe and lasting. This damage can persist, *even when* they are not at fault.[43] It can persist *even when* their primary fans or followers do not believe the claims.[44] Loss of value for a person brand, particularly a person brand that has a general popular following, can be harmed even if only a subset of the public believes the negative claims. Person brands have social and cultural capital.[45] This capital can become harmed, thereby affecting their overall brand value to a popular audience.

Although it may be difficult to repair reputational damage on social media, it is possible, actionable, and important to the restoration of reputation. As Ardia (2010) notes:

> Although the global communication networks that are the hallmarks of our networked society have brought new reputational challenges, they also provide novel solutions to prevent and ameliorate those harms. One such solution is to enlist, through legal and social incentives, the help of private online intermediaries such as content hosts and search providers. These intermediaries play a central role in community governance and are often in a position to

---

[41] Fournier and Eckhardt (2019) p. 611.
[42] Fournier and Eckhardt (2019).
[43] David, John (2016), *How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business*: Red Wheel/Weiser.
[44] Luedicke, Marius K, Craig J Thompson, and Markus Giesler (2010), "Consumer Identity Work as Moral Protagonism: How Myth and Ideology Animate a Brand-Mediated Moral Conflict," *Journal of consumer research*, 36 (6), 1016-32.
[45] Brooks, Gillian, Jenna Drenten, and Mikolaj Jan Piskorski (2021), "Influencer Celebrification: How Social Media Influencers Acquire Celebrity Capital," *Journal of Advertising*, 50 (5), 528-47, Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," *Journal of the Academy of Marketing Science*, 41 (3), 373-87.

Expert Report of Professor Humphreys                                        14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

recognize and respond to reputational harms.[46]

The public in which the reputational harm originally occurred persists on social media and may have limited exposure to traditional media.[47] Given the fracture of media audiences in the last 10 years, new forms of media are required to reach what was formerly a relatively unified "public" of news readers and TV viewers. Accordingly, an attempt to repair reputational harm must now account for new channels of communication and for the importance of sources in the communication process.

### B.  Reputational Damage in a Complex Media System

Assessing reputational damage is complex when the public sphere is fragmented by aspects of digital technology such as filter bubbles, political polarization, ranking algorithms, reputational cues, such as followers, and the proliferation of claims both true and false. Understanding how the "public sphere" is constructed online requires understanding how social media platforms filter and display content and how multiple platforms—traditional television and print in addition to web and social media—disseminate information.

### i.    The Media System

When a prominent person makes a claim, it enters the media system, a network of platforms and people who circulate information.[48] As illustrated in Figure 1 below, the media

---

[46]  Ardia (2010).
[47]  https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/
[48]  Chadwick, Andrew (2017), *The Hybrid Media System: Politics and Power*: Oxford University Press; Curran, James, Shanto Iyengar, Anker Brink Lund, and Inka Salovaara-Moring (2009) "Media System, Public Knowledge and Democracy: A Comparative Study," *European Journal of Communication*, 24 (1), 5-26; Gans, Herbert J (2004), Deciding What's News: A Study of CBS Evening News, NBC Nightly News, Newsweek, and Time: Northwestern University Press.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

system consists of press briefings or reports; Associated Press or other syndication; print and

web coverage by major print and broadcast news outlets; podcasts and radio; social media posts

on Twitter and Facebook or other platforms; comments, retweets, and likes to a story; and, in

some instances, re-coverage of the claims themselves in traditional journalism or social media,[49]

to say nothing of word-of-mouth conversation and other informal channels such as rumor or

gossip.[50] The spread of information, particularly when it originates from a high-profile individual

like Mr. Trump, is vast and sweeping. The claims of high-profile figures tend to receive more

coverage, and more sustained coverage, than others due to the routines of the newsroom and

reporting and the effects of status on public attention.[51]

---

[49] Pfeffer, Jürgen, Thomas Zorbach, and Kathleen M Carley (2014), "Understanding Online Firestorms: Negative Word-of-Mouth Dynamics in Social Media Networks," *Journal of Marketing Communications*, 20 (1-2), 117-28; Tuchman, Gaye (1978), *Making News: A Study in the Construction of Reality*, New York: Free Press; Curran (2009); Messner, Marcus and Marcia Watson Distaso (2008), "The Source Cycle: How Traditional Media and Weblogs Use Each Other as Sources," *Journalism Studies*, 9 (3), 447-63.

[50] Rosnow, Ralph L. and Gary A. Fine (1976), *Rumor and Gossip: The Social Psychology of Hearsay*: Elsevier.

[51] Grabe, Zhou & Barnett, 1999; Gans, Herbert J (2004), *Deciding What's News: A Study of Cbs Evening News, Nbc Nightly News, Newsweek, and Time*: Northwestern University Press; Sigal, Leon V (1973), "Bureaucratic Objectives and Tactical Uses of the Press," *Public Administration Review*, 336-45; Whitney, D Charles, Marilyn Fritzler, Steven Jones, Sharon Mazzarella, and Lana Rakow (1989), "Geographic and Source Biases in Network Television News 1982 - 1984," Journal of Broadcasting & Electronic Media, 33 (2), 159-74.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 1. The Media System[52]**



Estimating the number of impressions for a Statement requires itemizing impressions from each source that disseminated the Statement. As Figure 1 above illustrates, that means that one would need to calculate and then sum the number of impressions from, at a minimum, (1) web and social media, (2) print, and (3) television.

### ii.  Social Media Impressions

On social media, impressions are estimated by calculating an information cascade.[53] To model the impact of the Statements, I rely on the prior work in sociology, computer science, and information systems concerning cascades and social networks. To understand what might be needed to change attitudes and repair reputation, I rely on research from social psychology and marketing concerning persuasion, media exposure, and developing effective integrated media

---

52    I have grayed out media types that I am not considering in my quantitative analysis.
53    Vosoughi, Soroush, Deb Roy, and Sinan Aral (2018), "The Spread of True and False News Online," *Science*, 359 (6380), 1146-51.

A-188

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

campaigns that include social media advertising. A brief overview of prior research is necessary to understand how impressions and damage are calculated.

*Networks and Information Cascades.* Unlike traditional media, messages travel on social media through a network—a system of users connected by exchanges of information. The network structure—how many connections one has and how many connections *those* connections have—can determine whether and how fast a message travels through the network. Social capital is represented in the network by the number of followers, or connections, one has, and greatly increases how broadly and deeply a message spreads. If one sends a message, it has the potential reach of not only all of one's followers, but all of *their* followers as well. Additionally, false news spreads more broadly, more deeply in the network, and faster online than true news.[54]

Social media is a hybrid of mass and face-to-face communication.[55] In mass media like television or news, there is typically one source that sends messages out to many readers or viewers (known as one-to-many communication). In face-to-face distribution of rumors, messages are transmitted from one person to another, usually one at a time. In social media, messages are transmitted both through hubs (one-to-many) and dyadically, creating chains of messages called information cascades. The time it takes for the message to move from one person to another in the information cascade is typically a day for traditional media but can be only a few hours to seconds for online communication, leading to rapid dissemination of both

---

[54]    Vosoughi *et al.* (2018).
[55]    Humphreys, A. (2015). Social Media: Enduring Principles, Oxford University Press.

Expert Report of Professor Humphreys                                    18

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

true and false news.[56]

*Impression Rate*. Although the number of followers is a measure of reach, it represents only the potential impressions of a message. Information competes for attention in any attention economy.[57] Although a message may be tweeted to all followers, it is not necessarily seen by that number of followers for a variety of reasons: only a subset of followers will sign on that day, they follow a certain number of accounts, or ranking algorithms may not prioritize the content. For these reasons, information scientists incorporate an impression rate when calculating social media impressions, which represents the chance that the message was seen by a follower.[58]

*Engagement Rate*. Engagement rate represents the percent of people who engage with— retweet or like—a post. It has two components: 'liking rate' and 'retweet rate'. Here, I computationally consider only a subset of the engagement rate: the retweet rate, which is defined as the percent chance that the message was retweeted (or quote tweeted).[59] Only a fraction of social media posts are seen, and only a fraction of those are retweeted or liked. While not directly used in my calculation of impressions, 'liking' can be used in some algorithms to rank or promote content. In short, content that is 'liked' by more people is likely to be prioritized and therefore to be viewed by more people.[60] Engagement can be used to understand impact in that it reflects response to the statement. In social and web forms of media, comments can further

---

[56]    Pfeffer *et al.* (2014); Vosoughi *et al.* (2018).
[57]    Davenport, T. H. and J. C. Beck (2013). The attention economy: Understanding the new currency of business, Harvard Business Press.
[58]    Wang et al. (2016); https://martech.org/facebook-twitter-impressions/.
[59]    A quote tweet is a retweet with comment (https://help.twitter.com/en/using-twitter/types-of-tweets). When reporting the total number of retweets generated by a post, Twitter combines the number of retweets with the number of quote tweets.
[60]    Newswhip (2019). 2019 Guide to Publishing on Facebook. http://go.newswhip.com/rs/647-QQK-704/images/Facebook%20Publishing%202019_Final.pdf.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

constitute and amplify the impact of false information.[61]

*Impression vs. Individuals.* Scholarship on media viewership has provided two ways to measure audiences: as people and as impressions. New media like social and digital media tends to be measured in impressions[62] while old media tends to be measured in reach, or people.[63] One individual may receive multiple impressions. That is, some people may receive multiple exposures to a Statement while others may receive only one exposure. I assume that for media broadcast on television, one viewer represents one impression and do not consider the number of times a viewer was exposed to a statement during a broadcast, which is conservative. As I will discuss in the Damages section, I also lower my estimate of the number of exposures needed in a corrective campaign in order to account for the fact that the impressions generated by a corrective campaign may reach some people more frequently than others.

*Calculating Impressions.* To model the total number of impressions in an information cascade, one calculates and sums the number of impressions that occur at each level in the network.[64] To calculate the total number of impressions at each level requires also determining how many diffused to the next level of the network, multiplied by the chance those messages were seen, and then adding the number of impressions at the next level, and so on (see Figure 2 below).

---

[61]    Vosoughi *et al.* (2018).
[62]    https://theraveagency.com/blog/finding-the-value-in-twitter-impressions.
[63]    Gensch, Dennis and Paul Shaman (1980), "Models of Competitive Television Ratings," *Journal of Marketing Research*, 17 (3), 307-15, Picard, Robert G (1988), "Measures of Concentration in the Daily Newspaper Industry," *Journal of Media Economics*, 1 (1), 61-74.
[64]    Vosoughi *et al.* (2018).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### Figure 2.  Information Cascade



Adapted from Vosoughi, Soroush, Deb Roy, and Sinan Aral. "The spread of true and false news online." *Science* 359, no. 6380 (2018): 1146-1151.

- *Social media.* Social media impressions are measured based on the number of followers to an account, the account's estimated impression rate, the number of retweets, the impression rate of retweeters, and their number of followers at the second level.

The Impressions Model section details the particular parameters chosen given this prior literature and the data presented in the case.

### iii.    Traditional Media Impressions

Methods for calculating the number of impressions generated by traditional, mass media have been in use since at least 1942.[65] Because ratings are tied to advertising revenue, metrics are carefully audited by services like Nielsen and the Alliance for Audited Media (AAM).[66]

---

[65]    Buzzard, Karen (2012), *Tracking the Audience: The Ratings Industry from Analog to Digital*.
[66]    https://markets.nielsen.com/us/en/solutions/measurement/television/ and
https://auditedmedia.com/Solutions/Print-Publisher-Audits.

A-192

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Paradigms for measuring circulation and readership are well established in media and communication scholarship.[67] I therefore use the following measures of impression:

- *Television.* Television impressions are measured through viewership, the ratings derived from independently audited services like Nielsen.[68]

- *Print.* Print impressions are measured through circulation, the number of readers as reported by the AAM.[69]

- *Web impressions.* Though existing online, articles published on websites tend to be more 'traditional' in nature because viewership can be estimated by the amount of traffic or page views. I use the number of daily users, discounted by the bounce rate (the percent of users who do not perform an action on the site).

- *Total impressions.* Total impressions are calculated as the total of impressions across social media, television, print, and web.

### C. Assessing Damages for Defamation Online: Adapting Traditional Approaches to the Sphere of Social Media

#### i.   Rectifying Harm to Reputation Online

Traditional approaches to rectifying reputational harm involve attempts to repair reputation in the public sphere.[70] However, social media has complicated these traditional approaches in a few ways. Some aspects of social media such as filter bubbles and echo chambers have fragmented the public sphere such that it is unclear how or where reputation repair can and should take place. Secondly, trust in traditional media has declined across the ideological spectrum.[71] Whereas legitimate sources of news once went unquestioned, assessing trust of the source is now a primary concern of users when assessing claims both in social and

---

[67]   Gensch & Shaman (1980); Picard (1988).
[68]   https://markets.nielsen.com/us/en/solutions/measurement/television/
[69]   https://auditedmedia.com/Solutions/Print-Publisher-Audits
[70]   Ardia (2010).
[71]   https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

traditional media—and this is true regardless of political ideology.[72] Finally, increasing polarization[73] in the American context means that attitudes have become more entrenched and therefore harder to change.[74] In this section, I provide a brief overview of the theories necessary for understanding how reputational harm can occur, and be repaired, through social media.

Prior cases have taken a traditional approach to assessing damages to reputation in the public sphere. For example, in the case of *United States v. Macys.com, Inc.* (D. Del. July 26, 2000),[75] the remedy for alleged violation of consumers' expectations relating to product shipping time was the purchase of banner advertising on search engines to inform consumers about their rights when shopping online. However, the traditional approach represented by prior cases fails to take into account the new and complex technological infrastructure for communication, the erosion of trust in mass media particularly among the audience likely to be receptive to the Statements (*i.e.*, people on the political right and/or supporters of Mr. Trump)[76] and the importance of personal sources that are trusted by the individual for news online. Persuasion online now includes influencers, social networking, and live video in addition to search and display advertising. The educational campaign of *United States v. Bayer Corp.*, No. 07-01(HAA) (D.N.J. Jan. 4, 2007) is more akin to the current state of social media. In this case, an educational campaign was required as remediation that included a consumer brochure,

---

[72]   https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/

[73]   https://www.pewresearch.org/politics/interactives/political-polarization-1994-2017/

[74]   Conover, Michael, Jacob Ratkiewicz, Matthew Francisco, Bruno Gonçalves, Filippo Menczer, and Alessandro Flammini. "Political polarization on Twitter." In *Proceedings of the International AAAI Conference on Web and Social Media,* Vol. 5, No. 1, pp. 89-96. 2011; Prior, Markus. "Media and political polarization." *Annual Review of Political Science* 16 (2013): 101-127.

[75]   https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf.

[76]   https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/

A-194

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

advertisement for that brochure, and placement of the information with key opinion leaders and gatekeepers, such as physicians. In this way, remediation for reputational harm entails working with multiple sources that consumers trust to counter false claims.

### D.  Media Exposure and Counter-Attitudinal Attitude Change

To understand how to assess the costs for repairing reputational harm on social media, one must understand the process of attitude change, also known as persuasion.[77] Source, message, and even media type can play a role in how many exposures it requires to change attitudes.[78] For someone who holds a weak attitude or no attitude about someone or something, one exposure to a message from a reasonably credible source is likely to be enough to change attitudes.[79] However, for someone with entrenched beliefs, source and message quality become very important, and changing that belief requires more than a few exposures from a single source.[80] Due to confirmatory bias,[81] people are likely to attend to information that confirms or is congruent with their existing beliefs and ignore or discount information that is counter to them. The more entrenched the belief, the more exposures required to change attitudes. For these reasons, changing an attitude that is counter to one's existing set of beliefs is exceedingly hard and potentially requires multiple messages from multiple trusted sources.

Here, a trusted source means a person or entity that is trusted by the user or reader, not necessarily a source that would be deemed trustworthy by the public at large. Platforms like

---

[77]   Cialdini R. B., R. E. Petty, J. T. Cacioppo. (1981). Attitude and Attitude Change, *Annual Review of Psychology*.
[78]   Albarracin, D., and Shavitt, S. (2018). Attitudes and attitude change. *Annual Review of Psychology*, 69, 299–327; Cialdini *et al.* (1981).
[79]   Cialdini *et al.* (1981).
[80]   Cialdini *et al.* (1981).
[81]   Kahneman and Tversky (1974).

Expert Report of Professor Humphreys                         24

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

newspapers and websites can be the source, but they can also convey the information of sources that may or may not be trusted. Research in psychology and communication shows that readers and viewers can distinguish between the media source and the individual source when interpreting a message.[82] For example, a reader may not trust the *New York Times* but may trust direct quotes attributed to a trusted source reported by the *New York Times*.

On social media, attitude change can be even more complex. Filter bubbles mean that users are likely to see only information that is congruent with their present and past beliefs and behaviors[83] and come from selective media sources that viewers trust.[84] Due to homophily, we tend to know and follow others who have the same attitudes that we do. As Garrett (2009) notes, multiple messages coming from multiple sources about the same event or fact create the impression for the user that the event is indeed true and that the belief is universally held.

In all media, but particularly social media, messages are received, trusted, and interpreted relative to their source. Social capital (*i.e.*, how many people you know) and status (*i.e.*, legitimacy) of a source is important. Messages that come from sources with no social capital (*i.e.*, no followers) do not have the same strength as those that come from sources with considerable social capital.[85] Because trust of unfamiliar sources is typically lacking online,[86]

---

[82]    Bakker, Tom, Damian Trilling, Claes de Vreese, Luzia Helfer, and Klaus Schönbach (2013). "The Context of Content: The Impact of Source and Setting on the Credibility of News," *Recherches en Communication*, 40, 151-68.

[83]    Pariser (2011), "The Filter Bubble: What the Internet Is Hiding from You."

[84]    https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/.

[85]    Kruglanski, A. W., and Gigerenzer, G. (2011). "Intuitive and deliberate judgments are based on common principles": Correction to Kruglanski and Gigerenzer (2011). *Psychological Review*, 118(3), 522–522. https://doi.org/10.1037/a0023709

[86]    Metzger, M. J., and Flanagin, A. J. (2013). Credibility and trust of information in online environments: The

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

known and trusted sources are particularly important when communicating messages attempting to change attitudes online.[87] In this sense, attitude change requires the message to come from *inside* the filter bubble and requires considering a number of trusted sources within the echo chamber to influence opinion.

In sum, if harm is caused amongst a population who do not trust traditional media, the most effective way to repair it is through alternative informational channels the audience trusts and that mirror where people get their news.[88]

## IV. IMPRESSIONS MODEL

The Impressions Model section details the particular parameters chosen given this prior literature and the data presented in the case. In order to estimate the number of impressions generated by the Statements, I reviewed and analyzed news coverage of the claims, including 53 online news articles, 55 social media posts, 63 television broadcasts, and 14 print articles.

### A. Web Impressions

The web impressions analysis is limited to the set of 52 online news articles[89] cited in the Complaint in footnotes 9-14. In these footnotes, the Complaint list a set of online sources that reported on the Statements.

---

use of cognitive heuristics. *Journal of Pragmatics*, 59, 210–220.
https://doi.org/10.1016/j.pragma.2013.07.012.

[87] Liu, Shixi, Cuiqing Jiang, Zhangxi Lin, Yong Ding, Rui Duan, and Zhicai Xu (2015), "Identifying Effective Influencers Based on Trust for Electronic Word-of-Mouth Marketing: A Domain-Aware Approach," *Information Sciences*, 306, 34-52.

[88] For example, 35% of Republicans reported trusting national news media: https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/

[89] Please note, my analysis incorporates 53 unique URLs as the June 21, 2019 article by Yahoo! News appeared on both news.yahoo.com and sports.yahoo.com.

**A-197**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

To estimate the number of web impressions, I used data provided by Semrush, a company that provides website traffic statistics.[90] Semrush reports unique monthly visitors, and I transformed this measure to daily visitors by dividing unique monthly visitors by 30. Further, to account for people who visit the site but do not perform any other action, I multiplied daily visitors by 1 minus the bounce rate (see Figure 3 below). A table showing the online articles considered and the impressions estimate is included as Appendix D.

**Figure 3. Equation 1**

**Web Impressions = (Unique Monthly Visitors/30)\*(1-bounce rate)**

### B.  Social Media Impressions

The social media impressions analysis is limited to the set of tweets that (a) link to one of the 53 online news stories I considered in my analysis of web impressions, (b) were published by the primary account of the publisher or the article's author, and (c) contain one of the defamatory claims contained in the Statements when viewed by a user (*i.e.*, a user who sees the tweets is exposed to a defamatory claim even if they do not click through to the article). A total of 55 tweets met the three criteria.

To measure social media impressions, one must estimate the percent of followers who saw a particular message. As described above, this is called the impression rate. Impression rates vary depending on the number of followers and the other contextual conditions in the system such as

---

[90]     https://www.semrush.com/kb/26-traffic-analytics

Expert Report of Professor Humphreys                                              27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

competition for attention on any given day.[91] Impression rates for Twitter are estimated at between 1.3% to 2.6% for typical users.[92] However, that range can vary depending on number of followers, publisher/non-publisher status, frequency and relevance of tweets, and other variables. Sites aimed at creating shareable content, including political news, can have impression rates up to 22%.[93] Account holders can directly view their impression rate for each tweet, but otherwise the information is not publicly available. Buzzfeed, for example, has an impressions rate of 22%, which is convergent with conventional marketing goals that aim for a rate of 20%,[94] but lower than the 30% rate that Twitter suggested in 2014.[95]

Based on all publicly available information, I provide estimates using two impression rates. The first estimate comes from Wang *et al.*'s (2016) formula for calculating impressions given the total number of followers in the cascade, retweets, and followers of the original tweet (Equation 2a). Equation 2a can be used to estimate impressions for each account, given the account's number of followers, the number of retweets, and the followers of the retweeters. This means that each tweet has a unique impression rate. Wang *et al.* (2016) develop this equation from a full set of data taken from Buzzfeed and Buzzfeed News and its associated accounts (average followers at the time of Wang *et al.*'s analysis: Buzzfeed = 2.8 million, BuzzfeedNews = 470,000). Based on a full set of data, they are able to provide an estimate of impressions given

---

[91]   Wang et al., 2016; https://martech.org/facebook-twitter-impressions/.
[92]   https://martech.org/facebook-twitter-impressions/
[93]   https://martech.org/facebook-twitter-impressions/
[94]   https://www.tweetbinder.com/blog/twitter-impressions/; https://marxcommunications.com/what-does-impressions-mean-on-twitter/
[95]   Ad Age (2014). "Twitter Tells Brands They Can Reach 30% of Their Followers for Free," https://www.adweek.com/performance-marketing/twitter-tells-brands-they-can-reach-30-their-followers-free-158886/.

A-199

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

known and public data like followers and retweets. As a conservative step, I took into account the potential presence of bots as followers in my estimation although it may be unnecessary in this model.[96]

The impressions estimate generated by Equation 2a may be considered low for a number of reasons. First, Buzzfeed, from which the equation was developed, is an account that has had and continues to have considerably fewer followers than many accounts in our data set (*e.g.*, Buzzfeed$_{2022}$ = 6.3 million followers vs. New York Times$_{2022}$ = 54.4 million, Washington Post$_{2022}$ = 19.9 million).[97] Secondly, as large publications, people are likely to be exposed to these accounts because they are considered more legitimate than a site like Buzzfeed News.[98] Finally, because they are high status, "standard-bearers" of news, people often tweet them to share relevant, official news stories. In addition, I account for the potential presence of bots as followers, 12.6%, based on recent estimates in computer science.[99] The formula used to calculate impressions using Equation 2a is displayed in Figure 4 below. The formula is applied for each of the 55 tweets considered in the social media impressions analysis.

---

[96]   This may be an unnecessarily conservative step, as Wang *et al.* (2016) formed their estimate of parameters from a set of known and actual impressions provided by Twitter, which may have already accounted for bots.

[97]   Data were collected October 7th, 2022.

[98]   https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/

[99]   Luceri, L., Deb, A., Giordano, S., & Ferrara, E. (2019). Evolution of bot and human behavior during elections. *First Monday*, *24*(9). https://doi.org/10.5210/fm.v24i9.10213

**A-200**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 4. Equation 2a**

$$\text{Social Media Impressions} = 10^{\wedge}(0.7396 \log(TF*(1\text{-bot rate}))$$
$$+$$
$$0.0473 \log(PF*(1\text{-bot rate})) + 0.1027 \log(RT))$$

Where:

PF (primary followers) = number of followers of original tweet
RT (retweets) = number of retweets to the original post
TF (total followers) = average number of followers of all retweets*RT[100] + number of followers of original poster (PF)
Bot rate = 0.126

Given the differences between Buzzfeed and some of the accounts in the Twitter dataset, I calculated a second estimate of impressions based on an impression rate of 20% (Equation 2b).[101] Not only was Buzzfeed itself purported to have a rate close to this, but it is also a rate used as a marketing "rule of thumb" as a benchmark for most major accounts.[102] Given the size and the influence of some of the accounts in the dataset, 20% is a reasonable and likely estimate for impression rate. Here, I again used 12.6% to account for potential bots.[103] In this equation, I include impressions at both the first level (*i.e.*, the number of followers of the original tweet and an impression rate of 20%) and the second level of the information cascade (*i.e.*, the number of

---

[100]    To collect the number of followers for all retweets, I used the Twitter API to search for both retweets and quote tweets (retweets with comment) of each of the 55 original tweets considered in the social media impressions analysis. I then filtered out any tweets that don't reference the original tweet (*e.g.*, retweets of quote tweets). After analyzing the data, I found a discrepancy between the number of retweets displayed on www.Twitter.com and the number of retweets I was able to collect. The discrepancy is likely due to users whose accounts are private and/or protected, meaning their data is not retrievable using Twitter's API. Using the list of retweets and quote tweets I assembled, I collected the Tweet IDs of each user who posted a retweet or quote tweet and used Brandwatch to collect the follower count of each of the users at the time they posted the retweet or quote tweet. I then averaged the follower counts of each retweeters or quote tweeter for each of the 55 original tweet and multiplied the average by the number of retweets.

[101]    https://martech.org/facebook-twitter-impressions/.

[102]    https://www.tweetbinder.com/blog/twitter-impressions/.

[103]    Luceri *et al.* (2019)

Expert Report of Professor Humphreys                    30

**A-201**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

retweets multiplied by the average number of followers held by people who retweeted and an impression rate of a "typical" Twitter user of 1%[104]). The formula used to calculate impressions using Equation 2b is displayed in Figure 5 below. The formula is applied for each of the 55 tweets considered in the social media impressions analysis. A table showing the tweets considered and the impressions estimate (using both Equation 2a and Equation 2b) is included as Appendix E.

**Figure 5. Equation 2b**

**Social Media Impressions = followers$_{\text{first-level}}$*first level impression rate *(1-bot rate)+retweets*followers$_{\text{second-level}}$*second level impression rate*(1-bot rate)**

Where:

> Followers$_{\text{first-level}}$ = number of followers of the original tweet
> First level impression rate = 0.2
> Bot rate = 0.126
> Followers$_{\text{second-level}}$ = average number of followers of all retweets[105]
> Second level impression rate = 0.01

## C. Television Impressions

To measure television impressions, I relied on the TV News Archive, a database maintained by the Internet Archive, a non-profit archive of content from television, internet, and audio, among many other sources.[106] The Internet Archive's TV News Archive allows users to

---

[104]   https://martech.org/facebook-twitter-impressions/
[105]   I used the same process described above to collect data on the average number of followers of all retweets. I collected a list of all retweets and quote tweets of the 55 original tweets using the Twitter API. Using that list, I collected the follower accounts of all users who published a retweet or quote tweet from Brandwatch. I then averaged the follower counts of each retweeters or quote tweeter for each original tweet and multiplied the average by the number of retweets.
[106]   https://archive.org/details/tv

Expert Report of Professor Humphreys                                    31

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

search through the closed captioning of broadcasts. To identify broadcasts to incorporate into the television impressions analysis, I searched through the closed captioning of broadcasts mentioning "E Jean Carroll" from June 21, 2019, to June 27, 2019, from the following stations: ABC, Fox, NBC, MSNBC, CBS, and CNN. After identifying the broadcasts, I searched through the closed captioning to identify broadcasts that referenced the Statements. Please note, I considered only broadcasts that included verbatim quotes from Mr. Trump's Statements. The search yielded a total of 63 broadcasts.

To estimate the number of impressions these programs received, I consulted public reports of viewership for each program from 2019,[107] which are usually derived from Nielsen. Where possible, I collected the Live + Same Day[108] or P2+[109] ratings estimates for the program in which a Statement appeared. If I was unable to find ratings estimates associated with a specific program, I relied on the average total day viewership for the network for the quarter or year closest to June 2019. To be conservative, I only counted ratings for a particular program once per day, even if a program appeared multiple times in the search results. For instance, the search results include two broadcasts of *Anderson Cooper 360* on June 21, 2019, one at 5pm-6pm PDT[110] and another at 8pm-9pm PDT.[111] Even though both airings mention the Statements (and

---

[107]   *e.g.*, https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/. Wherever possible, I relied on ratings estimates from June 2019 or second quarter of 2019 or. In some instances, it was not possible to collect data from that time period. In these cases, I relied on data that averages viewers from 2018 to 2019 and from 2019 to 2020.

[108]   Live + Same Day is an estimate of the number of households that watched a program while it aired or watched it via DVR on the same day the program aired. (https://thevab.com/storage/app/media/Toolkit/mediaterminologyformulas.pdf; https://www.hollywoodreporter.com/tv/tv-news/tv-ratings-explained-a-guide-what-data-all-means-1245591/)

[109]   P2+ is an estimate of the persons aged 2 or older who watched a program.

[110]   https://archive.org/details/CNNW_20190622_000000_Anderson_Cooper_360/

[111]   https://archive.org/details/CNNW_20190622_030000_Anderson_Cooper_360

Expert Report of Professor Humphreys                                                    32

A-203

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

thereby generated two separate impressions), my analysis only incorporates ratings for one airing. Similarly, CNN's *New Day with Alisyn Camerota and John Berman* appeared in the search results two times on June 22, 2019, once between 3am-4am PDT[112] and again between 4am-5am PDT.[113] *New Day* is a three-hour long morning show that the TV News Archive split into three hour-long blocks. I am only counting once instance of New Day in my calculations even though viewers would have been exposed to a Statement twice.[114] A table showing the broadcasts considered, the ratings estimate, and the source of the rating estimate is included as Appendix F.

### D.  Print Impressions

To capture the spread of the news stories in print as well as online, I searched for print articles covering the Statements from the publications I considered in my analysis of web impressions. Using ProQuest's U.S. Newstream database, a database of all U.S. news from 1980 to present,[115] I searched for newspaper articles containing "E Jean Carroll" in the publications of interest from June 21, 2019, to June 27, 2019. All articles returned by the search were reviewed to ensure they mentioned at least one of the Statements. The search yielded 11 articles from six news publications that mentioned the Statement.

---

[112]     https://archive.org/details/CNNW_20190625_100000_New_Day_With_Alisyn_Camerota_and_John_Berman/

[113]     https://archive.org/details/CNNW_20190625_110000_New_Day_With_Alisyn_Camerota_and_John_Berman/

[114]     Additionally, I am also not considering whether the statements appeared multiple times within a one-hour block.

[115]     https://about.proquest.com/en/products-services/nationalsnews_shtml/

Expert Report of Professor Humphreys                          33

A-204

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

To estimate the number of print impressions, I used the data provided by the Alliance for Audited Media, a widely accepted standard for measuring print audience size that determines advertising rates.[116] I was able to find audience estimates for only five of the six publications. Only the nine articles from these five publications with audience estimates contributed to the print impressions estimate. A table showing the print articles considered and the circulation is included as Appendix G.

**E.  Total Impressions**

I calculated both a high and low estimate for impressions of Mr. Trump's Statements. The low estimate is calculated with social media impression rate using Equation 2a. The high estimate is calculated with industry standard impression rate to estimate social media impressions using Equation 2b.[117] To calculate the total impressions across media, I aggregated views/impressions for the (1) social media impressions, (2) TV impressions, (3) print impressions, and (4) web impressions (see Figure 6 below).

**Figure 6.  Equation 3**

**Total impressions = social media impressions + TV impressions + print impressions + web impressions**

Figure 7 below summarizes the results of the impressions analysis.

---

[116]  https://auditedmedia.com/about/who-we-are
[117]  Please note, in four cases the impressions associated with the "low" estimate are higher than the "high" estimate. Nonetheless, the "high" estimate is much higher than the "low" estimate overall.

Expert Report of Professor Humphreys                                  34

**A-205**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 7.  Total Impressions**

|  | **Social Media** | **Web** | **Print** | **TV** | **Total** |
|---|---|---|---|---|---|
| **High** | 63,040,041 | 13,922,234 | 2,613,232 | 108,580,000 | 188,155,507 |
| **Low** | 17,218,959 | 13,922,234 | 2,613,232 | 108,580,000 | 142,334,424 |

High=impression rate of 20% for first level followers, 1% for second level followers (Sullivan 2014)
Low=median impression rate of 5.2% (Wang *et al.* 2016)

The Statements generated between 142,334,424 and 188,155,507 impressions between June 21, 2019, and September 6, 2022, the time frame from which data were collected for this analysis.

### i.    Other Impressions Not Calculated into Model

There are a number of impressions that my estimate does not take into account. Equations 2a and 2b adjust for different impression rates, but they omit many significant sources of impressions due to data availability or clarity. This makes both estimates a considerable undercount of impressions.

*Web Impressions.* Online news impressions are limited to the articles cited in the Complaint. I did not count other online news articles that covered or discussed the Statements. Additionally, some of the articles I did consider were authored by the Associated Press[118] and

---

[118]    The analysis incorporates five versions of two Associated Press articles. Darlene Superville, Trump Denies Knowing NY Woman Accusing Him of Sexual Assault, ASSOCIATED PRESS (June 22, 2019); Darlene Superville, Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store, ABC NEWS (June 22, 2019); Associated Press, Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type", HOLLYWOOD REP. (June 25, 2019); Associated Press, Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type", CHI. TRIB. (June 24, 2019); Associated Press, Trump: Woman Who Accused Him of Sexual Assault Not His Type, DENVER POST (June 24, 2019).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Reuters.[119] Although it likely that identical (or very similar) versions of these articles appeared in

multiple publications, I did not count these impressions due to the inability to access traffic

numbers for each of these websites. For instance, the June 25, 2019, *Hollywood Reporter* article,

titled "Trump on E. Jean Carroll Sexual Assault Claim: 'She's Not My Type,'" appeared in at

least 20 additional publications.[120] Further, the June 22, 2019, Associated Press article, titled

"Trump Denies Knowing NY Woman Accusing Him of Sexual Assault" appeared in at least 7

additional publications.[121]

---

[119] The analysis incorporates two versions of the same Reuters article: Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", BUS. INSIDER (June 25, 2019); and Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", REUTERS (June 25, 2019).

[120] https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type; https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6; https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054; https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type; https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html; https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/; https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type; https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp; https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/; and https://www.necn.com/news/local/trump-e-jean-carroll/220418/.

[121] https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22; https://www.gazettenet.com/Carroll-26480259; https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial; https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault; https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; and https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f.

**A-207**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Social Media Impressions*. I limited social media impressions to those generated from tweets published by the primary account of the publisher or the article author. While I did consider the retweets and quote tweets of the 55 original tweets, I did not consider retweets to quote tweets even though a user who navigates to a quote tweet will be shown the text of the original tweet. Data suggests that some of the quote tweets generated significant engagement. For instance, four quote tweets[122] of The Hill's original tweet[123] published at 7:40 am ET on June 25 generated over 100 retweets. One of those quote tweets generated over 2,000 retweets.[124] For comparison, the combined total of all retweets generated by the original tweets I considered was 5,560.

Additionally, I did not consider any tweets from other publishers of stories covering Mr. Trump's Statements, tweets from users who shared links to the 52 articles (or other articles containing the Statements), or tweets in which users repeated or otherwise amplified the Statements.

Additionally, the social media impressions analysis does not consider impressions generated on other platforms, such as Facebook and Reddit because it is difficult to find research or publicly available data on impression rates for platforms other than Twitter. Nonetheless, there is evidence that the 52 online news articles I considered in my web impressions analysis were shared widely on those platforms. Using CrowdTangle,[125] a social media insights tool

---

[122]    https://twitter.com/1/status/1142180829835255808; https://twitter.com/1/status/1142184727492878336; https://twitter.com/1/status/1142197820826501120; and https://twitter.com/1/status/1142226611380600832.
[123]    https://twitter.com/1/status/1143477200148189184.
[124]    https://twitter.com/Olivianuzzi/status/1142197820826501120.
[125]    Meta provides a free and publicly accessible CrowdTangle extension for the Chrome browser that allows

Expert Report of Professor Humphreys                     37

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

owned and operated by Meta,[126] I searched for instances where the 52 articles were shared on Facebook and Reddit. CrowdTangle data were available for 39 of the news articles considered,[127] yielding a total of 588 shares and 396,390 interactions, disseminating to 476,196,543 followers.[128] On average, the data from CrowdTangle suggest that each article was shared 15 times and generated more than 10,000 interactions per article. Given the high number of shares and the overall number of followers associated with those shares, it is clear that my estimate of social media impressions is a significant undercount of the actual impressions generated.

*Television Impressions.* I limited the television impressions analysis to broadcasts contained in the Internet Archive's TV News Archive database from the following broadcasters: ABC, Fox, NBC, MSNBC, CBS, and CNN. I did not include television shows that paraphrased Mr. Trump's claims but did not directly quote. For example, *The Tucker Carlson Show*, which averaged over 2.8 million viewers at the time,[129] covered the issue for 12 minutes on June 25, 2019,[130] but I did not include it. Additionally, I only counted ratings for a particular program

---

users to track shares of webpages across multiple social media platforms (https://apps.crowdtangle.com/chrome-extension). For each share in CrowdTangle's database, the Chrome extension provides a list of each share, the number of interactions (i.e., the number of reactions, upvotes, likes, comments, and shares) generated by that share, and the total number of followers associated with the share. (Followers are defined as "The sum of Page Likes, Instagram followers, Twitter followers, or Subreddit subscribers for all of the matching results.") The browser extension does not track reach or impressions generated by a post nor does the list of shares incorporate data from private or restricted accounts.

[126] https://help.crowdtangle.com/en/articles/4201940-about-us

[127] It was not possible to find shares of the Washington Examiner article, likely due to the way the Washington Examiner structures its URL. Instead of generating URLs with unique identifiers, articles are assigned tags (in this case, the tag was "donald-trump") and stored on a single webpage in reverse chronological order. As a result, using the CrowdTangle Chrome extension returns the shares of all articles assigned the "Donald Trump" tag, rather than shares of the specific at-issue article.

[128] To arrive at the total number of followers, I summed together all the followers associated with each share. It was not possible to deduplicate unique followers across different articles and channels.

[129] https://www.forbes.com/sites/markjoyella/2021/06/15/tucker-carlson-has-most-watched-show-in-cable-news-as-fox-leads-basic-cable-for-17-straight-weeks/?sh=6c4a2379661c

[130] https://archive.org/details/tv.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

once in a day, even if a program was aired multiple times in day. I also did not consider the number of times a Statement was mentioned during a broadcast, even though multiple mentions of a Statement generate multiple impressions.

*Print Impressions.* I limited the print impressions analysis to publications that published an online news article that was cited in the Complaint. I did not count other print news articles about Carroll that may have mentioned the claims, even though I was able to find 33 print articles via ProQuest published between June 22, 2019, and September 28, 2022, that referenced the Statements.[131] None of these 33 articles overlapped with the 14 articles I considered in my analysis. Further, only five of the six publications contributed to the impressions estimate because I was unable to find publicly available circulation for all six publications.

*Other Sources of Impressions.* I did not include podcast impressions, although there is anecdotal evidence that these claims were discussed on podcasts and radio shows like *The Kevin Jackson Show* and the *New York Times' The Daily*.[132] I did not include impressions generated from people who were exposed to the Statements in article headlines while browsing Google News, Apple News, or other news aggregating applications. As well, I did not include face-to-face pass-along of the claims.

For these reasons, the estimate of impressions I provide is a conservative estimate in which several sources of further dissemination were not taken into account. A summary of

---

[131]   Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean"))

[132]   https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/, https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/, and https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

conservative steps taken in the impressions analysis is included in Appendix J.

## V. IMPACT ASSESSMENT

In this section, I provide an impact assessment to evaluate the nature and amount of harm done to Ms. Carroll's person brand as a result of Mr. Trump's Statements. The impact of these Statements should be viewed both qualitatively and quantitatively.

In the qualitative assessment, I assess the nature of the Statements and their more generalized harm to a brand that faces a general (rather than niche) public. I also take into account the nature of the associations and their likely harm to the person brand of a professional woman and assess the long-term nature of this harm. These are dynamics that occur on the sociocultural level and therefore require more qualitative assessment. Further, they impact the generalized social perceptions of Ms. Carroll, thereby diminishing her reputational value to speak to a broad and diverse public. As such, this kind of reputational harm may impact her ability to capitalize on her person brand in the future.

I also provide a quantitative impact assessment to link the impressions estimate with the damages estimate. How many people saw and might have believed or been receptive to Mr. Trump's Statements? There are some who would have read/heard his Statement and dismissed it out of hand. While the Statement itself may represent some generalized harm, to calculate a fair estimate to rectify the more specific harm, one must take into account the fact that not everyone may have read/heard and readily believed Mr. Trump's Statements. Yet, political science provides tools for estimating the quantitative impact by incorporating the likelihood that a reader or viewer would have been receptive to Mr. Trump's Statements.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### A.  Qualitative Impact Assessment

To conduct the qualitative impact analysis, I relied on materials publicly available from before and after Mr. Trump's Statements on June 21, 22, and 24, 2019. These include media coverage of Ms. Carroll both before and after the Statements,[133] Amazon reviews of her books,[134] negative social media comments generated after the Statements, and negative messages sent privately to Ms. Carroll.

Prior to the Statements on June 21, 2019, Ms. Carroll was a popular advice columnist at *Elle* Magazine, where she had been a mainstay for 25 years.[135] Her brand personality was that of a sassy dating advice columnist and author of books on a range of topics, including dating, culture, and the life of Hunter S. Thompson. As the columnist of "Ask E. Jean" at *Elle*, she reached about 4.5 million readers, according to her publisher.[136] Ms. Carroll was known widely for her personable, modern advice for women.[137] Over the years of her popularity, she was heralded as "feminism's answer to Hunter S. Thompson."[138] She is the author of *A Dog in Heat is a Hot Dog and Other Rules to Live By*, (1996) and *Mr. Right, Right Now!* (2005), books that offer "sassy" dating and personal advice.[139]  Former *Elle* editor-in-chief Robbie Myers, who until

---

[133]   Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean")).

[134]   https://www.amazon.com/product-reviews/0060530286 and https://www.amazon.com/product-reviews/0525935681/.

[135]   Deposition of Robbie Myers, October 12, 2022, 31:20-22, 32:4-12; https://www.nytimes.com/2020/02/19/business/media/e-jean-carroll-elle.html.

[136]   https://web.archive.org/web/20200520030235/http:/www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326. I was unable to find readership data prior to 2020.

[137]   Deposition of Robbie Myers, October 12, 2022, 23:7-24:4.

[138]   Quammen, David. "A Cheap Hide Out for Writers." New York Times. 01 Nov 1981: A.14.

[139]   Joan Kelly. "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2017 was Ms. Carroll's boss,[140] described her as a gifted, beloved writer:

> "That's a -- the term that came to mind is sort of she's a baller, meaning she's -- as a writer. She's a gifted writer. She is a journalist first and everything that she writes is informed by that, meaning the facts, but she -- she also, you know, has a lot of wit and I think that's why her readers loved her so much."[141]

Ms. Myers noted Ms. Carroll's "high public profile" and credited her with elevating the national advice column genre and building trust with her readers by being witty but grounded in the facts of journalism:

> "…I mean, what other people are doing is great, right, and it's fun and interesting, but women really trusted E. Jean and we got lots of feedback from readers that she helped them. Also, you know, they loved her voice because she puts a lot of funny in there or sort of -- but it's always undergirded by reporting."[142]

Ms. Myers stated that Ms. Carroll had made significant positive contributions to *Elle* in helping to build the magazine's audience both in print and online, which resulted in both a raise and increased space allotted to the "Ask. E. Jean" column.[143]

### i.   Reception to Ms. Carroll's Professional Work

Ms. Carroll was known to her readers as a "a sharp and funny social commentator, and a terrific journalist,"[144] offering "sassy female insights."[145] Ms. Carroll was noted for dishing out "SASSY BUT SANE ADVICE," "E. Jean's PUNCHY wisdom SHINES in compilation."[146]

"E. Jean Carroll, with her razor-sharp insights and wildly popular way of serving

---

[140]   Deposition of Robbie Myers, October 12, 2022, 9:11-13.
[141]   Deposition of Robbie Myers, October 12, 2022, 21:15-22.
[142]   Deposition of Robbie Myers, October 12, 2022, 22:12-18.
[143]   Deposition of Robbie Myers, October 12, 2022, 28:9-14, 28:18-21, and 32:9-12
[144]   https://www.amazon.com/gp/customer-reviews/RD84I3FPD8DS1/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.
[145]   https://www.amazon.com/gp/customer-reviews/RBTLK02LIQ4ED/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.
[146]   Dan. "E. Jean's PUNCHY wisdom SHINES in compilation." Indianapolis Star. 31 Mar 1996: D.6.

A-213

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

them up to the masses, is, above all else, a truth-seeker."[147]

"She's a real writer, a sharp and funny social commentator, and a terrific journalist, and I love her voice. Smart readers will be particularly impressed with her skill reporting the current research in sex and marriage. I admire the way she covers the waterfront. She goes to rock-climbing spots, moto-cross tracks, gun clubs, university labs, millionaires' cocktail parties. About halfway through, I realized, this woman is an explorer. I think we're lucky that someone with her quality of mind and sense of humor has turned her attention to one of the most frustrating dilemmas of contemporary women: how to find someone real to love."

After June 2019, the associations with Ms. Carroll's person brand shifted. One way to examine the shift in associations is through word association, as represented in a word cloud.[148] As can be seen in Figure 8 and Figure 9 below, the semantic associations shifted from those associated with her role as a sassy news columnist ("love," "dating," and "men") to being associated with Mr. Trump, sexual assault, and this case ("defamation," "justice"). While some shift was attributable to the publication of her memoir and *New York Magazine* piece in which she detailed the alleged encounter with Mr. Trump,[149] an analysis of Google search data in Subsection iii below, illustrates that Mr. Trump's response, and not her initial claim, resulted in the escalating attention that she has received and played a considerable role in shifting the nature and valence of associations with her name.

---

[147]   https://www.amazon.com/gp/customer-reviews/R2KGOC1J5G6VTR/
[148]   Humphreys and Wang (2018)
[149]   https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html.

Expert Report of Professor Humphreys                         43

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 8.  Before June 2019 (top 200 words in news articles about E. Jean Carroll)**



**Figure 9.  After June 2019 (top 200 words in news articles about E. Jean Carroll)**



ii.    **Elle's Readership**

It is also noteworthy to consider the composition of *Elle*'s readership. In 2019, 36% of the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

American public identified as conservative.[150] *Elle* has a large and diverse readership in all regions of the country.[151] Its readers have a median age of 41 and an income of $194,000 per year.[152] Given the composition of the United States and the reach of *Elle's* readership, a meaningful proportion of Elle readers, roughly 1 in 3 readers, is likely conservative. Further, according to a poll conducted by YouGov,[153] 76% of Republicans polled either found the allegations of sexual harassment and sexual assault made against Mr. Trump to be not credible or needed more information about the claims, which I consider to mean that they are receptive to believing the Statements in this case.[154] Taken together, this means that 26%[155] of *Elle* readers—or about one in four—may have been receptive to Mr. Trump's Statements. While not all *Elle* readers would have been receptive, a considerable portion would have.

One in four *Elle* readers being receptive to the Statements is a considerable portion of readers to critically damage Ms. Carroll's brand as a columnist for the magazine. *Elle* reported having 4.5 million readers in 2019,[156] meaning more than a million readers may have been receptive to the claim that she was a "totally lying" about having been sexually assaulted by Mr. Trump. Further, the shift in associations provoked by the Statements undermines generalized, public perceptions of Ms. Carroll in ways that can unsettle prior perceptions about her. These

---

[150]  https://news.gallup.com/poll/328367/americans-political-ideology-held-steady-2020.aspx
[151]  AAM 2019
[152]  http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326;
        https://www.nytimes.com/interactive/2019/08/08/opinion/sunday/party-polarization-quiz.html
[153]  https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-
        allegations-poll
[154]  The YouGov poll was conducted in 2020, after Ms. Carroll published the allegations about Mr. Trump.
[155]  26% is the product of multiplying the 34.7% of *Elle* who identify as conservative and the 76% of republicans
        polled who found the allegations of sexual harassment and sexual assault made against Mr. Trump to be
        either not credible or needed more information about the claims.
[156]  https://web.archive.org/web/20200520030235/http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=574
        8326

Expert Report of Professor Humphreys                                    45

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

readers also have friends, family, neighbors, and colleagues. They are part of the public at large. As sociologists argue, public perception can be colored not only by what an individual thinks, but also by what an individual's friends and family think.[157] For example, if someone not inclined to believe Mr. Trump's claims about Ms. Carroll is friends with or married to someone who does find them credible, this also imperils reputational value due to the nature of social influence, particularly over time.[158]

### iii.   Search Interest

Google Trends provides another way to assess the impact of Mr. Trump's Statements on Ms. Carroll's brand. Google Trends is a free tool that allows users to compare relative search interest on up to five different search terms and topics. Data on Google Trends are presented on a relative scaled from 0 to 100, indexed to the peak search volume achieved during the time period of interest. Using Google Trends, I can analyze the change in search volume related to E. Jean Carroll following *New York Magazine* publishing an excerpt from her memoir on June 21, 2019, and Mr. Trump making the Statements on June 21, 22, and 24, 2019.

The graph in Figure 10 below shows the relative search interest in E. Jean Carroll[159] from June 1, 2019, through June 30, 2022, for searches conducted in the United States.[160, 161] The data

---

[157]   Johnson, Cathryn, Timothy J. Dowd, and Cecilia L. Ridgeway (2006), "Legitimacy as a Social Process," *Annual Review of Sociology*, 32, 53-78.
[158]   Ardia (2010).
[159]   I relied on the "E. Jean Carroll" topic (as opposed to terms) when conducting the search. Topics are groups of keywords and phrases Google categorizes as referring to the same concept. Searching by topic is beneficial as it allows the results to incorporate misspellings and different ways of referring to the concept of interest. https://support.google.com/trends/answer/4359550?hl=en
[160]   https://trends.google.com/trends/explore?date=2019-06-01%202019-06-30&geo=US&q=%2Fm%2F02qwtqv
[161]   When exporting data from Google Trends, Google will sometimes list the daily volume as "<1" when the relative volume is between 0 and 1. I have converted all instances of "<1" to 0.5.

Expert Report of Professor Humphreys                                   46

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

show two clear spikes in search volume. The first spike occurred on June 22, the day Mr. Trump made his second Statement. The second occurred on June 24, the day that Mr. Trump made the third Statement. Notably, the relative search volume on June 21 (the day *New York Magazine* released an excerpt from Ms. Carroll's memoir) was 55, or nearly half the relative volume generated on June 22 (94) and June 25 (100), indicating the Mr. Trump's response to Ms. Carroll's accusation may have been at least as impactful as Ms. Carroll's allegations.

**Figure 10.  Daily Relative Search Interest for E. Jean Carroll for June 2019**



Another way to measure the impact of Mr. Trump's statement using data from Google Trends is by analyzing the "related queries." Related queries are other searches users conducted

Expert Report of Professor Humphreys                                              47

A-218

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

when searching for the topic of interest. Like search interest, related queries are indexed to the most commonly searched words and phrases and reported on a scale from 0 to 100. I reviewed the top related queries for searches of E. Jean Carroll to determine the degree to which consumers searching for Ms. Carroll were interested in her "Ask E. Jean" column compared to searches linking her to Mr. Trump.

The tables in Figure 11 below show the top related queries associated with searches of E. Jean Carroll[162] across three different time periods. The first time period (the "before" period) incorporates searches conducted from January 1, 2019, through June 20, 2019.[163] The second period (the "after – short" period) incorporates searches conducted from June 21, 2019, through November 3, 2019,[164] the day before Ms. Carroll filled the present lawsuit. The third period (the "after – long" period) incorporates searches conducted from November 4, 2019, through the end of the most recent month before I conducted my analysis, August 31, 2022.[165] Rows highlighted in green indicate related queries that link Ms. Carroll to her "Ask E. Jean" column; rows highlighted in yellow indicate related queries that link Ms. Carroll to Mr. Trump. As the data show, consumer associations for Ms. Carroll changed following her accusation and Mr. Trump's response. Prior to her allegations, related searches associated with Ms. Carroll's column were relatively high. After the allegations and Mr. Trump's response, queries related to Ms. Carroll's column disappear from the list and are replaced by queries linking Ms. Carroll to Mr. Trump.

---

[162]   Here too, I relied on the "E. Jean Carroll" topic when searching on Google Trends.
[163]   https://trends.google.com/trends/explore?date=2019-01-01%202019-06-20&geo=US&q=%2Fm%2F02qwtqv
[164]   https://trends.google.com/trends/explore?date=2019-06-21%202019-11-03&geo=US&q=%2Fm%2F02qwtqv
[165]   https://trends.google.com/trends/explore?date=2019-11-04%202022-08-31&geo=US&q=%2Fm%2F02qwtqv

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Figure 11.  Top Related Queries for E. Jean Carroll

| Before (01/01/19 – 06/20/19) | |
| --- | --- |
| Related Query | Relative Value |
| e jean | 100 |
| ask e jean | 75 |
| jean carroll | 69 |
| dear abby | 14 |
| miss manners | 6 |

| After – Short (06/21/2019 – 11/03/19) | |
| --- | --- |
| Related Query | Relative Value |
| jean carroll | 100 |
| e jean | 66 |
| e carroll | 60 |
| jean e carroll | 60 |
| e. jean | 23 |
| e. jean carroll | 22 |
| trump | 16 |
| carroll trump | 15 |
| trump jean carroll | 13 |
| e jean carroll trump | 8 |
| jean carroll young | 6 |
| e jean carroll young | 5 |
| donald trump | 3 |
| trump rape | 3 |
| e. jean carroll trump | 3 |
| jean carroll donald trump | 3 |
| anderson cooper | 2 |
| jean carroll anderson cooper | 2 |
| e.jean | 2 |
| donald trump e jean carroll | 2 |
| jean carrol | 2 |
| john johnson | 1 |
| e.jean carroll | 1 |
| e jean carrol | 1 |
| e jean carroll anderson cooper | 1 |

| After – Long (11/04/19 – 08/31/22) | |
| --- | --- |
| Related Query | Relative Value |
| jean carroll | 100 |
| e jean | 51 |
| e carroll | 49 |
| jean e carroll | 48 |
| trump | 21 |
| e. jean carroll | 21 |
| jean carroll trump | 18 |
| trump e jean carroll | 11 |
| trump rape | 5 |
| e. jean carroll trump | 4 |
| jean carroll young | 4 |
| jean carroll dna | 4 |
| donald trump | 3 |
| e jean carroll trump rape | 3 |
| trump dna | 3 |
| e jean carroll young | 2 |
| e jean carroll dna | 2 |
| e jean carroll news | 2 |
| e jean carroll donald trump | 2 |
| e jean carroll twitter | 2 |
| e jean carroll case | 2 |
| trump news | 2 |
| trump rape case | 1 |
| jean carroll dress | 1 |
| e jean carroll lawsuit | 1 |

iv.    **Engagement Analysis**

*Comments and Engagement on Social Media News Article Shares.* As an additional

Expert Report of Professor Humphreys                    49

**A-220**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

qualitative indicator of the impact of these Statements in the public sphere, I examined

engagement on social media that resulted as a response to news articles covering Mr. Trump's

Statements. The news articles I analyzed in the Impressions Model and that were posted on

Twitter by the publications received 7,880 responses and 10,982 likes. Comments on these

articles repeated and agreed with Mr. Trump's Statements about Ms. Carroll, showing yet again

that his Statements about her resonated with some people. For example, on a *Washington Post*

article, one commenter said, "Baloney---For over 20 years silence and now since book is ready

for sale we need new sensation to boost sale."[166] Another commenter, on the *New York Magazine*

article, replied, "I could care less about this phony article being that the source is a leftist

mouthpiece for brainwashing and helping an agenda of the antiAmerican left Communist

Democrats in DC work toward Communism of our country.  TRUMP is doing a great job.  I

voted for him and will do it again in 2020.  New York has the worst Mayor ever in the entire

United States.  SUPPORT CAPITALISM AND SAVE OUR NATION.  VOTE TRUMP

2020!"[167]

Since the news broke in June 2019, these same news publications have continued to cover

the story, which has extended the effect of Mr. Trump's Statements further into the present day.

To gain insight into whether the public continued to view Carroll negatively, I selected a sample

of four publications that covered Mr. Trump's Statements and were included in my Impressions

---

[166] Colby Itkowitz, Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies, WASH. POST (June 21, 2019), https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0e3e_story.html.

[167] Sarah Jones, E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman.", N.Y. MAG. (June 21, 2019), https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html.

A-221

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Model (New York Times, Daily Caller, Washington Examiner, and USA Today.) I identified

these news outlets' coverage of Ms. Carroll on Twitter and Facebook, after June 2019, when the

statements first appeared in news through when I conducted this analysis on September 28,

2022.[168] Searching for replies using three phrases that reference a subset of Mr. Trump's claims

("book sale," "sell her book" and "agenda") and three negative terms ("crazy," "whore," and

"bitch") led me to hundreds of negative comments about Ms. Carroll.  Figure 12 below includes

some of these comments, and Appendix H contains over a hundred additional examples.

---

[168]   On Twitter, I used the Twitter API to search for Carroll-related tweets authored by each of the four specified
news publication, using a query such as "e jean carroll from:usatoday since: 2019-07-01." On Facebook, I
went on each publication's Facebook Page and searched for posts mentioning "e jean carroll" since July
2019. I then collected all the comments and replies to these tweets and Facebook posts.

Expert Report of Professor Humphreys                    51

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 12.  Sample of Replies Generated by Long-Term News Coverage**[169]



The nature of the engagement around this news coverage continues to reference Mr.

Trump's Statements to this day and illustrates the changed tenor and malice of the associations

with Ms. Carroll's name. For example, in response to recent press coverage, readers say, "…

after all the women who have lied in court under oath about being raped by someone in or

affiliated with the trump administration, yeah ima call this bitch a liar. …", and label her a

"attention whore" and "lying bitch" in response to articles that contain the allegedly defamatory

---

[169] https://twitter.com/1/status/1304903451625713664, https://twitter.com/1/status/1303742205648142336, https://twitter.com/1/status/1303700235210891265, https://twitter.com/1/status/1438311461110095873, https://twitter.com/1/status/1572592008316981250, https://twitter.com/1/status/1572467301315940352.

Expert Report of Professor Humphreys                    52

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

claims. These negative messages are further indication of the lingering negative effect of Mr. Trump's claims about Ms. Carroll on her person brand.

*Posts on Twitter.* The negative and malicious nature of the messages to Ms. Carroll extend to social media more broadly as evidenced by posts with no direct connection to the original Statements.  Using the same search phrases as I did above led me to thousands of negative posts in response to or mentioning Ms. Carroll.[170]  Many of the replies and tweets I found explicitly reference and/or repeat Mr. Trump's defamatory claims about Ms. Carroll, as illustrated in Figure 13 below.

For example, RunnerMoe24 calls Ms. Carroll a "Liar…a disgusting person" and accuses her of making up the story to "draw sales for your book," as Mr. Trump claimed. These kinds of comments continue into the present, with Angerisinnate calling her a "sick, ugly, rejected old hag," and repeating Mr. Trump's claim that she is attempting to sell books as recently as September 2022.

---

[170]     I used Brandwatch to conduct this search. I searched for posts from January 1, 2019 through September 28, 2022 with the following query: (ejeancarroll OR "e jean carroll" OR "jean carroll" OR jeancarroll) OR engagingWith:ejeancarroll.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 13. Sample of Twitter Commentary about Ms. Carroll Following Mr. Trump's Statements**[171]

Patriot24
@RunnerMo24

Replying to @ejeancarroll

Liar, Liar. You are a disgusting person. Women like you are the reason people hesitate to believe women who are truly sexually assaulted. You are psychological messed up to lie about something like this to draw sales for your book because you're unknown by most. Seek help.

5:29 PM · Jun 21, 2019 · Twitter for Android

Chas
@firethornranch

@ejeancarroll says @realDonaldTrump attacked her in the 90's. She didn't report it, she's writing a book, etc blah, blah! "Same song same verse a little louder a little worse!" Another person using the #FalseMedia for publicity and a way to sell her book for $. #BadFiction

6:14 PM · Jun 21, 2019 · Twitter for iPhone

Even the HORSE knows
@Angerisinnate

He wouldn't have touched THAT with YOURS! Sick, ugly, rejected old hags trying to UP their book sales should go to prison themselves. Even her story backs his claim that he wouldn't EVER. This just makes women look bad.

msn.com
Trump will be sued for sexual assault by writer E. Jean Carr...
E. Jean Carroll, who is already suing Trump for defamation, notified a judge overseeing the case of her intent to sue as ...

12:23 PM · Sep 21, 2022 · Twitter Web App

MCWAY2000
@MCWAY2000

Replying to @poconnell2 @ananavarro and @ejeancarroll

The same screwball woman who waited until she had a book to pimp...ahem...sell before off-handedly claiming that Trump felt her up 30+ years ago? Notice how all these loons claim something happens DECADES ago, but only when Trump was becoming (and actually became) president

11:18 AM · Aug 4, 2021 · Twitter Web App

Scott L. Harris
@PapaNeanderthal

Replying to @ShelbyTalcott @DailyCaller and 2 others

She's not going to bring charges against Trump because it never happened. She only looking for 3 things: Publicly for her book, $$$, & some political agenda.!..

2:02 PM · Jun 22, 2019 · Twitter for iPhone

PinochetPilot
@pinochet_pilot

Replying to @ejeancarroll

Aren't you the lady that claimed trump sexually assaulted you? Lmao right. He has access to supermodels but he had time to go after you? Trump has a type, and it isn't crazy cat ladies. I guess if it helped your book sell 😂

8:26 PM · Sep 5, 2022 · Twitter for iPhone

FLOCCINAUCINIHILIPILIFICATION
@floccinaucini1

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda,"-Trump. E. Jean Carroll accussing Trump of rape in 1990 in ritzy department store, as bad as Kavanaugh's accuser! 🔴 What a Dork Fish!

6:24 PM · Jun 21, 2019 · Twitter Web App



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Replies Directly to Ms. Carroll on Facebook and Instagram.* Additionally, I reviewed comments and replies to posts made by Ms. Carroll on her personal Facebook and Instagram, accounts where I found hundreds of negative and malicious messages and attacks on her character (see Figure 14 and Figure 15 below.) One, for example, says, "I hope you're sued into hell and back for these FALSE allegations." Another says, "Pathetic.... you are a true POS... cry wolf years later? 20+ years??? Your (sic) a sorry sack of shit... not brave... brave would have been to call it out then and there...."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 14.  Examples from Ms. Carroll's Facebook Page[172]**



[172]    https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ51tESLc41qzM8fSB
Vm74Hipc1pe44QMxaibif3Zl?comment_id=10161904009925176;
https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ51tESLc41qzM8fSB
Vm74Hipc1pe44QMxaibif3Zl?comment_id=10161904500605176;
https://www.facebook.com/EJeanCarroll/posts/pfbid02KbarmdFqXiqXWMMy4C4QLfMNXp7iaVe7cJ4e6n
8b39SJVjExHMdnN8vXuRgib9pjl?comment_id=10162947248725176;
https://www.facebook.com/EJeanCarroll/posts/pfbid0pM1JLR679TDR96NHp2CdGZPFJS9xmq4cbSBCFpS
CfFKJJw9LyAes1sWYJZSJDC93l?comment_id=505171354452764.

Expert Report of Professor Humphreys                    56

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 15. Examples from Ms. Carroll's Instagram[173]**



The negative impression people have of Ms. Carroll persists to the present, as the hateful

messages continue to be posted and continue to reference Mr. Trump's Statements (see, for

example, Appendix H). While there are many messages of support for Ms. Carroll among the

posts I reviewed, the fact that I was able to find a high volume of negative and vicious messages

using a limited set of phrases is indicative of the persistent and ongoing harm to her person

---

[173]     https://www.instagram.com/p/ByS3GZAnG8T/c/18055365523120673,
         https://www.instagram.com/p/ByS3GZAnG8T/c/17890688779356795,
         https://www.instagram.com/p/ByS3GZAnG8T/c/17885005825367171,
         https://www.instagram.com/p/CGsjKyxJcHA/c/18081883450220561,
         https://www.instagram.com/p/CbF28JKuJmw/c/18146401978279673.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

brand. Appendix I contains over 1,000 examples of these acerbic and hurtful public comments, both from responses to her personal accounts and from Twitter more generally.

In addition to these types of general social media comments, Ms. Carroll received many malicious direct messages and emails, over 80 examples of which can be found in Appendix I. These hateful messages continue into 2022, calling her a "liar and a fraud" and a "stupid bitch."[174] The direct messages to Ms. Carroll come from a wide range of platforms including email, Facebook, Twitter, and the submission email account for her "Ask E. Jean" column.

Overall, my qualitative impact analysis indicates that Ms. Carroll's person brand has been harmed by Mr. Trump's Statements. While her brand was associated with dating and advice prior to the Statements in 2019, after the Statements, her name is, and continues to be, associated with a different set of associations, and she is assailed publicly and continually online, often with direct reference to Mr. Trump's Statements. The news coverage of her and search traffic about her continues to be tied to Mr. Trump and his Statements. While some public attention came just after the publication of her book, the highest volume of attention came directly after Mr. Trump's Statements.

### B.  Quantitative Impact Assessment

In addition to a qualitative analysis of the tenor and nature of the impact of Mr. Trump's Statements on Ms. Carroll's person brand, I conducted a quantitative analysis to assess the portion of impressions calculated in the impressions analysis that would have been made to a receptive audience (the "receptive impressions"). To approximate the receptive impressions, I

---

[174]     CARROLL_028059 and CARROLL_029774.

A-229

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

used estimates of the percent of the readership/viewership who identify as Trump supporters

and/or are Republicans and estimates of the percent of Republicans who did not find allegations

of sexual harassment and sexual assault made against Mr. Trump to be credible. I then

discounted the total number of impressions generated by the Statements (as calculated in the

Impressions Model) by the estimated percent of receptive impressions.

### i.    Readership Analysis

*Readership Based on Pew Data.* What percentage of the impressions were made to an

audience that was inclined to believe them? To understand the impact of Mr. Trump's claims

regarding Ms. Carroll, I used data from Pew Research's ongoing survey of American Trends.

Pew Research is a non-partisan think-tank that does "data-driven social research."[175] Their

American Trends panel survey provides information about Americans' political beliefs, and I use

it to calculate the percent of readership that were receptive to his claims.[176] I used data from the

survey Pew conducted between October 29 and November 11, 2019, making it a reasonable

approximation of the composition of readership of the sources where the June 21, 22, and 24,

2019 Statements appeared (subscription periods tend to be on a yearly basis). The survey data

and documentation are publicly available.[177] The Pew survey is "a national, probability-based

online panel of adults living in households in the United States" and generated 12,043 responses

collected from a nationally-representative sample.[178]

---

[175]   https://www.pewresearch.org/about/
[176]   https://www.pewresearch.org/our-methods/u-s-surveys/
[177]   The data from this study was downloaded and produced. Pew Research Center's American Trends Panel
        Wave 57, Pathways to Election News Project, November 26, 2019,
        https://www.pewresearch.org/journalism/dataset/american-trends-panel-wave-57/.
[178]   With a probabilistic sample of this size, the sampling error was ± 1.43 percentage points,
        https://www.pewresearch.org/our-methods/u-s-surveys/the-american-trends-panel/.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The following variables were used in the analysis:

- SOURCEUSE: "Please click on all of the sources that you got political and election news from in the past week. This includes any way that you can get the source. If you are unsure, please DO NOT click it. **[KEEP IN SAME ORDER AS SOURCEHEARD]**"

- PARTY: "In politics today, do you consider yourself a: **ASK IF INDEP/SOMETHING ELSE (PARTY=3 or 4) OR MISSING:** PARTYLN As of today do you lean more to…"

- THERMO: "We'd like to get your feelings toward a number of people on a 'feeling thermometer.' A rating of zero degrees means you feel as cold and negative as possible. A rating of 100 degrees means you feel as warm and positive as possible. You would rate the person at 50 degrees if you don't feel particularly positive or negative toward them." (recoded to Trump receptive if value was >=50).

*Receptivity based on YouGov Poll.* Not every Republican is necessarily inclined to be receptive to Mr. Trump's Statements. For that reason, I corrected by discounting according to the percent of Republicans who either (1) found the various allegations of sexual harassment and assault made against Mr. Trump to not be credible (49%) or (2) needed more information (27%), for a total of 76%.[179] I did not include those who were unsure. These responses indicate a reasonable expectation that the respondent either already believed Mr. Trump's Statements or was open to believing them, given their other beliefs and their current lack of information (*i.e.*, they did not select that they did believe the allegations made against Mr. Trump were credible).

I performed the following calculations:

- *Percent Republicans* = percent of a publications' audience that are Republican[180]

- *Percent Receptive Republicans* = Percent Republicans * Percent of Republicans Receptive to the claims (.76, YouGov)

---

[179]    https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll

[180]    Republicans were identified as PARTY=1 in the raw data.

Expert Report of Professor Humphreys                60

A-231

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- *Percent Trump Supporters* = sum of all people who were receptive towards Mr. Trump[181]

Based on this analysis, I can conclude that an average of 25% of the total impressions were to individuals inclined to be receptive to the Statements of Mr. Trump. As can be seen in Figure 16 below, the minimum receptive audience was 11.25% (*Huffington Post*), while publications like the *Daily Caller* had a more receptive audience of 68.63%.

---

[181]   I considered all people who listed a "feeling thermometer" greater than or equal to 50 to be receptive to Mr. Trump (*i.e.*, THERMO>=50).

Expert Report of Professor Humphreys                    61

**A-232**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 16.  Percentages of Republican or Republican-Leaning Readers/Viewers and the Percentage of Trump Supporters for Each Publication[182]**

| Publication | Percent Republican | Percent Receptive Republicans | Trump Supporters |
|---|---|---|---|
| The New York Times | 16.3% | 12.39% | 13.7% |
| ABC | 34.7% | 26.37% | 32.5% |
| NBC | 31.0% | 23.56% | 29.5% |
| CBS | 33.7% | 25.61% | 31.6% |
| Washington Post | 18.1% | 13.76% | 14.6% |
| Time | 21.0% | 15.96% | 18.5% |
| Huffington Post | 14.8% | 11.25% | 12.4% |
| Daily Caller | 90.3% | 68.63% | 84.9% |
| Fox News | 69.8% | 53.05% | 68.2% |
| MSNBC | 20.5% | 15.58% | 19.9% |
| CNN | 23.6% | 17.94% | 23.3% |
| The Wall Street Journal | 38.7% | 29.41% | 31.6% |
| USA Today | 34.9% | 26.52% | 32.6% |
| Politico | 22.4% | 17.02% | 17.8% |
| BuzzFeed | 23.2% | 17.63% | 19.8% |
| Newsweek | 23.1% | 17.56% | 20.9% |
| Business Insider | 31.5% | 23.94% | 26.3% |
| The Hill | 32.1% | 24.40% | 26.6% |
| Washington Examiner | 65.7% | 49.93% | 58.4% |
| The Guardian | 19.2% | 14.59% | 16.7% |
| **Average** | | **25.25%** | |

To calculate the final number of impressions to a receptive audience, I took the lowest of these variables, which is the Receptive Republicans, and multiplied the impressions generated by

---

[182]   Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019

**A-233**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

each media source by that percent. Data was not available for some of the publications considered in the Impressions Model. I used the average for all other publications if data was unavailable for a specific publication. Multiplying the impressions estimate from the Impressions Model by the Percent Receptive Republicans yields the percent of impressions made to people who were receptive to them. This estimate of the receptive impressions can then be carried forward to assess how much it would cost to repair reputational damage with this population. The formula used to calculate receptive impressions is displayed in Figure 17 below. The formula is applied to each of the media analyzed in the Impressions Model.

**Figure 17.  Receptive Impressions Calculation**

> **Receptive Impressions = Percent Republicans * Percent of Receptive Republicans * Impressions Estimate**

Where:

> Percent Republican = percent of a publications' audience that are Republican
> Receptive Republicans = Republicans receptive to the claims (.76, YouGov)[183]
> Impressions Estimate = the total impressions from the Impressions Model

Figure 18 below summarizes the total receptive impressions generated by the Statements. Appendix J includes the detailed results of the quantitative impact model.

**Figure 18.  Total Receptive Impressions**

|      | Social Media | Web | Print | TV | Total |
|------|-------------:|----:|------:|---:|------:|
| **High** | 12,441,816 | 3,275,673 | 444,737 | 26,774,128 | 42,936,354 |
| **Low**  | 3,580,974 | 3,275,673 | 444,737 | 26,774,128 | 34,075,512 |

---

[183]   If data related to Percent Republicans is not available, the equation is as follows: the average Percent Receptive Republicans (25.25%) * Impressions Estimate.

Expert Report of Professor Humphreys                    63

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The quantitative impact analysis uses information about readership, political ideology, and receptivity given political ideology to calculate the number of impressions generated by Mr. Trump's Statements that were made to a receptive audience. Certainly, as detailed in the qualitative impact analysis and impression analysis, the Statements caused sufficient harm to Ms. Carroll's brand to a general public, meaning individuals across the ideological spectrum. The quantitative impact analysis provides an estimate of the target audience for a corrective campaign. That said, the total harm done to Ms. Carroll's brand in the eyes of the generalized public exceeds the very limited bounds of this quantitative impact and damages calculation. Appendix J includes a summary of the various reasons why the quantitative impact analysis is an undercount.

## VI. MODELING THE COSTS FOR REPUTATION REPAIR IN SOCIAL MEDIA

### A. Modeling Reputation Repair on Social Media

As detailed in the theoretical background section above, defamation causes harm to one's reputation in the public sphere. As a corrective measure to repair reputation, an advertising and strategic communications plan can attempt to change attitudes that may have been affected by the Statements. This section details the methodology for calculating the costs to repair reputation damage via social media channels. The costs to repair the reputation are based on the estimates of the number of receptive impressions. The goal of the corrective campaign is to counteract the number of receptive impressions generated by the Statements, enabling Ms. Carroll to repair the damage done to her person brand by Mr. Trump. The best way to allocate spending on media for this kind of campaign would be to create a media mix that is based on how the target audience

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

gets their information.[184] Further, a particular group that does not trust traditional media, such as those who identify as Republicans and/or support Mr. Trump, requires alternative information channels that they do trust.

### i.    Campaign Goals, Platforms, and Measurements

In my opinion, and given the prior literature summarized in Section II, a campaign to repair reputational damage must include (i) hiring influencers whom the audience regards as trusted sources, (ii) circulating statements in multiple media to replicate the echo chambers in which they originated, (iii) ensuring that the audience is exposed to the message multiple times in order to create attitude change, and (iv) extending for a long enough time to allow for dissemination, given what is known about the slow spread of true versus false claims online[185] and the multifaceted nature of effective corrective repair through online channels (*e.g.*, *United States v. Bayer Corp.*, No. 07-01(HAA) (D.N.J. Jan. 4, 2007). A holistic social media campaign that includes these integrated elements is therefore the most effective way to repair reputational damage in this case.[186]

An effective social media campaign to repair reputational damage must be multi-pronged and include a mix of platforms and people. A typical social media campaign will combine display and search advertising along with hiring influencers to promote a message via blogs and on their Instagram, YouTube, and other channels. Production costs for video and to promote

---

[184]    Ardia 2010.
[185]    Vosoughi *et al.* (2018).
[186]    Shankar, V., and Kushwaha, T. (2020). Omnichannel Marketing: Are Cross-Channel Effects Symmetric? *International Journal of Research in Marketing*; Payne, E. M., Peltier, J. W., & Barger, V. A. (2017). Omni-channel marketing, integrated marketing communications and consumer engagement: A research agenda. *Journal of Research in Interactive Marketing*, 11(2), 185–197.

A-236

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

content are often also included. Because the source—and not just the message—is so critical to attitude change, particularly on social media, it is important to work with credible and likeable sources likely to gain traction with the intended audience. For this reason, hiring social and mass media influencers is critical to one's ability to repair reputational damage.

### ii.    Media Mix

To allocate media budget and media spend across each platform, I relied on the Pew data previously cited in the impact analysis. Using the Pew data, I conducted an analysis of the ways individuals who identify as Trump supporters reported getting their news (see Figure 19 below). Respondents who identified as Trump supporters[187] were asked "what is the most common way you get political and election news?" News websites or apps were the most commonly cited media used, with 23.1%. I added this together with social media (13%) to allocate the online and influencer budget. The next most common responses were cable (21.3%), local (15.6%), and national network television (14%), which I allocated to the mass media budget. I allocated radio (9.1%) and print (3.4%) accordingly as well, using publicly available data on rates for these media channels.

---

[187]    I analyzed the media habits of Trump supporters (THERMO variable >50), as that was the closest reflection of the receptive Republican audience in the Pew data.

Expert Report of Professor Humphreys                    66

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 19.  The Media Mix of Respondents who Identify as Trump Supporters**

| *NEWS_MOST_W57. What is the most common way you get political and election news?* | | | | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **Print newspaper or magazines** | 162 | 3.4 | 3.4 | 3.4 |
| **Radio** | 438 | 9.1 | 9.1 | 12.5 |
| **Local television** | 748 | 15.6 | 15.6 | 28.1 |
| **National network television** | 669 | 14 | 14 | 42.1 |
| **Cable television** | 1020 | 21.3 | 21.3 | 63.3 |
| **Social media** | 623 | 13 | 13 | 76.3 |
| **News website or app** | 1109 | 23.1 | 23.1 | 99.5 |
| **Refused** | 26 | 0.5 | 0.5 | 100 |
| *Total* | 4795 | 100 | 100 | |
| | | *99.5* | | |

To estimate the cost for repair on each platform, two measurements are used as the industry standard. To assess the number of impressions, one can use the cost per thousand impressions, otherwise known as cost per mille (CPM) to estimate how many impressions would be gained for each dollar spent and cost per click (CPC) to estimate the number of engagements each dollar is likely to yield. For each channel, I calculated either the CPM or CPC multiplied by the number of receptive impressions generated by the Statements (as discussed, below I also incorporated an attitude-change multiplier to account for the fact it takes multiple exposures to change an existing attitude). I also included costs to have social and mass media influencers share the message across their channels, similar to the method in which Mr. Trump's Statements were spread and that mirrors the ways in which Trump supporters get their news, according to analysis of the Pew Research poll.[188]

Costs of advertising were calculated as CPM or CPC multiplied by the target number of

---

[188]   Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019.

Expert Report of Professor Humphreys                    67

**A-238**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

impressions of each channel or platform. Whether to use CPM or CPC in a cost calculation depends on the goal of the campaign. Annual industry benchmark reports of CPM and CPC for different channels and platforms published by research firms and advertising networks are used in the damages model to estimate costs for reputation repair. When the cost of advertising of a specific channel could be calculated from either CPM or CPCI used CPC in the final cost of this channel in order to ensure attitude change/conversion. For influencer promotion and mass media advertising, only CPM was used for cost calculation because CPC is usually not available.

### iii.   Attitude Change Multiplier

As covered in the aforementioned psychological literature, an attitude is not changed by one impression alone. In order to actually change attitudes, a campaign would need to serve multiple impressions per person; showing someone a counter-attitudinal message one time will not change their attitude. This is true in traditional media,[189] but it is particularly true in the crowded attention marketplace of social media. While prior research has found that it requires about 3 to 5 impressions to change an attitude in traditional advertising exposure, on social media the number of exposures is likely much higher. Taking into account the attention environment, the strength of attitudes, and the impression rate (likelihood of an exposure leading to an actual impression), I estimate that a message would need to be seen approximately 3 to 5 times on social media *from a credible source* before it would lead to attitude change. With some audiences, 7 times may be more appropriate. For some audiences, it would be impossible to change attitudes.

---

[189]   Cacioppo and Petty (1980).

A-239

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### iv.   Potential Overlap in Impressions

As mentioned above, the aim of the corrective campaign is to repair the harm to Ms. Carroll's brand caused by the receptive impressions. Yet the literature on attitude change multipliers is based on individuals and not impressions (*i.e.*, one individual would require between 3 and 5 impressions to change attitudes). It is possible that the proposed campaign, which is measured in impressions, could serve multiple impressions to one individual, even without an attitude change multiplier. In order to account for this potential overlap, I provide estimates as low as a multiplier of 1, which would undercover the number of impressions needed for attitude change. For informative purposes, the damages model that I include provides a range of attitude change multiples, from 1 to 5. However, owing to the need to include multiple exposures for everyone in the target audience,[190] I believe at least 3 impressions would be needed to change attitudes in this case.

Empirical data suggest that a multiplier of 1 is overly conservative, especially given the media habits of the audience who were likely receptive to the Statements. Using the Pew dataset referenced previously, I conducted an analysis of media habits of Trump supporters. The data show that Trump supporters[191] are more likely to use only one news source (37% vs. 27% for non-Trump supporters), and they are more likely to use cable news than non-Trump supporters (21% vs. 16%).[192] If the audience tends to consume one news source, it is unlikely that they will

---

[190]   Cacioppo and Petty (1980); Housholder and LaMarre (2014); Weiss (1969).
[191]   Because the survey did not have a "receptive Republicans" measure and I could not infer it on an individual level, I used survey respondents who indicated support for Trump. According to my prior analysis, this percentage is roughly equivalent to receptive Republicans.
[192]   The most common way Trump supporters get their news is through a news website (23.1%), followed closely by cable television (21.3%). Although only 13% report commonly getting news from social media, 43.4%

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

receive multiple impressions from a campaign with a frequency multiplier of 1. A campaign that would actually change attitudes for this audience would need to show multiple impressions, particularly to those who only use one primary news source (the others would be likely to get multiple impressions if they use more than one news source).[193] Taking into account the potential overlap of impressions per person in this instance, the damages model therefore presents a conservative range from 1 impression—which I feel is an underestimate—to 5 impressions.

### B.  Costs of the Corrective Campaign

Figure 20 below shows the total costs of the corrective campaign. I include three costs: a low estimate, which incorporates an attitude change multiplier of 1; a medium estimate, which incorporates an attitude change multiplier of 3; and a high estimate, which incorporates an attitude change multiplier of 5. As detailed above, I believe a multiplier of at least 3 (the medium estimate) would constitute the minimum corrective campaign to run, given the importance of multiple exposures and the likelihood that the audience will receive them and be affected by them.[194] Appendix K includes the detailed results of the damages model.

---

report often or sometimes getting news from social media (17.9% reporting that they often get news from social media). The most common sources for political news by media can be found by analyzing the Pew Research 2019 dataset.  For each channel, I used the rates associated with the most common response, as listed in the Pew Survey (variables MAINSOPOL_USE_W57 and NEWS_MOST_W57). Respondents also provided an open-ended response about what media sources they use, which provided insight into the best channels for placement and guided rate selection.

[193]  Note that a campaign with a multiplier of 1 may result in some people seeing the same message more than once (say, for example on cable television), even if they only get their information from one news source. Nonetheless, a 1x multiplier mimics the number of initial impressions they received on a 1:1 basis, not a 3:1 basis, as I would suggest for counter-attitudinal messages.

[194]  Cacioppo and Petty (1980); Housholder and LaMarre (2014); Weiss (1969).

**A-241**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 20. Final Damages Calculations**

|  | **Low** | **Medium** | **High** |
|---|---|---|---|
| **High Impressions** | $4,199,772.24 | $12,599,316.71 | $20,998,861.18 |
| **Low Impression** | $3,333,058.72 | $9,999,176.17 | $16,665,293.62 |

High & low impressions from the Impressions Model
Low = 1x attitude change multiplier, Medium = 3x, High = 5x
In the campaign, I assume an impression rate of 5%[195] and
a bounce rate of 90%.[196]

The damages model presents a conservative estimate of the cost to run a multi-media campaign to correct attitudes amongst the audience most likely to have been receptive to the Statements (see Appendix J for the reasons why the damages model is conservative). It does not account for the harm to Ms. Carroll's brand in the public at large, but only among this specific receptive audience. The campaign takes into account readership and viewership patterns in the target audience, the number of receptive impressions, and the current advertising costs across media. In this case, the Statements came from Mr. Trump, a high-profile individual with a loyal following whom the media covered, and continues to cover, extensively. Given his status, Mr. Trump's Statements received a very large number of impressions. Of the large audience where these statements appeared, at least 25% were receptive to them. The estimate to correct reputational damage is therefore of the same magnitude as the inflicted harm.

---

[195] The CPMs I rely on for Twitter, Facebook, and YouTube influencers are based on an influencer's number of followers or subscribers. For the reasons described above, not all a user's followers will see an influencer's post. As a result, to ensure the corrective campaign generates sufficient impressions, it is necessary to incorporate an impression rate. In this case, I am relying on an impression rate of 5% which is the median impression rate calculated using Equation 2a from the Impression Model.

[196] The CPM I rely on for web blog influencers is based on site visits. To account for people who visit a blogger's website but do not perform any other action, I multiplied the impressions needed by a bounce rate of 90%, a typically bounce rate for blogs. (https://influencermarketinghub.com/glossary/bounce-rate/).

A-242

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## VII. CONCLUSION

I conclude that Mr. Trump's Statements about Ms. Carroll have significantly harmed her person brand. My conclusion is based on my academic research and expertise and my analysis of the facts of this case and of data I collected regarding the dissemination of, and receptivity to, Mr. Trump's Statements; it is also supported by abundant qualitative evidence. The models I developed demonstrate how Mr. Trump's Statements spread to a receptive audience across online and traditional media platforms and provide the basis for calculating the cost of an effort to repair the damage done to Ms. Carroll's person brand. My conclusions are as follows:

- **Impressions Model Conclusion:** Mr. Trump's Statements made on June 21, 22, and 24, 2019, received between 142,334,424 and 188,155,507 impressions across social, digital, television, and print media. The extraordinary dissemination of the Statements is in keeping with the high profile and ongoing media coverage of Mr. Trump.  While extraordinary, this number of impressions is a conservative estimate for reasons I have previously delineated.

- **Impact Model Conclusion:** Of the impressions generated, an average of 25% of recipients were receptive to these Statements, resulting in between 34,075,512 and 42,936,354 impressions that should be corrected. Further, my qualitative assessment of the impact of the dissemination of Mr. Trump's Statements is that they caused short- and long-term harm to Ms. Carroll beyond the estimate of receptive impressions calculated in my Impact Model. Evidence from a number of sources indicates that there has been a shift in the perceptions associated with Ms. Carroll's person brand with the general public and specific perceptions amongst a group of people receptive to the claims.

- **Damages Model Conclusion:** The cost to counteract the impact of these Statements is between $3,333,058.72 and $20,998,861.18. I believe the minimum corrective campaign to repair reputational damage would be the middle range, from $9,999,176.17 to $12,599,316.71 for reasons outlined above. Because I took a conservative approach to calculating the Impressions input, this range represents a conservative estimate.

I reserve the right to revisit and supplement this analysis and amend these conclusions should additional informatin and/or documents become available, such as Mr. Trump's October 12 statement, reiterating many of the defamatory claims against Ms. Carroll, in response to a

Expert Report of Professor Humphreys                                        72

A-243

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

judge's denial of Mr. Trump's request to delay his deposition. I further reserve the right to respond to opinions and issues raised by any opposing experts. Finally, I reserve the right to use demonstrative and/or other exhibits to present the opinions expressed in this report and/or any supplemental, amended, and/or rebuttal reports.

Dated: October 14, 2022

_____
Professor Ashlee Humphreys

Expert Report of Professor Humphreys                                73

A-244

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX A.  <u>PROFESSOR HUMPHREYS' CV AND PRIOR TESTIMONY</u>**


[Produced in Native Format]

A-245

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX B.  <u>MATERIALS CONSIDERED</u>

**Bates Stamped Documents**

- CARROLL_024475-79
- CARROLL_024499
- CARROLL_024554
- CARROLL_024559
- CARROLL_024562
- CARROLL_024640-41
- CARROLL_024684
- CARROLL_024796
- CARROLL_024944
- CARROLL_024974
- CARROLL_025080
- CARROLL_026326
- CARROLL_026329
- CARROLL_026331
- CARROLL_026473
- CARROLL_026479
- CARROLL_026596
- CARROLL_028058-59
- CARROLL_028063-65
- CARROLL_028069
- CARROLL_028115
- CARROLL_028549
- CARROLL_028588
- CARROLL_028592
- CARROLL_029331
- CARROLL_029774-75
- CARROLL_030105-08
- CARROLL_030111-29
- CARROLL_030131-48
- CARROLL_030150-56

**Legal Filings and Depositions**

- Complaint, November 4, 2019.
- Deposition of Robbie Myers, October 12, 2012.

Expert Report of Professor Humphreys                    75

A-246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Academic Articles**

- Ajzen, I. (1985), From intentions to actions: A theory of planned behavior. In J. Kuhl & J. Beckmann (Eds.), Action control: From cognition to behavior. Berlin, Heidelberg, New York: Springer-Verlag. (pp. 11–39).
- Albarracin, D., & Shavitt, S. (2018). Attitudes and attitude change. Annual Review of Psychology, 69, 299–327.
- Ardia, D. S. (2010). Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law. Harvard Civil Rights-Civil Liberties Law Review, 45(2), 261-328, p. 264.
- Ardia, David S. (2010), "Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law," Harvard Civil Rights-Civil Liberties Law Review, 45(2), 261-328, p. 261.
- Bakker, Tom, Damian Trilling, Claes de Vreese, Luzia Helfer, and Klaus Schönbach (2013), "The Context of Content: The Impact of Source and Setting on the Credibility of News," Recherches en Communication, 40, 151-68.
- Brooks, Gillian, Jenna Drenten, and Mikolaj Jan Piskorski (2021), "Influencer Celebrification: How Social Media Influencers Acquire Celebrity Capital," Journal of Advertising, 50 (5), 528-47,
- Cacioppo, John & Petty, Richard. (1979). Effects of message repetition and position on cognitive response, recall, and persuasion. Journal of Personality and Social Psychology. 37. 97-109.
- Cacioppo, John T and Richard E Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," Current issues and research in advertising, 3 (1), 97-122.
- Cialdini R B, R E Petty, J T Cacioppo, (1981) Attitude and Attitude Change, Annual Review of Psychology.
- Conover, M. et al (2011), "Political Polarization on Twitter." In Proceedings of the International AAAI Conference on Web and Social Media, 5:1, 89-96.
- Curran, J. et al (2009), "Media System, Public Knowledge and Democracy: A Comparative Study," European Journal of Communication, 24 (1), 5-26.
- Davenport, T. H. and J. C. Beck (2013). The attention economy: Understanding the new currency of business, Harvard Business Press.
- Dewenter, R., M. Linder, and T. Thomas (2019), "Can Media Drive the Electorate? The Impact of Media Coverage on Voting Intentions," European Journal of Political Economy, 58, 245-61.
- Festinger, L. (1962), "Cognitive dissonance." Scientific American 207(4): 93-106.
- Fournier, S., & Eckhardt, G. M. (2019). Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand. Journal of Marketing Research, 56(4), 602–619.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Gensch, Dennis and Paul Shaman (1980), "Models of Competitive Television Ratings," Journal of Marketing Research, 17 (3), 307-15.
- Grabe, M. E., Zhou, S., & Barnett, B. (1999). Sourcing and Reporting in News Magazine Programs: 60 Minutes versus Hard Copy. Journalism & Mass Communication Quarterly, 76(2), 293–311.
- Heider, Fritz (1946), "Attitudes and Cognitive Organization," The Journal of psychology, 21 (1), 107-12.
- Housholder and LaMarre (2014), Facebook Politics: Toward a Process Model for Achieving Political Source Credibility Through Social Media, Journal of Information Technology & Politics, 11:368–382.
- Huang, J., et al. (2021), "Large-scale quantitative evidence of media impact on public opinion toward China," Humanities and Social Sciences Communications, 8(1): 1-8.
- Hummon, Norman P and Patrick Doreian (2003), "Some Dynamics of Social Balance Processes: Bringing Heider Back into Balance Theory," Social networks, 25 (1), 17-49.
- Humphreys, A. and R. Jen-Hui Wang, (2018) Automated Text Analysis for Consumer Research, Journal of Consumer Research, Volume 44, Issue 6, Pages 1274–1306.
- Johnson, Cathryn, Timothy J. Dowd, and Cecilia L. Ridgeway (2006), "Legitimacy as a Social Process," Annual review of sociology, 32, 53-78.
- Kahneman and Tversky (1974), Judgment under Uncertainty: Heuristics and Biases, Vol. 185, No. 4157, pp. 1124-1131.
- Keller, K.L. (1993) Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, Journal of Marketing, 57:1, 1-22.
- Kruglanski, A. W., & Gigerenzer, G. (2011). "Intuitive and deliberate judgments are based on common principles": Correction to Kruglanski and Gigerenzer (2011). Psychological Review, 118(3), 522–522. https://doi.org/10.1037/a0023709
- Kunda Z. (1990), The case for motivated reasoning. Psychological Bulletin, 108(3):480-98.
- Liu, Shixi, Cuiqing Jiang, Zhangxi Lin, Yong Ding, Rui Duan, and Zhicai Xu (2015), "Identifying Effective Influencers Based on Trust for Electronic Word-of-Mouth Marketing: A Domain-Aware Approach," Information Sciences, 306, 34-52.
- Luceri, L., Deb, A., Giordano, S., & Ferrara, E. (2019). Evolution of bot and human behavior during elections. First Monday, 24(9). https://doi.org/10.5210/fm.v24i9.10213
- Luedicke, Marius K, Craig J Thompson, and Markus Giesler (2010), "Consumer Identity Work as Moral Protagonism: How Myth and Ideology Animate a Brand-Mediated Moral Conflict," Journal of consumer research, 36 (6), 1016-32.
- Messner, Marcus and Marcia Watson Distaso (2008), "The Source Cycle: How Traditional Media and Weblogs Use Each Other as Sources," Journalism Studies, 9 (3), 447-63.
- Metzger, M. J., & Flanagin, A. J. (2013). Credibility and trust of information in online environments: The use of cognitive heuristics. Journal of Pragmatics, 59, 210–220. https://doi.org/10.1016/j.pragma.2013.07.012.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," Journal of the Academy of Marketing Science, 41 (3), 373-87.
- Payne, E. M., Peltier, J. W., & Barger, V. A. (2017). Omni-channel marketing, integrated marketing communications and consumer engagement: A research agenda. Journal of Research in Interactive Marketing, 11(2), 185–197.
- Pfeffer, Jürgen, Thomas Zorbach, and Kathleen M Carley (2014), "Understanding Online Firestorms: Negative Word-of-Mouth Dynamics in Social Media Networks," Journal of Marketing Communications, 20 (1-2), 117-28.
- Picard, Robert G (1988), "Measures of Concentration in the Daily Newspaper Industry," Journal of Media Economics, 1 (1), 61-74.
- Prior, Markus (2013) "Media and political polarization." Annual Review of Political Science 16: 101-127.
- Shankar, V., & Kushwaha, T. (2020). Omnichannel Marketing: Are Cross-Channel Effects Symmetric? International Journal of Research in Marketing.
- Sharman, Jason C. (2007) "Rationalist and constructivist perspectives on reputation." Political Studies 55, no. 1: 20-37.
- Sigal, Leon V (1973), "Bureaucratic Objectives and Tactical Uses of the Press," Public Administration Review, 336-45.
- Singh, N., A. Singh, R. Sharma (2020), Predicting Information Cascade on Twitter Using Random Walk, Procedia Computer Science, 173, 201-209.
- Sterrett, D. et al (2019), "Who Shared It?: Deciding What News to Trust on Social Media," Digital Journalism, 7 (6), 783-801.
- Thomson, M. (2006). Human Brands: Investigating Antecedents to Consumers' Strong Attachments to Celebrities. Journal of Marketing, 70(3), 104–119, p. 104.
- Vosoughi, Soroush, Deb Roy, and Sinan Aral (2018), "The Spread of True and False News Online," Science, 359 (6380), 1146-51.
- Wang, L., Ramachandran, A., & Chaintreau, A. (2016). Measuring Click and Share Dynamics on Social Media: A Reproducible and Validated Approach. Proceedings of the International AAAI Conference on Web and Social Media, 10(2), 108-113.
- Weber, Max (1922/1978), Economy and Society: An Outline of Interpretive Sociology, Vol. 2: University of California Press.
- Weiss, Robert Frank (1969), "Repetition of Persuasion," Psychological Reports, 25 (2), 669-70.
- Whitney, D Charles, Marilyn Fritzler, Steven Jones, Sharon Mazzarella, and Lana Rakow (1989), "Geographic and Source Biases in Network Television News 1982‐1984," Journal of Broadcasting & Electronic Media, 33 (2), 159-74.
- Zha, X. et al (2018). Exploring the effect of social media information quality, source credibility and reputation on informational fit-to-task: Moderating role of focused immersion. Computers in Human Behavior, 79, 227–237.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Books**

- Buzzard, Karen (2012), Tracking the Audience: The Ratings Industry from Analog to Digital.
- Chadwick, Andrew (2017), The Hybrid Media System: Politics and Power: Oxford University Press.
- Cialdini, Robert B (1987), Influence, Vol. 3: A. Michel Port Harcourt.
- David, John (2016), How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business: Red Wheel/Weiser.
- Dyer (1979) Heavenly Bodies: Film Stars and Society.
- Gamson (1994) Claims to Fame: Celebrity in Contemporary America.
- Gans, Herbert J (2004), Deciding What's News: A Study of CBS Evening News, NBC Nightly News, Newsweek, and Time: Northwestern University Press.
- Humphreys, A. (2015). Social Media: Enduring Principles, Oxford University Press.
- Pariser (2011), "The Filter Bubble: What the Internet Is Hiding from You."
- Rosnow, Ralph L and Gary A Fine (1976), Rumor and Gossip: The Social Psychology of Hearsay: Elsevier.
- Tuchman, Gaye (1978), Making News: A Study in the Construction of Reality, New York: Free Press.
- Weber, Max (1922/1978), Economy and Society: An Outline of Interpretive Sociology, Vol. 2: University of California press.

**Websites**

- http://go.newswhip.com/rs/647-QQK-704/images/Facebook%20Publishing%202019_Final.pdf
- http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326
- https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054
- https://about.proquest.com/en/products-services/nationalsnews_shtml
- https://archive.org/details/tv
- https://auditedmedia.com/about/who-we-are
- https://auditedmedia.com/Solutions/Print-Publisher-Audits
- https://blogs.cornell.edu/info2040/2016/11/16/information-cascade-in-social-media/
- https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
- https://edu.gcfglobal.org/en/digital-media-literacy/how-filter-bubbles-isolate-you/1/
- https://edu.gcfglobal.org/en/digital-media-literacy/what-is-an-echo-chamber/1/
- https://hbr.org/2022/02/whats-the-point-of-a-personal-brand
- https://help.crowdtangle.com/en/articles/4201940-about-us

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard
- https://help.twitter.com/en/using-twitter/types-of-tweets
- https://influencermarketinghub.com/what-is-personal-branding/
- https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/
- https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type
- https://markets.nielsen.com/us/en/solutions/measurement/television/
- https://markets.nielsen.com/us/en/solutions/measurement/television/ and
- https://martech.org/facebook-twitter-impressions/
- https://marxcommunications.com/what-does-impressions-mean-on-twitter/
- https://news.gallup.com/poll/328367/americans-political-ideology-held-steady-2020.aspx
- https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html.
- https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-205
- https://projects.fivethirtyeight.com/polls/favorability/donald-trump/
- https://sproutsocial.com/insights/social-media-algorithms/
- https://theraveagency.com/blog/finding-the-value-in-twitter-impressions
- https://thevab.com/storage/app/media/Toolkit/mediaterminologyformulas.pdf
- https://time.com/5907973/donald-trump-loses-2020-election/
- https://time.com/6212677/donald-trump-investigations-explained/
- https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll
- https://trends.google.com/trends/explore?date=2019-01-01%202019-06-20&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-06-01%202019-06-30&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-06-21%202019-11-03&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-11-04%202022-08-31&geo=US&q=%2Fm%2F02qwtqv
- https://web.archive.org/web/20200520030235/http:/www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326
- https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type
- https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/
- https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.adweek.com/performance-marketing/twitter-tells-brands-they-can-reach-30-their-followers-free-158886/
- https://www.amazon.com/E-Jean-Carroll/e/B000AP7CJM
- https://www.amazon.com/gp/customer-reviews/R2KGOC1J5G6VTR/
- https://www.amazon.com/gp/customer-reviews/RBTLK02LIQ4ED/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286
- https://www.amazon.com/gp/customer-reviews/RD84I3FPD8DS1/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286
- https://www.amazon.com/product-reviews/0060530286
- https://www.amazon.com/product-reviews/0525935681/
- https://www.britannica.com/biography/Donald-Trump
- https://www.cbsnews.com/news/donald-trump-officially-fired-from-the-celebrity-apprentice/
- https://www.cnbc.com/2019/06/21/e-jean-carroll-says-donald-trump-sexually-assaulted-her.html
- https://www.cnn.com/2016/07/19/politics/donald-trump-republican-nomination-2016-election
- https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/
- https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type
- https://www.elle.com/author/4913/e-jean/
- https://www.forbes.com/sites/markjoyella/2021/06/15/tucker-carlson-has-most-watched-show-in-cable-news-as-fox-leads-basic-cable-for-17-straight-weeks/?sh=6c4a2379661c
- https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp
- https://www.foxnews.com/politics/trump-responds-jean-carroll-defamation-lawsuit-after-judge-denies-delay
- https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf
- https://www.gazettenet.com/Carroll-26480259
- https://www.goodreads.com/author/show/30738.E_Jean_Carroll
- https://www.hollywoodreporter.com/tv/tv-news/tv-ratings-explained-a-guide-what-data-all-means-1245591/
- https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6
- https://www.investopedia.com/terms/c/cpm.asp
- https://www.ipsos.com/en-us/news-polls/Republican-voters-continue-to-view-Trump-as-the-partys-leader
- https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault
- https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/
- https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/
- https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/
- https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/
- https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22
- https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/
- https://www.necn.com/news/local/trump-e-jean-carroll/220418/
- https://www.nytimes.com/2020/02/19/business/media/e-jean-carroll-elle.html
- https://www.nytimes.com/2020/09/28/arts/television/trump-taxes-apprentice.html
- https://www.nytimes.com/2021/01/20/us/politics/biden-president.html
- https://www.nytimes.com/interactive/2019/08/08/opinion/sunday/party-polarization-quiz.html
- https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html
- https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type
- https://www.pewresearch.org/about/
- https://www.pewresearch.org/fact-tank/2020/08/24/trumps-approval-ratings-so-far-are-unusually-stable-and-deeply-partisan/
- https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/
- https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/
- https://www.pewresearch.org/journalism/dataset/american-trends-panel-wave-57/
- https://www.pewresearch.org/our-methods/u-s-surveys/
- https://www.pewresearch.org/our-methods/u-s-surveys/the-american-trends-panel/
- https://www.pewresearch.org/politics/interactives/political-polarization-1994-2017/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/
- https://www.semrush.com/kb/26-traffic-analytics
- https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages
- https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html
- https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type
- https://www.tweetbinder.com/blog/twitter-impressions/
- https://www.usatoday.com/story/money/2019/07/03/e-jean-carroll-new-york-circuit-donald-trump-assault-accusation/1584135001/
- https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial?context=amp
- https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0e3e_story.html.
- https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f

**Social Media Posts**

- http://twitter.com/Angerisinnate/statuses/1572622451607244801
- http://twitter.com/firethornranch/statuses/1142194188852895746
- http://twitter.com/floccinaucini1/statuses/1142196689148813313
- http://twitter.com/pinochet_pilot/statuses/1566945839679180800
- http://twitter.com/RunnerMo24/statuses/1142182659071860737
- http://twitter.com/ScottLHarris1/statuses/1142493161886892032
- https://truthsocial.com/@realDonaldTrump/posts/109158586745522514
- https://truthsocial.com/@realDonaldTrump/posts/109158644496040450
- https://twitter.com/1/status/1142180829835255808
- https://twitter.com/1/status/1142184727492878336
- https://twitter.com/1/status/1142197820826501120
- https://twitter.com/1/status/1142226611380600832
- https://twitter.com/1/status/1143477200148189184
- https://twitter.com/1/status/1303700235210891265
- https://twitter.com/1/status/1303742205648142336

**A-254**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://twitter.com/1/status/1304903451625713664
- https://twitter.com/1/status/1438311461110095873
- https://twitter.com/1/status/1572467301315940352
- https://twitter.com/1/status/1572592008316981250
- https://twitter.com/AP/status/1580371759240548353
- https://twitter.com/MCWAY2000/status/1422939994235228162
- https://twitter.com/Olivianuzzi/status/1142197820826501120
- https://twitter.com/TristanSnell/status/1580309062115006464
- https://www.facebook.com/EJeanCarroll/posts/pfbid02KbarmdFqXiqXWMMy4C4QLf MNXp7iaVe7cJ4e6n8b39SJVjExHMdnN8vXuRgib9pjl?comment_id=10162947248725 176
- https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ5 1tESLc41qzM8fSBVm74Hipc1pe44QMxaibif3Zl?comment_id=10161904009925176
- https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ5 1tESLc41qzM8fSBVm74Hipc1pe44QMxaibif3Zl?comment_id=10161904500605176
- https://www.facebook.com/EJeanCarroll/posts/pfbid0pM1JLR679TDR96NHp2CdGZPF JS9xmq4cbSBCFpSCfFKJJw9LyAes1sWYJZSJDC93l?comment_id=505171354452764
- https://www.instagram.com/p/ByS3GZAnG8T/c/17885005825367171
- https://www.instagram.com/p/ByS3GZAnG8T/c/17890688779356795
- https://www.instagram.com/p/ByS3GZAnG8T/c/18055365523120673
- https://www.instagram.com/p/CbF28JKuJmw/c/18146401978279673
- https://www.instagram.com/p/CGsjKyxJcHA/c/18081883450220561


**TV Rating References**

- https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
- https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
- https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
- https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/
- https://thecomicscomic.com/2020/05/26/late-night-tv-ratings-for-2019-2020/
- https://www.adweek.com/tvnewser/evening-news-ratings-q2-2019-and-week-of-june-24/407844/
- https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
- https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/

A-255

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
- https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
- https://www.nytimes.com/2019/03/05/business/media/colbert-fallon-ratings-nielsen.html
- https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/

### Damages Model References

- https://blog.hootsuite.com/twitter-statistics/
- https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20ComparisonvOAAA.pdf
- https://www.gaebler.com/Washington+Examiner-DC-Newspaper-Advertising-Costs++12549
- https://www.webfx.com/social-media/pricing/influencer-marketing/
- https://www.wordstream.com/blog/ws/2021/07/12/facebook-ads-cost

### Print Publication Data References

- Audited Report for Boston Globe (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for Chicago Tribune (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for USA Today (12 months ended December 31, 2019), Alliance for Audited Media.
- Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.

### ProQuest Articles:

- "America, listen to Ms. Carroll." The Washington Post. 26 June 2019: A.26.
- Abraham, Yvonne. "Silly liberals, don't be mad." Boston Globe. 27 June 2019: B.1.
- Baker, Peter; Vigdor, Neil. "Trump Calls His New Accuser a Liar And Says, 'No. 1, She's Not My Type.'" New York Times. 25 June 2019: A.15.
- Bernard, Joan Kelly. "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Carpenter, Dan. "E. Jean's PUNCHY wisdom SHINES in compilation." Indianapolis Star. 31 Mar 1996: D.6.
- Colby Itkowitz; Davies, Emily; Fuchs, Hailey. "Latest sex assault allegation against Trump draws muted political reaction." The Washington Post. 26 June 2019: A.6.
- Graham, Renée. "If this nation cared about sexual assault, Trump would not be president." Boston Globe. 26 June 2019: A.11.
- Henneberger, Melinda. "Don't ignore latest Trump rape allegation." USA TODAY. 25 June 2019: A.7.
- Hesse, Monica. "Reading between the lines in E. Jean Carroll's columns." The Washington Post. 26 June 2019: C.1.
- Itkowitz; Davies, Emily; Fuchs, Hailey. "Latest sex allegation against Trump draws muted reaction" Chicago Tribune. 26 June 2019: 12.
- Pilkington, Ed. "Donald Trump accused of sexually assaulting writer E Jean Carroll." The Guardian. 21 June 2019: 39.
- Pilkington, Ed. "Why did the media downplay the latest sexual assault allegation against Trump?" The Guardian. 25 June 2019: 25.
- Quammen, David. "A Cheap Hide Out for Writers." New York Times. 01 Nov 1981: A.14.
- Reinhard, Beth; Colby Itkowitz. "N.Y. writer says Trump assaulted her in the '90s." The Washington Post; Washington, D.C. [Washington, D.C]. 22 June 2019: A.1.
- Rosenberg, Alyssa. "Trump will never be held accountable for his treatment of women." The Washington Post. 23 June 2019: A.23.
- Wagner, John. "Trump says latest accuser is 'lying.'" The Washington Post. 25 June 2019: A.3.
- Zaveri, Mihir. "Trump Repeatedly Denies Sexual Assault Claim by an Advice Columnist." New York Times. 23 June 2019: A.23.


**Databases**

- Brandwatch, https://www.brandwatch.com/
- Internet Archive TV News, https://archive.org/details/tv
- ProQuest, https://www.proquest.com/index
- Twitter API, https://developer.twitter.com/en/docs/twitter-api

A-257

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX C.  **GLOSSARY OF TERMS**

**Bounce Rate:** The percentage of users who leave a page without taking any action.

**Cost Per Click (CPC):** The cost an advertiser pays each time a user clicks on an advertisement.[197]

**Cost Per Mille (CPM):** The cost an advertiser pays per one thousand impressions generated by an advertisement on a web page.[198]

**Echo Chamber:** An environment where a person only encounters information or opinions that reflect and reinforce their own.[199]

**Engagement:**  Measures of audience involvement with or responsiveness to a particular message. Can include metrics such as likes, retweets, and comments/replies.

**Engagement Rate:**  The percentage of people who engage with a post. Engagement rate is calculated by dividing the number of impressions by the number of engagements.

**Filter Bubble:** An environment isolated by algorithms that prevent users from being exposed to information and perspectives they haven't already expressed an interest in.[200]

**Followers:** The total number of users who could potentially see another user's post.

**Impressions:** The total number of times a post or other piece of content has been displayed to users.[201]

**Impression Rate:** The percentage of a user's followers who are exposed to a post. Impression rates are unique to each account and are not publicly available. Nonetheless, academic researchers have developed a formula to estimate the impressions rate using follower counts.[202]

**Influencers:** People with specialized knowledge, authority, or insight into a specific niche or industry that can sway the opinions of a target audience.

**Information Cascade:** The way information is exchanged on social media networks. After a user posts content to social media, that user's followers observe that behavior and repeat the

---

197   https://www.investopedia.com/terms/c/cpm.asp
198   https://www.investopedia.com/terms/c/cpm.asp
199   https://edu.gcfglobal.org/en/digital-media-literacy/what-is-an-echo-chamber/1/
200   https://edu.gcfglobal.org/en/digital-media-literacy/how-filter-bubbles-isolate-you/1/
201   https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard
202   Wang et al., 2016

A-258

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

same process by reposting or sharing the original user's content. Through sharing and reposting, an unbroken chain of messages is formed with a common, singular origin, that keeps extending until individuals stop spreading or reposting it.[203]

**Media System:** A network of platforms, institutions, practices, and people understood as circulating information, who by interacting with one another, shape each other's opinions.[204]

**Network:** A system of users connected by exchanges of information.

**Network Structure:** The number of connections (*e.g.*, followers) one user has and the number of connections that user's connections have.

**Person Brand:** An actively curated image that projects how a person wants the public to view them. The brand image often consists of the person's unique combination of skills, experience, and personality.[205]

**Ranking Algorithm:** The algorithm each social media platform relies on to determine what content to display to each user.[206]

**Reach:** The total number of people who could potentially be exposed to a post or other piece of content.

**Retweet Rate:** The percentage of a user's followers who retweeted a post. The retweet rate is calculated by dividing the number of retweets by the number of followers.

**Social Capital:** The quality and quantity of social connections. Social capital can be measured by the number of connections a user has on a social media network. Users with high social capital are able to spread a message broadly and deeply on a network.

**Social Media Platform:** The websites and applications that focus on communication, community-based input, interaction, content-sharing, and collaboration. Some popular examples of social media platforms include Twitter, Facebook, Reddit, and YouTube.

**Source Credibility:** The extent to which the persons or entities generating information on social media are perceived to be trustworthy, knowledgeable, and believable.[207]

---

[203] Vosoughi et al., 2018; Singh et al., 2020 (https://www.sciencedirect.com/science/article/pii/S1877050920315283); https://blogs.cornell.edu/info2040/2016/11/16/information-cascade-in-social-media/
[204] https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-205
[205] https://hbr.org/2022/02/whats-the-point-of-a-personal-brand; https://influencermarketinghub.com/what-is-personal-branding/
[206] https://sproutsocial.com/insights/social-media-algorithms/
[207] Zha et al., 2018

A-259

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Unique Visitors:** The total number of unique visits to a given page. Each visitor to the site is counted once during the reporting period.[208]

---

[208] https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages

Expert Report of Professor Humphreys                                        89

## APPENDIX D.  WEB IMPRESSIONS MODEL

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|-----|-------|--------|------------------|---------|------------------------------|------------------|---------------------------|
| W-1 | US writer says Trump sexually assaulted her in mid-1990s[212] | Agence France-Presse (AFP) | 6/21/2019 | aljazeera.com | 3,200,000 | 0.4052 | 43,221 |
| W-2 | E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir[213] | Alexandra Alter | 6/21/2019 | newyorktimes.com | 60,400,000 | 0.4767 | 959,756 |
| W-3 | Trump On E. Jean Carroll Rape Allegation: 'I've Never Met This Person In My Life'[214] | Jenna Amatulli | 6/21/2019 | huffpost.com | 24,200,000 | 0.5484 | 442,376 |
| W-4 | Trump Responds To Rape Accuser: 'People Should Pay Dearly For Such False Accusations'[215] | Amber Athey | 6/21/2019 | dailycaller.com | 4,600,000 | 0.4859 | 74,505 |
| W-5 | Trump Says He 'Never Met' Author Who Has Accused Him of Sexual Assault[216] | Brian Bennett | 6/21/2019 | time.com | 12,800,000 | 0.3216 | 137,216 |

[209]   The total number of unique visitors to a given page in June 2019. Data collected from Semrush.
[210]   The percentage of users who leave a page without taking any action
[211]   Impressions estimate calculated using the following formula: (Unique Monthly Visitors/30)*(1-bounce rate)
[212]   https://www.aljazeera.com/news/2019/6/21/us-writer-says-trump-sexually-assaulted-her-in-mid-1990s
[213]   https://www.nytimes.com/2019/06/21/books/e-jean-carroll-trump.html
[214]   https://www.huffpost.com/entry/trump-response-e-jean-carroll-rape-allegation_n_5d0d4a42e4b0a394186c52
[215]   https://dailycaller.com/2019/06/21/trump-rape-accusation-false-e-jean-carroll/
[216]   https://time.com/5612502/trump-jean-carroll-sexual-assault-allegation/

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-6 | Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation[217] | Ellie Bufkin | 6/21/2019 | washingtonexaminer.com | 15,400,000 | 0.2133 | 109,494 |
| W-7 | Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s — 'Never Happened,' Trump Responds[218] | Adam Carlson | 6/21/2019 | people.com | 27,400,000 | 0.3455 | 315,557 |
| W-8 | Trump dismisses new sexual assault allegation[219] | Matthew Choi | 6/21/2019 | politico.com | 14,100,000 | 0.4098 | 192,606 |
| W-9 | Writer says she was raped by Trump in 1990s[220] | Casey Darnell | 6/21/2019 | news.yahoo.com | 13,900,000 | 0.4611 | 213,643 |
| W-10 | Writer says she was raped by Trump in 1990s[221] | Casey Darnell | 6/21/2019 | sports.yahoo.com | 11,000,000 | 0.4943 | 181,243 |
| W-11 | E. Jean Carroll Alleges President Donald Trump Assaulted Her[222] | EJ Dickson | 6/21/2019 | rollingstone.com | 9,800,000 | 0.4129 | 134,881 |
| W-12 | Trump responds to E Jean Carroll's allegations[223] | - | 6/21/2019 | theguardian.com | 28,100,000 | 0.4327 | 405,296 |

Expert Report of Professor Humphreys

91

217   https://www.washingtonexaminer.com/tag/donald-trump?source=%2Fnews%2Ftrump-issues-blistering-denial-of-e-jean-carrolls-rape-allegation
218   https://people.com/politics/donald-trump-raped-e-jean-carroll/
219   https://www.politico.com/story/2019/06/21/trump-dismisses-new-sexual-assault-allegation-1376698
220   https://news.yahoo.com/writer-says-she-was-raped-by-trump-in-1990-s-190337681.html
221   https://sports.yahoo.com/writer-says-she-was-raped-by-trump-in-1990-s-190337681.html
222   https://www.rollingstone.com/culture/culture-news/e-jean-carroll-president-donald-trump-sexual-assault-851261/
223   https://www.theguardian.com/us-news/live/2019/jun/21/trump-iran-news-us-latest-tehran-strike-washington-2020?page=with:block-5d0d4b9c8f081e872734c692#block-5d0d4b9c8f081e872734c692

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-13 | Magazine columnist accuses Trump of sexual assault more than two decades ago, an allegation he denies[224] | Beth Reinhard and Colby Itkowitz | 6/21/2019 | washingtonpost.com | 42,300,000 | 0.5450 | 768,450 |
| W-14 | E. Jean Carroll: "Trump attacked me in the dressing room of Bergdorf Goodman."[225] | Sarah Jones | 6/21/2019 | nymag.com | 8,100,000 | 0.4640 | 125,280 |
| W-15 | E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women[226] | Hilary Lewis | 6/22/2019 | hollywoodreporter.com | 11,500,000 | 0.3343 | 128,148 |
| W-16 | Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault[227] | Caitlin Mac Neal | 6/21/2019 | talkingpointsmemo.com | 1,800,000 | 0.5923 | 35,538 |
| W-17 | Longtime advice columnist E. Jean Carroll accuses Trump of sexual assault in 1990s[228] | Alex Pappas | 6/21/2019 | foxnews.com | 71,500,000 | 0.4955 | 1,180,942 |

Expert Report of Professor Humphreys

92

---

224  https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaad3c_story.html
225  https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html
226  https://www.hollywoodreporter.com/lifestyle/lifestyle-news/writer-e-jean-carroll-no-disrespectful-rape-charges-trump-1220447/
227  https://talkingpointsmemo.com/news/e-jean-carroll-donald-trump-sexual-assault
228  https://www.foxnews.com/politics/longtime-advice-columnist-e-jean-carroll-accuses-trump-of-sexual-assault-in-1990s

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-18 | Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims[229] | Daniel Politi | 6/22/2019 | slate.com | 10,500,000 | 0.3781 | 132,335 |
| W-19 | Author E. Jean Carroll accuses President Trump of sexual assault in 1990s[230] | Christina Prignano | 6/21/2019 | bostonglobe.com | 3,700,000 | 0.5045 | 62,222 |
| W-20 | Trump claims he's never met the columnist who just accused him of sexual assault despite photo evidence of them together[231] | Eliza Relman | 6/21/2019 | insider.com | 5,000,000 | 0.3806 | 63,433 |
| W-21 | Trump denies knowing NY woman accusing him of sexual assault[232] | Darlene Superville | 6/22/2019 | apnews.com | 13,700,000 | 0.2070 | 94,530 |
| W-22 | Trump Denies New Sexual Assault Allegation By Advice Columnist E. Jean Carroll[233] | Jessica Taylor | 6/21/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |

Expert Report of Professor Humphreys

93

229   https://slate.com/news-and-politics/2019/06/trump-slams-e-jean-carroll-accusation-sexual-assault-bergdorg-goodman.html
230   https://www.bostonglobe.com/news/politics/2019/06/21/author-jean-carroll-accuses-president-trump-sexual-assault/g3lN16JP6dqpiK5g0n9OJN/story.html
231   https://www.businessinsider.com/trump-says-e-jean-carroll-falsely-accused-him-sexual-assault-2019-6
232   https://apnews.com/article/politics-ap-top-news-new-york-donald-trump-sexual-assault-a99c37de570940a3a88d2245609ce328
233   https://www.npr.org/2019/06/21/734918876/trump-denies-new-sexual-assault-allegation-by-advice-columnist-e-jean-carroll

Case 23-793, Document 76, 11/20/2023, 3592059, Page284 of 300

Case 1:20-cv-07311-LAK   Document 135-8   Filed 02/16/23   Page 98 of 141

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-23 | Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s[234] | Josh Wingrove and Bloomberg | 6/21/2019 | fortune.com | 4,900,000 | 0.3350 | 54,717 |
| W-24 | Trump dismisses E. Jean Carroll rape allegation as 'fiction'[235] | - | 6/22/2019 | bbc.com | 30,500,000 | 0.4985 | 506,808 |
| W-25 | Woman Accuses Trump of Sexual Assault at New York Store in 1990s[236] | Josh Wingrove | 6/21/2019 | bloomberg.com | 18,100,000 | 0.3615 | 218,105 |
| W-26 | Remarks by President Trump Before Marine One Departure[237] | - | 6/22/2019 | white house | 2,100,000 | 0.3076 | 21,532 |
| W-27 | Trump goes on manic tirade after being asked about new rape allegation: Women get 'paid money to say bad things about me'[238] | Matthew Chapman | 6/22/2019 | rawstory.com | 2,800,000 | 0.6100 | 56,933 |
| W-28 | Writer E. Jean Carroll made a claim of sexual assault against Trump. Here's what we know[239] | William Cummings | 6/25/2019 | usatoday.com | 43,100,000 | 0.3823 | 549,238 |

---

234  https://fortune.com/2019/06/21/e-jean-carroll-trump-rape-new-yorker/
235  https://www.bbc.com/news/world-us-canada-48727972
236  https://www.bloomberg.com/news/articles/2019-06-21/e-jean-carroll-accuses-trump-of-sexual-assault/#xj4y7vzkg
237  https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-marine-one-departure-49/
238  https://www.rawstory.com/2019/06/trump-goes-on-manic-tirade-after-being-asked-about-new-rape-allegation-women-get-paid-money-to-say-bad-things-about-me/
239  https://www.usatoday.com/story/news/politics/onpolitics/2019/06/25/e-jean-carroll-what-we-know-sexual-assault-claim-against-trump/1546559001/

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-29 | George Conway Says Trump's Credibility is 'Annihilated' After President Denies Knowing Alleged Assault Victim[240] | Gillian Edevane | 6/22/2019 | newsweek.com | 13,100,000 | 0.3319 | 144,930 |
| W-30 | It Hurt. And It Was Against My Will': Trump Accuser Stands By Her Story[241] | Lulu Garcia-Navarro and Daniella Cheslow | 6/22/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |
| W-31 | Trump repeats contested claim he does not know latest sexual assault accuser[242] | Amanda Holpuch | 6/22/2019 | theguardian.com | 28,100,000 | 0.4327 | 405,296 |
| W-32 | Trump compares himself to Kavanaugh in latest sexual assault allegation[243] | Colby Itkowitz, Beth Reinhard and David Weigel | 6/22/2019 | washingtonpost.com | 42,300,000 | 0.5450 | 768,450 |
| W-33 | Trump denies knowing NY woman accusing him of sexual assault[244] | Darlene Superville | 6/22/2019 | abcnews.go.com | 16,800,000 | 0.4084 | 228,704 |

Expert Report of Professor Humphreys

95

---

240   https://www.newsweek.com/george-conway-says-trumps-credibility-annihilated-after-president-denies-knowing-alleged-1445387
241   https://www.npr.org/2019/06/22/735080909/it-hurt-and-it-was-against-my-will-trump-accuser-stands-by-her-story
242   https://www.theguardian.com/us-news/2019/jun/22/trump-sexual-assault-accuser-e-jean-carroll
243   https://www.washingtonpost.com/politics/trump-compares-himself-to-kavanaugh-in-latest-sexual-assault-allegation/2019/06/22/81e2c1b4-9509-11e9-aadb-74e6b2b46f6a_story.html
244   https://abcnews.go.com/Politics/wireStory/trump-faces-sexual-assault-allegation-issues-denial-63873470

A-266

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-34 | Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll[245] | Mihir Zaveri | 6/22/2019 | newyorktimes.com | 60,400,000 | 0.4767 | 959,756 |
| W-35 | Trump on E. Jean Carroll's Assault Allegations: 'She's Not My Type'[246] | Julia Arciga | 6/25/2019 | thedailybeast.com | 24,500,000 | 0.3059 | 249,818 |
| W-36 | EXCLUSIVE: Trump vehemently denies E. Jean Carroll allegation, says 'she's not my type'[247] | Jordan Fabian and Saagar Enjeti | 6/24/2019 | thehill.com | 17,500,000 | 0.3991 | 232,808 |
| W-37 | Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"[248] | The Associated Press | 6/25/2019 | hollywoodreporter.com | 11,500,000 | 0.3343 | 128,148 |
| W-38 | Trump says famed advice columnist who accused him of sexual assault is 'not my type'[249] | The Associated Press | 6/24/2019 | chicagotribune.com | 8,300,000 | 0.4070 | 112,603 |
| W-39 | Trump: Woman who accused him of sexual assault not his type[250] | The Associated Press | 6/24/2019 | denverpost.com | 3,200,000 | 0.4071 | 43,424 |

---

245   https://l-nytimes.com/2019/06/22/us/e-jean-carroll-donald-trump.html
246   https://www.thedailybeast.com/trump-on-e-jean-carrolls-assault-allegations-shes-not-my-type
247   https://thehill.com/homenews/administration/450116-trump-vehemently-denies-e-jean-carroll-allegation-shes-not-my-type/
248   https://www.hollywoodreporter.com/news/politics-news/trump-says-accuser-e-jean-carroll-not-my-type-1220818/
249   https://www.chicagotribune.com/nation-world/ct-nw-e-jean-carroll-donald-trump-sexual-assault-allegation-20190625-wql177cbtra7kd2fuq64xhs6b4-story.html
250   https://www.denverpost.com/2019/06/24/trump-addresses-sexual-assault-allegations/

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-40 | Trump Says Columnist Who Accused Him Of Rape Is 'Not My Type'[251] | Amber Athey | 6/24/2019 | dailycaller.com | 4,600,000 | 0.4859 | 74,505 |
| W-41 | Trump, accused again of sexual misconduct, insults woman who said he assaulted her[252] | Peter Baker and Niel Vigdor | 6/25/2019 | bostonglobe.com | 3,700,000 | 0.5045 | 62,222 |
| W-42 | Trump On E. Jean Carroll Accusing Him Of Rape: 'She's Not My Type'[253] | Antonia Blumberg | 6/24/2019 | huffpost.com | 24,200,000 | 0.5484 | 442,376 |
| W-43 | Trump denies woman's sexual assault accusation: 'She's not my type'[254] | Reuters | 6/25/2019 | insider.com | 5,000,000 | 0.3806 | 63,433 |
| W-44 | Trump denies woman's sexual assault accusation: 'She's not my type'[255] | Reuters | 6/25/2019 | reuters.com | 11,900,000 | 0.3870 | 153,510 |
| W-45 | I believe the president': GOP stands by Trump on sexual assault allegation[256] | Burgess Everett Melanie Zanona | 6/25/2019 | politico.com | 14,100,000 | 0.4098 | 192,606 |

251   https://dailycaller.com/2019/06/24/trump-e-jean-carroll-rape-not-my-type/
252   https://www.bostonglobe.com/news/nation/2019/06/25/trump-accused-again-sexual-misconduct-insults-woman-who-said-assaulted-her/ebBy7ynB1nOE96qZPbwa4M/story.html
253   https://www.huffpost.com/entry/trump-e-jean-carroll-rape-allegation-denial_n_5d1157dce4b0a39418678e0e
254   https://www.insider.com/trump-denies-womans-sexual-assault-accusation-shes-not-my-type-2019-6
255   https://www.reuters.com/article/usa-trump-women-idUSL2N23W0IF
256   https://www.politico.com/story/2019/06/25/trump-accuse-gop-1382385

Expert Report of Professor Humphreys

Case 23-793, Document 76, 11/20/2023, 3592059, Page288 of 300

Case 1:20-cv-07311-LAK   Document 135-8   Filed 02/16/23   Page 102 of 141

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-46 | Trump says he didn't rape author E. Jean Carroll: "She's not my type"[257] | Rebecca Falconer | 6/24/2019 | axios.com | 4,500,000 | 0.4717 | 70,755 |
| W-47 | The Real Meaning of Trump's 'She's Not My Type' Defense[258] | Megan Garber | 6/25/2019 | theatlantic.com | 15,600,000 | 0.2615 | 135,980 |
| W-48 | She's not my type': Trump again denies E. Jean Carroll's sexual misconduct allegation[259] | Rebecca Morin | 6/24/2019 | usatoday.com | 43,100,000 | 0.3823 | 549,238 |
| W-49 | A Look At President Trump's Pattern Of Responding To Accusations Of Sexual Misconduct[260] | Ari Shapiro and Anna North | 6/25/2019 | npr.org | 40,400,000 | 0.2309 | 310,945 |
| W-50 | Trump Responds to E. Jean Carroll Rape Allegation: 'She's Not My Type'[261] | Matt Stieb | 6/25/2019 | thecut.com | 5,200,000 | 0.4347 | 75,348 |
| W-51 | E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar[262] | Jia Tolentino | 6/25/2019 | newyorker.com | 6,900,000 | 0.4737 | 108,951 |

Expert Report of Professor Humphreys

98

257  https://www.axios.com/2019/06/24/trump-says-he-didnt-rape-author-e-jean-carroll-shes-not-my-type
258  https://www.theatlantic.com/entertainment/archive/2019/06/trump-e-jean-carroll-rape-allegation-not-my-type-defense/592555/
259  https://www.usatoday.com/story/news/politics/2019/06/24/trump-e-jean-carroll-shes-not-my-type/1554116001/
260  https://www.npr.org/2019/06/25/735930764/a-look-at-president-trumps-pattern-of-responding-to-accusations-of-sexual-miscon
261  https://www.thecut.com/2019/06/trump-on-e-jean-carroll-rape-claim-shes-not-my-type.html
262  https://www.newyorker.com/news/our-columnists/e-jean-carrolls-accusation-against-donald-trump-and-the-raising-and-lowering-of-the-bar

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[209] | Bounce Rate[210] | Impressions Estimate[211] |
|---|---|---|---|---|---|---|---|
| W-52 | Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"[263] | Jay Willis | 6/25/2019 | gq.com | 4,300,000 | 0.5004 | 71,724 |
| W-53 | Trump says sexual assault accuser E Jean Carroll 'not my type'[264] | - | 6/25/2019 | bbc.com | 30,500,000 | 0.4985 | 506,808 |
| | | | | | | TOTAL WEB IMPRESSIONS | 13,922,234 |

---

263  https://www.gq.com/story/trump-not-my-type
264  https://www.bbc.com/news/world-us-canada-48754959

Expert Report of Professor Humphreys

99

## APPENDIX E.  SOCIAL MEDIA IMPRESSIONS MODEL

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers[266] | Retweets[267] | Average RT Followers[268] | Total Followers[269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-1 | @LauraLitvan[272] | N/A | 17,586 | 597 | 10,946 | 28,532 | 302,891 | 60,190 |
| S-2 | @nytimes[273] | W-2 | 43,602,518 | 123 | 1,062 | 43,603,580 | 1,517,403 | 7,622,861 |
| S-3 | @dailycaller[274] | W-4 | 509,377 | 82 | 1,404 | 510,781 | 50,916 | 90,045 |
| S-4 | @dailycaller[275] | W-4 | 509,211 | 241 | 4,319 | 513,530 | 111,412 | 98,107 |
| S-5 | @dailycaller[276] | W-4 | 509,023 | 379 | 1,846 | 510,869 | 97,086 | 95,090 |
| S-6 | @time[277] | W-5 | 16,073,840 | 34 | 702 | 16,074,542 | 605,662 | 2,809,916 |
| S-7 | @people[278] | W-7 | 7,515,391 | 17 | 598 | 7,515,989 | 310,072 | 1,313,779 |

265  Twitter's unique identifier for the original tweet
266  Number of followers of original tweet
267  Total number of retweets (and quote tweets) to the original tweet
268  Estimated average number of followers of all retweets. Estimate is based on retweets accessible via the Twitter API.
269  (Average RT Followers * Retweets) + Primary Followers
270  Equation 2a: $10^{\wedge}(0.7396 \log(\text{Total Followers})*(1\text{-bot rate}) + 0.0473 \log(\text{Primary Followers}*(1\text{-bot rate})) + 0.1027 \log(\text{Retweets}))$. Where:
      "Bot rate" is an estimate rate of bot activity on Twitter. I'm estimating a 12.6% bot rate.
271  Equation 2b: (primary followers * First Level Impression Rate * (1-bot rate of 12.6%)) + (Retweets * Second Level Impression Rate * (1-bot rate)).
      Where:
      "First Level Impression Rate" is an estimated impression rate for the original tweet. I'm estimating a 20% First Level Impression Rate.
      "Second Level Impression Rate" an estimated impression rate for the retweets of the original tweet. I'm estimating a 1% Second Level Impression Rate.
272  https://twitter.com/LauraLitvan/status/1142179819075121154
273  https://twitter.com/nytimes/status/1142469834170601477
274  https://twitter.com/DailyCaller/status/1143013379558334464
275  https://twitter.com/DailyCaller/status/1142809657653813248
276  https://twitter.com/DailyCaller/status/1142420738865078272
277  https://twitter.com/TIME/status/1142190416256782337
278  https://twitter.com/people/status/1142189984574836736

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers[266] | Retweets[267] | Average RT Followers[268] | Total Followers[269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-8 | @politico[279] | W-8 | 3,838,011 | 621 | 8,539 | 3,846,550 | 501,872 | 717,229 |
| S-9 | @politico[280] | W-8 | 3,838,042 | 168 | 3,051 | 3,841,093 | 253,407 | 675,370 |
| S-10 | @politico[281] | W-8 | 3,838,042 | 66 | 1,727 | 3,839,769 | 214,427 | 671,886 |
| S-11 | @politico[282] | W-8 | 3,838,042 | 67 | 1,805 | 3,839,847 | 215,038 | 671,947 |
| S-12 | @RollingStone[283] | W-11 | 6,278,602 | 16 | 1,584 | 6,280,186 | 268,022 | 1,097,721 |
| S-13 | @washingtonpost[284] | W-13 | 13,798,619 | 229 | 4,023 | 13,802,642 | 684,581 | 2,420,050 |
| S-14 | @Slate[285] | W-18 | 1,778,594 | 24 | 1,661 | 1,780,255 | 104,961 | 311,247 |
| S-15 | @Slate[286] | W-18 | 1,778,506 | 15 | 10,499 | 1,789,005 | 104,756 | 312,259 |
| S-16 | @Slate[287] | W-18 | 1,778,538 | 12 | 3,580 | 1,782,118 | 97,870 | 311,264 |
| S-17 | @Slate[288] | W-18 | 1,778,659 | 13 | 5,059 | 1,783,718 | 99,595 | 311,484 |
| S-18 | @Slate[289] | W-18 | 1,778,670 | 10 | 2,492 | 1,781,162 | 95,355 | 311,129 |
| S-19 | @Slate[290] | W-18 | 1,778,685 | 9 | 7,318 | 1,786,003 | 95,909 | 311,490 |
| S-20 | @Slate[291] | W-18 | 1,778,560 | 8 | 1,622 | 1,780,182 | 92,734 | 311,006 |
| S-21 | @Slate[292] | W-18 | 1,778,681 | 9 | 464 | 1,779,145 | 93,526 | 310,950 |

279  https://twitter.com/politico/status/1421817206834081792
280  https://twitter.com/politico/status/1422057346393362048
281  https://twitter.com/politico/status/1422057355563634305
282  https://twitter.com/politico/status/1422057364051312264
283  https://twitter.com/RollingStone/status/1421897153927798720
284  https://twitter.com/washingtonpost/status/1422403993120194 58
285  https://twitter.com/Slate/status/1428156020773273 61
286  https://twitter.com/Slate/status/1424920148204380016
287  https://twitter.com/Slate/status/1426176012202598 40
288  https://twitter.com/Slate/status/1428849459432898 56
289  https://twitter.com/Slate/status/1434360727371124737
290  https://twitter.com/Slate/status/1432964950204126723
291  https://twitter.com/Slate/status/1426901680020075 20
292  https://twitter.com/Slate/status/1433552608509050 89

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers [266] | Retweets[267] | Average RT Followers [268] | Total Followers [269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-22 | @Slate[293] | W-18 | 1,778,697 | 5 | 692 | 1,779,389 | 88,022 | 310,946 |
| S-23 | @Slate[294] | W-18 | 1,778,705 | 3 | 2,678 | 1,781,383 | 83,682 | 310,988 |
| S-24 | @Slate[295] | W-18 | 1,778,696 | 5 | 1,481 | 1,780,177 | 88,166 | 310,981 |
| S-25 | @Slate[296] | W-18 | 1,778,673 | 7 | 547 | 1,779,220 | 91,129 | 310,945 |
| S-26 | @Slate[297] | W-18 | 1,778,701 | 3 | 1,903 | 1,780,604 | 83,601 | 310,967 |
| S-27 | @NPR[298] | W-22 | 7,770,046 | 94 | 956 | 7,771,002 | 382,281 | 1,358,989 |
| S-28 | @FortuneMagazine [299] | W-23 | 2,262,542 | 1 | 0 | 2,262,542 | 90,034 | 395,492 |
| S-29 | @BBCNews[300] | W-24 | 10,029,760 | 31 | 767 | 10,030,527 | 414,204 | 1,753,410 |
| S-30 | @BBCWorld[301] | W-24 | 25,250,057 | 66 | 3,758 | 25,253,815 | 930,727 | 4,415,878 |
| S-31 | @BBCWorld[302] | W-24 | 25,251,777 | 118 | 109,206 | 25,360,983 | 1,330,634 | 4,526,637 |
| S-32 | @RawStory[303] | W-27 | 198,447 | 39 | 7,764 | 206,211 | 38,345 | 37,335 |
| S-33 | @newsweek[304] | W-29 | 3,333,156 | 48 | 1,025 | 3,334,181 | 183,730 | 583,066 |
| S-34 | @NPR[305] | W-30 | 7,770,824 | 95 | 1,060 | 7,771,884 | 383,118 | 1,359,220 |

293  https://twitter.com/Slate/status/1143242046377025538
294  https://twitter.com/Slate/status/1143103358351360001
295  https://twitter.com/Slate/status/1143077862464983040
296  https://twitter.com/Slate/status/1142966568806227968
297  https://twitter.com/Slate/status/1143195574482677761
298  https://twitter.com/NPR/status/1142260932703334400
299  https://twitter.com/FortuneMagazine/status/1142556629906415616
300  https://twitter.com/BBCNews/status/1142225240942141440
301  https://twitter.com/BBCWorld/status/1142220276538720256
302  https://twitter.com/BBCWorld/status/1142380908311453696
303  https://twitter.com/RawStory/status/1142478448746749952
304  https://twitter.com/Newsweek/status/1142781858796703746
305  https://twitter.com/NPR/status/1142824913822244864

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers[266] | Retweets[267] | Average RT Followers[268] | Total Followers[269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-35 | @guardiannews[306] | W-31 | 2,875,794 | 10 | 2,203 | 2,877,997 | 138,523 | 502,881 |
| S-36 | @washingtonpost[307] | W-32 | 13,801,157 | 450 | 2,709 | 13,803,866 | 744,815 | 2,423,097 |
| S-37 | @washingtonpost[308] | W-32 | 13,802,210 | 426 | 7,599 | 13,809,809 | 813,052 | 2,440,919 |
| S-38 | @nytimes[309] | W-34 | 43,606,559 | 102 | 3,864 | 43,610,423 | 1,495,243 | 7,625,871 |
| S-39 | @thedailybeast[310] | W-35 | 1,220,166 | 42 | 5,081 | 1,225,247 | 91,591 | 215,150 |
| S-40 | @thehill[311] | W-36 | 3,294,185 | 125 | 1,681 | 3,295,866 | 207,974 | 577,660 |
| S-41 | @thehill[312] | W-36 | 3,294,122 | 68 | 26,072 | 3,320,194 | 256,624 | 591,307 |
| S-42 | @thehill[313] | W-36 | 3,294,403 | 31 | 1,554 | 3,295,957 | 174,036 | 576,283 |
| S-43 | @thehill[314] | W-36 | 3,294,049 | 9 | 3,448 | 3,297,497 | 152,682 | 576,071 |
| S-44 | @dailycaller[315] | W-40 | 509,572 | 151 | 1,738 | 511,310 | 63,413 | 91,367 |
| S-45 | @dailycaller[316] | W-40 | 509,664 | 17 | 867 | 510,531 | 38,068 | 89,218 |
| S-46 | @huffpost[317] | W-42 | 11,437,397 | 266 | 4,559 | 11,441,956 | 615,996 | 2,009,856 |
| S-47 | @politico[318] | W-45 | 3,840,348 | 61 | 14,392 | 3,854,740 | 242,492 | 678,966 |
| S-48 | @axios[319] | W-46 | 277,660 | 46 | 1,481 | 279,141 | 30,111 | 49,130 |

306  https://twitter.com/guardiannews/status/1142535020504113167
307  https://twitter.com/washingtonpost/status/1142492789336346624
308  https://twitter.com/washingtonpost/status/1142615547688955917
309  https://twitter.com/nytimes/status/1427944590522245122
310  https://twitter.com/thedailybeast/status/1143302340235202561
311  https://twitter.com/thehill/status/1143490901789471747
312  https://twitter.com/thehill/status/1143477201481891841
313  https://twitter.com/thehill/status/1143535303016495309
314  https://twitter.com/thehill/status/1143445235445436416
315  https://twitter.com/DailyCaller/status/1143314226095755265
316  https://twitter.com/DailyCaller/status/1143492790329970688
317  https://twitter.com/HuffPost/status/1143300651532898304
318  https://twitter.com/politico/status/1143648348945178624
319  https://twitter.com/axios/status/1432929687716044480

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Original Tweet ID[265] | Article Referenced | Primary Followers[266] | Retweets[267] | Average RT Followers[268] | Total Followers[269] | Impression Estimate Equation 2a[270] | Impressions Estimate Equation 2b[271] |
|---|---|---|---|---|---|---|---|---|
| S-49 | @usatoday[320] | W-48 | 3,812,700 | 18 | 1,852 | 3,814,552 | 183,849 | 666,751 |
| S-50 | @thecut[321] | W-50 | 1,411,305 | 5 | 12,513 | 1,423,818 | 75,654 | 247,243 |
| S-51 | @GQMagazine[322] | W-52 | 1,302,850 | 5 | 160 | 1,303,010 | 68,828 | 227,745 |
| S-52 | @GQMagazine[323] | W-52 | 1,302,856 | 3 | 3,926 | 1,306,782 | 65,717 | 227,842 |
| S-53 | @GQMagazine[324] | W-52 | 1,302,845 | 4 | 771 | 1,303,616 | 67,356 | 227,764 |
| S-54 | @BBCNews[325] | W-53 | 10,033,926 | 104 | 844 | 10,034,770 | 471,389 | 1,754,697 |
| S-55 | @BBCWorld[326] | W-53 | 25,264,091 | 362 | 1,322 | 25,265,413 | 1,116,377 | 4,420,345 |
| | | **TOTAL SOCIAL MEDIA IMPRESSIONS (LOW/HIGH)** | | | | | **17,218,959** | **63,040,041** |

Expert Report of Professor Humphreys

320  https://twitter.com/USATODAY/status/1143375768682160128
321  https://twitter.com/TheCut/status/1143501166678106112
322  https://twitter.com/GQMagazine/status/1436100846611768320
323  https://twitter.com/GQMagazine/status/1436450026269499919
324  https://twitter.com/GQMagazine/status/1439520859978947586
325  https://twitter.com/BBCNews/status/1143513920588830848
326  https://twitter.com/bbcworld/status/1143414344287510528

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX F. TV IMPRESSIONS MODEL

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-1 | Anderson Cooper 360[328] | 6/21/2019 | 5:00pm-6:00pm PDT | CNN (San Francisco) | 877,000[329] |
| T-2 | Anderson Cooper 360[330] | 6/21/2019 | 8:00pm-9:00pm PDT | CNN (San Francisco) | N/A |
| T-3 | Cuomo Prime Time[331] | 6/21/2019 | 9:00pm-10:00pm PDT | CNN (San Francisco) | 936,000[332] |
| T-4 | CBS Evening News[333] | 6/21/2019 | 6:30pm-7:00pm PDT | KPIX (CBS) | 5,863,000[334] |
| T-5 | The Ten O'Clock News on KTVU Fox 2[335] | 6/21/2019 | 10:00pm-10:59pm PDT | KTVU (FOX) | 1,401,000[336] |
| T-6 | The Last Word With Lawrence O'Donnell[337] | 6/21/2019 | 10:00pm-11:00pm PDT | MSNBC West | 2,010,000[338] |

---

[327] I only count ratings for a particular program once in a day. I use "N/A" to denote broadcasts that I am not counting.
[328] https://archive.org/details/CNNW_20190622_000000 Anderson_Cooper_360/
[329] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?vcr=1663095759923
[330] https://archive.org/details/CNNW_20190622_030000 Anderson_Cooper_360/
[331] https://archive.org/details/CNNW_20190622_040000 Cuomo_Prime_Time
[332] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[333] https://archive.org/details/KPIX_20190622_013000 CBS_Evening_News
[334] https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/
[335] https://archive.org/details/KTVU_20190622_050000_The_Ten_OClock_News_on_KTVU_Fox_2
[336] https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
[337] https://archive.org/details/MSNBCW_20190622_050000_The_Last_Word_With_Lawrence_ODonnell
[338] https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/

Expert Report of Professor Humphreys

105

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-7 | All In With Chris Hayes[339] | 6/21/2019 | 5:00pm-6:00pm PDT | MSNBC West | 1,552,000[340] |
| T-8 | The Rachel Maddow Show[341] | 6/21/2019 | 9:00pm-10:01pm PDT | MSNBC West | 2,561,000[342] |
| T-9 | CNN Newsroom Live[343] | 6/22/2019 | 1:00am-2:00am PDT | CNN (San Francisco) | 628,000[344] |
| T-10 | CNN Newsroom Live[345] | 6/22/2019 | 12:00am-1:00am PDT | CNN (San Francisco) | N/A |
| T-11 | CNN Newsroom With Ana Cabrera[346] | 6/22/2019 | 12:00pm-1:00pm PDT | CNN (San Francisco) | N/A |
| T-12 | New Day Weekend With Victor Blackwell and Christi Paul[347] | 6/22/2019 | 3:00am-4:00am PDT | CNN (San Francisco) | 534,000[348] |
| T-13 | New Day Weekend With Victor Blackwell and Christi Paul[349] | 6/22/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | N/A |
| T-14 | New Day Weekend With Victor Blackwell and Christi Paul[350] | 6/22/2019 | 5:00am-6:00am PDT | CNN (San Francisco) | N/A |

Expert Report of Professor Humphreys

106

339  https://archive.org/details/MSNBCW_20190622_000000_All_In_With_Chris_Hayes
340  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
341  https://archive.org/details/MSNBCW_20190622_040000_The_Rachel_Maddow_Show
342  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
343  https://archive.org/details/CNNW_20190622_080000_CNN_Newsroom_Live
344  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?vcr=1663095759923
345  https://archive.org/details/CNNW_20190622_070000_CNN_Newsroom_Live
346  https://archive.org/details/CNNW_20190622_190000_CNN_Newsroom_With_Ana_Cabrera
347  https://archive.org/details/CNNW_20190622_100000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul
348  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
349  https://archive.org/details/CNNW_20190622_110000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul
350  https://archive.org/details/CNNW_20190622_120000_New_Day_Weekend_With_Victor_Blackwell_and_Christi_Paul

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|-----|-------|------|------|---------|----------------------|
| T-15 | CNN Newsroom With Victor Blackwell and Christi Paul[351] | 6/22/2019 | 7:00am-8:00am PDT | CNN (San Francisco) | N/A |
| T-16 | CNN Newsroom With Fredricka Whitfield[352] | 6/22/2019 | 8:00am-9:00am PDT | CNN (San Francisco) | N/A |
| T-17 | Cavuto Live[353] | 6/22/2019 | 7:00am-9:00am PDT | Fox News West | 1,401,000[354] |
| T-18 | America's News HQ[355] | 6/22/2019 | 9:00am-11:00am PDT | Fox News West | 1,401,000[356] |
| T-19 | NBC Nightly News With Lester Holt[357] | 6/22/2019 | 5:30pm-5:59pm PDT | KNTV (NBC) | 6,769,000[358] |
| T-20 | CBS This Morning[359] | 6/22/2019 | 4:00am-5:59am PDT | KPIX (CBS) | 2,700,000[360] |
| T-21 | The Ten O'Clock News on KTVU Fox 2[361] | 6/22/2019 | 10:00pm-10:44pm PDT | KTVU (FOX) | 1,401,000[362] |

Expert Report of Professor Humphreys

107

351  https://archive.org/details/CNNW_20190622_140000_CNN_Newsroom_With_Victor_Blackwell_and_Christi_Paul
352  https://archive.org/details/CNNW_20190622_150000_CNN_Newsroom_With_Fredricka_Whitfield
353  https://archive.org/details/FOXNEWSW_20190622_140000_Cavuto_Live
354  https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
355  https://archive.org/details/FOXNEWSW_20190622_160000_Americas_News_HQ
356  https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
357  https://archive.org/details/KNTV_20190623_003000_NBC_Nightly_News_With_Lester_Holt
358  https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/
359  https://archive.org/details/KPIX_20190622_110000_CBS_This_Morning
360  https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
361  https://archive.org/details/KTVU_20190623_050000_The_Ten_OClock_News_on_KTVU_Fox_2
362  https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|-----|-------|------|------|---------|-----------------------|
| T-22 | KTVU Mornings on 2 at 7am[363] | 6/22/2019 | 7:00am–10:00am PDT | KTVU (FOX) | 1,401,000[364] |
| T-23 | Up With David Gura[365] | 6/22/2019 | 5:00am–7:00am PDT | MSNBC West | 900,000[366] |
| T-24 | The Rachel Maddow Show[367] | 6/22/2019 | 6:00pm–7:00pm PDT | MSNBC West | 2,561,000[368] |
| T-25 | Weekends With Alex Witt[369] | 6/22/2019 | 9:00am–11:00am PDT | MSNBC West | 900,000[370] |
| T-26 | Cuomo Prime Time[371] | 6/24/2019 | 10:00pm–11:00pm PDT | CNN (San Francisco) | 936,000[372] |
| T-27 | CNN Tonight With Don Lemon[373] | 6/24/2019 | 11:00pm–12:00am PDT | CNN (San Francisco) | 833,000[374] |

Expert Report of Professor Humphreys

108

363 https://archive.org/details/KTVU_20190622_140000_KTVU_Mornings_on_2_at_7am
364 https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
365 https://archive.org/details/MSNBCW_20190622_120000_Up_With_David_Gura
366 https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
367 https://archive.org/details/MSNBCW_20190623_010000_The_Rachel_Maddow_Show
368 https://www.tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
369 https://archive.org/details/MSNBCW_20190622_160000_Weekends_With_Alex_Witt
370 https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/
371 https://archive.org/details/CNNW_20190625_050000_Cuomo_Prime_Time
372 https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
373 https://archive.org/details/CNNW_20190625_060000_CNN_Tonight_With_Don_Lemon
374 https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-28 | CNN Newsroom With Brooke Baldwin[375] | 6/24/2019 | 12:00pm-1:00pm PDT | CNN (San Francisco) | 534,000[376] |
| T-29 | Situation Room With Wolf Blitzer[377] | 6/24/2019 | 3:00pm-4:00pm PDT | CNN (San Francisco) | 168,000[378] |
| T-30 | New Day With Alisyn Camerota and John Berman[379] | 6/24/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | 460,000[380] |
| T-31 | New Day With Alisyn Camerota and John Berman[381] | 6/24/2019 | 5:00am-6:00am PDT | CNN (San Francisco) | N/A |
| T-32 | Anderson Cooper 360[382] | 6/24/2019 | 5:00pm-6:00pm PDT | CNN (San Francisco) | 877,000[383] |
| T-33 | Cuomo Prime Time[384] | 6/24/2019 | 6:00pm-7:00pm PDT | CNN (San Francisco) | N/A |
| T-34 | CNN Tonight With Don Lemon[385] | 6/24/2019 | 7:00pm-8:00pm PDT | CNN (San Francisco) | N/A |

375  https://archive.org/details/CNNW_20190624_190000_CNN_Newsroom_With_Brooke_Baldwin
376  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
377  https://archive.org/details/CNNW_20190624_220000_Situation_Room_With_Wolf_Blitzer
378  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
379  https://archive.org/details/CNNW_20190624_110000_New_Day_With_Alisyn_Camerota_and_John_Berman
380  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
381  https://archive.org/details/CNNW_20190624_120000_New_Day_With_Alisyn_Camerota_and_John_Berman
382  https://archive.org/details/CNNW_20190625_000000_Anderson_Cooper_360
383  https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/?ver=1663095759923
384  https://archive.org/details/CNNW_20190625_010000_Cuomo_Prime_Time
385  https://archive.org/details/CNNW_20190625_020000_CNN_Tonight_With_Don_Lemon

Expert Report of Professor Humphreys

A-279

A-280

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-35 | Anderson Cooper 360[386] | 6/24/2019 | 9:00pm-10:00pm PDT | CNN (San Francisco) | N/A |
| T-36 | The Last Word With Lawrence O'Donnell[387] | 6/24/2019 | 10:00pm-11:00pm PDT | MSNBC West | 2,010,000[388] |
| T-37 | First Look[389] | 6/24/2019 | 2:00am-3:00am PDT | MSNBC West | 385,000[390] |
| T-38 | Morning Joe[391] | 6/24/2019 | 3:00am-6:00am PDT | MSNBC West | 1,033,000[392] |
| T-39 | Andrea Mitchell Reports[393] | 6/24/2019 | 9:00am-10:00am PDT | MSNBC West | 839,000[394] |
| T-40 | CNN Tonight With Don Lemon[395] | 6/25/2019 | 12:00am-1:00am PDT | CNN (San Francisco) | 833,000[396] |
| T-41 | Early Start With Christine Romans and Dave Briggs[397] | 6/25/2019 | 2:00am-3:00am PDT | CNN (San Francisco) | 534,000[398] |

386  https://archive.org/details/CNNW_20190625_040000_Anderson_Cooper_360
387  https://archive.org/details/MSNBCW_20190625_050000_The_Last_Word_With_Lawrence_ODonnell
388  https://www.adweek.com/tvnewser/here-arc-the-top-cable-news-shows-of-q2-2019/407842/
389  https://archive.org/details/MSNBCW_20190624_090000_First_Look
390  https://www.adweek.com/tvnewser/here-arc-the-top-cable-news-shows-of-q2-2019/407842/
391  https://archive.org/details/MSNBCW_20190624_100000_Morning_Joe
392  https://www.adweek.com/tvnewser/here-arc-the-top-cable-news-shows-of-q2-2019/407842/
393  https://archive.org/details/MSNBCW_20190624_160000_Andrea_Mitchell_Reports
394  https://www.adweek.com/tvnewser/here-arc-the-top-cable-news-shows-of-q2-2019/407842/
395  https://archive.org/details/CNNW_20190625_070000_CNN_Tonight_With_Don_Lemon
396  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-at-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
397  https://archive.org/details/CNNW_20190625_090000_Early_Start_with_Christine_Romans_and_Dave_Briggs
398  https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/

Expert Report of Professor Humphreys

110