# 23-0793-CV

## United States Court of Appeals

*for the*

## Second Circuit

───────────────

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

───────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 2 of 12 (Pages A-281 to A-560)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

i

**TABLE OF CONTENTS FOR JOINT APPENDIX**

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*")........................................ A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") ..................................... A-32

**Documents Submitted in *Carroll I***

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

Exhibit A to Kaplan Declaration -
Letter from Roberta A. Kaplan to Marc E.
Kasowitz, dated August 10, 2020, with Enclosure    A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023......... A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 ....................................... A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 ....................................... A-89

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Lisa
Birnbach, dated September 21, 2022 .................... A-92

Exhibit 2 to Kaplan Declaration -
Excerpts from Deposition Transcript of Carol
Martin, dated October 18, 2022 ........................... A-104

ii

                                                                    **Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................  A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ........................  A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................  A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ...........................  A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment .........  A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 ...................................................  A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 ...............................................  A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 .........................................  A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ................................................  A-405

iii

**Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................. A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 .......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ...................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ....................... A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 ......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ........................... A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 .................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022.................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ......................................................... A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023....................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

Page

Letter from Roberta A. Kaplan to the Honorable
   Lewis A. Kaplan, dated March 17, 2023 ............... A-509

   Annexed to Letter -
   Proposed Order ..................................................... A-511

### **Documents Submitted in *Carroll II***

Complaint and Demand for a Jury Trial, dated
   November 24, 2022 ................................................ A-513

Answer, dated January 27, 2023 ............................... A-542

First Amended Answer, dated February 10, 2023...... A-556

Defendant's Letter Motion for Discovery, dated
   February 10, 2023 ................................................ A-571

   Exhibit A to Defendant's Letter Motion -
   DNA Report, dated January 8, 2020 ..................... A-574

   Exhibit B to Defendant's Letter Motion -
   Twitter Post, dated February 25, 2021 .................. A-602

Plaintiff's Letter Response in Opposition to
   Defendant's Motion for Discovery, dated
   February 10, 2023 ................................................ A-607

Defendant's Letter Reply in Further Support of
   Motion for Discovery, dated February 10, 2023.... A-612

Transcript of Conference, dated February 7, 2023 .... A-614

Notice of Motion, by Defendant, for an Order
   Granting Partial Summary Judgment, dated
   February 23, 2023 ................................................ A-635

Declaration of Matthew G. DeOreo, for Defendant,
   in Support of Motion for Partial Summary
   Judgment, dated February 23, 2023...................... A-637

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020 .. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 .................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ...................................... A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023 ......... A-747

vii

| | Page |
|---|---|
| Declaration of Alina Habba, for Defendant, in Support of Motions *in Limine*, dated February 23, 2023 ................................................. | A-773 |
| Exhibit A to Habba Declaration - Excerpts from Deposition Transcript of Natasha Stoynoff, dated October 13, 2022 ......................... | A-775 |
| Exhibit B to Habba Declaration - Excerpts from Deposition Transcript of Jessica Leeds, dated October 13, 2022 ............................. | A-779 |
| Exhibit C to Habba Declaration - Plaintiff's Second Supplemental Rule 26(a)(1) Disclosures, dated October 14, 2022 (Reproduced herein at pp. A-487-A-492) | |
| Exhibit D to Habba Declaration - Plaintiff's Third Supplemental Rule 26(a)(1) Disclosures, dated January 6, 2023 (Reproduced herein at pp. A-493-A-499) | |
| Plaintiff's Notice of Omnibus Motion *in Limine*, dated February 23, 2023 ........................................ | A-783 |
| Declaration of Roberta A. Kaplan, for Plaintiff, in Support of Omnibus Motion *in Limine*, dated February 23, 2023 ........................................ | A-785 |
| Exhibit 1 to Kaplan Declaration - Excerpts from Deposition Transcript of Robert J. Fisher, dated February 6, 2023 .............................. | A-786 |
| Exhibit 2 to Kaplan Declaration - Expert Report of Robert J. Fisher, dated January 30, 2023 .................................................... | A-863 |

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ...................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................. A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)................................................................ A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)................................................................ A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 .................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 ......................... A-1065

x

**Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
    Opposition to Defendant's Motions *in Limine*,
    dated March 9, 2023 ............................................. A-1080

Exhibit 1 to Crowley Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
Video of Deposition of Natasha Stoynoff, taken
October 13, 2022
(All parties are already in possession of video
exhibit) ................................................................... A-1089

Exhibit 3 to Crowley Declaration -
Video of Deposition of Jessica Leeds, taken
October 13, 2022
(All parties are already in possession of video
exhibit) ................................................................... A-1091

Plaintiff's Response to Defendant's Local Civil
    Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
    Opposition to Defendant's Motion for Partial
    Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1110

Exhibit 2 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023
(Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
    Plaintiff, in Further Support of Omnibus Motion
    *in Limine*, dated March 16, 2023 .......................... A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 .......................... A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 ......................... A-1153

Reply Declaration of Alina Habba, for Defendant,
    in Further Support of Motions *in Limine*, dated
    March 16, 2023....................................................... A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022................................................ A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
dated April 13, 2023 ................................................ A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 ................................................ A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023................................................ A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 ............................... A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-1207

Plaintiff's Letter Response to Defendant's Motion
to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022   A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ...................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023........................ A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 ............................... A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................. A-1416

Trial Transcript, dated April 25, 2023....................... A-1420

Trial Transcript, dated April 26, 2023....................... A-1524

Trial Transcript, dated April 27, 2023....................... A-1697

Trial Transcript, dated May 1, 2023.......................... A-1851

Trial Transcript, dated May 2, 2023.......................... A-2036

Trial Transcript, dated May 3, 2023.......................... A-2210

Trial Transcript, dated May 4, 2023.......................... A-2375

Trial Transcript, dated May 8, 2023.......................... A-2567

Trial Transcript, dated May 9, 2023.......................... A-2771

Parties' Trial Exhibits:

PX-1        Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2    "Remarks by President Trump before
Marine One Departure" (Office of the
Press Secretary, June 22, 2019) ..............   A-2840

PX-3    "EXCLUSIVE: Trump vehemently
denies E. Jean Carroll allegation, says
'she's not my type'" (*The Hill*,
June 24, 2019)..........................................   A-2853

PX-4    Truth Social Post, dated
October 12, 2022......................................   A-2858

PX-6    "Donald Trump assaulted me in a
Bergdorf Goodman dressing room 23
years ago. But he's not alone on the list
of awful men in my life." (New York
Magazine, June 21, 2019) .......................   A-2859

PX-12    Photograph ...............................................   A-2879

PX-22    Sixth Floor Construction Plan of
Bergdorf Goodman ..................................   A-2880

PX-24    Sixth Floor Construction Plan of
Bergdorf Goodman ..................................   A-2881

PX-25    Video Excerpt from Defendant's
Interview with Billy Bush
(All parties are already in possession of
video exhibit) ..........................................   A-2882

PX-25-T    Transcript of Video Excerpt from
Defendant's Interview with Billy Bush ...   A-2883

PX-26    Video Excerpt from Presidential Debate
(All parties are already in possession of
video exhibit) ..........................................   A-2885

xvi

**Page**

| | | |
|---|---|---|
| PX-26-T | Transcript of Video Excerpt from Presidential Debate ................................. | A-2886 |
| PX-29 | Video Excerpt from Defendant's Speech at Campaign Rally (All parties are already in possession of video exhibit) ........................................ | A-2887 |
| PX-29-T | Transcript of Video Excerpt from Defendant's Speech at Campaign Rally... | A-2888 |
| PX-31 | Video Excerpt from Defendant's Speech (All parties are already in possession of video exhibit) ........................................ | A-2889 |
| PX-31-T | Transcript of Video Excerpt from Defendant's Speech................................. | A-2890 |
| PX-46 | Twitter Post, dated November 15, 2022... | A-2891 |
| PX-48 | Twitter Post, dated December 12, 2022 ... | A-2893 |
| PX-51 | Twitter Post, dated January 29, 2023 ....... | A-2896 |
| PX-53 | Twitter Post, dated January 29, 2023 ....... | A-2898 |
| PX-57 | Email, dated October 13, 2022 ................ | A-2901 |
| PX-112 | Video Excerpt from Defendant's Interview with Roger Ailes (All parties are already in possession of video exhibit) ........................................ | A-2902 |
| PX-112-T | Transcript of Video Excerpt from Defendant's Interview with Roger Ailes.. | A-2903 |
| PX-200 | Video Excerpt from Deposition of Donald J. Trump, taken October 19, 2022 ......................................... | A-2904 |

xvii

**Page**

PX-200-T  Transcript of Video Excerpt from
          Deposition of Donald J. Trump, taken
          October 19, 2022......................................  A-2905

DX-CK     Email Regarding Law & Order SVU,
          dated July 23, 2019 .................................  A-2986

Court Exhibits:

C         Timeline of Events ...................................  A-2987

D         WordPerfect Document Compare
          Summary of Jury Instructions..................  A-2988

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 1, 2023 ....................  A-3024

    Exhibit A to Letter -
    Excerpts of Trial Transcripts..................................  A-3042

    Exhibit B to Letter -
    LinkedIn Post.........................................................  A-3081

    Exhibit C to Letter -
    "One of the Democratic Party's biggest donors is
    exploring a new anti-Trump boycott" (*Vox*,
    July 2, 2020) ..........................................................  A-3083

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated May 5, 2023 ....................  A-3088

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 6, 2023 ....................  A-3091

Verdict Form, dated May 9, 2023 .............................  A-3095

Notice of Appeal, dated May 11, 2023 ......................  A-3099

Notice of Motion, by Defendant, for an Order
    Granting a New Trial or Remittitur, dated
    June 8, 2023 ..........................................................  A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
    Motion for a New Trial or Remittitur, dated
    June 8, 2023 ............................................................ A-3103

Declaration of Matthew G. DeOreo, for Defendant,
    in Support of Motion for a New Trial or
    Remittitur, dated June 8, 2023 .............................. A-3134

    Exhibit A to DeOreo Declaration -
    Complaint and Demand for a Jury Trial filed in
    *Carroll II*, dated November 24, 2022
    (Reproduced herein at pp. A-513-A-541)

    Exhibit B to DeOreo Declaration -
    Excerpts of Trial Transcripts.................................. A-3136

    Exhibit C to DeOreo Declaration -
    Complaint and Jury Demand filed in *Carroll I*,
    dated November 4, 2019
    (Reproduced herein at pp. A-639-A-667)

    Exhibit D to DeOreo Declaration -
    Verdict Form, dated May 9, 2023
    (Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
    Opposition to Defendant's Motion for a New
    Trial or Remittitur, dated June 22, 2023 ................ A-3219

    Exhibit 1 to Kaplan Declaration -
    Excerpts of Trial Transcripts.................................. A-3221

    Exhibit 2 to Kaplan Declaration -
    Twitter Post, dated June 21, 2019
    (Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 ................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 ................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
    Second Circuit, dated July 19, 2023 ..................... A-3339

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|-----|-------|------|------|---------|----------------------|
| T-42 | New Day With Alisyn Camerota and John Berman[399] | 6/25/2019 | 3:00am-4:00am PDT | CNN (San Francisco) | N/A |
| T-43 | New Day With Alisyn Camerota and John Berman[400] | 6/25/2019 | 4:00am-5:00am PDT | CNN (San Francisco) | 460,000[401] |
| T-44 | CNN Newsroom with Poppy Harlow and Jim Sciutto[402] | 6/25/2019 | 7:00am-8:00am PDT | CNN (San Francisco) | 534,000[403] |
| T-45 | World News Now[404] | 6/25/2019 | 2:42am-4:00am PDT | KGO (ABC) | 3,929,000[405] |
| T-46 | ABC World News Tonight With David Muir[406] | 6/25/2019 | 5:30pm-6:00pm PDT | KGO (ABC) | 9,390,000[407] |
| T-47 | Good Morning America[408] | 6/25/2019 | 7:00am-9:00am PDT | KGO (ABC) | 3,920,000[409] |

[399] https://archive.org/details/CNNW_20190625_100000_New_Day_With_Alisyn_Camerota_and_John_Berman
[400] https://archive.org/details/CNNW_20190625_110000_New_Day_With_Alisyn_Camerota_and_John_Berman
[401] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[402] https://archive.org/details/CNNW_20190625_140000_CNN_Newsroom_with_Poppy_Harlow_and_Jim_Sciutto
[403] https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
[404] https://archive.org/details/KGO_20190625_094200_World_News_Now
[405] https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
[406] https://archive.org/details/KGO_20190626_003000_ABC_World_News_Tonight_With_David_Muir
[407] https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
[408] https://archive.org/details/KGO_20190625_140000_Good_Morning_America
[409] https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/

Expert Report of Professor Humphreys

111

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-48 | The Late Show With Stephen Colbert[410] | 6/25/2019 | 11:35pm-12:37am PDT | KPIX (CBS) | 3,800,000[411] |
| T-49 | KPIX 5 News at 6:00PM[412] | 6/25/2019 | 6:00pm-6:30pm PDT | KPIX (CBS) | 5,468,000[413] |
| T-50 | CBS Evening News[414] | 6/25/2019 | 6:30pm-7:00pm PDT | KPIX (CBS) | 5,863,000[415] |
| T-51 | CBS This Morning[416] | 6/25/2019 | 7:00am-9:00am PDT | KPIX (CBS) | 2,700,000[417] |
| T-52 | Deadline: White House[418] | 6/25/2019 | 1:00pm-2:00pm PDT | MSNBC West | 1,378,000[419] |
| T-53 | First Look[420] | 6/25/2019 | 2:00am-3:00am PDT | MSNBC West | 385,000[421] |
| T-54 | Morning Joe[422] | 6/25/2019 | 3:00am-6:00am PDT | MSNBC West | 1,033,000[423] |

410 https://archive.org/details/KPIX_20190626_063500_The_Late_Show_With_Stephen_Colbert
411 https://www.nytimes.com/2019/03/05/business/media/colbert-fallon-ratings-nielsen.html?login=email&auth=login-email&login=email&auth=login-email#:~:text=The%20latest%20season-to-date,viewers%20in%20that%20same%20period.
412 https://archive.org/details/KPIX_20190626_010000_KPIX_5_News_at_600PM
413 https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
414 https://archive.org/details/KPIX_20190626_013000_CBS_Evening_News
415 https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/
416 https://archive.org/details/KPIX_20190625_140000_CBS_This_Morning
417 https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
418 https://archive.org/details/MSNBCW_20190625_200000_Deadline_White_House
419 https://www.adweek.com/tvnewser/here-arc-the-top-cable-news-shows-of-q2-2019/407842/
420 https://archive.org/details/MSNBCW_20190625_090000_First_Look
421 https://www.adweek.com/tvnewser/here-arc-the-top-cable-news-shows-of-q2-2019/407842/
422 https://archive.org/details/MSNBCW_20190625_100000_Morning_Joe
423 https://www.adweek.com/tvnewser/here-arc-the-top-cable-news-shows-of-q2-2019/407842/

Expert Report of Professor Humphreys

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-55 | MSNBC Live With Stephanie Ruhle[424] | 6/25/2019 | 6:00am-7:00am PDT | MSNBC West | 984,000[425] |
| T-56 | MSNBC Live With Hallie Jackson[426] | 6/25/2019 | 7:00am-8:00am PDT | MSNBC West | 887,000[427] |
| T-57 | MSNBC Live With Craig Melvin[428] | 6/25/2019 | 8:00am-9:00am PDT | MSNBC West | 800,000[429] |
| T-58 | Andrea Mitchell Reports[430] | 6/25/2019 | 9:00am-10:00am PDT | MSNBC West | 839,000[431] |
| T-59 | Late Night With Seth Meyers[432] | 6/26/2019 | 12:37am-1:37am PDT | KNTV (NBC) | 1,293,000[433] |
| T-60 | CBS Overnight News[434] | 6/26/2019 | 3:12am-4:00am PDT | KPIX (CBS) | 2,986,000[435] |
| T-61 | At This Hour With Kate Bolduan[436] | 6/27/2019 | 8:00am-9:00am PDT | CNN (San Francisco) | 534,000[437] |

424 https://archive.org/details/MSNBCW_20190625_130000_MSNBC_Live_With_Stephanie_Ruhle
425 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
426 https://archive.org/details/MSNBCW_20190625_140000_MSNBC_Live_With_Hallie_Jackson
427 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
428 https://archive.org/details/MSNBCW_20190625_150000_MSNBC_Live_With_Craig_Melvin
429 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
430 https://archive.org/details/MSNBCW_20190625_160000_Andrea_Mitchell_Reports
431 https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/
432 https://archive.org/details/KNTV_20190626_073700_Late_Night_With_Seth_Meyers
433 https://thecomicsconic.com/2020/05/26/late-night-tv-ratings-for-2019-2020/
434 https://archive.org/details/KPIX_20190626_101200_CBS_Overnight_News
435 https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
436 https://archive.org/details/CNNW_20190627_150000_At_This_Hour_With_Kate_Bolduan
437 https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/

Expert Report of Professor Humphreys

113

| No. | Title | Date | Time | Network | Ratings Estimate[327] |
|---|---|---|---|---|---|
| T-62 | ABC World News Tonight With David Muir[438] | 6/27/2019 | 3:30pm-4:00pm PDT | KGO (ABC) | 9,390,000[439] |
| T-63 | NBC Nightly News With Lester Holt[440] | 6/27/2019 | 7:00pm-7:30pm EDT | WRC (NBC) | 6,769,000[441] |
| | TOTAL TV IMPRESSIONS ESTIMATE | | | | 108,580,000 |

[438] https://archive.org/details/KGO_20190627_223000_ABC_World_News_Tonight_With_David_Muir
[439] https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
[440] https://archive.org/details/WRC_20190627_230000_NBC_Nightly_News_With_Lester_Holt
[441] https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/

Expert Report of Professor Humphreys

114

## APPENDIX G.  PRINT IMPRESSIONS MODEL

| No. | Article Title | Publication | Date | Circulation[442] |
|---|---|---|---|---|
| P-1 | Donald Trump accused of sexually assaulting writer E Jean Carroll | The Guardian | 6/21/2019 | N/A |
| P-2 | N.Y. writer says Trump assaulted her in the '90s | Washington Post | 6/22/2019 | 229,475[443] |
| P-3 | Trump Repeatedly Denies Sexual Assault Claim by an Advice Columnist | New York Times | 6/23/2019 | 454,861[444] |
| P-4 | Trump Calls His New Accuser a Liar And Says, 'No. 1, She's Not My Type' | New York Times | 6/25/2019 | 454,861[445] |
| P-5 | Trump says latest accuser is 'lying' | Washington Post | 6/25/2019 | 229,475[446] |
| P-6 | If this nation cared about sexual assault, Trump would not be president | Boston Globe | 6/25/2019 | 92,515[447] |
| P-7 | Don't ignore latest Trump rape allegation | USA Today | 6/25/2019 | 544,002[448] |
| P-8 | Why did the media downplay the latest sexual assault allegation against Trump? | The Guardian | 6/25/2019 | N/A |
| P-9 | Latest sex assault allegation against Trump draws muted political reaction | Washington Post | 6/26/2019 | 229,475[449] |
| P-10 | America, listen to Ms. Carroll | Washington Post | 6/26/2019 | 229,475[450] |
| P-11 | Latest sex allegation against Trump draws muted reaction | Chicago Tribune | 6/26/2019 | 149,093[451] |
| | | | **TOTAL PRINT IMPRESSIONS** | **2,613,232** |

---

442  I use "N/A" for publications for which I do not have circulation data.
443  Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
444  Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
445  Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
446  Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
447  Audited Report for Boston Globe (12 months ended March 31, 2020), Alliance for Audited Media.
448  Audited Report for USA Today (12 months ended December 31, 2019), Alliance for Audited Media.
449  Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
450  Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
451  Audited Report for Chicago Tribune (12 months ended March 31, 2020), Alliance for Audited Media.

Expert Report of Professor Humphreys

A-286

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX H.  <u>EXAMPLES OF NEGATIVE COMMENTS AND POSTS ABOUT</u>**

**<u>MS. CARROLL</u>**

[Produced in Native Format]

A-287

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX I. <u>EXAMPLES OF DIRECT MESSAGES AND EMAILS TO MS. CARROLL</u>**

[Produced in Native Format]

Expert Report of Professor Humphreys                    117

## APPENDIX J. IMPACT MODEL

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-1 | | | 25.45% | 43,221 | 43,221 | 10,999 | 10,999 |
| Web | W-2 | 16.30% | 76.00% | 12.39% | 959,756 | 959,756 | 118,895 | 118,895 |
| Web | W-3 | 14.80% | 76.00% | 11.25% | 442,376 | 442,376 | 49,758 | 49,758 |
| Web | W-4 | 90.30% | 76.00% | 68.63% | 74,505 | 74,505 | 51,131 | 51,131 |
| Web | W-5 | 21.00% | 76.00% | 15.96% | 137,216 | 137,216 | 21,900 | 21,900 |
| Web | W-6 | 65.70% | 76.00% | 49.93% | 109,494 | 109,494 | 54,673 | 54,673 |
| Web | W-7 | | | 25.45% | 315,557 | 315,557 | 80,301 | 80,301 |
| Web | W-8 | 22.40% | 76.00% | 17.02% | 192,606 | 192,606 | 32,789 | 32,789 |
| Web | W-9 | | | 25.45% | 213,643 | 213,643 | 54,366 | 54,366 |
| Web | W-10 | | | 25.45% | 181,243 | 181,243 | 46,122 | 46,122 |
| Web | W-11 | | | 25.45% | 134,881 | 134,881 | 34,324 | 34,324 |
| Web | W-12 | 19.20% | 76.00% | 14.59% | 405,296 | 405,296 | 59,141 | 59,141 |

452 Percent of a publications' audience that are Republican, based on data from Pew Research. Cell is empty when data for the relevant publication is not available.
453 Republicans receptive to the claims (.76, YouGov). Cell is empty when Percent Republican data is not available for the relevant publication.
454 Calculated using the following formula: Percent Republicans * Receptive Republicans. When Percent Republican data is not available, I rely on the average Percent Receptive Republicans (25.25%)
455 The impressions estimate calculated in the Impressions Model. For social media posts, the high estimate is calculated using Equation 2a.
456 The impressions estimate calculated in the Impressions Model. For social media posts, the low estimate is calculated using Equation 2b.
457 Calculated using the following formula:  Percent Republicans * Receptive Republicans * Impressions Estimate. If data related to Percent Republicans is not available, the equation is as follows: Average Percent Receptive Republicans (25.25%) * Impressions Estimate. The high receptive impressions estimate is based on the impressions estimate incorporating Equation 2a.
458 Calculated using the following formula: Percent Republicans * Receptive Republicans * Impressions Estimate. If data related to Percent Republicans is not available, the equation is as follows: Average Percent Receptive Republicans (25.25%) * Impressions Estimate. The low Receptive Impressions Estimate is based on the impressions estimate incorporating Equation 2b.

Expert Report of Professor Humphreys

118

Case 23-793, Document 77, 11/20/2023, 3592061, Page29 of 300

Case 1:20-cv-07311-LAK   Document 135-8   Filed 02/16/23   Page 123 of 141

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-13 | 18.10% | 76.00% | 13.76% | 768,450 | 768,450 | 105,708 | 105,708 |
| Web | W-14 | | | 25.45% | 125,280 | 125,280 | 31,880 | 31,880 |
| Web | W-15 | | | 25.45% | 128,148 | 128,148 | 32,610 | 32,610 |
| Web | W-16 | | | 25.45% | 35,538 | 35,538 | 9,043 | 9,043 |
| Web | W-17 | 69.80% | 76.00% | 53.05% | 1,180,942 | 1,180,942 | 626,466 | 626,466 |
| Web | W-18 | | | 25.45% | 132,335 | 132,335 | 33,676 | 33,676 |
| Web | W-19 | | | 25.45% | 62,222 | 62,222 | 15,834 | 15,834 |
| Web | W-20 | 31.50% | 76.00% | 23.94% | 63,433 | 63,433 | 15,186 | 15,186 |
| Web | W-21 | | | 25.45% | 94,530 | 94,530 | 24,055 | 24,055 |
| Web | W-22 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-23 | | | 25.45% | 54,717 | 54,717 | 13,924 | 13,924 |
| Web | W-24 | | | 25.45% | 506,808 | 506,808 | 128,969 | 128,969 |
| Web | W-25 | | | 25.45% | 218,105 | 218,105 | 55,502 | 55,502 |
| Web | W-26 | | | 25.45% | 21,532 | 21,532 | 5,479 | 5,479 |
| Web | W-27 | | | 25.45% | 56,933 | 56,933 | 14,488 | 14,488 |
| Web | W-28 | 34.90% | 76.00% | 26.52% | 549,238 | 549,238 | 145,680 | 145,680 |
| Web | W-29 | 34.90% | 76.00% | 26.52% | 144,930 | 144,930 | 38,441 | 38,441 |
| Web | W-30 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-31 | 19.20% | 76.00% | 14.59% | 405,296 | 405,296 | 59,141 | 59,141 |
| Web | W-32 | 18.10% | 76.00% | 13.76% | 768,450 | 768,450 | 105,708 | 105,708 |
| Web | W-33 | 34.70% | 76.00% | 26.37% | 228,704 | 228,704 | 60,314 | 60,314 |
| Web | W-34 | 16.30% | 76.00% | 12.39% | 959,756 | 959,756 | 118,895 | 118,895 |
| Web | W-35 | | | 25.45% | 249,818 | 249,818 | 63,572 | 63,572 |
| Web | W-36 | 32.10% | 76.00% | 24.40% | 232,808 | 232,808 | 56,796 | 56,796 |
| Web | W-37 | | | 25.45% | 128,148 | 128,148 | 32,610 | 32,610 |
| Web | W-38 | | | 25.45% | 112,603 | 112,603 | 28,655 | 28,655 |
| Web | W-39 | | | 25.45% | 43,424 | 43,424 | 11,050 | 11,050 |
| Web | W-40 | 90.30% | 76.00% | 68.63% | 74,505 | 74,505 | 51,131 | 51,131 |

Expert Report of Professor Humphreys

119

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Web | W-41 | | | 25.45% | 62,222 | 62,222 | 15,834 | 15,834 |
| Web | W-42 | 14.80% | 76.00% | 11.25% | 442,376 | 442,376 | 49,758 | 49,758 |
| Web | W-43 | 31.50% | 76.00% | 23.94% | 63,433 | 63,433 | 15,186 | 15,186 |
| Web | W-44 | | | 25.45% | 153,510 | 153,510 | 39,064 | 39,064 |
| Web | W-45 | 22.40% | 76.00% | 17.02% | 192,606 | 192,606 | 32,789 | 32,789 |
| Web | W-46 | 22.40% | 76.00% | 17.02% | 70,755 | 70,755 | 12,045 | 12,045 |
| Web | W-47 | | | 25.45% | 135,980 | 135,980 | 34,603 | 34,603 |
| Web | W-48 | 34.90% | 76.00% | 26.52% | 549,238 | 549,238 | 145,680 | 145,680 |
| Web | W-49 | | | 25.45% | 310,945 | 310,945 | 79,127 | 79,127 |
| Web | W-50 | | | 25.45% | 75,348 | 75,348 | 19,174 | 19,174 |
| Web | W-51 | | | 25.45% | 108,951 | 108,951 | 27,725 | 27,725 |
| Web | W-52 | | | 25.45% | 71,724 | 71,724 | 18,252 | 18,252 |
| Web | W-53 | | | 25.45% | 506,808 | 506,808 | 128,969 | 128,969 |
| Social | S-1 | | | 25.45% | 302,891 | 60,190 | 77,078 | 15,317 |
| Social | S-2 | 16.30% | 76.00% | 12.39% | 1,517,403 | 7,622,861 | 187,976 | 944,320 |
| Social | S-3 | 90.30% | 76.00% | 68.63% | 50,916 | 90,045 | 34,943 | 61,796 |
| Social | S-4 | 90.30% | 76.00% | 68.63% | 111,412 | 98,107 | 76,460 | 67,329 |
| Social | S-5 | 90.30% | 76.00% | 68.63% | 97,086 | 95,090 | 66,628 | 65,259 |
| Social | S-6 | 21.00% | 76.00% | 15.96% | 605,662 | 2,809,916 | 96,664 | 448,463 |
| Social | S-7 | | | 25.45% | 310,072 | 1,313,779 | 78,905 | 334,322 |
| Social | S-8 | 22.40% | 76.00% | 17.02% | 501,872 | 717,229 | 85,439 | 122,101 |
| Social | S-9 | 22.40% | 76.00% | 17.02% | 253,407 | 675,370 | 43,140 | 114,975 |
| Social | S-10 | 22.40% | 76.00% | 17.02% | 214,427 | 671,886 | 36,504 | 114,382 |
| Social | S-11 | 22.40% | 76.00% | 17.02% | 215,038 | 671,947 | 36,608 | 114,392 |
| Social | S-12 | | | 25.45% | 268,022 | 1,097,721 | 68,205 | 279,341 |
| Social | S-13 | 18.10% | 76.00% | 13.76% | 684,581 | 2,420,050 | 94,171 | 332,902 |
| Social | S-14 | | | 25.45% | 104,961 | 311,247 | 26,710 | 79,204 |
| Social | S-15 | | | 25.45% | 104,756 | 312,259 | 26,658 | 79,462 |

Expert Report of Professor Humphreys

120

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Social | S-16 | | | 25.45% | 97,870 | 311,264 | 24,905 | 79,208 |
| Social | S-17 | | | 25.45% | 99,595 | 311,484 | 25,344 | 79,264 |
| Social | S-18 | | | 25.45% | 95,355 | 311,129 | 24,265 | 79,174 |
| Social | S-19 | | | 25.45% | 95,909 | 311,490 | 24,406 | 79,266 |
| Social | S-20 | | | 25.45% | 92,734 | 311,006 | 23,598 | 79,143 |
| Social | S-21 | | | 25.45% | 93,526 | 310,950 | 23,800 | 79,128 |
| Social | S-22 | | | 25.45% | 88,022 | 310,946 | 22,399 | 79,128 |
| Social | S-23 | | | 25.45% | 83,682 | 310,988 | 21,295 | 79,138 |
| Social | S-24 | | | 25.45% | 88,166 | 310,981 | 22,436 | 79,136 |
| Social | S-25 | | | 25.45% | 91,129 | 310,945 | 23,190 | 79,127 |
| Social | S-26 | | | 25.45% | 83,601 | 310,967 | 21,274 | 79,133 |
| Social | S-27 | | | 25.45% | 382,281 | 1,358,989 | 97,280 | 345,827 |
| Social | S-28 | | | 25.45% | 90,034 | 395,492 | 22,911 | 100,642 |
| Social | S-29 | | | 25.45% | 414,204 | 1,753,410 | 105,404 | 446,196 |
| Social | S-30 | | | 25.45% | 930,727 | 4,415,878 | 236,845 | 1,123,723 |
| Social | S-31 | | | 25.45% | 1,330,634 | 4,526,637 | 338,611 | 1,151,908 |
| Social | S-32 | | | 25.45% | 38,345 | 37,335 | 9,758 | 9,501 |
| Social | S-33 | 23.10% | 76.00% | 17.56% | 183,730 | 583,066 | 32,256 | 102,363 |
| Social | S-34 | | | 25.45% | 383,118 | 1,359,220 | 97,493 | 345,885 |
| Social | S-35 | 19.20% | 76.00% | 14.59% | 138,523 | 502,881 | 20,213 | 73,380 |
| Social | S-36 | 18.10% | 76.00% | 13.76% | 744,815 | 2,423,097 | 102,457 | 333,321 |
| Social | S-37 | 18.10% | 76.00% | 13.76% | 813,052 | 2,440,919 | 111,843 | 335,773 |
| Social | S-38 | 16.30% | 76.00% | 12.39% | 1,495,243 | 7,625,871 | 185,231 | 944,693 |
| Social | S-39 | | | 25.45% | 91,591 | 215,150 | 23,308 | 54,750 |
| Social | S-40 | 32.10% | 76.00% | 24.40% | 207,974 | 577,660 | 50,737 | 140,926 |
| Social | S-41 | 32.10% | 76.00% | 24.40% | 256,624 | 591,307 | 62,606 | 144,255 |
| Social | S-42 | 32.10% | 76.00% | 24.40% | 174,036 | 576,283 | 42,458 | 140,590 |
| Social | S-43 | 32.10% | 76.00% | 24.40% | 152,682 | 576,071 | 37,248 | 140,538 |

Expert Report of Professor Humphreys

121

Case 23-793, Document 77, 11/20/2023, 3592061, Page32 of 300

Case 1:20-cv-07311-LAK   Document 135-8   Filed 02/16/23   Page 126 of 141

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| Social | S-44 | 90.30% | 76.00% | 68.63% | 63,413 | 91,367 | 43,519 | 62,703 |
| Social | S-45 | 90.30% | 76.00% | 68.63% | 38,068 | 89,218 | 26,125 | 61,229 |
| Social | S-46 | 14.80% | 76.00% | 11.25% | 615,996 | 2,009,856 | 69,287 | 226,069 |
| Social | S-47 | 22.40% | 76.00% | 17.02% | 242,492 | 678,966 | 41,282 | 115,587 |
| Social | S-48 | | | 25.45% | 30,111 | 49,130 | 7,662 | 12,502 |
| Social | S-49 | 34.90% | 76.00% | 26.52% | 183,849 | 666,751 | 48,764 | 176,849 |
| Social | S-50 | | | 25.45% | 75,654 | 247,243 | 19,252 | 62,917 |
| Social | S-51 | | | 25.45% | 68,828 | 227,745 | 17,515 | 57,955 |
| Social | S-52 | | | 25.45% | 65,717 | 227,842 | 16,723 | 57,980 |
| Social | S-53 | | | 25.45% | 67,356 | 227,764 | 17,140 | 57,960 |
| Social | S-54 | | | 25.45% | 471,389 | 1,754,697 | 119,956 | 446,524 |
| Social | S-55 | | | 25.45% | 1,116,377 | 4,420,345 | 284,088 | 1,124,860 |
| Print | P-1 | | | | 0 | 0 | 0 | 0 |
| Print | P-2 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-3 | 16.30% | 76.00% | 12.39% | 454,861 | 454,861 | 56,348 | 56,348 |
| Print | P-4 | 16.30% | 76.00% | 12.39% | 454,861 | 454,861 | 56,348 | 56,348 |
| Print | P-5 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-6 | | | 25.45% | 92,515 | 92,515 | 23,543 | 23,543 |
| Print | P-7 | 34.90% | 76.00% | 26.52% | 544,002 | 544,002 | 144,291 | 144,291 |
| Print | P-9 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-8 | | | | 0 | 0 | 0 | 0 |
| Print | P-10 | 18.10% | 76.00% | 13.76% | 229,475 | 229,475 | 31,567 | 31,567 |
| Print | P-11 | | | 25.45% | 149,093 | 149,093 | 37,940 | 37,940 |
| TV | T-1 | 34.70% | 76.00% | 26.37% | 9,390,000 | 9,390,000 | 2,476,331 | 2,476,331 |
| TV | T-2 | 34.70% | 76.00% | 26.37% | 9,390,000 | 9,390,000 | 2,476,331 | 2,476,331 |
| TV | T-3 | 20.50% | 76.00% | 15.58% | 1,552,000 | 1,552,000 | 241,802 | 241,802 |
| TV | T-4 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-5 | 23.60% | 76.00% | 17.94% | 877,000 | 877,000 | 157,299 | 157,299 |

Expert Report of Professor Humphreys

122

Case 23-793, Document 77, 11/20/2023, 3592061, Page33 of 300

Case 1:20-cv-07311-LAK   Document 135-8   Filed 02/16/23   Page 127 of 141

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-7 | 23.60% | 76.00% | 17.94% | 877,000 | 877,000 | 157,299 | 157,299 |
| TV | T-8 | | | | | 0 | 0 | 0 |
| TV | T-9 | 20.50% | 76.00% | 15.58% | 839,000 | 839,000 | 130,716 | 130,716 |
| TV | T-10 | 20.50% | 76.00% | 15.58% | 839,000 | 839,000 | 130,716 | 130,716 |
| TV | T-11 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-12 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-13 | 33.70% | 76.00% | 25.61% | 5,863,000 | 5,863,000 | 1,501,632 | 1,501,632 |
| TV | T-14 | 33.70% | 76.00% | 25.61% | 5,863,000 | 5,863,000 | 1,501,632 | 1,501,632 |
| TV | T-15 | 33.70% | 76.00% | 25.61% | 2,986,000 | 2,986,000 | 764,774 | 764,774 |
| TV | T-16 | 33.70% | 76.00% | 25.61% | 2,700,000 | 2,700,000 | 691,524 | 691,524 |
| TV | T-17 | 33.70% | 76.00% | 25.61% | 2,700,000 | 2,700,000 | 691,524 | 691,524 |
| TV | T-18 | 23.60% | 76.00% | 17.94% | 628,000 | 628,000 | 112,638 | 112,638 |
| TV | T-19 | | | | | 0 | 0 | 0 |
| TV | T-20 | | | | | 0 | 0 | 0 |
| TV | T-21 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-22 | | | | | 0 | 0 | 0 |
| TV | T-23 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-24 | | | | | 0 | 0 | 0 |
| TV | T-25 | 23.60% | 76.00% | 17.94% | 833,000 | 833,000 | 149,407 | 149,407 |
| TV | T-26 | | | | | 0 | 0 | 0 |
| TV | T-27 | 23.60% | 76.00% | 17.94% | 833,000 | 833,000 | 149,407 | 149,407 |
| TV | T-28 | 23.60% | 76.00% | 17.94% | 936,000 | 936,000 | 167,881 | 167,881 |
| TV | T-29 | 23.60% | 76.00% | 17.94% | 936,000 | 936,000 | 167,881 | 167,881 |
| TV | T-30 | | | | | 0 | 0 | 0 |
| TV | T-31 | 20.50% | 76.00% | 15.58% | 1,378,000 | 1,378,000 | 214,692 | 214,692 |
| TV | T-32 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-33 | 20.50% | 76.00% | 15.58% | 385,000 | 385,000 | 59,983 | 59,983 |
| TV | T-34 | 20.50% | 76.00% | 15.58% | 385,000 | 385,000 | 59,983 | 59,983 |

Expert Report of Professor Humphreys

123

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-35 | 34.70% | 76.00% | 26.37% | 3,920,000 | 3,920,000 | 1,033,782 | 1,033,782 |
| TV | T-36 | 33.70% | 76.00% | 25.61% | 5,468,000 | 5,468,000 | 1,400,464 | 1,400,464 |
| TV | T-37 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-38 | 31.00% | 76.00% | 23.56% | 1,293,000 | 1,293,000 | 304,631 | 304,631 |
| TV | T-39 | 20.50% | 76.00% | 15.58% | 1,033,000 | 1,033,000 | 160,941 | 160,941 |
| TV | T-40 | 20.50% | 76.00% | 15.58% | 1,033,000 | 1,033,000 | 160,941 | 160,941 |
| TV | T-41 | 20.50% | 76.00% | 15.58% | 800,000 | 800,000 | 124,640 | 124,640 |
| TV | T-42 | 20.50% | 76.00% | 15.58% | 887,000 | 887,000 | 138,195 | 138,195 |
| TV | T-43 | 20.50% | 76.00% | 15.58% | 984,000 | 984,000 | 153,307 | 153,307 |
| TV | T-44 | 31.00% | 76.00% | 23.56% | 6,769,000 | 6,769,000 | 1,594,776 | 1,594,776 |
| TV | T-45 | 31.00% | 76.00% | 23.56% | 6,769,000 | 6,769,000 | 1,594,776 | 1,594,776 |
| TV | T-46 | 23.60% | 76.00% | 17.94% | 534,000 | 534,000 | 95,778 | 95,778 |
| TV | T-47 | | | | | | 0 | 0 |
| TV | T-48 | | | | | | 0 | 0 |
| TV | T-49 | 23.60% | 76.00% | 17.94% | 460,000 | 460,000 | 82,506 | 82,506 |
| TV | T-50 | | | | | | 0 | 0 |
| TV | T-51 | | | | | | 0 | 0 |
| TV | T-52 | 23.60% | 76.00% | 17.94% | 460,000 | 460,000 | 82,506 | 82,506 |
| TV | T-53 | 23.60% | 76.00% | 17.94% | 168,000 | 168,000 | 30,132 | 30,132 |
| TV | T-54 | 20.50% | 76.00% | 15.58% | 2,010,000 | 2,010,000 | 313,158 | 313,158 |
| TV | T-55 | 20.50% | 76.00% | 15.58% | 2,010,000 | 2,010,000 | 313,158 | 313,158 |
| TV | T-56 | 33.70% | 76.00% | 25.61% | 3,800,000 | 3,800,000 | 973,256 | 973,256 |
| TV | T-57 | 20.50% | 76.00% | 15.58% | 2,561,000 | 2,561,000 | 399,004 | 399,004 |
| TV | T-58 | 20.50% | 76.00% | 15.58% | 2,561,000 | 2,561,000 | 399,004 | 399,004 |
| TV | T-59 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-60 | 69.80% | 76.00% | 53.05% | 1,401,000 | 1,401,000 | 743,202 | 743,202 |
| TV | T-61 | 20.50% | 76.00% | 15.58% | 900,000 | 900,000 | 140,220 | 140,220 |
| TV | T-62 | 20.50% | 76.00% | 15.58% | 900,000 | 900,000 | 140,220 | 140,220 |

Expert Report of Professor Humphreys

124

A-294

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A-295

| Category | No. | Percent Republican[452] | Receptive Republicans[453] | Percent Receptive Republicans[454] | Impression Estimate (Low)[455] | Impression Estimate (High)[456] | Receptive Impressions Estimate (Low)[457] | Receptive Impressions Estimate (High)[458] |
|---|---|---|---|---|---|---|---|---|
| TV | T-63 | 34.70% | 76.00% | 26.37% | 3,929,000 | 3,929,000 | 1,036,156 | 1,036,156 |
| | | | | TOTAL RECEPTIVE IMPRESSIONS (LOW/HIGH) | | | 34,075,512 | 42,936,354 |

Case 23-793, Document 77, 11/20/2023, 3592061, Page36 of 300

Case 1:20-cv-07311-LAK   Document 135-8   Filed 02/16/23   Page 130 of 141

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX K.  DAMAGES MODEL

*High Impression Estimate,[459] 1x Attitude Change Multiplier*

Impression Target:[459] 42,936,354
Attitude Change Multiplier: 1x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight[460] | Target Impressions[461] | Adjusted Impressions[462] | CPM (per 1,000 impressions)[463] | Total Cost[463] |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 2,790,863 | 2,790,863 | $6.46[464] | $18,028.98 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 2,790,863 | 2,790,863 | $14.40[465] | $40,188.43 |
| Influencer | Web Blog Influencer | 5.00% | 2,146,818 | 21,468,177 | $60.00[466] | $1,288,090.62 |
| | Twitter Influencer | 7.00% | 3,005,545 | 60,110,896 | $2.00[467] | $120,221.79 |
| | Facebook Influencer | 7.00% | 3,005,545 | 60,110,896 | $25.00[468] | $1,502,772.39 |
| | YouTube Influencer | 4.60% | 1,975,072 | 39,501,446 | $20.00[469] | $790,028.91 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 12,709,161 | 12,709,161 | $16.00[470] | $203,346.57 |
| | Cable TV (Excluding Primetime) | 21.30% | 9,145,443 | 9,145,443 | $10.00[471] | $91,454.43 |
| | Podcasts | 5.00% | 2,146,818 | 2,146,818 | $19.00[472] | $40,789.54 |
| | Radio | 4.10% | 1,760,391 | 1,760,391 | $4.00[473] | $7,041.56 |
| | Print newspapers | 3.40% | 1,459,836 | 1,459,836 | $67.00[474] | $97,809.01 |
| | **Total** | **100.00%** | **42,936,354** | | | **$4,199,772.24** |

---

[459]  The impressions estimate from the Impressions Model.
[460]  The percentage of impressions allocated to different media types. Allocations based on Trump supporters most common way of getting political and election news.
[463]  Calculated using the following formula: (Adjusted Impressions / 1000) * CPM.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

462   The number of impressions allocated to the media type, taking into account the impression rate for Twitter, Facebook, and YouTube influencers and the
bounce rate for web blog influencers. For all other media types the Adjusted Impressions are the same as the Target Impressions.
463   Calculated using the following formula: (Adjusted Impressions / 1000) * CPM.
464   https://blog.hootsuite.com/twitter-statistics/
465   https://www.wordstream.com/blog/ws/2021/07/12/facebook-ads-cost
466   https://www.webfx.com/social-media/pricing/influencer-marketing/
467   https://www.webfx.com/social-media/pricing/influencer-marketing/
468   https://www.webfx.com/social-media/pricing/influencer-marketing/
469   https://www.webfx.com/social-media/pricing/influencer-marketing/
470   https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparison%20AAA.pdf
471   https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparison%20AAA.pdf
472   https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparison%20AAA.pdf
473   https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparison%20AAA.pdf
474   https://www.gaebler.com/Washington+Examiner-DC-Newspaper-Advertising-Costs++12549

Expert Report of Professor Humphreys

127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*High Impression Estimate, 3x Attitude Change Multiplier*

Impression Target: 42,936,354
Attitude Change Multiplier: 3x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 8,372,589 | 8,372,589 | $6.46 | $54,086.93 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 8,372,589 | 8,372,589 | $14.40 | $120,565.28 |
| Influencer | Web Blog Influencer | 5.00% | 6,440,453 | 64,404,531 | $60.00 | $3,864,271.86 |
| | Twitter Influencer | 7.00% | 9,016,634 | 180,332,687 | $2.00 | $360,665.37 |
| | Facebook Influencer | 7.00% | 9,016,634 | 180,332,687 | $25.00 | $4,508,317.17 |
| | YouTube Influencer | 4.60% | 5,925,217 | 118,504,337 | $20.00 | $2,370,086.74 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 38,127,482 | 38,127,482 | $16.00 | $610,039.72 |
| | Cable TV (Excluding Primetime) | 21.30% | 27,436,330 | 27,436,330 | $10.00 | $274,363.30 |
| | Podcasts | 5.00% | 6,440,453 | 6,440,453 | $19.00 | $122,368.61 |
| | Radio | 4.10% | 5,281,172 | 5,281,172 | $4.00 | $21,124.69 |
| | Print newspapers | 3.40% | 4,379,508 | 4,379,508 | $67.00 | $293,427.04 |
| | **Total** | **100.00%** | **128,809,062** | | | **$12,599,316.71** |

Expert Report of Professor Humphreys

128

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*High Impression Estimate, 5x Attitude Change Multiplier*

Impression Target: 42,936,354
Attitude Change Multiplier: 5x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 13,954,315 | 13,954,315 | $6.46 | $90,144.88 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 13,954,315 | 13,954,315 | $14.40 | $200,942.14 |
| Influencer | Web Blog Influencer | 5.00% | 10,734,089 | 107,340,885 | $60.00 | $6,440,453.10 |
| | Twitter Influencer | 7.00% | 15,027,724 | 300,554,478 | $2.00 | $601,108.96 |
| | Facebook Influencer | 7.00% | 15,027,724 | 300,554,478 | $25.00 | $7,513,861.95 |
| | YouTube Influencer | 4.60% | 9,875,361 | 197,507,228 | $20.00 | $3,950,144.57 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 63,545,804 | 63,545,804 | $16.00 | $1,016,732.86 |
| | Cable TV (Excluding Primetime) | 21.30% | 45,727,217 | 45,727,217 | $10.00 | $457,272.17 |
| | Podcasts | 5.00% | 10,734,089 | 10,734,089 | $19.00 | $203,947.68 |
| | Radio | 4.10% | 8,801,953 | 8,801,953 | $4.00 | $35,207.81 |
| | Print newspapers | 3.40% | 7,299,180 | 7,299,180 | $67.00 | $489,045.07 |
| | **Total** | **100.00%** | **214,681,770** | | | **$20,998,861.18** |

Expert Report of Professor Humphreys

A-299

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A-300

*Low Impression Estimate, 1x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 1x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 2,214,908 | 2,214,908 | $6.46 | $14,308.31 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 2,214,908 | 2,214,908 | $14.40 | $31,894.68 |
| Influencer | Web Blog Influencer | 5.00% | 1,703,776 | 17,037,756 | $60.00 | $1,022,265.36 |
| | Twitter Influencer | 7.00% | 2,385,286 | 47,705,717 | $2.00 | $95,411.43 |
| | Facebook Influencer | 7.00% | 2,385,286 | 47,705,717 | $25.00 | $1,192,642.92 |
| | YouTube Influencer | 4.60% | 1,567,474 | 31,349,471 | $20.00 | $626,989.42 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 10,086,352 | 10,086,352 | $16.00 | $161,381.62 |
| | Cable TV (Excluding Primetime) | 21.30% | 7,258,084 | 7,258,084 | $10.00 | $72,580.84 |
| | Podcasts | 5.00% | 1,703,776 | 1,703,776 | $19.00 | $32,371.74 |
| | Radio | 4.10% | 1,397,096 | 1,397,096 | $4.00 | $5,588.38 |
| | Print newspapers | 3.40% | 1,158,567 | 1,158,567 | $67.00 | $77,624.02 |
| | **Total** | **100.00%** | 34,075,512 | | | **$3,333,058.72** |

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A-301

*Low Impression Estimate, 3x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 3x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 6,644,725 | 6,644,725 | $6.46 | $42,924.92 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 6,644,725 | 6,644,725 | $14.40 | $95,684.04 |
| Influencer | Web Blog Influencer | 5.00% | 5,111,327 | 51,113,268 | $60.00 | $3,066,796.08 |
| | Twitter Influencer | 7.00% | 7,155,858 | 143,117,150 | $2.00 | $286,234.30 |
| | Facebook Influencer | 7.00% | 7,155,858 | 143,117,150 | $25.00 | $3,577,928.76 |
| | YouTube Influencer | 4.60% | 4,702,421 | 94,048,413 | $20.00 | $1,880,968.26 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 30,259,055 | 30,259,055 | $16.00 | $484,144.87 |
| | Cable TV (Excluding Primetime) | 21.30% | 21,774,252 | 21,774,252 | $10.00 | $217,742.52 |
| | Podcasts | 5.00% | 5,111,327 | 5,111,327 | $19.00 | $97,115.21 |
| | Radio | 4.10% | 4,191,288 | 4,191,288 | $4.00 | $16,765.15 |
| | Print newspapers | 3.40% | 3,475,702 | 3,475,702 | $67.00 | $232,872.05 |
| | **Total** | **100.00%** | **102,226,536** | | | **$9,999,176.17** |

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A-302

*Low Impression Estimate, 5x Attitude Change Multiplier*

Impression Target: 34,075,512
Attitude Change Multiplier: 5x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 11,074,541 | 11,074,541 | $6.46 | $71,541.54 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 11,074,541 | 11,074,541 | $14.40 | $159,473.40 |
| Influencer | Web Blog Influencer | 5.00% | 8,518,878 | 85,188,780 | $60.00 | $5,111,326.80 |
| | Twitter Influencer | 7.00% | 11,926,429 | 238,528,584 | $2.00 | $477,057.17 |
| | Facebook Influencer | 7.00% | 11,926,429 | 238,528,584 | $25.00 | $5,963,214.60 |
| | YouTube Influencer | 4.60% | 7,837,368 | 156,747,355 | $20.00 | $3,134,947.10 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 50,431,758 | 50,431,758 | $16.00 | $806,908.12 |
| | Cable TV (Excluding Primetime) | 21.30% | 36,290,420 | 36,290,420 | $10.00 | $362,904.20 |
| | Podcasts | 5.00% | 8,518,878 | 8,518,878 | $19.00 | $161,858.68 |
| | Radio | 4.10% | 6,985,480 | 6,985,480 | $4.00 | $27,941.92 |
| | Print newspapers | 3.40% | 5,792,837 | 5,792,837 | $67.00 | $388,120.08 |
| | **Total** | **100.00%** | **170,377,560** | | | **$16,665,293.62** |

*Summary of Calculated Damages*:

| Attitude Change Multiplier | 1x | 3x | 5x |
|---|---|---|---|
| Low Receptive Impression Estimate | $3,333,058.72 | $9,999,176.17 | $16,665,293.62 |
| High Receptive Impression Estimate | $4,199,772.24 | $12,599,316.71 | $20,998,861.18 |

Expert Report of Professor Humphreys

132

A-303

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX L.  LIST OF CONSERVATIVE STEPS TAKEN**

| IMPRESSIONS MODEL | |
|---|---|
| Online News Articles Considered | • Online news impressions are limited to the articles cited in the Complaint. I did not count other online news articles that covered or discussed the Statements. <br><br> • Further, some of the articles from the Complaint were authored by the Associated Press and Reuters.[475] It is likely that identical (or very similar) versions of these articles appeared in multiple publications. For instance, the June 25, 2019 Hollywood Reporter article, titled "Trump on E. Jean Carroll Sexual Assault Claim: 'She's Not My Type,'" appeared in at least 20 additional publications.[476] Further, the June 22, 2019 Associated press article, titled "Trump Denies Knowing NY Woman Accusing |

---

[475]    The analysis incorporates two versions of the same Reuters article: Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", BUS. INSIDER (June 25, 2019); and Doina Chiacu, Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type", REUTERS (June 25, 2019).

[476]    https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-assault-is-not-his-type; https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6; https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054; https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type; https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html; https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/; https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type; https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018; https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-jean-carroll-not-my-type; https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp; https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/; https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#; https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/; and https://www.necn.com/news/local/trump-e-jean-carroll/220418/.

Expert Report of Professor Humphreys                     133

A-304

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| | Him of Sexual Assault" appeared in at least 7 additional publications. [477] |
| Social Media Posts Considered | • I limited social media impressions to those generated from Tweets published by the primary account of the publisher or the article author. I did not consider, for example, retweets of quote tweets, any tweets from other publishers of stories covering Mr. Trump's Statements, tweets from users who shared links to the 52 articles (or other articles containing the Statements), or tweets in which users repeated or otherwise amplified the Statements.<br><br>• Additionally, due to the opacity of other platforms, I do not account for impressions generated on any other social media platform, despite there being evidence the articles considered in the impressions analysis were spread widely online. |
| Print Articles Considered | • When identifying print articles, I limited the analysis to publications that published an online news article that was cited in the Complaint.<br><br>• The 11 articles I found are an undercount of all print articles published that covered the Statements. I was able to find 33 print articles via ProQuest published between June 22, 2019, and September 28, 2022, that referenced the Statements. [478] None of these articles overlapped with the 14 articles I considered in my analysis. |

---

[477] https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22; https://www.gazettenet.com/Carroll-26480259; https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial?context=amp; https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault; https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/; and https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f.

[478] Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean"))

A-305

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| | • Only 9 of the 11 articles I found contributed to the impressions estimate as I was unable to find publicly available circulation for all 11 articles. |
| TV Broadcasts Considered | • I only considered TV broadcasts contained in the Internet Archive's TV News Archive database from the following broadcasters: ABC, Fox, NBC, MSNBC, CBS, and CNN.<br><br>• Among the broadcasts I found on the TV News Archive, I only included broadcasts that included direct quotes from the Statements. Broadcasts that only included paraphrases of the Statements were not included. For example, The Tucker Carlson Show (ratings: 2,822,000) covered the issue for 12 minutes on June 25, 2019, but I did not include it.<br><br>• I only counted ratings for a particular program once in a day, even if a program was aired multiple times in day. I also did not consider the number of times a Statement was mentioned during a broadcast, even though multiple mentions of a Statement generate multiple impressions. |
| Other Sources of Impressions Not Considered | • I did not include impressions generated from podcasts or radio broadcasts that covered the Statements. There is anecdotal evidence that these claims were discussed on popular podcasts.[479]<br><br>• I did not include impressions generated from people who were exposed to the Statements in article headlines while browsing Google News, |

---

[479]   See, for example, the June 27, 2019 broadcast of *The Daily* (https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/) and two June 26, 2019 broadcasts of *The Kevin Jackson Show* (https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPcIrl3Rk/; https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

|  |  |
|---|---|
|  | Apple News, or other news aggregating applications. |
|  | • I did not consider the impact of word-of-mouth on the transmission of the Statements. |
| Social Media Impression Calculation | • Since tweets are seen only by a subset of a user's followers, I incorporated an impression rate into the impressions model. When selecting an impression estimate, I relied on a model developed by information scientists who relied on data collected from Buzzfeed's accounts. Using their model, I relied on Buzzfeed's impression rate as the high end for impression rates despite the fact Buzzfeed is less prominent than many of the sources included in my impression calculation. |
| Online News Impressions Calculation | • I incorporated a website's bounce rate when calculating online news impressions to exclude users who navigated to a website without performing any actions. Nonetheless, it's possible that users could have navigated directly to the relevant article on the website and been exposed the Statement without taking any additional actions. |
| **QUANTITATIVE IMPACT MODEL** | |
| Negative Associations are Harmful | • Any impression generated that linked Ms. Carroll's person brand with the content of the Statements is harmful. Person brands need to be protected and any information that connects a person brand to 'lying' and other negative information is harmful, even if the person's fans or followers do not believe the claims. Nonetheless, I limited my estimate of the quantitative impact to potential readers and viewers who identify as Trump supporters and/or are Republicans who may find Trump's Statements credible. |
| Limited Set of Impressions as an Input | • The impact model relies on the impressions estimate and therefore does not account for the impact associated with impressions generated from additional online and print articles, TV |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | broadcasts, and social media posts covering the Statements. |
|---|---|
| **DAMAGES MODEL** | |
| Impressions and Impact as Inputs | • The damages model also relies on the impact model and therefore does not account for impressions generated by additional online and print articles, TV broadcasts, and social media posts that covered the Statements.<br><br>• The damages model also relies on the impact model and therefore is limited to the costs needed to repair the impressions generated by people who are likely to be receptive to the Statements. |
| Production Costs | • The damages model does not incorporate the production and operating costs associated with running the campaign. |
| Attitude Change Multiplier | • When calculating damages, I included attitude change multipliers (1x, 3x, and 5x) to account for the fact that it takes multiple impressions to change an attitude. I estimate that 3 exposures would be most appropriate.<br>• I incorporated the 1x attitude change multiplier to account for the fact that the same person may have been exposed to multiple impressions. Empirical data suggests that a multiplier of 1 is overly conservative, especially because Mr. Trump's supporters are more likely to use only one news source. |

A-308

# EXHIBIT 9

A-309

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| **E. JEAN CARROLL** | ) | |
| | ) | |
| **v** | ) | **Case No. 20 civ. 7311 (LAK) (JLC)** |
| | ) | |
| **DONALD J. TRUMP** | ) | |
| | ) | |
| | ) | |

**EXPERT REBUTTAL REPORT OF ROBERT J. FISHER**

**PREPARED FOR DEFENDANT DONALD J. TRUMP**

A-310

TABLE OF CONTENTS

Assignment............................................................................................   1

Background and Qualifications..........................................................   1

Case Background................................................................................   1-2

Plaintiff's Expert .................................................................................   2

Information/Input Reviewed to Form Opinions.................................   2-3

General Overview ...............................................................................   3-4

Analysis of Statements ......................................................................   4-7

Reputation and Reputation Damage...................................................   7-8

Reputation Harm to Plaintiff .............................................................   8-9

Reputation Damage Repair Program..................................................   9-12

Summary of Conclusions and Opinions .............................................   12

Report Disclaimer ..............................................................................   12

## Assignment

I am a veteran communications professional, executive and counselor – acquired from my background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising and marketing.  I have also been acknowledged nationally by the legal profession and news media as an expert in the field of crisis communications and image/reputation management and damage repair.  Additionally, I am an experienced expert witness who has been involved in over approximately 80 cases, 70 of which were defamation or reputational harm-related cases during the past 16 years.  Due to that experience and expertise, I have been retained as an expert on behalf of the Defendant, Donald J. Trump.  Specifically, I have asked to review, analyze and offer my comments and assessment of the conclusions and opinions offered by Professor Ashlee Humphreys, PHD in her expert witness report prepared on behalf of the Plaintiff, E. Jean Carroll.

## Background and Qualifications

While my credentials (e.g., professional experience and expertise) are detailed in the attached CV, I will briefly encapsulate this background here to give credence to my qualifications to offer the opinions and conclusions contained in this Rebuttal Report.

As a preface to this, it is important to note that only one profession is solely oriented to the creation, development, enhancement, advancement and repair of a reputation, and that is public relations.  Advertising and marketing have some involvement but that isn't their main purpose.  A public relations professional is the most qualified to address issues relating to reputation.

My qualifications (in brief) as an expert and authority on reputation development, management and damage repair are as follows:

- 50 years as a public relations professional, 42 as owner of my own Los Angeles-based firm.

- Of the 400-plus clients my firm represented, 80 to100 had issues relating to a damaged reputation and/or were in a crisis situation that negatively impacted their reputation.

- Beginning in 1978, I acquired a significant national reputation with both the legal profession and the news media as a preeminent expert in crisis communications and reputation damage and repair which resulted in law firms throughout the nation retaining my firm's services as well as the news media utilizing me as an expert media information source and analyst.

- As an expert witness since 2006, I have represented both Plaintiffs and Defendants in 30 states (and the District of Columbia) in litigation that related to defamation or reputation harm.  I have testified over 25 times in depositions, arbitration hearings and trials (bench and jury), in both state and federal courts.

## Case Background

Following is a brief synopsis of the background that led to this litigation.

The Plaintiff in this case is E. Jean Carroll ("Carroll"), a resident of the State of New York who is a journalist, author, former writer for Saturday Night Live, and advice columnist for *Elle* magazine.  She hosted her own TV show "Ask E Jean" on America's Talking network, was reputedly the longest running advice columnist in the U.S. and has authored numerous books.

The Defendant is Donald J. Trump ("Trump"), a resident of the State of Florida and a former President of the United States. (Note: this lawsuit was filed while he was in office, but it was directed at him personally). Prior to that he was a businessman (real estate developer) and was the host of a television program.

The Plaintiff alleges that sometime between the Fall of 1995 and Spring of 1996, she encountered the Defendant when she was exiting the Bergdorf Goodman Department Store in New York City. She maintains that he requested that she assist him in helping to select a gift for a female friend. In doing so, she alleges that he raped her in a dressing room in the store. She stated that she did not report the alleged rape to law enforcement nor report the incident publicly because she was afraid of retaliation from him and feared the disclosure would ruin her life. In the aftermath of the Weinstein controversy and the "Me Too" movement, she decided to come forward and included an account of the incident in a book she wrote ("What Do We Need Men For? A Modest Proposal") which was published on July 2, 2019. Prior to publication, an excerpt from it on the alleged rape appeared in New Yorker Magazine on June 21, 2019, which was the first public exposure for her claim. In response, between June 21 and 24, 2019, the Defendant issued statements and made comments to the news media denying the Plaintiff's allegations of sexual assault and rape.

The Plaintiff maintains that the negative comments made the Defendant exhibited reckless disregard for the truth and ill will and resulted in significant reputational harm to her. As a result, on November 4, 2019, she filed a lawsuit against him for Defamation in the New York Supreme Court. (Note: The lawsuit was later moved to Federal Court in New York.) She is seeking an order to require the Defendant to retract all defamatory statements and to pay compensatory and punitive damages. The Defendant denies the allegations advanced by the Plaintiff in this lawsuit.

## Plaintiff's Expert

To assist with the case, the Plaintiff retained Professor Ashlee Humphreys, PHD ("Humphreys") to serve as an expert witness on her behalf. A graduate of Northwestern University with a Bachelor of Arts degree in Economics and Philosophy, Humphreys currently is employed by the University as a Professor of Integrated Marketing Communications at its Medill School of Journalism and as Professor of Marketing with its Kellogg School of Management. She reports that her focus of instruction is on assessing the impact of social media campaigns and strategically directing a portfolio of social media tools to pursue managerial goals involving persuasion, advertising, market growth, and branding. She purports to have a decade of experience in the field of digital communications and marketing and states that her expertise is the fields of marketing, advertising, market growth and social media.

From my review of Humphreys credentials she has a very impressive background of accomplishments, (including awards), however, she does not indicate that she has any professional background, experience or expertise in reputation management, damage or repair - which are at the center of this case. As stated above, her expertise is in fields that are promotion-oriented, including marketing, advertising, digital and social media campaigns. This case requires expertise in overcoming negative communications which damages a reputation.

## Information/Input Reviewed to Form Opinions

In connection with my preparation of this Rebuttal Report, I have received and reviewed from the Plaintiff's legal counsel, the following documents and information relating to this case:

- Expert Report of Professor Ashlee Humphreys, PHD  (October 14, 2022)

- Complaint: E. Jean Carroll v Donald J Trump  (November 4, 2019)

A-313

- Legal Documents:  Answer (January 23, 2020)

- Depositions:

    - E. Jean Carroll  (October 14, 2022)
    - Donald J. Trump  (October 19, 2022)

- Miscellaneous Documents

    - Plaintiff E. Jean Carroll's Responses and Objections to Defendant Donald J. Trump's Request for Production of Documents (June 27, 2022)
    - Plaintiff E. Jean Carroll's Second Set of Interrogatories to Defendant Donald J. Trump  (August 2, 2022)
    - Defendant's Amended Responses and Objections to Plaintiff's First Request for Production of Documents (August 26, 2022)
    - Defendant Donald J. Trump's Responses and Objections to Plaintiff's Second Set of Interrogatories (September 7, 2022)

## General Overview

I have reviewed the documents listed in the preceding section of this report, have received additional input from the Defendant's legal counsel and have done some basic internet research to obtain some background on the litigants, see what type of information existed on the lawsuit itself as well as to get a sense of the type and extent of media exposure that was generated by this lawsuit.

This core of this case which emanated from an alleged rape is a classic "he said, she said" situation.  The Plaintiff says he did, and the Defendant says he didn't.  There is no empirical evidence to support either side as there weren't any witnesses or no forensic evidence.  The Plaintiff reports she told two friends about the assault within a day or two and the Defendant said it couldn't have happened because he was accompanied at all times by a security person.  The Plaintiff has an explanation why she waited 23 years to go public with the assault and the Defendant reacted to the news with vehement statements of denial.  This lawsuit has a single Cause of Action – Defamation – and it is relating directly to the Defendant's responses and denials of being accused of sexual assault and rape.

In Humphrey's report, she properly disclaims that the Plaintiff's false statements are "alleged" and that the findings, conclusions and opinions she offers in the report are based on that assumption (Page 8, Footnote 20).  However, throughout the report, in her background information provided both on the incident and the subsequent actions and words by both parties once the Plaintiff went public, she only presents the "she said" side and not that of the "he said."  As a reporter with the New York Times, I was schooled in the "fair and balanced" code or principle of the journalism profession.  As an expert witness, I believe the "Case Background" section of any report which precedes the expert's conclusions and opinions section should present both sides equally because that provides the reader of the report with of fair, accurate and unbiased information on the matter which the expert has been asked to address. It also provides background, insight, perspective, and context to what occurred and to the litigation. I have found this to be proper procedure and have followed that in the approximately 50 expert witness reports I have authored in the past 16 years.

Additionally, as noted, while she did disclaim that the false statements were alleged, she possibly tipped her bias towards Carroll at the end of her report when she stated:

3

A-314

*"I reserve the right to revisit and supplement this analysis and amend these conclusions should additional information and/or documents become available, such as Mr. Trump's October 12 statement, **reiterating many of the defamatory claims** against Ms. Carroll, in response to a judge's denial of Mr. Trump's request to delay his deposition."*    (Pages 72.73)

**Analysis of Statements**

Immediately after Plaintiff Carroll went public with her allegation of sexual assault and rape, between June 21 and 24, 2019, Defendant Trump made a series of statements/comments/opinions denying her accusations. The Plaintiff takes issue with the comments and statements which were disseminated.

In a statement issued by (or on behalf of) Trump on June 21:

- Trump falsely stated that he did not rape Carroll.
- Trump falsely stated that he had never met Carroll.
- Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.
- Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales.
- Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation to carry out a political agenda.
- Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation as part of a conspiracy with the Democratic Party.

On June 22, Trump spoke with reporters and the Plaintiff said he made the following remarks:

- Trump falsely stated that he did not rape Carroll.
- Trump falsely stated that he had no idea who Carroll was.
- Trump stated that she made up the allegation to increase the sales of her book
- Trump stated that she made up the allegation to carry out a political agenda
- That she made up the allegation as part of a conspiracy against him by the Democratic party
- Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.
- Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent the rape accusation against him.

On June 24, in an interview with The Hill publication, Trump stated:

- The Plaintiff wasn't his type.
- The assault/rape never happened.

In her report, Humphreys detailed all these allegations (i.e., "she said") but did not provide the Defendant's responses. Following is a list of the allegations individually and the Defendant's words which led to them as well as some comments I would offer. (Note: As an expert, I cannot offer a legal opinion as to whether a statement is defamatory but as a professional communicator, I can provide an opinion or offer context and perspective as to whether it meets the criteria for defamation.)

Following is the list of alleged false statements and/or false implications as cited by the Plaintiff and reported by Humphreys in her report along information related to each and my own observations, comments, or assessment:

4

- Trump falsely stated that he did he did not rape Carroll.

    Comment: There is no evidence that the rape occurred. It cannot be a false statement to deny some action that hasn't been proven to have taken place. In fact, it is more of a defamatory statement for the Plaintiff to have made a statement that it did occur, especially without any evidence of it.

- Trump stated that he had never met Carroll.
- Trump falsely stated that he had no idea of who Carroll was.

    Carroll declares that she first met Trump when she was a writer on Saturday Night Live in 1987, then met him at a party in the 1990's and later they waved at each other across Fifth Avenue in 1994 or 1995.

    In his June 21, 2019 statement, Trump stated:

    > "I've never met this person in my life."

    In his deposition, Trump responded to this assertion by testifying:

    > Q. *When the allegation came out in 2019, you said you – I think it's your testimony that you had no idea who she was.*
    >
    > A. *I still don't.*

    Carroll produced a photograph showing herself talking with Trump at a party as a form of proof that they knew each other. Trump maintains that he was in a receiving line at the party and greeted a number of people which is not an indication he knew her. In his deposition (Page 18, 17-23), he testified:

    > Q. *So, if I can understand your testimony, sir, you're saying that at the time you made the statement, you were not aware of ever meeting Ms. Carroll? You have since seen a photograph that shows you with Ms. Carroll on a receiving line; correct?*
    >
    > A. *Along with a lot of other people. (81 – 17-23)*

    Comment: Whether Trump knew her or not is unknowable barring a third person documenting this was true and I have not seen any evidence of that. These could not be false statements unless there is verification that they indeed knew each other. Further, even if it was proven that these were false statements, it is highly questionable that a dispute over whether he knew her or not would cause Carroll reputational harm.

- Trump falsely implied that Carroll had accused other men of sexual assault:

    In his deposition (Page 91, 3-7), Trump did not deny that he made this allegation:

    > Q. *Now , in your June 22 statement, you claim that Ms. Carroll had falsely accused other men of sexual assault; correct?*
    >
    > A. *That's what I heard, yes. (91 – 3-7)*

In her deposition, Carroll addressed the subject in her testimony:

> Q.   *You also claimed that a girl scout leader sexually abused you every day for a two-week period when you were; is that correct?*
>
> A.   *Yes.*                    (Page 161, 6-10)
>
> Q.   *How many times in your life have you been sexually assaulted or raped?*
>
> A.   *When I was a child, when I was 5, another child, not knowing what he was11doing shoved a stick up my vagina or rock, I can't remember which, so that was an assault when I was 5. At Indiana University on a drive in the country in Brown County, a boy pulled over and I -- he called me a prick tease and so I scooted out and jumped out the car and he caught me and threw me on the ground, got on top of me and pulled out a knife. At a military academy, my friend and I were visiting her parents' friends who I think he was the dean of admissions and a boy threw me on the ground and then chased me through it was called the military -- chased me across the campus with his friends cheering him on. I was thrown on the ground when was by a neighbor's nephew. Luckily the mother and the daughter came out and caught him. Moonves in the elevator*          (Pages 73, 7-25 and 174, 2-9)

Comment:  From her own testimony, Trump's implication was true.

- Trump falsely implied that she fabricated the rape allegation to increase book sales.

Specifically, Trump was reported to have said the following:

> *"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh."* (Trump Statement, June 21, 2019)

In her deposition, Carroll testified (Page 157, 8-11):

> Q.   *Did you think it would help sell the book?*
>
> A.   *I thought people would be interested.*

Comment:  In the above excerpts of their testimony, Trump did not refer to Carroll directly when alluding to selling a book and in her testimony, Carroll implied that people would have interest in the rape charge, which indirectly would could be construed that it would result in an increase in sales. Further, Trump's comment was clearly an opinion and constitutes speculation and supposition.

- Trump falsely implied that Carroll had a political agenda.

Trump addressed this accusation in his deposition.  (Page 88, 14-23)

> Q.   *Another thing that you say in your June 21 statement is that Ms. Carroll was trying to carry out a political agenda? How did you know she had a political agenda if you didn't know who she was?*
>
> A.   *Somebody told me early on that she was somehow aligned with Hillary Clinton.*

6

Comment:  Trump was parroting something that someone told him.  His statement can also be classified as conjecture, speculation and opinion.

- Trump falsely implied that Carroll was conspiring against him with the Democratic Party.

  Trump's actual quote was as follows:

  > *"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible."* (Trump Statement, June 21, 2019)

  Comment:  Trump was soliciting information and input from others on any connection of Carroll With the Democratic Party and did not make a declarative statement that she was part of a conspiracy.

- Trump falsely implied that Carroll had been paid money to make the rape allegation.
  Trump's actual quote was as follows:

  > *"But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that woman were actually paid money to say bad things about me."* (Remarks to media, June 22, 2019)

  Comment:  Trump was generalizing and did not specifically refer to Carroll.  This can also be categorized as an opinion.

- Trump negatively implying she is not appealing to him.

  > *"I'll say it with great respect: Number one, she's not my type."*

  Comment:  This was clearly an opinion.

In summary, after a careful review of all the alleged false statements and negative implications that the Plaintiff claims that Trump made, it is my opinion that none of the statements she identified can be determined as being false and the negative implications are expressions of his opinions which constitute free speech and are protected under the First Amendment of the Constitution.  (This is not meant to be a legal conclusion, just my analysis of them.)

**Reputation and Reputation Damage**

As a preface to discussing Humphreys' input relating to the reputation damage to the Plaintiff in this case, it is important to analyze her views on reputations.  Having nearly 50 years of experience "in the field" in terms of addressing the issues of reputation harm and damage, I differ with Humphreys on her concept of what a reputation is and the impact of damage to it.  In her report, she expresses a lot of explanations and opinions relating to reputations and attributes them (through footnotes) to other sources.  (Side note:  I learned many years ago that there is often a significant difference between what you learn in textbooks as opposed to what actually transpires in the "real world.")  Following are some examples of what she wrote in her report relating to reputations and my views on them:

- *"Reputation is fundamentally a social concept; one's reputation is determined by the social esteem held among a bounded group of people, up to and including the public sphere at large.  It has value in the sense that it gives someone social standing and respect in society."*  (Page 11, IIIA)

7

Comment: She attributed this statement to an excerpt in a book on sociology. This definition is fine if this case was about someone's reputation being harmed in the community or social circles, but it is not germane in this case where the main thrust of the Plaintiff's grievances relates to the damage to her career or livelihood. A more appropriate definition of reputation would be that a reputation is the sum of all our actions that is reflected by the people around us in the way they treat us or interact with us. It is an indirect result of anything and everything that we do. Successful people have always stressed on the building and maintaining of reputation as a fundamental ingredient to success. This distinction is important in relation to the claims made by Carroll against Trump.

- *"A person brand that has a general popular following can be especially harmed by negative claims, even if only a subset of the public believes the claims.* (Page 4, A)

  Comment: To the contrary, a person who has an established positive brand and developed a reservoir of good will (e.g., Carroll) which can withstand attacks especially when coming from someone as controversial as Trump. It's the one no one knows that is most hurt because they have a "clean slate" where the negative input has no counterbalance.

**Reputation Harm to Plaintiff**

Throughout her report, Humphreys offers extensive observations, comments and opinions regarding the reputation harm that Carroll suffered from Trump's statements, comments and assertions. She discusses in great length how her "person brand" had been damaged resulting in people perceiving Carroll as being untrustworthy and someone that can't be believed. This is reflective of Carroll's assertions in her lawsuit what Trump's remarks caused a significant decrease in letters for advice she was receiving at Elle Magazine and led to her eventual dismissal from the magazine. Both were debunked by Carroll in her deposition through her own testimony. On the issue of receiving less letters from public awareness of the alleged rape:

> Q. Did you -- were you told in any of these letters or did you get any information from the outside that they were going down because of your article or was this just your perception?

> A. No, it was my perception... (Page 216, 3-8)

On being terminated by Elle because of the Trump alleged rape exposure:

> Q. Did someone from Elle tell you that?

> A. No, they would never admit it. (Page 178 9-11)

> Q. And at the bottom of this article do you see that it says in the last paragraph on the first page in response to a list of questions sent by The New York Times, a Hearst spokeswoman e-mailed the statement, quote, E. Jean Carroll was long a beloved voice in the pages of Elle. The decision not to renew her contract was a business decision that had nothing to do with politics, it said. Do you see that?

> A. Yes            (Page 183, 10-21)

Similarly, the Plaintiff, in her Complaint, states that that Trump's statements and comments constituted Defamation Per Se (which was not listed as a Cause of Action). Under New York law, Defamation Per Se is defined by the following criteria:

- Statements charging a Plaintiff with a serious crime.
- Statements that tend to injure another in their trade, business, or profession.
- Statements imputing a loathsome disease on a Plaintiff.
- Statements imputing unchastity on a woman.

Trump's comments and opinions did not accuse her of a serious crime, having a loathsome disease or being unchaste. He also did not say anything negative about her professional capability or career.

**Reputation Repair Program**

Following is my analysis and comments on the Reputation Repair Program advocated and advanced by Humphreys.

Preface

Humphreys expert report is extremely impressive in terms of the quality and quantity of the information, the research and statistics she advances, her thought processes and her attention to detail. Unfortunately, nowhere in her report is it more evident that she doesn't have the background, experience, knowledge, or insight into matters relating to reputation damage or repair than in the presentation of her reputation damage repair program. Humphreys' self-stated expertise is in advertising, marketing, social media and digital communications. The orientation of these is all primary geared to promotion and advancing positive content. Promoting someone or something as opposed to overcoming and reversing negative impressions, images and reputations are two different worlds. This is evident in aspects of her proposed program, from conception to the budget. Following is my analysis and my thoughts on her program.

Type of Program

In describing the type of program that would be needed to repair the reputation of Carroll, Humphreys stated:

> "A holistic, **integrated** campaign is needed to effectively create attitudinal change and in turn repair reputational damage" (Page 5, H)

However, this is not what she is proposing. Later she clarifies it to state the following:

> "A holistic **social media** campaign that includes these integrated elements is therefore the most effective way to repair reputational damage in this case." (Page 186, 65i)

Note the "integrated" reference in the first quote is actually related to a social media campaign - not a diverse. Multi-faceted communications campaign – as defined in the second quote. Humphreys' background and expertise is largely concentrated with the internet and social media. The vast majority of her program is linked to both, at the near exclusion of other channels of communication. In her report, she states:

> "Reputational repair is a matter of public good and must occur in relation to the public sphere and the sphere in which it was originally damaged." (Page 12, i)

The initial damage was from widespread news coverage as traditional media had a field day with the news of the alleged rape. That was the genesis of the negative exposure, not social media. She also states in her report:

> "The public in which the reputational harm originally occurred persists on social media and may have limited exposure to traditional media." (Page 47, 15)

9

This may be true, but conversely, there are a great amount of people (e.g., senior citizens, technologically-challenged people) that are not on the internet (except maybe for e-mails). Having almost the entire program geared to online exposure is equivalent to "putting all your eggs in one basket." The most successful type of communications program features dissemination of information through multiple communications channels.

(Side note: A good analogy is Custer at the last stand. There were 2,000 Indians to his 196 soldiers. He was not defeated because they outnumbered him. The massacre occurred because they surrounded him. If they came from one direction, they could have escaped by going the opposite direction. The theory is the same in communications, don't use one channel of communications, use a variety to ensure the message is received.)

In her report Humphreys herself gave two other reasons why it would be important to put a major focus on traditional news media instead of strictly social media:

> "Since the news broke in June 2019, these same news publications have continued to cover the story, which has extended the effect of Mr. Trump's Statements further into the present day." (Page 50, iv)

In short, she has made her own case for making a public relations program targeted to free media exposure an integral part of the program as opposed to dwelling almost solely on internet exposure and social media.

However, Humphreys appears to have a negative view of traditional news media as evidenced by this comment:

> "Secondly, trust in traditional media has declined across the ideological spectrum. Whereas legitimate sources of news once went unquestioned, assessing trust of the source is now a primary concern of users when assessing claims…" (Pages 22-23, Ci)

(Side note: Somewhat ironically, it is Trump and conservatives that have the most distrust of traditional media, often labeling reports as "false news.")

It also important to note that internet exposure (and even media exposure) is a form of "indirect" communications meaning that the receiver is not getting the message directly from the sender. The most effective form of communications is "direct" contact. There are many ways to do this (e.g., direct verbal conversations, letters, emails, speaking engagements, appearance at events) and it does not appear that any form of direct communications is in Humphreys' program.

Target Audiences

While she doesn't clearly define her audience, it would appear she is targeting the public in general, including those who were exposed to Trump's alleged negative comments about Carroll. Thus, her detailing of the importance of "impressions" being received by people multiple times to be effective. This is standard promotional advertising and marketing "language." There are aspects related to who would be receiving the program's messages and how they would interpret them that I'm not sure she is factoring in.

- Trump is a highly visible, famous and well-known person who is also highly controversial and generates extreme passions in people one way or the other. There is no "gray area" in people's views of him, it's all black or white. Therefore, you aren't going to change the negative comments or opinions he had about Carroll because recipients of them will have believed them or not when hey were first heard.

- Carroll also is a public figure, known by many people. She has also, for the most part, has long had a positive image that she has cultivated. Humphreys addressed that herself in her report:

10

*"Once a popular advice columnist at Elle Magazine, Ms. Carroll had invested many years in forming and maintaining a person brand as a wise, personable, and insightful truthseeker. As a celebrated writer, she had a broad readership, reaching about 4.5 million Elle readers."* (Page 4, B)

Therefore, Carroll's long standing positive image would possibly offset most of his derogatory remarks.

- In her report, Humphreys states the following in reference to what segment of the public who were exposed to Trump's comments about Carroll would be prone to believe them:

    *"In an attempt to quantify at least a portion of the impact these Statements had on Ms. Carroll's brand....an average of 25.45% of the impression recipients were likely receptive to Mr. Trump's message."* (Page 5 F)

In effect she is stating that only 25.45% of the people exposed to his comments would believe them.

- If only basically 25% would believe Trump, that leaves 75% of the public who could be impacted.

- If you reasonably assume that at least 50% wouldn't believe anything he said, you are left with a very small percentage that you would have to reach to counteract his negative comments about Carroll.

- Also factor in that they may not have heard his comments and/or did but didn't know (or care) who Carroll was and therefore there was no harm to her.

- Trump is controversial and often bombastic. This would make it less likely some people would believe him.

- Trump's previous admissions of sexual inappropriateness would also lessen people's belief in the negative statements, comments or opinions he had of Carroll.

11

A-322

**Summary of Conclusions and Opinions**

A general summary of my conclusions and opinions are as follows:

- Humphreys is an accomplished and aware-winning university professor who is an expert and appears to have significant and extensive expertise in advertising, marketing, market growth, social media and digital communications.

- While she most likely has background and experience in creating and building a reputation, there is no evidence that she has any background, experience or expertise in reputation management, damage and repair – which is reflected in her report - and that is essential to this case.

- Her report is very impressive and very professional but her strategy, approach and recommendations for the program she proposed are inappropriate and not suitable for a reputation damage repair program.

- She doesn't seem to understand the dynamics of who Trump is and how his comments and opinions would be received by diverse and polarized audiences and how that would factor in both how his messages would be received and how best to combat them.

**Report Disclaimer**

The views, conclusions and opinions stated in this report are based on information and input related to this case that I have received to date. Based on receiving additional documents or information (e.g., legal filings, expert reports, depositions or hearing transcripts, records, communications, data) that may be made available to me in the future, I would reserve the right to either add to, change and/or expand on the scope of what I have offered in this report.

Robert J. Fisher                                                    November 14, 2022

Robert J. Fisher                                             Date

12

A-323

# EXHIBIT 10

Page 1

```
1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------x

5    E. JEAN CARROLL,

6                    Plaintiff,

7       -vs-                            20 CIV. 7311

8    DONALD J. TRUMP,                   (LAK)(JLC)

9    in his personal capacity,

10                   Defendant.

11   ---------------------------x

12

13           DEPOSITION OF ROBERT FISHER

14               December 14, 2022

15

16

17

18

19   Reported by:

20   MARY F. BOWMAN, RPR, CRR

21   JOB NO. 220615

22

23

24

25
```

A-325

Page 16

1                          R. Fisher

2        Q.    You were there from 1968 to 1969?

3        A.    Yeah.  Yeah.  I started in mid --

4   probably mid '68, went into '69.

5        Q.    Did you reach a full year at The

6   Times?

7        A.    No, I wasn't there a full year.

8        Q.    What was your position?

9        A.    I was a reporter.  What they

10  call -- I worked in the Los Angeles bureau,

11  not in New York, and there are like ten

12  people there.

13              And when you're in a bureau, if

14  you're in New York, usually you have a

15  specialty type of thing.  But out there, we

16  were all generalists.  So I would do

17  various type assignments.  I could cover a

18  Litton stockholder meeting.  The next day I

19  could cover a press conference for the Los

20  Angeles Rams.  I just did all sorts of

21  articles.

22       Q.    Roughly how many articles did you

23  write while you worked there?

24       A.    Oh, I could not give you a guess.

25  I could not give you an estimate.  I did a

Page 17

```
 1                        R. Fisher
 2    lot of what you call -- I did multiple
 3    articles a day.  I was -- I covered the
 4    international beat for a while.  I could
 5    explain that to you.
 6              But I might write or three or
 7    four international stories a day and it was
 8    based on -- well, if you want me to get
 9    into it, it was based on pirating something
10    from the LA Times.  If you want me to get
11    into it, I will.  If not -- let's vague and
12    ambiguous just say I wrote a lot of
13    articles.
14       Q.    Did you name appear on the byline
15    for those articles?
16       A.    No, I can't remember -- no, they
17    couldn't.  Those kind of articles, you
18    couldn't put the byline because they were
19    basically plagiarism.  I mean -- not
20    plagiarism, but I mean taking information
21    from other sources.
22              So you couldn't put your name on
23    it because if you put your name -- if
24    anybody put their name on it, it would be
25    more -- it was more -- it looked like a
```

Page 98

1                         R. Fisher

2     there is anything else out there, that kind

3     of thing, and that's pretty much the

4     only -- oh, if the case has media exposure.

5     You know, 90 percent of the cases I have,

6     no one knows who the plaintiff and

7     defendants are.  And you know, there is --

8     the media doesn't cover it.

9              But if there are, I like to get a

10    sense of what, you know, what the -- I have

11    a case in New York, the Central Park Five

12    case where there is literally 5, 600

13    articles on the internet about it, you

14    know, that kind of thing.  But most cases

15    have none.

16              So I looked and I saw a few

17    articles.  You know, I don't read them all

18    because they all basically say the same

19    thing.  I just try to get a sense of what's

20    being said out there.

21       Q.    And can you approximate how many

22    articles you read about the case or the

23    parties involved in the case?

24       A.    This was about a month ago when I

25    got the assignment and -- probably about

Page 99

```
 1                    R. Fisher
 2  four or five, I'd say.  There were a lot
 3  of -- but you know, I mean, most of them
 4  are covering pretty much the same thing and
 5  so -- I just try to get a flavor of what's
 6  being said out there.
 7       Q.    And in addition to those four or
 8  five articles that you read, do you recall
 9  reviewing anything else as part of this
10  internet research?
11       A.    No.  No.  That's -- there
12  wasn't -- I didn't have a lot of time.  I
13  had a deadline of five days from the day
14  they -- Mr. Swift called me, to the day
15  that the report was due, it was like five
16  days.  I didn't have time to do too much
17  researching.
18            And frankly I didn't need to.
19  Because the scope of my -- I think -- in
20  the 60 -- 80 cases is I've had, this was
21  the first time I was ever hired as a
22  rebuttal.  You know, normally, I'm hired by
23  the plaintiff or defendant, you know,
24  handle the whole case.  This was the first
25  time I was ever hired exclusively to do a
```

Case 1:20-cv-07311-LAK   Document 135-10   Filed 02/16/23   Page 7 of 82

Page 103

1                          R. Fisher

2    and I'm trying to remember whether there

3    was exhibits or not.

4              I don't believe I read the

5    exhibits.  I just looked at the report.

6    Like I said, time was very short.  I

7    concentrated on the report.

8         Q.    If we can turn to what is the

9    table of contents, it's I guess -- the

10   (iii) just a couple of pages in, still in

11   the table of contents, you see there is

12   various appendices listed?  Sort of

13   following the conclusion on that page?

14        A.    Oh, yeah, appendix, you mean.

15        Q.    Yeah, by -- when you testified

16   previously that you didn't review the

17   exhibits, were you referring to the

18   appendices?

19        A.    Yeah.

20        Q.    So you had not reviewed any of

21   the appendices that are listed out in the

22   table of contents?

23        A.    I might have skimmed through just

24   to see what they look like, but I don't

25   remember -- I more or less stopped with the

Page 104

```
 1                    R. Fisher

 2   signature page on the thing.  I might have

 3   skimmed through some of them.

 4        Q.    Okay, let's turn to first turn to

 5   page 74 of this, of Exhibit 4.

 6        A.    Yes.

 7        Q.    You will see at the top, it says,

 8   "Appendix A, Professor Humphreys' CV and

 9   prior testimony," and underneath that in

10   brackets, it says "Produced in native

11   form"?

12        A.    Yeah, that bothered me a great

13   deal because I was not able to see her CV.

14        Q.    So you didn't receive or review

15   Professor Humphreys CV?

16        A.    No, and that bothered me.  That

17   bothered me.  I would have liked to have

18   seen her CV, but since they listed her

19   background within her report, you know, she

20   summarized her background in her report.

21              But it would have been nice to

22   see her -- the thing.  But I didn't feel it

23   was that germane.  I didn't really -- more

24   or less, you know, retained to look at her

25   opinions, not her background.
```

Page 105

```
 1                    R. Fisher

 2      Q.    If we turn to page 116 in this

 3  same exhibit.  You will see it says at the

 4  top, "Appendix A, Examples of negative

 5  comments and posts about Ms. Carroll," and

 6  then we see in brackets "Produced in native

 7  form"?  Do you see that?

 8      A.    Yeah, what does that mean,

 9  produced in native format?

10      Q.    We don't have to sort through

11  that now, but sort of my previous question,

12  did you review this appendix A that was

13  produced in native form?

14      A.    No, I never saw it.

15      Q.    And if you turn just one more

16  page, to page 117 of Professor Humphreys'

17  report, and you see another appendix

18  listed, it's appendix I, "Examples of

19  direct messages and emails to Ms. Carroll,"

20  and under that it says, "Produced in native

21  form," is it fair to say that you didn't

22  review appendix I either?

23      A.    No.

24      Q.    Let's turn back to page 75.

25      A.    Yes.
```

Page 106

1                          R. Fisher

2        Q.     At the top, do you see where it

3    says "Appendix B, materials considered"?

4        A.     Yes.

5        Q.     And then the first section says

6    "Bates stamped documents."

7               Did you review any of the

8    documents listed in this section?

9        A.     No.

10       Q.     And then under that on the same

11   page, we see a section entitled, "Legal

12   filings and depositions."

13              You testified previously that you

14   did review the complaint, is that correct?

15       A.     Yes.

16       Q.     Did you review the deposition of

17   Robbie Myers?

18       A.     No.

19       Q.     Turn to the next page, page 76,

20   header "Academic articles" and then there

21   is a list of academic articles that

22   continues on to page through page 78.

23              Do you see that?

24       A.     Yes.

25       Q.     And did you review any of the

Page 107

```
 1                    R. Fisher
 2    academic articles listed here?
 3         A.    No, I wasn't provided.
 4         Q.    By -- I believe you said no, you
 5    weren't provided.  Are you aware that these
 6    academic articles were made available to
 7    the defendant's counsel in conjunction with
 8    Professor Humphreys' expert report?
 9         A.    I don't know what the relevance
10    of these academic -- I don't know what
11    these academic articles are or what they're
12    about or whether they are -- I mean, you're
13    asking me about the things I'm not even
14    aware of and whether they are germane to
15    anything.
16         Q.    Okay, if we turn to page 79,
17    there is a section titled "Books."  Did you
18    review any of the books listed in this
19    section?
20         A.    No.
21         Q.    And then lower on that same page,
22    there is a section titled "Websites" and
23    then there is a list of URLs that continues
24    on to page 83.
25               Did you review any of the
```

A-334

Page 108

```
 1                    R. Fisher

 2   websites at those URLs?

 3       A.    No.

 4       Q.    Then if we turn to page 83, there

 5   is a section entitled "Social media posts"

 6   that continues on to page 84.

 7             Did you review any of those

 8   social media posts listed there?

 9       A.    No.

10       Q.    And then on page 84, there is a

11   section called, "TV rating references,"

12   that continues on to page 85.

13             Did you review any of those TV

14   rating references that Professor Humphreys

15   lists?

16       A.    No.

17       Q.    And then on page 85, we have a

18   section entitled, "Damages model

19   references," that lists as 5 bullets under

20   there.

21             Did you review any of those

22   damages model references that Professor

23   Humphreys lists?

24       A.    No.

25       Q.    And also on page 85, we have a
```

A-335

Page 109

```
 1                    R. Fisher

 2   section entitled, "Print publication data

 3   references."

 4             Did you review any of those print

 5   publication data references?

 6        A.    No.

 7        Q.    And at the end of 85, we have a

 8   section entitled, "ProQuest articles," and

 9   that continues on to page 86.

10             Did you review any of those

11   ProQuest articles?

12        A.    No.

13        Q.    And then finally, on page 86, we

14   have a section entitled "Databases."

15             Did you review or consult any of

16   those databases?

17        A.    No.

18        Q.    So if we look -- just I apologize

19   for maybe doing some flipping back and

20   forth between your rebuttal report and

21   Professor Humphreys' report.  If we open to

22   page 9 of your rebuttal report in the

23   paragraph with the header "preface."

24             Do you see that?

25        A.    Yes.
```

A-336

Page 111

```
 1                    R. Fisher
 2      A.     No.
 3      Q.     And you haven't read any of the
 4   other articles listed on pages 76 through
 5   78 of appendix B, is that correct?
 6      A.     The ones we went through
 7   meticulously, no.
 8      Q.     So what was the basis for your
 9   claim that her expertise is not
10   "primarily" -- or is "primarily geared to
11   promotion and advancing positive content"?
12      A.     I was taking her own words for
13   it.  She entered a description at the
14   beginning of her report which is what --
15   where people outline basically their
16   expertise.
17             She talked about -- she gave her
18   academic background which she is doing now
19   and she said she previously worked as a --
20   well, this was in her deposition, prior to
21   working at Northwestern, she worked in
22   events and promotion, promotions and --
23   events and promotions.
24             She said that her background was
25   very heavy in marketing and advertising and
```

**A-337**

Page 112

1                          R. Fisher

2     that she had experience in social media,

3     digital communications.  That sort of

4     thing.  That's -- I mean, that was her

5     background.

6                    And given that this is a

7     defamation case and given that defamation

8     relates to reputation harm, when she was

9     representing what her expertise is and

10    doesn't mention any background whatsoever

11    in reputation harm or reputation management

12    or damage, she is basically somewhat of a

13    fish out of water.

14                    For the most part, it would be

15    the equivalent to an attorney being a

16    family law attorney and then getting

17    involved in something in intellectual

18    property.

19                    It's both areas of law just like

20    advertising and marketing is areas of

21    communications but they're not the specific

22    specialization area that is required for

23    the task at hand.

24        Q.    And you made reference in your

25    answer to Professor Humphreys' depositions,

A-338

Page 116

1                          R. Fisher

2    promotions disqualify you as an expert in

3    this case?

4         A.    No.   Because I -- that's not the

5    sole base of my expertise.

6         Q.    And are you aware that academic

7    who study marketing regularly research and

8    study reputation and brand crises?

9         A.    Not that I was aware of.

10        Q.    Have you spent any time reviewing

11   the academic literature on reputation

12   repair?

13        A.    No, not specifically.

14        Q.    And would your opinions regarding

15   Professor Humphreys' report change if you

16   became aware that her primary area of study

17   is not related to the promotion and

18   advancing of positive content?

19        A.    I'm sorry, would you repeat that

20   question.

21        Q.    I said would your opinions

22   regarding Professor Humphreys' report

23   change if you became aware her primary area

24   of study is not primarily focused on the

25   promotion and advancing of positive

A-339

Page 117

```
 1                    R. Fisher
 2   content?
 3        A.   I would have to know what her
 4   primary focus was on.
 5        Q.   And --
 6        A.   I mean, it doesn't do any good to
 7   say that isn't her primary area.   That
 8   tells me nothing.   What is her -- you would
 9   have to tell me what her primary focus
10   seems to be on and I could make a better
11   judgment.
12        Q.   What sort of information would
13   you need to assess her primary focus?
14        A.   I need to know what her
15   background -- what her background and
16   experience and expertise are in the area of
17   reputation -- reputation in -- anything to
18   do with reputation.   Creating reputations,
19   building them, nurturing them, protecting
20   them and overcoming negative -- negative
21   content that harms reputations.
22             Nothing she said in her report
23   gave any indication she has any background
24   whatsoever in reputations.   And frankly,
25   her report reflected that.   But go ahead.
```

Page 119

```
 1                         R. Fisher
 2    It's not a reputation damage or anything to
 3    do with reputation per se.
 4              And I wouldn't be emphasizing
 5    that.  I would be saying, look, this is my
 6    background and expertise as it relates
 7    directly to reputations and either building
 8    them or protecting them or overcoming
 9    damage of them.
10              She has not one word in her
11    report -- and I didn't see her CV, so if
12    there is something in there, I apologize
13    for not seeing it.  But she didn't say one
14    word in her report in her describing her
15    background, experience and expertise that
16    related whatsoever to reputation or
17    reputation damage.
18         Q.   In your report, you make
19    reference to your work as a reporter at the
20    New York Times, correct?
21         A.   I was a reporter for the New York
22    Times, yes.
23         Q.   And you found that relevant to
24    mention in your report?
25         A.   Well, it was relevant in the
```

A-341

Page 121

1                      R. Fisher

2    that that was for roughly a year in 19 --

3        A.    Not quite, it was under a year.

4        Q.    Are you aware that one of

5    Professor Humphreys' professorships is at

6    Northwestern School of Journalism?

7        A.    That's an excellent school of

8    journalism.  It's one of the best around.

9        Q.    Were you aware that Professor

10   Humphreys was a professor at that school of

11   journalism?

12       A.    No.  No.

13       Q.    Can you turn to page 1 of

14   Professor Humphreys' report.  If you read

15   the very first sentence of her report, it

16   says, "I am a professor of integrated

17   marketing communications at the Medill

18   School of Journalism."

19            Do you see that?

20       A.    Yes.  But again, as I said,

21   journalism -- there is a difference between

22   teaching journalism and being in the field

23   covering events.  You're comparing apples

24   to oranges there.

25            I mean, it's one thing to get up

**A-342**

Page 123

```
 1                      R. Fisher
 2    in, you know, of how to be a journalist,
 3    what to write, how to write, how to conduct
 4    an interview right.  They don't go out and
 5    write articles themselves and they don't --
 6    journalist professors -- I have two years
 7    of journalism.  I know what they teach.
 8    It's not the same thing.  You're comparing
 9    apples to oranges.
10        Q.    Do you know what sort of classes
11    Professor Humphreys teaches?
12        A.    No, but I've about been -- I
13    don't know that journalism -- there is
14    different forms of communications back and
15    when I was going to journalism school, the
16    internet didn't exist.
17              So there is different
18    communications outlet that journalism
19    people, you know -- a lot of journalists
20    are contacted by Twitter now or this or
21    that.  There is the things -- but the
22    basics of journalism hasn't changed.  Maybe
23    the outlets of how you communicate change
24    but the basics of journalism hasn't
25    changed.
```

**A-343**

Page 127

```
 1                    R. Fisher
 2   shocked how different it is when you're out
 3   there as to how they're applied, which are
 4   used, how they're applied, that kind of
 5   thing.
 6              So I'm a little skeptical
 7   about -- you know, academia people and
 8   their theories on how you should do things
 9   as opposed to how they're done in the real
10   world.
11      Q.    And so I guess you understand
12   that lawyers cannot serve as experts in --
13      A.    Of course.
14      Q.    -- a lawsuit?
15              So besides, to use your term sort
16   of, real world PR professionals, are there
17   any other qualified experts in a defamation
18   case?
19      A.    I don't really think so.  I mean,
20   the bottom line is that to take somebody --
21   and I'm not talking specific about
22   Professor Humphreys, but I've been in other
23   cases, many other cases where the opposing
24   experts had -- especially in the internet,
25   they seem to hire, these law firms seem to
```

Page 168

1                    R. Fisher

2    I don't know.  I wasn't in the dressing

3    room at the time.  Very well could have

4    happened.

5              But the point is you have to look

6    at -- nothing I saw in any of the

7    documentation I read or any of the evidence

8    or anything that I saw validated that a

9    rape occurred.  And you know, I mean, he

10   says -- she said it did.  He said it

11   didn't.  I mean, I don't think anybody

12   could make a judgment.  It's -- you know,

13   you have two conflicting views and there is

14   no independent evidence one way or the

15   other.

16      Q.    And what do you mean when you

17   write, "It cannot be a false statement to

18   deny some action that hasn't been proven to

19   have taken place"?

20      A.    That's true.  A false

21   statement -- a statement as opposed to an

22   opinion, as you know, but I'll just put it

23   for the record, a statement is something

24   that could be proven or not proven, whereas

25   a -- whereas an opinion is something that

Page 169

1                         R. Fisher

2      obviously can't be proven.  And no one has

3      proved one way or the other -- so by the

4      classic definition of a false statement, it

5      can't be a false statement if it's not

6      proved to be untrue.

7          Q.    So is it your testimony that

8      whether or not Mr. Trump raped Ms. Carroll

9      is a question of opinion?

10         A.    No, I'm not saying it's a

11     question of opinion.  I'm saying it's --

12     there is no documented evidence that I'm

13     aware of -- now, there may be something.

14            Maybe she, like Monica Lewinsky,

15     maybe she kept her dress and has taken it

16     in for a sampling and they found his semen

17     on it.  I don't know.  I'm saying -- I can

18     only give my conclusions and opinions based

19     on knowledge that I have and I have no

20     knowledge whatsoever that that rape

21     occurred.

22            Now, if there is some, I don't

23     have it.  And if it didn't occur, it can't

24     be -- it can't -- when he denied it, it

25     can't be a false statement because it's an

A-346

Page 170

```
 1                        R. Fisher

 2   act that has never been proven to be.

 3        Q.    But if Trump committed the rape

 4   and therefore, knew he committed the rape,

 5   would it have been a false statement when

 6   he denied it?

 7        A.    Well, of course it would have

 8   been.  Of course it would have been.  There

 9   is no question about it.

10             But the point is we don't know it

11   was a false statement.  There is no

12   documented evidence that it was a false

13   statement.

14             The only way it would have been a

15   false statement -- I mean, he knows in his

16   own heart whether he did it or not.  But

17   the only way it would have been a false

18   statement is if somebody could prove it

19   really didn't happen and he lied about it.

20        Q.    Is it your opinion the only way

21   to prove defamation in this context is to

22   have documentary evidence proving that a

23   rape occurred?

24        A.    Well, it's common sense I think.

25   I don't know if it's my opinion, but I
```

A-347

Page 171

1                          R. Fisher

2    mean -- my -- am I supposed to say -- is

3    anyone supposed to say that Trump lied when

4    there is no evidence that he did lie?

5              I mean -- maybe you are seeing

6    something I'm not.  I mean, I know -- it

7    doesn't matter whether we think he did it

8    or not or didn't do it, something like

9    that.

10             The point is all you can -- you

11   don't try cases -- you don't decide cases

12   on supposition.  Well, you know, he must

13   have done it or we think he did it or

14   something.

15             You know you -- you put people in

16   the death chamber, you know -- you convict

17   people of murder based on hardcore

18   evidence, not supposition or, well, he

19   didn't like his girlfriend so he probably

20   murdered her.

21     Q.     In your opinion, is Ms. Carroll's

22   testimony that the rape occurred sufficient

23   to prove that the rape took place?

24     A.     No.  No.  Because she said it?  I

25   mean --

Page 172

```
 1                    R. Fisher

 2      Q.    So is it your opinion that in a

 3   he said/she said situation, we are not

 4   allowed to believe --

 5      A.    Either party --

 6      Q.    We are not allowed to believe the

 7   person who alleges that the sexual assault

 8   occurred?

 9      A.    No.  You're -- you know, you're

10   not guilty until you're proven guilty.

11   That means that everybody that was accused

12   of something would go to court and to jail,

13   you know -- you don't convict people of

14   burglary or crime or anything like that

15   unless there is evidence that they did it.

16              You're presumed -- in the

17   American judicial system -- and I'm not a

18   lawyer -- but in the American judicial

19   system, you are innocent until proven

20   guilty.  Isn't that true?

21              Well, it's the same thing in

22   anything, until you are proven guilty, you

23   are innocent.  The burden is on the thing

24   -- I could accuse you of stealing my

25   wallet.  does that mean you should go to
```

Page 173

```
 1                    R. Fisher
 2    trial and be convicted because I accused
 3    you of it?  I mean, I don't know where
 4    you're coming from.  I'm lost here.
 5              I mean, the bottom line just
 6    because she makes an accusation, we are
 7    supposed to assume it's true?  I mean --
 8         Q.   Is Ms. -- is Ms. Carroll's
 9    testimony relevant to whether or not
10    Trump's statement is false and therefore
11    defamatory?
12         A.   I don't believe so.  I believe
13    it's one person accusing the other of
14    wrongful act.  And the bottom line is there
15    has got to be -- if everybody went to court
16    and jail when somebody accused them of
17    something, the court system would be --
18    fall apart.
19              I mean, normally police don't
20    arrest somebody -- I mean, they're on --
21    unless there is evidence.  I mean, there
22    has to be evidence to it.
23         Q.   And does that evidence include
24    the testimony of the victim of a sexual
25    assault?
```

Page 181

```
 1                       R. Fisher
 2    conclusions based on it.
 3              I'm not going to opine on whether
 4    she has a strong case or not.
 5       Q.    If we look on the bottom of page
 6    5 of your report, and it goes on to page 6,
 7    you're addressing Ms. Carroll's claim that
 8    Trump falsely implied that she had accused
 9    other men of sexual assault and then you
10    set forth testimony from plaintiff and
11    defendant's depositions.
12              Do you see that?
13       A.    Yes.
14       Q.    And then at the bottom, on page 6
15    at the bottom of this subsection, after
16    pointing to Ms. Carroll's deposition
17    testimony in which she explains that she
18    had been sexually assaulted before, you
19    conclude, "Trump's implication was true."
20              What do you mean by that?
21       A.    Well, that's the one.  Most of
22    these seven statements were a he said/she
23    said situation.
24              But that was one where there was
25    actually, you know, one way or the other,
```

A-351

Page 182

```
1                    R. Fisher

2    there was actually some evidence.  I mean,

3    she -- she claimed that -- he claimed, I

4    suppose, that she had falsely accused other

5    men of sexual assault.  She denied it.

6            But then again, the evidence I

7    saw is that she did.  I mean, she accused

8    her girl scout leader of abusing her, and

9    then throughout this paragraph she talked

10   about they weren't all adults, but she

11   talked about other people assaulting her or

12   this or that.

13           So that was one of the couple

14   maybe where there was almost everything in

15   all those statements were totally he

16   said/she said, but that one it appears to

17   me that that wasn't a false statement

18   because she had accused other people.

19       Q.    Is there anything in the evidence

20   reviewed that showed that she had falsely

21   accused other people of sexual assault?

22       A.    Oh, I see what you mean.

23           Okay, I erred there.  I didn't

24   factor in the word "falsely."

25       Q.    So is your --
```

Page 183

1                    R. Fisher

2       A.    As I said, I -- this thing

3  overnight.

4              Yes, that changes the context of

5  this definitely.

6              I just saw had accused other

7  people of sexual assault.  Not falsely.

8              Right, we don't know -- we don't

9  know if these other things were false or

10  not with the girl scout leader, just that

11  she accused them.  But we don't know if

12  that was falsely.

13              Yes, I would agree that the word

14  "falsely" in there which I obviously missed

15  would change the -- would change in this.

16       Q.    And so recognizing now that the

17  word "falsely" is in there, what would your

18  comment be as revised?

19       A.    Well, I wouldn't make a comment

20  on that at all.  I would not have addressed

21  that particular statement at all because I

22  don't know whether they were falsely

23  accused or not.

24              So I wouldn't have even addressed

25  that particular comment because I would

Page 200

1                          R. Fisher

2      it in a manner that I felt was -- made

3      sense for my report or at least that my

4      style of doing things, let's put it that

5      way.

6          Q.    And if you look at -- I guess, so

7      the part of your report that is the

8      analysis of the statements that we have

9      been talking about, is it your testimony

10     that you were simply responding to the

11     reservation of rights that Professor

12     Humphreys includes at the bottom of page 72

13     in her report?

14         A.    I have to look at the bottom of

15     page 72.

16              Well, yes, that's the -- yes,

17     that's -- that was her -- I thought it was

18     the last paragraph.  It's the next-to-last

19     paragraph, I guess, as it turns out.

20              But yes, that was what it was

21     referencing to a little bit earlier there.

22         Q.    Okay.  And in this -- in your

23     report in this section called "Analysis of

24     statements," on page 4, toward the bottom

25     in the paragraph that begins in her report,

A-354

```
                                                    Page 201
 1                    R. Fisher
 2   you say, "Humphreys detailed all these
 3   allegations -- i.e. she said -- but did not
 4   provide the defendant's responses."
 5              Do you see that?
 6        A.    Yeah.
 7        Q.    If you turn to page 3, in the
 8   second paragraph from the bottom, about in
 9   the middle, you write, she, "She only
10   presents the 'she said' side and not that
11   of the 'he said.'"
12              Do you see that?
13        A.    Yeah.
14        Q.    So by the "she said," are you
15   referring to the allegations that
16   Ms. Carroll made against Mr. Trump in her
17   book, in the book excerpt that ran in New
18   York Magazine?
19        A.    I don't think I was -- I wasn't
20   referring to Ms. Carroll at all.
21        Q.    In presenting this case as a he
22   said/she said situation, the "she" is not
23   Ms. Carroll?
24        A.    Oh, oh, okay.  Yeah, no,
25   that's -- I'm sorry, yes, that is
```

Page 202

```
 1                    R. Fisher
 2   Ms. Carroll.
 3             No, I was talking about -- I
 4   didn't specify it to be what she said in
 5   the book or anything.  It could be what she
 6   said in the complaint.
 7             I'm talking about in general
 8   terms, the allegations that she was making
 9   against Mr. Trump, whether it was in her
10   article or in her complaint, I didn't
11   specify the source.
12             I just said that she has made
13   certain claims and allegations against him,
14   rightly or wrongly.  But, you know, she has
15   made allegations, and frankly, I don't know
16   if any of us know whether she is right or
17   wrong.  As I said, this is totally a he
18   said/she said.
19             But yes, that's -- I wasn't
20   sourcing it to any particular -- whether it
21   was the article, the book or the complaint.
22   I was just saying in general, the
23   allegations she was making.
24      Q.    So the "she said" are
25   Ms. Carroll's allegations, correct?
```

Page 203

1                    R. Fisher

2        A.    Yes.

3        Q.    And the "he said" would be

4   Mr. Trump's response to those allegations?

5        A.    Um-hm, correct.

6        Q.    So if we can go to page 6 of --

7   sorry, page 8 --

8        A.    Of my report?

9        Q.    Professor Humphreys' report,

10  sorry.

11       A.    Oh, getting confused on reports.

12             Okay.

13       Q.    If you look, there is a block

14  quote that represents Mr. Trump's statement

15  on June 21, 2019.

16       A.    Yeah.

17       Q.    Do you see that?

18       A.    Um-hm.

19       Q.    And that block quote continues on

20  through page 9 -- through the top of page

21  9?

22       A.    Um-hm.

23       Q.    And then starting on page 9,

24  there is a text that reads, "The second

25  statement was made to reporters at the

A-357

Page 204

```
 1                      R. Fisher
 2    White House on June 22," and then there is
 3    another block quote?
 4        A.    Yes.
 5        Q.    And then that continues on to
 6    page 10, of Professor Humphreys' report.
 7               And then we have a paragraph on
 8    page 10 that begins, "The final statement
 9    was published in an interview with The Hill
10    on June 24, 2019.
11        A.    Um-hm.
12        Q.    And it -- and it then goes on to
13    quote what Mr. Trump said to The Hill
14    reporters.
15        A.    Um-hm.
16        Q.    You see all three of these
17    statements quoted --
18        A.    Yes.
19        Q.    -- in Ms. Humphreys' report?
20        A.    Frankly, that was one of the
21    reasons that I broke out -- since she made,
22    it's refreshing my memory a little bit.
23    Since she spent three or four pages
24    spelling out word for word what he said, I
25    mean, you know, in these different
```

Page 205

1                    R. Fisher

2   interviews or comments that he made in

3   various cases, the 21st, 22nd, 24th or

4   whatever, that's one of the reasons she

5   went into it that I analyzed each one of

6   them individually because where she

7   presented the whole, the whole scope of

8   what he said, I thought that, you know,

9   since she brought that up, that I would --

10  that I would break down the ones -- not the

11  whole ones, but the ones -- the portions of

12  it that they considered defamatory.

13       Q.    But you would agree that

14  Professor Humphreys' report quotes what

15  Mr. Trump said in response to Ms. Carroll's

16  allegations?

17       A.    As far as I know.  I mean, I

18  assume -- I never saw the articles.  I

19  assume this is an accurate representation

20  of what he said.  I don't know that for a

21  fact.  But I'm going to assume it is.

22       Q.    So wouldn't these fully quoted

23  responses count as the "he said" side of

24  the equation?

25       A.    I think -- I think you could

A-359

Page 206

```
 1                    R. Fisher
 2   construe it that way, yes.
 3       Q.    Is there any part of the "he
 4   said" that you referred to in your report
 5   that you believe is missing from Professor
 6   Humphreys' report?
 7       A.    No.  That could -- that seems to
 8   be the -- I mean, as I said, I don't know.
 9   I didn't see -- I don't know frankly
10   whether this represents everything he said
11   or didn't say.  I mean, because I never saw
12   the original articles or the -- that these
13   came from.
14            So I don't know whether she
15   cherrypicked or whether this was everything
16   he said or not.
17            But to your point, yes, you could
18   say that this would, in fact, represent a
19   portion of the "he said" or good portion if
20   not all.
21       Q.    And so do you stand by what you
22   wrote in your report that Professor
23   Humphreys quote only presents the "she
24   said" side and not that of the "he said"?
25       A.    Well, in this context, yes, I
```

A-360

Page 207

```
 1                      R. Fisher

 2   guess this could -- could represent what he

 3   was saying in this, yes.

 4              This would be an accurate -- if

 5   it's complete, this would be a fair

 6   representation of his side.

 7      Q.    So if it's complete, you would

 8   agree that you mischaracterized Humphreys'

 9   report in saying it only presents the "she

10   said" side and not that of the "he said"?

11      A.    I think that's a fair assessment.

12      Q.    So if we look to page 7 of your

13   report, you recall that you disagreed with

14   Professor Humphreys' definition of

15   reputation?

16      A.    Yeah, I -- I think that she is --

17   I think she is coming from a different

18   perspective on that.  Of what reputation is

19   and the terms of -- I think she was --

20   well, go ahead and ask your question.

21      Q.    Can I just have you read her

22   definition that's at the -- that you quote

23   at the bottom of page 7 in your report.

24      A.    "Reputation is fundamentally a

25   social concept.  One's reputation is
```

Page 220

```
 1                    R. Fisher

 2    the specific question and provide

 3    follow-ups if I ask them.

 4            If we look at page 8 of your

 5    report, you provide your own definition of

 6    reputation.

 7            Do you see that?

 8    A.    Yes.

 9    Q.    It says, "More appropriate

10    definition of reputation would be that a

11    reputation is the sum of all of our actions

12    that is reflected by the people around us

13    in the same way they treat us or interact

14    with us"?

15    A.    Yes.

16    Q.    "It is an indirect result of

17    anything and everything that we do.

18    Successful people have always stressed on

19    the building and maintaining of reputation

20    as a fundamental ingredient to success."

21    A.    Yes.

22    Q.    Do you see that?

23    A.    Yes.

24    Q.    What's the difference between

25    your reference to, "The sum of all of our
```

A-362

Page 221

1                    R. Fisher

2    actions that is reflected in the people

3    around us and the way they treat us or

4    interact with us," and Professor Humphreys'

5    reference to "one's reputation determined

6    by the social esteem held among a bonded

7    group of people"?

8        A.    Because mine is very clearly

9    oriented more to business and how people

10   are looking.

11            For instance, the direct

12   inference of that is the sentence,

13   "Successful people have always stressed on

14   the building and maintaining of reputation

15   as a fundamental agreement to success."

16   "Success" is talking about business world.

17            That is more -- that is more --

18   it's more generic in nature than Ms. --

19   Ms. -- it's more generic in nature than

20   Ms. -- Professor Humphreys was.  But it's

21   also clearly more targeted to someone in

22   the public light and business world.

23   Someone successful.  Someone -- you're not

24   talking about someone being a success in

25   their -- that they are popular in their

A-363

Page 222

```
 1                    R. Fisher
 2   neighborhood or at the country club.  You
 3   are talking about success in terms of the
 4   business world.
 5        Q.    And does your report cite any
 6   source or authority for your definition?
 7        A.    No.  No.  No.  And I didn't feel
 8   the need to.  I'm my own authority.
 9              But I don't need -- that's just
10   general -- it's a general definition of
11   reputation.
12              I mean, there is many definitions
13   of reputation.  But that's -- that's
14   something I've had 50 years in the field
15   working on reputation and that's -- it's an
16   amalgamation of other definitions and maybe
17   with my own interpretation of it.  I don't
18   have to cite an authority.
19        Q.    But -- did you write this
20   definition yourself?
21        A.    I wouldn't claim total
22   authorship, but I think I -- it's probably
23   a hybrid of, you know, as I said, I've been
24   an expert witness a lot of cases and I
25   write about reputation damage.  I've
```

A-364

Page 223

```
 1                    R. Fisher

 2   written articles as you have seen on my

 3   things.  So I'm very aware of reputation

 4   and whatever.

 5            So I probably wrote this myself,

 6   but it is probably something that relates

 7   to other definitions I've seen in the past.

 8        Q.    But this is the first time you've

 9   used this particular definition in one of

10   your reports, correct?

11        A.    Yeah.  I think it's -- I mean,

12   I've written -- not treatises, but I've

13   written articles on reputation and a lot of

14   in detail.

15            This is kind of just -- it's not

16   necessarily a direct excerpt from one of

17   those, but it's just kind of a shortened

18   version of things I've said about

19   reputation in the past.

20        Q.    But in those articles, you

21   haven't sort of used this specific

22   three-sentence definition before, correct?

23        A.    No, I -- I created that.  I don't

24   think I lifted that from anything previous.

25   I think I just sat and wrote that from my
```

Page 224

                        R. Fisher

1

2    own, you know, my own knowledge that I've

3    had.

4        Q.    Wrote that for the purposes of

5    this rebuttal report?

6        A.    Yes, yes.

7        Q.    Okay.

8        A.    Again, let me just express real

9    quickly, I'm not knocking Ms. Carroll's

10   definition.  I think her definition is a

11   good one.  I'm just saying it's -- two

12   things.  I'm just -- well --

13       Q.    I'm going to hand you?

14             MR. SWIFT:  Just to clear it up.

15       There was -- were you finishing

16       answering his question or --

17       A.    When he is talking to her, it's

18   kind of hard.

19             The only point I was making is

20   twofold.  One it's too narrow of a

21   definition, and second of all, it's not

22   apropos to this particular situation.

23       Q.    So the court reporter is handing

24   you a document we will mark as Exhibit 7 or

25   Fisher 7.

Page 225

```
 1                      R. Fisher
 2      A.    Incidentally, there is --
 3            MR. SWIFT:  There is no question
 4      pending.
 5      A.    I was just going to say I don't
 6   think this has to end at 3.  There is no
 7   way this deposition is going to end by 3
 8   o'clock.  I mean, you could do it by Zoom
 9   or continue somewhere it's not going to
10   happen by 3.
11            (Exhibit 7, article entitled,
12       "The Importance and Psychology of
13       Reputation in Human Lives," marked for
14       identification, as of this date.)
15      Q.    Do you see what the court
16   reporter handed you is an article from the
17   source Medium entitled, "The Importance and
18   Psychology of Reputational Harm in Human
19   Lives"?
20      A.    Um-hm.
21      Q.    It's authored by Borderless
22   Technology Corp.?
23      A.    Um-hm.
24      Q.    It's published on February 9,
25   2018.  Do you see that?
```

A-367

Page 226

```
 1                      R. Fisher

 2      A.    I see it.  And that's the date of

 3   my wife's birthday, February 9.

 4            But anyway...

 5      Q.    Are you familiar with Borderless

 6   Technology Group?

 7      A.    No, I'm not.

 8      Q.    Have you seen this article

 9   before?

10      A.    No, I've not.

11      Q.    Can you read the first three

12   sentences of the article.

13      A.    "Reputation is the sum of all of

14   our actions as reflected by the people

15   around us in the way they treat or interact

16   with us."

17            Boy that sounds familiar.

18            "It is an indirect result of

19   anything and everything we do.  Successful

20   people have always stressed on the building

21   and maintaining of reputation as a

22   fundamental ingredient to success."

23            Boy, is that so?

24      Q.    You testified previously that you

25   developed your definition of reputation for
```

Page 227

```
 1                    R. Fisher
 2    the purposes of this rebuttal report.  Is
 3    that correct?
 4        A.    Yes, I did.
 5        Q.    Can you explain how the
 6    definition you wrote for your November 2020
 7    rebuttal report in this case appears
 8    verbatim in an article from February of
 9    2018?
10        A.    I never saw this article.  I --
11    no, I can't explain it.  I mean, obviously,
12    there is -- I'm looking like I'm a
13    plagiarist or something.
14              But I swear -- the only thing I
15    can think of -- I never saw this article.
16    I can say that unequivocally.  I've never
17    read an article about importance of
18    psychology in reputation ever.
19              The only thing I can say, and
20    it's too much of a coincidence to say the
21    words were exactly the same as I came up,
22    the only thing I can say is that I might
23    have seen this definition stand by itself
24    somewhere in the past and picked it up -- I
25    know I never saw the article.  The words
```

A-369

Page 228

```
 1                    R. Fisher

 2   speak for themselves.

 3             The only thing I can say is that

 4   over the course of time obviously, I pick

 5   and -- I pick up information from different

 6   places and the only thing I can say is I

 7   must have -- I must have -- I never saw

 8   this article as a whole.  I can guarantee

 9   you that.

10             The only thing I can say is

11   somewhere along the line somewhere, someone

12   else picked this up, that particular phrase

13   or paragraph or whatever, and I came across

14   it somewhere by itself and picked it up.

15             I must have had it in another --

16   sometimes I pick from my own reports.  I

17   might have put it another report and then

18   picked from it.  I don't know.

19             But my compliments to whoever

20   found this though.  It's -- so obviously,

21   that particular phrase I must have lifted

22   from another one of my reports or another

23   place that I had.

24             I mean, I do have a place where I

25   have different definitions of reputation
```

Page 229

1                    R. Fisher

2    kind of like a case -- a notes kind of

3    section I keep on the internet and

4    sometimes I go to it and extract out

5    definitions to feed -- to meet a particular

6    purpose.  And that is all I have -- that's

7    the only way I can explain it.

8         Q.    Okay.  So turning to page --

9         A.    Interesting.

10        Q.    Turning to page 9 of your report,

11   you state, about three-fourths of the way

12   down in the paragraph that begins, "Note,"

13   you write that Professor Humphreys is

14   proposing "a social media campaign, not a

15   diverse multi-faceted communications

16   campaign as part of her reputation repair

17   program."

18             Do you see that?

19        A.    Yes.

20        Q.    What do you mean by a "social

21   media campaign"?

22        A.    I mean, basically her -- the

23   whole campaign is, at least as she

24   described it, is an internet campaign.

25             Her campaign basically is -- the

Page 238

```
 1                     R. Fisher

 2    program.

 3        Q.    If I can just -- let's open

 4    Professor Humphreys' report which is

 5    Exhibit 4, the big one over there.  And if

 6    you could turn to page --

 7              MR. SWIFT:  It's Humphreys'

 8        report.

 9        Q.    Turn to page 126.

10        A.    126?

11              Okay.

12        Q.    And you will see at the top, it

13    says, "Appendix K damages model."

14        A.    Yes, I see it.

15        Q.    And you testified before that you

16    didn't focus on the appendices as part of

17    your review, but have you seen appendix K

18    before?

19        A.    I can't even be sure I had the

20    appendices, to be honest with you.  But I

21    didn't see them one way or the other.

22        Q.    If you could just look at this

23    and then I think it continues for a few

24    more pages giving different cost amounts.

25              But if we look at the information
```

Page 241

1                          R. Fisher

2     even the most effective way to do it.

3               So I've got two problems with

4     this.  I have a problem that she is putting

5     all her eggs in one basket, which would be

6     fine if they were unknown people maybe.

7               But when you have somebody

8     willing to do stuff for you for free and

9     you're spending all your money paying for

10    something that you can get otherwise,

11    it's -- I think her program -- and I have

12    the utmost respect for Professor Humphreys.

13    She is obviously extremely accomplished in

14    what she has done.

15              She has written books.  She has

16    got awards.  She has written articles.  But

17    she is totally a fish out of water.  She

18    doesn't understand how to repair -- she

19    knows how to promote things, but she has no

20    concept of how you overcome negative

21    reputations and her program is the best

22    example of it; not only in its direction

23    and focus, but the budget is ridiculous.

24              She said 3 to 20 million with

25    maybe the right figure being 10 to 12

Page 266

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3       _____
                                           )
4    E. JEAN CARROLL,                      )CASE NO.:
                                           )
5                        Plaintiff,        )20-Civ-7311
                                           )(LAK)(JLC)
6              v.                          )
                                           )
7    DONALD J. TRUMP, in his personal      )
     capacity,                             )
8                                          )
                         Defendant.        )
9       _____)

10

11

12

13

14           DEPOSITION OF ROBERT FISHER

15                   VOLUME II

16       REMOTELY IN LOS ANGELES, CALIFORNIA

17           TUESDAY, DECEMBER 20, 2022

18

19

20

21

22

23

24   REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR
                     CSR NO. 14125
25   JOB NO.:        220862

Page 296

1    disseminated?

2        A.   Oh, certainly.

3        Q.   And that means looking at different types

4    of news sources, among other things, and figuring

5    out how many people might have seen or heard

6    negative information?

7        A.   Well, I don't think there is a need to

8    figure out how many people.  It's a -- I mean, you

9    know -- I mean, there's no way to determine how many

10   people, but the bottom line is you have to get a

11   feel on various factors, such as what type of

12   audiences saw it, what the geographical spend was.

13   I mean, was it heard in just a small town or was it

14   nationwide?  I mean, there is a lot of factors that

15   dictate how would you approach planning and

16   implementing such a program.

17       Q.   And do you follow any particular

18   methodology to quantify the degree of dissemination

19   of allegedly defamatory statements in print and news

20   sources?

21       A.   No.  Unlike Professor Humphreys, I don't

22   do statistical analysis.  I mean, in most cases,

23   it's pretty clear -- both by the geographical spread

24   and by the means of the communications, it's pretty

25   clear on where -- you know, what the extent of the

Page 304

```
 1        Q.    And do you ever look at the readership

 2   data associated with the specific online news

 3   sources?

 4        A.    No.

 5        Q.    And do you know what a bounce rate is?

 6        A.    Yes.

 7        Q.    What's a bounce rate?

 8        A.    Well, bounce rate is how many times

 9   somebody goes on your website and actually sees

10   content as opposed to moving on.

11        Q.    And do you account for a bounce rate in

12   part of your analysis of the dissemination of online

13   news?

14        A.    That's something that I may or may not

15   factor in.

16        Q.    What -- what data do you use as your

17   source for specifying the bounce rate?

18        A.    Well, I haven't -- I don't get into it

19   that specifically.

20        Q.    Do you know any of the specific data

21   sources that experts use for bounce rates?

22        A.    Not particularly.

23        Q.    And has your methodology for tracking

24   dissemination in online news been subject to any

25   form of peer review?
```

Page 305

```
1          A.    Not that I know of but they may exist.

2          Q.    Have you ever seen it in any peer-reviewed

3     literature?

4          A.    No.  I haven't looked for it.

5          Q.    And do you -- turning to television, do

6     you follow any particular methodology to quantify

7     the dissemination of allegedly defamatory statements

8     through television?

9          A.    No.

10         Q.    And is there particular data sets that you

11    consult to measure the viewership of individual

12    television programs?

13         A.    No.

14         Q.    And has your methodology for tracking

15    dissemination of allegedly defamatory information on

16    television been subject to any peer review?

17         A.    No.  As I say, I'm not the one that would

18    be doing this.  So you can keep asking and I'll keep

19    saying no.

20         Q.    Understood.  And do you follow any

21    particular methodology to quantify the dissemination

22    of allegedly defamatory statements on Twitter?

23         A.    No.

24         Q.    And is there any data that you've

25    consulted to measure the level of engagement with
```

A-377

Page 306

```
 1   individual tweets?

 2        A.   No.

 3        Q.   And is there a particular source you use

 4   for an impression rate in connection with tweets and

 5   retweets of information on Twitter?

 6        A.   No.

 7        Q.   Do you know what an impression rate is?

 8        A.   Yes, I -- I looked at

 9   Ms. Humphreys' -- yes, I -- I have an idea of what

10   impression rate is.

11        Q.   And -- and what is an impression rate as

12   it pertains to Twitter?

13        A.   Well, impression rate is -- is basically

14   how many -- how many hits there are on a -- on a

15   particular -- on Twitter on a particular subject or

16   post.

17        Q.   And what -- what -- what is used to

18   measure those so-called hits on Twitter?

19        A.   I don't know specifically.

20        Q.   And have you ever done work with Twitter's

21   API?

22        A.   No.

23        Q.   Do you know what Twitter's API is?

24        A.   No.

25        Q.   Is there a peer-reviewed methodology that
```

A-378

Page 307

 1   you've used for tracking dissemination on Twitter --

 2        A.   No.

 3        Q.   -- for tracking allegedly defamatory

 4   information?

 5        A.   No.

 6        Q.   And just thinking about social media more

 7   generally, is there a particular methodology that

 8   you use to quantify dissemination of allegedly

 9   defamatory information on other forms of social

10   media?

11        A.   No.

12        Q.   Is there any particular data sources that

13   you use to measure dissemination or engagement with

14   defamatory information on social media?

15        A.   No.

16        Q.   And is there any peer-reviewed methodology

17   that you've used for tracking or quantifying

18   dissemination of information on social media?

19        A.   No.  As I said, this is not my -- this is

20   not my task or responsibility to do, it is -- all of

21   this would be handled by whatever firm or

22   subcontractors or consultants that are brought in

23   for -- to implement such a program, so you can keep

24   asking.

25        Q.   And do you agree that in order to assess

Page 308

1    the impact of an allegedly defamatory statement, you

2    have to determine approximately how many people

3    actually believed the statement when they read or

4    heard it?

5         A.   Well, that's not germane to my role in

6    this case so I don't feel the need to respond on

7    that.

8         Q.   So your testimony that it's not germane,

9    what percentage of people believe a statement is

10   true or false as part of your expert --

11        A.   No.  I'm -- I'm saying that I represent

12   the defendant in this case and that is something

13   that the -- the plaintiff is more -- is more germane

14   to her than to me, but if I was representing the

15   plaintiff, yes, then that would be -- that would be

16   more -- a more -- more my task or my responsibility.

17        Q.   But in order to -- as a general matter, in

18   order to assess the impact of alleged defamation, is

19   it important or relevant to understand the

20   percentage of people who read or viewed that

21   defamation or alleged defamation, sort of, to

22   understand the percentage of people that actually

23   believed it?

24        A.   It may or may not.

25        Q.   In what cases may it -- may it be

A-380

Page 309

1   relevant?

2       A.   Well, I mean, certainly -- certainly

3   the -- the plaintiff in this case is claiming

4   reputation harm as a result of statements that

5   Mr. Trump made whether they -- regardless of whether

6   they were true or false.  She's claiming reputation

7   harm, so therefore if I was her expert I would have

8   to delve into that, but in my role in this

9   particular case that's not part of my assignment.

10      Q.   So in this particular case, you have not

11  undertaken any efforts to determine what percentage

12  of people who read or heard Mr. Trump's allegedly

13  defamatory statements believed them?

14      A.   No.

15      Q.   Okay.  And as a general matter, as an

16  expert, do you a agree it is important to -- in

17  order to understand the impact of alleged defamation

18  to understand the percentage of people exposed to

19  those statements that are likely to believe it or

20  disbelieve it?

21      A.   Well, it's -- it's a moot point, the

22  question you're asking because the bottom line is

23  regardless of whether it's something that's

24  worthwhile or not in this particular case, I did not

25  have the ability to do so or may -- be more

**A-381**

Page 310

1   specific, the time to do so.  I was given five days

2   to -- from the time I was contacted, to the time I

3   prepared a report.  And I did not have the luxury

4   of -- of delving particularly beyond what was

5   reasonable for me to know to be able to offer my

6   conclusions and opinions.

7            And plus, I may add that having been

8   involved in these kind of things for 50 years,

9   representing people that have been damaged by

10  programs and the extent of the damage, how they were

11  damaged, how it manifested itself, so on and so

12  forth, I don't need to consult pie charts or to --

13  to have a -- have an educated feel of -- of what the

14  potential damage was.

15       Q.   And you would agree that in designing a

16  reputational repair campaign someone should, sort

17  of, focus on the forms of media that the target

18  audience actually consumes?

19       A.   That would be a reasonable -- a reasonable

20  thing to do.

21       Q.   And is part of your designing reputation

22  with repair campaigns, what sort of data do you rely

23  on to identify the types of media that your target

24  audience consumes?

25       A.   Well, I don't particularly get into data

Page 313

1    best news media that have the most credibility, the

2    reach, and whatever to go after, regardless of

3    whether they ever carried the original information.

4         Q.   And -- and what data do you rely upon to

5    determine what the best media is for your target

6    audience in terms of credibility and the other

7    things you mentioned?

8         A.   Knowledge.  I've been in this business

9    50 years.  A reporter for "The "New York Times", I

10   was in journalism -- I know the media, I know which

11   media -- who the media are, I know what they do, I

12   know who they reach out to, I know who reads them or

13   listens to them, I know what -- for instance, if I

14   had something from Mr. Trump back in the day, I

15   wouldn't go to MSNBC for it, I would go to FOX, you

16   know, or now Newsmax or America One [sic] or

17   whatever.

18            But the bottom line is I -- I have

19   knowledge; that's why I'm an expert.  I have

20   50 years of knowledge of working with the media.

21   Most of them were around 50 years ago.  "New York

22   Times" was around 50 years ago, so was the

23   Washington Post, so was ABC, so was AP, so was Wall

24   Street Journal.  I don't need to consult textbooks

25   or media guides -- again, we're just talking about

Page 315

```
1          Q.    Mr. Fisher, I'm just -- I feel like we're
2    well off the topic of my question --
3          A.    Well, I'm trying to -- we are but I'm
4    trying to educate you because the pattern of your
5    questions obviously shows a lack of knowledge
6    about --
7          Q.    Mr. Fisher, I get to ask the questions,
8    you have to answer them.
9          A.    Okay.  Pardon me.  Go ahead.
10         Q.    And we'll get through it more quickly if
11   you just stick to answering them.
12         A.    Go ahead.
13         Q.    So in this case you did do not any
14   analysis to calculate the number of times that
15   Mr. Trump's allegedly defamatory statements were
16   viewed; correct?
17         A.    No.
18         Q.    And so, you have no idea how many people
19   actually saw or read what Mr. Trump said about
20   Ms. Carroll?
21         A.    No.  I see you got Professor Humphreys
22   (inaudible) did charts somewhat to that effect but
23   no, I didn't.  I didn't -- as I said, I did not have
24   time at the time to do it.  I was on a strict
25   deadline so there were things -- there were some
```

A-384

Page 316

1   things I might have been done if I had a couple

2   months to do it, the luxury of time, but in this

3   case I had to meet the need.

4        Q.   Understood.  So just again, you did not --

5   you did not have any idea how many people actually

6   saw or read what Mr. Trump said about Ms. Carroll?

7        A.   Not at the time I did this report, no.

8        Q.   And sitting here today?

9        A.   Well, I -- I glanced at Professor

10  Humphreys' charts.  I didn't add them up but I

11  glanced at them.

12       Q.   Okay.  And you didn't perform any analysis

13  to calculate the percentage of people who were

14  likely to believe what Ms. Trump said about

15  Ms. Carroll; correct?

16       A.   No, I don't think I had to do a study

17  to -- to -- to get that information.  I mean,

18  Mr. Trump is a very well-known person and

19  has a -- is very polarizing.  And to answer your

20  question, I don't need to see surveys to have a good

21  feel on how many people would believe what he said

22  or not believe what he said.

23       Q.   And so, any opinion you have about

24  the -- the degree to which people were receptive to

25  what he said is based on your good feel and your

Page 317

1    instincts?

2        A.    Well, yeah, I think it's based on -- I

3    don't think good feel or instincts, I think

4    Mr. Trump has been a national figure since 2016.  I

5    mean, he was before that, but in a different context

6    and I -- I think that it's -- after eight years or

7    whatever it's been of -- six years of him being in

8    the public limelight, it's pretty -- pretty clear

9    who or -- what people are prone to accept what he

10   says and aren't accepting, including degrees.

11       Q.    And is -- is your -- your understanding

12   based on any particular data points?

13       A.    Not data points, no.  Just -- just

14   information, general information.

15       Q.    What do you mean by general information?

16       A.    Well, information about percentages, like

17   of people who are -- are strong advocates of Trump

18   as opposed to people that aren't.  I mean,

19   it's -- you know, it's very clear he has a very

20   adamant -- I mean, a very strong following to -- to

21   some extent.  And then, conversely there is a lot of

22   people that think he's the reincarnation of the

23   devil, you know, I mean, I don't think that's it.

24            So I mean, if -- if we were talking about

25   you or me, who are basically unknown and didn't have

A-386

Page 318

1    a profile or whatever, then I think you'd have to

2    delve into -- to the us as individuals to see, well,

3    you know, what kind of favorability ratings we have,

4    who we impact or who we don't impact.  But with

5    Mr. Trump that's not the case.

6         Q.   And so, you didn't analyze any -- or you

7    didn't analyze the idealogical makeup of people who

8    were exposed to Mr. Trump's allegedly defamatory

9    statements though reading print news in this case?

10        A.   Well, I did (inaudible) --

11        Q.   Did you consult any data?

12        A.   No, no data.  But I -- it's not -- define

13   the word analyze.  I mean, did I do a systematic

14   analysis, no, but do I -- did I analyze from the

15   sake of what is readily apparent about Mr. Trump and

16   -- and where he stands in the American public?  And

17   among the media, for that matter?

18        Q.   So can you -- can you walk me through what

19   specifically you did, sort of, what methodology you

20   followed for analyzing the idealogical makeup of

21   people who specifically saw Trump's allegedly

22   defamatory statement in print news sources?

23        A.   I didn't -- I didn't -- I didn't do any

24   analytical study of people who saw -- saw the

25   defamatory statements --

Page 319

```
1        Q.    Okay.  And did you --
2        A.    -- or allegedly defamatory statements.
3   Let me correct myself.
4        Q.    And did you do any analysis of the
5   ideological makeup of people who saw the allegedly
6   defamatory statements, specifically through online
7   news sources?
8        A.    No.
9        Q.    And did you do any analysis of the
10  idealogical makeup of the people who saw Mr. Trump's
11  allegedly defamatory statements through television?
12       A.    Tell me, how many hours are there in a
13  day, tell me that and then I'll answer your
14  question.
15       Q.    Mr. --
16       A.    I know, I can't ask you a question.  No,
17  no, no.
18       Q.    And did you do any analysis of the
19  idealogical makeup of people who were exposed
20  through -- to Mr. Trump's allegedly defamatory
21  statements through Twitter?
22       A.    No.
23       Q.    And did you do any analysis of the
24  receptivity of Mr. Trump's supporters to claims that
25  he committed sexual misconduct?
```

A-388

Page 320

```
 1        A.   No.
 2        Q.   And in this case, you haven't developed
 3   your own budget for a reputational repair program
 4   for Ms. Carroll; correct?
 5        A.   Well, no, I wasn't -- I wasn't -- although
 6   I did opine in the first part of the -- this
 7   deposition that -- two things; one, of course, that
 8   her -- that the budget she came forward with is -- I
 9   don't know what's a kind way of saying it -- is --
10        Q.   Just --
11        A.   Over --
12        Q.   -- answer my question, Mr. Fisher?
13        A.   Yes, I did -- I did opine to you in the
14   initial deposition that when we were talking about
15   that I had done programs for 100,000 to 900,000, my
16   own programs for budgets, I did opine something in
17   the higher -- maybe, higher end of that range would
18   be more than suitable for Ms. Carroll's program,
19   should she prepare.
20        Q.   But did you develop your own budget for --
21        A.   No, there was no purpose to it.  I'm not
22   representing the plaintiff.  Why would I -- why
23   would I put together a budget for a program that --
24   that is for -- for her?
25        Q.   And your report doesn't identify specific
```

Page 322

1    New Yorker" in your answer.   What do you mean "The

2    New Yorker" broke this story in the first place?

3            A.   Well, "The New Yorker" broke

4    Ms. Carroll -- Ms. Carroll wrote a book and one of

5    the chapters in the book addressed Mr. Trump's

6    alleged assault and a week before, I think it was on

7    the 21st -- the 21st of June, I think a week before,

8    the New York -- "The New Yorker" published an

9    excerpt from the book or ran an article on it and

10   that -- when I said broke the story, that was the

11   first it had reached the public.

12           Q.   And it's - and it's your understanding

13   that the print version of "The New Yorker" is where

14   this story begins?

15           A.   As far as public exposure, yes, that's my

16   total understanding.

17           Q.   And what about the allegedly defamatory

18   statements of Mr. Trump, do you know where those

19   originated?

20           A.   Well, those originated in response to "The

21   New Yorker" article.   In other words, the New

22   York -- let me finish.   "The New Yorker" article

23   came out, I believe, it was on the 21st of the month

24   and between the 21st and the 24th, on three

25   different occasions within the first three days,

Page 335

1    bullets that have, sort of, of negative opinions --

2         A.    I'm sorry, where is that in here?

3         Q.    At the top of -- the paragraph at the top

4    of page 29 --

5         A.    Oh, yeah, top of the paragraph, yeah.

6         Q.    -- down at the last sentence.

7         A.    Oh, I see. Yeah. "Anyone reading." Yes,

8    I see.

9         Q.    Okay. And so it says, "Anyone reading

10   these headlines relating to the Plaintiffs could

11   reasonably be expected to conclude," and then you

12   have a list of six negative conclusions that -- that

13   one might draw?

14        A.    Yes.

15        Q.    Did you consult any data to assess the

16   percentage of people who are likely to believe the

17   specific things that you listed here?

18        A.    No, there was no specific data. It's --

19   again, this was, first of all, as I've said before I

20   think in the last depo, I'm a big believer in rhyme,

21   reason, logic, and common sense. And I think that

22   anyone that read those articles -- I mean, I don't

23   think it's rocket science that these would be the

24   impressions that people would take away from some of

25   these headlines related to a series of health care

A-391

Page 336

1    facilities, particularly for people, elderly people.

2    I think it's -- I think that's -- I mean, sometimes,

3    you know, again, if it looks like a duck, walks like

4    a duck, and quacks like a duck, it's a duck, and I

5    think that's true in this case.

6        Q.    And so, is it your testimony that anyone

7    reading the -- the headlines that we looked at

8    before would come to these conclusions?

9        A.    Yes, it's more than that.  I mean, let me

10   not digress but go forward a little bit.  This is --

11   part of this is feedback I received from the client,

12   you know.  I mean, in other words, in talking to --

13   the client to hospital personnel, talking to the

14   lawyers, talking to the people, I mean, this is --

15   these are the kind of things that were circulating

16   in the community so -- I mean, I could have come to

17   these just from common sense and logic about how

18   people would interpret something like this, but I

19   also received feedback that this was the kind of

20   feedback that they were getting at the hospitals,

21   you know, from the nurses, doctors.  I mean, this

22   was kind of feedback people were giving to people

23   that were working from the hospital.

24            So it was more than just common sense of

25   how people would interpret something.  It was direct

A-392

Page 379

1   the subset of the general public that Professor

2   Humphreys identified is an appropriate target

3   audience for her reputational repair program?

4        A.   Yeah, I -- although I think it -- it's

5   narrowed.  The bottom line is I -- I think that's a

6   misguided target audience.  I mean --

7        Q.   Just so I can get an answer to my

8   question.  But your report said she was targeting

9   the public in general, when, in fact, her report

10  specifies a subset of the population that she's

11  targeted --

12       A.   Would you read me the part of my -- that

13  talked about the -- the public in general or -- read

14  that part.

15       Q.   "While she doesn't clearly define her

16  audience, it would appear she is targeting the

17  public in general."

18       A.   Okay.  Well, that's a little bit of

19  splitting hairs, but, yes, the Trump is a subset of

20  -- of the public in -- I mean, Trump supporters are

21  the public in general.  But the bottom line is that

22  I will concede to you that that is a -- a more

23  targeted definition by saying the Trump supporters.

24            I was just differentiating it from going

25  into it after industries or anything other than

A-393

Page 380

```
 1    people on the street.  But you're right, that's a
 2    more defined -- more defined definition.
 3         Q.   Okay.  So we're going look at your report
 4    briefly.  I'm going to mark -- mark it -- the one
 5    that doesn't have the page numbers as Fisher 20 just
 6    so we can, sort of, keep track of them both.
 7              (Exhibit 20 marked.)
 8              THE WITNESS:  Okay.  Do you want to put 20
 9    on that?  Got to be official here.
10    BY MR. CRAIG:
11         Q.   So if we turn to the second to the last
12    page.
13         A.   Yes.
14         Q.   And you see the second bullet down that
15    begins "If only"?
16         A.   Yes.
17         Q.   So your report states, "If only basically
18    25 percent would believe Trump, that leaves
19    75 percent of the public who could be impacted."
20              The next bullet reads, "If you reasonably
21    assume that at least 50 percent wouldn't believe
22    anything he said, you are left with a very small
23    percentage that you would have to reach to
24    counteract his negative comments about Carroll."
25         A.   Right.
```

Page 383

```
 1    certain group of people or the population and I

 2    think that that's -- those are reasonable

 3    projections based on what polls and surveys have

 4    shown about what his support is.

 5         Q.   But none of those polls and surveys are

 6    cited in your report --

 7         A.   No, no, no.

 8         Q.   And can you identify any peer-reviewed

 9    literature supporting the proposition that a

10    reputational repair program should ignore the

11    segment of the population that holds a negative

12    belief about the person whose reputation is damaged?

13         A.   You're going to have to -- in other words,

14    it ignores the percentage of the population that has

15    a negative opinion about who?

16         Q.   Ms. Carroll.

17         A.   You mean not address them?

18         Q.   Yes.

19         A.   I didn't know Ms. Carroll had any

20    negative -- I mean, you'd have to represent -- I

21    don't think anyone has a negative impression of

22    Ms. Carroll so --

23         Q.   You testified earlier that 25 -- you

24    believe 25 percent of the population would believe

25    Ms. Trump and that --
```

Page 385

1    win over, you know, and you're -- while you don't --

2    while people are -- you don't think you're going to

3    impact very much one group, you don't ignore them

4    and you don't -- you put the emphasis on those

5    people that are open to persuasion one way or the

6    other.

7         Q.    And is it your testimony that you should

8    not target the people, the population -- the segment

9    of the population among who your reputation was

10   damaged?

11        A.    Oh, no, no, no, definitely.  I -- well --

12        Q.    Let me rephrase my question, so I can get

13   a clear answer --

14        A.    Yeah, I guess the word target -- I mean,

15   you can target a lot of different groups.  That's

16   the problem, that word target.  I definitely think

17   you should reach out to those people, if that's what

18   you're asking.  I'm just saying that if you had to

19   weigh how much resources and time and budget and

20   money, that they would be better put to somebody

21   that isn't so -- would be so hard to change their

22   opinion on.

23        Q.    And -- and you testified last week that

24   you didn't review any of the peer-reviewed

25   literature cited by Professor Humphreys in her

Page 386

1    report; correct?

2         A.   No, I -- I stated earlier in this -- this

3    segment of the deposition that I don't read

4    peer-reviewed literature.

5         Q.   And so that would include the literature

6    cited in the section of her report entitled "Media

7    Exposure and Counter Attitude and No Attitude

8    Change"?

9         A.   Right.

10        Q.   And is it your opinion that people could

11   never change strongly-held beliefs?

12        A.   Well, that -- you can't make a blanket

13   statement with that.  I mean, there's -- there's --

14   I would say you might say percentages that can't

15   change your belief, but I don't think you can state

16   that not -- if you had 100 people, and you were

17   trying to change their opinion, all 100 would not

18   change it.  I mean, there's going be some people you

19   could reach -- reach to with some logic or common

20   sense.  No, I don't think you can make a blanket

21   statement like that.

22        Q.   And do you think it is more costly or less

23   costly to change a person's views when those views

24   are strongly held?

25        A.   Well, more costly.  I mean, it's going to

A-397

Page 387

1    take a more intense effort because if you're talking

2    about somebody with a clean slate, and if you go to

3    them and make a reasonable approach to them, you

4    have more chance to influence.  If you're talking to

5    someone, and they've got their back up -- I'm not

6    saying it's a lost cause, but it's going to take a

7    more intense effort to get them to change their

8    opinion.

9         Q.   And have you read any of the literature on

10   psychology and persuasion?

11        A.   No.

12        Q.   And what about on how people form and

13   change their beliefs?

14        A.   No.  But, again, I don't have to read

15   literature.  I've got 50 years of being a

16   communicator in which --

17        Q.   Again, just answers to the questions to

18   get through it --

19        A.   Okay.  No, I haven't read it.

20        Q.   And have you read any literature on the

21   number of exposures to a message that are required

22   in order to change someone's beliefs?

23        A.   No.

24        Q.   So if we look at -- I was trying to get my

25   page numbers correct here.

Page 389

1   I'm just saying that a couple of them, in my

2   opinion, are -- whether they're true or not true,

3   and I'm not opining on that, are -- would not have

4   the extent of reputational harm that maybe some of

5   the other ones would.  So, yes, I think it's

6   appropriate.

7        Q.   And so, is it your opinion that the

8   President of the United States calling someone a

9   liar with respect to an alleged sexual assault is

10  mild?

11       A.   That one -- of the four, that one I

12  will -- I will concede.  That one is -- probably

13  shouldn't have been on that list.  The other

14  three --

15       Q.   We'll go through them.

16            Is it your opinion that the President of

17  United States accusing someone of fabricating sexual

18  assault allegations to sell a book is mild?

19       A.   Yeah, I do.  And same with the political

20  agenda.  Yeah, I think that's --

21       Q.   Again, I'll go through them.

22       A.   Yeah.

23       Q.   Is it your opinion that the President of

24  the United States accusing someone of fabricating a

25  sexual assault allegation for political ends is

Page 391

1        Q.    So that wouldn't be a mild allegation,

2    defamatory statement?

3        A.    No, not mild.  I'll stick with the three

4    that are in there in that bracket, other than the

5    lying about selling books, political agenda, and I

6    don't know her.  I mean, somebody's saying, "I don't

7    know her," and the other person said, "I did.  I

8    don't."  That's -- that's not reputation harm in

9    that.

10       Q.    And is it your opinion that the President

11   of the United States implying someone is too ugly to

12   sexually assault is mild?

13       A.    Yeah.  I mean, first of all, again --

14       Q.    Just yes or no is fine.

15       A.    Yes, yes, I -- given who it's coming from,

16   yes.  I mean, Trump doesn't think much of women.  I

17   don't think (indiscernible) that much and, yeah, I

18   would agree that.

19       Q.    And do egregious and extreme statements

20   cause more reputational harm than mild statements?

21       A.    I would say that's a fair assessment.

22       Q.    And so, if this case involves statements

23   that you consider all to be egregious or extreme

24   rather than mild, your estimate of Ms. Carroll's

25   reputational damages would increase?

Page 393

```
1        A.    Well -- well, I can't make it as a
2   definitive fact, but generally, if someone -- my
3   understanding of Ms. Carroll, she has -- had a very
4   positive -- before all this happened, she had an
5   extremely positive -- a positive image, reputation,
6   and therefore, because of who she is, because of her
7   positive imagine, and her longstanding visibility in
8   the community, yes, I think she would -- she would
9   be able to offset that kind of derogatory comments,
10  again, not only because who she is but because who
11  Mr. Trump is and -- and in terms of allegations.
12       Q.    So, did you consult any data in connection
13  with your opinion about the possible effect of -- of
14  Ms. Carroll's preexisting reputation here?
15       A.    No.  And that's where I used the word
16  "possibly."  I mean, I could take that word out,
17  but, I mean, the bottom line is I hedged a little
18  bit.  But I think it's reasonable to assume that a
19  woman that had a public profile for 30 years and had
20  been all positive, that it's a -- if a certain
21  individual is known to be controversial makes some
22  comments about her, that it's not going to harm her
23  to any -- to the extent it might somebody who
24  didn't -- people didn't know.
25       Q.    And you would agree that longstanding
```

Page 394

1  positive reputations can be destroyed almost
2  instantly by a negative statement; correct?
3      A.   Yeah, you must have seen in one of my
4  reports where I said reputations -- there's an old
5  saying.  It takes years to build a reputation and
6  seconds to destroy it.
7          But, again, a lot of these questions that
8  you're asking, I would answer differently if it was
9  anyone but Mr. Trump.  But given the nature of his
10 controversial nature, I think everybody would look
11 at those with a -- you know, seed of doubt.
12     Q.   And have you consulted any -- any data
13 about how people filter Mr. Trump's comments when it
14 comes to statements he makes about other
15 individuals?
16     A.   Yes, yes, I've talked to -- all the time,
17 last six years.  I talked to people all the time.  I
18 mean, people I know, people -- friends, business --
19 family, business associates.  We talk all the time.
20 He's a public figure.  He makes thousands of
21 comments.  His tweets were famous.
22          Yes, I've talked -- over the years, I've
23 talked to hundreds, probably, of people about what
24 did you think of this or did you see Mr. Trump said
25 that and this, and did you hear his latest -- yeah,

Page 395

1    I would say yes.  Over six years, I've probably

2    talked to at least a hundred people, more.

3         Q.   And that is in your capacity as a family

4    member or friend or someone you might run --

5         A.   Well, some --

6         Q.   -- into in a business setting?

7         A.   Yeah.  Sorry.  Some in a business context,

8    but, I mean, you know, I talk to -- yeah, it's a

9    combination of personal conversations and, in some

10   cases, business conversations.

11        Q.   And is there any data that underlies that

12   opinion that you've addressed in your report?

13        A.   There may be.  I'm not aware of it.

14        Q.   Do you recall having any source for your

15   opinion that Mr. Trump causes less reputational harm

16   than another person saying the exact same thing?

17        A.   Only the knowledge, experience, and

18   expertise I've gained over 50 years of dealing with

19   people in public life and people in private life and

20   how they impact -- if someone that's well known

21   saying something as opposed to somebody that isn't

22   and how that impacts the recipient of the negative

23   assertions.

24        Q.   So I believe you gave this example when

25   you testified last week.  Is it your opinion that a

Page 397

```
 1    you know, I could answer the question.
 2         Q.   And so do you have -- do you have any data
 3    or other sources for differentiating between
 4    statements that Mr. Trump makes and Mr. Pence and
 5    Mr. Schumer makes?
 6         A.   Any data, no.  Just, you know, a
 7    combination of common sense and logic and -- and
 8    then my experience in the background on people
 9    calling each other names, and those who had positive
10    images making the assertions, and those who had
11    negative images making the assertions.
12         Q.   And you refer to something you've written
13    before that it can take a lifetime to build a
14    reputation but only seconds to destroy it, and it's
15    fair to say that that's something that you write in
16    most of your expert reports?
17         A.   Yeah, yeah.  I mean, I think -- I have
18    certain principles I cite.  I mean, I have a list of
19    like 32 principles that relate to reputation harm
20    that I've amassed over the years and I consult those
21    principles.  But, yeah, I think in almost every
22    report I put that in because -- particularly if I'm
23    representing the plaintiff, in a sense.
24              But, again, that is related to normal
25    people.  I mean, businesses against businesses or
```

Page 399

1    100 percent but she had a highly positive -- yes.

2        Q.    And you did not include the point that it

3    could take a lifetime to build a reputation but only

4    seconds to destroy in your report here; correct?

5        A.    No.  Because as I -- I represent -- first

6    of all, I usually do that in -- in conjunction with

7    the reputation damage repair programs I write.  And

8    since I didn't do it, I didn't put it in.  I use

9    that as a preface for the program, but in this case

10   I'm representing the defendant, so I didn't put it

11   in.

12       Q.    And you agree that the more broadly

13   negative information is disseminated, the greater

14   the reputational harm; correct?

15       A.    I'm sorry.  Please repeat that question.

16       Q.    You would agree that the more broadly

17   negative information is disseminated, the greater

18   the reputational harm?

19       A.    Well, that's logical, yes.

20       Q.    And you would also agree that the

21   President of the Untied States has one of the most

22   prominent platforms in the world?

23       A.    I think that's a fair assumption.

24       Q.    And are you a member of any political

25   party?

# EXHIBIT 11

A-406

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | No. 20 Civ. 7311 (LAK) (JLC) |
| Plaintiff, | |
| v. | |
| DONALD J. TRUMP, in his personal capacity, | **Rule 26(a)(1) Initial Disclosures** |
| Defendant. | |

### DEFENDANT DONALD J. TRUMP'S RULE 26(a)(1)  INITIAL DISCLOSURES

In accordance with Federal Rule of Civil Procedure 26(a), the defendant, Donald J. Trump ("Defendant"), by and through his attorney, Habba Madaio & Associates LLP, makes the following disclosures to the plaintiff, E. Jean Carroll ("Plaintiff"), in the above captioned matter as required by Fed. R. Civ. P. 26 (a)(1).

Defendant expressly reserves his right to assert any applicable privilege, defense, immunity or objection, including, but not limited to, the attorney-client, work product executive and deliberative process privileges. These disclosures are based on information now reasonably available, identifiable and/or knowable to Defendant. In addition, Defendant expressly reserves his right to supplement, amend, clarify, revise, and/or correct any or all of the disclosures herein at any time. Nothing in these initial disclosures constitutes, or is intended to constitute, a waiver of any claim, right, or defense in this case or otherwise. In addition, Defendant expressly reserves all applicable privileges, including without limitation, the attorney-client privilege and the work-product doctrine, and Defendant makes these disclosures subject to those privileges and immunities. Defendant further makes these disclosures subject to any discovery confidentiality order the Court may enter in this case.

1

**<u>DISCLOSURES</u>**

1.      **The name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), based on his current knowledge, information, and belief, and subject to further investigation, discovery, and analysis by experts, Defendant discloses the following individuals likely to have discoverable information that may be used to support Defendant's claims or defenses, other than the parties themselves. Defendant reserves the right to amend or supplement these disclosures, including as provided by Fed. R. Civ. P. 26(e). The following disclosures do not include persons whose testimony is likely to be used solely for impeachment, rebuttal, or expert witness testimony, who will be disclosed in accordance with the schedule set by the Court. Based on his current knowledge, information, and belief, and subject to further investigation, discovery, and analysis by experts, Defendant states that the following individuals are likely to have discoverable information that may be used to support his claims and defenses, other than the Parties themselves.

Defendant's position is that the underlying incident alleged in the Complaint did not occur. Notwithstanding the foregoing, individuals who may have discoverable knowledge or information to support one or more of his defenses include: (i) employees, agents, and/or managers of Bergdorf Goodman during the relevant time period for which the incident alleged in the Complaint is claimed to have occurred; (ii) employees, agents, and/or managers of CNN, Anderson Cooper 360, and/or Anderson Cooper, himself, relating to Plaintiff's appearance on the network on or about June 24, 2019; and (iii) publishers, editors, writers, consultants, and/or other individuals involved in the

development, editing and publication of Plaintiff's book, *What Do We Need Men For? A Modest Proposal*. Moreover, Defendant may identify witnesses that can attest to his location at the time or date of the incident alleged in the Complaint. However, since the Complaint only provides a general time frame, not a date certain, as to when the underlying incident is alleged to have occurred, Defendant is presently unable to provide the names of any such witnesses.

Expert disclosures will be made in accordance with the Court's scheduling order and Fed. R. Civ. P. 26(b)(2). Defendant reserves the right to use the testimony of other witnesses whose identity may be subsequently learned through discovery or other means.

**2.     A copy, or description by category and location, of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control, and may be used to support its claims or defenses, unless their use would be solely for impeachment**.

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii), based on current knowledge, and subject to further investigation, discovery, and analysis by experts, Defendant hereby discloses the following categories of documents and things in his possession, custody, or control that he may use to support his claims and defenses. Defendant reserves the right to amend or supplement these disclosures, including as provided under Fed. R. Civ. P. 26(e). The following disclosures do not include documents and things that are likely to be offered solely for impeachment.

Defendant's position is that the underlying incident alleged in the Complaint did not occur. Therefore, at the present time, Defendant is unaware of any documents, electronically stored information, or other tangible things in his possession relating to the instant matter that could be used to support his defenses for non-impeachment purposes.

A-409

3.      **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of the injuries suffered.**

Not applicable to Defendant.

4.       **Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action to indemnify or reimburse for payments made to satisfy the judgment.**

Not applicable to Defendant.

**<u>RESERVATION OF RIGHTS</u>**

The instant disclosure is without prejudice to and with a reservation of all rights to supplement, modify or amend Defendant's disclosure in accordance with the Federal Rules of Civil Procedure and/or any other applicable rules.

Respectfully submitted,

Dated: June 8, 2022
         New York, New York

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES, LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Phone: (908) 869-1188
Fax: (908) 450-1881
Email: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

To:     Counsel of record via email

A-410

# EXHIBIT 12

**A-411**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | No. 20 Civ. 7311 (LAK) (JLC) |
| Plaintiff, | |
| v. | |
| DONALD J. TRUMP, in his personal capacity, | **Rule 26(a)(1) Initial Disclosures** |
| Defendant. | |

### DEFENDANT DONALD J. TRUMP'S SUPPLEMENTAL RULE 26(a)(1)  INITIAL DISCLOSURES

In accordance with Federal Rule of Civil Procedure 26(a), the defendant, Donald J. Trump ("Defendant"), by and through his attorney, Habba Madaio & Associates LLP, hereby supplements his initial disclosures to the plaintiff, E. Jean Carroll ("Plaintiff"), in the above captioned matter as required by Fed. R. Civ. P. 26 (e).

 Defendant expressly reserves his right to assert any applicable privilege, defense, immunity or objection, including, but not limited to, the attorney-client, work product executive and deliberative process privileges. These disclosures are based on information now reasonably available, identifiable and/or knowable to Defendant. In addition, Defendant expressly reserves his right to supplement, amend, clarify, revise, and/or correct any or all of the disclosures herein at any time. Nothing in these initial disclosures constitutes, or is intended to constitute, a waiver of any claim, right, or defense in this case or otherwise. In addition, Defendant expressly reserves all applicable privileges, including without limitation, the attorney-client privilege and the work-product doctrine, and Defendant makes these disclosures subject to those privileges and immunities. Defendant further makes these disclosures subject to any discovery confidentiality order the Court

1

may enter in this case.

## DISCLOSURES

1.     **The name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

See Defendant's Initial Disclosures.

2.     **A copy, or description by category and location, of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control, and may be used to support its claims or defenses, unless their use would be solely for impeachment.**

See Defendant's Initial Disclosures.

3.     **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of the injuries suffered.**

See Defendant's Initial Disclosures.

4.     **Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action to indemnify or reimburse for payments made to satisfy the judgment.**

Although the insurer has disputed that coverage applies to this action, the following policy may be liable to satisfy all or part of a judgment in this action: The Chubb Group of Insurance Companies (policy no. 0359543-10). Relevant portions of said policy are attached.

A-413

## RESERVATION OF RIGHTS

The instant disclosure is without prejudice to and with a reservation of all rights to supplement, modify or amend Defendant's disclosure in accordance with the Federal Rules of Civil Procedure and/or any other applicable rules.

Respectfully submitted,

Dated: September 19, 2022
New York, New York

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES, LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Phone: (908) 869-1188
Fax: (908) 450-1881
Email: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

To:     Counsel of record via email

3

# EXHIBIT 13

A-415

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | Case 1:22-cv-10016-LAK-JLC |
| Plaintiff, | |
| v. | |
| DONALD J. TRUMP, | **Rule 26(a)(1) Initial Disclosures** |
| Defendant. | |

### DEFENDANT DONALD J. TRUMP'S RULE 26(a)(1)  INITIAL DISCLOSURES

In accordance with Federal Rule of Civil Procedure 26(a), the defendant, Donald J. Trump ("Defendant"), by and through his attorney, Habba Madaio & Associates LLP, makes the following disclosures to the plaintiff, E. Jean Carroll ("Plaintiff"), in the above-captioned matter as required by Fed. R. Civ. P. 26 (a)(1).

Defendant expressly reserves his right to assert any applicable privilege, defense, immunity or objection, including, but not limited to, the attorney-client, work product executive and deliberative process privileges. These disclosures are based on information now reasonably available, identifiable and/or knowable to Defendant. In addition, Defendant expressly reserves his right to supplement, amend, clarify, revise, and/or correct any or all of the disclosures herein at any time. Nothing in these initial disclosures constitutes, or is intended to constitute, a waiver of any claim, right, or defense in this case or otherwise. In addition, Defendant expressly reserves all applicable privileges, including without limitation, the attorney-client privilege and the work-product doctrine, and Defendant makes these disclosures subject to those privileges and immunities. Defendant further makes these disclosures subject to any discovery confidentiality order the Court may enter in this case.

A-416

## DISCLOSURES

1.     **The name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), based on his current knowledge, information, and belief, and subject to further investigation, discovery, and analysis by experts, Defendant discloses the following individuals likely to have discoverable information that may be used to support Defendant's claims or defenses, other than the parties themselves. Defendant reserves the right to amend or supplement these disclosures, including as provided by Fed. R. Civ. P. 26(e). The following disclosures do not include persons whose testimony is likely to be used solely for impeachment, rebuttal, or expert witness testimony, who will be disclosed in accordance with the schedule set by the Court. Based on his current knowledge, information, and belief, and subject to further investigation, discovery, and analysis by experts, Defendant states that the following individuals are likely to have discoverable information that may be used to support his claims and defenses, other than the Parties themselves.

Defendant's position is that the underlying incidents alleged in the Complaint did not occur and/or were mischaracterized by the Plaintiff. Notwithstanding the foregoing, individuals who may have discoverable knowledge or information to support one or more of his defenses include: (i) employees, agents, and/or managers of Bergdorf Goodman during the relevant time period for which the incident alleged in the Complaint is claimed to have occurred; (ii) employees, agents, and/or managers of CNN, Anderson Cooper 360, and/or Anderson Cooper, himself, relating to Plaintiff's appearance on the network on or about June 24, 2019; (iii) publishers, editors, writers, consultants,

2

A-417

and/or other individuals involved in the development, editing and publication of Plaintiff's book, *What Do We Need Men For? A Modest Proposal*; and (iv) individuals who may have discoverable knowledge or information regarding Plaintiff's meritless claims of psychological, emotional and pecuniary damages alleged in the Complaint by the Plaintiff. In addition, Defendant may identify witnesses that can attest to his location at the time or date of the incident alleged in the Complaint, however, since the Complaint only provides a general time frame, not a date certain, as to when the underlying incident is alleged to have occurred, Defendant is presently unable to provide the names of any such witnesses.

Additionally, pursuant to Fed. R. Civ. P. 26(b)(2), Robert J. Fisher of Fisher & Associates, will be an expert witness on behalf of the Defendant.  Further expert disclosures will be made in accordance with the Court's Scheduling Order and Fed. R. Civ. P. 26(b)(2). Defendant reserves the right to use the testimony of other witnesses whose identity may be subsequently learned through discovery or other means.

2.      **A copy, or description by category and location, of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control, and may be used to support its claims or defenses, unless their use would be solely for impeachment**.

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii), based on current knowledge, and subject to further investigation, discovery, and analysis by experts, Defendant hereby discloses the following categories of documents and things in his possession, custody, or control that he may use to support his claims and defenses. Defendant reserves the right to amend or supplement these disclosures, including as provided under Fed. R. Civ. P. 26(e). The following disclosures do not include documents and things that are likely to be offered solely for impeachment.

3

A-418

Defendant's position is that the underlying incidents alleged in the Complaint did not occur and/or were mischaracterized by the Plaintiff.  Therefore, at the present time, Defendant is unaware of any documents, electronically stored information, or other tangible things in his possession relating to the instant matter that could be used to support his defenses for non-impeachment purposes.

3.      **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of the injuries suffered**.

Not applicable to Defendant.

4.       **Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action to indemnify or reimburse for payments made to satisfy the judgment**.

To the best of Defendant's knowledge, none.

4

**RESERVATION OF RIGHTS**

The instant disclosure is without prejudice to and with a reservation of all rights to
supplement, modify or amend Defendant's disclosure in accordance with the Federal Rules of Civil
Procedure and/or any other applicable rules.

Dated:   January 9, 2023
          New York, New York

Respectfully submitted,

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES, LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
           -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Phone: (908) 869-1188
Fax: (908) 450-1881
Email: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

To:     Counsel of record via email

5

A-420

# EXHIBIT 14

A-421

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | No. 20 Civ. 7311 (LAK) (JLC) |
| Plaintiff, | |
| v. | |
| DONALD J. TRUMP, in his personal capacity, | |
| Defendant. | |

### DEFENDANT DONALD J. TRUMP'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

In accordance with Rules 26, 33 and 34 of the Federal Rules of Civil Procedure, the defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, hereby submits the within Supplemental Response (the "Response") to the First Set of Interrogatories of Plaintiff, E. Jean Carroll ("Plaintiff") dated May 27, 2022 (the "Interrogatories").

This response is based on information now reasonably available, identifiable and/or knowable to Defendant. In addition, Defendant expressly reserves his right to supplement, amend, clarify, revise, and/or correct his response at any time. In addition, Defendant expressly reserves his right to assert any applicable objection, defense, immunity, or privilege, including without limitation, the attorney-client privilege, the work-product doctrine, the deliberative process privilege, executive privilege, the presidential communications privilege, and the Presidential Records Act, and Defendant submits this response subject to those privileges and immunities. Defendant further submits this response subject to any confidentiality order the Court may enter in this case.

1

**A-422**

## PRELIMINARY STATEMENT & GENERAL OBJECTIONS

Defendant incorporates by reference the Preliminary Statement and General Objections set forth in Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories dated July 13, 2022.

## SUPPLEMENTAL RESPONSES AND OBJECTIONS TO INTERROGATORIES

2.   Identify all individuals with whom You have communicated, by any means, concerning Plaintiff or this Action .

**RESPONSE**: In addition to the General Objections, Defendant objects to this interrogatory as exceeding the scope of Local Rule 33.3 because it seeks the identification of witnesses that do not possess "knowledge of information relevant to the subject matter of the action." Defendant further objects to this interrogatory because it is overly broad, vague, ambiguous, disproportionate, unduly burdensome, and does not adequately describe the information sought with reasonable particularity.

Furthermore, Defendant objects to this interrogatory to the extent that it seeks (i) communications or information protected by the attorney-client privilege; (ii) communications or information protected by the deliberative process privilege; (iii) communications or information protected by executive privilege; (iv) the presidential communications privilege; (v) the Presidential Records Act; (vi) communications or information protected under the Privacy Act; and (vii) any other applicable privilege.

Subject to and without waiving the foregoing objections and the General Objections, Defendant, to the best of his knowledge and recollection, recalls having communications with the following individuals who may possess knowledge of information relevant to the subject matter of the action in accordance with Local Rule 33.3:

(1) Dan Scavino

2

A-423

(2) Nicholas Luna

(3) Molly Michael

(4) Hope Hicks

(5) Derek Lyons

(6) Jared Kushner

Dated: August 23, 2022
     New York, New York

Respectfully submitted,

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES, LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
          -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Phone: (908) 869-1188
Fax: (908) 450-1881
Email: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

To:    Counsel of record via email

3

A-424

# EXHIBIT 15

| | |
|---|---|
| **From:** | Michael Madaio <mmadaio@habbalaw.com> |
| **Sent:** | Wednesday, August 24, 2022 12:29 PM |
| **To:** | Matthew Craig; Roberta Kaplan; Shawn G. Crowley; Joshua Matz; Rachel Tuchman |
| **Cc:** | Peter Gabra; Alina Habba, Esq.; Randee Ingram |
| **Subject:** | RE: Discovery Correspondence in Carroll v. Trump |

This email was sent from outside the Firm.

Counsel,

We stand by the adequacy of our response. The objections you have raised are improper and misplaced for several reasons.

First, we have never represented that Defendant would waive all objections in his response to Interrogatory No. 2. We merely stated—while maintaining that the substance of all conversations between Defendant and his Executive Office staff are privileged—that we would be willing to identify the *names* of these individuals, as had been specifically requested in your letter dated August 17, 2022. To be clear, there is no question that Interrogatory No. 2 is objectional on numerous grounds, not the least of which is the overbreadth of your demand that Defendant "[i]dentify *all* individuals with whom [he] has communicated, by *any* means, concerning Plaintiff or this Action." Given the high-profile nature of this matter, and the vast number of people that Defendant dealt within the course of his presential duties, the scope of this request is unreasonable and far too broad. This is especially true considering that the definition of "You" includes Defendant's "servants, agents, employees, representatives, officers," etc. Effectively, Interrogatory No. 2 calls for Defendant to identify *any* communication (written, oral, or electronic) made by *any* member of the United States Government to *any* person which relates in *any* way to your client or this lawsuit. It goes without saying that this construction is untenable and improper.

Second, your contention that our response is "obviously incomplete" further confirms the overbreadth of your request. As stated therein, our response is limited to individuals with "knowledge or information relevant to the subject matter of the action" in accordance with Local Rule 33.3. We did not identify communications that were between Defendant (and his agents, servants, employees, etc) and members of the media, as these communications would be far too voluminous to list and are irrelevant to the subject matter of this action (aside from the alleged defamatory statements at issue, which Defendant has admitted to making in his Response to Notice to Admit). To the extent you seek identification of communications with DOJ officials (regarding Westfall Act Certification) or Defendant's attorneys (or "intermediaries" of same), to the extent any such communications exist, the identities of the individuals involved would be protected by attorney-client privilege.

Notably, Plaintiff's response to Defendant's First Set of Requests for Interrogatories perfectly illustrates the hypocrisy of your objections. In particular, Interrogatory No. 2 called for Plaintiff to "[i]dentify each Person with whom You or Your Representatives communicated in any way (including, but not limited to, in-person, by telephone, by email, by facsimile, or in writing) about the Action or any of the allegations in the Complaint." In addition to objecting to the overbreadth of the demand, Plaintiff failed to identify a single communication between herself and a member of the media, despite her numerous, well-documented appearances on television, news, podcasts, etc. wherein she frequently discusses the allegations in the Complaint. Nor did Plaintiff identify discussions with any of her attorneys or "intermediaries" of same. Plaintiff's response similarly failed to identify the names, addresses, and employment of the individuals identified. In other words, your current position is entirely contradictory – either both Plaintiff and Defendant's responses are inadequate or both are premised upon valid objections as to breadth, privilege, etc.

1

Although we stand by the validity of our objections, we are willing to discuss a mutually-agreeable scope of the parties' corresponding Interrogatories No. 2 and, to the extent necessary and proportionate, for the parties to amend their responses accordingly. Further, at the present time, we do not intend to call any of the individuals identified in Interrogatory No. 2 as witnesses at trial. To reiterate, we maintain our position that the substance of Defendant's conversations with these individuals are covered by executive privilege and/or other applicable privileges.

As for deposition dates, our coordinating paralegal is out of the office today but we should have a response for you regarding our client's availability by tomorrow.

Regards,

MICHAEL T. MADAIO, ESQ.
*Admitted to Practice in NJ, NY & FA*



HABBA MADAIO
& Associates LLP

1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
Telephone: 908-869-1188
Facsimile: 908-450-1881

The information in this e-mail is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Habba Madaio & Associates LLP for any loss or damage arising in any way from its use.

**From:** Matthew Craig <mcraig@kaplanhecker.com>
**Sent:** Tuesday, August 23, 2022 8:41 PM
**To:** Michael Madaio <mmadaio@habbalaw.com>; Randee Ingram <ringram@habbalaw.com>; Alina Habba, Esq. <ahabba@habbalaw.com>
**Cc:** Peter Gabra <pgabra@habbalaw.com>; Roberta Kaplan <rkaplan@kaplanhecker.com>; Shawn G. Crowley <scrowley@kaplanhecker.com>; Rachel Tuchman <rtuchman@kaplanhecker.com>
**Subject:** RE: Discovery Correspondence in Carroll v. Trump

Counsel:

We are surprised by Defendant's supplemental response to Plaintiff's Interrogatory No. 2 for the following reasons:

*First*, despite our understanding that you were no longer relying on objections to withhold information, Defendant's supplemental response "incorporates by reference the . . . General Objections set forth in Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories," reasserts or belatedly adds other pro forma objections, and then makes Defendant's answer to the interrogatory "subject to" those objections. Please identify any objections on which Defendant purports to be standing to withhold responsive information or confirm that Defendant has no objections to Interrogatory No. 2.

*Second*, even Defendant's revised interrogatory answer is obviously incomplete. Defendant's own initial disclosure in state court dated August 21, 2020, listed Judd Deere as an eyewitness and Sarah Sanders as a "likely" eyewitness in this action. What has occurred that caused you to change your position on whether those two individuals are relevant

A-427

# EXHIBIT 16

← **Tweet**



**Laura Litvan** ✓
@LauraLitvan

...

NEW: President Trump responds to sexual assault allegations by E. Jean Carroll, saying `I've never met this person in my life'

**Statement from President Donald J. Trump:**

"Regarding the "story" by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

5:17 PM · Jun 21, 2019 · Twitter Web Client

**378** Retweets   **219** Quote Tweets   **909** Likes

  



# EXHIBIT 17

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT
                          FOR THE
2                   SOUTHERN DISTRICT OF NEW YORK
3              CIVIL ACTION NO. 20 Civ. 7311 (LAK)(JLC)
4                     *** CONFIDENTIAL ***
5                                        VIDEOTAPED
    E. JEAN CARROLL,                     DEPOSITION UPON
6                                        ORAL EXAMINATION
          Plaintiff,                          OF
7                                        STEPHANIE GRISHAM
          v.
8
    DONALD J. TRUMP, in his
9   personal capacity,
10            Defendant.
    ------------------------------
11
12
13
14            TRANSCRIPT of the stenographic notes of
15   ANDREA F. NOCKS, a Certified Court Reporter and
16   Certified Realtime Court Reporter, Certificate No.
17   XI01573, taken virtually on Thursday, October 6,
18   2022, commencing at 11:52 a.m., Central Standard
19   Time.
20
21
22
23
24    Job No. P1-5497396
25

A-431

CONFIDENTIAL

Page 9

1    please let me know.  I'm used to it, you won't

2    offend me.

3              And if, for any reason, you don't

4    understand one of my questions, also just ask me and

5    I'll try to clarify.  It's important that the court

6    reporter which is on Zoom has the ability to take

7    down my questions and your answers, and every

8    question and answer has to be in words, no nodding

9    your head or something like that.  If you can

10   remember.

11        A.    Um-hum.

12        Q.    And I'll just key off the question,

13   or you probably heard the colloquy between me and

14   Ms. Habba about your mental state.

15              Is there anything that you, any kind

16   of medication or anything else that you are on right

17   now that would in any way impair your ability to

18   testify?

19        A.    I am on Tramadol right now.

20        Q.    What is Tramadol?

21        A.    It's a pain medication.

22        Q.    Why are you taking that?

23        A.    Because my foot is broken.

24        Q.    And when did you break your foot?

25        A.    Three weeks ago-ish.

A-432

CONFIDENTIAL

Page 10

```
1           Q.      Have you experienced any
2    hallucinations on Tramadol?
3           A.      No.
4           Q.      Have you had any blackouts on
5    Tramadol?
6           A.      No.
7           Q.      Have you experienced any other
8    symptoms -- how many days have you been on Tramadol?
9           A.      As needed, since I broke my foot.
10          Q.      And during that time, have you had
11   any other symptoms from Tramadol that would affect
12   your cognition, your ability to think, hear and
13   answer questions?
14          A.      No, I took a very low dose --
15          Q.      Thank you.
16          A.      -- for this purpose.
17          Q.      The other thing I want to tell you
18   especially --
19                  (Court Reporter clarification.)
20    BY MS. KAPLAN:
21          Q.      The other thing I want to tell you,
22   Ms. Grisham, is that to the extent you need a break,
23   I hope not, but if you're in pain or need a break,
24   just let us know and we'll accommodate you.
25          A.      Thank you.
```

CONFIDENTIAL

Page 12

1    Ms. Kaplan, not you, Ms. Grisham is under the

2    influence of drugs, narcotics.  She just admitted

3    that on the record.

4                   I understood from her attorney, Adam,

5    that she was not going to be deposed while she was

6    under the influence of any narcotics.  That was a

7    letter that she sent not only to me but on other

8    cases, and I understood that she would not be on

9    medication.

10                  MR. VanHo:  No, my understanding is,

11   is that she's on medication, she's disclosed the

12   medication.  She took a lower dose this morning for

13   it.  And at the time we sent the letter with regards

14   to the other cases, it also had a travel

15   restriction.  Depositions were supposed to be in

16   Cleveland, not in Kansas.  And the problem with

17   travel had to do with the plane flight and all that

18   information.

19                  There was an attempt to reschedule it

20   for Kansas; however, it was on such short notice, we

21   were not able to do so and fit in everybody's trial

22   calendar.  So it was a combination of factors that

23   went into it.

24                  My understanding is she goes back on

25   the 29th for reevaluation and, but for right now

A-434

CONFIDENTIAL

Page 13

1    she's taking a low dose and I've talked to her this

2    morning, I haven't had any problems communicating

3    with her.  She's answered all my questions.  She

4    does not appear to be under the influence of

5    anything that would impact her.

6                 MS. HABBA:  All due respect to you,

7    you did state that part of the problem on another

8    case was the fact that she was on pain medication so

9    you did not want her to testify.  That was on an

10   unrelated case.  Isn't that correct?

11                MR. VanHo:  It was a combination, it

12   was a combination of factors.

13                MS. HABBA:  Right.

14                MR. VanHo:  And then she was on a

15   higher level at that point, too.

16                MS. HABBA:  All due respect, we are

17   not physicians, but I would prefer to postpone this

18   deposition until Ms. Grisham is not on medication

19   that impairs.  Drugs and narcotics are going to.

20   We're not physicians.  It's not your place or mine,

21   frankly, or Ms. Kaplan's.  I'm speaking to --

22                MS. KAPLAN:  You want me to call

23   Judge Kaplan, Ms. Habba?  This is my deposition.

24   I --

25                MS. HABBA:  I actually think we

**A-435**

CONFIDENTIAL

Page 29

```
1    have occasion in that job to meet with Mr. Trump
2    one-on-one.
3                 Did you also participate in meetings
4    with other members of the administration?
5         A.      Yes.
6                 MR. SWIFT:  Objection to form.
7                 MS. KAPLAN:  And what's the objection
8    there, sir?
9                 MR. SWIFT:  I'm objecting as I did
10   previously due to her mental capacity based upon
11   Ms. Habba's prior statement.
12                MS. KAPLAN:  Okay.  That's an
13   objection that's noted for the record.  That's not
14   an objection to form.  An objection to form has to
15   do with how I ask the question.
16                MR. SWIFT:  Understood.  But you said
17   before, said now it has to be form and then -- or
18   privilege, so I am objecting based upon mental
19   capacity, and I could just keep that objection
20   throughout the proceeding 'cause I'm going to object
21   to every question until Judge Kaplan gets on the
22   line.
23                MS. KAPLAN:  Okay.  Can I have the
24   last Q and A read back?
25                (The following Question and Answer
```

CONFIDENTIAL

Page 88

```
 1          Q.      And were you entitled to any other
 2   compensation in connection with the book?
 3          A.      I believe there's some kind of
 4   royalties that happen after a certain period of
 5   time, but I honestly don't know the ins and outs of
 6   it.
 7          Q.      Have you received any?
 8          A.      No, I haven't received any.
 9          Q.      Okay.  Have you received any money
10   other than the advance since the book has been
11   published from the publisher?
12          A.      No, no.
13          Q.      Okay.  And have you ever been
14   arrested before?
15          A.      Yes, twice.
16          Q.      Okay.  What was the first time?
17          A.      Reckless driving.
18          Q.      And what was the approximate time
19   period?
20          A.      Oh, gosh.  It was probably -- it's in
21   my book.  I wrote about it extensively in my book.
22   Like eight, nine years ago.  It's a guess.
23          Q.      Okay.  That's okay if you're
24   estimating.  That's fine.
25                  And was there any sort of conviction
```

A-437

CONFIDENTIAL

Page 89

1    in connection with that arrest?

2          A.       We settled for -- we settled and we

3    settled for reckless driving, so yes, I guess.

4          Q.       Okay.  And what were the

5    circumstances that led to the reckless driving?

6          A.       I had had -- I was driving home from

7    a movie, I had had two glasses of wine.  The speed

8    limit was 45 and then it went to 35 very quickly and

9    I didn't know, so I got pulled over 'cause I was

10   still going 45 in a 35.

11               The policeman asked me if I had been

12   drinking, I said yes and he gave me a breathalyzer,

13   and it's a no tolerance state in Arizona and I was

14   arrested.

15         Q.       And what was your blood alcohol

16   content?

17         A.       .08.  The very minimum.

18         Q.       And then what about the second time

19   when you were arrested?

20         A.       The second time was a DUI and that

21   was in 2014 or 2015.

22         Q.       Okay.  And where was it that that

23   arrest occurred?

24         A.       Scottsdale, Arizona.

25         Q.       And were you breathalyzed in

A-438

CONFIDENTIAL

Page 90

1    connection with the arrest?

2            A.      Yes.

3            Q.      And what was your blood alcohol?

4            A.      .08.

5            Q.      And were you ultimately convicted of

6    a crime in connection with the arrest?

7            A.      Yes, DUI.

8            Q.      And have you, have you ever, have you

9    ever had any substance abuse problems?

10           A.      No.

11           Q.      Have you ever treated for any

12   substance abuse problems?

13           A.      No.  Well, I had to take

14   court-ordered AA and a class that was court ordered,

15   so yes.

16           Q.      Okay.  And was that in connection

17   with the DUI?

18           A.      Correct, the second one, yes.

19           Q.      And have you ever sued anybody

20   before?

21           A.      No.

22           Q.      Have you ever been sued before?

23           A.      No.

24           Q.      Have you ever -- you've never been a

25   party to a lawsuit before?

**A-439**

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
    -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for defendant Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>    *Plaintiff,*<br><br>  v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>    *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC<br><br><br>**DECLARATION OF ALINA HABBA, ESQ. IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE*** |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for Donald J. Trump (the "Defendant") in the above-captioned matter (the "Action").

2.    I submit this declaration pursuant in support of Defendant's Memorandum of Law in Opposition to Plaintiff's Omnibus Motion *in Limine*.  The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

3.    As counsel for Defendant, I have reviewed pleadings, and other documents related to the Action, and I am familiar with the facts and circumstances of this case.

1

**A-440**

4.      Attached hereto as **Exhibit A** is a true and accurate copy of relevant portions of the deposition transcript of Natasha Stoynoff, which deposition took place October 13, 2022.

5.      Attached hereto as **Exhibit B** is a true and accurate copy of the relevant portions of the deposition transcript of Jessica Leeds, which deposition took place on October 13, 2022.

6.      Attached hereto as **Exhibit C** is a true and accurate copy of the Expert Rebuttal Report of Robert J. Fisher dated November 14, 2022.

7.      Attached hereto as **Exhibit D** is a true and accurate copy of the relevant portions of the deposition transcript of Robert J. Fisher, which deposition took place on December 14, 2022.

8.      Attached hereto as **Exhibit E** is a true and accurate copy of the relevant portions of the deposition transcript of E. Jean Carroll, which deposition took place on October 14, 2022.

9.      Attached hereto as **Exhibit F** is a true and accurate copy of Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories dated June 27, 2022.

10.      Attached hereto as **Exhibit G** is a true and accurate copy of Plaintiff's Second Supplemental Rule 26(a)(1) Disclosures dated October 14, 2022.

11.      Attached hereto as **Exhibit H** is a true and accurate copy of Plaintiff's Third Supplemental Rule 26(a)(1) Disclosures dated January 6, 2023.

Dated: February 23, 2023                          Respectfully submitted,

Alina Habba, Esq.
Habba Madaio & Associates LLP
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

2

A-441

# EXHIBIT A

Page 1

```
 1                    NATASHA STOYNOFF

 2             UNITED STATES DISTRICT COURT

 3             SOUTHERN DISTRICT OF NEW YORK

 4   ------------------------------------    )

 5   E. JEAN CARROLL,                        )

 6                  Plaintiff,               ) Case No.

 7          vs.                              ) 20-Civ-7311

 8   DONALD J. TRUMP, in his personal capacity) (LAK)(JLC)

 9                  Defendants.              )

10   ------------------------------------    )

11

12

13             DEPOSITION OF NATASHA STOYNOFF

14                  NEW YORK, NEW YORK

15                  OCTOBER 13, 2022

16

17

18

19

20

21

22

23

24   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25   JOB NO. 218341
```

Page 20

```
 1                 NATASHA STOYNOFF
 2    interview.
 3         Q.  Did you -- what happened -- withdraw.
 4              Did you ever leave the pool area with
 5    Donald Trump or Melania Trump?
 6         A.  Yes.
 7         Q.  With whom?
 8         A.  With Donald.
 9         Q.  And how did that happen?
10         A.  He -- Melania was going upstairs to
11    change -- excuse my emotions -- and Donald said,
12    Have you seen the so-and-so room?  Have you seen the
13    painting in the whatever room.  He wanted to show me
14    a painting or a room.  I said no.  He goes, I'd like
15    to show you.  So he took me to this room.
16         Q.  Do you recall what room it was at
17    Mar-a-Lago?
18         A.  I mean, I don't know how to -- I don't know
19    that it had a number on it, but all I remember is we
20    came in the back door, walked down the hallway, and
21    turned right into a room.  That's as I recall it,
22    but I haven't really seen pictures to know -- I
23    haven't really seen a layout of Mar-a-Lago to know
24    exactly what door.
25         Q.  And what happened when you got to the room?
```

A-444

Page 21

1                    NATASHA STOYNOFF

2       A.  I walked in and he -- I walked into the

3   room first and I'm looking around the room wondering

4   what does he want to show me.  Nice room, what does

5   he want to show me.  Then I hear the door close

6   behind me and I turn around and he's right here

7   (indicating), and he grabs my shoulders and pushes

8   me against this wall and starts kissing me.

9       Q.  And did he say anything when he started

10  kissing you?

11      A.  No.

12      Q.  Did he say anything before?

13      A.  Not that I recall.

14      Q.  And what was going through your mind when

15  Donald Trump did this?

16      A.  Complete shock.  Thank you.  Complete shock

17  because it was very fast and I was taken -- taken by

18  surprise.

19      Q.  And do you recall how you reacted?

20      A.  I recall pushing him back twice.  I recall

21  trying to say something, but not really being able

22  to.  I was so flustered.

23      Q.  And when you pushed him back the first time

24  do you recall how Donald Trump reacted?

25      A.  Yes.  He just came toward me again.

A-445

# EXHIBIT B

Page 1

1                        JESSICA LEEDS

2               UNITED STATES DISTRICT COURT

3               SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------      )

5    E. JEAN CARROLL,                          )

6                    Plaintiff,                ) Case No.

7           vs.                                ) 20-Civ-7311

8    DONALD J. TRUMP, in his personal capacity) (LAK)(JLC)

9                    Defendants.               )

10   ------------------------------------      )

11

12

13                DEPOSITION OF JESSICA LEEDS

14                    NEW YORK, NEW YORK

15                    OCTOBER 13, 2022

16

17

18

19

20

21

22

23

24   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25   JOB NO. 218341

A-447

Page 17

```
 1                    JESSICA LEEDS

 2   Trump?

 3        A.   Yes.

 4        Q.   When was that?

 5        A.   Well, the first time I met him was on an

 6   airplane coming back from I believe Dallas, it was a

 7   Brandiff flight.  I was asked by the stewardess -- I

 8   was flying coach.  I was asked by the stewardess if

 9   I would like to come up and sit in first class.

10   Well, Brandiff had great meals.  Absolutely, I went

11   up to first class, and it was the first seat behind

12   the bulkhead.  And there was a gentleman sitting at

13   the window seat and he introduced himself, and we

14   shook hands and we chatted for a while.  He

15   introduced himself as Donald Trump.

16        Q.   And do you recall where you were traveling

17   on this flight?

18        A.   I was coming into New York, to Laguardia

19   because that's where my car was.

20        Q.   Okay.  And do you recall what year this

21   took place?

22        A.   I think it was '79.

23        Q.   Okay.  And you testified that the man

24   sitting in the window seat introduced himself as

25   Donald Trump.  Were you familiar with Donald Trump
```

A-448

Page 19

                        JESSICA LEEDS

1  mean by that?

2      A.  Well, he was with his hands grabbing me,

3  trying to kiss me, grabbing my breasts, pulling me

4  towards him, pulling himself on to me.  It was kind

5  of a struggle going on.  Part of my brain was

6  wondering why the people in the back -- in the seat

7  behind me weren't noticing that the seat was

8  jiggling around and why wasn't the guy that was

9  sitting across the aisle saying something or where

10 in hell was the stewardess.  That went on for what

11 seemed like a terribly long time, but it probably

12 was just a few seconds.

13         It was when he started putting his hand up

14 my skirt that I realized that nobody was going to

15 save me but me, and I was on the aisle, I managed to

16 wheel my way out of the chair, and grabbed my purse

17 and I went back to my seat in the back.

18     Q.  And did Donald Trump say anything while

19 this was happening?

20     A.  Not a word.  There was never any sound that

21 I can recall.

22     Q.  Did you say anything while this was

23 happening?

24     A.  Nope.

25

A-449

# EXHIBIT D

**A-450**

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ------------------------------x

5   E. JEAN CARROLL,

6                   Plaintiff,

7     -vs-                        20 CIV. 7311

8   DONALD J. TRUMP,            (LAK)(JLC)

9   in his personal capacity,

10                  Defendant.

11  ------------------------------x

12

13              DEPOSITION OF ROBERT FISHER

14                 December 14, 2022

15

16

17

18

19  Reported by:

20  MARY F. BOWMAN, RPR, CRR

21  JOB NO. 220615

22

23

24

25

A-451

Page 2

```
 1

 2

 3

 4

 5

 6                        December 14, 2022

 7                        10:11 a.m.

 8

 9

10          Deposition of ROBERT FISHER, held

11   at offices of Kaplan, Hecker & Fink, LLP,

12   350 Fifth Avenue, New York, New York,

13   before Mary F. Bowman, a Registered

14   Professional Reporter, Certified Realtime

15   Reporter, and Notary Public of the States

16   of New Jersey and New York.

17

18

19

20

21

22

23

24

25
```

Page 41

```
 1                    R. Fisher

 2    its counsel and service to clients during

 3    the past three decades."

 4         A.    Yes.

 5         Q.    Do you recall what any of those

 6    awards or honors were?

 7         A.    Yes, I do.  Several.  Many.

 8              They were from the Public

 9    Advisors Society of America.  They were

10    from the Public Communicators of Los

11    Angeles organization.  And -- in other

12    words, in my profession, like in many, they

13    have awards programs, and you submit -- you

14    can submit a project or a program or submit

15    something that you've done to a

16    competition, national or local, regional,

17    whatever, and they pick winners and they

18    give -- they have a banquet and they pass

19    out awards.

20              And I won many awards.  Most of

21    them were in the period of the '90s.  And I

22    stopped submitting forms, but I won a lot

23    of first place awards of excellence or

24    whatever, many, many, many.  And I finally

25    got tired of submitting -- I didn't feel
```

Page 42

```
 1                    R. Fisher

 2   the need to get any more awards, so

 3   probably around 2000, I stopped submitting

 4   them.

 5      Q.    Is there an award -- is there an

 6   award that you are most proud of or think

 7   represents your greatest Success?

 8      A.    Well, I mean, a lot of these

 9   rewards were for reputation damage, what

10   you'd call crisis communications.  And

11   people that had damaged reputations, I did

12   programs that won awards.

13            I think the one that I'm note

14   proud of is for the brothel industry in

15   Nevada.  There would be no brothel industry

16   in Nevada if it weren't for me.  There

17   wouldn't be one right there if it weren't

18   for me.

19            Back in 1988, when Rock Hudson

20   AIDS problem came to fore and everybody --

21   there was a panic about AIDS -- the

22   brothels were legalized in 1971 in Nevada.

23   And 1988 when they -- Rock Hudson thing

24   hit, the legislature decided to eliminate

25   brothels because they said anyone that goes
```

A-454

Page 43

```
 1                        R. Fisher

 2   in the brothel and has sex goes home to

 3   their wife or girlfriend and passes it on.

 4            So the theory was the brothel was

 5   rampant with AIDS and sexually-transmitted

 6   diseases, which wasn't true.  You were

 7   safer having sex with a woman in the

 8   brothel than you were with a woman who you

 9   met in church, and that has been

10   documented.

11            So anyway, the brothel industry

12   contacted me, long story short, said there

13   was already a bill in front of the state

14   legislature, they are going to outlaw us

15   unless we do something.

16            And I turned around the

17   perception in a matter of two or three

18   months to the point where the legislature

19   dropped the bill and they are still --

20   there is still brothels in Nevada.

21            So I won several awards for that,

22   for a crisis reputation management program.

23            I had another one for a program

24   where some in Marina Del Verde, an upscale

25   condo complex all the owners were going to
```

A-455

```
                                                      Page 44
 1                    R. Fisher

 2   get kicked out and I changed -- I managed

 3   to short-circuit the eviction of all those

 4   people through a litigation and through a

 5   program to show how these people were in

 6   bad straits and being harmed.

 7             In other words, I've won a lot of

 8   awards for reputation damage and bad

 9   representation programs.

10      Q.    With respect to your work on

11   behalf of the brothel industry, you

12   testified that you turned around -- let me

13   rephrase that.

14             You testified that you turned

15   around the perception in a matter of two to

16   three months.  What specifically did you do

17   in that time period?

18      A.    That was a classic case.  That's

19   going to be taught in schools for years to

20   come.

21             The bottom line is it's public

22   perception.  Reputation is about

23   perception.  Reputation is perception.

24   Reputation means how somebody perceives

25   something, how they view it, that sort of
```

A-456

Page 49

1                         R. Fisher

2     outlaw a brothel because they are rampant

3     with sexually transmitted disease, what are

4     they going to do, say, it's not true, it's

5     not true, it's not true?

6                 No one -- there is nothing they

7     could have done that would make people

8     believe it.  So you had to -- you had to

9     find somebody that would say what they were

10    saying that had no ties to them and yet had

11    total credibility.

12       Q.    Okay.  If we turn back to the

13    front page of your CV.

14                You see that you have listed

15    areas of expertise?

16       A.    Yes.

17       Q.    Public relations, marketing,

18    advertising, journalism, reputation, damage

19    to reputation and it goes on.

20                Are all of those areas relevant

21    to your testimony here today?

22       A.    Well, the only thing that is

23    relevant to my testimony is public

24    relations.  There is no other profession --

25    anything that deals with defamation.

A-457

```
                                               Page 50
 1                    R. Fisher

 2   Defamation is about reputation for the most

 3   part.  False statements, we know that.

 4              But it's about impacting

 5   someone's reputation.  The only profession

 6   has anything to do with reputation for the

 7   most part is public relations, not

 8   advertising, not marketing, no journalism.

 9              So I would say that list in this

10   case today, I would say public relations is

11   one.  Defamation another.  Damage to image

12   or reputation is another.  So some extent

13   crisis communications, management might be.

14   Public perception and opinion.  That would

15   be.  Probably.  That would be it.

16      Q.    If we turn now a few pages to

17   page 4 of your CV.

18              I guess let me pause.  If you

19   look at the bottom of page 3, you see there

20   is a header that says, "Expert Witness

21   Experience"?  Bottom of page 3 and

22   continues to page 4?

23      A.    Yes, yes.

24      Q.    Then if you just sort of leaf

25   through the next sort of four or five
```

Page 266

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3    _____
                                             )
4    E. JEAN CARROLL,                        )CASE NO.:
                                             )
5                      Plaintiff,            )20-Civ-7311
                                             )(LAK)(JLC)
6              v.                            )
                                             )
7    DONALD J. TRUMP, in his personal        )
     capacity,                               )
8                                            )
                       Defendant.            )
9    _____)

10

11

12

13

14             DEPOSITION OF ROBERT FISHER

15                     VOLUME II

16        REMOTELY IN LOS ANGELES, CALIFORNIA

17          TUESDAY, DECEMBER 20, 2022

18

19

20

21

22

23

24   REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR
                     CSR NO. 14125
25   JOB NO.:       220862

Page 267

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF NEW YORK

 3     _____
                                          )
 4     E. JEAN CARROLL,                   )CASE NO.:
                                          )
 5                      Plaintiff,        )20-Civ-7311
                                          )(LAK)(JLC)
 6             v.                         )
                                          )
 7     DONALD J. TRUMP, in his personal   )
       capacity,                          )
 8                      Defendant.        )
 9     _____)

10

11

12

13

14     DEPOSITION OF ROBERT FISHER, VOLUME II

15     TAKEN ON BEHALF OF THE PLAINTIFF IN

16     LOS ANGELES, CALIFORNIA, BEGINNING AT

17     12:35 P.M. AND ENDING AT 3:37 P.M., ON

18     TUESDAY, DECEMBER 20, 2022, BEFORE

19     NATALIE PARVIZI-AZAD, CERTIFIED SHORTHAND

20     REPORTER NUMBER 14125.

21

22

23

24

25
```

```
                                                              Page 268
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF, E. JEAN CARROLL:

 4        KAPLAN HECKER & FINK LLP
          BY:  MATTHEW CRAIG, ESQ.
 5             HELEN ANDREWS, ESQ.
               SHAWN CROWLEY, ESQ.
 6        350 FIFTH AVENUE
          NEW YORK, NEW YORK 10118
 7

 8    FOR THE DEFENDANT, DONALD J. TRUMP, IN HIS
      PERSONAL CAPACITY:
 9
          HABBA MADAIO & ASSOCIATES LLP
10        BY:  PETER SWIFT, ESQ.
          1430 U.S. HIGHWAY 206
11        BEDMINSTER, NEW JERSEY 07921

12

13    ALSO PRESENT:

14        TRAVIS SIMMONS, VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25
```

Page 313

1    best news media that have the most credibility, the

2    reach, and whatever to go after, regardless of

3    whether they ever carried the original information.

4         Q.   And -- and what data do you rely upon to

5    determine what the best media is for your target

6    audience in terms of credibility and the other

7    things you mentioned?

8         A.   Knowledge.  I've been in this business

9    50 years.  A reporter for "The "New York Times", I

10   was in journalism -- I know the media, I know which

11   media -- who the media are, I know what they do, I

12   know who they reach out to, I know who reads them or

13   listens to them, I know what -- for instance, if I

14   had something from Mr. Trump back in the day, I

15   wouldn't go to MSNBC for it, I would go to FOX, you

16   know, or now Newsmax or America One [sic] or

17   whatever.

18             But the bottom line is I -- I have

19   knowledge; that's why I'm an expert.  I have

20   50 years of knowledge of working with the media.

21   Most of them were around 50 years ago.  "New York

22   Times" was around 50 years ago, so was the

23   Washington Post, so was ABC, so was AP, so was Wall

24   Street Journal.  I don't need to consult textbooks

25   or media guides -- again, we're just talking about

Page 314

```
 1   news media at this point.  I don't need to consult
 2   them to know who -- who the movers and shakers are
 3   or where I need to be.
 4        Q.   And so, it -- you do not look at polling
 5   or any other data sets to identify the media
 6   consumption habits in this day and age of your
 7   target audience?
 8        A.   No.
 9        Q.   Okay.
10        A.   And it's somewhat premature anyway, but I
11   mean, that's when you get into the nitty gritty of
12   filling in my blueprint, whoever does it, that's --
13   that's at the time, that's what they will do.  My
14   task as an expert is I design a plan that has -- as
15   I said, tried and true activities that have proven
16   to be effective and valuable over a period of time.
17   My job isn't, in that, to get into the weeds of each
18   particular recommendation and break it down to the
19   Nth degree as to -- it would be premature to do it
20   because conditions can change from the time --
21   sometimes I do these reports and -- and the case
22   isn't over for three years.  I've had cases where
23   I've done the reports three years later.  Three
24   years is a big difference, why would I charge my
25   client --
```

# EXHIBIT E

Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3            SOUTHERN DISTRICT OF NEW YORK
 4
 5   E. JEAN CARROLL,            )
                  Plaintiff,     )
 6                               )
            -against-            )20-cv-7311(LAK)
 7                               )
     DONALD J. TRUMP, in his     )
 8   personal capacity,          )
                  Defendant.     )
 9   _____        )
10
11
12            ***CONFIDENTIAL***
13        VIDEOTAPED DEPOSITION OF
14            E. JEAN CARROLL
15           New York, New York
16         Friday, October 14, 2022
17
18
19
20   Reported By:
21   CATHI IRISH, RPR, CRR, CLVS
22
23
24
25
```

A-465

Page 178

```
 1            CARROLL - CONFIDENTIAL
 2   defendant's statements?
 3        A.    Absolutely.
 4        Q.    Why do you think that?
 5        A.    I believe they thought that the
 6   column had taken a hit.  Here it was
 7   probably the number one feature for years
 8   and I'm a liar.
 9        Q.    Did someone from Elle tell you
10   that?
11        A.    No, they would never admit it.
12        Q.    Who advised you that you were
13   being terminated from Elle Magazine?
14        A.    The managing editor.
15        Q.    Who was that?
16        A.    I had to look her up when she
17   called, Erin Hobday.  I thought she was
18   calling me to invite me to the Christmas
19   party.
20        Q.    Were you surprised by your
21   termination?
22        A.    That's putting it mildly.
23        Q.    In what manner were you advised?
24        A.    Very cheerful conversation.  She
25   said I'm calling to inform you that we
```

Page 188

```
 1              CARROLL - CONFIDENTIAL
 2    are not relevant but DF99WWW24RY-
 3    dms-ngarcia@hearst.com.
 4        A.   Yes.
 5        Q.   The date is 8/4/2019?
 6        A.   Yes.
 7        Q.   Okay.  Do you know who ngarcia at
 8    Hearst would be?
 9        A.   Who?
10        Q.   I'll state it differently.
11        A.   Oh, Nina Garcia.
12        Q.   Exactly.  Who is Ms. Garcia?
13        A.   Ms. Garcia is a well respected
14    editor in the magazine world.  She is the
15    editor-in-chief of Elle.  She's also one
16    of the stars of Project Runway.
17        Q.   She was the editor-in-chief at
18    Elle at this time?
19        A.   Yes.
20        Q.   Did you have a relationship with
21    Ms. Garcia?
22        A.   No, just an admirer of hers.  I
23    liked her style, I liked her on Project
24    Runway.
25        Q.   According to the contents of this
```

Page 189

```
 1            CARROLL - CONFIDENTIAL
 2   communication, it states "Hi, Kate, Emma
 3   told me you are aware of the E. Jean
 4   situation.  Sadly she will not reconsider
 5   her exclusive with New York Magazine.
 6   I've been talking to Erin Hobday about our
 7   situation with HR, and Brandy about our PR
 8   strategy.  Both feel prepared to move
 9   forward.  I don't feel it sets the right
10   precedent if we keep her.  Let me know
11   your thoughts."
12       A.    Exactly.
13       Q.    Do you know who Erin --
14             MS. KAPLAN:  I think she was
15       going to say exactly.  Anything else?
16             THE WITNESS:  This is a shocking
17       e-mail for me because what precedent
18       are they talking about, does anybody
19       know?
20   BY MS. HABBA:
21       Q.    I'll ask you some more detailed
22   questions.
23             According to the contents of this
24   communication that I just read, it is said
25   that you would not reconsider your
```

A-468

Page 217

```
 1              CARROLL - CONFIDENTIAL
 2    your blog?
 3         A.   Oh, Substack, yes, I do.
 4         Q.   You do.  Do you know how much?
 5         A.   Yes, 70,000 a year.
 6         Q.   And how long have you been
 7    generating that amount of income from the
 8    blog?
 9         A.   It was immediately popular.  Not
10    a big huge massive salutation but it's
11    doing all right.  I enjoy writing it.
12         Q.   Did it increase after 2019?
13         A.   Oh, I didn't start it until 2021.
14         Q.   So it's pretty successful since
15    you started it?
16         A.   It's successful for a Substack,
17    yes.
18         Q.   Have you sued anyone else?
19         A.   No.
20         Q.   Have you ever been sued?
21         A.   No.
22         Q.   Last set of questions I have for
23    you, you stated in the public that you had
24    DNA from the former president; is that
25    correct?
```

A-469

Page 218

1              CARROLL - CONFIDENTIAL

2        A.    Yes.

3        Q.    Why did you state that?

4        A.    Because we sent the dress to be

5    examined and then we got back a report.

6    Robbie published it.

7        Q.    What did that report say that you

8    recall?  And don't divulge anything that's

9    privileged, please, so conversations

10   between you and your attorney I don't want

11   to know.

12       A.    It is so far above my head.  The

13   reports about DNA are so detailed and so

14   much scientific rigor is required to

15   understand even the opening paragraph, I

16   can't really -- I can't say.

17       Q.    And how did you discover that

18   there might have been a trace of DNA from

19   this event?

20             MS. KAPLAN:  I don't think you

21        can answer that question.

22             MS. HABBA:  Okay.  I think I'm

23        done.

24             Oh, yes, I forgot.

25   ///

A-470

# EXHIBIT F

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL,<br>            *Plaint.ij,f,*<br><br>        v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>            *De fendant.* | No. 20 Civ. 7311 (LAK) (JLC) |

### PLAINTIFF'S RESPONSES AND OBJECTIONS TO
### DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York (together, the "Rules"), Plaintiff E. Jean Carroll ("Carroll"), by and through her undersigned attorneys, hereby submits her Responses and Objections (the "Responses") to the First Set of Interrogatories of Defendant Donald J. Trump ("Trump") dated May 27, 2022 (the "Interrogatories").

### GENERAL OBJECTIONS

The following general objections and responses (the "General Objections") are incorporated into each specific objection and response (the "Specific Objections") as if fully set forth therein:

1.      Carroll objects to the Interrogatories to the extent they are duplicative or cumulative or seek information that has been or will be provided through other means of discovery.

2.      Carroll objects to the Interrogatories to the extent they are vague, ambiguous, overly broad, unduly burdensome, seek information not relevant to the claims or defenses of any party, or are not proportional to the needs of the case.

3.      Carroll objects to Definition No. 5 on the ground that it purports to include Bergdorf Goodman's "current or former subsidiaries, affiliates, parents, predecessors and successors, divisions, departments and operating units, and includes, without limitation, each of their current or former officers, directors, members, partners, shareholders, employees, agents, officials, Representatives, and all Persons and entities acting or purporting to act on their behalf." Subject to this General Objection, in responding to the Interrogatories, Carroll will construe "Bergdorf" to refer only to "Bergdorf Goodman" and no other entity.

4.      Carroll objects to Definition No. 8 on the grounds that it is broader than the uniform definition of "communication" in Local Rule 26.3(c)(1). Subject to this General Objection, in responding to the Interrogatories, Carroll will use the definition of "communication" set forth in that Rule.

5.      Carroll objects to Definition No. 10 on the grounds that it is broader than the uniform definition of "concerning" in Local Rule 26.3(c)(7). Subject to this General Objection, in responding to the Interrogatories, Carroll will use the definition of "concerning" set forth in that Rule.

6.      Carroll objects to Definition No. 12 on the grounds that it is broader than the uniform definition of "document" in Local Rule 26.3(c)(2) and Federal Rule of Civil Procedure 34(a)(1)(A). Subject to this General Objection, in responding to the Interrogatories, Carroll will use the definition of "document" set forth in that Rule.

7.      Carroll objects to Definition No. 14 on the ground that it purports to include *Elle*'s "current or former subsidiaries, affiliates, parents, predecessors and successors, divisions, distributors, publishers, departments and operating units, and includes, without limitation, each of their current or former officers, directors, members, partners, shareholders, employees, agents,

2

officials, Representatives, and all persons and entities acting or purporting to act on their behalf, but not limited to Hearst." Subject to this General Objection, in responding to the Interrogatories, Carroll will construe "*Elle*" to refer only to "*Elle* Magazine" and no other entity. Carroll objects to Definition No. 21 on the ground that it defines "Carroll," "Plaintiff," "You," and "Your" as "E. Jean Carroll and her Representatives and former Representatives, including but not limited to, Kaplan Hecker & Fink, and Kaplan." Because this is solely a dispute between two parties, Carroll will construe "Plaintiff," "You," and "Your" to refer only to "E. Jean Carroll."

8.      Carroll objects to the Definitions and Instructions in the Interrogatories insofar as they purport to require unreasonable measures to identify responsive information or documents. In responding to the Interrogatories, Carroll will undertake a reasonable and diligent search of her accessible files, as required by the Federal Rules of Civil Procedure.

9.      Carroll objects to Instruction No. 2 insofar as it seeks to impose obligations greater than those imposed by Local Rule 26.2. For all claims of privilege, Carroll will identify only the information that it is required to be identified under Local Rule 26.2.

10.     Carroll objects to Instruction No. 5 insofar as it seeks to impose obligations greater than those imposed by Federal Rule of Civil Procedure 33(b)(4). For all objections, Carroll will state only the information that it is required to be stated under Federal Rule of Civil Procedure 33(b)(4).

11.     Carroll objects to Instruction No. 5 on the grounds that it is broader than the uniform definitions of "identify" in Local Rule 26.3(c)(3)–(4). Subject to this General Objection, in responding to the Interrogatories, Carroll will use the definitions of "identify" set forth in that Rule.

3

12.     Carroll objects to Instruction No. 6 and Instruction No. 7 on the grounds that they are broader than the uniform definitions of "and," "or," "and/or," "all," "any," and "each" in Local Rule 26.3(d)(1)–(2). Subject to this General Objection, in responding to the Interrogatories, Carroll will use the definitions set forth in that Rule.

13.     Carroll objects to Instruction No. 10 to the extent it encompasses information that is overbroad, unduly burdensome, disproportionate to the needs of the case, and irrelevant.

14.     Carroll objects to the Interrogatories to the extent that they purport to call for information or documents that: (a) are subject to attorney-client privilege; (b) constitute attorney work product; (c) contain information protected from disclosure based on common interest or a similar privilege; or (d) are otherwise protected from disclosure under any applicable privilege, law, or rule. Carroll will not produce such information in response to the Interrogatories, and any inadvertent identification thereof shall not be deemed waiver of any privilege with respect to such information.

15.     These Responses to the Interrogatories are made to the best of Carroll's present knowledge, information, and belief. These Responses are subject to change based on additional facts that may come to light as a result of discovery or investigation.

16.     Carroll reserves all objections or questions as to the competency, relevance, materiality, privilege, or admissibility of Carroll's Responses herein, which are presented as evidence in any subsequent proceeding in, or trial of, this or any other action, for any purpose whatsoever. Carroll's Interrogatories herein are not intended to be and shall not be construed as an agreement or concurrence with Trump's characterization of any facts, circumstances, or legal obligations, and Carroll reserves the right to contest any such characterizations as inaccurate.

17.     The following Responses are all designated as confidential on the understanding that the parties will agree on the terms of a protective order in this litigation.

18.     Carroll is available to meet and confer with Trump in an effort to resolve any disputes that may arise concerning these Interrogatories.

## RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES

1.     Identify all Persons who have any knowledge or information about any of the allegations in the Complaint, and for each Person identified, describe the subject matter of the knowledge that each Person possesses.

**RESPONSE**: In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, disproportionality, and the improper requirement that Carroll identify every single individual who may have heard the Statements (which were highly publicized). Notwithstanding and without waiver of her General and Specific Objections, Carroll identifies the following Persons with whom she communicated—prior to publication of the Article—about the fact that Trump had sexually assaulted her:

| *Individuals who Carroll informed about the Assault near-contemporaneously* | |
|---|---|
| Lisa Birnbach, Friend of Carroll | Contemporaneous outreach |
| Carol Martin, Friend of Carroll | Contemporaneous outreach |
| *Individuals who Carroll informed about the Assault prior to publication of the Article* | |
| Laurie Abraham, Editor at *Elle* Magazine; Editor at *New York* Magazine; Editor at *The Atlantic* Magazine | Read first draft of the Book and edited the Article |
| Matie Argiropoulous, Producer | Produced audio of the Book |
| Lisa Chase, Editor at *Elle* Magazine and *Outside* Magazine | Aware of Book publication |
| Elisabeth Dyssegaard, Editor at St. Martin's Press | Edited the Book |
| Nina Garcia, Editor-in-Chief at *Elle* Magazine | Oversaw Carroll's column at *Elle* Magazine until her termination in 2019 |
| David Haskell, Editor-in-Chief at *New York* Magazine | Publisher of the Article |
| Sarah Lazin, Agent to Carroll since 1992 | Assisted in selling Book to St. Martin's Press |
| Jody Quon, Photographer | Photographed the cover of the Article |

5

| Genevieve Smith, Editor at *New York* Magazine | Edited the Article |
|---|---|
| Dori Weintraub, Head of Publicity at St. Martin's Press | Coordinated publishing the Book |

    2.     Identify each Person or entity with whom You or Your Representatives communicated in any way (including, but not limited to, in-person, by telephone, by e-mail, by facsimile, or in writing) about the Action or any of the allegations in the Complaint.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory insofar as it seeks information protected by attorney-client privilege, attorney work-product doctrine, and other applicable privileges. Carroll also objects to this Interrogatory on the grounds of overbreadth, undue burden, and disproportionality. Notwithstanding and without waiver of her General or Specific Objections, Carroll refers to her Response to Interrogatory No. 1.

    3.     For each Statement, identify all Persons, other than You or Your Representatives, who have viewed, read, heard, or in any way became aware of that Statement.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, and disproportionality. Carroll further objects to this Interrogatory on the ground that it is obviously impossible for her to identify all persons who "viewed, read, heard, or in any way became aware of" the Statements, which were covered widely in the national press and discussed on social media. Notwithstanding and without waiver of her General or Specific Objections, Carroll refers to her Response to Interrogatory No. 1.

    4.     Identify each Person with whom You discussed the purported incident described in Paragraphs 22 through 42 of the Complaint.

**RESPONSE:** Notwithstanding and without waiver of her General Objections, Carroll states that she told Carol Martin and Lisa Birnbach that Trump assaulted her soon after it occurred.

5.      Identify and describe the exact damages that You are seeking in the Complaint and the facts upon which such damages are based, and identify all documents that describe, reflect, support, or relate to the damages sought.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory insofar as it seeks information protected by attorney-client privilege, attorney work-product doctrine, and other applicable privileges. Carroll further objects to this Interrogatory on the ground that it is premature since not a single document has been produced. Notwithstanding and without waiver of her General and Specific Objections, Carroll refers to Page 27 of the Complaint.

6.      Identify all of Your business or social relationships that were affected by the Statements, and identify how each such relationship was harmed, as referenced in Paragraph 129 of the Complaint.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory insofar as it seeks information protected by attorney-client privilege, attorney work-product doctrine, and other applicable privileges. Carroll further objects to this Interrogatory on the ground that it is premature since not a single document has been produced. Moreover, Carroll objects to this Interrogatory on vagueness and irrelevance grounds. Notwithstanding and without waiver of her General and Specific Objections, Carroll states that the letters she received for her "Ask E. Jean" column decreased by roughly 50% in the months of July, August, and September 2019 as compared to the number of letters received for the same period in 2018; and that her contract with *Elle* was not renewed in December 2019.

7.      Identify all medical providers, including mental health professionals, that have treated you from 1990 to the present, and explain the nature and purpose of such treatment

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, disproportionality, and irrelevance to the truth or falsity of the claims or defenses in this litigation. Notwithstanding and without waiver of her

A-478

General and Specific Objections, Carroll states that she did not seek professional treatment for any physical and/or mental injuries or conditions she suffered due to the Assault or the Statements.

> 8.    Identify all medication You have been prescribed since 1990 to the present, including the dates on which You were taking such medications, and the reason You were prescribed such medication.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, disproportionality, and irrelevance to the truth or falsity of the claims or defenses in this litigation. Notwithstanding and without waiver of her General and Specific Objections, Carroll states that she has not been prescribed medication as treatment for harms she has suffered in consequence of the Assault or the Statements.

> 9.    Describe in detail your record of employment, stating specifically as to each job the name and address of your employer, your duties, title, job description and authority, and the inclusive dates of beginning and ending each employment.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, and disproportionality. Notwithstanding and without waiver of her General and Specific Objections, Carroll identifies the following jobs and employers:

| Job | Employer | Dates of Employment |
|---|---|---|
| Columnist | "Ask E. Jean" Column<br>Lisa Chase and/or Robbie Myers<br>Elle Magazine<br>300 W 57th St.<br>New York, NY 10019 | 1993-2019 |
| TV Host | Ask E. Jean on *America's Talking*<br>Roger Ailes<br>30 Rockefeller Plaza<br>New York, NY 10112 | 1994-1996 |
| Author | *A Dog in Heat Is a Hot Dog and Other Rules to Live By*<br>Simon and Schuster<br>1230 6th Ave.<br>New York, NY 10020 | 1995-1996 |
| Host and Writer | TV pilots for the Carsey-Warner Company, PBS, and Tribune Studios | 1995-1999 |

A-479

| Co-Founder | GreatBoyfriends.com | 2000 |
|---|---|---|
| Author | *Mr. Right, Right Now!* HarperCollins Publishers LLC 195 Broadway New York, NY 10007 | 2004 |
| Author | *What Do We Need Men For?: A Modest Proposal* St. Martin's Press 120 Broadway New York, NY 10271 | 2019 |
| Columnist | Laurie Abraham *The Atlantic* Magazine 600 New Hampshire Ave., N.W. Washington, D.C. 20037 | 2020 |

10. Describe in detail each communication You had concerning Defendant, any interaction or communication with Defendant, or the allegations in the Complaint, including identifying the Person with whom You had the communication.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, irrelevance, and disproportionality. It would be absurd and impossible—not to mention needless and burdensome—for Carroll to detail every conversation she has had concerning Trump, who served as President from 2016-2020. In the Complaint itself, Carroll describes her interactions and communications with Trump. Moreover, as set forth in her Response to Trump's Requests for Production, Carroll will produce certain documents that address her communications with third parties concerning this Action or the allegations in the Complaint.

11. Identify each Person with knowledge of Your decision to write or publish the Book or the Article, and Your thought process behind such decision, as alleged in paragraphs 74 through 76 of the Complaint.

**RESPONSE:** Notwithstanding and without waiver of her General Objections, Carroll identifies the following individuals, who are described in more detail in Response No.1: Laurie

A-480

Abraham, Lisa Birnbach, Elisabeth Dyssegaard, David Haskell, Sarah Lazin, Carol Martin, Genevieve Smith, and Dori Weintraub.

12.   Identify each romantic partner You have had since the date of the purported incident.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of blatant sexism, overbreadth, undue burden, disproportionality, and irrelevance to the truth or falsity of the claims or defenses in this litigation. Notwithstanding and without waiver of her General and Specific Objections, Carroll states that she has had zero romantic partners since Trump sexually assaulted her in the mid-1990s.

13.   Identify each Person with knowledge of Your decision to speak with reporter, Barbaro, along with Martin and Birnbach, referenced in Paragraphs 101-104 in the Complaint.

**RESPONSE:**   Notwithstanding and without waiver of her General Objections, Carroll states that she did not speak to Barbaro with respect to the events described in Paragraphs 101-104 in the Complaint.

14.   Describe in detail how each of the Statements tended to or did injure Your trade, occupation or business, reputation, or finances, as alleged in paragraphs 82 through 100 of the Complaint, identify each Person with knowledge of such alleged injury, and for each financial loss, identify:

  a.   the amount of each loss;
  b.   the date of each loss;
  c.   whether the loss was a realized loss or an unrealized loss;
  d.   whether you claimed and/or received a tax deduction for such loss;
  e.   each account and account number that reflects each loss; and
  f.   whether the loss has be recouped or mitigated in any way.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, and disproportionality. Carroll further objects to this Interrogatory on the grounds that it is premature since not a single document has been produced. Notwithstanding and without waiver of her General and Specific Objections, Carroll states that, during her tenure as a Columnist at *Elle* Magazine, she was paid $5 a word, whereas at *The*

10

*Atlantic*, where she worked as a Contributing Writer since August 2020, she was paid $.023 a word. As set forth in her Response to Trump's Requests for Production, Carroll will produce certain documents concerning the economic injuries that the Statements caused her to suffer.

15.     Describe in detail Your alleged emotional harm, as alleged in paragraph 145 of the Complaint, including but not limited to any treatment You received in connection with Your alleged emotional harm and identify each person with knowledge of such treatment.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, and disproportionality. Carroll further objects to this Interrogatory on the grounds that it is premature since not a single document has been produced. Notwithstanding and without waiver of her General and Specific Objections, Carroll states that she suffered severe emotional distress following the Statements but did not seek professional treatment. As set forth in her Response to Trump's Requests for Production, Carroll will produce certain documents concerning the emotional injuries that the Statements caused her to suffer.

16.     For all of Your attorneys' fees and other professional fees You allegedly incurred as a result of the Statements, provide the name of the attorney or other professional, the work performed, and the date and amount of the invoice.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, disproportionality, and irrelevance to the truth or falsity of the claims or defenses in this litigation. Carroll further objects to this Interrogatory on the ground that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, and other applicable privileges. Carroll further objects to this Interrogatory on the ground that it seeks information that could threaten Carroll's security if made public.

17.     Identify each individual member of the group of, "Sixteen Women," referenced in Paragraph 78 of the Complaint, and describe, with respect to each individual member of the group:

a.   Your relationship; and
b.   any communications You had with such women.

11

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, disproportionality, and irrelevance to the truth or falsity of the claims or defenses in this litigation. Notwithstanding and without waiver of her General and Specific Objections, Carroll states that the following sixteen women have publicly revealed that (like Carroll herself) they were attacked by Trump: Kristin Anderson, Rachel Crooks Tasha Dixon, Jessica Drake, Jill Harth, Cathy Heller, Ninni Laaksonen, Jessica Leeds, Temple Taggard McDowell, Mindy McGillivray, Jennifer Murphy, Cassandra Searles, Natasha Stoynoff, Bridget Sullivan, Karena Virginia, and Summer Zervos.

18.   Identify all Persons who have ever characterized Your statements, assertions, accusations, or allegations of being biased, bogus, concocted, counterfeit, deceptive, dishonest, erroneous, exaggerated, fabricated, fake, fallacious, false, feigned, fictitious, flawed, forged, fraudulent, hyperbolic, impartial, imprecise, inaccurate, inconsistent, incorrect, inexact, invented, misleading, perfidious, phony, specious, spurious, unfounded, unreliable, untrue, or wrong.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, disproportionality, and irrelevance to the truth or falsity of the claims or defenses in this litigation. Carroll further objects to this Interrogatory on the ground that it depends on disputable, subjective, and vague characterizations. Notwithstanding and without wavier of her General and Specific Objections, Carroll notes that Trump himself has characterized Carroll using terms of the kind set forth in the Interrogatory.

19.   Describe in detail each instance of any arrest by law enforcement authorities, including the specific violation or offense for which You were arrested, the disposition of the arrest, the date and place of the arrest, and the date, court, and place of any conviction.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory as overbroad, unduly burdensome, and irrelevant to the truth or falsity of the claims or defenses in this litigation.

12

20.     Describe in detail any instance in which You accused another Person of sexual assault or inappropriate sexual conduct, including but not limiting to by identifying each such Person.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, disproportionality, and irrelevance to the truth or falsity of the claims or defenses in this litigation.

21.     Identify all amounts of compensation, remuneration, or funds, received in connection with the Book or the Article

**RESPONSE:** Notwithstanding and without waiver of her General Objections, Carroll states that she received an advance of $70,000 in connection with the Book, and that the money she received for the Article ($7,500 total at a rate of $1 per word) was used to pay off part of that advance. Carroll further states that the Book has yet to make back the advance.

22.     Identify any publishers or distributors with which You had any discussions concerning publishing or distributing the Book.

**RESPONSE:** Notwithstanding and without waiver of her General Objections, Carroll identifies the following publishers and distributors with which she had discussions about publishing or distributing the Book: Laurie Abraham, Lisa Davis, Elisabeth Dyssegaard, Sarah Lazin, Danielle Prielipp, and Dori Weintraub.

23.     Identify all Persons who have made, provided, discussed, or offered to make or provide, any funds, payments, donations, gifts or consideration of any value, in connection with this Action or in connection with any media or public appearances, press interviews, or consultations with any legal counsel or any other person concerning the Defendant, any accusation or allegation concerning Defendant, this Action, the Statements, Defendant's presidency or campaign, including but not limited to for security expenses, relocation, expenses, consulting, or attorneys' fees, and describe:

a. the nature of the contribution or provision of value or consideration; and
b. the dollar amount of the contribution or provision of value or consideration, if not financial in nature, the equivalent dollar amount of the contribution.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds of overbreadth, undue burden, disproportionality, and irrelevance to the truth or

13

falsity of the claims or defenses in this litigation. Carroll further objects to this Interrogatory insofar as it calls for information that is protected by the attorney-client privilege, attorney work-product doctrine, and other applicable privileges.

24.     Identify all other litigations, arbitrations, or other formal disputes involving You.

**RESPONSE:** Notwithstanding and without waiver of her General Objections, Carroll states that she has never previously been involved in a lawsuit, arbitration, or other formal dispute.

25.     Describe in detail Your reputation before the alleged defamation compared to Your reputation afterward, indicating all facts, contentions and opinions that reflect in any way upon Your reputation before and after the alleged defamation.

**RESPONSE:** In addition to her General Objections, Carroll objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information not relevant to the claims or defenses of any party in this Action. Notwithstanding and without waiver of her General and Specific Objections, Carroll states that, after Trump's Statements, she began to receive hate mail in response to his Statements and the allegations in this case, copies of which she will produce to Trump in discovery. Carroll further states that she had never before received hate mail in her life. She would, at times, get letters from people disagreeing with her advice, but never hate mail as vicious and targeted as she started to receive after Trump denied sexually assaulting her and called her a liar.

A-485

Dated: New York, New York
      June 27, 2022

By: _____

Roberta A. Kaplan
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K STREET NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

15

A-486

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

     *Plaintiff,*

  v.

DONALD J. TRUMP, in his personal capacity,

     *Defendant.*

No. 20 Civ. 7311 (LAK) (JLC)

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on this day, June 27, 2022, I served a true and correct copy of Plaintiff E. Jean Carroll's Responses and Objections to Defendant's First Set of Interrogatories by e-mail upon counsel for Defendant Donald J. Trump and by overnight delivery service to:

Alina Habba

Habba Madaio & Associates LLP

1430 U.S. Highway 206, Suite 240

Bedminster, New Jersey 07921

*Attorney for the Defendant Donald J. Trump*

Dated: June 27, 2022
New York, New York

      By:    _____

           Joshua Matz

16

A-487

# EXHIBIT G

A-488

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff,* | |
| v. | No. 20 Civ. 7311 (LAK) (JLC) |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant.* | |

## PLAINTIFF E. JEAN CARROLL'S SECOND
## SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES

Plaintiff E. Jean Carroll, by and through her undersigned counsel, hereby supplements her initial disclosures to Defendant as required by Fed. R. Civ. P. 26(e). Nothing in these supplemental initial disclosures constitutes, or is intended to constitute, a waiver of any claim, right, or defense in this case or otherwise. Plaintiff continues to investigate matters related to the litigation, may become aware of additional information through discovery or otherwise, and also may become aware of new reasons why information presently known may be relevant to this action. Moreover, the issues raised in this matter may require analysis by retained experts. Plaintiff reserves the right to supplement, revise, and/or correct these supplemental initial disclosures. In addition, Plaintiff expressly reserves all applicable privileges, including without limitation the attorney-client privilege and the work-product doctrine, and Plaintiff makes these disclosures subject to those privileges and immunities. Plaintiff further makes these disclosures subject to any discovery confidentiality order the Court may enter in this case.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## DISCLOSURES

1. **The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

    Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), based on her current knowledge, information, and belief and subject to further investigation, discovery, and analysis by experts, Plaintiff discloses the following individuals likely to have discoverable information that may be used to support Plaintiff's claims or defenses, other than the parties themselves. Plaintiff reserves the right to amend or supplement these disclosures, including as provided by Fed. R. Civ. P. 26(e). The following disclosures do not include persons whose testimony is likely to be used solely for impeachment, rebuttal, or expert witness testimony, who will be disclosed in accordance with the schedule set by the Court. Based on her current knowledge, information, and belief, and subject to further investigation, discovery, and analysis by experts, Plaintiff states that there are likely millions of people in the United States and across the world who witnessed Defendant's defamatory acts on June 21, 22, and 24, 2019. Plaintiff further states that the following eight individuals are likely to have discoverable information that may be used to support her claims, other than the parties themselves:

| Name | Contact Information | Subjects |
|------|--------------------|----------|
| Lisa Birnbach | c/o Andrew Celli<br>Emery Celli Brinckerhoff<br>Abady Ward & Maaxel LLP<br>600 Fifth Avenue at Rockefeller Center<br>New York, NY 10020<br>(212) 763-5000<br>acelli@ecbawm.com | Carroll's contemporaneous account of the underlying assault |

A-490

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Name | Contact Information | Subjects |
|------|---------------------|----------|
| Carol Martin | c/o Noam Biale<br>Sher Tremonte LLP<br>90 Broad Street<br>23rd Floor<br>New York, NY 10004<br>(212) 300-2455<br>nbiale@shertremonte.com | Carroll's contemporaneous account of the underlying assault |
| Cande Carroll | c/o Sidhardha Kamaraju<br>Pryor Cashman LLP<br>7 Times Square<br>40th Floor<br>New York, NY 10036<br>(212) 326-0895<br>skamaraju@pryorcashman.com | The timing of Carroll's coming forward and damages |
| Jessica Leeds | c/o Anne Champion<br>Gibson Dunn & Crutcher LLP<br>200 Park Ave<br>New York, NY 10166-0193<br>(212) 351-5361<br>achampion@gibsondunn.com | Account of her own assault by Defendant |
| Robbie Myers | c/o Kathleen Cassidy<br>Morvillo Abramowitz Grand Iason & Anello PC<br>565 Fifth Avenue<br>New York, NY 10017<br>(212) 880-9413<br>kcassidy@maglaw.com | Carroll's journalism career |
| Natasha Stoynoff | c/o Anne Champion<br>Gibson Dunn & Crutcher LLP<br>200 Park Ave<br>New York, NY 10166-0193<br>(212) 351-5361<br>achampion@gibsondunn.com | Account of her own assault by Defendant |

3

**A-491**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Name | Contact Information | Subjects |
|---|---|---|
| Stephanie Grisham | c/o Adam VanHo<br>VanHo Law<br>243 Furnace Street<br>Suite 201<br>Akron, Ohio 44304<br>(333) 653-8511<br>adam@vanholaw.com | Defendant's statements about Carroll |
| Cheryl Lee Beall | Cheryl Lee Beall ███████ | The Bergdorf Goodman department store in the relevant period, including the operations and layout of the store, and Defendant's presence in the store |

Expert disclosures will be made in accordance with the Court's scheduling order and Fed. R. Civ. P. 26(b)(2). Plaintiff reserves the right to use the testimony of other witnesses whose identity may be subsequently learned through discovery or other means.

2.  **A copy, or a description by category and location, of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

    *See* Plaintiff's Initial Disclosures.

3.  **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

    *See* Plaintiff's Initial Disclosures.

4.  **Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action to indemnify or reimburse for payments made to satisfy the judgment.**

    None applicable.

A-492

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**THE INSTANT DISCLOSURE IS WITHOUT PREJUDICE TO AND WITH A RESERVATION OF ALL RIGHTS TO SUPPLEMENT OR AMEND PLAINTIFF'S DISCLOSURE.**

Dated: New York, New York
      October 14, 2022

                                      _____

                                      Roberta A. Kaplan
                                      Shawn Crowley
                                      Matthew J. Craig
                                      KAPLAN HECKER & FINK LLP
                                      350 Fifth Avenue, 63rd Floor
                                      New York, New York 10118
                                      Telephone: (212) 763-0883
                                      rkaplan@kaplanhecker.com
                                      scrowley@kaplanhecker.com
                                      mcraig@kaplanhecker.com

                                      Joshua Matz
                                      KAPLAN HECKER & FINK LLP
                                      1050 K Street NW, Suite 1040
                                      Washington, DC 20001
                                      Telephone: (212) 763-0883
                                      jmatz@kaplanhecker.com

                                      *Counsel for Plaintiff E. Jean Carroll*

5

A-493

# EXHIBIT H

A-494

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>*Defendant.* | No. 20 Civ. 7311 (LAK) (JLC) |

## PLAINTIFF E. JEAN CARROLL'S THIRD
## SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES

Plaintiff E. Jean Carroll, by and through her undersigned counsel, hereby supplements her initial disclosures to Defendant as required by Fed. R. Civ. P. 26(e). Nothing in these supplemental initial disclosures constitutes, or is intended to constitute, a waiver of any claim, right, or defense in this case or otherwise. Plaintiff continues to investigate matters related to the litigation, may become aware of additional information through discovery or otherwise, and also may become aware of new reasons why information presently known may be relevant to this action. Moreover, the issues raised in this matter may require analysis by retained experts. Plaintiff reserves the right to supplement, revise, and/or correct these supplemental initial disclosures. In addition, Plaintiff expressly reserves all applicable privileges, including without limitation the attorney-client privilege and the work-product doctrine, and Plaintiff makes these disclosures subject to those privileges and immunities. Plaintiff further makes these disclosures subject to the discovery confidentiality order the Court has entered in this case.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## DISCLOSURES

1. **The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), based on her current knowledge, information, and belief and subject to further investigation, discovery, and analysis by experts, Plaintiff discloses the following individuals likely to have discoverable information that may be used to support Plaintiff's claims or defenses, other than the parties themselves. Plaintiff reserves the right to amend or supplement these disclosures, including as provided by Fed. R. Civ. P. 26(e). The following disclosures do not include persons whose testimony is likely to be used solely for impeachment, rebuttal, or expert witness testimony, who will be disclosed in accordance with the schedule set by the Court. Based on her current knowledge, information, and belief, and subject to further investigation, discovery, and analysis by experts, Plaintiff states that there are likely millions of people in the United States and across the world who witnessed Defendant's defamatory acts on June 21, 22, and 24, 2019. Plaintiff further states that the following nine individuals are likely to have discoverable information that may be used to support her claims, other than the parties themselves:

| Name | Contact Information | Subjects |
|---|---|---|
| Lisa Birnbach | c/o Andrew Celli<br>Emery Celli Brinckerhoff<br>Abady Ward & Maxel LLP<br>600 Fifth Avenue at Rockefeller Center<br>New York, NY 10020<br>(212) 763-5000<br>acelli@ecbawm.com | Carroll's contemporaneous account of the underlying assault |

A-496

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Name | Contact Information | Subjects |
|---|---|---|
| Carol Martin | c/o Noam Biale<br>Sher Tremonte LLP<br>90 Broad Street<br>23rd Floor<br>New York, NY 10004<br>(212) 300-2455<br>nbiale@shertremonte.com | Carroll's contemporaneous account of the underlying assault |
| Cande Carroll | c/o Sidhardha Kamaraju<br>Pryor Cashman LLP<br>7 Times Square<br>40th Floor<br>New York, NY 10036<br>(212) 326-0895<br>skamaraju@pryorcashman.com | The timing of Carroll's coming forward and damages |
| Jessica Leeds | c/o Anne Champion<br>Gibson Dunn & Crutcher LLP<br>200 Park Ave<br>New York, NY 10166-0193<br>(212) 351-5361<br>achampion@gibsondunn.com | Account of her own assault by Defendant |
| Robbie Myers | c/o Kathleen Cassidy<br>Morvillo Abramowitz Grand<br>Iason & Anello PC<br>565 Fifth Avenue<br>New York, NY 10017<br>(212) 880-9413<br>kcassidy@maglaw.com | Carroll's journalism career |
| Natasha Stoynoff | c/o Anne Champion<br>Gibson Dunn & Crutcher LLP<br>200 Park Ave<br>New York, NY 10166-0193<br>(212) 351-5361<br>achampion@gibsondunn.com | Account of her own assault by Defendant |

**A-497**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Name | Contact Information | Subjects |
|---|---|---|
| Stephanie Grisham | c/o Adam VanHo<br>VanHo Law<br>243 Furnace Street<br>Suite 201<br>Akron, Ohio 44304<br>(333) 653-8511<br>adam@vanholaw.com | Defendant's statements about Carroll |
| Cheryl Lee Beall | Cheryl Lee Beall<br>██████████ | The Bergdorf Goodman department store in the relevant period, including the operations and layout of the store, and Defendant's presence in the store |
| Robert Salerno | Robert Salerno<br>██████████ | The Bergdorf Goodman department store in the relevant period, including the operations and layout of the store, and Defendant's presence in the store |

Expert disclosures were made in accordance with the Court's scheduling order and Fed. R. Civ. P. 26(b)(2). Plaintiff reserves the right to use the testimony of other witnesses whose identity may be subsequently learned through discovery or other means.

2. **A copy, or a description by category and location, of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

   *See* Plaintiff's Initial Disclosures.

3. **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

   *See* Plaintiff's Initial Disclosures.

4

A-498

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

4. **Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action to indemnify or reimburse for payments made to satisfy the judgment.**

None applicable.


**THE INSTANT DISCLOSURE IS WITHOUT PREJUDICE TO AND WITH A RESERVATION OF ALL RIGHTS TO SUPPLEMENT OR AMEND PLAINTIFF'S DISCLOSURE.**

A-499

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Dated: New York, New York
       January 6, 2023

Roberta A. Kaplan
Shawn Crowley
Trevor W. Morrison
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

A-500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff*,

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF
PLAINTIFF E. JEAN CARROLL'S REPLY IN SUPPORT OF HER OMNIBUS
MOTION IN LIMINE

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear
before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff
E. Jean Carroll in the above-captioned action.

2.      I respectfully submit this declaration in support of Carroll's reply in support of her
omnibus motion in limine.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the official
transcript of Robert J. Fisher's deposition, which was taken in this action on December 14 and 20,
2022.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of an excerpt from the
official transcript of Robert J. Fisher's deposition, which was taken in the related action, *Carroll
v. Trump*, No. 22 Civ. 10016 (S.D.N.Y), on February 6, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

1

A-501

Dated:     New York, New York
           March 9, 2023

                                    _____
                                    Roberta A. Kaplan

A-502

# EXHIBIT 1

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------x

5  E. JEAN CARROLL,

6                    Plaintiff,

7     -vs-                        20 CIV. 7311

8  DONALD J. TRUMP,              (LAK)(JLC)

9  in his personal capacity,

10                   Defendant.

11 ------------------------------x

12

13            DEPOSITION OF ROBERT FISHER

14                December 14, 2022

15

16

17

18

19 Reported by:

20 MARY F. BOWMAN, RPR, CRR

21 JOB NO. 220615

22

23

24

25

A-504

Page 42

```
 1                     R. Fisher

 2   the need to get any more awards, so

 3   probably around 2000, I stopped submitting

 4   them.

 5       Q.    Is there an award -- is there an

 6   award that you are most proud of or think

 7   represents your greatest Success?

 8       A.    Well, I mean, a lot of these

 9   rewards were for reputation damage, what

10   you'd call crisis communications.  And

11   people that had damaged reputations, I did

12   programs that won awards.

13            I think the one that I'm note

14   proud of is for the brothel industry in

15   Nevada.  There would be no brothel industry

16   in Nevada if it weren't for me.  There

17   wouldn't be one right there if it weren't

18   for me.

19            Back in 1988, when Rock Hudson

20   AIDS problem came to fore and everybody --

21   there was a panic about AIDS -- the

22   brothels were legalized in 1971 in Nevada.

23   And 1988 when they -- Rock Hudson thing

24   hit, the legislature decided to eliminate

25   brothels because they said anyone that goes
```

A-505

Page 43

```
 1                     R. Fisher

 2   in the brothel and has sex goes home to

 3   their wife or girlfriend and passes it on.

 4            So the theory was the brothel was

 5   rampant with AIDS and sexually-transmitted

 6   diseases, which wasn't true.  You were

 7   safer having sex with a woman in the

 8   brothel than you were with a woman who you

 9   met in church, and that has been

10   documented.

11            So anyway, the brothel industry

12   contacted me, long story short, said there

13   was already a bill in front of the state

14   legislature, they are going to outlaw us

15   unless we do something.

16            And I turned around the

17   perception in a matter of two or three

18   months to the point where the legislature

19   dropped the bill and they are still --

20   there is still brothels in Nevada.

21            So I won several awards for that,

22   for a crisis reputation management program.

23            I had another one for a program

24   where some in Marina Del Verde, an upscale

25   condo complex all the owners were going to
```

A-506

# EXHIBIT 2

Page 1

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4    E. Jean Carroll,                    )
                                         )
5               Plaintiff,               )
                                         ) Case No.
6        vs.                             )
                                         ) 1:22-CV-10016-LAK
7    Donald J. Trump,                    )
                                         )
8               Defendant.               )
     _____  )

9

10

11

12

13

14        VIDEO DEPOSITION OF ROBERT J. FISHER

15           Via Zoom Videoconference

16           Monday, February 6, 2023

17

18

19

20

21   Reported by:

22   LISA MOSKOWITZ, CA CSR 10816, RPR, CRR, CLR,

23   Washington CSR 21001437, Nevada CCR 991,

24   NCRA Realtime Systems Administrator

25   JOB NO. 222071

Page 191

1    your work as an expert or PR professional or

2    a citizen that's aware?

3        A.   A citizen.  I follow the news.

4    I've always been -- you know, I was a

5    journalist for eight or nine years.  But, I

6    mean, I've always had a curiosity of what's

7    going on in the world.  So I read news,

8    politics, sports, business.  I don't look at

9    the comics, but I look at about everything

10   else.

11       Q.   When you say you were a journalist

12   for eight or nine years, where was that?

13       A.   It started junior high.  I started

14   my junior high newspaper in my school.  I

15   was one of two people that formed the

16   newspaper in the school, and then I was a

17   journalist all through four years of

18   college, three years of high school, four

19   years of college, junior high.  Actually I

20   had two, three, five, nine years of being on

21   school newspapers.  It's journalism.

22            I mean, I was writing articles,

23   interviewing people.  It wasn't paid

24   professional journalism, but it was still

25   journalism.  And of course I had that period

A-509

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0883
DIRECT EMAIL    rkaplan@kaplanhecker.com

March 17, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

Re:    *Carroll v. Trump*, No. 20 Civ. 07311 (LAK)

Dear Judge Kaplan:

I write on behalf of all parties concerning the trial date in this case (*Carroll I*), as well as the trial date in *Carroll v. Trump*, No. 22 Civ. 10016 (*Carroll II*).

The trial date in *Carroll I* is currently set for April 10, 2023, ECF No. 100, and the trial date in *Carroll II* is currently set for April 25, 2023, *see Carroll II*, ECF No. 49. The Court has stated its intention to address at a later date whether to try these actions together. *See Carroll II*, ECF No. 49. As the parties have begun their pretrial preparations—and have submitted motions related to the trial proceedings—they have also met and conferred concerning the possibility of a single consolidated trial, which would advance important interests of efficiency and judicial economy. Following those discussions, and consistent with the attached stipulation, the parties jointly and respectfully request that the Court consolidate the trials in *Carroll I* and *Carroll II*, subject to the following proposed terms and conditions that are agreed to by both parties:

- The consolidated trial shall start on April 25, 2023.

- The consolidated trial shall cover liability and damages for both *Carroll I* and *Carroll II*.

- The jury shall use a special verdict form to separately identify the damages, if any, attributable to each claim in *Carroll I* and *Carroll II*.

- Under Federal Rules of Civil Procedure 54(b) and 58(b)(2), the Court shall enter judgment on *Carroll I* only after all interlocutory appeals are finally resolved.

KAPLAN HECKER & FINK LLP                                                    2

- The parties shall not seek any stay of the trial date in either *Carroll I* or *Carroll II*.

- The parties shall waive any objection to the trial judgment in *Carroll II* based on its consolidation with *Carroll I*.

- On April 17, 2023, the parties shall jointly notify the District of Columbia Court of Appeals of the upcoming jury trial schedule and respectfully request that the court defer issuing any decision until the conclusion of the trial.

This joint proposal is consistent with Federal Rule of Civil Procedure 42(a), which is "a valuable and important tool of judicial administration, invoked to expedite trial and eliminate unnecessary repetition and confusion." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (internal quotations omitted). Indeed, consolidation is favored where it would "reduce the costs for all parties, and avoid the possible risk of inconsistent rulings." *Darezzo v. 200 Ninth Rest. LLC*, No. 14 Civ. 5099, 2015 WL 195852, at *3 (S.D.N.Y. Jan. 14, 2015).

The parties believe that trying *Carroll I* and *Carroll II* together serves these interests. Your Honor has recognized that the same factual question is "central" to both actions. *Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at *7 (S.D.N.Y. Oct. 12, 2022). As such, evidence relating to this central factual question "is relevant to both cases," *id.*, and will be presented at both trials. Because of the overlapping nature of these proceedings, a single trial will reduce costs across the board, avoid the risk of inconsistent factual rulings or jury confusion, and economize matters for the Court (as well as for both parties' witnesses). Finally, the parties are confident that their joint proposal accounts for any issues that might arise relating to the D.C. Court of Appeals' ultimate answer to the certified question and any subsequent action that the Second Circuit might take.

A Stipulation and Proposed Order memorializing the parties' proposed plan for consolidation is attached. The parties are available to discuss this proposal if helpful to the Court.

Respectfully submitted,

Roberta A. Kaplan

cc: All Counsel of Record

(Attachment)

**A-511**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff,* | |
| v. | No. 20 Civ. 7311 (LAK) |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant.* | |

### STIPULATION AND [PROPOSED] ORDER

WHEREAS the Court entered a Scheduling Order setting a trial date of April 10, 2023 in this action (*Carroll I*), ECF No. 100;

WHEREAS the Court entered a Scheduling Order in the related action *Carroll v. Trump*, No. 22 Civ. 10016 (*Carroll II*) setting a trial date of April 25, 2023, *Carroll II*, ECF No. 49;

WHEREAS Federal Rule of Civil Procedure 42(a) provides that the Court may order that actions be joined or consolidated in whole or in part if they involve "common issues of law or fact," Fed. R. Civ. P. 42(a);

WHEREAS *Carroll I* and *Carroll II* involve a common question of law or fact, ECF No. 96;

WHEREAS the parties have met and conferred on this matter and jointly request that *Carroll I* and *Carroll II* be consolidated for trial on April 25, 2023;

IT IS ACCORDINGLY STIPULATED AND AGREED that:

- The consolidated trial shall start on April 25, 2023.

- The consolidated trial shall cover liability and damages for both *Carroll I* and *Carroll II*.

- The jury shall use a special verdict form to separately identify the damages, if any, attributable to each claim in *Carroll I* and *Carroll II*.

A-512

- Under Federal Rules of Civil Procedure 54(b) and 58(b)(2), the Court shall enter judgment on *Carroll I* only after all interlocutory appeals are finally resolved.

- The parties shall not seek any stay of the trial date in either *Carroll I* or *Carroll II*.

- The parties hereby waive any objection to the trial judgment in *Carroll II* based on its consolidation with *Carroll I*.

- On April 17, 2023, the parties shall jointly notify the District of Columbia Court of Appeals of the upcoming jury trial schedule and respectfully request that the court defer issuing any decision until the conclusion of the trial.

Dated: March 17, 2023

Roberta A. Kaplan
Shawn Crowley
Trevor Morrison (admitted *pro hac vice*) Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Phone: (212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Alina Habba
Michael Madaio
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, NJ 07921
Phone: (908) 869-1188
ahabba@habbalaw.com
mmadaio@habbalaw.com

*Counsel for Defendant Donald J. Trump*

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street, Suite 1040
Washington, D.C. 20001
Phone: (212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

IT IS SO ORDERED this _____ day of _____, 2023

_____
The Hon. Lewis A. Kaplan
United States District Judge

2

A-513

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, | |
| Plaintiff, | No. _____ |
| v. | |
| DONALD J. TRUMP, | **COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| Defendant. | |

Plaintiff E. Jean Carroll, by and through her attorneys at Kaplan Hecker & Fink LLP, alleges as follows:

### INTRODUCTION

1.     Roughly 27 years ago, playful banter at the luxury department store Bergdorf Goodman on Fifth Avenue in New York City took a dark turn when Defendant Donald J. Trump seized Plaintiff E. Jean Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her.

2.     In the aftermath, Carroll confided in two close friends. One urged her to report the crime to the police, but the other warned that Trump would ruin her life and livelihood if she reported it.

3.     Carroll chose silence—and remained silent for over two decades.

4.     Carroll knew then that sexual assault was pervasive. She also knew that men have been assaulting women and getting away with it since before she was born. And she knew that while a woman who accused *any* man of rape was rarely believed, a woman who accused a rich, famous, violent man of rape would probably lose everything. She therefore reasonably concluded that if she accused Donald Trump of rape he would bury her in threats and lawsuits, and she would probably lose her reputation, not to mention everything she had worked for and achieved.

-1-

5.     Near the end of the 2016 presidential election, Carroll watched in horror as numerous women offered highly credible (and painfully familiar) accounts of Trump assaulting them; Trump responded with insults and denials; the public fractured; and Trump not only won the election, but grew *more* popular with some supporters as a result of the controversy.

6.     Carroll's mother, a respected Republican official in Indiana, was dying during the last six weeks of the presidential election. Carroll, wanting to make her mother's last days as pleasant as possible and avoid causing her any pain, decided to remain silent about what Trump had done to her.

7.     But that all changed in late 2017, when the Harvey Weinstein scandal and its aftermath signaled a profound shift in how American society responds to accusations of sexual misconduct by powerful men. It suddenly seemed possible that even Trump could be held to account.

8.     For Carroll, that project grew more urgent—and more personal—as the #MeToo era prompted a flood of new letters to her advice column seeking her counsel about how to respond to sexual assault and abuse. In her column, Carroll encourages her readers to be brave, to think clearly, and to seek justice. When readers overcome with doubt and anxiety have turned to her seeking advice, Carroll has always advised taking action. But she never confessed her own experiences. She never revealed that she, too, had been a victim of sexual assault. Over time, as described below, the contradiction between Carroll's words and her actions became increasingly untenable.

9.     Carroll is a journalist. She watched as a throng of women came forward and accused Trump of sexual assault, only to be denigrated and then brushed aside. When she felt she should finally come forward herself, Carroll wanted to do it differently. She decided to describe Trump's

rape in a book she had already begun to write about her experiences with various men. She did not want to tell her story to the police, a newspaper, an elected official, or a fellow journalist, and be treated as a "victim." In other words, she wanted to tell her own story on her own terms.

10.     When Carroll's account was published, Trump lashed out with a series of false statements. He denied the rape. Trump made additional false claims about Carroll in 2022, more than three years after she first went public, damaging her reputation even further.

11.     Trump's underlying sexual assault severely injured Carroll, causing significant pain and suffering, lasting psychological harms, loss of dignity, and invasion of her privacy. His recent defamatory statement has only added to the harm that Carroll had already suffered.

12.     Carroll filed this lawsuit to obtain redress for her injuries and to demonstrate that even a man as powerful as Trump can be held accountable under the law.

## THE PARTIES

13.     Plaintiff E. Jean Carroll is a journalist, author, former writer for Saturday Night Live, and former advice columnist for *Elle* magazine. She is a resident and domiciliary of the State of New York.

14.     Defendant Donald J. Trump is the former President of the United States. Trump is currently a resident and domiciliary of the State of Florida.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

17.     This Court has personal jurisdiction over Trump pursuant to New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1) and (2). The Court may also exercise pendent personal jurisdiction over Trump for claims that share a common nucleus of operative facts. Jurisdiction over Trump is all the more appropriate because, in September 2020, Trump voluntarily removed a related action against him, captioned *Carroll v. Trump*, 20 Civ. 07311, to this Court pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2).

## FACTUAL ALLEGATIONS

### I.     TRUMP RAPES CARROLL AT BERGDORF GOODMAN

18.     One evening between the fall of 1995 and the spring of 1996, Carroll left work and went to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. She was and remains a regular shopper at Bergdorf's.

19.     That evening, Carroll did not find whatever she was looking for and prepared to leave Bergdorf's empty-handed. As she exited through Bergdorf's revolving side door on 58th Street, Trump arrived and entered through that very same door, which was cater-cornered across from the Plaza Hotel.

20.     Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily *Ask E. Jean* TV show, a small hit on the "America's Talking" network started by Roger Ailes. She was also on a frequent guest and commentator on the widely watched *Today* show and *Good Morning America*.

21.     Trump and Carroll had previously been photographed at a party together:



22.     At the 58th Street revolving glass doorway of Bergdorf's, Trump put up his hand to stop her from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!"

23.     Trump said that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to come advise him. Carroll was surprised but thrilled that Trump would want her advice. She stuck around, imagining the funny stories that she might later recount.

24.     Trump and Carroll began searching for a gift that Trump could give to the unnamed girl. As they stood just inside the door, Carroll pointed to the handbags. Trump made a face; he did not like that idea. Carroll instead suggested a hat. Trump walked over, going straight for a fur hat, prompting Carroll to object that no woman would wear a dead animal on her head.

25.     As Trump cuddled the fur hat, Carroll asked how old "the girl" was. Trump did not answer, instead asking Carroll how old she was. When Carroll replied that she was fifty-two years old, he taunted her, "You're so *old*!"

26.     Trump then had an idea: He would buy lingerie instead.

27.     Trump and Carroll rode up the escalator to the lingerie department. When they arrived, it was uncharacteristically empty, with no sales attendant in sight. Sitting on the counter near them were two or three boxes and a see-through bodysuit in lilac gray.

28.    Snatching the bodysuit, Trump insisted that Carroll try it on. Bemused, Carroll responded that *he* should try it on himself, adding that it was his color. Trump and Carroll went back and forth, teasing each other about who should try on the bodysuit.

29.    Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on."

30.    Trump maneuvered Carroll to the dressing room. As they moved, Carroll laughed, thinking to herself that she would make him put the bodysuit on over his pants.

31.    Strangely for Bergdorf's, the dressing room door was open and unlocked.

32.    Trump closed the door of the dressing room.

33.    Immediately, Trump lunged at Carroll, pushing her against the wall, bumping her head quite badly, and putting his mouth on her lips.

34.    Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll burst out in awkward laughter. She could hardly process the insanity of the situation. She also hoped, at least at first, that laughter would bruise his ego and cause him to retreat.

35.    But Trump did not stop. He seized both of her arms and pushed her up against the wall again, bumping her head a second time. While pinning Carroll against the wall with his shoulder, Trump jammed his hand under her coatdress and pulled down her tights.

36.    Trump opened his overcoat and unzipped his pants. Trump then pushed his fingers around Carroll's genitals and forced his penis inside of her.

37.    Carroll resisted, struggling to break free. She tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other). Finally, she raised a knee up high enough to push him out and off her.

38.    Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.

39.    The whole attack lasted two to three minutes.

40.     Trump attacked Carroll without her consent in order to satisfy his own sexual desires.

41.     Trump's physical contact with Carroll was offensive and wrongful.

## II.     CARROLL CONFIDES IN TWO FRIENDS ABOUT THE RAPE

42.     As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, the author, journalist, and correspondent on TV morning shows.[1] Carroll was breathless and still reeling from the assault. She kept laughing, manically—her way of coping with the stress and trauma that she had just experienced.

43.     Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room. She told Birnbach how Trump had pulled down her tights and put his penis inside of her.

44.     "He raped you," Birnbach kept repeating. She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a rape victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.

45.     Carroll drove home and crawled straight into bed.

46.     Over the next few days, Carroll confided in a second friend, the New York City journalist and news anchor Carol Martin. They sat together in the kitchen as Carroll described the rape. This time, Carroll did not laugh. Nobody laughed. The gravity of the assault had finally started to sink in.

47.     Martin solemnly advised Carroll to tell no one. Recognizing that Trump was a powerful man, Martin feared that if her friend came forward, disaster would ensue. Martin warned

---

[1] Birnbach wrote a story about Trump's Mar-a-Lago that was published in February 1996. *See* Lisa Birnbach, *Mi Casa Es Su Casa*, NEW YORK (Feb. 12, 1996). Birnbach has suggested that it was because of her work on that article that Carroll called her immediately after the assault.

Carroll, in sum and substance: "Tell no one. Forget it! He has two hundred lawyers. He'll bury you."

48.    Carroll took Martin's advice. She knew how brutal and dangerous Trump could be.

49.    Carroll was also afraid of being dragged through the mud if she reported the rape. She was convinced that nobody would believe her if she came forward. And like so many other survivors of sexual assault, Carroll also blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had raped her because she had entered that Bergdorf dressing room.

50.    Fundamentally, Carroll was raised to believe that strong women get by in the world with a stiff upper lip—*i.e.*, by putting hardship and suffering behind them. She believed that strong women laugh at disasters because feeling sad only doubles the burden. To Carroll, laughter is how women have dealt with calamity for thousands of years. So Carroll put her chin up and tried to move on.

51.    Carroll also considered that, in our society, women who have been raped are looked at as "spoiled goods," and she resented the fact that practically every woman who courageously came forward with their stories of abuse was subjected to questions like "why didn't you scream" and "why didn't you come forward immediately."

52.    Carroll thus chose silence.

53.    Carroll did not mention the rape again for over twenty years. She did not want to be seen—or to see herself—as a victim of sexual assault. And although Carroll was reluctant to use the word "rape" because she did not want to be perceived by others as a rape victim for the reasons discussed above, she never had any doubt that Trump had sexually assaulted her.

54.     Trump's sexual assault of Carroll has caused her, and continues to cause her, significant pain and suffering, lasting psychological and pecuniary harms, loss of dignity and self-esteem, and invasion of her privacy.

55.     As a result of the pain and suffering caused by Trump's sexual assault, Carroll has not been able to sustain a romantic relationship since the day Trump raped her. Nor has she engaged in sex with anyone since that time. Carroll has had difficulty trusting men and cannot maintain an intimate relationship. In Carroll's own words the "music had stopped" and the "light had gone out" after Trump attacked her at Bergdorf's.

### III.   CARROLL REMAINS SILENT FOR TWENTY YEARS

56.     For the next twenty years, Carroll pursued her career as a writer and advice columnist. Over time, she built a loyal audience and enjoyed the support of her publisher. Her *Ask E. Jean* advice column in *Elle* magazine became the longest, still-active advice column in American publishing. Its success resulted in large part from the many letters sent to her by readers.

57.     Carroll's column in *Elle* was about life and love. Readers' questions ranged from the lighthearted to the deeply personal. From time to time, readers would ask questions about whether behavior that they experienced at work, at church, and in their relationships was appropriate. When Carroll detected sexism or abuse, she did her level best to call it out and to help women protect themselves.

58.     One reader, for example, despaired in 1994, "my boss is always rubbing up against me . . . . He scares me because he's very powerful and could ruin me." Carroll responded: "Darling, if the old snake has done so much to help your career, why are you still an assistant? Sex harassers are filthy yellow sneaking cowards and must be won over, or crushed . . . . If all else fails, next

time the old waterhead touches you, give him a knee in the groin. You've got nowhere to go but up."[2]

59.    Another reader had been raped when thirteen years old and sought advice from Carroll because her rapist had just become her co-worker. Carroll responded: "[T]he gentleness of your [letter] speaks strongly for your forgiving nature; however, it makes my duty *very* difficult. Because now I must harden your soul. I must twist a little bit of steel—I'd try a big block of metal if I could—around your backbone, and persuade you to report your rapist to the police."[3] Carroll added:

> "First, call your rape crisis center and speak with a counselor. Second, join a group of rape survivors—with their hardy support, you'll start constructing a world for *yourse,f* and leave the world the rapist built for you. And, third, find another job at once. (Do *not* tell your employer about the rape. Do *not* inform the rapist of these steps. Stay cool. He's dangerous.)"[4]

60.    In her advice columns, Carroll sought to offer witty, wise, and worldly guidance, and to address her readers in a clear, straightforward manner. She often urged readers to speak the truth and to recognize patterns of rationalization and abuse. Readers' perception of Carroll as honest, thoughtful, frank, and well-meaning were essential to Carroll's professional success.

61.    But in responding to her readers, Carroll did not confess her own life experiences, including the sexual assault by Trump described above.

62.    During the last month of the election of 2016, Carroll watched a multitude of women reveal that Trump had engaged in sexual misconduct. She saw Trump brutally attacking

---

[2] *Reprinted in* E. JEAN CARROLL, A DOG IN HEAT IS A HOT DOG AND OTHER RULES TO LIVE BY 28-29 (1996).

[3] *Id.* at 141-42.

[4] *Id.* at 142.

his accusers on a national stage—denying their accusations, while also savaging their reputations and insulting their appearance.

63.     And as Carroll sat at the bedside of her dying mother in a Bloomington, Indiana hospital, watching numerous, credible women stun the nation with their stories of Trump's sexual brutality, Carroll briefly considered whether she, too, should reveal that Trump had raped her. But she feared—just as she had for decades—that Trump would lie his way out of it, while destroying her life and reputation. He had done it before to plenty of women and, it seemed to Carroll, he would readily do it again. And, worst of all, coming forward with her story would also cause a media storm in Indiana and destroy her mother's last happy days on the planet. Carroll feared that it would cost her and her family dearly without actually changing anything, especially since any accusation made during the presidential campaign would be characterized by Trump and his allies as a stunt to thwart his election.

64.     Indeed, Carroll worried that she might make Trump more popular in states like Indiana by revealing the rape, since his electoral fortunes had steadily improved despite credible allegations of sexual abuse. To Carroll, it appeared that some of Trump's political supporters actually admired the fact that Trump was rich enough, macho enough, and powerful enough to be sued by—and to pay off—all these women he had groped and penetrated (especially porn stars and *Playboy* models).

65.     Carroll, in honor of her mother's remarkable life, many years of which were spent as a local and loyal Republican elected official, and because she thought the publicity would help Trump win the election, warily persisted in her decades-old silence.

66.     Carroll's mother died on October 11, 2016. In 2017, Carroll decided to write a book drawing on her observations as an advice columnist, but focusing specifically on her own life and

trying to understand why so many *Ask E. Jean* letter-writers complained about men. On the morning of October 5, 2017, Carroll set out on a road trip, traveling to towns named after women. When she arrived in each town named after a woman (Angelica, New York, Tallulah, Louisiana, Marianna, Arkansas, and so forth), she spoke to women from all walks of life about their relationships with men. She asked many of her subjects about the roles that men play in their lives.

## IV.   CARROLL DECIDES TO SPEAK OUT

67.     On the very day Carroll began her road trip for her book, October 5, 2017, the *New York Times* revealed that Harvey Weinstein had sexually assaulted and harassed dozens of women in the film industry.[5] The news went off in Carroll's mind like a bomb. She could not stop reading. Painful memories of abuse at the hands of men, including Trump, swept over her.

68.     Days later, several women accused Weinstein of rape.[6] It soon became clear to Carroll, and to the American people, that Weinstein's abuses had been enabled for decades by a loose network of loyalists and lawyers, who had ensured that Weinstein evaded accountability for his exploitation of women—even though it was an open secret in Hollywood.

69.     As the Weinstein scandal persisted, Carroll saw society respond to the accusations with a seriousness and depth of self-reflection that she had never seen before; all too often, and as recently as the 2016 election, many Americans had brushed aside or marginalized accusations of sexual misconduct by powerful men. Carroll also saw other women suddenly feel emboldened to come forward with their own reports of harassment, exploitation, abuse, violence, and rape.

---

[5] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Cᵢf Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017).

[6] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017).

70.    Carroll was moved by this experience. The walls that she had erected in her mind—the fear that Trump would emerge unscathed, the wariness of allowing him and his allies to come after her, the doubt that speaking up would actually matter, and the nagging anxiety that she was somehow to blame for being raped—began to crumble. Decades of deflection, diversion, and denial dissolved, resurfacing memories and feelings that she had hidden away.

71.    Carroll was struck by the fact that Weinstein, for all his wealth and power, could still be held accountable for his sexual misconduct. She saw how women had at last changed the public conversation by saying "Me Too" and by demanding accountability.

72.    These observations lead Carroll to reflect again on her column in *Elle* magazine, and to ask whether she was a hypocrite. For decades, she had paired her trademarked wit with steely resolve in confronting the everyday unfairness—and, all too often, the abuse—that her (largely female) readers confessed. Carroll's written persona was brave. But she *still* had not confessed her own experiences of abuse, her fear of coming forward, or her creeping self-doubt.

73.    These internal reflections loomed larger in her mind—and became inescapable—as more readers of Carroll's advice column began asking, "Should I come forward with my account of surviving sexual abuse or harassment?"

74.    Carroll finally decided that she owed her readers the truth. She also owed them (and many other women) solidarity in their efforts to bring justice and accountability to powerful men who had engaged in sexual assault and gotten away with it. She knew that it would be painful to speak up. But she also knew that it was the right thing to do so.

75.    While Carroll was on the road trip across the country talking to women as research for her book, she started a list of the 21 most hideous men she had ever encountered—men who had, each in his own way, left indelible and ugly marks on her story. This list grew into a book,

*What Do We Need Men For?: A Modest Proposal*. In that book, Carroll interspersed the stories of women she had met while traveling the country with the men on her "Most Hideous List."

76.     Two men on the Most Hideous List haunted Carroll the most. The first was Cam Parks, the Waterfront Director at her Girl Scout camp, a man who sexually abused her every day during a two-week period when she was twelve. The second was Donald Trump, the man who raped her when she was 52. Carroll described that attack in detail.

77.     Carroll knew a book was the right place for her to come forward about Trump's assault. Writing is Carroll's lifeblood; she writes to process the world around her and to reveal her inner self. It's her normal way of living: she writes about what happens to her, often in a confessional, idiosyncratic manner. She also believed that a book would allow her to control her narrative and speak directly to her readers. This was important. Carroll did not want to be, or to act like, a victim. She wanted to tell her story on her terms, rather than as filtered through journalists or social media. Her language was specific.

78.     In her book, Carroll truthfully described, in meticulous detail, the rape in Bergdorf Goodman:

> "The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, then thrusts his penis halfway—or completely, I'm not certain—inside me."[7]

79.     She also explained why she had not come forward earlier:

> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them only to see the man turn it around, deny, threaten, and attack them doesn't sound like much fun. Also, I'm a coward."[8]

---

[7] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL 248 (2019).

[8] *Id.* at 244.

80.     At noon on June 21, 2019, *New York* magazine published Carroll's account of the rape on NYMag.com as an excerpt of her forthcoming book. The excerpt first appeared on *The Cut*, a vertical on NYMag.com. The excerpt appeared on newsstands three days later in the June 24-July 7 print edition.

81.     Carroll's book was released by St. Martin's Press on July 2, 2019.

82.     After Carroll came forward, Trump publicly denied the attack in three separate statements, published on June 21, 22, and 24, respectively.

83.     On June 21, 2019, Trump issued the following public statement:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."[9]

84.     On June 22, 2019, Trump made the following statement to reporters:

---

[9]     *See* Laura Litvan (@LauraLitvan), Twitter (June 21, 2019, 2:17 PM), https://twitter.com/LauraLitvan/status/1142179819075121154.

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[10]

---

[10] *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019).

85.    Two days later, on June 24, 2019, The Hill released an interview in which Trump made the following statement in response to Carroll: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[11]

86.    On June 27, Birnbach and Martin went on the record to corroborate Carroll.[12]

87.    Speaking to Carroll, Martin, and a reporter, Birnbach said:

"I remember [Carroll] saying repeatedly, he pulled down my tights . . . . [Carroll] did say, he put his penis in me. And I said—my face just did it. What? He raped you? And [Carroll] said, eh. He kept pulling down—he pulled down my tights. He pulled down my tights . . . . It just—it was horrible. We fought. And I [Birnbach] said, let's go to the police. [Carroll said,] No. [Birnbach said,] Come to my house. [Carroll said,] No. I want to go home. [Birnbach said,] I'll take you to the police. [Carroll said,] No. It was 15 minutes of my life, it's over. Don't ever tell anybody. I just had to tell you."[13]

88.    Responding to Carroll, Birnbach, and a reporter, Martin said:

"From what I could sense of you [Carroll], you were, A, you were handling it, as you handle things. She doesn't break down easily on anything. And there was none of that, as you told me. It wasn't like she started crying, or nothing that was a frantic kind of response to it. It was like, I can't believe this happened."[14]

89.    Martin added: "I said, don't tell anybody. I wouldn't tell anybody this."[15]

90.    Separately, Birnbach observed, "I believe E. Jean in this episode that she recounted to me in 1996. Yes. Without hesitation. She's not a fabulist. She doesn't make things up."[16]

---

[11] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, Hill (June 24, 2019).

[12] Michael Barbaro et al., *Corroborating E. Jean Carroll*, N.Y. Times (June 27, 2019).

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] Jessica Bennett et al., *Why E. Jean Carroll, "the Anti-Victim," Spoke Up About Trump*, N.Y. Times (June 27, 2019).

## V.    TRUMP AGAIN DENIES RAPING CARROLL AND MAKES A SLEW OF FALSE, INSULTING CLAIMS ABOUT HER

91.    Three years after the June 2019 defamatory statements, Trump—at this point, no longer President—once again made false and insulting claims about Carroll.

92.    More specifically, on October 12, 2022, Trump posted the following:

"This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. This decision is from the Judge who was just overturned on my same case. I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country."

He then continued:

"In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to 'Trump'!"[17]

93.    This statement appeared on Trump's personal account on Truth Social, a social media platform created by Trump and operated by Trump Media & Technology Group, one of Trump's many businesses. As Trump has explained, he created Truth Social after he was banned

---

[17] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 12, 2022, 10:38 PM), https://truthsocial.com/@realDonaldTrump/posts/109158644496040450.

from Twitter to build a platform through which he could disseminate his message broadly, including into New York, and to profit from such dissemination: "[Y]our favorite American President has been silenced. This is unacceptable."[18]

94.     Trump published the October 12 statement to his more than four million followers on Truth Social. Around the same time, Trump had his statement distributed to reporters, including reporters at publications headquartered in New York such as *Fox News* and the *New York Times*, and emailed to a listserv of supporters.[19]

95.     Not surprisingly, Trump's October 12 statement was widely reported in the press,[20]

---

[18] SEC Form 8-K, filed by Digital World Acquisition Corp. (Oct. 20, 2021), at Ex. 99.1.

[19] Lawrence Richard, *Trump Responds to E. Jean Carroll Defamation Lawsuit After Judge Denies Delay: "A Hoax and a Lie"*, Fox News (Oct. 12, 2022).

[20] *See, e.g.*, Kaitlin Lewis, *Trump Blasts E. Jean Carroll's 'Complete Con Job' Case, Ordered to Testify*, Newsweek (Oct. 12, 2022); Larry Neumeister & Jill Colvin (The Associated Press), *Trump Angrily Lashes Out After His Deposition Is Ordered*, Seattle Times (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, AP News (Oct. 12, 2022); Lawrence Richard, *Trump Responds to E. Jean Carroll Defamation Lawsuit After Judge Denies Delay: 'a Hoax and a Lie'*, Fox News (Oct. 12, 2022); The Associated Press, *Trump Angrily Lashes Out After His Deposition Is Ordered*, The Denver Post (Oct. 12, 2022); The Associated Press, *Trump Calls Legal System a 'Broken Disgrace' After Judge Orders Deposition in E. Jean Carroll Defamation Suit*, MarketWatch (Oct. 12, 2022); Steve Benen, *The Case that Will Force Trump into a New, Risky Deposition*, MSNBC (Oct. 13, 2022); Virginia Chamlee, *Donald Trump Slams Rape Accuser After Being Ordered to Testify in Defamation Suit*, People (Oct. 13, 2022); Ewan Palmer, *Donald Trump's Deposition Is the October Surprise No One Was Expecting*, Newsweek (Oct. 13, 2022); Areeba Shah, *Trump Melts Down on Truth Social After Judge Blasts His Attempt to "Run Out The Clock"*, Salon (Oct. 13, 2022); Mary Papenfuss, *Trump Stumped over Why Jan. 6 Panel Didn't Just Ask Him to Testify Earlier. Nobody Else Is.* Huffington Post (Oct. 13, 2022); Connor Surmonte, *'This Woman Is Not My Type!' Donald Trump Claims He Didn't Assault Accuser E. Jean Carroll After Judge Orders Ex-Prez to Sit for Deposition*, Radaronline.com (Oct. 13, 2022); The Associated Press, *Judge Says Trump Must Give Deposition in Defamation Lawsuit, Setting Off Tirade by Former President*, Cleveland.com (Oct. 13, 2022); The Associated Press, *Trump Criticizes Legal System After His Deposition in Defamation Lawsuit Ordered*, PBS (Oct. 13, 2022); Jennifer Wood, *Trump Is Reportedly 'Raging' like a Madman as He Deals with the Legal Ramifications of the DOJ Documents Case, Rape Accuser E. Jean Carroll, and More*, UPROXX.COM (Oct. 13, 2022); Ewan Palmer, *Has Trump Just Had the Worst Week of His Political Life?* Newsweek (Oct. 14, 2022); Tom Boggioni, *Trump Has Limited Options as His Rape Defamation Deposition Looms—*

*None of Them Good: Legal Expert*, RAW STORY (Oct. 16, 2022); Jennifer Wood, *Trump Is Scheduled To Be Deposed this Week for a Defamation Suit and a Former U.S. Attorney Thinks He Might Be Screwed*, UPROXX.COM (Oct. 16, 2022); Dylan Stableford, *Trump Has a Deposition in E. Jean Carroll's Defamation Lawsuit. Here's What To Know About the Case.* YAHOO! NEWS (Oct. 17, 2022); Tom Boggioni, *Trump's Latest Rant About His Rape Defamation Case Could 'Blow a Hole' in His Defense: Report*, RAW STORY (Oct. 18, 2022); Aldous J. Pennyfarthing, *Trump May Have Destroyed His Best Defense in the E. Jean Carroll Rape Defamation Case*, DAILYKOS.COM (Oct. 18, 2022); Matt Prigge, *Trump May Have Ruined His E. Jean Carroll Defamation Case by Being an Oversharing Idiot on Truth Social*, UPROXX.COM (Oct. 18, 2022); Greg Walters, *Trump Just Blew Up His Rape Lawsuit Defense*, VICE NEWS (Oct. 18, 2022); David B. Caruso & Jennifer Peltz, *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, AP NEWS (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, ATLANTA JOURNAL–CONSTITUTION (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, BREITBART (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, BUFFALO NEWS (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, CHI. TRIB. (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump To Be Deposed in Defamation Suit Filed by Rape Accuser*, CHRON.COM (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Lawsuit Filed by Writer E. Jean Carroll*, THE MERCURY NEWS (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, NEWSDAY (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Answers Questions in Defamation Suit Filed by E. Jean Carroll*, PBS (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, PHI. INQUIRER (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, SAN ANTONIO EXPRESS NEWS (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Deposed in Defamation Suit Filed by E. Jean Carroll*, SAN DIEGO UNION TRIB. (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump To Be Deposed in Defamation Suit Filed by Rape Accuser*, S.F. CHRONICLE (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, SEATTLE TIMES (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, SFGATE (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump To Be Deposed in Defamation Suit Filed by E. Jean Carroll*, ST. LOUIS POST-DISPATCH (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, STAR ADVERTISER (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Donald Trump Deposed in Defamation Suit Filed by E. Jean Carroll*, SYRACUSE.com (Oct. 19, 2022); David B. Caruso & Jennifer Peltz (The Associated Press), *Trump To Be Deposed in Defamation Suit Filed by Rape Accuser*, TIMES UNION (Oct. 19, 2022); Summer Concepcion, *Trump Scheduled To Be Deposed Wednesday in Writer's Defamation Lawsuit*, NBC NEWS (Oct. 19, 2022); Shayna Jacobs, *Trump Deposed at Mar-a-Lago in Case Brought by Sexual Assault Accuser*, WASH. POST (Oct. 19, 2022); Samaa Khullar, *Legal Experts: Trump 'Just Blasted His Own Defense Apart' in Truth Social Rant*, RAW STORY (Oct. 19, 2022); Brady Knox, *Trump Appears for Deposition in E.*

and the Associated Press's coverage of the statement was syndicated across a significant number

of additional publications.[21]

_Jean Carroll Defamation Lawsuit_, WASH. EXAMINER (Oct. 19, 2022); Jessica Levinson, _Invoking the Fifth Won't Help Trump this Time_, MSNBC (Oct. 19, 2022); Ewan Palmer, _Donald Trump Deposition at Mar-a-Lago as He's Asked Questions Under Oath_, NEWSWEEK (Oct. 19, 2022); Nicole Silverio, _Trump Sits for Deposition in Defamation Suit Brought by Rape Accuser_, DAILY CALLER (Oct. 19, 2022); Zoe Strozewski, _Will E. Jean Carroll's Dress Be Revealed at Trump's Deposition?_, NEWSWEEK (Oct. 19, 2022); The Associated Press, _Trump To Be Deposed in Defamation Suit Filed by Rape Accuser_, ABC NEWS (Oct. 19, 2022); The Associated Press, _Trump Deposed in Defamation Suit Filed by E. Jean Carroll_, HILL (Oct. 19, 2022); The Associated Press, _Donald Trump Deposed in Defamation Suit_, HUFFINGTON POST (Oct. 19, 2022); The Associated Press, _Trump Deposed in Defamation Suit Filed by E. Jean Carroll_, MARKETWATCH (Oct. 19, 2022); The Associated Press, _Trump Deposed in Lawsuit Filed by Writer E. Jean Carroll_, ORANGE CNTY. REGISTER (Oct. 19, 2022); The Associated Press, _Trump Deposed in Defamation Suit Filed by E. Jean Carroll_, POLITICO (Oct. 19, 2022); The Associated Press, _Trump Deposed in Defamation Suit Filed by Rape Accuser E. Jean Carroll_, ST. LOUIS POST-DISPATCH (Oct. 19, 2022); The Associated Press, _Trump Deposed in Defamation Suit Filed by E. Jean Carroll_, TAMPA BAY TIMES (Oct. 19, 2022); The Associated Press, _Trump To Be Deposed in Defamation Suit Filed by Rape Accuser_, U.S. NEWS (Oct. 19, 2022); Benjamin Weiser (New York Times), _What To Know as Trump Is Deposed in E. Jean Carroll Defamation Suit_, SEATTLE TIMES (Oct. 19, 2022); Benjamin Weiser, _What To Know as Trump Is Deposed in E. Jean Carroll Defamation Suit_, N.Y. TIMES (Oct. 19, 2022); Molly Crane-Newman & Dave Goldiner, _Former President Donald Trump Deposed in E. Jean Carroll Rape Defamation Suit_, N.Y. DAILY NEWS (Oct. 20, 2022); Shayna Jacobs (The Washington Post), _Trump Deposed at Mar-a-Lago in Case Brought by Sexual Assault Accuser_, SFGATE.COM (Oct. 20, 2022); The Associated Press, _Donald Trump Deposed in Defamation Suit Filed by E. Jean Carroll_, NPR (Oct. 20, 2022); Mary Papenfuss, _Trump Doubles Down on Undermining Defense Against E. Jean Carroll's Defamation Case_, HUFFINGTON POST (Oct. 21, 2022).

[21] _See, e.g._, Associated Press, _Trump Calls Legal System a 'Broken Disgrace' After Judge Orders Deposition in E. Jean Carroll Defamation Suit_, MARKETWATCH (Oct. 12, 2022); Associated Press, _Judge: Trump Must Sit for Deposition in Defamation Lawsuit_, SPECTRUM NEWS 1 (AUSTIN) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is Ordered_, AP NEWS (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is Ordered_, AP NEWS (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is Ordered_, DAILY HERALD (SUBURBAN CHICAGO) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is Ordered_, THE DENVER POST (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is Ordered_, KING 5 (SEATTLE) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is Ordered_, KGW811 (PORTLAND, OR) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is Ordered_, KHOU 11 (HOUSTON) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is Ordered_, KVUE ABC (AUSTIN) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, _Trump Angrily Lashes Out After His Deposition Is_

96.    In the October 12 statement, Trump falsely stated that he did not rape Carroll.

97.    In the October 12 statement, Trump falsely stated that he had no idea who Carroll was.

98.    In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales.

---

*Ordered*, THE SEATTLE TIMES (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, TRIB LIVE (PENNSYLVANIA) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WFAA (DALLAS) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WISHTV.COM 8 (INDIANAPOLIS) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WNEP (SCRANTON) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WOOD TV (GRAND RAPIDS) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WTSP 10 (TAMPA BAY) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WUSA 9 (WASHINGTON DC) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, YAHOO! (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, YAHOO! NEWS (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, YAHOO! NEWS (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, 11 ALIVE (ATLANTA) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, 69 NEWS (ALLENTOWN) (Oct. 12, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, 9NEWS (DENVER) (Oct. 12, 2022); Associated Press, *Trump Criticizes Legal System After His Deposition in Defamation Lawsuit Ordered*, PBS (Oct. 13, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, ABC 15 (ARIZONA) (Oct. 13, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, FOX 13 (SALT LAKE CITY) (Oct. 13, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, PRESS DEMOCRAT (Oct. 13, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WCPO (CINCINNATI) (Oct. 13, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WFTS (TAMPA BAY) (Oct. 13, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WHDH TV 7NEWS (BOSTON) (Oct. 13, 2022); Larry Neumeister & Jill Colvin, *Trump Angrily Lashes Out After His Deposition Is Ordered*, WTVR 6 NEWS (RICHMOND) (Oct. 13, 2022).

99.     In the October 12 statement, Trump also insulted Carroll's physical appearance, implying that she was too ugly for him to have sexually assaulted.

100.    This insulting statement was consistent with other statements that Trump had made in response to other accusations of sexual assault by other women. About one woman who claimed he groped her and tried to put his hand up her skirt while they were seated next to each other on an airplane, Trump told crowds at a rally, "Believe me, she would not be my first choice, that I can tell you."[22] He reportedly called that same woman "the cunt on the airplane" when he ran into her at a charity gala years after the assault.[23] About a second woman, who claimed he forcibly pinned her to a wall and kissed her without consent while she was interviewing him for a magazine, Trump said to crowds at another rally, "Take a look, you take a look. Look at her, [then] look at her words, you tell me what you think. I don't think so."[24] Indeed, Trump often responds to claims that he has behaved inappropriately by simultaneously attacking the individual's credibility and attractiveness. When a female journalist quoted him as saying in a 1992 interview that "you have to treat women like shit," Trump insisted later, "The woman's a liar, extremely unattractive, lots of problems because of her looks."[25]

---

[22] Jose A. DelReal, *Trump Mocks Sexual Assault Accusers: "She Would Not Be My First Choice"*, WASH. POST (Oct. 14, 2016).

[23] BARRY LEVINE & MONIQUE EL-FAIZY, ALL THE PRESIDENT'S WOMEN: DONALD TRUMP AND THE MAKING OF A PREDATOR 72 (2019).

[24] Naomi Lim, *Donald Trump on Accuser: "Take a Look at Her . . . I Don't Think So"*, CNN (Oct. 13, 2016).

[25] Nancy Collins, *Donald Trump Talks Family, Women in Unearthed Transcripts: "When I Come Home and Dinner's Not Ready, I Go Through the Roof"*, HOLLYWOOD REP. (Oct. 13, 2016).

-23-

## VI.    TRUMP'S FALSE STATEMENT WAS MADE WITH KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

101.    The false statement that Trump made about Carroll on October 12, 2022, was published with knowledge of its falsity and/or with reckless disregard for the truth.

102.    Trump knew who Carroll was at the time he raped her. And Trump also knew who Carroll was when he made his October 12 statement.

103.    Trump identified Carroll on sight when they met at Bergdorf Goodman.

104.    In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.

105.    In October 2022, Trump knew it was false to state that he had no idea who Carroll was.

106.    In October 2022, Trump knew it was false to state that he had never raped Carroll.

107.    In October 2022, Trump's defamatory claim that Carroll had "completely made up a story" and thus fabricated the rape accusation to promote her book rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his claim about Carroll's motive was false.

108.    Moreover, Trump lacked any factual basis for his statement implying that Carroll had revealed to the public that he raped her at Bergdorf Goodman to promote "a really crummy book." And since his statement about Carroll was made to impute motives for lying, when in fact he knew that Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published his statement with reckless disregard for the truth.

109.    Trump's false, insulting, and defamatory October 12 statement about Carroll—and his actual malice in making that statement—is fully consistent with his tried-and-true playbook for responding to credible public reports that he sexually assaulted women.

-24-

110.    In 2005, Trump admitted—on a hot mic—to repeatedly sexually assaulting women

in almost exactly the same manner that he had raped Carroll:

> "I better use some Tic Tacs just in case I start kissing her [the woman Trump was
> looking at, whom he had never met before]. You know, I'm automatically attracted
> to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even
> wait. And when you're a star, they let you do it. You can do anything . . . . Grab
> 'em by the pussy. You can do anything. . . . Ooh, [she has] nice legs, huh?"[26]

111.    Based on Carroll's own experiences, Trump's 2005 statement was not "locker room

talk" or mere braggadocio. It was a true description of how Trump believes he can treat women—

and of how he *has* treated them on many occasions, including at Bergdorf Goodman.

112.    Indeed, Trump has openly suggested that sexual assault is inevitable when men and

women interact. In 2013, for instance, he tweeted: "26,000 unreported sexual assults [sic] in the

military . . . . What did these geniuses expect when they put men & women together?"[27]

113.    In addition to Carroll, Trump has been accused publicly by over a dozen women of

forcibly kissing them, groping them above or below the waist, or attempting to rape them—often

upon meeting him for the very first time. Those women include Jill Harth, Jessica Leeds, Cathy

Heller, Temple Taggart McDowell, Karena Virginia, Bridget Sullivan, Tasha Dixon, Mindy

McGillivray, Rachel Crooks, Natasha Stoynoff, Summer Zervos, and Cassandra Searles. Trump

has responded to their accusations in a manner eerily similar to the statements he made about

Carroll in June 2019.

114.    A book by Barry Levine and Monique El-Faizy documents 67 incidents of alleged

inappropriate behavior by Trump toward women, including 26 allegations of unwanted sexual

contact. Forty-three of the allegations of inappropriate behavior in the book had not been

---

[26] *Transcript: Donald Trump's Taped Comments About Women*, N.Y. TIMES (Oct. 8, 2016).

[27] Daniella Diaz, *Trump Defends Tweet on Military Sexual Assault*, CNN (Sept. 8, 2016).

previously reported.[28] The book traces "Trump's transformation from a kid from Queens to high school 'ladies' man' into a womanizing, model-chasing, porn-star-frequenting philanderer," who "repeatedly and systematically engaged in aggressive sexual pursuit of women over the course of many decades."[29]

115.    Trump thus knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth. He knew she was telling the truth because he knew who she was and he knew that he had raped her, just as he had sexually assaulted many other women over many years.

## VII.    CARROLL SUFFERS REPUTATIONAL AND OTHER HARM

116.    Trump's false and insulting claims about Carroll were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

117.    Carroll has suffered harm as a direct result of Trump's false, defamatory statement.

118.    Coming forward put Carroll in the crosshairs of one of the most powerful men on the planet. He has since created and used his own powerful social media platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of fabricating a rape allegation to promote a book.

119.    Trump's October 12 statement has caused Carroll emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

---

[28] *See* LEVINE & EL-FAIZY, *supra* n.23, at 2.

[29] *Id.* at 2-3.

120.   Carroll has suffered professional harm as a direct result of Trump's defamatory statement. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood as a writer, advice columnist, and journalist.

## CAUSES OF ACTION

### COUNT I
### Battery

121.   Carroll incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

122.   Trump committed battery against Carroll when he forcibly raped and groped her.

123.   Trump intentionally, and without her consent, attacked Carroll to satisfy his own sexual desires. Trump's physical contact with Carroll was offensive and wrongful under all the circumstances. Trump continued to attack and rape Carroll despite her attempts to fight against him.

124.   Trump's conduct was the direct and proximate cause of Carroll's past and future substantial damages, including significant pain and suffering, lasting psychological and pecuniary harms, loss of dignity, and invasion of privacy.

125.   Trump's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to rape in the first degree (§ 130.35), rape in the third degree (§ 130.25), sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).

126.   Plaintiff's claim for battery is thus timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

## COUNT II
### Defamation

127.    Carroll incorporates by reference paragraphs 1 through 120 and re-alleges them as if set forth fully herein.

128.    Trump published his October 12, 2022 statement containing numerous defamatory claims on Truth Social, to members of the media, and to his supporters.

129.    His statement identified—and was "of or concerning"—Carroll.

130.    His statement contained numerous falsehoods about Carroll, whether on its face and/or by virtue of a clear implication affirmatively intended by Trump.

131.    Trump's false statement regarding Carroll was defamatory *per se*.

132.    Trump's false and defamatory statement was published throughout New York State and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statement about Carroll would receive a wide circulation by providing it to the national press.

133.    Trump made his false and defamatory statement knowing that it was false or with reckless disregard for its truth or falsity.

134.    Trump made his false statement with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on Carroll and Carroll's rights.

135.    Trump's false and defamatory statement caused Carroll to suffer reputational, emotional, and professional harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Carroll respectfully requests that the Court:

i.        Order Trump to retract his defamatory statement;

ii.   Award Carroll compensatory damages in an amount to be determined at trial;

iii.  Award Carroll punitive and exemplary damages in an amount to be determined at trial; and

iv.   Award Carroll pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff E. Jean Carroll hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: New York, New York
       November 24, 2022

Roberta A. Kaplan
Shawn Crowley
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1051 K Street NW, Suite 1040
Washington, D.C. 20001
(202) 742-2661
jmatz@kaplanhecker.com

*Attorneys for Plaintiff E. Jean Carroll*

-29-

A-542

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>                    *Plaintiff,*<br><br>        v.<br><br>DONALD J. TRUMP,<br><br>                    *Defendant.* | Civil Action No.: 22-cv-10016<br><br>**ANSWER**<br><br>**Jury Trial Demanded** |

The defendant, Donald J. Trump ("Defendant"), subject to and reserving all rights, for his Answer to the Complaint, says:

1. Defendant denies the allegations set forth in Paragraph 1 of the Complaint.

2. Defendant denies the allegations set forth in Paragraph 2 of the Complaint.

3. Defendant denies the allegations set forth in Paragraph 3 of the Complaint.

4. Defendant denies the allegations set forth in Paragraph 4 of the Complaint.

5. Defendant denies the allegations set forth in Paragraph 5 of the Complaint.

6. Defendant denies the allegations set forth in Paragraph 6 of the Complaint.

7. Defendant denies the allegations set forth in Paragraph 7 of the Complaint.

8. Defendant denies the allegations set forth in Paragraph 8 of the Complaint.

9. Defendant denies the allegations set forth in Paragraph 9 of the Complaint.

10. Defendant denies the allegations set forth in Paragraph 10 of the Complaint.

11. Defendant denies the allegations set forth in Paragraph 11 of the Complaint as the allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 11 of the Complaint.

12. Defendant denies the allegations set forth in Paragraph 12 of the Complaint.

13.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 13 of the Complaint.

14.     As to Paragraph 14, Defendant admits only that he served as the 45th President of the United States and is a resident of the State of Florida.

15.     Defendant denies the allegations set forth in Paragraph 15 of the Complaint as the allegations set forth a legal conclusion,

16.     Defendant denies the allegations set forth in Paragraph 16 of the Complaint as the allegations set forth a legal conclusion,

17.     Defendant denies the allegations set forth in Paragraph 17 of the Complaint as the allegations set forth a legal conclusion,

18.     Defendant denies the allegations set forth in Paragraph 18 of the Complaint.

19.     Defendant denies the allegations set forth in Paragraph 19 of the Complaint.

20.     Defendant denies the allegations set forth in Paragraph 20 of the Complaint.

21.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

22.     Defendant denies the allegations set forth in Paragraph 22 of the Complaint.

23.     Defendant denies the allegations set forth in Paragraph 23 of the Complaint.

24.     Defendant denies the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendant denies the allegations set forth in Paragraph 25 of the Complaint.

26.     Defendant denies the allegations set forth in Paragraph 26 of the Complaint.

27.     Defendant denies the allegations set forth in Paragraph 27 of the Complaint.

28.     Defendant denies the allegations set forth in Paragraph 28 of the Complaint.

29.     Defendant denies the allegations set forth in Paragraph 29 of the Complaint.

30.     Defendant denies the allegations set forth in Paragraph 30 of the Complaint.

31.     Defendant denies the allegations set forth in Paragraph 31 of the Complaint.

32.     Defendant denies the allegations set forth in Paragraph 32 of the Complaint.

33.     Defendant denies the allegations set forth in Paragraph 33 of the Complaint.

34.     Defendant denies the allegations set forth in Paragraph 34 of the Complaint.

35.     Defendant denies the allegations set forth in Paragraph 35 of the Complaint.

36.     Defendant denies the allegations set forth in Paragraph 36 of the Complaint.

37.     Defendant denies the allegations set forth in Paragraph 37 of the Complaint.

38.     Defendant denies the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendant denies the allegations set forth in Paragraph 39 of the Complaint.

40.     Defendant denies the allegations set forth in Paragraph 40 of the Complaint.

41.     Defendant denies the allegations set forth in Paragraph 41 of the Complaint.

42.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 42 of the Complaint.

43.     Defendant denies the allegations set forth in Paragraph 43 of the Complaint.

44.     Defendant denies the allegations set forth in Paragraph 44 of the Complaint.

45.     Defendant denies the allegations set forth in Paragraph 45 of the Complaint.

46.     Defendant denies the allegations set forth in Paragraph 46 of the Complaint.

47.     Defendant denies the allegations set forth in Paragraph 47 of the Complaint.

48.     Defendant denies the allegations set forth in Paragraph 48 of the Complaint.

49.     Defendant denies the allegations set forth in Paragraph 49 of the Complaint.

50.     Defendant denies knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in Paragraph 50 of the Complaint.

51.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 51 of the Complaint.

52.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 52 of the Complaint.

53.     Defendant denies the allegations set forth in Paragraph 53 of the Complaint.

54.     Defendant denies the allegations set forth in Paragraph 54 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 54 of the Complaint.

55.     Defendant denies the allegations set forth in Paragraph 55 of the Complaint.

56.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 56 of the Complaint.

57.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 57 of the Complaint.

58.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 58 of the Complaint.

59.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 59 of the Complaint.

60.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 60 of the Complaint.

61.     Defendant denies the allegations set forth in Paragraph 61 of the Complaint.

62.     Defendant denies the allegations set forth in Paragraph 62 of the Complaint.

63.     Defendant denies the allegations set forth in Paragraph 63 of the Complaint.

64.     Defendant denies the allegations set forth in Paragraph 64 of the Complaint.

65.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 65 of the Complaint.

66.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 66 of the Complaint.

67.     Defendant denies the allegations set forth in Paragraph 67 of the Complaint.

68.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 68 of the Complaint.

69.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 69 of the Complaint.

70.     Defendant denies the allegations set forth in Paragraph 70 of the Complaint.

71.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71 of the Complaint.

72.     Defendant denies the allegations set forth in Paragraph 72 of the Complaint.

73.     Defendant denies the allegations set forth in Paragraph 73 of the Complaint.

74.     Defendant denies the allegations set forth in Paragraph 74 of the Complaint.

75.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 75 of the Complaint.

76.     Defendant denies the allegations set forth in Paragraph 76 of the Complaint.

77.     Defendant denies the allegations set forth in Paragraph 77 of the Complaint.

78.     Defendant denies the allegations set forth in Paragraph 78 of the Complaint.

79.     Defendant denies the allegations set forth in Paragraph 79 of the Complaint.

80.     Defendant denies the allegations set forth in Paragraph 80 of the Complaint and

A-547

respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

81.     Defendant denies the allegations set forth in Paragraph 81 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

82.     Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 82 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

83.     Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 83 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

84.     Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 84 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

85.     Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 85 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

86.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 86 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

87.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 87 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

88.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 88 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

89.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 89 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

90.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 90 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

91.     Defendant denies the allegations set forth in Paragraph 91 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 91 of the Complaint.

92.     Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 92 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

93.     Defendant admits that he made the statement on Truth Social, but denies the balance of the allegations set forth in Paragraph 93.

94.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 94 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

95.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 95 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

96.     Defendant denies the allegations set forth in Paragraph 96.

97.     Defendant denies the allegations set forth in Paragraph 97.

98.     Defendant denies the allegations set forth in Paragraph 98.

99.     Defendant denies the allegations set forth in Paragraph 99.

100.    Defendant denies the allegations set forth in Paragraph 100.

101.    Defendant denies the allegations set forth in Paragraph 101 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 101 of the Complaint.

102.    Defendant denies the allegations set forth in Paragraph 102 of the Complaint.

103.    Defendant denies the allegations set forth in Paragraph 103 of the Complaint.

104.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 104 of the Complaint.

105.    Defendant denies the allegations set forth in Paragraph 105 of the Complaint.

106.    Defendant denies the allegations set forth in Paragraph 106 of the Complaint.

107.    Defendant denies the allegations set forth in Paragraph 107 of the Complaint.

108.    Defendant denies the allegations set forth in Paragraph 108 of the Complaint.

109.    Defendant denies the allegations set forth in Paragraph 109 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 109 of the Complaint.

110.    Defendant denies the allegations set forth in Paragraph 110 of the Complaint.

111.    Defendant denies the allegations set forth in Paragraph 111 of the Complaint.

112.    Defendant denies the allegations set forth in Paragraph 112 of the Complaint.

113.    Defendant denies the allegations set forth in Paragraph 113 of the Complaint.

114.    Defendant denies the allegations set forth in Paragraph 114 of the Complaint.

115.    Defendant denies the allegations set forth in Paragraph 115 of the Complaint.

116.    Defendant denies the allegations set forth in Paragraph 116 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 116 of the Complaint.

117.    Defendant denies the allegations set forth in Paragraph 117 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 117 of the Complaint.

118.    Defendant denies the allegations set forth in Paragraph 118 of the Complaint.

119.    Defendant denies the allegations set forth in Paragraph 119 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 119 of the Complaint.

120.    Defendant denies the allegations set forth in Paragraph 120 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 120 of the Complaint.

## CAUSES OF ACTION

### COUNT I
### Battery

121.    Defendant incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

122.    Defendant denies the allegations set forth in Paragraph 122 of the Complaint.

123.    Defendant denies the allegations set forth in Paragraph 123 of the Complaint.

124.    Defendant denies the allegations set forth in Paragraph 124 of the Complaint.

125.    Defendant denies the allegations set forth in Paragraph 125 of the Complaint as the

allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 125 of the Complaint.

126.    Defendant denies the allegations set forth in Paragraph 126 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 126 of the Complaint.

## COUNT II
## Defamation

127.    Defendant incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

128.    Defendant denies the allegations set forth in Paragraph 128 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 128 of the Complaint.

129.    Defendant denies the allegations set forth in Paragraph 129 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 129 of the Complaint.

130.    Defendant denies the allegations set forth in Paragraph 130 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 130 of the Complaint.

131.    Defendant denies the allegations set forth in Paragraph 131 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 131 of the Complaint.

132.    Defendant denies the allegations set forth in Paragraph 132 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 132 of the Complaint.

133.    Defendant denies the allegations set forth in Paragraph 133 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 133 of the Complaint.

134.    Defendant denies the allegations set forth in Paragraph 134 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 134 of the Complaint.

135.    Defendant denies the allegations set forth in Paragraph 135 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 135 of the Complaint.

## GENERAL DENIAL

Each numbered paragraph in this Answer responds to the identically numbered paragraph in the Complaint. Defendant denies any allegations contained in the headings and subheadings throughout the Complaint. Defendant denies all allegations, declarations, claims or assertions in the Complaint that are not specifically admitted in this Answer.

## ADDITIONAL DEFENSES

As separate, additional defenses to the Complaint and the purported causes of action therein, but without assuming the burden of proof with regard to these defenses, Defendant alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

136.    The Complaint fails to state a cause of action.

## SECOND AFFIRMATIVE DEFENSE

137.    The alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States.

### THIRD AFFIRMATIVE DEFENSE

138.    The challenged statements are protected by and privileged under Article I, Section 8 to the New York State Constitution.

### FOURTH AFFIRMATIVE DEFENSE

139.    The alleged defamatory statements are true.

### FIFTH AFFIRMATIVE DEFENSE

140.    Some or all of the statements at issue are matters of opinion that are not capable of being proven true or false.

### SIXTH AFFIRMATIVE DEFENSE

141.    The alleged defamatory statements are with respect to a public person.

### SEVENTH AFFIRMATIVE DEFENSE

142.    The alleged defamatory statements are not reasonably capable of the defamatory meaning attributed to them by Plaintiff.

### EIGHTH AFFIRMATIVE DEFENSE

143.    The claims set forth in Plaintiff's Complaint are unconstitutional.

### NINTH AFFIRMATIVE DEFENSE

144.    Plaintiff's claims are barred because her damages, if any, were caused by acts of third persons, for which Defendant is not responsible.

### TENTH AFFIRMATIVE DEFENSE

145.    Plaintiff is a public figure for purposes of this case, and Defendant did not publish with actual malice.

### ELEVENTH AFFIRMATIVE DEFENSE

146.    Plaintiff is not entitled to punitive damages as a matter of law.

## TWELFTH AFFIRMATIVE DEFENSE

147.  Plaintiff is not entitled to injunctive relief as a matter of law.

## THIRTEENTH AFFIRMATIVE DEFENSE

148.  Plaintiff is not entitled to counsel fees and/or costs as a matter of law.

## FOURTEENTH AFFIRMATIVE DEFENSE

149.  Plaintiff has not sufficiently pled defamation *per se*.

## FIFTEENTH AFFIRMATIVE DEFENSE

150.  Plaintiff has failed to plead damages with the required specificity.

## SIXTEENTH AFFIRMATIVE DEFENSE

151.  Neither Defendant nor the challenged statements proximately caused any injury that the Plaintiff allegedly suffered.

## SEVENTEENTH AFFIRMATIVE DEFENSE

152.  Plaintiff has not suffered special damages.

## EIGHTEENTH AFFIRMATIVE DEFENSE

153.  Plaintiff has not sufficiently pled defamation.

## NINETEENTH AFFIRMATIVE DEFENSE

154.  Plaintiff's claim is barred due to prior pending action filed by the Plaintiff.

## TWENTIETH AFFIRMATIVE DEFENSE

155.  CPLR 214-J violates the due process clause of the New York State Constitution.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

156.  Plaintiff's claims are time-barred by the applicable statute(s) of limitations.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

157.  Plaintiff has not sufficiently pled the cause of action of battery.

A-555

## TWENTY-THIRD AFFIRMATIVE DEFENSE

158.    Defendant hereby reserves the right to assert all affirmative defenses available

under any applicable federal and state law, and to assert any cross-claims, counterclaims and third-

party claims when and if they become appropriate in this action.

**WHEREFORE,** Defendant respectfully requests that this Court:

(1) Deny any and all relief sought by Plaintiff in this Complaint;

(2) Deny any and all purported damages sought by Plaintiff in the Complaint;

(3) Award counsel fees, costs, and any further relief as this Court may be deem just and

proper.

Dated: New York, New York
       January 27, 2023

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
                -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Counsel for Defendant, Donald J. Trump*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 22-cv-10016 |
| *Plaintiff,* |  |
| v. | **FIRST AMENDED ANSWER** |
| DONALD J. TRUMP, | **Jury Trial Demanded** |
| *Defendant.* |  |

The defendant, Donald J. Trump ("Defendant"), subject to and reserving all rights, for his First Amended Answer to the Complaint, says:

1.     Defendant denies the allegations set forth in Paragraph 1 of the Complaint.

2.     Defendant denies the allegations set forth in Paragraph 2 of the Complaint.

3.     Defendant denies the allegations set forth in Paragraph 3 of the Complaint.

4.     Defendant denies the allegations set forth in Paragraph 4 of the Complaint.

5.     Defendant denies the allegations set forth in Paragraph 5 of the Complaint.

6.     Defendant denies the allegations set forth in Paragraph 6 of the Complaint.

7.     Defendant denies the allegations set forth in Paragraph 7 of the Complaint.

8.     Defendant denies the allegations set forth in Paragraph 8 of the Complaint.

9.     Defendant denies the allegations set forth in Paragraph 9 of the Complaint.

10.     Defendant denies the allegations set forth in Paragraph 10 of the Complaint.

11.     Defendant denies the allegations set forth in Paragraph 11 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 11 of the Complaint.

12.     Defendant denies the allegations set forth in Paragraph 12 of the Complaint.

13.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 13 of the Complaint.

14.     As to Paragraph 14, Defendant admits only that he served as the 45th President of the United States and is a resident of the State of Florida.

15.     Defendant denies the allegations set forth in Paragraph 15 of the Complaint as the allegations set forth a legal conclusion,

16.     Defendant denies the allegations set forth in Paragraph 16 of the Complaint as the allegations set forth a legal conclusion,

17.     Defendant denies the allegations set forth in Paragraph 17 of the Complaint as the allegations set forth a legal conclusion,

18.     Defendant denies the allegations set forth in Paragraph 18 of the Complaint.

19.     Defendant denies the allegations set forth in Paragraph 19 of the Complaint.

20.     Defendant denies the allegations set forth in Paragraph 20 of the Complaint.

21.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

22.     Defendant denies the allegations set forth in Paragraph 22 of the Complaint.

23.     Defendant denies the allegations set forth in Paragraph 23 of the Complaint.

24.     Defendant denies the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendant denies the allegations set forth in Paragraph 25 of the Complaint.

26.     Defendant denies the allegations set forth in Paragraph 26 of the Complaint.

27.     Defendant denies the allegations set forth in Paragraph 27 of the Complaint.

28.     Defendant denies the allegations set forth in Paragraph 28 of the Complaint.

2

29.     Defendant denies the allegations set forth in Paragraph 29 of the Complaint.

30.     Defendant denies the allegations set forth in Paragraph 30 of the Complaint.

31.     Defendant denies the allegations set forth in Paragraph 31 of the Complaint.

32.     Defendant denies the allegations set forth in Paragraph 32 of the Complaint.

33.     Defendant denies the allegations set forth in Paragraph 33 of the Complaint.

34.     Defendant denies the allegations set forth in Paragraph 34 of the Complaint.

35.     Defendant denies the allegations set forth in Paragraph 35 of the Complaint.

36.     Defendant denies the allegations set forth in Paragraph 36 of the Complaint.

37.     Defendant denies the allegations set forth in Paragraph 37 of the Complaint.

38.     Defendant denies the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendant denies the allegations set forth in Paragraph 39 of the Complaint.

40.     Defendant denies the allegations set forth in Paragraph 40 of the Complaint.

41.     Defendant denies the allegations set forth in Paragraph 41 of the Complaint.

42.     Defendant denies knowledge or information sufficient to form a belief as to the
truth of the allegations set forth in Paragraph 42 of the Complaint.

43.     Defendant denies the allegations set forth in Paragraph 43 of the Complaint.

44.     Defendant denies the allegations set forth in Paragraph 44 of the Complaint.

45.     Defendant denies the allegations set forth in Paragraph 45 of the Complaint.

46.     Defendant denies the allegations set forth in Paragraph 46 of the Complaint.

47.     Defendant denies the allegations set forth in Paragraph 47 of the Complaint.

48.     Defendant denies the allegations set forth in Paragraph 48 of the Complaint.

49.     Defendant denies the allegations set forth in Paragraph 49 of the Complaint.

50.     Defendant denies knowledge or information sufficient to form a belief as to the

3

truth of the allegations set forth in Paragraph 50 of the Complaint.

51.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 51 of the Complaint.

52.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 52 of the Complaint.

53.     Defendant denies the allegations set forth in Paragraph 53 of the Complaint.

54.     Defendant denies the allegations set forth in Paragraph 54 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 54 of the Complaint.

55.     Defendant denies the allegations set forth in Paragraph 55 of the Complaint.

56.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 56 of the Complaint.

57.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 57 of the Complaint.

58.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 58 of the Complaint.

59.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 59 of the Complaint.

60.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 60 of the Complaint.

61.     Defendant denies the allegations set forth in Paragraph 61 of the Complaint.

62.     Defendant denies the allegations set forth in Paragraph 62 of the Complaint.

63.     Defendant denies the allegations set forth in Paragraph 63 of the Complaint.

64.     Defendant denies the allegations set forth in Paragraph 64 of the Complaint.

65.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 65 of the Complaint.

66.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 66 of the Complaint.

67.     Defendant denies the allegations set forth in Paragraph 67 of the Complaint.

68.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 68 of the Complaint.

69.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 69 of the Complaint.

70.     Defendant denies the allegations set forth in Paragraph 70 of the Complaint.

71.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71 of the Complaint.

72.     Defendant denies the allegations set forth in Paragraph 72 of the Complaint.

73.     Defendant denies the allegations set forth in Paragraph 73 of the Complaint.

74.     Defendant denies the allegations set forth in Paragraph 74 of the Complaint.

75.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 75 of the Complaint.

76.     Defendant denies the allegations set forth in Paragraph 76 of the Complaint.

77.     Defendant denies the allegations set forth in Paragraph 77 of the Complaint.

78.     Defendant denies the allegations set forth in Paragraph 78 of the Complaint.

79.     Defendant denies the allegations set forth in Paragraph 79 of the Complaint.

80.     Defendant denies the allegations set forth in Paragraph 80 of the Complaint and