# 23-0793-CV

## United States Court of Appeals

*for the*

## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 3 of 12 (Pages A-561 to A-840)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

i

## TABLE OF CONTENTS FOR JOINT APPENDIX

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*")........................................ A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") ...................................... A-32

### **Documents Submitted in *Carroll I***

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

Exhibit A to Kaplan Declaration -
Letter from Roberta A. Kaplan to Marc E.
Kasowitz, dated August 10, 2020, with Enclosure     A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023.........     A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 ......................................     A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 ......................................     A-89

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Lisa
Birnbach, dated September 21, 2022 ....................     A-92

Exhibit 2 to Kaplan Declaration -
Excerpts from Deposition Transcript of Carol
Martin, dated October 18, 2022 ...........................     A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 ................................................. A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 .............................................. A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ........................................ A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ............................................... A-405

iii

**Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................ A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 ......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ...................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ....................... A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 ......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ........................... A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 ................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ........................ A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 ............................. A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 ................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ......................................................... A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023 ...................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 ........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

**Page**

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated March 17, 2023 ...............    A-509

    Annexed to Letter -
    Proposed Order ......................................................    A-511

### **Documents Submitted in *Carroll II***

Complaint and Demand for a Jury Trial, dated
    November 24, 2022 .................................................    A-513

Answer, dated January 27, 2023 ...............................    A-542

First Amended Answer, dated February 10, 2023......    A-556

Defendant's Letter Motion for Discovery, dated
    February 10, 2023 .................................................    A-571

    Exhibit A to Defendant's Letter Motion -
    DNA Report, dated January 8, 2020 .....................    A-574

    Exhibit B to Defendant's Letter Motion -
    Twitter Post, dated February 25, 2021 ..................    A-602

Plaintiff's Letter Response in Opposition to
    Defendant's Motion for Discovery, dated
    February 10, 2023 .................................................    A-607

Defendant's Letter Reply in Further Support of
    Motion for Discovery, dated February 10, 2023....    A-612

Transcript of Conference, dated February 7, 2023 ....    A-614

Notice of Motion, by Defendant, for an Order
    Granting Partial Summary Judgment, dated
    February 23, 2023 .................................................    A-635

Declaration of Matthew G. DeOreo, for Defendant,
    in Support of Motion for Partial Summary
    Judgment, dated February 23, 2023......................    A-637

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020.. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ....................................... A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023......... A-747

vii

**Page**

Declaration of Alina Habba, for Defendant,
in Support of Motions *in Limine*, dated
February 23, 2023 .................................................. A-773

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 .......................... A-775

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-779

Exhibit C to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022
(Reproduced herein at pp. A-487-A-492)

Exhibit D to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023
(Reproduced herein at pp. A-493-A-499)

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-783

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-785

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-786

Exhibit 2 to Kaplan Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023 .................................................... A-863

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ...................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................ A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A).............................................................. A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B).............................................................. A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 ................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 .......................... A-1065

x

**Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
Opposition to Defendant's Motions *in Limine*,
dated March 9, 2023 ............................................. A-1080

Exhibit 1 to Crowley Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
Video of Deposition of Natasha Stoynoff, taken
October 13, 2022
(All parties are already in possession of video
exhibit) ................................................................. A-1089

Exhibit 3 to Crowley Declaration -
Video of Deposition of Jessica Leeds, taken
October 13, 2022
(All parties are already in possession of video
exhibit) ................................................................. A-1091

Plaintiff's Response to Defendant's Local Civil
Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
Opposition to Defendant's Motion for Partial
Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-1110

Exhibit 2 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023
(Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
    Plaintiff, in Further Support of Omnibus Motion
    *in Limine*, dated March 16, 2023 .......................... A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 .......................... A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 ......................... A-1153

Reply Declaration of Alina Habba, for Defendant,
    in Further Support of Motions *in Limine*, dated
    March 16, 2023 ....................................................... A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022 ................................................ A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
    dated April 13, 2023 ................................................ A-1175

    Exhibit A to Letter Motion -
    Excerpts from Deposition Transcript of E. Jean
    Carroll, dated October 14, 2022 ........................... A-1185

    Exhibit B to Letter Motion -
    Letter from Roberta A. Kaplan to Alina Habba,
    dated April 10, 2023 ............................................... A-1190

    Exhibit C to Letter Motion -
    Letter from Roberta A. Kaplan to Chad Seigel,
    dated April 11, 2023................................................ A-1193

    Exhibit D to Letter Motion -
    Defendant's First Set of Interrogatories filed in
    *Carroll I*, dated May 27, 2022 .............................. A-1196

    Exhibit E to Letter Motion -
    Plaintiff's Responses and Objections to
    Defendant's First Set of Interrogatories filed in
    *Carroll I*, dated June 27, 2022
    (Reproduced herein at pp. A-470-A-486)

    Exhibit F to Letter Motion -
    Excerpts from Deposition Transcript of Donald J.
    Trump, dated October 19, 2022 ............................ A-1207

Plaintiff's Letter Response to Defendant's Motion
    to Reopen Discovery, dated April 13, 2023 ........... A-1213

    Exhibit A to Letter Response -
    Letter from Roberta A. Kaplan to Alina Habba,
    dated April 10, 2023
    (Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022   A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ..................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023....................... A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 .............................. A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................. A-1416

Trial Transcript, dated April 25, 2023....................... A-1420

Trial Transcript, dated April 26, 2023....................... A-1524

Trial Transcript, dated April 27, 2023....................... A-1697

Trial Transcript, dated May 1, 2023........................... A-1851

Trial Transcript, dated May 2, 2023........................... A-2036

Trial Transcript, dated May 3, 2023........................... A-2210

Trial Transcript, dated May 4, 2023........................... A-2375

Trial Transcript, dated May 8, 2023........................... A-2567

Trial Transcript, dated May 9, 2023........................... A-2771

Parties' Trial Exhibits:

PX-1        Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2     "Remarks by President Trump before
Marine One Departure" (Office of the
Press Secretary, June 22, 2019) ...............   A-2840

PX-3     "EXCLUSIVE: Trump vehemently
denies E. Jean Carroll allegation, says
'she's not my type'" (*The Hill*,
June 24, 2019).........................................   A-2853

PX-4     Truth Social Post, dated
October 12, 2022......................................   A-2858

PX-6     "Donald Trump assaulted me in a
Bergdorf Goodman dressing room 23
years ago. But he's not alone on the list
of awful men in my life." (New York
Magazine, June 21, 2019) .......................   A-2859

PX-12     Photograph ................................................   A-2879

PX-22     Sixth Floor Construction Plan of
Bergdorf Goodman ..................................   A-2880

PX-24     Sixth Floor Construction Plan of
Bergdorf Goodman ..................................   A-2881

PX-25     Video Excerpt from Defendant's
Interview with Billy Bush
(All parties are already in possession of
video exhibit) ..........................................   A-2882

PX-25-T    Transcript of Video Excerpt from
Defendant's Interview with Billy Bush ...   A-2883

PX-26     Video Excerpt from Presidential Debate
(All parties are already in possession of
video exhibit) ..........................................   A-2885

xvi

|  |  | Page |
|---|---|---|
| PX-26-T | Transcript of Video Excerpt from Presidential Debate ................................. | A-2886 |
| PX-29 | Video Excerpt from Defendant's Speech at Campaign Rally (All parties are already in possession of video exhibit) ........................................... | A-2887 |
| PX-29-T | Transcript of Video Excerpt from Defendant's Speech at Campaign Rally... | A-2888 |
| PX-31 | Video Excerpt from Defendant's Speech (All parties are already in possession of video exhibit) ........................................... | A-2889 |
| PX-31-T | Transcript of Video Excerpt from Defendant's Speech................................. | A-2890 |
| PX-46 | Twitter Post, dated November 15, 2022... | A-2891 |
| PX-48 | Twitter Post, dated December 12, 2022 ... | A-2893 |
| PX-51 | Twitter Post, dated January 29, 2023 ....... | A-2896 |
| PX-53 | Twitter Post, dated January 29, 2023 ....... | A-2898 |
| PX-57 | Email, dated October 13, 2022 ................ | A-2901 |
| PX-112 | Video Excerpt from Defendant's Interview with Roger Ailes (All parties are already in possession of video exhibit) ........................................... | A-2902 |
| PX-112-T | Transcript of Video Excerpt from Defendant's Interview with Roger Ailes.. | A-2903 |
| PX-200 | Video Excerpt from Deposition of Donald J. Trump, taken October 19, 2022 ......................................... | A-2904 |

xvii

**Page**

PX-200-T   Transcript of Video Excerpt from
           Deposition of Donald J. Trump, taken
           October 19, 2022......................................   A-2905

DX-CK      Email Regarding Law & Order SVU,
           dated July 23, 2019 ................................   A-2986

Court Exhibits:

C          Timeline of Events ..................................   A-2987

D          WordPerfect Document Compare
           Summary of Jury Instructions.................   A-2988

Letter from Joseph Tacopina to the Honorable
   Lewis A. Kaplan, dated May 1, 2023 ...................   A-3024

   Exhibit A to Letter -
   Excerpts of Trial Transcripts.................................   A-3042

   Exhibit B to Letter -
   LinkedIn Post.........................................................   A-3081

   Exhibit C to Letter -
   "One of the Democratic Party's biggest donors is
   exploring a new anti-Trump boycott" (*Vox*,
   July 2, 2020) ...........................................................   A-3083

Letter from Roberta A. Kaplan to the Honorable
   Lewis A. Kaplan, dated May 5, 2023 ...................   A-3088

Letter from Joseph Tacopina to the Honorable
   Lewis A. Kaplan, dated May 6, 2023 ...................   A-3091

Verdict Form, dated May 9, 2023 ..............................   A-3095

Notice of Appeal, dated May 11, 2023 ......................   A-3099

Notice of Motion, by Defendant, for an Order
   Granting a New Trial or Remittitur, dated
   June 8, 2023 ..........................................................   A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
   Motion for a New Trial or Remittitur, dated
   June 8, 2023 ............................................................ A-3103

Declaration of Matthew G. DeOreo, for Defendant,
   in Support of Motion for a New Trial or
   Remittitur, dated June 8, 2023 .............................. A-3134

Exhibit A to DeOreo Declaration -
   Complaint and Demand for a Jury Trial filed in
   *Carroll II*, dated November 24, 2022
   (Reproduced herein at pp. A-513-A-541)

Exhibit B to DeOreo Declaration -
   Excerpts of Trial Transcripts.................................. A-3136

Exhibit C to DeOreo Declaration -
   Complaint and Jury Demand filed in *Carroll I*,
   dated November 4, 2019
   (Reproduced herein at pp. A-639-A-667)

Exhibit D to DeOreo Declaration -
   Verdict Form, dated May 9, 2023
   (Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
   Opposition to Defendant's Motion for a New
   Trial or Remittitur, dated June 22, 2023 ................ A-3219

Exhibit 1 to Kaplan Declaration -
   Excerpts of Trial Transcripts.................................. A-3221

Exhibit 2 to Kaplan Declaration -
   Twitter Post, dated June 21, 2019
   (Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 ................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 ................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
    Second Circuit, dated July 19, 2023 .................... A-3339

respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

81.    Defendant denies the allegations set forth in Paragraph 81 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

82.    Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 82 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

83.    Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 83 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

84.    Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 84 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

85.    Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 85 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

86.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 86 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

87.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 87 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

88.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 88 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

89.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 89 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

90.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 90 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

91.    Defendant denies the allegations set forth in Paragraph 91 of the Complaint as the allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 91 of the Complaint.

92.    Defendant admits that the Defendant issued the referenced statements set forth in Paragraph 92 and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

93.    Defendant admits that he made the statement on Truth Social, but denies the balance of the allegations set forth in Paragraph 93.

94.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 94 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

95.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 95 of the Complaint and respectfully refers the Court to the cited documents for the true, accurate, and contextual meaning thereof.

A-563

96.     Defendant denies the allegations set forth in Paragraph 96.

97.     Defendant denies the allegations set forth in Paragraph 97.

98.     Defendant denies the allegations set forth in Paragraph 98.

99.     Defendant denies the allegations set forth in Paragraph 99.

100.     Defendant denies the allegations set forth in Paragraph 100.

101.     Defendant denies the allegations set forth in Paragraph 101 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 101 of the Complaint.

102.     Defendant denies the allegations set forth in Paragraph 102 of the Complaint.

103.     Defendant denies the allegations set forth in Paragraph 103 of the Complaint.

104.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 104 of the Complaint.

105.     Defendant denies the allegations set forth in Paragraph 105 of the Complaint.

106.     Defendant denies the allegations set forth in Paragraph 106 of the Complaint.

107.     Defendant denies the allegations set forth in Paragraph 107 of the Complaint.

108.     Defendant denies the allegations set forth in Paragraph 108 of the Complaint.

109.     Defendant denies the allegations set forth in Paragraph 109 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 109 of the Complaint.

110.     Defendant denies the allegations set forth in Paragraph 110 of the Complaint.

111.     Defendant denies the allegations set forth in Paragraph 111 of the Complaint.

112.     Defendant denies the allegations set forth in Paragraph 112 of the Complaint.

113.     Defendant denies the allegations set forth in Paragraph 113 of the Complaint.

114.    Defendant denies the allegations set forth in Paragraph 114 of the Complaint.

115.    Defendant denies the allegations set forth in Paragraph 115 of the Complaint.

116.    Defendant denies the allegations set forth in Paragraph 116 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 116 of the Complaint.

117.    Defendant denies the allegations set forth in Paragraph 117 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 117 of the Complaint.

118.    Defendant denies the allegations set forth in Paragraph 118 of the Complaint.

119.    Defendant denies the allegations set forth in Paragraph 119 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 119 of the Complaint.

120.    Defendant denies the allegations set forth in Paragraph 120 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 120 of the Complaint.

## CAUSES OF ACTION
### COUNT I
### Battery

121.    Defendant incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

122.    Defendant denies the allegations set forth in Paragraph 122 of the Complaint.

123.    Defendant denies the allegations set forth in Paragraph 123 of the Complaint.

124.    Defendant denies the allegations set forth in Paragraph 124 of the Complaint.

125.    Defendant denies the allegations set forth in Paragraph 125 of the Complaint as the

allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 125 of the Complaint.

126.    Defendant denies the allegations set forth in Paragraph 126 of the Complaint as the allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 126 of the Complaint.

**COUNT II**
**Defamation**

127.    Defendant incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

128.    Defendant denies the allegations set forth in Paragraph 128 of the Complaint as the allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 128 of the Complaint.

129.    Defendant denies the allegations set forth in Paragraph 129 of the Complaint as the allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 129 of the Complaint.

130.    Defendant denies the allegations set forth in Paragraph 130 of the Complaint as the allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 130 of the Complaint.

131.    Defendant denies the allegations set forth in Paragraph 131 of the Complaint as the allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 131 of the Complaint.

132.    Defendant denies the allegations set forth in Paragraph 132 of the Complaint as the allegations set forth a legal conclusion. To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 132 of the Complaint.

133.    Defendant denies the allegations set forth in Paragraph 133 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 133 of the Complaint.

134.    Defendant denies the allegations set forth in Paragraph 134 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 134 of the Complaint.

135.    Defendant denies the allegations set forth in Paragraph 135 of the Complaint as the allegations set forth a legal conclusion.  To the extent that a response is required, Defendant denies the allegations set forth in Paragraph 135 of the Complaint.

## GENERAL DENIAL

Each numbered paragraph in this Answer responds to the identically numbered paragraph in the Complaint. Defendant denies any allegations contained in the headings and subheadings throughout the Complaint. Defendant denies all allegations, declarations, claims or assertions in the Complaint that are not specifically admitted in this Answer.

## ADDITIONAL DEFENSES

As separate, additional defenses to the Complaint and the purported causes of action therein, but without assuming the burden of proof with regard to these defenses, Defendant alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

136.    The Complaint fails to state a cause of action.

## SECOND AFFIRMATIVE DEFENSE

137.    The alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States.

11

## THIRD AFFIRMATIVE DEFENSE

138.    The challenged statements are protected by and privileged under Article I, Section 8 to the New York State Constitution.

## FOURTH AFFIRMATIVE DEFENSE

139.    The alleged defamatory statements are true.

## FIFTH AFFIRMATIVE DEFENSE

140.    Some or all of the statements at issue are matters of opinion that are not capable of being proven true or false.

## SIXTH AFFIRMATIVE DEFENSE

141.    The alleged defamatory statements are with respect to a public person.

## SEVENTH AFFIRMATIVE DEFENSE

142.    The alleged defamatory statements are not reasonably capable of the defamatory meaning attributed to them by Plaintiff.

## EIGHTH AFFIRMATIVE DEFENSE

143.    The claims set forth in Plaintiff's Complaint are unconstitutional.

## NINTH AFFIRMATIVE DEFENSE

144.    Plaintiff's claims are barred because her damages, if any, were caused by acts of third persons, for which Defendant is not responsible.

## TENTH AFFIRMATIVE DEFENSE

145.    Plaintiff is a public figure for purposes of this case, and Defendant did not publish with actual malice.

## ELEVENTH AFFIRMATIVE DEFENSE

146.    Plaintiff is not entitled to punitive damages as a matter of law.

**TWELFTH AFFIRMATIVE DEFENSE**

147.    Plaintiff is not entitled to injunctive relief as a matter of law.

**THIRTEENTH AFFIRMATIVE DEFENSE**

148.    Plaintiff is not entitled to counsel fees and/or costs as a matter of law.

**FOURTEENTH AFFIRMATIVE DEFENSE**

149.    Plaintiff has not sufficiently pled defamation *per se*.

**FIFTEENTH AFFIRMATIVE DEFENSE**

150.    Plaintiff has failed to plead damages with the required specificity.

**SIXTEENTH AFFIRMATIVE DEFENSE**

151.    Neither Defendant nor the challenged statements proximately caused any injury that the Plaintiff allegedly suffered.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

152.    Plaintiff has not suffered special damages.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

153.    Plaintiff has not sufficiently pled defamation.

**NINETEENTH AFFIRMATIVE DEFENSE**

154.    Plaintiff's claim is barred due to prior pending action filed by the Plaintiff.

**TWENTIETH AFFIRMATIVE DEFENSE**

155.    CPLR 214-J violates the due process clause of the New York State Constitution.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

156.    Plaintiff's claims are time-barred by the applicable statute(s) of limitations.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

157.    Plaintiff has not sufficiently pled the cause of action of battery.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

158.    The alleged defamatory statements are absolutely privileged pursuant to New York Civil Rights Law § 74 because such statements constitute a fair and true report of a judicial proceeding.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

159.    Defendant hereby reserves the right to assert all affirmative defenses available under any applicable federal and state law, and to assert any cross-claims, counterclaims and third-party claims when and if they become appropriate in this action.

**WHEREFORE,** Defendant respectfully requests that this Court:

(1) Deny any and all relief sought by Plaintiff in this Complaint;

(2) Deny any and all purported damages sought by Plaintiff in the Complaint;

(3) Award counsel fees, costs, and any further relief as this Court may be deem just and

proper.

Dated: New York, New York
       February 10, 2023

TACOPINA, SEIGEL & DeOREO

Joseph Tacopina, Esq.
Chad Seigel, Esq.
Matthew G. DeOreo, Esq.
275 Madison Ave., Fl. 35
New York, New York 10016
Telephone: (212)227-8877
Facsimile: (212) 619-1028
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
mdeoreo@tacopinalaw.com


And

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Counsel for Defendant, Donald J. Trump*

15

A-571

# tacopina seigel trial lawyers
TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

February 10, 2023

**FILED BY ECF**
Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: **Carroll v. Trump**, 22 Civ. 10016 (LAK) ("Carroll II")

Dear Judge Kaplan:

  We represent Defendant, Donald J. Trump, and write to respectfully request an immediate ruling concerning a dispute that has arisen between the parties. At the outset, it should be noted that we are not seeking to delay the trial date.

  The instant dispute arises from Plaintiff's public filing of a DNA report in *Carroll I* in New York State Court prior to that case being removed to this Court (NYECF Docket No. 56)(Ex. A hereto)("DNA Report"). The DNA Report was attached to Plaintiff's publically filed First Notice to Submit to Physical Examination to Defendant Donald J. Trump, which demanded that Mr. Trump submit to an examination in order to "obtain a buccal, blood or skin cell sample from Defendant sufficient for DNA analysis and comparison against unidentified male DNA present on the dress that Plaintiff wore during the sexual assault at issue in this action." (*Id.*)

  However, the DNA Report filed with this demand is missing pages 25 to 37, which appear to include the report's appendix. Yesterday, while my office and co-counsel were preparing a list of trial exhibits for *Carroll II*, we emailed Plaintiff's counsel requesting a copy of the missing pages of the report. Plaintiff's counsel emailed us back stating that they would not produce the missing pages because (a) Your Honor did not allow the parties to seek discovery in *Carroll II* for such material, as discovery only pertained to Plaintiff's damages; (b) fact discovery is over in *Carroll II*; (c) the missing pages from the DNA Report are not discoverable because the report was drafted by a non-testifying expert; and (d) Mr. Trump did not submit to such a physical examination for a DNA sample.

  The Court should reject Plaintiff's objections as to the production of these missing pages for

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
February 10, 2023
Page 2

the following reasons. First, the question as to whether the alleged sexual assault even occurred goes directly to the issue of Plaintiff's purported damages. If no sexual assault occurred, Plaintiff clearly could not have been harmed by it.

Second, even if fact discovery has been completed, Plaintiff herself produced 895 pages of discovery on February 1, 2023. Plaintiff never explained why such a document production was produced after discovery was purportedly over.

Third, regardless of whether the DNA Report was drafted by a non-testifying expert, Plaintiff clearly put this very report at issue when she served it as part of a discovery demand and then publicly filed it for all to see. Notably, this filing garnered substantial media attention. In fact, Plaintiff has stated publicly that she already has DNA from Mr. Trump, which necessarily implies that his DNA is on the dress in question. She also sent the following Tweet on February 25, 2021: "Cyrus Vance, the Manhattan District Attorney, has Trump's taxes. Fani Willis, the Georgia Prosecutor, has Trump's phone call. Mary Trump has her grandfather's will. **And I have the dress. Trump is basically in deep shit.**" (Exhibit B hereto)(emphasis supplied). Hence, Plaintiff is using the DNA Report to litigate this case in public and imply that Mr. Trump's DNA is on the dress.

Therefore, Plaintiff's expert was not merely hired by Plaintiff to consult, but was hired to publically state in a court filing that Plaintiff has DNA evidence against Mr. Trump. Or at the very least, Plaintiff has waived such protection by affirmatively using the DNA Report to seek DNA from Mr. Trump and then making public comments about it. *See In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, No. 14-MC-2548 (VEC), 2021 WL 2481835, at *4 (S.D.N.Y. June 17, 2021)("Although Abrantes-Metz and Bamberger are non-testifying expert consultants who would normally be entitled to the protections of Rule 26(b)(4)(D), Plaintiffs have waived those protections."); *Agron v. Trustees of Columbia Univ. in City of New York*, 176 F.R.D. 445, 449 (S.D.N.Y. 1997)("Plaintiff, by submitting the Deutsch Report to Defendant in discovery, voluntarily waived the only relief that Rule 26(b)(4)(B) provides—the non-disclosure of expert discovery for a non-testifying expert.").

Fourth, Mr. Trump is indeed willing to provide a DNA sample for the sole purpose of comparing it to the DNA found on the dress at issue, so long as the missing pages of the DNA Report are promptly produced prior to our client producing his DNA.

Fifth, there are additional compelling reasons for the production of the missing pages of the DNA Report. While Plaintiff has not listed the DNA Report as an exhibit or listed a DNA expert as a trial witness, she may be lying in wait and intending to use such evidence on cross-examination

A-573

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
February 10, 2023
Page 3

of Defendant's witnesses or in her rebuttal. It is respectfully submitted that due process dictates that Mr. Trump should have access to the full DNA Report in order to properly prepare for trial and for such a possibility.

Sixth, Plaintiff would suffer no unfair prejudice or harm by the production of the full DNA Report. Mr. Trump's DNA is either on the dress or it is not. Why is Plaintiff now hiding from this reality? We surmise that the answer to that question is that she knows his DNA is not on the dress because the alleged sexual assault never occurred.

Your consideration is greatly appreciated.

Very truly yours,

Joseph Tacopina

cc:    All counsel by ECF

A-574

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM    INDEX NO. 160694/2019
NYSCEF DOC. NO. 96                                   RECEIVED NYSCEF: 02/18/2020

# EXHIBIT 1

**A-576**

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM INDEX NO. 160694/2019
NYSCEF DOC. NO. 56 Case 1:22-cv-10016-LAK Document 51-1 Filed 02/10/23 Page 3 of 28 RECEIVED NYSCEF: 02/18/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

E. JEAN CARROLL,

                    *Plaintiff,*

  -against-

DONALD J. TRUMP, in his personal capacity,

                    *Defendant.*

---

Index No. 160694/2019


Hon. Doris Ling-Cohan

**PLAINTIFF'S FIRST NOTICE TO SUBMIT TO PHSYICAL EXAMINATION
TO DEFENDANT DONALD J. TRUMP**

    PLEASE TAKE NOTICE THAT, pursuant to CPLR § 3121, Defendant Donald J. Trump

is required to submit to a physical examination by LabCorp at its office located at 1145 19th Street

NW #601, Washington, D.C. 20036, or at another location convenient for Defendant, on March 2,

2020, at 9 a.m. The examination shall obtain a buccal, blood or skin cell sample from Defendant

sufficient for DNA analysis and comparison against unidentified male DNA present on the dress

that Plaintiff wore during the sexual assault at issue in this action. *See* Exhibit A.

Dated: New York, New York
    January 30, 2020

By:  /s/ Roberta A. Kaplan
    Roberta A. Kaplan
    KAPLAN HECKER & FINK LLP
    350 Fifth Avenue, Suite 7110
    New York, New York 10118
    Tel: (212) 763-0883
    Fax: (212) 564-0883
    rkaplan@kaplanhecker.com

    *Counsel for Plaintiff E. Jean Carroll*

# EXHIBIT A

A-578

INDEX NO. 160694/2019
NYSCEF DOC. NO. 56    Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 5 of 28    RECEIVED NYSCEF: 02/18/2020



**Forensic Analytical™ Crime Lab**

**Laboratory Report**[1]

| | |
|---|---|
| Roberta Kaplan, Esq.<br>Kaplan, Hecker, & Fink LLP<br>350 Fifth Ave., Ste 7110<br>New York, NY 10118 | Report Date:   January 8, 2020<br>FACL Case #:   20190357<br>Client #:        21497<br>Client Case #:  160694/2019 |

**Case Name:   E. Jean Carroll v. Donald Trump**

**Report Type:  Physical Evidence Examination and DNA Analysis**

### Background and Purpose of Examination

The following information is taken from a complaint filed November 4, 2019 with the New York Supreme Court by Roberta Kaplan, counsel for E. Jean Carroll in which it is alleged:

Approximately 23 years ago, E. Jean Carroll visited Bergdorf Goodman, a luxury department store in New York City, to shop. Upon leaving the store, Carroll ran into Donald Trump, with whom she was acquainted. Trump asked Carroll to assist him in purchasing a gift at Bergdorf Goodman for a girl. Carroll agreed and they both entered the store. While browsing the store, Trump suggested visiting the lingerie department. He insisted Carroll try on a see-through bodysuit and maneuvered her into a dressing room, closing the door behind them. At that moment, Trump assaulted Carroll. During the assault, Trump grabbed Carroll's arms, pinned her against the wall, placed his hand under her dress, pulled down her tights, and fondled her vagina with his fingers. He unzipped his pants and forced his penis inside of her. Shortly thereafter, Carroll was able to free herself and ran out of the dressing room and out of the store. The dress and shoes she wore at the time of the assault were kept in her closet until 2019 when Carroll donned them for a photoshoot.

Kaplan requested Forensic Analytical Crime Lab (FACL) examine the dress and shoes to determine if male biology, specifically semen, is present. Additionally, to determine if ████████, ████████, ████████████, ████████████████████, and ████████ – all individuals

---

[1] This report was published in full-color and should be read in that form.

3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

A-579

Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 6 of 28

FACL Case No. 20190357

who possibly came into contact with the dress at the time of the photoshoot – can be eliminated as contributors to any biology foreign to E. Jean Carroll.

### Items of Physical Evidence

The following item of physical evidence was received at FACL from Oliver Farnum of Kaplan, Hecker, & Fink LLP on November 7, 2019 via FedEx courier:

1. A reference buccal specimen from E. Jean Carroll.

The following item of physical evidence was received at FACL from Alina Mogilyanskaya of Mintz Group LLC on November 8, 2019 via FedEx courier:

2. A black dress.

The following item of physical evidence was received at FACL from E. Jean Carroll on November 13, 2019 via FedEx courier:

3. A pair of shoes.

The following items of physical evidence were received at FACL from Oliver Farnum of Kaplan, Hecker, & Fink LLP on December 13, 2019 via FedEx courier:



4. A reference buccal specimen from ███████████.
5. A reference buccal specimen from ███████████.
6. A reference buccal specimen from ███████████.
7. A reference buccal specimen from ███████████.

The following item of physical evidence was received at FACL from Oliver Farnum of Kaplan, Hecker, & Fink LLP on December 19, 2019 via FedEx courier:

8. A reference buccal specimen from ███████████.

### Evidence Examination

#### Reference Specimens

Descriptions and processing of the reference swab specimens for DNA analysis are summarized in Table 1. The external packaging and the reference swabs are shown in Figures 1 through 6.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 2 of 37

**A-580**

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 96 Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 7 of 28   RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357

Table 1. Reference specimen processing summary.

| FACL Item No. | Description of Reference Specimen | Total Human DNA recovered, ng | DNA Typing Assay, ng |
|---|---|---|---|
| 1 | E. Jean Carroll reference buccal swabs (2) – stained light brown, one whole swab consumed for analysis → 1A | ~ 1123 | ~ 0.8 |
| 4 | ██████████ reference buccal swab (1) – stained light yellow, approximately ½ of swab consumed for analysis → 4A | ~ 416 | ~ 0.8 |
| 5 | ██████████ reference buccal swab (1) – stained faint yellow, approximately ½ of swab consumed for analysis → 5A | ~ 861 | ~ 0.8 |
| 6 | ██████████ reference buccal swab (1) – stained light yellow, approximately ½ of swab consumed for analysis → 6A | ~ 853 | ~ 0.8 |
| 7 | ██████████ reference buccal swab (1) – stained very pale yellow, approximately ½ of swab consumed for analysis → 7A | ~ 601 | ~ 0.8 |
| 8 | ██████████ reference buccal swab (1) – stained light brown, approximately ½ of swab consumed for analysis → 8A | ~ 1289 | ~ 0.8 |



Figure 1. E. Jean Carroll reference buccal specimen [#1], packaging and swabs before sampling.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

**A-581**

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM  INDEX NO. 160694/2019
NYSCEF DOC. NO. 56  Case 1.22-cv-10016-LAK  Document 51-1  Filed 02/10/23  Page 8 of 28  RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 2. ▓▓▓▓▓▓ reference buccal specimen [#4], packaging and swab before and after sampling.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 4 of 37

A-582

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM

NYSCEF DOC. NO. 96

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 3. ▮▮▮▮ reference buccal specimen [#5], packaging and swab before and after sampling.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 5 of 37

A-583

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM INDEX NO. 160694/2019
NYSCEF DOC. NO. 56   Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 10 of 28   RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 4. ▇▇▇▇ reference buccal specimen [#6], packaging and swab before and after sampling.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

**A-584**

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
NYSCEF DOC. NO. 56

Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 11 of 28

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 5. ███████████ reference buccal specimen [#7], packaging and swab before and after sampling.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

**A-585**

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
NYSCEF DOC. NO. 56
INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 12 of 28

FACL Case No. 20190357



Figure 6. ▇▇▇ reference buccal specimen [#8], packaging and swab before and after sampling.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 8 of 37

A-586

FACL Case No. 20190357

### Item #2 Dress

A black "Donna Karan" brand jacket dress [#2] was submitted to FACL for examination. The packaging for this specimen is shown in Figure 7. The outside and inside surfaces of the dress are shown in Figures 8 through 11. The dress is size 6 and appeared minimally worn. Some apparent animal hairs were noted on the dress. Several scuff/wear marks and/or stains were observed on the outer surface of the dress, most notably the backs of the sleeves. Numerous fluorescent deposits were revealed on the dress with high intensity filtered (450 nm) light. Acid phosphatase activity, a presumptive indication of the presence of semen, was not detected in any of thirty-three fluorescent stains tested on the dress. Various surface areas of the dress were swabbed to collect biological material. Descriptions and processing of the sample swabs taken from the dress are summarized in Table 2. The surface areas swabbed are illustrated in Figures 8 through 10. The sample swabs are shown in Figures 12 through 17. All the swabs were consumed for analysis. The results of these analyses are described below.



Figure 7. Dress [#2], external and nested packaging.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

A-587

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 56 Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 14 of 28 RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 8.  Dress [#2], outside front showing approximate sample areas A, B, C, D, and E.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 10 of 37

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
NYSCEF DOC. NO. 96    Case 1.22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 15 of 28
INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 9. Dress [#2], outside back showing approximate sample areas A, B, C, and D.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 11 of 37

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 56    Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 16 of 28
RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 10.  Dress [#2], inside front showing approximate sample area F.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 12 of 37

A-590

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 56
RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 11.  Dress [#2], inside back.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 13 of 37

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
NYSCEF DOC. NO. 56

Case 23-793, Document 78, 11/20/2023, 3592064, Page51 of 300
Case 1:22-cv-10016-LAK Document 51-1 Filed 02/10/23 Page 18 of 28

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357

Table 2. Summary of dress swab processing for DNA analysis.

| FACL Item # | Area of Dress swabbed | Microscopy Results | Total Human DNA recovered, ng | Total Male DNA recovered, ng | DNA Typing Assay, ng |
|---|---|---|---|---|---|
| 2A | Outside left shoulder/front neck area (1 swab) | moderate amount of skin cells | ~ 0.54 | ~ 0.03 | All, combined as 2AB (Yfiler) |
| 2B | Outside right shoulder/front neck area (1 swab) | numerous skin cells | ~ 0.65 | ~ 0.09 | |
| 2C | Outside left sleeve (2 swabs) | moderate amount of skin cells | ~ 0.76 | ~ 0.07 | All (Inv. 24plex) |
| 2D | Outside right sleeve (2 swabs) | numerous skin cells, low NECs[2] | ~ 1.01 | ~ 0.53 | All (Inv. 24plex) |
| 2E | Outside front skirt area (1 swab) | moderate amount of skin cells | ~ 0.88 | ~ 0.07 | All, combined as 2EF (Yfiler) |
| 2F | Inside front skirt area (1 swab) | low number of skin cells and NECs | ~ 0.16 | ~ 0.02 | |

---

[2] NECs = nucleated epithelial cells

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facmedlab.com Fax: 510/887-4451

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
NYSCEF DOC. NO. 56

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

Case 23-793, Document 78, 11/20/2023, 3592064, Page52 of 300
Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 19 of 28

FACL Case No. 20190357



Figure 12. Dress outside left shoulder/front neck area swabs.



Figure 13. Dress outside right shoulder/front neck area swab.



Figure 14. Dress outside left sleeve swabs.



Figure 15. Dress outside right sleeve swabs.



Figure 16. Dress outside front skirt area swab.



Figure 17. Dress inside front skirt area swab.

Forensic Analytical Crime Lab

3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

A-593

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020
Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 20 of 28

FACL Case No. 20190357

**Item #3 Shoes**

A pair of Barney's New York brand patent leather high heels [#3] were submitted to FACL for examination. The packaging for this specimen is shown in Figure 18. The shoes, shown in Figures 19 through 21, are size 40 and appeared well-worn. Scuff marks and various stains were observed about the shoes. Multiple areas fluoresced when visualized with high intensity filtered light. Acid phosphatase activity was not detected in three fluorescent stains tested on the shoes. The shoes were not pursued further.



Figure 18. Shoes [#3], packaging.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 16 of 37

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 96                                        RECEIVED NYSCEF: 02/18/2020

Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 21 of 28

FACL Case No. 20190357



Figure 19. Shoes [#3], top surface.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 17 of 37

A-595

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 56
Case 1.22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 22 of 28
RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357



Figure 20.  Right shoe [#3], outer and inner surfaces.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 18 of 37

A-596

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
NYSCEF DOC. NO. 56

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357





Figure 21.  Left shoe [#3], outer and inner surfaces.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 19 of 37

A-597

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

Case 1.22-cv-10016-LAK   Document 51-1   Filed 02/10/23   Page 24 of 28

FACL Case No. 20190357

## Genetic Analysis of DNA

In this case several loci, or genetic markers, were amplified using the polymerase chain reaction [PCR] and subsequently typed using the **Investigator 24plex QS** genotyping system. The STR loci typed with 24plex are known as **TH01, D3S1358, vWA, D21S11, TPOX, DYS391, D1S1656, D12S391, SE33**, D10S1248, D22S1045, D19S433, D8S1179, D2S1338, **D2S441, D18S51, FGA, D16S539, CSF1PO, D13S317, D5S818, D7S820**, and amelogenin, a gene for sex determination. This system also includes one Y-STR marker, **DYS391**, to aid in determining the number of males in a mixed result.

TH01, D3S1358, vWA, D21S11, TPOX, DYS391, D1S1656, D12S391, SE33, D10S1248, D22S1045, D19S433, D8S1179, D2S1338, D2S441, D18S51, FGA, D16S539, CSF1PO, D13S317, D5S818, D7S820 are short tandem repeat [STR] loci. These loci are composed of core segments of DNA three to four bases in length repeated in tandem. Autosomal loci have two alleles per locus where the difference between alleles is the number of repeated core segments within each allele. An individual who is heterozygous at any given locus possesses alleles that have a different number of repeated core segments. An individual who is homozygous at any given locus possesses alleles with the same number of repeated core segments. The primers that recognize these STR loci are labeled with a fluorescent dye so that they can be detected and quantitatively assessed after electrophoresis.

Male specific Y chromosome genetic markers can be employed to examine male-only traits in male/female mixtures. Male specific Y chromosome genetic markers can also be employed to count the number of males in male/male mixtures. All individuals related to one another through the male line of inheritance share the same Y chromosome genetic markers. Since the Y chromosome markers are inherited together as a group, the group of Y chromosome markers is considered as one type called a haplotype. The frequency of occurrence of a haplotype can only be determined by counting the proportion of a population possessing that haplotype. For some evidence samples in this case we utilized the **Yfiler** typing system. The seventeen Y-STR genes included in this system are **DYS456, DYS389i, DYS390, DYS389ii, DYS458, DYS19, DYS385**

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 20 of 37

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
NYSCEF DOC. NO. 56
INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

Case 1:22-cv-10016-LAK    Document 51-1    Filed 02/10/23    Page 25 of 28

FACL Case No. 20190357

**a,b**[3], **DYS393**, **DYS391**, **DYS439**, **DYS635**, **DYS392**, **Y GATA H4, DYS437, DYS438**, and **DYS448**.

Genetic analysis of the specimens in this case involved the following essential steps:

1. Evidence and reference samples were digested with SDS and proteinase K.

2. DNA was extracted from sample digests with the EZ1 Advanced XL robot. Evidence sample DNA extracts were concentrated using Microcon molecular filters.

3. The various genes described above were amplified using the Polymerase Chain Reaction [PCR].

4. The STR genes and amelogenin were typed using capillary electrophoresis.

Interpretation of the following evidence profiles was assisted/supplemented with STRmix™ probabilistic genotyping software. STRmix™ uses laboratory specific parameters (STR kit, amplification protocols and capillary electrophoresis platform) and the quantitative allele peak data from an electropherogram in a Markov Chain Monte Carlo (MCMC) analysis to interpret contributor profiles in a DNA result. During MCMC analysis the likely genotypes of the individual contributors to a DNA profile are determined and given a weight of probability. The more likely genotypes of the contributors to a DNA profile, as determined by this analysis, will have higher weights.

Comparison of a reference profile to an interpreted (or deconvoluted) evidence profile is performed using a likelihood ratio (LR), which assesses the probability of two alternative hypotheses. Typically, the hypothesis of the prosecution ($H_p$) includes the person of interest (POI) whereas the alternative hypothesis ($H_d$) attempts to explain the data in the absence of the POI as a contributor. The LR of any given proposition will indicate which hypothesis has more support.[4] In general, a LR > 1 favors $H_p$ and a LR < 1 favors $H_d$.

---

[3] The DYS385 locus is duplicated on the Y chromosome such that one set of primers amplifies the DYS385a locus as well as the DYS385b locus. Each of these loci has acquired genetic variation over time as a consequence of mutation. The typing analysis itself is not able to determine which of the two alleles detected by the DYS385 primers originates from the "a" locus or the "b" locus. Typically, most other Y STR loci produce only one allele per male because there is only one copy of these genes per individual.

[4] The FBI expanded CODIS core STR loci frequency data for the populations used in the LR calculations at FACL, provided with STRmix™, is described in: Population data on the expanded CODIS core STR loci for eleven populations of significance for forensic DNA analyses in the United States. *Forensic Science International: Genetics* 25 (2016) 175-181. The ABI STR loci frequency data used for LR calculations at FACL is from the Applied Biosystems GlobalFiler™ PCR Amplification Kit User Guide, Publication Number 4477604, Revision E.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 21 of 37

A-599

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357

FACL likelihood ratio range:

| Likelihood ratio | Verbal equivalent |
| --- | --- |
| ≥ 1 million | Very strong support for POI inclusion |
| 10,000 to 999,999 | Strong support for POI inclusion |
| 1000 to 9,999 | Moderate support for POI inclusion |
| 2 to 999 | Limited support for POI inclusion |
| 1 | Uninformative |
| > 0.001 to < 1 (1/LR = 2 to 999) | Limited support for POI exclusion |
| 0 to ≤ 0.001 (1/LR ≥ 1000) | POI is excluded |

**Results**

**#2D Dress outside right sleeve swabs**

1. The DNA recovered from the dress outside right sleeve swabs [#2D] was determined to be a mixture of at least four contributors: three significant contributors, of whom at least one is male, and at least one minor/trace-level contributor.

2. The #2D dress outside right sleeve swabs typing result was analyzed with STRmix assuming four contributors. E. Jean Carroll was then compared to this result as a potential contributor.

3. The DNA result from the dress outside right sleeve swabs is approximately 3 million times more likely if the DNA originated from E. Jean Carroll and three unknown individuals than if the DNA originated from four unknown individuals. This likelihood ratio provides very strong support that E. Jean Carroll is a significant contributor to this result.

4. This DNA result was analyzed with STRmix assuming four contributors and assuming E. Jean Carroll as a contributor. ████████ was then compared to this result as a potential contributor.

5. The DNA result from the dress outside right sleeve swabs is approximately 1 quadrillion times more likely if the DNA originated from E. Jean Carroll, ████████, and two unknown individuals than if the DNA originated from E. Jean Carroll and three unknown individuals. This likelihood ratio provides very strong support that ████████ is a significant contributor to this result.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 22 of 37

A-600

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 56
Case 1:22-cv-10016-LAK   Document 51-1   Filed 02/16/23   Page 27 of 28
RECEIVED NYSCEF: 02/18/2020

FACL Case No. 20190357

6. This DNA result was analyzed with STRmix assuming four contributors and assuming E. Jean Carroll and ██████████ as contributors. ██████, ███████████, ██████████████, and ██████████ were then compared to this result as potential contributors.

7. ██████████ (1/LR >> 1000), █████████████ (LR = 0), ████████████████████ (LR = 0), and ██████████ (LR = 0) are all eliminated as potential contributors to the mixture of DNA from the dress outside right sleeve swabs.

## #2C Dress outside left sleeve swabs

8. The DNA recovered from the dress outside left sleeve swabs [#2C] was determined to be a mixture of at least four contributors: two significant contributors and at least two minor/trace-level contributors, of whom at least one is male.

9. The #2C dress outside left sleeve swabs typing result was analyzed with STRmix assuming four contributors. E. Jean Carroll was then compared to this result as a potential contributor.

10. The DNA result from the dress outside left sleeve swabs is approximately 10 trillion times more likely if the DNA originated from E. Jean Carroll and three unknown individuals than if the DNA originated from four unknown individuals. This likelihood ratio provides very strong support that E. Jean Carroll is a significant contributor to this result.

11. This DNA result was analyzed with STRmix assuming four contributors and assuming E. Jean Carroll as a contributor. ██████████████ was then compared to this result as a potential contributor.

12. The DNA result from the dress outside left sleeve swabs is approximately 70 trillion times more likely if the DNA originated from E. Jean Carroll, █████████████, and two unknown individuals than if the DNA originated from E. Jean Carroll and three unknown individuals. This likelihood ratio provides very strong support that ████████████ is a significant contributor to this result.

13. This DNA result was analyzed with STRmix assuming four contributors and assuming E. Jean Carroll and ██████████ as contributors. ██████, ███████████, ██████████████, and ██████████ were then compared to this result as potential contributors.

14. ██████ (1/LR >> 1000), █████████████ (1/LR >> 1000), ████████████████████ (1/LR >> 1000), and ██████████ (LR = 0) are all eliminated as potential contributors to the mixture of DNA from the dress outside left sleeve swabs.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

Page 23 of 37

FACL Case No. 20190357

### #2AB Combined DNA extracts from dress shoulder/neck area swabs
### #2EF Combined DNA extracts from dress front skirt swabs

15. The Y-chromosome STR analyses of the male DNA recovered from the combined DNA extracts from the dress shoulder/neck area swabs [#2AB] and the front skirt swabs [#2EF] revealed a low-level mixture of at least three contributors. Due to the complexity of each mixture, elucidation of individual Y-STR haplotypes is not feasible.

Additional reference specimens may be submitted for comparison to the DNA typing results from the combined DNA extracts from the dress shoulder/neck area swabs [#2AB], and the dress outside left [#2C] and outside right [#2D] sleeve swabs. The electropherograms documenting the Investigator 24plex and Yfiler analysis results are provided in Appendix 1.

**Disposition of Evidence**

All evidence items will be returned to the submitter.

Prepared by:                                    Reviewed by:

Nancy Wilson, M.S., Forensic Scientist [5]       Alan Keel, Senior Forensic Scientist [6]

The testing described and documented herein was completed in compliance with the accreditation requirements of the current ISO/IEC 17025 standard, ANSI National Accreditation Board (ANAB), and FBI Quality Assurance Standards as defined by the ANAB Forensic Testing Certificate and Scope of Accreditation (AT-1641).

[5] Lab analyses conducted by and report written by Nancy Wilson.
[6] Report reviewed by and technical review of lab analyses by Alan Keel.

Forensic Analytical Crime Lab
3700 Depot Road, Suite 403, Hayward, California 92545-2761 Telephone: 510.266.8100 www.facmindlab.com fax: 510.887.4451

A-602

# EXHIBIT B



Explore

Settings

Tweet

**E. Jean Carroll** @ejeancarroll

Cyrus Vance, the Manhattan District Attorney, has Trump's taxes.

Fani Willis, the Georgia Prosecutor, has Trump's phone call.

Mary Trump has her grandfather's will.

And I have the dress.

Trump is basically in deep shit.

washingtonpost.com
Trump's tax returns have been turned over to Manhattan district attorney
District Attorney Cyrus R. Vance Jr. is leading a criminal investigation into the former president and his business activities.

12:49 PM · Feb 25, 2021

**5,815** Retweets **579** Quote Tweets **26.6K** Likes

**suef** @suef07389606 · Feb 25, 2021
Replying to @ejeancarroll
He will get away with everything he always does
8 2 15

**E. Jean Carroll** @ejeancarroll · Feb 25, 2021
Replying to @suef07389606
Not this time, Suef!
10 3 239

**Old Wise Crone** @oldwisecrone · Feb 25, 2021
Replying to @ejeancarroll
You keep saying that . . . But nothing happens. . . 😱
5 1 37

**E. Jean Carroll** @ejeancarroll · Feb 25, 2021
Replying to @oldwisecrone
The wheels of justice turn slowly. But Mary Trump and I have a lawyer who makes those wheels turn with more gusto!
34 60 786

Search Twitter

**New to Twitter?**
Sign up now to get your own per

Sign up with G

Sign up with A

Create accou

By signing up, you agree to the T Privacy Policy, including Cookie U

**Relevant people**

**E. Jean Carroll** @ejeancarroll
Whipsawed by Cor JEAN at e.jean@as Witless? Read my S ejeancarroll.subst Atlantic, VF, NYmag

**What's happening**

NBA · Last night
**Bucks at Lakers**

Trending in United States
**Open Your Eyes**
6,629 Tweets

Politics · Trending
**The CDC**
29.5K Tweets

Politics · Trending
**Fetterman**
54.2K Tweets

Fashion & beauty · Trending
**#LISAxCelineWinter23**
Trending with LALISA AT CELIN

Show more

Terms of Service Privacy Policy Accessibility Ads info More ···
© 2023 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.
Log in S

A-604

he always looks a way to get out of not appearing.

💬 11          🔁 16          ♡ 201          📊          ⬆️

**E. Jean Carroll** ✓ @ejeancarroll · Feb 25, 2021
Replying to @PeteCelino
He has been involved in over 3,500 lawsuits. Many of these he loses or settles. He has been in court many many times before.

💬 10          🔁 31          ♡ 310          📊          ⬆️

Show replies

**Lets Get Real** @reallauranor · Feb 25, 2021
Replying to @ejeancarroll
But I'm so tired of waiting! Why are we still waiting?

💬 3          🔁 1          ♡ 19          📊          ⬆️

**E. Jean Carroll** ✓ @ejeancarroll · Feb 25, 2021
Replying to @reallauranor
Because the American Justice system is not quick.

💬 12          🔁 5          ♡ 141          📊          ⬆️

**Jamison Twins** 🌐 ✓ @PSYCHICTWINS · Feb 25, 2021
Replying to @ejeancarroll
We predicted them all.

💬 1          🔁 3          ♡ 19          📊          ⬆️

**E. Jean Carroll** ✓ @ejeancarroll · Feb 25, 2021
Replying to @PSYCHICTWINS
Indeed you did, Jamisons!

AND how does the future look now, ladies??

💬 3          🔁 4          ♡ 48          📊          ⬆️

Show replies

**Trisha Greenhalgh** ✓ @trishgreenhalgh · Feb 25, 2021
Replying to @ejeancarroll and @duty2warn
You are one courageous woman.

💬          🔁          ♡ 9          📊          ⬆️

**afrobella** ✓ @afrobella · Feb 25, 2021
Replying to @ejeancarroll
LOVE to hear this!

💬          🔁          ♡ 1          📊          ⬆️

**Tara Dublin** ✓ @taradublinrocks · Feb 26, 2021
Replying to @ejeancarroll
Isn't it just GLORIOUS?! @MaryLTrump
#WomenWillEndTrump

💬 4          🔁 12          ♡ 120          📊          ⬆️

**Mary L Trump** ✓ @MaryLTrump · Feb 26, 2021
Replying to @taradublinrocks and @ejeancarroll
It is, indeed.

💬 7          🔁 11          ♡ 108          📊          ⬆️

Show replies

**Shane Plumer, Esq.** ✓ @ShanePlumerEsq · Feb 25, 2021
Replying to @ejeancarroll
If only White people cared. 🧍

## Explore
## Settings

🔍

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

A-605

Replying to @ejeancarroll

Why do you think he was willing to destroy our democracy just to hold onto power, because he knew this was all coming his way as soon as he got kicked out. With as much stress and anxiety as he caused us over the last 4 years, it's gonna be nice seeing his house of cards crumble.

💬 3        🔁 13        ♡ 141        📊        ⬆️

Show replies

**Donald Blake** @Bobadibob · Feb 25, 2021        · · ·
Replying to @ejeancarroll

If only it were true. But anybody who's got eyes knows that nothing is going to come out of it. It's like he's fucking magical. Nothing touches him. He's the reason I don't believe in justice anymore.

He's living proof that karma doesn't exist .

I feel for you ma'am.

💬 11        🔁 2        ♡ 9        📊        ⬆️

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

2/10/23, 1:49 PM

# Explore

⚙ Settings

🔍

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

A-607

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL        212.763.0883
DIRECT EMAIL       rkaplan@kaplanhecker.com

February 10, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *Carroll v. Trump*, 22 Civ. 10016 (LAK) ("*Carroll II*")

Dear Judge Kaplan:

We write on behalf of Plaintiff E. Jean Carroll in response to Defendant Donald J. Trump's letter motion seeking an "immediate ruling" on the latest dispute that has arisen between the parties and promising that Trump does not "seek to delay the trial date." ECF 51 at 1. Trump's letter should be seen for exactly what it is: a transparent effort to manufacture a dispute over a document Trump has known about for *more than three years*, in order to delay these proceedings, put off the first day of trial at all costs, prejudice potential jurors, and "take back" his own past strategic decisions in this litigation. But as this Court has observed, "[l]itigants may not try their cases, withhold evidence, and then seek to reopen when their tactical decisions yield adverse results." *Korea First Bank v. Lee*, 14 F. Supp. 2d 530, 532 (S.D.N.Y. 1998). Trump's motion should be denied.

\* \* \*

Three days ago, Joseph Tacopina, new counsel for Trump, stood before this Court and gave his "word" that he "will be ready to try this case." Tr. at 13 (Feb. 7, 2023). "If you say April," he continued, "I'm trying it in April. I'm not running from this obligation." *Id.*

At the same time, however, Trump was secretly laying the groundwork for a bad-faith effort to taint the potential jury pool, upend this Court's discovery orders, and delay these proceedings. Days before they made any initial outreach to Carroll on this subject, Trump or his legal team told reporters that Trump was now willing (after years of unequivocal refusal) to provide a DNA sample to Carroll as part of this litigation. On February 9, 2023, less than 48 hours after the parties appeared before the Court, the *Daily Beast* and the *Independent* published almost identical stories concerning Trump's intentions. As the *Daily Beast* reported, "[a]ccording to a source familiar with his defense team's new strategy, Trump's proposition has not yet been made to the opposing side. But if they follow through, it would position them to tell jurors his DNA was offered—just never tested." *See* Jose Pagliery, *Trump Says He'll Hand Over His DNA for E. Jean*

KAPLAN HECKER & FINK LLP                                                2

*Carroll Case*, Daily Beast (Feb. 9, 2023); *see also id.* ("'It sounds like a continuation of the dilatory tactics that Trump uses all the time,' said Albert Scherr, a University of New Hampshire law school professor who serves as one of the nation's top experts on forensic DNA evidence. 'As a general rule, Trump's lawyers in every venue have the strong propensity to delay and delay and muck things up.'").[1]

Having leaked these reports to the press in a blatant effort to influence the jury pool and throw a wrench into the pretrial schedule, Trump now asks this Court to endorse his strategy in the guise of a motion to reopen discovery to explore the DNA issue. Trump's apparent objective is to position himself as "trying" to provide his DNA, even though it was his own strategic decisions that led to the exclusion of that issue from the litigation in the first place. Carroll, now 79 years old, has built her case with powerful additional evidence and is ready to prove Trump's liability before a jury; she should not be prejudiced by Trump's latest gambit to violate the Court's orders and uproot the trial date.

* * *

There can be no doubt that Trump makes his motion in bad faith. At Tuesday's conference, his counsel made multiple representations about their readiness for trial. In addition to giving the Court his "word" that Trump would be ready in April, Mr. Tacopina insisted, "We want to proceed to trial as quickly as possible," and Ms. Habba suggested that Carroll's counsel had made "false" claims with respect to her client's interest in delay. Tr. at 5, 15 (Feb. 7, 2023). They offered only a single case-related reason for modifying the schedule: giving Trump's emotional damages expert, Dr. Nace, additional time to complete his work. Trump made the same representation in a letter to the Court earlier in the week: "Adjournment is sought *solely* to redress the inability of our psychiatric expert to meet the current deadline." ECF 48 at 1 (emphasis added). And Trump agreed at the outset of *Carroll II* that discovery should be limited to new issues and identified the specific damages-related discovery that he sought to pursue. *See* Tr. at 3–9 (Dec. 21, 2022); *see id.* at 16 (agreeing that "discovery about whether this incident ever happened … [was] all done").

Testing Trump's DNA is obviously not a new issue, as Trump spent the early years of this litigation categorically refusing Carroll's request for a DNA sample. Indeed, Carroll first sought a DNA sample from Trump in January 2020. NYSCEF No. 56.[2] Recognizing the sensitive nature of that discovery request, Carroll attached to her CPLR 3121 notice a report prepared by an expert that showed there was unidentified male DNA present on the dress that Carroll wore during the sexual assault at Bergdorf Goodman. *Id.* Days after receiving that request, however, Trump moved to stay the state court proceedings. NYSCEF No. 49. As soon as that stay motion was denied, Carroll renewed her DNA request—this time, only to have the Department of Justice intervene in the case under pressure from Trump. Of course, this Court then denied DOJ's motion to substitute. While appellate proceedings were ongoing, and the parties were preparing for discovery, Carroll's

---

[1] *See also* Rachel Sharp, *Trump finally offers to hand over DNA to E Jean Carroll rape case – after deadline passes to submit evidence*, Independent (Feb. 9, 2023).

[2] References to "NYSCEF No. __" are to the state court docket in *Carroll v. Trump*, No. 160694/2019 (N.Y. Sup. Ct.). References to *Carroll I* relate to *Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.).

A-609

# KAPLAN HECKER & FINK LLP

3

counsel again reiterated Carroll's interest in obtaining Trump's DNA, even indicating that it might obviate the need to take Trump's deposition. Tr. at 28 (Feb. 22, 2022), *Carroll I*.

But Trump persisted in unequivocally rejecting any effort to obtain his DNA. Among other things, Trump "wholly object[ed] to [the] request for a DNA sample." As Ms. Habba went on to argue in an August 15, 2022 letter:

> Plaintiff has not demonstrated a reasonable basis for such an intrusive request, nor does it reasonably relate to her claims and defences [*sic*] in this matter. Further, the request is highly prejudicial given chain of custody concerns and violates Defendant's privacy rights, which are especially sensitive given that he is a former President. In the event that Plaintiff files a Motion to Compel, we will adamantly oppose it and seek a protective order to prevent its enforcement.

Carroll was thus faced with a choice: almost three years into the litigation, she could engage in a protracted fight over an unprecedented request to obtain a former president's DNA—a request that Trump had repeatedly resisted, vowed to continue resisting, and would inevitably turn into a substantial issue in this Court and in any subsequent or interlocutory appellate proceedings. Or she could pivot, take Trump's deposition, and work toward the trial date that the Court had already set, armed with the overwhelming evidence already available to her. She elected the latter course so that she might prove her case without further delay—a goal that was especially important in light of Trump's demonstrated pattern of exploding court deadlines and escaping accountability. Having made that choice in response to Trump's own highly strategic calculation, and in reliance on the orders issued by this Court, Carroll is entitled to proceed to trial without affording Trump a chance to change his mind about this decision (or any others in the case) that he may now regret.

\* \* \*

Trump did not make his new document request until hours before the parties filed their joint pretrial motion in *Carroll I* and exchanged exhibits in *Carroll II*. This request is thus untimely and prejudicial, and the points that Trump advances to support it are entirely meritless.

As your Honor is aware, the parties completed fact discovery in *Carroll I* on October 19, 2022. The Court later entered a scheduling order in *Carroll II*, where the Court recognized that *Carroll I* had "fully explored the question whether the defendant sexually assaulted the plaintiff." ECF 19 at 1. Fact discovery in *Carroll II* has since closed as well, and the parties have identified trial exhibits in both actions, none of which concern DNA. *See Carroll I*, ECF 128.

There is thus absolutely no basis for Trump's motion. The law is clear that discovery should not be reopened to allow a party to pursue discovery that it already "had an ample opportunity to pursue." *Kulkarni v. City Univ. of New York*, No. 01 Civ. 10628, 2003 WL 23319, at \*4 (S.D.N.Y. Jan. 3, 2003); *see also Kelly v. Wright Med. Tech., Inc.*, No. 00 Civ. 8808, 2003 WL 40473 (S.D.N.Y. Jan. 3, 2003) (Kaplan, J.) (denying motion to reopen discovery where there was "no persuasive reason to relieve plaintiff of the consequences of her own failure to seek discovery [] in a timely fashion"). Where, as here, "a party is aware of the existence of documents or other information before the close of discovery and propounds requests after the deadline has passed, those requests should be denied." *Gucci Am., Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 140

KAPLAN HECKER & FINK LLP                                                                    4

(S.D.N.Y. 2011). Obviously, these principles apply with greater force when the moving party actively *resisted* the very discovery in question for years. *See Korea First Bank*, 14 F. Supp. 2d at 532.[3]

        Moreover, if Trump's untimely request were accepted, it would inevitably delay the trial. Despite his counsel's protestations otherwise—and their pretense that this is a simple matter—the reality is that Trump's proposal would involve numerous substantial, time-consuming steps. Those include (1) meet-and-confers regarding the conditions under which Trump's biological material would be taken, transported, and maintained; (2) the secure acquisition of Trump's DNA by Carroll's expert; (3) the testing of Trump's DNA; (4) a report by Carroll's expert; (5) a report by Defendant's rebuttal expert; (6) depositions of both experts; and (7) motion practice regarding any requested *in limine* rulings. This case does not involve an isolated sample of unidentified male DNA; the dress contains a mix of DNA, testing of which would necessarily involve complex analysis. In the meantime, Trump would almost certainly be searching for yet another reason to delay, or another decision that he made earlier in the case that he would prefer to revisit, while seeking to again pollute the potential jury pool. *See* Tr. at 12 (Feb. 7, 2023) ("[T]hings keep happening in this case and the cases involving your client ...."); *Carroll v. Trump,* No. 20 Civ. 7311, 2022 WL 6897075, at *6–*7 (S.D.N.Y. Oct. 12, 2022); *Carroll v. Trump,* 590 F. Supp. 3d 575, 587–88 (S.D.N.Y. 2022).

        None of Trump's one-off points changes this analysis. ECF 51 at 2–3. Many of the specific premises of his argument—the circumstances of the February 2020 state court filing, and a February 2021 tweet—are old news, and could have been raised and litigated long before today. Nor is it relevant that Carroll recently produced documents: that production followed from requests for discovery that Trump had served in *Carroll II* within the discovery window. Trump's concern with surprise evidence or witnesses can easily be put to rest: because of Trump's obstinance throughout discovery, there is no DNA evidence in this case, and none will be introduced at trial (indeed, we will be filing a motion *in limine* to that effect).[4] And Trump's opening suggestion that this request "goes directly to the issue of ... damages" is absurd: discovery in *Carroll II* is limited to damages, not whether the sexual assault itself occurred, since the parties had every opportunity to thoroughly explore that issue through discovery in *Carroll I*.

                                                * * *

        At bottom, Trump's motion is yet another bad faith and legally frivolous delay tactic. Carroll sought Trump's DNA early in the case and he refused to provide it. He persisted in that refusal for well over a year and in both state and federal court. Carroll therefore chose to prove her case using alternative evidence—and has amassed powerful proof that Trump sexually assaulted her. Now that discovery has closed, Carroll is at long last entitled to present her proof to a jury at trial. Trump may prefer to put off trial for another day, and he (and his new lawyers) may regret

---

[3] The appearance of new counsel makes no difference. *See, e.g., Emamian v. Rockefeller Univ.*, 823 F. App'x 40, 43 (2d Cir. 2020) ("The desire by new counsel to reopen discovery for the purposes of pursuing new [] theories does not amount to 'good cause' necessitating a reversal of the district court's rulings, particularly in light of the prejudice to [the nonmoving party] that would have ensued from additional delay in the already-protracted case.").

[4] Trump's letter seems to imply that Carroll has already had Trump's DNA tested. She has not. Because Trump refused to provide his DNA earlier in this litigation, there has been no DNA for testing.

A-611

KAPLAN HECKER & FINK LLP                                              5

decisions that he made earlier in the case, but that is no basis to again delay Carroll's day in court. Nor is it a basis to upend the discovery process and undertake a complex factual and expert discovery proceeding into issues that Trump himself spent years opposing. The rules established by the Court apply to all parties, including Trump, and the time has come for him to face a jury.

Respectfully submitted,

Roberta A. Kaplan

cc:      Counsel of Record

A-612

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

February 10, 2023

**FILED BY ECF**
Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      **Re:**    **Carroll v. Trump, 22 Civ. 10016 (LAK) ("Carroll II")**

Dear Judge Kaplan:

      We respectfully submit this letter on behalf of Defendant, Donald J. Trump, to briefly reply to Plaintiff's opposition to our request for the full copy of the DNA report she filed in connection with *Carroll I*.

      At the outset, while Plaintiff asserts that Defendant's request is an attempt to delay the trial, that is simply not true. As we advised the Court in the very first paragraph of our letter, "we are not seeking to delay the trial date." To that end, we have already conferred with a DNA expert, and will be able to immediately have a DNA analysis conducted and a relevant report generated.

      In addition, Plaintiff's assertion that Defendant or his legal team, in an effort to taint the potential jury pool, told reporters that Defendant is willing to provide a DNA sample is categorically false. First, neither Defendant nor his legal team conveyed any such information to reporters. And second, the contention defies commonsense, as just a day after the cited February 9th article was published, Defendant filed the instant request. Accordingly, neither Defendant nor his legal team would have had a reason to provide such information to the press for purposes of tainting a jury pool. Ironically, despite Plaintiff's complaint about seeking to influence the potential jury by conveying information to the media, it is Plaintiff, herself, who wrote a book about her claim and then went on a press tour to further popularize her claim and influence the public. Indeed, Plaintiff's tweet attached to our prior letter is just one of many examples of Plaintiff continuing to make public statements.

      Based on the reasons set forth herein and in our initial letter, we respectfully submit that Plaintiff should be directed to provide the full DNA report.

A-613

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
February 10, 2023
Page 2

Your consideration is greatly appreciated.

Very truly yours,

Joseph Tacopina

cc:    All counsel by ECF

N27QcarC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    E. JEAN CARROLL

4                    Plaintiff

5            v.                           22 Civ. 10016 (LAK)
                                              Conference
6    DONALD J. TRUMP

7                    Defendant

8    ------------------------------x
                                          New York, N.Y.
9                                         February 7, 2023
                                          11:00 A.M.
10
     Before:
11
                         HON. LEWIS A. KAPLAN
12
                                          District Judge
13
                          APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     ROBERTA ANN KAPLAN
16   SHAWN GIOVJIAN CROWLEY
     HELEN ANDREWS
17   TREVOR MORRISON

18   TACOPINA SEIGEL & DeOREO
          Attorneys for Defendant
19   JOSEPH TACOPINA
     CHAD DEREK SEIGEL
20   MATTHEW G. DeOREO

21   HABBA MADAIO & ASSOCIATES LLP
          Attorneys for Defendant
22   ALINA HABBA
     MICHAEL MADAIO

23

24

25

N27QcarC

```
 1                  (In open court; case called)
 2              DEPUTY CLERK:  Counsel for plaintiff, are you ready?
 3      Can you please put your appearances on the record.
 4              MS. KAPLAN:  We are.  Roberta Kaplan from Kaplan
 5      Hecker.  I'm here with my partner Shawn Crowley, my colleague
 6      Trevor Morrison, and my other colleague Helen Andrews.
 7              DEPUTY CLERK:  Counsel for defendant, are you ready?
 8              MR. TACOPINA:  Yes.  Good morning, your Honor.
 9              THE COURT:  Good morning.
10              MR. TACOPINA:  Joseph Tacopina for Donald Trump, along
11      with my partners Chad Seigel and Matthew DeOreo seated directly
12      to my right.  Good morning, your Honor.
13              MS. HABBA:  Good morning, your Honor Alina Habba and
14      Michael Madaio also for Donald Trump.
15              THE COURT:  Good morning.
16              Well, Ms. Habba, I had a rather delphic letter from
17      you last week saying several unspecified scheduling issues had
18      arisen, and you wanted to raise them.  So tell me what they are
19      please.
20              MS. HABBA:  Yes, your Honor.  Most of them we -- I'm
21      going to actually have Mr. Tacopina raise, if that's okay with
22      you, as he is going to be handling some of these issues himself
23      in terms of scheduling.
24              But there's a general question and concern, frankly,
25      with having Carroll I and Carroll II having separate dates and
```

N27QcarC

1    general questions on how that would work given that they're the

2    same set of facts.

3              THE COURT:  Mr. Tacopina.

4              MR. TACOPINA:  Thank you very much, your Honor.

5              Your Honor, I trust you also received our letter dated

6    yesterday, February 6, outlining I guess basically --

7              THE COURT:  No.

8              MR. TACOPINA:  No.  Okay.

9              Can we hand one up to the Court, your Honor?  I'm

10   going to talk to you about it anyway.  It was hand delivered at

11   4:00 p.m.

12             THE COURT:  Where and to whom was it hand delivered?

13             MR. TACOPINA:  Your Honor, I can't speak to who.  We

14   had a messenger from our office bring it to the Court and

15   deliver it.  Was it filed also electronically?  I'm going to

16   hand you up the letter your Honor.

17             THE COURT:  I appreciate that.

18             MR. TACOPINA:  I'm sorry, your Honor.

19             THE COURT:  But since the pandemic, we don't have mail

20   delivery within the court.  We have to send staff to get mail,

21   and we don't do it every hour.  Okay.

22             MR. TACOPINA:  Could I hand this up?

23             THE COURT:  Sure, you can.

24             MR. TACOPINA:  I know co-counsel has it, your Honor.

25   But if you don't mind, could I use the podium, by the way?

N27QcarC

```
 1              THE COURT:  I'd prefer it.

 2              MR. TACOPINA:  Your Honor, there are scheduling issues

 3      I'd like to address.  Would the Court want a minute to peruse

 4      the letter or do you want me to plow ahead?

 5              THE COURT:  I think it might be a good idea if I read

 6      the letter.

 7              MR. TACOPINA:  Why don't I sit down for five minutes.

 8              THE COURT:  I'm only up to the first sentence of the

 9      second paragraph, but right away let me tell you all that I've

10      had enough of the personal accusations between and among

11      lawyers, and I don't want to see any more.  I thought I made

12      that clear in the past.

13              All right.  Go head, Mr. Tacopina.

14              MR. TACOPINA:  Thank you very much, your Honor.

15              THE COURT:  Does this, by the way, respond to some

16      writing or writings that I haven't been provided with?  Because

17      it quotes from them.

18              MS. HABBA:  Yes.

19              MR. TACOPINA:  Maybe Ms. Kaplan -- I think Ms. Kaplan

20      submitted a letter as well that maybe you didn't receive also.

21              MS. KAPLAN:  I apologize your Honor we thought you

22      received it.  We submitted a letter on February 6 that we

23      thought we had delivered to chambers.

24              MR. TACOPINA:  It's all right if you only read mine,

25      your Honor.  There's no need to read both.
```

A-618

N27QcarC

1        THE COURT:  I'm sure Ms. Kaplan feels I only need to

2    read hers, and not yours.

3        MS. KAPLAN:  I'm not going to comment, your Honor.

4        THE COURT:  Okay, Mr. Tacopina.

5        MR. TACOPINA:  Thank you, your Honor.

6        At the outset, let me just say Andrew informed us

7    going forward we will email Andrew when we're delivering

8    something by mail.  I think both sides will do that as well to

9    make sure you got it.

10        At the outset, I want to ensure the Court that we have

11    not come into this case looking to delay it just for dilatory

12    reasons.  We want to proceed to trial as quickly as possible to

13    put this behind our client.

14        I was brought into this case, my firm was brought into

15    this case to try it, and that's what I will do.  I intend to

16    try it as quickly as possible.  We were just retained, your

17    Honor, January -- one week ago.

18        THE COURT:  Is Ms. Habba going to stay in the case or

19    not?

20        MR. TACOPINA:  Yes, your Honor.

21        THE COURT:  Go ahead.

22        MR. TACOPINA:  In fact, we were retained January 31,

23    one week ago.  On that same day, that we filed our notices of

24    appearances.  We appeared at a deposition of the plaintiff on

25    the same day we were retained.  That being said, in order to

N27QcarC

1    sufficiently prepare for trial, we do need several items to be

2    brought to the Court's attention bearing on that timing.  Most

3    importantly, the scheduling order that was entered on

4    December 21 set yesterday, February 6, as the deadline for

5    completion of expert discovery.  However, before we entered the

6    case, your Honor, our co-counsel, Ms. Habba's firm, experienced

7    some substantial difficulties retaining someone, an expert to

8    conduct the IME.

9            By way of background, pursuant to your scheduling

10   order of December 21, co-counsel -- when I say co-counsel,

11   Ms. Habba's firm -- immediately contacted potential experts for

12   the purposes of performing that IME and issuing an expert

13   report.  Quite frankly, unfortunately, due to the unique nature

14   of this case and the incredibly expedited schedule, it was

15   substantially difficult for them to secure a --

16           THE COURT:  No, it is not incredibly expedited.

17           MR. TACOPINA:  Okay.

18           THE COURT:  It is not.  *United States v. Microsoft*, a

19   case of some moment went to trial within five months of the

20   filing of the complaint.

21           MR. TACOPINA:  Okay, your Honor.

22           So to revert back to at least -- it was -- at least

23   the timing was expedited for some of the experts' availability,

24   but I understand what you're saying.  And, again, I don't

25   quarrel with that at all.  But, anyway, it was difficult for

N27QcarC

1    them to find an expert willing to assist very quickly.

2            Nonetheless, they conferred with an expert referral

3    service and ultimately were able to retain the services of

4    Edgar Nace on January 9, and right after the holidays and they

5    were able to do that.

6            So co-counsel contacted plaintiff's counsel that same

7    day to request the IME and identify Dr. Nace as the examiner in

8    accordance with the scheduling order, but because Dr. Nace's

9    wife was suffering from a life-threatening medical condition

10   which limited his availability, co-counsel wasn't at the time

11   able to give a date certain for the IME.  Instead, inquired as

12   to the plaintiff's availability, when the plaintiff might be

13   available.

14           By the way, let me just say this -- and, again, we

15   weren't here yet -- but the expert, Dr. Nace, did assure that

16   despite his wife's condition at the time, he would be able to

17   meet the scheduling order.  He assured co-counsel of that.

18           Two days later, on January 11, the plaintiff's counsel

19   sent co-counsel a letter objecting to the IME for three

20   reasons:

21           First, they didn't file -- co-counsel didn't file a

22   motion for an IME under Rule 35.

23           Second, the IME wasn't needed because the plaintiff

24   wasn't diagnosed with any "mental disorder or condition."

25           And, lastly, Dr. Nace wasn't qualified because he

N27QcarC

 1   purportedly focused on drug addiction only.

 2           As to the first claim, your Honor, pursuant to the

 3   scheduling order, your Honor directed plaintiff to submit to an

 4   IME upon request, so no motion in fact was needed.

 5           As to the second claim, a diagnosis isn't needed as a

 6   prerequisite for an IME.  All that's needed is a claim of

 7   emotional damages, which you have in abundance here.

 8           Indeed, their expert, Dr. Liebowitz, diagnosed the

 9   plaintiff with suffering from an ongoing trauma from the

10   alleged rape that was so severe that it significantly

11   diminished her quality of life, and her losses were profound

12   and enduring and lasted over 20 years.

13           THE COURT:  I took the time to read your letter.

14           MR. TACOPINA:  Okay.

15           THE COURT:  It's not all that helpful for you to read

16   it back to me.

17           MR. TACOPINA:  It's not the letter, but yes, you're

18   right.

19           So the bottom line is this:  Those issues were

20   presented.  That caused a back-and-forth because at that point

21   then, after the objection, instead of performing the

22   examination of the IME and complying with the schedule for the

23   report, what then happens is the objection then created this

24   delay.

25           On January 19, co-counsel responded to the objection

**A-622**

N27QcarC

1    letter explaining all the things we just discussed and

2    requested a meet-and-confer, which occurred on the 24th.  On

3    the 24th, plaintiff's counsel wanted to know the precise amount

4    of time Dr. Nace would need to examine the plaintiff, and

5    co-counsel said a meaningful amount of time because, remember,

6    their expert, Dr. Liebowitz, had 22 hours with the plaintiff.

7          So anyway, that's when the issue happened.  That's

8    again referenced in the letter.  I'm not going to read the

9    letter.  And I don't have the letter in front of me, your

10   Honor.  But that's when the issue happened with Dr. Nace's wife

11   where she took a dramatic turn for the worse, had surgery, and

12   there was a risk of death, apparently.

13         THE COURT:  Is that behind us now, or not?

14         MR. TACOPINA:  She's here still, but there's some

15   severity.  What Dr. Nace said to co-counsel, and I confirmed

16   that before we arrived here today, was that by February 28, he

17   would be able to do the IME and complete the report.

18         And as far as we know, that still stands correct.

19         MS. HABBA:  Yes.

20         MR. TACOPINA:  So that's one of the focal points of

21   this sort of scheduling issue.

22         I'm trying to see if there is anything else I need to

23   say.  Your Honor, you read the letter.  Dr. Nace's issue speaks

24   for itself.  Obviously, since we've entered the case, we've

25   tried to come up with other options for experts to do this IME.

N27QcarC

1    Again, that's been one week.  It's not been incredibly easy

2    because of our imposed -- not the Court's, but our imposed

3    timeline -- and we need them to drop everything and commence

4    immediately.  But we are doing that.  We are working toward

5    that.

6              But on the 25th, co-counsel reached out to plaintiff's

7    counsel to meet and confer regarding the extension of time to

8    complete discovery, and plaintiff's counsel said that they

9    basically by email, they'd give a slight extension but

10   indicated that, you know, their expert examined the plaintiff

11   for 22 hours, but we should forego -- this is not a personal

12   attack.  I respect everyone at that table, by the way -- but we

13   should forego an expert examination of the plaintiff and just

14   rely on her three-hour deposition that covered not only

15   emotional damages but financial damages.

16             The obvious problem with that is that would give the

17   plaintiff an enormous unfair advantage in the eyes of a jury

18   because they would have an expert testifying who spent 22 hours

19   with the plaintiff and would testify to their findings based on

20   that.  We would have an expert get up there and say "Never met

21   the plaintiff, I read a deposition, and here is my opinion."

22   You can imagine how that would play out in the eyes of a fact

23   finder.  Sounds like their expert was prepared, spent time with

24   the plaintiff, and ours didn't.  Just read some cold words on a

25   transcript.  So anyway, that is sort of where we are at, I

N27QcarC

1    think.

2          Following that exchange was another meet-and-confer

3    that was contemplated for January 27, but that didn't happen

4    because co-counsel didn't have our expert yet, aside from

5    Dr. Nace and his delayed schedule, which was, again,

6    February 28.

7          So we are -- we, my firm, is coming in.  We are

8    diligently trying to supplement Dr. Nace and find a backup

9    expert, and we're doing that on a daily basis.  I have my

10   entire firm working on that.  And we've spoken with several.

11   Dr. Nace again informs that he is available still to do this by

12   the 28th.

13         And sort of that's where we stand, your Honor.  We are

14   looking -- I'm looking for --

15         THE COURT:  To be precise, what you said before, if I

16   understood you correctly, was that he can do the IME and his

17   report by February 28, right?

18         MR. TACOPINA:  Again, I -- yes.  I've not spoken to

19   him.  I looked over to co-counsel who just acknowledged yes,

20   so...

21         MS. HABBA:  Yes, your Honor, that's our understanding

22   from Dr. Nace.

23         THE COURT:  Thank you.

24         MR. TACOPINA:  So that's where we're at, your Honor.

25         I don't think I need to then go into the issue of why

N27QcarC

1    the Carroll II case, the one I'm brought in to try, is

2    different than the first case because the whole issue of the

3    damages are completely -- completely different in that case.

4            The bottom line is, your Honor, I am looking for a

5    slight, a slight adjustment of the Court's schedule; not a

6    massive one, but a slight one.  Some of them have to do with us

7    being competently prepared to try this case.  This is a case

8    where the allegations happened, as we stand here now, like 27

9    years ago, around 27 years ago.  I think there's a lot of work

10   for us to do to catch up to be ready to try this case.  As I

11   asked, I asked for a six-week adjournment from the Court's

12   trial schedule.  The first week of June we will be ready to go.

13   There will be nothing, come hell or high water, to prevent us

14   from doing that.

15           THE COURT:  You know, I've heard that before.

16           MR. TACOPINA:  Not from me you haven't.  You and I

17   have tried a case before, your Honor.  And I give you my word

18   here, with all those people behind us taking notes.

19           THE COURT:  Mr. Tacopina, I understand you have been

20   before me.  To say we have no issues is a vast understatement.

21   I have a lot of respect for you.  I have a lot of respect --

22           MR. TACOPINA:  Thank you.

23           THE COURT:  -- for the folks at the front table too,

24   as you know.  And but things keep happening in this case and

25   the cases involving your client, and I'd be fool not to take

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N27QcarC

1    that into account too.

2            MR. TACOPINA:  I understand, your Honor.  All I can

3    tell you is this:  I'm new to this foray.

4            THE COURT:  It's not your first rodeo.

5            MR. TACOPINA:  Not my first rodeo.  It is my first

6    rodeo in this Saldome, if you will.

7            THE COURT:  Okay.  Yes.

8            MR. TACOPINA:  But it's certainly, your Honor, I give

9    you my word.  I will be ready to try this case.  Look, I'll be

10   ready for this case.  If you say April, I'm trying it in April.

11   I'm not running from this obligation.

12           THE COURT:  I know that.

13           MR. TACOPINA:  That was very magnanimous of me to tell

14   you that.  But, your Honor, I'm asking just to be ready -- we

15   have an expert who is now going to spend some time with the

16   plaintiff, issue a report.  I have to do some catch up.  We do

17   have a trial schedule in May.  Not your problem; mine.  I have

18   a personal issue in April.  Not your problem; mine.  I can

19   relay it to the Court if you'd like.  I'm asking for the first

20   week of June.  I will not be anywhere but here to start the

21   trial in this case.

22           If you can't do it, your Honor, I understand.  I'll be

23   ready whenever you want me to be ready.  If you say start

24   tomorrow, I'll be ready, but I'm asking to be competent in this

25   case, to be completely prepared, and at least discharge my

1    obligations.  I'm asking if we could push the trial date over.

2          The IME schedule and everything else, February 28.  I

3    think Ms. Kaplan in her letter yesterday suggested February 21

4    as the sort of date for the service of rebuttal for defendant's

5    psychological expert.  I guess we're asking for a week past

6    that.  And I'm just asking for the trial to start the first

7    week of June, if your Honor could accommodate for substantial

8    reasons.

9          THE COURT:  Look, we've got fundamentally two

10   different -- I think different issues.  One is the problem with

11   the expert.  I understand what that's all about.

12          And the other is that you'd like more time to get

13   ready.

14          In the best of all possible worlds -- actually, maybe

15   a third issue, which is whatever personal issue you have.  But

16   they're very different.

17          MR. TACOPINA:  Yes.

18          THE COURT:  Because two of those issues were on the

19   table when you agreed to come into this case.  You came in to

20   an April 17 trial date knowing whatever your April schedule

21   was, and knowing that in the best of all possible worlds, all

22   lawyers want as much time as they can get to prepare for trial.

23   I did when I did it, and I understand that.

24          Let me hear from Ms. Kaplan, and we'll see where we

25   go.

N27QcarC

1          MS. HABBA:  Your Honor, before Ms. Kaplan's rebuttal

2     to his argument, there is one other portion with Carroll I, if

3     you'd like me to speak to it first, and then she can address

4     them both, or we can, you know, bounce back and forth.

5          THE COURT:  Have a seat, Ms. Kaplan.

6          MS. HABBA:  Sorry.  I thought I would raise it so

7     Robbie doesn't have to get up twice.

8          So, your Honor, thank you for hearing me as well.  I

9     know it's burdensome having multiple firms on one case.

10         As far as Carroll II, we have not had any delays.  My

11    firm has been on it and met all deadlines outside -- with

12    meet-and-confers working properly with co-counsel -- with

13    opposing counsel, and I think we've made headway through

14    several calls without getting court intervention.  So,

15    respectfully, anybody saying otherwise would just be false.

16    This was filed November, end of November, as you know,

17    Carroll II, and there have not been any extensions.

18         The other issue I want to address on Carroll I, which,

19    again, I have not asked for any trial adjournments or

20    extension.  I came into that case and had to argue in a week in

21    front of the Second Circuit, and did so on the Westfall Act, as

22    you know, which the Court stated that the former president was

23    an employee of the government.  That, of course, decision

24    delayed things, but that was by no means counsel's intention to

25    move this along, and, quite honestly, as co-counsel has said,

N27QcarC

1    Mr. Tacopina, our client wants this behind him.  He's very

2    confident that this will be behind him, and we would like to

3    get this trial over and done with.

4            I would like to echo the sentiments of Mr. Tacopina

5    because I do have firsthand knowledge on the issue of the

6    expert.  He is telling us the 28th.  It was a very serious

7    issue.  Obviously, life happens.  I again am happy to --

8            THE COURT:  Can we get to Carroll I, which is what you

9    rose for.

10           MS. HABBA:  Well, that's what I was going to say.

11   Happy to have on Carroll II a separate hearing, but I'm not

12   really sure on why we would be doing that.  This is something

13   Mr. Tacopina and I have addressed.

14           Another issue with Carroll I is, as you know, we just

15   argued in January due to the Court's scheduling in Washington,

16   and are waiting for that decision.  We can't deny that that is

17   also happening.  We filed a motion to stay in the Southern

18   District of New York, and then opposing counsel agreed to a

19   stay pending the D.C. Court of Appeals decision.  We're still

20   waiting on that, sir.

21           THE COURT:  A stay of what?

22           MS. HABBA:  A stay pending the decision from

23   Washington.

24           THE COURT:  A stay of what?

25           MS. HABBA:  Of this hearing.  Of this case.  So what

1   happened was we had a meet-and-confer, your Honor, without

2   intervention from the Court.  Ms. Kaplan agreed to push off --

3   it's true, is this not accurate?  I'm sorry, Robbie is

4   disagreeing, and I'm happy to hear, but we had originally

5   decided that we were going to wait to argue in Washington on

6   the second issue, which was bounced by the Second Circuit.  We

7   are still waiting on a decision on that.

8            THE COURT:  I know that.

9            MS. HABBA:  Right.  So I just raise that to the Court

10  as we are still to this day waiting on that decision, which in

11  my estimation would be that they are going to bounce it back to

12  the Second Circuit, but that's just a guess from our

13  conversations in court that day.  So I have to raise it on the

14  record.  It's obviously --

15           THE COURT:  They have to respond to the Second Circuit

16  one way or another.

17           MS. HABBA:  Of course.  I just wanted to raise to the

18  Court that we are still waiting on a decision from that bench.

19           THE COURT:  I appreciate being informed of that.

20           MS. KAPLAN:  Your Honor, I can be very brief.

21           What we just heard from Mr. Tacopina -- and I'm trying

22  to be as -- I'm trying to avoid any (indecipherable).  What we

23  just heard from Mr. Tacopina is the meet-and-confer that should

24  have happened between counsel before we showed up in court.

25           I just heard for the first time that Dr. Nace is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N27QcarC

1    available in an email sent to us on January 25.  They wrote,

2    "As such, we will not be able to proceed with Dr. Nace as the

3    defense psychiatric expert in this matter."  If they told us on

4    Friday that Dr. Nace was available and he can do it by

5    February 28, we would have agreed to that.  We implored them on

6    the call on Friday to offer us something short of a six-week

7    extension of all deadlines in all cases.

8          Second of all, with respect to the IME, I heard more

9    about what they think about the IME from Mr. Tacopina just now

10   than I have ever heard on a phone call from them.  We're not

11   refusing to do the IME.

12         THE COURT:  I'm sorry, you're what?

13         MS. KAPLAN:  We're not refusing to offer our client

14   for an IME.  We wanted to know how long they needed, what

15   tests, if any, they intended to run.  It's not like examining

16   someone's knee.  It's a different kind of examination, and

17   under the rules, we're entitled to understand what the timing

18   and the scope of the IME.  And we've heard nothing from them

19   for all these weeks until I heard a little bit from

20   Mr. Tacopina.

21         Similarly, on Friday, if Mr. Tacopina had a personal

22   issue, he should have raised it with us.  It's not appropriate

23   to have consultations like this among counsel before your

24   Honor.  It's a waste of everyone's time.

25         So we obviously would object, your Honor, to any

1    extension of the deadlines outside of the expert issue.  With

2    respect to the expert issue, we have no trouble with

3    February 28 and could adjust the schedule accordingly just for

4    issues that relate to the expert psychiatric issue, but there's

5    a lot of other dates in the case that have nothing to do with

6    that.  None of those dates should move, and we should be on

7    trial for April.  Thank you, your Honor.

8              THE COURT:  And you should be on trial when?

9              MS. KAPLAN:  For April.  April 17 as scheduled.

10             THE COURT:  All right.

11             Is there anything confidential, Mr. Tacopina, about

12   whatever your personal issue with April is?

13             MR. TACOPINA:  None whatsoever.  And the reason it

14   wasn't raised with Ms. Kaplan in the meet-and-confer really is

15   not the overriding issue.

16             THE COURT:  No, it's not, but I'd like to hear about

17   that.

18             MR. TACOPINA:  No, here is the issue.  I will be blunt

19   with you.  My daughter, who lives in London, is about to have

20   her first child.  It's my first grandchild, and I wanted to be

21   there on April 17 is the date that she is due, to be there for

22   the birth of my first grandchild, and my daughter's first baby.

23   That's it.  Obviously, if you tell me to be here, I'll see some

24   pictures and some videos and do a Zoom call, and we'll be fine.

25   That wasn't the basis --

N27QcarC

1           THE COURT:  Look, you have my good wishes about --
2           MR. TACOPINA:  Thank you.
3           THE COURT:  -- the forthcoming grandchild.  We hope
4    everything goes well, and --
5           MR. TACOPINA:  Your Honor, that wasn't the thrust of
6    the request.  And it's a matter of weeks, not months, for the
7    adjournment, the trial.  Weeks, not months.  That's all I want
8    to point out.  Dilatory tactics come in.  Your Honor, I'd like
9    to try this in October.  You've heard enough.  I know.
10          THE COURT:  I know enough about it.
11          MR. TACOPINA:  I know.  I know.  I know.
12          THE COURT:  Anything else, Ms. Kaplan?
13          MS. KAPLAN:  Not from us, your Honor.
14          THE COURT:  All right.  So far as the contretemps of
15    this morning, I will let you know what I decide soon.
16          What do we estimate for the duration of the trial?
17          MS. KAPLAN:  Sometime between five days and ten days,
18    I'm not exactly sure where, but probably closer to five is my
19    guess.  There are not that many witnesses, your Honor.
20          THE COURT:  Mr. Tacopina?
21          MR. TACOPINA:  Sounds about right to me.  I wouldn't
22    imagine it would be longer than that at all.
23          THE COURT:  All right.  Based on my experience not too
24    long ago in another comparable case, the estimates sound more
25    or less right.  All right.  I will let you know about that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N27QcarC

1            Now, I, of course, am extremely well aware of the

2       pendency of the Carroll I case in the District of Columbia

3       Court of Appeals.  We are just all going to have to wait.  That

4       case is trial ready, if there is to be a trial.  Whether we try

5       it, assuming there is going to be a trial, jointly with this or

6       not, I haven't decided yet.  We will see what happens.

7       Preparation for that ought to be basically done.  And so I

8       don't think I have to decide now.  And I won't.

9            I don't think I'd be giving away a state secret to say

10      I listened to the argument, watched the argument, I think, at

11      some later date in the D.C. Court of Appeals, and I think it's

12      anybody's guess what they're going to do.  And we'll leave it

13      at that.

14            You'll hear from me.  Thank you.

15            (Adjourned)

16

17

18

19

20

21

22

23

24

25

A-635

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

E. JEAN CARROLL,                                    Civil Action No.:
                                                    22-cv-10016
                          Plaintiff,

     – against –                                    **NOTICE OF MOTION**

DONALD J. TRUMP,

                          Defendant.
------------------------------------------------------------------X

     **PLEASE TAKE NOTICE** that upon the annexed: (a) Declaration of Matthew G. DeOreo,

(b) the Local Rule 56.1 Statement of Defendant; and (c) the accompanying Memorandum of Law,

Defendant will move this Court, before the Honorable Lewis A. Kaplan, U.S.D.J., in the United

States Courthouse, Southern District of New York, 500 Pearl Street, New York, N.Y. 10007, on such

day when counsel may be heard, for an Order, pursuant to Fed. R. Civ. P. 56, dismissing Plaintiff's

defamation claim (Count II of the Complaint filed in this action) in its entirety with prejudice, with

such other and further relief as the Court deems just and proper.

A-636

Dated: New York, New York
       February 23, 2023

TACOPINA, SEIGEL & DeOREO

By: _____
    Joseph Tacopina, Esq.
    Chad Seigel, Esq.
    Matthew G. DeOreo, Esq.
    275 Madison Ave., Fl. 35
    New York, New York 10016
    Tel: (212) 227-8877
    Fax: (212) 619-1028
    jtacopina@tacopinalaw.com
    cseigel@tacopinalaw.com
    mdeoreo@tacopinalaw.com

Counsel for Defendant, Donald J. Trump

_____
Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

Counsel for Defendant, Donald J. Trump

TO:    All counsel by ECF

2

A-637

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
E. JEAN CARROLL,                                                    Civil Action No.:
                                                                    22-cv-10016
                        *Plaintiff,*

    – against –

DONALD J. TRUMP,

                        *Defendant.*
------------------------------------------------------------------X

## DECLARATION OF MATTHEW G. DeOREO

I, MATTHEW G. DeOREO, declare as follows under the penalty of perjury:

1.      I respectfully submit this Declaration in support of the motion for partial summary judgment of Defendant Donald J. Trump, seeking the dismissal of Plaintiff's defamation claim (Count II of the Complaint filed in this action [*Carroll II*]) in its entirety with prejudice, with such other and further relief as the Court deems just and proper.

2.      The sole purpose of this Declaration is to submit Exhibits to the Court.  These exhibits are as follows:

    a.      **Exhibit A**: A true and accurate copy of Plaintiff's Complaint that she filed in *Carroll I*[1];

    b.      **Exhibit B**:  A true and accurate copy of Defendant's Answer filed in *Carroll I*;

    c.      **Exhibit C**:  A true and accurate copy of Plaintiff's Complaint that she filed in *Carroll II*;

---
[1] *Carroll v. Trump*, 1:20-cv-7311-LAK-JKLC.

A-638

    d.    **Exhibit D**:  A true and accurate copy of Defendant's First Amended Answer filed in *Carroll II*;

    e.    **Exhibit E**:  A true and accurate copy of  the Transcript of the Anderson Cooper interview of Plaintiff on June 24, 2019; and

    f.    **Exhibit F**:  A true and accurate copy of the following media article: Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, <u>Hill</u> (June 24, 2019).

3.    I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       February 23, 2023

                                 MATTHEW G. DeOREO

2

A-639

# EXHIBIT A

**A-640**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------

E. JEAN CARROLL,

*Plaintiff,*

-against-

DONALD J. TRUMP, in his personal capacity,

*Defendant.*

---------------------------------------

Index No. _____

**COMPLAINT AND
JURY DEMAND**

Plaintiff E. Jean Carroll ("Plaintiff" or "Carroll"), by and through her attorneys at Kaplan
Hecker & Fink LLP, alleges as follows:

## INTRODUCTION

1.      Nobody in this nation is above the law. Nobody is entitled to conceal acts of sexual
assault behind a wall of defamatory falsehoods and deflections. The rape of a woman is a violent
crime; compounding that crime with acts of malicious libel is abhorrent. Yet that is what Defendant
Donald J. Trump did to Plaintiff E. Jean Carroll.

2.      Roughly 23 years ago, playful banter at the luxury department store Bergdorf
Goodman on Fifth Avenue in New York City took a dark turn when Trump seized Carroll, forced
her up against a dressing room wall, pinned her in place with his shoulder, and raped her.

3.      In the aftermath, Carroll confided in two close friends. One urged her to report the
crime to the police, but the other warned that Trump would ruin her life and livelihood if she
reported it.

4.      Carroll chose silence—and remained silent for over two decades.

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-10016-LAK  Document 66-2  Filed 02/23/23  Page 3 of 29          RECEIVED NYSCEF: 11/04/2019

5.      Carroll knew then that sexual assault was pervasive. She also knew that men have been assaulting women and getting away with it since before she was born. And she knew that while a woman who accused *any* man of rape was rarely believed, a woman who accused a rich, famous, violent man of rape would probably lose everything. She therefore reasonably concluded that if she accused Donald Trump of rape he would bury her in threats and lawsuits, and she would probably lose her reputation, not to mention everything she had worked for and achieved.

6.      Near the end of the 2016 presidential election, Carroll watched in horror as numerous women offered highly credible (and painfully familiar) accounts of Trump assaulting them; Trump responded with insults and denials; the public fractured; and Trump not only won the election, but grew *more* popular with some supporters as a result of the controversy.

7.      Carroll's mother, a respected Republican official in Indiana, was dying during the last six weeks of the presidential election. Carroll, wanting to make her mother's last days as pleasant as possible and avoid causing her any pain, decided to remain silent about what Trump had done to her.

8.      But that all changed in late 2017, when the Harvey Weinstein scandal and its aftermath signaled a profound shift in how American society responds to accusations of sexual misconduct by powerful men. It suddenly seemed possible that even Trump could be held to account.

9.      For Carroll, that project grew more urgent—and more personal—as the #MeToo era prompted a flood of new letters to her advice column seeking her counsel about how to respond to sexual assault and abuse. In her column, Carroll encourages her readers to be brave, to think clearly, and to seek justice. When readers overcome with the doubt and anxiety have turned to her seeking advice, Carroll has always advised taking action. But she never confessed her own

2

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM
INDEX NO. 160694/2019

NYSCEF DOC. NO. 2 Case 1:22-cv-10016-LAK Document 66-2 Filed 02/08/23 Page 4 of 29
RECEIVED NYSCEF: 11/04/2019

experiences. She never revealed that she, too, had been a victim of sexual assault. Over time, as described below, the contradiction between Carroll's words and her actions became increasingly untenable.

10.    Carroll is a journalist. She watched as a throng of women came forward and accused Trump of sexual assault, only to be denigrated and then brushed aside. When she felt she should finally come forward herself, Carroll wanted to do it differently. She decided to describe Trump's rape in a book she had already begun to write about her experiences with various men. She did not want to tell her story to the police, a newspaper, an elected official, or a fellow journalist, and be treated as a "victim." In other words, she wanted to tell her own story on her own terms.

11.    When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the rape. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of rape. For good measure, he insulted her physical appearance.

12.    Each of these statements was false. Each of them was defamatory.

13.    Trump knew that these statements were false; at a bare minimum, he acted with reckless disregard for their truth or falsity. Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he raped her, and he knew who she was in 2019. He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of rape. To do so, he smeared her integrity, honesty, and dignity—all in the national press.

3

14.     These lies were familiar to Trump. He had used them before, when other women stated that he had grabbed, groped, or raped them.

15.     Trump's defamatory statements injured Carroll. They inflicted emotional pain and suffering, they damaged her reputation, and they caused substantial professional harm.

16.     Carroll filed this lawsuit to obtain redress for those injuries and to demonstrate that even a man as powerful as Trump can be held accountable under the law.

## THE PARTIES

17.     Plaintiff E. Jean Carroll is a journalist, author, former writer for Saturday Night Live, and advice columnist for *Elle* magazine. She is a resident of the State of New York.

18.     Defendant Donald J. Trump is currently the President of the United States, although he is sued here only in his personal capacity. Since taking office, Trump has filed several lawsuits in his personal capacity, including *Trump v. Vance, Jr. et al.*, No. 19 Civ. 8694 (S.D.N.Y.), *Trump et al. v. Deutsche Bank AG et al.*, No. 19 Civ. 3826 (S.D.N.Y.), *Donald J. Trump for President, Inc. et al. v. Padilla et al.*, No. 19 Civ. 1501 (E.D. Cal.), *Trump v. Committee on Ways and Means of the U.S. House of Representatives et al.*, No. 19 Civ. 2173 (D.D.C.), and *Trump et al. v. Committee on Oversight and Reform of the U.S. House of Representatives et al.*, No. 19 Civ. 1136 (D.D.C.). Trump is also defending a related case pending in this Court. *See Zervos v. Trump*, No. 150522/2017 (N.Y. Sup. Ct., N.Y. Cty.). Trump is a resident of the State of New York.

## JURY DEMAND

19.     Plaintiff E. Jean Carroll hereby demands a trial by jury.

## JURISDICTION & VENUE

20.     This Court has jurisdiction pursuant to NY CPLR § 301.

21.     Venue is proper in this county pursuant to NY CPLR § 503 and § 509.

4

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2   Case 1:20-cv-10816-LAK   Document 66-2   Filed 02/03/23   Page 6 of 29   RECEIVED NYSCEF: 11/04/2019

## FACTUAL ALLEGATIONS

### I.    TRUMP RAPES CARROLL AT BERGDORF GOODMAN

22.    One evening between the fall of 1995 and the spring of 1996, Carroll left work and went to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. She was and remains a regular shopper at Bergdorf's.

23.    That evening, Carroll did not find whatever she was looking for and prepared to leave Bergdorf's empty-handed. As she exited through Bergdorf's revolving side door on 58th Street, Trump arrived and entered through that very same door, which was cater-cornered across from the Plaza Hotel.

24.    Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily *Ask E. Jean* TV show, a small hit on the "America's Talking" network started by Roger Ailes. She was also on a frequent guest and commentator on the widely watched *Today* show.

25.    Trump put up his hand to stop her from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!"

26.    Trump said that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to come advise him. Carroll was surprised but thrilled that Trump would want her advice. She stuck around, imagining the funny stories that she might later recount.

27.    Trump and Carroll began searching for a gift that Trump could give to the unnamed girl. As they stood just inside the door, Carroll pointed to the handbags. Trump made a face; he did not like that idea. Carroll instead suggested a hat. Trump walked over, going straight for a fur hat, prompting Carroll to object that no woman would wear a dead animal on her head.

5

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-10016-LAK   Document 66-2   Filed 02/03/23   Page 7 of 29    RECEIVED NYSCEF: 11/04/2019

28.    As Trump cuddled the fur hat, Carroll asked how old "the girl" was. Trump did not answer, instead asking Carroll how old she was. When Carroll replied that she was fifty-two years old, he taunted her, "You're so *old*!"

29.    Trump then had an idea: He would buy lingerie instead.

30.    Trump and Carroll rode up the escalator to the lingerie department. When they arrived, it was uncharacteristically empty, with no sales attendant in sight. Sitting on the counter near them were two or three boxes and a see-through bodysuit in lilac gray.

31.    Snatching the bodysuit, Trump insisted that Carroll try it on. Bemused, Carroll responded that *he* should try it on himself, adding that it was his color. Trump and Carroll went back and forth, teasing each other about who should try on the bodysuit.

32.    Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on."

33.    Trump maneuvered Carroll to the dressing room. As they moved, Carroll laughed, thinking to herself that she would make him put the bodysuit on over his pants.

34.    Strangely for Bergdorf's, the dressing room door was open and unlocked.

35.    Trump closed the door of the dressing room.

36.    Immediately, Trump lunged at Carroll, pushing her against the wall, bumping her head quite badly, and putting his mouth on her lips.

37.    Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll burst out in awkward laughter. She could hardly process the insanity of the situation. She also hoped, at least at first, that laughter would bruise his ego and cause him to retreat.

38.    But Trump did not stop. He seized both of her arms and pushed her up against the wall again, bumping her head a second time. While pinning Carroll against the wall with his shoulder, Trump jammed his hand under her coatdress and pulled down her tights.

6

A-646

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 2        Case 1:22-cv-10016-LAK   Document 66-2   Filed 02/23/23   Page 8 of 29        RECEIVED NYSCEF: 11/04/2019

39.     Trump opened his overcoat and unzipped his pants. Trump then pushed his fingers around Carroll's genitals and forced his penis inside of her.

40.     Carroll resisted, struggling to break free. She tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other). Finally, she raised a knee up high enough to push him out and off her.

41.     Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.

42.     The whole attack lasted two to three minutes.

## II.     CARROLL CONFIDES IN TWO FRIENDS ABOUT THE RAPE

43.     As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, the author, journalist, and correspondent on TV morning shows.[1] Carroll was breathless and still reeling from the assault. She kept laughing, manically— her way of coping with the stress and trauma that she had just experienced.

44.     Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room. She told Birnbach how Trump had pulled down her tights and put his penis inside of her.

45.     "He raped you," Birnbach kept repeating. She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a rape victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.

46.     Carroll drove home and crawled straight into bed.

47.     Over the next few days, Carroll confided in a second friend, the New York City journalist and news anchor Carol Martin. They sat together in the kitchen as Carroll described the

---

[1] Birnbach wrote a story about Trump's Mar-a-Lago that was published in February 1996. *See* Lisa Birnbach, *Mi Casa Es Su Casa*, NEW YORK (Feb. 12, 1996). Birnbach has suggested that it was because of her work on that article that Carroll called her immediately after the assault.

7

**A-647**

rape. This time, Carroll did not laugh. Nobody laughed. The gravity of the assault had finally started to sink in.

48.     Martin solemnly advised Carroll to tell no one. Recognizing that Trump was a powerful man, Martin feared that if her friend came forward, disaster would ensue. Martin warned Carroll, in sum and substance: "Tell no one. Forget it! He has two hundred lawyers. He'll bury you."

49.     Carroll took Martin's advice. She knew how brutal and dangerous Trump could be.

50.     Carroll was also afraid of being dragged through the mud if she reported the rape. She was convinced that nobody would believe her if she came forward. And like so many other survivors of sexual assault, Carroll also blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had raped her because she had entered that Bergdorf dressing room.

51.     Fundamentally, Carroll was raised to believe that strong women get by in the world with a stiff upper lip—*i.e.*, by putting hardship and suffering behind them. She believed that strong women laugh at disasters because feeling sad only doubles the burden. To Carroll, laughter is how women have dealt with calamity for thousands of years. So Carroll put her chin up and tried to move on.

52.     Carroll thus chose silence.

53.     Carroll did not mention the rape again for over twenty years. She did not want to be seen—or to see herself—as a victim of sexual assault.

54.     Carroll has not had sex with anyone since that day when Trump raped her.

**A-648**

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM
NYSCEF DOC. NO. 2
INDEX NO. 160694/2019
RECEIVED NYSCEF: 11/04/2019

Case 1:22-cv-10016-LAK Document 66-2 Filed 02/09/23 Page 110 of 299

## III.  CARROLL REMAINS SILENT FOR TWENTY YEARS

55.     For the next twenty years, Carroll pursued her career as a writer and advice columnist. Over time, she built a loyal audience and enjoyed the support of her publisher. Her *Ask E. Jean* advice column in *Elle* magazine became the longest, still-active advice column in American publishing. Its success resulted in large part from the many letters sent to her by readers.

56.     Carroll's column in *Elle* was about life and love. Readers' questions ranged from the lighthearted to the deeply personal. From time to time, readers would ask questions about whether behavior that they experienced at work, at church, and in their relationships was appropriate. When Carroll detected sexism or abuse, she did her level best to call it out and to help women protect themselves.

57.     One reader, for example, despaired in 1994, "My boss is always rubbing up against me . . . . He scares me because he's very powerful and could ruin me." Carroll responded: "Darling, if the old snake has done so much to help your career, why are you still an assistant? Sex harassers are filthy yellow sneaking cowards and must be won over, or crushed . . . . If all else fails, next time the old waterhead touches you, give him a knee in the groin. You've got nowhere to go but up."[2]

58.     Another reader had been raped when thirteen years old and sought advice from Carroll because her rapist had just been hired as a co-worker. Carroll responded: "[T]he gentleness of your [letter] speaks strongly for your forgiving nature; however, it makes my duty *very* difficult. Because now I must harden your soul. I must twist a little bit of steel—I'd try a big block of metal

---

[2] *Reprinted in* E. JEAN CARROLL, A DOG IN HEAT IS A HOT DOG AND OTHER RULES TO LIVE BY 28-29 (1996).

9

A-649

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 11/04/2019

Case 1:22-cv-10016-LAK   Document 66-2   Filed 02/09/23   Page 111 of 29

if I could—around your backbone, and persuade you to report your friend to the police."[3] Carroll added:

> "First, call your rape crisis center and speak with a counselor. Second, join a group of rape survivors—with their hardy support, you'll start constructing a world for *yourse,f* and leave the world the rapist built for you. And, third, find another job at once. (Do *not* tell your employer about the rape. Do *not* inform the rapist of these steps. Stay cool. He's dangerous.)"[4]

59.     In her advice columns, Carroll sought to offer witty, wise, and worldly guidance, and to address her readers in a clear, straightforward manner. She often urged readers to speak the truth and to recognize patterns of rationalization and abuse. Readers' perception of Carroll as honest, thoughtful, frank, and well-meaning were essential to Carroll's professional success.

60.     But in responding to her readers, Carroll did not confess her own life experiences, including the sexual assault by Trump described above.

61.     During the last month of the election of 2016, Carroll watched a multitude of women reveal that Trump had engaged in sexual misconduct. She saw Trump brutally attacking his accusers on a national stage—denying their accusations, while also savaging their reputations and insulting their appearance.

62.     And as Carroll sat at the bedside of her dying mother in a Bloomington, Indiana hospital, watching numerous, credible women stun the nation with their stories of Trump's sexual brutality, Carroll briefly considered whether she, too, should reveal that Trump had raped her. But she feared—just as she had for decades—that Trump would lie his way out of it, while destroying her life and reputation. He had done it before to plenty of women and, it seemed to Carroll, he would readily do it again. And, worst of all, coming forward with her story would also cause a

---

[3] *Id.* at 141-42.

[4] *Id.* at 142.

10

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM
NYSCEF DOC. NO. 2

INDEX NO. 160694/2019
RECEIVED NYSCEF: 11/04/2019

media storm in Indiana and destroy her mother's last happy days on the planet. Carroll feared that it would cost her and her family dearly without actually changing anything, especially since any accusation made during the presidential campaign would be characterized by Trump and his allies as a stunt to thwart his election.

63.     Indeed, Carroll worried that she might make Trump *more* popular in states like Indiana by revealing the rape, since his electoral fortunes had steadily improved despite credible allegations of sexual abuse. To Carroll, it appeared that some of Trump's political supporters actually admired the fact that Trump was rich enough, macho enough, and powerful enough to be sued by—and to pay off—all these women he had groped and penetrated (especially porn stars and *Playboy* models).

64.     Carroll, in honor of her mother's remarkable life, many years of which were spent as a local and loyal Republican elected official, and because she thought the publicity would help Trump win the election, warily persisted in her decades-old silence.

65.     Carroll's mother died on October 11, 2016. In 2017, Carroll decided to write a book drawing on her observations as an advice columnist, but focusing specifically on her own life and trying to understand why so many *Ask E. Jean* letter-writers complained about men. On the morning of October 5, 2017, Carroll set out on a road trip, traveling to towns named after women. When she arrived in each town named after a woman (Angelica, New York, Tallulah, Louisiana, Marianna, Arkansas, and so forth), she spoke to women from all walks of life about their relationships with men. She asked many of her subjects about the roles that men play in their lives.

## IV.    CARROLL DECIDES TO SPEAK OUT

66.     On the very day Carroll began her road trip for her book, October 5, 2017, the *New York Times* revealed that Harvey Weinstein had sexually assaulted and harassed dozens of women

11

Case 1:22-cv-10016-LAK Document 66-2 Filed 02/09/23 Page 113 of 29

in the film industry.[5] The news went off in Carroll's mind like a bomb. She could not stop reading. Painful memories of abuse at the hands of men, including Trump, swept over her.

67.     Days later, several women accused Weinstein of rape.[6] It soon became clear to Carroll, and to the American people, that Weinstein's abuses had been enabled for decades by a loose network of loyalists and lawyers, who had ensured that Weinstein evaded accountability for his exploitation of women—even though it was an open secret in Hollywood.

68.     As the Weinstein scandal persisted, Carroll saw society respond to the accusations with a seriousness and depth of self-reflection that she had never seen before; all too often, and as recently as the 2016 election, many Americans had brushed aside or marginalized accusations of sexual misconduct by powerful men. Carroll also saw other women suddenly feel emboldened to come forward with their own reports of harassment, exploitation, abuse, violence, and rape.

69.     Carroll was moved by this experience. The walls that she had erected in her mind—the fear that Trump would emerge unscathed, the wariness of allowing him and his allies to come after her, the doubt that speaking up would actually matter, and the nagging anxiety that she was somehow to blame for being raped—began to crumble. Decades of deflection, diversion, and denial dissolved, resurfacing memories and feelings that she had hidden away.

70.     Carroll was struck by the fact that Weinstein, for all his wealth and power, could still be held accountable for his sexual misconduct. She saw how women had at last changed the public conversation by saying "Me Too" and by demanding accountability.

---

[5] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid C,f Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017).

[6] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017).

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2          RECEIVED NYSCEF: 11/04/2019

71.     These observations lead Carroll to reflect again on her column in *Elle* magazine, and to ask whether she was a hypocrite. For decades, she had paired her trademarked wit with steely resolve in confronting the everyday unfairness—and, all too often, the abuse—that her (largely female) readers confessed. Carroll's written persona was brave. But she *still* had not confessed her own experiences of abuse, her fear of coming forward, or her creeping self-doubt.

72.     These internal reflections loomed larger in her mind—and became inescapable—as more readers of Carroll's advice column began asking, "Should I come forward with my account of surviving sexual abuse or harassment?"

73.     Carroll finally decided that she owed her readers the truth. She also owed them (and many other women) solidarity in their efforts to bring justice and accountability to powerful men who had engaged in sexual assault and gotten away with it. She knew that it would be painful to speak up. But she also knew that it was the right thing to do so.

74.     While Carroll was on the road trip across the country talking to women as research for her book, she started a list of the 21 most hideous men she had ever encountered—men who had, each in his own way, left indelible and ugly marks on her story. This list grew into a book, *What Do We Need Men For?: A Modest Proposal*. In that book, Carroll interspersed the stories of women she had met while traveling the country with the men on her "Most Hideous List."

75.     Two men on the Most Hideous List haunted Carroll the most. The first was Cam Parks, the Waterfront Director at her Girl Scout camp, a man who sexually abused her every day during a two-week period when she was twelve. The second was Donald Trump, the man who raped her when she was 52. Carroll described that attack in detail.

76.     Carroll knew a book was the right place for her to come forward about Trump's assault. Writing is Carroll's lifeblood; she writes to process the world around her and to reveal her

13

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-10016-LAK   Document 66-2   Filed 02/09/23   Page 115 of 29   RECEIVED NYSCEF: 11/04/2019

inner self. It's her normal way of living: she writes about what happens to her, often in a confessional, idiosyncratic manner. She also believed that a book would allow her to control her narrative and speak directly to her readers. This was important. Carroll did not want to be, or to act like, a victim. She wanted to tell her story on her terms, rather than as filtered through journalists or social media. Her language was specific.

77.     In her book, Carroll truthfully described, in meticulous detail, the rape in Bergdorf Goodman:

> "The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, then thrusts his penis halfway—or completely—I'm not certain—inside me."[7]

78.     She also explained why she had not come forward earlier:

> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them, never sounded like much fun. Also, I'm a coward."[8]

79.     At noon on June 21, 2019, *New York* magazine published Carroll's account of the rape on NYMag.com as an excerpt of her forthcoming book. The excerpt first appeared on *The Cut,* a vertical on NYMag.com. The excerpt appeared on newsstands three days later in the June 24-July 7 print edition.

80.     Carroll's book was released by St. Martin's Press on July 2, 2019.

---

[7] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL 248 (2019).

[8] *Id.* at 244.

14

### V.  TRUMP REPEATEDLY DENIES RAPING CARROLL AND MAKES A SLEW OF FALSE, INSULTING STATEMENTS ABOUT HER

81.    In three statements—published on June 21, 22, and 24 respectively—Trump

responded to Carroll by publicly, falsely, and maliciously smearing her reputation.

82.    On June 21, 2019, Trump issued the following public statement:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

83.    Upon information and belief, Trump's June 21 statement was first given to the

press, including Laura Litvan of *Bloomberg News*, who posted it on Twitter at 2:17 p.m.[9]

---

[9]    *See* Laura Litvan (@LauraLitvan), Twitter (June 21, 2019 2:17 PM), https://twitter.com/LauraLitvan/status/1142179819075121154.

15

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 2
Case 1:22-cv-10016-LAK Document 66-2 Filed 02/09/23 Page 117 of 29
RECEIVED NYSCEF: 11/04/2019

84.    Trump's June 21 statement was subsequently shared online by other journalists and

covered by many leading news sources as Trump's statement in response to Carroll.[10]

85.    In the June 21 statement, Trump falsely stated that he did not rape Carroll.

86.    In the June 21 statement, Trump falsely stated that he had never met Carroll.

87.    In the June 21 statement, Trump falsely implied and affirmatively intended to imply

that he had no idea who Carroll was.

---

[10] *See, e.g.*, AFP News Agency, *US Writer Says Trump Sexually Assaulted Her in Mid-1990s*, AL JAZEERA, (June 21, 2019); Alexandra Alter, *E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir*, N.Y. TIMES (June 21, 2019); Jenna Amatulli, *Trump on E. Jean Carroll Rape Allegation: "I've Never Met This Person in My Life"*, HUFFINGTON POST (June 21, 2019); Amber Athey, *Trump Responds to Rape Accuser: "People Should Pay Dearly for Such False Accusations"*, DAILY CALLER (June 21, 2019); Brian Bennet, *Trump Says He "Never Met" Author Who Has Accused Him of Sexual Assault*, TIME (June 21, 2019); Ellie Bufkin, *Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation*, WASH. EXAMINER (June 21, 2019); Adam Carlson, *Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s—"Never Happened," Trump Responds*, PEOPLE MAG. (June 21, 2019); Matthew Choi, *Trump Dismisses New Sexual Assault Allegation*, POLITICO (June 21, 2019); Casey Darnell, *Writer Says She Was Raped by Trump in 1990s*, YAHOO! NEWS (June 21, 2019); EJ Dickson, *E. Jean Carroll Alleges President Donald Trump Assaulted Her*, ROLLING STONE (June 21, 2019); Vivian Ho & Lauren Gambino, *Evening Summary: Trump Responds to E Jean Carroll's Allegations*, GUARDIAN (June 21, 2019); Colby Itkowitz, *Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies*, WASH. POST (June 21, 2019); Sarah Jones, *E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdof Goodman."*, N.Y. MAG. (June 21, 2019); Hilary Lewis, *E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespecful" to Migrant Women*, HOLLYWOOD REP. (June 22, 2019); Caitlin Mac Neal, *Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault*, TALKING POINTS MEMO (June 21, 2019); Alex Pappas, *Longtime Advice Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FOX NEWS, (June 21, 2019); Daniel Politi, *Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims*, SLATE (June 22, 2019); Christina Prignano, *Author E. Jean Carroll Accuses President Trump of Sexual Assault in 1990s*, BOS. GLOBE (June 21, 2019); Eliza Relman, *Trump Claims He's Never Met the Columnist Who Just Accused Him of Sexual Assault Despite Photo Evidence of Them Together*, BUS. INSIDER (June 21, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Jessica Taylor, *Trump Denies New Sexual Assault Allegation by Advice Columnist E. Jean Carroll*, NPR (June 21, 2019); Josh Wingrove, *Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FORTUNE (June 21, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019); Josh Wingrove, *Woman Accuses Trump of Sexual Assault at New York Store in 1990s*, BLOOMBERG (June 21, 2019).

16

88.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales.

89.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation to carry out a political agenda.

90.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation as part of a conspiracy with the Democratic Party.

91.     On June 22, 2019, Trump made the following statement to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

17

**A-657**

INDEX NO. 160694/2019
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 11/04/2019

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[11]

92.     Like his first statement, Trump's June 22 statement regarding Carroll was widely reported in the national press.[12]

93.     In the June 22 statement, Trump falsely stated that he did not rape Carroll.

94.     In the June 22 statement, Trump falsely stated that he had no idea who Carroll was.

95.     In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

96.     In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent the rape accusation against him.

---

[11] *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019).

[12] *See, e.g.*, Matthew Chapman, *Trump Goes on Manic Tirade After Being Asked About New Rape Allegation: Women Get "Paid Money to Say Bad Things About Me"*, RAW STORY (June 22, 2019); William Cummings, *Writer E. Jean Carroll Made a Claim of Sexual Assault Against Trump. Here's What We Know*, USA TODAY (June 25, 2019); Gillian Edevane, *George Conway Says Trump's Credibility is "Annihilated" After President Denies Knowing Alleged Assault Victim*, NEWSWEEK (June 22, 2019); Lulu Garcia-Navarro, *"It Hurt. And It Was Against My Will": Trump Accuser Stands by Her Story*, NPR (June 22, 2019); Amanda Holpuch, *Trump Repeats Contested Claim He Does Not Know Latest Sexual Assault Accuser*, GUARDIAN (June 22, 2019); Colby Itkowitz et al., *Trump Compares Himself to Kavanaugh in Latest Sexual Assault Allegation*, WASH. POST (June 22, 2019); Darlene Superville, *Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store*, ABC NEWS (June 22, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Mihir Zaveri, *Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll*, N.Y. TIMES (June 22, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019).

18

A-658

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM                INDEX NO. 160694/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-10016-LAK  Document 66-12  Filed 09/09/23  Page 20 of 29    RECEIVED NYSCEF: 11/04/2019

97.     Two days later, on June 24, 2019, *The Hill* released an interview in which Trump made the following statement in response to Carroll: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[13]

98.     Trump's statement in *The Hill* was widely reported by the national press.[14]

99.     This insulting statement was consistent with Trump's response to other accusations of sexual assault. About one woman who claimed he groped her and tried to put his hand up her skirt while they were seated next to each other on an airplane, Trump told crowds at a rally,

---

[13] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019).

[14] *See, e.g.*, Julia Arciga, *Trump on E. Jean Carroll's Assault Allegations: "She's Not My Type"*, DAILY BEAST (June 24, 2019); Associated Press, *Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"*, HOLLYWOOD REP. (June 25, 2019); Associated Press, *Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type'*, CHI. TRIB. (June 24, 2019); Associated Press, *Trump: Woman Who Accused Him of Sexual Assault Not His Type*, DENVER POST (June 24, 2019); Amber Athey, *Trump Says Columnist Who Accused Him of Rape Is "Not My Type"*, DAILY CALLER (June 24, 2019); Peter Baker & Neil Vigdor, *Trump, Accused Again of Sexual Misconduct, Insults Woman Who Said He Assaulted Her*, BOS. GLOBE (June 25, 2019); Antonia Blumberg, *Trump on E. Jean Carroll Accusing Him of Rape: "She's Not My Type"*, HUFFINGTON POST (June 24, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, BUS. INSIDER (June 25, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, REUTERS (June 25, 2019); Burgess Everett & Melanie Zanona, *"I Believe the President": GOP Stands by Trump on Sexual Assault Allegation*, POLITICO (June 25, 2019); Rebecca Falconer, *Trump Says He Didn't Rape Author E. Jean Carroll: "She's Not My Type"*, AXIOS (June 24, 2019); Megan Garber, *The Real Meaning of Trump's "She's Not My Type" Defense*, ATLANTIC (June 25, 2019); Rebecca Morin, *"She's Not My Type": Trump Again Denies E. Jean Carroll's Sexual Misconduct Allegation*, USA TODAY (June 24, 2019); Ari Shapiro, *A Look at President Trump's Pattern of Responding To Accusations Of Sexual Misconduct*, NPR (June 25, 2019); Matt Stieb, *Trump Responds to E. Jean Carroll Rape Allegation: "She's Not My Type"*, CUT (June 25, 2019); Jia Tolentino, *E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar*, NEW YORKER (June 25, 2019); Jay Willis, *Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"*, GQ (June 25, 2019); Anthony Zurcher, *Trump Says Sexual Assault Accuser E Jean Carroll "Not My Type"*, BBC NEWS (June 25, 2019).

19

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM
NYSCEF DOC. NO. 2
INDEX NO. 160694/2019
Case 1:20-cv-00316-LAK Document 66-2 Filed 09/03/20 Page 21 of 29
RECEIVED NYSCEF: 11/04/2019

"Believe me. She would not be my first choice. That I can tell you."[15] He reportedly called that same woman "the cunt on the airplane" when he ran into her at a charity gala years after the assault.[16] About a second woman, who claimed he forcibly pinned her to a wall and kissed her without consent while she was interviewing him for a magazine, Trump said to crowds at another rally, "Take a look. You take a look. Look at her, [then] look at her words. You tell me what you think. I don't think so. I don't think so."[17] Indeed, Trump often responds to claims that he has behaved inappropriately by simultaneously attacking the individual's credibility and attractiveness. When a female journalist quoted him as saying in a 1992 interview that "you have to treat women like shit," Trump insisted later, "The woman's a liar, extremely unattractive, lots of problems because of her looks."[18]

100. In the June 24 statement, Trump falsely stated that he did not rape Carroll.

101. On June 27, Birnbach and Martin went on the record to corroborate Carroll.[19]

102. Speaking to Carroll, Martin, and a reporter, Birnbach said:

"I remember [Carroll] saying repeatedly, he pulled down my tights . . . . [Carroll] did say, he put his penis in me. And I said—my face just did it. What? He raped you? And [Carroll] said, eh, he kept pulling down—he pulled down my tights. He pulled down my tights . . . . It just—it was horrible. We fought. And I said, let's go to the police. No. Come to my house. No. I want to go home. I'll take you to the

---

[15] Jose A. DelReal, *Trump Mocks Sexual Assault Accusers: "She Would Not Be My First Choice"*, WASH. POST (Oct. 14, 2016).

[16] BARRY LEVINE & MONIQUE EL-FAIZY, ALL THE PRESIDENT'S WOMEN: DONALD TRUMP AND THE MAKING OF A PREDATOR 72 (2019).

[17] Naomi Lim, *Donald Trump on Accuser: "Take a Look at Her . . . I Don't Think So"*, CNN (Oct. 13, 2016).

[18] Nancy Collins, *Donald Trump Talks Family, Women in Unearthed Transcripts: "When I Come Home and Dinner's Not Ready, I Go Through the Roof"*, HOLLYWOOD REP. (Oct. 13, 2016).

[19] Michael Barbaro et al., *Corroborating E. Jean Carroll*, N.Y. TIMES (June 27, 2019).

20

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM            INDEX NO. 160694/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-10016-LAK Document 66-2 Filed 02/09/23 Page 222 of 229     RECEIVED NYSCEF: 11/04/2019

police. No. It was 15 minutes of my life, it's over. Don't ever tell anybody. I just had to tell you."[20]

103.    Responding to Carroll, Birnbach, and a reporter, Martin said:

"From what I could sense of you, you were, A, you were handling it, as you handle things. She doesn't break down easily on anything. And there was none of that, as you told me. It wasn't like she started crying, or nothing that was a frantic kind of response to it. It was like, I can't believe this happened."[21]

104.    Martin added: "I said, don't tell anybody. I wouldn't tell anybody this."[22]

105.    Separately, Birnbach observed, "I believe E. Jean in this episode that she recounted to me in 1996. Yes. Without hesitation. She's not a fabulist. She doesn't make things up."[23]

## VI.    TRUMP'S FALSE STATEMENTS ABOUT CARROLL WERE MADE WITH KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

106.    The false statements that Trump made about Carroll on June 21, 22, and 24, 2019, were published with knowledge of their falsity and/or with reckless disregard for the truth.

107.    Trump knew who Carroll was at the time he raped her.

108.    Trump identified Carroll on sight when they met at Bergdorf Goodman.

109.    In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Jessica Bennett et al., *Why E. Jean Carroll, "the Anti-Victim," Spoke Up About Trump,* N.Y. TIMES (June 27, 2019).

21

A-661

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-10016-LAK Document 66-2 Filed 02/03/23 Page 223 of 299     RECEIVED NYSCEF: 11/04/2019

110.    In 1987, Trump and Carroll were photographed at a party together:



111.    Trump has stated that he possesses "one of the great memories of all time."[24]

112.    Trump has also described himself as a "very stable genius."[25]

113.    In June 2019, Trump knew it was false to state that he had never met Carroll.

114.    In June 2019, Trump knew it was false to state that he had no idea who Carroll was.

115.    In June 2019, Trump knew it was false to state that he had never raped Carroll.

116.    Trump's other defamatory statements about Carroll in June 2019—that she had fabricated the rape accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment—rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false.

117.    Moreover, Trump lacked any factual basis for these highly specific statements regarding why Carroll had revealed to the public that he raped her at Bergdorf Goodman. And since all of these statements about Carroll were made to impute motives for lying, when in fact he

---

[24] Foreign Staff, *Donald Trump: I Have "One of the Greatest Memories of All Time"*, TELEGRAPH (Oct. 26, 2017).

[25] Daniella Diaz, *Trump: I'm a "Very Stable Genius"*, CNN (Jan. 6, 2018).

22

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2                                           RECEIVED NYSCEF: 11/04/2019

knew that Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published these statements with reckless disregard for the truth.

118.    Trump also lacked any factual basis for stating (or affirmatively implying) that Carroll had falsely accused other men of sexual assault. And since he knew that her accusation against him was truthful, he had strong reason to doubt the veracity of his statement that she was lying about other men. Trump thus made this statement with reckless disregard for the truth.

119.    Carroll did not reveal Trump's rape for any of the reasons imputed to her by Trump. Each and every statement that he made about her motives for coming forward—and her supposed conspiracy with political actors to fabricate a rape accusation—was false.

120.    To the contrary, Carroll feared that revealing Trump's rape would cause terrible damage to her reputation, career, and personal life. That was especially true given Trump's famed litigiousness and public abuse of those who criticize him. Carroll made this decision to honor her values and to inspire other sexually abused women to seek justice and accountability.

121.    With respect to politics, to the extent Carroll considered such things at all, it was principally to worry that coming forward might *benefit* Trump by firing up his base and affording him another opportunity to play the victim on national television.

122.    Trump's series of false, insulting, and defamatory statements about Carroll—and his actual malice in making those statements—are fully consistent with his tried-and-true playbook for responding to credible public reports that he sexually assaulted women.

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-10016-LAK  Document 66-2  Filed 02/09/23  Page 225 of 229    RECEIVED NYSCEF: 11/04/2019

123.    In 2005, Trump admitted—on a hot mic—to repeatedly sexually assaulting women in almost exactly the same manner that he had raped Carroll:

> "I'd better use some Tic Tacs just in case I start kissing her [the woman Trump was looking at, whom he had never met before]. You know, I'm automatically attracted to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything. Grab them by the pussy. You can do anything. . . . Oh, [she has] nice legs, huh?"[26]

124.    Based on Carroll's own experiences, Trump's 2005 statement was not "locker room talk" or mere braggadocio. It was a true description of how Trump believes he can treat women—and of how he *has* treated them on many occasions, including at Bergdorf Goodman.

125.    Indeed, Trump has openly suggested that sexual assault is inevitable when men and women interact. In 2013, for instance, he tweeted: "26,000 unreported sexual assults [sic] in the military . . . . What did these geniuses expect when they put men & women together?"[27]

126.    In addition to Carroll, Trump has been accused publicly by over a dozen women of forcibly kissing them, groping them above or below the waist, or attempting to rape them—often upon meeting him for the very first time. Those women include Jill Harth, Jessica Leeds, Cathy Heller, Temple Taggart McDowell, Karena Virginia, Bridget Sullivan, Tasha Dixon, Mindy McGillivray, Rachel Crooks, Natasha Stoynoff, Summer Zervos, and Cassandra Searles. Trump has responded to their accusations in a manner eerily similar to the statements he made about Carroll in June 2019.

127.    A recently published book by Barry Levine and Monique El-Faizy documents 67 incidents of alleged inappropriate behavior by Trump toward women, including 26 allegations of unwanted sexual contact. Forty-three of the allegations of inappropriate behavior in the book had

---

[26] *Transcript: Donald Trump's Taped Comments About Women*, N.Y. TIMES (Oct. 8, 2016).

[27] Daniella Diaz, *Trump Defends Tweet on Military Sexual Assault*, CNN (Sept. 8, 2016).

24

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2          Case 1:22-cv-10016-LAK   Document 66-2   Filed 02/09/23   Page 26 of 29          RECEIVED NYSCEF: 11/04/2019

not been previously reported.[28] The book traces "Trump's transformation from a kid from Queens to high school 'ladies' man' into a womanizing, model-chasing, porn-star-frequenting philanderer," who "repeatedly and systematically engaged in aggressive sexual pursuit of women over the course of many decades."[29] In one instance, Karen Johnson describes Trump hiding behind a tapestry at his Mar-a-Lago home during a party and, when she walked by to use the restroom, grabbing her by the genitals, pulling her toward him, and kissing her without consent.[30] In another, Kristin Anderson describes Trump putting his hands up her skirt and touching her vagina through her underwear in a Manhattan nightclub. Trump denied that could have happened because he never would have been at a nightclub alone.[31]

128.    Trump thus knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth. He knew she was telling the truth because he knew who she was and he knew that he had raped her, just as he had sexually assaulted many other women over many years.

## VII.    CARROLL SUFFERS REPUTATIONAL AND OTHER HARM

129.    Trump's false and insulting statements about Carroll were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

130.    Carroll has suffered harm as a direct result of Trump's false, defamatory statements.

131.    Carroll endured stoically when she kept secret the fact that Trump had raped her. But coming forward put her in the crosshairs of the most powerful man on the planet. He has since

---

[28] *See* LEVINE & EL-FAIZY, *supra* n.16, at 2.

[29] *Id.* at 2-3.

[30] *Id.* at 80-82, 88, 254.

[31] *Id.* at 250-51.

25

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 2          Case 1:20-cv-10016-LAK   Document 66-2   Filed 02/05/23   Page 227 of 229          RECEIVED NYSCEF: 11/04/2019

used that platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of conspiring with political operatives in a despicable lie.

132.  These defamatory statements have caused Carroll emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

133.  Carroll has suffered professional harm as a direct result of Trump's defamatory statements. Carroll's professional success is inextricably bound up with her *Ask E. Jean* advice column, where readers look to her for wisdom, wit, honesty, integrity, and courage. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood and attracts readers.

134.  Trump's defamatory statements caused Carroll to lose the support and goodwill of many of her readers. Many were turned off by even the idea of writing to a woman whom the President of the United States branded a "liar." Since Trump defamed her, some fans have stopped sending letters altogether—thus impairing Carroll's column, which requires a steady flood of compelling letters to which she can respond. In the months of July, August, and September 2019, Carroll received roughly 50% fewer letters than she received during the same period in 2018.

135.  Carroll is an advice columnist whose reputation is the very lifeblood of her trade, and Trump's defamatory statements have therefore inflicted wide-ranging and substantial harm.

136.  Carroll filed this lawsuit to obtain redress for those injuries.

## CAUSE OF ACTION: DEFAMATION

137.  Plaintiff Carroll incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

138.  Trump published statements to the media on June 21, 22, and 24, 2019.

139.  Each of those statements identified—and was "of or concerning"—Carroll.

FILED: NEW YORK COUNTY CLERK 11/04/2019 09:59 AM    INDEX NO. 160694/2019
NYSCEF DOC. NO. 2    Case 1:20-cv-10016-LAK Document 66-2 Filed 09/09/23 Page 28 of 29    RECEIVED NYSCEF: 11/04/2019

140.    Each of those statements contained numerous falsehoods about Carroll, whether on their face and/or by virtue of a clear implication affirmatively intended by Trump.

141.    Trump's false statements regarding Carroll were defamatory *per se*.

142.    Trump's false and defamatory statements were published throughout New York State and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statements about Carroll would receive a wide circulation by making them to the national press.

143.    Trump made these false and defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

144.    Trump made these false statements with ill will and spite, and with wanton, reckless, or willful disregard for their injurious effects on Carroll and Carroll's rights.

145.    Trump's false and defamatory statements caused Carroll to suffer reputational, emotional, and professional harm, as alleged above.

### PRAYER FOR RELIEF

WHEREFORE, Carroll prays for relief as follows:

a.    Ordering Trump to retract any and all defamatory statements;

b.    Ordering Trump to pay compensatory damages in an amount to be determined at trial;

c.    Ordering Trump to pay punitive damages in an amount to be determined at trial; and

d.    Awarding pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

27

A-667

Case 1:20-cv-10631-LAK   Document 66-2   Filed 08/09/23   Page 229 of 299

Dated: November 4, 2019                    Respectfully submitted,

                                           By:

                                           _____

                                           Roberta A. Kaplan
                                           Matthew J. Craig
                                           Martha E. Fitzgerald
                                           KAPLAN HECKER & FINK LLP
                                           350 Fifth Avenue, Suite 7110
                                           New York, New York 10118
                                           Tel: (212) 763-0883
                                           Fax: (212) 564-0883
                                           rkaplan@kaplanhecker.com
                                           mcraig@kaplanhecker.com
                                           mfitzgerald@kaplanhecker.com

                                           *Counsel for Plaintiff E. Jean Carroll*

28

A-668

# EXHIBIT B

A-669

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM       INDEX NO. 160694/2019
NYSCEF DOC. NO. 63    Case 1:22-cv-10016-LAK    Document 66-3    Filed 02/23/23    Page 2 of 13    RECEIVED NYSCEF: 02/28/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
E. JEAN CARROLL,                                        Index No.:  160694/19

                        Plaintiff,

            -against-                                    **ANSWER**

DONALD J. TRUMP, in his personal capacity,

                        Defendant.
-------------------------------------------------------------------X

Defendant Donald J. Trump ("President Trump"), subject to and reserving all rights to his

immunity, under the Supremacy Clause of the United States Constitution, Article IV, Section II, of a

sitting United States President from being sued in state court while serving as President, for his

answer to the complaint:

1.    Denies the allegations contained in paragraph 1 of the Complaint.

2.    Denies the allegations contained in paragraph 2 of the Complaint.

3.    Denies the allegations contained in paragraph 3 of the Complaint.

4.    Denies the allegations contained in paragraph 4 of the Complaint.

5.    Denies the allegations contained in paragraph 5 of the Complaint.

6.    Denies the allegations contained in paragraph 6 of the Complaint.

7.    Denies the allegations contained in paragraph 7 of the Complaint.

8.    Denies the allegations contained in paragraph 8 of the Complaint.

9.    Denies the allegations contained in paragraph 9 of the Complaint.

10.   Denies the allegations contained in paragraph 10 of the Complaint.

11.   Denies the allegations contained in paragraph 11 of the Complaint.

12.   Denies the allegations contained in paragraph 12 of the Complaint.

A-670

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM
NYSCEF DOC. NO. 68

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/28/2020

Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 3 of 13

13.     Denies the allegations contained in paragraph 13 of the Complaint.

14.     Denies the allegations contained in paragraph 14 of the Complaint.

15.     Denies the allegations contained in paragraph 15 of the Complaint.

16.     Denies the allegations contained in paragraph 16 of the Complaint.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint.

18.     Denies the allegations contained in paragraph 18 of the Complaint.

19.     The allegation contained in paragraph 19 of the Complaint asserts a demand for a jury trial for which no response is required.

20.     Denies the allegations contained in paragraph 20 of the Complaint.

21.     Denies the allegations contained in paragraph 21 of the Complaint.

22.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint.

23.     Denies the allegations contained in paragraph 23 of the Complaint.

24.     Denies the allegations contained in paragraph 24 of the Complaint.

25.     Denies the allegations contained in paragraph 25 of the Complaint.

26.     Denies the allegations contained in paragraph 26 of the Complaint.

27.     Denies the allegations contained in paragraph 27 of the Complaint.

28.     Denies the allegations contained in paragraph 28 of the Complaint.

29.     Denies the allegations contained in paragraph 29 of the Complaint.

30.     Denies the allegations contained in paragraph 30 of the Complaint.

31.     Denies the allegations contained in paragraph 31 of the Complaint.

32.     Denies the allegations contained in paragraph 32 of the Complaint.

A-671

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM
NYSCEF DOC. NO. 68
INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/28/2020

33.     Denies the allegations contained in paragraph 33 of the Complaint.

34.     Denies the allegations contained in paragraph 34 of the Complaint.

35.     Denies the allegations contained in paragraph 35 of the Complaint.

36.     Denies the allegations contained in paragraph 36 of the Complaint.

37.     Denies the allegations contained in paragraph 37 of the Complaint.

38.     Denies the allegations contained in paragraph 38 of the Complaint.

39.     Denies the allegations contained in paragraph 39 of the Complaint.

40.     Denies the allegations contained in paragraph 40 of the Complaint.

41.     Denies the allegations contained in paragraph 41 of the Complaint.

42.     Denies the allegations contained in paragraph 42 of the Complaint.

43.     The allegations contained in paragraph 43 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 43 of the Complaint.

44.     Denies the allegations contained in paragraph 44 of the Complaint.

45.     Denies the allegations contained in paragraph 45 of the Complaint.

46.     Denies the allegations contained in paragraph 46 of the Complaint.

47.     Denies the allegations contained in paragraph 47 of the Complaint.

48.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Complaint.

49.     Denies the allegations contained in paragraph 49 of the Complaint.

50.     Denies the allegations contained in paragraph 50 of the Complaint.

51.     Denies the allegations contained in paragraph 51 of the Complaint.

52.     Denies the allegations contained in paragraph 52 of the Complaint.

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 66 Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 5 of 13          RECEIVED NYSCEF: 02/28/2020

53.     Denies the allegations contained in paragraph 53 of the Complaint.

54.     Denies the allegations contained in paragraph 54 of the Complaint.

55.     Denies the allegations contained in paragraph 55 of the Complaint.

56.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 56 of the Complaint.

57.     The allegations contained in paragraph 57 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 57 of the Complaint.

58.     The allegations contained in paragraph 58 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 of the Complaint.

59.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 of the Complaint.

60.     Denies the allegations contained in paragraph 60 of the Complaint.

61.     Denies the allegations contained in paragraph 61 of the Complaint.

62.     Denies the allegations contained in paragraph 62 of the Complaint.

63.     Denies the allegations contained in paragraph 63 of the Complaint.

64.     Denies the allegations contained in paragraph 64 of the Complaint.

65.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65 of the Complaint.

66.     The allegations contained in paragraph 66 of the Complaint can neither be admitted

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 68   Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 6 of 13   RECEIVED NYSCEF: 02/28/2020

nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 66 of the Complaint.

    67.    The allegations contained in paragraph 67 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 67 of the Complaint.

    68.    Denies the allegations contained in paragraph 68 of the Complaint.

    69.    Denies the allegations contained in paragraph 69 of the Complaint.

    70.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Complaint.

    71.    Denies the allegations contained in paragraph 71 of the Complaint.

    72.    Denies the allegations contained in paragraph 72 of the Complaint.

    73.    Denies the allegations contained in paragraph 73 of the Complaint.

    74.    Denies the allegations contained in paragraph 74 of the Complaint.

    75.    Denies the allegations contained in paragraph 75 of the Complaint.

    76.    Denies the allegations contained in paragraph 76 of the Complaint.

    77.    The allegations contained in paragraph 77 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 77 of the Complaint.

    78.    The allegations contained in paragraph 78 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 78 of the Complaint.

    79.    Denies the allegations contained in paragraph 79 of the Complaint.

A-674

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM
NYSCEF DOC. NO. 68
Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 7 of 13
INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/28/2020

80. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80 of the Complaint.

81. Denies the allegations contained in paragraph 81 of the Complaint.

82. Denies the allegations contained in paragraph 82 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

83. The allegations contained in paragraph 83 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 83 of the Complaint.

84. The allegations contained in paragraph 84 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 84 of the Complaint.

85. Denies the allegations contained in paragraph 85 of the Complaint.

86. Denies the allegations contained in paragraph 86 of the Complaint.

87. Denies the allegations contained in paragraph 87 of the Complaint.

88. Denies the allegations contained in paragraph 88 of the Complaint.

89. Denies the allegations contained in paragraph 89 of the Complaint.

90. Denies the allegations contained in paragraph 90 of the Complaint.

91. The allegations contained in paragraph 91 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 91 of the Complaint and respectfully refers the Court to any alleged statements for their full and complete content and context.

92. The allegations contained in paragraph 92 of the Complaint can neither be admitted

6

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 68                                        RECEIVED NYSCEF: 02/28/2020

Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 8 of 13

nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 92 of the Complaint.

93.     Denies the allegations contained in paragraph 93 of the Complaint.

94.     Denies the allegations contained in paragraph 94 of the Complaint.

95.     Denies the allegations contained in paragraph 95 of the Complaint.

96.     Denies the allegations contained in paragraph 96 of the Complaint.

97.     The allegations contained in paragraph 97 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 97 of the Complaint and respectfully refers the Court to any alleged statement for its full and complete content and context.

98.     The allegations contained in paragraph 98 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 98 of the Complaint.

99.     The allegations contained in paragraph 99 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 99 of the Complaint.

100.    Denies the allegations contained in paragraph 100 of the Complaint.

101.    The allegations contained in paragraph 101 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 101 of the Complaint.

102.    The allegations contained in paragraph 102 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM
NYSCEF DOC. NO. 68

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/28/2020

of the allegations contained in paragraph 102 of the Complaint.

103.    The allegations contained in paragraph 103 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103 of the Complaint.

104.    The allegations contained in paragraph 104 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 104 of the Complaint.

105.    The allegations contained in paragraph 105 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 105 of the Complaint.

106.    Denies the allegations contained in paragraph 106 of the Complaint.

107.    Denies the allegations contained in paragraph 107 of the Complaint.

108.    Denies the allegations contained in paragraph 108 of the Complaint.

109.    Denies the allegations contained in paragraph 109 of the Complaint.

110.    Denies allegations contained in paragraph 110 of the Complaint and respectfully refers the Court to any alleged photographs for their full and accurate depictions.

111.    The allegations contained in paragraph 111 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 111 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

A-677

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM
NYSCEF DOC. NO. 65

INDEX NO. 160694/2019

RECEIVED NYSCEF: 02/28/2020

Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 10 of 13

112.    The allegations contained in paragraph 112 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 112 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

113.    Denies the allegations contained in paragraph 113 of the Complaint.

114.    Denies the allegations contained in paragraph 114 of the Complaint.

115.    Denies the allegations contained in paragraph 115 of the Complaint.

116.    Denies the allegations contained in paragraph 116 of the Complaint.

117.    Denies the allegations contained in paragraph 117 of the Complaint.

118.    Denies the allegations contained in paragraph 118 of the Complaint.

119.    Denies the allegations contained in paragraph 119 of the Complaint.

120.    Denies the allegations contained in paragraph 120 of the Complaint.

121.    Denies the allegations contained in paragraph 121 of the Complaint.

122.    Denies the allegations contained in paragraph 122 of the Complaint.

123.    The allegations contained in paragraph 123 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 123 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

124.    Denies the allegations contained in paragraph 124 of the Complaint

125.    The allegations contained in paragraph 125 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 125 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

A-678

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM       INDEX NO. 160694/2019
NYSCEF DOC. NO. 68       Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 11 of 13   RECEIVED NYSCEF: 02/28/2020

126.   Denies the allegations contained in paragraph 126 of the Complaint.

127.   The allegations contained in paragraph 127 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 127 of the Complaint.

128.   Denies the allegations contained in paragraph 128 of the Complaint.

129.   Denies the allegations contained in paragraph 129 of the Complaint.

130.   Denies the allegations contained in paragraph 130 of the Complaint.

131.   Denies the allegations contained in paragraph 131 of the Complaint.

132.   Denies the allegations contained in paragraph 132 of the Complaint.

133.   Denies the allegations contained in paragraph 133 of the Complaint.

134.   Denies the allegations contained in paragraph 134 of the Complaint.

135.   Denies the allegations contained in paragraph 135 of the Complaint.

136.   Denies the allegations contained in paragraph 136 of the Complaint.

### FIRST CAUSE OF ACTION

137.   Paragraphs 1 through 136 are realleged.

138.   Denies the allegations contained in paragraph 138 of the Complaint.

139.   Denies the allegations contained in paragraph 139 of the Complaint.

140.   Denies the allegations contained in paragraph 140 of the Complaint.

141.   Denies the allegations contained in paragraph 141 of the Complaint.

142.   Denies the allegations contained in paragraph 142 of the Complaint.

143.   Denies the allegations contained in paragraph 143 of the Complaint.

144.   Denies the allegations contained in paragraph 144 of the Complaint.

145.   Denies the allegations contained in paragraph 145 of the Complaint.

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 66 Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 12 of 13 RECEIVED NYSCEF: 02/28/2020

## DEMAND FOR RELIEF

146.   President Trump denies that plaintiff is entitled to any relief requested in the *ad damnum* clause of the Complaint or any other relief.

## FIRST AFFIRMATIVE DEFENSE

147.   Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States.

## SECOND AFFIRMATIVE DEFENSE

148.   The Complaint fails to state a cause of action.

## THIRD AFFIRMATIVE DEFENSE

149.   The alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States.

## FOURTH AFFIRMATIVE DEFENSE

150.   The alleged defamatory statements are true.

## FIFTH AFFIRMATIVE DEFENSE

151.   Plaintiff's claim is barred because her damages, if any, were caused by acts of third persons, for which defendant is not responsible.

## SIXTH AFFIRMATIVE DEFENSE

152.   Plaintiff is not entitled to punitive damages as a matter of law.

## SEVENTH AFFIRMATIVE DEFENSE

153.   Plaintiff has not sufficiently alleged defamation *per se*.

## EIGHTH AFFIRMATIVE DEFENSE

154.   Plaintiff has failed to plead damages with the required specificity.

**A-680**

Case 1:22-cv-10016-LAK   Document 66-3   Filed 02/23/23   Page 13 of 13

## NINTH AFFIRMATIVE DEFENSE

155.    The Court lacks personal jurisdiction over President Trump.


WHEREFORE, defendant Donald J. Trump respectfully demands judgment dismissing the

Complaint in its entirety, together with costs, disbursements, and all such other relief as this Court

deems just and proper.

Dated: New York, New York
        January 23, 2020

                                LAROCCA HORNIK ROSEN
                                & GREENBERG LLP

                        By: _____
                                Lawrence S. Rosen, Esq.
                                Amy D. Carlin, Esq.
                                Patrick McPartland, Esq.
                                40 Wall Street, 32nd Floor
                                New York, New York 10005
                                T: (212) 530-4822, 4836, 4837
                                E: LROSEN@LHRGB.COM
                                    ACARLIN@LHRGB.COM
                                    PMCPARTLAND@LHRGB.COM

                                *Attorneys for Donald J. Trump*


To:     Roberta Kaplan, Esq.
        Kaplan Hecker & Fink LLP
        350 Fifth Avenue, Suite 7110
        New York, NY  10118

A-681

# EXHIBIT E

A-682

# TRANSCRIPTS  Transcript Providers

**Shows By Category:**

**Return to Transcripts main page**

## ANDERSON COOPER 360 DEGREES

**President Trump On His Most Recent Accuser: "It Never Happened, She's Not My Type"; Interview With Columnist E. Jean Carroll Who Accuses President Trump of Sexual Assault; In Latest Interview, President Trump Assails Joe Biden, Saying Biden's "Embarrassed" Obama Isn't Endorsing Him; President Trump, Pence Place Dems For Filthy Conditions Where U.S. Keeps Migrant Kids. Aired 8-9p ET**

Aired June 24, 2019 - 20:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

[20:00:13] ANDERSON COOPER, CNN HOST: Good evening.

She's not my type. That is what the president of the United States has just said about the woman who says he sexually assaulted her. She's not my type.

Which is what one says when a friend tries to fix you up, not my type. It's not what anyone really says when accused of what amounts to rape. Not my type.

That is precisely what President Trump just said and not for the first time either. She's not my type. He just said this about his 15th and latest accuser.

And we begin tonight with her account of the alleged sexual assault that she says she endured at his hands. And that alone should be compelling enough at any other time it would be.

Today, it's also part of a larger and more troubling story of collective indifference. Somehow, and we'll explore

A-683

the reasons why, the fact that the president has been accused 14 other times of unwanted sexual advances or outright sexual assault, has numbed people to just how abnormal this is -- these kind of accusations.

When Bill Clinton was accused two decades ago, it shook the country. Well, now the country shrugs as if one allegation is an outrage but 15 are a statistic. Even though he's on tape boasting about being able to get away with such assaults because he's a celebrity, even when as in this case the alleged assault is corroborated by two other people that she told at the time, back in the mid '90s.

That's when writer and "Elle Magazine" advice columnist E. Jean Carroll says this happened at a dressing room at New York clothing store Bergdorf Goodman, just steps away from Trump Tower. She writes about it and other painful encounters in her book "What Do We need Men For?: A Modest Proposal."

We spoke just a short time ago.

(BEGIN VIDEOTAPE) COOPER: I want to begin just by asking you about the latest thing that the president has said just moments -- a short time ago, he gave an interview to "The Hill". He said: I'll say it with great respect. Number one, she's not my type. Number two, it never happened. It never happened. OK?

E. JEAN CARROLL, AUTHOR, "WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL": I love that. I am so glad I'm not his type. I'm so glad.

This is -- this was 20 years ago. And I probably was at that moment, in that five minutes, the most attractive woman in Bergdorf's, in that one bit of time.

COOPER: And you think that's what it was about for him?

CARROLL: I don't know what it was about. Anderson, we were having a high old time. You remember Donald Trump. Hail-fellow-well-met, walking up and down the streets of New York, greeting everybody. Everybody liked him.

COOPER: You're talking about in 1995, '96.

CARROLL: '95, '96, he was Shakespearean. He was great. You'd love to see him on the street.

So when we met in Bergdorf's and he said, help me, advise me to find a present, I was -- I was thrilled. I

A-684

thought this is hilarious.

COOPER: I'm wondering, the statement he said, which you just made, which is "she's not my type", number -- that's the number one thing.

CARROLL: I love that I'm not his type.

COOPER: He has said that previously. There was a woman Jessica Leeds who --

CARROLL: Oh, I know.

COOPER: -- came forward. And he said, I think we actually have the tape of what he said, and it echoes some of the language. Let's just play what he said about Jessica Leeds in front of a crowd.

(BEGIN VIDEO CLIP)

TRUMP: When you looked at that horrible woman last night, you said, I don't think so. I don't think.

She would not be my first choice, that I can tell you. Man! You don't know. That would not be my first choice.

(END VIDEO CLIP)

CARROLL: He also called Miss Universe fat. Miss Piggy I think he called her. Miss Universe, one of the most beautiful women in the solar system, and he called her fat. COOPER: The other thing that he said is that you're totally lying.

He said again in this interview, new interview, he said: Totally lying. I don't know anything about her. I know nothing about this woman. I know nothing about her. She is -- it is just a terrible thing that people can make statements like that.

CARROLL: He's denied all 15 women who've come forward. He denies. He turns it around. He threatens any attacks.

COOPER: Let's talk about what you say happened because obviously the details of it all matter and this is -- I should point out -- just part of -- this is one person you talk about in your book. This is not a book about

A-685

Donald Trump.

CARROLL: No.

COOPER: This is not -- there's not Donald Trump on the cover.

CARROLL: No.

COOPER: This is about your life and --

CARROLL: Don't even mention his name. I mentioned his name once in the book. Once.

COOPER: So you were -- you say you were in Bergdorf Goodman.

CARROLL: I was coming out of Bergdorf's --

COOPER: Which is a store I heard you liked a lot.

CARROLL: It's a posh and cozy --

COOPER: Your face lights up when you talk about Bergdorf Goodman's.

CARROLL: I was just there.

COOPER: OK.

CARROLL: I just love it.

So, I was coming out. And he was coming in -- he was standing out -- he put his hand like this, so I did not go through the revolving door. He came in, he said, hey, you're that advice lady. And I said, hey, you're that real estate tycoon.

He said, come advise me, I want to buy a present. I said, oh, for who? He said for a girl.

So, I was enchanted. It was such a great moment.

A-686

[20:05:01] So, how about the handbags? Oh, no. He doesn't want a handbag. Well, how about a hat? So, he strolls (ph) --

COOPER: And you hadn't -- had you met him prior to that?

CARROLL: Just once, briefly. There's a picture --

COOPER: That's the photo of, with --

CARROLL: With my ex-husband and he with his ex-wife, a very -- a very nice --

COOPER: Which, by the way, he had said he'd never even met you previously. Obviously, the picture which we have tells a different story.

CARROLL: So we went to the hats and he immediately put a -- grabbed a fur hat, of course. I said oh, you can't put a dead animal on your head. And then I found out later of course, all of his women wear those fur hats. Ivana, Ivanka. You've seen pictures. They all -- OK.

Yes, I said, how old is the young lady? And he said how old are you? And I said 52. And he said you're so old.

COOPER: He said that?

CARROLL: Of course. He said, you're so old. And shortly after that he said, I know, lingerie. Or he could have said underwear.

And so we went up the escalator. He we went to the lingerie department. It was empty. There was nobody there. There was nobody on the whole floor, frankly.

I think he goes through bathing suits and -- the store was not popular at the time. Nobody was there. On the counter --

COOPER: That's going to sound strange to people, that nobody was in the --

CARROLL: Because Bergdorf's is the greatest store on the earth. They take care of whatever you want there. If

A-687

you're thirsty they'll bring you water. They'll comb all over the country to get you what you want.

It was a moment in time, nobody was there. Plus, a dressing room door was open, which is very unusual because usually they're locked and the attendant comes and locks it, escorts you in. OK. So on the --

COOPER: He said lingerie because he said he wanted you to help pick out some lingerie.

CARROLL: He was not having it with the hats. The hats were -- OK. So then we went out. He was trying get some lingerie. And I am just like oh -- I can die now forever on this store. We're going to go get lingerie.

COOPER: You go -- you say you go up to the lingerie department and no one is around.

CARROLL: And there are two or three boxes on the counter. The fancy -- remember the old-fashioned lingerie boxes. And a filmy see-through body suit in lilac gray. And he snatches it up and he says go try this on.

I said you try it on. He said no, it looks like it fits you. I said it goes with your eyes. He said no, go put this on. And Anderson --

COOPER: So at this point you're saying it's a friendly --

CARROLL: I was joshing.

COOPER: Joshing.

CARROLL: I used to be a writer at "Saturday Night Live." I see an entire sketch of making Donald Trump put this filmy thing over his pants. That is what I'm thinking.

I'm not thinking I think it's -- I was laughing as I said it. He said, well -- he went like this. And I walked in stupidly --

COOPER: So, for you, this was kind of a New York moment.

CARROLL: Oh, the best -- just like the best New York -- Donald Trump is going to put on a filmy body suit? It's like oh, I couldn't -- so he -- let's go in the dressing room. I thought I'm going to make him put the pants on. Walked in.

A-688

And the minute I was in there he shut the door and pushed me up against the wall and bang -- banged my head on the wall and kissed me. It was so shocking. I couldn't -- of course, I started laughing again. Because --

COOPER: You started laughing.

CARROLL: Of course.

COOPER: Why? Why of course?

CARROLL: Because it was a way of -- if it was at all erotic, if a man is laughed at it usually will make him -- and he put his shoulder against me to hold me against the wall. And at that point I realized that I was in a very difficult situation.

COOPER: Did he say anything?

CARROLL: No. No. It was just like we're going to do this thing, we're just so hot for each other. Why would I even try to think what he was thinking?

Anyway, so, he pushed -- you know -- he pushed me -- held me with his shoulder and I was wearing a coat dress and tights. And he pulled down the tights. And so, that's --

COOPER: He pulled them with both hands?

CARROLL: One. And that was when it turned serious. I realized that this was -- this was -- this was a fight.

And even though I can talk about it now and put words to it, at the time, the adrenaline is pouring through me and all I want to do is --

COOPER: How would you describe -- were you -- you said you were surprised --

CARROLL: Fighting.

[20:10:00] COOPER: Fighting. Were you scared? Were you angry?

A-689

CARROLL: No. I was too panicked to be scared.

COOPER: Too panicked to be scared. OK.

CARROLL: You know?

COOPER: You said adrenaline was pumping.

CARROLL: I assume it was. Because I got stronger -- he's 6'3". I looked it up. I was about 6'1" in the massive heels I was wearing. And so, we were even -- almost even in height. And down go the tights.

And it was against my will. And it hurt. And it was a fight.

COOPER: And this is not a question I would normally ask. And if you don't want to answer I totally understand. But given the prior accusations, which have all been of forms of assault or harassment, you're saying there was actual penetration.

CARROLL: Yes.

COOPER: Did you -- which is -- puts it into a different category of any of these other -- any of the other women who have come forward. I mean, that is -- that is the definition of rape. One definition.

CARROLL: That's the definition. Yes.

COOPER: How long --

CARROLL: Brief. Brief. Because when a woman is stamping her feet --

COOPER: And that's what you were doing? You started stamping your feet?

CARROLL: I always think back and think that was the stupidest thing I've ever done. I should never have done it. And then I didn't behave --

COOPER: When you say I should have never done, it you mean --

A-690

CARROLL: That was just a dumb thing to go into a dressing room with a man that I hardly know. And have him shut the door. And then be unable to stop him.

And I was a competitive athlete. So I wasn't like a -- I didn't freeze. I rose to the occasion. And it did not last long.

And that's why I don't use the word you just used. I use the word fight.

COOPER: You don't use the word rape.

CARROLL: Sexual violence is in every country in every strata of society, and I just feel that so many women are undergoing sexual violence. Mine was short. I got out. I'm happy now. I'm moving on.

And I think of all the women who are enduring constant sexual violence. So, this one incident, this one, what, three minutes in this little dressing room, I just say it's a fight. That way I'm not the victim, right? I'm not the victim.

COOPER: You don't feel like a victim.

CARROLL: I was not thrown on the ground and ravished. Which the word "rape" carries so many sexual connotations. This was not -- this was not sexual. It just hurt. It just --

COOPER: I think most people think of rape as a -- it is a violent assault. It is not --

CARROLL: I think most people think of rape as being sexy.

COOPER: Let's take a short break --

CARROLL: They think of the fantasies.

COOPER: We're going to take a quick break. If you can stick around we'll talk more on the other side.

CARROLL: You're fascinating to talk to.

(END VIDEOTAPE)

A-691

(COMMERCIAL BREAK)

[20:17:22] COOPER: More on my conversation with E. Jean Carroll and the president's latest denial of her sexual violence allegations against him.

He said, quote, "She's not my type." He's also said previously he did not know her, had never met her, even though they had in fact met. She's the woman on the left along with her husband a local news anchor at the time and the president's wife at the time, Ivana. The president has also said flat out that she is lying.

We were talking in the last segment about what she says happened in that department store dressing room and more specifically the word she does not use to describe it.

(BEGIN VIDEOTAPE)

COOPER: Before the break, you said you don't use the word "rape." A lot of women hearing this, I mean, a lot of people hearing this who believe you would say that this is rape. CARROLL: You know, I just have trouble with the word. I just have

trouble. I write an advice column for 25 years and women write to me with these devastating stories and they have been violently, you know, disposed of by men. And I just -- I feel too much respect for their suffering.

I didn't suffer, Anderson. I did not suffer. I didn't lose my job. I wasn't beaten. You know, I just don't use the --

COOPER: So you say you stomped your foot. And then --

CARROLL: And I had my purse in this hand. The only reason I know I had my purse in this hand is because by the time I got out to Fifth Avenue, I reached in to get my phone. So apparently I was holding my purse the whole time.

COOPER: Do you remember leaving the store?

CARROLL: I remember being out on Fifth Avenue. I remember going through the first floor out the door. I don't remember which door but I ended up on Fifth Avenue.

A-692

COOPER: What is going through your mind in that moment? You've gotten out. But what --

CARROLL: Flight. I felt relief to get the heck out.

COOPER: Because I don't think any guy can understand unless they've been sexually assaulted what a woman goes through -- I mean, if what you're saying is you're attacked in this place you'd never expect -- you that enjoy being in, you just -- did you think about police? Did you think about talking to friends? What was going through your mind?

CARROLL: I called my friend right away. And one of the first things she said to me is: E. Jean, stop laughing, this is not funny.

COOPER: You were laughing when you described it to her?

CARROLL: I was laughing as soon as she got on the phone apparently. I don't remember it.

COOPER: CNN has talked to both friends who say you that spoke to them around that time.

[20:20:03] And one of them says that yes, that you were laughing.

CARROLL: Yes, doesn't that sound totally insane? I guess -- well, that's how I deal with things in life. You know, to me life is a marriage of comedy and tragedy, right?

And if you don't laugh at things, you're going to have a hard time moving forward, as you know. You know, the way is to smile, get past it, and move on. And that -- you know, that is a great way to handle it.

COOPER: You're a writer, though. I mean, at the time, did you think about writing this? Did you -- I mean, did you think about --

CARROLL: I wanted to forget it.

COOPER: Really?

CARROLL: Oh, I didn't -- because I thought, A, my fault. B, I was stupid. C, I didn't think of it as the word you're using. I didn't think of it as rape.

A-693

I thought of it as a violent incident. I thought of it as a fight. And I'll tell you how stupid -- I thought I won because I got out.

COOPER: The person you talked to on the into, did they tell you -- they said that -- they told us that they recommended you go to the police and they offered to go with you.

CARROLL: To go -- E. Jean, I'll go with you. You have to go to the police. You should report this to the police.

It was so far beyond me to go anyplace, to do anything except just go home and take a shower and get clean and get in my bed.

COOPER: Was there a thought you should go to the police for you?

CARROLL: No. I just didn't want the rigmarole. I just didn't want to do it.

And like many, many, many other women, a lot of women, it's a personal choice. Do you want to go to the police? Every woman has to decide for herself.

COOPER: Did you worry -- obviously you're a public person in New York, very well-known writer. You're on television shows.

Did you worry it would define you in some sort of way?

CARROLL: I hadn't thought of that, but I think you're right. I think you're right. And that is part of the -- that's interesting. I hadn't thought of that.

COOPER: Why then right about it now? Why come forward --

CARROLL: Because I was ready. It's my time. Everybody -- well, here's what happened. Two years ago, Megan Twohey and Jodi Kantor astounded the world with their bombshell about Weinstein, right?

COOPER: Harvey Weinstein.

CARROLL: And that started the surge of "me too." And what happened is the women who were writing to my

A-694

advice column they wanted to stand up too and they wanted -- should they go to the police? Should they turn in their husbands? How about their stepson?

And I thought oh, my -- so two years of this and I thought I am just such a -- what am I doing? These are the -- my correspondence. I love them. COOPER: You felt --

CARROLL: Yes.

COOPER: -- being fraudulent.

CARROLL: That's the word.

COOPER: You're giving them advice and you yourself --

CARROLL: I'm telling them exactly what to do.

COOPER: You're saying come forward.

CARROLL: Or not. You can't -- not every woman should come forward.

COOPER: Every situation is different.

CARROLL: Every situation -- so right.

COOPER: So, look, you decide to write about it. Again, it's just part of a larger book that this is not the subject of the entire book. It's made headlines.

CARROLL: No, it's just a sliver. It's a sliver --

COOPER: But you knew -- you saw -- when Jessica Leeds came forward, when other women came forward during the campaign, did you ever think oh, this is the time I should add my voice to it?

CARROLL: No, they're doing it. Anderson, they were doing it. And I watched from the sidelines.

You know, it occurred to me just two days -- when Bill Clinton was running for president and there was what

A-695

they called the bimbo explosion. I had lunch with McGovern and I said, what do you think about all these women complaining about Bill Clinton? And McGovern said it's helping him. I said, what? He said watch. It's helping him.

COOPER: And you believe all those women coming forward helped Trump?

CARROLL: Yes.

COOPER: In what way?

CARROLL: It showed him very manly, he takes what he wants, he's rich enough to have any woman, play -- you know, beautiful Playboy playmates, porn stars, and he's so rich he can pay them off. He can have any woman he wants. I think it plays well.

COOPER: E. Jean Carroll, thank you very much.

CARROLL: Anderson Cooper, you're welcome.

(END VIDEOTAPE) COOPER: Coming up next, reaction to what you just heard and what the president has just said about E. Jean Carroll from Maggie Haberman from "The Times," Amanda Carpenter, Laura Coates. That's just ahead.

(COMMERCIAL BREAK)

[20:28:35] COOPER: We're talking tonight about the president's latest defense in the face of the latest sexual misconduct allegation against him. He just told "The Hill" that accuser number 15, E. Jean Carroll, whose allegations amount to rape, was, quote, not my type, and that she's lying.

Here's how she reacted.

(BEGIN VIDEO CLIP)

COOPER: I'm wondering, the statement that he said which he's just made which is she's not my type, that was the number one thing --

A-696

CARROLL: I love that I'm not his type. Don't you love that you're not his type?

He also called Miss Universe fat. Miss Piggy, I think he called her. Miss Universe, one of the most beautiful women in the solar system, and he called her fat.

(END VIDEO CLIP)

COOPER: Joining us now, CNN Political Analyst and "New York Times" White House Correspondent, Maggie Haberman. Also, Amanda Carpenter, communications director for Senator Ted Cruz. And CNN legal analyst Laura Coates.

Thanks for being with us.

Maggie, the reaction from the president saying he doesn't -- he's never met her, that obviously, you know, there's a picture where they have met. Do you -- her response that this plays well, that this actually somehow, it doesn't affect the way people see him, do you believe that?

MAGGIE HABERMAN, CNN POLITICAL ANALYST: I was struck by her saying that to you. And I think there is something probably to that, whether it is a portion of people within his supporters who find sort of the idea of being very macho and being very tough and sort of taking what you want to be appealing.

[20:30:00] You know, he had a similar statement in response to an allegation in 2016 where somebody had accused him of assault on an airplane.

COOPER: Right.

(CROSSTALK)

HABERMAN: And he said she -- right, basically leads (ph), and he said she wouldn't be my first choice or something to that affect at a rally. And that there too is another similar statement that is also a striking statement because rape or sex assaults are not about sex, they're about power and he makes no distinction between them. And the President has been very concerned about allegations against people like Bill Clinton or Harvey Weinstein, less so when it involves himself or Republicans.

COOPER: Yes. Amanda, the President tonight saying that "it's just a terrible thing that people can make

statements like that." In his original statement on Friday night, he said that people should pay dearly for such false accusations. Some I guess might see that as a threat. I'm wondering what you make of the allegation and the response to it.

AMANDA CARPENTER, CNN POLITICAL COMMENTATOR: E. Jean Carroll is not another random woman that Donald Trump can dismiss. I grew up reading her advice columns and what I loved about her and still to this day is that she would lift somebody up and kick them under the butt at the same time. So I'm going to do a little bit of that tonight.

People are wondering, are we numb to this? Is this different? Yes, this is different in 2020 because we the people have so much more information about Donald Trump's sexual impulses than we did in 2016.

Michael Cohen is in jail right now in part because of the lies that he told to silence Stormy Daniels and keep her truth from the public. He's following the same playbook trying to smear these women again saying there is not -- he's not -- she's not his type. It didn't happen.

But for this to matter, people have to make the argument. Someone has to put the question before the people. Should sexual misconduct disqualify a man from being in a position of power? When you put it like that, obviously, the answer is yes.

But, there was a time when the answer was no. That answer used to be no for someone like Roger Ailes, Les Moonves, Harvey Weinstein. It became yes once people had clear information and we have a pattern here.

Jean Carroll is someone with credibility. Women know her. They know her story. They know the way that she's counseled women for so long. So when she tells you, "I came out with this story now because all these women kept asking me for advice," she's doing what she's done for the last 25 years. She's telling her story and trying to help women navigate this time.

COOPER: Laura, I mean, I think Amanda makes good points. There are the people who are going to listen to this and just discount this and say, look, OK, this is -- there's political agenda. She's selling a book, which is what the President has also pointed out.

You know, it is remarkable that an allegation like this can be made against a sitting president and having not be, you know, the headline of every newspaper, certainly says a lot about where we are right now. LAURA COATES, CNN LEGAL ANALYST: It does. And it also her statements to you, Anderson, were extraordinarily

striking because it really laid out a lot of the preconceived notions and misconceptions people have one about the definition of rape. She thought it was about sexual attraction, which rape is about power and a power dynamic and exploitation of power. It's little to do with sexual attraction.

Number two, it's the idea of her and what people assume a victim will act like. People have a lot of credibility issues start (ph) with E. Jean Carroll because of the laughter that she says she expressed even in telling a friend and the idea that she felt somehow blamed in her own mind for going into this dressing room with Donald Trump as a citizen at that point in time.

And so, a lot of those factors, the jury and the court of public opinion look at and say, well, somebody who says that they are not actually a victim, somebody who is laughing through it, can I assign credibility?

And the real truth of the matter is, Anderson, you know, when I prosecuted a number of cases involving sexual assault, including delayed reporting, one of the hurdles we always face, not only the jury, but the person who was victimized, acknowledging what happened to them, understanding the impact of it and we always had to guard against the idea of saying, look, a victim comes as they come. You cannot define and explain to them how they should be acting if in fact she's credible.

COOPER: Amanda, you know, what you said about, you know, this is -- this should be different. This is different. People know her, read her column, just even the coverage of this, though, you know, it hasn't gotten a huge amount of coverage or any kind of sustained coverage.

CARPENTER: Yes. And even tonight there was news that "The New York Times" or "New York Post" was instructed to take down the column because there's people that want to protect Trump. And these are very uncomfortable questions.

You know, I didn't see many Democrats putting out statements about this because it's an uncomfortable conversation. But I trust that when you put it before people in a clear way, should men who commit acts of sexual violence, assault against women, should they be in positions of power, yes or no? We should not shirk away from this.

[20:35:04] But there's a lot of people that want to duck and cover and hope this will go away because it's hard to talk about. It's hard to watch a woman's pain.

COOPER: Maggie, I mean, I don't know if this is -- would make any kind of -- I mean, you had, you know,

more than a dozen people come forward --

HABERMAN: Right.

COOPER: -- albeit during a campaign. HABERMAN: I mean -- well, except -- during a campaign is actually when people are paying a lot of attention to -- number one, to information and this was not just at the end of the campaign. We reported on at the times many months before the election.

I do think that the issue here in part is that I don't -- I think that voters have largely made up their mind in one direction or the other about this President. I think that if hearing about Michael Cohen and pay offs to a porn star and an affair did not change people's minds, which polls indicate it didn't, I don't think anything is going to.

COOPER: Laura, just finally, Mayor de Blasio over the weekend said that the New York Police Department would investigate this allegation, but the statute of limitations has expired on them, even though New York State updated the law back in 2016. It's not retroactive, is it?

COATES: Well, he's offering to reopen the investigation in the event that she actually wanted to go forward. And really the issue here to me, Anderson, is even if it were available to her, she's saying that she has decided based on the advice of counsel that she was approaching her.

I'm talking to Alisyn Camerota earlier today on "New Day" about this very issue that she thought, you know what, I probably won't be able to win this, so it's a fool's errand to be able to do it. And that speaks volumes about where we really are in conjunction with both Maggie and Amanda are talking about, the idea that one would think if they are a victim of sexual assault in this country in 2019, it would be a fool's errand to pursue against the person of power.

COOPER: Amanda Carpenter, Maggie Haberman, Laura Coates, appreciate it. Thank you very much. Maggie is going to stick around and that interview with President Trump just gave there was a lot more to digest. He once again sales his main Democratic rival and his reasoning is pretty interesting. We'll have that ahead.

(COMMERCIAL BREAK)

[20:40:38] COOPER: There's more breaking news now in that interview that he just did with the Hill. President Trump weighs into presidential politics and talks strifefully (ph) about the man who so far leading

A-700

the Democratic -- or is the leading Democratic opponent, I should say, former Vice President Joe Biden. It's an extended riff on his earlier remarks about Biden's intelligence.

(BEGIN VIDEO CLIP)

DONALD TRUMP, PRESIDENT OF THE UNITED STATES: How he doesn't get President Obama to endorse him, there has to be some reason why he's not endorsing him. He was the vice president. They seemed to have gotten along and how President Obama is not endorsing him is rather a big secret. If you want to know -- if you know the answer, please let me know, because I think it's very important.

And then he goes and lies and said I asked the President not to endorse me. Give me a break. He said he asked the President because he's embarrassed by the fact that Obama is not endorsing him. So he goes and says, "I asked President Obama not to endorse me." Well, he was trying to get the endorsement. So it could be that President Obama knows something, but there is something going on in that brain of his.

(END VIDEO CLIP)

COOPER: And Maggie Haberman joins me, as well as David Gergen, advisor to four presidents over the years. It's interesting, he's -- it sound similar what he -- I mean, he's doing a number of things there but similar to what he did to Hillary Clinton sort of raising the possibility, throwing out the possibility, "Oh, there's something happening in his brain."

HABERMAN: Yes. No, this sounds like we're in late stage 2016 or mid- stage 2016 at this point. He's suggesting that there is some medical issue with Joe Biden and --

COOPER: That Obama knows about.

HABERMAN: -- and I can't say. But, remember, his refrain throughout 2016 was there is something going on, folks, and that's exactly what this is. It's funny. He is zeroing in on something that was sort of the least credible thing that Biden has said about his Obama relationship --

COOPER: Right.

HABERMAN: -- which is, "Oh, I asked him not to endorse me." And yet they are putting out these tweets with best friend bracelets of the two of them.

A-701

However, Donald Trump did not endorse Mike Pence recently in an interview, either. And I doubt that he would say it was because there was something going on in the brain and there was a big secret about it. There are a lot of reasons why Barack Obama might not be endorsing Joe Biden and it is very in keeping with how President Trump has planned on going at Joe Biden.

COOPER: But, you know, David, it is interesting though that -- I mean, the President does have a remarkable ability to kind of zero in on something, in this case, you know, Joe Biden's statement that he told Obama -- he asked Obama not to endorse him, which is just, you know, it's hard to imagine that is actually true.

But the President kind of zeros in on things which, you know, he has a point there and then -- I mean, he obviously is now taking it to a medical issue and stuff. But, it is kind of one of the skills that he has to kind of hone in on a weakness and make the most of it.

DAVID GERGEN, CNN SENIOR POLITICAL ANALYST: Yes. Let me just say first of all, Anderson, thank you for giving so much coverage of Ms. Carroll and then especially for allowing three women to have the first voices and what -- would it deserve to be a much more serious conversation in the days ahead. In the meantime, on -- you know, the President had -- Donald Trump is a master at planting smears. Planting the ideas that he doesn't allowed to -- he has certain sprouts into bigger ideas. And what he is suggesting now is that he said, I think he's off. He's different.

He was very definitely saying that mentally and psychologically he's less of a man, less of a candidate than he was. This is from the same White House, the same president that was furious with the questions raised about Donald Trump's own mental stability.

And the President then, of course, had that famous phrase that he's a very stable genius, just smacking down. But this is par for the course what we've seen and very importantly, I do think it suggests a kind of race we're going to have ahead. It's going to be a mean and frequently dirty race.

COOPER: And does that work, Maggie? I mean, it's --

HABERMAN: It worked last time.

COOPER: -- with all the evidence it seems to point to the fact that it kind of does.

A-702

HABERMAN: Negative politics works, it always has. And as we have seen increasingly in these campaign cycles over the last four years, voters don't really hold it against candidates for going negative because they assume that all politicians are bad. And so there's actually less of a cost for Donald Trump whose negatives are high already.

It's not like he's going to bring his own down that far is his gamble. He can't win reelection based on the math of his base right now. So it can only be through certain advantages of the map and tearing down the Democrat and he assumes it will be Joe Biden. And I think he thinks that Joe Biden is someone who he knows how to run against.

[20:45:01] COOPER: David, the President also talked about how he doesn't need congressional approval for a military strike against Iran. And in that conversation, I want to play something that he said.

(BEGIN VIDEO CLIP)

TRUMP: I have ideas that intelligent people, they'll come up with some thoughts. I actually learned a couple of things the other day when we had our meeting with Congress.

(END VIDEOTAPE)

COOPER: You know, the -- I guess the members of Congress will be relieved to learn that the President, you know, thinks they'd come up with some thoughts. The notion, how do you think he -- this whole Iran thing has sort of played out for the President?

GERGEN: Well, he's getting a fair amount of credit from the left and I'm among the people who are thankful that he didn't send any missiles. I think it would have made the situation much, much worse. But this hasn't played out yet, Anderson.

You know, the Iranians are about to breakout the nuclear agreement itself. This is going to get a lot harder and tougher in the days ahead. And it's not very far away when the Iranians are going to start to have breakout.

So I don't think -- well, I don't think -- I think it's way too early to make judgments about how presidential decision making. And we know it's sloppy, but what the end result is going to be I don't think we know yet.

COOPER: Yes. He also went on to say that he doesn't like keeping Congress, in his words, abreast, that he

A-703

doesn't have to do it legally.

HABERMAN: I understand that that his view and that is increasingly the view of the White House. Congress does not agree and it's been the view of the White House on all manner of things, whether it is these congressional oversight investigations or whether it is about potential military action.

I think that this is going to be yet another thing that the Democratic held House is going to try to have adjudicated by a court, but that also gets into those areas.

COOPER: Yes. Maggie Haberman, David Gergen, thank you very much. Still to come tonight, filthy conditions for migrant kids separated from their families and who the President blames for it.

(COMMECIAL BREAK)

[20:50:57] COOPER: More details came out this weekend about the conditions in which migrant kids are reportedly being held in this country. Republican Congressman Mike McCaul called them "the worst I've ever seen".

A lawyer who visited the facilities in Texas told "The New Yorker," children kept filthy and hungry, denied showers, left to sleep on concrete floors. Vice President Pence blamed Democrats in Congress. And on NBC, President Trump falsely blamed President Obama and then took credit for ending family separation.

Let's check in with Chris now. It is kind of amazing, Chris, that the President is taking credit for ending family separation when obviously that was part of their entire policy.

CHRIS CUOMO, CNN ANCHOR: It did it. He likes the harshness of it. They continue to do it. That's the truth. There's a lot of ugly truth here. I have never seen a crisis since maybe when you were in New Orleans talking about Katrina that was as openly understood and ignored as this one is. They all know all about it, Anderson, and no one is doing a damn thing. We're waiting this week.

So you have, why are they there? They are up against it. This is not about abuse that is intentional as far as I know, but that's starting to change. The El Paso tent city is much better. Imagine if they had money to build a lot more of those that they've been begging for.

The federal government was in court arguing that sanitary conditions does not require soap or toothbrushes.

A-704

That's where this government's head is right now. They're putting a premium on harshness and it's horrible.

COOPER: And yet -- I mean, for this President it pays off, I mean, among supporters.

CUOMO: It does. Until somebody finds it's positive opposite as a message. You cannot tell me that Americans are happy about harshness against kids. They're not showing you those faces down there for a reason. It's the one part that pisses me off. They say, well, privacy rights, Anderson. I must respect these children's privacy rights, please. If you respected anything about it, the situation would be nothing like this.

COOPER: What are you doing tonight? What do you got?

CUOMO: So, we have the campaign manager for Bernie Sanders to test his case about education. How is he going to pay for this? Why is it fair?

And then you know who I have, Chloe Flower. You're going to love her. She blew up the Grammys with Cardi B, remember? She mixes classical music with hip-hop. Her song is number one on iTunes. It doesn't even have lyrics. And, she knows all this stuff about human trafficking. She's been doing that work with the U.N. longer than music.

COOPER: Wow, that's awesome. All right, Chris, we'll see you then about seven minutes from now.

Coming up, President Trump crying foul again about the 2016 election results. Unfounded claims? Yes. A popularity contest and a mantra from my favorite stand-up comic all next on "The Ridiculist."

(COMMERCIAL BREAK)

[20:57:14] COOPER: Time now for "The Ridiculist." And tonight it's another entry from President Trump's department of grievances. In an interview with NBC yesterday, the President repeated his widely debunk claim that Casper, the deep state ghost, somehow tampered with the 2016 election results. That's right 2016, still talking about it.

Now, granted, he was responding to a question but he still took the bait like a big, beautiful, elegant Trump hotel sea bass.

(BEGIN VIDEO CLIP)

A-705

CHUCK TODD, NBC ANCHOR: You didn't like the fact that you lost the popular vote. That bothered you, didn't it?

TRUMP: Well, I think it was a -- I mean, I'll say something that, again, is controversial. There were a lot of votes cast that I don't believe. I look at California. TODD: Mr. President.

TRUMP: Excuse me.

TODD: But that's a --

TRUMP: Take a look at Judicial Watch. Take a look at their settlement where California admitted to a million votes. They're admitted to a million votes.

(END VIDEO CLIP)

COOPER: OK. There are countless ways to respond to that. No one says it better though than my favorite stand-up comic, SNL's Jeannie Darcy.

(BEGIN VIDEO CLIP)

JEANNIE DARCY, SNL STAND-UP COMEDIAN: Don't even get me started. Don't even get me started. White ladies, don't get me started. Can I hear it from the sisters? Don't get me started. No, you know what, get me started.

(END VIDEO CLIP)

COOPER: Don't get me started. Don't even get me started. Where have you gone, Jeannie Darcy? This nation turns its only eye to you.

But, all right, get me started because here's the thing, California never admitted to a "million votes," whatever that actually means. It sounds like something whispered on the floor of a now bankrupt casino.

The settlement the President referred to was California removing the names of inactive voters (INAUDIBLE), even the conservative group in the push acknowledged most of those people had probably died or moved away.

A-706

Most importantly, there's no evidence of widespread voter fraud, not in California or in any other state. The President has claimed was up to no good. Despite these sleuthing efforts such as they were of his so-called voter fraud commission. Don't get me started on that michigas (ph).

Now, what continues to blow my mind and maybe it shouldn't at this point, but I've had a couple of wine coolers, so he's been hung up on this for nearly three years. The thing is he won. He won the Electoral College, which is all that matters constitutionally. He is the president. Take yes for an answer. Just take yes for an answer. But he is like kind of like a jilted would be prom king who walks around all day listening to the soundtrack of Broadway's Wicked

(BEGIN VIDEO CLIP)

(END VIDEO CLIP)

COOPER: It's a show tune for everything in my opinion. The President would actually love Wicked. It is in the biggest theater on Broadway. Not term limited, it's a total cash cow and it's got a wizard unbound by checks and balances.

Anyway, it may be difficult for someone who previously loved (ph) beauty pageants to really absorb this, but not everything is a popularity contest. Regardless of polls, regardless of the raw vote count, he is the commander-in-chief. He's got veto power with a giant sharpie and he's still very popular among his supporters and here on "The Ridiculist."

The news continues. I want to hand it over to Chris for "CUOMO PRIME TIME."

Chris?

A-707

# EXHIBIT F

# EXCLUSIVE: Trump vehemently denies E. Jean Carroll allegation, says 'she's not my type'

thehill com/homenew /admini tration/450116 trump vehemently denie  e jean carroll allegation  he  not my type/

Jordan Fabian and Saagar Enjeti                                    June 24, 2019



<u>Administration</u>

by Jordan Fabian and Saagar Enjeti - 06/24/19 6:43 PM ET

Greg Nash

A-709

President Trump said Monday that writer E. Jean Carroll was "totally lying" when she recently accused him of raping her during an encounter in a New York department store in the mid 1990s.

In an exclusive interview with The Hill, the president vehemently denied the allegations just hours after Carroll detailed the alleged incident during a cable news interview

{mosads}"I'll say it with great respect: Number one, she's not my type. Number two, it never happened  It never happened, OK?" the president said while seated behind the Resolute Desk in the Oval Office.

Carroll said on CNN that Trump "just went at it" when he allegedly cornered her in a dressing room at Bergdorf Goodman, adding that "he pulled down my tights, and it was a fight "

She first came forward with her allegations on Friday. Trump denied the allegations in a statement that day and then again while speaking with reporters on Saturday

When asked if Carroll was lying, Trump on Monday repeated his assertion that he had never met her.

"Totally lying. I don't know anything about her," he said. "I know nothing about this woman. I know nothing about her. She is — it's just a terrible thing that people can make statements like that "

"I love that I'm not his type," Carroll said in an interview on CNN, responding to Trump's comments shortly after they were published.

She pointed out that Trump has denied all the accusations from women who have accused him of sexual misconduct.

"He denies, he turns it around, he threatens and he attacks," Carroll said

Carroll's account of the alleged incident was detailed in an excerpt of her forthcoming book published Friday afternoon in New York Magazine. The excerpt included a photo that identified Carroll, Trump, his then-wife, Ivana Trump, and Carroll's then-husband, John Johnson, attending the same party around 1987.

Trump dismissed the photo on Saturday, telling reporters, "Standing with my coat on in a line — give me a break — with my back to the camera. I have no idea who she is."

Carroll, a longtime advice columnist for Elle magazine, alleged in her book that she ran into Trump at Bergdorf Goodman in New York City during fall 1995 or spring 1996. The two recognized each other and Trump asked her for advice on purchasing a gift for a woman, according to Carroll

A-710

After she suggested buying a handbag or a hat, Carroll claimed that Trump turned his attention to lingerie  The two joked that the other should try the clothing on before they eventually made their way to the dressing room, she said in her account.

Once inside, Trump allegedly lunged at her, pushed her against a wall and kissed her before pulling down her tights and raping her  Carroll wrote that she fought Trump off and then ran out of the dressing room. She said the alleged incident lasted no more than three minutes.

Explaining why she didn't come forward until now, Carroll wrote about the retribution and dismissal she expected to receive and called herself "a coward."

She has said in interviews following the publication of her account that she does not plan to file a criminal complaint over the incident

More than a dozen women have accused Trump of sexual misconduct since he launched his presidential campaign in 2015  The alleged incidents have spanned decades  Tape emerged in October 2016 of Trump bragging on the set of "Access Hollywood" in 2005 about groping women without their consent.

Trump has denied all allegations of sexual misconduct, and the White House has said that the women accusing him are lying.

In Monday's wide ranging interview with The Hill, the president touched on topics including everything from the Federal Reserve to the U.S. women's national soccer team.

Asked about rising tensions with Iran, Trump said he has the authority to take military action against the nation without congressional approval.

"But we've been keeping Congress abreast of what we're doing … and I think it's something they appreciate," he said  "I do like keeping them abreast, but I don't have to do it legally "

"We were pretty close to maybe making a decision to strike. Then I decided not to do it. Nobody went out, by the way. I was going to make that decision by a certain time, and I decided not to do it because it wasn't really proportional," Trump added.

He also weighed in on the 2020 campaign, saying he hopes Democratic front-runner former Vice President Joe Biden "does very well," but he thinks "there is something going on in that brain of his."

"How he doesn't get President Obama to endorse him — there has to be some reason why he's not endorsing him," the president said. "He was the vice president. They seem to have gotten along. And how President Obama's not endorsing him is rather a big secret," Trump mused, adding, "Then he goes and lies and said, 'I asked the president not to endorse me ' Give me a break."

A-711

*—Updated at 9 p.m. Brett Samuels contributed.*

Tags Donald Trump Joe Biden New York New York sexual assault allegation

## More Administration News

## See All

Administration

## Biden cites 'progress' in inflation data but admits 'prices are still too high'

by Brett Samuels 1 hour ago

Administration / 1 hour ago

Administration

## White House announces press office promotions, additions ahead of midterms

by Brett Samuels 3 hours ago

Administration / 3 hours ago

Policy

## Biden names Colorado's Camp Hale first national monument of presidency

by Zack Budryk 19 hours ago

Policy / 19 hours ago

Administration

## Here's what the White House is expecting today's Social Security COLA increase to be

by Alex Gangitano 21 hours ago

Administration / 21 hours ago

See All

A-712

## Top Stories

## See All

House

## Five things to watch for at Thursday's Jan. 6 hearing

by Mike Lillis and Rebecca Beitsch 5 hours ago
House  /  5 hours ago

Defense

## Rising nuclear fears spur debate over red lines in Ukraine war

by Ellen Mitchell and Colin Meyn 5 hours ago
Defense  /  5 hours ago

Morning Report

## The Hill's Morning Report — Trump will be front and center at today's Jan. 6 hearing

by Alexis Simendinger and Kristina Karisch 5 hours ago
Morning Report  /  5 hours ago

Campaign

## NBC interview draws new scrutiny over Fetterman's health

by Julia Manchester 5 hours ago
Campaign  /  5 hours ago
See All

A-713

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

E. JEAN CARROLL,                                    Civil Action No.:
                                                    22-cv-10016
                              *Plaint...f,*

            – against –

DONALD J. TRUMP,

                              *D..fendant.*

------------------------------------------------------------------X

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

---

TACOPINA, SEIGEL & DeOREO              HABBA MADAIO & ASSOCIATES
Joseph Tacopina, Esq.                       Alina Habba, Esq.
Chad Seigel, Esq.                    1430 US Highway 206, Suite 240
Matthew G. DeOreo, Esq.                Bedminster, New Jersey 07921
275 Madison Ave., Fl. 35                         -and-
New York, New York 10016          112 West 34th Street, 17th & 18th Floors
Tel: (212) 227-8877                   New York, New York 10120
Fax: (212) 619-1028                    Telephone: (908) 869-1188
jtacopina@tacopinalaw.com              Facsimile: (908) 450-1881
cseigel@tacopinalaw.com             E-mail: ahabba@habbalaw.com
mdeoreo@tacopinalaw.com


                  Counsel for Defendant Donald J. Trump

A-714

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

PRELIMINARY STATEMENT AND BRIEF
STATEMENT OF THE FACTS ........................................................................................... 1

October 12, 2022 Statement................................................................................................. 2

The October 12, 2022 Statement Was Clearly About *Carroll I* ........................................ 3

Plaintiff's *Carroll II* Complaint Concedes That Trump Was
Merely Restating His Position in *Carroll I* and Summarizing
his Allegations in his *Carroll I* Answer When He Wrote the
October 12, 2022 Statement................................................................................................. 4

The Anderson Cooper Interview Reference in the October 12, 2022
Statement Does Not Alter This Analysis.............................................................................. 8

ARGUMENT...................................................................................................................... 11

POINT I
STANDARDS FOR THIS MOTION................................................................................. 11

POINT II
PLAINTIFF'S DEFAMATION CLAIM IS BARRED BY
THE ABSOLUTE LITIGATION PRIVILEGE................................................................. 12

CONCLUSION................................................................................................................... 18

i

## TABLE OF AUTHORITIES

**Case Law**

*Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427
(E.D.N.Y. 2013) ............................................................................................. 4,13-14

*Baiul v. NBCUniversal Media, LLC*, No. 13 CIV. 2205
KBF, 2014 WL 1651943  (S.D.N.Y. Apr. 24, 2014), aff'd,
607 F. App'x 18 (2d Cir. 2015) ......................................................................... 13,15

*Burke v. Newburgh Enlarged City Sch. Dist.*, 195 A.D.3d
674 (2d Dep't 2021) .......................................................................................14-15,17

*Doe v. Baram*, No. 20 CIV. 9522 (ER), 2021 WL 4847076
(S.D.N.Y. Oct. 15, 2021) ...................................................................................14,15

*Easton v. Pub. Citizens, Inc.*, No. 91 CIV. 1639 (JSM), 1991
WL 280688 (S.D.N.Y. Dec. 26, 1991), aff'd, 969 F.2d 1043
(2d Cir. 1992) ....................................................................................................... 13

*Fisher v. Abady*, 280 A.D.2d 417 (1st Dep't 2001).................................................12,14-15

*Ford v. Levinson*, 90 A.D.2d 464 (1st Dep't 1982).................................................14-15

*Glantz v. Cook United, Inc.*, 499 F. Supp. 710 (E.D.N.Y. 1979).......................17

*Grayson v. Ressler & Ressler*, No. 15 CIV. 8740 (ER), 2018 WL
3611951 (S.D.N.Y. July 27, 2018).......................................................................12

*Haynes v. Bonner*, 69 Misc. 3d 1201(A) (Sup. Ct. NY Co. 2020)..............................13-15

*Holy Spirit Ass'n for Unification of World Christianity v. New
York Times Co.*, 49 N.Y.2d 63 (1979)................................................................4, 13

*Hudson v. Goldman Sachs & Co*, No. 600502/00, 2000 WL
35928688 (Sup. Ct. N.Y. Co. Dec. 18, 2000)........................................................14

*Jeanty v. Cerminaro*, No. 21-1974-CV, 2023 WL 325012
(2d Cir. Jan. 20, 2023)...........................................................................................13

*Kinsey v. New York Times Co.*, 991 F.3d 171 (2d Cir. 2021)............................12

*Marom v. Town of Greenburgh*, No. 18 CIV. 7637 (JCM), 2020
WL 978514, at *6 (S.D.N.Y. Feb. 28, 2020)........................................................13

*McNally v. Yarnall*, 764 F. Supp. 853 (S.D.N.Y. 1991)................................................................14-15

*Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301
(1st Dep't 1995)................................................................................................................13, 17

*Riel v. Morgan Stanley*, No. 06 CV 524 (TPG), 2007 WL
541955 (S.D.N.Y. Feb. 16, 2007), aff'd, 299 F. App'x 91
(2d Cir. 2008)..............................................................................................................14-15, 17

*Silver v. Kuehbeck*, No. 05 CIV. 35 (RPP), 2005 WL 2990642
(S.D.N.Y. Nov. 7, 2005), aff'd, 217 F. App'x 18 (2d Cir. 2007)................................................13, 15

*Southridge Cap. Mgmt., LLC. v. Lowry*, No. 01 CIV.4880 RO,
2003 WL 68041 (S.D.N.Y. Jan. 7, 2003).................................................................................12-13, 15

*Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302 (S.D.N.Y. 2019).........................................14-15

**Statutes**

N.Y. Civ. Rights Law § 74 .................................................................................1-2, 4,8,10,12-15,17

**A-717**

## INTRODUCTION

Defendant Donald J. Trump ("Trump" or "Defendant"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in support of his Motion for Partial Summary Judgment, seeking the dismissal of Plaintiff's defamation claim (Count II of the Complaint filed in this action [*Carroll II*]) in its entirety with prejudice, with such other and further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT AND BRIEF STATEMENT OF THE FACTS

Count II of the *Carroll II* Complaint of Plaintiff, E. Jean Carroll ("Carroll" or "Plaintiff")(Ex. C[1]), arises from alleged defamatory statements that Trump made on October 12, 2022 (the "October 12, 2022 Statement") that summarized his pleading in *Carroll I*[2], described the positions he took in *Carroll I*, and provided background information concerning such pleading and positions taken. (T.56.1[3] ¶1). Furthermore, the alleged defamatory statements clearly reference the pending litigation (*Carroll I*) and even referenced this Court in *Carroll I* being reversed by the Second Circuit. (T.56.1 ¶2).

Therefore, it is obvious that Trump, in the October 12, 2022 Statement, was merely writing about Plaintiff's pending lawsuit against him (*Carroll I*), while referencing Carroll's claims in *Carroll I*, his positions taken in *Carroll I*, and background information concerning *Carroll I*. (T.56.1 ¶¶1-3). Consequently, the alleged defamatory statements in the October 12, 2022 Statement, as a matter of law, are protected by the absolute litigation privilege under N.Y. Civ. Rights Law § 74, and Count II of the *Carroll II* Complaint (Ex. A), which wholly arise from such statements, should be summarily dismissed with prejudice.

---

[1] All exhibit references herein refer to those attached to the accompanying Declaration of Matthew G. DeOreo.

[2] *Carroll v. Trump*, 1:20-cv-7311-LAK-JKLC.

[3] "T.56.1" refers to Trump's accompanying Local Civil Rule 56.1 Statements of Material Facts.

1

A-718

**October 12, 2022 Statement**

Plaintiff's Complaint in *Carroll II* alleges that Trump made the October 12, 2022 Statement, and that some statements therein were untrue because Trump states (allegedly falsely) that: (a) Trump did not rape Plaintiff; (b) Trump did not know Carroll and never met her before; and (c) Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to increase sales for her new book. (T.56.1 ¶4). This is critically important because, as demonstrated below, these alleged three categories of purportedly false Trump statements arise from **the exact same** alleged issues that were being litigated in *Carroll I*.

Consequently, the October 12, 2022 Statement was merely a repetition and summary of what Trump had alleged in his Answer filed in *Carroll I*, which in turn, unequivocally establishes that the alleged defamatory statements alleged in *Carroll II* are covered by the absolute litigation privilege.  In other words, since Trump's October 12, 2022 Statement merely stated the exact position that Trump took in *Carroll I*, such alleged defamatory statements cannot, as a matter of law, serve as a basis for a defamation claim.  As demonstrated below, the alleged defamatory portions of the October 12, 2022 Statement are absolutely privileged under the litigation privilege pursuant to Civil Rights Law §74.

Specifically, the Complaint alleges as follows:

[O]n October 12, 2022, Trump posted the following:

> "This '**Ms. Bergdorf Goodman case**' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. **This decision is from the Judge who was just overturned on my same case**. I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not

2

**A-719**

> supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country."

He then continued:

> "In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to 'Trump'!"

(*Carroll II* Complaint ¶ 92)(Ex. C)(emphasis added)(T.56.1 ¶5).

## **The October 12, 2022 Statement Was Clearly About *Carroll I***

It cannot be credibly disputed that the October 12, 2022 Statement was about the "case" (*i.e.* lawsuit) that Plaintiff brought against Trump.  One need not even go past the first sentence of such statement to comprehend that indisputable fact, which reads: "This 'Ms. Bergdorf Goodman **case**' is a complete con job ...." (*Carroll II* Complaint ¶ 92)(Ex. C)(emphasis added)(T.56.1 ¶¶6-7).  Clearly, prior to the filing of *Carroll II*, there was no other "Bergdorf Goodman case" concerning Plaintiff and Trump other than *Carroll I*.

Additionally, Trump, in the October 12, 2022 Statement, made another unmistakable reference to *Carroll I*, when he cited to this Court being reversed by the Second Circuit in *Carroll I*: "This decision is from the Judge who was just *overturned* on *my same case*." (*Carroll II* Complaint ¶ 92)(Ex. C)(emphasis added)(T.56.1 ¶8). *See also Carroll v. Trump*, 49 F.4th 759, 761 (2d Cir. 2022)("We reverse the District Court's holding that the President of the United States is not an employee of the

3

government under the Westfall Act.").

While we expect Plaintiff, in her opposition papers to this Motion, to quibble with the exactness of the connection and nexus between the October 12, 2022 Statement and *Carroll I*, as shown below in the Argument section, the absolute privilege afforded by Section 74 is liberally construed and does not require such exactness.[4]

**Plaintiff's *Carroll II* Complaint Concedes That Trump Was Merely Restating His Position in *Carroll I* and Summarizing his Allegations in his *Carroll I* Answer When He Wrote the October 12, 2022 Statement**

The *Carroll II* Complaint alleges with precision what Plaintiff claims is false with regard to October 12, 2022 Statement.  The Complaint in *Carroll II* alleges:

In the October 12 statement, Trump falsely stated that he did not rape Carroll.

In the October 12 statement, Trump falsely stated that he had no idea who Carroll was.

In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales.

(*Carroll II* Complaint ¶¶ 96-98)(Ex. C)(T.56.1 ¶9).

Hence, Plaintiff specifically alleges **three categories of purported falsity**, namely Trump's statements (allegedly false) that: (a) Trump did not rape Plaintiff; (b) Trump did not know Carroll and never met her before; and (c) Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to increase sales for her new book ("Three Categories of Alleged Falsity").

However, the Three Categories of Alleged Falsity pertain to the same exact issues that were being litigated in *Carroll I*.  Accordingly, when Trump made the October 12, 2022 Statement concerning the Three Categories of Alleged Falsity, all that he was doing was summarizing and/or

---

[4]  "A fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67 (1979)(quotations and brackets omitted); *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 456 (E.D.N.Y. 2013)(holding same).

4

restating his allegations (*i.e.* his denials and affirmative defenses) and/or positions asserted in his Answer filed in *Carroll I*. This is so for three reasons.

**First**, Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that he did not rape Plaintiff. (T.56.1 ¶13). While she alleges that with consistency in her *Carroll I* Complaint, below are some examples:

> He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of rape. [¶ 13]
>
> \*\*\*
>
> Trump falsely stated that he did not rape Carroll. [¶ 85, *see also* ¶¶ 93 and 100]
>
> \*\*\*
>
> Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation .... [¶ 90]
>
> \*\*\*
>
> Trump knew it was false to state that he had never raped Carroll. [¶ 115]
>
> Trump knew that the accusation was true .... [¶ 116]
>
> [Trump] knew that Carroll had spoken the truth .... [¶ 117]
>
> [H]e knew that her accusation against him was truthful .... [¶ 118]

(*Carroll I* Complaint at ¶¶ 13, 85,90, 93, 100, 115-118)(Ex. A)(T.56.1 ¶13).

In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. (*Carroll I* Answer at ¶¶ 13, 85, 90, 93, 100, 115-118)(Ex. B)(T.56.1 ¶14). Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged defamatory statements (alleged in the *Carroll I* Complaint) "are true." (*Carroll I* Answer at ¶150)(Ex. B)(T.56.1 ¶15).

Therefore, when Trump stated that he did not rape Plaintiff in the October 12, 2022 Statement,

5

he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer, and they are all absolutely privileged. (T.56.1 ¶16).

**Second**, Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that he did not know Plaintiff at the time of the October 12, 2022 Statement, nor in the 1990s. (T.56.1 ¶17). While Plaintiff alleges that throughout her *Carroll I* Complaint, here are some examples:

> Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he raped her, and he knew who she was in 2019. [¶13]

> ***

> Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily Ask E. Jean TV show, a small hit on the "America's Talking" network started by Roger Ailes. She was also ... a frequent guest and commentator on the widely watched Today show. [¶24]

> Trump put up his hand to stop her from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!" [¶25]

> ***

> Trump falsely stated that he had never met Carroll. [¶86]

> Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was. [¶87]

> ***

> Trump falsely stated that he had no idea who Carroll was. [¶94]

> ***

> In June 2019, Trump knew it was false to state that he had never met Carroll. [¶113]

> In June 2019, Trump knew it was false to state that he had no idea who Carroll was. [¶114]

(*Carroll I* Complaint at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114)(Ex. A)(T.56.1 ¶17).

In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. (*Carroll I* Answer at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114)(Ex. B)(T.56.1 ¶18).  Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged defamatory statements (alleged in the *Carroll I* Complaint) "are true." (*Carroll I* Answer at ¶150)(Ex. B)(T.56.1 ¶19).

Therefore, when Trump stated, in the October 12, 2022 Statement, that he did not know Plaintiff in the 1990s nor when he made the October 12, 2022 Statement, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer, and they are all absolutely privileged. (T.56.1 ¶20).

**Third**, Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that Plaintiff made the false rape allegation against him in order to enhance the sales of her book. (T.56.1 ¶21).  Below are some examples:

> Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales ... and make money. [¶11]
>
> ***
>
> Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales. [¶88]
>
> ***
>
> Trump's other defamatory statements about Carroll in June 2019 [included] that she had fabricated the rape accusation to increase her book sales .... [¶116]

(*Carroll I* Complaint at ¶¶ 11, 88 and 116)(Ex. A)(T.56.1 ¶21).

In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. (*Carroll I* Answer at ¶¶ 11, 88 and 116)(Ex. B)(T.56.1 ¶22).  Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged defamatory statements (alleged in the *Carroll I* Complaint) "are true." (*Carroll I* Answer at ¶150)(Ex. B)(T.56.1 ¶23).

7

Therefore, when Trump stated, in the October 12, 2022 Statement, that Plaintiff made the false rape allegation against him in order to enhance the sales of her book, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer, and they are all absolutely privileged. (T.56.1 ¶24).

* * *

Consequently, Plaintiff's Three Categories of Alleged Falsity attributed to the October 12, 2022 Statement clearly concern Trump's mere summary of his allegations and positions taken in his *Carroll I* Answer, and the absolute litigation privilege of Section 74 applies, and Count II should be dismissed.

**The Anderson Cooper Interview Reference in the October 12, 2022**
**Statement Does Not Alter This Analysis**

When faced with the wholly determinative fact that the October 12, 2022 Statement only summarized Trump's allegations and positions taken in his *Carroll I* Answer, we expect Plaintiff may attempt to side-step that fact by arguing that the October 12, 2022 Statement mentioned the Anderson Cooper interview, but such interview was not dealt with in Trump's *Carroll I* Answer. For two simple reasons, the reference to the Anderson Cooper interview does not prohibit the application of the absolute litigation privilege to the October 12, 2022 Statement.

**First**, as noted above, the *Carroll II* Complaint alleges only Three Categories of Alleged Falsity attributed to the October 12, 2022 Statement, which concern the alleged false statements that (a) Trump did not rape Plaintiff, (b) Trump did not know her (in the 1990s or later) and (3) Plaintiff is lying to increase sales of her book. Thus, the reference to the Anderson Cooper interview has zero significance – it does not change the entire essence of the Three Categories of Alleged Falsity. In other words, Plaintiff does not attribute any falsity to Trump's reference to this interview; it just happened to be mentioned in the October 12, 2022 Statement. (T.56.1 ¶¶25-26).

8

A-725

**Second**, the Anderson Cooper interview was inextricably intertwined with the *Carroll I* Complaint, and thus, Trump's reference to such interview in the October 12, 2022 Statement is inextricably intertwined with his allegations and positions taken in *Carroll I*.  This is so because:

      (a)    One of Trump's alleged defamatory statements alleged in the *Carroll I* Complaint – the June 24, 2019 statement ("I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?") was published in the very article cited in the *Carroll I* Complaint that also referenced the Anderson Cooper interview, namely Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, Hill (June 24, 2019)(Ex. F)(*Carroll I* Complaint at ¶¶ 97-100, and footnote 13)(Ex. A)(T.56.1 ¶27); and

      (b)    Plaintiff herself clearly speaks about one of the Trump statements quoted in the *Carroll I* Complaint ("she's not my type") during Anderson Cooper interview. (T.56.1 ¶28)(Ex. E).

Specifically, as to "(a)" above, the June 24, 2019 Hill article (which is cited in the *Carroll I* Complaint) actually quotes the Anderson Cooper interview: "'I love that I'm not his type,' Carroll said in an interview on CNN, responding to Trump's comments shortly after they were published." (June 24, 2019 Hill Article at p. 2)(Ex. F)(T.56.1 ¶¶27-28).  *See also* the Transcript of the Anderson Cooper interview at pp. 14-15: "COOPER: I'm wondering, the statement that he said which he's just made which is she's not my type, that was the number one thing – | CARROLL: I love that I'm not his type. Don't you love that you're not his type?" (T.56.1 ¶29)(Ex. E).

As to "(b)" above, the *Carroll I* Complaint has multiple references to the "she's not my type" statement. (*Carroll I* Complaint at ¶ 97 and footnotes 13 and 14)(Ex. A)(T.56.1 ¶30).

9

A-726

Accordingly, the October 12, 2022 Statement concerning the Anderson Cooper interview (which Plaintiff has not even alleged to be defamatory) clearly related to the underlying facts of *Carroll I*, and when Trump spoke about that interview in the October 12, 2022 Statement, all he was doing was referring to the same subject matter as alleged in the *Carroll I* Complaint, and his reference to this interview does not prevent the October 12, 2022 Statement from being absolutely privileged under Civil Rights Law § 74.

\* \* \*

Based upon the forgoing, and for the reasons set forth below, Plaintiff's defamation claim (Count II of the *Carroll II* Complaint) lacks merit and should be dismissed with prejudice.

10

## ARGUMENT

## POINT I

## STANDARDS FOR THIS MOTION

The standards for summary judgment motions in Federal Court are well-known to the Court,

and thus need not be extensively briefed.  That being said, such standards are succinctly set forth below:

> Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) ). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F.Supp.2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) ).

> In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, a motion for summary judgment cannot be defeated on the basis of conclusory assertions, speculation, or unsupported alternative explanations of facts. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *see also Senno*, 812 F.Supp.2d at 467 (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F.Supp.2d at 467–68 (citing *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505).

11

*Grayson v. Ressler & Ressler*, No. 15 CIV. 8740 (ER), 2018 WL 3611951, at \*4–5 (S.D.N.Y. July 27, 2018)(granting summary judgment and dismissing plaintiff's defamation claim based upon New York's absolute litigation privilege).

As demonstrated below, Trump meets these above-cited summary judgment standards with regard to his instant motion.  Consequently, the Court should grant this motion and dismiss Count II in its entirety with prejudice.

## POINT II

## PLAINTIFF'S DEFAMATION CLAIM IS BARRED BY THE ABSOLUTE LITIGATION PRIVILEGE

Section 74 of the New York Civil Rights Law[5] provides in relevant part:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

N.Y. Civ. Rights Law § 74. This law "prohibits a civil action that alleges injury from the publication of a fair and true report of any judicial proceeding" and grants an "absolute privilege." *Fishof v. Abady*, 280 A.D.2d 417, 417 (1st Dep't 2001) (internal citations and quotations omitted).

Therefore, if Section 74 applies to an alleged defamatory statement, such a statement cannot serve as the basis for a defamation claim, regardless of malice or bad faith. *See Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021)("This 'privilege is absolute and is not defeated by allegations of malice or bad faith.'"); *Southridge Cap. Mgmt., LLC. v. Lowry*, No. 01 CIV.4880 RO, 2003 WL 68041, at \*2 (S.D.N.Y. Jan. 7, 2003)("This protection exists whether or not the person reporting acts with malice.").

---

[5] This Court has already held that New York law applies to this claim. *See Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 185507, at \*10 (S.D.N.Y. Jan. 13, 2023).

Importantly, "New York courts liberally interpret Section 74's 'fair and true report standard ....'" *Jeanty v. Cerminaro*, No. 21-1974-CV, 2023 WL 325012, at *2 (2d Cir. Jan. 20, 2023); *see also Marom v. Town of Greenburgh*, No. 18 CIV. 7637 (JCM), 2020 WL 978514, at *6 (S.D.N.Y. Feb. 28, 2020)("New York courts have broadly construed [Section 74] ...."); *Easton v. Pub. Citizens, Inc.*, No. 91 CIV. 1639 (JSM), 1991 WL 280688, at *3 (S.D.N.Y. Dec. 26, 1991)("The New York courts and federal courts employing New York law have liberally interpreted the meaning of fair and true."), aff'd, 969 F.2d 1043 (2d Cir. 1992); *Haynes v. Bonner*, 69 Misc. 3d 1201(A), *4 (Sup. Ct. NY Co. 2020)("Substantially accurate [standard] is interpreted liberally ....")(quotations omitted).

"A fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67 (1979)(quotations and brackets omitted); *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 456 (E.D.N.Y. 2013)(holding same).

In that regard, if the statement is "a substantially accurate **description of [a party's] position** in ... [a] proceeding [it is] privileged under New York Civil Rights Law § 74." *Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301, 310 (1st Dep't 1995)(emphasis added); *see also Baiul v. NBCUniversal Media, LLC*, No. 13 CIV. 2205 KBF, 2014 WL 1651943, at *17 (S.D.N.Y. Apr. 24, 2014)("Disson's statements concerning the Lanham Act Action, including his description of the suit as 'just weird,' clearly fall within this privilege and may not serve as a basis for a libel action."), aff'd, 607 F. App'x 18 (2d Cir. 2015); *Silver v. Kuehbeck*, No. 05 CIV. 35 (RPP), 2005 WL 2990642, at *16 (S.D.N.Y. Nov. 7, 2005)("[T]he Court finds that Abady's statement was a substantially accurate account of his clients' position in the litigation initiated by Silver's complaint."), aff'd, 217 F. App'x 18 (2d Cir. 2007); *McNally v. Yarnall*, 764 F. Supp. 853, 856 (S.D.N.Y. 1991)("Stern in his alleged statement was merely restating his client's position in defending the action."); *Hudson v. Goldman*

13

*Sachs & Co*, No. 600502/00, 2000 WL 35928688 (Sup. Ct. N.Y. Co. Dec. 18, 2000) ("The statement to the New York Times was a substantially accurate description of defendant's position in the action commenced by plaintiff and thus was privileged under New York Civil Rights Law Section 74.").

A statement that merely **summarizes a party's pleadings** is equally protected. *See Burke v. Newburgh Enlarged City Sch. Dist.*, 195 A.D.3d 674, 676 (2d Dep't 2021)("Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within section 74's privilege.")(quotations omitted); *Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 311 (S.D.N.Y. 2019)(holding same); *Haynes*, 69 Misc. 3d 1201(A), * 2 (holding same); *Doe v. Baram*, No. 20 CIV. 9522 (ER), 2021 WL 4847076, at *5 (S.D.N.Y. Oct. 15, 2021)("The press release does no more than restate the allegations in the Complaint, and is a fair report of the pending judicial proceeding.")

This absolute privilege also extends to a "the release by the parties of **background material** regarding their positions in the case." *Riel v. Morgan Stanley*, No. 06 CV 524 (TPG), 2007 WL 541955, at *10 (S.D.N.Y. Feb. 16, 2007)(emphasis added), aff'd, 299 F. App'x 91 (2d Cir. 2008); *see also Aguirre*, 961 F. Supp. 2d at 457 (holding same); *Wexler*, 374 F. Supp. 3d at 311 (same); *Lacher v. Engel*, 33 A.D.3d 10, 17 (1st Dep't 2006)(same); *Fishcf v. Abady*, 280 A.D.2d 417, 417–18 (1st Dep't 2001)(same); *Ford v. Levinson*, 90 A.D.2d 464, 465 (1st Dep't 1982)("Realistically considered, it constitutes background to the misconduct attributed to the Fords in the complaint rather than a separate and independently defamatory accusation, and comes within the statutory privilege afforded to a 'fair and true report' of a 'judicial proceeding.'").

Therefore, if a party makes statements about the positions he/she has in a litigation, or even background information regarding such positions, such statements are absolutely privileged.[6] Here, that is exactly what Trump did in his October 12, 2022 Statement.

**First**, as demonstrated above, Trump's alleged defamatory statements in the October 12, 2022 Statement obviously concerned *Carroll I*. The first sentence of such statement reads: "This 'Ms. Bergdorf Goodman **case**' is a complete con job ...." (*Carroll II* Complaint ¶ 92)(Ex. C)(emphasis added)(T.56.1 ¶7). Clearly, prior to the filing of *Carroll II*, there was no other "Bergdorf Goodman case" concerning Plaintiff and Trump other than *Carroll I*. Trump, in the October 12, 2022 Statement, also made another obvious reference to *Carroll I,* when he cited to this Court being reversed by the Second Circuit in *Carroll I* ("This decision is from the Judge who was just *overturned* on *my same case*." (*Carroll II* Complaint ¶ 92)(Ex. C)(emphasis added)(T.56.1 ¶8). Thus, Trump was clearly speaking of the *Carroll I* case when he made the October 12, 2022 Statement.

**Second**, the Three Categories of Alleged Falsity of the October 12, 2022 Statement concern the same exact issues that were being litigated in *Carroll I,* namely (a) whether Trump raped Plaintiff; (b) whether Trump knew Carroll in the 1990s or subsequently when he made the October 12, 2022 Statement; and (c) whether Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to increase sales for her new book. Accordingly, when Trump made the October 12, 2022 Statement concerning the Three Categories of Alleged Falsity, all that he was doing was summarizing and/or

---

[6] It should be noted that while there are a substantial amount of cases applying Section 74 to media defendants, this statute applies equally to non-media defendants. *See Branca v. Mayesh*, 101 A.D.2d 872, 873 (2d Dep't 1984)("While statutory predecessors to section 74 limited the privilege to members of the media who acted without malice, the privilege now extends to 'any person', whether or not he acts with malice."), aff'd, 63 N.Y.2d 994 (1984); *see also Haynes*, 69 Misc. 3d 1201(A), *4 (privileged statement was made by a party to a proceeding); *Aguirre*, 961 F. Supp. 2d 427 at 457 (same); *Baiul*, 2014 WL 1651943, at *17 (same); *Doe*, 2021 WL 4847076, at *5 (same); *Wexler*, 374 F. Supp. 3d at 311 (same); *Southridge Cap. Mgmt.*, 2003 WL 68041, at *2 (same); *Riel*, 2007 WL 541955, at *10 (same)*; Lacher*, 33 A.D.3d at 17 (privileged statement was made by an attorney representing a party to a proceeding); *Ford*, 90 A.D.2d at 465 (attorney representing a party ); *Silver*, 2005 WL 2990642, at *16 (attorney representing a party ); McNally, 764 F. Supp. at 856 (attorney representing a party ); *Fishof*, 280 A.D.2d at 417 (attorney representing a party ); *Burke*, 195 A.D.3d at 676 (attorney representing a party).

restating his allegations (*i.e.* his denials and affirmative defenses) asserted in his Answer filed in *Carroll I.*

**Third**, when Trump stated that he did not rape Plaintiff in the October 12, 2022 Statement, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer. (*Compare Carroll I* Complaint at ¶¶ 13, 85,90, 93, 100, 115-118 with *Carroll I* Answer at ¶¶ 13, 85, 90, 93, 100, 115-118, and 150)(Exs. A and B)(T.56.1 ¶16).

**Fourth**, when Trump stated, in the October 12, 2022 Statement,  that he did not know Plaintiff at the time of the October 12, 2022 Statement, nor in the 1990s, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer.  (*Compare Carroll I* Complaint at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114 with *Carroll I* Answer at ¶¶ 13, 24, 25, 86, 87, 94, 113-114, and 150)(Exs. A and B)(T.56.1 ¶20).

**Fifth**, when Trump stated, in the October 12, 2022 Statement, that Plaintiff made the false rape allegation against him in order to enhance the sales of her book, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer. (*Compare Carroll I* Complaint at ¶¶ 11, 88 and 116 with *Carroll I* Answer at ¶¶ 11, 88, 116, and 150)(Exs. A and B)(T.56.1 ¶24).

**Sixth**, the portions of October 12, 2022 Statement concerning the Anderson Cooper interview (which Plaintiff has not even alleged to be defamatory) clearly related to the underlying facts of *Carroll I,* and when Trump spoke about that interview in the October 12, 2022 Statement, all he was doing was referring to the same subject matter as alleged in the *Carroll I* Complaint. (T.56.1 ¶¶25-30).  Therefore, Trump's reference to the Anderson Cooper interview was an accurate description of his position in *Carroll I*, or at the very least, was a description of background material regarding his positions taken in *Carroll I.*

Consequently, Trump's above-referenced statements contained in the October 12, 2022 Statement (a) were "a substantially accurate description of [a party's] position in ... [a] proceeding [*i.e.* *Carroll I*]," *Mulder*, 208 A.D.2d at 310 (1st Dep't 1995); (b) "essentially summariz[ed] or restat[ed] the allegations of a pleading filed in an action [*i.e.* Trump's Answer filed in *Carroll I*]," *Burke*, 195 A.D.3d at 676; and (c) were a "release by [a] part[y] of background material regarding [his] positions in the case [*i.e.* the reference to the Anderson Cooper interview]," *Riel*, 2007 WL 541955, at \*10.

Accordingly, Trump's above-referenced statements are protected by the absolute litigation privilege afforded by Civil Rights Law § 74, and Count II of the *Carroll II* Complaint, which wholly arises from the above-referenced statements, should be dismissed with prejudice.[7]

---

[7] It should also be noted that Plaintiff cannot escape the absolute litigation privilege by arguing that the October 12, 2022 Statement was merely a republication of the alleged defamatory statements cited in the *Carroll I* Complaint. First, Plaintiff never alleges such republication in her *Carroll II* Complaint. Second, just because an alleged defamatory statement summarizes a party's position in a pending action, and the pending action is a defamation case against such party, does not remove the later alleged defamatory statement from the absolute litigation privilege. To do so would mean that no defendant sued for defamation could be protected by such privilege when he/she explains why such defamation case lacks merit and why his/her statements that are subject to the prior lawsuit were true. That is clearly not the law. *See Glantz v. Cook United, Inc.*, 499 F. Supp. 710, 715 (E.D.N.Y. 1979)("[W]e cannot accept plaintiff's position that § 74 should not be applied to reports of libel actions. It may appear somewhat unfortunate that plaintiffs in such cases, by reason of § 3016 of the C.P.L.R., must plead the allegedly libelous statements and thus open themselves to the risk of their republication. However, libel actions, as most others, are public. As such, they may be fairly reported. \*\*\* [P]laintiff has not presented us with one compelling reason to bar application of the literal words of § 74. In the absence of such a reason we are compelled to treat defendants' 'report' of the Glantz v. Scoppetta libel action as we would treat the report of any other public judicial proceeding. Thus, if it was 'fair and true' it was privileged.").

17

## CONCLUSION

For the foregoing reasons, Defendant Trump respectfully requests that the Court grant his

Motion for Partial Summary Judgment, dismiss Plaintiff's defamation claim (Count II of the *Carroll*

*II* Complaint) with prejudice, and grant such further and other relief as the Court deems just and

equitable.

Dated: New York, New York
         February 23, 2023

TACOPINA, SEIGEL & DeOREO

By: _____
    Joseph Tacopina, Esq.
    Chad Seigel, Esq.
    Matthew G. DeOreo, Esq.
    275 Madison Ave., Fl. 35
    New York, New York 10016
    Tel: (212) 227-8877
    Fax: (212) 619-1028
    jtacopina@tacopinalaw.com
    cseigel@tacopinalaw.com
    mdeoreo@tacopinalaw.com


_____
Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
            -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com


Counsel for Defendant, Donald J. Trump

Counsel for Defendant, Donald J. Trump

18

A-735

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

E. JEAN CARROLL,                                    Civil Action No.:
                                                    22-cv-10016
                    *Plaintiff*,

        – against –

DONALD J. TRUMP,

                    *Defendant*.
-------------------------------------------------------------------X

## LOCAL CIVIL RULE 56.1 STATEMENT OF
## DEFENDANT DONALD J. TRUMP

        In accordance with Local Civil Rule 56.1, Defendant Donald J. Trump respectfully submits

the following material facts as to which he contends there is no genuine issue to be tried for this

action ("*Carroll II*"):

        1.      Count II of the *Carroll II* Complaint of Plaintiff, E. Jean Carroll ("Carroll" or

"Plaintiff"), arises from alleged defamatory statements that Trump made on October 12, 2022 (the

"October 12, 2022 Statement") that summarized his pleading in *Carroll I*[1], described the positions

he took in *Carroll I* and provided background information concerning such pleading and positions

taken.  *See Carroll I* Complaint (Ex. A[2]) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118;

*Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II*

Complaint (Ex. C) at ¶¶ 92, 96-98.

---

[1] *Carroll v. Trump*, 1:20-cv-7311-LAK-JKLC.

[2] All exhibit references herein refer to those attached to the accompanying Declaration of
Matthew G. DeOreo.

2.      Furthermore, the October 12, 2022 Statement clearly referenced the pending litigation (*Carroll I*) and even referenced this Court in *Carroll I* being reversed by the Second Circuit. *See Carroll II* Complaint (Ex. C) at ¶¶ 92; *see also Carroll v. Trump*, 49 F.4th 759, 761 (2d Cir. 2022)("We reverse the District Court's holding that the President of the United States is not an employee of the government under the Westfall Act.").

3.      Trump's October 12, 2022 Statement merely references Plaintiff's pending lawsuit against him (*Carroll I*), Carroll's claims in *Carroll I*, and Trump's allegations, defenses and positions taken in *Carroll I*, and relevant background information concerning *Carroll I*. *See Carroll I* Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98; *see also Carroll*, 49 F.4th at 761.

**October 12, 2022 Statement**

4.      Plaintiff's Complaint in *Carroll II* alleges that Trump made the October 12, 2022 Statement, and portions of that statement were untrue because Trump states (allegedly falsely) that: (a) Trump did not rape Plaintiff; (b) Trump did not know Carroll and never met her before; and (c) Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to increase sales for her new book.  *See Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

5.      Specifically, the Complaint alleges as follows:

[O]n October 12, 2022, Trump posted the following:

> "This '**Ms. Bergdorf Goodman case**' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. **This decision is from the Judge who was just overturned on my same case**. I don't know this woman, have

2

no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country."

He then continued:

"In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to 'Trump'!"

*Carroll II* Complaint (Ex. C) ¶ 92 (emphasis added).

**The October 12, 2022 Statement Was Clearly About *Carroll I***

6.      The October 12, 2022 Statement was about the "case" (*i.e.* lawsuit) that Plaintiff

brought against Trump. *See Carroll I* Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100,

113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150;

*Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98; *see also Carroll*, 49 F.4th at 761.

7.      The first sentence of the October 12, 2022 Statement reads: "This 'Ms. Bergdorf

Goodman case' is a complete con job ...." *Carroll II* Complaint at ¶ 92 (Ex. C)(emphasis added).

8.      Additionally, Trump, in the October 12, 2022 Statement, made another unmistakable

reference to *Carroll I*, when he cited to this Court being reversed by the Second Circuit in *Carroll I*: "This decision is from the Judge who was just *overturned* on *my same case*." *Carroll II* Complaint ¶ 92 (Ex. C)(emphasis added).

9.     The *Carroll II* Complaint alleges what Plaintiff claims is false with regard to October 12, 2023 Statement.  The Complaint in *Carroll II* alleges:

> In the October 12 statement, Trump falsely stated that he did not rape Carroll.
>
> In the October 12 statement, Trump falsely stated that he had no idea who Carroll was.
>
> In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales.

*Carroll II* Complaint (Ex. C) ¶¶ 96-98.

10.     Hence, Plaintiff specifically alleges three categories of purported falsity, namely Trump statements (allegedly false) that: (a) Trump did not rape Plaintiff; (b) Trump did not know Carroll and never met her before; and (c) Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to increase sales for her new book ("Three Categories of Alleged Falsity"). *See Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

11.     However, the Three Categories of Alleged Falsity pertain to the exact same issues that were being litigated in *Carroll I. See Carroll I* Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

12.     When Trump made the October 12, 2022 Statement concerning the Three Categories of Alleged Falsity, he was merely summarizing and/or restating his allegations (*i.e.* his denials and affirmative defenses) and/or positions asserted in his Answer filed in *Carroll I. See Carroll I*

4

Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

13.    Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that he did not rape Plaintiff.  Below are some examples:

> He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of rape. [¶ 13]
>
> ***
>
> Trump falsely stated that he did not rape Carroll.  [¶ 85, *see also* ¶¶ 93 and 100]
>
> ***
>
> Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation .... [¶ 90]
>
> ***
>
> Trump knew it was false to state that he had never raped Carroll.  [¶ 115]
>
> Trump knew that the accusation was true .... [¶ 116]
>
> [Trump] knew that Carroll had spoken the truth .... [¶ 117]
>
> [H]e knew that her accusation against him was truthful .... [¶ 118]

*Carroll I* Complaint (Ex. A) at ¶¶ 13, 85, 90, 93, 100, 115-118.

14.    In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. *See Carroll I* Answer (Ex. B) at ¶¶ 13, 85, 90, 93, 100, 115-118.

15.    Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged

5

defamatory statements (alleged in the *Carroll I* Complaint) "are true." *Carroll I* Answer (Ex. B) at ¶150.

16.    Therefore, when Trump stated that he did not rape Plaintiff in the October 12, 2022 Statement, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer. *See Carroll I* Answer (Ex. B) at ¶¶ 13, 85, 90, 93, 100, 115-118; *Carroll II* Complaint (Ex. C) at ¶ 92.

17.    Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that he did not know Plaintiff at the time of the October 12, 2022 Statement, nor in the 1990s. Below are some examples:

> Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he raped her, and he knew who she was in 2019. [¶13]
>
> ***
>
> Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily Ask E. Jean TV show, a small hit on the "America's Talking" network started by Roger Ailes. She was also on a frequent guest and commentator on the widely watched Today show. [¶24]
>
> Trump put up his hand to stop her from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!" [¶25]
>
> ***
>
> Trump falsely stated that he had never met Carroll. [¶86]
>
> Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was. [¶87]
>
> ***
>
> Trump falsely stated that he had no idea who Carroll was. [¶94]

6

A-741

\*\*\*

> In June 2019, Trump knew it was false to state that he had never met Carroll. [¶113]

> In June 2019, Trump knew it was false to state that he had no idea who Carroll was. [¶114]

*Carroll I* Complaint (Ex. A) at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114.

18.    In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. *See Carroll I* Answer (Ex. B) at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114.

19.    Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged defamatory statements (alleged in the *Carroll I* Complaint) "are true." *Carroll I* Answer (Ex. B) at ¶150.

20.    Therefore, when Trump stated, in the October 12, 2022 Statement, that he did not know Plaintiff in the 1990s nor subsequently when he made the October 12, 2022 Statement, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer. *Carroll I* Complaint (Ex. A) at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114; *Carroll I* Answer (Ex. B) at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114;   *Carroll II* Complaint (Ex. C) at ¶ 92.

21.    Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that Plaintiff made the false rape allegation against him in order to enhance the sales of her book.  Below are some examples:

> Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales ... and make money. [¶11]

\*\*\*

7

> Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales. [¶88]
>
> ***
>
> Trump's other defamatory statements about Carroll in June 2019 [included] that she had fabricated the rape accusation to increase her book sales .... [¶116]

*Carroll I* Complaint (Ex. A) at ¶¶ 11, 88 and 116.

22.      In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. *Carroll I* Answer (Ex. B) at ¶¶ 11, 88 and 116.

23.      Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged defamatory statements (alleged in the *Carroll I* Complaint) "are true." *Carroll I* Answer (Ex. B) at ¶150.

24.      Therefore, when Trump stated, in the October 12, 2022 Statement, that Plaintiff made the false rape allegation against him in order to enhance the sales of her book, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer. *Carroll I* Complaint (Ex. A) at ¶¶ 11, 88 and 116; *Carroll I* Answer (Ex. B) at ¶¶ 11, 88 and 116; *Carroll II* Complaint (Ex. C) at ¶ 92.

25.      Plaintiff was interviewed on CNN by Anderson Cooper on June 24, 2019.  *See* Transcript of Anderson Cooper's CNN interview of Plaintiff (Ex. E).

26.      Plaintiff does not attribute any falsity to Trump's reference to the Anderson Cooper interview; it just happened to be mentioned in the October 12, 2022 Statement.  Plaintiff does not allege that the reference to the Anderson Cooper interview was defamatory.  *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

27.     One of Trump's alleged defamatory statements alleged in the *Carroll I* Complaint – the June 24, 2019 statement ("I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?") was published in the very article cited in the *Carroll I* Complaint that also referenced the Anderson Cooper interview, namely Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, <u>Hill</u> (June 24, 2019)(Ex. F). *See Carroll I* Complaint at ¶¶ 97-100, and footnote 13.

28.     The June 24, 2019 <u>Hill</u> article (which is cited in the *Carroll I* Complaint) actually quotes the Anderson Cooper interview: "'I love that I'm not his type,' Carroll said in an interview on CNN, responding to Trump's comments shortly after they were published." *See* June 24, 2019 <u>Hill</u> Article (Ex. F) at p. 2.

29.     Plaintiff herself clearly speaks about one of the Trump statements quoted in the *Carroll I* Complaint ("she's not my type") during Anderson Cooper interview. *See* the Transcript of the Anderson Cooper interview (Ex. E) at pp. 14-15: "COOPER: I'm wondering, the statement that he said which he's just made which is she's not my type, that was the number one thing – | CARROLL: I love that I'm not his type. Don't you love that you're not his type?"

30.     The *Carroll I* Complaint has multiple references to the "she's not my type" statement. *See Carroll I* Complaint (Ex. A) at ¶ 97 and footnotes 13 and 14.Dated:    New York, New York
         February 23, 2023

9

30.    The *Carroll I* Complaint has multiple references to the "she's not my type" statement.

*See Carroll I* Complaint (Ex. A) at ¶ 97 and footnotes 13 and 14. Dated:    New York, New York
February 23, 2023

TACOPINA, SEIGEL & DeOREO

By:    _____
Joseph Tacopina, Esq.
Chad Seigel, Esq.
Matthew G. DeOreo, Esq.
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
mdeoreo@tacopinalaw.com

Counsel for Defendant, Donald J. Trump

_____
Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

Counsel for Defendant, Donald J. Trump

10

A-745

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>          *Plaintiff,*<br><br>   v.<br><br>DONALD J. TRUMP,<br><br>          *Defendant.* | Civil Action No.: 22-cv-10016<br><br><br>**NOTICE OF DEFENDANT'S<br>MOTIONS *IN LIMINE*** |

     **PLEASE TAKE NOTICE** that, the defendant, Donald J. Trump ("Defendant"), hereby

moves this Court at the Daniel Patrick Moynihan United States Courthouse, Courtroom 15C, 500

Pearl Street, New York, New York, on such date and at such time as the Court may direct, for an

Order *in limine* to: (1) preclude Plaintiff from presenting any evidence relating to Defendant's

purported interactions with non-party witnesses Natasha Stoynoff and Jessica Leeds; (2) preclude

Plaintiff from presenting evidence relating to speeches and statements made by Defendant while

he was campaigning for President; (3) preclude Plaintiff from introducing any evidence relating to

the "Access Hollywood" tape, including the tape itself; (4) preclude Plaintiff from introducing any

evidence relating to emotional damages Plaintiff purports to have sustained as a result of the

alleged incident; and (5) preclude Cheryl Lee Beall and Robert Salerno from testifying at trial.

1

**A-746**

This motion is supported by the annexed Memorandum of Law, including the incorporated Memorandum of Law filed in the action captioned *E. Jean Carroll v. Donald J. Trump, in his personal capacity,* under Civil Case No. 1:20-cv-7311-JAK-JLC (ECF No. 131), Declaration of Alina Habba, Esq. dated February 23, 2023, with exhibits, any arguments or evidence presented hereafter, and all arguments or evidence presented at a hearing or with leave of Court.

Dated: February 23, 2023                Respectfully submitted,

Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
                    -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

2

A-747



<div align="right">

Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

</div>

<div align="right">

February 23, 2023

</div>

**VIA ECF**
The Honorable Lewis A. Kaplan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

      Re:    *E. Jean Carroll v. Donald J. Trump*
              1:22-cv-10016 (LAK) ("*Carroll II*")
              <u>Memorandum of Law in support of Defendant's Motions *in Limine*</u>

Dear Judge Kaplan:

      Given that the relief sought in this motion is identical in many respects to that sought in the Motions *in Limine* filed by Defendant in the related action pending before your Honor, *Carroll v. Trump*, No. 1:20-cv-7311-LAK-JLC ("*Carroll I*"), Defendant will rely upon the attached Memorandum of Law in Support of Defendant's Motions *in Limine*, which was filed in *Carroll I* on February 16, 2023 (ECF No. 131), with respect to the argument made in connection with Motions *in Limine* 1 through 4 in this action. In the interest of brevity and judicial economy, Defendant incorporates those arguments by reference herein.

      Further, Defendant is asserting one additional Motion *in Limine* in the instant action which was not previously made in *Carroll I*. The argument in support of that additional motion, Motion *in Limine* No. 5, is set forth below.

<div align="center">

\*      \*      \*      \*      \*

</div>

A-748

V. *Motion In Limine* **No. 5: Cheryl Lee Beall and Robert Salerno Should Be Precluded From Testifying At Trial.**

Plaintiff seeks to introduce two witnesses—Cheryl Lee Beall and Robert Salerno—who must be precluded from testifying due to Plaintiff's failure to timely disclose them.

Rule 37(c)(1) provides that any "party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness . . . not so disclosed." Fed. R. Civ. P. 37(c)(1). "Although Rule 37's text requires preclusion as a sanction for non-compliance with Rule 26, district courts have "broad discretion to determine the nature of any sanction that should be imposed under Rule 37, based on all the facts of the case." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 FRD 147, 156 (S.D.N.Y. 2012) (citations omitted). The purpose of [Rule 37] is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004). With respect to a party's belated disclosure of a witness, courts will consider the following factors in determining whether said witness should be permitted to testify at trial: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.*

Here, Plaintiff seeks to introduce testimony of two 'surprise' witnesses, Cheryl Lee Beall and Robert Salerno, whose identities were disclosed for the first time more than *three years* after the commencement of Plaintiff's companion action, *Carroll v. Trump*, No. 1:20-cv-7311 (LAK) (JLC) ("*Carroll I*"), and at the tail end of, or even *after* the expiration of, the fact discovery period. First, Plaintiff identified Cheryl Lee Beall—who supposedly has knowledge of the Bergdorf Goodman store during the relevant time periods—as a potential witness for the first time in her

2

Second Supplemental Rule 26(a)(1) Disclosures, which was served on October 14, 2022 – just *five days* before the fact discovery period ended on October 19, 2022. Habba Decl., Ex. C. Second, Plaintiff identified another Bergdorf-related witness, Robert Salerno, for the first time in her Third Supplemental Rule 26(a)(1) Disclosure, which was served on January 6, 2023 – approximately *two and a half months* after the close of fact discovery. *See* Habba Decl., Ex. D.

While Plaintiff may claim that these witnesses were timely disclosed in their Initial Disclosures, the operative deadlines are those set forth in *Carroll I* since this Court previously held in its Order dated December 21, 2022 (ECF. No. 19), that discovery in *Carroll II* is "limited to" "damages . . . allegedly suffered by plaintiff as a result of the alleged sexual assault as distinguished from the defamation alleged in *Carroll I*, and the October 12, 2022 statement," and further confirmed that "the discovery taken in *Carroll I*, **which has been completed**, fully explored the question whether the defendant sexually assaulted the plaintiff as she alleged." *See* ECF No. 19 at 1 (emphasis added). Since neither Mr. Salerno nor Ms. Beall are being introduced as witnesses with respect to the narrow scope of permissible discovery *Carroll II*, but rather on the "fully explored" issue of whether the subject incident occurred, the disclosure of these witnesses is, in effect, governed by the Court's scheduling order in *Carroll I*. In this context, the disclosures were untimely and long delayed.

Prior to Plaintiff's disclosure of these witnesses, Defendant had no knowledge of these individuals, their knowledge, or the purported relevance to this action. And due to the belated nature of Plaintiff's disclosure of these witnesses, Defendant was deprived of a reasonable opportunity to depose either witness. As a result, Defendant lacks any understanding as to the subject matter of the testimony that either witness seeks to provide. Indeed, as Plaintiff readily acknowledges in its motion papers in *Carroll I*, "disclosure of a new witness after the close of fact

discovery and on the eve of trial is ***inherently prejudicial***." *See Carroll I*, ECF No. 134 at 25 (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d. Cir. 2006)). Plaintiff is correct – such a belated disclosure of witnesses who were previously unknown to the other party is precisely the type of 'sandbagging' that is prohibited by Rule 37. *Ebewo*, 309 F.Supp.2d at 607.

Moreover, the four factors enumerated in *Patterson* weigh heavily against the inclusion of these witnesses at trial. Plaintiff has not offered any explanation for the late disclosure of Ms. Beall and Mr. Salerno, who, as witnesses with purported knowledge relating to Bergdorf Goodman, could have been identified any time during the prior three years of litigation in *Carroll I. See*, *e.g.*, *Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 20 (S.D.N.Y.1995) ("The federal discovery rules place a duty on a party to turn over not only proper materials of which he is aware, but also those of which he reasonably *ought* to have been aware.") (emphasis added). As for the importance of their testimony, Defendant has no knowledge of what either witness intends to testify to. If their testimony has little importance, then it should be precluded for lack of relevance. If, on the other hand, the testimony has significant importance, then Defendant's lack of an opportunity to depose the witnesses would result in significant prejudice, thereby weighing heavily against permitting the testimony under both the second and third factors. As to the last factor, the possibility of a continuance, this Court has made clear that it is disinclined to adjourn the trial date any further, so any such continuance would be solely in the Court's discretion, and is not being sought or otherwise requested by Defendant.

Based on the foregoing, it is respectfully submitted that the Plaintiffs proposed witnesses, Robert Salerno and Cheryl Lee Beall, should be precluded from testifying at trial.

**A-751**

## CONCLUSION

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests that the Court grant the above-referenced motions *in limine* and rule that: (1) preclude Plaintiff from presenting any evidence relating to Defendant's purported interactions with non-party witnesses Natasha Stoynoff and Jessica Leeds; (2) preclude Plaintiff from presenting evidence relating to speeches and statements made by Defendant while he was campaigning for President; (3) preclude Plaintiff from introducing any evidence relating to the "Access Hollywood" tape, including the tape itself; (4) preclude Plaintiff from introducing any evidence relating to emotional damages Plaintiff purports to have sustained as a result of the alleged incident; and (5) preclude Cheryl Lee Beall and Robert Salerno from testifying at trial, and (6) for any additional relief that this Court may deem just equitable, and proper.

Respectfully submitted,

Dated: February 23, 2023
      New York, New York

Alina Habba, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

-and-

Joseph Tacopina, Esq.
TACOPINA SEIGEL & DEOREO
275 Madison Avenue, 35th Floor,
New York, New York 10016
Telephone: (212) 227–8877

*Counsel for Defendant, Donald J. Trump*

**A-752**

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
|        *Plaintiff,* | |
|     v. | |
| DONALD J. TRUMP, in his personal capacity, | |
|        *Defendant.* | |

<div align="center">

**MEMORANDUM OF LAW IN SUPPORT OF MOTIONS *IN LIMINE***

</div>

<div align="right">

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

</div>

**A-753**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... i

LEGAL STANDARD.............................................................................................1

ARGUMENT .......................................................................................................1

    I.    *Motion In Limine No. 1:* Evidence Relating to Defendant's Alleged
Encounters With Natasha Stoynoff And Jessica Leeds Must Be Precluded
Under Rule 404 .........................................................................................2

        a.  Rule 415 Is Not Applicable ............................................................4

           i. The Instant Action Is Not "Based On" A Sexual Assault............................5

           ii. The Alleged Encounters Described By Ms. Stoynoff and Ms. Leeds
Do Not Fit Within Rule 413's Definition of "Sexual Assault" .......................6

        b.  The Probative Value of Ms. Stoynoff and Ms. Leeds' Testimony
Is Substantially Outweighed By The Risk of Unfair Prejudice .......................8

        c.  The Testimony of Ms. Leeds And Ms. Stoynoff Is Irrelevant........................12

    II.   *Motion In Limine No. 2:* Video of Defendant's Campaign Speeches
Must Be Deemed Inadmissible ..............................................................12

    III.  *Motion In Limine No. 3:* The Access Hollywood Tape Must Be Excluded .........14

    IV.  *Motion In Limine No. 4*: Evidence Concerning Any Purported Emotional
Harm Stemming From The Alleged Incident Must Be Precluded........................15

CONCLUSION....................................................................................................16

i

A-754

**TABLE OF AUTHORITIES**

*Cases*

*Alexander v. Hanson,*
 66 F. Supp. 3d 162, 167 (N.D.N.Y. 2021)............................................................15

*Boyce v. Weber,*
 19-CV-3825 (JMF), 2021 WL 2821154, at *8 (S.D.N.Y. July 7, 2021)...............5

*Carroll v. Trump,*
 22-CV-10016 (LAK) (S.D.N.Y. 2022)................................................................15

*Doe v. Glanzer,*
 232 F.3d 1258, 1268 (9th Cir. 2000) ....................................................................4

*Highland Capitol Management LP v. Schneider,*
 370 F.Supp.2d 461 (S.D.N.Y. 2005). ...................................................................1

*Huddleston v. United States,*
 85 U.S. 681, 691-92 (1988) .........................................................................2, 8, 10

*Hynes v. Coughlin,*
 9 F.3d 285, 290 (2d Cir.1996) ...............................................................................2

*Johnson v. Elk Lake Sch. Dist.,*
 283 F.3d 138, 155-56 (3d Cir. 2002) ............................................................4, 7, 10

*Lewis v. Sch. Dist. No. 70,*
 05-CV-776-WDS, 2009 WL 928874, at *5 (S.D. Ill. Apr. 6, 2009) ..............11, 12

*Montanez v. City of Syracuse,*
 019 WL 4328872, at *4 (N.D.N.Y. Sept. 12, 2019) ..............................................3

*Palmieri v. Defaria,*
 88 F.3d 136, 141 (2d Cir. 1996) ............................................................................1

*Rapp v. Fowler,*
 20-CV-9586 (LAK), 2022 WL 5243030, at *1 (S.D.N.Y. Oct. 6, 2022)..............2

*Richman v. Burgeson,*
 98 C 7350, 2008 WL 2567132, at *8 (N.D. Ill. June 24, 2008) ..........................12

*United States v. Aboumoussallem,*
 726 F.2d 906, 911–12 (2d Cir. 1984) ..................................................................14

A-755

*United States v. Aminy,*
  15 F.3d 258, 260 (2d Cir. 1994) ................................................................3

*United States v. Curley,*
  639 F.3d 50, 56 (2d Cir. 2011) ..............................................................1, 2

*United States v. Dupree,*
  06 F.3d 131, 135 (2d Cir. 2013) ...............................................................1

*United States v. Gordon,*
  987 F.2d 902, 908 (2d Cir. 1993) ............................................................3

*United States v. Guardia,*
  135 F.3d 1326, 1328, 1332 (10th Cir. 1998) ...........................................4

*United States v. Foley,*
  740 F.3d 1079 (7th Cir. 2014) ..................................................................5

*United States v. Larson,*
  112 F.3d 600, 604 (2d Cir. 1997) .........................................................8, 9

*United States v. LeMay,*
  260 F.3d 1018, 1028 (9th Cir. 2001). .......................................................8

*United States v. McCallum,*
  584 F.3d 471, 475 (2d Cir. 2009). ......................................................2, 15

*United States v. Rogers,*
  587 F.3d 816, 822 (7th Cir. 2009) ...........................................................4

*United States v. Spoor,*
  904 F.3d 141, 154 (2d Cir. 2018) ..................................................4, 8, 10

*Wynne v. Renico,*
  606 F.3d 867, 871 (6th Cir. 2010) ..........................................................14

## Rules and Statutes

§ 5403 Scope, 23 Fed. Prac. & Proc. Evid. § 5403 (2d ed.) ...........................5

18 U.S.C. chapter 109A ...................................................................................6

Fed. R. Evid. 403 ......................................................................................8, 11

Fed. R. Evid. 404(b)(1)-(2) ............................................1, 2, 3, 8, 13, 14, 15

A-756

Fed. R. Evid 413(d)................................................................................4, 7, 8

Fed. R. Evid 414 ........................................................................................8

Fed. R. Evid 415(a)......................................................................3, 4, 5, 6, 8, 10

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motions *in limine* seeking to: (1) preclude Plaintiff from presenting any evidence relating to Defendant's purported interactions with non-party witnesses Natasha Stoynoff and Jessica Leeds; (2) preclude Plaintiff from presenting evidence relating to speeches and statements made by Defendant while he was campaigning for President; (3) preclude Plaintiff from introducing any evidence relating to the "Access Hollywood" tape, including the tape itself; and (4) preclude Plaintiff from introducing any evidence relating to emotional damages Plaintiff purports to have sustained as a result of the alleged incident. For the reasons set forth herein, Defendant's motions *in limine* should be granted in their entirety.

## LEGAL STANDARD

It is well-established that a district court may determine evidentiary issues in motions *in limine* prior to the commencement of trial. *See*, *e.g.*, *United States v. Dupree*, 706 F.3d 131, 135 (2d Cir. 2013). "The purpose of an *in limine* motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). In deciding a motion *in limine*, the Court should exclude evidence that is clearly inadmissible on all potential grounds. *Highland Capitol Management LP v. Schneider*, 370 F.Supp.2d 461 (S.D.N.Y. 2005); *see also* Fed. R. Evid. 402. Further, under Rule 403, even otherwise relevant evidence should be found inadmissible where it "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

1

## ARGUMENT

I.   *Motion In Limine No. 1:* **Evidence Relating to Defendant's Alleged Encounters With Natasha Stoynoff And Jessica Leeds Is Inadmissible Propensity Evidence.**

Rule 404(b) of the Federal Rules of Evidence governs the admissibility of evidence of "crimes, wrongs, or acts" other than those charged in the indictment. *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (quoting Fed. R. Evid. 404(b)). Rule 404(b) states, in relevant part:

> (1) Prohibited Uses. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b)(1)-(2).

For other act evidence to be admissible under Rule 404(b), (1) it must be offered for a proper purpose, (2) it must be relevant to a disputed issue, and (3) the probative value of the evidence cannot be substantially outweighed by its potential for unfair prejudice pursuant to Rule 403; in addition, (4) at defendant's request, the district court should give the jury an appropriate limiting instruction. *See United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). Critically, "'[o]ther act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense." *Curley*, 639 F.3d at 57 (citing Fed. R. Evid. 404(b)); *see also Hynes v. Coughlin,* 79 F.3d 285, 290 (2d Cir. 1996) (character evidence is inadmissible for the purpose of showing "propensity"); *Rapp v. Fowler*, 20-CV-9586 (LAK), 2022 WL 5243030, at *1 (S.D.N.Y. Oct. 6, 2022) ("Evidence to show propensity in most circumstances is precluded by the Federal Rules of Evidence.")

2

In the instant matter, Plaintiff seeks to offer testimony at trial from two witnesses, Natasha Stoynoff and Jessica Leeds, both of whom claim to have had previous sexual encounters with Defendant. While Defendant adamantly denies the veracity of the allegations made by these witnesses, the question of whether Ms. Leeds' and Ms. Stoynoff's claims are credible is ultimately immaterial. Indeed, the testimony of both witnesses is patently barred by Rule 404(b) since Plaintiff seeks to offer such evidence as a means of showing that Defendant is more likely to have engaged in the wrongful conduct alleged by Plaintiff, by virtue of the purported wrongful conduct claimed by Ms. Stoynoff and Ms. Leeds. Such evidence is clearly impermissible propensity and/or character evidence under Rule 404(b)(1).

Further, none of the "permitted uses" under Rule 404(b)(2) apply here since any evidence surrounding the alleged encounters described by Ms. Stoynoff and Ms. Leeds does not inform Defendant's alleged motive or intent during Plaintiff's claimed encounter, nor does it have any bearing on Defendant's opportunity, preparation, plan, or knowledge of the incident alleged by the Plaintiff in the matter *sub judice*. The claims made by Ms. Stoynoff and Ms. Leeds are markedly different than the accusation which lies at the heart of this action. Indeed, the accusations put forth by these witnesses are wholly disconnected from, and irrelevant to, Plaintiff's claim for defamation and the underlying sexual assault, which Plaintiff claims occurred in the mid-1990s inside the changing room of a Bergdorf Goodman and involve accusations of a violent rape. The claims of Ms. Stoynoff and Ms. Leeds, on the other hand, involve substantially different circumstances and far different, less severe alleged acts. Fed. R. Evid. 404(b)(2). *See, e.g., United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("[E]vidence of another act should not be admitted as proof of the defendant's knowledge or intent unless the other act is sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated

3

by the proponent of the evidence. . . Similarity - being a matter of relevancy - is judged by the degree in which the prior act approaches near identity with the elements of the offense charge[d]. There is no necessity for synonymity but there must be substantial relevancy....") (internal quotation and citations omitted); *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (stating Rule 404(b) evidence requires "close parallel" to charged offense to warrant consideration for admission); *Montanez v. City of Syracuse*, 2019 WL 4328872, at *4 (N.D.N.Y. Sept. 12, 2019) ("The proffering party must show more than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature.").

Moreover, while Plaintiff will likely argue that the evidence is covered under Rule 415's exception to the prohibition on propensity evidence for civil cases involving sexual assault, that exception clearly does not apply in the instant scenario for the reasons set forth below. Even if it did, the admission of any such testimony would be barred by Rule 403, as the probative value of the testimony of both Ms. Stoynoff and Ms. Leeds does not outweigh the significant prejudice that would result to Defendant by allowing their inclusion.

**A. Rule 415 is Not Applicable**

Rule 415(a) states, in pertinent part, that: "In a civil case involving a claim for relief based on a party's alleged sexual assault or child molestation, the court may admit evidence that the party committed any other sexual assault. The evidence may be considered as provided in Rule 413 and 414." *See* Fed. R. Evid. 415(a). In determining whether evidence of an unrelated sexual assault is admissible under Rule 415, "courts adopt a three-step inquiry. . . . First, the defendant must be accused of an offense of sexual assault []; second, the evidence being proffered must relate to the commission of another offense of sexual assault []; and last, the evidence has to be relevant." *Doe*

4

*v. Glanzer*, 232 F.3d 1258, 1268 (9th Cir. 2000), *citing United States v. Guardia*, 135 F.3d 1326, 1328, 1332 (10th Cir. 1998).

Although Rule 415 "reflects an exception . . . to the common law practice of excluding propensity evidence," in particular instances involving "evidence that the defendant committed any other sexual assault," the Rule "does not require district courts to evaluate such evidence with a 'thumb on the scale in favor of admissibility,' but merely 'alters the category of permissible inferences available to the jury.'" *United States v. Spoor*, 904 F.3d 141, 154 (2d Cir. 2018) (citing *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 155-56 (3d Cir. 2002); *United States v. Rogers*, 587 F.3d 816, 822 (7th Cir. 2009)); Fed. R. Evid. 415.

In the instant action, the evidence that Plaintiff seeks to introduce with respect to Defendant's alleged encounters with Ms. Stoynoff and Ms. Leeds plainly does not qualify for inclusion under the Rule 415 exception to propensity evidence because the instant does not involve a "claim for relief based on a party's alleged sexual assault" as is required under Rule 415, and because the alleged encounters described by Ms. Leeds and Ms. Stoynoff do not qualify as "sexual assault" under Rule 413(d).

### i. The Instant Action Is Not "Based On" A Sexual Assault

The application of Rule 415 is limited to a "civil case involving a claim for relief based on a party's alleged sexual assault." Fed. R. Evid. 415. Although there is a "dearth of precedent" addressing what qualifies as a claim "based on" an alleged sexual assault, courts have recognized "two distinct approaches" in how to assess this issue. *Boyce v. Weber*, 19-CV-3825 (JMF), 2021 WL 2821154, at *8 (S.D.N.Y. July 7, 2021). The first, the 'categorical approach,' is derived from the Wright & Miller treatise and provides that a "court is confronted with a claim 'based on' a sexual offense only when the elements of that offense are also elements of the civil claim itself."

**A-762**

*Id.* (citing § 5403 Scope, 23 Fed. Prac. & Proc. Evid. § 5403 (2d ed.)). The second, the 'alternative approach,' permits a court to broadly consider "whether an alleged sexual assault constitutes a factual premise of the plaintiff's claim." *Boyce*, 2021 WL 2821154 at *9 (citing *United States v. Foley*, 740 F.3d 1079 (7th Cir. 2014)).

In weighing the validity of these two approaches, the Wright & Miller treatise endorsed the 'categorical approach' and found it to be the more suitable test, noting that "[i]t is clear that the drafters intended by the 'based on' language in Rule 415 to refer to cases where defendant is sued by a victim for injuries inflicted by a sexual assault or child molestation." § 5403 Scope, 23 Fed. Prac. & Proc. Evid. § 5403 (2d ed.). In coming to this conclusion, the treatise expounds upon several hypothetical scenarios and cautions against expanding the reach of Rule 415 to such drastic lengths. Of particular note, one of the hypothetical scenarios raised by the treatise seems to directly reference the facts of the instant action and argues that applying Rule 415 in this way would create significant ambiguity in the application of the Rule and conflict with the Congressional intent. *See* § 5403 Scope, 23 Fed. Prac. & Proc. Evid. § 5403 (2d ed.) ("[I]magine an action for defamation in publishing an accusation that the plaintiff, a politician, had committed sexual assaults and the defense of truth is raised . . . once one starts down that path it is difficult to know where one could reasonably draw the line."). This reasoning is persuasive and raises the legitimate concern that applying Rule 415 to the instant action will broaden the scope of the Rule to a significant degree and risk upending Rule 404 in a manner that was never intended by Congress.

Therefore, this Court should adopt the 'categorical approach' and find that Rule 415 is not applicable to the instant action since Plaintiff's sole claim is not "based on" a claim for sexual assault, but, rather, a claim for defamation.

ii.     **The Alleged Encounters Described By Ms. Stoynoff and Ms. Leeds Do Not Fit Within Rule 413's Definition of "Sexual Assault"**

Assuming *arguendo* that Rule 415 can be applied to actions that sounds in defamation, the Rule still has no bearing here because neither of the alleged events described by Ms. Stoynoff and Ms. Leeds qualify as a 'sexual assault' subject to Rule 415.

The term 'sexual assault' is defined in Rule 413(d), which provides that it encompasses conduct that is "a crime under federal law or under state law" and which also involves: "(1) any conduct prohibited by 18 U.S.C. chapter 109A; (2) contact, without consent, between any part of the defendant's body — or an object — and another person's genitals or anus; (3) contact, without consent, between the defendant's genitals or anus and any part of another person's body; (4) deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or (5) an attempt or conspiracy to engage in conduct described in subparagraphs (1)–(4)." *See* Fed. R. Evid. 413(d).

The alleged encounters described by Ms. Stoynoff and Ms. Leeds do not fit within any of the above-stated categories. Subparagraph (d)(1) plainly does not apply since neither witness alleges any conduct that occurred within a "special maritime [or] territorial jurisdiction of the United States or in a Federal prison[.]"[1] *See* 18 U.S.C. 109A § 2241-2248; *see also* 18 U.S.C. § 7 (defining "special maritime and territorial jurisdiction of the United States").

Likewise, subparagraphs (2) through (4) are inapplicable since neither witness alleges any contact involving the genitals or anus of either party nor that they were forced to suffer any bodily injury or physical pain in their alleged interactions with Defendant. In sum, Ms. Stoynoff testified

---

[1] The alleged incident involving Ms. Stoynoff occurred in Florida and the purported claim by Ms. Leeds took place on a domestic flight from Dallas to New York. As such, these two incidents did not involve any type of purported conduct that transpired on an international flight, travel over the "high seas," or any other type of activity that would remotely fit within the parameters of this statute.

7

that Defendant "grabb[ed] [her] shoulders and pushe[d] her against this wall and start[ed] kissing her," *see* Affirmation of Alina Habba, Esq. ("Habba Aff."), Exhibit A, while Ms. Leeds claimed that Defendant "tri[ed] to kiss [her]" and "grabb[ed] [her] breasts," *see* Habba Aff., Ex. B.. Even accepting these statements as true—which, again, Defendant resolutely denies the veracity of said claims—the conduct described by Ms. Stoynoff and Ms. Leeds simply does not fit within the definition of "sexual assault" under Rule 413, which requires forcible contact with either party's genitalia or the derivation of sexual gratification from inflicting bodily harm upon another. Fed. R. Evid 413(d). None of these elements are present here.

Plaintiff will likely argue that subparagraph (5)—the catchall provision which encompasses any 'attempt' to engage in any of the conduct enumerated in subparagraphs (2) through (4)—is applicable here. However, this is simply not the case. With respect to Ms. Stoynoff, it is indisputable that her testimony does not involve any allegation of conduct, or attempted conduct, that is covered by subparagraphs (2) through (4). As for Ms. Leeds, Plaintiff will presumably argue that Ms. Leeds' testimony reflects an alleged attempt by Defendant to non-consensually contact her genitals since she stated that Defendant "started putting his hand up [her] skirt." Habba Aff., Ex. B. However, this single, ambiguous statement, without more, is not sufficient to evince that Defendant intended to touch Ms. Leeds' genitals, and Ms. Leeds has not even alleged as much. Rather, she testified that the touching stopped almost immediately after it "started," and failed to even indicate how far Defendant's hands were from her genitals, what direction his hands were moving, how quickly they were moving, or any other relevant details that would provide a basis to infer that Defendant intended to non-consensually contact her genitals. *See, e.g., Johnson v. Elk Lake School Dist.*, 283 F. 3d 138, 156 (3d Cir. 2002) ("Where a past act cannot be shown with reasonable certainty, its probative value is reduced and it may prejudice the

defendant unfairly, confuse the issues, mislead the jury, and result in undue delay and wasted time."). Thus, the vagueries of Ms. Leeds' unsubstantiated and uncharged incident—which allegedly took place in 1979, more than 40 years ago—is simply not sufficient to bring it within the purview of Rule 413(d)(5).

Therefore, since neither Ms. Leeds nor Ms. Stoynoff have alleged any conduct that can be qualified as a "sexual assault," Rule 415 has no bearing on the instant matter.

**B.  The Probative Value Of Ms. Stoynoff And Ms. Leeds' Testimony Is Substantially Outweighed By The Risk Of Unfair Prejudice**

Even if Rule 415 could hypothetically be applied in the instant scenario, evidence of Defendant's alleged encounters with Ms. Stoynoff and Ms. Leeds would nonetheless be inappropriate because it is irrelevant and the probative value of such evidence is substantially outweighed by its potential for unfair prejudice.

It is well-established that courts must consider the Rule 403 balancing test in determining whether to allow evidence of other sexual assaults under Rule 415. *See United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) ("An item of evidence that would be admissible under [Rules 413, 414, and 415] may nonetheless be excluded pursuant to Fed.R.Evid. 403 if the trial judge determines that its probative value is substantially outweighed by its potential for unfair prejudice.") (citing *Huddleston v. United States,* 485 U.S. 681, 687-88, 108 S.Ct. 1496, 1500-01 (1988); Fed. R.Evid. 404(b) Advisory Committee Note (1972)). Indeed, even when Rule 415 applies, a court is required to "to determine the probative value of this inference and to weigh whether the prior act evidence will be unfairly prejudicial." *United States v. Spoor*, 904 F.3d 141, 154 (2d Cir. 2018). In making that determination, courts consider factors such as "(1) the similarity of the prior acts to the acts charged, (2) the closeness in time of the prior acts to the acts charged, (3) the frequency of the prior acts, (4) the presence or lack of intervening circumstances, and (5)

the necessity of the evidence beyond the testimonies already offered at trial." *Id.* at 154-155 (internal quotation omitted), *citing United States v. LeMay*, 260 F.3d 1018, 1028 (9th Cir. 2001).

As to the first point, as explained in Paragraph I *supra*, the circumstances surrounding the accusations made by Ms. Stoynoff and Ms. Leeds are vastly different from those involved in the alleged incident at issue in this matter.. As a result, recounting these alleged encounters will offer no relevant or meaningful insight into the central question of whether the subject incident occurred in the mid-1990s. In other words, there is simply no relation between the testimony of Ms. Stoynoff and Ms. Leeds and the facts at issue in this case.

Regarding the second factor, the lack of closeness in time between the events alleged by Ms. Stoynoff and Ms. Leeds cuts heavily against the inclusion of such evidence. Ms. Stoynoff claims that her encounter took place in 2005, approximately ten years after Plaintiff's claimed incident in the mid-1990s. Meanwhile, Ms. Leeds claims that her encounter with Defendant took place in 1979, nearly twenty years prior to the alleged incident at issue herein. Given the ten and twenty year gaps on each end, these events are so detached in time that they simply have no relevance to the subject incident. Further, since the alleged events occurred so long ago (particularly Ms. Leeds' incident, which purportedly occurred more than 40 years ago), additional caution is warranted since these events are highly attenuated and subject to memory distortion. *See, Larson*, 112 F.3d at 605 ("Exclusion of proof of other acts that are too remote in time caters principally to the dual concerns for relevance and reliability . . . [t]he evaluation of the proffered evidence in light of these concerns must be made on a case-by-case basis to determine whether the significance of the prior acts has become too attenuated and whether the memories of the witnesses has likely become too frail.").

As for the third factor, the frequency of the prior acts, both Ms. Stoynoff and Ms. Leeds claim that their encounters were a single, isolated incident. Neither alleges that Defendant ever did, or made any attempt to, repeat any of the purported acts. Given the solitary nature of their claims, the accounts of Ms. Leeds and Ms. Stoynoff offer no support for the proposition that the subject incident was in line with a continuing pattern of similar alleged behavior. Therefore, this factor weighs heavily in favor of exclusion of the proposed evidence.

The fourth factor, the presence of intervening factors, is largely irrelevant here, as there are no discernible intervening factors at play. In fact, if anything, there is but one intervening factor that ties together the allegations of Ms. Leeds, Ms. Stoynoff, and Plaintiff – their allegations were made publicly only *after* Defendant became a leading presidential candidate, despite their alleged incidents having supposedly occurred decades earlier. As a result, the timing of their accusations undercuts the trustworthiness of their accounts and raises serious questions as to their credibility. Therefore, this factor weighs in favor of precluding their testimony.

Finally, the fifth factor, the necessity of the evidence beyond the testimonies already offered at trial, is relevant only to the extent Plaintiff lacks sufficient evidence to independently establish the merit of her claims. Yet, Plaintiff has frequently and profusely proclaimed that she has 'overwhelming' evidence to substantiate her claim that the alleged incident did, in fact, occur. Thus, by Plaintiff's own admission, there is no necessity for additional, extrinsic evidence. Her claim should be permitted to stand or fall on its own merits, without the the inclusion of uncharged, uncorroborated claims from other women, spanning several decades, which are entirely disconnected from the facts of this case. *See, e.g., Johnson v. Elk Lake School Dist.*, 283 F.3d at 152 (recognizing that limits need to be placed on admissibility of Rule 415 evidence "to ensure that the plaintiff may not 'parade past the jury a litany of potentially prejudicial similar acts that

11

have been established or connected to the defendant only by unsubstantiated innuendo'") (*quoting Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496 (1988)). Simply put, Plaintiff has the burden of establishing that the incident alleged in the Complaint occurred, and she has consistently declared that she has sufficient evidence to do so. Thus, she should not be permitted to look towards other unrelated and uncorroborated allegations as a means of impermissibly bolstering her claim.

In short, evidence pertaining to the alleged events described by Ms. Stoynoff and Ms. Leeds offers little to no probative value but poses an immense risk of unfair prejudice. *See, e.g., Spoor*, 904 F. 3d at 155 ("The district court should also consider the potential for unfair prejudice, including the possibility that prior act evidence will lead the jury to convict out of passion or bias or because they believe the defendant is a bad person deserving of punishment – a particular risk with this sort of evidence."). Therefore, even if found to be otherwise admissible under Rules 404(b) and 415, evidence regarding Ms. Leeds and Ms. Stoynoff's alleged encounters with Defendant must be excluded under Rule 403 due its overwhelmingly prejudicial effect.

**C. The Testimony of Ms. Leeds and Ms. Stoynoff Is Irrelevant**

Rule 402 states, unambiguously, that "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. As set forth in Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probably than it would be without the evidence[] and the fact is of consequence in determining the action." Fed. R. Evid. 401.

Here, for the same reasons detailed in Paragraph I(B) above, Ms. Stoynoff and Ms. Leeds must be precluded from testifying because the subject matter of their testimony is irrelevant to the facts of this matter and is of no consequence in determining this action. Therefore, such evidence is barred by Rule 402.

12

A-769

II.    *Motion In Limine No. 2:* **Video of Defendant's Campaign Speeches Must Be Deemed Inadmissible**

In accordance with the Rules and applicable case law, Plaintiff should be precluded from arguing and from introducing evidence and testimony relating to Defendant's campaign speeches, which she presumably intends to include for the purpose of demonstrating the manner in which Defendant has denied other, unrelated allegations of sexual assault. Such evidence is not only irrelevant and prejudicial to Defendant, but also constitutes inadmissible character evidence.

First, the campaign speech videos must be excluded under Rule 402 due to lack of relevance. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."); *see also* Fed. R. Evid. 401 (providing that evidence is relevant if it "has any tendency to make a fact more or less probably than it would be without the evidence[] and the fact is of consequence in determining the action."). Indeed, evidence purporting to show the manner in which Defendant addressed other allegations of sexual assault is extraneous to the factual issues involved this particular action, as it has no bearing on the central question the jury will be asked to address in this case – namely, whether or not the alleged incident occurred in the mid 1990s at Bergdorf Goodman. None of the campaign videos that Plaintiff seeks to introduce reference Plaintiff, nor do they even remotely relate to the alleged incident at issue herein. In fact, each and every one of the campaign videos that Plaintiff has marked as exhibits (PX-26 through PX-32) are from speeches that Defendant gave in 2016, several years *before* Plaintiff even went public with her allegations. Statements made in these speeches, therefore, are entirely irrelevant to questions that will be presented to the jury at trial.

Second, the introduction of the campaign videos must be excluded under Rule 403, since a significant danger of jury confusion and unfair prejudice to Defendant may result. There is no question that Defendant—a former President of the United States and current 2024 presidential candidate—is a preeminent political figure who evokes strong feelings of emotion from both his

supporters and his detractors alike. Thus, inclusion of videos taken from his campaign speeches would threaten to unnecessarily politicize the trial, enflame the passions of the jury, and confuse the issues that are in their exclusive province to decide. It is crucial that the jury's deliberations are focused solely on whether the incident occurred, and not a general referendum on Defendant's political career or ideologies. Any reference to Defendant's political career, his political views, or statements he made and actions he took while in office are immaterial and will not aid Plaintiff in proving her case-in-chief at trial. Therefore, the campaign-related videos that Plaintiff intends to produce, marked PX-26 through PX-32, have no probative value as they bear no relation to the alleged incident, and carry a significant risk of causing unfair prejudice and jury confusion.

Third, the subject exhibits constitute impermissible character evidence. As stated above, Rule 404(b) of the Federal Rules of Evidence specifically precludes evidence which attempts to prove that "on a particular occasion the person acted in accordance with the character or trait." To the extent that these exhibits are presented to give credence to past allegations of sexual assault, they must be excluded for the reasons set forth *supra*.

### III.  *Motion In Limine No. 3:* The *Access Hollywood* Tape Must Be Excluded

Per the Pre-Trial Order, Plaintiff intends to submit the "Access Hollywood video recording of Donald J. Trump speaking to Billy Bush in September 2005" marked as PX-25 (the "Access Hollywood Tape"), and a segment of the September 26, 2016 Presidential debate discussing same marked as PX-26. The proposed evidence, however, is not being offered for any proper purpose. As stated above, FRE 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The Second Circuit has long recognized that this excludes evidence of prior acts by the defendant. *United States v.*

14

**A-771**

*Aboumoussallem*, 726 F.2d 906, 911–12 (2d Cir. 1984); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) ("Federal Rule 404(b) applies to all propensity evidence, whether used to show that the defendant or another individual acted in conformity with their prior misconduct.")

While Rule 404(b) bars all propensity evidence, the Rule does permit evidence of prior acts introduced for a non-propensity purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" as to the defendant. Fed. R. Evid. 404(b)(2). The Second Circuit has cautioned, however, that even when used for a permitted purpose, such evidence presents a special danger of prejudice to the defense. Thus, in the Second Circuit, "[t]o determine whether to admit Rule 404(b) evidence, the court should consider whether: '(1) the prior [act] evidence [is being] 'offered for a proper purpose'; (2) the evidence [is] relevant to a disputed issue; (3) the probative value of the evidence [is] substantially outweighed by its potential for unfair prejudice pursuant to Rule 403; and (4) [there is] an appropriate limiting instruction." *Alexander v. Hanson*, 566 F. Supp. 3d 162, 167 (N.D.N.Y. 2021) (citing *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009)).

Here, Defendant expects that Plaintiff will attempt to introduce this evidence to demonstrate that Defendant is 'predisposed' to committing sexual assault. However, Plaintiff's desire to introduce this evidence can serve only one purpose: to suggest to the jury that Defendant had a propensity for sexual assault and therefore the alleged incident must have in fact occurred. Evidence offered to prove such allegations would be precisely the type of propensity evidence precluded by Rule 404(b). Furthermore, as is plainly evident, the contents of the Access Hollywood Tape, and Defendant's comments concerning them, do not even tangentially relate to the core of Plaintiff's claim. Accordingly, as the proposed evidence constitutes improper propensity evidence and is also irrelevant and highly prejudicial, it must be precluded.

15

IV.    *Motion In Limine No. 4:* **Evidence Concerning Any Purported Emotional Harm Stemming From The Alleged Incident Must Be Precluded**

At trial, Plaintiff may attempt to reference purported emotional or psychological pain she claims to have suffered as the result of the alleged underlying incident. However, any such evidence or statements must be precluded because Plaintiff did not allege to have sustained any such harm in her pleadings, nor is it a relevant aspect of her claim for defamation. Indeed, this Court expressly held in the companion case to this action, *Carroll v. Trump*, 22-CV-10016 (LAK) (S.D.N.Y. 2022) ("*Carroll II*") that "emotional or psychological damages, allegedly suffered by plaintiff as a result of the alleged sexual assault" are not a part of this case and only relevant in *Carroll II*. Therefore, reference to any such damages must be excluded from the trial in *Carroll I.*

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests that the Court grant the above-referenced motions *in limine* and rule that: (1) Plaintiff is precluded from presenting any evidence relating to Defendant's purported interactions with non-party witnesses Natasha Stoynoff and Jessica Leeds; (2) Plaintiff is precluded from presenting evidence relating to speeches and statements made by Defendant while he was campaigning for President; (3) Plaintiff is precluded from introducing any evidence relating to the "Access Hollywood" tape; and (4) Plaintiff is precluded from introducing any evidence relating to emotional damages Plaintiff purports to have sustained as a result of the alleged incident.

Dated: February 16, 2023          Respectfully submitted,
          New York, New York

                                   Alina Habba, Esq.
                                   Michael T. Madaio, Esq.
                                   HABBA MADAIO & ASSOCIATES LLP

16

**A-773**

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>                    *Plaintiff,*<br><br>         v.<br><br>DONALD J. TRUMP,<br><br>                    *Defendant.* | Civil Action No.: 22-cv-10016<br><br><br>**DECLARATION OF ALINA HABBA, ESQ. IN SUPPORT OF DEFENDANT'S MOTIONS *IN LIMINE*** |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for Donald J. Trump (the "Defendant") in the above-captioned matter (the "Action").

2.      I submit this declaration pursuant in support of Defendant's Motions *in Limine*. The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

3.      As counsel for Defendant, I have reviewed pleadings, and other documents related to the Action, and I am familiar with the facts and circumstances of this case.

4.      Attached hereto as **Exhibit A** is a true and accurate copy of relevant portions of the deposition transcript of Natasha Stoynoff, which deposition took place on October 13, 2022.

1

**A-774**

5.      Attached hereto as **Exhibit B** is a true and accurate copy of the relevant portions of the deposition transcript of Jessica Leeds, which deposition took place on October 13, 2022.

6.      Attached hereto as **Exhibit C** is a true and accurate copy of Plaintiff's Second Supplemental Rule 26(a)(1) Disclosures.

7.      Attached hereto as **Exhibit D** is a true and accurate copy of Plaintiff's Third Supplemental Rule 26(a)(1) Disclosures.

Dated: February 23, 2023                    Respectfully submitted,

Alina Habba, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

2

# EXHIBIT A

Page 1

```
 1                    NATASHA STOYNOFF

 2              UNITED STATES DISTRICT COURT

 3              SOUTHERN DISTRICT OF NEW YORK

 4    -----------------------------------    )

 5    E. JEAN CARROLL,                        )

 6                   Plaintiff,               ) Case No.

 7           vs.                              ) 20-Civ-7311

 8    DONALD J. TRUMP, in his personal capacity) (LAK)(JLC)

 9                   Defendants.              )

10    -----------------------------------    )

11

12

13              DEPOSITION OF NATASHA STOYNOFF

14                   NEW YORK, NEW YORK

15                    OCTOBER 13, 2022

16

17

18

19

20

21

22

23

24    REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25    JOB NO. 218341
```

A-777

Page 20

                          NATASHA STOYNOFF

1

2    interview.

3         Q.   Did you -- what happened -- withdraw.

4              Did you ever leave the pool area with

5    Donald Trump or Melania Trump?

6         A.   Yes.

7         Q.   With whom?

8         A.   With Donald.

9         Q.   And how did that happen?

10        A.   He -- Melania was going upstairs to

11   change -- excuse my emotions -- and Donald said,

12   Have you seen the so-and-so room?  Have you seen the

13   painting in the whatever room.  He wanted to show me

14   a painting or a room.  I said no.  He goes, I'd like

15   to show you.  So he took me to this room.

16        Q.   Do you recall what room it was at

17   Mar-a-Lago?

18        A.   I mean, I don't know how to -- I don't know

19   that it had a number on it, but all I remember is we

20   came in the back door, walked down the hallway, and

21   turned right into a room.  That's as I recall it,

22   but I haven't really seen pictures to know -- I

23   haven't really seen a layout of Mar-a-Lago to know

24   exactly what door.

25        Q.   And what happened when you got to the room?

A-778

Page 21

```
 1                    NATASHA STOYNOFF

 2        A.  I walked in and he -- I walked into the

 3   room first and I'm looking around the room wondering

 4   what does he want to show me.  Nice room, what does

 5   he want to show me.  Then I hear the door close

 6   behind me and I turn around and he's right here

 7   (indicating), and he grabs my shoulders and pushes

 8   me against this wall and starts kissing me.

 9        Q.  And did he say anything when he started

10   kissing you?

11        A.  No.

12        Q.  Did he say anything before?

13        A.  Not that I recall.

14        Q.  And what was going through your mind when

15   Donald Trump did this?

16        A.  Complete shock.  Thank you.  Complete shock

17   because it was very fast and I was taken -- taken by

18   surprise.

19        Q.  And do you recall how you reacted?

20        A.  I recall pushing him back twice.  I recall

21   trying to say something, but not really being able

22   to.  I was so flustered.

23        Q.  And when you pushed him back the first time

24   do you recall how Donald Trump reacted?

25        A.  Yes.  He just came toward me again.
```

A-779

# EXHIBIT B

Page 1

1                    JESSICA LEEDS

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------    )

5    E. JEAN CARROLL,                        )

6                  Plaintiff,                ) Case No.

7          vs.                               ) 20-Civ-7311

8    DONALD J. TRUMP, in his personal capacity) (LAK)(JLC)

9                  Defendants.               )

10   ------------------------------------    )

11

12

13              DEPOSITION OF JESSICA LEEDS

14                 NEW YORK, NEW YORK

15                 OCTOBER 13, 2022

16

17

18

19

20

21

22

23

24   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25   JOB NO. 218341

A-781

Page 17

```
 1                        JESSICA LEEDS
 2   Trump?
 3         A.   Yes.
 4         Q.   When was that?
 5         A.   Well, the first time I met him was on an
 6   airplane coming back from I believe Dallas, it was a
 7   Brandiff flight.  I was asked by the stewardess -- I
 8   was flying coach.  I was asked by the stewardess if
 9   I would like to come up and sit in first class.
10   Well, Brandiff had great meals.  Absolutely, I went
11   up to first class, and it was the first seat behind
12   the bulkhead.  And there was a gentleman sitting at
13   the window seat and he introduced himself, and we
14   shook hands and we chatted for a while.  He
15   introduced himself as Donald Trump.
16         Q.   And do you recall where you were traveling
17   on this flight?
18         A.   I was coming into New York, to Laguardia
19   because that's where my car was.
20         Q.   Okay.  And do you recall what year this
21   took place?
22         A.   I think it was '79.
23         Q.   Okay.  And you testified that the man
24   sitting in the window seat introduced himself as
25   Donald Trump.  Were you familiar with Donald Trump
```

Page 19

```
 1                    JESSICA LEEDS

 2   mean by that?

 3       A.  Well, he was with his hands grabbing me,

 4   trying to kiss me, grabbing my breasts, pulling me

 5   towards him, pulling himself on to me.  It was kind

 6   of a struggle going on.  Part of my brain was

 7   wondering why the people in the back -- in the seat

 8   behind me weren't noticing that the seat was

 9   jiggling around and why wasn't the guy that was

10   sitting across the aisle saying something or where

11   in hell was the stewardess.  That went on for what

12   seemed like a terribly long time, but it probably

13   was just a few seconds.

14           It was when he started putting his hand up

15   my skirt that I realized that nobody was going to

16   save me but me, and I was on the aisle, I managed to

17   wheel my way out of the chair, and grabbed my purse

18   and I went back to my seat in the back.

19       Q.  And did Donald Trump say anything while

20   this was happening?

21       A.  Not a word.  There was never any sound that

22   I can recall.

23       Q.  Did you say anything while this was

24   happening?

25       A.  Nope.
```

A-783

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff,*

v.

DONALD J. TRUMP,

*Defendant.*

No. 22 Civ. 10016 (LAK) (JLC)

### NOTICE OF PLAINTIFF E. JEAN CARROLL'S OMNIBUS MOTION IN LIMINE

PLEASE TAKE NOTICE that Plaintiff E. Jean Carroll hereby moves this Court, before the Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, located at 500 Pearl Street, New York, NY 10007, on a date to be set by the Court, for an order in limine (1) admitting Carroll's prior consistent statements to Lisa Birnbach and Carol Martin about Defendant Donald J. Trump's attack; (2) admitting the testimony of Natasha Stoynoff and Jessica Leeds regarding their own experiences with Trump; (3) excluding testimony from witnesses whom Trump has not disclosed, precluding Trump from testifying to undisclosed information, and precluding any testimony or commentary concerning DNA evidence; (4) precluding cross-examination or evidence regarding Stephanie Grisham's prior misdemeanor convictions, her unrelated pending lawsuit, and her use of a prescription medication; (5) precluding comments and cross-examination regarding Carroll's choice of counsel; and (6) precluding Robert J. Fisher from testifying as a rebuttal expert witness.

This motion is supported by the annexed memorandum of law and the declaration of Roberta A. Kaplan and accompanying exhibits.

A-784

Dated: New York, New York
       February 23, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

2

**A-785**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff,* | |
| v. | No. 22 Civ. 10016 (LAK) (JLC) |
| DONALD J. TRUMP, | |
| *Defendant.* | |

### DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF
### PLAINTIFF E. JEAN CARROLL'S OMNIBUS MOTION IN LIMINE

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action.

2.     I respectfully submit this declaration in support of Carroll's omnibus motion in limine.

3.     Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the official transcript of Robert J. Fisher's deposition, which was taken in this action on February 6, 2023.

4.     Attached hereto as **Exhibit 2** is a true and correct copy of the Expert Report of Robert J. Fisher, dated January 30, 2023.

5.     Attached hereto as **Exhibit 3** is a true and correct copy of the Expert Report of Ashlee Humphreys, PhD, dated January 9, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     New York, New York
February 23, 2023

Roberta A. Kaplan

A-786

# EXHIBIT 1

Page 1

1                   UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF NEW YORK

3

4    E. Jean Carroll,                )
                                     )
5                   Plaintiff,       )
                                     ) Case No.
6         vs.                        )
                                     ) 1:22-CV-10016-LAK
7    Donald J. Trump,                )
                                     )
8                   Defendant.       )
     _____)

9

10

11

12

13

14         VIDEO DEPOSITION OF ROBERT J. FISHER

15              Via Zoom Videoconference

16              Monday, February 6, 2023

17

18

19

20

21    Reported by:

22    LISA MOSKOWITZ, CA CSR 10816, RPR, CRR, CLR,

23    Washington CSR 21001437, Nevada CCR 991,

24    NCRA Realtime Systems Administrator

25    JOB NO. 222071

A-788

Page 10

```
 1              In Carroll II, as you're talking

 2      about, I was asked to do just an expert

 3      report, and it had nothing to do with

 4      rebuttal reports but do an expert report in

 5      that case.

 6         Q.   And by you were asked, you were

 7      asked by defendant's counsel; is that

 8      correct?

 9         A.   Yes, that's correct.

10         Q.   Mr. Fisher who's on the line

11      today -- I'm sorry.  Mr. Swift.

12         A.   Mr. Swift, yes.  He can claim my

13      name.  That's fine.

14         Q.   So is it your testimony that your

15      report in Carroll II which was dated

16      January 30, 2023, was not a rebuttal report?

17         A.   No, not at all.  No.  In Carroll I,

18      I was specifically retained to do -- as a

19      rebuttal expert, and my main task was to do

20      a rebuttal report, and we had two

21      subsequent -- or one deposition over two

22      periods.

23              In rebuttal II after the

24      plaintiff -- I'm sorry.  In Carroll II when

25      the plaintiff refiled, they asked me to do
```

A-789

Page 11

```
 1   an expert report which had nothing to do
 2   with rebutting anything.  It was just
 3   strictly to do a report on -- as an expert
 4   in that case.
 5           So the first one was a rebuttal
 6   report.  The second one was a plain expert
 7   report.
 8       Q.   Okay.
 9           So your position is that your
10   report in Carroll II is not a response to or
11   rebuttal of Professor Humphreys' report in
12   Carroll II?
13       A.   No.  In fact, I didn't even read --
14   Professor Humphrey did two reports.  She did
15   a rebuttal report -- or she did a report on
16   the June 21, June 22, and June 24 statements
17   of Mr. Trump.  I wrote -- and then she filed
18   a report on that.  I wrote a rebuttal report
19   on that.
20           Subsequently Mr. Trump made other
21   statements on October 12, 2022, of which
22   case subsequent to that, the plaintiff filed
23   a second lawsuit which included battery I
24   think, as well as defamation.  I was asked
25   after that to do a full expert report based
```

Page 12

1    on her, you know, her new complaint

2    addressing defamation.  None of it has to do

3    anything -- Professor Humphreys subsequently

4    did a second report based on the October 12

5    statement.  I was not asked to do a rebuttal

6    report on her second report and, as a matter

7    of fact, I didn't even read it.  I skimmed

8    it, but I'm not here to talk about her

9    second report.

10        Q.   Understood.

11        A.   Okay.

12        Q.   And so I'm going to -- we'll mark

13   this as Fisher 1.

14             (Exhibit Number 1 was marked

15             for identification.)

16   BY ATTORNEY CRAIG:

17        Q.   The court reporter just handed you

18   a document marked as Exhibit 1.  Is this the

19   report you prepared in Carroll II and issued

20   on January 30, 2023?

21        A.   That's correct.

22        Q.   Okay.  How many hours did it take

23   you to draft this report?

24        A.   I don't know exactly, but I'm going

25   to guess probably around 12, 15 hours.

A-791

Page 27

```
1       Q.    When you say you were approached by

2   a case with Meghan Markle, do you mean

3   Meghan Markle approached you or someone who

4   is looking to sue Meghan Markle?

5       A.    Yes, her half sister.  It's gotten

6   a lot of public exposure already.  But, yes,

7   it's a case where Meghan Markle's half

8   sister is suing her for defamation.  Based

9   on a book and interviews that she did on

10  Oprah and with, you know, various interviews

11  she's done along with Harry, she's basically

12  made claims about her family, both her half

13  sister and father, that aren't true.  The

14  father is not part of the suit, but the half

15  sister says that her reputation has been

16  damaged by the false statements that

17  Ms. Markle has made.

18      Q.    And has your approach to your work

19  as an expert changed since your Carroll I

20  deposition in any way?

21      A.    No, no.  I've been -- no, the

22  answer is no.  I mean, I've had 80 cases

23  over 17 years, and I'll end there because

24  you like yes or no answers.

25            No, it hasn't changed.  I try to
```

Page 28

1    give context and perspective when I guess

2    it's not needed sometimes.

3        Q.   Have you developed any new methods

4    or methodologies or techniques as part of

5    your work since your Carroll I deposition?

6        A.   No, because those methodologies are

7    rock solid.  There's no reason to reinvent

8    the wheel when they are accepted

9    methodologies, and they're effective

10   methodologies.

11       Q.   And would you say your methodology

12   in Carroll II is similar to your methodology

13   in Carroll I?

14       A.   I would say so, yes.

15       Q.   Okay.

16            And if we can look at your report

17   which is Exhibit 1 which you still have in

18   front of you, I just had a -- on page 2 --

19       A.   Oh, they're back and back.  That's

20   unusual.  Okay.  I went from 1 to 3, and I

21   thought a page was missing.  Yes, go ahead.

22       Q.   Do you see there's a section in the

23   middle of the page with the title Media

24   Expert/Analysis?

25       A.   Yes.

Page 37

1      Q.    And then three of them are from

2   right after his October 20, 2022, alleged

3   defamatory statement; correct?

4      A.    Yes.

5      Q.    And how did you identify these six

6   particular articles?

7      A.    I don't understand what you mean by

8   identify.

9      Q.    How did you choose to review these

10   six articles as opposed to a different set

11   of six articles?

12      A.    Well, as I mentioned last

13   deposition, they were representative.  I

14   looked at a lot more articles than that,

15   but, I mean, most of the articles were

16   exactly the same.  I mean, different

17   publications, different reporters but

18   basically information provided was exactly

19   the same.

20           In other words, I could have read

21   20 articles that were no different.  So I

22   picked two or three out that were

23   representative of them.

24           And I didn't see the need to list

25   every article that I looked at given that

Page 38

1    most of them were rubber stamps of the

2    others.  It didn't seem to be productive or

3    needed.

4        Q.   So is it your testimony that you

5    relied on articles besides these six in

6    forming your opinion or that these are the

7    only six that you relied on in forming your

8    opinion?

9        A.   Well, I don't know what you -- I

10   quibble with the word relied on, quite

11   frankly.  I looked at media articles to see

12   how they were addressing this situation.  I

13   mean, were they doing it straight arrow,

14   just totally objective?  Were they slanting

15   it to one side or the other, slanting it to

16   the plaintiff's side or defendant's side?

17   So I was just basically trying to get a feel

18   of what the -- of how the press was handling

19   this situation, and that was the purpose of

20   it.  And I felt that these six -- I didn't

21   feel I needed to list 30 articles because

22   these six were certainly representative of a

23   whole.

24       Q.   But in terms of the analysis you

25   just described, that analysis applies to

A-795

Page 39

1   these six articles, or did you analyze other

2   articles that you haven't disclosed in your

3   report?

4       A.   I don't know if the word analyze is

5   appropriate.  I've read other articles.  As

6   I've said, since they were mirror images of

7   these articles, they didn't offer anything

8   new or substantive that would have required

9   me to put them down.

10          In other words, if you have ten

11  articles and every word has -- every one has

12  the exact same words in them, there's no

13  reason to list ten.  You can just list a

14  representative sample of them.

15      Q.   Is it your testimony that every

16  other article that you read has the exact

17  same words as these six articles?

18      A.   Not exact words.  Don't take it

19  literally.  What I'm saying they covered the

20  same subjects.  They covered the -- they

21  were reporting the same facts.

22      Q.   So, Mr. Fisher, I think you

23  testified yes, but let me make sure I've got

24  it right.  You're familiar with the

25  requirement that an expert witness disclose

A-796

Page 40

1    in their report the facts or data considered

2    in forming their opinion.  Are you familiar

3    with that requirement?

4        A.   Yes, I am.

5        Q.   And besides these six articles, did

6    you consider any other articles in forming

7    your opinion?

8        A.   No.

9        Q.   Okay.

10       A.   Because they were all the same as

11   these.  Once I read the first one, and then

12   I read all the others that were the same, I

13   didn't consider them.

14       Q.   Okay.

15            And the next header down on this

16   page 12 of Exhibit 1, you'll see it says:

17   Internet research?

18       A.   Yes.

19       Q.   And you write:  During the course

20   of this assignment, I conducted research to

21   review information on the internet that

22   might be pertinent to the litigants and the

23   lawsuit as well as to seek clarification and

24   definition of various subjects.

25            Do you see that?

Page 44

```
 1   at out of curiosity.  It doesn't affect my

 2   findings, whatever, but it's just curiosity.

 3       Q.   In this case are there any internet

 4   sources that you reviewed that aren't listed

 5   in your report in any way?

 6       A.   Well, I didn't list the -- I didn't

 7   list the -- you know, in this case -- well,

 8   this case involved individuals, not

 9   companies.  It involved Mr. Trump and

10   Ms. Carroll; so I wasn't looking up websites

11   of businesses or anything.  I didn't look up

12   Trump's website, for instance, and I don't

13   even know if Carroll has one.  So I guess

14   not, no.

15       Q.   So are there any internet sources

16   that you considered that are not disclosed

17   in this report that you think are relevant

18   to your opinions or findings in the report?

19       A.   No.  I think the only type of -- in

20   all the types of research -- by the way,

21   there's one other type of research I didn't

22   get to finish.  That's as I'm writing a

23   report, I'll research for spelling of words

24   or is one word better than another and all

25   that.
```

A-798

Page 46

```
 1   it's relevant to the case, yes, I do list
 2   it.
 3            But usually that only comes in the
 4   form of media articles for the most part.
 5      Q.   And those relevant media articles
 6   in this case are the six that we are talking
 7   about before?
 8      A.   Yeah.  One other thing too is if I
 9   come across a legal document on the internet
10   which they haven't provided me, then I would
11   put that down as well.  I would record that
12   because that's -- that's specifically
13   related to the case as opposed to the
14   background and what products this company
15   makes.
16      Q.   Were there any legal documents in
17   this case that you found through your
18   internet research that you didn't -- that
19   you listed here?
20      A.   No, there were none in this case
21   that I -- sometimes I come across, not often
22   but not in this case, no.
23      Q.   Approximately how long did you
24   spend on your internet research in
25   connection with your Carroll II report?
```

Page 47

```
 1        A.   I would say at most an hour,

 2    maybe -- I'd say a half hour to an hour and

 3    a half is generally for most cases, you

 4    know, I just do a cursory look at -- you

 5    know, I Google whatever it is, and then I

 6    look down, scroll down and look and see if

 7    there's anything.

 8             So I would say 45 minutes to an

 9    hour and a quarter would be average.

10        Q.   Average in all your cases?

11        A.   Yeah, in most cases.

12        Q.   In this case 30 to 60 minutes?

13        A.   Yeah, unless something like the one

14    case I had which I won't mention the name

15    of, there were like 2- or 300 media articles

16    on; so I probably spent three or four hours

17    on that.  But that's a rare case.

18        Q.   Are there any parts of your report

19    that are based on the internet research that

20    you did in connection with this case?

21        A.   I would say -- I would say no

22    except maybe -- no, I mean, the legal

23    documents, complaints gave me information.

24    Deposition.  I got a lot of good information

25    off the depositions.  And the expert report.
```

Page 48

```
 1              I would say off the internet

 2    possibly if I got one of those articles off

 3    the internet, I don't know -- as I sit here,

 4    I don't remember where the articles came

 5    from, but I would have listed it, and that

 6    would have been a factor.

 7        Q.   In terms of the legal documents

 8    that you list here, I know a number of them

 9    were also listed in your rebuttal report in

10    Carroll I.

11        A.   Probably most of them.

12        Q.   Did you re-review the documents in

13    connection with preparing your Carroll II,

14    or did you list them because you previously

15    considered them?

16        A.   Yes -- no, I didn't re-review

17    anything.  I just listed -- anything

18    important in them I would have had in my

19    original rebuttal report or in my notes, the

20    notes I take when I read things.  So there's

21    no need for me to go back and look at the

22    original documents.

23        Q.   And elsewhere in your report you

24    refer to the idea that you reviewed and

25    analyzed previous applicable experiences
```

Page 49

1  that you've had in your professional

2  communications and expert witness

3  backgrounds.  Are there specific previous

4  applicable experiences you drew upon in

5  preparing this Carroll II report?

6       A.   I think I mean that in a general

7  sense as opposed to individual cases.  No, I

8  can't say that there was a specific case or

9  more than one case.  It's more or less the

10 broad overview of circumstances that

11 happened in such cases of this type.

12      Q.   And did you review any files from

13 prior cases in connection with your Carroll

14 II report?

15      A.   No, not in writing this report, no.

16      Q.   Okay.

17           And you also write in your report

18 that you don't rely on, quote, surveys,

19 studies, tests, research, or other forms of

20 qualitative types of analyses, facts

21 gathering procedures.  Is that sort of a

22 fair reflection of the type of materials you

23 didn't consider in connection with your --

24      A.   Yes.

25      Q.   -- Carroll II report?

Page 50

```
 1      A.    Yes.  I'm sorry to interrupt.  I do

 2    that often unfortunately.

 3            No -- yes, I think all of those

 4    things -- some of those things are

 5    applicable and need to be -- need to be

 6    done.  But as I said in a previous

 7    deposition, this wouldn't be the time to do

 8    it.  In other words, I think it's -- I

 9    have -- like when I do reputation --

10    reputation damage programs, then it's

11    important to do that.  But it's important to

12    do it at the time the program is to be done,

13    not prior.

14            I don't need to do those kind of

15    things basically to assess, you know, the

16    type of damage that our -- you know.

17            For instance, what if you go out in

18    the street --

19      Q.    Just --

20      A.    Okay.  Right.

21            I think there's a need for those

22    but not necessarily at this point in time

23    and further down the line.

24      Q.    In going back to -- it's on page 11

25    of your report, Exhibit 1, at the bottom
```

Page 51

```
 1    it -- you write:  Partial review.  Next up,

 2    Professor Humphreys Carroll II report.

 3              What did you mean by partial

 4    review?

 5        A.   I spent two minutes looking at it.

 6        Q.   Okay.

 7        A.   Basically what I did is -- unless

 8    you just want me to say -- basically what I

 9    did is skim through the report to see how it

10    compared to her original report that I was

11    tasked to analyze and brought on.

12              So, in other words, her basic

13    opinions, concepts, whatever.  So I took

14    maybe two, three minutes, and I went through

15    it, just scrolled through it.  This report

16    was shorter than her first one.  And I just

17    scrolled through it to see if the same --

18    she was offering the same line of thinking

19    and opinions as she did before.

20        Q.   Were you directed to only do a

21    partial review of Professor Humphreys'

22    report?

23        A.   No, I wasn't directed to do

24    anything with her second report.  I mean, I

25    was provided it by Mr. Swift, but he didn't
```

A-804

Page 52

```
1   give me any direction as to what to do.  He
2   said -- she did another report based on the
3   October 12 thing.
4          I mean, he didn't ask me to read it
5   in total.  He didn't ask me to comment on it
6   or anything.  He just said -- I assume he
7   just thought it would be good for me for
8   background.
9     Q.    Are there any parts of Professor
10  Humphreys' Carroll II report that you sought
11  to rebut in connection with your Carroll II
12  report?
13    A.    No, not at all.  But I did -- I do
14  have a section in this report, which I'm
15  sure you're aware of, that does discuss
16  Ms. Carroll's expert, but most of that is
17  information derived from the first report,
18  is basically on her views and opinions.
19          I did put one paragraph into this
20  report.  The only thing I picked out of that
21  report in skimming it was a statistic that
22  she had related to the number of people that
23  might be influenced by Mr. Trump's comments.
24  And that's near the end of the report.
25          You know, I just made a reference
```

Page 55

1       Q.   Understood.

2            And in the skimming that you

3    referred to before of Professor Humphreys'

4    report, was that just the body of the

5    report, or did you also skim the appendices?

6       A.   Oh, I didn't look at the

7    appendices.  I just looked at the report

8    itself from the top to the bottom.  In other

9    words, I just scrolled down the report.

10           For instance, her introduction of

11   herself was the same.  You know, her

12   qualifications was the same as before.  I

13   just wanted to see if her second report was

14   consistent with the first in terms of her

15   general opinions and conclusions.  And it

16   was.

17      Q.   And did you run a redline of the

18   two reports?

19      A.   I don't know what you mean running

20   a redline.

21      Q.   That's fine.

22           Did you receive a link to the

23   folder that Professor Humphreys provided on

24   a cloud content management site called Box?

25      A.   What, from Mr. Swift?

A-806

Page 56

 1      Q.    Yes.

 2      A.    A link to a folder that Professor

 3  Humphreys did called Box?

 4      Q.    Through a site called Box?

 5      A.    No, I never received anything like

 6  that.

 7      Q.    Okay.

 8            In connection with your Carroll II

 9  report, did you do any analysis to calculate

10  the total number of times Mr. Trump's

11  October 12, 2022, statement was viewed?

12      A.    We're going to go through this

13  again.

14            No, I didn't.

15      Q.    So you have no idea how many people

16  actually saw or read Mr. Trump's October 12,

17  2022, statement about Ms. Carroll?

18      A.    No.  But I do know that it was on

19  his Truth social which he has 2 million

20  people I think.  I'm not sure, but I assume

21  knowing that he has a very dedicated fan

22  base and that he has his own since he got

23  kicked off Twitter, I assume a fair amount

24  of people saw it.  It doesn't matter to me

25  whether it was a hundred thousand or

A-807

Page 58

1   correctly, is it your testimony -- did you

2   see it as your role as an expert to sort of

3   look at the statement standing alone to

4   assess sort of the degree of harm that a

5   statement like that could cause?

6        A.   Well, for a large part, yes.  I

7   mean, what my job was to analyze two issues:

8   One is were the statements defamatory.

9   Again, not making a legal conclusion or

10  anything, but I am a communications expert,

11  and I can read what the New York law is

12  relating to defamation, and I can form my

13  own opinions on whether they were false

14  statements or not.

15       The second thing is whether they

16  were false statements or not, that's for a

17  jury to decide.  It's not for me to decide.

18  That's what the trial is for and for the

19  jury to decide.

20       But looking at it, whether they're

21  false or not, did they cause reputation harm

22  to the plaintiff?

23       Now you're talking about magnitude

24  here.  What you're talking about is

25  magnitude.  Did 50 people see it or did

A-808

Page 66

1    popularity polls and whether they are going

2    to vote for him, but I've never seen a poll

3    that was taken of a person.  I don't know

4    that any polls exist, so it's hard for me to

5    research.

6        Q.   Have you ever looked for any polls

7    about the media habits of Donald Trump

8    supporters?

9        A.   No, because I'm pretty sure I know

10   what they are.  Try Fox News.

11       Q.   Just turn back to page 11 in your

12   report.

13       A.   I wish these were not front and

14   back.

15       Q.   I share your preference.

16       A.   Yeah, it's a lot easier to thumb

17   through.

18       Q.   On page 11 of Exhibit 1 in the

19   middle of the page, there's a header that

20   reads, Information input reviewed to form

21   opinions.

22            Do you see that?

23       A.   Yes, I do.

24       Q.   And then under that it says:  I

25   have received and reviewed from the

Page 67

```
 1    plaintiff's legal counsel the following

 2    documents and information.

 3            Did you mean defendant's legal

 4    counsel?

 5       A.   Yes.

 6       Q.   I just wanted to make sure.

 7       A.   Sometimes I try save a little money

 8    by using -- by cutting and pasting a little

 9    bit.  That one got by me.

10       Q.   Are there -- I guess just on that

11    topic, are there other parts of your report

12    that you draw from other reports in terms of

13    background or whatever it might be?

14       A.   Well, yes.  There's some things.

15    For instance, page 12 and 13.  I mean,

16    there's things -- I still read over these

17    things when I go through, you know, the

18    report, but I would say the section analysis

19    of opinion -- I mean, I'd say the section

20    internet research, sources to obtain the

21    information, analysis of opinion, preface,

22    methodology -- well, no, I take it back.

23            Some of these I do change these.

24    But the basic framework of these are pretty

25    much the same although I do add -- for
```

Page 68

1    instance, under methodology, I change that

2    from time to time.  I add things in, take

3    things out.

4           But yes, I mean, the bottom line is

5    since I approach every case the same way

6    basically, whether I'm representing a

7    plaintiff or defendant, you know, that kind

8    of thing, there are certain things that are

9    applicable to every case I do.

10          And I don't believe in charging my

11   client -- reinvent the wheel and charge my

12   client extra hours to retype the information

13   that I already have.  I missed that

14   plaintiff/defendant thing.  I feel bad about

15   that.

16      Q.   If we turn to page 12 under that

17   paragraph that has the header, Preface, the

18   last sentence reads:  Where there is a

19   disagreement since I was retained by the

20   plaintiff, I will presume that the

21   information provided on their behalf is

22   correct and will base my conclusions and

23   opinions on it being true unless I am aware

24   of -- or will be subsequently provided --

25   evidence to the contrary.

A-811

Page 69

1          In that sentence did you mean

2  defendant as opposed to plaintiff as well?

3     A.   Yes, obviously, yeah.

4          I was told that by several lawyers

5  that concept there.  Several lawyers have

6  told me that in various cases.

7          Yes, I meant for that to be

8  defendant as well.

9     Q.   What parts of your report or

10  opinion are based on a presumption that the

11  information provided by defendant is true?

12     A.   Well, none really.  In other

13  words -- in other words, as I said, this is

14  a he said/she said case.  In the case

15  there's really no collaborating evidence --

16  there's no outside collaborating evidence on

17  either side like with the rape.  Did he rape

18  her or didn't he rape her?  There's no

19  evidence any way whether it happened or

20  didn't happen.  It could have happened, or

21  maybe it did, maybe it didn't.

22          The point is some cases that I've

23  had that there was a lot of gray area the

24  best way to term it.  And I've had to, but

25  in this case there wasn't any of that.  You

Page 70

```
 1    had the plaintiff making certain statements
 2    and the defendant -- I didn't particularly
 3    look at Mr. Trump's statements as being true
 4    or not.  I looked at most of these
 5    statements and the fact that there was no
 6    outside collaborating evidence, that -- in
 7    some instances there was no outside
 8    collaborating evidence, so I don't know
 9    what's true.  So I didn't take his side or
10    the other side.  I don't know what's true.
11              In others, I think they were
12    clearly opinion.  I don't think they were
13    statements at all.  I think they were
14    clearly opinion.
15      Q.   If we turn to page 14 of your
16    report.  And at the top you have a section
17    titled, Defamation Damages.
18              Do you see that?
19      A.   No, I don't.  I see a section that
20    says, Defamation Definition, not damages.
21      Q.   Sorry.  My mistake.  Let me restate
22    the question.
23              At the top of page 14, do you see a
24    section with the title, Defamation
25    Definition?
```

Page 75

1   down on that same page, page 14 of your

2   report, there's a section that's titled

3   Analysis of Statements.

4           Do you see that?

5       A.   Yes, I do.

6       Q.   And this goes on for a couple of

7   pages.  In this section of your report are

8   you offering your opinion on whether or not

9   Mr. Trump's statement about Ms. Carroll

10  satisfies the elements of defamation you set

11  forth above?

12      A.   I wouldn't say the word opinion.  I

13  would say assessment.

14      Q.   What's the difference between --

15      A.   Well, I mean, you know -- well,

16  yeah, opinion I think is a little bit of a

17  stronger word.

18          Yes, it basically answers yes to

19  that.  I'm a reasonably intelligent person.

20  I can look at what the -- what something

21  is -- is purported to fit a certain criteria

22  is to be considered defamation, and I can

23  analyze what the specific statements are and

24  offer my assessment of whether I feel it

25  meets that.  I'm not offering a legal

Page 77

```
 1    is some -- an assessment I have of how I see
 2    it.
 3              You know, I'm not shoving it down
 4    their throat.  I mean, I'm adding a little
 5    more -- people are not sophisticated.
 6    People on juries are not sophisticated in
 7    communications.  I mean, they can be
 8    housewives, they can be plumbers, they can
 9    be architects, they can be engineers,
10    whatever.  They're experts in their areas or
11    whatever, but they're not sophisticated.
12    Lawyers aren't sophisticated in
13    communications either.  Lawyers are the
14    worst I've seen.
15              But the point being is I'm there as
16    an expert witness.  My field of expertise is
17    communications.  I'm not trying to ram
18    anything down their throats.  I'm just
19    saying that from a communications standpoint
20    as being an expert, this is my analysis or
21    this is a thing.  And you can factor that
22    in, ignore it, factor it in if helps you
23    give some insight or perspective or context
24    what the statements are about, all the
25    better.
```

Page 79

```
 1   in this part of your report under analysis
 2   of the statements you're offering an expert
 3   opinion or something different?
 4       A.   No, I'm not offering expert
 5   opinion.  It's not my job to offer an expert
 6   opinion.
 7            As I said, if you go through these
 8   items one by one, you'll see -- I mean, I do
 9   comment at the end of each one.  Some of it
10   I include testimony.  I include different
11   things in here, additional information that
12   the jury can decide from Trump's testimony,
13   from Carroll's testimony from, you know,
14   from various factors.  I'm trying to give
15   them a broader picture from which they make
16   a decision on.
17            This is my assessment.  Whether
18   expert opinion, I think maybe we're
19   splitting hairs a little bit in here.  But I
20   mean, it is my assessment.  I agree with
21   you, opinion is, you know, sort of saying
22   the same thing.  But, yeah, I mean, it is my
23   opinion as an individual as an expert.
24       Q.   And it's your position that as an
25   expert you're permitted to testify to
```

Page 83

```
 1   hearing from many multiple people.
 2       Q.   Mr. Fisher, if you can just answer
 3   my question.
 4            What's the difference between the
 5   question -- so the jury will have to ask
 6   whether or not Mr. Trump's statements meet
 7   the criteria for defamation.  And it says
 8   here that you are offering your assessment
 9   on whether or not Mr. Trump's statements
10   meet the criteria for defamation.  I'm
11   wondering what's the difference between the
12   question the jury will ask and the question
13   that you are purporting to answer?
14       A.   Probably no difference at all.  But
15   then I'm not the decision maker, and I'm not
16   telling them to make that decision.
17            As I said, they're going to hear
18   from Professor Humphreys.  They're going to
19   hear from other people.  I'm one factor.
20   I'm not like a mosaic.  I'm one piece of a
21   puzzle or whatever.  They're going to hear a
22   lot of pieces of puzzle, and it's their job
23   to listen to everyone and make an informed
24   decision.
25       Q.   In your Carroll I report that we
```

A-817

Page 84

1    went over in your last designation, that

2    also had a section that was entitled

3    Analysis of Statements.

4            Do you recall that?

5        A.   Yes, I do.

6        Q.   Is what you're doing in your

7    Carroll I report with respect to analysis of

8    statements the same as what you're doing in

9    your Carroll II report with respect to the

10   analysis of statements?

11       A.   Yes, but the statements are a

12   little different.

13       Q.   Of course.

14       A.   I'm doing the October 12.  There

15   were several things that he covered in his

16   June 21, 22, and 24 statements that aren't

17   in the October 12.  I focused on the

18   October 12 statements here.

19       Q.   But the type of the analysis is the

20   same?

21       A.   Generally, yeah.  The format,

22   generally, yeah.

23       Q.   And were you asked to perform an

24   analysis of the statements regarding whether

25   or not they met the criteria for defamation?

A-818

Page 88

```
 1        Q.    Toward the -- right at the bottom

 2   you write:  There is no evidence that the

 3   defendant assaulted or raped the plaintiff.

 4   It cannot be a false statement to deny some

 5   action that hasn't been proven to have taken

 6   place.

 7              Do you see that?

 8        A.    Yes.

 9        Q.    Is it your opinion that Trump's

10   denial of the rape is true or currently

11   true?

12        A.    We don't know.  Nobody knows.

13   There is no -- she -- he could have raped

14   her or he may not have raped her.  No one

15   knows.  I mean, I've pored through

16   everything trying to find something that

17   would sway my thought one way or the other,

18   but the point is all you have is her

19   accusation and his denial.

20              We don't know if she's telling the

21   truth or he -- no one.  I haven't seen -- if

22   you've got any evidence or people that say

23   they saw it happen or forensic evidence or

24   she had gone to the hospital and there was a

25   rape kit -- this is -- it's like me.  If I
```

Page 90

```
 1        A.   I don't know.  It's not false
 2   because -- I don't know if it's true or not,
 3   but it's not false because there's no
 4   documentation that the event ever occurred.
 5        Q.   So is it your opinion that when a
 6   person denies sexually assaulting or raping
 7   someone, is it your position that person is
 8   telling the truth unless it has been proven
 9   in court that they actually did rape that
10   person?
11        A.   Not necessarily in a court, but
12   there's some evidence of it, yes.
13             I mean, a false statement -- a
14   statement as opposed to an opinion -- a
15   statement is something that can be proven
16   true or not true.  That's the difference
17   between an opinion and statement.
18        Q.   And do you think Mr. Trump's
19   statement that he didn't rape Ms. Carroll is
20   a statement or an opinion?
21        A.   Well, it's an opinion of his that
22   he didn't do it.  I mean, it's --
23        Q.   What part of raping someone
24   involves an opinion?
25        A.   Well, there has to be -- there has
```

Page 91

```
 1    to be confirmation that the act happened in

 2    the first place.

 3        Q.    Is Ms. Carroll's testimony

 4    sufficient to prove that the act happened in

 5    the first place?

 6        A.    No.  I don't know where you're

 7    coming from to be honest with you,

 8    Mr. Craig.

 9            You're trying to tell me that

10    anyone that accuses someone of something is

11    telling the truth, and that's the -- I mean,

12    any accusation is true?  I'm sorry.  Maybe

13    we're on different -- we're on different

14    planes.  I don't understand.

15            If that were true that

16    everybody that accused someone of doing

17    something wrong, would the other person go

18    to jail instantly?

19            ATTORNEY SWIFT:  I'm sorry.  Let me

20        jump in one more time.

21            Mr. Fisher, Mr. Craig cannot answer

22        your questions.

23            THE WITNESS:  I understand.  That

24        was rhetorical, Mr. Swift.  That was

25        rhetorical.
```

Page 92

```
 1          The bottom line is unless there's

 2     some evidence that something happened,

 3     there's no way you can tell whether

 4     Ms. Carroll was telling the truth or

 5     Mr. Trump was telling the truth.

 6 BY ATTORNEY CRAIG:

 7     Q.   And the evidence that you're

 8 referring to can't be Ms. Carroll's

 9 testimony.  Is that what you're saying?

10     A.   No, not by itself.  The point is

11 what would this world be like if people were

12 making accusations and everybody assumed

13 they were true?  The bottom line is there is

14 no fact -- there's no fact in this case.

15 The fact would be that the rape occurred or

16 didn't occur.  There's no -- there's no

17 fact.  I mean, one side is saying something

18 and the other side is saying something.

19     Q.   If all the jury heard in this case

20 was Ms. Carroll's testimony that the rape

21 did happen, that wouldn't be enough to prove

22 defamation?

23     A.   No.  If I'm sitting on the jury and

24 the woman is on the stand and said I was

25 raped, and there's no -- there's no evidence
```

A-822

Page 93

1    that she was raped whatsoever, I wouldn't

2    consider the other side denying it as being

3    defamatory.

4        Q.   And so sitting here today, is it

5    your position that Trump's denial of the

6    rape cannot be false?

7        A.   It may or may not.  It has to be

8    proven to be false.  She's making the

9    accusation he made a false statement.  We

10   don't know if it's a false statement or not.

11   She doesn't know -- I mean, in her mind she

12   may.  So yes.  No, you can't declare it as a

13   false statement because there's no fact base

14   to judge whether he's telling the truth or

15   not.

16       Q.   And Ms. Carroll's testimony isn't a

17   factual basis to judge --

18       A.   No.

19       Q.   -- whether he's telling the truth

20   or not?

21       A.   No.

22       Q.   Why not?

23       A.   Because an accusation of something

24   is -- are we to take her word for it?  No,

25   it's not.

A-823

Page 100

1   police will go out and arrest the person and

2   try them and convict them just based on the

3   one person's accusation.  That doesn't

4   happen.

5        Q.   On page 15 of your report, you

6   write:  Whether Trump knew her or not is

7   unknowable barring a third person

8   documenting this was true, and I have not

9   seen any evidence of that.

10       A.   Yes --

11       Q.   These could not be false statements

12  unless there's verification that they indeed

13  knew each other.

14       A.   Yes.

15       Q.   What do you mean by verification in

16  that?

17       A.   Yes, this is the same exact concept

18  as the last one.  The point is she says

19  Trump knew her.  He says he didn't.  What I

20  find hard to believe is if she did know

21  Trump, somebody else must have known that

22  they knew each other, somewhere.  Somebody

23  must have witnessed them talking or know.

24  Therefore, why -- I haven't seen any

25  affidavits or declarations from her, from

Page 101

```
1   friends or somebody that says, oh, yeah, I
2   know she knows Trump.  I've seen them
3   talking at parties or this or that.
4            The bottom line is their
5   relationship it's hard to believe strictly
6   no one else witnessed their knowing each
7   other except the two of them.  It just seems
8   to be somewhere along the line -- even her
9   husband hasn't come forward.
10           Why hasn't her husband done a
11  deposition and said my wife knows Trump.
12  I've been with them.  I've seen them, you
13  know.  I know them.  Nobody has come --
14  she's basically making allegations with
15  offering no proof.  So this is the exact
16  same thing as her accusing him of rape.
17  There's no verifiable evidence or
18  third-party verification or validation that
19  they knew each other.  Nobody else has come
20  forward and said, yeah, I know they know
21  each other.
22       Q.   Is there a rule of evidence you're
23  relying on that would require evidence from
24  a third party as verification as you call
25  it?
```

Page 102

```
 1      A.   No, but -- no, not necessarily.
 2  But what I'm saying is like the other one,
 3  you can't convict somebody of something,
 4  whether it be a false statement or rape or
 5  anything without verifiable proof that
 6  what's being alleged is true.  Like she's
 7  alleging here that he knew her.  Well, he
 8  denies it.  So who do you believe?  Him or
 9  her?
10      Q.   So is it your testimony that it's a
11  principle of defamation law that proof from
12  a third party would be required to resolve
13  Ms. Carroll's claim about knowing Mr. Trump?
14      A.   No, I don't think there's anything
15  in defamation law that addresses that
16  subject at all.  Nothing I've ever seen.
17      Q.   So where does the principle come
18  from?
19      A.   Well, of common sense.  Rhyme,
20  reason, logic, common sense or American
21  justice.  The American jurisprudence system
22  says a person is considered innocent until
23  proven guilty.  That means somebody -- it's
24  not enough to say somebody did something
25  wrong.  You have to prove it.  You don't
```

Page 103

1    send people to jail based on someone's

2    accusation.  It's the same concept here.

3           You don't consider somebody defamed

4    someone if they're denying something that no

5    one knows happened or not.

6           And in terms of this, I just

7    find -- this is part -- the rape, I don't

8    know.  I have no idea whether he raped her

9    or not.

10          But this one doesn't make sense.

11   If he knew her, there's got to be other

12   people that witnessed their knowledge --

13   that had the knowledge that they knew each

14   other.  Why would she not -- I believe in

15   logic, common sense.  If she's got a case,

16   why doesn't she bring someone forward --

17   it's not my job to determine this.  Why

18   doesn't she bring someone forward to say I

19   know that they knew each other.  And say

20   why -- I witnessed them talking, sitting in

21   a bar having a drink together, or I saw them

22   at a party talking, or I went over to their

23   house and he was there.  I mean, why --

24          Basically what you have is you have

25   one party, Ms. Carroll, making a series of

Page 104

1    accusations or at least a couple that have

2    no -- there is no fact.  There's no

3    verification that it is true.

4         Q.   And if Ms. Carroll testifies at

5    trial that she had met Donald Trump before,

6    that's insufficient verification.  Is that

7    your position?

8         A.   By herself, yeah.  I mean,

9    especially if he denies it.

10             Now, we'll go back to this

11   picture --

12        Q.   Again, Mr. Fisher, we're trying to

13   keep it confined to the questions.

14        A.   Okay.

15        Q.   Then on page 16 of Fisher -- your

16   report, Exhibit 1, do you see the final

17   comment under the series of bullets where

18   you write:  There is no reckless regard for

19   the truth if there is no, quote, truth to

20   base it on.

21             Do you see that?

22        A.   Yeah, 100 percent.

23        Q.   And what -- do you understand what

24   the concept of reckless -- I think it's

25   disregard means in the defamation context?

A-828

Page 108

```
 1        Q.    I'm just going to read again the

 2   part of Exhibit 1.  You write:  Her

 3   allegations of false statements appear to be

 4   based on speculation, conjecture,

 5   supposition, assumption, presumption, and

 6   hypothesizing.

 7             So what part of her allegations are

 8   based on speculation?

 9        A.    Well, that's probably misworded a

10   little bit.  I'm talking about people that

11   would take her -- I'm talking about how

12   other people would interpret what she was

13   saying.  It's probably not -- it's probably

14   not worded properly.  I'm not talking about

15   her.

16             Obviously her statements that he

17   raped her are not based on a presumption or

18   a hypothesizing assumption.  I'm talking

19   more how other people would interpret what

20   she was saying.  I didn't mean that to

21   reference to her.  I meant it to reference

22   to other people that would believe what

23   she's saying.

24        Q.    So is it your position sort of

25   sitting here today, not in your report, but
```

Page 112

```
 1      thing.
 2           Speculation and conjecture maybe I
 3      got carried away a little bit on wording
 4      but yes.  You're assuming -- if somebody
 5      tells you something that you have no
 6      evidence or knowledge is true or not,
 7      you're assuming, you're presuming,
 8      you're speculating, all of those, that
 9      they're telling the truth.
10           They're all -- I didn't have to use
11      all those words probably, but the bottom
12      line is it all basically goes around
13      their accepting that what she's telling
14      them is true because they don't know.
15 BY ATTORNEY CRAIG:
16      Q.   And if a jury were to believe
17 Ms. Carroll's allegations of sexual assault,
18 are they also engaging in speculation,
19 conjecture, supposition, assumption,
20 presumption and hypothesizing?
21      A.   Yeah.
22           ATTORNEY SWIFT:  Objection to form.
23           THE WITNESS:  I mean, yes anybody
24      that believes something, whether it's
25      her friend, her doctor, her husband, or
```

A-830

Page 113

1       the jury, anybody -- now, the jury has a

2       right to do that.  If they want to do

3       that, fine.  They have a right to do

4       that.

5           In this case when they're faced

6       with a he said/she said situation and

7       they have to make a determination, they

8       can't just say -- well, they can hang.

9       They can say we don't know, but that

10      usually doesn't happen.

11          They are most likely going to have

12      to choose between one of the two.  Most

13      likely.  They're going to have to see

14      who they believe or not.

15          And since it's not based on any

16      knowledge, any direct knowledge or any

17      concrete evidence or anything that

18      guides them to which is right or wrong,

19      they're making -- they're going to make

20      up in their mind who they believe.

21  BY ATTORNEY CRAIG:

22      Q.   If we go down a bit below on

23  page 16 of your report, you write:  In

24  summary, after a careful review of all the

25  alleged false statements and negative

A-831

Page 114

```
 1   implications that the plaintiff claims that

 2   Trump made, it is my opinion that none of

 3   the statements she identified can be

 4   determined as being false.

 5           Is it not possible to determine

 6   whether or not Donald Trump raped

 7   Ms. Carroll?

 8       A.   No.

 9       Q.   And is it possible to determine --

10       A.   You tell me how.

11       Q.   Is it possible to determine whether

12   or not Donald Trump and Ms. Carroll met at

13   Bergdorf's that day?

14       A.   I haven't seen evidence of it.

15       Q.   And is it possible to determine

16   whether or not Donald Trump knew

17   Ms. Carroll?

18       A.   That's more likely to be

19   determined.  The first two I'd say no

20   because there's no evidence.  That one -- if

21   the police or someone did a thorough

22   investigation, they probably -- if a

23   detective got on it or something like that,

24   that's possible to be determined, yes.  But

25   so far the plaintiff hasn't done that or
```

A-832

Page 116

 1            But it seems to me that on whether
 2       he knew her or not would be easier for
 3       someone to ferret out by doing some
 4       investigation.  I mean, talking to
 5       everyone that he knew, talking to
 6       everyone that she knew and saying, do
 7       you know that you travel in the same
 8       social circles.  Can you verify that
 9       they knew each other?
10            I think if somebody delved into it,
11       which I'm surprising she hasn't, I think
12       that's probably provable.  But the other
13       two, if there was going to be any way to
14       prove it, it would have come out by now.
15  BY ATTORNEY CRAIG:
16       Q.   If there was a photo of those two
17  together, would that be the type of evidence
18  that would prove that Donald Trump, in fact,
19  knew Ms. Carroll?
20       A.   Absolutely not.  If -- you know,
21  Trump moves around.  Trump draws people
22  around like a magnet.  His explanation --
23  and I don't know if it's true or not, he
24  said that was a receiving line where a bunch
25  of people came there and somebody caught a

Page 119

1    must --

2       Q.    Again, Mr. Fisher, try to keep it

3    to the questions.

4       A.    Okay.

5       Q.    In all this discussion we've had

6    about the evidence in this case, what part

7    of your experience in public relations

8    informs your opinions on the strength of the

9    evidence in this case?

10      A.    There is no evidence in this case.

11   Tell me what evidence there is in this case?

12   There is no -- evidence is concrete

13   information or verification of anything.

14   There's no evidence in this case.   What

15   evidence is there in this case?   That's

16   rhetorical again.

17            There is only two people making

18   claims.   There is absolutely no evidence one

19   way or the other in this case.   There's just

20   two people that are making verbal claims

21   back and forth, claims or opinions or

22   accusations, whatever.   I haven't seen any

23   concrete evidence of any kind in this case.

24      Q.    You testified before that you

25   reviewed the depositions of both Ms. Carroll

A-834

Page 120

```
 1   and Mr. Trump from Carroll I; correct?
 2       A.   Yes, that's correct.
 3       Q.   Have you reviewed any of the other
 4   depositions that were taken in this case?
 5       A.   No, none have been provided to me.
 6   I didn't know there were any others.
 7       Q.   Have you reviewed any of the
 8   documents that were produced by either side
 9   in this case?
10       A.   Yeah, I mean, the documents I
11   reviewed are -- which were provided to me --
12   some were from the plaintiffs and some were
13   on the defendants.  Page 11.
14       Q.   Besides those documents listed
15   under legal documents in your report, are
16   there other parts of the discovery record
17   that you reviewed in this case that you
18   didn't list there?
19       A.   Absolutely not.  Absolutely not.
20            When it comes to -- I might decide
21   whether to put a newspaper article down on
22   my list or something like that, but when it
23   comes to legal documents or any kind of
24   documents, I list -- like here.  Under
25   page 11, legal documents.  Answer.  That's
```

Page 124

1    defamation per quod.  There's different

2    subsets of defamation, and this is a

3    separate one.

4            And I found it hard to believe in

5    the first thing, the first complaint, that

6    they didn't -- cause of action.  The second

7    complaint they didn't either.

8            I thought that since it was thrown

9    out there in both complaints and also

10   mentioned in Ms. -- or Professor Humphreys'

11   original report, I don't know if it was in

12   the second, but she also mentioned it in the

13   second report that I thought that, you know,

14   to dot my Is and cross my Ts, I would

15   address that with a paragraph or two in

16   here, which I did.

17       Q.   Are you an expert on the

18   requirements of pleading causes of action in

19   federal court?

20       A.   No, I'm not.

21       Q.   And you opined in here that

22   Mr. Trump's October, 2022, statement does

23   not constitute defamation per se; is that

24   correct?

25       A.   No, no.  Because he didn't -- I

Page 125

```
 1    mean, he didn't --
 2         Q.   Just yes or no.
 3         A.   No, no.  It's obvious from the --
 4    none of these relate to him.
 5         Q.   Are you aware that Mr. Trump moved
 6    to dismiss Ms. Carroll's defamation claim in
 7    Carroll II on that very basis?
 8         A.   No, I wasn't informed of that.
 9         Q.   And are you aware that Judge Kaplan
10    rejected that argument?
11         A.   Judge Kaplan?
12         Q.   Judge Kaplan is the judge in this
13    case?
14         A.   Interesting.  Judge Kaplan and the
15    law firm is Kaplan.  That's interesting.
16    Any relation?
17              No, I was not aware.  I said I
18    wasn't aware.
19         Q.   Is it your opinion, understanding
20    now that Judge Kaplan rejected the argument
21    that this was not defamation per se, that
22    his decision was incorrect?
23         A.   I'm sorry.  Repeat that.
24         Q.   I'll represent to you Judge Kaplan
25    rejected Mr. Trump's argument that his
```

A-837

Page 126

1    statement was not defamatory per se.

2        A.    So he's saying that it could be

3    defamation per se?

4              ATTORNEY SWIFT:  Matt, if you can

5        just rephrase the question.

6              THE WITNESS:  Yeah, because I'm

7        confused.

8    BY ATTORNEY CRAIG:

9        Q.    So I will represent to you that

10   Mr. Trump moved to dismiss Ms. Carroll's

11   defamation claim in Carroll II arguing that

12   it was -- did not constitute defamation per

13   se.  And Judge Kaplan rejected that argument

14   and refused to dismiss the complaint.

15             Given the opinion that you express

16   in your report, is it your position that

17   Judge Kaplan's decision was wrong in holding

18   that these statements did constitute

19   defamation per se?

20       A.    Obviously not.  I'm not a judge.

21   If this was -- if this was looked at in

22   court and the judge made a decision after

23   hearing both sides, I mean, I wasn't aware

24   of that, and I'll defer to the judge.

25       Q.    So is it your position that your --

A-838

Page 129

1          in other words, to make a decision.

2               And we're going to take a lunch

3          break now.  I can't even focus on what

4          you're saying at this point.  I haven't

5          eaten since 6 o'clock in the morning.

6               THE VIDEOGRAPHER:  The time is now

7          12:33 p.m., and we are off the video

8          record.

9               (Lunch recess taken from

10              12:33 p.m.  to 1:11 p.m.)

11              THE VIDEOGRAPHER:  The time is now

12         1:11 p.m., and we are back on the video

13         record.

14    BY ATTORNEY CRAIG:

15         Q.   Mr. Fisher, you conclude in your

16    report that plaintiff has benefited from,

17    quote, this public dispute.  I'll direct

18    you, if you want to look at it, it's on

19    page 24 of Exhibit 1.

20              Is it your position that plaintiff

21    has benefited from her dispute with

22    Mr. Trump?

23         A.   I believe so.  I believe there are

24    extraneous factors that -- I said a net

25    benefit.  I think my term was net benefit.

Page 130

1    I think when you weigh what possible harm

2    there was to her from his comments and you

3    weigh that against some of the possible

4    positive benefits to her that came from him,

5    I think it's clear all things, you know,

6    being considered that she came out better

7    for this.

8         Q.   And when you say possible harm and

9    possible positive benefits, why do you use

10   the term "possible"?

11        A.   I think they're more real than

12   possible.  I guess you can't -- I guess

13   there's no way you can make a declarative

14   judgment but I think that factoring in

15   common sense and logic, a lot of positive

16   things would have come out from his, for

17   lack of a better word, tirade against her

18   based on her comments that he raped her.

19        Q.   Is there any data that supports

20   that conclusion?

21        A.   Not data, no.  There are no data.

22   It's just -- you know, it's just basic in my

23   assessment based on my background and

24   expertise and experience in the field of

25   communications particularly as it relates to

A-840

Page 133

1    particularly with someone like Mr. Trump

2    that the effects of positive or negatively

3    that he has on segments of society based on

4    what he says and does.

5       Q.   Are you aware of any literature

6    that supports the view that defamation might

7    be beneficial to the person about whom false

8    information has spread?

9       A.   No.  And as a matter of fact, I've

10   never made that -- in 60 cases of which I've

11   probably represented plaintiffs in 50 of

12   them, I've never made that kind of assertion

13   before.  This is a new territory.

14          I think it's an unusual

15   circumstance, and I think that the facts

16   and, as I say, combined with common logic

17   would lead you to that inevitable

18   conclusion.

19      Q.   And I take it you're unaware of any

20   literature that supports the view that rape

21   victims might benefit from being defamed by

22   their accuser?

23          ATTORNEY SWIFT:  Objection to form.

24          THE WITNESS:  Not being defamed by

25     their accuser, although that's generally