# 23-0793-CV

## United States Court of Appeals

*for the*

## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 4 of 12 (Pages A-841 to A-1120)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

**i**

## TABLE OF CONTENTS FOR JOINT APPENDIX

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*")........................................ A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") ...................................... A-32

### **Documents Submitted in *Carroll I***

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

    Exhibit A to Kaplan Declaration -
    Letter from Roberta A. Kaplan to Marc E.
    Kasowitz, dated August 10, 2020, with Enclosure    A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023......... A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 ...................................... A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 ...................................... A-89

    Exhibit 1 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Lisa
    Birnbach, dated September 21, 2022 .................... A-92

    Exhibit 2 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Carol
    Martin, dated October 18, 2022 ........................... A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 ............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 .................................................. A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 ............................................... A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ......................................... A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ................................................ A-405

iii

|  | **Page** |
|---|---|
| Exhibit 12 to Kaplan Declaration - Defendant's Supplemental Rule 26(a)(1) Initial Disclosures, dated September 19, 2022 ................ | A-410 |
| Exhibit 13 to Kaplan Declaration - Defendant's Rule 26(a)(1) Initial Disclosures in *Carroll II*, dated January 9, 2023 ......................... | A-414 |
| Exhibit 14 to Kaplan Declaration - Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, dated August 23, 2022 ..................................... | A-420 |
| Exhibit 15 to Kaplan Declaration - Email from Michael Madaio to Matthew Craig and Others, dated August 24, 2022 ...................... | A-424 |
| Exhibit 16 to Kaplan Declaration - Twitter Post, dated June 21, 2019 ........................ | A-427 |
| Exhibit 17 to Kaplan Declaration - Excerpts from Deposition Transcript of Stephanie Grisham, dated October 6, 2022 ........................... | A-429 |
| Declaration of Alina Habba, for Defendant, in Opposition to Plaintiff's Omnibus Motion *in Limine*, February 23, 2023 .................................... | A-439 |
| Exhibit A to Habba Declaration - Excerpts from Deposition Transcript of Natasha Stoynoff, dated October 13, 2022 ........................ | A-441 |
| Exhibit B to Habba Declaration - Excerpts from Deposition Transcript of Jessica Leeds, dated October 13, 2022 ............................. | A-445 |

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 .................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ......................................................... A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023 ....................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 ........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

                                                                    **Page**

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated March 17, 2023 ............... A-509

    Annexed to Letter -
    Proposed Order ...................................................... A-511

### **Documents Submitted in *Carroll II***

Complaint and Demand for a Jury Trial, dated
    November 24, 2022 ................................................ A-513

Answer, dated January 27, 2023 ............................... A-542

First Amended Answer, dated February 10, 2023...... A-556

Defendant's Letter Motion for Discovery, dated
    February 10, 2023 ................................................ A-571

    Exhibit A to Defendant's Letter Motion -
    DNA Report, dated January 8, 2020 ..................... A-574

    Exhibit B to Defendant's Letter Motion -
    Twitter Post, dated February 25, 2021 ................. A-602

Plaintiff's Letter Response in Opposition to
    Defendant's Motion for Discovery, dated
    February 10, 2023 ................................................ A-607

Defendant's Letter Reply in Further Support of
    Motion for Discovery, dated February 10, 2023.... A-612

Transcript of Conference, dated February 7, 2023 .... A-614

Notice of Motion, by Defendant, for an Order
    Granting Partial Summary Judgment, dated
    February 23, 2023 ................................................ A-635

Declaration of Matthew G. DeOreo, for Defendant,
    in Support of Motion for Partial Summary
    Judgment, dated February 23, 2023...................... A-637

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020.. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ....................................... A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023......... A-747

vii

**Page**

Declaration of Alina Habba, for Defendant,
in Support of Motions *in Limine*, dated
February 23, 2023 .................................................. A-773

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-775

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-779

Exhibit C to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022
(Reproduced herein at pp. A-487-A-492)

Exhibit D to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023
(Reproduced herein at pp. A-493-A-499)

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-783

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-785

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-786

Exhibit 2 to Kaplan Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023 .................................................. A-863

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ....................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................ A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)............................................................... A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)............................................................... A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 ................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 .......................... A-1065

x

**Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
    Opposition to Defendant's Motions *in Limine*,
    dated March 9, 2023 ............................................. A-1080

Exhibit 1 to Crowley Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
Video of Deposition of Natasha Stoynoff, taken
October 13, 2022
(All parties are already in possession of video
exhibit) .................................................................. A-1089

Exhibit 3 to Crowley Declaration -
Video of Deposition of Jessica Leeds, taken
October 13, 2022
(All parties are already in possession of video
exhibit) .................................................................. A-1091

Plaintiff's Response to Defendant's Local Civil
    Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
    Opposition to Defendant's Motion for Partial
    Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1110

Exhibit 2 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023
(Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
    Plaintiff, in Further Support of Omnibus Motion
    *in Limine*, dated March 16, 2023 .......................... A-1130

    Exhibit 1 to Kaplan Reply Declaration -
    Defendant's Rule 26(a)(1) Initial Disclosures,
    dated January 9, 2023
    (Reproduced herein at pp. A-414-A-419)

    Exhibit 2 to Kaplan Reply Declaration -
    Excerpts from Deposition Transcript of E. Jean
    Carroll, dated October 14, 2022 .......................... A-1132

    Exhibit 3 to Kaplan Reply Declaration -
    Excerpts from Deposition Transcript of Robert J.
    Fisher, dated February 6, 2023 ............................ A-1136

    Exhibit 4 to Kaplan Reply Declaration -
    Expert Report of Robert J. Fisher, dated
    January 30, 2023
    (Reproduced herein at pp. A-863-A-890)

    Exhibit 5 to Kaplan Reply Declaration -
    Excerpts from Deposition Transcript of Robert J.
    Fisher, dated December 20, 2022 ........................ A-1153

Reply Declaration of Alina Habba, for Defendant,
    in Further Support of Motions *in Limine*, dated
    March 16, 2023 ....................................................... A-1160

    Exhibit A to Habba Reply Declaration -
    Joint Proposed Discovery Plan, dated
    December 19, 2022 ................................................ A-1162

    Exhibit B to Habba Reply Declaration -
    Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
    January 9, 2023
    (Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
    dated April 13, 2023 ................................................ A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 ................................................ A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023................................................ A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 .............................. A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ........................... A-1207

Plaintiff's Letter Response to Defendant's Motion
    to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022   A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ..................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023....................... A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 .............................. A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................. A-1416

Trial Transcript, dated April 25, 2023....................... A-1420

Trial Transcript, dated April 26, 2023....................... A-1524

Trial Transcript, dated April 27, 2023....................... A-1697

Trial Transcript, dated May 1, 2023........................... A-1851

Trial Transcript, dated May 2, 2023........................... A-2036

Trial Transcript, dated May 3, 2023........................... A-2210

Trial Transcript, dated May 4, 2023........................... A-2375

Trial Transcript, dated May 8, 2023........................... A-2567

Trial Transcript, dated May 9, 2023........................... A-2771

Parties' Trial Exhibits:

PX-1          Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2    "Remarks by President Trump before
        Marine One Departure" (Office of the
        Press Secretary, June 22, 2019) ...............   A-2840

PX-3    "EXCLUSIVE: Trump vehemently
        denies E. Jean Carroll allegation, says
        'she's not my type'" (*The Hill*,
        June 24, 2019).........................................   A-2853

PX-4    Truth Social Post, dated
        October 12, 2022....................................   A-2858

PX-6    "Donald Trump assaulted me in a
        Bergdorf Goodman dressing room 23
        years ago. But he's not alone on the list
        of awful men in my life." (New York
        Magazine, June 21, 2019) .......................   A-2859

PX-12   Photograph ...............................................   A-2879

PX-22   Sixth Floor Construction Plan of
        Bergdorf Goodman .................................   A-2880

PX-24   Sixth Floor Construction Plan of
        Bergdorf Goodman .................................   A-2881

PX-25   Video Excerpt from Defendant's
        Interview with Billy Bush
        (All parties are already in possession of
        video exhibit) ...........................................   A-2882

PX-25-T Transcript of Video Excerpt from
        Defendant's Interview with Billy Bush ...   A-2883

PX-26   Video Excerpt from Presidential Debate
        (All parties are already in possession of
        video exhibit) ...........................................   A-2885

xvi

|  |  | Page |
|---|---|---|
| PX-26-T | Transcript of Video Excerpt from Presidential Debate ................................. | A-2886 |
| PX-29 | Video Excerpt from Defendant's Speech at Campaign Rally (All parties are already in possession of video exhibit) ........................................... | A-2887 |
| PX-29-T | Transcript of Video Excerpt from Defendant's Speech at Campaign Rally... | A-2888 |
| PX-31 | Video Excerpt from Defendant's Speech (All parties are already in possession of video exhibit) ........................................... | A-2889 |
| PX-31-T | Transcript of Video Excerpt from Defendant's Speech................................. | A-2890 |
| PX-46 | Twitter Post, dated November 15, 2022... | A-2891 |
| PX-48 | Twitter Post, dated December 12, 2022 ... | A-2893 |
| PX-51 | Twitter Post, dated January 29, 2023 ....... | A-2896 |
| PX-53 | Twitter Post, dated January 29, 2023 ....... | A-2898 |
| PX-57 | Email, dated October 13, 2022 ................ | A-2901 |
| PX-112 | Video Excerpt from Defendant's Interview with Roger Ailes (All parties are already in possession of video exhibit) ........................................... | A-2902 |
| PX-112-T | Transcript of Video Excerpt from Defendant's Interview with Roger Ailes.. | A-2903 |
| PX-200 | Video Excerpt from Deposition of Donald J. Trump, taken October 19, 2022 ......................................................... | A-2904 |

xvii

**Page**

PX-200-T  Transcript of Video Excerpt from
Deposition of Donald J. Trump, taken
October 19, 2022....................................  A-2905

DX-CK  Email Regarding Law & Order SVU,
dated July 23, 2019 ..................................  A-2986

Court Exhibits:

C  Timeline of Events.....................................  A-2987

D  WordPerfect Document Compare
Summary of Jury Instructions.................  A-2988

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated May 1, 2023 ....................  A-3024

Exhibit A to Letter -
Excerpts of Trial Transcripts..................................  A-3042

Exhibit B to Letter -
LinkedIn Post...........................................................  A-3081

Exhibit C to Letter -
"One of the Democratic Party's biggest donors is
exploring a new anti-Trump boycott" (*Vox*,
July 2, 2020) ...........................................................  A-3083

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated May 5, 2023 ....................  A-3088

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated May 6, 2023 ....................  A-3091

Verdict Form, dated May 9, 2023 ..............................  A-3095

Notice of Appeal, dated May 11, 2023 ......................  A-3099

Notice of Motion, by Defendant, for an Order
Granting a New Trial or Remittitur, dated
June 8, 2023 ...........................................................  A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
Motion for a New Trial or Remittitur, dated
June 8, 2023 ........................................................... A-3103

Declaration of Matthew G. DeOreo, for Defendant,
in Support of Motion for a New Trial or
Remittitur, dated June 8, 2023 ............................. A-3134

Exhibit A to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit B to DeOreo Declaration -
Excerpts of Trial Transcripts................................. A-3136

Exhibit C to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019
(Reproduced herein at pp. A-639-A-667)

Exhibit D to DeOreo Declaration -
Verdict Form, dated May 9, 2023
(Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
Opposition to Defendant's Motion for a New
Trial or Remittitur, dated June 22, 2023 ................ A-3219

Exhibit 1 to Kaplan Declaration -
Excerpts of Trial Transcripts................................. A-3221

Exhibit 2 to Kaplan Declaration -
Twitter Post, dated June 21, 2019
(Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 .................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 .................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
Second Circuit, dated July 19, 2023 ...................... A-3339

**A-841**

Page 138

1    self-admittedly came forward because she

2    admired the women that came forward because

3    of Weinstein and these other people, and she

4    felt that they had the courage to do so and

5    she should as well.

6        Q.   And it's your position that the

7    women who come forward and then are defamed

8    by their -- the person they've accused

9    experience a net benefit, positive change to

10   their reputation?

11       A.   Yes, I do.  I think so.  I think

12   that -- I think the weight of -- every

13   person that's accused of rape is going to

14   shoot back at their accuser.  I mean, that's

15   standard.  They don't have the fame of

16   Mr. Trump.  They don't have the

17   communications form of Mr. Trump.  They

18   don't have the devoted following of

19   Mr. Trump.

20           I challenge you to name me one

21   person that's ever been accused of rape that

22   didn't turn around and attack his accuser.

23           So I think there's a lack of

24   validity -- not a lack of validity.  I think

25   there's a lack of impact on someone to try

A-842

Page 140

1    Because, quite frankly, I think it's human

2    nature -- don't ask me if I'm a clinical

3    psychologist.  My wife is.  I'm not.  But I

4    think it's human behavior that someone that

5    accuses someone of something like that is --

6    has had a more sympathetic view of her than

7    the person that says I didn't do it.  She's

8    lying.  I didn't do it.  She's crazy.

9              I think 80 percent of people --

10   that's my own.  I don't have any data.  I

11   think 80 percent would tend to side with the

12   woman who accused than some guy saying they

13   didn't do it.

14      Q.   Can you think of any other scenario

15   in which you would take the position that

16   someone was better off after someone defamed

17   them in terms of their reputation?

18      A.   Another person?  Or what do you

19   mean by scenario?  I'm sorry.

20      Q.   Outside of the sexual assault and

21   rape allegation context, is there any other

22   context in which you believe that someone

23   would be better off after someone spread

24   false information about them?

25      A.   Oh, yes.  I think anything related

A-843

Page 144

1          Again, I go back to saying this is

2   an unusual case.  This is maybe a one in a

3   million type of case where I don't think

4   I've ever not only in expert witness work

5   but as a PR professional, I don't think I've

6   ever felt that the person that was a victim

7   of defamation was better off than they were

8   before it.

9        Q.   So is there any professional

10  experiences that you're drawing upon to

11  reach your conclusions in this what you call

12  one in a million case?

13       A.   Well, yes.  I think the

14  professional experience is that every

15  case -- I mean, forget expert witness work,

16  although that's part of it obviously.  I've

17  had 50, 60 cases.  I think that -- 60.

18          I think going back to my 50 years

19  in public relations that -- yes.  I've seen

20  the effects of reputation harm.  I've seen

21  them on famous people.  I've seen them on

22  unknown people.  I've seen them in every

23  way, shape, or form.  Not only with

24  individuals but with businesses.

25          So what I'm saying is this is a

A-844

Page 148

1        Certified Stenographer.)

2    BY ATTORNEY CRAIG:

3        Q.    The six newspaper articles we

4    talked about before, is there anything

5    besides those newspaper articles?

6        A.    Well, reading her biography, her

7    profile.

8        Q.    Where did you see her biography?

9        A.    Well, I went online and saw

10   information about her.  I told you I Googled

11   her.  A gal like that, she had a couple of

12   pages of content about her on there, and I

13   looked at some of it for background.  As I

14   said, I looked to see who she was, and I saw

15   nothing negative whatsoever about her, not

16   unrelated to the Trump case, but I saw

17   nothing in her background that was negative.

18   It appears she was a total professional and

19   viewed that way.

20       Q.    So besides the articles you

21   mentioned before and the Googling you did,

22   anything else that you considered?

23       A.    Yeah, these -- I have it in my

24   report here.  These articles.  I quote some

25   of the articles on the Trump case, the six

A-845

Page 149

1    that I listed there.  I quoted some of them

2    in my report and talked about the highly

3    laudatory comments that were made in those

4    articles about her after the fact.  After

5    the suit.

6        Q.   Is your entire understanding of

7    Ms. Carroll's reputation based on the

8    comments in those six articles?

9        A.   Well, we already talked about

10   online I saw --

11       Q.   So the six articles and the

12   Googling you did?

13       A.   Yeah, the Googling for the most

14   part, yeah, and also in the complaint.  The

15   complaint, the original complaint and the

16   other complaint talked about her image, her

17   reputation, talked about her

18   accomplishments.

19            I mean, it's all over the place.  I

20   don't deny the woman -- I never heard of her

21   before the Trump case.  I mean, I live in

22   L.A.  She's in New York.  I don't read Elle

23   magazine.  So I didn't know who she was from

24   these two people when I walked in this room.

25            The point is I did do research on

Page 151

```
 1              ATTORNEY SWIFT:  I'm sorry.  Two
 2     people talking over each other.  Can we
 3     go over that one more time, please.
 4  BY ATTORNEY CRAIG:
 5     Q.   The question was this:  So this is
 6  the first case that you've used the concept
 7  of a virtual shield against defamation; is
 8  that correct?
 9     A.   Well, certainly the first time I've
10  ever used that phrase or that thought but,
11  yeah, I don't -- it's hard to think that
12  anyone has a shield against defamation per
13  se.  But --
14     Q.   Again, it's a yes-or-no question.
15     A.   Yeah, yeah, it's yes.
16     Q.   And are you aware of any
17  peer-reviewed literature that addresses the
18  concept of a virtual shield against
19  defamation?
20     A.   No.
21     Q.   And is it your position that a
22  well-known person with a positive reputation
23  cannot be harmed by false statements about
24  them?
25     A.   No, I didn't say that across the
```

A-847

Page 156

1   accusations.  It's more involved with the

2   people involved and how each of these people

3   are viewed.

4       Q.   You've written before that it can

5   take a lifetime to build a reputation and

6   only seconds to destroy it?

7       A.   Oh, that's true.

8       Q.   And you've actually included that

9   principle in almost every other expert

10  report you've offered?

11      A.   When I'm representing the

12  plaintiff, yeah, and not when I'm

13  representing the defendant.

14      Q.   Why wouldn't you include that

15  principle when you're representing the

16  defendant?

17      A.   Because I'm not trying to make the

18  plaintiff's case for them.  Why would I put

19  something in a report that is basically

20  making the other side's case?  That would be

21  kind of idiotic, I think.

22      Q.   I'm going to mark this as

23  Exhibit 3.

24           (Exhibit Number 3 was marked

25           for identification.)

A-848

Page 167

1    Quinnipiac University poll from December 14,

2    2022; is that correct?

3         A.   Yes.

4         Q.   And did you review the actual

5    polling data, or did you see the results of

6    the poll reported somewhere?

7         A.   I saw the results in a newspaper

8    article; I saw them.

9         Q.   And do you recall what newspaper

10   article that was?

11        A.   No, I don't.  In fact, I backtrack.

12   I'm not even sure it was a newspaper

13   article.  It must have been.  It wouldn't

14   have been online like that; so I had to see

15   it in some form of a document.  It probably

16   was a newspaper article.  No, I didn't make

17   note of what it was.  It was just a report.

18   Was probably an AP report, but I'm not sure.

19        Q.   And do you know the actual question

20   that the Quinnipiac poll asked for which it

21   reported results?

22        A.   Not exact wording, but the poll was

23   basically do they have a favorable view --

24   do they have a favorable view of Mr. Trump

25   or not.  It was basically a view of what's

A-849

Page 168

1    your approval of Mr. Trump.

2         Q.   And do you know what the sample

3    size was?

4         A.   No, I didn't.

5         Q.   Do you know what the margin of

6    error was?

7         A.   No, not specifically.

8         Q.   And was there a reason you selected

9    this particular poll to rely upon?

10        A.   Just mainly because it was the most

11   recent one I saw.  At the time I wrote this

12   report, it was three weeks old or something

13   like that.  And I thought this reflects the

14   current view according -- the Quinnipiac

15   poll is considered a fairly reliable poll.

16        Q.   Sorry, I didn't mean to --

17        A.   No, it's not like it's done by

18   Frank Luskin or someone, Frank whatever his

19   name was who was at Fox.  It's an

20   independent poll.  It's not looked upon as

21   favoring one side or the other.

22        Q.   Have you considered any other

23   polling data in connection with your report?

24        A.   No, no.  I just thought that that

25   was pretty representative.  It seemed to me

A-850

Page 177

1    grain of salt, in other words, because they

2    know he's prone to excessive attacks.

3        Q.   And earlier in your report you

4    state that the plaintiff, quote, was aware

5    that she was, quote, putting herself in the

6    crosshairs of one of the most powerful men

7    on the planet?

8        A.   Yeah, her best friend told her that

9    when she -- she told two people.  One of

10   them said go to the police department.  One

11   said don't because he's rich and powerful

12   and has a lot of lawyers and why expose

13   yourself to that.  And she basically said

14   she concurred with that opinion, that she

15   knew she would be going into the dragon's

16   mouth, so to speak, if she came forward.

17       Q.   Do you think Ms. Carroll bears some

18   of the responsibility for the harm that

19   resulted from her accusations against

20   Mr. Trump?

21       A.   Absolutely not.

22            ATTORNEY SWIFT:  Objection to form.

23            THE WITNESS:  Absolutely not.  She

24       has a right to come forward and make the

25       accusation.  I mean, you know, we don't

Page 178

```
 1        know if it's true or not.  But, you
 2        know, if it isn't true, then she's lying
 3        and shouldn't have come forward.  If it
 4        is true, she certainly has the right to
 5        come forward, that kind of thing.
 6             At one point in time, 20 some years
 7        ago, she decided it would be in her best
 8        interest not to come forward.  And then
 9        as a result of occurrences that happened
10        a few years ago she decided that maybe I
11        should, and she did.
12   BY ATTORNEY ANDREWS:
13        Q.   Have you looked at any data or
14   studies about how Mr. Trump's personality
15   informs the public's reception to things he
16   says?
17        A.   I don't think I have to do studies
18   or anything like that.  I mean, as I say,
19   Mr. Trump's been in the news for six years,
20   day in and day out.  You don't need to do a
21   study to observe what goes on with him.  The
22   purpose of study is because you're privy to
23   it on a day-to-day basis.
24        Q.   How do you know how other people
25   respond to him based on his personality --
```

Page 179

1        A.    He's a public figure, Mr. Craig.  I

2   talk to people all the time about him.  I

3   talk to friends, relatives, family, business

4   colleagues, people on the street.  I go on a

5   cruise, we talk about -- we meet strangers,

6   you talked about Trump.  Trump is a highly,

7   highly visible figure that people like to

8   talk about.  You don't have to do a study

9   when day in and day out over six years

10  you're talking to a broad cross-section of

11  people of all persuasions.  I've talked to

12  Trump supporters.  I've talked to people

13  that don't know his name almost, and I've

14  talked to people that hate him vehemently.

15           I've done a study.  I've been in a

16  study for six years ever since he first ran

17  for president.

18      Q.    And by study you mean those

19  conversations you just described?

20      A.    Yeah, what more can you do in a

21  survey.  I've talked to people in all walks

22  of life, and all areas of the country.  In

23  fact in Europe.  We do all of our cruises in

24  Europe.  I've talked to people over there.

25  I've talked to old people, young people.  I

Page 181

```
 1   conversations like anyone else in the United

 2   States would have been having over the last

 3   six years?

 4       A.   For the most part anyone else in

 5   the United States has had over -- I haven't

 6   since I was retained which was what?  A

 7   couple months ago?  I haven't done any as an

 8   expert.  I haven't talked to people

 9   specifically an expert because I didn't

10   feel -- I felt I had enough insight from

11   that.

12            No, just talking to people in

13   general, kind of water cooler conversations,

14   you know.

15       Q.   And on this same page of Exhibit 1,

16   page 19, you refer to Mr. Trump's, quote,

17   long and very public history of accusations

18   by women -- let me just go down here.

19       A.   The last bullet point.

20       Q.   Yeah.  Let me start over.

21            You write here, you refer to

22   defendant's long and very public history of

23   accusations by women and inappropriate

24   sexual behavior as well as his own

25   admissions in this area.
```

A-854

Page 189

1    skirt.  He admitted to that.

2        Q.   Is that part of the Billy Bush

3    tape, or is that something different?

4        A.   That was the Billy Bush tape.  I

5    think the one about him -- I think that was

6    also on the Billy Bush tape about him

7    sitting next to a stranger and kiss them,

8    and they're not going to do anything.

9            I think I read the part about him

10   kissing anyone somewhere else as well.  I

11   think that was mainly the whole brouhaha

12   that came when the Billy Bush tape came in.

13       Q.   And you write on page 19, the same

14   page that we're on, under the header

15   Weinstein/Me Too phenomenon?

16       A.   Yes.

17       Q.   Quote, the environment and dynamics

18   of women reporting sexual assaults and rapes

19   changed dramatically in recent years

20   emanating from the Harvey Weinstein scandal

21   and movement spawned by Me Too, Time's Up.

22       A.   Yeah.

23       Q.   In drafting your report, what

24   sources did you consider in forming your

25   opinions with respect to the, quote,

Page 190

```
 1    environment and dynamics, close quote, of

 2    reports of sexual assault and rapes?

 3        A.   No specific.  That is just --

 4    that's just from reading multiple --

 5    listening and hearing multiple reports over

 6    the years.  I mean, I've -- like most people

 7    I followed the Weinstein trials.  I'm aware

 8    of the Me Too.  I read countless magazine

 9    articles and listen to TV, radio over the

10    period of years talking about the impact

11    that the Weinstein thing had on people

12    coming forward.

13            And actually Cosby predated

14    Weinstein.  But it was Weinstein that was

15    the big one.  Over a period of years I've

16    been ongoing reading reports and information

17    relating to how women would now come

18    forward, and they were emboldened to come

19    forward.

20            Even Ms. Carroll is a perfect

21    example.  She said that she claimed that

22    genesis of that was why she came forward.

23        Q.   And the sort of reading magazine

24    articles and listening to radio that you

25    referenced, were you doing that as part of
```

Page 195

 1    prior to her lawsuit, but I became aware of

 2    her professional accomplishments prior to

 3    being contacted to serve as an expert

 4    witness in this case.

 5             Do you see that?

 6        A.   Yes, I do.

 7        Q.   So besides that sort of personal

 8    experience you had had, did you -- is there

 9    any data to quantify the media coverage that

10    Ms. Carroll received after Mr. Trump's

11    defamation as compared to before?

12        A.   Well, I think, yes.  I think if

13    you're just doing an analysis or Google or

14    something like that, you can see that there

15    weren't hardly any articles on her prior to

16    the Trump incident, for lack of a better

17    word, and now -- exponentially her

18    visibility has risen tremendously.  I mean,

19    the bottom line -- I just used myself as an

20    example because I had never heard of her

21    before I started reading articles about

22    Trump being accused of rape and whatever.

23    And most of those articles, and I did

24    analysis in this report which is in the next

25    section, by the way, on 20 here is that the

Page 197

1    study?  No.  From looking online and looking

2    at the first ten pages of her Google

3    presence, it was clear that there was a

4    tremendous increase in articles about her or

5    exposure than there was prior to that.

6        Q.   By looking -- by your reference to

7    looking at the first ten pages of Google,

8    you just mean the nature of the search

9    results that you would see if you put in

10   E. Jean Carroll's name in Google?

11       A.   Yeah, in other words, you know,

12   each page has 10 to 12 things on it and you

13   go through pages 2, 3, 4, 5.

14            You know, I saw other references to

15   Ms. Carroll but not nearly the weight of the

16   exposure she received after she came forward

17   to accuse Mr. Trump of rape.

18       Q.   You referred in your earlier answer

19   to you did an analysis in this report which

20   is in the next section on page 20, and those

21   articles are highly favorable toward

22   Ms. Carroll.  Are you referring just to the

23   three articles you talk about on page 20 and

24   carrying over to page 21?

25       A.   Yeah, in other words, on page 20

Page 198

1    it's those square points there touting her

2    background, article, and praise.  In other

3    words, the bottom line is in reporting the

4    news, the news was that she accused him of

5    rape and he made some statements, and she

6    sued him for defamation.  That's the news.

7            You know, any good reporter is

8    going to give background on the participants

9    in such a dispute.  Trump you don't have to.

10   They mention -- but going beyond mentioning

11   she was a well-known author and had been a

12   columnist for Elle magazine.  Some of them

13   went into making very complimentary remarks

14   about her.

15      Q.   Besides these three articles, are

16   there any other articles that you considered

17   in connection with this part of your report?

18      A.   Yeah, as I said earlier today, I've

19   seen -- I mean, a lot of these articles

20   were -- contained the same information.  I

21   didn't -- I didn't -- I just used these as a

22   representative sample.  I believe I saw

23   others that said nice things about her too,

24   you know, whatever.  I mean, I don't have to

25   do pages on it.  I gave some examples from

A-859

Page 200

1      Q.    And did you consider any other

2   sources of information besides those 10 to

3   12 articles and the three you selected from

4   those here in generating or drafting this

5   portion of your report?

6      A.    No, no.  I don't think so.  I was

7   using the media.  I think the media is a

8   good harbinger of what is out there.  I

9   think that's the job of the media is to

10  reflect what's going on in the world and

11  society and not only to report the news but

12  give perspective about the news background,

13  interpretation.  That's why you have

14  editorials, columns, commentary, that kind

15  of thing.  You don't only report the news

16  but to give insight and perspective on it.

17     Q.    Is it your opinion that being known

18  as a rape victim of a powerful person is a

19  positive reputational characteristic?

20            ATTORNEY SWIFT:  Objection to form.

21            THE WITNESS:  I would say that

22       it's -- no, no.  I don't think it's --

23       I'm sure somebody would -- something

24       somebody would not want on their résumé

25       per se.  But the point -- all I'm saying

A-860

Page 206

```
 1      record.

 2              (Recess taken from 2:59 p.m. to

 3              3:08 p.m.)

 4              THE VIDEOGRAPHER:  The time is now

 5      3:08 p.m., and we're back on the video

 6      record.

 7  BY ATTORNEY CRAIG:

 8      Q.   So, Mr. Fisher, if you want to turn

 9  to page 22 of your report at Exhibit 1, you

10  see there's a section that has the header,

11  Reputation Repair Program?

12      A.   Yes.

13      Q.   And you note in here that at the

14  bottom of -- sorry.  Right above that

15  section you say:  While I attribute the

16  following mostly to her first report, the

17  content from my brief review from her second

18  report was the same in both her reports.

19              And then you go on to the section

20  entitled Reputation Repair Program.

21              Do you see that?

22      A.   Uh-huh.

23      Q.   Is it accurate to say that the text

24  of this with the exception of that one

25  paragraph on page 24 draws from your first
```

Page 207

1    report?

2         A.    Yes, yes.

3         Q.    And so this is written,

4    specifically concerns the reputation repair

5    program that Professor Humphreys developed

6    in her Carroll I report?

7         A.    Yeah.  Most of this text was in my

8    rebuttal report.  It's just since I was

9    doing an overview of the entire case, I

10   thought I should have a section in here

11   about her report.  But most of this is old

12   ground covered in our first two depositions.

13        Q.    And, in fact, the citations in this

14   section are to pages in Professor Humphreys'

15   first report --

16        A.    Correct.

17        Q.    -- from Carroll I?

18        A.    Correct.  100 percent, yes.

19        Q.    Is there anything different sort of

20   in substance between what's in this report

21   and then what's in your prior Carroll I

22   report?

23        A.    No, I don't believe so.  I think

24   that -- I mean, obviously this is only an

25   excerpt from my first report because my

Page 208

1    first report was, what, 10, 12 pages.  I

2    just put out -- basically from the first

3    report I just pulled out sort of the gist

4    of, you know, the important points from that

5    first report.  I added in a paragraph just

6    referencing the second report which you saw.

7              And so there's no real new ground

8    break in that.  It's just I thought if I was

9    doing a comprehensive report on the whole

10   case, I would have had to add in, you know,

11   something related to their expert.

12        Q.   Were there any additional materials

13   that we didn't cover --

14        A.   No.

15        Q.   -- in your last deposition --

16        A.   No.

17        Q.   Let me just get the question out.

18              Are there any materials that

19   weren't addressed or covered in your last

20   deposition that you considered before

21   including this section in your Carroll II

22   report?

23        A.   No, no.  As I said, what I was

24   trying to do was just to kind of summarize

25   the main points I had in the -- relating to

A-863

# EXHIBIT 2

A-864

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **E. JEAN CARROLL** | ) | |
| | ) | |
| | ) | |
| **v** | ) | **Case No. 1:22-CV-10016-LAK** |
| | ) | |
| **DONALD J. TRUMP** | ) | |
| | ) | |

**EXPERT REPORT OF ROBERT J. FISHER**

**PREPARED FOR DONALD J. TRUMP**

**January 30, 2023**

A-865

TABLE OF CONTENTS

Assignment……………………………………………………………….....    1

Compensation…………………………………………………………….....    1

Background and Qualifications………………………………………………    1-5

Record of Testimony…………………………………………………………    5-7

Case Background…………………………………………………………….    7-9

Lawsuit Information………………………………………………………….    9-11

Information/Input Reviewed to Form Opinions………………………………    11-12

Analysis and Opinions……………………………………………………….    12-16

Analysis of Reputation Impact……………………………………………….    17-21

Plaintiff's Expert…………………………………………………………….    21-24

Conclusion…………………………………………………………………..    24-25

A-866

ASSIGNMENT

I am a veteran communications professional, executive and counselor – acquired from my background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising and marketing.   I have also been acknowledged nationally by the legal profession and news media as an expert in the field of crisis communications and image/reputation management and damage repair.   Additionally, I am an experienced expert witness who has been involved in over approximately 80 cases, 70 of which were defamation or reputational harm-related cases during the past 17 years.   Due to that experience and expertise, I have been retained as an expert on behalf of the Defendant, Donald J. Trump to address the Cause of Action of Defamation in the lawsuit filed by the Plaintiff, E. Jean Carroll. Specifically, I have asked to review, analyze and offer my comments, conclusions and opinions of any reputation harm that may or may not have been incurred by the Plaintiff as a result of the alleged false statements made about her attributed to the Defendant in a public pronouncement made on October 12, 2022.

COMPENSATION

For consultations, information gathering, research and the preparation of this report, my compensation was $600 per hour.  If a deposition is required, the rate will be $700 per hour with a four-hour minimum. Should I testify at the trial for this case, the rate will be $2,500 for a half day and $5,000 for a full day. Travel fee is $200 per hour and travel expenses would be required to be reimbursed as well.

BACKGROUND AND QUALIFICATIONS

General Summary

I am a veteran public relations, advertising, marketing and communications executive and counselor and journalist with 54 years of experience, including 42 years operating my own communications firm, Fisher & Associates, Inc., located in the Los Angeles, California. During my professional career, I have provided counsel and services to clients in a broad range of businesses, professions, and industries as well as to nonprofit organizations and government entities on a local, national and international basis as required.

While I am a communications generalist through the breadth of my professional background and experience (e.g., journalism, public relations, marketing, advertising), I am also a nationally-recognized expert in crisis communications, reputation management and image repair and counseling. My firm was a (and possibly the) national pioneer in creating and developing public relations and marketing/communications programs for the legal profession. My firm has provided litigation support in over 100 civil and criminal cases (including trials) throughout the United States. Additionally, for the past 17 years I have served as an expert witness, representing both Plaintiff's and Defendants in approximately 80 cases in 30 states and the District of Columbia.  For decades I have functioned as an expert information source and analyst for the mass media on issues relating to crisis communications, damaged image and reputation.

Litigation Experience

Because of my 42-year background in representing law firms and being involved in litigation and trials by handling communications and the "Court of Public Opinion," I have amassed a great

1

A-867

amount of background and experience in the judicial process and all aspects of litigation. This has led to me periodically receiving calls from law firms, individuals and businesses throughout the U.S. from those who needed aid and counsel. A brief list of some of the major litigation and/or legal actions in which I was called to provide counsel or services, include:

- Iranian Hostages before the U.S. Supreme Court (Washington, D.C.)
- Dennis Wilson (Beach Boys) Estate Dispute (Los Angeles)
- Maxicare Bankruptcy (Los Angeles)
- United Airlines Crash in Iowa Cornfield (Chicago)
- International Organization Branded Cult (Scottsdale, Arizona)
- Legislature Threat to Ban Brothels in Nevada
- High School Students Killed (Paducah, Kentucky)
- Rodney King Beating (Los Angeles)
- IRS Indictment of CPA Firm for Tax Fraud (San Francisco)
- Homeowners Facing Loss of Homes (Los Angeles)
- BKK/BFI Landfill Fraud (Southern California)
- Firestone Tire Class Action Lawsuit re Defective Tires (Los Angeles/Washington, D.C.)

Media Expert/Analysis

As a direct result of my involvement in many litigious situations (many high profile), over the past few decades, I have often been sought out by the media as an expert information source and analyst to provide background, information, interpretation and analysis, commentary and opinions on news, issues and matters relating to those people, businesses, institutions, governments, etc. who were controversial, in conflict or in trouble. Generally, this related to what the public perception of the situation was, how could it be changed by those involved and what damage has or was it causing to their image, reputation or brand in the short and/or long terms. As an example, with both of the O.J. Simpson civil and criminal trials, and in-between the two, I was regularly interviewed by local, national and international print and electronic media as an expert media source/analyst.

Expert Witness

In 2006, due to my extensive career in journalism, public relations, marketing and advertising, I began providing service to litigants as an expert witness. Since then I have served as an expert witness in approximately 80 cases on behalf of both Defendants and Plaintiffs in 29 states throughout the United States (California, New York, Florida, West Virginia, Georgia, North Carolina, Mississippi, Virginia, Utah, Tennessee, New Mexico, Nevada, Hawaii, Washington, Colorado, Minnesota, Michigan, Maryland, Louisiana, Delaware, Michigan, Wisconsin, Ohio, Louisiana, Kentucky, Arizona, Texas, Alabama) plus the District of Columbia. I have provided sworn testimony in depositions, hearings, arbitration hearings and trials. The bulk of the cases have primarily been in the areas of journalism, defamation (libel and slander) and public opinion/perception. I have also been involved in cases relating to professional malpractice, overbilling, inappropriate billing, loss of image and reputation, professional business operation and damage to a future professional career.

Education

San Jose State College    Bachelor of Arts degree    Public Relations (1966)
University of California at Los Angeles (UCLA) Periodic courses taken to upgrade knowledge. Numerous seminars, workshops and other education forums to enhance knowledge.

A-868

Professional Experience

- New York Times      Newspaper      Reporter
- Los Angeles Beautiful, Inc.    Non-profit organization    Public Relations Director
- Harshe, Rotman & Druck    National PR Firm    Asst. Account Executive
- Burson-Marsteller, Inc.    National PR Firm    Account Executive
- Atlantic Richfield Plaza    Shopping Center    Promotion Director
- Doremus & Company    National PR Firm    Account Supervisor
- Fisher & Associates, Inc.    PR Firm (Founded 1978)    President

Related Experience

While in the United States Army (1966-68), I served as a Public Information Officer in West Germany. I provided traditional public relations counsel and services for the Army, and I also interacted with the German media/community on its behalf.

Awards and Honors

I have received numerous awards from local and national public relations and marketing organizations for my counsel and service to clients during the past five decades.

Professional Memberships

- Public Relations Society of America (former Executive Committee Member of Counselor's Academy)
- Public Communicators of Los Angeles (officer for five years)
- Institute of Management Consultants (board member)
- Public Interest Radio and Television Education Society
- American Heart Association (Vice Chairman, Communications Committee)

Lectures and Publications

Throughout my professional career, I have spoken and written on a wide variety of subjects related to public relations, marketing and communications for business as well as for specialty areas (e.g., crisis communications, legal marketing/litigation support).

- Lectures/Presentations – I have lectured at universities (e.g., UCLA), to national conventions (e.g., American Bar Association) and at a variety of speaking forums (e.g. weekly/monthly meetings, seminars, symposiums) held by a diverse range of professional and business organizations.

- Publications – I have written a large number of articles for a variety of local, regional and national general, business, professional (e.g., legal) and trade publications, online and offline, including newspapers, magazines, newsletters and websites. (I have also been interviewed for, quoted in and had articles written about me in local, regional and national legal publications.)

- Defamation/Reputation Harm Articles – Articles I have written specifically addressing reputation damage and defamation during the past 10 years have included:

3

A-869

- ◼ *"Image/Reputation/Brand Damage:  Does Litigation Solve the Problem?"*
- ◼ *"Defamation:  The Stain That Can Never Be Removed."*
- ◼ *"Negative Communications:  The Process of Absorption and Transmission."*
- ◼ *"Harmful Media Exposure:  Beware of the Hidden Sources of Damage."*
- ◼ *"Defamation:  Guiding Principles of Negative Communications That Result in Image and Reputation Damage."*
- ◼ *"Defamation Defense:  Is there a Third Bite of the Apple."*
- ◼ *"Image/Reputation Damage From Media News Reports:  Is it Legally Actionable."*
- ◼ *"Reputation Damage Can Emanate From Actions/In-Actions…As well as Words."*
- ◼ *"Defamation Cases:  Why an Expert Witness is Vital."*

RECORD OF TESTIMONY

List of cases for which I have provided testimony over the past four years

During this period, I have had my deposition taken 15 times:

- May 8, 2019 – *Robert Gish, M.D.; Robert G.  Gish Consultants, LLC v Celeste E. Le Sage*, Superior Court of California, County of San Diego.

- January 23, 2020 – *Kenneth L. Creal and Kenneth L. Creal, an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles

- January 31, 2020 – *Examination Board of Professional Home Inspectors and American Society of Home Inspectors, Inc.  v International Association of Certified Home Inspectors and Nickifor Gromicko a/k/a Nick Gromicko.*  United States District Court for the District of Colorado

- February 27, 2020 – *Party Animal, Inc.  v Evanger's Dog and Cat Food Co, Inc., Nutripack, LLC,* United States District Court, Central District of California.

- June 12, 2020 – *Riley's American Heritage Farms, James Patrick Riley v James Elsasser, Steven Llanusa, Hilary LaConte, Beth Bingham, Nancy Treser Osgood, David S. Nemer, Ann O'Connor, and Brenda Hamlett,* United States District Court Central District of California – Eastern Division.

- February 24, 2021 - *Hebrew Health Homes Network, Inc., Arch Plaza, Inc. Arch Plaza Properties, Inc. Aventura Plaza, Inc. Jackson Plaza, Inc., Hebrew Homes of Miami Beach, Inc., Ponce Plaza, Inc. Ponce Plaza Properties, Inc., Hebrew Home Sinai, Inc., South Beach Plaza, Inc., Hebrew Homes of South Beach, Inc., South Beach Nursing and Rehabilitation Center, Inc., University Plaza Rehabilitation and Nursing Center, Inc., University Plaza Properties, Inc., Hebrew Homes management Services, Inc. v* Greenberg Traurig, P.A., a Florida Corporation, Greenberg Traurig, LLP, a New York Limited Liability Partnership and William B. Eck.  Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida

4

A-870

- April 27, 2021 – *Russ Newman v American Psychological Association (APA), David H. Hoffman, Sidley Austin LLP and Sidley Austin (D.C.) LLP*. American Arbitration Association, Washington, D.C.

- June 18, 2021 - *The Law Offices of Brenden R. Appel and Brenden R. Appel v Georgia's Restaurant and Pancake House, Inc. and Harry Kulubis*. Circuit Court of Cook County, Illinois County Department, Law Division.

- December 10, 2021 – *Legno Bastone, Inc. v Provenza Floors, Inc. and Brian J. Sullivan*. In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida Civic Action.

- March 16, 2022 – *Doan Restoration of Arizona, LLC and Doan Restoration of Michigan, LLC v Paul Curtis, Jane Doe Curtis and PR&C Specialities, LLC*, Superior Court of the State of Arizona, Maricopa County.

- April 7, 2022 – *Michael Coleman and Jamael Stewart v City of Delray Beach*.  In the Circuit Court of the 15th Judicial District in and for Palm Beach County, Florida.

- September 30, 2022 – *Linda Fairstein v Netflix, Inc., Ava DuVernay and Attica Locke*, United States District Court, Southern District of New York.

- October 31, 2022 – *Cumberland Family Medical Centers, Inc., d/b/a Health Kids Clinics v James A. Miller, M.D. and Blue Grass Clinics, PLLC.*, Commonwealth of Kentucky, Casey Circuit Court.

- November 29, 2022 – *San Juan Products, Inc. and American Environmental Corporation v River Pools & Spas, Inc.; River Pools Franchising, Inc.; and Thursday Pools, LLC.*, The United States District Court for the Middle District of Florida, Tampa Division.

- December 14 and 20, 2022 - E. Jean Carroll v Donald J. Trump, Supreme Court of the State of New York, County of New York.

During this period, I have testified at the following one arbitration hearing:

- On December 11, 2019, I testified at an arbitration hearing in the case of *Susan M. Packard v Morgan Stanley*, Financial Industry Regulation Authority, Washington, D.C.

During this period, I have testified in three jury trials:

- On January 24, 2020, I testified in the trial of *Harry Loveland; Charlene Loveland v Sol Del Cielo, LLC; Abraham Sandoval, Jr, an individual; M. L. Culkin Construction Company, Inc.,* Superior Court of California County of Los Angeles

- On February 24 and March 2, 2020, I testified in the trial of *Justice Protection Project, Lenore Albert v Xcentric Ventures LLC, Yelp, Inc. George Olivo, Megan Nikolic, Pam Ragland, Karen Rozier, Sheryl Alexander and Rene Dawson,* Superior Court of California County of Orange

- On February 25, 2020, I testified in the trial of *Nicholas Krakana v Scottsdale Police Department,* United States District Court, District of Arizona

During this period, I have testified in one bench trial:

- On September 21, 2021, I testified in the trial of *Kenneth L. Creal and Kenneth L. Creal,an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles.

CASE BACKGROUND

Reason for Lawsuit

The Plaintiff maintains that the Defendant sexually assaulted and raped her in the Bergdorf Goodman department store in New York City sometime during the period of the Fall of 1995 and the Spring of 1996. When she went public with the alleged crime in June 2019, she contends that the Plaintiff, in defending himself, issued a number of false statements in June of 2019 and October of 2022 which defamed her and damaged her reputation. The lawsuit was filed on November 24, 2022 for Battery and Defamation.

Profile of Parties Related to This Case

A brief profile of the litigants in this lawsuit is as follows:

Plaintiff

The Plaintiff in this case is E. Jean Carroll ("Carroll"), a resident of the State of New York who is a journalist, author (five books), former writer for Saturday Night Live (Emmy nominated), and advice columnist for *Elle* magazine (reputedly the longest serving columnist in the U.S.) and hosted her own TV program "Ask E. Jean" on America's Talking network.

Defendant

The Defendant is Donald J. Trump ("Trump"), a resident of the State of Florida and a former President of the United States.  Prior to that he was a businessman (real estate developer) and was the host of a NBC network television program.

Background to Rape Allegation

As detailed in her Complaint, following is a description of the alleged sexual assault and rape as the Plaintiff described it.  It should be noted, there is no documentation, evidence or independent verification of her account of this incident and the Defendant denies any of this occurred.

The Plaintiff alleges that sometime between the Fall of 1995 and Spring of 1996, she encountered the Defendant when she was exiting the Bergdorf Goodman Department Store in New York City.  She maintains that after speaking briefly, he requested that she assist him in helping to select a gift for a female friend.  In the course of assisting him in finding a gift, she alleges that he assaulted and raped her in a dressing room in the store.  She reports that after suggesting handbags or hats as a gift, the Defendant said he wanted to purchase some lingerie. They proceeded to the lingerie department which was empty with no sales attendants (and

presumably customers) in sight. Plaintiff contends that the Defendant maneuvered her into a dressing room, shut the door and proceeded to force himself upon her, to include forcing his penis inside her. She subsequently pushed him away, broke free and exited the dressing room and building.

Plaintiff Reporting Incident

Immediately after leaving the building, Plaintiff reports she used her mobile telephone to call a friend, Lisa Birnbach, and informed her of the incident. Ms. Birnbach urged her to contact the police and report the attack. She chose not to and requested her friend not to tell anyone. Within a few days, she revealed the incident in a meeting with another friend, Carol Martin. Ms. Martin cautioned her not to tell anyone because the Defendant was too powerful and he would "bury her." Weighing both pieces of advice, the Plaintiff decided not to report the alleged rape to law enforcement nor report the incident publicly because she was afraid of retaliation from the Defendant and feared the disclosure and subsequent turmoil would ruin her life.

Plaintiff Goes Public With Report of the Incident

Approximately 20 years later, in the aftermath of the Weinstein controversy and the "Me Too" movement, she decided to come forward and included an account of the incident in a book she wrote ("What Do We Need Men For? A Modest Proposal") which was published on July 2, 2019. She determined that it was the right format for her to come forward about the Defendant's assault and it would allow her to tell her own story in her own words and on her terms rather than have it interpreted through an interview or revealed through social media channels. Prior to publication, however, an excerpt from the book detailing the alleged assault and rape appeared in New Yorker Magazine on June 21, 2019. This became the first public exposure for her claim.

Defendant's Reaction and Response

The Defendant immediately responded to the disclosure published in the June 21 New Yorker article three times over the next four days denying the Plaintiff's allegations of sexual assault and rape. These included:

- On June 21, he issued the following public statement:

  *"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.*

  *Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.*

  *Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened.*

7

A-873

*False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.*

*If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."*

- On June 22, he made the following statement to reporters:

*"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—*

*[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.*

*[Reporter]: You were in a photograph with her.*

*[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.*

*And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.*

*New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.*

*It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.*

*You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.*

*But here's a case, it's an absolute disgrace that she's allowed to do that."*

- On June 24, The Hill published an interview with the Defendant in which he was quoted as saying: *"I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"*

A-874

Plaintiff Files Lawsuit

On November 4, 2019, Carroll filed a lawsuit against Trump in the Supreme Court of the State of New York, County of New York (Case No. 20 civ. 7311 (LAK) (JLC)) with a single Cause of Action of Defamation. The lawsuit was filed in response to Trump's comments and alleged false statements (outlined above) in response to the Plaintiff going public with her allegations of assault and rape.

Defendant' Additional Public Defense

Prior to the Plaintiff filing the new lawsuit under the Adult Survivors Act ("ASA") which included a Cause of Action for Battery as well as one for Defamation, Trump commented on the alleged incident in a post he made on his social media platform, Truth Social on October 12, 2022. Allegedly, he also distributed the statement to news media headquartered in New York. The statement included the following text:

> *"This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. This decision is from the Judge who was just overturned on my same case. I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country."*

> *In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to 'Trump'!"*

LAWSUIT INFORMATION

The new lawsuit was filed on behalf of the Plaintiff, E. Jean Carroll, against the Defendant, Donald J. Trump, on November 24, 2022, in the United States District Court, Southern District of New York.

Causes of Action

In its Complaint, the Plaintiff cites the following Causes of Action:

A-875

- Battery
- Defamation

Relief Sought in Lawsuit

Through its lawsuit, the Plaintiff is seeking the following relief:

- Order Trump to retract his defamatory statement.

- Award Carroll compensatory damages in an amount to be determined at trial.

- Award Carroll punitive and exemplary damages in an amount to be determined at trial.

- Award Carroll pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

Plaintiff's Contentions

With respect to the Cause of Action of Defamation, in her Complaint, the Plaintiff offered the following contentions:

- Trump published his October 12, 2022 statement containing numerous defamatory claims on Truth Social, to members of the media, and to his supporters.
- Trump's statement identified—and was "of or concerning"—Carroll.

- Trump's statement contained numerous falsehoods about Carroll, whether on its face and/or by virtue of a clear implication affirmatively intended by Trump.

- Trump's false statement regarding Carroll was defamatory *per se*.

- Trump's false and defamatory statement was published throughout New York State and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statement about Carroll would receive a wide circulation by providing it to the national press.

- Trump made his false and defamatory statement knowing that it was false or with reckless disregard for its truth or falsity.

- Trump made his false statement with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on Carroll and her rights.

- Trump's false and defamatory statement caused Carroll to suffer reputational, emotional, and professional harm.

Plaintiff's Alleged Reputation Harm

In her Complaint, the Plaintiff alleged the following forms of reputation harm she has suffered:

10

**A-876**

- Trump's false and insulting claims about Carroll were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

- Carroll has suffered harm as a direct result of Trump's false, defamatory statement.

- Coming forward put Carroll in the crosshairs of one of the most powerful men on the planet. He has since created and used his own powerful social media platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of fabricating a rape allegation to promote a book.

- Trump's October 12 statement has caused Carroll emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

- Carroll has suffered professional harm as a direct result of Trump's defamatory statement. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood as a writer, advice columnist, and journalist.

INFORMATION/INPUT REVIEWED TO FORM OPINIONS

In connection with my preparation of this report, I have received and reviewed from the Plaintiff's legal counsel, the following documents and information relating to this case:

Complaints

- E. Jean Carroll v Donald J. Trump  (November 4, 2019)
- E. Jean Carroll v Donald J. Trump  (November 24, 2022)

Legal Documents

- Answer (January 23, 2020)
- Plaintiff E. Jean Carroll's Response and Objections to Defendant Donald J. Trump's Request for Production of Documents  (January 27, 2022)
- Plaintiff E. Jean Carroll's Second Set of Interrogatories to Defendant Donald J. Trump (August 2, 2022)
- Defendant's Amended Responses and Objections to Plaintiff's First Request for Production of Documents  (August 26, 2022)
- Defendant Donald J. Trump's Responses and Objections to Plaintiff's Second Set of Interrogatories  (September 7, 2022)

Depositions

- E. Jean Carroll (October 14, 2022)
- Donald J. Trump (October 19, 2022)

Miscellaneous Documents

- Expert Report of Professor Ashlee Humphreys, Ph.D  (October 14, 2022)
- Expert Report of Professior Ashlee Humphreys, Ph.D (Partial Review) (January 9, 2023)

11

A-877

Media Exposure

- Slate Magazine: "E. Jean Carroll Told Her Story Anyway" (June 25, 2019)
- Christian Science Monitor: "E. Jean Carroll: She Said, He Said, and How Media Weighs Balance" (June 26, 2019)
- New York Times: "Why E. Jean Carroll, 'The Anti-Victim,' Spoke Up About Trump" (June 27, 2019)
- New York Times: "What to Know About E. Jean Carroll's Defamation Suit Against Trump" (October 19, 2022)
- Forbes: "E. Jean Carroll Case:  What to Know About the Defamation Suit Accusing Trump of Rape" (October 20, 2022)
- Associated Press: "Donald Trump Response in Defamation Suit filed by E. Jean Carroll" (October 20, 2022)

Internet Research

During the course of this assignment, I conducted research to review information on the internet that might be pertinent to the litigants and the lawsuit as well as to seek clarification and definition on various subjects.

Sources to Obtain Information

The aforementioned documents and informational materials listed along with internet research I conducted and information I received from Plaintiff's legal counsel provided me with the information related to this case and specific to it which formed the basis for the findings, conclusions and opinions I offer in this report.

ANALYSIS AND OPINIONS

Preface

Following are my comments, conclusions and opinions as they pertain to the issues I was asked to address as outlined in the previous "Assignment" section of this report. My input in this report will be based on the information I obtained and reviewed in this case which was detailed in the "Information/Input Received to Form Opinions" section of the report.  The information, which emanated from both sides in this litigation, reflects both of their understandings of the facts as well as their interpretations and views of them. In some instances, they agree on information and facts and in others they don't. It is not my task or responsibility to determine who is right or wrong; that will be determined in court. My responsibility is to analyze, evaluate and opine on reputational damage from the facts I know to be true. Where there is a disagreement, since I was retained by the Plaintiff, I will presume that the information provided on their behalf is correct and will base my conclusions and opinions on it being true unless I am aware of – or will be subsequently provided - evidence to the contrary.

Methodology

To reach these conclusions and opinions, the methodology I used in this case is consistent with that which is standard operating procedure that public relations and communications professionals as well as expert witnesses use when addressing issues and situations for clients like those in this case in making their determinations and offering their findings, conclusions and opinions.

12

A-878

- Carefully reviewed all documentation and information on the background to this dispute as well as that related to the litigation as well any other unrelated information that is germane to this the issues in contention in this case.

- Carefully analyzed the information provided regarding the dispute and their positions on it as espoused by both parties in this litigation (as reflected in the Case Background section of this report).

- Queried Defendant's legal counsel to get additional information and clarification as needed.

- Researched information as needed on the internet.

- Applied the principles of negative communications to this case as appropriate.

- Followed peer accepted procedures in both the public relations and expert witness professions as to how to analyze and assess situations which negatively impact reputations as well as devise strategies, plans and actions to restore them.

- Reviewed and analyzed previous applicable experiences I have had in my professional communications and expert witness background that may be applicable to this situation and would provide me with insight to assist me in forming my conclusions and opinions.

Relative to the last point above, it is important to note that any conclusions and opinions I offer are based on the professional background and the experience and expertise I have amassed during my 54-year background in communications (outlined in earlier sections of this report) and not emanating from surveys, studies, tests, research or other forms of qualitative, qualitative types of analyses or fact gathering procedures. They are based on direct experience and observations working with people, businesses and/or entities in similar situations and what transpired from them.  This is covered in Rule 702 and 703 which states:

- The use of opinions will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts.

- The expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education."

- Using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert is qualified; (2) the testimony addresses a subject matter on which the factfinder can be assisted by an expert; (3) the testimony is reliable; and (4) the testimony "fit" the facts of the case.

My five-decade background in all major professional areas of communications along with my 42 years of experience in litigation support, my specialization in reputation management and repair counseling and programs as well as my 17 years as an expert witness clearly gives credence to the validity of the following comments, conclusions and opinions I offer relating to this case.

13

**A-879**

Defamation Definition

In the Plaintiff's lawsuit, one of the Causes of Action is Defamation. Under New York law, a claim of Defamation must contain these elements:

- A false statement
- That is published to a third party
- Without privilege or authorization
- That causes harm, unless the statement is one of the types of publications actionable regardless of harm.
  (*Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 Fed.Appx. 8, 11 (2d Cir. 2018) (citing *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017); *Stepanov v. Dow Jones & Co.*, 987 N.Y.S. 2d 37, 41-42 (1st Dept. 2014)).

General Overview

I have reviewed the documents listed in the preceding section of this report, have received additional input from the Defendant's legal counsel and have done some basic internet research to obtain some background on the litigants, see what type of information existed on the lawsuit itself as well as to get a sense of the type and extent of media exposure that was generated by this lawsuit.

The core of this case which emanated from an alleged assault and rape is a classic "he said, she said" situation. The Plaintiff says he did, and the Defendant says he didn't. There is no empirical evidence to support either side as there weren't any witnesses nor forensic evidence. The Plaintiff reports she told two friends about the assault within a couple days and the Defendant said it couldn't have happened because he was accompanied at all times by a security person who would have witnessed the encounter with the Plaintiff. The Plaintiff has an explanation why she waited 23 years to go public with the assault and rape (fearing damage to her professionally and personally) and the Defendant reacted to the news with vehement statements of denial. The Cause of Action of Defamation in this lawsuit is directly related to the Defendant's responses and denials of being accused of sexual assault and rape.

Analysis of Statements

As aforementioned, on October 12, 2022, slightly more than three years after the aforementioned comments made by Trump about Carroll at the time she went public with her allegations of assault and rape, Trump made additional comments through his social media platform, Truth Social. Much of his comments were similar to those previously made. The following are those cited in the Complaint and my assessment on them:

- In the October 12 statement, Trump falsely stated that he did not rape Carroll.

  Comment: In the American Judicial System, the cardinal principle is that every person accused of a crime is presumed to be innocent unless and until his or her guilt is established beyond a reasonable doubt. There is no evidence that the Defendant assaulted or raped the Plaintiff. It cannot be a false statement to deny some action that hasn't been proven to have taken place. In fact, it is more of a defamatory statement for the Plaintiff to have made a statement that it did occur, especially without any evidence of it.

14

A-880

- In the October 12 statement, Trump falsely stated that he had no idea who Carroll was.

Carroll declares that she first met Trump when she was a writer on Saturday Night Live in 1987, then met him at a party in the 1990's and later they waved at each other across Fifth Avenue in 1994 or 1995.

In his deposition, Trump responded to this assertion by testifying:

> Q. *When the allegation came out in 2019, you said you – I think it's your testimony that you had no idea who she was.*
>
> A. *I still don't.*

Carroll produced a photograph showing herself talking with Trump at a party as a form of proof that they knew each other. Trump maintains that he was in a receiving line at the party and greeted a number of people which is not an indication he knew her. In his deposition (Page 18, 17-23), he testified:

> Q. *So, if I can understand your testimony, sir, you're saying that at the time you made the statement, you were not aware of ever meeting Ms. Carroll? You have since seen a photograph that shows you with Ms. Carroll on a receiving line; correct?*
>
> A. *Along with a lot of other people. (81 – 17-23)*

Comment:  Whether Trump knew her or not is unknowable barring a third person documenting this was true and I have not seen any evidence of that.  These could not be false statements unless there is verification that they indeed knew each other.  Further, even if it was proven that these were false statements, it is highly questionable that a dispute over whether he knew her or not would cause Carroll reputational harm.

- In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales.

Specifically, In a similar alleged false statement made on June 12, 2019, Trump was reported to have said the following:

> *"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh."*

In her deposition, Carroll testified (Page 157, 8-11):

> Q. *Did you think it would help sell the book?*
>
> A. *I thought people would be interested.*

Comment:  In the above excerpts of their testimony, Trump did not refer to Carroll directly when alluding to selling a book and in her testimony, Carroll implied that

A-881

people would have interest in the rape charge, which indirectly would could be construed that it would result in an increase in sales. Further, Trump's comment was clearly an opinion and constitutes speculation and supposition.

- *The false statement that Trump made about Carroll on October 12, 2022, was published with knowledge of its falsity and/or with reckless disregard for the truth.*

Comment:  To be determined at trial.

- *Trump identified Carroll on sight when they met at Bergdorf Goodman.*

Comment:  No evidence that they ever met at the store.

- *In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.*

Comment:  Moving in the same circles does not guarantee they knew each other and there is no evidence that he ever watched her television program.

- *In October 2022, Trump's defamatory claim that Carroll had "completely made up a story" and thus fabricated the rape accusation to promote her book rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his claim about Carroll's motive was false.*

Comment:  There is no evidence that the rape occurred other than her allegation. He denies the allegation of rape.  Unless there is proof it happened, his denial is not a false statement.

- *Moreover, Trump lacked any factual basis for his statement implying that Carroll had revealed to the public that he raped her at Bergdorf Goodman to promote "a really crummy book." And since his statement about Carroll was made to impute motives for lying, when in fact he knew that Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published his statement with reckless disregard for the truth.*

Comment:  There is no reckless regard for the truth if there is no "truth" to base it on.

This is entirely a "he said, she said" situation where there is no concrete evidence advanced by the Plaintiff or anyone on her behalf  that her "statements of fact" are true.  Only her word. Without verifiable proof, her allegations of false statements appear to be based on speculation, conjecture, supposition, assumption, presumption and hypothesizing.  The Defendant's denials are only false statements if the allegations they address are based on fact.  In summary, after a careful review of all the alleged false statements and negative implications that the Plaintiff claims that Trump made, it is my opinion that none of the statements she identified can be determined as being false and the negative implications are expressions of his opinions which constitute his right to free speech.  (This is not meant to be a legal conclusion, just my analysis of them.)

16

A-882

ANALYSIS OF REPUTATION IMPACT

In this section of the report, an analysis will be made of what, if any, reputation harm resulted from the alleged false statements of the Defendant and what effect – negative or positive – it would have on the Plaintiff, professionally and personally.

In the Plaintiff's Complaint, there were numerous allegations regarding the reputation harm that she suffered from the Defendant's statements, comments and assertions. This is reflective of her assertions that the Defendant's remarks caused a significant decrease in letters for advice she was receiving at Elle Magazine and led to her eventual dismissal from the magazine.   Both were debunked by the Plaintiff in her deposition through her own testimony.   On the issue of receiving less letters from public awareness of the alleged rape:

> Q.  Did you -- were you told in any of these letters or did you get any information from the outside that they were going down because of your article or was this just your perception?
>
> A.  No, it was my perception... (Page 216, 3-8)

On being terminated by Elle because of the Trump alleged rape exposure:

> Q.  Did someone from Elle tell you that?
>
> A.  No, they would never admit it.   (Page 178 9-11)
>
> Q.  And at the bottom of this article do you see that it says in the last paragraph on the first page in response to a list of questions sent by The New York Times, a Hearst spokeswoman e-mailed the statement, quote, E. Jean Carroll was long a beloved voice in the pages of Elle. The decision not to renew her contract was a business decision that had nothing to do with politics, it said. Do you see that?
>
> A.  Yes                           (Page 183, 10-21)

Similarly, the Plaintiff, in her Complaint, states that that Trump's statements and comments constituted Defamation Per Se (which was not listed as a Cause of Action) because they tended to (and did) damage Carroll in her trade, occupation, and/or business. Under New York law, Defamation Per Se is defined by the following criteria:

- Statements charging a Plaintiff with a serious crime.
- Statements that tend to injure another in their trade, business, or profession.
- Statements imputing a loathsome disease on a Plaintiff.
- Statements imputing unchastity on a woman.
  (*Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992).

Trump's comments and opinions did not accuse her of a serious crime, having a loathsome disease or being unchaste. As to the criteria listed above relating to professional harm, the Complaint states that the Plaintiff has suffered professional harm as a direct result of the Defendant's defamatory statement(s).   By attacking her, it alleges, he has injured the reputation on which she makes her livelihood as a writer, author, advice columnist, and journalist.  In point of fact, in all his remarks, the Defendant did not directly say anything negative about her ability

17

A-883

or competence as a writer, columnist, journalist or book author or any other aspect of her professional capability or career.

Additional forms of reputation harm the Plaintiff cites in her Complaint, include:

- Plaintiff has suffered harm as a direct result of Trump's false, defamatory statement.

    Comment:  Whether the statement(s) was defamatory will be determined at trial.

- Plaintiff coming forward put her in the crosshairs of one of the most powerful men on the planet.

    Comment:  She was aware of that when she went public with her accusations.

- Defendant has created and used his own powerful social media platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of fabricating a rape allegation to promote a book.

    Comment:  Defendant did make his October 12 statement on his social media platform and his comments and opinions are the subject of this lawsuit.

- Defendant's October 12 statement has caused the Plaintiff emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

    Comment:  The allegation he raped her is unproven and the damage to her reputation will be addressed in the next section.

Reputation Damage Perspective

To some degree, the Plaintiff most likely suffered some reputational harm.  Unquestionably, the Defendant has a following of loyal supporters who take everything he says as "gospel."  However, the trial will determine whether his disparaging remarks about the Plaintiff is actionable against him based on whether his statements were defamatory or not.  If not, he cannot be held legally responsible for any reputational harm that emanated from his negative comments, allegations or opinions about her.

There is a case to be made that this dispute and resulting litigation may actually have proven to be a net benefit to the Plaintiff in terms of her reputation and public standing.  The following factors must be weighed in evaluating this hypothesis:

- Plaintiff's Positive Reputation – Prior to the Defendant's statements, the Plaintiff Carroll was not an unknown entity who had no public presence and was, in effect, a "clean slate" which the Defendant Trump could negatively define her with his comments and opinions.  Carroll was a "public person" who was well known for three decades and had an excellent reputation as a writer, author (five books) journalist and had a high profile position as an advice columnist for 27 years with a leading national magazine (Elle).  Additionally she was a writer for one of television's most popular programs (Saturday Night Live) and had received an Emmy nomination for her work on it.

18

A-884

This positive public profile affords Carroll a virtual "shield" to a large extent to offset the negative portrait that Trump may have tried to paint of her with his negative remarks about her as opposed to if she was a person no one had ever heard of or who had not have had a pre-existing positive reputation. In short, people would be less likely to think ill of her and here reputation damaged based on his input.

- <u>Defendant's Own Reputation</u> – The Defendant Trump is, arguably, a highly controversial person who, while having a passionate following – is highly unpopular with a vast majority of the public. In a recent poll (December 14, 2022) conducted by Quinnipiac University, 31% of those polled approved of him and 59% disapproved. It was reported that this was the lowest approval rating he has ever received. It is reasonable to project that his favorability rating could continue to decline with the multitude of investigations and litigation with which he is embroiled.

  Additionally, two other factors need to be considered. One is his personality which is seen by many as volatile, combustible, inflammatory and he is renowned for attacking his opponents. The Plaintiff herself cited this as a reason she did not go public when the alleged assault took place in the late 1990's. The other is his perceived public reputation for inappropriate sexual contact with women – approximately 20 women have accused him of inappropriate behavior. Some he has self-admitted to while other such allegations he has denied.

  There are some basic conclusions that can be drawn from these three factors, including:

  - More than two-thirds of the country (Quinnipiac University Poll) d no quite give credence to his negative remarks about the Plaintiff (i.e. consider the source). In fact, many if not most would be predisposed to favor or think well of anyone he opposes.

  - Given his controversial personality and his penchant towards often excessive and relentless attacks on those who oppose him, it is reasonable to presume that most would consider his remarks in that light and would be sympathetic to the Plaintiff.

  - With consideration given to the Defendant's long – and very public – history of accusations by women and inappropriate sexual behavior, as well as his own admissions in this area, the most likely conclusion is that significant amount of people might believe the Plaintiff's allegations against him.

<u>Weinstein/Me Too Phenomenon</u> – The environment and dynamics of women reporting sexual assaults and rapes changed dramatically in recent years emanating from the Harvey Weinstein scandal and movements spawned by it (e.g. Me Too, Times Up). The Plaintiff herself pointed to this as the reason that she came forward with her allegations against the Defendant after two decades. The culture now is that women are "heroes" who come forward to report sexual assaults, harassment or rapes. The Plaintiff would be seen as being particularly brave to accuse such a famous, rich and powerful person as the Defendant.

- <u>Visibility and Prominence</u> – As previously stated, the Plaintiff was a public figure over a three decade span, most notably in the New York area and among women who were aware of her advice column in Elle Magazine. However, it is without question that

19

A-885

coming forward to accuse the Defendant has raised her profile exponentially nationwide through the massive media coverage that ensued as well as internet exposure. This has been virtually non-stop since she went public with her accusations in June 2019. It will continue at least through the trial which is scheduled for April of this year. (Note: I had never heard of the Plaintiff prior to her lawsuit but I became of aware of her professional accomplishments prior to being contacted to serve as an expert witness in this case.)

- Positive Media Exposure – Similar to several of the factors above, the extensive media coverage of her initial reporting of the alleged assault and rape continuing through all the litigation that has been ongoing since she filed her original lawsuit in November 2019 has highly positive for her for several reasons: sympathy for being a victim, coming forward publicly to report a wrong and being brave in taking on a powerful person who cause her harm. Some examples of media exposure that was complimentary and highly positive to her in terms of creating awareness of her professional credentials and competence:

  - ■ Touting her background – In an article in the Christian Science Monitor (June 26, 2019) titled "E. Jean Carroll: She Said, He Said, and How Media Weighs Balance," it published her credentials:

    --- *"…when the writer and advice columnist E. Jean Carroll…"*

    --- *"…the well-known author's…"*

    --- *"…given a respected public figure like Ms. Carroll, whose advice column "Ask E. Jean" has appeared in Elle magazine since 1993…"*

  - ■ Articles of Praise – In an article in the New York Times (June 27, 2019) titled "Why E. Jean Carroll, 'The Anti-Victim,' Spoke Up About Trump," her resume was accentuated with praise for her character and professionalism. Some quotes:

    --- "Ms. Carroll, who once wrote for 'Saturday Night Live'…"

    --- *"Carroll has written the "Ask E. Jean" column for 20 years."*

    --- *"Emmy nominated…"*

    --- *"Ask E. Jean" televisions series on NBC's America's Talking."*

    --- *"…Playboy's first female contributing editor."*

    --- *"She's a total original."*

    --- *"She was incapable of being uninteresting, or writing a boring sentence,"* said Bill Tonelli, her editor at Esquire. *"She was fearless." "She is a very honorable woman."*

    --- *Those public appearances are in keeping with how friends describe her: the girlfriend who would ride a Yugoslav freighter to Tangier; the plucky author of a popular column who dispensed advice on every aspect of her*

20

A-886

*devoted readers' lives, from sex to careers, but kept her own struggles private. She is a former Miss Cheerleader USA turned journalist, whose gonzo-style approach led The New York Times in 1981 to call her "feminism's answer to Hunter S. Thompson."*

In the Slate magazine (June 25, 2019), the article "E. Jean Carroll Told Her Story Anyway" included the following highly positive assessment:

--- *"...Carroll is that he's merely the one who caused the popular advice columnist..."*
--- *"...Or she could take her prodigious skills as a writer, a television personality, and a raconteur and tell her own story in her own way."*

Since she came forward publicly in 2019 to accuse the Defendant of sexual assault and rape, there have been scores of articles about her accusations and the litigation. The above examples are indicative of the positive treatment she received in those articles.

Based on all these factors as outlined in this section, it is my opinion – as a communications expert with 50 years of working in the field of reputation management and repair – that while the Plaintiff may have suffered some reputation harm (mainly with the small segment of the population that is enamored with the Defendant), there have been significant benefits to her in terms of increased visibility and prominence as well as positive enhancement of public perception of her character and reputation.

Footnote. In the New York Times article referenced above, another passage from the article is quite revealing as to any negative impact of the Plaintiff personally and how she was coping with the situation. As excerpt from the article:

*"After taping an interview with CNN on Monday, Ms. Carroll went to a party in Brooklyn, where friends and former editors had gathered to toast her with a bottle of Chartreuse (her favorite) and a cake that read BRAVE. How was she? They wanted to know. Was she checking Twitter? Was she scared?*

*"I'm having a ball," she replied."*

<u>PLAINTIFF'S EXPERT</u>

To assist with the case, the Plaintiff retained Professor Ashlee Humphreys, Ph.D ("Humphreys") to serve as an expert witness on her behalf. A graduate of Northwestern University with a Bachelor of Arts degree in Economics and Philosophy, Humphreys currently is employed by the University as a Professor of Integrated Marketing Communications at its Medill School of Journalism and as Professor of Marketing with its Kellogg School of Management. She reports that her focus of instruction is on assessing the impact of social media campaigns and strategically directing a portfolio of social media tools to pursue managerial goals involving persuasion, advertising, market growth, and branding. She purports to have a decade of experience in the field of digital communications and marketing and states that her expertise is the fields of marketing, advertising, market growth and social media.

From my review of Humphreys credentials she has a very impressive background of accomplishments, (including awards), however, she does not indicate nor has she demonstrated that she has any professional background, experience or expertise in reputation management,

21

A-887

damage or repair - which are at the center of this lawsuit. I have also studied her 14-page CV and see no indication of anything in her professional career in this area. As stated above, her expertise is in fields that are promotion-oriented, including marketing, advertising, digital and social media campaigns. This case requires a background, experience and expertise in assessing, coping with and overcoming negative communications which cause harm to and damage a reputation. She states that her current professional focus is as follows:

> "My current work continues to investigate market emergence and change, but has expanded include the areas of social media and sustainability. I also continue to be a leader in the method of automated text analysis in consumer research by publishing and leading workshops and seminars for scholars in both consumer psychology and CCT."

This is consistent with her work and expertise in her past professional career and this is not suitable expertise for the issues in this lawsuit.

Assignments

Humphreys was retained by the Plaintiff's legal counsel twice to prepare Expert Witness Reports. The first was to cover the alleged false statements made by the Defendant on June 21, 22 and 24, 2019. The second report covered his October 12, 2022 statement.

Both of Humphrey's expert reports for the June 21, 22 and 24 statements as well as the one for October 12 are extremely impressive in terms of the quality and quantity of the information, the research and statistics she advances, her thought processes and her attention to detail. Unfortunately, nowhere in her reports is it more evident that she doesn't have the background, experience, knowledge, or insight into matters relating to reputation damage or repair than in the presentation of her reputation damage repair program. Humphreys' self-stated expertise is in advertising, marketing, social media and digital communications. The orientation of these is all primary geared to promotion and advancing positive content. Promoting someone or something as opposed to overcoming and reversing negative impressions, images and reputations are two different worlds. This is evident in aspects of her proposed program, from conception to the budget. Following is my analysis and my thoughts on her program. (Note: While I will attribute the following mostly to her first report, the content, from my brief review of the second report, was the same in both her reports.)

Reputation Repair Program

In her Expert Witness Reports, Humphreys outlined a Reputation Damage Repair Program to be implemented to restore the Plaintiff's reputation. Following is my analysis and comments on this program advocated and advanced by Humphreys.

In describing the type of program that would be needed to repair the reputation of Carroll, Humphreys in her first report stated:

> "A holistic, integrated campaign is needed to effectively create attitudinal change and in turn repair reputational damage" (Page 5, H)

However, this is not what she is proposing. Later she clarifies it to state the following:

> "A holistic social media campaign that includes these integrated elements is therefore the most effective way to repair reputational damage in this case." (Page 186, 65i)

22

A-888

Note the "integrated" reference in the first quote is actually related to a social media campaign - not a diverse. Multi-faceted communications campaign – as defined in the second quote. Humphreys' background and expertise is largely concentrated with the internet and social media. The vast majority of her program is linked to both, at the near exclusion of other channels of communication.  In her first report, she states:

> *"Reputational repair is a matter of public good and must occur in relation to the public sphere and the sphere in which it was originally damaged."*   (Page 12, i)

The initial damage was from widespread news coverage as traditional media had a field day with the news of the alleged rape. That was the genesis of the negative exposure, not social media. She also states in her first report:

> *"The public in which the reputational harm originally occurred persists on social media and may have limited exposure to traditional media."*   (Page 47, 15)

This may be true, but conversely, there are a great amount of people (e.g., senior citizens, technologically- challenged people) that are not on the internet (except maybe for e-mails). Having highest concentration of the program and budget geared to online exposure is equivalent to "putting all your eggs in one basket."  The most successful type of communications program features dissemination of information through multiple communications channels giving each sufficient budget to effectively ensure all bases are covered in terms of reaching the target audiences.  Also, overreliance on the use of statistical data on impressions to determine where the focus and budget is allocated is not necessarily prudent to achieve the objectives.

(Side note:  A good analogy is Custer at the last stand.  There were 2,000 Indians to his 196 soldiers.  He was not defeated because they outnumbered him.  The massacre occurred because they surrounded him. If they came from one direction, they could have escaped by going the opposite direction.  The theory is the same in communications, don't overemphasize or rely heavily on one channel of communications, use a variety to ensure the message is received.)

In her reports Humphreys herself gave two other reasons why it would be important to put a major focus on traditional news media instead of strictly social media:

> *"Since the news broke in June 2019, these same news publications have continued to cover the story, which has extended the effect of Mr. Trump's Statements further into the present day."* (Page 50, iv)

In short, she has made her own case for making a public relations program targeted to free media exposure an integral part of the program as opposed to the major thrust of her program dwelling almost solely on internet exposure and social media.

However, Humphreys appears to have a negative view of traditional news media as evidenced by this comment:

> *"Secondly, trust in traditional media has declined across the ideological spectrum. Whereas legitimate sources of news once went unquestioned, assessing trust of the source is now a primary concern of users when assessing claims…"*   (Pages 22-23, Ci, First Report)

(Side note:  Somewhat ironically, it is Trump and conservatives that have the most distrust of traditional media, often labeling reports as "false news.")

It also important to note that internet exposure (and even media exposure) is a form of "indirect" communications meaning that the receiver is not getting the message directly from the sender. The most effective form of communications is "direct" contact. There are many ways to do this (e.g., direct verbal conversations, letters, emails, speaking engagements, appearance at events) and it does not appear that any form of direct communications is in Humphreys' program.

When evaluating the approach to her program, here are some factors to consider:

- The relatively small size of the audience that can be impacted or influenced by the program as discussed in the preceding section.

- As stated in a previous section, there is no need for a massive online and social media campaign (e.g. extensive advertising and marketing, paying influencers) when the mass media would give coverage for free of an ongoing story which she readily admits.

- If Carroll were to prevail in this case, the initial media exposure would be substantial and the positive outcome of the litigation would significantly repair her reputation and a program would only be needed to build on that news and lessen the need for such a major program. (Note:  If she loses the case, Trump wouldn't be responsible for the program and a larger program would be needed in that instance.)

Second Expert Report

In her second report covering the Defendant's October 12 statement, Humphreys - as her assignment was essentially the same - she reported she used the same methodology to develop her findings as she did in the first report.  In her report, she estimated that 21.42% of those people exposed to the Defendant's negative comments about the Plaintiff would have been receptive to them.  (Note: in effect, she is reporting that less than one in four people might possibly have given any credence to the Defendant's alleged false statements.)

CONCLUSION

As stated in the Assignment section of this report, I was asked to review, analyze and provide my comments, observations, conclusions and opinions on the Cause of Action of Defamation in this lawsuit as well as to assess what, if any, impact there was on the reputation of the Plaintiff from the negative communications about her emanating from the Defendant in his October 12, 2022 statement. It is my professional and expert opinion - based on all available evidence, the information I reviewed as well as my experience and expertise in the communications field and (as it relates to negative reputations) and as an expert witness in the field of Defamation that:

- While I can not offer a legal opinion, it is my personal assessment and judgment, as a professional communicator and communications expert, that the alleged false statements attributed to the Defendant in this lawsuit did not meet the criteria for Defamation as I understand it under New York law.

- While the views, comments and opinions of the Defendant may have caused some minimal reputation harm to the Plaintiff (which would not be actionable if not determined to be Defamation at trial), it is my professional assessment and opinion that the Plaintiff benefitted from this public dispute in terms of increased positive exposure for her as a professional and positive enhancement of her personal character and reputation.

24

Report Disclaimer

The views, conclusions and opinions stated in this report are based on information and input related to this case that I have received to date. Based on receiving additional documents or information (e.g. legal filings, expert reports, depositions or hearing transcripts, records, communications, data) that may be made available to me in the future, I would reserve the right to either add to, change and/or expand on the scope of what I have offered in this report.

_____
Robert J. Fisher

JANUARY 30, 2023
Date

25

A-891

# EXHIBIT 3

A-892

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

E. JEAN CARROLL,

<em>Plaintiff,</em>

v.

DONALD J. TRUMP,

<em>Defendant.</em>

No. 22 Civ. 10016 (LAK)

---

<u>**EXPERT REPORT OF PROFESSOR ASHLEE HUMPHREYS, PHD**</u>

January 9, 2023

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

   A. Qualifications ................................................................................................ 1

   B. Assignment .................................................................................................... 2

   C. Summary of Opinions .................................................................................... 3

II.   CASE BACKGROUND ...................................................................................... 5

   A. The Parties ..................................................................................................... 5

      i.    E. Jean Carroll ....................................................................................... 5

      ii.   Donald J. Trump ................................................................................... 6

   B. Allegedly Defamatory Statement ................................................................. 8

III.  THEORETICAL BACKGROUND ................................................................ 10

   A. Reputation and Reputational Damage ........................................................ 10

      i.    Reputational Repair ........................................................................... 11

      ii.   Person Brands and Brand Value ........................................................ 12

   B. Reputational Damage in a Complex Media System ................................... 14

      i.    The Media System ............................................................................. 14

      ii.   Social Media Impressions ................................................................. 16

      iii.  Traditional Media Impressions ......................................................... 21

   C. Assessing Damages for Defamation Online: Adapting Traditional Approaches to the
      Sphere of Social Media ............................................................................... 22

   D. Media Exposure and Counter-Attitudinal Attitude Change ....................... 23

IV.   IMPRESSIONS MODEL .................................................................................. 25

   A. Web Impressions ......................................................................................... 26

   B. Social Media Impressions ............................................................................ 27

   C. Television Impressions ................................................................................ 32

   D. Print Impressions ......................................................................................... 33

   E. Total Impressions ......................................................................................... 33

   F. Other Impressions Not Included in the Model ............................................ 34

V.    IMPACT ASSESSMENT ................................................................................. 36

   A. Qualitative Impact Assessment ................................................................... 37

      i.    Ms. Carroll's Professional Career .................................................... 38

      ii.   Reception to Ms. Carroll's Professional Work ................................. 40

A-894

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

     iii.    Qualitative Evidence of Impact ............................................................ 42

  B. Quantitative Impact Assessment.............................................................. 45

     i.    Readership Analysis........................................................................... 46

**VI. MODELING THE COSTS FOR REPUTATION REPAIR ................................. 50**

  A. Modeling Reputation Repair on Social Media.......................................... 50

     i.    Campaign Goals, Platforms, and Measurements ................................ 50

     ii.    Media Mix .......................................................................................... 51

     iii.    Attitude Change Multiplier ................................................................ 53

     iv.    Potential Overlap in Impressions ..................................................... 54

  B. Costs of the Corrective Campaign ........................................................... 55

**VII. CONCLUSION ................................................................................................. 57**

**APPENDIX A.  PROFESSOR HUMPHREYS' CV AND PRIOR TESTIMONY............. 59**

**APPENDIX B.  MATERIALS CONSIDERED ................................................................. 73**

**APPENDIX C.  GLOSSARY OF TERMS ...................................................................... 87**

**APPENDIX D.  IMPRESSIONS MODEL ...................................................................... 90**

  A. Web Impressions Model .......................................................................... 90

  B. Social Media Impressions Model ............................................................. 94

  C. TV Impressions Model ............................................................................ 97

  D. Print Impressions Model .......................................................................... 97

**APPENDIX E.  ADDITIONAL EXAMPLES OF NEGATIVE COMMENTS.................. 98**

**APPENDIX F.  IMPACT MODEL .............................................................................. 113**

**APPENDIX G.  DAMAGES MODEL ......................................................................... 115**

**APPENDIX H.  LIST OF CONSERVATIVE STEPS TAKEN ......................................... 121**

A-895

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## I. INTRODUCTION

### A. Qualifications

I am a Professor of Integrated Marketing Communications at Medill School of Journalism and Professor of Marketing at the Kellogg School of Management, Northwestern University. I hold a Doctorate in Marketing from the Kellogg School of Management with a concentration in Cultural Sociology and a Bachelor of Arts degree in Economics and Philosophy from Northwestern University.

I have been on the faculty at Northwestern University for 14 years, regularly teaching classes on Social Media, Consumer Research, and Marketing Research. I instruct students on both the strategic and analytical tasks of Marketing, which include assessing the impact of social media campaigns and strategically directing a portfolio of social media tools to pursue managerial goals involving persuasion, advertising, market growth, and branding.

My current research focuses on social media and online communities. I am the author of *Social Media: Enduring Principles* (Oxford University Press, 2016), a review and synthesis of the empirical social science research on social media. My research on social media includes a project looking at the development of norms and institutions on social media platforms like Wikipedia and YouTube. I also have conducted recent research in the area of online search and search engine optimization, including a project in which I use text analysis to identify consumer goals that, when matched, can optimize advertising spending and increase click-through rates. In this work, I have developed and refined the method of automated text analysis, which I use to analyze textual data—a method I helped introduce to Marketing.

My broader research agenda concerns the role of institutions in markets. My dissertation

1

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

research examined how markets are created through shifts in social structure using the case of casino gambling in America. This research ("Megamarketing: The Creation of Markets as a Social Process, *Journal of Marketing*, 2010) was selected as a lead article in the *Journal of Marketing*.

I have received several accolades for my research. I was runner up for the Maynard Award for best paper in Marketing. I have also won the Sidney J. Levy award in 2010 for the contribution of my dissertation research to Consumer Culture Theory. In addition, I was named an MSI Young Scholar in 2012 and have been selected as an MSI Scholar in 2020, one of a select group of 35 Marketing Scholars who are counted "amongst the most prominent marketing scholars in the world," according to Barbara Kahn, MSI's Executive Director.

My full CV and list of matters in which I have testified is attached as Appendix A.

### B. Assignment

I was engaged by Kaplan Hecker & Fink LLP on behalf of E. Jean Carroll to create an analytic model to (1) estimate the number of impressions for the allegedly defamatory statement ("Statement") that was posted on Truth Social by Donald Trump on October 12, 2022[1] and circulated on social and traditional media ("Impressions Model"), (2) analyze the impact, if any, of this Statement by estimating the percentage of people who may have been receptive to this Statement and assess the damage to Ms. Carroll's reputation and person brand ("Impact Model"), and (3) provide a model to estimate costs for reputational repair based on the impact of those impressions ("Damages Model") on behalf of Ms. Carroll in connection with the above-

---

[1]   https://truthsocial.com/@realDonaldTrump/posts/109158644496040450.

2

Expert Report of Professor Humphreys

**A-897**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

captioned case.[2, 3]

I also submitted a report in the case *Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.) (LAK) (JLC). In the present report I estimate the impressions, impact, and damages for only the October 12, 2022 Statement using the same methodology adopted in my prior analysis.

The analysis detailed in this report provides an estimate of the impressions across social and traditional media channels and their reputational impact in order to assess reputational harm based on the information provided to me by Counsel and my independent research. Specifically, it takes into account the multi-channel dissemination of the Statement across social media like Twitter and Truth Social, traditional media like the *Washington Post* and Fox News, and websites like the *Vice.com* and the *Radar Online*.

My analysis is presented as of January 9, 2023. I reserve the right to amend or supplement my opinions if new information becomes available to me.

### C.  Summary of Opinions

After reviewing the data provided in this case, performing independent research and analysis, and based on my own professional background, prior research, education, and more than a decade of experience in the field of digital communication and marketing, I conclude the following with a reasonable degree of certainty:

---

[2]   I was assisted in the preparation of this report by a team of research assistants at Voluble Insights, whom I supervised. Throughout my report, I use the word "I" to refer to work conducted by myself or work Voluble implemented under my direction.

[3]   For the purposes of writing this report, I am being compensated at a rate of $600 per hour, subject to a 15 percent discount. I will be compensated at a rate of $1,000 per hour for deposition testimony, and at a rate of $1,000 per hour for trial testimony, subject to the same 15 percent discount. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in this report or subsequent testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

3

A-898

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A. Person brands are well-known people who also possess a set of brand meanings and associations that have value. Person brands are formed through exposure in a media system. They have social and cultural capital and can become devalued when an unpredictable event occurs, or if a negative claim is made about the person. A person brand that has a general popular following can be especially harmed by negative claims, even if only a subset of the public believes the claims. Their reputation relies on a "generalized perception" among the public, and public opinions and individual beliefs can shift when people take cues from their surroundings, including what they learn in the media. The damage to a person brand can be severe and lasting, no matter if the person at issue is at fault or whether their primary followers believe the claims.

B. Mr. Trump made the at-issue Statement on October 12, 2022, in regard to Ms. Carroll's allegation that Mr. Trump had sexually assaulted her in the mid-1990s in the dressing room of a Bergdorf Goodman department store in New York City. The Statement made by Mr. Trump, an extraordinarily high-profile person, generated significant online conversation and media coverage.

C. A measure of the dissemination of the Statement is possible using an information cascade model to estimate impressions on social media and with ratings, circulation, and web traffic data to estimate impressions on traditional media. I have identified between **13,787,119 and 18,020,819 impressions** generated by Mr. Trump's Statement ("Impressions Model"). This number of impressions reflects the prominence of Mr. Trump, but nonetheless is a conservative estimate for the reasons I detail in the description of the Impressions Model.

D. The impressions Mr. Trump's Statement generated across online and traditional media impacted Ms. Carroll's person brand. It is possible to quantify some, but not all, of the negative impact. Mr. Trump's Statement built on the effects of initial statements in June 2019 and further impacted Ms. Carroll's person brand by keeping allegedly defamatory statements in the public sphere. In particular, his statement reinforced existing damage to Ms. Carroll's person brand and prompted further harm. Social and online media users published negative and vicious comments about Ms. Carroll in response to Mr. Trump's statements, indicating that her person brand has been, and continues to be harmed. Since Mr. Trump's Statement followed other similar statements made in June 2019, Mr. Trump's Statement again linked negative associations with her person brand and strengthened existing negative associations with her person brand among the audience who is receptive to Mr. Trump's statement.

E. In an attempt to quantify at least a portion of the impact this Statement had on Ms. Carroll's brand, I applied academic research and industry estimates related to audience composition to estimate that, of the impressions collected, an average of 21.42% of the impressions were receptive to Mr. Trump's message, resulting in an estimated range of **3,764,125 to 5,649,724 receptive impressions** that should be corrected (*i.e.,* impressions that may have been received by those who likely found the Statement credible; "Impact Model").

4

Expert Report of Professor Humphreys

A-899

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

F.  The utterance and circulation of Mr. Trump's Statement caused short- and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand among the general public and specific perceptions among a group of people receptive to the claims. Ms. Carroll's reputational value has been diminished due to the Statement. This kind of reputational harm has a long-lasting effect on her ability to capitalize on her person brand in the future because Ms. Carroll has lost control of her brand, which she worked for decades to develop.

G.  A holistic, integrated campaign is needed to effectively create attitudinal change and in turn repair reputational damage. In such a campaign, the corrective message would need to come from a trusted source and, absent any other prior campaigns, would need to ensure that the audience is exposed to the message multiple times. For example, one such solution to reputation repair is to enlist the help of multiple online intermediaries and sources that consumers trust. The campaign would need to take into account where the target audience gets their news. Using my estimates for the quantifiable impact of Mr. Trump's Statement (*i.e.*, the 3,764,125 to 5,649,724 receptive impressions that should be corrected) and research related to exposures required and media considerations costs, I estimate that the cost to counteract the impact of the defamatory claims is between **$368,183.78 and $2,763,107.82** ("Damages Model"). Given the above-stated needs of the campaign and contingent on a prior campaign being run, I believe the appropriate corrective campaign would be the low range of the Damages Model, from $368,183.78 to $552,621.56.

H.  My estimates of the impressions generated by the Statement, the quantification of the receptive impressions, and the costs of the corrective campaign are all conservative. Among other things, I consider only a subset of the impressions generated by Mr. Trump's Statement. Therefore, I undercount the receptive impressions and the costs needed to correct the receptive impressions.

The materials I considered are noted in this report, provided as appendices or native files, and/or listed in Appendix B. A glossary of technical terms used throughout my report can be found in Appendix C.

## II.  CASE BACKGROUND

### A.  The Parties

#### i.   E. Jean Carroll

Elizabeth Jean (E. Jean) Carroll is a journalist, author, former writer for *Saturday Night*

5

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Live*, and former advice columnist for *Elle* Magazine.[4] Ms. Carroll wrote for *Saturday Night Live* in the 1980s and hosted her own show called *Ask E. Jean* on MSNBC's predecessor, America's Talking, from 1994 to 1996.[5] Her work was featured in numerous major publications including *Rolling Stone*, *GQ*, and *Playboy*. Ms. Carroll's column for *Elle* Magazine, "Ask E. Jean," was at the time it was published, the longest running advice column in the United States.[6]

Ms. Carroll is also the author of numerous books including *Female Difficulties: Sorority Sisters*, *Rodeo Queens*, *Frigid Women*, *Smut Stars, and Other Modern Girls*, *Hunter: The Strange and Savage Life of Hunter S. Thompson*, *A Dog in Heat Is a Hot Dog and Other Rules to Live By*, *Mr. Right, Right Now*, and *What Do We Need Men For?: A Modest Proposal*.[7]

ii.    **Donald J. Trump**

Donald John Trump is an American businessman, media personality, and politician who served as the 45th president of the United States from 2017 to 2021.[8] He was a real estate developer who owned and/or had his name on numerous hotels, casinos, golf courses, and other buildings in New York and around the world.[9] In 2004, Mr. Trump starred in "The Apprentice" (later known as "The Celebrity Apprentice"), a reality television competition series where he judged aspiring business people based on his business experience.[10] He hosted for 14 seasons until 2015.[11]

---

[4]    https://www.elle.com/author/4913/e-jean/.
[5]    https://www.usatoday.com/story/money/2019/07/03/e-jean-carroll-new-york-circuit-donald-trump-assault-accusation/1584135001/.
[6]    https://www.amazon.com/E-Jean-Carroll/e/B000AP7CJM.
[7]    https://www.goodreads.com/author/show/30738.E_Jean_Carroll.
[8]    https://www.britannica.com/biography/Donald-Trump.
[9]    https://www.britannica.com/biography/Donald-Trump.
[10]    https://www.nytimes.com/2020/09/28/arts/television/trump-taxes-apprentice.html.
[11]    https://www.cbsnews.com/news/donald-trump-officially-fired-from-the-celebrity-apprentice.

Expert Report of Professor Humphreys

A-901

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

In July 2016, Mr. Trump was nominated as the Republican presidential candidate and ultimately won the 2016 U.S. presidential election.[12] Throughout his time as president, Mr. Trump enjoyed significant support from Republican voters, with an average of 87% of Republicans saying they approved his handling of the job from 2017 through 2020.[13] After serving one term as president, Mr. Trump lost his bid for re-election and officially left the White House in January 2021.[14]

Since leaving office, there have been a number of investigations into Mr. Trump, his business dealings, and his handling of classified information.[15] Despite these investigations, polls show that support for Mr. Trump has remained consistent. Polls tracked by FiveThirtyEight show that Mr. Trump has maintained a favorability rating of around 40% from February 2021 through December 7, 2022.[16] Favorability among Republican voters is even higher. A September 2022 New York Times-Siena College poll found that 90% of Republican respondents had either a very favorable or a somewhat favorable impression of Mr. Trump.[17] Further, the same poll found that 91% of Republican respondents indicated they would vote for Mr. Trump, assuming he were the Republican nominee and President Biden were the Democratic nominee in the 2024 election.[18] In an August 2022 Ipsos poll, 59% of Republicans indicated that Mr. Trump should be the Republican party nominee for the 2024 election.[19] According to a YouGov poll conducted

---

[12] https://www.cnn.com/2016/07/19/politics/donald-trump-republican-nomination-2016-election.html.
[13] https://www.pewresearch.org/fact-tank/2020/08/24/trumps-approval-ratings-so-far-are-unusually-stable-and-deeply-partisan/.
[14] https://time.com/5907973/donald-trump-loses-2020-election/;
https://www.nytimes.com/2021/01/20/us/politics/biden-president.html.
[15] https://time.com/6212677/donald-trump-investigations-explained/.
[16] https://projects.fivethirtyeight.com/polls/favorability/donald-trump/.
[17] https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html.
[18] https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html.
[19] https://www.ipsos.com/en-us/news-polls/Republican-voters-continue-to-view-Trump-as-the-partys-leader.

7

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

October 16-18, 2022, Mr. Trump's overall favorability rating was 42% (N=1,500, ±3.2%)
(YouGov Economist 2022).[20]

## B. Allegedly Defamatory Statement

Mr. Trump posted the Statement and a video[21] to his Truth Social account on October 12,
2022, in which he made allegedly defamatory claims about Ms. Carroll.[22] Previously, Mr. Trump
had made statements containing allegedly defamatory claims in response to the allegation by Ms.
Carroll in an excerpt from her 2019 book that Mr. Trump sexually assaulted her in the mid-1990s
in the dressing room of a Bergdorf Goodman department store in New York City.[23]

The Truth Social Statement was released by Mr. Trump on October 12, 2022:

> This "Ms. Bergdorf Goodman" case is a complete con job, and our legal system in
> this Country, but especially in New York State (just look at Peekaboo James), is a
> broken disgrace. You have to fight for years, and spend a fortune, in order to get
> your reputation back from liars, cheaters, and hacks. This decision is from the
> Judge who was just overturned on my same case. I don't know this woman, have
> no idea who she is, other than it seems she got a picture of me many years ago,
> with her husband, shaking my hand on a reception line at a celebrity charity event.
> She completely made up a story that I met her at the doors of this crowded New
> York City Department Store and, within minutes, "swooned" her. It is a Hoax and
> a lie, just like all the other Hoaxes that have been played on me for the past seven
> years. And, while I am not supposed to say it, I will. This woman is not my type!
> She has no idea what day, what week, what month, what year, or what decade this
> so-called "event" supposedly took place. The reason she doesn't know is because
> it never happened, and she doesn't want to get caught up with details or facts that
> can be proven wrong. If you watch Anderson Cooper's interview with her, where
> she was promoting a really crummy book, you will see that it is a complete Scam.
> She changed her story from beginning to end, after the commercial break, to suit
> the purposes of CNN and Anderson Cooper. Our Justice System is broken along
> with almost everything else in our Country. Her lawyer is a political operative and

---

[20]   A breakdown of favorability by party was not available in the reported results, and the raw data was not
       provided. https://docs.cdn.yougov.com/ez0xfzdbfl/econtoplines.pdf.

[21]   https://truthsocial.com/@realDonaldTrump/posts/109158586745522514.

[22]   Throughout this report, when I use the phrase "defamatory statements," I mean "allegedly defamatory
       statements" and am basing my opinion on the assumption that these statements are defamatory.

[23]   Complaint dated November 4, 2019, in *Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.) (LAK) (JLC) ("*Carroll I*
       Complaint").

8

A-903

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

> Cuomo crony who goes around telling people that the way to beat Trump is to sue him all over the place. She is suing me on numerous frivolous cases, just like this one, and the court system does nothing to stop it. In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to "Trump"![24]

In addition to this Statement, on October 12, 2022, Mr. Trump posted a video featuring clips from Ms. Carroll's 2019 *Anderson Cooper 360* interview overlaid with text commentary,[25] and then posted two similar videos on Truth Social on October 20, 2022.[26] While the focus of this report is the claims made in the text-based Statement, the spread of these three videos likely furthered Mr. Trump's efforts to cast Ms. Carroll in a negative light. I nevertheless do not attempt to identify or attribute any additional harm caused by the videos themselves.

I understand that this Statement contained several allegedly defamatory claims about Ms. Carroll, including: (1) that Mr. Trump did not rape Ms. Carroll; (2) that he had no idea who Ms. Carroll was; and (3) that Mr. Trump implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "Hoax," "Scam," or ploy to increase her book sales.[27]

As discussed below, this Statement received widespread circulation across print, web, social, and traditional media outlets, directly impacted Ms. Carroll's brand, and furthered negative associations already in the public sphere.

---

[24]   https://truthsocial.com/@realDonaldTrump/posts/109158644496040450.
[25]   https://truthsocial.com/@realDonaldTrump/posts/109158586745522514.
[26]   https://truthsocial.com/@realDonaldTrump/posts/109200571344419422;https://truthsocial.com/
@realDonaldTrump/posts/109200531178060636.
[27]   Complaint dated November 17, 2022, in *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.) (LAK) ¶¶ 96-98 (the "Complaint").

9

A-904

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## III.  THEORETICAL BACKGROUND

### A.  Reputation and Reputational Damage

Reputation is fundamentally a social concept; one's reputation is determined by the social esteem held among a bounded group of people, up to and including the public sphere at large.[28] It has value in the sense that it gives someone social standing and respect in society. Reputation has been conceptualized as property—something that has economic value—and as dignity— something that has moral value.[29]

Reputation is determined in the sphere of generalized public opinion, which encompasses individual beliefs but is more than the sum of them—a "generalized perception."[30] What people think their friends, family, coworkers, and other members of their community think is an important determinate of an individual's belief, particularly if one does not have strong opinions about an issue or person. Over time, the beliefs of a subset of society, including what is represented in the media, can shift public opinion and generalized associations as people take cues from those around them who believe differently.[31] If someone is receptive to a claim—if it is congruent with their other beliefs and/or if the claim comes from a source they trust—they may only need to be exposed to it once to form a belief.[32] If they are less receptive to the claim,

---

[28]  Weber, Max (1922/1978), *Economy and Society: An Outline of Interpretive Sociology*, Vol. 2: University of California Press.

[29]  Ardia, David S. (2010), "Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law," *Harvard Civil Rights-Civil Liberties Law Review*, 45(2), 261-328, p. 261.

[30]  Weber, Max (1922/1978), *Economy and Society: An Outline of Interpretive Sociology*, Vol. 2: University of California Press. Sharman, Jason C. (2007) "Rationalist and constructivist perspectives on reputation." *Political Studies* 55, no. 1: 20-37.

[31]  Dewenter, Ralf, Melissa Linder, and Tobias Thomas (2019), "Can Media Drive the Electorate? The Impact of Media Coverage on Voting Intentions," *European Journal of Political Economy*, 58, 245-61. Huang, J., *et al.* (2021). "Large-scale quantitative evidence of media impact on public opinion toward China," *Humanities and Social Sciences Communications,* 8(1), 1-8.

[32]  Heider, Fritz (1946), "Attitudes and Cognitive Organization," *The Journal of Psychology*, 21(1), 107-12, Hummon, Norman P and Patrick Doreian (2003), "Some Dynamics of Social Balance Processes: Bringing Heider Back into Balance Theory," *Social Networks*, 25 (1), 17-49.

10

Expert Report of Professor Humphreys

A-905

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

mere exposure, again from a trusted source, can eventually change attitudes through repetition.[33] An individual's receptivity to a claim is based on the process through which people process new information, form beliefs, and integrate beliefs with prior knowledge.[34] According to the balance theory of attitudes,[35] when people do not have a belief about a person, it is relatively easy to create a belief, particularly when it is congruent with their other beliefs.[36] However, once people have a belief, it is harder to change that belief and requires multiple exposures, often from several different, trusted sources.[37]

### i.   Reputational Repair

Reputational repair is a matter of public good and must occur in relation to the public sphere and the sphere in which it was originally damaged. To quantify the damage to one's reputation, one must look to the *cost to repair* rather than the *cost to inflict* reputational harm. I therefore provide three models: a model that estimates the impressions that initially created the reputational beliefs, a model to estimate the percentage of readers or viewers who were receptive to those claims, and a model of damages that estimates the cost to repair reputational damage.

---

[33]   Cialdini, Robert B (1987), *Influence*, Vol. 3: A. Michel Port Harcourt, Sterrett, David, Dan Malato, Jennifer Benz, Liz Kantor, Trevor Tompson, Tom Rosenstiel, Jeff Sonderman, and Kevin Loker (2019), "Who Shared It?: Deciding What News to Trust on Social Media," *Digital Journalism*, 7 (6), 783-801.

[34]   Ajzen, I. (1985). From intentions to actions: A theory of planned behavior. In J. Kuhl & J. Beckmann (Eds.), Action control: From cognition to behavior. Berlin, Heidelberg, New York: Springer-Verlag. (pp. 11-39).; Heider (1946); Cacioppo, J. T. and R. E. Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," *Current Issues and Research in Advertising*, 3 (1), 97-122.

[35]   Heider, Fritz (1946), "Attitudes and Cognitive Organization," *The Journal of Psychology*, 21 (1), 107-12.

[36]   Kunda Z. (1990), The case for motivated reasoning. Psychological Bulletin, 108(3):480-98.; Housholder and LaMarre (2014), Facebook Politics: Toward a Process Model for Achieving Political Source Credibility Through Social Media, *Journal of Information Technology & Politics*, 11:368–382; Festinger, L. (1962), "Cognitive dissonance." *Scientific American* 207(4): 93-106; Kahneman and Tversky (1974), Judgment under Uncertainty: Heuristics and Biases, Vol. 185, No. 4157, pp. 1124-1131.

[37]   Cacioppo, John & Petty, Richard (1979), Effects of message repetition and position on cognitive response, recall, and persuasion. Journal of Personality and Social Psychology. 37. 97-109.; Housholder and LaMarre (2014); Weiss, Robert Frank (1969), "Repetition of Persuasion," *Psychological Reports*, 25 (2), 669-70.

11

Expert Report of Professor Humphreys

A-906

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**ii.    Person Brands and Brand Value**

Human, or person, brands are "well-known persona[e] who [are] the subject of marketing communications efforts," and have been shown to enhance consumers' feelings of autonomy and relatedness to the brand and others.[38] Starting from attachment theory, scholars have researched the ways in which consumers and audiences form attachments to people—who themselves become brands—through exposure in a media system.[39] Human brands are both biographical people and brands—constellations of meaning—and these two elements form interdependences as the actions of biographical people can affect their brand value.[40] Brand value is the aggregate of associations with a brand.[41] If those associations change, brand value can be diminished.

Person brands can become devalued when unpredictable or unforeseen events occur to them.[42] Fournier and Eckhardt (2019), for example, find that mortality, hubris, unpredictability, and social embeddedness underlie the value of human brands and have the potential to build or diminish brand value. As Fournier and Eckhardt say, "the meaning and daily manifestations of person-brands are inherently socially embedded in a web of relationships that the person-brand cannot control, escape, or ignore."[43] That is, if an unpredictable event or claim is made about the person, it affects their brand because of their embeddedness within a social system.[44] The

---

[38]   Thomson, M. (2006). Human Brands: Investigating Antecedents to Consumers' Strong Attachments to Celebrities. *Journal of Marketing*, 70(3), 104–119, p. 104.

[39]   Dyer (1979), Heavenly Bodies: Film Stars and Society; Thomson (2006); Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," Journal of the Academy of Marketing Science, 41 (3), 373-87; Fournier, S., & Eckhardt, G. M. (2019), Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand, *Journal of Marketing Research*, 56(4), 602–619.

[40]   Fournier and Eckhardt (2019).

[41]   Keller, K.L. (1993), Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, *Journal of Marketing*, 57:1, 1-22.

[42]   Dyer (1979), *Heavenly Bodies: Film Stars and Society*; Gamson (1994), *Claims to Fame: Celebrity in Contemporary America*.

[43]   Fournier and Eckhardt (2019) p. 611.

[44]   Fournier and Eckhardt (2019).

12

Expert Report of Professor Humphreys

A-907

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

damage to a person brand can be severe and lasting. This damage can persist *even when* they are not at fault.[45] It can persist *even when* their primary fans or followers do not believe the claims.[46] Loss of value for a person brand, particularly a person brand that has a general popular following, can be harmed even if only a subset of the public believes the negative claims. Person brands have social and cultural capital.[47] This capital can become harmed, thereby affecting their overall brand value to a popular audience.

Negative associations, if not repaired, persist in the public imagination. On social media, where comments and other content are archived and searchable, these associations linger for many years, if not decades.[48] However, if reinforced, these negative associations become even stronger in both the present public and in the long-term memory of those who are receptive to them.[49] If not repaired, these long-term associations persist and strengthen attitudes in the receptive audience.

Although it may be difficult to repair reputational damage on social media, it is possible, actionable, and important to the restoration of reputation. As Ardia (2010) notes:

> Although the global communication networks that are the hallmarks of our networked society have brought new reputational challenges, they also provide novel solutions to prevent and ameliorate those harms. One such solution is to

---

[45] David, John (2016), *How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business*: Red Wheel/Weiser.

[46] Luedicke, Marius K, Craig J Thompson, and Markus Giesler (2010), "Consumer Identity Work as Moral Protagonism: How Myth and Ideology Animate a Brand-Mediated Moral Conflict," *Journal of consumer research*, 36 (6), 1016-32.

[47] Brooks, Gillian, Jenna Drenten, and Mikolaj Jan Piskorski (2021), "Influencer Celebrification: How Social Media Influencers Acquire Celebrity Capital," *Journal of Advertising*, 50 (5), 528-47, Parmentier, Marie-Agnès, Eileen Fischer, and A Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," *Journal of the Academy of Marketing Science*, 41 (3), 373-87.

[48] Baym, Nancy K. (2015). Personal connections in the digital age. John Wiley & Sons. Humphreys, A. (2016). Social media: Enduring principles. Oxford University Press.

[49] Collins, A. M., & Loftus, E. F. (1975). A spreading-activation theory of semantic processing. Psychological review, 82(6), 407. Arpan, L., Rhodes, N., & Roskos-Ewoldsen, D. R. (2007). Attitude accessibility: Theory, methods, and future directions. Communication and social cognition: Theories and methods, 351-376.

13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

enlist, through legal and social incentives, the help of private online
intermediaries such as content hosts and search providers. These intermediaries
play a central role in community governance and are often in a position to
recognize and respond to reputational harms.[50]

The public in which the reputational harm originally occurred persists on social media and may have limited exposure to traditional media.[51] Given the fracture of media audiences in the last 10 years, new forms of media are required to reach what was formerly a relatively unified "public" of news readers and TV viewers. Accordingly, an attempt to repair reputational harm must now account for new channels of communication and for the importance of sources in the communication process.

### B.  Reputational Damage in a Complex Media System

Assessing reputational damage is complex when the public sphere is fragmented by aspects of digital technology such as filter bubbles, political polarization, ranking algorithms, reputational cues, such as followers, and the proliferation of claims both true and false. Understanding how the "public sphere" is constructed online requires understanding how social media platforms filter and display content and how multiple platforms—traditional television and print in addition to web and social media—disseminate information.

### i.    The Media System

When a prominent person makes a claim, it enters the media system, a network of platforms and people who circulate information.[52] As illustrated in Figure 1 below, the media

---

[50]  Ardia (2010).
[51]  https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/.
[52]  Chadwick, Andrew (2017), *The Hybrid Media System: Politics and Power*: Oxford University Press; Curran, James, Shanto Iyengar, Anker Brink Lund, and Inka Salovaara-Moring (2009) "Media System, Public Knowledge and Democracy: A Comparative Study," *European Journal of Communication*, 24 (1), 5-26; Gans,

14

Expert Report of Professor Humphreys

A-909

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

system consists of press briefings or reports; Associated Press or other syndication; print and web coverage by major print and broadcast news outlets; podcasts and radio; social media posts on Twitter and Facebook or other platforms; comments, retweets, and likes to a story; and, in some instances, re-coverage of the claims themselves in traditional journalism or social media,[53] to say nothing of word-of-mouth conversation and other informal channels such as rumor or gossip.[54] The spread of information, particularly when it originates from a high-profile individual like Mr. Trump, is vast and sweeping. The claims of high-profile figures tend to receive more coverage, and more sustained coverage, than others due to the routines of the newsroom and reporting and the effects of status on public attention.[55]

---

Herbert J (2004), Deciding What's News: A Study of CBS Evening News, NBC Nightly News, Newsweek, and Time: Northwestern University Press.

[53] Pfeffer, Jürgen, Thomas Zorbach, and Kathleen M Carley (2014), "Understanding Online Firestorms: Negative Word-of-Mouth Dynamics in Social Media Networks," *Journal of Marketing Communications*, 20 (1-2), 117-28; Tuchman, Gaye (1978), *Making News: A Study in the Construction of Reality*, New York: Free Press; Curran (2009); Messner, Marcus and Marcia Watson Distaso (2008), "The Source Cycle: How Traditional Media and Weblogs Use Each Other as Sources," *Journalism Studies*, 9 (3), 447-63.

[54] Rosnow, Ralph L. and Gary A. Fine (1976), *Rumor and Gossip: The Social Psychology of Hearsay*: Elsevier.

[55] Grabe, M. E., Zhou, S., & Barnett, B. (1999). Sourcing and Reporting in News Magazine Programs: 60 Minutes versus Hard Copy. Journalism & Mass Communication Quarterly, 76(2), 293–311; Gans, Herbert J (2004), *Deciding What's News: A Study of Cbs Evening News, Nbc Nightly News, Newsweek, and Time*: Northwestern University Press; Sigal, Leon V (1973), "Bureaucratic Objectives and Tactical Uses of the Press," *Public Administration Review*, 336-45; Whitney, D Charles, Marilyn Fritzler, Steven Jones, Sharon Mazzarella, and Lana Rakow (1989), "Geographic and Source Biases in Network Television News 1982‐1984," Journal of Broadcasting & Electronic Media, 33 (2), 159-74.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Figure 1. The Media System[56]



Estimating the number of impressions for the Statement requires itemizing impressions from each source that disseminated the Statement. As Figure 1 above illustrates, that means that one would need to calculate and then sum the number of impressions from, at a minimum, (1) web and social media, (2) print, and (3) television.

ii. **Social Media Impressions**

On social media, impressions are estimated by calculating an information cascade.[57] To model the impact of the Statement, I rely on the prior work in sociology, computer science, and information systems concerning cascades and social networks. To understand what might be needed to change attitudes and repair reputation, I rely on research from social psychology and marketing concerning persuasion, media exposure, and developing effective integrated media campaigns that include social media advertising. A brief overview of prior research is necessary

---

[56]   I have grayed out media types that I am not considering in my quantitative analysis.

[57]   Vosoughi, Soroush, Deb Roy, and Sinan Aral (2018), "The Spread of True and False News Online," *Science*, 359 (6380), 1146-51.

16

A-911

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

to understand how impressions and damage are calculated.

*Networks and Information Cascades.* Unlike traditional media, messages travel on social media through a network—a system of users connected by exchanges of information. The network structure—how many connections one has and how many connections *those* connections have—can determine whether and how fast a message travels through the network. Social capital is represented in the network by the number of followers, or connections, one has, and greatly increases how broadly and deeply a message spreads. If one sends a message, it has the potential reach of not only all of one's followers, but all of *their* followers as well. Additionally, false news spreads more broadly, more deeply in the network, and faster online than true news.[58]

Social media is a hybrid of mass and face-to-face communication.[59] In mass media like television or news, there is typically one source that sends messages out to many readers or viewers (known as one-to-many communication). In face-to-face distribution of rumors, messages are transmitted from one person to another, usually one at a time. In social media, messages are transmitted both through hubs (one-to-many) and dyadically, creating chains of messages called information cascades. The time it takes for the message to move from one person to another in the information cascade is typically a day for traditional media but can be only a few hours to seconds for online communication, leading to rapid dissemination of both true and false news.[60]

*Impression Rate.* Although the number of followers is a measure of reach, it represents

---

[58]   Vosoughi *et al.* (2018).
[59]   Humphreys, A. (2016), Social Media: Enduring Principles, Oxford University Press.
[60]   Pfeffer *et al.* (2014); Vosoughi *et al.* (2018).

17

Expert Report of Professor Humphreys

A-912

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

only the potential impressions of a message. Information competes for attention in any attention economy.[61] Although a message may be tweeted to all followers, it is not necessarily seen by that number of followers for a variety of reasons: only a subset of followers will sign on that day, they follow a certain number of accounts, or ranking algorithms may not prioritize the content. For these reasons, information scientists incorporate an impression rate when calculating social media impressions, which represents the chance that the message was seen by a follower.[62]

*Engagement Rate.* Engagement rate represents the percent of people who engage with— retweet or like—a post. It has two components: 'liking rate' and 'retweet rate'. Here, I computationally consider only a subset of the engagement rate: the retweet rate, which is defined as the percent chance that the message was retweeted (or quote tweeted).[63] Only a fraction of social media posts are seen, and only a fraction of those are retweeted or liked. While not directly used in my calculation of impressions, "liking" can be used in some algorithms to rank or promote content. In short, content that is "liked" by more people is likely to be prioritized and therefore to be viewed by more people.[64] Engagement can be used to understand impact in that it reflects the response to the statement. In social and web forms of media, comments can further constitute and amplify the impact of false information.[65]

*Impression vs. Individuals.* Scholarship on media viewership has provided two ways to

---

[61]   Davenport, T. H. and J. C. Beck (2013), The attention economy: Understanding the new currency of business, Harvard Business Press.
[62]   Wang, L., Ramachandran, A., & Chaintreau, A. (2016). Measuring Click and Share Dynamics on Social Media: A Reproducible and Validated Approach. Proceedings of the International AAAI Conference on Web and Social Media, 10(2), 108-113;  https://martech.org/facebook-twitter-impressions/.
[63]   A quote tweet is a retweet with comment (https://help.twitter.com/en/using-twitter/types-of-tweets). When reporting the total number of retweets generated by a post, Twitter combines the number of retweets with the number of quote tweets.
[64]   Newswhip (2019), 2019 Guide to Publishing on Facebook, http://go.newswhip.com/rs/647-QQK-704/images/Facebook%20Publishing%202019_Final.pdf.
[65]   Vosoughi *et al.* (2018).

18

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

measure audiences: as people and as impressions. New media like social and digital media tends to be measured in impressions[66] while old media tends to be measured in reach, or people.[67] One individual may receive multiple impressions. That is, some people may receive multiple exposures to a statement while others may receive only one exposure. I assume that for media broadcast on television, one viewer represents one impression, and I do not consider the number of times a viewer was exposed to a statement during a broadcast, which is conservative. As I will discuss in the Damages section, I also lower my estimate of the number of exposures needed in a corrective campaign in order to account for the fact that the impressions generated by a corrective campaign may reach some people more frequently than others.

*Calculating Impressions.* To model the total number of impressions in an information cascade, one calculates and sums the number of impressions that occur at each level in the network.[68] To calculate the total number of impressions at each level requires also determining how many diffused to the next level of the network, multiplied by the chance those messages were seen, and then adding the number of impressions at the next level, and so on (see Figure 2 below).[69]

---

[66]  https://theraveagency.com/blog/finding-the-value-in-twitter-impressions.
[67]  Gensch, Dennis and Paul Shaman (1980), "Models of Competitive Television Ratings," *Journal of Marketing Research*, 17 (3), 307-15, Picard, Robert G (1988), "Measures of Concentration in the Daily Newspaper Industry," *Journal of Media Economics*, 1 (1), 61-74.
[68]  Vosoughi *et al.* (2018).
[69]  Note that I calculate first and second level impressions for Twitter, but only first level impressions for Truth Social due to a lack of data availability on Truth Social.

19

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### Figure 2. Information Cascade



- *Social media.* Social media impressions are measured based on the number of followers to an account, the account's estimated impression rate, the number of retweets, the impression rate of retweeters, and their number of followers at the second level.

The Impressions Model section details the particular parameters chosen, given this prior literature and the data presented in the case.

*Truth Social.* Truth Social is a social media platform that has a parallel structure to Twitter.[70,71] It contains profiles that send "Truths" and shares the structure of having followers that are exposed to the messages of those accounts that they "follow." Users can then "re-truth" the statement, which circulates it to their followers, and/or users can engage with the Truth by "liking" it.[72] Due to the structural alignment in the platform, Truth Social is conceptually

---

70   https://mashable.com/article/inside-truth-social-trump-social-network-tour.
71   https://www.wsj.com/articles/what-is-truth-social-media-trump-spac-what-to-know-11645552299.
72   *Id.*

20

**A-915**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

identical to Twitter. In cases where I do not have full information about the impression and

engagement rates on Truth Social, I have used estimates derived from prior analyses of Twitter.

Given that Mr. Trump is one of, if not the most, prominent user of Truth Social, with 4.7 million

followers,[73] this is likely an undercount, as I will later discuss.

### iii.   Traditional Media Impressions

Methods for calculating the number of impressions generated by traditional, mass media

have been in use since at least 1942.[74] Because ratings are tied to advertising revenue, metrics

are carefully audited by services like Nielsen and the Alliance for Audited Media (AAM).[75]

Paradigms for measuring circulation and readership are well established in media and

communication scholarship.[76] I therefore use the following measures of impressions:

- *Television.* Television impressions are measured through viewership, the ratings derived from independently audited services like Nielsen.[77]

- *Print.* Print impressions are measured through circulation, the number of readers as reported by AAM.[78]

- *Web impressions.* Though existing online, articles published on websites tend to be more "traditional" in nature because viewership can be estimated by the amount of traffic or page views. I use the number of daily users, discounted by the bounce rate (the percent of users who do not perform an action on the site).

- *Total impressions.* Total impressions are calculated as the total of impressions across social media, television, print, and web.

---

[73]   https://truthsocial.com/@realDonaldTrump, captured December 7, 2022.
[74]   Buzzard, Karen (2012), *Tracking the Audience: The Ratings Industry from Analog to Digital.*
[75]   https://markets.nielsen.com/us/en/solutions/measurement/television/; https://auditedmedia.com/Solutions/Print-Publisher-Audits.
[76]   Gensch & Shaman (1980); Picard (1988).
[77]   https://markets.nielsen.com/us/en/solutions/measurement/television/.
[78]   https://auditedmedia.com/Solutions/Print-Publisher-Audits.

21

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### C.  Assessing Damages for Defamation Online: Adapting Traditional Approaches to the Sphere of Social Media

Traditional approaches to rectifying reputational harm involve attempts to repair reputation in the public sphere.[79] However, social media has complicated these traditional approaches in a few ways. First, some aspects of social media, such as filter bubbles and echo chambers, have fragmented the public sphere such that it is unclear how or where reputation repair can and should take place. Second, trust in traditional media has declined across the ideological spectrum.[80] Whereas legitimate sources of news once went unquestioned, assessing trust of the source is now a primary concern of users when assessing claims both in social and traditional media—and this is true regardless of political ideology.[81] Finally, increasing polarization[82] in the American context means that attitudes have become more entrenched and therefore harder to change.[83] In this section, I provide a brief overview of the theories necessary for understanding how reputational harm can occur, and be repaired, through social media.

Prior cases have taken a traditional approach to assessing damages to reputation in the public sphere. For example, in the case of *United States v. Macys.com, Inc.* (D. Del. July 26, 2000),[84] the remedy for alleged violation of consumers' expectations relating to product shipping time was the purchase of banner advertising on search engines to inform consumers about their rights when shopping online. However, the traditional approach represented by prior

---

[79]  Ardia (2010).

[80]  https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/.

[81]  https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/.

[82]  https://www.pewresearch.org/politics/interactives/political-polarization-1994-2017/.

[83]  Conover, Michael, Jacob Ratkiewicz, Matthew Francisco, Bruno Gonçalves, Filippo Menczer, and Alessandro Flammini. "Political polarization on Twitter." In *Proceedings of the International AAAI Conference on Web and Social Media*, Vol. 5, No. 1, pp. 89-96. 2011; Prior, Markus. "Media and political polarization." *Annual Review of Political Science* 16 (2013): 101-127.

[84]  https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf.

Expert Report of Professor Humphreys

A-917

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

cases fails to take into account the new and complex technological infrastructure for communication, the erosion of trust in mass media, particularly among the audience likely to be receptive to the Statement (*i.e.*, people on the political right and/or supporters of Mr. Trump),[85] and the importance of personal sources that are trusted by the individual for news online. Persuasion online now includes influencers, social networking, and live video in addition to search and display advertising. The educational campaign of *United States v. Bayer Corp.*, No. 07-01 (HAA) (D.N.J. Jan. 4, 2007) is more akin to the current state of social media. In this case, an educational campaign was required as remediation that included a consumer brochure, advertisement for that brochure, and placement of the information with key opinion leaders and gatekeepers, such as physicians. In this way, remediation for reputational harm entails working with multiple sources that consumers trust to counter false claims.

### D. Media Exposure and Counter-Attitudinal Attitude Change

To understand how to assess the costs for repairing reputational harm in a media system, one must understand the process of attitude change, also known as persuasion.[86] Source, message, and even media type can play a role in how many exposures it requires to change attitudes.[87] For someone who holds a weak attitude or no attitude about someone or something, one exposure to a message from a reasonably credible source is likely to be enough to change attitudes.[88] However, for someone with entrenched beliefs, source and message quality become very important, and changing that belief requires more than a few exposures from a single

---

[85]   https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/.

[86]   Cialdini R. B., R. E. Petty, J. T. Cacioppo (1981), Attitude and Attitude Change, *Annual Review of Psychology*, 32, 357–404.

[87]   Albarracin, D., and Shavitt, S. (2018), Attitudes and attitude change, *Annual Review of Psychology*, 69, 299-327; Cialdini *et al.* (1981).

[88]   Cialdini *et al.* (1981).

23

A-918

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

source.[89] Due to confirmatory bias,[90] people are likely to attend to information that confirms or is congruent with their existing beliefs and ignore or discount information that is counter to them. The more entrenched the belief, the more exposures required to change attitudes. For these reasons, changing an attitude that is counter to one's existing set of beliefs is exceedingly hard and potentially requires multiple messages from multiple trusted sources.

Here, a trusted source means a person or entity that is trusted by the user or reader, not necessarily a source that would be deemed trustworthy by the public at large. Platforms like newspapers and websites can be the source, but they can also convey the information of sources that may or may not be trusted. Research in psychology and communication shows that readers and viewers can distinguish between the media source and the individual source when interpreting a message.[91] For example, a reader may not trust *The New York Times* but may trust direct quotes attributed to a trusted source reported by *The New York Times*.

On social media, attitude change can be even more complex. Filter bubbles mean that users are likely to see only information that is congruent with their present and past beliefs and behaviors[92] and that comes from selective media sources that viewers trust.[93] Due to homophily, we tend to know and follow others who have the same attitudes that we do. As Garrett (2009) notes, multiple messages coming from multiple sources about the same event or fact create the

---

[89]   Cialdini *et al.* (1981).
[90]   Kahneman and Tversky (1974).
[91]   Bakker, Tom, Damian Trilling, Claes de Vreese, Luzia Helfer, and Klaus Schönbach (2013). "The Context of Content: The Impact of Source and Setting on the Credibility of News," *Recherches en Communication*, 40, 151-68.
[92]   Pariser (2011), "The Filter Bubble: What the Internet Is Hiding from You."
[93]   https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-levels-of-trust-in-a-number-of-news-sources-than-republicans/.

24

A-919

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

impression for the user that the event is indeed true and that the belief is universally held.[94]

In all media, but particularly social media, messages are received, trusted, and interpreted relative to their source. Social capital (*i.e.*, how many people you know) and status (*i.e.*, legitimacy) of a source is important. Messages that come from sources with no social capital (*i.e.*, no followers) do not have the same strength as those that come from sources with considerable social capital.[95] Because trust of unfamiliar sources is typically lacking online,[96] known and trusted sources are particularly important when communicating messages attempting to change attitudes online.[97] In this sense, attitude change requires the message to come from *inside* the filter bubble and requires considering a number of trusted sources within the echo chamber to influence opinion.

In sum, if harm is caused among a population who do not trust traditional media, the most effective way to repair it is through alternative informational channels the audience trusts and that mirror where people get their news.[98]

## IV. IMPRESSIONS MODEL

The Impressions Model section details the particular parameters chosen, given the prior literature and the data presented in the case. In order to estimate the number of impressions

---

[94]   Garrett, R. K. (2009), Echo chambers online?: Politically motivated selective exposure among Internet news users. *Journal of computer-mediated communication*, *14*(2), 265-285.

[95]   Kruglanski, A. W., and Gigerenzer, G. (2011), "Intuitive and deliberate judgments are based on common principles": Correction to Kruglanski and Gigerenzer (2011), *Psychological Review*, 118(3), 522–522. https://doi.org/10.1037/a0023709.

[96]   Metzger, M. J., and Flanagin, A. J. (2013), Credibility and trust of information in online environments: The use of cognitive heuristics. *Journal of Pragmatics*, 59, 210–220. https://doi.org/10.1016/j.pragma.2013.07.012.

[97]   Liu, Shixi, Cuiqing Jiang, Zhangxi Lin, Yong Ding, Rui Duan, and Zhicai Xu (2015), "Identifying Effective Influencers Based on Trust for Electronic Word-of-Mouth Marketing: A Domain-Aware Approach," *Information Sciences*, 306, 34-52.

[98]   For example, 35% of Republicans reported trusting national news media: https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

generated by the Statement, I reviewed and analyzed news coverage of the claims, including 17 online news articles, 14 social media posts (13 from Twitter and one from Truth Social), five television broadcasts, and one print article.

### A.  Web Impressions

The web impressions analysis is limited to a subset of the online news articles cited in the Complaint in footnote 20. In this footnote, the Complaint lists a set of online sources that reported on the Statement. I first evaluated this list for inclusion and exclusion based on whether the statement was prominent, appearing in the first half of the article, and was related to the overall topic of the article. This analysis yielded 17 web articles for inclusion and excluded 48 articles from those mentioned in the Complaint.[99]

To estimate the number of web impressions, I used data provided by Semrush, a company that provides website traffic statistics.[100] Semrush reports unique monthly visitors, and I transformed this measure to daily visitors by dividing unique monthly visitors by 30. Further, to account for people who visit the site but do not perform any other action, I multiplied daily visitors by 1 minus the bounce rate (see Figure 3 below). A table showing the online articles included in this analysis and the impressions estimate is provided as Appendix D.

**Figure 3.  Equation 1**

$$\text{Web Impressions} = (\text{Unique Monthly Visitors}/30)*(1\text{-bounce rate})$$

---

[99]  Note that the articles that were excluded do include the allegedly defamatory Statement. However, I excluded them as a conservative step because the Statement was not listed prominently in the article.
[100]  https://www.semrush.com/kb/26-traffic-analytics.

26

Expert Report of Professor Humphreys

A-921

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### B.  Social Media Impressions

The social media impressions analysis is limited to the set of tweets that (a) link to one of the 17 online news stories I considered in my analysis of web impressions, (b) were published by the primary account of the publisher or the article's author, or (c) contain an image of the Statement made on Truth Social.[101] I identified a total of 13 tweets using these criteria. In all three cases, I limited the analysis to tweets that contain the defamatory Statement when viewed by a user on Twitter.

To measure social media impressions, one must estimate the percent of followers who saw a particular message. As described above, this is called the impression rate. Impression rates vary depending on the number of followers and the other contextual conditions in the system such as competition for attention on any given day.[102] Impression rates for Twitter are estimated at between 1.3% to 2.6% for typical users.[103] However, that range can vary depending on number of followers, publisher/non-publisher status, frequency and relevance of tweets, and other variables. Sites aimed at creating shareable content, including political news, can have impression rates up to 22%.[104] Account holders can directly view their impression rate for each tweet, but otherwise the information is not publicly available. Buzzfeed, for example, has an impression rate of 22%, which is convergent with conventional marketing goals that aim for a rate of 20%,[105] but lower than the 30% rate that Twitter suggested in 2014.[106]

---

[101]  These tweets were identified through a search of keywords on Twitter, such as "trump," "carroll," "statement," and "truth social" (https://twitter.com/search?q=<keywords>&src=typed_query&f=image), combined with a manual review of the images in the search results.

[102]  Wang *et al.*, 2016; https://martech.org/facebook-twitter-impressions/.

[103]  https://martech.org/facebook-twitter-impressions/.

[104]  https://martech.org/facebook-twitter-impressions/.

[105]  https://www.tweetbinder.com/blog/twitter-impressions/; https://marxcommunications.com/what-does-impressions-mean-on-twitter/.

[106]  Ad Age (2014). "Twitter Tells Brands They Can Reach 30% of Their Followers for Free,"

27

Expert Report of Professor Humphreys

A-922

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

For the reasons stated above, I therefore divided the tweets into two sets, one set circulated by publishers and highly influential individuals with over 500k followers, who are known to have higher impression rates, and one set of tweets by typical users, who likely have more typical impression rates of 1%. Equations 2a and 2b (low and high publisher impression rates) are applied to publishers/influencers. Equation 2c, using an impression rate of 1%, is applied to the "typical" Twitter user.

For publishers/influencers, I provide estimates based on all publicly available information, using two impression rates. The first estimate comes from Wang *et al.*'s (2016) formula for calculating impressions given the total number of followers in the cascade, retweets, and followers of the original tweet (Equation 2a).[107] Equation 2a can be used to estimate impressions for each account, given the account's number of followers, the number of retweets, and the followers of the retweeters. This means that each tweet has a unique impression rate. Wang *et al.* (2016) develop this equation from a full set of data taken from Buzzfeed and Buzzfeed News and its associated accounts (average followers at the time of Wang *et al.*'s analysis: Buzzfeed = 2.8 million, BuzzfeedNews = 470,000). Based on a full set of data, they are able to provide an estimate of impressions given known and public data like followers and retweets. As a conservative step, I took into account the potential presence of bots as followers in my estimation although it may be unnecessary in this model.[108]

I account for the potential presence of bots as followers, 12.6%, based on recent estimates

---

https://www.adweek.com/performance-marketing/twitter-tells-brands-they-can-reach-30-their-followers-free-158886/.

[107] Wang *et al.*, 2016.

[108] This may be an unnecessarily conservative step, as Wang *et al.* (2016) formed their estimate of parameters from a set of known and actual impressions provided by Twitter, which may have already accounted for bots.

28

Expert Report of Professor Humphreys

A-923

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

in computer science.[109] The formula used to calculate impressions using Equation 2a is displayed in Figure 4 below. The formula is applied to the four tweets in the social media impressions analysis from publishers or highly influential individuals (followers > 500,000).

### Figure 4. Equation 2a

$$\textbf{Social Media Impressions}_{\textbf{publishers}} = 10\textasciicircum(0.7396 \log(TF*(1\text{-bot rate})) + 0.0473 \log(PF*(1\text{-bot rate})) + 0.1027 \log(RT))$$

Where:

     PF (primary followers) = number of followers of original tweet
     RT (retweets) = number of retweets to the original post
     TF (total followers) = average number of followers of all retweets*RT[110] + number of followers of original poster (PF)
     Bot rate = 0.126

Given the differences between Buzzfeed and some of the publishers in the Twitter dataset, I calculated a second estimate of impressions based on an impression rate of 20% (Equation 2b).[111] Not only was Buzzfeed itself purported to have a rate close to this, but it is also a rate used as a marketing "rule of thumb" as a benchmark for most major accounts.[112] Given the size and the influence of some of the accounts in the dataset, 20% is a reasonable and likely

---

[109] Luceri, L., Deb, A., Giordano, S., & Ferrara, E. (2019), Evolution of bot and human behavior during elections, *First Monday*, *24*(9), https://doi.org/10.5210/fm.v24i9.10213.

[110] To collect the number of followers for all retweets, I used the Twitter API to search for both retweets and quote tweets (retweets with comment) of each of the 13 tweets considered in the social media impressions analysis. I then filtered out any tweets that do not reference the original tweet (*e.g.*, retweets of quote tweets). After analyzing the data, I found a discrepancy between the number of retweets displayed on www.twitter.com and the number of retweets I was able to collect. The discrepancy is likely due to users whose accounts are private and/or protected, meaning their data is not retrievable using Twitter's API. Using the list of retweets and quote tweets I assembled, I collected the Tweet IDs of each user who posted a retweet or quote tweet and used Brandwatch to collect the follower count of each of the users at the time they posted the retweet or quote tweet. I then averaged the follower counts of each retweeter or quote tweeter for each of the 13 original tweet and multiplied the average by the number of retweets.

[111] https://martech.org/facebook-twitter-impressions/.

[112] https://www.tweetbinder.com/blog/twitter-impressions/.

29

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

estimate for impression rate. Here, I again used 12.6% to account for potential bots.[113] In this equation, I include impressions at both the first level (*i.e.*, the number of followers of the original tweet and an impression rate of 20%) and the second level of the information cascade (*i.e.*, the number of retweets multiplied by the average number of followers held by people who retweeted and an impression rate of a "typical" Twitter user of 1%[114]). The formula used to calculate impressions using Equation 2b is displayed in Figure 5 below. The formula is applied to the four tweets in the social media impressions analysis from publishers or highly influential individuals (followers > 500,000). A table showing the tweets considered and the impressions estimate (using both Equation 2a and Equation 2b) is included as Appendix D.

**Figure 5. Equation 2b**

$$\text{Social Media Impressions}_{\text{publishers}} = \text{followers}_{\text{first-level}}*\text{first level impression rate}*(1\text{-bot rate})+\text{retweets}*\text{followers}_{\text{second-level}}*\text{second level impression rate}*(1\text{-bot rate})$$

Where:

Followers$_{\text{first-level}}$ = number of followers of the original tweet
First level impression rate = 0.2
Bot rate = 0.126
Followers$_{\text{second-level}}$ = average number of followers of all retweets[115]
Second level impression rate = 0.01

As stated above, for the accounts of news publications or Twitter users with more than

---

[113] Luceri *et al.* (2019).
[114] https://martech.org/facebook-twitter-impressions/.
[115] I used the same process described above to collect data on the average number of followers of all retweets. I collected a list of all retweets and quote tweets of the 13 tweets using the Twitter API. Using that list, I collected the follower counts of all users who published a retweet or quote tweet from Brandwatch. I then averaged the follower counts of each retweeters or quote tweeter for each original tweet and multiplied the average by the number of retweets.

30

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

500,000 followers, I use the same impression rates and methodology as in Wang *et al.* (2016)

and all my prior analyses. However, for the more typical Twitter users (under 500,000 followers)

who tweeted Mr. Trump's Statement, I use an impression rate of 1% for both first and second

level of the information cascade, which is the low-end of impression rates reported publicly.[116]

This is applied to the nine tweets in the social media dataset in the social media impressions

analysis from "typical" users (those with follower counts < 500,000).

**Figure 6. Equation 2c**

$$\text{Social media impressions}_{\text{typical}} = \text{followers}_{\text{first-level}}*\text{first-level impression rate}_{\text{typical}}*(1\text{-bot rate})+\text{retweets}*\text{followers}_{\text{second-level}}*\text{second-level impression rate}*(1\text{-bot rate})$$

Followers$_{\text{first-level}}$ = number of followers of the original tweet
First-level impression rate$_{\text{typical}}$=.01
Bot rate = 0.126
Second-level impression rate = .01
Followers$_{\text{second-level}}$ = average number of followers of all retweets[117]

*Twitter Versus Truth Social Impression Rates.* For the purpose of this analysis, I assume

that Truth Social has the same impression rate structure as Twitter due to their structural

similarity (*i.e.*, followers, re-truths, liking, etc.). Mr. Trump has 4.7 million followers on Truth

Social. The Statement received 22,219 likes and 6,810 re-truths, an engagement rate of 0.64%

which is far higher than the rates seen on Twitter (average engagement on Twitter is 0.037%).[118]

---

[116] https://martech.org/facebook-twitter-impressions/.
[117] I used the same process described above to collect data on the average number of followers of all retweets. I collected a list of all retweets and quote tweets of the 13 tweets using the Twitter API. Using that list, I collected the follower counts of all users who published a retweet or quote tweet from Brandwatch. I then averaged the follower counts of each retweeters or quote tweeter for each original tweet and multiplied the average by the number of retweets.
[118] https://www.rivaliq.com/blog/good-engagement-rate-

31

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

For these reasons, I believe that using Twitter impression rates to estimate the impressions Mr. Trump's Statement received on Truth Social is an undercount.

To infer the Truth Social impression rate, I calculated the median impression rate from Twitter, taking into account both the publisher impressions using the Wang *et al.*'s formula and the typical Twitter user impressions illustrated in Equation 2c. The median rate is 6%, and I therefore use this for the low estimate. The same Twitter impression rate[119] was used for the high estimate.

**Figure 7. Equation 2d**

$$\text{Total social media impressions} = \text{social media impressions}_{\text{publishers}} + \text{social media impressions}_{\text{typical}} + \text{Truth Social impressions}_{\text{first level}}$$

## C. Television Impressions

To measure television impressions, I relied on the TV News Archive, a database maintained by the Internet Archive, a non-profit archive of content from television, internet, and audio, among many other sources.[120] The Internet Archive's TV News Archive allows users to search through the closed captioning of broadcasts. To identify broadcasts to incorporate into the television impressions analysis, I searched the closed captioning of broadcasts for key phrases from Mr. Trump's Statement from October 12 through November 9, 2022, from the following broadcasters: ABC, Fox News, NBC, MSNBC, CBS, and CNN.[121] After identifying the

---

twitter/#:~:text=According%20to%20our%202022%20Social,industries%2C%20from%20fashion%20to%20no
nprofits.

[119]   https://martech.org/facebook-twitter-impressions/.

[120]   https://archive.org/details/tv.

[121]   I used the following search query: Trump AND Carroll AND ("complete con job" OR (liars AND cheaters AND hacks) OR (hoax AND and AND lie) OR (promote AND book AND "complete scam") OR "not telling

32

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

broadcasts, I searched the closed captioning further to identify broadcasts that included only verbatim quotes from Mr. Trump's Statement. The search yielded a total of five broadcasts.

To estimate the number of impressions these programs received, I consulted public reports of viewership for each program from US TVDB,[122] which are derived from Nielsen. Where possible, I collected P2+[123] ratings estimates for the program in which the Statement appeared on the day it was aired. A table showing the broadcasts considered, the ratings estimate, and the source of the rating estimate is included as Appendix D.

### D.  Print Impressions

I also considered one print article in the *Washington Post* that mentioned the Statement.

To estimate the number of impressions generated by the *Washington Post* article, I used the data provided by AAM, a widely accepted standard for measuring print audience size that determines advertising rates.[124]

### E.  Total Impressions

To calculate the total impressions across media, I aggregated views/impressions for the (1) social media impressions (Twitter and Truth Social), (2) TV impressions, (3) print impressions, and (4) web impressions (see Figure 8 below).

**Figure 8.  Equation 3**

$$\text{Total impressions} = \text{social media impressions} + \text{TV impressions} + \text{print impressions} + \text{web impressions}$$

---

the truth" OR "it never happened" OR "changed her story from beginning to end" OR ("made up a story that I met her" AND swooned) OR "get caught up with details or facts that could be proven wrong" OR "I don't know this woman" OR "have no idea who she is" OR ("not telling the truth" AND "a woman I had nothing to do with")).

[122]  https://ustvdb.com/.
[123]  P2+ is an estimate of the persons aged 2 or older who watched a program.
[124]  https://auditedmedia.com/about/who-we-are.

33

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Figure 9 below summarizes the results of the impressions analysis.

**Figure 9. Total Impressions**

|  | Twitter | Truth Social | Web | TV | Print | Total |
|---|---|---|---|---|---|---|
| **High** | 4,828,186 | 904,000 | 5,100,593 | 7,029,000 | 159,040 | 18,020,819 |
| **Low** | 1,227,286 | 271,200 | 5,100,593 | 7,029,000 | 159,040 | 13,787,119 |

High = impression rate of 20% for first level followers, 1% for second level followers (Sullivan 2014).
Low = impression rate calculated for publishers (Wang *et al.* 2016).
For individual Twitter users with fewer than 500,000 followers, 1% for both first and second levels and for both High and Low.

The Statement generated between 13,787,119 and 18,020,819 impressions from October 12, 2022, through November 9, 2022, the timeframe from which data were collected for this analysis.

**F.  Other Impressions Not Included in the Model**

There are a number of impressions that my estimate does not take into account. Although I have used Equations 2a and 2b to adjust for different impression rates, I have also omitted some sources of impressions due to data availability or clarity. This makes both estimates a considerable undercount of impressions.

*Web Impressions.* Online news impressions are limited to the subset of articles cited in the Complaint described above. I did not count other online news articles that covered or discussed the Statement. Additionally, some articles that covered Mr. Trump's statement were authored by the Associated Press. Although it is likely that identical (or very similar) versions of these articles appeared in multiple publications, I did not count these impressions due to the inability to

34

**A-929**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

access traffic numbers for each of these websites. For instance, the October 12, 2022, AP article, titled "Trump Angrily Lashes Out After His Deposition Is Ordered,"[125] appeared in at least 137 additional news outlets; however, I included only the one published on the Seattle Times in my Impressions Analysis.[126]

*Social Media Impressions.* I limited social media impressions to those that quote the Statement directly. While I did consider the retweets and quote tweets of the 13 original tweets, I did not consider in-text quotations or paraphrases of the statement. To measure the information cascade on Truth Social, I count only first-level impressions and not re-truths due to data availability. Additionally, I did not consider any tweets from other publishers of stories covering Mr. Trump's Statement, tweets from users who shared links to the 17 articles (or other articles containing the Statement), or tweets in which users repeated or otherwise amplified the Statement.

The social media impressions analysis does not consider impressions generated on other platforms, such as Facebook and Reddit, because it is difficult to find research or publicly available data on impression rates for platforms other than Twitter. Nonetheless, there is evidence that the 17 online news articles I considered in my web impressions analysis were shared widely on those platforms. Using CrowdTangle,[127] a social media insights tool owned and

---

[125] Larry Neumeister & Jill Colvin, Trump Angrily Lashes Out After His Deposition Is Ordered, THE SEATTLE TIMES (Oct. 12, 2022), https://apnews.com/article/new-york-lawsuits-manhattan-donald-trump-lewis-a-kaplan-ce7b11f1f0e3ea1bec35e8f1f1b929d9.

[126] *See, e.g.*, Larry Neumeister & Jill Colvin, Trump Angrily Lashes Out After His Deposition Is Ordered, YAHOO! NEWS (Oct. 12, 2022); Larry Neumeister & Jill Colvin, Trump Angrily Lashes Out After His Deposition Is Ordered, DENVER POST (Oct. 12, 2022); Larry Neumeister & Jill Colvin, Trump Angrily Lashes Out After His Deposition Is Ordered, DAILY HERALD (SUBURBAN CHI.) (Oct. 12, 2022).

[127] Meta provides a free and publicly accessible CrowdTangle extension for the Chrome browser that allows users to track shares of webpages across multiple social media platforms (https://apps.crowdtangle.com/chrome-extension). For each share in CrowdTangle's database, the Chrome extension provides a list of each share, the

35

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

operated by Meta,[128] I searched for instances where the 17 articles were shared on Facebook and Reddit. CrowdTangle data were available for 16 of the news articles considered, establishing a total of 101 shares and 11,966 interactions, disseminated to 132,875,540 followers.[129] Given the high number of shares and the overall number of followers associated with those shares, it is clear that my estimate of social media impressions is a significant undercount of the actual impressions generated.

*Television Impressions.* To calculate television impressions, I again limited the search to television programs that directly quoted the Statement. Television impressions included in this analysis were limited to broadcasts contained in the Internet Archive's TV News Archive database from the following broadcasters: MSNBC and Fox News.[130] I did not include television shows that paraphrased but did not directly quote Mr. Trump's Statement or YouTube, Rumble, or podcast streams.

For these reasons, the estimate of impressions I provide is a conservative estimate in which several sources of further dissemination were not taken into account. A summary of conservative steps taken in the impressions analysis is included in Appendix H.

## V.  IMPACT ASSESSMENT

In this section, I provide an impact assessment to evaluate the nature and amount of harm

---

number of interactions (*i.e.*, the number of reactions, upvotes, likes, comments, and shares) generated by that share, and the total number of followers associated with the share. (Followers are defined as "The sum of Page Likes, Instagram followers, Twitter followers, or Subreddit subscribers for all of the matching results.") The browser extension does not track reach or impressions generated by a post nor does the list of shares incorporate data from private or restricted accounts.

[128]  https://help.crowdtangle.com/en/articles/4201940-about-us.

[129]  To arrive at the total number of followers, I summed together all the followers associated with each share. It was not possible to deduplicate unique followers across different articles and channels.

[130]  I searched across the following major networks: ABC, Fox News, NBC, MSNBC, CBS, and CNN. My search yielded suitable results only from Fox News and MSNBC.

36

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

done to Ms. Carroll's person brand as a result of Mr. Trump's Statement. The impact of this Statement should be viewed both qualitatively and quantitatively.

In the qualitative assessment, I assess the nature of the Statement and its more generalized harm and ongoing harm to a brand whose value derives from a general (rather than niche) public. I also take into account the nature of the associations and their likely harm to the person brand of a professional woman and assess the long-term nature of this harm. These are dynamics that occur on the sociocultural level and therefore require a more qualitative assessment. Further, they impact the generalized social perceptions of Ms. Carroll, thereby diminishing her reputational value to speak to a broad and diverse public. As such, this kind of reputational harm may impact her ability to capitalize on her person brand in the future.

I also provide a quantitative impact assessment to link the impressions estimate with the damages estimate. How many people saw and might have believed or been receptive to Mr. Trump's Statement? There are some who would have read/heard his Statement and dismissed it out of hand. While the Statement itself may represent some generalized harm, to calculate a fair estimate to rectify the more specific harm, one must take into account the fact that not everyone may have read/heard and readily believed Mr. Trump's Statement. Yet, political science provides tools for estimating the quantitative impact by incorporating the likelihood that a reader or viewer would have been receptive to Mr. Trump's Statement.

### A. Qualitative Impact Assessment

To conduct the qualitative impact analysis, I considered Ms. Carroll's brand prior to June 2019, the damage to her brand after June 2019, and an assessment of the social media and news coverage after Mr. Trump's Statement on October 12, 2022. The materials I relied on to assess

37

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Ms. Carroll's brand include media coverage of Ms. Carroll both before and after Mr. Trump's Statement,[131] Amazon reviews of her books,[132] and negative social media comments generated after the Statement. I understand that Mr. Trump's at-issue Statement was published after he made three similar statements on June 21, 22, and 24, 2019, which are not at issue in this case. Given that the allegedly defamatory statement on October 12, 2022, reinforced and furthered negative associations introduced in the statements on June 21, 22, and 24, 2019, when considering the strengthening of the negative associations, I found it fair and necessary to assess Ms. Carroll's brand prior to June 21, 2019 (*i.e.*, the time before Mr. Trump made any comments that were disseminated to the press regarding Ms. Carroll's alleged encounter with Mr. Trump).

### i.    Ms. Carroll's Professional Career

Prior to June 21, 2019, Ms. Carroll was a popular advice columnist at *Elle* Magazine, where she had been a mainstay for 25 years.[133] Her brand personality was that of a sassy dating advice columnist and author of books on a range of topics, including dating, culture, and the life of Hunter S. Thompson. As the columnist of "Ask E. Jean" at *Elle*, she reached about 4.5 million readers, according to her publisher.[134] Ms. Carroll was known widely for her personable, modern advice for women.[135] Over the years of her popularity, she was heralded as "feminism's answer to Hunter S. Thompson."[136] She is the author of *A Dog in Heat Is a Hot Dog and Other Rules to*

---

[131]  Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean")).
[132]  https://www.amazon.com/product-reviews/0060530286 and https://www.amazon.com/product-reviews/0525935681/.
[133]  Deposition of Robbie Myers, October 12, 2022, 31:20-22, 32:4-12; https://www.nytimes.com/2020/02/19/business/media/e-jean-carroll-elle.html.
[134]  https://web.archive.org/web/20200520030235/http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326. I was unable to find readership data prior to 2020.
[135]  Deposition of Robbie Myers, October 12, 2022, 23:7-24:4.
[136]  Quammen, David, "A Cheap Hide Out for Writers." N.Y. Times. 01 Nov 1981: A.14.

38

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Live By* (1996) and *Mr. Right, Right Now!* (2005), books that offer "sassy" dating and personal advice.[137] Former *Elle* editor-in-chief Robbie Myers, who until 2017 was Ms. Carroll's boss,[138] described her as a gifted, beloved writer:

> [T]he term that came to mind is sort of she's a baller, meaning [] as a writer. She's a gifted writer. She is a journalist first and everything that she writes is informed by that, meaning the facts, but she—she also [] has a lot of wit and I think that's why her readers loved her so much.[139]

Ms. Myers noted Ms. Carroll's high public profile and credited her with elevating the national advice column genre and building trust with her readers by being witty but grounded in the facts of journalism:

> I mean, what other people are doing is great, right, and it's fun and interesting, but women really trusted E. Jean and we got lots of feedback from readers that she helped them. Also, you know, they loved her voice because she puts a lot of funny in there . . . but it's always undergirded by reporting.[140]

It should also be noted that Ms. Carroll built her person brand amongst a general and diverse audience. Ms. Carroll initially built her following at *Elle*, where she had over 4.5 million readers weekly.[141]  The *Elle* audience appears to be general readership that roughly represents the ideological composition of Americans, of which roughly 30% identify as conservative.[142] This would seem to indicate that she had a broad public following for her books and other journalism.

---

[137]  Joan Kelly, "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13.
[138]  Deposition of Robbie Myers, October 12, 2022, 9:11-13.
[139]  Deposition of Robbie Myers, October 12, 2022, 21:15-22.
[140]  Deposition of Robbie Myers, October 12, 2022, 22:12-18.
[141]  http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326.
[142]  http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326;
https://www.nytimes.com/interactive/2019/08/08/opinion/sunday/party-polarization-quiz.html

39

Expert Report of Professor Humphreys

A-934

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### ii.   Reception to Ms. Carroll's Professional Work

Ms. Carroll was known to her readers as a "a sharp and funny social commentator, and a terrific journalist,"[143] offering "sassy female insights."[144] Ms. Carroll was noted for dishing out "SASSY BUT SANE ADVICE," "E. Jean's PUNCHY wisdom SHINES in compilation."[145]

> "E. Jean Carroll, with her razor-sharp insights and wildly popular way of serving them up to the masses, is, above all else, a truth-seeker."[146]

> "She's a real writer, a sharp and funny social commentator, and a terrific journalist, and I love her voice. Smart readers will be particularly impressed with her skill reporting the current research in sex and marriage. I admire the way she covers the waterfront. She goes to rock-climbing spots, moto-cross tracks, gun clubs, university labs, millionaires' cocktail parties. About halfway through, I realized, this woman is an explorer. I think we're lucky that someone with her quality of mind and sense of humor has turned her attention to one of the most frustrating dilemmas of contemporary women: how to find someone real to love."

After June 2019, the associations with Ms. Carroll's person brand shifted. One way to examine the shift in associations is through word association, as represented in a word cloud.[147] As can be seen in Figure 10 and Figure 11 below, the semantic associations shifted from those associated with her role as a sassy news columnist ("love," "advice," and "men") to being associated with Mr. Trump, sexual assault, the previous defamation case Ms. Carroll filed against Mr. Trump, and the present case ("defamation," "justice").[148] While some shift was attributable to the publication of her memoir and *New York Magazine* piece in which she detailed

---

[143]   https://www.amazon.com/gp/customer-reviews/RD84I3FPD8DS1/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.

[144]   https://www.amazon.com/gp/customer-reviews/RBTLK02LIQ4ED/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.

[145]   Dan. "E. Jean's PUNCHY wisdom SHINES in compilation." Indianapolis Star. 31 Mar 1996: D.6.

[146]   https://www.amazon.com/gp/customer-reviews/R2KGOC1J5G6VTR/.

[147]   Humphreys, A. and R. Jen-Hui Wang, (2018) Automated Text Analysis for Consumer Research, Journal of Consumer Research, Volume 44, Issue 6, Pages 1274–1306.

[148]   Proquest search query of US Newstream: (e jean carroll) AND (stype.exact("Newspapers") AND ps.exact("Carroll, E Jean")).

40

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the alleged encounter with Mr. Trump,[149] Mr. Trump's response likely played a considerable role in shifting the nature and valence of associations with her name.

**Figure 10.  Before June 2019 (top 200 words in news articles about E. Jean Carroll)**



---

[149]   https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html.

41

Expert Report of Professor Humphreys

A-936

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 11.  After June 2019 (top 200 words in news articles about E. Jean Carroll)**



### iii.    Qualitative Evidence of Impact

Mr. Trump's Statement and subsequent videos on Truth Social were made and began being circulated on October 12, 2022. Just after releasing the Statement, the allegedly defamatory claims about Ms. Carroll rose to prominence on social media. For example, on Facebook in response to the news articles that repeated his claim, users like Odette Hayek picked up the same claim, saying "How much money get paid [*sic*] for this hoax?" and that she was "trying to sell books" (October 19, 2022). Others labeled her a "lier" [sic] looking for "money" and "attention," (October 13, 2022). These terms and the framing of Ms. Carroll's allegation derive directly from language used in Mr. Trump's Truth Social Statement (*e.g.*, hoax, liar, etc.). Once again, posts arose attacking Ms. Carroll's credibility (Figures 12 and 13). Similar examples of users repeating language from Mr. Trump's Statement or directing general vitriol toward Ms. Carroll in response to Ms. Trump's Statement are displayed in Figure 12 and Figure 13 below.

42

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 12.  Sample of Facebook Comments Responding to News Articles Posted on Publication's Facebook Pages [150]**



_____

150  https://www.facebook.com/nytimes/posts/pfbid034f8wyVEE9LSkXgVQe1PqZW2jgNN12EpsouZWRuhqUtQp
HExUiAZRM9NNVWpewT9Gl?comment_id=5600395803407358;
https://www.facebook.com/nytimes/posts/pfbid034f8wyVEE9LSkXgVQe1PqZW2jgNN12EpsouZWRuhqUtQ
pHExUiAZRM9NNVWpewT9Gl?comment_id=1235320900356499;
https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGk9Lwpmg8YuGyUDWo7iX4PADFmmRfiZ
Z1GcnYbZY3mvXuT4PT2ded8vl?comment_id=635626811503742;
https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGk9Lwpmg8YuGyUDWo7iX4PADFmmRfiZ
Z1GcnYbZY3mvXuT4PT2ded8vl?comment_id=807621376955040;
https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGk9Lwpmg8YuGyUDWo7iX4PADFmmRfiZ
Z1GcnYbZY3mvXuT4PT2ded8vl?comment_id=3361166484105968;
https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGk9Lwpmg8YuGyUDWo7iX4PADFmmRfiZ

A-938

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 13.  Sample of Twitter Commentary about Ms. Carroll Following Mr. Trump's Statement[151]**



Mr. Trump's Statement and the widespread circulation this statement received on social media depicts Ms. Carroll as the perpetrator of a "con job" who is seeking to make money and perpetrating a "hoax." One should note that the claims and the vitriol aimed at Ms. Carroll and

Z1GcnYbZY3mvXuT4PT2ded8vl?comment_id=1313452902545808;
https://www.facebook.com/vicenews/posts/pfbid02xyYRYJic1JvqRnPaXUYhsgi77Dbnot7H94ecmfDKhmpWVpMALi9EJLhdx84WRqJ2l?comment_id=501843185157034501843185157034.

[151]   https://twitter.com/Stefild/status/1582782819041873923;
https://twitter.com/mherndon23/status/1580592423042158592;
https://twitter.com/bahman2990/status/1580542210809815040;
https://twitter.com/RKeane4711/status/1582961054652321798.

44

Expert Report of Professor Humphreys

A-939

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

circulated in the public sphere due to Mr. Trump are not new. I observed a similar negative

reaction after Mr. Trump initially responded to Ms. Carroll's allegations in his June 2019

statements to the press.[152] The reiteration of the allegedly defamatory claims about Ms. Carroll

makes attitudes about Ms. Carroll again accessible and brings them to the top of peoples' minds,

which further denigrates Ms. Carroll's person brand.[153] The new Statement reengages the

receptive public with the claims, which strengthens the attitudes of those who have heard the

similar claims previously, and creates new associations for those who have not yet heard it.

Appendix E contains examples of negative sentiment towards Ms. Carroll on social media. In

terms of Ms. Carroll's attempts to rebuild her brand, it is critically destructive.

### B.  Quantitative Impact Assessment

In addition to a qualitative analysis of the tenor and nature of the impact of Mr. Trump's

Statement on Ms. Carroll's person brand, I conducted a quantitative analysis to assess the portion

of impressions calculated in the impressions analysis that would have been made to a receptive

audience (the "receptive impressions"). To approximate the receptive impressions, I used

estimates of the percent of the readership/viewership who identify as Trump supporters and/or

are Republicans and estimates of the percent of Republicans who did not find allegations of

sexual harassment and sexual assault made against Mr. Trump to be credible. I then discounted

the total number of impressions generated by the Statement (as calculated in the Impressions

Model) by the estimated percent of receptive impressions.

---

[152]  See *Carroll I* Complaint.
[153]  Krosnick, J. A. (1989). Attitude importance and attitude accessibility. Personality and Social Psychology
Bulletin, 15(3), 297-308. Arpan, L., Rhodes, N., & Roskos-Ewoldsen, D. R. (2007). Attitude accessibility:
Theory, methods, and future directions. Communication and social cognition: Theories and methods, 351-376.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### i.   Readership Analysis

*Readership Based on Pew Data.* I based my estimates for the receptive audience on estimates from a Pew Research survey conducted between October 29 and November 11, 2019, making it a reasonable approximation of the composition of readership of the sources where the Statement appeared.[154]  Patterns of media use by party have remained largely stable since that time, as trust in traditional media among Republicans has continued to decline.[155] The survey data and documentation are publicly available.[156] The Pew survey is "a national, probability-based online panel of adults living in households in the United States" and generated 12,043 responses collected from a nationally-representative sample.[157]

The following variables were used in the analysis:

- SOURCEUSE: "Please click on all of the sources that you got political and election news from in the past week. This includes any way that you can get the source. If you are unsure, please DO NOT click it. **[KEEP IN SAME ORDER AS SOURCEHEARD]**"

- PARTY: "In politics today, do you consider yourself a: **ASK IF INDEP/SOMETHING ELSE (PARTY=3 or 4) OR MISSING:** PARTYLN As of today do you lean more to…"

- THERMO: "We'd like to get your feelings toward a number of people on a 'feeling thermometer.' A rating of zero degrees means you feel as cold and negative as possible. A rating of 100 degrees means you feel as warm and positive as possible. You would rate the person at 50 degrees if you don't feel particularly positive or negative toward them." (recoded to Trump receptive if value was >=50).

*Receptivity Based on YouGov Poll.* Not every Republican is necessarily inclined to be

---

[154]   While the survey is from late 2019, I think it is unlikely that readership patterns have changed significantly since that time. I was unable to find a more up-to-date survey with a similarly reliable and robust methodology.

[155]   https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-widen-driven-by-a-decline-among-republicans/.

[156]   The data from this study were downloaded and produced. Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019, https://www.pewresearch.org/journalism/dataset/american-trends-panel-wave-57/.

[157]   With a probabilistic sample of this size, the sampling error was ± 1.43 percentage points, https://www.pewresearch.org/our-methods/u-s-surveys/the-american-trends-panel/.

46

Expert Report of Professor Humphreys

A-941

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

receptive to Mr. Trump's Statement. For that reason, I corrected by discounting according to the percent of Republicans who either (1) found the various allegations of sexual harassment and assault made against Mr. Trump to not be credible (49%) or (2) needed more information (27%), for a total of 76%.[158] I did not include those who were unsure. These responses indicate a reasonable expectation that the respondent either already believed Mr. Trump's Statement or was open to believing them, given their other beliefs and their current lack of information (*i.e.*, they did not select that they did believe the allegations made against Mr. Trump were credible).

I performed the following calculations:

- *Percent Republicans* = percent of a publication's audience that are Republican[159]

- *Percent Receptive Republicans* = Percent Republicans * Percent of Republicans receptive to the claims (.76, YouGov)

- *Percent Trump Supporters* = sum of all people who were receptive towards Mr. Trump[160]

Based on this analysis, I can conclude that an average of 21.42 % of the impressions associated with each publication were to individuals inclined to be receptive to the Statement of Mr. Trump. As can be seen in Figure 14 below, the minimum receptive audience was 11.25% (*Huffington Post*), while publications like the *Daily Caller* had a more receptive audience of 68.63%.

---

[158]  https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll. As mentioned above, I was unable to find a more up-to-date polling data measuring Republicans' beliefs about the credibility of sexual assault allegations made against Mr. Trump.
[159]  Republicans were identified as PARTY=1 in the raw data.
[160]  I considered all people who listed a "feeling thermometer" greater than or equal to 50 to be receptive to Mr. Trump (*i.e.*, THERMO>=50).

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 14.  Percentages of Republican or Republican-Leaning Readers/Viewers and the Percentage of Trump Supporters for Each Publication**[161]

| Publication | Percent Republican | Percent Receptive Republicans | Trump Supporters |
|---|---|---|---|
| The New York Times | 16.3% | 12.39% | 13.7% |
| ABC | 34.7% | 26.37% | 32.5% |
| Washington Post | 18.1% | 13.76% | 14.6% |
| Huffington Post | 14.8% | 11.25% | 12.4% |
| Fox News | 69.8% | 53.05% | 68.2% |
| MSNBC | 20.5% | 15.58% | 19.9% |
| Newsweek | 23.1% | 17.56% | 20.9% |
| **Average** | | **21.42%** | |

To calculate the final number of impressions to a receptive audience, I took the lowest of these variables, which is the Receptive Republicans, and multiplied the impressions generated by each media source by that percent. Data was not available for some of the publications considered in the Impressions Model. I used the average for all other publications if data was unavailable for a specific publication. Multiplying the impressions estimate from the Impressions Model by the Percent Receptive Republicans yields the percent of impressions made to people who were receptive to them. This estimate of the receptive impressions can then be carried forward to assess how much it would cost to repair reputational damage with this population. The formula used to calculate receptive impressions is displayed in Figure 15 below. The formula is applied to each of the media analyzed in the Impressions Model.

---

[161] Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019.

Expert Report of Professor Humphreys

A-943

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Figure 15.  Receptive Impressions Calculation**

> **Receptive Impressions = Percent Republicans \* Percent of Receptive Republicans \* Impressions Estimate**

Where:

> Percent Republican = percent of a publication's audience that are Republican
> Receptive Republicans = Republicans receptive to the claims (.76, YouGov)[162]
> Impressions Estimate = the total impressions from the Impressions Model

Figure 16 below summarizes the total receptive impressions generated by the Statement.

Appendix F includes the detailed results of the quantitative impact model.

**Figure 16.  Total Receptive Impressions**

|       | Social Media | Truth Social | Web | Print | TV | Total |
|-------|-------------:|-------------:|----:|------:|---:|------:|
| **High** | 2,252,842 | 193,647 | 1,178,390 | 21,878 | 2,002,968 | 5,649,724 |
| **Low**  | 502,796 | 58,094 | 1,178,390 | 21,878 | 2,002,968 | 3,764,125 |

The quantitative impact analysis uses information about readership, political ideology, and receptivity given political ideology to calculate the number of impressions generated by Mr. Trump's Statement that were made to a receptive audience. Certainly, as detailed in the qualitative impact analysis and impressions analysis, the Statement caused sufficient harm to Ms. Carroll's brand to a general public, meaning individuals across the ideological spectrum. The quantitative impact analysis provides an estimate of the target audience for a corrective campaign. That said, the total harm done to Ms. Carroll's brand in the eyes of the generalized public exceeds the very limited bounds of this quantitative impact and damages calculation. Appendix H includes a summary of the various reasons why the quantitative impact analysis is an undercount.

---

[162]  If data related to Percent Republicans is not available, the equation is as follows: the average Percent Receptive Republicans (21.42%) \* Impressions Estimate.

49

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## VI.  MODELING THE COSTS FOR REPUTATION REPAIR

### A.  Modeling Reputation Repair on Social Media

As detailed in the theoretical background section above, defamation causes harm to one's reputation in the public sphere. As a corrective measure to repair reputation, an advertising and strategic communications plan can attempt to change attitudes that may have been affected by Mr. Trump's Statement. This section details the methodology for calculating the costs to repair reputation damage via social media channels. The costs to repair the reputation are based on the estimates of the number of receptive impressions. The goal of the corrective campaign is to counteract the number of receptive impressions generated by the Statement, enabling Ms. Carroll to repair the damage done to her person brand by Mr. Trump. The best way to allocate spending on media for this kind of campaign would be to create a media mix that is based on how the target audience gets their information.[163] Further, a particular group that does not trust traditional media, such as those who identify as Republicans and/or support Mr. Trump, requires alternative information channels that they do trust.

### i.    Campaign Goals, Platforms, and Measurements

In my opinion, and given the prior literature summarized in Section II, a campaign to repair reputational damage must include (i) hiring influencers whom the audience regards as trusted sources, (ii) circulating statements in multiple media to replicate the echo chambers in which they originated, (iii) ensuring that the audience is exposed to the message multiple times in order to create attitude change, and (iv) extending for a long enough time to allow for dissemination, given what is known about the slow spread of true versus false claims online[164]

---

[163]  Ardia 2010.
[164]  Vosoughi *et al.* (2018).

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

and the multifaceted nature of effective corrective repair through online channels (*e.g.*, *United States v. Bayer Corp.*, No. 07-01 (HAA) (D.N.J. Jan. 4, 2007). A holistic social media campaign that includes these integrated elements is therefore the most effective way to repair reputational damage in this case.[165]

An effective social media campaign to repair reputational damage must be multi-pronged and include a mix of platforms and people. A typical social media campaign will combine display and search advertising along with hiring influencers to promote a message via blogs and on their Instagram, YouTube, and other channels. Production costs for video and to promote content are often also included. Because the source—and not just the message—is so critical to attitude change, particularly on social media, it is important to work with credible and likeable sources likely to gain traction with the intended audience. For this reason, hiring social and mass media influencers is critical to one's ability to repair reputational damage.

### ii.    Media Mix

To allocate media budget and media spend across each platform, I relied on the Pew data previously cited in the impact analysis. Using the Pew data, I conducted an analysis of the ways individuals who identify as Trump supporters reported getting their news (see Figure 17 below). Respondents who identified as Trump supporters[166] were asked "what is the most common way you get political and election news?" News websites or apps were the most commonly cited media used, with 23.1%. I added this together with social media (13%) to allocate the online and

---

[165]   Shankar, V., and Kushwaha, T. (2020), Omnichannel Marketing: Are Cross-Channel Effects Symmetric? *International Journal of Research in Marketing*; Payne, E. M., Peltier, J. W., & Barger, V. A. (2017), Omni-channel marketing, integrated marketing communications and consumer engagement: A research agenda. *Journal of Research in Interactive Marketing*, 11(2), 185–197.

[166]   I analyzed the media habits of Trump supporters (THERMO variable >50), as that was the closest reflection of the receptive Republican audience in the Pew data.

51

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

influencer budget. The next most common responses were cable (21.3%), local (15.6%), and national network television (14%), which I allocated to the mass media budget. I allocated radio (9.1%) and print (3.4%) accordingly as well, using publicly available data on rates for these media channels.

**Figure 17.  The Media Mix of Respondents who Identify as Trump Supporters**

| *NEWS_MOST_W57. What is the most common way you get political and election news?* | | | | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **Print newspaper or magazines** | 162 | 3.4 | 3.4 | 3.4 |
| **Radio** | 438 | 9.1 | 9.1 | 12.5 |
| **Local television** | 748 | 15.6 | 15.6 | 28.1 |
| **National network television** | 669 | 14 | 14 | 42.1 |
| **Cable television** | 1020 | 21.3 | 21.3 | 63.3 |
| **Social media** | 623 | 13 | 13 | 76.3 |
| **News website or app** | 1109 | 23.1 | 23.1 | 99.5 |
| **Refused** | 26 | 0.5 | 0.5 | 100 |
| *Total* | 4795 | 100 | 100 | |
| | | *99.5* | | |

To estimate the cost for repair on each platform, two measurements are used as the industry standard. To assess the number of impressions, one can use the cost per thousand impressions, otherwise known as cost per mille (CPM) to estimate how many impressions would be gained for each dollar spent and cost per click (CPC) to estimate the number of engagements each dollar is likely to yield. For each channel, I calculated either the CPM or CPC multiplied by the number of receptive impressions generated by the Statement (as discussed, below I also incorporated an attitude-change multiplier to account for the fact it takes multiple exposures to change an existing attitude). I also included costs to have social and mass media influencers share the message across their channels, similar to the method in which Mr. Trump's Statement

52

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

was spread and that mirrors the ways in which Trump supporters get their news, according to analysis of the Pew Research poll.[167, 168] Due to an overlap in influencers across social media platforms, I assume that Truth Social impression rates and costs are similar to the lowest-cost social media platform.[169]

Costs of advertising were calculated as CPM or CPC multiplied by the target number of impressions of each channel or platform. Whether to use CPM or CPC in a cost calculation depends on the goal of the campaign. Annual industry benchmark reports of CPM and CPC for different channels and platforms published by research firms and advertising networks are used in the damages model to estimate costs for reputation repair. When the cost of advertising of a specific channel could be calculated from either CPM or CPC, I used CPC in the final cost of this channel in order to ensure attitude change/conversion. For influencer promotion and mass media advertising, only CPM was used for cost calculation because CPC is usually not available.

### iii.   Attitude Change Multiplier

As covered in the aforementioned psychological literature, an attitude is not changed by one impression alone. In order to actually change attitudes, a campaign would need to serve multiple impressions per person; showing someone a counter-attitudinal message one time will not change their attitude. This is true in traditional media,[170] but it is particularly true in the crowded attention marketplace of social media. While prior research has found that it requires

---

[167]  Truth Social was not available when the Pew Research Survey was conducted in 2019. A survey conducted by Pew in 2022 indicates that 2% of people get their news from Truth Social, https://www.pewresearch.org/fact-tank/2022/11/18/key-facts-about-truth-social-as-donald-trump-runs-for-u-s-president-again/. However, because of its centrality to the receptive audience, I would include it in the campaign under Social Media.

[168]  Pew Research Center's American Trends Panel Wave 57, Pathways to Election News Project, November 26, 2019.

[169]  https://www.axios.com/2022/01/25/trump-truth-social-influencers.

[170]  Cacioppo and Petty (1980).

53

**A-948**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

about 3 to 5 impressions to change an attitude in traditional advertising exposure, on social media the number of exposures is likely much higher. Taking into account the attention environment, the strength of attitudes, and the impression rate (likelihood of an exposure leading to an actual impression), I estimate that a message would need to be seen approximately 3 to 5 times on social media *from a credible source* before it would lead to attitude change. For some audiences, 7 times may be more appropriate. For some audiences, it would be impossible to change attitudes. However, as I will discuss, contingent on a prior campaign, the number of exposures needed to change attitudes could be lower.

### iv.    Potential Overlap in Impressions

As mentioned above, the aim of the corrective campaign is to repair the harm to Ms. Carroll's brand caused by the receptive impressions. Yet the literature on attitude change multipliers is based on individuals and not impressions (*i.e.*, one individual would require between 3 and 5 impressions to change attitudes). It is possible that the proposed campaign, which is measured in impressions, could serve multiple impressions to one individual, even without an attitude change multiplier. In order to account for this potential overlap, I provide estimates as low as a multiplier of 1, which would undercover the number of impressions needed for attitude change. For informative purposes, the damages model that I include provides a range of attitude change multiples, from 1 to 5.

Empirical data suggest that a multiplier of 1 is often overly conservative, especially given the media habits of the audience who were likely receptive to the Statement. Using the Pew dataset referenced previously, I conducted an analysis of media habits of Trump supporters. The

54

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

data show that Trump supporters[171] are more likely to use only one news source (37% vs. 27%

for non-Trump supporters), and they are more likely to use cable news than non-Trump

supporters (21% vs. 16%).[172] If the audience tends to consume one news source, it is unlikely

that they will receive multiple impressions from a campaign with a frequency multiplier of 1. A

campaign that would actually change attitudes for this audience would need to show multiple

impressions, particularly to those who only use one primary news source (the others would be

likely to get multiple impressions if they use more than one news source).[173] However, it may be

the case that if a previous campaign had been run, the need to expose the audience to the

message multiple times would be moot. Taking into account the potential overlap of impressions

per person in this instance, the damages model therefore presents a conservative range from 1

impression to 5 impressions.

### B.  Costs of the Corrective Campaign

Figure 18 below shows the total costs of the corrective campaign. I include three costs: a

low estimate, which incorporates an attitude change multiplier of 1; a medium estimate, which

incorporates an attitude change multiplier of 3; and a high estimate, which incorporates an

---

[171] Because the survey did not have a "receptive Republicans" measure and I could not infer it on an individual level, I used survey respondents who indicated support for Trump. According to my prior analysis, this percentage is roughly equivalent to receptive Republicans.

[172] The most common way Trump supporters get their news is through a news website (23.1%), followed closely by cable television (21.3%). Although only 13% report commonly getting news from social media, 43.4% report often or sometimes getting news from social media (17.9% reporting that they often get news from social media). The most common sources for political news by media can be found by analyzing the Pew Research 2019 dataset. For each channel, I used the rates associated with the most common response, as listed in the Pew Survey (variables MAINSOPOL_USE_W57 and NEWS_MOST_W57). Respondents also provided an open-ended response about what media sources they use, which provided insight into the best channels for placement and guided rate selection.

[173] Note that a campaign with a multiplier of 1 may result in some people seeing the same message more than once (say, for example on cable television), even if they only get their information from one news source. Nonetheless, a 1x multiplier mimics the number of initial impressions they received on a 1:1 basis, not a 3:1 basis, as I would suggest for counter-attitudinal messages.

55

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

attitude change multiplier of 5. As detailed above, in most cases, a multiplier of at least 3 (the medium estimate) would constitute the minimum corrective campaign to run, given the importance of multiple exposures and the likelihood that the audience will receive them and be affected by them.[174] However, if a prior corrective campaign had been run, some harm would have been mitigated.[175] I therefore would recommend the lowest damages estimate of $368,183.78 to $552,621.56, contingent on a prior campaign having been executed.[176] Appendix G includes the detailed results of the damages model.

**Figure 18.  Final Damages Calculations**

|                    | Low          | Medium         | High           |
|--------------------|--------------|----------------|----------------|
| **High Impressions** | $552,621.56  | $1,657,864.69  | $2,763,107.82  |
| **Low Impressions**  | $368,183.78  | $1,104,551.33  | $1,840,918.88  |

High & low impressions from the Impressions Model
Low = 1x attitude change multiplier, Medium = 3x, High = 5x
In the campaign, I assume an impression rate of 5%[177] and a
bounce rate of 90%.[178]

The damages model presents a conservative estimate of the cost to run a multi-media campaign to correct attitudes amongst the audience most likely to have been receptive to the

---

[174] Cacioppo and Petty (1980); Housholder and LaMarre (2014); Weiss (1969).
[175] Note that with the relatively low impression rates used in the impressions and damages analysis (1 to 20%), the likelihood of counting the same person twice is relatively low. However, as a reasonable and conservative step, I use the lowest frequency multiplier to avoid overly-exposing the target audience to the corrective message.
[176] Cacioppo and Petty (1980); Housholder and LaMarre (2014); Weiss (1969).
[177] The CPMs I rely on for Twitter, Facebook, and YouTube influencers are based on an influencer's number of followers or subscribers. For the reasons described above, not all of a user's followers will see an influencer's post. As a result, to ensure the corrective campaign generates sufficient impressions, it is necessary to incorporate an impression rate. In this case, I am relying on an impression rate of 5% which is the median impression rate calculated using Equation 2a from the Impression Model.
[178] The CPM I rely on for web blog influencers is based on site visits. To account for people who visit a blogger's website but do not perform any other action, I multiplied the impressions needed by a bounce rate of 90%, a typically bounce rate for blogs. (https://influencermarketinghub.com/glossary/bounce-rate/).

56

Expert Report of Professor Humphreys

**A-951**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Statement (see Appendix H for the reasons why the damages model is conservative). It does not account for the harm to Ms. Carroll's brand in the public at large, but only among this specific receptive audience. The campaign takes into account readership and viewership patterns in the target audience, the number of receptive impressions, and the current advertising costs across media. In this case, the Statement came from Mr. Trump, a high-profile individual with a loyal following whom the media covered, and continues to cover, extensively. Given his status, Mr. Trump's Statement received a very large number of impressions. Of the large audience where this Statement appeared, at least 21% were receptive to them. This audience continues to circulate Mr. Trump's claim, which continues to harm Carroll's person brand and impede attempts to counter-act the damage. The repeated nature of the claims in the public sphere only serves to reinforce and strengthen negative associations put forward by Mr. Trump and keep these associations top of mind for the public. Further, the claim does not go away.  It is archived on the internet and therefore remains easily accessible in the public sphere.

## VII.   CONCLUSION

I conclude that Mr. Trump's Statement about Ms. Carroll has significantly harmed her person brand. My conclusion is based on my academic research and expertise, and my analysis of the facts of this case and of data I collected regarding the dissemination of, and receptivity to, Mr. Trump's Statement; it is also supported by abundant qualitative evidence. The models I developed demonstrate how Mr. Trump's Statement spread to a receptive audience across online and traditional media platforms and provide the basis for calculating the cost of an effort to repair the damage done to Ms. Carroll's person brand. My conclusions are as follows:

- **Impressions Model Conclusion:** Mr. Trump's Statement made on October 12, 2022, received between 13,787,119 and 18,020,819 impressions across social, digital, television,

57

**A-952**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

and print media. The extraordinary dissemination of the Statement is in keeping with the high profile and ongoing media coverage of Mr. Trump. This number of impressions is a conservative estimate for reasons I have previously delineated.

- **Impact Model Conclusion:** Of the impressions generated, an average of 21.42% of recipients for each publication were receptive to this Statement, resulting in between 3,764,125 to 5,649,724 impressions that should be corrected. Further, my qualitative assessment of the impact of the dissemination of Mr. Trump's Statement is that they caused short- and long-term harm to Ms. Carroll beyond the estimate of receptive impressions calculated in my Impact Model. This harm builds upon the initial effects of Statements caused by Mr. Trump's in June 2019 statements in the sense that it strengthens negative associations with Ms. Carroll's brand and provides further, archived content of these negative associations in the public sphere.

- **Damages Model Conclusion:** The cost to counteract the impact of this Statement is between $368,183.78 and $2,763,107.82. I believe the appropriate corrective campaign to repair reputational damage would be the low range, from $368,183.78 to $552,621.56 for reasons outlined above. Because I took a conservative approach to calculating the Impressions input, this range represents a conservative estimate.

I reserve the right to revisit and supplement this analysis and amend these conclusions should additional information and/or documents become available. I further reserve the right to respond to opinions and issues raised by any opposing experts. Finally, I reserve the right to use demonstrative and/or other exhibits to present the opinions expressed in this report and/or any supplemental, amended, and/or rebuttal reports.

Dated: January 9, 2023

Professor Ashlee Humphreys

58

Expert Report of Professor Humphreys

A-953

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX A. <u>PROFESSOR HUMPHREYS' CV AND PRIOR TESTIMONY</u>

**ASHLEE HUMPHREYS**
a-humphreys@northwestern.edu
(847) 644-8802

Integrated Marketing Communications        1870 Campus Drive
Medill School of Journalism        MTC 3-109
Northwestern University        Evanston, IL 60208

**EDUCATION**
>  **Ph.D.**, Marketing, Kellogg School of Management, Northwestern University.
>
>  **B.A.**, Economics, Philosophy, Northwestern University.

**EMPLOYMENT**
> Northwestern University
> Medill School of Journalism, Media, and Integrated Marketing Communications
> > *Professor, September 2022 to present*
> > *Associate Professor, September 2015 to 2022*
> > *Assistant Professor, September 2008 to 2015*
> Kellogg School of Management, Joint Appointment
> > *Professor, September 2022 to present*
> > *Associate Professor, January 2019 to 2022*

**BOOK**

Humphreys, Ashlee (2016), *Social Media: Enduring Principles*, Oxford University Press. 2nd edition, forthcoming, 2023.

**ONGOING**

Digital Satisfaction Index, https://www.performics.com/about-us/intent-lab/

**JOURNAL PUBLICATIONS**

Corciolani, M., Giuliani, E., Humphreys, A., Nieri, F., Tuan, A. and Zajac, E.J. (2023), Lost and Found in Translation: How Firms Use Anisomorphism to Manage the Institutional Complexity of CSR. J. Manage. Stud., https://doi.org/10.1111/joms.12877.

Berger, Grant Packard, Reihane Boghrati, Ming Hsu, Ashlee Humphreys, Andrea Luangrath, Sarah Moore, Gideon Nave, Christopher Olivola, Matthew Rocklage, (2022), Wisdom from Words: Marketing Insights from Text Analysis, *Marketing Letters*, 1-13.

59

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Carpenter, Greg S. and Ashlee Humphreys, (2022) "If it's famous, it must be good: The social construction of brand value in the US wine market," The Routledge Handbook of Wine and Culture, 372-381.

Lamberton, Cait and Ashlee Humphreys, "Social Media: From Classic Psychological Theories to New Opportunities," *APA Handbook of Consumer Psychology*, 489-511.

Humphreys, Ashlee (2021), "The Textuality of Markets," *AMS Review* 11, no. 3: 304-315.

Gonsalves, Chahna, S Ludwig, K de Ruyter, A Humphreys, (2021) "Writing for impact in service research," *Journal of Service Research* 24 (4), 480-499.

Pamuksuz, Utku, Joseph T. Yun, A Humphreys, (2021) "A Brand-New Look at You: Predicting Brand Personality in Social Media Networks with Machine Learning, *Journal of Interactive Marketing*, 56 (1), 1-15.

Huff, Aimee, Ashlee Humphreys and Sarah Wilner, (2021), "The Politicization of Objects: Meaning and Materiality in the U.S. Cannabis Market, *Journal of Consumer Research*.

Humphreys, Ashlee, Mathew Isaac, and Becky Hui-Jen Wang, (2021), "Construal Matching in Online Search: Applying Text Analysis to Illuminate the Consumer Decision Journey," *Journal of Marketing Research 58 (6),* 1101-1119.

Debenedetti, A, D Philippe, D Chaney, A Humphreys (2021), "Maintaining Legitimacy in Contested Mature Markets through Discursive Strategies: The Case of Corporate Environmentalism in the French Automotive Industry, *Industrial Marketing Management* 92, 332-343.

Berger, Jonah, Ashlee Humphreys, Stephan Ludwig, Wendy Moe, and David Schweidel, (2020), "Uniting the tribes: Using Text for Marketing Insight," *Journal of Marketing*, *84*(1), pp.1-25.

Corciolani, Matteo, Kent Grayson, and Ashlee Humphreys, (2020), "Do more experienced critics review differently?: How field-specific cultural capital influences the judgments of cultural intermediaries." *European Journal of Marketing* 54, no. 3 (2020): 478-510.

Carpenter, Gregory S. and Ashlee Humphreys (2019), "What the Wine Industry Understands About Connecting with Consumers," *Harvard Business Review*, March 5, 2019. https://hbr.org/2019/03/what-the-u-s-wine-industry-understands-about-connecting-with-customers.

Humphreys, Ashlee and Gregory S. Carpenter (2018), "Status Games: Market Driving Through Social Influence in the U.S. Wine Industry," *Journal of Marketing*, https://doi.org/10.1509/jm.16.0179.

60

A-955

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Humphreys, Ashlee and Rebecca Jen-Hui Wang (2017), "Automated Text-Analysis for Consumer Research," *Journal of Consumer Research*, Volume 44, Issue 6, 1 April 2018, Pages 1274–1306.

Humphreys, Ashlee and Craig J. Thompson (2014), "Branding Disaster: Reestablishing Trust through the Ideological Containment of Systemic Risk Anxieties," *Journal of Consumer Research*, 44 (4) (lead article).

Humphreys, Ashlee (2014), "How is Sustainability Structured?: The Discursive Life of Environmentalism," *Journal of Macromarketing*, 34 (3).

Humphreys, Ashlee and Kathy LaTour (2013), "Framing the Game: Assessing the Impact of Cultural Representations on Consumer Perceptions of Legitimacy," *Journal of Consumer Research*, 40 (4).

Humphreys, Ashlee (2010), "Semiotic Structure and the Legitimation of Consumption Practices: The Case of Casino Gambling," *Journal of Consumer Research*, 37 (3), 490-510.

Humphreys, Ashlee (2010), "Megamarketing: The Creation of Markets as a Social Process," *Journal of Marketing*, 74 (2), 1-19 (lead article).

Humphreys, Ashlee and Kent Grayson (2008), "The Intersecting Roles of Consumer and Producer: A Critical Perspective on Co-Production, Co-Creation and Prosumption," *Sociology Compass*, 2, 1-18.

Humphreys, Ashlee (2006), "The Consumer as Foucauldian 'Object of Knowledge,'" *Social Science Computer Review*, 24 (3), 296-309.

61

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## EXPERT WITNESS

September 2020
***Aaron Rich v. Edward Butowsky, Matthew Couch, and America First Media,*** Civil Action No.
1:18-cv-00681-RJL (Defamation)

February 2021
***Erica Lafferty et al. v. Alex Jones et al.,*** FBT-CV18-6075078-S, Superior Court J.D. of Fairfield
at Bridgeport (Defamation), consulting expert

January 2021
***Class vs. Bosch LCC, Bosch GmBH and General Motors***, No. 2:17-cv-11661-CGS-APP,
District Court of Eastern Michigan (Marketing), testifying expert

November 2022
***Joe Feehan, Luna Aziz, and Legendairy Milk, LLC vs. Kyrstal Duhaney and Milky Mama,
LLC*** , No. 1:19-CV-01169-RP, District Court for the Western District of Texas, Austin Division
(Defamation)

*Ongoing*
***E Jean Carroll vs. Donald J. Trump (in his personal capacity)***, No. Case No. 20-CV-7311,
District Court for the Southern District of New York (Defamation)

## CONTRIBUTION STATEMENT

My research concerns *how institutions shape consumer norms, values, and practices.* My
contributions to consumer behavior come from using institutional theory and the method of
automated text analysis to investigate market emergence. In "Semiotic Structure and the
Legitimation of Consumption Practices: The Case of Casino Gambling," (*Journal of Consumer
Research*, 2010), I investigate the cultural process by consumption practices are legitimated over
time. Through text analysis of newspaper reporting, I show that a gradual change in the language
used to discuss casino gambling paved the way for market emergence. This work won the Sidney
J. Levy award for outstanding work in CCT in 2010. In "Megamarketing: Market Creation as a
Social Process," published in the *Journal of Marketing* (2010), I complement this approach by
applying these insights to understand megamarketing. This research was published as the lead
article in the *Journal of Marketing* and was runner-up for the Harold H. Maynard Award for best
article of the year.

With Kathy LaTour, I extend this understanding to individual cognitive structures to
understand how media framing shapes perceptions of legitimacy on an implicit, individual level
(Humphreys and LaTour 2013). In "Branding Disaster: Reestablishing Trust through the
Ideological Containment of Systemic Risk Anxieties," with Craig Thompson, we show how this
process contains consumer anxieties about risk following a crisis, in a comparative analysis of
the Exxon vs. BP oil spills (Humphreys and Thompson 2014) that innovates by adding visual

62

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

content analysis. This article was selected as lead article in the *Journal of Consumer Research*. My current work continues to investigate market emergence and change, but has expanded include the areas of social media and sustainability. I also continue to be a leader in the method of automated text analysis in consumer research by publishing and leading workshops and seminars for scholars in both consumer psychology and CCT.

## BOOK CHAPTERS

Carpenter, Greg and Ashlee Humphreys (forthcoming), "If it's Famous, It Must Be Good; The Social Construction of Brand Value in the US Wine Market," *Routledge Handbook of Wine and Culture,* ed. Jennifer Smith-Maguire.

Humphreys, Ashlee (2019), "Consumer Behavior and E-Commerce," Handbook for Marketing Strategy, ed. Bodo Schlegelmilch and Russell Winer.

Humphreys Ashlee. (2019) "Automated Text Analysis" In *Handbook of Market Research*. Homburg C., Klarmann M., Vomberg A. (eds). New York, NY: Springer.

Humphreys, Ashlee (2017), "Social Media," Routledge Handbook of Consumer Behavior, Tina Lowrey and Michael Solomon eds.: London: Routledge.

Humphreys, Ashlee (2010), "Co-Producing Experiences," in *Medill on Media Engagement*, Edward Malthouse and Abe Peck, eds. New York: Pine Forge Press.

Humphreys, Ashlee (2009), "Stacking the Deck: Gambling in Film and the Legitimation of Casino Gambling," in *Explorations in Consumer Culture Theory*, John F. Sherry and Eileen Fischer, eds. New York: Routledge.

## OTHER PUBLICATIONS

Carpenter, Gregory and Ashlee Humphreys, "What the Wine Industry Understands About Connecting with Consumers," *Harvard Business Review*, March 3, 2019, https://hbr.org/2019/03/what-the-u-s-wine-industry-understands-about-connecting-with-customers.

Humphreys, Ashlee and Mathew S. Isaac, "The Development of a Digital Satisfaction Scale (DSS) and Index (DSI) to Evaluate Consumers' Satisfaction with Their Online Experiences," Chicago, IL: Intent Lab. Available at: http://www.performics.com/about/digital-satisfaction-index/.

Foerstner, Abigail, Ashlee Humphreys, and Ellen Shearer (2013), "Energizing Media Coverage of Energy Issues: The Impact of Different Reporting Frames on Audience Engagement and Understanding," Washington, DC: Lounsbery Foundation.

63

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Humphreys, Ashlee (2012), "Megamarketing" in *Encyclopedia of Management*, Volume 9, Marketing, New York: Wiley.

Humphreys, Ashlee (2010), "Advertising," in *World Book Encyclopedia*. Chicago, IL: World Book.

## WORKS IN PROGRESS

"Shifting the Shape: Strategic Shaping and the Symbolic Management of Risk," with Matteo Corciolani, Elisa Giuliani, Ashlee Humphreys, Dalli Daniele, and Annamaria Tuan (submitted the *Academy of Management Journal*)

Humphreys, Ashlee with Andrew Smith, "Professional Contests and the Institutionalization of Social Media" (2nd Round, *Journal of Marketing*)

Humphreys, Ashlee, "The Access/Ownership Distinction in Everyday Consumption Practices," (draft available).

Humphreys, Ashlee, "Do Brands Like Us? The Perceived Liking of the Brand for the Self and Brand Attraction" with Lora Harding (manuscript in preparation).

Humphreys, Ashlee and Mathew S Isaac, "Digital Satisfaction," (draft available).

## REFEREED PROCEEDINGS

Huff, Aimee, Ashlee Humphreys and Sarah Wilner, (2018) "Markets and Meaning: The Role of Product Form in Legitimacy, the case of Marijuana," Advances in Consumer Research, Vol. 43.

Giuliani, Elisa, A Humphreys, D Dalli, A Tuan, M Corciolani (2018), "Strategic CSR Framing by Firms in Emerging Markets," *Academy of Management Proceedings* 2018 (1), 15922

Humphreys, Ashlee and Kathy LaTour (2011), "Together We Stand, Divided We Fall: Categorization and the Process of Legitimation," *Advances in Consumer Research*, Vol. 39, 172-176.

Harding, Lora and Ashlee Humphreys (2010), "Self-Brand Attraction: An Interpersonal Attraction Approach to Brand Relationships," *Advances in Consumer Research*, Vol. 37, 68-69.

Humphreys, Ashlee and Robert V. Kozinets (2009), "The Construction of Value in Attention Economies," *Advances in Consumer Research*, Vol. 36, 689.

Humphreys, Ashlee (2009), "Legitimation and Semiotic Structure," *Advances in Consumer Research*, Vol. 36, 135-138.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Mick, David Glen and Ashlee Humphreys (2008), "Consumer Freedom from Consumer Culture Theory Perspectives," *Advances in Consumer Research - North American Conference Proceedings*, Vol. 35, 18-19.

Humphreys, Ashlee (2008), "Understanding Collaboration and Collective Production: New Insights on Consumer Co-Production," *Advances in Consumer Research*, Vol. 35, 63-66.

Humphreys, Ashlee and Markus Giesler (2007), "Access Versus Ownership in Consumer Research," *Advances in Consumer Research*, Vol. 34, 696-698.

**ACADEMIC CONFERENCE PRESENTATIONS**

"Markets and Meaning: The Role of Product Form in Legitimacy, the case of Marijuana," Austin, TX. October 2018.

"The Politicization of Objects," Consumer Culture Theory Conference, Odense, Denmark, July 2018.

"Professional Contests and the Institutionalization of Social Media," Baltimore, MD, October 2014.

"Wine Worlds," European Marketing Association Conference, Istanbul, Turkey, July 2013.

"Sustainability and Social Class," European Association of Consumer Research, Barcelona, Spain, June 2013.

"Oil Spills as Disaster Myths: Grotesque Realism in Postmodern Consumer Culture," Consumer Culture Theory Conference, Oxford University, August 2012.

"Consumer Culture Theory in Marketing Research," American Marketing Association Winter Educator's Conference, Las Vegas, NV, February 2011.

"The Discursive Life of Environmentalism," Consumer Culture Theory Conference, Evanston, IL, August 2011.

"Together We Stand, Divided We Fall: Categorization and the Process of Legitimation," Association for Consumer Research, St. Louis, MO, October 2010.

"Legitimacy and the Cultural Diffusion of Casino Gambling, 1976-2006," Association for Consumer Research, San Francisco, CA, October 2008.

"Attention Economies and the Construction of Value: The Case of YouTube," with Robert V. Kozinets, Association for Consumer Research, San Francisco, CA, October 2008.

Expert Report of Professor Humphreys

A-960

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"Attention Economies and the Construction of Value: The Case of YouTube," with Robert V. Kozinets, International Communication Association, Montreal, Quebec, May 2008.

"Consumer Freedom from Consumer Culture Theory Perspectives," with David Mick, Association for Consumer Research, Memphis, TN, October 2007.

"Managing Co-production: The Case of Wikipedia," with Kent Grayson, Association for Consumer Research, Memphis, TN, October 2007.

"Philosophy and Consumption: Discussions on Trust and Brands," with Shona Bettany, Susan Dobscha, Marcus Giesler, Kent Grayson, Ashlee Humphreys, Krittinee Nuttavuthisit, Rob Kleine, Jonathan Schroeder, Alladi Venkatesh, Clara Gustafsson, Association for Consumer Research, Memphis, TN, October 2007.

"Stacking the Deck: Gambling in Film and the Legitimization of Casino Gambling," Consumer Culture Theory Conference, Toronto, ON, May 2007.

"The Access/Ownership Distinction in the Media Marketplace," with Markus Giesler, Association for Consumer Research, Orlando, FL, October 2006.

"The Access/Ownership Distinction in Consumer Behavior," Session Chair, Association for Consumer Research, Orlando, FL, October 2006.

"Commodity Fission," Circulations Conference, York University, March 2005.


**INVITED TALKS**

"Automated Text Analysis," 11th Triennial Invitational Choice Symposium, Cambridge, MD, May 2019.

"The Politicization of Objects," Pontifical Catholic University of Chile, April 2019.

"The Politicization of Objects," Guelph University, Guelph, ON, March 2019.

"Automated Text Analysis and Social Media," University of Manitoba, February 2019.

"The Emergence of Social Media as a Professional Field," MORS, Kellogg School of Management, September 2018, Northwestern University.

"Digital Satisfaction Index (DSI)," Marketing Science Institute Trustees Meeting, November 2016, San Francisco.

"Levels of Analysis and Matching Theory with Data," Association of Consumer Research

66

A-961

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Doctoral Consortium, October 2016, Berlin, Germany.

"The Discursive Life of Environmentalism...and what it means for Corporate Social Responsibility," University of Wyoming, Laramie, Wyoming, August 2016.

"Publishing Sociological Research in Marketing," Macromarketing Doctoral Consortium, July 2016, Dublin, Ireland.

"Professional Contests and the Emergence of Social Media as an Institutional Field," York University, Toronto, Canada, May 2016.

"The Emergence of Social Media as an Institutional Field," Kern Conference, April 2016, Rochester, NY.

"Professional Contests and the Emergence of Social Media as an Institutional Field," Concordia University, Montreal, Canada, March 2016.

"The Emergence of Social Media as an Institutional Field," SKEMA, Lille, France, December 2015.

"Market Creation as a Social Process," Marketplace Mutations: New Perspectives on Consumer and Firm Behaviors that are Transforming the Market," Wilfred Laurier University, Waterloo, ON, May 2015.

"Writing the Book on Social Media: The Legitimation of Social Media as a Professional Field," 3rd Annual Digital Marketing Conference, Jinan University, Guangzhou, China, May 2015.

"Writing the Book on Social Media: The Legitimation of Social Media as a Professional Field," HEC Paris Marketing Camp, Paris, France, April 2015.

Automated Content Analysis in Marketing Research, Association of Consumer Research, Baltimore, MA, October 2014.

Consumption and Markets Workshop, "Oil Spills as Disaster Myths," University of California, Irvine, Irvine, CA, March 2014.

Qualitative Data Analysis Workshop, "Macro Approaches to Data Collection," Tucson, AZ, June 2013.

Kellogg Attitudes Motivation Processes Group (KAMP), "Framing the Game," Kellogg School of Management, Evanston, IL, April 2013.

Thought Leaders in Services Management, "Consumer Perceptions of Service Constellations: Implications for Service Innovation," Nijmegen, Netherlands, June 2012.

67

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Chicago Consumer Culture Community (C4), "Sustainability and Social Class," Chicago, IL, April 2012.

University of Arizona, "Wine Worlds," Tucson, Arizona, March 2012.

Association of Health Care Journalists, "Journalism and Social Media," Chicago, IL, September 2012.

University of Innsbruck, "Access as a Consumer Institution and Orientation," Innsbruck, Austria, May 2011.

Rochester Institute of Technology, "The Discursive Life of Environmentalism," Rochester, NY, April 2011.

University of Wisconsin, "The Discursive Life of Environmentalism," Madison, WI, March, 2011.

Queen's University, "Left out of the Green Revolution? Sustainability and Social Class in the United States," Kingston, Ontario, September 2010.

Chicago Consumer Culture Community (C4), "Words, Words, Words: The Use of Automated Content Analysis in Consumer Research," October 2009

Medill Board of Advisors Meeting, "Chip-less Cookies and Cream-less Oreos: Applying Attitudes Research to Understand Audience Interest," Evanston, IL. October 2009.

American Bar Association, "Social Networking 101," Chicago, IL. March, 2009.

## TEACHING

KSM 461 Critical Thinking in Social, Digital, and Mobile Media (MBA), 2020-Present
IMC 466 Social Media (Master's Level), 2014-Present
IMC 401 Marketing Research (Master's Level), 2018
IMC 400 Consumer Insight (Master's Level), 2016
IMC 300/301 Consumer Insight, 2008-2018
IMC 466 Global Perspectives, 2012-2016
IMC 440 Summer Residency Projects, 2008-Present
IMC 455 Online Consumer Insight, Winter 2013
IMC 455 Consumer Insight (Master's Level), Fall 2014

## ADVISING

Russel Nelson, University of Irvine, 2015 (Committee Member)
Lez Trujillo Torres, University of Illinois Chicago (Committee Member)
Alex Mitchell, Queens University (External Committee Member)

68

A-963

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**SERVICE**

*Service to the Field*

> *Journal of Consumer Research,* ERB
>> *Associate Editor,* 2016-2018, 2020-Present
>> *Editorial Board,* 2008-present
> *Journal of Marketing,* ERB
>> *Associate Editor,* 2020-Present
>> *Editorial Board,* 2018-Present
>> *Reviewer,* 2010-Present
> *Journal of Marketing Research*
>> *Associate Editor (ad hoc),* 2020-Present
>> *Reviewer,* 2016-Present
> *Journal of Business Research*
>> Guest Editor, Fall 2019
> *AMS Review,* ERB
>> *Editorial Board,* 2019-Present.
> *Journal of Interactive Marketing,* ERB
>> *Editorial Board,* 2018-Present
> *Journal of Consumer Culture,* Reviewer
>> 2009-Present
> *Consumption, Markets, and Culture*
>> Editorial Review Board 2010-Present
> Reviewer 2008-Present
> *Marketing Theory,* Reviewer
>> 2007-2009
> *Sociological Forum,* Reviewer
>> 2010
> *American Behavioral Scientist,* Reviewer
>> 2010-Present
> *Association for Consumer Research Conference*
>> Reviewer 2008-2010
>> Program Committee 2011-Present
>> Special Session Curator, 2013
> *European Science Foundation,* Grant Reviewer
>> 2010, 2012
> *Chicago Consumer Culture Community,* Organizer
>> 2010-Present
> *Consumer Culture Theory Conference,* Program Committee
>> Reviewer 2008-2010
>> Program Committee 2011-2013
> Dissertation Committee Member, Russell Nelson, "Competitive Dynamics in New Markets: Measuring Innovation, Successful Strategies, and the Role of Social Media," University of Irvine, September 2013.

69

Expert Report of Professor Humphreys

A-964

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Dissertation Committee Member, Lez Trujllo Torres, University of Illinois, Chicago, May 2019

Dissertation Committee Member, Alex Mitchell, Queens University, June 2018

*Service to Northwestern*

Chapin Fellow, Chapin Humanities Residential College 2012-2017
Senior Thesis Advisor
Stanley Polit, School of Education and Social Policy, 2010
Ashley Heyer, School of Education and Social Policy, 2010

*Service to Medill*

MSIMC Curriculum Committee
2008-Present
    Strategic Planning Committee
2019
    Committee to Evaluate Procedures for Promotion
2019
MSJ Curriculum Committee
2008-2011
IMC Undergraduate Curriculum Committee
2008-2012
IMC Faculty Search Committee
2000-2010
Digital Magazine Search Committee
    2011-2012
*Medill Matters* Co-Editor
    2010-2012

**SHORT BIO**

Ashlee Humphreys is Associate Professor at the Medill School of Journalism, Media, and Integrated Marketing Communications, Northwestern University. Her research uses a sociological perspective to examine core topics in marketing management and consumer behavior and has been published in *Journal of Marketing*, *Journal of Consumer Research*, *Journal of Marketing Research* and *Sociology Compass*. Professor Humphreys has been elected both an MSI Scholar (2020) and MSI Young Scholar (2015) and has won the Sidney J. Levy award for best research from a dissertation in CCT. She received her PhD in Marketing from Kellogg School of Management at Northwestern University in 2008.  Her current research interests include the role of institutions in markets, processes of co-production, and the development of online communities, and she serves as an Associate Editor at the *Journal of Marketing* and the *Journal of Consumer Research*.

70

Expert Report of Professor Humphreys

A-965

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## MEMBERSHIPS

Association for Consumer Research
American Marketing Association
American Sociological Association

## HONORS AND AWARDS

MSI Scholar, 2020

MSI Young Scholar, 2015

ASG Faculty Honor Roll, Northwestern University, Evanston, IL, 2012.

Harold H. Maynard Award, Runner-up, *Journal of Marketing*, American Marketing Association, 2010.

Sidney J. Levy Award, Consumer Culture Theory Conference, 2010.

## PRESS COVERAGE

"Winemakers Tell Us What We Want," *The Australian*, April 16, 2019.

"It Takes Status To Succeed In The U.S. Wine Business, Says Two Academic Researchers," Thomas Pellechia, *Forbes,* March 9, 2019.
https://www.forbes.com/sites/thomaspellechia/2019/03/09/it-takes-status-to-succeed-in-the-u-s-wine-business-says-two-academic-researchers/.

"A Retail Dilemma: Consumers Believe In Pictures As Digital Trust Declines," Laura Heller, *Forbes*, 21, 2019. https://www.forbes.com/sites/lauraheller/2019/02/21/a-retail-dilemma-consumers-believe-in-pictures-as-digital-trust-declines.

"How What You Say Reveals More Than You Think,"  *Knowledge@Wharton*, February 16, 2018. https://knowledge.wharton.upenn.edu/article/say-reveals-think/.

"Contractor BP Wants You to Think the Gulf Is OK," Jason Plautz, *National Journal*, April 20, 2015.

"Media coverage creates oil spill amnesia — so don't read this!," *Grist*, http://grist.org/list/media-coverage-creates-oil-spill-amnesia-so-dont-read-this/

"Place Your Bets," Merrill Perlman, *Columbia Journalism Review*, September 30, 2013.

71

Expert Report of Professor Humphreys

A-966

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"Gaming versus Gambling," Michael Finney, *Consumer Talk*, KGO 810, Saturday 21, 2013.

"Why are consumers more likely to participate in online gaming than gambling?" *e! Science News*, September 10, 2013.

"Medill Energy Report Sparks Debate," Mike Smith, Huffington Post, April 29, 2013.
"Chicago Chapter Learns about Social media for Working Journalists," Pia Christensen, *Health Journalism*, Association of Health Care Journalists, September 27, 2012.

72

Expert Report of Professor Humphreys

A-967

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX B. **MATERIALS CONSIDERED**

**Bates Stamped Documents**

- CARROLL_024475-79
- CARROLL_024499
- CARROLL_024554
- CARROLL_024559
- CARROLL_024562
- CARROLL_024640-41
- CARROLL_024684
- CARROLL_024796
- CARROLL_024944
- CARROLL_024974
- CARROLL_025080
- CARROLL_026326
- CARROLL_026329
- CARROLL_026331
- CARROLL_026473
- CARROLL_026479
- CARROLL_026596
- CARROLL_028058-59
- CARROLL_028063-65
- CARROLL_028069
- CARROLL_028115
- CARROLL_028549
- CARROLL_028588
- CARROLL_028592
- CARROLL_029331
- CARROLL_029774-75
- CARROLL_030105-08
- CARROLL_030111-29
- CARROLL_030131-48
- CARROLL_030150-56

**Legal Filings and Depositions**

- Complaint, November 4, 2019.
- Complaint, November 17, 2022.
- Deposition of Robbie Myers, October 12, 2012.

73

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Academic Articles

- Ajzen, I. (1985), "From intentions to actions: A theory of planned behavior," In J. Kuhl & J. Beckmann (Eds.), Action control: From cognition to behavior. Berlin, Heidelberg, New York: Springer-Verlag. (pp. 11-39).
- Albarracin, D., & Shavitt, S. (2018), Attitudes and attitude change. Annual Review of Psychology, 69, 299-327.
- Ardia, D. S. (2010), Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law. Harvard Civil Rights-Civil Liberties Law Review, 45(2), 261-328, p. 264.
- Bakker, Tom, Damian Trilling, Claes de Vreese, Luzia Helfer, and Klaus Schönbach (2013), "The Context of Content: The Impact of Source and Setting on the Credibility of News," Recherches en Communication, 40, 151-68.
- Brooks, Gillian, Jenna Drenten, and Mikolaj Jan Piskorski (2021), "Influencer Celebrification: "How Social Media Influencers Acquire Celebrity Capital," Journal of Advertising, 50 (5), 528-47.
- Cacioppo, John & Petty, Richard. (1979). Effects of message repetition and position on cognitive response, recall, and persuasion. Journal of Personality and Social Psychology. 37. 97-109.
- Cacioppo, John T and Richard E Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," Current issues and research in advertising, 3 (1), 97-122.
- Cialdini R B, R E Petty, J T Cacioppo, (1981) Attitude and Attitude Change, Annual Review of Psychology, 32, 357–404.
- Collins, A. M., & Loftus, E. F. (1975). A spreading-activation theory of semantic processing. Psychological review, 82(6), 407. Arpan, L., Rhodes, N., & Roskos-Ewoldsen, D. R. (2007). Attitude accessibility: Theory, methods, and future directions. Communication and social cognition: Theories and methods, 351-376.
- Conover, M. et al (2011), "Political Polarization on Twitter." In Proceedings of the International AAAI Conference on Web and Social Media, 5:1, 89-96.
- Curran, J. et al (2009), "Media System, Public Knowledge and Democracy: A Comparative Study," European Journal of Communication, 24 (1), 5-26.
- Dewenter, R., M. Linder, and T. Thomas (2019), "Can Media Drive the Electorate? The Impact of Media Coverage on Voting Intentions," European Journal of Political Economy, 58, 245-61.
- Festinger, L. (1962), "Cognitive dissonance." Scientific American 207(4): 93-106.
- Fournier, S., & Eckhardt, G. M. (2019). Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand. Journal of Marketing Research, 56(4), 602–619.
- Garrett, R. K. (2009). Echo chambers online?: Politically motivated selective exposure among Internet news users. Journal of computer-mediated communication, 14(2), 265-285.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Gensch, Dennis and Paul Shaman (1980), "Models of Competitive Television Ratings," Journal of Marketing Research, 17 (3), 307-15.
- Grabe, M. E., Zhou, S., & Barnett, B. (1999). Sourcing and Reporting in News Magazine Programs: 60 Minutes versus Hard Copy. Journalism & Mass Communication Quarterly, 76(2), 293-311.
- Heider, Fritz (1946), "Attitudes and Cognitive Organization," The Journal of psychology, 21 (1), 107-12.
- Housholder and LaMarre (2014), Facebook Politics: Toward a Process Model for Achieving Political Source Credibility Through Social Media, Journal of Information Technology & Politics, 11:368-382.
- Huang, J., et al. (2021), "Large-scale quantitative evidence of media impact on public opinion toward China," Humanities and Social Sciences Communications, 8(1): 1-8.
- Hummon, Norman P and Patrick Doreian (2003), "Some Dynamics of Social Balance Processes: Bringing Heider Back into Balance Theory," Social networks, 25 (1), 17-49.
- Humphreys, A. and R. Jen-Hui Wang, (2018) Automated Text Analysis for Consumer Research, Journal of Consumer Research, Volume 44, Issue 6, Pages 1274–1306.
- Joan Kelly. "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13.
- Johnson, Cathryn, Timothy J. Dowd, and Cecilia L. Ridgeway (2006), "Legitimacy as a Social Process," Annual review of sociology, 32, 53-78.
- Kahneman and Tversky (1974), Judgment under Uncertainty: Heuristics and Biases, Vol. 185, No. 4157, pp. 1124-1131.
- Keller, K.L. (1993) Conceptualizing, Measuring, and Managing Customer-Based Brand Equity, Journal of Marketing, 57:1, 1-22.
- Krosnick, J. A. (1989). Attitude importance and attitude accessibility. Personality and Social Psychology Bulletin, 15(3), 297-308. Arpan, L., Rhodes, N., & Roskos-Ewoldsen, D. R. (2007). Attitude accessibility: Theory, methods, and future directions. Communication and social cognition: Theories and methods, 351-376.
- Kruglanski, A. W., & Gigerenzer, G. (2011). "Intuitive and deliberate judgments are based on common principles": Correction to Kruglanski and Gigerenzer (2011). Psychological Review, 118(3), 522–522. https://doi.org/10.1037/a0023709
- Kunda Z. (1990), The case for motivated reasoning. Psychological Bulletin, 108(3):480-98.
- Liu, Shixi, Cuiqing Jiang, Zhangxi Lin, Yong Ding, Rui Duan, and Zhicai Xu (2015), "Identifying Effective Influencers Based on Trust for Electronic Word-of-Mouth Marketing: A Domain-Aware Approach," Information Sciences, 306, 34-52.
- Luceri, L., Deb, A., Giordano, S., & Ferrara, E. (2019). Evolution of bot and human behavior during elections. First Monday, 24(9). https://doi.org/10.5210/fm.v24i9.10213
- Luedicke, Marius K, Craig J Thompson, and Markus Giesler (2010), "Consumer Identity Work as Moral Protagonism: How Myth and Ideology Animate a Brand-Mediated Moral Conflict," Journal of consumer research, 36 (6), 1016-32.
- Messner, Marcus and Marcia Watson Distaso (2008), "The Source Cycle: How Traditional Media and Weblogs Use Each Other as Sources," Journalism Studies, 9 (3), 447-63.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Metzger, M. J., & Flanagin, A. J. (2013). Credibility and trust of information in online environments: The use of cognitive heuristics. Journal of Pragmatics, 59, 210–220. https://doi.org/10.1016/j.pragma.2013.07.012.
- Parmentier, Marie-Agnès, Eileen Fischer, and A. Rebecca Reuber (2013), "Positioning Person Brands in Established Organizational Fields," Journal of the Academy of Marketing Science, 41 (3), 373-87.
- Payne, E. M., Peltier, J. W., & Barger, V. A. (2017). Omni-channel marketing, integrated marketing communications and consumer engagement: A research agenda. Journal of Research in Interactive Marketing, 11(2), 185–197.
- Pfeffer, Jürgen, Thomas Zorbach, and Kathleen M Carley (2014), "Understanding Online Firestorms: Negative Word-of-Mouth Dynamics in Social Media Networks," Journal of Marketing Communications, 20 (1-2), 117-28.
- Picard, Robert G (1988), "Measures of Concentration in the Daily Newspaper Industry," Journal of Media Economics, 1 (1), 61-74.
- Prior, Markus (2013) "Media and political polarization." Annual Review of Political Science 16: 101-127.
- Quammen, David. "A Cheap Hide Out for Writers." New York Times. 01 Nov 1981: A.14.
- Rosnow, Ralph L. and Gary A. Fine (1976), Rumor and Gossip: The Social Psychology of Hearsay: Elsevier.
- Shankar, V., & Kushwaha, T. (2020). Omnichannel Marketing: Are Cross-Channel Effects Symmetric? International Journal of Research in Marketing, 38 (2), 290-310.
- Sharman, Jason C. (2007) "Rationalist and constructivist perspectives on reputation." Political Studies 55, no. 1: 20-37.
- Sigal, Leon V (1973), "Bureaucratic Objectives and Tactical Uses of the Press," Public Administration Review, 336-45.
- Singh, N., A. Singh, R. Sharma (2020), Predicting Information Cascade on Twitter Using Random Walk, Procedia Computer Science, 173, 201-209.
- Sterrett, D. et al (2019), "Who Shared It?: Deciding What News to Trust on Social Media," Digital Journalism, 7 (6), 783-801.
- Thomson, M. (2006). Human Brands: Investigating Antecedents to Consumers' Strong Attachments to Celebrities. Journal of Marketing, 70(3), 104–119, p. 104.
- Vosoughi, Soroush, Deb Roy, and Sinan Aral (2018), "The Spread of True and False News Online," Science, 359 (6380), 1146-51.
- Wang, L., Ramachandran, A., & Chaintreau, A. (2016). Measuring Click and Share Dynamics on Social Media: A Reproducible and Validated Approach. Proceedings of the International AAAI Conference on Web and Social Media, 10(2), 108-113.
- Weber, Max (1922/1978), Economy and Society: An Outline of Interpretive Sociology, Vol. 2: University of California Press.
- Weiss, Robert Frank (1969), "Repetition of Persuasion," Psychological Reports, 25 (2), 669-70.
- Whitney, D Charles, Marilyn Fritzler, Steven Jones, Sharon Mazzarella, and Lana Rakow (1989), "Geographic and Source Biases in Network Television News 1982‐1984," Journal of Broadcasting & Electronic Media, 33 (2), 159-74.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Zha, X. et al (2018). Exploring the effect of social media information quality, source credibility and reputation on informational fit-to-task: Moderating role of focused immersion. Computers in Human Behavior, 79, 227–237.

**Books**

- Baym, Nancy K. Personal connections in the digital age. John Wiley & Sons, 2015.
- Buzzard, Karen (2012), Tracking the Audience: The Ratings Industry from Analog to Digital.
- Chadwick, Andrew (2017), The Hybrid Media System: Politics and Power: Oxford University Press.
- Cialdini, Robert B (1987), Influence, Vol. 3: A. Michel Port Harcourt.
- Davenport, T. H. and J. C. Beck (2013). The attention economy: Understanding the new currency of business, Harvard Business Press.
- David, John (2016), How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business: Red Wheel/Weiser.
- Dyer (1979), Heavenly Bodies: Film Stars and Society.
- Gamson (1994), Claims to Fame: Celebrity in Contemporary America.
- Gans, Herbert J (2004), Deciding What's News: A Study of CBS Evening News, NBC Nightly News, Newsweek, and Time: Northwestern University Press.
- Humphreys, A., 2016. Social media: Enduring principles. Oxford University Press.
- Pariser (2011), "The Filter Bubble: What the Internet Is Hiding from You."
- Rosnow, Ralph L and Gary A Fine (1976), Rumor and Gossip: The Social Psychology of Hearsay: Elsevier.
- Tuchman, Gaye (1978), Making News: A Study in the Construction of Reality, New York: Free Press.
- Weber, Max (1922/1978), Economy and Society: An Outline of Interpretive Sociology, Vol. 2: University of California press.

**Websites**

- http://go.newswhip.com/rs/647-QQK-704/images/Facebook%20Publishing%202019_Final.pdf.
- http://www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326.
- http://www.seattletimes.com/nation-world/nation/judge-trump-must-sit-for-deposition-in-defamation-lawsuit/
- https://abcnews.go.com/Politics/wireStory/trump-woman-accused-sexual-assault-type-63921054
- https://abcnews.go.com/US/wireStory/trump-deposed-defamation-suit-filed-rape-accuser-91736202
- https://about.proquest.com/en/products-services/nationalnews_shtml

77

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://archive.org/details/tv
- https://auditedmedia.com/about/who-we-are
- https://auditedmedia.com/Solutions/Print-Publisher-Audits/
- https://blogs.cornell.edu/info2040/2016/11/16/information-cascade-in-social-media/
- https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
- https://docs.cdn.yougov.com/ez0xfzdbfl/econtoplines.pdf.
- https://edu.gcfglobal.org/en/digital-media-literacy/how-filter-bubbles-isolate-you/1/
- https://edu.gcfglobal.org/en/digital-media-literacy/what-is-an-echo-chamber/1/
- https://hbr.org/2022/02/whats-the-point-of-a-personal-brand
- https://help.crowdtangle.com/en/articles/4201940-about-us
- https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard
- https://help.twitter.com/en/using-twitter/types-of-tweets
- https://influencermarketinghub.com/glossary/bounce-rate/
- https://influencermarketinghub.com/what-is-personal-branding/
- https://lasvegassun.com/news/2019/jun/24/trump-woman-who-accused-him-of-sexual-assault-not/
- https://libn.com/2019/06/25/trump-says-woman-accusing-him-of-sexual-assault-not-my-type
- https://markets.nielsen.com/us/en/solutions/measurement/television/
- https://martech.org/facebook-twitter-impressions/
- https://marxcommunications.com/what-does-impressions-mean-on-twitter/
- https://mashable.com/article/inside-truth-social-trump-social-network-tour
- https://news.gallup.com/poll/328367/americans-political-ideology-held-steady-2020.aspx
- https://nymag.com/intelligencer/2019/06/president-donald-trump-faces-new-rape-accusation.html
- https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-205
- https://people.com/politics/donald-trump-slams-rape-accuser-ordered-testify-defamation-trial/
- https://projects.fivethirtyeight.com/polls/favorability/donald-trump/
- https://radaronline.com/p/donald-trump-responds-accuser-e-jean-carroll-judge-orders-deposition/
- https://sproutsocial.com/insights/social-media-algorithms/
- https://theraveagency.com/blog/finding-the-value-in-twitter-impressions.
- https://thevab.com/storage/app/media/Toolkit/mediaterminologyformulas.pdf
- https://time.com/5907973/donald-trump-loses-2020-election/
- https://time.com/6212677/donald-trump-investigations-explained/
- https://today.yougov.com/topics/politics/articles-reports/2020/05/06/how-americans-view-sexual-assault-allegations-poll/.
- https://trends.google.com/trends/explore?date=2019-01-01%202019-06-20&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-06-01%202019-06-

78

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

30&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-06-21%202019-11-03&geo=US&q=%2Fm%2F02qwtqv
- https://trends.google.com/trends/explore?date=2019-11-04%202022-08-31&geo=US&q=%2Fm%2F02qwtqv
- https://uproxx.com/viral/donald-trump-raging-doj-rape-defamation-case/.
- https://ustvdb.com/
- https://web.archive.org/web/20200520030235/http:/www.ellemediakit.com/r5/showkiosk.asp?listing_id=5748326
- https://wjla.com/news/nation-world/trump-woman-who-accused-him-of-sexual-assault-not-his-type
- https://www.abc27.com/news/us-world/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/
- https://www.abqjournal.com/1332620/trump-woman-who-accused-him-of-sexual-assault-not-his-type.html
- https://www.adweek.com/performance-marketing/twitter-tells-brands-they-can-reach-30-their-followers-free-158886/
- https://www.amazon.com/E-Jean-Carroll/e/B000AP7CJM.
- https://www.amazon.com/gp/customer-reviews/R2KGOC1J5G6VTR/
- https://www.amazon.com/gp/customer-reviews/RBTLK02LIQ4ED/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.
- https://www.amazon.com/gp/customer-reviews/RD84I3FPD8DS1/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=0060530286.
- https://www.amazon.com/product-reviews/0060530286/
- https://www.amazon.com/product-reviews/0525935681/
- https://www.axios.com/2022/01/25/trump-truth-social-influencers.
- https://www.britannica.com/biography/Donald-Trump
- https://www.cbsnews.com/news/donald-trump-officially-fired-from-the-celebrity-apprentice/
- https://www.cnbc.com/2019/06/21/e-jean-carroll-says-donald-trump-sexually-assaulted-her.html
- https://www.cnn.com/2016/07/19/politics/donald-trump-republican-nomination-2016-election
- https://www.courthousenews.com/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault/
- https://www.dailykos.com/story/2022/10/18/2129774/-Trump-may-have-destroyed-his-only-real-defense-in-the-E-Jean-Carroll-rape-defamation-case.
- https://www.denverpost.com/2022/10/12/trump-angrily-lashes-out-after-his-deposition-is-ordered-2/.
- https://www.deseret.com/2019/6/24/20676380/trump-woman-who-accused-him-of-sexual-assault-not-his-type
- https://www.elle.com/author/4913/e-jean/
- https://www.forbes.com/sites/markjoyella/2021/06/15/tucker-carlson-has-most-watched-

79

Expert Report of Professor Humphreys

A-974

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

show-in-cable-news-as-fox-leads-basic-cable-for-17-straight-weeks/?sh=6c4a2379661c
- https://www.fox35orlando.com/news/trump-said-woman-who-accused-him-of-sexual-assault-not-his-type.amp
- https://www.foxnews.com/politics/trump-responds-jean-carroll-defamation-lawsuit-after-judge-denies-delay
- https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf.
- https://www.gazettenet.com/Carroll-26480259
- https://www.goodreads.com/author/show/30738.E_Jean_Carroll
- https://www.hollywoodreporter.com/tv/tv-news/tv-ratings-explained-a-guide-what-data-all-means-1245591/
- https://www.huffpost.com/entry/trump-undermining-own-defamation-case-e-jean-carroll_n_6351b5f0e4b051268c52af87
- https://www.insider.com/trump-woman-who-accused-him-of-sexual-assault-not-his-type-2019-6
- https://www.investopedia.com/terms/c/cpm.asp
- https://www.ipsos.com/en-us/news-polls/Republican-voters-continue-to-view-Trump-as-the-partys-leader
- https://www.kcci.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018
- https://www.kcra.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.kmbc.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.ksbw.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.ksl.com/article/46579012/trump-denies-knowing-ny-woman-accusing-him-of-sexual-assault
- https://www.listennotes.com/podcasts/the-daily/corroborating-e-jean-carroll-PfFq5DHZoag/
- https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s1-e-jean-FQEPeIrl3Rk/
- https://www.listennotes.com/podcasts/the-kevin-jackson/20190626-h1-s2-e-jean-4OxWMCNKko_/
- https://www.localsyr.com/news/politics/trump-woman-who-accused-him-of-sexual-assault-not-his-type/
- https://www.marketwatch.com/story/new-york-advice-columnist-claims-trump-sexually-assaulted-her-in-mid-1990s-2019-06-22
- https://www.nbcboston.com/news/politics/trump-e-jean-carroll/108391/
- https://www.necn.com/news/local/trump-e-jean-carroll/220418/
- https://www.newsweek.com/trump-blasts-e-jean-carrolls-complete-con-job-case-ordered-testify-1751392
- https://www.npr.org/2022/02/22/1082243094/trumps-social-media-app-launches-year-after-twitter-ban
- https://www.nydailynews.com/news/politics/us-elections-government/ny-trump-

80

Expert Report of Professor Humphreys

**A-975**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

deposition-e-jean-carroll-rape-defamation-suit-20221019-
a6gqmeu66rgxfp6rtmka7ovmha-story.html
- https://www.nytimes.com/2020/02/19/business/media/e-jean-carroll-elle.html
- https://www.nytimes.com/2020/09/28/arts/television/trump-taxes-apprentice.html
- https://www.nytimes.com/2021/01/20/us/politics/biden-president.html
- https://www.nytimes.com/2022/10/19/nyregion/trump-e-jean-carroll-lawsuit.html
- https://www.nytimes.com/interactive/2019/08/08/opinion/sunday/party-polarization-
quiz.html
- https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-
poll-crosstabs.html
- https://www.pbs.org/newshour/politics/trump-criticizes-legal-system-after-his-
deposition-in-defamation-lawsuit-ordered
- https://www.pbs.org/newshour/politics/trump-says-woman-who-accused-him-of-sexual-
assault-is-not-his-type
- https://www.pewresearch.org/about/
- https://www.pewresearch.org/fact-tank/2020/08/24/trumps-approval-ratings-so-far-are-
unusually-stable-and-deeply-partisan/
- https://www.pewresearch.org/fact-tank/2021/08/30/partisan-divides-in-media-trust-
widen-driven-by-a-decline-among-republicans/
- https://www.pewresearch.org/fact-tank/2022/11/18/key-facts-about-truth-social-as-
donald-trump-runs-for-u-s-president-again/
- https://www.pewresearch.org/journalism/2020/01/24/democrats-report-much-higher-
levels-of-trust-in-a-number-of-news-sources-than-republicans/
- https://www.pewresearch.org/journalism/dataset/american-trends-panel-wave-57/
- https://www.pewresearch.org/our-methods/u-s-surveys/
- https://www.pewresearch.org/our-methods/u-s-surveys/the-american-trends-panel/
- https://www.pewresearch.org/politics/interactives/political-polarization-1994-2017/
- https://www.pressherald.com/2019/06/23/trump-denies-knowing-ny-woman-accusing-
him-of-sexual-assault/
- https://www.rawstory.com/e-jean-carroll-trump-2658467176/
- https://www.rivaliq.com/blog/good-engagement-rate-
twitter/#:~:text=According%20to%20our%202022%20Social,industries%2C%20from%2
0fashion%20to%20nonprofits
- https://www.salon.com/2022/10/13/melts-down-on-truth-social-after-blasts-his-attempt-
to-run-out-the-clock/
- https://www.semrush.com/kb/26-traffic-analytics
- https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages
- https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-
men.html
- https://www.theguardian.com/us-news/2019/jun/25/donald-trump-says-assault-accuser-e-
jean-carroll-not-my-type
- https://www.tweetbinder.com/blog/twitter-impressions/
- https://www.usatoday.com/story/money/2019/07/03/e-jean-carroll-new-york-circuit-

81

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

donald-trump-assault-accusation/1584135001/
- https://www.usnews.com/news/best-states/new-york/articles/2019-06-21/trump-faces-new-sexual-assault-allegation-he-issues-denial?context=amp
- https://www.vice.com/en/article/z34gej/trump-rape-lawsuit-defense-e-jean-carroll
- https://www.washingtonpost.com/nation/2022/10/19/trump-author-defamation-case/
- https://www.washingtonpost.com/politics/magazine-columnist-accuses-trump-of-sexual-assault-more-than-two-decades-ago-an-allegation-he-denies/2019/06/21/2afc6f12-945a-11e9-b58a-a6a9afaa0e3e_story.html
- https://www.wsj.com/articles/what-is-truth-social-media-trump-spac-what-to-know-11645552299
- https://www.wtae.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.wvtm13.com/article/shes-not-my-type-president-trump-denies-sexually-assaulting-author-in-store/28180018#
- https://www.wwltv.com/article/news/trump-issues-denial-after-new-sexual-assault-allegation/507-33064ca1-b511-40e2-bbe2-57e7d672fc9f

**Social Media Posts**

- http://twitter.com/Angerisinnate/statuses/1572622451607244801
- http://twitter.com/firethornranch/statuses/1142194188852895746
- http://twitter.com/floccinaucini1/statuses/1142196689148813313
- http://twitter.com/pinochet_pilot/statuses/1566945839679180800
- http://twitter.com/RunnerMo24/statuses/1142182659071860737
- http://twitter.com/ScottLHarris1/statuses/1142493161886892032
- https://truthsocial.com/@realDonaldTrump/
- https://truthsocial.com/@realDonaldTrump/posts/109158586745522514
- https://truthsocial.com/@realDonaldTrump/posts/109158644496040450
- https://truthsocial.com/@realDonaldTrump/posts/109200531178060636
- https://truthsocial.com/@realDonaldTrump/posts/109200571344419422
- https://twitter.com/1/status/1142180829835255808
- https://twitter.com/1/status/1142184727492878336
- https://twitter.com/1/status/1142197820826501120
- https://twitter.com/1/status/1142226611380600832
- https://twitter.com/1/status/1143477200148189184
- https://twitter.com/1/status/1303700235210891265
- https://twitter.com/1/status/1303742205648142336
- https://twitter.com/1/status/1304903451625713664
- https://twitter.com/1/status/1438311461110095873
- https://twitter.com/1/status/1572467301315940352
- https://twitter.com/1/status/1572592008316981250
- https://twitter.com/AP/status/1580371759240548353
- https://twitter.com/bahman2990/status/1580542210809815040

82

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://twitter.com/MCWAY2000/status/1422939994235228162
- https://twitter.com/mherndon23/status/1580592423042158592
- https://twitter.com/Olivianuzzi/status/1142197820826501120
- https://twitter.com/RKeane4711/status/1582961054652321798
- https://twitter.com/Stefild/status/1582782819041873923
- https://twitter.com/TristanSnell/status/1580390962115006464
- https://www.facebook.com/EJeanCarroll/posts/pfbid02KbarmdFqXiqXWMMy4C4QLf MNXp7iaVe7cJ4e6n8b39SJVjExHMdnN8vXuRgib9pjl?comment_id=10162947248725 176
- https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ5 1tESLc41qzM8fSBVm74Hipc1pe44QMxaibif3Zl?comment_id=10161904009925176
- https://www.facebook.com/EJeanCarroll/posts/pfbid043HtweB8cSVrpUX4jTsLnYVcZ5 1tESLc41qzM8fSBVm74Hipc1pe44QMxaibif3Zl?comment_id=10161904500605176
- https://www.facebook.com/EJeanCarroll/posts/pfbid0pM1JLR679TDR96NHp2CdGZPF JS9xmq4cbSBCFpSCfFKJJw9LyAes1sWYJZSJDC93l?comment_id=505171354452764
- https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGk9Lwpmg8YuGyUDW o7iX4PADFmmRfiZZ1GcnYbZY3mvXuT4PT2ded8vl?comment_id=635626811503742
- https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGk9Lwpmg8YuGyUDW o7iX4PADFmmRfiZZ1GcnYbZY3mvXuT4PT2ded8vl?comment_id=807621376955040
- https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGk9Lwpmg8YuGyUDW o7iX4PADFmmRfiZZ1GcnYbZY3mvXuT4PT2ded8vl?comment_id=336116648410596 8
- https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGk9Lwpmg8YuGyUDW o7iX4PADFmmRfiZZ1GcnYbZY3mvXuT4PT2ded8vl?comment_id=131345290254580 8
- https://www.facebook.com/nytimes/posts/pfbid034f8wyVEE9LSkXgVQe1PqZW2jgNN 12EpsouZWRuhqUtQpHExUiAZRM9NNVWpewT9Gl?comment_id=56003958034073 58
- https://www.facebook.com/nytimes/posts/pfbid034f8wyVEE9LSkXgVQe1PqZW2jgNN 12EpsouZWRuhqUtQpHExUiAZRM9NNVWpewT9Gl?comment_id=12353209003564 99
- https://www.facebook.com/vicenews/posts/pfbid02xyYRYJic1JvqRnPaXUYhsgi77Dbno t7H94ecmfDKhmpWVpMALi9EJLhdx84WRqJ2l?comment_id=501843185157034
- https://www.instagram.com/p/ByS3GZAnG8T/c/17885005825367171
- https://www.instagram.com/p/ByS3GZAnG8T/c/17890688779356795
- https://www.instagram.com/p/ByS3GZAnG8T/c/18055365523120673
- https://www.instagram.com/p/CbF28JKuJmw/c/18146401978279673
- https://www.instagram.com/p/CGsjKyxJcHA/c/18081883450220561


**TV Rating References**

- https://www.adweek.com/tvnewser/here-are-the-top-cable-news-shows-of-q2-2019/407842/

Expert Report of Professor Humphreys

A-978

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- https://www.thewrap.com/broadcast-evening-news-ratings-2019-2020/
- https://ustvdb.com/networks/msnbc/shows/all-in-chris-hayes/
- https://ustvdb.com/networks/msnbc/shows/chris-jansing-reports/
- https://ustvdb.com/networks/msnbc/shows/reidout/
- https://ustvdb.com/networks/msnbc/shows/deadline-white-house/
- https://ustvdb.com/networks/fox-news/shows/special-report-bret-baier/
- https://www.adweek.com/tvnewser/evening-news-ratings-q2-2019-and-week-of-june-24/407844/
- https://www.adweek.com/tvnewser/morning-show-ratings-q2-2019-week-of-june-24/407846/
- https://www.adweek.com/tvnewser/q2-2019-ratings-cnn-is-a-top-10-basic-cable-network-in-total-day-but-remains-stuck-behind-fox-news-and-msnbc-during-prime-time/407838/
- https://www.nytimes.com/2019/03/05/business/media/colbert-fallon-ratings-nielsen.html
- https://pagesix.com/2019/06/27/cbs-this-morning-ratings-plunge-after-massive-shake-up/
- https://press.nbcnews.com/2019/07/02/nbc-nightly-news-with-lester-holt-wins-second-quarter-of-2019/
- https://press.foxnews.com/2019/12/fox-news-channel-notches-highest-rated-primetime-in-network-history
- https://thecomicscomic.com/2020/05/26/late-night-tv-ratings-for-2019-2020/
- https://deadline.com/2020/09/abc-news-world-news-tonight-viewership-2019-20-1234582089/
- https://www.adweek.com/tvnewser/q2-19-ratings-msnbc-remains-one-of-the-most-watched-networks-on-cable-but-saw-a-key-program-slip-in-the-demo/407840/

**Damages Model References**

- https://blog.hootsuite.com/twitter-statistics/
- https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20ComparisonvOAAA.pdf
- https://www.gaebler.com/Washington+Examiner-DC-Newspaper-Advertising-Costs++12549
- https://www.webfx.com/social-media/pricing/influencer-marketing/
- https://www.wordstream.com/blog/ws/2021/07/12/facebook-ads-cost

**Print Publication Data References**

- Audited Report for Boston Globe (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for Chicago Tribune (12 months ended March 31, 2020), Alliance for Audited Media.

84

Expert Report of Professor Humphreys

**A-979**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Audited Report for New York Times (12 months ended March 31, 2020), Alliance for Audited Media.
- Audited Report for USA Today (12 months ended December 31, 2019), Alliance for Audited Media.
- Audited Report for Washington Post (12 months ended September 30, 2019), Alliance for Audited Media.
- Audited Report for Washington Post (6 months ended March 31, 2022), Alliance for Audited Media.

**ProQuest Articles:**

- "America, listen to Ms. Carroll." The Washington Post. 26 June 2019: A.26.
- Abraham, Yvonne. "Silly liberals, don't be mad." Boston Globe. 27 June 2019: B.1.
- Baker, Peter; Vigdor, Neil. "Trump Calls His New Accuser a Liar And Says, 'No. 1, She's Not My Type.'" New York Times. 25 June 2019: A.15.
- Bernard, Joan Kelly. "Get a Grip and Take Some Sassy but Sane Advice from Elle's E. Jean." Newsday. 22 Mar 1994: B.13
- Carpenter, Dan. "E. Jean's PUNCHY wisdom SHINES in compilation." Indianapolis Star. 31 Mar 1996: D.6.
- Colby Itkowitz; Davies, Emily; Fuchs, Hailey. "Latest sex assault allegation against Trump draws muted political reaction." The Washington Post. 26 June 2019: A.6.
- Graham, Renée. "If this nation cared about sexual assault, Trump would not be president." Boston Globe. 26 June 2019: A.11.
- Henneberger, Melinda. "Don't ignore latest Trump rape allegation." USA TODAY. 25 June 2019: A.7.
- Hesse, Monica. "Reading between the lines in E. Jean Carroll's columns." The Washington Post. 26 June 2019: C.1.
- Itkowitz; Davies, Emily; Fuchs, Hailey. "Latest sex allegation against Trump draws muted reaction" Chicago Tribune. 26 June 2019: 12.
- Pilkington, Ed. "Donald Trump accused of sexually assaulting writer E Jean Carroll." The Guardian. 21 June 2019: 39.
- Pilkington, Ed. "Why did the media downplay the latest sexual assault allegation against Trump?" The Guardian. 25 June 2019: 25.
- Quammen, David. "A Cheap Hide Out for Writers." New York Times. 01 Nov 1981: A.14.
- Reinhard, Beth; Colby Itkowitz. "N.Y. writer says Trump assaulted her in the '90s." The Washington Post; Washington, D.C. [Washington, D.C]. 22 June 2019: A.1.
- Rosenberg, Alyssa. "Trump will never be held accountable for his treatment of women." The Washington Post. 23 June 2019: A.23.
- Wagner, John. "Trump says latest accuser is 'lying.'" The Washington Post. 25 June 2019: A.3.
- Zaveri, Mihir. "Trump Repeatedly Denies Sexual Assault Claim by an Advice Columnist." New York Times. 23 June 2019: A.23.

85

Expert Report of Professor Humphreys

A-980

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Databases**

- Brandwatch, https://www.brandwatch.com/
- Internet Archive TV News, https://archive.org/details/tv
- ProQuest, https://www.proquest.com/index
- Twitter API, https://developer.twitter.com/en/docs/twitter-api

86

Expert Report of Professor Humphreys

A-981

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# APPENDIX C. GLOSSARY OF TERMS

**Attitudes:** A lasting, generalized evaluation of an object, person, or idea.

**Bounce Rate:** The percentage of users who leave a page without taking any action.

**Cost Per Click (CPC):** The cost an advertiser pays each time a user clicks on an advertisement.[179]

**Cost Per Mille (CPM):** The cost an advertiser pays per one thousand impressions generated by an advertisement on a web page.[180]

**Echo Chamber:** An environment where a person only encounters information or opinions that reflect and reinforce their own.[181]

**Engagement:** Measures of audience involvement with or responsiveness to a particular message. Can include metrics such as likes, retweets, and comments/replies.

**Engagement Rate:** The percentage of people who engage with a post. Engagement rate is calculated by dividing the number of impressions by the number of engagements.

**Filter Bubble:** An environment isolated by algorithms that prevent users from being exposed to information and perspectives they haven't already expressed an interest in.[182]

**Followers:** The total number of users who could potentially see another user's post.

**Impressions:** The total number of times a post or other piece of content has been displayed to users.[183]

**Impression Rate:** The percentage of a user's followers who are exposed to a post. Impression rates are unique to each account and are not publicly available. Nonetheless, academic researchers have developed a formula to estimate the impressions rate using follower counts.[184]

**Influencers:** People with specialized knowledge, authority, or insight into a specific niche or industry that can sway the opinions of a target audience.

**Information Cascade:** The way information is exchanged on social media networks. After a user posts content to social media, that user's followers observe that behavior and repeat the

---

[179] https://www.investopedia.com/terms/c/cpm.asp
[180] https://www.investopedia.com/terms/c/cpm.asp
[181] https://edu.gcfglobal.org/en/digital-media-literacy/what-is-an-echo-chamber/1/
[182] https://edu.gcfglobal.org/en/digital-media-literacy/how-filter-bubbles-isolate-you/1/
[183] https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard
[184] Wang et al., 2016

87

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

same process by reposting or sharing the original user's content. Through sharing and reposting, an unbroken chain of messages is formed with a common, singular origin, that keeps extending until individuals stop spreading or reposting it.[185]

**Media System:** A network of platforms, institutions, practices, and people understood as circulating information, who by interacting with one another, shape each other's opinions.[186]

**Network:** A system of users connected by exchanges of information.

**Network Structure:** The number of connections (*e.g.*, followers) one user has and the number of connections that user's connections have.

**Person Brand:** An actively curated image that projects how a person wants the public to view them. The brand image often consists of the person's unique combination of skills, experience, and personality.[187]

**Ranking Algorithm:** The algorithm each social media platform relies on to determine what content to display to each user.[188]

**Reach:** The total number of people who could potentially be exposed to a post or other piece of content.

**Retweet Rate:** The percentage of a user's followers who retweeted a post. The retweet rate is calculated by dividing the number of retweets by the number of followers.

**Social Capital:** The quality and quantity of social connections. Social capital can be measured by the number of connections a user has on a social media network. Users with high social capital are able to spread a message broadly and deeply on a network.

**Social Media Platform:** The websites and applications that focus on communication, community-based input, interaction, content-sharing, and collaboration. Some popular examples of social media platforms include Twitter, Facebook, Reddit, and YouTube.

**Source Credibility:** The extent to which the persons or entities generating information on social media are perceived to be trustworthy, knowledgeable, and believable.[189]

---

[185] Vosoughi et al., 2018; Singh, N., A. Singh, R. Sharma (2020), Predicting Information Cascade on Twitter Using Random Walk, Procedia Computer Science, 173, 201-209; https://blogs.cornell.edu/info2040/2016/11/16/information-cascade-in-social-media/

[186] https://oxfordre.com/politics/view/10.1093/acrefore/9780190228637.001.0001/acrefore-9780190228637-e-205

[187] https://hbr.org/2022/02/whats-the-point-of-a-personal-brand; https://influencermarketinghub.com/what-is-personal-branding/

[188] https://sproutsocial.com/insights/social-media-algorithms/

[189] Zha, X. et al (2018). Exploring the effect of social media information quality, source credibility and reputation on informational fit-to-task: Moderating role of focused immersion. Computers in Human Behavior, 79, 227–237.

88

Expert Report of Professor Humphreys

A-983

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Truth Social:** An alternative social media platform created by former President Donald J. Trump. The site has Twitter-like features and design, where the users can create profiles, follow other users, and create posts. In the place of "tweets" and "retweets," Truth Social calls its similar functions "Truths" and "re-truths."[190]

**Unique Visitors:** The total number of unique visits to a given page. Each visitor to the site is counted once during the reporting period.[191]

---

[190]  https://www.npr.org/2022/02/22/1082243094/trumps-social-media-app-launches-year-after-twitter-ban.
[191]  https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages.

89

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## APPENDIX D. IMPRESSIONS MODEL [192]

### A. Web Impressions Model

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors [193] | Bounce Rate [194] | Impressions Estimate [195] |
|-----|-------|--------|------------------|---------|------------------|-------------|-------------------|
| W-1 | What to Know as Trump Is Deposed in E. Jean Carroll Defamation Suit [196] | Benjamin Weiser | 10/19/2022 | nytimes.com | 94,300,000 | 64.07% | 1,129,400 |
| W-2 | Trump deposed at Mar-a-Lago in case brought by sexual assault accuser [197] | Shayna Jacobs | 10/19/2022 | washingtonpost.com | 61,000,000 | 56.77% | 879,010 |
| W-3 | Trump responds to E. Jean Carroll defamation lawsuit after judge denies delay: 'a hoax and a lie' [198] | Lawrence Richard | 10/13/2022 | foxnews.com | 41,900,000 | 33.58% | 927,666 |
| W-4 | Trump Doubles Down On Undermining Defense Against E. Jean Carroll's Defamation Case [199] | Mary Papenfuss | 10/21/2022 | huffpost.com | 20,100,000 | 45.15% | 367,495 |
| W-5 | Trump to be deposed in defamation suit filed by rape accuser [200] | The Associated Press | 10/19/2022 | abcnews.go.com | 17,900,000 | 68.55% | 187,652 |

[192]  Please see Appendix D produced in Excel format along with this Report for a more detailed Impressions Model.
[193]  The total number of unique visitors to a given page in October 2022. Data collected from Semrush.
[194]  The percentage of users who leave a page without taking any action.
[195]  Impressions estimate calculated using the following formula: (Unique Monthly Visitors/30)*(1-bounce rate).
[196]  https://www.nytimes.com/2022/10/19/nyregion/trump-e-jean-carroll-lawsuit.html.
[197]  https://www.washingtonpost.com/nation/2022/10/19/trump-author-defamation-case/.
[198]  https://www.foxnews.com/politics/trump-responds-jean-carroll-defamation-lawsuit-after-judge-denies-delay.
[199]  https://www.huffpost.com/entry/trump-undermining-own-defamation-case-e-jean-carroll_n_6351b5f0e4b051268c52af87.
[200]  https://abcnews.go.com/US/wireStory/trump-deposed-defamation-suit-filed-rape-accuser-91736202.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[193] | Bounce Rate[194] | Impressions Estimate[195] |
|---|---|---|---|---|---|---|---|
| W-6 | Donald Trump Slams Rape Accuser After Being Ordered to Testify in Defamation Suit[201] | Virginia Chamlee | 10/13/2022 | people.com | 52,100,000 | 71.22% | 499,813 |
| W-7 | Trump Blasts E. Jean Carroll's 'Complete Con Job' Case, Ordered to Testify[202] | Kaitlin Lewis | 10/13/2022 | newsweek.com | 27,200,000 | 71.14% | 261,664 |
| W-8 | Trump's latest rant about his rape defamation case could 'blow a hole' in his defense: report - Raw Story - Celebrating 18 Years of Independent Journalism[203] | Tom Boggioni | 10/18/2022 | rawstory.com | 3,300,000 | 33.98% | 72,622 |
| W-9 | Trump angrily lashes out after his deposition is ordered[204] | The Associated Press | 10/13/2022 | denverpost.com | 3,200,000 | 60.34% | 42,304 |
| W-10 | Trump Just Blew Up His Rape Lawsuit Defense[205] | Greg Walters | 10/18/2022 | vice.com | 14,500,000 | 65.22% | 168,103 |
| W-11 | Former President Donald Trump deposed in E. Jean Carroll rape defamation suit[206] | Molly Crane-Newman and Dave Goldiner | 10/19/2022 | nydailynews.com | 7,900,000 | 60.21% | 104,780 |

201  https://people.com/politics/donald-trump-slams-rape-accuser-ordered-testify-defamation-trial/.
202  https://www.newsweek.com/trump-blasts-e-jean-carrolls-complete-con-job-case-ordered-testify-1751392.
203  https://www.rawstory.com/e-jean-carroll-trump-2658467176/.
204  https://www.denverpost.com/2022/10/12/trump-angrily-lashes-out-after-his-deposition-is-ordered-2/.
205  https://www.vice.com/en/article/z34gej/trump-rape-lawsuit-defense-e-jean-carroll.
206  https://www.nydailynews.com/news/politics/us-elections-government/ny-trump-deposition-e-jean-carroll-rape-defamation-suit-20221019-a6sgmeu6orgxfpf6rtmka7ovmha-story.html.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[193] | Bounce Rate[194] | Impressions Estimate[195] |
|---|---|---|---|---|---|---|---|
| W-12 | Trump Is Reportedly 'Raging' Like A Madman As He Deals With The Legal Ramifications Of The DOJ Documents Case, Rape Accuser E. Jean Carroll, And More[207] | Jenifer Wood | 10/14/2022 | uproxx.com | 4,500,000 | 82.57% | 26,145 |
| W-13 | Trump angrily lashes out after his deposition is ordered[208] | Larry Neumeister and Jill Colvin | 10/13/2022 | seattletimes.com | 4,900,000 | 57.32% | 69,711 |
| W-14 | Trump criticizes legal system after his deposition in defamation lawsuit ordered[209] | Larry Neumeister and Jill Colvin | 10/13/2022 | pbs.org | 12,200,000 | 55.50% | 180,967 |
| W-15 | This Woman Is Not My Type!' Donald Trump Claims He Didn't Assault Accuser E. Jean Carroll After Judge Orders Ex-Prez To Sit For Deposition[210] | Connor Surmonte | 10/14/2022 | radaronline.com | 5,900,000 | 69.37% | 60,239 |
| W-16 | Trump may have destroyed his only real defense in the E. Jean Carroll rape defamation case[211] | Aldous J Pennyfarthing | 10/18/2022 | dailykos.com | 2,300,000 | 35.26% | 49,634 |

207  https://uproxx.com/viral/donald-trump-raging-doj-rape-defamation-case/.
208  http://www.seattletimes.com/nation-world/nation/judge-trump-must-sit-for-deposition-in-defamation-lawsuit/.
209  https://www.pbs.org/newshour/politics/trump-criticizes-legal-system-after-his-deposition-in-defamation-lawsuit-ordered.
210  https://radaronline.com/p/donald-trump-responds-accuser-e-jean-carroll-judge-orders-deposition/.
211  https://www.dailykos.com/story/2022/10/18/2129774/-Trump-may-have-destroyed-his-only-real-defense-in-the-E-Jean-Carroll-rape-defamation-case.

Expert Report of Professor Humphreys

A-987

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| No. | Title | Author | Publication Date | Website | Unique Monthly Visitors[193] | Bounce Rate[194] | Impressions Estimate[195] |
|-----|-------|--------|-----------------|---------|-----------------------------|------------------|---------------------------|
| W-17 | Trump melts down on Truth Social after judge blasts his attempt to "run out the clock"[212] | Areeba Shah | 10/13/2022 | salon.com | 5,800,000 | 62.04% | 73,389 |
| | | | | TOTAL WEB IMPRESSIONS | | | **5,100,593** |

Expert Report of Professor Humphreys

---

[212] https://www.salon.com/2022/10/13/melts-down-on-truth-social-after-blasts-his-attempt-to-run-out-the-clock/.

## B. Social Media Impressions Model

| No. | Original Tweet ID[213] | Article Referenced | Primary Followers[214] | Retweets[215] | Average RT Followers[216] | Total Followers[217] | Impression Estimate Equation 2a[218] for publishers and Equation 2c[219] for typical Twitter users | Impressions Estimate Equation 2b[220] and Equation 2c[221] for typical Twitter users |
|---|---|---|---|---|---|---|---|---|
| S-1 | @FoxNews[222] | W-3 | 22,480,294 | 30 | 689 | 22,500,975 | 778,223 | 3,929,736 |
| S-2 | @Newsweek[223] | W-7 | 3,589,816 | 8 | 3,433 | 3,617,277 | 161,197 | 627,740 |
| S-3 | @NYDailyNews[224] | W-11 | 823,625 | 9 | 133,190 | 2,022,338 | 98,992 | 154,446 |
| S-4 | @RonFilipkowski[225] | Truth Social Statement Capture | 532,316 | 441 | 5,229 | 2,838,180 | 185,813 | 113,202 |

Expert Report of Professor Humphreys

---

213  Twitter's unique identifier for the original tweet.
214  Number of followers of original tweet.
215  Total number of retweets (and quote tweets) to the original tweet.
216  Estimated average number of followers of all retweets. Estimate is based on retweets accessible via the Twitter API.
217  (Average RT Followers * Retweets) + Primary Followers.
218  Equation 2a: $10^{\wedge}(0.7396 \log(\text{Total Followers})*(1\text{-bot rate}) + 0.0473 \log(\text{Primary Followers})*(1\text{-bot rate}) + 0.1027 \log(\text{Retweets}))$. Where: "Bot rate" is an estimate rate of bot activity on Twitter. I'm estimating a 12.6% bot rate.
219  Equation 2c: $\text{followers}_{\text{first-level}} * .01*(1\text{-bot rate}) + \text{retweets}*\text{followers}_{\text{Second-level}} * .01*(1\text{-bot rate})$. Where: "Bot rate" is an estimate rate of bot activity on Twitter. I'm estimating a 12.6% bot rate.
220  Equation 2b: (primary followers * First Level Impression Rate * (1-bot rate of 12.6%)) + (Retweets * Second Level Impression Rate * (1-bot rate)). Where: "First Level Impression Rate" is an estimated impression rate for the original tweet. I'm estimating a 20% First Level Impression Rate. "Second Level Impression Rate" an estimated impression rate for the retweets of the original tweet. I'm estimating a 1% Second Level Impression Rate.
221  Equation 2c: $\text{followers}_{\text{first-level}} * .01*(1\text{-bot rate}) + \text{retweets}*\text{followers}_{\text{Second-level}} * .01*(1\text{-bot rate})$. "Bot rate" is an estimate rate of bot activity on Twitter. I'm estimating a 12.6% bot rate.
222  https://twitter.com/FoxNews/status/1580428136285552640.
223  https://twitter.com/Newsweek/status/1580549579514122243.
224  https://twitter.com/NYDailyNews/status/1582788494199468032.
225  https://twitter.com/RonFilipkowski/status/1580384386872406017.

| No. | Original Tweet ID[213] | Article Referenced | Primary Followers[214] | Retweets[215] | Average RT Followers[216] | Total Followers[217] | Impression Estimate Equation 2a[218] for publishers and Equation 2c[219] for typical Twitter users | Impressions Estimate Equation 2b[220] and Equation 2c[221] for typical Twitter users |
|---|---|---|---|---|---|---|---|---|
| S-5 | @theanthonydavis[226] | Truth Social Statement Capture | 16,828 | 24 | 1,450 | 51,618 | 451 | 451 |
| S-6 | @DianaCialino[227] | Truth Social Statement Capture | 13,413 | 3 | 4,688 | 27,477 | 240 | 240 |
| S-7 | @jruss_jruss[228] | Truth Social Statement Capture | 7,788 | 17 | 5,988 | 109,582 | 958 | 958 |
| S-8 | @eelarson[229] | Truth Social Statement Capture | 4,700 | 1 | 41 | 4,741 | 41 | 41 |
| S-9 | @Proudmimi12[230] | Truth Social Statement Capture | 3,988 | 3 | 19,488 | 62,451 | 546 | 546 |
| S-10 | @TheResisterHQ[231] | Truth Social Statement Capture | 1,305 | 1 | 7,594 | 8,899 | 78 | 78 |
| S-11 | @SheilaGOP[232] | Truth Social | 1,011 | 0 | 0 | 1,011 | 9 | 9 |

226  https://twitter.com/theanthonydavis/status/1580431838408949760.
227  https://twitter.com/DianaCialino/status/1580726073700257793.
228  https://twitter.com/jruss_jruss/status/1582751261362835456.
229  https://twitter.com/eelarson/status/1580399047654850561.
230  https://twitter.com/Proudmimi12/status/1580636265065897984.
231  https://twitter.com/TheResisterHQ/status/1580581533785919489.
232  https://twitter.com/SheilaGOP/status/1580341410267418624.

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

96

| No. | Original Tweet ID[213] | Article Referenced | Primary Followers[214] | Retweets[215] | Average RT Followers[216] | Total Followers[217] | Impression Estimate Equation 2a[218] for publishers and Equation 2c[219] for typical Twitter users | Impressions Estimate Equation 2b[220] and Equation 2c[221] for typical Twitter users |
|---|---|---|---|---|---|---|---|---|
| | | Statement Capture | | | | | | |
| S-12 | @pattyeludwig[233] | Truth Social Statement Capture | 572 | 24 | 2,312 | 56,053 | 490 | 490 |
| S-13 | @crazyhogposts[234] | Truth Social Statement Capture | 196 | 2 | 14,109 | 28,414 | 248 | 248 |
| TOTAL SOCIAL MEDIA IMPRESSIONS (LOW/HIGH) | | | | | | | 1,227,286 | 4,828,186 |

| Truth Social URL | Truth Social Account | Date | 6% Impression Rate | 20% Impression Rate |
|---|---|---|---|---|
| https://truthsocial.com/@realDonaldTrump/posts/109158644496040450 | @realDonaldTrump | Oct 12, 2022; 21:38 | 271,200 | 904,000 |

Expert Report of Professor Humphreys

233 https://twitter.com/pattyeludwig/status/1580407740413145089.
234 https://twitter.com/crazyhogposts/status/1580617213236899840.

**C. TV Impressions Model**

| No. | Title | Date | Time | Network | Ratings Estimate |
|-----|-------|------|------|---------|------------------|
| T-1 | All In With Chris Hayes[235] | October 20, 2022 | 12:00am-1:00am PDT | MSNBC | 1,305,000[236] |
| T-2 | Chris Jansing Reports[237] | October 19, 2022 | 10:00am-11:00am PDT | MSNBC | 664,000[238] |
| T-3 | The Reid Out[239] | October 19, 2022 | 4:00pm-5:00pm PDT | MSNBC | 1,284,000[240] |
| T-4 | Deadline White House[241] | October 19, 2022 | 1:00pm-3:00pm PDT | MSNBC | 1,353,000[242] |
| T-5 | Special Report With Bret Baier[243] | October 19, 2022 | 3:00pm-4:00pm PDT | FOX News | 2,423,000[244] |
| | | | | **TOTAL TV IMPRESSIONS ESTIMATE** | **7,029,000** |

**D. Print Impressions Model**

| No. | Article Title | Publication | Date | Circulation |
|-----|---------------|-------------|------|-------------|
| P-1 | Trump deposed in defamation case brought by accuser | Washington Post | 10/20/22 | 159,040[245] |
| | | | **TOTAL PRINT IMPRESSIONS** | **159,040** |

---

235  https://archive.org/details/MSNBCW_20221020_070000_All_In_With_Chris_Hayes/.
236  https://tustvdb.com/networks/msnbc/shows/all-in-chris-hayes/.
237  https://archive.org/details/MSNBCW_20221019_170000_Chris_Jansing_Reports/.
238  https://tustvdb.com/networks/msnbc/shows/chris-jansing-reports/.
239  https://archive.org/details/MSNBCW_20221019_230000_The_ReidOut/.
240  https://tustvdb.com/networks/msnbc/shows/reidout/.
241  https://archive.org/details/MSNBCW_20221019_200000_Deadline_White_House/.
242  https://tustvdb.com/networks/msnbc/shows/deadline-white-house/.
243  https://archive.org/details/FOXNEWSW_20221019_220000_Special_Report_With_Bret_Baier/.
244  https://tustvdb.com/networks/fox-news/shows/special-report-bret-baier/.
245  Audited Report for Washington Post (6 months ended March 31, 2022), Alliance for Audited Media.

Expert Report of Professor Humphreys

A-992

## APPENDIX E. ADDITIONAL EXAMPLES OF NEGATIVE COMMENTS



**Rogelio Rodriguez**
@Rogelio06290905

Replying to @KinojaMaswali and @NYDailyNews

This happened because he has money.  That's it.

2:06 PM · Oct 19, 2022

https://twitter.com/Rogelio06290905/status/1582795434963398659



**Ezekiel**
@Ezekill58

Replying to @NYDailyNews

Where the f was troll hiding at in the first place.
Another bullshytter going after Trump

6:30 PM · Oct 19, 2022

https://twitter.com/Ezekill58/status/1582861665942765568



**Edward Phillips**
Payed announcement by the democratic party of the USA

Like   Reply   11w

https://www.facebook.com/nytimes/posts/pfbid0348wyvVEE9LSkXgVQe1PqzZW2jgNN12EpsozZWRuhqUtQpHExUiAZRM9NNVVpewT9Gl?comment_id=1
4457254259121443

Expert Report of Professor Humphreys

98

**Joe Leone**
Another gold digger crawls out of the past

Like  Reply  11w

https://www.facebook.com/nytimes/posts/pfbid0348xwyVEE9LSkXgvVQe1PqZW2jgNN12EpsouZWRuhqUtQpHExUiAZRM9NNVVWpewT9Gl?comment_id=6847723988067



**Rebecca Harris**
Lol,wow perfect timing...she just remember

Like  Reply  11w

https://www.facebook.com/nytimes/posts/pfbid0348xwyVEE9LSkXgvVQe1PqZW2jgNN12EpsouZWRuhqUtQpHExUiAZRM9NNVVWpewT9Gl?comment_id=8081300771776650

**Frank Brynok**
Its another distraction ploy by democrats. I wonder how much they're paying her

Like  Reply  11w

https://www.acebook.com/nytimes/posts/pfbid0348xwyVEE9LSkXgvVQe1PqZW2jgNN12EpsouZWRuhqUtQpHExUiAZRM9NNVVWpewT9Gl?comment_id=6500775457388



**Politicide.news** · Follow

Carrol is a straight up wack job... I love Dems who support this utter nonsense as it completely discredits everything else they are trying to claim. Theyre all 2 time losers working on the trifecta. Russian Collusion? 🤪 Ukranian Coercion? 🤪 Jan 6th Sedition? 🤪 one look at Trumps wives in comparison to Carrol with an eye witness sitting mere feet way? Yeah....utter nonsense.... Leftist Democrats are insane and corrupt...

Like  Reply  11w  Edited

https://www.facebook.com/nytimes/posts/pfbid0348xwyVEE9LSkXgvVQe1PqZW2jgNN12EpsouZWRuhqUtQpHExUiAZRM9NNVVWpewT9Gl?comment_id=325149061589817



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



https://www.facebook.com/nytimes/posts/pfbid0348wyVEE9LSkXgVQe1PqZW2jgNNJ2EpsonZWRuhqUtQpHExUjAZRM9NNVVWpewT9Gf?comment_id=4248797479805438



https://www.facebook.com/nytimes/posts/pfbid0348wyVEE9LSkXgVQe1PqZW2jgNNJ2EpsonZWRuhqUtQpHExUjAZRM9NNVVWpewT9Gf?comment_id=1292196594866803



https://www.facebook.com/nytimes/posts/pfbid0348wyVEE9LSkXgVQe1PqZW2jgNNJ2EpsonZWRuhqUtQpHExUjAZRM9NNVVWpewT9Gf?comment_id=6073905210824489



https://www.facebook.com/washingtonpost/posts/pfbid04Gy656TvsBCPzgWAEjKH1gLSPCGPPUe1YZXmvDFjJL8VFpMC7Yy3gbhiBP6mHAW?comment_id=788512402232831

100

Expert Report of Professor Humphreys



**Robert Yamin**
She's a lunatic, anyone see her interview??? Lol!!!

Like   Reply   11w

https://www._acebook.com/washingtonpost/posts/pfbid0u4Gy656TyvBCPzgWAEjKHgLSPCGPPUeJYZXjnvDEjJL8VFpMC7Y3jgbhhBP6nIIAW!?comment_id=8731904440322237



**Jim Brady**
Lock the crazy lady up!!!

Like   Reply   12w

https://www.facebook.com/FoxNews/posts/pfbid02qviCtHMJMGk9Lwpmg8YufGyiUDWo7iX4PADFnmnRfiZZ1GcnYbZY3mvXuiT4PT2dedl8v!?comment_id=414645607507043



**Carl Angell**
She is a proven liar....surprised she is not a Dem congresswoman.

Like   Reply   11w

https://www.facebook.com/FoxNews/posts/pfbid02qviCtHMJMGk9Lwpmg8YufGyiUDWo7iX4PADFnmnRfiZZ1GcnYbZY3mvXuiT4PT2dedl8v!?comment_id=1241517413296491



⬥ Top fan
**Marty Strukelj**
She's a liar. If he did why the hell did you wait this long. You evil corrupt B*+-h

Like   Reply   11w

https://www.facebook.com/FoxNews/posts/pfbid02qviCtHMJMGk9Lwpmg8YufGyiUDWo7iX4PADFnmnRfiZZ1GcnYbZY3mvXuiT4PT2dedl8v!?comment_id=4617904779279639

Expert Report of Professor Humphreys

101

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Cory Sartin**
Thats akk women do is lie gentlemen when you go around any women gentlemen make sure you record the entire duration of the interaction

Like   Reply   12w

https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGki9Lwpmg8YuGyUDWo7iX4PADFmmRfjZZ1GenYbZY3mvXuf4PT2ded8vl?comment_id=
417111670599743



⊕ Top fan
**Matthew Burroughs**
Lol. Shes lying through her teeth. Goin after fame and a check

Like   Reply   12w        👍❤️😆 6

https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGki9Lwpmg8YuGyUDWo7iX4PADFmmRfjZZ1GenYbZY3mvXuf4PT2ded8vl?comment_id=
1326744251473991



**Ginny Miller**
And we're just now hearing about it!! OK lady, get your two minutes of fame and then climb back under that moldy rock!!

Like   Reply   12w        😆👍 22

https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGki9Lwpmg8YuGyUDWo7iX4PADFmmRfjZZ1GenYbZY3mvXuf4PT2ded8vl?comment_id=
6193676031165970



**Anthony Madani**
This woman needs psychiatric examination

Like   Reply   12w        👍 3

https://www.facebook.com/FoxNews/posts/pfbid02qvfCtHMJMGki9Lwpmg8YuGyUDWo7iX4PADFmmRfjZZ1GenYbZY3mvXuf4PT2ded8vl?comment_id=
5083796144829907

Expert Report of Professor Humphreys

102

A-996

A-997

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Cathie Brusseau**
Money money money !!! All lies to try to get money. He will never give in to blackmail of these disgusting woman

Like   Reply   12w

https://www.facebook.com/FoxNews/posts/pfbid02qvtCtHMJMGk9Lwpmg8YuGyUDWo7iX4PADFnmnRfjZZ1GcnYbZY3mvXuiT4PT2dedI8vl?comment_id=525391580140343434



**Ryan Humphreys**
Ejoan is just another lying Sl@g paid by the Demorats to try & derail trumps election , try again you scumbags you fail EVERYTIME 👍

Like   Reply   12w

https://www.facebook.com/FoxNews/posts/pfbid02qvtCtHMJMGk9Lwpmg8YuGyUDWo7iX4PADFnmnRfjZZ1GcnYbZY3mvXuiT4PT2dedI8vl?comment_id=496416649191470



**Dmitry Klokov**
She looks like a complete nutcase

Like   Reply   12w

https://www.facebook.com/FoxNews/posts/pfbid02qvtCtHMJMGk9Lwpmg8YuGyUDWo7iX4PADFnmnRfjZZ1GcnYbZY3mvXuiT4PT2dedI8vl?comment_id=426266042961744



**Steve Boggs**
She is a lying puke

Like   Reply   12w

https://www.acebook.com/FoxNews/posts/pfbid02qvtCtHMJMGk9Lwpmg8YuGyUDWo7iX4PADFnmnRfjZZ1GcnYbZY3mvXuiT4PT2dedI8vl?comment_id=145124742203797972

Expert Report of Professor Humphreys

103

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Georgia Jones**
She is mentally unbalanced. Her MSM interview demonstrated that.

Like   Reply   12w

https://www.facebook.com/FoxNews/posts/pfbid02qvfCHHMMGk9Lwpmg8YuGyUDWo7iX4PADFmmRfiZZ1GcnYbZY3mvXuT4PT2ded8x)?comment_id=4547585298841889



**Danny Inglese**
30 + years ago. Give me a fu.. break. Jean Carroll is probably looking for money because inflation is kicking her pretty bad.
Ask yourself, why didn't you come forward 30+ years ago 😩😩😩
All B.S.

Like   Reply   12w   Edited

https://www.facebook.com/FoxNews/posts/pfbid02qvfCHHMMGk9Lwpmg8YuGyUDWo7iX4PADFmmRfiZZ1GcnYbZY3mvXuT4PT2ded8x)?comment_id=9763858970880082



**Mark Eckhardt**
Guaranteed it's a lie. She sees the progressives making sh*t up about him all the time and getting away with it. She's just another POS trying to get in on it. Progressives are disgusting, hateful and vile liars.

Like   Reply   12w

https://www.facebook.com/FoxNews/posts/pfbid02qvfCHHMMGk9Lwpmg8YuGyUDWo7iX4PADFmmRfiZZ1GcnYbZY3mvXuT4PT2ded8x)?comment_id=6312327552214857



**Adam Della**
Of course this old 👵 would lie she just wants her 5 minutes of fame.

Like   Reply   11w

https://www.facebook.com/NYDailyNews/posts/pfbid02vbKqzsaf5E5xy2Lana83q9EF84CHaexBFVPk6NFh6cs5EWrBRvTfbZkqTX8D44sTC)?comment_id=334094746956020

Expert Report of Professor Humphreys

104

A-999

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Da-lai Wu**
The guy has dated nothing but models his whole life can you imagine him even going near anybody who looked like this?! Give me a break!

Like   Reply   11w

https://www.facebook.com/NYDailyNews/posts/pfbid02YFdXSSDcgKHJ1WGP14689nq8gz7LyuxabpdBK73 idhr896f6pdrwX4b63aSVVy4jeA1?comment_id=4
1981977367649G



**Haruna Baba**
Is a lair, and she must pay, for defamation of character..so now somebody cant have a decent carrier or money, women ll just came from nowere and accuse him...

Like   Reply   11w                                                    💙 2

https://www.facebook.com/NYDailyNews/posts/pfbid02YFdXSSDcgKHJ1WGP14689nq8gz7LyuxabpdBK73 idhr896f6pdrwX4b63aSVVy4jeA1?comment_id=5
1097805726376Z



**Dan TheMan**
That is kinda funny. Why is it always liberals getting raped by conservatives? I'm not buying it. She most likely regretted having sex with him.

Like   Reply   12w

https://www.facebook.com/seattletimes/posts/pfbid038CLuhY1rPeEzr1DRDwmjA95mEsUAHvSvGNK4AyU559pkGA2FFdG86RV5aRU1FbRY1?comment_id
=6157d2326X9534



**Connie Cricchio**
I am so sure this woman is sick

Like   Reply   12w

https://www.facebook.com/seattletimes/posts/pfbid038CLuhY1rPeEzr1DRDwmjA95mEsUAHvSvGNK4AyU559pkGA2FFdG86RV5aRU1FbRY1?comment_id
=3426667230945090

Expert Report of Professor Humphreys

105

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Chris Treadgold**
Another sham.

When it comes out that it Didn't happen then the 'lady' should be charged for false allegations... And put in jail.

The Left are running scared because they know he will get in and throw everyone in jail.

Like   Reply   12w

https://www.facebook.com/newshour/posts/pfbid0YPUeureawmwfL6zZ3yXV1fG8AAWPyfAsL2K9vPLLIGP4tSHMzWZSgKac5BYd8J8sl?comment_id=8035
56720944408



**April Lagasse**
Give me a break. Yeah, someone is going to wait 30 years to report this crime. There is a great evil in our world. An evil which no longer hides.

Like   Reply   12w

https://www.facebook.com/newshour/posts/pfbid0YPUeureawmwfL6zZ3yXV1fG8AAWPyfAsL2K9vPLLIGP4tSHMzWZSgKac5BYd8J8sl?comment_id=4974
9544205900S



**Sharon Harraman**
She's a liar

Like   Reply   12w

https://www.facebook.com/newshour/posts/pfbid0YPUeureawmwfL6zZ3yXV1fG8AAWPyfAsL2K9vPLLIGP4tSHMzWZSgKac5BYd8J8sl?comment_id=1888
95235796708S

Expert Report of Professor Humphreys

106



**Jill Bidens Hair** 🟠
@NanetteDonnelly

Replying to @TwoSidesofTruth @Gigi69030829 and 43 others

Who believes Trump, who was in his 50s at the time, actually went shopping for his GF at a department store? Somehow end up in a PUBLIC dressing room w/Carroll, but nobody saw him/her together? She's crazy.

10:21 PM · Nov 1, 2022

https://twitter.com/NanetteDonnelly/status/1587630954222436353

Expert Report of Professor Humphreys

107

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A-1002

108





bahman🎈 khaneh mashroteh
@bahman2990

Trump responds to E. Jean Carroll defamation lawsuit
after judge denies delA hoax and a lie'
foxnews.com/politics/trump... #FoxNews Mfucker
from E. Jean Carroll from 1990 till now you didn't feel
your penis was ripped off by the president , whore who
taught you to take your dignity?

foxnews.com
Trump responds to E. Jean Carroll defamation lawsuit after judge denies delay; ...
Former President Donald Trump emailed a statement to his supporters
Wednesday denying any wrongdoing in the ongoing defamation case brought b...

8:53 AM · Oct 13, 2022

https://twitter.com/bahman2990/status/1580542210809815040

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**dreamy121**
@dreamy121

Replying to @SkyNews

lol..yeah, trust the gin and 20 cats lady to tell the 'truth' !

1:20 AM · Oct 20, 2022

https://twitter.com/dreamy121/status/1582965032362864640

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER





Mair Mair
@SassyMair

This is being done weeks before election time 😢
Trump doesn't have to commit rape to get a woman,
we have seen the women he goes for- have you seen
her? Ugly 🤮 Trump scheduled to appear Wednesday
for deposition in E. Jean Carroll lawsuit - CNN Politics



apple.news
**Trump appears for deposition in E. Jean Carroll lawsuit**
Former President Donald Trump appeared Wednesday for a deposition as part of
the defamation lawsuit brought by former magazine columnist E. Jean Carroll.

11:07 AM · Oct 19, 2022

https://twitter.com/SassyMair/status/1582750376628887552

Expert Report of Professor Humphreys

111



Expert Report of Professor Humphreys

A-1006

Cable News Watch
@CableNewsWatch

...

What a joke.  Does anyone believe that ugly ass chick?

Ken Shepherd @KenShepherd · Oct 12, 2022
Trump to be deposed in E. Jean Carroll defamation lawsuit after federal judge
rejected request for delay foxnews.com/politics/trump...#FoxNews

2:44 PM · Oct 12, 2022

https://twitter.com/CableNewsWatch/status/1580268104239976448

112

Expert Report of Professor Humphreys

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A-1007

## APPENDIX F. IMPACT MODEL[246]

| Category | No. | Percent Republican[247] | Receptive Republicans[248] | Percent Receptive Republicans[249] | Impression Estimate (Low)[250] | Impression Estimate (High)[251] | Receptive Impressions Estimate (Low)[252] | Receptive Impressions Estimate (High)[253] |
|---|---|---|---|---|---|---|---|---|
| Web | W-1 | 16.30% | 76.00% | 12.39% | 1,129,400 | 1,129,400 | 139,910 | 139,910 |
| Web | W-2 | 18.10% | 76.00% | 13.76% | 879,010 | 879,010 | 120,917 | 120,917 |
| Web | W-3 | 69.80% | 76.00% | 53.05% | 927,666 | 927,666 | 492,108 | 492,108 |
| Web | W-4 | 14.80% | 76.00% | 11.25% | 367,495 | 367,495 | 41,336 | 41,336 |
| Web | W-5 | 34.70% | 76.00% | 26.37% | 187,652 | 187,652 | 49,487 | 49,487 |
| Web | W-6 | | | 21.42% | 499,813 | 499,813 | 107,066 | 107,066 |
| Web | W-7 | 23.10% | 76.00% | 17.56% | 261,664 | 261,664 | 45,938 | 45,938 |
| Web | W-8 | | | 21.42% | 72,622 | 72,622 | 15,556 | 15,556 |
| Web | W-9 | | | 21.42% | 42,304 | 42,304 | 9,062 | 9,062 |
| Web | W-10 | | | 21.42% | 168,103 | 168,103 | 36,010 | 36,010 |
| Web | W-11 | | | 21.42% | 104,780 | 104,780 | 22,445 | 22,445 |
| Web | W-12 | | | 21.42% | 26,145 | 26,145 | 5,601 | 5,601 |
| Web | W-13 | | | 21.42% | 69,711 | 69,711 | 14,933 | 14,933 |

246  Please see Appendix F produced in Excel format along with this Report for a more detailed Impact Model.
247  Percent of a publications' audience that are Republican, based on data from Pew Research. Cell is empty when data for the relevant publication is not available.
248  Republicans receptive to the claims (.76, YouGov). Cell is empty when Percent Republican data is not available for the relevant publication.
249  Calculated using the following formula: Percent Republicans * Receptive Republicans. When Percent Republican data is not available, I rely on the average Percent Receptive Republicans (21.42%).
250  The impressions estimate calculated in the Impressions Model. For social media posts, the high estimate is calculated using Equation 2a.
251  The impressions estimate calculated in the Impressions Model. For social media posts, the low estimate is calculated using Equation 2b.
252  Calculated using the following formula: Percent Republicans * Receptive Republicans * Impressions Estimate. If data related to Percent Republicans is not available, the equation is as follows: Average Percent Receptive Republicans (21.42%) * Impressions Estimate. The high receptive impressions estimate is based on the impressions estimate incorporating Equation 2a.
253  Calculated using the following formula: Percent Republicans * Receptive Republicans * Impressions Estimate. If data related to Percent Republicans is not available, the equation is as follows: Average Percent Receptive Republicans (21.42%) * Impressions Estimate. The low Receptive Impressions Estimate is based on the impressions estimate incorporating Equation 2b.

Expert Report of Professor Humphreys

113

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Category | No. | Percent Republican[247] | Receptive Republicans[248] | Percent Receptive Republicans[249] | Impression Estimate (Low)[250] | Impression Estimate (High)[251] | Receptive Impressions Estimate (Low)[252] | Receptive Impressions Estimate (High)[253] |
|---|---|---|---|---|---|---|---|---|
| Web | W-14 | | | 21.42% | 180,967 | 180,967 | 38,765 | 38,765 |
| Web | W-15 | | | 21.42% | 60,239 | 60,239 | 12,904 | 12,904 |
| Web | W-16 | | | 21.42% | 49,634 | 49,634 | 10,632 | 10,632 |
| Web | W-17 | | | 21.42% | 73,389 | 73,389 | 15,721 | 15,721 |
| Social | S-1 | 69.80% | 76.00% | 53.05% | 778,223 | 3,929,736 | 412,832 | 2,084,646 |
| Social | S-2 | 23.10% | 76.00% | 17.56% | 161,197 | 627,740 | 28,300 | 110,206 |
| Social | S-3 | | | 21.42% | 98,992 | 154,446 | 21,205 | 33,084 |
| Social | S-4 | | | 21.42% | 185,813 | 113,202 | 39,803 | 24,249 |
| Social | S-5 | | | 21.42% | 451 | 451 | 97 | 97 |
| Social | S-6 | | | 21.42% | 240 | 240 | 51 | 51 |
| Social | S-7 | | | 21.42% | 958 | 958 | 205 | 205 |
| Social | S-8 | | | 21.42% | 41 | 41 | 9 | 9 |
| Social | S-9 | | | 21.42% | 546 | 546 | 117 | 117 |
| Social | S-10 | | | 21.42% | 78 | 78 | 17 | 17 |
| Social | S-11 | | | 21.42% | 9 | 9 | 2 | 2 |
| Social | S-12 | | | 21.42% | 490 | 490 | 105 | 105 |
| Social | S-13 | | | 21.42% | 248 | 248 | 53 | 53 |
| Print | P-1 | 18.10% | 76.00% | 13.76% | 159,040 | 159,040 | 21,878 | 21,878 |
| TV | T-1 | 20.50% | 76.00% | 15.58% | 1,305,000 | 1,305,000 | 203,319 | 203,319 |
| TV | T-2 | 20.50% | 76.00% | 15.58% | 664,000 | 664,000 | 103,451 | 103,451 |
| TV | T-3 | 20.50% | 76.00% | 15.58% | 1,284,000 | 1,284,000 | 200,047 | 200,047 |
| TV | T-4 | 20.50% | 76.00% | 15.58% | 1,353,000 | 1,353,000 | 210,797 | 210,797 |
| Truth Social | T-5 | 69.80% | 76.00% | 53.05% | 2,423,000 | 2,423,000 | 1,285,353 | 1,285,353 |
| | | | | 21.42% | 271,200 | 904,000 | 58,094 | 193,647 |
| **TOTAL RECEPTIVE IMPRESSIONS (LOW/HIGH)** | | | | | | | **3,764,125** | **5,649,724** |

Expert Report of Professor Humphreys

114

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A-1009

## APPENDIX G. DAMAGES MODEL[254]

*High Impression Estimate, 1x Attitude Change Multiplier*

Impression Target:[255] 5,649,724
Attitude Change Multiplier: 1x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight[256] | Target Impressions[257] | Adjusted Impressions[258] | CPM (per 1,000 impressions) | Total Cost[259] |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 367,232 | 367,232 | $6.46[260] | $2,372.32 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 367,232 | 367,232 | $14.40[261] | $5,288.14 |
| Influencer | Web Blog Influencer | 5.00% | 282,486 | 2,824,862 | $60.00[262] | $169,491.73 |
| | Twitter Influencer | 7.00% | 395,481 | 7,909,614 | $2.00[263] | $15,819.23 |
| | Facebook Influencer | 7.00% | 395,481 | 7,909,614 | $25.00[264] | $197,740.35 |
| | YouTube Influencer | 4.60% | 259,887 | 5,197,746 | $20.00[265] | $103,954.93 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 1,672,318 | 1,672,318 | $16.00[266] | $26,757.09 |
| | Cable TV (Excluding Primetime) | 21.30% | 1,203,391 | 1,203,391 | $10.00[267] | $12,033.91 |
| | Podcasts | 5.00% | 282,486 | 282,486 | $19.00[268] | $5,367.24 |
| | Radio | 4.10% | 231,639 | 231,639 | $4.00[269] | $926.55 |
| | Print newspapers | 3.40% | 192,091 | 192,091 | $67.00[270] | $12,870.07 |
| | **Total** | **100.00%** | **5,649,724** | | | **$552,621.56** |

*High Impression Estimate, 3x Attitude Change Multiplier*

Impression Target: 5,649,724
Attitude Change Multiplier: 3x
Impression Rate: 5%
Bounce Rate: 90%

Expert Report of Professor Humphreys

115

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 1,101,696 | 1,101,696 | $ 6.46 | $7,116.96 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 1,101,696 | 1,101,696 | $ 14.40 | $15,864.43 |
| Influencer | Web Blog Influencer | 5.00% | 847,459 | 8,474,586 | $ 60.00 | $508,475.18 |
| | Twitter Influencer | 7.00% | 1,186,442 | 23,728,842 | $ 2.00 | $47,457.68 |
| | Facebook Influencer | 7.00% | 1,186,442 | 23,728,842 | $ 25.00 | $593,221.05 |
| | YouTube Influencer | 4.60% | 779,662 | 15,593,239 | $ 20.00 | $311,864.78 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 5,016,955 | 5,016,955 | $ 16.00 | $80,271.28 |
| | Cable TV (Excluding Primetime) | 21.30% | 3,610,174 | 3,610,174 | $ 10.00 | $36,101.74 |
| | Podcasts | 5.00% | 847,459 | 847,459 | $ 19.00 | $16,101.71 |
| | Radio | 4.10% | 694,916 | 694,916 | $ 4.00 | $2,779.66 |
| | Print newspapers | 3.40% | 576,272 | 576,272 | $ 67.00 | $38,610.22 |
| | **Total** | **100.00%** | **16,949,173** | | | **$1,657,864.69** |

254  Please see Appendix G produced in Excel format along with this Report for a more detailed Damages Model.
255  The impressions estimate from the Impressions Model.
256  The percentage of impressions allocated to different media types. Allocations based on Trump supporters most common way of getting political and election news.
257  The number of impressions allocated to the media type. Calculated using the following formula: Impression Target * Weight.
258  The number of impressions allocated to the media type, taking into account the impression rate for Twitter, Facebook, and YouTube influencers and the bounce rate for web blog influencers. For all other media types the Adjusted Impressions are the same as the Target Impressions.
259  Calculated using the following formula: (Adjusted Impressions / 1000) * CPM.
260  https://blog.hootsuite.com/twitter-statistics/.
261  https://www.wordstream.com/blog/ws/2021/07/12/facebook-ads-cost.
262  https://www.webfx.com/social-media/pricing/influencer-marketing/.
263  https://www.webfx.com/social-media/pricing/influencer-marketing/.
264  https://www.webfx.com/social-media/pricing/influencer-marketing/.
265  https://www.webfx.com/social-media/pricing/influencer-marketing/.
266  https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparison%OAAA.pdf.
267  https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparison%OAAA.pdf.
268  https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparison%OAAA.pdf.
269  https://oaaa.org/Portals/0/2022_01%20Solomon%27s%20US%20Major%20Media%20CPM%20Comparison%OAAA.pdf.
270  https://www.gaebler.com/Washington+Examiner-DC-Newspaper-Advertising-Costs++12549.

Expert Report of Professor Humphreys

116

A-1010

A-1011

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*High Impression Estimate, 5x Attitude Change Multiplier*

Impression Target: 5,649,724
Attitude Change Multiplier: 5x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 1,836,160 | 1,836,160 | $ 6.46 | $11,861.60 |
| | Facebook Native Ads – Promoted Posts | 6.50% | 1,836,160 | 1,836,160 | $ 14.40 | $26,440.71 |
| Influencer | Web Blog Influencer | 5.00% | 1,412,431 | 14,124,311 | $ 60.00 | $847,458.64 |
| | Twitter Influencer | 7.00% | 1,977,403 | 39,548,070 | $ 2.00 | $79,096.14 |
| | Facebook Influencer | 7.00% | 1,977,403 | 39,548,070 | $ 25.00 | $988,701.75 |
| | YouTube Influencer | 4.60% | 1,299,437 | 25,988,732 | $ 20.00 | $519,774.63 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 8,361,592 | 8,361,592 | $ 16.00 | $133,785.47 |
| | Cable TV (Excluding Primetime) | 21.30% | 6,016,956 | 6,016,956 | $ 10.00 | $60,169.56 |
| | Podcasts | 5.00% | 1,412,431 | 1,412,431 | $ 19.00 | $26,836.19 |
| | Radio | 4.10% | 1,158,193 | 1,158,193 | $ 4.00 | $4,632.77 |
| | Print newspapers | 3.40% | 960,453 | 960,453 | $ 67.00 | $64,350.36 |
| | **Total** | **100.00%** | **28,248,621** | | | **$2,763,107.82** |

Expert Report of Professor Humphreys

117

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 1x Attitude Change Multiplier*

Impression Target: 3,764,125
Attitude Change Multiplier: 1x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 244,668 | 244,668 | $ 6.46 | $1,580.56 |
| | Facebook Native Ads - Promoted Posts | 6.50% | 244,668 | 244,668 | $ 14.40 | $3,523.22 |
| Influencer | Web Blog Influencer | 5.00% | 188,206 | 1,882,063 | $ 60.00 | $112,923.76 |
| | Twitter Influencer | 7.00% | 263,489 | 5,269,775 | $ 2.00 | $10,539.55 |
| | Facebook Influencer | 7.00% | 263,489 | 5,269,775 | $ 25.00 | $131,744.39 |
| | YouTube Influencer | 4.60% | 173,150 | 3,462,995 | $ 20.00 | $69,259.91 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 1,114,181 | 1,114,181 | $ 16.00 | $17,826.90 |
| | Cable TV (Excluding Primetime) | 21.30% | 801,759 | 801,759 | $ 10.00 | $8,017.59 |
| | Podcasts | 5.00% | 188,206 | 188,206 | $ 19.00 | $3,575.92 |
| | Radio | 4.10% | 154,329 | 154,329 | $ 4.00 | $617.32 |
| | Print newspapers | 3.40% | 127,980 | 127,980 | $ 67.00 | $8,574.68 |
| | **Total** | **100.00%** | **3,764,125** | | | **$368,183.78** |

Expert Report of Professor Humphreys

118

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 3x Attitude Change Multiplier*

Impression Target: 3,764,125
Attitude Change Multiplier: 3x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 734,004 | 734,004 | $ 6.46 | $4,741.67 |
| | Facebook Native Ads – Promoted Posts | 6.50% | 734,004 | 734,004 | $ 14.40 | $10,569.66 |
| Influencer | Web Blog Influencer | 5.00% | 564,619 | 5,646,188 | $ 60.00 | $338,771.28 |
| | Twitter Influencer | 7.00% | 790,466 | 15,809,326 | $ 2.00 | $31,618.65 |
| | Facebook Influencer | 7.00% | 790,466 | 15,809,326 | $ 25.00 | $395,233.16 |
| | YouTube Influencer | 4.60% | 519,449 | 10,388,986 | $ 20.00 | $207,779.72 |
| Traditional | Broadcast TV (Excluding Primetime) | 29.60% | 3,342,543 | 3,342,543 | $ 16.00 | $53,480.69 |
| | Cable TV (Excluding Primetime) | 21.30% | 2,405,276 | 2,405,276 | $ 10.00 | $24,052.76 |
| | Podcasts | 5.00% | 564,619 | 564,619 | $ 19.00 | $10,727.76 |
| | Radio | 4.10% | 462,987 | 462,987 | $ 4.00 | $1,851.95 |
| | Print newspapers | 3.40% | 383,941 | 383,941 | $ 67.00 | $25,724.03 |
| | **Total** | **100.00%** | **11,292,376** | | | **$1,104,551.33** |

Expert Report of Professor Humphreys

119

A-1013

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Low Impression Estimate, 5x Attitude Change Multiplier*

Impression Target: 3,764,125
Attitude Change Multiplier: 5x
Impression Rate: 5%
Bounce Rate: 90%

| Ad Category | Media Type | Weight | Target Impressions | Adjusted Impressions | CPM (per 1,000 impressions) | Total Cost |
|---|---|---|---|---|---|---|
| Native | Twitter Promoted Tweets | 6.50% | 1,223,341 | 1,223,341 | $ 6.46 | $7,902.78 |
| | Facebook Native Ads – Promoted Posts | 6.50% | 1,223,341 | 1,223,341 | $ 14.40 | $17,616.11 |
| | Web Blog Influencer | 5.00% | 941,031 | 9,410,313 | $ 60.00 | $564,618.79 |
| Influencer | Twitter Influencer | 7.00% | 1,317,444 | 26,348,877 | $ 2.00 | $52,697.75 |
| | Facebook Influencer | 7.00% | 1,317,444 | 26,348,877 | $ 25.00 | $658,721.93 |
| | YouTube Influencer | 4.60% | 865,749 | 17,314,976 | $ 20.00 | $346,299.53 |
| | Broadcast TV (Excluding Primetime) | 29.60% | 5,570,905 | 5,570,905 | $ 16.00 | $89,134.49 |
| | Cable TV (Excluding Primetime) | 21.30% | 4,008,793 | 4,008,793 | $ 10.00 | $40,087.93 |
| Traditional | Podcasts | 5.00% | 941,031 | 941,031 | $ 19.00 | $17,879.60 |
| | Radio | 4.10% | 771,646 | 771,646 | $ 4.00 | $3,086.58 |
| | Print newspapers | 3.40% | 639,901 | 639,901 | $ 67.00 | $42,873.39 |
| **Total** | | 100.00% | 18,820,626 | | | **$1,840,918.88** |

*Summary of Calculated Damages:*

| Attitude Change Multiplier | 1x | 3x | 5x |
|---|---|---|---|
| Low Receptive Impression Estimate | $368,183.78 | $1,104,551.33 | $1,840,918.88 |
| High Receptive Impression Estimate | $552,621.56 | $1,657,864.69 | $2,763,107.82 |

Expert Report of Professor Humphreys

A-1015

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**APPENDIX H. LIST OF CONSERVATIVE STEPS TAKEN**

| IMPRESSIONS MODEL | |
|---|---|
| Online News Articles Considered | • Online news impressions are limited to the articles cited in the Complaint. I did not count other online news articles that covered or discussed the Statement.<br>• Further, some of the articles from the Complaint were authored by the Associated Press. It is likely that identical (or very similar) versions of these articles appeared in multiple publications. For instance, the October 12, 2022, AP article, titled "Trump Angrily Lashes Out After His Deposition Is Ordered,"[271] appeared in at least 137 additional news outlets while I only included the one published on the Seattle Times.[272] |
| Social Media Posts Considered | • I limited social media impressions to those that quote the Statement directly or contain an image of the Statement. While I did consider the retweets and quote tweets of the 13 original tweets, I did not consider in-text quotations or paraphrases of the statement.<br>• Additionally, I did not consider any tweets from other publishers of stories covering Mr. Trump's Statement, tweets from users who shared links to the 17 articles (or other articles containing the Statement), or tweets in which users repeated or otherwise amplified the Statement.<br>Additionally, due to the opacity of other platforms, I did not account for impressions generated on any other social media platform, despite there being evidence the articles considered in the impressions analysis were spread widely online. |

---

[271] Larry Neumeister & Jill Colvin, Trump Angrily Lashes Out After His Deposition Is Ordered, THE SEATTLE TIMES (Oct. 12, 2022), https://apnews.com/article/new-york-lawsuits-manhattan-donald-trump-lewis-a-kaplan-ce7b11f1f0e3ea1bec35e8f1f1b929d9.

[272] See for example Larry Neumeister & Jill Colvin, Trump Angrily Lashes Out After His Deposition Is Ordered, YAHOO! NEWS (Oct. 12, 2022); Larry Neumeister & Jill Colvin, Trump Angrily Lashes Out After His Deposition Is Ordered, THE DENVER POST (Oct. 12, 2022); Larry Neumeister & Jill Colvin, Trump Angrily Lashes Out After His Deposition Is Ordered, DAILY HERALD (SUBURBAN CHICAGO) (Oct. 12, 2022).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| TV Broadcasts Considered | • I only considered TV broadcasts contained in the Internet Archive's TV News Archive database from the following broadcasters: ABC, Fox, NBC, MSNBC, CBS, and CNN.<br>• Among the broadcasts I found on the TV News Archive, I only included broadcasts that included direct quotes from the Statement. |
| Other Sources of Impressions Not Considered | • I did not include impressions generated from people who were exposed to the Statement in article headlines while browsing Google News, Apple News, or other news aggregating applications.<br>• I did not consider second-level impressions (re-truths) of Mr. Trump's initial statement.<br>• I did not consider the impact of word-of-mouth on the transmission of the Statement. |
| Online News Impressions Calculation | • I incorporated a website's bounce rate when calculating online news impressions to exclude users who navigated to a website without performing any actions. Nonetheless, it's possible that users could have navigated directly to the relevant article on the website and been exposed the Statement without taking any additional actions. |
| **QUANTITATIVE IMPACT MODEL** | |
| Negative Associations are Harmful | • Any impression generated that linked Ms. Carroll's person brand with the content of the Statement is harmful. Person brands need to be protected and any information that connects a person brand to a "hoax" and a "scam" and other negative information is harmful, even if the person's fans or followers do not believe the claims. Nonetheless, I limited my estimate of the quantitative impact to potential readers and viewers who identify as Trump supporters and/or are Republicans who may find Trump's Statement credible. |
| Limited Set of Impressions as an Input | • The impact model relies on the impressions estimate and therefore does not account for the impact associated with impressions generated from additional online and print articles, TV broadcasts, and social media posts covering the Statement. |

Expert Report of Professor Humphreys                    122

A-1017

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| DAMAGES MODEL | |
|---|---|
| Impressions and Impact as Inputs | • The damages model also relies on the impressions model and therefore does not account for impressions generated by additional online and print articles, TV broadcasts, and social media posts that covered the Statement.<br>• The damages model also relies on the impact model and therefore is limited to the costs needed to repair the impressions generated by people who are likely to be receptive to the Statement. |
| Production Costs | • The damages model does not incorporate the production and operating costs associated with running the campaign. |
| Attitude Change Multiplier | • When calculating damages, I included attitude change multipliers (1x, 3x, and 5x) to account for the fact that it takes multiple impressions to change an attitude. In most cases, a multiplier of at least 3 (the medium estimate) would constitute the minimum corrective campaign to run. However, if Ms. Carroll were to run a prior corrective campaign, some harm would have been mitigated. As a result, I use the lowest frequency multiplier to avoid overly exposing the target audience to the corrective message. |

A-1018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

E. JEAN CARROLL,                                    Civil Action No.:
                                                    22-cv-10016 (LAK)
                          *Plaintiff,*

      – against –

DONALD J. TRUMP,

                          *Defendant.*
-------------------------------------------------------------------X

### <u>DECLARATION OF MATTHEW G. DeOREO</u>

I, MATTHEW G. DeOREO, declare as follows under the penalty of perjury:

1.      I respectfully submit this Declaration in opposition to Plaintiff's Omnibus Motion *in Limine*.

2.      The sole purpose of this Declaration is to submit Exhibits to the Court.  These exhibits are as follows:

      a.    **Exhibit 1**: Defendant's Memorandum of Law in support of his Motion *in Limine* in *Carroll v. Trump*, No. 1:20-cv-7311-LAK-JLC (ECF No. 131)("*Carroll I*");

      b.    **Exhibit 2**: the February 16, 2023 Declaration of Alina Habba filed in support of Defendant's  Motion *in Limine* in *Carroll I* (ECF No. 132)("Habba Declaration");

      c.    **Exhibit 3**: Exhibit A to the Habba Declaration (ECF No. 132-1);

      d.    **Exhibit 4**: Exhibit B to the Habba Declaration (ECF No. 132-2);

A-1019

    e.     **Exhibit 5**: Defendant's Memorandum of Law in opposition to Plaintiff's Motion *in Limine* in *Carroll I* (ECF No. 136);

    f.     **Exhibit 6**: the February 23, 2023 Declaration of Alina Habba filed in opposition to Plaintiff's Motion *in Limine* in *Carroll I* (ECF No. 137)("Habba Opposition Declaration");

    g.     **Exhibit 7**: Exhibit A to the Habba Opposition Declaration (ECF No. 137-1);

    h.     **Exhibit 8**: Exhibit B to the Habba Opposition Declaration (ECF No. 137-2);

    i.     **Exhibit 9**: Exhibit D to the Habba Opposition Declaration (ECF No. 137-4);

    j.     **Exhibit 10**:  Exhibit E to the Habba Opposition Declaration (ECF No. 137-5); and

    k.     **Exhibit 11**: Defendant's Reply Memorandum of Law in further support of his Motion *in Limine* in *Carroll I* (ECF No. 140).

3.    I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       March 9, 2023

                                         MATTHEW G. DeOREO

A-1020

# EXHIBIT 2

A-1021

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for defendant Donald J. Trump*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>*Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC<br><br><br>**DECLARATION OF ALINA HABBA, ESQ. IN SUPPORT OF DEFENDANT'S MOTIONS *IN LIMINE*** |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for Donald J. Trump (the "Defendant") in the above-captioned matter (the "Action").

2.     I submit this declaration pursuant in support of Defendant's Motions *in Limine*. The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

3.     As counsel for Defendant, I have reviewed pleadings, and other documents related to the Action, and I am familiar with the facts and circumstances of this case.

1

A-1022

4.      Attached hereto as **Exhibit A** is a true and accurate copy of relevant portions of the deposition transcript of Natasha Stoynoff, which deposition took place October 13, 2022;

5.      Attached hereto as **Exhibit B** is a true and accurate copy of the relevant portions of the deposition transcript of Jessica Leeds, which deposition took place on October 13, 2022.

Dated: February 16, 2023                    Respectfully submitted,

Alina Habba, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
                    -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

2

A-1023

# EXHIBIT 3

A-1024

# EXHIBIT A

A-1025

Page 1

```
 1                    NATASHA STOYNOFF

 2              UNITED STATES DISTRICT COURT

 3              SOUTHERN DISTRICT OF NEW YORK

 4    ------------------------------------    )

 5    E. JEAN CARROLL,                        )

 6                    Plaintiff,              ) Case No.

 7         vs.                                ) 20-Civ-7311

 8    DONALD J. TRUMP, in his personal capacity) (LAK)(JLC)

 9                    Defendants.             )

10    ------------------------------------    )

11

12

13              DEPOSITION OF NATASHA STOYNOFF

14                   NEW YORK, NEW YORK

15                    OCTOBER 13, 2022

16

17

18

19

20

21

22

23

24    REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25    JOB NO. 218341
```

Page 21

1                    NATASHA STOYNOFF

2        A.  I walked in and he -- I walked into the

3   room first and I'm looking around the room wondering

4   what does he want to show me.  Nice room, what does

5   he want to show me.  Then I hear the door close

6   behind me and I turn around and he's right here

7   (indicating), and he grabs my shoulders and pushes

8   me against this wall and starts kissing me.

9        Q.  And did he say anything when he started

10  kissing you?

11       A.  No.

12       Q.  Did he say anything before?

13       A.  Not that I recall.

14       Q.  And what was going through your mind when

15  Donald Trump did this?

16       A.  Complete shock.  Thank you.  Complete shock

17  because it was very fast and I was taken -- taken by

18  surprise.

19       Q.  And do you recall how you reacted?

20       A.  I recall pushing him back twice.  I recall

21  trying to say something, but not really being able

22  to.  I was so flustered.

23       Q.  And when you pushed him back the first time

24  do you recall how Donald Trump reacted?

25       A.  Yes.  He just came toward me again.

A-1027

# EXHIBIT 4

A-1028

# EXHIBIT B

A-1029

Page 1

```
 1                    JESSICA LEEDS

 2              UNITED STATES DISTRICT COURT

 3              SOUTHERN DISTRICT OF NEW YORK

 4    ------------------------------------    )

 5    E. JEAN CARROLL,                        )

 6                    Plaintiff,              ) Case No.

 7              vs.                           ) 20-Civ-7311

 8    DONALD J. TRUMP, in his personal capacity) (LAK)(JLC)

 9                    Defendants.             )

10    ------------------------------------    )

11

12

13              DEPOSITION OF JESSICA LEEDS

14                  NEW YORK, NEW YORK

15                  OCTOBER 13, 2022

16

17

18

19

20

21

22

23

24    REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25    JOB NO. 218341
```

```
 1                   JESSICA LEEDS
 2   mean by that?
 3        A.  Well, he was with his hands grabbing me,
 4   trying to kiss me, grabbing my breasts, pulling me
 5   towards him, pulling himself on to me.  It was kind
 6   of a struggle going on.  Part of my brain was
 7   wondering why the people in the back -- in the seat
 8   behind me weren't noticing that the seat was
 9   jiggling around and why wasn't the guy that was
10   sitting across the aisle saying something or where
11   in hell was the stewardess.  That went on for what
12   seemed like a terribly long time, but it probably
13   was just a few seconds.
14           It was when he started putting his hand up
15   my skirt that I realized that nobody was going to
16   save me but me, and I was on the aisle, I managed to
17   wheel my way out of the chair, and grabbed my purse
18   and I went back to my seat in the back.
19        Q.  And did Donald Trump say anything while
20   this was happening?
21        A.  Not a word.  There was never any sound that
22   I can recall.
23        Q.  Did you say anything while this was
24   happening?
25        A.  Nope.
```

A-1031

# EXHIBIT 5

A-1032

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>                     *Plaintiff,*<br><br>        v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>                     *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S OMNIBUS MOTION IN LIMINE**

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

LEGAL STANDARD.........................................................................................1

ARGUMENT.....................................................................................................1

     I.     The Court Should Preclude Natasha Stoynoff and Jessica Leeds From
           Testifying At Trial ...............................................................................1

          A.  The Witnesses' Testimony Does Not Qualify Under The Rule 415 Exception 3

          B.  The Proposed Testimony Is Not *Modus Operandi* Evidence .........................11

          C.  Even If Otherwise Admissible, The Testimony of Ms. Stoynoff and Ms. Leeds
              as *modus operandi* evidence must be denied ..................................................13

     II.    Plaintiff's Motion *in Limine* to Exclude the Expert Report and the Testimony of
           Robert Fisher as Defendant's Rebuttal Expert Witness Should be Denied ...........14

          A.  The Defendant's Expert Report of Robert Fisher Sufficiently Rebuts the
              Plaintiff's Expert Report of Professor Ashlee Humphreys.............................14

          B.  Defendant's Expert Report from Robert Fisher Should Not be Excluded as It
              Complies with Rule 702 and the *Daubert* Case................................................16

     III.   There Is No Basis To Preclude Any Additional Information, Including Witnesses
           Identified In Defendant's Pre-Trial Order and References to DNA Evidence ......19

          A.  Reference to Plaintiff's Public Representations concerning DNA Evidence
               Must Be Permitted ........................................................................................19

          B.  All of Defendant's Trial Witnesses Should Be Permitted To Testify .............21

CONCLUSION.................................................................................................27

A-1034

## TABLE OF AUTHORITIES

*Cases*

*Badolato v. Long Island R.R,*
   2016 WL 6236311 (E.D.N.Y. Oct. 25, 2016)........................................................25

*Beech Aircraft Corp. v. Rainey,*
   488 U.S. 153 (1988)..............................................................................................17

*Carroll v. Trump,*
   Lm 00 Ag , / . . / 4*0. 01 UJ 0. . 41/0 &Q.B,L ,W Dc`, / 3*0. 01' ......................20

*Daubert v. Merrell v. Down Pharmaceuticals,*
   509 U.S. 579(1993)..........................................................................14, 16, 17, 18

*Ebert v. Nassau County,*
   No. CV 05-5445, 2008 WL 4443238,(E.D.N.Y. Sept. 26, 2008). .........................15

*Ebewo v. Martinez,*
   309 F. Supp. 2d 600 (S.D.N.Y. 2004) .......................................................23, 24, 26

*Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.,*
   2002 WL 31108380 (S.D.N.Y. Sept. 23, 2002) ....................................................24

*Harris v. Donohue,*
   2017 WL 3638452 (N.D.N.Y. Aug. 23, 2017).........................................24, 25, 26

*Hewitt v. Metro-North Commuter Railroad,*
   14-CV-8052 (AJN), 2017 WL 1155068 (S.D.N.Y. Mar. 24, 2017)................24, 25

*Highland Capitol Management LP v. Schneider,*
   370 F.Supp.2d 461 (S.D.N.Y. 2005) .......................................................................1

*Hinton v. Patnaude,*
   162 F.R.D. 435 (N.D.N.Y. 1995) .........................................................................23

*Howard University v. Borders,*
   20-CV-04716 (LJL), 2022 WL 3568477 (S.D.N.Y. Aug. 17, 2022) ...............23, 24

*Hynes v. Coughlin,*
   79 F.3d 285 (2d Cir.1996) ......................................................................................3

*In re Resuling Prod. Liab. Litig.,*
   309 F. Supp.2d 531 (S.D.N.Y. 2004) ....................................................................15

*Johnson v. Elk Lake School Dist.,*
    283 F. 3d 138 (3d Cir. 2002) ..........................................................................................10

*Kunstler v. City of New York,*
    242 F.R.D. 261 (S.D.N.Y. 2007) ...............................................................................23, 24

*Laspata DeCaro Studio Coporation v. Rimowa GmbH,*
    16-cv-934 (LGS), 2018 WL 3059650 (S.D.N.Y. June 20, 2018)...........................23

*Marvel Worldwide, Inc. v. Kirby,*
    777 F. Supp. 2d 720 (S.D.N.Y. 2011) ...........................................................22, 23

*Mugavero v. Arms Acres, Inc.,*
    03-CV-5724, 2009 WL 1904548 (S.D.N.Y. July 1, 2009)....................................25

*Palmieri v. Defaria,*
    88 F.3d 136 (2d Cir. 1996) ..........................................................................................1

*Rapp v. Fowler,*
    20-CV-9586 (LAK), 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022)............3, 5, 7, 8, 10, 13, 14

*United States v. Barnason,*
    825 F.Supp.2d 367 (S.D.N.Y. 2012) .................................................................3, 4

*United States v. Benedetto,*
    571 F.2d 1246 (2d Cir. 1978) ..............................................................................11, 12

*United States v. Brand,*
    467 F.3d 179 (2d Cir. 2006) ....................................................................................9

*United States v. Campbell,*
    300 F.3d 202 (2d Cir. 2002) ..................................................................................11

*United States v. Crowley,*
    318 F.3d 401 (2d Cir. 2003). ...................................................................................9

*United States v. Curley,*
    639 F.3d 50 (2d Cir. 2011) .......................................................................................3

*United States v. Danzey,*
    594 F.2d 905 (2d Cir.). .............................................................................................12

*United States v. Downing,*
    297 F.3d 52 (2d Cir. 2001) ......................................................................................2

A-1036

*United States v. Dupree,*
    706 F.3d 131 (2d Cir. 2013). ............................................................1

*United States v. Dukagjini,*
    326 D.3d 45 (2d Cir. 2003) ............................................................14

*United States v. Duncan,*
    42 F.2d 359 (2d Cir. 1992) ............................................................14

*United States v. Flam,*
    369 F.3d 154 (2d Cir. 2004) ............................................................2

*U.S. v. Frederick,*
    702 F. Supp. 2d 32 (E.D.N.Y. 2009) ............................................................20

*United States v. Garcia,*
    291 F.3d 127 (2d Cir. 2002) ............................................................11

*United States v. Hourihan,*
    66 F.3d 458 (2d Cir. 1995) ............................................................9

*United States v. Livoti,*
    196 F.3d 322 (2d Cir.1999). ............................................................2

*United States v. Manley,*
    632 F.2d 978 (2d Cir.1980) ............................................................9, 10

*United States v. McCallum,*
    584 F.3d 471 (2d. Cir. 2009) ............................................................11

*United States v. Mills,*
    895 F.2d 897 (2d Cir. 1990) ............................................................12

*United States v. Neary,*
    733 F.2d 210 (2d Cir. 1984) ............................................................12

*United States v. Porterfield,*
    20-CR-42-A, 2022 WL 17091256 (W.D.N.Y. Nov. 21, 2022)............................................................8

*United States v. Pugh,*
    937 F.3d 108 (2d. Cir. 2019) ............................................................10

*United States v. Reese,*
    933 F.Supp.2d 579 (S.D.N.Y.2013) ............................................................12

*United States v. Rosa,*
11 F.3d 315 (2d Cir. 1993) ............................................................................9

*United States v. Schᵢⱼfer,*
851 F.3d 166 (2d Cir. 2017) ..........................................................................4

*United States v. Spoor,*
904 F.3d 141 (2d Cir. 2018) ..........................................................................3

*United States v. Williams,*
205 F.3d 23 (2d Cir.2000) .............................................................................2

*Universe Antiques, Inc. v. Vareika,*
10-cv-3629, 2011 WL 5117057 (S.D.N.Y. Oct. 21, 2011) ...................................25

*Ventra v. United States,*
121 F. Supp. 2d 326 (S.D.N.Y. 2000) ..........................................................23

## Rules and Statutes

Fed. R. Evid. 402 ....................................................................................1, 13, 14

Fed. R. Evid. 403 .............................................................................1, 2, 13, 14, 20

Fed. R. Evid. 404(b)..........................................................................2, 3, 11, 12, 13, 14,

Fed. R. Evid. 415(a)..........................................................................3, 4, 9, 10, 11, 14,

Fed. R. Evid. 413(d)..........................................................................4, 5, 7, 8, 9, 10

Rule 26(a)(2)(D)(ii) ...........................................................15, 16, 21, 22, 24, 25, 26

Fed. R. Evid. 702 ...............................................................15, 16, 17, 18, 19, 20

18 U.S.C. chapter 109A ................................................................................4, 5, 7

18 U.S.C. §§ 2241, 2242, 2243, and 2244 ..........................................................5

18 U.S.C.A. § 7 ...........................................................................................7

Federal Practice and Procedure § 2049.1 (3d ed. 2010) ............................................22

Fed. R. Civ. P. 37(c) ...................................................................................24

Federal Practice and Procedure § 26.27[2][d] at 26-93 ...........................................24

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in opposition to the omnibus motion *in limine* filed by the plaintiff, E. Jean Carroll ("Plaintiff"), on February 2016, 2023 (the "Motion"). For the reasons set forth herein, the Motion should be denied.

## LEGAL STANDARD

It is well-established that a district court may determine evidentiary issues in motions *in limine* prior to the commencement of trial. *See, e.g., United States v. Dupree*, 706 F.3d 131, 135 (2d Cir. 2013). "The purpose of an *in limine* motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). In deciding a motion *in limine*, the Court should exclude evidence that is clearly inadmissible on all potential grounds. *Highland Capitol Management LP v. Schneider*, 370 F.Supp.2d 461 (S.D.N.Y. 2005); *see also* Fed. R. Evid. 402. Further, under Rule 403, even otherwise relevant evidence should be found inadmissible where it "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Accordingly, for the reasons set forth herein, Plaintiff's omnibus motion *in limine* must be denied in its entirety.

## ARGUMENT

### I. The Court Should Preclude Natasha Stoynoff and Jessica Leeds From Testifying At Trial.

In her Motion, Plaintiff attempts to argue that the Court should admit the testimony of two proposed witnesses, Natasha Stoynoff and Jessica Leeds, each of whom intend to offer testimony concerning alleged prior encounters they claim to have had with Defendant. Plaintiff's position,

A-1039

however, is unavailing since the introduction of this type of propensity evidence is clearly foreclosed by the Rules of Evidence and governing case law.[1]

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Pursuant to this Rule, "[e]vidence of prior criminal conduct is admissible under Federal Rules of Evidence 404(b) and 403 if it is relevant to an issue at trial *other than the defendant's character*, and if its probative value is not substantially outweighed by the risk of unfair prejudice." *United States v. Williams,* 205 F.3d 23, 33 (2d Cir.2000) (citing *United States v. Livoti,* 196 F.3d 322, 326 (2d Cir.1999)) (emphasis added). The Second Circuit has clarified that, for 'other act' evidence to be properly admitted under Rule 404, the following requirements must be satisfied: "(1) it [is] offered for a proper purpose; (2) it [is] relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court [gives] an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. Flam*, 369 F.3d 154, 156 (2d Cir. 2004) (citing *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2001).

Here, Plaintiff readily admits that the proposed testimony of Ms. Stoynoff and Ms. Leeds qualifies as 'other act' evidence prohibited by Rule 404(b)(1). Indeed, there is no reasonable dispute that the testimony of these two witnesses, Ms. Stoynoff and Ms. Leeds, constitutes anything other than propensity evidence, since Plaintiff admittedly seeks to introduce their testimony to as a means of showing that it is "*more likely* that [Defendant] sexually assaulted [Plaintiff][.]" *See* Pl. Mem. at 10 (ECF No. 134). Therefore, absent an exception to Rule 404(b)(1),

---

[1] Additional argument explaining why the testimony of these two witnesses is improper—and must be deemed inadmissible—is set forth in Defendant's Memorandum of Law in support of Motions *in Limine* (ECF No. 131), which Defendant incorporates by reference herein.

2

A-1040

this evidence is barred as a matter of law. *See, e.g., United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (citing Fed. R. Evid. 404(b)) ("Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense." *Curley*, 639 F.3d at 57 (citing Fed. R. Evid. 404(b)); *see also Hynes v. Coughlin,* 79 F.3d 285, 290 (2d Cir.1996) (character evidence inadmissible to show "propensity"); *United States v. Barnason*, 825 F.Supp.2d 367, 371 (S.D.N.Y. 2012) ("In general, 'propensity' evidence is inadmissible.") (citing Fed. R. Evid. 404(b)); *Rapp v. Fowler*, 20-CV-9586 (LAK), 2022 WL 5243030, at \*1 (S.D.N.Y. Oct. 6, 2022) ("Evidence to show propensity in most circumstances is precluded by the Federal Rules of Evidence.").

Plaintiff, unsurprisingly, ventures to claim that two exceptions apply in the instant scenario. First, she contends that the testimony of Ms. Stoynoff and Ms. Leeds qualify as evidence of "other sexual assault," which is admissible pursuant to Rule 415. Second, Plaintiff argues that said testimony is admissible under Rule 404(b)(2) as evidence of an apparent *modus operandi*. Both arguments miss the mark and are predicated upon misapplied principles of law.

### A. The Witnesses' Testimony Does Not Qualify Under The Rule 415 Exception

Plaintiff contends that the testimony of both Ms. Stoynoff and Ms. Leeds should be deemed admissible pursuant to Rule 415, which sets forth a narrow exception to the prohibition on propensity evidence. In straining to arrive at this conclusion, Plaintiff raises disingenuous arguments, distorts the applicable standard of law, and mischaracterizes operative case law – including prior decisions rendered by this Court.

Rule 415 "reflects an exception in prosecutions for sex crimes to the common law practice of excluding propensity evidence." *United States v. Spoor*, 904 F.3d 141, 154 (2d Cir. 2018) (citing *United States v. Schaffer*, 851 F.3d 166, 178-79 (2d Cir. 2017)).

3

A-1041

Rule 415(a) provides, in relevant part:

> In a civil case involving a claim for relief based on a party's alleged sexual assault or child molestation, the court may admit evidence that the party committed any other sexual assault or child molestation. The evidence may be considered as provided in Rules 413 and 414.

Fed. R. Evid. 415(a).

As Plaintiff correctly acknowledges, for evidence to qualify under Rule 415, two requirements must be satisfied: (1) the subject action must be "based on" a "sexual assault"; and (2) the conduct alleged by the nonparty accuser must qualify as a "sexual assault" under Rule 413(d). *See* Pl. Mem. at 6 (ECF No. 134) (citing *Barnason*, 825 F. Supp. 2d at 372). Here, contrary to Plaintiff's contention, neither condition is satisfied.

*First*, as detailed at length in Defendant's Memorandum of Law in support of Motions *in Limine*, which is incorporated by reference herein, this Court should adopt the 'categorical approach' endorsed by the Wright & Miller treatise. Under this approach, the instant action is not "based on" a sexual assault since Plaintiff's sole claim sounds in defamation. *See* ECF No. 131 at 5-6.

*Second*, none of the conduct alleged by either proposed witness, Ms. Stoynoff or Ms. Leeds, meets the statutory definition of a "sexual assault" under Rule 415. The term "sexual assault" is derived from Rule 413(d), which defines it as conduct that is "a crime under federal law or under state law" and which also involves:

> (1) any conduct prohibited by 18 U.S.C. chapter 109A;

> (2) contact, without consent, between any part of the defendant's body — or an object — and another person's genitals or anus;

> (3) contact, without consent, between the defendant's genitals or anus and any part of another person's body;

4

(4) deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or

(5) an attempt or conspiracy to engage in conduct described in subparagraphs (1)–(4).

Fed. R. Evid. 413(d).

Contrary to Plaintiff's claim that "[o]f the five proscribed categories, the most directly applicable ones to this case are Rule 413(d)(1) and (d)(2)," Pl. Mem. at 6 (ECF No. 134), neither provision is applicable here.

With respect to Rule 413(d)(1)—which encompasses "any conduct prohibited by 18 U.S.C. chapter 109A"—Plaintiff points to this Court's holding in *Rapp v. Fowler*, No. 20-cv-9586 (LAK), 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022) to claim that the proposed testimony need only meet the statutory definition of "sexual contact" contained in 18 U.S.C. chapter 109A. However, this position is based upon an incorrect reading of this Court's decision in *Rapp* because Plaintiff overlooks the jurisdictional requirement of 18 U.S.C. chapter 109A.

18 U.S.C. chapter 109A is comprised of eight sections, four of which are relevant to Rule 413(d)(1) since they criminalize various type of sexual conduct – 18 U.S.C. §§ 2241, 2242, 2243, and 2244.[2] Each of these sections contain a uniform limiting principle, namely that they only apply to conduct that occurs "*in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency.*" *See* 18 U.S.C. §§ 2241(a)-(b), 2242, 2243(a)-(b)[3], and 2244(a)-(b) (emphasis added).

---

[2] Section 2245 also criminalizes certain conduct, but it is plainly inapplicable here since it requires an allegation of murder. *See* 18 U.S.C. § 2245.

[3] Section 2243(c) is the only provision which does not contain the identical territorial jurisdiction language, but it requires the actor to have been "acting in their capacity as a Federal law enforcement office" so it clearly has no application here.

5

The "special maritime and territorial jurisdiction of the United States," in turn, is confined to the following areas:

(1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

(2) Any vessel registered, licensed, or enrolled under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes, or any of the waters connecting them, or upon the Saint Lawrence River where the same constitutes the International Boundary Line.

(3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

(4) Any island, rock, or key containing deposits of guano, which may, at the discretion of the President, be considered as appertaining to the United States.

(5) Any aircraft belonging in whole or in part to the United States, or any citizen thereof, or to any corporation created by or under the laws of the United States, or any State, Territory, district, or possession thereof, while such aircraft is in flight over the high seas, or over any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

(6) Any vehicle used or designed for flight or navigation in space and on the registry of the United States pursuant to the Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies and the Convention on Registration of Objects Launched into Outer Space, while that vehicle is in flight, which is from the moment when all external doors are closed on Earth following embarkation until the moment when one such door is opened on Earth for disembarkation or in the case of a forced landing, until the competent authorities take over the responsibility for the vehicle and for persons and property aboard.

(7) Any place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States.

(8) To the extent permitted by international law, any foreign vessel during a voyage having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States.

(9) With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act . . . the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

18 U.S.C.A. § 7.

Notably, neither Ms. Stoynoff nor Ms. Leeds testified that their alleged encounters with Defendant took place in any of the above-enumerated locations considered to be within the "special maritime and territorial jurisdiction of the United States." Ms. Stoynoff claimed that her purported interaction with Defendant occurred at his Mar-a-Lago residence in Palm Beach, Florida, *see* Habba Decl., Ex. A , which is plainly not covered by 18 U.S.C.A. § 7. As for Ms. Leeds, although she claimed that her alleged experience with Defendant occurred on an aircraft, she stated that it was a *domestic* flight that was traveling from Dallas to New York. *See* Habba Decl., Ex. B. Thus, subsection (4) of 18 U.S.C.A. § 7 is not applicable to her claim, nor is any other subsection of the statute. As a result, since neither Ms. Stoynoff nor Ms. Leeds will testify about an event that occurred in the "special maritime and territorial jurisdiction of the United States," the subject matter of their testimony cannot possibly be concerning "conduct prohibited by 18 U.S.C. chapter 109A." Fed. R. Evid. 413(d)(1). Therefore, 413(d)(1) has no application here.

Further, contrary to Plaintiff's contention, this Court's decision in *Rapp* only solidifies this point. In *Rapp*, this Court noted that the definition of "sexual contact"—which Plaintiff so heavily relies upon—is only relevant "*if all of the other elements of Section 2244's predicates are*

7

*satisfied.*" *Rapp*, 2022 WL 5243030, at *2 (emphasis added). One of those elements is the requirement that the conduct occur "in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency." 18 U.S.C. 2244; *see also United States v. Porterfield*, 20-CR-42-A, 2022 WL 17091256, at *8 (W.D.N.Y. Nov. 21, 2022) (noting that the "federal jurisdiction element [must] be met" to establish a violation of 18 U.S.C. § 2244(a)). Since that is clearly not the case in the instant matter, Rule 413(d)(1) does not apply.

As for Rule 413(d)(2)—as discussed at length in Defendant's Memorandum of Law in Support of his Motions *in Limine*—there is simply no testimony from either Ms. Stoynoff or Ms. Leeds which alleges that Defendant engaged in any conduct purportedly involving contact between any party of Defendant's body and the genitals or anus of either woman. Therefore, Rule 413(d)(2) has no relevance to the proposed testimony of either witness.

Plaintiff also makes a half-hearted attempt to argue that Rule 413(d)(5) applies because, according to Plaintiff, "both women indicate in their testimony that [Defendant] would have continued his assault had he not been stopped." *See* Pl. Mem. at 7-8 (ECF No. 134). This argument is unavailing because there is simply no support for Plaintiff's bald assertion; indeed, despite claiming that their position is supported by the witnesses' testimony, Plaintiff fails to cite to either deposition transcript in support of her claim that both women alleged that Defendant "would have continued his assault had he not been stopped." *Id.* This omission speaks volumes – neither transcript contains any such testimony.

Plaintiff's misleading assertion aside, Rule 413(d)(5) is irrelevant because neither of the witnesses' testimony are sufficient to show that Defendant attempted to commit any of the acts

enumerated in Rule 415(d)(1) through (d)(4). *See* Fed. R. Evid. 413(d)(5) (requiring a showing of "an attempt or conspiracy to engage in conduct described in subparagraphs (1)–(4)."). To establish that an individual attempted to commit a crime, it must be shown that said individual "intend[ed] to commit the crime and t[ook] a 'substantial step' towards its completion." *United States v. Hourihan*, 66 F.3d 458, 462 (2d Cir. 1995) (citing *United States v. Rosa,* 11 F.3d 315, 337 (2d Cir. 1993). Here, Plaintiff is unable to satisfy either element.

To establish intent, it is necessary to "prove that the defendant intended to engage in conduct constituting a crime." *United States v. Crowley*, 318 F.3d 401, 408 (2d Cir. 2003). Neither woman has offered any testimony to this effect. They both testified that there was no verbal communication between themselves and Defendant during the alleged encounters, and neither alleged any facts which tend to show that Defendant had intended to initiate non-consensual contact with their genitals or anus. *See* Habba Decl., Ex. A at tr. 21:9-13 (Q: And did he say anything when he started kissing you? A: No. Q: Did he say anything before? A: Not that I recall."); Habba Decl., Ex. B at tr. 19:19-25 ("Q: And did [Defendant] say anything while this was happening? A: Not a word. There was never any sound that I can recall. Q: Did you say anything while this was happening? A: Nope."). Therefore, the intent element fails cannot be satisfied with respect to either witness.

As for second element, "[a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime." *United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980). The step "must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *United States v. Brand*, 467 F.3d 179, 202 (2d Cir. 2006) (citing

*Manley*, 632 F.2d at 987-988. "In determining whether conduct constitutes the requisite 'substantial step,' 'the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished. . . .'" *United States v. Pugh*, 937 F.3d 108, 119 (2d. Cir. 2019) (quoting *Manley*, 632 F.2d at 987).

Here, neither Ms. Stoynoff nor Ms. Leeds have alleged that Defendant took any "substantial step" towards violating Rule 413(d)(1) through (d)(4). Ms. Stoynoff's testimony—which alleges that Defendant "grabb[ed] [her] shoulders and push[ed] [her] against [a] wall and start[ed] kissing [her]"—simply does not implicate that Defendant sought to initiate non-consensual contact with her genitals, or any other conduct that fits the statutory definitions of "other sexual assault" set forth in Rule 413(d). *See* Habba Decl., Ex. A at tr. 21:7-8. As for Ms. Leeds, she testified that her supposed encounter with Defendant lasted "just a few seconds" and did not involve any contact, or attempted contact, with either party's genitals. Habba Decl., Ex. B. at tr. 19:13. While she did claim that Defendant "started putting his hands up [her] skirt," this non-descript account, without more, is insufficient to establish that Defendant took a "substantial step" towards violating Rule 415(d), particularly since she failed to indicate whether Defendant's hands made any contact with her body and, if so, how far the contact was from her genitals, what direction his hands were moving, how quickly they were moving, or any other relevant details that would provide a basis to infer that Defendant intended to initiate non-consensual contact with her genitals. *See Rapp*, 2022 WL 5243030, at *2 (finding that testimony that defendant placed his "'hand on [the deponent's] leg . . . about two inches above [his] knee' and remained there for 'maybe 30 to 45 seconds'" is "not evidence of an 'other sexual assault' within the meaning of Rule 415(a), regardless of the question of intent."); *see also Johnson v. Elk Lake School Dist.*, 283 F. 3d 138, 156 (3d Cir. 2002) ("Where a past act cannot be shown with reasonable certainty, its probative

value is reduced and it may prejudice the defendant unfairly, confuse the issues, mislead the jury, and result in undue delay and wasted time.").

Based on the foregoing, the testimony of Plaintiff's proposed witnesses, Ms. Stoynoff and Ms. Leeds, do not fall within the purview of Rule 415. Therefore, this evidence must be excluded from trial.

### B.  The Proposed Testimony Is Not *Modus Operandi* Evidence

While it is true that the Second Circuit takes an "inclusionary approach" to Rule 404(b)(2) evidence, this approach does not permit a party "to offer, carte blanche, any prior act of the defendant in the same category of [activity]." *United States v. McCallum*, 584 F.3d 471, 475 (2d. Cir. 2009) (quoting *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002)). The party seeking to introduce evidence under Rule 404(b)(2) "must do more than demonstrate that the evidence is not offered solely to show that the defendant is a bad person," *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir. 1978); she must show that one of the specifically enumerated exceptions to Rule 404(b)(2) applies.

Plaintiff contends that the testimony of Ms. Stoynoff and Ms. Leeds should be admitted as *modus operandi* evidence. The justification for permitting *modus operandi* evidence under Rule 404(b)(2) is "to prove the identity of the defendant as the person who committed the offense being prosecuted," which is established by demonstrating that the crime fits within a unique pattern of conduct attributable to the defendant. *United States v. Campbell*, 300 F.3d 202, 215 (2d Cir. 2002). As explained by the Second Circuit:

> Evidence of a person's prior similar acts is probative on the issue of identity, only when his commission of other acts tends to show that he had a design or plan to commit the act alleged. For the prior similar acts to be probative of identity there must be "a high degree of similarity ... [leading] to the logical inference, by virtue of the combination of common features, that a common plan or design was at the basis for all the [criminal acts] and hence that it was the [defendant] who committed

this [criminal act]." *United States v. Danzey,* 594 F.2d 905, 913 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). Indeed, as we have previously noted, "evidence of other crimes offered to prove identity or common plan or design must be more similar than when those crimes are offered to prove intent." *Id.* at 913 n. 6. The more unique and unusual are the common characteristics of the similar acts involved, the more probative become the prior acts, since they then are sufficiently distinctive to be viewed as "fingerprints" or "signatures" of the person charged. *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir.1978).

*United States v. Neary*, 733 F.2d 210, 216 (2d Cir. 1984).

To qualify as evidence of a *modus operandi*, the alleged conduct must "share enough characteristics with the charged offenses that they share the 'signature' required for use in establishing a modus operandi under Rule 404(b)," *United States v. Reese,* 933 F.Supp.2d 579, 582 (S.D.N.Y. 2013) (citing *United States v. Danzey,* 594 F.2d 905, 911 (2d Cir.1979)). In other words, the evidence sought to be introduced must show be that of a "signature crime,' *i.e.*, a *modus operandi* where the crimes are 'so nearly identical in method as to ear-mark them as the handiwork of the accused.'" *United States v. Mills*, 895 F.2d 897, 907 (2d Cir. 1990). "[M]uch more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts . . . *[t]he device used must be so unusual and distinctive as to be like a signature*." *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir. 1978) (emphasis in original).

In the instant scenario, Plaintiff's position that the conduct alleged by Ms. Stoynoff and Ms. Leeds is so distinct that it should be viewed as a "signature crime" is plainly without merit. *Mills*, 895 F.2d at 907. Indeed, the purported *modus operandi* that Plaintiff seeks to attribute to Defendant—sexually assaulting a woman and then subsequently denying it—is (unfortunately) not conduct that can be considered unique in our society.[4] It certainly is not the type of distinct

---

[4] Plaintiff acknowledges as much in her Complaint by repeatedly stressing her belief that sexual assault is "pervasive" in modern society and that "powerful" men are often not held accountable for such acts. *See generally* Complaint (ECF No. 1).

and identifiable conduct that can be "ear-mark[ed] . . . as the handiwork" of Defendant to charge

him as the only perpetrator who could have possibly committed the act in question. *Id.* At most,

the testimony of the two witnesses would merely purport to show the "repeated commission of

crimes of the same class," which falls well short of qualifying as a *modus operandi*.

Further, Plaintiff's contention that she seeks to introduce the testimonial evidence because

"it makes it *more likely* that [Defendant] sexually assaulted [Plaintiff] and then lied when he denied

having done so," Pl. Mem. at 10 (ECF No. 134), reveals her true intention – to introduce the

evidence solely for the purpose of establishing propensity. As such, Plaintiff's request should be

rejected for the same reason this Court declined to admit propensity evidence in *Rapp v. Fowler*:

> Plaintiff here argues that the evidence . . . is pertinent to whether Mr. Fowler's
> interaction with Mr. Rapp was motivated by Mr. Fowler's desire to gratify either
> his own or Mr. Rapp's sexual desire or to degrade or abuse Mr. Rapp or,
> alternatively, to corroborate Mr. Rapp's testimony concerning his encounter with
> the Mr. Fowler. The second of these arguments really amounts to saying that the
> evidence is offered precisely for the prohibited purpose of showing Mr. Fowler's
> character in order to show that he acted in accordance with that character on a
> different occasion — is offered purely to show propensity. And the probative value
> of the first argument, if it has any, would be outweighed quite substantially by the
> risk that the jury would consider the evidence regarding Mr. Dawes purely or
> predominantly for the unfair, and prejudicial purpose foreclosed by Rule 404(b)(1).

*Rapp*, 2022 WL 5243030, at *2.

Therefore, Plaintiff's request to introduce the testimony of Ms. Stoynoff and Ms. Leeds

as *modus operandi* evidence must be denied.

## C. Even If Otherwise Admissible, The Testimony Of Ms. Stoynoff and Ms. Leeds Must Be Precluded Under Rules 402 and 403

Assuming *arguendo* that one or both of the proposed testimonies of Ms. Stoynoff and/or

Ms. Leeds qualify under either the Rule 415 or Rule 404(b)(2) exceptions—which they do not—

such evidence is nonetheless inadmissible under Rules 402, due to irrelevance, and under 403,

since the probative value of such evidence is substantially outweighed by its potential for unfair

prejudice. These arguments are fully set forth in Defendant's Memorandum of Law in support of

Motions *in Limine* (ECF No. 131), and Defendant fully incorporates them by reference herein. *See*

*also Rapp*, 2022 WL 5243030, at *2 (finding testimony of prior sexual assault, which was

inadmissible under Rule 415, was likewise inadmissible under Rule 404(d)(2) because it was

"offered purely to show propensity" and because its probative value was "quite substantially

outweighed by the risk that the jury would consider the evidence regarding [the witness] purely or

predominantly for the unfair, and prejudicial purpose foreclosed by Rule 404(b)(1).").

II.   **Plaintiff's Motion *in Limine* to Exclude the Expert Report and the Testimony of Robert Fisher as Defendant's Rebuttal Expert Witness Should Be Denied**

A.   **The Defendant's Expert Report of Robert Fisher Sufficiently Rebuts the Plaintiff's Expert Report of Professor Ashlee Humphreys**

Plaintiff seeks to exclude Robert Fisher ("Fisher") as an expert witness in this litigation

due to his purported failure to properly rebut the report of Plaintiff's proposed expert Professor

Ashlee Humphreys.  This argument is wholly without merit, as set forth more fully below.

A court maintains full discretion to determine whether expert testimony will be admitted.

*See United States v. Duncan,* 42 F.2d 359 (2d Cir. 1992) (internal citations omitted).  Further, the

Federal Rules of Evidence "provide a liberal standard for the admissibility of expert testimony."

*United States v. Dukagjini,* 326 D.3d 45, 52 (2d Cir. 2003) (citing *Daubert v. Merrell v. Down*

*Pharmaceuticals,* 509 U.S. 579, 588 (1993).

As such, "[o]ne of the fundamental requirements of Rule 702 is that the proposed testimony

'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *In re Resuling*

*Prod. Liab. Litig.,* 309 F. Supp.2d 531, 540 (S.D.N.Y. 2004) (quoting Rule 702).

As stated in Plaintiff's moving papers, under Rule 26(a)(2)(D)(ii), a party may submit

expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter

identified by another party." However, "[a] rebuttal report is not the proper 'place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice." *Ebert v. Nassau County,* No. CV 05-5445, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (citations omitted).

Despite Plaintiff's assertions to the contrary, the content of Fisher's expert report **does** proffer evidence that effectively "contradicts or rebuts evidence" provided by Professor Humphreys in her proposed expert report. With respect to her qualifications as a potential expert, Fisher emphasizes that Professor Humphreys "does not indicate that she has any professional background, experience or expertise in reputation management, damage or repair – which are the center of this case." *See* Habba Decl., Ex. C at 2.

Regarding Professor Humphreys' methodology in preparing her report, Fisher emphasizes:

It [is] also important to note that internet exposure (and even media exposure) is a form of 'indirect' communications meaning that the receiver is not getting the message directly from the sender. The most effective form of communications is "direct" contact. There are many ways to do this (e.g., direct verbal conversations, letters, emails, speaking engagements, appearances at events) and does not appear that any form of direct communications is in Humphreys' program.

Habba Decl., Ex. C at 10.

Additionally, on page eight of his expert report, Fisher rebuts Professor Humphreys' definition of "reputation" and counters by stating that "[a] more appropriate definition of reputation would be that a reputation is the sum of all our actions that is reflected by the people around us in the way they treat us or interact with us. It is an indirect result of anything and everything that we do. Successful people have always stressed on the building and maintaining of reputation as a fundamental ingredient to success. This distinction is important in relation to the claims made by Carroll against Trump." *Id.*

15

A-1053

Further, with respect to the reputational repair program proffered by Professor Humphreys and the methodology to support her conclusions, Fisher opines that "[h]aving almost the entire program geared to online exposure is equivalent to 'putting all your eggs in one basket.' The most successful type of communications program features dissemination of information through multiple communications channels." *Id.*

On that point, Fisher further rebuts Humphreys' report by stating that "the most effective ways to do this (e.g., direct verbal conversations is 'direct' contact. There are many ways to do this (e.g., direct verbal conversations, letters, emails, speaking engagements, appearances at events) and it does not appear that any form of direct communications is in Humphreys' program." *Id.*

Based upon the foregoing, Plaintiff's argument is meritless. In compliance with Rule 26(a)(2)(D)(ii), Rule 702, and applicable and supporting case law, it is clear that the expert report of Robert Fisher effectively "contradicted or rebutted" the opinions set forth by Professor Humphreys. Furthermore, the rebuttal report set forth by Fisher is supported by sufficient and compelling evidence, as set forth above. Accordingly, Fisher's expert testimony should be admitted at the time of trial, and Plaintiff's Motion *in Limine* should be denied.

### B. Defendant's Expert Report from Robert Fisher Should Not be Excluded as It Complies with Rule 702 and the *Daubert* Case

Plaintiff also seeks to preclude Robert Fisher from testifying as an expert at trial due to his purported failure to comply with the case of *Daubert v. Merrell v. Dow Pharmaceuticals,* 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence. Plaintiff's contentions in this regard are similarly unpersuasive and should be summarily dismissed by this Court.

As set forth above, the applicable Rule of Evidence governing expert testimony is Fed. R. Evid. 702. In applying Rule 702, "general acceptance" is not a prerequisite to admissibility. *See*

*Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169 (1988).  On that point, the Supreme Court of the United States held that a rigid "general acceptance" requirement would be contrary to the "liberal thrust" of the Federal Rules and the Court's "general approach of relaxing the traditional barriers or 'opinion' testimony." *Beech Aircraft Corp,* 488 U.S. at 169 (citing Rules 701 to 705).

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. In analyzing the requirements set forth in Rule 702, it is essential to note that not all five elements need to be complied with in order to comply with Rule 702 – only one of the five elements need to be satisfied.  *See Daubert v. Merrell v. Dow Pharmaceuticals,* 509 U.S. 579 (1993).

Therefore, regarding the requirements set forth by Rule 702, it is respectfully submitted that Fisher meets three of these elements: knowledge, skill and experience.  As such, Robert Fisher clearly qualifies as an expert in this litigation and his expert testimony should be admitted.

With respect to the "skill element" set forth in Rule 702, Fisher testified during his deposition that he received several awards and honors throughout his career.  Specifically, he received awards from the Public Advisors Society of America and the Public Communicators of Los Angeles. *See* Habba Decl., Ex. D at tr. 41:5-42:4.

In particular, Fisher testified that one of the multiple awards he received in the reputational damage field was when he repaired the damaged reputation of the brothel industry in Nevada and rehabilitated its perception overall in the community. *Id.* at tr. 42:5 – 43:22.  Additionally, Fisher testified that he "managed to short-circuit the eviction of [tenants of an upscale condo complex,

Marina Del Verde] by creating a reputational damage program to repair the tenants' reputation and allow them to remain as tenants in this condo complex. *Id.* at tr. 43:23-44:9.

Regarding the "experience element" set forth in Rule 702, Fisher further testified to his extensive experience in public relations, which is essential when analyzing situations involving reputational harm and reputational damage repair. *Id.* at tr. 49:12-50:15. With respect to his expertise in public relations, Fisher's expert report states that he has 50 years of experience as a public relations professional and during that time period, "80 to 100 [of his clients] had issues relating to a damaged reputation crisis situation that negatively impacted their reputation.

Additionally, throughout his lengthy and extensive career, Fisher "acquired a significant national reputation with both the legal profession and the news media as a preeminent expert in crisis communications and reputation damage and repair…." *See* Habba Decl., Ex. C at 1.

Fisher also satisfied the "knowledge element" of Rule 702 through his deposition testimony. Specifically, Fisher testified to the following:

Q:     And – and what data do you rely upon to determine what the best media is for your target audience in terms of credibility and the other things you mentioned?

A:     Knowledge. I've been in this business 50 years. A reporter for "The New York Times", I was in journalism – I know the media, I know which media – who the media are, I know what they do, I know who they reach out to, I know who reads them or listens to them, I know that – for instance, if I had something from Mr. Trump back in the day, I wouldn't go to MSNBC for it,, I would go to FOX, you know or now Newsmax or America One [sic] or whatever..

          But the bottom line is I – I have knowledge; that's why I'm an expert. I have 50 years of knowledge of working with the media. Most of them were around 50 years ago. "New York Times" was around 50 years ago, so was the Washington Post, so was ABC, so was AP, so was Wall Street Journal. I don't need to consult textbooks or media guides – again, we're just talking about news media at this point. I don't need to consult them to kno?w who – who the movers and shakers are or where I need to be.

*See* Habba Decl., Ex. D at tr. 313:4-314:3.

Thus, as set forth above, although only one out of five elements are required to be shown under Rule 702 to be permitted to provide expert testimony, Fisher clearly establishes three of those elements: knowledge, experience and skill. As such, it is respectfully requested that Fisher's expert testimony should be admitted at trial and Plaintiff's Motion *in Limine* should be denied.

Accordingly, as set forth herein and as evidenced by the contents of Robert Fisher's expert report and deposition testimony, Robert Fisher should be admitted as an expert rebuttal witness for this litigation, as his expert report clearly complies with Rule 702 and the *Daubert* case. Consequently, Plaintiff's Motion *in Limine* should be denied.

### III. There Is No Basis To Preclude Any Additional Information, Including Witnesses Identified In Defendant's Pre-Trial Order and References to DNA Evidence

#### A. Reference to Plaintiff's Public Representations concerning DNA Evidence Must Be Permitted.

Plaintiff's contention that this Court should preclude *any* testimony or commentary concerning DNA evidence is wholly unavailing. Contrary to Plaintiff's assertion, Defendant is entitled to cross-examine Plaintiff with respect to the fact that she publicly, and falsely, proclaimed that she was in possession of Defendant's DNA.

As previously stated, the Court may only exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, issue confusion, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. "Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *U.S. v. Frederick*, 702 F. Supp. 2d 32, 35 (E.D.N.Y. 2009).

In the instant matter, Defendant seeks to cross-examine Plaintiff on her prior representations to the public that she had somehow obtained Defendant's DNA. Indeed, during her deposition testimony, she candidly admitted that she publicly stated that she had his DNA. *See*

A-1057

Habba Decl., Ex. E at tr. 217:24-218:22. The probative value of Plaintiff's testimony regarding her prior representations outweighs any nominal prejudice she may claim under the Rule 403 balancing test. The fact that Plaintiff was publicly representing that she was in possession of Defendant's DNA, when she in fact was not, goes towards her motivation and tends to show that she was seeking to attract media attention and bolster her story in the public eye. Indeed, a jury could view this evidence as a significant and probative factor in support of Defendant's argument that Plaintiff manufactured her defamation claim for the purpose of garnering publicity.

As for potential undue prejudice to Plaintiff, there simply is none. For the avoidance of doubt, Defendant is not seeking to introduce an expert to opine on Plaintiff's report, nor does he intend to introduce Plaintiff's DNA report on this subject. Instead, Defendant only seeks to cross-examine Plaintiff as to public statements that she made regarding Defendant's DNA, and her motivation for making such statements. Given the limited nature of this inquiry, such testimony could not conceivably unduly prejudice Plaintiff.

Nor would such a line of inquiry encroach upon any of the concerns that this Court raised in the Order dated February 15, 2023 in *Carroll II. See Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023). Despite Plaintiff's attempt to characterize the February 15, 2023 Order as a blanket ban on any and all evidence pertaining to DNA in *Carroll II* (and, presumably, this mater), this Court's ruling was narrow in scope and merely denied Defendant's application to obtain an appendix which was attached to a DNA report that Plaintiff filed in state court. *Id*. at *3. The denial was premised upon the Court's finding that pre-trial discovery has already concluded and that such a request may delay the trial date. *Id*. at *8. The Order does not, however, purport to preclude the parties from making *any* mention of DNA at trial, nor does it specifically exclude reference to Plaintiff's numerous public assertions that she obtained

20

A-1058

Defendant's DNA, thereby prematurely condemning him of guilt[5]. Plaintiff has not argued, nor can she, that Defendant's cross-examination of Plaintiff on her own prior statements would delay this trial, nor force the parties to regale the entire history of Plaintiff's attempts to obtain Defendant's DNA. As such, Plaintiff is entitled to introduce testimony and commentary regarding this highly relevant issue.

### B. All of Defendant's Trial Witnesses Should Be Permitted To Testify

In the Motion, Plaintiff contends that Defendant should be precluded from calling five non-party witnesses identified by Defendant in the pre-trial order—namely, David Haskell, Elizabeth Dyssegaard, Erin Hobday, Laurie Abraham, and Sarah Lazin—on the basis that Defendant purportedly violated Rule 26(a)(1) by failing to amend his Initial Disclosures to identify said witnesses. This position is flawed in its premise since Plaintiff did not have any obligation to identify these witnesses because they were known to—in fact, disclosed by—Plaintiff. Further, even if there were some technical violation of Rule 26, the omission of these witnesses from Defendant's Initial Disclosures is "harmless" because their names were "known to all parties." *See* Advisory Committee Notes, 146 F.R.D. 682, 691 (1993).

Rule 26 requires parties to provide "the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information." Fed. R. Civ. P. 26(a)(1)(A). Further, Rule 26(e) requires that the parties supplement its initial disclosures "if the party learns that in some material respect the information disclosed is incomplete or incorrect, and

---

[5] For instance, Plaintiff has made numerous posts on social media claiming that the DNA evidence on "the dress" will purportedly serve as damning evidence against Defendant in this case. *See, e.g., https://twitter.com/ejeancarroll/status/1400122740720480262; https://twitter.com/ejeancarroll/status/1364995845439901700; https://twitter.com/ejeancarroll/status/1256301599426785280.*

if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).

The key language Plaintiff has conveniently overlooked is that "additional or corrective information" need only be supplemented in an initial disclosure if it "*has not otherwise been made known to the other parties* during the discovery process or in writing." *Id.* (emphasis added). Indeed, as memorialized in the Advisory Committee Notes to the 1993 Amendments, it is well established that Rule 26 imposes "*no obligation* to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition[.]" Advisory Committee Notes, 146 F.R.D. 682, 691 (1993); *see also Marvel Worldwide, Inc. v. Kirby,* 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011), *a'f'd in part, vacated in part on other grounds sub nom. Marvel Characters, Inc. v. Kirby,* 726 F.3d 119 (2d Cir. 2013) ("[T]he duty to supplement a Rule 26 disclosure is only necessary when the omitted or afteracquired information has not otherwise been made known to the other parties during the discovery process.") (*quoting* 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2049.1 (3d ed. 2010));

Consistent with this principle, it is evident that Defendant did not commit any violation of Rule 26. It is beyond dispute that Plaintiff was aware of the identities of the five witnesses and the scope of their knowledge. In fact, it was *Plaintiff* who disclosed four of those witnesses, Haskell, Dyssegaard, Abraham, and Lazin, as individuals who "have any knowledge or information about any of the allegations in the Complaint" in her answers to interrogatories. Pl. Mem. at 24 (ECF No. 134); *see also* Habba Decl., Ex. F. The fifth, Hobday, was discussed by Plaintiff in her deposition and identified as the managing editor of *Elle* and the individual who advised Plaintiff

A-1060

of her termination.[6] *See* Habba Decl., Ex. E at tr. 178:12-19.  As a result, Defendant did not have any duty to supplement his Rule 26 initial disclosures to include the identities of any of these witnesses, since Plaintiff was the one who made their identities known in the first place. *See*, *e.g.*, *Laspata DeCaro Studio Coporation v. Rimowa GmbH*, 16-cv-934 (LGS), 2018 WL 3059650 at *9 (S.D.N.Y. June 20, 2018) (finding that plaintiff had "no duty to supplement its initial disclosures" to include a witness who the defendant had "list[ed] as an individual likely to possess knowledge relevant to th[e] action."); *Howard University v. Borders,* 20-CV-04716 (LJL), 2022 WL 3568477, at *2 (S.D.N.Y. Aug. 17, 2022) (finding that plaintiff had "no obligation to supplement its initial disclosures" to identify trial witness when defendant was "well aware of [the witness's] identity and her role from the beginning of the litigation and that it was possible that [the plaintiff] might choose to use her as a witness."); *Marvel* Worldwide, 777 F. Supp. 2d at 727 ("Because [plaintiff] became aware of [declarants] at . . . depositions, [defendants] did not have a duty to supplement their Rule 26 initial disclosures.").

Moreover, even assuming *arguendo* that Defendant did commit some technical violation of Rule 26, it does not follow that preclusion of Defendant's proposed witnesses is warranted under Rule 37. "The purpose of [Rule 37] is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004). "Imposition of sanctions under Rule 37 is a drastic remedy and should only be applied in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." *Hinton v. Patnaude*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (citation omitted); *see also*

---

[6] Plaintiff was also shown communications which revealed that Ms. Hobday was involved in the internal deliberations to terminate Plaintiff, for reasons that were "shocking" to Plaintiff and which directly contradict allegations contained in the Complaint. *See* Habba Decl., Ex. E at tr. 188:25-189:19.

*Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000) ("[P]reclusion is a drastic remedy and therefore [warrants] discretion and caution."); *Kunstler v. City of New York*, 242 F.R.D. 261, 265 (S.D.N.Y. 2007) (noting that preclusion is "disfavored"); *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y. 2004) ("Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution.").

Rule 37(c) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . at trial, *unless the failure was substantially justified or is harmless*." Fed. R. Civ. P. 37(c) (emphasis added). The 1993 Advisory Committee Notes to Rule 37 emphasizes that "the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties" and clarifies that situations where violation should be considered "harmless" include, among other things, "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties." *See* Advisory Committee Notes, 146 F.R.D. 682, 691 (1993); *see also Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) ("[A] failure to disclose witness information is 'harmless' if the other party was well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial.") (quoting 6 Moore's Federal Practice § 26.27[2][d] at 26-93).

Here, any violation of Rule 26 by Defendant would clearly qualify as a "harmless" one since Plaintiff was aware of the identities of Haskell, Dyssegaard, Hobday, Abraham, and Lazin, and fully understood their relevance to this case. As such, she has no basis for arguing that they should be precluded from testifying at trial. *See, e.g., Harris v. Donohue*, 2017 WL 3638452 (N.D.N.Y. Aug. 23, 2017) (declining to preclude witnesses when "[p]laintiff was clearly aware

that both [witnesses] possessed relevant knowledge [and] could have taken the deposition of either individual at an appropriate time prior to trial and chose not to."); *Hewitt v. Metro-North Commuter Railroad*, 14-CV-8052 (AJN), 2017 WL 1155068, at *3 (S.D.N.Y. Mar. 24, 2017) ("Because [the plaintiff] 'was well aware of the identity of the undisclosed witness and the scope of knowledge well before the trial,' [the defendant's] 'failure to disclose . . . is 'harmless.'") (citations omitted); *Howard University*, 2022 WL 3568477, at *2 ("Defendants were well aware of Ms. Jones Gentry's identity and her role from the beginning of the litigation and that it was possible that Howard might choose to use her as a witness . . . [t]here thus was no obligation on Howard to supplement its initial disclosures . . . [a]nd, even if there were such a duty, the violation would be harmless."); *Mugavero v. Arms Acres, Inc.,* 03-CV-5724, 2009 WL 1904548, at *5 (S.D.N.Y. July 1, 2009) ("[B]ecause Defendants had reason to know during the discovery period that Peter Mugavero and Dr. Weinshel might have information relevant to Plaintiff's damages claims, her failure to disclose their identity in her discovery responses was harmless, and Defendants' motion to preclude them from testifying is denied."); *Universe Antiques, Inc. v. Vareika,* 10-cv-3629, 2011 WL 5117057, at *4 (S.D.N.Y. Oct. 21, 2011) ("The [plaintiffs] will suffer no prejudice if the Undisclosed Witnesses are called at trial because the Undisclosed Witnesses include individuals with whom the [plaintiffs] are very familiar . . . [i]n these circumstances, the Court finds no credible risk of unfair surprise or sandbagging with new evidence.")

Further, to the extent that Plaintiff argues that she has been prejudiced because she was unaware that Defendant intended to call these five individuals as trial witnesses, no such notice requirement exists under Rule 26. As the court in *Harris v. Donahue* explained:

> Plaintiff asserts that [he lacked notice] that the defendants intended to use either Nielson or Palumbo as witnesses. However, the purpose of Rule 26(a)(1)(A) is to "alert an opposing party of the need to take discovery of the named witness." *Badolato v. Long Island R.R.*, 2016 WL 6236311, at *4 (E.D.N.Y. Oct.

25, 2016). Plaintiff was clearly aware that both Nielson and Palumbo possessed relevant knowledge of underlying June 21, 2014 incident at issue in the case. As such, plaintiff could have taken the deposition of either individual at an appropriate time prior to trial and chose not to.

As Harris was well aware of the identity and general scope of knowledge of both Nielson and Palumbo before trial, defendants' failure to include either Nielson or Palumbo in their Rule 26 disclosure was harmless. Therefore, plaintiff's motion to preclude the testimony of Nielson and Palumbo will be denied.

*Harris v. Donahue*, 1:15-CV-01274 (DNH) (CFH), 2017 WL 3638452, at *2(N.D.N.Y. Aug. 23,

2017). Thus, Plaintiff's argument is entirely unfounded in the law.

Lastly, Plaintiff's contention that Defendant's has engaged in conduct tantamount to "trial by ambush" is completely undermined by the manner in which Plaintiff identified her own trial witnesses throughout the course of discovery proceedings. For instance, Plaintiff identified Cheryl Lee Beall—who supposedly has knowledge of the Bergdorf Goodman store during the relevant time periods— as a potential witness for the first time in her Second Supplemental Rule 26(a)(1) Disclosures, which was served on October 14, 2022 – just *five days* before the fact discovery period ended on October 19, 2022. Habba Decl., Ex. G Similarly, Plaintiff identified another Bergdorf-related witness, Robert Salerno, for the first time in her Third Supplemental Rule 26(a)(1) Disclosure, which was served on January 6, 2023 – approximately *two and a half months* after the close of fact discovery. *See* Habba Decl., Ex. E. Prior to these disclosures, Defendant had no knowledge of these individuals, their knowledge, or the purported relevance to this action. Yet, due to Plaintiff's late disclosure, Defendant was not provided ample opportunity to depose either witness; as a result, to date Defendant lacks any understanding as to the subject matter of the testimony that either witness seeks to provide. This is precisely the type of "'sandbagging' an opposing counsel with new evidence" that is precluded under Rule 37, *Ebewo v. Martinez*, 309 F.

A-1064

Supp. 2d 600, 607 (S.D.N.Y. 2004), and is, undoubtedly, significantly more prejudicial than Defendant's purported failure to disclose witnesses who Plaintiff was well aware of.

Therefore, Plaintiff's request to precluded Defendant from calling David Haskell, Elizabeth Dyssegaard, Laurie Abraham, Sarah Lazin, and Erin Hobday as witnesses at trial must be denied.

## CONCLUSION

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests that the Court deny Plaintiff's omnibus motion *in limine* in its entirety.

Dated: February 23, 2023          Respectfully submitted,
     New York, New York

                              Alina Habba, Esq.
                              Michael T. Madaio, Esq.
                              HABBA MADAIO & ASSOCIATES LLP

A-1065

# EXHIBIT 11

A-1066

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
|     *Plaintiff,* | |
| v. | |
| DONALD J. TRUMP, in his personal capacity, | |
|     *Defendant.* | |

**DEFENDANT DONALD J. TRUMP'S**
**REPLY IN SUPPORT OF MOTIONS *IN LIMINE***

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
    -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
      mmadaio@habbalaw.com

A-1067

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ........................................................................................................................ 1

    I.    The Court Should Preclude the Testimony of Stoynoff and Leeds ......................... 1

        A.  Rule 415 Mandates the Exclusion of Stoynoff's and Leeds' Testimony ........... 1

        B.  The Proposed Testimony Cannot Be Admitted as *Modus Operandi* Evidence . 4

        C.  Even If Otherwise Admissible, The Testimony of Ms. Stoynoff And Ms. Leeds Must Be Precluded Under Rules 402 and 403 ................................................. 6

    II.    The Access Hollywood Tape is Inadmissible ...................................................... 6

    III.    Despite Plaintiff's Claims to the Contrary, The Videos of Defendant's Campaign Speeches Must be Deemed Inadmissible by this Court ......................................... 7

        A.  The Campaign Videos Should Be Precluded Under Rule 404(b)(2) ............... 7

        B.  The Campaign Videos Should Similarly Be Inadmissible Under Rule 403 ...... 9

    IV.    The Court Should Preclude Evidence of Any Purported Emotional Harm Arising From the Alleged Incident .................................................................................. 10

CONCLUSION ................................................................................................................ 10

A-1068

## TABLE OF AUTHORITIES

*Cases*

*Boyce v. Weber,*

    19-CV-3825 (JMF), 2021 WL 2821154, at *9 (S.D.N.Y. July 7, 2021)................................2

*Carroll v. Trump,*

    22-CV-10016 (LAK) (S.D.N.Y. 2022) ..................................................................10

*Rapp v. Fowler,*

    No. 20-CV-9586 (LAK), 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022)....................................3

*United States v. Anglin,*

    No. 98-CR-147, 1998 U.S. Dist. LEXIS 7302, 1998 WL 252078, at *2 (S.D.N.Y. May 19,
1998) ....................................................................................................8

*United States v. Barnason,*

    852 F. Supp. 2d 367, 372 (S.D.N.Y. 2012) ...........................................................1

*United States v. Benedetto,*

    571 F.2d 1246, 1249 (2d Cir. 1978) ..................................................................7

*United States v. Danzey,*

    594 F.2d 905, 911 (2d Cir.1979) .....................................................................6

*United States v. Mills,*

    895 F.2d 897, 907 (2d Cir. 1990) ..................................................................4, 6

*United States v. Mohamed,*

    148 F. Supp. 3d 232 (E.D.N.Y. 2015) ................................................................5

*United States v. Peña,*

    978 F. Supp. 2d 254, 260 (S.D.N.Y. 2013) ..........................................................6

A-1069

*United States v. Reese,*

　33 F.Supp.2d 579, 582 (S.D.N.Y. 2013) ...................................................................6

*United States v. Schohn,*

　No. 19-CR-139-A, 2022 U.S. Dist. LEXIS 84527, at *26 n.8 (W.D.N.Y. May 10, 2022)......3


**Rules and Statutes**

18 U.S.C.A. § 7 ...........................................................................................................4, 5

8 U.S.C. Chapter 109A ................................................................................................3, 5

18 U.S.C. §§ 2241, 2242, 2243, and 2244 ..................................................................3, 4

Fed. R. Evid. 402 .............................................................................................................6

Fed. R. Evid. 404 .............................................................................................2, 6, 7, 8, 9

Fed. R. Evid. 413 ......................................................................................................2, 4, 5

Fed. R. Evid.414 ..............................................................................................................2

Fed. R. Evid. 415 .....................................................................................................1, 2, 6

Fed. Prac. & Proc. Evid. § 5403 ..................................................................................2, 9

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this reply memorandum of law in support of his Motions *in Limine*.

## PRELIMINARY STATEMENT

Plaintiff, E. Jean Carroll ("Plaintiff") in her opposition, attempts to rely on irrelevant, unduly prejudicial evidence to support her sole claim of defamation. However, even after mischaracterizing the Federal Rules of Evidence and controlling case law, she has failed to assert a valid basis for permitting the admission of the evidence at issue. Therefore, it is respectfully submitted that Defendant's Motions *in Limine* be granted in their entirety.

## ARGUMENT

### I.  THE COURT SHOULD PRECLUDE THE TESTIMONY OF STOYNOFF AND LEEDS

#### A.  Rule 415 Mandates The Exclusion of Stoynoff's and Leeds' Testimony

*First,* as this case is not one "based on" sexual assault, the Rule 415 exception cannot apply to Stoynoff's and Leeds' testimony. "As an initial step, it must first be determined whether [Rule] 415 is applicable." *United States v. Barnason*, 852 F. Supp. 2d 367, 372 (S.D.N.Y. 2012). The application of Rule 415 is limited to a "civil case involving a claim for relief based on a party's alleged sexual assault." Fed.R.Evid. 415. As detailed at length in Defendant's moving papers, there are two distinct approaches that have been utilized to determine what qualifies as a claim "based on" an alleged sexual assault. First, there is the "categorical approach", endorsed by the Federal Practice and Procedure Treatise (Wright and Miller), which explains that under this approach "the court is confronted with a claim "based on" a sexual offense only when the elements of that offense are also elements of the civil claim itself. Fed. Prac. & Proc. Evid. § 5403 (2d ed. 2020) (scope of

1

Rule 415) (suggesting the same interpretation of "involving" under Rules 413 and 414 and citing cases identifying the issue).

Plaintiff argues that this court should adopt an alternative approach (a "fact-based approach") wherein a court is permitted to broadly consider "whether an alleged sexual assault constitutes a factual premise of the plaintiff's claim." *Boyce v. Weber*, 19-CV-3825 (JMF), 2021 WL 2821154, at *9 (S.D.N.Y. July 7, 2021). Plaintiff, however, principally relies on non-binding authority in characterizing the categorical approach as the "minority position." Pl. Mem. at (ECF 138) ("Pl. Mem."). In setting forth this argument, Plaintiff ignores the rationale underlying the categorical approach, as the fact-based approach would broaden the scope of the Rule to a significant degree and risk upending Rule 404 in a manner that was never intended by Congress. This is a defamation case, which does not have sexual assault as an element, and thus the categorical approach prohibits the application of Rule 415.

*Second*, assuming, *arguendo,* that Rule 415 applies, there can be no reasonable dispute that Defendant's alleged misconduct toward Stoynoff and Leeds does not rise to the level of sexual assault for the purposes of Rule 413(d). The term "sexual assault" is derived from Rule 413(d), which defines it as conduct that is "a crime under federal law or under state law" and which also involves:

> (1) any conduct prohibited by 18 U.S.C. chapter 109A;
> (2) contact, without consent, between any part of the defendant's body — or an object — and another person's genitals or anus;
> (3) contact, without consent, between the defendant's genitals or anus and any part of another person's body;
> (4) deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or
> (5) an attempt or conspiracy to engage in conduct described in subparagraphs (1)–(4).

> [Fed. R. Evid. 413(d).]

Plaintiff, in her opposition, readily concedes that 413(d)(2)–(4) have no application in the case at bar. Nor could they, as the non-party witnesses did not testify that Defendant made any contact with either witnesses' genitals or anus, nor that the inflicted death, bodily injury, or physical pain upon them. Instead, Plaintiff half-heartedly attempts to argue that 413(d)(1) and 413(d)(5) apply in the case herein. Neither argument should be countenanced by this Court.

As to Rule 413(d)(1), it is blackletter law that any conduct that is prohibited by 18 U.S.C. Chapter 109A must occur "*in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency.*" See 18 U.S.C. §§ 2241(a)-(b), 2242, 2243(a)-(b), and 2244(a)-(b) (emphasis added). Plaintiff, however, disingenuously attempts to contort the requirements set forth by Rule 413(d)(1) by arguing that a movant is not bound by the Rule's territorial requirements and instead "need only to identify a federal or state crime that the other party committed by virtue of engaging in any of the conduct that Chapter 109A prohibits. *See* Pl. Mem. at 4 *citing United States v. Schohn,* No. 19-CR-139-A, 2022 U.S. Dist. LEXIS 84527, at *26 n.8 (W.D.N.Y. May 10, 2022). This is a clear misreading of the Rule. Indeed, the case that Plaintiff relies on to support this lofty proposition notes that the alleged sexual contact for Chapter 109A must apply to "any individual in the 'territorial jurisdiction of the United States.'" *Schohn*, 2022 U.S. Dist. LEXIS 84527, at *26 n.8

More importantly, this Court has already expressly rejected Plaintiff's construction of Rule 413(d)(1). In *Rapp v. Fowler*, this Court noted that "in order to constitute 'sexual assault' for the purpose of Rule 413(d), the conduct at issue must satisfy one of the five enumerated categories under that rule and, *in addition*, constitutes a crime under either federal or state law." *Rapp v. Fowler*, No. 20-CV-9586 (LAK), 2022 WL 5243030, at *1, n.4 (S.D.N.Y. Oct. 6, 2022) (emphasis

added). Again, Plaintiff only relies on two of the five enumerated categories, which are 413(d)(1) and (5), the first of which has the above-described territorial requirements that Plaintiff cannot satisfy.

Here, neither Stoynoff nor Leeds testified that their alleged encounters with Defendant took place in any of the enumerated locations considered to be within the "special maritime and territorial jurisdiction of the United States." 18 U.S.C.A. § 7[1].  Therefore, this Court should reject Plaintiff's interpretation of 413(d)(1) and find that it is inapplicable to the instant matter.

As to the other enumerated category upon which Plaintiff attempts to rely, namely Rule 413(d)(5), she creatively tries to argue that the Rule applies because, according to Plaintiff, "Stoynoff's and Leeds' testimony also clearly show that Trump "attempte[d] . . . to engage in" sexual contact and thus may be admitted on that basis alone" *See* Pl. Mem. at 5. Plaintiff's sly attempt to truncate the full text of this subsection, which states that the alleged sexual assault must involve "an attempt or conspiracy to engage in *conduct described in subparagraphs (1)–(4)*, cannot cure her failure to meet the proscribed elements. This is so, because Plaintiff fails to establish that there was an attempt to contact genitalia. *See* Defendant's Motions *in Limine* at 8 (ECF 131).

**B.  The Proposed Testimony Cannot Be Admitted as *Modus Operandi* Evidence**

The testimony that Plaintiff wishes to proffer does not constitute *modus operandi* evidence because Defendant's alleged conduct toward the non-party witnesses is not sufficiently similar and distinct that it can be "ear-mark[ed] . . . as the handiwork" of Defendant to charge him as the only perpetrator who could have possibly committed the acts in question. *United States v. Mills*, 895

---

[1] As fully described in Defendant's Opposition to Plaintiff's Motions *in Limine*, neither of the alleged assaults occurred within the territorial jurisdiction of the United States. *See* Defendant's Opposition (ECF 138)

F.2d 897, 907 (2d Cir. 1990). Defendant has fully briefed this issue in his Opposition to Plaintiff's

Motions in Limine (ECF 136) and incorporates the arguments set forth by reference herein.

Plaintiff primarily relies on *United States v. Mohamed*, 148 F. Supp. 3d 232 (E.D.N.Y.

2015) to support her contention that Stoynoff's and Leeds' testimony should be admitted under

Rule 404(b)(2). This case, however, is readily distinguishable and directly cuts against this

proposition. In *Mohammed*, the Government moved to admit evidence of a 2004 carjacking to

demonstrate that the defendant was the perpetrator of the charged offense that occurred in 2000.

*Id.* at 239. In its opinion, the Court carefully outlined a set of unique facts that demonstrated a

common *modus operandi*. The Court held that "[d]espite the relative commonality of carjackings

and Toyota pickup trucks, the combination of the presence of Toyota pickup trucks both as targets

and as transportation to the crime in two carjackings, the targeting of groups including Westerners

in both instances, and the tactic of shooting and seriously injuring victims who do not comply

immediately, are sufficient to establish a common modus operandi." *Id.*

No such similarities can be drawn here. Plaintiff alleges that Defendant subjected her to a

violent rape. Stoynoff and Leeds, however, testify to alleged attacks that pale in comparison, which

consisted of purported groping and kissing. The highly distinguishable facts that are present in

*Mohammed*, using the same exact vehicle, going after a unique class of victims, and the stark

similarity of the killings, simply cannot be found here. Furthermore, in *Mohammed*, the proffered

evidence occurred a mere four years after the commission of the charged crimes, whereas here, the

alleged attacks occurred *decades* apart. As such, Plaintiff's request to introduce the testimony of

Stoynoff and Leeds as *modus operandi* evidence must be denied as it is offered only for the

purposed of demonstrating Defendant's purported propensity for sexual assault.

### C. Even If Otherwise Admissible, The Testimony Of Ms. Stoynoff And Ms. Leeds Must Be Precluded Under Rules 402 and 403

Assuming, *arguendo,* that one or both of the proposed testimonies of Ms. Stoynoff and/or Ms. Leeds qualify under either the Rule 415 or Rule 404(b)(2) exceptions—which they do not—such evidence is nonetheless inadmissible under Rules 402, due to irrelevance, and under 403, since the probative value of such evidence is substantially outweighed by its potential for unfair prejudice. These arguments are fully set forth in Defendant's Memorandum of Law in support of Motions *in Limine* (ECF No. 131), and Defendant fully incorporates them by reference herein.

### II. THE ACCESS HOLLYWOOD TAPE IS INADMISSIBLE

Plaintiff's attempt to admit the so-called "Access Hollywood Tape" (the "Tape") runs headlong into Rule 404's prohibition against propensity evidence. The proposed evidence does not share any unique characteristics to this case or demonstrate a *modus operandi* or pattern of misconduct. In the instant matter, Plaintiff has alleged that Defendant violently raped her. The conduct described on the Tape, which Defendant denies ever actually occurred, were made ten years *after* the purported incident took place and does not reflect the type of unique and distinctive conduct that can be "ear-mark[ed] . . . as the handiwork" of Defendant to isolate him as the only person that could have possibly committed these acts. *Mills*, 895 F.2d at 907. *See also United States v. Peña*, 978 F. Supp. 2d 254, 260 (S.D.N.Y. 2013) ("When offered to prove identity through modus operandi, the prior acts must share an unusual characteristic or signature with the charged offenses." (internal quotation marks and citations omitted)).

To qualify as evidence of a *modus operandi*, the alleged conduct must "share enough characteristics with the charged offenses that they share the 'signature' required for use in establishing a modus operandi under Rule 404(b)," *United States v. Reese,* 933 F.Supp.2d 579, 582 (S.D.N.Y. 2013) (citing *United States v. Danzey,* 594 F.2d 905, 911 (2d Cir.1979)). "[M]uch

6

more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts . . . *[t]he device used must be so unusual and distinctive as to be like a signature*." *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir. 1978) (emphasis in original). Here, the actions described on the tape bear little resemblance to the actions that allegedly took place in or around 1995 and are not so distinct or unique to qualify as *modus operandi* evidence.

Plaintiff, in continuing her unabashed demand to admit the Tape, has made it clear that she wishes to convert this trial into a referendum on Plaintiff's character and distract the jury from determining the merits of the controlling issues of this case. As such, the proposed evidence's sole purpose is to serve as inadmissible propensity evidence and should be precluded from being presented at trial.

### III. DESPITE PLAINTIFF'S CLAIMS TO THE CONTRARY, THE VIDEOS OF DEFENDANT'S CAMPAIGN SPEECHES MUST BE DEEMED INADMISSIBLE BY THIS COURT

In opposition to Defendant's Motion *in Limine* No. 3, Plaintiff attempts to circumvent Rules 403 and 404 of the Federal Rules of Evidence by asking this Court to admit the Defendant's campaign speeches as evidence in this action. This argument is clearly without merit and should be summarily dismissed by this Court.

#### A. The Campaign Videos Should Be Precluded Under Rule 404(b)(2)

One of plaintiff's apparent themes in her opposition to Defendant's Motions *in Limine* is that Defendant has a *modus operandi* of prior alleged sexual assaults that Plaintiff is attempting to use as evidence of the sexual assault alleged in this litigation.

Specifically, Plaintiff is seeking to introduce footage of campaign speeches which contain statements of the Defendant responding to false and unsubstantiated allegations of sexual assault against him. Plaintiff's opposition goes into excruciating detail as to the content set forth in certain

portions of those campaign videos. However, no matter how many irrelevant statements Plaintiff itemizes in her opposition, the fact remains that the introduction of these campaign videos would be in direct contravention to Rule 404(b)(2).

As set forth in Defendant's moving papers, in order for "other act" evidence to be admissible under Rule 404(b)(2), it must be relevant to a disputed issue. The incident in question involved an alleged assault of the Plaintiff at the Bergdorf Goodman department store in the 1990's. None of the statements contained in the campaign videos – let alone in Plaintiff's opposition to this Motion *in Limine* – reference the Plaintiff, the alleged incident at Bergdorf Goodman, or the type of distinct conduct alleged in this matter in any way. Further, these campaign videos were from the Defendant's 2016 campaign and were made **prior to** the Plaintiff's first public statements about her alleged incident. *United States v. Anglin*, No. 98-CR-147, 1998 U.S. Dist. LEXIS 7302, 1998 WL 252078, at *2 (S.D.N.Y. May 19, 1998) (finding that despite many similarities between two bank robberies including "the same type of location was chosen for both robberies . . . [and] robbery of such locations is a relatively rare occurrence in the New York Metropolitan area, . . . . the method of each robbery was not sufficiently idiosyncratic to mark it as [defendant's] modus operandi or to distinguish it from the methods used in thousands of other robberies committed each year"). Therefore, any of the statements in the campaign videos are clearly irrelevant to the alleged incident in this case or the issues to be deliberated by the jury at trial.

Accordingly, any and all campaign videos should be precluded at trial as inadmissible, pursuant to Fed.R.Evid. 404(b)(2).

8

**B.  The Campaign Videos Should Similarly Be Inadmissible Under Rule 403**

Plaintiff also avers that the campaign videos "do not raise Rule 403 concerns."  This argument strains credulity.  Rule 403 specifically states that: "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: **unfair prejudice, confusing the issues, misleading the jury,** undue delay, wasting time, **or** needlessly presenting cumulative evidence." (emphasis supplied).

The lack of probative value of the campaign video statements is clearly demonstrated in Defendant's moving papers regarding Rule 404(b) (*see also* Point IIIA above) as those statements are undoubtedly irrelevant to the alleged incident and issues to be presented to the jury at trial. Here, Plaintiff alleges that a denial of a prior bad act constitutes evidence of *modus operandi*, which is a baseless proposition. The denial of a prior bad act, which would otherwise be inadmissible under Rule 404(b) to establish a defendant's propensity to commit the alleged offense, does not render the prior bad act admissible. Countenancing such an illogical contention would turn Rule 404(b) on its head. If the Court adopted Plaintiff's position, it would penalize a Defendant for asserting his or her innocence as to a prior bad act, which is palpably unfair and defeats the very purpose of Rule 404(b). Accordingly, Plaintiff's attempt to backdoor improper 404(b) evidence should be denied.

Conversely, any probative value that could possibly be attributed to the campaign videos would be substantially outweighed by unfair prejudice, confusing the issues, **and** by misleading the jury.  It is undisputed that Defendant is a well-known and controversial public figure, not to mention the 45th President of the United States.  As such, showing excerpts of 2016 campaign videos would serve no purpose but to unfairly prejudice the Defendant by diverting attention away from evidence actually pertinent to the matter *sub judice*.

Consequently, the campaign videos should be precluded from this trial and be declared inadmissible, in conjunction with Rule 403, as any probative value from these videos would be substantially outweighed by unfair prejudice as well the strong possibility of confusing the issues and misleading the jury.

## IV. THE COURT SHOULD PRECLUDE EVIDENCE OF ANY PURPORTED EMOTIONAL HARM ARISING FROM THE ALLEGED INCIDENT

In her opposition to Defendant's Motion *in Limine* No. 4, the Plaintiff essentially concedes the Court's holding in the companion case to this action, *Carroll v. Trump,* 22-CV-10016 (LAK) (S.D.N.Y. 2022) ("*Carroll II*"), that "emotional or psychological damages, allegedly suffered by plaintiff as a result of the alleged sexual assault" are not part of this case and only relevant in *Carroll II.* Consequently, any evidence of purported emotional harm related to the alleged incident involving the Plaintiff should be excluded by this Court as inadmissible.

Thus, for the foregoing reasons set forth herein and in the Defendant's moving papers, it is respectfully requested that the Defendant's Motion *in Limine* No. 4 be granted and any purported emotional harm arising from the alleged incident should be precluded by this Court.

## CONCLUSION

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests that the Court grant his Motions *in Limine* in their entirety.

Dated: March 2, 2023               Respectfully submitted,
     New York, New York

                                 Alina Habba, Esq.
                                 Michael T. Madaio, Esq.
                                 HABBA MADAIO & ASSOCIATES LLP

A-1080

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff*,

v.

DONALD J. TRUMP,

*Defendant*.

No. 22 Civ. 10016 (LAK) (JLC)

### DECLARATION OF SHAWN G. CROWLEY IN SUPPORT OF
### PLAINTIFF E. JEAN CARROLL'S OPPOSITION TO DONALD J. TRUMP'S MOTION
### IN LIMINE

I, Shawn G. Crowley, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action.

2.      I respectfully submit this declaration in support of Carroll's opposition to Defendant Donald J. Trump's motion in limine.

3.      On October 14, 2022, I had an initial telephone call with Cheryl Beall, who served as assistant store manager at Bergdorf Goodman during the time period relevant to this action. During that call, I spoke with Ms. Beall about her knowledge of the Bergdorf store, including its operations and layout, as well as Trump's presence at the store, and learned that she was willing to testify to those topics at trial.

4.      Following that call, on that same day, Carroll made her second supplemental disclosures in the related action, *Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.) ("*Carroll I*"),

which contained the information relating to Beall required under Federal Rule of Civil Procedure 26(a)(1)(A)(i). *See* ECF 71-3.

5.       On December 23, 2022, I had an initial telephone call with Robert Salerno, who served as senior vice president of finance and administration at Bergdorf Goodman during the relevant time period. During that call, I spoke briefly with Mr. Salerno about his knowledge of the Bergdorf store as well as Trump's presence there.

6.       On January 6, 2023, I had a second telephone call with Mr. Salerno, and learned that he was willing to testify to at trial. That same day, Carroll made her third supplemental disclosures in *Carroll I*, which contained the information relating to Salerno required under Federal Rule of Civil Procedure 26(a)(1)(A)(i). *See* ECF 71-4.

7.       On January 9, 2023, Carroll made her initial disclosures in the present action, setting forth the same information for Ms. Beall and Mr. Salerno as she had disclosed in *Carroll II*.

8.       Attached hereto as **Exhibit 1** is a true and correct copy of Carroll's Rule 26(a)(1) Initial Disclosures in this action, dated January 9, 2023.

9.       Attached hereto as **Exhibit 2** is the video of Natasha Stoynoff's deposition, which was taken in *Carroll I* on October 13, 2022. The video is being submitted to the Court via DVD.

10.     Attached hereto as **Exhibit 3** is the video of Jessica Leeds' deposition, which was taken in *Carroll I* on October 13, 2022. The video is being submitted to the Court via DVD.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      New York, New York
            March 9, 2023                              _____
                                                      Shawn G. Crowley

A-1082

# EXHIBIT 1

A-1083

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff,*

v.

DONALD J. TRUMP,

*Defendant.*

No. 22 Civ. 10016 (LAK)

### PLAINTIFF E. JEAN CARROLL'S RULE 26(a)(1) INITIAL DISCLOSURES

Plaintiff E. Jean Carroll, by and through her undersigned counsel, hereby makes the following initial disclosures to Defendant in the above-captioned matters as required by Fed. R. Civ. P. 26(a)(1).

Nothing in these initial disclosures constitutes, or is intended to constitute, a waiver of any claim, right, or defense in this case or otherwise. Plaintiff continues to investigate matters related to the litigation, may become aware of additional information through discovery or otherwise, and may become aware of new reasons why information presently known may be relevant to this action. Moreover, the issues raised in this matter may require analysis by retained experts. Plaintiff reserves the right to supplement, revise, and/or correct these initial disclosures. In addition, Plaintiff expressly reserves all applicable privileges, including without limitation the attorney-client privilege and the work-product doctrine, and Plaintiff makes these disclosures subject to those privileges and immunities. Plaintiff further makes these disclosures subject to the discovery confidentiality order the Court has entered in this case.

A-1084

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## DISCLOSURES

1. **The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), based on her current knowledge, information, and belief and subject to further investigation, discovery, and analysis by experts, Plaintiff discloses the following individuals likely to have discoverable information that may be used to support Plaintiff's claims or defenses, other than the parties themselves. Plaintiff reserves the right to amend or supplement these disclosures, including as provided by Fed. R. Civ. P. 26(e). The following disclosures do not include persons whose testimony is likely to be used solely for impeachment, rebuttal, or expert witness testimony, who will be disclosed in accordance with the schedule set by the Court. Based on her current knowledge, information, and belief, and subject to further investigation, discovery, and analysis by experts, Plaintiff states that there are likely millions of people in the United States and across the world who witnessed Defendant's defamatory act on October 12, 2022. Plaintiff further states that the following individuals are likely to have discoverable information that may be used to support her claims, in addition to the parties themselves:

| Name | Contact Information | Subjects |
|------|---------------------|----------|
| Lisa Birnbach | c/o Andrew Celli<br>Emery Celli Brinckerhoff<br>Abady Ward & Maaxel LLP<br>600 Fifth Avenue at Rockefeller Center<br>New York, NY 10020<br>(212) 763-5000<br>acelli@ecbawm.com | Carroll's contemporaneous account of the underlying assault |

A-1085

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Name | Contact Information | Subjects |
|------|---------------------|----------|
| Carol Martin | c/o Noam Biale<br>Sher Tremonte LLP<br>90 Broad Street<br>23rd Floor<br>New York, NY 10004<br>(212) 300-2455<br>nbiale@shertremonte.com | Carroll's contemporaneous account of the underlying assault |
| Cande Carroll | c/o Sidhardha Kamaraju<br>Pryor Cashman LLP<br>7 Times Square<br>40th Floor<br>New York, NY 10036<br>(212) 326-0895<br>skamaraju@pryorcashman.com | The timing of Carroll's coming forward and damages |
| Jessica Leeds | c/o Anne Champion<br>Gibson Dunn & Crutcher LLP<br>200 Park Ave<br>New York, NY 10166-0193<br>(212) 351-5361<br>achampion@gibsondunn.com | Account of her own assault by Defendant |
| Robbie Myers | c/o Kathleen Cassidy<br>Morvillo Abramowitz Grand Iason & Anello PC<br>565 Fifth Avenue<br>New York, NY 10017<br>(212) 880-9413<br>kcassidy@maglaw.com | Carroll's journalism career |
| Natasha Stoynoff | c/o Anne Champion<br>Gibson Dunn & Crutcher LLP<br>200 Park Ave<br>New York, NY 10166-0193<br>(212) 351-5361<br>achampion@gibsondunn.com | Account of her own assault by Defendant |

A-1086

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Name | Contact Information | Subjects |
|---|---|---|
| Stephanie Grisham | c/o Adam VanHo<br>VanHo Law<br>243 Furnace Street<br>Suite 201<br>Akron, Ohio 44304<br>(333) 653-8511<br>adam@vanholaw.com | Defendant's statements about Carroll |
| Cheryl Lee Beall | Cheryl Lee Beall<br>████████████ | The Bergdorf Goodman department store in the relevant period, including the operations and layout of the store, and Defendant's presence in the store |
| Robert Salerno | Robert Salerno<br>████████████ | The Bergdorf Goodman department store in the relevant period, including the operations and layout of the store, and Defendant's presence in the store |

Expert disclosures will be made in accordance with the Court's Pretrial and Scheduling Order and Fed. R. Civ. P. 26(b)(2). Plaintiff reserves the right to use the testimony of other witnesses whose identity may be subsequently learned through discovery or other means.

2. **A copy, or a description by category and location, of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii), based on current knowledge, and subject to further investigation, discovery, and analysis by experts, Plaintiff hereby discloses the following categories of documents and things in her possession, custody or control that she may use to support her claims. Plaintiff reserves the right to amend or supplement these disclosures, including

4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

as provided under Fed. R. Civ. P. 26(e). The following disclosures do not include documents and things that are likely to be offered solely for impeachment:

1. Material in the discovery record in *Carroll v. Trump*, No. 20 Civ. 7311 (LAK) ("*Carroll I*"), consistent with the Court's Pretrial and Scheduling Order in this Action. *See* ECF 19 at 1.

2. Defendant's statements identified or referred to in Paragraphs 10, 82-85, 91-99 of the Complaint in this Action, which also encompass the statements identified or referred to in the Complaint in *Carroll I*.

3. Other publications, public statements, and content created by Defendant.

4. Proof of damages.

**3. A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

Plaintiff has sustained damages in an amount to be determined at trial, which includes, without limitation, damages to her reputation and future career prospects, emotional and psychological damages, and loss of consortium, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements. Plaintiff has retained the services of experts to opine on the Plaintiff's damages, for which disclosures will be made in accordance with the Court's Pretrial and Scheduling Order and Fed. R. Civ. P. 26(b)(2). Plaintiff reserves the right to modify this calculation of damages accordingly.

**4. Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action to indemnify or reimburse for payments made to satisfy the judgment.**

None applicable.

A-1088

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**THE INSTANT DISCLOSURE IS WITHOUT PREJUDICE TO AND WITH A RESERVATION OF ALL RIGHTS TO SUPPLEMENT OR AMEND PLAINTIFF'S DISCLOSURE.**

Dated: New York, New York
       January 9, 2023

Roberta A. Kaplan
Shawn Crowley
Trevor W. Morrison
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaint₁f E. Jean Carroll*

6

A-1089

# EXHIBIT 2

## Deposition Video of N. Stoynoff

*Provided to the Court on Exhibit DVD*

A-1090

A-1091

# EXHIBIT 3

## Deposition Video of J. Leeds

*Provided to the Court on Exhibit DVD*

A-1092

A-1093

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP,<br><br>*Defendant.* | No. 22 Civ. 10016 (LAK) |

## PLAINTIFF E. JEAN CARROLL'S RESPONSE TO DEFENDANT DONALD J. TRUMP'S LOCAL CIVIL RULE 56.1 STATEMENT

Pursuant to Local Rule 56.1 of the Civil Rules of this Court, Plaintiff E. Jean Carroll submits the following responses to Defendant Donald J. Trump's Local Civil Rule 56.1 Statement, ECF 68, and a statement of additional material facts in support of her opposition to Trump's motion for summary judgment.

## I.    RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1.      Count II of the *Carroll II* Complaint of Plaintiff, E. Jean Carroll ("Carroll" or "Plaintiff"), arises from alleged defamatory statements that Trump made on October 12, 2022 (the "October 12, 2022 Statement") that summarized his pleading in *Carroll I*, described the positions he took in *Carroll I* and provided background information concerning such pleading and positions taken. *See Carroll I* Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

**Response:** Disputed in that Trump mischaracterizes his October 12, 2022 Statement. Further disputed in that the cited paragraphs of the *Carroll I* Complaint, *Carroll I* Answer, and *Carroll II* Complaint do not support the characterization that Trump's October 12, 2022 Statement "summarized his pleading in *Carroll I*, described the positions he took in *Carroll I* and provided background information concerning such pleading and positions taken."

2.      Furthermore, the October 12, 2022 Statement clearly referenced the pending litigation

A-1094

(*Carroll I*) and even referenced this Court in *Carroll I* being reversed by the Second Circuit. *See Carroll II* Complaint (Ex. C) at ¶¶ 92; *see also Carroll v. Trump*, 49 F.4th 759, 761 (2d Cir. 2022)("We reverse the District Court's holding that the President of the United States is not an employee of the government under the Westfall Act.").

**Response:** Disputed in that Trump mischaracterizes his October 12, 2022 Statement.

Further disputed in that the cited paragraph of the *Carroll II* Complaint does not support the

characterization that the October 12, 2022 Statement "clearly referenced the pending litigation

(*Carroll I*) and even referenced this Court in *Carroll I* being reversed by the Second Circuit."

3.    Trump's October 12, 2022 Statement merely references Plaintiff's pending lawsuit against him (*Carroll I*), Carroll's claims in *Carroll I*, and Trump's allegations, defenses and positions taken in *Carroll I*, and relevant background information concerning *Carroll I*. See *Carroll I* Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98; *see also Carroll*, 49 F.4th at 761.

**Response:** Disputed in that Trump mischaracterizes his October 12, 2022 Statement.

Further disputed in that the cited paragraphs of the *Carroll I* Complaint, *Carroll I* Answer, and

*Carroll II* Complaint do not support the characterization that "Trump's October 12, 2022

Statement merely references Plaintiff's pending lawsuit against him (*Carroll I*), Carroll's claims

in *Carroll I*, and Trump's allegations, defenses and positions taken in *Carroll I*, and relevant

background information concerning *Carroll I*."

4.    Plaintiff's Complaint in *Carroll II* alleges that Trump made the October 12, 2022 Statement, and portions of that statement were untrue because Trump states (allegedly falsely) that: (a) Trump did not rape Plaintiff; (b) Trump did not know Carroll and never met her before; and (c) Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to increase sales for her new book. *See Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

**Response:** Disputed as an incomplete statement of the allegations in Plaintiff's Complaint

in *Carroll II*. Further disputed in that the cited paragraphs of the *Carroll II* Complaint do not

support the characterization that "portions of that statement were untrue because Trump states

(allegedly falsely) that: (a) Trump did not rape Plaintiff; (b) Trump did not know Carroll and never

met her before; and (c) Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to

increase sales for her new book." The cited paragraphs of the *Carroll II* Complaint state that, "In

the October 12 statement, Trump falsely stated that he did not rape Carroll"; "In the October 12

statement, Trump falsely stated that he had no idea who Carroll was"; and "In the October 12

statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the

rape accusation as a 'hoax,' 'scam,' or ploy to increase her book sales." *Carroll II* Compl. ¶¶ 96–

98.

> 5.      Specifically, the Complaint alleges as follows:

> [O]n October 12, 2022, Trump posted the following:

>> "This '**Ms. Bergdorf Goodman case**' is a complete con job, and
>> our legal system in this Country, but especially in New York State
>> (just look at Peekaboo James), is a broken disgrace. You have to
>> fight for years, and spend a fortune, in order to get your reputation
>> back from liars, cheaters, and hacks. **This decision is from the
>> Judge who was just overturned on my same case**. I don't know
>> this woman, have no idea who she is, other than it seems she got a
>> picture of me many years ago, with her husband, shaking my hand
>> on a reception line at a celebrity charity event. She completely made
>> up a story that I met her at the doors of this crowded New York City
>> Department Store and, within minutes, 'swooned' her. It is a Hoax
>> and a lie, just like all the other Hoaxes that have been played on me
>> for the past seven years. And, while I am not supposed to say it, I
>> will. This woman is not my type! She has no idea what day, what
>> week, what month, what year, or what decade this so-called 'event'
>> supposedly took place. The reason she doesn't know is because it
>> never happened, and she doesn't want to get caught up with details
>> or facts that can be proven wrong. If you watch Anderson Cooper's
>> interview with her, where she was promoting a really crummy book,
>> you will see that it is a complete Scam. She changed her story from
>> beginning to end, after the commercial break, to suit the purposes of
>> CNN and Andy Cooper. Our Justice System is broken along with
>> almost everything else in our Country."

> He then continued:

>> "In the meantime, and for the record, E. Jean Carroll is not telling
>> the truth, is a woman who I had nothing to do with, didn't know, and
>> would have no interest in knowing her if I ever had the chance. Now
>> all I have to do is go through years more of legal nonsense in order

A-1096

to clear my name of her and her lawyer's phony attacks on me. This can only happen to 'Trump'!"

*Carroll II* Complaint (Ex. C) ¶ 92 (emphasis added).

**Response**: Disputed to the extent that the emphasized words support Trump's mischaracterizations of the October 12, 2022 Statement.

6.      The October 12, 2022 Statement was about the "case" (*i.e.* lawsuit) that Plaintiff brought against Trump. *See Carroll I* Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98; *see also Carroll*, 49 F.4th at 761.

**Response**: Disputed in that Trump mischaracterizes his October 12, 2022 Statement. Further disputed in that the cited paragraphs of the *Carroll I* Complaint, *Carroll I* Answer, and *Carroll II* Complaint do not support the characterization that "[t]he October 12, 2022 Statement was about the 'case' (*i.e.* lawsuit) that Plaintiff brought against Trump."

7.      The first sentence of the October 12, 2022 Statement reads: "This 'Ms. Bergdorf Goodman case' is a complete con job ...." *Carroll II* Complaint at ¶ 92 (Ex. C)(emphasis added).

**Response**: Disputed as incomplete and a mischaracterization of Trump's October 12, 2022 Statement. The first sentence of the October 12, 2022 statement reads: "This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace." *Carroll II* Compl. ¶ 92.

8.      Additionally, Trump, in the October 12, 2022 Statement, made another unmistakable reference to *Carroll I,* when he cited to this Court being reversed by the Second Circuit in *Carroll I*: "This decision is from the Judge who was just *overturned* on *my same case*." *Carroll II* Complaint ¶ 92 (Ex. C)(emphasis added).

**Response**: Disputed in that Trump mischaracterizes his October 12, 2022 Statement. Further disputed in that the cited paragraph of the *Carroll II* Complaint does not support the characterization that "Trump, in the October 12, 2022 Statement, made another unmistakable reference to *Carroll I,* when he cited to this Court being reversed by the Second Circuit in *Carroll I.*"

4

A-1097

9.      The *Carroll II* Complaint alleges what Plaintiff claims is false with regard to October 12, 2023 Statement. The Complaint in *Carroll II* alleges:

In the October 12 statement, Trump falsely stated that he did not rape Carroll.

In the October 12 statement, Trump falsely stated that he had no idea who Carroll was.

In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales.

*Carroll II* Complaint (Ex. C) ¶¶ 96-98.

**Response:** Disputed to the extent that the cited paragraphs of the *Carroll II* Complaint allege falsity with respect to a statement Trump made on October 12, *2022*.

10.      Hence, Plaintiff specifically alleges three categories of purported falsity, namely Trump statements (allegedly false) that: (a) Trump did not rape Plaintiff; (b) Trump did not know Carroll and never met her before; and (c) Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to increase sales for her new book ("Three Categories of Alleged Falsity"). *See Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

**Response:** Disputed as an incomplete statement of the allegations in Plaintiff's Complaint in *Carroll II.* Further disputed in that the cited paragraphs of the *Carroll II* Complaint do not support the characterization that "Plaintiff specifically alleges three categories of purported falsity, namely Trump statements (allegedly false) that: (a) Trump did not rape Plaintiff; (b) Trump did not know Carroll and never met her before; and (c) Plaintiff made up the false accusation (or hoax, scam or ploy) of rape to increase sales for her new book." The cited paragraphs of the *Carroll II* Complaint state that, "In the October 12 statement, Trump falsely stated that he did not rape Carroll"; "In the October 12 statement, Trump falsely stated that he had no idea who Carroll was"; and "In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a 'hoax,' 'scam,' or ploy to increase her book sales." *Carroll II* Compl. ¶¶ 96–98.

11.      However, the Three Categories of Alleged Falsity pertain to the exact same issues that were being litigated in *Carroll I. See Carroll I* Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88,

5

90, 93, 94, 100, 113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

**Response:** Disputed for the same reasons stated in Plaintiff's Response to Paragraph 10.

Further disputed in that the cited paragraphs of the *Carroll I* Complaint, *Carroll I* Answer, and

*Carroll II* Complaint do not support the characterization that "the Three Categories of Alleged

Falsity pertain to the exact same issues that were being litigated in *Carroll I*."

12.     When Trump made the October 12, 2022 Statement concerning the Three Categories of Alleged Falsity, he was merely summarizing and/or restating his allegations (*i.e.* his denials and affirmative defenses) and/or positions asserted in his Answer filed in *Carroll I*. *See Carroll I* Complaint (Ex. A) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118; *Carroll I* Answer (Ex. B) at ¶¶ 11, 13, 24, 25, 85-88, 90, 93, 94, 100, 113-118, 150; *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

**Response:** Disputed for the same reasons stated in Plaintiff's Response to Paragraph 10.

Further disputed in that the cited paragraphs of the *Carroll I* Complaint, *Carroll I* Answer, and

*Carroll II* Complaint do not support the characterization that Trump's October 12, 2022 Statement

"was merely summarizing and/or restating his allegations (*i.e.* his denials and affirmative defenses)

and/or positions asserted in his Answer filed in *Carroll I*."

13.     Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that he did not rape Plaintiff. Below are some examples:

> He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of rape. [¶ 13]
>
> ***
>
> Trump falsely stated that he did not rape Carroll. [¶ 85, see also ¶¶ 93 and 100]
>
> ***
>
> Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation .... [¶ 90]
>
> ***

A-1099

Trump knew it was false to state that he had never raped Carroll. [¶ 115]

Trump knew that the accusation was true .... [¶ 116]

[Trump] knew that Carroll had spoken the truth .... [¶ 117]

[H]e knew that her accusation against him was truthful .... [¶ 118]

*Carroll I* Complaint (Ex. A) at ¶¶ 13, 85,90, 93, 100, 115-118.

**Response**: Disputed as an incomplete statement of the allegations in Plaintiff's *Carroll I*

Complaint.

14.    In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. *See Carroll I* Answer (Ex. B) at ¶¶ 13, 85, 90, 93, 100, 115-118.

**Response**: Undisputed.

15.    Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged defamatory statements (alleged in the *Carroll I* Complaint) "are true." *Carroll I* Answer (Ex. B) at ¶150.

**Response**: Undisputed.

16.    Therefore, when Trump stated that he did not rape Plaintiff in the October 12, 2022 Statement, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer. *See Carroll I* Answer (Ex. B) at ¶¶ 13, 85, 90, 93, 100, 115-118; *Carroll II* Complaint (Ex. C) at ¶ 92.

**Response**: Disputed in that Trump mischaracterizes his October 12, 2022 Statement.

Further disputed in that the cited paragraphs of the *Carroll I* Answer and *Carroll II* Complaint do

not support the characterization that "when Trump stated that he did not rape Plaintiff in the

October 12, 2022 Statement, he was only repeating and summarizing his allegations and positions

taken in his *Carroll I* Answer."

17.    Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that he did not know Plaintiff at the time of the October 12, 2022 Statement, nor in the 1990s. Below are some examples:

> Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he raped her, and he knew who she was in 2019. [¶13]
>
> ***
>
> Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily Ask E. Jean TV show, a small hit on the "America's Talking" network started by Roger Ailes. She was also on a frequent guest and commentator on the widely watched Today show. [¶24]
>
> Trump put up his hand to stop her from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!" [¶25]
>
> ***
>
> Trump falsely stated that he had never met Carroll. [¶86]
>
> Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was. [¶87]
>
> ***
>
> Trump falsely stated that he had no idea who Carroll was. [¶94]
>
> ***
>
> In June 2019, Trump knew it was false to state that he had never met Carroll. [¶113]
>
> In June 2019, Trump knew it was false to state that he had no idea who Carroll was. [¶114]

*Carroll I* Complaint (Ex. A) at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114.

**Response:** Disputed as an incomplete statement of the allegations in Plaintiff's Complaint in *Carroll I.* Disputed as incorrect to the extent that it characterizes Trump's statements as declaring only "that he did not know Plaintiff at the time of the October 12, 2022 Statement" or

"in the 1990s." Trump declared that he did not meet Plaintiff or know Plaintiff at *any* time. *See, e.g.*, *Carroll I* Compl. ¶¶ 82, 86, 87, 91, 94; Ex. 1 ("Trump Dep.") at 58:14–60:8, 64:25–67:9.

18.      In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. *See Carroll I* Answer (Ex. B) at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114.

**Response:** Undisputed.

19.      Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged defamatory statements (alleged in the *Carroll I* Complaint) "are true." *Carroll I* Answer (Ex. B) at ¶150.

**Response:** Undisputed.

20.      Therefore, when Trump stated, in the October 12, 2022 Statement, that he did not know Plaintiff in the 1990s nor subsequently when he made the October 12, 2022 Statement, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer. *Carroll I* Complaint (Ex. A) at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114; *Carroll I* Answer (Ex. B) at ¶¶ 13, 24, 25, 86, 87, 94, 113 and 114; *Carroll II* Complaint (Ex. C) at ¶ 92.

**Response:** Disputed in that Trump mischaracterizes his October 12, 2022 Statement.

Further disputed for the same reasons stated in Plaintiff's Response to Paragraph 17. Further

disputed in that the cited paragraphs of the *Carroll I* Complaint, *Carroll I* Answer, and *Carroll II*

Complaint do not support the characterization that "when Trump stated, in the October 12, 2022

Statement, that he did not know Plaintiff in the 1990s nor subsequently when he made the October

12, 2022 Statement, he was only repeating and summarizing his allegations and positions taken in

his *Carroll I* Answer."

21.      Plaintiff alleges in her *Carroll I* Complaint that Trump made false statements when he declared that Plaintiff made the false rape allegation against him in order to enhance the sales of her book. Below are some examples:

> Through express statements and deliberate implications, he accused
> Carroll of lying about the rape in order to increase book sales ... and
> make money. [¶11]

***

9

> Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales. [¶88]
>
> ***
>
> Trump's other defamatory statements about Carroll in June 2019 [included] that she had fabricated the rape accusation to increase her book sales .... [¶116]

*Carroll I* Complaint (Ex. A) at ¶¶ 11, 88 and 116.

**Response:** Disputed as an incomplete statement of the allegations in Plaintiff's Complaint in *Carroll I.*

22.    In response, Trump denied all of the above-quoted and cited paragraphs of the *Carroll I* Complaint in his *Carroll I* Answer. *Carroll I* Answer (Ex. B) at ¶¶ 11, 88 and 116.

**Response:** Undisputed.

23.    Trump also alleged the Affirmative Defense in his *Carroll I* Answer that his alleged defamatory statements (alleged in the *Carroll I* Complaint) "are true." *Carroll I* Answer (Ex. B) at ¶150.

**Response:** Undisputed.

24.    Therefore, when Trump stated, in the October 12, 2022 Statement, that Plaintiff made the false rape allegation against him in order to enhance the sales of her book, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer. *Carroll I* Complaint (Ex. A) at ¶¶ 11, 88 and 116; *Carroll I* Answer (Ex. B) at ¶¶ 11, 88 and 116; *Carroll II* Complaint (Ex. C) at ¶ 92.

**Response:** Disputed in that Trump mischaracterizes his October 12, 2022 Statement. Further disputed in that the cited paragraphs of the *Carroll I* Complaint, *Carroll I* Answer, and *Carroll II* Complaint do not support the characterization that "when Trump stated, in the October 12, 2022 Statement, that Plaintiff made the false rape allegation against him in order to enhance the sales of her book, he was only repeating and summarizing his allegations and positions taken in his *Carroll I* Answer."

25.    Plaintiff was interviewed on CNN by Anderson Cooper on June 24, 2019. *See* Transcript of Anderson Cooper's CNN interview of Plaintiff (Ex. E).

**Response:** Undisputed.

26.    Plaintiff does not attribute any falsity to Trump's reference to the Anderson Cooper interview; it just happened to be mentioned in the October 12, 2022 Statement. Plaintiff does not allege that the reference to the Anderson Cooper interview was defamatory. *Carroll II* Complaint (Ex. C) at ¶¶ 92, 96-98.

**Response:** Disputed in that Trump mischaracterizes the allegations of Plaintiff's

Complaint in *Carroll II*. Plaintiff's Complaint in *Carroll II* asserts that Trump made a false and

defamatory statement when he asserted that Carroll lied about the rape in her interview with

Anderson Cooper in order to promote "a really crummy book." *See*, *e.g.*, *Carroll II* Compl. ¶¶ 92,

107, 108, 118. Further disputed in that the cited paragraphs of the *Carroll II* Complaint do not

support the characterization that the Anderson Cooper interview "just happened to be mentioned

in the October 12, 2022 Statement." The October 12, 2022 Statement states: "If you watch

Anderson Cooper's interview with her, where she was promoting a really crummy book, you will

see that it is a complete Scam. She changed her story from beginning to end, after the commercial

break, to suit the purposes of CNN and Andy Cooper." *Carroll II* Compl. ¶ 92.

27.    One of Trump's alleged defamatory statements alleged in the *Carroll I* Complaint – the June 24, 2019 statement ("I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?") was published in the very article cited in the *Carroll I* Complaint that also referenced the Anderson Cooper interview, namely Jordan Fabian & Saagar Enjeti, EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says *"She's Not My Type"*, Hill (June 24, 2019)(Ex. F). *See Carroll I* Complaint at ¶¶ 97-100, and footnote 13.

**Response:** Undisputed.

28.    The June 24, 2019 Hill article (which is cited in the *Carroll I* Complaint) actually quotes the Anderson Cooper interview: "'I love that I'm not his type,' Carroll said in an interview on CNN, responding to Trump's comments shortly after they were published." *See* June 24, 2019 Hill Article (Ex. F) at p. 2.

**Response:** Disputed to the extent that it suggests that the original version of the June 24,

2019 Hill article quoted the Anderson Cooper interview.

A-1104

29.    Plaintiff herself clearly speaks about one of the Trump statements quoted in the *Carroll I* Complaint ("she's not my type") during Anderson Cooper interview. *See* the Transcript of the Anderson Cooper interview (Ex. E) at pp. 14-15: "COOPER: I'm wondering, the statement that he said which he's just made which is she's not my type, that was the number one thing – |CARROLL: I love that I'm not his type. Don't you love that you're not his type?"

**Response:** Undisputed.

30.    The *Carroll I* Complaint has multiple references to the "she's not my type" statement. See *Carroll I* Complaint (Ex. A) at ¶ 97 and footnotes 13 and 14.

**Response:** Disputed in that the *Carroll I* Complaint quotes Trump's June 24, 2019 statement, which contains the language "she's not my type," only once, *Carroll I* Compl. ¶ 97, and footnotes 13 and 14 in the *Carroll I* Complaint cite articles reflecting the dissemination of Trump's June 24, 2019 statement. *Carroll I* Compl. ¶¶ 97 n.13, 98 n.14.

## II.    PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### A.    Trump Defames Carroll

31.    On October 12, 2022, Trump posted the following on Truth Social:



- October 12, 2022 -

### Statement by Donald J. Trump, 45th President of the United States of America

This "Ms. Bergdorf Goodman" case is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. This decision is from the Judge who was just overturned on my same case. I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, "swooned" her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called "event" supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country. Her lawyer is a political operative and Cuomo crony who goes around telling people that the way to beat Trump is to sue him all over the place. She is suing me on numerous frivolous cases, just like this one, and the court system does nothing to stop it. In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to "Trump"!



Ex. 2; *see also* Trump Dep. at 127:9–15, 132:9–134:13.

32.     Truth Social is a social media platform launched by Trump as an alternative to Twitter. Trump Dep. at 125:22–24.

33.     When Trump posted this statement, he had over 4 million followers on Truth Social. *Id.* at 126:4–127:8.

34.     Trump testified that he wrote and posted the entire statement himself without talking to anyone. *Id.* at 127:9–15, 134:10–18.

35.     Trump also testified that he had people from his office distribute the October 12, 2022 Statement to the press, including to an email list of reporters. *Id.* at 127:16–129:2.

36.     Carroll's reputation was further damaged by the October 12, 2022 Statement, and she received significant negative media attention, both publicly and privately, after Trump made the statement. *See* Ex. 3 ("Humphreys Rep.") at 42–45 & Appx. E.

37.     The quantitative data shows that Trump's October 12, 2022 Statement was widely disseminated. Based on a comprehensive analysis conducted by Professor Ashlee Humphreys, and using conservative estimates, Trump's defamatory October 12, 2022 Statement generated between 13,787,119 and 18,020,819 impressions across various forms of media. *See id.* at 25–35 & Appxs. D, H.

38.     Professor Humphreys' analysis showed that 21.42% of readers and listeners were likely to believe Trump's October 12, 2022 Statement. *Id.* at 45–49 & Appx. F. As a result, between 3,764,125 to 5,649,724 of the impressions generated by Trump's October 12, 2022 Statement were likely received by people who were receptive to them. *Id.*

A-1107

Dated: New York, New York
      March 9, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
Telephone: (212) 742-2661
Facsimile: (212) 564-0883
jmatz@kaplanhecker.com

*Attorneys for Plaintiff E. Jean Carroll*

**A-1108**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff*,

v.

DONALD J. TRUMP,

*Defendant*.

No. 22 Civ. 10016 (LAK)

### DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF PLAINTIFF E. JEAN CARROLL'S OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOR SUMMARY JUDGMENT

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action.

2.      I respectfully submit this declaration in support of Plaintiff's opposition to Defendant Donald J. Trump's motion for summary judgment.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the official transcript of Trump's October 19, 2022 deposition taken in *Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.) ("*Carroll I*").

4.      Attached hereto as **Exhibit 2** is a true and correct copy of a Truth Social post containing the statement that Trump made about Carroll on October 12, 2022, which was marked as Exhibit 28 during Trump's deposition in *Carroll I*.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the Expert Report of Ashlee Humphreys, PhD, dated January 9, 2023.

A-1109

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   New York, New York
         March 9, 2023                          Roberta A. Kaplan

A-1110

# EXHIBIT 1

Page 1

```
 1

 2              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
              CASE No. 20 CIV. 7311 (LAK)(JLC)
 4

 5  E. JEAN CARROLL,

 6            Plaintiff,

 7  -vs-

 8  DONALD J. TRUMP,
    in his personal capacity,
 9
            Defendant.
10  _____/

11

12

13                   =  =  =

14              CONFIDENTIAL

15                   =  =  =

16

17      VIDEOTAPED DEPOSITION OF DONALD J. TRUMP

18
            Wednesday, October 19, 2022
19           10:22 a.m. - 3:50 p.m.

20           The Mar-a-Lago Club
            1100 South Ocean Boulevard
21          Palm Beach, Florida, Florida

22

23  Stenographically Reported By
    Pamela J. Pelino, RPR, FPR, CLR
24  Notary Public, State of Florida
    TSG REPORTING
25  JOB NO. 218342
                   -  -  -
```

A-1112

```
                                                        Page 58
 1                        D. J. TRUMP

 2        A.    Other people in the press, yes.

 3        Q.    If you could read -- if you're able to --

 4   and I apologize for the size of the text.

 5              If you could read that statement into the

 6   record.

 7        A.    You want me to read the whole thing?

 8        Q.    Please.

 9        A.    It's a very unclear copy.  Do you have a

10   better copy of it?

11        Q.    I think this is the best we have.  I

12   could read it in.  I'll read it in.

13        A.    Yeah, why don't you read it in.

14        Q.    It says:  "Statement from President

15   Donald J. Trump.  Regarding the 'story' by

16   E. Jean Carroll claiming she once encountered me at

17   Bergdorf Goodman 23 years ago, I've never met this

18   person in my life.  She's trying to sell a new book.

19   That should indicate her motivation.  It should be

20   sold in the fiction section.  Shame on those who

21   make up false stories of assault, who try to get

22   publicity for themselves or sell a book or carry out

23   a political agenda like Julie Swetnick, who falsely

24   accused Justice Brett Kavanaugh.  It's just as bad

25   for people to believe it, particularly when there is
```

Page 59

1                        D. J. TRUMP

2    zero evidence.  Worse still for a dying publication

3    to try to prop itself up by pedaling fake news.

4    It's an epidemic.  Ms. Carroll in New York Magazine:

5    No pictures, no surveillance, no videos, no reports,

6    no sales attendants around???  I would like to thank

7    Bergdorf Goodman for confirming they have no video

8    footage of any such incident because it never

9    happened.  False accusations diminish the severity

10   of real assault.  All should condemn false

11   accusations and any actual assault in the strongest

12   possible terms.  If anyone has information that the

13   Democratic party is working with Ms. Carroll or

14   New York Magazine, please notify us as soon as

15   possible.  The world should know what's really going

16   on.  It's a disgrace, and people should pay dearly

17   for such false accusations."  Do you see that?

18   That's what you have in front of you?

19        A.    Yeah.

20        Q.    And I think you've already confirmed that

21   this is a statement that you gave to someone on your

22   staff to give to the press?

23        A.    Yeah.

24        Q.    And that's how it ended up in

25   Laura Littman's tweets?

A-1114

Page 60

                              D. J. TRUMP

1

2        A.    Perhaps, yes.

3        Q.    Sitting here today, do you stand by this

4   statement?

5        A.    Yes.

6        Q.    Sitting here today, are there any

7   inaccuracies in this statement that you now know of?

8        A.    Not that I can see, no.  The only thing

9   that I would say is -- and I've just heard this --

10   that she has no idea when this event took place, and

11   somehow 23 years is mentioned, 23 years ago.  It's a

12   long time.  But she has no idea supposedly when this

13   took place, what season, what year, what month, what

14   day.  She knows nothing.  And for some reason, it's

15   put down here 23 years ago.  So, you know, at one

16   point I was told 23 years.  But I've heard since she

17   really has no clue when this took place supposedly,

18   which -- it didn't take place.

19        Q.    So is it your testimony that when

20   Ms. Carroll made her allegations, she had -- putting

21   aside what day it happened that she had no idea

22   whatsoever of what year it took place?

23        A.    My lawyers told me that.

24        Q.    Okay.  I don't want to know what your

25   lawyers told you.

A-1115

Page 64

1                           D. J.  TRUMP

2          this.

3     BY MS. KAPLAN:

4          Q.     And I take it -- is it fair to say that

5     when you made comments while you were president on

6     your way to somewhere, on your way to an event, on

7     your way to boarding Air Force One or Marine One

8     that a transcript would be created like this and

9     released by your press office?

10         A.     Oftentimes, yeah.

11         Q.     Are you better able -- this is a long

12    one.  Let's try to do this, sir.  Are you better

13    able to read the writing in this document than the

14    previous document?

15         A.     I can.  You could read it.  But why don't

16    you read it?

17         Q.     You want me to read it?

18         A.     Yeah.

19         Q.     When my son was little, I couldn't stand

20    reading books to him because you had to read it so

21    slow, and it would drive me nuts.  But I'm going to

22    try to read it slow.

23                At the bottom of page 1800, it says "The

24    President," colon, and then it says as follows:

25                "I have no idea who this woman is.  This

Page 65

                              D. J. TRUMP

1

2    is a woman who has also accused other men of things

3    as you know.  It is a totally false accusation.  I

4    think she was married, as I read.  I have no idea

5    who she is, but she was married to an actually nice

6    guy, Johnson, a newscaster.

7              "Question:  You were in a photograph with

8    her?

9              "The President:  Standing with coat on in

10   a line -- give me a break -- with my back to the

11   camera.  I have no idea who she is.  What she did

12   is -- it's terrible, what's going on.  So it's a

13   total false accusation, and I don't know anything

14   about her, and she's made this charge against

15   others.  And, you know, people have to be careful

16   because they're playing with very, very dangerous

17   territory."

18             Am I going slow enough?

19   A.      Yeah, you're going fine.

20   Q.      "And when they do that -- and it's

21   happening more and more.  And when you look at what

22   happened to Justice Kavanaugh and when you look at

23   what's happening to others, you can't do that for

24   the sake of publicity.  New York Magazine is a

25   failing magazine.  It's ready to go out of business

A-1117

Page 66

                              D. J. TRUMP

1

2    from what I hear.  They'll do anything they can, but

3    this was about many men.  And I was one of the many

4    men that she wrote about.  It's a totally false

5    accusation.  I have absolutely no idea who she is.

6    There's some picture where we're shaking hands.  It

7    looks like it's some kind of event.  I have my coat

8    on.  I have my wife standing next to me.  And I

9    didn't know her husband, but he was a newscaster.

10   But I have no idea who she is.  None whatsoever.

11   It's a false accusation, and it's a disgrace that a

12   magazine like New York -- which is one of the

13   reasons it's failing.  People don't read it anymore.

14   So you're trying to get readership by using me.

15   It's not good.  You know, there were cases that the

16   mainstream media didn't pick up, and I don't know if

17   you've seen them, and they were put on Fox.  But

18   there were numerous cases where women were paid

19   money to say bad things about me.  You can't do

20   that.  You can't do that.  And those women did wrong

21   things, that women were actually paid money to say

22   bad things about me.  But here's a case.  It's an

23   absolute disgrace that she's allowed to do that."

24              You made that statement, correct?

25        A.    Read the last part, please.

A-1118

Page 67

                         D. J. TRUMP

1

2        Q.    "But here's a case.  It's an absolute

3   disgrace that she's allowed to do that."

4        A.    Yes.

5        Q.    Okay.  And I'm going to ask the same

6   questions I asked last time.

7              I take it you stand by that statement

8   today?

9        A.    Yes.

10       Q.    Sitting here today, are you aware of any

11  inaccuracies in your statement?  I'm not asking

12  about her allegation.  About your statement.

13       A.    No.  I think it's pretty much fine.  I

14  can't -- I haven't reviewed it in great detail, but,

15  you know, it was standing outside of a helicopter

16  that was getting ready to take off.  But, no, that

17  was -- that -- the statement is, in my opinion,

18  correct.

19       Q.    Okay.  And just so the record is clear,

20  if at any point you come across any inaccuracies,

21  please don't hesitate to let us know.

22             Let's go now to the third statement,

23  which we're going to mark as DJT 22.

24             (DJT Exhibit 22 was marked for

25  identification.)

Page 125

1                        D. J. TRUMP

2    work out those problems for herself.  Now, like

3    everyone else, she gets paid by a radical,

4    left-leaning publisher to say bad and untrue

5    things."  Do you see that?

6         A.    Yeah.

7         Q.    I want to focus on the very last

8    sentence, which says:  "Now, like everyone else, she

9    gets paid by a radical, left-leaning publisher to

10   say bad and untrue things."

11        A.    Yeah.

12        Q.    Do you know who her publisher was?

13        A.    No.  I just heard it was a publisher that

14   did some very bad books on us.

15        Q.    I'll represent to you her publisher was

16   Harper Collins.

17        A.    Yeah.  And they haven't been great.

18        Q.    Do you know who published your

19   son-in-law, Jared Kushner's book?

20        A.    Could be, but they published some very

21   bad ones too.

22        Q.    What is Truth Social?

23        A.    It's a platform that's been opened by me

24   as an alternative to Twitter.

25        Q.    And your handle on Truth Social is

A-1120

Page 126

                         D. J.  TRUMP

2   @realdonaldtrump?

3        A.    I believe so, yes.

4        Q.    And as of today, you have approximately

5   four million followers on Truth Social?

6        A.    I don't know the number.  I know

7   Truth Social is doing very well.  I think it was

8   number one ahead of TikTok, number one ahead of

9   Twitter, number one ahead of Instagram and everyone

10  else for the last number of days.  I just noticed

11  that.  Somebody put it on my desk.  They have the

12  ratings, and they said Truth Social is hot.

13       Q.    And I'll represent to you, sir, that we

14  looked it up, and it showed, at least as of the last

15  time we looked, you had around four million -- a

16  little bit over four million followers.

17       A.    On me personally.

18       Q.    On you personally.

19       A.    Not Truth Social, on me.  I don't know.

20  That's possible.

21       Q.    Okay.  And like Twitter, people have the

22  ability to repost, or I think as you used the

23  expression in Truth Social, "retruth" posts that you

24  make from your @realdonaldtrump account; correct?

25       A.    I think so, yes.  Yes, they do.