# 23-0793-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## JOINT APPENDIX
### Volume 6 of 12 (Pages A-1401 to A-1680)

---

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

i

## TABLE OF CONTENTS FOR JOINT APPENDIX

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*").........................................    A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") .....................................    A-32

### <u>Documents Submitted in *Carroll I*</u>

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

    Exhibit A to Kaplan Declaration -
Letter from Roberta A. Kaplan to Marc E.
Kasowitz, dated August 10, 2020, with Enclosure    A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023.........    A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 .......................................    A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 .......................................    A-89

    Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Lisa
Birnbach, dated September 21, 2022....................    A-92

    Exhibit 2 to Kaplan Declaration -
Excerpts from Deposition Transcript of Carol
Martin, dated October 18, 2022 ...........................    A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 .......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 .................................................. A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 ............................................... A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ......................................... A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ................................................ A-405

iii

                                                                    **Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................ A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 .......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ...................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ....................... A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 ......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ........................... A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 .................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 ................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ......................................................... A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023 ...................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 .......... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

|  | **Page** |
|---|---|
| Letter from Roberta A. Kaplan to the Honorable Lewis A. Kaplan, dated March 17, 2023 ............... | A-509 |
| Annexed to Letter - Proposed Order ...................................................... | A-511 |

## **Documents Submitted in *Carroll II***

| Complaint and Demand for a Jury Trial, dated November 24, 2022 ................................................. | A-513 |
|---|---|
| Answer, dated January 27, 2023 ................................. | A-542 |
| First Amended Answer, dated February 10, 2023...... | A-556 |
| Defendant's Letter Motion for Discovery, dated February 10, 2023 ................................................. | A-571 |
| Exhibit A to Defendant's Letter Motion - DNA Report, dated January 8, 2020 ..................... | A-574 |
| Exhibit B to Defendant's Letter Motion - Twitter Post, dated February 25, 2021 .................. | A-602 |
| Plaintiff's Letter Response in Opposition to Defendant's Motion for Discovery, dated February 10, 2023................................................. | A-607 |
| Defendant's Letter Reply in Further Support of Motion for Discovery, dated February 10, 2023.... | A-612 |
| Transcript of Conference, dated February 7, 2023 .... | A-614 |
| Notice of Motion, by Defendant, for an Order Granting Partial Summary Judgment, dated February 23, 2023................................................. | A-635 |
| Declaration of Matthew G. DeOreo, for Defendant, in Support of Motion for Partial Summary Judgment, dated February 23, 2023...................... | A-637 |

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020.. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ...................................... A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023......... A-747

vii

**Page**

Declaration of Alina Habba, for Defendant,
in Support of Motions *in Limine*, dated
February 23, 2023 ................................................. A-773

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-775

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 ............................. A-779

Exhibit C to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022
(Reproduced herein at pp. A-487-A-492)

Exhibit D to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023
(Reproduced herein at pp. A-493-A-499)

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-783

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-785

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-786

Exhibit 2 to Kaplan Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023 ................................................... A-863

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ...................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................ A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)............................................................... A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)............................................................... A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 .................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 .........................   A-1065

x

                                                                    **Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
    Opposition to Defendant's Motions *in Limine*,
    dated March 9, 2023 .............................................. A-1080

    Exhibit 1 to Crowley Declaration -
    Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
    January 9, 2023 ...................................................... A-1082

    Exhibit 2 to Crowley Declaration -
    Video of Deposition of Natasha Stoynoff, taken
    October 13, 2022
    (All parties are already in possession of video
    exhibit) .................................................................. A-1089

    Exhibit 3 to Crowley Declaration -
    Video of Deposition of Jessica Leeds, taken
    October 13, 2022
    (All parties are already in possession of video
    exhibit) .................................................................. A-1091

Plaintiff's Response to Defendant's Local Civil
    Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
    Opposition to Defendant's Motion for Partial
    Summary Judgment, dated March 9, 2023 ............ A-1108

    Exhibit 1 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Donald J.
    Trump, dated October 19, 2022 ............................ A-1110

    Exhibit 2 to Kaplan Declaration -
    Truth Social Post, dated October 12, 2022 ............ A-1127

    Exhibit 3 to Kaplan Declaration -
    Expert Report of Ashlee Humphreys, Ph.D, dated
    January 9, 2023
    (Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
    Plaintiff, in Further Support of Omnibus Motion
    *in Limine*, dated March 16, 2023 ..........................   A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ...........................   A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 .............................   A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 .........................   A-1153

Reply Declaration of Alina Habba, for Defendant,
    in Further Support of Motions *in Limine*, dated
    March 16, 2023 ......................................................   A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022 ................................................   A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
dated April 13, 2023 ................................................. A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 ................................................. A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023................................................. A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 ............................... A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1207

Plaintiff's Letter Response to Defendant's Motion
to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022    A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ..................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023....................... A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 ............................... A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................. A-1416

Trial Transcript, dated April 25, 2023....................... A-1420

Trial Transcript, dated April 26, 2023....................... A-1524

Trial Transcript, dated April 27, 2023....................... A-1697

Trial Transcript, dated May 1, 2023.......................... A-1851

Trial Transcript, dated May 2, 2023.......................... A-2036

Trial Transcript, dated May 3, 2023.......................... A-2210

Trial Transcript, dated May 4, 2023.......................... A-2375

Trial Transcript, dated May 8, 2023.......................... A-2567

Trial Transcript, dated May 9, 2023.......................... A-2771

Parties' Trial Exhibits:

PX-1         Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2      "Remarks by President Trump before
          Marine One Departure" (Office of the
          Press Secretary, June 22, 2019) ...............   A-2840

PX-3      "EXCLUSIVE: Trump vehemently
          denies E. Jean Carroll allegation, says
          'she's not my type'" (*The Hill*,
          June 24, 2019).........................................   A-2853

PX-4      Truth Social Post, dated
          October 12, 2022....................................   A-2858

PX-6      "Donald Trump assaulted me in a
          Bergdorf Goodman dressing room 23
          years ago. But he's not alone on the list
          of awful men in my life." (New York
          Magazine, June 21, 2019) ......................   A-2859

PX-12     Photograph ................................................   A-2879

PX-22     Sixth Floor Construction Plan of
          Bergdorf Goodman ..................................   A-2880

PX-24     Sixth Floor Construction Plan of
          Bergdorf Goodman ..................................   A-2881

PX-25     Video Excerpt from Defendant's
          Interview with Billy Bush
          (All parties are already in possession of
          video exhibit) ...........................................   A-2882

PX-25-T   Transcript of Video Excerpt from
          Defendant's Interview with Billy Bush ...   A-2883

PX-26     Video Excerpt from Presidential Debate
          (All parties are already in possession of
          video exhibit) ...........................................   A-2885

xvi

**Page**

PX-26-T  Transcript of Video Excerpt from
Presidential Debate ................................. A-2886

PX-29  Video Excerpt from Defendant's Speech
at Campaign Rally
(All parties are already in possession of
video exhibit) ........................................... A-2887

PX-29-T  Transcript of Video Excerpt from
Defendant's Speech at Campaign Rally... A-2888

PX-31  Video Excerpt from Defendant's Speech
(All parties are already in possession of
video exhibit) ........................................... A-2889

PX-31-T  Transcript of Video Excerpt from
Defendant's Speech................................. A-2890

PX-46  Twitter Post, dated November 15, 2022... A-2891

PX-48  Twitter Post, dated December 12, 2022 ... A-2893

PX-51  Twitter Post, dated January 29, 2023 ....... A-2896

PX-53  Twitter Post, dated January 29, 2023 ....... A-2898

PX-57  Email, dated October 13, 2022 ................ A-2901

PX-112  Video Excerpt from Defendant's
Interview with Roger Ailes
(All parties are already in possession of
video exhibit) ........................................... A-2902

PX-112-T  Transcript of Video Excerpt from
Defendant's Interview with Roger Ailes.. A-2903

PX-200  Video Excerpt from Deposition of
Donald J. Trump, taken October 19,
2022 ......................................................... A-2904

xvii

**Page**

PX-200-T    Transcript of Video Excerpt from
            Deposition of Donald J. Trump, taken
            October 19, 2022....................................    A-2905

DX-CK       Email Regarding Law & Order SVU,
            dated July 23, 2019 ................................    A-2986

Court Exhibits:

C           Timeline of Events....................................    A-2987

D           WordPerfect Document Compare
            Summary of Jury Instructions.................    A-2988

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 1, 2023 ...................    A-3024

    Exhibit A to Letter -
    Excerpts of Trial Transcripts.................................    A-3042

    Exhibit B to Letter -
    LinkedIn Post...........................................................    A-3081

    Exhibit C to Letter -
    "One of the Democratic Party's biggest donors is
    exploring a new anti-Trump boycott" (*Vox*,
    July 2, 2020) ...........................................................    A-3083

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated May 5, 2023 ...................    A-3088

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 6, 2023 ...................    A-3091

Verdict Form, dated May 9, 2023 .............................    A-3095

Notice of Appeal, dated May 11, 2023 ......................    A-3099

Notice of Motion, by Defendant, for an Order
    Granting a New Trial or Remittitur, dated
    June 8, 2023 ...........................................................    A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
    Motion for a New Trial or Remittitur, dated
    June 8, 2023 ........................................................... A-3103

Declaration of Matthew G. DeOreo, for Defendant,
    in Support of Motion for a New Trial or
    Remittitur, dated June 8, 2023 .............................. A-3134

    Exhibit A to DeOreo Declaration -
    Complaint and Demand for a Jury Trial filed in
    *Carroll II*, dated November 24, 2022
    (Reproduced herein at pp. A-513-A-541)

    Exhibit B to DeOreo Declaration -
    Excerpts of Trial Transcripts.................................. A-3136

    Exhibit C to DeOreo Declaration -
    Complaint and Jury Demand filed in *Carroll I*,
    dated November 4, 2019
    (Reproduced herein at pp. A-639-A-667)

    Exhibit D to DeOreo Declaration -
    Verdict Form, dated May 9, 2023
    (Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
    Opposition to Defendant's Motion for a New
    Trial or Remittitur, dated June 22, 2023 ................ A-3219

    Exhibit 1 to Kaplan Declaration -
    Excerpts of Trial Transcripts.................................. A-3221

    Exhibit 2 to Kaplan Declaration -
    Twitter Post, dated June 21, 2019
    (Reproduced herein at p. A-2839)

xix

Page

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 ................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 ................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
Second Circuit, dated July 19, 2023 ..................... A-3339

A-1401

31

We talk about the first time we met/ then the dinner with George,....and walking along (what avenue?) and Natasha saying "I have finally got you alone, I have a million questions for you." and right now 11:56 she says:

N. Since last fall I have been desperately trying to have drinks with you ALONE.

E-We got it now, with *The Atlantic* readers listening in.

N-(laughing) Right. Right. On our walk we only had like ten minutes, a few moments, a few connecting moments.

The dinner with George:
N-It was crazy. It was CRAZY we were together like that.

E- And you did something I never would have done.  Never. Never.

N- (terrified) What did I do?

E-You asked George about Kellyanne.

N-Did I really?

E shaking her head, the all-knowing.

N-Because I'm so (raising her hand, flatting it out and making a tamping down gesture with her hand---like she is forcing the air out of a blowup mattress).

E- I know. But you were ON IT.  And he was very forth-coming. I sat there like this (whips head around and drops chin to her clavicle)

N-He was REALLY forthcoming. He answered way more than I asked.

E- throwing up her hands. I was STUNNED.

A-1402

32

N-I can't remember specifically what I asked---I had a list of questions in my purse, believe you me.  All ready.  (This cracks E. up)  I had studied.

E- You said: It must be very difficult with Kellyanne----I think that's how you started.  And I defended Kellyanne.

N-Oh! I remember that! (laughing) I remember that.

E- And you were worried about George being happy. And he was REALLY forthcoming. And Molly is sitting there eating and commenting and supporting George.

N-I'll betcha Molly remembers everything.

------
16:27
E- Did you know who force his tongue down your throat?

N- Yes. He did. Did he do that would you too?

E- No. He put his lips against mine.  But I was laughing.

N- He did. The whole thing was very fast. (now she runs her hand through the top of her hair and pulls it up and away from the left and takes it around and drops it on her right shoulder----it is such a part of Natasha, lifting and dropping her hair, one barely notices that she does it constantly.)

N-Very fast. But it was there (the tongue).

E- (Rearing back in disgust) Oh!

N- Because I remember thinking ....ugh. I can't even bear reading that any more. Any time somebody summarizes my story in one of those serial-killer things? The tongue. That is always the line they pull. And I just want to forget that moment.

Confidential

A-1403

33

E-What I want to do now is find out who you were at the time----around this period we are talking about.  Who were you at the time of this incident?

N-I was 40. It was 2005. People magazine was still near the top of its game.

E- It was a big deal.

N- It was a big deal.  And I was one of the handful lying around everywhere interviewing the top A-List actors and musicians. Whether it was Jon Bonjovi, Or Meryl Streep, Or Paul McCartney. Or Lauren Bacall.  I'm giving you the ones I liked.  Anyone who was the hottest. I was talking to those people. I was very experienced in film, so I was one of their main film people.

E- And where did you live?  Did you live in an apartment in Ny at the time?

N. Upper east side. Lived on the same block for almost 20 years. A two-bedroom in the east 70's. Lots of space. I used to walk to work. It was like a 30-minute walk to People magazine. So I would walk there, walk home.

E-Was People in the Time-Life building?  At Rockefeller  center?

N-Right across from Radio City Music Hall.

E- You lived with a boyfriend, by yourself, what?

N-Husband (as if imparting a deep secret)

E. What was your life like. Who cooked? You had to go to a lot of parties.

N-I'm a Slavic woman so I love to cook and I love to feed people. But we are living a Manhattan life, so there is a lot of delivery and I would go to lots of cocktail things and dinners with actors, publicists, or parties to cover.

E- Are you a late night person? Did you write deep into the night?

N-I was on the staff of the magazine. So I wrote at the office. and was late every day.  I'm a night person. And I have trouble waking up in the morning. So I was always rushing in a few minutes late.

The whole time/life thing about separating the writers and the reporters.21:49

She arrived in 1997 as a reporter (That really was the hey-day) ---this was when TIME life had "reporters" reporting the stories, and they made huge files containing "color and quotes<" and then another person "a writer" wrote the story. She was there when they finally integrated the reporting and the writing.  And she was there when people magazine when from Black and White to color.

E-Did they hire you as a reporter or writer?

N-They called me a reporter correspondent.  So I just reported. I would send in like 20-30 pages of stuff.  And then someone else condensed and shaped it as a writer.

E-Jesus, what a horrible---that's how TIME used to be written.

N-Yeah. That was their thing. I came from newspapers where I wrote my own features, so it felt really odd.

----

N-I grew up obsessed with films. I memorized entire films.  I was twelve when I memorized the entire three hours of Gone with the Wind. So I loved films. So for me, to meet the actors, directors and writers, that was really---I just couldn't---that to me was heaven.

E- It's like a Ticket. As Hunter Thompson always said. People who have never lived it have no idea how exciting and wonderful it is. And News.

Confidential

A-1405

35

N-There is something about touching (she touches touches touches the air) a newspaper....or having dinner with George and you are right there talking to the person, it's like----What's the word for that?

E-Yeah, what is the word for that?

N-I don't even know if there is one. We should make one up.

E- So

E- So you get on a plane and you fly down to Florida, and

N-I stayed in a hotel nearby. I still have my call sheet from that day.

E- So you're going to see a man you have interviewed many times before. And so what was your mood?

N-I arrived. Glad to see them. Very much wanting to do a good job. On story like this there is always a bit of tug of war---the photographer is shooting, wondering when I'm going to get my time, make sure I get enough time to talk with them. It was very broken up. They are shooting. (hands plant the shooting) I got them for 15 minutes. (hands plant the 15 minutes) Then they shoot something else (hands plant the shooting something else) Then I got the twenty minutes here. (hands plant---it looks like she is picking up bags of potatoes and moving from one side of her table to the other.) So I'm very concerned. Am I gonna get what I need? He's kind of a challenge to interview.  If all you need are sound bites, he's easy. He's got his one sentences ready for you. If you want something deeper, that's a challenge. Because he doesn't go deep.

E- I think he's just shallow. I'm shallow, myself. I am a very shallow person. I live on the surface of life. I don't go deep. So I recognize that in him. 30:03

N-I see it in him, But I don't sense it about you.

A short discussion on how shallow I am....etc., etc.

N-So asking him about feelings----he can't. Because he doesn't have those. If I asked, "Was it a struggle to do this...or that....there is no answer because he does not delve. I'm the opposite. I ruminate on things for hours.

E- he has four or five reactions. It was great. It was tremendous. It was sad.

N-So you really have to press him. What I do is I ask him to give me an example. I was trying to ask him if he planned to be hands on with Barron. And he was like "Melania will handle all that stuff. So I keep pressing. I say, so have you ever changed a diaper? Trying to get him to think. I don't know if I ever got answered. I'll have to look it up. I asked things like did you teach your kids how to ride a bike? Or, will you get up in the middle of the night if they are crying. But I don't recall him answering any of those. He was like (she opens an imaginary door) an empty cupboard.

E-Wow. And all the while, you are turning him on.

Natasha shakes her head, amazed.

N-Boy or boy.

E-Were you taking notes or tape recorder?

N-Tape recorder. A mini cassette tape recorder

E. And when you go on an interview you have extra batteries, extra tapes, and extra recorder in your bag ready to go?

N-I should, but I never do. But you probably do, right?

E. I have back=ups of the backups. I was recording this zoom and recording it on my eye phone. When I travel I have extra cords, extra chargers, pens in every color, extra notebooks. Also I use video to record now, so I can watch their faces again and again as they talk.

Confidential

A-1407

37

N-And Melania is hard to get stuff from too. She's also a surface person. I find them very much alike. But she's very polite. Appears very sweet. There is a steeliness about her. She probably gave more than he did in the interview.

e-So when he takes you into the room and the door closes. You don't remember him chasing you.

N-And Melania is hard to get stuff from too. She's also a surface person. I find them very much alike. But she's very polite. Appears very sweet. There is a steeliness about her. She probably gave more than he did in the interview.

E-So when he takes you into the room and the door closes. You don't remember him chasing you, but the professor does. But when he pushed you up against the door, are you quite sure he didn't grind against you. If his tongue was going down your throat, I think his pelvis was against you.

N- I think my hands went up immediately.  (holding her hands at shoulder level and testing . . . testing) So there was space.

E-Yes, but your hands were like this (holding up my hands and pushing pushing pushing) and then---(I slam my hands back to my chest) they're like THIS, because he is pushing against you.  You see?  You're like this. ((hands out fingers spread.)  And then his weight, his big . . . obesity comes at you, so your hands are thrust back, so I don't think he would be able to try and thrust his tongue unless he was pressing his hips against you.

N-If he did, I can't remember it. It's possible. But I can't remember it. I'm trying to think.  I didn't tell anybody that. I don't remember being asked about it.

E- Maybe you didn't feel it.

(I raise my eyebrows)
It takes a moment.

E- Hahahahaha.

Confidential

CARROLL_027344

Natasha crumples with laughter and practically rolls upon her table.

N-Oooooh my god!

We are laughing so hard, I actually have to wipe my eyes!  Such a relief to laugh at him!

N- We have to get a group of us together to talk about this!  My theory.  I also think that it's a MIND thing for him.

BY THE WAY you have not lived until you sit TRANSCRIBING THIS AS  THE US IS FINDING THE HIGHEST COVID INFECTIONS IN THE WORLD AND THE TRUMP ADMINISTRATION IS HOLDING THEIR FIRST COVID PRESS CONFERENCE IN TWO MONTHS AND VP PENCE IS TELLING AMERICA HOW GREAT A JOB THEY DID. It is completely surreal.

N-Like a power-mind thing. And not even necessarily, a physical thing.  I think he just wants to dominate. There may not be any physical reaction going on with him. He may be thinking: I want to over-take that person.

E. No. I think he wanted to have sex with you.

N. Huh.

silence.

N. Well that would make sense then.

E. there is NO REASON to over-power you for any other thing. There's no reason to over-power you, you're just a reporter from Time, uh, People magazine.  No reason to over-power you.  He wanted to have sex with you. THAT'S what he wanted to do. (he even spoke it as plainly as a man could.)

CARROLL_027345

A-1409

39

N-I mean like Karena and some other people, he's only got like two minutes.

E-He wants her to react and say ooooo, you SEXY, big man, let's meet later. I'm telling you, it's sex with him.  A lot of people disagree with me.  They think he has to dominate everyone around him---true, but then he puts a sexual layer on top of that.

N-long pause. long pause.  Long pause.  She rocks back and forth in her chair.
He didn't seem to be such a . . . . (rocking....rocking)   ......man who enjoyed the actual event.

E-Oh! I agree! I agree!

N-So I feel that that's not the important thing with him.

E (Like twelve year old boys) He has the boyish thing. The excitement of rubbing up against a woman is sometimes more fun for guys than wielding the body of a woman around in a bed.

I have no idea, I say at last.

--------

E. So you were raised playing sports.

N- it was 1975 when "Farah facet was a star," and I had a big strong body, and I didn't fit in.  But the thing about growing up playing sports is you learn how good it is to be strong. So for women mentally and emotionally, it's very good.

N-I learned honor from my parents. My parents were the most honorable people I ever knew. They would never lie.  They were such good---good people, strong and dependable.

E-Take me through Mike Tyson.

Confidential

CARROLL_027346

A-1410

40

Natasha reaches behind her head, takes a handful of hair and pulls it around on her right shoulder.

N- He was at that famous gym in Brooklyn. HIILARY swank trained there. https://en.wikipedia.org/wiki/Gleason%27s_Gym So he had something going on (and I will have to check emails) and I went to interview him. And I was already training in boxing so I took my gloves.

E- When did you start training as a fighter.

N-2004.

E- What take it up?

N- I needed something that was, I needed something athletic to feel strong and I always sensed that boxing would be good for me. I never wanted to stand in a gym and just lift weights or run on a treadmill. I wanted to do something that was active and moving (throwing punches as she talks) and I wanted to HIT!  (she gentle fluffs out her shoulder hair and strokes it) I wanted to throw punches. That I wasn't permitted to throw in real life. I wanted to throw punches that people deserved, that they never got from me, cuz I was too nice.  So I had pent-up punches that had to be expressed. And there I was with Trump IN THAT MOMENT and I didn't use it.

E-(screeching) if anybody deserved it, it was this guy!

This sets off the dog who starts howling.

E-I turn to him and say---EXACTLY!

N-What's your dog's name.

E. Guffington Von Fluke.

Guff rises up to the screen and stares at Natasha.

N-Ohhhh! Aren't you a handsome! Handsome!

Confidential

CARROLL_027347

A-1411

41

E-How did Tyson react when you punched HIM?

N-Well, when I met him, I was carrying my gloves and I said, "I'm gonna take you down." I'm gonna TAKE YOU OUT! And he laughed. And the guys around him were laughing. Cuz I'm like, "Come on! Come on!" And I think at first he didn't want to throw a punch. But I egged him on. "Come on! Come on!" I think somebody handed him some gloves. So we sparred a little bit.

E- Were you there to write about him?

N-I was there to interview him for something.

E I remember meeting him when I was at Saturday Night live. And I remember being the same height or slightly taller than Mike Tyson. I was probably wearing high-high heels. (he was very gentle and sweet with a chest like a card table and his baby lisp).

N- I feel that way about Arnold Schwarzenegger. I felt I could have punched him and knocked him out. Listen to me! When it comes time when I REALLY HAVE TO HIT SOMEBODY, and I don't do it.

E- and you boxed with Norman. Did Norris join in?

N- Norris was a very dainty southern girl and she watched from the window. But it happened every time I visited.

E-He must have loved it.

N- He LOVED it. And not only that, he taught me how to drink Scotch. He took me to a Provincetown Bar, And they brought out all these different bottles of Scotch. And he made me do a whole tasting. He would pour each one into a different glass and explain to me the beauty of each one. And why each one was great in its own way. (She demonstrates hoisting the glasses and swallowing ....uh-huh! Uh-hun! Uh-huh! That's mossy. Or Peaty, or whatever. And that man could drink, boy. He could drink.

Confidential

A-1412

42

E. Alas, now I have to bring up the subject of what happened the next day.

Both our moods plummet.  We had been laughing and boasting and yelling and cracking up with Tyson and Mailer, and I have to bring up THE NEXT DAY.

E- You went back to your hotel. Your called your professor.

N- And the next day I had this massage appointment, which Trump had set up for me. It was at 8 in the morning. An hour before anything was opening. ( when I got there the day before he was telling me I should book an appointment at the spa and I said Oh! Actually I tried to get your massage guy---but he's all booked up unfortunately.  And before I knew it he goes and comes back  and says, "I spoke to the guy. You're in 8 am tomorrow. I didn't ask him to do it, he just did it. He said, "He's gonna come in an extra hour early for you. The top guy!")

E- Wow.

N-I didn't want him to do that for me. And I just knew there was no way I could get there at 8 in the morning. As I explained to you, I am not a morning person. So I raced to get there. And I'm late. And when I get there the massage guy is just nervous and panicked.  And I just assume he's panicked because I'm late.  Because he came in EARLY for me. I said, "Look I'm sorry I'm late."

E- How late.

N- 15- 20 minutes. I said, I will pay you for the whole hour. DON'T worry about it."
And he said, "No, it's not that. Mr. Trump was here waiting for you."

E-Oooooo. This makes me so sick I have to turn away and stare out a window and curse.
Now I get it---it was the masseuse's nervousness which revealed Trump's evil intension.

Confidential

CARROLL_027349

A-1413

43

N-I said, What do you mean, he was here? And he goes: He was waiting for you." It was just him and Trump. Nobody else was there because they were not open.

E- I rest your case. (I need to hear no more.)

N- So now I'm in the massage room and I'm starting to get a massage and it occurs to me that---"Could he come back?" I am lying on this massage table almost naked with a towel around me in a strange place where he's the owner, he made the appointment, and he was there just a few minutes before....and if he came back, this guy is just gonna let him right in. So I couldn't relax at all and I had to end the massage. I said, "I can't." and I left. I felt so vulnerable and on the precipice of being completely violated. I felt naked physically, emotionally, and mentally. I was unsafe.

N-when women are angry they cry.  And when men want to cry they get angry. So when I talked to my professor (this was after the first day and he shoved her against the wall) My voice was shaking.  And when I called my good friend, Marina, a film producer.  She produced Crash, the movie that won best picture----I cried.  It was a punch that I couldn't throw. (Marina is one of the six corroborators.

----

N-I started out as teen-aged paparazzi, did you know that? Taking pictures. I was 17, 18, and I would take pictures of all the top celebrities who came to Toronto.  I would stake them out at the Four Seasons by the swimming pool or the restaurants.

E- scrrrrreaching.  No!

N-I used to bake cookies for the doormen of the 4 Seasons Hotel in Toronto to bribe them to tell me when some of the stars would be coming so I could be there take a picture and then I would run down to the Toronto Star to the newsroom and it would be on the front page the next day! It was great! I

Confidential

CARROLL_027350

was the nicest paparazzi you could ever meet! I'm a shy high school kid, please Mr. Beatty, Mr. Nicolson, please can I take your picture?

E-Melting   What an origin story.

N-And they'd be like Oh! OK! So I was getting all these shots none of the other photographers could get.  They think they're giving a shot to a nice kid. and then I RUSH DOWN TO THE PAPER!  HERE'S MY FILM!! And I got paid for it! And so then what happened is I started interviewing them.  I would bump into them in the gift shop.  My friends who worked in the gift shop would hide me in the stock room and then when a celebrity came in, I'd come out, I'd start talking to them, I'd do a little interview, and then I'd write it for the school paper.  All these EXCLUSIVE INTERVIEWS with all these top actors and musicians that nobody else could get.

I'd take the door man cookies and say, "When's Madonna showing up?" U2 , Bono the Cars, Huey Lewis, Duran Duran Bruce Springsteen was by the pool---1980-1982----Marlon Brando....I sneaked on his film set and got it.....and I still see that picture on line

E- You should write a memoir.

N-People tell me that. When you wrote your memoir, was that the first time you wrote about yourself.

E-I only write about myself.  Anytime I'm talking to anybody I am writing about myself.....as we all are---some of us more obviously than others

E- What would you be wearing when you were a teenage paparazzi

N-That was my white jumpsuit era. My hair was (waving her hand down her face)  longer Marilyn. Like Marilyn, but longer---waves

Asking for photos.

E-Journalism was mother's milk to you.

Confidential

A-1415

45

Natasha wants to write about me for this series. We'll do the flip.

Confidential

CARROLL_027352

A-1416

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL        212.763.0883
DIRECT EMAIL     rkaplan@kaplanhecker.com

April 23, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:        <em>Carroll v. Trump</em>, 22 Civ. 10016 (LAK)

Dear Judge Kaplan:

On behalf Plaintiff E. Jean Carroll, we submit this letter in opposition to Defendant Donald J. Trump's motion purporting to "request clarification" of the Court's decision concerning Natasha Stoynoff's testimony. ECF 142 at 1. Trump does not really seek *clarification* of that decision, which was perfectly clear in admitting Stoynoff's testimony and rejecting Trump's grounds for seeking to exclude it. Instead, what Trump actually seeks is *reconsideration* of the Court's ruling. But because he does so: (1) well after the reconsideration deadline lapsed; (2) in sole reliance on a document that he has possessed for over seven months; and (3) in disregard of the legal and factual grounds on which this Court admitted Stoynoff's testimony, Trump's motion should be denied.

*        *        *

In *Carroll I*, both parties filed motions in limine addressing the admissibility of Stoynoff's testimony. *See* ECF 131 & 134, *Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.). The parties then incorporated their arguments in their *Carroll II* motions in limine. *See* ECF 70 at 1 & ECF 73 at 3.

On March 10, 2023, the Court denied Trump's motion in limine to exclude Stoynoff's testimony in *Carroll I*, concluding that it is admissible under Federal Rule of Evidence 415. *See Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 2441795, at *5-*7 (S.D.N.Y. Mar. 10, 2023). The Court observed that "Rule 413(d)(5) defines as 'sexual assault' for purposes of Rule 415 an attempt to engage in conduct described in Rule 413(d)(2), among other provisions." *Id.* at *5; *see also* Fed. R. Evid. 413(d)(2) (providing that "sexual assault" includes "contact, without consent, between any part of the defendant's body—or an object—and another person's genitals or anus"). The Court further observed that "Rule 413(d) requires also that any such attempt [] constitute a crime

KAPLAN HECKER & FINK LLP                                                          2

under federal or state law." *Carroll*, 2023 WL 2441795, at \*5. Based on the record before it, the Court found that Trump's conduct, as described by Stoynoff at her deposition, violated at least two Florida statutes, thus satisfying the crime requirement of Rule 413(d). *See id.* at \*5-\*6. The Court further reasoned that "a jury reasonably [could] conclude that Mr. Trump at least attempted to have contact with Ms. Stoynoff that, if it had occurred, would have met the requirements of Rule 413(d)." *Id.* at \*7. Thus, the Court found that a jury might reasonably conclude that Trump's conduct toward Stoynoff constituted an attempt under Rule 413(d), including an attempt to bring any part of his body into contact with her "genitals or anus." *See* Rule 413(d)(2).

As Your Honor explained, this conclusion about Trump's motives was based on numerous considerations. *First* (though this was not alone sufficient), Stoynoff had "described Mr. Trump kissing her without her consent and against her will." *Carroll*, 2023 WL 2441795, at \*6. *Second*, Stoynoff had "testified also that Mr. Trump was lying when he denied 'groping' her without her consent." *Id. Third*, "the circumstances of the alleged encounter" were "suggestive of a plan, formed before Mr. Trump invited Ms. Stoynoff to [an] unoccupied room and closed the door behind her, to take advantage of that privacy and to do so without regard to Ms. Stoynoff's wishes." *Id. Finally*, "the *Access Hollywood* tape and the testimony of Ms. Leeds are additional evidence . . . in deciding whether to infer that the ultimate goal of Mr. Trump's alleged actions with Ms. Stoynoff was to bring his hands or other parts of his anatomy into contact with Ms. Stoynoff's most private parts." *Id.* Taken together, these factors could allow a reasonable juror to conclude that Trump's conduct toward Stoynoff—which, as she had described it, was unquestionably criminal in Florida—fell within Rules 413(d) and 415.[1] Accordingly, the Court denied Trump's motion to exclude Stoynoff's testimony in *Carroll I. See id.*

Just over two weeks after denying Trump's motion to exclude Stoynoff's testimony in *Carroll I*, the Court granted Carroll's motion in limine in *Carroll II* seeking to admit this testimony. *Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023). In so doing, the Court adopted its reasoning from *Carroll I* and stated, in no uncertain terms, that "the testimony of Ms[]. Stoynoff . . . regarding [her] experience[] involving the defendant come[s] within Federal Rules of Evidence 413 and 415 and will not be excluded under Rule 403." *Id.* at \*8.

\*       \*       \*

In his letter filed yesterday, Trump purports to "request clarification" of the Court's March 10 opinion. ECF 142 at 1. But there is nothing about that opinion that needs to be clarified. Instead, he effectively asks the Court to reconsider and vacate its decisions admitting Stoynoff's testimony, and to undertake *voir dire* questioning of Stoynoff before deciding whether her testimony may be admitted under Rule 415. But there is a reason why Trump does not style his request as one for reconsideration: he cannot satisfy any part of the applicable legal standard. *See, e.g., United States v. Johnson*, No. 14 Cr. 00412, 2015 WL 4999461, at \*1 (N.D. Cal. Aug. 20, 2015) (characterizing Government's "request for clarification" of an order on motions in limine as "a thinly veiled, out-of-order motion for reconsideration").

---

[1] As Carroll observed in her motion in limine in *Carroll I*, additional evidence supported this finding. Most notably, "Stoynoff testified that she pushed Trump back twice and he stopped assaulting her *only after* a member of his staff walked in. Stoynoff Dep. at 21:20-21, 22:3-4." ECF 138 at 5, *Carroll I* (emphasis added).

A-1418

KAPLAN HECKER & FINK LLP                                                    3

As an initial matter, Trump's motion is untimely under Local Civil Rule 6.3, which requires that a motion for reconsideration "be served within fourteen (14) days after the entry of the Court's determination of the original motion." Any motion asking the Court to reconsider the admissibility of Stoynoff's testimony pursuant to the March 10 order was due almost a month ago (March 24).[2]

Beyond this fatal timing issue, the "extraordinary remedy" Trump requests is obviously unwarranted. *Gutierrez v. City of New York*, No. 08 Civ. 6537, 2012 WL 3245344, at *1 (S.D.N.Y. Aug. 9, 2012). "A party making a motion for reconsideration is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings." *Pfizer, Inc. v. Stryker Corp.*, No. 02 Civ. 8613, 2005 WL 383702, at *1 (S.D.N.Y. Feb. 17, 2005) (Kaplan, J.) (quotation omitted); *accord Weiss v. El Al. Israel Airlines, Ltd.*, 471 F. Supp. 2d 356, 358 (S.D.N.Y. 2006) ("A motion for reconsideration is not an opportunity for a losing party to advance new arguments to supplant those that failed in the prior briefing of the issue."). Rather, to prevail on a motion for reconsideration, the movant must identify "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013).

Trump's motion does not come close to satisfying any of these requirements. Trump does not cite any controlling decision—or any decision at all—that would disturb the Court's holding. He does not identify any new evidence, but instead relies on a document that he has possessed for over seven months (and that plainly cannot support a reconsideration motion). *See U.S. Bank Nat. Ass'n as securities intermediary v. PHL Variable Ins. Co.*, No. 12 Civ. 6811, 2015 WL 4610894, at *2-*3 (S.D.N.Y. July 30, 2015). Finally, Trump does not argue (nor could he credibly maintain) that the Court's orders concerning Stoynoff's testimony constitute clear error or manifest injustice. The Court identified multiple grounds on which a reasonable juror could find that Trump's conduct targeting Stoynoff constituted an attempt to engage in conduct covered by Rule 413(d). Even if Stoynoff's trial testimony more closely resembles the language that Trump attributes to her—and Trump will still bear a heavy burden if he seeks to rely on this document[3]—the Court's original analysis would remain well supported.[4] Indeed, the Court itself observed that there were myriad overlapping grounds on which to find that Trump's forcible kissing of Stoynoff was part of an attempt to engage in contact with her in a way that would be consistent with Rule 415.[5]

---

[2] Trump does not seek "clarification" of the Court's March 27 opinion admitting Stoynoff's testimony in *Carroll II*, yet this opinion most directly controls here. For that reason, too, Trump's motion is procedurally defective—and even if he had sought reconsideration of that opinion, his request would also be untimely (the deadline passed on April 10).

[3] If Trump wishes to introduce this document at trial, he will have the burden of establishing that the statements attributed to Stoynoff are not hearsay, as well as the additional "burden of proving that [the] notes reflect the witness's own words rather than the note-taker's characterization." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 168 F. Supp. 2d 57, 60 (S.D.N.Y. 2001) (quoting *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992)).

[4] Of course, Trump is free to argue that Stoynoff's testimony is mistaken—in other words, he is free to argue that his interaction with her either did not occur at all or did not occur as she says it did. This factual dispute thus remains for the jury to resolve. *See Carroll*, 2023 WL 2441795, at *7.

[5] Moreover, for the reasons described in Carroll's motion in limine, the Court could alternatively and additionally admit Stoynoff's testimony under Federal Rule of Evidence 404(b), which allows the admission of prior bad act

A-1419

KAPLAN HECKER & FINK LLP                                                    4

Perhaps recognizing the weakness of his reconsideration motion, Trump concludes it with the offensive and wholly unsupported accusation that Plaintiff's counsel engaged in "clear efforts to coach and influence" Stoynoff's testimony. ECF 142 at 2. Not only is this charge baseless, but as we approach the start of a two-week jury trial in this case, we would like to remind defense counsel that spurious allegations like this against opposing counsel are not tolerated. *See, e.g.*, *Carroll II*, Conf. Tr. at 4 (Feb. 7, 2023) ("I've had enough of the personal accusations between and among lawyers, and I don't want to see any more."); N.Y. Standards of Civility § I.B. ("Effective representation does not require antagonistic or acrimonious behavior.").

For these reasons, Trump's motion should be denied. To provide needed clarity, Carroll respectfully requests that the Court issue a decision on this motion prior to opening arguments.

Respectfully submitted,

Roberta A. Kaplan

cc:     Counsel of Record
        Anne Champion, Esq. (Counsel for Ms. Stoynoff)

---

evidence where it evinces a relevant *modus operandi*. *See* ECF 134 at 8-10, *Carroll I*. This separate basis for admitting this testimony further undermines any claim that denying reconsideration would be a manifest injustice.

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                    Plaintiff,              New York, N.Y.
 4
              v.                            22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                    Defendant.
 7   ------------------------------x        Jury Trial

 8                                          April 25, 2023
                                            9:55 a.m.
 9

10   Before:

                         HON. LEWIS A. KAPLAN,
11

12                                          District Judge
                                                  and a Jury

13

                              APPEARANCES
14

     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18

     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24

     W. PERRY BRANDT
25        Attorney for Defendant
```

1              (In the robing room; Ms. Kaplan, Ms. Crowley, Mr.

2    Tacopina, and Mr. Seigel present)

3              THE COURT:  Be seated.  I gather the jurors are in the

4    room, right?

5              THE DEPUTY CLERK:  No, Judge.  They are not physically

6    in the room yet.  The jury department is getting the list

7    ready.

8              THE COURT:  Fine.  Let's go in the courtroom.  I

9    misunderstood.

10             (Case called)

11             THE DEPUTY CLERK:  Plaintiff, are you ready?

12             MS. KAPLAN:  We are.

13             THE DEPUTY CLERK:  Counsel, please put your appearance

14   on the record.

15             MS. KAPLAN:  On behalf of plaintiff, your Honor, it's

16   myself, Roberta Kaplan; my partners Shawn Crowley and Michael

17   Ferrara from my law firm; and our colleague Matt Craig.  I'm

18   also here with our client E. Jean Carroll and our jury

19   consultant Reiko Hasuike.

20             COUNSEL:  Good morning, your Honor.

21             THE DEPUTY CLERK:  Counsel for defendants, are you

22   ready?

23             MR. TACOPINA:  Yes.  Good morning, your Honor.  Joseph

24   Tacopina for Mr. Trump.  Along with me here, your Honor, to my

25   immediate left is attorney Josh Dubin, who will be assisting me

1   during the jury selection proceedings exclusively.  To his

2   immediate left is Chad Seigel, my partner.  To Mr. Seigel's

3   immediate left is Perry Brandt.  Perry is an attorney who is of

4   counsel to my firm.  Right ahead of me in the seat closest to

5   the jury box is Matt DeOreo, my partner; and to his left is

6   Michael Madaio.

7           THE COURT:  Good morning, all.

8           MR. TACOPINA:  I'm sorry, your Honor to our immediate

9   left is Eric Nelson, who is our IT tech.

10          THE COURT:  The jury department is still in the last

11  phases of getting the panel ready.  The only reason, folks,

12  that we left the bench was because I was misinformed that the

13  jurors were already in the courtroom.  So nothing happened in

14  the robing room.  Whatever is going to happen is going to

15  happen right here.

16          Mr. Tacopina, I understand you have something you

17  wanted to say.

18          MR. TACOPINA:  Your Honor, there are two issues,

19  nothing too substantial, but one is there was a request——and I

20  have shared this with opposing counsel——for a brief *ex parte*

21  discussion regarding sort of logistics that would invoke some

22  attorney work product and defense strategy that I would not

23  want to reveal to either -- to the opposing counsel.

24          Now, what I also said to opposing counsel was that if

25  your Honor, after hearing that, thought it was something that

1    you had to share with opposing counsel, I would have no

2    objection to that at all.  It was just something that I think

3    would help smooth some things along going forward in this

4    trial.  That's one request.

5                The second --

6                THE COURT:  Well, that's fairly straightforward.

7                MR. TACOPINA:  Yes, sir.

8                THE COURT:  I don't do that.

9                MR. TACOPINA:  Okay.  Just making the request, your

10   Honor.

11               THE COURT:  Okay.

12               MR. TACOPINA:  Secondly, this one I'm not sure, I

13   think we spoke to opposing counsel about potentially doing this

14   at sidebar.  It invokes a medical issue regarding a witness.

15               Let me start out by saying this is not a request for

16   an adjournment, because I know how much you love those.  That's

17   not happening.

18               But there is an issue that is substantially --

19               THE COURT:  You know, back when you first appeared in

20   the case, you said if I say we are going to go on April 25, we

21   are going to go on April 25.

22               MR. TACOPINA:  And here we are.

23               THE COURT:  And here we are.

24               MR. TACOPINA:  Here we are.

25               So anyway, your Honor, there is an issue, though,

1   regarding the medical -- dire medical condition of a witness

2   that I think I just want to alert the Court to.  I have spoken

3   to Ms. Kaplan about it, and we are trying to see if there is a

4   way to deal with it.  It's a little premature at this point, so

5   just fronting it now.  I don't know how much you want me to

6   elaborate on the record.  I'm a little concerned about putting

7   all this out in open court because, you know, there are some

8   privacy issues regarding this situation.

9           THE COURT:  Well, look, I can imagine there might be,

10  but what you are really telling me is that we are going ahead

11  today and there may be, down the road, some further discussion

12  about this or there may not be.  Is that about it?

13          MR. TACOPINA:  Yes, sir.

14          THE COURT:  Okay.  Fine.  I'm duly alerted.

15          MR. TACOPINA:  I think that's it, your Honor.

16          THE COURT:  Okay.  I know I received a copy of what I

17  never knew until a month ago was called a deck, but a few

18  graphics that the plaintiff intends to use on opening

19  statement, and they were shared with Mr. Tacopina.

20          Mr. Tacopina, is there anything that you intend to use

21  on openings.

22          MR. TACOPINA:  Yes, your Honor, there is.  There is

23  one photograph.  Let me just be sure of something.

24          (Counsel confer)

25          MR. TACOPINA:  We have one photograph that we intend

A-1425

1   on using in the opening, your Honor, and we are sharing that

2   with opposing counsel now.

3            MS. CROWLEY:  Your Honor, were you given a copy of the

4   defense --

5            THE COURT:  No.

6            (Pause)

7            THE COURT:  Do we have an issue here or not?

8            MS. CROWLEY:  Just one second, your Honor.

9            MR. TACOPINA:  Your Honor, how would you like us to

10  hand this up to your Honor?

11           THE COURT:  The usual practice is you give it to the

12  courtroom deputy.

13           MR. TACOPINA:  That's what I thought.  Okay.

14           THE COURT:  I am looking at Defendant's Exhibit CV for

15  identification.  Is there any issue about it?

16           MS. CROWLEY:  No, your Honor.

17           THE COURT:  Okay.

18           MR. TACOPINA:  Your Honor, we may have an issue with

19  one -- we just received the exhibits for the opening now.  And

20  by the way, we just exchanged them, as well, so I'm not saying

21  they are late or anything.  We just have one issue.

22           THE COURT:  I thought I was copied on an e-mail to you

23  last night which I saw after dinner.  Isn't that right?

24           MS. CROWLEY:  No, your Honor, that was just to the

25  Court.  We exchanged with defense counsel this morning.

1          MR. TACOPINA:  We are just looking at it for the first

2     time.  There may be an issue.  We don't have to deal with it

3     right this second if you don't want -- if you want to get

4     started with the jury.

5          THE COURT:  Why don't you try and work it out.

6          MR. TACOPINA:  Okay, okay.

7          THE COURT:  There are just one or two more things that

8     I had to say before we bring in the jurors.

9          First, I want you all to understand exactly how this

10     is working.  I don't know the exact size of the panel, but it

11     is in the vicinity of a hundred.  They obviously won't all fit

12     in this room.  We are going to bring approximately 48 into this

13     room, and the remainder will be in the jury assembly room.

14     They will be handed, just the ones in the jury assembly room, a

15     written copy of the questions I am going to put in the course

16     of the *voir dire*.  I will give that to counsel at the same

17     time.  The jurors in the room will not be given the written

18     questions.  They are going to hear them orally.

19          The purpose of handling it that way is that I will

20     instruct the people in the jury assembly room that they are to

21     follow along in the questioning even though they are not in

22     this room and to make note of any questions that they would

23     have answered affirmatively had they been in the room so that

24     when we replace anyone from the live group in the room with

25     people from downstairs, the people who are coming in for the

1    first time can be asked would you have answered yes to anything

2    I have asked so far and, if so, what?  And in that way we avoid

3    repeating the whole *voir dire* with a second group.  So I just

4    wanted to alert you that that's the way it is going to work.

5              Secondly, the first question for the panel is going to

6    be, in substance, this:  Is there anything about the nature of

7    this case or the parties that would make it difficult for you

8    to be entirely fair to both parties and to come to a just and

9    impartial verdict?  And I will ask people to raise their hands

10   if the answer is yes, and my normal practice would be simply to

11   excuse anybody who answers that question yes.

12             Does anybody have a problem with that?  I hear none.

13             MR. TACOPINA:  Your Honor, will that be after the

14   description of the case?

15             THE COURT:  Yes, it will.

16             MR. TACOPINA:  Okay.  Thank you.

17             THE COURT:  Now, just a question of procedure, and I

18   can work with this either way, there sometimes come points in

19   the course of a *voir dire* where a juror gives an answer that at

20   least seems to me grounds for excusal then and there, whatever

21   it is.  You know, the juror is leaving on a jet plane tomorrow,

22   whatever it is, and what I propose to do at that point is

23   simply say one word: "counsel."  And if I hear nothing, you

24   understand I am going to excuse that juror.  If you have an

25   issue about that and you want me to ask more questions or

1    anything of that sort, then you should let me know.  Okay?

2            One more thing, and then we are just about all ready

3    to go.  I encourage counsel on both sides to inform your

4    clients and witnesses to please refrain from making any

5    statements that are likely to incite violence or civil unrest.

6    I request also that you discuss with your respective clients

7    and witnesses the need to refrain from making comments or

8    engaging in conduct that has the potential to jeopardize the

9    safety or wellbeing of any individuals or the rule of law,

10   particularly as it applies to proceedings in this courtroom.

11   Both parties are well aware of the publicity this case has

12   attracted and likely will continue to attract throughout the

13   trial, and of my concerns especially with respect to the safety

14   and privacy of the jurors in this case.

15           By making this request now, I am not implying and do

16   not intend to imply that either party or either party's counsel

17   has engaged in any misconduct with respect to this trial.  I am

18   simply making this request to you now, before we get started

19   with the main events, to try to avoid problems down the road.

20           (Court and deputy clerk confer)

21           THE COURT:  Okay.  We should have a panel within five

22   minutes.

23           MR. FERRARA:  Michael Ferrara for the plaintiff, your

24   Honor.

25           May I ask how your Honor intends to handle sidebar

1   questioning?  We obviously have a lot of press in the room, and

2   the two things I'm thinking of -- there may be more, but the

3   two things that came to me are, number one, to the extent we

4   are going to talk about -- potentially talk about sexual abuse,

5   that's going to be, of course, very sensitive to some of our

6   jurors.  Even though they are anonymous, they are not going to

7   understand how anonymous they are.

8            THE COURT:  I hope they will by the time I get

9   finished.

10           MR. FERRARA:  So do we but, again, just sort of for a

11  human nature idea.

12           And secondly, to the extent some jurors have strong

13  opinions about the parties in this case, it might be

14  inflammatory for them to express those in front of the other --

15  the rest of the venire.

16           So I just -- those are two things that come to mind

17  for me, but I'm sure the Court has other thoughts as well,

18  perhaps, but I wanted to raise it.

19           THE COURT:  What's the point at the end?

20           MR. FERRARA:  The point, your Honor, is that we do

21  think some questioning should occur at sidebar.  Obviously if

22  the press want to pool and come to the sidebar for certain

23  things, we have no objection.  On the other hand, it is -- the

24  more folks who are there, including if the jury knows they are

25  press, instances of sexual assault may be more difficult to

1    honestly talk about.

2            THE COURT:  Thank you.

3            Mr. Tacopina, anything on that?

4            MR. TACOPINA:  Nothing on that, your Honor.  We do

5    have one --

6            THE COURT:  Okay.

7            MR. DUBIN:  Your Honor, I know that the parties

8    submitted dueling proposed statements of the case.  Would we --

9    is the Court going to provide us in advance with a copy of what

10   the Court intends to read?

11           THE COURT:  No.

12           MR. DUBIN:  Thank you, your Honor.

13           THE COURT:  If you have an objection, I know that the

14   lawyers in this room are capable of making them.

15           MR. DUBIN:  Understood, your Honor.

16           THE COURT:  Okay.  So we are just giving them a couple

17   of minutes to finish being organized.

18           (Pause)

19           THE COURT:  A fair number of jurors have to be moved

20   from the first floor up to here.  It's probably going to take

21   five to ten minutes to be ready to begin the *voir dire*, and so

22   we will be in recess for that period.

23           And for the information of counsel, the mic is going

24   live to the jury assembly room.  It either has or is about to.

25   See you in a few minutes.
             (Recess)

```
 1              THE COURT:  Good afternoon.  I am not quite exactly
 2    sure why wound up getting off to a late start, but we did.
 3              We don't move the lectern.  If you move the lectern,
 4    all the little electronic gremlins come out and it's chaos.
 5              If your time estimates are accurate, then we won't get
 6    to testimony this afternoon.
 7              MS. KAPLAN:  Thank you, your Honor.  We will let the
 8    witness know.
 9              MR. TACOPINA:  I think you were looking at me when you
10    were talking about the lectern.  I have spoken to the tech
11    people in here and cocounsel.  The rope is long enough to make
12    it right to here so we are facing the jury.
13              You don't want that at all.
14              THE COURT:  We are not moving it.
15              MR. TACOPINA:  It's perfect right there.
16              THE COURT:  I somehow thought you would see it my way.
17              MR. TACOPINA:  I do.
18              (Jury present)
19              THE COURT:  Folks, sorry about the late start.  We are
20    working on the heat.  There we are.
21              Swear the jury, please.
22              (A jury of nine impaneled and sworn)
23              THE COURT:  Folks, before we go further, now that
24    you've been sworn, I am going to give you some preliminary
25    instructions to guide you in your participation in the trial.
```

1        As I've already told you, it's going to be your job to
2   find from the evidence what the facts are.  That's up to you
3   alone.  You then have to apply to the facts, as you find them
4   to be, the law that I give to you, and you are obliged to do
5   that.

6        Nothing I may say or do during the course of the trial
7   is intended to indicate what your verdict should be or how you
8   should find the facts.  The evidence from which you are going
9   to find the facts will consist of the testimony of witnesses,
10  documents and other things received into the record as
11  exhibits, and any facts that the lawyers agree upon or that the
12  Court may instruct you to find.  I can't remember the last time
13  I ever did that.  So if that comes up, I'll talk to you about
14  it again, but it hasn't come up for years.

15       Certain things are not evidence and are not to be
16  considered by you.  Let me tell you what they are.  Statements,
17  arguments, and questions by lawyers are not evidence.
18  Objections to questions or to evidence, other evidence, like
19  documents, are not evidence.  The objections are not evidence.

20       Lawyers, of course, have an obligation to their
21  clients to object when they think evidence is being offered
22  that is not properly for your consideration.  If I sustain the
23  objection, you normally won't hear or see the evidence.  If I
24  overrule it, you will hear the answer or see the document,
25  whatever it happens to be, and you will treat it just like

1    anything else.  Every once in a while, somebody is leaping to

2    his feet or her feet to say objection.  The witness blurts out

3    the answer or I can't rule fast enough and you hear something.

4    And if I ultimately conclude that you shouldn't have heard it,

5    I'll tell you to disregard it, and you must disregard it.

6             Anything that I exclude or tell you to disregard is

7    not evidence and you can't consider it.  Anything you may have

8    seen or heard outside the courtroom is not evidence and has to

9    be disregarded too.  You are to decide the case solely on the

10   evidence presented here in this courtroom.

11            There are two kinds of evidence.  One is called

12   direct.  The other kind is called circumstantial.  I am going

13   to talk to you about that more at the end of the trial.

14            In a nutshell, direct evidence is direct proof of a

15   fact because an eyewitness saw it or heard it or whatever,

16   perceived it with his or her own senses.  It could also be the

17   physical qualities of an article, like a book.  You could have

18   the book.  You could tell what color it is, how many pages it

19   has.  That's direct evidence.

20            Circumstantial evidence is just a reference to proving

21   one fact that you don't have definitive evidence of by proving

22   something else that leads logically to an inference in your

23   mind that what you can't see directly or definitively actually

24   exists.

25            There is an old example I'll probably repeat at the

A-1434

1    end of the trial about weather.  If we were all in here and

2    couldn't see the weather, and we were interested in the

3    weather, whether it had changed since 9:30 this morning, and

4    suddenly people started walking into the courtroom with wet

5    clothes and umbrellas.  The circumstantial evidence is the wet

6    clothes and umbrellas, it tells you by inference, by a logical

7    deduction of your mind, the weather must have changed, because

8    people don't ordinarily walk in here in totally wet clothes.

9    That's all it means, and I'll talk to you about that a little

10   more later.

11          I am not going to give you full instructions on the

12   law now, I'll do that later, but I do think it will be helpful

13   to you to give you a little context here to help you understand

14   the evidence as it comes in, why it's coming in, what it may

15   relate to.

16          But I do that with this caution, this caveat.  That

17   is, to the extent, if any, that my final instructions at the

18   end of the case are different than anything I say now, and they

19   will certainly be more complete and they might even differ in

20   some respect, it's those instructions that matter when you go

21   into the jury room.  That's what you'll apply.  If it's not

22   entirely consistent with what I say now, you will forget what I

23   say now.

24          Let's start out with the fact that this is a civil

25   case.  It's not a criminal case.  It is brought by one private

1    individual, Ms. Carroll, against another private individual,

2    Mr. Trump.  She claims, and he denies, that he injured her in

3    various ways, and she seeks to recover money damages to

4    compensate her for those injuries, alleged injuries.

5            A criminal case, I'm sure you all know, is very

6    different.  It's brought by the government against an

7    individual or occasionally a company for allegedly have broken

8    criminal laws.  And what the government seeks to do in a case

9    like that, if it wins, is to punish the defendant by sometimes

10   sending him to jail, sometimes by a fine, and occasionally in

11   some other way.

12           Here is the important thing or one important thing,

13   anyway.  Sometimes the very same conduct that could be a crime,

14   if the government prosecuted it, also can give a private

15   individual a civil claim for money damages if the person was

16   injured by that conduct.

17           Now, to be clear, again, Mr. Trump has not been

18   charged criminally for the conduct Ms. Carroll alleges, and I'm

19   not expressing any view, one way or the other, as to whether

20   his alleged conduct was or would have been a crime, assuming it

21   happened.  I simply am explaining to you the distinction

22   between the two kinds of cases as background information.

23           Now, as I told you already, Ms. Carroll brings two

24   kinds of claims.  One is for defamation, and I gave you the

25   thumbnail version about defamation earlier, a false statement

1    injurious to somebody's reputation.

2          The other is for something that we lawyers called

3    battery.  We are not talking about the little bunny powering

4    your radio.  We are talking about what is a technical, legal

5    term.  So to avoid any confusion in this case, I want to say a

6    few words about battery in the technical, legal term.  What is

7    it.

8          Generally speaking, the word battery in the context of

9    a civil lawsuit, like this one, refers to the unjustified

10   touching of another person without the consent of the person

11   touched, with intent to cause bodily contact that a reasonable

12   person would find offensive.  The slightest unlawful touching

13   of another person is sufficient.

14         For purposes of civil claims, the law does not draw a

15   line between different degrees of violence.  It totally

16   prohibits all unconsented-to touching from the least to the

17   most violent that a reasonable person would find offensive.  In

18   other words, anything from a gentle but unwanted peck on the

19   cheek to stabbing somebody with a knife could be battery for

20   purposes of a civil case like this one.

21         Now, in this case, as you know, Ms. Carroll claims

22   that Mr. Trump raped and sexually assaulted her.  He denies it.

23   And it will be your job to decide what, if anything, actually

24   happened, but my present point is that rape and sexual assault,

25   although we usually think of them in terms of crimes, are

1    different kinds of battery when you look at them in the context

2    of a civil lawsuit like this one.

3            And one reason I'm explaining this to you is this.

4    Many of you may have heard of something called a statute of

5    limitations, which is an enactment of the legislature that

6    usually imposes a time limit on how soon after some episode

7    takes place somebody has to bring a civil lawsuit for damages

8    if they are ever going to bring it.  There is a clock running,

9    normally.

10           Last year, New York enacted a new statute that, in

11   some circumstances, and for limited period of time, revived the

12   ability to bring a civil lawsuit to recover damages for some

13   kinds of sexual misconduct, and New York has defined the kinds

14   of sexual misconduct for which it temporarily has revived the

15   ability to bring civil lawsuits for damages, and it's done that

16   by referring to criminal law definitions of some sex crimes.

17           Ms. Carroll's battery claim here is not time barred

18   because it has been revived for a limited period.  That's not

19   to say it's a good claim.  It's not to say it happened.  I am

20   not saying anything about that.  I'm just saying there is no

21   statute of limitations issue in this case in the sense in which

22   you normally think of it, perhaps.  Now, it is involved here in

23   the background, but that's a legal matter.  I'll take care of

24   it.  To the extent there are facts at issue, you are going to

25   decide them.  But I just want you to understand what I've just

1    said.

2          In order for Ms. Carroll's battery claim to come

3    within this revival statute, as I just implied, she has to

4    establish that Mr. Trump's conduct, if there was any, came

5    within one of those criminal law definitions that I referred to

6    a minute ago.

7          But as I already mentioned to you, and I'll explain in

8    much greater detail later, that doesn't turn this into a

9    criminal case.  Mr. Trump is not here being prosecuted for any

10   crime, and Ms. Carroll doesn't have to prove him guilty of a

11   crime, and she doesn't have to prove him guilty beyond a

12   reasonable doubt either.  That's the standard of proof in a

13   criminal case.  What she has to do to recover for battery is to

14   prove the essential elements of her battery claim by a

15   preponderance of the evidence.  I'll tell you what those are

16   later on in the case.

17         Now, I talked about the defamation claim, and I'm not

18   going to say much more about that.  The one thing I will say

19   about it now is that in order to win on the defamation claim,

20   Ms. Carroll has to prove several different elements.  I just

21   want to put a place marker in your mind, that on certain of

22   those elements she has to prove her case by clear and

23   convincing evidence, which is a more demanding standard than

24   preponderance of the evidence.  That's all.  Just hold it in

25   the back of your mind.  We will go over all of this later, but

1    just be aware of that.

2            A few words about your conduct as jurors.  As I told

3    you before, and I reiterate now, no research, no looking up

4    anything, no visiting any place.  You are not to do any of that

5    stuff.  You can't go on the web, you can't Google, you can't

6    tweet, period.

7            Until I finish instructing you at the end of the case

8    and say, ladies and gentlemen, you will now retire to

9    deliberate upon your verdict, you are not to discuss the case,

10   even among yourselves, and certainly not with anybody else.

11           I have already talked to you BlackBerries and the

12   Internet and email and tweeting and social media.  All of that

13   is prohibited insofar as it relates to this case.  You just

14   can't do that.  If any of you become aware that anybody on the

15   jury has been communicating on social media, emailing friends

16   about the case, anything like that, you have to let me know

17   through Andy.

18           Finally, do try as hard as you possibly can not to

19   form any opinion until all the evidence is in.  Keep an open

20   mind until you start your deliberations at the end of the case.

21   You are free to take notes if you want to.  Bear in mind in

22   deciding what you want to do that sometimes it's hard to take

23   notes and listen at the same time.  But do whatever makes sense

24   to you.  The notes are for your own personal use.  They are not

25   to be discussed with anyone before you begin your

1  deliberations, and you are not to take them out of the jury

2  room at the end of the day.  You leave them there and Andy will

3  see that they are appropriately safeguarded.

4          If you don't take notes, remember that it's your own

5  individual responsibility to pay attention, to listen to the

6  evidence, and that's regardless of whether you were taking

7  notes.  We depend on the judgment of all of you in reaching a

8  verdict, and you each have a responsibility to remember the

9  evidence.

10         Now, we are going to begin the trial immediately.

11  Each side gets to make an opening statement.  An opening

12  statement is not evidence.  It's not argument.  It's an outline

13  of what that party intends to prove, and it's offered to help

14  you understand what you are about to hear and why.

15         I always think of opening statements as I come to

16  think of trailers at the movies back in the days when we used

17  to go to the movies.  The trailer is basically an ad for some

18  other movie, and they are trying to get you interested and to

19  go see that other movie.  And my experience is that sometimes

20  it's right on the money, and I go see the other movie and it's

21  just what I expected, and sometimes it bears no resemblance to

22  that other movie and it wasn't really a very good guide at all.

23  I just offer that for your assistance and also so that you bear

24  in mind that the opening statements aren't evidence.

25         Once we are done with the opening statements, the

```
 1   plaintiff will present her witnesses.  The defendant has a

 2   right to cross-examine them.  Then the defendant will present

 3   his witnesses and the plaintiff gets to cross-examine them.

 4   Once all the evidence is in, you will hear closing arguments in

 5   which the lawyers will summarize and interpret the evidence for

 6   you, and I'll give you my instructions and you will retire and

 7   deliberate.

 8          Just to give you an idea, the opening statements will

 9   probably take about three-quarters of an hour or so each.  We

10   will have a break between the plaintiff's and the defendant's,

11   not a long one, but a break.  And then we, at least as current

12   plans are, we will start hearing testimony tomorrow.

13          There we are.

14          Anything else?

15          Ready for openings?

16          MR. TACOPINA:  Yes, your Honor.

17          THE COURT:  Who is opening for the plaintiff?

18          MS. CROWLEY:  I am, your Honor.

19          THE COURT:  Ms. Crowley.

20          MS. CROWLEY:  I'd like to take you back to an evening

21   in the spring of 1996.  E. Jean Carroll, the plaintiff in this

22   case, was leaving the Bergdorf Goodman department store in

23   Manhattan.  But as she was exiting through the revolving doors,

24   she saw Donald Trump coming in the other way.  They recognized

25   each other.  Trump was famous in New York City.  His name was
```

1   on a bunch of buildings and his face was often in the tabloids.

2   And Ms. Carroll was a well-known writer.  She had her own

3   advice column and a daily TV show.  They'd even met each other

4   once at a party.

5         So they started chatting.  Trump asked Ms. Carroll to

6   help him pick out a gift for a woman.  She agreed, thinking it

7   would make for a funny story.  They moved through the store

8   joking and laughing and eventually made their way up to the

9   lingerie department on the sixth floor.  As usual, it was empty

10  that time of night.

11        Trump walked over to the counter and picked up a lacy

12  body suit.  He tossed it to Mr. Carroll and told her to try it

13  on for him.  She laughed, told him to try it on himself.

14  Wouldn't it be hilarious, she thought, if he put this thing on

15  over his clothes.

16        Still laughing, they moved to the dressing room,

17  Ms. Carroll thinking, he might actually try on this lingerie.

18        But the moment they went inside, everything changed.

19  Suddenly, nothing was funny.  Donald Trump slammed against

20  Ms. Carroll against a wall.  He pressed his lips against her.

21  She struggled to break free but couldn't.  Trump was almost

22  twice her size.  He held down her arm, pulled down her tights,

23  and then he sexually assaulted her.

24        Eventually, Ms. Carroll was able to break free, and

25  she ran out the dressing room and fled the store.  She told two

1   friends right away about the assault.  One told her to call the

2   police.  The other told her not to say a word.  She warned

3   Ms. Carroll that Donald Trump would ruin her life and her

4   career if she spoke up.  In the end, Ms. Carroll swore them to

5   secrecy and feared -- filled with fear and shame, she kept

6   silent for decades.

7          Eventually, though, silence became impossible.  In

8   2017, Ms. Carroll began to write a book about women's

9   perspectives on the men in their lives.  As she wrote, the book

10  turned into more of a memoir, and she started to include some

11  stories from her own life.

12         After writing for a couple of months, Ms. Carroll made

13  the difficult decision to include a chapter describing how

14  Donald Trump had sexually assaulted her years before.  And when

15  an excerpt from that book was published in June 2019, Donald

16  Trump's responsive was explosive.  He was president at the time

17  and, speaking from the White House, he went on the attack,

18  seeking to destroy and humiliate her.  He said that none of it

19  ever happened.  He never met Ms. Carroll.  He had no idea who

20  she was.  He ridiculed her, accusing her of inventing the story

21  to make money to sell a book, to advance some grand political

22  conspiracy.  He even said, Ms. Carroll must be lying because,

23  I'm quoting here, she is not my type, not my type.  We all know

24  what that means.  He was saying she was saying too ugly to

25  assault.

1        Suddenly, Ms. Carroll was all over the headlines.  The

2   most powerful person in the world, as the then-sitting

3   president, with the world's biggest microphone, had branded her

4   a liar and a fraud.  Her reputation as a trusted journalist, a

5   reputation she had spent her whole career building, was damaged

6   badly.  She lost any sense of safety and security.  She became

7   a target for online attacks.  Thousands of people posted

8   messages about her filled with hate and threats.

9        But Donald Trump was not done.  Three years later, in

10  October of 2022, just last fall, he came after her again, with

11  a post on his social media site.  He called her story a con

12  job, a hoax.  He said, once again, she is not my type.  Once

13  again, her inbox was filled with insults and threats.

14        And that is why we are here today, because Donald

15  Trump sexually assaulted E. Jean Carroll in the dressing room

16  of Bergdorf Goodman, and when she spoke publicly about what he

17  had done, he defamed her and tried to ruin her.  This case is

18  Ms. Carroll's chance to clear her name, to pursue justice, and

19  to get her life back.

20        My name is Shawn Crowley and together with my

21  colleagues, Robbie Kaplan, Mike Ferrara, and Matt Craig, I am

22  proud to represent Ms. Carroll in this trial.

23        Members of the jury, as Judge Kaplan said, this

24  opening statement is our opportunity to give you a roadmap of

25  the evidence that you are going to see and hear throughout this

1    trial, evidence that we submit will prove that Donald Trump

2    assaulted Ms. Carroll back in 1996 and that he defamed her when

3    he said she made the whole thing up.

4           You, of course, are going to hear from Ms. Carroll

5    herself.  She will testify about her traumatic encounter with

6    Donald Trump, about her decision to stay silent so long, and

7    about how when she finally did speak publicly, Donald Trump

8    responded with vicious lies meant to destroy her.

9           But this is not a he-said, she-said case.  It's not a

10   he-said, she-said case.  Ms. Carroll is not the only person

11   that you are going to hear from at this trial.

12          You will also hear from many other witnesses who

13   completely corroborate her account, like Ms. Carroll's friends,

14   Lisa Birnbach and Carol Martin, who she told about the assault

15   immediately after it happened and who confirmed every detail of

16   her story.

17          You will hear from two former employees of the

18   Bergdorf Goodman store, two people who Ms. Carroll has never

19   met, never spoken to, but who will back up key details of her

20   account.

21          You will hear from Ms. Carroll's sister, Cande

22   Carroll, who will tell you why it's not surprising that

23   Ms. Carroll remained silent for decades before she revealed

24   what Donald Trump had done to her.

25          You will hear from Roberta Myers, Robbie Myers,

1   Ms. Carroll's former boss and editor-in-chief of L Magazine,

2   where Ms. Carroll worked for decades.  Ms. Myers will tell you

3   about Ms. Carroll's groundbreaking career as a journalist and

4   the integrity that it was built on.

5        You will hear from two experts who will explain the

6   harm that Donald Trump caused Ms. Carroll, including the

7   psychological damage from the assault, and the destruction that

8   Donald Trump's statements caused Ms. Carroll's reputation.

9        You will hear from two other women, Natasha Stoynoff

10  and Jessica Leeds, who will testify that Donald Trump assaulted

11  them in very much the same way he assaulted Ms. Carroll,

12  because that is his MO.

13       You are going to hear Donald Trump say that in his own

14  words.  You will hear him bragging about doing almost the same

15  thing he did to Ms. Carroll to other women.

16       That is just some of the evidence and the testimony

17  that you are going to hear over the course of this trial,

18  evidence showing that Donald Trump assaulted E. Jean Carroll

19  and then lied over and over again when she came forward.

20       I am going to describe that a little bit more in a

21  minute, but first I'd like to step back and talk a little bit

22  about Ms. Carroll.  As I mentioned, you are going to hear her

23  testify under oath in this trial.  She is going to take that

24  witness stand.  She will tell you that she grew up in rural

25  Indiana and always dreamed of becoming a writer, and she worked

```
 1   hard at achieving that dream for decades.

 2         She sold her first piece of writing at 36, moved to

 3   New York City, and lived the life she'd always imagined.  She

 4   wrote countless articles and had her own advice column called

 5   Ask E. Jean, which became one of the longest-running advice

 6   columns in history.  She wrote five books, was an Emmy

 7   nominated writer for Saturday Night Live in the mid '90s, and

 8   even had her own TV show, also called Ask E. Jean, which ran on

 9   national TV.

10         By this time, in the mid 90s, she married and divorced

11   twice, but she still had good relationships with her

12   exhusbands.  She continued to date and socialize and live her

13   life.

14         But in the spring of 1996, she ran into Donald Trump

15   in the Bergdorf Goodman clothing store, and what happened next

16   would change her life forever.  You will hear Ms. Carroll

17   testify about it.  She will tell you that she finished filming

18   her TV show in Fort Lee, New Jersey, at about 5 p.m. that day,

19   just as she did every day, and she headed into the city to do a

20   little shopping at Bergdorf's.  She described how she spent a

21   little time looking for something that she had been wanting,

22   but she find it, so she headed toward the exit on 58th Street.

23         But as she got to the revolving door, she saw Donald

24   Trump coming in.  As I said, Trump was a familiar face in New

25   York City at the time.  Not as famous as he is today.  This was
```

1   pre Apprentice and decades before he would run for president.

2   But in Manhattan he was well known for his real estate ventures

3   and for the lavish lifestyle that he led.

4           Ms. Carroll recognized him and Donald Trump recognized

5   her as well.  As I said, they met at least once before.  And

6   Ms. Carroll was a well-known writer at the time who had a TV

7   show modeled after her advice column that ran twice every

8   weekday on national TV.

9           When Trump saw her coming toward that revolving door,

10  he held up his hand to stop her.  He said:  Hey, you're that

11  advice lady.  Ms. Carroll replied:  Hey, you're that real

12  estate tycoon.  Trump told Ms. Carroll that he was stopping for

13  a present for a woman, and he had enlisted her as the advice

14  lady to help him pick something out.  Ms. Carroll agreed.  She

15  thought it would be something to laugh about with her friends

16  later, how she helped Donald Trump pick out a present for a

17  woman.

18          Off they went through the store.  She suggested a

19  handbag, a hat, and eventually Trump suggested they go look at

20  lingerie.  They took the escalators up to the sixth floor and

21  walked to the lingerie section.  It was empty when they got

22  there.  Trump walked to the counter and picked up a body suit.

23  He tossed it to Ms. Carroll, told her to try it on.

24  Ms. Carroll played along.  She tossed it back.  She said:  You

25  try it on.  It's your color.  They went back and forth laughing

1    until Mr. Trump took her by the arm and led her to a dressing

2    room.  They went inside.

3          Now, let me pause here for a second and address what

4    some of you may be thinking.  Why on earth would Ms. Carroll

5    let Donald Trump lead her to a dressing room?  You will hear

6    that Ms. Carroll has asked herself that question many, many

7    times over the last three decades.

8          In fact, it's one of the reasons that she waited so

9    long to speak publicly, because she blamed herself for what

10   happened.  She thought, how could she have been so stupid to go

11   into a dressing room with Donald Trump.  Honestly, that's a

12   question that one might ask with the benefit of hindsight.

13         But that is not what Ms. Carroll was thinking that

14   night at Bergdorf's in 1996.  To her, the situation was

15   harmless and funny.  Her friends would laugh later when she

16   told them about this random encounter.  And the truth is, she

17   didn't see Donald Trump as a threat back then.  She knew him as

18   a character, a man about town.  She actually thought she could

19   trust him.  But she was wrong.

20         Immediately after they got into the dressing room,

21   Mr. Trump banged the door closed and lunged at her.  He pushed

22   her against the wall and pressed his mouth to hers.  Her head

23   slammed against the wall.  Ms. Carroll will tell you that she

24   was shocked.  With a sense of fear and panic, she laughed and

25   resisted, trying to get him to back off, trying to diffuse the

1    situation, to kill anything that he might think invited the

2    attack.

3            When Trump didn't stop, Ms. Carroll shoved him.  She

4    kicked at him.  She stomped her feet.  She struggled.  She hit

5    him with her purse, tried to knee him off her.  But she

6    couldn't.  He was a big man, had easily a hundred pounds on

7    her.  And he was determined.

8            Trump grabbed her arms with one hand and held her up

9    against the wall.  He took his other hand and jammed it up her

10   dress, pulling down her tights, grabbing her vagina, and

11   pushing his fingers inside her.  He kept his fingers there for

12   a few seconds and then removed his hands and forced his penis

13   inside her.

14           Eventually, Ms. Carroll was able to get her knee up

15   high enough to get Donald Trump off of her.  She pulled up her

16   tights, ran out the dressing room, and fled the store out onto

17   Fifth Avenue.  The whole attack lasted just a few minutes, but

18   it would stay with her forever.

19           During this trial you are going to hear from

20   Ms. Carroll, and she will describe in painstaking and painful

21   detail what happened that evening in Bergdorf.  I expect that

22   you will find her testimony credible and convincing, both

23   because of what she will say and what she will not say.  You

24   will not hear Ms. Carroll embellish her story or try to make it

25   sound better than it is.

 1          You will even hear her admit things that don't

 2    necessarily help her case.  Ms. Carroll is going to

 3    acknowledge, for example, exactly when the assault happened.

 4    She doesn't recall the exact day or month.  But she will

 5    testify that she believes it was a Thursday, because that's the

 6    only night of the week that Bergdorf stayed open past 6 p.m.

 7    And she is fairly certain that it was the spring because she

 8    remembers what she was wearing, a black wool dress, but no

 9    coat.  So it was not too hot, but also not cold enough for a

10    jacket.

11          While Ms. Carroll doesn't remember exactly when this

12    happened, she remembers almost every detail of what happened,

13    and her testimony alone will be enough for you to find Donald

14    Trump liable in this case.

15          But let me be clear.  This case does not rest solely

16    on Ms. Carroll's testimony.  Ms. Carroll's testimony is enough,

17    but you don't have to rely on it alone to find Mr. Trump

18    liable, because there will be so much more.  Let me give you

19    just a couple of examples.

20          As I mentioned, I expect that Ms. Carroll is going to

21    testify that the floor with the lingerie department was

22    basically deserted the night she was there with Donald Trump.

23    I wouldn't blame you if you thought that's odd, that a whole

24    floor of a department store in New York City was empty.

25          So you will also hear from two people who worked at

1    that same exact department store back in 1996, Cheryl Beall and

2    Bob Salerno.  Ms. Beall was the assistant manager of Bergdorf

3    Goodman, and Mr. Salerno was the chief of operations.

4            Now, they are both going to tell you straight up they

5    did not know about the assault when it happened.  In fact, they

6    didn't even know who Ms. Carroll was until fairly recently, and

7    they have never met or spoken with her.  But their testimony is

8    extremely important because it completely confirms every detail

9    that Ms. Carroll will tell you about Bergdorf's on the night of

10   the assault.

11           I expect Ms. Beall will testify that her office was on

12   the sixth floor, right next to the laundry department.  Her

13   description of that section's layout of the dressing rooms

14   matches what Ms. Carroll will describe.  In fact, you are going

15   to see the floor plans from back in 1996.  Ms. Beall and

16   Mr. Salerno will also testify that Bergdorf stayed open late on

17   Thursday night, the night Ms. Carroll believes the assault

18   happened.  They will confirm that while the store was often

19   empty in the evenings, it was dead on Thursdays and that was

20   particularly true for higher floors like the sixth, because

21   there were so few shoppers.  There were also very few sales

22   attendants.  So they will explain that only one or two

23   employees covered the whole sixth floor in the evening.  So it

24   was common for some sections, like lingerie, to be completely

25   unattended.

1          It was hardly a surprise that Donald Trump and

2     Ms. Carroll were the only people in this area of the sixth

3     floor of Bergdorf's that night, that no one saw them in the

4     minute or two it took them to walk from the escalators to

5     lingerie, and that no one heard, as Ms. Carroll struggled to

6     break free of Trump's brief brutal attack.

7          But there is more.  As I mentioned, Ms. Carroll told

8     two friends about the assault almost immediately after it

9     happened, and you are going to hear from them as well.

10         Ms. Carroll will testify that after she escaped the

11    dressing room, she ran out of the store onto Fifth Avenue.

12    Disoriented, shocked, and not knowing what to do, she pulled

13    out her cell phone -- yes, they had them in the '90s -- and

14    called her friend, Lisa Birnbach, another respected journalist.

15         Ms. Birnbach will testify that when she answered the

16    phone, Ms. Carroll was hyperventilating and was anxious as she

17    reported what just happened.  Ms. Carroll told Ms. Birnbach

18    that she had run into Donald Trump as she was leaving

19    Bergdorf's, that he asked her to help him pick out a gift, that

20    they ended up in the dressing room of the lingerie department,

21    and that Trump pulled down her tights and forced his penis

22    inside her.  You will hear that Ms. Birnbach told Ms. Carroll,

23    in no uncertain terms, E. Jean, you have been raped.  You have

24    to go to the police.  But Ms. Carroll said no.  She was ashamed

25    and she was afraid.  So she made Ms. Birnbach promise never to

Case 23-793, Document 81, 11/20/2023, 3592067, Page74 of 300

1   speak of it again.

2          Ms. Carroll couldn't stop thinking about what

3   happened.  So a day or two later, when she saw her close friend

4   Carol Martin at work, she decided she had to tell her what had

5   happened too.  As Ms. Carroll and Ms. Martin will both

6   describe, they met in Ms. Martin's kitchen that evening, still

7   in shock, Ms. Carroll described what Donald Trump had done to

8   her.  You will hear that Ms. Martin gave Ms. Carroll exactly

9   the opposite advice as she had gotten the day before.  Ms.

10  Martin told Ms. Carroll to tell no one and do nothing.  In her

11  view, Trump was way too powerful.  He had hundreds of lawyers,

12  and he would bury Ms. Carroll if she came forward.

13         Ms. Carroll took that advice, and the evidence will

14  show that Ms. Birnbach and Ms. Martin respected their friend's

15  wishes not to talk about the attack.  For more than two

16  decades, they didn't tell a soul, didn't speak about it again,

17  and neither did Ms. Carroll.  Instead, she tried to move on.

18         Listen.  I understand that this decision that

19  Ms. Carroll made to keep quiet for so long, it may be difficult

20  for many of us to understand, especially in today's world.

21  It's hard to get why someone who had been hurt so badly would

22  do nothing about it.

23         But this was nearly three decades ago.  The evidence

24  will show that it was a different world for women, especially

25  single women who were trying to make successful careers in the

1   public spotlight.

2          Ms. Carroll was born in 1943.  You'll hear from her

3   sister, Cande, who will tell you a bit about their lives

4   growing up.  She will tell you that she and E. Jean were

5   members of what she calls the

6   post-World-War-II-grin-and-bear-it generation.  In their family

7   they were taught never to complain, keep their chins up, put on

8   a smile, and move forward.  That's what Ms. Carroll's family

9   did when bad things happened to them and that's what she did

10  when Donald Trump assaulted her.  Back then, to Ms. Carroll,

11  staying silent felt like the only choice she had to move on

12  with her life.

13         And as she will tell you, she blamed herself for what

14  happened.  She thought she should have known that Donald Trump

15  could be violent toward women.  She should have noticed the

16  sixth floor of the store was empty.  She shouldn't have joked

17  with him about lingerie.  In her mind, for many years, what

18  happened was her fault.  You are going to hear that that's

19  actually pretty common.

20         Dr. Leslie Lebowitz, a clinical psychologist and

21  trauma specialist, is going to testify in this trial in a

22  couple of days, and she will explain to you that there is

23  actually nothing unique about Ms. Carroll's decision.

24         (Continued on next page)

25

1           MS. CROWLEY:  Many victims of sexual assault wait

2     years or decades to share what happened to them, and some never

3     do.  Dr. Lebowitz will describe how she spent many hours

4     meeting with Ms. Carroll.  She will explain how Ms. Carroll

5     blames herself for what happened and how the guilt and

6     embarrassment she feels have tormented Ms. Carroll and for a

7     long time kept her from speaking up.  Ms. Carroll will testify

8     about this herself.  How could she share with the world that

9     she had been dumb enough to go into a dressing room with Donald

10    Trump.  How could she describe what he had done to her?

11          For many, many years she couldn't.  So she stayed

12    silent.  She focused on her career.  She moved forward.  But

13    the memory of what Donald Trump did to her back in 1996 stayed

14    with her.  And as time passed, it became a harder and harder

15    memory for her to suppress.

16          You will hear that in 2017 Ms. Carroll took a road

17    trip, interviewing women for a book that she was working on.

18    She wanted to talk to women across the country and ask them

19    about their perspectives—good and bad—about the men in their

20    lives, then she read about them.  The same day that she set out

21    on this road trip, a flood of women publicly shared that they

22    had been sexually assaulted by a famous Hollywood film

23    producer.  Other women soon followed, sharing their own stories

24    of being sexually assaulted by powerful men.

25          As Ms. Carroll listened to these women, she started to

1   catalog her own experiences with men throughout her life and,

2   sadly, they weren't all positive.  Other men had hurt her,

3   including one of her former husbands.  She decided that it was

4   finally time to write about these experiences.

5        As someone who had spent her whole career giving

6   advice to women, often about bad things that had happened to

7   them, it was time to share some things that had happened in her

8   own life, so she started to make a list of men who had

9   mistreated her.  The evidence will show that at first she did

10  not include Donald Trump on that list.  She thought about it

11  for a long time.  She understood the gravity of accusing the

12  then-president of the United States of sexual assault, and she

13  was afraid.  She worked on her book for months before she

14  decided to include him, to tell her whole truth.

15       You will hear that about two weeks before the book was

16  published in June 2019, *New York Magazine* ran an excerpt of the

17  book that included the story of the assault.  This was the

18  first time that Ms. Carroll spoke publicly about the fact that

19  Donald Trump had assaulted her.

20       The backlash was swift and brutal, much worse than

21  anything she had imagined.  Donald Trump, president at the

22  time, immediately denied the assault, but he went much further

23  than that.  Over the course of three days, Trump issued a

24  series of false denials and vicious and baseless attacks.  He

25  told reporters and the world that he had never met Ms. Carroll,

1    had no idea who she was.  He claimed he was never in Bergdorf

2    that day.  He accused her of making up a story to sell a book

3    or carry out some political agenda.  He threatened that she

4    would pay dearly for her false accusations.  He said:  I'll say

5    it with great respect.  She's not my type.  Ms. Carroll was too

6    ugly for him to assault.

7            Suddenly Ms. Carroll was front page news, branded a

8    liar and a fraud by the president of the United States.

9    Speaking from the White House, Trump used the most powerful

10   platform on earth to lie about what he had done, attack

11   Ms. Carroll's integrity, and insult her appearance.  The

12   White House is a place where presidents have signed laws,

13   declared wars.  So is it any wonder that when Donald Trump

14   spoke, many people around the world listened, believed what he

15   told them?  Of course not.  The evidence will show that when

16   president Trump called E. Jean Carroll a liar, people listened

17   and her hard-earned reputation as a writer and a journalist

18   took a serious hit.

19           And three years later, in October of last year, he saw

20   fit to drag her name through the mud again.

21           Posting on the social media site Truth Social, Trump

22   told his millions of followers that Ms. Carroll's story was a

23   con job and a hoax, and he couldn't help himself, he said it

24   again:  She's not my type.  The evidence will show that

25   millions and millions of people saw this post.  His supporters

1    latched on to his messages and barraged her with threatening

2    e-mails and tweets.  Here are a few of them.  I will give you a

3    minute to read them, and you are going to see many more

4    throughout this trial.

5              (Pause)

6              MS. CROWLEY:  After Donald Trump's statements in

7    October and the tweets and threats that followed, Ms. Carroll's

8    reputation took another major hit.  You are going to hear from

9    Robbie Myers, the former editor in chief of *Elle Magazine* where

10   Ms. Carroll worked for 25 years.  Ms. Myers will tell you that

11   Ms. Carroll was a beloved writer.  She was celebrated for her

12   ability to write powerfully while sticking to the facts.

13   Ms. Myers will explain how Ms. Carroll revolutionized advice

14   columns and how her readers trusted her.  This was ruined when

15   Donald Trump went after her.  She lost readers and fans.

16             You will also hear from Professor Ashlee Humphreys,

17   who is an expert in sociology and communications.  She is going

18   to testify about how far Trump's statements spread, how much

19   damage they caused, and how much it would cost to repair

20   Ms. Carroll's reputation.

21             So Ms. Carroll decided she had to fight back.  She

22   filed this lawsuit to hold Donald Trump accountable for what he

23   did to her in that dressing room and for what he did years

24   later when he attacked her integrity and lied about her to the

25   whole world.  She filed this lawsuit to restore her good name.

1      Members of the jury, that's just some of the evidence

2   that you are going to hear throughout this trial, evidence

3   proving that Donald Trump assaulted E. Jean Carroll and then

4   defamed her.

5      But you are also going to hear that Ms. Carroll is not

6   the only woman that Donald Trump has done this to.  In fact,

7   you are going to hear him say that in his own words.  You are

8   going to see a video of Trump chatting about women with a TV

9   host behind the scenes back in 2005.  He didn't know it at the

10  time, but there was a hot mic that caught what he was saying.

11  You are going to hear it.  You are going to hear him say:  "you

12  know, I'm automatically attracted to beautiful women.  I just

13  start kissing them.  It's like a magnet, just kiss.  I don't

14  even wait."  He said, "And when you're a star, they let you do

15  it.  You can do anything.  Grab them by the pussy.  You can do

16  anything."  Those are Donald Trump's words.  You will hear

17  them.

18      Now, listen, I expect that when Mr. Trump's lawyer

19  speaks to you in a few minutes, he is going to tell you that

20  Ms. Carroll is lying, that she made this whole thing up, and

21  when he does that, I would ask you to think about what Donald

22  Trump himself admitted when he thought no one was listening,

23  what he bragged about, "Just start kissing them.  I don't even

24  wait.  I can do anything.  Grab them by the pussy."  This was

25  not locker room talk.  It's exactly what he did to Ms. Carroll

1    and to other women.  You are going to hear from Jessica Leeds

2    and Natasha Stoynoff, two other women who Trump sexually

3    assaulted in a remarkably similar way.

4          First, Ms. Leeds.  The evidence will show that Donald

5    Trump assaulted Jessica Leeds on an airplane in 1979.  She was

6    seated next to him in the first class cabin.  After they made

7    small talk and finished their meals, Trump lunged at her, he

8    pressed his body against her, tried to kiss her, grabbed her

9    breasts, and started to put his hand up her skirt, exactly as

10   he did to Ms. Carroll.  Thankfully, before he could get any

11   further, Ms. Leeds wriggled away and fled to the back of the

12   plane.

13         Now, Ms. Leeds is a few years older than Ms. Carroll

14   and is very much a product of the same generation.  Like

15   Ms. Carroll, for a very long time, she didn't tell a soul what

16   happened.  She didn't want to risk losing her job or being

17   humiliated for coming forward.  But in 2016, Ms. Leeds watched

18   the presidential debate and she heard Donald Trump say that he

19   had never kissed a woman without her consent.  She knew she

20   couldn't stay silent any longer.  After Ms. Leeds spoke

21   publicly, Trump attacked her.  He called her a liar.  He told

22   the world that she was not his type.  Sound familiar?

23         You will also hear from Natasha Stoynoff.  She was a

24   reporter for *People* magazine.  In December of 2005,

25   Ms. Stoynoff traveled down to Mar-a-Lago to write a story about

1    Trump's one-year wedding anniversary.  The evidence will show

2    that Ms. Stoynoff -- Mr. Trump led Ms. Stoynoff to an empty

3    room, claiming that he wanted to show her something there.  As

4    soon as they got inside, Trump closed the door, grabbed

5    Ms. Stoynoff's shoulders, pushed her against the wall, and

6    started kissing her.  Fortunately, Trump was interrupted before

7    he could do more.

8          In 2016, Ms. Stoynoff also shared her story publicly.

9    And guess what happened next?  Trump called her a liar, denied

10   the attack, and insulted her appearance.  "Go look at her," he

11   said.  "I don't think so."

12         Three women, one clear pattern.  Start with a friendly

13   encounter in a semi public place.  All of a sudden pounce,

14   kiss, grab, grope.  Don't wait.  When you are a star, you can

15   do anything you want.  And when they speak up about what

16   happened, attack.  Humiliate them.  Call them liars.  Call them

17   too ugly to assault.  That is what Donald Trump did to Natasha

18   Stoynoff, what he did to Jessica Leeds, what he did to E. Jean

19   Carroll.

20         Members of the jury, we will present overwhelming

21   evidence that Ms. Carroll is telling the truth.  You will hear

22   it from Ms. Carroll herself, from Lisa Birnbach, Carol Martin,

23   Cande Carroll, from Robbie Myers, Natasha Stoynoff, Jessica

24   Leeds, from the two former Bergdorf Goodman employees.

25   Together they add up to one conclusion:  Ms. Carroll is telling

1    the truth.

2          But Donald Trump himself, Trump himself will give you

3    another reason to find for Ms. Carroll here.  The evidence will

4    show that he has told lie after lie in this case, and those

5    lies are even more evidence that Ms. Carroll's sworn testimony

6    will be the truth.  I will describe just a few examples of what

7    you are going to hear throughout this trial.  First, you are

8    going to hear Trump lie about Bergdorf's, the store where the

9    assault took place.  You see, a couple of months ago, Trump

10   testified under oath in this case in what's called a

11   deposition.  You are going to hear some of that testimony

12   during this trial.  You are going to see it on video.  One

13   thing that you will hear Trump say under oath is that he almost

14   never shopped at stores like Bergdorf Goodman; that he never

15   went to stores like that, and certainly never bought gifts

16   there.  But the evidence will show that is completely untrue.

17   Both Ms. Beall and Mr. Salerno, who worked at Bergdorf Goodman

18   in the mid 1990s, will testify that they saw him at the store

19   on multiple occasions, and that is not surprising as because,

20   as you will hear, Bergdorf was located directly across the

21   street from Trump Tower, where Mr. Trump was living and working

22   at the time.

23          Next, you will hear Trump lie about not knowing

24   Ms. Carroll.  That is not true.  There is photographic evidence

25   of the two of them together at an event, engaged in

1    conversation.  The evidence will show that this is Donald Trump

2    with his back to you.  He is facing E. Jean Carroll.  She is

3    standing next to her husband at the time, and Trump is standing

4    next to his wife, Ivana Trump.  This photo was taken only a few

5    years before the assault.  So Donald Trump and Ms. Carroll

6    definitely met.  And as I mentioned, Ms. Carroll was well known

7    in New York in the '90s.  She was a famous writer who had an

8    advice column and her own daily TV show.  Trump didn't know

9    Ms. Carroll?  Not true.

10           Another lie.  That Ms. Carroll was not Donald Trump's

11   type.  Donald Trump has said this many times.  I didn't assault

12   her because she is not my type.  But that is also not true.  As

13   you will see on video, when Trump was shown this photograph at

14   his deposition late last year, he looked at it for a moment, he

15   pointed to Ms. Carroll, and he said, unprompted, it's Marla,

16   yeah, it's Marla, my wife.  You will hear that Marla was Marla

17   Maples, Donald Trumps second wife.  She appears nowhere in this

18   photo.  To be clear, at his deposition just a few months ago,

19   Donald Trump pointed at Ms. Carroll, the woman he has declared

20   over and over again is not his type, and he mistook her for

21   Marla Maples, his second wife, a former model who admitted

22   in -- he admitted in that same deposition was exactly his type.

23   What will this tell you?  It will tell you that Ms. Carroll was

24   also exactly his type, the type of beautiful woman who he was

25   so automatically attracted to he just started kissing and did

1    whatever he wanted to.

2          Donald Trump has said:  I've never met E. Jean

3    Carroll.  I never went to Bergdorf's.  She's not my type.  As

4    the evidence will show, these are lies, and they are just some

5    of the lies that you will hear from Donald Trump throughout

6    this trial.

7          I am going to sit down in a minute, but before I do, I

8    want to say a word about what you are going to be asked to

9    decide at the end of this trial, once you have heard from all

10   of the witnesses and the evidence is in.  As Judge Kaplan told

11   you and as he will explain in more detail before you

12   deliberate, Ms. Carroll brought two claims against Donald

13   Trump, so there will be two claims that you need to decide.

14         The first claim, as Judge Kaplan described, is for

15   what's called battery, and that has to do with what happened in

16   the Bergdorf Goodman dressing room back in 1996.  I expect that

17   Judge Kaplan will instruct you that battery covers a range of

18   conduct, from forcibly grabbing or groping someone without

19   their consent to rape.  If you find that Donald Trump did any

20   one of those things, he is liable for battery.

21         Ms. Carroll's second claim, as Judge Kaplan said, is

22   for defamation.  That has to do with the harm that Donald Trump

23   did to Ms. Carroll's reputation and good name.  The key

24   question for that claim is whether Trump was lying in that

25   October 2022 Truth Social post that you saw, whether he was

1    lying when he said he never met Ms. Carroll and claimed that

2    she made the whole thing up.

3          Now, as you consider the evidence over the next week

4    or so, I would ask you to remember that this is not a criminal

5    case.  As Judge Kaplan explained, you are not being asked to

6    decide whether anyone committed a crime beyond a reasonable

7    doubt.  This is a civil case, so you will be asked if it is

8    more likely than not that Donald Trump groped or assaulted

9    Ms. Carroll.  That's one of the questions that you will have to

10   answer, more likely than not.  When you consider the evidence,

11   it will be clear what the answer is.  Donald Trump sexually

12   assaulted Ms. Carroll.  And it will be clear that years later,

13   after Ms. Carroll came forward and spoke the truth, Donald

14   Trump lied and defamed her.

15         Members of the jury, at the end of this trial, we are

16   going to have a chance to speak to you again.  We will go

17   through the evidence and explain to you how it all supports

18   only one conclusion here:  Donald Trump is liable on both

19   counts.

20         THE COURT:  Thank you.  We will take a ten-minute

21   break.

22         (Jury not present)

23         THE COURT:  Bring in the jury.

24         (Jury present)

25         THE COURT:  Members of the jury, one slight scheduling

1   adjustment.

2          We are going to start trial every day at 10:00 because

3   I am told the logistics of getting you screened and into the

4   building take more time than usual, which of course makes

5   sense, so I am going to ask you to be here at 9:00, not 10:00.

6   It will get you into the building in time to start at 10:00.

7   You are going to get some breakfast and you will get a cup of

8   coffee and then we will proceed at that point.

9          Okay.  Mr. Tacopina.

10          MR. TACOPINA:  Thank you, your Honor.

11          Counsel, ladies and gentlemen of the jury:

12          In this country the one thing that cannot be

13   compromised, that can never be bent, that must always be

14   absolute, that must never be wielded based on the whims of

15   those who seek to abuse it is the justice system.  It is our

16   defense against all tyranny.  It is what gives you the citizens

17   of this country the ability to defend against oppression, it

18   can never be compromised, regardless of who the defendant is

19   and regardless of how much apathy you may feel toward a

20   particular defendant.

21          People have very strong feelings about Donald Trump

22   one way or the other, very strong feelings.  That's fact.  And

23   it's okay to feel however you feel.  You can hate Donald Trump.

24   It's okay.  But there is a time and a secret place for that,

25   for you to express those feelings.  It's called a ballot box

1    during an election, not here in a court of law.  Because to do

2    so in a court of law would make one no better than those who

3    would seek to bend the rule of law for their own personal

4    agendas.  We must all strive to be better than that, to protect

5    all of us, all of us in this country.

6            And while no one is above the law, no one is also

7    beneath the law.  Politicians don't make this country great.

8    Jurors do.  My fear in this case is not the evidence, it's not

9    the facts at all.  Because if you follow your solemn oaths as

10   jurors and apply the law to the facts as the judge will

11   instruct you later, justice will be served.  What is paramount

12   in this courtroom is the rule of law and that every defendant,

13   regardless of his name, be protected for the sake of all of us.

14   The judge early on said it in his instructions.  It is the

15   bedrock of our country.  It is the bedrock of our country.

16   What you are all doing right now is very serious stuff.  It

17   protects all of us.

18           With that in mind, the evidence will show you what

19   E. Jean Carroll is doing is an affront to justice.  The

20   evidence will show you that she is abusing the system by

21   advancing a false claim of rape for money, for political

22   reasons, and for status.  And in doing so, in doing so, she is

23   really minimizing true rape victims, real rape victims.  She is

24   exploiting their pain and their suffering.  She is capitalizing

25   on their stories.  The evidence is going to show you this loud

1    and clear.  After you hear the evidence in this case, you

2    cannot let her profit from her abuse of this process and her

3    attempts to deceive you.

4          Ladies and gentlemen, my name is Joe Tacopina.  I was

5    introduced earlier.  I, along with Chad Seigel, Perry Brandt,

6    Matthew DeOreo and Mike Madiao, have the privilege of

7    representing Donald Trump.

8          Nobody is above the law, but nobody is beneath it.  We

9    all have to be treated the same way.  Even if you hate Donald

10   Trump -- and, again, I don't get into anyone's politics.  We

11   don't even know.  That's fine.  But you have to do your jobs

12   here and treat him the way any of us would want to be treated

13   and uphold that rule of law.

14         This case must be decided on the evidence and only the

15   evidence.  And I want to talk to you about the evidence, ladies

16   and gentlemen, right now.  I want to talk to you about E. Jean

17   Carroll's story.  Her story is that in some unknown season in

18   either 1995 or 1996—see I heard today it was 1996, but she has

19   testified previously sometime in 1995 or 1996, more than 25

20   years ago, she was violently raped in a dressing room in the

21   lingerie section of Bergdorf Goodman.

22         I also heard today that now it was on a Thursday.  And

23   we heard from the opening that there is going to be evidence

24   that Thursday is a dead day in Bergdorf Goodman.  I don't think

25   there is a dead day in Bergdorf Goodman, but maybe Thursday is

1    a lighter day, so all of a sudden we are hearing today that

2    this must have occurred on a Thursday.  You will hear E. Jean

3    Carroll's stories from the beginning when she started coming up

4    with this in 2017.  There was no reference to a Thursday.  This

5    upscale department store in midtown Manhattan on Fifth Avenue,

6    during normal store hours, after she thought he, Donald Trump,

7    was going to try a very pretty, petite, see-through, one-piece

8    bodysuit for a woman over his suit pants.

9          It all comes down to do you believe the unbelievable.

10   That's what this case is going to come down to.  Do you believe

11   the unbelievable?  Nothing else you will hear in this courtroom

12   matters, nothing else.

13         I have heard the opening statement already where they

14   are talking about other women making accusations, who will come

15   in here, from 1979, another woman making another accusation.

16   That's not for you to decide here.  Those people have never

17   made a claim.  No one has ever told the police, including

18   Ms. Carroll.  No one.  Because that would require a real

19   investigation.  No one has ever done that.  But they want you

20   to focus on anything but the E. Jean Carroll story because it

21   is so incredible and so unbelievable.  In her own words it's

22   unbelievable.

23         They want to focus on this lewd conversation that they

24   put up on the screen from 20 years ago where Donald Trump said

25   something, foolishly about, you know, if you are a celebrity

1    you can do this, and it was called locker room talk.  I heard

2    Ms. Crowley—in a very good opening statement, by the way—say,

3    oh, no, it's not locker room talk.  It is locker room talk.  It

4    is foolish, but it's locker room talk.  It's not an admission

5    of anything certainly.  It wasn't referring to having done it.

6    But that's what they want you to focus on, exactly what they

7    want you to focus on, anything but.  The only thing you have to

8    decide in this case, anything but the E. Jean Carroll story.

9    Focus on everything else.  Because if you lay your focus on

10   that story, justice will be served very quickly.

11          You know, they put up tweets.  All the evidence you

12   have seen so far, the 25-year-old quote, tweets from some

13   unknown random person who may or may not be a Donald Trump fan

14   who attacked Ms. Carroll's allegation on social media, nothing

15   to do with Donald Trump, that's the evidence they put up so

16   far.

17          They said that the Bergdorf Goodman witnesses will

18   confirm every detail of the assault.  Mark those words.  They

19   just said the Bergdorf Goodman witnesses will confirm every

20   detail of the assault.  What are they going to confirm?  That

21   there was a lingerie department?  That there was a dressing

22   room?  How does that confirm a rape, that there was a dressing

23   room in the lingerie department in Bergdorf Goodman?  There was

24   no question about that.  Donald Trump was just never there.

25          The only real question for you to answer at this trial

1    is do you believe the unbelievable?  And as to that answer, you

2    will see even E. Jean Carroll herself will admit her story is

3    unbelievable.  She will admit her story is unbelievable, but

4    you're supposed to believe it.  Just buckle in and listen to

5    this story and all the attempted explanations for the

6    unexplainable.

7            Opening statements, as the judge indicated, are the

8    lawyers giving you a preview of how we believe the evidence

9    will unfold in this case, but it's more than that.  It's more

10   than that.  It's a promise to you.  It's a promise to you that

11   what we say is going to be proven is proven or what we say is

12   going to be disproven is disproven.  It is a promise.

13           It's not like a politician's promise, you know, those

14   politicians when they run for office, they promise the moon and

15   the stars and unemployment will go down and taxes will go down

16   and the economy will get better and, based on those promises,

17   you vote for them.  And then after the promises and after the

18   vote, then you see if they kept their promise or not.  That's

19   not this.  That's a politician's promise.

20           This is, we make you promises and I am making to you

21   right now these promises.  You get to then see if I have kept

22   my promise, if she has kept her promise, and then you vote.

23   That's what's important.  Because there was a lot of facts left

24   out, as the evidence will show, in the plaintiff's opening

25   statement, a lot of important facts, and the evidence will show

1    you that.

2            You heard a little bit about Ms. Carroll's story, but

3    let's talk about the details of it and more importantly the

4    lack of details.  You will learn that E. Jean Carroll can't

5    tell you the date she claims to have been raped.  I mean,

6    pretty important event in anyone's life.  She can't tell you

7    the date that she claims to have been raped.  She can't tell

8    you the month that she claims to have been raped.  She can't

9    tell you the season.  She can't even tell you the year that she

10   claims to have been raped by Donald Trump.  Not even the year.

11           The evidence will show you that E. Jean Carroll can't

12   do any of those things because her story isn't true.  She

13   doesn't want to give Donald Trump the opportunity to provide an

14   alibi or present witnesses to refute her claim likes, oh, it

15   happened on October 12, 1995, huh, let's see where anyone was

16   on October 12, 1995.  No.  See, we can't provide an alibi or

17   refute a claim because there is no date, there is no season,

18   they don't even know the year.

19           Instead, what you will learn, she simply said that she

20   was raped on some unknown date 27 or 28 years ago.  Trust me,

21   27 or 28 years ago.  So as the evidence will show you, her

22   story is that on some unknown date 27 or 28 years ago, she was

23   about to exit Bergdorf Goodman department store in Manhattan

24   and she saw Donald Trump in the street through the other side

25   of the door.  According to Ms. Carroll's story, she then saw

1    Donald Trump on the other side of that door hold up his hand,

2    so she stopped inside and waited for him to enter; and when he

3    did, she said Donald Trump said, Hey, you are that advice lady,

4    and they made a big deal of that picture that they showed where

5    they had some encounter a while back.  They actually said they

6    met at an event.  No, they didn't meet at an event.  That photo

7    that they showed you—and the evidence will make this loud and

8    clear—was a brief meeting in a line of people at a big gala, a

9    group setting.  It wasn't like an event, a private event.  It

10   was at some big theater.  There was some event at a theater,

11   and you are going to hear more about it.  There were hundreds

12   of people there.  Donald Trump was, as they said, one of the

13   most famous men in New York at that time.  He had a book.  His

14   name was all over buildings.  He was a tabloid figure.  His

15   wife Ivana was there.

16          So in that group setting, with hundreds of people,

17   many of whom went to shake his hand and say hello, Ms. Carroll

18   and her then husband John Johnson, who was a news journalist,

19   who, by the way, in that photograph you can see that's who

20   Donald Trump is talking to, he is actually putting his hand

21   towards John Johnson, that was eight or nine years before the

22   Bergdorf Goodman incident.  That five-minute encounter, it

23   wasn't a few years ago -- a few years prior, as they said.  It

24   was eight or nine years before the Bergdorf Goodman encounter.

25   They never spoke and they never spoke since that event.  It was

1   a hi, how are you doing?  Mr. Trump is talking to John Johnson,

2   who is a famous news reporter.  I think he was an anchor for

3   Channel 11 News in the city.  So of course he doesn't remember

4   meeting one of hundreds of people at some gala eight or nine

5   years earlier in a five-minute encounter when he testified last

6   year, which would now be over 30 years ago.  Of course he

7   doesn't remember meeting her.  Maybe she remembers meeting him.

8            E. Jean Carroll's story continues.  Upon seeing him,

9   she said, Hey, you are that real estate tycoon.  And when --

10  this is her story.  And when he came in, she went shopping with

11  him in Bergdorf Goodman to help him buy lingerie, women's

12  lingerie, obviously.

13           She will tell you in this time period, around '95 or

14  '96, how famous Donald Trump was, that people recognized him in

15  the store, that a Bergdorf Goodman associate actually

16  recognized him.  And this was the women's Bergdorf Goodman, by

17  the way.  There is two Bergdorf Goodmans.  There is a men's one

18  and on the other side is the woman's one.  The women's one is

19  mostly populated by women, and Donald Trump obviously stood out

20  for a lot of reasons, including the fact that he was a man.

21  But he is in that store and, as she tells it, they traveled up

22  to the sixth floor, taking escalators along the way, but she

23  didn't see another single person anywhere in that store.

24  Bergdorf Goodman in the middle of the day, open.  Not a

25  customer, not a sales attendant, not a soul.  The evidence will

 1   show you that she claims that not one person, as they rode the

 2   escalator, as they got off the escalator on to the sixth floor,

 3   as they walked into the lingerie section, while they were in

 4   the lingerie section, not one person was there.  It was like

 5   the *Walking Dead*, like the place was abandoned.

 6          Now, on the entire floor -- and I heard in the opening

 7   statement they said, oh, on Thursdays it is usual that it is

 8   empty, usual.  First of all, Thursday is a new fact we will get

 9   to that during this trial, but employees are going to be there.

10   Employees are going to be there with merchandise.

11          You are going to hear about this Bergdorf Goodman

12   store.  It's a store of perfections it is so posh and upscale

13   it refers to its customers as clients.  I go to Zara, I'm a

14   customer.  Go to Bergdorf Goodman, you're a client.  It's a

15   little different.

16          And yet E. Jean Carroll will tell you that not one

17   salesperson attended to Donald Trump while he was shopping on

18   the sixth floor.  Instead, what you will hear from her is that,

19   in this posh, upscale store, there were simply three or four

20   boxes of merchandise left unattended on the counter and

21   alongside one little separate piece of lingerie just left

22   alone, and that Donald Trump, according to her, picked up a

23   piece of lingerie and, after some discussion, E. Jean Carroll

24   thought that Donald Trump was going to try the lingerie on over

25   his pants.  As she said, the story is unbelievable.

1          E. Jean Carroll will describe that lingerie, according

2     to her, was very pretty, petite, see-through, lilac, grayish

3     blue, one-piece bodysuit with lace.  Donald Trump is sort of a

4     tall man, 6' 2" or so, in '95 or '96, he weighed at least 225

5     pounds, and he was supposed to fit this piece of lingerie,

6     women's lingerie, over his pants.

7          But according to E. Jean Carroll, she went into the

8     dressing room with Donald Trump -- and, by the way, I don't

9     know if they said this in the opening, but she walked in first.

10    So she goes first into the dressing room where she thinks he is

11    going to try on a small piece of women's lingerie over his

12    pants.  This is her story.

13         So she will tell you that the dressing room door was

14    not only unlocked, but it was also open, and she will tell you

15    herself how odd that is, what an odd fact that was.  This is

16    going to be from her testimony, Ms. Carroll's testimony.

17    Because the dressing room doors at Bergdorf Goodman, she will

18    tell you, are usually closed and locked, and that they usually

19    remained closed and locked until a client wants to try

20    something on.  But according to E. Jean Carroll's story, not

21    this time.  As luck would have it, one door was completely

22    unlocked and wide open.  And on this occasion, the dressing

23    room door just happened to be unlocked and open.  She and

24    Donald Trump could enter without assistance.  And that's what

25    she claims they did.

1          Her story continues.  As soon as she stepped into the

2     dresser room, the locker room where you try on women's

3     lingerie, Donald Trump, without locking the door——according to

4     her, he didn't lock the door——he lunged at her, immediately

5     shoving her up against the wall twice.  It was so hard that

6     E. Jean Carroll banged her head, causing it to hurt.  She

7     claims the noise was so loud that someone in the next dressing

8     room could have easily heard it.  She claims the noise was so

9     loud that, had a sales attendant been on the floor, they would

10    have heard it.

11         E. Jean Carroll will tell you that Donald Trump put

12    his mouth on hers.  She understood at that point that this was

13    a battle, that this was a fight.  And so how did she supposedly

14    respond to this battle-fight-combat?  Well, in her own words

15    she will tell you how she responded.  She laughed.  She

16    laughed.  Normal thing to do you just got hurt, some guy who is

17    100 pounds more than you weighs -- you know, 6' 2", pounding

18    her head against the wall, and she realized she is in a battle

19    and her reaction is to laugh.  Laugh.

20         Well, her story continues.  An unlocked dressing room

21    of an upscale Manhattan department store, Donald Trump pulled

22    down E. Jean Carroll tights, forcibly restrained her, violently

23    raped her for up to as long as three minutes.  If I didn't

24    speak for three minutes, you would see how long three minutes

25    is.  But for up to three minutes.

1          Now, during that time she said she tried to stomp on

2    his foot, she tried to push him back and, with her tights still

3    pulled down, restricting the movement of her legs, somehow she

4    managed to get her knee up high enough to push this man, who

5    weighed more than 100 pounds than her, off of her, all while

6    balancing on high heels.

7          Ladies and gentlemen, you are going to hear from

8    E. Jean Carroll that during this colossal battle her tights

9    never ripped.  She never let go of her purse that she was

10   holding as she was getting violently raped.  She held on to her

11   purse.  That hand could have been used for something else, but

12   instead she held on to her purse.  And she never screamed, not

13   once, never screamed.

14         In fact, according to E. Jean Carroll, after managing

15   to escape from Donald Trump, while afraid that he may be coming

16   after her and chasing her, what did she do?  It's her story

17   that she rode the escalator down six floors, didn't seek help

18   from anyone inside the store, and it's her story that after

19   leaving the dressing room, again, not a customer, not a sales

20   attendant, not a security person, not a single soul was

21   anywhere to be seen in this New York City department store.  Of

22   course not, because they would be called witnesses.  According

23   to E. Jean Carroll, she just walked out of the store.

24         Ladies and gentlemen, E. Jean Carroll cannot produce

25   any objective evidence to back up her claim because it didn't

Case 23-793, Document 81, 11/20/2023, 3592067, Page100 of 300

A-1480

1    happen.  Objective evidence not just her word in this

2    unbelievable story.  The evidence will show you she can't

3    produce a single record showing injuries.  The evidence will

4    show you that she never went to a medical doctor or even a

5    therapist.  She never sought to preserve any video from the

6    department store because they had video on that floor to

7    protect from theft.  Never sought to preserve that.  That would

8    have made this a pretty easy, quick trial.  Pop in the video

9    and let's see what happened.

10           You will learn that she was an avid writer.  You will

11   hear about what a glorious writer she was and that she kept a

12   diary.  And she never wrote in her diary anything about

13   supposedly being raped by Donald Trump in her personal diary.

14   There was absolutely -- no police report will be produced in

15   this courtroom documenting her claim.

16           The evidence will show you that E. Jean Carroll was an

17   advice columnist to women, advice columnist to women who

18   regularly advised her readers to report men to the police if

19   they so much as threatened violence.  If they talk to you

20   harshly or you are worried that they were threatening violence,

21   call the police.  You are going to learn in fact that E. Jean

22   Carroll once called the police on teenagers who had vandalized

23   her mailbox.  She called the police when they vandalized her

24   mailbox, but apparently not when she was violently raped.

25           What else are you going to learn?  You are going to

1   learn that E. Jean Carroll, from her own story, supposedly,

2   after being raped, she decided to keep the dress she allegedly

3   wore in that rape.  She never wore it again, never washed it,

4   and she stored that dress in her closet for almost 25 years.

5           You are going to learn that during those two decades

6   E. Jean Carroll says she never told anyone about this alleged

7   rape other than those two people you heard about Lisa Birnbach

8   and Carol Martin, and we will talk plenty about them.

9           So what does E. Jean Carroll say about Lisa Birnbach

10  and Carol Martin?  You will hear from her that she called Lisa

11  Birnbach from her cell phone immediately upon leaving Bergdorf

12  Goodman.  That's what she is going to testify to and that's

13  what was said in the opening.  And immediately after being

14  raped by Donald Trump, she told -- she called Lisa Birnbach and

15  told Carol Martin in person within the days that followed.  But

16  the evidence will show you that is simply not true.

17          Ms. Birnbach, according to the E. Jean Carroll story,

18  when she received the call, she said, Jean, you have been

19  raped.  And according to Ms. Carroll, she said it hadn't dawned

20  on me that I was raped until Lisa Birnbach told me that I was

21  raped.  Let that swivel around in your brain for a second.  It

22  didn't dawn on me, the evidence will show, that I was raped

23  until my friend told me that I was raped.

24          You are going to learn that Ms. Birnbach and

25  Ms. Martin were not E. Jean Carroll best friends in 1995 or '96

1   and that she would not have told either one of them this story

2   at that time.  You will learn that she didn't, which is why the

3   evidence will show you that both Lisa Birnbach and Carol

4   Martin, over the course of about 25 years, never told another

5   person that Donald Trump raped their friend.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TACOPINA:  He never told another person, even when

2    Donald Trump became president in 2016.  Jeez.  That guy became

3    president.  He raped my friend.

4          Who would make up a story like this, and who would go

5    along with it?  The evidence will show you, people with a

6    political vent, people with a financial motive, and people who

7    desire to be in the spotlight.  That's who would make up a sick

8    story like this.

9          And the evidence will show you that E. Jean Carroll,

10   Lisa Birnbach, and Carol Martin hated Donald Trump, loathed

11   Donald Trump politically, not because anyone got raped.  But

12   just politically they hated him.  And you will see the evidence

13   with your own eyes, folks, proof positive, that they schemed to

14   hurt Donald Trump politically, schemed, proof positive, my

15   promise to you.

16         In September 2017, Carol Martin sent an email to E.

17   Jean Carroll attacking Donald Trump politically, saying in this

18   email to her friend, E. Jean Carroll, one of the two outcry

19   witnesses, this has to stop, referring to Donald Trump.  As

20   soon as we are both well enough to scheme, we must do our

21   patriotic duty again, one.  Two, E. Jean Carroll replies to

22   that email.  She says:  Totally, all caps, three exclamation

23   points.  We need to scheme now.

24         She then says something very telling.  I have

25   something special to tell you about when we meet.  I have

1   something special for you when we meet.  Sure enough, within

2   weeks of that email exchange, where they talk about scheming

3   and Ms. Carroll telling her, I have special for you when we

4   meet, within weeks of that, E. Jean Carroll, an author, started

5   writing a book which included a story about her being raped by

6   Donald Trump decades earlier, on some unknown date in some

7   unknown year, in a dressing room at Bergdorf Goodman while

8   trying on women's lingerie.

9          And you are going to learn that E. Jean Carroll, Lisa

10  Birnbach, and Carol Martin colluded to get their story

11  straight, colluded about this made-up story.  You are going to

12  see evidence that made it clear that they were trying to get

13  everything together.

14         But the devil is in the details, they say, and you'll

15  see for yourselves that their stories don't synch up.  The

16  absurdities of their stories and the inconsistencies within

17  them will reveal their lies and their true intentions.  Watch

18  them during this trial.  They will not be hard to spot.

19         Now, during this trial you are going to hear that Lisa

20  Birnbach, Carol Martin, just like their friend, E. Jean

21  Carroll, can't tell you when Donald Trump, one of New York's

22  most famous people, according to E. Jean Carroll, supposedly

23  raped her.  They can't tell you either.  They can't remember

24  the month, the date, the season, the year.  And the evidence

25  will show you that's not just a coincidence.  They all somehow

1    forgot all that.  That's not a coincidence.

2          Instead, you will see that no one in this courtroom

3    will ever be able to tell you when this alleged rape occurred,

4    because it never did.  They won't even be able to tell you the

5    year, because it never did.

6          Proof will make it clear that E. Jean Carroll were

7    wrote her story about Donald Trump to sell a book, which it

8    did, hurt him politically, and to inject herself in the

9    spotlight.  Again, I'm telling you this as a promise to you

10   that once the evidence is in, you will see this, and we will

11   talk again during the summations.

12         The evidence will show you that following the

13   publication of her story about being raped by Donald Trump, her

14   life was never better.  A woman who claims to be raped, in

15   painful and painstaking details, I think that was the words I

16   heard on the opening statement of the plaintiff, painful and

17   painstaking details, will tell you her life has never been

18   better.  You will hear in her own words that she has been

19   fabulous, that she has received lots of positive support, she

20   is making more money, and she is appearing on podcasts and

21   television now, ever since this revelation of this painful and

22   painstaking rape allegation.  Painful and painstaking pain

23   allegation.

24         Just to talk about it was painful, I heard Ms. Crowley

25   say in her opening statement.  Talking about it was very

1    painful.

2          Fortunately, she went on television, and she went on

3    CNN.  And she talked to Anderson Cooper about her claim that

4    she was raped.  You will be able to watch that video, that

5    interview.  You will be able to witness her bizarre behavior

6    and hear the stranger things she says in that video, and you

7    will be able to see her basking in the spotlight, having the

8    absolute time of her life.  She became a celebrity and loved

9    every minute of it.

10         This is from her.  These are her words.  The evidence

11   will show you that E. Jean Carroll fabricated a story about

12   Donald Trump while he was president, then made that story the

13   center of her life and her lifestyle.  In fact, you are going

14   to hear how that lifestyle led to this very lawsuit.  You will

15   learn that after E. Jean Carroll published her false story

16   being raped by Donald Trump, he denied it and he called her a

17   liar in 2019, called her a liar again in 2022.  I'm sorry.

18   2022.  Plaintiff said he exploded and attacked her.  He dragged

19   her name through the mud by calling her a liar.

20         She falsely alleged that he raped her.  She called him

21   a rapist.  Of course he exploded.  Of course he attacked her.

22   She is falsely accusing him of rape to make money to sell a

23   book because she hated him politically and because she wanted

24   to become a celebrity, which she has become, by the way, based

25   on this allegation.

1          Evidence will show you that E. Jean Carroll was in

2     fact lying because she was never raped by Donald Trump in a

3     Bergdorf Goodman shopping store in the woman's lingerie

4     changing room in the middle of the day.

5          And you are going to learn that while she was at a

6     party, E. Jean Carroll -- she is now on the party circuit, she

7     was invited to every party -- while at a party, E. Jean Carroll

8     met an attorney named George Conway, and George Conway was a

9     political critic of Donald Trump, and spoke to her about suing

10    Donald Trump.  E. Jean Carroll said:  I didn't want to sue him.

11    Before she met George Conway at this party, a very harsh

12    opponent, political opponent of Donald Trump, E. Jean Carroll

13    had not even thought of suing Donald Trump, but he convinced

14    her to, and he recommended --

15          MS. CROWLEY:  Objection, your Honor.

16          THE COURT:  Sustained.

17          MR. TACOPINA:  The evidence will show you that after

18    that conversation, Ms. Carroll went and hired Ms. Kaplan.

19          MS. CROWLEY:  Objection, your Honor.

20          THE COURT:  Sustained.

21          The jury will disregard that.

22          MR. TACOPINA:  Along those lines, you are going to

23    hear that one of the witnesses in this case, in this case, for

24    Ms. Carroll has said that if Donald Trump has to deal with so

25    many lawsuits, he won't be able to run for office, and here we

1    are.

2         You'll also learn that as part of her continuing

3    effort to synch up their stories with respect to her litigation

4    against Donald Trump, E. Jean Carroll, Lisa Birnbach, Carol

5    Martin all got together, all got together and discussed the

6    story.  But the evidence will show you in this courtroom,

7    because their story is not true, it doesn't match up.  They

8    don't match up.  It's all a lie because Donald Trump never

9    raped E. Jean Carroll.  Even calling her a liar was the truth.

10   He never raped her and he never defamed her.  Because of that,

11   despite her effort to profit from her lies in this courtroom,

12   E. Jean Carroll has not suffered emotional or financial harm

13   from being raped or being defamed by Donald Trump.  Quite to

14   the contrary.  Quite to the contrary.

15        Ladies and gentlemen, Ms. Carroll brought this case

16   and the burden remains on her to prove it at all times.  She

17   brought this claim, and you'll see that's a burden she cannot

18   carry.

19        As the trial unfolds, you will see our defense, our

20   defense.  Our defense will come out through their witnesses.

21   That's where our defense is come will from, their witnesses

22   through cross-examination, as the judge mentioned earlier.

23   That's when, after they testify under questioning by

24   plaintiff's counsel, we get to question them.  That's where our

25   defense is in this case.  It's coming out through the

 1  questioning of their witnesses.  That's our entire defense.

 2  That and some sworn testimony from Donald Trump that you are

 3  going to see.

 4       Why is that so?  Because it did not happen, because

 5  there are no witnesses to call to prove a negative.  Other than

 6  saying I didn't do it, which he said he is being sued for, he

 7  has denied it.  There is nothing else he could say.  He wasn't

 8  there.  He didn't do it.

 9       You are going to hear from Donald Trump in his

10  under-oath video deposition questioned by the same lawyers who

11  are here today.  In his sworn testimony there is the same thing

12  if he were here saying the same thing.  I didn't do it.  I

13  didn't do it.  Because there is no more for him to add.  There

14  is absolutely nothing more for him to add.  He can't add

15  anything more, which is why I don't want to distract from the

16  focus of her story.

17       This is about her claim, which he has vigorously

18  denied.  You are going to see him vigorously deny it.  At

19  times, by the way, when he vigorously denies that on video, you

20  are going to hear he gets angry, says some snarly things.

21  That's understandable.  He is being falsely accused of rape.

22  But you -- the focus -- you have to decide if you believe this

23  story or not.  That's it.  All this other window dressing and

24  noise is to distract you from her story, because that's all you

25  need to decide, do you believe it or not.  E. Jean Carroll is

1    going to tell you how her story falls apart, from her own

2    words, her own voice, her own podcasts, her videos and her

3    book.

4          At the end of this case we are going to ask you to do

5    what American juries have been asked to do for well over 200

6    years, which is decide the case on the evidence alone, just the

7    evidence.  Not politics, not personalities; just on the

8    evidence.

9          If you just apply your God-given common sense and your

10   sound judgment and your street smarts, which I think we have an

11   abundance here, E. Jean Carroll will not be able to deceive you

12   with her story.  You have to listen to it.  When you look at

13   that story, your intelligence and your integrity -- your

14   integrity will carry the day.  It will not let her profit from

15   an abuse of our justice system.

16         With that, I'll end on this one photograph, just one

17   photograph I want you to see.  You are going to see this

18   photograph again during trial.  That is a photograph of E. Jean

19   Carroll with a man posing as her alleged rapist while she gives

20   a walking tour.  As a matter of fact, the name of the walking

21   tour she is giving for profit is Most Hideous Men in New York

22   City Walking Tour.  And she has a prison jump suit on.  And she

23   is giving this walking tour related to the sale of her book.

24         And as she is walking around New York City for the

25   Most Hideous Men in New York Walking Tour, and, sure enough,

1    she stops in front of Trump Tower, see's a man there who is

2    posing as her alleged rapist as she is wearing a headset and

3    smiling from ear to ear.  Imagine seeing a guy who was

4    disguised and dressed as your rapist and you see that person 20

5    something years later and you're smiling from ear to ear.  It

6    is said that a picture is worth a thousand words.  You will see

7    during this trial why this picture is worth so many more.

8            Ladies and gentlemen, thank you for indulgence.  Thank

9    you for your time.

10           Your Honor, thank you very much.

11           THE COURT:  Thank you.

12           Ladies and gentlemen, we will see you tomorrow

13   morning.  Remember, be in, please, by 8 and we will start

14   testimony at -- I said 9.  Didn't I.?  Did I say 9?  We are

15   going to start testimony at 10.

16           The jury department folks are in the back.  Andy will

17   give you the time you need to be here when you go into the jury

18   room.  There are a lot of cooks making this stew, getting you

19   in and out, folks.  They don't all talk to me.

20           Counsel remain, please.

21           (Jury not present)

22           THE COURT:  Mr. Tacopina, in light of what you said a

23   few minutes ago, I take it you are now telling my that

24   Mr. Trump will not testify live in this case.  Is that correct

25   or not correct?

NG3B6ART2

1          MR. TACOPINA:  The answer is, I am not sure, your
2    Honor.  That's the honest answer.  You can look at me that way.
3    That's the answer.

4          THE COURT:  Here is what you said.  Our defense will
5    come out through our witnesses.  That's where our defense is
6    coming from, their witnesses.  That's when, after they testify
7    under questioning by plaintiff's counsel we get to question
8    them.  That's where our defense is in this case.  It's coming
9    through the questioning of their witnesses.  That's our entire
10   defense, that and some sworn testimony from donned Trump is
11   what the transcript says, you are going to see, referring to
12   the deposition.  You then talk about the deposition and then
13   you said, because there is nothing more for him to add.  There
14   is absolutely nothing for him to add.

15         Look, I have represented clients who don't tell me
16   until the last minute what they want to do.  This is not a
17   circumstance in which you can just keep the entire apparatus
18   that goes with an appearance by him hanging in total
19   uncertainty.

20         MR. TACOPINA:  We do not mean to do that, your Honor.

21         THE COURT:  I appreciate that you do not mean to do
22   that, but the time has come.  I don't mean this minute, but you
23   are going to have to tell me this week.

24         MR. TACOPINA:  We are just waiting on a couple of
25   rulings from your Honor, and I will tell you that.

```
 1              Again, you did point something out.  There are certain
 2    clients who have desires, and I understand.  I will abide by
 3    whatever order you give me.  It will be this week.
 4              THE COURT:  This week.
 5              MR. TACOPINA:  Yes, sir.
 6              THE COURT:  Fish or cut bait.
 7              MR. TACOPINA:  Fish or cut bait.
 8              THE COURT:  Obviously, if something totally unforeseen
 9    happens, exceptions can be made.  But this is, in light of what
10    you just said, beginning to look like a very unnecessary
11    imposition on a lot of people.
12              MR. TACOPINA:  Imposition?
13              THE COURT:  On security, on court staff.  You follow?
14              MR. TACOPINA:  I follow.  I wouldn't even take us down
15    that road.
16              Your Honor, my intention, based on what I believe the
17    current state of the rulings are and the testimony, and I
18    hadn't see -- I know there was a ruling last night or today.  I
19    don't have my phone.
20              THE COURT:  There was a ruling on the deposition
21    designations.
22              MR. TACOPINA:  That's sort of one of the X factors.
23              THE COURT:  I commend it to your attention.
24              MR. TACOPINA:  Your Honor, I want to make sure the
25    Court didn't think I was running afoul of any of the rulings.
```

1    I cut out parts of my opening based on your order.  I was

2    simply -- I was not addressing -- when I talked about

3    Mr. Conway, I wasn't addressing litigation funding at all.

4              THE COURT:  I understand that.  But I also ruled that

5    we are not having any attacks on opposing counsel and all of

6    that.

7              MR. TACOPINA:  I wasn't attacking -- I have great much

8    for Ms. Kaplan and them.  I wasn't -- it was how she decided

9    she wanted to sue because initially she said --

10             THE COURT:  And you said all that.

11             MR. TACOPINA:  Then you struck it.

12             THE COURT:  I didn't strike anything.  I sustained an

13   objection.  You got your George Conway story.

14             MR. TACOPINA:  Thank you.

15             THE COURT:  Ms. Kaplan.

16             MS. KAPLAN:  One thing, your Honor, much more in the

17   manner of housekeeping, the parties have submitted an

18   instruction to you about the 2019 defamation case.  We

19   obviously don't need a decision right now, but you might want

20   to think about giving that after Ms. Carroll testifies to

21   better explain to the jury.  We just wanted to put that on your

22   radar screen.

23             THE COURT:  It is on my radar screen.

24             Mr. Tacopina, do you have anything to say about that?

25   I have a letter from your side.  I'm sorry.  I'm looking at the

1    wrong letter.  But you saw Ms. Kaplan's letter of yesterday

2    about an instruction in relation to Carroll 1.

3              MR. SEIGEL:  Your Honor, if I may, I can address that

4    it is our position that this jury shouldn't be placed in a

5    position to speculate on issues.

6              THE COURT:  Should or should not?

7              MR. SEIGEL:  Should not be in a position to have to

8    speculate regarding issues of presidential immunity or the fact

9    that this defendant was seeking to avoid litigation based on

10   his status as president.  It's not an issue in this case and it

11   could evoke potential negative reactions from this jury.  They

12   don't need to hear it.  It's simply enough to say, I think,

13   that based on various arguments that were raised, that issue is

14   not for them to decide.

15             THE COURT:  You would rather have them speculate that

16   the reason the other case hasn't been resolved is because it

17   has no merit, or something like that?

18             MR. SEIGEL:  Not that it has no merit.  There are

19   various issues that are still pending right now.  The fact that

20   the case is pending would suggest that in fact it may or may

21   not have merit.

22             MS. KAPLAN:  That's exactly our concern, your Honor.

23   I agree with Mr. Seigel that we don't want the jury to

24   speculate, and that's why we put this language in because we

25   think if there is no explanation, that's exactly what they will

1    do.

2            THE COURT:  The proposal from the other side, to the

3    extent there is, in my understanding, any objection to it is to

4    these two lines.

5            Mr. Trump defended that lawsuit in part on the ground

6    that he could not be sued because he was president at the time

7    he made those statements.  Those issues, a reference to, in

8    part, on the ground remain unresolved.

9            Now, the statement is entirely accurate, isn't it?

10           MR. SEIGEL:  Your Honor, yes, it is accurate.  But

11   that doesn't mean it should go to this jury.

12           THE COURT:  And the reason it shouldn't is why?

13           MR. SEIGEL:  The concern, your Honor, is this jury may

14   have a negative reaction to the fact that the defendant is

15   using his status as a former president in order to, in laymen's

16   terms, avoid a lawsuit.  They don't need to hear that fact.

17           THE COURT:  You are here urging that Mr. Trump

18   truthfully denied the allegations, yes?  I think that's what I

19   listened to for the last quite eloquent 45 minutes.

20           MR. SEIGEL:  Of course, your Honor.

21           THE COURT:  Right.

22           Why isn't it fair game for the other side to say,

23   well, maybe he doesn't want to meet the facts head on?

24           MR. SEIGEL:  Your Honor, he is meeting the facts head

25   on by defending this particular litigation.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              THE COURT:  By defending the other one either.

 2              MR. SEIGEL:  Your Honor, the problem with that is

 3     that -- the problem with that, your Honor, is that it invites

 4     the jury to find that he's not addressing the facts head on and

 5     is in fact using his status as a president in order to avoid a

 6     litigation which could evoke a negative reaction.  It's not

 7     something that this jury needs to hear.

 8              It's also, your Honor, something that -- it's also

 9     something that touches on advice of counsel.

10              THE COURT:  It touches on advice of counsel.  How does

11     it do that?

12              MR. SEIGEL:  Your Honor, if the defendant in that

13     litigation is taking a particular course based on information

14     that is provided to him by his counsel to best dispose of the

15     litigation, it touches on advice of counsel.  But the Justice

16     Department also was involved in that, your Honor.  There is a

17     host of issues.

18              THE COURT:  You are telling me --

19              MR. SEIGEL:  Fair enough.

20              THE COURT:  I was here.

21              MR. SEIGEL:  That's true.  I only read about it.

22              Your Honor knows --

23              THE COURT:  It is back before me, Justice Department

24     notwithstanding.

25              MR. SEIGEL:  Your Honor, if this instruction is going
```

1   to be given to the jury, then we should be in a position to

2   have to explain to them the Westfall Act.  It just complicates

3   the issues.  I think it's simply enough for the jury to hear

4   that that matter is still pending based on a variety of issues,

5   and you can instruct them that they are not to consider that.

6   The only consideration for them is this case.

7           THE COURT:  I'll think about it.

8           MR. SEIGEL:  Thank you.

9           THE COURT:  But there are arguments both ways on this,

10  I think.

11          Anything else this evening?

12          MS. CROWLEY:  Not from us, your Honor.

13          THE COURT:  Thank you.

14          If another attorney is going to speak, I'll have

15  everybody sit down and have the court reporter back at his

16  station

17          MR. DeOREO:  I apologize for interrupting you.

18          THE COURT:  It's all right.  Let's just get on with

19  it.

20          MR. DeOREO:  It's a pure housekeeping.  If plaintiff

21  testifies tomorrow, we need to use audio.  If we use audio,

22  there is going to be a foundation of authenticity issue that we

23  don't want -- we are inclined that we don't want to have the

24  audio or video or both played to the jury until you decide

25  whether we can use it.

1          THE COURT:  Of course.  But I am glad you raised it,

2    because I got that letter this morning.  Of course it would

3    have been a lot better if I had gotten it several days ago,

4    because it raises a bunch of issues.

5          The first issue is, where is the transcript of the

6    audio?  We try lots of cases with lots of audio in this court,

7    and the U.S. Attorney's Office, without fail, provides the

8    Court with a transcript, even if there is a fight about who is

9    speaking; even if there is a fight about audibility, to the

10   extent they can transcribe it, all of that stuff.

11         My first question is, do you have any transcripts?

12         MR. DeOREO:  Sometimes the CNN has provided

13   transcripts of their own videos.

14         THE COURT:  I'm sorry?

15         MR. DeOREO:  CNN has provided transcripts of their own

16   audios or videos.

17         THE COURT:  What videos are we talking about and where

18   are the transcripts?  I don't have videos and I don't have

19   transcripts.  What am I supposed to rule on?

20         MR. DeOREO:  Your Honor, your pretrial order

21   specifically says we don't have to identify exhibits for

22   cross-examination, which we have not done.  If we had done

23   that, we would have been forfeiting our right to impeach.

24         Your Honor, these videos speak for themselves.  They

25   are not unclear.  You can hear them.  You can see them.  If the

NGMCAP22

1    witness is saying that I didn't say that, then they can say

2    that.  I don't know any rule that says you can't use an audio

3    tape without a transcript.  I have never seen that before.

4         THE COURT:  I don't know any rule that requires the

5    United States of America, when they prosecute cases, based on

6    wiretaps, that they have to furnish a transcript, but it's done

7    in every case.

8         MR. DeOREO:  These aren't wiretaps.  They are publicly

9    on the Internet.

10        THE COURT:  I don't know what they are, Mr. DeOreo.  I

11   don't know what they are.

12        MR. DeOREO:  It's the witness' own choice.  They go on

13   to an -- on a podcast or on CNN.  They are not being secretly

14   recorded.  Sometimes it's their own podcast.  Lisa Birnbach,

15   it's her own website.  She puts it out there.  It's not a

16   secret recording that someone, it's a -- it's not a murky

17   recording.  They are not surreptitious.  These are recordings

18   that they put on on their own websites or they went onto CNN.

19   We are not claiming that it's some hidden camera with -- or

20   some hidden recording device.

21        THE COURT:  You write me a letter within 24 hours of

22   jury selection, maybe less, and you talk about audios that are

23   not specified.  All of the stuff about CNN, I believe, I'm

24   hearing for the first time, and I don't know what I'm dealing

25   with.  That's what I'm saying to you.

1           MR. SEIGEL:  Your Honor, if I may, I apologize.

2    You're absolutely right.  The items were not referenced because

3    they are intended --

4           THE COURT:  Impeachment material.  Got that.  Of

5    course.

6           MR. SEIGEL:  You are right, your Honor.

7           Just for clarification, so you do know, they are audio

8    and/or video recordings of various witnesses which these

9    witnesses made.  They would be available to listen to them,

10   watch them, without first publishing them to the jury, and they

11   can authenticate them.

12          The reason the letter was submitted was in an

13   abundance of caution to alert the Court of the plan for the

14   witness to be able to authenticate it without the juror or jury

15   first hearing it.  We have done this before in other matters.

16   We find that headphones are very efficient.  We will bring

17   enough.  We have it set up.  We just wanted to alert the Court.

18          THE COURT:  Mr. Ferrara.

19          MR. FERRARA:  Your Honor, there is one video that I'm

20   pretty sure I know what defense counsel is referring to, and I

21   believe it's the video of Ms. Carroll on Anderson Cooper,

22   because we understood.

23          THE COURT:  That sounds like it might be familiar.

24          MR. FERRARA:  Fair enough.

25          Because we understand that they want -- we anticipate

1    that they would play that.  We plan to play that and to impeach

2    her ourselves under, I believe it's 607.  We will have a

3    transcript prepared of the brief part of that tape that we

4    actually intend to play.

5          THE COURT:  This is the enjoyed it.

6          MR. FERRARA:  It involves some color being given to

7    the word -- whether people find rape sexy.  There are only a

8    few lines that are relevant, and we will make a transcript of

9    that by tomorrow.

10          THE COURT:  How much of your problem does that solve?

11          MR. SEIGEL:  Not very much, your Honor.  There is a

12    lot of audio and video from these witnesses.

13          THE COURT:  Let me hear from Mr. Ferrara.

14          MR. FERRARA:  The other video, we will authenticate

15    these without the use of video.  We will use the old-school

16    method of, Ms. Carroll has seen it on a disk, she has initialed

17    the disk.  I will hand her the disk.  She will describe what is

18    on the desk in a way --

19          THE COURT:  But you're talking about what you're

20    intending to use, not what they are intending to use.

21          MR. FERRARA:  We don't need the use of the headsets

22    for that.

23          Then there is one other video.  In this video this is

24    our -- they are both our exhibits, but this is an exhibit that

25    we have always intended to use, which is Donald Trump appearing

NG6C4RR2

1    on Roger Ailes' show.  The reason we are -- the reason we are

2    introducing it is the idea being that Mr. Trump was -- Mr.

3    Ailes and Ms. Carroll shared a set, essentially.  They were in

4    a similar studio area.  We are going --

5              THE COURT:  Where, when?  What are we talking about?

6              MR. FERRARA:  We are going to establish that.  We will

7    authenticate that, your Honor.  If defense objects, of course

8    your Honor can deal with it, and we are happy to.

9              THE COURT:  But you're talking about what you intend

10   to use.

11             MR. FERRARA:  Sorry.  I just wanted your Honor to know

12   we will also provide a video of the sort of first -- we will

13   provide a transcript of the first sort of ten seconds of that.

14             THE COURT:  But his problem is not with what you

15   intend to use.  It's with what he might want to use.

16             MR. FERRARA:  I stood up, your Honor, because I

17   thought maybe the Anderson Cooper might help them.  Number 2, I

18   just wanted to flag that we have a similar issue that we will

19   cite.

20             THE COURT:  Let's get back to you.

21             How much other stuff?

22             MR. SEIGEL:  Your Honor, there is -- the plaintiff has

23   appeared on numerous podcasts and on televised programs.  This

24   is -- a large part of it would be for impeachment purposes.  If

25   she adopts the statements that she makes, we may not have to

1    use it, but there is a voluminous amount.  I think with the

2    system that we have in mind we can do so efficiently.  For

3    instance, Ms. Carroll, if you can put the headphones on.  Your

4    Honor would have a set.  Opposing counsel would have a set.  I

5    am going to play a 20-second clip.  Tell me if you recognize

6    this.  Is that your voice?  Did you say that?  That would be

7    sufficient to authenticate it.  Very good.  We can take the

8    headphones off and then publish it to the jury once it is

9    submitted.  Only if we need to, your Honor.  It would

10   essentially be the equivalent of producing a tangible piece of

11   evidence to the witness and showing it to her.

12            THE COURT:  Where is the record evidence of what the

13   witness authenticated if you do it that way?

14            MR. SEIGEL:  If she authenticates it, it's burned onto

15   a CD.

16            THE COURT:  It's on a CD.

17            MR. SEIGEL:  That we have done, yes.

18            Unfortunately, because we don't have the opportunity

19   that opposing counsel has to sit down with the plaintiff and

20   say, listen to this and do you recognize this --

21            THE COURT:  No.  But you have already identified the

22   excerpts that you think you want to use.

23            MR. SEIGEL:  Yes.

24            THE COURT:  Right.

25            MR. SEIGEL:  That's right, your Honor.

1          THE COURT:  You have the ability to come in here with

2    storage media.

3          MR. SEIGEL:  Yes.

4          THE COURT:  One excerpt per storage medium, yes.

5          MR. SEIGEL:  Yes, your Honor.  We will do that.

6          THE COURT:  Let's just walk through it because all I'm

7    trying to do is to understand what it is you're talking about

8    and figure out how I can have an acceptable record.

9          MR. SEIGEL:  Sure.

10          THE COURT:  Ms. Carroll says on the stand, and I'm

11    making it up.  You know, this is hypothetical.  It was really

12    at Neiman Marcus in Dallas, right, and now you have got some

13    recording in which she said it was in Nordstrom's in

14    Minneapolis, and now what do you want to do with that

15    recording?

16          MR. SEIGEL:  We want to play it for everyone in the

17    courtroom in this well, excluding the jury, and ask Ms. Carroll

18    if she --

19          THE COURT:  If that's her voice.  If she recognizes

20    it.  Did she say those things.  Yes?

21          MR. SEIGEL:  That's right.

22          THE COURT:  If you get the answers you hope to get,

23    then you want to offer it in evidence and we have whatever we

24    have in relation to that.

25          MR. SEIGEL:  Right.

1          THE COURT:  It either comes in or it doesn't.

2          MR. SEIGEL:  Yes.

3          THE COURT:  What you, I think, are really proposing,

4    and correct me if I'm wrong, because I'm trying to walk through

5    this with you, is to save the time of the jury being walked

6    back to the jury room while the audio is played aloud in the

7    courtroom and you ask your authentication questions.  What you

8    want to do is, you want the jury to sit there and everybody

9    else is sitting with ear muffs listening to something the jury

10   can't hear.  And the jury then, assuming for the sake of

11   argument that it doesn't get in eventually, is listening to

12   Ms. Carroll's answers, verbal answers to your questions that

13   the jury has heard about a tape that they have not heard and

14   may never hear, and we may then have a discussion about whether

15   you can use it with the jury sitting here.

16          That's the plan?

17          MR. SEIGEL:  We would do it in this fashion and just

18   say, Ms. Carroll, we are going to play an audio for you, tell

19   me if you recognize your voice, and she could authenticate it

20   that way.  It's no different than saying, Ms. Carroll, we want

21   you to look at this document.  We will just identify as an

22   audio.  Or we could actually -- that would be one way to do it,

23   your Honor.

24          THE COURT:  I appreciate the imagination and maybe I'm

25   just not sufficiently imaginative, but I'm certainly

1   traditional.  I think we have been excusing the jury from those

2   kinds of discussions for several hundred years and that's what

3   we are going to do here.  OK?

4          MR. SEIGEL:  OK.

5          One second, your Honor.

6          THE COURT:  Do you have a problem, Mr. Tacopina?  Am I

7   missing something?

8          MR. TACOPINA:  I am getting something explained to me

9   from the person that runs all this stuff.  I'm missing a lot

10  right now.

11         THE COURT:  I don't think so.

12         MR. SEIGEL:  We are having our own little powwow here

13  trying to figure out --

14         THE COURT:  I understand, I appreciate that.

15         MR. SEIGEL:  We were trying to find an efficient way

16  to do this without having to excuse the jurors.  We thought the

17  headset might work.  We will defer, obviously -- this goes

18  without saying, we are deferring to your Honor, however you see

19  best to do this.

20         My hope is, along with my colleagues, that if we ask

21  the witness if she made certain statements on a podcast, she

22  will just accept them knowing that we have that.  But if she

23  doesn't, then we will have to do what your Honor suggested.

24         THE COURT:  I may be mistaken.  You know what this

25  material is.  I don't.  I have not heard any direct testimony

1    yet either, which matters here, right.  But I have a feeling,

2    just a feeling, instinct, 50 years doing this, that you are

3    making more out of this than may be warranted.  You get a

4    statement from the stand and you are telling me this is

5    principally an impeachment problem, right?

6                MR. SEIGEL:  Yes.

7                THE COURT:  So you want to impeach with a prior

8    inconsistent statement.

9                Now, under the rules, as I remember them, I have not

10   reread them this week, but as I remember them, you have to lay

11   a foundation even to begin thinking about that, right?

12               MR. SEIGEL:  That's correct.

13               THE COURT:  You have to say to the witness, didn't you

14   on such and such occasion say in substance or in words X,

15   right?

16               MR. SEIGEL:  Yes.

17               THE COURT:  Do we agree?

18               MR. SEIGEL:  Yes.

19               THE COURT:  If the witness says yes, OK, no harm, no

20   foul, no jury excused, no problem.  If the witness says, I

21   don't remember, then you have problem number 2.

22               Problem number 2 then becomes, how do you deal with

23   the issue of refreshment of recollection?  Now, that presents a

24   somewhat different problem than impeachment.  Because there

25   you're permitted to refresh a witness' memory or attempt to do

1   so, essentially with anything.

2            MR. SEIGEL:  Right.

3            THE COURT:  So there I don't see the device that I was

4   seeing earlier, putting aside the electronics for a minute,

5   with there being no record of what you are using to impeach.

6   Assuming the electronics work out, then you say, all right, put

7   on your headset, I am going to play for you -- you can't even

8   say what you are doing, right?  Because you got the jury there.

9            MR. SEIGEL:  Right.

10           THE COURT:  I may circle back to this in a minute.

11  But you are going to say, just listen.  Is your memory now

12  refreshed?  Answer:  No.  Hypothetically.

13           I don't offhand remember the answer to the question

14  of, can you then offer the inconsistent statement?  But I'll

15  certainly know it by tomorrow.

16           MR. SEIGEL:  Yes, you will.  We will help in that

17  regard.

18           THE COURT:  I'm sure you will.

19           Suppose, hypothetically, the answer is, yes, but you

20  have taken it completely out of context.  Now where are we?

21           MR. SEIGEL:  We can have an entire recording -- we

22  will have the full clip available, and we can provide it to

23  opposing counsel as well.

24           THE COURT:  With transcript, no transcript?  Because

25  it may become very important for me to have the transcript at

1    that point.

2              MR. SEIGEL:  Right.  There are no transcripts.  These

3    are live podcasts, online that we pulled clips of.

4              THE COURT:  Didn't somebody say a minute ago that CNN

5    did transcripts?

6              MR. SEIGEL:  CNN -- that's fair.  CNN itself, the

7    Anderson Cooper.

8              THE COURT:  Anderson Cooper is not going to be a

9    problem.

10             MR. SEIGEL:  Right.  There is a transcript of that

11   online as well.  They provide it.

12             But these are podcasts on various websites that are

13   not at all well known, and there are no transcripts that were

14   produced for those.  They are just clips that are 15 seconds

15   long, 20 seconds long and I think, if anyone were to hear them,

16   they are sort of self-contained.  They are not out of context.

17             THE COURT:  How does anybody know that?

18             MR. SEIGEL:  You'd have to hear it.  I understand.

19   Certainly the witness would.

20             THE COURT:  And maybe the judge too.

21             MR. SEIGEL:  Of course.  That's why we have headsets

22   for everyone.

23             THE COURT:  You've got a 15-second thing you've got

24   off some yenevelt website.  How do I know it's complete?

25             MR. SEIGEL:  We will have the entire recording

1    available, and we could go back or back as far as anyone deems

2    necessary or ahead as far as anyone deems necessary.

3              THE COURT:  I can just see how efficient this is.

4              I am going to think some more about it.

5    Provisionally, I think it's kind of problematic, but we will

6    see.  It may depend very much on the precise context in which

7    the question arises.

8              Mr. Ferrara.

9              MR. FERRARA:  Your Honor, appreciate the Court

10   thinking through this.  I'll just flag, completely understand,

11   of course, why defense counsel does not want to share this with

12   us beforehand.

13             THE COURT:  Right.  I'm not quarreling with that.

14             MR. FERRARA:  Understood.  We may be in a position,

15   your Honor, because, again, if it's a document, to your Honor's

16   point, about completeness, we can rifle through a document much

17   more quickly than we can rifle through an audio recording to

18   make sure we don't believe that, under completeness, some other

19   portion should be offered or it's not taken out of context or

20   make some other objection.  We may -- I apologize in advance --

21   be asking the Court for more time to do that.

22             Number 2, there are sensitive 412 issues in this case

23   which certain portions that might be played, that might be a

24   little ahead or a little behind that could implicate issues

25   that we briefed for your Honor, and we don't want -- I don't

1    think anyone is suggesting we inadvertently want something to

2    be played for the jury or to go back to the jury that

3    implicates an issue that your Honor has not ruled on.

4         THE COURT:  Sure.  Let me suggest this.  I think all

5    these smart people at the front and back table ought to put

6    their heads together about this.  I am not suggesting that the

7    defense has any obligation at all to tip your hand as to what

8    the material is.  I think maybe if you talk about this a little

9    more, you may make all of us smarter.

10        Now, the equipment you want to bring in is what

11   exactly?

12        MR. SEIGEL:  Can our IT person respond to this?

13        THE COURT:  Of course.

14        MR. SEIGEL:  Thank you very much, your Honor.  It is

15   above my pay grade and knowledge.

16        MR. NELSON:  Your honor, I took the liberty last night

17   of taking a photograph of the materials that we would like to

18   bring in, and I would be happy to provide this to the Court so

19   you'll have a better understanding of what we are talking

20   about.

21        Also, your Honor, I spoke with William, your IT

22   person, and explained to him, in the event that we are allowed

23   to do this, the way it would be set up.

24        THE COURT:  I don't know William.

25        MR. NELSON:  One of your IT people here with the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Court.

2          In addition, your Honor, I also asked counsel, in the

3    event that they would need to play something, that they would

4    have full use of it as well.

5          THE COURT:  I am sure they are very eager.

6          I appreciate being given this photograph of a roll of

7    duct tape, seven pairs of earphones, and a great big black box

8    that looks like it ought to be on Mission Impossible, and may

9    either be a stereo system or a way to blow up the Kremlin.  I

10   don't know what it is.  How could I possibly know.

11         MR. NELSON:  Your Honor, if I may, one thing it will

12   do, it will not be played through the court system.  In order

13   words, the jury will not hear anything that is being played.

14         THE COURT:  I understand.

15         What is this black box supposed to do?

16         MR. NELSON:  There is actually two devices in there,

17   your Honor.  The one that has got all the knobs on it, it's

18   actually a Mackie sound board that would be sitting to my left

19   over here.  I would be able to control the audio levels with

20   that.  The other box, the elongated box on top of it, is a

21   distribution amp where all the headphones would then plug into.

22   It would come out of my computer into that Mackie sound board.

23         THE COURT:  Does it have any network access?

24         MR. NELSON:  No, sir, none whatsoever.

25         THE COURT:  Does it have any wireless communication

capability?

1

2          MR. NELSON:  None whatsoever, your Honor.

3          THE COURT:  Physically you may bring it in, which is

4  not to say you may use it.

5          MR. NELSON:  Understood, your Honor.

6          THE COURT:  It certainly would deliver to the jury, if

7  it were used, I take it, one message loud and clear, which is

8  that the defense argues that something the jury may not hear

9  and possibly should never hear is inconsistent with the

10  witness' testimony.  It is, we say she is a liar, look at the

11  black box device.  Isn't it?

12          MR. NELSON:  To a degree, your Honor.

13          THE COURT:  To a degree.  How much of a degree?

14          MR. NELSON:  I'll say this.  All audio podcasts,

15  everything that would be heard by the witness and by counsel

16  and yourself, they were actually a screenshot from the site

17  that they were taken from.

18          THE COURT:  What does that mean?

19          MR. NELSON:  Essentially, your Honor, whatever website

20  it was from, whatever podcast it may have been, whose ever show

21  it was on, it is identified because it was recorded as a video,

22  so you can see what is being played, even from an audio

23  podcast.

24          THE COURT:  That makes it worse.

25          MR. TACOPINA:  No.  I think that makes it better, your

1    Honor.  In case there is a recollection that needs to be

2    refreshed regarding being on John Smith's podcast, the John

3    Smith podcast, it may refresh her recollection if she saw the

4    screenshot of the actual podcast page.

5         THE COURT:  You could also have a piece of paper on

6    which is typed John Smith's podcast, and you could show her the

7    piece of paper and say, have you looked at the piece of paper?

8    Has that refreshed your recollection?

9         MR. TACOPINA:  Rather than identifying what that piece

10   of paper is, it would be of no consequence at all to anyone.

11        THE COURT:  So what you want to do is you want to

12   display to the jury something, the authenticity of which --

13        MR. TACOPINA:  I wouldn't display it to the jury, your

14   Honor.

15        THE COURT:  Who are you displaying it to?

16        MR. TACOPINA:  The witness.

17        THE COURT:  And you are going to do that through the

18   headsets in the --

19        MR. TACOPINA:  No.  That one would be on the screen.

20        THE COURT:  On whose screen?

21        MR. TACOPINA:  The witness' screen.

22        THE COURT:  I thought he just said this wouldn't

23   involve using the court system.

24        MR. TACOPINA:  Not that big thing you have there with

25   the plugs and the headsets.

```
 1              THE COURT:  There is only one screen in front of the

 2    witness.

 3              MR. TACOPINA:  That one.

 4              THE COURT:  One.  It is connected to the Court's

 5    system.

 6              MR. TACOPINA:  Can we show exhibits the way we showed

 7    the photo before or they showed their things?  Can't we show

 8    exhibits through the court system without the jury seeing it?

 9              THE COURT:  Yes.

10              MR. TACOPINA:  That's what I meant, if that helps.  I

11    don't know if it helps.

12              THE COURT:  I am not sure if it does or not.

13              MR. TACOPINA:  This might not ever happen.  It may not

14    come to fruition, but I just don't know how to impeach a

15    witness.  I have done a lot of these.  If I say, you said this

16    on a certain date, hopefully, we won't even have to play the

17    thing.  The witness says:  Yes, I recall that.

18              THE COURT:  Right.  We are agreed on that. If we get

19    past that is where it begins to get a little narley, doesn't

20    it?

21              MR. TACOPINA:  It would give the witness, obviously,

22    the refuge that if they don't recall anything, they don't get

23    impeached because we can't --

24              THE COURT:  If that's true, as a matter of law, that's

25    true, no matter what the source of the impeaching statement is.
```

```
 1              MR. TACOPINA:  No, no.  I misspoke.  If we are not
 2    able to authenticate it's a podcast, for example, if we are not
 3    able to let the witness hear her voice on the podcast, how
 4    would we either impeach or refresh the recollection of that
 5    witness?
 6              THE COURT:  Well, refresh is the easy part.
 7              MR. TACOPINA:  Yes, I agree.
 8              THE COURT:  Mr. Ferrara, do you want to make a
 9    contribution or not?
10              MR. FERRARA:  I think it circles back to what your
11    Honor said.  You could have a transcript.  You could hand the
12    transcript up.
13              THE COURT:  We are here on Tuesday afternoon and there
14    aren't any transcripts.
15              MR. FERRARA:  We are going to have transcripts
16    tomorrow.  I don't see --
17              THE COURT:  You are not going to have it from them.
18              MR. TACOPINA:  The transcript doesn't solve it.  How
19    can you hear her voice on a transcript?
20              MR. FERRARA:  Unless the Court -- it's another step.
21    In other words, it's one thing to say, Ms. Carroll, do you
22    recall saying something on such and such occasion?  If
23    Ms. Carroll says, I don't recall, it's much easier to put the
24    transcript portion that would refresh her recollection.
25              THE COURT:  Of course.
```

1          MR. FERRARA:  I'm not suggesting that defense has to

2    transcribe every recording she has ever done in its entirety.

3    We can certainly at least have some portion of a transcript.

4          THE COURT:  Why can't you do that, Mr. Tacopina?

5          MR. TACOPINA:  Let me read your question.

6          MR. NELSON:  Your Honor, while he is doing that, I

7    need to clarify one thing and hopefully help the Court.  It's

8    not a static image being recorded off the screenshot.  Two

9    things it does.  It identifies the mark of where the audio

10   starts and where the audio ends, because the audio bar on the

11   podcast, it is moving as the video is playing or as the audio

12   and video is playing.

13         THE COURT:  That bar begins at 000 at the point where

14   you started recording it off the podcast and stops at whatever

15   the end point is of what you elected to record.  Is that right?

16         MR. NELSON:  It is, your Honor.  But, in addition to

17   that, I have the full clip of what that portion was taken from.

18   If opposing counsel needs to hear something else, I could then

19   play something for them from the full podcast, few seconds

20   before, few seconds after, wherever they want me to go.

21         THE COURT:  Do we know how long any of these podcasts

22   are?

23         MR. TACOPINA:  The clips we plan on using are

24   relatively brief, obviously.

25         THE COURT:  I'm confident of that.

1           Are they 12-second clips out of a 22-second podcast

2    cost, or are they 12-second clips out of a 15-minute audio

3    segment with Ms. Carroll on it, or whoever the witness is?

4    Seems to me that makes a difference.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. TACOPINA:  Should I?

2              THE COURT:  Yes, please.

3              MR. TACOPINA:  I don't think you are asking what I'm

4     being told, which is, there is no clip that's more than a

5     minute long.  But that's not what you are asking.  You are

6     asking, outside of that clip, how long is that podcast.

7              THE COURT:  Exactly.

8              MR. TACOPINA:  Yes.  So the answer is --

9              THE COURT:  You don't know.

10             MR. TACOPINA:  -- they are different.  They are all

11    different.

12             THE COURT:  They are all different.  Right.  So go

13    back to the one that I have a little bit of and only a little

14    bit of familiarity with, which is the Anderson Cooper one,

15    which I understand is not going to be a problem.

16             MR. TACOPINA:  Right.

17             THE COURT:  Just take that.

18             MR. TACOPINA:  For an example.

19             THE COURT:  She was on the Anderson Cooper show doing

20    that interview, as I remember the briefing, before and after a

21    commercial break, right?

22             MR. TACOPINA:  Yes.

23             THE COURT:  So would I be right in guessing she was on

24    that show for 15 minutes, 30 minutes, something like that?

25             MR. TACOPINA:  I think eight.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  Eight.

2          MR. TACOPINA:  Eight or nine.

3          THE COURT:  Okay.

4     And suppose you now have a nine-second clip that you

5 want to use for refreshment or impeachment.  Now, what are we

6 supposed to do when the other side says, How do I know it's

7 complete?  How do I know she doesn't say in a portion that the

8 defense chose not to record the opposite of what they are

9 playing?  How do I know any of that?

10         (Counsel confer)

11         MR. TACOPINA:  Your Honor, the only thing I can think

12 to expedite this a little bit is, after the direct of

13 Ms. Carroll -- giving it to them before the direct, obviously,

14 for example, they are going to play the CNN video now in their

15 case in chief under 607.  After the direct, after the direct, I

16 will give them the complete disks of podcasts.  Maybe we could

17 take a little break and they, the team, could sort of listen,

18 make sure that's the full thing, because we are giving the full

19 thing.  As an officer of the court, I represent --

20         THE COURT:  You are going to give them the complete so

21 they can sit there for 40 minutes listening to everything,

22 including what you don't intend to use, or are you going to

23 give them everything and discretely flag what you intend to

24 use?  Because obviously you see the point of that.

25         MR. TACOPINA:  I mean honestly, look, I have complete

1    confidence –- if it's after the direct, I will give it to the

2    lawyers, both the complete and the portion we intend to use,

3    just so they have it, as long as it is not discussed with –-

4    and I will take their representation.

5              THE COURT:  Of course.

6              Does that work?

7              MR. FERRARA:  So after direct, understanding at the

8    point which we can no longer speak with Ms. Carroll about the

9    substance of her testimony, we would receive the entirety of –-

10   so let's say there is Defense Exhibit 1 for impeachment, we

11   would receive the entirety of Defense Exhibit 1 recording plus

12   an indication of what portion they think they will have to use

13   to refresh or impeach Ms. Carroll.

14             THE COURT:  That's what I understand.

15             MR. FERRARA:  I think that will work.

16             MR. TACOPINA:  I will do that, of course, with the

17   understanding that they are –-

18             THE COURT:  Now –- go ahead.  I didn't mean to

19   interrupt.

20             MR. TACOPINA:  I said, yes, I propose that.  I think

21   that's the easiest.  And again, I will accept their

22   representation that they won't share the portion of the videos

23   with the witness.

24             THE COURT:  Of course.  We have good lawyers here.  I

25   have confidence in all of them.

A-1523

1          Okay.  We have spent about an hour on this.  I think

2    it was useful to do it.  I appreciate that defense counsel were

3    trying to do something that they thought would be efficient,

4    and I understand why that thought dawned, and I am appreciative

5    of that.  And I think everybody ultimately has gotten to a

6    place that makes sense, and good, that's what I want to see

7    from responsible counsel, and I see it.

8          MR. TACOPINA:  Thank you, your Honor.

9          THE COURT:  Okay.  It's been a long day.  Have a very

10   good evening, everybody.

11         COUNSEL:  Thank you, your Honor.

12         (Adjourned to Wednesday, April 26, 2023, at 10:00

13   a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

N4QMCAR1                                                          105

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                    Plaintiff,              New York, N.Y.
4
            v.                              22 Civ.10016 (LAK)
5
     DONALD J. TRUMP,
6
                    Defendant.
7    ------------------------------x       Jury Trial

8                                          April 26, 2023
                                           10:10 a.m.
9
     Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                           District Judge
12                                              and a Jury

13
                            APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant

1              THE COURT:  Good morning, all.

2              Just very brief and not for discussion.  Footnote to

3     last night.  After the discussion about these earphones, and

4     everybody will remember what I'm talking about, the court

5     reporters told me that it's basically unworkable from their

6     point of view because normally when they take down verbatim

7     materials from audio recordings, it takes sitting with the

8     recording and working back and forth and making sure you got a

9     word correctly, and they tell me it would be dreadful to try to

10    accomplish that in the context of live testimony in a trial.

11    So that's just another consideration.

12             Next.  Anything else before we bring the jury in?

13             MS. KAPLAN:  One issue, your Honor.

14             We literally, your Honor, just became aware that the

15    defendant in this case posted on his social media site, Truth

16    Social, a lengthy statement which is, I think on its face,

17    inconsistent with your orders on two separate motions *in

18    limine*, one about comments about lawyers and one about DNA.

19             THE COURT:  Well, do you have it to show me?

20             MS. KAPLAN:  I have it written down.  Someone is

21    trying to print it.  I don't think we have a printout.  I can

22    read it to your Honor, if you want.  I apologize.

23             THE COURT:  Go ahead.

24             MS. KAPLAN:  It says:  The E. Jean Carroll case,

25    Ms. Bergdorf Goodman is a made-up scam.  Scam is in all caps.

1    Her lawyer is a political operative financed by a big political

2    donor that they said didn't exist, only to get caught lying

3    about that.  Just look at her CNN interview before and after

4    the commercial break, like a different person.  She said there

5    was a dress, using the old Monica Lewinsky quote/unquote stuff,

6    that she didn't want to produce it.  The dress should be

7    allowed to be part of the case.  This is a fraudulent and false

8    story dash witch hunt, exclamation point, April 26, 8:51, I

9    assume.  Mr. Tacopina.

10           MR. TACOPINA:  Your Honor, I obviously know nothing

11   about what I have just heard.  This is the first I am hearing

12   of it.  I will just say that those seem to be consistent with

13   the comments that they opened on yesterday regarding his

14   videotaped deposition.  Again, I'm not aware -- you look

15   perplexed.

16           THE COURT:  I am not perplexed.  If it is as if you

17   told me that yesterday was the 4th of July.  That's all.

18           MR. TACOPINA:  These are out-of-court comments,

19   obviously, saying that it's a hoax or a scam or whatever the

20   word was.  Again, I haven't seen this.  It is basically what he

21   said on the videotaped deposition that they opened on

22   yesterday.  Your Honor.

23           THE COURT:  What about the business about the DNA

24   where he, for three years, refused to give a DNA sample and now

25   he wants it in the case?

A-1527

1          MR. TACOPINA:  I'll address that, your Honor, if you

2     like.  For three years the issue was whether there was a

3     Westfall Act issue here or some presidential immunity.

4          THE COURT:  That isn't even close to true.

5          MR. TACOPINA:  On Carroll 1.?

6          THE COURT:  It was a very late in Carroll 1 when the

7     Westfall issue was first raised and the DNA request had been

8     outstanding.  I don't remember the exact time period, but for

9     quite a considerable time period before anybody ever thought of

10    the word Westfall.

11         MR. TACOPINA:  Your Honor, again, you know I entered

12    this case in January.  I wasn't part of that back and forth.

13    My understanding, I will say, is that that case was never going

14    to be -- the defense in that was executive, some sort of

15    privilege argument there that is apparently still pending

16    before the appellate courts at this point.  That was the focus

17    of that case, not defending the underlying allegation.  The

18    focus was --

19         THE COURT:  I think you're mistaken about that too.

20         MR. TACOPINA:  That's my understanding.

21         The point is, your Honor, when I became involved, when

22    I got into the case and we were trying the underlying sexual

23    assault case, yes, I wanted the DNA tested and I wanted my

24    client to submit.  That's a strategy decision I made when I

25    looked at their report and realized there was nothing there.

1  The Court ruled on that.  DNA will not be uttered in this

2  courtroom.

3          THE COURT:  What seems to be the case is that your

4  client is basically endeavoring certainly to speak to his

5  "public," but, more troublesome, to the jury in this case about

6  stuff that has no business being spoken about.

7          MR. TACOPINA:  The jury has been instructed not to

8  read any media or press in this case, right, your Honor, so we

9  have to assume the jury is not going to violate the Court's

10 order.

11         I will do this.  First of all, let's also just put

12 things in context.  A week ago, before this trial started,

13 there was an article which I read again yesterday in reference

14 to -- that was a leak -- not certainly Ms. Kaplan or her

15 office, but somebody leaked the fact that two mock juries had

16 come to a conclusion finding liability.  You talk about

17 prejudicial a week before a trial.  I think that pretty much is

18 the pinnacle of prejudicial.

19         THE COURT:  But you say you are not accusing the

20 plaintiff's team of having done that.

21         MR. TACOPINA:  I'm not accusing Ms. Kaplan, Ms.

22 Crowley, or any of the lawyers on that team.  Somebody from the

23 plaintiff's side did that, whether it was a jury consultant,

24 one of the jurors that they use.  Somebody from that side

25 leaked it.  Certainly it wasn't us.  I'm being consistent with

1   the Court's desires here, and I have a great deal of respect

2   for Ms. Kaplan and I like Ms. Kaplan.  I'm not suggesting she

3   would have done that.  But someone from that world leaked that.

4           THE COURT:  Someone from that world may have been

5   somebody that was picked up off the street and offered whatever

6   they offered these days to sit for a day and give an opinion

7   and leave.  Now, you know how those things work, and you are

8   trying to pin it on the plaintiff.

9           MR. TACOPINA:  No, your Honor.  It's impossible

10  because they knew about the other juries and the other juries.

11  It was not a person that was on the jury who didn't sign a

12  protective order, by the way, and just left.  This individual,

13  if you read the article, which I have read --

14          THE COURT:  I have too.  It says that there were 37,

15  if I have the number right, people brought in and the 37 were

16  all, as I understood the article, in one place at one time and

17  then they were divided into three groups.

18          MR. TACOPINA:  Correct.

19          THE COURT:  Every person in there knew there were

20  three groups.

21          MR. TACOPINA:  Yes.  But every person in there, if

22  they were provided three groups, would have known what the

23  other jurors came to as a conclusion, I would imagine.

24  Hopefully, that was protected, right?

25          THE COURT:  Mr. Tacopina, I have a good imagination

Case 23-793, Document 81, 11/20/2023, 3592067, Page150 of 300

A-1530

1   too and I can imagine that you are right, and I can imagine the

2   facts are entirely different.

3          MR. TACOPINA:  OK.  I never complained about --

4          THE COURT:  What you are trying to do is to get away

5   from a statement by your client, a public statement that, on

6   the face of it, seems entirely inappropriate.

7          MR. TACOPINA:  Your Honor, I will address that with my

8   client today.  I will.  I assure you.  I will try and prevent,

9   to the degree I have the ability to, any posts regarding that.

10          I'm sorry, your Honor.  I just can't accept the fact

11   that that is inappropriate and a leak about results in a

12   confidential, protective-order, governed mock jury was leaked

13   to the press.

14          THE COURT:  You don't know that it was a leak by

15   anybody who had any obligation to anything in this case.  It

16   may have been, I acknowledge that.  But you could not put a

17   witness on the stand to establish what you are assuming is the

18   case, unless I don't know something.

19          MR. TACOPINA:  You are right.  I'm relying on common

20   sense.  There was information regarding exhibits in there and

21   everything else, but whatever.

22          Again, your Honor, I am just trying to say, there has

23   been things on both sides, if the jury wants to violate the

24   Court's order, that could affect their fair and impartial

25   deliberations.  I will assure you.  There was a protective

1    order that was given that wasn't signed and executed.  Again,

2    I'm not -- I don't mean to blend the issues.

3          Here is all I could tell you.  I will speak to my

4    client and ask him to refrain from any further posts regarding

5    this case.  I've been very careful not to say a word about our

6    case publicly, and I will continue to do that, and we will

7    have -- I will do the best I can do, your Honor.  That's all I

8    can say.

9          THE COURT:  I hope you're more successful because we

10   are getting into an area, conceivably, in which your client may

11   or may not be tampering with a new source of potential

12   liability.  I think you know what I mean.

13         MR. TACOPINA:  Your Honor, I will address that, but,

14   again -- yes.  Leave it at that.  Thank you.

15         THE COURT:  Anything else?

16         MS. KAPLAN:  Nothing, your Honor.

17         THE COURT:  Let's get the jury.

18         (Jury present)

19         THE COURT:  Good morning, folks.  As sometimes

20   happens, something came up overnight that I needed to do

21   address before you came into the courtroom, but it's behind us

22   now, so the plaintiff will call her first witness.

23         MS. KAPLAN:  Your Honor, plaintiff calls to the stand

24   Cheryl Beall.

25   CHERYL L. BEALL,

**A-1532**

1        called as a witness by the Plaintiff,

2        having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MS. KAPLAN:

5    Q.  Good morning, Ms. Beall.

6    A.  Good morning.

7    Q.  What is your current job?

8    A.  I'm the vice-president of human resources at a cosmetics

9    company.

10   Q.  Have you done other work in the retail industry?

11   A.  Yes.

12   Q.  For how long have you been working in the retail industry?

13   A.  I've probably been in retail now for about 33 years.

14   Q.  In addition to your current job, have you had occasion to

15   work for other retail brands?

16   A.  Yes.  Many of them.

17   Q.  Can you give the jury a couple of examples.

18   A.  Sure.  I have worked for Prada, Hermez, David Yurman, Louie

19   Vuitton, Ermengildo Zegna.

20   Q.  I want to focus in right now, Ms. Beall, on the spring of

21   1996.  For most of my questioning I will be asking you about

22   that period so you have a reference for my questions.

23   A.  OK.

24   Q.  Right now, to start out, where were you working in the

25   spring of 1996?

A-1533

1    A.   At Bergdorf Goodman.

2    Q.   What is Bergdorf Goodman?

3    A.   Bergdorf Goodman with is a luxury retail specialty store.

4    Q.   Where is it located?

5    A.   57th and Fifth Avenue.

6    Q.   Now, Ms. Beall, you are testifying today in the case of E.

7    Jean Carroll v. Donald Trump?

8    A.   Yes.

9    Q.   Have you ever spoken with Ms. Carroll before?

10   A.   No.

11   Q.   Have you ever met her before?

12   A.   No.

13   Q.   What was the first time you heard her name?

14   A.   I probably read about it, but the first time I was aware of

15   it was when I was contacted by your office.

16   Q.   Going back to the spring of 1996, what was your job at that

17   point at Bergdorf Goodman?

18   A.   I was the store manager of the women's store.

19   Q.   Had you been working at Bergdorf for a long time by that

20   point?

21   A.   Yes.  Since 1988.

22   Q.   Could you describe, just generally for the jury, what your

23   responsibilities were as store manager?

24   A.   Sure.  As the store general manager, my responsibilities

25   were to operate the store.  It was a daily operations, oversee

A-1534

1   the sales team, and ensure that we had appropriate customer

2   service.

3   Q.  Did you like your job as store manager at Bergdorf Goodman?

4   A.  I loved my job.

5   Q.  Now, in the spring of 1996, to the best of your

6   recollection, which floors at Bergdorf Goodman were

7   available -- sold merchandise to the public?

8   A.  In 1996, we had the first through the seventh floors.

9   Q.  When you worked at Bergdorf as manager in the spring of

10  1996, did you have an office?

11  A.  Yes, I did.

12  Q.  Where was your office located?

13  A.  It was in the sixth floor behind the client services

14  department.

15  Q.  As part of your job as store manager, did you spend most of

16  the day in your office or did you do other things?

17  A.  No.  I was definitely on the selling floor probably 95

18  percent of the time.  We weren't allowed to be in our offices.

19  Q.  How would customers or a member of the public walking into

20  Bergdorf Goodman, how would they get to the higher floors?

21  A.  They would take one of the two elevator banks, either on

22  57th or 58th Street side, and then the other option would be to

23  take escalators.  We have a single bank in the middle of the

24  store.

25  Q.  During that period again, spring of 1996 or even we could

A-1535

1    stretch it a little bit, late 1995, spring of 1996, was

2    Bergdorf Goodman opened on weekdays?

3    A.   Yes.  Monday through Friday on the weekdays.

4    Q.   What were the store hours on weekdays?

5    A.   10 a.m. until 6 p.m.  On Thursdays, we were open until 8.

6    Q.   Why did Bergdorf stay open until 8 on Thursdays?

7    A.   It's a very typical retail thing that one night a week you

8    leave your store open so that you can either do store events,

9    but also because many people are working, and so they may not

10   be able to come during busy store hours.

11   Q.   You have testified, Ms. Beall, that you have been working

12   in the retail industry for more than 30 years.

13   A.   Uh-huh.

14   Q.   I take it -- withdrawn.

15           Based on the experience, do you have familiarity with

16   other department stores in New York City?

17   A.   Of course.

18   Q.   Which ones?

19   A.   Nordstrom's, Neiman Marcus, Saks Fifth Avenue,

20   Bloomingdale's, Macy's, formerly Barneys.

21   Q.   Can you explain to the jury, if you could, what would be

22   the difference for a shopper in their experience of walking

23   into Bergdorf, on the one hand, versus a store like

24   Bloomingdale's on the other?

25   A.   I think the primary difference is that the other stores

1   that we were referring to are department stores.  Bergdorf's is

2   a multi-brand luxury specialty store, which was very important

3   to us.  The difference is primarily that it's set up in a much

4   more residential design and is very focused on service,

5   probably especially at that time more so than merchandise.

6   Q.  When you say residential design, what do you mean?

7   A.  When you walk into it, instead of it being rows and rows

8   and rows of racks and other things, you see a lot of furniture.

9   There is a lot of space to move around in the store, and it

10  generally feels like an apartment.  The Goodman family that

11  owned the building originally, they had an apartment at the top

12  of the store, so the rest of the store was designed to look

13  like that.

14  Q.  During this period when you were store manager, did

15  Bergdorf Goodman get busy on occasion?

16  A.  Sure.  Especially Christmastime.  Probably between

17  Thanksgiving and New Years, we did about 20 to 25 percent of

18  our annual volume.

19  Q.  Which floors were typical the busiest?

20  A.  For sure, ladies' footwear.  The seventh floor could be

21  busy at times.  That was our home decor store.  For sure the

22  first floor where we have cosmetics and fine jewelry, hats and

23  handbags.

24  Q.  I think you just answered my question.  Just to make sure

25  it's clear for the record, what merchandise was sold on the

Case 23-793, Document 81, 11/20/2023, 3592067, Page157 of 300

A-1537

1    first floor of Bergdorf at this point in time?

2    A.  On the first floor at that time it would have been fine

3    jewelry, cosmetics, hats, gloves, scarves, and handbags.

4    Q.  You testified that you had an office on the sixth floor of

5    Bergdorf Goodman at this point in time?

6    A.  Yes.

7    Q.  What merchandise, if any, was sold on the sixth floor?

8    A.  The sixth floor was a more contemporary floor, so it had

9    lingerie, it had, depending on the season -- in the spring you

10   had said, so that would have probably had swimwear at that time

11   and the designer sportswear, but it wasn't Couture.

12   Q.  I'm glad the court reporter asked you the question.  What

13   do you mean when you say Couture?

14   A.  It's the very high-level designer, like a Chanel or

15   something of that nature.

16   Q.  In terms of busyness, Ms. Beall, how would the sixth floor

17   compare to the other floors we have been discussing?

18   A.  Probably less so because lingerie wasn't a huge focus for

19   us.  The contemporary designers certainly weren't our stock and

20   trade.  It was a popular floor, but it wasn't our busiest floor

21   and what most people would come to Bergdorf's specifically

22   looking for.

23   Q.  Again, focusing in on this period of time, Ms. Beall, for

24   the store as a whole, how busy would it get on Thursday

25   evenings?

A-1538

1    A.  If we were doing a special event, like if we were doing a

2    designer appearance or if we were doing some kind of an event,

3    it would be pretty busy right around wherever the event was

4    being held.

5            Thursday nights could be rather quiet.  Again, most of

6    our business would happen earlier in the day.  People would

7    come for lunch and then they would do their shopping.  Most

8    people were gone by 4 or 5 because they have evening

9    engagements.

10   Q.  What about the sixth floor on Thursday nights during this

11   time period?

12   A.  Same thing.  We would rarely have -- if we had had a

13   designer appearance, it would have been during the day,

14   probably ending at 4.  It wasn't one of our busiest floors.

15           MS. KAPLAN:  I am going to ask Clinton to put up in

16   front of you an exhibit that's been marked as Plaintiff's

17   Exhibit 24.

18   A.  Do I need my glasses?

19   Q.  You will be able to see it on your computer screen.

20           Do you have that?

21   A.  Yes.  I need my glasses.

22   Q.  Can you tell me, Ms. Beall, what this document is?

23   A.  It is the floor plan of Bergdorf's for the sixth floor.

24   Q.  Is this floor plan consistent with your recollection of

25   what the sixth floor looked like in 1996?

Case 23-793, Document 81, 11/20/2023, 3592067, Page159 of 300

A-1539

1   A.  Yes.

2           MS. KAPLAN:  Plaintiff offers PX-24 into evidence,

3   your Honor.

4           MR. BRANDT:  No objection, your Honor.

5           THE COURT:  It is received.

6           (Plaintiff's Exhibit 24 received in evidence)

7           THE COURT:  Is it possible to blow that up a little

8   bit more?

9           MS. KAPLAN:  Yes.

10          Clinton, could you blow up the left side of the

11  document.

12  Q.  To just generally orient everyone, Ms. Beall --

13  A.  And me.

14  Q.  -- and yourself, which side of the document is 57th Street?

15  A.  Do I point?

16  Q.  Yes.

17  A.  It's the last -- left side.

18  Q.  We don't need to mark it yet, but the left side of the

19  document.

20  A.  Um-hum.

21  Q.  Where would Fifth Avenue be?

22  A.  On the bottom of the document.

23  Q.  We have blown up, so you can't see it.  I take it that

24  means that 58th Street IS on the right side of the document?

25  A.  It's not visible here, but yes.

N4QMCAR1                      Beall - Direct                      121

1   Q.  Can you show the jury where the escalator you were just

2   talking about earlier is located.

3   A.  Will they be able to see --

4   Q.  You can actually mark it, I think yourself.  They will be

5   able to see if you circle it on your screen.

6   A.  I'm not circling it.

7           Do you have a chart that I could point to?

8   Q.  No.

9           THE COURT:  Let the AV guy take a look.

10  A.  You want me to circle it?

11  Q.  Circle where the escalator is.

12  A.  Great.

13  Q.  Can you show the jury where your office was.

14          Same thing.  Can you show the jury where the lingerie

15  department is.

16  A.  It's kind of a bigger circle.

17          THE COURT:  Indicating an irregular shape which

18  extends farther toward the top of the page than any other drawn

19  lines.

20          MS. KAPLAN:  Now, is it possible -- I don't know if

21  it's possible to keep these drawings on and show another

22  exhibit.

23          THE DEPUTY CLERK:  The markings are an overlay.  They

24  will stay on the screen.

25          MS. KAPLAN:  We will do the other exhibit when we are

Case 23-793, Document 81, 11/20/2023, 3592067, Page161 of 300

A-1541

1   done with this.

2   Q.  Could you explain to the jury if someone was coming up --

3   withdrawn.

4        You see toward the kind of irregular shaped area that

5   the judge just pointed out, there is some squares that say FR?

6   A.  Yes.

7   Q.  What are those?

8   A.  They are the fitting rooms or dressing room.

9   Q.  Do you see, again, in the lingerie department that you

10  pointed out there is some kind of -- leading into it there is

11  some dotted lines.

12        Do you see that?

13  A.  The dotted lines -- they are kind of marking where the

14  departments kind of end and begin?

15  Q.  That was my question.

16  A.  Yeah.

17  Q.  What do those dotted lines -- I take it, from what you

18  said, those were not walls?

19  A.  They are not walls.  They are entries into different rooms.

20  You remember I mentioned that it's kind of a residential feel.

21  So you wouldn't -- you often didn't have large grand spaces.

22  Q.  Let me ask you this question, Ms. Beall.  If someone was

23  coming up on the escalator to the sixth floor, can you show the

24  jury where they would be.  Where they would be facing?

25  A.  Where they would be facing?  This way.

N4QMCAR1                    Beall - Direct                    123

1   Q.  If someone from the escalator wanted to walk to the

2   lingerie department, can you show me how they would do that?

3   A.  Should I draw that on the --

4   Q.  That would be wonderful.

5   A.  They might stop in that middle section, but the end game is

6   in the larger room.

7   Q.  In connection with the lingerie department itself,

8   Ms. Beall, can you explain to the jury, to the best you recall,

9   how it was arranged?  Were there display cabinets?  Were there

10  chairs, tables?  Again, to the best of your recollection.  It's

11  a long time ago.

12  A.  Yes.  Basically, the lingerie department was made up of the

13  bigger room that I showed where it ends, the bigger room and

14  then kind of a corridor area.  And around all of the walls you

15  have bars that would have the displays, and then in between

16  there would be a face-out, which is basically a display of a

17  particular item.  There would probably be a couple of

18  mannequins in the bigger room.  There was definitely like a

19  piece of furniture that one could sit on if they were waiting.

20  And then in that little narrow corridor area we would typically

21  have a vitrine.  It's a case line that has -- it's wooden with

22  drawers, and then there is a glass section where underneath the

23  glass you could have like bras and panties and things

24  displayed.

25  Q.  You used the word vitrine.  Would it be fair to say that

A-1543

1   that's equivalent to a cabinet, display cabinet?

2   A.  Yeah.  Case line cabinet.

3   Q.  Can you show the jury where that vitrine would be on this

4   diagram.

5   A.  Probably, it would have been right around here, and it

6   didn't abut any walls.  It's a freestanding case.

7   Q.  Just to get everyone oriented, one more question about the

8   layout, Ms. Beall.  You mentioned swimwear before.  Where would

9   the swimwear be?

10  A.  It moved, as one does.  But the area -- should I draw?

11  Q.  Sure.

12  A.  The area over here, below my office, you see it's kind of

13  circular here.  That's what we refer to as a swing shop.  And a

14  swing shop meant it was seasonal.  We might have swimwear there

15  at one time and other times it would have something else.  I

16  think at one point it may have been at the other end of the

17  floor, but, for the most part, I think we usually put it right

18  there.

19  Q.  Based on your recollection and experience, Ms. Beall, on a

20  Thursday night in the spring of 1996, would there always be an

21  attendant in the lingerie department?

22  A.  Unfortunately, no.  I wish there were.

23  Q.  You said unfortunately.  What do you mean by that?

24  A.  We would usually have a staff of about between five and

25  seven associates in a given department, especially lingerie,

1    but, obviously, we are open six days a week with one extended

2    night, so you have to cover all those shifts, and a Thursday

3    night you wouldn't tend to schedule highly because the traffic

4    was very low.  We needed them during the day.

5            And so they would be there, unless they were taking a

6    dinner break or their 15-minute break.  Or we had an intercell

7    policy.  If I was in the lingerie department helping you and

8    you started sharing with me that you are going on holiday, then

9    we might go to another department to look at footwear or to go

10   look at other clothes for your vacation.

11   Q.  Let me ask you the question this way.  The intercell policy

12   that you just referenced, does that mean that sales force were

13   incentivized financially to sell the same customer merchandise

14   in different departments?

15   A.  Absolutely.  They are on commission and actually are given

16   intercell goals.

17           THE COURT:  Excuse me.  I am not sure I understood

18   your answer.  As I understood the question.  It was whether

19   there would be any attendant or, if so, more than one, how many

20   in that lingerie department on a Thursday evening.  I

21   understand everything you said, but I am not sure how it leads

22   to the answer.

23           THE WITNESS:  Well, there would probably be people

24   scheduled, except that they may not be there at any given time.

25   They were not compelled to stay put during a scheduled shift.

 1          THE COURT:  And they left for what reasons?

 2          THE WITNESS:  The reasons they would leave is because

 3    they might go to a break, they might have to step away with a

 4    client to look at another part of the store.

 5          THE COURT:  Thank you.

 6          Continue, please.

 7    Q.  I want to direct you to the fitting rooms.  What is your

 8    recollection of what was inside the fitting rooms, their signs

 9    and what was inside?

10    A.  On the sixth floor specifically, the fitting rooms were

11    rather small.  On some of the other floors they might be a

12    little larger, but in the lingerie department specifically, and

13    actually the other ones on the sixth floor, they are small.

14    They have a mirror.  They have either a hook or they would have

15    a bar, and either a bench for a chair.

16    Q.  The doors of the fitting rooms, Ms. Beall, what were they

17    made out of?

18    A.  Wood.

19    Q.  Would it be possible -- withdrawn.

20          Would the doors of the fitting room sometimes be open?

21    A.  Unfortunately, yes.

22    Q.  You say unfortunately.  Why?

23    A.  Because we would have liked for them to be kept closed, but

24    many of the sales associates would either prop them open, tie a

25    ribbon to keep it open, or would just not close it.  They

**A-1546**

1   weren't necessarily on springs.

2   Q.  Once the doors closed, did they lock automatically?

3   A.  Yes.

4   Q.  In terms of the size of the fitting room, you said it was

5   smaller than other fitting rooms at Bergdorf.  Could two people

6   still fit inside?

7   A.  Oh, sure, yeah.  People shop together.

8          MS. KAPLAN:  Now, let's do that other document now so

9   I don't forget.  Clinton, can we put up Plaintiff's Exhibit 22.

10          Let's take off the drawings, if we can.

11          THE DEPUTY CLERK:  Clear.

12          MS. KAPLAN:  I'm very proud of myself.

13  Q.  Plaintiff's Exhibit 22, do you recognize this document?

14  A.  Yes, I do.  It's -- I don't know why it's different, but,

15  yeah, it's the sixth floor.

16  Q.  It says in the top corner -- I'm sorry.

17          MS. KAPLAN:  Let's see if we can blow up the top left

18  corner, Clinton, because I definitely can't read it.  It is a

19  little hard to read.

20  Q.  Do you see there are some words in that top left corner?

21  Can you read that.

22  A.  In what was the lingerie department?

23  Q.  In the area that you previously identified as lingerie,

24  correct.

25  A.  Yes.  It says:  Intimate.

1   Q.  That's the same as lingerie, correct?

2   A.  Yes.

3           MS. KAPLAN:  Plaintiffs offer Exhibit 22.

4           MR. BRANDT:  No objection.

5           THE COURT:  Received.

6           (Plaintiff's Exhibit 22 received in evidence)

7   Q.  In the period of the mid 1990s, Ms. Beall, was it common

8   for famous people to shop at Bergdorf Goodman?

9   A.  Yes, absolutely.

10  Q.  Anyone you remember in particular?

11  A.  Yes.  Some of my favorite ones were, we had Pierce Brosnan.

12  We had Donna Karan come, she was shopping with Barbra

13  Streisand, and Candice Bergan, Goldie Hawn.

14  Q.  When famous people or celebrities came into shop at

15  Bergdorf Goodman, did Bergdorf Goodman have a policy about how

16  they were supposed to be treated?

17  A.  Yes.  Basically, we were trained and my expectation with my

18  team was that we were to be very discreet.

19  Q.  In the course of your job as store manager, did you ever

20  have to instruct an employee to be more discreet with a

21  celebrity?

22  A.  Yes.

23  Q.  Can you explain.

24  A.  You know, people get excited when they see people that they

25  are familiar with, and it is very much part of the Bergdorf

A-1548

1  culture to provide privacy and discretion, if people were

2  commenting on behaviors and whatnot.  I just saw this famous

3  football guy yesterday with this person and now today he's in

4  with another person, you really had to ask them to back off.

5  They had to be discreet.  They were not to say anything about

6  it.

7  Q.  Now, sitting here today, Ms. Beall, you obviously know who

8  defendant Donald J. Trump is?

9  A.  Yes.

10 Q.  Have you ever spoken to Mr. Trump?

11 A.  No.

12 Q.  Have you ever seen him?

13 A.  Yes.

14 Q.  In what circumstances?

15 A.  On the street.  I have seen him in Trump Tower a couple of

16 times, I guess, and -- the first time I ever noticed him was on

17 the corner of 57th and Fifth, when I was going to cross the

18 street.

19 Q.  What's the proximity between 57th and Fifth and Bergdorf

20 Goodman?

21 A.  It's our corner.

22 Q.  During the time that you worked at Bergdorf Goodman, were

23 you ever alerted to the fact that Donald Trump was in the

24 store?

25          MR. BRANDT:  Objection, your Honor.  Calls for

N4QMCAR1                    Beall - Direct                    130

1    hearsay.

2            THE COURT:  Not necessarily.  For what purpose is it

3    offered?

4            MS. KAPLAN:  It is not offered for the truth.  It's

5    offered for continuing this discussion of how celebrities were

6    treated at the store.

7            MR. BRANDT:  Your Honor, it sounds to me as if it's

8    actually offered for the truth of the statement that she was

9    told that he was there.

10           So we talked about celebrities already.  If we get to

11   him, she has already said she has only seen the defendant in

12   person three times and none of those times was in the store.  I

13   think we have already covered celebrities, and I think the

14   answer calls -- the question calls for hearsay.

15           MS. KAPLAN:  I can rephrase it, your Honor.

16           THE COURT:  Rephrase it.

17   Q.  Ms. Beall, would you have been expected to be alerted when

18   someone like Donald Trump came into the store?

19   A.  No.

20   Q.  Why not?

21   A.  Because if Donald Trump were the president, I would be

22   alerted because there would be secret service.  But at that

23   particular time he was a regular person.  He is a real estate

24   guy.  There would be no need to let me know that he was coming.

25           MS. KAPLAN:  No further questions, your Honor.

1              THE COURT:  Cross-examination.  Thank you.

2              MR. BRANDT:  Thank you, your Honor.

3              THE COURT:  Mr. Brandt, right?

4              MR. BRANDT:  Yes, your Honor.

5              THE COURT:  Thank you.

6    CROSS-EXAMINATION

7    BY MR. BRANDT:

8    Q.  Ms. Beall, Perry Brandt.  Nice to see you.

9    A.  Nice to meet you as well.

10   Q.  I have just a few questions for you.

11             The first thing is, you testified, I think, previously

12   that you worked at Bergdorf's from 1988 to 1998, is that

13   correct?

14   A.  Sounds about right.

15   Q.  We are talking about between 25 and 35 years ago, is that

16   correct?

17   A.  Sure.

18   Q.  So that goes back in time?

19   A.  It goes back in time.

20   Q.  Also, I think you said that you did not, prior to this

21   matter, know Ms. Carroll, is that correct?

22   A.  No.

23   Q.  You didn't know anything of the allegations in this case,

24   is that correct?

25   A.  I mean, I understand that there is -- it's been in the

N4QMCAR1                    Beall - Brandt                    132

1  papers, but I am not a fan or a follower.

2  Q.  That was my question, so thank you.

3         One of the things you talked about earlier was the

4  fact that Bergdorf's was considered to be a luxury specialty

5  store, is that correct?

6  A.  Yes, um-hum.

7  Q.  And catered to maybe a more upscale clientele than the

8  other department stores you mentioned, correct?

9  A.  For sure.

10  Q.  I think you said this previously, but you prided yourself

11  on customer service?

12  A.  Absolutely.

13  Q.  So what I understood you to mean, and correct me if I'm

14  wrong, is that when -- I'll call it client came in -- did you

15  call them clients or customers?  You called them clients,

16  right?

17  A.  Yes.

18  Q.  When a client came in, you tried to give that extra special

19  dose of attention, correct?

20  A.  Sure.

21  Q.  And then I think you also talked about famous people coming

22  in and that although you said maybe you had to be discreet, you

23  also instructed your sales staff to give them extra special

24  service, correct?

25  A.  I don't think I said that famous people should get extra

A-1552

N4QMCAR1                    Beall - Brandt                    133

1   special attention.  I said that they were to be very discreet

2   with them for sure.

3   Q.  Did they get special attention if somebody came in who was

4   famous, extra help, extra attention?

5   A.  I guess it depends on how they arrived at the store.

6   Often, people call in advance and make appointments.  So a

7   sales associate would set up a fitting room and order lunch

8   etc., but if you just showed up, then we would pull out all the

9   stops for sure if you needed assistance.

10  Q.  But then I kind of understood you to say that Mr. Trump at

11  that time was not particularly special, at least compared to

12  other celebrities, is that correct?

13  A.  He wasn't a celebrity at that time.

14  Q.  That wasn't my question.

15       One of the things in your direct testimony that was

16  talked about was the spring of 1996, is that correct?

17  A.  Yes.

18  Q.  Obviously, things changed over time, is that right?

19  A.  Yes.

20  Q.  For example, your store hours might change over time,

21  depending on what season it was?

22  A.  Yes.

23  Q.  Your staffing might change, depending on what the season

24  was?

25  A.  Often.

A-1553

1   Q.  So, i.e., you might have folks there a lot there during the

2   holiday season or maybe in the spring season when people are

3   looking for summer clothes.  You might have more traffic,

4   correct?

5   A.  Spring, not as much.

6   Q.  And also --

7   A.  We wouldn't have the extra -- we wouldn't tend to have

8   extra staff on in spring.

9   Q.  One thing you did mention, though, was you talked a lot

10  about Thursday nights in your prior questioning.

11          Do you recall that?

12  A.  Yes.  We spoke of Thursday.

13  Q.  But as I understood your testimony, the staffing could be a

14  lot more, especially on the sixth floor, at other times of the

15  day or on other days, correct?

16          THE COURT:  A lot more than what.

17  Q.  A lot more of what you had mentioned for Thursday nights.

18          MR. BRANDT:  Thank you, your Honor.

19  A.  We had -- I'm not sure I fully understand.

20          (Continued on next page)

21

22

23

24

25

A-1554

1    Q.  It was poorly asked so let me start over.

2    A.  Okay.

3    Q.  I wrote down that you said that when the sixth floor was

4    fully staffed you might have between five to seven sales

5    associates up there?

6    A.  No, no, no.  I'm sorry.  We would hire about five to seven

7    people --

8    Q.  Okay.

9    A.  -- to be lingerie associates.

10   Q.  Got it.

11   A.  Because we did hire two departments for the most part.  But

12   the reason that you hire five to seven is because you've got

13   six days a week and you have an extended day on Thursday, so in

14   order to make sure that you have a couple of people there most

15   of the time and hopefully one person there, that's how you

16   would build your staffing model, but you would never have all

17   of them there --

18   Q.  Okay, thank you.

19   A.  -- at the same time.

20   Q.  So what you tried to do, as I understand your answer just

21   now, is you tried to have at least two people there most of the

22   time?

23   A.  At least one person in most of the time.  Sometimes, I

24   mean, it's great, but that would probably be at peak times,

25   like lunchtime.

A-1555

1   Q.  So a lot depends on the time of day.

2   A.  Sure.

3   Q.  And a lot depends on the day, correct?

4   A.  Sure.

5   Q.  So if we are focused on some time other than the Thursday

6   evening, the staffing might be different.

7   A.  Sure.

8   Q.  Another thing I recalled you saying was that the fitting

9   room doors were supposed to be closed, is that correct?

10  A.  That was the plan.

11  Q.  And were the sales associates instructed that the doors

12  were supposed to be closed?

13  A.  Yes, they were instructed --

14  Q.  Okay.

15  A.  -- but --

16  Q.  And I think I understood your testimony that if the door

17  was closed, it was locked from the outside, correct?

18  A.  Locked from the outside?  No, I mean, it's locked --

19  Q.  That's what I mean, locked.

20  A.  It automatically locks, yes.

21  Q.  Right?

22  A.  You need a key to get in.

23  Q.  That's my question.

24  A.  Yes.

25  Q.  So somebody from the outside to get into the fitting room

1   would have to be let in by a sales associates?

2   A.  Unless the door was propped.

3   Q.  And, again, your policy was for the door to be closed?

4   A.  The policy was.

5   Q.  Okay.  And your sales associates were instructed to follow

6   that policy, correct?

7   A.  Yes, but they are sales associates.

8   Q.  Now, when I looked at the -- when I looked at the picture,

9   it looked like the fitting rooms were relatively close to the

10  main area.  Is that fair to say?

11  A.  They are off the main room.

12  Q.  By how many feet?

13  A.  If this were the fitting -- if this were the lingerie

14  department, the jury team, over here, would be fitting rooms.

15  Q.  Okay.  So eight to ten feet, give or take?

16  A.  Sure, from depending on where you are in the department.

17  Q.  And did the walls go all the way to the ceiling or was

18  there any stopping of the wall before it got to the ceiling?

19  A.  No.

20          Can I ask you a quick question?  I'm -- now I'm

21  thinking that I didn't hear the question correctly.  Did you

22  say they did or did not go --

23  Q.  No, I asked you did they go all the way to the ceilings or

24  not?

25  A.  They do.  They do go all the way to the ceiling, yeah.

A-1557

1    Q.  Here's my question.  Given the proximity from the fitting

2    room to the main area, if somebody, let's say, screamed from

3    inside a dressing room, would they be heard out in the main

4    area?

5    A.  If they screamed, I guess, depending on the volume, sure.

6    Q.  And if somebody's head was --

7              THE COURT:  Counselor, if a tree falls in the forest

8    and there is no one there to hear, right?  It depends whether

9    somebody is there, doesn't it?

10             MR. BRANDT:  I got an answer, your Honor.

11             THE COURT:  I know you did, but let's not play this

12   kind of game.

13             MR. BRANDT:  I'm not playing a game, your Honor.  I'm

14   trying to ask the witness questions.

15             THE COURT:  You know where I'm coming from.

16   BY MR. BRANDT:

17   Q.  Let me ask you this question.

18   A.  Okay.

19   Q.  Where did you have security cameras located in Bergdorf in

20   general?

21   A.  The only thing that I can tell you for certain, I know we

22   had them at the -- at all of the doors, but I don't actually

23   know where they would have been in the store.

24   Q.  Let's start with the doors.  So talking about the main

25   entrances and exits to the store?

**A-1558**

1   A.  I think we did, and I think we had them in fine jewelry.

2   For sure we had them down at the employee entrance and exit.

3   Those would have been the ones that I would have occasion to

4   see.

5   Q.  Okay.  And did you maintain the footage for some period of

6   time from the security cameras?

7   A.  I would assume so.  That wasn't my responsibility.

8   Q.  And if somebody were to request the footage, could they get

9   ahold of it, like if somebody in the store got contacted and

10  said somebody wants to look at the footage, could they look at

11  the footage?

12  A.  Within a certain period of time.  I don't know what the

13  rewind is.  Every company has a different policy, and I assume

14  there are record retention laws.

15  Q.  You mentioned that there were, you thought, security

16  cameras in fine jewelry, correct?  Were there security cameras

17  around the escalators?  Do you know?

18  A.  I don't think so.

19  Q.  And then did you consider lingerie to be an expensive

20  item --

21  A.  No.

22  Q.  -- that you sold?

23          Do you know whether or not there were security cameras

24  in the lingerie section?

25  A.  I would be very surprised.

A-1559

N4q2Car2                        Beall - Cross                        140

1   Q.   Your office was close by there, correct?

2   A.   Um-hmm.

3   Q.   Did you have security camera by your office?

4   A.   No.

5   Q.   Did you have security guards in Bergdorf's?

6   A.   There would be -- we have the doorman on 58th Street and

7   then we would have a couple of guards that would be down on the

8   ground floor.

9   Q.   And did the guards roam the store from time to time?

10  A.   There were a couple of security executives that might take

11  a pass through the store at a particular time, but typically

12  the guards were at the front door.

13  Q.   And were clients able to seek out the security guards if

14  they wanted to?

15  A.   Yeah, I guess they could talk -- they could talk to the guy

16  down at the front door.

17  Q.   Okay.

18  A.   I don't think most people engaged with our security.

19  Q.   Okay.

20  A.   It wasn't a highly visible thing given the kind of store we

21  were.

22  Q.   Sure.  If somebody had a security concern they could seek

23  out a security guard, correct?

24  A.   Sure.

25  Q.   And then also I think you mentioned --

1            THE COURT:  Excuse me, Mr. Brandt.

2            Were the security guards you did have in uniforms

3    indicating that they were security guards.

4            THE WITNESS:  At the front entrances.

5            THE COURT:  At the front entrance.

6            Anywhere else?

7            THE WITNESS:  No.

8            THE COURT:  Okay.  Go ahead, counselor.

9            MR. BRANDT:  Thank you, your Honor.

10   BY MR. BRANDT:

11   Q.  Also I think you said the store was located on Fifth Avenue

12   between 57th and 58th Street --

13   A.  Yes.

14   Q.  -- is that right?

15           Is that a generally heavily traveled sidewalk out in

16   front of Bergdorf's kind of 24/7?

17   A.  Yeah, I would say so.

18   Q.  So a lot of people would be walking by Bergdorf's even on a

19   Thursday night.

20   A.  At nighttime I don't really know, but I'm sure there is a

21   fair amount of people there.

22   Q.  I also understood you to say that you saw Mr. Trump on

23   three occasions, but none of those occasions was in the store,

24   correct?

25   A.  I didn't actually say three.

A-1561

1   Q.  Oh.

2   A.  I said probably a couple of times in Trump Tower.

3   Q.  Okay.

4   A.  Because, you know, there you are and I did happen to -- the

5   first time I ever noticed him was on the corner of 57th and

6   5th, just because I happened to look over where he stopped, and

7   I was surprised that he was tall.

8   Q.  But I do understand your testimony correctly that you

9   personally did not see him in the store --

10  A.  No.

11  Q.  -- at any time.

12  A.  No.

13  Q.  One final question or couple of questions.  I think you

14  indicated you had been contacted by plaintiff's counsel about

15  becoming a witness in the case, is that correct?

16  A.  Uh-huh.

17  Q.  Do you recall being contacted by any representatives of the

18  defense team who wanted to talk to you?

19  A.  Yeah, fairly recently these investigators showed up at my

20  apartment unannounced, yes.

21  Q.  And you did not talk to them, did you?

22  A.  No, I told them that I was in the middle of my business day

23  and that I would have to speak to them another time.

24          MR. BRANDT:  Excuse me one moment.

25          (Counsel confer)

A-1562

1  Q.  Did you get a call yesterday morning?

2  A.  Yes, bright and early.

3  Q.  And did you hang up the phone?

4  A.  Did I hang up the phone?  No.  I said, I'm sorry, I can't

5  speak to you right now.  I was just joining a meeting.

6  Q.  Okay.  What time was that?

7  A.  Probably sometime between 8 and 8:30, I guess.

8          MR. BRANDT:  I think that's all I have.  Thank you

9  very much.

10          MS. KAPLAN:  Very briefly, your Honor.

11          THE COURT:  Thank you.  Redirect.

12  REDIRECT EXAMINATION

13  BY MS. KAPLAN:

14  Q.  Ms. Beall, you will recall that my friend on the other side

15  asked you some questions about security cameras.

16  A.  Um-hmm.

17  Q.  And you talked about security cameras likely being around

18  where fine jewelry was sold, is that correct?

19  A.  Um-hmm.

20  Q.  On what floor was fine jewelry sold?

21  A.  The first floor.

22  Q.  You also probably recall some questioning about the

23  dressing room doors and the policy that the doors were supposed

24  to be closed.  Do you recall that --

25  A.  Right.

A-1563

N4q2Car2                    Beall - Redirect                    144

1    Q.  -- those questions and those answers?

2    A.  Um-hmm.

3    Q.  And in one of your answers to my colleague's questions you

4    said, if I got it right—I think I did—quote, "but they are

5    sales associates."  Do you recall giving that answer?

6    A.  Yes.

7    Q.  What did you mean by that?

8    A.  I didn't mean to be impertinent.  I just -- sales

9    associates are there to sell and to do -- it's been my

10   experience over the many years that sales associates can be --

11   like most employees, are told lots of policies, but when it's

12   convenient for them or they -- whether they forget or they

13   intentionally decide that something is more convenient for

14   them, they would typically do it.

15   Q.  Is it fair to say that the policy that dressing room doors

16   are supposed to be closed was not -- that the associate does

17   not fully comply with that policy?

18   A.  Yes.

19        I guess I just feel like I should clarify, we continue

20   to use the word "policy."  I would be shocked if you could find

21   a handbook that would say "and all fitting rooms are to remain

22   closed."  It's when you are training somebody, you know, the

23   doors are locked, and so they were given keys.  And when I

24   would walk through the store and I would see them open on an

25   occasion, I would say, What are you guys doing, come on, and I

1  would close the door.

2  Q.  And I take it --

3  A.  It's not a policy, so to speak.

4  Q.  And I take it in walking around the store and seeing

5  fitting room doors open, that happened on more than one

6  occasion?

7  A.  Regularly.

8           MS. KAPLAN:  Thank you, your Honor.

9           THE COURT:  Thank you.  Anything else, Mr. Brandt?

10          MR. BRANDT:  Nothing further.

11          THE COURT:  Thank you.  You are excused.

12          (Witness excused)

13          THE COURT:  Next witness, please.

14          MR. FERRARA:  Plaintiff calls herself, E. Jean

15  Carroll, your Honor.  And if your Honor wouldn't mind, we are

16  just going to do musical chairs a little bit while Ms. Carroll

17  takes the stand.

18          THE COURT:  All right.  Well, why don't we take our

19  morning break while you get organized.

20          MR. FERRARA:  Thank you, your Honor.

21          THE COURT:  Fifteen minutes, folks.

22          (Recess)

23          (Jury not present)

24          MR. FERRARA:  Would your Honor like me in my seat for

25  when the jury enters?  I just didn't want to be presumptuous.

Case 23-793, Document 81, 11/20/2023, 3592067, Page185 of 300

A-1565

1          THE COURT:  No, you can stand there.  Who knows?

2   You'll catch a cab.

3          (Continued on next page)

Case 23-793, Document 81, 11/20/2023, 3592067, Page186 of 300

A-1566

1              (Jury present)

2              MR. FERRARA:  The plaintiff's next witness is E. Jean

3     Carroll.

4              May I inquire, your Honor?

5              THE COURT:  Let's get her sworn first.

6     E. JEAN CARROLL,

7         the plaintiff herein, having been duly sworn,

8         testified as follows:

9              MR. FERRARA:  Now may I inquire?

10             THE COURT:  Counselor.

11    DIRECT EXAMINATION

12    BY MR. FERRARA:

13    Q.  Good morning, Ms. Carroll.

14    A.  Good morning, Mr. Ferrara.

15    Q.  How old are you?

16    A.  79.

17    Q.  What do you do for a living?

18    A.  I am a writer.

19    Q.  Where do you live?

20    A.  I live in a tiny cabin in the mountains in upstate

21    New York.

22    Q.  How long have you lived there?

23    A.  Since the mid 1980s.

24    Q.  Where did you grow up?

25    A.  Rural Indiana.

N4q2Car2                    Carroll – Direct                    148

1    Q.  How large a family?

2    A.  Mother, father, four children, and a dog and a cat.

3    Q.  Where do you fall in the children?

4    A.  I am the firstborn.

5    Q.  Are you currently married?

6    A.  No.

7    Q.  Why are you here today?

8    A.  I am here because Donald Trump raped me, and when I wrote

9    about it, he said it didn't happen.  He lied and shattered my

10   reputation, and I am here to try to get my life back.

11   Q.  We are going to talk at length about that in a few minutes,

12   but let's first cover a little bit more of your background.

13   Okay?

14   A.  Um-hmm.

15   Q.  Where did you go to college?

16   A.  Indiana University.

17   Q.  Can you give us a sense of what sorts of activities you

18   were involved in?

19   A.  I was in a sorority and I was a cheerleader.

20   Q.  How about beauty pageants?

21   A.  My sorority would nominate me to be in beauty pageants.

22   Q.  I want to show you what's been marked for identification as

23   Plaintiff Exhibit 13.

24          Do you recognize this?

25   A.  Yes.  That's Ms. America on the right and that's my

N4q2Car2                    Carroll - Direct                    149

1   sorority sister Linda Loo Mugg who was a previous Miss Indiana

2   University, and that's me in the middle.

3          MR. FERRARA:  Plaintiff offers Exhibit 13, your Honor.

4          MR. TACOPINA:  No objection.

5          THE COURT:  Received.

6          (Plaintiff's Exhibit 13 received in evidence)

7   BY MR. FERRARA:

8   Q.  If we could publish this for the jury, Mr. Lam.

9          Now that we are looking at it, around when was this

10  photograph taken, Ms. Carroll?

11  A.  19 -- 19 -- 1963.

12  Q.  Where are you in the photo?

13  A.  The hair -- in the middle.

14  Q.  We can take that down, Mr. Lam.  Thank you.

15          What year did you graduate?

16  A.  My class graduated in 1965, but because I did not return a

17  library book, I didn't get my diploma until 1967.

18  Q.  What did you hope to do professionally after graduating?

19  A.  Well, I wanted to be a writer.

20  Q.  Before we get to your writing, could you just walk us

21  through some of the jobs that you held after graduation?

22  A.  I held a cheerleading camp, and I was a market researcher

23  for Procter & Gamble.  I was a gym teacher in Chicago.  I was a

24  gym teacher in Idaho.  And this whole time I was submitting

25  articles to magazines, pitching ideas and trying to get

1  published.

2  Q.  Did you get married after graduation?

3  A.  About -- let's see, about three or four years after

4  graduation.

5  Q.  To whom?

6  A.  Stephen B. Byers.

7  Q.  Who is Steve Byers?

8  A.  We lived in Indiana together.  We met after college.  He

9  went on to become the editor in chief of *Outdoor Life*, but we

10  went to Montana together to be young and married and have an

11  adventurous life.

12  Q.  Are you still married to Mr. Byers?

13  A.  No.

14  Q.  Did you divorce?

15  A.  We -- yes, we divorced -- we split up in 1980 or 1981,

16  after a very successful companionship and marriage.

17  Q.  Was it a difficult divorce?

18  A.  No.  We were -- Steve and I were very good friends.  He was

19  like my best friend.  So we decided we would be -- both be

20  happier if we split up.

21  Q.  Where did you live after you separated from Mr. Byers?

22  A.  I moved to Manhattan.

23  Q.  So let's talk then about your time in New York, and I'm

24  going to ask you some questions about your professional career

25  in the '80s and '90s, okay?

A-1570

1    A.   Um-hmm.

2    Q.   What did you do for work when you arrived in New York City?

3    A.   I was writing for magazines.

4    Q.   Can you list some of them for us?

5    A.   Yes, *Esquire, Playboy, Outside Magazine, Rolling Stone* and

6    later I went on to work for the *Vanity Fair* and *New York* and

7    *The Atlantic.*

8    Q.   What did you write for *Elle* magazine?

9    A.   *Elle* magazine is the world's largest fashion magazine, and

10   the American *Elle* was thought of as the thinking woman's

11   fashion magazine, and I wrote the advice column.

12   Q.   What was the name of the column?

13   A.   Ask E. Jean.

14   Q.   What year -- around what year did you start writing that

15   column?

16   A.   1993.

17   Q.   How long did you write it for?

18   A.   27 years at *Elle*.  I'm still writing it as I sit here

19   today.

20   Q.   For 27 years while at *Elle*?

21   A.   At *Elle*, yes.

22   Q.   Let me show you what have been marked for identification as

23   Plaintiff's Exhibits 15 and 16, and maybe we will show you 15

24   first.  Do you recognize that?

25   A.   Yes.

N4q2Car2                    Carroll - Direct                    152

1    Q.  What is that?

2    A.  That is a picture of me from the column.

3    Q.  Around what year would that have been taken?

4    A.  That I'm not sure, '97 or '98.

5    Q.  And let's take a look at 16.  What is that?

6    A.  That's a picture of me that they used for the column, yes.

7            MR. FERRARA:  Plaintiff offers Exhibits 15 and 16,

8    your Honor.

9            MR. TACOPINA:  Your Honor, I have no objection.  I

10   just would like to see if we can get a time frame on when these

11   photos were taken or when they were used.

12           MR. FERRARA:  I'm happy to inquire, your Honor.

13           THE COURT:  You got the time frame on 15, but do 16.

14           MR. FERRARA:  Yes, your Honor.

15   BY MR. FERRARA:

16   Q.  Ms. Carroll, around when is your best memory of when --

17   A.  Around --

18   Q.  Let me finish.  I apologize.

19           What's the best you can do on time frame for when

20   Exhibit 16 was taken?

21   A.  Best I can do is 1998.  I'm going by hairstyle.

22           MR. FERRARA:  Your Honor, plaintiff offers 15 and 16.

23           THE COURT:  They are received.

24           (Plaintiff's Exhibits 15, 16 received in evidence)

25   BY MR. FERRARA:

A-1572

1   Q.  Thank you for putting them side by side, Mr. Lam.  If we

2   can show them to the jury just this way.

3           So for clarity, Ms. Carroll, who is the person in both

4   of these photos?

5   A.  That is myself.

6   Q.  And when it says Ask E. Jean, that's the title of your --

7   A.  Yes.

8   Q.  -- column?

9           We can take these down.  Thank you, Mr. Lam.

10          Were you also on television around this time, let's

11  say the '80s or '90s?

12  A.  In the mid '90s, yes, I had a television show.

13  Q.  Let me show you what's been marked for identification as

14  Plaintiff's Exhibit 19.  What is this?

15  A.  This is the logo for the *Ask E. Jean* television, yes, for

16  the show.

17          MR. FERRARA:  Plaintiff offers 19, your Honor.

18          MR. TACOPINA:  No objection.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 19 received in evidence)

21  BY MR. FERRARA:

22  Q.  If we could briefly show the jury this exhibit.  We can

23  take that down.  Thank you, sir.

24          What network was the *Ask E. Jean* Show on?

25  A.  It was a new NBC cable channel called America's Talking,

**A-1573**

1    which became MSNBC.

2    Q.   What years were you on TV?

3    A.   '94 to '96.

4    Q.   What type of show was it?

5    A.   It was the advice column come alive.

6    Q.   Meaning what?

7    A.   Instead of correspondents writing in to the column, they

8    actually came on the show, sat on the sofa, told me their

9    problems, and I would help solve them.

10   Q.   Have you ever taken acting classes?

11   A.   No.

12   Q.   How often was your show on during that period of time?

13   A.   It ran live show every day at 4:00 and then it reran at 11

14   that night.

15   Q.   Whose idea was the show?

16   A.   Roger Ailes.

17   Q.   Who is Roger Ailes?

18   A.   Roger Ailes was a respected broadcaster who started

19   America's Talking and went on to create Fox News.

20   Q.   Was he your boss at the time?

21   A.   Yes.

22   Q.   Was Mr. Ailes also on television during that period in the

23   mid '90s?

24   A.   Yes, Roger also had a show.

25   Q.   Do you recall the name of the show?

**A-1574**

1  A.  *Straightforward.*

2  Q.  Do you recall what time his show was on?

3  A.  He was live every -- he was live about half the time.  He

4  was on at 8:00 at night.

5  Q.  Do you recall what kind of show Mr. Ailes had?

6  A.  Yeah, he interviewed newsmakers, celebrities, interesting

7  people.

8  Q.  Have you ever seen -- at that time in the mid '90s, did you

9  ever have occasion to see Mr. Ailes' set?

10  A.  Yes.

11  Q.  About how many times?

12  A.  Oh, I saw it quite often, quite often.  He had two sets.

13  He had one in Fort Lee and one in the city.

14        MR. FERRARA:  May I approach the witness, your Honor?

15        THE COURT:  Yes.

16        (Counsel confer)

17  BY MR. FERRARA:

18  Q.  Ms. Carroll, I'm handing you what's been marked as

19  Plaintiff Exhibit 112.

20        Do you recognize that?

21  A.  Yes.

22  Q.  What is it?

23  A.  It's a disk, a DVD.

24  Q.  How do you recognize it?

25  A.  I saw what was on this disk and initialed it with my

1    initials and then I put the date and then I wrote the word

2    "Roger."

3               MR. FERRARA:  May I approach, your Honor?

4               THE COURT:  Yes.

5    Q.  I will take that back from you.  Thank you.

6               So I would like to show you a still image from the

7    video on that disk.

8               If we can pull up 112, please, Mr. Lam, and just pause

9    it at the very beginning.

10               What are we looking at, Ms. Carroll?

11   A.  That's Roger Ailes on the left and that's Donald Trump --

12               THE COURT:  Please, Ms. Carroll.

13               This isn't in evidence, right?

14               MR. FERRARA:  Fair enough, your Honor.  I apologize.

15   That was a bad question.

16   BY MR. FERRARA:

17   Q.  Do you recognize this image?

18   A.  Yes.

19   Q.  Are you familiar with the set?

20   A.  Yes.

21   Q.  Does it accurately depict the set as you recall it from

22   that time period?

23   A.  Yes.

24               MR. FERRARA:  Your Honor, plaintiff offers 112 and,

25   your Honor, for clarity, what we want to offer is about -- I

A-1576

1    think it's about a two-minute clip at the beginning.  We just

2    want to play maybe the first minute and a half or so.

3              MR. TACOPINA:  Right now?

4              MR. FERRARA:  Yes.  We were going to play it now.  We

5    can hold off.  That's fine.  We can take this up.  We can

6    circle back to this.

7              THE COURT:  Okay.  Move along.

8    BY MR. FERRARA:

9    Q.  So if we could bring that down for now, Mr. Lam.

10             Let's talk about some other professional work you were

11   doing other than your column and your TV show.  Were you making

12   other TV appearances in the '80s and '90s?

13   A.  Yes.

14   Q.  What shows?

15   A.  *Good Morning America, The Today Show*, the occasional talk

16   show.  I remember being on Greg Kinnear's show.  He had a show

17   back in the day.  Yes.

18   Q.  Were you writing for any TV programs at the time?

19   A.  Years before, in 1987, I wrote for *Saturday Night Live*.

20   Q.  Were you nominated for any awards for your writing?

21   A.  I was nominated for an Emmy.

22   Q.  For -- for what?

23   A.  For writing.

24   Q.  For which piece of writing?

25   A.  It was the William Shatner show.

A-1577

1   Q.  Were you also writing books at that time?

2   A.  Yes.

3   Q.  Did you get remarried?

4   A.  In which period?

5   Q.  Oh, sorry, in the '80s or '90s, were you remarried?

6   A.  Yes, in the '80s.

7   Q.  To whom?

8   A.  John Johnson.

9   Q.  Who is John Johnson or what did he do at that time?

10  A.  John Johnson was an anchorman in television, anchorman in

11  New York City.  At first he was for years on ABC and then he

12  moved to CBS as anchorman.

13  Q.  I'm sorry.  I apologize if I missed it.  Do you recall what

14  year you were married to Mr. Johnson?  Did you say?

15  A.  '87 or '88.

16  Q.  Do you recall how long you were married to Mr. Johnson?

17  A.  Three years.  We were together five years.

18  Q.  Were you then divorced?

19  A.  Yes, but after the divorce we continued seeing each other.

20  Q.  What about, just to go back to your professional career,

21  what about websites?  Have you been involved in any websites?

22  A.  Yes.

23  Q.  What websites have you played some role in?

24  A.  My sister Cande Carroll and I founded GreatBoyfriends.com.

25  Q.  What is GreatBoyfriends.com?

A-1578

N4q2Car2                    Carroll - Direct                    159

1    A.  When I wrote the -- as I write the advice column, one of

2    the main questions coming in from both men and women is how can

3    they find that person, that one person, how this can they find

4    the person that will love them and they will love.  It's a

5    major concern.  And Cande and I finally decided to help people

6    find the one.

7    Q.  When did you start that website?

8    A.  2001.

9    Q.  Do you still own that website?

10   A.  No, we sold it.

11   Q.  For how much?

12   A.  Oh, for $600,000.

13   Q.  Did you use that website to date?

14   A.  I -- no.

15   Q.  Any other websites?

16   A.  In 2011 I started, I founded with Kenneth Shaw a dating

17   site called Tawkify.

18   Q.  What is Tawkify?

19   A.  Tawkify is a matchmaking company which uses AI and

20   technology, along with human matchmakers, to find people good

21   partners.

22   Q.  Do you still own that company?

23   A.  I founded it.  I stepped back in 2014.

24   Q.  Have you made any money from that?

25   A.  No.

A-1579

1   Q.  Why did you choose to start two dating companies?

2   A.  It's -- I received around 200 letters a month into *Ask*

3   *E. Jean*.  Many people wanted to find someone who made them

4   happy, and it was a natural inclination that I felt that I

5   wanted to help them out.

6   Q.  Ms. Carroll, let's turn to the reason you are here.  I

7   would like to ask you some questions about what happened with

8   Donald Trump.  Okay?

9   A.  Um-hmm.

10  Q.  Let's just start with when you first recall meeting

11  Mr. Trump.

12  A.  It was in 1987 at one of two places.  It was either at a

13  *Saturday Night Liv*e party, an NBC party; or John was working at

14  ABC at the time, so it could have been an ABC party.

15  Q.  Let me show you what's been marked for identification as

16  Plaintiff's Exhibit 12.  Do you recognize this?

17  A.  Yes.

18  Q.  What is in?

19  A.  This is a picture of myself, John Johnson, Ivana, and

20  Donald Trump.

21  Q.  Do you recall when it was taken?

22  A.  I believe, I'm dating it from 1987 because I have always

23  thought it was an NBC *Saturday Night Liv*e party.

24  Q.  Sorry.  To be clear, was it taken at the event you

25  described where you first met Mr. Trump or --

Case 23-793, Document 81, 11/20/2023, 3592067, Page200 of 300

A-1580

1   A.  Yes.

2   Q.  -- some other place?

3   A.  Yes, yes.

4        MR. FERRARA:  Your Honor, plaintiff offers 12.

5        MR. TACOPINA:  No objection, your Honor.

6        THE COURT:  Received.

7        (Plaintiff's Exhibit 12 received in evidence)

8   BY MR. FERRARA:

9   Q.  Mr. Lam, if we could publish this to the jury.

10       So let's go through it.  As we look at the photo,

11  Ms. Carroll, there is a man with his hand up with his back to

12  the camera.  Who is that?

13  A.  It's Donald Trump.

14  Q.  Who is sort of directly -- who is the woman directly in

15  front of Mr. Trump as he is standing there sort of smiling,

16  looking at him?

17  A.  That's myself.

18  Q.  Who is to your left in the photo, to our right?

19  A.  The man or the woman?

20  Q.  I'm sorry.  The man.  Who is the man in your left in the

21  image to our right?

22  A.  That's my husband, John Johnson.

23  Q.  And then who is to Mr. Johnson's left at the -- the woman

24  at the far right of the photo?

25  A.  That's Ivana Trump.

Case 23-793, Document 81, 11/20/2023, 3592067, Page201 of 300

1  Q.  Where did this photo come from?

2  A.  I always had it in my possession.

3  Q.  Are you -- you appear to be speaking, but do you recall

4  what, if any, conversation you had with the Trumps in this

5  photo?  Do you recall what's being discussed?

6  A.  No, I don't.

7  Q.  Do you recall approximately how long the conversation

8  lasted?

9  A.  Yes, it was at least five or six minutes.

10  Q.  We can take that down, Mr. Lam.  Thank you, sir.

11          What was your general opinion of Mr. Trump at that

12  time?

13  A.  I thought he was a well-known raconteur, man about town,

14  well liked.

15  Q.  What's a -- is raconteur a nice word or a mean word?

16  A.  A raconteur is a sophisticated man who is entertaining to

17  be around.

18  Q.  Did you find him attractive?

19  A.  Yes.

20  Q.  Why?

21  A.  He was very personable.

22  Q.  Did you ever see Donald Trump again?

23  A.  Briefly on the street on --

24  Q.  When was that?

25  A.  Sometime after 1987.  I'm not sure when.  I was on -- he

Case 23-793, Document 81, 11/20/2023, 3592067, Page202 of 300

A-1582

1  was on the Trump Tower side and I was opposite, across the

2  traffic, and he waved and I turned around to see who he is

3  waving to, and I deducted it was me, and so I waved back.

4  Q.  Are you sure he was waving at you?

5  A.  No, never been 100 percent positive.

6  Q.  Did you ever exchange any words with him during that

7  encounter?

8  A.  No.  There are loud buses going back and forth, so, no.

9  Q.  Were you well known at that time when you encountered

10  Mr. Trump across the street?

11  A.  Only in the mildest form.

12  Q.  Were you ever recognized around -- on the street around

13  that time?

14  A.  Yes.

15  Q.  When was the next time you saw Donald Trump?

16  A.  At Bergdorf's.

17  Q.  Okay.  So sitting here now, when do you believe Donald

18  Trump assaulted you?

19  A.  This question, the when, the when, the date has just been

20  something that I am constantly trying to pin down.  It's very

21  difficult.  However, I can tell you, going by what I was

22  wearing, which was a wool dress, tights, high heels, but no

23  coat, and because of the light and because it wasn't too cold

24  out, yet it was cold, and because of the dress I was wearing, I

25  have always pinned it to a short period the last few months of

N4q2Car2                    Carroll - Direct                    164

1   '94 or '95.  However, it had come to light not too long ago

2   that Lisa Birnbach, the woman I called immediately after the

3   event, had written a *New York* magazine piece about Donald

4   Trump.  It was sort of a bombshell piece because it was a -- it

5   was Mar-a-Lago was being opened as a club.

6            MR. TACOPINA:  Your Honor, objection.

7            THE COURT:  Ms. Carroll, the question is "when do you

8   believe he assaulted you?"

9   Q.  Ms. Carroll --

10           MR. FERRARA:  Let me pose another question, your

11  Honor.

12  Q.  As between fall of 1995 and spring of 1996 --

13           MR. TACOPINA:  I'm sorry, your Honor.  I have to

14  object.  The year just given -- years just given was '94-'95,

15  so that misstates her answer unintentionally, unintentionally.

16           THE COURT:  Well, I wouldn't say it misstates, but she

17  certainly used the phrase.  She said that she had always pinned

18  it in the last two months of '94 or '95 and then she was going

19  on to explain that something happened and the inference that

20  seemed apparent to me was she was about to say in light of what

21  she was about to talk about, maybe '94-'95 wasn't correct.  So

22  let's just see where we are going with this.  I understand why

23  everybody thinks it's important or at least some people think

24  it is important.

25           THE WITNESS:  Wait a minute, your Honor.

1              THE COURT:  No, no.  We will wait for another

2     question.

3     BY MR. FERRARA:

4     Q.  Ms. Carroll, you were -- you were referring to an article

5     that was written.  We are not going to get into the substance

6     of the article.  Why does the article you described -- how has

7     that helped you remember, to the best of your ability, when

8     this encounter happened?

9     A.  Mr. Tacopina said I said '94-'95.  I meant '95-'96.

10    Q.  Thank you for clarifying, but let me ask you this question.

11    You mentioned an article.

12    A.  Yes.

13    Q.  I don't want to talk about the substance of the article,

14    okay?

15    A.  Okay.

16    Q.  I just want to ask you how you feel like that article has

17    helped you think about when the encounter with Mr. Trump

18    happened.

19    A.  Yes.  Lisa Birnbach wrote an article about Mar-a-Lago and

20    Donald Trump.

21    Q.  Please don't get into the substance of it.

22    A.  Okay.

23    Q.  Thank you.

24    A.  Donald Trump -- it was for *New York* magazine.  She

25    published this article in February 1996.  I believe that Lisa

1  never would have gone down to Mar-a-Lago to cover Trump if she

2  knew what Donald Trump had done to me in Bergdorf's.

3          MR. TACOPINA:  Objection, your Honor.  I ask that be

4  stricken, her belief.

5          MR. FERRARA:  We oppose that objection, your Honor.

6          THE COURT:  I understand.

7          No, I'm going to leave it stand.  It's not for the

8  truth of it, it's an explanation of how the article led to her

9  present view.

10  BY MR. FERRARA:

11  Q.  Why do you believe, Ms. Carroll, that the season was fall

12  or spring?

13  A.  By what I was wearing and by the light, whether it was dark

14  or light or whether it was twilight.

15  Q.  I think you started to mention this, but just give us the

16  specifics of what you were wearing when you encountered

17  Mr. Trump for the -- during that period?

18  A.  A wool dress and thick tights.

19  Q.  What day of the week do you think the assault occurred, if

20  any?

21  A.  It's always been in the back of my mind that it was a

22  Thursday, but I never said it because I wasn't 100 percent

23  positive.

24  Q.  Why do you think it was a Thursday?

25  A.  Because I -- it -- we ran into each other, it wasn't

Case 23-793, Document 81, 11/20/2023, 3592067, Page206 of 300

A-1586

1   afternoon, I believe it was early evening.

2   Q.  Now, Ms. Carroll, you have -- you have written publicly

3   about this encounter with Donald Trump, right?

4   A.  Yes.

5   Q.  Spoken publicly about it?

6   A.  Yes.

7   Q.  You have been deposed about it, right?

8   A.  Yes.

9   Q.  You have never before said it was Thursday.  Is that right?

10  A.  I've always -- I've always thought it was a Thursday.  I

11  didn't say it was a Thursday because I wasn't 100 percent

12  certain.  As I sit here today, I'm not even 100 percent

13  certain, but I think it was on a Thursday night.

14  Q.  Are you sure?  Are you sure, Ms. Carroll?

15  A.  I feel sure, but I can't say I'm 100 percent sure.

16  Q.  I'm going to show you what's been marked for identification

17  as Plaintiff Exhibit 14.  Do you recognize this?

18  A.  Yes.

19  Q.  What is it?

20  A.  That's a picture of myself taken in 1995 or '96.

21          MR. FERRARA:  Plaintiff offers 14, your Honor.

22          MR. TACOPINA:  No objection, your Honor.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 14 received in evidence)

25  BY MR. FERRARA:

**A-1587**

1  Q.  If we could publish this, Mr. Lam.  Thank you.

2          How old are you -- about how old were you in this

3  photograph?

4  A.  52.

5  Q.  We can take that down.  Thank you, sir.

6          So turning to this period of time—1995, 1996—just

7  give us very briefly, what would a typical day look like for --

8  typical weekday look like for you?

9  A.  I would get up in the morning.  I lived in a little cottage

10 in Nyack.  I would feed the dogs, I would feed the cats, I

11 would feed the birds, and then I would sit down and write the

12 television show, the intros, the introductions, I would read

13 the research, and I would get ready to do the show, drive to

14 Fort Lee, go into hair and makeup, and then go live at 4:00.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

A-1588

 1   Q.  What was in Fort Lee?

 2   A.  Fort Lee was where the NBC cable channel was.

 3   Q.  Is that Fort Lee, New Jersey?

 4   A.  Yes.

 5   Q.  About how long would it take to tape the show?

 6   A.  It wasn't taped.  It was always live.  One hour a day.

 7   Q.  So, on the day in question, when you encountered Mr. Trump,

 8   what did you do after -- what do you recall doing after taping

 9   the show that day?

10   A.  Well, I drove into New York.

11   Q.  Why?

12   A.  I was looking for -- I was looking for something special, I

13   don't remember what it was, and I went to Bergdorf's.

14   Q.  How frequently would you shop at Bergdorf Goodman?

15   A.  Bergdorf had beautiful, beautiful things.  Bergdorf also

16   had terrific sales.  So I would tend to go to Bergdorf's once

17   or twice a year for the sale, for the sales.

18   Q.  How long was the drive -- about how long was the drive

19   typically from Fort Lee to Bergdorf's?

20   A.  32, 35 minutes.

21   Q.  What route would you take?

22   A.  Fort Lee is at the George Washington Bridge.  I traveled

23   across the George Washington Bridge and then travel up the West

24   Side Highway, take a left on 57th, and I was there.

25   Q.  Do you recall specifically on that day why you were going

Case 23-793, Document 81, 11/20/2023, 3592067, Page209 of 300

A-1589

1    to Bergdorf's?

2    A.  I am guessing that it was a sale.

3    Q.  Do you recall sitting here today?

4    A.  No.

5    Q.  Did you buy anything that day?

6    A.  I don't think I did because I didn't have carrier bags with

7    me.  I didn't have shopping bags.

8    Q.  Do you recall how long you were in the store?

9    A.  No.

10   Q.  When did you first see Mr. Trump that day?

11   A.  I was leaving the store, and I was exiting the 58th Street

12   entrance, and I was just about to go out the door.  He was

13   standing on the other side of it and put up his hand.

14   Q.  You're putting up your hand to indicate what, Ms. Carroll,

15   so it's clear?

16   A.  It's universal signal for stop.

17   Q.  What did you do?

18   A.  I stopped.

19   Q.  What happened next?

20   A.  And he came through the door and he said, hey, you are that

21   advice lady.

22   Q.  How did you respond?

23   A.  I said, hey, you're that real estate tycoon.

24   Q.  What was your impression of Donald Trump at that time when

25   you saw him at Bergdorf's?

Case 23-793, Document 81, 11/20/2023, 3592067, Page210 of 300

**A-1590**

1   A.  Very personable, engaging.

2   Q.  What happened after you said, hey, you're that real estate

3   tycoon?

4   A.  He said, I need to buy a gift, come help me.  Come help me.

5   Come advise me.

6   Q.  Did you agree?

7   A.  I was delighted.

8   Q.  Why?

9   A.  Well, it was such a funny New York scene.  I'm a born

10  advice columnist.  I love to give advice, and here was Donald

11  Trump asking me for advice about buying a present.  It was a

12  wonderful prospect for me.

13  Q.  Who was he shopping for, if you know?

14  A.  I asked him.  I said:  Who is it for?  He said:  A girl.

15  And then I asked him, trying to figure out who it would be:

16  How old is she?  And he replied with:  How old are you?

17  Q.  What did you say?

18  A.  I said 52.

19  Q.  How did he respond?

20  A.  He said:  You are so old.

21  Q.  Was that in a fresh way or in a sort of teasing way?

22  A.  No.  It was humorous the way he said it.

23  Q.  What did the two of you do next?

24  A.  At the time, in '96, the little circular alcove we were

25  standing in had displayed three or four handbags, which were so

Case 23-793, Document 81, 11/20/2023, 3592067, Page211 of 300

**A-1591**

1   beautiful and such works of art I thought, wow, any girl would

2   love one of these handbags.  But he didn't like the idea of a

3   handbag.  So we went -- we turned to the left, went walk

4   through the first floor to the hats.  I thought a hat would be

5   great, and she is going to love a hat.

6   Q.  As far as you were able to tell -- what floor of Bergdorf

7   were you on at this point?

8   A.  First floor.

9   Q.  As far as you were able to tell, did anyone recognize you

10  or Mr. Trump?

11  A.  There was a shopper.  She was tiny, because I remember her

12  staring up at him in awe.  She recognized him.  He was very

13  pleasant.

14  Q.  Anyone else?

15  A.  There was a sales attendant, and she was also very pleased

16  to see him.  He was pleased to see her.

17  Q.  What, if any, words did they exchange?

18  A.  I think he said hello, how are you doing, how are you.

19  Q.  What happened after hats?

20  A.  He was holding -- he picked up a hat that was a fur hat and

21  he was petting it like a little cat or a dog.  And as he was

22  petting it he said, I know, lingerie.

23  Q.  Lingerie meaning underwear?

24  A.  Yes.

25  Q.  Where was the lingerie -- the lingerie section, I guess, in

**A-1592**

1    the store?  Where was that located?

2    A.  I didn't know where it was.  I do now know where it is.

3    But he led the way to the escalator, and we started to go up

4    the escalator.

5    Q.  What floor do you recall lingerie being on at that time?

6    A.  Six.

7    Q.  Was there anything sort of discomforting to you about the

8    fact that Mr. Trump had proposed the lingerie?

9    A.  No.  By this time -- first of all, he was very talkative.

10   In the escalator he talked about how great Bergdorf's was.  At

11   one time he was thinking of buying Bergdorf's.  I was

12   absolutely enchanted -- I could only think of it as a scene,

13   such a great story, so I was delighted to go to lingerie with

14   him.

15   Q.  Were you chatting --

16   A.  Yes.  He was very funny, yeah.

17   Q.  Do you recall what the two of you were discussing as you

18   made your way to the lingerie area?

19   A.  He was talking about Bergdorf's.  I don't remember

20   precisely.

21   Q.  What was the tone of the conversation?

22   A.  Very joshing and light.

23   Q.  Who, if anyone else, in the store did you see as you rode

24   up to the lingerie area?

25   A.  I wasn't looking.  I was watching him and watching that I

A-1593

1  didn't fall when I went on the escalator -- when the escalator

2  hit the top.

3  Q.  When you arrived at the six floor on the escalator, do you

4  recall how you walked to the area where the lingerie was?

5  A.  Yeah.  We walked -- yeah.

6  Q.  Sort of walk us through how you remember moving through the

7  floor, which way you would turn, etc.

8  A.  Do you mind if I stand up?  Because I cannot -- I'm very,

9  very bad on direction.

10            MR. FERRARA:  Your Honor, may the witness stand up to

11  orient herself?

12            THE COURT:  Yes.

13  A.  We go to the top.  We turn to the left.

14  Q.  Then what?  Is the lingerie like right there?

15  A.  No, no.  If you just keep going, you will see lingerie a

16  little bit to the right, just slightly off to a little section.

17  Q.  What happened when the two of you arrived at that section?

18  A.  There is a glass covered sort of cabinet, very elegant

19  piece of furniture.  And on the top of this glass was a lovely

20  piece of see-through grayish blue bodysuit, and he snatched it

21  up.  He held it up and he said:  Go put this on.

22  Q.  Is a body suit a type of lingerie?

23  A.  Yes.  It's quite a lovely piece.  It looks like a swimsuit,

24  except this was see-through?  They used to be called teddies.

25  Q.  Who else was in the -- in that area when you -- with you

Case 23-793, Document 81, 11/20/2023, 3592067, Page214 of 300

**A-1594**

1    and Mr. Trump?

2    A.  I didn't see anybody.

3    Q.  Was that surprising?

4    A.  It didn't surprise me, no.

5    Q.  What about sales attendants?

6    A.  Didn't see any.

7    Q.  Why didn't that surprise you?

8    A.  Bergdorf's was not busy in the evenings.

9    Q.  Have you written before that you were surprised by the lack

10   of people on the floor?

11   A.  Well -- I was not surprised and yet I was surprised.

12   Q.  How is that?

13   A.  The whole thing about going up in the escalators with

14   Donald Trump was surprising.  The fact that we didn't see any

15   salespeople, I think I noticed it.  I may have described it

16   before as being surprising.  I may have been surprised.  I

17   really can't say.  Now I find it surprising.

18   Q.  What happened after Mr. Trump picked up the piece of

19   lingerie?

20   A.  He said:  Go put this on.

21   Q.  Did you?

22   A.  No.  I had no intention of putting it on.

23   Q.  What was his demeanor when he said go put this on?

24   A.  Jesting, joshing.

25   Q.  How did you respond?

N4QMCAR3                    Carroll - Direct                    176

1   A.  I said:  You put it on.  It's your color.

2   Q.  What did he say?

3   A.  Then he held it up and he held it against me.  He said:

4   You're in shape.  Go put this on.  I said:  No.  It goes with

5   your eyes.  It's your size.  You put it on.

6   Q.  Why in the world would you think that Mr. Trump would put

7   on that piece of lingerie?

8   A.  Because his tone was -- he was having a very good time and

9   so was I.  The idea was very funny, and I could just picture it

10  in my mind, Donald Trump putting on this filmy see-through bit

11  of lingerie over his pants.  That's how I pictured it.

12  Q.  So what happened next?

13  A.  He said:  Go try this one -- no.  He said:  Let's try this

14  on.  And he motioned towards the dressing room.

15  Q.  What did you do?

16  A.  Well, I thought, hmm, and he had me by the arm -- he

17  motioned with his arm, he had me by the arm with this hand, and

18  the door was open and he went like this.  And I said OK.  I

19  sort of saw it as a Saturday Night Live sketch.  I had written

20  a sketch that was similar to this very scene I was entering.

21  And Donald Trump was being very light and it was very joshy and

22  pleasant and very funny.

23  Q.  Just to be clear, was he dragging you into the dressing

24  room?

25  A.  No.  He went like this.

1  Q.  In your mind, at the time, Ms. Carroll, had things --

2  withdrawn.

3          Had you been flirting sort of much this time with

4  Mr. Trump?

5  A.  Yeah.  I was flirting the whole time, probably.

6  Q.  At this point now, when Mr. Trump has proposed going to the

7  dressing room, have things escalated in your mind?

8  A.  The comedy was escalating, and I thought it was getting

9  funnier and funnier.

10  Q.  Did you ever think about saying, no, I'm not going in?

11  A.  No.  It didn't occur to me.  I didn't really think about

12  going into the dressing room.  I thought of it as sort of an

13  open area.  I thought the door was open, we walked in.  I

14  didn't picture anything about what was about to happen.  Didn't

15  picture it.

16  Q.  What happened once you -- first off, was the dressing room

17  open or closed?

18  A.  The door was opened.  That open door has plagued me for

19  years because I just walked into it, just walked in.

20  Q.  Let's take it one step at a time.  What happened once you

21  entered the dressing room?

22  A.  He immediately shut the door and shoved me up against the

23  wall and shoved me so hard my head banged.

24  Q.  What were you thinking at that moment?

25  A.  I was extremely confused and suddenly realizing that what I

N4QMCAR3                    Carroll - Direct                    178

1   thought was happening was not happening.

2   Q.  How did you react in that moment?

3   A.  I was laughing as we walked in, and I continued to laugh

4   because I thought -- I wasn't sure -- for a minute I thought

5   maybe it was a mistake, that he didn't mean to do that.  He

6   didn't mean to shut the door.  And just to make sure -- I

7   continued to laugh just in case he was thinking of something

8   intimate.  And so I'm very rapidly trying to figure out, what's

9   going on and trying to get out of it at the same time.

10  Q.  What did he do next?

11  A.  I pushed him back, and he thrust me back against the wall

12  again, banging my head again.

13  Q.  Were you still laughing at this point?

14  A.  I think I may have been.  I really -- here is the thing.  I

15  didn't -- just in case -- this is going to sound odd.  I didn't

16  want to make a scene.  I know that sounds strange.  I didn't

17  want to -- I didn't want to make him angry at me.  I didn't

18  want to stop what started out as something light and fun and

19  comedic and a great story to people I am having dinner with,

20  and it suddenly turned absolutely dark.

21  Q.  What did he do after he pushed you up against the wall the

22  second time?

23  A.  He put his shoulder against me and hold me against the

24  wall.

25  Q.  Then what happened?

**A-1598**

1  A.  I remember him being -- he was very large, and his whole

2  weight came against my chest and held me up there, and he

3  leaned down and pulled down my tights.

4  Q.  What, if anything, were you doing while that was happening?

5  A.  I was pushing him back.  It was quite clear that I was not

6  going -- I didn't want anything else to happen.  It was quite

7  clear.  I pushed him back.  This arm was pinned down.  This arm

8  had my purse.  Trying to get him back.

9  Q.  At any point during this encounter, do you recall saying

10 no?

11 A.  No, I don't recall saying it.  I may have said it.

12         MR. FERRARA:  Just one moment, your Honor.

13 Q.  At any point during this encounter did you scream?

14 A.  I don't remember screaming.  I'm not a screamer.  I'm a

15 fighter.  I'm much more physical than I am vocal.

16 Q.  What about his head?  What is happening?

17 A.  His head was beside mine breathing.  First, he put his

18 mouth against me.

19 Q.  Do you mean he kissed you?

20 A.  Yes.

21 Q.  Did you kiss him back?

22 A.  No.  I didn't consider it a kiss.  It was such -- it was a

23 shocking thing for him to suddenly put his mouth against mine.

24 I thought what.  What.  What.  No.

25 Q.  Do you think -- based on what you were experiencing, do you

1   believe that if someone had been nearby, they would have been

2   able to hear what was happening in the dressing room?

3   A.  They would have heard the head hitting and definitely would

4   have heard me laughing.

5   Q.  You described Mr. Trump as a -- you described Mr. Trump as

6   sort of, I think, larger than you?

7   A.  Yeah.

8   Q.  Do you recall approximately what the difference or how tall

9   are you?

10  A.  At the time I was five-nine.  Because I'm 79, I have sort

11  of all compacted down due to gravity, but at the time I was

12  five-nine.  I was wearing four-inch heels.  So it put me about

13  level with Donald Trump, who I think is six-two.  I was

14  six-one.  And I weighed at the time about 120, and I believe he

15  weighed about 100 more pounds.

16  Q.  Were you afraid while this was happening?

17  A.  I was in -- this is going to sound strange.  I was almost

18  too frightened to think if I was afraid or not.  I was

19  stamping.  My whole reason for being alive in that moment was

20  to get out of that room.

21  Q.  How were you trying to accomplish that?

22  A.  Stamping and trying to wiggle out from under him.  But he

23  had pulled down my tights and his hand went -- his fingers went

24  into my vagina, which was extremely painful, extremely painful.

25  It was a horrible feeling because he curved, he put his hand

1   inside of me and curved his finger.  As I'm sitting here today,

2   I can still feel it.  It was --

3   Q.  Then what happened?

4   A.  Then he inserted his penis.

5   Q.  What did you do in that moment?

6   A.  I tried --

7   Q.  Do you need a moment, Ms. Carroll?

8   A.  You asked me what I did in that moment.  I always think

9   back to why I walked in there to get myself in that situation,

10  but I'm proud to say I did get out.  I got my knee up.  I got

11  my knee up and pushed him back.

12  Q.  Was anything in your hands?

13  A.  My handbag.

14  Q.  Why were you holding your handbag?

15  A.  I have no idea.

16  Q.  I want to be -- I want to make sure I understand it.

17          How were you able to -- were you able to see what

18  Mr. Trump was doing with his hand, or are you telling us what

19  you experienced sort of physically by feeling it?

20  A.  He was against me, his whole shoulder -- I couldn't see

21  anything.  I couldn't see anything that was happening.  But I

22  could certainly feel it.  I could certainly feel that pain in

23  the finger jamming up.

24  Q.  How long was your dress?

25  A.  Mid knee.  Mid knee.

A-1601

1   Q.  Do you recall how far down he pushed your tights?

2   A.  Yeah.  A little bit below mid thigh.

3   Q.  Were you wearing underwear?

4   A.  No.  To me, tights are underwear.  I wouldn't wear two pair

5   of underwear, no.

6   Q.  Do you recall either of you saying anything as this was

7   happening?

8   A.  I can't say if I said -- I can't say -- I had so much

9   adrenaline pouring through me at this time, I can't tell you if

10  I said anything.

11  Q.  Do you know if he ejaculated?

12  A.  I don't think so.

13  Q.  You said you got your knee up.  What happened next?

14  A.  Once I could get my knee up, I could get him to back off.

15  I could actually move his body.  I was quite strong.  I was an

16  athlete.  I could push him back by putting that knee up.

17  Q.  What did you do after you were able to push him off?

18  A.  I exited the room, and I got out of the store as quickly as

19  I could.

20  Q.  How long do you believe the encounter, the assault in the

21  dressing room, do you recall how long that assault lasted?

22  A.  From walking in, from walking in?

23  Q.  Just in the dressing room.

24  A.  A very few minutes, very few.  That was another thing that

25  surprised me.

Case 23-793, Document 81, 11/20/2023, 3592067, Page222 of 300

A-1602

1    Q.  What surprised you?

2    A.  To go from a very funny story, light, joshy, and me

3    thinking this is just going to be the most terrific scene.  I

4    can't wait to tell everyone -- to having his hand jammed up me.

5    Not a lot of time lapsed.

6    Q.  How did you get out of the store?

7    A.  I walked out.

8    Q.  Do you recall whether you took the escalators?  Did you

9    take the elevator?  What do you recall?

10   A.  I have never been able to find the elevators in Bergdorf's.

11   I am never sure where they are.  So I headed back the way I

12   came, up the escalator.

13   Q.  Were you running?  Were you walking?

14   A.  I am going to guess -- I'm guessing I walked swiftly.

15   Q.  Did you tell anyone in the store what had happened?

16   A.  I didn't see anybody.  I am not saying they weren't there.

17   I just didn't see anybody.

18   Q.  Did Mr. Trump, do you know -- were you able to tell whether

19   he came after you?

20   A.  I was never sure if he was behind me.  I got out as quickly

21   as I could.

22   Q.  How did you leave the store?

23   A.  On Fifth Avenue, one of the Fifth Avenue doors.

24   Q.  Do you recall what time of day it was when --

25   A.  It was pretty dark when I was outside.

Case 23-793, Document 81, 11/20/2023, 3592067, Page223 of 300

A-1603

1    Q.  Did Mr. Trump follow you out of the store?

2    A.  No.  Not that I know.

3    Q.  I think you were touching on this Ms. Carroll, but sitting

4    here today, how do you feel about your decision to go into that

5    dressing room?

6    A.  It was very stupid.  It changed.  I know people have been

7    through a lot worse than this, but it had -- it left me -- it

8    left me unable to ever have a romantic life again.

9    Q.  Let's turn to what you did immediately upon leaving the

10   store.  What was the first thing you did when you were back on

11   the street?

12   A.  I called my friend, Lisa Birnbach.

13   Q.  Who is Lisa Birnbach?

14   A.  Lisa Birnbach is a respected journalist.  She wrote the

15   *Preppy Handbook*.  She was a correspondent on television, well

16   liked and very funny woman.

17   Q.  At that time how long had you known Ms. Birnbach?

18   A.  Four or five years.

19   Q.  How did you meet?

20   A.  Her husband was a producer, and I met Lisa at a

21   television -- he was producing a television series called

22   Working It Out.  And I stopped in to see the boyfriend of my

23   friend and I met Lisa there.

24   Q.  What is your relationship with Ms. Birnbach like today?

25   A.  We were very close friends.

A-1604

1    Q.  Around what time was it, as best you can remember, when you

2    called Ms. Birnbach that night?

3    A.  I don't know the exact hour, but it was darkish.

4    Q.  Why did you call Ms. Birnbach specifically?  Why her?

5    A.  Well, I am wondering myself if I hadn't just read her piece

6    about Donald Trump in New York magazine.  I don't remember

7    that.  But -- she was top of mind definitely because she was

8    the funnest woman I knew.  And I thought that if I could tell

9    Lisa, I had to tell somebody what happened.  And if Lisa

10   thought it was funny, then it was not a bad thing.  OK, fine.

11   I didn't completely do a stupid thing.  Lisa thinks it's funny.

12   So I called Lisa.

13   Q.  I have to ask, Ms. Carroll, why would Ms. Birnbach ever

14   think this was funny?

15   A.  I had not processed it.  I had not processed what was going

16   on.  I felt the hand jammed, and I felt the back of my head

17   hurting.  I hadn't put -- adrenaline was flowing through my

18   body.  So it was very hard for me -- it was just very hard for

19   me to comprehend if it was what it was.  Of course, I probably

20   had a good idea of what it was.  So I had to tell Lisa.

21   Q.  Sitting here today, do you believe any part of that -- of

22   the part of what occurred -- the assault in the dressing room,

23   do you believe any part of that was funny?

24   A.  No.  It was tragic.  No.  No.

25   Q.  Do you recall your conversation with Ms. Birnbach that

Case 23-793, Document 81, 11/20/2023, 3592067, Page225 of 300

**A-1605**

1    night on the phone?

2    A.  Yes, I do.

3    Q.  Can you describe it.

4    A.  I said, you are not going to believe what just happened.  I

5    just needed to tell her.  I said I met Donald Trump in

6    Bergdorf's.  We went lingerie shopping and I was so dumb I

7    walked in a dressing room and he pulled down my tights.

8    Q.  What did she say?

9    A.  Lisa said, E. Jean, I don't think this is funny because

10   apparently I was laughing as I told her.

11   Q.  Do you recall laughing while you were telling her?

12   A.  No.  Sort of, but not.

13   Q.  What else did you say?

14   A.  Well, she asked me, she said, after she heard he had pulled

15   down my tights, she asked me, did he insert his penis?  I said

16   yes.  And then Lisa said the words:  Probably why I called her.

17   She said he raped you.  He raped you, E. Jean.  You should go

18   to the police.  I said:  No way.  Then she said:  I will go

19   with you.

20   Q.  Did you go to the police?

21   A.  No.

22   Q.  Why not?

23   A.  I couldn't imagine anything.  I couldn't.

24   Q.  Why can you not imagine going to the police after having

25   been assaulted?

A-1606

1  A.  Because I had done -- I thought it was -- I was ashamed.  I

2  thought it was my fault.

3  Q.  Why did you think it was your fault, Ms. Carroll?

4  A.  Because I was flirting with him and laughing and having one

5  of the great times.  It was high comedy.  It was funny.  And

6  then to have it turn into the --

7  Q.  Do you recall anything else about that conversation with

8  Ms. Birnbach?

9  A.  Yes.  After she told me to go to the police, I said no, no

10  way.  She said:  I'll go with you.  I said no.  I could not

11  talk about this with anyone.  And we are not going to talk

12  about it either.  I don't want to talk about it anymore.  And

13  that's it.

14  Q.  Then what did you do that night after the call ended?

15  A.  I walked to the garage and drove home.

16  Q.  That night, the night of the assault, do you recall whether

17  you had any physical signs of injury?

18  A.  My head hurt, my vagina felt pain, and --

19  Q.  Did you seek medical attention?

20  A.  No.

21  Q.  Was there any damage to your clothing?

22  A.  No.

23  Q.  What did you do with the dress you were wearing?

24  A.  I hung it in the closet.

25  Q.  Did you throw it out?

1   A.  No.  It was a beautiful dress.  It was the most expensive

2   dress I owned.  I always thought that I would probably wear it

3   again.

4   Q.  What was your state of mind that night?

5   A.  I was extremely riled.  I didn't know who I was.  I didn't

6   know how I -- I couldn't believe that it happened.  I couldn't

7   believe that it happened to me.  I couldn't -- it was very,

8   very difficult.  It took me a long time to calm down.

9   Q.  During this period of time, did you keep a journal?

10  A.  Yeah.

11  Q.  What kind of journal?

12  A.  I was -- when I was younger I used to keep a journal where

13  I would talk about my emotions and the ins and outs of

14  relationships.  After I turned 40, my diaries are just mainly

15  bullet diaries.  Threw the ball for the dog, went for a hike.

16  Q.  How, if at all, did you record in your diary what had

17  happened with Mr. Trump?

18  A.  I'm very superstitious.  I don't put bad things in my

19  diary.  I don't make note of anything that's bad.  I don't

20  write it down.  If I don't write it down, I don't think about

21  it.

22  Q.  What did you do the next day?

23  A.  I went to work.

24  Q.  You didn't skip work?

25  A.  No.

N4QMCAR3                    Carroll - Direct                    189

1    Q.  Why not?

2    A.  I'm a person who always looks on the bright side, and I

3    tried to find something that would help me get over this

4    horrible thing, and I decided I was happy to be alive.  I was

5    just glad I wasn't dead.  I thought, heck, yes, I am going to

6    go to work.  And also because I thought I knew best.  I didn't

7    see a therapist.

8    Q.  Let's talk about that.  Let's come back to that.

9    A.  OK.

10   Q.  Who, if anyone, at work did you tell what had happened?

11   A.  Yes.  Carol Martin.

12   Q.  Who is Carol Martin?

13   A.  Carol Martin was an anchorwoman at ABC in New York, and she

14   was also at my cable channel and she had her show called Alive

15   and Wellness.

16   Q.  What was your relationship with Ms. Martin at that period

17   of time?

18   A.  She was a very good friend.

19   Q.  What is your relationship with Ms. Martin now?

20   A.  She is still a very good friend.

21   Q.  In the mid '90s, how long had you known Ms. Martin?

22   A.  I had known Carol since 1988, I think.

23   Q.  I think you testified that you told Ms. Birnbach you didn't

24   want to talk about the event?

25   A.  Yeah.  We agreed.  We are never going to talk about this

**A-1609**

1    again.

2    Q.   Why would you raise it with Ms. Martin?

3    A.   Because I just saw Carol.  I saw her and I needed a hug.

4    Q.   Do you remember what you said to Ms. Martin?

5    A.   I said:  Carol, you are not going to believe it.  I had a

6    run-in with Donald Trump at Bergdorf's.  She said -- she saw my

7    face.  She said:  We can't talk here.  We were back behind the

8    studio.  She said:  Let's talk tonight at my house.

9    Q.   Do you recall, was the next day, the next day, how long

10   after the assault this conversation with Ms. Martin happened?

11   A.   I think the next day.

12   Q.   Did you in fact speak with her at her home?

13   A.   Yes.

14   Q.   Who was there?

15   A.   Just Carol and her dog Cisco.  I think it was Cisco.

16   Q.   What the two of you discuss?  What did you tell her?

17   A.   I took her through step by step what happened.  And Carol

18   is a very unjudgmental, open-hearted friend.  But she was --

19   she gave me the exact -- her concern was very different than

20   Lisa's.  Carol's concern was, do not go to the police.

21   Q.   Why did -- did she explain that advice?

22   A.   Yeah.  She said:  Keep it to yourself.  He has 200 lawyers.

23   He will bury you.

24   Q.   What did you say?

25   A.   I agreed with Carol.

A-1610

1   Q.  Do you recall anything else from that conversation?

2   A.  Yes.  We started at the beginning of the story again.

3   Again, I went through it.

4   Q.  How did that conversation end?

5   A.  We agreed never to talk about it.

6   Q.  Whose idea was that?

7   A.  Both -- it was Carol's idea.  Tell no one.  She was very

8   clear about that.  So we didn't even talk.  She and I didn't

9   even talk about it after that.

10  Q.  Why?

11  A.  When something is painful and it causes pain to talk about

12  it, we didn't talk about it.  Also, I never raised the subject

13  again with either Carol or Lisa.

14  Q.  Do you recall the next time you spoke with anyone about the

15  assault?

16  A.  I think it was Carol and Lisa again.

17  Q.  Do you recall about how long elapsed before you talked to

18  them again?

19  A.  Many years.

20  Q.  Why did you stay silent for so long?

21  A.  Because I would never -- I would never report something

22  like this, just for the obvious reasons.  Roger Ailes would

23  have fired me.  He was friends with Donald Trump.  I would have

24  lost my job at *Elle*.  I was frightened of Donald Trump.  I

25  thought he would retaliate.  I was ashamed.  I thought it was

N4QMCAR3                       Carroll - Direct                       192

1    my fault.

2    Q.  Were you afraid of how others might react?

3    A.  No.  I knew how others would react.  Women who are raped

4    are looked at as soiled goods.  They are looked at as less.

5    People say:  Oh, you're so brave, you're so brave, but really

6    they are thinking, I don't know, she should have been smarter

7    or, I don't know, she should have screamed or, I don't know,

8    maybe she was dressed -- maybe that dress she was wearing --

9    maybe she flirted too much.  That's the thing.  In my opinion,

10   that's what many people think.

11   Q.  What about your family.  Did you tell them?

12   A.  No, never.

13   Q.  Why wouldn't you tell your family?

14   A.  We didn't talk -- my family is very upbeat.  We are all

15   about having a great life and doing well and come on and

16   let's -- every single one of my sisters is a cheerleader.  We

17   are all for having a great time.  We do not discuss anything

18   that would cause my parents or my sisters and brothers to feel

19   badly.

20            MR. FERRARA:  Your Honor, I see it's around 12:30.

21   There was something the defense counsel and I had to raise with

22   you.  I didn't know if there was a lunch break window.  This

23   might be a natural point.

24            THE COURT:  Members of the jury, 2:00.

25            Counsel remain.  We will see if we can iron out

1   whatever you have in mind.

2           (Jury not present)

3           THE COURT:  Where are we?

4           MR. FERRARA:  Your Honor, I plan to ask Ms. Carroll

5   some questions about the sort of harm that flowed to her from

6   this assault.  We appreciate that defense is entitled to ask

7   questions about other potential causes of the damage she is

8   going to describe.

9           There are two areas, though, that we want to explore

10  because -- that I want to raise with your Honor because,

11  depending on your Honor's rulings, I will either front it or

12  not, essentially.

13          THE COURT:  Everybody is talking about fronting

14  things.  I don't know what that means.

15          MR. FERRARA:  I will elicit it on direct if your Honor

16  believes it's admissible.

17          So the two areas in particular regarding this 412

18  issue that we have discussed, we are prepared to -- we would

19  not object if defense counsel wants to ask Ms. Carroll about

20  another instance of sexual abuse from her past that involved a

21  camp counselor.  Mr. Tacopina is familiar with it.  I briefly

22  mentioned this to him.  If defense plans to raise other

23  instances of sexual assault from Ms. Carroll's past, we would

24  object to that.  I raised it with him.  He might stand up and

25  say he has no intention of doing so and I apologize --

A-1613

1            THE COURT:  Let's find out.

2            MR. TACOPINA:  Hold on.  I have to read the last thing

3     he just said, your Honor.

4            MR. FERRARA:  If there are other instances of prior

5     sexual assaults that defense counsel intends to inquire about

6     other than the camp counselor.

7            MR. TACOPINA:  Mr. Seigel is going to handle this 412

8     issue, your Honor, with the Court's permission.

9            MR. SEIGEL:  Thank you.

10           There are two other instances that we would seek to

11    elicit.  One is with respect to her dentist, who she claims

12    sexually assaulted her, and the other is with regard to Les

13    Moonves.

14           THE COURT:  I'm sorry.  The other is with regard to?

15           MR. SEIGEL:  The other is with regard to Les Moonves.

16           She was an adult at the time of both of those alleged

17    sexual assaults, and she testified that this particular

18    incident left her unable to even -- to ever have a romantic

19    life again.

20           With respect to 412, her direct testimony just opened

21    the door to that.  We are obviously going to limit the scope of

22    our cross-examination.

23           THE COURT:  When was the alleged incident with the

24    dentist?

25           MR. SEIGEL:  She was an adult, your Honor.  I don't

1    think she specifies a particular time, but she was clearly an

2    adult.

3            MR. FERRARA:  We are not sure the dentist is in the

4    book.

5            MR. TACOPINA:  It's the deposition.

6            MR. SEIGEL:  Your Honor, the deposition testimony, I

7    am looking at it here.

8            MR. FERRARA:  Your Honor, while Mr. Seigel looks, I

9    think we gave your Honor deposition transcripts, if your Honor

10   wants to look yourself.

11           Fair enough.  Let the record reflect I read the

12   judge's look and withdrew my suggestion.

13           THE COURT:  All respect, everybody is working very

14   hard.  If you want to bring an issue to my attention, it would

15   at least be helpful when that happens if somebody has some

16   vague idea of what the incident is, right.  I understand there

17   is a vague idea, but when is question number 2 that has to be

18   asked?

19           MR. FERRARA:  I don't know that the deposition

20   reflects it, your Honor.

21           THE COURT:  That's the dentist.

22           MR. SEIGEL:  Your Honor, it's page 174, lines 8.

23           THE COURT:  I don't have it here, folks.

24           MR. SEIGEL:  I'll read into the record.

25           THE COURT:  Please don't.

1          I'd like to see the deposition.

2          I thought I made clear in an order a week or two ago

3    that I had to have a copy of depositions you were going to

4    refer to.

5          MR. FERRARA:  I apologize.  I thought we had done

6    that.  I apologize, Judge.

7          THE COURT:  Maybe you did.  As far as I know, it's a

8    secret.

9          We are on the dentist, and what page should I be

10   looking to to bring back my memories of my most recent root

11   canal?

12         MR. SEIGEL:  Page 174, line 8 through 20 or 24, your

13   Honor.

14         THE COURT:  In a nutshell, insofar as the dentist

15   episode is concerned, the defense argument is that this is

16   relevant because what the plaintiff said here is an alternate

17   explanation for why it is she now says that since the episode

18   with Mr. Trump, the alleged episode, she has been unable to

19   have a romantic relationship.

20         Is that the argument?

21         MR. SEIGEL:  That's correct, your Honor.

22         THE COURT:  So you are going to say that it's not

23   because of what happened with Mr. Trump; it's because of the

24   dentist.

25         MR. SEIGEL:  Our position is nothing happened with

N4QMCAR3                    Carroll - Direct                    197

1    Mr. Trump, so that's correct, amongst other reasons, your

2    Honor.

3              THE COURT:  I thought I said whatever happened with

4    Mr. Trump.

5              MR. SEIGEL:  I'm sorry, your Honor.  Yes.

6              THE COURT:  If I didn't, I was mistaken.

7              This business with the dentist, you have no indication

8    of when it happened, is that right?

9              MR. SEIGEL:  She hasn't provided a specific date.

10   That's correct, your Honor.

11             THE COURT:  She has not even provided, I don't mean to

12   be flip, but based on what you asked me to read, a century

13   either.

14             MR. SEIGEL:  That's true.

15             Your Honor, part of our argument would be here, it's

16   relevant also because it appears to be the plaintiff's modus

17   operandi where she continually makes accusations against others

18   without specific time frames, so it's certainly relevant for

19   that.

20             The other individual I identified is Les Moonves.

21   That's relevant for two reasons.  First, with respect to 412,

22   she describes an incident in great detail where Mr. Moonves

23   sexually assaulted her in graphic detail on an elevator.

24             THE COURT:  Page.

25             MR. SEIGEL:  Bear with me one moment, your Honor.

N4QMCAR3                    Carroll - Direct                    198

1        Your Honor, it's page 162 of the transcript, lines 12

2   through 17.

3        THE COURT:  Give me a minute.  Is that right or not

4   right?

5        MR. TACOPINA:  That's not right.

6        MR. SEIGEL:  We can set forth in graphic detail in her

7   book, which we have the relevant portions identified as

8   Defendant's Exhibit AA.  I could hand that up to the Court.

9        THE COURT:  That would be helpful.

10        MR. SEIGEL:  It's also in the deposition testimony,

11   your Honor, if that's easier, page 164.

12        THE COURT:  In the book you want me to look where?

13        MR. SEIGEL:  In the book, it would be page 184,

14   beginning on line 8.

15        THE COURT:  If you are talking, I can't read.

16        I must be missing something.  The account that you

17   want me to read, if I understand you correctly, is this long

18   footnote on page 184.

19        MR. SEIGEL:  No, your Honor.  It begins on page 184

20   and continues to page 186.  I can direct your attention to 186,

21   where she specifically describes this alleged incident starting

22   with the third paragraph from the bottom.

23        THE COURT:  OK.  Let me get there.

24        This is said to have occurred when?

25        Judging by what's at the bottom of page 185, it looks

A-1618

1   like 1997.  Is that right?

2           MR. SEIGEL:  That's what's noted in the book.

3           THE COURT:  At least as to that one, Mr. Ferrara, I

4   understand the point.  What is your position?

5           MR. FERRARA:  Regarding Moonves?

6           THE COURT:  Moonves.

7           MR. FERRARA:  That it is a prohibited use under 412.

8   It's a sexual assault.  It's evidence offered to prove that a

9   victim engaged in other sexual behavior.  And that covers --

10  that rule covers sexual assault, your Honor.

11          Your Honor, I can cite a case, if your Honor wants to

12  see it, but that's the position.

13          MR. SEIGEL:  Except the case law doesn't apply in that

14  instance.

15          THE COURT:  Excuse me.  I am not finished with

16  Mr. Ferrara.

17          The case is what and what what proposition does it

18  stand for?

19          MR. FERRARA:  I can cite, for instance, a Ninth

20  Circuit case, *S.M. v. J.K.*, 262 F.3d 914, 919, a 2001 case in

21  the Ninth Circuit.  It stands for the proposition.  A quote is:

22  "Excluding prior instances of sexual assault, in addition to

23  prior accusations, serves Rule 412's principal purpose to

24  protect rape victims from the degrading and embarrassing

25  disclosure of intimate details about their private lives."

N4QMCAR3                    Carroll - Direct                    200

1          THE COURT:  Let me hear from your adversary, please.

2          MR. SEIGEL:  Thank you, first of all, that rule

3  applies only when the witness has not raised it herself and

4  opened the door.

5          THE COURT:  Only when the witness --

6          MR. SEIGEL:  Only when the witness has not raised this

7  issue herself and opened the door, which clearly has happened

8  here.  That's first.

9          Second, the purpose of the rule is not frustrated in

10 this instance in any regard, given that this allegation was set

11 forth in a book that the plaintiff published at large to the

12 public.

13         Your Honor, it's also relevant for one additional

14 purpose beyond 412.  That is this.  This plaintiff has

15 testified previously that the reason she brought this lawsuit

16 against Donald Trump is because he called her a liar.  That's

17 the reason that we are here today, according to her, at least

18 initially.

19         However, Les Moonves also called her a liar.  This is

20 set forth in the deposition testimony publicly, and she didn't

21 file a lawsuit against him, which undermines her claim that

22 that's the reason for bringing this lawsuit, so it's relevant

23 on that ground as well.

24         THE COURT:  Give me a moment, fellows.

25         Mr. Ferrara, go back and tell me succinctly, if you

A-1620

1    would, what it is that your Ninth Circuit case says about the

2    rule that, in your view, requires the exclusion of the Moonves

3    incident.

4            MR. FERRARA:  The rule prohibits evidence of other

5    sexual assaults.

6            THE COURT:  It excludes evidence of other sexual

7    behavior.

8            MR. FERRARA:  Apologize.  I was describing what we

9    believe these cases stand for.  They take behavior and they

10   include sexual assault in there.

11           THE COURT:  I understand there are such cases.

12           What about the fact that your client is testifying

13   here, and indeed probably has already, she has already, that by

14   virtue of this incident with Mr. Trump that she claims

15   occurred, she subsequently has been unable to form a romantic

16   relationship.  That was the very first thing your adversary

17   said and this is relevant to that.

18           What do you say to that?

19           MR. FERRARA:  Defense counsel describes the issue as

20   the door opening.  We think that there are doors, most of which

21   remain closed, some of which will be open.

22           THE COURT:  Except at Bergdorf.

23           MR. FERRARA:  Well played.

24           We concede that there will be things that they can ask

25   about, not disputing that.  We will discuss another one

A-1621

1    momentarily, when we turn to the second issue that I had

2    raised.

3            For instance, we are not disputing, your Honor, that

4    the incident with the camp counselor can be inquired into.  Our

5    expert and their expert have discussed the impact of the camp

6    counselor on Ms. Carroll's ability to form relationships.  We

7    get it.

8            But neither expert relied on Les Moonves, for

9    instance, as part of why Ms. Carroll might be suffering today,

10   so we think that no door regarding Mr. Moonves has been opened,

11   and it cannot be the rule that any time a witness talks about

12   sexual activity of any kind that 412 is simply off the hinges,

13   etc.

14           THE COURT:  Let me ask your colleague.

15           MR. SEIGEL:  Your Honor, it's interesting to me that

16   it would be OK with the introduction of evidence relating to

17   her abuse at the hands of a camp counselor but not Les Moonves.

18   It seems the reason for that, although they are not saying so,

19   is because they understand that that might evoke sympathy for

20   her.  There is no distinction.  That might elicit sympathy for

21   her.  The fact of the matter is, your Honor, there is a

22   history --

23           THE COURT:  And being assaulted in an elevator by

24   Mr. Moonves would not.

25           MR. SEIGEL:  The difference is, she is a child in one

N4QMCAR3                    Carroll - Direct                    203

1   instance, your Honor.  There is a crucial distinction.

2           THE COURT:  Rape of children is very sympathetic, but

3   rape of adult women is not?

4           MR. SEIGEL:  I am not saying that's the case, your

5   Honor, by any stretch, but there is a distinction.  In fact,

6   your Honor, not to get into the history of this --

7           THE COURT:  I wouldn't want to hang by that

8   distinction.

9           MR. SEIGEL:  -- that's why the Adult Survivors Act was

10  only passed subsequently to the law regarding --

11          THE COURT:  Please, could we get to the point.

12          MR. SEIGEL:  The point, your Honor, is that both of

13  these instances would rebut plaintiff's claim that the reason

14  that she is allegedly unable to engage in sexual relationships

15  from 1995 and decades forward is a result of this alleged

16  incident in this case, as opposed to prior trauma.

17          And on that note, I would just point out, and my

18  colleague here failed to bring this to the Court's attention,

19  that even --

20          THE COURT:  Could we not do that anymore.  I just read

21  an absolutely scurrilous letter the other day with the word

22  perjury six times in four lines, or something, and I've about

23  had it with the carping by the lawyers at each other.  You are

24  all responsible, reputable lawyers, and every once in a while

25  you don't act like it.

1    MR. SEIGEL:  Your Honor, let me just address the point

2  that I think needs to be raised.  That is, in opposing

3  counsel's initial papers with respect to 412, in a footnote,

4  footnote 3, page 6, they state:  Even if Carroll were to open

5  the door to some of the evidence here at issue, the opening

6  would permit rebuttal evidence.  And then they say:  Only to

7  the extent it's necessary to address this specific issue.

8         The specific issue here is whether or not this

9  plaintiff has suffered emotional trauma as a result of the

10  alleged incident in this case and, consequently, when she

11  states that that's the circumstance, they have opened the door.

12  And based on what they themselves have acknowledged, we are

13  permitted to rebut it.  That's all we are seeking to do here.

14         THE COURT:  Bottom line of all of it is, you say that

15  because there was an untoward incident involving Moonves, which

16  the plaintiff says happened in 1997, you're entitled to use

17  that because that would tend to show, at least theoretically,

18  possibly, that her inability to form relationships, if that in

19  fact exists, is either attributable to Moonves, not Trump, or

20  maybe to both.

21         That's the argument, right?

22         MR. SEIGEL:  I wouldn't limit it just to her inability

23  to have sex or engage in romantic relationships, but any other

24  trauma that she claims that she has continued to incur in the

25  decades following this alleged incident.  It would tend to,

N4QMCAR3                    Carroll - Direct                    205

1   one --

2            THE COURT:  In other words, she is suffering from

3   emotional distress because of the Moonves incident, in addition

4   to or instead of Trump?

5            MR. SEIGEL:  That's correct.  And the cumulative

6   effect of that.

7            THE COURT:  Why not?

8            MR. FERRARA:  Because it hasn't -- no one has

9   suggested up until that point that that's the case.  The reason

10  we proposed the camp counselor was actually not to elicit

11  sympathy.  It was because --

12           THE COURT:  Forget the camp counselor for the moment.

13  Let's focus on what we are talking about.

14           MR. FERRARA:  Again, your Honor, it simply hasn't come

15  up with anyone theory's about why Ms. Carroll was harmed.

16           THE COURT:  It's an argument.

17           MR. FERRARA:  It's an argument that requires evidence

18  that our position is 412 prohibits.

19           THE COURT:  It's an argument that requires evidence

20  that?

21           MR. FERRARA:  412 prohibits.

22           THE COURT:  I am having trouble with that.  The lady

23  comes in and said:  X happened to me and because X happened to

24  me, I have consequences.  And they come in and say:  Well,

25  something very much like X happened on another occasion, and

N4QMCAR3                    Carroll - Direct                    206

1    why isn't that relevant to the claim that it's X?

2              MR. FERRARA:  I understand the point, your Honor.  We

3    believe 412 prohibits inquiry into other sexual assaults.

4              THE COURT:  No matter what?

5              MR. FERRARA:  I'm not saying no matter what, which is

6    why we have conceded that there is at least one that is

7    potentially relevant.  If defense counsel doesn't want to get

8    us into the other one, we won't.  But I wouldn't -- all I was

9    saying was, because experts had discussed it, because experts

10   had said this is part of the harm, we understand that that is

11   going to come in.  We get it.

12             THE COURT:  Counselor, did your expert going to

13   attribute any causal consequence to the Moonves incident?

14             MR. SEIGEL:  That's his intention, your Honor.

15             THE COURT:  Is it in his report?

16             MR. SEIGEL:  What he speaks to, your Honor, is that

17   the traumas --

18             THE COURT:  Simple question.  Yes, it's in the report.

19   No, it's not in the report.

20             MR. SEIGEL:  Yes, it is, your Honor, in general.  Not

21   specifically Moonves, but her prior trauma.  He references it

22   and that would be included within it.  What he says is that you

23   can't associate her alleged damages to this incident based on

24   her prior alleged traumas.

25             THE COURT:  If he is asked what the prior traumas are,

N4QMCAR3                    Carroll - Direct                    207

1    is he going to be able to answer that question?

2              MR. SEIGEL:  Yes, your Honor.

3              THE COURT:  I'll think about it over lunch.  That

4    takes care of potentially the Moonves incident.

5              MR. FERRARA:  We are happy to provide your Honor with

6    a copy of the report, because there are other instances

7    mentioned and that one is not.  If your Honor would like to see

8    it.

9              THE COURT:  Yeah.

10             MR. FERRARA:  We will provide a copy through your

11   deputy.

12             THE COURT:  Give it to my law clerk.

13             MR. FERRARA:  The second point, which, again, Mr.

14   Tacopina and I briefly discussed and I believe we are at

15   loggerheads, is we concede -- there will be evidence --

16   Ms. Carroll will testify that her second husband, Mr. Johnson,

17   was violent with her on a few occasions.  It was not sexual

18   violence.  We concede that that is something that defense

19   should be allowed to inquire into and how that affected her and

20   the long-term harm.

21             We believe that the reasons for those fights, the

22   underlying discussion of their relationship is out of bounds.

23   We believe it is 403.  We are likely -- I am not sure it's

24   relevant under 402 why they were fighting.  What is relevant

25   is, that they fought, that he was violent with her, and how

N4QMCAR3                    Carroll - Direct                    208

1   that affected her ability to be intimate with men.  We

2   understand.

3           Why they fought is not relevant under 402 and

4   absolutely outweighed under 403.

5           THE COURT:  Mr. Tacopina.

6           MR. TACOPINA:  Your Honor, I think it is relevant

7   because, again, we are citing the plaintiff's book here as the

8   source, so it's her own words.  Why they fought is relevant

9   because if you read the book and take that for what it is and

10  believe her statement in the book, the reason he got violent

11  with her, according to her book, is that she called him an ape.

12  And the fact that she called him an ape, her exhusband, which

13  is why she claims he strangled her is relevant.  It puts into

14  context that particular incident.

15          She also told the expert, her doctor, Dr. Lebowitz,

16  about calling him an ape for the purpose of the evaluation and

17  what it elicited from Mr. Johnson.  The fact that he was

18  violent towards her is going to come in, but not the underlying

19  reason.  I think it is completely relevant.

20          THE COURT:  The underlying reason is most assuredly

21  not coming in.  Nothing about it is coming in.  The violence

22  may come in, as counsel acknowledged, but I disagree with you.

23  I think it's not relevant.

24          But even if it were relevant, in all the

25  circumstances, I think it is a subject on which the unfair

N4QMCAR3                    Carroll - Direct                    209

1  prejudicial effect, outrageously, not substantially,

2  outrageously outweighs any probative value.  And to introduce

3  that in front of a mixed-race jury in New York is, frankly,

4  outrageous, in my opinion.  It's not happening.

5          MR. TACOPINA:  OK, your Honor.  Got your ruling.

6  Those are not my words.  Those are Ms. Carroll's word from her

7  book.

8          THE COURT:  I am not quarreling with her words.  I'm

9  not approving of her words.  But you know what I'm talking

10  about.  And this was well planned.  And mind you, you're a

11  lawyer, you're trying to do your job.  I know just what you are

12  up to.  I am not allowing it.

13          MR. TACOPINA:  I don't know what that means what I'm

14  up to.

15          What I'm trying to is trying to defend a case.  I have

16  a situation where the cause of the assault was written in her

17  book.  So now all the jury is going to hear is he violently

18  assaulted her without a cause.  I don't think that's right.

19  That's all.

20          THE COURT:  You are entitled to your opinion, but it's

21  not mine.

22          (Luncheon recess)

23

24

25

A-1629

1              A F T E R N O O N    S E S S I O N

2                         2:05 p.m.

3         (Jury not present)

4         THE COURT:  Good afternoon.  Unfinished business

5   before lunch.  Defense can go into the Moonves question, not

6   the dentist.

7         Anything else.

8         MR. FERRARA:  Just one other thing, your Honor.  We

9   had briefed --

10        THE COURT:  Can't hear you.

11        MR. FERRARA:  I am so sorry.

12        THE COURT:  You are not the one who scraped the chair.

13        MR. FERRARA:  We have briefed the funding issue for

14  your Honor and that, again, it's not imminent in my direct, but

15  if your Honor will -- we of course think it is wholly

16  inadmissible, but if your Honor would allow it I would, again,

17  elicit some direct.  So we would just ask for a ruling.  We

18  think funding is inadmissible, irrelevant, etc., and those

19  papers have been in front of your Honor but it's something we

20  would like to get into if your Honor says it is coming in.

21        THE COURT:  Do you expect to finish the direct this

22  afternoon?

23        MR. FERRARA:  There is a chance.

24        THE COURT:  Well, sufficient unto the day.  We will

25  see where we get.  But it's precluded unless and until I rule

N4q2Car4                    Carroll - Direct                    211

1    otherwise.  I think my order made that clear.

2              MR. FERRARA:  It did, your Honor, but we think it

3    would be unfairly prejudicial -- if your Honor thinks it comes

4    in, then we would like the jury to hear it on direct first.

5              THE COURT:  I understand.

6              MR. FERRARA:  Thank you, your Honor.

7              MR. TACOPINA:  Your Honor, can I?

8              THE COURT:  Mr. Tacopina.

9              MR. TACOPINA:  Just very quickly, your Honor.  I heard

10   the Court's ruling and understand it.  I want to be consistent

11   with the ruling even in something we had discussed.  The book

12   sort of premise and title has to do with a variety of

13   mistreatment by men.  I would like to just ask that general

14   question, without getting into specifics of any particular

15   person or whatnot, because that's part of the sort of thesis of

16   the book, the 21 most hideous men list in the book.  I won't

17   get into any -- except for Les Moonves and maybe this Cam,

18   there won't be any reference to another individual by name or

19   any particular act by name, just the fact that they were a

20   plethora or sort of a group of men that she claims mistreated

21   her throughout her life.  Is that okay?

22             MR. FERRARA:  We don't object to that, your Honor.  We

23   will take it question by question.

24             MR. TACOPINA:  Okay.  That would be it.  Okay.

25             (Continued on next page)

A-1631

N4q2Car4                    Carroll - Direct                    212

1            (Jury present)

2            THE COURT:  Good afternoon, folks.

3            Ms. Carroll, I remind you that you are still under

4   oath.  We will continue now.

5            MR. FERRARA:  Thank you, your Honor.

6   BY MR. FERRARA:

7   Q.  Ms. Carroll, do you recall towards -- a little bit towards

8   the beginning of your testimony I had shown you like a disk?

9   Do you remember that?

10  A.  Yes.

11  Q.  I want to --

12           MR. FERRARA:  Well, your Honor, I think -- well, I

13  want to now move for admission . . .

14           (Counsel confer)

15           MR. FERRARA:  Your Honor, plaintiff offers 55, which

16  is that disk.

17           MR. TACOPINA:  No objection, your Honor.

18           THE COURT:  For the record what is it?  Fine.  55 is

19  received.

20           MR. FERRARA:  Pardon me.  I'm sorry.  I misspoke.

21  It's 112.

22           THE COURT:  Strike 55.  Plaintiff's 112 is received.

23           MR. FERRARA:  Thank you, Ms. Crowley.

24           (Plaintiff's Exhibit 112 received in evidence)

25           (Video played)

A-1632

1    BY MR. FERRARA:

2    Q.  If we pause just briefly.

3           So Mr. Lam, we can show this on -- to the jurors,

4    please.  So before we -- oh, and let me also actually show

5    you -- sorry, Mr. Lam.  Let's just take this down briefly.

6           Can we show the witness what's been marked for

7    identification as 112T.  Oh, and we should take this off.

8    Sorry, Mr. Lam.  We shouldn't publish it.

9           So what is this we are looking at?

10   A.  This is a transcript of Roger Ailes interviewing Donald

11   Trump on Roger Ailes' television show called *Straightforward*.

12   Q.  Did you read, did you follow along with this transcript

13   while you watched the first, say, minute --

14   A.  Yes.

15   Q.  -- of the video.

16          And does the transcript accurately reflect what is

17   said in the video?

18   A.  Yes.

19          MR. FERRARA:  Plaintiff offers 112T, your Honor.

20          THE COURT:  It is received.

21          (Plaintiff's Exhibit 112T received in evidence)

22          THE COURT:  Members of the jury, this requires a

23   little explanation.

24          You are about to see a video and this you have heard

25   is a transcript of audio on the video disk you are about to

A-1633

1    see.  It is the video that is truly the evidence here.

2    Whatever you see and hear on the video, that's the evidence.

3    The transcript was prepared by somebody else.  It's an aid to

4    following the video and the sound on the video.  If you were to

5    perceive a difference between the sound on the video and the

6    transcript, it's the sound that you hear that's the evidence,

7    not the transcript.

8              Okay.  Let's go.

9              MR. FERRARA:  Thank you, your Honor.

10             And we will have 112T in evidence but, Mr. Lam,

11   perhaps we could just use the screen to show the video, which I

12   think will be clear.

13             (Video played)

14             MR. FERRARA:  We can take that down Mr. Lam.  Thank

15   you.

16   BY MR. FERRARA:

17   Q.  Remind us, who is Mr. Trump speaking with in this

18   interview?

19   A.  That's Roger Ailes, the respected broadcaster who also

20   started Fox News.

21   Q.  When did Mr. Ailes' show run on television in relation to

22   your show?

23   A.  My shown ran live at 4:00 in the afternoon.  Roger's show

24   aired live at 8:00.  My show reran in New York at 11:00 on

25   tape, then Roger's show followed mine at 12.

Case 23-793, Document 81, 11/20/2023, 3592067, Page254 of 300

A-1634

1   Q.  Where were Mr. Ailes' studios in relation to your studio --

2   or set?  Let me --

3   A.  Sets.  They kept Roger's set on the sets -- we -- many of

4   the shows use the same studio, so they break the sets between

5   shows and then put them up.  Roger had -- he did live shows in

6   New Jersey and he did live shows also in New York.  So we ran

7   into each other almost every day in Fort Lee.

8   Q.  When you say "we," who do you --

9   A.  Roger and I.

10  Q.  Do you recall ever seeing Mr. Trump on Mr. Ailes' set?

11  A.  No.

12  Q.  And do you recall -- sitting here today, Ms. Carroll, do

13  you know when exactly that interview was filmed or aired?

14  A.  I have a pretty good idea.

15  Q.  When do you think that was filmed or aired?

16  A.  Well, whenever that big parade was.

17  Q.  Okay.  So let's -- so thank you for just going back to

18  that.

19          Let's come back, though, now to where we were, sort of

20  where we had left off before lunch.

21          I think we had finished discussing the assault and

22  sort of your immediate steps that you took.  Looking sort of

23  further out, have you had a romantic relationship since the

24  assault?

25  A.  No.

A-1635

1    Q.  Why not?

2    A.  I -- the short answer is because Donald Trump raped me.

3    Q.  How did that affect you in a way -- can you describe for

4    the jurors why that assault left you unable to form a romantic

5    connection?

6    A.  What I did was I flirted with Donald Trump.  I laughed with

7    him.  I tried to be -- tried to engage him.  I laughed at his

8    jokes.  I found him charming.  And what happened to me when I

9    was flirting?  I got into serious trouble.  And so I, after

10   that event, I found it's impossible for me -- if I meet a man

11   who is a possibility, it's impossible for me to even -- well,

12   to even look at him and smile.  And in order to fall in love or

13   have dinner with someone, you've got to at least look at them

14   in the eye and smile, and I couldn't -- I couldn't force myself

15   to show a man that I liked that I liked them.  I couldn't do

16   it.  It just led to terrible consequences, hence, I didn't meet

17   anybody.

18   Q.  I'm sorry to ask this so directly, but have you had sex

19   since Donald Trump assaulted you?

20   A.  No.

21   Q.  This person you just described to us as sort of having shut

22   down, is that how you portrayed yourself on television

23   following the assault or in public appearances?

24   A.  No, I have a, I have a, I have a public self, which is

25   vibrant and wanting to help everyone, and always, always upbeat

A-1636

1   and always optimistic and always putting forth a strong front.

2   And then I have, you know, a private side, and that's the one

3   that can't admit out loud that there's been any suffering.

4            MR. FERRARA:  May I approach the witness, your Honor?

5            THE COURT:  You may.

6   A.  Thank you.

7   Q.  What is private E. Jean Carroll like?

8   A.  Well, I like her.  I like private E. Jean.  She gets to be

9   quiet and she doesn't have to be the invincible old lady that's

10  my front.  I'm invincible.  I solve other people's problems.  I

11  am the cheerleader.  I'm the one who says you can go on, pick

12  yourself up, you can do it, you can do it.  And when my

13  correspondents don't take my advice, I go right on and say you

14  can do it, you can do it, you can do it.

15           Private E. Jean is -- she -- she is not that

16  cheerleader.

17  Q.  Prior to the assault, had there been extended period of

18  time where you had not, let's say, dated?

19  A.  No.  I loved meeting men.  I loved going out.  I loved

20  conversations.  I loved dancing.  I loved meeting new people,

21  loved it.  I loved life.  I loved living in New York.  It's the

22  best place in the world.

23  Q.  Remind us how old you were when Mr. Trump assaulted you?

24  A.  52.

25  Q.  Could your age have been a reason why you never had sex

N4q2Car4                    Carroll - Direct                    218

1   again?

2   A.  I don't think so.  You know, I feel young.  I'm a young 79,

3   and at 52, some people in this room know, at 52, a woman is

4   really reaching a glorious peak because she's got the right

5   job, she's got the right look, she is not self-conscious about

6   her body anymore, she is confident.  52 is a great, just a

7   great age.  It's one of the most powerful ages a woman can be.

8   Q.  Have you given interviews since you spoke publicly about

9   the assault?

10  A.  Have I?  Yes.

11  Q.  About the assault?

12  A.  Yes.

13  Q.  Do you recall saying in an interview in July 2019 that you

14  think your age may have played a role in why you didn't find a

15  romantic connection again?

16          MR. TACOPINA:  Excuse me.  I'm just going to ask for a

17  specific reference to whatever interview in July of 2019 we are

18  referring to.

19          MR. FERRARA:  Sure.

20          (Counsel confer)

21  Q.  Do you recall saying that in an interview, Ms. Carroll?

22  A.  Can you repeat it please?

23  Q.  Do you recall saying that you -- do you recall suggesting

24  that age may have played a role in why you were unable to find

25  a romantic connection?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4q2Car4                    Carroll - Direct                    219

1   A.  May I see it?

2   Q.  Let's go to -- well, let me come back to it, Ms. Carroll.

3   Let me ask you a different way that I think will have it more

4   at my fingertips.  Let me put it this way.  Do you recall

5   saying -- and just one moment, your Honor.

6               (Counsel confer)

7   BY MR. FERRARA:

8   Q.  Do you recall saying in August of 2019 or around then that

9   you think perhaps it -- your inability to find a romantic

10  connection was not because of Mr. Trump, that it may have been

11  luck?

12  A.  I have said that, specifically I remember saying that in my

13  book.  I thought it -- I thought luck -- I've always believed

14  that luck has a strong influence in everyone's life.

15  Q.  Have you tried to date since the assault?

16  A.  Well, yes.  I mean, I was not unaware that I was not in a

17  romantic relationship.  I was very aware of that and I knew

18  something was wrong.

19  Q.  Have you tried -- have you tried to use dating apps?

20  A.  Yes.

21  Q.  Which ones?

22  A.  Well, mainly I was on dating apps because I was studying

23  the competition because I had two -- I was a founder of two

24  dating sites.  So most of my activity on the dating sites were

25  to look at the competition.  But I confess I was also looking.

N4q2Car4                    Carroll - Direct                    220

1   Q.  Were you able to find anyone, any match?

2   A.  No.

3   Q.  Were you set up on any dates after --

4   A.  Yes.

5   Q.  You are chuckling --

6   A.  My friends noticed that I'd been sitting at home, and so my

7   friends at Esquire, five or six guys, got together and found

8   the perfect man for me and they had a dinner and I was invited

9   and the man was invited.  He was perfect.  He was a journalist.

10  He was just so entertaining, and his conversation was

11  enthralling, and I took one look at him and I was so obnoxious.

12  I didn't laugh at his jokes, didn't look in his eyes, looked

13  away when he was talking because he was a possible.  He was

14  just about right.  Scared me to death.

15  Q.  Why?

16  A.  I -- well, I think it's because -- flirting, flirting ended

17  up as the worst decision of my life.

18  Q.  What is that -- just to be clear, what is that a reference

19  to, the worst decision?

20  A.  Flirting.

21  Q.  The worst decision of your life, what is that a reference

22  to?

23  A.  Going in that dressing room.

24  Q.  Sitting here today, do you believe you were afraid to be

25  around sort of a suitable potential partner?  Was it fear?

A-1640

1          MR. TACOPINA:  I'm sorry.  I really just don't --

2          THE COURT:  Sustained.

3          MR. FERRARA:  I will withdraw that question.

4    BY MR. FERRARA:

5    Q.  How do you feel about not having been in a relationship

6    since the mid '90s?

7    A.  I feel I have lost out.  I'm sorry.  I am a happy person

8    basically, but I'm aware that I have lost out on one of the

9    glorious experiences of any human being.  Being in love with

10   somebody else, making dinner with them, walking the dog

11   together.  I don't have that.  I am -- and just cuddling on the

12   sofa, watching TV, and eating popcorn.  I am aware of how much

13   I have lost and I feel, here's the thing, I feel like I should

14   be able to overcome it.

15   Q.  I want to come back to your second marriage to Mr. Johnson,

16   John Johnson.  Was there violence in that relationship?

17   A.  Yes.

18   Q.  What kind of violence?

19   A.  Well, we were -- it was a very passionate marriage, very

20   passionate, very hot, very tempestuous, lots of fun, I mean, we

21   would laugh so hard I would literally fall out of my chair.

22          But on the flip side of that is we argued.  We were

23   dog and cat.

24   Q.  Was there violence?

25   A.  Yes.

1  Q.  What kind of violence?

2  A.  He strangled me three times.

3  Q.  Was the violence ever sexual?

4  A.  Never.

5  Q.  Did you ever call the police about it?

6  A.  No.

7  Q.  Did you ever sue John Johnson for violence?

8  A.  No.

9  Q.  What is your relationship with Mr. Johnson like today?

10 A.  We are friendly; distant, but friendly.

11 Q.  How, if at all, do you believe that that violence in your

12 marriage affected or caused you to be unable to be with -- to

13 find a partner?

14 A.  Well, John and I had -- as I say, it was very -- it's like

15 many people would consider it to be a -- a wonderful marriage

16 because they didn't see the . . .

17      It -- we -- I'm -- I will confess, we continued to

18 have sex after our divorce, so I don't believe it had any

19 effect on me never engaging in sex after that.

20 Q.  Were you romantic with any other men after you divorced

21 Mr. Johnson?

22 A.  Yes, I had a really quite lovely time with William Goldman.

23 Q.  I'm going to ask about, apologies, another difficult area,

24 Ms. Carroll.

25 A.  Um-hmm.

Case 23-793, Document 81, 11/20/2023, 3592067, Page262 of 300

A-1642

1  Q.  I want to -- was there -- has there been a prior instance

2  of sexual abuse that you suffered involving a camp counselor?

3  A.  Yes.

4  Q.  How old were you?

5  A.  12.

6  Q.  Describe the circumstances of what happened.

7  A.  I had been going to a Girl Scout camp named Ella J. Logan

8  since I was eight and the waterfront director, Cam, was my --

9  he was someone that I wanted to please.  He taught me to swim,

10 he taught me to sail.  He taught me all the canoe strokes.  I

11 wanted to make Cam happy.  We all wanted to make Cam -- we all

12 wanted to have Cam say we were doing well.  And when I turned

13 12, Cam -- this is in 1950, the Girl Scouts had a beauty

14 contest.  I happened to win it.  Cam took me out in the boat to

15 congratulate me and molested and fondled me and that continued

16 for two straight weeks.

17 Q.  Did you tell anyone at the time?

18 A.  No.

19 Q.  Why not?

20 A.  I was ashamed.

21 Q.  Why were you ashamed?

22 A.  Well, I --

23     MR. TACOPINA:  Your Honor, object to the relevance on

24 that one, that last one.

25     THE COURT:  Overruled.

**A-1643**

1  Q.  You can answer it, Ms. Carroll.  Do you remember the -- the

2  question was why did you feel ashamed?

3  A.  I was a child.  I thought I could have stopped him, but

4  I -- it was Cam.  It was Cam.  He would take me into the dining

5  room.  He would always make sure I sat by him and under the

6  table he would run his hand up my legs and into my shorts in

7  front of hundreds -- well, not hundreds, but 90 or 100 fellow

8  campers and I would freeze.  So it's a shameful thing because I

9  couldn't move.

10 Q.  Have you ever sought therapy for that incident?

11 A.  No.

12 Q.  Why not?

13 A.  I thought of it.  I -- the Cam -- I outgrew Cam.  I went

14 back to the same camp the next year, never looked at him, never

15 turned my eyes in his direction.  I became a counselor in

16 training.  At 13, I had solved my own problem.  I went on, I

17 was a brave young woman and didn't look back.  I think I got

18 free of it fairly well.  I have memories of Cam occasionally,

19 that's true.  I probably should have gone to a therapist, but I

20 didn't.

21 Q.  Do you believe that the incident with the camp director

22 could have played a role in why you have been unable to find a

23 romantic partner the last two decades?

24 A.  No.

25 Q.  Why not?

**A-1644**

1  A.  Because he -- Cam didn't -- it was not violent.

2  Q.  Has -- sorry?

3  A.  The incident in Bergdorf's was very violent.

4  Q.  I want to -- for clarification, was the -- you mentioned

5  William Goldman.  Was your relationship with William Goldman

6  before or after Mr. Trump assaulted you?

7  A.  Before.

8  Q.  Have you ever been diagnosed with any mental health

9  conditions such as PTSD or depression?

10  A.  No.

11  Q.  Have you taken any medication for depression or anxiety?

12  A.  No.

13  Q.  Are you a happy person, Ms. Carroll?

14  A.  I am a happy person.  I know it seems strange to hear me

15  after today, but I'm basically a happy person.  But I think I

16  could work on a few things.

17  Q.  How often, if at all, do you think about the assault that

18  night at Bergdorf's?

19  A.  Well, that very night the visions would wash over me.  I

20  couldn't -- it was horrible.  Not only did it happen in

21  Bergdorf, but it happened over and over and over in my mind

22  because I did not have the ability to strike to get the visions

23  out of my head.

24         As I learned to deal with the sudden intrusions, I got

25  better and better at moving them aside.  And so they -- I've

**A-1645**

1    had them ever since the attack.  They were more frequent right

2    after the attack and they stayed about -- I had -- I would be

3    going about my normal day, I would be walking the dog, I would

4    be hiking on -- hiking, and suddenly up would come the vision.

5    Those types of intrusions happened regularly.  I didn't know

6    when they would come, I didn't know when to expect them, but

7    they would absolutely take over my brain.  I would move them

8    aside.  So that was fairly frequent.

9    Q.  Can you give the jurors a sense or examples of what -- what

10   would you see?  What does a vision sort of look like?

11   A.  Just recently, I pulled over to the side of the high -- of

12   the road on my way home because it was late and I thought I

13   would rest my eyes and just take a quick nap.  I closed my

14   eyes.  I must have fallen asleep.  Because when I woke, I felt

15   Donald Trump again on top of me, his huge -- I thought for a

16   minute I was going to die because I couldn't breathe.  That's

17   the sudden, horrible kind.

18           But normally I would be cooking pasta or just going

19   about my normal day, and in would slide just a picture of him

20   going like this into the dressing room or hitting my head or

21   feeling his fingers jammed up inside of me and then with effort

22   I could move those out of my mind.  I think everybody has

23   visions coming up.

24   Q.  Were there specific -- are there specific things, were

25   there specific things that triggered these visions?

A-1646

1   A.  I've never been able to -- if I could figure that out, I

2   would be happy.  The incident I mentioned about pulling over to

3   the side of the road, that happened the very night that I had

4   been with all my *Elle* coworkers, my coworkers from the '90s,

5   and I saw faces that I hadn't seen since the '90s, and I think

6   that may have triggered it.

7   Q.  With whom, if anyone, do you discuss these visions when

8   they occur?

9   A.  Nobody.

10  Q.  Why not?

11  A.  Well, I don't want to ruin somebody else's day.  Also,

12  there are certain people that like to say what did you dream

13  last night or they like to hear what people are thinking.  I

14  just don't like to talk about it.

15  Q.  How, if at all, did Donald Trump's presidential aspirations

16  affect your visions, the frequency or the severity, if at all?

17  A.  Well, in 1950 -- 2015 when he declared for president, he

18  was everywhere.  I mean, we are New Yorkers and he was -- he

19  was not only in New York, he was around the world constantly

20  and all the newspapers, TV, and the cable channels on social

21  media.  I could not avoid him.  I had to get strong or, you

22  know, go live in a locked room.  So I got pretty good.  It was

23  a constant, being hit with the world images of Donald Trump.  I

24  had to get strong.  So they became less, they actually became

25  less.

A-1647

1  Q.  I want to show you what's been marked for identification as

2  Plaintiff's Exhibit 5.  Do you recognize this?

3  A.  Yes.

4  Q.  What is this?

5  A.  It's a book that I wrote, a memoir.

6  Q.  Mr. Lam, if we could just flip through so Ms. Carroll could

7  see the entire exhibit.

8          Ms. Carroll, is that the entire book?

9  A.  That was, you know, the front, the back, and a few pages

10 inside.

11         MR. FERRARA:  Your Honor, plaintiffs offer Exhibit 5.

12         MR. TACOPINA:  No objection, your Honor.

13         THE COURT:  Received.

14         (Plaintiff's Exhibit 5 received in evidence)

15 BY MR. FERRARA:

16 Q.  We are going to talk about this book a little bit more in a

17 few minutes, but the reason I want to show it now, if we could

18 turn, Mr. Lam, to page 244, as the numbers go in the book.

19         I'm not going to read this, but I want to call your

20 attention to where it says "have I suffered mental anguish,"

21 etc.  Do you see that?

22 A.  Yes.

23 Q.  And do you see you say "very little"?

24 A.  Yeah.  I see that.

25 Q.  How -- and then if we go down further, do you see where it

1    says "I am fine"?

2    A.  Yes.

3    Q.  Mr. Lam, it's about five lines up to the right.  "I am

4    fine.  I can't explain it."

5    A.  Um-hmm.

6    Q.  There you go.  "But I never suffered."

7    A.  Um-hmm.

8    Q.  Do you see that?

9    A.  Yes.

10   Q.  How do we square that statement with what you have

11   testified to the last few minutes?

12   A.  This is the public -- my public person.  I would never

13   write a book about my suffering.  I'm going to say I'm fine,

14   and also I'm better than fine.  In reality, that is my --

15   that's Ask E. Jean writing this.  This is a woman who answers

16   other people's problems, who has no problems herself, which

17   is -- she says "I'm fine here, I can't explain, but I never

18   suffered."  That's the invincible public woman, not the private

19   one.

20           MR. FERRARA:  We can take this down.  Thank you.

21           Have you made other public statements along these

22   lines, Ms. Carroll?

23   A.  Yes.

24   Q.  Why?

25   A.  I'm presenting a woman to the world who I admire, sort of a

N4q2Car4                    Carroll - Direct                    230

1   female Don Quixote.  Bring me your problems, I will right your

2   wrongs.  I'm also incapable of displaying my weaknesses.  I

3   don't think it helps my readers.  I think my readers like it

4   when I stay strong.

5   Q.  Are you familiar with the show *The Apprentice*?

6   A.  Yeah.

7   Q.  Just briefly what is *The Apprentice*?

8   A.  A show starring Donald Trump.

9   Q.  Have you ever watched the show?

10  A.  Yes.

11  Q.  What did you think of it?

12  A.  I liked it.

13  Q.  How can you like a show that sort of features the person

14  who raped you?

15  A.  I love the premise of ambitious young businesspeople

16  competing for a job.  I thought that was really quite witty and

17  it was different.  It was so much better than, you know, the

18  dating contests and the beauty contests and those -- this was a

19  real contest where you could watch it and learn a thing or two.

20  It was very -- it was beautifully produced.

21  Q.  What about Bergdorf Goodman.  Do you still shop there?

22  A.  Occasionally.

23  Q.  Why?

24  A.  They have some of the loveliest things that the world has

25  ever created.  As I said before, they have some of the

A-1650

1   loveliest sales, so I like to go there and see.

2   Q.  Does being in Bergdorf's trigger the sort of flashbacks you

3   were describing?

4   A.  No, because I'm prepared.

5   Q.  Prepared how?

6   A.  Well, it's like if I'm -- when Donald Trump declared for

7   presidency, I had to be prepared to see him constantly.  When I

8   go into Bergdorf's which is not that often, but when I give

9   myself a treat, I don't -- I'm prepared.

10  Q.  When you were writing your Ask E. Jean column, would you

11  receive letters from readers asking for advice about sexual

12  assault?

13  A.  Yes.

14  Q.  What advice would you give them?

15  A.  See a therapist.  Go to the police.  Report it.  Get the

16  support you need.

17  Q.  Which, if any, of those things did you do --

18  A.  I didn't do a single one of them.

19  Q.  Just let me finish——I apologize Ms. Carroll——so the record

20  is clear for our court reporter's sake.

21          Which of those things did you do after Mr. Trump

22  assaulted you?

23  A.  Not any of them.

24  Q.  Have you taken any of the advice that you would have given

25  the readers?

A-1651

1   A.  No.

2   Q.  Why not?

3   A.  I'm not as smart as I think I am.

4   Q.  We have talked, I have asked you, Ms. Carroll, about

5   whether you saw a therapist, right?  Just to be clear, have you

6   seen a therapist since this case began?

7   A.  Yes.

8   Q.  Was that in connection with the case?

9   A.  Yes.

10  Q.  What, if anything -- do you recall who those person or

11  people -- with whom did you meet?

12  A.  Dr. Leslie Lebowitz and I was terrified because I was being

13  asked to see a therapist.  It was not something I wanted to do

14  at all actually.

15  Q.  Do you know -- if you don't, it's fine.  Do you know

16  whether Dr. Lebowitz diagnosed you with anything?

17  A.  I don't think she did.

18  Q.  Let's change gears a little bit.  Let me ask you some

19  questions about your politics.

20  A.  Okay.

21  Q.  How did you feel when Donald Trump announced he was running

22  for president?

23  A.  I didn't think he would be a good president.

24  Q.  Why not?

25  A.  I thought he -- I thought he was evil.

**A-1652**

N4q2Car4                    Carroll - Direct                    233

1    Q.  Why did you think he was evil?

2    A.  Because he raped me.

3    Q.  What about his politics?  Do you agree with those?

4    A.  I barely know what they are.

5    Q.  What did you think of him as a president?

6    A.  Oh, I thought he was terrible.

7    Q.  Why didn't you speak publicly about the assault when he

8    first started running for election?

9    A.  My mother was dying in Indiana.  I was at her side with my

10   brothers and sisters.  That was during October.  And I

11   noticed—and I'm sure I'm not the only one—that the more women

12   who came forward to accuse him, the better he did --

13          MR. TACOPINA:  Objection, your Honor.

14   A.  -- in the polls.

15          MR. FERRARA:  Apologies.  There was an objection, your

16   Honor.

17          THE COURT:  I'm sorry.  I didn't hear it at all.

18          MR. TACOPINA:  Sorry.

19          THE COURT:  I'm always listening for Mr. Tacopina's

20   very soft voice.

21          MR. TACOPINA:  It hasn't even been that often.

22          THE COURT:  That is true.

23          What is the objection, Mr. Tacopina.

24          MR. TACOPINA:  The reference, your Honor, on line 24,

25   end of line 24.

1           THE COURT:  I see.  No, I'm going to overrule it.

2    BY MR. FERRARA:

3    Q.  When did you --

4           THE COURT:  Let me explain to the jury.  The answer

5    that Ms. Carroll gave is received to the extent it is addressed

6    to the question about why she didn't speak publicly.  She

7    referred to various things that she became aware of through the

8    news or whatever.  That's not received for the truth of those

9    things that were said.  It's received only for the fact that

10   she heard things like that and it informed, in her testimony,

11   her decision not to speak publicly then.

12          Let's proceed.

13   BY MR. FERRARA:

14   Q.  When did your mother pass away?

15   A.  October 9.

16   Q.  Of what year?

17   A.  2016.

18   Q.  Are you registered with a political party?

19   A.  I'm a registered Democrat.

20   Q.  Do you volunteer or do campaign work for a political party?

21   A.  No.

22   Q.  Are you bringing this lawsuit because of your political

23   views?

24   A.  No.

25   Q.  Were your political views part of your reason for writing

**A-1654**

1    the book that we just looked at?

2    A.  No, it didn't enter into it.

3    Q.  For whom did you vote in 2012?

4    A.  Barack Obama.

5    Q.  What about 2016?

6    A.  Hillary Clinton.

7    Q.  In 2020?

8    A.  Joe Biden.

9    Q.  Have you ever voted for a Republican candidate?

10   A.  I have.

11   Q.  For president?

12   A.  No.

13   Q.  Do you donate to any political campaigns?

14   A.  I have once.

15   Q.  To whom?

16   A.  Barack Obama.

17   Q.  Do you recall how much?

18   A.  A thousand dollars.

19   Q.  Have you publicly expressed your dislike of Donald Trump?

20   A.  Yes.

21   Q.  Have you ridiculed him publicly?

22   A.  Yes.

23   Q.  What is your opinion of Donald Trump today?

24   A.  He is vile.

25   Q.  Have you expressed that opinion privately to your friends

N4q2Car4                    Carroll - Direct                    236

1    as well?

2    A.  Yes.

3    Q.  I'm going to show you -- I'm going to show you --

4           MR. FERRARA:  May I have just one moment, your Honor?

5           (Counsel confer)

6    Q.  Ms. Carroll, I'm showing you what's been marked for

7    identification as Plaintiff Exhibit 120.  And if we could turn

8    to the second page of that document, Mr. Lam.  Thank you.

9           Now, just calling your attention to the top, do you

10   recognize that?

11   A.  Yes.

12   Q.  What is that?

13   A.  It's the Most Hideous Men in New York City Walking Tour.

14   Q.  Are you depicted?

15   A.  Yes.

16   Q.  Approximately what year was this photograph taken, do you

17   know?

18   A.  2019.

19   Q.  One moment, your Honor.

20          (Counsel confer)

21          MR. TACOPINA:  One second, your Honor.

22          THE COURT:  Sorry.  Were you addressing me?

23          MR. TACOPINA:  I'm sorry.  I just said one second,

24   your Honor.  We are trying to resolve something here without

25   getting your Honor involved.

N4q2Car4                    Carroll - Direct                    237

1           (Counsel confer)

2    BY MR. FERRARA:

3    Q.  Let's bring that down and let me show you what's been

4    marked for identification as Plaintiff's Exhibit 121.

5    Ms. Carroll, is this the same photograph without maybe some of

6    the text at the bottom?

7    A.  Yes.

8           MR. FERRARA:  Your Honor, plaintiff offers 121.

9           MR. TACOPINA:  No objection.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 121 received in evidence)

12          MR. FERRARA:  If we could publish that, Mr. Lam.

13   Thank you.

14          What do we see here, Ms. Carroll?

15   A.  We see a man wearing a Donald Trump mask and apparently

16   padding on his shoulders and he is spreading out a flag that

17   says Most Hideous Men in New York Walking Tour.

18   Q.  What is the Most Hideous Men in NYC Walking Tour?

19   A.  I had noticed that in New York City you could go on a

20   walking tour for Most Famous Gangsters in New York Walking

21   Tour, The Most Famous Male Writers Walking Tour, The Most

22   Famous Murder Houses in New York Walking Tour and I thought,

23   okay, let's just do a hideous man tour.  But I flipped it.  We

24   visited, within a six-block radius of Fifth Avenue and Sixth

25   Avenue, all the places where rather well-known men mistreated

N4q2Car4                    Carroll - Direct                    238

1   women.  But I didn't -- sometimes I didn't even mention men.  I

2   mentioned the women who stood up to the men who were

3   mistreating them and stood their ground and helped change the

4   culture of sexual harassment and violence.

5   Q.  So was there a Donald Trump stop on your tour?

6   A.  It was in front of Trump Tower.

7   Q.  Was this person in the photograph a part of your tour?

8   A.  No, no, no.  We happened to see him walking -- he was out

9   in front getting $5 per picture, and we stopped and --

10  Q.  Why are you smiling next to someone dressed up at Donald

11  Trump?

12  A.  Because it's funny.  It's not Donald Trump.  He is wearing

13  a plastic mask.  He was personally quite comical because he --

14  before he let us take his picture, he demanded that I give him

15  $5.  So I am laughing.  I gave him the $5.  I mean, he is

16  working hard, give him the $5.

17  Q.  Do you recall how many of these walking tours you did?

18  A.  About six.

19  Q.  How much money would you make off of the tours?

20  A.  I didn't charge.

21  Q.  We could take that down.  Thank you, Mr. Lam.

22         Ms. Carroll, what, if any part of your motivation in

23  bringing this lawsuit is to settle a political score?

24  A.  I'm not settling a political score at all.  I'm settling a

25  personal score because he called me a liar repeatedly and it

N4q2Car4                    Carroll - Direct                    239

1   really has decimated my reputation.  I am a journalist.  The

2   one thing I have to have is the trust of the readers.  If they

3   think I am a liar, it's -- I was fired.

4   Q.  Let's table that for a few minutes.  Let me ask you a few

5   questions on this topic.

6               THE COURT:  Let's take a break here.  15 minutes.

7               (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-1659

1              (Jury not present)

2              THE COURT:  Give me one minute.

3              Before we bring the jury in, the whole subject of

4    litigation funding is precluded.  I'll make a brief remark

5    about it now.

6              In general, litigation funding is not relevant.  Here

7    I allowed very limited discovery against what seemed to me a

8    remote but plausible argument that maybe something to do with

9    litigation funding arguably was relevant to the credibility of

10   one or two answers by this witness in her deposition.  I gave

11   the defense an additional deposition of the plaintiff, and I

12   gave the defense limited document discovery.

13             On the basis of all that, I have concluded that there

14   is virtually nothing there as to credibility.  And even if

15   there were, the unfair prejudicial effect of going into the

16   subject would very substantially outweigh any probative value

17   whatsoever.

18             I may at some point write in more detail, but I don't

19   promise to do so.  That's the ruling.  The subject is closed.

20             MS. KAPLAN:  One quick matter, your Honor.

21             THE COURT:  Yes.

22             MS. KAPLAN:  It seems highly relevant to what your

23   Honor just said.  I had spoken this morning about the Truth

24   Social post from Mr. Trump.  There were actually at least two

25   of them which I will provide to your Honor after court.

N4QMCAR5                                                                      241

1              Unfortunately, at 1:54 p.m. this afternoon,

2    Mr. Trump's son, Eric Trump, put out a tweet -- this is not

3    Truth Social.  This is on Twitter -- that reads:  Zoom out.

4    Jean Carroll's legal battle against my father is allegedly

5    being funded, all caps funded, by political activist Reid

6    Hoffman, cofounder of LinkedIn.  A civil lawsuit being funded

7    by a billionaire with no direct involvement in the case out of

8    pure hatred, spite, or fear of a formidable candidate is an

9    embarrassment to our country, should be illegal, and tells

10   everything you need to know about the case at hand....

11             In light of the Truth Social posts, in light of this

12   tweet by Mr. Trump's son, we obviously are considering whether

13   any remedy here would be appropriate, your Honor.  It seems to

14   us that would be true in any case for a party -- let me put it

15   this way.  If Mr. Trump were going to come in and testify, he

16   would not be able to testify about the topics like litigation

17   funding that your Honor has already excluded.  For him to be

18   able to do, effectively, the same thing or try to, effectively

19   do the same thing, on Truth Social or have his son do the same

20   thing on Twitter seems to us to be highly inappropriate.

21             We are going to do some research on this.  It's just a

22   warning.  We may ask your Honor for some form of relief.  We

23   have to try to figure out what would be most appropriate

24   overnight.

25             THE COURT:  That's up to you.

A-1661

1          Mr. Tacopina.

2          MR. TACOPINA:  Your Honor --

3          THE COURT:  I am not asking for a response.  I was

4    addressing you.  I am not offended.  Don't worry.  I'm

5    addressing you.

6          I said something this morning about your client,

7    perhaps now sailing in harm's way, conceivably with his son, if

8    the report I just heard is true.

9          Remedies that might be available from this Court may

10   not be the only relevant remedies.  If I were in your shoes,

11   I'd be having a conversation with the client.

12         MR. TACOPINA:  Can I just respond now.  You did

13   address me.  We discussed the earlier post this morning.  I

14   heard you and I made my response and my record on that.  I

15   don't need to expound on that further.

16         As far as the tweet from Eric Trump, his son, I will

17   address everything with the appropriate parties.

18         Let me just say this.  This was before your ruling

19   about five minutes ago.  In that tweet there is absolutely

20   nothing offensive or anything even remotely prejudicial.  It

21   was stating a fact that there is -- he actually used the word

22   alleged funding by Reid Hoffman, who hates his father.  That's

23   a fact.  All those things are a fact.  Reid Hoffman posted it

24   himself.  Eric Trump didn't do anything wrong.  Everything he

25   said was true.  I am just pointing out, it was before your

N4QMCAR5                    Carroll - Direct                    243

1    ruling.

2           THE COURT:  Eric Trump isn't before me, so you don't

3    have to defend Eric Trump.  I am simply suggesting to you that

4    there are some relevant United States statutes here and

5    somebody on your side ought to be thinking about them.

6           MR. TACOPINA:  I've been thinking about them.

7           THE COURT:  Good.

8           MR. TACOPINA:  Since our chat this morning.

9           THE COURT:  Good.

10          Let's get the jury.

11          (Jury present)

12          THE COURT:  Thank you.  The witness is reminded she is

13   still under oath.

14          You may continue, counselor.

15          MR. FERRARA:  Thank you, your Honor.

16   Q.  We were talking before we broke, Ms. Carroll, about Donald

17   Trump winning the 2016 presidential race.

18          Do you recall where you were when you learned that he

19   had won?

20   A.  Yes.  I was at Lisa Birnbach's apartment.

21   Q.  That's the same Ms. Birnbach we spoke about earlier?

22   A.  Yes.

23   Q.  What, if anything, did the two of you discuss that night

24   regarding the assault?

25   A.  Well, she -- it was -- Lisa had thrown a big party, and

Case 23-793, Document 81, 11/20/2023, 3592067, Page283 of 300

A-1663

1    there is a lot of activity.  The room was very full.  But I

2    caught her eye, and we looked at each other across the room.

3    And what my look said to Lisa was, can you believe that Donald

4    Trump is now president.  But then I spoke about it to her

5    later, and she had no idea.

6    Q.  I apologize for cutting you off.  I don't necessarily want

7    you to repeat what someone else said unless I ask you a

8    question and the defense can have an opportunity.

9         Let me just ask you this.  At the time did you know

10   what Ms. Birnbach was thinking when she looked at you?

11   A.  I thought I did, but I was wrong.

12   Q.  When did you decide to speak publicly about Mr. Trump

13   assaulting you?

14   A.  I had planned -- my agent called me and said, it's time to

15   write a book.  And I had been revolving an idea of -- over the

16   last 26 years, I had received many, many, many letters from

17   women complaining about men.  And I thought, wouldn't it be

18   interesting to go across the country, talk to women, and find

19   out what they really think about men.  We hear their

20   complaints.  But what do they really think.  So, on the very

21   day I started the trip, the Harvey Weinstein story broke in the

22   Times.

23   Q.  Do you recall what year that was?

24   A.  Yes.  It was 2017.

25   Q.  How did that development in the news impact your thinking

A-1664

1    about what to write about?

2    A.  Well, normally, a story about a man in the Times would not

3    have affected me, but the reaction to the bombshell in the

4    Times from women around the country was startling.  Women

5    started to say what happened to them, that it was not just one

6    woman.  It was woman after woman after woman all standing up

7    and saying what various men had done to them.  It was like a

8    wave broke.  Women were going to be no longer silent.

9         Well, I couldn't help but be affected.  I'm on the

10   road.  I'm interviewing women about men.  I couldn't help but

11   start thinking about the couple of really not great guys that I

12   had encountered in my life, and I started to make a mental list

13   just to see who would be on that list.  That was in November.

14   And by December I had decided to include Donald Trump on the

15   list.

16   Q.  Let's pause there for a moment.  Showing you what's in

17   evidence as Plaintiff's 5.

18        MR. FERRARA:  We can show this to the jury too, Mr.

19   Lam.

20   Q.  Is this the cover of your book?

21   A.  Yes.

22   Q.  The title is *What Do We Need Men For?  A Modest Proposal*.

23   Is that right?

24   A.  Yes.

25   Q.  What does the title mean?

N4QMCAR5                          Carroll - Direct                          246

1    A.  Well, the basic one, if you are going to complain, to ask

2    E. Jean all day long about men are not doing this right, men

3    are not doing that right.  What do we really need them for.  I

4    found out by the end of the trip, women love men.  We need men.

5    We need them for hundreds and hundreds of things.  We just

6    don't want men to run everything.

7    Q.  How do you feel about men?

8    A.  I like them.

9    Q.  You started to describe -- why did -- you were talking

10   about sort of including -- deciding whether to include

11   Mr. Trump on the list or not?

12   A.  Yeah.  It was an inner battle.

13   Q.  If you can describe to the jury your thinking about whether

14   to include the assault in the book or not.

15   A.  I thought I had enough men on the list.  I had 20.  They

16   included everybody from the mechanic that put my wheels on

17   wrong to the man who shouted at me and my dog who drove by in

18   the pickup truck.  I had a man on the list who wouldn't let me

19   park in an empty parking lot.

20        So it was -- in some way it was a comedy.  It had a

21   lot of comedy.  But in other ways the list was very serious.

22   And I went back and forth about -- he's Donald Trump.  He's a

23   sitting president.  I should just go on being silent.

24        And then as I was writing the book, I just decided, E.

25   Jean, if you are going to do it, you are going to come clean,

1    if you expect your leaders to know the truth, the real truth,

2    this is the time.  This is the time.  I thought:  OK, 76 years

3    of being silent.  I'm done with being silent.

4    Q.  When was your book published?

5    A.  2019.

6    Q.  How, if at all, did the fact that Donald Trump was

7    president affect your decision to include him in this book?

8    A.  It was the very fact that he was president that made me

9    really pause over doing it.  I just said, E. Jean, don't be a

10   chicken.  Put the man on the list.  He is the worst of all.  So

11   I did it.

12   Q.  Were you paid an advance for your book?

13   A.  Yes.

14   Q.  How much?

15   A.  $70,000.

16   Q.  Have you received -- for the jury's sake and for mine, what

17   is an advance?

18   A.  An advance -- a publisher, if they like your proposal, they

19   will give you enough money so you can have enough time and

20   resources to write the book.

21   Q.  Have you received any other money for the book?

22   A.  No.

23   Q.  How did that advance, $70,000, compare to other advances

24   for other books?

25   A.  It was way less.

1   Q.  Were you reimbursed for the time you spent on the road

2   interviewing --

3   A.  No.

4        MR. FERRARA:  We can take this down, Mr. Lam.  Thank

5   you.

6   Q.  When you were negotiating with your publisher, how, if at

7   all, did you market -- how did you market this book?

8   A.  Well, in my complete innocence, I thought people would be

9   interested in what women were saying.  I thought readers would

10  like to hear what women thought.  But I was also aware that

11  they will be also interested in the list, and they would be

12  particularly aware and interested in a book that mentioned

13  Donald Trump.

14  Q.  How was the chapter about Mr. Trump and the assault in

15  particular, how was that used to market the book?

16  A.  It was mentioned repeatedly in the proposal.

17  Q.  How has the book sold?

18  A.  Oh, not at all.  Terrible.

19  Q.  Let talk a little about communications you had or

20  discussions with people prior to the book being published.  OK.

21        Before you made the decision -- withdrawn.

22        After you decided to include the assault in the book,

23  with whom, if anyone, other than your writing team, with whom,

24  if anyone, did you share that you had made that decision?

25  A.  I had to send an email to my agent saying, oh, by the way,

1   I am going to mention Donald Trump and that he assaulted me.

2   She was probably the first other person that I told.  So it was

3   Sarah and then it was the editors at St. Martin's, who bought

4   the book.

5   Q.  I apologize.  My question may have been a little unclear

6   there.

7           I meant, outside of the sort of publishing team, who,

8   if anyone, did you tell about the decision?

9   A.  I told Carol and Lisa.

10  Q.  Is that Ms. Birnbach and Ms. Martin?

11  A.  Yes.

12  Q.  Starting with Ms. Birnbach, why did you tell her you had

13  decided to include this account in the book?

14  A.  Because in my first drafts of the book, I mentioned her by

15  name and also mentioned Carol by name, and I wanted them to see

16  the nine pages that were about Donald Trump, and I gave them an

17  early draft of it.

18  Q.  What about Ms. Martin, what did you say to her?

19  A.  I said:  Carol, I would like -- I am going to give you an

20  early draft of the book.  I want you to look at it.  If you see

21  anything that you don't agree with, if I did something wrong,

22  if I got the facts screwed up, let me know, and I gave it to

23  Carol.

24  Q.  How did they respond?

25  A.  I never heard from her.

1   Q.  What did you share with them?

2   A.  I shared nine pages of the draft that I was going to turn

3   in.

4   Q.  Were either of them ultimately named in the book?

5   A.  No.  Prior to publication, I took the names out and just

6   referred to them as two good friends, both journalists.

7   Q.  Did either of them provide any feedback on the excerpt?

8   A.  No.  They are both writers.

9   Q.  The first time that chapter about Donald Trump, do you

10  recall the first time that was sort of published or made

11  public, just maybe as an excerpt?

12  A.  Yes.

13  Q.  When was that?

14  A.  That was at the end of June 2019.

15  Q.  If you recall, in what form was that excerpt first

16  published?

17  A.  That was New York magazine ran an early excerpt of it, and

18  it hit the Internet before it hit the magazine came out in hard

19  copy.  So it ran three days on the Internet before it hit --

20  before the publishing form appeared.

21  Q.  Were you involved in pitching the excerpt to New York

22  magazine?

23  A.  Yes.

24  Q.  Let me show you what has been marked for identification as

25  Plaintiff's Exhibits 6 and 7.

A-1670

1        MR. FERRARA:  Are we able to show those side by side

2   for the witness?

3            Thank you so much.

4   Q.  I think it's going to be right to left, so 6 should be on

5   your right.

6   A.  Right.

7   Q.  What is that?  Do you recognize that?

8   A.  Yes.

9   Q.  What is it?

10  A.  I believe this is -- I can't see the date on it.  I could

11  tell you if it was a hard copy.  The magazine -- in magazine

12  form or whether it was -- here it is.

13           MR. FERRARA:  Thank you, Mr. Lam.

14  A.  This is the online version, which hit the Internet way

15  before it was supposed to.

16  Q.  What's the date on this?

17  A.  June 21.

18  Q.  Of what year?

19  A.  2019.

20           MR. FERRARA:  We could minimize that, Mr. Lam.  Thank

21  you so much.

22  Q.  To the left on your screen is plaintiff's 7.  What is that?

23  A.  I'm deducing that must be the magazine version.

24  Q.  We don't want you to have to deduce.  Do you want us to

25  flip through it so you can see it?

A-1671

1   A.  They had different layouts.  One was the magazine.  One was

2   the Internet.

3          MR. FERRARA:  Mr. Lam, why don't we flip through 7 so

4   Ms. Carroll can see it.

5   A.  Yes.  This is the magazine.

6          MR. FERRARA:  Your Honor, plaintiffs offer 6 and 7.

7   Your Honor, we do so subject to -- I was discussing with Mr.

8   Tacopina.  We may just -- both parties may just take a look at

9   these before they go to the jurors to make sure we are offering

10  only the relevant portions.  We are going to offer them subject

11  to redaction after discussion with defense counsel.

12         THE COURT:  Agreeable, Mr. Tacopina?

13         MR. TACOPINA:  Yes, agreeable.

14         THE COURT:  They are received on that basis.

15         (Plaintiff's Exhibits 6 and 7 received in evidence)

16         MR. FERRARA:  Thank you so much.

17  Q.  Now that the jurors are able to see, Ms. Carroll, on the

18  left, which one do we have?  PX-7, what's that?

19  A.  That's the magazine.

20  Q.  On the right?

21  A.  That's the Internet that broke early.  The story broke

22  early on the Internet.

23  Q.  What is the Cut?  In Plaintiff's 6, you see it says the

24  cut.com in the top left corner.  What is the Cut?

25  A.  The Cut is a section of New York magazine.

Case 23-793, Document 81, 11/20/2023, 3592067, Page292 of 300

A-1672

1          MR. FERRARA:  We can take these down.  Thank you, Mr.

2     Lam.

3     Q.  Why did you publish an excerpt of the book -- why did you

4     publish this excerpt in a magazine before the book was

5     published?

6     A.  When I write a book, it's best to get word out to help book

7     sales.  The more people who read about your book, the more

8     likely they are to pick it up.  So a magazine, particularly New

9     York magazine, was an excellent way to get the word out.

10    Q.  Why this excerpt in particular?  Why was that chosen?

11    A.  I didn't choose it.  The publisher gave the editor of New

12    York magazine the entire book and suggested that they make the

13    cut of the book that they think the New York readers would like

14    and be most interested in.

15    Q.  Were you hoping that this would help sell books?

16    A.  Absolutely.

17    Q.  Why did you choose to publish in New York magazine in

18    particular?  Why that magazine?

19    A.  It's one of the great news magazines.

20    Q.  Where were you -- let's go back.  Were you writing the E.

21    Jean column?

22    A.  Yes.

23    Q.  Remind us what magazine?

24    A.  That was in *Elle* magazine.

25    Q.  If you were writing asking E. Jean for *Elle* magazine, why

1    not publish this excerpt in *Elle* magazine as well?

2    A.   Because *Elle* magazine would never have published this

3    excerpt.

4    Q.   Why not?

5    A.   *Elle* magazine is a beautiful magazine that is about

6    culture, art, music, film.  It is -- the last thing that I

7    would ever publish is an article written by their advice

8    columnist who helps women not get into trouble and solve their

9    problems, this woman confessing that she was making a bad

10   mistake and suffered for it.

11   Q.   Do you know if anyone at *Elle* read the excerpt before it

12   was published in New York magazine?

13   A.   Nobody did.

14   Q.   Had you published standalone articles in other publications

15   before this?

16   A.   Yes.

17   Q.   When you did so, would you typically check with your bosses

18   at *Elle* before doing so?

19   A.   Sometimes.  But *Elle* liked their writers to be published in

20   other magazines.  It accrued well.  They wanted their writers

21   to be seen in other magazines.

22   Q.   Why is that?

23   A.   It added to *Elle*'s -- it burnished *Elle*'s reputation.

24   Q.   I want to show you what has been marked for identification

25   as Plaintiff's Exhibit 11.

A-1674

1          Do you recognize this?

2   A.  Yes.

3   Q.  What is this?

4   A.  It's a Hearst magazine.  Hearst owns *Elle*.  It's the writer

5   agreement for the year.

6   Q.  With what writer?

7   A.  With E. Jean Carroll.

8   Q.  What's the date of this?

9   A.  2000 -- I think that is for 2019 to 2020.

10         MR. FERRARA:  Plaintiff offers Exhibit 11, your Honor.

11         THE COURT:  Mr. Tacopina.

12         MR. TACOPINA:  No objection, your Honor.

13         THE COURT:  It's received.

14         (Plaintiff's Exhibit 11 received in evidence)

15  Q.  Do you see the date up there at the top, Ms. Carroll, that

16  says January 28, 2019?

17  A.  Yes.

18         MR. FERRARA:  We won't walk through the entire thing.

19  It's in evidence.

20  Q.  Is there a clause in this contract that prevents you from

21  publishing -- that prevented you from publishing with other

22  magazines?

23  A.  No.

24  Q.  Is there a clause in this contract that gave *Elle* the right

25  of first refusal for something you had drafted?

1    A.  No.

2            MR. FERRARA:  We can take this down.  Thank you, Mr.

3    Lam.

4    Q.  Were you paid for the Cut article?

5    A.  I was not paid.  The magazine paid for publishing 7,500

6    words, but the money went to St. Martin's.

7            THE COURT:  Who was St. Martin's.

8            THE WITNESS:  St. Martin's was the publisher of *What*

9    *Do We Need Men For*.

10           THE COURT:  The book.

11           MR. FERRARA:  Thank you, your Honor.

12   Q.  Calling your attention to June 9 of 2019, do you recall

13   sharing the excerpt with Ms. Martin and Ms. Birnbach?

14   A.  Yes.

15   Q.  How did you share it with them?

16   A.  I sent it to them in an email attachment.

17   Q.  Why did you do that?

18   A.  Because it was about ready to be published.  They didn't

19   know it was going to be in the magazine.  I had to give them a

20   heads-up.

21   Q.  How, if at all, did they respond?

22   A.  Well, Carol and Lisa are both writers.  And if they had no

23   disagreements with anything that appeared, that was OK.

24   Q.  Just to go back, how -- did they respond?

25   A.  No.  I don't remember.  I honestly don't remember.  I mean,

A-1676

1  they were OK with it.  They would certainly let me know if I

2  got a fact wrong.  Carol and Lisa are both very outspoken, so

3  they would have had no problem telling me if I had something

4  wrong.

5  Q.  Were Ms. Martin and Ms. Birnbach ever publicly identified

6  as the people you had told?

7  A.  Yes.

8  Q.  Let me call your attention to June 27 of 2019.

9          Were you interviewed with Ms. Martin and Ms. Birnbach

10  on or about that day?

11  A.  Yes.

12  Q.  What was the interview for?

13  A.  It was for the New York Times.

14  Q.  Could you describe just for the jury, describe the

15  circumstances of the interview, where it was, who participated.

16  A.  Megan Twohey of the New York Times.  I got on the phone for

17  Lisa Birnbach for an hour and then Carol Martin for an hour and

18  tried to convince them to go on the record.

19          Previous to that, the last three or four days before

20  the Times article, Lisa and Carol had talked with reporters to

21  verify the story, but they didn't want to go on the record.

22          THE COURT:  Would you want to explain please to the

23  jury what that means.

24          THE WITNESS:  That means the New York Times was asking

25  Lisa Birnbach, when we publish our story we want to say Lisa

A-1677

1   Birnbach said.  They wanted to use her name.

2   Q.  Did they agree.

3   A.  Lisa Birnbach agreed only after she called Jamie Lee Curtis

4   and Jamie said:  Lisa, she is a good friend.  Go on the record.

5           THE COURT:  Sustained, sustained, sustained.

6           Just a moment.

7           MR. FERRARA:  If you wouldn't mind --

8           THE COURT:  Just a minute.

9           The jury will disregard everything after Lisa Birnbach

10  agreed.

11          I take it that solves your problem, right, Mr.

12  Tacopina?

13          MR. TACOPINA:  It does, your Honor, yes, sir.

14          THE COURT:  Everything after that is stricken and will

15  be disregarded.

16  Q.  Were you, Ms. Birnbach, and Ms. Martin interviewed together

17  or separately?

18  A.  Together.

19  Q.  How, if at all, did doing that interview together -- pardon

20  me.  What was the interview about?

21  A.  It was about what happened in Bergdorf's.

22  Q.  How, if at all, did conducting that interview together

23  change your recollection of the events?

24  A.  It didn't change my recollection of the event at all.  What

25  surprised me is what they were doing when they received my

Case 23-793, Document 81, 11/20/2023, 3592067, Page298 of 300

A-1678

1   call.  I didn't know Lisa was feeding her children, for

2   instance, so those little details I found surprising.  But as

3   for what happened in Bergdorf's, no, that stayed.

4   Q.  I want to show you what has been marked for identification

5   as Plaintiff's Exhibit 122.

6           Do you recognize this?

7   A.  It's Carol Martin sending me a joke --

8   Q.  I apologize for interrupting you, Ms. Carroll.  It's not

9   yet in evidence.  If you wouldn't mind, is it an email chain?

10  A.  Yes.

11  Q.  Between who is this chain?

12  A.  Carol Martin and myself.

13  Q.  What is the date at the top?

14  A.  Trump names --

15  Q.  I'm so sorry to cut you off.  I do not like to interrupt

16  you, but I don't want you to read it because the judge hasn't

17  decided if the jury is entitled to it.

18  A.  OK.

19  Q.  What is the date of the email?

20  A.  9 -- September 23, 2017.

21          MR. FERRARA:  Your Honor, plaintiff offers 122.

22          MR. TACOPINA:  No objection, your Honor.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 122 received in evidence)

25          MR. FERRARA:  Mr. Lam, if we could start and just take

**A-1679**

1    this in sections.  Why don't we start with the bottom.  Thank

2    you so much.

3    Q.  Do you see here -- what are we looking at here, Ms.

4    Carroll?

5    A.  The subject line, it says:  Trump names Sarah Palin

6    ambassador to Namibia.  And the link is to the New Yorker.

7    It's the humor column by, what's his name, Borowitz, who is

8    very funny.

9            MR. FERRARA:  If we slide up, Mr. Lam, please.

10   Q.  If you look here do you see, Ms. Carroll, September 23 at

11   9:27 a.m., the email from Carol Martin?

12   A.  Yes.

13   Q.  Do you see where it says, as soon as we are both well

14   enough to scheme?

15   A.  Yeah.

16   Q.  We must do our patriotic duty again.

17   A.  Right.

18   Q.  Do you know what Ms. Martin was referring to?

19   A.  I have no idea, none.

20   Q.  If we could go up a little further, do you see here -- this

21   is an email from you to Ms. Martin.

22            Do you see that?

23   A.  Yeah.

24   Q.  Totally, I have something special for you when we meet.

25            Do you see that?

1   A.  Yes.

2   Q.  What was the something special that you had for her?

3   A.  I don't know.  Carol and I like to give each other surprise

4   gifts.  I don't know.

5   Q.  As of September 23, 2017, had you started your road trip

6   for your book?

7   A.  No.  I hadn't even conceived of the book.  Wait.  No.  I

8   had not gone on the trip.

9   Q.  Did you have a sense at this time what you wanted to write

10  about?

11  A.  I was thinking about writing about women complaining about

12  men.

13  Q.  Were you and Ms. Martin scheming to bring down Donald

14  Trump?

15  A.  No.

16          MR. FERRARA:  We can take this down.  Thank you, Mr.

17  Lam.

18  Q.  Let's turn to events that occurred after the piece was

19  published in the online New York magazine.  OK?

20  A.  Yes.

21  Q.  Do you recall how Donald Trump responded after the excerpt

22  was published online?

23  A.  Yes.

24  Q.  What do you recall?

25  A.  A blizzard of negative, derogatory name calling.