# 23-0793-cv

## United States Court of Appeals

*for the*

## Second Circuit

───────────◆───────────

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

─────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 7 of 12 (Pages A-1681 to A-1960)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

   – and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

**i**

**TABLE OF CONTENTS FOR JOINT APPENDIX**

                                                                    **Page**

District Court Docket Entries (20-cv-07311-LAK)
    (hereinafter "*Carroll I*")......................................... A-1

District Court Docket Entries (22-cv-10016-LAK)
    (hereinafter "*Carroll II*") ...................................... A-32

**Documents Submitted in *Carroll I***

Exhibit Annexed to Declaration of Roberta A.
    Kaplan, for Plaintiff, in Opposition to
    Defendant's Motion to Substitute, dated
    October 5, 2020
    (Declaration omitted herein):

    Exhibit A to Kaplan Declaration -
    Letter from Roberta A. Kaplan to Marc E.
    Kasowitz, dated August 10, 2020, with Enclosure    A-60

Memorandum of Law, by Defendant, in Support of
    Motions *in Limine*, dated February 16, 2023......... A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
    dated February 16, 2023 ...................................... A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
    in Support of Omnibus Motion *in Limine*,
    dated February 16, 2023 ...................................... A-89

    Exhibit 1 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Lisa
    Birnbach, dated September 21, 2022 .................... A-92

    Exhibit 2 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Carol
    Martin, dated October 18, 2022 ........................... A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 .................................................. A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 ............................................... A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ......................................... A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ................................................ A-405

iii

**Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................ A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 .......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ...................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ....................... A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 ......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ........................... A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 .................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 .................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ......................................................... A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023 ...................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 ........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

|  | Page |
|---|---|
| Letter from Roberta A. Kaplan to the Honorable Lewis A. Kaplan, dated March 17, 2023 ............... | A-509 |
| Annexed to Letter - Proposed Order ...................................................... | A-511 |

**Documents Submitted in _Carroll II_**

| | |
|---|---|
| Complaint and Demand for a Jury Trial, dated November 24, 2022 ................................................ | A-513 |
| Answer, dated January 27, 2023 ............................... | A-542 |
| First Amended Answer, dated February 10, 2023...... | A-556 |
| Defendant's Letter Motion for Discovery, dated February 10, 2023 ................................................ | A-571 |
| Exhibit A to Defendant's Letter Motion - DNA Report, dated January 8, 2020 ..................... | A-574 |
| Exhibit B to Defendant's Letter Motion - Twitter Post, dated February 25, 2021 .................. | A-602 |
| Plaintiff's Letter Response in Opposition to Defendant's Motion for Discovery, dated February 10, 2023 ................................................ | A-607 |
| Defendant's Letter Reply in Further Support of Motion for Discovery, dated February 10, 2023.... | A-612 |
| Transcript of Conference, dated February 7, 2023 .... | A-614 |
| Notice of Motion, by Defendant, for an Order Granting Partial Summary Judgment, dated February 23, 2023 ................................................ | A-635 |
| Declaration of Matthew G. DeOreo, for Defendant, in Support of Motion for Partial Summary Judgment, dated February 23, 2023...................... | A-637 |

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020.. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ........................................ A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023 ......... A-747

vii

**Page**

Declaration of Alina Habba, for Defendant,
in Support of Motions *in Limine*, dated
February 23, 2023 ................................................... A-773

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 .......................... A-775

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-779

Exhibit C to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022
(Reproduced herein at pp. A-487-A-492)

Exhibit D to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023
(Reproduced herein at pp. A-493-A-499)

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-783

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-785

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 .............................. A-786

Exhibit 2 to Kaplan Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023 ................................................... A-863

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ..................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................ A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)............................................................... A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)............................................................... A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 ................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 ......................... A-1065

x

Page

Declaration of Shawn G. Crowley, for Plaintiff, in
　　Opposition to Defendant's Motions *in Limine*,
　　dated March 9, 2023 ............................................. A-1080

Exhibit 1 to Crowley Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
Video of Deposition of Natasha Stoynoff, taken
October 13, 2022
(All parties are already in possession of video
exhibit) .................................................................. A-1089

Exhibit 3 to Crowley Declaration -
Video of Deposition of Jessica Leeds, taken
October 13, 2022
(All parties are already in possession of video
exhibit) .................................................................. A-1091

Plaintiff's Response to Defendant's Local Civil
　　Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
　　Opposition to Defendant's Motion for Partial
　　Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1110

Exhibit 2 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023
(Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
    Plaintiff, in Further Support of Omnibus Motion
    *in Limine*, dated March 16, 2023 .......................... A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 .......................... A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................ A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 ........................ A-1153

Reply Declaration of Alina Habba, for Defendant,
    in Further Support of Motions *in Limine*, dated
    March 16, 2023 ...................................................... A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022 ................................................ A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
dated April 13, 2023 ................................................. A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 ................................................ A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023................................................ A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 .............................. A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-1207

Plaintiff's Letter Response to Defendant's Motion
to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022  A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ..................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023....................... A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................ A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 .............................. A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................ A-1416

Trial Transcript, dated April 25, 2023....................... A-1420

Trial Transcript, dated April 26, 2023....................... A-1524

Trial Transcript, dated April 27, 2023....................... A-1697

Trial Transcript, dated May 1, 2023........................... A-1851

Trial Transcript, dated May 2, 2023........................... A-2036

Trial Transcript, dated May 3, 2023........................... A-2210

Trial Transcript, dated May 4, 2023........................... A-2375

Trial Transcript, dated May 8, 2023........................... A-2567

Trial Transcript, dated May 9, 2023........................... A-2771

Parties' Trial Exhibits:

PX-1          Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2      "Remarks by President Trump before
Marine One Departure" (Office of the
Press Secretary, June 22, 2019) ............... A-2840

PX-3      "EXCLUSIVE: Trump vehemently
denies E. Jean Carroll allegation, says
'she's not my type'" (*The Hill*,
June 24, 2019)........................................... A-2853

PX-4      Truth Social Post, dated
October 12, 2022...................................... A-2858

PX-6      "Donald Trump assaulted me in a
Bergdorf Goodman dressing room 23
years ago. But he's not alone on the list
of awful men in my life." (New York
Magazine, June 21, 2019) ....................... A-2859

PX-12    Photograph ................................................ A-2879

PX-22    Sixth Floor Construction Plan of
Bergdorf Goodman .................................. A-2880

PX-24    Sixth Floor Construction Plan of
Bergdorf Goodman .................................. A-2881

PX-25    Video Excerpt from Defendant's
Interview with Billy Bush
(All parties are already in possession of
video exhibit) ........................................... A-2882

PX-25-T  Transcript of Video Excerpt from
Defendant's Interview with Billy Bush ... A-2883

PX-26    Video Excerpt from Presidential Debate
(All parties are already in possession of
video exhibit) ........................................... A-2885

xvi

**Page**

PX-26-T    Transcript of Video Excerpt from
Presidential Debate ................................. A-2886

PX-29    Video Excerpt from Defendant's Speech
at Campaign Rally
(All parties are already in possession of
video exhibit) ............................................ A-2887

PX-29-T    Transcript of Video Excerpt from
Defendant's Speech at Campaign Rally... A-2888

PX-31    Video Excerpt from Defendant's Speech
(All parties are already in possession of
video exhibit) ............................................ A-2889

PX-31-T    Transcript of Video Excerpt from
Defendant's Speech................................. A-2890

PX-46    Twitter Post, dated November 15, 2022... A-2891

PX-48    Twitter Post, dated December 12, 2022 ... A-2893

PX-51    Twitter Post, dated January 29, 2023 ....... A-2896

PX-53    Twitter Post, dated January 29, 2023 ....... A-2898

PX-57    Email, dated October 13, 2022 ................ A-2901

PX-112    Video Excerpt from Defendant's
Interview with Roger Ailes
(All parties are already in possession of
video exhibit) ............................................ A-2902

PX-112-T   Transcript of Video Excerpt from
Defendant's Interview with Roger Ailes.. A-2903

PX-200    Video Excerpt from Deposition of
Donald J. Trump, taken October 19,
2022 ......................................................... A-2904

xvii

**Page**

PX-200-T   Transcript of Video Excerpt from
           Deposition of Donald J. Trump, taken
           October 19, 2022......................................  A-2905

DX-CK      Email Regarding Law & Order SVU,
           dated July 23, 2019 ..................................  A-2986

Court Exhibits:

C          Timeline of Events ....................................  A-2987

D          WordPerfect Document Compare
           Summary of Jury Instructions...................  A-2988

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 1, 2023 ....................  A-3024

    Exhibit A to Letter -
    Excerpts of Trial Transcripts..................................  A-3042

    Exhibit B to Letter -
    LinkedIn Post...........................................................  A-3081

    Exhibit C to Letter -
    "One of the Democratic Party's biggest donors is
    exploring a new anti-Trump boycott" (*Vox*,
    July 2, 2020) ...........................................................  A-3083

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated May 5, 2023 ....................  A-3088

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 6, 2023 ....................  A-3091

Verdict Form, dated May 9, 2023 .............................  A-3095

Notice of Appeal, dated May 11, 2023 ......................  A-3099

Notice of Motion, by Defendant, for an Order
    Granting a New Trial or Remittitur, dated
    June 8, 2023 ...........................................................  A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
Motion for a New Trial or Remittitur, dated
June 8, 2023 ............................................................ A-3103

Declaration of Matthew G. DeOreo, for Defendant,
in Support of Motion for a New Trial or
Remittitur, dated June 8, 2023 .............................. A-3134

Exhibit A to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit B to DeOreo Declaration -
Excerpts of Trial Transcripts.................................. A-3136

Exhibit C to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019
(Reproduced herein at pp. A-639-A-667)

Exhibit D to DeOreo Declaration -
Verdict Form, dated May 9, 2023
(Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
Opposition to Defendant's Motion for a New
Trial or Remittitur, dated June 22, 2023 ................ A-3219

Exhibit 1 to Kaplan Declaration -
Excerpts of Trial Transcripts.................................. A-3221

Exhibit 2 to Kaplan Declaration -
Twitter Post, dated June 21, 2019
(Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 ................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 ................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
Second Circuit, dated July 19, 2023 ..................... A-3339

A-1681

1   Q.  Sitting here today, do you recall what he said?

2   A.  Yes.

3   Q.  Can you describe, to the best of your recollection, what

4   you remember.

5   A.  It was surprising because I thought he would deny it

6   because Donald Trump generally denies.

7            MR. TACOPINA:  Objection, your Honor.

8            THE COURT:  Sustained.

9            Rephrase the question, counselor.

10  Q.  Let me do it this way.  Let me show you what has been

11  marked for identification as Plaintiff Exhibit 1.

12  A.  Oh.  Thank you.

13  Q.  Do you recognize this?

14  A.  Yes.

15  Q.  What is this?

16  A.  It's a statement from President Donald J. Trump.

17  Q.  What's the date?  It's at the bottom.

18  A.  June 21, 2019.

19  Q.  Without getting into the substance, is this statement

20  responding to your accusation?

21  A.  Yes.

22            MR. FERRARA:  Plaintiff offers Exhibit 1, your Honor.

23            MR. TACOPINA:  No objection.

24            THE COURT:  Received.

25            (Plaintiff's Exhibit 1 received in evidence)

Case 23-793, Document 82, 11/20/2023, 3592069, Page22 of 300

A-1682

1          MR. FERRARA:  If we could publish this, please, Mr.
2  Lam.
3          Mr. Lam, if we could zoom into the sort of box -- if
4  we could scroll down a little further.  I am not going to read
5  this, but I am just going to leave for the jury to look at.
6  Q.  I just want to call your attention, Ms. Carroll, to just a
7  few lines in this.
8  A.  Yes.
9  Q.  If we look at the second line down, do you see it says I
10  have never met this person in my life?
11  A.  Yes.
12  Q.  She is trying to sell a new book?
13  A.  Yes.
14  Q.  That should indicate her motivation.
15  A.  Right.
16  Q.  I'd like to call your attention to the bottom.  If anyone
17  has information that the democratic party is working with
18  Ms. Carroll and New York magazine, please notify us as soon as
19  possible.
20  A.  Um-hum.
21          MR. FERRARA:  We can bring that down, Mr. Lam.  Let's
22  bring up Plaintiff's 2.
23  Q.  Do you recognize this?
24  A.  Yes.
25  Q.  What is it?

Case 23-793, Document 82, 11/20/2023, 3592069, Page23 of 300

A-1683

1   A.  It's an impromptu press conference with President Trump

2   before Marine One, before the helicopter -- before he gets on

3   the helicopter.

4   Q.  What's the date in the front of this document?

5   A.  June 22, 2019.

6   Q.  Would this be the day after?

7   A.  Yes.

8   Q.  Would this be the day after the piece came out in the cut?

9   A.  Yes.

10  Q.  If we turn to --

11          MR. FERRARA:  Mr. Lam if we can turn to the page that

12  has the Bates stamp ending 1800.  That's the one.

13  A.  Um-hum.

14  Q.  On this page does then President Trump address a question

15  about you?

16  A.  Yes.

17          MR. FERRARA:  Your Honor, plaintiff offers 2 with the

18  same caveat that we will endeavor with defense to make sure

19  that we only have in the relevant portions of this exhibit.

20          MR. TACOPINA:  With that agreement, yes, your Honor.

21          THE COURT:  Received on that basis.

22          (Plaintiff's Exhibit 2 received in evidence)

23          MR. FERRARA:  If we could just show the front page,

24  Mr. Lam.  If we could zoom in on the middle, remarks by

25  President Trump, just so the jury can orient themselves, the

Case 23-793, Document 82, 11/20/2023, 3592069, Page24 of 300

A-1684

1   middle of the page, the date.  If we could now flip to 1800,

2   the bottom question and that response.

3           Is there a way to pull that out?  Thank you so much,

4   sir.

5   A.  Um-hum.

6   Q.  Again, just, to flag a few portions, certainly not to read

7   this all, then President Trump says:  I have no idea who this

8   woman is.

9   A.  Yes.

10  Q.  That you have accused other men of things?

11  A.  Yes.

12  Q.  It's a totally false accusation?

13  A.  Yes.

14  Q.  You see that?

15  A.  Yes.

16          MR. FERRARA:  If we can flip the page to 1801 at the

17  top.

18  A.  Um-hum.

19          MR. FERRARA:  We can now take this down.  Thank you.

20          Why don't we put up, just for the witness.

21  Q.  If I could show you, Ms. Carroll, what's been marked for

22  identification as Plaintiff's Exhibit 3.

23  A.  Yeah.

24  Q.  What is this?

25  A.  This is June 24, 2019.  It is an interview with President

A-1685

N4QMCAR5                     Carroll - Direct                     266

1    Trump by The Hill, the website The Hill.

2              MR. FERRARA:  Your Honor, plaintiff offers Exhibit 3.

3              MR. TACOPINA:  No objection.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 3 received in evidence)

6              MR. FERRARA:  If we could show this to the jurors,

7    please.

8              MR. TACOPINA:  Your Honor, there is no problem with it

9    going in.

10             MR. FERRARA:  If we can sort of minimize this, and we

11   can turn to the next page.

12   Q.  If we look at the top, calling your attention, Ms. Carroll,

13   there, President Trump is quoted as saying:  You are totally

14   lying.

15   A.  Yes.

16             MR. FERRARA:  If we could go to the third paragraph,

17   please, Mr. Lam, where he says:  I'll say it with great

18   respect.  Number 1, she's not my type.  Number 2, it never

19   happened.  It never happened, OK.

20   A.  Um-hum.

21             MR. FERRARA:  We could take that down.

22   Q.  What do you understand that to mean, Ms. Carroll, that

23   you're not his type?

24   A.  It means that besides me being a liar and a woman out to

25   sell books and an operative of the democratic party and a woman

A-1686

N4QMCAR5                    Carroll - Direct                    267

1  who accuses all sorts of other men for rape.  I'm too ugly to

2  attack, too ugly to rape.

3              (Continued on next page)

A-1687

1   Q.  I think before I showed you those exhibits, I think you may

2   have said you were surprised by how Mr. Trump reacted?

3   A.  Yeah.

4   Q.  And I will just ask you directly, Ms. Carroll, you had

5   related, you know, an account in which you said that he had

6   raped you.  How did you expect him to respond?

7   A.  I thought he was going to say it was consensual.

8   Q.  Why was what he actually said so much -- why was it worse

9   than him describing it as consensual?

10  A.  He said it didn't happen.  He said it didn't happen.  He

11  was there.  He knows it happened.

12  Q.  Did anyone from then-president Trump's staff reach out to

13  you about your allegations?

14  A.  No.

15  Q.  Did anyone on his behalf ask about your political

16  affiliations?

17  A.  No.

18  Q.  What about your financial situation?

19  A.  No.

20  Q.  What happened after -- what happened to you after Mr. Trump

21  made those statements?

22  A.  People have gone through much worse than being reviled by

23  president Trump for three days, much worse.  I understand that.

24  But, boy, it hit me and it laid me low because I lost -- I lost

25  my reputation.  Nobody looked at me the same.  It was gone.

1   Even people who knew me would look at me with, you know, pity

2   in their eyes and the people who had no opinion now thought I

3   was a liar and hated me.  Oh my God.  The force of hatred

4   coming at me was staggering.

5   Q.  How did it -- how did that hatred, how did it come at you?

6   In what form?

7   A.  People telling me they are reading about it on the

8   Internet, am I E. Jean Carroll; opening up my e-mail and seeing

9   threats against my life; opening up my *Ask E. Jean* letters

10  which are generally -- you know, it's my lifeline, it gives me

11  spirit, reading Ask E. Jean, and they are saying terrible

12  things to me.

13  Q.  Did I hear -- I apologize.

14          How many messages sort of threatening you physically

15  did you receive?

16  A.  Not a lot, but serious threats, around ten.

17  Q.  What was your reaction to receiving in particular those

18  threatening messages?

19  A.  I bought bullets for a gun that I owned.

20  Q.  What did you do with the messages themselves?

21  A.  Oh, I deleted them immediately.

22  Q.  Why did you delete them?

23  A.  Well, they were on my computer.  I thought I could handle

24  it just by getting -- deleting them and never seeing them

25  again.

A-1689

1   Q.   To be clear, has anyone physically hurt or attacked you

2   since president Trump made those statements?

3   A.   No.

4   Q.   Did you also -- have you also received positive support

5   since --

6   A.   Yes.

7   Q.   Just for the court reporter's sake, I am just going to

8   repeat the question.

9         Have you received positive support since Mr. Trump

10  made those statements?

11  A.   Yes.

12  Q.   In what form has that -- did that take?

13  A.   Loving, heart-swelling letters coming from people all over

14  the country.  You know, it bore me up.  But here's the thing.

15  The vileness and the dirt and the seedy language and people

16  describing what they think I did and why nobody in the world

17  would touch me because of my enormous ugliness, it sort of

18  swamped the heartfelt letters that I was receiving on the other

19  hand.

20  Q.   Sitting here today, are you happy you have spoken publicly

21  about what Mr. Trump did to you or do you regret it?

22  A.   I have regretted this about a hundred times, but in the

23  end, in the end, being able to get my day in court finally is

24  everything to me, so I'm happy.

25  Q.   Are you okay to keep going?  Do you --

A-1690

N4q2Car6                    Carroll - Direct                    271

1   A.  I'm happy.  This is -- I'm happy.  I'm glad that I got to

2   tell my story in court.

3            MR. FERRARA:  Your Honor, I don't want --

4   Q.  Ms. Carroll, do you want to take a moment?

5   A.  Yes, I'm going to get myself together here in court.  This

6   is my moment.  I'm not going to sit here and cry and waste

7   everybody's time.

8   Q.  So shall I keep going?

9   A.  Yes.

10  Q.  Okay.  How, if at all, do you believe that Mr. Trump's June

11  2019 statements have affected your reputation?

12  A.  I am no longer believed.  I got fired.  I lost my readers.

13  I lost eight million readers.  My magazine work has suffered.

14  The number of letters I receive has gone down.  I am still in

15  their swinging.  I've still got my  Ask E. Jean column on

16  Substack, and I have got 19,000 readers.  But it's been a huge

17  loss, and I'm slowly building it back.

18  Q.  If you don't mind, I'm going to unpack some of what you

19  just said.

20           So I think I heard you say you were fired.

21  A.  Yeah.

22  Q.  From where were you fired?

23  A.  *Elle* magazine.

24  Q.  When did they fire you?

25  A.  They fired me -- they came to my house, a five-member

Case 23-793, Document 82, 11/20/2023, 3592069, Page31 of 300

A-1691

1   photographic crew, to take my picture for the next two years,

2   and then at the end of the year they fired me.

3   Q.  Do you know why you were fired?

4   A.  Yes.

5   Q.  Why?

6   A.  Because I accused Donald Trump.

7   Q.  Were you able to obtain a new job?

8   A.  No.

9   Q.  What do you do now for work?

10  A.  I have a Substack.

11  Q.  And what is Substack?

12  A.  A Substack is a way for writers to reach their audience,

13  their readers, directly through newsletters.

14  Q.  What was the readership of your column in *Elle* towards the

15  end, sort of the end of the period you were writing that column

16  for *Elle*?

17  A.  Eight million.

18  Q.  What is the readership of your Substack now?

19  A.  It's probably gone down from -- I just said 19,000, it's

20  probably 18,098.  I don't know.  I haven't looked at it today.

21  Q.  Well, how would you compare financially.  How much were you

22  making your last year at *Elle* versus what you are making now at

23  Substack?

24  A.  Well, because I worked -- because the *Elle* column was

25  published once a month and I received $5,000 a month, I think

A-1692

1    it was $5,000?  Yeah, $5,000 a month.  And now I turn out three

2    columns every week, so I am doing, I don't know, ten times the

3    work, and I still manage to have about the same income.

4    Q.  Might it be a little more?

5    A.  Slightly more, yeah.

6    Q.  Do you pitch work to other publications?

7    A.  Yes.

8    Q.  What other publications have you written for since you left

9    *Elle*?

10   A.  Outside -- no, *Vanity Fair* and *Atlantic*.

11   Q.  I want to ask you a couple of questions about the articles

12   you wrote for *The Atlantic*.

13   A.  Yes.

14   Q.  Are you familiar with a woman named Jessica Leeds?

15   A.  Yes.

16   Q.  Who is Jessica Leeds?

17   A.  Jessica Leeds is a woman my age who came -- who told her

18   story to *The New York Times* about Donald Trump on an airplane

19   in 1980 or 1979.

20   Q.  Have you ever interviewed Ms. Leeds?

21   A.  Yes, I have.

22   Q.  Why?

23   A.  When I told my story, people started to compare me to the

24   other women who have come forward.  And as a journalist, I

25   realize that the other women's stories had not been told in

A-1693

1   detail.  The press tends to use words like "grope" and "grab."

2   I wanted to know, as a journalist --

3            MR. TACOPINA:  I'm sorry, your Honor.  I'm going to

4   object and ask that line 23 on be stricken.  You know, you made

5   a previous ruling, your Honor, regarding what's coming into

6   this case and what's not.

7            THE COURT:  What are you asking me to strike,

8   Mr. Tacopina?

9            MR. TACOPINA:  23 on.  Referring apparently to other

10  people than Ms. Leeds, and that's certainly not relevant here

11  and not admissible.

12           THE COURT:  Members of the jury, I think we will break

13  here and let me deal with the lawyers on this, so I will see

14  you tomorrow morning.  We will start at 10 again.  Actually we

15  will really start at 10, God willing.

16           Before the jury leaves—thank you very much for

17  this—I want to emphasize to you my instruction about not

18  looking at anything whatsoever in the press, online, or letting

19  anybody talk to you about this case or tell you anything about

20  it.  Very important.

21           So see you tomorrow morning.

22           (Jury not present)

23           THE COURT:  Everyone can be seated.  Ms. Carroll, you

24  can sit down at counsel table if you want.

25           THE WITNESS:  Oh, thank you.

**A-1694**

N4q2Car6                    Carroll - Direct                    275

1      THE COURT:  Make clear, Mr. Tacopina, what your point

2 is.

3      MR. TACOPINA:  My point was, your Honor, that the

4 witness started -- in an answer as to why she had interviewed

5 an individual who was one of the two individuals you allowed

6 into this case regarding propensity evidence, she started going

7 into other women and that's supposed to be not in this case.

8 And apparently, you know, that's the second time it's happened.

9 It shouldn't be -- there should be an instruction to the

10 witness not to mention other women.  There is Ms. Leeds and

11 Ms.Stoynoff.  We are trying to work something out here

12 regarding the line of questioning, but my objection was the

13 fact that it was going on about -- the question was why did you

14 interview her, and the answer had to do with other women had

15 come forward.

16      MR. FERRARA:  We have no objection, your Honor, to

17 striking that portion.  I think Ms. Carroll is covering a lot

18 today.  We have no problem with -- to be candid, it is

19 something that we are not trying to import inappropriate

20 testimony through open-ended questions.  Of course that's not

21 what we are trying to do, and we are happy -- I'm happy to say

22 it in front of everyone, or if your Honor wants to, it is not

23 something we are trying to import.  We are not trying to import

24 accusations against other women through this testimony.

25      THE COURT:  Okay.  In view of the agreement, maybe you

A-1695

```
N4q2Car6                    Carroll - Direct                    276
```

1    can even agree on exactly what you want stricken and remind me

2    in the morning when the jury is here because they are gone now.

3              How much longer on the direct, Mr. Ferrara?

4              MR. FERRARA:  Probably 40 minutes, your Honor, 35

5    minutes.

6              THE COURT:  Okay.

7              MR. FERRARA:  I'm pretty -- I'm in the last, say, ten

8    or so pages.

9              THE COURT:  Okay.  Anything else this evening?  No?

10   Fine.  See you tomorrow.

11             MR. TACOPINA:  10:00, your Honor.

12             THE COURT:  Yes.

13             (Adjourned to Thursday, April 27, 2023, at 10 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

A-1696

277

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                        Page
      CHERYL L. BEALL
 3    Direct By Ms. Kaplan . . . . . . . . . . . . 113
      Cross By Mr. Brandt  . . . . . . . . . . . . 131
 4    Redirect By Ms. Kaplan . . . . . . . . . . . 143

 5    E. JEAN CARROLL

 6    Direct By Mr. Ferrara  . . . . . . . . . . . 147

 7                    PLAINTIFF EXHIBITS

 8    Exhibit No.                          Received

 9    24   . . . . . . . . . . . . . . . . . . . 120

10    22   . . . . . . . . . . . . . . . . . . . 128

11    13   . . . . . . . . . . . . . . . . . . . 149

12    15, 16  . . . . . . . . . . . . . . . . . . 152

13    19   . . . . . . . . . . . . . . . . . . . 153

14    12   . . . . . . . . . . . . . . . . . . . 161

15    14   . . . . . . . . . . . . . . . . . . . 167

16    112  . . . . . . . . . . . . . . . . . . . 212

17    112T  . . . . . . . . . . . . . . . . . . . 213

18    5  . . . . . . . . . . . . . . . . . . . . 228

19    121  . . . . . . . . . . . . . . . . . . . 237

20    6 and 7  . . . . . . . . . . . . . . . . . . 252

21    11  . . . . . . . . . . . . . . . . . . . . 255

22    122  . . . . . . . . . . . . . . . . . . . 259

23    1  . . . . . . . . . . . . . . . . . . . . 262

24    2  . . . . . . . . . . . . . . . . . . . . 264

25    3  . . . . . . . . . . . . . . . . . . . . 266
```

N4RMCAR2

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                   Plaintiff,              New York, N.Y.
4
              v.                           22 Civ.10016 (LAK)
5
     DONALD J. TRUMP,
6
                   Defendant.
7    ------------------------------x       Jury Trial

8                                          April 27, 2023
                                           10:50 a.m.
9

10   Before:

                       HON. LEWIS A. KAPLAN,
11
                                           District Judge
12                                          and a Jury

13
                           APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant
```

N4RMCAR2                          Carroll – Direct

1               (Pages 278-307 SEALED)

2               THE COURT:  Good morning, everyone.  Let's bring in

3     the jury.

4               MR. FERRARA:  Your Honor, as the jury comes in, your

5     Honor may remember that defense was kind enough to offer giving

6     us their -- some of their impeachment evidence at the break

7     after the direct.  We would ask your Honor if there is possible

8     to have a slightly longer break at that time so --

9     understanding.

10              THE COURT:  Because we are making such great time.

11    OK.  I take the point.

12              (Jury present)

13              THE COURT:  Good morning, ladies and gentlemen, I know

14    it's no consolation.  I'm sorry we are getting a late start

15    with you.  The lawyers and I have been working on matters

16    related to this case that needed to be addressed before we

17    resumed this morning for the last hour or so, and it just was

18    something that had to be done then.  Sorry for the delay.

19              Ms. Carroll, you are still under oath.

20              Mr. Ferrara you may continue.

21              MR. FERRARA:  Thank you, your Honor.

22    E. JEAN CARROLL, resumed.

23    DIRECT EXAMINATION (cont'd)

24    BY MR. FERRARA:

25    Q.  Good morning, Ms. Carroll.

N4RMCAR2                          Carroll - Direct

 1   A.  Good morning.

 2   Q.  We were talking yesterday about the book you wrote.

 3            Do you recall that?

 4   A.  Yes.

 5   Q.  I am referring to the book in which you discussed Mr. Trump

 6   assaulting you.

 7            Do you recall that?

 8   A.  Yes.

 9   Q.  In that book, did you also discuss Les Moonves assaulting

10   you?

11   A.  Yes.

12   Q.  Who is Les Moonves?

13   A.  Les Moonves was the president and CEO of CBS.

14   Q.  What did Mr. Moonves do to you?

15   A.  After an interview with Mr. Moonves, I entered an elevator.

16   He followed me and pushed me up against the wall.

17   Q.  Who, if at all, did you tell about that after it happened?

18   A.  No one.

19   Q.  Was the book the first time you spoke publicly about that?

20   A.  Yes.

21   Q.  How did Mr. Moonves react?

22   A.  Very quietly.  He denied it within a group of other denials

23   that other women had made.

24   Q.  Against Mr. Moonves?

25   A.  Yes.

**A-1700**

N4RMCAR2                          Carroll - Direct

1   Q.  Have you sued Mr. Moonves for defamation?

2   A.  No.

3   Q.  Why not?

4   A.  He didn't -- he did not defame me.  He did not call me a

5   liar.

6   Q.  How is Donald Trump different?

7   A.  Donald Trump called me a liar, said I was pulling a scam,

8   said I was a con, I was running a con, that I was a democratic

9   operative, that I had accused other men of rape, that I was in

10  it for the money, that I was in it for the attention.  And Les

11  Moonves stayed quiet.

12  Q.  Let's go back -- I was asking you about some work you've

13  done since *Elle* fired you.

14  A.  Yes.

15  Q.  We are talking about some articles that you had written for

16  the Atlantic.

17          Do you recall that line of questioning?

18  A.  Yes.

19  Q.  Let me ask you, was one of the articles about someone named

20  Natasha Stoynoff?

21  A.  Yes.

22  Q.  Who is Ms. Stoynoff?

23  A.  Ms. Stoynoff is a respected journalist.  She was a reporter

24  for *People* magazine.  And her beat was Donald Trump.

25  Q.  Why did you decide to write an article about Ms. Stoynoff?

A-1701

N4RMCAR2                          Carroll – Direct

 1   A.  Ms. Stoynoff had accused Donald Trump.

 2   Q.  Was that interview published?

 3   A.  Yes.

 4   Q.  Was your interview with -- during your interview, did you

 5   discuss Ms. Stoynoff's allegations against Mr. Trump?

 6   A.  Yes.

 7   Q.  Was that interview an attempt by you to influence her story

 8   in any way?

 9   A.  Oh, no.  You can't influence Natasha Stoynoff.

10   Q.  How, if at all, did that interview change your recollection

11   of what happened to you?

12   A.  Oh, not at all.

13   Q.  Have you given interviews since your book was published?

14   A.  Yes.

15   Q.  Do you recall some of the interviews you have given?

16   A.  Yes.  The Washington Post, New York Times.  The Daily

17   Beast, CNN, Lawrence O'Donnell, the Anna Sale podcast.

18   Q.  I noticed you coughing.  I know the water on your left is

19   fresh.  I don't know about the water on the right.  Stick with

20   the left.  Perfect.

21           How about Anderson Cooper?

22   A.  Yes.  I did an interview with Anderson Cooper.

23           MR. FERRARA:  May I approach the witness, your Honor?

24           THE COURT:  Yes.

25   Q.  I want to show you what has been marked as Plaintiff's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 82, 11/20/2023, 3592069, Page42 of 300

A-1702

N4RMCAR2                          Carroll - Direct

1   Exhibit 108.

2           Do you recognize that?

3   A.  Yes.

4   Q.  What is that?

5   A.  This is a DVD that I viewed on April 23, 2023, and it's

6   written Anderson on it.

7   Q.  I am going to come take that back.

8           If you look at the screen in front of you, is this a

9   still from the video?

10  A.  Yes.

11  Q.  Does the video fairly and accurately depict your -- part of

12  your interview with Mr. Cooper?

13  A.  Yes.

14  Q.  Do you recall when the interview took place?

15  A.  Yes, I do.  The story came out on a Friday and this

16  interview was on Monday.

17  Q.  You're saying shortly after your story came out?

18  A.  Yes.

19          MR. FERRARA:  Your Honor, plaintiff offers 108.

20          MR. TACOPINA:  No objection, your Honor.

21          THE COURT:  Received.

22          (Plaintiff's Exhibit 108 received in evidence)

23          MR. FERRARA:  If we could also pull up 108-T just for

24  the witness.

25  Q.  Do you recognize this, Ms. Carroll?

Case 23-793, Document 82, 11/20/2023, 3592069, Page43 of 300

A-1703

N4RMCAR2                          Carroll - Direct

 1   A.  Yes.

 2   Q.  What is this?

 3   A.  This is a transcript of the interview with Anderson Cooper.

 4   Q.  Were you able to follow along with this transcript as you

 5   watched the video?

 6   A.  Yes.

 7   Q.  Does it fairly and accurately --

 8   A.  It was perfectly accurate.

 9   Q.  Transcript of what you recall seeing?

10   A.  Yes.

11           MR. FERRARA:  Plaintiff offers 108-T, your Honor.

12           THE COURT:  Received.

13           (Plaintiff's Exhibit 108-T received in evidence)

14           THE COURT:  Members of the jury, I remind you about

15   what I said concerning transcripts versus recordings of sound

16   and video.  It applies here too.

17           MR. FERRARA:  We can take this down for a moment.  We

18   will come back.

19   Q.  Ms. Carroll, to be clear, is the exhibit I showed you, 108,

20   is that the entire interview or just part of it?

21   A.  That was just a slice.

22   Q.  Before we look at it, let me ask you, do you recall

23   describing rape as sexy when you spoke to Mr. Cooper?

24   A.  No.

25           MR. FERRARA:  If we could play Plaintiff's 108,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4RMCAR2                        Carroll - Direct

1    please, Mr. Lam.

2              (Video played)

3              MR. FERRARA:  We can pause it there.  Thank you so

4    much, Mr. Lam.

5    Q.  Ms. Carroll, what did you mean when you said most people

6    think of rape as sexy?

7    A.  I meant that rape is used in our culture in entertainment.

8    For instance, in the Game of Thrones there are nine violent

9    rapes, and they were used as plot developments to draw in the

10   audience and to attract a larger audience.  I'm talking about

11   even old movies, like *The Fountainhead* with Gary Cooper and

12   Patricia Neal portrayed rape on the screen.  It is everywhere

13   used to attract an audience and they are using it, I think,

14   because it has sexual connotations.

15   Q.  Do you believe rape is sexy?

16   A.  No.  I think rape is one of the most violent and horrible

17   things that can happen to a woman or a man.

18   Q.  Do you believe that what Donald Trump did to you is sexy?

19   A.  No, no.

20   Q.  I want to turn now to the topic of the lawsuit, the

21   lawsuits that you filed.

22   A.  Yes.

23   Q.  Let's go back to November 2019.

24   A.  Yes.

25   Q.  Do you recall suing Donald Trump around that time?

N4RMCAR2                         Carroll - Direct

1    A.  Yes.

2    Q.  What did you sue him for?

3    A.  Defamation.

4    Q.  Why?

5    A.  Because he called me a liar, because he said I had accused

6    other men of rape.  He said I was an operative or in a

7    conspiracy with the democratic party.  He said I was trying to

8    sell a book, so I made up this story.  And he said I was too

9    ugly to rape.  So I sued him.

10   Q.  Did anyone tell you to sue him?

11   A.  No.

12   Q.  When did you get the idea of bringing a lawsuit?

13   A.  It was constant -- when I was doing interviews with

14   journalists, many journalists concluded their interviews by

15   asking me, are you going to sue him?  And I would say I'm

16   thinking about it, but probably not.

17   Q.  Was there any conversation that crystallized the idea for

18   you?

19   A.  Yes.

20   Q.  What was that?

21   A.  I had a conversation with George Conway.

22   Q.  Who is George Conway?

23   A.  George Conway is a republican lawyer.

24   Q.  If you know, do you know Mr. Conway's views on Donald

25   Trump?

N4RMCAR2                       Carroll - Direct

1    A.  George Conway does not like Donald Trump.

2    Q.  When did you meet George Conway?

3    A.  I met him at a party.

4    Q.  Whose party?

5    A.  Molly Jong-fast.

6    Q.  Who Ms. Jong-Fast?

7    A.  She is the well-known respected journalist and podcaster,

8    the daughter of Erica Jong.

9    Q.  Do you recall when the party was?

10   A.  I think it was in July.

11   Q.  Of what year?

12   A.  2019.

13   Q.  Were you struggling financially when you filed the lawsuit

14   in November 2019?

15   A.  No.

16   Q.  Were you -- where were you working then?

17   A.  I was at *Elle* magazine.

18   Q.  Were you hoping to make a large payout from that case?

19   A.  It's not about the money.  It's about getting my name back.

20   Q.  Have you tweeted about the case since you filed?

21   A.  Yes.

22   Q.  I apologize.  For the court reporter's sake, let me finish

23   the question.

24          Have you tweeted about the case since you filed it?

25   A.  Yes.

N4RMCAR2                         Carroll – Direct

1    Q.  Why?

2    A.  I'm a journalist.  From time to time, I report on the case.

3    It's something that I find interesting.  I think a few other

4    people might also.

5    Q.  For my next question, if you could remind the jurors, you

6    currently write for Substack?

7    A.  Yes.

8    Q.  Remind us quickly, what is Substack?  What do you write for

9    Substack?

10   A.  Substack is a way for writers, journalists to reach their

11   readers through newsletters.

12   Q.  Have you encouraged people to subscribe to your Substack in

13   order to get updates from you about this case?

14   A.  Yes.

15   Q.  Why have you done that?

16   A.  I thought people would be interested, and I certainly have

17   received the response that they are very, very interested in

18   this case.

19   Q.  How, if at all, does it help you financially to have

20   additional subscribers to your Substack?

21   A.  It would definitely help financially.

22   Q.  How did you feel when you first filed the case in 2019?

23   A.  Scared, but proud.

24   Q.  Fair to say this is -- would this be the fourth year that a

25   lawsuit has been going on?

N4RMCAR2                        Carroll – Direct

1   A.  Yes.

2   Q.  From the time you filed it to now, have there been

3   important moments along the way?

4   A.  Yes.

5   Q.  How, if at all, have you celebrated some of those moments?

6   A.  I wouldn't call celebrating, but I would call it enjoying a

7   good moment.

8   Q.  How have you enjoyed those good moments?

9   A.  Meet with my friends.  We might have a toast.  And feel

10  that we were happy to be together.

11  Q.  Have some of those been what we think of as parties?

12  A.  Yes.

13  Q.  What sorts of folks would be at some of these parties?  Can

14  you give us a sense?

15  A.  Yes.  Journalists, podcasters, commentators.

16  Q.  How about folks we would think of as celebrities?

17  A.  Yes.

18  Q.  Have you enjoyed the attention you have received from this

19  case?

20  A.  I like attention.  There is no question, I like attention.

21  I don't particularly like attention because I'm suing Donald

22  Trump.  That is not -- getting attention for being raped is

23  not -- it's hard.  Getting attention for making a great

24  three-bean salad, that would be good.

25  Q.  Do you ever regret bringing this lawsuit?

Case 23-793, Document 82, 11/20/2023, 3592069, Page49 of 300

N4RMCAR2                          Carroll - Direct

1    A.  About five times a day.

2    Q.  Why?

3    A.  It is -- it doesn't feel pleasant to be under threat.

4    Q.  How do you mean?

5    A.  Well, this morning, for instance, I thought I would just

6    take a peek at my Twitter.  I pretty much stayed away from it.

7    I thought today I would take a look.  There it was again, the

8    onslaught of the liar, slut, ugly, old.  It went on, just

9    rolling, rolling.  It's not a great way to begin the day.  But

10   I couldn't be more proud to be here.

11   Q.  Has anyone reached out to you, Ms. Carroll, about

12   potentially filming a documentary about you?

13   A.  Yes.

14   Q.  About how many people have reached out?

15   A.  Between eight and nine.

16   Q.  How have you responded to those?

17   A.  I ignored their emails.

18   Q.  All of them?

19   A.  No.  One I kept ignoring, and then a friend from *Elle* said,

20   you had better answer Ivy Meeropol emails.

21   Q.  Is Ivy Meeropol a documentarian?

22   A.  Ivy Meeropol is a well-known and greatly respected maker of

23   documentary films.

24   Q.  Are you currently filming a documentary?

25   A.  No.

N4RMCAR2                         Carroll - Direct

1    Q.  Why did you agree in the first place?

2    A.  I was a big admirer of Ivy's work.

3    Q.  Why did you stop filming?

4    A.  Because this lawsuit became very important, and Ivy and I

5    decided together, we should cease.

6    Q.  Have you received any payments for that documentary?

7    A.  No.

8    Q.  I want to call your attention -- I think this is sort of

9    the last topic.  I want to call your attention to October of

10   2022.

11   A.  Yes.

12   Q.  Do you recall, what, if any, additional relevant statements

13   did Donald Trump make at that time?

14   A.  Just when I had managed to get my Substack up and running,

15   get my career a little bit back and feeling that things were

16   going to be OK, Donald Trump posted on social media every

17   single thing that I was suing him for.  He repeated it on

18   October 12 and then added the fact that he thought the justice

19   system in America was broken, and one of the prime examples of

20   the justice system being broken was my suing him.

21   Q.  Let me show you what has been marked for identification as

22   Plaintiff's Exhibit 4.

23            Do you recognize this?

24   A.  Yes.

25   Q.  What is it?

N4RMCAR2                         Carroll - Direct

1    A.  This is Donald Trump's Truth Social piece.

2    Q.  Are you able to see the date?

3    A.  October 12, 2022.

4             MR. FERRARA:  Your Honor, plaintiff offers 4.

5             THE COURT:  Received.

6             (Plaintiff's Exhibit 4 received in evidence)

7             MR. FERRARA:  If we could show that to the jury, Mr.

8    Lam.

9             THE COURT:  Yes.

10             MR. FERRARA:  Thank you.

11             Mr. Lam, maybe we could scroll up and focus right

12   underneath where it says statement by Donald J. Trump.  That

13   probably works.

14   Q.  Is this the statement, Ms. Carroll, where Mr. Trump called

15   your case a con job?

16   A.  Yes.

17   Q.  Where he called the justice system a broken disgrace?

18   A.  Yes.

19   Q.  Just focusing on the middle, again, he says, this woman is

20   not my type?

21   A.  Yes.

22             MR. FERRARA:  I am just giving the jurors another

23   moment to read it, your Honor.  Of course, the jurors will have

24   this as a marked exhibit.

25             Mr. Lam, I will ask that you take this down and we can

Case 23-793, Document 82, 11/20/2023, 3592069, Page52 of 300

A-1712

N4RMCAR2                         Carroll – Direct

1  keep moving.

2  Q.  Are you on Truth Social, Ms. Carroll?

3  A.  Yes.

4  Q.  How did you find out about this statement?

5  A.  I heard from several people that he had posted it.

6  Q.  How, if at all, do you believe this statement affected your

7  reputation?

8  A.  I really thought I was gaining back a bit of ground.  I

9  thought, it's starting to go and I felt, you know, happy that,

10  you know, I was back on my feet, had garnered some readers, and

11  feeling pretty good, and then, boom, he knocks me back down

12  again.

13  Q.  Were you surprised by the statement?

14  A.  Stunned.

15  Q.  Why?

16  A.  Because I'm suing him for saying these very things.

17  Q.  In light of Mr. Trump's October 22 statement, did you file

18  a second lawsuit?

19  A.  Yes.

20  Q.  Is that second lawsuit why we are here today?

21  A.  Yes.  This is why we are here.

22  Q.  What did you sue him for in the second lawsuit?

23  A.  I sued him for defamation of character.

24  Q.  Anything else?

25  A.  Yes.  I also sued him for assault.

N4RMCAR2                         Carroll - Direct

1    Q.   Why didn't you sue him for assault in the first lawsuit?

2    A.   Because the time period allowed was -- it had passed, and I

3    could not do it.

4    Q.   What happened that allowed you to do it -- to sue him for

5    assault in the second lawsuit?

6    A.   The state assembly and the state senate passed what they

7    called the Adult Survivors Act, and it gave survivors of sexual

8    assault, sexual abuse, sexual harassment a one-year window to

9    come forward and bring suit against the people.

10   Q.   Had you advocated for passage of that law?

11   A.   Yes.

12   Q.   Why.

13   A.   Because I understand why women, particularly, and some men

14   do not come forward and tell what happened.  It takes sometimes

15   years to get the courage to face the person who hurt you, if at

16   all.  It takes years.  And some maturity and some age.  It

17   takes -- there are many people, reasons why people don't report

18   it, and this act gives us a chance to be heard.

19   Q.   What, if any, I'll call it sort of public response did you

20   experience after Mr. Trump made his October 2022 statement?

21   A.   It was not very nice.

22   Q.   What do you recall?

23   A.   Just a wave of slime.  It was very seedy comments, very

24   denigrating.  Almost an endless stream of people repeating what

25   Donald Trump says, I was a liar and I was in it for the money,

N4RMCAR2                        Carroll – Direct

1    can't wait for the payoff, working for the democrats, over and

2    over.  But the main thing was way too ugly.  It is very hard to

3    get up in the morning and face the fact that you're receiving

4    these messages you are just too ugly to go on living,

5    practically.

6    Q.  Let me show you what has been marked for identification as

7    Plaintiff's Exhibit 45.

8              Do you recognize this, Ms. Carroll?

9    A.  Yeah.  I think it was -- it appeared -- yeah.

10   Q.  What is it?

11   A.  It's a tweet.

12   Q.  What is the date?

13   A.  October 13.

14   Q.  Of what year?

15   A.  2022.

16   Q.  Is your name mentioned?

17   A.  I guess that is me.

18             MR. FERRARA:  Your Honor, plaintiff offers 45.

19             THE COURT:  Received.

20             (Plaintiff's Exhibit 45 received in evidence)

21             MR. FERRARA:  Mr. Lam, we can publish this for the

22   jurors.  Thank you.

23             If we just focus on the tweet in the upper left, the

24   sort of main tweet.

25   Q.  Ms. Carroll, this was the day after Mr. Trump's statement?

A-1715

N4RMCAR2                         Carroll - Direct

1    A.  Yes.

2    Q.  Does it appear to be a response to Trump, I had nothing to

3    do with E. Jean Carroll?

4    A.  Yes.

5            MR. FERRARA:  I am not going to read this.

6            We can take that down.  Thank you, Mr. Lam.

7            Just for the witness, if you wouldn't mind, sir, if we

8    could show Ms. Carroll what's been marked for identification as

9    Plaintiff's Exhibit 46.

10   Q.  Do you recognize this?

11   A.  Yes.

12   Q.  What is it?

13   A.  It's a tweet.

14   Q.  What's the date?

15   A.  October 20, 2022.

16   Q.  Are you mentioned?

17   A.  Yes.

18           MR. FERRARA:  Plaintiff offers 46, your Honor.

19           THE COURT:  Received.

20           (Plaintiff's Exhibit 46 received in evidence)

21           MR. FERRARA:  If we could show that, Mr. Lam.

22   Q.  Is this an example of a tweet in which you are called a

23   liar?

24   A.  Yes.

25           MR. FERRARA:  Let's take this down.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4RMCAR2                          Carroll - Direct

1              Let's show Ms. Carroll only what's been marked for
2    identification as Plaintiff's 48.
3    Q.  Do you recognize this?
4    A.  Yes.
5    Q.  What is it?
6    A.  It's a tweet.
7    Q.  What's the date?
8    A.  It's down at the bottom.  Let's see.  October 19, 2022.
9    Q.  Does it mention you?
10   A.  Yes.
11             MR. FERRARA:  Plaintiff offers Exhibit 48, your Honor.
12             THE COURT:  Received.
13             (Plaintiff's Exhibit 48 received in evidence)
14             MR. FERRARA:  If we could scroll down a little
15   further, Mr. Lam.  Up.  I just want to see what's on the
16   bottom.  There we go.  Thank you.
17   A.  Yeah.
18             MR. FERRARA:  Could we take a look at Plaintiff's 57,
19   just for the witness.
20             May I just have one moment, your Honor?
21             THE COURT:  Sure.
22             MR. FERRARA:  Let's take this one down for now, if you
23   wouldn't mind, Mr. Lam.  We will come back to that.
24             Let's look instead at what's been marked for
25   identification as Plaintiff's Exhibit 51.

N4RMCAR2                          Carroll - Direct

1   Q.  Do you recognize this, Ms. Carroll?

2   A.  Yes.

3   Q.  What is it?

4   A.  It's a tweet.

5   Q.  What is the date?

6   A.  January 15, 2023.

7   Q.  Does it refer to you?

8   A.  Yes.

9           MR. FERRARA:  Plaintiff offers 51, your Honor.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 51 received in evidence)

12          MR. FERRARA:  May we show this, Mr. Lam.  Thank you.

13          We can take this down, Mr. Lam.  Thank you.

14  Q.  The last exhibit I will show you for now, Ms. Carroll, is

15  what's been marked for identification as Plaintiff Exhibit 53.

16          Do you recognize this?

17  A.  Yes.

18  Q.  What's the date?

19  A.  November 3, 2022.

20  Q.  Does it refer to you?

21  A.  Yes.

22          MR. FERRARA:  Plaintiff offers 53, your Honor.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 53 received in evidence)

25          MR. FERRARA:  If we could show the jury, Mr. Lam.

N4RMCAR2                         Carroll – Direct

1    Maybe we could start at the top.

2    Q.  Is the top tweet from you, Ms. Carroll?

3    A.  Yes.

4          MR. FERRARA:  If we could scroll down to the reply,

5    Mr. Lam.  Scroll a little further.  Thank you.

6    Q.  Ms. Carroll, this says:  If this chick got laid by

7    Mr. Trump, it was likely the last time she was.

8          Do you see that?

9    A.  Yes.

10   Q.  In fact, have you been physical with someone since -- have

11   you had sex since Mr. Trump assaulted you?

12   A.  No.

13   Q.  Do you know any of the people who sent you any of these

14   messages?

15   A.  No.

16   Q.  The exhibits that we have looked at, is that all of the

17   tweet or are these examples?

18   A.  No, no.  These are examples.

19   Q.  How, if at all, were these similar to Tweets or messages

20   you received after Mr. Trump made his initial statements in

21   2019?

22   A.  Can you repeat that?

23   Q.  Sure.  Sorry.

24          These statements all came after the October 2022

25   denial by Mr. Trump?

N4RMCAR2                          Carroll - Direct

1    A.  Yes.

2    Q.  How, if at all, do they compare to tweets or messages you

3    received after Mr. Trump made his first remarks in June of

4    2019?

5    A.  They were equally, equally disparaging and hurtful, but

6    these particularly hurt because I thought I had made it through

7    and here they are again.

8    Q.  Sitting here today, have you stopped -- to this day have

9    you stopped -- to this day are you still receiving messages

10   like this?

11   A.  I looked at my Twitter this morning.  They haven't stopped.

12          MR. FERRARA:  May I just have one moment, your Honor?

13          THE COURT:  Yes.

14          MR. FERRARA:  Nothing further.

15          THE COURT:  Thank you.

16          Is this the point where you and Mr. Tacopina need some

17   time?

18          MR. TACOPINA:  Yes, your Honor.

19          MR. FERRARA:  That would be ideal.

20          THE COURT:  What do you say, 15 minutes, 20 minutes?

21          MR. FERRARA:  That would work.

22          THE COURT:  Fifteen minutes.

23          11:30, folks.

24          (Jury not present)

25          (Recess)

N4r2Car3                         Carroll – Cross

1           (Jury not present)

2           THE COURT:  Okay.  Let's get the jury.

3           (Jury present)

4           THE COURT:  Please be seated, everyone.

5           Members of the jury, are you guys warm enough?

6           JUROR:  Could be warmer.

7           THE COURT:  Andy, let's put out a call for a little

8    more heat, please.

9           All right.  We are now to cross-examination.

10   Mr. Tacopina.

11          MR. TACOPINA:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. TACOPINA:

14   Q.  Good afternoon -- good morning, Ms. Carroll.

15          Good morning, Ms. Carroll.

16   A.  Good morning.

17   Q.  There you go.

18          You and I have never spoken before, is that right?

19   A.  Correct.

20   Q.  Now, I'm going to show you something which has been

21   previously marked as Defense Exhibit AA.  Just take a look at

22   that and see if you recognize it, please.

23   A.  Yes.

24   Q.  Okay.  And that's the cover of your book, the *What Do We*

25   *Need Men For?  A Modest Proposal*, correct?

N4r2Car3                          Carroll - Cross

1    A.  Yes.

2              MR. TACOPINA:  And, your Honor, this is a compilation

3    of some excerpts from that book.  We have turned it over to

4    counsel.  I'm going to offer this, subject to any redactions

5    that counsel needs, into evidence at this time.

6              MR. FERRARA:  With that caveat, no objection, your

7    Honor.

8              THE COURT:  All right.  On that basis, received.

9              (Defendant's Exhibit AA received in evidence)

10   BY MR. TACOPINA:

11   Q.  Ms. Carroll, using your own words, the facts you allege in

12   your story you have told here to this jury are odd, correct?

13   A.  Can you repeat that again?

14   Q.  Sure.  Using your own words, the facts you allege in the

15   story you have told here are odd, O-D-D?

16   A.  Ah, yes.  Odd.

17   Q.  In fact, you could agree that your story is inconceivable,

18   correct?

19   A.  Certain parts of this story are difficult to conceive of,

20   yes.

21   Q.  And we will talk about your story and your accusations in a

22   while, but before we get there, you were writing the Ask

23   E. Jean column in *Elle* magazine for 25 years, correct?

24   A.  26 years.

25   Q.  26.

N4r2Car3                        Carroll - Cross

 1              And it's fair to say that gave you status in New York,
 2    at least you believe that you gave you status in New York,
 3    correct?
 4    A.  Yes, it did.
 5    Q.  And you were fired from *Elle* magazine on December 11, 2019,
 6    right?
 7    A.  Yes.
 8    Q.  And after you lost your job at *Elle* magazine, you felt
 9    small and diminished, right?
10    A.  Yes.
11    Q.  And at that point in 2019, you experienced a different way
12    of life, right?
13    A.  Yes.  It was the first time that I had lost something very
14    important to me.
15    Q.  And that's because, in your own words, you then felt like
16    just another person, right?
17    A.  I have never felt like another person, like just another,
18    never like that.
19    Q.  You never felt like that after you lost your job?
20    A.  I felt many things, perhaps for a moment I felt like -- I
21    don't think I feel like just another person.  I don't think
22    there is such a thing as just another person.
23    Q.  Well, you testified yesterday about your interview session
24    with Dr. Lebowitz, your expert witness in this case, right?
25    A.  Yes.

Case 23-793, Document 82, 11/20/2023, 3592069, Page63 of 300

A-1723

N4r2Car3                        Carroll - Cross

1   Q.  Okay.  Do you remember telling her that after you lost your

2   job you felt like just another person?

3   A.  Yes, yeah, you are right.

4   Q.  And you would agree that status is important to you?

5   A.  Yes.

6   Q.  Especially in New York, right, status is everything in

7   New York I think, right, you said?

8   A.  Status is important, yes.

9   Q.  And you testified yesterday about your political

10  alignments.  You have been a member of the democratic party

11  since the days of Bill Clinton, correct?

12  A.  Yes.

13  Q.  And when you found out that Donald Trump had announced he

14  was running for president in 2016, you were almost in

15  disbelief.

16  A.  Not almost in disbelief.  I was in disbelief.

17  Q.  And by your own account you had heartache?

18  A.  Yes.

19  Q.  And by your own account you felt really bad.

20  A.  I felt really bad, yes.

21  Q.  And to be clear, the reason you felt really bad was because

22  you didn't think Donald Trump would be a good presidential

23  candidate.

24  A.  That's right.

25  Q.  And in fact you wrote a book entitled *What Do We Need Men*

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car3                          Carroll - Cross

1   *For*, the one that's up on the screen --

2              MR. TACOPINA:  Your Honor, is it on the screen for

3   everyone in this courtroom?  Could the Court inquire?

4              THE COURT:  Yes.

5              MR. TACOPINA:  The jury as well?  Okay.

6   BY MR. TACOPINA:

7   Q.  Now, that is your book in which you included the story

8   about your supposedly being raped by Donald Trump in a Bergdorf

9   Goodman changing room, right?

10  A.  Not supposedly.  I was raped --

11  Q.  Right.

12  A.  -- by Donald Trump.

13  Q.  That's your version, correct?

14  A.  In Bergdorf.

15  Q.  That's your version, right, Ms. Carroll, that you were

16  raped?

17  A.  Those are the facts.

18  Q.  Okay.  And that's what you included in this book, right?

19  A.  Yes.

20  Q.  And you said yesterday you didn't say anything about the

21  rape when he was running, Mr. Trump, that is, was running for

22  president because you were troubled by the fact he was running

23  for president, but you didn't say anything about it publicly

24  because your mother was dying.  That's what you said yesterday,

25  right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 82, 11/20/2023, 3592069, Page65 of 300

A-1725

```
         N4r2Car3                    Carroll - Cross
```

1    A.  It was one of the reasons.

2    Q.  One of the reasons.  What was any of the other reasons?

3    A.  I was never going to talk about what Donald Trump did,

4    never.

5    Q.  Never, okay.

6         So yesterday when you testified that you didn't want

7    to come forward at this point, even though he was running for

8    president and you claimed he had raped you, you didn't want to

9    do that because one of the reasons you said was your mother was

10   dying, correct?

11   A.  She was on her death bed.  My sisters and brother and I had

12   joined her at the end of September to spend our last weeks

13   together.

14   Q.  And ultimately your mother unfortunately passed away in

15   October of 2016, right?

16   A.  Yes.

17   Q.  For the record.

18   A.  Yes.

19   Q.  I'm sorry.  Yeah.  Okay.

20        And that's a month before the election took place more

21   or less, correct?

22   A.  Yes.

23   Q.  So why didn't you come out with the story after your mother

24   passed away before he was elected?

25   A.  I was in deep, incredible, painful mourning.

A-1726

N4r2Car3                         Carroll - Cross

1   Q.  How old was your mother when she passed?

2   A.  97.  She would have been 98.

3   Q.  This had nothing to do with the fact that the book wasn't

4   ready yet, did it, Ms. Carroll, the reason you didn't come out

5   at that point?

6   A.  I hadn't conceived of writing a book at that point.

7   Q.  Okay.  Now, you did e-mail an excerpt of your book which

8   you had written to Laurie Abraham on June 13, 2019, right?

9   A.  Repeat the question.

10  Q.  Sure.  You e-mailed an excerpt from your book which you had

11  written to Laurie Abraham on June 13, 2019.

12  A.  If you say I did.  Can you show me the e-mail?

13  Q.  Sure.

14  A.  I e-mail with Laurie Abraham quite a bit.

15  Q.  We can do that.

16  A.  She was my editor.

17  Q.  Okay.  I will show you the e-mail.  We are going to show

18  the witness and counsel Defense Exhibit AD, for identification,

19  which, for you all at the front table, is the June 13, 2019

20  e-mail.  Just that does not get displayed to the jury.

21          THE COURT:  It does not get described as to what it is

22  either at this point.

23          MR. TACOPINA:  Yes, your Honor.

24  BY MR. TACOPINA:

25  Q.  Do you recognize that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 82, 11/20/2023, 3592069, Page67 of 300

A-1727

N4r2Car3                         Carroll - Cross

1    A.  Yes.

2    Q.  Okay.  So let me reask the question.  Having reviewed the

3    document on the screen, does it refresh your recollection that

4    you e-mailed an excerpt from the book which you had written to

5    Laurie Abraham on June 13, 2019?

6    A.  It was an excerpt that they had edited and I was fixing

7    various sentences and then mailed it back to them.

8    Q.  One of the things you said to Laurie Abraham was, Here's

9    the excerpt of the book, right?

10   A.  Yeah, the excerpt that they had chosen and edited.

11   Q.  Okay.  The question is, did you e-mail Laurie Abraham an

12   excerpt of your book on June 13, 2019?

13   A.  Yes.

14   Q.  And Laurie Abraham was a senior writer at *New York*

15   magazine, correct?

16   A.  She was -- yes.

17   Q.  You can take that down, by the way.

18          And when you sent Ms. Abraham your excerpt, Donald

19   Trump was in his second year of presidency at that point,

20   right?  June 2019.

21          THE COURT:  I think if you do the math, you got the

22   year wrong.

23          MR. TACOPINA:  I have the year wrong, your Honor?

24          THE COURT:  I don't mean the numerical year, I think

25   the interval.  He would have been inaugurated on January 20,

N4r2Car3                    Carroll - Cross

1    2017.

2              MR. TACOPINA:  Correct.

3              THE COURT:  And he would have finished his second year

4    on January 19, 2019, and June of 2019 would have been his third

5    year.

6              MR. TACOPINA:  You are right, your Honor.  Thank you.

7    BY MR. TACOPINA:

8    Q.  Between the second and third year of his presidency,

9    correct, when you sent that clip -- the excerpt to Ms. Abraham?

10   A.  Yes.

11   Q.  And in your excerpt you explained your motivation for

12   coming forward with your allegations against Mr. Trump.  You

13   wrote, "But now" -- you know what?  Hold on.  Let me do it like

14   this.  I'm going to put up what has been premarked as

15   Defense AF for identification.  I have shared it with

16   co-counsel.  Okay.

17             Your Honor, I am offering, subject to an agreement

18   with counsel, Defense AF into evidence, subject to their review

19   and redactions again.

20             MR. FERRARA:  May I just have one moment to consult

21   with Mr. Tacopina?

22             THE COURT:  Yes.

23             (Counsel confer)

24             MR. FERRARA:  Subject to the caveat regarding

25   redactions.

Case 23-793, Document 82, 11/20/2023, 3592069, Page69 of 300

N4r2Car3                        Carroll - Cross

1          THE COURT:  Subject to the?

2          MR. FERRARA:  Subject to the caveat regarding

3     redactions, no objection.

4          THE COURT:  Received on that basis.

5          (Defendant's Exhibit AF received in evidence)

6          MR. TACOPINA:  Your Honor, we are offering a very

7     limited portion of that that I will ask be displayed to the

8     jury.  If we could just display page 27 only.

9     BY MR. TACOPINA:

10    Q.  What you wrote in your excerpt to Ms. Abraham was that

11    after -- "but now, after two years of watching the man in

12    action, I've become persuaded that he wants to kill me."

13    Right?

14    A.  What is this from?

15    Q.  From your book excerpt that you sent to Ms. Abraham.

16    A.  That's a draft.  I see, but it was never printed.

17    Q.  I understand it's a draft that you sent to Ms. Abraham,

18    correct?

19    A.  I'm not sure.  I haven't seen that.  I haven't -- is this

20    on page 27?

21    Q.  It is.  If you would like, we could provide you with a

22    copy.

23    A.  Could I see the full page 27?  Oh, okay.  Thank you.  Yeah,

24    that's a draft.  We didn't -- I decided to take that out before

25    the excerpt was printed.

N4r2Car3                         Carroll - Cross

1   Q.  Okay.  But for the purpose of our conversation here today,

2   I'm going to ask you about the draft that you ultimately

3   decided to take out.  What you wrote in the draft initially was

4   that, "But now, after two years of watching the man in action,

5   I've become persuaded that he wants to kill me.  He's poisoning

6   my water.  He's polluting my air.  He's cooking my planet.

7   And, as he stacks the courts, my rights over my body are being

8   taken away state by state——I'm afraid that my right to free

9   speech will go next.  So now I will tell you what happened."

10          That's what you wrote in your initial draft, correct?

11  A.  Yes.

12  Q.  That part never made it to the book, did it?

13  A.  No.

14  Q.  And when you are referring to all of this here regarding

15  Donald Trump, that is sort of his political positions on these

16  various topics, correct?

17  A.  Right.

18  Q.  Yesterday you told a story you didn't know what his

19  political positions were at all, right?

20  A.  I'm not 100 percent certain about his political positions.

21  I know generally.

22  Q.  Okay.  You can take that down.  Thank you.

23          You are aware that your friend Carol Martin also had

24  strong feelings against Donald Trump, as you testified to

25  yesterday, correct?

Case 23-793, Document 82, 11/20/2023, 3592069, Page71 of 300

A-1731

N4r2Car3                    Carroll - Cross

1    A.  Yes.

2    Q.  In fact, on September 23, 2017, she sent you an e-mail

3    mocking him.

4           MR. TACOPINA:  That's an e-mail that's already in

5    evidence through the plaintiff's case.  I don't know if you

6    want us to put it up or you could put it up, but it's

7    Plaintiff's 122.

8           I think they could do it, guys.  You want to do it,

9    Mike?

10          THE COURT:  Let's just have, to the extent we can

11   manage this, one set of exhibits, instead of having two copies

12   of every exhibit.

13          MR. FERRARA:  I think that's what Mr. Tacopina was

14   trying to do, so we are going to show -- we will show the one

15   we put.

16          MR. TACOPINA:  Thank you.

17          THE COURT:  Great.  Thank you.

18   BY MR. TACOPINA:

19   Q.  This is in evidence.  It can be displayed, please.  So this

20   is that e-mail that you were asked about yesterday, correct?

21   A.  Yes.

22   Q.  Okay.  And specifically she wrote you saying, "I don't know

23   much about Namibia, but I know it ain't called Nambia as Orange

24   Crush called it at the UN this week," right?

25   A.  Um-hmm.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car3                        Carroll - Cross

1    Q.  And Orange Crush, she was referring to Donald Trump there,
2    right?
3    A.  Yes.
4    Q.  In fact, the subject of the e-mail is "Trump named Sarah
5    Palin Ambassador to Nambia," right?
6    A.  Um-hmm.
7    Q.  In that e-mail, Carol Martin also told you or wrote to you
8    "this has to stop."
9    A.  Um-hmm.
10   Q.  Do you see that?
11   A.  Yeah.
12   Q.  And she said, "As soon as we are both well enough to
13   scheme, we must do our patriotic duty again."
14   A.  Um-hmm.
15   Q.  Right?
16          Now, you responded to that e-mail within a few hours
17   later that afternoon, correct?
18   A.  Um-hmm.
19          THE COURT:  You have to use words, Ms. Carroll.
20          THE WITNESS:  Yes, yes.  Thank you.
21   BY MR. TACOPINA:
22   Q.  And in response to that e-mail, you replied to Carol
23   Martin's e-mail completely and emphatically agreeing with her
24   that Donald Trump had to be stopped and you must do your
25   patriotic duty by any means of scheming, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car3                        Carroll - Cross

1   A.  Those are not my words.

2   Q.  No.  Your words are all caps "totally" with three

3   exclamation points.

4   A.  Yes.

5   Q.  "I have something special for you when we meet."  Right?

6   A.  Yes.

7   Q.  Now, you were asked about that e-mail by Mr. Ferrara

8   yesterday, and you said you had no -- I quote, you had no idea

9   what she was referring to, right?

10  A.  No, I had -- not -- the only thing I can figure out is a

11  joke sent by Andy Borowitz of the *New Yorker*.  I had no -- I

12  had no recollection of what the something special I had for

13  Carol Martin could possibly be, no idea.

14  Q.  Do you have any recollection of what Carol Martin meant

15  when she said to you, "When we are both well enough to scheme,

16  we must do our patriotic duty here"?

17  A.  No.

18  Q.  No idea?

19  A.  None.

20  Q.  None.  And that's an e-mail only from, what, less than five

21  years ago?

22  A.  Yes.

23  Q.  Now, you recounted conversations with Carol Martin from 28

24  years ago, correct?

25  A.  Yes.

N4r2Car3                         Carroll - Cross

1   Q.  Okay.  But this you have no idea what this means, right?

2   A.  I told Carol Martin what Trump did to me in the dressing

3   room.  Those are facts that I could never forget.  This is an

4   e-mail, among probably hundreds of e-mails between Carol and I,

5   that I have no recollection of, but I suspect it's something

6   funny.  You know, that's not typical Carol Martin language

7   "patriotic duty," so I can't imagine what it is, maybe -- I

8   have no idea.

9   Q.  You remember you had tea with Carol Martin that night at

10  her house 28 years ago, right?

11  A.  Yes.

12  Q.  You remember that detail?

13  A.  Yes.

14  Q.  Had nothing to do with what happened at Bergdorf Goodman,

15  right?

16  A.  I remember the tea and I remember her dog Cisco or Doc

17  being there, right.

18  Q.  And you are a writer, obviously much more versed in the

19  English language than I am.  The word "scheme" means what to

20  you?

21  A.  It is a typical word that Carol and I use, carrying no

22  connotations of evil.  It's just a word we use.

23  Q.  You and Carol Martin use the word "scheme" often?

24  A.  Not often, but it's -- she has very colorful language and

25  so do I.

N4r2Car3                          Carroll - Cross

1    Q.  You produced e-mails in this case, right?

2    A.  Pardon?

3    Q.  You produced e-mails in this case, correct?  For this

4    litigation, you produced your e-mails that were --

5    A.  Yes, I believe we produced many e-mails.

6    Q.  Yes.  Is there any other e-mail that you have ever seen

7    where you and Carol Martin used the word "scheme"?

8    A.  I did not review what was sent in discovery.

9    Q.  We will get to that in a second, but you have no idea what

10   that something special after you said "totally" you were

11   referring to, right, no idea?

12   A.  I had no idea.  Carol and I -- it's one of our traditions

13   to exchange gifts, weird, funny gifts.  She gave me a sun hat.

14   She gave me a clock.  I give her books.  You know, it's just

15   something that we do.

16   Q.  Is that what you are referring to here, a gift?  Now you

17   recall that?

18   A.  I don't recall anything --

19   Q.  Okay.

20   A.  -- about this e-mail.

21   Q.  Okay.

22        Now, to be clear, Carol Martin is the same person you

23   have produced as a witness to support your claim in this case,

24   one of the two people you supposedly told about this purported

25   incident with Donald Trump shortly after it occurred, correct?

A-1736

N4r2Car3                         Carroll – Cross

1    A.  Yes.

2    Q.  Okay.  And Lisa Birnbach is the other person that you

3    brought forth as your second witness to support that, correct?

4    A.  Yes.

5    Q.  Okay.  In connection with the discovery in this case, the

6    obligations, you turned over your e-mails to counsel, correct?

7    A.  Yes.

8    Q.  And you turned over all your e-mails in possession from

9    2017, correct, in your possession?

10            MR. FERRARA:  I'm going, to object to the extent

11   whether it's within her knowledge, your Honor.

12            MR. TACOPINA:  Well, your Honor, there is a basis

13   that -- I don't want to run afoul of the Court's rules, but

14   there is a good-faith basis to ask this line of questioning.

15   It is only a few more.

16            THE COURT:  Sidebar.

17            MR. TACOPINA:  Yes, sir.

18            (Continued on next page)

19

20

21

22

23

24

25

N4r2Car3                          Carroll - Cross

1              (At the sidebar)

2              MR. FERRARA:  Your Honor, my objection is based on the

3      idea that this is getting into work product.  We were the ones

4      at the end of the day responsible for the production, not

5      Ms. Carroll.  Also, what was produced and was not produced has

6      been litigated.  There have been -- you know, the parties have

7      traded letters and all of the appropriate litigation about

8      this, things were objected to, things were not objected to.  So

9      to hold Ms. Carroll accountable at this point for things that

10     were or were not produced is too late and inappropriate.

11             MR. TACOPINA:  Your Honor, this has nothing to do with

12     any disputes over the appropriateness or what was produced or

13     not, but what was happening here is, in 2017, she gave over her

14     e-mails to counsel, all of them, and there are a vast number of

15     e-mails from 2017.  The one that was not produced was this

16     e-mail, and it comes from her same e-mail address that she sent

17     all the other ones over from.

18             THE COURT:  What one that was not produced?

19             MR. TACOPINA:  The exhibit that's in evidence.  I'm

20     discussing right now the September 23 e-mail, your Honor,

21     PX 122.

22             THE COURT:  I take it this is not a lady who sat

23     around and had a filing cabinet full of 2000 e-mails on paper,

24     right.

25             MR. FERRARA:  That's not how we pulled her e-mail.

N4r2Car3                      Carroll - Cross

1              THE COURT:  How did you do her e-mail.

2              MS. CROWLEY:  We had access to her e-mail.  We ran

3      searches.  We reviewed the e-mails, and we produced responsive

4      e-mails.

5              THE COURT:  Is that disputed?

6              MR. TACOPINA:  Oh, I know they produced responsive

7      e-mails, but the one thing that was not in there——I don't fault

8      them at all——is that one.

9              THE COURT:  Where did it come from?

10             MR. TACOPINA:  From Ms. Martin.

11             THE COURT:  So?

12             MR. TACOPINA:  Yes, we have it, your Honor, but it

13     wasn't produced by her.

14             THE COURT:  Yeah, look.

15             MR. TACOPINA:  It seems it was intentionally left out

16     is what my point was.

17             THE COURT:  You are, and I understand why, but you are

18     attempting to assign responsibility, at least by implication

19     and maybe more directly, to Ms. Carroll personally for the fact

20     that it was not turned over, and what I am given to understand

21     is that she had nothing to do with turning over the e-mails;

22     that she gave counsel access to her electronic account.

23     Counsel --

24             MR. TACOPINA:  Is that right?

25             THE COURT:  Counsel did a search, and who knows why,

A-1739

N4r2Car3                        Carroll - Cross

1    but whatever it is, it doesn't sound to me like it's her fault.

2              MR. TACOPINA:  That's accurate.  You are right.  That

3    was what happened.  She produced the e-mails to you, and then

4    you turned them over --

5              MS. CROWLEY:  Yeah.

6              MR. TACOPINA:  -- or she gave you the access to the

7    account --

8              MR. CRAIG:  We did a full collection of her inbox, ran

9    a search protocol.  Obviously it was years and years of data.

10   She didn't hand over individual e-mails to us.

11             THE COURT:  I'm sorry.  You did a full what?

12             MR. CRAIG:  We collected her entire e-mail inbox.  We

13   undertook a review.  Ms. Carroll did not hand over specific

14   e-mails to us at a request.

15             MR. TACOPINA:  Your Honor, I'm moving on.  I will pass

16   on that.

17             THE COURT:  Okay.

18             (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          MR. TACOPINA:  Okay, your Honor.

3          THE COURT:  The objection to the last question is

4    sustained.  Go ahead, Mr. Tacopina.

5          MR. TACOPINA:  Thank you.

6    BY MR. TACOPINA:

7    Q.  The book entitled *What Do We Need Men For*, in which you

8    include your rape allegation by Mr. Trump at Bergdorf Goodman,

9    you started writing that book two years after the September 23

10   e-mail we discussed with you and Carol Martin in which you

11   discussed doing your patriotic duty and stopping Donald Trump

12   and scheming two weeks after that e-mail, correct?

13   A.  No.

14   Q.  No?  When did you start writing that book?

15   A.  I went on a trip across the country to towns named after

16   women starting on October 6.

17   Q.  Right.  That's two weeks after that e-mail?

18   A.  I did not start the book.

19   Q.  Well, the first edition -- when you went on this road trip,

20   as you say -- and you mentioned this in the prologue of your

21   book, correct, Ms. Carroll?

22   A.  Into what?

23   Q.  The road trip that you set out for on October 6, it's in

24   the prologue of your book, right?

25   A.  Yes.

N4r2Car3                        Carroll - Cross

1    Q.  You said you set out on this road trip for purposes of

2    gathering information for your book, correct?

3    A.  Yes.

4    Q.  Okay.  And the first edition of your book was published in

5    July of 2019.

6    A.  Yes.

7    Q.  And even before it was published, you discussed the book

8    with Carol Martin.

9    A.  Yes.

10   Q.  In fact, on June 23, 2019, you text Lisa Birnbach that you

11   gave her and Carol Martin the chapter about Donald Trump even

12   before the book was published, correct?

13   A.  I wanted to make sure that they had no additions,

14   corrections, and that they gave me permission to print it.  I

15   would not have printed it if they had not both given me

16   permission.

17   Q.  Okay.  Ms. Carroll, my question was this, though.  On June

18   23, 2019, you text Lisa Birnbach that you gave her and Carol

19   Martin the chapter about Donald Trump even before the book was

20   published, yes, right?

21   A.  Yes.

22   Q.  And you say you wanted their input before you published it?

23   A.  Yeah, I did.

24   Q.  And as you wrote in that text, and I will put it up for you

25   for your ability to review it, AJ, just for the witness,

N4r2Car3                    Carroll - Cross

1    please, and counsel.

2          By the way, is that the message that you sent to Lisa

3    Birnbach on June 23, 2019?

4    A.  Yes.

5          MR. TACOPINA:  Your Honor, I would offer Defense AJ

6    into evidence.

7          MR. FERRARA:  Without objection.

8          THE COURT:  Received.

9          (Defendant's Exhibit AJ received in evidence)

10         MR. TACOPINA:  Please publish that to everyone.

11   BY MR. TACOPINA:

12   Q.  So what you wrote to or texted to, I should say, Lisa

13   Birnbach was that "I told Megan" -- and, by the way, Megan is

14   *The New York Times* report he recall Megan Twohey, right?

15   A.  Yes.

16   Q.  "I told Megan that I gave you and Carol the chapter at our

17   Carmine's dinner."

18   A.  Yes.

19   Q.  "That neither of you read it.  That I turned over the

20   entire book to you when I got sick, and we agreed you would

21   publish it when I croaked, and you never read it.  I copped to

22   the fact that I sent you proof of the excerpt before it was

23   published with instructions not to forward it, copy it, etc.

24   Are you eating birthday cake?"

25         So you just testified a minute ago that you had sent a

1   copy to Lisa Birnbach and Carol Martin for them to read it and

2   give you back input, correct?

3   A.  Yes.

4   Q.  Here, what you are saying is you told Megan, *The New York*

5   *Times* reporter, something completely untrue, right?

6   A.  No, I told Megan the absolute facts.

7   Q.  Well, what you told Megan, according to you, is that you

8   told Megan that "neither of you"——being Lisa Birnbach and Carol

9   Martin"——read it.  That's your text messages right there,

10  right?

11  A.  Because they never replied.  I gave Carol Martin and Lisa

12  Birnbach hard copies of the chapter.

13  Q.  Um-hmm.

14  A.  I said, If you have any changes, let me know.  I never

15  heard from either one of them.  I assumed——we know what the

16  first three letters of that is——that neither had read it.

17  Q.  Or you could assume that neither had any changes, right?

18  A.  I could also assume that, correct.

19  Q.  But why would you need to tell Lisa Birnbach that you

20  didn't read the book?

21  A.  I --

22  Q.  When you say --

23  A.  -- guess I'm wondering if Carol -- if Lisa had read it.  To

24  this day, I don't know if Carol or Lisa had actually read that

25  chapter.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car3                          Carroll - Cross

1    Q.  To this day?

2    A.  To this day.

3    Q.  They are two of your best friends, right?

4    A.  Yeah.

5    Q.  And they will be testifying in this courtroom about the

6    subject matter of that chapter.

7    A.  You will have to ask Carol and Lisa if they read the

8    chapter.  I do not know.

9    Q.  Okay.  But what you did tell Lisa is that you told *The New*

10   *York Times* reporter that neither of you read it.  Right?

11   A.  That's what I was assuming.

12   Q.  And again, you repeat it at the bottom, "and you never read

13   it," right, twice in that one text message?

14   A.  Well, that is -- I was in the hospital, and -- very ill.  I

15   made out a will.  It was very serious.  I appointed Lisa

16   Birnbach as my literary executor, and part of being a literary

17   executor would -- included -- she knew I was working on a book,

18   and she agreed, with tears rolling down both of our faces, that

19   she would publish it if I died.

20   Q.  Okay.  My question was about the highlighted portions where

21   you repeat in one text message "and you never read it"?

22   A.  I'm telling you the story about being in the hospital

23   because Lisa didn't read it because she didn't remember my

24   passwords to get in to the book.

25   Q.  So you know definitively now that Lisa did not read it,

N4r2Car3                          Carroll - Cross

1   correct?

2   A.  She didn't read the draft that I was working on.  She

3   couldn't have.

4   Q.  Okay.  So when you assumed she didn't read it before, you

5   have a recollection now that she did not read it, correct?

6   A.  I never knew.  You are going to have to ask Carol and Lisa

7   whether they read that -- the chapter that I gave them at

8   Carmine's.

9   Q.  I will, but I'm asking you if you know that they read it or

10  not?

11  A.  I don't know.  I have no idea.

12  Q.  Okay.  And then you say, "I copped to the fact that I sent

13  you the proof of the excerpt before it was published with

14  instructions not to forward it, copy it, etc.," right?

15  A.  This is another few pages.  This is the actual edit of the

16  excerpt I sent to Carol and Lisa few days before it was to be

17  published in *New York* magazine.

18  Q.  Right.  And when you say you copped to that fact, what does

19  that mean?

20  A.  That means I told Megan that I had sent Carol and Lisa a

21  finished proof of the excerpt before it was published.

22  Q.  Okay.  You can take that down by the way.  Thank you.

23          Now, even though you discussed your unpublished

24  chapter about Donald Trump with Carol and Lisa, you supposedly

25  spoke to them shortly after the alleged rape and they couldn't

Case 23-793, Document 82, 11/20/2023, 3592069, Page86 of 300

**A-1746**

N4r2Car3                          Carroll – Cross

1  give you a specific date of the alleged incident, either,

2  right?

3  A.  No.

4  Q.  They couldn't.

5  A.  No.

6  Q.  You couldn't.

7  A.  No.

8  Q.  No one.

9  A.  I wish to heaven we could give you a date.  I wish we could

10  give you a date.

11  Q.  In fact, they couldn't even tell you the year, whether it

12  was 1995 or 1996?

13  A.  Oh, no, no.  Lisa believes that because she published a

14  sort of a bombshell *New York* magazine piece about Mar-a-Lago

15  being opened as a club and Donald Trump had personally invited

16  Lisa to come down to do the story of the opening of the club,

17  *New York* magazine published it February -- in February.  I'm

18  not quite sure of the date.  Lisa believes she never would have

19  accepted that assignment if it had happened before she went

20  down to Florida.  So that places it definitely in 1996.

21  Q.  Okay.  And certainly you or them couldn't tell you whether

22  it was the fall or the spring.  You have testified to that?

23  A.  No, Lisa believes that it was in the spring of '96 because

24  of the *New York* magazine articles.  She swears up and down that

25  she would never go if she had heard about what Trump did to me

N4r2Car3                      Carroll - Cross

1    in Bergdorf's.

2    Q.  We will get a chance to talk to Lisa little bit later but

3    I'm asking you now, Ms. Carroll.

4          That's -- regarding this alleged time frame that you

5    provide over the course of the fall of 1995 or the spring of

6    1996, you don't know obviously, fair to say, the exact date of

7    this incident?

8    A.  I wish I did.

9    Q.  I know.

10          You never identified a day of the week of this

11   incident, correct?

12   A.  Correct.

13   Q.  Except at trial yesterday you, for the first time -- and I

14   think your lawyer asked you in your book and your deposition

15   you had mentioned you could never recall the day.  For the

16   first time yesterday at trial you said it has always been in

17   the back of your mind that it was a Thursday, but you never

18   said it because you weren't sure, right?

19   A.  Right.

20   Q.  Right.

21          Well, you were never sure of the year either, right,

22   Ms. Carroll?

23   A.  Right.

24   Q.  But you gave two years there, right?

25   A.  Right, and I -- yeah.

**A-1748**

N4r2Car3                       Carroll - Cross

1    Q.  You weren't sure the season, but you took a guess at that,

2    as well, correct?

3    A.  Yes.

4    Q.  But the day of the week, Thursday, that you were pretty

5    sure of, you never said it before yesterday, correct?

6    A.  I said it out loud.  All along I've been thinking it

7    probably was a Thursday.

8    Q.  All along, but you never verbalize that anywhere in your

9    book or in --

10   A.  No.

11   Q.  -- all the interviews you have done, right?

12   A.  I try to stick to the facts in the book.  That was a

13   probability and I didn't print it.

14   Q.  And when you were deposed, how about when you were deposed?

15   You didn't mention Thursday either, right?

16   A.  No.  I didn't mention a lot of things when I was deposed.

17   Q.  Well, you were talking about the date of when this happened

18   or the time frame, and you guessed on years and seasons, but

19   not the date, correct?

20   A.  Yeah.

21   Q.  Okay.

22        By the way, you consistently testified that you

23   thought it was either the fall of 1995 or spring of '96, right?

24   A.  Consistently.

25   Q.  Except yesterday you did say the fall of '94 and the spring

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1749

N4r2Car3                          Carroll - Cross

1   of '95, right?

2   A.  I tried to correct it.  I said -- I caught myself.  I

3   caught myself.  I realized I said it and I said, excuse me, I

4   meant in '95-'96.

5   Q.  And in fact that's your best guess, right, the fall of '95

6   or winter of '96?

7   A.  No, my best guess is the spring of '96, but I am also

8   saying it possibly could have been in the fall of '95.

9   Q.  Well, you are saying your best guess is the spring of '96

10  now because of what your friend Lisa -- Carol Martin told you?

11  A.  No, what Lisa told me about the *New York* magazine.

12  Q.  Lisa, I'm sorry, Lisa, you are right.  You are saying your

13  best guess is now '96 because of what Lisa told you about the

14  *New York* magazine piece, right?

15  A.  Yes, yes.

16  Q.  Because your independent recollection, aside from what

17  someone else told you, was that you were not sure, either '95

18  or '96, right?

19  A.  Right.

20  Q.  Okay.  And until publishing your book in 2019, which

21  included your rape story about Donald Trump, you hadn't

22  publicly disclosed this purported attack for 23 or 24 years,

23  right?

24  A.  Right.  I was never going to talk about it.

25  Q.  And in fact, in your book, you state that men are becoming

N4r2Car3                         Carroll - Cross

1    a nuisance.  That's sort of the premise of your book, right?

2    A.  It's -- my premise is the women who write to me at Ask

3    E. Jean are finding men to be a nuisance.

4    Q.  Okay.  At one point I think in your book you propose we

5    should dispose of all men?

6    A.  Into Montana.

7    Q.  Into Montana?

8    A.  Yeah, and retrain them.

9    Q.  So retrain.  So all the men here in this courtroom, in this

10   country, all get shuffled off to Montana and get retrained.

11   A.  You understand that that was said as a satire.

12   Q.  Ah.  Okay.

13            THE COURT:  It comes from Jonathan Swift's *A Modest

14   Proposal* 700 years ago, right?

15            THE WITNESS:  Yes.

16            THE COURT:  Let's move on.

17            MR. TACOPINA:  Thank you, your Honor.

18   BY MR. TACOPINA:

19   Q.  So the book premise talks about the purpose of -- the

20   premise that in order to support your position you drove to

21   these towns that you said were named after women and you asked

22   people in each town what do we need men for, right?

23   A.  Yes, I had --

24   Q.  Okay.  As part of that road trip, you would only eat in

25   cafés named after women?

Case 23-793, Document 82, 11/20/2023, 3592069, Page91 of 300

A-1751

N4r2Car3                      Carroll – Cross

1    A.  Yes.

2    Q.  Listen to music only sung by women?

3    A.  Yes.

4    Q.  Drink wines named for women only?

5    A.  Yes.

6    Q.  Only read books written by women?

7    A.  Yes.

8    Q.  And only wear clothes designed by women?

9    A.  Yes.

10   Q.  Okay.  And during this road trip that you took, you were

11   keeping a list called the most hideous men of my life, right?

12   A.  Yes.

13   Q.  Was that satire or was that serious?

14   A.  That was dead serious.

15   Q.  That was dead serious.  Okay.  All right.  So the most

16   hideous men of your life list was dead serious, right?

17   A.  Yes.

18   Q.  And the list ultimately identified 21 men you considered to

19   be hideous.

20   A.  Again, the list had lighter moments, for instance, two guys

21   who drove by me in a truck and yelled something physically

22   impossible for me to perform with my dog, those two guys made

23   the list.

24   Q.  Now, but you just said that list was dead serious.  It was

25   not dead serious, then?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car3                          Carroll - Cross

1   A.  The list can be dead serious with lighter moments.

2   Q.  Okay, but somehow that -- those men made it on to your dead

3   serious list of 21 men, correct?

4   A.  They made it on.

5   Q.  The mechanic who put --

6   A.  Yes.

7   Q.  -- your wheel on the wrong way --

8   A.  Yes.  He made the list.

9   Q.  -- he was one of the 21 most --

10  A.  Yes, because he later cost me $2,000 to have that fixed.

11  Q.  I guess some man who wouldn't let you park in an empty

12  parking lot, he was one of the most hideous men in your life

13  also?

14  A.  That's right.

15  Q.  Okay.  All right.  Now, it's your contention that you

16  didn't decide to include Donald Trump on that list until you

17  were already four or five weeks into writing the book, right?

18  A.  Yes.

19  Q.  In fact, you claimed that it wasn't until four or five

20  weeks into writing the book about the hideous men and why women

21  don't need men that you decide to first write about the alleged

22  incident at Bergdorf Goodman with Donald Trump, right?

23  A.  Yes.

24  Q.  And this is a book you desperately want and/or need to

25  sell, correct?  After you had begun drafting it, you wanted it

Case 23-793, Document 82, 11/20/2023, 3592069, Page93 of 300

A-1753

N4r2Car3                          Carroll - Cross

1    to do well, correct?

2    A.  Yes, I would like to sell the book I'm writing, yes.

3    Q.  And you thought that adding to your book the story about

4    being sexually assaulted by Donald Trump inside of a dressing

5    room in a department store would be a major element of your

6    book, right?

7    A.  I thought people would be interested.  It turned out I was

8    wrong.

9    Q.  And again, after you compiled your hideous men list and

10   four or five weeks into writing the book, Donald Trump then

11   became part of your book, right?

12   A.  He became part of the book and he -- his chapter was moved

13   around in the book.  He was not permanently fixed in the book

14   until the very end.

15   Q.  You obviously thought and you were told, I think you

16   testified, by your publisher that you thought including the

17   story about Donald Trump in your book while he was still

18   president would help sell the book obviously?

19   A.  I thought so.  I was wrong.

20   Q.  But you thought so, correct?

21   A.  Well, of course.

22   Q.  Okay.

23          And you said in fact you knew people would be

24   interested in the book when it mentioned Donald Trump, right?

25   A.  Yes, and again I was wrong.

N4r2Car3                    Carroll - Cross

1   Q.  Okay.  And a book proposal, just so we understand a book

2   proposal, argues why your book is marketable and will sell

3   copies, right?

4   A.  Yes.

5   Q.  And your Donald Trump Bergdorf Goodman story was the focal

6   point of your proposal, correct?

7   A.  It was a highlight definitely.

8   Q.  And writing the book is not the same as getting a publisher

9   or getting monetary advance or selling copies, right?

10  A.  Repeat the question, please.

11  Q.  Well, let me withdraw the question and ask the question

12  actually in English.  How about that?

13          When you set out to write a book, some of the things

14  that you could do is you get a publisher, right?

15  A.  Yes.

16  Q.  Okay.  You get a monetary advance in some --

17  A.  Yes.

18  Q.  -- instances.

19  A.  Sometimes.

20  Q.  Right?

21          And then hopefully you sell copies.

22  A.  Yes.

23  Q.  Okay.  And obviously you discussed with your publisher that

24  your Donald Trump story was critical to all of that, right?

25  A.  I don't think it was critical.  It was certainly a part of

Case 23-793, Document 82, 11/20/2023, 3592069, Page95 of 300

A-1755

N4r2Car3                        Carroll - Cross

1    the book.

2    Q.  As you were writing chapters for your book and getting

3    ready for your book proposal, you had to send an e-mail to your

4    agent, right?

5    A.  Yes.

6    Q.  And in fact you sent a written book proposal by e-mail to

7    Sarah is it Lazin?

8    A.  Lazin.

9    Q.  On March 7, 2018, right?

10   A.  I don't -- I'm not sure of the date.

11   Q.  Let me show you something that may or may not be able to

12   refresh your recollection, identification only, AN, please.

13          Just read that to yourself, Ms. Carroll.  When you are

14   done, let me know.

15   A.  Um-hmm, yes.

16   Q.  Do you recall sending an e-mail to Sarah Lazin on March 7,

17   2018, about your proposal?

18   A.  Now that I see this, yes.

19   Q.  And what you said to -- and she, again, is your literary

20   agent?

21   A.  Yes.

22   Q.  And you said that you will have to figure out a way for

23   this proposal not to get into the wrong hands as it could set

24   off its own little firestorm, right?

25   A.  I didn't say firestorm.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car3                          Carroll - Cross

1   Q.  Little storm.  I'm sorry, right, little storm.

2           And what you meant by that, obviously, was that the

3   disclosure of your proposal could set out a little storm

4   because it included the story about Bergdorf Goodman and Donald

5   Trump, right?

6   A.  Yes.

7   Q.  And you wrote that your book -- you wrote that your book

8   was a written -- written by an advice columnist, growing tired

9   of being impartial, finally lets loose and recalls the

10  grabbing, shoving, pestering, pinching, harassing, and mauling

11  by men in her own life, including being sexually assaulted by

12  president Trump in Bergdorf Goodman, correct?

13  A.  This is another exhibit?  What is this?

14  Q.  This, actually, is another exhibit.  You are right.  I was

15  asking you a question, but what's on the screen—hopefully just

16  for the witness, correct?—is another exhibit, but I was asking

17  you that question.  I don't know if you needed your

18  recollection refreshed.

19          THE COURT:  Is there a pending question?

20          MR. TACOPINA:  There is.

21  Q.  Did you write in your -- that your book in your proposal

22  was written by an advice columnist who, growing tired of being

23  impartial, finally lets loose, recalls the grabbing, shoving,

24  pestering, pinching, harassing, and mauling by men in her own

25  life, included being sexually assaulted by president Trump in

A-1757

N4r2Car3                          Carroll – Cross

1    Bergdorf's?

2    A.  I certainly wrote that.  I'm not sure if it made it into

3    the final draft.  This is an early draft, I suspect.

4    Q.  Okay.  And in that proposal, you didn't mention any other

5    men other than Donald Trump who was the president of the

6    country at the time, correct?

7    A.  I -- I don't recall.

8    Q.  Okay.  Now, for two decades -- you can take that down,

9    thanks.

10            For two decades, Ms. Carroll, you never called the

11   police and never revealed this story in your hundreds of

12   columns, correct?

13            MR. FERRARA:  I just object to the compound nature.

14   It is two questions.

15            THE COURT:  Sustained.

16            MR. TACOPINA:  Okay, okay.

17   BY MR. TACOPINA:

18   Q.  In two decades, you never called the police, correct?

19   A.  Correct.

20   Q.  Okay.  In two decades, you never revealed this story in

21   your hundreds of advice columns, correct?

22   A.  Correct.

23   Q.  Only when you were trying to get a publisher and sell your

24   book did this story come out, correct, for the first time?

25   A.  The story came out not because I was writing a book.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car3                        Carroll - Cross

1   Q.  My question was timing.  Only when you were trying to get

2   your publisher, and it may just be coincidence, but only when

3   you were trying to get a publisher and get money to sell your

4   book did the story come out for the first time?

5   A.  The story came out because in October, the first day I

6   started on my road trip, *The New York Times* published their

7   bombshell about Harvey Weinstein, and when that happened,

8   across the country women began telling their stories, and I was

9   flummoxed at, wait a minute, can we actually speak up and not

10  be pummeled?  Woman after woman stood up.  I thought, well,

11  this may be a way to change the culture of sexual violence.  I

12  said -- the light dawned.  I thought we can actually change

13  things if we all, if we all tell our stories.  And I thought,

14  by God, all right, this may be the time.

15  Q.  This may be the time.  Okay.  So it was the Harvey

16  Weinstein and all the women that came forward against him that

17  caused you to sort of leap into action and expose your

18  decades-old allegation, right?

19  A.  It caused me to realize that staying silent does not work.

20  It doesn't work.  If women speak up, we have a chance of

21  limiting the harm that happens.

22  Q.  And the women in the Harvey Weinstein ordeals all went to

23  the police, correct?

24  A.  No.

25  Q.  They didn't go to the police?

N4r2Car3                          Carroll - Cross

1    A.  I have no -- I don't know the details.

2    Q.  Do you know where Harvey Weinstein lives right now?

3              MR. FERRARA:  Objection.

4              THE COURT:  Sustained.

5    Q.  Do you know if Harvey Weinstein is in jail?

6              THE COURT:  Sustained.

7    Q.  I'm going to go back to my question again, which really is

8    about timing.  I understand you gave us the reasons why you

9    came out with it when you came out with it.  My simple question

10   is when you were trying to sell your book and get money for

11   your book is when you first mentioned the story about Donald

12   Trump in Bergdorf Goodman at that same time, correct?

13   A.  Yes.

14   Q.  And you got a $70,000 advance to write your book, right?

15   A.  Yes.

16   Q.  You may have even have gotten a signing bonus, correct?

17   A.  Didn't, I don't think I did.

18   Q.  You don't think you did?

19   A.  I'm not sure.

20   Q.  Well, do you recall testifying previously that you may have

21   gotten a signing bonus?

22   A.  I -- I don't know.

23   Q.  You don't know?

24   A.  I don't know what a signing bonus is.

25   Q.  I'm sorry, Ms. Carroll.  Did you just say you don't know

A-1760

N4r2Car3                         Carroll – Cross

1    what a signing bonus for a book advance is?

2    A.  Yeah, I have no idea.

3    Q.  I'm going to play a --

4    A.  I --

5    Q.  Hold on.

6           MR. TACOPINA:  I'm going to notify counsel, your

7    Honor, I plan on playing a portion of the deposition, a video

8    portion, very small, from the October 14, 2022 deposition from

9    a transcript that's page 158/lines 11-18.  Let me know when you

10   are ready.

11           (Continued on next page)

1           THE COURT:  Counsel, it would have been really helpful
2   if the binder I had been given had page numbers in it.
3           MR. TACOPINA:  I'm sorry.  I thought you had a copy of
4   the transcript in front of you.
5           THE COURT:  I was just directed to something else by
6   mistake.  Let me see what I have.
7           MR. TACOPINA:  OK, your Honor.
8           MR. FERRARA:  We have two extra copies, if your Honor
9   would like them.
10          MR. TACOPINA:  We gave the copies as well this
11  morning, your Honor.
12          MR. FERRARA:  Just for ease --
13          THE COURT:  Let's just see if I have it.
14          I do have it.  Is there any objection or not?
15          MR. FERRARA:  No, your Honor.
16          THE COURT:  Let me just say to the jury, depositions
17  are testimony taken in cases like this, all civil cases, pretty
18  much before trial.  They consist of questions by lawyers and
19  answers by the witness under oath.  They can be used in some
20  circumstances in trials.  Judges are not present when they are
21  taken, so the judge has to rule on any objections there may be
22  when the case comes to trial.
23          In this case, the deposition was taken on October 14
24  of last year, and the witness was under oath at the time.
25          Read the testimony, sir.

A-1762

N4RMCAR4                        Carroll - Cross

1          MR. TACOPINA:  Your Honor, for this one I am going to

2     play the video clip.

3          THE COURT:  OK.

4          MR. TACOPINA:  It is consistent with that line of

5     testimony.  Whenever you are ready, give me a look.  That means

6     everyone is going to see it.

7     Q.  Ms. Carroll, you just testified you don't know what a

8     signing bonus is.  Please look at your video deposition.

9          (Video played)

10    Q.  That was you, right?

11    A.  That was me.

12    Q.  So six months ago you knew was that a signing bonus was to

13    the point where you brought it up in an answer, right?

14         THE COURT:  Counselor.

15         MR. TACOPINA:  Yes, your Honor.

16         THE COURT:  Just a moment.

17         I withdraw the comment.

18         Go ahead and answer the question, please, Ms. Carroll.

19    A.  I like that I pictured myself as a baseball player with

20    getting a signing bonus.  I guess I did at that time, but I was

21    a little confused, I see, by this clip.  I am going:  I don't

22    know, did I, did I.  It's basically the same answer.  I don't

23    know that I got extra money.  It's the same answer.  I don't

24    know if I got extra money.

25    Q.  You say it's the same answer.  You testified about a minute

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

A-1763

N4RMCAR4                          Carroll - Cross

 1   ago here before this jury that you don't know what a signing

 2   bonus was, correct?

 3          MR. FERRARA:  Objection, your Honor.  Asked and

 4   answered.

 5          THE COURT:  Sustained.

 6   Q.  You started talking about this Donald Trump Bergdorf

 7   Goodman story as part of the campaign to sell your book, and

 8   you talked to *New York* magazine as part of your prepublication

 9   publicity, correct?

10   A.  Yes.

11   Q.  In fact, this Donald Trump story was the single most

12   important part of your prepublication -- publicity focus,

13   right?

14   A.  It grew into that.

15   Q.  Grew into that.

16          Before your book was available for purchase,

17   Ms. Carroll, you chose to release your allegations against

18   Donald Trump in an article appearing in The Cut, correct?

19   A.  Yes.

20   Q.  And The Cut is, I guess, an online version of *New York*

21   magazine?

22   A.  No.  The Cut is a section of New York magazine.  It's a

23   vertical, one of their verticals online also.

24   Q.  And that article was published in The Cut on June 21, 2019,

25   correct?

**A-1764**

N4RMCAR4                         Carroll – Cross

1    A.  Yes.

2    Q.  And you saw that yesterday.  I think that was put into

3    evidence, in part, by the plaintiff, by you, correct?

4    A.  Yes.

5    Q.  And that article was actually an edited version of your

6    book, right?

7    A.  Yes.  It contained several brief -- it was a combination of

8    chapters.

9    Q.  And you approved the edits for the cut piece, correct?

10   A.  Yes.

11   Q.  Let's now talk about your story involving Donald Trump and

12   Bergdorf Goodman.

13           THE COURT:  Given that you're changing gears, ladies

14   and gentlemen, lunchtime.  2:00, please.

15           (Jury not present)

16           (Luncheon recess)

17

18

19

20

21

22

23

24

25

A-1765

N4RMCAR4                          Carroll – Cross

1                          AFTERNOON SESSION

2                               2:10 p.m.

3              (In open court)

4              THE COURT:  Good afternoon, everybody.

5              Please bring in the jury.

6              (Jury present)

7              THE COURT:  Ms. Carroll, you are still under oath.

8              Members of the jury, I hope you enjoined your

9      delicious repast.

10             Mr. Tacopina, you may proceed.

11             MR. TACOPINA:  Thank you, your Honor.

12     BY MR. TACOPINA:

13     Q.  Mr. Carroll, I left off with you by saying that I want to

14     discuss your story regarding Bergdorf Goodman and Donald Trump.

15             You met Donald Trump at that event briefly in 1987?

16     A.  Yes.

17     Q.  That was over 35 years ago, as we sit here today, correct?

18     It was a long time ago.

19     A.  Yeah, right.

20     Q.  When you met him at that event, you weren't alone at the

21     time, right?

22     A.  No.

23     Q.  That meeting happened --

24             THE COURT:  Just a second.  The question was:  You

25     weren't alone, right?  And you answered no, which raises the

N4RMCAR4                          Carroll - Cross

1    question of whether he is not right or whether you weren't

2    alone.

3    Q.  When you met him, Donald Trump, in 1987, you were not alone

4    at the time?

5    A.  That's correct.

6    Q.  That meeting happened within a group of people?

7    A.  There were four of us.

8    Q.  Right.

9           You, your husband, John Johnson; Donald Trump, and his

10   wife Ivana?

11   A.  Yes.

12   Q.  And you spoke for about five minutes, five or six minutes?

13   A.  Yes.

14   Q.  During that group conversation you spoke with Ivana?

15   A.  Yes.

16   Q.  And you actually had in your possession a photograph that

17   was snapped of that brief encounter, correct?

18   A.  Yes.

19   Q.  And you kept that photograph of you with Donald Trump for

20   two decades, right?

21   A.  It was in a scrapbook.

22   Q.  Whose scrapbook?

23   A.  My scrapbook.

24   Q.  I said, you kept that photograph of you with Donald Trump

25   for two decades?

**A-1767**

N4RMCAR4                         Carroll - Cross

1   A.  Yes.

2   Q.  And because that photograph was taken before iPhones and

3   all these things, it was a physical photograph, like the

4   traditional?

5   A.  Yes.

6   Q.  You made it a point when submitting your book proposal that

7   we talked about to include within that book proposal the

8   photograph that we just discussed, correct, of Donald Trump?

9   A.  Yes.

10          MR. TACOPINA:  Could you put up PX-12, please.  It's

11  in evidence.

12  Q.  Just to be clear, this is the photograph we are talking

13  about, correct?

14  A.  Yes.

15  Q.  That's the encounter, right?

16  A.  Yes.

17  Q.  That, by the way, is your exhusband, John Johnson, who you

18  described strangled you three times, correct?

19  A.  Yes.

20  Q.  And that brief encounter happened either at one or two

21  parties, right?

22  A.  Yes.

23  Q.  I think it was maybe the NBC television party where you

24  worked or an ABC party where your exhusband, John Johnson,

25  worked?

Case 23-793, Document 82, 11/20/2023, 3592069, Page108 of 300

A-1768

N4RMCAR4                         Carroll - Cross

1    A.  Yes.

2    Q.  You don't remember for sure which one it was when you met

3    Donald Trump, right?

4    A.  No.

5    Q.  You also don't recall where the party was hosted?

6              THE COURT:  I'm sorry.  It's the same problem.

7              MR. TACOPINA:  I just realized that.  You're right,

8    your Honor, absolutely.

9    Q.  You also don't recall where the party was hosted?

10   A.  I can picture the room, but I don't remember where the room

11   was.

12   Q.  And you don't remember the subject matter that you

13   discussed?

14   A.  It was various subjects.  Quickly, it was a lilting, quick,

15   juicy, interesting conversation that I don't remember what the

16   topics were.

17   Q.  Do you remember that it was a juicy conversation, but you

18   don't remember what was juicy about it?

19   A.  That's right.

20   Q.  In fact, you don't even remember who else you spoke to at

21   the party.

22   A.  No.  I had memories of speaking to people, probably, at

23   this party, but I can't absolutely say for certain that it was

24   this party.

25   Q.  After that party where you had this quick conversation of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 82, 11/20/2023, 3592069, Page109 of 300

A-1769

N4RMCAR4                        Carroll - Cross

1    five minutes between the four of you -- and it seemed like a

2    bunch of people right behind you as well.

3              Is that right, Mr. Carroll?

4    A.  I think they are shoving through to go around us.

5    Q.  In any event, after that, you never had any phone calls or

6    communications with Donald Trump, correct?

7    A.  Correct.

8    Q.  I mean up until the time you say you met him in Bergdorf.

9    And you never exchanged any letters or anything with him,

10   correct?

11   A.  No.  You are right.

12             MR. TACOPINA:  You can take that down.  Thank you.

13   Q.  In fact, after the party and before the alleged incident at

14   Bergdorf Goodman, the only other interaction you claim to have

15   had with Donald Trump was in either '94 or '95, right?

16   A.  Yes.

17             MR. FERRARA:  Objection.

18             THE COURT:  Sustained.  '94, '95.

19             MR. TACOPINA:  Judge -- let me do that again.

20   Q.  Before the alleged incident at Bergdorf Goodman, the only

21   other interaction you claim to have had with Donald Trump was

22   in 1994 or 1995, before?

23             THE COURT:  I'll allow the question.  The witness

24   should listen to it.

25   A.  I thought I corrected '94 or '95 yesterday.

N4RMCAR4                        Carroll - Cross

1   Q.  Ms. Carroll, I am not talking about the alleged incident at

2   Bergdorf Goodman.  You said that's '95, '96, right?  That's

3   where we're at.  Yes?

4   A.  OK.

5   Q.  I'm talking about a year before that, the other encounter

6   you had with Donald Trump.

7   A.  You mean the wave across the street?

8   Q.  Yeah, that's what I mean.

9   A.  I couldn't put it before '94 or '95.  I said sometime

10  between '87 and '95, '96.

11  Q.  '87.  OK.  Hold on one second.

12  A.  Possibly.  It had to be sometime within --

13  Q.  Give me one second.  I am just going to look at something,

14  Ms. Carroll.

15          MR. TACOPINA:  I am going to read -- direct everyone's

16  attention -- I will just read it, your Honor.  I am not going

17  to post it.  As soon everybody is ready.

18          Deposition, page 50 of Ms. Carroll from October 14,

19  2022, line 19 through line 9, for the purpose of this question:

20  Page 50, line 19 to page 51, line 9.

21          THE COURT:  Just give me a minute.

22          Go ahead.

23          MR. TACOPINA:  Counsel, are you ready?

24          MR. FERRARA:  Yes.  Thank you.

25  Q.  You testified under oath in a deposition, Ms. Carroll,

N4RMCAR4                          Carroll - Cross

1    that:

2    "Q. Following the conversation, can you please tell me any

3    other time you met with Donald Trump?

4    "A. He said hello to me one time on the street, waved.

5    "Q. When was that?

6    "A. '94 or '95.

7    "Q. When was that?  Was that in New York?

8    "A. Yes.

9    "Q. Do you remember where in New York?

10   "A. Yeah.  He was standing on the side of Fifth Avenue where

11   the Trump building is, and I was across the street on Fifth

12   Avenue."

13           You gave that answer to that question under oath,

14   correct, Ms. Carroll?

15   A.  Yes.

16   Q.  And that was truthful?

17   A.  Yes.

18   Q.  My question was, other than the party and before Bergdorf

19   Goodman, the only other time you claim to have interacted with

20   Donald Trump was in 1994 or 1995, right?

21   A.  Yes.

22   Q.  And that was this incident we just described where he's on

23   one side of Fifth, you're on the other, right?

24   A.  Yes.

25   Q.  And you think he may have waved to you from across the

N4RMCAR4                     Carroll - Cross

1   street in traffic?

2   A.  Yes.

3   Q.  And it's your sworn testimony that Donald Trump waved at

4   you across traffic, even though he only met you briefly at a

5   party eight or nine years earlier and hadn't had any

6   interactions with you since, correct?

7              MR. FERRARA:  Objection.

8              THE COURT:  Sustained.  Argumentative.

9   Q.  Well, you testified that the party was 1987, so that's

10  eight or nine years earlier than '94 or '95, right?

11             THE COURT:  We can all do the math.

12  A.  Yes.

13             Let's move it along.  Everybody can subtract 84 from

14  93, or whatever it is.

15             MR. TACOPINA:  Thanks, your Honor.

16  Q.  Other than that, math that we can all do, you hadn't any

17  other interactions with him since, correct?

18  A.  Yes.

19  Q.  And you are not even sure really if he was waving at you,

20  right, Ms. Carroll?

21  A.  I turned around to see if anyone was standing behind me.  I

22  didn't see anyone.  So I waved back.

23  Q.  It seemed to you that he was waving at you, but, as you

24  have said previously, you can't say with certainty whether he

25  was waving at you or someone else, right?

N4RMCAR4                        Carroll - Cross

1    A.  That's right.

2    Q.  Let's talk about Bergdorf Goodman for a minute.

3            You would agree that Bergdorf Goodman is a store of

4    perfections?

5    A.  Yes.

6    Q.  In fact, the store's perfections are well known?

7    A.  Yes.

8    Q.  You would agree that the store is also posh?

9    A.  Yes.

10   Q.  Meaning it's upscale, right.  OK.

11           The store is also gracious?

12   A.  Particularly gracious, yes.

13   Q.  Meaning its employees are courteous and attentive.  In

14   fact, in this regard you would agree that the store is novel?

15   A.  Many stores aim to have -- to be gracious.

16   Q.  When I asked you about gracious, I'm saying, when you said

17   gracious, you mean that its employees are courteous and

18   attentive, correct?

19   A.  By gracious I mean they are warm and inviting and conducive

20   to shopping.

21   Q.  And its level of service and attention to customers is

22   strikingly unique and resembles nothing else.

23           You said that, right?

24   A.  Yes.

25   Q.  In fact, it is your belief that because Bergdorf Goodman is

N4RMCAR4                        Carroll - Cross

1    such an upscale store, it even refers to its customers as

2    clients, right?

3    A.  I don't think I said that, but I certainly agree with it.

4    Q.  Is it your testimony that you have not used clients in

5    regards to Bergdorf Goodman's customers?

6    A.  I am not sure if I did or not.  I don't know.

7    Q.  On the day you claim to have seen Donald Trump at Bergdorf

8    Goodman you were alone when you went into the store, right?

9    A.  Yes.

10   Q.  And you don't recall with any clarity of what you went

11   there to buy that day, correct?

12   A.  No.

13            THE COURT:  No, it's not correct or --

14            THE WITNESS:  No.  That's correct.  I don't remember

15   what I was shopping for.

16            MR. TACOPINA:  Sorry, your Honor.

17   Q.  When you were leaving Bergdorf Goodman that day you

18   supposedly saw Donald Trump coming in?

19   A.  Yes.

20   Q.  And at the time you were separated by a door?

21   A.  Yes.

22   Q.  In your book, which you published in 2019, you don't recall

23   whether it was a revolving door or just a regular hinge door,

24   correct?  Is that correct?

25   A.  Yes.

A-1775

N4RMCAR4                         Carroll - Cross

1   Q.  Now, as you sit here today, are you definitive that it was

2   a revolving door?

3   A.  As I sit here today, I know it's a revolving door.

4   Q.  As you sit here today, you know it's a revolving door.  OK.

5           MR. TACOPINA:  Let's put up AA in evidence.  For

6   reference, it's the book, page 245, lines 5 through 8.

7   A.  When I wrote the book --

8           THE COURT:  There is no question yet, Ms. Carroll.

9           MR. TACOPINA:  Only for counsel and the witness.

10          THE COURT:  Is there a question.

11          MR. TACOPINA:  Yes.

12  Q.  You just testified that you are certain it is a revolving

13  door as you sit here today.

14          In your book, on page 245 --

15          MR. TACOPINA:  Counsel, can I proceed?

16          MR. FERRARA:  Yes.  Thank you.

17          MR. TACOPINA:  Please display to the jury as well.

18          AA in evidence, this is from page --

19          THE COURT:  Is AA in evidence?

20          MR. TACOPINA:  AA in evidence, your Honor, page 245,

21  lines 5 through 8.

22  Q.  You write in your book, in relevant portions:  I am going

23  out the revolving door and one of New York's most famous men is

24  coming in the revolving door, or it could have been a regular

25  door at the time.  I can't recall.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

N4RMCAR4                        Carroll - Cross

1   A.  When I wrote the book --

2           THE COURT:  There is no question yet, Ms. Carroll.

3   Q.  This is from your book back in 2019, right?

4   A.  Yes.

5   Q.  Correct.

6           And today, despite what you wrote in your book, today

7   it's your testimony that not that you can't recall, that you

8   are sure it was a revolving door.

9   A.  Yes.

10  Q.  What cleared up your memory on that?

11  A.  I went to Bergdorf's.

12  Q.  When?

13  A.  In 2019, perhaps when the book was accomplished.

14  Q.  So after you published the book where you say you can't

15  recall if it was a revolving or regular door, you went to

16  Bergdorf's to check it out?

17  A.  Yes, I did.

18  Q.  You would agree that 2019 is more than 20 plus years from

19  1995 or 1996, right?

20  A.  Yes.

21  Q.  And you are certain that Bergdorf would never have changed

22  their doors?

23  A.  No, I'm not certain.  I was never sure about the door when

24  I wrote the book.  Not sure about the door.  I could see him.

25  I couldn't remember whether it was a revolving door or

N4RMCAR4                        Carroll - Cross

1    push-in-and-out door.

2    Q.  You wrote the book in 2019?

3    A.  I wrote it in 2018.

4    Q.  Again, my question is, you became sure that it was a

5    revolving door in 2019?

6    A.  Yes.

7    Q.  Because you went there 20 something years after the alleged

8    incident?

9    A.  Yes, I did.

10   Q.  According to you, as you were coming out of the store, he,

11   from the outside, held his hand up?

12   A.  Yes.

13   Q.  And he did that, obviously, while he was still outside and

14   on the other side of the door?

15   A.  Yes.

16   Q.  And you stayed inside the store?

17   A.  Yes.

18   Q.  You didn't come out at any particular point; you waited for

19   him?

20   A.  No.  He went like this, so I stopped.

21   Q.  OK.

22          And at the time of this supposed interaction, your

23   story is that Donald Trump didn't have any security with him at

24   all?

25   A.  None that I could see.

N4RMCAR4                         Carroll – Cross

1    Q.  In fact, according to you, just like yourself, he was

2    alone?

3    A.  I believe he was.

4    Q.  As far as you know, you can't identify anybody by name who

5    saw this supposed interaction between you and Mr. Trump?

6    A.  No.

7             THE COURT:  I'm sorry to interrupt again.  Does that

8    mean, Ms. Carroll, that the statement that you can't identify

9    anybody or saw it is not correct or that it is correct?

10            THE WITNESS:  I could not identify anyone who was in

11   the store at the time or outside with Donald Trump at the time.

12            THE COURT:  Mr. Tacopina, I would hope you would

13   phrase your questions in a way that we don't have to keep doing

14   this.

15            MR. TACOPINA:  Sure, your Honor.

16            THE COURT:  Thanks.

17   Q.  According to you, at that moment upon seeing -- the moment

18   he saw you in Bergdorf Goodman he said to you, hey, you're that

19   advice lady?

20   A.  Yes.

21   Q.  And you responded by saying, hey, you're that real estate

22   tycoon?

23   A.  Yes.

24   Q.  And around this period of time, from 1995 to 1996, Donald

25   Trump was a well-known public figure?

N4RMCAR4                         Carroll - Cross

1    A.  Yes.

2    Q.  He was a man about town who could make television

3    appearances and was entertaining?

4    A.  Yes.

5    Q.  And you yourself called him one of New York's most famous

6    men?

7    A.  Oh, absolutely.

8    Q.  It's your story that the people in the store recognized him

9    at the time?

10   A.  Yes.  Two people in the store.

11   Q.  One was a customer who was sort of gaping at him, correct?

12   A.  Yes.

13   Q.  And, according to you, a sales attendant recognized Donald

14   Trump also?

15   A.  Yes.

16   Q.  It's your story that no sales attendant at Bergdorf tried

17   to help him?

18   A.  No.  That is -- no sales assistant tried to help him.

19   Q.  According to you, after Donald Trump saw you through a

20   door, stopped you, supposedly recognized you after speaking to

21   you for a few minutes eight or nine years earlier, he asked you

22   to help him buy a present?

23            MR. FERRARA:  Objection to the argumentative portion

24   of the question, your Honor.

25            THE COURT:  Sustained.  Rephrase.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 82, 11/20/2023, 3592069, Page120 of 300

A-1780

Case 1:22-cv-10016-LAK   Document 189   Filed 06/15/23   Page 84 of 154     390
N4RMCAR4                    Carroll - Cross

1  Q.  After Donald Trump saw you, he asked you to help him buy a
2  present?
3  A.  Yes.
4  Q.  And after Donald Trump called you old, according to you, he
5  got the idea of shopping for lingerie?
6  A.  It was several minutes after we met he said -- I questioned
7  him who the present was for.  He said a girl.  I offered him
8  the idea of a handbag.  I offered him the idea of a hat.  I
9  told him every woman would love a hat.  And he picked up a hat.
10  And it was a very pleasant, sort of jovial time discussing
11  presents.
12  Q.  He, in fact, asked you to help him buy the lingerie?
13  A.  Then he said the word.  He didn't say can you help me
14  buy -- he said:  I know.  Lingerie.
15          THE COURT:  Hold up a minute, Mr. Tacopina.
16          Go ahead.
17          MR. TACOPINA:  Thank you.
18  Q.  You have a specific memory of him using the word lingerie,
19  specifically that word?
20  A.  I had a memory of him saying lingerie.  And then, as I was
21  writing, I thought, he also could have said underwear or
22  another word for lingerie.  I believe that he said:  I know.
23  Lingerie.
24  Q.  It's your testimony that when you were writing you realized
25  maybe it wasn't lingerie but some other word that he said?

N4RMCAR4                          Carroll - Cross

1    A.  It all meant the same thing.  It all meant ladies'

2    undergarments.  I'm pretty sure he said lingerie.  I put that

3    in the book.  I think I also put in the book he could have said

4    underwear.  But he definitely suggested ladies' undergarments.

5    Q.  According to you, you agreed to go with Donald Trump and

6    help him buy lingerie?

7    A.  Yes.  I was delighted.  I thought, the story was shaping up

8    to be quite hilarious.

9    Q.  At that point it's your story that you and Donald Trump

10   left the ground floor to go to the lingerie department?

11   A.  Yes.

12   Q.  You took the escalator up?

13   A.  Yes.

14   Q.  I believe it was the sixth floor, correct?  You believe it

15   was the sixth floor?

16   A.  Yes.

17   Q.  It seemed like you were on the escalators for a long time.

18   A.  He was a big talker, so the time went pretty quickly.

19   Q.  My question was, did it seem like you were on the

20   escalators for a long time?

21   A.  Yes.  But the time went quickly.

22   Q.  Even though you were on the escalators a long time, but the

23   time went quickly, going about six flights in a New York City

24   department store, it's your story you didn't see a single other

25   person in the entire store as you did?

N4RMCAR4                         Carroll - Cross

1    A.  I was not looking for other people.  I was engaged in a

2    very interesting conversation with Donald Trump talking about

3    maybe at one time he was thinking of buying Bergdorf's.  He's a

4    very engaging conversationalist.  So I was not looking around.

5    I was probably paying more attention to the conversation.

6    Q.  Would it be accurate to say you didn't see another person

7    in that store as you were going up the escalator?

8    A.  I was not looking for other people.  I did not -- I did not

9    form an opinion either way whether there are other people.

10   Q.  You didn't.

11          I am going to read you from your sworn testimony.

12          MR. TACOPINA:  Before I do, I'll alert everyone where

13   we are going:  October 14, 2022, page 105, lines 5 through 10.

14          MR. FERRARA:  No objection.

15          THE COURT:  Go ahead.

16   Q.  When you say you didn't form an opinion one way or the

17   other i there were other people, you were asked this question

18   on October 20, '22 under oath --

19          THE COURT:  Mr. Tacopina, I put out an order about ten

20   days ago.

21          MR. TACOPINA:  I have it.

22          THE COURT:  Good.  Let's stick to it.

23          MR. TACOPINA:  OK.

24          THE COURT:  Just read the testimony.

25   Q.  "QUESTION:  At any point after you went on the escalator,

1    did you speak to any other staff members at Bergdorf?

2    "A. No.  We didn't see any other people.  We did not see

3    anybody going up the escalator."

4           You gave that testimony under oath a few months ago,

5    right?

6           THE COURT:  That's why the court reporter was there,

7    took it down.  We are not going to have that colloquy back and

8    forth.  That's what I said in the order.

9    Q.  Was the testimony you gave truthful?

10   A.  Yes.

11   Q.  In October?

12   A.  Yes.  We didn't see anybody else.  I didn't know what he

13   saw, but I didn't see anybody else.

14   Q.  It's not that you don't recall one way or another.  You can

15   sit here affirmatively testifying you did not see anyone else,

16   correct?

17   A.  I was not concentrated on it.  Because I was not

18   concentrated on looking around, I did not see anyone.

19          THE COURT:  Mr. Tacopina, you have your answer.  Let's

20   move along.

21          MR. TACOPINA:  I'm moving on, your Honor.  I am moving

22   on.

23   Q.  Once you got to the sixth floor of the lingerie floor,

24   after getting off the escalator, you say you and Donald Trump

25   walked to the lingerie section.

N4RMCAR4                          Carroll - Cross

1    A.  Yes.

2    Q.  And it's your story while on the sixth floor you didn't see

3    any customers there?

4    A.  No, I didn't see any customers.

5    Q.  It is your claim you didn't see a single person in any of

6    the departments you walked through on that floor?

7    A.  I didn't see anybody.  We went past cruise wear.  Could

8    have been bathing suits.  I think it was cruise wear.  I didn't

9    see any people.

10   Q.  It's your story that you didn't see any customers on the

11   entire sixth floor?

12   A.  Didn't see any.

13   Q.  Aside from customers, you also didn't see any sales

14   attendants?

15   A.  Did not see any.

16   Q.  It's your testimony that in one of New York's most

17   prestigious department stores, there was not a salesperson or a

18   customer or employee on the sixth floor?

19              MR. FERRARA:  I am going to object.

20              THE COURT:  Objection sustained.

21              You get to make a closing argument in this case,

22   counselor, and this isn't the time for it.

23   Q.  Because Bergdorf Goodman is such an attentive, upscale

24   store, you would agree it doesn't make sense that a sales

25   attendant would not be present in the lingerie department when

N4RMCAR4                          Carroll - Cross

1    you were supposedly there with Donald Trump?

2              MR. FERRARA:  Objection.

3              THE COURT:  Sustained.

4              MR. TACOPINA:  Can I understand the basis of that,

5    your Honor.

6              THE COURT:  Yes.  It's argumentative.  It's repetitive

7    and it's inappropriate.

8              MR. TACOPINA:  I never asked if she thought it ever

9    made sense.

10             THE COURT:  I'm sorry, Mr. Tacopina.  We are going to

11   move on.  In this courtroom, the ruling is the ruling, not the

12   start of an argument.

13   Q.  You'd agree that story about no one being on the sixth

14   floor is inconceivable, correct?

15   A.  It's hard to imagine that there would not be a sales

16   attendant in Bergdorf's.  It's surprising.

17   Q.  The word you used to describe that lack of sales attendants

18   or anyone close was inconceivable, correct?

19   A.  Yes.

20   Q.  Inconceivable --

21   A.  Cannot be imagined.

22   Q.  Unbelievable, correct?

23   A.  Yes, that's what it means.

24   Q.  Now, the quality of merchandise and the cost of merchandise

25   at Bergdorf Goodman is relatively expensive compared to a

A-1786

N4RMCAR4                          Carroll - Cross

1   Bloomingdale's or something, no offense to Bloomingdale's,

2   correct?

3   A.  I think it is, yes.

4   Q.  And you'd agree that in Bergdorf Goodman a single piece of

5   lingerie could easily costs hundreds and hundreds of dollars?

6   A.  Yes.

7   Q.  And lingerie, some pieces of lingerie are skimpy, things

8   that could easily be concealed and shoplifted.

9   A.  I don't know.

10  Q.  You don't know if they are skimpy --

11  A.  I know some of them are skimpy, yes, that's a good word.

12  Q.  But it's your story that in this posh, upscale store, there

13  were simply three or four boxes of merchandise left unattended

14  by the checkout counter in the lingerie section?

15  A.  There are three or four boxes.  I don't know if there is

16  anything in them.  But there was a bodysuit on the counter.

17  Q.  Next to the three or four boxes?

18  A.  Yes.

19  Q.  Unattended?

20  A.  Absolutely unattended.

21  Q.  According to you, Donald Trump picked up that piece of

22  lingerie next to the three or four boxes and said to you:  Go

23  put this on?

24  A.  Yes.  He said:  Go try this on.

25  Q.  Go try this on.

Case 23-793, Document 82, 11/20/2023, 3592069, Page127 of 300

A-1787

N4RMCAR4                        Carroll - Cross

1              Based on your own story, Donald Trump told you to go

2       try on the lingerie, correct?

3       A.  Yes.

4       Q.  He didn't ask to go into a changing room with you, did he?

5       A.  No.

6       Q.  And in response to Mr. Trump telling you to go try on the

7       lingerie, it's your story that you thought you could get him to

8       try it on?

9       A.  No.  My story is, I told him that it was his color.

10      Q.  Before you told him it was his color, you told him that he

11      should go try on the lingerie?

12      A.  Yeah.  I had no intention of putting on any lingerie, but I

13      thought it was terrifically funny that he was holding it up in

14      the air, and this is really a beautiful piece of lingerie, see

15      through.  And it struck me as suddenly funny if I could get him

16      to put it on.  If he's talking about trying on lingerie, maybe

17      he should be the one to put it on.

18      Q.  You thought that would be a story you could tell your

19      friends at dinner?

20      A.  That's exactly what I thought.

21      Q.  And the lingerie, is that see through, very pretty, lilac,

22      grayish blue, one-piece bodysuit with lace?

23      A.  Yes.

24      Q.  And Donald Trump is about six foot three inches?

25      A.  I think so.

N4RMCAR4                        Carroll - Cross

1   Q.  You say he weighed 100 pounds more than you, so

2   approximately 225 pounds back in 1995 or '96?

3   A.  That's what makes it so comical.  If Donald Trump weighed

4   130 and was five foot eight, there would be no humor in it.

5   But Donald Trump being a large, tall, very manly man, it made

6   it twice as funny, the idea of Donald Trump putting this

7   lingerie on over his pants.

8   Q.  It's your claim that that was your plan, to get this large

9   man to put on a not-so-large, see-through lace bodysuit over

10  his suit pants?

11  A.  That was what I was thinking in my mind.  It just struck me

12  as very funny.  If a man tells me to go put on some lingerie,

13  my natural instinct is to tell him to go put on the lingerie.

14  I was just turning everything around.

15  Q.  In order to get Donald Trump to try on this lingerie over

16  his clothes, it's your story that you tossed it at him and told

17  him it goes with his eyes?

18  A.  No.  It was bluish.

19  Q.  It's your testimony you told him it was his size?

20  A.  Yes.

21  Q.  Obviously, it wasn't his size.  You were just kidding.

22  A.  No.  When you're having funny joshing, back and forth, I

23  didn't think any of it was serious.  I had written a similar

24  scene on Saturday Night Live and got nominated for an Emmy for

25  the very thing of a man getting dressed in front of a mirror.

N4RMCAR4                           Carroll - Cross

1    The idea was, to me, hilarious.

2    Q.  You wrote a scene for Saturday Night Live about a man

3    putting on lingerie over a suit?

4    A.  About a man getting dressed in the bathroom, and he was

5    wearing his underwear.

6    Q.  Over his suit?

7    A.  No.  It was just a man in his bathroom falling in love with

8    himself in front of the mirror.

9    Q.  To you that's a similar scene as Donald Trump, in the

10   middle of Bergdorf Goodman, with his suit on, trying on a piece

11   of women's lingerie?

12   A.  That's how my mind works.  That's how comedy is born.  You

13   take two opposite things, you put them together, and it makes a

14   new scene.  That's where comedy comes from.

15   Q.  Did that ask it ever air on Saturday Night Live?

16   A.  Yes.

17   Q.  When was that?

18   A.  1987, William Shatner played the role.

19   Q.  According to you -- by the way, there was no woman involved

20   in that skit; it was just one person alone in a bathroom?

21   A.  No, no.  Nora Dunn was playing his wife and was making very

22   unflattering comments as he was falling in love with himself in

23   front of the mirror.

24   Q.  Are you done?

25   A.  Yeah.

Case 23-793, Document 82, 11/20/2023, 3592069, Page130 of 300

                                                                            400
N4RMCAR4                         Carroll - Cross

1   Q.  At that point of the story you say that you picked out

2   often unattended sales counter or he picked out.

3           Who picked out the lingerie, you or him?

4   A.  He snatched it up.  There was no picking out.  There were

5   no other items to choose from.  He just picked it up.

6   Q.  And then you went with him into the dressing room, correct?

7   A.  He said:  Let's go put this on.  I had no concept about how

8   this was going to turn out.  I thought this funny conversation

9   would continue.

10  Q.  According to you, you went into the dressing room first.

11  A.  That's because he had me -- made the manly gracious

12  gesture, after you, or some people say, ladies first.

13  Q.  You say he held you by the arm and brought you into the

14  dressing room?

15  A.  I'm not saying he hold me.  I'm saying he had me by the

16  arm.  I thought it was a friendly, steering sort of -- sort of

17  steering me that way, hand on the elbow as a man guides a woman

18  through a hallway or upstairs.

19  Q.  In your previous testimony had you mentioned that he had

20  guided you with his arm on your arm into the locker room or

21  changing room?

22  A.  I am not sure.

23  Q.  Now, once you got into the changing room, you went first.

24  You were in there first, right?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4RMCAR4                        Carroll - Cross

1   Q.  And the dressing room door was open and unlocked.

2   A.  Yes.

3   Q.  As you described, that was an odd thing?

4   A.  Yes, it was odd.

5   Q.  That's because Bergdorf's dressing room doors are usually

6   closed.

7   A.  I think most department stores keep their dressing room

8   doors closed.

9   Q.  I'm asking about Bergdorf Goodman:  So Bergdorf Goodman

10  dressing room doors are usually closed?

11  A.  Yes.  It struck me as odd.

12  Q.  Usually the way that works is, they remain closed and

13  locked until a client wants to try something on and a sales

14  attendant will unlock the door and let them in?

15  A.  Yes.

16  Q.  For the sake of this story, you'd agree that the dressing

17  room door being opened at that moment, to use your word, was an

18  amazing happenstance?

19  A.  I was surprised, yes.

20  Q.  Is that what an amazing happenstance means?

21  A.  Amazing, yeah.

22  Q.  And your plan, again, was, once inside, to get Donald Trump

23  to try this lingerie on over his clothes, not under it?

24  A.  The last thing I wanted to see is Donald Trump taking off

25  his clothes.  I wanted to put it on over his clothes and,

Case 23-793, Document 82, 11/20/2023, 3592069, Page132 of 300

A-1792

1    frankly, I didn't really expect that to happen.  I just

2    expected the sort of the joshing to continue.  We would walk in

3    the dressing room, turn around and walk out.

4    Q.  So you walked into the dressing room not really expecting

5    him to try on the lingerie --

6    A.  I pictured in my mind as the most hilarious image of him

7    putting it on over his pants.  I didn't have a minute to think

8    any further because he slammed the door and thrust me up

9    against the wall.  So my thinking about what was going to

10   happen was overcome with what actually did happen.

11   Q.  But the plan was at least to enter that dressing room, to

12   have him try that lingerie on over his suit, not under it, yes?

13   A.  That's what I was picturing.  I didn't have a plan.  I

14   didn't want the scene to stop.  It was, you know, very funny.

15   I didn't want to be the one to call the end to it.

16   Q.  At that time still you saw no one on that floor account,

17   correct?

18   A.  No.  I saw no one.

19   Q.  Why did you have to go in a dressing room for this?  If

20   there was no one on this floor, he wasn't taking off these

21   clothes, he was just putting this lingerie over his clothes,

22   why did you have to go to a dressing room for him to do that?

23   A.  I don't know.  Making it all funnier.

24   Q.  All the funnier?

25   A.  There are mirrors in dressing rooms.  That's why you go

N4RMCAR4                    Carroll - Cross

1   into a dressing room.  There are mirrors.

2   Q.  It's your story that once you stepped into the dressing

3   room, the door banged closed and Donald Trump pushed you up

4   against the wall?

5   A.  Yes.

6   Q.  He didn't look the door behind him, you said, correct?

7   A.  No.

8   Q.  Instead --

9            THE COURT:  Not correct or it is correct?  Sorry, Mr.

10  Tacopina.  You're the one putting the questions.

11  Q.  Is it correct that he didn't lock the door behind you?

12  A.  He did not look the door.

13  Q.  And, instead, he immediately pushed you up against the wall

14  so hard that you banged your head?

15  A.  Yes.

16  Q.  According to you, it was so hard that it hurt?

17  A.  Yes.

18  Q.  It's your story that he pushed you a second time?

19  A.  Yes.  Because I pushed back.  After he pushed me into the

20  first, I pushed back.

21  Q.  And that caused you to hit your head again.

22  A.  Yes.

23  Q.  It is also your testimony you didn't feel like Donald Trump

24  was trying to hurt you, you said, correct?  I'm sorry.

25  Withdrawn.

1          It's also your testimony that you said that you don't

2   feel that Donald Trump was trying to hurt you?

3   A.  I didn't think so.  I was very confused.  I thought maybe

4   it was a mistake.  The first push, I thought, he couldn't have

5   meant that.  I thought he had made a mistake.  I thought that's

6   very strange, that I thought it was a mistake.  Yeah.

7   Q.  In any event, with regard to the noise from the alleged

8   assault, it is your story that you heard a bang when you hit

9   your head?

10  A.  Yes.

11  Q.  According to you, the bang was so loud that if someone was

12  in the dressing room next door they would have heard it?

13  A.  Yes.

14  Q.  According to you, the bang was so loud, if there were a

15  sales attendant outside the dressing rooms they would have

16  heard it?

17  A.  Yes.

18  Q.  So, based on your own account, Donald Trump was trying to

19  attack you quietly so others couldn't hear.

20  A.  I don't think he was thinking about what noise was being

21  made.

22  Q.  It's only after that second push into the wall it's your

23  story that you realized at this point the situation was

24  serious?

25  A.  Yes.

N4RMCAR4                    Carroll - Cross

1    Q.  It's your testimony that when Donald Trump, this big and

2    heavy man, lunged at you and banged your head against the wall

3    so hard it hurt, you still didn't think it was serious at that

4    point?

5    A.  I was trying to figure out what the hell was going on.

6    This is a man.  This is Donald Trump.  I thought I knew him.

7    We had just been laughing 12, 15 seconds before.  And here I am

8    being pushed up against the wall.  I had no idea.  It took me

9    several seconds to process what the heck was going on.  It

10   didn't make any sense.  It didn't make any sense at all.

11            Then he put his mouth against mine.  Then I

12   understood.  OK.

13   Q.  In fact, you viewed what went on in that dressing room as a

14   fight.

15   A.  Yes.

16   Q.  In fact, in response to this supposedly serious situation

17   that you viewed as a fight, where you got physically hurt, it's

18   your story that you not only didn't scream out, but you started

19   laughing?

20   A.  I did not scream.  I started laughing.  That is right.  I

21   don't think I started laughing.  I think I was laughing going

22   into the dressing room, and I think I laughed pretty

23   consistently after the kiss to absolutely throw cold water on

24   anything he thought was about to happen.  Laughing is a very

25   good -- I use the word weapon -- to calm a man down if he has

N4RMCAR4                    Carroll - Cross

1    any erotic intention.

2    Q.  According to you, after Donald Trump had you against the

3    wall, he pulled your tights down?

4    A.  Yes.

5    Q.  It's your story that at some point you felt his penis

6    inside of you?

7    A.  Yes.

8    Q.  But before that, it's your sworn testimony that you felt

9    his fingers, what you said was rummaging around your vagina?

10   A.  It's an unforgettable feeling.

11   Q.  Now, when you say rummaging around your vagina, that's

12   different than inserting a finger inside your vagina.

13   A.  At first he rummaged around and then he put his finger

14   inside me.

15   Q.  In your book you wrote that he was forcing his fingers

16   around my private area and then thrust his penis halfway

17   completely, I'm not certain, inside me.  Is that accurate?

18   A.  Yes.

19   Q.  And this attack or this fight, based on your word, this

20   fight that you were in, could have taken as long as three

21   minutes?

22   A.  From entering the dressing room to my leaving it, I don't

23   think it could be any more than three minutes.  I may be wrong.

24   I didn't have a stopwatch, but it was about three minutes.

25   Q.  Even though you understood you were in the middle of this

N4RMCAR4                          Carroll - Cross

1    supposed battle, you never screamed at Donald Trump or screamed

2    for help?

3    A.  I'm not a screamer.

4    Q.  You said that yesterday, I'm not a screamer, right?

5    A.  I'm not a screamer.  Here is the thing.  I was too much in

6    a panic to screech.  I was fighting.

7    Q.  When you're fighting and being sexually assaulted and

8    raped, because you are not a screamer, as you describe it, you

9    wouldn't scream?

10   A.  I'm not a screamer.  You can't beat up on me for not

11   screaming.

12   Q.  I'm not beating up on you.  I'm asking you questions,

13   Ms. Carroll.

14   A.  No.  Women who come forward, one of the reasons they don't

15   come forward is because they are always asked why didn't you

16   scream.  Some women scream.  Some women don't.  It keeps women

17   silent.

18   Q.  And, according to you, this attack wasn't taking place in

19   some secluded place in the middle of nowhere in a forest.  That

20   was in a crowded department store in New York City.

21   A.  Yes.  Not crowded, though.

22   Q.  Right.  The inconceivable part, right?

23        MR. FERRARA:  Objection, your Honor.

24        THE COURT:  Sustained.

25   Q.  When you spoke with Dr. Lebowitz after filing your lawsuit,

N4RMCAR4                         Carroll - Cross

1   you were still trying to come up with an explanation for your

2   story as why you did not scream.

3   A.  I wasn't coming up with a story.  It's usually -- I would

4   say more than usually under discussion when a woman is raped

5   and she doesn't scream.  It's usually discussed, why didn't she

6   scream.  Why didn't you scream, E. Jean?  Why didn't you

7   scream?  It's what a woman -- you better have a good excuse why

8   you didn't scream.  Because if you didn't scream, you weren't

9   raped.  I'm telling you, he raped me, whether I screamed or

10  not.

11  Q.  You need a minute, Ms. Carroll?

12  A.  No.  You go right on.

13  Q.  Aside from you not being a screamer, another reason you

14  gave for possibly not screaming was because you were wondering

15  if the pressure Donald Trump's shoulder placed against your

16  chest interfered with your ability to scream, correct?

17  A.  It could be.  I don't need an excuse for not screaming.

18  Q.  OK.

19        Despite that, you certainly wish your story included

20  you having screamed?

21  A.  Of course I do.  More people would have believed me if I

22  had screamed.

23  Q.  Aside from not being a screamer, and perhaps his chest was

24  interfering with your ability to scream, along the same lines

25  at some point you prepared a list of questions -- list of

N4RMCAR4                        Carroll - Cross

1   answers to questions you thought you might be asked about your

2   story.

3            Do you recall that?

4   A.  What?

5   Q.  Did you prepare a list of answers to questions you thought

6   you might be asked about your story?

7   A.  I absolutely think of answers that I may should prepare

8   myself on.

9   Q.  I am going to show you, just you, what has been marked as

10  Defense Exhibit AR.

11           What did you say, oh?

12  A.  Oh.  Surprise.  Where are my glasses?  I have lost my

13  glasses.  OK.

14           MR. FERRARA:  Your Honor.  I don't mean to interrupt.

15  I think Ms. Carroll's glasses were here.  May I approach?

16           THE WITNESS:  Thank you.

17  Q.  Ms. Carroll, I am going to direct your attention to the

18  second embolden question.

19  A.  OK.

20           THE COURT:  Is this in evidence?

21           MR. TACOPINA:  It's not yet, your Honor.

22           THE COURT:  Then we are not going to have any

23  discussion of what's in it.

24           MR. TACOPINA:  That she didn't recall something.  I'll

25  offer defendant's AR into evidence.

Case 23-793, Document 82, 11/20/2023, 3592069, Page140 of 300

N4RMCAR4                        Carroll - Cross

1              MR. FERRARA:  May I just have one moment?

2              MR. TACOPINA:  Subject to redaction, of course.

3              MR. FERRARA:  May I just have one moment, your Honor?

4              THE COURT:  Yes.

5              MR. FERRARA:  Subject to Mr. Tacopina's caveat, no

6     objection.

7              THE COURT:  Received on that basis.

8              (Defendant's Exhibit AR received in evidence)

9              MR. TACOPINA:  Just put that one block up, though.

10             You can display that.

11             Your Honor, I don't know if the jury has it.  I

12    certainly --

13             THE COURT:  I think they do.  Is it on your screen,

14    folks?

15             MR. TACOPINA:  It was on that one.  OK.  Thank you.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

N4r2Car5                         Carroll - Cross

BY MR. TACOPINA:

Q.  So that's a question that you anticipate being asked and
that question was why didn't you scream?

A.  Right.

Q.  And you wrote down "too much adrenaline powering through me
to think to scream."  Do you see that?

A.  Yeah.

Q.  So that's the third potential reason why you didn't scream
you have testified to.

A.  It's another reason why I didn't scream.

Q.  Now, according to this, screaming would have been a purely
voluntary action you need to think about before doing?

A.  Mr. Tacopina, if I was going to make up a lie, I would have
lied when I was writing this and say I screamed my head off.  I
didn't.  When I came forward, I told the truth.  I said I
didn't scream.  We could probably come up with more reasons I
didn't scream, but I did not scream.  I did not scream.

Q.  Well, Ms. Carroll, the reason why you wrote that you wish
you had screamed was why?  Why did you write you wish you had
screamed?

A.  Because more people would have believed me.

Q.  How about more people may have heard you and helped you?
Is that a possibility?

A.  No, I didn't want to make a scene.

Q.  Oh.  So you didn't scream while you were getting violently

N4r2Car5                          Carroll - Cross

1    raped because didn't you want to make a scene?

2              MR. FERRARA:  Objection, your Honor.

3              THE COURT:  Overruled.

4    Q.  You could answer.

5    A.  Repeat your question.

6    Q.  Sure.  So you didn't scream while you were getting

7    violently raped because you didn't want to make a scene.

8    A.  That's right.  That's probably why I didn't scream.

9    Q.  Okay.

10             Now, with the specifics to the rape allegation, Donald

11   Trump, you said, had his penis inside of you while your tights

12   were obviously still down?

13   A.  Yes.

14   Q.  And to be clear, it's your story that Donald Trump did not

15   take off your tights?

16   A.  No, no, just pulled down.  They were still above the knees.

17   Q.  They were above the knees.

18   A.  Um-hmm.

19   Q.  And because your tights were above the knees, you couldn't

20   get your knee up?

21   A.  I couldn't get it all the way up.  I finally got it up,

22   though.

23   Q.  Okay.

24             And it's your story that you tried to stomp on his

25   foot.

N4r2Car5                          Carroll - Cross

1   A.  Yes.  That didn't work.

2   Q.  According to you, Donald Trump had his hands on your arms.

3   A.  Briefly, but mainly he was holding me against the wall with

4   the weight of his shoulder.

5   Q.  And it's your story you tried to get your arms up to push

6   him back.

7   A.  Yes, this hand had to be -- I was a little pinned because

8   his shoulder was right here, so this arm was pretty much inert,

9   but I could move it a little bit and go like this.  This arm

10  was almost completely free.

11  Q.  And according to you, you did push him back.

12  A.  I hit him back with my knee up.

13  Q.  Okay.

14          And while all this was happening, your purse was still

15  in one of your hands.

16  A.  Yeah, I know.  Yeah.  I never let go of my purse.

17  Q.  What kind of purse was it?

18  A.  It was a Coach -- a square bag with stand-up handles.

19  Q.  It had stand-up handles on it.

20  A.  Um-hmm.

21  Q.  Okay, so stand-up handles are the solid fixtures, the hard

22  handles?

23  A.  Yeah, and they are leather stand-up.  The leather stood up,

24  too.

25  Q.  Leather stand-up handles.  Okay.

N4r2Car5                         Carroll - Cross

1           You never hit him with your purse, did you?

2    A.  I went like this, yeah.

3    Q.  You did hit him with your purse.

4    A.  I believe I did.

5    Q.  Okay.  When did you recall that fact, Ms. Carroll, hitting

6    him with your purse?

7    A.  I've always recalled that fact.

8    Q.  And you mentioned that when you were giving your television

9    interviews about this case or your video deposition?

10   A.  I'm not sure if I did.

11   Q.  Okay.

12          You describe what was going on in there as a

13   colossal -- "in there" being in the locker room, changing room,

14   a colossal struggle.

15   A.  To me it was a colossal struggle.

16   Q.  And despite this colossal struggle while you were being

17   violently raped, you -- for as long as three minutes, you never

18   let go of your purse.

19   A.  No, I never did.

20   Q.  And at one point it's your testimony you managed to get

21   your knee up and push Donald Trump off of you by yourself.

22   A.  Yes.

23   Q.  And even though the tights or your panties were above your

24   knees?

25   A.  Yeah.  I could -- they are tights because they are

N4r2Car5                         Carroll - Cross

1    stretchy.  Tights are amazingly -- I wasn't wearing control top

2    hose.  I was wearing tights, which are extremely stretchy.

3    Q.  And what portion of your knee came in contact with what

4    portion of his body?  Or let me withdraw and rephrase.

5          Your knee came in contact with what portion of his

6    body?

7    A.  Can I stand up?

8    Q.  If that would help.

9          MR. TACOPINA:  Your Honor, is that okay?

10          THE COURT:  Yes, go ahead.

11   A.  Right about here.

12   Q.  So it went to his -- just for the record, you are

13   indicating your right hip?

14   A.  About hip level.

15   Q.  That's at your height, right, when you --

16   A.  We were basically the same height, because I was wearing

17   four-inch heels and I was 5' 9" at the time so 6' 1".

18   Q.  So you are saying that you got your knee up to his -- it

19   would be waist, as high as his waist?

20   A.  No, below his waist.

21   Q.  Below his waist.

22          And you just said something.  Four-inch heels.  It's

23   your story you did this while you were balancing on four-inch

24   heels, you said?

25   A.  I can dance backwards and forwards in four-inch heels.  I

N4r2Car5                         Carroll - Cross

1   can raise one leg in heels.

2   Q.  Well, you are not dancing here, you are --

3   A.  No, it was -- fighting, as you know, required -- well, you

4   worked out all the time.  We have read about it.  You

5   understand with the feet.

6   Q.  All right.  Let me ask a question.  That will get me in

7   trouble if I do.  I won't respond to that.  So I'm just going

8   to move on.

9           But the fact is the entire time you were wearing

10  four-inch heels?

11  A.  The entire time, yes.

12  Q.  So just to make sure I understand the story and then we

13  will move on, this man was almost twice as large as you,

14  weighed 100 pounds more than you, right?

15  A.  Not twice as large.  He weighed probably over a hundred

16  more pounds than I.

17  Q.  How tall are you?

18  A.  I was at the time 5' 9".

19  Q.  5' 9".  Are you talking about with your heels or --

20  A.  No.  With my heels I was 6' 1".

21  Q.  Okay.  And this man who was, as you said, more -- probably

22  more than a hundred pounds.  Just so I understand the story

23  correctly, as your tights were pulled down, you were able to

24  get one knee up, after fighting for as much as three minutes

25  against a man who was much heavier than you, while being

N4r2Car5                         Carroll - Cross

1   sexually penetrated without ever letting go of your purse --

2   A.  Yeah.

3   Q.  -- you somehow managed to get your knee up --

4           MR. FERRARA:  Objection.

5           THE COURT:  Sustained.

6   BY MR. TACOPINA:

7   Q.  After that occurred, you pulled your tights back up and

8   walked out of Bergdorf Goodman wearing those tights?

9   A.  I wore the tights.  They did not come off.

10  Q.  Okay.  And you pulled them back up, right, Ms. Carroll?

11  A.  I pulled them up, yes.

12  Q.  And those tights never ripped during this colossal

13  struggle, correct?  I'm sorry, your Honor.

14          Those tights never ripped during this colossal

15  struggle?

16  A.  I don't believe they did.

17  Q.  And it's your testimony that you don't know if Mr. Trump

18  ejaculated?

19  A.  Are -- I couldn't see what was going on.

20  Q.  After you claimed to have pushed Donald Trump off of you,

21  you turned and got out of the dressing room?

22  A.  Yes.

23  Q.  You didn't say anything to him?

24  A.  No.

25  Q.  And in fact, even at that point, you still didn't scream

N4r2Car5                        Carroll - Cross

1    for help while you were outside the dressing room either for

2    the same reasons you gave before——we won't go through them

3    again——correct?

4    A.  I did not scream.

5    Q.  And according to you, you were afraid he may have been

6    coming after you.

7    A.  Yes.

8    Q.  In fact, it's your story you were fearful he would follow

9    you and maybe grab you.

10   A.  Yes.

11   Q.  But according to your story, you still didn't seek help

12   from anyone in the store?

13   A.  Yes, I didn't.  No, I didn't.

14   Q.  And it's your story you took the escalator down six floors?

15   A.  Yes.

16   Q.  And, again, during this period, the aftermath, it's your

17   story that you still did not see anyone in the store, a

18   customer in the store after you left the dressing room?

19   A.  I wasn't looking for people.  I was looking to get out.

20   Q.  And it's your -- in fact, it's your story you didn't see a

21   single soul in the store after you left the dressing room?

22   A.  I don't think I did.

23           MR. TACOPINA:  One second your Honor.

24           THE COURT:  How much longer do you expect to be?

25           MR. TACOPINA:  Oh, a bit, a bit.

N4r2Car5                          Carroll - Cross

1              THE COURT:  We will take a --

2              MR. TACOPINA:  You want to take a break?  I don't even

3    know what time it is.

4              THE COURT:  It's quarter after three.

5              MR. TACOPINA:  You want to take a break now?

6              THE COURT:  15 minutes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N4r2Car5                         Carroll - Cross

1               (Jury not present)

2               THE COURT:  Okay, folks.  Let's get the jury back.

3               (Jury present)

4               THE COURT:  Okay, Mr. Tacopina.  You may continue.

5               MR. TACOPINA:  Thank you, your Honor.

6    BY MR. TACOPINA:

7    Q.  Ms. Carroll, you said you left Bergdorf Goodman without

8    seeking any help from employees or security at that point,

9    correct?

10   A.  Yes.

11   Q.  And instead, according to you, you just walked out of the

12   store and called Lisa Birnbach?

13   A.  Yes.

14   Q.  And your testimony is that you did that on a cell phone.

15   A.  Yes.

16   Q.  And on that same cell phone, obviously, you could have

17   easily called 9-1-1.

18   A.  Yes, I could have easily called 9-1-1.

19   Q.  But you didn't.  Instead you called Ms. Birnbach.

20   A.  Yes.

21   Q.  At this time you knew Ms. Birnbach for about four or five

22   years?

23   A.  Yes.

24   Q.  And --

25   A.  Six years probably.

A-1811

421

N4r2Car5                          Carroll - Cross

1   Q.  And at that time she certainly wasn't your closest friend.

2   A.  She was a close friend, not my closest.

3   Q.  Prior to this alleged incident at Bergdorf, you didn't

4   speak to her overly often.

5   A.  Not overly often, that is correct.

6   Q.  In fact, you can't even name another personal matter you

7   confided in with -- in with her prior to this alleged incident.

8   A.  Oh, no.  We had many conversations.  We discussed her

9   breaking up with a certain person.

10  Q.  That's her talking to you, confiding in you, right?

11  A.  Yes.

12  Q.  My question was, you can't name another personal matter of

13  yours that you confided in her prior to this alleged incident?

14  A.  Well, I believe when she was confiding in me, I would

15  return the confidence with -- confiding with her with whatever

16  I was going through.  I just don't remember it.

17  Q.  Okay.

18          You certainly can't say definitively that prior to

19  this alleged incident at Bergdorf you ever shared any other

20  instances with Ms. Birnbach in which you felt abused in your

21  past either sexually or otherwise?

22  A.  I don't think I did.

23  Q.  So to be clear, it's your testimony that even though at the

24  time she wasn't your closest friend and you never confided

25  anything like this to her before, you thought your first call

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car5                          Carroll - Cross

1    when you left Bergdorf Goodman should be to her?

2                MR. FERRARA:  Objection.  Argumentative.  Asked and

3    answered.

4                THE COURT:  Sustained.

5    BY MR. TACOPINA:

6    Q.  You thought your first call when you left Bergdorf Goodman

7    should be to Ms. Birnbach?

8    A.  She was exactly the person I needed to talk to.

9    Q.  And in your story it's because Ms. Birnbach was supposedly

10   hilarious?

11   A.  And still is the funniest person I know.

12   Q.  Okay.  And according to you, if Lisa Birnbach had laughed

13   after you told her you had been sexual assaulted, you would be

14   okay, home free?

15   A.  I thought it would put -- I had thought it would let me

16   know it was not as bad as I probably knew it was.  I would feel

17   better if Lisa laughed and said, that is funny, then I would

18   have felt better.

19   Q.  So it was a possibility in your mind that you were going to

20   describe a violent sexual assault to your good friend against

21   you that had just taken place and Lisa would have laughed and

22   said, oh, that is funny?

23   A.  I was going to tell her the story, which I thought was

24   hilarious, and then I got to the point where I had to tell Lisa

25   that he pulled down my tights, and before I said that, Lisa had

N4r2Car5                        Carroll - Cross

1   to tell me to stop laughing.  My mind -- I think I was slightly

2   disordered and disoriented.

3   Q.  You just said, Ms. Carroll, that you were going to tell

4   Lisa the story that you thought was hilarious?

5   A.  Yes.

6   Q.  So you thought the story of being raped --

7   A.  No, no.

8   Q.  -- by Donald Trump --

9   A.  No, I don't think that story was -- I don't think that

10  story was hilarious.  I thought that story was tragic.  I

11  wanted to tell Lisa because I hoped Lisa would tell me, oh, no,

12  E. Jean, it's okay, it's okay, it's all right.

13  Q.  I understand, Ms. Carroll, but you just testified that you

14  were going to tell her the story which you thought was

15  hilarious.

16            MR. FERRARA:  Objection.

17            THE COURT:  Sustained.  That isn't even close,

18  Mr. Tacopina.

19            MR. TACOPINA:  Oh, it is very close, your Honor.  I am

20  looking at the transcript.

21            THE COURT:  I'm looking at the transcript, too.  What

22  she said was, "I was going to tell her the story, which I

23  thought was hilarious, and then I got to the point where I had

24  to tell Lisa that he pulled down my tights, and before I said

25  that, Lisa had to tell me to stop laughing," and so forth.

N4r2Car5                      Carroll - Cross

```
 1            MR. TACOPINA:  Okay.  Can I ask a question based on

 2    that?

 3            THE COURT:  Now -- I don't know what the question is.

 4            MR. TACOPINA:  Can I try?

 5    Q.  Okay.  You just heard the Judge read accurately from the

 6    transcript, which is, "I was going to tell her the story, which

 7    I thought was hilarious."

 8            Up to that point of what you just testified to, what

 9    story were you going to tell Lisa that you thought was

10    hilarious?

11    A.  Let me rephrase that.  "Which I thought was hilarious"

12    should read "which I hope was hilarious."  I wanted her to tell

13    me -- if Lisa laughed, I would have felt so much better.  I was

14    disoriented.  I had adrenaline flowing through me.  I called

15    Lisa Birnbach and she told me exactly apparently what I really

16    called her about.

17    Q.  And when she told you, it's your story that she told you

18    that she had been raped, and that shocked you.

19    A.  Repeat the question, please.

20    Q.  Sure.  I will break it down, actually, into two questions.

21            According to you, Ms. Birnbach shocked you on the

22    phone.

23    A.  When I heard the words, when Lisa said, "he raped you,"

24    those were the words, those were the words that brought the

25    reality to my forefront of my mind.
```

N4r2Car5                          Carroll - Cross

1   Q.  Okay.  And that's what shocked you that she had told you

2   that you had been raped.

3   A.  I don't like the word, to hear the word, Lisa Birnbach

4   saying the word "rape," was -- the two -- Lisa Birnbach, funny,

5   kind, warm, telling me I had been raped, that -- even though I

6   had just been, it's hard -- when something horrible happens to

7   you, it's hard to grasp what happened.

8   Q.  In fact, Ms. Carroll, it's your sworn testimony that before

9   speaking to Ms. Birnbach it didn't occur to you that you had

10  been raped.

11  A.  My mind was disordered.  I was so full of adrenaline, I am

12  not even aware of my thinking process.  It's flowing.  It's

13  pumping.  I had enough strength to get out.  I was happy to be

14  alive.

15  Q.  Had it occurred to you, before Lisa Birnbach told you you

16  were raped, that you had been raped?

17  A.  Well, obviously I would have come to that conclusion

18  myself.  I guess I just needed to tell somebody the story.

19  Q.  Okay.  I'm not asking you what conclusion you would have

20  come to eventually.  My question is just this one.  Before Lisa

21  Birnbach had told you you had been raped, had it occurred to

22  you that you had been raped?

23          MR. FERRARA:  Your Honor, objection.  I think it's

24  been answered.

25          THE COURT:  Sustained.

A-1816

N4r2Car5                    Carroll - Cross

1   BY MR. TACOPINA:

2   Q.  According to you, even when Ms. Birnbach told you that you

3   had been raped, you couldn't stop laughing after she said that

4   to you.

5   A.  I may have laughed at that point really not to hear what

6   she just said.  I may have.  I'm not clear when I stopped

7   laughing.

8          MR. TACOPINA:  One second, please, your Honor.

9          (Pause)

10          MR. FERRARA:  May I just have one moment, your Honor?

11   I apologize.

12          (Counsel confer)

13          MR. FERRARA:  Your Honor, after conferring with

14   counsel, the way we are seeing the transcript is that

15   Ms. Carroll said:  "I may have.  I made clear when I stopped

16   laughing."  We heard, "I may have.  I'm not clear when I

17   stopped laughing."

18          THE COURT:  I'm not sure where you are reading back to

19   me from.

20          MR. FERRARA:  Line 4.

21          THE COURT:  You are reading from something other than

22   line 4 on my page.

23          MR. FERRARA:  We can circle back to it, your Honor.

24          THE COURT:  Okay.

25          MR. FERRARA:  Now it appears as line 13.  No.  That's

N4r2Car5                    Carroll - Cross

1    me.  I'm sorry, your Honor.  I'll stop.  I'm not helping.

2              THE COURT:  Next question, Mr. Tacopina.

3              MR. TACOPINA:  I'm actually going to put up what's

4    been received into evidence as Defense AA of the book.  It's

5    page 242, line 5.  Even though it is in evidence, I am going to

6    give counsel just a minute to get it.

7              MR. FERRARA:  Thank you.

8              MR. TACOPINA:  Please put that up.  It is in evidence,

9    so display it for the jury, as well, please.

10             Your Honor, I don't see it on this screen, so I don't

11   know if that means -- okay.  Thank you, thank you.

12   BY MR. TACOPINA:

13   Q.  Okay.  Just go to that --

14             THE COURT:  This is something else on the screen now.

15             (Pause)

16             MR. TACOPINA:  AA, there we go.  AA in evidence.  This

17   is page 242 of the book, last line of paragraph 5.

18             THE COURT:  Okay.

19   BY MR. TACOPINA:

20   Q.  This is when -- from your book, Ms. Carroll, when

21   Ms. Birnbach is telling you that you were raped --

22   A.  Right.

23   Q.  -- "go to the police.  I'll go with you."  And she said

24   several time "E. Jean, I don't think this is funny

25   because—this is one of the strangest facts of all—I could not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car5                          Carroll - Cross

1   stop laughing."

2          Do you recall that now?

3   A.  Right.

4          MR. TACOPINA:  Okay.  You can take that down.

5   BY MR. TACOPINA:

6   Q.  And like you just said, that's one of the strangest facts

7   of all.

8   A.  Yeah, absolutely.

9   Q.  How long did this phone call with Ms. Birnbach last, if you

10  know?

11  A.  No, I don't know.

12  Q.  And she advised you to go to the police, Ms. Birnbach?

13  A.  Yes.

14  Q.  And you told her that you weren't going to the police?

15  A.  I said no way.

16  Q.  And because you didn't get the answer you were hoping for

17  from Ms. Birnbach or the reply or the response to make you feel

18  okay, you felt unbalanced?

19  A.  Yes.

20  Q.  And according to you, you didn't sit down or get water or

21  do anything to take care of yourself at that particular moment?

22  A.  I got in my car and drove home.

23  Q.  And you didn't call anyone else.

24  A.  No.

25  Q.  You first sued Donald Trump on November 4, 2019,

N4r2Car5                        Carroll - Cross

1    Ms. Carroll?

2    A.  I what?

3    Q.  You first sued Donald Trump on November 4, 2019.

4    A.  Yes.

5    Q.  Okay.  And four months before your litigation, on June 23,

6    2019, you texted Lisa Birnbach and gave her and Carol Martin --

7    telling her that you had given them that book chapter about

8    Donald Trump before it was published.  That's already in

9    evidence.  We talked about it before.  You recall?

10   A.  Yes.

11   Q.  And in that text, you stated that you discussed that

12   excerpt with both Lisa Birnbach and Carol Martin.

13   A.  Yes.

14   Q.  Now, it's your testimony that after telling Ms. Birnbach

15   that you were raped by Donald Trump on the day it allegedly

16   happened, you never spoke with her about it again prior to your

17   litigation nearly 25 years later.

18           MR. FERRARA:  Objection, mischaracterization.

19           MR. TACOPINA:  What part, Mike?

20           MR. FERRARA:  One moment, your Honor.

21           (Counsel confer)

22   BY MR. TACOPINA:

23   Q.  Ms. Carroll, aside from the e-mail interactions before the

24   book came out --

25   A.  Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4r2Car5                          Carroll - Cross

1    Q.  -- you had never spoken to Ms. Birnbach about what

2    allegedly happened that day, again, prior to your litigation

3    nearly 25 years later.

4    A.  I believe I spoke to her about it probably once or twice in

5    June, July, August, and September.

6    Q.  Of what year?

7    A.  Of 2019.

8    Q.  Okay.  So aside from June of 2019, we will go back to the

9    earliest date, since either '95 or '96 up until June of 2019,

10   you have never had a conversation with Lisa Birnbach --

11   A.  No.

12   Q.  -- about the alleged rape --

13   A.  No.

14   Q.  -- by Donald Trump at Bergdorf Goodman?

15   A.  No.

16   Q.  So it's your story, then, that even though Lisa Birnbach

17   told you to go to the police, she never circled back with you

18   even once about the alleged incident to see if you did.

19   A.  No.  I made it clear I was not going to the police.

20   Q.  Okay.  And so you drove home after speaking to Lisa

21   Birnbach that day.

22   A.  Yes.

23   Q.  And it's your story that other than Ms. Birnbach, you

24   didn't speak to any other friends that night about supposedly

25   being raped at Bergdorf Goodman?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  No, I did not.

2    Q.  And likewise you didn't speak to any family members about

3    it.

4    A.  No.  I would never tell my family.  Never.  Never.  Or any

5    other authority ever.

6    Q.  And it's your testimony that you just went straight home.

7    A.  Yes, I did go right straight home.

8    Q.  And according to you, after you got home, you don't

9    remember taking a shower that night.

10   A.  I don't think I did.

11   Q.  You don't think you took a shower that night.  Okay.

12   A.  No, I don't remember doing it.

13   Q.  According to you, after twice banging your head hard, you

14   felt pain on your head.

15   A.  Yes.

16   Q.  Right?

17          But according to you, you didn't check your head to

18   see if you had any injuries that night?

19   A.  I think I felt it.  I think it hurt.  I don't remember

20   looking at it in the mirror or anything.  I may have.  I don't

21   remember.

22   Q.  And you also didn't take any medication that night?

23   A.  I'm not a big person for taking medication, but I may have

24   taken an Advil or aspirin.  I don't know.

25   Q.  And you still had pain the next day when you woke up?

A-1822

N4r2Car5                    Carroll - Cross

1   A.  Oh, yeah.

2   Q.  You didn't -- obviously didn't go to the hospital.

3   A.  No.

4   Q.  Didn't go to a doctor.

5   A.  No.

6   Q.  Didn't call out sick from work.

7   A.  No.  And I still felt -- felt my vagina still hurt from his

8   fingers.

9   Q.  And so despite that feeling that you just described and all

10  the other things, the day after you just went to work.

11  A.  Right straight to work just to prove to myself that I was

12  going to go on and life goes on and that's how I do it.  I get

13  up the next day and I go on.

14  Q.  And it's your story that either that day or the day after

15  you told Carol Martin at work about the alleged incident at

16  Bergdorf Goodman?

17  A.  Yes.

18  Q.  And even as far back as the mid 1990s—I think you

19  testified to this yesterday, Ms. Carroll—that Ms. Martin

20  didn't like Donald Trump?

21  A.  Carol Martin had done a -- she was an anchorwoman in

22  New York --

23  Q.  I'm just asking you if that -- Mike, is there a reason?

24  You want it to approach?

25          MR. FERRARA:  I think the witness was answering the

N4r2Car5                          Carroll - Cross

1   question.

2          MR. TACOPINA:  No.  Can I have a second with counsel,

3   please?

4          (Counsel confer)

5          MR. TACOPINA:  Your Honor, I'm just going to ask the

6   witness for a yes or no on that.  I discussed with counsel,

7   trying to avoid any issues.

8   BY MR. TACOPINA:

9   Q.  But you were aware as far back as the mid '90s that Carol

10  Martin did not like Donald Trump?

11  A.  Yes.

12  Q.  In fact, it's your testimony that you gave Carol Martin a

13  few details right there and then while still at work?

14  A.  Yes, I did.

15  Q.  And according to you, after you gave Ms. Martin a few

16  details about what supposedly happened, she told you let's talk

17  about it at my house tonight.

18  A.  Yes.

19  Q.  And I think you described you went to her house that night?

20  A.  Right.

21  Q.  Correct?

22  A.  Right.

23  Q.  And told her supposedly what happened at Bergdorf Goodman

24  that night?

25  A.  Yes, actually it was in the early evening, not even at

N4r2Car5                    Carroll - Cross

1   night.

2   Q.  Okay.  Do you remember the time?

3   A.  It was right after work, 5 or 6.

4   Q.  Okay.  And according to you, after hearing your story,

5   Ms. Martin told you to tell no one about it.

6   A.  Emphatically.

7   Q.  Emphatically.

8           And it's your testimony you took Ms. Martin's advice

9   not to go to the police?

10  A.  That's the advice I wanted, and so that's the advice I

11  followed.

12  Q.  So after speaking to Ms. Martin, you never told anyone else

13  about this alleged attack apart from that related to this

14  litigation and subsequently the book that came out in 2019,

15  correct?

16  A.  That's correct.

17  Q.  Now, the reason, I think you testified yesterday, was Carol

18  Martin told you not to go to the police because Donald Trump

19  was powerful?

20  A.  Yes.

21  Q.  And you were frightened of Donald Trump at the time.

22  A.  He was not only powerful, he was rich, he was famous, and,

23  as Carol put it, he has 200 lawyers.

24  Q.  And because of him being powerful, you didn't go to the

25  police.  You didn't want to tell your story.

N4r2Car5                    Carroll - Cross

1   A.  I don't -- no, I did not want to tell my story.  I did not
2   want to -- I was ashamed of myself.
3   Q.  But one of the reasons Carol Martin told you not to tell
4   the story to anyone and one of the reasons you have testified
5   that you never told the story to anyone was because of Donald
6   Trump's power.
7   A.  I was afraid Donald Trump would retaliate, which exactly is
8   what he did.  That's exactly.  One of my biggest fears came
9   absolutely true.
10  Q.  Okay.
11  A.  He has two tables full of lawyers here today.  It came
12  absolutely true.
13  Q.  We have about the same amount of lawyers.  Not everyone is
14  a lawyer, Ms. Carroll, but regardless of that --
15          THE COURT:  Come on, Mr. Tacopina, let's move along.
16          MR. TACOPINA:  Yes, sir.
17  BY MR. TACOPINA:
18  Q.  So instead you waited for Donald Trump to become arguably
19  the most powerful man in the world, president of the
20  United States of America, to tell your story to everybody.
21  A.  I waited until other women -- I was not a pioneer.  I'm a
22  follower.  I saw other women coming forward after Harvey
23  Weinstein and I thought who am I?  Who am I not to stay silent?
24  Also, I was 78 or 79.  I just thought I've been silent too
25  long.

N4r2Car5                          Carroll - Cross

```
1    Q.  In the decades preceding your lawsuit, you certainly never
2    told any doctors ever about the supposed incident?
3    A.  No.
4    Q.  And after supposedly being raped by Donald Trump you never
5    saw a medical doctor or got an evaluation?
6    A.  No, no.
7    Q.  Never went to a psychiatrist?
8    A.  No.
9    Q.  Never went to a psychologist?
10   A.  No.
11   Q.  No doctors whatsoever.
12   A.  No.
13   Q.  And as a result, you have no medical records showing
14   physical injuries from this colossal battle you have described?
15   A.  I have --
16           MR. FERRARA:  Objection, your Honor.
17           THE COURT:  Sustained.  Argumentative.  The answer is
18   stricken.
19   BY MR. TACOPINA:
20   Q.  As a result, do you have any medical records showing
21   physical injuries from the story?
22   A.  No.
23   Q.  You have no photographs of any physical injuries.
24   A.  No, I never took any photographs.
25   Q.  You are not aware of anyone who saw any physicals injuries
```

N4r2Car5                       Carroll - Cross

1    on you?

2    A.  They couldn't be seen.  You can't see inside my vagina as I

3    am driving home.  No, you can't see it.

4    Q.  How about the head?  You said your head --

5    A.  No.  My hair would cover it.  It was probably a bump on the

6    back.  I could feel the bump, but that's covered.

7    Q.  Did you show Carol Martin the bump?

8    A.  No.

9    Q.  No, you didn't.

10   A.  Well --

11          THE COURT:  There is no question.

12   A.  I don't know.

13          THE COURT:  Ms. Carroll, there is no question.

14          THE WITNESS:  Okay.

15   BY MR. TACOPINA:

16   Q.  And you never went to the police to report this alleged

17   incident?

18          MR. FERRARA:  Objection.  Asked and answer.

19          THE COURT:  Mr. Tacopina --

20          MR. TACOPINA:  Did I ask that already?

21          THE COURT:  I'm out -- well, I'm not going to be

22   guilty of hyperbole, but plenty.

23          MR. TACOPINA:  Okay, your Honor.

24   BY MR. TACOPINA:

25   Q.  Well, let me ask you this question anew.  You would agree

N4r2Car5                         Carroll - Cross

1    that not reporting this alleged attack to the police is a very

2    odd fact, to use your words?

3    A.  No, that's not an odd fact.  As a matter of fact, it --

4    many women do not go to the police.  I understand why.

5    Q.  Okay.  So it's not an odd fact that you didn't report it to

6    the police.

7    A.  No, it's not.  It's the usual fact.

8            MR. TACOPINA:  Put up AA in evidence, please.

9    Q.  It's from your book, Ms. Carroll, page 242, lines 9-12.

10   Actually, let's get counsel get situated.  AA in evidence, page

11   242, lines 9-12.

12           MR. FERRARA:  Just one moment, your Honor.

13           (Counsel confer)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

N4RMCAR6                        Carroll - Cross

```
 1              MR. TACOPINA:  We are OK.
 2   Q.  This is in evidence, Ms. Carroll?
 3   A.  Yes.
 4   Q.  You just said it wasn't odd that you didn't go to the
 5   police.  This is from your own book:  There are several facts,
 6   however.  I will try to make them as unsexy as possible so as
 7   not to turn up -- what is that word?
 8   A.  Gonadal.
 9   Q.  What does that mean?
10   A.  A glow comes from the male gonads.
11   Q.  The gonadal glow of his base, facts that are so odd that I
12   want to clear them up now before we start.  Did I report the
13   attack to the police?  No.
14              In your book, you say you want to clear up this odd
15   fact that you did not report this to the police.  Now, do you
16   agree that it is odd that you didn't report this to the police?
17   A.  I think it appears odd to you.
18   Q.  I didn't write this book, Ms. Carroll.
19              MR. FERRARA:  Objection.
20   A.  I am employing many --
21              MR. FERRARA:  I have an objection.  I just wanted to
22   the witness to finish her answer.
23              THE COURT:  Let her finish the answer.
24              MR. TACOPINA:  Yes, sir.
25   A.  There is a group of facts here.  To many readers, they will
```

N4RMCAR6                          Carroll – Cross

1    appear odd, and I wanted to set matters straight before I told

2    the story, and I wanted people to know right up front I did not

3    report the attack.

4    Q.  But you would agree, as a writer, the way you write this is

5    not that some people may think this is odd.  You write that

6    there are facts that are so odd I want to clear them up now

7    before we start?

8             MR. FERRARA:  Objection.  Asked and answered.

9             THE COURT:  Sustained.

10   Q.  These are your words in this exhibit, correct?

11            THE COURT:  Sustained.

12   Q.  You mentioned yesterday when you testified that there were

13   threats that were made to you after the story came out,

14   especially death threats, right?

15   A.  Yes.

16   Q.  Did you report those death threats to the police?

17   A.  No.

18   Q.  Any law enforcement authority?

19   A.  No.

20   Q.  You just bought bullets?

21   A.  Yes.

22   Q.  Today you said you feel you were under threat and then some

23   tweets -- I think there were tweets that were sent to you,

24   tweeted at you, whatever the terminology is, or displayed in

25   court.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4RMCAR6                      Carroll - Cross

1   A.  Um-hum.

2            THE COURT:  You need to answer with words.

3            THE WITNESS:  Yes.  I'm sorry.

4   A.  Yes.

5   Q.  Do you have any tweets where anyone threatened you?

6   A.  Yes.  But in the early days, I will just delete those to

7   get them out of my sight.

8   Q.  When is the early days?  Can you fix that time period?

9   A.  Within days of when it was first revealed on June 21 in The

10  Cut.

11  Q.  You said you opened your Twitter this morning because you

12  testified yesterday and you saw all this horrific stuff?

13  A.  And I opened it again today just to check.

14  Q.  Were there any threats today?

15  A.  No.

16           MR. TACOPINA:  Your Honor, can I have one second with

17  counsel?

18           THE COURT:  Yes.

19           MR. TACOPINA:  Your Honor, I think we have to approach

20  on something, an issue.

21           THE COURT:  All right.

22           (Continued on next page)

23

24

25

N4RMCAR6                      Carroll - Cross

1          (At sidebar)

2          MR. SEIGEL:  There is a dispute over one of the audios

3    that we seek to play.  It's of an interview --

4          MR. TACOPINA:  Television interview on CNN.

5          MR. SEIGEL:  -- on June 24, 2019 of Ms. Carroll.

6    During it she was asked whether or not she would go to the

7    police and was advised --

8          THE COURT:  Slower.

9          MR. SEIGEL:  She was asked whether she would go to the

10   police, given that the mayor at the time expressed an interest

11   in investigating this.  And she said it was her understanding

12   that the statute of limitations had run, so she could not

13   bring a claim.  That's the first transcript.

14         The transcript we do not have a dispute on is of an

15   interview two days earlier in which he was advised that the

16   statute of limitations did not run.

17         We are seeking to introduce the audio of the second

18   transcript that I referenced, the one on June 26 -- excuse

19   me -- June 24, which actually it's the earlier interview, in

20   which he learns the statute of limitations had not run, and

21   nonetheless she gives that as an explanation for why --

22         THE COURT:  You lost me.

23         MR. SEIGEL:  She does two interviews.

24         The first interview, the one that we are having a

25   dispute over -- excuse me.  I'm a little backwards here.  The

```
1    first interview, that we don't have a dispute over, she is told
2    that the statute of limitations had run.  She is aware of that
3    fact.  And she gives an alternative explanation for why she
4    doesn't bring a criminal claim.
5              THE COURT:  She gives who?
6              MR. SEIGEL:  The interviewer.  She doesn't cite the
7    statute of limitations.  The dispute that we are having
8    relates --
9              THE COURT:  Why she doesn't bring a claim for what?
10             MR. SEIGEL:  Criminal charge for rape.
11             THE COURT:  You're saying she had earlier in the
12   interview she thought that the statute had run?
13             MR. SEIGEL:  Right.  When she was advised earlier that
14   it hadn't.
15             MR. TACOPINA:  In an interview two days earlier, which
16   is the next exhibit.
17             MR. SEIGEL:  I can read it into the record.
18             The interviewer says to her:  I guess the reason I'm
19   asking is because the mayor of New York City, Mayor Bill
20   DeBlasio, who of course is running against President Trump, has
21   said that if you were to bring a case forward, if you -- he
22   will pursue it.  He will have the New York City Police
23   Department pursue it.  So do you want to pursue this legally?
24             Ms. Carroll responds:  This, the greatest police
25   department in the world.  The detectives are great in New York.
```

N4RMCAR6                        Carroll - Cross

1    The thing is, it's past the time.  Its experts -- I've been

2    talking to experts -- experts, and they say that we've passed

3    the legal --

4            Ms. Camerota, the interviewer, says:  The statute of

5    limitations.

6            Ms. Carroll says:  Yes.  Thank you.

7            The interviewer continues:  Yes.  There was a statute

8    of limitations in place at the time that this happened in late

9    '95 or '96.  That has since changed.  And Mayor DeBlasio, when

10   he heard your story, said that he would pursue on your behalf

11   an investigation.

12           We redacted portions relating to the dress pertaining

13   to the DNA, so we took that out.

14           Ms. Carroll continues:  I'd consider it, but the

15   experts are telling me that --

16           And the interview says:  You consulted lawyers?

17           And she says:  Yeah.  Well, they've written to me.  I

18   have never consulted a lawyer in my life.  It's not something I

19   would do.  They have, you know, emailed me to tell me that, you

20   know, this, as you say, the statute of limitations is passed

21   because I don't know the legal -- I don't know -- I don't want

22   to say -- because I don't know what it is.

23           Notwithstanding that, on June 24, two days earlier,

24   she appears during an interview where she hears from a

25   prosecutor --

445
N4RMCAR6                        Carroll - Cross

 1              THE COURT:  I'm sorry.  What about a prosecutor?

 2              MR. SEIGEL:  She is told in the interview two days

 3     earlier that the statute of limitations was revived.  It's no

 4     longer moribund and she can bring a claim.  During that

 5     interview she doesn't cite the statute of limitations as a

 6     basis for not going forward.  She gives an alternate

 7     explanation.

 8              THE COURT:  To wit.

 9              MR. SEIGEL:  This one is not in dispute, but she

10     claims in this interview that it would be disrespectful for her

11     to bring a criminal charge.

12              MR. TACOPINA:  This is not in dispute.  Only the first

13     one is putting in context the inconsistency, your Honor.

14              MR. SEIGEL:  That's right.

15              MR. FERRARA:  Your Honor, our objections are on 402

16     and 403 grounds.

17              As to 403, if your Honor is this confused, imagine how

18     much confusion the jury is going to be under.  We think that

19     this particular exhibit, the one that we object to, which is

20     AB, discusses criminal investigations and that we don't want

21     the jury thinking this is a criminal case.

22              We think that Ms. Carroll is arguably responding to

23     questions about whether a criminal case could be brought.  She

24     is saying candidly, I don't know.  She is being candid about

25     it.

N4RMCAR6                          Carroll - Cross

1          If they want to ask her about AW, we have no

2     objection.  We have an objection to AB, given it discusses

3     criminal investigations and the like.

4          MR. SEIGEL:  I just want to respond briefly and say,

5     first of all, once the transcript is read, it clears it up.  I

6     understand without the transcript trying to explain it, just

7     asking questions, it's certainly confusing, but the transcript

8     puts this in context.

9          MR. TACOPINA:  The video would put it in context.

10          MR. SEIGEL:  That's true.

11          Two, it goes to credibility.

12          THE COURT:  No.  403.  This is ridiculous.  Total

13     confusion.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

N4RMCAR6                    Carroll - Cross

1              (In open court)

2              MR. SEIGEL:  Can I proceed?

3              THE COURT:  Sure.

4    Q.  Ms. Carroll -- let me withdraw.

5              You did an interview on MSNBC with a host named

6    Lawrence O'Donnell in June of 2019, correct?

7    A.  Yes.

8              MR. TACOPINA:  Can you put the cover page up for

9    Ms. Carroll or the screenshot of the video.

10             That's Chris Matthews.  It is AW.

11             THE COURT:  If you can't do this, let's move on to

12   something else.

13             MR. TACOPINA:  I think we can.  It's here.  Just stop

14   it.

15   Q.  That's a screenshot from the interview you did with

16   Lawrence O'Donnell on the Last Word on MSNBC, correct?

17   A.  Yes.

18             MR. TACOPINA:  Your Honor, we would offer this,

19   Exhibit AW, into evidence.

20             THE COURT:  Is there any objection?

21             MR. FERRARA:  Subject to certain discussions with

22   counsel about redactions, no.

23             THE COURT:  Received.

24             (Defendant's Exhibit AW received in evidence)

25             MR. TACOPINA:  I would like to play AW for the jury at

N4RMCAR6                        Carroll - Cross

1    this point from the beginning.

2              (Video played)

3    Q.  Do you recall that interview?

4    A.  Yes.

5    Q.  And you stand by what you said there?

6    A.  I looked -- I remember what was going on.  I had read a

7    news story that day about hundreds of women at the border who

8    had no protection who are being attacked by men.  It was

9    uppermost in my mind.  I felt bad for them.  I felt helpless.

10   I couldn't help them.  I said this out of sympathy.  At the

11   time I had no intention of bringing a lawsuit.

12   Q.  You appeared on August 12, 2019 on a podcast called

13   UnStyled and spoke to its host, Christine Barberich?

14   A.  Yes.

15   Q.  About that camp counselor who you testified to who

16   supposedly sexually abused you?

17   A.  Yes.

18   Q.  That camp counselor was that person named Cam?

19   A.  Yes.

20   Q.  That person was identified as hideous man number 6 in your

21   book?

22   A.  Yes.

23   Q.  You told Christine Barberich on this podcast that being

24   sexually abused by Cam had more of an effect on you than any

25   other person that abused you?

N4RMCAR6                          Carroll - Cross

1   A.  I am not sure what the context was.  Was I talking about

2   childhood events?

3             MR. TACOPINA:  You guys have that clip?

4             MR. FERRARA:  I don't think we do.  I apologize if I'm

5   wrong, but I don't have it here.

6             Apologies.  One moment, your Honor.

7             MR. TACOPINA:  We will come back to it, your Honor, if

8   need be.  We will straighten this out.

9   Q.  You said that you think about what Cam did every day?

10  A.  In some form it glances through my mind.  Maybe not

11  absolutely every day, but it's frequent.

12  Q.  And you acknowledged in that podcast that Cam, you came to

13  learn, was arrested years later?

14  A.  Yes.

15  Q.  And you recognize that after Cam supposedly abused you he

16  may have abused other girls prior to his arrest, correct?

17            MR. FERRARA:  Objection.

18            THE COURT:  Sustained.

19  Q.  According to you, Donald Trump is a brutal and dangerous

20  man?

21  A.  Yes, he is.

22  Q.  But, according to you, you wouldn't bring a criminal charge

23  against him because that would be disrespectful to women being

24  raped by the border and around the world?

25            MR. FERRARA:  Objection.

N4RMCAR6                          Carroll - Cross

1          THE COURT:  You already asked that question.

2          MR. TACOPINA:  I did not ask this question.  I read --

3     played what she said.  I am asking a question about what she

4     said.

5          MR. FERRARA:  This is not a criminal case, your Honor.

6          THE COURT:  Sustained.

7     Q.  Let me ask you this.  How would you -- it's not a criminal

8     case.  How would you bringing criminal charges be disrespectful

9     to some people at the border?

10         MR. FERRARA:  Objection.

11         THE COURT:  Sustained.  Correct me if I'm wrong,

12    counsel, but I believe in the State of New York private

13    individuals can't bring criminal charges and probably have not

14    been able to do that in at least a century or two.

15         MR. TACOPINA:  No, they can't.  They could go to the

16    police department.

17         THE COURT:  That's not what you said, counselor.  We

18    have been up and down the mountain on the question of whether

19    she went to the police, so let's move on.

20         MR. TACOPINA:  We have not been up and down the

21    mountain of what we just heard.

22         Can I ask one question?

23         THE COURT:  Move on.

24         MR. TACOPINA:  I guess not.

25    Q.  According to you, security cameras must have picked you and

N4RMCAR6                        Carroll - Cross

 1   Donald Trump up at the 58th Street entrance of the store?
 2   A.  I was guessing that they must have picked -- got a shot of
 3   us, yes.
 4   Q.  You wrote that in your book, right?
 5   A.  Yes.
 6   Q.  So according to you and your book, you therefore would have
 7   been filmed on the ground floor of Bergdorf Goodman with Donald
 8   Trump?
 9   A.  Yes.
10   Q.  According to you, cameras could have also captured you
11   going up the escalator?
12   A.  Yes.
13   Q.  And it's your testimony that cameras could have filmed you
14   walking into the lingerie department?
15   A.  Could have, yes.
16           THE COURT:  Assuming there were any, right,
17   Ms. Carroll?
18           THE WITNESS:  I have never, your Honor, been able to
19   verify if there were cameras in the dressing room or in the
20   lingerie department.
21   Q.  The reason you have never been able to verify that is
22   because you never tried to get any videos that would have
23   existed to support your claim?
24           MR. FERRARA:  Objection.  Can we have a time period,
25   your Honor?

N4RMCAR6                    Carroll - Cross

1        MR. TACOPINA:  Sure.

2   Q.  When you were allegedly assaulted in Bergdorf Goodman by

3   Donald Trump and on the first floor with Donald Trump and on

4   the escalators with Donald Trump, you never thereafter, that

5   day, the next day, the next week or ever tried to get the

6   videos that could have existed to support your claim?

7        MR. FERRARA:  I object to the breadth of the question.

8        THE COURT:  Sustained.

9        MR. TACOPINA:  The breadth.  OK.

10  Q.  Did you go back the next day to get -- ask for the video

11  camera footage?

12       THE COURT:  Sustained.  It assumes there is such a

13  thing.

14       MR. TACOPINA:  Ms. Carroll in fact testified, as did

15  the Bergdorf Goodman witness, that on the main floor there are

16  security cameras, your Honor.

17       THE COURT:  Ms. Carroll testified she guessed, and we

18  have had the testimony from the witness who was at Bergdorf at

19  the time, and she said what she said.  We are not going to ask

20  questions based on this kind of statement.

21       MR. TACOPINA:  Can I ask this question?

22       THE COURT:  I don't know yet.  I have not heard it.

23       MR. TACOPINA:  I know you don't know it, so I am going

24  to ask it, and you will let me know.

25  Q.  Did you ever attempt to ascertain whether there is any

N4RMCAR6                        Carroll - Cross

 1   video footage of you and Donald Trump at Bergdorf Goodman?

 2             MR. FERRARA:  Objection.

 3             THE COURT:  Sustained.  I sustained the objection to

 4   that question within the last three minutes.

 5   Q.  You are a writer, Ms. Carroll?

 6   A.  Yes.

 7   Q.  And you wrote every day for 18 years at a period of time

 8   when you were married to Steve Byers?

 9   A.  I was still in the -- I was pitching to magazines, and I

10   refused -- everybody said no, no, no, and nobody wanted my

11   work.  They didn't like my ideas.  And I kept at it until I got

12   my foot in the door.

13   Q.  You, early on in life, dedicated yourself to becoming a

14   writer?

15   A.  Yes.

16   Q.  And writing was important to you?

17   A.  Yes.  It's the way I process my life.

18   Q.  And you kept a diary?

19   A.  I've always diaries.

20   Q.  Despite the fact that you're clearly an avid writer who

21   kept a diary, you never made a diary entry contemporaneously

22   memorializing this alleged rape by Donald Trump in your diary?

23   A.  No.  I don't write about negative.

24   Q.  You would put in your diary things like, threw the ball for

25   the dog?

N4RMCAR6                        Carroll - Cross

1    A.  Yeah, basically.  You have -- in discovery I turned over

2    many diaries.  You can see -- I threw the ball for the dog you

3    will probably see, I don't know, 400 times.

4    Q.  In your diary you would write, threw the ball --

5    A.  For the dog.

6    Q.  You said the reason you didn't put bad things in your diary

7    is because you were superstitious?

8    A.  Yes.

9    Q.  And superstitious in what regard, Ms. Carroll?

10   A.  I always felt if I wrote something bad, I'd have to think

11   about it.  If I write it, I'm thinking about it.  It would -- I

12   don't want to think about bad things.

13   Q.  But you wrote a book about the worst thing that ever

14   happened to you.

15   A.  I thought it was time not to be silent.

16   Q.  Now, even though you didn't keep an account of this alleged

17   rape in your diary, you did keep the dress you supposedly wore

18   that day?

19   A.  Yes.

20   Q.  Didn't throw it out?

21   A.  No.  It was a beautiful dress.

22   Q.  You didn't burn it?

23   A.  No.  I would never burn a beautiful item of clothing.

24        THE COURT:  We are going to break here for the day.

25   We will return on Monday at 10:00.

N4RMCAR6

1              Counsel remain, please.

2              Members of the jury, please do not discuss the case

3      with anyone, including among yourselves.  Have a great weekend.

4              (Jury not present)

5              THE COURT:  Where are you going with this, Mr.

6      Tacopina?

7              MR. TACOPINA:  Where am I going with this?  That she

8      saved the dress, still hangs in her closet.  The witness is

9      right here, your Honor, but I guess that's OK.

10             THE COURT:  If you object, that's fine.  She can leave

11     the room.  You're right.

12             MR. TACOPINA:  I think so.

13             THE COURT:  Please leave the room, Ms. Carroll.

14             MR. FERRARA:  She is just collecting her bag, your

15     Honor.

16             MR. TACOPINA:  One of the things she has repeated is

17     that these bad things, she wants them out of her mind, out of

18     her head.

19             By the way, let me start out by saying, if you think I

20     am going anywhere near DNA or anything like that, I am not.

21             THE COURT:  That's what I wanted to find out.

22             MR. TACOPINA:  Your Honor, I'm actually shocked that

23     you think I would run afoul of the Court's order that's so

24     clear.  I didn't mention it in my opening.  I have no intention

25     of eliciting that.

N4RMCAR6

 1              THE COURT:  That's why I sent everybody out, just so

 2      that I could be sure.  Because once that bell rings, there is

 3      no way to unring it.

 4              MR. TACOPINA:  I'll read you my questions, if you'd

 5      like.

 6              THE COURT:  You don't have to read me your questions.

 7      You tell me you are not going near it.  I accept that you are

 8      not going near it.

 9              MR. TACOPINA:  Just about the fact that she kept the

10      dress, didn't get rid of the dress.

11              THE COURT:  Sentimentality.  I understand.

12              How long do you expect to be on Monday.

13              MR. TACOPINA:  I'm more than halfway through my

14      outline, which was shorter than Mr. Ferrara's outline.  I

15      think -- again, it depends if I have to impeach or not impeach.

16      Things have moved a little bit in the last bit.  That's why we

17      got to these tapes that we didn't expect to get to before we

18      had to address it with you.

19              THE COURT:  I think it would go a lot faster if we cut

20      out the repetition and if we stopped asking argumentative

21      questions.

22              MR. TACOPINA:  Your Honor, honestly, I'm at a loss

23      because I've done this once or twice in my life.  I know how

24      your Honor wants to run this courtroom, and I understand your

25      rules and I respect you.  I know that you're by the book in

N4RMCAR6

1    every way, shape, or form.  I crafted every question in a

2    way -- if something sounded argumentative, I didn't mean to be.

3    I was summarizing her statements.  I don't know what one

4    question I asked that was argumentative.

5              THE COURT:  There were more than one.

6              MR. TACOPINA:  Really?

7              THE COURT:  Oh, yes.  I sustained objections whenever

8    they were made to them.

9              MR. TACOPINA:  For example, the last round of

10   questions that you sustained an objection on was, to me -- I'm

11   at a loss for what was the fact that she didn't go to the

12   police about this man that she thinks is dangerous and brutal.

13   Even though I asked if she didn't go to the police before, it's

14   in regards to the questioning about Donald Trump.

15             THE COURT:  The fact that she didn't go to the police

16   is about as notorious a fact as the Yankees have not won the

17   World Series in years.

18             MR. TACOPINA:  The Mets more.

19             THE COURT:  The Mets more.  I'll give you the Mets

20   too.

21             But everybody knows it.  It's on the table, it's a

22   fact, and you will do your best with it, for what it's worth.

23   But to do it 20, 30 times, enough already.

24             MR. TACOPINA:  OK.  I know you don't really mean 20,

25   30 times.  I know you're just --

A-1848

N4RMCAR6

```
1          THE COURT:  Yes.  My wife always tells me that I'm
2     guilty of hyperbole, and I try to catch myself whenever I get
3     launched into it.
4          I have to correct something in the record.  I said for
5     Jonathan Swift and A Modest Proposal --
6          MR. TACOPINA:  What was that.
7          THE COURT:  Several centuries ago, not 700 years ago.
8     We will correct the record on that.
9          MR. TACOPINA:  Can we just leave the record alone.
10         THE COURT:  Jonathan Swift was an English writer of
11    considerable note.  I was forced to learn this when I was in
12    college.  And he wrote a book, a play, an article, I couldn't
13    tell you today called, A Modest Proposal, and it was about how
14    to solve some dreadful social problem affecting the British
15    then empire, and I frankly don't remember what the problem was
16    or what his absolutely ludicrous suggestion was, but it was one
17    that any reasonable-thinking person would have thought was
18    absolutely unthinkable.  And, therefore, when he spoke about a
19    modest proposal, what he was speaking about was in a sense of
20    irony and sarcasm, and I commend it to you because the very
21    first time I ever looked at the cover of this lady's book, it
22    brought back nightmares of Jonathan Swift.
23         MR. TACOPINA:  Judge, do you remember that great scene
24    in My Cousin Vinny where he said --
25         THE COURT:  You're from Brooklyn, and I'm from Staten
```

A-1849

N4RMCAR6

1  Island.  If either one of us didn't remember every scene in *My*

2  *Cousin Vinny*, there would something seriously wrong with us.

3              MR. TACOPINA:  The Judge said too:  Your Honor, for

4  the witness and only the witness.

5              THE COURT:  Absolutely.

6              Enough of *My Cousin Vinny*.  Enough of Jonathan Swift.

7              Everybody have a good weekend.

8              Before you go off to try to do that, I'm genuinely

9  appreciative of the cooperation among counsel.  I don't know

10  where we would be without that.  I appreciate it.

11              Thank you.  Have a great weekend.

12              (Adjourned to May 1, 2023, at 10:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION
 2    Examination of:                              Page
 3    E. JEAN CARROLL
 4    Direct By Mr. Ferrara  . . . . . . . . . . . 308
 5    Cross By Mr. Tacopina  . . . . . . . . . . . 330
 6
 7                        PLAINTIFF EXHIBITS
 8    Exhibit No.                              Received
 9     108   . . . . . . . . . . . . . . . . . . 312
10     108-T . . . . . . . . . . . . . . . . . . 313
11     4   . . . . . . . . . . . . . . . . . . . 321
12     45  . . . . . . . . . . . . . . . . . . . 324
13     46  . . . . . . . . . . . . . . . . . . . 325
14     48  . . . . . . . . . . . . . . . . . . . 326
15     51  . . . . . . . . . . . . . . . . . . . 327
16     53  . . . . . . . . . . . . . . . . . . . 327
17
18                        DEFENDANT EXHIBITS
19    Exhibit No.                              Received
20     AA  . . . . . . . . . . . . . . . . . . . 331
21     AF  . . . . . . . . . . . . . . . . . . . 339
22     AJ  . . . . . . . . . . . . . . . . . . . 352
23     AR  . . . . . . . . . . . . . . . . . . . 410
24     AW  . . . . . . . . . . . . . . . . . . . 447
25
```

N512car1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   E. JEAN CARROLL,
3
                 Plaintiff,              New York, N.Y.
4
             v.                          22 Civ.10016 (LAK)
5
   DONALD J. TRUMP,
6
                 Defendant.
7  ------------------------------x       Jury Trial

8                                        May 1, 2023
                                         9:30 a.m.
9
   Before:
10
                     HON. LEWIS A. KAPLAN,
11
                                         District Judge
12                                        and a Jury

13
                          APPEARANCES
14
   KAPLAN HECKER & FINK LLP
15      Attorneys for Plaintiff
   BY:  ROBERTA A. KAPLAN
16       MICHAEL J. FERRARA
         SHAWN G. CROWLEY
17       MATTHEW J. CRAIG

18
   TACOPINA SEIGEL & DeOREO
19      Attorneys for Defendant
   BY:  JOSEPH TACOPINA
20       CHAD D. SEIGEL
         MATTHEW G. DeOREO
21

22  HABBA MADAIO & ASSOCIATES, LLP
        Attorneys for Defendant
23  BY:  ALINA HABBA
         MICHAEL T. MADAIO
24

25  W. PERRY BRANDT
        Attorney for Defendant

A-1852

N512car1

1          (Pages 461 through 471 sealed)

2          (In open court; jury not present)

3          THE COURT:  Good morning, everybody.

4          COUNSEL:  Good morning.

5          THE COURT:  I'm about to get the jury.

6          MR. FERRARA:  Just one point, your Honor.  We had

7    concluded on Thursday with some cross-examination about the

8    dress.

9          THE COURT:  About -- oh, yes, yes.

10         MR. FERRARA:  It's plaintiff's position that line of

11   inquiry has been exhausted.  We take -- we understand that

12   there are some legitimate questions around if this had

13   happened, wouldn't you have burned the dress, we understand

14   that idea.  But at this point that has come out, and if defense

15   wants to get into the fact that it was laundered or

16   unlaundered, for instance, we think that simply invites

17   speculation, so we would ask at this point that Mr. Tacopina

18   move on.

19         MR. TACOPINA:  I fronted that with Mr. Ferrara.

20         THE COURT:  You were looking down into your notes and

21   I didn't get what you said.

22         MR. TACOPINA:  And I'm not at a microphone either.

23         THE COURT:  Aside from that, it was clear as a bell.

24         MR. TACOPINA:  I fronted that with Mr. Ferrara, your

25   Honor, so we didn't have any issues going forward.  I would

N512car1

1  actually just ask a few questions when we concluded on Thursday

2  about the dress.  Obviously I'm not asking anything regarding

3  any testing or anything of that nature, simply that the dress

4  still hangs in her closet, that it wasn't washed, it wasn't

5  laundered, and that it was not worn, and it was just kept, and

6  that's the end of the inquiry.

7          MR. FERRARA:  It doesn't still hang in Ms. Carroll's

8  closet for reasons of litigation, so that -- I don't think it

9  is going --

10         THE COURT:  Get to the bottom line.  What's the

11  plaintiff's position?

12         MR. FERRARA:  We would object to further questions

13  about the dress.

14         THE COURT:  At all.

15         MR. FERRARA:  They are either asked and answered or we

16  think they go beyond what is appropriate.

17         THE COURT:  Mr. Tacopina, what would be new in your

18  proposed line of questioning?

19         MR. TACOPINA:  I only asked two questions about the

20  dress, did you throw it out or burn it and what would be new is

21  that -- look.  I'm going based on source material from an

22  article in 2019 where the dress still hangs in her closet.

23  Maybe that's changed.  But the fact is, the dress was kept for

24  two decades by Ms. Carroll.  I just want to bring that out and

25  that it hadn't been washed or laundered, which I think goes to

N512car1

1    the --

2                THE COURT:  We are not going there.

3                MR. TACOPINA:  Okay.

4                THE COURT:  Unless you want to go into your client's

5    history of refusing to furnish a DNA sample for three years.

6                MR. TACOPINA:  Okay.  Well, my client did offer a DNA

7    sample this year, two months after the case was brought, but,

8    your Honor --

9                THE COURT:  Your client offered that DNA sample as

10   part of a *quid pro quo* after all discovery was closed, and

11   let's not relitigate that question.

12               MR. TACOPINA:  I wasn't planning on that.  Just

13   responding to your Honor's statement.

14               Okay.  So then I will just ask about the fact that the

15   dress was kept for the last two decades after the assault,

16   period, without the laundering and washing and whatnot.

17               MR. FERRARA:  Again, your Honor, we think it's asked

18   and answered.  It was asked:  "Even though you didn't keep an

19   account of" -- this is at the transcript from Thursday at

20   454/line 16:  "Now, even though you didn't keep an account of

21   this alleged rape in your diary, you did keep the dress you

22   supposedly wore that day.

23   "A  Yes.

24   "Q  Didn't throw it out?

25   "A  No.  It was a beautiful dress.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N512car1

1      "Q  You didn't burn it.

2      "A  No, I would never burn a beautiful item of clothing."

3              And at that point your Honor concluded the day.

4              THE COURT:  Okay.  It's closed.

5              MR. TACOPINA:  Okay, your Honor.  No problem.  That's

6      fine.

7              THE DEPUTY CLERK:  Shall I get the jury, Judge?

8              THE COURT:  One more second.  The motion that I found

9      on my desk from the defense this morning, has that been filed

10     yet or no?

11             MR. TACOPINA:  Mr. Seigel will be dealing with that.

12             MR. SEIGEL:  It has, your Honor.

13             THE COURT:  It is now denied.

14             Okay.  Get the jury.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

N512Car1                          Carroll – Cross

1            (Jury present)

2    E. JEAN CARROLL, previously sworn, resumed.

3            THE COURT:  Good morning, everybody.  I hope everybody

4    had a restful weekend, if damp.

5            Ms. Carroll, you are still under oath.

6            Let's proceed.  Mr. Tacopina.

7            MR. TACOPINA:  Thank you, your Honor.

8    CROSS-EXAMINATION (continued)

9    BY MR. TACOPINA:

10   Q.  Ms. Carroll, I would like to talk to you about Bergdorf

11   Goodman and your returning there after the alleged assault.

12   You continued to shop at Bergdorf after that 1995 or '96

13   incident you described, correct?

14   A.  Yes.

15   Q.  Okay.  And you go into changing rooms there when making

16   purchases?

17   A.  No, I don't believe I ever went into a dressing room.

18           MR. TACOPINA:  One second, please, your Honor.

19           I am going to direct counsel's attention to

20   Ms. Carroll's deposition from January 31 of 2023, lines 14-16.

21   I could actually back it up to line 7 for context.

22           THE COURT:  And what page?

23           MR. TACOPINA:  I'm sorry, page 93.

24           THE COURT:  Thank you.

25           MR. TACOPINA:  Counsel, when you are ready, just let

N512Car1                         Carroll - Cross

1   me know, please.

2           THE COURT:  Do I have a copy of this transcript,

3   folks?

4           (Counsel confer)

5           MR. TACOPINA:  You do, your Honor, but we have an

6   extra.

7           THE COURT:  That would be kind.  Thank you.

8           MR. TACOPINA:  Your Honor, when you are ready.

9           THE COURT:  I'm ready.

10  BY MR. TACOPINA:

11  Q.  Ms. Carroll, you just testified you didn't go into the

12  changing rooms.  I'm going to read to you from your deposition

13  testimony, January 31 of this year, starting at line 7, page

14  93:

15  "Q  You used to go to Bergdorf Goodman.  You testified that you

16  still go to Bergdorf Goodman.  Would you have any issue going

17  to Bergdorf Goodman again as a result of Donald Trump?

18  "A  No.

19  "Q  Did you go into the changing rooms alone?

20  "A  Yes."

21          That was four months ago when you gave that answer,

22  correct?

23  A.  I think I was thinking of the time I accompanied my niece

24  who was choosing a wedding dress, so the whole thing was a

25  changing room.  I may have been thinking of that.  I can't

N512Car1                         Carroll - Cross

1    remember.

2    Q.  Well, the question that you were asked and the answer you

3    gave was, "Did you go into changing rooms alone?" and you said,

4    "Yes."

5    A.  Ah.  I may have been thinking of a time that I am now not

6    recollecting, but what I do recollect buying in Bergdorf are

7    earrings, looking at shoes, strolling through the housewares,

8    picking up a journal as a Christmas present for my friends.  I

9    have -- I don't know what I was thinking about in that

10   deposition.

11   Q.  Okay.

12   A.  I may have been right, and I may be just forgetting it

13   today.

14   Q.  Speaking of which, you just outlined some of the things you

15   purchased at Bergdorf's since 1995 and '96?

16   A.  Yes.

17   Q.  You have made many purchases at Bergdorf Goodman since 1995

18   and '96.

19   A.  I have not made many, but I've certainly made several.

20   Q.  Okay.  Well, for instance, in 1997 you made purchases at

21   Bergdorf Goodman on four different dates?

22   A.  I probably did.

23   Q.  Let me see if I could help you.  I'm going to put up AY for

24   the witness and counsel and the Court, please.  Something will

25   be coming up, Ms. Carroll?

N512Car1                         Carroll – Cross

1    A.  Ah, right.

2    Q.  This is a journal that you prepared or that you maintained?

3    A.  Yes.  This is a QuickBooks report.

4    Q.  And did you -- was this prepared by you or maintained by

5    you?

6    A.  This is maintained by my sister Cande Carol.

7              MR. TACOPINA:  Your Honor, I would offer AY.

8              MR. FERRARA:  Without objection.

9              THE COURT:  Received.

10             (Defendant's Exhibit AY received in evidence)

11   BY MR. TACOPINA:

12   Q.  So this could be displayed, please.

13             So you see right there on AY there are four different

14   purchases?

15   A.  Yes.

16   Q.  Okay.  Basically -- your Honor, could I just have one

17   second?

18             (Counsel confer)

19             MR. TACOPINA:  Apparently there is another page, same

20   exhibit, still AY, second page.  I don't know if there is a way

21   to zoom that a little bit.  Okay.  And that's the second page.

22   BY MR. TACOPINA:

23   Q.  So between 2001 and 2018, you made purchases at Bergdorf

24   Goodman on 23 different dates.  Correct, Ms. Carroll?

25   A.  Yes.

N512Car1                          Carroll - Cross

1    Q.  Okay.  You can take that down.  Thanks.

2         Now, of course that doesn't include the times you went

3    there perhaps and didn't buy anything?

4    A.  That's true.

5    Q.  So it's clear from this, there was no -- you were not

6    afraid or concerned about going to Bergdorf Goodman after the

7    alleged assault in '95 or '96?

8    A.  No, no.  I made that clear, that Bergdorf's is not a place

9    that I am afraid to enter.

10   Q.  I think you testified just now you mentioned something

11   about an event there where -- an event or an occasion, I should

12   say, where your niece, it was your niece was trying on a

13   wedding dress?

14   A.  She was trying on wedding dresses.

15   Q.  Dresses.  Okay.  And you were there also with Lisa Birnbach

16   that day.

17   A.  Yes.

18   Q.  And you guys were having champagne, correct?

19   A.  Yes.

20   Q.  And it's your testimony that during that occasion while you

21   were in the same store which you claimed to have been raped in

22   alongside the person you claimed to have called immediately

23   following the rape, it's your story the alleged attack never

24   entered your head once?

25         MR. FERRARA:  Objection to the argumentative portion.

N512Car1                          Carroll - Cross

1              THE COURT:  Rephrase it.

2     BY MR. TACOPINA:

3     Q.  Did -- when you were there with Lisa Birnbaum -- Birnbach,

4     sorry.

5              When you were there with Lisa Birnbach that day where

6     you were discussing your niece's wedding dresses and having

7     champagne with Lisa, did the alleged attack ever enter your

8     head?

9     A.  I don't remember it entering my head.  It could have -- a

10    vision could have streaked through my brain while we were

11    there, but this was a very happy occasion, and I wasn't there

12    to remember the time in the dressing room in 1996.

13    Q.  And did you have any discussions with Lisa about --

14    A.  No.

15    Q.  -- the alleged attack?

16    A.  No.

17    Q.  You testified at trial, I think it was on Wednesday, the

18    first day of your testimony, that when Donald Trump was running

19    for president, you couldn't get away from him.  You kept seeing

20    his face, and it was hard.

21    A.  Yeah.

22    Q.  Okay.  You are familiar with the TV show *The Apprentice*?

23    A.  Yes.

24    Q.  It's a reality show that featured Donald Trump as the host

25    or a host?

A-1862

N512Car1                    Carroll - Cross

1   A.  Yes.  I was a big sort of fan of the show.  I was very

2   impressed by it.

3   Q.  As a matter of fact, I think you did a Facebook post once

4   where you said you were a massive fan, right?

5   A.  I had never seen such a witty competition on television.

6   It was about something that was worthwhile, about business

7   plans and business people, ambitious young business people

8   competing to win a job.  The part where who he fired at the

9   end, I didn't watch that part.  I loved the competitions.

10  Q.  Okay.  But you made a Facebook post saying you were a

11  massive—all caps—*Apprentice* fan?

12  A.  That's because two of my friends had appeared on *The*

13  *Apprentice* and I wanted to boost -- I wanted to make it known

14  that I also liked *The Apprentice*.

15  Q.  Okay.  So you liked *The Apprentice* and you watched it, fair

16  to say?

17  A.  It was a very good television show.

18  Q.  And only about a few -- by the way, let me show you AZ to

19  make sure we are talking about the same thing, please.  AZ,

20  Ms. Carroll, is that your Facebook post?

21  A.  Yes.

22  Q.  Okay.

23  A.  What's the date on that?

24  Q.  4/22/12, Ms. Carroll.  It's right on -- I'm sorry, that

25  looks like November -- no, no, that's the day it was printed.

N512Car1                         Carroll - Cross

1    Hold on one second.  It's from 2012.  Hold on.

2            Do you recall the time frame in which you made that

3    post?

4    A.  I think a friend of mine was appearing on the show, which

5    prompted me to do it, but that I'm not sure.

6    Q.  Okay.

7    A.  That I'm not sure.

8    Q.  All right.

9            Now, let me ask you this.  You also made a Facebook

10   post regarding Donald Trump and a sort of a joke.  Do you

11   recall making a joke about Donald Trump on your Facebook post?

12   A.  Mr. Tacopina, I made several jokes about Donald Trump.

13   Q.  Okay.  Then let me show you this one.  This is BA, defense

14   BA, your Honor.

15           Do you recall that Facebook post from August 6, 2012,

16   Ms. Carroll?  And I refer your attention to your post up top.

17   A.  Yes.

18           MR. TACOPINA:  Okay.  I offer, your Honor, BA into

19   evidence.

20           MR. FERRARA:  Your Honor, we don't object to the

21   portion that is simply Ms. Carroll's post, but it is followed

22   by many comments that we think --

23           MR. TACOPINA:  No problem, your Honor.  We agree that

24   that should be redacted.  We will just focus on what's actually

25   highlighted on the screen, and we will leave it up like that.

N512Car1                        Carroll - Cross

1           MR. FERRARA:  That's fine, although it is visible on

2    the screen, your Honor.

3           MR. TACOPINA:  We can take care of that, apparently.

4           Okay, Mike?

5           MR. FERRARA:  Yes, thank you.

6           MR. TACOPINA:  We offer Defendant's Exhibit BA.

7           THE COURT:  BA, as redacted so as to limit it only to

8    Ms. Carroll's post, is received.

9           (Defendant's Exhibit BA received in evidence)

10          MR. TACOPINA:  Please publish to the jury as well.

11          THE COURT:  Yes.

12   BY MR. TACOPINA:

13   Q.  So this is a Facebook post by you from April -- I'm sorry,

14   August 6, 2012, and here you write:  "Would you have sex with

15   Donald Trump for $17,000?  (Even if you could (a) give the

16   money to charity, (b) close your eyes, and he is not allowed to

17   speak.)"

18          So you joked around about having sex with Donald Trump

19   for money in this Facebook post, correct?

20   A.  Yes.

21   Q.  And in 2012 -- 2012 -- let me summarize this question.  In

22   2012, that was about five years before you started writing your

23   story about being raped by Donald Trump.

24   A.  I started that story in December 2017.

25   Q.  So a little over five years.

A-1865

N512Car1                      Carroll - Cross

1   A.   Um-hmm.

2   Q.   Earlier you made this joke about having sex with Donald

3   Trump for money.

4            THE COURT:  Mr. Tacopina, everybody's got the math

5   down cold and that question was asked just a minute ago.

6            MR. TACOPINA:  Okay, your Honor.

7            THE COURT:  So move on.

8            MR. TACOPINA:  Okay.  We can take that down.

9   BY MR. TACOPINA:

10  Q.   Your book lists the 21 most hideous men you ever

11  encountered.  We discussed that earlier.

12  A.   Mr. Tacopina --

13  Q.   Yes, Ms. Carroll?

14  A.   -- not the 21 that I have ever encountered.  The list

15  included high comedy and dark events.

16  Q.   Okay.

17  A.   It had men who were merely annoying, which I put into it

18  for comic effect to bring out the true evil of the more vile

19  men on the list.  So it's a balanced list.

20  BY MR. TACOPINA:

21  Q.   I understand, Ms. Carroll.  Thank you.

22            And without getting into any details, but it

23  identifies purported attacks that men have made against you.

24  A.   Yes.

25  Q.   And according to you, your book doesn't even include all

Case 23-793, Document 82, 11/20/2023, 3592069, Page206 of 300

A-1866

N512Car1                          Carroll – Cross

1   the people who sexually assaulted you?

2          MR. FERRARA:  Objection, your Honor.  412.

3          THE COURT:  Members of the jury, please go into the

4   jury room for a minute.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N512Car1                      Carroll - Cross

 1              (Jury not present)

 2              THE COURT:  Be seated, folks.

 3              Mr. Ferrara.

 4              MR. FERRARA:  Your Honor, I don't know where

 5     Mr. Tacopina is going here, but we have obviously briefed to

 6     the Court the idea that prior sexual assaults, prior sexual

 7     experiences.  There is a procedure under 412.  This is very

 8     sensitive evidence, and so not knowing where he was going, I

 9     objected.

10              THE COURT:  Well --

11              MR. TACOPINA:  That was --

12              THE COURT:  The first question to you, Mr. Ferrara, is

13     forget about where he is going, what about the question that's

14     on the table?

15              MR. FERRARA:  The question that's on the table could

16     potentially elicit other instances in which Ms. Carroll was

17     sexually assaulted that we have moved --

18              THE COURT:  The answers are "yes," "no," or "I don't

19     remember."

20              MR. FERRARA:  I'm not sure it's appropriate even for

21     the jury to have in front of it evidence that there were other

22     people outside of the book who -- first off, even -- some of

23     the sexual assaults in the book have been kept out.  So I don't

24     understand the relevance of sexual assaults outside the book.

25              THE COURT:  Okay.  Just so I am clear, then, your

N512Car1                         Carroll - Cross

1    position is that a "yes" answer is itself barred by 412.

2    That's your position.

3                MR. FERRARA:  Potentially.

4                THE COURT:  Not potentially, is.

5                MR. FERRARA:  Yes.

6                THE COURT:  Okay, now Mr. Tacopina.

7                MR. TACOPINA:  That was the entirety of the question,

8    your Honor.  And by the way, I did preface it with saying

9    "without going into any details."

10               THE COURT:  I know, but let's cope with the argument.

11               MR. TACOPINA:  Okay.  I don't think that's 412 at all.

12   I'm discussing, your Honor, her book.  She just testified to

13   this list of 21 most hideous men being both serious and light,

14   paraphrasing Ms. Carroll's words, serious and light, and the

15   list of 21 most hideous men apparently doesn't include all the

16   people that may have assaulted her.  There is nothing more than

17   that.  That was it.  That was the question.  I will tell you

18   the next -- well, the next couple questions.

19               THE COURT:  I appreciate that.  I know what the

20   question is.  What I am looking for is your argument for why it

21   is permissible.

22               MR. TACOPINA:  Well, I don't think it violates 412 at

23   all, and I think the point is her book, which she claims is a

24   list of 21 most hideous men, which was discussed on both direct

25   and cross, you know, identifies purported attacks, and then of

N512Car1                          Carroll - Cross

1    course it identifies other people like, you know, who fixed her

2    tire or something like that but doesn't include all the people

3    who had assaulted her.

4           THE COURT:  But what the rule says is, "The following

5    evidence is not admissible in a proceeding involving alleged

6    sexual conduct: (1) evidence offered to prove that a victim

7    engaged in other sexual behavior."

8           Now let me put to one side something that may pop into

9    your head or others.  Although I find it surprising that this

10   should be the case, there are plenty of cases that say that

11   nonconsensual sex, rape, or other nonconsensual sex is other

12   sexual behavior covered by the rule.  In other words, the rule

13   prohibits receipt of evidence offered to prove that a victim

14   engaged in other sexual behavior, consensually or otherwise.

15   Now, with that, why is an answer to this question permissible?

16          MR. TACOPINA:  Your Honor, you know what I will do?

17   The last question -- I assume the Court has the transcript up

18   there?

19          THE COURT:  Well --

20          MR. TACOPINA:  It's gone now, probably.

21          THE COURT:  It's here, it's there.  I will get it

22   back.

23          MR. TACOPINA:  The question before the one that was

24   objected to.

25          THE COURT:  I have it.  The last one was, "And without

N512Car1                    Carroll - Cross

1   getting into any details, but it identifies purported attacks

2   that men have made against you," and the answer was "Yes."

3           MR. TACOPINA:  Okay.

4           THE COURT:  And that went to the book, and the book is

5   in evidence, so that's under the heading of no harm, no foul.

6   It's here.

7           MR. TACOPINA:  Right.  So I think and, your Honor, I

8   just want to -- let me first address the issue here that's on

9   the floor.

10          THE COURT:  Good.

11          MR. TACOPINA:  I will withdraw that last question,

12  skip the next two that I had, because it sort of ties in, and

13  just simply ask, based on that last answer that these purported

14  attacks which she identified or said yes to, none of them were

15  ever reported to the police and leave it at that.  I won't ask

16  the other questions.

17          MR. FERRARA:  I believe no objection to that.

18          I just wanted to clear up one thing in case, your

19  Honor, for future -- potential future objections.  The book is

20  not in in its entirety.  The book has other attacks that we

21  accept will come in.  For instance, John Johnson, Les Moonves.

22  So the question Mr. Tacopina asked about the book containing

23  other attacks, we understand, we did not object.  I just wanted

24  to flag our position is just because it is in the book, which

25  again is not entirely in evidence, we would not --

N512Car1                        Carroll - Cross

1           THE COURT:  That had escaped my mind, and I appreciate

2    the update.

3           MR. TACOPINA:  There is nothing obviously outside of

4    the Les Moonves that we are talking about, even though it is in

5    the book, so that's clear.

6           THE COURT:  Fine.  So let's get the jury back and

7    there is no objection to the question you propose to ask.

8           MR. FERRARA:  Correct.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N512Car1                        Carroll – Cross

1          (Jury present)

2          THE COURT:  Folks, thanks for bearing with us there.

3    Next question, Mr. Tacopina.

4          MR. TACOPINA:  Yes, your Honor, just to put the next

5    question in context.

6    Q.  Ms. Carroll, I asked you, the last question before the one

7    that we did not complete was that the book identified purported

8    attacks and you said yes, right?

9    A.  Excuse me.  Repeat the question, please.

10   Q.  Your Honor, could I just have it read back the question and

11   answer?

12         THE COURT:  Yes.

13         MR. TACOPINA:  Thank you.

14         (Court and court reporter confer)

15         THE COURT:  "And without getting into any details, but

16   it identifies purported attacks that men have made against

17   you," the witness answered "yes."

18         MR. TACOPINA:  Okay.

19         THE COURT:  Next question.

20         MR. TACOPINA:  I would like to play a snippet from the

21   deposition from October 14, 2022.  I have identified for

22   counsel already it's page 160, 11-13 on the transcript, I'm

23   just going to play that very short video snippet of that

24   testimony.  Counsel?

25         MR. FERRARA:  May I just have one moment, your Honor?

A-1873

N512Car1                          Carroll - Cross

1                (Counsel confer)

2                MR. FERRARA:  No objection your Honor.

3                THE COURT:  Okay.

4                MR. TACOPINA:  Display to the jury it's 162.

5                THE COURT:  I'm sorry.  You said 160 a minute ago.

6                MR. TACOPINA:  That's our exhibit number, okay, that's

7      how we identify it here, your Honor.

8                THE COURT:  I see.  So you are playing an excerpt --

9                MR. TACOPINA:  From the deposition.

10               THE COURT:  -- from the deposition of October 14,

11     2022, and it appears in the transcript of the deposition, for

12     those of us who are following along that way, at page 160/lines

13     11-13 of the transcript.

14               MR. TACOPINA:  Perfect, your Honor.

15               Go ahead.

16               (Video played)

17               MR. TACOPINA:  So one, we need volume.

18               (Video played)

19     BY MR. TACOPINA:

20     Q.  You have in fact, though, called the police on other

21     instances regarding -- not regarding assaults, correct,

22     Ms. Carroll?

23     A.  Mr. Tacopina, I was born in 1943.  I am a member of the

24     silent generation.  Women like me were taught and trained to

25     keep our chins up and to not complain.  The fact that I never

N512Car1                        Carroll - Cross

1      went to the police is not surprising for someone my age.  We

2      were not ever trained to call the police, ever.  I would rather

3      have done anything than call the police.

4              MR. TACOPINA:  Okay, your Honor.  Could I have that

5      stricken as nonresponsive?  I asked the question --

6      A.  And I will now answer I did call the police on one

7      occasion.  I was living in Helen Hayes', who was a respected

8      American actress -- I think she was called the Queen of

9      American Stage.  Anyway, I had her house.  I was living in her

10     old farmhouse.  It was a landmark.  And on Halloween, some kids

11     went by and hit Helen Hayes' -- Helen Hayes's mailbox.  So I

12     called the police because I thought they were marring this

13     famous homestead's mailbox.  I did call the police.  That's the

14     one and only time in my life I have ever called the police and

15     it was on behalf of someone else.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

N515car2                          Carroll - Cross

1   BY MR. TACOPINA:

2   Q.  So it is your testimony you called the police if a mail box

3   is attacked but not if you are personally attacked or sexually

4   assaulted?

5   A.  I would never call about something I was ashamed of.

6   Listen, I was ashamed of what happened.  I thought it was my

7   fault.  I would never, never, never go to the police.  Ever.

8           MR. TACOPINA:  Your Honor, could I just, for the

9   record, have everything before "I will now answer the question"

10   stricken on that previous answer?

11          MR. FERRARA:  We object.  We think it is context, your

12   Honor.

13          THE COURT:  Pardon?

14          MR. FERRARA:  We think it is context for the answer.

15          THE COURT:  That's why he is objecting.

16          Your application is exactly what, Mr. Tacopina?

17          MR. TACOPINA:  Your Honor, I asked that question about

18   calling the police regarding the mail box and Ms. Carroll

19   started describing sort of the generation she was born in and

20   these other things, and then she said "I will now answer the

21   question."  So, anything before "I will now answer the

22   question." I ask be stricken.

23          THE COURT:  Granted.  The jury is to disregard that.

24   Q.  I think on direct you testified, Ms. Carroll, direct

25   examination by Mr. Ferrara, you testified about your advice

N515car2                          Carroll - Cross

1    column and how you would advise readers to report men to the

2    police, when appropriate?

3    A.  Yes.

4    Q.  I would just like to go through a few of those snippets of

5    your columns I have identified to plaintiff's counsel already,

6    and I don't know if you recall them off the top of your head,

7    if not, Ms. Carroll, I can show them to you, but do you recall

8    the column where you -- this, again, is the Ask E. Jean column

9    from May of 1994, where you advised a reader, someone who asked

10   you a question that her assistant had been raped by a man and

11   you told her to call the police and actually gave her the New

12   York Sex Crimes hotline to report rape?

13   A.  I always, in most cases, advised my readers to go to the

14   police.

15          MR. TACOPINA:  OK.  I would like to show you CW,

16   Defendant's Exhibit CW -- I'm sorry, CY, just for Ms. Carroll,

17   please.

18   Q.  That's *Elle*, that was the magazine in which you wrote the

19   Ask E. Jean column?

20   A.  Yes.

21          MR. TACOPINA:  Second page for Ms. Carroll to identify

22   that?  OK, a different second page?

23   Q.  OK.  Again, this is from 1994, it is a magazine, but --

24          MR. FERRARA:  Pardon me, your Honor.

25          MR. TACOPINA:  Yes.

N515car2                        Carroll – Cross

 1              (Counsel conferring)

 2   BY MR. TACOPINA:

 3   Q.  Sorry.  I said 1994, Ms. Carroll.  Mr. Ferrara corrected

 4   me; he is right, it was September '98.  This is a column where

 5   you told a writer who was talking about her friend getting

 6   drunk and ending up at some guy's apartment and woke up lying

 7   in bed next to him, and she felt responsible and was worried

 8   that she was probably raped, and you advised her to take her to

 9   a gynecologist at once, see that she is examined, it is

10   probably too late to obtain evidence of a rape, but she must be

11   tested for venereal disease, hepatitis, HIV, etc., and to call

12   New York City Police Department rape hotline and you gave the

13   number; a compassionate and knowledgeable female detective will

14   talk to your friend.  And, ask I suggest that you speak with

15   the detective, too.  Your own experience has been pretty

16   shattering even if you are a street-grade actress and could

17   hide your feelings, do not speak to the man, the district

18   attorney's office will decide if your friend has enough

19   evidence to bring the charge against him.

20              You wrote that?

21              MR. TACOPINA:  I offer CY, your Honor.

22              MR. FERRARA:  No objection.

23              THE COURT:  Received.

24              (Defendant's Exhibit CY received in evidence)

25              MR. TACOPINA:  Please put up BC for Ms. Carroll alone

A-1878

N515car2                         Carroll - Cross

1    at this point.

2    BY MR. TACOPINA:

3    Q.  BC, Ms. Carroll, is another one of your advice columns, I

4    think this is the online version, again similar subject matter,

5    it is from August of 2006.  Do you recall that?

6    A.  Yes.

7              MR. TACOPINA:  I offer BC, your Honor.

8              MR. FERRARA:  Your Honor, there is nothing on this

9    exhibit that suggests a date.

10             MR. TACOPINA:  Can you highlight the portion, please?

11             That suggests what, Mike?  A date?

12             MR. FERRARA:  It is an undated document, your Honor.

13   I'm not arguing it, I am simply saying this is --

14             THE COURT:  I've got it.  I think this is probably

15   cumulative anyway.

16             MR. TACOPINA:  OK, your Honor.

17             THE COURT:  Let's at least move on.

18             MR. TACOPINA:  Yeah, yeah.  We will do that.

19   BY MR. TACOPINA:

20   Q.  How about BD?  Take a quick look at BD, Ms. Carroll?

21             MR. TACOPINA:  BD, please?  Not BC.

22   Q.  Similar thing, we are not going to offer it because it

23   doesn't appear to be date stamped, but this is a column where

24   you advised a reader if her boyfriend threatens to beat up her

25   dog, she should call the police?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N515car2                        Carroll - Cross

1    A.  Oh, yeah.  I remember that.

2    Q.  You remember it?

3    A.  Very well.  She wrote back to me just recently and told me

4    what happened.

5    Q.  Let me show you BE.  This nice and clean the date, August

6    30th, 2016, from your Ask E. Jean column.  Do you recall this?

7    A.  Yes.

8            MR. TACOPINA:  I offer BD, your Honor.  It is dated.

9            MR. FERRARA:  No objection.

10           THE COURT:  BD is received.

11           (Defendant's Exhibit BD received in evidence)

12   BY MR. TACOPINA:

13   Q.  So this was in your column:  How do I deal with threatening

14   e-mails from my ex?  And the reader wrote to you that her

15   ex-husband, who lived in Europe, had threatened to expose her

16   past and you replied:  I have spoken with Steven G. Rodriguez

17   an experienced attorney, and you go on to advise at the end of

18   the day, you repeat that he advised that this woman call the

19   police because of threatening e-mails; correct?

20   A.  Yes.

21   Q.  Just a few more.  BG, please?

22           E. Jean column from May of 2017.  Do you recognize

23   that, Ms. Carroll?

24   A.  Yes, I do.

25           MR. TACOPINA:  I offer BG as well, your Honor.

Case 23-793, Document 82, 11/20/2023, 3592069, Page220 of 300

N515car2                         Carroll - Cross

```
 1              MR. FERRARA:  Your Honor, objection.  This is becoming
 2    cumulative.
 3              THE COURT:  Granted.  Sustained.
 4    BY MR. TACOPINA:
 5    Q.  Suffice it to say, Ms. Carroll, without going through the
 6    rest of these, there were numerous times where you have advised
 7    your readers to call the police, report them to the New York
 8    City Police Department Sex Crimes Hotline and what not, right?
 9    A.  Absolutely.  Yes.
10    Q.  Now, after you wrote your book accusing Donald Trump of
11    raping you, he publicly denied that accusation.  We have been
12    through that, yes?
13    A.  Yes.
14    Q.  And, according to you, he accused you of lying about the
15    rape allegation in order to increase your book sales, carry out
16    a political agenda, and to make money?
17    A.  I think that's the former president's argument.
18    Q.  Right.  That's what I'm saying.  That's what he accused you
19    of lying about --
20    A.  Yes, yes.
21    Q.  -- was the rape allegation to increase book sales, your
22    political agenda, and to make money?
23    A.  Yes.
24    Q.  And you claimed those accusations against you are false?
25    A.  Yes.
```

Case 23-793, Document 82, 11/20/2023, 3592069, Page221 of 300

A-1881

N515car2                         Carroll – Cross

1   Q.  And with regard to increasing book sales and making money,

2   you included the story in Bergdorf story in your book to market

3   it and sell it, as you testified to?

4   A.  I didn't include it to market it or sell it.  I included it

5   because I had reached a point in my life, at 76 years old, I

6   was no longer going to be silent.  That's why I included it.

7   Q.  And we went through e-mails earlier, I won't show them to

8   you again, but where you discussed about how you felt really

9   bad about his candidacy, and you were deeply troubled about his

10  presidency, and you felt it was your patriotic duty to stop

11  him?  Do you recall that?

12          MR. FERRARA:  Objection, your Honor.  Compound.

13          THE COURT:  Sustained as to form.

14  BY MR. TACOPINA:

15  Q.  Do you recall testifying earlier about your feelings about

16  Donald Trump and how troubled you were about his presidency?

17  A.  I do not like Donald Trump and I think he was a terrible

18  president.

19  Q.  OK.

20  A.  No question.

21  Q.  And you thought you needed to do your patriotic duty to

22  stop him?

23          MR. FERRARA:  Objection.

24          THE COURT:  Sustained.

25  Q.  Only two months before your October 14th, 2020 deposition,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N515car2                         Carroll - Cross

1    Carol Martin sent you a text message asking if she -- Carol

2    Martin -- could get reimbursed for her expenses to travel from

3    New Jersey to New York to meet a lawyer.

4    A.  Yes.

5              MR. TACOPINA:  I am going to show you BS, please?

6    Publish that to the witness and counsel and the Court.

7    Q.  Do you see that text message?  That's the one I am asking

8    you about; correct, Ms. Carroll?

9    A.  Yes.

10   Q.  Shortly after that you replied, in sum and substance -- we

11   don't have to get into the details of it, but -- you replied,

12   in sum and substance, that you would have that taken care of;

13   correct?

14   A.  I had no idea how it would be taken care of but I wanted to

15   assure Carol, who was worried about the costs of the bridges,

16   the gas, the parking; Carol is on a fixed income and I just

17   wanted to assure her that we would figure it out, and I believe

18   it was figured out.  I think they had a Zoom meeting instead of

19   an in-person meeting so none of these expenses actually were

20   caused to Carol.

21   Q.  OK.  I mean, in fact what you told Ms. Carol is that you

22   would send a car to pick her up?

23   A.  I actually thought that is probably what I would do but I

24   didn't know.

25   Q.  OK.  That's neither here nor there.  That's fine.

N515car2                          Carroll - Cross

1   A.  I'm just guessing.

2   Q.  That's the subject matter of the text message?

3   A.  Carol is on a fixed income and she wanted to --

4            THE COURT:  Look, Ms. Carroll, it would help if you

5   would just answer the question, and Mr. Tacopina, it would help

6   if you were clear when your question was over and what it was

7   asking.

8            MR. TACOPINA:  When I stop talking it is generally

9   over, your Honor, but OK.

10  Q.  OK.  The subject matter of that initial text from Ms. Carol

11  Martin to you was about transportation and arrangements for

12  transportation --

13  A.  Yes.

14  Q.  -- period, right?

15  A.  Yes.

16  Q.  Shortly after you assured her it would be taken care of and

17  whatever you said, Carol Martin replied to you saying:  Thanks

18  for helping with that.  No more chats and texts until further

19  notice.

20           MR. TACOPINA:  Can we take a look at that, please?

21  Q.  You received that from Ms. Martin on August 10, 2022?

22           MR. FERRARA:  Your Honor, we object.  This is hearsay.

23  It is -- the document is not in evidence and we would object to

24  its admission.

25           MR. TACOPINA:  Well, I offer this, your Honor.  It is

A-1884

N515car2                         Carroll - Cross

1    not being offered for the truth of the matter, it is being

2    offered for the state of mind of Ms. Carroll and Ms. Martin.

3              THE COURT:  How is it relevant to her state of mind?

4              MR. TACOPINA:  To Ms. Carroll's?

5              THE COURT:  Yes.

6              MR. TACOPINA:  Because she replies to this message.

7    There is a statement here about no more chats and texts.

8              THE COURT:  You don't have to -- you know you have got

9    an objection to the document, it is not in evidence, so

10   repeating the substance of what is not in evidence --

11             MR. TACOPINA:  Sorry.

12             THE COURT:  -- is not moving the ball down the field

13   and shouldn't happen.

14             MR. TACOPINA:  It goes to the state of mind of

15   Ms. Carroll, your Honor, specifically the second sentence in

16   that.

17             THE COURT:  Are you telling me that there is going to

18   be a response to this?

19             MR. TACOPINA:  Yes.

20             MR. FERRARA:  May I just have one moment with counsel,

21   your Honor?

22             THE COURT:  Yes.

23             (Counsel conferring)

24             MR. FERRARA:  I agree there is a response.  It is

25   inscrutable to me, your Honor.  We object to this document.

N515car2                          Carroll - Cross

1              THE COURT:  Let me see the response.

2              MR. TACOPINA:  Please show the Court.

3          And your Honor if I can put in context what it is but

4    I'm not going to --

5              THE COURT:  Wait a minute.  Now, what I am looking at

6    on the screen is a whole bunch of different items.  Are these

7    all in a single exhibit or are they different exhibits?

8              MR. TACOPINA:  Single exhibit, your Honor.

9              THE COURT:  What is the exhibit?

10             MR. TACOPINA:  BS.

11             THE COURT:  And what you are offering is the green and

12   the first blue; is that right?

13             MR. TACOPINA:  The first and second blue, your Honor.

14   With just the first blue -- I am not saying anything that is

15   objectionable, but there is apparently an emoji that doesn't

16   show up on a printout.

17             THE COURT:  Thank you.

18             MR. TACOPINA:  An emoji is that little face.

19             THE COURT:  I am stuck in the 18th century, as you

20   know.

21          I don't think this is admissible.  Sustained.

22   BY MR. TACOPINA:

23   Q.  Carol Martin's attorney is named Noam Biale?

24             MR. FERRARA:  Objection.  Relevance.

25             THE COURT:  Sustained.

N515car2                          Carroll - Cross

1    Q.  Was Carol Martin's attorney recommended by your attorney?

2            MR. FERRARA:  Objection.  Relevance.

3            THE COURT:  Sustained.

4    Q.  Let's talk about how you found an attorney; forget who, an

5    attorney in this case.  You first decided to sue Donald Trump

6    after an attorney you met at a house party told you to

7    seriously think about suing him?

8    A.  No.  He didn't tell me to seriously think about suing him,

9    he just laid out the difference between a criminal case and a

10   civil case.

11   Q.  And the attorney we are talking about is George Conway;

12   right?

13   A.  Yes.

14           MR. TACOPINA:  Bear with me one second, Ms. Carroll,

15   and your Honor.

16   Q.  Did Mr. Conway tell you that you should seriously think

17   about suing Donald Trump?

18   A.  No.

19   Q.  No.  OK.  I'm going to read you a portion of your

20   deposition from October 14, 2022.

21           Counsel, page 205, lines 4 through 14.  Let me know

22   when you are ready, please.

23           MR. FERRARA:  No objection.

24   Q.  OK.  So you said Mr. Conway did not tell you to seriously

25   think about suing Donald Trump.  I'm going to read a question

N515car2                          Carroll - Cross

1   and answer from October 14, 2022 deposition:

2   "Q  At what point did you decide to file a lawsuit against the

3   defendant?

4   "A  Well, wherever I went after the story went, people said are

5   you going to sue him?  Are you going to sue him?  And I would

6   say no, no, no.  I'm not going to do it.  I'm just not.  And

7   then I had a conversation with someone who knew the ins and

8   outs, an actual lawyer, and he said you should really think

9   about -- you should really seriously think about this."

10            Do you recall giving that testimony?

11            THE COURT:  We don't ask that question.

12  Q.  Was that true?  Was that testimony true?

13  A.  Yes.  George said you should seriously think about this

14  after he laid out the two various ways.  That is correct.

15  Q.  That is correct.

16            Before that you had no intention of suing Donald

17  Trump, as we just heard?

18  A.  Not really.

19  Q.  And you are aware of George Conway's feelings towards

20  Donald Trump?  You testified to that on direct?

21  A.  Yes.

22  Q.  And after seeing Mr. Conway at this party and talking about

23  suing Donald Trump, only two days later you retained an

24  attorney?

25  A.  I met an attorney two days later, yes.

N515car2                          Carroll - Cross

1   Q.  And was it Mr. Conway who recommended you to the attorney

2   you met?

3   A.  Yes.

4   Q.  And by the way, you met with both Lisa Birnbach and Carol

5   Martin and yourself with your attorney?

6           MR. FERRARA:  Objection.

7           THE COURT:  Ground?

8           MR. FERRARA:  I withdraw the objection, your Honor.

9           THE COURT:  Overruled.

10  A.  We had a dinner together.

11  Q.  Yourself, Lisa Birnbach, Carol Martin?

12  A.  We were invited along with several people.

13  Q.  So my question was you met with Lisa Birnbach and Carol

14  Martin with your attorney?

15  A.  We didn't -- it wasn't an official meeting.  We happened to

16  be along at a dinner.

17  Q.  Wasn't an official meeting.  OK.

18          And, by the way, Lisa Birnbach and Carol Martin are

19  the two women you said you told about the alleged assault in

20  Bergdorf Goodman?

21  A.  Yes.  Yes.

22  Q.  Now, despite -- withdrawn despite -- it is your testimony

23  that you chose to sue Donald Trump because he called you a

24  liar?

25  A.  Yes.

N515car2                          Carroll - Cross

1    Q.  Because you couldn't let that assertion stand?

2    A.  He did more than call me a liar.

3    Q.  And you cannot let that assertion stand?

4    A.  He -- no.  Because he added to that assertion.

5    Q.  I'm going to play from the deposition a very small clip, it

6    is 224, and I will identify it before you play it, please, for

7    counsel, from the October 14, 2022 deposition, page 162, lines

8    12 through 17.

9             Eric, that will be played for everyone when counsel is

10   ready.

11            MR. FERRARA:  No objection.

12            MR. TACOPINA:  Your Honor, may I?

13            THE COURT:  Sure.

14            MR. TACOPINA:  Sure?  OK.

15            (Video played)

16   BY MR. TACOPINA:

17   Q.  So because he called you a liar, you couldn't let it stand

18   and you sued him?

19   A.  Yes.

20   Q.  In your book, "What Do We Need Men For?" you also made

21   accusations against Les Moonves?

22   A.  Yes.

23   Q.  And Les Moonves was the chief -- sorry, the chairman of the

24   board, president, and chief executive officer of CBS?

25   A.  Yes.

N515car2                          Carroll - Cross

```
 1    Q.  One of the largest networks in the country?

 2    A.  Yes.

 3    Q.  Very powerful man in media?

 4    A.  Very.

 5    Q.  And, in fact, you listed him, I think, in your most hideous

 6    men list?

 7    A.  Yes.

 8    Q.  That's because, according to you, while you were in your

 9    50s, Les Moonves sexually assaulted you while you were in an

10    elevator?

11    A.  Yes.

12    Q.  And in your book you accused him of stepping into an

13    elevator behind you, going at you like an octopus, while having

14    an erection?

15    A.  Yes.  I didn't write those words, "while having an

16    erection," but I did say he went after me like an octopus.

17    Q.  OK.  Well, specifically, did you write in your book that --

18    and it is AA in evidence --

19              MR. TACOPINA:  Just put it up, it is just easier; page

20    186, 13 through 15.

21    Q.  You wrote that:  Moonves, with his arms squirming and

22    poking and goosing and scooping and pricking and pulling and

23    prodding, jabbing, is looking for fissures -- holes, OK -- I

24    don't even know I own.

25              That's what Mr. Moonves moon did to you?
```

511
N515car2                    Carroll - Cross

1    A.  Yes.

2    Q.  You can take that down.

3           And Les Moonves denied your accusation against him,

4    publicly?

5    A.  He denied it within -- *New York* magazine called him and his

6    denial ran with the *New York* magazine piece.

7    Q.  Right.  And he said it never happened?

8    A.  Yes.  He said it never happened.

9    Q.  And by saying it never happened, he was calling you a liar?

10   A.  He simply denied it, he didn't call me any names.  He

11   didn't say I was an operative of the democratic party.  He

12   didn't say I was running a scam.

13   Q.  You made public your sexual assault accusation against Les

14   Moonves and he called you a liar?

15   A.  No, he just denied it.

16   Q.  Well, by denying it he said you weren't telling the truth?

17   A.  He didn't call me names, he didn't grind my face into the

18   mud like Donald Trump did.

19   Q.  Now, his denials of your accusations were made publicly?

20   A.  They were made publicly in *New York* magazine.

21   Q.  And, in fact, you said that if a person looks, they could

22   find it online?  His denial?

23   A.  I believe he also -- 12 women had come forward to accuse

24   Les Moonves and he made a denial denying all 12 women at the

25   time so you can find that denial online.

N515car2                          Carroll - Cross

1   Q.  I'm not asking about other women with Mr. Moonves, I'm

2   asking about you.

3   A.  You are asking about the denial and that denial you can

4   find online.  I am included in a batch of denying 12 women.

5   Q.  Suffice it to say, you didn't sue Les Moonves but you sued

6   Donald Trump because he called you a liar?

7            THE COURT:  This certainly sound repetitious, don't

8   you think?

9            MR. TACOPINA:  Did I get the Les Moonves part already?

10           THE COURT:  Yes.

11           MR. TACOPINA:  I didn't think I did, but OK.  Your

12   Honor, I don't think I have that on the record, I don't think I

13   did.

14           THE COURT:  Page 310 of the real-time transcript:

15   "Q  Have you sued Mr. Moonves for defamation?

16   "A  No."

17           MR. TACOPINA:  OK, your Honor.  Thank you.

18   BY MR. TACOPINA:

19   Q.  Now, according to you, if Donald Trump had responded to

20   your accusation against him by saying you agreed to have sex

21   with him or that it was consensual, you would not view that as

22   him saying that you were a liar?

23           MR. FERRARA:  Objection.

24           THE COURT:  Ground.

25           MR. FERRARA:  Argumentative.  Speculation.

N515car2                       Carroll - Cross

```
 1              THE COURT:  Sustained.

 2              MR. TACOPINA:  Let's do this.  I would like to play

 3    from the deposition 10/14/22, clip 230, page 165, line 25 to

 4    166, line 9.  When counsel is ready, just let me know.  Are we

 5    ready?  Are we there?

 6              MR. FERRARA:  Just a minute.  No objection.

 7              THE COURT:  Go ahead.

 8              MR. TACOPINA:  Can I play that, please, for the jury

 9    and witness and everyone?

10              (Video played)

11              MR. FERRARA:  Your Honor, we think that the next, that

12    there is at least seven more lines that need to be played, for

13    context, under the rule of completeness.

14              THE COURT:  Page?

15              MR. FERRARA:  166, lines 9 through 15.

16              THE COURT:  Agreed.

17              Play the rest.

18              MR. TACOPINA:  Can we play the rest?  Yes.

19              To what line do you want played?

20              THE COURT:  15.

21              MR. TACOPINA:  15?  OK.  Can you give us a second,

22    because these are clips just of our exhibits.

23              THE COURT:  Sure.

24              MR. TACOPINA:  If we can't play it I will read it,

25    certainly.
```

1          Mike, do you want me to read it?

2               MR. FERRARA:  Do you prefer to read this?

3               MR. TACOPINA:  Your Honor, to move this along, I am

4     going to read.

5               THE COURT:  Members of the jury, this is what the

6     witness testified to on that occasion after what was just

7     played on the video.

8               (Video played)

9               MR. TACOPINA:  OK Mike?

10              MR. FERRARA:  Yes.  Thank you.

11    BY MR. TACOPINA:

12    Q.  So, Ms. Carroll, so would that have been true if Mr. Trump

13    had, instead of saying it didn't happen, he wasn't there, that

14    if he had said it was consensual, would that have been true?

15              MR. FERRARA:  Objection.  Speculation.

16              THE COURT:  No, it is not speculation.  If Mr. Trump

17    said it had been consensual, would that have been true.

18              MR. TACOPINA:  That's it.

19              THE COURT:  That's the question.

20              MR. FERRARA:  Pardon me.  I misheard it.  Fair enough.

21    BY MR. TACOPINA:

22    Q.  Ms. Carroll?

23    A.  No, it was not consensual.  Not consensual.

24    Q.  That means it would not have been true?

25    A.  But at least it would be Donald Trump admitting he was

N515car2                         Carroll - Cross

1    there.  He was there.

2    Q.  But it would not have been true what he would have said if

3    he had said it was consensual, according to you?

4    A.  No, it was not consensual.

5    Q.  And despite the fact that what he would have said if he had

6    said that, based on your testimony, were not true, you don't

7    know if you would have sued him?

8    A.  I can't say.  That didn't happen.

9              THE COURT:  Wait.  I'm sorry.  What didn't happen?

10             THE WITNESS:  He didn't say it was consensual, he just

11   flatly said it didn't happen.

12   BY MR. TACOPINA:

13   Q.  Now let's forget about what he said for a second, but

14   according to you there could have been just a disagreement over

15   whether you consented or not?

16             MR. FERRARA:  Objection.

17             MR. TACOPINA:  Objection?  I will play the clip then

18   of the deposition.  166, Mike.

19             THE COURT:  Didn't you just play this?

20             MR. TACOPINA:  It is different, your Honor.  It is

21   different.  And I will verify that in one second.

22             THE COURT:  166?

23             MR. TACOPINA:  Hold on one second, your Honor?  You

24   know what, your Honor?  It is a different clip.  It is a

25   different exhibit number but it is the same clip, you are

1    right.  You are right.

2    Q.  So, Ms. Carroll, if we understand your story correctly, it

3    is your testimony that -- well, withdrawn.

4            According to what you just testified to, what you

5    heard, your testimony in the deposition, you said that it would

6    have been him saying it happened and then we could have

7    disagreed and then I could have vehemently said no, I did not

8    consent.

9            So, do you think there was perhaps just a disagreement

10   between you and Mr. Trump?

11           MR. FERRARA:  I object to this.  I think it is

12   confusing.  I think it is irrelevant.  I don't understand their

13   defense to be consent.  I think this is irrelevant.

14           THE COURT:  Sustained.

15           MR. TACOPINA:  OK.

16   BY MR. TACOPINA:

17   Q.  The story, Ms. Carroll, the story that you testified to

18   about what happened in the Bergdorf changing room back in 1995

19   or 1996, could that somehow be viewed as consensual?

20   A.  No.

21           MR. FERRARA:  Objection.  Objection.

22           THE COURT:  Sustained.

23           MR. TACOPINA:  Your Honor, I'm going to get into an

24   area that I just want to front with the Court.  We are moving

25   along here.  Are we taking a morning break?  Would now be a

Case 23-793, Document 82, 11/20/2023, 3592069, Page237 of 300

A-1897

N515car2                        Carroll - Cross

1   decent time to do it or do you want me to plow ahead here?

2            THE COURT:  If you want to take our break here we will

3   take our break here.  15 minutes.

4            MR. TACOPINA:  Thank you, your Honor.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N515car2                           Carroll - Cross

1           (Jury not present)

2           (Recess)

3           THE COURT:  OK.  So what evidentiary treats do we

4    have?

5           MR. TACOPINA:  Thank you.  Your Honor, the first one

6    is resolved, it is a question.  I just didn't want the Court to

7    hear it and think we were going in a different direction.

8    Mr. Ferrara and I discussed it so it is just a short question.

9           The one issue is this, that we are going to have an

10   objection on, is I'm going into the witness' interview of

11   Natasha Stoynoff, who is one of the other defense witnesses,

12   she did a verbatim transcript of that interview that she did.

13          THE COURT:  Well, I have heard you say, or in writing,

14   characterize it as a verbatim transcript.  Whether that --

15          MR. TACOPINA:  Ms. Carroll said it was in her --

16          THE COURT:  I have seen it.

17          MR. TACOPINA:  OK.

18          THE COURT:  I suspect it isn't, but --

19          MR. TACOPINA:  OK.

20          THE COURT:  -- whatever.

21          MR. TACOPINA:  A transcript anyway.  But we want to

22   use relevant portions, obviously not the whole thing.  We are

23   going to offer it subject to redaction, and the relevant

24   portions are the questioning by Ms. Carroll of Ms. Stoynoff

25   regarding what occurred with Trump, Donald Trump.  And if you

N515car2                          Carroll - Cross

1   look at the parts we are going to be offering --

2              THE COURT:  I don't have it up here, so.

3              MR. TACOPINA:  OK.  Sorry.

4              THE COURT:  I mean, it is somewhere in the computer,

5   I'm sure.

6              MR. TACOPINA:  We will get you another copy.  It is

7   Exhibit no. BT.

8              THE COURT:  You may want Ms. Carroll out of the room.

9              MR. TACOPINA:  I thought she was.

10             THE COURT:  She was, but she is sneaking up on you.

11             Would you wait in the witness room, please,

12   Ms. Carroll?

13             MR. TACOPINA:  Your Honor, we have it here but what we

14   can do to make it easier, we can show you on the screen the

15   clips we intend on using from this --

16             THE COURT:  We will try.

17             MR. TACOPINA:  OK.  There you go.  So anyway, your

18   Honor, this is an interview where she's questioning

19   Ms. Stoynoff regarding what happened with Donald Trump

20   regarding this experience.  There was going to be a hearsay

21   objection.  The hearsay objection -- I am pressing the button.

22             This is an interview where she is questioning

23   Ms. Stoynoff about what happened with her and Donald Trump and,

24   as the Court knows, Ms. Stoynoff will be a witness here.  So we

25   are not offering this for Natasha Stoynoff's statement on the

N515car2                      Carroll - Cross

1    truth of the subject but what she said.  We are offering it to

2    show, to put in context Ms. Carroll's statements which the jury

3    could construe as an effort to influence Ms. Stoynoff's

4    testimony, specifically that sexual contact occurred.  It is

5    Ms. Carroll's statements that we want to introduce here.  And

6    while not dispositive of the rule -- as I said, Ms. Stoynoff is

7    going to testify -- what is important is Ms. Carroll's

8    statements, not offering Ms. Stoynoff's statements for the

9    truth of the matter, she will be here to testify, but

10   Ms. Carroll's statements.  She is continually attempting to get

11   Ms. Stoynoff to say there was grinding and she continually

12   refuses that sort of notion three times and that's the clips of

13   BT that we are going to play.  That's the only portions of the

14   transcript.

15            THE COURT:  So what is on the screen --

16            MR. TACOPINA:  Let's start with the first one.  OK,

17   this is the first one.  Let me know when you are done, your

18   Honor.

19            THE COURT:  Mr. Ferrara?

20            MR. TACOPINA:  There is more, your Honor, by the way.

21            THE COURT:  Does that mean there is more to this

22   first, what you are calling the first one?

23            MR. TACOPINA:  This is just all one interview, it is

24   just broken up on different slides and it is not that long.

25   There is a few more attributions, two more, I think, two more

A-1901

N515car2                        Carroll - Cross

1    slides.  Would you like to see them all?

2              THE COURT:  What I am not understanding -- and whoever

3    is operating the equipment would simply stop changing what's in

4    front of me every day, that would be helpful.

5              MR. TACOPINA:  It is definitely not me.

6              THE COURT:  No, I understand.  All right.

7              Now, if I had hard copy then I could know what page

8    you are talking about and what parts and we could have a

9    record, but these --

10             MR. TACOPINA:  You will have a hard copy.  One second.

11             THE COURT:  These electronic flashings are not much of

12   a help.

13             MR. TACOPINA:  OK.

14             THE COURT:  Thank you.  All right.  So I now have in

15   front of me something marked Defendant's Exhibit BT for

16   identification.  What is the first thing you want to raise with

17   me?

18             MR. TACOPINA:  Page 20 to 21, your Honor.

19             THE COURT:  The entirety?

20             MR. TACOPINA:  No.  That's the whole thing, it is

21   these snippets.  What is in front of you right now is 20

22   through 21 on the screen.  The snippets of page 20 to 21.

23             THE COURT:  No, it is not.

24             MR. TACOPINA:  It is not?

25             THE COURT:  I mean, what is on the screen is a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   significantly modest subset of what I am looking at on 20 and

2   21 of the hard copy.

3           MR. TACOPINA:  That's why we are not offering the

4   entire transcript because, subject to redaction, only using the

5   relevant portions meaning this portion.  So, you are right, it

6   is -- that's why we didn't give up the whole thing.  So, if you

7   look at the end of page 20, and there are no lines here but the

8   fourth attribution from the bottom on page 20 on the hard copy,

9   your Honor.

10          THE COURT:  OK.  I see that.

11          MR. TACOPINA:  All the way to --

12          THE COURT:  To the phrase "doing that" on page 21?  Is

13  that the first thing I am to focus on?

14          MR. TACOPINA:  Yes, your Honor.

15          THE COURT:  OK.

16          Mr. Ferrara?

17          MR. FERRARA:  Your Honor, we don't object to questions

18  about this.  I, myself, elicited on Ms. Carroll's direct,

19  generally speaking, this interview so we understand that the

20  defense is entitled to ask some questions around whether

21  Ms. Carroll was trying to influence Ms. Stoynoff's story.  We

22  understand that.  This exhibit is confusing, it contains

23  hearsay.  We think the exhibit should not come in, though we

24  understand that the defense is entitled to ask questions around

25  this.

N515car2                         Carroll - Cross

1           MR. TACOPINA:  Well, but the exhibit would come in

2      only subject to redaction, your Honor.  The only thing that --

3           THE COURT:  That doesn't help because subject to

4      redaction means what?  It means someday somebody is going to

5      take some unspecified something out of it.  I got that.

6           MR. TACOPINA:  The only thing we are offering are the

7      slides we are showing on the screen -- and there are how many

8      in total, please?

9           We will do the same thing, I will identify the page

10     and the line.

11          THE COURT:  This is tremendously confusing.

12          Look.  You are going to have Ms. Stoynoff on the

13     stand, right?

14          MR. TACOPINA:  Yes, your Honor.

15          THE COURT:  And you are perfectly at liberty to ask

16     her whether she had interviewed with Ms. Carroll, yes?

17          MR. TACOPINA:  That's not the point, though.  The

18     point is not that she had interviewed, it is that Ms. Carroll,

19     this is Ms. Carroll's document --

20          THE COURT:  And -- and -- you are entitled to ask her,

21     whether during the course of the interview, Ms. Carroll said

22     thus and such or asked thus and such.  Right?

23          MR. TACOPINA:  Sure.

24          THE COURT:  And I guess she says yes, no, or I don't

25     remember.

N515car2                        Carroll – Cross

1           MR. TACOPINA:  And if she says no, I can't impeach

2    with Ms. Carroll's document.  Ms. Carroll created this.

3           THE COURT:  Yes.  Well, it is rather a joint creation,

4    just like the transcript of this trial is a joint creation.

5           MR. TACOPINA:  I will say that Ms. Carroll created the

6    document that purports to show the words of the interview.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N512Car3                    Carroll - Cross

1           THE COURT:  I don't see why you are not just entitled
2    to establish through Ms. Carroll that she interviewed this,
3    that she raised the question of what happened between
4    Ms. Stoynoff and Mr. Trump, and then ask her whether in the
5    course of it she asked Ms. Stoynoff whether Mr. Trump behaved
6    in a certain way.  And if she says yes, I don't know what we
7    are fooling around with this document for.  And if she says no,
8    then you may be able to impeach her with the document, maybe,
9    depending on foundation.  And if she doesn't remember, you
10   could refresh her recollection with it.
11          What's wrong with that?
12          MR. TACOPINA:  I would have to -- it's not about just
13   did she speak to her and ask her about this or that.  I would
14   ask specific questions like:  Did you ask her if he -- if
15   Ms. Stoynoff recalled Trump grinding against you?  And she told
16   you:  Riding?  And you said:  No, grinding.  And she said:
17   Grinding, oh, Lord.
18          I would like to -- what's important here, your Honor,
19   is the attempts to put words in Ms. Stoynoff's mouth.
20          THE COURT:  So this --
21          MR. TACOPINA:  I think it's a party admission, I would
22   imagine.  She wrote it in the transcript.  We can't -- I don't
23   see why this wouldn't be able to go in on that basis alone.
24   This was authored by the witness.  It's a party opponent
25   admission, and it is just a narrow --

N512Car3                         Carroll - Cross

1              THE COURT:  Part of your problem with that is that if

2      Ms. Carroll says that Ms. Stoynoff says the light was green,

3      that's an admission at the first level, but it can't come in

4      for what Ms. Stoynoff said the light was.

5              MR. TACOPINA:  Right, which is why that portion is not

6      being offered for the truth of the matter.  What's being

7      offered is Ms. Carroll's own words in this interview which has

8      to be put into context by the answers.  But the words of

9      Ms. Carroll, which I think it would be fair to argue or a jury

10     could construe as an effort to influence the answers of

11     Ms. Stoynoff, and if you read the entire four slides that we

12     have, I believe that's a fair impression you can get.

13             THE COURT:  I will look at your slides.  So I have

14     looked at the first one.

15             MR. TACOPINA:  Second.

16             THE COURT:  What you have up here is the entirety of

17     page 21?

18             MR. TACOPINA:  I know.  This will be the next one.

19             THE COURT:  Where will I find it in the transcript or

20     whatever it is?

21             MR. TACOPINA:  Hold on one second.  Page 22-23, is

22     that what I am being told?  Yes, the bottom of page 22, going

23     into 23, obviously it continues.

24             THE COURT:  What do you mean "obviously it continues"?

25             MR. TACOPINA:  The slide.  It cuts off at a word.  The

N512Car3                          Carroll - Cross

1  next slide will capture the entire sentence.

2            THE COURT:  So where is the rest of it?

3            MR. TACOPINA:  Next.  There you go.

4            THE COURT:  And what page of this document will I find

5  this part on?

6            MR. TACOPINA:  37.

7            THE COURT:  37.  You jump from 22 to 37 for context?

8  I'm lost.

9            MR. TACOPINA:  It's not -- it's not context.  There's

10  things in here about wine and other witnesses now on 22.

11            THE COURT:  We have now taken 20 minutes trying to

12  figure out what it is you are trying to put in.  Because you

13  haven't got the electronics figured out.

14            MR. TACOPINA:  Well, could I do this, then, your

15  Honor, I could show her the document, the entirety of BA -- BT.

16  I could ask her if she recognizes it, what she recognizes it to

17  be, I could offer it subject to redaction and play only the

18  four snippets of slide regarding questions about her insisting

19  to Ms. Stoynoff that she must have been grinded against.

20  That's what this is all about, her attempts to influence

21  Ms. Stoynoff's testimony.

22            THE COURT:  I understand what you are trying to do,

23  but with no disrespect to your staff, whoever is responsible

24  for it, it isn't put together, and we have now spent 20 minutes

25  because of that.

N512Car3                        Carroll - Cross

1          MR. TACOPINA:  Your Honor, it will actually be very

2    quick when I do this.  I'm asking about one, two, three

3    attributions.

4          THE COURT:  And I'm still trying to find out what the

5    second one is in its entirety.

6          MR. TACOPINA:  I'm going to read it to you.

7          THE COURT:  I know that it starts on page 22 at the

8    bottom.

9          MR. TACOPINA:  If your Honor doesn't mind, I will just

10   read you the three things I'm going to use:

11         Question by Ms. Carroll:  Do you recall him grinding

12   against you?

13         Answer by Ms. Stoynoff:  Riding?

14         THE COURT:  This starts at what page?

15         MR. TACOPINA:  This is back earlier.  This is the page

16   20-21.

17         Can you guys jump in, Chad or Eric, when the judge

18   asks what page, please let him know, because you have that

19   there and I don't.

20         THE COURT:  The second one starts at page 22, second

21   attribution from the bottom, and as nearly as I got in that

22   last long colloquy is it ends someplace on page 31.

23         MR. TACOPINA:  No.

24         THE COURT:  Only I don't know where.

25         MR. TACOPINA:  No the second slide is simply this,

Case 23-793, Document 82, 11/20/2023, 3592069, Page249 of 300

A-1909

N512Car3                          Carroll - Cross

1    this.  This is the second slide.

2              THE COURT:  So it ends --

3              MR. TACOPINA:  At the word "superiors."

4              THE COURT:  -- on page 23.

5              MR. TACOPINA:  Correct, at the word "superiors."  "It

6    was just at" is not part of the question, and we could remove

7    that or whatever.  I don't think it is prejudicial.  So we

8    would just highlight it like that.  That's the second one.

9              I only have one more.

10             THE COURT:  All right.  Let's go to that one.

11             MR. TACOPINA:  Okay.  Third one.  The third one starts

12   with this.  This is the entire and last side.

13             THE COURT:  What page is this?

14             MR. TACOPINA:  This is page 37.

15             THE COURT:  37.  Okay.  I know what I am buying on my

16   Lotto tickets.

17             MR. TACOPINA:  This is the third and last one, your

18   Honor.

19             THE COURT:  It starts at page 37.

20             MR. TACOPINA:  And ends at page 37.

21             THE COURT:  Give me a hint on where on the page?

22             MR. TACOPINA:  All right.  I'm going to do that.

23             MR. SEIGEL:  It's the second attribution to "E."

24   Midway down on page 37.

25             THE COURT:  Part way through that attribution.

N512Car3                    Carroll - Cross

1           MR. TACOPINA:  Yes.

2           MR. SEIGEL:  Beginning with "so when he takes."  The

3    first word.

4           MR. TACOPINA:  But the attribution that -- the core we

5    are asking about "when he pushed you up against the door,"

6    that's where it starts, because there is more about the

7    professor in there.  That's a hearsay witness.  That's not --

8    we cut that out.

9           THE COURT:  All right.  Now, thank you for that.  Now

10   I understand what you are trying to do.

11          Mr. Ferrara.

12          MR. FERRARA:  Your Honor, we continue to think that

13   the right way to do this is through questioning.  I will say if

14   your Honor disagrees with us, there is other context that we

15   think is important, and I wasn't able to compare.  But if we

16   were to go -- if I could ask Mr. Tacopina to go back to the

17   excerpt that goes from page 22 to 23, for instance, I just

18   candidly want to see if I have an objection here.

19          MR. TACOPINA:  That one, Mike?

20          MR. FERRARA:  Yes.  Thank you.  If we can just pause

21   here for one second.

22          So for instance, your Honor, this ending it here

23   suggests -- and I understand, I take Mr. Tacopina's point that

24   it would not be for the truth and your Honor would instruct the

25   jury to that effect, but the reason this is very confusing and

N512Car3                     Carroll - Cross

1    the jurors have had difficulty -- might have difficulty with it

2    is they end it at "I would have told my superiors."  Which

3    suggests Ms. Stoynoff did not tell people what had happened.

4    But the sentences immediately after this, the rest of this

5    response, Ms. Stoynoff goes into who she did tell --

6              MR. TACOPINA:  That's fine.

7              MR. FERRARA:  -- for example.

8              THE COURT:  Let me add a little more than that,

9    Mr. Ferrara.

10             MR. FERRARA:  Again, we understand that --

11             THE COURT:  We understand that you understand his

12   point.

13             MR. FERRARA:  We think that the use of the exhibit is

14   a mess, that it gets into a lot of Ms. Stoynoff's prior

15   statements that should not, of course, come in for the truth

16   but that will be very confusing, and Ms. Stoynoff's statements

17   do not go to Ms. Carroll's intent or what Ms. Carroll was

18   trying to do.  So we think that the use of the exhibit is

19   inappropriate and confusing.  We understand the questions will

20   be asked.

21             MR. TACOPINA:  Ms. Carroll's statements go to

22   Ms. Carroll's intent and Stoynoff's statements are not being

23   offered for the truth, and Ms. Stoynoff is going to testify and

24   I don't think any of this is going to be in dispute when she

25   testifies either, but --

 1          THE COURT:  Look we have now spent at least 30 minutes

 2   on this.  I don't see why -- I recognize what you are trying to

 3   do.  Your point is that in the course of talking to

 4   Ms. Stoynoff about what had happened to Ms. Stoynoff,

 5   Ms. Carroll asked her three times whether, among the things

 6   that Mr. Trump did to her, was grinding his body in some way

 7   against her.  Got it.  Okay?  And your interpretation of that,

 8   that you want to argue to the jury, is that means that

 9   Ms. Carroll was trying to suggest that Ms. Stoynoff

10   quote/unquote remembered that that happened.  She was trying to

11   put words in the witness's mouth.  And looking at the document

12   BT for identification, I think—and I want you to correct me if

13   I got this wrong—it is at least arguable, maybe even

14   inescapable, but at least arguable that she asked three times

15   at three different places in this discussion that question is

16   because she never got a straight answer.

17          MR. TACOPINA:  Oh.

18          THE COURT:  She got at page 21 "I don't recall."  At

19   page 22, she got first "I don't remember if he did. . . I don't

20   think he did," with a rationale for why if he had done she

21   would have behaved differently.

22          MR. TACOPINA:  Right.

23          THE COURT:  And then at page 30 -- whatever the other

24   one was.

25          MR. TACOPINA:  7.

A-1913

N512Car3                    Carroll - Cross

1        THE COURT:  37, she got:  "If he did, I can't remember

2   it.  It's possible, but I can't remember it.  I'm trying to

3   think.  I didn't tell anybody that."

4        MR. TACOPINA:  That was the final one.

5        THE COURT:  Right.  That was the final one.

6        MR. TACOPINA:  And the first one started with, "Was he

7   grinding against you" and she said the first time, "I don't

8   recall him doing that."  So that's not "I have no

9   recollection."  It's "I don't recall him doing that" was the

10  first one.  The second one is I "don't remember if he did, but

11  if he had" -- well, your Honor just --

12       THE COURT:  Yeah, right.  So I get your point, and I

13  hope you got mine.  So I think you are entitled to go into it.

14       Now we are talking about how?  In a way that will not

15  be confusing and take three times as much time.

16       MR. TACOPINA:  Right.

17       THE COURT:  If not much more than the game is worth,

18  and I don't mean to suggest it's a game in any kind of

19  frivolous way.

20       MR. TACOPINA:  I know what you mean.

21       THE COURT:  I wouldn't suggest it's satire.  It seems

22  to upset you, and I didn't suggest that to begin with.  But

23  there we are.

24       MR. TACOPINA:  I'm just going to put the bottle in my

25  mouth so I don't speak right now.

N512Car3                     Carroll - Cross

1          Your Honor, could I --

2          THE COURT:  Just a minute.

3          MR. TACOPINA:  -- ask you something that might help?

4     Could I literally hand you the two pages of my questions

5     regarding this.

6          THE COURT:  No, no, no, no.  I'm done reviewing cross

7     outlines.

8          MR. TACOPINA:  Okay.  I think you would understand

9     where we are going with this and how quickly we can get there

10    if I did it this way.

11         THE COURT:  You are not going to do it this way.  I

12    think the way to do this is by questions to Ms. Carroll, and if

13    you have to use the document to refresh and maybe even to

14    impeach on a very targeted way, we will cope with it.  But this

15    is no more than a five-minute proposition.

16         MR. TACOPINA:  I think it's going to take a lot longer

17    that way than if I just show these three slides, but I will do

18    whatever your Honor please.

19         THE COURT:  That's what we are going to do.

20         MR. TACOPINA:  Okay.

21         THE COURT:  Let's get the jury.

22         (Continued on next page)

23

24

25

N512Car3                        Carroll - Cross

1            (Jury present)

2            THE COURT:  Again, members of the jury, sorry for the

3       longer than expected interruption, but I think we have resolved

4       some things that will save a fair amount of time.  And although

5       I hesitate to make any predictions, I just want you to know

6       that we are on or ahead of schedule in terms of the duration of

7       the trial.  Every hour that equation -- that estimate changes,

8       but we are not doing badly at all.

9            Okay.  Ms. Carroll, you are still under oath.

10           Mr. Tacopina.

11           MR. TACOPINA:  Thank you, your Honor.

12      BY MR. TACOPINA:

13      Q.  Ms. Carroll, as far as you say you can recall it that you

14      were assaulted more than several times?

15      A.  Yes.

16      Q.  And the only alleged assaulter that you ever brought a

17      lawsuit against is Donald Trump?

18      A.  Yes.

19      Q.  And he is I think the only person you ever sued?

20      A.  Ever.

21      Q.  Ever.

22           And during the same month you filed your lawsuit

23      against Donald Trump, in November of 2019, you posted a

24      question on Twitter:  Why isn't a rape allegation worth an

25      impeachment inquiry?  Do you recall that?

Case 23-793, Document 82, 11/20/2023, 3592069, Page256 of 300

**A-1916**

N512Car3                         Carroll - Cross

1              MR. FERRARA:  Object to relevance.

2              THE COURT:  Just a moment.

3              Overruled.

4    BY MR. TACOPINA:

5    Q.  Do you recall that, Ms. Carroll?

6    A.  I don't recall it, but I probably said it.

7    Q.  Okay.  On direct examination when Mr. Ferrara was

8    questioning you, you testified that you did not attempt to

9    influence Natasha Stoynoff when you questioned her.

10   A.  I don't believe I tried to influence her.

11   Q.  Before bringing this lawsuit against Donald Trump for

12   allegedly raping you, you interviewed Natasha Stoynoff on June

13   22, 2020.

14             MR. FERRARA:  Objection.

15             THE COURT:  What's the ground?

16             MR. FERRARA:  If your Honor and perhaps if

17   Mr. Tacopina looks at the question, I think it misstates the

18   date, it's the "before bringing."

19             THE COURT:  This is to form.  Rephrase the question.

20   BY MR. TACOPINA:

21   Q.  Before bringing this, the battery assault lawsuit

22   against --

23             THE COURT:  Might it not be useful at this point to

24   clarify?

25             THE WITNESS:  Hmm, yes.

N512Car3                        Carroll - Cross

1          THE COURT:  You know what I am talking about, number

2    one and number two.

3          MR. FERRARA:  In terms of an instruction, your Honor?

4          THE COURT:  In some way.

5          MR. TACOPINA:  Okay.  We will figure it out.  You want

6    us to get together to --

7          THE COURT:  No.  Maybe we can do it now.

8          MR. TACOPINA:  Okay, sure.

9          THE COURT:  Members of the jury -- and if counsel has

10   any objection to my doing it?

11         MR. TACOPINA:  It's okay.

12         THE COURT:  Okay.

13         Members of the jury, there are two lawsuits between

14   Ms. Carroll and Mr. Trump.  This is one of them.  The first

15   lawsuit was brought in 2019.  That's not the one we are dealing

16   with.  It's still alive, but you don't have to worry about why

17   or where or whatever.  That was brought solely for alleged

18   defamation that Mr. Trump allegedly committed in 2019.  At that

19   time, Ms. Carroll could not have sued him for allegedly raping

20   her for legal reasons.

21         The legal context changed.  It changed in November of

22   2022.  She at that time gained the right to sue him for the

23   rape, the alleged rape.

24         In addition, Mr. Trump had issued a statement that you

25   have already seen in October of 2022 in which Ms. Carroll

N512Car3                        Carroll - Cross

1    contends Mr. Trump libeled her or defamed her again.  That's

2    this case.  You are not concerned with the first case.  You

3    just need to know, for example, for the context of some

4    questions that it is out there, and it is not your job and

5    don't worry about that.

6               Any objection to that, Mr. Tacopina?

7               MR. TACOPINA:  That was perfect, your Honor.

8               THE COURT:  *Wunderbar*.

9               MR. FERRARA:  Agreed, your Honor.

10              THE COURT:  Okay.  Let's go.

11   BY MR. TACOPINA:

12   Q.  Before bringing this lawsuit, the one that's before the

13   jury against Donald Trump, you interviewed Natasha Stoynoff on

14   June 22, 2020.

15   A.  Yes.

16   Q.  And you prepared a transcript of that interview.

17   A.  Yes.

18   Q.  And during that interview, even though Natasha Stoynoff

19   repeatedly told you that she didn't recall Donald Trump

20   grinding against her, you repeatedly try to get her to say that

21   she did.

22   A.  I didn't get her to try to say that she did.  I just asked

23   her to try to think if it was a possibility.

24   Q.  Well, you asked Ms. Stoynoff at one point:  Do you recall

25   him grinding against you?

1               And she said:  Riding?

2               And then you responded with:  Grinding.

3               And she said, her response was:  Grinding?  Oh, God.

4               And you then said:  He was pushing you, you said.

5               And Ms. Stoynoff replied to you:  That's a question I

6    never thought I would hear.

7               You then said to Ms. Stoynoff:  He had me pressed up

8    against the wall, and I was aware of that.  That's what you

9    said to Ms. Stoynoff.

10              And Ms. Stoynoff said:  Right.  I don't recall him

11   doing that?

12              MR. FERRARA:  Objection, your Honor.

13              THE COURT:  Sustained.

14              Oh, no.  Withdraw my ruling.  Go ahead, counselor.

15              MR. TACOPINA:  Okay.  So overruled on that one.

16              THE COURT:  Yes.

17   BY MR. TACOPINA:

18   Q.  Do you recall saying that to Ms. Stoynoff or having that

19   colloquy, that question and answer?

20   A.  Yes, I do.

21   Q.  Okay.  After that exchange, you continued to press the

22   issue and you --

23              THE COURT:  Sustained as to form.

24              MR. TACOPINA:  Yes, sir.

25   BY MR. TACOPINA:

N512Car3                          Carroll - Cross

1    Q.  After that exchange, it went on, you subsequently asked

2    Ms. Stoynoff, question:  You shook your head and pushed back.

3    Now think, did he grind against you?

4            And Ms. Stoynoff answered:  I don't remember if he

5    did.  And the reason I don't think he did is because I feel as

6    though if he had done anything more serious, more sexual that

7    had to do with sex parts, I would have told my supervisors.

8            Do you remember that part of the interview?

9    A.  Clearly.

10           MR. FERRARA:  Your Honor, we would ask for an

11   instruction that Ms. Stoynoff's responses are not for the truth

12   of the matter.

13           THE COURT:  Yes, of course.

14           Members of the jury, Ms. Stoynoff's responses as just

15   read to you and as may be read to you further from this

16   discussion are not admissible for the truth of what

17   Ms. Stoynoff said.  You may consider them for the fact that

18   they were said to Ms. Carroll because they shed light on what

19   Ms. Carroll did and why she did it.

20           MR. TACOPINA:  Thank you, your Honor.

21   BY MR. TACOPINA:

22   Q.  And the last part of the interview, even though you just

23   heard what Ms. Stoynoff said twice --

24           THE COURT:  Sustained.

25           MR. TACOPINA:  Okay.

A-1921

541

N512Car3                          Carroll – Cross

1   BY MR. TACOPINA:

2   Q.  You went on to ask her:  But when he pushed up against you,

3   when he pushed you up against the door, are you quite sure he

4   didn't grind against you?  If his tongue was going down your

5   throat, I think his pelvis was against you.

6           Ms. Stoynoff replied:  I think my hands went up

7   immediately, so there was space.

8           Your question:  Yes, but your hands were like this,

9   holding her hands and pushing.  And then they are like this,

10  because he is pushing against you.  You see?  You are like

11  this.  And then his weight, his big obesity comes at you, so

12  your hands are thrust back.  So I don't think he would be able

13  to try and thrust his tongue unless he is pressing his hips

14  against you.

15          Ms. Stoynoff replies:  If he did, I can't remember.

16  It's possible, but I can't remember it.  I'm trying to think.

17  I didn't tell anybody that.  I don't remember being asked about

18  it.

19          Do you recall that portion of the interview?

20  A.  Yes, I do.

21  Q.  Okay.  Let's move on to another topic.

22          You appeared on numerous media outlets following the

23  release of your book, Ms. Carroll?

24  A.  Yes.

25  Q.  And in fact Anderson Cooper's producer contacted you to

Case 23-793, Document 82, 11/20/2023, 3592069, Page262 of 300

A-1922

1    arrange an interview with him?

2    A.  Yes.

3    Q.  And Anderson Cooper is a host on CNN?

4    A.  Yes.

5    Q.  And that happened only a couple of days after your story

6    about Donald Trump and Bergdorf Goodman appeared online in The

7    Cut?

8    A.  Yes.

9    Q.  And again The Cut is the online version of *New York*

10   magazine, right?

11   A.  The Cut is part of *New York* magazine, yes.

12   Q.  And you actually did appear on Anderson Cooper.

13   A.  Yes.

14   Q.  And there was an interview conducted by Anderson Cooper's

15   show, by Anderson Cooper himself, on CNN?

16   A.  Yes.

17   Q.  And that was June 24, 2019?

18   A.  Yes.

19   Q.  I'm just going to show you something that's been marked as

20   Defense Exhibit CC, just for yourself to take a look at.

21          And that's a screenshot of the Anderson Cooper

22   interview from June 24, 2019.

23   A.  Yes.

24   Q.  Okay.

25          MR. TACOPINA:  Your Honor, and we worked out this with

N512Car3                    Carroll – Cross

1    counsel, we are offering Defense CC into evidence.

2              MR. FERRARA:  Without objection.

3              THE COURT:  Okay, CC is received.

4              (Defendant's Exhibit CC received in evidence)

5              MR. TACOPINA:  Your Honor, it's about an eight-minute

6    clip that I would like to play for the jury at this point.

7              THE COURT:  Okay.

8              (Court and court reporter confer)

9              THE COURT:  The question is what's going on the

10   transcript.  Okay?  The question boils down to this:  Does the

11   transcript at this point say "video played" or are we expecting

12   the court stenographer to get the verbatim exchange in what

13   happened on the video?

14             MR. TACOPINA:  I would be more than fine with saying

15   "video played" because the exhibit itself is in evidence.

16             MS. KAPLAN:  Same.

17             THE COURT:  Okay.  That's what we are doing.

18             MR. TACOPINA:  Big smile on the court reporter's face,

19   by the way.

20             THE COURT:  Big smile.

21             MR. TACOPINA:  Big smile.

22             Okay.  We will play CC, and then I will ask some

23   questions about it.  Please take a look, and this is for

24   Ms. Carroll and the jury, as well.  Okay?  Make sure there is

25   enough volume, please, and let's let it go.

Case 23-793, Document 82, 11/20/2023, 3592069, Page264 of 300

A-1924

N512Car3                        Carroll - Cross

1              (Video played)

2    BY MR. TACOPINA:

3    Q.  Okay, Ms. Carroll --

4              THE COURT:  Is this the whole thing?

5              MR. TACOPINA:  That's the whole thing, your Honor,

6    yes.

7    BY MR. TACOPINA:

8    Q.  Now, that last line that you just said, that most people

9    think of rape as being sexy, is that something you believe?

10   A.  I think most people think of rape as being sexy because in

11   our culture we are saturated with entertainment shows which

12   continually show rapes to gather an audience.  For instance,

13   *Game of Thrones* showed between nine -- they showed graphically,

14   in detail, nine rapes and over 50 attempted rapes and actual

15   rapes just in the one show *Game of Thrones*.  Rape is everywhere

16   in our entertainment world, and it is used because it excites

17   people and draws an audience.  Hence I said I think most people

18   think of rape as being sexy.

19   Q.  You are comparing television rape scenes to real life rape

20   scenes?

21   A.  No, I was not.  To me, rape is the most horrible, violent

22   act that can be done against a woman or a man.

23   Q.  When you were speaking to Anderson Cooper and you said you

24   think that most people think that rape is sexy, you weren't

25   talking about television rapes.  He was asking you about what

A-1925

N512Car3                      Carroll - Cross

1   happened to --

2   A.  No.  I'm just -- I was talking about the culture in

3   general.  Anderson Cooper's audience, I was -- I assume a lot

4   of people think of rape as being sexy.

5   Q.  And you used the word "fight," not "rape" to describe what

6   happened to you in that interview because sexual violence is in

7   every country and every strata of society and you just feel

8   that so many women are undergoing sexual violence and that

9   yours was short, you got out, you are happy now, and you are

10  moving on.  Do you stand by that statement?

11  A.  I felt, I felt humble that I was aware of how much sexual

12  violence there is in the world.  I felt lucky to have gotten

13  out alive and was able to tell my story.  And at the time, when

14  I wrote the book, I don't think I used the word "rape."  I was

15  very -- I just very uncomfortable using the word because when I

16  use the word these intrusions and the visions would come up

17  into my head.  So I just -- I liked the word "fight" because it

18  gave -- it gave me action.  I felt I took action, and it wasn't

19  something done to me.  I got away.  So I used the word "fight."

20  Q.  Okay.  And after you made that comment that we discussed

21  about how you characterized rape being sexy, Anderson Cooper

22  said let's take a short break, and then you went to commercial

23  break, right?

24  A.  No.  I said "think of the fantasies."

25  Q.  Right, and then you said "you are fascinating to talk to"

A-1926

N512Car3                        Carroll - Cross

1    also, but right after that portion he took a break.

2    A.  Yes.

3    Q.  Okay.  And I would like to play from your deposition clip

4    425.  It's EJC-425.  It's from the deposition of October 14,

5    2022, page 203/line 19 to page 204/line 7, and I will play the

6    video clip of that when everyone is ready.

7              THE COURT:  Page and lines again, please.

8              MR. TACOPINA:  203, your Honor, 203/line 19 to

9    204/line 7.

10             MR. FERRARA:  We object to this portion, your Honor.

11             THE COURT:  Ground.

12             MR. TACOPINA:  It's the deposition.

13             MR. FERRARA:  I understand.  On relevance and

14   speculation grounds.

15             THE COURT:  No.  Overruled.

16             MR. TACOPINA:  Mike, are you guys ready?

17             MR. FERRARA:  Yes, thank you.

18             MR. TACOPINA:  You can play 245, clip 245.

19             (Video played)

20   BY MR. TACOPINA:

21   Q.  And lastly one thing you said on that interview,

22   Ms. Carroll, is that you would be -- you thought this initial

23   part of your story about meeting Donald Trump and the lingerie

24   banter back and forth, you were going to be able to dine out on

25   this story forever.  What did you mean by that?

N512Car3                    Carroll – Cross

1   A.  I meant the story was so funny, shopping with Donald Trump

2   in Bergdorf's, it was such a meaty, juicy, hilarious story.  I

3   was looking forward to actually going out soon and telling

4   everybody the story, perhaps writing about it.  It was just --

5   it was such a New York story, and such a happy story, and then

6   of course it turned tragic.

7   BY MR. TACOPINA:

8   Q.  Now, you first you heard the judge describe the two

9   different lawsuits.  In the first lawsuit you sued Donald Trump

10  in November of 2019.

11  A.  Yes.

12  Q.  And during the course of that lawsuit, in 2021 you started

13  writing a blog on Substack.

14  A.  Yes.

15  Q.  And you make money from your blog based on your

16  subscribers?

17  A.  Yes.

18  Q.  In fact, from that blog you make $70,000 a year or did.

19  A.  Yes.

20  Q.  And you agree that's certainly successful for a Substack

21  blog.

22  A.  Yes.

23  Q.  You talked about a documentary with that famed documentary

24  producer Ivy, it's Meeropol, right?

25  A.  Yes.

Case 23-793, Document 82, 11/20/2023, 3592069, Page268 of 300

**A-1928**

1  Q.  Okay.  And you start to engage with Ivy Meeropol about
2  doing a documentary on your story?
3  A.  No, on my life.
4  Q.  On your life.
5  A.  Yes.
6  Q.  Okay.  And of course that came after the story that you
7  told about Donald Trump became public.
8  A.  Yes.
9  Q.  All right.  And you paused that documentary project.
10  A.  Yes.
11  Q.  Right.  Because you were told it was not a good look for
12  this trial.
13  A.  No.
14  Q.  No?  Why did you pause it?
15  A.  I didn't pause it.  Ivy decided that during this trial she
16  would not be engaging with me in any way as to not interfere.
17  Q.  Okay.  So you agreed to resume the documentary project
18  after the trial is done.
19  A.  We have never agreed to that.
20  Q.  Okay.  Now, in fact, you have appeared on the podcast
21  CheerLEADING for Democracy which premiered on September 9,
22  2021?
23  A.  I, I don't -- I -- if you say.
24  Q.  We will show you something.  We are going to show --
25  A.  I'm not sure what.

N512Car3                         Carroll - Cross

1    Q.  Can we get a screenshot for BU?

2    A.  Oh, okay.  This was a Midas Brothers.

3    Q.  I'm sorry, what?

4    A.  The Midas Brothers.

5    Q.  The Midas Brothers.  That's CheerLEADING for Democracy.  Do

6    you recall appearing on that podcast?

7    A.  Yes.

8           MR. TACOPINA:  I offer BU, your Honor.  I'm going to

9    play a relevant portion that plaintiff already has.

10          MS. KAPLAN:  We have no objection to the portion that

11   I discussed with defense counsel prior to this moment.

12          (Counsel confer)

13          MR. FERRARA:  No objection, your Honor.

14          THE COURT:  And I take it the agreement is this is an

15   excerpt from this podcast?

16          MR. FERRARA:  Correct.

17          THE COURT:  Mr. Tacopina?

18          MR. TACOPINA:  Yes, your Honor.

19          THE COURT:  Okay.  BU is received.

20          (Defendant's Exhibit BU received in evidence)

21   BY MR. TACOPINA:

22   Q.  We are going to play a snippet from that podcast,

23   Ms. Carroll.

24          Go ahead.

25          (Video played)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N512Car3                    Carroll – Cross

1   BY MR. TACOPINA:

2   Q.  Okay.  So what you were saying was that obviously you were

3   making more money with your Substack podcast than you had done

4   previously?

5   A.  Yes.

6   Q.  Okay.  And the reason you were able to make more money with

7   your podcast following your accusations against Donald Trump is

8   because of the number of people who subscribed to your podcast.

9           MR. FERRARA:  Objection.

10          THE COURT:  Overruled.

11  A.  In part, yes.

12  Q.  Now, it would be fair to say, Ms. Carroll, that your life

13  has been fabulous since your book came out.

14  A.  That is what I like my life to appear to be.

15  Q.  Okay.  As a matter of fact, that's what you said, correct,

16  in the past?

17  A.  I say it quite a bit.  That is how I want people to

18  perceive me.  Underneath my private self is another thing

19  altogether.

20  Q.  Well, you were going on all these TV shows and podcasts

21  after the allegations came out and, for example, in December of

22  2019, you -- that was one month after you filed your initial

23  lawsuit against Donald Trump, right?  December 2019?

24  A.  Yes.

25  Q.  Yeah.  So you appeared on a podcast called the Maris

N512Car3                          Carroll - Cross

1    Review, BV.

2                Please show it to the witness.

3                Do you remember the Maris Review podcast?

4    A.  Yes.

5    Q.  We don't have to play that now.  It's okay.  Take it down.

6                During that podcast, you confirmed that your life had

7    been fabulous since the book came out, right?

8                THE COURT:  Sustained as to form.

9                MR. TACOPINA:  Yeah.

10   BY MR. TACOPINA:

11   Q.  During that podcast, you confirmed or you stated that your

12   life had been fabulous since the book came out.

13   A.  I always say my life is fabulous.  No matter who asks me,

14   what time of day, I will always reply it's fabulous.

15   Q.  Except in this courtroom in front of this jury?

16   A.  In this courtroom I am being forced to tell the truth.

17   Q.  So all these TV shows and all these podcasts and in your

18   book where you say how great your life is, that's all lies?

19   A.  No.  I want -- if I walked in the courtroom today and you

20   said:  Hi, E. Jean.  How are you?  I would have said:  Fine.

21   I'm fabulous.  It is my -- it is the way I present myself to

22   the world.  It's E. Jean the writer, E. Jean the advice

23   columnist.  I am the one, rightly or wrongly, I see myself as

24   solving other people's problems.  That is what my Substack is.

25   That is what I have done for almost 29 years.  So I always say

                 N512Car3                    Carroll - Cross

1      I'm fine.  The column is not called E. Jean Asks Other People

2      For Their Advice.  It's called Ask E. Jean.  I put up a front.

3      Q.  Right.  I'm not talking --

4      A.  That's what I said.

5      Q.  -- about your column, your advice column, Ms. Carroll, I'm

6      talking when you go on TV or radio or interviews or podcasts

7      and are asked about the incident with Donald Trump, you always

8      say that you are fabulous now.

9      A.  Of course I do.

10     Q.  Okay.

11     A.  I don't want anyone to know I suffered.  I did not and

12     still don't, unfortunately, during this trial I have to reveal

13     what is actually going on, but up until now, I would be ashamed

14     to know -- let people know what is actually going on.

15     Q.  You also explain on that podcast that you were receiving

16     lots of support --

17     A.  Um-hmm.

18     Q.  -- since your book came out?

19     A.  Um-hmm.

20     Q.  Yes?

21             THE COURT:  Please answer with words.

22     A.  Yes.

23     Q.  And you confirm you were receiving lots of love?

24     A.  Yes.

25     Q.  In fact, you were receiving several invitations to parties

                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

A-1933

N512Car3                         Carroll - Cross

1    relating to your litigation against Donald Trump.

2    A.  One or two parties, yes.

3    Q.  I am going to show you what's been marked as BW, a text

4    message -- well, just take a look at it, BW, please, for the

5    witness and counsel.

6              Before -- let me ask you this question first,

7    Ms. Carroll, before you read all that.

8              Do you recall sending a text message to Carol

9    Martin --

10   A.  Yes.

11   Q.  -- about invitations to parties.

12             Okay I'm going to offer BW, your Honor?

13             MR. FERRARA:  Just one moment, your Honor, please.

14   A.  Um-hmm, um-hmm, um-hmm, yes.

15             THE COURT:  There is no question yet, Ms. Carroll.

16             THE WITNESS:  Oh.

17             MR. FERRARA:  No objection.

18             MR. TACOPINA:  Okay.

19             THE COURT:  BW is received.

20             (Defendant's Exhibit BW received in evidence)

21   BY MR. TACOPINA:

22   Q.  Please display to the jury as well.

23             In a November text message to Carol Martin -- you

24   called her, by the way, Caroly?

25   A.  Caroly.

Case 23-793, Document 82, 11/20/2023, 3592069, Page274 of 300

A-1934

N512Car3                          Carroll - Cross

1    Q.  Caroly with a Y.  Okay.

2         You say:  "We have several invitations.  Molly Jong

3    Fast has invited you, Lisa, me, Mary Trump, Joyce Vance, Katie

4    Phang, Jen Taub, and Margaret Sullivan to dinner on December 2,

5    the night before the court hearing!  It's going to be a whoop.

6    Then on December 3, Mary Trump is inviting you, me, and Lisa to

7    breakfast with Joyce, Katie, and Jen, who are all staying at

8    her digs in SoHo.  Then we gather" -- "then we all go together

9    to Robbie and Joshua's office and gather in the Ruth Bader

10   Ginsburg conference room on the 63rd floor of the Empire State

11   Building and listen to the hearing being piped in.  We can't go

12   to court because of COVID rules.  Only Robbie and Joshua are

13   permitted in court.  But the Ruth Bader Ginsburg conference

14   room is much better.  Lots of food.  So that's the plan.

15   Dinner December 2nd, the night before, at Molly's; breakfast

16   the next morning at Mary's in SoHo; then we all go to Robbie's

17   office to listen to the hearing.  Can't wait!"

18         THE COURT:  Is there a question?

19         MR. TACOPINA:  Yes.

20   Q.  Is that celebrating, Ms. Carroll?

21   A.  It was coming together for a good moment, yes.

22   Q.  And I'm going to show you another -- you can take that

23   down, please.  Another message which was an e-mail you

24   received.  It is CS.  Okay.  And I will direct your attention.

25   Okay.  Do you recognize that?

N512Car3                         Carroll - Cross

1    A.  Yes.

2    Q.  That's an e-mail you received from Kathy Griffin?

3    A.  Yes.

4    Q.  Okay, on November 30 --

5    A.  Yes.

6    Q.  -- '21.

7              MR. TACOPINA:  I offer that, your Honor.

8              MR. FERRARA:  Your Honor, we object to the

9    out-of-court statements.

10              MR. TACOPINA:  Well, let me do this.

11              MR. FERRARA:  I am just looking at it.  I apologize,

12    your Honor.  It is not a short e-mail.

13              MR. TACOPINA:  I think maybe I could solve this, your

14    Honor.

15              THE COURT:  Are you withdrawing the question?

16              MR. TACOPINA:  Yes, I will withdraw it and try

17    something else.

18              THE COURT:  Okay.

19              MR. TACOPINA:  That might make this a little easier

20    without even having to offer this.

21    BY MR. TACOPINA:

22    Q.  Ms. Carroll, in sum and substance, this refers to a watch

23    party that you had for your case.

24    A.  Yes.  We are gathering because we are very hopeful.  These

25    are my friends.  They are supporting me.  I am -- I am happy to

N512Car3                         Carroll – Cross

1    reread these e-mails.  I had forgotten.  Yes.

2              (Continued on next page)

N515car4                          Carroll - Cross

1    BY MR. TACOPINA:

2    Q.  So, again, my question was, this refers to a watch party

3    you were having for your case?

4    A.  Yes.

5    Q.  OK.

6    A.  Yes.

7            MR. TACOPINA:  I don't need to offer this, your Honor.

8    We can take that down.

9            THE COURT:  OK.

10   Q.  Now, as you said on direct testimony, especially in New

11   York, status is everything?

12   A.  Status is important in New York, that's for sure.

13   Q.  And you would agree that you had a lot of media exposure

14   since coming forward with your story about Donald Trump?

15   A.  I had some media exposure, you know, so.

16   Q.  Well, we have already talked about several podcasts you

17   have been on, we are not playing them all now:  *UnStyled*,

18   hosted by Christene Barberich?

19   A.  Yes.

20   Q.  *The Maris Review*, which we just saw?

21   A.  Yes.

22   Q.  *CheerLEADING for Democracy*?  The Meidas guys?

23   A.  Yes.

24   Q.  There are numerous other podcasts, the *New York Times Daily*

25   podcast?

N515car4                    Carroll - Cross

1   A.  Yes.

2   Q.  *Trumpcast*, an interview with E. Jean Carroll?

3   A.  Yes.

4   Q.  *Women Who Travel*, which is a Conde Nast podcast?

5   A.  Yes.  That was about traveling with my dog.

6   Q.  Right; Author E. Jean Carroll on her Feminist Road Trip

7   Across America?

8   A.  Yes.

9   Q.  And again, that was after your accusation came out?

10  A.  It was after the book came out.

11  Q.  After the book came out.

12  A.  Yes.

13  Q.  Another podcast:  *By the Book*, Bonus Episode, Speaking out

14  and Giving Advice from E. Jean Carroll?

15  A.  Most of this was book publicity.  When you publish a book

16  you gotta get on a few podcasts and let people know.  It is

17  part of bringing out a book.

18  Q.  I'm not quarreling, I am just asking.

19  A.  OK, yes.

20  Q.  These are some of the podcasts, right?

21          Another one was *All Ears* with Abigail Disney?

22  A.  Yes.

23  Q.  And that's just a podcast that we have just named which you

24  have been a guest on.  You have also been featured in numerous

25  television interviews, we have talked about some of them

Case 23-793, Document 82, 11/20/2023, 3592069, Page279 of 300

A-1939

N515car4                     Carroll - Cross

1    already; right?

2    A.  A few.

3    Q.  Lawrence O'Donnell on MSNBC?

4    A.  Yes.

5    Q.  Alisyn Camerota on CNN?

6    A.  Yes.  Yes.

7    Q.  Anderson Cooper on CNN?

8    A.  Yes, it was.

9    Q.  You saw that?

10   A.  I had a book just come out.  I was -- it's a good thing

11   when your book comes out to talk to people and let them know I

12   have a book out which is about my life.

13   Q.  OK.

14       MSNBC Chris Matthews also?

15   A.  Yes.

16       THE COURT:  Mr. Tacopina, how much longer with this?

17       MR. TACOPINA:  This whole thing?

18       THE COURT:  This list of the names you find a basis to

19   add here.

20       MR. TACOPINA:  Just a few more questions, your Honor.

21   That's it.

22       THE COURT:  All right.

23   BY MR. TACOPINA:

24   Q.  After taping your interview on CNN on June 24, 2019, that

25   was the Alisyn Camerota one, you went to a party in Brooklyn

N515car4                          Carroll - Cross

1   where your friends and former editors had gathered to toast you

2   with your favorite bottle of Chartreuse, which was your

3   favorite?

4   A.  That was a great night.  All my old friends were there.

5   Q.  OK.

6         And your friends and editors wanted to know how you

7   were doing and you told them all you were having a ball?

8   A.  I always say -- it's: "I'm fine."  "I'm having a really

9   good time."

10  Q.  OK.

11  A.  It was a great night.

12  Q.  By the way, at that party you handed over a small box to

13  the hostess who organized it, which was a gift from Bergdorf

14  Goodman?

15  A.  Which I had bought that day, yes.

16  Q.  At Bergdorf Goodman?

17  A.  Yes, at Bergdorf Goodman; earrings.

18        MR. TACOPINA:  Your Honor, the last three I'm just

19  going to mention -- I'm not going to play but mention.

20  Q.  In addition to the TV interviews we just mentioned, you

21  were also featured on other videotaped interviews like AM Joy

22  on MSNBC?

23  A.  Yes.

24  Q.  *New York* Magazine YouTube channel?

25  A.  Yes.  Yes.

N515car4                     Carroll - Cross

1   Q.  Now, Ms. Carroll, during your testimony here before this
2   jury, several times you became upset and emotional, you cried.
3   A.  Yes.
4   Q.  That has never happened to you before on any of these
5   television appearances or in your full-day deposition, where
6   you became emotional and cried in describing this incident;
7   right?
8   A.  I don't believe I did, no.
9   Q.  Now, all of this attention you were getting, we just listed
10  a whole host of these shows and what not that you were on, you
11  wanted more still?  More publicity?
12  A.  Yes.  I had just published a book and -- yes.
13  Q.  OK.  I'm going to show you what has been marked as CG,
14  which is an e-mail from you to Tara Fitzpatrick.  That's the
15  first page, Ms. Carroll.  When you have a chance to look at
16  that, let me know.
17  A.  Yes.
18  Q.  OK.  Second?
19      Do you recall that e-mail?
20  A.  Yes.
21      MR. TACOPINA:  OK.  I offer CG, your Honor, into
22  evidence.
23      MR. FERRARA:  Just looking at it for the first time,
24  your Honor.
25      MR. TACOPINA:  It was produced by you, Bates

N515car4                          Carroll - Cross

1    stamped --

2              THE COURT:  Mr. Tacopina, that's unnecessary.

3              MR. TACOPINA:  I am identifying the Bates stamp

4    number.  Sorry, your Honor.

5              MR. FERRARA:  Your Honor, from what we can tell we

6    have no objection, but the e-mail --

7              THE COURT:  Then from what I can tell you have no

8    objection.

9              MR. FERRARA:  Well, the e-mail is cut off, your Honor.

10             THE COURT:  I see.

11             MR. FERRARA:  I apologize.  I'm not suggesting that

12   Mr. Tacopina did anything to the document, I just do not recall

13   the rest.

14             THE COURT:  Mr. Tacopina, is there more to this?

15             MR. TACOPINA:  No, no more to it.

16             MR. FERRARA:  May I have a moment.

17             THE COURT:  How come it ends in the middle of a

18   sentence?

19             (Counsel conferring)

20             MR. FERRARA:  No objection, your Honor.

21             THE COURT:  Received.

22             (Defendant's Exhibit CG received in evidence)

23   BY MR. TACOPINA:

24   Q.  Can we display that to the jury, please, going back to the

25   first page?  I'm not sure what's on it.

N515car4                         Carroll - Cross

1           OK, so this is an e-mail on July 18, 2019, that you
2    sent to Tara Fitzpatrick, Allan Mayer, Shari Culpepper
3    regarding schedule.  And just before I ask you, those three
4    individuals were who?
5    A.  They were 42West.
6    Q.  And 42West is a public relations and marketing firm that
7    you had hired?
8    A.  They're a crisis management firm, also a PR firm.
9    Q.  PR firm, right.
10          And what you write in this e-mail to them that you
11   took care of the large press, New York Times -- next page,
12   please -- the Washington Post, CNN, MSNBC, NBC Nightly News,
13   etc. --
14          THE COURT:  Mr. Tacopina, the reason this is in
15   evidence --
16          MR. TACOPINA:  Yes.
17          THE COURT:  -- is that so you don't have to read it
18   out loud.
19          MR. TACOPINA:  I won't read the whole thing.  There is
20   one pertinent part.  You are right.  I'm sorry.
21   BY MR. TACOPINA:
22   Q.  After you describe the large, so to speak, news that you
23   brought in, you say that 42West is not living up to its
24   phenomenal reputation in getting me more radio, digital
25   podcasts, and blogs.

N515car4                           Carroll - Cross

1            So you were upset with 42West for not getting you more

2       press?

3       A.  Well, I was upset because there had been a storm about my

4       accusation against President Trump and my feelings were hurt

5       that nobody cared about the book, oddly enough.  I thought the

6       book was pretty good.  It was about what women actually thought

7       about men.  And I was completely innocent, I thought, perhaps

8       we could -- I was asking for maybe a few more NPR interviews,

9       some podcasts and some blogs to get the word out about the

10      actual book.  The book was not selling.  The book was a dud.

11      It was an absolute dud and I was a little frustrated.  I

12      thought, this is a good book.  Wait until they hear what these

13      women have to say.  It is funny.  It is great.  Don't you want

14      to know what women actually think about men?  So, I talked to

15      42West.  NPR, I suggested NPR stations across the country.  I

16      had videos of the interviews of the women.  I had all sorts of

17      great stuff, but the book was a dud.

18      Q.  OK.

19            THE COURT:  Mr. Tacopina, do you have more than

20      another five or 10 minutes for the whole examination?

21            MR. TACOPINA:  Oh yes, sir.  Yes, sir.

22            THE COURT:  OK.  We will break for lunch here.  2:00.

23            (Continued on next page)

24

25

N515car4                        Carroll – Cross

 1              (Jury not present)

 2              THE COURT:  Counsel, remain for a minute.  I have

 3      something to take up with you.

 4              Be seated, folks.

 5              MR. FERRARA:  Shall we excuse the witness, your Honor?

 6              THE COURT:  Not necessarily.

 7              As exhibits are coming in, Andy has to get hard copy

 8      to be marked admitted so that we have a record, and I'm advised

 9      that both sides are way behind.

10              MR. FERRARA:  Yes.  That is -- if there is fault it is

11      on both parties.  We are working on the redactions, that is

12      largely what -- and we may have to take up a few issues with

13      your Honor but I will say we are working to really try to

14      resolve those problems.

15              THE COURT:  Good.  Success on your heads.  Let's get

16      that wrapped up.  That's fine.  Thank you.  See you at 2:00.

17              (Luncheon recess)

18              (Continued on next page)

19

20

21

22

23

24

25

N515car4                         Carroll – Cross

1                    A F T E R N O O N   S E S S I O N

2                              2:15 p.m.

3              THE COURT:  OK.  Let's get the jury in.

4              How much longer, Mr. Tacopina?

5              MR. TACOPINA:  Without obviously knowing whether I am

6      going to have to impeach or not, I would say less than an hour.

7              THE COURT:  OK.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N515car4                         Carroll - Cross

1              (Jury present)

2              THE COURT:  Good afternoon, folks.

3              Ms. Carroll, you are still under oath.

4              You may continue.

5              MR. TACOPINA:  Thank you, your Honor.  Your Honor, I

6    neglected -- I showed the witness an exhibit but neglected to

7    offer it so I'm going to do that now again real quick.

8              Can we pull up BV, please?  We identified it earlier.

9              MR. FERRARA:  No objection.

10             THE COURT:  Received.

11             (Defendant's Exhibit BV received in evidence)

12   BY MR. TACOPINA:

13   Q.  You saw that earlier but that's the podcast of *The Maris*

14   *Review*?

15   A.  Yes.

16             MR. TACOPINA:  Thank you.  You can take that down.

17   Please put up CH for the witness?

18   Q.  Ms. Carroll, this is an e-mail that you had sent to --

19             THE COURT:  Don't do that.  You understand --

20             MR. TACOPINA:  Sorry.

21             THE COURT:  -- it is not in evidence.

22   BY MR. TACOPINA:

23   Q.  Do you recognize that, Ms. Carroll?

24   A.  Yes.

25   Q.  And did you send an e-mail to Shari Culpepper from your

N515car4                          Carroll - Cross

1   42 West agency in July of 2019 discussing sort of a road trip?

2   Bookings?

3   A.  Oh no.  NPR is for radio interviews, it was not a road

4   trip.

5   Q.  OK, for the radio interviews?

6   A.  It was just from my cabin.  It was not a road trip, I was

7   going to sit in my cabin and talk to NPR stations.

8   Q.  In different cities?

9   A.  In different cities.  It didn't come off.

10  Q.  In any event, you had -- you were interested in doing NPR

11  interviews for all different cities, I guess?

12  A.  Yes, and it turned out it couldn't be done.

13  Q.  OK.  OK.

14          You can take that down, please.

15          You kept track of all the attention you were getting

16  regarding your story coming out, your book and what not, with

17  Google Alerts about yourself?

18  A.  Yes, I had Google Alerts; yes.

19  Q.  And that started out around June 21, 2019?

20  A.  No.  I've always had Google Alerts.

21  Q.  After your article appeared in *The Cut*, that's again the

22  first time the story appeared publicly?

23  A.  Yes.

24  Q.  You received a lot of positive letters?

25  A.  Yes.

N515car4                        Carroll - Cross

1    Q.  And you told Dr. Lebowitz -- that's the doctor who was

2    hired as your expert?

3    A.  Yes.

4    Q.  You told Dr. Lebowitz, after coming forward with your

5    story, you were concerned about being harmed?

6    A.  Yes.

7    Q.  You sent a text message to Carol Martin on June 27, 2019 --

8    actually let me put up CJ.  CJ.

9            Do you recognize that, Ms. Carroll?

10   A.  This is a letter to Carol Martin's daughter Courtney.

11   Q.  Directing your attention --

12           THE COURT:  Is it a letter you wrote?

13           THE WITNESS:  This is a letter -- Carol Martin's

14   daughter Courtney was very concerned.

15           THE COURT:  Forget about what Courtney was concerned

16   or not concerned.  Is this something you wrote?

17           THE WITNESS:  Yes.

18           MR. TACOPINA:  I offer this CJ into evidence.

19           THE COURT:  Any objection?

20           MR. FERRARA:  No objection, your Honor.

21           THE COURT:  Received.

22           (Defendant's Exhibit CJ received in evidence).

23   BY MR. TACOPINA:

24   Q.  Your Honor, I was just informed -- and to be fair to

25   counsel -- the version that we, counsel agreed upon, the bottom

N515car4                          Carroll - Cross

1    three attributions were in there.  So this will be received

2    subject to redaction, it is just the first lengthy text message

3    that is signed by E. Jean.

4              THE COURT:  Is that agreeable?

5              MR. FERRARA:  Yes, it is.  I ask that it be sort of --

6              MR. TACOPINA:  It won't be shown.

7              MR. FERRARA:  That's fine.

8              THE COURT:  OK.

9              MR. TACOPINA:  OK.  This is the portion that's in.

10   Please publish to the jury?

11             THE COURT:  Yes.

12   BY MR. TACOPINA:

13   Q.  So, after telling your -- nothing.  Strike that.  Not

14   after.

15             You just testified that you had told Dr. Lebowitz that

16   you were concerned for being harmed after your story came

17   out --

18             THE COURT:  I'm sorry.  Clarify the time.  You say you

19   just testified.  Does that mean contemporaneous with this

20   e-mail or contemporaneous with something else?

21   BY MR. TACOPINA:

22   Q.  My last question and your last answer was that I had asked

23   you, had you told Dr. Lebowitz, your expert in this case, that

24   after coming forward with your story your concern about being

25   harmed, and you said yes.

N515car4                    Carroll - Cross

1    A.  Yes.

2    Q.  Now I'm going to show you this text message, which is in

3    evidence, to Carol Martin, the relevant portion.  To Carol

4    Martin:  Do not worry.  I have been walking these great New

5    York streets the last six days ALONE -- in all caps -- and at

6    night, all day long, and receive nothing but thanks and thumbs

7    up.  It is the opposite of concern.

8            MR. FERRARA:  Your Honor, I don't have a problem with

9    that.  It is just that Mr. Tacopina characterized it as to

10   Ms. Martin, I believe it was to her daughter.

11           THE COURT:  Rephrase.

12   BY MR. TACOPINA:

13   Q.  OK.  This, in fact, was a text message that you had sent to

14   Carol Martin, correct, and then to pass on to her daughter?

15   A.  No.

16   Q.  This was directed to her daughter?

17   A.  Yes.  I wrote directly to her daughter.

18   Q.  So, with that adjustment in my question, that this was sent

19   to Ms. Martin's daughter, what you wrote there was true?

20   A.  Yes.  That -- I was talking about New York streets.  I was

21   worried about where I lived up in Orange County.

22   Q.  You can take that down.

23           Ms. Carroll, as you sit here today, you know there was

24   a Law & Order episode that features a woman --

25           MR. FERRARA:  Objection, your Honor.  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N515car4                          Carroll - Cross

1           THE COURT:  Come to side bar.

2           MR. TACOPINA:  Pardon me?

3           THE COURT:  Come to side bar.

4           MR. TACOPINA:  Yes.

5           (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N515car4                    Carroll - Cross

1              (At side bar)

2              THE COURT:  OK.  What's going on.

3              MS. CROWLEY:  Your Honor, just one second?

4              MR. FERRARA:  Sorry, your Honor.

5              MR. TACOPINA:  What is going on, your Honor, is two

6      things.  There is an e-mail about the -- I was going to inquire

7      about regarding the TV show Law & Order, it is relevant for the

8      reasons I will explain.  The second before I did that I was

9      just asking if she had any independent knowledge of this show.

10     Law & Order, in 2012, did a TV show in which the episode

11     featured a woman getting raped in the Bergdorf Goodman lingerie

12     dressing room in 2012.

13             Ms. Carroll received an e-mail, responded to an e-mail

14     from someone saying that you should be aware that there is this

15     Law & Order episode from 2012.

16             THE COURT:  When does this Law & Order episode air?

17             MR. TACOPINA:  2012.  Originally.  It may have been

18     repeats.

19             MR. SIEGEL:  Originally.  It was on repeats.

20             MR. TACOPINA:  So, this lady is just telling her that

21     this aired in 2012 and had a character talking about being

22     raped in a Bergdorf Goodman lingerie dressing room.

23     Ms. Carroll replied saying:  I haven't seen it but this happens

24     all the time with Law & Order stories -- which indicates she

25     watches Law & Order -- also, there are 200 scripted shows a

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

N515car4                          Carroll - Cross

 1   year on TV, this kind of thing is bound to show up.  Indeed,

 2   I'm surprised this plot is not seen more often.

 3              So, we are offering that, obviously --

 4              THE COURT:  OK.

 5              MR. TACOPINA:  -- not for the truth, but for her

 6   response that is relevant.

 7              THE COURT:  I get it.

 8              What is the objection?

 9              MR. FERRARA:  Your Honor, we think she is

10   demonstrating here that she does not know about this episode.

11   Mr. Tacopina wants to use it to impeach her, that she made this

12   up, modeled it on this episode which is seven years before her

13   book came out.  We think under 402 and 403 it should be kept

14   out.

15              THE COURT:  No, no, no.  I will allow it.

16

17

18

19

20

21

22

23

24

25

N515car4                          Carroll - Cross

1           (In open court)

2           MR. TACOPINA:  OK.

3           THE COURT:  Go ahead.

4           MR. TACOPINA:  Thank you.

5    BY MR. TACOPINA:

6    Q.  So my initial question was, as you sit here today, you know

7    that there was a Law & Order episode from 2012 that featured a

8    woman getting raped in the Bergdorf Goodman lingerie dressing

9    room; correct?

10   A.  I am aware, yes.

11   Q.  I would like to show you what's been marked Defendant's

12   Exhibit CK.  For purposes of identification let's leave the

13   whole thing up.

14          Ms. Carroll, take a look at that and let me know when

15   you are done.

16   A.  Oh.  Yes.

17   Q.  OK.  Do you recall that e-mail exchange?

18          THE COURT:  Let's first find out whether she can

19   identify, without saying what it is, Mr. Tacopina.

20          MR. TACOPINA:  Right.

21   Q.  Can you identify that?

22   A.  Yes.  I remember receiving this e-mail.

23          MR. TACOPINA:  I would offer that as Defendant's

24   Exhibit CK, your Honor.

25          MR. FERRARA:  No objection, your Honor.

N515car4                      Carroll - Cross

1            THE COURT:  It is received.

2            (Defendant's Exhibit CK received in evidence)

3    BY MR. TACOPINA:

4    Q.  You can put that up, please, and display it with the

5    Court's permission.

6            The first e-mail in this exhibit, there was two, an

7    e-mail to you, and then your response was on June 23rd, 2019,

8    from a woman named Grace Brophy, who wrote to warn you that a

9    Law & Order SVU episode entitled "Theater Tricks" aired in 2012

10   and had a character speaking of a fantasy that he rapes a woman

11   in a Bergdorf Goodman dressing room in the lingerie department.

12   You then replied, on July 23, 2019:  I haven't seen it, but

13   this happens all the time with Law & Order stories.  Also,

14   there are 200 scripted shows a year on TV.  This kind of thing

15   is bound to show up.  Indeed, I'm surprised this sort of plot

16   is not seen more often.

17           Now, because you said this happens all the time with

18   Law & Order stories, can I assume that means that you watch

19   Law & Order?

20   A.  I am a big fan of Law & Order but not Law & Order SVU, it

21   is too violent.  I like Law & Order, though.

22   Q.  And despite claiming that you were surprised this sort of

23   plot is not seen more often -- withdrawn.

24           What did you mean by you were surprised that this sort

25   of plot is not seen more often?

N515car4                         Carroll - Cross

1   A.  Well, I hadn't seen it and I have yet to see it.  Somebody

2   dreaming of -- the Law & Order writers are very good about

3   keying into the psyche of their viewers, and one of the most

4   frequent fantasies of both men and women is -- as we have

5   discussed before -- unfortunately, rape.  So, I just expressed

6   my surprise that this kind of plot is not seen more often about

7   fantasy.

8   Q.  Fantasy of getting raped in the lingerie section of the

9   Bergdorf Goodman department store?

10  A.  That was amazing to me.

11  Q.  What do you mean amazing?  I assume amazing coincidence?

12  A.  Yes.  Astonishing.

13  Q.  Astonishing.

14          So five years before you came out with your story, an

15  astonishing coincidence that Law & Order --

16          MR. FERRARA:  Objection.

17          THE COURT:  Sustained.

18  Q.  Just go back to that first e-mail for one second, I want to

19  make one thing clear, please, the first e-mail to Ms. Carroll

20  on the same exhibit.  The other e-mail, please; CK.

21          Ms. Carroll, just to be clear, the writer, Ms. Brophy

22  at some point writes:  Perhaps the writer of the episode,

23  Marygrace O'Shea, is one of the friends that you told?

24          To be clear, you don't know who Marygrace O'Shea is?

25  A.  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N515car4                          Carroll - Cross

1    Q.  And you never told her anything about the Bergdorf Goodman

2    incident?

3    A.  No.  I told no one.

4    Q.  OK.  You can take that down.

5             You were fired from *Elle* magazine on December 11,

6    2019?

7    A.  Yes.

8    Q.  And it is your testimony that *Elle* magazine fired you

9    because Donald Trump called you a liar?

10   A.  Yes.

11   Q.  In fact, you don't blame *Elle* magazine for your

12   termination, according to you?

13   A.  I understood.  I was angry about it and hurt.  And I was

14   forlorn.  And I was going to miss my readers.  But, yes, they

15   let me go after 27 years.

16   Q.  And no one from *Elle* magazine told you that you were being

17   fired from *Elle* magazine because you were being branded a liar

18   by Donald Trump?

19   A.  No, they did not tell me that.

20   Q.  Did not tell you that.

21            In fact, you are aware that *Elle* magazine has publicly

22   stated that the decision not to renew your contract was a

23   business decision that had nothing to do with politics?

24   A.  Well, I think they're right when they say it is a business

25   decision, because when one of their --

N515car4                    Carroll - Cross

1          MR. FERRARA:  Your Honor, I object to this question.

2          THE COURT:  Sustained.  The jury will disregard the

3    question and the suggestion that *Elle* magazine issued a

4    statement or what it said.  There is no evidence of that.

5          MR. TACOPINA:  Your Honor, if I can direct the Court

6    attention and counsel's attention to the deposition of October

7    14, 2022, page 183, lines 10 to 21.

8          THE COURT:  Give me a minute.

9          MR. TACOPINA:  Yes, sir.

10         THE COURT:  You said 193?

11         MR. TACOPINA:  183, your Honor.

12         THE COURT:  OK.

13         MR. TACOPINA:  183, lines 10 to 21.

14         MR. FERRARA:  Same objection, your Honor.

15         THE COURT:  Same ruling.  Sustained.

16         MR. TACOPINA:  Yes.

17   BY MR. TACOPINA:

18   Q.  Regardless, you were very surprised by your termination in

19   December of 2019?

20   A.  I thought they were calling me to invite me to their

21   Christmas party.

22   Q.  Yet four months earlier, on August 1, 2019, you sent an

23   e-mail to your agent, Sarah Lazin?

24   A.  Yes.

25   Q.  Telling her that after Nina Garcia -- who I think you

N515car4                              Carroll - Cross

1    testified on direct is the head of *Elle* magazine?

2    A.  Yes, she was the editor in chief.

3    Q.  So you sent an e-mail to Sarah Lazin that after Nina Garcia

4    took over at *Elle*, the magazine cut your pay in half from

5    $10,000 a column to $5,000 a column?

6    A.  That was being done across the board at magazines, they

7    were cutting back on salaries and pages.

8    Q.  In fact, in August of 2019, before your firing in December,

9    you were looking to get out of your contract with *Elle*

10   magazine?

11   A.  I was looking for other work at other magazines as an

12   advice columnist, true.

13   Q.  OK, but you were looking for other work.  You were looking

14   to get out of your contract with *Elle* magazine?

15   A.  I had my contract checked by a lawyer, yes.

16   Q.  And you told your agent, Sarah, that *The Atlantic* was

17   interested in sort of stealing you and your advice column from

18   *Elle*?

19   A.  Yes.

20   Q.  And you were considering it?

21   A.  Yes, I was considering it.  Yes.

22   Q.  And that's because *Elle* cut your salary in half?

23   A.  Yes.

24   Q.  And left you without an editor?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300