# 23-0793-cv

## United States Court of Appeals

*for the*

## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 8 of 12 (Pages A-1961 to A-2240)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

i

## TABLE OF CONTENTS FOR JOINT APPENDIX

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*")......................................... A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") ...................................... A-32

### Documents Submitted in *Carroll I*

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

    Exhibit A to Kaplan Declaration -
    Letter from Roberta A. Kaplan to Marc E.
    Kasowitz, dated August 10, 2020, with Enclosure   A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023......... A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 ....................................... A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 ........................................ A-89

    Exhibit 1 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Lisa
    Birnbach, dated September 21, 2022.................... A-92

    Exhibit 2 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Carol
    Martin, dated October 18, 2022 ........................... A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 .................................................. A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 ............................................... A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ......................................... A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ................................................ A-405

iii

**Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................. A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 .......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ..................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ....................... A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 ......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ............................ A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 .................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 ................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ........................................................ A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023....................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 ........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

|  | Page |
|---|---|
| Letter from Roberta A. Kaplan to the Honorable Lewis A. Kaplan, dated March 17, 2023 | A-509 |
| Annexed to Letter - Proposed Order | A-511 |

### Documents Submitted in *Carroll II*

| | |
|---|---|
| Complaint and Demand for a Jury Trial, dated November 24, 2022 | A-513 |
| Answer, dated January 27, 2023 | A-542 |
| First Amended Answer, dated February 10, 2023 | A-556 |
| Defendant's Letter Motion for Discovery, dated February 10, 2023 | A-571 |
| Exhibit A to Defendant's Letter Motion - DNA Report, dated January 8, 2020 | A-574 |
| Exhibit B to Defendant's Letter Motion - Twitter Post, dated February 25, 2021 | A-602 |
| Plaintiff's Letter Response in Opposition to Defendant's Motion for Discovery, dated February 10, 2023 | A-607 |
| Defendant's Letter Reply in Further Support of Motion for Discovery, dated February 10, 2023 | A-612 |
| Transcript of Conference, dated February 7, 2023 | A-614 |
| Notice of Motion, by Defendant, for an Order Granting Partial Summary Judgment, dated February 23, 2023 | A-635 |
| Declaration of Matthew G. DeOreo, for Defendant, in Support of Motion for Partial Summary Judgment, dated February 23, 2023 | A-637 |

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020.. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ...................................... A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023......... A-747

vii

**Page**

Declaration of Alina Habba, for Defendant,
in Support of Motions *in Limine*, dated
February 23, 2023 ................................................ A-773

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 .......................... A-775

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-779

Exhibit C to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022
(Reproduced herein at pp. A-487-A-492)

Exhibit D to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023
(Reproduced herein at pp. A-493-A-499)

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-783

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-785

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 .............................. A-786

Exhibit 2 to Kaplan Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023 .................................................... A-863

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ...................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................ A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A).............................................................. A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B).............................................................. A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 ................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 ......................... A-1065

x

**Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
Opposition to Defendant's Motions *in Limine*,
dated March 9, 2023 ............................................. A-1080

Exhibit 1 to Crowley Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
Video of Deposition of Natasha Stoynoff, taken
October 13, 2022
(All parties are already in possession of video
exhibit) ................................................................... A-1089

Exhibit 3 to Crowley Declaration -
Video of Deposition of Jessica Leeds, taken
October 13, 2022
(All parties are already in possession of video
exhibit) ................................................................... A-1091

Plaintiff's Response to Defendant's Local Civil
Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
Opposition to Defendant's Motion for Partial
Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1110

Exhibit 2 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023
(Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
   Plaintiff, in Further Support of Omnibus Motion
   *in Limine*, dated March 16, 2023 .......................... A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 .......................... A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 ......................... A-1153

Reply Declaration of Alina Habba, for Defendant,
   in Further Support of Motions *in Limine*, dated
   March 16, 2023 ...................................................... A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022 ................................................ A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
dated April 13, 2023 ................................................ A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 ................................................ A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023................................................ A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 .............................. A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-1207

Plaintiff's Letter Response to Defendant's Motion
to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022   A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ........................................................ A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ..................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023........................ A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 ............................... A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................. A-1416

Trial Transcript, dated April 25, 2023........................ A-1420

Trial Transcript, dated April 26, 2023........................ A-1524

Trial Transcript, dated April 27, 2023........................ A-1697

Trial Transcript, dated May 1, 2023........................... A-1851

Trial Transcript, dated May 2, 2023........................... A-2036

Trial Transcript, dated May 3, 2023........................... A-2210

Trial Transcript, dated May 4, 2023........................... A-2375

Trial Transcript, dated May 8, 2023........................... A-2567

Trial Transcript, dated May 9, 2023........................... A-2771

Parties' Trial Exhibits:

PX-1        Twitter Post, dated June 21, 2019 ............ A-2839

xv

|  |  | **Page** |
|---|---|---|
| PX-2 | "Remarks by President Trump before Marine One Departure" (Office of the Press Secretary, June 22, 2019) .............. | A-2840 |
| PX-3 | "EXCLUSIVE: Trump vehemently denies E. Jean Carroll allegation, says 'she's not my type'" (*The Hill*, June 24, 2019)......................................... | A-2853 |
| PX-4 | Truth Social Post, dated October 12, 2022.................................... | A-2858 |
| PX-6 | "Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life." (New York Magazine, June 21, 2019) ....................... | A-2859 |
| PX-12 | Photograph ................................................ | A-2879 |
| PX-22 | Sixth Floor Construction Plan of Bergdorf Goodman ................................. | A-2880 |
| PX-24 | Sixth Floor Construction Plan of Bergdorf Goodman ................................. | A-2881 |
| PX-25 | Video Excerpt from Defendant's Interview with Billy Bush (All parties are already in possession of video exhibit)........................................... | A-2882 |
| PX-25-T | Transcript of Video Excerpt from Defendant's Interview with Billy Bush ... | A-2883 |
| PX-26 | Video Excerpt from Presidential Debate (All parties are already in possession of video exhibit)........................................... | A-2885 |

xvi

|  |  | Page |
|---|---|---|
| PX-26-T | Transcript of Video Excerpt from Presidential Debate ................................. | A-2886 |
| PX-29 | Video Excerpt from Defendant's Speech at Campaign Rally (All parties are already in possession of video exhibit) ........................................... | A-2887 |
| PX-29-T | Transcript of Video Excerpt from Defendant's Speech at Campaign Rally... | A-2888 |
| PX-31 | Video Excerpt from Defendant's Speech (All parties are already in possession of video exhibit) ........................................... | A-2889 |
| PX-31-T | Transcript of Video Excerpt from Defendant's Speech................................. | A-2890 |
| PX-46 | Twitter Post, dated November 15, 2022... | A-2891 |
| PX-48 | Twitter Post, dated December 12, 2022 ... | A-2893 |
| PX-51 | Twitter Post, dated January 29, 2023 ....... | A-2896 |
| PX-53 | Twitter Post, dated January 29, 2023 ....... | A-2898 |
| PX-57 | Email, dated October 13, 2022 ................ | A-2901 |
| PX-112 | Video Excerpt from Defendant's Interview with Roger Ailes (All parties are already in possession of video exhibit) ........................................... | A-2902 |
| PX-112-T | Transcript of Video Excerpt from Defendant's Interview with Roger Ailes.. | A-2903 |
| PX-200 | Video Excerpt from Deposition of Donald J. Trump, taken October 19, 2022 ......................................................... | A-2904 |

xvii

**Page**

PX-200-T  Transcript of Video Excerpt from
Deposition of Donald J. Trump, taken
October 19, 2022........................................ A-2905

DX-CK  Email Regarding Law & Order SVU,
dated July 23, 2019 .................................. A-2986

Court Exhibits:

C  Timeline of Events .................................... A-2987

D  WordPerfect Document Compare
Summary of Jury Instructions................. A-2988

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated May 1, 2023 .................... A-3024

Exhibit A to Letter -
Excerpts of Trial Transcripts................................ A-3042

Exhibit B to Letter -
LinkedIn Post.......................................................... A-3081

Exhibit C to Letter -
"One of the Democratic Party's biggest donors is
exploring a new anti-Trump boycott" (*Vox*,
July 2, 2020) .......................................................... A-3083

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated May 5, 2023 .................... A-3088

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated May 6, 2023 .................... A-3091

Verdict Form, dated May 9, 2023 .............................. A-3095

Notice of Appeal, dated May 11, 2023 ...................... A-3099

Notice of Motion, by Defendant, for an Order
Granting a New Trial or Remittitur, dated
June 8, 2023 ........................................................... A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
Motion for a New Trial or Remittitur, dated
June 8, 2023 ............................................................ A-3103

Declaration of Matthew G. DeOreo, for Defendant,
in Support of Motion for a New Trial or
Remittitur, dated June 8, 2023 .............................. A-3134

Exhibit A to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit B to DeOreo Declaration -
Excerpts of Trial Transcripts.................................. A-3136

Exhibit C to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019
(Reproduced herein at pp. A-639-A-667)

Exhibit D to DeOreo Declaration -
Verdict Form, dated May 9, 2023
(Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
Opposition to Defendant's Motion for a New
Trial or Remittitur, dated June 22, 2023 ................ A-3219

Exhibit 1 to Kaplan Declaration -
Excerpts of Trial Transcripts.................................. A-3221

Exhibit 2 to Kaplan Declaration -
Twitter Post, dated June 21, 2019
(Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 .................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 .................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
    Second Circuit, dated July 19, 2023 .................... A-3339

N515car4                    Carroll - Cross

1    Q.  And didn't run your column in July of 2019?

2    A.  Didn't run it, and they also cut my column pages from two

3    pages to one.

4    Q.  OK.

5    A.  They also hid the column in the magazine and kept -- in

6    magazines you get a pride of placement with the most

7    interesting piece of writing in what we call the "well".  The

8    well is where the beautiful pictures are and that's usually

9    where the Ask E. Jean column resided, but when the new folks

10   came in, the Ask E. Jean column was found in a different place

11   every month so nobody could find the column.  They also buried

12   me online.

13   Q.  And you complained to your agent that Nina Garcia, the

14   editor in chief at *Elle*, loathed or hated you because you

15   published your book excerpt in *New York* magazine?

16   A.  They were not happy.

17   Q.  And that's the book excerpt that obviously featured the

18   story about Donald Trump and Bergdorf Goodman?

19   A.  Yes.

20   Q.  And you agree that Nina Garcia, the editor in chief of

21   *Elle*, is a well respected editor in the magazine world?

22   A.  Nina is extremely respected.  And also, she was the star of

23   project run way.  Nina Garcia is a brilliant editor in chief.

24   Q.  And you told your agent that Nina really loathes you?

25   A.  Nina got very, very angry at me for publishing the excerpt

Case 23-793, Document 83, 11/20/2023, 3592070, Page22 of 300

A-1962

N515car4                         Carroll - Cross

1  in *New York* magazine.

2  Q.  OK, but did you use the word "loathe" in describing how

3  Nina felt about you to your agent?

4  A.  I am sure I did.

5  Q.  OK.

6           Now, you testified at trial on direct that you were

7  fired from *Elle* magazine because Donald Trump accused you or

8  defamed you?

9  A.  Because he called me a liar and my entire column rested on

10  the foundation that readers were able to trust that I would

11  tell them the truth.

12  Q.  OK.

13  A.  So, when the president of the United States called me a

14  liar for three straight days, I took a huge hit.  My

15  trustworthiness was exploded.  It was like -- just crumbled,

16  the foundation on which the whole column had rested for 27

17  years.

18  Q.  OK.  In your August e-mail, August 2019 e-mail to your

19  agent, you said that the reason that Nina hated or loathed you

20  was because you published your excerpt in *New York* magazine.

21  A.  Yes.

22  Q.  By that point Donald Trump, who had already called you a

23  liar, nearly a month and a half earlier on June 21, 2019?

24  A.  Yes.

25  Q.  When explaining -- withdrawn.

N515car4                          Carroll - Cross

1           Nowhere in the e-mail to your agent do you say that

2    the reason that Nina Garcia hates you or loathes you -- I'm

3    sorry, loathes you -- is because Donald Trump called you a

4    liar?

5    A.  I don't put it in an e-mail but she hated me and loathed

6    me.  You can use both words.

7    Q.  OK.  So nowhere in the e-mail that she hated and you

8    loathed you do you write that that's because Donald Trump

9    called you a liar?

10   A.  Sarah and I had talked on the phone and I was distraught

11   that the readers would no longer trust me.  You don't -- you

12   can't write to an advice columnist if you can't trust what she

13   is going to tell you is the true, best advice, and I didn't

14   have that foundation any longer.

15   Q.  Well, but my question is regarding the e-mail you sent to

16   your agent Sarah, about why it was that Nina Garcia

17   loathed/hated you, the only reason you cited in that e-mail was

18   because your book excerpt was published in *New York* magazine?

19   A.  Yes.  I put it in an e-mail because Sarah and I had been on

20   the phone talking about the foundation being pulled away from

21   me when the president called me a liar.

22   Q.  No, actually -- you know what?  Let's do that, please put

23   up CL.

24           Take a look at CL.  And what is that?  Do you

25   recognize that, I should say.

N515car4                          Carroll - Cross

1    A.  Oh.  Right.

2    Q.  Is that the e-mail that we have been discussing?

3    A.  Right.

4           MR. TACOPINA:  I offer Defendant's Exhibit CL, your

5    Honor, into evidence.

6           MR. FERRARA:  There are certainly portions of this

7    that are admissible, others perhaps not, your Honor.  I'm happy

8    to discuss with defense counsel.  I think he wants to show a

9    portion that is admissible we have no objection to.

10          THE COURT:  What part?

11          MR. FERRARA:  It is a discussion between Ms. Carroll

12   and her agent and her agent is on the chain.  I would just want

13   to look at it more closely.

14          THE COURT:  Why don't you do that.

15          MR. TACOPINA:  Take a look, because I plan on using

16   the whole thing.

17          MR. FERRARA:  OK.  Thank you for the time.  No

18   objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit CL received in evidence)

21   BY MR. TACOPINA:

22   Q.  Ms. Carroll, this is the e-mail that we have been

23   discussing that you sent to your agent Sarah Lazin and talking

24   about why Nina loathed you, and you say it is because you

25   published the book excerpt in *New York* magazine?

Case 23-793, Document 83, 11/20/2023, 3592070, Page25 of 300

N515car4                         Carroll - Cross

1   A.  Yes.

2   Q.  Nowhere in this e-mail do you say that Nina loathed you

3   because Donald Trump called you a liar; do you?

4   A.  No.  I talked about -- with Sarah on the phone, and I put

5   it in this e-mail about the publishing of the excerpt.

6   Q.  Oh.  So in the e-mail you said that she loathed you because

7   you published the excerpt in a competitor magazine?

8   A.  Yes.

9   Q.  But yet you had a separate phone call with Sarah?

10  A.  Oh, yes.  Many separate phone calls, yes.

11  Q.  Now, at one point you saw Nina Garcia sent a message saying

12  that they weren't going to renew your contract because they

13  didn't feel it set the right precedent?

14          MR. FERRARA:  Objection.  Objection, your Honor.  I do

15  not believe Ms. Carroll is on the e-mail that Mr. Tacopina

16  is --

17          THE COURT:  Just let me... the question is did you see

18  such a message?

19          MR. TACOPINA:  Yes.

20          THE WITNESS:  I'm sorry.  What?

21          MR. TACOPINA:  Sure.  Let me just reread the question.

22          MR. FERRARA:  Your Honor, the question should be

23  framed prior to this litigation.

24          THE COURT:  Fair point.  Rephrase.

25  BY MR. TACOPINA:

N515car4                         Carroll - Cross

1   Q.  Prior to this litigation, had you seen an e-mail in which

2   Nina Garcia sent out a message stating that the reason they

3   weren't going to renew your contract is because they didn't

4   feel it set the right precedent by keeping you?

5   A.  I don't remember seeing that.

6   Q.  OK.

7           MR. FERRARA:  Objection.  I move to strike the

8   question which has the -- which embeds a premise, your Honor.

9           MR. TACOPINA:  A question is not evidence.

10          THE COURT:  The jury is reminded that it is only the

11  witness' answers that are evidence, not the questions.

12  BY MR. TACOPINA:

13  Q.  Ms. Carroll, since you don't remember seeing that, I'm

14  going to see if I can refresh your recollection just by showing

15  to you, Ms. Carroll.

16  A.  OK.

17  Q.  Ms. Carroll, I will show you something.  Take a look at it.

18  When you are done, let me know?

19  A.  Have me see it?

20          MR. TACOPINA:  261, and the whole thing please, at

21  first?

22          THE COURT:  What is it.

23          MR. TACOPINA:  Oh, deposition testimony.  I'm sorry.

24  Ah.  This is just to refresh the witness' recollection, your

25  Honor.

A-1967

N515car4                          Carroll - Cross

1           THE COURT:  OK, but there has to be a record of what

2    you are showing her.

3           MR. TACOPINA:  Yes.  I'm going to do that right now, I

4    misstated it.

5           Is there a way to put up the deposition testimony for

6    Ms. Carroll or I could give her a hard copy?

7           187, line 25, Mike, to 189, line 12.  I'm just going

8    to show it to the witness to see if it refreshes her

9    recollection.  You know what?  I am just going to give her

10   mine.

11   Q.  So I will direct your attention to the bottom of that page,

12   line 25, it is just one line, and then when you are done, look

13   up, and I will move it -- there we go.  Just read that page.

14   A.  Yes.  Editor in chief here?

15          THE COURT:  No.

16   Q.  No, no.  To yourself.

17          Scoot up a little bit for the whole page?

18          And when you are done, look up, Ms. Carroll.

19   A.  Uh-huh.

20   Q.  And then just scoot up to the next page, please, to line

21   12?  Right there.

22   A.  OK.

23          MR. FERRARA:  Your Honor, I would ask that the defense

24   show Ms. Carroll the rest of this, of page 189.

25          MR. TACOPINA:  To refresh her recollection?

A-1968

N515car4                          Carroll - Cross

1              MR. FERRARA:  Yes.

2              MR. TACOPINA:  I can show her what I would like but I

3     will show her the rest of 189.

4              Go ahead.

5     A.  Yes.

6     Q.  OK, Ms. Carroll.  Does that refresh your recollection as to

7     whether or not -- I'm not going to re-describe it, it was

8     objected to before, but does that refresh your recollection

9     seeing the message, that we discussed previously, from *Elle*?

10    A.  Yes.

11    Q.  It does?  OK.

12             And that was that, they didn't feel prepared to move

13    forward?

14             MR. FERRARA:  Objection, your Honor.  May we approach?

15             THE COURT:  All right.

16             (Continued next page)

17

18

19

20

21

22

23

24

25

Case 23-793, Document 83, 11/20/2023, 3592070, Page29 of 300

1          (At side bar)

2          THE COURT:  Mr. Ferrara.

3          MR. FERRARA:  Your Honor, at her deposition, which

4    Mr. Tacopina just showed to the witness, she describes being

5    shocked about seeing an e-mail, which is entirely hearsay, in

6    which employees or people who run *Elle* magazine discuss,

7    outside of Ms. Carroll's presence -- she is not on the

8    e-mail -- they discuss potentially why they fired her.  It is

9    hearsay.  And the deposition makes clear when she says, when

10   the witness at the deposition, says on page 189 at line 16:

11   This is a shocking e-mail for me because what precedent are

12   they talking about?  Does anybody know?  It is clear she has

13   never seen it other than the litigation.  Answering honestly

14   today, yes, she has, at her deposition, but it is not an e-mail

15   that Ms. Carroll is competent to get into evidence, it is

16   hearsay.

17          THE COURT:  Mr. Tacopina?

18          MR. TACOPINA:  I'm not offering the e-mail, your

19   Honor, just the sort of the summary content that she was

20   aware --

21          THE COURT:  You are not offering it for the truth,

22   only for its content?

23          MR. TACOPINA:  No.  For the -- I have an idea.

24   Whenever I am having trouble when I make an argument, I'm going

25   to withdraw the offer of this and move on.

Case 23-793, Document 83, 11/20/2023, 3592070, Page30 of 300

A-1970

N515car4                    Carroll – Cross

1          THE COURT:  OK.  Sounds like a good plan.

N515car4                          Carroll - Cross

1              (In open court)

2              THE COURT:  Question is withdrawn.

3              MR. TACOPINA:  Yes, I withdraw that, your Honor.

4   BY MR. TACOPINA:

5   Q.  The book excerpt that you did not give to *Elle* but to *New*

6   *York*, you received $7,000 for that?

7   A.  I did not receive it.

8   Q.  Somebody received $7,000?

9   A.  My publisher.

10  Q.  Your publisher.

11             And you didn't even tell *Elle* magazine, your employer

12  at the time, that you decided to give an exclusive to *New York*

13  magazine after the fact?

14  A.  Right.

15  Q.  At that point you worked at *Elle* magazine for over two

16  decades?

17  A.  Yes.

18  Q.  You testified -- excuse me.

19             You testified a short while ago being an advice

20  columnist rests on your ability to be trusted?

21  A.  Yes.

22  Q.  And you testified at trial Thursday, page 253, line 25 to

23  254, line 3 --

24             If you want to look at it, Mike, I'm going to ask a

25  question.

Case 23-793, Document 83, 11/20/2023, 3592070, Page32 of 300

A-1972

N515car4                              Carroll - Cross

1              MR. FERRARA:  Sorry.  Thank you.

2              THE COURT:  Just a minute.

3              MR. FERRARA:  Thank you.

4    BY MR. TACOPINA:

5    Q.  Ms. Carroll, you testified at trial, on direct examination

6    by Mr. Ferrara, that if you were writing Ask E. Jean for *Elle*

7    magazine, was the question, why did you not publish this

8    excerpt in *Elle* magazine as well?  And your answer was:

9    Because *Elle* magazine would never have published this excerpt.

10             Do you recall giving that answer at trial?

11   A.  Yes.

12             THE COURT:  I'm sorry.  What page and line are we at?

13             MR. TACOPINA:  Sorry, your Honor?

14             THE COURT:  Page and line.

15             MR. TACOPINA:  Trial testimony, page 253, line 25 to

16   254, line 3.

17             THE COURT:  OK.  Thank you.

18   BY MR. TACOPINA:

19   Q.  That's your testimony before this jury, that *Elle* would

20   never publish that?

21   A.  Never.  They would never publish it.

22   Q.  I'm going to play you defense 268, it is from your

23   deposition.  Before we play it --

24             THE COURT:  I'm sorry.  Defense 268?  Defendant's

25   exhibits have letters.

N515car4                          Carroll - Cross

1           MR. TACOPINA:  It is a deposition, your Honor.  I'm

2      sorry.  That's our identification.  I'm going to give page and

3      line of the deposition right now.  OK?  It is deposition from

4      October 14, 2022; page 192, line 25, to 193, line 13.

5           MR. FERRARA:  Your Honor, we object to the hearsay in

6      this deposition transcript.

7           MR. TACOPINA:  Goes to Ms. Carroll's state of mind,

8      your Honor.

9           THE COURT:  Sustained.

10     BY MR. TACOPINA:

11     Q.  Well, was it your understanding that *Elle* magazine was

12     disappointed that you were not giving the exclusive to them?

13          MR. FERRARA:  If her understanding is based on

14     hearsay, we object.

15          MR. TACOPINA:  It is her state of mind.

16          THE COURT:  How is it relevant?

17          MR. TACOPINA:  Because she testified at this trial

18     that *Elle* would not have published that.

19          THE COURT:  That's her state of mind today.

20          MR. TACOPINA:  Right.  I want to inquire about her

21     state of mind in October.

22          THE COURT:  I don't get it.  I don't get it.

23          MR. TACOPINA:  I hate to ask you if we can approach

24     again.  Are you going to let me if I do?

25          THE COURT:  But I may not release you at the end.

Case 23-793, Document 83, 11/20/2023, 3592070, Page34 of 300

A-1974

N515car4                         Carroll – Cross

1              MR. TACOPINA:  Mr. Siegel will go up there.

2              THE COURT:  That's OK.  You can go up, too.

3              (Continued next page)

Case 23-793, Document 83, 11/20/2023, 3592070, Page35 of 300

N515car4                        Carroll - Cross

1               (At side bar)

2               THE COURT:  Once more, with feeling.

3               MR. TACOPINA:  He is going to try.

4               MR. SIEGEL:  I will give it a shot.  So, she testified

5       at this trial --

6               THE COURT:  That *Elle* would never have published it.

7               MR. SIEGEL:  Right.

8               THE COURT:  Right.

9               MR. SIEGEL:  That was her understanding.  However, her

10      understanding --

11              THE COURT:  Well, I don't know if she said it was her

12      understanding but she certainly said that.  I'm not saying she

13      didn't say it was her understanding, but there is a difference.

14              MR. SIEGEL:  OK.  So, she testified in a contrary way

15      in October of 2022, expressing her understanding that *Elle*

16      would have published the article and was disappointed that she

17      did not give them the exclusive.

18              THE COURT:  Who is *Elle* magazine?

19              MR. SIEGEL:  It's her employer.

20              THE COURT:  Well, yeah.  There is a hearsay rule

21      involved here too, isn't there?

22              MR. SIEGEL:  We can --

23              THE COURT:  I mean, you know, if I want to know

24      President Biden's state of mind, I don't get it from a postal

25      delivery worker.

A-1976

N515car4                         Carroll - Cross

1          MR. SIEGEL:  OK.  So we can reframe the question by

2     asking who it is that she spoke to?

3          MR. TACOPINA:  Here is the thing, your Honor.  When

4     she testified on direct that *Elle* would have never published

5     that, that was also based on hearsay, right?

6          THE COURT:  No.  Not necessarily.  It is just her

7     opinion.

8          MR. SIEGEL:  Right, but it would be an opinion based

9     on information she received from others.

10          THE COURT:  How do you know?  How do you know?  Maybe

11     that was just her opinion.

12          MR. TACOPINA:  Can I ask her her opinion in October of

13     2022?

14          THE COURT:  I want to understand what the relevance

15     is.  That's my problem.

16          MR. TACOPINA:  The relevance is her opinion changed.

17     In October 2022 it was that *Elle* was mad that they couldn't

18     publish it.  In April of 2023 it is *Elle* would have -- her

19     opinion is *Elle* would have never published it.

20          MR. SIEGEL:  Here is the significance with respect to

21     this trial.  She was claiming that she was damaged --

22          THE COURT:  I'm sorry.  One lawyer on a side.

23          MR. SIEGEL:  I'm sorry.

24          Tag me in?

25          THE COURT:  Who is doing this?

N515car4                      Carroll - Cross

1          MR. SIEGEL:  I'll take it from here.

2          MR. TACOPINA:  I'll be quiet.

3          MR. SIEGEL:  So, she is claiming at this trial that

4    she suffered professional harm as a result of Donald Trump

5    calling her a liar.

6          THE COURT:  Right.  Right.

7          MR. SIEGEL:  OK.  So what she testified on direct, the

8    reason *Elle* terminated her had nothing to do with the fact that

9    she gave her story to a competitor.  That's what she testified

10   to here.  However, she testified in October that *Elle* was in

11   fact disappointed she did not give them the story.  It

12   contradicts her testimony at this trial.

13         THE COURT:  Well, it might, unless it is the janitor

14   who told her that they were disappointed, for example.

15         MR. SIEGEL:  OK.

16         THE COURT:  Mr. Ferrara?

17         MR. FERRARA:  Your Honor, there is a way to do this.

18   They could have called a witness who would come in and testify

19   about why Ms. Carroll was fired.

20         THE COURT:  Yes, but respond to the point we are

21   dealing with, not what they could have done.

22         MR. FERRARA:  That's the point of the hearsay rule,

23   your Honor.  This is -- Ms. Carroll is testifying to things

24   other people said that we cannot test, that we don't know who

25   said it, where they got the idea, etc.  Ms. Carroll testified

Case 23-793, Document 83, 11/20/2023, 3592070, Page38 of 300

A-1978

N515car4                    Carroll - Cross

1   why she believes that she was fired and it was based on things

2   like what the piece was about and its length and things of that

3   nature.  This is not responsive to that.  It was not hearsay on

4   direct and there is no percipient witness who can testify.

5       THE COURT:  My sense of this is, first, that I think

6   it is probably hearsay, or at least that the hearsay problem

7   has not been overcome.  But, more basically, I think this is

8   403.  This is confusing, it is not important, even if it is

9   relevant, it has, in many respects, been covered already, so

10   let's just move on.

11       MR. SIEGEL:  OK, your Honor.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N515car4                          Carroll - Cross

1                (In open court)

2                THE COURT:  See, Mr. Tacopina?  I let you go.

3                MR. TACOPINA:  Thank you, your Honor.  I appreciate

4      that.

5      BY MR. TACOPINA:

6      Q.  I would like to move on to a different topic, Ms. Carroll,

7      regarding some damages that you may claim to have sustained as

8      the cause of this incident.  You testified about Mr. Johnson

9      your ex-husband, we are not going to talk about that again, but

10     that was your last significant relationship?  Yes?

11     A.  Yes.  I dated one -- seriously one fellow after John, yes.

12     Q.  You have testified that every once in a while you would go

13     out on dates?

14     A.  Yes.

15     Q.  You wanted to meet people?

16     A.  Yes.

17     Q.  When you testified -- and Mr. Ferrara asked you this

18     question, not me -- you said that you hadn't had sex since the

19     alleged incident at Bergdorf Goodman with Mr. Trump?

20     A.  That's right.

21     Q.  And you testified at trial -- I am going to read it, your

22     Honor, it is page 215, line 21, to 216, line 2.

23                Are you OK, Mike?

24                MR. FERRARA:  Yes.

25     Q.  Mr. Ferrara was asking you a question, in part he says:  I

N515car4                          Carroll - Cross

1    think we had finished discussing the assault and sort of your

2    immediate steps that you took.  Looking sort of further out,

3    have you had any romantic relationship since the assault?

4              Answer by you:  No.

5              Question:  Why not?

6              Answer by you, in front of this jury:  I -- the short

7    answer is because Donald Trump raped me."

8              You gave that testimony just a few days ago?

9    A.  Yes.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N512Car5                    Carroll - Cross

1   Q.  And was that truthful testimony?

2   A.  Yes.

3   Q.  Okay.  I'm going to show you AQ, which I don't believe is

4   in evidence, Mike, but let me know.  It is not in evidence.

5           MR. TACOPINA:  Your Honor, can I approach counsel just

6   to tell him something?

7           (Counsel confer)

8           MR. TACOPINA:  Could we put up that screenshot right

9   there for Ms. Carroll, please, what you have there, Eric, Chad.

10          THE COURT:  What is the problem with the exhibits,

11  Mr. Tacopina?

12          MR. TACOPINA:  I don't know, your Honor, but here we

13  are.

14          We are here.  May I ask?  Okay.

15  BY MR. TACOPINA:

16  Q.  Ms. Carroll, that is the unstyled podcast you were on

17  with --

18  A.  Yes.

19  Q.  -- Christine Barberich?

20  A.  Yes.

21          MR. TACOPINA:  So this is defense AQ, which I will

22  offer subject to redaction.  It is one snippet that is being

23  played.

24          MR. FERRARA:  I apologize, your Honor.  What we have

25  been handed as AQ is a -- okay.  I think that's -- I think I

Case 23-793, Document 83, 11/20/2023, 3592070, Page42 of 300

N512Car5                         Carroll - Cross

1    understand.  We understand.  Unstyled.  No objection to this

2    much.

3              THE COURT:  To what much?  Is there a paper copy of

4    this so I can be brought into the loop here?

5              MR. TACOPINA:  Hold on.  We are going to give

6    you . . .

7              (Counsel confer)

8              MR. TACOPINA:  The good news is this will be the last

9    time we are going to be doing this, your Honor, so . . .

10             (Counsel confer)

11             THE COURT:  Is somebody going to give me a paper copy

12   or not?

13             MR. TACOPINA:  I have one for your Honor.

14             THE COURT:  Thank you.

15             MR. TACOPINA:  It's actually opened.

16             THE COURT:  So what you have given me is like pages

17   and pages and pages.

18             MR. TACOPINA:  Your Honor, I had it opened, two pages.

19   We are going to give you this.  It is highlighted.  We will

20   give you a highlighted version.  This is the only part that we

21   are offering from AQ.

22             MR. FERRARA:  There is no objection to that portion,

23   your Honor.

24             THE COURT:  Okay.  So what I understand is that I have

25   a transcript marked AQ for identification and it is in excess

Case 23-793, Document 83, 11/20/2023, 3592070, Page43 of 300

N512Car5                        Carroll - Cross

1    of 39 pages long and what you are proposing to do is to play on

2    the AV system, is that right?

3              MR. TACOPINA:  Yes, your Honor.

4              THE COURT:  The portion of a video that corresponds to

5    page 25 -- excuse me, page 36/line 25, beginning with the word

6    "I" as in ice cream, to page 37/line 6.  Right?

7              MR. TACOPINA:  Correct.

8              THE COURT:  Okay.

9              MR. TACOPINA:  May I do that?

10             THE COURT:  Yes, you may.

11             MR. TACOPINA:  So it is offered.  It was received,

12   your Honor?  Yes, sir?

13             THE COURT:  I thought I heard no objection, right?

14             MR. TACOPINA:  Right.  Just making sure it is

15   received.

16             MR. FERRARA:  Your Honor, just I think it is page

17   36/line 21, which I believe is the beginning.

18             THE COURT:  That's not what's highlighted in what I

19   have.  I know these are picky details but, you know, this is

20   court.

21             (Counsel confer)

22             MR. FERRARA:  We would not object if the portion is

23   played from line 21 on page 36 for completeness.

24             MR. TACOPINA:  I agree with him.  We are going to play

25   lines 21 to line 6.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1984

N512Car5                        Carroll - Cross

1          THE COURT:  Through 37/line 6.  All right.  That much
2     is received.
3          (Defendant's Exhibit AQ 36:21-37:6 received in
4     evidence)
5          MR. TACOPINA:  Okay, Ms. Carroll.
6          Are we ready?  Apparently we are ready.
7          (Audio played)
8     BY MR. TACOPINA:
9     Q.  Okay.  So you would agree what you said in that podcast is
10    quite different from what you said to this jury?
11         THE COURT:  First of all, my understanding was that
12    you stopped before the end of the excerpt you said you offered.
13         MR. TACOPINA:  Did we do that?
14         THE COURT:  Yes, you did.
15         MR. TACOPINA:  Eric, can you play the rest of the
16    excerpt?
17         I'm going to read the rest of it in.  Where did we
18    stop.  Mike?
19         (Counsel confer)
20         MR. TACOPINA:  I'm going to read it.
21         THE COURT:  Members of the jury, what Mr. Tacopina is
22    about to do, as I understand, is going to read to you the rest
23    of what he said he was going to play, and it's received.
24         MR. TACOPINA:  Yes, your Honor.
25         Okay.  This is just a lot of fun.  So, Mike, I'm going

1    to start with "my desire for desire was killed."

2    Q.  This is the continuation, Ms. Carroll, "but I think if I

3    had met someone, had the good luck to meet somebody, I think I

4    would have been" -- why are you standing?

5           MR. FERRARA:  I apologize, your Honor.  Mr. Tacopina,

6    I would just ask that Mr. Tacopina read the whole thing from

7    21 --

8           MR. TACOPINA:  Okay.  I will do that.

9           MR. FERRARA:  -- through to the end.

10          MR. TACOPINA:  I will do that.  The problem is -- oh,

11   so page 36.

12   Q.  Okay.  I'm going to read it all, Ms. Carroll, sorry.

13          Your answer in this podcast was:  Well, after the

14   episode in Bergdorf's, I never had sex again, but I think it

15   wasn't because of him.  I think it was I just didn't have the

16   luck to meet that person that would cause me to be desirous

17   again.  I think maybe in that dressing room my desire for

18   desire was killed, but I think if I had met somebody, had the

19   good luck to meet somebody, I think I would have been revived

20   again.  I think the desire would have been boiled up again.  I

21   just think I've been unlucky.  Who knows?  Maybe I'll walk out

22   here on 26th Street and boom."

23          Okay, Mr. Ferrara, Mike?

24          MR. FERRARA:  Yes.  Thank you.

25   BY MR. TACOPINA:

A-1986

N512Car5                         Carroll - Cross

1    Q.  So, Ms. Carroll, you heard yourself say in that podcast

2    that you don't think the reason you have not had sex again

3    since the Bergdorf incident was because of him, meaning Donald

4    Trump.

5    A.  I heard myself say that, yes.

6    Q.  Okay.

7    A.  May I add?

8    Q.  No.  I'm not asking anymore questions on that.  We are

9    going to move right along.  Okay?  Did you want to say

10   something else, though?

11   A.  No.  Go ahead.

12   Q.  Okay.  Now, I'm going to move on.  All right.  Your

13   original lawsuit, the one that the judge said, the first

14   lawsuit was filed in November 2019, only sought damages for

15   your alleged defamation.

16   A.  Yes.

17   Q.  Okay.  And by contrast, your current lawsuit, the one

18   containing the battery, not only seeks damages for defamation,

19   but also seeks emotional damages for your alleged rape.

20   A.  Yes.

21   Q.  And the first edition of your book was July 2019.

22   A.  Yes.

23   Q.  Years before you could sue for emotional injuries stemming

24   from the alleged rape.

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N512Car5                        Carroll - Cross

1   Q.  And in your book with regard to the emotional state

2   following the alleged rape, you wrote -- you know what?  It is

3   in evidence.  AA.  Let's just put that up.

4           MR. TACOPINA:  Mike, it's page 244/lines 23 to 28, but

5   it's in evidence as Defense AA.  You can publish that.

6           MR. FERRARA:  I would just ask to see, for the witness

7   and the parties, your Honor, what exactly Mr. Tacopina --

8           MR. TACOPINA:  It is already in evidence, but we could

9   do that.  It's AA.  Put up page 244/lines 23 to 28.  That's it.

10          MR. FERRARA:  No objection.

11          MR. TACOPINA:  Okay.  You can publish that to the

12  jury, as well, please.  It is.  Okay.

13          So in your book with regard to your emotional state

14  following the alleged rape you wrote, "Indeed, before 2015,

15  when the man began appearing in the newspapers -- in the papers

16  and on TV daily, I rarely thought of it.  When he forced

17  himself on the notice of the entire nation, I, like everyone

18  else, tweeted jokes about him, complained to friends that

19  America was going to hell in a handbasket, and so on.  I am

20  fine.  I can't explain it, but I never suffered."

21          At trial, in explaining that, you said that that was

22  the public E. Jean.

23  A.  Yes.

24  Q.  Not the private E. Jean.

25  A.  Yes.

Case 23-793, Document 83, 11/20/2023, 3592070, Page48 of 300

A-1988

N512Car5                    Carroll - Cross

1    Q.  And so this was from your book.

2    A.  Yes.

3          THE COURT:  We have established.

4    Q.  So was the book in part untruthful?

5    A.  No, the book was written -- no, it was truthful.  The book

6    was truthful.  I just did not reveal my -- my deep self.  I

7    didn't reveal that.  I kept something back.

8    Q.  Well, you would agree this is more than keeping something

9    back.  This is saying completely the opposite, that you are

10   fine and you never suffered?

11         MR. FERRARA:  Objection.  Argumentative.

12         THE COURT:  Sustained.

13   BY MR. TACOPINA:

14   Q.  Well, how about when you, aside from television and your

15   book and advice columns and whatnot and podcasts, how about in

16   your deposition when you testified there, Ms. Carroll, was that

17   the public E. Jean Carroll or the private E. Jean Carroll?

18         MR. FERRARA:  Objection.

19         THE COURT:  Sustained.

20   Q.  Okay.  Before filing your rape cause of action, you

21   testified at a deposition on October 14 that we have heard

22   about from 2022 with respect to your first defamation claim.

23   Yes?

24   A.  Yes.

25   Q.  Okay.  And during that deposition, it was your testimony

N512Car5                          Carroll - Cross

1   that, before 2017, you would have said that this alleged rape

2   had no effect on you in the decades that followed.

3              MR. FERRARA:  Your Honor, may we just have a page?

4              MR. TACOPINA:  Sure.

5              THE COURT:  Of course.

6              MR. TACOPINA:  Page 145.

7              THE COURT:  Read the testimony.

8              MR. TACOPINA:  You want me to read the testimony?

9              THE COURT:  No.  I want you to start by giving us the

10  page.  I'm sorry for interrupting, but you are going to have

11  to --

12             MR. TACOPINA:  Yes, your Honor, you are right.  Page

13  145/lines 10 through 19, start there.

14             THE COURT:  Okay.

15  BY MR. TACOPINA:

16  Q.  I'm sorry.  I'm going to read to you from 10 to 19 --

17             MR. FERRARA:  Your Honor, we think for completeness it

18  should be 10 to 24, your Honor.  In fact, your Honor, to be

19  honest, it should go to 146/line 4.

20             THE COURT:  Mr. Tacopina.

21             MR. TACOPINA:  Whatever you desire, your Honor.

22             THE COURT:  It's not my desire.

23             MR. TACOPINA:  I would like to read from 10 to 19.

24             THE COURT:  I sustain Mr. Ferrara's point.  You go to

25  146/line 4.

Case 23-793, Document 83, 11/20/2023, 3592070, Page50 of 300

A-1990

N512Car5                     Carroll - Cross

1              MR. TACOPINA:  Okay.

2    BY MR. TACOPINA:

3    Q.  Question to you Ms. Carroll during your deposition:

4    "Q  During the two decades that followed, how would you say the

5    alleged attack impacted your life?

6    "A  Well, four or five years ago, I would have told you it had

7    no effect.  I'm as good as new.  This is great.  I'm fine.  I

8    rarely think of it.  But I've come to understand that the rape

9    changed my life, which is shocking for me."

10             THE COURT:  I'm sorry to interrupt, Mr. Tacopina, but

11   you misread a word.

12             MR. TACOPINA:  I did?

13             THE COURT:  Start from "I'm fine."

14             MR. TACOPINA:  Line 5, your Honor?

15             THE COURT:  No, "I'm fine."

16   BY MR. TACOPINA:

17   Q.  "I'm fine.  I rarely think of it.  But I've come to

18   understand that that rape changed my life, which is shocking

19   for me to now understand.

20   "Q  When you say four or five years ago, do you remember when

21   you started this lawsuit?

22   "A  No.  Before that.  Before that.  I'm talking about the time

23   before this.

24   "Q  Before the lawsuit?

25   "A  No, before I wrote the book, before anything.  I was just

Case 23-793, Document 83, 11/20/2023, 3592070, Page51 of 300

1   living my life as a normal person."

2            THE COURT:  You skipped a word.

3   BY MR. TACOPINA:

4   "A  No, before I wrote the book, before anything.  When I was

5   just living my life as a normal person."

6            MR. TACOPINA:  What line am I going to, by the way?

7            THE COURT:  You finished.

8            MR. TACOPINA:  Mike, what line was that?

9            THE COURT:  4.

10           MR. TACOPINA:  That's it?  Okay.  That's it, then.

11           THE COURT:  Is there a question?

12           MR. TACOPINA:  Yes.

13  BY MR. TACOPINA:

14  Q.  So in the decades that followed the alleged attack, you

15  thought things were fine.

16  A.  No, I didn't.

17  Q.  Well, you just heard your testimony that --

18           THE COURT:  Sustained.

19           MR. TACOPINA:  Okay.

20  Q.  In fact, according to you, you rarely thought of this

21  supposed rape by Donald Trump?

22  A.  Well, I -- when I say the word "think," that is a process

23  that I believe when I plan, when I write, I'm thinking of

24  concepts.  I didn't mention that I have intrusions.  That's not

25  thinking to me.  I had the images coming into my head.  That's

Case 23-793, Document 83, 11/20/2023, 3592070, Page52 of 300

N512Car5                        Carroll - Cross

1   something entirely different, the intrusions of the day in

2   Bergdorf Goodman.

3   Q.  Okay.  The question you were asked during the deposition

4   was how this impacted your life, this attack, and you didn't

5   narrow it down to when you think about it.  You just said:  I

6   rarely think of it, but I understand that it's come -- you

7   understand that rape -- the rape -- that that rape has changed

8   your life?

9   A.  When I say rarely think, when I actually think of what

10  happened as a concept and review it.  I'm not talking about the

11  hideous, vile intrusions that rise up through my head, whether

12  I want them or not.  I have come to believe and to understand

13  that I was not fine.  That I put on the -- I put on the

14  pleasant, you know, go-get-'em face that I have always had.

15  Q.  And it's your story that your perception only started to

16  change in 2017.

17           MR. FERRARA:  Objection.

18           THE COURT:  Does that purport to be a summary of the

19  testimony you read?

20           MR. TACOPINA:  That just purports to be a question.  I

21  could read it from the transcript of the deposition, your

22  Honor.  I'm just asking a question, but I will cite page --

23           THE COURT:  Let's rephrase it.

24           MR. TACOPINA:  Okay.

25  BY MR. TACOPINA:

N512Car5                        Carroll - Cross

1   Q.  Is it true that your perception only started to change in

2   2017?

3   A.  My perceptions were changing a little bit all of the time,

4   like everyone's.  Everyone's perceptions undergo daily change.

5   I was living through that and I was coming to understand some

6   very terrible things that I didn't want to face, did not want

7   to face.

8   Q.  And that perception really started to change with the Me

9   Too movement and Harvey Weinstein coming out.

10  A.  It changed -- it was one story, the Harvey Weinstein story.

11  Q.  By the way, Ms. Carroll, you have never been diagnosed with

12  anxiety or depression?

13  A.  No.

14  Q.  You have never taken an antidepressant or other medication

15  to cope --

16  A.  No.

17  Q.  -- with any of the alleged emotional distress from

18  supposedly being assaulted by Donald Trump?

19  A.  No.

20  Q.  No doctor has ever recommended that you take an

21  antidepressant or any type of prescription drug?

22  A.  No.

23  Q.  In fact, in the years since 1995, you never saw a mental

24  health professional.

25  A.  I have never seen a mental health professional.

Case 23-793, Document 83, 11/20/2023, 3592070, Page54 of 300

A-1994

N512Car5                          Carroll - Cross

1    Q.  Okay.

2    A.  I wish I had?

3               THE COURT:  Mr. Tacopina, are we near the end or not?

4               MR. TACOPINA:  We are getting close, your Honor.  We

5    are.

6               THE COURT:  Define "close."  I want to know if we

7    should take a break.

8               MR. TACOPINA:  Ten or 15.

9               THE COURT:  We will take a break.

10              See you in 15 minutes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 23-793, Document 83, 11/20/2023, 3592070, Page55 of 300

A-1995

N512Car5                         Carroll - Cross

1              (Jury not present)

2              MR. TACOPINA:  Less than 10.

3              THE COURT:  You said by lunch.  You said by lunch.

4              MR. TACOPINA:  Things got a little complicated with

5      the . . .

6              THE COURT:  Yeah.

7              MR. TACOPINA:  Did I say by lunch?

8              THE COURT:  Yeah, you did.

9              MR. TACOPINA:  I didn't eat yet, your Honor.

10             THE COURT:  That's okay.  I want to keep you hungry.

11      Maybe if you make it in 10 your colleague will get you

12      some Kansas City ribs for dinner.

13             MR. BRANDT:  That I will do.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Case 23-793, Document 83, 11/20/2023, 3592070, Page56 of 300

N512Car5                        Carroll - Cross

1              (Jury present)

2              THE COURT:  Okay, folks.  Mr. Tacopina.

3              MR. TACOPINA:  Thank you, your Honor.

4    BY MR. TACOPINA:

5    Q.  The reason, Ms. Carroll, you never saw a mental health

6    professional in these past decades is because you feel you are

7    happy, well adjusted, and that your life is going well.

8              MR. FERRARA:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10   BY MR. TACOPINA:

11   Q.  After filing your cause of action for the battery case,

12   this one, on November 24, 2022, when you began seeking

13   emotional damages for the alleged rape by Donald Trump, you

14   testified again in another deposition on January 31 of this

15   year, 2023.

16   A.  Yes.

17   Q.  And that was after you met with Dr. Lebowitz?

18   A.  Yes.

19   Q.  And Dr. Lebowitz is a psychologist, right?

20   A.  Yes.

21   Q.  And he is the one hired for this litigation to support your

22   claim of emotional damages for the alleged rape?

23   A.  She.

24   Q.  She.  I'm sorry.

25   A.  Yes.

Case 23-793, Document 83, 11/20/2023, 3592070, Page57 of 300

N512Car5                          Carroll - Cross

1   Q.  And during your deposition on January 31 of this year, it

2   was your testimony that the alleged rape was an underlying

3   theme of your life?

4           THE COURT:  Look, if you are going to quote testimony,

5   you are going to quote testimony.

6           MR. TACOPINA:  Okay, I was . . .

7           Page 19 of the January 31, 2023 deposition transcript.

8   Line 25, on page 19, Mike, to line 11 on page 20.

9           MR. FERRARA:  No objection.

10          MR. TACOPINA:  Okay.

11          THE COURT:  I'm sorry.  What did you say, Mr. Ferrara?

12          MR. FERRARA:  No objection, your Honor.

13          THE COURT:  Go ahead and read it.

14          MR. TACOPINA:  Okay.

15  BY MR. TACOPINA:

16  "Q  How have you worked to push memories away of the alleged

17  incident in your" -- "alleged incident in your complaint with

18  Donald Trump?

19  "A  It's an ongoing project.  It's an underlying theme of my

20  life.  It -- a vision or a -- a word or a -- an image or a

21  piece of tape or just a flash of a photo will occur in my mind,

22  and I will bat it away, and if it comes back, I -- I have to

23  consciously shove it away, and then I continue with my day."

24          And that was truthful testimony.

25  A.  Yes.

Case 23-793, Document 83, 11/20/2023, 3592070, Page58 of 300

N512Car5                    Carroll - Cross

1   Q.  Now -- withdrawn, withdrawn.

2              You testified on January 31, 2023, that you start

3   experiencing -- I'm asking in general in the deposition,

4   experiencing images arising in your head shortly after you left

5   Bergdorf?

6   A.  Yes, very shortly.

7   Q.  And during that same deposition, you testified that these

8   episodes started to occur less often in 2016?

9   A.  I had to learn how to handle so many images of Donald Trump

10  coming at me across all media because he declared for the

11  presidency in 2015.  So I had to get used to seeing him

12  everywhere.

13  Q.  I am going to show you what is marked as Defense Exhibit

14  CU, Ms. Carroll.

15             (Counsel confer)

16             THE COURT:  Could we just move this along now.

17             MR. TACOPINA:  We are going to be done in a second,

18  your Honor.  We have moved a lot along.

19             THE COURT:  A second?  Okay.

20             MR. TACOPINA:  A minute?

21             (Counsel confer)

22  BY MR. TACOPINA:

23  Q.  Defense Exhibit CU, Ms. Carroll, is before you.

24             MR. TACOPINA:  Please turn the slide.  We are

25  redacting something, your Honor, at the plaintiff's request,

                    N512Car5                      Carroll - Cross

1    properly.

2              THE COURT:  Am I to get a copy of this now?

3              MR. FERRARA:  I am familiar with it, your Honor.  I

4    can hand mine up.

5              THE COURT:  Thank you.

6              MR. TACOPINA:  Okay?  All right.

7         Your Honor, we are redacting the bottom two

8    attributions, but Defendant's Exhibit CU, please show

9    Ms. Carroll, the second page.  Okay.

10             THE COURT:  This is in evidence, I take it, yes?

11             MR. TACOPINA:  It is in evidence as PX 121, your

12   Honor, without -- the photo is in evidence but without the

13   Instagram posting and without the attribution below, so we are

14   putting this in.

15             THE COURT:  All right.

16             MR. TACOPINA:  Okay.  As a matter of fact, I would

17   offer it, your Honor, to make this a little easier, offer it as

18   Defense CU.

19             THE COURT:  Received as redacted.

20             (Defendant's Exhibit CU redacted received in evidence)

21             MR. TACOPINA:  Please publish to the jury.

22   BY MR. TACOPINA:

23   Q.  So this you were asked about on your direct testimony.

24   After claiming to be raped by Donald Trump, you started this --

25   at some point after you started this hideous men walking tour

                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page60 of 300

A-2000

N512Car5                        Carroll - Cross

1    in New York City.

2    A.  Yes.

3    Q.  And what was the walking tour?

4    A.  The walking tour was I noticed that in New York, New York

5    has the best walking tours in the whole world.  You can have a

6    walking tour to look at homes of gangsters, a walking tour to

7    see the homes of famous writers, a walking tour to see the

8    homes of famous murderers, and I thought it might be

9    instructive to have a walking tour visiting the buildings where

10   hideous men resided and the men who mistreated women.

11   Q.  Okay.

12   A.  But it turned out that the men were rarely mentioned.  What

13   I zeroed in on were the women who stood up to them.

14   Q.  Okay.  But if I were to join you on your walking tour,

15   where would we be going?

16   A.  You would be starting out at Tiffany's, where even up to

17   the '90s, the executive women who worked at Tiffany's were not

18   allowed to speak up at meetings.  They were told not to be

19   aggressive until Paula Smith decided that she would speak up at

20   a meeting and they tried to fire her.

21          THE COURT:  Ms. Carroll, please, the hour grows late.

22          THE WITNESS:  Okay.

23          THE COURT:  The question is if Mr. Tacopina were to

24   join you, where would you be going.

25          THE WITNESS:  Okay, we would be going to Tiffany's

N512Car5                    Carroll - Cross

1    first.

2    BY MR. TACOPINA:

3    Q.  Then?  Where else?

4    A.  Then to NBC, Rockefeller Center; and then to -- we would

5    cross over Sixth Avenue and go to Fox News and then -- for Bill

6    O'Reilly; then we would go to CBS.

7    Q.  Anywhere else?

8    A.  That's roughly an outline, and then to the place where

9    Studio 54 was, yes.

10   Q.  Okay.

11   A.  That's a rough outline.  There were stops along the way.

12   Q.  And you posted this picture of yourself standing next to a

13   man wearing a Donald Trump mask holding a banner --

14   A.  Yes.

15   Q.  -- on your tour you post that on your Instagram.

16   A.  Yes.

17   Q.  Okay.  And you are smiling.

18   A.  Yes.

19   Q.  You were having a fabulous time there?

20   A.  It was a very instructive tour.

21        MR. TACOPINA:  Your Honor --

22   Q.  By the way, what's -- why the orange jumpsuit?

23   A.  It was my way of saying some of these hideous men, some of

24   the men on the tour were, for instance, Weinstein, Cosby, they

25   had yet to be put in jail, so for this particular tour, I wore

N512Car5                     Carroll - Redirect

1    an orange jumpsuit.

2            MR. TACOPINA:  Okay.  Your Honor, last thing, I'm just

3    going to play a snippet of what's already in evidence, Defense

4    Exhibit BV.  But for you, I prepared a special transcript that

5    just has the front, the exact line we are playing, and the

6    certification?

7            THE COURT:  I'm honored.

8            MR. TACOPINA:  That's special for you, your Honor.

9            Here, here.

10           MR. FERRARA:  Thank you so much.

11   BY MR. TACOPINA:

12   Q.  Okay.  This is in evidence.  It is BV.  Ms. Carroll, I'm

13   just going to plea you a snippet of your podcast interview from

14   the Maris Review from December 2019.  Okay?

15   A.  All right.

16   Q.  All right.  Let's go.  Nope.

17           (Audio played)

18           MR. TACOPINA:  Thank you.  No further questions, your

19   Honor.

20           THE COURT:  Thank you.  Redirect.

21           MR. FERRARA:  Thank you, your Honor.

22           THE COURT:  Mr. Ferrara.

23   REDIRECT EXAMINATION

24   BY MR. FERRARA:

25   Q.  Good afternoon, Ms. Carroll.

Case 23-793, Document 83, 11/20/2023, 3592070, Page63 of 300

A-2003

N512Car5                         Carroll - Redirect

1    A.  Good afternoon, Mr. Ferrara.

2    Q.  So Mr. Tacopina there just played an excerpt of an

3    interview in which you said you were fabulous.  You heard that?

4    A.  Yes.

5    Q.  He played several other examples of you being interviewed

6    saying you were great.  Do you recall those?

7    A.  Yes.

8    Q.  About enjoying positive moments in the case.

9    A.  Yes.

10   Q.  Do you recall those questions?

11   A.  Yes.

12   Q.  Have you also had negative moments throughout the case?

13   A.  Yes, but I never mention them.

14   Q.  Ms. Carroll, do you believe there is a right way for a

15   person to live their life as someone who has been raped?

16   A.  No.

17   Q.  Do you believe there is anything wrong with a person who

18   has been raped finding happiness later in life?

19   A.  No.

20          MR. TACOPINA:  Objection to the form of that question.

21          THE COURT:  To the form?

22          MR. TACOPINA:  Yes.  First of all, it's leading.

23          THE COURT:  Sustained.

24   BY MR. FERRARA:

25   Q.  Have you -- how do you feel about having found some

1    happiness later in your life, Ms. Carroll?

2    A.  I feel, uh, I feel good.  I feel good about it.  It took

3    some -- yeah, that's the goal of all of us in this courtroom,

4    just to find a little bit of happiness.

5    Q.  How, if at all, has bringing this lawsuit given you a sense

6    of control over your life?

7    A.  Instead of living with the feeling of shame, which I've

8    always covered up and living with the feeling that I caused

9    this horrible thing to happen, by telling my story, I started

10   to take a little bit of control, and it's been a long way, and

11   this is a very satisfying moment for me to be here to answer

12   your questions.

13   Q.  Ms. Carroll, help us understand why you said in those

14   interviews that you were fabulous but in this courtroom you

15   have testified to real harm flowing from the assault?

16   A.  If anyone on the street came up to me before -- as I was

17   coming in today and said, E. Jean, how are you?  I would say,

18   I'm fine.  I am fabulous.  It's just the way I answer people.

19   I don't -- I don't want to tell -- I don't want to tell people

20   horrible things.  I want them to know that I feel fine and how

21   are they?  When I meet someone -- and when someone asks me how

22   I am, I am more concerned with the person who is asking.  I

23   don't want to upset their day.  I don't want to, as I said,

24   unload on them.

25   Q.  So Mr. Tacopina asked you about a podcast in which you said

Case 23-793, Document 83, 11/20/2023, 3592070, Page65 of 300

A-2005

N512Car5                        Carroll - Redirect

1   that your desire for desire was killed.  Do you recall that?

2   A.  Yes.

3   Q.  I believe you said in that podcast that if you met the

4   right person again, maybe the desire would have boiled up

5   again.  Do you remember that?

6   A.  Yes.

7   Q.  Has it?

8   A.  Well, that's -- that's the thing about luck.  You make your

9   own luck in this life.  I believe in luck.  I really am a

10  strong believer in success.  People who are successful have a

11  lot of luck.  But here's the thing.  I was killing my own luck.

12  I was getting in the way of my own luck.  I made sure I wasn't

13  lucky.  I just made sure I didn't meet the person because I

14  didn't allow myself to flirt or smile at a possible romantic

15  partner.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

N515car6                         Carroll - Redirect

1    BY MR. FERRARA:

2    Q.  Why not?

3    A.  Because smiling and flirting got me into a heck of a lot of

4    trouble.

5    Q.  What are you referring to, Ms. Carroll?  Just to clarify.

6    A.  Donald Trump, in the dressing room, at Bergdorf.

7    Q.  I apologize in advance, I might jump around a little bit,

8    Ms. Carroll.

9           Mr. Tacopina showed you a text message that you sent

10   to Carol Martin's daughter.  Do you recall those questions?

11   A.  Yes.

12   Q.  Why was it important to you to reassure Ms. Martin's

13   daughter regarding safety?

14   A.  Ms. Martin's daughter, her -- Ms. Martin's daughter's

15   daughter was in nursery school and her daughter felt really

16   unsafe and wanted to withdraw, take her child out of nursery

17   school because she was worried -- frantic -- that her child

18   would be hurt because her mother was going on the record as the

19   second woman I told.  And I wanted to reassure her that I

20   thought she would be safe, that I felt safe.  And I did feel

21   safe in New York.  New York is the best place in the world, I

22   felt very safe here.

23          So when I told her, look, I can walk the streets, you

24   are fine, go ahead.  I wanted her to keep her daughter in

25   school.

N515car6                         Carroll – Redirect

1   Q.  You were also asked some questions about an e-mail to you

2   regarding an episode of a television show.  Do you recall that?

3   An episode of SVU.  Do you recall that?

4   A.  Yes.

5   Q.  Have you ever seen that episode?

6   A.  Never.

7   Q.  Had you ever seen it or heard of it before you wrote your

8   book?

9   A.  Never.

10  Q.  Sitting here today, do you have any idea what actually

11  happens in that episode of television?

12  A.  No.

13  Q.  Are you making up your accusation based on what happened in

14  a popular TV show?

15  A.  No.  No.

16  Q.  Mr. Tacopina showed you, I believe it was Defendant's

17  Exhibit AJ, which was a text you sent to Lisa Birnbach on June

18  23, about giving her a chapter of the book at Carmine's.  Do

19  you recall this?

20  A.  Yes.

21  Q.  I want to show you what's been marked for identification as

22  Plaintiff's Exhibit 103.  Do you recognize this, Ms. Carroll?

23  A.  Yes.

24  Q.  Is this an e-mail from you to Lisa Birnbach and Francis

25  Martin?

Case 23-793, Document 83, 11/20/2023, 3592070, Page68 of 300

N515car6                         Carroll - Redirect

1   A.  Yes.  Carol Martin, yes.

2   Q.  Sorry, that name, that is Carol Martin?

3   A.  Yes.

4   Q.  What is the date of this?

5   A.  June 9, 2019.

6   Q.  Does it concern the dinner at Carmine's?

7          THE COURT:  Are you offering this?

8          MR. FERRARA:  Your Honor I just was establishing the

9   relevance with the Court before I did.

10  A.  Yes.  I mentioned I handed Carol an --

11         MR. FERRARA:  I apologize, I don't mean to cut you off

12  Ms. Carroll.  I only wanted to briefly establish the relevance.

13         I offer Plaintiff's Exhibit 103.

14         MR. TACOPINA:  Can I see the rest of it?

15         MR. FERRARA:  Sure.

16         MR. TACOPINA:  No objection.

17         THE COURT:  Received.

18         (Plaintiff's Exhibit 103 received in evidence)

19         MR. TACOPINA:  Mr. Lam, can you show that to the

20  jurors?

21  BY MR. FERRARA:

22  Q.  I want to call your attention to the sort of first main

23  paragraph where you describe giving each an early hard copy of

24  a portion of the book when we dined at Carmine's.  And, of

25  course, neither of you read it.

N515car6                          Carroll - Redirect

1              Do you see that?

2    A.  Uh-huh.

3    Q.  Do you recall whether this was two weeks before the exhibit

4    that Mr. Tacopina showed you regarding the reporter?  Do you

5    recall?

6              MR. TACOPINA:  Your Honor, it is a leading question

7    but I'm loathe to object, but.

8              THE COURT:  But what?  Sorry?

9              MR. TACOPINA:  I'm objecting.  It is a leading

10   question, so.  I am objecting.

11             THE COURT:  Sustained as to form.

12   BY MR. FERRARA:

13   Q.  Do you recall, Ms. Carroll, sitting here today, when you

14   sent this e-mail in relation to the text you sent in

15   Defendant's Exhibit AJ?

16   A.  AJ is, what was it?  What was AJ?

17             MR. FERRARA:  Can we show, can I enlist your help,

18   Mr. Tacopina, to show the witness Defendant's Exhibit AJ?

19             Your Honor, I withdraw it.  The exhibit speaks for

20   themselves.  I withdraw it.  I apologize for the delay.  We can

21   move on.  We can bring this down.  Thank you.

22   Q.  Ms. Carroll, Mr. Tacopina asked you why you didn't scream

23   during the encounter.  Do you recall that?

24   A.  Yes.

25   Q.  Why did those questions affect you the way they did?

N515car6                          Carroll - Redirect

1    A.  It was startling to me that in 2023 a woman would be asked

2    if she screamed.

3              MR. TACOPINA:  Your Honor, I object to that.  Ask that

4    be stricken.

5              THE COURT:  Overruled.

6    Q.  Mr. Tacopina also asked about laughing during the assault.

7    Do you remember that?

8    A.  Yes.

9    Q.  Have you ever tried to hide the fact that you laughed

10   during the assault, Ms. Carroll?

11   A.  No.  No.

12   Q.  He also asked you many times about not having gone to the

13   police.  Do you recall those questions?

14   A.  Yes.  Yes.

15   Q.  Have you ever tried to hide that you did not go to the

16   police?

17   A.  No.  I wanted women to know I did not go to the police

18   because many women do not go to the police.

19   Q.  Ms. Carroll, how old was -- if you know, how old was

20   Mr. Trump when he assaulted you?

21   A.  He was two or three years younger than me.  So, I was 52,

22   so he was 49 or 50.

23   Q.  Mr. Tacopina asked, showed you some of your advice columns

24   in which you gave advice to readers who go to the police, for

25   instance.

Case 23-793, Document 83, 11/20/2023, 3592070, Page71 of 300

A-2011

N515car6                          Carroll - Redirect

1   A.  Yes.

2   Q.  Do you recall those?

3   A.  Yes.

4   Q.  Why didn't you take your own advice, Ms. Carroll?

5   A.  Because Donald Trump was a very powerful -- first of all, I

6   wouldn't go to the police.  I just wouldn't go to the police.

7   It was too shameful to go to the police.  Donald Trump had too

8   much power, he knew everybody in New York.  I didn't think the

9   police would take me seriously.  I thought it was my fault.  I

10  just wouldn't go to the police.  Women my age just put our

11  chins up, took our licks, and went right on.  That's how we

12  were trained.  We weren't told to go to the police.  As it

13  turns out, I have looked this up, according to the National

14  Institute --

15          MR. TACOPINA:  Objection, your Honor.

16          THE COURT:  Sustained.

17          THE WITNESS:  OK.

18  Q.  Mr. Tacopina also asked you, Ms. Carroll, about your not

19  having sued Les Moonves.  Do you remember those questions?

20  A.  Say that again?

21  Q.  Mr. Tacopina asked about the fact that you have not sued

22  Les Moonves.  Do you recall that?

23  A.  Yes.

24  Q.  What did Les Moonves do to you?

25  A.  He pushed up against me in an elevator.

N515car6                         Carroll - Redirect

1   Q.  Did he rape you?

2   A.  No.

3   Q.  Mr. Tacopina asked when you recalled the fact that you hit

4   Mr. Trump with your purse.  Do you remember that question?

5   A.  Yes.

6   Q.  I believe you testified you have always recalled that fact.

7   Do you remember saying that?

8   A.  Yes.

9   Q.  I want to show the witness a page of her January 31, 2023

10  deposition, page 42, lines 18 and 19, and this will be just for

11  the -- we can actually -- Mr. Lam, if we can go back to the

12  full image?

13           MR. TACOPINA:  Your Honor, I would object to this on

14  hearsay grounds.  She is not a party opponent, obviously, to

15  them, of course.

16           THE COURT:  Sorry.  I'm confused.  This is a

17  deposition of the witness?

18           MR. TACOPINA:  Of her, yes.

19           MR. FERRARA:  It is a prior consistent statement, your

20  Honor.

21           THE COURT:  To rebut an accusation of recent

22  fabrication.

23           MR. FERRARA:  Yes, your Honor.

24           THE COURT:  Members of the jury, what you are about to

25  see, according to counsel, is testimony that the witness gave

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2013

N515car6                          Carroll - Redirect

1    in January 2023.  It is not to be considered for the truth of

2    what she said but the suggestion, as I recall it -- and you

3    will remember and your memory will control -- the suggestion

4    was made in opening statement and on cross-examination that

5    Ms. Carroll came up with the assertion that she hit Mr. Trump

6    with the purse only recently.  This is offered to show

7    plaintiff claims that she said that on January 31, 2023, at

8    least.

9    BY MR. FERRARA:

10   Q.  Before we show the jurors the relevant portion,

11   Ms. Carroll, at this point, for clarity, at this point in the

12   deposition, are you testifying about some of the flashbacks

13   that you told us about?

14   A.  Yes.

15          MR. FERRARA:  Mr. Lam, if we can highlight and publish

16   for the jury page 42, line 18 and 19?

17   Q.  Was that truthful testimony, Ms. Carroll?

18   A.  Yes.

19          MR. FERRARA:  We can take that down, Mr. Lam.  Thank

20   you.

21   Q.  Ms. Carroll, Mr. Tacopina spent some time talking about the

22   hideous men list.  Do you remember that?

23   A.  Yes.

24   Q.  How many men are on the list, Ms. Carroll?

25   A.  21.

N515car6                         Carroll - Redirect

1    Q.  How old are you?

2    A.  Almost 80.

3    Q.  How many men have you met in your life?

4    A.  Thousands.

5    Q.  And how many of those are not hideous?

6    A.  Thousands are not hideous.  Most of them are pretty, pretty

7    wonderful guys.

8    Q.  Do you recall, Mr. Tacopina also asked you if you ever

9    testified before that Mr. Trump guided you into the dressing

10   room by your arm.

11           Do you recall that?

12   A.  Yes.  I think I do.

13   Q.  I want to show you -- I want show the witness the October

14   24, 2023 deposition, page 111, line 17 to 22.

15           THE COURT:  I think you misspoke as to the year.

16   2022.

17           MR. FERRARA:  Oh.  Pardon me, your Honor.  I did. it

18   is the October 2022 deposition, page 111, line 17 to 22.  Your

19   Honor, I believe, without objection, we would like to show this

20   to the jury.

21           MR. TACOPINA:  Your Honor, yes, with the same

22   instruction as before.

23           THE COURT:  Yes.

24           Members of the jury, you may consider this bit of

25   testimony you are about to be shown for the same purpose as the

1    prior piece, not for the truth of the matter, it is to rebut a

2    suggestion of recent fabrication.

3                MR. FERRARA:  If we can publish that?

4                THE COURT:  Yes.

5                MR. FERRARA:  Thank you, Mr. Lam.

6    Q.  Was that truthful testimony, Ms. Carroll?

7    A.  Yes.

8    Q.  To be clear -- I just want to be totally clear and fair --

9    you are not suggesting he was dragging you by the arm?

10   A.  No.  It was just a light tug on the elbow.

11               MR. FERRARA:  We can take that down.  Thank you.

12   Q.  Do you recall Mr. Tacopina asked you whether it had

13   occurred to you before your call with Lisa Birnbach that you

14   had been raped?  Just do you recall that line of questioning.

15   A.  I do recall the line of questioning, yes.

16   Q.  And he asked you about your statement when Lisa said he

17   raped you brought the reality to the forefront of your mind.

18   Do you remember saying that?

19   A.  Yes.

20   Q.  Ms. Carroll, was there ever a doubt in your mind about what

21   had happened in that dressing room?

22   A.  My -- oh.  Where I am sitting here today was there ever a

23   doubt?  No.  No doubt.  But the seconds, the minutes following

24   it I -- it was -- the floods through my body, I guess it is

25   adrenaline, my overwhelming thought was I had died and was

N515car6                         Carroll - Redirect

1   somehow still alive.  That was -- really.  It took me minutes,

2   well seconds, and then minutes.  And even when Lisa said it, it

3   took a real effort for me to take it in.

4   Q.  Was -- sorry.

5   A.  Yes.  Lisa is the one who focused my brain for that moment.

6   It was Lisa saying that.

7   Q.  Was there ever any doubt in your mind that Mr. Trump had

8   penetrated you with his fingers and penis?

9   A.  Oh, never a doubt about that.

10  Q.  Was there a doubt in your mind that you tried to shove him

11  away?

12  A.  Oh, no.  There was never a doubt about that.

13  Q.  Was there ever a doubt in your mind regarding whether you

14  had consented to this, to what he had done to you?

15  A.  Never.  The minute that door shut I -- there was no

16  consent.

17  Q.  Was there ever a doubt in your mind that you hit him in the

18  head with your purse?

19  A.  I believe I hit him in the head with my purse that year.

20  Q.  Was there ever a doubt in your mind that you tried to fight

21  him off?

22  A.  No.  Never.  That's how I got out.

23  Q.  Before you spoke to Ms. Birnbach how, if at all, have you

24  processed all of that information?

25  A.  Before I had?

N515car6                         Carroll - Redirect

1    Q.  Before.

2    A.  I hadn't processed.  I was just happy to somehow find

3    myself alive when I thought I had been killed.  It was just --

4    it's almost impossible, it seemed like the whole front of my

5    head had been wiped out.  I couldn't think.  I could --

6    whatever I did, I did the right thing because I got out.  So,

7    it was going to take my brain a few minutes to catch up with my

8    body.  My body did the right thing, my body got out, so it

9    took -- I was a little behind on putting it together.

10   Q.  Mr. Tacopina asked you a few questions about your contract

11   with *Elle* magazine.  Do you remember those?

12   A.  Yes.

13   Q.  Is there a difference between trying to get out of your

14   contract with *Elle* versus being fired?

15   A.  Yes.

16   Q.  What is that?  What is the difference?

17   A.  Well, I loved *Elle*.  And when they cut me, cut down my

18   pages and when my readership started falling after the

19   president called me a liar, I was feeling a little bereft, so I

20   thought, well, let's see what else -- maybe I can move the

21   column to a magazine that would, you know, really love my

22   readers as much as I did.  So, yes, I thought, *Listen, E. Jean,*

23   *let's move on.  Let's move on.*  So I talked to The Atlantic.

24   Q.  When you lost your job at *Elle* magazine, what other parts

25   of your life did you lose as a result?

N515car6                      Carroll - Redirect

1   A.  I -- it is strange.  I always thought of myself as Ask E.

2   Jean, the female Don Quixote righting wrongs.  I know it sounds

3   crazy seeing me at 79 thinking I can right wrongs, but it

4   changed how I -- you know, jobs are important.  Each one of us

5   are -- what we do for a living is important and to have it

6   taken away was devastating.  I really didn't recover for about

7   a year.

8   Q.  Mr. Tacopina also showed you a joke you made about having

9   sex with Donald Trump for money.  Do you recall that?

10  A.  Yeah.  Yes, I do.

11  Q.  Why do you joke about difficult things in your life?

12          MR. TACOPINA:  Objection.

13          THE COURT:  Overruled.

14          MR. TACOPINA:  Your Honor, it's -- OK.  Leading but --

15  OK.

16          THE COURT:  No, it wasn't, actually.  It was as

17  open-ended a question as I can imagine.

18          MR. TACOPINA:  Well, yes, your Honor, except the

19  question that precedes it doesn't mention -- or the answer has

20  nothing to do with difficult things in her life but -- it

21  assumes a fact that has not been testified to before that she

22  jokes about things in her life.

23          THE COURT:  Well, all right.  Rephrase it.

24  BY MR. FERRARA:

25  Q.  Ms. Carroll, why did you joke about having sex with Donald

Case 23-793, Document 83, 11/20/2023, 3592070, Page79 of 300

N515car6                         Carroll - Redirect

1    Trump?

2    A.  For thousands of years if women haven't laughed at what men

3    have done to them we just couldn't go on.  It is a way of

4    dealing with terrible things.  You laugh, and when you laugh

5    you lift your spirits just for maybe a second, maybe for a

6    minute, maybe for a half day.  When you laugh it makes you feel

7    better.  It's much better to laugh at something, I think, than

8    to cry about something.  I just -- laughter picks up my

9    spirits, that's it.  That's my -- I may have a dark comic view

10   of what occurred but that's my way of dealing with it, that's

11   my way of lifting my spirits.

12   Q.  Mr. Tacopina also asked you about a number of TV shows that

13   you have appeared on since you spoke publicly about Donald

14   Trump assaulting you.  Do you remember those questions?

15   A.  Yes.

16   Q.  Ms. Carroll, was your TV show, *Ask E. Jean*, was that show

17   on TV before or after you spoke publicly about Mr. Trump

18   assaulting you?

19   A.  Before.

20   Q.  How many years was it on?

21   A.  It was on from '94 to '96.

22   Q.  How many days a week did it air?

23   A.  It aired five days a week, twice a day.

24   Q.  For how long did you write for Saturday Night Live?

25   A.  A year.  1987.

N515car6                              Carroll - Redirect

1   Q.  Were you on other TV programs before you spoke publicly

2   about Mr. Trump assaulting you?

3   A.  Yes.

4   Q.  Why was it important to you to speak publicly about what

5   Mr. Trump had done to you?

6   A.  Because I had been silent for 76 years.  It was just time.

7   I was sick of staying silent.  It was just time.  It was time.

8   76 years is a long time to stay silent.

9   Q.  Were you spreading lies about Mr. Trump during those

10  appearances?

11  A.  No.

12  Q.  Mr. Tacopina asked why, during those TV appearances,

13  whether you had cried.  Do you recall that?

14  A.  Yes, I remember.

15  Q.  Were you asked during those appearances, Ms. Carroll,

16  repeatedly, why you didn't scream?

17  A.  I was -- I was rarely asked any detail about the attack.

18  Q.  Were you asked during those appearances to discuss, in

19  depth, the shame that you feel?

20  A.  No.

21  Q.  Were you called a liar on any of those TV appearances?

22  A.  No.

23  Q.  Were you asked the difference between what it feels like to

24  have a man rummage around in your vagina versus insert his

25  fingers in your vagina?  Were you ever asked that question on

Case 23-793, Document 83, 11/20/2023, 3592070, Page81 of 300

A-2021

N515car6                          Carroll – Redirect

1    any of those TV appearances?

2    A.  No.  Never.

3           MR. FERRARA:  Your Honor, I have a few more questions

4    which turn on one last exhibit which I have discussed with

5    defense counsel and I don't know if -- I will just --

6           (Counsel conferring)

7           MR. FERRARA:  Your Honor, I have a few more questions

8    including an exhibit and I believe we would like to approach to

9    discuss one potential redaction to the exhibit before I show it

10   to the jurors.

11          THE COURT:  Very well.

12          (Continued next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

N515car6                        Carroll - Redirect

1              (At side bar)

2              MR. TACOPINA:  Close.

3              THE COURT:  Maybe.

4              MR. FERRARA:  For the record, I'm referring to what's

5    been marked for identification Plaintiff's Exhibit 57, this is

6    an e-mail, and your Honor is holding an unredacted copy and we

7    have a redacted copy.  The unredacted version is Plaintiff's

8    Exhibit 50 and the redacted copy is Plaintiff's Exhibit 57.  We

9    would like to redact the reference to --

10             THE COURT:  Yes, I know.

11             MR. FERRARA:  -- *Who names their cat vagina?  A whore,*

12   *that's who.*  We believe it is 412 and basis to redact.

13             MR. TACOPINA:  I don't think it is basis to redact.

14   I'm not going to question her about it but this is an e-mail

15   they're introducing from -- who is it from?

16             MR. FERRARA:  She doesn't know who.

17             MR. TACOPINA:  Somebody who harassed her?

18             MR. FERRARA:  Yes.

19             MR. TACOPINA:  OK.  So, someone who harassed her.  If

20   we are going to get into the harassment from an individual who

21   is unknown --

22             THE COURT:  I'm confused.  It is an e-mail from what?

23             MR. FERRARA:  This is one of the e-mails that

24   Ms. Carroll will testify she received after Mr. Trump made his

25   October 2022 denial.  It is part of the sort of hate mail, it

Case 23-793, Document 83, 11/20/2023, 3592070, Page83 of 300

A-2023

N515car6                          Carroll - Redirect

1   goes to damages.  We do not -- we think that it is -- that the

2   idea of Vagina T. Fireball, there is improper inference that

3   flows under 412 that Ms. Carroll is some sort of -- he is

4   calling her a whore, etc.  We think that that is inappropriate.

5              THE COURT:  It is out under 403, 412, and 402.

6              MR. FERRARA:  Thank you, your Honor.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N515car6                        Carroll - Redirect

1              (In open court)

2              THE COURT:  Let's go.

3     BY MR. FERRARA:

4     Q.  I want to show you one more document and I believe it's

5     marked for identification as Plaintiff's Exhibit 57.  Do you

6     recognize this?

7     A.  It's very recognizable.

8     Q.  Is this an e-mail to you?

9     A.  Yes.

10    Q.  What is the date?

11    A.  October 13, 2022.

12    Q.  Just remind us what date -- do you recall when Mr. Trump

13    posted his denial on TruthSocial about you?

14    A.  October 12, 2022.

15              MR. FERRARA:  Plaintiff offers 57, your Honor.

16              THE COURT:  Received.

17              (Plaintiff's Exhibit 57 received in evidence)

18    BY MR. FERRARA:

19    Q.  If we can publish this, Mr. Lam, to the jury?  Thank you.

20              Do you know who Steph C. is, Ms. Carroll?

21    A.  No.

22    Q.  Do you see it says:  You are going to get hurt very badly.

23    A.  Yes.

24    Q.  And at the end:  Better end the bullshit quick, bitch.

25              Do you see that?

Case 23-793, Document 83, 11/20/2023, 3592070, Page85 of 300

A-2025

N515car6                              Carroll - Recross

1    A.  Yes.

2    Q.  Is this similar to other communications you received after

3    Mr. Trump's October 2022 statement?

4    A.  Unfortunately.

5              MR. FERRARA:  May I have a moment, your Honor?

6              THE COURT:  Yes.

7              MR. FERRARA:  Nothing further.

8              THE COURT:  Is there going to be anything further,

9    Mr. Tacopina?

10             MR. TACOPINA:  Yes, your Honor.

11             THE COURT:  How long?

12             MR. TACOPINA:  Not too long.

13             THE COURT:  Define not too long.

14             MR. TACOPINA:  Like a third of the ground that

15   Mr. Ferrara covered, so 5, 10 minutes.

16             THE COURT:  OK.  Go ahead.

17             MR. TACOPINA:  Thank you.

18   RECROSS EXAMINATION

19   BY MR. TACOPINA:

20   Q.  You were asked by Mr. Ferrara just now, I think the first

21   question was you were asked about how you feel finding

22   happiness finally and you said that you feel good.  Do you

23   remember that question?

24   A.  Yes.

25   Q.  But, earlier you said that your happiness was just a public

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N515car6                        Carroll - Recross

1   persona.  So, are you happy or are you not happy now?

2   A.  I'm happy.

3   Q.  OK.

4   A.  With undertones.

5   Q.  Happy with undertones?

6   A.  Of -- of --

7   Q.  OK.  Shall I go on?

8   A.  Of unhappiness.

9   Q.  The answer is you are happy with undertones of unhappiness?

10  A.  Yes.  It goes up and down, it is not always totally buoyant

11  and gleeful and happy.  There are times when I feel unhappy, of

12  course.

13  Q.  You testified on redirect that you were astonished that in

14  2023 someone would ask you about not screaming.  Do you

15  remember saying that?

16  A.  Yes.

17  Q.  Do you understand, Ms. Carroll, that I'm not judging what

18  is the appropriate reaction for any true rape victim, I was

19  questioning the fact that you gave four different answers for

20  not screaming?

21          THE COURT:  Sustained.  The jury will disregard that

22  remark.

23  Q.  Well, the reason you gave for not screaming was, one, you

24  are not a screamer.

25  A.  Right.

N515car6                         Carroll - Recross

1   Q.  You also said that Donald Trump's chest interfered with

2   your screaming?

3   A.  I guess I did.

4   Q.  Do you recall saying that you had too much adrenaline to

5   think to scream?

6   A.  That makes sense.

7   Q.  OK.  And then lastly you said you didn't scream because you

8   didn't want to make a fuss?

9   A.  I'm sure all -- you can have many reasons for not

10  screaming.

11  Q.  You understand that's what I was asking you about?

12  A.  Yes.

13          THE COURT:  Now, look.  You understand that that's not

14  an appropriate question so move on.

15          MR. TACOPINA:  OK, your Honor.  I thought based on the

16  answer it was but I'm sorry, I will move on.

17          THE COURT:  Mr. Tacopina, you get to have a closing

18  argument in this case and it is after I instruct the jury.

19          MR. TACOPINA:  OK.  Fine.

20          THE COURT:  Or before, actually, but...

21  BY MR. TACOPINA:

22  Q.  In evidence is Defendant's Exhibit AR that was already

23  introduced into evidence, subject to redaction, but the portion

24  we have shown before we will show again.  Ms. Carroll, you

25  prepared questions, you recall, when you were getting ready for

N515car6                         Carroll - Recross

1   your book proposal, questions that would come up about your

2   story; correct?

3   A.  Yes.

4   Q.  OK.

5   A.  I was asked to do that and I did it.

6   Q.  Someone asked you to prepare questions that you thought

7   would come up and you did?

8           MR. FERRARA:  Your Honor, recross is not an

9   opportunity to show exhibits again from cross-examination.

10          MR. TACOPINA:  I am doing it for limited purpose.  If

11  I could show the exhibit?  I am not showing the exhibit out of

12  the blue.

13          THE COURT:  So what exactly is the objection,

14  Mr. Ferrara?

15          MR. FERRARA:  Repetitive.  403.  Asked and answered.

16          MR. TACOPINA:  Not what I'm about to ask.  I will show

17  it.

18          THE COURT:  You may show her and then we will see what

19  the question is.

20          MR. TACOPINA:  Sure.

21  BY MR. TACOPINA:

22  Q.  Defendant's Exhibit AR in evidence, the questions that you

23  prepared in anticipation of the question you would be asked for

24  your book, please display --

25          Do you want ME to display to the witness, your Honor?

Case 23-793, Document 83, 11/20/2023, 3592070, Page89 of 300

A-2029

N515car6                        Carroll - Recross

1    It is in evidence but just to the witness?

2              THE COURT:  No.  If it is in evidence you can display

3    it.

4    BY MR. TACOPINA:

5    Q.  This is what was shown before, page 10.  Do you see that

6    middle question?

7    A.  Yes.

8    Q.  That was one of the questions that you had prepared in

9    anticipation of being asked when you were telling your story,

10   correct?

11   A.  I expected they would ask me if I screamed.

12   Q.  OK.  "Why didn't you scream?"  So, it wasn't so astonishing

13   to you, when you were preparing this for your book

14   presentation, that someone might ask you why you didn't scream;

15   correct?

16             MR. FERRARA:  Objection.

17             THE COURT:  Ground?

18             MR. FERRARA:  Argumentative.

19             THE COURT:  Sustained.  Sustained.

20             MR. TACOPINA:  OK.

21   Q.  To summarize, you anticipated you would be asked that

22   question --

23             THE COURT:  You just said that.  Would you please stop

24   the repetition?

25             MR. TACOPINA:  OK.  All right.  Thanks.

Case 23-793, Document 83, 11/20/2023, 3592070, Page90 of 300

A-2030

N515car6                          Carroll - Recross

1   Q.  And lastly, regarding your conversation with Ms. Birnbach

2   that you were asked about during your redirect examination by

3   Mr. Ferrara, he asked you:  Was there ever a doubt in your mind

4   what happened in that dressing room?

5           Do you remember being asked that question?

6   A.  Yes.

7   Q.  And you said:  No.

8           I'm going to play you from the deposition of October

9   2022, pages 137, lines 19 through 22.

10          Mike, let me know when you are ready; page 137, line

11  19 to 22.

12          MR. FERRARA:  No objection.

13          MR. TACOPINA:  We will play that.  Go ahead.

14          (Video played)

15          MR. TACOPINA:  OK, the video didn't come but it was

16  the audio of the deposition and it was fine.

17          Thank you, Ms. Carroll.

18          THE COURT:  Mr. Ferrara, anything else?

19          MR. FERRARA:  Nothing further, your Honor.

20          THE COURT:  Ms. Carroll, you are excused.  Thank you.

21          Ladies and gentlemen, tomorrow morning, 10:00 for the

22  jury.  And thank you, all.

23          (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page91 of 300

N515car6                         Carroll - Recross

1              (Jury not present)

2              THE COURT:  You can step down, Ms. Carroll.

3              THE WITNESS:  Thank you.

4              (Witness excused)

5              THE COURT:  Be seated, folks.

6              Mr. Ferrara?

7              MR. FERRARA:  I know it will surprise your Honor to

8    hear, but there was one objection I did not make that I wanted

9    to raise with the Court.  It was during Mr. Tacopina's

10   questions regarding George Conway.  We did not want to call

11   attention to this.  Many of Mr. Tacopina's questions were

12   perfectly acceptable, we understand that Mr. Conway is an

13   appropriate area to ask about.  He asked one question that we

14   thought went too far and did not want to call attention to and

15   was subject of *in limine* which was that Mr. Conway introduced

16   Ms. Carroll to her lawyer.  We think the choice of counsel was

17   briefed and is out, we think that goes to choice of counsel.

18   We ask that it be stricken.  We are not going to ask for an

19   instruction, but we ask there be no argument that George

20   Conway, for example, introduced Ms. Carroll to Ms. Kaplan, for

21   example, as part of some conspiracy, etc., etc.

22             MR. TACOPINA:  That is specifically why I didn't

23   actually identify Ms. Kaplan.  I just said "a lawyer," "he

24   introduced you to a lawyer," even though I knew it was

25   Ms. Kaplan.

N515car6                          Carroll - Recross

1            THE COURT:  Let me take a look.

2            MR. FERRARA:  Sure, your Honor.  I believe the court

3    reporter was kind enough to mark where this occurred.

4            (Record read)

5            THE COURT:  So, it is the last question and answer?

6            MR. FERRARA:  Correct, your Honor.

7            THE COURT:  May I hear the last question and answer

8    again, please.  And that was from today?

9            OFFICIAL REPORTER:  Yes, your Honor.

10           (Record read)

11           THE COURT:  Mr. Tacopina?

12           MR. TACOPINA:  Yes, your Honor.  I stand by that

13   question.  I think it is an appropriate question because

14   Mr. Conway introduced Ms. Carroll to an attorney and I

15   specifically did not mention Ms. Kaplan.  I had no intention of

16   arguing Ms. Kaplan is part of any democratic conspiracy, or

17   anyone at that table, so that's why I sort of made it bland

18   when I said "an attorney."

19           THE COURT:  Look.  I have three things to say about

20   that.  Based on the representation by Mr. Tacopina that there

21   will be no such argument for the rest of this case about

22   Mr. Conway and how the lawyer got together with Ms. Carroll, I

23   don't think I have a problem going forward.  And going

24   backward, there is a contemporaneous objection rule for a

25   reason and the plaintiff made a decision not to do it

N515car6                     Carroll - Recross

1    contemporaneously -- not for me to judge whether it was a good

2    idea or bad idea.  And, in any case, they're not seeking, as I

3    understand it, to have it stricken at this point, or are you?

4              MR. FERRARA:  I was asking for it to be stricken.

5              THE COURT:  I'm not going to strike it in light of the

6    representation.

7              MR. FERRARA:  Understood.

8              THE COURT:  OK.  Anything else?  Anything else?  No?

9    OK.

10             (Adjourned to May 2, 2023 at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

654

1                          INDEX OF EXAMINATION

2     Examination of:                                 Page

3      E. JEAN CARROLL

4     Cross By Mr. Tacopina  . . . . . . . . . . . 476

5     Redirect By Mr. Ferrara  . . . . . . . . . . 622

6     Recross By Mr. Tacopina  . . . . . . . . . . 645

7                          PLAINTIFF EXHIBITS

8     Exhibit No.                                 Received

9      103  . . . . . . . . . . . . . . . . . . . 628

10     57   . . . . . . . . . . . . . . . . . . . 644

11                         DEFENDANT EXHIBITS

12    Exhibit No.                                 Received

13     AY   . . . . . . . . . . . . . . . . . . . 479

14     BA   . . . . . . . . . . . . . . . . . . . 484

15     CY   . . . . . . . . . . . . . . . . . . . 497

16     BD   . . . . . . . . . . . . . . . . . . . 499

17     CC   . . . . . . . . . . . . . . . . . . . 543

18     BU   . . . . . . . . . . . . . . . . . . . 549

19     BW   . . . . . . . . . . . . . . . . . . . 553

20     CG   . . . . . . . . . . . . . . . . . . . 562

21     BV   . . . . . . . . . . . . . . . . . . . 567

22     CJ   . . . . . . . . . . . . . . . . . . . 569

23     CK   . . . . . . . . . . . . . . . . . . . 576

24     CL   . . . . . . . . . . . . . . . . . . . 584

25     AQ 36:21-37:6  . . . . . . . . . . . . . . 604

1     CU redacted   . . . . . . . . . . . . . . . 619
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

N525car1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      E. JEAN CARROLL,
 3
                      Plaintiff,              New York, N.Y.
 4
                 v.                           22 Civ. 10016 (LAK)
 5
      DONALD J. TRUMP,
 6
                      Defendant.
 7    ------------------------------x         Jury Trial
 8                                            May 2, 2023
                                             9:50 a.m.
 9
      Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                             District Judge
12                                             and a Jury
13
                         APPEARANCES
14
      KAPLAN HECKER & FINK LLP
15         Attorneys for Plaintiff
      BY:  ROBERTA A. KAPLAN
16         MICHAEL J. FERRARA
           SHAWN G. CROWLEY
17         MATTHEW J. CRAIG
18
      TACOPINA SEIGEL & DeOREO
19         Attorneys for Defendant
      BY:  JOSEPH TACOPINA
20         CHAD D. SEIGEL
           MATTHEW G. DeOREO
21
22    HABBA MADAIO & ASSOCIATES, LLP
           Attorneys for Defendant
23    BY:  ALINA HABBA
           MICHAEL T. MADAIO
24
25    W. PERRY BRANDT
           Attorney for Defendant
```

Case 23-793, Document 83, 11/20/2023, 3592070, Page97 of 300

A-2037

N525car1

1                    (Pages 657-677 SEALED by order of the Court)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 23-793, Document 83, 11/20/2023, 3592070, Page98 of 300

A-2038

N525car1

1              (In open court; jury not present)

2              THE DEPUTY CLERK:  Shall I get the jury, Judge?

3              THE COURT:  Yes.  Absolutely.

4              THE WITNESS:  Shall I sit?

5              THE COURT:  Yes.  For the moment.  My deputy is out of

6      the room getting the jury, and when he returns he will ask you

7      to stand and be sworn.

8              THE DEPUTY CLERK:  Jury entering.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 23-793, Document 83, 11/20/2023, 3592070, Page99 of 300

A-2039

N525car1                         Birnbach - Direct

1                (Jury present)

2                THE DEPUTY CLERK:  Please be seated, everyone.

3                THE COURT:  Ms. Crowley, call your next witness,

4       please.

5                MS. CROWLEY:  Thank you, your Honor.  The plaintiff

6       calls Lisa Birnbach.

7       LISA BIRNBACH,

8            called as a witness by the Plaintiff,

9            having been duly sworn, testified as follows:

10               THE DEPUTY CLERK:  Please be seated and pull your

11      chair up to the mic, and if you can please state your name and

12      spell your last name for the record.

13               THE WITNESS:  My name is Lisa Birnbach.

14      B-I-R-N-B-A-C-H.

15               MR. FERRARA:  Your Honor, may I bring up some water

16      for the witness?

17               THE COURT:  Yes.

18               MR. FERRARA:  Thank you.

19               THE WITNESS:  Thank you.

20               MR. FERRARA:  Sure.

21      DIRECT EXAMINATION

22      BY MS. CROWLEY:

23      Q.  Good morning, Ms. Birnbach.

24      A.  Good morning.

25      Q.  What do you do for a living?

N525car1                        Birnbach - Direct

1    A.  I'm a writer.

2    Q.  Where are you from?

3    A.  I'm from New York City.

4    Q.  Do you know the plaintiff in this case, E. Jean Carroll?

5    A.  I do.

6    Q.  For how long have you known Ms. Carroll?

7    A.  About 32-33 years I think.

8    Q.  Did there come a time when Ms. Carroll told you about an

9    encounter that she had with Donald Trump?

10   A.  Yes.

11   Q.  When was that?

12   A.  I believe it was in the spring of 1996.

13   Q.  Could you describe in just a sentence what Ms. Carroll told

14   you about that encounter?

15   A.  She told me that Donald Trump recognized her outside or

16   right in the doorway of Bergdorf Goodman, asked her to help him

17   shop, and assaulted her upstairs in a dressing room.

18   Q.  Did she tell you this in-person or on the phone?

19   A.  It was on the phone.

20   Q.  About how long after the assault had happened did

21   Ms. Carroll tell you about it?

22   A.  I would say five to seven minutes.

23   Q.  So we are going to come back to that in a little bit but

24   first I would like to talk a bit about your background.  You

25   mentioned that you are a writer.  Have you published stories in

N525car1                          Birnbach - Direct

1    magazines?

2    A.  Yes.

3    Q.  Which ones?

4    A.  *New Yorker*, *New York*, *Spy*, *Glamour*, *TV Guide*, *Parade*, and

5    others.

6    Q.  Have you ever worked for any magazines?

7    A.  Yes.  I was an editor at *Spy* and a contributing editor of

8    *Parade*.

9    Q.  What type of magazine is *Spy*?

10   A.  *Spy* was a satirical humor magazine.

11   Q.  Have you written any books?

12   A.  Yes.  I have written about 22.

13   Q.  And just generally speaking, what are your books about?

14   A.  Well, my books are, generally speaking, humorous, and they

15   are non-fiction about the way we live.

16   Q.  Were any of your books political in nature?

17   A.  No.

18   Q.  Now I would like to focus on the time period in the

19   mid-'90s.  What were you doing for work at that time?

20   A.  In the mid-'90s I was a full-time parent, I was a -- I

21   wrote for individual TV shows, variety shows.  I was a host

22   panelist on a VH1 show that I am sure nobody has ever seen

23   called "The Whole Enchilada."  And, I was doing freelance work.

24   Q.  Ms. Birnbach, you testified that you met Ms. Carroll -- you

25   have known Ms. Carroll for about 32 or 33 years, that you met

N525car1                    Birnbach - Direct

1    her around 1990?

2    A.  I think so.  I think I was pregnant with my first child

3    when I met her.

4    Q.  How did you meet?

5    A.  Her best friend at the time was the girlfriend of my then

6    husband's sort of work partner --

7    Q.  And how did that --

8    A.  -- work friend.

9    Q.  And how did that lead you to Ms. Carroll?

10   A.  I think we had a couple of dinners with the other couple in

11   the center.

12   Q.  Had you heard of Ms. Carroll before you met her?

13   A.  I had.  I had admired her writing, her very stylish

14   reporting in *Esquire* and in *Outside* magazine.

15   Q.  Now, in the period in the mid-'90s, what was Ms. Carroll's

16   job?

17   A.  In the mid-'90s Ms. Carroll was writing her column at *Elle*,

18   Ask E. Jean, the advice column, and she was hosting a daily

19   talk show or daily advice show called "Ask E. Jean" for a cable

20   network.

21   Q.  Did you ever appear on the show?

22   A.  I did once.

23   Q.  How would you describe your relationship with Ms. Carroll

24   in the mid-'90s?

25   A.  We were -- we were more work friends.  We became more work

Case 23-793, Document 83, 11/20/2023, 3592070, Page103 of 300

1  friends, especially when the other couple split up and we

2  didn't have that social fabric in between us.  We -- we were

3  not rare to be women in magazine and media but, you know, we --

4  we were good work friends, I would say.

5  Q.  What work were you doing?

6  A.  You know, interviewing people.  I appeared on TV a lot in

7  those days but, you know, our paths crossed.

8  Q.  What, if any work, did you do with Ms. Carroll during this

9  period in the mid-'90s?

10  A.  We concocted a pilot together with TV producers and

11  directors, a pilot which would have been a movie review show

12  for PBS.

13  Q.  Did the pilot ever run?

14  A.  Thank God, no.

15  Q.  Ms. Birnbach, did you ever meet the defendant in this case,

16  Donald Trump?

17  A.  I have.

18  Q.  Where did you meet him?

19  A.  I met him at a friend's birthday party in 1995.

20  Q.  Who was the friend?

21  A.  Her name was Andrea Eastman.

22  Q.  And who was Ms. Eastman?

23  A.  She was a talent agent at ICM.

24  Q.  Before you met Donald Trump at this birthday party, did you

25  know who he was?

N525car1                        Birnbach - Direct

1    A.  Of course.

2    Q.  When you say "of course," what do you mean?

3    A.  He was a fixture in New York tabloid life.

4    Q.  Did you speak with Mr. Trump at the birthday party?

5    A.  Andrea introduced us.

6    Q.  And what did you discuss?

7    A.  She told him I was a writer -- she probably said, because

8    she was an agent, a fabulous writer -- and he said, Who do you

9    write for?  I said, *New York* magazine, and others.  He said,

10   Would you be interested in coming to see Mar-a-Lago?  I want to

11   turn it into a club.  And I said, Sure.

12   Q.  Did you speak to Donald Trump again after the party?

13   A.  Donald Trump called me about once a month for about -- I

14   mean the answer is yes, I did.  He called me about once a month

15   for about five or six months to make sure I was still

16   interested in writing the article.

17   Q.  And did there come a time when you actually wrote the

18   article?

19   A.  Yes.

20   Q.  Did you travel to Mar-a-Lago?

21   A.  I did.

22   Q.  How did you get there?

23   A.  On Mr. Trump's private plane.

24   Q.  When was this?

25   A.  It was January, the end of January 1996.

N525car1                         Birnbach - Direct

1   Q.  Where did you stay when you were down at Mar-a-Lago?

2   A.  I stayed in a bedroom at Mar-a-Lago.

3   Q.  How long did you stay there?

4   A.  I think two nights.

5   Q.  What did you do over the course of two nights and days that

6   you were at Mar-a-Lago?

7   A.  I carried a small tape recorder and lots and lots of

8   cassettes, and I said to him, I'm going to just tape everything

9   you say on a tour of your property, it will be a stream of

10  consciousness.  And so, that's what I did.  And we, *Look at*

11  *this room*.  *Look at the door knobs*.  *Look at this gorgeous*

12  *chandelier*.  It was just a tour of the whole place.

13  Q.  After the interview, was your article published?

14  A.  Yes.

15  Q.  Where was it published?

16  A.  In *New York* magazine.

17  Q.  What was it called?

18  A.  It was called *Mi Casa Es Su Casa*.

19  Q.  I would like to show you, the witness, and counsel, what's

20  been marked for identification as Plaintiff's Exhibit 8.  Do

21  you see that on your screen, Ms. Birnbach?

22  A.  Yes.

23  Q.  Do you recognize it?

24  A.  Yes.

25  Q.  What is it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page106 of 300

A-2046

N525car1                    Birnbach - Direct

1   A.  It is the cover of *New York* magazine from February 12,

2   1996.

3   Q.  Is this where your article is published?

4   A.  Yes.

5          MS. CROWLEY:  Your Honor, the plaintiff offers

6   Plaintiff's Exhibit 8.

7          MR. BRANDT:  No objection.

8          THE COURT:  Received.

9          (Plaintiff's Exhibit 8 received in evidence)

10  BY MS. CROWLEY:

11  Q.  If you can focus on the top right of the exhibit, what is

12  the date there?

13  A.  February 12, 1996.

14  Q.  Is that the date the article was published?

15  A.  Yes.

16  Q.  If we can turn to the second page of the exhibit, do you

17  recognize this photograph?

18  A.  Yes, I do.

19  Q.  How do you recognize it?

20  A.  I'm sorry?

21  Q.  How do you recognize it?

22  A.  I recognize it because I stood off to the side when they

23  took that picture.  That is Donald Trump and his daughter

24  Ivanka.

25  Q.  So this photograph was taken during your interview at

1   Mar-a-Lago?

2   A.  Yes.

3   Q.  We can take that down.

4          Mrs. Birnbach, did you hear from Donald Trump again

5   after the article was published?

6   A.  Not directly.

7   Q.  Did you hear from someone else?

8   A.  His assistant called me.

9   Q.  Have you spoken to Donald Trump again since the article was

10  published?

11  A.  No.  I haven't.

12  Q.  OK.  So you testified a few minutes ago that at some point

13  Ms. Carroll called you and told you that Donald Trump had

14  assaulted her.  Where were you when you received this call?

15  A.  I was giving my children dinner in our sort of kitchen area

16  at home.

17  Q.  Do you recall what date you received the call?

18  A.  No.

19  Q.  What year was it?

20  A.  It was 1996.

21  Q.  How do you know that?

22  A.  I know that because I believe E. Jean called me, of all her

23  friends and acquaintances, because she knew I had just been at

24  Mar-a-Lago.

25  Q.  What time of day was it when Ms. Carroll called you?

Case 23-793, Document 83, 11/20/2023, 3592070, Page108 of 300

A-2048

1    A.   It was sometime between, I would say, 6:00 and 7:00.

2    Q.   How do you know that?

3    A.   Well, I had two kids at the time, and one was 6 and one was

4    almost 3, and that's when they ate.

5    Q.   What was the first thing that Ms. Carroll said when you

6    picked up the phone?

7    A.   She said, Lisa, you are not going to believe what happened

8    to me.

9    Q.   How did she sound?

10   A.   Breathless.  Hyperventilating.  Emotional.  Her voice was

11   doing all kinds of things.

12   Q.   Was she laughing?

13   A.   She may have been a little bit laughing.  It sounded like

14   she had just this surge of adrenaline.

15   Q.   What did she say after she said, Lisa, you are not going to

16   believe what just happened?

17   A.   E. Jean said that she had, after work that day, she had

18   gone to Bergdorf's to look around, and she was on her way

19   out -- and I believe it was a revolving door -- and she said on

20   the other side of the glass from her going in, as she was going

21   out, Donald Trump said to her, *Hey, you're the advice lady.*

22   And she said, *You're the real estate guy.*  And he said, *You're*

23   *so good at advice, you are so smart, why don't you help me pick*

24   *out a present for a friend?*  So she thought she would, it

25   sounded like a funny thing, this guy, who is famous.  And she

N525car1                    Birnbach - Direct

1    went back in the store and tried to, in my -- in my memory

2    tried to show him things; Would she like a hat?  Would she like

3    a belt?  What about these sunglasses?  You know, something like

4    that, and he kept rejecting her suggestions and suggested they

5    go upstairs.  They went upstairs, eventually finding themselves

6    in the lingerie department, and there was no one behind the

7    counter but there was a little bodysuit --

8    Q.  Ms. Birnbach, I'm going to stop you here.  What did you

9    think when Ms. Carroll told you that she went with Donald Trump

10   to the lingerie department?

11   A.  I was surprised that she did that.  I thought it was kind

12   of nutty.  I didn't think it was dangerous because, you know, I

13   had just spent a few days with him, he didn't strike me as

14   dangerous.

15   Q.  What did she say happened after they got to the lingerie

16   department?

17   A.  He said, *Why don't you try this on?*  And she, continuing

18   sort of the jokey banter that they had, she said, *Why don't you*

19   *try it on?*  And then the next thing that happened is they were

20   both in the dressing room and he slammed her against the wall.

21   And then, as she was trying to move, he -- he slammed his whole

22   arm, pinned her against the wall with his arm and shoulders,

23   and with his free hand pulled down her tights.  And E. Jean

24   said to me many times, *He pulled down my tights.  He pulled*

25   *down my tights.*  Almost like she couldn't believe it.  She was

Case 23-793, Document 83, 11/20/2023, 3592070, Page110 of 300

A-2050

N525car1                    Birnbach - Direct

1   still processing what had just happened to her.  It had just

2   happened to her.  *He pulled down my tights*.  And then he

3   penetrated her.

4   Q.  Did she say how he penetrated her?

5   A.  Yes.  She said with his penis.

6   Q.  What did you say after Ms. Carroll described this to you?

7   A.  As soon as she said that -- even though I knew my children

8   didn't know the word -- I ducked out of the room -- my phone

9   was wireless -- and I said, I whispered, *E. Jean, he raped you.*

10  *You --*

11  Q.  What -- I'm sorry.

12  A.  *You should go to the police.  No, no, no, I don't want to*

13  *go to the police.*

14  Q.  That's what she said in response?

15  A.  That's what she said.

16  Q.  What did you say to that?

17  A.  I said, *He raped you.  I will take you to the police.*  And

18  she said, *I don't want to go to the police.  We had a fight.*

19  Q.  Did Ms. Carroll use the word "rape" to describe what had

20  happened?

21  A.  No.

22  Q.  How did she describe it?

23  A.  We fought.  You know, it sounded like a physical fight.

24  She tried to get free from him and she did not like that word.

25  She did not want me to say that word.

Case 23-793, Document 83, 11/20/2023, 3592070, Page111 of 300

A-2051

N525car1                          Birnbach - Direct

1    Q.  What did Ms. Carroll say after you said *I'll take you to*
2    *the police*, or *I will go to the police with you*?
3    A.  She said, *Promise me you will never speak of this again,*
4    *and promise me you will tell no one.*  And I promised her both
5    those things.
6    Q.  How did the call end?
7    A.  She said -- I said, *Please, come here.  I will give you*
8    *dinner.  You can stay here.*  Because she lived out of town.
9    She said, *No, I just want to go home.*
10   Q.  How long, approximately how long did the call last?
11   A.  Three minutes.  Four minutes.
12   Q.  What did you do after you hung up the phone?
13   A.  I think I re-heated my kids' nuggets.
14   Q.  After you got off the phone with Ms. Carroll, did you tell
15   anyone what she had just told you?
16   A.  No.
17   Q.  Did you call the police yourself?
18   A.  No.
19   Q.  Why not?
20   A.  It was her -- it was her life, her story, not my story.
21   She clearly didn't want to tell anybody else what happened and
22   I honored that.
23   Q.  After Ms. Carroll called you and told you that she had been
24   assaulted, did you ever check in with her to see how she was
25   doing?

Case 23-793, Document 83, 11/20/2023, 3592070, Page112 of 300

1   A.  No.

2   Q.  Why not?

3   A.  She asked me never to bring it up.

4   Q.  And in the months and years that followed the phone call,

5   how often, if at all, did you think about what Ms. Carroll told

6   you?

7   A.  I worked to not think about it.

8   Q.  Why?

9   A.  Because I had made a promise to her not to bring it up, not

10  to discuss it, and certainly not tell anybody, so I put it -- I

11  buried it and it, as life went on, it was easier to not think

12  about it.

13  Q.  During this time period in the mid-'90s, was Ms. Carroll

14  the only friend who told you she had been assaulted by men?

15  A.  Hardly.  Hardly.  Especially other women --

16          MR. BRANDT:  Objection, your Honor; relevance, if we

17  are talking about other people.

18          MS. CROWLEY:  Your Honor, I think it is relevant as to

19  why they didn't speak about it again and why Ms. Birnbach

20  didn't tell anyone or think about it.

21          MR. BRANDT:  Your Honor, I think it is extraneous and

22  it is talking about other people who we don't even know who

23  they are.

24          THE COURT:  I will allow it.  I am assuming it is

25  going to be brief.

N525car1                          Birnbach - Direct

1              THE WITNESS:  I would just say that many of my friends

2      in the mid-'90s had been harassed, molested, or been

3      propositioned by people they worked with or worked for.

4      BY MS. CROWLEY:

5      Q.  Now, since the phone call to you -- Ms. Carroll's phone

6      call to you in 1996, had the two of you kept in touch?

7      A.  Yes.

8      Q.  What is your relationship like today?

9      A.  We are very close, close, close friends.

10     Q.  And what made you -- when did you become closer?

11     A.  My -- when my kids first got to know E. Jean, they fell in

12     love with her because she would make pillow forts in our living

13     room when she would come over and we just had a lot of fun

14     together.  And at one point in the last six years E. Jean got

15     very sick and I -- I found myself sort of taking care of her

16     and feeling like I was the friend she could count on.

17     Q.  You said that your kids, as they got older, loved

18     Ms. Carroll.  How old are your kids?

19     A.  They are now in their 20s and 30s.

20     Q.  So around what time period was she making pillow forts with

21     them?

22     A.  Well, it had to have been in the early 2000s.

23     Q.  Did you and Ms. Carroll ever discuss the assault again?

24     A.  Not until 2019.

25     Q.  In this period between 1996, the phone call in 1996 and

Case 23-793, Document 83, 11/20/2023, 3592070, Page114 of 300

A-2054

N525car1                    Birnbach - Direct

1   2019, did Ms. Carroll discuss her personal life with you?

2   A.  Not too much.  No.

3   Q.  Did she discuss any romantic relationships with you?

4   A.  No.

5   Q.  Did you ever observe Ms. Carroll going on any dates or

6   having any relationships during this period?

7   A.  No, I didn't.

8   Q.  I would like to shift gears for a minute.  Ms. Birnbach,

9   who did you support in the 2016 presidential election?

10  A.  Hilary Clinton.

11  Q.  Are you registered with a political party?

12  A.  I am.

13  Q.  Which one?

14  A.  Democrat.

15  Q.  Have you donated money to political candidates?

16  A.  I have.

17  Q.  Including Hilary Clinton?

18  A.  I have.

19  Q.  Where were you on the night of the 2016 election?

20  A.  In my apartment on West End Avenue with about 25 friends.

21  Q.  Was Ms. Carroll there?

22  A.  Yes.  She was.

23  Q.  As far as you know, were any of these 25 people at your

24  apartment supporters of Donald Trump's candidacy for president?

25  A.  I am sure they weren't.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N525car1                        Birnbach - Direct

1    Q.  During the evening of the election what, if any

2    discussions, did you and Ms. Carroll have about the fact that

3    Donald Trump had assaulted her years before?

4    A.  None.  None whatsoever.

5    Q.  Did you think about the assault that night?

6    A.  I wasn't thinking about the assault that night.

7    Q.  Why not?

8    A.  I was thinking about -- first I was thinking that the

9    candidate I supported was doing well and then I was much, I

10   think, and all my friends, were surprised that Donald Trump

11   won.

12   Q.  Do you remember sharing a particular look with Ms. Carroll

13   during the election night?

14   A.  No.  I don't.

15   Q.  How did you feel when Donald Trump was declared the winner?

16   A.  Surprised and upset.

17   Q.  I would like to direct your attention to February 14, 2018.

18   Do you recall going to a dinner that night?

19   A.  Yes, I do.

20   Q.  Who did you go to dinner with?

21   A.  I went to dinner with E. Jean Carroll, Carol Martin, and my

22   then boyfriend.

23   Q.  Where was the dinner?

24   A.  It was at Carmine's restaurant on Broadway.

25   Q.  Did you know Carol Martin before this dinner?

Case 23-793, Document 83, 11/20/2023, 3592070, Page116 of 300

A-2056

N525car1                    Birnbach - Direct

1   A.  I knew who she was and I think I may have met her once

2   before with E. Jean.  After E. Jean recovered from her illness

3   I think I met her at a dinner, but I didn't really know her,

4   no.

5   Q.  What, if anything, did Ms. Carroll give you during this

6   dinner?

7   A.  She gave each of us a pair of socks that she -- including

8   Michael, and then she gave Carol and me blue envelopes that

9   were sealed and I think had ribbons on them and --

10  Q.  What, if anything, did Ms. Carroll say about what was

11  inside the envelope?

12  A.  I think she said please read this but don't show it to

13  anybody.

14  Q.  Did you ever open the envelope?

15  A.  No.

16  Q.  So you didn't read what was inside?

17  A.  No, I did not.

18  Q.  Why not?

19  A.  Something in the way she said it made me feel like it

20  might -- it might create responsibilities that I wasn't

21  prepared to have at that time.

22  Q.  What do you mean by that?

23  A.  Well, if I had to read it but not tell anybody, you know,

24  it just sounded like it could be something heavy that I wasn't

25  ready for.

Case 23-793, Document 83, 11/20/2023, 3592070, Page117 of 300

A-2057

N525car1                        Birnbach - Direct

1   Q.  I would like to move forward a little bit and call your

2   attention to April of 2019.  What were you doing for a living

3   during this time?

4   A.  I was writing articles and book reviews.

5   Q.  Did you write any articles about Ms. Carroll?

6   A.  I wrote one in the Talk of the Town section of the *New*

7   *Yorker*.

8   Q.  What was the article about?

9   A.  It was about a New York City walking tour that E. Jean

10  Carroll was leading through the prism of hideous men.  She

11  called it The Hideous Men Walking Tour, or something like that.

12  Q.  Did you go on the tour?

13  A.  I did.

14  Q.  Did Ms. Carroll mention on the tour that Donald Trump had

15  assaulted her?

16  A.  No, she didn't.

17  Q.  What, if any discussions, did you and Ms. Carroll have on

18  the tour about the fact that Donald Trump had assaulted her

19  years before?

20  A.  We had zero conversation about it.  At that point we had

21  never discussed it.

22  Q.  What was the name of the article that you wrote?

23  A.  I don't remember exactly but I think it was -- it had the

24  words "hideous men" in it.

25  Q.  Was it published?

N525car1                    Birnbach - Direct

1  A.  It was published in the *New Yorker*.

2  Q.  Now, by this time, April 2019, had you opened the envelope

3  or read what was inside?

4  A.  No, I hadn't.

5  Q.  Did there come a time when you learned that Ms. Carroll was

6  writing a book?

7  A.  Yes.  I knew Ms. Carroll was writing a book.  In 2017 she

8  got a contract, I believe, to write what I thought was a

9  travelogue book, like Travels with Charlie, the Steinbeck, but

10  from a woman's perspective, and she was taking her dog to small

11  towns in America named after women to find out how women were

12  feeling.

13  Q.  And back in 2017, what was your understanding as to whether

14  Ms. Carroll would include descriptions from her own life in the

15  book?

16  A.  I had no reason to believe there was anything about her

17  life in the book.

18  Q.  Did there come a time when you read an excerpt from

19  Ms. Carroll's book?

20  A.  I read -- yes.  Yes.

21  Q.  When was that?

22  A.  The week before her excerpt was printed in *New York*

23  magazine E. Jean sent me a copy of it, by e-mail, asked me to

24  read it, not share it with anyone, and let me know that the

25  fact checkers from the magazine would be calling me to confirm

Case 23-793, Document 83, 11/20/2023, 3592070, Page119 of 300

N525car1                        Birnbach - Direct

1   the details that she wrote about.

2   Q.  Do you recall when this was?

3   A.  Early to mid-June of 2019.

4   Q.  Did you read the excerpt?

5   A.  I did.

6   Q.  What was it about?

7   A.  Well, it was about, included the assault by Donald Trump.

8   Q.  And you testified that Ms. Carroll emailed it to you.  Was

9   anyone else included on this e-mail?

10  A.  Carol.  Carol Martin was.

11  Q.  Did the account of the assault in the excerpt generally

12  match your recollection of what Ms. Carroll told you back in

13  1996?

14  A.  Yes.

15  Q.  What, if any notes or edits to the excerpt, did you give to

16  Ms. Carroll?

17  A.  I don't believe I gave her any.

18  Q.  In the excerpt does Ms. Carroll describe the fact that she

19  called a friend right after the assault happened?

20  A.  Yes.  I think so.

21  Q.  Were you mentioned by name?

22  A.  No.  No, I wasn't.

23  Q.  Prior to the excerpt's release, what if any conversations

24  did you have about whether you would be named in the excerpt?

25  A.  After I read the excerpt I called E. Jean and told her how

N525car1                    Birnbach - Direct

1    brave she was and what a good piece it was, and I said that

2    I -- or I think it was before the fact-checkers called me, and

3    I said, *Could you please tell the fact checkers I didn't want*

4    *to be named in the piece?* in case they wanted "the friend"

5    identified.

6    Q.  I'm sorry.  You said you didn't want to be named?

7    A.  I did not.

8    Q.  Why not?

9    A.  Well, because by then Donald Trump was president with a

10   following that was -- could be very rude and angry.

11   Q.  I would like to show you what's in evidence as Defendant's

12   Exhibit AJ.

13            If we can just zoom in?

14            Do you recognize this exhibit?

15   A.  Yes.  It's an e-mail that E. Jean sent me.

16   Q.  An e-mail or a text?

17   A.  Oh.  It's a text.  Sorry.

18   Q.  Was this text sent before or after the excerpt Ms. Carroll

19   sent you, the excerpt that was going to be published in *New*

20   *York* magazine?

21   A.  This text came after the excerpt was published.

22   Q.  Who is the "Megan" that Ms. Carroll is referring to in the

23   first sentence?

24   A.  That's Megan Twohey, who is a reporter at the New York

25   Times.

Case 23-793, Document 83, 11/20/2023, 3592070, Page121 of 300

N525car1                          Birnbach - Direct

1   Q.  In the third sentence Ms. Carroll says:  I turned over the

2   entire book to you when I got sick and we agreed you would

3   publish it when I croaked.

4           Do you recall Ms. Carroll giving you a draft of the

5   book?

6   A.  I do.

7   Q.  When was that?

8   A.  That was when she was in the hospital in Orange County, New

9   York, in the intensive care.  She did not send me a draft, she

10  sent each chapter as an e-mail.

11  Q.  Why did she send you those chapters?

12  A.  Because at that point --

13          MR. BRANDT:  I want to object, your Honor.  That calls

14  for speculation.

15          THE COURT:  Sustained.  Sustained.

16  Q.  Where was Ms. Carroll when she sent you those chapters?

17  A.  She was in intensive care.

18  Q.  Did you ever read any of the chapters?

19  A.  I did not.  I was hoping that she would recover and she

20  could finish the book herself.

21  Q.  Ms. Carroll then says:  I copped to the fact that I sent

22  you the proof of the excerpt before it was published with

23  instructions not to forward it, copy it, etc.

24          What is the excerpt that she is referring to?

25  A.  The *New York* magazine chapter.

Case 23-793, Document 83, 11/20/2023, 3592070, Page122 of 300

N525car1                          Birnbach - Direct

1              MS. CROWLEY:  We can take that down.  Thank you,

2      Mr. Lam.

3      Q.  You testified you were not named in the *New York* magazine

4      excerpt.  Did there come a time when you agreed to be publicly

5      identified as the friend who Ms. Carroll called after the

6      assault?

7      A.  Yes.

8      Q.  When was that?

9      A.  I don't remember the date but it was not long after.

10     E. Jean invited Carol and me to lunch to meet a few reporters

11     from the New York Times who wanted to write about what happened

12     to her, and over the course of lunch Carol and I were persuaded

13     that we would be more effective if we were real people and not

14     anonymous sources.

15     Q.  And when you say "Carol" you are referring to?

16     A.  Carol Martin.

17     Q.  Were you named in a particular publication?

18     A.  Yes.  In the New York Times.

19     Q.  And was it an article?

20     A.  Well, it was an article by Megan Twohey and it was also --

21     she shared her recorded interview with E. Jean, Carol Martin,

22     and me, with *The Daily*, the New York Times podcast.

23     Q.  You said she interviewed you.  Where did that interview

24     take place?

25     A.  That took place also in my living room.

Case 23-793, Document 83, 11/20/2023, 3592070, Page123 of 300

N525car1                        Birnbach - Direct

1   Q.  And who was present for the interview?

2   A.  Ms. Carroll, Ms. Martin, my daughter-in-law was nursing my

3   grandson in the room, and I was there.

4   Q.  Prior to this interview what, if any conversations, had you

5   and Carol Martin had about what Ms. Carroll had told you on the

6   phone back in 1996?

7   A.  Could you repeat the question?

8   Q.  Yes.  I'm sorry.

9          Before this interview in your living room --

10  A.  Right.

11  Q.  What, if any conversations, did you have with Carol Martin

12  about what E. Jean Carroll had said to you on the phone in

13  1996?

14  A.  The only conversation we had was I believe when -- when we,

15  between the lunch with the New York Times people and the actual

16  interview about how our children felt about using our names.

17  Q.  Was the interview published?

18  A.  Yes.

19  Q.  And what about the podcast?

20  A.  It was also published, the next day.

21  Q.  You testified that one of the reasons that you initially

22  did not want to be publicly named was because you were worried

23  about certain of the president's followers.  What, if anything

24  happened, after you were identified publicly as the friend who

25  Ms. Carroll called after the assault?

N525car1                          Birnbach - Direct

1    A.  Well, I was active on Twitter in those days, very active,

2    and I received, on my Twitter account and to my website, some

3    pretty awful anti-Semitic messages.

4    Q.  I would like to show you on the screen an image, that can

5    be shown to the jury as well, what is in evidence as

6    Plaintiff's Exhibit 5.

7              Do you recognize this, Ms. Birnbach?

8    A.  Yes.

9    Q.  What is it?

10   A.  It is the cover of E. Jean Carroll's latest book.

11   Q.  Have you read it?

12   A.  Yes.

13   Q.  When did you first read it?

14   A.  I read it about a month after it was published.

15   Q.  As a writer, what did you think of Ms. Carroll's book when

16   you read it?

17   A.  The book made me a bit uncomfortable -- and I never said

18   this to herself -- but the back and forth between some pretty

19   hair-raising experiences in her life with some very breezy

20   travel pieces, it was, you know, it was hard for me to make the

21   transition from the two kinds of writing in the book.

22             MS. CROWLEY:  Can I just have a moment, your Honor?

23             THE COURT:  Yes.

24             (Counsel conferring)

25   BY MS. CROWLEY:

Case 23-793, Document 83, 11/20/2023, 3592070, Page125 of 300

A-2065

N525car1                         Birnbach - Direct

1   Q.  Ms. Birnbach, just yes or no, did Ms. Carroll's book

2   include descriptions of other times, apart from Donald Trump,

3   of other men who had assaulted her?

4   A.  Yes.

5   Q.  Does that include a camp counselor who assaulted her when

6   she was a child?

7   A.  Yes.

8   Q.  Did the book also describe an incident in which she was

9   assaulted by Les Moonves?

10  A.  Yes.

11  Q.  Before you read the book, had Ms. Carroll told you about

12  the assaults by the camp counselor or Les Moonves?

13  A.  No.

14  Q.  Did it surprise you that Ms. Carroll hadn't told you about

15  those incidents?

16  A.  No.

17  Q.  Why not?

18  A.  Ms. Carroll is a very "up" person.  She is not a victim,

19  she doesn't want anybody's pity.  She is somebody who -- and I

20  think it's the way she was raised; instead of wallowing, she

21  puts on lipstick, dusts herself off, and moves on.  I think

22  that's how she's gotten through her life.

23  Q.  Were you identified by name in the book as the friend who

24  Ms. Carroll called after the assault?

25  A.  I don't think I was.

Case 23-793, Document 83, 11/20/2023, 3592070, Page126 of 300

1   Q.  Is your name mentioned elsewhere in the book?

2   A.  Yeah.

3   Q.  Where?

4   A.  Well, I'm one of the people she dedicated the book to, and

5   also I think there is a piece in the book or a paragraph or two

6   about the time we went wedding gown shopping with Ms. Carroll's

7   niece Lauren.

8   Q.  Where did you go wedding dress shopping?

9   A.  We went to Bergdorf's.

10  Q.  Did you and Ms. Carroll discuss the fact that Trump had

11  assaulted her when you went wedding dress shopping at

12  Bergdorf's?

13  A.  No.

14  Q.  Did you think about that?

15  A.  I didn't want to think about it and I didn't think about

16  it.  I was thinking about Lauren and, you know, this was kind

17  of a day for her.

18  Q.  And to be clear, Lauren is Ms. Carroll's niece?

19  A.  Her niece; and Lauren's mom was out of town and so we

20  were -- there was a real aunt and a fake aunt.  And we took

21  pictures and we Facetimed with her mom, and it was about Lauren

22  and her excitement about getting married.

23          MS. CROWLEY:  We can take that exhibit down, Mr. Lam.

24  Thank you.

25  Q.  Apart from the New York Times article and podcast, did you

N525car1                         Birnbach - Direct

1    speak publicly about Ms. Carroll's phone call in any other

2    forum?

3    A.  Yes.  After the New York Times article appeared, which was

4    the same day as *The Daily* was dropped, or aired, or whatever

5    you say, I was really deluged with producers asking me to do

6    interviews and I did one short, I think, five-minute interview

7    with NPR, and several weeks later I was on CNN.

8    Q.  Whose show on CNN?

9    A.  I was on Anderson Cooper's.

10   Q.  Did NPR and CNN reach out to you or did you reach out to

11   them?

12   A.  Oh no.  They reached out to me.

13   Q.  Were you paid for making these appearances?

14   A.  No.

15   Q.  So why did you do them?

16   A.  Because I was telling the truth, because my friend was

17   telling the truth, and I felt strongly that I could be a

18   supportive friend.

19   Q.  You testified that you received many, many requests to be

20   interviewed and to talk on TV about the phone call.  Did you

21   agree to do any other public interviews or broadcasts?

22   A.  Nothing -- nothing on TV or radio.  Many months later

23   E. Jean was invited to be -- to talk about her book at a place

24   called The Wing, which is a -- it is defunct now but it was a

25   women's club, and it was kind of a Q&A, and I did that with

N525car1                         Birnbach - Direct

1   her.  And we did another -- we spoke at another event, I was
2   the Q, she was the A, at -- it was called Next Tribe.  They
3   weren't televised, they were in, you know, small rooms.
4   Q.  Generally speaking, what did you and Ms. Carroll talk about
5   at these two events?
6   A.  We talked about her book, we talked about how women and men
7   were feeling -- how women were feeling about men.  We talked
8   about the climate, about the relationships between men and
9   women.  We talked, also, about her life as a journalist.
10  Q.  Were you paid for these appearances?
11  A.  No.
12  Q.  Now, when did you first learn that Ms. Carroll was
13  intending to sue Donald Trump?
14  A.  After she decided to sue Donald Trump.
15  Q.  Was it before or after the lawsuit was filed?
16  A.  I think after.
17  Q.  How did you learn?
18  A.  I believe E. Jean sent me an e-mail or a text about it.
19  Q.  What, if anything, did Ms. Carroll tell you about whether
20  you would be named in connection with the lawsuit?
21  A.  She told me that I would be -- I would be integral.
22  Q.  Have you attended any court appearances in connection with
23  Ms. Carroll's case?
24  A.  I was never in the courtroom before but I did come to one
25  other argument.

Case 23-793, Document 83, 11/20/2023, 3592070, Page129 of 300

A-2069

N525car1                    Birnbach - Direct

1  Q.  Why did you come to that argument?

2  A.  Because it's scary to go to court by yourself.  I now

3  realize how scary.

4  Q.  Apart from the court appearance that you went to with

5  Ms. Carroll, have you listened to any court appearances

6  remotely?

7  A.  I did once.

8  Q.  Where were you when you listened to it?

9  A.  I was in the conference room of your law firm.

10 Q.  Was anyone else present at the time?

11 A.  Yes.  There were a bunch of friends of E. Jean's, most of

12 them lawyers.

13 Q.  Ms. Birnbach, you previously testified that you did not

14 support Donald Trump's candidacy for president.

15 A.  Right.

16 Q.  Have you spoken or written publicly about your feelings

17 toward Donald Trump?

18 A.  I certainly have, yes.

19 Q.  Where?

20 A.  Twitter.  And I used to have a podcast and I spoke -- I

21 mean, I write my opinions so it is just you know, for my --

22 Q.  Have you written your opinions about Donald Trump on

23 Facebook?

24 A.  Yes, probably.  I haven't been on Facebook in a few years,

25 but I probably did.

N525car1                    Birnbach - Direct

1   Q.  You testified that you had a podcast?

2   A.  Yes.

3   Q.  Is it still in existence?

4   A.  No.

5   Q.  What was it called?

6   A.  It was called *Five Things That Make Life Better*.

7   Q.  And when did it run?  What years?

8   A.  From 2018 to, I think, 2021.

9   Q.  What was it about, just generally?

10  A.  It was a weekly show that started with the simple exercise

11  of life is hard, things are bad, what can I be grateful for?

12  Fresh cherries.  The smell of flowers.  A good night's sleep.

13  A hot bubble bath.  Whatever.  You know, it was like that.  And

14  then it became an interview show and all of my guests had to

15  also say their five things, and almost all of them included

16  their dog.

17  Q.  You testified that you would, on occasion, discuss Donald

18  Trump on the podcast.  What sorts of things did you say about

19  him?

20  A.  I am sure I said that I thought he was a bad president.  I

21  am sure I thought -- I'm sure I talked about his self-interest,

22  his profiting from the White House, his appointing cabinet

23  members who were unqualified.  I am sure I suggested he never

24  read a history book or the Constitution.  I'm not a fan.

25  Q.  Have you referred to Donald Trump on your podcast as a

N525car1                         Birnbach - Direct

1    narcissistic sociopath?

2    A.  That sounds right.

3    Q.  Have you described him as Vladimir Putin's agent?

4    A.  It is quite possible that I did, yes.

5    Q.  Do you recall when you described Donald Trump that way on

6    your podcast?

7    A.  No.  And actually, a lot of my guests were not fans of

8    Donald Trump as well, so --

9    Q.  You testified that you don't recall when you used --

10   A.  No.

11   Q.  Is there anything that I could show you that might refresh

12   your recollection?

13   A.  If you have something that is a transcript or an excerpt I

14   would appreciate it.

15          MS. CROWLEY:  Mr. Lam, can we pull up, just for the

16   witness and counsel, Plaintiff's Exhibit 164?

17   Q.  If you could take a look at that, don't read it, but look

18   up after you have read the first couple sentences?

19   A.  Oh wow.  OK.  Yeah.

20   Q.  Does that refresh your recollection as to when you said

21   those things about Donald Trump?

22   A.  I said those things on my episode of my podcast right after

23   January 6, 2021.

24   Q.  And what had happened on January 6?

25          MR. BRANDT:  Objection, your Honor.  Irrelevant.

N525car1                    Birnbach - Direct

1          THE COURT:  Overruled.

2    Q.  You can answer.

3    A.  What happened was the insurrection at the Capitol, and our

4    government and Constitution and democracy falling apart.

5    Q.  Ms. Birnbach, have you described Donald Trump on your

6    podcast as, *an infection like herpes that we can't get rid of*?

7    A.  I did.

8    Q.  Have you said that you think about him all the time?

9    A.  I did.  When I had a podcast, yes.

10   Q.  And did you say these things before or after you received

11   the excerpt from Ms. Carroll's book that she sent you?

12   A.  Before.  I started saying those things when he assumed the

13   presidency in 2017.

14   Q.  Do you recall saying on your podcast that, *The cult of*

15   *Trump will decline, he will be dealing with a lot of lawsuits*?

16   A.  Yes.

17   Q.  What did you mean by that?

18   A.  Well, there was talk in New York about the Trump

19   organization inflating prices when it was convenient and

20   deflating them to pay taxes.  There were all kinds of things

21   going on with the National Enquirer.  There were -- I mean, the

22   guy had done a lot of bad things and I was hoping that there

23   would be, at some point he would have to account for them.

24   Q.  You testified that your podcast ran from 2018 to 2021.

25   About how many episodes aired of your podcast?

N525car1                        Birnbach - Direct

1    A.  I don't really know.  I know -- I think 200.

2    Q.  And what was Mr. Trump's political position during the time

3    that your podcast ran?

4    A.  It started when he was president and it ended after he --

5    he moved out of the White House.  I think it ended in May of

6    2021, so President Biden -- so, Joe Biden was president.

7    Q.  Now, I have just a couple more questions.  I would like to

8    circle back to June 2019 when you received Ms. Carroll's -- the

9    excerpt from Ms. Carroll's book.  To your knowledge, had

10   Mr. Trump announced whether he was running for re-election at

11   that time?

12   A.  I don't know.

13   Q.  How, if at all, did you think that Ms. Carroll's allegation

14   against Trump would affect his chances of getting re-elected?

15           MR. BRANDT:  I will object, your Honor.  Calls for

16   speculation.

17           THE COURT:  Sustained.

18   BY MS. CROWLEY:

19   Q.  Ms. Birnbach, did you receive a subpoena to testify in this

20   trial?

21   A.  No.

22   Q.  You are testifying voluntarily?

23   A.  Yes.

24   Q.  Why?

25           MR. BRANDT:  Objection, your Honor.  That's

Case 23-793, Document 83, 11/20/2023, 3592070, Page134 of 300

A-2074

N525car1                          Birnbach - Direct

1    irrelevant.

2              MS. CROWLEY:  Your Honor, this witness' motives have

3    been repeatedly attacked by the defense counsel.

4              THE COURT:  Overruled.

5    A.  I am here because my friend, my good friend who is a good

6    person, told me something terrible that happened to her, and as

7    a result she lost her employment and her life became very, very

8    difficult.  I am here because I am her friend and I want the

9    world to know that she was telling the truth.

10             MS. CROWLEY:  One moment, your Honor?

11             (Counsel conferring)

12             MS. CROWLEY:  No further questions.

13             THE COURT:  All right.  Thank you.

14             15-minute break.

15             THE DEPUTY CLERK:  Members of the jury, please come

16   this way and bring your notebooks with you.

17             (Recess; continued on next page)

18

19

20

21

22

23

24

25

Case 23-793, Document 83, 11/20/2023, 3592070, Page135 of 300

A-2075

N522Car2                        Birnbach - Cross

1              (In open court; jury not present)

2              THE DEPUTY CLERK:  I will get the jury?

3              THE COURT:  Yes.

4              (Jury present)

5              THE COURT:  All right.  The witness is still under

6    oath.

7              Mr. Brandt.

8              MR. BRANDT:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. BRANDT:

11   Q.  Ms. Birnbach, I want to follow up on a few of the questions

12   Ms. Crowley asked you.

13             First, I think you indicated you are registered

14   Democrat, correct?

15   A.  Correct.

16   Q.  And you have made many campaign donations always to

17   Democrats, correct?

18   A.  I think I once gave a little bit of money -- none of these

19   donations are huge, but I think I once gave a little bit of

20   money to a pro-choice Republican.

21             MR. BRANDT:  Referring to the deposition, your Honor,

22   page 55.

23             THE COURT:  May I please have the deposition

24   transcript?

25             MR. BRANDT:  Yes.  Andy has it.

Case 23-793, Document 83, 11/20/2023, 3592070, Page136 of 300

A-2076

N522Car2                         Birnbach - Cross

1          THE COURT:  It was neatly camouflaged.  Go ahead.

2          MR. BRANDT:  Sure.

3    Q.  Starting at page 55/line 22, the question was:

4    "Q  Are you registered" --

5          MS. CROWLEY:  Objection, your Honor.

6          You are reading from the deposition?

7          MR. BRANDT:  Yes.

8          MS. CROWLEY:  Can we have a moment?

9          THE COURT:  Yes.

10          (Counsel confer)

11          MR. BRANDT:  No objection?

12          THE COURT:  I don't know.

13          MS. CROWLEY:  No objection, your Honor.

14          THE COURT:  55/22 to where?

15          MR. BRANDT:  56/7, let's do 56/8.

16          THE COURT:  All right.

17    BY MR. BRANDT:

18    "Q  Are you registered with any political party?

19    "A  I'm a Democrat.

20    "Q  And have you ever donated to any political campaigns in the

21    past?

22    "A  Yes.

23    "Q  Which campaigns?

24    "A  Many.

25    "Q  And have those all been democratic campaigns?

N522Car2                    Birnbach - Cross

1   "A  Yes."

2           Did you give that testimony?

3   A.  I did.

4           THE COURT:  That's why the court stenographer was

5   there.

6   Q.  Is that true testimony at the time?

7   A.  Yes.

8   Q.  Thank you.

9           And you donated to Hillary Clinton in 2016, you think?

10  A.  I think so.

11  Q.  And you donated to Joe Biden in 2020?

12  A.  Yes.

13  Q.  And it's fair to say that you are not a fan of Donald

14  Trump, as you said earlier.

15  A.  That's right.

16  Q.  And in fact, one of the things Ms. Crowley asked you was

17  whether you have or had a Facebook page, is that correct?

18  A.  Yes.

19  Q.  And I believe you answered in the affirmative, that you did

20  have a Facebook page.

21  A.  I did.

22  Q.  Do you recall saying in a Facebook post the following:

23  "Does it get worse than Donald Trump?  Could he be more of a

24  slime ball for whom there are no consequences?  Will America

25  survive this administration?  Will we?  Some days I am just not

Case 23-793, Document 83, 11/20/2023, 3592070, Page138 of 300

N522Car2                    Birnbach - Cross

1  sure.  I'll tell you one thing, in my entire life, I've never

2  felt the hatred that I feel towards this person."

3          Did you make that statement?

4  A.  Yes.

5  Q.  Also, Ms. Crowley asked you about some of your podcasts, is

6  that correct?

7  A.  Yes.

8  Q.  I would like to delve into those in a little more detail.

9          Do you recall doing a podcast with Norm Ornstein?

10  A.  I do.

11  Q.  And did you say there, "President Trump, and I don't like

12  to use those two words together"?  Did you make that statement?

13  A.  Sounds like something I would say.

14  Q.  In that same podcast, did you also say something along the

15  lines of "Throughout the three terrifying years of this

16  presidency"?

17  A.  Yes.

18  Q.  And did you say something along the lines of "Does Trump --

19  is he so delusional that he thinks this is really successful"?

20  Did you make that statement?

21  A.  Sounds like something I would say.

22  Q.  And then do you recall doing a podcast with a Steve

23  Levingston?

24  A.  Yes.

25  Q.  And do you recall make the following statement in that

Case 23-793, Document 83, 11/20/2023, 3592070, Page139 of 300

A-2079

1   podcast, "Though I feel like Donald Trump and his affiliates

2   have taken up all of our brain, I mean, I do feel for the first

3   time in my life that I think about the president all the time.

4   I should be thinking about my diet.  I should be thinking about

5   my kids more."

6           Did you make that statement?

7   A.  Yes.

8   Q.  Do you recall doing a podcast with a Mr. Kurt Andersen?

9   A.  Yes.  Did you make the following statement there, "Wow,

10  wow.  Well, you know what I mean.  I, as I say every day,

11  because I think about him, as you said, every hour, every day

12  that I'm awake, and unfortunately when I sleep, I think history

13  will be -- I mean, the history books will be written and Bill

14  Barr will be the center of some and Trump will.  I mean, it's

15  unfathomable that he will be treated as anything but a tragic,

16  cataclysmic, self-interested person who is not good for

17  America."

18          Did you say that?

19  A.  I did.

20  Q.  Do you recall doing a podcast with Alexandra Pelosi?

21  A.  I do.

22  Q.  Do you recall making the following statement in that

23  podcast:  "I cannot listen to Donald Trump speak.  I feel like

24  it irritates an infection or he is an infection.  Maybe that's

25  just me.  I just can't wait for this to be over.  And I, I'm

1   saying this because it's not going to be over soon.  No matter

2   what, he'll be president until January.  God help us.  And you

3   know what?  We're going to hear him.  We're going to hear him

4   forever.  He is part of who we are now.  He is like herpes.  We

5   got him, and we can't get rid of him."

6              MS. CROWLEY:  Objection, your Honor.  Asked and

7   answered and 403.

8              THE COURT:  Which part of it?

9              MS. CROWLEY:  The "he's like herpes."

10             MR. BRANDT:  It's appropriate evidence of bias, your

11  Honor.

12             THE COURT:  Oh, really?  I'm glad to know where you

13  are going.

14             MR. BRANDT:  I'm a master of understatement.

15             THE COURT:  Well, you know, look.  What can I say?  If

16  we want to get technical here, this question is a little

17  compound, don't you think?

18             MR. BRANDT:  It is just reading a quote and did she --

19             THE COURT:  I know it is, but we could read the Bible

20  and ask at the end of that, you know, did you say that of some

21  divine figure?

22             MR. BRANDT:  True.  This is a relatively short one.

23  And the question is did the witness make the statements.

24             THE COURT:  I'll allow it.

25             MR. BRANDT:  Thank you, your Honor.

Case 23-793, Document 83, 11/20/2023, 3592070, Page141 of 300

A-2081

N522Car2                    Birnbach - Cross

1   BY MR. BRANDT:

2   Q.  Two more, Ms. Birnbach.  Do you recall doing a podcast with

3   Chris Whipple?

4   A.  Yes.

5   Q.  And did you make the following comments there, "Yeah, way

6   back when, the cult of Trump, I think, will decline.  My

7   opinion is he is going to be dealing with a lot of lawsuits and

8   he's not going to be so powerful as he thinks he is.  I mean,

9   people think he's going to run for president.  That's total

10  crap.  He won't.  He can't.  He's not a good president."

11          Did you make that statement?

12  A.  Again, sir, it sounds like something I would have said.

13  Q.  And then one more.  Ms. Crowley touched on this.  Do you

14  recall doing a podcast with Noel Casler?

15  A.  Yes.

16  Q.  And did you make the following statement there:  "So look,

17  we know.  We know it all.  He's a madman.  He's a narcissistic

18  sociopath.  He is a malignant sociopath.  He is a demented.  He

19  is a Russian agent.  He is Vladimir Putin's asset.  I don't

20  know.  He's bad.  He's bad.  And God knows what he can do

21  before he leaves."

22          Did you make that statement?

23  A.  Yes.

24  Q.  Now, you also mentioned during your direct examination with

25  Ms. Crowley that you first met Ms. Carroll in the 1990s, is

Case 23-793, Document 83, 11/20/2023, 3592070, Page142 of 300

A-2082

N522Car2                          Birnbach - Cross

1   that right?

2   A.  Yes.

3   Q.  And I think you said you have been in touch with her to

4   some degree ever since the '90s, is that right?

5   A.  Yes.

6   Q.  First you were just friends and work colleagues?

7   A.  Yes.

8   Q.  Correct.

9        In fact, you were trying to create a pilot for a

10  public broadcasting show?

11  A.  Yes.

12  Q.  And then later you pitched another pilot to another

13  company?

14  A.  Correct.

15  Q.  And then you were also on the E. Jean talk show on one

16  occasion, is that right?

17  A.  On one occasion.

18  Q.  But today you would describe yourselves as the closest of

19  friends, is that right?

20  A.  Yes.

21  Q.  In fact, in 2019, she recommended you for a job at the

22  *Daily Beast*, correct?

23  A.  Uh-huh, yeah, that is correct.

24  Q.  And you are very close friends until today?

25  A.  Yes.

Case 23-793, Document 83, 11/20/2023, 3592070, Page143 of 300

A-2083

N522Car2                    Birnbach - Cross

1   Q.  Now, you talked about this with Ms. Crowley, and I want to

2   bore in a little deeper and this relates to the evening of the

3   2016 election.  So take yourself back in time there.  I think

4   you said you watched the 2016 election at your residence, is

5   that correct?

6   A.  Yes.

7   Q.  And you had, I think you said, 20 or 25 guests in your

8   home.

9   A.  That's right.

10  Q.  And Ms. Carroll was one of the guests in your home,

11  correct?

12  A.  Yes.

13  Q.  And all of the people who were there at the party had voted

14  for Hillary, I think you said, is that correct?

15  A.  I assume that, yes.

16  Q.  And I think you said the evening started well and, as far

17  as you were concerned, the evening ended badly.

18  A.  Yes.

19  Q.  Because Donald Trump won?

20  A.  Right.

21  Q.  And all of the friends who were there were shocked and

22  upset about that, correct?

23  A.  Correct.

24  Q.  And it's your testimony, is it not, that at that night,

25  election night, in your residence, with Ms. Carroll president,

N522Car2                    Birnbach - Cross

1   it never --

2              THE COURT:  I don't think she's even run yet.

3              MR. BRANDT:  Oh.

4              THE COURT:  You promoted her.

5              MR. BRANDT:  Sorry about that.  Present, president,

6   whatever.  Let me start over.  I apologize.

7   BY MR. BRANDT:

8   Q.  Is it your testimony that on that night, at your residence,

9   with Ms. Carroll present, it never came up in your mind the

10  connection between Ms. Carroll and Mr. Trump and the alleged

11  incident at Bergdorf Goodman?

12  A.  That is correct, it did not come up.

13  Q.  It did not enter your mind.

14  A.  I wasn't thinking about it.

15  Q.  And then also a little bit later on I think you mentioned

16  this, there was an article in the *New York Times* that you gave

17  an interview about, correct?

18  A.  Yes.

19  Q.  And you told the reporter there that you had not recalled

20  the alleged incident at Bergdorf Goodman's on election night,

21  correct?

22  A.  I have said I was -- yeah, I mean, that was the -- I know

23  the article you are speaking of, and she understood me

24  correctly as not having thought about it at that point.

25  Q.  And what you told *The New York Times* on that occasion was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N522Car2                          Birnbach - Cross

1   truthful, you had not remembered any such incident on election

2   night, correct?

3   A.  I wouldn't put it that way, sir.  I would say I wasn't

4   thinking about it.  It was in my brain, but it wasn't -- I

5   wasn't tapping that part of my brain.

6   Q.  Okay.  Well let's go to your deposition, please, and I'm

7   going to start at page 65/line 17.  Actually, starting at line

8   2.  65/2, thank you, to 21.  Let me know when everyone's ready.

9   "Q  Did you tell *The New York Times* that you had forgotten what

10  Ms. Carroll had told you in 1996 on election" --

11              MS. CROWLEY:  Objection, your Honor.

12              THE COURT:  What's the objection?

13              MS. CROWLEY:  It's not an inconsistent statement.

14              THE COURT:  You have to lay a better foundation for

15  this, Mr. Brandt.

16              MR. BRANDT:  Thank you, your Honor.

17  BY MR. BRANDT:

18  Q.  Maybe I misunderstood your testimony, Ms. Birnbach, but did

19  I recall your testimony earlier that on election night you did

20  not remember the Bergdorf incident?

21  A.  I wasn't thinking about it.  I was thinking about what was

22  happening in front of us.

23  Q.  Okay.  Well, that wasn't actually my question.  My question

24  was not whether you were or weren't thinking about it.  My

25  question was did you remember it?

N522Car2                    Birnbach - Cross

1          THE COURT:  Well, here's what the question actually

2     was.  Let me get to the precise point.

3          Page 45/line 23:  "Is it your testimony that on that

4     night at your residence, with Ms. Carroll president, it never

5     came up in your mind the connection between Ms. Carroll and

6     Mr. Trump and the alleged incident at Bergdorf Goodman?

7     "A  That is correct; it did not come up.

8     "Q  It did not enter your mind?

9     "A  I wasn't thinking about it."

10         MR. BRANDT:  And at page 65 it says doesn't remember,

11    your Honor, which is why I asked the question.

12         THE COURT:  And that's why I'm going to sustain the

13    objection.

14         MR. BRANDT:  Okay.

15         THE COURT:  I should also, just for the sake of

16    completeness, further down the same page in your examination

17    moments ago, you put the following question:  "And what you

18    told *The New York Times* on that occasion was truthful, you had

19    not remembered any such incident on election night, correct?"

20    And the witness answered:  "I wouldn't put it that way, sir.  I

21    would say I wasn't thinking about it.  It was in my brain, but

22    it wasn't -- I wasn't tapping that part of my brain."

23         So the objection is sustained.

24    BY MR. BRANDT:

25    Q.  Sitting here today, Ms. Birnbach, can you say whether or

1  not on that election night evening you did remember it or

2  didn't remember it?

3  A.  I can't answer that question.  I can tell you I wasn't

4  thinking about it.

5  Q.  Now, you do remember it now, is that correct?

6          THE COURT:  Remember what?

7          MR. BRANDT:  The incident at Bergdorf's.

8  A.  Yes.

9  Q.  And is that because Ms. Carroll reminded you of it in 2019?

10 A.  When E. Jean told me she was writing about it, she gave me

11 permission to think about it again, and there are parts of the

12 phone call—remember, it's just a phone call—that I remember

13 vividly.

14 Q.  So that memory came back to you at the time the book was

15 coming out?

16 A.  It didn't come back.  I thought about it again.

17 Q.  In any event, she said that *New York* magazine was going to

18 be excerpting a portion of it and the fact-checkers would be

19 calling you, correct?

20 A.  Yes.

21 Q.  And she even sent you the draft excerpt from the *New York*

22 magazine, correct?

23 A.  Yes.

24 Q.  And afterwards, you made public appearances about the

25 allegations yourself, correct?  I think you testified to that

N522Car2                    Birnbach - Cross

1    with Ms. Crowley.

2    A.  Not right then.  It was at least a month later.

3    Q.  But you did have some public appearances on it.

4    A.  One.

5    Q.  Okay.  Also, you mentioned something in your direct

6    examination about a couple of book events that you attended --

7    A.  Yes.

8    Q.  -- with Ms. Carroll.  Did I understand that correctly?

9    A.  Yes.

10   Q.  And I think you said one was called The Wing, is that

11   correct?

12   A.  Yes.

13          MR. BRANDT:  Could we pull up DI, please, for the

14   Court and counsel, and this is a two-page exhibit.

15   Q.  And can you tell us what it is?

16          THE COURT:  Yes, go ahead.

17   A.  What is it?  It is an e-mail I received from Ms. Carroll

18   about our event at The Wing, which was -- I don't see the date,

19   but it was in October of 2019 or November.

20          MR. BRANDT:  I would offer defendants's Exhibit DI,

21   your Honor.

22          MS. CROWLEY:  No objection.

23          THE COURT:  Received.

24          (Defendant's Exhibit DI received in evidence)

25   BY MR. BRANDT:

Case 23-793, Document 83, 11/20/2023, 3592070, Page149 of 300

N522Car2                    Birnbach - Cross

1   Q.  Just to sum up, Ms. Birnbach, was this a description of a

2   book event that you were going to attend with Ms. Carroll where

3   you -- I think you said you were going to do the Q's and she

4   was going to do the A's, is that right?

5   A.  Yes, yes.

6   Q.  And then I think you mentioned that you had one other such

7   event, is that correct?

8   A.  Yes.

9   Q.  Can we pull up DH, please.  Oh, and -- never mind.

10         And I'm only interested in the bottom half of this

11  exhibit, but before we get there, can you tell us what this is,

12  Ms. Birnbach?

13  A.  This is an e-mail from Ms. Carroll about the other book

14  event which is called Next Tribe.

15  Q.  Okay.  And I think you mentioned Next Tribe earlier in your

16  direct examination, is that correct?

17  A.  Yes.

18  Q.  If you look in the --

19         MR. BRANDT:  I would offer DH, your Honor.

20         MS. CROWLEY:  One moment, your Honor.

21         (Counsel confer)

22         MR. BRANDT:  With redactions, your Honor, I would

23  offer DH.

24         MS. CROWLEY:  With redaction, no objection.

25         THE COURT:  On that basis, received.

N522Car2                     Birnbach - Cross

1          (Defendant's Exhibit DH redacted received in evidence)

2          MR. BRANDT:  Mr. Nelson, what I would like for you to

3    do, if you look at the middle of the page, there is a thing

4    that says "sent from my iPhone," and below that it says "on

5    September 30th," could we just have the "on September 30th" and

6    below, and publish that to the jury, please.

7    BY MR. BRANDT:

8    Q.  Ms. Birnbach, this exhibit is in evidence, but this is an

9    e-mail from Ms. Carroll to you, correct?

10   A.  Correct.

11   Q.  And just to summarize, it says, "Yes, we're first.  Yes, 15

12   minutes.  Hell, yes.  If you can get copies of *True Prep* to

13   Jeannie or have a bookseller come in and sell them, that would

14   be excellenté.  Jeannie's e-mail is Jeannie@nexttribe.com.  She

15   is the founder."

16          Then continuing on it says, "And even if you can't get

17   20 or 30 books there, we'll talk about your book and my book

18   anyway.  The main thing is to"——and this is in all caps——"sell

19   books!!"  Is that correct?

20   A.  Yes.

21   Q.  And what you were doing was trying to sell Ms. Carroll's

22   books, correct?

23   A.  She was on a book tour.  I mean, correct, and I would say

24   that she really wasn't able to have a book tour, so these two

25   events were about as much as she got to do.

N522Car2                    Birnbach - Redirect

1   Q.  But the purpose of what you were helping her with at this

2   point with her book was to sell books, correct?

3   A.  Well, yes.  That's how writers make money.

4   Q.  And that's what she said here.

5   A.  Yes.

6          MR. BRANDT:  Thank you.  That's all I have.

7          THE COURT:  Okay.  Thank you.

8          Redirect?

9          MS. CROWLEY:  Just one moment, your Honor.

10         THE COURT:  You may proceed.

11         MS. CROWLEY:  Thank you.

12  REDIRECT EXAMINATION

13  BY MS. CROWLEY:

14  Q.  Ms. Birnbach, Mr. Brandt just showed you an e-mail marked

15  DH, where you and Ms. Carroll discussed an event on her book

16  tour.

17  A.  Um-hmm.

18  Q.  You testified that Ms. Carroll was not able to have a book

19  tour?

20  A.  That's right.

21  Q.  What did you mean by that?

22  A.  Well, ordinarily a writer of her fame and renown would go

23  on a several-city or many-city book tour.  I have done that on

24  many occasions.  And you sign books at book stores, you do TV

25  and radio interviews, and so on.  But because of security

N522Car2                    Birnbach - Redirect

1    concerns, Ms. Carroll didn't get to have a tour.

2    Q.  What were the security concerns?

3    A.  That followers of Mr. Trump were harassing --

4            MR. BRANDT:  Objection, your Honor.

5            THE COURT:  Pardon me?

6            MR. BRANDT:  Objection, irrelevant.

7            MS. CROWLEY:  Your Honor, he elicited this testimony.

8            THE COURT:  Yes.  Continue.

9    A.  Should I?

10   Q.  Yes, you can continue.

11   A.  The concern was for her safety because followers of

12   Mr. Trump's were threatening her.

13   Q.  Mr. Brandt asked you several questions on cross-examination

14   about your political affiliation.  Do you recall those?

15   A.  Yes, I do.

16   Q.  As well as your feelings about Donald Trump as the

17   president.  Do you remember those?

18   A.  I do.

19   Q.  When Ms. Carroll called you in 1996 and told you that

20   Donald Trump had just assaulted her, was he known as a

21   political figure?

22   A.  Not at all.

23   Q.  I'm going to show you what's been marked for identification

24   as Plaintiff's Exhibit 133, if you could just display that for

25   the witness and counsel.  And Mr. Lam, if we could focus on the

Case 23-793, Document 83, 11/20/2023, 3592070, Page153 of 300

N522Car2                      Birnbach - Redirect

1    sort of middle of the page.  Yup.

2             Do you recognize this?

3    A.  Yes.

4    Q.  What is it?

5    A.  It's a text conversation between Ms. Carroll and me.

6             MR. FERRARA:  Plaintiff offers Plaintiff Exhibit 133.

7             MR. BRANDT:  No objection.

8             THE COURT:  Received.

9             (Plaintiff's Exhibit 133 received in evidence)

10   BY MS. CROWLEY:

11   Q.  At the top of the screen, there is a text message from

12   Ms. Carroll to you.  There is a text message from Ms. Carroll

13   to you that says, "We could go" -- it starts in the middle.  It

14   says, "We could go to a restaurant near you.  Megan agrees with

15   you.  She didn't like Sardi's."

16            Who is the Megan in the text?

17   A.  It's the reporter from *The New York Times*, Megan Twohey.

18   Q.  And what is the lunch or food discussion that Ms. Carroll

19   is talking about?

20   A.  She is talking about the interview that I had agreed to

21   have on the record with Megan Twohey and Carol Martin.

22   Q.  And you respond, "I'm leaning towards going on the record."

23   What does going on the record mean?

24   A.  Well, it meant that *The New York Times* could use my name

25   and identify me as the person that Ms. Carroll called right

N522Car2                        Birnbach - Redirect

1    after the episode.

2    Q.  You then say, "It wasn't political in 1996 when you told me

3    it was personal."  What did you mean by that?

4    A.  Donald Trump in 1996 was a well-known New York person.  He

5    was not in politics.  He was not near politics.  He was a guy

6    who liked publicity and attention and he was also a known

7    womanizer.  And so I said here what I mean in the deepest part

8    of my heart and my brain.  My friend wasn't raped by a

9    president.  She was assaulted by a guy, a real estate guy, who

10   liked women and harassed a lot of women.  So it wasn't --

11           MR. BRANDT:  Move to strike, your Honor.

12           THE COURT:  Pardon?

13           MR. BRANDT:  Move to strike.  That's not responsive,

14   and goes way beyond the bounds of the question, and it's 403.

15   BY MS. CROWLEY:

16   Q.  The question was what did you mean by it was personal, not

17   political?

18   A.  It was --

19           THE COURT:  Just give me a second, folks.

20           MR. BRANDT:  The last part of the answer.

21           THE COURT:  I can't hear you.

22           MR. BRANDT:  The last part of the answer.

23           THE COURT:  I'm trying to get exactly what the

24   objection is to.  Give me a moment.

25           MR. BRANDT:  Lacks foundation.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page155 of 300

1              THE COURT:  Members of the jury will disregard the

2    part of the answer that came after the phrase "a guy, a real

3    estate guy."

4    BY MS. CROWLEY:

5    Q.  Ms. Birnbach, Mr. Brandt asked you a question -- questions

6    about several statements that you made about Donald Trump the

7    president on your podcast.  Do you recall those?

8    A.  Yes.

9    Q.  Fair to say that you were not a supporter of Donald Trump

10   for president?

11   A.  That is fair.

12   Q.  Would you lie to prevent Donald Trump from being president?

13   A.  Never.

14   Q.  Would you give public interviews about an untrue story in

15   order to prevent Donald Trump from being president?

16   A.  No, of course not.

17   Q.  Would you walk into court and perjure yourself in order to

18   prevent Donald Trump from being president?

19   A.  Never in a million years.

20              MS. CROWLEY:  One moment, your Honor.

21              (Counsel confer)

22              MS. CROWLEY:  Nothing further.

23              THE COURT:  Thank you.

24              Anything else, Mr. Brandt?

25              MR. BRANDT:  Just briefly, your Honor.

Case 23-793, Document 83, 11/20/2023, 3592070, Page156 of 300

A-2096

N522Car2                    Birnbach - Recross

1    RECROSS EXAMINATION

2    BY MR. BRANDT:

3    Q.  Ms. Birnbach, I think what you just said in response to

4    Ms. Crowley was back in 1996 Mr. Trump was not a political

5    figure, correct?

6    A.  Correct.

7    Q.  But in 2019, when these allegations surfaced and

8    Ms. Carroll's books came out and she gave interviews and you

9    gave interviews, he was a political figure, correct?

10            MS. CROWLEY:  Objection to form.

11            THE COURT:  Rephrase it, counselor.

12            MR. BRANDT:  Sure, your Honor.

13    BY MR. BRANDT:

14    Q.  In 2019, he was a political figure, correct?

15    A.  Yes.

16    Q.  He was president.

17    A.  Yes.

18            MR. BRANDT:  That's all I have.  Thank you.

19            THE COURT:  All right.  Thank you.

20            Anything else?

21            MS. CROWLEY:  Nothing further.

22            THE COURT:  Ms. Birnbach, you are excused.  Thank you.

23            THE WITNESS:  Thank you.

24            (Witness excused)

25            THE COURT:  Next witness.

Case 23-793, Document 83, 11/20/2023, 3592070, Page157 of 300

A-2097

N522Car2                         Leeds - Direct

1            MR. FERRARA:  The plaintiff calls Jessica Leeds.

2       JESSICA LEEDS,

3            called as a witness by the plaintiff,

4            having been duly sworn, testified as follows:

5            THE COURT:  Mr. Ferrara.

6            MR. FERRARA:  Thank you, your Honor.

7       DIRECT EXAMINATION

8       BY MR. FERRARA:

9       Q.  Good morning, Ms. Leeds.

10      A.  Good morning.

11      Q.  Where do you live?

12      A.  I live in Ashville, North Carolina.

13      Q.  How old are you?

14      A.  81.

15      Q.  Briefly, could you describe your education?

16      A.  I have not gotten a degree from college, but I've got the

17      college courses.

18      Q.  Are you currently working?

19      A.  No, I'm retired.

20      Q.  What did you do before you retired?

21      A.  I was a stockbroker.

22      Q.  Where did you work as a stockbroker?

23      A.  I worked for about 30 years for a company by the name of

24      Hornblower down in the Wall Street area, 20 Broad.

25      Q.  Have you ever met the defendant in this case, Donald Trump?

N522Car2                        Leeds - Direct

1     A.  Yes.

2     Q.  Where did you meet him?

3     A.  I met him first on an airplane in I think 1979 or '8.

4     Q.  Where were you flying to and from?

5     A.  I was flying into New York.  I can't remember whether it

6     was from Dallas or from Atlanta.

7     Q.  How often were you flying around that time?

8     A.  At that time I was working for a newsprint company as a

9     traveling sales representative, and I was basically traveling

10    three weeks out of four.

11    Q.  Do you recall what month that particular flight was?

12    A.  I believe it was like September.

13    Q.  What time of day was the flight?

14    A.  It was midday because I can remember the lights from the

15    sun were still streaming into the airplane.

16    Q.  How old would you have been at that time?

17    A.  37.

18    Q.  I want to show you what's been marked for identification as

19    Plaintiff's Exhibit 18.  What is -- do you recognize this?

20    A.  Yes.

21    Q.  What is that?

22    A.  That's a picture of me on Lake Michigan in '79.

23             MR. FERRARA:  Plaintiff offers 18.

24             MR. TACOPINA:  No objection.

25             THE COURT:  Received.

Case 23-793, Document 83, 11/20/2023, 3592070, Page159 of 300

A-2099

N522Car2                      Leeds - Direct

1           (Plaintiff's Exhibit 18 received in evidence)

2    BY MR. FERRARA:

3    Q.  Is this how you looked around the time of the flight where

4    you met Mr. Trump?

5    A.  No.  At that time I was wearing my hair quite long.

6    Q.  On the flight your hair would have been long?

7    A.  Yes.

8    Q.  We can bring that down.  Thank you.

9           So where -- when you boarded the plane, where were you

10   sitting?

11   A.  I was sitting in the back part of the coach.

12   Q.  Did your seat change?

13   A.  Yes.

14   Q.  What happened?

15   A.  The stewardess came down the aisle, one of the stewardesses

16   came down the aisle and asked me if I would like to come up to

17   first class.

18   Q.  What did you say?

19   A.  Yes, of course.

20   Q.  So where did you -- where were you seated at that point?

21   A.  So I came up and it was the first seat on the right side of

22   the bulkhead.

23   Q.  If you wouldn't mind, just so that we can picture it,

24   how -- what was the layout of the first class cabin like on

25   that flight?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N522Car2                         Leeds - Direct

1   A.  It was on the left side, towards the front of the airplane,

2   there were three rows, and on the right side, because of the

3   bulkhead took up one row, there was only two rows.

4   Q.  So is this a plane that would have had one aisle down the

5   middle or two aisles?

6   A.  No, it had one aisle.

7   Q.  And so, again, just to make sure we understand it, so

8   there -- and how many seats per row per side in first class?

9   A.  Two.

10  Q.  So on the left side of the aisle, as you are facing the

11  front of the plane, it would be three rows of two seats?  Do I

12  have that right?

13  A.  No, just two rows on either side of the aisle.

14  Q.  Okay.  So which row were you -- which seat were you in?

15  A.  I was in the aisle seat in the first two seats facing the

16  bulkhead.  The bulkhead was right in front of us.

17  Q.  How many other people were -- did you -- if you are recall,

18  how many other people were seated in first class on that

19  flight?

20  A.  I seem to recall that it was full.

21  Q.  Who -- so who, if anyone, was sitting next to you?

22  A.  When I got up there and sat down, the gentleman sitting by

23  the window introduced himself as Donald Trump.  We shook hands.

24  Q.  Before we talk about your interaction with Mr. Trump, were

25  there flight attendants in the first class cabin?

N522Car2                    Leeds - Direct

1   A.  There was one flight -- the flight attendant who had asked

2   me to come up.

3   Q.  And were any women seated in first class other than you?

4   A.  No.

5   Q.  So at the time of this flight, when he introduced himself,

6   did you know who Mr. Trump was?

7   A.  No.  I was working out of Connecticut, living in

8   Connecticut, and so I wasn't aware of the social scene or the

9   real estate scene in New York City.

10  Q.  What, if any, conversation did the two of you have?

11  A.  I don't remember anything substantial.  It was just chat.

12  Q.  Did there come a time when that changed?

13  A.  Well, what happened was they served a meal, and it was a

14  very nice meal, as Braniff was -- was -- reputation to do, and

15  it was cleared and we were sitting there when all of a sudden

16  Trump decided to kiss me and grope me.

17  Q.  What led to that?  Was there conversation?

18  A.  There was no conversation.  It was like out of the blue.

19  Q.  Do you recall saying anything that would have suggested to

20  Mr. Trump that that was an invited advance?

21  A.  Not at all.

22  Q.  What did you -- so describe, if you would, what he did

23  exactly.

24  A.  Well, it was like a tussle.  He was -- his hands and -- he

25  was trying to kiss me, he was trying to pull me towards him.

Case 23-793, Document 83, 11/20/2023, 3592070, Page162 of 300

A-2102

N522Car2                              Leeds - Direct

1   He was grabbing my breasts, he was -- it's like he had 40

2   zillion hands, and it was a tussling match between the two of

3   us.  And it was when he started putting his hand up my skirt

4   that that kind of gave me a jolt of strength, and I managed to

5   wiggle out of the seat and I went storming back to my seat in

6   the coach.

7   Q.  What -- were you saying anything as this was happening?

8   A.  I don't think there was a word or a sound made by either

9   one of us.

10  Q.  What about -- did you scream or yell?

11  A.  No.

12  Q.  What about the other people -- did -- were you able to see

13  whether other people were reacting in the cabin?

14  A.  I can remember thinking that the people behind us must have

15  thought something was going on because the chair was wiggling

16  around, and I can remember the guy sitting across the aisle

17  from me, his eyes were like saucers.  But -- and I can remember

18  thinking where is the stewardess?  Why doesn't someone come and

19  help me?  And then I realized nobody was going to help me, I

20  had to do it myself, and that's when I got the strength to get

21  up and get out.

22  Q.  Why didn't you yell or shout or sort of exclaim something

23  to draw attention to what was happening?

24  A.  Well, in my head, I think I called him a name, but, no,

25  not -- it never occurred to me to yell out.

Case 23-793, Document 83, 11/20/2023, 3592070, Page163 of 300

A-2103

N522Car2                         Leeds - Direct

1    Q.  Why not?

2    A.  I don't know.

3    Q.  How long did that -- how long did Mr. Trump sort of -- was

4    he grabbing and groping you?

5    A.  Well, it seemed like forever, but it probably was just a

6    few seconds.

7    Q.  Did you later give -- since this encounter, have you given

8    interviews about it?

9    A.  Yes.

10   Q.  Do you recall saying in an interview that it lasted

11   significantly longer than a few seconds?

12   A.  I think the first time somebody asked me that, in fact I

13   think it was Anderson Cooper's program, he -- I said something

14   about 15 minutes, but it couldn't -- it just seemed like

15   forever, but it was seconds.

16   Q.  Sorry, I think you testified that you went back to your

17   seat in the back, is that right?

18   A.  Correct.

19   Q.  Who, if anyone, did you tell what had happened while you

20   were still on the plane?

21   A.  I didn't tell anybody.

22   Q.  Why not?

23   A.  It never occurred to me to tell anybody.

24   Q.  What about when the flight landed?  Did you tell anyone on

25   the -- in the plane's crew?

Case 23-793, Document 83, 11/20/2023, 3592070, Page164 of 300

N522Car2                          Leeds - Direct

1    A.  I did stay on the airplane until everybody had left because

2    I didn't want to take the chance of running into him again out

3    in the terminal, but, no, I didn't complain to the stewards, I

4    didn't complain to the airline people.  I just got in my car

5    and drove home.

6    Q.  Who did you tell, let's say, at work immediately after the

7    incident?

8    A.  I did not tell anybody at work because I didn't think they

9    would be interested in my experience.

10   Q.  Why not?

11   A.  At that time, in that place, in the work environment, men

12   basically could get away with a lot.  And that's sort of where

13   I put it.

14   Q.  Did there come a time when you decided to speak publicly

15   about what Mr. Trump had done to you?

16   A.  Yes, when it became apparent to me that he wanted to run

17   for president, I started telling everybody.  I didn't think he

18   was much of a businessman, but I thought even less of him as a

19   person.  So I started -- I started off telling my family,

20   telling my children, telling my friends, my neighbors, my book

21   club.  I told everybody and anybody who would listen to me.

22   Q.  Why was it important to you to do that?

23   A.  Because I thought that he was not the kind of person we

24   wanted as president.

25   Q.  I think we mentioned this, you mentioned Anderson Cooper.

N522Car2                        Leeds - Direct

1    Have you -- did there come a point in time where you did some,

2    we will say, media appearances?

3    A.  Oh, yeah, there was quite a scrim.

4    Q.  How did those come about?

5    A.  Well, after the *Times* story, which was published October

6    12, there were a bunch of reporters sitting outside my

7    apartment building, and one of them who managed to get past the

8    doormen -- they were very protective of me, but one of them got

9    past the doorman and it happened to be the booker for Anderson

10   Cooper.  Well, since it had been Anderson Cooper who had asked

11   Trump the question during the debate that he had had with

12   Hillary, which Trump denied that he had ever, ever groped or

13   been inappropriate to a woman, that so infuriated me that I

14   agreed to be on his show.

15   Q.  You mentioned a *New York Times* story.  What was *The New*

16   *York Times* story?

17   A.  Well, after the debate where Trump denied that he had

18   had -- been aggressive towards any woman, I was so angry that I

19   didn't sleep well, and the next morning I woke up and I opened

20   my door and there was my *New York Times* sitting at the door,

21   and I picked it up and I said, I know what I'll do?  I'll write

22   a letter to the editor.  I'll tell my story in that letter.

23   And I sat down and I wrote a letter and I didn't proofread it,

24   I didn't -- I just sent it off.  And then I went out and I came

25   back and my phone was ringing, I picked it up and this lady

N522Car2                          Leeds - Direct

1    introduced herself as Megan Twohey from *The New York Times*, and

2    she said very kindly, we can't print your letter, but I would

3    like to send over a reporter and you can tell your story to

4    him.

5           So, sure enough, a reporter showed up.  We talked for

6    most of the day.  And then they said, well, we would like to

7    take some pictures.  Okay.  So they came with a photographer

8    and they took some pictures.  And then they said, we would like

9    to do a video.  Okay.  So we did a video.

10          And the video came out on a Wednesday, and then it was

11   Thursday morning that they printed my story.  It -- I don't

12   know if you have ever had the experience of picking up a

13   newspaper and seeing your face on the front page.  It was, wow,

14   I was amazed.

15   Q.  I want to show you what's been marked for identification as

16   Plaintiff's Exhibit 26.

17          MR. FERRARA:  May I approach the witness, your Honor?

18          THE COURT:  Yes.

19   Q.  Do you recognize that?

20   A.  Yes.

21   Q.  What is that?

22   A.  This is the debate that he --

23   Q.  Is -- I'm sorry to cut you off.

24   A.  This is the debate where Anderson Cooper asked him if he

25   had harassed a woman physically.

Case 23-793, Document 83, 11/20/2023, 3592070, Page167 of 300

N522Car2                        Leeds - Direct

1   Q.  So just to back up two beats, is that a DVD?

2   A.  Yes.

3   Q.  And how do you know that what you just described is on the

4   DVD?

5   A.  My signature is on it and the date.

6   Q.  Were you able to view it before testifying?

7   A.  Yes.

8            MR. FERRARA:  Your Honor, plaintiffs offer 26.

9            MR. TACOPINA:  Objection.

10           THE COURT:  What's the objection?

11           MR. TACOPINA:  Relevance.  We're going to offer a

12  presidential debate into evidence for the jury to see a

13  presidential debate?  She testified she watched it.  She can

14  talk about her reactions to it.  But offering the debate into

15  evidence --

16           THE COURT:  Is it an excerpt or is it a larger?

17           MR. FERRARA:  It is an excerpt, your Honor, which is

18  the point that Ms. Leeds was just making that she saw.

19           THE COURT:  How long is the excerpt?

20           MR. FERRARA:  Maybe a minute 45 seconds?

21           (Video played)

22           THE COURT:  Hold it.

23           MR. FERRARA:  Your Honor, if it would be helpful, I

24  was going to show, just for the witness, Plaintiff's 26T which

25  is a transcript which we could look at to get a sense of the

N522Car2                        Leeds - Direct

1      length.

2              THE COURT:  Okay.

3              MR. FERRARA:  So 2 minutes 27 seconds.  I was off by a

4      minute.

5              MR. TACOPINA:  Is there some more?

6              MR. FERRARA:  Yes.  We can scroll down, Mr. Lam.

7      Thank you so much.

8              THE COURT:  All right, Mr. Tacopina now tell me the

9      objection.

10             MR. TACOPINA:  What's that, your Honor?

11             THE COURT:  Now tell me the objection.

12             MR. TACOPINA:  I'm just reading the last part.

13             THE COURT:  Take your time.

14             MR. FERRARA:  Sorry, Mr. Lam, could we -- thank you so

15     much.

16             THE COURT:  And remind me, Mr. Ferrara, did I rule on

17     this pretrial?

18             MR. FERRARA:  I don't believe there has been a motion

19     on this.

20             (Counsel confer)

21             MR. TACOPINA:  Just that snippet, we have no objection

22     to just that snippet being played.

23             THE COURT:  Plaintiff's 26 is received.

24             MR. TACOPINA:  Limited to just that portion that was

25     on the screen.

Case 23-793, Document 83, 11/20/2023, 3592070, Page169 of 300

 1              THE COURT:  I don't know what that means.

 2              MR. TACOPINA:  Well --

 3              MR. FERRARA:  That's all that's on the disk, your

 4      Honor.

 5              THE COURT:  Okay.  So 26 and the transcript 26T are

 6      both received.

 7              Members of the jury, as to the transcript, I say the

 8      same thing I have said to you before.  That's to help you

 9      listen to the video.  It's the video that controls.  Okay.

10      Let's go.

11              MR. FERRARA:  Thank you.

12              Mr. Lam, if we could play Plaintiff's 26.

13              (Plaintiff's Exhibit 26, 26T received in evidence)

14              (Video played)

15              MR. FERRARA:  Thank you, Mr. Lam.

16      BY MR. FERRARA:

17      Q.  Ms. Leeds, did you watch that debate live?

18      A.  Yes.

19      Q.  What was your reaction?

20      A.  I was furious.

21      Q.  Why?

22      A.  Because he was lying.

23      Q.  How did you know?

24      A.  The experience I had with him, stories I had heard from

25      other people.

N522Car2                         Leeds - Direct

1           MR. TACOPINA:  Objection, your Honor.

2           THE COURT:  Strike stories she heard from other

3    people.

4    BY MR. FERRARA:

5    Q.  I'll ask another question, Ms. Leeds.

6           Let me ask a few questions about -- just to finish

7    this idea of media appearances.  Do you recall sitting here

8    today other -- I think you mentioned Anderson Cooper and *The*

9    *New York Times*.  Any other media appearances that you recall?

10   A.  There were -- there seemed to be a lot of interest, which I

11   found very surprising.  There was foreign press, there was a

12   group even from Japan and France, and a couple more appearances

13   on CNN and MSNBC.

14   Q.  Were you compensated for any of those appearances?

15   A.  No.

16   Q.  Why did you do them?

17   A.  Well, first of all, it would never occur to me to be paid,

18   that this was a financial kind of thing.  This was something I

19   felt that I wanted to tell people so that they could make an

20   informed decision.

21   Q.  What public response did you experience after you spoke

22   publicly about what Mr. Trump had done to you?

23   A.  Well, my kids would not let me listen to any messages on my

24   phone message machine.  I do not have a social presence.  I

25   don't do Facebook.  I don't do any of that.  What I experienced

N522Car2                        Leeds - Direct

1    was the phenomena of people saying to me, Thank you very much,

2    and you are so brave, and that basically continues to this day.

3    Q.  Do you recall -- I want to ask you a few questions about

4    how, if at all, Mr. Trump responded.  Do you recall when the

5    *New York Times* ran your story?

6    A.  Well, right after the debate.  It was the week after the

7    debate.  I think it was October 12.

8    Q.  Of 2016?

9    A.  Of 2016.

10   Q.  Do you know whether Mr. Trump ever responded?

11   A.  I heard that during a rally -- not a rally, but one of his

12   appearances right after that that he said something about that

13   he acknowledged that somebody on an airplane was making a claim

14   against him, but look at her, I would never make a pass at her,

15   which was a reflection of the fact that he is now looking at

16   a -- well, then, 76-year-old woman as opposed to a 38-year-old

17   woman.

18              MR. FERRARA:  May I approach, your Honor?

19              THE COURT:  How much longer do you expect to be on

20   direct?

21              MR. FERRARA:  Maybe ten more minutes, your Honor.

22              THE COURT:  Lunch break.  2:00, folks.

23              (Luncheon recess)

24

25

N525car3                          Leeds - Direct

1                  A F T E R N O O N   S E S S I O N

2                              2:00 p.m.

3              THE COURT:  Bring in the jury.

4              MR. TACOPINA:  Your Honor, there is going to be an

5      issue coming up that I should have fronted earlier but it is an

6      objection to something they're going to be putting in.  Is it

7      possible to have a side bar once they're seated?

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 23-793, Document 83, 11/20/2023, 3592070, Page173 of 300

A-2113

N525car3                          Leeds - Direct

1              (Jury present)

2              THE COURT:  Members of the jury, while you were

3     walking in the lawyers told me they need to seed me at side

4     bar.  Please bear with us for a minute.

5              (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N525car3                          Leeds - Direct

1                  (At side bar)

2          MR. TACOPINA:  First of all, thank you for not ratting

3   me out to the jury that it was me.  You said "lawyers" in a

4   very generic tone and so I appreciate that.

5          Mr. Ferrara had just mentioned something they wanted

6   to introduce -- and it will actually cover two witnesses, it

7   will save the objection for the next witness -- basically it is

8   denials by Trump to the claim that Ms. Leeds is making, and

9   then tomorrow it will be the same thing, the claim that

10  Ms. Stoynoff is making.  And I said, my objection is it is

11  not -- there is no defamation claim against them, they want to

12  put it in for modus operandi evidence.

13         THE COURT:  I don't understand.

14         MR. TACOPINA:  OK.  They intend on introducing

15  evidence by way of video -- I think?

16         MR. FERRARA:  Correct.

17         MR. TACOPINA:  -- where Donald Trump will say this

18  lady on the airplane is not telling the truth, sum and

19  substance.  Same thing tomorrow.

20         THE COURT:  Well, didn't we already get that this

21  morning?

22         MR. FERRARA:  We have -- this morning we had Ms. Leeds

23  testified to Donald Trump responding to her allegations, she

24  was aware of this campaign speech.  I would like to play the

25  campaign speech.  Our -- it is not hearsay.  Our theory of

A-2115

1    relevance is that just that when -- essentially, when Donald

2    Trump assaults a woman and she comes forward, he denies it and

3    then he says that she is too ugly to sexually assault.  And he

4    has done it with Ms. Carroll, we are going to prove he did it

5    with Ms. Leeds, and we are going to prove he did it with

6    Ms. Stoynoff.  So that is essentially the modus operandi.

7              MR. TACOPINA:  It is sort of a bootstrapping argument.

8              THE COURT:  It is looping.

9              MR. TACOPINA:  I never should have used the word that

10   in that letter, but yes, it assumes that an assault happened

11   and I think that is still an issue that is up in the air for

12   the jury.  So, he said, When he assaults someone, he denies it.

13   Well, maybe he didn't assault someone and denies it.

14             THE COURT:  Well, the evidence he is proposing to

15   offer is not evidence as to whether or not it happened except

16   to the extent that Trump says it didn't.

17             MR. TACOPINA:  Yeah.

18             THE COURT:  They're not offering it for the truth of

19   Trump's statement, they're offering it for the fact that he

20   said it.

21             MR. TACOPINA:  I understand.  Just -- they have, on

22   the record, that she heard that Trump denied it.  I don't think

23   they should be able to play his speech denying it and, you

24   know, whatever he says about it directly.  I mean, I think

25   that's in evidence and, again, there is no defamation claim

N525car3                          Leeds - Direct

1   here.

2            THE COURT:  And you are agreeing it is not hearsay, it

3   is in evidence, it is stipulated.

4            MR. TACOPINA:  It's stipulated?

5            THE COURT:  Well, I am asking you.

6            MR. TACOPINA:  What she testified to, she testified to

7   without objection.

8            THE COURT:  That's not what I am asking you.

9            MR. TACOPINA:  OK.  What are you asking me?

10           THE COURT:  I am asking you whether you are prepared

11   to stipulate that Trump denied it publicly.

12           MR. FERRARA:  Your Honor, respectfully, that would not

13   go to our --

14           MR. TACOPINA:  Sure.

15           MR. FERRARA:  That does not go the whole way towards

16   what we are trying to do.

17           Donald Trump denied -- forcefully denied Ms. Carroll's

18   allegations.

19           THE COURT:  Right.

20           MR. FERRARA:  What we want to show is that there are

21   two other credible sexual assaults that he committed, or

22   assaults that he committed, and that he did the exact -- he

23   denied them in the exact same way which undercuts --

24           THE COURT:  The exact same way how?

25           MR. FERRARA:  He is going to say, *This is crazy.*  With

Case 23-793, Document 83, 11/20/2023, 3592070, Page177 of 300

A-2117

1   respect to Ms. Leeds there is a suggestion that it is a

2   democratic, some conspiracy to bring him down, and he is going

3   to say, *Look at her, she's not my type*, etc.  And I don't

4   remember the exact words but it is similar with Ms. Stoynoff.

5   And so, the idea is it undercuts his denial of Ms. Carroll

6   because he is doing it the same way multiple times.

7            THE COURT:  I will allow it.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N525car3                          Leeds - Direct

1              (In open court)

2              THE COURT:  OK, Ms. Leeds.  You are still under oath.

3              Mr. Ferrara, you may proceed.

4              MR. FERRARA:  Waiting for the court reporter, your

5    Honor.

6              THE COURT:  Always a good idea.

7    BY MR. FERRARA:

8    Q.  Ms. Leeds, before we took a break you were testifying about

9    Mr. Trump's response to you speaking publicly and I wanted

10   to -- your Honor, if I may approach -- I want to show you

11   what's been marked for identification as Plaintiff's Exhibit

12   31.  Do you recognize that?

13   A.  Yes.

14   Q.  What is that?

15   A.  It's a disk of the rally that Trump spoke at.

16   Q.  Let me -- and is this the -- how do you know?

17   A.  I remember seeing it when he had a rally and it was

18   reported to me that he had made some remarks about me being

19   somebody on an airplane.

20   Q.  I asked you a bad question.  I apologize.

21              I just meant is that a DVD you have had the

22   opportunity to review before?

23   A.  Yes.

24   Q.  And how do you recognize it?

25   A.  I have my signature on it, and date.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Let me also show you what's been marked for identification

2    as Plaintiff's Exhibit 31T-like-tango.  Ms. Leeds, before you

3    testified, did you have an opportunity to look at this

4    transcript while you followed along with the video on

5    Plaintiff's Exhibit 31?

6    A.  Yes.

7    Q.  Does this transcript fairly and accurately depict what was

8    said on that, in that video?

9    A.  Yes.

10            MR. FERRARA:  Your Honor, plaintiffs offer 31 and 31T.

11            THE COURT:  They are received.

12            (Plaintiff's Exhibits 31 and 31T received in evidence)

13            THE COURT:  Ladies and gentlemen, same instructions

14   about the transcript I have given previously.

15            MR. FERRARA:  I will just, your Honor, approach, and

16   retrieve that exhibit.

17            Thank you, Ms. Leeds.

18            Mr. Lam, if we could bring up 31 for the -- thank you,

19   and play this exhibit?  Thank you.

20            (Video played)

21            MR. FERRARA:  We can take that down, Mr. Lam.  Thank

22   you.

23   Q.  Ms. Leeds, who do you understand Mr. Trump to be referring

24   to?

25   A.  I believe I was the only person who had this story so I

Case 23-793, Document 83, 11/20/2023, 3592070, Page180 of 300

A-2120

N525car3                          Leeds - Direct

1     thought it was me.

2     Q.  What did you understand him to mean when he said you would

3     not be his first choice?

4     A.  This is why I gave the Times a picture of me at the time

5     that I would have met Trump, so that -- because I knew he could

6     not imagine making a pass at a 78-year-old woman.

7     Q.  I want to ask -- change topics for a moment, Ms. Leeds.  I

8     want to ask a few more questions about your sort of political

9     views.  Do you consider yourself politically active?

10    A.  Yes.

11    Q.  In what ways?

12    A.  Well, since my grandmother was a suffragette I vote in

13    every election whether I know the issues or not.  I contribute

14    some to candidates that I like.  And, yes, I try to watch it

15    and read and educate myself on the issues.

16    Q.  Are you registered with a political party?

17    A.  Yes, I am.

18    Q.  Which one?

19    A.  Democratic.

20    Q.  Can you give us a sense of which candidates or, you know,

21    you recall contributing to?

22    A.  Well, I contributed to Raphael Warnock in Atlanta in

23    Georgia, and to Stacey Abrams.  I contributed to whoever was

24    running against Susan Collins and I don't remember her name.

25    Locally, in North Carolina, I have contributed to several

Case 23-793, Document 83, 11/20/2023, 3592070, Page181 of 300

A-2121

N525car3                          Leeds - Direct

1   candidates there.

2   Q.  Have you ever contributed to Hilary Clinton?

3   A.  No, I never did.

4   Q.  Do you recall ever testifying about wanting a button or

5   getting a button from her?

6   A.  Oh yeah, because my daughter is quite involved with

7   politics in North Carolina, yes.  I have gotten buttons.  We

8   voted.

9   Q.  How much did you have to give --

10  A.  They just gave them out, there was no cost.

11  Q.  Have you ever donated to a republican candidate?

12  A.  No.

13  Q.  Are you familiar with the plaintiff in this matter, E. Jean

14  Carroll?

15  A.  She contacted me about an article she was writing several

16  years after -- after that election.

17  Q.  Had you met Ms. Carroll before?

18          THE COURT:  I'm sorry.  Which election?

19  A.  The Trump-Clinton election, so while Trump was president.

20  Q.  Had the two of you met?

21  A.  Only on Zoom.

22  Q.  Do you recall when that was?

23  A.  Well, I had moved to North Carolina in 2019 so it was, I

24  think, in the summertime of 2019.

25  Q.  Are you familiar with her allegations in this matter?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N525car3                         Leeds - Direct

1    A.  I think at that time that I was aware that she had written

2    a book, and yes.

3    Q.  How would you describe your relationship with Ms. Carroll

4    today?

5    A.  An acquaintance but not a friend.

6    Q.  Before I sit down, did you ever encounter Mr. Trump again

7    after he assaulted you on the plane?

8    A.  As a matter of fact, yes, I did.

9    Q.  When was that?

10   A.  Well, when I first got to New York in '81 I got a job at

11   the Humane Society of New York on 59th Street, and they were

12   holding a fundraiser, a gala, at Saks Fifth Avenue, for all of

13   their designers, and I was asked to man the table that

14   distributed the table number for each guest.  And I had a nice

15   dress and so there I was, on what I considered just a New York

16   event evening at Saks Fifth Avenue, and everybody was dressed

17   up to the nines.  And I got to meet Bill Blass, and Geoffrey

18   Beene, and Donna Karan, and even Gloria Vanderbilt and a whole

19   bunch of designers.  And while I was handing out the table

20   chips, Trump and his very, very pregnant wife Ivana, came up to

21   the table.  And I looked at him and I thought, boy, I remember

22   you.  I didn't say anything but it went through my head.  And

23   as he took the chip from my hand he looked at me and he said, *I

24   remember you.  You're that cunt from the airplane*.  Well, it

25   was like a bucket of cold water had been thrown over my head.

Case 23-793, Document 83, 11/20/2023, 3592070, Page183 of 300

A-2123

N525car3                          Leeds - Cross

```
1    It was like suddenly a crowded room became empty and I was
2    standing there all by myself.  He took the chip, he walked
3    away.  Very shortly after that I gathered my stuff and I went
4    home.  And that's where I -- that's -- that was my last
5    dealings with Mr. Trump.
6              MR. FERRARA:  Can I have one moment, your Honor?
7              (Counsel conferring)
8              MR. FERRARA:  Nothing further.
9              THE COURT:  All right.  Cross-examination.
10             MR. TACOPINA:  Thank you, your Honor.
11             THE COURT:  Mr. Tacopina.
12   CROSS-EXAMINATION
13   BY MR. TACOPINA:
14   Q.  Ms. Leeds, good afternoon.
15   A.  Good afternoon.
16   Q.  You just testified you are a registered democrat?
17   A.  Correct.
18   Q.  Very passionate about politics?
19   A.  Yes.
20   Q.  And you didn't tell anyone about supposedly being assaulted
21   by Donald Trump for almost 40 years, not a single person;
22   correct?
23   A.  Correct.
24   Q.  And you held it in for those 40 years until he was running
25   for president?
```

Case 23-793, Document 83, 11/20/2023, 3592070, Page184 of 300

N525car3                         Leeds - Cross

1    A.  Correct.

2    Q.  And in the years prior to 2016 you had watched Donald Trump

3    in the news and you knew that he was previously talking about

4    running for president?

5    A.  Correct.

6    Q.  You didn't take him seriously at first?

7    A.  Correct.

8    Q.  It was only when it became apparent to you that he was

9    actually running for president did you start telling your

10   story?

11   A.  That is correct.

12   Q.  And it was only then when you saw Donald Trump was

13   seriously running for president that you started telling

14   stories about him to anyone who would be patient and listen?

15   A.  Correct.

16   Q.  And that would include your book club?

17   A.  Correct.

18   Q.  Neighbors?

19   A.  Yes.

20   Q.  Your son?

21   A.  Yes.

22   Q.  Who is a republican, by the way?

23   A.  Who is a republican.

24   Q.  You guys still talk to each other?

25   A.  Absolutely.

N525car3                           Leeds - Cross

1   Q.  And you watched the debate, I think we saw a little snippet

2   of it --

3   A.  Yes.

4   Q.  -- with Ms. Clinton in 2016?

5   A.  Yes.

6   Q.  And you watched with a neighbor who was also passionate

7   about politics?

8   A.  That is correct.

9   Q.  And suffice it to say, you didn't like Donald Trump's

10  behavior or mannerisms in the debate?

11  A.  Even watching it today it infuriates me.

12  Q.  And, in fact, you and your neighbor were very angry, to use

13  your words I think you said, *What an asshole that man is.*

14  A.  Correct.

15  Q.  And you were so angry during the debate that you were

16  jumping up and down in front of your TV?

17  A.  That is correct.

18  Q.  And you were so angry during that debate you were later

19  tossing and turning and didn't even sleep that night?

20  A.  That is correct.

21  Q.  So following the debate, the following morning, you decided

22  to write that letter to the editor of the New York Times about

23  your story involving Donald Trump?

24  A.  Correct.

25  Q.  And I think you said you sent it out so hastily you didn't

N525car3                        Leeds - Cross

1   even proofread it?

2   A.  Correct.

3   Q.  And you got that immediate response that you told about,

4   from Ms. Twohey --

5   A.  Correct.

6   Q.  -- from the Times?

7           And that's how your story went public?

8   A.  Correct.

9   Q.  Now, you went public with your story in October 2016, a

10  month before the election?

11  A.  Correct.

12  Q.  And you did an interview with NPR about your story?

13  A.  Correct.

14  Q.  And in the interview with NPR you said you had great

15  difficulty thinking Donald Trump might be president for the

16  next four years?

17  A.  Correct.

18  Q.  You did an interview with the New York Times as well, or I

19  think that was part and parcel to your initial story coming

20  out; right?

21  A.  Correct.

22  Q.  And you told them that telling your story you were hoping

23  that that would make a difference in the election.

24  A.  Correct.

25  Q.  Hoping it would obviously influence the election against

Case 23-793, Document 83, 11/20/2023, 3592070, Page187 of 300

N525car3                         Leeds - Cross

1   Donald Trump?

2   A.  Correct.

3   Q.  And then you went on CNN and spoke with Anderson Cooper?

4   A.  Correct.

5   Q.  And that was October 13th, 2016?

6   A.  Yes.

7   Q.  And the very next day you gave that interview with NPR on

8   October 14th, with Audie Cornish?

9   A.  Correct.

10  Q.  And again, in order to tell your story about Donald Trump?

11  A.  Correct.

12  Q.  Even after Donald Trump was elected, during his presidency,

13  you hoped the story would lead to a congressional investigation

14  of him?

15  A.  Not that I recall saying.

16  Q.  OK.  You don't remember saying in your NPR interview, the

17  one entitled -- not NPR.  Actually, you did another interview,

18  *Democracy Now!*?

19  A.  Yes.

20  Q.  And do you recall in the *Democracy Now!*, that was with Amy

21  Goodman?

22  A.  Correct.

23  Q.  Do you recall saying that you were now calling for a

24  congressional investigation of Mr. Trump?

25  A.  I don't think I said I was calling.  I don't remember it

N525car3                          Leeds - Cross

 1   that well.  I do -- would think that I would wish that there

 2   would be some sort of hearing on him.

 3              MR. TACOPINA:  OK.  Do we have that clip ready to go?

 4   Do we?  Before that I'm going to direct counsel's attention to

 5   the transcript -- does the Court have one too?

 6              MR. DeOREO:  No.  I can hand one up.

 7              MR. TACOPINA:  Please do.

 8              Mike, do you have the transcript?

 9              (Counsel conferring)

10   BY MR. TACOPINA:

11   Q.  Ms. Leeds, were you looking for your story to have it --

12   let me withdraw that last question and let me ask you this.

13              Were you looking for your story to have an impact on

14   Donald Trump's presidency?

15   A.  That would be far beyond my expectations.

16   Q.  OK.

17              Would it be fair to say that as you sit here today you

18   certainly don't want to see Donald Trump regain the presidency?

19   A.  True.

20   Q.  OK.

21              Now, let's just talk about your story on the airplane,

22   Ms. Leeds.  Just a few minutes ago I think -- and after

23   watching the video of the denial by Donald Trump where at the

24   end he said it wouldn't be my first choice --

25              THE COURT:  I'm sorry.  Can we get to a question,

                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page189 of 300

A-2129

N525car3                          Leeds - Cross

1   please?

2              MR. TACOPINA:  I'm creating a context, your Honor.

3              THE COURT:  Let's get to the question.

4   BY MR. TACOPINA:

5   Q.  Here is the question.  You used the words, in response to

6   that, *You couldn't imagine him making a pass at a 78-year-old*

7   *woman*.  Do you remember saying that?

8   A.  Yes.

9   Q.  So what he did to you on the plane, was that a pass?

10  A.  No.

11  Q.  Why did you use the words, *You couldn't imagine him making*

12  *a pass at a 78-year-old woman*?

13  A.  Well, to talk about a physical confrontation is not easy

14  and it's more common for men to make passes, which are more

15  benign, so it's a matter of relegating him, putting it down a

16  little notch.

17  Q.  OK, but you are testifying here about what you claim was an

18  assault by Donald Trump in front of this jury.

19  A.  That's true.

20  Q.  OK.

21             And you subsequently called it a pass to put it down a

22  notch?

23  A.  Yes.

24  Q.  So you think this took place in 1979, this airplane

25  incident?

 1   A.  I believe so.

 2   Q.  Can you give us an exact date so we can check Mr. Trump's

 3   records or the airline records?

 4   A.  No.  I really can't.  It's too far.

 5   Q.  And your story, you were on an airplane flying into

 6   LaGuardia Airport in Queens?

 7   A.  Correct.

 8   Q.  And you don't recall exactly where it was coming from, one

 9   or two potential locations; right?

10   A.  Correct.

11   Q.  And a flight attendant asked you if you would like to move

12   to first class from coach and you gladly accepted?

13   A.  Yes.

14   Q.  And you were seated next to a man who was sitting against

15   the window?

16   A.  Correct.

17   Q.  So you had the aisle seat?

18   A.  Correct.

19   Q.  And it's your story that the man shook your hand and

20   introduced himself as Donald Trump?

21   A.  Correct.

22   Q.  Did you introduce yourself to him as well as Jessica Leeds?

23   A.  Yup.

24   Q.  And at the time you had no idea who Donald Trump was?

25   A.  That's true.

N525car3                       Leeds - Cross

1   Q.  As far as you know he was some random guy sitting next to
2   you on a plane?
3   A.  He was some random guy setting next to me on a plane.
4   Q.  After your introductions you both had your meals on the
5   plane?
6   A.  Correct.
7   Q.  And while you were eating you didn't speak to one another?
8   A.  I don't recall any conversation that went while we were
9   eating, no.
10  Q.  OK.  Other than, *Hi, I'm Donald Trump*, and, *Hi, I'm Jessica*
11  *Leeds*, you don't recall any words exchanged between the two of
12  you, do you?
13  A.  I know we chatted but I don't remember what we chatted
14  about.
15  Q.  OK.
16          To be clear, this was a commercial plane with other
17  passengers on it?
18  A.  Yes.
19  Q.  And it is your story that after you were done eating, the
20  flight attendant cleared your tray tables and this man suddenly
21  attacked you?
22  A.  Correct.
23  Q.  It is your story this man grabbed you with his hands, tried
24  to kiss you, grabbed your breasts, and pulled you towards him?
25  A.  Correct.

N525car3                          Leeds - Cross

1    Q.  And pulled himself onto you?

2    A.  It's not -- no, not onto me but he was leaning-in to me,

3    pushing me against the back of the seat.

4    Q.  OK.  And then according to you he, at one point, put his

5    hand on your knee?

6    A.  He started putting his hand up my skirt.

7    Q.  OK, on your leg and up your skirt?

8    A.  Correct.

9    Q.  And that's when -- and is that the story, the complete

10   story of the interaction you described as kind of a struggle?

11   A.  Yeah.

12   Q.  And you said that, at trial, that the incident probably

13   lasted just a few seconds?

14   A.  Probably.

15   Q.  Now, of course I think you also testified that you went on

16   Anderson Cooper and said that the struggle went on for 15

17   minutes?

18   A.  Yeah.

19   Q.  And Anderson Cooper said, *Gee, that was a long time*,

20   correct?

21   A.  He was correct, that is a long time.  And it did not go on

22   for 15 minutes.

23   Q.  So when you initially came public with the story your

24   rendition was this assault lasted 15 minutes?

25   A.  I was never asked how long it went on so I never put a time

Case 23-793, Document 83, 11/20/2023, 3592070, Page193 of 300

N525car3                          Leeds - Cross

1   frame on it until Anderson Cooper asked me.  It never occurred

2   to me to think it was any longer.  It was kind of just coming

3   out with a number.

4   Q.  So when you said 15 minutes, that was just your guess at

5   that moment?

6   A.  That is correct.

7   Q.  And during the struggle you described you don't ever

8   recalling telling the man to stop, or say no, or anything like

9   that?

10  A.  I don't think there was a word exchanged between us.

11  Q.  OK.

12          And when you say between us, that would also

13  include -- you answered my next question -- the man didn't say

14  anything to you either?

15  A.  Correct.

16  Q.  You describe the alleged interaction as a silent pantomime?

17  A.  Yes.

18  Q.  And it is your story that your seat was juggling while you

19  were engaged in the struggle?

20  A.  Yes.

21  Q.  And, according to you, the struggle was seen by another

22  passenger right across the aisle from you?

23  A.  That is correct.

24  Q.  Because you were exposed, so to speak, in the sense that

25  you were in the aisle seat?

Case 23-793, Document 83, 11/20/2023, 3592070, Page194 of 300

A-2134

N525car3                         Leeds - Cross

 1    A.  Correct.

 2    Q.  It is your testimony that the passenger never said anything

 3    or came to your aid?

 4    A.  Correct.

 5    Q.  Likewise, no flight attendant said anything or came to your

 6    aid?

 7    A.  Correct.

 8    Q.  And according to you, you realize that no one was going to

 9    help you?

10    A.  Correct.

11    Q.  And I think you said at trial, on direct testimony, it

12    never occurred to you to ask for help or ring the stewardess

13    bell or anything like that?

14    A.  I don't think I could have reached the stewardess bell.  I

15    was busy.

16    Q.  You said it never occurred to you to call out for help?

17    A.  No.  I made no noise, no, I don't recall any noise.  I

18    don't remember asking, even when I got up, saying anything.  I

19    know what went through my head, but I don't know if I said it.

20    Q.  And that's at that point when this man's hand, according to

21    you, started going up your skirt, you said I don't need this

22    and you got up?

23    A.  Yes.

24    Q.  And it is your story, as you told the New York Times, if

25    the man had just stuck with the upper part of your body, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N525car3                         Leeds - Cross

1   might not have gotten that upset?

2   A.   True.

3   Q.   So, according to you, it was only when he eventually

4   started bringing his hands towards your knee and up your thigh

5   that you said I don't need any more of this and got up?

6               THE COURT:  Sustained.

7   A.   Yes.

8               THE COURT:  The word knee has come only from your

9   lips, Mr. Tacopina.

10              MR. TACOPINA:  The word knee?

11              THE COURT:  Yes.

12  BY MR. TACOPINA:

13  Q.   So, according to you, it is only when he eventually started

14  putting his hands up your skirt that you said I don't need

15  this, and got up?

16  A.   Yes.

17  Q.   And to do that -- you were in the aisle -- you basically

18  had to get out of your chair and leave, right?

19  A.   I had to wiggle my way out.  I had to exert a certain

20  amount of force that up until that moment I didn't think I had.

21  Q.   OK.  When you got up out of your chair, was he grabbing at

22  you?

23  A.   Yes.

24  Q.   To bring you back?

25  A.   Yes.

N525car3                          Leeds - Cross

1   Q.  So he was standing up at this point and lunging for you?

2   A.  Yup.

3   Q.  From the window seat into the aisle?

4   A.  Yes.

5   Q.  And no one said a word?

6   A.  No one.

7   Q.  Including you?

8   A.  Including me.

9   Q.  Give me one second, please.

10         Once you got back to your seat you didn't say anything

11  to the other passenger that you were sitting next to to

12  describe what had just happened?

13  A.  No.

14  Q.  You didn't say anything to the flight attendant in the back

15  of the plane?

16  A.  No.

17  Q.  And it is your story that you didn't say anything to anyone

18  about this when you returned to your seat at all?

19  A.  At all.

20  Q.  And even after the plane landed, you didn't say anything

21  about it to the airline personnel?

22  A.  No.

23  Q.  I think you said, on direct testimony, it didn't occur you

24  to report it to the airline?

25  A.  That is correct.

N525car3                         Leeds - Cross

```
 1   Q.  You didn't say anything about that to your family?

 2   A.  No.

 3   Q.  You didn't say anything about it to your friends?

 4   A.  No.

 5   Q.  Of course, at that time you didn't know who that man was?

 6   A.  I knew he was Donald Trump.

 7   Q.  Based on his introduction?

 8   A.  Correct.

 9   Q.  So, did you remember his name over the last 40 years?

10   A.  Yes.

11   Q.  So, ever since he introduced himself you remembered his

12   name?

13   A.  Correct.

14   Q.  So, when you got back to wherever home was at the time, I

15   think Connecticut maybe?

16   A.  Correct.

17   Q.  Did you try and find out who Donald Trump was?

18   A.  No.

19   Q.  When is the next time you heard that name?

20   A.  When I moved to New York in '81.

21   Q.  In '81.  OK.

22           In '79 you were working as a sales person for that

23   paper company, I think Bowater?

24   A.  Bowater, yes.

25   Q.  Bowater.
```

Case 23-793, Document 83, 11/20/2023, 3592070, Page198 of 300

1              And in that position you had to travel all over the

2    United States?

3    A.  Correct.

4    Q.  And you had traveled by air and you would experience flight

5    delays and airlines losing luggage and whatnot, correct?

6    A.  Correct.

7    Q.  And you consider those circumstances to be the rigors of

8    travel?

9    A.  Correct.

10   Q.  In addition to not saying anything to the other passenger

11   or the flight attendant or the airline personnel when you

12   landed, and your family, you also didn't say anything to your

13   co-workers?

14   A.  Correct.

15   Q.  And, likewise, you didn't mention it to your boss?  Your

16   superior?

17   A.  Correct.

18   Q.  And the reason you didn't say anything to your boss is

19   because you didn't want to explain about the -- to use your

20   words -- the rigors of travel?

21   A.  Correct.

22   Q.  So it is your testimony that getting sexually assaulted on

23   a plane is sort of just rigors of travel?

24   A.  Yes.

25   Q.  OK.

N525car3                           Leeds - Cross

1              Now, after this event, three years later you say you

2      were at a gala, I think it was the Humane Society gala?

3      A.  Yes; the Humane Society of New York.

4      Q.  And Donald Trump was there, you saw him there?

5      A.  Yes.

6      Q.  And he supported that society, you said?

7      A.  Yes.

8      Q.  And it was held at Saks Fifth Avenue?

9      A.  Correct.

10     Q.  And your task that evening was to distribute the people

11     their table assignments?

12     A.  Correct.

13     Q.  And you had a chance to meet a number of very famous people

14     there.  I think you rattled some off before?

15     A.  Yes.

16     Q.  And then you saw Donald Trump with his pregnant wife at the

17     time?

18     A.  Correct.

19     Q.  And they came up to you to get their table assignment.

20     They were together?

21     A.  Correct.

22     Q.  And it is your testimony that Donald Trump, standing there

23     next to his pregnant wife said to you, *I remember you.  You're

24     the cunt from the airplane*?

25     A.  Yes.

Case 23-793, Document 83, 11/20/2023, 3592070, Page200 of 300

A-2140

N525car3                          Leeds - Cross

1   Q.  Right in front of his pregnant wife?

2   A.  Correct.

3   Q.  And, according to you, not only was his pregnant wife

4   there, it was a crowded scene around that table as well?

5   A.  Correct.

6   Q.  And that was from a few-second interaction from the

7   airplane that he remembered you, apparently?

8   A.  Apparently.

9   Q.  Now, according to you when you were on that plane -- and

10  this is three years earlier?

11  A.  Correct.

12  Q.  You were wearing a brown tweed, single-breasted, very

13  corporate-looking business suit?

14  A.  Correct.

15  Q.  At the charity gala you were wearing what I think you

16  described as a spectacular yellow ball gown?

17  A.  Correct.

18  Q.  Soon after that flight you had discussed that you had cut

19  your hair from long to short?

20  A.  Correct.

21  Q.  So at this charity gala you had -- your hair was short

22  already at this point?

23  A.  Correct.

24  Q.  But even though your hair was short, not long, you were

25  dressed differently, a few years had passed, it is your

Case 23-793, Document 83, 11/20/2023, 3592070, Page201 of 300

A-2141

N525car3                          Leeds - Cross

1   testimony that Donald Trump remembered you from the plane?

2              MR. FERRARA:  Objection.  Argument.

3              THE COURT:  Sustained.

4   Q.  When Donald Trump made that comment to you, your hair was

5   different than it was on the plane; correct?

6   A.  Correct.

7   Q.  Your dress, obviously, was very different?

8   A.  Correct.

9   Q.  And the interaction on the plane was a few seconds?

10  A.  I sat with him for several hours before they served a meal.

11  Q.  Oh, several hours?

12  A.  Yes.

13  Q.  So, in that conversation did he ask you any personal

14  information about you?

15  A.  No more so than anybody else had a casual conversation.

16  Q.  OK.

17  A.  It was casual.

18  Q.  And you recall that you did an interview with *Democracy*

19  *Now!*, I guess.  What type of interview was that, *Democracy Now!*

20  Was that a video interview?

21  A.  No.  I went to their studio.

22  Q.  In studio.

23         You said that, to Democracy Now!, *We women remember in*

24  *exquisite detail when it happened, how it happened, where it*

25  *happened, how they got out of it, and how they got home.*

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page202 of 300

A-2142

N525car3                         Leeds - Cross

1              Do you remember saying that?

2    A.  Yes, I do.

3    Q.  And it is your view that those details are remembered

4    regardless of how long ago it occurred?

5    A.  Yes.

6    Q.  In fact, you think those circumstances stay with an actual

7    victim of abuse with excruciatingly clear detail?

8    A.  Yes, I do.

9    Q.  OK.

10              In terms of when this supposed assault occurred, on

11   October 13th, 2016, you told Anderson Cooper during an

12   interview that it happened in '79 and that is still your best

13   estimate; correct?

14   A.  Correct.

15   Q.  You were interviewed, I think you mentioned, by Ms. Carroll

16   a few years back?

17   A.  Yes.

18   Q.  And you told her it was either -- you recall telling her it

19   was either 1979 or 1980?

20   A.  When asked, I was making a quick remembrance.

21   Q.  Just a few more things, Ms. Leeds.

22              With regard to your story about Donald Trump on the

23   commercial plane, is it fair to say you can't name one witness

24   who saw what happened to you?

25   A.  Absolutely not.

N525car3                          Leeds - Redirect

1    Q.  And not a single person can corroborate your story?

2    A.  That is correct.

3    Q.  And you testified earlier, we don't have to go through it

4    again, that you hadn't told anyone on the plane or thereafter?

5              THE COURT:  Let's not go through it again.

6              MR. TACOPINA:  I said we are not going to go through

7    it again, but.

8              THE COURT:  But you are going through it again, so

9    let's move on.

10             MR. TACOPINA:  OK.

11   BY MR. TACOPINA:

12   Q.  Ms. Leeds, this last thing.  You have no claim or cause of

13   action against Donald Trump in front of this jury; correct?

14   A.  Correct.

15   Q.  And you have never sued Donald Trump?

16   A.  Correct.

17   Q.  You never reported him to the police?

18   A.  Correct.

19             MR. TACOPINA:  Ms. Leeds, thank you for your time.

20             THE COURT:  Thank you, Mr. Tacopina.

21             Mr. Ferrara.

22             MR. FERRARA:  Thank you, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. FERRARA:

25   Q.  Ms. Leeds, fair to say you don't remember the date that

1   this, that Mr. Trump assaulted you on a plane?

2   A.  No.

3         THE COURT:  I'm sorry.  No, it is not fair to say

4   that?  Or no, you don't remember the date?

5         MR. FERRARA:  Sorry.

6         THE WITNESS:  I don't remember the date.

7         THE COURT:  Thank you.

8   BY MR. FERRARA:

9   Q.  Nevertheless, do you remember vividly every single thing

10  that happened during that encounter?

11  A.  Yes, I do.

12  Q.  Why didn't you tell your bosses what had happened?

13  A.  It was -- if I had gone in and complained about what had

14  happened, my feeling was that my boss would say to me, *Well,*

15  *that's really too bad.  How about lunch?*  I didn't think I

16  would get any sympathy.  I didn't want any sympathy.  I did

17  not -- I wanted this job, it was a good paying job.

18  Q.  So -- I didn't mean to interrupt you, Ms. Leeds.

19  A.  It just never occurred to me.  This was in the late '70s,

20  women didn't complain about situations in their workplace.

21  Q.  Can you help us understand why you would think of a sexual

22  assault like this as a rigor of travel?

23  A.  Most of the jobs that I held -- no, all of the jobs I held

24  over the years have been in male-dominated fields and the

25  banter between co-workers and myself, the men that I worked

N525car3                          Leeds - Redirect

1    with, was frequently sexual in nature.  And that was just part

2    of the workplace.

3            In traveling around the United States I was frequently

4    asked to go up to first class and I met with some men and it

5    was almost always 99 percent men in first class.  I would chat

6    with them and a lot of them would ask me to go to dinner or

7    would ask impertinent questions and it was just part of the

8    daily activity of the travel.

9    Q.  Why did you refer to what happened on the plane as

10   Mr. Trump making a pass at you?  Why did you use that word?

11   A.  Again, it's a matter of when you start talking about

12   somebody being physically aggressive.  It's hard, it's not easy

13   to think about it again, and the most usual behavior was a pass

14   and it was just instinctively trying to put it into a less

15   painful memory.

16   Q.  So, for clarity, do you consider what Donald Trump did on

17   the plane to be a pass?

18           MR. TACOPINA:  Objection to the leading.  She just

19   gave an answer to that question as well.

20           THE COURT:  Overruled.

21   Q.  You may answer, Ms. Leeds.

22   A.  Could you ask the question again?

23   Q.  Of course.

24           Do you consider what Donald Trump did on that plane to

25   have been a pass?

Case 23-793, Document 83, 11/20/2023, 3592070, Page206 of 300

N525car3                    Leeds - Redirect

1   A.  No.

2   Q.  If you recall, do you remember why you cut your hair during

3   that period of time?

4   A.  Well, for the same reason I stopped wearing skirts; it was

5   trying to remove as much attention to my femininity as I could.

6   Q.  Why?

7   A.  I didn't want to draw attention to myself.

8   Q.  Ms. Leeds, are you making this up because you hate Donald

9   Trump?

10  A.  No, I am not making it up.

11  Q.  Would you walk into this courtroom and commit perjury for a

12  political reason?

13  A.  No.

14  Q.  Mr. Tacopina asked you about a statement you made about

15  wanting to share your story to make a difference in the

16  election.  Do you recall that question?

17  A.  Yes.

18  Q.  As part of that interview, did you also say that you wanted

19  to share your story to make a difference in society's view of

20  women?  Do you recall saying that?

21  A.  Yes.

22  Q.  To make a difference -- sorry -- to change some of the

23  behavior, the sexual behavior between men and women in both

24  directions?  Do you remember saying that?

25  A.  Yes.

Case 23-793, Document 83, 11/20/2023, 3592070, Page207 of 300

N525car3                         Leeds - Redirect

1    Q.  Ms. Leeds, is there any doubt in your mind who assaulted
2    you on that plane?
3    A.  None.
4    Q.  Who was it?
5    A.  Donald Trump.
6    Q.  Why did you find it less upsetting when he had his hands
7    above your skirt than when they went into your skirt, when his
8    hand went into your skirt?
9    A.  That's sort of the demarcations -- I mean, people -- men --
10   would frequently pat you on the shoulder and grab you or
11   something like that and you just -- it is not serious and you
12   don't -- you don't -- but when somebody starts to put their
13   hand up your skirt, you know they're serious and this is not
14   good.
15   Q.  Did you invite any of the physical contact on that flight,
16   Ms. Leeds?
17   A.  I don't think I did.  I don't know what he perceived, I
18   don't know why he perceived that I was -- that I was available.
19   I personally thought he was just bored.  But, the fact remains
20   that he physically assaulted me.
21           MR. FERRARA:  Nothing further.
22           THE COURT:  Thank you.
23           Mr. Tacopina.
24           MR. TACOPINA:  Nothing, your Honor.
25           THE COURT:  Thank you, Ms. Leeds.  You are excused.

Case 23-793, Document 83, 11/20/2023, 3592070, Page208 of 300

A-2148

N525car3                        Salerno - Direct

1    Thank you very much.

2              (Witness excused)

3              Next witness.

4              MS. CROWLEY:  The plaintiff calls Robert Salerno.

5    ROBERT SALERNO,

6         called as a witness by the Plaintiff,

7         having been duly sworn, testified as follows:

8              THE DEPUTY CLERK:  Please, be seated.  Sir, if you can

9    please state your name and spell your last name for the record?

10             THE WITNESS:  My name is Robert Salerno.

11   S-A-L-E-R-N-O.

12             THE DEPUTY CLERK:  Thank you.

13             THE COURT:  You may proceed, Ms. Crowley.

14             MS. CROWLEY:  Thank you, your Honor.

15   DIRECT EXAMINATION

16   BY MS. CROWLEY:

17   Q.  Good afternoon, Mr. Salerno.

18   A.  Good afternoon.

19   Q.  Are you currently employed?

20   A.  No.

21   Q.  Are you retired?

22   A.  Yes.

23   Q.  What did you do before you retired?

24   A.  Going back from the beginning after graduating from grad

25   school, I went to work for Abraham & Strauss as a trainee,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N525car3                          Salerno - Direct

1   worked my way up to become a buyer and went into the operating

2   side, then went to Coopers & Lybrand, which is now

3   Pricewaterhouse Coopers as their first retail consultant.

4   Spent a lot of time there.  Became a partner, practice leader,

5   and got tired of traveling six and a half days a week, and went

6   to Bergdorf Goodman as senior VP of admin for a few years.

7   Left that, and then became a kind of "hired CEO" for designers

8   and various businesses.  And, I have also taught at FIT, taught

9   retail management leadership.

10  Q.  What is FIT?

11  A.  Fashion Institute of Technology.

12  Q.  For those of us who may not be familiar with those names,

13  are those all within the retail industry?

14  A.  Abraham & Strauss was part of Federated, it is now owned by

15  Macy's, the enemy at the time.  Coopers & Lybrand is

16  Pricewaterhouse Coopers, that's a large accounting firm.

17  Q.  Now, focusing on the mid-1990s, where were you working

18  during that period?

19  A.  I was at Bergdorf Goodman.

20  Q.  What is Bergdorf Goodman?

21  A.  Bergdorf Goodman is a large luxury speciality store.

22  Q.  Mr. Salerno, you are testifying today in the case E. Jean

23  Carroll v. Donald Trump.  Have you ever met Ms. Carroll before?

24  A.  No.

25  Q.  Have you ever spoken with her?

Case 23-793, Document 83, 11/20/2023, 3592070, Page210 of 300

A-2150

N525car3                          Salerno - Direct

1   A.  No.

2   Q.  When was the first time that you heard her name?

3   A.  I don't know, maybe a year or so ago.  I'm not sure.

4   Q.  Have you ever met the defendant Donald Trump?

5   A.  No.

6   Q.  Have you ever seen him in person?

7   A.  Yes.

8   Q.  Where?

9   A.  In the store, in Bergdorf's.

10  Q.  We will come back to that in a few minutes, but first,

11  where is Bergdorf's located?

12  A.  The corner of 57th and Fifth Avenue.

13  Q.  I would like to show you what's been marked for

14  identification as Plaintiff's Exhibit 170.

15         MS. CROWLEY:  If we could put that on the screen,

16  Mr. Lam?

17  Q.  Do you recognize this, Mr. Salerno?

18  A.  Yes.

19  Q.  What is it?

20  A.  It looks like a map of midtown Manhattan.

21  Q.  Does this map accurately depict the area around 58th Street

22  and Fifth Avenue?

23  A.  Yes.

24         MS. CROWLEY:  Plaintiff offers Plaintiff's Exhibit

25  170.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page211 of 300

A-2151

N525car3                          Salerno - Direct

1           MR. SIEGEL:  No objection.

2           THE COURT:  Received.

3           (Plaintiff's Exhibit 170 received in evidence)

4    BY MS. CROWLEY:

5    Q.  Do you see Bergdorf's on that map?

6           MS. CROWLEY:  Can you take that down?

7    Q.  Did you draw that?

8    A.  No.  I have no way.

9           MS. CROWLEY:  You can put the map up without --

10   Q.  Could you identify -- and I think you can actually draw on

11   the screen -- where you see Bergdorf Goodman?

12   A.  Use my finger?  OK.  Yes.  Here it is.

13   Q.  Is the --

14   A.  I drew it.

15          THE DEPUTY CLERK:  Is it there?

16          THE WITNESS:  Yes.

17          THE DEPUTY CLERK:  It is on his screen but not ours.

18          MS. CROWLEY:  Oh, it is?

19          Is it possible to display that to the jury, Mr. Lam?

20   Q.  We can come back to this.  Actually, you know what?  Let's

21   make this easier.  Could you just identify, using the cross

22   streets, where Bergdorf Goodman is on this map?

23   A.  Yes.  Bergdorf's is on the west side of Fifth Avenue

24   between 57th and 58th Street.

25   Q.  And do you see Trump Tower on this map?

N525car3                         Salerno - Direct

1   A.  Yes.

2   Q.  Can you describe where it is?

3   A.  Trump Tower is on Fifth Avenue on the east side, basically

4   on the corner of 56th and Fifth.

5   Q.  So, roughly across the street from Bergdorf?

6   A.  Roughly.  I could see it from my office.

7           MS. CROWLEY:  You can take this down, Mr. Lam.

8   Q.  When did you begin working at Bergdorf?

9   A.  It was sometime in '95.

10  Q.  What was your title when you started working there?

11  A.  I started there as a consultant and got hired as senior VP

12  of administration.

13  Q.  When did you get hired as senior VP?

14  A.  I think it was January.

15  Q.  Of which year?

16  A.  '96 it would have been.

17  Q.  What does it mean to be a senior VP of administration?

18  A.  The simplest way is I was responsible for everything that

19  wasn't creative, so I had under my responsibility

20  alterations -- alterations, store design and construction,

21  finance, systems, security, logistics, housekeeping.

22  Q.  You testified that that included overseeing security in the

23  store?

24  A.  Yup.  They reported to me.

25  Q.  How long were you in the role, this role, Mr. Salerno?

N525car3                          Salerno - Direct

1    A.  About three years, I believe.

2    Q.  I would like to talk a little bit about Bergdorf's.  How

3    many floors, in this period in the mid-'90s, how many floors

4    did Bergdorf Goodman have?

5    A.  There is 10 floors, in total, going up; and then there is a

6    basement.

7    Q.  And how many of those floors were accessible to customers?

8    A.  Eight of them.

9    Q.  I'm sorry.  You said eight?

10   A.  Eight of them, yes.

11   Q.  Were all eight of those floors accessible by escalator?

12   A.  Yes.

13   Q.  During the time that you worked at Bergdorf, was the store

14   open every weekday?

15   A.  Yes.

16   Q.  What were the store hours on weekdays at the time?

17   A.  I believe it was 9:30 to about 6:00, and Thursday nights we

18   were open late, until about 8:00.

19   Q.  Why did the store stay open late on Thursday nights?

20   A.  I would like to say it was for people who came to buy their

21   clothes that they were going to use to go out on the weekends,

22   plus it is tradition in retail to be open on Thursday nights,

23   going way back, because that's when people got paid.  And

24   husbands and wives would go shopping for furniture or for

25   mattresses or a variety of things.  So, traditionally, stores

Case 23-793, Document 83, 11/20/2023, 3592070, Page214 of 300

N525car3                          Salerno - Direct

1    were open late on Thursdays.  In Bergdorf's case it was more --

2    since we didn't sell furniture, it was more for people who were

3    going out Friday night, or Saturday, or Sunday.

4    Q.  In the time that you worked at Bergdorf, did the store get

5    busy on occasion?

6    A.  Did the store -- generally -- well, depends on how you

7    define "busy."  For Bergdorf's, yeah, we would have busier

8    periods.

9    Q.  What do you mean by "for Bergdorf's, yeah"?

10   A.  Well, for Bergdorf's it wasn't -- Bergdorf's is not Macy's

11   or Saks.  We didn't have tons of people going through the door,

12   huge customer counts.  It was much more genteel, quieter.

13   Q.  Were certain seasons busier than others at Bergdorf?

14   A.  Yeah, fall, particularly September-October when the new

15   lines were launched; and then Christmas.

16   Q.  What about the spring?

17   A.  Spring was not that busy.

18   Q.  Which floors were generally the busiest?

19   A.  Well, the first floor, because it was accessible, and then

20   the fifth floor because we had a nice cafe up there.  And the

21   fifth floor was, I guess you would call it, relatively

22   moderate, for Bergdorf.

23   Q.  What about the sixth floor?

24   A.  Not very busy.

25   Q.  What about in the evenings?

Case 23-793, Document 83, 11/20/2023, 3592070, Page215 of 300

N525car3                        Salerno - Direct

1    A.  Not very busy.

2    Q.  And what about on Thursday evenings?

3    A.  Well, Thursday evenings, other than maybe Christmastime,

4    Thursday evenings weren't that busy.

5    Q.  Now, you testified a minute ago that as part of your role

6    as VP of administration you oversaw the store security.  Did

7    Bergdorf's have security cameras at that time in the '90s,

8    mid-'90s?

9    A.  We only had a few.

10   Q.  And where were they located?

11   A.  I think it was the employee entrance, the loading dock.  We

12   might have had one in furs.  And we might have had fine

13   jewelry; I don't recall.

14   Q.  What floor was furs on?

15   A.  Two.

16   Q.  And what about fine jewelry?

17   A.  The main floor.

18   Q.  The main floor?

19   A.  Yes.

20   Q.  Were there security cameras on the sixth floor?

21   A.  I don't believe so.

22   Q.  How, if at all, were the security cameras monitored?

23   A.  Well, they really weren't.  They were just, if you think of

24   the technology back in the '90s, if anybody here remembers what

25   VCRs were -- videotapes -- that's kind of what we had, totally

N525car3                          Salerno - Direct

1    unlike now.

2    Q.  And based on your knowledge as head of security, were these

3    videotapes -- the footage on these videotapes, maintained?

4    A.  Well, first of all, I wasn't head of security.  Security

5    reported to me.

6    Q.  I apologize.

7    A.  Let's be clear.  I think the tapes were maintained and they

8    might have been used if we had a case of taking somebody to

9    court, they might use it for evidence.  But it really wasn't a

10   big deal, totally unlike now.

11   Q.  How long were the videotapes maintained?

12   A.  I don't recall.  Not very long.  They didn't last long, the

13   quality wasn't very good.

14   Q.  And what happened after videotapes were no longer

15   maintained?

16   A.  They probably were destroyed or taped over.

17   Q.  What, if any security guards, were in Bergdorf in the

18   mid-'90s?

19   A.  We had perimeter door security, we had guards at the

20   loading dock and at the employee entrance, and we had two

21   undercover people that kind of floated through the store.

22   Q.  When you say "undercover" you mean they were not in

23   uniform?

24   A.  They were not in uniform.

25   Q.  And were there two uniformed guards on each floor or

N525car3                        Salerno - Direct

1    through out the whole store?

2    A.  No.  There were two staff the whole time, we might just

3    have one on at any given time, and they floated around the

4    store.

5    Q.  In 1996, what floor was the lingerie section located on?

6    A.  I believe it was on the sixth floor.

7    Q.  And how big was the lingerie department?

8    A.  I don't recall the square footage, it wasn't that large.

9    Q.  To your knowledge, what percentage of the store's revenue

10   did it earn through lingerie sales?

11   A.  Oh, less than one percent.

12   Q.  I'm going to show you an exhibit that is in evidence now as

13   Plaintiff's Exhibit 22, and this is a construction blueprint of

14   the sixth floor of Bergdorf from 1995.  Is this blueprint

15   generally consistent with your recollection of the layout of

16   the store back in 1996, the layout of the sixth floor back in

17   1996?

18   A.  Yes.

19   Q.  Do you see the lingerie department in this blueprint?

20   A.  Yeah.  I believe it is called "Intimate," by the way.

21   Q.  And I think now you may be able to actually circle on the

22   screen.

23   A.  So, it is up here.

24   Q.  Indicating the upper left quadrant of the exhibit.

25             Do you see where the lingerie fitting rooms are on

Case 23-793, Document 83, 11/20/2023, 3592070, Page218 of 300

A-2158

1   this blueprint?

2   A.  Not quite sure.  They might be over on the side.

3   Q.  Can you describe the layout of the fitting rooms,

4   Mr. Salerno?

5   A.  Generally our fitting rooms, totally unlike what you would

6   see at The Gap or any other store, our fitting rooms tended to

7   be larger because the sale was actually closed in the fitting

8   room with the salesperson.  Now, with Intimate, it was less so.

9   With the designer floors it was more salesperson, the customer,

10  and occasionally a fitter, so you need a large enough room.

11  Every fitting room had -- was carpeted.  It was a comfortable

12  space.  You had places for customers to hang their bags, to

13  hang their coats, to put a bench to sit on.  Some of the finer

14  fitting rooms, like on the fourth floor, at that time we had

15  fax machines -- if you remember what fax machines were.  When I

16  went there Jackie Kennedy used to come in and have lunch and do

17  business, do her editing in the fitting room.

18         So it was more than just a place where you were

19  crammed in to try on clothes.

20  Q.  Focusing on the fitting rooms in the lingerie section, how

21  many people could fit inside?

22  A.  I don't recall offhand.  At least two.  I can't imagine

23  more than that.

24         MS. CROWLEY:  Mr. Lam, could you just zoom in on the

25  left side of the blueprint?

Case 23-793, Document 83, 11/20/2023, 3592070, Page219 of 300

A-2159

N525car3                          Salerno - Direct

1   Q.  Do you see the lingerie section a little bit more clearly,

2   Mr. Salerno?

3   A.  Yes, ma'am.

4              (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page220 of 300

800

N522Car4                    Salerno - Direct

1    Q.  What, if anything, do you recall about whether the fitting

2    room doors locked?

3    A.  Generally they had locks.  The salespeople had keys on

4    little elastic bands around their wrist.  But most of the time,

5    a lot of times, the doors were not locked.  They didn't -- they

6    kept them open, they propped them open.  So occasionally they

7    would be locked, sometimes not.  I would go through and close

8    them just because I'm anal like that.

9    Q.  And Mr. Lam, if we could just zoom out so we can see the

10   full sort of left-hand side of the screen.

11          Do you see the escalators in this blueprint,

12   Mr. Salerno?

13   A.  Yes, ma'am.

14   Q.  Could you circle them?

15   A.  They are in the center of the store.

16   Q.  Were the escalators open or were there walls around them?

17   A.  There were walls around them.  There were structural walls.

18   Q.  So when you were riding on the escalators, was it possible

19   to see the floor around you?

20   A.  Not to the left and right.  When you came down the

21   escalator, went up the escalator, you would see the floor area

22   in front of you.

23   Q.  Mr. Salerno, what role, if any, did you have in deciding

24   where different departments were located in the store?

25   A.  I was part of a group, a team.

N522Car4                     Salerno - Direct

1  Q.  To your knowledge, why was the lingerie section located in

2  the corner of the sixth floor?

3  A.  Lingerie was a destination department.  You know, we

4  weren't Victoria's Secret or Aerie or some of the other

5  intimate apparel stores.  So if you were shopping for lingerie,

6  you came there deliberately.  You came there deliberately, so

7  you didn't put it in a high traffic area.  You put it kind of

8  out of the way because you new people would find it or be taken

9  there by the salespeople.

10 Q.  And to be clear, the lingerie section sold women's

11 clothing?

12 A.  Yes.

13 Q.  Did you ever observe men in that section?

14 A.  Yes.

15 Q.  To your knowledge, were there always sales attendants in

16 every department in the store?

17 A.  No.

18 Q.  Why not?

19 A.  Well, selling in Bergdorf's at that time was very

20 different.  We encouraged our salespeople to work with a

21 customer.  So if you came in and bought, I don't know, a

22 blouse, they would take you to a similar designer department or

23 they would walk you around the store.  So there were times when

24 you didn't have salespeople there.  They would be off taking

25 you to buy a handbag or shoes to go with that outfit.

N522Car4                    Salerno - Direct

1              MS. CROWLEY:  And just so the record is clear, your

2     Honor, I believe when I asked where the escalators were,

3     Mr. Salerno circled the dead center of the exhibit.

4              THE COURT:  So indicated.

5     BY MS. CROWLEY:

6     Q.  Mr. Salerno, you testified that you saw Donald Trump in

7     Bergdorf.  When was that?

8     A.  I don't recall.  Sometime when I was there.

9     Q.  When you were working there?

10    A.  Yeah, when I was working there.

11    Q.  How did you recognize him?

12    A.  I've seen his face in *Women's Wear*.

13    Q.  And do you recall how many times you saw him in the store?

14    A.  Maybe one or two.  I can't remember.

15             MS. CROWLEY:  One moment, your Honor.

16             (Counsel confer)

17             MS. CROWLEY:  Nothing further.

18             THE COURT:  Okay.  Do you expect to be long, whoever

19    is going to do the cross?

20             MR. SEIGEL:  No, your Honor.

21             THE COURT:  All right.  We will do it live.

22             MR. SEIGEL:  In an abundance of caution, if you want

23    to take a break now.

24             THE COURT:  I know what that means.

25             15 minutes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page223 of 300

A-2163

N522Car4                          Salerno - Direct

1              (Recess)

2              (Jury not present)

3              THE COURT:  Get the jury.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N522Car4                          Salerno - Cross

 1              (Jury present)

 2              THE COURT:  The witness is still under oath.

 3    Mr. Seigel, is it?

 4              MR. SEIGEL:  Yes.  Thank you, your Honor.

 5    CROSS-EXAMINATION

 6    BY MR. SEIGEL:

 7    Q.  Good afternoon, Mr. Salerno.

 8    A.  Good afternoon.

 9    Q.  Bergdorf Goodman has a men's store and a women's store, is

10    that right?

11    A.  That's correct.

12    Q.  And which store did you work in?  Where was your office?

13    A.  My office was in the top of the women's store.

14    Q.  And the two buildings—the men's store and the women's

15    store—were located across the street from each other?

16    A.  That's correct.

17    Q.  Now, you testified on direct to seeing Donald Trump in the

18    store and you mentioned women's wear.  Just for clarity, is

19    women's wear different than the lingerie department?

20    A.  Yes and no.  I'm not quite sure of the question.

21    Q.  Well, is there a department in Bergdorf Goodman dedicated

22    to just women's wear, for instance, gowns, ballroom, ballroom

23    dresses, things of that nature?

24    A.  Yeah.

25              THE COURT:  Sustained as to form.

N522Car4                        Salerno - Cross

1    A.  The answer is yes.

2            THE COURT:  Mr. Salerno, when I say sustained, that

3    means stop, don't answer.

4            THE WITNESS:  Okay.

5            THE COURT:  The answer is stricken.  Put another

6    question.

7            MR. SEIGEL:  Thank you.

8    BY MR. SEIGEL:

9    Q.  So Mr. Salerno, is the women's wear department different

10   than the lingerie department?

11   A.  There are multiple women's wear departments.

12   Q.  And specifically do you recall where you saw Donald Trump

13   in the mid '90s, which department?

14   A.  I might have seen him on the main floor and I might have

15   seen him on the fifth floor.

16   Q.  Okay.  And do you remember if you saw him with anyone?

17   A.  I can't recall.

18   Q.  Now, you had discussed the hours that Bergdorf Goodman was

19   open on direct when you were there.  And you mentioned that the

20   store was open late on Thursday nights.  Would the reason that

21   the store would be kept open because there would be more

22   traffic particularly on that night than on other nights?

23   A.  There generally was more traffic on Thursday nights.

24   Q.  Okay.  And --

25            THE COURT:  Than on other nights.

 1                    THE WITNESS:  Than on other nights.

 2                    THE COURT:  And the other nights it was closed.

 3                    THE WITNESS:  During Christmas.

 4                    THE COURT:  So, Mr. Seigel, let's try to --

 5                    MR. SEIGEL:  Let me clarify that.

 6       BY MR. SEIGEL:

 7       Q.  So as the senior vice president of administration, is it

 8       your understanding at Bergdorf Goodman that if no one were in

 9       the store or it didn't have sufficient traffic to justify

10       remaining open, the store would not have been open on Thursday

11       night later?

12                    MS. CROWLEY:  Objection to form.

13                    THE COURT:  Sustained.

14                    MR. SEIGEL:  Okay.

15       Q.  I think you testified on direct that the store was open on

16       Thursday nights to accommodate people who were, for instance,

17       going out on Friday and Saturday and wanted to purchase

18       merchandise?

19       A.  That's correct.

20       Q.  And Bergdorf Goodman is, I think you said, a luxury

21       specialty store?

22       A.  That's correct.

23       Q.  Based on your experience, did the store pride itself on

24       providing exceptional customer service?

25       A.  Absolutely.

N522Car4                        Salerno - Cross

1    Q.  And also on providing personalized shopping experiences to

2    its customers?

3    A.  Yes.

4    Q.  In fact, I think the store referred to its customers as

5    clients rather than customers, is that right?

6    A.  Generally, yes.

7    Q.  And this is in line with the store's emphasis on providing

8    exceptional personalized service, is that right?

9    A.  That is correct.

10   Q.  And also creating a luxury shopping experience for its

11   clientele.

12   A.  That's right.

13   Q.  And based on your understanding, the use of the term

14   "client" by Bergdorf's is meant to suggest a more exclusive and

15   personalized relationship between the store and its customers.

16   Is that right?

17   A.  That's correct.

18   Q.  In fact, did the store sales associates refer to themselves

19   as personal shoppers?

20   A.  Some did, some didn't.

21   Q.  And those that did, was that meant to further emphasize the

22   personalized service and attention given to each client who

23   shops at Bergdorf's?

24           MS. CROWLEY:  Objection.

25           THE COURT:  Sustained.

N522Car4                         Salerno - Cross

1   Q.  Mr. Salerno, what's your understanding as to why sales

2   associates were referred to as personal shoppers?

3             MS. CROWLEY:  Objection.

4             THE COURT:  Sustained.

5   Q.  Because the store was focused on service, salespeople might

6   follow or accompany clients to assist them with their

7   personalized shopping experiences, is that right?

8             MS. CROWLEY:  Objection.

9             THE COURT:  Sustained.

10            First of all, this is all repetitious; and, secondly,

11  the questions are not in appropriate form.

12            MR. SEIGEL:  Let me ask it this way, then.

13  BY MR. SEIGEL:

14  Q.  Mr. Salerno, would salespeople personally assist clients in

15  their shopping experiences?

16  A.  Yes.

17  Q.  And how would they do that?

18  A.  Any number of ways, from simple showing garments, to

19  coordinating garments and product, to taking them around to

20  other floors, to show, as I said, handbags that go with or

21  shoes that go with a garment or a coat that goes with a

22  garment, depending on their style and taste.

23  Q.  And when you worked there in the mid 1990s, how many

24  employees would work in Bergdorf Goodman on a given day?

25  A.  I don't know that I can answer that.  Our total head count

N522Car4                          Salerno - Cross

1    was probably around 6 or 700.

2    Q.  6 or 700 employees?

3    A.  Right, but they weren't all working there at the same time.

4    Q.  Let's say on a Thursday night, do you have an idea

5    approximately how many employees might work in that store?

6    A.  No.

7              THE COURT:  Does he have an idea?  Is that where we

8    are?

9              MR. SEIGEL:  All right.

10   Q.  Can you approximate how many employees would work in the

11   store on a Thursday night when you were there?

12   A.  No.

13   Q.  Now, Bergdorf Goodman cared about the appearance of its

14   departments, is that right?

15   A.  Yes.

16   Q.  You certainly didn't want to leave, for instance, on the

17   sixth floor merchandise just lying around loose.

18   A.  Yes.

19   Q.  Is that right?

20   A.  That's correct.

21   Q.  And you would agree that lingerie at Bergdorf's is an

22   expensive item, is that right?

23   A.  I would think so.

24   Q.  Could it also be a high margin item?

25   A.  I don't think the margin percentage was much different than

Case 23-793, Document 83, 11/20/2023, 3592070, Page230 of 300

N522Car4                        Salerno - Cross

1    other luxury items.

2    Q.  Okay.  But you would agree that lingerie could be easily

3    shoplifted?

4    A.  I don't think so.

5    Q.  And why is that?

6    A.  Could it be?  Are you asking hypothetical?

7    Q.  I'm asking why is it that lingerie at Bergdorf Goodman

8    could not be easily shoplifted?

9              MS. CROWLEY:  Objection.

10             THE COURT:  I don't think there is a basis for saying

11   it couldn't be easily shoplifted or that it could.

12             Next question.

13   BY MR. SEIGEL:

14   Q.  Mr. Salerno, as the vice president, senior vice president

15   of administration, I think you said that you were responsible

16   for security?

17   A.  Yes, sir.

18   Q.  Did you interact with security?

19   A.  Yes.

20   Q.  And during your interactions, did the topic of shoplifting

21   ever come up?

22             MS. CROWLEY:  Objection.

23             THE COURT:  Sustained.

24   Q.  Were you familiar with any protocols at Bergdorf Goodman

25   relating to shoplifting?

Case 23-793, Document 83, 11/20/2023, 3592070, Page231 of 300

N522Car4                    Salerno - Cross

1   A.  I'm not sure I understand what you mean.

2   Q.  Okay.  Did Bergdorf Goodman implement any policies while

3   you were there to lessen or safeguard against shoplifting?

4   A.  Yes.

5   Q.  And what were those policies?

6   A.  That's a response -- well, responsibility of everybody in

7   the store, not just security.  We prosecuted anyone we caught

8   shoplifting.  We had security tags on certain items.  I'm

9   trying to remember what else.  I'm not sure what you mean by

10  policies.

11  Q.  Okay.  Would the store take measures to safeguard against

12  shoplifting, for instance, watching customers or clients to

13  ensure that they did not take items?

14          MS. CROWLEY:  Objection.

15          THE COURT:  Sustained.

16  Q.  Did Bergdorf Goodman take any measures to ensure that

17  clients would not steal merchandise?

18          MS. CROWLEY:  Objection.

19          THE COURT:  Sustained.

20  Q.  You talked about personal shoppers and personalized sales

21  experiences.  Would sales associates accompany clients to

22  dressing rooms?

23  A.  Yes.

24  Q.  And were there locks on the doors, specifically on the --

25  let's deal with the sixth floor dressing rooms in the lingerie

N522Car4                         Salerno - Cross

1    department.  Were there locks on the door for the changing

2    room?

3    A.  I don't recall specifically, but I would guess so.

4    Q.  And did the sales associates have keys required to unlock

5    those doors?

6    A.  Yes.

7    Q.  Now, with regard to security, you had mentioned that there

8    were, I think you said, undercover security that floated

9    throughout the store?

10   A.  That's correct.

11   Q.  And essentially what they would do was keep an eye out for

12   any suspicious activity?

13   A.  Yes.

14   Q.  And they were also responsible for documenting anything

15   suspicious or inappropriate?

16   A.  I don't think they documented it unless something occurred.

17   Q.  Okay.  And you mentioned security cameras on the ground

18   floor.  In addition to those security cameras, I think you

19   mentioned that there was --

20            THE COURT:  Do you mean to be say camera singular or

21   cameras --

22            MR. SEIGEL:  Let me clarify.

23            THE COURT:  -- plural?

24            MR. SEIGEL:  Thank you.

25   Q.  So, Mr. Salerno, was there -- at least let's start with

N522Car4                        Salerno - Cross

1    this.  Was there at least one security camera on the ground

2    floor at Bergdorf Goodman when you were there?

3    A.  I believe so.

4    Q.  Okay.

5    A.  At the employee entrance.

6    Q.  At the employee entrance?

7    A.  And the loading dock.

8    Q.  Okay.  So we have at least two cameras now.

9    A.  Yup.

10   Q.  What about on the front door where clients would come in

11   and out?  Would there be cameras there?

12   A.  I don't think so.

13   Q.  Okay.  But would there be a security guard stationed on the

14   ground floor?

15   A.  We had security guards at every door.

16   Q.  And the security guard on the ground floor, was he in

17   uniform?

18   A.  No.  Well, define uniform.

19   Q.  You tell me.  I'm not sure.  What was he dressed like?

20   A.  He was dressed like you.

21   Q.  Okay.

22   A.  In a blue blazer.

23   Q.  And he was stationed at the front door?

24   A.  They were, yes.

25   Q.  Oh, there were multiple security guards?

Case 23-793, Document 83, 11/20/2023, 3592070, Page234 of 300

A-2174

N522Car4                    Salerno - Cross

1    A.  Sure.  We had multiple doors.

2    Q.  Ah.

3              THE COURT:  How many at each door?

4              THE WITNESS:  One.

5              THE COURT:  Thank you.

6    BY MR. SEIGEL:

7    Q.  And I think you had said there was also a camera on the

8    ground floor in the jewelry department?

9    A.  There might have been in fine jewelry.  I don't recall.

10   Q.  And you had made reference to I guess back in the day there

11   were VCR tapes, is that how this surveillance footage was

12   stored?

13             MS. CROWLEY:  Objection.

14             THE COURT:  What's the objection?

15             MS. CROWLEY:  "Back in the day."

16             THE COURT:  Sustained.

17             MR. SEIGEL:  Okay.  Let's clarify.

18   BY MR. SEIGEL:

19   Q.  When you were there in the mid to late '90s, the security

20   footage was recorded on VCR videotapes?

21   A.  Correct.

22   Q.  And you had -- you said they were probably destroyed after

23   a period of time, but you don't know that for a fact, do you?

24   A.  I don't.

25   Q.  And at a bare minimum, you know that if someone wanted to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page235 of 300

A-2175

N522Car4                        Salerno - Redirect

1   request that footage and provide it to the police, let's say,

2   within a day or a week, it would be available, is that right?

3   A.  That's generally.  In all the times we were there, we

4   barely used it.

5   Q.  But nonetheless, it was there if police needed to retrieve

6   it, is that correct?

7   A.  That's correct.

8           MR. SEIGEL:  Thank you very much.

9           THE COURT:  Thank you.

10          Anything else?

11          MS. CROWLEY:  Just briefly, your Honor.

12  REDIRECT EXAMINATION

13  BY MS. CROWLEY:

14  Q.  Mr. Salerno, Mr. Seigel asked you about how many employees

15  worked at Bergdorf when you were there.  Do you recall that?

16  A.  Yes.

17  Q.  And I believe you estimated that the head count was about 6

18  to 700, is that right?

19  A.  That's right.

20  Q.  Did all of those 6 to 700 people work out on the floor?

21  A.  No.

22  Q.  Could you describe the different positions?

23  A.  Well, my alterations department for men's and women's, we

24  had about I think it was close to 200 people, seamstresses,

25  fitters, tailors, you know, people you need in alterations

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N522Car4                        Salerno – Redirect

1    department.  They were not on the floor.

2            My logistics people, the people who moved stock,

3    received trucks, they generally weren't on the floor.

4            The systems people were not on the floor.  They were

5    in the systems area.

6    Q.  And Mr. Seigel also asked you about Thursday nights and

7    sales attendants on Thursday nights.  Do you recall those

8    questions?

9    A.  Vaguely, yes.

10   Q.  How many -- about how many sales attendants would be out on

11   a floor on a Thursday evening?

12   A.  I can't -- I can't recall.  I don't know.

13   Q.  Were there more or less --

14           MR. SEIGEL:  Objection, your Honor.  He says he

15   doesn't recall.

16           THE COURT:  Overruled.

17   BY MS. CROWLEY:

18   Q.  Were there more or less than there were during peak hours

19   during the day?

20   A.  We staff it much less.

21   Q.  You were also asked several questions on cross about how

22   sales attendants interacted with customers in the store.  Do

23   you recall those questions?

24   A.  Yes.

25   Q.  And I believe you testified that they were -- sales

N522Car4                    Salerno - Redirect

1   attendants were trained to give personal attention to certain

2   clients, customers?

3   A.  To every client that wanted it.  Some people don't want --

4   some people don't want personal attention.  Others do.

5   Q.  Were sales attendants trained to follow customers around a

6   store?

7   A.  They were trained -- I'm not sure "followed" is the correct

8   way.  They don't tail people, like some stores you go into and

9   they latch on to you like a fly.  Bergdorf's doesn't work like

10  that or didn't work like that.

11  Q.  How, if at all, were salespeople, sales attendants trained

12  to interact with celebrities or famous people who came in the

13  store?

14  A.  Well, everybody, including my staff, was -- the culture was

15  not to -- basically ignore and not pay attention to

16  celebrities.  The reason they shop in the store was because

17  they didn't want to be approached for autographs and people

18  oohing and aahing.  So you kind of gave them their distance,

19  everybody——my housekeeping staff, my logistics staff, everybody

20  had that.

21  Q.  You were also asked questions by Mr. Seigel about the men's

22  and women's store at Bergdorf's, correct?

23  A.  Correct.

24  Q.  And you testified that you worked in the women's store.

25  A.  My office was in the women's store.  I had responsibility

N522Car4                       Salerno - Recross

1    for both.

2    Q.  To be clear, did you see Donald Trump in the men's store or

3    the women's store?

4    A.  I believe it was in the women's store.

5              MS. CROWLEY:  Thank you.

6              THE COURT:  Thank you.

7              Mr. Seigel, anything else?

8              MR. SEIGEL:  Just briefly, your Honor.

9    RECROSS EXAMINATION

10   BY MR. SEIGEL:

11   Q.  Mr. Salerno, you just testified that the sales associates

12   were trained to, when necessary, give distance to, for

13   instance, celebrities.  That doesn't mean to not attend to them

14   or ensure that any of their needs are met, does it?

15             MS. CROWLEY:  Objection to the form.

16             THE COURT:  Sustained as to the form.

17             MR. SEIGEL:  Okay.  Let me reframe it.

18   BY MR. SEIGEL:

19   Q.  Mr. Salerno, would the sales associates at Bergdorf Goodman

20   make an effort to ensure that the needs of its

21   clientele——celebrity or otherwise——are met?

22   A.  I would hope so.

23   Q.  And that is something that you required of your employees?

24   A.  I would hope so, yes.

25             MR. SEIGEL:  Okay.  Thank you very much.

Case 23-793, Document 83, 11/20/2023, 3592070, Page239 of 300

N522Car4                    Lebowitz - Direct

 1              THE COURT:  Thank you.  You are excused, Mr. Salerno.

 2              (Witness excused)

 3              THE COURT:  Next witness.

 4              MS. KAPLAN:  Plaintiff calls to the stand Dr. Leslie

 5    Lebowitz.

 6     LESLIE LEBOWITZ,

 7         called as a witness by the plaintiff,

 8         having been duly sworn, testified as follows:

 9    DIRECT EXAMINATION

10    BY MS. KAPLAN:

11    Q.  Good afternoon, Dr. Lebowitz.  Dr. Lebowitz, what is your

12    current job?

13    A.  I'm a clinical psychologist in private practice.

14    Q.  And could you explain what does it mean to be a clinical

15    psychologist?

16    A.  Sure.  It means that I went to school for about seven

17    years.  During that time I spent about four years doing course

18    work in psychology, spent about seven years learning how to do

19    clinical work, psychotherapy, and how to assess people, and at

20    the same time spent the same amount of time learning how to do

21    research and how to think about the question of how do we know

22    what we know, what constitutes reliable and valid information.

23    At the end of that time, you are required to do your own piece

24    of independent research, which I did, and after that you do an

25    internship, which is an intensive clinical year, and after that

N522Car4                    Lebowitz - Direct

1   you do some postgraduate clinical hours that are supervised,

2   and then you have a doctorate in psychology.

3   Q.  And I think you mentioned this, Doctor, but as a clinical

4   psychologist, do you see patients?

5   A.  I do.

6   Q.  And that's as part of a private practice?

7   A.  It is.

8   Q.  And for how long have you been doing that?

9   A.  Since about 1992, I think.

10  Q.  And with respect to your practice as a clinical

11  psychologist, do you have any particular specialization?

12  A.  I do.  I have a specialization in psychological trauma.

13  Q.  We are going to talk a lot about that today and probably

14  tomorrow, Doctor, but just at the outset, can you explain to

15  the jury what you mean when you say trauma?

16  A.  Yeah.  I mean some kind of an event that is so painful and

17  emotionally overwhelming or difficult in terms of what it means

18  that we can't cope with it using our normal capacity to cope

19  with difficult things.  And because we can't manage it in our

20  usual way, it has the ability to harm us long term.

21       And there's all kinds of events which are potentially

22  in that category, things like natural disasters or manmade

23  disasters, combat is in that category, rape and sexual assault

24  and other forms of interpersonal violence are in that category,

25  traumatic loss.  Those are all things that have the power to

N522Car4                      Lebowitz - Direct

 1  harm us because they exceed our capacity to cope.

 2  Q.  I'm going to ask Mr. Lam to put up the first page of the

 3  demonstrative exhibit and I'm going to ask you some questions,

 4  Doctor, about your background.

 5          So could you tell the jury, you kind of talked about

 6  it generically at the beginning, but what precisely was your

 7  education after high school?

 8  A.  I have a bachelor's degree from Oberlin College and then a

 9  master's and a doctorate from Duke University.

10  Q.  And for how long have you been working in the area of

11  trauma as you just described it to the jury?

12  A.  Well, I really started in graduate school in about 1984.

13  Q.  And can you tell the jury, starting in graduate school,

14  what kind of work were you doing in connection with trauma?

15  A.  My research was oriented towards trauma, so, for example, I

16  interviewed about 30 women who were victims of some kind of

17  sexual assault for my dissertation.  We also tried to figure

18  out how best to help those people.  So we treated victims both

19  individually and in group treatment throughout my graduate

20  career.  And then eventually we wrote some of that material up

21  in papers to be published.

22  Q.  And Doctor, after you got -- you received your doctorate

23  and graduated from graduate school, what did you do next in the

24  field of trauma?

25  A.  I did two things.  I became a faculty member at the

N522Car4                        Lebowitz - Direct

1    University of Massachusetts Boston where I started their first

2    graduate and undergraduate courses in trauma and supervised

3    graduate students.  But I also began to work collaboratively

4    with people at a place called the Victims of Violence program,

5    which was a treatment facility in Boston, and they wanted help

6    trying to figure out how best to evaluate the treatment they

7    were providing, so I worked with them in doing that.

8    Q.  And at the Victims of Violence program, Doctor, was that in

9    connection with a particular hospital?

10   A.  Yeah, it was affiliated with the Cambridge Hospital and

11   Harvard University and it was run by two women, a Dr. Mary

12   Harvey and a Dr. Judith Herman.

13   Q.  You mentioned Dr. Judith Herman.  Does she herself have any

14   kind of importance in the field of trauma?

15   A.  Yes.  She wrote one of, arguably, the most seminal books in

16   the field.  It was a very important early book.  She recently

17   wrote a new one, but she was pivotal in helping the field get

18   started actually.

19   Q.  And was Dr. Herman connected to any medical school?

20   A.  Harvard Medical School.

21   Q.  And when was it when you were working during this time with

22   Dr. Herman that the Victims -- for the Victims of Violence

23   program, what years?

24   A.  I think it was 1991 through '97.

25   Q.  And did you also -- have you had any experience, Doctor,

Case 23-793, Document 83, 11/20/2023, 3592070, Page243 of 300

A-2183

823

1  working with people who experience trauma in the military?

2  A.  I have.  In the -- I have two separate encounters like

3  that.  After I left the university, I went to work for a place

4  called the National Center for Posttraumatic Stress Disorders

5  which was run out of the -- it was run out of the Veterans

6  Administration, and this was a specialized facility within the

7  VA that was dedicated to assessment, research, and treatment of

8  service-connected difficulties.

9        I worked in two parts of the National Center.  They

10  had just started for the first time something called the

11  women's health sciences division, which was beginning to look

12  at the needs of female service members, and I worked there and

13  was pivotal in putting the question of whether or not people

14  have been sexually traumatized into their assessment protocols.

15  And then after about a year, I went over to what was called the

16  behavioral sciences division, which was the portion of the

17  National Center that was primarily treating male combat

18  veterans.  And in both places I did a mixture of assessment,

19  treatment, supervision, and collaborated on some research.

20  Q.  And just to put this, again, in the context of time, what

21  years were you doing that work, Doctor?

22  A.  That was really in 1994 to 1996.

23  Q.  And there has been a bit of a complaint, Doctor.  If you

24  could maybe move the microphone closer to your mouth, that

25  would be great.

N522Car4                        Lebowitz - Direct

1   A.  Is this better?

2   Q.  Much better.

3   A.  Okay.

4   Q.  I think you said that at the National Center for

5   Posttraumatic Stress Disorders you worked with combat veterans.

6   Can you put a little bit more meat on the bones of what you

7   were doing there?

8   A.  Yeah, the National Center was charged with both assessing

9   people and trying to evaluate when people had service-related

10  posttraumatic stress disorders or other service-related

11  difficulties, but they were also charged with trying to figure

12  out how to best treat people who had had combat exposure.  So

13  we were doing both.  There is a lot of research going on there

14  and a lot of treatment and training of up-and-coming clinicians

15  and researchers.

16  Q.  In addition or separate from the work that you did with the

17  National Center for Posttraumatic Stress Disorders, did you

18  have any other experience, Doctor -- have you had any other

19  experience working with people in the military?

20  A.  Yeah, in the early 2000s, Congress mandated that each

21  branch of the service come up with a way to address the problem

22  of sexual assault within the military, and I was asked to write

23  the psychological part of the curriculum for the Air Force and

24  to help train them on how to respond to men and women who were

25  coming forward and saying that they had been sexually

N522Car4                    Lebowitz - Direct

1   assaulted.

2          So I developed a curriculum, did the initial training

3   in Montgomery, but then after that, for about the next ten

4   years, trained in a variety of military bases around the

5   country.  I continued to train in Montgomery, but we also -- I

6   also trained at other places around the country for about the

7   next ten years.

8   Q.  And did you have occasion, Doctor, to do any work with

9   anyone connected later to the National Center for Post -- that

10  was a bad question.  Withdrawn, your Honor.

11         Did you come later to work with anyone connected with

12  the National Center of Posttraumatic Stress Disorders?

13  A.  I did.  A number of years later, one of the scientists I

14  had worked with at the National Center and myself and two other

15  people began to work on a treatment protocol, kind of

16  innovative treatment protocol to try to help -- initially

17  started focusing on U.S. Marines, but it's broadened since

18  then, but to try to help men and women who were still in active

19  duty to see whether or not we could help them essentially get a

20  little bit ahead of some of the stress problems that they were

21  having that were related to combat injuries, psychological

22  combat injury.

23  Q.  And when did you do that work, Doctor?

24  A.  I started that work in 2007.  I participated in developing

25  the treatment protocol and in supervising the first couple of

1   clinical trials.  My involvement ended in about 2016, and it is

2   still ongoing.

3   Q.  I think you touched on this, Doctor, but I take it you have

4   also had occasion to teach psychology at the college or

5   university level?

6   A.  I have.  I was a faculty at University of Massachusetts at

7   Boston where I taught graduates and undergraduates.  They had a

8   clinical program there, so I also supervised the research and

9   clinical work of graduate students.  And after I left the

10  university, I have continued to lecture in colleges and

11  universities.  Sometimes I do trainings.  I taught the peer

12  counselors at Harvard for many years.  So I have taught on and

13  off, but I haven't worked as a full-time faculty member since

14  then.

15  Q.  And have you published academic articles in your field,

16  Doctor?

17  A.  I have.

18  Q.  And I'm going to ask you a technical term and then I'm

19  going to ask you to explain it.  Were those articles peer

20  reviewed?

21  A.  They were.

22  Q.  And what does it mean for an article to be peer reviewed?

23  A.  So for an article to be peer reviewed means that you have

24  submitted it to a journal that requires that and what that

25  journal does is they remove your name and any kind of

N522Car4                         Lebowitz - Direct

1    identifying information that connects you to the article and

2    then they send it to other people in the field who have

3    expertise in that particular issue and they then review it

4    independently and make a recommendation to the editor as to

5    whether or not it should be published.

6    Q.  And how many articles or peer-reviewed articles, Doctor,

7    have you had published?

8    A.  About 17.

9    Q.  And have you also had occasion to serve as an expert

10   consultant or witness in legal cases, Doctor?

11   A.  I have.

12   Q.  And for how long have you been doing that?

13   A.  Since 1994.

14   Q.  And what kinds of cases have you worked on?

15   A.  I have worked in civil cases, such as this, I have worked

16   in military cases, and I have worked in regular criminal cases.

17   Q.  And when you served as an expert consultant or witness in

18   those cases, what side of the V have you worked for?

19   A.  It depends.  In -- you know, I work in cases where my

20   expertise in trauma is relevant, so in civil cases, I am

21   typically on the plaintiff's side.  In criminal cases, I could

22   be on either side depending on the situation.

23   Q.  And has there ever been an occasion, Doctor, where you

24   declined to provide the expert opinion that you were engaged or

25   asked to give?

N522Car4                    Lebowitz - Direct

1   A.  Of course.

2   Q.  And can you explain?

3   A.  Well, this comes up in one of two ways.  It's not uncommon

4   for an attorney to call me because they think that trauma might

5   actually be an important part of the story that they are trying

6   to tell, but I don't find it compelling, and so those kinds of

7   requests tend to end before I am engaged.

8         Sometimes -- this is less often, but sometimes I'm

9   hired but what I find is not considered to be helpful by the

10  attorney and then I might not continue to work in that case.

11  Q.  About how many times have you been engaged but then you

12  didn't continue to work on the case?

13  A.  At least five or six, maybe more.

14  Q.  And have you -- withdrawn.

15        In those occasions, Doctor, without giving me any

16  information about the particular case, can you explain why you

17  didn't proceed further in those cases?

18  A.  A couple of them, a few of them were prosecutions for rape

19  and -- but I did not feel confident that what had happened met

20  that criteria.  Some of them were murder cases where the lawyer

21  was hoping that trauma might be the best explanation for

22  somebody's behavior, but I thought that there might be an

23  explanation, for example, that they might have a character

24  disorder.  There could be some other explanation that was more

25  primary, so in those cases I also didn't continue.

N522Car4                    Lebowitz - Direct

1   Q.  Have you testified before, as you are doing today, Doctor,

2   as an expert witness in a courtroom?

3   A.  I have.

4   Q.  And approximately how many times have you done that?

5   A.  I would say about a dozen.

6   Q.  And in all those cases, were you qualified to testify as an

7   expert?

8   A.  I was.

9   Q.  Now, in this case, Doctor, were you asked to provide an

10  opinion, an expert opinion, on behalf of plaintiff, E. Jean

11  Carroll?

12  A.  I was.

13  Q.  And what were you asked to do?

14  A.  I was asked to evaluate whether Ms. Carroll had been harmed

15  by the alleged events that occurred with Mr. Trump; and, if she

16  had been, in what ways.

17  Q.  And briefly, because we're going to spend a lot of your

18  testimony talking about this, but briefly, did you form an

19  opinion?

20  A.  I did.

21  Q.  And again briefly, Doctor, what was that opinion?

22  A.  There were three dominant ways that I felt that she had

23  been harmed.  She has suffered from painful, intrusive memories

24  for many years; she endured a diminishment in how she thought

25  and felt about herself; and, perhaps most prominently, she

N522Car4                    Lebowitz - Direct

1   manifests very notable avoidance symptoms which have curtailed

2   her romantic and intimate life and caused profound loss.

3   Q.  We are going to talk about those things much more, Doctor,

4   but I want to set the table a bit.

5           In order to form the opinion you just summarized, what

6   steps did you take?

7   A.  I interviewed Ms. Carroll.  I did what is called an

8   unstructured clinical interview, which is essentially a very

9   free-ranging conversation that occurs over many hours in which

10  I simply ask the person about their life, about what happened,

11  about what it meant to them.

12  Q.  And is it your typical practice, Doctor, to conduct an

13  unstructured interview as you have just described?

14  A.  It is.

15  Q.  And are there other ways that other experts in your field

16  form opinions in your field that's different than an

17  unstructured clinical interview?

18  A.  There are.  There are highly structured interviews like,

19  for example, if you are trying to figure out whether somebody

20  does or does not have a particular diagnosis, there are some

21  formal instruments that you can use.  There is paper and pencil

22  testing where you give somebody a series of questions on a

23  piece of paper and they answer them for you.  There is other

24  kinds of psychological testing that people can do.  Or you

25  could do a highly structured interview to try to assess, you

N522Car4                         Lebowitz - Direct

1   know, essentially whether somebody is in a particular category

2   or not.

3   Q.  So why as a general practice, Doctor, do you prefer to do

4   an unstructured clinical interview?

5   A.  I think that if you really want to understand an

6   individual, then you have to ask them about themselves and you

7   have to talk to them about your life -- their lives.

8          You know, what a more structured assessment will do is

9   it will tell you whether somebody is in a particular category,

10  but it doesn't tell you very much, or anything necessarily,

11  about how what they have experienced has played out in their

12  lives, how it has affected them, and it doesn't tell you very

13  much about who they are.

14         Two people can have the same symptom but it may affect

15  them differently and it may affect their lives differently.

16  And so that's one reason why you want to ask somebody about

17  that.

18         The other reason it is helpful to do an unstructured

19  interview is that everybody has a different way of talking and

20  thinking about themselves and their experiences, and it takes a

21  while to listen to somebody's language and to their

22  characteristic ways of describing themselves until you feel

23  like you are actually understanding what they are trying to

24  communicate.  I think you actually had -- I think there was

25  even an example of it yesterday.  I watched a little bit of the

N522Car4                        Lebowitz - Direct

1    testimony, and there was a moment when Ms. Carroll says -- I
2    think she is asked whether she was frightened, and she says,
3    No, I was too panicked to be afraid.  And it was such an
4    interesting comment because if you were assessing her with a
5    formal measure, with a paper and pencil measure, and you said,
6    Were you frightened, she would have said, No.  But since it was
7    a conversation and she could say, I was too panicked to be
8    frightened, if you are in an interview situation, you can say,
9    Well, what did you mean by that?  What do you mean by panic?
10   What does panic mean for you?  And then the person might say
11   something like, Well, I couldn't think at all.  I didn't feel
12   like myself.  I felt like my heart was racing.  I couldn't
13   catch my breath.  I felt like my stomach had turned to jello.
14   So then I, as a clinical psychologist, would know that actually
15   she was profoundly frightened, but that's just not the language
16   that she attaches to it.  She calls it something else.  But you
17   can only figure that out if you are actually having a
18   conversation with somebody.

19        The other reason why an unstructured interview, and
20   especially a lengthy one, is helpful is that you want to hear
21   not only how people typically present themselves, you know,
22   essentially what they lead with, but you want the opportunity
23   to hear what the missing pieces are, what they don't usually
24   talk about or what's difficult or painful to talk about.  And
25   you even want to give them the opportunity to reveal things

N522Car4                      Lebowitz - Direct

1      that they may not be particularly aware of.  And all of that

2      takes time and all of it requires that the person be given the

3      opportunity to just talk and reveal themselves.

4      Q.  Doctor, is there anything about plaintiff E. Jean Carroll

5      that, to your mind, made an unstructured clinical interview

6      appropriate?

7      A.  Yeah, pretty much everything about her, actually.  For one

8      thing, while she is a very smart and intelligent woman, she is

9      not a particularly psychologically minded or introspective

10     person.  You know, she is not somebody who spends a lot of time

11     thinking about how she feels.  So if I'm interested in exactly

12     that question, which is how she feels, it's going to take a

13     little bit of time to get to it because in a sense she is

14     exploring it in a new way for herself as well.  So that takes a

15     while.

16             And she is also somebody who -- she is action oriented

17     more than anything else, and none of us are particularly aware

18     of the things that we avoid.  It's hard to ask somebody what

19     you avoid because, by definition, you are avoiding it, so you

20     are not thinking about it very much.  And if you want to be

21     able to evaluate whether or not there are important things that

22     people avoid, especially if those are things that people feel

23     ashamed about, you need to have the opportunity to have that

24     kind of conversation.

25     Q.  For how long did you spend with Ms. Carroll in an

N522Car4                    Lebowitz - Direct

1   unstructured interview setting?

2   A.  I think altogether it was 20 to 22 hours.

3   Q.  And that sounds like a long time, Doctor.  How does that

4   compare to other cases in which you have been retained?

5   A.  I think that's about in the middle for me, actually.

6   Q.  And what topics, generally speaking, did you discuss with

7   Ms. Carroll during that interview?

8   A.  Well, we started with her --

9   Q.  Let me interrupt myself.  22 hours, you didn't do that in

10  one day, I take it.

11  A.  No.

12  Q.  Can you explain --

13  A.  Yeah.

14  Q.  -- what those hours entailed in terms of how you scheduled

15  it?

16  A.  Yeah.  We had three long in-person interviews and then a

17  few much shorter ones over Zoom.

18  Q.  And going back to my last question, what topics, generally

19  speaking, did you cover during those 22 hours?

20  A.  We covered, you know, everything that I thought would

21  inform my understanding of who she was and how she got to this

22  point.  So we talked about her childhood, her family, her

23  culture and socialization and upbringing, how emotions and

24  things like that were managed in her family.  We talked about

25  her development from early childhood until now, talked about

N522Car4                          Lebowitz - Direct

1   her professional work, her intimate relationships, her dating

2   life, the adversity that she's encountered, and we talked about

3   what she alleges happened with Mr. Trump and what happened

4   after that.

5   Q.  Now, how would you -- after spending all that time with

6   Ms. Carroll, how would you describe her as a person?

7   A.  Well, in the interview I found her open and forthcoming,

8   very easy to engage, not particularly introspective.  I didn't

9   think she had any signs of thought disorder, character

10  disorder, or major mental illness.  She struck me as unusually

11  vivacious and extroverted.

12  Q.  Are you being paid for your work in this case, Doctor?

13  A.  I am.

14  Q.  And can you explain how much?

15  A.  I am being paid $600 an hour.

16  Q.  Now, I said I would come back to it, and I am coming back

17  to it already, Doctor.  What makes something traumatic?

18  A.  I think that the simplest overarching way to think about

19  this is it has to do with what it feels like and what it means

20  to us.  Those two things—what it feels like and what it

21  means—have the -- can initiate a whole cascade of

22  psychological and biological responses that shape our responses

23  to a traumatic event.  I think it will be clearer if I give you

24  an example.

25              So, for example, if you think about a potentially

N522Car4                     Lebowitz - Direct

1   nontraumatic event but which is painful, so consider, for

2   example, losing a loved one, losing your partner of many years

3   after a long illness.  So that's something that is incredibly

4   painful, it is really, really sad, and also it requires that

5   how you think about yourself in the world has to adjust.  If

6   you have always thought of yourself as a married person, if

7   that person's always been by your side, your whole idea -- we

8   are going to call it a schema later on, but your whole sense of

9   what it means to be you is going to have to adjust in some

10   important ways.  So what happens in the aftermath of a loss

11   like that is you need to essentially process the emotions and

12   get used to the changes.

13        In the case of a normal loss, there is a lot of social

14   support for that.  People bring food, they bring company and

15   support.  There are often religious or social institutions that

16   help you -- that kind of help hold you through that process.

17   And over time, what you expect is that the intense grief

18   becomes less sharp and you still might feel it sometimes, but

19   you also become able to think about the loss in other sorts of

20   ways.  You remember the person with humor, with fondness, with

21   love, and with sadness, and you get used to being without them

22   and life goes on without -- ideally, life goes on without any

23   kind of psychological injury.

24        If you contrast that to the challenge that is posed by

25   a traumatic loss, so let's say a more traumatic situation might

N522Car4                          Lebowitz - Direct

1    be let's say you've got a 16-year-old daughter and she wants

2    the keys to the car.  You have a fight with your partner about

3    whether or not that's a good idea.  You win the fight and your

4    daughter takes the car.  As a result of that, she is brutally

5    murdered.  Now you have a very different situation.  Because

6    every time you walk towards your grief about your daughter, you

7    are confronted with horrifying imagery related to the loss,

8    imagery that has the power to kind of shut you down.  Also,

9    when people try to bring comfort, perhaps you feel guilty and

10   ashamed about your choice to give her the keys, and that makes

11   you unable to take that kind of comfort from other people, and

12   so you withdraw from those sources of social support.  Maybe

13   you hate yourself because you fought for the keys for her and

14   now she died.

15         So in that sort of a situation, what that event means,

16   which is you feel bad about yourself now, you are pulling

17   yourself away from your community, and you can't quite get to

18   the natural process of working through those feelings because

19   it is so horrifying that you close down.  When that happens, we

20   get stuck and in that place of stuckness, traumatic pain can

21   endure, unfortunately indefinitely in one form or another,

22   causing symptoms.

23         (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 83, 11/20/2023, 3592070, Page258 of 300

A-2198

N525car3                    Lebowitz - Direct

1   BY MS. KAPLAN:

2   Q.  And when you say indefinitely, Doctor, how long can someone

3   be stuck in the sense that they're suffering from negative

4   consequences from trauma?

5   A.  The tragedy is that there is no time limit on it.

6          In general, if people are unable to in some way

7   resolve a traumatic event, in other words they can't come to a

8   way to understand it that allows them to feel OK about

9   themselves and OK about other people and adequately safe in the

10  world, and if they can't process the feelings, the consequences

11  can last for the rest of their lives.

12  Q.  Doctor, can someone who is experiencing negative

13  psychological symptoms or consequences for trauma still be

14  successful in other areas of their life?

15  A.  Of course.

16  Q.  Can you give an example for the jury?

17  A.  Sure.  You know, potentially traumatic events are extremely

18  common.  Probably most people in this courtroom have

19  encountered some adversity in their lives.  And, you know, many

20  times we are able to meet that adversity successfully and go

21  on.  It is also true that many people are injured by some kind

22  of traumatic event in their life, but that doesn't mean they

23  don't get up in the morning and go to work, that they don't

24  make dinner for their kids, that they don't show up for their

25  friends' birthday parties, that they don't continue to be

Case 23-793, Document 83, 11/20/2023, 3592070, Page259 of 300

1    potentially quite successful professionally.

2              You know, humans are complicated and there is a lot of

3    different parts to what we are and so it is possible to have

4    one part of your life go down or be injured and have many other

5    parts continue to be successful.

6    Q.  Doctor, is a person experiencing negative symptoms or

7    psychological responses to trauma always aware that that's

8    what's going on?

9    A.  No.

10   Q.  Why?

11   A.  There is a -- well, you know, for one thing, there is an

12   awful lot in our minds that we are not aware of.  Some, you

13   know, a lot of scientists argue that most of what is happening

14   at any point in time we are not aware of.  But, more than that,

15   you know, it is one of the hallmarks of trauma that if you can

16   resolve it, it is likely for part of it to essentially go

17   underground in your psyche, and from that underground position

18   continue to influence your thoughts, your perceptions, your

19   feelings, and your behaviors.

20   Q.  Can you give an example, Doctor, for the jury, of how

21   someone may be experiencing trauma and acting on it but not

22   being aware that that's what is happening?

23   A.  Sure.  I can give you one that you may well have observed

24   in your life.

25              So, I am thinking about somebody who is a great

1    parent.  Right?  A really warm, supportive, very accepting

2    parent, but for whatever reason, when his oldest son gets to be

3    about 14 or 15, he finds himself just overreacting to him, just

4    hectoring him, nagging him, feeling afraid that he is not going

5    to be OK, just like he is on him like white on rice, and in a

6    way that is clearly not helpful, that is kind of relentless.

7    And after these kind of moments where he loses his perspective

8    and is obsessive with this kid, he backs away saying, yeah, I

9    didn't need to say the same thing to him for 45 minutes

10   straight.  Why didn't I drop it?  But he isn't able to drop it

11   and he keeps doing it.  If you know something about his

12   upbringing, what might be visible to you, as an observer, is

13   that he is after his kid for the very same qualities that were

14   problematic for him as a kid that caused him to be traumatized

15   as a child.  But that isn't in front of mind for him and so it

16   is influencing his re-activity to his kid and makes him act in

17   ways that are uncharacteristic but he is not really aware of

18   it.  And even when he has some awareness of it, he can't pull

19   it back in the moment, it has become automatic.

20   Q.  Doctor, is there a diagnosis that is most commonly

21   associated with adverse psychological consequences from trauma?

22   A.  There is a few.  Depression is very common, as are mood

23   disorders, in general; any kind of anxiety disorder, and

24   substance abuse are the diagnoses that often attend to trauma.

25   But the most frequently associated one and the only one for

N525car3                         Lebowitz - Direct

1    which you actually have to have had a traumatic event is a

2    diagnosis that is called post-traumatic stress disorder, or

3    that we sometimes refer to as PTSD.

4              THE COURT:  This is a good place to stop.

5              Folks, we will see you at 10:00 tomorrow.

6              Counsel, remain please.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N525car3

 1          (Jury not present)

 2          THE COURT:  Doctor, you can step down now.

 3          THE WITNESS:  Thank you.

 4          (Witness steps down)

 5          THE COURT:  Please be seated, folks.

 6          Lest I forget, let me say for the benefit of both

 7   sides, I do not permit the tendering of a proposed expert in

 8   front of a jury.  You just ask the next question.  You have

 9   clearly gone past that, but for the benefit of the defense

10   also, you just ask your questions.  If there is an objection, I

11   will rule.

12          Where are we?  What is happening next?  How long do

13   you expect to be with this witness?

14          MS. KAPLAN:  So I think maybe another 45 minutes to an

15   hour.  Some of these concepts, as you probably noticed, are

16   hard to understand, so I am taking them in baby steps but I

17   think I can be done in 45 minutes to an hour, on direct.

18          THE COURT:  How long on cross do we expect?

19          MR. SIEGEL:  Maybe an hour, if that.

20          THE COURT:  And you are going to cross-exam

21   Mr. Siegel; is that right?  Yes?

22          MR. SIEGEL:  Yes.

23          THE COURT:  And then who comes after the doctor?

24          MS. KAPLAN:  Next we have Ms. Carroll's sister Cande

25   Carroll.

Case 23-793, Document 83, 11/20/2023, 3592070, Page263 of 300

N525car3

1              MR. TACOPINA:  Sorry.  You say next?

2              THE COURT:  How long?

3              MS. KAPLAN:  Very short, your Honor; 25 minutes max.

4              THE COURT:  What is the defense case on cross?

5              MR. BRANDT:  Shorter.

6              THE COURT:  And then after?

7              MS. KAPLAN:  Then we have Natasha Stoynoff.  That

8      would be about the same as Ms. Leeds.

9              THE COURT:  Which was what?

10             MS. KAPLAN:  Very good question, your Honor.  My

11     colleague is saying 45 minutes.

12             MR. FERRARA:  45 minutes.

13             THE COURT:  Defense, how long do you think you were?

14     Not very long.

15             MR. TACOPINA:  No, but my cross should be four or five

16     hours, at the most.

17             THE COURT:  On a 45-minute direct?

18             MR. TACOPINA:  I was just kidding, your Honor.

19             THE COURT:  Hmm?

20             MR. TACOPINA:  I was just kidding.  A little levity in

21     the process.  That's all.

22             THE COURT:  It would have been levity but-for the

23     prologue.

24             MR. TACOPINA:  Same thing.  Same thing as the Leeds

25     cross and Ms. Leeds, as you saw, was very --

N525car3

```
 1              THE COURT:  So maybe an hour and a half with
 2    Ms. Stoynoff.
 3              MS. KAPLAN:  Then we have Carol Martin, your Honor.
 4              THE COURT:  Yes.
 5              MS. KAPLAN:  That is about an hour.
 6              MR. TACOPINA:  That, no joking, that might be just a
 7    little bit longer.  That's the second witness, but not much
 8    longer.
 9              MS. KAPLAN:  Then we have expert Ashlee Humphreys?
10              THE COURT:  Yes.
11              MS. KAPLAN:  And we have Robbie Myers.  Robbie Myers
12    will be very short, she was an editor --
13              THE COURT:  How long with Humphreys, all told?
14              MS. KAPLAN:  Hour and a half, I'm being told.
15              THE COURT:  And on defense?
16              MR. SIEGEL:  Half hour.
17              MS. KAPLAN:  Robbie Myers is very short, correct?  20
18    minutes, I'm told.
19              THE COURT:  Other side?
20              MR. BRANDT:  10, 20 minutes.
21              THE COURT:  OK.
22              MS. KAPLAN:  The only thing I left out, your Honor,
23    are the Trump designations.  We were going to kind of fit them
24    in where and when appropriate and I think -- how long is the
25    tape?  45 minutes, your Honor.
```

N525car3

1            THE COURT:  OK.  Defense case, if any?

2            MR. TACOPINA:  Your Honor, we were just speaking about

3      that at the break.  We have Dr. Nace, you know that issue we

4      discussed.

5            THE COURT:  Yes, I know.

6            MR. TACOPINA:  So we are working that out.  I am

7      thinking -- Robbie, does it look like Thursday -- it is five

8      more witness, Robbie, after this one?  Five more witnesses?  Is

9      that right?

10           MS. KAPLAN:  I'm terrible at math but I think that

11     sounds about right.

12           Is that right?

13           We assume, given the pace we were going today, your

14     Honor, that we should done by early or midday Thursday, so that

15     would leave time for Dr. Nace do it the rest of Thursday

16     afternoon.

17           MR. TACOPINA:  Your Honor, I spoke to Andy about the

18     potential of doing Zoom -- not a Zoom but Teams, a virtual

19     examination where Ms. Kaplan's firm would send someone to where

20     he is and we would do the same with us, we would do it by

21     virtual.

22           THE COURT:  Well, we have to know.

23           MR. TACOPINA:  Your Honor, I understand, but it is

24     completely day by day.  I spoke to the doctor yesterday --

25           THE COURT:  I got that, but what I am really asking

N525car3

1    you is barring that he can't do it at all, you want to do it by

2    remote and you want -- you are thinking you would do it

3    Thursday afternoon.

4              MR. TACOPINA:  Exactly.

5              THE COURT:  OK.  So, Andy is right here, I think.

6              THE DEPUTY CLERK:  Yes.

7              THE COURT:  He keeps a low profile.  So, you have your

8    answer to that.

9              THE DEPUTY CLERK:  Yes.

10             THE COURT:  And that's it, right, Mr. Tacopina?  Or

11   not.

12             MR. TACOPINA:  That is it.

13             THE COURT:  So Mr. Trump is not going to be coming.

14             MR. TACOPINA:  Correct, your Honor.

15             THE COURT:  OK.  You know, it is his call.  You

16   understand that.  I understand that.  He understands that,

17   right?

18             MR. TACOPINA:  Correct.  Of course.

19             THE COURT:  OK.  Anything else we need to talk about

20   this afternoon?

21             MR. TACOPINA:  Your Honor, there is one thing, maybe

22   we can discuss it amongst ourselves and come back to you

23   tomorrow.  Just on Ms. Carroll's sister, I'm just not sure of

24   the scope of the testimony.  My understanding is it is going to

25   be something along the lines of "she would never have told us."

N525car3

1    Ms. Carroll already testified to that.  I don't know if it's an

2    appropriate or even permissible witness if that's the scope of

3    it and maybe we can discuss it amongst ourselves a little bit

4    more.

5          THE COURT:  That may be a good idea because you don't

6    know the questions yet and I can't very well rule on

7    objections.

8          MR. TACOPINA:  I didn't expect you to rule right now,

9    I am teeing it up a little bit.  That's all.

10          THE COURT:  OK.  I have learned from both of you in

11    this case is what you are doing is fronting it, an expression I

12    many never heard before until here.

13          OK.  I think that takes care of that and I will let

14    you know whether I will be prepared to do charging conference

15    on Friday or on Monday in the next day or so.

16          MS. KAPLAN:  Thank you, your Honor.

17          (Adjourned to May 3, 2023 at 9:30 a.m.)

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                                 Page

 3    LISA BIRNBACH

 4    Direct By Ms. Crowley  . . . . . . . . . . . 679

 5    Cross By Mr. Brandt  . . . . . . . . . . . . 715

 6    Redirect By Ms. Crowley  . . . . . . . . . . 731

 7    Recross By Mr. Brandt  . . . . . . . . . . . 736

 8     JESSICA LEEDS

 9    Direct By Mr. Ferrara  . . . . . . . . . . . 737

10    Cross By Mr. Tacopina  . . . . . . . . . . . 763

11    Redirect By Mr. Ferrara  . . . . . . . . . . 783

12    ROBERT SALERNO

13    Direct By Ms. Crowley  . . . . . . . . . . . 788

14    Cross By Mr. Seigel  . . . . . . . . . . . . 804

15    Redirect By Ms. Crowley  . . . . . . . . . . 815

16    Recross By Mr. Seigel  . . . . . . . . . . . 818

17     LESLIE LEBOWITZ

18    Direct By Ms. Kaplan . . . . . . . . . . . . 819

19                      PLAINTIFF EXHIBITS

20    Exhibit No.                                 Received

21    8   . . . . . . . . . . . . . . . . . . . . 686

22    133   . . . . . . . . . . . . . . . . . . . 733

23    18   . . . . . . . . . . . . . . . . . . . . 739

24    26, 26T  . . . . . . . . . . . . . . . . . . 749

25    31 and 31T . . . . . . . . . . . . . . . . . 759
```

```
1    170   . . . . . . . . . . . . . . . . . . 791

2                        DEFENDANT EXHIBITS

3    Exhibit No.                           Received

4    DI   . . . . . . . . . . . . . . . . . 728

5    DH redacted   . . . . . . . . . . . . . 730

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

N554CAR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                     Plaintiff,              New York, N.Y.
 4
                v.                           22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                     Defendant.
 7   ------------------------------x         Jury Trial

 8                                           May 3, 2023
                                             10:05 a.m.
 9
     Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                             District Judge
12                                             and a Jury

13                           APPEARANCES

14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant
```

N554CAR1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning, everyone.

3              MS. KAPLAN:  Good morning, your Honor.

4              THE COURT:  I am asking counsel to remind me that we

5     should not let the day end without discussing the schedule for

6     summations and for charging conference.

7              Okay.  Let's get the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N532Car1                    Lebowitz - Direct

1              (Jury present)

2              THE COURT:  Good morning, folks.  Hope you had a good

3      night.

4              Dr. Lebowitz, you are still under oath.

5              We will proceed.  Ms. Kaplan.

6       LESLIE LEBOWITZ, resumed.

7      DIRECT EXAMINATION

8      BY MS. KAPLAN:

9      Q.  Dr. Lebowitz, we left off yesterday talking about PTSD, and

10     I want to get back to that.

11             But before we get there, do you recall giving some

12     testimony yesterday about something that E. Jean said, E. Jean

13     Carroll said in her testimony at this trial?

14     A.  Yes, but I'm not sure which part of it you are referring

15     to.

16     Q.  Well, let me just ask it this way.  Have you been following

17     in some way E. Jean Carroll's testimony at this trial?

18     A.  I followed some of it.  I was here the day before yesterday

19     observing.

20     Q.  And is that something you have done in other cases?

21     A.  Sure.

22     Q.  Now back to PTSD.  Is there a degree of harm, Doctor, that

23     is necessary in order for someone to be diagnosed with PTSD?

24     A.  Yes, a very high level of harm.  In order to get diagnosed

25     with PTSD, you need to have symptoms in four different

N532Car1                        Lebowitz - Direct

1    categories, and those symptoms need to be intense and

2    disruptive.

3              So in order to meet full criteria for PTSD, you are

4    talking about a pretty severe mental illness, which is often

5    chronic.  It is also the case that people can have symptoms in

6    one or two categories and suffer a lot of negative consequences

7    from that as well.

8    Q.  And in this case, Doctor, did you diagnosis Ms. Carroll

9    with PTSD?

10   A.  I did not.

11   Q.  Did -- does Ms. Carroll have symptoms in any of the four

12   categories you talked about?

13   A.  She does.  She has avoidance symptoms, she has alterations

14   in her thoughts and feelings about herself, and she has

15   intrusions.

16   Q.  Now, Doctor, based on your experience as a psychologist and

17   your reading of the literature, what percentage of people who

18   have experienced trauma then have sufficient symptoms to be

19   diagnosed with PTSD?

20   A.  You know, the data is a little bit complicated because

21   there are so many different kinds of trauma, but it's

22   approximately 20 to 30 percent of people who meet full criteria

23   for posttraumatic stress disorder.

24   Q.  And what about the people in the other 70 to 80 percent,

25   Doctor?

N532Car1                        Lebowitz - Direct

1   A.   There is a larger category of people who have some enduring

2   and painful symptoms but who will never meet full criteria.  In

3   fact, there has been some -- there was some research done a

4   while ago where they looked at the impact of having a few very

5   severe symptoms versus meeting full criteria, and the research

6   was basically making the point that both are quite injurious to

7   a life.  However, we do think about PTSD as being a severe

8   illness.

9   Q.   Now, Mr. Lam, can you put up the second page of the

10  demonstrative.

11          Understanding that every person is different, Doctor,

12  are there broad categories of the ways in which a traumatic

13  effect -- withdrawn.

14          Are there broad categories of the ways in which a

15  traumatic event --

16          THE COURT:  Sorry.  Would you take that a little

17  slower?

18          MS. KAPLAN:  Sure.  I apologize, your Honor.

19  BY MS. KAPLAN:

20  Q.   Are there broad categories, Doctor, of the ways in which

21  trauma can affect a person?

22  A.   Yes.  I think the easiest way to think about it is that

23  what is remarkable about trauma is that it has a capacity to

24  affect all aspects of our functioning.  So it can affect us

25  emotionally, biologically, it can affect how we think about

1    things, and how we remember things, and it can of course affect

2    how we behave and experience our lives.  So there is really no

3    aspect of self that cannot be reached by the impact of a severe

4    trauma.

5    Q.  I want to start at the beginning, Doctor.  So, first of

6    all, what happens to a person's brain when they are

7    experiencing trauma?

8    A.  When your brain is flooded with stress hormones, our normal

9    functioning is altered, and E. Jean actually -- Ms. Carroll

10   actually described this quite well when she talked about not

11   feeling like herself, feeling like her thinking was disordered,

12   feeling that adrenaline was surging through her body and that

13   it was hard to make sense of things.

14          What happens to -- so what happens when you are

15   flooded with hormones like that, stress hormones, is that what

16   we call the prefrontal cortex, the control of the prefrontal

17   cortex is reduced and diminished.  The prefrontal cortex is

18   basically the part of our brain that we have most associated

19   with what it means to be human.  It's the part that allows us

20   to consider alternative courses of action, to plan, to kind of

21   hold the big picture.  It's really what people mean when they

22   talk about being thoughtful and using their mental apparatus to

23   negotiate their lives.  That's kind of the prefrontal cortex.

24          That gets radically reduced when you are flooded with

25   those kinds of hormones.  What happens instead is a much older

N532Car1                        Lebowitz - Direct

1    part of the brain, the part of the brain that we actually share

2    with other mammals, it becomes much more active and much more

3    influential; and what that means is that, rather than being

4    able to rely the way we usually can on being thoughtful and

5    evaluating different options and choosing the best one, we fall

6    back on what are kind of automatic and habitual responses, kind

7    of like a startle response.  That would be a kind of behavior

8    that comes from the older part of the brain.  But it also leads

9    people to essentially not be able to access certain behaviors

10   that they and other people imagine one would access in a time

11   of stress and, instead, do things that appear to be illogical

12   and irrational.

13   Q.  Mr. Lam, you can take down that page of the demonstrative,

14   please.

15          So you are saying, Doctor -- if I understood you

16   correctly, you are saying that the impact of the stress

17   hormones on the prefrontal lobe can have a lot of impacts on a

18   person's brain, one of which is for them to act in ways that

19   may seem irrational or illogical.  Is that fair?

20   A.  Yes.

21   Q.  Can you give me an example of that, or give the jury an

22   example of that?

23   A.  Many, actually.

24          The first one that comes to mind is I remember a story

25   I heard when I was much younger, but it always stuck with me.

Case 23-793, Document 83, 11/20/2023, 3592070, Page277 of 300

857

N532Car1                    Lebowitz - Direct

1    It was a friend of my mother's was a child in Finland during

2    World War II, and she was holding her mother's hand on a

3    beautiful spring day when bombs began to fall, and the force of

4    the bombs blew her mother's hat off; and rather than doing the

5    obvious, rational thing that we all imagine we would do, which

6    is to scoop her daughter up and run for safety, she dropped her

7    daughter's hand and ran for her hat.

8           This is the kind of thing people do.  People forget

9    how to dial 9-1-1.  They don't scream even if they are being

10   raped in the stacks of the public library, when screaming might

11   actually be helpful.  There are just so many ways that we don't

12   act in the way that we imagine we would.  We fall back on

13   something else.

14   Q.  Now, Doctor, is there a part of the brain that lags behind

15   because of these stress hormones that are flooding the brain

16   during trauma?

17   A.  Yes, and you actually heard a description of this, I think,

18   the day before yesterday.

19          That prefrontal cortex that I just talked about, the

20   thinking, considering part of the brain, is much slower than

21   the automatic part of the brain.  It is much slower to react.

22   So if you think about how quickly you react to threat, you

23   know, your body jumps right away, you can feel that in your

24   body right away, but it takes much longer to figure out what is

25   actually happening.

N532Car1                     Lebowitz - Direct

1           So oftentimes when people suddenly find themselves in

2    a dangerous situation that they didn't anticipate, their body

3    begins to react to the fear, but their mind lags behind in

4    figuring out what is actually going on, and there is something

5    in that lag that may also account for some of the seemingly

6    illogical ways that people respond.

7    Q.  Now, how do the stress hormones that you have been talking

8    about, Doctor, impact how a person remembers the traumatic

9    event after it happens?

10   A.  So they have a huge impact on memory.  Memory is actually a

11   complicated process, and at each stage of that process, what we

12   are feeling and what seems important to us has an influence on

13   what we can code, what we move into long-term storage, and what

14   we are able to access afterwards.

15          And in particular, our -- and there are certain kinds

16   of memory functions that essentially are less expensive than

17   other ones, they use less resources.  So sensory memory,

18   remembering what something smelled like or felt like or sounded

19   like, those are relatively inexpensive for our brain to do.  We

20   have a lot of bandwidth for that.  But remembering, for

21   example, the context of something when it happened, where you

22   were living at the time, what the larger context of your life

23   was, that can actually be much more difficult because that

24   takes essentially more resources for the brain.  And so in

25   times of trauma, what people tend to -- they tend to

N532Car1                     Lebowitz - Direct

 1    hyper-attend to certain elements and actually lose other ones.

 2         And I want to say two more things about this.  One is

 3    that at the beginning of a traumatic event, we are more likely

 4    to hyper-encode information.  But the hormones that facilitate

 5    that hyper-encoding are actually fairly toxic.  And so it is

 6    often the case that by the end of a traumatic event, we are

 7    encoding even less.  It is not uncommon, for example, for

 8    people -- and I think this is true of E. Jean, of Ms. Carroll,

 9    actually.  It's not uncommon for people to remember all kinds

10    of details at the beginning and then not really remember how

11    they got away.

12         Another example that might be helpful to think about

13    is if you think, you know, if you imagine a circumstance where

14    you have left your kid playing on the sidewalk for just a

15    minute while you ran in the house to grab something, and

16    suddenly you hear this terrible screeching of a car and a

17    sickening crash against metal.  You run out of the house and

18    you don't see your child.

19         That feeling, the sound of the screeching tire and

20    that feeling in the pit of your stomach, you are never going to

21    forget that feeling, right?  But you could easily have a

22    situation 15, 20 years later, ten years later, whatever, where

23    you are talking with your spouse about that night, and the

24    conversation goes something like that:  *Do you remember that*

25    *terrible night in Brooklyn?  We weren't in Brooklyn.  We were*

N532Car1                    Lebowitz - Direct

1    *in Manhattan.  No, we weren't.  We were in Brooklyn*.  And back

2    and forth with, you know, *It was 19 such-and-such.  No, it was*

3    *really this year.  No, he was in third grad*e.  *He wasn't*.  He

4    *was in second grad*e.  *I wouldn't have let him outsid*e.  *If he*

5    *was in second grad*e.

6              So those kinds of details are context.  They are the

7    other things.  And our brain doesn't hold onto things that at

8    the time didn't seem important.  Our brain holds onto the

9    things that feel emotionally salient in the sense of

10   life-threatening.  That's what we hang on to and we hang on to

11   it in a very visceral and physical way.

12   Q.  People, Doctor, have memory lapses all the time.  So what's

13   the difference between just a regular memory lapse and what you

14   have been discussing in terms of memory affected by trauma?

15   A.  Normal memory fades in part because it's not that

16   important, because we have other things to remember and it kind

17   of goes away, because it is woven into the narrative of our

18   life and it doesn't pop out in any particular way.

19             Traumatic memory lingers for a few reasons.  One of

20   the reasons is that, almost by definition, a traumatic memory

21   is not woven into the fabric of your life in the same way.  It

22   often is not well-integrated in the brain, meaning the

23   different pieces of it are often not woven together very well

24   in the brain, and instead of being housed in your mind as a

25   kind of coherent story with a beginning, a middle, and end,

N532Car1                    Lebowitz - Direct

1   with all of the little pieces put together, it may be stored as

2   literally just a smell or just a feeling in your body or just a

3   sound.  And when you reaccess that memory, it may come back,

4   again, not as a story, but as a physical reexperiencing of

5   something.  It's what we call flashbacks, actually.

6   Q.  In the time that you spent with Ms. Carroll, Doctor, did

7   you observe any of these -- this kind of a memory?

8   A.  I did.  There was one point, I think it was sort of a

9   little bit later on in the interview, when I was asking certain

10  types of questions, where she began to squirm in her seat

11  because she was actually reexperiencing Mr. Trump's fingers

12  inside of her, what she alleges to be Mr. Trump's fingers

13  inside of her.

14  Q.  Doctor, what is an intrusive memory?

15  A.  So an intrusive memory is when some part of the traumatic

16  experience, either what it felt like or it felt like in your

17  body or in your emotions, just pierces your consciousness and

18  lands in the middle of your experience and essentially hijacks

19  your attention.  So you have heard descriptions of this in this

20  trial, when Ms. Carroll talked about how she would just be

21  going about her day and, for no reason that she could imagine,

22  suddenly a memory would pop into mind and it was like her day

23  would go on a swerve.

24  Q.  And you may have just answered the question, but just to be

25  clear, Doctor, what, if any, is the connection between

N532Car1                      Lebowitz - Direct

1    intrusive memories and trauma?

2    A.  So intrusive memories are like -- they are like flags that

3    are planted where unresolved and painful traumatic experiences

4    lie.  You know, they are the signal that there is something

5    here that has been too awful to digest like normal experience,

6    and so it lies in memory in essentially an active form and

7    comes into your life unbidden.  It's like you don't choose to

8    think about it; it just enters.

9    Q.  Do people who experience intrusive memories, Doctor, always

10   experience them in the same way?  Now I'm asking from person to

11   person.

12   A.  No.  One person might have nightmares, somebody else might

13   have flashbacks, a third person might simply have an idea that

14   takes control at times that comes from the trauma.

15   Q.  And can one person, Doctor, have different kinds of

16   intrusive memories?

17   A.  Yes, and that's typical.  One person could have -- could

18   experience visceral, you know, physical remembrances, they

19   could experience, you know, the sense of watching the scene

20   roll out like a movie script.  They could have nightmares.

21   They could have fears that they respond to which are

22   essentially some kind of an intrusion, yes.

23   Q.  Ms. Carroll testified the other day in this courtroom,

24   Doctor, that she rarely thinks about Donald Trump but that she

25   has intrusive memories.  Can you explain that to the jury from

Case 23-793, Document 83, 11/20/2023, 3592070, Page283 of 300

N532Car1                    Lebowitz - Direct

1    a psychological perspective?

2    A.  Sure.  So when Ms. Carroll is talking about thinking, she

3    is talking about the activity of her prefrontal cortex.  She is

4    talking about all the moments when she is engaged in a

5    creative, intellectual, thoughtful life.  And most importantly,

6    she is talking about the experience that she has chosen to

7    think about something.  It is volitional.  Right?

8         Whereas when she talks about an intrusion, she talks

9    about something that just enters her mind and takes her away

10   from where she is and essentially hijacks her attention and

11   which she has no control over.  The issue of control here is

12   fundamental, the question of whether you are choosing to think

13   about something or something is just grabbing you.

14   Q.  Now, are there -- as a general matter, Doctor, are there

15   triggers for intrusive memories?

16   A.  I think most of us would assume that there is always some

17   kind of a trigger, but one doesn't always know what it is.

18   Q.  And is it possible -- withdrawn.

19        Can you give the jury an example of someone from --

20   having intrusive memory but not understanding what the trigger

21   is?

22   A.  Sure.  I'm thinking about a veteran who is walking down the

23   street, it's a beautiful day, he's feeling fine, and suddenly

24   he's having a panic attack and he has no idea why.  I happen to

25   know that on the street he was walking down, there is a

1    Vietnamese restaurant and he had combat exposure in Vietnam,
2    and my guess is that it was the smell of Vietnamese food
3    cooking that actually triggered a memory of having been in
4    combat in Vietnam, but he's not aware of it.  We can roll that
5    back and I can make him aware of it, but he didn't know it.
6    Q.  In the minutes after the alleged assault, Doctor,
7    Ms. Carroll has testified that her overwhelming thought was
8    that she was -- she had died but was still alive.  Can you
9    explain that again in psychological terms?
10   A.  Yeah, this is a very interesting description, and it's
11   extremely common to survivors of rape, and it's interesting
12   because it applies even when the victim knows consciously that
13   her life was actually never in danger.  So, for example, if you
14   were to ask Ms. Carroll:  Did you think he was trying to murder
15   you?  She would say:  Oh, absolutely not.  And that's true for
16   many, if not most, women who are raped by men who believe they
17   had reason to trust.  But yet it is incredibly common for
18   people to describe the experience as a mortal threat.  And I
19   think this is because that's what it feels like
20   psychologically.
21        If you think for a moment about what it means to be a
22   person, how you experience your personhood, it starts very,
23   very early in development, right, from the first time a baby
24   starts, you know, throwing their spoon over the high chair
25   through the tantrums of two- and three-year-olds and the

N532Car1                      Lebowitz - Direct

1    independence of adolescence and into, if you will, adulthood.

2    And through all of those transitions, one of the things that is

3    happening is you are consolidating a sense of this is me and

4    that is you, and we are distinguished because I have a boundary

5    and you have a boundary.  I can invite you in and I can push

6    you away.  But we know ourselves as -- we recognize ourselves

7    as people, as fully human because we have boundaries and

8    autonomy.  We can take action.  And what rape does is it so

9    violates that sense of humanity and independence and selfhood

10   than people feel psychologically that they are being killed.

11   They feel at risk.  They feel like their personhood is being

12   murdered, even if they know at some level that they were never

13   in that kind of mortal, physical danger, if that makes sense.

14   Q.  Now, we have been talking about -- mostly about the brain

15   and about emotional reactions.  I want to pause for a second to

16   turn to actual reactions in other parts of the body.

17   A.  Okay.

18   Q.  Can people who have experienced trauma actually feel

19   physical symptoms in other parts of their body?

20   A.  Yes.  When I talk about a visceral remembering, it feels

21   like it's happening right then.  It feels like somebody's hands

22   are on you or in you or in some way it is literally being -- it

23   is literally -- it feels like it's happening in the present.

24   It's one of the hallmarks of trauma is that the past doesn't

25   stay past, it continues to revisit us now.

N532Car1                         Lebowitz - Direct

1   Q.  And in addition to feeling something, like, happening

2   again, Doctor, can people experience common physical pains

3   from --

4   A.  Sure, I mean, there is a couple ways in which this is

5   important, and it becomes very important over the lifespan,

6   which is when you -- you know, when you are intruded upon or

7   when you are struggling to avoid intrusive memories or in any

8   way being revisited by the trauma, it is common to have -- for

9   the stress hormones from that event to also revisit you.  So

10  people can have all kind of physical symptoms at the time, but

11  even if there is not an awareness that that is happening in the

12  present, it is well-documented at this point that there are

13  long-term consequences, specifically a history of serious

14  traumatic events, such as a sexual assault, is -- seems to

15  contribute substantially to the development of a wide range of

16  physical illnesses, including autoimmune diseases, diabetes,

17  cardiovascular problems, musculoskeletal problems.  So in other

18  words, a history of trauma is a risk factor for the development

19  of all kinds of illness down the road, and that's because of

20  the effect of stress hormones on the body.

21  Q.  In the time you spent with Ms. Carroll, Doctor, did you

22  observe her feeling any of these physical symptoms?

23  A.  At the very conclusion of our interview, where we had

24  really gone over everything, and I think she had, because of

25  the amount of time that we had spoken, she had gotten a kind of

N532Car1                         Lebowitz - Direct

1    bird's eye view of her life, she doubled over, holding her

2    stomach and just said I have a really bad stomachache.  And

3    after that, she got actually very sick with pneumonia, and so I

4    didn't speak with her for a while, and then we then met over

5    Zoom to complete the interview.  She mentioned that she still

6    had the stomach ache.

7    Q.  Could you put up, Mr. Lam, the second page of the

8    demonstrative again.

9            I want to turn now, Doctor, to the second category of

10   harm, which is -- responses to trauma, which is changes in

11   thinking.

12           You can take that down, Mr. Lam.

13           I am going to use kind of a fancy term, and I want, if

14   you can, if you can explain it to the jury, Doctor, that would

15   be great.

16           What does the term "schema" or the word "schema" mean

17   in the context of psychology?

18   A.  So we use the word "schema" as a shorthand way of

19   describing how our mind holds all of our knowledge and all of

20   our beliefs and all of our expectations.  And these schemas or

21   these mental maps or internal representations are all kind of

22   interchangeable terms.  They develop over the course of a

23   lifetime, so they kind of layer one on top of each other.  And

24   the thing about a schema, the role of a schema is to both help

25   you interpret what happens to you and respond to it adaptively

N532Car1                         Lebowitz - Direct

1    and in the best way you can.

2            So, for example, we all know that there is danger

3    everywhere, right?  You know, bad things happen.  But you all

4    had to have some kind of operating schema that you could get

5    out of bed this morning and get to the courtroom, and although

6    you know that there is a possibility that you could have gotten

7    shot on the way, that wasn't really the schema you were working

8    with because if you were working with that schema, you probably

9    wouldn't have left your house.  So you work with the schema

10   that it will probably be okay, I'll probably be safe enough,

11   I'll get to the courtroom, I'll listen to testimony all day,

12   and then I will go home and that will probably be okay, too.

13   So that's an example of the fact that even though you have

14   schemas that say, you know, people get shot, like you do know

15   it, but you go forward into the day with the schema that

16   most -- that's going to best facilitate your functioning that

17   day and best fits the data of reality as it seems to you in

18   that moment.  We basically use the most positive, optimistic

19   schemas we can use that seem to match up adequately with

20   reality, and those schemas change, of course.  If something

21   happened, it would change.  So that's kind of how they work.

22   Q.  You just said, Doctor, a schema could affect your

23   functioning that day.  Do people have more than one schema?

24   A.  Yeah, we have multiple schemas.  We all have different ways

25   that we think of ourselves.  You know, I have one experience of

N532Car1                    Lebowitz - Direct

1   myself when I am testifying, a different one when I am being a

2   parent, yet another if I'm in a doctor's office.  We all have

3   different kind of representations of who we are depending on

4   the circumstance, and those different representations also hold

5   different feelings.  So it's very common for people, it's

6   actually, you know, universal for people to both have ways that

7   they feel good about themselves and ways that they feel bad

8   about themselves.  We all have a whole host of schemas.

9   Q.  What, if any, is the relationship between schemas and

10  feelings?

11  A.  Yeah, that's a good question.  Schemas are usually thought

12  about in a kind of cognitive way, you know, what do you

13  believe, what do you know, but they are also attached to

14  feelings because, you know, when you think about yourself as

15  competent or incompetent, that then is attached to certain

16  kinds of feelings that go with it.

17  Q.  So how, if at all, Doctor, does experiencing trauma impact

18  a person's schemas or the way they think about things?

19  A.  It's one of the profound and enduring ways that trauma does

20  affect.  So, for example, if we go back to the schema of

21  safety, if there was a part of your life in which you felt safe

22  and then something terrible happens, your basic schema for

23  safety might be shattered or radically changed.

24          Similarly, if you go forward into the world with the

25  expectation that you are a person worthy of being respected and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N532Car1                    Lebowitz - Direct

1    treated fairly or appropriately and something happens, somebody

2    powerful denigrates and abuses you, it affects -- it has the

3    power to affect how you think and how you feel about yourself.

4    Q.   Doctor, in connection with the trauma of sexual abuse or

5    sexual assault, what does the phrase self-blame mean?

6    A.   So in this context, self-blame is understood as an

7    irrational attribution of responsibility.  So specifically,

8    even though we all know that nobody can be responsible for the

9    decision of somebody else to commit a crime against you, in

10   sexual assault, it is unbelievably common for people to feel

11   like it was their fault.  Psychologists spend some time

12   thinking about why that is, and one of the primary reasons or

13   one of the primary motivations that seems to drive that kind of

14   self-blame is that the experience of being raped is such an

15   overwhelming and horrifying experience of being rendered

16   helpless and if, in some way -- even if it's not true, even if

17   it's irrational and even if it's harmful long-term, but in the

18   immediate aftermath, if there is some way that you can clutch

19   back control, clutch back a sense of power, people will do it.

20   And one of the ways that people do it is they think, well, if

21   only I didn't do that, it wouldn't have happened.  So

22   therefore, if I don't do that, whatever it is, it will never

23   happen again, and it's a way for people to try to push back

24   against feeling helpless and out of control, by taking the

25   responsibility onto themselves.

N532Car1                    Lebowitz - Direct

1          The problem, of course, with it is that when you take

2     responsibility for something terrible having happened when it

3     actually isn't your responsibility, it makes you feel very bad

4     about yourself and it is also not true, and so it makes it

5     harder to work through the trauma.

6     Q.  Doctor, does a person whose been sexually assaulted

7     actually have to believe at a conscious level that they are to

8     blame for being assaulted?

9     A.  No.  I mean, absolutely not.  I think, you know, this is

10    the -- this is the conundrum of the human mind, which is that

11    there are things that we think and there are things that we

12    feel and they don't always line up.  So, no, people who believe

13    politically and in every way that a woman cannot be responsible

14    for the decision of a man to rape her nonetheless will feel

15    guilty and ashamed and responsible when it happens.

16         It is such a -- it is such a ubiquitous response, it

17    is so common that when I was in graduate school and doing my

18    original research, I once made a list of all the reasons that

19    women blame themselves for being raped because it -- well, I

20    will explain.

21         So on that list, I had people who said, well, I was

22    raped because I was wearing a short skirt, which is the kind of

23    standard one.

24         Somebody else said, I was raped because I was wearing

25    a long skirt.  It caught his attention.

N532Car1                        Lebowitz - Direct

1        Somebody thought she had been raped because she pushed

2   her hair back over her shoulder.

3        Somebody thought she had been raped because she went

4   to a party.

5        Somebody thought she was raped because she didn't go

6   to a party, and it was punishment.

7        And then finally I had a woman who was raped by a

8   stranger in the middle of the night in her house and she said,

9   well, I haven't really figured out what I did yet, but I'm sure

10  I will.  I'm still thinking on it.

11        So all of those are sort of indications of how

12  desperate and how irrational people are to feel some sense of

13  control over their bodies and their lives again.

14  Q.  Mr. Lam, could you put up the second page of the

15  demonstrative, please.

16        I would like to turn now, Doctor, to the third item on

17  this page, which is changes in behavior.  And let me begin by

18  asking, does a person -- this sounds like a crazy thing to say,

19  but does a person learn from trauma?

20  A.  Yes, of course.

21  Q.  You can take that down, Mr. Lam.

22  A.  Of course.  The most striking aspect of what it means to be

23  a person, you know, as a species, is our extraordinary capacity

24  to learn and adapt.  That's why, you know, we live in so many

25  places on the earth and why we are the dominant species.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N532Car1                    Lebowitz - Direct

1            But that extraordinary capacity is also the portal

2      through which trauma harms us.  Trauma can be thought of as

3      essentially an indelible form of learning.  You learn something

4      that you didn't want to know.  It changes how you think about

5      things, it changes your brain, and then you have to adapt to

6      it.

7      Q.  So what, Doctor, does the phrase "avoidant behavior" mean?

8      A.  Avoidant behavior is any kind of action that a person

9      takes——and that can be internal, as in batting away thoughts,

10     or external, as in avoiding certain people or places——that

11     helps them avoid reminders, *i.e.* avoid intrusions, and avoid

12     remembrances of what happened.

13     Q.  And is there a connection between avoidant behaviors and

14     trauma, Doctor?

15     A.  Yes, avoidant behaviors are what we do when we are trying

16     to avoid traumatic memory.

17     Q.  And why do people engage in adaptive -- avoidant behaviors,

18     excuse me?

19     A.  So that they don't have to -- they avoid them in an effort

20     to both stay safe and to avoid a repetition of what happened

21     and also to avoid thinking or feeling about it to the best of

22     their ability.

23     Q.  Now, when someone, Doctor, who has experienced trauma is

24     engaging in avoidant behavior, do they always know that that's

25     what they are doing?

N532Car1                         Lebowitz - Direct

1    A.  No.  Sometimes they know and sometimes they don't.  And

2    sometimes they know and they can't get themselves to stop.

3    Q.  Now, does every person respond to trauma?  I think we may

4    have touched on this, but does every person respond to trauma

5    exactly the same way?

6    A.  No, absolutely not.

7    Q.  And what explains the variation?

8    A.  Well, part of it is just that people are different.  Part

9    of it is that traumas have different meanings, both, you know,

10   across the board, but also to individual people.

11        People are also different over the course of their

12   lifespan.  What you could manage as an adult you might not be

13   able to manage as a much younger or a much older person.

14        And people also have different strengths and

15   vulnerabilities.  Some people are more resilient in some ways.

16        I think one of the things to just think about also in

17   terms of trauma is that, you know, we all have some strengths

18   and some weaknesses, right?  But sometimes when the

19   circumstances change very unexpectedly, what has been a

20   strength becomes a weakness, and that can happen also.

21   Q.  What does the phrase "resilience" mean, Doctor?

22   A.  Resilience is a way of describing an individual's ability

23   to kind of bounce back from adversity, and people have

24   different amounts of resiliency and different amounts of

25   resiliency for different kinds of situations.  Somebody might

N532Car1                          Lebowitz - Direct

 1   be very resilient for certain things and then that resiliency
 2   might run out around something else.
 3   Q.  And what explains -- what, if any, factors explain
 4   differences in resiliency, Doctor?
 5   A.  Well, that is still a matter to some extent of open debate,
 6   but we know a few things that seem to facilitate the
 7   development of resilience.  One is having a warm, supportive
 8   family.  The other is being intelligent, attractive, and
 9   sociable.  The third is having experiences which are
10   challenging and difficult, but not traumatic.  It sort of
11   builds strength.
12   Q.  I want to turn now to Ms. Carroll, and I know you said it
13   yesterday, but just to remind the jury, what are the ways that,
14   in your view, Ms. Carroll has been negatively impacted by the
15   incident at Bergdorf Goodman?
16   A.  She suffers from intrusions.  She suffered a diminishment
17   in her ability to feel positively about herself in certain
18   ways.  She experiences or manifests avoidance behaviors which
19   have led to an inability to maintain a romantic and intimate
20   life, which has led to deep feelings of loss.
21   Q.  Now, we spoke a bit about schemas in the way someone sees
22   themselves in the world.  How has the incident at Bergdorf
23   Goodman affected Ms. Carroll's schemas, the way she sees
24   herself in the world?
25   A.  Well, partly because she blamed herself for it.  She felt

Case 23-793, Document 83, 11/20/2023, 3592070, Page296 of 300

A-2236

1   like she was stupid in a way that was hard to shake.  But

2   perhaps even more fundamentally than that, it made her feel

3   like she was worth less than she had been before.  She felt

4   degraded and diminished.  She felt like she had been treated as

5   if she wasn't even a person.  And that, of course, made her

6   feel like she was worth less than a person -- than the person

7   she had been.

8   Q.  Is there any connection between what you just said, Doctor,

9   and Ms. Carroll's reluctance to use words like "rape" or

10  "victim"?

11  A.  Sure.  There is all the connection.  Ms. Carroll, you know,

12  like most of us in many ways, doesn't want to be a victim,

13  doesn't want to be pitied, but perhaps more than most people,

14  she has fiercely identified with being strong, being resilient,

15  being the person who can just march on and overcome thing, you

16  know, stiff upper lip, take an action and put it behind you.

17          And being raped meant, to her, being a victim, being

18  weak, being stupid, being vulnerable, being dirty.  And so

19  there is no part of her that wanted any part of that word to

20  apply to her, and so it was very hard to use it.  Using a word

21  like "fight" is much more attractive because it places her in

22  an active role.  Using a word like "rape victim" suggests that

23  the other person actually dominated in that fight, and that's

24  painful.

25  Q.  Doctor, we have talked about self-blame, but what, if any,

1   conclusions did you reach about whether Ms. Carroll experiences

2   self-blame?

3   A.   Absolutely.  I think for many years, for most of the years,

4   she just simply blamed herself for the assault, period.  She

5   just felt like she had done something stupid and that's why it

6   happened.  She was also afraid of other people blaming her,

7   which is an understandable fear.

8   Q.   And moving forward to more recent periods, does she still

9   at a conscious level believe that she is to blame?

10  A.   I think, you know, based on the advice she gave other

11  women, based on, you know, changes in the political landscape,

12  I think that if you asked her what she believes is true, she

13  would say, no, a woman can't be responsible.  If you asked her

14  what do you feel is true, I think she would probably still say,

15  well, it still feels like it's kind of true.  That's just one

16  of the ways that humans work.  We don't always feel what we

17  think.

18  Q.   Now, we have talked about intrusive memories, and I

19  apologize if this is slightly repetitive, but what, if

20  anything, Doctor, did you conclude with respect to whether

21  Ms. Carroll experiences intrusive memories?

22  A.   She does.  She experiences intrusive physical remembrances.

23  She can still feel aspects of the assault.  She can still hear

24  aspects of the assault.  She remembers the feelings in her

25  body.  She sometimes sees pieces or all of the experience kind

N532Car1                        Lebowitz - Direct

1    of spooling like a video before her.  She has some night

2    terrors that might be related.  And sometimes just some part of

3    it just pops into her mind unwittingly, you know, without

4    choice.

5    Q.  What, if any, impact do these intrusive memories have on

6    Ms. Carroll day to day?

7    A.  I think there are two ways in which they operate.  On a

8    day-to-day, they come up, they capture her attention, and they

9    diminish her quality of her day.  They infect it with a kind of

10   darkness and a sadness that wouldn't otherwise be there.  But

11   probably the most notable way in which it affects her is

12   that -- is the ways in which she works so hard, so assiduously

13   to avoid feeling the fear, the vulnerability, and the sense

14   that it was her fault, yeah.

15   Q.  During your interviews or your time speaking with

16   Ms. Carroll, are there any examples of her experiencing

17   intrusive memories that come to mind?

18   A.  There was the experience of the fingers that I mentioned.

19   There were several times where she just was clearly feeling in

20   her body what had happened, and those are very uncomfortable

21   times for her.

22   Q.  Is pushing away the intrusive memories that you have

23   discussed, is that a kind of avoidant behavior?

24   A.  It is.

25   Q.  And how is this -- I think you touched on it, but how has

N532Car1                    Lebowitz - Direct

1    this effort to bat them away impacted Ms. Carroll?

2    A.  Well, it takes a lot of mental work.  It's part of what you

3    are doing when you should be doing something else; you are

4    pushing them away.

5              I also think that intrusive memories are what drive

6    avoidant behaviors, and avoidant behaviors have been very

7    prominent in her posttraumatic response.

8    Q.  Now, in terms of intrusive memories——and there is been some

9    testimony about this in this case——at a certain point in time,

10   Donald Trump announces that he is running for president, and so

11   his image is around a lot more than previously.  Can you

12   explain what, if any, impact that had on Ms. Carroll's

13   intrusive memories?

14   A.  Yes.  Well, at first it got much worse.  She had many, many

15   more intrusions and many more physical symptoms in response to

16   the intrusions.  But over time it began to diminish somewhat so

17   she did not feel as inundated with those intrusions.

18   Q.  Is there a scientific explanation for that?

19   A.  Yeah, it's actually -- the basis of probably the most

20   common cognitive behavioral treatment for trauma is called

21   exposure therapy, where you expose somebody to what they are

22   afraid of, what they are trying to avoid.  The idea is that if

23   you do it enough, the brain begins to learn that it is not

24   present.  It is pushed away a little bit, and you become less

25   afraid.  So ironically, the -- Mr. Trump running for president

N532Car1                      Lebowitz - Direct

1   was a kind of real-world exposure treatment.  Suddenly he was

2   everywhere.  She couldn't avoid him.  Her symptoms got much

3   worse initially, which is what happens in exposure treatment,

4   as well.  And then they got somewhat quieter, which also

5   happens in treatment.

6   Q.  What, if anything, Doctor, did you conclude about

7   Ms. Carroll's resiliency?

8   A.  I think she is an extremely resilient person.

9   Q.  And can you explain to the jury why you think she is so --

10  why you think she is so resilient.

11  A.  You know, she never hesitated to take on challenges.  She

12  did all kinds of things that were really remarkable and unusual

13  for a woman in that time, and she had prior adversity that she

14  overcame without any significant diminishment to her life.

15  Q.  And is there anything about her background that explains to

16  you, Doctor, some of that resiliency?

17  A.  Yeah.  She had a warm, loving family.  There was a lot of

18  independence in her childhood, a lot of rough-and-tumble play

19  in her childhood, and her family, her family's culture fostered

20  a lot of grit, a lot of not attending to feelings of

21  vulnerability but, rather, simply coping with them.  So, for

22  example, when kids got hurt or when somebody got bullied or had

23  some kind of an adverse experience, the message from her family

24  was very much take care of that and move on.  It was not

25  discussed.  It was not indulged in any way.