# 23-0793-cv

## United States Court of Appeals

*for the*

## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 9 of 12 (Pages A-2241 to A-2520)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

i

## TABLE OF CONTENTS FOR JOINT APPENDIX

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*")......................................... A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") ...................................... A-32

### Documents Submitted in *Carroll I*

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

Exhibit A to Kaplan Declaration -
Letter from Roberta A. Kaplan to Marc E.
Kasowitz, dated August 10, 2020, with Enclosure    A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023......... A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 ....................................... A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 ....................................... A-89

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Lisa
Birnbach, dated September 21, 2022 ..................... A-92

Exhibit 2 to Kaplan Declaration -
Excerpts from Deposition Transcript of Carol
Martin, dated October 18, 2022 ............................ A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 ............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 .................................................. A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 ............................................... A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ......................................... A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ................................................ A-405

iii

**Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................. A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 .......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ....................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ........................ A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 .......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ............................. A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 ..................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ........................... A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 ............................... A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 ................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ........................................................ A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023 ...................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 ........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

                                                              **Page**

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated March 17, 2023 ............... A-509

    Annexed to Letter -
    Proposed Order ...................................................... A-511

### **Documents Submitted in *Carroll II***

Complaint and Demand for a Jury Trial, dated
    November 24, 2022 ................................................ A-513

Answer, dated January 27, 2023 ............................... A-542

First Amended Answer, dated February 10, 2023...... A-556

Defendant's Letter Motion for Discovery, dated
    February 10, 2023 ................................................ A-571

    Exhibit A to Defendant's Letter Motion -
    DNA Report, dated January 8, 2020 ..................... A-574

    Exhibit B to Defendant's Letter Motion -
    Twitter Post, dated February 25, 2021 ................. A-602

Plaintiff's Letter Response in Opposition to
    Defendant's Motion for Discovery, dated
    February 10, 2023 ................................................ A-607

Defendant's Letter Reply in Further Support of
    Motion for Discovery, dated February 10, 2023.... A-612

Transcript of Conference, dated February 7, 2023 .... A-614

Notice of Motion, by Defendant, for an Order
    Granting Partial Summary Judgment, dated
    February 23, 2023 ................................................ A-635

Declaration of Matthew G. DeOreo, for Defendant,
    in Support of Motion for Partial Summary
    Judgment, dated February 23, 2023 ...................... A-637

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020.. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ...................................... A-707

Memorandum of Law, by Defendant, in Support of
    Motion for Partial Summary Judgment, dated
    February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
    February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
    February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
    Motions *in Limine*, dated February 23, 2023......... A-747

vii

|  | Page |
|---|---|
| Declaration of Alina Habba, for Defendant, in Support of Motions *in Limine*, dated February 23, 2023 | A-773 |
| Exhibit A to Habba Declaration - Excerpts from Deposition Transcript of Natasha Stoynoff, dated October 13, 2022 | A-775 |
| Exhibit B to Habba Declaration - Excerpts from Deposition Transcript of Jessica Leeds, dated October 13, 2022 | A-779 |
| Exhibit C to Habba Declaration - Plaintiff's Second Supplemental Rule 26(a)(1) Disclosures, dated October 14, 2022 (Reproduced herein at pp. A-487-A-492) | |
| Exhibit D to Habba Declaration - Plaintiff's Third Supplemental Rule 26(a)(1) Disclosures, dated January 6, 2023 (Reproduced herein at pp. A-493-A-499) | |
| Plaintiff's Notice of Omnibus Motion *in Limine*, dated February 23, 2023 | A-783 |
| Declaration of Roberta A. Kaplan, for Plaintiff, in Support of Omnibus Motion *in Limine*, dated February 23, 2023 | A-785 |
| Exhibit 1 to Kaplan Declaration - Excerpts from Deposition Transcript of Robert J. Fisher, dated February 6, 2023 | A-786 |
| Exhibit 2 to Kaplan Declaration - Expert Report of Robert J. Fisher, dated January 30, 2023 | A-863 |

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ...................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................ A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)............................................................... A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)............................................................... A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 ................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 .......................... A-1065

x

**Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
   Opposition to Defendant's Motions *in Limine*,
   dated March 9, 2023 ............................................... A-1080

Exhibit 1 to Crowley Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
Video of Deposition of Natasha Stoynoff, taken
October 13, 2022
(All parties are already in possession of video
exhibit) .................................................................... A-1089

Exhibit 3 to Crowley Declaration -
Video of Deposition of Jessica Leeds, taken
October 13, 2022
(All parties are already in possession of video
exhibit) .................................................................... A-1091

Plaintiff's Response to Defendant's Local Civil
   Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
   Opposition to Defendant's Motion for Partial
   Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1110

Exhibit 2 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023
(Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
    Plaintiff, in Further Support of Omnibus Motion
    *in Limine*, dated March 16, 2023 .......................... A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 ......................... A-1153

Reply Declaration of Alina Habba, for Defendant,
    in Further Support of Motions *in Limine*, dated
    March 16, 2023 ....................................... A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022 ................................................ A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
dated April 13, 2023 ................................................ A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 ................................................ A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023................................................ A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 ............................... A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1207

Plaintiff's Letter Response to Defendant's Motion
to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022   A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ..................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023....................... A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 .............................. A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................. A-1416

Trial Transcript, dated April 25, 2023....................... A-1420

Trial Transcript, dated April 26, 2023....................... A-1524

Trial Transcript, dated April 27, 2023....................... A-1697

Trial Transcript, dated May 1, 2023.......................... A-1851

Trial Transcript, dated May 2, 2023.......................... A-2036

Trial Transcript, dated May 3, 2023.......................... A-2210

Trial Transcript, dated May 4, 2023.......................... A-2375

Trial Transcript, dated May 8, 2023.......................... A-2567

Trial Transcript, dated May 9, 2023.......................... A-2771

Parties' Trial Exhibits:

PX-1          Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2       "Remarks by President Trump before
Marine One Departure" (Office of the
Press Secretary, June 22, 2019) ............... A-2840

PX-3       "EXCLUSIVE: Trump vehemently
denies E. Jean Carroll allegation, says
'she's not my type'" (*The Hill*,
June 24, 2019)......................................... A-2853

PX-4       Truth Social Post, dated
October 12, 2022..................................... A-2858

PX-6       "Donald Trump assaulted me in a
Bergdorf Goodman dressing room 23
years ago. But he's not alone on the list
of awful men in my life." (New York
Magazine, June 21, 2019) ........................ A-2859

PX-12     Photograph ................................................ A-2879

PX-22     Sixth Floor Construction Plan of
Bergdorf Goodman .................................. A-2880

PX-24     Sixth Floor Construction Plan of
Bergdorf Goodman .................................. A-2881

PX-25     Video Excerpt from Defendant's
Interview with Billy Bush
(All parties are already in possession of
video exhibit) ........................................... A-2882

PX-25-T  Transcript of Video Excerpt from
Defendant's Interview with Billy Bush ... A-2883

PX-26     Video Excerpt from Presidential Debate
(All parties are already in possession of
video exhibit) ........................................... A-2885

xvi

**Page**

PX-26-T    Transcript of Video Excerpt from
Presidential Debate .................................   A-2886

PX-29    Video Excerpt from Defendant's Speech
at Campaign Rally
(All parties are already in possession of
video exhibit) ............................................   A-2887

PX-29-T    Transcript of Video Excerpt from
Defendant's Speech at Campaign Rally...   A-2888

PX-31    Video Excerpt from Defendant's Speech
(All parties are already in possession of
video exhibit) ............................................   A-2889

PX-31-T    Transcript of Video Excerpt from
Defendant's Speech.................................   A-2890

PX-46    Twitter Post, dated November 15, 2022...   A-2891

PX-48    Twitter Post, dated December 12, 2022 ...   A-2893

PX-51    Twitter Post, dated January 29, 2023 .......   A-2896

PX-53    Twitter Post, dated January 29, 2023 .......   A-2898

PX-57    Email, dated October 13, 2022 ................   A-2901

PX-112    Video Excerpt from Defendant's
Interview with Roger Ailes
(All parties are already in possession of
video exhibit) ............................................   A-2902

PX-112-T    Transcript of Video Excerpt from
Defendant's Interview with Roger Ailes..   A-2903

PX-200    Video Excerpt from Deposition of
Donald J. Trump, taken October 19,
2022 ..........................................................   A-2904

xvii

**Page**

PX-200-T   Transcript of Video Excerpt from
               Deposition of Donald J. Trump, taken
               October 19, 2022....................................   A-2905

DX-CK      Email Regarding Law & Order SVU,
               dated July 23, 2019 ..................................   A-2986

Court Exhibits:

C              Timeline of Events ....................................   A-2987

D              WordPerfect Document Compare
               Summary of Jury Instructions.................   A-2988

Letter from Joseph Tacopina to the Honorable
     Lewis A. Kaplan, dated May 1, 2023 ....................   A-3024

     Exhibit A to Letter -
     Excerpts of Trial Transcripts...................................   A-3042

     Exhibit B to Letter -
     LinkedIn Post...........................................................   A-3081

     Exhibit C to Letter -
     "One of the Democratic Party's biggest donors is
     exploring a new anti-Trump boycott" (*Vox*,
     July 2, 2020) ...........................................................   A-3083

Letter from Roberta A. Kaplan to the Honorable
     Lewis A. Kaplan, dated May 5, 2023 ....................   A-3088

Letter from Joseph Tacopina to the Honorable
     Lewis A. Kaplan, dated May 6, 2023 ....................   A-3091

Verdict Form, dated May 9, 2023 ..............................   A-3095

Notice of Appeal, dated May 11, 2023 ......................   A-3099

Notice of Motion, by Defendant, for an Order
     Granting a New Trial or Remittitur, dated
     June 8, 2023 ...........................................................   A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
Motion for a New Trial or Remittitur, dated
June 8, 2023 ............................................................ A-3103

Declaration of Matthew G. DeOreo, for Defendant,
in Support of Motion for a New Trial or
Remittitur, dated June 8, 2023 .............................. A-3134

Exhibit A to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit B to DeOreo Declaration -
Excerpts of Trial Transcripts.................................. A-3136

Exhibit C to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019
(Reproduced herein at pp. A-639-A-667)

Exhibit D to DeOreo Declaration -
Verdict Form, dated May 9, 2023
(Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
Opposition to Defendant's Motion for a New
Trial or Remittitur, dated June 22, 2023 ................ A-3219

Exhibit 1 to Kaplan Declaration -
Excerpts of Trial Transcripts.................................. A-3221

Exhibit 2 to Kaplan Declaration -
Twitter Post, dated June 21, 2019
(Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 .................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 .................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
Second Circuit, dated July 19, 2023 ..................... A-3339

Case 23-793, Document 84, 11/20/2023, 3592071, Page21 of 300

A-2241

N532Car1                     Lebowitz - Direct

1  Q.  Apart from batting away -- having to bat away intrusive

2  memories, does Ms. Carroll engage in avoidant behaviors in any

3  other ways?

4  A.  She does.

5  Q.  How?

6  A.  The most -- I mean, some avoidant behaviors aren't a

7  problem.  She avoids certain kinds of media representations,

8  like rape in the media and things like that, and those aren't a

9  problem.  Those are perfectly reasonable adaptations.

10         The one that is really a problem for her is that

11  following her encounter with Mr. Trump, she began to shut down

12  in the presence of any potentially eligible man.  So any man

13  that was about her age, as Mr. Trump is, and who is seen to be

14  somebody who she might be able to be interested in, she began

15  to have this experience that she described as being like a

16  metal grate over a storefront window just pulling down, and as

17  it pulled down, her eyes would also get pulled down and her

18  whole -- and rather than her usual extremely vivacious and sort

19  of extroverted and playful, interpersonal style, she would find

20  herself looking at the ground and speaking in monosyllables,

21  and she hated it.  I don't think in the beginning she really

22  knew why she was doing it, but it was an uncontrollable

23  response.  She couldn't stop doing it.  And that closing down,

24  that shutting down, you know, she is avoiding anything that

25  reminds her of threat, anything that reminds her of the

Case 23-793, Document 84, 11/20/2023, 3592071, Page22 of 300

N532Car1                         Lebowitz - Direct

1   situation in which she felt so harmed.  But in doing so, she

2   also foreclosed certain possibilities in her life.

3   Q.  Can you provide an example of this, Doctor?

4   A.  One happened during the interview.  She got in the elevator

5   in the hotel and an attractive man about her age got in also.

6   They were both going to get coffee, and rather than engaging in

7   her customary banter, which she would have done had it been a

8   woman getting in the car getting a cup of coffee, she just

9   found herself looking at the ground and unable to speak.  And

10  that day she was very aware of it because we were in the middle

11  of interviewing, and even then she could not control the

12  symptom.

13  Q.  When did Ms. Carroll start engaging in the avoidant

14  behavior that you have just been talking about?

15  A.  After the alleged event with Mr. Trump.

16  Q.  And you touched on this a couple of questions ago, but what

17  is your best understanding of when she first realized this was

18  happening?

19  A.  You know, there are so many times when things flicker in

20  and out of awareness, so you might have a moment where you kind

21  of know it, and then you mostly don't know it.  I don't think

22  she really knew that it was connected until -- potentially even

23  until she wrote the book.  I think she came up with a lot of

24  alternative explanations, which is what people do.  You know,

25  when you see yourself engaging in a behavior that isn't what

N532Car1                         Lebowitz - Direct

1   you want to do and doesn't make sense, the mind makes up

2   alternative explanations.  And so she decided she just hadn't

3   met the right guy yet, you know, she hadn't been lucky, she was

4   getting older.  I think she just -- and I think she just came

5   up with a bunch of explanations, and then I think she didn't

6   hold on to the connection, which is also incredibly common for

7   trauma, that the connection between your current problems and

8   the past traumatic experience, that connection gets buried and

9   people lose it.

10  Q.  And how does Ms. Carroll's avoidant behavior with respect

11  to eligible men her age compare to her romantic patterns before

12  the incident at Bergdorf Goodman?  And again, I don't want you

13  to give any specificity, just very general.

14  A.  It's a very sharp departure.  Actually, it's a complete

15  departure.  Her previous pattern had been to be in a long-term

16  partnership and, when that wasn't happening, to date pretty

17  avidly for a period of time until she found somebody else she

18  wanted to be in a long-term partnership with, and she was very,

19  very social and outgoing, and all of that changed afterwards.

20  Q.  Now, how do you reconcile what you have been saying about

21  avoidant behaviors, Doctor, with the fact that Ms. Carroll

22  continued to shop at Bergdorf Goodman?

23  A.  Well, she didn't feel that Bergdorf Goodman raped her was

24  the primary reason.  The store -- she didn't blame the store.

25  She blamed herself.  The store didn't feel threatening.  I also

N532Car1                        Lebowitz - Direct

1    think that -- yeah, I think that's the primary reason.

2    Q.  You just said she didn't feel that Bergdorf Goodman raped

3    her, but you are also aware, are you not, that Ms. Carroll from

4    time to time would watch *The Apprentice*?

5    A.  Yes.

6    Q.  And how do you reconcile her avoidant behaviors with that?

7    A.  Okay, that sort of links to the other thing I was going to

8    say.  I think anywhere Ms. Carroll could see evidence that she

9    was negatively affected by what happened, she would fight

10   against it.  So to not go back into Bergdorf's would have been

11   really obvious, given how much she loved that store.  To not

12   watch *The Apprentice* in her social and professional circle at

13   the time would have -- would have revealed something, it would

14   have led her to stand out in some way, because there was a lot

15   of excitement about that show in her circles.  So I know she

16   did watch it and she did admire it professionally, but I don't

17   think she watched it anywhere nearly as much and certainly

18   without the kind of pleasure that she would have watched it had

19   that event not happened.  So I think she basically did the

20   minimum where that was concerned.

21   Q.  Are you aware of how Ms. Carroll reacted the first time she

22   saw footage from *The Apprentice*?

23   A.  I am, and it is significant.  So the first time she saw

24   footage, she had gone -- I don't remember which studio it was,

25   but she had gone to a television studio to pitch a new show,

N532Car1                    Lebowitz - Direct

1    and she went with a colleague and they were going to go back

2    and forth and kind of co-pitch the show.  And the producer

3    said, I've got something I want to show you, and he clicked on

4    the trailer for *The Apprentice*.  She became so flooded with

5    feelings, with memories, with feelings, with a sense of panic

6    that she actually lost her capacity to speak, which is

7    something people often talk about in an instance of feeling

8    really flooded and overwhelmed by feelings.  Literally she

9    couldn't find the words and she shut down, and the person she

10   was with needed to pitch the entire show because she was so

11   overwhelmed at that time.

12   Q.  One more question on this, Doctor.  How do you explain the

13   fact that Ms. Carroll kept the dress she wore that day in her

14   closet?

15   A.  I think it's a similar dynamic.  I think that she loves

16   clothes, and that was the most expensive dress she had ever

17   bought.  I think to get rid of it would have been so out of

18   character, it would have been impossible to avoid the

19   realization that she was that negatively affected.

20       I also think at a deeper psychological level I think

21   Ms. Carroll knew that there was a part of her that was stuck

22   there, that was stuck with what the dress represented, that she

23   had lost something that she couldn't get back, and she held on

24   to the dress almost as a way of holding on to the hope that she

25   would one day be able to revisit it and reclaim the part of

N532Car1                        Lebowitz - Direct

1    herself that she had lost.

2            So I think there are a few reasons why she held on to

3    the dress.

4    Q.  During your examination, Doctor, did you discuss with

5    Ms. Carroll a negative experience she had as a young girl with

6    a camp counselor?

7    A.  I did.

8    Q.  How do you know that that experience isn't the cause of the

9    harms that you have been discussing here during your testimony?

10   A.  Well, part of how I know is that there is about more than

11   40 years of active, happy, joyful interactions with men and

12   with the social world after that.  So there is no evidence from

13   her life that that event, although it was painful at the time,

14   that it disrupted her functioning in any serious way.

15   Q.  Did you discuss with Ms. Carroll a negative experience she

16   had with the CBS head Les Moonves?

17   A.  I did.

18   Q.  And how do you know that that experience isn't the cause of

19   the problems that you have been discussing?

20   A.  Well, even though the time span is much shorter because she

21   was an adult with Les Moonves, again, her behavior does not

22   change after that event and she didn't hold herself responsible

23   for it.  But mostly it's because she didn't have any symptoms

24   from it.

25   Q.  Did you discuss with Ms. Carroll her second marriage to a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   gentleman by the name of John Johnson?

2   A.  I did.

3   Q.  About how much time did you spend discussing that with her?

4   A.  We came back to it several times, about an hour.

5   Q.  And what was your understanding of their relationship?

6   A.  I think Ms. Carroll and Mr. Johnson loved each other a

7   great deal.  I think they had a strong connection.  It was also

8   a somewhat combustive relationship.  Her assessment was that we

9   are not well-suited to be married to each other, but there was

10  a lot of love and respect between them, as well.

11  Q.  And you were aware there was some incidence of violence in

12  that relationship?

13  A.  Yes.  There were three instances of quite serious violence,

14  and it's why the marriage ended.

15  Q.  Sitting here today, Doctor, are you aware that Mr. Trump's

16  expert -- withdrawn.

17        How do you know that the violence in that relationship

18  wasn't the cause of the problems that we have been discussing?

19  A.  Well, there are really two ways I know.  One is, after her

20  marriage ended and the -- kind of the heat was taken out, she

21  and Mr. Johnson continued to be friends, they continued to

22  watch the news together, sometimes there were even periods of

23  intimacy in the year or two after that marriage ended, and that

24  kind of came to a close as she was resuming her normal dating

25  and socializing behavior.  So her pattern after that marriage

N532Car1                    Lebowitz - Direct

1    ended in terms of her social interactions with men were the

2    same as they had been before that marriage, so there was no

3    change in -- there was no sort of discernible or objectively

4    discernible change in her behavior until after the experience

5    with Mr. Trump.

6    Q.  One final question, Doctor.  What is the best way for

7    someone who is not an expert in psychology to make sense of the

8    impact, the psychological impact that the assault at Bergdorf

9    had on Ms. Carroll?

10   A.  Because she was frightened and rendered helpless in a way

11   that had never happened to her before and because she blamed

12   herself and because the meaning of that event and the feelings

13   associated with it were simply too big for her to cope with in

14   her usual ways, it became a stuck point in her life, something

15   that she had to walk around in her day-to-day basis; and, in

16   doing that, in working so hard to stay away from those feelings

17   of helplessness and vulnerability, she gave up one of the great

18   sources of joy and connection in her life, which was the

19   opportunity to be intimate with a man, and that was a huge loss

20   for her.

21            MS. KAPLAN:  No further questions.

22            THE COURT:  All right.  Thank you.  We will take our

23   morning break.  15 minutes, please.

24            (Recess)

25            (Jury not present)

N532Car1                      Lebowitz - Direct

1              THE DEPUTY CLERK:  Should I get the jury?

2              THE COURT:  Yes.

3              MS. KAPLAN:  Could I bring up one housekeeping matter?

4    We appreciate and understand the difficulties with Dr. Nace's

5    health issues, but if we are going to take his testimony

6    tomorrow, someone has to book a flight, board a flight, and

7    then we have to figure out how that impacts our other

8    witnesses.  So we are getting close to the point in time where

9    it will be logistically almost impossible, and I just want to

10   see if we can get a hard date.  They still don't know, and I

11   appreciate that, but we really do need to know very soon.

12             MR. TACOPINA:  So, your Honor, I spoke to Ms. Kaplan

13   just a few minutes ago outside.  I will be making a call at the

14   lunch break to get an update.  It's really day by day.  But, as

15   I said, I will let them know at the end of lunch one way or

16   another what the status is, and we will proceed either way.

17             THE COURT:  Well, I don't understand exactly what that

18   means.  You will proceed either way means that you are going to

19   use him or you are not going to use him, and if the answer is

20   you want to use him and there isn't a flight available to get

21   anybody down there, what's happening in your estimation?

22             MR. TACOPINA:  Yes, your Honor, I just want to say

23   that I think everything we have discussed on this matter has

24   been *in camera*, under seal.  I don't want to get into the issue

25   because it is not --

N532Car1                         Lebowitz - Direct

 1            THE COURT:  No, I think you are absolutely right in

 2     that, and I appreciate and respect that, but we have a

 3     practical problem.

 4            MR. TACOPINA:  Yeah, which will be resolved today.

 5     When I say one way or another, either we will schedule it for

 6     tomorrow or we won't schedule it at all.

 7            THE COURT:  So does somebody get on an airplane now or

 8     not?

 9            MR. TACOPINA:  Right.  That's what I said I would let

10     them know after the lunch break.  I have no phones.

11            THE COURT:  Look, Ms. Kaplan, what is the latest you

12     can know in order to get somebody on an airplane?

13            MS. KAPLAN:  Lunchtime, your Honor, but I would prefer

14     to hear at the beginning of lunchtime, rather than the end of

15     lunchtime, so we can see what flights are available.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

Case 23-793, Document 84, 11/20/2023, 3592071, Page31 of 300

1              THE COURT:  You can see what flights are available

2       now.

3              MR. TACOPINA:  I'm trying.  I'm really trying.

4              THE COURT:  I'm not questioning that.  I'm not

5       questioning that.

6              MR. TACOPINA:  Yes.

7              THE COURT:  All right.  Let's cut the baby in

8       quarters.  1:15.  OK?  Fish or cut bait.  Can you do that?

9              MR. TACOPINA:  If we break a few minutes before 1:00?

10      Because I have to go down and get the phone, your Honor.

11             THE COURT:  Yes.  And we will break a few minutes

12      before 1:00, we will break at quarter to 1:00.

13             MR. TACOPINA:  Yes.

14             THE COURT:  We will deal with it.

15             All right let's go.  Get the jury.

16             THE DEPUTY CLERK:  Jury entering.

17             (Continued on next page)

18

19

20

21

22

23

24

25

N535CAR2                          Lebowitz - Cross

1                    (Jury present)

2                    THE COURT:  OK.  Mr. Siegel, cross-examination.

3                    MR. SIEGEL:  Thank you, your Honor.

4        CROSS-EXAMINATION

5        BY MR. SIEGEL:

6        Q.  Good morning, Dr. Lebowitz.

7        A.  Good morning, Mr. Siegel.

8        Q.  You were hired by Ms. Carroll's attorneys to evaluate her

9        in this case; correct?

10       A.  Yes.

11       Q.  And also to prepare an expert report; right?

12       A.  Yes.

13       Q.  To testify on her behalf at a prior deposition on March

14       14th of this year?

15       A.  Yes.

16       Q.  And, of course, to testify at this trial?

17       A.  That is correct.

18       Q.  And you are being paid $600 an hour for the services you

19       are rendering on Ms. Carroll's behalf?

20       A.  That is correct also.

21       Q.  You interviewed Ms. Carroll sometime around Thanksgiving of

22       last year?

23       A.  I believe that is when the interviews began.

24       Q.  And during that interview process you prepared

25       contemporaneous notes of what Ms. Carroll said to you; is that

N535CAR2                        Lebowitz - Cross

1   right?

2   A.  Yes.

3   Q.  In fact, as she spoke to you, you were quickly typing what

4   she said; right?

5   A.  Yes.

6   Q.  And incorporating what was conveyed to you by Ms. Carroll,

7   you then prepared an expert report containing your opinions in

8   this case?

9   A.  Yes.

10  Q.  Now, as an expert witness, you understand that the

11  materials you prepare in connection with the case may be relied

12  upon in a court; right?

13  A.  Yes.

14  Q.  So when you prepare those materials you want to be as

15  complete and accurate as possible; is that right?

16  A.  Yes.

17  Q.  And you certainly make it a point not to omit any

18  information you deem important, right?

19  A.  Not that I deem important.

20  Q.  Now, on direct you testified about the supposed ways

21  Ms. Carroll has been negatively impacted by the alleged

22  incident at Bergdorf Goodman and what allegedly being raped

23  meant to Ms. Carroll.  You are not offering an opinion in this

24  case --

25              THE COURT:  I'm sorry, counselor.  This is sounding

N535CAR2                        Lebowitz - Cross

1    compound.

2            MR. SIEGEL:  I will rephrase.

3    Q.  Ms. Carroll -- excuse me -- Dr. Lebowitz, on direct you

4    testified about, these are your words:  The ways Ms. Carroll

5    has been negatively impacted by the alleged incident at

6    Bergdorf Goodman; is that right?

7    A.  Yes.

8    Q.  And you also testified about what allegedly being raped

9    meant to Ms. Carroll; is that right?

10   A.  Yes.

11   Q.  Now, just to be clear, you are not offering an opinion in

12   this case on whether the alleged sexual assault in fact

13   occurred; is that correct?

14   A.  That is correct.

15   Q.  Your opinions are simply assuming that it did; is that

16   right?

17   A.  My opinions are focused on the observable consequences of

18   that event, not on assessing the rape, the event itself.

19   Q.  So in answer to my question are you assuming, for purposes

20   of your opinion, that the alleged rape occurred?

21   A.  I'm not opining about that.

22   Q.  So you have no opinion one way or the other?

23   A.  Well, that's different.

24   Q.  You just testified that you are not offering an opinion in

25   this case on whether the alleged sexual assault occurred;

 1    right?

 2    A.   That is correct.

 3    Q.   And, to be clear, you have no independent knowledge of

 4    whether that alleged sexual assault occurred or not; right?

 5    A.   That is correct.

 6    Q.   Let's -- withdrawn.

 7              Your opinions in this case are based upon the accuracy

 8    and truth of what Ms. Carroll told you; right?

 9    A.   Yes.

10    Q.   If Ms. Carroll made up this entire event, that would be a

11    problem for your report and opinion; right?

12    A.   Yes.

13    Q.   Likewise, if Ms. Carroll falsely told you about her

14    feelings, that would render your report and opinion unreliable;

15    correct?

16    A.   Yes.

17    Q.   And if Ms. Carroll falsely told you about her alleged

18    symptoms, that also would render your report and opinion

19    unreliable; correct?

20    A.   Yes.

21    Q.   Now, on direct you testified that Ms. Carroll:

22    "Experiences intrusive physical remembrances and can still feel

23    aspects of the assault.  She remembers the feelings in her

24    body, she sometimes sees pieces of the experience kind of

25    spooling like a video before her."

Case 23-793, Document 84, 11/20/2023, 3592071, Page36 of 300

N535CAR2                         Lebowitz - Cross

1              Now, that opinion is based on the accuracy and

2    truthfulness of what Ms. Carroll told you, correct?

3    A.  Yes.

4    Q.  Dr. Lebowitz, you are familiar with the term "malingering"

5    in a forensic or psychological aspect?

6    A.  I am.

7    Q.  And what malingering means is lying, correct?

8    A.  Yes.

9    Q.  That means lying about a symptom, yes?

10   A.  Yes.

11   Q.  Lying about a feeling?

12   A.  Yes.

13   Q.  Lying about a cause?

14   A.  Sure.

15   Q.  And of course lying about an event; is that right?

16   A.  Yes.

17   Q.  Now, you understand that Ms. Carroll has a vested interest

18   in the outcome of this case, right?

19   A.  I'm not sure what you mean by vested, but she certainly

20   cares very much about the outcome of the case; yes.

21   Q.  That's what I meant.

22              You understand that, right?

23   A.  Yes.

24   Q.  OK.

25              Would it be fair to say that she may have presented

1   her symptoms and experiences in a way that would benefit her

2   case?

3   A.  I don't believe she did that.  Actually, I think that she

4   is so averse to being symptomatic and to being vulnerable that

5   there have been many times where she has actually presented

6   herself in ways that run exactly counter to, for example, my

7   conclusions that she was injured.

8   Q.  Based on your experience, though, in light of that

9   statement, you would agree that if someone falsely accuses

10  another of misconduct, it is conceivable they might be hesitant

11  to provide fabricated details relating to that accusation?

12  A.  I'm not sure that I have -- I'm not sure that is within my

13  expertise.

14  Q.  I want to direct your attention to your deposition

15  testimony on March 14th, 2023.

16              THE COURT:  Can I have a copy, please?

17              MR. SIEGEL:  Sorry, your Honor.

18              THE COURT:  Did you have a page and line?

19              MR. SIEGEL:  Yes, your Honor.  Thank you.  Page 202,

20  line 23 through line 203.

21              THE COURT:  These pages only have about 25 lines on

22  them.

23              MR. SIEGEL:  I'm sorry.  I misspoke.  Thank you, your

24  Honor.  Page 202, line 23, through page 203, line 4.

25              MS. KAPLAN:  We don't see any inconsistency, your

N535CAR2                         Lebowitz - Cross

1   Honor.

2            THE COURT:  Sustained.

3   BY MR. SIEGEL:

4   Q.  Dr. Lebowitz, let's talk about your evaluation methods in

5   this case, the ones that you relied upon in forming your

6   opinion.  You conducted an unstructured, open-ended inquiry; is

7   that right?

8   A.  Yes.

9   Q.  And what that basically means is that you had a long

10  conversation with Ms. Carroll and asked her largely open-ended

11  questions?

12  A.  Yes.

13  Q.  And during that conversation you asked about circumstances

14  in her life and how they affected her; right?

15  A.  I did.

16  Q.  And you did that to assess her symptoms and experiences,

17  correct?

18  A.  Yes; to understand who she was as a person and how what had

19  happened to her what it had meant to her.  All of the above,

20  yes.

21  Q.  And during that process you didn't use any objective

22  psychological instruments or tests to corroborate what she told

23  you; correct?

24  A.  That is true.

25  Q.  Now, on occasion you have used psychological instruments

N535CAR2                        Lebowitz - Cross

1   alongside open-ended inquiries in connection with lawsuits you

2   have been involved in?

3   A.  On occasion.

4   Q.  And you are familiar with the Minnesota Multiphasic

5   Personality Inventory, or MMPI, as it is called; right?

6   A.  I am, but that is not an instrument I have relied on or

7   used.

8   Q.  Well, it is a formal assessment instrument used to assess

9   whether someone is malingering; right?

10  A.  It is used to assess a lot of things.  It does have a

11  malingering -- a scale that is relevant for malingering, yes.

12  Q.  And there are, in fact, other texts other than the MMPI

13  that are available to specifically assess malingering?

14  A.  Yes.

15  Q.  In this case you could have sought the aid of a

16  neuropsychologist -- I think you said you don't do this

17  yourself -- but you could have sought --

18          THE COURT:  Let's try the question again, please.

19          MR. SIEGEL:  Fine.

20  Q.  In this case, Dr. Lebowitz, you could have sought the aid

21  of a neuropsychologist to help you administer any of these

22  tests for malingering; correct?

23  A.  Theoretically.

24  Q.  Well, in reality you could have made that recommendation if

25  you wanted to; correct?

N535CAR2                          Lebowitz - Cross

1    A.  Sure.

2    Q.  You didn't do that here, right?

3    A.  That's right.

4    Q.  So, for purposes of forming your opinion in this case, you

5    essentially took Ms. Carroll's word for it; correct?

6              MS. KAPLAN:  Objection.

7              THE COURT:  Sustained.

8              MR. SIEGEL:  I will rephrase it.

9    Q.  Dr. Lebowitz, for purposes of forming your opinion in this

10   case, you relied upon Ms. Carroll presumably giving you

11   truthful and accurate information, correct?

12   A.  Yes.

13   Q.  And you did that without any objective measures to

14   corroborate what she was telling you; right?

15             Withdrawn.  I will rephrase it.

16             You did that without any objective tests or

17   instruments to corroborate what she told you?

18   A.  I did not give her any standardized psychological tests or

19   paper and pencil screening devices; that is true.

20   Q.  Let's look at some of the things that Ms. Carroll told you

21   during the interview.  Ms. Carroll told you she believed she

22   lost her job because Donald Trump called her a liar; correct?

23   A.  Yes.

24   Q.  I think you said you were in court two days ago when

25   Ms. Carroll testified in this courtroom on May 1st?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N535CAR2                          Lebowitz - Cross

1    A.  I can't remember that, I have to think about it.  I was

2    here the last day that she was on the stand for

3    cross-examination.  I wasn't here for direct.

4    Q.  And during that cross-examination did you hear Ms. Carroll

5    testify in this courtroom that her editor in chief at *Elle*,

6    Nina Garcia, loathed her for publishing her story about Donald

7    Trump in *New York* magazine?

8    A.  I did hear her say -- I'm not sure if that's exactly what I

9    heard but something like that.

10   Q.  OK.  Ms. Carroll never told you when you were interviewing

11   her that her editor in chief loathed her for publishing her

12   story in a competitor magazine, did she?

13   A.  No.

14   Q.  Do you recall writing in your report that Ms. Carroll lives

15   with a higher level of chronic fearfulness than she did before

16   Donald Trump's denunciation?

17   A.  Yes.  Yes.

18   Q.  And as to whether Ms. Carroll felt safe walking down a

19   street after Donald Trump said she lied, you concluded that,

20   before it began to subside, Ms. Carroll simply felt frightened

21   and overwhelmed and could not eat or sleep well.  Is that

22   right?

23   A.  Yes, but I think you are conflating a few different things

24   which I would like to clarify.

25              In the immediate aftermath --

Case 23-793, Document 84, 11/20/2023, 3592071, Page42 of 300

N535CAR2                    Lebowitz - Cross

1   Q.  Dr. Lebowitz, I am sure you will have an opportunity to --

2              MS. KAPLAN:  No.  You just asked her the question.

3   She hasn't answered the question.

4              MR. SIEGEL:  She answered my question.

5              MS. KAPLAN:  She did not answer it.

6              MR. SIEGEL:  I will repeat it then.

7              MS. KAPLAN:  No.  You don't get to repeat it.

8              MR. SIEGEL:  Your Honor?

9              THE COURT:  Ms. Kaplan, you don't get to argue --

10             MS. KAPLAN:  Sorry, your Honor.

11             THE COURT:  -- with opposing counsel.

12             Do you have something to say to me?

13             MS. KAPLAN:  Yes, your Honor.  I think she should be

14  permitted to answer the question.

15             THE COURT:  Mr. Siegel, why not?

16             MR. SIEGEL:  It calls for yes, or no and I thought I

17  got a response.

18             THE WITNESS:  And I said that you were misrepresenting

19  it.

20             THE COURT:  Let's leave it right there.  Move ahead,

21  Mr. Siegel.

22             MR. SIEGEL:  Thank you, your Honor.

23  BY MR. SIEGEL:

24  Q.  I want to show you what's in evidence as Exhibit CJ, it's a

25  text from E. Jean Carroll to another person on June 27, 2019.

1          Eric?  You can publish it, it is in evidence.

2          Dr. Lebowitz, I want to direct your attention to the

3   highlighted portion.

4   A.  OK.

5   Q.  That reads:  Do not worry.  I have been walking these great

6   New York streets the last six days alone, and at night, all day

7   long, and receive nothing but thanks and thumbs up.  It is the

8   exact opposite of concern.

9          This was a text message from E. Jean Carroll.  Do you

10  see that?

11  A.  I do.

12         MR. SIEGEL:  Take it down, Eric.

13         THE COURT:  Was there going to be a question or was

14  that a vision test?

15         MR. SIEGEL:  Actually, I thought put more words in but

16  I will try to ask it quicker.

17  Q.  The date of the text was June 24, 2019.  Do you see that?

18  A.  I do.

19  Q.  And that is only three days after Donald Trump first said

20  that E. Jean Carroll lied on June 21, 2019; is that right?

21  A.  I will take your word for that.

22  Q.  Well, you read Ms. Carroll's complaint in this case, right?

23  A.  Yes.

24  Q.  Now, did Ms. Carroll tell you about this text message or

25  its content during your interview?

Case 23-793, Document 84, 11/20/2023, 3592071, Page44 of 300

A-2264

N535CAR2                        Lebowitz - Cross

1   A.  No.

2   Q.  Now, on direct you testified extensively about intrusion

3   and said that when you were questioning Ms. Carroll, she began

4   to squirm and told you it was because she was supposedly

5   re-experiencing Donald Trump's fingers in you.

6           Do you recall that testimony?

7   A.  Yes.

8   Q.  All right.  You obviously --

9           MS. KAPLAN:  Objection, your Honor.  I think the

10  question is misphrased.  I don't think he meant to say "in

11  you."

12          THE COURT:  Well, it's objectionable as to form in any

13  case at least.

14          MR. SIEGEL:  All right.

15  BY MR. SIEGEL:

16  Q.  Dr. Lebowitz, do you recall your testimony on direct a

17  short while ago about this intrusive episode that you described

18  Ms. Carroll experiencing during the interview where she began

19  to squirm?

20  A.  I do.

21  Q.  During that you obviously couldn't see what was in her mind

22  at that point, right?

23  A.  Right.

24  Q.  And you never used objective instruments to test if what

25  she was telling you was a lie; right?

Case 23-793, Document 84, 11/20/2023, 3592071, Page45 of 300

N535CAR2                    Lebowitz - Cross

 1              MS. KAPLAN:  Objection, your Honor.

 2              THE COURT:  Sustained as to form.

 3    Q.  When Ms. Carroll, as you described it, squirmed, you didn't

 4    use any objective psychological instruments or tests to

 5    determine the cause of her squirming, did you?

 6              MS. KAPLAN:  Objection, your Honor.

 7              THE COURT:  What's the objection?

 8              MS. KAPLAN:  There is no foundation for this; if there

 9    are any objective psychological instruments or tests to

10    determine squirming.

11              THE COURT:  How about that?

12              MR. SIEGEL:  She's the expert and can speak to that.

13              THE COURT:  Is that what you are doing?  Are you

14    asking her whether there are objective tests, whether she

15    considers them valid, why she used them, why she didn't use

16    them, if there are any?  Is that what you intend to do here?

17              MR. SIEGEL:  I thought she already addressed, your

18    Honor, that there are tests available to determine the

19    lingering but I will explore it, your Honor, if need be.

20              THE COURT:  Well, if that's what you want to do.

21    BY MR. SIEGEL:

22    Q.  So, Dr. Lebowitz, earlier in your testimony you said that

23    there is objective tests, psychological tests that can be used

24    to determine whether someone is lying; right?

25    A.  I agreed that there are some psychological tests that

1    people sometimes use to try to assess whether somebody is

2    telling the truth.  Like all psychological tests there are

3    problems, sometimes they're accurate and reliable, sometimes

4    they're not.

5    Q.  And in this instance you didn't use any of those

6    psychological tests to determine if what Ms. Carroll was

7    conveying to you, as she squirmed, was truthful; right?

8    A.  There are no psychological tests to evaluate whether or not

9    somebody is having an internal experience of a flashback.  The

10   so-called objective tests for assessing whether or not somebody

11   is suffering from something like an intrusion or a flashback

12   would be something like, for example, the

13   clinician-administered PTSD scale, which is literally a series

14   of questions in which you ask the person whether they're having

15   certain kinds of symptoms.  It is considered structured and

16   reliable and valid because if two people give the same test,

17   their answers tend to correlate, and because it lines up very

18   specifically with the DSM -- the Diagnostic Manual's --

19   description of post-traumatic stress.  But even when using what

20   is arguably the gold standard way to evaluate PTSD and to

21   evaluate flashbacks and effects on schemas and all the rest, it

22   is simply a series of questions.  The point of the structure of

23   the exam is to make sure you ask all the possible questions to

24   assess whether or not somebody may or may not have symptoms

25   that lead them to be diagnosed with a particular thing.  But,

Case 23-793, Document 84, 11/20/2023, 3592071, Page47 of 300

A-2267

N535CAR2                         Lebowitz - Cross

1    it is still a series of questions that one person asks another.

2    Q.  Thank you, Dr. Lebowitz.

3             So you didn't use any psychological test to determine

4    whether or not Ms. Carroll's explanation to you for her

5    squirming was truthful; right?

6             MS. KAPLAN:  Objection.

7             THE COURT:  Sustained.

8    Q.  You just mentioned there is symptoms of PTSD?

9    A.  I do.

10   Q.  You agree that Ms. Carroll does not have PTSD; correct?

11            THE COURT:  I think the answer was actually quite a

12   bit more elaborate than your purported summary of it,

13   counselor.

14            MR. SIEGEL:  Then I will ask it this way.

15   Q.  You had testified in the midst of that statement that there

16   are tests available to assess PTSD; correct?

17   A.  I did.

18   Q.  OK.

19            Does Ms. Carroll have PTSD?

20   A.  No.  That's why I didn't give her that test.

21   Q.  OK.

22            Now, during your interview, Ms. Carroll told you she

23   has intrusive images that have been ongoing since the alleged

24   rape; correct?

25   A.  She did.

Case 23-793, Document 84, 11/20/2023, 3592071, Page48 of 300

A-2268

N535CAR2                    Lebowitz - Cross

1   Q.  Now I want to show you Defendant's Exhibit AA in evidence,

2   it is Ms. Carroll's book, page 244, lines 22 through 23.

3              MR. SIEGEL:  You can publish it.

4              MS. KAPLAN:  No.  We need to see it first.

5              MR. SIEGEL:  I'm sorry.  It is in evidence, but that's

6   fine.

7              MS. KAPLAN:  I am being told there is a redaction

8   issue.

9              MR. SIEGEL:  It is fine.  This was already shown to

10  Ms. Carroll.  That's fine.

11             THE COURT:  Mr. Siegel, let's both of you cut off the

12  byplay.  And that is addressed to Ms. Carroll, too.  If

13  somebody has something to say, say it to me and not just go at

14  each other.

15             MS. KAPLAN:  I apologize, your Honor.  We wanted to

16  see because apparently there are still some redaction issues.

17             THE COURT:  Are there or are there not, Mr. Siegel?

18             MS. KAPLAN:  No issue, your Honor.

19             MR. SIEGEL:  Thank you.

20             THE COURT:  No?  All right.

21  BY MR. SIEGEL:

22  Q.  Dr. Lebowitz, this is a portion of Ms. Carroll's book and I

23  will just read it to you.  It says:  Indeed, before 2015, when

24  the man began appearing in the papers and on TV daily, I rarely

25  thought of it.  When he forced himself on the notice of the

N535CAR2                        Lebowitz - Cross

1   entire nation, I, like everyone else, tweeted jokes about him,

2   complained to friends that America was going to hell in a

3   handbasket and so on.  I am fine.  I can't explain it, but I

4   never suffered.

5          Reading that you would agree that -- we can take that

6   down -- saying she has been having these intrusive images since

7   the event itself, and saying in her book "I rarely thought of

8   it," are inconsistent in terms of content; is that correct?

9   A.  No.

10  Q.  I want to direct your attention to your deposition

11  testimony, March 14, 2023, pages 136, lines 20 to 25.  When

12  everyone is ready.

13          THE COURT:  You want lines 20 to 23?

14          MR. SIEGEL:  20 to 25, your Honor.

15          THE COURT:  In other words --

16          MS. KAPLAN:  No.

17          MR. SIEGEL:  I promise I will get to that next portion

18  immediately after.

19          THE COURT:  Oh no, no, no.  There is an objection.

20  Ms. Kaplan is on her feet.

21          MS. KAPLAN:  Yes, your Honor.  We think it needs to go

22  to page 137, line 8.

23          MR. SIEGEL:  Happily, your Honor.  Can I proceed?

24          THE COURT:  Yes.

25          MR. SIEGEL:  Thank you.

N535CAR2                        Lebowitz - Cross

1   BY MR. SIEGEL:

2   Q.  Dr. Lebowitz, I direct your attention to your deposition --

3   A.  I can't see it, if that's what you want me to do.

4   Q.  Sorry.

5           THE COURT:  Mr. Siegel, you are going to have to get

6   this together.  This has been going on for several days.

7           MR. SIEGEL:  The tech person is putting it on the

8   screen now, your Honor.  Or, to speed this along, I can just

9   read it to her, if that's OK.

10          THE COURT:  Whatever you want to do, Mr. Siegel.

11          MR. SIEGEL:  Thank you very much, your Honor.

12  BY MR. SIEGEL:

13  Q.  OK.  Ah, there we are.  So, Dr. Lebowitz, do you see here

14  the question to you --

15          THE COURT:  Just read it.  I know she can see it.  We

16  all know she can see it.

17          MR. SIEGEL:  I wanted to make sure it was on her

18  monitor, your Honor, but fair enough.

19          THE COURT:  I thought you were just going to read it

20  because it is not on the monitor.  I don't know what you are

21  doing.  You just told me you were going to read it.

22          MR. SIEGEL:  I am, but it just came up on the screen

23  after I heard that.

24          THE COURT:  Either way.  Just get with it.

25  BY MR. SIEGEL:

N535CAR2                        Lebowitz - Cross

1   Q.  So, question to you:

2   "Q  So there is no inconsistency for her saying that she's been

3   having these ongoing intrusive images since the event herself

4   and then her saying in her book I rarely thought of it?

5   "A  They are -- they are inconsistent in terms of content.

6   They are consistent with her psychologically, you know, we

7   don't all say the same thing depending on our social

8   environment, right?  We say something different in a more

9   intimate setting than we say in a more public setting.  We

10  present ourselves differently in those circumstances.  So, it

11  is consistent with that, even if the actual content doesn't

12  line up perfectly."

13         Dr. Lebowitz, was that truthful testimony?

14  A.  It was absolutely truthful testimony and -- and I'm going

15  to have to -- you are going to just have to give me a moment.

16  OK?

17         When Ms. Carroll made clear during her testimony which

18  I -- which is correct, is that there is a difference in terms

19  of thinking and intrusions.  What I am saying here, I'm just

20  not parsing it that -- that clearly.  So -- she is continuing

21  to think of him but she is pushing it away very hard.  What she

22  is also doing in her book -- first of all, she is making a

23  distinction between thinking and intrusions which she has done

24  here in the court, and there is a distinction between her

25  public persona and her private suffering.  That is what is

N535CAR2                          Lebowitz - Cross

1   being revealed here.

2   Q.  Dr. Lebowitz, would you agree with me now that those two

3   statements are inconsistent in terms of content?

4   A.  I would not agree with you that they are different in any

5   way than is truthful or meaningful is what I am saying.

6   Q.  In light of what you just read, it is your position that

7   these two statements, that she has been having intrusive images

8   since the event herself and in her book I rarely thought of it,

9   are consistent with Ms. Carroll's psychology; is that right?

10  A.  They are consistent with Ms. Carroll psychologically and

11  they are also consistent with her testimony that she makes a

12  distinction between thinking about things, i.e., choosing to

13  think about something, and being inflicted with an intrusion.

14  It is all consistent with that.

15  Q.  OK.

16        And what you mean by they're consistent with

17  Ms. Carroll psychologically is that people may say something

18  different in a more intimate setting than they say in a more

19  public setting; is that correct?

20  A.  Yes, and that they are particularly consistent with who she

21  is since she is, more than average, resistant to being seen as

22  somebody who has been hurt or is vulnerable or injured.  So

23  they're both consistent with the more general human impulse to

24  say, *Yeah, I'm fine*, when they may not be, but it is more

25  specific to her, which is she is more like that than most

N535CAR2                        Lebowitz - Cross

1   people.

2   Q.  I want to show you Ms. Carroll's deposition testimony on

3   October 14, 2022.

4        MR. SIEGEL:  Your Honor, page 145, lines 10 through

5   19.

6        Robbie?

7        MS. KAPLAN:  Do you have a copy?  We have got it.

8        MR. SIEGEL:  Just let me know when you are ready.

9   Robbie, is that OK?

10       MS. KAPLAN:  Yes.

11       MR. SIEGEL:  Thank you.

12       Eric, can you display it to the witness?

13       I will speed this along, your Honor.

14  Q.  On October 14, 2022 Ms. Carroll testified, as follows:

15  "Q  During the two decades that followed, how would you say the

16  alleged attack impacted your life?

17  "A  Well, four or five years ago I would have told you it had

18  no effect, I'm as good as new.  This is great, I'm fine.  I

19  rarely think of it.  But I have come to understand that that

20  rape changed my life, which is shocking for me to now

21  understand."

22       Now, that was Ms. Carroll's statement in a sworn

23  deposition, not her book.  It is on the screen now before you.

24  A.  Yes.

25  Q.  And you would agree that a deposition is not the equivalent

N535CAR2                        Lebowitz - Cross

1    of a book, right?

2              MS. KAPLAN:  Objection.

3              THE COURT:  Sustained.

4              MR. SIEGEL:  We can take that down.

5    Q.  On direct you testified about avoidance, and you explained

6    that avoiding things -- withdrawn -- that avoidances, avoiding

7    things, people, and places help a person avoid reminders of

8    trauma; is that right?

9    A.  Yes; and also one can avoid internal experiences as well;

10   thoughts, feelings.

11   Q.  And you would agree that psychologically seeing certain

12   things, people, and places connected to trauma can cause

13   someone to think about that trauma; right?

14   A.  Sometimes, of course.

15   Q.  Now, as for your report, and as I think you testified

16   today, you concluded that Ms. Carroll's harms are manifested

17   and pronounced avoidance behaviors which reflect ongoing

18   fearfulness related to the alleged assault; right?

19   A.  Yes.

20   Q.  In fact, based on what Ms. Carroll told you, you concluded

21   that she's tried very hard to not think about the alleged

22   Bergdorf Goodman incident as much as possible; right?

23   A.  Yes.

24   Q.  Now, Ms. Carroll told you that she doesn't typically keep

25   things in her closet that she doesn't wear, right?

N535CAR2                              Lebowitz - Cross

1    A.  Correct.

2    Q.  And she also told you that she has a small closet, right?

3    A.  Yes.

4    Q.  But you are aware that Ms. Carroll kept the dress she says

5    she wore during the alleged incident for over 20 years; right?

6    A.  I am.  I discussed it earlier.

7    Q.  Right.  You testified on direct you think Ms. Carroll kept

8    the dress because she had lost something she couldn't get back

9    and held on to the dress almost as a way of holding on to hope.

10          Do you recall that testimony on direct?

11   A.  Yes.  I testified that there were likely more than one

12   reason why the dress was still in her closet and that was my

13   thought about what one of those reasons might be.

14   Q.  Dr. Lebowitz, I think you said that you took

15   contemporaneous notes, you were typing quickly as you spoke to

16   Ms. Carroll?

17   A.  Yes.

18   Q.  And, in fact, Ms. Carroll didn't tell you that that was the

19   reason she kept the dress, right?

20   A.  No.  That is my psychological assessment.

21   Q.  Right.

22   A.  That is not something that she said in that way.

23   Q.  Right.  The reason she told you she kept the dress is

24   because it was expensive; right?

25   A.  Yes.

N535CAR2                    Lebowitz - Cross

1    Q.  And as you sit here today, you don't have any independent

2    knowledge as to whether or not she actually wore that dress

3    over the years since the mid-1990s; do you?

4              MS. KAPLAN:  Objection.

5              THE COURT:  What is the relevance of that?

6              MR. SIEGEL:  She is claiming that Ms. Carroll engaged

7    in avoidance behaviors and our position is keeping the dress

8    for 20 years she claims she was raped in isn't consistent with

9    that.

10             THE COURT:  Why don't you ask that question.

11             MR. SIEGEL:  She is testifying, your Honor, as to her

12   belief as to why Ms. Carroll kept the dress.  I am just asking,

13   based on that opinion, whether or not she has any independent

14   knowledge as to whether or not Ms. Carroll wore that dress.

15   Because I think that would affect her opinion.

16             THE COURT:  OK.  Let's ask her that.

17             MR. SIEGEL:  Fine.  Thank you very much, your Honor.

18   BY MR. SIEGEL:

19   Q.  So, Dr. Lebowitz, do you have any independent knowledge as

20   to whether or not Ms. Carroll actually wore that dress over the

21   years since the mid-1990s?

22   A.  Of course not.

23   Q.  No.

24             Ms. Carroll told you she watched *The Apprentice* a few

25   times, right?

N535CAR2                           Lebowitz - Cross

1    A.  She did.

2    Q.  She told you she didn't watch it a lot; right?

3    A.  That's correct.

4    Q.  Are you aware that Ms. Carroll testified, at this trial,

5    two days ago, on May 1, that she watched *The Apprentice* and was

6    "a big sort of fan of the show"?

7    A.  I am.

8    Q.  Now, again, you took contemporaneous notes of Ms. Carroll's

9    interview of you -- excuse me -- Ms. Carroll's interview by

10   you?

11              MS. KAPLAN:  Asked and answered, your Honor.

12              THE COURT:  Sustained.

13   Q.  When you spoke to Ms. Carroll, did she ever tell you that

14   she was "a big sort of fan of the show"?

15   A.  Yes, she did, actually.

16   Q.  She did.  And it is your testimony that she told you that

17   even though, according to you, she only told you she watched it

18   a few times?

19   A.  She told me that she thought it had amazing production

20   values, that there was a, like, kind of a brand-new idea, and

21   that she appreciated the artistry, if you will, of the show

22   from a professional point of view.  She told me that.

23   Q.  Right.  Did she tell you that she posted on social media

24   that she was a massive fan of the show?

25   A.  No, that is not inconsistent.  She is exuberant in most of

Case 23-793, Document 84, 11/20/2023, 3592071, Page58 of 300

A-2278

N535CAR2                          Lebowitz - Cross

1    her statements.

2    Q.  But she told you she didn't watch the show a lot, right?

3              MS. KAPLAN:  Objection, your Honor.  Asked and

4    answered.

5              THE COURT:  Sustained.

6    Q.  Now, in addition to not diagnosing Ms. Carroll with

7    post-traumatic stress disorder, you also didn't diagnose her as

8    having anxiety; correct?

9              THE COURT:  Rephrase the question, counselor.  Stop

10   making your argument as part of the question.

11             MR. SIEGEL:  OK.

12   Q.  Did you diagnose Ms. Carroll with post-traumatic stress

13   disorder?

14   A.  I did not.

15   Q.  Did you diagnose her as having anxiety?

16   A.  I did not.

17   Q.  Did you diagnose her with major depression?

18   A.  I did not.

19   Q.  There is absolutely no psychological, psychiatric, or

20   therapeutic diagnosis that Ms. Carroll suffers from which may

21   have been caused by her alleged Bergdorf Goodman incident; is

22   that right?

23             MS. KAPLAN:  Argumentative, your Honor.

24             THE COURT:  I will allow it.

25   A.  If I understand your question correctly, you are asking me

N535CAR2                        Lebowitz - Cross

1   does Ms. Carroll meet diagnostic criteria for a major mental

2   illness.  The answer to that is no.  She does have symptoms

3   that fit within the rubric of post-traumatic stress disorder

4   but she does not have enough to meet the full criteria for what

5   is essentially a disabling and a chronic mental illness.

6   Q.  OK, so my question was:  There is absolutely no

7   psychological psychiatric or therapeutic diagnosis that

8   Ms. Carroll suffers from which may have been caused by her

9   alleged Bergdorf Goodman incident; is that right?

10           MS. KAPLAN:  Asked and answered and argumentative,

11   your Honor.

12           THE COURT:  Sustained.

13   Q.  A separate question, Dr. Lebowitz.  Would you agree that

14   there is no clinical diagnosis to corroborate Ms. Carroll's

15   allegation in this case?

16           MS. KAPLAN:  Objection, your Honor.

17           THE COURT:  Sustained, at least as to form.

18           MR. SIEGEL:  All right.

19   Q.  Dr. Lebowitz, is there a clinical diagnosis to support

20   Ms. Carroll's allegation in this case?

21           MS. KAPLAN:  Objection, your Honor.

22           THE COURT:  Rephrase.

23           MR. SIEGEL:  I will do it one more time.

24           THE COURT:  The problem is the word "clinical."

25           MR. SIEGEL:  OK.  Fair enough.  Thank you.

Case 23-793, Document 84, 11/20/2023, 3592071, Page60 of 300

A-2280

N535CAR2                    Lebowitz - Cross

1   Q.  Dr. Lebowitz, there is no psychological, psychiatric or

2   therapeutic diagnosis to support Ms. Carroll's allegation in

3   this case; is that correct?

4            MS. KAPLAN:  Your Honor, may we have a side bar?

5            THE COURT:  OK.

6            (Continued next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N535CAR2                    Lebowitz - Cross

1                    (At side bar)

2          MS. KAPLAN:  So, the issue, your Honor, is I want to

3    know what he is asking.  Is he asking is there a diagnosis that

4    supports her damages from something?  Or is he asking is her

5    diagnosis, of course, that it actually happened?  I'm not aware

6    there is any diagnosis that we have already talked about that

7    would support the truth of whether something happened or not.

8          That's the problem I am having with the question.

9          THE COURT:  Well, and there is the further problem and

10   that is I don't know what a therapeutic diagnosis could

11   possibly be.

12         MR. SIEGEL:  I can remove that word, your Honor.

13         THE COURT:  I am sure you could.

14         MR. SIEGEL:  Tell me if this would be sufficient:

15   There is no psychological or psychiatric diagnosis to

16   corroborate Ms. Carroll's allegation in this case.

17         MS. KAPLAN:  What allegation?

18         THE COURT:  Pardon?

19         MS. KAPLAN:  What allegation?  The fact that the

20   assault happened?  Or the fact that she has damage from the

21   assault?

22         MR. TACOPINA:  The Bergdorf Goodman incident.

23         MR. SIEGEL:  Yes.

24         THE COURT:  I'm sorry?

25         MR. TACOPINA:  Sorry.  I was just answering.

N535CAR2                          Lebowitz - Cross

1          MR. SIEGEL:  OK.  Your Honor, I will try it again.

2          So, there is no psychological or psychiatric diagnosis

3     to corroborate Ms. Carroll's claim that she was raped at

4     Bergdorf Goodman.

5          MS. KAPLAN:  I don't think there is foundation for

6     that.  I think he hasn't established there would be a diagnosis

7     to corroborate whether something happened or not.

8          THE COURT:  Why isn't that right, Mr. Siegel?

9          MR. SIEGEL:  Sorry, your Honor.

10          THE COURT:  How could there be a psychological or

11     psychiatric diagnosis that would corroborate what happened at

12     Bergdorf Goodman?

13          MR. SIEGEL:  Because she is testifying that assuming

14     this occurred -- withdrawn.

15          If someone is violently raped in any location, it is

16     conceivable they may actually suffer from some type of mental

17     disorder as a result.  That mental disorder would, therefore,

18     corroborate their claim of rape.

19          THE COURT:  Maybe.  Maybe not.

20          MR. SIEGEL:  That's true.  Maybe.  Maybe not.

21          THE COURT:  But she has already testified that there

22     is no major psychologic disorder under the DSM-whatever-number.

23          MR. SIEGEL:  Yes.

24          MR. TACOPINA:  Let me ask this question.  The judge

25     had a problem with the word "clinical."  I'm sorry.  In other

Case 23-793, Document 84, 11/20/2023, 3592071, Page63 of 300

1    words, there is no diagnosis, take out "clinical" to

2    corroborate Ms. Carroll's allegation in this case.  I think --

3    should I not be part of this?  I don't think I should be part

4    of this.

5              THE COURT:  That's number one, but we will pass over

6    that.

7              MR. TACOPINA:  All right.  Thank you.

8              THE COURT:  Because you are smiling.  And so am I.

9              MR. TACOPINA:  And you are too.

10             THE COURT:  The record will reflect.

11             No.  You are trying -- there this wonderful old Mainer

12   joke.  A guy walks up to the general store and was obviously

13   lost and he asked these two guys sitting on the stoop, how do

14   you get to Millinocket?  Isn't this the way the joke goes?  And

15   there is a lot of talk with a heavy Maine accent, and after 15

16   minutes one of the guys on the stoop says: *You can't get to*

17   *Millinocket from here.*

18             I don't think you can get to where you want to go from

19   here.

20             MR. SIEGEL:  Why don't you ask that last question?

21             MR. TACOPINA:  Just move on.  We will start here.

22             MS. KAPLAN:  One more issue, your Honor, and I didn't

23   want to ask for a side bar, but we have an issue now.  He asked

24   her whether she took -- she gave her the MMPI.

25             THE COURT:  Yes.

Case 23-793, Document 84, 11/20/2023, 3592071, Page64 of 300

A-2284

1          MS. KAPLAN:  Dr. Nace didn't give her the MMPI.

2          THE COURT:  So?

3          MS. KAPLAN:  I don't know whether he is testifying or

4    not.  That's the problem.  I would ordinarily say: *Isn't it*

5    *true that Mr. Trump's expert also didn't give her that test?*

6    But I'm trying to be careful of the fact that they may not even

7    be putting him in.

8          MR. TACOPINA:  Which you will know before you get up

9    for redirect.

10          THE COURT:  You mean this cross is going to continue

11   that long?

12          MR. TACOPINA:  Well, it is only 15 more minutes.  But

13   you won't be done with your redirect.

14          THE COURT:  Look.  Let's just try to move ahead.

15          MR. SIEGEL:  I will, your Honor.

16          MR. TACOPINA:  That problem will be resolved, Robbie.

17

18

19

20

21

22

23

24

25

N535CAR2                        Lebowitz - Cross

1              (In open court)

2              THE COURT:  Next question, please.

3              MR. SIEGEL:  Thank you very much.

4      BY MR. SIEGEL:

5      Q.  Dr. Lebowitz, based on what Ms. Carroll told you, you

6      concluded that the alleged incident at Bergdorf Goodman is the

7      cause of her inability to engage in romantic and sexual

8      partners; correct?

9      A.  I did.

10     Q.  But you would agree that it is possible something else

11     other than the alleged Bergdorf Goodman incident may have

12     caused Ms. Carroll's supposed inability to engage with

13     potential romantic partners, correct?

14     A.  In psychology it is -- it is always possible.  We can only

15     ever say that things are within a certain degree of certainty.

16     We can't even say the sun is definitely going to rise tomorrow

17     as a psychologist so of course there is always a possibility.

18     Q.  Are you aware that Ms. Carroll appeared on a podcast

19     entitled *UnStyled* in August of 2019 in which she said:  Well,

20     after the episode in Bergdorf's I never had sex again, but I

21     think it wasn't because of him.  I think it was just that I

22     didn't have the luck to meet that person that would cause me to

23     be desirous again.

24     A.  If I am remembering this material correctly, I think she

25     also at some point acknowledged that one creates one's own luck

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N535CAR2                          Lebowitz - Cross

1   and her avoiding behavior precluded her from creating the luck

2   that she needed to meet somebody and I think that is what she

3   is saying there.

4   Q.  And you are drawing that conclusion based on an assumption

5   that what she told you was correct; true?

6   A.  No, I am basing that on my memory, which I hope is

7   accurate, of what she actually said in that podcast or some of

8   her materials, that one creates one's own luck in creating

9   context for that.

10  Q.  I understand but I'm not -- in forming your opinion as to

11  her psychological condition on that issue you're relying upon

12  the accuracy of what Ms. Carroll told you, correct?

13  A.  I am a little confused by your question.  I'm sorry.

14  Q.  OK.  Let me reframe it.

15          Everything you are testifying to here today, including

16  what you just said, is based on the accuracy of what

17  Ms. Carroll told you; correct?

18  A.  It is actually based on two things.  It is based on what

19  she told me viewed through the lens of what I understand

20  research and clinical work about trauma has taught us over the

21  last 40 years, and also my clinical experience.  So, when

22  somebody tells me something I don't receive it like a video

23  recording, I filter it through the lens of what I know about

24  people and behavior and trauma in general.  So there is really

25  two forces at work here, right?  One is what is she telling me;

N535CAR2                    Lebowitz - Cross

1   and then, secondarily, does this make sense, is this consistent

2   with what we know more generally about how people work and how

3   trauma affects people.  So, there is two factors at work here.

4   Q.  Did you hear the portion of the podcast where she said:  I

5   think it wasn't because of him?

6   A.  I didn't hear the podcast but I think I read a transcript

7   of it.

8   Q.  You are aware that Ms. Carroll has claimed she experienced

9   sexual assaults before this alleged Bergdorf Goodman incident;

10  is that right?

11  A.  I am.

12  Q.  But you don't attribute the symptoms you found to any of

13  those past incidents?

14  A.  No.

15  Q.  You are aware that Ms. Carroll testified in her 2022

16  deposition that she was sexually abused by a girl scout leader

17  when she was a child?

18  A.  I am.

19  Q.  And according to you there is no evidence that that

20  experience affected her functioning?

21  A.  There is no evidence it affected her functioning.  I think

22  that it -- she thought about it and it was a painful event in

23  her life.  We all have pain, though, that doesn't necessarily

24  affect our functioning.  There is no evidence it affected her

25  functioning as far as I could discern.

1   Q.  In preparation for your evaluation and testimony you read

2   her January 31st, 2023 deposition; correct?

3   A.  No.  I think the timing of that doesn't work.

4   Q.  OK.  Have you ever heard -- withdrawn.

5          Are you aware that Ms. Carroll testified at a

6   deposition on January 31st, this year, that she never claimed

7   to be traumatized by any of the --

8          THE COURT:  Sustained.  Look.  There is a rule about

9   how you are to do this and that isn't it.

10  Q.  Dr. Lebowitz, did you read Ms. Carroll's January 31st, 2023

11  deposition?

12  A.  I think so but I am not positive.  I would have to look at

13  it.  I'm not sure.

14         MR. SIEGEL:  OK.  Can you show it to her?

15         Your Honor, may I approach?

16         THE COURT:  For what purpose?

17         MR. SIEGEL:  To show her the deposition to refresh her

18  recollection.

19         THE COURT:  As to whether she has read it?  Fine.

20         MS. KAPLAN:  Can you tell us what line -- your Honor,

21  can you ask him to tell us what lines?

22         THE COURT:  I'm sorry.  I couldn't understand you,

23  Ms. Kaplan.

24         MS. KAPLAN:  We are asking about what part of the

25  deposition he --

A-2289

N535CAR2                     Lebowitz - Cross

1              THE COURT:  At the moment we are trying to find out if

2    the witness remembers ever having read it.

3              MS. KAPLAN:  Sorry, your Honor.

4              THE WITNESS:  I think I have seen it.

5              THE COURT:  Have you read it?

6              THE WITNESS:  I think so.  I couldn't swear to it, but

7    I think so.

8              THE COURT:  A little louder so the jury can hear.

9              THE WITNESS:  I think I have read it.

10   BY MR. SIEGEL:

11   Q.  OK.  Do you recall --

12             THE COURT:  This is not a memory quiz.  There was a

13   reporter.

14             MR. SIEGEL:  OK.

15   Q.  I want to direct your attention to page 65, lines 3 through

16   10.

17             (Counsel conferring)

18             THE WITNESS:  Yes.

19             THE COURT:  I appreciate the conference but is there

20   going to be a question?

21             MR. SIEGEL:  Yes.

22             MR. TACOPINA:  They're working on it.

23             MR. SIEGEL:  We will resolve this amongst ourselves,

24   your Honor.

25             (Counsel conferring)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page70 of 300

N535CAR2                    Lebowitz - Cross

1              THE COURT:  Folks, *tempus fugit*.  I apologize for the

2      Latin.  Time is flying.

3              MR. SIEGEL:  I think I can move this along.

4      Q.  I just want to direct your attention to page 65 -- you can

5      read it to yourself -- lines 3 through 10 and I will ask you

6      one question after you do.

7      A.  OK.

8              MS. KAPLAN:  Your Honor, can we have a side bar,

9      please?

10             MR. SIEGEL:  Robbie --

11             THE COURT:  There is not even a question yet.  Do we

12     need a side bar?

13             MR. SIEGEL:  I don't think so, your Honor.

14             MS. KAPLAN:  OK.

15     BY MR. SIEGEL:

16     Q.  Dr. Lebowitz, Ms. Carroll said she was traumatized by Cam;

17     is that correct?

18     A.  Yes.

19     Q.  Now, do you recall documenting in your notes, that you took

20     contemporaneously when interviewing Ms. Carroll, that she can

21     experience back pain if she is just thinking about Cam?

22     A.  Yes.

23     Q.  So Ms. Carroll told you she experiences physical

24     manifestation of pain just from thinking about Cam; right?

25     A.  Yes.

**A-2291**

N535CAR2                        Lebowitz - Cross

1   Q.  Do you think that is an important fact when evaluating

2   Ms. Carroll's emotional condition?

3   A.  It is certainly a fact that I considered when evaluating

4   the effect of Cam on Ms. Carroll; yes.

5   Q.  You didn't include that in your report though, correct?

6   A.  That's true.

7   Q.  Now, you testified about -- coming to the end here -- some

8   of the behavior Ms. Carroll supposedly exhibited during this

9   alleged rape such as not screaming; right?

10  A.  Yes.

11  Q.  And it is your opinion that such behavior, not screaming,

12  would be consistent with a rape, correct?

13  A.  Absolutely.

14  Q.  But you would agree that screaming is also consistent with

15  a rape, right?

16  A.  I think screaming, under those circumstances, is an

17  excellent response to being sexually assaulted.  I also happen

18  to know, both from research and from 40 years of clinical work,

19  that it is one of the least likely things that actually occur.

20  Q.  But you agree with me that screaming would be consistent

21  with a rape, correct?

22  A.  Sure.  Some people scream.  That's a good idea.

23  Q.  Dr. Lebowitz, when you were deposed on March 14 of this

24  year, you couldn't think of any reactions by a person claiming

25  rape that would not be consistent with that claim; correct?

N535CAR2                        Lebowitz - Cross

1              THE COURT:  I'm sorry?

2              THE WITNESS:  There is a lot of negatives in that

3    question.

4              MS. KAPLAN:  Object to the form.

5              THE COURT:  Rephrase it.

6    BY MR. SIEGEL:

7    Q.  You testified at your deposition in this case on March 14,

8    2023; correct?

9    A.  Yes.  I will take your word for that, yes.

10   Q.  And you were asked whether you could think of any reactions

11   by a person claiming rape that would not be consistent with

12   that claim, right?  That would be inconsistent with a claim of

13   rape?

14             MS. KAPLAN:  Your Honor, if we can get a page number,

15   please?

16             MR. SIEGEL:  Sure.

17   A.  I don't remember the context of that exchange and I would

18   have to have it in context before I can answer it because I

19   don't remember that specific sentence from my deposition.

20   Q.  Sure.

21             Page 154, Robbie, line 20, through 155, line 2.

22             MS. KAPLAN:  OK, we have the context.

23   Q.  Dr. Lebowitz --

24             THE COURT:  There is an objection on the record.  Has

25   it been addressed?

1         MS. KAPLAN:  We lost the question on our screen.  If

2    the court reporter can read it back?

3         THE COURT:  I don't want it read back.  Get the

4    transcript.  Well, indeed it is on the screen.

5         THE WITNESS:  I see the question but I actually need

6    the context for it.

7         THE COURT:  Doctor, hold it for a minute.

8         THE WITNESS:  OK.

9         THE COURT:  Is the objection being pressed or not?

10        MS. KAPLAN:  No.  We withdraw the objection, your

11   Honor.

12        THE COURT:  OK.  Go ahead.

13        MR. SIEGEL:  Thank you.

14   BY MR. SIEGEL:

15   Q.  I direct your attention to line 20 through -- what is on

16   your screen, line 20 of page 154, to line 2 on page 155?

17   A.  I don't have it on my screen.

18        THE COURT:  Line 2 is not on her screen.

19        MS. KAPLAN:  And that, your Honor, we do think she

20   needs more context.

21        MR. SIEGEL:  We will put up the whole thing.

22        THE COURT:  Is that an objection or not?

23        MS. KAPLAN:  It is an objection, your Honor.

24        THE COURT:  And what other context are we talking

25   about?

N535CAR2                          Lebowitz - Cross

1              MS. KAPLAN:  So, she goes on to answer the question.

2              THE COURT:  Could you just give me the page and line

3    for context?

4              MS. KAPLAN:  All the way to 156, line 7.

5              MR. SIEGEL:  Your Honor, that's not responsive and it

6    doesn't put it in context.

7              THE COURT:  I'll be the judge of that.  Let me read

8    it.  I agree with Mr. Siegel.

9              What is your question, Mr. Siegel?

10             MR. SIEGEL:  Thank you, your Honor.

11   BY MR. SIEGEL:

12   Q.  Dr. Lebowitz, on March 14, 2023, you were asked this

13   question and gave this answer:

14   "Q  Are there any reactions to a rape that are not consistent

15   with the victim actually being raped?

16   "A  There may be.  I can't call any to mind at this moment, but

17   there may be."

18             Was that truthful testimony?  Oh, I'm sorry --

19   A.  Yes.

20   Q.  OK.  Now, you said that all of Ms. Carroll's behavior and

21   feelings as she conveyed them to you are consistent with being

22   raped; correct?

23   A.  They were consistent with who she is and with being raped.

24   There was nothing inconsistent.

25   Q.  OK.  But if what she told you is false, then all of her

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page75 of 300

A-2295

N535CAR2                         Lebowitz - Cross

1    alleged behavior and feelings that she conveyed to you would

2    have to be inconsistent with her having been raped; is that

3    correct?

4            MS. KAPLAN:  Objection to form, your Honor.

5    A.  I think what is getting lost here --

6            THE COURT:  Wait.  There is an objection.

7            THE WITNESS:  Sorry.

8            THE COURT:  The objection is sustained.

9    Q.  Dr. Lebowitz, you are not offering an opinion in this case

10   on whether Ms. Carroll was raped, right?

11   A.  I am not.

12   Q.  And I think you said you have no independent knowledge of

13   whether that happened or not?

14   A.  That is correct.

15           MR. SIEGEL:  Thank you.  I have nothing further.

16           THE COURT:  OK.  Thank you.

17           Will there be redirect?

18           MS. KAPLAN:  There will, your Honor.

19           THE COURT:  OK.  2:00, folks.

20           (Luncheon recess; continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N532Car3

1                   A F T E R N O O N    S E S S I O N

2                            2:00 p.m.

3          (Jury not present)

4          THE COURT:  Where are we on schedule?

5          MS. KAPLAN:  Your Honor, so we have a report to make.

6    Dr. Nace will not be testifying, and then in terms of giving

7    you -- sorry --

8          THE COURT:  Go ahead.

9          MS. KAPLAN:  In terms of the agenda, today we will

10   finish Dr. Lebowitz, we will put on E. Jean Carroll's sister,

11   we will put on Natasha Stoynoff, and then, in the remaining

12   time──if there is remaining time──we will start the Trump

13   deposition designations.

14         I think we resolved -- we have been talking.  I think

15   we may have resolved any remaining objections there, which

16   would be good, and then tomorrow will be Carol Martin, Ashlee

17   Humphreys, Robbie Myers and, depending how we go today, that

18   may not even take up the whole day tomorrow.

19         THE COURT:  Okay.  Thank you.

20         MS. KAPLAN:  If that's helpful.

21         THE COURT:  Very helpful.  Thank you.

22         And given the conclusion on Dr. Nace --

23         MS. KAPLAN:  I will waive the issue, your Honor.  I'm

24   not going to ask any questions.

25         THE COURT:  You are waiving redirect?

N532Car3

1              MS. KAPLAN:  No, not redirect.  The question we talked

2    at sidebar I won't ask.

3              THE COURT:  Okay.

4              MR. TACOPINA:  Your Honor, just so you understand --

5    I'm sorry.

6              THE COURT:  And then we are done, right, done defense

7    case?

8              MR. TACOPINA:  Correct.

9              THE COURT:  Okay.

10             MR. TACOPINA:  Your Honor, there is an issue that Mike

11   and I were discussing.  I just want to raise it.  As far as I

12   understand, as far as Dr. Nace is concerned, it became an

13   impossibility for him to be able to go tomorrow, so -- for

14   various reasons that we have discussed in the back.  So we are

15   not -- we are just going to move forward.

16             THE COURT:  Is it a scheduling issue or ultimate

17   health issue?

18             MR. TACOPINA:  Health issue.

19             THE COURT:  Okay.  Because depending on what the facts

20   are—and we don't have to get into them—I could have had some

21   flexibility if I needed it.

22             MR. TACOPINA:  Yeah, your Honor, practically speaking,

23   I don't think that would work out.  I appreciate what you just

24   said, by the way.  I appreciate that a lot.  But I just don't

25   think it's, practically speaking, going to be useful to do

N532Car3

1    that.

2              THE COURT:  Okay.

3              MR. TACOPINA:  So thank you, though.

4              THE COURT:  All right.

5              MR. TACOPINA:  Just one issue real quick, your Honor.

6    During the testimony of Ms. Stoynoff, the plaintiff plans on

7    introducing the Billy -- what should we call it?  Billy Bush

8    tape?  Mike?

9              MR. FERRARA:  Yes.

10             MR. TACOPINA:  The Billy Bush tape, let's call it

11   that.

12             THE COURT:  You can call it whatever you want.

13             MR. TACOPINA:  What would you like to call it, your

14   Honor?

15             THE COURT:  We all know what you are talking about.

16             MR. TACOPINA:  Anyway, so I would object to them

17   putting it in through Ms. Stoynoff, because obviously it is

18   subject to connection, authentication, but they are going to

19   play it later today during the deposition transcript --

20   deposition -- video depositions that have been designated

21   for --

22             THE COURT:  So therefore, if I understand you

23   correctly, it's going to come in today.

24             MR. TACOPINA:  It's going to come in today later, but

25   I don't think it should be played twice.  It's not -- obviously

Case 23-793, Document 84, 11/20/2023, 3592071, Page79 of 300

N532Car3

1    it's not authenticated at this point.  It would have to only

2    come in subject to connection.  I think he could ask about it,

3    but playing it twice in two hours I think is --

4              THE COURT:  That's a separate question, but you don't

5    seriously contend that it isn't authentic, right?

6              MR. TACOPINA:  Oh, no, not seriously.

7              THE COURT:  All right.  I consider only serious

8    objections.

9              MR. TACOPINA:  Right.

10             THE COURT:  Right?  There is no issue as to

11   authenticity, right?

12             MR. TACOPINA:  Yes, right.

13             THE COURT:  Okay.  All right.  I understand your other

14   point.  We will deal with it if it becomes necessary.

15             MR. TACOPINA:  Thank you, your Honor.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

N532Car3                        Lebowitz - Redirect

1          (Jury present)

2          THE COURT:  Good afternoon.  Members of the jury, a

3   little scheduling progress report.

4          Based on what the lawyers have told me thus far——and

5   bearing in mind that I am not in the insurance-writing

6   business, things change in cases——I think you can reasonably

7   expect to get the case early next week.

8          Okay.  Dr. Lebowitz, you are still under oath.

9          Ms. Kaplan, any redirect?

10          MS. KAPLAN:  Yes, your Honor.

11   REDIRECT EXAMINATION

12   BY MS. KAPLAN:

13   Q.  Dr. Lebowitz, during your cross-examination by Mr. Seigel,

14   there were a series of questions, and I'm going to try to

15   refresh you.  You said you wanted to clarify something, so I'm

16   going to give you that opportunity.

17          Mr. Seigel asked you this question:  Do you recall

18   writing in your report that Ms. Carroll lives with a higher

19   level of chronic fearfulness than she did before Donald Trump's

20   denunciation?  You answered:  Yes, yes.  And then he asked you,

21   as to whether Ms. Carroll felt safe walking down a street after

22   Donald Trump said she lied, you concluded that it began to

23   subside -- you concluded that it began to subside.  Ms. Carroll

24   simply felt frightened and overwhelmed and could not eat or

25   sleep well, is that right?  And you said, yes, but I think you

Case 23-793, Document 84, 11/20/2023, 3592071, Page81 of 300

N532Car3                    Lebowitz - Redirect

1    are conflating a few different things which I would like to

2    clarify.

3            Do you recall that testimony?

4    A.  I do.

5    Q.  Would you please clarify -- let the jury know what you

6    wanted to clarify.

7    A.  Sure.  Right after Mr. Trump denounced Ms. Carroll, she had

8    a period of time in which she felt really terrified.  She was

9    having trouble eating, she was having trouble sleeping.  I

10   think she lost five pounds in a very short period of time.  It

11   was a short period of time where she felt really inundated with

12   hateful e-mails and she was fearful.  That did subside.  And in

13   general I don't think Ms. Carroll has ever been fearful on the

14   streets of New York.  New York is a place that she feels safe

15   and feels actually supported by.

16           Where the fear has been relevant and enduring is alone

17   in her home, in her cabin, where she sleeps with a loaded gun

18   to this day because she was afraid that Mr. Trump's

19   denunciation of her and his invitation for people who knew

20   something about her to come forward might invite people to seek

21   her out and harm her.  And that fear, you know, she doesn't

22   experience it, you know, as a kind of daily throb of fear

23   because she has a loaded gun, but she did learn how to shoot

24   effectively and she does continue to sleep with a loaded gun by

25   her bed, which suggests to me the presence of some ongoing

N532Car3                    Lebowitz - Redirect

1   fearfulness.

2   Q.  Dr. Lebowitz, do you recall that Mr. Seigel asked you a

3   number of questions about psychological tests or instruments?

4   A.  I do.

5   Q.  And just to set the groundwork there, could you explain to

6   the jury what is a psychological instrument or the

7   psychological instruments you were talking about, what do they

8   look like, how are they administered?  That was very compound.

9   A.  That's okay.

10            THE COURT:  Yes, it was.  Let's try again.

11            MS. KAPLAN:  Yeah.

12  Q.  Can you explain to the jury how a psychological instrument

13  like that is administered?

14            THE COURT:  Could we maybe even let's find out what it

15  is?

16            MS. KAPLAN:  Withdrawn.

17  Q.  Could you please tell us what a psychological instrument

18  is, Dr. Lebowitz?

19  A.  Well, there are lots of different kinds, first of all.  The

20  kinds that I was being asked about are -- Mr. Seigel mentioned

21  the MMPI, and he mentioned -- referred to some screening

22  instruments.  So there are a lot of tests where it is

23  basically -- let's start with the first one.  There are these

24  things called paper-and-pencil tests.  You have probably seen

25  them in your doctor's office, where you sit down and you get

Case 23-793, Document 84, 11/20/2023, 3592071, Page83 of 300

A-2303

N532Car3                    Lebowitz - Redirect

 1    like nine questions that are basically finding out, have you

 2    been depressed, have you been anxious, how much are you

 3    drinking?  So they are very straightforward.  They are usually

 4    yes/no answers, or maybe you have the Likert scale, where you

 5    can answer like 1 to 5 about how much you agree with the

 6    statement.  But they are very straightforward.  They ask you

 7    are you having trouble sleeping?  Are you sad most of the time?

 8    They are questions like that.  They are -- I'm not really sure

 9    why they are called objective, because they rely entirely on

10    the individual's self-report, and the truth is that it is a lot

11    easier to present yourself in a way that you want to present

12    yourself when you are being asked a yes/no question on a piece

13    of paper.  It is much harder to present yourself in a certain

14    kind of way in the course of a long conversation.  But aside

15    from that, that's -- those are one kind of test, the

16    paper-and-pencil test.

17         The MMPI, which he referred to, is a more complicated

18    test where you are asked lots and lots and lots of questions,

19    550 questions, actually, and they are all true/false.  So do

20    you read car mechanics magazines?  I have headaches often.  I

21    am sad most of the time.  Those kinds of questions like that.

22    You either say it is true about you or it is false about you.

23         There is the idea that people with certain personality

24    traits will tend to answer questions in a similar way.  So you

25    can get like a profile of somebody's personality and that can

1    also include symptom measures and indications of psychological

2    disorder like psychosis or character disorder, antisocial

3    personality, and one of the scales on that test, which is what

4    I was asked about today, it's called the F scale, but it's

5    basically -- there are a couple of the subscales which try to

6    get at whether or not people are being truthful.  How they try

7    to get at it is that they assume that if you endorse lots and

8    lots and lots of symptoms, you might be faking bad.  Of course

9    the problem with that is sometimes people have lots and lots of

10   symptoms, but at any rate that would never be a problem for

11   Ms. Carroll.

12          And there are some other subscales on there.  I don't

13   use the test I'm not very familiar with it.  But there are some

14   other ways that they try to see whether or not people are being

15   consistent and so they are most likely to be truthful.

16          The thing about all these tests, though, that is

17   important to understand is they are basically trying to figure

18   out do you look more like one category of people or more like

19   another category of people?  And they are entirely dependent on

20   your ability to both understand the question accurately and

21   your willingness to answer it truthfully.

22          But you get a number when you are done, and sometimes

23   people feel that numbers are more objective than descriptions,

24   and I think that might be -- I think that may be one of the

25   reasons why they are considered objective.

N532Car3                    Lebowitz - Redirect

1          The other reason is that there is the idea that if you

2     give the same test to the same person twice, they will probably

3     answer it in the same way, so there is the idea that that makes

4     it a reliable test.

5          And all of these tests are validated against, for

6     example, a clinical interview.  So if I give you a test for

7     depression and you get a number on there that is -- looks like

8     you are depressed, we believe that it is accurate because when

9     they were developing the test, they would always pair that

10    finding with an actual interview.  But in general, people have

11    more faith in the accuracy and the validity of an in-depth

12    interview than they ever do on a screening, on a screening

13    test.

14          MR. SEIGEL:  Your Honor, objection to what people in

15    general have more faith in.

16          THE COURT:  Explain that answer, Doctor, so that I can

17    make a ruling.

18          THE WITNESS:  Sure.  When tests are being developed,

19    you have to figure out whether or not they are valid, which

20    just means is this test assessing the thing it purports to be

21    assessing.  So if you are looking at a test like the Beck

22    Depression Inventory, which is like 9 or 20 -- a series of

23    questions about whether or not you are depressed, the way they

24    figured out that it was a pretty good paper-and-pencil measure

25    for depression is they gathered a cohort of people, some of

N532Car3                    Lebowitz - Redirect

1    whom were depressed and some who weren't.  The people who were

2    depressed were assessed using a clinical interview.  They were

3    then given a test.  The idea being that if a clinician thought

4    you were depressed and you came up depressed on this test, then

5    the test is a pretty good indication of being depressed.  But

6    the gold standard is typically an in-depth clinical interview.

7            THE COURT:  I will let the answer stand, but you can

8    recross on it if you wish.

9    BY MS. KAPLAN:

10   Q.  I take it from what you just said, Dr. Lebowitz, you tend

11   not to use these kinds of tests very often?

12   A.  I don't use them very often.  I use them on occasion, but

13   not very often.

14   Q.  And in this case, did you reach a conclusion as to whether

15   tests like that would have been helpful or not?

16   A.  I did.

17   Q.  And what was the conclusion you reached?

18   A.  I didn't feel like they were going to add any valuable

19   information in this situation.

20   Q.  And can you explain why, Doctor?

21   A.  Sure.  I have assessed for trauma and PTSD so many times

22   that I actually know what the questions would be.  And it was

23   my assessment that although Ms. Carroll had some of the

24   symptoms in pretty severe form, she didn't have enough symptoms

25   in enough category to meet criteria for a full diagnosis of

N532Car3                     Lebowitz - Redirect

1    PTSD.  On the basis of my interview, I also didn't think she

2    had a major depressive disorder, a major anxiety disorder, or

3    any other form of significant mental illness.  So there was no

4    reason to do a test.  It would have just told me what I already

5    knew.

6    Q.  And during your examination of Ms. Carroll, I take it you

7    asked her a lot of questions?

8    A.  I did.

9    Q.  And is there an overlap, Doctor, between the questions you

10   asked her and the kinds of questions you would find on the

11   tests that you have been talking about?

12   A.  Yeah.  The way I structure an interview is the first part

13   of it, and that can be quite a lengthy part, the questions are

14   very open-ended.  I just want someone to tell me about their

15   life and their experiences in their own words.  If I hear

16   things that make me think there is more information that needs

17   to be gotten on that particular issue, then I may ask some more

18   structured and some more specific questions.

19        So with Ms. Carroll, you know, I'm sure my opening

20   question about the alleged event was, you know, what happened

21   and how do you -- you know, how did it affect your life.  But

22   at some point I would have asked her more specific questions

23   about the quality of her intrusions, her avoidance behaviors.

24   I would have followed up with the kinds of questions that I

25   would be asking if I was doing a more structured exam.

1    Q.  Doctor, how debilitated -- you have used that word today I

2    believe.  How debilitated does someone have to be to be

3    diagnosed with PTSD?

4    A.  It is considered a severe and a disabling illness.  When,

5    for example, we used to evaluate veterans, combat veterans for

6    PTSD, PTSD is -- it's considered a service-related injury.  So

7    if you have posttraumatic stress disorder, you are entitled to

8    a certain level of disability payments.  If you have partial

9    PTSD, you are also entitled to disability payments, but not as

10   much as full-blown PTSD.

11          We considered full-blown PTSD to be a disabling

12   illness in which somebody in all likelihood would not be able

13   to work and would need as much support as the military could

14   provide.  We also gave compensation for partial PTSD because it

15   was understood that that, too, represented a cost to people's

16   lives, and that's a situation they deserved to be compensated

17   for.

18   Q.  So I understand, Doctor, with full PTSD, at least in the

19   context of veterans, they -- the assumption is they are so

20   debilitated they cannot work, is that fair?

21   A.  Pretty much, yeah.

22   Q.  And what do you mean by partial PTSD?

23   A.  I mean that somebody, you know, could, like Ms. Carroll,

24   have severe avoidance behaviors and some intrusions and some

25   decrements to herself self-esteem, but that it didn't reach the

N532Car3                          Lebowitz - Redirect

1   level where it has diminished her functioning or so intrusive

2   in her life that she meets full criteria.  She just doesn't.

3   Q.  Now, you testified at the very beginning, I believe,

4   Doctor, that there have been two categories, as I recall, where

5   you have been asked to give opinions and that you haven't given

6   them.  Let me take them one by one.

7         The first one, as I understand it, is when you get a

8   call, someone describes the case to you, and you don't even get

9   engaged because you don't believe you can provide the opinion

10  that's asked for.  Did I get that right?

11  A.  Yes.

12  Q.  And can you again, without revealing any confidential

13  information, can you give the jury a sense of what happens

14  there that leads you to reach that decision?

15  A.  Well, it could be a situation in which somebody has engaged

16  in some really bad behavior of some kind, you know, maybe

17  financial or criminal or assaultive, and the lawyer might have

18  the idea that the information they have about this person's

19  life or their childhood that indicates they have a trauma

20  history, that that might be a compelling explanation for that

21  behavior, and I might not agree.  I might think that, based on

22  information I am being presented with, that there is a good

23  chance I won't agree, and so they might want to find a

24  different expert.  That's one kind of situation.

25  Q.  And could you describe the second situation that's come up?

N532Car3                    Lebowitz - Redirect

1   A.   The second situation has come up in the context of a

2   prosecutor——there were a couple in the military, I think; there

3   may have been some civilian ones——where a prosecutor has wanted

4   to retain me to testify as to damages in the process of

5   prosecuting somebody for rape, and there have been instances

6   where I didn't feel like there was adequate information for me

7   to rely on and/or I did not find the material compelling enough

8   to feel confident to participate in that kind of a prosecution.

9   Q.   So just so I understand, in the second category of cases,

10  you are asked to provide an opinion as to whether a person

11  suffered psychological consequences from a sexual assault?

12  A.   Yeah, there are certain places——New Mexico is one and it

13  sometimes happens in the military——where, in order to prosecute

14  for certain levels of sexual assault, there needs to be an

15  indication that the victim was damaged.

16           MR. SEIGEL:  Objection.  Relevancy.

17           THE COURT:  Overruled.

18  A.   There needs to be information that the victim was damaged,

19  otherwise you have to bring a lesser charge.  So sometimes I'm

20  asked to participate in those cases.  But what has happened on

21  a couple of occasions is that after interviewing the victim,

22  either I thought that while she might have had an -- a bad

23  experience, I was not compelled that the person who was being

24  charged had actually intended to rape them or I felt like the

25  victim was too impaired in the sense that she was psychotic or

N532Car3                    Lebowitz - Redirect

1    she had too severe a character disorder for me to feel

2    confident in relying on what she was telling me about her

3    experience, and so in not knowing and not being certain enough,

4    I chose not to participate in those cases.

5    Q.  Now, Doctor, in the course of your work, your many years as

6    working as a psychologist, have you had occasion to deal with

7    people who you believe were exaggerating their symptoms?

8    A.  Yes, on occasion.

9    Q.  And could you give the jury again, without revealing

10   anything confidential, what kinds of signals or clues would

11   lead you to that conclusion?

12   A.  Well, it used to come up occasionally in the Veterans

13   Administration at the National Center because there was such a

14   high level of compensation for full-blown PTSD that sometimes

15   people would come in and it would seem that they had memorized

16   the checklist and they could tell you this laundry list of

17   symptoms.  But if you stood back and engaged them in a longer,

18   more freewheeling and open-ended interview, the rest of the

19   story didn't attach to those symptoms in a way that was

20   plausible.  So sometimes it happened there.

21          I have interviewed people who are, you know, are so

22   hyperbolic about everything that it is hard to discern what is

23   actually true, where the real pain is.

24          I think I might need a follow-up question I think I

25   lost my train of thought.

Case 23-793, Document 84, 11/20/2023, 3592071, Page92 of 300

A-2312

N532Car3                    Lebowitz - Redirect

1    Q.   That's okay, Doctor.

2            Based on the time you spent with E. Jean Carroll,

3    sitting here today, do you have an opinion whether she is

4    someone who exaggerates or minimizes adversity?

5    A.   Oh, she is, without question, somebody who minimizes

6    adversity, and that is to be -- and it is -- in general, she is

7    a pretty effusive and ebullient person, so she has -- you know,

8    she is expressive, but when it comes to adversity, it is hard

9    for her to even give it voice, much less exaggerate anything.

10   She is a minimizer.

11   Q.   Doctor, you recall that Mr. Seigel asked you a bunch of

12   questions about malingering.  Do you recall that?

13   A.   He did.

14   Q.   What is malingering?

15   A.   It is lying or misrepresenting your symptoms or your

16   experience in some way.

17   Q.   And he asked you a bunch of questions about -- withdrawn.

18           Sitting here today, Doctor, do you have an opinion one

19   way or the other -- I know it wasn't in your report, but do you

20   have an opinion one way or another as to whether Ms. Carroll

21   was malingering?

22   A.   I do.

23           MR. SEIGEL:  Objection.

24           MS. KAPLAN:  I think he opened the door, your Honor.

25           MR. SEIGEL:  Your Honor, could we approach?  Sidebar?

A-2313

N532Car3                    Lebowitz - Redirect

1              THE COURT:  I can't hear you.

2              MR. SEIGEL:  Could we have a sidebar on this?

3              THE COURT:  Yes.

4              (Continued on next page)

Case 23-793, Document 84, 11/20/2023, 3592071, Page94 of 300

 1              (At the sidebar)

 2              THE COURT:  Mr. Seigel, I take it the objection is not

 3    to the question that was asked and answered, but to the one you

 4    fear comes next.

 5              MR. SEIGEL:  It's a question -- that's correct, your

 6    Honor.

 7              THE COURT:  Okay.

 8              MR. SEIGEL:  Which goes to the ultimate conclusion in

 9    this case.  I think that Ms. Carroll intends to ask her if she

10    believes Ms. Carroll's claim.

11              MS. KAPLAN:  So, your Honor, I would not have ever

12    raised it and our report didn't raise it specifically, but then

13    on cross he asked a whole bunch of questions geared -- and I

14    could get it from the transcript -- geared to the whole issue

15    that she couldn't tell one way or the other whether she was

16    malingering or not, therefore trying to suggest in the mind of

17    the jury that this whole thing could be made up and that she

18    could have pulled the wool over the doctor's eyes, as well.

19              THE COURT:  I would like to see the transcript you are

20    relying on, Ms. Carroll.

21              MS. KAPLAN:  Okay.  We will get it, your Honor.

22              (Pause)

23              (Continued on next page)

24

25

Case 23-793, Document 84, 11/20/2023, 3592071, Page95 of 300

A-2315

N532Car3                    Lebowitz - Redirect

1              (In open court)

2              THE COURT:  Members of the jury, this may take more

3    than two minutes, so into the jury room, please.

4              And you I think, Dr. Lebowitz, should leave as well.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 23-793, Document 84, 11/20/2023, 3592071, Page96 of 300

1              (Jury and witness not present)

2              THE COURT:  We are waiting for some hard copy

3     transcript of what the lawyers are discussing, but let's get

4     started if we can.  Over to you, Ms. Kaplan, I think.

5              And just for the sake of clarity to those who were not

6     at the sidebar, I said to Mr. Seigel, and he confirmed that I

7     was correct, that the objection was not to the question that

8     was actually asked and answered——if, namely, whether

9     Dr. Lebowitz had an opinion as to whether Ms. Carroll was

10    malingering——but to the question that he expected would follow,

11    which is "and what was that opinion."

12             So that's what I think we are discussing, yes?

13             MS. KAPLAN:  Yes.  So I can start reading some

14    excerpts, if that would be helpful, your Honor.

15             THE COURT:  You can start.  But I didn't get the rest

16    of the sentence.

17             MS. KAPLAN:  I can start reading some excerpts from

18    the screen, if that would be helpful, your Honor.

19             THE COURT:  It would also be helpful to get page

20    numbers, which I hope correspond on my screen and yours.

21             MS. KAPLAN:  We believe it was page 46/line 1 through

22    47/line 12.

23             THE COURT:  I have read that part.  I don't see that

24    it is right on point or anything.  He was just asking what

25    evaluation methods, unless our pagination is different.

N532Car3                    Lebowitz - Redirect

1              MS. KAPLAN:  I think our pagination is wrong.  Do you
2    want me to read it out loud?
3              THE COURT:  Sure.
4              MS. KAPLAN:  Okay.  He says:  "Now, that opinion is
5    based on the accuracy and truthfulness of what Ms. Carroll told
6    you, correct?"
7              THE COURT:  If you give me one minute.
8              MS. KAPLAN:  I'm sorry, your Honor?
9              THE COURT:  No, it's not your problem, it's mine.  I
10   can do a key word search and catch up to you in a minute.
11             So in my transcript I'm at page 72, so go ahead.
12             MS. KAPLAN:  I'm going to start over, your Honor,
13   because I can't remember where I left off.
14   "Q  Now, that opinion is based on the accuracy and truthfulness
15   of what Ms. Carroll told you, correct?
16   "A  Yes.
17   "Q  Dr. Lebowitz, you are familiar with the term 'malingering'
18   in a forensic or psychological aspect?
19   "A  I am.
20   "Q  And what 'malingering' means is lying, correct?
21   "A  Yes.
22   "Q  That means lying about a symptom?  Yes?
23   "A  Yes.
24   "Q  Lying about a feeling?
25   "A  Yes.

N532Car3                    Lebowitz - Redirect

1   "Q  Lying about a cause?

2   "A  Sure.

3   "Q  And of course lying about an event, is that right?

4   "A  Yes.

5   "Q  Now, you understand that Ms. Carroll has a vested interest

6   in the outcome of this case, right?

7   "A  I'm not sure what you mean by 'vested,' but she certainly

8   cares very much about the outcome of the case, yes.

9           "That's what I meant.  You understand that."

10          THE COURT:  You've got to interpose the Q and the A if

11  you are going to read it.

12          MS. KAPLAN:  I'm sorry, your Honor.

13  BY MS. KAPLAN:

14  "Q  That's what I meant.  You understand that, right?

15  "A  Yes.

16  "Q  Okay.  Would be fair to say that she may have presented her

17  symptoms and experiences in a way that would benefit her case?

18  "A  I don't believe she did that.  Actually I think that she is

19  so adverse to being symptomatic and to be vulnerable that there

20  have been many times where she has actually presented herself

21  in ways that run exactly counter to, for example, my

22  conclusions that she was injured.

23  "Q  Based on your experience, though, in light of that

24  statement, you would agree that if someone falsely accuses

25  another of misconduct, it is conceivable that they may be

Case 23-793, Document 84, 11/20/2023, 3592071, Page99 of 300

A-2319

N532Car3                      Lebowitz - Redirect

1    hesitant to provide fabricated details relating to that

2    accusation?

3    "A  I'm not sure that I have.  I'm not sure that is within my

4    expertise."

5            And then I can go on.  He refers to just some

6    deposition testimony about that.

7            THE COURT:  Which you want to read or don't want to

8    read?

9            MS. KAPLAN:  I only see pieces at a time, your Honor.

10           THE COURT:  So is this the sum and substance of what

11   you are talking about?

12           MS. KAPLAN:  He also asked about malingering, test for

13   malingering, gets her to say she didn't conduct in another

14   section.

15           THE COURT:  Right.  Well, right, and she just said

16   that all over again.

17           MS. KAPLAN:  Correct.

18           THE COURT:  Okay.  Mr. Seigel.

19           MR. SEIGEL:  Your Honor, I didn't ask her for her

20   opinion as to whether or not Ms. Carroll was telling the truth

21   or if she believed her.  To the contrary.  I asked two

22   questions preceding that colloquy that was just put up

23   beginning with, "You are not offering an opinion in this case

24   on whether the alleged sexual assault in fact occurred,"

25   followed by, "You have no independent knowledge of whether that

N532Car3                    Lebowitz - Redirect

1    alleged sexual assault occurred or not."  This does not open

2    the door for her ultimate opinion.

3              THE COURT:  This is a much smaller problem, if it's a

4    problem at all, than meets everybody's eyes.  I quite agree

5    that it would not be appropriate for Dr. Lebowitz and

6    presumably any other expert——but I don't have to go there——to

7    give an opinion as to whether or not another witness in the

8    case had told the truth in court.  I think that's common ground

9    and at least it's my view and that's the law in this court.

10             Now, Mr. Seigel, with great respect, I certainly know

11   that you probably did not want to elicit an opinion -- let me

12   strike that and come back to the next point.

13             There is, at least arguably, a distinction between an

14   opinion as to whether a witness testified falsely in court and

15   whether a psychologist or other mental health professional

16   concluded that a witness in the course of an examination by the

17   mental health professional was malingering, that is,

18   exaggerating or lying to the mental health professional for

19   whatever reason.  It could be exaggeration, it could be

20   presenting an all-false account of what allegedly happened, but

21   that's concept number two.

22             Concept number three, you asked this question and got

23   this answer, Mr. Seigel:

24   "Q  Would it be fair to say that she may have presented her

25   symptoms and experiences in a way that would benefit her case?

N532Car3                      Lebowitz - Redirect

1    "A  I don't believe she did that."

2            The opinion, unless I am misinterpreting this, that

3    you are trying to prevent her from giving came out of her mouth

4    in response to your question this morning.  Am I mistaken?

5            MR. SEIGEL:  That's what she says in response to that

6    question, your Honor.

7            THE COURT:  Okay.  So what's the dispute?

8            MR. SEIGEL:  The dispute is, I am not asking her in

9    that question whether she formed a belief as to whether

10   Ms. Carroll was telling the truth about her accusation.

11           THE COURT:  Where and when?

12           MR. SEIGEL:  Whenever.

13           THE COURT:  Here or in exaggerating or misrepresenting

14   yourself to the doctor?  Not that I think it matters in this

15   case, by the way.

16           MR. SEIGEL:  It would be to the doctor, your Honor.

17           THE COURT:  Okay.

18           MR. SEIGEL:  And here.  It is just in general, your

19   Honor.  But I think would it be -- well, it is moving up the

20   screen.  But I don't ask her --

21           THE COURT:  The answer you don't want to hear you

22   already elicited, isn't that true?  And if it's not, why isn't

23   it?

24           MR. SEIGEL:  Your Honor, I am not asking whether or

25   not this witness was in fact malingering or lying.  I'm just

N532Car3                         Lebowitz - Redirect

1    asking if she may have done that.  That's it.  May have

2    presented her symptoms and experiences in a way, not that this

3    happened or didn't happen.

4              THE COURT:  Well, you know, "may have" is -- well, I'm

5    going to try to suppress my inherent bent toward irony.

6              You said, "Would it be fair to say she may have

7    presented her symptoms and experiences in a way that would

8    benefit her?"  She didn't say no.  She may not have done that

9    in the sense of, no, she most certainly didn't do that or it's

10   certainly impossible that she did that.  She said "I don't

11   believe she did that."

12             You said:  "Might she have done it?"

13             She said:  "I don't think she did it."

14             Isn't that the import of what that testimony is?

15             MR. SEIGEL:  Her answer is not responsive to the

16   question.

17             THE COURT:  Ah, but that objection wasn't made and no

18   motion to strike it was made.  And if we took out all the

19   unresponsive answers in this record, it would be a lot shorter

20   all around, like in every trial, by the way.

21             MR. SEIGEL:  Nor am I asking her here for her opinion

22   on the ultimate conclusion.

23             THE COURT:  Well, what do you think this was?  "I

24   don't believe she did that."  That's not her opinion?

25             MR. SEIGEL:  No, exaggeration of --

Case 23-793, Document 84, 11/20/2023, 3592071, Page103 of 300

A-2323

N532Car3                    Lebowitz - Redirect

 1          THE COURT:  She didn't say:  I don't believe that is

 2   engraved on the tablets that came down with Moses.  She didn't

 3   say that.

 4          MR. SEIGEL:  Did she believe she exaggerated her

 5   symptoms, not whether or not this event occurred, whether or

 6   not there was an alleged rape.  She doesn't speak to that here.

 7          THE COURT:  Do you think "experiences" might cover the

 8   alleged rape?

 9          MR. SEIGEL:  Not on the ultimate issue in this case,

10   your Honor, no.

11          THE COURT:  Nobody has asked her that.

12          MR. SEIGEL:  Right.

13          THE COURT:  Except you.  Well, maybe you didn't

14   either.

15          MR. SEIGEL:  I did not.

16          THE COURT:  But you got the answer.

17          MR. SEIGEL:  No, I did not there.

18          THE COURT:  But this is a tempest in a teapot.  The

19   record is what the record is, and that's what it's going to be.

20          MR. SEIGEL:  Your Honor, this is experiences which

21   could be, as well, post the allegations.  I'm not talking about

22   the alleged rape here.  On this record --

23          THE COURT:  Mr. Seigel, with all due respect, the

24   issue here is not what you were talking about.  The issue is

25   that the answer you are now objecting to prospectively is in

1   this record now and I hear no basis for it going away.

2          MR. SEIGEL:  Your Honor, when you are dealing with the

3   fundamental issue as to whether or not an expert can opine on

4   the ultimate issue in the case, I think the record with respect

5   to opening the door would have to be greater than a general

6   conclusory statement.

7          THE COURT:  Mr. Seigel, with all due respect, we are

8   not talking about opening the door.  I know that's what

9   Ms. Carroll said at the sidebar.  The problem with it is that

10  the door has opened and closed and the horse is out of the

11  barn.  That's the problem.

12         MR. SEIGEL:  Your Honor, "I don't believe she did

13  that" refers, based on that question and answer, that to

14  whether or not she presented her symptoms and some general

15  conclusory reference to experiences.

16         THE COURT:  Like how she liked the baseball game.

17         MR. SEIGEL:  Your Honor, experiences how she would be

18  potentially post --

19         THE COURT:  I'm not going to argue this with you

20  further because we have reached the point of diminishing

21  returns.  The issue before me and the reason the jury is in the

22  other room while we are having this discussion has to do with

23  the fact that counsel asked if Dr. Lebowitz had an opinion, if

24  my memory serves, on the subject of whether Ms. Carroll was

25  malingering.  Do I remember the question?  And she said she had

Case 23-793, Document 84, 11/20/2023, 3592071, Page105 of 300

A-2325

N532Car3                    Lebowitz - Redirect

1   an opinion, right?  Do we all agree that's what happened?  Or

2   do I have to get it out of the transcript?

3              MR. SEIGEL:  Your Honor, to the contrary, she actually

4   said. . .

5              (Counsel confer)

6              MR. TACOPINA:  I think you are right, your Honor.

7              THE COURT:  Yes.  Thank you, Mr. Tacopina, and we are

8   both right, you and I, because --

9              MR. TACOPINA:  Even a broken clock works twice a day.

10             THE COURT:  Exactly so.  Or as I read somewhere last

11  night, even a blind squirrel finds an acorn once in a while.

12             MR. TACOPINA:  Oh, you read that.

13             THE COURT:  I did read that last night.

14             MR. TACOPINA:  We will see about that.

15             THE COURT:  We will see about that.

16             MR. TACOPINA:  Sure will.

17             THE COURT:  Okay.  But that was the question.  She

18  said:  I do.  You, Mr. Seigel, objected.  There was no pending

19  question, of course, but you objected, and we do that all the

20  time.  Lawyers do that all the time.  They object

21  prospectively.  So when we got to the sidebar I said, You are

22  really objecting to the next question, aren't you?  And you

23  said yes, and we had a discussion at the sidebar.  And

24  Ms. Carroll said, You opened the door, Mr. Seigel, right?

25             MR. SEIGEL:  Yes.

Case 23-793, Document 84, 11/20/2023, 3592071, Page106 of 300

N532Car3                    Lebowitz - Redirect

1          THE COURT:  And I have now looked at the transcript
2     and she has read some of it back, and I am saying it doesn't
3     matter whether you opened the door, the answer is already in
4     the record for whatever it means.  What it means is a matter
5     for argument, and you win, Mr. Seigel.  The next question will
6     not be asked or answered.
7          MR. SEIGEL:  I learned to remain quiet when I won.
8          MR. TACOPINA:  It didn't feel like a win.  I would say
9     it didn't feel like a win.
10         THE COURT:  You know, it doesn't quite fit here, but
11    the first lead lawyer in a case I tried, I hate to tell you how
12    many decades ago, once said to me that when the judge has ruled
13    your way, it's time to be quiet and get out of the courtroom.
14         Now, I realize you are not so happy with the ruling,
15    but there it is.
16         Okay.  Let's get the jury back.
17         MS. KAPLAN:  Thank you, your Honor.
18         THE COURT:  Somebody should tell Dr. Lebowitz.
19         MS. KAPLAN:  Oh, yes.
20         (Continued on next page)
21
22
23
24
25

Case 23-793, Document 84, 11/20/2023, 3592071, Page107 of 300

A-2327

N532Car3                       Lebowitz - Cross

1            (Jury and witness present).

2            THE COURT:  Thanks, folks.

3            Ms. Carroll, you may proceed.

4            MS. KAPLAN:  No further questions, Dr. Lebowitz.

5            THE COURT:  All right.  Any recross?

6            MR. SEIGEL:  Yes, your Honor.

7    RECROSS EXAMINATION

8    BY MR. SEIGEL:

9    Q.  Dr. Lebowitz, you testified on redirect about asking

10   Ms. Carroll open-ended questions about what happened and how it

11   affected her life, correct?

12   A.  Yes.

13   Q.  Okay.  You have no independent knowledge of whether this

14   alleged sexual assault occurred or not, correct?

15   A.  That's correct.

16   Q.  And your opinion in this case is based upon the accuracy

17   and truth of what Ms. Carroll told you.  Yes?

18   A.  Yes, in the context of what I know about psychology and

19   trauma, yes.

20           MR. SEIGEL:  Thank you very much.  Nothing further.

21           THE COURT:  Thank you.

22           Anything else, Ms. Carroll?

23           MS. KAPLAN:  Nothing, your Honor.

24           THE COURT:  Thank you, Dr. Lebowitz.  You are excused.

25           (Witness excused)

Case 23-793, Document 84, 11/20/2023, 3592071, Page108 of 300

A-2328

N532Car3                          C. Carroll – Direct

 1              THE COURT:  Next witness.

 2              MR. CRAIG:  Plaintiff calls Cande Carroll.

 3     CANDE CARROLL,

 4          called as a witness by the plaintiff,

 5          having been duly sworn, testified as follows:

 6              THE COURT:  You may proceed, counselor.

 7     DIRECT EXAMINATION

 8     BY MR. CRAIG:

 9     Q.  Good afternoon, Ms. Carroll.

10              Ms. Carroll, are you related to E. Jean Carroll?

11     A.  Yes.  We are sisters.

12     Q.  Are you older or younger?

13     A.  I'm younger, four years.

14     Q.  And are you currently employed?

15     A.  I am retired.

16     Q.  Where do you live?

17     A.  Most of the year I live in Cocoa Beach, Florida, and a few

18     months of the year, maybe four, four and a half months, I live

19     in Denville, New Jersey.

20     Q.  Do you have any children?

21     A.  I do.  I have one son.

22     Q.  And where does he live?

23     A.  He lives in Denville, New Jersey, with his family.

24     Q.  And do you have any grandchildren?

25     A.  I do.

N532Car3                         C. Carroll - Direct

1    Q.  How many?

2    A.  There is one living there.  He is eight years old.

3    Q.  And where did you grow up, Ms. Carroll?

4    A.  I grew up, my first five years in Huntertown, Indiana, and

5    then the rest of my childhood and teen years were in

6    Fort Wayne, Indiana.

7    Q.  Did you live with your parents?

8    A.  I did.

9    Q.  And who were your parents?

10   A.  My mother was Betty McKinney.  My father was Thomas F.

11   Carroll, Jr.

12   Q.  In addition to E. Jean, do you have other siblings?

13   A.  I do.  I have a younger sister Barbara, six years younger;

14   and ten years younger than Barbara is Thomas Carroll.

15   Q.  And did you grow up with your siblings?

16   A.  I did.

17   Q.  And so you fall second in the birth order?

18   A.  Yes.

19   Q.  And what was your father's profession?

20   A.  He owned furniture stores in Fort Wayne.

21   Q.  What was your mother's profession?

22   A.  She was a homemaker, and after my sister Barbara was well

23   into elementary school, she worked at the Allen County public

24   library.

25   Q.  And are your parents still living?

N532Car3                         C. Carroll - Direct

1    A.  They are not.

2    Q.  How would you describe your relationship with your parents

3    growing up?

4    A.  It was a loving family.

5    Q.  Did you consider your relationship to be open?

6    A.  No, not particularly.

7    Q.  And what do you mean by not particularly?

8    A.  We didn't talk about personal things much.

9    Q.  How often, if ever, would you talk about issues in romantic

10   relationships?

11   A.  Never.

12   Q.  Talk to them about issues in your dating life?

13   A.  No.

14   Q.  Are there any sorts of negative experiences you would share

15   with them?

16   A.  Not exactly that I would share with them.

17   Q.  And what do you mean by not exactly that you would share

18   with them?

19   A.  Ask me that again.

20   Q.  What do you mean by not exactly that you would share with

21   them?

22   A.  I wouldn't have brought anything to their attention.

23   Q.  Do you mean that sometimes they would become aware of

24   negative experiences?

25   A.  Yes.

Case 23-793, Document 84, 11/20/2023, 3592071, Page111 of 300

N535car4                        C. Carroll - Direct

1   Q.  Can you give us an example of what you mean by that?

2   A.  I would say they were fairly protective and I had a

3   negative experience when I was -- it was probably fall of my

4   senior year in high school.

5   Q.  And what was that negative experience?

6            MR. BRANDT:  Your Honor, objection.  Relevance.

7            THE COURT:  Mr. Craig.

8            MR. CRAIG:  I believe it will give some context in

9   this sort of short line of questioning about her family, your

10  Honor.

11           MR. BRANDT:  Again, your Honor, I think the experience

12  of the witness has been related to the issue here.

13           THE COURT:  Certainly on the present record,

14  sustained.  You can.  Try to lay a foundation.

15  BY MR. CRAIG:

16  Q.  Ms. Carroll, when did you speak with -- did you speak with

17  your parents about negative experiences?

18  A.  Rarely, if ever.

19  Q.  And why is that?

20  A.  I was private.

21  Q.  And how would you describe your family environment when it

22  came to sharing negative things?

23  A.  We were private.  We were private.

24           (Continued on next page)

25  BY MR. CRAIG:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page112 of 300

A-2332

N535car4                         C. Carroll - Direct

1   Q.  And how, if at all, did your parents teach you to be

2   private about negative things?

3   A.  They didn't really teach me.  I would say probably just by

4   example.

5   Q.  And how, if at all, did your parents teach you to portray

6   yourself publicly?

7   A.  Oh.  Always with a positive attitude.

8   Q.  And how would your parents communicate that message?

9   A.  If we were -- if I was on my way out the door for maybe a

10  challenge at school, or a contest of some kind, or a speech, my

11  dad would always say "smile."

12  Q.  And how often would your dad say that?

13  A.  Many days a week.

14  Q.  And what about your mother?  Would she say that as well?

15  A.  She didn't necessarily say that but she was behind it all

16  the way.

17  Q.  When you were growing up in Indiana, were you and E. Jean

18  close?

19  A.  Not particularly.  We shared a room.

20  Q.  Did you speak at all about personal problems when you were

21  growing up?

22  A.  Never.

23  Q.  How did your relationship with E. Jean change as you got

24  older?

25  A.  When E. Jean graduated from high school, she took a job in

N535car4                        C. Carroll - Direct

1    Madison, Wisconsin, and so we were no longer sharing a room and

2    so from that time on we became close.

3    Q.  Did you speak about personal problems then when she moved

4    out of the house?

5    A.  No.

6    Q.  Now, I want to direct your attention to the early 1990s.

7    At that time how much did you speak with your sister E. Jean?

8    A.  Most days.

9    Q.  What accounts for that change?

10   A.  We were working together, she was writing a biography of

11   Hunter S. Thompson and I was working with her doing research,

12   transcription.

13   Q.  And how long did you work with her on that book?

14   A.  Probably through 1993.

15   Q.  Did you continue working with her in any capacity after

16   that?

17   A.  I did.  I -- we created a website as a place to, where I

18   could curate her advice columns and articles she had written

19   for other publications.

20   Q.  Did you work with her on any additional projects?

21   A.  Other than -- other than specific articles which came one,

22   by one, by one, no, not until 2002.

23   Q.  And what happened in 2002?

24   A.  E. Jean came up with an idea for an online dating site and

25   I worked with her on that project.  We were partners.

N535car4                          C. Carroll - Direct

1   Q.  In this period in the early 1990s to the 2000s, did you

2   speak with E. Jean about personal problems?

3   A.  No.

4   Q.  Did you speak with her about difficult experiences in your

5   personal lives?

6   A.  Not really.  I had had a significant breakup with a

7   boyfriend in 2000 and I spoke with her about that.

8   Q.  And are you aware that your sister E. Jean has accused

9   Donald Trump of sexually assaulting her?

10  A.  Yes, I am aware of that.

11  Q.  And when did you learn about that?

12  A.  In 2019.

13  Q.  And how did you learn about her accusation?

14  A.  An excerpt from a book she was writing appeared in *New York*

15  magazine.  I believe it was *New York* magazine.

16  Q.  And how did you learn about that book excerpt?

17  A.  As I recall, she sent an e-mail to the entire family.  One

18  e-mail to the entire family with a link to the article.

19  Q.  After you received that link, did E. Jean ever explain to

20  you why she hadn't told you about the sexual assault

21  previously?

22  A.  I don't recall that she did.

23  Q.  Did you ever ask?

24  A.  I don't think I did.

25  Q.  Why not?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2335

N535car4                          C. Carroll - Cross

1   A.  It seemed to be explained in the article.  But I can't

2   remember specifically how.

3   Q.  Did it surprise you that E. Jean had not told you about the

4   sexual assault before?

5   A.  No.

6   Q.  Why not?

7   A.  She just wouldn't have.  We didn't talk about those things.

8   Q.  And, in 2019, how would you describe your relationship with

9   E. Jean?

10  A.  It was close.

11  Q.  Were you surprised that you learned about E. Jean's

12  accusation against Donald Trump via e-mail?

13  A.  No.

14          No further questions, your Honor.

15          THE COURT:  Thank you.  Cross-examination.

16          MR. BRANDT:  Thank you, your Honor.

17          THE COURT:  Thank you, Mr. Brandt.

18  CROSS EXAMINATION

19  BY MR. BRANDT:

20  Q.  Ms. Carroll, W. Perry Brandt.  I just have a few questions

21  you following up on the prior questioning.

22          So, E. Jean Carroll is your older sister by four

23  years; is that correct?

24  A.  Yes, that's correct.

25  Q.  And you grew up together, correct?

Case 23-793, Document 84, 11/20/2023, 3592071, Page116 of 300

N535car4                    C. Carroll - Cross

1    A.  Correct.

2    Q.  And I think you said this on your direct examination but

3    correct me if I am wrong, you actually shared a bedroom with

4    her?

5    A.  We did.

6    Q.  And for how many years did you share a bedroom?

7    A.  From my birth until 1961, approximately.

8    Q.  So I'm guessing about 14, 15 years, give or take?

9    A.  Yes.

10   Q.  So you actually shared a bedroom with E. Jean Carroll for

11   14-15 years, give or take?

12   A.  I believe so.

13   Q.  And then I think you said she moved away?

14   A.  Yes.

15   Q.  She moved away.  But I think you also said that after you

16   both were adults you continued to stay in touch; correct?

17   A.  Yes.

18   Q.  And your relationship was close; correct?

19   A.  Yes.

20   Q.  And I think you said in the 1990s you were in almost daily

21   contact with her; correct?

22   A.  Yes.

23   Q.  And you did this book, worked on a book with her I think

24   you said?

25   A.  I did research and transcriptions for her on that book.

N535car4                    C. Carroll - Cross

1   Q.  And I think you said going forward, in about 2002, you and

2   she founded the greatboyfriends.com website?

3   A.  Yes.  That's right.  I don't think I said greatboyfriends,

4   but that was the name of it, yes.

5   Q.  But anyway, to make a long story short, during the 1990s

6   you were in close contact with her, correct?

7   A.  Yes.

8   Q.  And you had a close personal relationship, correct?

9   A.  Yes.

10  Q.  And I think you said you talked almost daily, correct?

11  A.  Most days.

12  Q.  And the first you ever heard about any alleged sexual

13  assault on your sister by Donald Trump wasn't until 2019?

14  A.  I believe so, yes.

15  Q.  That's the first you ever heard and you heard by e-mail?

16  A.  The e-mail was a link to the article.

17  Q.  OK.  And that's the first you had ever been told by your

18  sister, over all those years since the 1990s; correct?

19          MR. CRAIG:  Objection.  Asked and answered?

20          THE COURT:  I think so.  Sustained.

21          MR. BRANDT:  Thank you.

22          Thank you very much.

23          THE COURT:  Any further examination?

24          MR. CRAIG:  Nothing further, your Honor.

25          THE COURT:  Thank you, Ms. Carroll.  You are excused.

Case 23-793, Document 84, 11/20/2023, 3592071, Page118 of 300

N535car4

1              THE WITNESS:  Thank you.

2              (Witness excused)

3              THE COURT:  Who is the next witness?

4              MR. FERRARA:  Plaintiff calls Natasha Stoynoff.

5              THE COURT:  The direct you estimate is how long?

6              MR. FERRARA:  30 to 40 minutes.

7              THE COURT:  Let's take our break here.

8              (Recess)

9              THE COURT:  Let's get the jury, please.

10             MR. TACOPINA:  Your Honor, we are at the point where

11    we have an issue that we fronted. I know you don't prefer

12    fronted.  We advanced to the Court --

13             THE COURT:  Well, I am perfectly neutral about the

14    word.  I just never used it that way.

15             MR. TACOPINA:  We had advanced to the Court

16    previously, Mr. Ferrara and I, it is about the issue of that

17    the Billy Bush tape being played twice.  So while we are not

18    contesting authenticity, seriously or otherwise, it is going to

19    be played in the deposition -- designated deposition testimony

20    that is coming in this afternoon.  I don't think it should be

21    played twice because this witness is going to testify that she

22    saw it and heard it but it is going to be played -- the next

23    witness is basically depositions, it is going to be played

24    there.

25             THE COURT:  Do you have something to say about this,

N535car4

1    Mr. Ferrara?

2            MR. FERRARA:  It depends on whether your Honor is

3    inclined to -- your Honor, in other words -- yes, your Honor.

4    I think it is perfectly appropriate for us to play it.  We have

5    seen defense put multiple pieces of evidence in front of

6    different witnesses.  We haven't objected.  It is appropriate.

7    There are two things we want the jury to do while they watch

8    the video two different times and we think the evidence comes

9    in differently.  It is part of Ms. Stoynoff's story that she is

10   going to explain, it is part of the steps she took in her life,

11   and then it is also something that we showed to Mr. Trump in

12   his deposition and we would like the jury to see his reaction

13   to it at that time as well.

14           THE COURT:  Look.  I understand the point, but the

15   fact of the matter is that there has been so much repetition in

16   this trial.  And it's, in effect, relevant for two different

17   reasons.  How long is it?

18           MR. FERRARA:  A minute and 57 seconds.

19           THE COURT:  I think we can all tolerate a minute and

20   57 seconds.

21           Bring the jury in, please.

22           What is our best time estimate on this witness?

23           MR. FERRARA:  I have about maybe 35 or 40 minutes.

24           MR. TACOPINA:  20.

25           THE COURT:  Thank you.

Case 23-793, Document 84, 11/20/2023, 3592071, Page120 of 300

A-2340

N535car4

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-2341

N535car4                          Stevens - Direct

1          (Jury present)

2          THE COURT:  Call your next witness, Mr. Ferrara.

3          MR. FERRARA:  Plaintiff calls Natasha Stoynoff to the

4    stand.

5          THE DEPUTY CLERK:  Please rise and raise your right

6    hand.

7    NANCY STEVENS,

8        called as a witness by the Plaintiff,

9        having been duly sworn, testified as follows:

10         THE DEPUTY CLERK:  Please be seated, and if you could

11   please state your name and spell your first and last names for

12   the record.

13         THE WITNESS:  Nancy Stevens.  N-A-N-C-Y S-T-E-V-E-N-S.

14   DIRECT EXAMINATION

15   BY MR. FERRARA:

16   Q.  So, good afternoon.  Let's clear up some confusion right

17   off the bat.  Do you go by any other names?

18   A.  Yes.  I also go by Natasha Stoynoff.

19   Q.  Why is that?

20   A.  Because that is my professional name.  It is my family's

21   original name.  And I started using it professionally and

22   always meant to legally change it but just never got around to

23   it.

24   Q.  Is that the name you prefer?

25   A.  I prefer it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N535car4                         Stevens - Direct

1   Q.  So I will call you Ms. Stoynoff.

2            Where do you live?

3   A.  I live in Canada right now.

4   Q.  What do you to for a living?

5   A.  I'm an author and freelance journalist.

6   Q.  Just briefly, could you describe some of your recent

7   projects?

8   A.  Yes.  I have written.  I just finished my 16th book,

9   they're usually memoirs.  Some of them are celebrity memoirs.

10  I am also a freelance magazine journalist.  I do feature

11  stories and cover stories, usually with actors and musicians.

12  And, I am currently working on two TV pilots.

13  Q.  I want to call your attention to the year 1992.  Where did

14  you work at that time?

15  A.  I was living in Toronto then and I was working for the

16  Toronto Sun, I had a column, and I also started freelancing for

17  *People* magazine there.

18  Q.  At some point did you leave Toronto as part of your work

19  with People?

20  A.  Yes.  I moved to New York in summer of '97.

21  Q.  What was your role at *People* at that time, 1997?

22  A.  I was on-contract for a year at the magazine and I did a

23  combination of entertainment stories and human interest

24  stories.  I was a reporter.

25  Q.  What does it mean to be on-contract?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N535car4                              Stevens - Direct

1    A.  It's -- it is like a step below being on-staff somewhere.

2              So, I think contracts are for a certain amount of

3    time.  You can have a six-month contract.  I had a year

4    contract.  Almost like a work-for-hire situation.

5    Q.  And so then, on-staff is like being a full-time employee?

6    A.  Yes.

7    Q.  Did there come a point where you were on-staff at *People*

8    magazine?

9    A.  Yes.

10   Q.  When was that?

11   A.  The summer of 1998 I went on full-staff.

12   Q.  How long did you work on full-staff for *People* magazine, or

13   until what year?

14   A.  Until the end of 2009.

15   Q.  Can you give us a sense of what you worked on during your

16   time at *People* magazine?

17   A.  Yes.  Mostly entertainment stories interviewing actors and

18   musicians, and of course news stories as well, and human

19   interest.  But mostly entertainment.

20   Q.  Are you familiar with the term "beat"?  B-E-A-T.

21   A.  Yes, I am.

22   Q.  What does that mean in your profession?

23   A.  At the magazine, reporters are given what we call beats,

24   which means that we concentrate on a certain actor or TV show

25   so that we are the ones who do those interviews over and over.

1   For example, one of my beats was the *Sex and The City*

2   television show, so when we had to interview the actors or

3   director or anything related to the show, I was often -- I was

4   one of the main ones to do those interviews.  And this is a way

5   to build rapport with the celebrities and with their publicists

6   and so everyone is familiar with each other and feel

7   comfortable with each other.

8   Q.  Were you ever on a beat involving Donald Trump?

9   A.  Yes.

10  Q.  When were you on -- what beat was that?

11  A.  The Trump beat.  I was on the Trump beat.

12  Q.  Do you recall what years you were on that beat?

13  A.  Yes.  It probably started, I think *The Apprentice* began in

14  2004, so it might have started around then.  2003, 2004.

15  Q.  What kind of stories would you cover involving Mr. Trump?

16  A.  I did an *Apprentice* cover.  I did a story on his wedding to

17  Melania, I went down to Mar-a-Lago, his home in Florida for

18  that, and all sorts of anything in between.  I also did other

19  Trump-related stories.  I did a story on Ivana's wedding -- I

20  can't remember who her husband was -- and I believe I did a

21  story on Melania for something, I just can't remember what it

22  was either.

23  Q.  When you reported on those stories, what sorts of

24  interactions would you have with Mr. Trump?

25  A.  Well, I would be interviewing him on the phone, in-person,

Case 23-793, Document 84, 11/20/2023, 3592071, Page125 of 300

N535car4                          Stevens - Direct

1   often at his home on Fifth Avenue, at his home in Mar-a-Lago,

2   sometimes at events, sometimes on the set of *The Apprentice*.

3   Q.  Let me call your attention to the sort of end of 2005, late

4   December 2005.  Did you have occasion to cover a story

5   involving Mr. Trump and his family at that time?

6   A.  Yes, I did.

7   Q.  What story was that?

8   A.  This was a story that we were working on about his -- first

9   year anniversary and the arrival of their baby Barron.

10  Q.  Do you want to take a moment?

11  A.  I'm all right.

12  Q.  Sorry.  To whom was Mr. Trump married then?

13  A.  He was married to Melania.

14  Q.  I want to show you what's been marked for identification as

15  Plaintiff's Exhibit 9.  Do you recognize this?

16  A.  Yes.

17              (Continued on next page)

18

19

20

21

22

23

24

25

Case 23-793, Document 84, 11/20/2023, 3592071, Page126 of 300

A-2346

N532Car5                         Stevens - Direct

1   Q.  What is it?

2   A.  This is a story I reported when I went down to Mar-a-Lago

3   at the end of 2005.

4              MR. FERRARA:  Plaintiff offers 9, your Honor.

5              MR. TACOPINA:  No objection.

6              THE COURT:  Received.

7              (Plaintiff's Exhibit 9 received in evidence)

8   BY MR. FERRARA:

9   Q.  Mr. Lam, we could show this to the jury, please.  Thank

10  you.

11             And so this photo that we are looking at sort of on

12  the right side of the screen, was that taken at Mar-a-Lago?

13  A.  Yes.

14  Q.  We can take that down, Mr. Lam.  Thank you.

15             Do you recall when that was published?

16  A.  Yes, sometime in January 2006.

17  Q.  Did you -- how does it work?  Did you write this article?

18  A.  For that article, I reported it and I believe there was

19  another writer who wrote it.  So that means I went down and

20  interviewed everybody, wrote it all out, sent it to the

21  magazine, and then there was another staff writer who kind of

22  put it together.  His name is on there as well.

23  Q.  Let me also show you what's been marked for identification

24  as Plaintiff's Exhibit 17.  Do you recognize this?

25  A.  Yes.

N532Car5                          Stevens - Direct

1    Q.  What is it?

2    A.  This is a group photo that was taken when I was down at

3    Mar-a-Lago doing all the interviews for that anniversary story

4    I mentioned.

5              MR. FERRARA:  Plaintiff offers 17.

6              MR. TACOPINA:  No objection.

7              THE COURT:  Received.

8              (Plaintiff's Exhibit 17 received in evidence)

9    BY MR. FERRARA:

10   Q.  Let's just take a look quickly here.  If we sort of look,

11   the second person from the left, as we look at the photo, who

12   is that?

13   A.  That's me.

14   Q.  Who is to your left in the photo, to our right?

15   A.  Donald Trump.

16   Q.  And sort of in front of him in the gold?

17   A.  His wife Melania.

18   Q.  Who were the other folks in the photo?

19   A.  Someone -- there is a photographer, and someone there is

20   the makeup artist, and I'm not sure who the other three are.

21   They were part of the crew somehow, with makeup, hair, or

22   photos.

23   Q.  Do you recall when this photo was taken?

24   A.  It was taken the day I was there doing interviews, December

25   27th, 2005.

N532Car5                         Stevens - Direct

1    Q.  We can take that down.  Thank you, sir.

2              What was your itinerary for this trip to Mar-a-Lago?

3    A.  I arrived the evening of the 26th, checked into a hotel,

4    and then I was there for most of the day at Mar-a-Lago on the

5    27th, and then I left the next day.

6    Q.  So how does it work when you are conducting interviews in a

7    setting like this?  Are they prescheduled or is it sort of grab

8    folks as they are available?  How did it work during that sort

9    of that day you were there?

10   A.  In this instance, when you are doing the photo shoot at the

11   same time as trying to interview people, you try to sort of

12   work together, and I would try to grab whoever I could

13   interview, whether it is Donald or Melania, in between photo

14   shoots.  So sort of ten minutes here, 15 minutes there, grab

15   one, grab another, and at the end of the day the point was to

16   have them together to have a little bit of banter between

17   husband and wife.

18   Q.  So at some point did you interview Mr. Trump that day?

19   A.  Yes, several times.

20   Q.  And at another point did you interview Mr. Trump and

21   Mrs. Trump together?

22   A.  Yes.

23   Q.  Was there a break in between those interviews?

24   A.  Yes, there was.

25   Q.  What happened during that break?

Case 23-793, Document 84, 11/20/2023, 3592071, Page129 of 300

N532Car5                      Stevens - Direct

1   A.  When we were preparing to -- when I was preparing to
2   interview them together, Melania had just finished a photo
3   shoot by the pool and she was going to go upstairs and change
4   and get ready for the next photo shoot, and so we were on a
5   little bit of a break, and Donald said, I would like to have
6   you seen this really great room, this painting in this really
7   great room.  There is this really great room we've got.  Have
8   you seen it?  I can't remember his exact words, something like
9   that.  And I said, No, I haven't.  And -- so he led the way to
10  show me this room.
11  Q.  So let me ask you a question just to back up really
12  quickly.  So where were you conducting the interview of this
13  sort of one-on-one interview of Mr. Trump?  Where were you
14  conducting that?
15  A.  So while she was doing the photo shoot by the pool, we were
16  all in the backyard.  She is by the pool doing the photo shoot,
17  and we are sitting in a little area closer to the back doors
18  that has couches and tables and that's where I'm -- I was
19  talking to him.
20  Q.  How many people were around at that point?
21  A.  Well, all the people in that photo you showed and probably
22  lots of staff going in and out, so I guess in total maybe 20
23  people were sort of back and forth.
24  Q.  So where did you go with Mr. Trump after he said, I want to
25  show you this room?

Case 23-793, Document 84, 11/20/2023, 3592071, Page130 of 300

A-2350

N532Car5                         Stevens - Direct

1   A.  So we -- I followed him, and we went in through these back

2   doors and down a hall, as I recall it, and turned right into a

3   room.

4   Q.  Who was with you at that point?

5   A.  As I recall, just he and I.

6   Q.  So what happened next?

7   A.  So we -- we walked into a room, and I'm looking in this

8   room, and I went in first and I'm looking around, I'm thinking,

9   wow, really nice room, wonder what he wants to show me, and

10  he -- I hear the door shut behind me.  And by the time I turn

11  around, he has his hands on my shoulders and he pushes me

12  against the wall and starts kissing me, holding me against the

13  wall.

14  Q.  Was anyone else in the room at this time?

15  A.  Nobody else.

16  Q.  What did you -- how did you react?

17  A.  I started -- I tried to push him away.

18  Q.  Had you -- had anything been said up until that point when

19  you walked into the room?  Did he say anything or did you say

20  anything?

21  A.  No, not that I recall.

22  Q.  Did you say anything to invite that conduct?

23  A.  No.

24  Q.  So what -- I think you said you tried to shove him away.

25  What happened?

N532Car5                        Stevens - Direct

1   A.  He came toward me again, and I tried to shove him again.

2   Q.  What was he doing sort of -- what was he doing with, let's

3   say, the rest of his face or body?

4   A.  Well, he was kissing me and, you know, he was against me

5   and just holding my shoulders back.

6   Q.  Did you -- what, if anything, did you say while this was

7   happening?

8   A.  I didn't say words.  I couldn't.  I tried.  I mean, I was

9   just flustered and sort of shocked and I -- no words came out

10  of me.  I tried, though.  I remember just sort of mumbling.

11  Q.  Did you tell him to stop?

12  A.  I couldn't say the words.

13  Q.  Did you scream?

14  A.  No.

15  Q.  How long -- do you recall how long that went on for?

16  A.  A few minutes.

17  Q.  How did it end?

18  A.  A butler came into the room.

19  Q.  Sorry?  You said the butler, was that the person -- was

20  that the person's actual title or is that --

21  A.  That was his title.  The butler or head butler was my

22  contact for the day.  So when I went there in the morning, he

23  is the person I called.  He is the person who took me around.

24  He is the person who sort of was coordinating things for me

25  while I was there.

N532Car5                          Stevens - Direct

1   Q.   What did the butler do?

2   A.   Came to tell us that Melania was finished changing, it was

3   time to go back to the couch area and resume the interviews.

4   Q.   How did Mr. Trump react when the butler came in?

5   A.   He stopped doing what he was doing.

6   Q.   Were you able to perceive whether the butler saw what had

7   been happening?

8   A.   I don't know if he saw, but to my mind, I gave him a kind

9   of a "get me out of here" look, and I felt like he understood.

10  Q.   So what happened, what happened next?

11  A.   The butler led us back to the couch area, and Melania was

12  on her way, and Trump said a few things to me.

13  Q.   What did he say to you?

14  A.   He said, Oh, you know we are going to have an affair, don't

15  you?  You know, don't forget what -- don't forget what Marla

16  said, best sex she ever had.  We are going to go for steak, we

17  are going to go to Peter Luger's.  We're going to have an

18  affair.

19  Q.   What was the reference to Marla?  What was that?

20  A.   Marla Maples, his second wife, was quoted on the cover of

21  the *Daily News* or the *New York Post*, I think, as saying that

22  Donald Trump was the best sex she ever had.

23  Q.   What did you say in response to any of this?

24  A.   I had trouble speaking.  I was so shocked and flustered at

25  what had just transpired and what was transpiring that, like, I

Case 23-793, Document 84, 11/20/2023, 3592071, Page133 of 300

1   couldn't get words out.  I was just like choked up.  I couldn't

2   answer him.

3   Q.  At some point did Marla return -- sorry, pardon me, at some

4   point did Melania return?

5   A.  Yes.

6   Q.  And what happened at that point?

7   A.  So they -- she sat down next to him and then he suddenly

8   was very doting on her, and I was to continue the interview,

9   which I did.

10  Q.  How were you able to continue the interview after what had

11  just happened?

12  A.  Well, it was not easy, but I had my questions with me.  I

13  sort of went on autopilot, and I just knew I had to go back

14  with my work done.  So I really went on kind of an autopilot

15  thing.

16  Q.  What happened after the interview?

17  A.  I was there for a little longer, probably observing the

18  next photo shoot, and then I went back to my hotel.

19  Q.  Had -- let me do this.  Mr. Lam, if we could go back to

20  Plaintiff's Exhibit 17.

21          This is the photo of you all.  Ms. Stoynoff, do you

22  know whether this photo was taken before or after Mr. Trump

23  assaulted you?

24  A.  I don't recall.

25  Q.  Are you smiling in this photo?

N532Car5                        Stevens - Direct

1    A.  Yes.

2    Q.  Do you think you could have been smiling standing next to

3    Mr. Trump had it been taken after the assault?

4    A.  Yes, I do, because I was trying to pretend that nothing had

5    happened.

6    Q.  Were you able to do that?

7    A.  I tried.  I'm not sure if it worked.  But I was trying my

8    best.

9    Q.  Thank you, Mr. Lam, we can take that down.

10          Before this incident, how many times had you

11   personally interviewed Mr. Trump?

12   A.  I would say eight, nine, ten times, something like that.

13   Q.  Had he ever tried anything like this before?

14   A.  Never.

15   Q.  Had he ever been inappropriate before?

16   A.  No, just asking me out for dinner, that sort of thing, but

17   nothing physical.

18   Q.  What was different about this occasion?

19   A.  It was the first and only time I had ever been in a room

20   alone with him.

21   Q.  That night, the night he assaulted you, did you tell anyone

22   about what had happened?

23   A.  Yes.

24   Q.  Who did you tell?

25   A.  I spoke to my journalism professor, my former journalism

Case 23-793, Document 84, 11/20/2023, 3592071, Page135 of 300

N532Car5                          Stevens - Direct

1    professor, and I told him and that night or in the morning I

2    spoke to one of my dearest friends, a film producer in

3    Los Angeles, Marina.

4    Q.  What about when you returned to New York?  Did you tell

5    anyone?

6    A.  Yes.  As soon as I went to the office, as soon as I got to

7    the office, I told my next superior up what had happened.

8    Q.  Did you tell the -- so and you are talking about your next

9    superior up at *People* magazine?

10   A.  Yes.

11   Q.  Did you tell, let's say, like, the executives, let's say,

12   the folks who run *People* magazine?  Did you tell them what had

13   happened?

14   A.  I didn't tell anyone higher than my next superior, who was

15   my dearest friend, as well.

16   Q.  Why didn't you tell anyone higher than your next sort of

17   one level up?

18   A.  I told other colleagues, but no one higher, because I was

19   ashamed and humiliated to what had happened.  I went through

20   the whole thing about what did I do?  And I was worried what

21   would happen if I told them.  I was worried that they would

22   kill the story and then Trump would try and get revenge on me

23   and try and destroy me.  And I was also worried that they would

24   be concerned about sending me out on other interviews; that,

25   you know, why -- and I didn't want to cause trouble.  I just

N532Car5                          Stevens - Direct

1    did not want to cause trouble for the magazine.

2    Q.  I want to ask you a couple of questions about the story,

3    but let me just -- I want to ask one other question about the

4    assault.  Before the butler came into the room, did Mr. Trump

5    do anything to you that suggested he was going to stop on his

6    own?

7    A.  No.

8    Q.  So let's talk about the story.  Did this one-year

9    anniversary story run as planned?

10   A.  Yes, it did.

11   Q.  How were you -- why did you allow that to happen given what

12   he had done?

13   A.  Well, the only way to stop him would have been to tell my

14   top editors, which is something I definitely did not want to

15   do.

16   Q.  How, if at all, did that encounter in the room, how if at

17   all did that appear in the story that ran?

18   A.  The encounter in the room did not appear in the story.

19   Q.  How, if at all, did your work at *People* magazine change

20   after Mr. Trump assaulted you?

21   A.  Well, the main reason I immediately went to my superior is

22   to tell her that I never wanted to interview Donald Trump again

23   and to take me off the Trump beat, and she did.

24   Q.  How, if at all, did the assault affect how you conduct

25   interviews going forward in your career?

N532Car5                          Stevens - Direct

1    A.  Well, I have to say that what happened -- how do I describe

2    this?  It really kind of had a profound effect on me.  It's

3    funny, even though something can last a few minutes, it can

4    really affect you.  And I think for me, professionally, I come

5    from Canada, Canadians are known to be very kind and nice

6    people, I believe.  And I think for a long time I was trying to

7    say to myself you are too nice, don't smile so much, don't be

8    so kind, don't -- I'm known as a very nice journalist, nice

9    reporter.  Like when I interview people, I try to make them

10   feel comfortable and have a nice conversation.  Other

11   journalists are often very more interrogating.  That's not my

12   style.  But I told myself that should be my style.  Maybe I

13   shouldn't be so nice.  Maybe just being a person smiling and

14   nice brought that on to me.  So that affected my interview

15   style for a while.

16   Q.  To be clear, Ms. Stoynoff, do you believe sitting here

17   today that you did anything to invite what Donald Trump did to

18   you that day?

19   A.  No.

20   Q.  Did you ever see Mr. Trump again?

21   A.  Yes.

22   Q.  Where?

23   A.  A few months later, I'm not sure the month, we had a mutual

24   friend, Oleg Cassini, the fashion designer, he had passed away,

25   and he had a memorial, and both Donald and I were speaking at

N532Car5                          Stevens - Direct

1    the memorial.  Oleg was a friend of mine.

2    Q.  Did you have any kind of private conversation or say

3    anything to Mr. Trump that day?

4    A.  Oh, no.  I stayed away from him.

5    Q.  What about members of his family?

6    A.  Yes.

7    Q.  What do you recall?

8    A.  A couple of months later, later that year, in 2006, I'm

9    estimating here, I was walking down the street by Trump Tower

10   in New York, and I was with a friend of mine who was visiting

11   from Toronto, and we were walking right by Trump Tower, and we

12   saw Melania come out with baby Barron from the residence.

13   Q.  Did the two of you chat?

14   A.  Yes.

15   Q.  What was said?

16   A.  I said, Melania.  She said, Natasha, why don't I see you

17   anymore?  Because they were used to me doing all the stories.

18   And then, of course, what happened was there was the baby

19   story, there was this story, there was that story and it wasn't

20   me.  So it was noticeable to her.  And we just chatted for a

21   little bit, and she introduced me to Barron, and that was

22   pretty much it.

23   Q.  Did you tell her the truth about why she didn't see you

24   anymore?

25   A.  No.

N532Car5                          Stevens - Direct

1    Q.  Do you recall what you said?

2    A.  Do -- I didn't --

3    Q.  Do you recall what you said in response to her question,

4    Why don't we see you anymore?

5    A.  Oh.  I don't recall exactly.  I probably just made up,

6    well, I miss you, something like that.  But I'm not exactly

7    sure.

8    Q.  I want to ask a few questions.  I want to ask you a few

9    questions about your politics, if that's okay, Ms. Stoynoff.

10           Would you describe yourself as a politically active

11   person?

12   A.  Not at all.

13   Q.  Are you registered with a political party in the

14   United States?

15   A.  I am not.

16   Q.  Do you vote in the United States?

17   A.  I think -- well, I became an American citizen in my mid

18   thirties, and I think I have only voted in maybe three

19   elections.

20   Q.  When you --

21   A.  Not that I didn't want to vote for more, but I just didn't.

22   Q.  Were those presidential elections or other elections?

23   A.  They were presidential elections.

24   Q.  Do you recall who you voted for?

25   A.  I recall twice for President Obama.  I can't remember what

N532Car5                          Stevens - Direct

1   the third election was.  I can't recall what it was, but I

2   think I did vote a third time.

3   Q.  Did you vote for Hillary Clinton when she ran against

4   Donald Trump?

5   A.  I did not.

6   Q.  Do you recall, have you ever voted for any conservative

7   candidates in Canada?

8   A.  Yes, I have.

9   Q.  Do you express your political views on Twitter at times?

10  A.  Well, I don't really know enough about American politics to

11  discuss them or express my political views.  I don't -- I

12  express more my feelings on the person.  I can't really discuss

13  policy well, I'm sorry to say.

14  Q.  Let me ask you a more specific question.  What did you

15  think of Donald Trump as a president?

16  A.  I thought he was terribly unfit.

17  Q.  Do you -- have you tweeted about Donald Trump?

18  A.  I'm certain I have.

19  Q.  For example, have you called him an enemy of the people?

20  A.  I don't recall, but that sounds like something I might say.

21  Q.  Were you happy or sad when he was voted out of office?

22  A.  Happy.

23  Q.  Do you know -- just in terms of the other party in this

24  case, do you know the plaintiff, E. Jean Carroll?

25  A.  Yes.

N532Car5                        Stevens - Direct

1   Q.  How would you describe your relationship with Ms. Carroll?

2   A.  We are friends.  We are new friends.

3   Q.  Has Ms. Carroll ever interviewed you?

4   A.  Yes, she has.

5   Q.  When was that?

6   A.  In the summer of 2020 she began a series for *The Atlantic*

7   magazine on several women who had been hurt by Donald Trump.

8            MR. FERRARA:  Your Honor, I'm happy to move to strike

9   that last portion of Ms. Stoynoff.  I did not mean to elicit

10  it.

11           THE COURT:  The jury will disregard everything after

12  "in the summer of 2020."

13  BY MR. FERRARA:

14  Q.  Just focusing on the interview that Ms. Carroll did with

15  you, Ms. Stoynoff, did she -- she interviewed you about your

16  experience with Donald Trump?

17  A.  Yes.

18  Q.  What did -- on that topic, what -- do you recall what the

19  two of you discussed?

20  A.  Well, we talked about the incident and she also asked me

21  about my background and my current professional world and my

22  life.

23  Q.  Did anything about that interview or doing that interview

24  with Ms. Carroll change your recollection of what had happened

25  between you and Donald Trump?

N532Car5                        Stevens - Direct

1   A.  No.

2   Q.  At any point in that interview, did you believe that

3   Ms. Carroll was trying to influence your memory of what had

4   happened?

5   A.  No, not at all.

6   Q.  Have you followed developments -- are you aware that

7   Ms. Carroll has sued Donald Trump?  That's why you are here?

8   A.  Yes.

9   Q.  Have you followed the case?

10  A.  Yes.

11  Q.  Have you at times expressed public support for Ms. Carroll?

12  A.  I'm sure I have.

13  Q.  All right.  So I want to turn back now to you and your

14  life, sort of, as you -- sort of what developed after all of

15  this.

16          Let's go back to October 2016.  Did you publish an

17  essay in *People* magazine around that time?

18  A.  Yes, I did.

19  Q.  What was that essay about.

20  A.  It was about the incident at Mar-a-Lago that happened

21  between Donald and me.

22  Q.  Was that the first time you had spoken publicly about

23  Donald Trump assaulting you?

24  A.  Yes.

25  Q.  Why did you write that essay?

N532Car5                          Stevens - Direct

1    A.  I wanted to warn the American people and the

2    *Access Hollywood* tape had come out the week before, I think,

3    and it horrified me.  And then he did a debate the following

4    week with Hillary Clinton, and Anderson Cooper asked him, Have

5    you ever kissed a woman without consent?  And he said no.  And

6    I thought if I was a voter -- I was a voter, but I would want

7    to know if the candidate I was about to vote for was lying like

8    this about hurting women.

9             MR. FERRARA:  May I approach, your Honor?

10            THE COURT:  Yes.

11   Q.  Ms. Stoynoff, I want to show you what's been marked for

12   identification as Plaintiff's Exhibit 25.

13            Do you recognize that?

14   A.  Yes.

15   Q.  What is that?

16   A.  It is the *Access Hollywood* clip that you showed me.

17   Q.  And how do you know?

18   A.  I initialed and dated it.

19   Q.  Let me also, if we could, put up on the screen, Mr. Lam,

20   for the witness, what's been marked for identification as

21   Plaintiff's Exhibit 25T.

22            Do you recognize this, Ms. Stoynoff?

23   A.  Yes, it's the transcript of the *Access Hollywood* tape.

24   Q.  Were you able to follow along with this transcript while

25   you watched the video?

N532Car5                    Stevens - Direct

1   A.  Yes.

2   Q.  Does the transcript fairly and accurately depict what is

3   said on the video?

4   A.  Yes, it does.

5   Q.  Your Honor, plaintiff offers 25 and 25T.

6           MR. TACOPINA:  Your Honor, obviously without waiving

7   anything previous, objections we have, no objection.

8           THE COURT:  But there is no authenticity issue,

9   correct?

10          MR. TACOPINA:  I'm even talking about before the

11  trial, your Honor, but correct.  No authenticity issue.

12          THE COURT:  Okay.  25 and 25T are received.

13          (Plaintiff's Exhibits 25, 25T received in evidence)

14          THE COURT:  Members of the jury, 25T, the transcript,

15  is received on the same basis as all the other transcripts.

16  It's the recording that is evidence.

17          MR. FERRARA:  Your Honor, may I?  For this, I printed

18  copies I would like to ask to hand out to the jurors, and I can

19  hand them up and I have plenty.  May I hand the jurors some

20  copies of the transcript?

21          THE COURT:  Yes.

22          MR. FERRARA:  Thank you.

23  BY MR. FERRARA:

24  Q.  Mr. Lam, we can take this off the screen.  We can take down

25  25T.  I think folks have copies.  And if we could, let's play

Case 23-793, Document 84, 11/20/2023, 3592071, Page145 of 300

A-2365

N532Car5                         Stevens - Direct

1    Plaintiff's 25.

2              (Video played)

3    BY MR. FERRARA:

4    Q.  Thank you, Mr. Lam.  We can bring that down.

5              You also -- sorry, Ms. Stoynoff, do you recall seeing

6    at least a part of that tape sort of when it first aired?

7    A.  Yes.

8    Q.  Do you recall when that was?

9    A.  Yes.  It -- I think it aired -- first aired Friday

10   afternoon, and I saw it almost immediately.

11   Q.  What was your reaction when you saw that?

12   A.  A combination of sick to my stomach and a little bit of --

13   I don't know if this is the right word, but relief.  Because I

14   actually for the first time thought to myself, oh, he does this

15   to a lot of women.  It's not just me.  It's not just something

16   I did.  And then the horrifying part to me was that I

17   worried -- I worried that because I didn't say anything at the

18   time, other women were hurt by him.  So I had some regret

19   there.

20   Q.  Ms. Stoynoff, you also mentioned a debate that you watched.

21   A.  Yes.

22   Q.  Let me -- Mr. Lam, if we could just bring up what is in

23   evidence as Plaintiff's Exhibit 26, and if we can just bring up

24   the first image.

25              Ms. Stoynoff, is this the debate that you were

1    referring to?

2    A.  I believe so.

3    Q.  Anderson Cooper was asking questions, is that the one?

4    A.  Yes, this looks like the one.

5    Q.  We don't have to play this again, but we can bring that

6    down.  Thank you, Mr. Lam.

7           How did you feel when you saw that debate?

8    A.  Well, *People* magazine had asked me if I wanted to write

9    something about what happened.  By this time they knew, the top

10   editors now knew.  And after that *Access Hollywood* tape came

11   out they asked me if I wanted to write something, and I said,

12   you know what?  He's got a debate next week.  Let me see what

13   he says.  If he comes clean, if he is honest——because I know he

14   will be asked about it——I'm not writing anything.  And let me

15   see what he says.

16          So when I saw it and Anderson Cooper asked him, Have

17   you ever kissed a woman without consent, and he said no, I

18   thought to myself, you liar.  I just felt really upset that he

19   was lying to the American people.

20   Q.  Do you recall the date that your essay was published in

21   *People* magazine?

22   A.  Yes, October 12, 2016.

23   Q.  Did Mr. Trump respond?

24   A.  I believe his attorneys got in touch with the magazine and

25   gave some sort of denial and he, he said something on his

N532Car5                         Stevens - Direct

1   campaign trail and I think on Twitter.

2   Q.  Let me show you --

3            MR. FERRARA:  If I may approach, your Honor?

4   Q.  I want to show you what's been marked for identification as

5   Plaintiff's Exhibit 29.  Do you recognize that?

6   A.  Yes.

7   Q.  What is that?

8   A.  This is the -- this is him on the campaign trail, a clip of

9   what he said about me.

10  Q.  How do you know?

11  A.  You showed this to me previously, and I initialed it.

12  Q.  Let me also show you what's been marked for identification

13  as Plaintiff's Exhibit 29T.  Do you recognize this?

14  A.  Yes.  This is a transcript of this clip.

15  Q.  Were you able to follow along while you watched the video?

16  A.  Yes.

17  Q.  Does it fairly and accurately depict what is said on the

18  video?

19  A.  Yes.

20           MR. FERRARA:  Your Honor, plaintiffs offer 29 and 29T.

21           MR. TACOPINA:  No objection, your Honor.

22           THE COURT:  Received.

23           (Plaintiff's Exhibits 29, 29T received in evidence)

24           THE COURT:  Same instruction regarding 29T, the

25  transcript.

N532Car5                         Stevens - Direct

 1              MR. FERRARA:  Mr. Lam, if we could bring up 29,

 2      please, and we could play this.  Thank you.

 3              (Video played)

 4      BY MR. FERRARA:

 5      Q.  Ms. Stoynoff, did Mr. Trump assault you in a public area?

 6      A.  No, we were alone in the room.

 7      Q.  Why wasn't it part of the story that was published about

 8      the one-year anniversary?

 9      A.  That's just a crazy question.  Because if my top editors

10      knew what had happened, the story just would have been killed.

11      That just would not be part of a "wedding, we are having a

12      baby, we are having a happy marriage" story.

13      Q.  What did you understand Mr. Trump to be saying when he

14      said, Look at her, I don't think so?

15      A.  I am assuming he means that I am unattractive.

16              MR. FERRARA:  May I have one moment, your Honor?

17              (Counsel confer)

18              MR. FERRARA:  Nothing further, your Honor.  Thank

19      you.

20              THE COURT:  All right.  Thank you.

21              Cross-examination, Mr. Tacopina.

22              MR. TACOPINA:  Yes.

23              MR. FERRARA:  Your Honor, just quickly, I might just

24      retrieve the exhibit from the witness stand.

25              THE COURT:  All right.

N532Car5

1    CROSS-EXAMINATION

2    BY MR. TACOPINA:

3    Q.  Good afternoon, Ms. Stoynoff.

4    A.  Good afternoon, Mr. Tacopina.

5    Q.  Mr. Seigel, you have no legal claim against Donald Trump

6    before this jury, correct?

7    A.  You mean am I suing him?

8    Q.  You have no legal claim against Donald Trump before this

9    jury?

10   A.  No, I don't have anything --

11   Q.  Thank you.

12           MR. TACOPINA:  No further questions.

13           THE COURT:  Okay.  Anything else?

14           MR. FERRARA:  No, your Honor.

15           THE COURT:  You are excused, Ms. Stoynoff.  Thank you.

16           (Witness excused)

17           THE COURT:  What's next?

18           MS. KAPLAN:  Next we are going to play the deposition

19   designations from Mr. Trump's deposition.

20           THE COURT:  From Mr. Trump's deposition.  Okay.

21           This is sworn testimony given by Mr. Trump.  Counsel

22   will announce the date.

23           May I have a transcript, please?

24           MS. KAPLAN:  Yes, you may, your Honor.

25           October 19, 2022, your Honor.

N532Car5

1          (Video played)

2          MR. TACOPINA:  Judge, we have to stop this for a

3     second, please.

4          THE COURT:  Stop it.  What's the problem?

5          MR. TACOPINA:  It's my understanding that this was --

6     that you haven't ruled on this particular portion.

7          MS. KAPLAN:  I spoke to Mr. Brandt who said he is no

8     longer asserting relevancy.

9          MR. TACOPINA:  Okay.  That was still pending, the

10    ruling.  That's fine, your Honor.

11         THE COURT:  Go ahead.

12         (Video played)

13         THE COURT:  Let's pause right there.

14         We are going to break for the day, but I still want to

15    talk to counsel afterward.

16         Ladies and gentlemen, 10:00 tomorrow morning.

17         (Continued on next page)

18

19

20

21

22

23

24

25

Case 23-793, Document 84, 11/20/2023, 3592071, Page151 of 300

A-2371

N532Car5

1              (Jury not present)

2              THE COURT:  Okay.  You can all be seated, please.

3              I just want to talk to you a little bit more about the

4      schedule.  It looks to me like we are on target to finish

5      probably after lunch tomorrow, is that about right?

6              MS. KAPLAN:  I agree, your Honor.

7              THE COURT:  Okay.  So far as -- let's go back to

8      summations.  I know I asked you this probably the day before

9      yesterday, but I can't find my note, frankly.  What are your

10     thoughts about duration of summations? Ms. Carroll.

11             MS. KAPLAN:  Your Honor, I think, I'm trying to -- I'm

12     not 100 percent sure it's what I told you, but I think it's

13     what I told you, that we were thinking two hours for closing

14     and then about an hour for rebuttal.

15             THE COURT:  And Mr. Tacopina.

16             MR. TACOPINA:  Approximately two and a half hours,

17     your Honor, give or take.

18             THE COURT:  Okay.  Then I'm going to propose the

19     following.  I will have the draft charge ready for you to

20     either pick up or──if you give us e-mail addresses where you

21     want it sent──sent to you 8:00 Monday morning.  We will have

22     the charge conference here 9:00 Monday morning, and then,

23     assuming everybody's here, jury I mean, we will go into

24     summations at 10:00 on Monday morning.  We will shorten the

25     lunch hour, and we will hope to get all the summations done, if

1    I have computed right, before we are done for the day, and

2    maybe even -- well, no, I take that back.  That doesn't work.

3    Here is what I am trying to accomplish.  I think it will take

4    an hour to deliver the charge approximately.  So if we can

5    finish the summations on Monday, then I will charge Tuesday

6    morning, and the jury would go to deliberations immediately.

7         Any thoughts, objections, issues?

8         MS. KAPLAN:  None on our side, your Honor.

9         THE COURT:  Okay.  Now, if people run over time, it

10   may be necessary to shift all or part of the rebuttal into

11   Tuesday morning, and I suspect nobody wants to do that.  But

12   that's within your control, not mine.

13        MS. KAPLAN:  Yes, we understand, your Honor.

14        THE COURT:  Mr. Tacopina, you got that?

15        MR. TACOPINA:  I have it, yes, sir.

16        THE COURT:  Okay.  I don't really expect the charge is

17   going to be very controversial, but there it is.

18        Mr. Seigel, you were rising.

19        MR. SEIGEL:  On a separate matter if we are done with

20   scheduling.

21        THE COURT:  Separate matter.

22        MR. SEIGEL:  If we are done with scheduling.

23        THE COURT:  Mr. Craig, were you jumping up on

24   scheduling?  Sorry.  You are not Mr. Craig, forgive me.  I will

25   get to know everybody by the time we are finished.

N532Car5

1              Okay.  What is it, Mr. Seigel?

2              MR. SEIGEL:  Thank you, your Honor.

3              For purposes of the record, I don't want to belabor

4      this.  I know there has been extensive motion practice on this.

5      We just wanted to renew our objection with regard to

6      Ms. Stoynoff as it pertains to Rule 413 and move to strike her

7      testimony, given our position that her testimony does not

8      satisfy the threshold for admissibility under Rule 413.

9              THE COURT:  Denied.  The question for admissibility is

10     whether a jury reasonably could find that there was a sexual

11     assault on her, actual or attempted, and my conclusion is that

12     the jury so could find.  They are certainly not obliged to find

13     it, but they certainly could find it based on her testimony and

14     all the other evidence of record.

15             Okay.  Thank you.

16             COUNSEL:  Thank you.

17             (Adjourned to Thursday, May 4, 2023, at 10:00 a.m.)

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                             Page

 3     LESLIE LEBOWITZ

 4    Direct By Ms. Kaplan . . . . . . . . . . . . 852

 5    Cross By Mr. Siegel  . . . . . . . . . . . . 892

 6    Redirect By Ms. Kaplan . . . . . . . . . . . 940

 7    Recross By Mr. Seigel  . . . . . . . . . . . 967

 8     CANDE CARROLL

 9    Direct By Mr. Craig  . . . . . . . . . . . . 968

10    Cross By Mr. Brandt  . . . . . . . . . . . . 975

11    NANCY STEVENS

12    Direct By Mr. Ferrara  . . . . . . . . . . . 981

13    Cross By Mr. Tacopina  . . . . . . . . . . .1009

14                      PLAINTIFF EXHIBITS

15    Exhibit No.                             Received

16     9  . . . . . . . . . . . . . . . . . . 986

17     17  . . . . . . . . . . . . . . . . . . 987

18     25, 25T  . . . . . . . . . . . . . . . .1004

19     29, 29T  . . . . . . . . . . . . . . . .1007

20

21

22

23

24

25
```

N545car1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                     Plaintiff,              New York, N.Y.
 4
                  v.                         22 Civ. 10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                     Defendant.
 7   ------------------------------x          Jury Trial

 8                                            May 4, 2023
                                             10:00 a.m.
 9
     Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                             District Judge
12                                             and a Jury

13                           APPEARANCES

14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant
```

Case 23-793, Document 84, 11/20/2023, 3592071, Page156 of 300

A-2376

N545car1

1               (Trial resumed; jury not present)

2               THE COURT:  Good morning.

3               MS. KAPLAN:  Good morning, your Honor.

4               THE COURT:  Does counsel have anything before I call

5      the jury in?

6               MR. TACOPINA:  No, your Honor.

7               THE COURT:  OK.  Let's bring in the jury.

8               THE DEPUTY CLERK:  Jury entering.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N545car1

1           (Jury present)

2           THE DEPUTY CLERK:  Please be seated, everyone.

3           THE COURT:  Good morning, folks.  I believe we were in

4    the course of playing excerpts from Mr. Trump's deposition.  Am

5    I right?

6           MS. KAPLAN:  Exactly, your Honor.

7           THE COURT:  And we are going to continue that, yes?

8           MS. KAPLAN:  Yes, your Honor.

9           THE COURT:  Ladies and gentlemen, we are just going to

10   pick up where it was left off yesterday afternoon with

11   Mr. Trump's deposition excerpts.

12           (Video played)

13           THE COURT:  Pause.

14           What's the problem?  We have an AV problem.  Are the

15   images on your screens, folks?

16           JUROR:  Not all of them.

17           THE COURT:  Good now?

18           THE DEPUTY CLERK:  Yes.

19           THE COURT:  OK.  Let's go back like 60 seconds.

20           (Video played)

21           MS. KAPLAN:  Your Honor, just for housekeeping

22   purposes, I think it is already admitted, but we will -- the

23   designation of that video is PX 200, and we will have a

24   corresponding transcript that will be PX 200-T.

25           THE COURT:  I'm not clear what are you saying is

N545car1

1    PX 200.

2              MS. KAPLAN:  The video played.

3              THE COURT:  The video deposition designation?

4              MS. KAPLAN:  Correct, your Honor.

5              THE COURT:  Any problem, Mr. Tacopina?

6              MR. TACOPINA:  No, your Honor.

7              THE COURT:  PX- 200 and 200-T are both received.

8              (Plaintiff's Exhibits 200 and 200-T received in

9    evidence)

10             THE COURT:  Members of the jury, the same instruction

11   I gave you previously with respect that was prepared for the

12   DVD or electronic version, the electronic version is what

13   controls.

14             Your next witness?

15             MS. KAPLAN:  Plaintiff calls Carol Martin.

16             THE DEPUTY CLERK:  Ms. Martin, if you would please

17   take the stand?  Right this way, ma'am, and if you could just

18   step around and up on the witness stand?  If you could please

19   remain standing and raise your right hand.

20   FRANCES CAROL MARTIN,

21       called as a witness by the Plaintiff,

22       having been duly sworn, testified as follows:

23             THE DEPUTY CLERK:  Thank you.  Please, be seated.  If

24   you could please state your name and spell your first and last

25   names for the record?

A-2379

N545car1                          Martin - Direct

1          THE WITNESS:  Sure.  After I pull the chair up a

2     little bit.  My name is Frances Carol Martin.  F-R-A-N-C-E-S,

3     C-A-R-O-L, M-A-R-T-I-N.

4          THE COURT:  You may proceed, Ms. Kaplan.

5     DIRECT EXAMINATION

6     BY MS. KAPLAN:

7     Q.  Ms. Martin, you just said "Frances Carol Martin."  Is there

8     a name that you go by?

9     A.  Yes; just Carol Martin.

10    Q.  Ms. Martin, do you know the plaintiff in this case?

11    A.  Yes, I do.

12    Q.  For how long have you known her?

13    A.  I think I have known her almost 30 years now.

14    Q.  We are going to come back to Ms. Carroll shortly but I want

15    to ask you background first.  What do you currently do for a

16    living?

17    A.  I'm a retired journalist.

18    Q.  And where did you grow up?

19    A.  Detroit, Michigan.

20    Q.  Where did you go to college?

21    A.  Also in Detroit, Wayne State University.

22    Q.  And what did you get your degree in?

23    A.  It was in journalism and social work; liberal arts, as we

24    called it.

25    Q.  What did you do after college?

Case 23-793, Document 84, 11/20/2023, 3592071, Page160 of 300

A-2380

N545car1                    Martin - Direct

1   A.  My first job was with a local NBC television station in

2   Detroit, and then I was a writer for a couple of years at the

3   Detroit Free Press, our local paper.  Then I moved to

4   Washington, D.C. to start a television career as a producer and

5   an on-air personality.

6   Q.  At some point did you get to New York, Ms. Martin?

7   A.  In 1975 I was offered a job at WCBS, Channel 2 here in New

8   York.

9   Q.  And what did you do at WCBS?

10  A.  I was a general assignment reporter, initially.

11  Q.  And did that change?

12  A.  Over the years, yeah.  I worked as a general assignment

13  reporter for the first three years.  I had my first child in

14  1980, and after that I came back and became a part of the

15  regular news team daily.

16  Q.  What do you mean by part of the daily news team?  I'm going

17  to ask you this because some people may be young and don't

18  understand what daily news used to be like.

19  A.  This was 1980, early '80s and the like, and we had, really

20  only three newscasts, ultimately there were four on a regular

21  basis.  I did two of them, 5:00 and 6:00 news anchor with our

22  news team.  We were pretty recognizable back then, we only had

23  13 stations back then I think.

24          MS. KAPLAN:  Mr. Lam, could you show, only for the

25  witness, PX- 128?

N545car1                          Martin - Direct

1    Q.  I want you to look at it, Ms. Martin, but don't say

2    anything to me.  Do you recognize this?

3    A.  I do.

4    Q.  Is your picture in this document?

5    A.  Yes, it is.

6              MS. KAPLAN:  Your Honor I would like to offer PX- 128.

7              MR. TACOPINA:  No objection.  Received.

8              (Defendant's Exhibit 128 received in evidence)

9    BY MS. KAPLAN:

10   Q.  Ms. Martin, does PX- 128 have anything to do with the job

11   you have just been describing at CBS --

12   A.  Yes --

13   Q.  -- Channel 2?

14   A.  -- this was our primary news team.  As you see on there at

15   5:00, 6:00, and 11:00.  I was part of that team.  The late Jim

16   Jensen and Michelle Marsh were also part of our team, also

17   myself and Rolland Smith, and our sportscaster was Warner

18   Wolf -- who everybody remembers -- and the weathercaster was

19   Frank Field.  So, that was the recurring team.

20   Q.  For how long did you work at Channel 2?

21   A.  I was there for almost 30 years.

22   Q.  When did you leave?

23   A.  In 1994.

24   Q.  And where did you go in 1994?

25   A.  I was offered a job at a startup cable news station --

Case 23-793, Document 84, 11/20/2023, 3592071, Page162 of 300

N545car1                         Martin - Direct

1   well, it wasn't news, it was a cable station in Fort Lee, New

2   Jersey, it was called America's Talking Cable.

3   Q.  And you just said MSNBC.  What was the relationship between

4   America's Talking and MSNBC?

5   A.  The originator of the America's Talking station was the

6   late Roger Ailes, and he ultimately became one of the

7   beginning, I guess he was -- my station, America's Talking

8   cable was the precursor to MSNBC at that time.

9   Q.  And you mentioned Roger Ailes.  Was he your boss?

10  A.  He was.  Yes.

11  Q.  And what show, if any, did you host on America's Talking?

12  A.  I hosted a show called Alive and Wellness.

13  Q.  It seems somewhat self-explanatory, but can you tell me

14  what that show was about?

15  A.  Sure.  It was basically health and wellness issues, mental

16  issues, holistic living.  We had all kinds of guests, people

17  like Deepak Chopra or you could get a guy on the Internet

18  telling you something.

19  Q.  When did that show run?  How many days a week?

20  A.  It was five days a week.

21  Q.  And was the show recorded live?

22  A.  Yes, it was.

23  Q.  Do you recall when it aired?

24  A.  I think about 11:00 in the morning, daily.

25  Q.  Now, just to set the record straight, Ms. Martin, when did

N545car1                    Martin - Direct

1   that new cable network you have been talking about, America's

2   Talking, start broadcasting?

3   A.  It was July 4th of 1994.

4   Q.  And as of that date were you already working at America's

5   Talking?

6   A.  Yes.  We had begun about a month before.

7   Q.  Did there come a point in time when America's Talking

8   stopped operations?

9   A.  Yes.

10  Q.  And when was that?

11  A.  Two years later on that exact date, actually; July 4th of

12  '96.

13  Q.  Did you work at America's Talking that whole time?

14  A.  Yes, I did.

15  Q.  I think you may have mentioned this but just to make sure

16  it is in, where was the studio for America's Talking located?

17  A.  It was in Fort Lee, New Jersey, just over the George

18  Washington Bridge.

19  Q.  And you mentioned Mr. Ailes, Ms. Martin.  Did Mr. Ailes

20  have his own show on America's Talking at that time?

21  A.  Yes, I believe he does.

22  Q.  Do you remember what it is called?

23  A.  Straight Talk, I'm pretty sure.

24  Q.  And what kind of a show was it?

25  A.  His show was primarily a political show, current events and

1   the like, but he had more specialized guests.

2   Q.  Just to finish your, kind of, work background.  After

3   America's Talking ceased operations, what did you do next?

4   A.  I went to work for about a year and a half at -- the

5   People's Court was being brought back with our former mayor Ed

6   Koch, and I was an in-studio anchor for that show for one year.

7   Q.  Did there come a point in time when you retired,

8   Ms. Martin?

9   A.  I think formally I retired in about 2001.  I haven't worked

10  regularly in television since then.

11  Q.  And so, what do you spend your time doing today?

12  A.  A few projects that come up time to time.  I also have a

13  7-year-old granddaughter, she takes up a lot of time.

14  Q.  And I think you testified at the very beginning that you

15  know the plaintiff E. Jean Carroll in this case?

16  A.  Yes, I do.

17  Q.  For how long have you known her?

18  A.  About 30 years.

19  Q.  And do you recall how you met?

20  A.  Not the exact time, but we did work together at America's

21  Talking.

22  Q.  When you worked together at America's Talking, you already

23  knew each other?

24  A.  Yes, we did.

25  Q.  And any recollection of how you knew each other already?

N545car1                        Martin - Direct

1   A.  Well, since she was a writer for *Elle* magazine we would

2   occasionally run into each other at media-related events so we

3   met then, and we knew some people in common.

4   Q.  Did there come a point, Ms. Martin, when you and E. Jean

5   Carroll became friends?

6   A.  Closer friends, yes.

7   Q.  When was that?

8   A.  Especially during the America's Talking years, '94 to '96.

9   Q.  And what did Ms. Carroll do at America's Talking?

10  A.  She had a show which was called *Ask E. Jean* and was pretty

11  much based on her advice column.

12  Q.  And how did E. Jean Carroll's show compare to the other

13  shows on the network?

14  A.  I would like to say it was a lot livelier than some, it was

15  totally unpredictable, and it was really all from Jeannie's

16  personality and her advice stance.

17  Q.  And was E. Jean Carroll's show also taped live?

18  A.  Yes, it was.

19  Q.  And when you were -- withdrawn.

20          During the years of America's Talking, how often would

21  you see E. Jean Carroll?

22  A.  Pretty much every day.

23  Q.  During these years, between 1994 to 1996, when you were

24  working at America's Talking, did you see Ms. Carroll outside

25  of work?

Case 23-793, Document 84, 11/20/2023, 3592071, Page166 of 300

N545car1                     Martin - Direct

1   A.  Yes.

2   Q.  What would you, generally speaking, what would you do

3   together outside of work?

4   A.  We did regular aging women things.  That's the way I like

5   to describe it.  We had lots of lunches, we saw movies

6   together, we went to comedy clubs.  We did things that were

7   enjoyable to both of us.

8   Q.  And during this period when America's Talking was in

9   operation, how would you characterize your friendship with

10  Ms. Carroll?

11  A.  Close.  It was a close friendship, and on certain levels we

12  kept growing closer.

13  Q.  And is your friendship still like that today?

14  A.  I believe so.  I hope so.

15  Q.  Now, Ms. Martin, did there come a time when Ms. Carroll

16  told you about something that had happened to her with

17  Mr. Trump at Bergdorf Goodman?

18  A.  Yes.

19  Q.  And tell me -- I'm going to take this piece by piece, if we

20  can, but tell me what you remember when that first happened.

21  A.  It was an ordinary day, I would say.  I don't remember the

22  day of the week exactly, but we were finishing with our shows

23  after a regular day, I think it was after E. Jean's show

24  because she asked if I was doing anything and could we hang out

25  for a moment at my house.

Case 23-793, Document 84, 11/20/2023, 3592071, Page167 of 300

N545car1                          Martin - Direct

1   Q.  I think you said you don't recall exactly what day it was.

2   A.  What day of the week I don't, no.

3   Q.  In terms of the two-year period at America's Talking, do

4   you have any recollection whether it was closer to the end of

5   that period or closer to the beginning?

6   A.  Somewhere in the middle.  I'm sorry.  I'm not sure.

7   Q.  Where were you when Ms. Carroll said to you, *Let's go to*

8   *your hous*e?

9   A.  We had driven from the studio in each of our cars, I lived

10  very close to the studio, so we were at my home in the kitchen.

11  Q.  So let me back up.  Where did she tell you that she wanted

12  to go, suggested going to your house?

13  A.  We were still at the station.  We had both completed our

14  day.

15  Q.  And then I take it from what you just said you both went to

16  your house?

17  A.  Yes.

18  Q.  Did you drive separately or together?

19  A.  Separately.

20  Q.  And during this period of time was it rare for Ms. Carroll

21  to come over to your house?

22  A.  No.  Not at all.

23  Q.  Did you and Ms. Carroll subsequently drive to your house?

24  A.  Yes.

25  Q.  How about how far away from the America's Talking studio

N545car1                         Martin - Direct

1   were you living?

2   A.  Only about 10 to 15 minutes I would say.

3   Q.  And did you and Ms. Carroll approximately arrive there at

4   the same time?

5   A.  I think so.  Yes.

6   Q.  And when you got to your house, was anyone else there?

7   A.  No.  I was home alone.

8   Q.  And once you got to the house, where did you go?

9   A.  We went to the kitchen.

10  Q.  And where in the kitchen did you sit, if anywhere?

11  A.  There was an island area where we generally sat.

12  Q.  And do you recall whether you had anything to drink?

13  A.  Something, and I'm not exactly sure what.

14  Q.  OK.  Now I want to take this piece by piece, if we can.

15  Tell me, what do you recall -- appreciating that it was a long

16  time ago, but what do you recall the first thing Ms. Carroll

17  said to you in your kitchen that day?

18  A.  We both just settled in with whatever we were drinking, and

19  I'm sitting at the counter and Jeannie sort of was nestled to

20  my right, as I recall, just sort of leaning in, and she started

21  telling me what had just happened.

22  Q.  And what did she say -- again, taking this piece by piece,

23  what did she say what happened?

24  A.  She introduced it by saying, *You won't believe what*

25  *happened to me the other night.*  As I recall.  And I didn't

Case 23-793, Document 84, 11/20/2023, 3592071, Page169 of 300

N545car1                        Martin - Direct

1  know what to expect and so, I just turned to her and she said,

2  *Trump attacked me*.

3  Q.  Now let's pause right there, Ms. Martin.  When she said

4  "Trump," did you know who she was referring to?

5  A.  Yeah.  Pretty much.  There was only one that I knew of.

6  Q.  And how did you know who Trump was?

7  A.  Just having lived in New York so long you are sort of part

8  of the landscape for me.

9  Q.  At that point had you ever met Mr. Trump in person?

10  A.  Only in passing at a news event, perhaps.  I do not know

11  him.

12  Q.  And just so the record is clear, when she said "Trump," who

13  did you understand it to be?

14  A.  Donald Trump.  Yes.

15  Q.  What, if anything, at this point in time, did you know

16  about Mr. Trump's politics?

17  A.  Nothing, really.  I knew him as a businessman.  I mean

18  observationally.  I did not think of him as a politician,

19  although I was aware that he often had comments about current

20  events that I would read in the newspaper.

21  Q.  Now, Ms. Carroll says to you that *Trump attacked me*.  Do

22  you recall what you said next, if anything?

23  A.  Yeah.  I was completely floored.  I didn't quite know what

24  was coming next.  She is leaning in to me, and I'm saying, *What

25  are you talking about?*  But the next thing that came to my mind

N545car1                     Martin - Direct

1  was if she was OK and that's what I asked her.  So I said, *Are*
2  *you OK?*  Because she seemed -- her affect was, I would say,
3  anxious and excitable, but she could be that way sometimes but
4  that part was different in her affect.  But what she was saying
5  didn't make any sense at first.
6  Q.  And when you asked her was she OK, did she respond?
7  A.  She said -- she probably said I don't know.  She kept
8  telling me what happened, *that he attacked me*.  I think she
9  said "pinned me" is what she said and I still didn't know what
10 that meant.
11 Q.  So, to the best of your recollection -- I understand it
12 would be crazy if you could remember every word, but what did
13 she tell you that day about what had happened to her at
14 Bergdorf Goodman?
15 A.  Basically, she backtracked.  I kept asking her to
16 backtrack.  It wasn't a linear conversation, as you would
17 expect, because it was news, it was I didn't know what I am
18 hearing here, and she was clearly agitated, anxious.  And she
19 said she was at Bergdorf's the night before -- probably two
20 nights, if I recall -- and that she ran into Mr. Trump going in
21 one of the revolving doors.  And she said that they started up
22 a conversation.  My sense is that she engaged him, or vice
23 versa, because that's not uncommon for E. Jean.  He recognized
24 her, she recognized him.
25 Q.  And did it surprise you that she told you that she started

N545car1                        Martin - Direct

1   chatting with Mr. Trump at Bergdorf Goodman?

2   A.  No.  Not at all, no.

3   Q.  Why not?

4   A.  Because that's who she is.  I only would imagine that she

5   saw it as another New York story.  There was a lot of them that

6   she would run upon.

7   Q.  And during that point in time did you shop at Bergdorf

8   Goodman?

9   A.  Occasionally.  Not that often.

10  Q.  And what else did she tell you about what happened once

11  they were inside Bergdorf Goodman?

12  A.  So, she related that they sort of started kibbitzing or

13  talking back and forth, it was apparently friendly, and she

14  said that he was looking for a gift.  And so, she engaged him

15  that way suggesting certain things.  I don't remember all of

16  the things.  But this must have gone on for a few minutes and

17  then, somehow, they started up the stairs -- escalator, she

18  said.

19  Q.  And did she tell you what happened after they got off the

20  escalator?

21  A.  Yeah.  And again, this was disjointed because I would stop

22  and ask her, *What do you mean?  What do you mean?*  And she was

23  explaining as she's going that once they reached a level -- and

24  I don't know Bergdorf's that well, but once they reached a

25  level where there was -- there were dressing rooms, and she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N545car1                      Martin - Direct

1  said at that point that he attacked her.  Those were the words

2  that I remember but I still said, *What do you mean? You look*

3  *OK.  You look* -- and she had been at work so I couldn't put it

4  together.  And she didn't use the word "rape," that I recall.

5  I have said that before.  But she said it was a frenzy.  She

6  said, *I was fighting. I was fighting.*  She kept saying that.

7  Q.  Let me clarify something you said before.  I think you said

8  that she and Mr. Trump were kibbitzing?

9  A.  Yes.  Lack of better word.  They were just bantering, I

10  think it was banter back and forth, talking about what kind of

11  gift, she would suggest something to him, but she said it was

12  friendly.

13  Q.  And when she is telling you what happened in terms of the

14  attack, was she crying?

15  A.  No, she was not.

16  Q.  Was she visibly upset?

17  A.  Yes, she was.

18  Q.  How would you describe her state to the best you can?

19  A.  I think I used the word "frenzy" before.  She was

20  gesturing, she was in a state of remembering, best I could

21  tell, just what had happened, and I think the more she spoke

22  the worse is it got.  At least that's how I was feeling it.

23  Q.  And, Ms. Martin, during this conversation, did you touch

24  E. Jean?

25  A.  Yes.  We would hug.  We would stop and hug in a moment or

N545car1                          Martin - Direct

1    whatever it took to kind of keep ourselves together while she

2    is telling me.  It was a very disconcerting thing to hear,

3    needless to say.

4    Q.  And during that conversation, Ms. Martin, did Ms. Carroll

5    say anything about what, if anything, she planned to do about

6    the attack?

7    A.  Well, this was the thing.  I said -- I asked her right away

8    had she told anyone because I didn't know at that point, and

9    she did tell me she had called Lisa Birnbach -- who I think has

10   already testified -- but she told me that she called Lisa and

11   Lisa told her immediately, *you've been raped and I'll take you*

12   *to the police*, or words to that effect.  Lisa was very

13   definitive.

14   Q.  At that point in time did you know Lisa Birnbach?

15   A.  Yes, I knew Lisa.

16   Q.  Were you friends?

17   A.  We weren't friends like E. Jean and I are, she was a friend

18   of E. Jean.

19   Q.  And what, if anything, did you say to Ms. Carroll about

20   what she should do in the future?

21   A.  Well, after we had conversed for, I don't know, maybe half

22   an hour, 25 minutes, she explained that she thought she was

23   doing the right thing by not doing anything but she wasn't

24   asking me what I would do.  And so, at some point I just

25   volunteered that I didn't think she should do anything because

Case 23-793, Document 84, 11/20/2023, 3592071, Page174 of 300

A-2394

N545car1                          Martin - Direct

1    it was Donald Trump and he had a lot of attorneys and I thought

2    he would bury her, is what I told her.

3    Q.  Do you remember anything else about that conversation you

4    had with Ms. Carroll in the kitchen that day?

5    A.  Anything meaning?

6    Q.  Anything that you discussed that you haven't told me about?

7    A.  Well, in terms of my response to her, I have questioned

8    myself more times than not over these years as to why I told

9    her that.  I am not proud that that's what I told her, in

10   truth, but she didn't contest.  This is something I know about

11   E. Jean.  She walked into my house and told me that with what I

12   presume to have been what she knew about herself, how she was

13   handling this event.  She was -- other than that, it was about

14   consolation and friends talking.

15   Q.  Do you think you would give someone that same advice today,

16   Ms. Martin?

17              MR. TACOPINA:  Objection, your Honor.

18              THE COURT:  Sustained.  Sustained.

19              MS. KAPLAN:  I will move on.

20   Q.  About how long did the conversation in your kitchen with

21   Ms. Carroll take place?

22   A.  It was about an hour at that point.  I had a teenage

23   daughter and I figured she would be coming home so we --

24   Q.  Now, you are aware that Ms. Carroll published a book called

25   *What Do We Need Men For*?

Case 23-793, Document 84, 11/20/2023, 3592071, Page175 of 300

A-2395

N545car1                        Martin - Direct

1    A.  Yes, I am.

2    Q.  In the years between that conversation and when Ms. Carroll

3    published that book, did you have any further discussions with

4    Ms. Carroll about this incident?

5    A.  We did not.

6    Q.  And why do you think you never discussed it?

7    A.  It is sort of amazing but she didn't ask me not to but it

8    just wasn't something we talked about.

9    Q.  And during those same years, between the conversation in

10   your kitchen and the time she published her book, did you tell

11   anyone else about what E. Jean had told you that day?

12   A.  I did not.

13   Q.  Moving ahead now a couple of decades, did there come a

14   point in time, Ms. Martin, when you learned that in that book

15   Ms. Carroll was going to write about the incident at Bergdorf

16   Goodman?

17   A.  Yes, I did.

18   Q.  And was Trump already president at that time?

19   A.  Yes, he was.

20   Q.  And were you surprised that Ms. Carroll intended to do

21   that?

22   A.  Well, I was, only in that I knew she had written a new book

23   and I knew the content of the book and the premise of the book,

24   I guess, and it was about 11 or 15 of the worse men she had

25   ever met.  And so I knew that was there, I knew she had been on

1    the road collecting information, I knew all of that and I never

2    asked her if she was going to add that in, I just didn't.  And

3    then she told me one day that Lisa and I were -- she had

4    dedicated the book to us for, I guess, keeping the covenant, if

5    you want to call it that.

6    Q.  What are you saying when you say "keeping the covenant"?

7    A.  I mean even though she told Lisa, I think, or Lisa told

8    her --

9              MR. TACOPINA:  I'm sorry, your Honor.  I have to

10   object to this.

11             THE COURT:  Just a minute.  Just a minute.

12             No.  Objection overruled.  The question is,

13   essentially, what did you mean by saying keeping the covenant?

14             THE WITNESS:  Should I answer?

15   Q.  You can answer.

16   A.  Yeah.  It just meant that the understanding that I had was

17   that this is private, this is her decision not to go any

18   further, and I was honoring that.  I believed what she was able

19   to choose for her life.

20   Q.  Now, did there come a time, Ms. Martin, when Ms. Carroll

21   gave you a draft hard copy of the chapter that included what

22   had happened at Bergdorf Goodman?

23   A.  Yes.

24   Q.  Can you tell the jury briefly what you remember about that?

25   A.  My recollection is it was an evening, a dinner with Lisa

1  Birnbach and her husband Michael on the Upper West Side and

2  just a dinner, and she brought a sheath of papers that included

3  that chapter, which was I think only about 11 pages or

4  something, out of the book.

5  Q.  After the dinner did you, Lisa, and Ms. Carroll discuss the

6  contents of what was in her book in that chapter?

7  A.  In that chapter alone?  No, we did not.

8  Q.  And did you read the chapter after she gave it to you that

9  night?

10  A.  I didn't read it right away but we had a sense of what it

11  was about because we knew what had happened, so.

12  Q.  Are you aware, sitting here today, Ms. Martin, that at a

13  certain point in time an excerpt from Ms. Carroll's book was

14  published in *New York* magazine?

15  A.  Yes, I am.

16  Q.  When that happened, did you read the excerpt?

17  A.  Yes, I think I did.  Yes.

18  Q.  Let me go back in time.  At any point until that excerpt

19  was published did you say to Ms. Carroll, in words or

20  substance, that you wanted to make changes to what she was

21  writing about in terms of Bergdorf Goodman?

22  A.  No.  I did not.

23  Q.  And at the time the excerpt was published in *New York*

24  magazine, did you have any plan to come forward publicly as one

25  of the two people she told at the time?

Case 23-793, Document 84, 11/20/2023, 3592071, Page178 of 300

A-2398

N545car1                          Martin - Direct

1   A.  No.

2   Q.  Why not?

3   A.  It was, by then, we are talking about 2019 or so I think

4   when the book was published, and I had a real worry about the

5   climate of the country and the like, and I wasn't sure I wanted

6   to be associated with something that was that difficult to talk

7   about.  Also, there were people in my life, in my family, who

8   were very worried about it.

9   Q.  And why were the people in your life worried about it?

10              MR. TACOPINA:  Objection.

11              THE COURT:  Sustained.

12  Q.  Were you concerned about security issues?

13  A.  I was.

14  Q.  Did you discuss your concerns about security issues with

15  Ms. Carroll?

16  A.  I did.

17  Q.  Did there come a point in time, Ms. Martin, when you did

18  agree to be publicly identified as one of the two people

19  Ms. Carroll told at the time?

20  A.  Yes.

21  Q.  And how did that happen?

22  A.  It primarily, it was a podcast that the New York Times

23  does, The Daily, and we were specifically asked if we would

24  participate to talk about the book and to talk about the

25  chapter and the incident, frankly.

N545car1                        Martin - Direct

1   Q.  At that point in time, the time of the New York Times

2   podcast, did you still have those concerns about security?

3   A.  I did, but sort of like the cat was out of the bag.  I

4   mean, I was in the -- Lisa and I had been obviously identified

5   but we weren't written about in the book, per se.

6   Q.  And so, why did you agree to be identified in the New York

7   Times podcast?

8   A.  Well, because by that time not only was it obvious that,

9   again, we were part of the story, but I respected what was

10  talked about.  It was very much sort of like the crucible, for

11  me, anyway, of women's issues that were being discussed.  The

12  #MeToo movement was pretty prominent at that point and I felt

13  that the book itself, maybe that chapter, had something

14  important to say.

15  Q.  Now, sitting here today, Ms. Martin, do you like Donald

16  Trump?

17  A.  Not particularly.

18  Q.  How do you feel about his political positions?

19  A.  Not good at all.

20  Q.  How did you feel when he was elected president?

21  A.  I have used the word devastated and I still feel that way.

22  Q.  Why?

23  A.  My world view is very different than what I think he

24  espouses, as well as some of his -- I'm sorry.

25  Q.  No, you can finish your answer.

N545car1                        Martin - Direct

1   A.  OK -- some of what I presume to be his party.

2   Q.  Just give me a second?

3   A.  Sure.

4            (Counsel conferring)

5   A.  Sorry.  I keep trying to adjust in this chair.  I'm sorry.

6   Q.  Did you discuss your negative views about Mr. Trump with

7   other people?

8   A.  Yes.

9   Q.  And have you ever called Mr. Trump dangerous?

10  A.  Probably.

11  Q.  Have you ever called him malignant?

12  A.  I don't remember that word, but possibly.

13  Q.  Have you ever said that you hate Donald Trump?

14  A.  Not that I am sure of, but possibly.

15  Q.  And did you share your negative views about Donald Trump

16  with Ms. Carroll?

17  A.  Yes.

18  Q.  Do your negative views about Donald Trump, do they have

19  anything to do with your testimony that you just gave in this

20  case?

21  A.  Specifically about the attack or?  No.

22  Q.  Are you testifying in this case because of your negative

23  views about him?

24  A.  Oh.  No.  No, I am not.

25  Q.  Shifting gears a little bit, did you ever come to regret

Case 23-793, Document 84, 11/20/2023, 3592071, Page181 of 300

A-2401

N545car1                         Martin - Direct

1  the fact that you were publicly identified as one of the people

2  E. Jean Carol told at the time?

3  A.  It became a bit uncomfortable at different times.

4  Q.  And why is that?

5  A.  The more the case spiraled up, is what I can call it, which

6  is to say there was such a -- the climate of the country was

7  changing by the year.  I'm thinking now after the 2020, I think

8  election, it felt more difficult to identify with some things.

9  I still believe, I know what I believe happened to E. Jean, I

10  know what is in the book, I knew all of the above, but it was

11  difficult because people in my family were very concerned about

12  identification.

13  Q.  And in this case, Ms. Martin, did you have to produce

14  documents including texts off your telephone?

15  A.  Yes, I did.

16  Q.  Were you happy about having to do that?

17  A.  Not at all.

18  Q.  Did you have to give a deposition in this case?

19  A.  I did.  Last fall.

20  Q.  Were you happy about having to do that?

21  A.  No.

22  Q.  Did you convey those feelings of unhappiness to

23  Ms. Carroll?

24  A.  Yes.

25  Q.  How did she react?

N545car1                          Martin - Direct

1    A.  Very concerned, always, but what I didn't understand then

2    that I think I understand better now, was that she -- I

3    couldn't see her way forward at that point because there was no

4    adult survivors law, some of the things that have come since,

5    and so it felt like she was just being, well, hammered in a lot

6    of ways, if I could use that word.  She was out there.

7    Q.  Did you and Ms. Carroll remain close friends at this point

8    in time?

9    A.  We did.  We did.  We still are.

10   Q.  I'm going to show you a document that I think has been

11   admitted into evidence as Plaintiff's Exhibit 122.  Do you have

12   that in front of you?

13   A.  Yes, I do.

14   Q.  Now just to set the table, at the bottom of this document

15   there is an e-mail and in that e-mail address Carol --

16   A.  Shenpa.

17   Q.  What is that e-mail?

18   A.  S-H-E-N-P-A.

19   Q.  Is that your e-mail address?

20   A.  Yes, it is.  I hate to have to admit it for everybody.

21            THE COURT:  You might want to change it.

22            THE WITNESS:  Yes, I think so.

23            THE COURT:  And the jury should draw no inference from

24   the fact that I said that.  Obviously e-mails get to be public

25   and that can be undesirable.

N545car1                          Martin - Direct

1          MS. KAPLAN:  Your Honor, thank you for raising that I

2    am sure, counsel, we will agree to certain appropriate

3    redactions.

4          THE COURT:  Is that agreed?

5          MR. TACOPINA:  Oh sure.  Yes.

6          THE COURT:  OK.

7    BY MS. KAPLAN:

8    Q.  What are you doing in this e-mail, Ms. Martin?

9    A.  This was an e-mail that I suppose was forwarded because

10   that's what I am looking at, this was an incident when I know

11   Mr. Trump, who was president then, was, I suppose doing this --

12   he was at a news conference, as I recall, and he was speaking

13   about what he said was Nambia.  I knew it to be a country in

14   Africa, Namibia, and I found it to be embarrassing.  And so it

15   was picked up, obviously, in the digital news and I sent it

16   ahead to people I knew because it was, I thought, kind of -- I

17   just thought that he should have known better.

18   Q.  And the e-mail that you have is from yourself to yourself.

19   Does that mean there were people who were BCC'd?

20   A.  I think so.  I am pretty sure of that.  I did that a lot.

21   I'm sorry.

22   Q.  No problem.

23          MS. KAPLAN:  Mr. Lam, if you can go up in the e-mail a

24   bit?  Right there is perfect.

25   Q.  Now, the middle part of this page is also an e-mail from

N545car1                         Martin - Direct

1   you?

2   A.  Yes.

3   Q.  And if we go all the way up maybe that will refresh, it is

4   an e-mail exchange with you and Ms. Carroll?

5   A.  Yes.

6   Q.  Now, in that, in the middle e-mail you say:  I don't know

7   much about Namibia, but I know it ain't Nambia as Orange Crush

8   called it at the UN this week?

9   A.  Yes, I do.

10  Q.  Who was Orange Crush?

11  A.  That was probably a nickname for Mr. Trump.

12  Q.  And if you go down, it says:  As soon as we are both well

13  enough to scheme.  Do you see that?

14  A.  Yes, I do.

15  Q.  What do you mean by well enough?

16  A.  I think there were a lot of health issues going on then.

17  That's the best I can get from this date in time.  Not COVID so

18  much, but other things.  And so, it was literally that as soon

19  as we are both well enough to scheme, my meaning -- oh, should

20  I continue?  Continue?

21  Q.  I will ask the question.

22  A.  I'm sorry.

23  Q.  What do you mean by scheme, Ms. Martin?

24  A.  It is basically that we would often talk about ways to

25  change the climate or to work on issues of interest to us as, I

N545car1                          Martin - Direct

1    guess you would call us, very liberal feminist -- if I can use

2    the word -- women.  We had groups of people we talked to, we

3    were on these e-mail threads, and "scheme" had to do with that.

4    Q.  And this middle e-mail we just looked at, does this have

5    anything whatsoever to do with what Ms. Carroll says happened

6    to her at Bergdorf Goodman?

7    A.  No.  It does not.

8    Q.  Now, if you go up in the e-mail there is a response from

9    E. Jean Carroll at the top?

10   A.  Totally that piece, that line?

11   Q.  Correct.

12   A.  Yes.

13   Q.  And she says:  I have something special for you when we

14   meet.

15           Do you see that?

16   A.  Yes, I do.

17   Q.  What was the something special?

18   A.  I'm surmising, because I sort of remember this time frame,

19   that it was a gift that she had for me.

20   Q.  Do you recall what the gift was?

21   A.  Yes; it was for my granddaughter, it was a squirrel.  Not a

22   live squirrel, obviously.

23   Q.  Did Ms. Carroll have a habit of giving you gifts?

24   A.  She did, and they were usually a little unusual, as was

25   this one.  That's the reason that it comes to mind.

N545car1                          Martin - Direct

1    Q.  Now, this e-mail was dated 2017.

2    A.  Yes.

3    Q.  When Ms. Carroll first told you about what had happened at

4    Bergdorf Goodman, did that happen in 2017 or the mid-1990s?

5    A.  Oh no, the mid-1990s.

6    Q.  Give me a second?

7    A.  Sure.

8            (counsel conferring)

9    Q.  Before we get to the end, Ms. Martin, the texts that were

10   produced from your phone in this case, did they say, from time

11   to time, negative things about Ms. Carroll?

12   A.  Did my texts say?

13   Q.  Yes.

14   A.  I think so, something I had completely forgotten, but which

15   I spoke to E. Jean about.

16   Q.  And how do you feel about that today?

17   A.  I feel horrible, mostly because the whole episode of having

18   my documents dumped and my e-mails, there might have been 10

19   years worth that we were required to provide for the deposition

20   and it is just the scope of everything personal and private

21   that I felt entitled to say, in truth, and there were times

22   that E. Jean and I spoke about the safety factor and just the

23   escalation of her case and how she was being, what I believed

24   to be, defamed, I will have to use that word, on a regular

25   basis.  A lot of things were coming up.  And I didn't see an

N545car1                         Martin - Direct

1   end game in this, I didn't know where she was going with this,

2   and so I felt I had a lot of things going on in my own life, to

3   be honest, and it was difficult, it was like stacking up, and

4   I -- I was backing off things.

5   Q.  And has your friendship with Ms. Carroll changed as a

6   result of the fact that you said some negative things about her

7   in texts?

8   A.  It is not, because we spoke about it as it was happening.

9   She knew exactly what I was feeling.

10  Q.  Ms. Martin, were you subpoenaed to testify here today?

11  A.  No, I was not.

12  Q.  Are you testifying here voluntarily?

13  A.  Yes, I am.

14  Q.  Were you looking forward to testifying here today?

15  A.  No, I was not.

16  Q.  Can you explain why you are here?

17  A.  I am here because I am here to reiterate and remember what

18  my friend E. Jean Carroll told me -- it has been, well, in the

19  mid-'90s so that's about 27 years ago.  I believed it then and

20  I believe it today.

21            MR. TACOPINA:  Objection, your Honor.  She believes?

22            THE COURT:  Pardon me?

23            MR. TACOPINA:  According to the allegation.

24            THE COURT:  I'm sorry?

25            MR. TACOPINA:  She testified what she believes

N545car1                        Martin - Direct

1    regarding the allegation, that she believes Ms. Carroll.

2    That's completely inappropriate and should be stricken.

3              THE COURT:  I will strike that sentence:  I believed

4    it then and I believe it today.

5              THE WITNESS:  OK.  I'm sorry.

6              THE COURT:  That's all right.

7              MS. KAPLAN:  Nothing further at this point.

8              THE WITNESS:  Thank you.

9              THE COURT:  All right.  We will break for 15 minutes.

10             (Recess; Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N542Car2

1            (Jury not present)

2            THE COURT:  Before we bring the jury in, I just want

3       to make note that I was handed a letter, and while perhaps I

4       should recognize the name, I don't, the sender, but it is

5       somebody who says they are in the press.  I have no reason to

6       doubt that.  I am just careful about what I say.

7            I understand the point, and it has to do with media

8       access to exhibits and the timeliness of access to exhibits.

9       And I would just suggest to the person who wrote me the letter

10      who I assume is here, is that right?  Okay.  Over the lunch

11      break, if you haven't already, talk to the lawyers because

12      that's -- they have got to see this letter and they have to

13      have an opportunity to inform me about it.

14           MS. BEKIEMPIS:  My name is Victoria Bekiempis.  Your

15      Honor, thank you for hearing me.

16           I had reached out to plaintiff's counsel's

17      representatives regarding the provision of the video deposition

18      to the media and was told that trial exhibits would not be

19      provided.  The media understands that in civil litigation it is

20      often up to the parties --

21           THE COURT:  I don't want to hear the merits here.  All

22      right?  If you or any other member of the media has a legal

23      application to make, there is a vehicle for doing it.  I would

24      be happy to hear it at an appropriate time and with the parties

25      having an opportunity to be heard on it.

N542Car2

1           MS. BEKIEMPIS:  Thank you, your Honor.

2           THE COURT:  All right.  Let's get the jury.

3           And make sure the lawyers have a copy of your letter,

4      please.

5           MS. BEKIEMPIS:  Will do.

6           (Continued on next page)

N542Car2                          Martin - Cross

1              (Jury present)

2              THE COURT:  Everybody ready?  All right.

3    Cross-examination, Mr. Tacopina.

4              MR. TACOPINA:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. TACOPINA:

7    Q.  Good morning, Ms. Martin.

8    A.  Good morning.

9    Q.  I think you said you are a registered Democrat?

10   A.  I am.

11   Q.  And you have donated to political campaigns about ten times

12   or so?

13   A.  Perhaps.

14   Q.  You --

15   A.  Small -- I'm sorry.

16   Q.  Go ahead.

17   A.  Small donations.  I just wanted to make that point.

18   Q.  Including Hillary Clinton's campaign?

19   A.  Yes.

20   Q.  Okay.  And you watched the results of the 2016 presidential

21   election with Donald Trump and Hillary Clinton, obviously.

22   A.  Not with them.  I know what you are saying, though.

23   Q.  You watched with those two participants.  Not with them.

24   You weren't with both of them.

25   A.  Okay.

N542Car2                         Martin - Cross

1    Q.  Obviously, I think you just said you were devastated when

2    you learned that Donald Trump won?

3    A.  I was.

4    Q.  I think it's not an overstatement to say you hated this man

5    politically?

6    A.  I try not to use that word.

7    Q.  Disliked this man politically?

8    A.  That would be correct.

9    Q.  You were asked by Ms. Kaplan on your direct examination

10   about having to turn over and produce some text messages and

11   e-mails --

12   A.  Yes.

13   Q.  -- over the years, correct?

14   A.  Yes.

15   Q.  Okay.  Suffice to say you did not expect at the time you

16   were writing those e-mails for those to see the inside of a

17   courtroom.

18   A.  No, certainly not.

19   Q.  They were personal.

20   A.  All of them, yes.

21   Q.  Okay.  And you reviewed those text messages and e-mails

22   before you came here to testify today.

23   A.  For the deposition last fall.

24   Q.  Okay.  I'm going to discuss a few of them with you, okay,

25   Ms. Martin?  I will show them to you.

Case 23-793, Document 84, 11/20/2023, 3592071, Page193 of 300

A-2413

N542Car2                     Martin - Cross

1   A.  Um-hmm.

2   Q.  We will go one by one.  All right?

3   A.  Okay.

4   Q.  Okay.

5           Please put up Exhibit EA just for the witness and

6   counsel and the Court.

7           Take a look at that, Ms. Martin, if you can.

8   A.  A little small, but I will do my best.

9   Q.  He can zoom in a little bit.  See if you can identify it.

10  A.  Okay.

11  Q.  Do you remember sending -- who is Karen Johnson?

12  A.  She is a friend.

13  Q.  Okay.

14  A.  Again, forgive me.  There is no way for her information to

15  be -- there is a phone number on this.

16  Q.  No.  We have agreed, Ms. Martin -- it's a good point.  We

17  have agreed with counsel that information will be redacted

18  before these documents are placed into evidence --

19  A.  Okay.

20  Q.  -- in public filing, okay?

21  A.  Okay.  Thank you.

22  Q.  Don't worry.

23           So you recall sending -- you recall sending Karen

24  Johnson a text message --

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N542Car2                    Martin - Cross

1    Q.  -- on June 2?

2    A.  Yes.

3            MR. TACOPINA:  Okay.  I would offer that, your Honor,

4    as Defendant's EA.

5            THE COURT:  Ms. Carroll.

6            MS. KAPLAN:  Objection, your Honor.

7            THE COURT:  On the ground?

8            MS. KAPLAN:  Hearsay.

9            THE COURT:  In what way.  Without getting into what it

10   says, point me to what sentence.

11           MS. KAPLAN:  It's a prior statement of the witness and

12   he hasn't established inconsistency with anything she said.

13           MR. TACOPINA:  I'm not impeaching the witness, your

14   Honor.

15           THE COURT:  Prior inconsistent statement, is that the

16   theory?

17           MR. TACOPINA:  No I'm not impeaching the witness.

18           THE COURT:  I'm sorry.  What you just said was I'm

19   impeaching the witness.

20           MR. TACOPINA:  I said I'm not impeaching the witness.

21   I guess I was soft.

22           THE COURT:  And the relevance of it is what?

23           MR. TACOPINA:  State of mind, bias, your Honor, this

24   is the author of these messages.  I want to ask her about them.

25           THE COURT:  Overruled, but, you know --

N542Car2                        Martin - Cross

1              MR. TACOPINA:  This will --

2              THE COURT:  -- keep it under control.

3              MR. TACOPINA:  Yes.  Just a few of them and there is a

4    stated reason I could explain at sidebar if your Honor wants

5    ever.

6              (Defendant's Exhibit EA received in evidence)

7    BY MR. TACOPINA:

8    Q.  Anyway this, Ms. Martin, is in evidence.  It's a text

9    message—you can display it before the jury—that basically

10   said "perfect" -- this is you to Ms. Johnson.  "Perfect.  You

11   checking this God awful Trump thing tonight?  Hillary was on

12   fire today.  But this man needs to be put away.  God help us,

13   but he is so unhinged, I think the bubble will burst sooner or

14   later.  At least I pray."

15             Okay.  That was you writing that.

16   A.  Yes, I suppose so if it's here, yes.

17   Q.  Let me show you another one.  Defense Exhibit EB as in

18   "Edward Boy"?

19             THE COURT:  Why don't you just ask if she has said

20   these things.

21             MR. TACOPINA:  Well, there's a few I would like to

22   introduce.  I could do that, your Honor.  I will start with

23   that.  But there are a few that could be introduced.

24   BY MR. TACOPINA:

25   Q.  Let me start like this.  Take a look at that.  It's up on

Case 23-793, Document 84, 11/20/2023, 3592071, Page196 of 300

N542Car2                      Martin - Cross

1    your screen.

2              Not in front of the jury, correct?

3              MR. NELSON:  Correct.

4    BY MR. TACOPINA:

5    Q.  Did you tell Kari Strong -- who is Kari Strong?  A friend

6    of yours?

7    A.  She is a family member.

8    Q.  Family member.  Okay.

9              -- on November 29, 2016, that, "I hate this man who is

10   running our world, spreading his stank all over."

11             Do you recall saying that or writing that message?

12   A.  Clearly I did.  It sounds like something I would have said

13   at that point.

14   Q.  Okay.  Take a look at EC.  Do you recall on December 17,

15   2016, writing -- sending an e-mail to Ms. Carroll.  And others,

16   by the way, I think.  This was sent to multiple people, as you

17   will see.  Can you see the e-mail behind it?  The main e-mail

18   behind it with those names on it?

19   A.  Yes, yes.

20   Q.  Okay.  Do you recall sending an e-mail to Ms. Carroll and

21   others with a link to a *New York Times* article referring to a

22   12-step program for responding to president elect Trump and

23   writing her, "Are you traumatized by the election of Donald

24   Trump?  Here's the program for you."

25             Do you recall that?

Case 23-793, Document 84, 11/20/2023, 3592071, Page197 of 300

N542Car2                    Martin - Cross

1   A.  I don't recall writing it, but I'm looking at it, so I

2   acknowledge it.

3   Q.  Okay.  And later that day, Ms. Carroll e-mailed you back

4   saying "This is wonderful, Miss Caroly.  Thank you."

5   A.  Um-hmm.

6   Q.  Do you recall that or do you see it?

7   A.  Yes, I see it.

8   Q.  And you acknowledge that is an e-mail that you received?

9   A.  This was right after the election, correct?

10  Q.  Yes, ma'am.  The date is up there?

11  A.  Yes, that's what I am making reference to.  Excuse me.

12  Yes, I see it.

13  Q.  And Caroly is what, I guess, Ms. Carroll calls you?

14  A.  Yeah.  It's sort of a shortening, yes.

15  Q.  So Defense Exhibit ED.  On November 27, 2016, at 9:27, you

16  sent an e-mail to Ms. Carroll and others with a link to an

17  article and wrote, "One of the most powerful warnings by Joy

18  Reid of MSNBC, bamboozlement warning and already happening.

19  Media normalization of Trumpism.  His poll numbers will

20  improve.  The international community will come around.

21  Melania, Ivanka will be . . . unorthodox but charming, gracious

22  self for huge media fall."

23            THE COURT:  That's not the word.

24            MR. TACOPINA:  "Fail," sorry.  My outline is -- I

25  miswrote that.

N542Car2                      Martin - Cross

1    Q.  "Fail."  "Huge media fail."  Right?

2    A.  Yes, I am looking at it, yes.

3    Q.  And you received that e-mail back from Ms. Carroll later

4    that day saying "Joy is Cassandra."

5    A.  I know what that means.

6    Q.  What does that mean by the way?

7    A.  Cassandra is usually someone who might predict something

8    that's coming, at least as I know it to be --

9    Q.  Okay.

10   A.  -- in the future.  So she is speaking, I think, of Joy

11   Reid, who had written the other.

12           May I add something, though, or not?

13   Q.  Sure, sure.

14   A.  Only that this was typically the way many communications

15   went between me and my set of friends, especially right after

16   the 2016 election.  I think I used the word "devastated."  This

17   is a reflection of how we were feeling.

18   Q.  Okay.  I'm going to show you what's been marked as Defense

19   Exhibit EE.  And that is an e-mail you sent to Ms. Carroll and

20   others with an article about Donald Trump's daughter Ivanka

21   taking his seat during a G20 meeting with world leaders and you

22   wrote, "I know you guys either saw this or whatever.  But it's

23   just too much, as Charles Blow's Twitter comments say, I don't

24   know, bad as it all is, how this thing of the two junior

25   grifters just sashaying into meeting with world leaders and

N542Car2                    Martin - Cross

1    nobody objects???  I gotta stop trying to be informed on

2    whazzup in the world.  It makes me physically sick.  How will

3    it ever end???"

4            Do you recall sending that e-mail to Ms. Carroll and

5    others?

6    A.  I'm looking at it, so I'm sure, if that was my name.

7            MR. TACOPINA:  Your Honor, I would offer this as EE.

8            MS. KAPLAN:  No objection, your Honor.

9            THE COURT:  EE is received.

10           (Defendant's Exhibit EE received in evidence)

11   BY MR. TACOPINA:

12   Q.  Show you EF now.

13   A.  I'm sorry?

14   Q.  I'm going to show you another exhibit, EF, EF.

15           And by the way, that last e-mail, let me harken back

16   to it a second.  The two junior grifters you were referring to,

17   who was that let me ask you that?

18   A.  It would have been Ivanka and Jared, I think, if that's who

19   I referred to.  Yeah, Ivanka takes her father's seat.

20   Q.  Okay.  So you were talking about his daughter and his

21   daughter's husband.

22   A.  Correct.

23           MS. KAPLAN:  I apologize for interrupting.  On EE we

24   don't object, but there are going to be some redactions that

25   need to be made.  I assume that's okay with you, Mr. Tacopina.

A-2420

N542Car2                    Martin - Cross

1       I will show you.

2           MR. TACOPINA:  Please.

3           (Counsel confer)

4           THE COURT:  There are certainly a lot of e-mail

5    addresses on it.

6           MR. TACOPINA:  All of those, by the way, your Honor,

7    just so you know, I think we have discussed this, every single

8    e-mail address, including Ms. Carroll, the witness or anyone

9    else's, will be redacted.  There is also a top portion of this

10   e-mail, exhibit, rather, that we have agreed to redact that has

11   nothing to do with the conversation we just discussed with the

12   witness.

13          THE COURT:  Let's just get on with it.

14   BY MR. TACOPINA:

15   Q.  Okay.  Show you EF now.  Take a look at EF.  This is an

16   August 3 -- there is EF.  That's the big one that we will zoom

17   in for you a little bit.  That's an August 3, 2017 e-mail sent

18   to Ms. Carroll and others with a link to *The New York Times*

19   article about then White House Chief Strategist Stephen Bannon

20   and then Attorney General Jeff Sessions and you wrote, "Hi.

21   This will be in weekend *New York Times Magazine* released today.

22   A warning.  One of the most frightening deep dives into what is

23   happening right now under Trump-Sessions-Bannon.  Long read,

24   but necessary.  I had no idea the plot was so thick and

25   demonic.  God help us.  Sorry to sound so panicked."

Case 23-793, Document 84, 11/20/2023, 3592071, Page201 of 300

A-2421

N542Car2                          Martin - Cross

```
 1              Do you recall sending that e-mail?
 2      A.  I'm looking at it, so I suppose I did, yes.
 3      Q.  And Ms. Carroll sent you back a response saying, again,
 4      "Thank you, Ms. Caroly."  Do you see that?
 5      A.  Yes, yes.
 6              MR. TACOPINA:  Your Honor, I'm going to offer EF.
 7              MS. KAPLAN:  Again, subject to appropriate redactions,
 8      your Honor.
 9              MR. TACOPINA:  Yes, of course.
10              THE COURT:  Received.
11              (Defendant's Exhibit EF received in evidence)
12      BY MR. TACOPINA:
13      Q.  I'm going to show you Defendant's EG.  I won't offer all of
14      them.  You mentioned someone named Helen Young an article about
15      Donald Trump telling -- saying that Japanese dignitaries, he
16      never knew there were so many countries until he was elected
17      and you wrote, "Oh my God, make it stop."  I'm sorry.  You sent
18      a link.
19              THE COURT:  Counselor.
20              MR. TACOPINA:  Okay.
21      A.  Yes.
22      Q.  You sent a link that talked about -- well, the link is from
23      Raw Story, says "Watch Trump tells Japanese dignitaries he
24      never knew there were so many countries until he was elected,"
25      and you send to -- you get a response from Helen Young saying,
```

Case 23-793, Document 84, 11/20/2023, 3592071, Page202 of 300

N542Car2                      Martin - Cross

1    "Oh my God, make it stop," correct?

2    A.   Yes.

3    Q.   Okay.  Defense Exhibit EH, April 12, 2018, you sent an

4    e-mail to Ms. Carroll and others with *The New York Times*

5    article about Donald Trump issuing an order demanding an

6    evaluation of the Postal Service's finance and writing, "He is

7    out of his freaking mind.  This is terrifying."  Right?

8    A.   I said that?

9    Q.   Okay.

10   A.   I'm sorry.  I'm reading it right now.

11   Q.   It's okay, Ms. Martin.  Let me know when you are done.

12   A.   So many of these, if I may, are obviously forwards of

13   stories that were written with our comments attached.

14   Q.   Yes.

15   A.   I don't quite understand why that wasn't my prerogative to

16   make these comments.

17   Q.   I'm not saying it's not your prerogative, Ms. Martin.

18   A.   I don't understand why they are being offered as evidence.

19   Q.   Yeah, you just don't have to understand it, unless the

20   Court rules otherwise.  I'm just going to ask you some

21   questions and you can give me honest answers.  Okay?

22   A.   Thank you.

23   Q.   Defense Exhibit EI.  That's a September 4, 2018 e-mail, and

24   that's an e-mail from you, again, to a group of people all who

25   will be redacted by way of identification of e-mail addresses,

Case 23-793, Document 84, 11/20/2023, 3592071, Page203 of 300

N542Car2                    Martin - Cross

1    saying, "Guys, this is, there are no words.  I don't mean to

2    keep sending this awful dark stuff, but we need to know our

3    enemy inside and out.  This made my head spin."

4            And that was in reaction to a *Washington Post* story by

5    a journalist regarding a telephone call between Donald Trump

6    and Bob Woodward, correct?

7    A.  Apparently so, yes.

8            MS. KAPLAN:  Objection, your Honor.  Just I think this

9    is getting cumulative.

10           MR. TACOPINA:  No, your Honor.  There is a very

11   specific reason.  And if you want a sidebar.  There's not many

12   more of these e-mails, but there is a reason.

13           THE COURT:  Look.  I don't want a sidebar.  If

14   somebody is asking for one, I will consider it.

15           MR. TACOPINA:  Okay.

16           THE COURT:  I like to have trials without any

17   sidebars.  It's quicker.

18           MR. TACOPINA:  Okay.  I'll just scoot ahead, then.

19   BY MR. TACOPINA:

20   Q.  I'm going to show you EJ.  This is a March 19, 2020

21   e-mail -- I'm sorry, this is a text message, not an e-mail,

22   back to your friend Karen Johnson that we talked about before

23   saying, relevant portions, "I cannot bear to listen to Trump.

24   I feel unsafe under his rule."

25           Do you recall sending Karen that message?

N542Car2                    Martin - Cross

1    A.  I suppose so.

2    Q.  When you say you suppose so, you are not doubting that

3    that's your words in your text message, are you?

4    A.  No, I'm not doubting it.

5    Q.  EK, Defense Exhibit EK.  There's two more on this section,

6    and then we will move on to something else.  November 20, 2020,

7    you text someone named Pat Barbarito?

8            THE COURT:  Do you have to go into the names of these

9    individuals?

10           MR. TACOPINA:  No.

11   Q.  You text someone saying, "I hate Donald Trump more than

12   words.  He deliberately abandoned us."

13           Do you recall saying that?

14   A.  Not that day, but it was probably what I was feeling.

15   Q.  And, again, you don't dispute the authenticity or those

16   words, do you?

17   A.  I suppose it was in the dump that was taken, right?

18   Q.  From your phone.

19   A.  Yes.

20   Q.  Your text messages.

21   A.  Yes.

22   Q.  And another text message, Defense Exhibit EL, this is you

23   texting another friend of yours and saying in relevant portions

24   of this text message, "I can't believe Trump on golf course

25   today.  Miles-long food lines, millions without jobs, refusing

N542Car2                         Martin - Cross

1     to sign the legislation to help.  I despise this man.  He can't

2     be gone soon enough."  Do you recall saying that to your

3     friend?

4     A.   That was in 2020, is that right?

5     Q.   That was December 24, 2020, Christmas Eve of 2020.

6     A.   So that was after the election of 2020.

7     Q.   Yes.

8     A.   That's what I meant at that point, yes.

9     Q.   Now you can take that down.

10              You worked for America's Talking, I think you said,

11    between June of '94 and July of '96, about two years?

12    A.   Correct, yes.

13    Q.   And you worked with Ms. Carroll there?

14    A.   Yes.

15    Q.   And before working together at that cable news channel,

16    it's fair to say you only knew her marginally?

17    A.   No, I knew her better than marginally.

18    Q.   Okay.  Were you friends?

19    A.   We were friends, yes.

20    Q.   So you would run into her——I think you said this before——on

21    various social occasions or social functions that you were both

22    involved in with the media industry and whatnot?

23    A.   Yes.  I also knew her -- I should say I lived in an

24    apartment with her ex-husband, so we knew each other that way,

25    although they were not married at that moment, but I knew her

Case 23-793, Document 84, 11/20/2023, 3592071, Page206 of 300

N542Car2                    Martin - Cross

1    that way.

2    Q.  Okay.  And after the America's Talking cable network ceased

3    to exist, you never worked together again with Ms. Carroll?

4    A.  No.

5    Q.  Now, you would still -- despite that, you still became very

6    close friends and stayed in touch regularly, correct?

7    A.  Yes.

8    Q.  And you and E. Jean Carroll regularly e-mailed each other

9    in 2016 and 2017 about Donald Trump.

10   A.  About the election and Donald Trump.

11   Q.  And Donald Trump.  Okay.  I'm going to show you Defense

12   Exhibit EM.  This is, again, between you and Ms. Carroll now.

13   That is an e-mail from November 11, 2016, and you sent an

14   e-mail to Ms. Carroll with the subject "Retweet by Full Frontal

15   on Twitter.  Watch the link on Lizzo.  You will feel

16   Trumpfree."

17            Why are you laughing?

18   A.  I'm trying to put it together in my head, and when I see

19   Lizzo, I'm assuming it is going to be something about the

20   entertainer Lizzo.  I'm not sure, though.  I haven't read it

21   yet.

22   Q.  The relevant portion I just want to read you from this

23   e-mail is:  Jeannie, how are you feeling (about apocalypse

24   today)?  Three days in, and I feel worse.  Seeking solutions.

25   Lots of petitions out there.  Electoral college thing.  Sending

Case 23-793, Document 84, 11/20/2023, 3592071, Page207 of 300

N542Car2                    Martin - Cross

1    you two thought pieces.  Something had to happen to stop this

2    train.

3              Do you recall sending this e-mail to Ms. Carroll?

4              MS. KAPLAN:  Just one clarification, your Honor.  I

5    think it says "the train" rather than "this train."

6              MR. TACOPINA:  What did I say?

7              MS. KAPLAN:  "This train."  No big deal.

8    BY MR. TACOPINA:

9    Q.  Anyway, do you recall sending this e-mail?

10   A.  Yes, I suppose so.

11             MR. TACOPINA:  Okay.  Your Honor, I offer this as EM

12   in evidence, Defense Exhibit EM.

13             MS. KAPLAN:  No objection, your Honor.

14             THE COURT:  Received.

15             (Defendant's Exhibit EM received in evidence)

16   BY MR. TACOPINA:

17   Q.  Another -- this is between you and Ms. Carroll now.  I'm

18   just going to focus on that.  You sent her an e-mail on

19   January 6, with a link to an article appearing to reference in

20   parens -- well, "all the terrifying things that Donald Trump

21   did lately," and there is a link to an article under it that

22   basically says the same thing in the link, correct?

23             THE COURT:  Did you identify an exhibit?

24             MR. TACOPINA:  I'm sorry.  I think I did, your Honor.

25   But if not, it's EN, Defense Exhibit EN.  Actually, you are

Case 23-793, Document 84, 11/20/2023, 3592071, Page208 of 300

A-2428

N542Car2                          Martin - Cross

1   right, your Honor.  I did not.

2   BY MR. TACOPINA:

3   Q.  Do you remember sending that?

4   A.  This is the one that said:  This is horrifying, but I had

5   to pass it along?

6   Q.  Yes.

7   A.  Yes.

8   Q.  "At least we are not alone in this fresh hell"?

9   A.  Yes.

10          MR. TACOPINA:  I'm offering EN, your Honor.

11          THE COURT:  Received.

12          (Defendant's Exhibit EN received in evidence)

13  BY MR. TACOPINA:

14  Q.  Again, just you and Ms. Carroll, further in this EN, same

15  exhibit EN, which is in evidence—and you can publish that,

16  Eric, obviously—Ms. Carroll wrote you back -- please go back

17  to the -- Ms. Carroll wrote you back, "Thank you, Miss Carol.

18  I'm still trying to pull myself together after reading the

19  *Times* revelation Friday night that the Russians handed Trump

20  the election because Putin was terrified of Hillary!"

21          Do you recall the substance of that e-mail

22  conversation or basically what it reads it says?

23  A.  I have to say it was probably one of many, especially

24  looking at the time stamp.

25  Q.  And we are going to go through a few more just between you

N542Car2                        Martin - Cross

1    and Ms. Carroll.  Defense Exhibit EO, I will show you, it is

2    January 10, 2017, and that is an e-mail you sent to Ms. Carroll

3    with a link to an article by e-mail with the subject "What is

4    the Donald Trump Golden Shower Allegation About?  Glad You

5    Asked."  And Ms. Carroll e-mail you back at 11 p.m. that night

6    saying "I'm in heaven."  And that same night, about eight

7    minutes later, you replied, "I don't think I can sleep.  Dreams

8    of peeing during impeachment.  Too much smoke here/fire very

9    nearby."

10            Do you recall that e-mail?

11   A.  Attempt at humor, sorry.

12   Q.  Okay.  Whatever it is.

13            MR. TACOPINA:  I am offering EO, your Honor.

14            MS. KAPLAN:  No objection, your Honor.

15            THE COURT:  Pardon me?

16            MS. KAPLAN:  No objection.

17            THE COURT:  Received.

18            (Defendant's Exhibit EO received in evidence)

19   BY MR. TACOPINA:

20   Q.  EP, Ms. Martin, is a March 14, 2017 e-mail to Ms. Carroll

21   with a link to a *New York Times* article and the subject *"New*

22   *York Times* Kirschner's Trump-in-law's near $400 million deal

23   with a Chinese firm," and you write to Ms. Carroll, "Dear God,

24   make this stop."

25   A.  That was from me to Jean.

Case 23-793, Document 84, 11/20/2023, 3592071, Page210 of 300

A-2430

```
 1              THE COURT:  There is no question yet, ma'am.

 2              THE WITNESS:  Oh, I'm so sorry.

 3     Q.  Do you recall that?

 4     A.  Yes.  I'm looking at it.  Yes.

 5              MR. TACOPINA:  Let me just -- let me offer.  This is

 6     EP?  EP.  I will offer EP, your Honor.

 7              MS. KAPLAN:  No objection.

 8              THE COURT:  Received.

 9              (Defendant's Exhibit EP received in evidence)

10     BY MR. TACOPINA:

11     Q.  I would like to show you a government exhibit

12     now—government, it's normally where I live—but plaintiff's

13     exhibit, PX 122.  You were shown this on questions by

14     Ms. Kaplan earlier.  I want to talk to you about it for a

15     minute.  This is in evidence already as PX 122.

16              That's the e-mail that you sent to Ms. Carroll back on

17     September 23, 2017.  Do you want some water, by the way,

18     Ms. Martin?

19     A.  I have some.

20     Q.  Oh, you have some?

21     A.  Yeah.

22     Q.  September 23, 2017, right?  This is the Namibia topic we

23     discussed earlier.

24              When you say -- let's go just right to the point here.

25     You say, "As soon as we are both well enough to scheme, we must
```

N542Car2                    Martin - Cross

1    do our patriotic duty again."

2            Do you know what the definition of "scheme" is?

3    A.  I think I do.

4    Q.  What do you think it is?

5    A.  It's a plan, to put a plan together.

6    Q.  Okay.

7    A.  That's how I think of a scheme.

8    Q.  That's how you think of a scheme.  Is it a secret plan?

9    A.  No, not necessarily.

10   Q.  Okay.  So, anyway, the plan you were going to put together

11   to do your patriotic duty with Ms. Carroll was what?

12   A.  Was generally what we would work on for some of those

13   causes I just mentioned.  This was right after the election of

14   Mr. Trump.  I'm looking at the date on here.  So this was a

15   very typical conversation about the kinds of energy that we put

16   toward democratic causes, some of the things that I'm

17   interested in, anyway.

18   Q.  This was specifically regarding Donald Trump, though.

19   That's, of course, Donald Trump.

20   A.  Yes.

21   Q.  When you say, We are going to scheme or as soon as we are

22   both well enough to scheme, we must -- we must do our patriotic

23   duty again, do you have anything in particular you were

24   referring to there, aside from just supporting democratic

25   causes?

N542Car2                          Martin - Cross

1    A.  Supporting democratic causes.

2    Q.  That's the scheme?

3    A.  That's the scheme.

4    Q.  But you had been supporting democratic causes all along,

5    right?

6    A.  But it's still -- it's still a plan.

7    Q.  It's still a plan.

8    A.  Yes.

9    Q.  Okay.  And in response to that——I think you have seen this

10   also——Ms. Carroll in all caps "totally" with three exclamation

11   points "I have something special for you when we meet."

12   A.  Yes.

13   Q.  And to you this something special was a stuffed squirrel?

14   A.  Well, I believe so.

15   Q.  Yeah.  Now, you testified previously in this litigation via

16   deposition, right?

17   A.  Yes, yes.

18   Q.  When did you remember that "I have something special for

19   you when we meet" was a stuffed squirrel?

20   A.  I only put it together with the timeline.

21   Q.  With the timeline?

22   A.  Yes.

23   Q.  Okay.  When did you put it together, that timeline?

24   A.  I can't really tell you.

25   Q.  After the deposition but before the trial?

N542Car2                         Martin - Cross

1   A.  Are you speaking of the deposition I gave to your --

2   Q.  Yes.

3   A.  Back in October.

4   Q.  In October.

5           So it was after October and before today?

6   A.  I'm not sure, sir.

7   Q.  Okay.

8   A.  I really don't know.

9   Q.  Well, you didn't talk about that something special in the

10  scheme e-mail being a stuffed squirrel in your deposition, did

11  you?

12  A.  I don't know.

13  Q.  Okay.  All right.  You can take that down.  Thanks.

14          So it's your testimony that Ms. Carroll told you she

15  was sexually assaulted.

16  A.  Yes.

17  Q.  And this happened at your house?

18  A.  Yes, the discussion.

19  Q.  The discussion.  The discussion.  That was not a clear

20  question.  The discussion.

21  A.  Yeah.

22  Q.  And it's your testimony that Ms. Carroll told you she was

23  sexually assaulted this one and only time.  She never had

24  mentioned that to you before, being sexually assaulted, right?

25  Let me rephrase that question.

N542Car2                      Martin - Cross

1          This was the first time Ms. Carroll had ever mentioned

2    to you that she had been sexually assaulted?

3    A.  I think so.

4    Q.  You think so?

5    A.  I think so.

6    Q.  Would that be something you would likely forget if

7    Ms. Carroll told you she was sexually assaulted another time?

8    A.  No, but I think what you are speaking about in 1996, in

9    that time frame, we weren't closer before that, we weren't as

10   close as we could have been if we were speaking about something

11   like that.

12   Q.  Okay.

13   A.  I didn't know her that way until she told me about the

14   attack by Mr. Trump.

15   Q.  How about after you became close?  Did she tell you about

16   any other sexual assaults?

17   A.  No.

18   Q.  No?  Okay.

19          Did the name Les Moonves ever come up to you?

20   A.  I know who that is.

21   Q.  From Ms. Carroll?  Did she ever mention him to you?

22   A.  From the book.  I knew about it from her book and I knew

23   vaguely.

24   Q.  What do you mean?  You knew vaguely what?  I'm sorry.

25   A.  I knew vaguely about some charges that had been brought

Case 23-793, Document 84, 11/20/2023, 3592071, Page215 of 300

A-2435

N542Car2                         Martin - Cross

1    against Mr. Moonves at some point.  I couldn't give you a year.

2    I had heard it in the media circles.

3    Q.  That's a different question.  My question was did

4    Ms. Carroll ever -- before the book came out ever mention to

5    you anything about --

6    A.  I don't think we had --

7    Q.  -- Les Moonves?

8    A.  -- that discussion.

9    Q.  Okay.  Now, this was obviously an important conversation

10   you had with Ms. Carroll.

11   A.  Yes, yes.

12   Q.  And you were shocked --

13   A.  Yes.

14   Q.  -- by it.

15   A.  Yes, I was.

16   Q.  And it involved Donald Trump, someone who you knew well of.

17   You knew he was a very famous person in New York?

18   A.  From the e-mails, well, yes, not at that point, obviously

19   there weren't e-mails, but --

20   Q.  No.  I'm not talking about the e-mails we just went

21   through.  I'm just saying you knew who Donald Trump was.

22   A.  Yes.

23   Q.  You were a journalist in New York --

24   A.  Absolutely.

25   Q.  -- obviously, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page216 of 300

A-2436

N542Car2                    Martin - Cross

1    A.  Absolutely.

2    Q.  Back in '95 or '96.

3    A.  Yes.

4    Q.  But you don't know the date she supposedly told you this?

5    A.  Oh, no, I couldn't give you an exact date.

6    Q.  Now, how about a year?  Can you give me an exact year?

7    A.  It was either '95 or '96.

8    Q.  Do you know the month the conversation with you and

9    Ms. Carroll happened in your house?

10   A.  I'm sorry, I can't.  I was saying I didn't make -- I didn't

11   memorialize it.  I didn't write it down anywhere.

12   Q.  Okay.  Okay.  And it's your story that before Ms. Carroll

13   supposedly told you she was attacked by Donald Trump, she

14   didn't make a specific request to speak to you?

15   A.  I'm sorry.  I don't understand.

16        MS. KAPLAN:  Objection to the form, your Honor.

17        MR. TACOPINA:  One second.  I will rephrase that.

18   BY MR. TACOPINA:

19   Q.  How did you -- what was the watershed event that got you to

20   your house that night?  Was it a request by Ms. Carroll to

21   speak to you or did you just all decide to go have coffee or

22   something at your house?

23   A.  She asked what I was doing.  It was not an unusual request.

24   She said let's go -- do you have some time?  Let's go to your

25   house, or something, words to that effect.  There was no

Case 23-793, Document 84, 11/20/2023, 3592071, Page217 of 300

A-2437

N542Car2                    Martin - Cross

1   watershed.  I didn't know what she wanted to talk about.  It

2   could have been nothing, based on our past gatherings.

3   Q.  Okay.  So it's your testimony today that she requested to

4   go to your house to discuss something?

5   A.  Yes, yes.

6              MR. TACOPINA:  I'm going to read, your Honor, from,

7   and counsel, the deposition, page 30.

8              MS. KAPLAN:  This is Ms. Martin's deposition?

9              MR. TACOPINA:  Yes, of course.

10             Page 30.  It's a little -- there are some objections,

11  so it starts at line 8 and I guess I will go to 21 for

12  completeness.

13             THE COURT:  Give me a moment.

14             MR. TACOPINA:  And the relevant lines for impeachment

15  purposes are 18 and 19, your Honor.

16             MS. KAPLAN:  Objection, your Honor.  I don't see any

17  inconsistency.

18             THE COURT:  Nor do I.  Sustained.

19             MR. TACOPINA:  Okay.

20  BY MR. TACOPINA:

21  Q.  Anyway, it's -- Ms. Martin, it's your testimony that before

22  you got to your house and had that conversation, did you know

23  specifically what Ms. Carroll wanted to speak to you about?

24  A.  No, I did not.

25  Q.  Now, at the time of this supposed conversation at your

N542Car2                    Martin - Cross

1   house, you were married to Joseph Terry?

2   A.  Yes.

3   Q.  Okay.  And according to you, your conversation with

4   Ms. Carroll happened in your home after the end of the work

5   day?

6   A.  Yes, of our work day, yes.

7   Q.  Your work day.  No one else was in the house at that point?

8   A.  No, they were not.

9   Q.  Now, according to you, Ms. Carroll told you that she felt

10  physically okay that day, right?

11  A.  If those were the words.  I can't -- I can't be absolutely

12  sure if those were her words.  I'm looking at her and I assumed

13  she seemed okay and she was frazzled.

14  Q.  Okay.  Did she tell you she was physically okay that day?

15  A.  I -- maybe in so many words.  I'm sorry I can't give you an

16  exact --

17  Q.  It's okay.  I'll go to the deposition, page 33/lines 12

18  through 15.

19              THE COURT:  Any objection?

20              MS. KAPLAN:  None, your Honor.

21              THE COURT:  Go ahead.

22  BY MR. TACOPINA:

23  Q.  Okay.  This is -- well:

24  "Q  What was your advice?

25  "A  Because she said" -- I'm sorry.  Withdrawn.  "Because she

N542Car2                     Martin - Cross

1    had said she felt physically okay that day and she wasn't sure

2    what to do, I advised her not to do anything."

3              Was that truthful testimony in October?

4    A.  I think so.

5    Q.  Okay.  Now the other reason you said also, just to complete

6    the record, here you -- I just read you your testimony where

7    you said you advised her not to do anything because she said

8    she felt physically okay.

9              THE COURT:  Let's please get to a question.

10             MR. TACOPINA:  It is.  I had to set it up with that,

11   your Honor.

12   Q.  You also said that --

13             THE COURT:  No.  Questions don't get set up.  We are

14   not serving dinner in a restaurant.  Let's go on.

15             MR. TACOPINA:  Then, you know what?  We will skip that

16   question.

17   BY MR. TACOPINA:

18   Q.  It's your testimony that after Ms. Carroll first told you

19   about this alleged incident, you spoke to her again about it

20   before her book was published.

21   A.  Before her book was published.

22   Q.  Before her book was published, right around the time her

23   book was published.

24   A.  Yes.

25   Q.  Okay.  That was about 24 years later?

Case 23-793, Document 84, 11/20/2023, 3592071, Page220 of 300

A-2440

N542Car2                    Martin - Cross

1   A.  I think so.

2   Q.  Next time you had a conversation about your friend being

3   attacked in Bergdorf Goodman by Donald Trump, 24 years later,

4   right?

5          THE COURT:  Argumentative.  Sustained.  And counselor,

6   for your information --

7          MR. TACOPINA:  Yes, sir.

8          THE COURT:  -- the definition of an argumentive

9   question in *Black's Law Dictionary* is "a question in which the

10  examiner interposes a viewpoint under the guise of asking a

11  question."  So go on.

12         MR. TACOPINA:  Thank you.

13  BY MR. TACOPINA:

14  Q.  So you testified, you testified in your deposition that you

15  didn't even discuss Ms. Carroll's book with her containing her

16  Donald Trump Bergdorf Goodman story before it came out in 2019,

17  correct?

18  A.  I think that's correct, yes.  I didn't know she was going

19  to include that story.  That would be the reason.

20  Q.  Now, The Daily podcast that you did, that was yourself,

21  Ms. Carroll, and Ms. Birnbach.

22  A.  Yes.

23  Q.  Okay.  I didn't hear you.

24         And do you remember the date of that Daily podcast?

25  A.  Not really.  I'm only guessing June of 20 -- I can't guess.

Case 23-793, Document 84, 11/20/2023, 3592071, Page221 of 300

A-2441

N542Car2                        Martin - Cross

1    I'm not certain.

2    Q.  It was around the time Ms. Carroll's book was published,

3    obviously?

4    A.  That's correct, yes.

5    Q.  Okay.  And before suing Donald Trump, Ms. Carroll informed

6    you she was going to file a lawsuit against him.

7    A.  She was working on the New York Adult Victims of Survivors

8    Act and I knew that she was working in that realm.  I did not

9    know exactly what she was going to do.

10   Q.  According to you, it was up to the point where you were

11   deposed in October of last year, you never spoke with any of

12   Ms. Carroll's attorneys about her allegations.

13   A.  No, I did not.

14   Q.  However, in August of 2022, you at least were contacted by

15   an attorney who linked you up with your current attorney, Noam

16   Biale?

17   A.  Yes, that's correct.

18   Q.  That was one of Ms. Carroll's attorney who linked you up

19   with your current attorney?

20           MS. KAPLAN:  Objection, your Honor.

21           THE COURT:  I don't understand the question.  Let's

22   start with that.

23           MR. TACOPINA:  Okay.

24           THE COURT:  Please don't answer.

25   Q.  Who linked you up with your current attorney, Mr. Biale?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N542Car2                       Martin - Cross

1   A.  Well, that would be E. Jean's attorney, but I didn't see it

2   as a link-up.

3   Q.  Who referred you to your attorney?

4   A.  I was told that I had to have my own representation.

5   Q.  Now, on August 10, I would like to show you Defense Exhibit

6   BS.

7           And Robbie, it is the redacted portion we discussed.

8           MS. KAPLAN:  I wasn't given a copy.  Do you have a

9   copy?

10  BY MR. TACOPINA:

11  Q.  Anyway, Ms. Martin, before you look at that, let me ask you

12  a question.  Do you recall a text exchange between you and

13  Ms. Carroll about arranging transportation, coming into the

14  city for either a meeting or something you had regarding her

15  case?

16  A.  Vaguely.

17  Q.  Vaguely.  Okay.

18          And in response to that Defense BS, if you could

19  please blow it up a little bit for Ms. Martin, you said,

20  "Thanks for helping on that.  No more chats and texts until

21  further notice."

22          What did you mean by that?

23  A.  Nothing nefarious, I can tell you that.  I'm not sure.

24  Q.  Okay.  Okay.

25          MR. TACOPINA:  Your Honor, we will offer BS with the

Case 23-793, Document 84, 11/20/2023, 3592071, Page223 of 300

N542Car2                    Martin - Cross

1   appropriate redactions agreed upon by counsel.

2           THE COURT:  Any objection?

3           MS. KAPLAN:  Subject to appropriate redactions, your

4   Honor, no objection.

5           THE COURT:  Received on that basis.

6           (Defendant's Exhibit BS received in evidence)

7   A.  I'm still reading that text.  Is that okay?

8   Q.  Sure, you could read it.

9   A.  "No more chats.  Update from Noam"——that would be my

10  representative——"is upsetting," and I'm not sure what I meant

11  by that.  I'm really not.

12          THE COURT:  And conversations with your counsel,

13  except in unusual circumstances, are private.

14          THE WITNESS:  Okay.

15  BY MR. TACOPINA:

16  Q.  Okay.  Anyway --

17  A.  Ah.  I know what this was about.

18  Q.  Okay.  Well, there is not a question, and I don't want to

19  get into conversations with you and your counsel.

20  A.  This is -- okay.

21  Q.  Okay?

22  A.  This is not with my counsel.

23  Q.  I know.  This is a text message from you to E. Jean, right?

24  A.  Yes.

25  Q.  And in that message, do you know what the "no more chats

Case 23-793, Document 84, 11/20/2023, 3592071, Page224 of 300

A-2444

N542Car2                     Martin - Cross

1   and texts until further notice" is about?

2   A.  Now I do.

3   Q.  What is that?

4   A.  It had to do with the fact that I was going to have to

5   retain Mr. -- Noam as my, I guess you would call it counsel for

6   this ongoing because at that point the case was going -- she

7   was filing a case against Mr. Trump.  At this point they were

8   going to subpoena me.  That's what I know this means, because I

9   said I can fill them in on addresses, have to let them in at

10  the gate.  I've never been subpoenaed in my life.  I didn't

11  know what to expect.  But I was told someone would be coming to

12  subpoena me for this case.

13  Q.  Okay.  Okay.  Is that it?

14  A.  Is that it?

15  Q.  Yes.  I'm saying that's what you wanted to say?

16  A.  Regarding this text, yes, uh-huh.

17  Q.  Okay.  Thank you.

18          I'm going to show you Defense Exhibit CR.  That is a

19  text between you and Ms. Carroll on August 2, 2022, that you

20  wrote.

21  A.  Ah.

22  Q.  "Expect some day" -- I guess your attorney expects some day

23  in September and there you are referring to I guess your

24  deposition where you would be testifying about this case in a

25  deposition?

N542Car2                          Martin - Cross

1   A.  Yes.

2   Q.  Okay.  And you told Ms. Carroll in this August 2, 2020

3   text, "You, me, Miss Lisa," which is Birnbach I guess?

4   A.  Yes, yes.

5   Q.  "Definitely," and that's all caps, "definitely have to sit

6   together and chat before then, depending on Lisa's recovery, of

7   course."

8          Do you see that?

9   A.  Yes, I do.

10          MR. TACOPINA:  I offer CR, your Honor, Defense CR in

11  evidence.

12          MS. KAPLAN:  Subject to redactions, your Honor.

13          THE COURT:  Received on that basis.

14          MS. KAPLAN:  No objections.

15          (Defendant's Exhibit CR received in evidence)

16  BY MR. TACOPINA:

17  Q.  You could publish that, by the way.

18          So before testifying under oath in this case for your

19  deposition, Ms. Martin, you told Ms. Carroll that there was a

20  definite need for you, her, and Lisa to all get together,

21  correct?

22  A.  I see it here, but I think I know what the implication is

23  from that word "definitely."

24  Q.  Well, my question was simply, before testifying under oath,

25  you told Ms. Carroll that there was a definite need for you,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page226 of 300

N542Car2                        Martin - Cross

1    Lisa, and Ms. Carroll to get together before your deposition,

2    correct?

3    A.  I am looking at it.  I do not remember it, but I'm sure I

4    must have said it or texted it, excuse me.

5    Q.  I would like to show you Defense Exhibit ER and this is a

6    text——you take a look at it, we will zoom in on the relevant

7    portion——that you sent to a friend, without identifying the

8    friend, I guess, where you expressed your awareness that

9    Ms. Carroll was planning to sue Donald Trump for rape?

10   A.  Yes.

11   Q.  And that it's gone to another level and something you can't

12   relate to?

13   A.  Yes.

14   Q.  And lastly, that you think this quest has become -- no

15   sorry.  Lastly, for her, meaning Ms. Carroll, sadly you think

16   this quest has become a lifestyle.

17   A.  Yes.

18   Q.  Do you recall saying that?

19   A.  I'm reading it.  I know what I meant or I should say I

20   remember when it was written.

21         MR. TACOPINA:  Okay, your Honor.  We would offer this

22   defense exhibit.  It's ER?  ER.

23         MS. KAPLAN:  No objection, your Honor, subject to

24   redaction.

25         THE COURT:  Same ruling.

N542Car2                    Martin - Cross

1          (Defendant's Exhibit ER received in evidence)

2    BY MR. TACOPINA:

3    Q.  When you say it's become a lifestyle for Ms. Carroll, what

4    did you mean?

5    A.  I have to preface this with another comment I made a little

6    earlier, which had to do with my own what I called stacking up

7    in my own life.  There were some things going on right here in

8    this time period that I know why I was as you might call it

9    hyperbolic if you would like about certain things.  The point

10   that you made, it's gone to another level, the lifestyle issue,

11   lifestyle is a word I use.  Perhaps I used it wrong in this

12   case, according to what I think you are implying.

13   Q.  I'm --

14   A.  It had nothing to do with her -- forgive me.  I don't

15   mean --

16   Q.  I'm not implying anything.  I'm just asking you what you

17   meant.

18   A.  Lifestyle didn't mean she has a lifestyle that she is

19   growing up.  I know about what I have been -- what I am

20   assuming you are --

21   Q.  Okay, in this text message you have talked about, I guess,

22   to whoever you are writing to.  Was Pat your friend?  Is that

23   who Pat was?

24   A.  She is a friend, yes.

25   Q.  She, I'm sorry, she.

Case 23-793, Document 84, 11/20/2023, 3592071, Page228 of 300

A-2448

N542Car2                        Martin - Cross

1           And basically, you know, she had responded, I guess,
2      to Ms. Carroll's text, and you said you are not being cynical.
3      You are just telling the truth.  Right?
4      A.  Yes.
5      Q.  All right.  Next, I am going to show --
6                MR. TACOPINA:  That's offered already?  That's in?  I
7      offered it.
8                MS. KAPLAN:  I believe so.
9                MR. TACOPINA:  Next, Robbie, this is the one I'm not
10     going to offer but just show the witness.
11               MS. KAPLAN:  What's the letters?
12               MR. TACOPINA:  BW.
13     A.  Oh, I know what this is, too.
14     Q.  So, Ms. Martin, here's another one.  This is, I guess, a
15     text message you sent to your daughter in which you were
16     venting.  This is not being offered into evidence, so don't
17     worry about it.
18     A.  I'm not sure I'm seeing the right one.  "This came in two
19     weeks ago Thanksgiving."
20               MR. TACOPINA:  Well, is this all of BW, guys, that we
21     have?  Let's do this.  That is not it.  I need the full one.
22     Q.  But I can read from your deposition about this message.  We
23     are not going to offer the message anyway.
24     A.  This is December 1 of '21.
25     Q.  December 1 --

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

N542Car2                          Martin - Cross

1          THE COURT:  Ms. Martin, please wait for a question.

2          THE WITNESS:  Sorry.

3          MR. TACOPINA:  Bear with me one second, your Honor.

4   BY MR. TACOPINA:

5   Q.  Okay, counsel, page 64 of Ms. Martin's depositions, lines

6   11 through 17.  This actually might make it a little easier.

7          THE COURT:  Let's just wait a minute.

8          Any objection?

9          MS. KAPLAN:  Your Honor, for completeness, we think it

10  should go to 25.

11         THE COURT:  You are proposing to read 11 to 17.

12         MR. TACOPINA:  I was proposing 11 to 17.  They want me

13  to go to 25.

14         THE COURT:  Yes.  I heard that part.  The text is not

15  in and you are not offering it, right?

16         MR. TACOPINA:  Correct.

17         THE COURT:  I don't understand the relevance.

18         MR. TACOPINA:  Your Honor, there is a reason we are

19  not offering this text that both parties agreed to.

20         THE COURT:  But now the question is -- all right.  You

21  agreed to that.

22         MR. TACOPINA:  She testified to this text in her

23  deposition, and so I want to ask her questions.

24         THE COURT:  Not in the page -- well, maybe.  I see.  I

25  see what you are saying.  Go ahead, Mr. Tacopina, 11 to 17.

N542Car2                    Martin - Cross

1    Q.  Ms. Martin --

2              MR. TACOPINA:  Take this down please.

3    Q.  Ms. Martin, I'm just going to read you a question from the

4    deposition.  This is:

5    "Q  Mr. Swift showed you a text message that you sent to your

6    daughter I believe it was on December 1, 2021?"

7              Answer by you:  "Yes."

8    "Q  And you testified in substance that you were venting to

9    your daughter, correct?

10             Answer by you:  "Yes."

11             Do you recall being asked that question?

12   A.  Vaguely.

13   Q.  Okay.

14   A.  I think so.

15             THE COURT:  It's stenographically recorded,

16   Mr. Tacopina.

17             MR. TACOPINA:  Yes, I know.  I'm trying to bring her

18   back to her recollection back to that Q and A.  I know it is

19   stenographically recorded.

20   A.  This is during the deposition you are speaking of.

21   Q.  Yes, ma'am.

22             THE COURT:  Next question.

23   Q.  You expressed your state of mind about Ms. Carroll to your

24   daughter that Ms. Carroll was acting a little scary.  Do you

25   recall saying that?

Case 23-793, Document 84, 11/20/2023, 3592071, Page231 of 300

A-2451

N542Car2                         Martin - Cross

1    A.  Possibly, yes.

2    Q.  And that she was turning this transaction, your word, into

3    a lifestyle.  Do you recall saying that?

4    A.  I don't, but if it's on a text, I suppose I did.

5    Q.  And that she was loving the adulation?

6    A.  Is this on my screen?  It's not.

7    Q.  Okay.  It's not.

8    A.  It's all right.

9    Q.  Do you remember saying that Ms. Carroll loves the

10   adulation?

11          THE COURT:  Let's just wait for a question, okay?

12          THE WITNESS:  Yes.

13   Q.  We can show you this text.

14          MR. TACOPINA:  Again, we are not offering it, your

15   Honor.

16          (Pause)

17          MR. TACOPINA:  Can we show the text or can we not show

18   the text?  Here we go.  Okay.

19   Q.  So the questions were, from the text message, again,

20   just --

21          THE COURT:  This is?

22          MR. TACOPINA:  A text from December 1.

23          THE COURT:  Does it have an exhibit designation?

24          MR. TACOPINA:  It does, your Honor.  BW.

25          THE COURT:  All right.

A-2452

N542Car2                        Martin - Cross

1          MR. TACOPINA:  BW.  Thank you, your Honor.

2    BY MR. TACOPINA:

3    Q.  Okay.  So let's just focus right here.  The three questions

4    I just asked you from that text exchange or the text message

5    you sent to your daughter, that Ms. Carroll was acting a little

6    scary -- "E is acting a little scary."  Do you see that?  Can

7    you highlight that?

8    A.  Yes.  I'm sorry.

9    Q.  Do you see that?

10   A.  I do.

11   Q.  And E. is Ms. Carroll, correct?

12   A.  Yes, yes.

13   Q.  And you go on to say "she is definitely turning this whole

14   never-ending transaction into a lifestyle."  Correct?

15   A.  I'm reading that, yes.

16   Q.  I know you are reading it.  That's what you sent to your

17   daughter, right?

18   A.  Yes.

19   Q.  And then you say, "She is loving the adulation."  "E. Jean

20   is loving the adulation."  Do you see that down there?

21   A.  Yes.  I'm sure.  I don't think --

22   Q.  "We are all her cheerleaders."

23   A.  Yes.

24   Q.  Okay.  You can take that down, I think.  No.  Just one more

25   question on that.  I'm sorry.

N542Car2                       Martin - Cross

1           And you say that at some point that Ms. Carroll was in

2     too deep and you were just not there for it.

3           Highlight that part, please.  It is in the middle

4     here, guys.  I did it?  Oh.  I could do that?  If I touch the

5     screen everyone can see that?  Oh, cool.  Okay.

6           Do you see what I just underlined with my finger?

7     A.  Oh, I'm sorry.  I was reading this.  What did you say?

8     Q.  "In too deep.  I'm just not there for it."

9     A.  Um-hmm.

10    Q.  And you are talking about, again, Ms. Carroll is in too

11    deep and you are just not there for it?

12    A.  I think so.

13    Q.  You can take that down.

14          MR. TACOPINA:  And it's not being offered, your Honor.

15    Q.  After you --

16          THE COURT:  Mr. Tacopina, how much longer do you

17    expect to be with the witness?

18          MR. TACOPINA:  Not much, your Honor.

19          THE COURT:  Define that.

20          MR. TACOPINA:  Well . . .

21          (Counsel confer)

22          MR. TACOPINA:  Your Honor, maybe -- probably no more

23    than ten minutes, maybe less, but can we just break and then I

24    will just finish right after lunch?  We have another exhibit.

25    I want to make sure it is ready to go.  Or if you want me to go

Case 23-793, Document 84, 11/20/2023, 3592071, Page234 of 300

N542Car2                    Martin - Cross

1    ahead, whatever you want me to do.

2           THE COURT:  Look, the jury wants to have lunch, a lot

3    of people want to have lunch, and we will have lunch.  However,

4    you are telling me that you are going to finish right after

5    lunch, and I think it's fair to say.

6           MR. TACOPINA:  I am telling you that.

7           THE COURT:  And you are telling the jury that, too,

8    right?

9           MR. TACOPINA:  I'm telling the jury right after lunch.

10          THE COURT:  I don't mean literally, literally.

11          MR. TACOPINA:  Literally within a ten-minute range.

12          THE COURT:  It's ten minutes to 1.  Let's say 2:10,

13   and we will then see what "right after lunch" means.

14          (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

A-2455

N545car3                        Martin - Cross

1                   A F T E R N O O N   S E S S I O N

2                            2:10 p.m.

3            THE COURT:  Good afternoon.

4            The jury, please?

5            (Jury present)

6            THE DEPUTY CLERK:  Please be seated, everyone.

7            THE COURT:  OK.  Just before we start the questioning,

8     with respect to the two letters I have from members of the

9     press, Ms. Bekiempis and Mr. Lee, the parties shall respond to

10    these no later than Saturday noon, and the press may respond no

11    later than Sunday at 5:00.

12           In one respect I am prepared to rule on this now.

13    There are some sealed files from something earlier this week,

14    April 27 and May 1, and conceivably another short part but I'm

15    not certain of the date because the cover is not on the copy

16    that I have.  I will make those publicly available but not

17    until there is a verdict and the jury is discharged.  I find

18    that any earlier disclosure risks very substantial damage to

19    the ability to have a decision by the jury unaffected by

20    inappropriate outside materials.  And, I reserve the right to

21    elaborate on that finding.

22           Let's go.  The witness is still under oath.

23    Mr. Tacopina.

24           MR. TACOPINA:  Thanks, your Honor.

25    BY MR. TACOPINA:

N545car3                    Martin - Cross

1   Q.  Good afternoon again, Ms. Martin.  I'm going to show you

2   Defendant's Exhibit EX, it is right in front of you, and just

3   take a look at that portion, and that's just a text message

4   that you sent to your friend Pat on December 2 of 2021; right?

5   A.  Yes.

6   Q.  And the subject matter, in sum and substance, Ms. Martin,

7   is basically after Ms. Carroll filed her lawsuit against Donald

8   Trump, you attended a party relating to her lawsuit?

9   A.  Yes.

10  Q.  OK.  You just mentioned in this text message some of the

11  people who were there, Preet Bharara and Mary Trump and Kathy

12  Griffin.  And Kathy Griffin was that comedian who stirred up

13  some controversy holding up a severed Donald Trump replica head

14  or something?  Is that who she is?

15  A.  That is who she is.

16  Q.  And you wrote that -- discussed your interaction with

17  people at the party in sum and substance; right?

18  A.  Yes.

19  Q.  And that was a party after the lawsuit was filed?  After

20  Ms. Carroll filed her lawsuit against Donald Trump?

21  A.  Yes.

22          MR. TACOPINA:  OK.  Thank you.  You can take that

23  down.

24  Q.  Ms. Carroll published her book around July of 2019;

25  correct, Ms. Martin?

N545car3                         Martin - Cross

1  A.  Yes.

2  Q.  And it is your testimony that before her book was

3  published, you didn't tell a single person that you had a

4  friend who was supposedly raped by Donald Trump?

5  A.  Not to my recollection.

6  Q.  And even though you were married at the time that this

7  supposed conversation with Ms. Carroll happened at your home,

8  it is your story that you didn't even tell your husband that a

9  work colleague, that you became friends with, was raped by

10  Donald Trump?

11  A.  That is my recollection.

12  Q.  Even during the election period, 2016, when he was running

13  in the election, it was something you obviously felt strongly

14  about you said; correct?

15  A.  The 2016 election.

16  Q.  2016, yes.

17  A.  Yes.

18  Q.  And even during that election you supposedly -- not

19  supposedly -- withdrawn -- you never said a word that Donald

20  Trump supposedly raped your friend?

21  A.  During that election?

22  Q.  Yes, during the election when you were sitting with other

23  people and discussing the election with other people?

24  A.  I do not recall ever saying that.

25          MR. TACOPINA:  OK, Ms. Martin.  Thank you very much

N545car3                           Martin - Redirect

1    for your time today.  OK?

2              THE WITNESS:  OK.

3              THE COURT:  All right.  Thank you.

4              Redirect.  You may proceed.

5              MS. KAPLAN:  Thank you, your Honor.

6    REDIRECT EXAMINATION

7    BY MS. KAPLAN:

8    Q.  Ms. Martin, do you recall that -- we are going to put it

9    up.

10             MS. KAPLAN:  Let's put up Defendant's Exhibit CR.  I

11   think it is in evidence.

12             Can you guys put it up?

13             MR. TACOPINA:  Yeah, sure.

14   Q.  I want to focus at the bottom.  Let me try, as they're

15   putting it up, to focus you, Ms. Martin.  Do you recall

16   Mr. Tacopina showing you a text -- and now you have it up in

17   front of you -- from August 2022 in which you are talking about

18   sitting together to chat with Lisa Birnbach and E. Jean

19   Carroll?

20   A.  Yes.  I'm looking at it.

21   Q.  And the deposition that you gave in this case, do you

22   recall, was in October 2022?

23   A.  Yes.

24   Q.  Between the date of this text, which is August 2022, and

25   your deposition, which is October 2022, did the three of you --

N545car3                        Martin - Redirect

1   meaning E. Jean Carroll, Lisa Birnbach, and yourself -- ever

2   sit down together to talk about your deposition testimony?

3   A.  I don't have a recollection of that.

4   Q.  Now, do you recall that Mr. Tacopina read some questions

5   and answers that you gave at your deposition in October?

6   A.  Yes.

7   Q.  And some of that testimony was about venting to your

8   daughter about this case, E. Jean's case?

9   A.  Yes.

10  Q.  And isn't it true -- withdrawn.

11          Do you recall giving this testimony at your

12  deposition?  I'm just going to read it.

13          THE COURT:  Page?

14          MS. KAPLAN:  Excuse me, your Honor.  It is page 65.

15          THE COURT:  Lines, please?

16          MS. KAPLAN:  Lines 2 through 11.

17          MR. TACOPINA:  2 through 11?

18          MS. KAPLAN:  Yes.

19          MR. TACOPINA:  Your Honor, I would object to that.

20  It's what we discussed earlier.

21          MS. KAPLAN:  Your Honor, I think it is appropriate

22  testimony.  First of all, for the rule of completeness in terms

23  of the testimony, it is follow-up to the questions and answers

24  that were asked at the deposition.

25          THE COURT:  What was the Q&A he put in?

Case 23-793, Document 84, 11/20/2023, 3592071, Page240 of 300

A-2460

N545car3                    Martin - Redirect

1           MS. KAPLAN:  He put in Q&A from page 64 --

2           MR. TACOPINA:  11 through 17, your Honor.

3           THE COURT:  And you propose to read what?

4           MS. KAPLAN:  I propose to read -- actually, I will

5    make it clearer, I can make it 18 to 25 and then 1 --

6           THE COURT:  Sorry.

7           MS. KAPLAN:  18 to 25 on page 64, just completing it,

8    and then 1 through 11 on page 65.

9           MR. TACOPINA:  Your Honor, we have no problem with 18

10   through 25, they think that completes it -- they didn't ask me

11   to complete it before -- but 1 through 11 -- or 2 through 11, I

12   should say, is objectionable.  It is something we objected to

13   before and the Court sustained.

14          THE COURT:  Not exactly.

15          MR. TACOPINA:  OK.  Not exactly.

16          THE COURT:  You can go through 65, line 7.

17          MS. KAPLAN:  OK.

18          THE COURT:  I sustain the objection as to 8 through

19   11.

20          MS. KAPLAN:  OK.  Got it.

21   BY MS. KAPLAN:

22   Q.  So, I'm going to read the Q&A that followed the Q&A that

23   Mr. Tacopina read to you.  Let me just read two sentences from

24   what you read so you have the context.

25   "Q  You testified in substance" -- starting at line 15, your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page241 of 300

A-2461

N545car3                    Martin - Redirect

1   Honor -- "that you were venting to your daughter, correct?
2   "A  Yes.
3   "Q  Because you felt that E. Jean's case was dragging on too
4   long?
5   "A  I felt that there were -- you want me to answer?
6   "Q  Yes.  I think just yes or no.
7   "A  Dragging on too long is not -- I felt that perhaps things
8   wouldn't turn out as well as we all hoped and I was cautious.
9   I was worried.
10  "Q  When you were venting to your daughter in this text
11  exchange, did you have any reason to doubt whether E. Jean's
12  allegation that Donald Trump raped her was true?
13  "A  I did not have any reason to doubt that, that it was true."
14          Do you recall that testimony at your deposition?
15  A.  Yes.  Yes.
16  Q.  Now, Mr. Tacopina asked you a series of questions about
17  text messages, both with Ms. Carroll and your friends, other
18  friends; correct?
19  A.  Correct.
20  Q.  And he showed you a number of messages in which I think it
21  is fair to say you were venting frustration in those text
22  messages, correct?
23  A.  Correct.
24  Q.  And was it uncommon for you to complain about friends to
25  other friends when they were on your nerves?

N545car3                          Martin - Redirect

1   A.  "Uncommon" is a tough word.  I would say no, it was not

2   uncommon.  It could happen.

3   Q.  And is there anything that you recall saying in those texts

4   about E. Jean Carroll that you would not say to her face?

5   A.  No.  There really wasn't.

6   Q.  Now, you testified that after getting a subpoena in this

7   case you produced a whole bunch of texts and e-mails; right?

8   A.  Yes.

9   Q.  And you reviewed those e-mails before they were produced,

10  correct?

11  A.  Yes.

12  Q.  And in those e-mails you were venting sometimes about this

13  case; correct?

14  A.  Yes.

15  Q.  And in those e-mails you were venting sometimes about

16  E. Jean, correct?

17  A.  Yes.

18  Q.  And you used words like "scary"; correct?

19  A.  Yes.

20  Q.  You used words like "I don't relate"; correct?

21  A.  I -- I -- yes.

22  Q.  And you used a word like "narcissistic" to describe

23  Ms. Carroll; correct?

24  A.  I did.

25  Q.  And in any of those texts or messages that Mr. Tacopina

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N545car3                          Martin - Redirect

 1   showed you, did you ever express any doubt about that what

 2   Ms. Carroll had told you in the mid-1990s wasn't true?

 3   A.  No, I did not.

 4            THE COURT:  I think you have a double negative.

 5            MS. KAPLAN:  Withdrawn.  Withdrawn, your Honor.  I

 6   did.

 7   Q.  In any of those messages did you express any doubt about

 8   what Ms. Carroll had told you in the mid-1990s?

 9   A.  I did not.

10   Q.  In any of those texts do you say you didn't believe her?

11   A.  No, I did not.

12   Q.  In any of those texts do you say something like, *I wish I*

13   *hadn't agreed to go along with this mad*e up story?

14   A.  Oh no.  Not at all.

15   Q.  In fact, you said the opposite; right?

16            MR. TACOPINA:  Objection to the leading, your Honor.

17            MS. KAPLAN:  Withdrawn, your Honor.

18   Q.  I want to show you a document that's been marked for

19   identification as PX- 148, and I believe this was shown to you

20   by Mr. Tacopina on cross.  Do you recall that?

21   A.  Yes.  I'm trying -- OK, it was to Pat.

22   Q.  And the text at the bottom is the one Mr. Tacopina showed

23   you --

24   A.  Oh, yes --

25   Q.  -- and you are talking about hating Donald Trump more than

A-2464

N545car3                      Martin - Redirect

1   words; correct?

2   A.  -- yes.

3   Q.  Do you recall he asked you some questions about that and

4   you gave some answers?

5   A.  Yes.

6   Q.  Now, why don't you look at the text above, and in the text

7   above you are talking about the case; is that correct?  This

8   case?

9   A.  Yes.

10  Q.  And you are talking about going to a proceeding, a hearing

11  in this case; correct?

12  A.  Yes.

13  Q.  And you say -- and I'm going to apologize for my use of

14  language -- I will try to be more subtle but you say:  "I'm

15  thinking how the -- f-word -- this is happening from a simple

16  chat with a friend 25 years ago."  Correct?

17  A.  Yes.

18  Q.  What was the simple chat 25 years ago that you were

19  referring to there?

20  A.  It was when she told me about the attack from Donald Trump.

21  I'm pretty sure that's what I was referring to.

22  Q.  Now, Mr. Tacopina showed you a whole bunch of other texts

23  and e-mails, correct?

24  A.  Yes.

25  Q.  And in those texts and e-mails you talked about hating

Case 23-793, Document 84, 11/20/2023, 3592071, Page245 of 300

A-2465

N545car3                          Martin - Redirect

1   Donald Trump?

2   A.  Yes.  Yes, I did.

3   Q.  You talked about despising Donald Trump?

4   A.  Yes.

5   Q.  And I think it is fair to say you talked about disliking

6   Donald Trump?

7   A.  Yes.

8   Q.  OK.

9        And you also -- he showed you an e-mail, it is DX EM

10  that said, in which you said:  Something has to happen to stop

11  the train.

12       Do you recall that --

13  A.  Yes.

14  Q.  -- that e-mail?

15       And he showed you another e-mail that said:  At least

16  we are not alone in this fresh hell.

17       Do you recall that e-mail?

18  A.  Yes.

19  Q.  And he showed you a third e-mail that said:  Dear God, make

20  this stop.

21  A.  Yes.

22  Q.  Do you recall that e-mail?

23  A.  Yes.

24  Q.  Ms. Martin, you wanted to stop the train; correct?

25  A.  The train being?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page246 of 300

A-2466

N545car3                           Martin - Recross

1   Q.  The Trump presidency.

2   A.  The Trump presidency, yes, I did want it to; yes.

3   Q.  Would you be willing to lie in this courtroom -- withdrawn.

4           Would you be willing to lie to stop the Trump train?

5   A.  No, I would not.

6   Q.  Would you be willing to commit perjury to stop the Trump

7   train?

8   A.  No, I would not.

9   Q.  Would you be willing to lie to get out of this fresh hell,

10  as you described it?

11  A.  No, I would not.

12  Q.  And, finally, Ms. Martin, would you be willing to commit

13  perjury, which is lying under oath, to make this stop?

14  A.  Under no circumstances.  No, I would not.

15          MS. KAPLAN:  Nothing further, your Honor.

16          THE COURT:  Thank you.

17          Mr. Tacopina?

18          MR. TACOPINA:  Yes, your Honor.  Just a couple.

19  RECROSS EXAMINATION

20  BY MR. TACOPINA:

21  Q.  So, Ms. Martin, you say you would have said anything that

22  you said in the messages that you heard here in court today,

23  that you had sent to other friends about Ms. Carroll, you would

24  have said any of that to her face?

25  A.  Yes.

Case 23-793, Document 84, 11/20/2023, 3592071, Page247 of 300

A-2467

N545car3                    Martin - Recross

1  Q.  OK.  That she was a narcissist?

2  A.  Yes.  We have had that discussion.

3  Q.  She was scary?

4  A.  I don't know exactly what I meant on that, but yes.

5  Q.  You would have said to her that she has turned this

6  transaction into a lifestyle?  You would have said that to her

7  face, right?

8  A.  In those exacts words?

9  Q.  Ms. Kaplan just asked you would you have said anything that

10 you said in the texts and e-mails to Ms. Carroll's face, and

11 you said "yes."

12 A.  Yes.  The answer is yes.

13 Q.  And "turning this transaction into a lifestyle," you would

14 have said this to her face?

15 A.  Yes.

16 Q.  OK.  Ms. Kaplan just went on to ask you about a series of

17 things that in these messages between you and Ms. Carroll

18 about, you know, the things you discussed with each other.

19 A.  Yes.

20 Q.  And the question ultimately was did you ever express any

21 doubt about Ms. Carroll's story in those messages.  Do you

22 remember that question?

23 A.  I --

24 Q.  From Ms. Kaplan, going through the messages just between

25 you and Ms. Carroll.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page248 of 300

A-2468

N545car3                    Martin - Recross

1   A.  Oh, yes, just a moment ago.

2   Q.  Just a moment ago, between you and Ms. Carroll, all the

3   things you discussed, and Ms. Kaplan said did you ever call her

4   a liar?  Did you ever express any doubt?

5           THE COURT:  Counsel, that is so long.  If you have a

6   question, let's narrow it.

7   BY MR. TACOPINA:

8   Q.  Did you ever express in any of those messages that she was

9   a liar?  And you said "no," right?

10  A.  Yes.  Correct.  Yes.

11  Q.  Again, the message between you and Ms. Carroll, did you

12  ever express that you had any doubt?  And you said "no"?

13  A.  Correct.

14  Q.  In any of those messages, did you ever say anything that

15  called into question her story?  And you said "no" right?

16  A.  Not that I can recall.

17  Q.  OK.  In any of those messages did you ever allude to Donald

18  Trump as a rapist?

19  A.  No.  I don't believe so.

20          MR. TACOPINA:  Thank you.  No further questions.

21          THE COURT:  Thank you.

22          Ms. Kaplan.

23          MS. KAPLAN:  Nothing further, your Honor.

24          THE COURT:  Ms. Martin, thank you.  You are excused.

25          THE WITNESS:  Thank you.

Case 23-793, Document 84, 11/20/2023, 3592071, Page249 of 300

N545car3                         Humphreys - Direct

1            (Witness excused)

2            THE COURT:  Next witness.

3            MS. CROWLEY:  Plaintiff calls Professor Ashlee

4    Humphreys.

5            THE DEPUTY CLERK:  Ma'am, if you would please take the

6    stand?  Right this way.  Please remain standing and raise your

7    right hand for a moment.

8    ASHLEE HUMPHREYS,

9         called as a witness by the Plaintiff,

10        having been duly sworn, testified as follows:

11           THE DEPUTY CLERK:  Please state your name and spell

12   your first and last names for the record.

13           THE WITNESS:  Sure.  My name is Ashlee Humphreys.

14   A-S-H-L-E-E; the last name is Humphreys, H-U-M-P-H-R-E-Y-S.

15           THE COURT:  You may proceed, Ms. Crowley.

16   DIRECT EXAMINATION

17   BY MS. CROWLEY:

18   Q.  Good afternoon, Professor Humphreys.  What is your current

19   profession?

20   A.  I'm a professor of marketing and integrated marketing

21   communication.

22   Q.  Where?

23   A.  At Northwestern University.

24   Q.  How long have you been on the faculty at Northwestern?

25   A.  Since 2008, so about 14 years.

Case 23-793, Document 84, 11/20/2023, 3592071, Page250 of 300

A-2470

N545car3                        Humphreys - Direct

1   Q.  Have you been asked to perform work on behalf of the

2   plaintiff E. Jean Carroll in this case?

3   A.  Yes, I have.

4   Q.  On what topic?

5   A.  So I was asked to assess the extent of exposure to a

6   statement.

7   Q.  Whose statement?

8   A.  The statement of Mr. Trump.

9   Q.  And if you could possibly pull the microphone a little bit

10  closer?

11  A.  Yes.

12  Q.  In the course of that work, did you prepare a report that

13  describes the work and any conclusions that you reached?

14  A.  I did.

15  Q.  Professor Humphreys, where did you go to college?

16  A.  I went to Northwestern University.

17  Q.  Did you perform any graduate studies?

18  A.  I did.  I have my Ph.D in marketing.

19  Q.  From where?

20  A.  Also from Northwestern University.

21  Q.  And now that you are on the faculty -- sorry, what was your

22  Ph.D in?  Did you say that?

23  A.  It was in marketing with a focus on cultural sociology.

24  Q.  And now that you are on the faculty at Northwestern, what

25  do you teach?

N545car3                          Humphreys - Direct

1    A.  I teach digital, social, mobile media, as well as marketing

2    strategy.

3    Q.  Are you familiar with the term "reputational repair"?

4    A.  Yes, I am.

5    Q.  What is it?

6    A.  So, reputational repair is when someone makes a concerted

7    effort, usually through marketing communications, to repair

8    their reputation or create positive associations associated

9    with them.

10   Q.  Is that one of the topics that you teach your students at

11   Northwestern?

12   A.  Yes, it is.

13   Q.  In addition to teaching, do you engage in research?

14   A.  Yes, I do.

15   Q.  Are you currently engaged in any?

16   A.  Yes, I am.

17   Q.  What are you researching?

18   A.  So, right now I'm revising my book on social media.  I have

19   a couple projects, one is about French wine.  The other is

20   about the early days of online news and online journalism.

21   Q.  Have you authored any books?

22   A.  I have.

23   Q.  How many?

24   A.  One book.

25   Q.  What was it called?

Case 23-793, Document 84, 11/20/2023, 3592071, Page252 of 300

A-2472

N545car3                          Humphreys - Direct

1   A.  *Social Media:  Enduring Principles.*

2   Q.  In the course of your work in academia, have you published

3   articles?

4   A.  Yes, I have.

5   Q.  About how many?

6   A.  I have published about, I would say about 15 articles.

7   Q.  And, just generally, what are those articles about?

8   A.  So they're about a wide range of topics, but generally I

9   study how new industries become socially accepted and how they

10  deal with issues of stigma.

11  Q.  Are those articles peer-reviewed?

12  A.  Yes, they are.

13  Q.  Have you made any presentations in the course of your work?

14  A.  Yes, I have.

15  Q.  About how many?

16  A.  So if you combine academic conferences and invited talks, I

17  have given over 50 presentations.

18  Q.  Where were those presentations?

19  A.  So there are places throughout the world and throughout the

20  country.

21  Q.  Aside from this case, have you ever been engaged as an

22  expert witness in any other cases?

23  A.  Yes, I have.

24  Q.  How many times?

25  A.  Four previous cases.

N545car3                          Humphreys - Direct

1   Q.  In those cases were you retained by the defendant or the

2   plaintiff?

3   A.  By the plaintiff.

4   Q.  Have you ever testified in court before?

5   A.  No, I haven't.

6   Q.  Have you testified in depositions?

7   A.  Yes, I have.

8   Q.  Generally speaking, what kinds of opinions did you offer in

9   these other cases?

10  A.  So I generally do two types of cases, one type of case I do

11  marketing and kind of deceptive marketing practices.  The other

12  type of case I do is defamation, usually on social media.

13  Q.  Professor, are you being paid for your work in connection

14  with this case?

15  A.  Yes, I am.

16  Q.  How much?

17  A.  So I am paid $500 for preparation of the report, and then

18  I'm paid $850 for trial testimony.

19  Q.  And that's per hour?

20  A.  That's right.  Correct.

21  Q.  Based on your experience, are those rates fairly standard

22  for experts in your field?

23  A.  Yes, they are.

24  Q.  Professor Humphreys, you testified that you were asked by

25  the plaintiff, E. Jean Carroll, to do work in this case.  Can

A-2474

N545car3                          Humphreys - Direct

1    you describe generally what the nature of that work was?

2    A.  Sure.  So, the nature of the work was to look at a

3    statement that was posted on social media and to understand the

4    spread of that statement, how many people saw it, how broadly

5    did it spread, then to look at the impact that statement might

6    have had on Ms. Carroll's reputation, if any, and finally to

7    estimate, well, how much would it cost to repair that

8    reputation.

9    Q.  And you testified, I believe, that the statement was by the

10   defendant Donald Trump?

11   A.  That's right.  Yes.

12   Q.  Did anyone assist you in your work?

13   A.  Yes.

14   Q.  Who?

15   A.  I was assisted by four research assistants.

16   Q.  Why did you use research assistants in this case?

17   A.  So, in this case there was quite a bit of social media data

18   which had to be collected and cleaned and sorted.

19           MS. CROWLEY:  Can I have a moment, your Honor?

20           THE COURT:  Sure.

21           (Counsel conferring)

22           MS. CROWLEY:  Thank you.

23   Q.  Professor, did you help prepare a slide deck summarizing

24   the work that you did and the conclusions that you reached in

25   connection with this case?

N545car3                          Humphreys - Direct

1    A.  Yes, I did.

2    Q.  And would that deck assist the jury in understanding your

3    testimony today?

4    A.  Yes.

5    Q.  I'm going to put it up on the screen.  Is this the deck

6    that you prepared?

7    A.  Yes, it is.

8    Q.  If we could just publish that to the jury, Mr. Lam?

9             MR. BRANDT:  No objection.

10            THE COURT:  Is there an exhibit -- it is Plaintiff's

11   Exhibit 43, I see.  OK.

12   BY MS. CROWLEY:

13   Q.  You testified a minute ago that your work involved

14   assessing damage to Ms. Carroll's reputation as a result of a

15   statement by Donald Trump.  I'm showing you on this slide

16   what's been received in evidence as Plaintiff's Exhibit 4.  Is

17   this the statement that you focused on in your analysis in this

18   case?

19   A.  Yes, it is.

20   Q.  What was the date of that statement?

21   A.  The date is October 12, 2022.

22   Q.  And where was that statement posted?

23   A.  It was posted on the social networking site called

24   TruthSocial.

25   Q.  Prior to your work on this case, were you familiar with

Case 23-793, Document 84, 11/20/2023, 3592071, Page256 of 300

N545car3                          Humphreys - Direct

1    TruthSocial?

2    A.  Yes.

3    Q.  What is it?

4    A.  So TruthSocial is a social networking site where people

5    have profiles.  It is a lot like Twitter, it has the same

6    structure as Twitter where somebody has a profile and people

7    can follow that person, and the followers or some of them see

8    the message that is posted.

9    Q.  Does Donald Trump have a profile on TruthSocial?

10   A.  Yes, he does.

11   Q.  Do you know about how many followers he has?

12   A.  I believe he has 4.7 million followers.

13   Q.  So, just in broad strokes, could you explain how you went

14   about figuring out how, if at all, Mr. Trump's October 12, 2022

15   statement affected Ms. Carroll's reputation?

16   A.  Sure.  So the first step in the process was to figure out

17   how widely was the statement seen, how many times did it appear

18   to people.  And that I call the impressions model.

19          The next step was to figure out, OK, people saw the

20   statement but did it have an impact on Ms. Carroll's

21   reputation?  So for that I first did a qualitative analysis

22   where I looked at what was the response on social media, what

23   did people say in response when they were Retweeting or

24   circulating the statement, and then I also wanted to know,

25   well, what percentage of those people likely believed the

N545car3                          Humphreys - Direct

1    statement, were they receptive to the statement.  And that I

2    call the impact analysis.

3            And then, finally, I needed to know, OK, for those

4    people who might have been receptive to the statement, how much

5    would it cost to repair Ms. Carroll's reputation.

6    Q.  And in your experience, is this a standard way -- fairly

7    standard way to measure reputational harm by experts in your

8    field?

9    A.  Yes, it is.

10   Q.  So, I would like to talk first about some basic concepts.

11   What is a reputation?

12   A.  So, a reputation, we all have a reputation, we develop it

13   through our life, our friendships, our work.  It allows us to

14   kind of be a member of society to build trust with people.  So,

15   we all have reputations and, of course, if we are more famous

16   or well known, that reputation can also exist amongst people we

17   don't know in the media and in the public sphere.

18   Q.  Explain how reputation can be damaged.

19   A.  So, a reputation can be damaged when there emerge negative

20   associations that kind of undermine that reputation that might

21   cause people to mistrust you or think you are a bad person or

22   things like that.

23   Q.  And how, if at all, can a reputation that's been damaged be

24   repaired?

25   A.  So, reputation can be repaired through sort of strategic

N545car3                        Humphreys - Direct

1   concerted efforts to build positive associations back to that

2   person.

3   Q.  Is it always possible to repair damage to a reputation?

4   A.  No, not always.

5   Q.  What happens if a reputation is not repaired?

6   A.  So, if a reputation isn't repaired, you know, those

7   negative associations can follow someone throughout their life;

8   particularly on social media, those negative associations, they

9   can kind of hang around forever.

10  Q.  So we are going to talk about that more in a minute but

11  first you testified that the first analysis that you performed

12  in connection with your work in this case was creating, I think

13  what we called, it was an impression model.  What is an

14  impression?

15  A.  So, an impression is one person seeing a message one time.

16  Q.  What does it mean for something to have a high number of

17  impressions?

18  A.  So, if something has a high number of impressions it means

19  that it was shown many times, likely to many people.

20  Q.  In conducting this analysis what, if any observations, did

21  you make about whether Donald Trump's October 12 statement

22  spread from TruthSocial to other forms of media?

23  A.  Yes.  So Mr. Trump initially posted his statement on

24  TruthSocial, but it then made it to other media and other types

25  of media.  So, for example, some people took a screenshot of

Case 23-793, Document 84, 11/20/2023, 3592071, Page259 of 300

A-2479

N545car3                              Humphreys - Direct

1    the statement and posted it on Twitter, and so it circulated

2    there.  It circulated on -- through news articles, through

3    online web articles by being directly quoted.  It was in print

4    articles.  And then, it also appeared directly on television.

5    Q.  And did you calculate the number of impressions of Donald

6    Trump's statement on each of these forms of media?

7    A.  Yes.

8    Q.  And just so we are clear, that means that you found the

9    number of times that the statement was viewed on each of these

10   sources of media?

11   A.  Yes.  That's right.

12   Q.  So let's start with the web, the Internet.  Can you tell

13   us, can you explain how you calculated the number of times

14   Donald Trump's October 12 statement was viewed on the web?

15   A.  Sure.  So, I started with a list of articles that were

16   outlined in the complaint to this case.

17   Q.  What is the complaint?

18   A.  The complaint is kind of the initial document that outlined

19   the allegations against Mr. Trump.

20   Q.  And how many articles were cited in the complaint?

21   A.  So, initially in the complaint I think there were over

22   about 60 articles.

23   Q.  Did you use all of them in your analysis?

24   A.  No, I didn't.

25   Q.  How many did you consider?

N545car3                         Humphreys - Direct

1   A.  So, I ultimately considered 17 articles.

2   Q.  And how did you include or what analysis did you, what

3   criteria did you use to select those 17?

4   A.  Yes.  So the ones that I chose to count featured the

5   statement prominently, it related to the headline, it might

6   have appeared in the first half of the article.  It was a

7   prominent part of those 17 articles.

8   Q.  What were some of the websites where those articles, those

9   17 articles were posted?

10  A.  Right.  So, as you can see here it appeared widely across a

11  diverse range of websites including news magazines like

12  Newsweek, Huffington Post, other traditional papers like the

13  Washington Post, Denver Post, and then also on the online

14  websites of Fox News and ABC.

15  Q.  After you identified the 17 articles on these websites,

16  what did you do next?

17  A.  So, next I needed to know how many people visit that

18  website and for that I used a service that will tell you how

19  many page views, how many people have gone to that website.

20  Q.  Does the fact that a person visits a website necessarily

21  mean they read the article that is posted there?

22  A.  Not necessarily, and so I corrected for that.

23  Q.  How did you do that?

24  A.  So, I used something called a bounce rate, which is

25  basically the percent of people who bounce off the site.  They

1   go to the site but don't click anything or scroll down.

2   Q.  So you deducted that bounce rate from the total number of

3   people who visited these sites?

4   A.  That's right.

5   Q.  And after you did that that, what did you determine was the

6   total number of web impressions from Donald Trump's October

7   12th statement?

8   A.  So, for web impressions I added those up and it came out to

9   5.1 million impressions.

10  Q.  And just to be clear, that means that there were

11  5.1 million times that people saw Donald Trump's statement on

12  the web?

13  A.  That's right.

14  Q.  You testified that you also calculated the social media

15  impressions of Donald Trump's statement and I believe you said

16  you considered Twitter and TruthSocial?

17  A.  Correct.

18  Q.  Why did you only consider those two social media sites?

19  A.  So, for TruthSocial, that was the initial place that the

20  statement was posted.  For Twitter, it is a very transparent

21  platform and so you can see exactly how many people have

22  Retweeted, how many followers people have, that kind of thing.

23  Q.  Which TruthSocial posts did you consider in this analysis?

24  A.  So I only considered the October 12th post.

25  Q.  Mr. Trump's?

Case 23-793, Document 84, 11/20/2023, 3592071, Page262 of 300

A-2482

N545car3                        Humphreys - Direct

1   A.  Trump's October 12th post.

2   Q.  Which Twitter post did you consider?

3   A.  So, I considered Twitter posts that connected to those news

4   articles that I counted in the first analysis that contained

5   the statement in the post itself, the Twitter post, and then I

6   also counted any Twitter post that directly screenshotted the

7   statement itself.

8   Q.  How many Twitter posts was that?

9   A.  Oh, so that was 13 Twitter posts total.

10  Q.  And just to be clear, a Twitter post is also called a

11  Tweet?

12  A.  That's correct.

13  Q.  Do you see on the slide before you, are those the 13 Tweets

14  that you considered?

15  A.  Yes.

16  Q.  Were the 13 Tweets, did they come from 13 different Twitter

17  accounts or did they come from one Twitter account?

18  A.  Yes, there were 13 accounts in total.

19  Q.  What were some of those accounts?

20  A.  Right, so as you can see here they're accounts like Fox

21  News or Newsweek.  New York Daily News, from very prominent

22  podcasters like Ron Filipkowski, but also more typical

23  individuals, and you can see the Twitter handles here.

24  Q.  The right-hand column in this chart says "Followers."  What

25  does that mean?

Case 23-793, Document 84, 11/20/2023, 3592071, Page263 of 300

A-2483

N545car3                          Humphreys - Direct

1    A.  The followers are the number of people who follow that

2    account on Twitter.

3    Q.  So using these 13 Tweets, how did you calculate the number

4    of impressions from Donald Trump's statements on Twitter?

5    A.  So, to calculate the number of impressions, you have to

6    keep in mind that not all of your followers see what you Tweet.

7    There are many reasons that people might not sign on that day,

8    they may subscribe to a lot of accounts, and that information

9    might be crowded out, so actually only a fraction of your

10   followers see what you Tweet and so you have to take a series

11   of deductions.  So, hypothetically, you know, if you have a

12   hundred followers, the first deduction you have to consider is

13   a bot.

14          So, a bot is an account or a follower who would follow

15   you and just kind of, it is in a computer, it Retweets what you

16   Tweet.  So if you are Fox News you could have a follower that

17   is just a bot that Retweets what you Tweet so I took those out.

18   And computer science research tells us that about 12 percent of

19   your followers are bots and so I subtracted those.  So, if you

20   subtract that, then that leaves you with, hypothetically, about

21   87 followers.  But then you need to make another cut for some

22   of the reasons that I mentioned because people may not sign on

23   that day, etc.  So, the benchmark in marketing is thought to be

24   20 percent, that 20 percent of your followers see what you

25   Tweet, so that would leave you with about 17 followers.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N545car3                          Humphreys - Direct

1      Alternatively, computer science gives us a formula or

2  a way to calculate how many people would see your Tweet if you

3  have other information about it.  So, if you know how many

4  times it has been Retweeted, how many followers those people

5  have, things like that, then you can basically use a formula to

6  calculate how many impressions your Tweet got using that

7  formula, and that comes out to anywhere from 6 percent of your

8  followers to as low as 1 percent of your followers, for a

9  typical person.

10 Q.  Turning to the slide on the screen, and if you could use

11 the first row, would you walk us through how you calculated the

12 number of impressions from Donald Trump's statement on the Fox

13 News account?

14 A.  Sure.  So, for Fox News, for example, they have

15 22.4 million followers.  The total followers includes the

16 followers who saw the original quote because it was Retweeted,

17 so you include those Retweets as well.  And then you take the

18 deductions that I mentioned:  The bots, the 12 percent, and the

19 impression rate which is either 6, 1, or 20 percent.  And so,

20 for Fox News that would leave you with a low estimate of

21 778,000 people impressions on the low end, or on the high end

22 3.9 million impressions.

23 Q.  It looks like you calculated high and low impressions for

24 the first four Twitter accounts on the chart but not for the

25 last nine.  Can you explain why you did that?

N545car3                          Humphreys - Direct

1    A.  Sure.  So, for the people that you see in yellow here,

2    those are more just typical people and so I didn't use that

3    high a rate, I used a rate of 1 percent for them, just assuming

4    that they're going to have a 1 percent impression rate, and

5    everybody who saw their Tweets are just going to be typical

6    people, too, and so those people also will have a 1 percent

7    impression rate.

8    Q.  So you assume that for the average person only about 1

9    percent of their followers would see the Tweet in which they're

10   Retweeting Donald Trump's statement?

11   A.  That's correct.

12   Q.  Were you able to determine the total amount of impressions

13   of Donald Trump's statement on Twitter, on the 13 Twitter

14   accounts?

15   A.  Yes.  So I calculated the impressions for each account and

16   then I added those up.

17   Q.  And how did you calculate the number of TruthSocial

18   impressions from Donald Trump's post?

19   A.  So, for TruthSocial it's pretty much just like Twitter, and

20   yet it hasn't been studied quite as much.  We also didn't have

21   full access to the Retweeting information, and so because it is

22   structurally similar to Twitter, I used the same impression

23   rate, that 6 percent rate.

24   Q.  And what were the total number of social media impressions

25   of Twitter and TruthSocial from the statement?

N545car3                           Humphreys - Direct

1   A.  So, when you add those up, then you get a high estimate of

2   5.7 million impressions and a low estimate of 1.5 million

3   impressions.

4   Q.  So, just to be clear, that means that a total of between

5   1.5 -- or the statement, Donald Trump's October 12th statement,

6   was viewed between 1.5 million and 5.7 million times on Twitter

7   and TruthSocial?

8   A.  That's right, yes.

9   Q.  You also calculated television impressions from Donald

10  Trump's statement.  How did you do that?

11  A.  For that I needed to know what TV shows aired the statement

12  and there is a service where basically anything that is spoken

13  on television gets transcribed into text, and so you can search

14  that text for key portions of the statement.  And so, I

15  basically used that database to search for the statement to

16  find which programs aired the statement.

17  Q.  How many programs aired the statement?

18  A.  Five programs.

19  Q.  Which stations aired the statement?

20  A.  So the statement appeared on MSNBC and Fox News.

21  Q.  Once you identified the five programs that aired the

22  statements, what did you do next?

23  A.  After that I needed to know how many people were actually

24  watching the program when this statement was aired, and for

25  that I used a service called Neilsen that measures audiences,

Case 23-793, Document 84, 11/20/2023, 3592071, Page267 of 300

A-2487

N545car3                    Humphreys - Direct

1  that measures exactly how many people are watching the program

2  at that time.

3  Q.  And how many people watched Donald Trump's or viewed Donald

4  Trump's October 12th statement on television?

5  A.  So, if you add that up, that is 7 million impressions.

6  Q.  Finally, you testified that you also calculated print

7  impressions from Donald Trump's statement.  Can you explain how

8  you did that?

9  A.  Yes.  So, there is a database where you can search all

10 print news articles and so I, again, searched for the statement

11 and I found one print article.

12 Q.  Where was that article published?

13 A.  That was in the Washington Post.

14 Q.  And what was -- how did you determine the total number of

15 impressions from the Washington Post article?

16 A.  So, here there is a service that measures how many readers

17 every article has, and the circulation rate for the Washington

18 Post was 159,000 people.

19 Q.  After looking at all of these forms of media, were you able

20 to estimate the total number of impressions of Donald Trump's

21 October 12th statement?

22 A.  Yes, I was.

23 Q.  And what was your final estimate?

24 A.  So the final estimate, when you add up across all the

25 media, was between 13.7 million and 18 million impressions.

N545car3                      Humphreys - Direct

1    Q.  Are there any impressions that your analysis didn't

2    consider or didn't take into account?

3    A.  Yes.  So there are quite a few things I left out.  I didn't

4    count articles that weren't cited in the complaint.  I didn't

5    count articles where -- that might have paraphrased the

6    statement but included the same meaning.  I didn't include, for

7    example, the Associated Press -- AP -- had an article, it was

8    widely circulated, I think 137 articles in various local

9    publications.  I didn't count those just because it was too

10   hard to find those numbers.  There are things on social media

11   that I didn't include, certain platforms like Facebook or

12   Reddit.  I didn't include paraphrases on Twitter.  I didn't

13   include video platforms like YouTube.  And then, I also didn't

14   include radio, podcasts, and then just word-of-mouth, one

15   person telling another.

16   Q.  So, was your estimate of total number of times that Donald

17   Trump's statement was viewed or heard likely an overcount or

18   undercount?

19   A.  It was an undercount.

20   Q.  Now, after calculating the total number of times that the

21   statement was viewed, what did you do next?

22   A.  So, after I calculated how many times the statement was

23   viewed, I needed to understand, *Well, did it harm Ms. Carroll's*

24   *reputation?  What impact did it actually have*?  And that had

25   two parts.

N545car3                        Humphreys - Direct

1          The first part was the qualitative part where I went

2    through and I read a lot of the social media feedback that

3    occurred sort of directly in response to the statement, these

4    were kind of comments made on Tweets and Retweets of the

5    statement itself, to assess if there had been reputational harm

6    and to try to understand what that was.  And then I did a kind

7    of quantitative analysis where I wanted to understand how many

8    people, how many of those impressions were actually likely to

9    believe the statement or were receptive to it.

10   Q.  So I want to talk briefly about the first, the qualitative

11   analysis.  Can you explain how you did that?

12   A.  Sure.  So, I started by looking at material about

13   Ms. Carroll that was written and published about her prior to

14   June 2019.

15   Q.  Why did you look at material that was published or written

16   about Ms. Carroll prior to June 2019?

17   A.  So, in June 2019 Mr. Trump made a series of statements that

18   impacted her reputation and I felt it was important to account

19   for some of that change prior to October 12th.

20   Q.  Can you describe what you observed about Ms. Carroll's

21   reputation prior to June 2019 as compared to after June 2019?

22   A.  So, when I looked at the materials from before June 2019,

23   that means I looked at reviews of her books, media coverage of

24   her, even Amazon reviews of her books that were before that,

25   just reader responses to it.  I kind of first got a glimpse of

1    that and found, you know, she was known as kind of like a sassy

2    dating advice columnist, a real truth-teller a journalist, who

3    gave trusted advice on dating and living in the city.  And then

4    after, I looked at the social media posts from June through

5    October, and then I looked at media posts from after October.

6    Q.  And you described Ms. Carroll's reputation prior to June

7    2019.  How did that compare to the reputation that you observed

8    after, immediately after June 2019?

9    A.  So, after June 2019, you know, of course there was a lot

10   more volume of statements about her and they contained pretty

11   negative associations including that she was a liar, the

12   perpetrator of a scam, a hoax.  Things like that.

13   Q.  And how did you or what did you observe about Ms. Carroll's

14   reputation after June 2019 as compared to -- withdrawn.

15          What did you determine about Ms. Carroll's reputation

16   prior to the October 12, 2022 statement by Donald Trump as

17   compared to after October 12th?

18   A.  So, what I noticed is that those meetings existed after

19   June 2019, but the frequency of the posting with those

20   associations had started to decline.  However, after the

21   statement on October 12th, the frequency of the negative

22   associations, the volume of them again escalated.

23   Q.  What did you conclude about whether Donald Trump's October

24   12th statement affected Ms. Carroll's reputation?

25   A.  So, given the timing and the fact that they were in kind of

Case 23-793, Document 84, 11/20/2023, 3592071, Page271 of 300

N545car3                         Humphreys - Direct

1   direct response to his statement, as well as the particular

2   language, words like "liar" etc., I concluded that there was a

3   relationship.

4   Q.  And where did you observe this language and the particular

5   words like "liar"?

6   A.  So these were in social media posts on Facebook, Twitter.

7   Places like that.

8   Q.  Turning to the next slide on the screen, are these some

9   examples of some of the Twitter comments that you observed?

10  A.  Yes.

11  Q.  What are the dates of these posts?

12  A.  So, these occur October 13th, October 19th, October 20th.

13  Q.  Do you see the post that says:  I know for a fact

14  Mr. President wouldn't touch that ugly Bitch with your dick.

15  A.  Yes.

16  Q.  How, if at all, does that post relate to the substance of

17  Mr. Trump's October 12th statement?

18  A.  So what you can see here, this is in response, or it is

19  called a quote Tweet to the initial statement that you see --

20  you see Mr. Trump's statement below -- and this is sort of

21  typical, often people would rephrase what he had said or used

22  some of the same terms, but sometimes in more vulgar language.

23  Q.  And do you see the post that says:  Nearly everybody and

24  their mother knows that woman a liar.

25  A.  Yes.

N545car3                    Humphreys - Direct

1  Q.  How does that post relate to the substance of Mr. Trump's

2  October 12th statement?

3  A.  So, in this post and many of the others the language, the

4  terms were associated or contained in his statement and not in

5  Ms. Carroll's initial allegation.

6  Q.  Are these some of the Facebook posts that you reviewed?

7  A.  Yes.

8  Q.  And what are the dates of these posts?

9  A.  So these occurred directly afterwards as well, October

10  13th, October 19th.

11  Q.  And do you see the post that says:  How much money get paid

12  for this hoax?

13  A.  Yes.

14  Q.  How does that post relate to the substance of Trump's

15  October 12th statement?

16  A.  So that, again, just paraphrases or parrots a claim made in

17  his statement.

18  Q.  Were these posts similar to other comments and posts that

19  you reviewed?

20  A.  Yes, I would say they were typical.

21  Q.  Having determined that Donald Trump's October 12th

22  statement had a negative impact on Ms. Carroll's reputation,

23  what was the next step in your analysis?

24  A.  So, the next step was to figure out, of the number of

25  impressions, how many of those impressions were to people who

Case 23-793, Document 84, 11/20/2023, 3592071, Page273 of 300

A-2493

1   would believe them, who found, were receptive to some of those

2   claims.

3   Q.  And why is that a necessary step in your analysis?

4   A.  So that's really important because I need to figure out,

5   well, how much would it cost to repair the reputational damage.

6   And I only need to estimate the costs for those people who

7   likely believed the statement.

8   Q.  How did you go about figuring out the number of people who

9   saw Mr. Trump's October 12th statement who likely believed it?

10  A.  Right.  So, not all of those impressions believe the words

11  of Mr. Trump.  Right?  And so, it was kind of a two-step

12  process to figure that out.  There is a poll, a non-partisan

13  polling service that can tell you for every publication what

14  percent of the readers are a democrat or republican, but of

15  course not all republicans believe Mr. Trump.  And so, I used

16  another poll to understand, well, of those republicans, what

17  percent of those were likely to have believed him.

18  Q.  And what did you determine was the percent of republicans

19  for each publication who likely believed Mr. Trump's statement,

20  believed Mr. Trump?

21  A.  So, for each publication I took the percent of republicans,

22  and then of those republicans took how many republicans

23  typically believe Mr. Trump and then came up with the

24  percentages that you see here on the right.  And so, I used the

25  percentage for each publication.  Those came up to an average

Case 23-793, Document 84, 11/20/2023, 3592071, Page274 of 300

N545car3                        Humphreys - Direct

1   of 21 percent.

2   Q.  So, to be clear, the 21 percent is the percentage of

3   republicans who viewed the statement who likely believed it?

4   A.  Yes.  I would call those receptive impressions.

5   Q.  What was the next step in your analysis?

6   A.  So, the next step was to take the number of impressions

7   that I had from that first step, which was a lot of

8   impressions, and then discount it by only the impressions where

9   people were receptive to the statement.  And so, that gives you

10  an estimate, a high and low estimate for each type of media,

11  and then you can add those up.

12  Q.  And what did you, when you alleged it up, what did you get?

13  A.  So, on the low end we have 3.7 million receptive

14  impressions and on the high end you have 5.6 million receptive

15  impressions.

16  Q.  And just to summarize, does that mean that between

17  3.7 million and 5.6 million people saw Mr. Trump's statement

18  and likely believed it?

19  A.  That's correct.

20  Q.  To your knowledge -- we saw some examples of negative

21  commentary that Ms. Carroll received after the October 12

22  statement.  To your knowledge, did Ms. Carroll receive any

23  positive response following Donald Trump's statement?

24  A.  Yes, she did.

25  Q.  How, if at all, did your analysis account for the positive

Case 23-793, Document 84, 11/20/2023, 3592071, Page275 of 300

A-2495

N545car3                          Humphreys - Direct

1    response that she received?

2    A.   So, one thing in my analysis that I noticed is, prior to

3    the June 2019 statement, there were, of course, many positive

4    associations of her but the volume was relatively small.  After

5    the October 12 statement there was a huge volume of

6    associations associated with her, some of those were positive,

7    but then a huge volume, a very large number, tens of thousands

8    of those associations were really negative.

9    Q.   How, if at all, do positive responses or comments offset

10   negative responses?

11   A.   I would say in terms of reputation, they don't.  So, if you

12   imagine, like, at the place where you work, if 20 percent of

13   your colleagues think that you stole money where you work,

14   let's say you have a hundred colleagues and 20 of them think

15   that you stole money, that still has an impact on your work

16   life and your day-to-day reputation, and so I think that

17   20 percent is still important.

18              (Continued on next page)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 84, 11/20/2023, 3592071, Page276 of 300

A-2496

1   Q.  Now, in addition to analyzing how many people saw

2   Mr. Trump's statement and how many people who saw the statement

3   likely believed it, did you conduct any other analysis in your

4   work in this case?

5   A.  Yes.  So the last stage was to figure out, okay, for those

6   receptive impressions, those who might have believed the

7   statement, how much would it cost to repair Ms. Carroll's

8   reputation for those people?

9   Q.  How do you repair someone's reputation after a statement?

10  A.  Yeah, so you can run a campaign to put out positive

11  messages about that person.

12  Q.  Is that called a reputational repair campaign?

13  A.  Yes.

14  Q.  Have you ever yourself executed a reputational repair

15  campaign?

16  A.  No, I have not.

17  Q.  How do you know about it?

18  A.  So I teach them every quarter to my students who go on to

19  have jobs in executing reputational repair campaigns.

20  Q.  Can you explain how a reputational repair campaign works?

21  A.  Yes.  So first you need to identify where to place the

22  messages.  What media does your target audience, the people's

23  whose mind you want to change, what media do they use?  Where

24  do they get their information?

25  Q.  So to be clear, the target audience here is that 21 percent

1    or the people that you determined saw Mr. Trump's statement and

2    likely believed it?

3    A.  That's right.

4    Q.  And your campaign sends positive messages or corrective

5    messages to those people to try to change their minds?

6    A.  That's correct.

7    Q.  Can you give -- did you design a particular reputational

8    repair campaign for Ms. Carroll in this case?

9    A.  Yes, I did.

10   Q.  Can you give us some examples of corrective messages that

11   you would use as part of a reputational repair campaign for

12   Ms. Carroll?

13   A.  Yes, so what the campaign would look like is it would place

14   these positive messages where people get their news, and it is

15   important that you place them with a trusted source because

16   this audience, almost any audience only believes information

17   coming from people they trust, right?  So it could look like a

18   social media influencer sharing a message about a great piece

19   Ms. Carroll wrote for *Harper's* and how much they liked it, how

20   funny or witty it was.  It would be positive messages like

21   that.

22   Q.  And how did you determine where those messages would be

23   placed?

24   A.  So here I used the same poll that I did in the second step

25   to learn where does this audience get their news.

N542Car4                          Humphreys - Direct

1  Q.  And what did you find out?

2  A.  So for this audience, about 21 percent get news from cable

3  TV, 29 percent, almost 30 percent comes from broadcast TV, and

4  then the rest is divided amongst podcast, radio, also social

5  media platforms like Facebook and Twitter.

6  Q.  Once you determined where the target audience——meaning

7  people whose minds you want to change——get their news, what did

8  you do next?

9  A.  So the next step was to figure out, well, how much does it

10 cost to buy messages on these media?  And for things like cable

11 TV, that's pretty straightforward.  There are published

12 advertising rates.  For influencers, now it is also pretty

13 straightforward.  There are a range of influencers, and you can

14 find out, well, how much would it cost to pay something called

15 a micro-influencer, somebody who has a medium following, you

16 can find those rates.

17 Q.  What is an influencer?

18 A.  So an influencer is someone who has a relatively large

19 social media following, and they are not just like style

20 influencers, as you might think of them.  They exist now for

21 many different categories and across the political spectrum.

22 So there are -- there can be -- there are liberal social media

23 influencers, there are conservative social media influencers.

24 Q.  So apart from identifying where the target audience gets

25 their news and then figuring out how much it would cost to run

Case 23-793, Document 84, 11/20/2023, 3592071, Page279 of 300

A-2499

1   corrective messages there, were there any other considerations

2   in your analysis?

3   A.  Yes.  So the final consideration was how many times to show

4   people the message.  Nobody's mind is really changed from

5   seeing a message one time, especially if it is kind of counter

6   to what you already believe.  And so psychology tells us that

7   you need to show people a message three or five times in order

8   to change their beliefs.

9   Q.  Did you consider how much it would cost to run corrective

10  messages about Ms. Carroll one time?

11  A.  Yes, I did.

12  Q.  Why?

13  A.  So the one-time number would assume that a prior campaign

14  had been run.  You know, you don't want to hit people over the

15  head with the message if you have already shown them the

16  message.  And so I included the one-time in case a prior

17  campaign had been run.

18  Q.  To your knowledge had a prior reputational repair campaign

19  been run for Ms. Carroll?

20  A.  No.

21  Q.  So was the estimate for cost of only showing corrective

22  messages one time a realistic estimate in this case?

23  A.  I don't think that campaign would be effective in changing

24  attitudes.

25  Q.  Using the chart on this slide, can you walk us through how

Case 23-793, Document 84, 11/20/2023, 3592071, Page280 of 300

N542Car4                          Humphreys - Direct

1    you calculated the cost to run positive messages about

2    Ms. Carroll on broadcast TV?

3    A.   Sure.  So on broadcast TV, as you can see here, you would

4    spend about 30 percent of your impressions, you would want to

5    get 30 percent of your impressions from broadcast TV.  And an

6    impression for a thousand impressions, it would cost you $16.

7    And so you basically do the math on that and that comes out to

8    spending a hundred and thirty-three hundred thousand dollars.

9            (Court reporter confers)

10   A.   A hundred and thirty-three hundred thousand dollars.

11           THE COURT:  133,000, right?

12           THE WITNESS:  A hundred and thirty-three hundred

13   thousand dollars.

14   Q.   I think $133,000, right?

15   A.   Oh, sorry, 133,000.

16   Q.   And how much would it cost to place corrective messages

17   about Ms. Carroll using Facebook insurance influencers?

18   A.   So for Facebook influencers, you want to get 7 percent of

19   your total impressions there.  But remember what I said about

20   impressions.  So, you know, the number of followers that

21   somebody has on Facebook, you have to take the impression rate

22   of like 5 percent of those people are going to see the post.

23   And so you would shoot to get, at the end of the day, 1.9

24   million impressions and it costs $25 per thousand impressions,

25   which would leave you with $988,000.

N542Car4                      Humphreys - Direct

1    Q.  After calculating the amount it would cost to place

2    corrective messages on each type of media, were you able to

3    determine how much it would cost to place corrective messages

4    on all these types of media?

5    A.  That's right.  So I calculated for each type of media how

6    much it would cost and I added that up.

7    Q.  And what was the number?

8    A.  So the final number at the high end was $2.7 million.

9    Q.  What was the next step in your analysis?

10   A.  So the final step was to apply this logic to kind of my

11   previous -- my low impressions estimate and my high impressions

12   estimate for each level of frequency——for one, three, and five

13   times.

14   Q.  And what was the range, the cost range to run a

15   reputational repair campaign for Ms. Carroll following the

16   October 12 statement?

17   A.  So at the low, low end it would be three hundred and

18   sixty-eight thousand dollars, hundred thousand dollars and on

19   the high end it would be $2.7 million but, again, I don't think

20   the low campaign would be effective if no campaign had been run

21   previously.

22   Q.  So to summarize, Professor Humphreys, what was your

23   conclusion about how far or how wide Mr. Trump's statements

24   spread?

25   A.  So my conclusion about how wide it spread in the

Case 23-793, Document 84, 11/20/2023, 3592071, Page282 of 300

A-2502

N542Car4                         Humphreys - Direct

1    impressions analysis was that it had between 13.7 million

2    impressions and 18 million impressions.

3    Q.  And again, that was the number of times that the October 12

4    statement was viewed?

5    A.  Correct.

6    Q.  And what was your conclusion about how many people who saw

7    that statement likely believed it?

8    A.  So my conclusion there was that about on average 21 percent

9    of people were likely to believe it, and that gives you between

10   3.7 million and 5.6 million impressions.

11   Q.  And what was your conclusion as to how much it would cost

12   to repair Ms. Carroll's reputation amongst the target audience,

13   the people who saw the statement and likely believed it?

14   A.  So on the low, low end it would be three hundred and

15   sixty-eight hundred thousand dollars, and on the high end it

16   would be 2.7 million.

17             THE COURT:  Did you mean to say 368,000?

18             THE WITNESS:  Yes.

19   Q.  And 2.7 million?

20   A.  That's right.

21             MS. CROWLEY:  One moment, your Honor.

22             (Counsel confer)

23             MS. CROWLEY:  No further questions.

24             THE COURT:  Let's take our break.  15 minutes.

25             (Recess)

Case 23-793, Document 84, 11/20/2023, 3592071, Page283 of 300

N542Car4                          Humphreys - Direct

1           (Jury not present)

2           THE COURT:  Okay, folks.  Is there something?

3           MS. CROWLEY:  Yes, just super briefly, your Honor.  We

4    have the cross of this witness and then a very, very short

5    witness after that.  We have spoken to defense counsel.  If

6    your Honor would indulge us and the jury would be okay with it,

7    if we go a little bit past 4:30 we could all be here so that we

8    could get that witness done.  We then have two brief

9    evidentiary just matters to bring up with your Honor about two

10   documents that we would like to put into evidence, so we will

11   not be prepared to rest today until those issues are resolved.

12   We would propose, if we can resolve those issues, we could rest

13   first thing Monday morning before summations.

14          THE COURT:  What are the evidentiary issues?

15          MS. CROWLEY:  One relates to a stipulation that we are

16   sort of hashing out relating to Ms. Carroll's testimony about

17   her diaries and the other relates to a book authored by

18   Mr. Trump that we would like to introduce.

19          THE COURT:  What book?

20          MS. CROWLEY:  It's called *Think Like a Billionaire,*

21   and we just want to -- we would like to introduce a small

22   portion where he talks about shopping and giving gifts from

23   Bergdorf's.

24          THE COURT:  What's the problem with that,

25   Mr. Tacopina?

N542Car4                      Humphreys - Direct

 1              MR. TACOPINA:  That hasn't been authenticated, your

 2     Honor.  There is a process.

 3              THE COURT:  It hasn't been authenticated?

 4              MR. TACOPINA:  Authenticated, yes.

 5              THE COURT:  Has it been published?

 6              MR. TACOPINA:  It's been published, but there is a

 7     coauthor.  You asked me what the problem is?  Here's the

 8     problem.  There is a coauthor.  It's a long book, and there are

 9     sections.  And they want to introduce a particular paragraph in

10     the book.  I don't know the process of how this book was

11     written.  They had a chance to depose Mr. Trump.  They asked

12     him about shopping in Bergdorf Goodman and elsewhere.  They did

13     not ask --

14              THE COURT:  Does somebody have the book here?

15              MS. KAPLAN:  I do, your Honor.

16              MR. TACOPINA:  What I was saying, your Honor, is they

17     didn't ask them about this book or this passage they want to

18     introduce.  I don't know what the process was.  I don't know if

19     the coauthor wrote this part or not.  I don't know if a ghost

20     writer wrote it.  But this has never been presented to the

21     defendant at his deposition to authenticate, like the Billy

22     Bush video was, for example.

23              MS. KAPLAN:  I can respond, your Honor, if you would

24     like.

25              MR. TACOPINA:  And we don't know that it's actually

Case 23-793, Document 84, 11/20/2023, 3592071, Page285 of 300

A-2505

N542Car4                    Humphreys - Direct

1   his statement.  Yes, it's his book, but there is a coauthor.

2          THE COURT:  Yeah, yeah.  Now I understand.  I have

3   looked at it.

4          All right, let's get the jury in.  We will worry about

5   this later.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 23-793, Document 84, 11/20/2023, 3592071, Page286 of 300

1    (Jury present)

2            THE COURT:  Okay, cross-examination, Mr. Brandt.

3            MR. BRANDT:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. BRANDT:

6    Q.  Professor Humphreys, first, you understand that one of the

7    underlying issues here is an alleged incident that supposedly

8    occurred at Bergdorf Goodman in the mid 1990s, correct?

9    A.  Yes, I understand.

10   Q.  Obviously you weren't there, correct?

11   A.  That's correct.

12   Q.  And so you have personal -- no personal knowledge of what

13   did or didn't happen on that date, correct?

14   A.  That's correct.

15   Q.  Okay.  What you were here today to testify about was a post

16   made on Truth Social in October of 2022, correct?

17   A.  That's correct.

18           THE COURT:  Could we please skip the obvious?

19           MR. BRANDT:  We will, your Honor.

20   BY MR. BRANDT:

21   Q.  And as I understand it, Professor Humphreys, what your

22   opinion is based on is assessing the amount needed to repair

23   Ms. Carroll's reputation because the post said she wasn't

24   telling the truth, is that correct?

25   A.  I'm sorry.  Could you say it again?

Case 23-793, Document 84, 11/20/2023, 3592071, Page287 of 300

N542Car4                         Humphreys - Cross

1    Q.  Sure.  I will try again.

2            As I understand your testimony, it is about the

3    reputational damage occasioned to Ms. Carroll because the

4    statement said she wasn't telling the truth about the Bergdorf

5    Goodman situation, correct?

6    A.  So my purpose here was to estimate the cost to repair her

7    reputation caused by the impact of Mr. Trump's statement.

8    Q.  Okay.  But the damage to reputation goes to the issue of

9    alleging she wasn't telling the truth, correct?

10           THE COURT:  It's a little more elaborate than that,

11   isn't it, counsel?

12           MR. BRANDT:  I was trying to sum it up, your Honor.

13           THE COURT:  Yeah, I know you were.

14   BY MR. BRANDT:

15   Q.  Well, I will ask another question.  Let me flip it around,

16   Professor Humphreys.

17           In your professional opinion, is there an adverse

18   reputational impact to someone whose been falsely accused of

19   rape?

20   A.  I'm not sure -- that's not what I assessed in my report.

21   Q.  No, I'm asking you, in your professional opinion, if

22   someone is falsely accused of rape, is there reputational

23   damage in that situation?

24           MS. CROWLEY:  Objection, your Honor.

25           THE COURT:  Sustained.

N542Car4                        Humphreys - Cross

1   BY MR. BRANDT:

2   Q.  Now, we have had some discussion about this previously, but

3   there are actually two cases, correct?

4   A.  That's right.

5   Q.  And you were retained as an expert by Ms. Carroll in two

6   cases, correct?

7   A.  Correct.

8   Q.  And the first case chronologically related to statements

9   made by Mr. Trump in June of 2019, correct?

10  A.  That's correct.

11  Q.  And as I recollect your first report, you said that those

12  statements were widely published at the time, correct?

13  A.  Yes.

14  Q.  And following that time, there were appearances by

15  Ms. Carroll and others on news shows and interviews and

16  podcasts and articles, is that correct?

17  A.  I did not study those as part of my report.

18  Q.  So you didn't look at any of that?

19  A.  I did not look at her activities, no.

20  Q.  Okay.  We will come to that in a little bit.

21          But did you at least come to the conclusion that there

22  had been widespread publication of the June 2019 statements?

23  A.  Yes.

24  Q.  And the statement that you looked at in the second case was

25  only the October 2022 statement, correct?

N542Car4                           Humphreys - Cross

1    A.   That's right.

2    Q.   To borrow a phrase, would you agree that the horse was kind

3    of out of the barn between 2019 and 2022 on these issues?

4    A.   Could you say what you mean by a horse being out of the

5    barn?  How do you mean?

6    Q.   Sure.  There had already been publication of Mr. Trump's

7    position on these issues for three and a half years prior to

8    October of 2022, correct?

9    A.   Correct.  Three statements had already been published.

10   Q.   So that was already out in the public domain, correct?

11   A.   That's correct.

12   Q.   And then one thing I understood you to say in your direct

13   testimony——and I wrote it down, and correct me if I am

14   wrong——that you said people's minds typically aren't changed by

15   a one-time statement.  Did I get that down correctly?

16   A.   That's true if they already hold an attitude.  If it's a

17   counter-attitudinal message, yes.

18   Q.   Okay.  And I think that's consistent with your deposition

19   testimony, that typically one statement is not going to change

20   somebody's mind, correct?

21   A.   Not -- yeah, if they have a prior attitude, it will not

22   change someone's mind.

23   Q.   And in this particular case, what you are focused on is a

24   single statement, which is Mr. Trump's statement in October of

25   2022, correct?

Case 23-793, Document 84, 11/20/2023, 3592071, Page290 of 300

1    A.  That's correct.

2    Q.  A single statement, correct?

3    A.  That's correct.

4    Q.  And to follow your logic, people aren't going to change

5    their minds over one statement.

6    A.  You know, we don't know if these are the same people.

7    That's underdetermined.  His statement might have been seen by

8    new people.

9    Q.  Okay.  You don't know, do you?

10   A.  I think it's very likely that this statement was seen by

11   some new people.

12   Q.  Okay, but you actually, going back to your testimony

13   previously, all of your numbers are estimates, are they not?

14   A.  They are estimates that are grounded in peer-reviewed

15   social science research.

16   Q.  Sure, but you don't know exactly who may have seen the

17   Truth Social post, correct?  You can't name the however many

18   million people that you talk about, correct?

19   A.  Correct.  That information is not available to me.

20   Q.  Right.  And similarly, you talked about the other media,

21   like the publish media, the television media, you don't know

22   who read those newspapers, who saw those TV shows, correct?

23   A.  That's correct.  That information is not available.

24   Q.  And again, you are not a mind reader, and so you don't know

25   whose mind was or wasn't influenced by anything they read,

N542Car4                     Humphreys - Cross

1    correct?

2    A.  I'm sorry, could you say it again?

3    Q.  Yeah, sure.  I mean, point of fact is you don't know what

4    went on in any particular individual's mind as to whether the

5    statement by Mr. Trump changed their mind, didn't change their

6    mind, was read, ignored, or anything, correct, any particular

7    person.

8    A.  On the individual level, no.

9    Q.  In fact, what you have done is just come up with estimates,

10   correct?

11   A.  I would say they are not -- they are actually not

12   estimates.  They are taken from the real data, right?  So we

13   know how many people were watching a show.  We know how many

14   people read the newspaper.  Those things aren't estimates.

15   Those are real facts.  Those are numbers.

16   Q.  Agree with that, but again, going back to my point, you

17   don't know what was going on in the mind of those readers or

18   listeners or viewers, correct?

19   A.  Correct.

20   Q.  Also, just to make sure we are clear, Truth Social, as I

21   understand it, was a platform that was at least founded in part

22   by Mr. Trump, is that correct?

23   A.  That's correct.

24   Q.  And you limited your analysis of -- withdrawn.

25             You limited your analysis of the social media

N542Car4                        Humphreys - Cross

1    impressions to ones that quote that statement correctly on

2    Truth Social, correct?

3    A.  That's not correct.

4    Q.  Okay.  Would you agree with me that most of the people who

5    are on this Truth Social platform would be people favorable to

6    president Trump?

7    A.  That's likely true.

8    Q.  And someone who is predisposed to think well of Mr. Trump

9    would be more likely to believe something he said, and the flip

10   side is someone who is predisposed to believe Ms. Carroll would

11   be predisposed to believe what she said, correct?

12   A.  Yes, that's fair.

13   Q.  And I think you also said this a minute ago.  I want to

14   make sure I understand it.  You did not analyze the impact of

15   anything Ms. Carroll said following the June 2019 statements,

16   correct?

17   A.  That's correct.  I was focused on the damage of Mr. Trump's

18   statement.

19   Q.  Okay.  So, for example, she gave an interview on Anderson

20   Cooper one day.  You didn't assess what the impact of that

21   interview was to the viewing public, correct?

22             MS. CROWLEY:  Objection, your Honor.

23             THE COURT:  Overruled.

24   Q.  You may answer the question.  I can reask it if you would

25   like.

N542Car4                          Humphreys - Cross

1    A.  That would be great if you could.

2    Q.  There is evidence in the record that Ms. Carroll appeared

3    on the Anderson Cooper show on MSNBC.  As I understand what you

4    have told us, you did not analyze the impact of that message on

5    the public, correct?

6    A.  That was not in the -- that was prior to the October 12

7    statement, so no.

8    Q.  And then similarly, you did not assess the impact of

9    Ms. Carroll's book that was published out to the public,

10   correct?

11   A.  Correct.  It was not focused on Ms. Carroll's statements.

12   Q.  And then excerpts from that book were published in the *New*

13   *York* magazine and in The Cut.  As I understand your testimony,

14   you didn't try to estimate the impact of that publication,

15   correct?

16           MS. CROWLEY:  Objection, your Honor.  This is asked

17   and answered.

18           THE COURT:  Why not, counselor?

19           MR. BRANDT:  I was talking about a different

20   publication.

21           MS. CROWLEY:  I believe he asked whether she analyzed

22   any of Ms. Carroll's statements, and the witness testified that

23   she didn't.

24           THE COURT:  Sustained.

25           MR. BRANDT:  Okay.

N542Car4                         Humphreys - Cross

```
 1              One other question on that line, your Honor, and I
 2    don't mean to cross your boundary.
 3    Q.  Is it correct that you didn't analyze any positive comments
 4    on social media about Ms. Carroll that were made by others?
 5    A.  That's not correct.
 6    Q.  Okay.  Did you look at positive statements about her on
 7    social media?
 8    A.  Yes.  So I did see a number of positive statements during
 9    my qualitative analysis.
10    Q.  Did you measure those?
11    A.  No.  My goal here was to measure the reputational harm.
12    Q.  Okay.  So you saw it, but you didn't measure it.
13    A.  Correct.
14    Q.  So as I understand your testimony, all you did was measure
15    the negative impact and you didn't look at any positive impact.
16    A.  So I did look at the positive impact in my qualitative
17    analysis.
18    Q.  Did you measure it?
19    A.  It didn't cause reputational harm and so those statements
20    didn't require correction.
21    Q.  Okay.  So fair enough.  Let me ask you this question.  Did
22    you undertake to see whether or not there had been any campaign
23    undertaken by Ms. Carroll to mitigate any alleged damage from
24    the October 2022 statement?
25    A.  No.  To my knowledge there wasn't one.
```

A-2515

N542Car4                      Humphreys - Cross

1   Q.  There was no effort to mitigate.  I want to make sure I

2   understand your answer.

3   A.  As far as I know, there was no reputational repair

4   campaign.

5   Q.  Okay.  And the bottom line, as I understand your testimony,

6   is people predisposed to believe Ms. Carroll were most likely

7   to continue to believe her and people who were predisposed to

8   believe Mr. Trump would be predisposed to believe him, correct?

9   A.  Could you say what you mean by predisposed?

10  Q.  Yeah, more likely to.  I will reask the question.  Thank

11  you.

12          People who tended to believe Mr. Trump would be more

13  likely to believe the October 22 statement and people who were

14  more likely to believe Ms. Carroll would be more likely not to

15  believe the statement, correct?

16          MS. CROWLEY:  Objection, your Honor.  Asked and

17  answered.

18          THE COURT:  Yes, I think so.

19          MR. BRANDT:  I tried to reask it in a better way.

20          THE COURT:  Yes, but you did ask it earlier and got an

21  answer.

22          MR. BRANDT:  Okay.

23          Thank you very much.

24          THE COURT:  Okay.  Any --

25          MS. CROWLEY:  One minute.

Case 23-793, Document 84, 11/20/2023, 3592071, Page296 of 300

A-2516

N542Car4                    Humphreys - Redirect

```
 1              THE COURT:  Okay.  Thank you.
 2    REDIRECT EXAMINATION
 3    BY MS. CROWLEY:
 4    Q.  Professor Humphreys, Mr. Brandt just asked you several
 5    questions about whether you know who actually saw Donald
 6    Trump's October 12 statement.  Do you recall those?
 7    A.  Yes, I do.
 8    Q.  And you testified that you don't know exactly who saw the
 9    statement, correct?
10    A.  In terms of identifiable names, I can't tell you the names
11    of those people.
12    Q.  But you were able to estimate how many people -- how many
13    people saw the statement, correct?
14    A.  That's right.
15    Q.  And I believe you testified that between 13 and 18 million
16    people saw the statement?
17    A.  That's correct.
18    Q.  And of the people who saw it, you testified that between
19    3.7 million and 5.6 million likely believed it.
20    A.  That's right.
21    Q.  Mr. Brandt also asked you several questions about the work
22    you did in connection with Ms. Carroll's first lawsuit,
23    correct?
24    A.  That's right.
25    Q.  And there you were asked to analyze the harm that Donald
```

Case 23-793, Document 84, 11/20/2023, 3592071, Page297 of 300

1    Trump's June 2019 statements caused to Ms. Carroll's

2    reputation?

3    A.  Yes.

4    Q.  And you calculated how much it would cost to repair

5    Ms. Carroll's reputation in connection with those June 2019

6    statements?

7    A.  Yes, I have done that.

8    Q.  And was that cost higher or lower than --

9              MR. BRANDT:  Objection, your Honor.  This is not that

10   case.  Irrelevant.

11             MS. CROWLEY:  I believe Mr. Brandt asked several

12   questions about the work that Professor Humphreys did in this

13   case, and I think it is relevant when he was suggesting that

14   that work didn't affect the analysis in this case.

15             MR. BRANDT:  That was only to set a demarcation line,

16   your Honor.  I was very careful not to ask anything about that

17   opinion.

18             MS. CROWLEY:  I'm not going to ask any specifics about

19   the opinion, just how it compared.

20             MR. BRANDT:  Well, she is.  Excuse me, your Honor, but

21   she is trying to get a number or something out or a final

22   answer and I --

23             THE COURT:  She just said she is not trying to get a

24   number out.  She said higher or lower, yes?  Or did I miss

25   something?

Case 23-793, Document 84, 11/20/2023, 3592071, Page298 of 300

A-2518

N542Car4                        Humphreys - Redirect

1        MR. BRANDT:  Well, I think even higher or lower is

2   getting a number out.

3        THE COURT:  Look, members of the jury, the question of

4   whether there was any adverse effect by virtue of the 2019

5   statements and, if there was, how much adverse effect is not at

6   issue in this case.  It is not for you to determine.

7        With that instruction, I will allow an answer to the

8   question as it was asked.

9        MS. CROWLEY:  May I ask it again?

10       THE COURT:  You may ask it again.

11  BY MS. CROWLEY:

12  Q.  Was the cost that you estimated to repair Ms. Carroll's

13  reputation following Trump's June 2019 statements higher or

14  lower than the cost that you estimated it would take to repair

15  her reputation following the October 12 statement?

16  A.  It was higher.

17  Q.  Why was it higher?

18  A.  So that statement generated considerably more impressions

19  and considerably more receptive impressions.

20  Q.  And how did that factor into the analysis that you did on

21  the cost following the October 12 statement?

22  A.  So here I only looked at the reputational harm from the

23  October 12 statement.

24       MS. CROWLEY:  Thank you, your Honor.  Nothing further.

25       THE COURT:  Thank you.

Case 23-793, Document 84, 11/20/2023, 3592071, Page299 of 300

A-2519

N542Car4                     Myers - Direct

1        Anything else, Mr. Brandt?

2        MR. BRANDT:  Nothing further.

3        THE COURT:  Thank you.  You are excused, Professor.

4        (Witness excused)

5        THE COURT:  Next witness.

6        MS. CROWLEY:  The plaintiff calls Roberta Myers.

7        THE COURT:  Ladies and gentlemen, if it's not a huge

8   problem we may go a little later than 4:30.  If it's a serious

9   problem for anybody, just raise your hand.  No hands raised.

10   ROBERTA MYERS,

11       called as a witness by the plaintiff

12       having been duly sworn, testified as follows:

13        THE COURT:  You may proceed, counsel.

14        MS. CROWLEY:  Thank you, your Honor.

15   DIRECT EXAMINATION

16   BY MS. CROWLEY:

17   Q.  Good afternoon, Ms. Myers.

18   A.  Good afternoon.

19   Q.  Are you currently employed?

20   A.  No.

21   Q.  Are you retired?

22   A.  No.

23   Q.  What do you do for a living?

24   A.  I'm a consultant and I'm on several boards and I'm a board

25   member, and I do occasional projects from time to time.

N542Car4                          Myers - Direct

1    Q.  Were you previously employed?

2    A.  Yes.

3    Q.  Where were you employed?

4    A.  My last job I was the editor in chief of *Elle*.

5    Q.  Of *Elle* magazine?

6    A.  The Elle brand, yes.

7    Q.  What is the Elle brand?

8    A.  Well, it's a -- it's a brand for women who care about many

9    things.  I mean it's essentially considered a fashion magazine,

10   but we also cover a lot of different things.

11   Q.  When were you the editor in chief at *Elle*?

12   A.  From 2000 to 2017.

13   Q.  Did you ever hold any other positions at *Elle*?

14   A.  Yes, I actually worked at *Elle*, I was the editor in chief

15   of the magazine named *Mirabella* before I went to *Elle*, and the

16   first time I worked at *Elle* I was an assigning editor, so it

17   was several years before that.

18   Q.  What is an assigning editor?

19   A.  Somebody who works with writers, you know, just sort of

20   develops stories and come up with ideas, and then you are

21   responsible for where that story goes throughout the process.

22   Q.  When were you an assigning editor at *Elle*?

23   A.  In 1993?

24   Q.  Through when?

25   A.  1995.