# 23-0793-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 11 of 12 (Pages A-2801 to A-3080)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

i

## TABLE OF CONTENTS FOR JOINT APPENDIX

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*")........................................   A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") .....................................   A-32

### **Documents Submitted in *Carroll I***

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

Exhibit A to Kaplan Declaration -
Letter from Roberta A. Kaplan to Marc E.
Kasowitz, dated August 10, 2020, with Enclosure   A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023.........   A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 .......................................   A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 .......................................   A-89

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Lisa
Birnbach, dated September 21, 2022 ....................   A-92

Exhibit 2 to Kaplan Declaration -
Excerpts from Deposition Transcript of Carol
Martin, dated October 18, 2022 ...........................   A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 ............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 .................................................. A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 ............................................... A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ......................................... A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ................................................ A-405

iii

**Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................. A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 .......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ...................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ....................... A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 .......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ............................ A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 .................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 .......................... A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 ................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ......................................................... A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023 ...................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 ........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

**Page**

Letter from Roberta A. Kaplan to the Honorable
   Lewis A. Kaplan, dated March 17, 2023 ............... A-509

   Annexed to Letter -
   Proposed Order ...................................................... A-511

## Documents Submitted in *Carroll II*

Complaint and Demand for a Jury Trial, dated
   November 24, 2022 ................................................ A-513

Answer, dated January 27, 2023 ................................ A-542

First Amended Answer, dated February 10, 2023 ...... A-556

Defendant's Letter Motion for Discovery, dated
   February 10, 2023 ................................................. A-571

   Exhibit A to Defendant's Letter Motion -
   DNA Report, dated January 8, 2020 ..................... A-574

   Exhibit B to Defendant's Letter Motion -
   Twitter Post, dated February 25, 2021 ................. A-602

Plaintiff's Letter Response in Opposition to
   Defendant's Motion for Discovery, dated
   February 10, 2023 ................................................. A-607

Defendant's Letter Reply in Further Support of
   Motion for Discovery, dated February 10, 2023 .... A-612

Transcript of Conference, dated February 7, 2023 .... A-614

Notice of Motion, by Defendant, for an Order
   Granting Partial Summary Judgment, dated
   February 23, 2023 ................................................. A-635

Declaration of Matthew G. DeOreo, for Defendant,
   in Support of Motion for Partial Summary
   Judgment, dated February 23, 2023 ...................... A-637

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020.. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ...................................... A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023......... A-747

vii

**Page**

Declaration of Alina Habba, for Defendant,
in Support of Motions *in Limine*, dated
February 23, 2023 ................................................. A-773

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-775

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-779

Exhibit C to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022
(Reproduced herein at pp. A-487-A-492)

Exhibit D to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023
(Reproduced herein at pp. A-493-A-499)

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-783

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-785

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 .............................. A-786

Exhibit 2 to Kaplan Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023 .................................................... A-863

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 ...................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................ A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A).............................................................. A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B).............................................................. A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 ................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 ......................... A-1065

x

**Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
    Opposition to Defendant's Motions *in Limine*,
    dated March 9, 2023 ............................................... A-1080

Exhibit 1 to Crowley Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
Video of Deposition of Natasha Stoynoff, taken
October 13, 2022
(All parties are already in possession of video
exhibit) .................................................................. A-1089

Exhibit 3 to Crowley Declaration -
Video of Deposition of Jessica Leeds, taken
October 13, 2022
(All parties are already in possession of video
exhibit) .................................................................. A-1091

Plaintiff's Response to Defendant's Local Civil
    Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
    Opposition to Defendant's Motion for Partial
    Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1110

Exhibit 2 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023
(Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
    Plaintiff, in Further Support of Omnibus Motion
    *in Limine*, dated March 16, 2023 .......................... A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 .......................... A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 ........................ A-1153

Reply Declaration of Alina Habba, for Defendant,
    in Further Support of Motions *in Limine*, dated
    March 16, 2023 ...................................................... A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022 ............................................... A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
dated April 13, 2023 ............................................... A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 .............................................. A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023 ............................................... A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 .............................. A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-1207

Plaintiff's Letter Response to Defendant's Motion
to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 ................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022   A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ..................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023....................... A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 .............................. A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................ A-1416

Trial Transcript, dated April 25, 2023....................... A-1420

Trial Transcript, dated April 26, 2023....................... A-1524

Trial Transcript, dated April 27, 2023....................... A-1697

Trial Transcript, dated May 1, 2023.......................... A-1851

Trial Transcript, dated May 2, 2023.......................... A-2036

Trial Transcript, dated May 3, 2023.......................... A-2210

Trial Transcript, dated May 4, 2023.......................... A-2375

Trial Transcript, dated May 8, 2023.......................... A-2567

Trial Transcript, dated May 9, 2023.......................... A-2771

Parties' Trial Exhibits:

PX-1          Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2    "Remarks by President Trump before
Marine One Departure" (Office of the
Press Secretary, June 22, 2019) ...............   A-2840

PX-3    "EXCLUSIVE: Trump vehemently
denies E. Jean Carroll allegation, says
'she's not my type'" (*The Hill*,
June 24, 2019) ...........................................   A-2853

PX-4    Truth Social Post, dated
October 12, 2022 .....................................   A-2858

PX-6    "Donald Trump assaulted me in a
Bergdorf Goodman dressing room 23
years ago. But he's not alone on the list
of awful men in my life." (New York
Magazine, June 21, 2019) ........................   A-2859

PX-12    Photograph ................................................   A-2879

PX-22    Sixth Floor Construction Plan of
Bergdorf Goodman ..................................   A-2880

PX-24    Sixth Floor Construction Plan of
Bergdorf Goodman ..................................   A-2881

PX-25    Video Excerpt from Defendant's
Interview with Billy Bush
(All parties are already in possession of
video exhibit) ...........................................   A-2882

PX-25-T    Transcript of Video Excerpt from
Defendant's Interview with Billy Bush ...   A-2883

PX-26    Video Excerpt from Presidential Debate
(All parties are already in possession of
video exhibit) ...........................................   A-2885

xvi

**Page**

PX-26-T    Transcript of Video Excerpt from
           Presidential Debate ..................................    A-2886

PX-29      Video Excerpt from Defendant's Speech
           at Campaign Rally
           (All parties are already in possession of
           video exhibit) ............................................    A-2887

PX-29-T    Transcript of Video Excerpt from
           Defendant's Speech at Campaign Rally...    A-2888

PX-31      Video Excerpt from Defendant's Speech
           (All parties are already in possession of
           video exhibit) ............................................    A-2889

PX-31-T    Transcript of Video Excerpt from
           Defendant's Speech.................................    A-2890

PX-46      Twitter Post, dated November 15, 2022...    A-2891

PX-48      Twitter Post, dated December 12, 2022 ...    A-2893

PX-51      Twitter Post, dated January 29, 2023.......    A-2896

PX-53      Twitter Post, dated January 29, 2023.......    A-2898

PX-57      Email, dated October 13, 2022 ................    A-2901

PX-112     Video Excerpt from Defendant's
           Interview with Roger Ailes
           (All parties are already in possession of
           video exhibit) ............................................    A-2902

PX-112-T   Transcript of Video Excerpt from
           Defendant's Interview with Roger Ailes ..    A-2903

PX-200     Video Excerpt from Deposition of
           Donald J. Trump, taken October 19,
           2022 .........................................................    A-2904

xvii

**Page**

PX-200-T  Transcript of Video Excerpt from
Deposition of Donald J. Trump, taken
October 19, 2022.....................................  A-2905

DX-CK  Email Regarding Law & Order SVU,
dated July 23, 2019 ..................................  A-2986

Court Exhibits:

C  Timeline of Events....................................  A-2987

D  WordPerfect Document Compare
Summary of Jury Instructions.................  A-2988

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated May 1, 2023 ....................  A-3024

Exhibit A to Letter -
Excerpts of Trial Transcripts.................................  A-3042

Exhibit B to Letter -
LinkedIn Post.........................................................  A-3081

Exhibit C to Letter -
"One of the Democratic Party's biggest donors is
exploring a new anti-Trump boycott" (*Vox*,
July 2, 2020) ...........................................................  A-3083

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated May 5, 2023 ....................  A-3088

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated May 6, 2023 ....................  A-3091

Verdict Form, dated May 9, 2023 ..............................  A-3095

Notice of Appeal, dated May 11, 2023 ......................  A-3099

Notice of Motion, by Defendant, for an Order
Granting a New Trial or Remittitur, dated
June 8, 2023 ...........................................................  A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
Motion for a New Trial or Remittitur, dated
June 8, 2023 ............................................................ A-3103

Declaration of Matthew G. DeOreo, for Defendant,
in Support of Motion for a New Trial or
Remittitur, dated June 8, 2023 .............................. A-3134

Exhibit A to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit B to DeOreo Declaration -
Excerpts of Trial Transcripts.................................. A-3136

Exhibit C to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019
(Reproduced herein at pp. A-639-A-667)

Exhibit D to DeOreo Declaration -
Verdict Form, dated May 9, 2023
(Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
Opposition to Defendant's Motion for a New
Trial or Remittitur, dated June 22, 2023 ................ A-3219

Exhibit 1 to Kaplan Declaration -
Excerpts of Trial Transcripts.................................. A-3221

Exhibit 2 to Kaplan Declaration -
Twitter Post, dated June 21, 2019
(Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 ................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 ................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
Second Circuit, dated July 19, 2023 ..................... A-3339

N592Car1                         Charge

1          The evidence in this case is the sworn testimony of

2    the witnesses, the exhibits received in evidence, and the

3    stipulation or stipulations between counsel.  I know there was

4    at least one.  I don't remember if there was more than one.

5    You will.  A stipulation, as I told you, is just an agreement

6    between the parties as to some factual matter that you must

7    accept.

8          What is not evidence, however, is questions,

9    arguments, and objections by the lawyers.  You are not to

10   consider any statements that I struck or told you to disregard.

11         In deciding this case, I remind you that you are

12   obliged to consider only the evidence you have seen and heard

13   in this courtroom.  Anything that you may have learned

14   elsewhere that could conceivably have a bearing on this case

15   must be disregarded.

16         Now, before I get on to the conduct of your

17   deliberations, there are two specific bits of evidence that I

18   need to talk about.

19         There was evidence received during the trial that

20   Ms. Carroll claims shows that Mr. Trump sexually assaulted

21   women other than Ms. Carroll.  A sexual assault, or an

22   attempted sexual assault on a person other than Ms. Carroll——in

23   other words, on somebody else——may be considered by you in

24   deciding whether Mr. Trump raped, sexually abused, or forcibly

25   touched Ms. Carroll, as she claims, provided that Ms. Carroll

N592Car1                          Charge

1    has established by a preponderance of the evidence that

2    Mr. Trump sexually assaulted or attempted to sexual assault the

3    other person.  To illustrate the point, if you find that

4    Ms. Carroll proved by a preponderance of the evidence that

5    Mr. Trump sexually assaulted, or attempted to sexual assault,

6    Ms. Leeds, then you may consider that fact in deciding whether

7    Ms. Carroll proved also that Mr. Trump raped or sexually abused

8    or forcibly touched Ms. Carroll——in other words, in answering

9    questions 1, 2, and 3 on the verdict form.  If you do not find

10   that Ms. Carroll proved by a preponderance of the evidence that

11   Mr. Trump sexually assaulted, or attempted to sexual assault,

12   Ms. Leeds, then you may not consider the alleged incident

13   involving Ms. Leeds in deciding whether Ms. Carroll proved also

14   that Mr. Trump raped, sexually abused, or forcibly touched

15   Ms. Carroll——in other words, Question 1, 2, or 3 on the verdict

16   form.  That same analysis would apply to the testimony of

17   Ms. Stoynoff.

18           Now, there are three points I need to make in relation

19   to the evidence of alleged sexual assault or attempted sexual

20   assault on women other than Ms. Carroll.

21           First, the term "sexual assault," solely for the

22   purpose of considering whether Mr. Trump sexually assaulted or

23   attempted to sexual assault women other than Ms. Carroll, has a

24   different meaning than the other definitions of sex offenses

25   throughout the rest of my instructions, principally and

Case 23-793, Document 86, 11/20/2023, 3592073, Page23 of 300

A-2803

N592Car1                          Charge

1    probably exclusively in relations to questions 1, 2, and 3.  In

2    determining whether Mr. Trump sexually assaulted or attempted

3    to sexual assault Ms. Leeds or Ms. Stoynoff, he must have

4    brought himself into contact, or attempted to bring himself

5    into contact, without the other women's consent, with the

6    sexual or reproductive organs of the other women, in other

7    words, their genitals, and not merely other parts of the body.

8           Second, I used the word "attempt."  The word "attempt"

9    in this context means that Mr. Trump intended to make contact

10   with a woman's genitals and did some act that was a substantial

11   step in an effort to make such contact.  A substantial step is

12   something more than mere preparation or planning.

13          Third, a sexual assault on a person other than

14   Ms. Carroll on its own would not alone be sufficient to prove

15   that the defendant, Mr. Trump, committed the alleged rape,

16   sexual abuse, or forcible touching of Ms. Carroll.  As you

17   consider this evidence, bear in mind at all times that

18   Ms. Carroll has the burden of proving that Mr. Trump raped,

19   sexually abused, or forcibly touched her.

20          Those are my instructions concerning your

21   consideration of evidence of alleged sexual assaults or

22   attempted sexual assaults on women other than Ms. Carroll.  But

23   just to be sure that I am clear, the definition of "sexual

24   assault" that I have just given you applies only to your

25   determination of whether to consider the evidence concerning

1    alleged assaults or attempted assaults on those other women.

2    It has no application to anything else in these instructions.

3           The other item of evidence I now will address.  During

4    the cross-examination of Ms. Carroll, you heard some questions

5    directed to her concerning an e-mail that Ms. Carroll received

6    from another person in which the other person purported or

7    claimed to describe an alleged episode of a TV show called

8    *Law & Order SVU* and of Ms. Carroll's reply to that e-mail.  The

9    e-mail from the other person was not offered to prove that what

10   the other person said in that e-mail was true.  It was offered

11   only to prove that somebody said those things to Ms. Carroll,

12   and then you have Ms. Carroll's response for whatever it tells

13   you about Ms. Carroll's state of mind or credibility.  In other

14   words, you can consider this other person's e-mail as evidence

15   of what that person wrote to Ms. Carroll, telling her that

16   there was such an episode, but not as evidence that there in

17   fact ever was such an episode or what it may have contained.

18   Remember I talked about the moon being made of green cheese or

19   Limburger cheese.  That's the principle I am alluding to here.

20          Now, as for other matters affecting your analysis and

21   consideration of the evidence, just a few things to say.

22          I suspect all of you have heard the terms somewhere in

23   your lives "direct" and "circumstantial evidence."  I, for one,

24   although I must be insane to do it, am a trial movie and TV

25   show addict.  I watch them all.  And I hear all these

N592Car1                          Charge

1    discussions of direct and circumstantial evidence, and a lot of

2    them are wrong.  So let me tell you what it is all about and --

3    I could not do this job without Andy.  Thank you, Andy.

4            Direct evidence is evidence that you hear when a

5    witness testifies about something that the witness knows

6    because the witness saw it, heard it, touched it, felt it,

7    smelled it and, in my last trial, tasted it.  It was a trial

8    about beer.  That is direct evidence.  The witness is telling

9    you, because they perceived it, something about what the

10   witness saw and knows.

11           Direct evidence can also be in the form of an exhibit.

12   Suppose this transcript binder was an exhibit in this case.

13   Suppose it mattered what color it was bound in or how many

14   pages were in it.  You could look at it yourself, the physical

15   object.  You could tell it's blue binding and you could check

16   the pagination or count them.  That's direct evidence,

17   something you know because it is knowable.  It is right in

18   front of you.

19           The other kind of evidence is referred to as

20   circumstantial evidence.  Circumstantial evidence simply refers

21   to proving fact A indirectly by offering evidence of fact B and

22   drawing a conclusion from fact B that fact A is probably so or

23   not probably so.

24           The wet umbrella example is always used in this

25   courthouse.  If, suddenly, people started walking into this

Case 23-793, Document 86, 11/20/2023, 3592073, Page26 of 300

1    courtroom with wet umbrellas and you couldn't see outside and

2    it was sunny this morning when you came in, the wet umbrellas

3    are circumstantial evidence.  Your common sense tells you the

4    weather changed.  It is raining.  It could be a pipe burst, but

5    the chances are it's raining.  Circumstantial evidence is

6    logic, common sense.  The bottom line, the punch line is

7    circumstantial evidence in the eye of the law is just as

8    valuable as direct evidence.  Your verdict must be based on

9    your conscientious evaluation of all the evidence—direct and

10   circumstantial.  If that disabused any misimpressions, good.

11   And if it was just a new education, that's fine, too.

12        Now, we have heard the word "credibility" yesterday,

13   didn't we, a few times.  Obviously it's at issue in this case

14   in a lot of ways.  The determination of credibility in this

15   case is up to you.  It's up to you to decide how believable

16   each witness was in the testimony the witness gave.  You are

17   the sole judges of that.  You are the sole judges of how

18   important that testimony was.  In deciding on the weight to

19   give to the testimony of witnesses, use all the tests for

20   truthfulness you would apply in determining something important

21   to you in your life.

22        Your decision on whether or not to believe a witness

23   may depend on how the witness impressed you.  You have watched

24   all or substantially all of them testify.  Everything a witness

25   does or says on the witness stand counts in your determination.

N592Car1                         Charge

1    Did the witness appear to be frank, forthright, and candid?  Or

2    did the witness answer questions on direct examination in a

3    responsive and forthcoming manner but answer questions on

4    cross-examination evasively or unresponsively?  You should

5    consider the opportunity the witness had to see, hear, and know

6    the things about which the witness testified, the accuracy of

7    the witness's memory, the reasonableness and probability of the

8    testimony, whether the testimony is consistent or inconsistent,

9    and whether it is corroborated or not corroborated with other

10   credible testimony and evidence.

11          In evaluating credibility, use your own common sense,

12   your good judgment, your life experience.  You must, in

13   evaluating witness testimony, do so without bias or prejudice

14   for or against either party and with an attitude of complete

15   fairness and impartiality.

16          If in the course of your deliberations you conclude

17   that a witness intentionally testified falsely to a material

18   fact during the trial, you are entitled to disregard everything

19   that witness said on the principle that one who testifies

20   falsely as to a material fact may also testify falsely to other

21   facts.  But credibility is not necessarily an all-or-nothing

22   proposition.  You may accept so much of any witness's testimony

23   as you think is true and accurate and reject only those parts,

24   if any, that you conclude is false or inaccurate.

25          Now, you have heard during this trial from two expert

Case 23-793, Document 86, 11/20/2023, 3592073, Page28 of 300

N592Car1                         Charge

1    witnesses——specifically, Dr. Lebowitz and Professor Humphreys.

2    An expert witness is somebody who, by education and experience,

3    has become expert in some art, science, profession, or calling.

4    Under the rules of evidence, expert witnesses may give opinions

5    as to matters in which they profess to be experts.  They can

6    also explain the reasons for their opinions.  The purpose of

7    expert testimony is to assist you in understanding the evidence

8    and in coming to an independent decision.

9          In deciding on the credibility and persuasiveness of

10   expert testimony, you should consider the expert's

11   qualifications, his or her opinions, the bases for the expert's

12   opinions, and all of the other considerations I have talked

13   about in regard to witness credibility generally.  You may give

14   the testimony of experts whatever weight you think it deserves

15   in light of everything else in this case.  You shouldn't

16   expect -- excuse me, accept expert testimony just because

17   somebody is an expert.  Even with expert witnesses, use your

18   common sense, your good judgment, and your own life experience.

19         You each may give expert testimony as much weight, if

20   any, as you think it deserves in light of all of the evidence.

21   You also may reject the testimony of any expert witness in

22   whole or in part if you conclude that the reasons given in

23   support of an opinion are unsound or if you for other reasons

24   don't believe or credit the expert witness.

25         Now, we are truly in the home stretch.  I will stand

Case 23-793, Document 86, 11/20/2023, 3592073, Page29 of 300

A-2809

N592Car1                          Charge

1    up for a while if I can get this microphone where I can be

2    heard.

3            You are going to retire to decide this case in just a

4    few minutes.  It's your duty to consult with each other and to

5    deliberate with the goal of coming to an agreement.  Each of

6    you must decide for yourself the answers to the questions I

7    have put to you, but you should do so only after considering

8    the case with your fellow jurors, and you should not hesitate

9    to change an opinion when convinced that it's mistaken.

10           Just give me a second.

11           Your answers to each question must be unanimous, but

12   you are not required to give up your honest convictions

13   concerning the effect or the weight of the evidence for the

14   mere purpose of returning a verdict or solely because of the

15   opinion of other jurors.  Discuss and weigh your respective

16   opinions dispassionately, without regard to sympathy, without

17   regard to prejudice or favor for either party, and adopt that

18   conclusion which in your good conscience appears to be

19   consistent with the truth.

20           I need to say a word about your notes.  Any notes you

21   may have taken are for your personal use only.  You each may

22   consult your own notes during deliberations, but any notes you

23   have taken are not to be relied upon during deliberations as a

24   substitute for the collective memory of all nine of you.  Your

25   notes should be used as memory aids, but should not be given

N592Car1                        Charge

1    precedence over your independent recollection of the evidence.

2    If you didn't take notes, you should rely on your independent

3    recollection of the proceedings and you should not be

4    influenced by the notes of others.  The notes are not to be

5    given any greater weight than the recollection or impression of

6    each juror as to what the testimony may have been.

7           Again, you each must make your own decision concerning

8    the proper answer to each question based on your consideration

9    of the evidence and your discussions with your fellow jurors.

10   No one should surrender his or her conscientious beliefs solely

11   for the purpose of returning a unanimous verdict.

12          As I told you, you are going to have a printed copy,

13   you will have plenty of printed copies of my instructions in

14   the jury room.  It will probably take us ten or 15 minutes to

15   get them back there.  You will see that the printed

16   instructions contain here and there legal citations which

17   usually appear in brackets.  Those citations are included to

18   aid the lawyers and me and you are to ignore them.  You will

19   probably think they are in hieroglyphics anyway.  They are

20   there because both the lawyers and I need an order trail when

21   we are considering these instructions in case there is a

22   question about the legal authority for the proposition just

23   preceding the citation, but you ignore the citations

24   altogether.

25          Now, it is conceivable that you may have questions

Case 23-793, Document 86, 11/20/2023, 3592073, Page31 of 300

N592Car1                              Charge

1    about my instructions despite the fact that the lawyers and I

2    have done our level best to make them as clear as they possibly

3    can be.  The procedure, if you have a question, is that you

4    should agree on what the question is.  The foreperson of the

5    jury—and I will come to that in a minute—should make a note

6    of what the question is.  Every page and line number of the

7    jury instructions -- to rephrase it more accurately, every page

8    and every line of type is numbered, so if there is a question

9    about a particular part or parts of the instructions, please

10   include the page number and the line numbers that the question

11   pertains to.  There is a very practical reason for that.  When

12   I get a question from the jury, the lawyers have to be

13   consulted, we all have to understand what the question is.  If

14   we don't all agree what the question means, further proceedings

15   have to be undertaken.  If we all agree what the question

16   means, we have to discuss what the right answer is.  If there

17   is a disagreement, I decide the right answer.  And the more

18   clear we are on what the question is, the more quickly we can

19   do that and the more responsive we can be to the question.

20           I would also, in that vein, say that if you want any

21   of the testimony reread or provided to you in writing, we can

22   do that.  The procedure is the same.  Agree on what you want, I

23   hope.  Foreperson sends in a note.  Any notes that come in

24   should be in sealed envelopes, by the way.  Indicate exactly

25   what you want as best you can—who the witness was, what the

N592Car1                        Charge

1   subject was, direct, cross, do the best you can.  And the

2   procedure we undergo is the same.  We have to agree on what we

3   think you are asking for, we have to decide what the right

4   portion to read back is, and all of that takes a certain amount

5   of time.

6            So by all means, if you want something, we will

7   provide it to you.  Be sure you need it because it takes time

8   and we need to be responsive to save your time.

9            It also can take time to prepare the material because

10   sometimes we send it in in writing, sometimes we bring you into

11   the courtroom to read it, and if it's done in writing, various

12   things have to be taken care of before it can go into the jury

13   room.

14            All nine of you need to be there to deliberate.  If

15   somebody is missing, you are not a jury.  Do not deliberate

16   unless you are all there.

17            When you retire, you are going to select one member of

18   the jury as your foreperson.  That person will preside over

19   your deliberations and speak for you in open court when, as,

20   and if that becomes necessary.  The foreperson, as I said, will

21   send out any notes.

22            Now let's talk about the verdict.  When you reach a

23   verdict, the foreperson is to write a note saying "verdict."

24   Put it in a sealed envelope.  Do not label the envelope.  Hand

25   it to the officer who will be right outside the jury room.  The

Case 23-793, Document 86, 11/20/2023, 3592073, Page33 of 300

A-2813

N592Car1                         Charge

1    officer will bring it to me, and I will get the people who need

2    to be here here.

3           Now, it is 11:30.  I'm going to give the lawyers a

4    period of time to go out for lunch if they need to or feel they

5    want to, so it may take a little time once you have reached a

6    verdict or indeed if there is a note, depending on where people

7    are, to get back to you.  But be patient.  We understand that

8    we need to be as quick as we can and we will do that.  But

9    that's the way it will work.  Note, "verdict," sealed envelope,

10   and we will take it from there.

11          Your answers to the questions on the verdict form need

12   to be unanimous.  You also have to follow the instructions.

13   This is not necessarily a ten-question quiz.  This is like

14   taking an exam, right?  You answer Question 1.  If you answer

15   Question 1 one way, you go to Question 2.  If you answer it the

16   other way, you go to Question 4.  Follow the instructions.

17   Make sure you are following the instructions.  Don't add any

18   commentary on the verdict forms.  Believe it or not, I had a

19   jury do that once, and it was a lengthy problem for everybody.

20   If there is editorial comment, it's a mistake.

21          Of course you know that -- well, you don't know if you

22   have been following my instruction, but you have probably

23   guessed that there may have been some media coverage of this

24   case, and hopefully you have not partaken of any of it or

25   allowed anybody to communicate it to you.  And that continues.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 86, 11/20/2023, 3592073, Page34 of 300

N592Car1                         Charge

1   No reading, no watching, no listening to media coverage, no

2   commentary.  You are totally insulated.  It is between and

3   among the nine of you while your deliberations go on and until

4   I take a verdict and discharge you.

5          I have already talked about notes.  One more thing

6   about notes.  Do not, in a note or if for some reason you are

7   in open court, ever say how the vote stands on anything unless

8   I specifically ask you.  Okay?

9          Now, folks, I remind you that you guys took an oath to

10  render a fair and impartial judgment, without prejudice,

11  without sympathy, and without fear, based solely on the

12  evidence and the applicable law.  And I want to elaborate for a

13  minute on your obligation under that oath to render judgment

14  solely upon the evidence in this case and the applicable law.

15         As I said, forgive me for repeating, you as the jurors

16  are the judges of the facts, and nothing I have said or done

17  should be taken as indicating any view on my part as to what

18  your conclusion should be about the facts—about what actually

19  happened.  But in determining what actually happened—that is,

20  in reaching your decision on the facts—it is your sworn duty

21  to follow all of the rules of law that I have explained to you.

22  You have no right to disregard or to question the wisdom or

23  correctness of any rule I have stated to you.  You must not

24  substitute or follow your own notion or opinion as to what the

25  law is or what it ought to be.  It is your duty to apply the

Case 23-793, Document 86, 11/20/2023, 3592073, Page35 of 300

A-2815

1455

N592Car1                          Charge

1    law as I have explained it to you, regardless of the

2    consequences.  And that applies to all of the law I have given

3    you, including the fact that all or most of the issues of fact

4    that I have put to you and that you will answer must be decided

5    according to the preponderance of the evidence and the meaning

6    of preponderance of the evidence.

7            I know you are going to do your duty under your oath

8    and render a just and true verdict according to the facts as

9    you find them and the law that I have given you.

10           I will ask you to remain seated for just a moment.

11           Counsel, if there are any objections to the charge as

12   given upon which I have not already ruled, come to the sidebar.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N592Car1                        Charge

 1              (At the sidebar)

 2              THE COURT:  Okay.  Plaintiff, anything?

 3              MS. KAPLAN:  Nothing, your Honor.

 4              THE COURT:  Mr. Tacopina.

 5              MR. TACOPINA:  We have four, your Honor.

 6              THE COURT:  All right.

 7              MR. TACOPINA:  The first one is——I will refer to the

 8    instructions——page 11, on line 11.  The sentence ends with

 9    "responsibility of what Mr. Trump allegedly did" in here.  You

10    injected something that is not here on the instructions and

11    it's on page 15/line 5 of the trial transcript, "in other

12    words" --

13              THE COURT:  I'm trying to follow you, that's all.  I'm

14    puzzled because I don't know how I injected something here from

15    page 15 of the trial transcript, but go ahead.

16              MS. KAPLAN:  If you read page 15 of the trial

17    transcript, you will see what you injected, the monitor --

18              THE COURT:  All right, so let's see that.

19              MR. TACOPINA:  You added, "In other words, what you

20    find he did that got you to this point."  If you are going to

21    add that, your Honor should add, "if anything," "what he did,

22    if anything," but this sentence was added in.

23              THE COURT:  Okay.  Just let me make a note.  You are

24    on line 11?

25              MR. TACOPINA:  Yes, your Honor, right after here,

A-2817

N592Car1                          Charge

1    right after "did."

2              THE COURT:  What you really want there "if anything."

3              MR. TACOPINA:  Well, your Honor, hold on, make sure

4    I'm making this clear.  There was a sentence that's not written

5    here that was injected, and what you said is, "In other words,

6    what you find he did that got you to this point."  Being that

7    you injected that sentence, I think you have to add the word

8    "in other words, what you find he did, if anything, that got

9    you to this point."

10             MS. CROWLEY:  Judge, if we are on this question,

11   punitive damages, then they have decided that he's done

12   something, so I don't think --

13             MR. TACOPINA:  That's happened throughout this,

14   "allegedly did," "if he did."  You don't assume -- you don't

15   instruct the jury, in other words, what you find he did that

16   got --

17             THE COURT:  Mr. Trump, true or false, this relates to

18   Question 5?

19             MR. TACOPINA:  True.

20             THE COURT:  True.  The instructions are that they are

21   not to answer Question 5 unless they answered Question 1,

22   Question 2, or Question 3 "yes."  True or false.

23             MR. TACOPINA:  True, true.

24             THE COURT:  Overruled.  Next one.

25             MR. TACOPINA:  Next page, 12, this is the only -- the

A-2818

N592Car1                        Charge

1    other ones have to do with things you said extemporaneously.

2              THE COURT:  Page 12.

3              MR. TACOPINA:  12 is, the way it is written I think is

4    improper.  "Written statements, like" --

5              MS. KAPLAN:  Line?

6              MR. TACOPINA:  Sorry, 21.

7              "Written statements like Mr. Trump's October 12, 2022

8    statement constitute libel."  I think that obviously should be

9    "written statements," without referring to Mr. Trump, "if found

10   to be defamatory."

11             THE COURT:  My view is that it is fine as given, but I

12   will clarify it.

13             MR. TACOPINA:  Okay.  Page 24.

14             MS. KAPLAN:  24.

15             MR. TACOPINA:  Page 24, end of line 4 through line 6

16   you didn't read this, your Honor.  Page 24.

17             THE COURT:  I thought I did.

18             MR. TACOPINA:  No.  You stopped.  The last word you

19   said was "episode may have contained."

20             THE COURT:  But I made the point.

21             MR. TACOPINA:  You said the Limburger cheese things.

22             THE COURT:  I made the point.

23             MR. TACOPINA:  You made the point, but it's written in

24   the instructions here.

25             THE COURT:  So you would like me to do it again?

N592Car1                        Charge

 1              MR. TACOPINA:  I would like you to read that sentence

 2     that you didn't read.  "You may also consider Ms. Carroll's

 3     response to the e-mail to the extent, if any, that you believe

 4     Ms. Carroll's response bears" --

 5              THE COURT:  I'm absolutely confident that I am right

 6     about this and that, you are correct, I may not have read it

 7     exactly there, but in that context, I said it in substance.

 8              MR. TACOPINA:  Okay, your Honor.

 9              THE COURT:  Can we go back?

10              (Pause)

11              MR. TACOPINA:  If that's your recollection, I'm fine

12     with it.

13              THE COURT:  I want to be sure I understand and it's an

14     important case and I want to be sure my recollection is right.

15     So give me a minute, and I will go look on the screen.

16              (In open court)

17              THE COURT:  This will only be a minute or two, folks.

18              (At the sidebar)

19              THE COURT:  I did cover it, but I'm having Andy print

20     out the page if, of course, we can print out the page.

21              MR. TACOPINA:  Okay, your Honor.  Should I give you

22     the last one or do you want to wait?

23              THE COURT:  Give me the last one as long as Kris is

24     here.

25              MR. TACOPINA:  It's on page 25.

A-2820

N592Car1                    Charge

1          THE COURT:  Okay.

2          MR. TACOPINA:  This first full paragraph.  Instead of

3    "you watched each witness testify" what you said was "you

4    watched all or substantially all of them testify."

5          THE COURT:  I understand your point, and I will fix

6    it.

7          MR. TACOPINA:  Thank you.

8          THE COURT:  Anything else?

9          MR. TACOPINA:  That's it.

10          THE COURT:  Let's just see whether Andy can print this

11    up.

12          MR. TACOPINA:  So, your Honor, page 12 you said you

13    were going to go correct?

14          THE COURT:  Yes.

15          MR. TACOPINA:  And then we have to change the actual

16    instruction going back to the jury.

17          THE COURT:  Don't worry about that.

18          MR. TACOPINA:  I'm a little worried about it, but if

19    you say don't worry, I won't worry.

20          THE COURT:  No.  Come back.  We are still waiting --

21          MR. TACOPINA:  I followed them.

22          MS. KAPLAN:  Excuse me.

23          THE COURT:  I'm waiting to print if we can do it.

24          MS. KAPLAN:  Sorry, your Honor.

25          THE COURT:  Andy, as always, you are a wonder.

A-2821

1461

N592Car1                              Charge

1              THE DEPUTY CLERK:  I did not succeed with line

2       numbers.

3              THE COURT:  Okay.  So where are we?  Here is the

4       transcript.  "The other item of evidence I now will address.

5       During the cross-examination of Ms. Carroll you heard some

6       questions directed to her concerning an e-mail that Ms. Carroll

7       received from another person in which the other person

8       purported or claimed to describe an alleged episode of a TV

9       show called *Law & Order SVU* and of Ms. Carroll's reply to that

10      e-mail.  The e-mail from the other person was not offered to

11      prove that what the other person said in that e-mail was true.

12      It was offered only to prove that somebody said those things to

13      Ms. Carroll, and then you have Ms. Carroll's response for

14      whatever it tells you about Ms. Carroll's state of mind or

15      credibility.  In other words, you can consider" --

16             MR. TACOPINA:  Got it.

17             THE COURT:  -- "this other person's e-mail as evidence

18      of what that person wrote to Ms. Carroll, telling her that

19      there was such an episode, but not as evidence that there in

20      fact ever was such an episode or what it may have contained."

21             MR. TACOPINA:  Thank you, your Honor.  Okay.

22             THE COURT:  So we have page 12 and page 24, right?

23             MR. TACOPINA:  Yes, your Honor.

24             (In open court)

25             THE COURT:  Okay, folks.  Two little things.  Counsel,

N592Car1                          Charge

1    quite understandably, pay close attention to whether what I say

2    is precisely what's written down here and call to my attention

3    anything where I perhaps departed by a word or two.

4         When I was explaining to you that I was going to use

5    the terms "defamation and libel" interchangeably, I said

6    "written statements, like Mr. Trump's October 12, 2022

7    statement, constitute libel.  I'm striking those words, in

8    other words, "like Mr. Trump's October 12, 2022 statement," to

9    avoid any implication that I was making a determination as to

10   whether Mr. Trump's statement that day was defamatory.  That's

11   your job.  The reference to Mr. Trump's October 12, 2022

12   statement was simply another way of saying that the social

13   media, written social media post was a written statement and

14   because it was written, it falls into the libel category rather

15   than the other category of defamation.  It will be corrected

16   and it will be precisely right in the copy you get, and I have

17   just told you what was meant by it.

18        Mr. Tacopina, point me to the other reference.

19        MR. TACOPINA:  Sure, your Honor.  It was page 25,

20   lines 3 and 4.

21        THE COURT:  Thank you.

22        When I was talking to you about witness credibility, I

23   made the statement "you watched" -- I think I said "all or

24   substantially all of the witnesses testify."  Well, of course,

25   what I had in mind there is you saw almost all of the witnesses

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N592Car1                        Charge

1     testify live in this courtroom.  You also saw some deposition

2     testimony, including Mr. Trump's.  That was testifying.  You

3     are entitled to evaluate what you saw in that video in

4     assessing his credibility and what you saw in the videos of

5     other people in evaluating their credibility.

6              That's all I have to say in terms of corrections, and

7     we will send you a corrected copy of the typed script as soon

8     as you retire.

9              Now, it's a quarter to 12, and I think what we will

10    do, I normally keep lawyers in the courtroom while a jury is

11    deliberating so that we can get everybody together quickly if

12    there is a note, but everybody on both sides has been working

13    extremely hard, and we are going to have, for them, not for

14    you——you will have your own lunch——a lunch break where if they

15    want to leave the premises, they can.  And so if there were a

16    note or, for that matter, a verdict between 12:15 and 1:30, we

17    may not be in a position to respond because there may be people

18    missing and you will just have to hang out.  But if there is a

19    verdict during that period, you write the note, give it to the

20    officer, and I will know that and we will move as fast as we

21    can.

22             All right.  Anything else, counsel, before we swear

23    the officer?

24             MS. KAPLAN:  Not for plaintiff, your Honor.

25             MR. TACOPINA:  No, your Honor.  Thank you.

N592Car1                          Charge

1              THE COURT:  All right.

2              (Court and deputy confer).

3              THE COURT:  You will have what has been referred to to

4     me as a clean laptop, whatever exactly that means, in the jury

5     room with images of all of the exhibits on it.  It will take us

6     some time to get that back to you.

7              (Deputy and court confer)

8              THE COURT:  We also have a DVD player and we have some

9     hard copies.  Andy is in charge of wrangling this with the

10    lawyers and, as fast as we can, you will get all the exhibits

11    one way or the other.  And if there is anything you find you

12    need and you don't have, send us a note and we will fix it.

13             Okay.  Let's swear the officer.

14             THE DEPUTY CLERK:  Would the marshal please come

15    forward and raise your right hand.

16             You do solemnly swear that you will keep the jurors

17    impaneled and sworn in this cause together in some private and

18    convenient place.  You shall suffer no one to speak to them,

19    nor shall you speak to them yourself without direction of this

20    Court, unless it be to ask them if they have agreed upon the

21    verdict, so help you God.

22             THE MARSHAL:  I do.

23             THE DEPUTY CLERK:  Thank you.

24             THE COURT:  Ladies and gentlemen, you will now retire

25    and deliberate upon your verdict.

N592Car2

 1                (Jury retires to deliberate; 11:50 a.m.)

 2                THE COURT:  Please be seated, folks.

 3                Counsel, is there any reason why the Court should not

 4      fill media requests for copies of the verdict form, blank

 5      copies?

 6                MS. KAPLAN:  Not from our side, your Honor.

 7                MR. TACOPINA:  No, your Honor.

 8                THE COURT:  Andy will take care of it in due course.

 9                Andy, the answer to the question is the DE can

10      distribute the blank verdict form.

11                Okay, folks, we are in recess pending -- one more

12      thing.  I assume it's suitable, acceptable to counsel on both

13      sides that you will work out whatever needs to be worked out

14      with the exhibits and the laptop and the DVD player and all of

15      that and that there will either be an agreement and he will,

16      without any further court appearance, take whatever needs to go

17      into the jury room without any further involvement by me, and

18      if there is a disagreement, you will bring me the disagreement.

19                MS. KAPLAN:  Absolutely.

20                THE COURT:  Acceptable?

21                MS. KAPLAN:  Absolutely, your Honor.

22                MR. TACOPINA:  Yes, your Honor.

23                THE COURT:  Done.  Okay.  Thanks, folks.

24                (Recess pending verdict; 11:51 a.m.)

25                (In open court; jury not present; 12:25 p.m.)

N592Car2

```
 1          THE COURT:  In a superabundance of caution, my law

 2     clerk has prepared a redlined, revised copy of the jury

 3     instructions, and she is giving them to counsel.  And we will

 4     mark -- is Andy here?  Andy is here.  Andy, would you mark this

 5     Court Exhibit D.  And then I will tell you what pages there are

 6     markings on, but I invite you to scrutinize the whole thing.

 7     The pages that I have tabs on are 12, 15, 26, and 31-32.

 8          MR. TACOPINA:  Your Honor, just to be clear, there are

 9     pages on those five pages?

10          THE COURT:  That is my understanding, but I want you

11     to just turn all the pages and you be satisfied that there are

12     no other marked changes.  That's what my law clerk tells me.

13          MR. TACOPINA:  We don't see a mark on page 12, for

14     example, or 15 either.

15          THE COURT:  Did I say 12?  It's on 13.  Sorry, I

16     misread it.

17          MR. TACOPINA:  Can I make a request?

18          THE COURT:  Yes.

19          MR. TACOPINA:  Page 13, where it says "written

20     statements constitute libel," would I be able to -- my request

21     would be that it say "written statements constitute libel if

22     found to be defamatory by clear and convincing proof."  Here it

23     just says "written statements constitute libel."

24          THE COURT:  Yeah, I know.  Now, look.  I respect

25     lawyers doing whatever they can to get an edge and to do what
```

1    they think is in the interests of their clients, and I respect

2    you for that; but, you know, given the verdict form here, it is

3    impossible for there to be a finding of defamation unless what

4    you just asked me to add were satisfied.  You know that.  And

5    furthermore, you didn't object to this in the charge conference

6    yesterday.  And so I understand where you are coming from, but

7    I'm not going to do it because it's totally superfluous.

8              Okay.  Anything else from either side?

9              MS. KAPLAN:  About something other than the charge,

10   your Honor?

11             THE COURT:  No.  I'm talking about --

12             MS. KAPLAN:  Still on the charge.

13             THE COURT:  Right?  So my copy with these changes,

14   Court Exhibit D, I take it there are no objections.

15             MR. TACOPINA:  I just need a second, your Honor.  One

16   more second.  There's five pages.  One more second.

17             We're good, your Honor.

18             THE COURT:  You're good.  Okay.

19             So then with the agreement of all sides, I trust, my

20   law clerk will run this in final.  The final without the

21   redline markings will be marked Court Exhibit E, and Andy will

22   take nine copies into the jury room and give final copies to

23   counsel on both sides.

24             Agreed, Mr. Tacopina?

25             MR. TACOPINA:  Yes, your Honor.

N592Car2

```
1              THE COURT:  Ms. Kaplan?

2              MS. KAPLAN:  Yes, your Honor.

3              THE COURT:  Okay.  Done.  Now we have already eaten up

4     your lunchtime.  So if you got back at 1:45, you will be

5     forgiven.  Okay?

6              Ms. Kaplan.

7              MS. KAPLAN:  One additional issue, your Honor.

8              THE COURT:  I'm sorry?

9              MS. KAPLAN:  One additional issue.  Do you want me to

10    raise it later?

11             THE COURT:  I don't know what it is.

12             MS. KAPLAN:  Okay.  So, your Honor, I think you may

13    have been provided with a copy of this.  At approximately 9:04

14    this morning, Donald Trump put up on Truth Social a statement

15    which I could read aloud, but it could be -- have two possible

16    meanings to people, either that the fact that he can't speak in

17    the press is unfair to him or possibly implying that he wasn't

18    given an opportunity to speak in his own defense in this case.

19    That second meaning is obviously very troublesome for us.  It's

20    been picked up in at least seven journalistic -- Rolling Stone,

21    Law & Crime, ABC already.  If the jury reaches a verdict before

22    the end of the day, there is no problem, because they are

23    obviously sequestered and that's not an issue.  If the jury is

24    unable to reach a verdict by the close of business today, we

25    would suggest an instruction be read to them about --
```

Case 23-793, Document 86, 11/20/2023, 3592073, Page49 of 300

1   basically -- I can read it to your Honor, basically suggesting

2   that Mr. Trump had every opportunity to testify in this case

3   and he was not prevented in any way from presenting a defense.

4   And I can read it aloud if your Honor would like or I can hand

5   it --

6           THE COURT:  I don't think that's necessary.

7           Mr. Tacopina.

8           MR. TACOPINA:  Your Honor, I mean, so what I just

9   heard was a request for a missing witness charge or a witness

10  statement as a whole.  But let me just put this in context.  I

11  read this and, look, I had that other post removed the other

12  day.  Every other post has been removed.  There has been no

13  further post.

14          THE COURT:  You know, I know you said that, and I

15  accept that you thought it was accurate when it was

16  communicated to me, and the other side sent me a letter a day

17  or two ago saying it isn't true.

18          MR. TACOPINA:  But it's true now.

19          THE COURT:  It's true now.

20          MR. TACOPINA:  Yeah, yeah, it was removed.  It was

21  removed.

22          THE COURT:  When?

23          MR. TACOPINA:  When they sent the letter.  We all

24  thought it was removed.  They thought it.  So did I.  And I

25  don't know how to search that stuff, and it was way back from

Case 23-793, Document 86, 11/20/2023, 3592073, Page50 of 300

N592Car2

1   April 20-whatever, when it first came up, your Honor.

2          THE COURT:  So now when did you tell him -- and I'm

3   not imputing dishonesty to you --

4          MR. TACOPINA:  Yeah.

5          THE COURT:  -- you understand.  When you told me it

6   had been removed, in fact it hadn't been removed.

7          MR. TACOPINA:  Well, actually I didn't say that to

8   your Honor, because I didn't see it with my own eyes.  What I

9   did say was Eric Trump's post was removed.  We were discussing

10  that and that was removed.

11         We all believed— Ms. Kaplan's side, as well—that the

12  other post was removed, but apparently it wasn't.  It was in a

13  queue from April 26, your Honor.  But it's a resolved issue.

14  It has been removed.  And I'm doing everything I can to make

15  sure everyone is satisfied here.

16         But on this recent post, if I may address it, I assume

17  your Honor has seen it, yes?

18         THE COURT:  I've been told of it.

19         MR. TACOPINA:  Okay.  It is not anything that would

20  require any instruction to a jury.

21         First of all, let's put this in context.  He is --

22         THE COURT:  I'm not instructing the jury.

23         MR. TACOPINA:  Okay.

24         THE COURT:  Look.  We are dealing here with what we

25  are dealing with --

Case 23-793, Document 86, 11/20/2023, 3592073, Page51 of 300

A-2831

N592Car2

```
1              MR. TACOPINA:  Yes.

2              THE COURT:  -- and I have no further comment.

3              MR. TACOPINA:  Okay.  Thank you, your Honor.

4              1, 2?

5              THE COURT:  What?

6              MR. TACOPINA:  I'm more concerned about lunch right

7    this minute.  The cafeteria?  Can I go to the cafeteria?

8              THE COURT:  Yes, you can go to the cafeteria.  You can

9    even go out.

10             MR. TACOPINA:  No, coming in is so much fun, I'd

11   rather stay in.

12             THE COURT:  Good.

13             MR. TACOPINA:  Thank you.

14             MS. KAPLAN:  Thank you, your Honor.

15             (Recess pending verdict; 12:32 p.m.)

16             (In open court; jury not present; 3:02 p.m.)

17             THE COURT:  Good afternoon.  I have received a note

18   reading in its entirety "Verdict."

19             THE DEPUTY CLERK:  Shall I get the jury?

20             THE COURT:  Just give me one minute.

21             Assuming that there is in fact a verdict and, for that

22   matter, even assuming there isn't, which doesn't seem very

23   likely, decorum will be maintained in the courtroom.  No

24   shouting, no jumping up and down, no race for the door.  Just

25   remain seated and quiet.  There are further things that have to
```

N592Car2

1    happen in that event.

2              All right.  Let's get the jury.

3              (Jury present; 3:04 p.m.)

4              THE COURT:  Jurors all present.

5              Members of the jury, who is the foreperson?

6              (Juror 81 stands)

7              THE COURT:  Yes, ma'am.  Has the jury in fact reached

8    a verdict?

9              THE FOREPERSON:  We have.

10             THE COURT:  Would you please pass the envelope to

11   Andy.  Thank you.

12             (Pause)

13             THE COURT:  The clerk will publish the verdict.

14             THE DEPUTY CLERK:  As to battery, did Ms. Carroll

15   prove, by a preponderance of the evidence, that (1) Mr. Trump

16   raped Ms. Carroll?  Answer:  No.

17             Question 2.  Did Mr. Trump sexually abuse Ms. Carroll?

18   Answer:  Yes.

19             Question 4.  Ms. Carroll was injured as a result of

20   Mr. Trump's conduct?  Answer:  Yes.

21             Dollar amount that would fairly and adequately

22   compensate her for injury --

23             THE COURT:  "For that injury."

24             THE DEPUTY CLERK:  For that injury or those injuries.

25   $2 million.

Case 23-793, Document 86, 11/20/2023, 3592073, Page53 of 300

N592Car2

1          Question 5.  Mr. Trump's conduct was willfully or

2    wantonly negligent, reckless, or done with a conscious

3    disregard of the rights of Ms. Carroll, or was so reckless as

4    to amount to such disregard?  Answer:  Yes.

5          How much, if any, should Mr. Trump pay to Ms. Carroll

6    in punitive damages?  Answer:  $20,000.

7          As to defamation, did Ms. Carroll prove, by a

8    preponderance of the evidence, that, Question 6, Mr. Trump's

9    statement was defamatory?  Answer:  Yes.

10          Did Ms. Carroll prove, by clear and convincing

11    evidence, that, as to Question 7, Mr. Trump's statement was

12    false?  Answer:  Yes.

13          Question 8.  That Mr. Trump made the statement with

14    actual malice?  Answer:  Yes.

15          Did Ms. Carroll prove, by a preponderance of the

16    evidence, that, Question 9, Ms. Carroll was injured as a result

17    of Mr. Trump's publication of the October 12, 2022 statement?

18    Answer:  Yes.

19          If "yes," answer a dollar amount for any damages other

20    than reputation repair program.  $1 million.

21          If "yes," insert a dollar amount for any damages for

22    the reputation repair program only.  $1,700,000.

23          Question 10.  In making the statement, Mr. Trump acted

24    maliciously, out of hatred, ill will, spite, or wanton,

25    reckless, or willful disregard of the rights of another?

N592Car2

1       Answer:  Yes.

2              If "yes," how much, if any, should Mr. Trump pay to

3       Ms. Carroll in punitive damages?  $280,000.

4              THE COURT:  And it has affixed to it the juror

5       numbers.

6              Is there a request for a poll, Mr. Tacopina?

7              MR. TACOPINA:  Yes, your Honor.

8              THE COURT:  Poll the jury, please, Andy.

9              THE DEPUTY CLERK:  Juror No. 10, in seat no. 1, is

10      that your verdict?

11             JUROR 10:  Yes.

12             THE DEPUTY CLERK:  Juror No. 37, is that your verdict?

13             JUROR 37:  Yes.

14             THE DEPUTY CLERK:  Juror No. 39, is that your verdict?

15             JUROR 39:  Yes, it is.

16             THE DEPUTY CLERK:  Juror No. 44, is that your verdict?

17             JUROR 44:  Yes.

18             THE DEPUTY CLERK:  Juror No. 48, is that your verdict?

19             JUROR 48:  Yes.

20             THE DEPUTY CLERK:  Juror No. 58 --

21             JUROR 58:  Yes, it is.

22             THE DEPUTY CLERK:  -- is that your verdict?

23             JUROR 58:  Yes, it is.

24             THE DEPUTY CLERK:  Thank you.

25             Juror No. 77, is that your verdict?

Case 23-793, Document 86, 11/20/2023, 3592073, Page55 of 300

1        JUROR 77:  Yes.

2        THE DEPUTY CLERK:  Juror No. 80, is that your verdict?

3        JUROR 80:  Yes.

4        THE DEPUTY CLERK:  Juror No. 81, is that your verdict?

5        JUROR 81:  Yes.

6        THE DEPUTY CLERK:  Verdict unanimous, your Honor.

7        THE COURT:  Thank you.

8        Is there any reason why the verdict should not be

9   filed and recorded and judgment entered?

10        Ms. Kaplan.

11        MS. KAPLAN:  None from our side, your Honor.

12        THE COURT:  Mr. Tacopina.

13        MR. TACOPINA:  No, your Honor.

14        THE COURT:  The judgment will be filed and recorded.

15        Any reason why the jury shouldn't be discharged at

16   this time?

17        MS. KAPLAN:  None for plaintiff, your Honor.

18        MR. TACOPINA:  No, your Honor.

19        THE COURT:  Members of the jury, you have done an

20   important and a hard task.  I never comment on jury verdicts

21   because I respect the role of the jury.  It is the bedrock of

22   the system.

23        When I first began practicing law in New York, there

24   was a then very elderly and distinguished judge of this Court

25   who at least two members of the United States Supreme Court

Case 23-793, Document 86, 11/20/2023, 3592073, Page56 of 300

N592Car2

1    referred to at various times as the finest trial judge in

2    America.  His name was Ed Weinfeld.  And Ed Weinfeld made it a

3    point of principle never to thank jurors.  It was his view that

4    serving on a jury is a civic duty and a privilege of being an

5    American.

6            I follow Ed Weinfeld almost all the time, but not on

7    this point.  It is a duty, it is a privilege, but, as someone

8    said—and it was probably Mr. Tacopina—you were torn out of

9    your lives, you were brought here, told not to read anything in

10   the papers, not to talk to anybody, and to do a hard job of

11   work; and I knew, watching you through this trial, and I know

12   the lawyers did, too, that you paid close attention even when

13   it wasn't riveting at the moment.  You took this with the

14   seriousness to which both sides were entitled in the great

15   American tradition.

16           And so I, as an officer of the United States and I

17   know on behalf of the lawyers in this case on both sides,

18   express gratitude to you for the job you have done, whether one

19   agrees with it or not.  You did what we asked you to do and you

20   did it conscientiously.

21           Now, in a minute I'm going to discharge you.  I want

22   to talk about anonymity for a moment.  Once you leave here

23   today, each of you individually has the right to talk about the

24   case, to relate your experiences, and you have the right not to

25   do that.  You would each individually have the right to

A-2837

N592Car2

1   identify yourself as someone who was on this jury or not.  My

2   advice to you is not to identify yourselves——not now and not

3   for a long time.

4           What I do direct is that if you are one who elects to

5   speak to others and to identify yourselves to others, I direct

6   you not to identify anyone else who sat on this jury.  Each of

7   you owes that to the other, whatever you decide for yourself.

8           Now, with that, I discharge you.  You will go back

9   into the jury room and collect your belongings.  You will leave

10  your notes there, they will be taken care of, and you will

11  leave the courthouse as you have left the courthouse each day

12  of this trial.  I understand your transportation is waiting.

13          So I thank each and every one of you, and you are now

14  discharged and may rise and leave.

15          (Jury discharged)

16          THE COURT:  You may be seated.

17          Counsel, is there anything else we need to accomplish

18  this afternoon?

19          MS. KAPLAN:  Not from our side, your Honor.

20          MR. TACOPINA:  No, your Honor.

21          THE COURT:  All right.  I thank you all, counsel, for

22  your cooperation and for your willingness to work with each

23  other, and for your respect for the Court——not for me, but for

24  this institution.  That's what it's about.  I don't think I

25  have anything else to say.  Good job all around.  Thank you,

Case 23-793, Document 86, 11/20/2023, 3592073, Page58 of 300

A-2838

N592Car2

1  folks.

2          COUNSEL:  Thank you, your Honor.

3                          oOo

← **Tweet**



**Laura Litvan** ✓
@LauraLitvan

⋯

NEW: President Trump responds to sexual assault allegations by E. Jean Carroll, saying `I've never met this person in my life'

**Statement from President Donald J. Trump:**

"Regarding the "story" by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by paddling fake news—it's an epidemic.

"Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened.

"False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

5:17 PM · Jun 21, 2019 · Twitter Web Client

**378** Retweets    **219** Quote Tweets    **909** Likes

♡            ⟲            ♡

PLAINTIFF'S
EXHIBIT
**PX-1**
22 Civ. 10016 (LAK)

A-2840

| Message | |
|---|---|
| **From:** | White House Press Office [info@mail.whitehouse.gov] |
| **Sent:** | 6/22/2019 9:02:16 PM |
| **To:** | Press Office [pressoffice@donaldtrump.com] |
| **Subject:** | Remarks by President Trump Before Marine One Departure |

PLAINTIFF'S
EXHIBIT
**PX-2**
22 Civ. 10016 (LAK)

Remarks by President Trump Before Marine One Departure



Office of the Press Secretary

**FOR IMMEDIATE RELEASE**

June 22, 2019

REMARKS BY PRESIDENT TRUMP

BEFORE MARINE ONE DEPARTURE

South Lawn

10:18 A.M. EDT

THE PRESIDENT:  So we're going to Camp David.  We're going to have meetings and a lot of work.  Coming back sometime tomorrow, but we're heading out right now to Camp David.





MP-001796



MP-001797



MP-001798



MP-001799

A-2845



Q   Mr. President, you had said earlier that you never met E. Jean Carroll.  There was a photograph of you and her in the late 1980's --

THE PRESIDENT:  I have no idea who this woman is.  This is a woman who has also accused other men of things, as you know.  It is a totally false accusation.  I think she was married -- as I read; I have no idea who she is -- but she was married to a, actually, nice guy, Johnson -- a newscaster.

A-2846

Q    You were in a photograph with her.

THE PRESIDENT:  Standing with coat on in a line -- give me a break -- with my back to the camera.  I have no idea who she is.  What she did is -- it's terrible, what's going on.  So it's a total false accusation and I don't know anything about her.  And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory.  And when they do that -- and it's happening more and more.  When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine.  It's ready to go out of business, from what I hear.  They'll do anything they can.  But this was about many men, and I was one of the many men that she wrote about.  It's a totally false accusation.  I have absolutely no idea who she is.  There's some picture where we're shaking hands.  It looks like at some kind of event.  I have my coat on.  I have my wife standing next to me.  And I didn't know her husband, but he was a newscaster.  But I have no idea who she is -- none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York -- which is one of the reasons it's failing.  People don't read it anymore, so they're trying to get readership by using me.  It's not good.

You know, there were cases that the mainstream media didn't pick up.  And I don't know if you've seen them.  And they were put on Fox.  But there were numerous cases where women were paid money to say bad things about me.  You can't do that.  You can't do that.  And those women did wrong things -- that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed
to do that.



MP-001802



MP-001803



MP-001804



MP-001805



MP-001806

A-2852



Thank you.

                    END              10:37 A.M. EDT

Unsubscribe

The White House · 1600 Pennsylvania Ave NW · Washington, DC 20500-0003 · USA · 202-456-1111

A-2853

# EXCLUSIVE: Trump vehemently denies E. Jean Carroll allegation, says 'she's not my type'

thehill.com/homenews/administration/450116-trump-vehemently-denies-e-jean-carroll-allegation-shes-not-my-type/

Jordan Fabian and Saagar Enjeti                                    June 24, 2019



<u>Administration</u>

by Jordan Fabian and Saagar Enjeti - 06/24/19 6:43 PM ET



PLAINTIFF'S EXHIBIT

PX-3

22 Civ. 10016 (LAK)

Greg Nash

A-2854

President Trump said Monday that writer E. Jean Carroll was "totally lying" when she recently accused him of raping her during an encounter in a New York department store in the mid-1990s.

In an exclusive interview with The Hill, the president vehemently denied the allegations just hours after Carroll detailed the alleged incident during a cable news interview.

{mosads}"I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?" the president said while seated behind the Resolute Desk in the Oval Office.



When asked if Carroll was lying, Trump on Monday repeated his assertion that he had never met her.

"Totally lying. I don't know anything about her," he said. "I know nothing about this woman. I know nothing about her. She is — it's just a terrible thing that people can make statements like that."



2/5

A-2855



*—Updated at 9 p.m. Brett Samuels contributed.*





TRUTH.

Email or username | Password | Log in

Home

Search

← @realDonaldTrump's post

Donald J. Trump
@realDonaldTrump · 1d

SAVE AMERICA
PRESIDENT DONALD J. TRUMP

- October 12, 2022 -

Statement by Donald J. Trump, 45th President of the United States of America

This "Ms. Bergdorf Goodman" case is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. This decision is from the Judge who was just overturned on my same case. I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, "swooned" her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called "event" supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country. Her lawyer is a political operative and Cuomo crony who goes around telling people that the way to beat Trump is to sue him all over the place. She is suing me on numerous frivolous cases, just like this one, and the court system does nothing to stop it. In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to "Trump"!

6,596 · 21,330 · Oct 12, 2022, 22:38

Reply · ReTruth · Like

New to Truth Social?
Sign up now to discuss what's happening.

Sign up

Trends

People To Follow · View all

Proudly made in the United States of America.

Continue the conversation
Join Truth Social to get the full story and details.

Log in

Sign up

PLAINTIFF'S EXHIBIT
**PX-4**
22 Civ. 10016 (LAK)

A-2859

# Hideous Men

Ⓒ thecut com/2019/06/donald trump a  ault e jean carroll other hideou  men html

June 21, 2019

first person June 21, 2019

**Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago. But he's not alone on the list of awful men in my life.**

By E. Jean Carroll Photograph By Amanda Demme
E  Jean Carroll  Photo  Amanda Demme for New York Magazine



PLAINTIFF'S EXHIBIT
**PX-6**
22 Civ. 10016 (LAK)

A-2860



A-2861











A-2866



A-2867





A-2869



So … we may proceed to ████████████████████████████ Les Moonves, chairman of the board, president, and chief executive officer of the CBS Corporation.

This happens in the time — one of the happiest of my happy life — when I am booming around the country writing for *Esquire.* I have been interviewing Moonves in the lounge of the Hotel Nikko in Beverly Hills for a story (presciently titled by my editor "Dangerous Minds," February 1997), and the short, gravel-voiced Moonves apparently takes one look at me — a 50-something journalist in a pair of old brown-and-beige oxfords — and his life is no longer his own.

After the interview is finished (and for a man like Moonves, talking about himself for an hour and a half is as good as downing two gallons of Spanish fly), he follows me to the elevator. When I turn to say good-bye, he says: "You're smart."

I say: "Thank you!"

He says: "Smart enough to choose an out-of-the-way hotel," and he steps into the elevator behind me and, his pants bursting with demands, goes at me like an octopus. I don't know how many apertures and openings you possess, Reader, but Moonves, with his arms squirming and poking and goosing and scooping and pricking and prodding and jabbing, is looking for fissures I don't even know I own, and — by God! — I am not certain that even if I pull off one of his arms it won't crawl after me and attack me in my hotel bed. Hell, I am thrilled I escape before he expels his ink.

Naturally, I do not mention this in the article. I am a member of the Silent Generation. We do not flap our gums. We laugh it off and get on with life. (Moonves, for his part, told *New York* he "emphatically denies" the incident occurred.)

A-2870





**Beauty contests are** such a rage when I am growing up that my camp — a Girl Scout camp! holds yearly pageants  So it happens that the first beauty contest I am nominated for is Miss Camp Ella J. Logan. (Later I'll win Miss Indiana University, no doubt due to my "talent": I take to the stage dressed as Edith Sitwell and perform a dramatic reading of *Dick and Jane*.)

There is no talent portion at camp, alas. We contestants walk up and down the dock; the judges, who've roared across the lake in a magnificent Chris-Craft and who are now seated in deck chairs, call my name

I walk over and whisper: "What?"

They whisper: "You are Miss Camp Ella J. Logan."

After they put the papier-mâché crown on my head, the cape on my shoulders, and give me the baton covered in Reynolds Wrap, Old Cam, ███████████████████████ ████ the waterfront director, takes me out in a boat and runs his hands under my shirt and up my shorts. He is breathing and moving his hand slowly and hotly, and I fight no battles in my head. My mind goes white. This is Cam. This is the man who has watched me grow from an 8-year-old Brownie Scout, and his notice is an honor. This is Cam, who teaches me to swim

A-2872

and dive and awards me the coveted White Cap! This is Cam, who continues to run his hand inside my shorts and under my blouse    even in the dining room during dinner, under the table, squeezing my thighs, shoving his fingers — saying, "You're my girl. You're my girl. You're my girl," and making me Girl Scout–promise "not to tell anyone."

I am astonished by what I'm about to write  I keep laughing
He does this until I go home. I am 12.

My friends will be stunned to read this  My sisters and brother will be speechless  But Aly Raisman, the great Olympian gymnast, and the more than 150 young women who spoke out in court about Lawrence Nassar, the USA Gymnastics team doctor, will not be shocked. Nassar abused some of the young women in front of their own mothers  Nobody saw it

And old Cam? He writes a book called *The Girl Scout Man.* It is listed in "rather remarkable" condition, though there is some "light foxing and some very modest yellowing of the pages," on Abe Books, the rare-books dealer. Here is a shortened version of its description:

> "This loving homage to Girl Scouting is a record of many of the experiences and incidents and occurrences spanning the over twenty-five years of dedicated service of Cam Parks, done mostly at Camp Ella J. Logan, near Fort Wayne, Indiana, on the shore of Dewart Lake  If you, Reader, are an alumnus of Logan    memories of time spent at this camp may well be sweeping over you right now."

No thank you.

As a Scout, I returned to Camp Ella J. Logan year after year, becoming tall and womanly, receiving letters from boys with swak written on the backs of the envelopes, going on weeklong canoe trips, and completing my counselor in training program

Cam I avoided. Never once did I speak to him or look at him again, but my brain does not avoid him. He and his maroon swim trunks may have been dead these last 40 years, but old Cam and the boat are the events — of all the events in my life — that somehow swim constantly back into my head. And it's Cam who, when he dies at the age of 72 and the story starts going around that he was "suddenly dismissed" from coaching, causes me the most pain.

I could have spoken up! Maybe not when I was 12. But when I was 25. He died when I was 34. I might have stopped him.







On the *Ask E. Jean* show, which aired from 1994 to 1996. Photo: Courtesy of the author

This is during the years I am doing a daily *Ask E. Jean* TV show for the cable station America's Talking, a precursor to MSNBC launched by Roger Aile ▮▮▮▮▮▮▮▮▮

Early one evening, as I am about to go out Bergdorf's revolving door on 58th Street, and one of New York's most famous men comes in the revolving door, or it could have been a regular door at that time, I can't recall, and he says: "Hey, you're that advice lady!"

And I say to No  20 on the Most Hideous Men of My Life List  "Hey, you're that real estate tycoon!"

A-2874

I am surprised at how good-looking he is. We've met once before, and perhaps it is the dusky light but he looks prettier than ever  This has to be in the fall of 1995 or the spring of 1996 because he's garbed in a faultless topcoat and I'm wearing my black wool Donna Karan coatdress and high heels but not a coat.

"Come advise me," says the man  "I gotta buy a present "

"Oh!" I say, charmed. "For whom?"

"A girl," he says

"Don't the assistants of your secretaries buy things like that?" I say.

"Not this one," he says. Or perhaps he says, "Not this time." I can't recall. He is a big talker, and from the instant we collide, he yammers about himself like he's Alexander the Great ready to loot Babylon.

As we are standing just inside the door, I point to the handbags  "How about    "

"No!" he says, making the face where he pulls up both lips like he's balancing a spoon under his nose, and begins talking about how he once thought about buying Bergdorf 's.

"Or … a hat!" I say enthusiastically, walking toward the handbags, which, at the period I'm telling you about — and Bergdorf's has been redone two or three times since then — are mixed in with, and displayed next to, the hats  "She'll love a hat! You can't go wrong with a hat!"

I don't remember what he says, but he comes striding along — greeting a Bergdorf sales attendant like he owns the joint and permitting a shopper to gape in awe at him — and goes right for a fur number.

"Please," I say  "No woman would wear a dead animal on her head!"

What he replies I don't recall, but I remember he coddles the fur hat like it's a baby otter.

"How old is the lady in question?" I ask.

"How old are you?" replies the man, fondling the hat and looking at me like Louis Leakey carbon-dating a thighbone he's found in Olduvai Gorge.

"I'm 52," I tell him

"You're so old!" he says, laughing — he was around 50 himself — and it's at about this point that he drops the hat, looks in the direction of the escalator, and says, "Lingerie!" Or he may have said "Underwear!" So we stroll to the escalator. I don't remember anybody else greeting

A-2875

him or galloping up to talk to him, which indicates how very few people are in the store at the time

I have no recollection where lingerie is in that era of Bergdorf's, but it seems to me it is on a floor with the evening gowns and bathing suits, and when the man and I arrive — and my memory now is vivid     no one is present

There are two or three dainty boxes and a lacy see-through bodysuit of lilac gray on the counter  The man snatches the bodysuit up and says  "Go try this on!"

"*You* try it on," I say, laughing. "It's your color."

"Try it on, come o*n,*" he says, throwing it at me.

"It goes with your eyes," I say, laughing and throwing it back

"You're in good shape," he says, holding the filmy thing up against me. "I wanna see how this looks "

"But it's *your* size," I say, laughing and trying to slap him back with one of the boxes on the counter.

"Come on," he says, taking my arm. "Let's put this on."

*This is gonna be hilarious,* I'm saying to myself — and as I write this, I am staggered by my stupidity  As we head to the dressing rooms, I'm laughing aloud and saying in my mind  *I'm gonna make him put this thing* on o*ver his pants!*

There are several facts about what happens next that are so odd I want to clear them up before I go any further:

*Did I report it to the police?*

No

*Did I tell anyone about it?*

Yes. I told two close friends. The first, a journalist, magazine writer, correspondent on the TV morning shows, author of many books, etc., begged me to go to the police.

"He raped you," she kept repeating when I called her. "He raped you. Go to the police! I'll go with you  We'll go together "

My second friend is also a journalist, a New York anchorwoman. She grew very quiet when I told her, then she grasped both my hands in her own and said, "Tell no one. Forget it! He has 200 lawyers. He'll bury you." (Two decades later, both still remember the incident clearly and

A-2876

confirmed their accounts to *New York*.)

*Do I have photos or any visual evidence?*

Bergdorf's security cameras must have picked us up at the 58th Street entrance of the store. We would have been filmed on the ground floor in the bags-and-hats sections. Cameras also must have captured us going up the escalator and into the lingerie department  New York law at the time did not explicitly prohibit security cameras in dressing rooms to "prevent theft." But even if it had been captured on tape, depending on the position of the camera, it would be very difficult to see the man unzipping his pants, because he was wearing a topcoat. The struggle might simply have read as "sexy." The speculation is moot, anyway: The department store has confirmed that it no longer has tapes from that time

*Why were there no sales attendants in the lingerie department?*

Bergdorf Goodman's perfections are so well known     it is a store so noble, so clubby, so posh — that it is almost easier to accept the fact that I was attacked than the fact that, for a very brief period, there was no sales attendant in the lingerie department. *Inconceivable* is the word. Sometimes a person won't find a sales attendant in Saks, it's true; sometimes one has to look for a sales associate in Barneys, Bloomingdale's, or even Tiffany's; but 99 percent of the time, you will have an attendant in Bergdorf's  All I can say is I did not, in this fleeting episode, see an attendant. And the other odd thing is that a dressing-room door was open. In Bergdorf's dressing rooms, doors are usually locked until a client wants to try something on.

*Why haven't I "come forward" before now?*

Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, ███████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████ never sounded like much fun.
Also, I am a coward.

A-2877



Carroll, Donald and Ivana Trump, and Carroll's then-husband, television-news anchor John Johnson, at an NBC party around 1987. Photo: Courtesy of the author

**So now I will tell you** what happened:

The moment the dressing-room door is closed, he lunges at me, pushes me against the wall, hitting my head quite badly, and puts his mouth against my lips. I am so shocked I shove him back and start laughing again. He seizes both my arms and pushes me up against the wall a second time, and, as I become aware of how large he is, he holds me against the wall with his shoulder and jams his hand under my coat dress and pulls down my tights.

I am astonished by what I'm about to write: I keep laughing. The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, thrusts his penis halfway — or completely, I'm not certain — inside me. It turns into a colossal struggle. I am wearing a pair of sturdy black patent-leather four-inch Barneys high heels, which puts my height around six-one, and I try to stomp his foot. I try to push him off with my one free hand — for some reason, I keep holding my purse with the other — and I finally get a knee up high enough to push him out and off and I turn, open the door, and run out of the dressing room.

A-2878

The whole episode lasts no more than three minutes. I do not believe he ejaculates. I don't remember if any person or attendant is now in the lingerie department. I don't remember if I run for the elevator or if I take the slow ride down on the escalator. As soon as I land on the main floor, I run through the store and out the door — I don't recall which door — and find myself outside on Fifth Avenue.

██████████████████████████████████████████████ And whether it's my age, the fact that I haven't met anyone fascinating enough over the past couple of decades to feel "the sap rising," as Tom Wolfe put it, or if it's the blot of the real-estate tycoon, I can't say. But I have never had sex with anybody ever again.

*From* What Do We Need Men For? A Modest Proposal*, by E. Jean Carroll. Copyright © 2019 by the author and reprinted by permission of St. Martin's Publishing Group. James, Arthur, and Evelyn are pseudonyms.*

*Makeup by Caitlin Wooters at Art Department; Hair by Clay Nielsen at Art Department.*

*\*This article appears in the June 24, 2019, issue of* New York *Magazine.* **Subscribe Now!**

Case 23-793, Document 86, 11/20/2023, 3592073, Page99 of 300

PLAINTIFF'S
EXHIBIT
**PX-12**
22 Civ. 10016 (LAK)

CARROLL_030211



Confidential

Case 23-793, Document 86, 11/20/2023, 3592073, Page100 of 300



PLAINTIFF'S
EXHIBIT
**PX-22**
22 Civ. 10016 (LAK)

Case 23-793, Document 86, 11/20/2023, 3592073, Page101 of 300



PLAINTIFF'S
EXHIBIT
**PX-24**
22 Civ. 10016 (LAK)

A-2882

A-2883

<u>00:00 – 01:57</u>

**Unknown**: She used to be great. She's still very beautiful.

**Donald Trump**: I moved on her actually. You know she was down on Palm Beach. I moved on her, and I failed. I'll admit it. I did try and fuck her. She was married.

**Unknown**: That's huge news there.

**Donald Trump**: No, no, Nancy. No this was -- and I moved on her very heavily in fact I took her out furniture shopping. She wanted to get some furniture. I said I'll show you where they have some nice furniture. I moved on her like a bitch, but I couldn't get there. And she was married. Then all-of-a-sudden I see her, she's now got the big phony tits and everything. She's totally changed her look.

**Billy Bush**: Sheesh, your girl's hot as shit. In the purple.

**Donald Trump**: Whoa. Whoa.

**Billy Bush**: Yes. The Donald has scored. Whoa, my man.

[Crosstalk]

**Donald Trump**: Look at you. You are a pussy.

**Billy Bush**: You gotta get the thumbs up. You gotta get the thumbs up.

[Crosstalk]

**Donald Trump**: Alright you and I will walk out.

**Unknown**: Oh my God, is she hot.

**Donald Trump**: Maybe it's a different one.

**Billy Bush**: It better not be the publicist. No, it's, it's her.

**Donald Trump**: Yeah, that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful -- I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star they let you do it. You can do anything.

**Billy Bush**: Whatever you want.

**Donald Trump**: Grab them by the pussy. You can do anything.



PLAINTIFF'S EXHIBIT
**PX-25-T**
22 Civ. 10016 (LAK)

A-2884

**Billy Bush**:  Yeah those legs. All I can see is the legs.

**Donald Trump**:  Oh, it looks good.

**Billy Bush**:  Come on, shorty.

**Donald Trump**:  Oh, nice legs, huh?

**Billy Bush**:  Oof, get out of the way honey. Oh, that's good legs. Go ahead.

**Donald Trump**:  It's always good if you don't fall out of the bus. Like Ford, Gerald Ford, remember?

**Billy Bush**:  Down below, pull the handle.

A-2885

A-2886

00:00 – 02:27

**Anderson Cooper**: The question from Patrice was about 'Are you both modeling positive and appropriate behaviors for today's youth?' We received a lot of questions online, Mr. Trump about the tape that was released on Friday, as you can imagine. You called what you said 'locker room banter'. You described kissing women without consent, grabbing their genitals. That is sexual assault. You bragged that you have sexually assaulted women. Do you understand that?

**Donald Trump**: No, I didn't say that at all. I don't think you understood what was said. This was locker room talk. I am not proud of it. I apologize to my family, I apologized to the American people. Certainly, I am not proud of it. But this is locker room talk. You know, when we have a world where you have ISIS chopping off heads, where you have, and frankly, drowning people in steel cages, where you have wars and horrible, horrible sights all over and you have so many bad things happening, this is like medieval times. We haven't seen anything like this. The carnage all over the world and they look and they see, can you imagine the people that are frankly doing so well against us with ISIS and they look at our country and see what's going on. Yes, I'm very embarrassed by it, I hate it, but it's locker room talk and it's one of those things. I will knock the hell out of ISIS. We are going to defeat ISIS. ISIS happened a number of years ago in a vacuum that was left because of bad judgment. And I will tell you, I will take care of ISIS. And we should get on to much more important things and much bigger things.

**Anderson Cooper**: For the record, though, are you saying that what you said on the bus 11 years ago, that you did not actually kiss women without consent or grope women without consent?

**Donald Trump**: I have great respect for women. Nobody has more respect for women than I do.

**Anderson Cooper**: So for the record, you're saying you never did that?

**Donald Trump**: Frankly, you hear these things. And they are said. And I was embarrassed by it. But I have respect for women--

**Anderson Cooper**: --Have you ever done those things?

**Donald Trump**: -- And women have respect for me. And I will tell you -- no I have not. And I will tell you, that I'm going to make our country safe and we're going to have borders which we don't have now. People are pouring into our country and they're coming in from the Middle East and other places. We're gonna make America safe again, we're gonna make America great again but we're gonna make America safe again and we're gonna make America wealthy again. Because if you don't do that, it just, it sounds harsh to say, but we have to build up the wealth of our nation. Other nations are taking our job and they're taking our wealth.


PLAINTIFF'S EXHIBIT

**PX-26-T**

22 Civ. 10016 (LAK)

A-2887

A-2888

**00:00 – 01:25**

**Donald Trump**: Then, there was a writer from People Magazine, who wrote a story on Melania and myself on our first anniversary. The story was beautiful, it was beautiful, it was lovely. But last night we hear that after 12 years – this took place 12 years ago, this story – a new claim that I made inappropriate advances during the interview to this writer.

And I asked very simple question, why wasn't it part of the story that appeared 20, or 12 years ago? Why wasn't it a part of the story? Why didn't they make it part of the story? I was one of the biggest stars on television with The Apprentice and I would've been one of the biggest stories of the year. Think of it, she's doing this story on Melania, who was pregnant at the time, and Donald Trump, our one-year anniversary and she said I made inappropriate advances, and by the way, the area was a public area, people all over the place.

Take a look. You take a look. Look at her. Look at her words. You tell me, what you think. I don't think so. I don't think so.



PLAINTIFF'S EXHIBIT

**PX-29-T**

22 Civ. 10016 (LAK)

A-2889

A-2890

**00:00 – 00:32**

**Donald Trump:** Hopefully our great movement and there's never been anything like this in the United States and the only way they figure they can slow it down is to come up with people that are willing to Say, Oh I was with Donald Trump in 1980, I was sitting with him on an airplane and he went after me on the plane. Yeah, I'm gonna go after. Believe me, she would not be my first choice.



PLAINTIFF'S EXHIBIT

PX-31-T

22 Civ. 10016 (LAK)

A-2891

**Page Vault**

| | |
|---|---|
| Document title: | Roy Keane on Twitter: "@SkyNews Really! Everybody and their mother knows that woman is a liar!" / Twitter |
| Capture URL: | https://twitter.com/RKeane4711/status/1582961054652321798 |
| Page loaded at (UTC): | Tue, 15 Nov 2022 01:42:34 GMT |
| Capture timestamp (UTC): | Tue, 15 Nov 2022 01:42:52 GMT |
| Capture tool: | v7.15.1 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/96.0.4664.93 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 2 |
| Capture ID: | c455ef2c-a678-4510-8fcc-756118439d34 |
| User: | gbe-bawesson |

PLAINTIFF'S
EXHIBIT
**PX-46**
22 Civ. 10016 (LAK)

PDF REFERENCE #:    xnJ8KAxoAwENJ6dJa2f7fj





Explore

Settings

← **Tweet**

**Sky News** @SkyNews · Oct 20
In a 2019 book, E Jean Carroll accused Mr Trump of raping her at the New York department store Bergdorf Goodman - a claim he has dismissed as a "hoax"

news.sky.com
Donald Trump questioned for defamation suit over...
In her book, American columnist E Jean Carroll accused the ex-President of rape. He called her a li...

15 11 27

**Roy Keane**
@RKeane4711

Replying to @SkyNews

Really! Everybody and their mother knows that woman is a liar!

5:05 AM · Oct 20, 2022 · Twitter for iPhone

**5** Likes

Search Twitter

## New to Twitter?

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Sign up with phone or email

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

## Relevant people

**Roy Keane**
@RKeane4711
Follow

**Sky News**
@SkyNews
Follow
For breaking news @SkyNewsBreak. Watch live on Sky 501, Virgin Media HD 602, Freeview 233 and YouTube. Download our app: onelink.to/skynews

## What's happening

Television · LIVE
**The Voice airing on NBC**

Jungkook · Trending
**HAVE A SAFE FLIGHT JUNGKOOK**
30.4K Tweets

Politics · Trending
**Obergefell**
3,502 Tweets

Television · LIVE
**Below Deck Mediterranean airing on Bravo**

Television · LIVE
**Bachelor in Paradise airing on ABC**

Show more

Terms of Service Privacy Policy Cookie Policy
Accessibility Ads info More ···
© 2022 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.
Log in Sign up

A-2893

🔒 **Page Vault**

| | |
|---|---|
| Document title: | Ezekiel on Twitter: "@NYDailyNews Where the f was troll hiding at in the first place. Another bullshytter going after Trump" / Twitter |
| Capture URL: | https://twitter.com/Ezekill58/status/1582861665942765568 |
| Page loaded at (UTC): | Mon, 12 Dec 2022 00:39:41 GMT |
| Capture timestamp (UTC): | Mon, 12 Dec 2022 00:40:23 GMT |
| Capture tool: | 10.14.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/106.0.5249.199 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.16.0) |
| PDF length: | 3 |
| Capture ID: | wFckRv8azCdtWDJYJrC7mk |
| User: | gbe-bawesson |

PLAINTIFF'S
EXHIBIT
**PX-48**
22 Civ. 10016 (LAK)

PDF REFERENCE #: gqCRGgY5WAHqL91Yt9W4cx



← **Tweet**

**New York Daily News** ✓ @NYDailyNews · Oct 19
⊘ Official

Trump says the rape allegation is "a hoax and a lie."

The former president is set to undergo questioning today in the defamation suit by E. Jean Carroll, a columnist who claims he raped her 25 years ago.

It will give lawyers a chance to interrogate Trump

nydailynews.com
Former President Donald Trump deposed in E. Jean Carroll rape defam...
The only confirmation that the deposition took place was a brief statement made on Wednesday afternoon by a spokesperson for the ...

💬 8        ⟲ 9        ♡ 15        ⬆

**Ezekiel**
@Ezekill58

Replying to @NYDailyNews

Where the f was troll hiding at in the first place.
Another bullshytter going after Trump

10:30 PM · Oct 19, 2022

Q Search Twitter

**New to Twitter?**
Sign up now to get your own personalized timeline!

G    Sign up with Google

🍎    Sign up with Apple

**Sign up with phone or email**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

**Ezekiel**        **Follow**
@Ezekill58

**New York Daily Ne...** ✓    **Follow**
@NYDailyNews
⊘ Official
NY's Hometown Paper 📰 Breaking news, national, sports, politics, entertainment NYC & beyond /
nydailynews.com / About
bit.ly/nydnmedia1 ➡
bit.ly/nydnsubscribe

**What's happening**

NBA · LIVE
**Bulls at Hawks**

Trending in United States
**Fauci**
589K Tweets

Only on Twitter · Trending
**#搞定要要個阿**
163K Tweets

Sports · Trending
**Pelicans**
16.3K Tweets

Sports · Trending
**Brady**
Trending with 49ers, Brock Purdy

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···
© 2022 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.        Log in        Sign up

Tweet

**Ezekiel**
@Ezekill58

Replying to @NYDailyNews

Where the f was troll hiding at in the first place. Another bullshytter going after Trump

10:30 PM · Oct 19, 2022

Search Twitter

**New to Twitter?**

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Sign up with phone or email

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

**Ezekiel**
@Ezekill58
Follow

**New York Daily Ne...**
@NYDailyNews
Official
Follow

NY's Hometown Paper 🍎 Breaking news, national, sports, politics, entertainment NYC & beyond / nydailynews.com / About bit.ly/nydnmedia1 ➡️ bit.ly/nydnsubscribe

**What's happening**

NBA · LIVE
**Bulls at Hawks**

Trending in United States
**Fauci**
589K Tweets

Only on Twitter · Trending
**#搞定要要個阿**
163K Tweets

Sports · Trending
**Pelicans**
16.3K Tweets

Sports · Trending
**Brady**
Trending with 49ers, Brock Purdy

Show more

Terms of Service Privacy Policy Cookie Policy
Accessibility Ads info More ···
© 2022 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.

Log in Sign up



A-2896

**Page Vault**

| | |
|---|---|
| Document title: | The REAL Politically Savvy on Twitter: "@ejeancarroll How much were you paid and why now??? Yeah. I call bullshit." / Twitter |
| Capture URL: | https://twitter.com/patriot_savvy/status/1614750852454965251 |
| Page loaded at (UTC): | Sun, 29 Jan 2023 15:41:29 GMT |
| Capture timestamp (UTC): | Sun, 29 Jan 2023 15:42:01 GMT |
| Capture tool: | 10.20.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.179 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| PDF length: | 2 |
| Capture ID: | e9Eq3bH9yPHkCwKVRjkuHc |
| User: | kh-admin |

PLAINTIFF'S
EXHIBIT
**PX-51**
22 Civ. 10016 (LAK)

PDF REFERENCE #: d4LbVhHMPdLbD8JbvoTRJh

CARROLL_031542

A-2897

Tweet

**The REAL Politically Savvy**
@patriot_savvy

@ejeancarroll How much were you paid and why now??? Yeah. I call bullshit.

10:26 PM · Jan 15, 2023 · **5** Views

Search Twitter

**New to Twitter?**

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

**The REAL Politicall...** Follow
@patriot_savvy
"If the freedom of speech is taken away then dumb and silent we may be led, like sheep to the slaughter." ~ George Washington

**What's happening**

NHL · Last night
**Coyotes at Ducks**

Trending in United States
**Eagles -2.5**
77.2K Tweets

Sports · Trending
**Mitoma**
43.1K Tweets

Trending in United States
**#fearwomen**
6,071 Tweets

Politics · Trending
**Iran**
293K Tweets

Show more

Terms of Service Privacy Policy Cookie Policy
Accessibility Ads info More ···
© 2023 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.

Log in Sign up

Document title: The REAL Politically Savvy on Twitter: "@ejeancarroll How much were you paid and why now??? Yeah. I call bullshit." / Twitter
Capture URL: https://twitter.com/patriot_savvy/status/1614750852454965251
Capture timestamp (UTC): Sun, 29 Jan 2023 15:42:01 GMT

A-2898

 Page Vault

| | |
|---|---|
| Document title: | We Aren't For Sale on Twitter: "@ejeancarroll If this chic got layed by Trump it was likely the last time she was." / Twitter |
| Capture URL: | https://twitter.com/scottagain2/status/1588001000375263233 |
| Page loaded at (UTC): | Sun, 29 Jan 2023 17:10:08 GMT |
| Capture timestamp (UTC): | Sun, 29 Jan 2023 17:10:39 GMT |
| Capture tool: | 10.20.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.179 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| PDF length: | 3 |
| Capture ID: | eoDYqRwr8tBMvrAfmi1qie |
| User: | kh-admin |

PLAINTIFF'S
EXHIBIT
**PX-53**
22 Civ. 10016 (LAK)

PDF REFERENCE #:      xnPkVg1eoqiYzxPWM8ajNs

CARROLL_031622

← **Tweet**

**E. Jean Carroll** ✓ @ejeancarroll · Nov 2, 2022
I lived seven decades without a checkmark, honey...I ain't gonna need one for my eighth!



💬 321     ↻ 595     ♡ 11.5K

**We Aren't For Sale**
@scottagain2
Replying to @ejeancarroll

If this chic got layed by Trump it was likely the last time she was.

2:51 AM · Nov 3, 2022

1 Like

💬          ↻          ♡          ⬆️

🔍 Search Twitter

**New to Twitter?**
Sign up now to get your own personalized timeline!

G   Sign up with Google

🍎  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

**We Aren't For Sale**     Follow
@scottagain2
Patriot

**E. Jean Carroll** ✓     Follow
@ejeancarroll
Whipsawed by Confusion? ASK E. JEAN at e.jean@askejean.com Driven Witless? Read my Substack ejeancarroll.substack.com SNL, Atlantic, VF, NYmag

**What's happening**

NBA · Starts at 11:00 AM
**Heat at Hornets**

Politics · Trending
**Iran**
305K Tweets

Sports · Trending
**#ChiefsFootball**

Fitness · Trending
**Planet Fitness**
1,302 Tweets

Sports · Trending
**Mitoma**
77.7K Tweets

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···
© 2023 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.

Log in     Sign up



Tweet

We Aren't For Sale
@scottagain2

Replying to @ejeancarroll

If this chic got layed by Trump it was likely the last time she was.

2:51 AM · Nov 3, 2022

1 Like

Search Twitter

**New to Twitter?**

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

We Aren't For Sale
@scottagain2
Patriot
Follow

E. Jean Carroll
@ejeancarroll
Whipsawed by Confusion? ASK E. JEAN at e.jean@askejean.com Driven Witless? Read my Substack ejeancarroll.substack.com SNL, Atlantic, VF, NYmag
Follow

**What's happening**

NBA · Starts at 11:00 AM
Heat at Hornets

Politics · Trending
Iran
305K Tweets

Sports · Trending
#ChiefsFootball

Fitness · Trending
Planet Fitness
1,302 Tweets

Sports · Trending
Mitoma
77.7K Tweets

Show more

Terms of Service Privacy Policy Cookie Policy
Accessibility Ads info More ···
© 2023 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.
Log in Sign up

Document title: We Aren't For Sale on Twitter: "@ejeancarroll If this chic got layed by Trump it was likely the last time she was." / Twitter
Capture URL: https://twitter.com/scottagain2/status/1588001000375263233
Capture timestamp (UTC): Sun, 29 Jan 2023 17:10:39 GMT

A-2901

**To:** E.Jean@askejean.com[E.Jean@askejean.com]
**From:** Steph C[jazzyjasperkitty@gmail.com]
**Sent:** Thur 10/13/2022 7:07:21 AM (UTC)
**Subject:** SPECTACULAR!

████████████████ You are obviously a narcissist the way that you brag about yourself & you think that you're all that & then some. When you worked with playboy you were "so jealous" over the beautiful playboy models because all men wanted them that you wanted people to think that you were beautiful & were wanted by men too (only you're "not" beautiful, you are just an old ugly skank whore!) No man wants to touch you (even your ex husbands dumped you!) So to convince the world that you are wanted by men (when you know damn good & well that you're not) you make up these lies that you were raped by two men! (You are a disgusting low life liar & you are going to get hurt "very badly" for the lies that you are telling! You are "very ugly" both inside & out & you are going to be even more uglier than you already are if you don't cease & desist with these false allegations of rape that you are telling!) Better end the bullshit quick bitch!



PLAINTIFF'S
EXHIBIT

**PX-57**
22 Civ. 10016 (LAK)

CARROLL_031518

A-2902

A-2903

**00:00 – 01:06**

**Roger Ailes:** We know he loves a deal. Real estate, gambling, casinos, whatever. But his theme song very well could be I love a parade. He was Grand Marshal for the New York Military Academy parade, marched in the Vietnam parade, and this weekend he'll be the Grand Marshal of the largest parade ever to be held in the United States. The nation's parade on Veteran's Day celebrating the 50th anniversary of the end of World War II. Grand Marshal, Donald Trump.

**Donald Trump:** Well, how are you?

**Roger Ailes:** Great to see you!

**Donald Trump:** It's been a little while.

**Roger Ailes:** Yeah well, we sometimes catch a flight back. I saw you one night with your daughter on a flight back from Florida.

**Donald Trump:** A little while ago, and you were saying you were thinking about doing this crazy CNBC thing.

**Roger Ailes:** Yeah, I wasn't sure if I was gonna do CNBC, I asked you, you advised me, and here we are.

**Donald Trump:** I said do it. Anything you do turns out, and boy did this turn out. Really a great job.

**Roger Ailes:** Tell me about being Grand Marshal of the parade. How do you get to do that?

**Donald Trump:** Well it's really for me a great honor. I was approached by Mayor Giuliani and Tom Fox and a lot of the folks and we're gonna have I guess the biggest parade in the history of New York City and I think that means the history of the country. And it's going to be on Saturday about 11 o'clock right up Fifth Avenue.


PLAINTIFF'S EXHIBIT

PX-112-T

22 Civ. 10016 (LAK)

A-2904

A-2905

Confidential

Page 1

```
 1

 2                UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
               CASE No. 20 CIV. 7311 (LAK)(JLC)
 4

 5   E. JEAN CARROLL,

 6            Plaintiff,

 7   -vs-

 8   DONALD J. TRUMP,
     in his personal capacity,
 9
              Defendant.
10   _____/

11

12

13                    =   =   =

14                 CONFIDENTIAL

15                    =   =   =

16

17       VIDEOTAPED DEPOSITION OF DONALD J. TRUMP

18

              Wednesday, October 19, 2022
19              10:22 a.m. - 3:50 p.m.

20               The Mar-a-Lago Club
              1100 South Ocean Boulevard
21            Palm Beach, Florida, Florida

22

23   Stenographically Reported By
     Pamela J. Pelino, RPR, FPR, CLR
24   Notary Public, State of Florida
     TSG REPORTING
25   JOB NO. 218342
                       -   -   -
```

PLAINTIFF'S
EXHIBIT
**PX-200-T**
22 Civ. 10016 (LAK)

A-2906

Confidential

1                          D. J. TRUMP

2      APPEARANCES:

3      On behalf of the Plaintiff:

4           ROBERTA KAPLAN, ESQ.
            MATTHEW CRAIG, ESQ.
5           SHAWN CROWLEY, ESQ.
            JOSHUA MATZ, ESQ.
6           KAPLAN HECKER & FINK LLP
            350 Fifth Avenue
7           New York, New York 10118

8

9      On behalf of the Defendant:

10          ALINA HABBA, ESQ.
            MICHAEL MADAIO, ESQ.
11          HABBA MADAIO & ASSOCIATES LLP
            1430 US Highway 206
12          Bedminster, New Jersey 07921

13

14     Videographer:

15          DAVID GRIFFIN

16

17

18

19

20

21

22

23

24

25

A-2907

1                         D. J. TRUMP

21        Q.    And by the early 1990s, would it be fair
22   to call you or to characterize you as a real estate
23   tycoon?
24        A.    Yeah.
25        Q.    Trump Tower on Fifth Avenue, that was

A-2908

```
 1                    D. J. TRUMP
 2   completed in 1983?
 3        A.    Around that time, yes.
 4        Q.    And when did you move into the -- your
 5   penthouse apartment there?
 6        A.    Maybe a year later.
 7        Q.    And that remained your primary residence
 8   until you were elected president; correct?
 9        A.    That's right.
10



13        Q.    And Trump Tower -- where is Trump Tower
14   located?
15        A.    57th and Fifth.
16
17              And at some point you became the owner of
18   the Plaza Hotel in New York; correct?
19        A.    Yes.
20        Q.    And where is the Plaza Hotel located?
21        A.    59th off Fifth Avenue.
22        Q.    And for how long were you the owner --
23   withdrawn.
24              During what years were you the owner of
25   the Plaza Hotel?
```

1                        D. J. TRUMP

2        A.    I don't know the years.  About five

3    years.

4        Q.    Do you know when it began?  When you

5    bought it?

6        A.    In the early '90s.

A-2910

1                          D. J. TRUMP

2

24        Q.    Now, in the '80s and '90s, is it fair to

25    say you had a busy social life?

A-2911

```
 1                    D. J. TRUMP
 2         A.    I don't know.  I mean, I don't know what
 3    you -- you'd have to define "social life."  I
 4    wouldn't say that busy.  I was working very hard.
 5    So I didn't have time to be too much onto the social
 6    calendar.  But yeah.
 7         Q.    Well, let me try to phrase it this way:
 8    In the evenings you went out quite a bit in New York
 9    City to benefits, galas, et cetera?
10         A.    Lot of charity events, yes.  But I don't
11    think that much, no.
```

Page 22

1                        D. J. TRUMP

2

15            So in the period in the '80s and '90s,

16    we've already discussed you would go to benefits and

17    parties.  And is it fair to say that at a lot of

18    those parties, there would be a -- or benefits there

19    would be kind of a photography line either at the

20    beginning or throughout the event?

21        A.    Yes.

22        Q.    And that people would take photographs

23    like Getty Images and then put them out?

24        A.    Right.

25

A-2913

1                          D. J. TRUMP

2

21        Q.    And this is another Getty Images

22    printout, and is it fair to say that this document

23    indicates that you were the grand marshal of the New

24    York City Veterans Day Parade on November 10, 1995,

25    in New York City?

1                    D. J. TRUMP

2       A.    Yes.

1                       D. J. TRUMP

23            Similarly true that during this same

24    period you made appearances on television; correct?

25        A.    Yes.

Page 32

                           D. J. TRUMP

1

2        Q.    Sitting here today, can you recall any TV

3   interviews that you did that you remember?

4        A.    I did everything.

5        Q.    When you say "everything," give me some

6   examples if you can.

7        A.    I did the late night shows.  I did the

8   newscasts.  I even did some of the political shows

9   on Sunday, even though I wasn't really in politics

10  as I am now.  But they wanted me to do that, and I

11  did that.  They'd ask me to do them all the time.

12  So I did quite a bit of television.

A-2917

1                         D. J. TRUMP

11        Q.    I think you already answered this

12   question, but just so the record is clear, did you

13   watch the program Good Morning America from time to

14   time in this period of the late 1980s through the

15   mid-1990s?

16        A.    A little bit.

17        Q.    Did you appear on the Today Show during

18   this period?

19        A.    Yes.

20        Q.    Same question:  Did you watch the Today

21   Show during this period?

22        A.    Little bit.

A-2918

```
 1                       D. J. TRUMP



 4        Q.    During this period did you have any
 5   friends in the television industry who worked in the
 6   television industry?
 7        A.    Probably.  But I wasn't much involved at
 8   that point in the television industry, but I
 9   probably did.
10        Q.    Anyone come to mind right now?
11        A.    Maybe Bob Wright.
12        Q.    Who is Bob Wright?
13        A.    He was the head of NBC, I think, at that
14   time.
15        Q.    What about Roger Ailes?  When did you
16   become friends with Roger Ailes?
17        A.    Later.
18        Q.    Approximately?
19        A.    More in the seven-, eight-year-ago
20   period.
```

A-2919

1                          D. J. TRUMP

6         Q.    What years were you married to your first

7    wife, Ivana Trump?

8         A.    So about '78 to the early '90s.

A-2920

1                          D. J. TRUMP



4        Q.    Okay.  Your next wife was a woman by the
5   name of Marla Maples?
6        A.    Yes.  Right.
7        Q.    And sitting here today, do you recall
8   what years you were married to Ms. Maples?
9        A.    I'd have to get the exact dates for you.
10  I can do that very easily.
11       Q.    Okay.  I have written down -- I could be
12  wrong, but I have written down 1983 to 1999.  Does
13  that sound about right?
14       A.    About right, yeah.
15       Q.    Okay.  We're going to hand you two
16  documents marked as DJT 16 and 17.

A-2921

1                       D. J. TRUMP

20          THE WITNESS:  I mean, it's possible, but

21      I don't think very much, no.


23      Q.   I take it you bought gifts for your wives

24   for their birthdays?

25      A.   Yes, generally.

A-2922

```
 1                          D. J. TRUMP

 2          Q.    And I take it you bought gifts for women

 3     you were dating?

 4          A.    It's -- you know, probable.




 9                At least in your first marriage, you were

10     seeing women outside of your marriage while you were

11     married; correct?




16                THE WITNESS:  I don't know.


18          Q.    Well, you were very public about the fact

19     that you were seeing Ms. Maples when you were still

20     married to Ivana Trump; no?

21          A.    No, I don't think I was public about it.

22          Q.    Well, there were many, many articles

23     about it at the time; correct?

24          A.    I don't think I was public about it.  No,

25     I don't think I was public about it at all.
```

Page 46

1                      D. J. TRUMP

2      Q.    Isn't it true that you were seeing

3  Ms. Maples before you were divorced from

4  Ivana Trump?

5      A.    I don't know.  It was towards the end of

6  the marriage.  So I don't know, really.  It could be

7  a lapover, but I don't really know.

15      Q.    Did you ever have occasion to go to the

16  department store Bergdorf Goodman?

17      A.    Very rarely.

18      Q.    When you say very rarely, can you give me

19  more detail?  How rarely?

20      A.    I mean, almost -- for me almost never.  I

21  would very rarely go there.

22      Q.    When you went there, what do you recall

23  shopping for?

24      A.    I don't know.  It's possible I was there,

25  but I don't know that I ever shopped there for

Page 47

```
 1                          D. J. TRUMP
 2    myself.
 3         Q.    So when you shopped there for yourself to
 4    the extent you went there, you were shopping for
 5    others?
 6         A.    I don't think I ever shopped for others.
 7    It's possible that one or both of my wives shopped
 8    there a little bit, but I don't remember ever buying
 9    something for myself at Bergdorf Goodman.  I went
10    there very seldom almost if ever.
```

1                              D. J. TRUMP

 9        Q.    Then let's limit it to Bergdorf's.

10   Bergdorf's was pretty close to Trump Tower and very

11   close to the Plaza hotel; right?

12        A.    That's right.

A-2926

1                    D. J. TRUMP

9        Q.    I'm handing you a document that's been

10   marked as DJT 18.  It bears the Bates range Carroll

11   24378 through 24385.  Do you have that in front of

12   you?

13        A.    Yeah.

14        Q.    Sitting here today, do you recognize this

15   document?

16        A.    No.

17        Q.    I will represent to you that this is the

18   excerpt from Ms. Carroll's book that was published

19   in New York Magazine online -- originally online on

20   June 21, 2019.

21        A.    Okay.

22        Q.    At any point in time, did you read this

23   article?

24        A.    Excuse me?

25        Q.    Did you ever read this article?  This

Page 55

```
 1                          D. J. TRUMP
 2    document in front of --
 3         A.    No, I don't believe I did.




 7         Q.    I've handed you a book marked as DJT 19,
 8    a book by E. Jean Carroll.  It says What Do We Need
 9    Men For, and if you look at the publication date, it
10    says first edition July 2019.  Do you have that?
11         A.    Yes.
12         Q.    Do you have that book in front of you?
13         A.    Yeah.
14         Q.    Sitting here today, sir, have you ever
15    read this book either in its entirety or any portion
16    of this book?
17         A.    No, never have.  I've never seen the book
18    actually.
```

A-2928

1                            D. J. TRUMP

 8    You responded publicly to Ms. Carroll's allegations

 9    on the same day that the excerpt was published in

10    the New York Magazine, which was June 21, 2019;

11    correct?

12        A.    I think so.

13        Q.    Let's take a look at that.

1                    D. J. TRUMP

6              So what we've handed you as DJT 20 is a

7    blown-up, for legibility purposes, version of a

8    tweet posted by a woman by the name of Laura Littman

9    at 5:17 p.m. on June 21, 2019.  Do you have that in

10   front of you?

11        A.    Yes.

15        Q.    The statement that is in this tweet, is

16   this a statement that you gave?

17        A.    I mean, essentially that's what I said,

18   yeah.

```
 1                         D. J. TRUMP




 5              If you could read that statement into the
 6      record.






14         Q.    It says:  "Statement from President
15      Donald J. Trump.  Regarding the 'story' by
16      E. Jean Carroll claiming she once encountered me at
17      Bergdorf Goodman 23 years ago, I've never met this
18      person in my life.  She's trying to sell a new book.
19      That should indicate her motivation.  It should be
20      sold in the fiction section.  Shame on those who
21      make up false stories of assault, who try to get
22      publicity for themselves or sell a book or carry out
23      a political agenda like Julie Swetnick, who falsely
24      accused Justice Brett Kavanaugh.  It's just as bad
25      for people to believe it, particularly when there is
```

1               D. J. TRUMP

2    zero evidence.  Worse still for a dying publication

3    to try to prop itself up by pedaling fake news.

4    It's an epidemic.  Ms. Carroll in New York Magazine:

5    No pictures, no surveillance, no videos, no reports,

6    no sales attendants around???  I would like to thank

7    Bergdorf Goodman for confirming they have no video

8    footage of any such incident because it never

9    happened.  False accusations diminish the severity

10   of real assault.  All should condemn false

11   accusations and any actual assault in the strongest

12   possible terms.  If anyone has information that the

13   Democratic party is working with Ms. Carroll or

14   New York Magazine, please notify us as soon as

15   possible.  The world should know what's really going

16   on.  It's a disgrace, and people should pay dearly

17   for such false accusations."  Do you see that?

18   That's what you have in front of you?

19        A.    Yeah.

20        Q.    And I think you've already confirmed that

21   this is a statement that you gave to someone on your

22   staff to give to the press?

23        A.    Yeah.

```
 1                    D. J. TRUMP




 6              MS. KAPLAN:  Let's mark as DJT 21 a

 7         document bearing the Bates range -- hold on --

 8         DJT 21, a document bearing the Bates range

 9         MP1795 through MP1807.

10              (DJT Exhibit 21 was marked for

11    identification.)

12    BY MS. KAPLAN:

13         Q.    Do you have that in front of you?

14         A.    Yeah.










22         Q.    And these are statements that were put

23    out when you were the president of the United

24    States?

25         A.    Yeah.
```

1                          D. J. TRUMP

2          Q.    And if you look at the top email, the

3     address of the email, it says under that "Remarks by

4     President Trump before Marine One departure"?

5          A.    Yes.

6          Q.    Marine One is a helicopter?

7          A.    Yes.

8          Q.    And if you look where it shows you

9     speaking about halfway or two-thirds of the way down

10    the document, the very first thing you say:  "So

11    we're going to Camp David"?

12         A.    Yes.

13         Q.    So am I correct in interpreting this --

14    that this is a statement you made while boarding or

15    getting onto Marine One --

16         A.    Looks like it.

17         Q.    -- to go to Camp David?

18         A.    It looks like it.

1                          D. J. TRUMP

22              Let's go now to the third statement,

23    which we're going to mark as DJT 22.

24              (DJT Exhibit 22 was marked for

25    identification.)

Page 68

D. J. TRUMP

1

2      BY MS. KAPLAN:

3          Q.    You have in front of you, sir, a

4      five-page document.  The first page says in bold

5      type "Exclusive:  Trump vehemently denies

6      E. Jean Carroll allegation.  Says she's not my

7      type."

8              It's from a publication known as The

9      Hill.  It's dated June 24, 2019, and it's attributed

10     to the gentleman Jordan Fabian and -- or maybe not

11     the gentleman.  It's attributed to two people,

12     Jordan Fabian and Saagar Enjeti.  Do you see that?

13         A.    Yes.

14         Q.    So this is two days after the last

15     statement we're looking at, which is on June 22nd.

16             Do you recall having an interview with

17     reporters from The Hill on June 24, 2019?

18         A.    Vaguely, yes.

19         Q.    And do you recall where that interview

20     took place?

21         A.    I think it was in the Oval Office.

1                              D. J. TRUMP

7         Q.    And you're quoted just below that

8    paragraph as saying as follows -- and this one I'll

9    read:  "I'll say it with great respect.  Number one,

10   she's not my type.  Number two, it never happened.

11   It never happened.  Okay?"

12             And then the reporters say:  "The

13   president said, 'Well, see you behind the Resolute

14   Desk in the Oval Office.'"  Do you see that?

15        A.    Yes, I do.

16        Q.    And the statement that I just read that

17   begins "I'll state with great respect," that was a

18   statement that you made to the reporter for The Hill

19   on June 24, 2019; correct?

20        A.    Yes.

21        Q.    And the same set of questions.  I take

22   it, sir, that you stand by that statement today?

23        A.    Yes, I do.

Page 78

1                          D. J. TRUMP

6         Q.    So before you made your statements that
7    it never happened in 2019, did you or anyone on your
8    staff reach out to anyone at Bergdorf Goodman?
9         A.    I didn't have to reach out to anybody
10   because it didn't happen.  And by the way, if it did
11   happen, it would have been reported within minutes.
12   You're talking about going to a major floor
13   probably.  I assume the most important floor, a
14   major floor in a major department stores that's a
15   very busy store, by the way, and checkout counters
16   and everything else.  And I would be in there?  I
17   mean, it's the most ridiculous -- it's the most
18   ridiculous, disgusting story.  It was just made up.

Page 79

1                          D. J. TRUMP

4        Q.    After you made the statements that you
5    made in June of 2019, did you or anyone working for
6    you reach out to Bergdorf Goodman?
7        A.    After the statement was made?   No.

A-2939

1                        D. J. TRUMP

4        Q.    In your June 21 statement that's marked

5   as Exhibit 20, you say -- and this is the Littman

6   tweet -- "I never met this person in my life."

7        A.    Yes.

8        Q.    Was that a true statement when you made

9   it on June 21, 2019?

10       A.    It was a true statement when I made it.

11  I think subsequently or at some point they showed a

12  picture on a receiving -- I was on a celebrity line

13  for a charity, and I think I was either shaking her

14  hand or her husband's hand on a receiving line.

15  Like I say, I shake a lot of hands with people, but

16  I had no idea who she was.

17       Q.    So if I can understand your testimony,

18  sir, you're saying that at the time you made the

19  statement that's in DJT 20, you were not aware of

20  ever having met Ms. Carroll?  You have since seen a

21  photograph that shows you with Ms. Carroll on a

22  receiving line; correct?

23       A.    Along with a lot of other people.

24             MS. HABBA:  Objection to form.

25             THE WITNESS:  This was a very public -- I

A-2940

Confidential

Page 81

1                          D. J. TRUMP

2          think it was a charity or a celebrity event or

3          something.  And I think that's her big claim to

4          fame, you know, that she shook my hand at some

5          celebrity event.

6     BY MS. KAPLAN:

7          Q.    So the answer to my question is yes, that

8     after you made the statement, you became aware that

9     there's a photo of you with Ms. Carroll in a

10    receiving line; correct?

11         A.    At some point.

12         Q.    Okay.

13         A.    I saw there was a photo on a receiving

14    line, yes.

15         Q.    Okay.

16              MS. KAPLAN:  Let's mark the photo.  What

17         number are we on?

18              (DJT Exhibit 23 was marked for

19    identification.)

20    BY MS. KAPLAN:

21         Q.    You have in front of you a black and

22    white photograph that we've marked as DJT 23.  And

23    I'm going to ask you:  Is this the photo that you

24    were just referring to?

25         A.    I think so, yes.

A-2941

Confidential

```
 1                          D. J. TRUMP

 2        Q.    And do you recall when you first saw this

 3   photo?

 4        A.    At some point during the process, I saw

 5   it.  I guess that's her husband, John Johnson, who

 6   was an anchor for NBC.  Nice guy, I thought.  I

 7   mean, I don't know him, but I thought he was pretty

 8   good at what he did.  I don't even know the woman.

 9   I don't know who -- it's Marla.

10        Q.    You're saying Marla is in this photo?

11        A.    That's Marla, yeah.  That's my wife.

12        Q.    Which woman are you pointing to?

13              MS. HABBA:  No, that's Carroll.

14              THE WITNESS:  Oh, I see.

15   BY MS. KAPLAN:

16        Q.    The person you just pointed to was

17   E. Jean Carroll.

18              MS. HABBA:  That's your wife.

19   BY MS. KAPLAN:

20        Q.    And the person -- the woman on your right

21   was --

22        A.    I don't know.  This was the picture.  I

23   assume that's John Johnson.

24              MS. HABBA:  That's Carroll.

25              THE WITNESS:  That's Carroll?  Because
```

1                              D. J. TRUMP

2          it's very blurry.

**A-2943**

1                          D. J. TRUMP

6          Q.     Now, in your June 21 statement, which

7     is -- in your June 21 statement, which is DJT 20,

8     you said that Ms. Carroll was trying to sell a new

9     book and that you said shame on those who make up

10    false stories of assault to try to get publicity for

11    themselves or sell a book?

12         A.     Yeah, that's right.

13         Q.     Before you made that statement, did you

14    have any knowledge one way or the other of the

15    financial arrangements between Ms. Carroll and the

16    publisher of her book?

17         A.     No.

18         Q.     Did you even know who her publisher was?

19         A.     No.

20         Q.     Did you ever see her book contract?

21         A.     No.

22         Q.     Did you know anything about Ms. Carroll's

23    financial situation?

24         A.     No.

25         Q.     Did you know anything about her expected

Page 88

```
 1                      D. J. TRUMP
 2  book sales?
 3        A.    No idea.




 7              Before you made this statement that
 8  appears in DJT 20, do you know whether you or anyone
 9  working for you did any research on Ms. Carroll?
10        A.    I just don't know.  It's possible
11  somebody -- when they heard this horrible
12  accusation, it's possible that somebody did a little
13  quick research but not that I know of.
14        Q.    Another thing that you say in your June
15  21 statement is that Ms. Carroll was trying to carry
16  out a political agenda?
17        A.    Yeah.
```

A-2945

1                          D. J. TRUMP

18        Q.    Before issuing your statement on June 21,

19   did you learn what political party Ms. Carroll

20   belonged to?

21        A.    No, I didn't know that.

22        Q.    Before you issued your June 21 statement,

23   did you have any documents indicating that she was

24   pursuing a political agenda?

25        A.    No.

A-2946

```
 1                    D. J. TRUMP
 2        Q.    At the end of your statement, your June
 3   21 statement, you say:  "If anyone has information
 4   that the Democratic party is working with
 5   Ms. Carroll or New York Magazine, please notify us
 6   as soon as possible."
 7             Did anyone ever notify you --
 8        A.    I don't know.
 9        Q.    Sitting here today, you can't recall
10   anyone who notified you?
11        A.    I don't know, yeah.
```

A-2947

1                        D. J. TRUMP

19              One of the other things that you said

20   about Ms. Carroll at the time appears in your June

21   24 statement, which is DJT 22, and what you said

22   there is:  "I'll say it with great respect.  Number

23   one, she's not my type."

24              When you said that Ms. Carroll was not

25   your type, you meant that she was not your type

A-2948

D. J. TRUMP

1
2  physically; right?

3      A.   I saw her in a picture.  I didn't know

4  what she looked like, and I said it -- and I say it

5  with as much respect as I can, but she is not my

6  type.

7      Q.   And, again, when you say "type," you just

8  referred to looking at photos.  So you mean

9  physically she's not your type?

10     A.   Physically she's not my type, and now

11 that I've gotten indirectly to hear things about

12 her, she wouldn't be my type in any way, shape, or

13 form.

14     Q.   But when you were talking back on June

15 24th, you were referring to her not being your type

16 physically; correct?

17     A.   I saw a photo of her.

18     Q.   Okay.

19     A.   And the only difference between me and

20 other people is I'm honest.  She's not my type.

A-2949

Page 95

1                    D. J. TRUMP


4       Q.    I take it the three women you've married
5   are all your type?


8                THE WITNESS:  Yeah.

A-2950

1                          D. J. TRUMP

22        Q.    What is Truth Social?

23        A.    It's a platform that's been opened by me

24   as an alternative to Twitter.

25        Q.    And your handle on Truth Social is

Page 126

```
1                    D. J. TRUMP

2    @realdonaldtrump?

3         A.    I believe so, yes.
```

A-2952

1                          D. J. TRUMP

5          Q.    Okay.  Now, on October 12, just a few
6     days ago, you issued a statement on Truth Social
7     about Ms. Carroll and this case; correct?
8          A.    I believe so, yes.
9          Q.    And the statement that you posted, who
10    wrote that statement?
11         A.    I did.
12         Q.    You yourself?
13         A.    Yeah.
14         Q.    Did you post the statement yourself?
15         A.    Yes.
16         Q.    And in addition to posting the statement
17    on Truth Social, you also sent it to the press?
18         A.    Yes.  It's called truth and post.  We
19    post much like -- how would you say it?  We put out
20    a statement, and we also put it on Truth.

1                        D. J. TRUMP

11             MS. KAPLAN:  Let's look at the statement.

12        Let's mark it as -- what's my next number?

13             MR. MADAIO:  DJT 28.

16             THE WITNESS:  I can't read this.

17             MS. KAPLAN:  Well, we have a blown-up

18        version.

19   BY MS. KAPLAN:

20        Q.   Let's mark it as 28 and 28A.

24             So what we have in front of you as DJT

25   28, sir, is the post as it appeared on Truth Social

Page 132

```
 1                        D. J. TRUMP

 2    on October 12, 2022, and a blown-up version because

 3    we appreciate that the type is very small.  A

 4    blown-up version that should be more legible.

 5          A.    I can see it, yeah.




 9          Q.    So it says:  "October 12, 2022, statement

10    by Donald J. Trump, forty-fifth President of the

11    United States of America.  This 'Ms. Bergdorf

12    Goodman case' is a complete con job, and our legal

13    system in this country but especially in New York

14    State (just look at Peekaboo James) is a broken

15    disgrace.  You have to fight for years and spend a

16    fortune in order to get your reputation back from

17    liars, cheaters, and hacks.  This decision is from

18    the judge who was just overturned on my same case.

19    I don't know this woman, have no idea who she is

20    other than it seems she had a picture of me many

21    years ago with her husband shaking my hand on a

22    reception line at a celebrity charity event.  She

23    completely made up a story that I met her at the

24    doors of this crowded New York City department store

25    and within minutes 'swooned' her."  "Swooned" is in
```

A-2955

Confidential

1                         D. J. TRUMP

2     quotes.

3             "It is a hoax and a lie just like all the

4     other hoaxes that have been played on me for the

5     past seven years, and while I'm not supposed to say

6     it, I will.  This woman is not my type!  She has no

7     idea what day, what week, what month, what year, or

8     what decade this so-called 'event' supposedly took

9     place.  The reason she doesn't know is because it

10    never happened, and she doesn't want to get caught

11    up with details or facts that could be proven wrong.

12    If you watch Anderson Cooper's interview with her

13    where she was promoting a really crummy book, you

14    will see that it is a complete scam.  She changed

15    her story from beginning to end after the commercial

16    break to suit the purposes of CNN and Andy Cooper.

17    Our justice system is broken along with almost

18    everything else in our country.  Her lawyer is a

19    political operative and Cuomo crony who goes around

20    telling people that the way to beat Trump is to sue

21    him all over the place.  She is suing me on numerous

22    frivolous cases just like this one, and the court

23    system does nothing to stop it.

24             "In the meantime and for the record,

25    E. Jean Carroll is not telling the truth, is a woman

A-2956

```
 1                        D. J. TRUMP

 2     I had nothing to do with, didn't know, and would

 3     have no interest in knowing her if I ever had the

 4     chance.  Now all I have to do is go through years

 5     more of legal nonsense in order to clear my name of

 6     her and her lawyer's phony attacks on me.  This can

 7     only happen to 'Trump'!"

 8               Did I read that correctly?

 9          A.    Great statement, yeah.  True.  True.

10          Q.    And now that you've heard it again and

11     you have it in front of you, you again confirm that

12     you wrote the whole thing yourself?

13          A.    I wrote it all myself.  All myself.
```

A-2957

1                         D. J. TRUMP

24      Q.   Now, at the beginning of your post, the

25   reference "Ms. Bergdorf Goodman" is a reference to

Page 137

```
 1                         D. J. TRUMP
 2   Ms. Carroll; right?
 3        A.    That's right.




 9        Q.    Now, when you say in here I don't know
10   this woman and have no idea who she is, even though
11   you're using the present tense, you're referring
12   back to your knowledge as of when she first made the
13   allegation --
14        A.    I still don't know this woman.  I think
15   she's a wack job.  I have no idea.  I don't know
16   anything about this woman other than what I read in
17   stories and what I hear.  I know nothing about her.
18        Q.    Okay.  Well, I guess the distinction I'm
19   trying to make, sir, is that when the allegation
20   came out in 2019, you said you -- I think it's your
21   testimony that you had no idea who she was.
22        A.    I still don't.
23        Q.    Well, today you at least know that she's
24   a plaintiff in a case suing you; correct?
25        A.    Oh, yes.  That, I know, but I know
```

A-2959

Confidential

```
 1                    D. J. TRUMP
 2   nothing about her.  I think she's sick, mentally
 3   sick.
 4        Q.    Okay.  You say in this post -- you use a
 5   strange word, which I want to ask you about.  You
 6   say she completely made up a story that I met her at
 7   the doors of this crowded New York City department
 8   store and within minutes swooned her.  Do you see
 9   that?
10        A.    Yeah.
11        Q.    What does "swooned her" mean?
12        A.    That would be a word, maybe accurate or
13   not, having do with talking to her and talking
14   her -- to do an act that she said happened, which
15   didn't happen.  And it's a nicer word than the word
16   that starts with an F, and this would be a word that
17   I used because I thought it would be inappropriate
18   to use the other word.  And it didn't happen.
19        Q.    Okay.  I was curious when I read this.
20   So I looked up the word "swoon" in the dictionary,
21   and under the dictionary, it means "to faint with
22   extreme emotion."  That's not what you meant here?
23             MS. HABBA:  Objection to the form.
24             THE WITNESS:  Well, sort of that's what
25        she said I did to her.  She fainted with great
```

Page 139

```
 1                       D. J. TRUMP
 2         emotion.  She actually indicated that she loved
 3         it.  Okay?  She loved it until commercial
 4         break.  In fact, I think she said it was sexy,
 5         didn't she?  She said it was very sexy to be
 6         raped.  Didn't she say that?

 8         Q.    So, sir, I just want to confirm:  It's
 9    your testimony that E. Jean Carroll said that she
10    loved being sexually assaulted by you?
11         A.    Well, based on her interview with
12    Anderson Cooper, I believe that's what took place.
13    And we can define that.  You'll have to show that.
14    I'm sure you're going to show that.  But she was
15    interviewed by Anderson Cooper, and I think she said
16    that rape was sexy -- which it's not, by the way.
17    But I think she said that rape was sexy, and it
18    was -- she actually said things that were very
19    strange, and then she was a different person after
20    the -- when he said "We'll take a break right now.
21    We're going to take a break right now," he didn't
22    like what she was saying.  He was very upset with
23    what -- and then she came back, and she was a much
24    different woman in the second half, so to speak.
```

A-2961

1                                D. J. TRUMP

17        Q.    And so the question I'm asking you is did
18   she say in that interview that she loved being
19   sexually assaulted by you?
20        A.    Well, she said something to that effect.
21   I mean, you'll have to take a look at the interview
22   yourself.  I believe she said rape was sexy, to
23   which Anderson Cooper is dying.  He's saying let's
24   get to a commercial break immediately.  I think you
25   better watch the interview.  I'm sure you have, but

A-2962

Confidential

Page 141

```
 1                         D. J. TRUMP
 2    you better watch the interview.
 3        Q.    In the interview when Ms. Carroll talked
 4    about rape being sexy, isn't it true that she said
 5    that's a view that many other people hold?
 6        A.    Oh, I don't know.  I mean, I don't know.
 7    All I know is I believe she said rape is sexy or
 8    something to that effect, but you'll have to watch
 9    the interview.  It's been awhile.
10        Q.    And just to clarify, I think you said a
11    few minutes earlier that you used the word "swooned"
12    as a synonym for -- you said the F word -- for
13    sexual intercourse?
14        A.    Yeah.  That's because that's what she
15    said.
16        Q.    What do you mean?  She never used the
17    word "swooned."
18        A.    No.  She said that I did something to her
19    that never took place.  There was no anything.  I
20    know nothing about this nut job.
21        Q.    Okay.  Then you go on to say in the
22    statement:  "And while I am not supposed to say it,
23    I will."  Why were you not supposed to say it?
24        A.    Because it's not politically correct to
25    say -- read the next.  Go ahead.  That she's not my
```

A-2963

```
 1                         D. J. TRUMP
 2    type?  Yeah.  Because it's not politically correct
 3    to say it, and I know that, but I'll say it anyway.
 4    She's accusing me of rape, a woman that I have no
 5    idea who she is.  It came out of the blue.  She's
 6    accusing me of rape -- of raping her, the worst
 7    thing you can do, the worst charge.
 8              And you know it's not true too.  You're a
 9    political operative also.  You're a disgrace.  But
10    she's accusing me and so are you of rape, and it
11    never took place.  And I will tell you I made that
12    statement, and I said, while it's politically
13    incorrect, she's not my type.  And that's
14    100 percent true.  She's not my type.
```

A-2964

1                              D. J. TRUMP

16        Q.    Now, in your Truth Social statement on

17   October 12, you use the word "hoax."  Specifically

18   you say:  "It is a hoax and a lie just like all of

19   the other hoaxes that have been played on me for the

20   past seven years."  Do you see that --

21        A.    Yeah.

22        Q.    -- or recall making that statement?

23              And I take it what you're saying there is

24   Ms. Carroll fabricated her claim that you sexually

25   assaulted her; correct?

A-2965

1                      D. J. TRUMP

2      A.    Yes.  Totally.  100 percent.

3      Q.    Fair to say -- you'd agree with me, would

4  you not, that you use the term "hoax" quite a lot?

5      A.    Yes, I do.

6      Q.    CNN reported that you used it more than

7  250 times in 2020.  Does that sound right?

8      A.    Could be.  I've had a lot of hoaxes

9  played on me.  This is one of them.

10     Q.    And how would you define the word "hoax"?

11     A.    A fake story, a false story, a made-up

12  story.

13     Q.    Something that's not true?

14     A.    Something that's not true, yes.

15     Q.    Sitting here today, can you recall what

16  else you have referred to as a hoax?

17     A.    Sure.

20          THE WITNESS:  The Russia Russia Russia

21        hoax.  It's been proven to be a hoax.  Ukraine

22        Ukraine Ukraine hoax.  The Mueller situation

23        for two and a half years hoax ended in no

24        collusion.  It was a whole big hoax.  The lying

25        to the FISA court hoax, the lying to Congress

Page 148
```
 1                        D. J. TRUMP
 2        many times hoax by all these people, the scum
 3        that we have in our country, lying to Congress
 4        hoax, the spying on my campaign hoax.  They
 5        spied on my campaign, and now they admit it.
 6        That was another hoax, and I could get a whole
 7        list of them.  And this is a hoax too.

 9        Q.    This -- when you say "this" and "that" --
10        A.    This ridiculous situation that we're
11   doing right now.  It's a big, fat hoax.  She's a
12   liar and she's a sick person in my opinion.  Really
13   sick.  Something wrong with her.
14        Q.    Okay.  In addition to the Russia Russia
15   Russia hoax, the Ukraine Ukraine Ukraine hoax, the
16   Mueller or Mueller hoax, the lying to FISA hoax, the
17   lying to Congress hoax, and the spying on your
18   campaign hoax, isn't it true that you also referred
19   to the use of mail-in ballots as a hoax?
20        A.    Yeah, I do.  Sure.

22              THE WITNESS:  I do.  I think they're very
23        dishonest.  Mail-in ballots, very dishonest.
24   BY MS. KAPLAN:
25        Q.    And isn't it true that you yourself have
```

Page 149

```
1                    D. J. TRUMP

2    voted by mail?


4          THE WITNESS:  I do.  I do.  Sometimes I

5    do.  But I don't know what happens to it once

6    you give it.  I have no idea.
```

1                           D. J. TRUMP

20          Q.    Are you familiar -- I'm sure you are --

21   with something that's often referred to as "the

22   Access Hollywood tape"?

23          A.    Yes, I am.

24                MS. KAPLAN:   Okay.  Let's mark it and

25          play it as 35.

A-2969

1                         D. J. TRUMP

4                 (DJT Exhibit 35 was marked for

5       identification.)

6                 (Video played.)

8       Q.    That's you in that video, speaking?

9       A.    Yes, correct.

10      Q.    And am I correct that video was recorded

11      in January -- withdrawn.

12                Am I correct that that video was recorded

13      September of 2005?

14      A.    I guess that would -- don't know the

15      date.  But whatever date it was is fine with me.

16      Q.    And am I correct that you were engaged to

17      your current wife sometime in 2004?

18      A.    I don't know.

19      Q.    Am I correct that you married your

20      current wife in January 2005?

21      A.    I don't know relative to that tape, no.

A-2970

1                        D. J. TRUMP

2        Q.    And the person that you were speaking to

3    that's now famous in that video was Billy Bush?

4        A.    That's right.

A-2971

Page 172

```
1                        D. J. TRUMP


3         Q.    Please let me --

4         A.    This is very old news.  Fully litigated

5    during debates, during everything else.  Fully

6    litigated.

7         Q.    Okay --

8         A.    And you know what I said then and I say

9    it now?  Locker room talk.  That was locker room

10   talk.  That's what goes on.
```

1                           D. J. TRUMP


3        Q.    And you did say in the video that you,

4   quote, moved on her heavily; correct?

5        A.    Excuse me?

6        Q.    You do say in the video that you,

7   quote --

8        A.    Yeah.

9        Q.    -- moved on her heavily?

10        A.    I did say that, yes, absolutely.

11        Q.    And you do say in the video that as part

12   of trying to have sex with this woman, you took her

13   furniture shopping; correct?

14        A.    We actually did look for furniture, yes.

15        Q.    So that was true?  You actually took this

16   woman Nancy furniture shopping?

17        A.    I think so.  I mean, it's been a long

18   time ago.  How long is that?  Long time ago.

19              But I think so.  I do think so.

20        Q.    Is that the only occasion when you took a

21   woman shopping?

22        A.    I think so.

A-2973

1                              D. J. TRUMP

5          Q.    And you say -- and again, this has become

6    very famous -- in this video, "I just start kissing

7    them.  It's like a magnet.  Just kiss.  I don't even

8    wait.  And when you're a star, they let you do it.

9    You can do anything, grab them by the pussy.  You

10   can do anything."

11               That's what you said; correct?

12        A.    Well, historically, that's true with

13   stars.

14        Q.    True with stars that they can grab women

15   by the pussy?

16        A.    Well, that's what -- if you look over the

17   last million years, I guess that's been largely

18   true.  Not always, but largely true.  Unfortunately

19   or fortunately.

20        Q.    And you consider yourself to be a star?

21        A.    I think you can say that, yeah.

22        Q.    And -- now, you said before, a couple of

23   minutes ago, that this was just locker room talk?

24        A.    It's locker room talk.

25        Q.    And so does that mean that you didn't

A-2974

1                        D. J. TRUMP

2    really mean it?

3         A.    No.  It's locker room talk.  I don't

4    know.  It's just the way people talk.

A-2975

```
 1                          D. J. TRUMP




 8          Q.    Okay.  Now, are you familiar with a woman
 9     by the name of Natasha Stoynoff?
10          A.    No.  You'll have to give me a little bit
11     of a background.
12          Q.    Do you remember she wrote about you a lot
13     when she worked at People magazine?
14          A.    Oh, I do remember that there was some
15     woman that wrote, and then she -- a long time later,
16     I think, she wrote a wonderful story.  And then a
17     long time later, as I remember it

19                    -- a long time later she said that I
20     was aggressive with her, but she wrote the most
21     beautiful story.  And then all of a sudden -- like
22     is it a year or two years later -- she comes out
23     with this phony story that I was aggres- -- I said,
24     Well, why would she have written such a good story
25     for People magazine?  She wrote a really nice piece.
```

A-2976

1                        D. J. TRUMP

2    And then all of the sudden, like, you know, years or

3    months, many months later, she came up with this

4    phony charge.

A-2977

1                          D. J. TRUMP

23          Q.    Let's watch a video -- and again, I

24     apologize for the technology -- where you talk about

25     Ms. Stoynoff's allegations.

1                         D. J. TRUMP

2              MS. HABBA:  Are we marking this?

3              MS. KAPLAN:  We're going to mark it.

4         It's a clip of a video from a campaign event in

5         West Palm Beach on October 13, 2016, and we'll

6         mark it as DJT 36.

7              (DJT Exhibit 36 was marked for

8    identification.)

9              (Video played.)


11        Q.    You'd agree with me that the person you

12   were just talking about in that video was

13   Natasha Stoynoff; correct?

14        A.    Yes.

A-2979

1                          D. J. TRUMP

23        Q.    You're familiar with a woman by the name
24   of Jessica Leeds?
25        A.    No, I don't think so.  But explain.  Go

```
 1                        D. J. TRUMP

 2    ahead.
```

```
13         Q.    Does that mean that this refreshes your

14    recollection of who this is?

15         A.    Yes, it does.  This woman made up a

16    story, just like your client made it up.  Just made

17    up a story.  Having to do with sitting next to me on

18    an airplane.

19              And, I mean, I'll have to read this

20    again, but that story was so false, also.

21              But this was, I guess, making out as

22    opposed to what your client said.  This story was so

23    false.  This is a disgrace, also.

25         Q.    And do you recall speaking about
```

Page 184

                        D. J. TRUMP

1    Ms. Leeds' allegations at campaign events in 2016?

2         A.    I might have.  I thought it was so like

3    your client, I thought it was so ridiculous.

4         Q.    Let's take a look at the next video,

5    which is DJT 38.

6                (DJT Exhibit 38 was marked for

7    identification.)

8                (Video played.)

13        Q.    When you said in that video that

14   Ms. Leeds would not be your first choice, you were

15   referring to her physical looks; correct?

16        A.    Just the overall, not -- I looked at her.

17   I see her.  I hear what she says.  Whatever.  You

18   wouldn't be a choice of mine, either, to be honest

19   with you.  I hope you're not insulted.  I wouldn't

20   under any circumstances have any interest in you.

21   I'm honest when I say it.

22                She, I would not have any interest in.

1                          D. J. TRUMP

25        Q.    The video we just watched where you

Page 192

```
 1                    D. J. TRUMP
 2   talked about Ms. Leeds.
 3           What else did you know about Ms. Leeds
 4   that would indicate to you that she was -- would not
 5   have been your first choice other than how she
 6   looked?
 7      A.    I don't know.  I think I probably saw her
 8   on television or something.
 9           But -- I don't want to be insulting, but
10   when people accuse me of something, I think I have a
11   right to be insulting, because they're insulting me.
12   They're doing the ultimate insult.  They make up
13   stories and then I'm not allowed to speak my mind?
14   No, I disagree with that.
15           She would not have been anywhere on a
16   list.  I just -- just wouldn't have been for me.
17           It's disgusting.  What she said was
18   disgusting.
19           Can you imagine doing that on an
20   airplane, what she said?  I'm doing that on an
21   airplane?  That's almost as ridiculous as doing it
22   in Bergdorf Goodman in a dressing room.
```

A-2984

```
 1                        D. J. TRUMP



 4       Q.    Isn't it true that just a few minutes ago
 5   you couldn't remember the date of your engagement to
 6   your current wife, Melania?
 7       A.    No, no.  No.  We're talking about a
 8   different thing.  We're talking about a woman where
 9   something happened that was inappropriate; right?
10   Inappropriate.  It was highly inappropriate.  She
11   would remember that date.  I would imagine she would
12   have complained to the airlines.  She would know the
13   flight.  She would know everything about it.
14             She didn't even know the year, as I
15   remember it.  Just like your client doesn't know the
16   year, doesn't know anything about it.
17             If something happened like that to your
18   client, your client would know the second.  She'd
19   know down to the second.  She'd know the day, the
20   month, the year, right down to the second.
```

A-2985

1                          D. J. TRUMP

4        Q.    In the last paragraph of the statement

5   that you made on June 21 that appears in the

6   Laura Littman tweet, DJT 20, you said as follows --

7        A.    Last paragraph where?

8        Q.    DJT 20.

9        A.    Go ahead.  What is it?

10       Q.    You say as follows:  "The world should

11  know what's really going on.  It is a disgrace, and

12  people should pay dearly for such false

13  accusations."

14             Do you see that?

15       A.    Yeah.  Yeah.

16       Q.    And the person you meant who should pay

17  dearly for such false accusations was

18  E. Jean Carroll; correct?

19       A.    Yeah, and I think their attorneys, too.

20  I think the attorneys, like you, are a big part of

21  it.  Because you know it's a phony case.

A-2986

**Message**

| | |
|---|---|
| **From:** | E. Jean Carroll ███████████ |
| **on behalf of** | E. Jean Carroll < ████████████ > ████████████ |
| **Sent:** | 7/23/2019 10:42:50 PM |
| **To:** | ████████████ |
| **Subject:** | Re: Write to E.Jean |

DEFENDANT'S
EXHIBIT

DX-CK
22cv10016

tabbies

Thank you, Grace!

I haven't seen it, but this happens
all the time with Law and Order
stories. Also there are 200 scripted
shows a year on tv, this kind of
thing is bound to show up.
Indeed, I'm surprised
this sort of plot is not seen
more often.

Ravishing regards,
E. Jean

Wait! You haven't read
the immortal masterpiece,
WHAT DO WE NEED MEN FOR?
go to A Modest Proposal

On Sun, Jun 23, 2019 at 2:24 PM AskEJean < ████████████ > wrote:

Just wanted to warn you that a Law & Order SVU episode: Theatre Tricks 2012 has a character, a judge,
speaking of a fantasy that he rapes a woman in a Bergdorf Goodman dressing room in the Lingerie Dept. I saw
the episode last night. Trumpsters will use against you. Perhaps the writer of the episode, Marygrace O\'Shea is
one of the friends that you told. Anyway, this is just a \"heads up.\" Down with Trump whatever the case.

From,
████████████

Copyright © 2019 AskEJean

Confidential

A-2987

Court Ex. C.

# Timeline of Events



Conway Recommends
Litigation and Attorney

Ongoing Media Exposure,
Celebratory Parties
and Lifestyle

Martin Text About
Getting Together with
Carroll and Birnbach
Before her Deposition

Nov. 2019

Nov. 2021

Nov. 2022

Mid-July
2019

Nov. 2019

Aug. 2022

First Lawsuit

Martin Text Regarding:
1) Too Much Celebratory Stuff Over
Something That Hasn't Really Happened
2) Going to sue Trump for Rape WTF
3) Gone to Another Level,
Something I Can't Relate To
4) It Has Become a Lifestyle

Second Lawsuit

A-2988

*Court Ex*
*5/9/23*

WordPerfect Document Compare Summary

Original document:  G:\LAK\DRAFTS\Carroll II charge circulation draft_after charge conference.wpd
Revised document:  G:\LAK\DRAFTS\Carroll II charge final.wpd
Deletions are shown with the following attributes and color:
   ~~Strikeout~~, Blue  RGB(0,0,255).
   Deleted text is shown as full text.
Insertions are shown with the following attributes and color:
   <u>Double Underline</u>, Redline, Red  RGB(255,0,0).

The document was marked with 30 Deletions, 34 Insertions, 0 Moves.

A-2989

UNITED STATES DISTRICT COURT                          <u>JURY ROOM COPY</u>
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                     Plaintiff,

              -against-                                    22-cv-10016 (LAK)


DONALD J. TRUMP,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**<u>JURY INSTRUCTIONS</u>**

*Table of Contents*

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     THE LAW AND THE VERDICT FORM . . . . . . . . . . . . . . . . . . . . . 1
        A.      The Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        B.      The Adult Survivors Act. . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        C.      Verdict Form Part One: Battery Questions . . . . . . . . . . . . . . . . 3
                1.      Question 1: Rape. . . . . . . . . . . . . . . . . . . . . . . . . . . 3
                2.      Question 2: Sexual abuse . . . . . . . . . . . . . . . . . . . . 4
                3.      Question 3: Forcible touching. . . . . . . . . . . . . . . . . . 6
                4.      Questions 4 and 5:  Damages . . . . . . . . . . . . . . . . . . 8
                        (a)     Question 4: Compensatory damages. . . . . . . . . . . 8
                        (b)     Question 5: Punitive damages. . . . . . . . . . . . . . 9
                                (1)     Willful or wanton negligence, recklessness, or conscious
                                        disregard . . . . . . . . . . . . . . . . . . . . . . . . . 10
                                (2)     Punitive damages - amount . . . . . . . . . . . . . 11
        D.      Verdict Form Part Two: Defamation Questions . . . . . . . . . . . . . . 123
                5.      Question 6: Defamatory . . . . . . . . . . . . . . . . . . . . 134
                6.      Question 7: Falsity . . . . . . . . . . . . . . . . . . . . . . . 145
                7.      Question 8: Actual malice. . . . . . . . . . . . . . . . . . . . 15
                8.      Question 9: Compensatory damages. . . . . . . . . . . . . . . 156
                9.      Question 10: Punitive damages. . . . . . . . . . . . . . . . . 17

III.    TRIAL PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189
        A.      Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        B.      Role of the Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
        C.      Role of the Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.     EVALUATION OF EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . 212
        A.      What Is and Is Not Evidence. . . . . . . . . . . . . . . . . . . . . . . 212
        B.      Evidence of Sexual Assault on Other Persons . . . . . . . . . . . . . . 22
        C.      Law & Order Exhibit and Testimony . . . . . . . . . . . . . . . . . . . 234
        D.      Direct and Circumstantial Evidence . . . . . . . . . . . . . . . . . . . . 245
        E.      Witness Credibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245
        F.      Expert Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

V.      DELIBERATION OF THE JURY . . . . . . . . . . . . . . . . . . . . . . . . . 267
        A.      Duty to Deliberate / Unanimous Verdict . . . . . . . . . . . . . . . . . 267
        B.      Notes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278
        C.      Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289
        D.      All Jurors Required for Deliberation . . . . . . . . . . . . . . . . . . . . 289
        E.      Selection of Foreperson . . . . . . . . . . . . . . . . . . . . . . . . . . . 289
        F.      Verdict Form. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289
        G.      Return of Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2930

| | | |
|---|---|---|
| H. | Media | 2930 |
| I. | Communications Between Court and Jury | 301 |
| J. | Juror Oath | 301 |
| K. | Exceptions | 302 |

1    **I.**     **INTRODUCTION**

2           Members of the jury, we have reached that point in the trial where you are about to

3 begin your function as jurors. My instructions to you will be in four parts.

4           First, I will describe the verdict form that you will use to address the factual questions

5 that you are to decide and the law to be applied in doing so. Second, I will instruct you about the trial

6 process, including the burden of proof. Third, I will give you instructions concerning your evaluation

7 of the evidence. The fourth and final section of these instructions will relate to your deliberations.

8

9    **II.**     **THE LAW AND THE VERDICT FORM**

10           Your verdict in this case will be in the form of answers principally to "Yes" or "No"

11 questions. I ask my staff to distribute the verdict form to you now so it may help you to follow the

12 instructions that I am about to give you.

13

14        **A.**     **The Nature of the Case**

15           You of course know that the plaintiff in this case, E. Jean Carroll, is suing the

16 defendant, Donald Trump, for money damages for injuries she claims to have suffered as a result of

17 an alleged incident with Mr. Trump at a New York department store in the mid 1990s and as a result

18 of an allegedly defamatory statement Mr. Trump made about her in October 2022.

19           In support of the first claim, Ms. Carroll alleges that Mr. Trump recognized her at the

20 department store and asked her to help him select a present for a woman who was not at the store.

21 The two allegedly went to the lingerie department, where Mr. Trump allegedly insisted that Ms.

22 Carroll try on a bodysuit, and she allegedly responded that he should try it on himself. According to

23 Ms. Carroll, the pair allegedly went to a dressing room and Mr. Trump allegedly closed the dressing

2

1     room door. Ms. Carroll claims that Mr. Trump then pushed her against the wall and kissed her

2     without her consent. After she allegedly pushed him away and laughed at him, she claims that he

3     pushed her against the wall again, pulled down her tights, and forcibly raped her before she managed

4     to push him away and flee the store. Ms. Carroll claims that this alleged conduct by Mr. Trump

5     constituted a battery as that term is used in the civil context of this case. Mr. Trump, as you know,

6     denies that this ever happened.

7          The second claim is based on a statement Mr. Trump posted on social media on

8     October 12, 2022 in which he stated that he did not know Ms. Carroll, that her story is a "Hoax and

9     a lie," and that she changed her story from beginning to end in an interview on CNN while she was

10     promoting her book in which she described the alleged incident with Mr. Trump, among other things.

11     Ms. Carroll claims that Mr. Trump's statement was false and defamatory, and that she suffered

12     reputational, emotional, and professional harm as a result of his statement. Mr. Trump denies that

13     his statement was false or defamatory.

14

15     **B.**     **The Adult Survivors Act**

16          Ms. Carroll's first claim is called a claim for battery. At the beginning of this trial, I

17     explained to you what a battery claim is in the context of a civil lawsuit. Ms. Carroll's claim that Mr.

18     Trump raped her is a civil battery claim that she was permitted to bring in this case because it falls

19     under a new law New York enacted in 2022, called the Adult Survivors Act. Under the Adult

20     Survivors Act, persons who allegedly were abused sexually as adults, but whose time within which

21     to sue for damages for any such abuse had expired, were given a new one-year period within which

22     to sue their alleged abusers. The Adult Survivors Act thus "revived" claims that otherwise might

1  have been expired.

2           New York has defined the kinds of sexual misconduct for which the Adult Survivors

3  Act temporarily revived the ability to bring civil lawsuits for damages. It has done so by reference

4  to the criminal law definitions of certain sex crimes. Ms. Carroll claims that Mr. Trump is liable to

5  her for battery on three different and alternative bases, each of which corresponds to a criminal law

6  definition of a different sex crime. Mr. Trump denies that he is liable to her for battery on any of

7  those three alternative bases. Accordingly, the first set of questions in the verdict form has to do with

8  whether or not Ms. Carroll has established that Mr. Trump's conduct, if any, came within any one

9  of those criminal law definitions. But I reiterate to you that this is a civil case for damages, not a

10 criminal case.

11

12         **C.      Verdict Form Part One: Battery Questions**

13                 **1.      Question 1: Rape**

14         The first of the three definitions is that of rape. That is the subject of Question 1 on

15 the verdict form. Question 1 asks you to decide whether Ms. Carroll has proved, by a preponderance

16 of the evidence, that Mr. Trump raped her. I will explain later the preponderance of the evidence

17 standard. Right now, I will focus on the required elements of rape under New York law.

18         In order to establish that Mr. Trump raped her, Ms. Carroll must prove each of two

19 elements by a preponderance of the evidence.

20         The first element is that Mr. Trump engaged in sexual intercourse with her.

21         The second element is that Mr. Trump did so without Ms. Carroll's consent by the use

22 of forcible compulsion.

4

1         Let me define those terms for you.

2         "Sexual intercourse" means any penetration, however slight, of the penis into the

3 vaginal opening. In other words, any penetration of the penis into the vaginal opening, regardless of

4 the distance of penetration, constitutes an act of sexual intercourse. Sexual intercourse does not

5 necessarily require erection of the penis, emission, or orgasm.

6         [*People v. Berardicurti*, 167 A.D.2d 840, 841 (4th Dept. 1990); N.Y.
7         Criminal Jury Instr. & Model Colloquies § 130.35(1)]
8
9         "Forcible compulsion" means intentionally to compel by use of physical force.

10         If you find that Ms. Carroll has proven by a preponderance of the evidence both of

11 those elements, you will answer "Yes" to Question 1. If you answer Question 1 "Yes," I instruct you

12 that Mr. Trump thus committed battery against Ms. Carroll. There will be no need to consider

13 whether he committed battery on the other two alternative bases. So if you answer Question 1 "Yes,"

14 you will skip Questions 2 and 3 and go on to Question 4. If you find Ms. Carroll has not proven

15 either of the two elements of rape by a preponderance of the evidence, you must answer "No" to

16 Question 1 and proceed to Question 2, which deals with the second of the three alternative bases for

17 the battery claim.

18

19     **2.**     **Question 2: Sexual abuse**

20         The second theory of battery corresponds to something called sexual abuse. Sexual

21 abuse has two elements. In order to establish that Mr. Trump sexually abused her, Ms. Carroll must

22 prove each of these two elements by a preponderance of the evidence.

23         The <u>first element</u> is that Mr. Trump subjected Ms. Carroll to sexual contact.

24         The <u>second element</u> is that Mr. Trump did so without Ms. Carroll's consent by the use

5

1    of forcible compulsion.

2            Sexual contact for this purpose means any touching of the sexual or other intimate

3    parts of a person for the purpose of gratifying the sexual desire of either party. It includes the

4    touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly

5    or through clothing.

6            I just used the term "sexual or intimate part" in defining sexual contact. For this

7    purpose, a "sexual part" is an organ of human reproduction.

8            [*People v. Blodgett*, 37 A.D.2d 1035, 1036 (3d Dept. 1971).]

9            The law does not specifically define which specific parts of the body are "intimate."

10   Intimacy, moreover, is a function of behavior and not simply anatomy. Therefore, if any touching

11   occurred, the manner and circumstances of the touching may inform your determination whether Mr.

12   Trump touched any of Ms. Carroll's intimate parts. You should apply your common sense to

13   determine whether, under general societal norms and considering the circumstances, any area or areas

14   Mr. Trump touched, if he touched any, were sufficiently personal or private that it would not have

15   been touched in the absence of a close relationship between the parties.

16           [*People v. Sene*, 66 A.D.3d 427, 427-28 (1st Dept. 2009); *Rapp v. Fowler*,
17           No. 20-CV-9586 (LAK), 2022 WL 1997176, at *2 (S.D.N.Y. June 6, 2022)].
18
19
20           I mentioned also that the touching, if any, of any sexual or intimate parts must have

21   been for the purpose of gratifying the sexual desire of either party. Sexual gratification is a subjective

22   determination which may be inferred from the nature of the acts committed and the circumstances

23   in which they occurred. There is no requirement that actual gratification occur, but only that the

24   touching, if any, was for that purpose.

6

1                     [*People v. Rodriguez*, 764 N.Y.S.2d 301, 302 (2d Dept. 2003); *People v.*
2                     *Teicher*, 52 N.Y.2d 638, 646 (1981).]

3            "Forcible compulsion," as I defined for you a few minutes earlier, means intentionally

4    to compel by the use of physical force.

5            If you find that Ms. Carroll has proven by a preponderance of the evidence both of

6    those elements, you will answer "Yes" to Question 2. If you answer Question 2 "Yes," I instruct you

7    that Mr. Trump thus committed battery against Ms. Carroll. There will be no need to consider

8    whether he committed battery on the third alternative basis. So if you answer Question 2 "Yes," you

9    therefore will skip Question 3 and go on to Question 4. If you find Ms. Carroll has not proven either

10   of the two elements of sexual abuse by a preponderance of the evidence, you must answer "No" to

11   Question 2 and proceed to Question 3, which deals with the third of the three alternative bases for

12   the battery claim.

13

14           **3.**       **Question 3: Forcible touching**

15            The third alternative theory of battery is something called forcible touching.

16            Forcible touching occurs when a person intentionally, and for no legitimate purpose,

17    forcibly touches the sexual or intimate parts of another person for the purpose of degrading or

18    abusing such person *or* for the purpose of gratifying the actor's sexual desire. It has five elements.

19            The first element is that Mr. Trump touched a sexual or intimate part or parts of Ms.

20    Carroll. I already have defined for you the terms "sexual or intimate parts." You will apply that

21    instruction here in deciding whether Ms. Carroll has proved this element of forcible touching.

22            The second element of forcible touching, as the name implies, is that the touching of

23    any of Ms. Carroll's sexual or intimate part or parts, if any occurred, must have been forcible.

7

1    Forcible touching includes squeezing, grabbing, pinching, rubbing, or other bodily contact that

2    involves the application of some level of pressure to the victim's sexual or intimate part or parts.

3    Any bodily contact involving the application of some level of pressure to another person's sexual or

4    intimate part qualifies as forcible touching.

5                            [*People v. Hatton*, 26 N.Y.3d 364, 369 (2015); *People v. Guaman*, 22 N.Y.3d

6                            678, 684 (2014).]

7              The <u>third element</u> of forcible touching is that the forcible touching, if any, was

8    intentional. Intent means conscious objective or purpose. Thus, a person intentionally forcibly

9    touches the sexual or other intimate parts of another person when that person's conscious objective

10    or purpose is to do so.

11              The <u>fourth element</u> of forcible touching requires that the forcible touching, if any, of

12    Ms. Carroll by Mr. Trump must have been for the purpose of degrading or abusing her *or* for the

13    purpose of gratifying Mr. Trump's sexual desire. I already have defined the term "sexual

14    gratification," and you will apply that instruction here in deciding whether Ms. Carroll has proved

15    Mr. Trump forcibly touched her for the purpose of gratifying his sexual desire. If you do not find that

16    the forcible touching of Ms. Carroll, if any, was for the purpose of gratifying Mr. Trump's sexual

17    desire, you must consider whether the forcible touching, if any, was for the purpose of degrading or

18    abusing Ms. Carroll.

19              The <u>fifth and final element</u> is that the forcible touching, if any, was committed without

20    consent. Forcible touching takes place without a person's consent when it results from any

21    circumstances in which a person does not expressly or impliedly acquiesce to the actor's conduct.

22                [N.Y. Criminal Jury Instr. & Model Colloquies § 130.52(1)].

23             If you find that Ms. Carroll has proved by a preponderance of the evidence all five of

8

1     these elements, you will answer "Yes" to Question 3. If you answer Question 3 "Yes," I instruct you

2     that Mr. Trump thus committed battery against Ms. Carroll. In that event, you will go on to Question

3     4. If you find Ms. Carroll has not proven one or more of the elements of forcible touching by a

4     preponderance of the evidence, you must answer "No" to Question 3. You will skip Questions 4 and

5     5 and proceed to Question 6, which begins the questions relating to Ms. Carroll's defamation claim.

6

7         **4.**     **Questions 4 and 5: Damages**

8         Questions 4 and 5 deal with the subject of damages in relation to Ms. Carroll's battery

9     claim. My instructions to you on the law of damages should not be taken by you as a hint that you

10     should find for the plaintiff. That is for you to decide by answering the questions I have put to you

11     based on the evidence presented. But if you answer "Yes" to any of Questions 1, 2, or 3, you will

12     have determined that Ms. Carroll has prevailed on her claim of battery. In that case, it will be your

13     task to determine from the evidence a dollar amount, if any, that would justly and adequately

14     compensate Ms. Carroll for any physical injury, pain and suffering, and mental anguish, as well as

15     emotional distress, fear, personal humiliation, and indignation that she has suffered, or will suffer

16     in the future, as a result of Mr. Trump's alleged rape, sexual abuse, or forcible touching, as the case

17     may be.

18         You may award damages only for those injuries that you find Ms. Carroll has proven

19     by a preponderance of the evidence. Compensatory damages must not be based on speculation or

20     sympathy. They must be based on the evidence presented at trial and only on that evidence.

21         [*Lewis v. City of New York*, 689 F. Supp. 2d 417, 429 (E.D.N.Y. 2010)].

22     **(a)**     **Question 4: Compensatory damages**

9

1         If you answer "Yes" to Question 4 – in other words, if you conclude that Ms. Carroll

2 has proved by a preponderance of the evidence that she was injured as a result any of the three

3 theories of battery by Mr. Trump that I have explained already – she would be entitled to a dollar

4 amount to compensate her adequately and fairly for any physical injury, pain and suffering, mental

5 anguish, emotional distress, fear, personal humiliation, and/or indignation she suffered by virtue of

6 Mr. Trump's alleged battery (that is his alleged rape, sexual abuse or forcible touching of Ms.

7 Carroll, as the case may be). Damages may be awarded based on a plaintiff's subjective testimony

8 of pain, but the plaintiff's proof must satisfactorily establish that the injury is more than minimal.

9         [*A.B. v. Staropoli*, No. 08-cv-4585 (LMS), 2013 WL 12441525, at *6
10         (S.D.N.Y. Dec. 11, 2013); N.Y. Pattern Jury Instr. § 3:3].

11 So if you answer Question 4 "Yes," you will determine the amount that would fairly and adequately

12 compensate her for the injuries she allegedly sustained as a result of Mr. Trump's battery and enter

13 that amount in the space provided in Question 4 of the verdict form.

14         [*McWeeney v. Lambe*, 138 A.D.3d 796, 796 (2d Dept. 2016); *Poulos v. City*
15         *of New York*, No. 14CV03023LTSBCM, 2018 WL 3750508, at *9 (S.D.N.Y.
16         July 13, 2018), *report and recommendation adopted*, No. 14 CV
17         3023-LTS-BCM, 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018); *Brooker v.*
18         *State*, 206 A.D.2d 712, 712 (3d Dept. 1994); *Wright v. Musanti*, 887 F.3d
19         577, 583 (2d Cir. 2018).]
20
21
22         On the other hand, if you answer "No" to Question 4 – that is, if you determine that

23 Ms. Carroll has not proved by a preponderance of the evidence that she was injured as a result of Mr.

24 Trump's conduct, if any – you will write down in the blank space provided on your form "$1" in

25 nominal damages.

26         Regardless of your answers to Question 4, you will go on to Question 5.

27         **(b)**     **Question 5: Punitive damages**

A-3001

1           Question 5 deals with the subject of punitive damages.

2           In the event you find Mr. Trump liable to Ms. Carroll for battery – that is, for rape,

3   sexual abuse or forcible touching – you may, but you are not required to, award Ms. Carroll punitive

4   damages in addition to any compensatory damages that you may award.

5           You may award punitive damages if Ms. Carroll proved, by a preponderance of the

6   evidence, that Mr. Trump's conduct, if any, that caused Ms. Carroll's alleged injury was wanton and

7   reckless or done with a conscious disregard for the rights of Ms. Carroll. Punitive damages may be

8   awarded for conduct that reflects a high degree of immorality. The purpose of punitive damages is

9   not to compensate the plaintiff.  It is to punish the defendant for wanton and reckless acts or acts

10   done with a conscious disregard for the rights of the plaintiff, and thereby to discourage the defendant

11   and other people like him from acting in a similar way in the future.

12           [N.Y. Pattern Jury Instr. Civil § 2:278; *Action House, Inc. v. Koolik*, 54 F.3d
13           1009, 1013 (2d Cir. 1995); *Payne v. Jones*, 711 F.3d 85, 102 & n.16 (2d Cir.
14           2013); *Juniper Ent., Inc. v. Calderhead*, No. 07-CV-2413 ADS AKT, 2013
15           WL 120636, at *4 (E.D.N.Y. Jan. 9, 2013); *Ligo v. Gerould*, 244 A.D.2d 852
16           (4th Dept.1997)].

17

18           **(1)**     **Willful or wanton negligence, recklessness, or conscious**
19                        **disregard**
20

21           The first part of Question 5 asks you to determine whether Ms. Carroll has proved,

22   by a preponderance of the evidence, that Mr. Trump's conduct, if any, was done with willful or

23   wanton negligence, or recklessness, or a conscious disregard of the rights of Ms. Carroll, or was so

24   reckless as to amount to such conscious disregard. "Wantonly" means causelessly, without restraint,

25   and in reckless disregard of the rights of others. "Willfully" means with knowledge that the conduct

26   will result in a violation of a known legal duty. "Negligence" means the omission to perform a duty,

11

1    as well as the commission of an act which would violate a duty. You are instructed that Mr. Trump

2    had a duty to exercise reasonable care not to injure Ms. Carroll. A person acts "recklessly" when he

3    or she is aware of and consciously disregards a substantial and unjustifiable risk – a risk that is of

4    such a nature and degree that disregarding it constitutes a gross deviation from the standard of

5    conduct that a reasonable person would observe in the situation.

6              [*Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017); *Home Ins. Co. v. Am. Home*
7              *Prods. Corp.*, 75 N.Y.2d 196, 203-04 (1990).]
8

9                        **(2)      Punitive damages - amount**

10            If you answer "Yes" to the first part of Question 5 – in other words, that Ms. Carroll

11   has proved by a preponderance of the evidence that Mr. Trump's conduct, if any, was willfully or

12   wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was

13   so reckless as to amount to such disregard – you will write down an amount, if any, that you find Mr.

14   Trump should pay to Ms. Carroll in punitive damages.

15            In arriving at your decision as to the amount of punitive damages, you should consider

16   the nature and reprehensibility of what Mr. Trump allegedly did. That would include:

17            •      the character of the alleged wrongdoing,

18            •      whether Mr. Trump's alleged conduct demonstrated an indifference to, or a

19                   reckless disregard of, the health, safety or rights of others,

20            •      whether Mr. Trump's alleged conduct was done with an improper motive or

21                   vindictiveness,

22            •      whether the alleged act or acts constituted outrageous or oppressive

23                   intentional misconduct,

12

1       • how long the alleged conduct went on,

2       • Mr. Trump's awareness of what harm the alleged conduct caused or was

3       likely to cause,

4       • Mr. Trump's financial condition and the impact your punitive damages award,

5       if any, would have on Mr. Trump,

6       • whether and how often Mr. Trump has committed similar acts of this type in

7       the past and the actual and potential harm created by Mr. Trump's alleged

8       conduct, including the harm to individuals or entities other than Ms. Carroll.

9       Importantly, with respect to the last consideration, although you may consider the

10  harm, if any, to individuals or entities other than Ms. Carroll in determining the extent to which Mr.

11  Trump's conduct was reprehensible, and to that extent relevant to whether to award punitive damages

12  and any amount thereof, you may not add a specific amount to your punitive damages award to

13  compensate persons other than Ms. Carroll or to punish Mr. Trump for any harm Mr. Trump caused,

14  if any, to others. The amount of punitive damages that you award must be both reasonable and

15  proportionate to the actual and potential harm suffered by Ms. Carroll, and to the compensatory

16  damages, if any, you awarded Ms. Carroll.

17       [*Wright v. Musanti*, No. 14-cv-8976 (KBF), 2017 WL 253486, at *13
18       (S.D.N.Y. Jan. 20, 2017), *aff'd*, 887 F.3d 577 (2d Cir. 2018); *Brink's Inc v.*
19       *City of N.Y.*, 717 F.2d 700, 706-07 (2d Cir. 1983); N.Y. Pattern Jury Instr.
20       Civil § 2:278].

21

22

13

D.    **Verdict Form Part Two: Defamation Questions**

The next set of questions in the verdict form, Questions 6 through 10, deal with Ms. Carroll's defamation claim in relation to Mr. Trump's October 12, 2022 statement, specifically the portions of that statement about Ms. Carroll. Under New York law, there are two categories of defamation, one of which is called libel. Written statements, ~~like Mr. Trump's October 12, 2022 statement,~~ constitute "libel." I am telling you this because I might use the terms defamation and libel interchangeably in my instructions.

You have heard and seen Mr. Trump's October 12, 2022 statement at various points in this trial. To remind you, that statement, which Ms. Carroll alleges was defamatory, is set forth as follows:

"This 'Ms. Bergdorf Goodman case' is a complete con job. . . . She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie . . . . She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. . . . In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance."

14

1    There are several elements Ms. Carroll has the burden of proving for her to recover

2    damages for libel. I will instruct you on each on those elements as we go over the questions in the

3    verdict form.

4

5    **5.    Question 6: Defamatory**

6    Question 6 on the verdict form asks whether Ms. Carroll has proved by a

7    preponderance of the evidence that Mr. Trump's statement was defamatory. A statement is

8    defamatory if it tends to disparage a person in the way of his or her business, office, profession, or

9    trade. It also is defamatory if it tends to expose a person to hatred, contempt or aversion, or to induce

10   an evil or unsavory opinion of that person in the minds of a substantial number of the community,

11   even though it may impute no moral turpitude to the person.

12       [*Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985); *Conti v. Doe*, 535 F. Supp. 3d
13       257, 267 (S.D.N.Y. 2021)]
14
15   Not every unpleasant or uncomplimentary statement is defamatory. A statement that

16   is merely unpleasant, offensive or embarrassing, or that hurts the plaintiff's feelings, is not

17   necessarily defamatory. Because language often has different meanings, the law imposes upon the

18   plaintiff the burden of proving that the October 12, 2022 statement about the plaintiff in fact would

19   have been understood by the average person as defamatory.

20   If Ms. Carroll has proved, by a preponderance of the evidence, that Mr. Trump's

21   October 12, 2022 was defamatory, you will answer "Yes" to Question 6 and go on to Question 7.

22   If you answer it "No," your task ends there and you will return your verdict in the manner that I will

23   describe later.

6.     **Question 7: Falsity**

Question 7 asks whether Ms. Carroll has proved, by clear and convincing evidence, that Mr. Trump's statement was false. I will explain later the clear and convincing standard of proof. A statement is false if it is not substantially true. You will determine from the evidence presented what the truth was and then compare that with Mr. Trump's October 12, 2022 statement, taking that statement according to the ordinary meaning of its words.

As you probably already have guessed, whether Mr. Trump's statement is false or true depends largely or entirely on whether you find that Mr. Trump raped, sexually abused, forcibly touched or otherwise sexually attacked Ms. Carroll.

If Ms. Carroll has proved, by clear and convincing evidence, that Mr. Trump's October 12, 2022 statement was false, you will answer "Yes" to Question 7 and go on to Question 8. If you answer it "No," your task ends there and you will return your verdict in the manner that I will describe later.

7.     **Question 8: Actual malice**

Question 8 in substance asks you to determine whether Ms. Carroll has proved, by clear and convincing evidence, that Mr. Trump made the statement with what the law calls actual malice. Actual malice in this context means that when Mr. Trump made the statement, he knew it was false or acted in reckless disregard of its truth or falsity. Reckless disregard means that when Mr. Trump made the October 12, 2022 statement, he had serious doubts as to the truth of the statement or made the statement with a high degree of awareness that it probably was false. So Question 8 asks you to decide whether Ms. Carroll proved by clear and convincing evidence that Mr. Trump knew

16

1    that his October 12, 2022 statement was false, had serious doubts as to the truth of his statement, or

2    had a high degree of awareness that his statement probably was false.

3         If you so find, you will answer "Yes" to question 8 and go on to Questions 9 and 10,

4    which deal with damages for the defamation claim. If you answer Question 8 "No," your task ends

5    there and you will return your verdict in the manner that I will describe later.

6

7    **8.    Question 9: Compensatory damages**

8         Questions 9 and 10 deal with damages for defamation. As I stated to you before when

9    I instructed you on damages for Ms. Carroll's battery claim, the fact that I instruct you on the law of

10   damages must not be taken as an indication that you should decide for Ms. Carroll. You will decide

11   on the evidence presented and the rules of law that I have given you whether Ms. Carroll is entitled

12   to recover from Mr. Trump for her defamation claim.

13        Question 9 deals with the subject of compensatory damages for the alleged October

14   12, 2022 defamation, and of course you will be answering it only if you have found Mr. Trump liable

15   for that alleged defamation.

16        In the event that Mr. Trump is liable for defamation, you will award an amount that,

17   in the exercise of your good judgment and common sense, you decide is fair and just compensation

18   for the injury to plaintiff's reputation and the humiliation and mental anguish in her public and

19   private life which you decide was caused by defendant's statement. In fixing that amount you should

20   consider the plaintiff's standing in the community, the nature of defendant's statement made about

21   the plaintiff, the extent to which the statement was circulated, the tendency of the statement to injure

22   a person such as the plaintiff, and all of the other facts and circumstances in the case. These damages

17

1    cannot be proved with mathematical accuracy. Fair compensation may vary, ranging from one dollar,

2    if you decide that there was no injury, to a substantial sum if you decide that the injury was

3    substantial.

4        [N.Y. Pattern Jury Instr. Civil 3:29 (modified); *Ferri v. Berkowitz*, 561 F.
5        App'x 64, 65 (2d Cir. 2014).]

6        In this case, I have divided the damages determination into parts. The first part asks

7    you whether or not Ms. Carroll has proved by a preponderance of the evidence that she was injured

8    in any of the respects I just described. That is the "Yes" or "No" question. If the answer is "Yes,"

9    you first will fill in the amount you award for all defamation damages <u>excluding</u> the reputation repair

10   program that was discussed during Professor Humphreys's testimony. Second, you will fill in the

11   amount, if any, that you award for the reputation repair program only.

12       On the other hand, if your answer to the first part of Question 9 is "No" – that is, if

13   you determine that Ms. Carroll has not proved by a preponderance of the evidence that she was

14   injured as a result of Mr. Trump's October 12, 2022 statement – you will write down in the blank

15   space provided on your form "$1" in nominal damages.

16       Regardless of your answer to Question 9, you will go on to Question 10.

17

18   9.    **Question 10: Punitive damages**

19       In addition to her claim for compensatory damages, which I covered while discussing

20   Question 9, Ms. Carroll asks also that you award punitive damages. Similar to my earlier instructions

21   to you regarding punitive damages in relation to Ms. Carroll's battery claim, punitive damages in

22   relation to a libel claim may be awarded to punish a defendant who has acted maliciously and to

1   discourage others from doing the same. Now please bear in mind that I previously instructed you on

2   the meaning of the term "actual malice" in connection with Question 8. With respect to this Question

3   10, however, I am using the word "malice" or "maliciously," not the phrase "actual malice." And

4   the word "malice" or "maliciously" for this Question 10 means something different from the term

5   "actual malice." A statement is made maliciously for purposes of this Question 10 if it is made with

6   deliberate intent to injure or made out of hatred, ill will, or spite or made with willful, wanton or

7   reckless disregard of another's rights.

8           [*Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 174 (2d Cir. 2000).]

9           If you answer "Yes" to that first part of Question 10 – that is, you find that Mr. Trump

10  acted maliciously, as I have just defined that term for you, in making the October 12, 2022 statement

11  about Ms. Carroll – you will write down an amount, if any, that you find Mr. Trump should pay to

12  Ms. Carroll in punitive damages. If you answer "No" to that first part of Question 10 – that is, you

13  find that Mr. Trump's statement was not made maliciously – you may not award punitive damages.

14  Ms. Carroll bears the burden of proving by a preponderance of the evidence that Mr. Trump acted

15  in accordance with this standard.

16          [*Greenbaum v. Svenska Handelsbanken*, N.Y., 979 F. Supp. 973, 976
17          (S.D.N.Y. 1997), *on reconsideration sub nom. Greenbaum v. Handlesbanken*,
18          26 F. Supp. 2d 649 (S.D.N.Y. 1998); *Celle v. Filipino Rep. Enterprises Inc.*,
19          209 F.3d 163, 184 (2d Cir. 2000)].
20
21          In arriving at your decision as to the amount of punitive damages, you should

22  consider:

23          •   The nature and reprehensibility of what Mr. Trump did. That would include

24              the character of the wrongdoing and Mr. Trump's awareness of what harm the

1      conduct caused or was likely to cause. In considering the amount of punitive

2      damages to award, you should weigh this factor heavily.

3      •   The actual and potential harm created by Mr. Trump's conduct.

4      •   Mr. Trump's financial condition and the impact your punitive damages award

5      will have on the defendant.

6      The amount of punitive damages that you award, if any, must be both reasonable and

7      proportionate to the actual and potential harm suffered by the plaintiff, and to the compensatory

8      damages, if any, you awarded the plaintiff.

9      Once you have answered Question 10, if you answer that question, you will return

10     your verdict in the manner I will describe to you later.

11

12   **III.**    **TRIAL PROCESS**

13     I have described to you the law to be applied to the facts and put to you the questions

14   that require answers in order to resolve the claims in this case. Now I will instruct you about the trial

15   process, beginning with the burden of proof.

16

17     **A.**    **Burden of Proof**

18     Ms. Carroll bears the burden of proving her claim by a preponderance of the evidence

19   with respect to all questions except Questions 7 and 8, which I will address in a moment. As I told

20   you at the outset, proof beyond a reasonable doubt, which is the proper standard of proof in a

21   criminal trial, does not apply to a civil case such as this and you should put it out of your mind.

22     To establish something by a preponderance of the evidence means to prove that the

20

1    contention of the party with the burden of proof on that question is more likely true than not true.

2    In other words, a "preponderance" of the evidence means that the party with the burden of proof on

3    a particular question has demonstrated that the odds of that party being right is more than 50-50, even

4    if only by a very tiny amount. It refers to the quality and persuasiveness of the evidence, not to the

5    number of witnesses or documents. In determining whether a claim has been proved by a

6    preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless

7    of which party may have called them, and all the relevant exhibits received in evidence, regardless

8    of which party may have produced them.

9            If, after considering all of the evidence, you find the evidence of both parties to be

10    exactly in balance – in other words, that the chances of the plaintiffs' contention or the defendants'

11    contention being correct with respect to any question I have put to you are exactly equal – then the

12    party with the burden of proof on that question has failed to sustain his or her burden and you must

13    find for the other party on that issue. On the other hand, if the party with the burden of proof on a

14    particular question has persuaded you that its contention is more likely correct than the chances that

15    its opponent is right, even if only by a little, then you must find for the party with the burden of proof

16    on that particular question.

17            For Questions 7 and 8, Ms. Carroll bears the burden of proving her claim by clear and

18    convincing evidence. If you conclude that Ms. Carroll has failed to establish her claim with respect

19    to the issues in Questions 7 (falsity) and 8 (actual malice) by clear and convincing evidence, you must

20    decide against her on those issues. What does "clear and convincing evidence" mean? Clear and

21    convincing evidence is a more exacting standard than proof by a preponderance of the evidence,

22    where you need believe only that a party's claim is more likely true than not true. On the other hand,

21

1   "clear and convincing" proof is not as high a standard as the burden of proof applied in criminal

2   cases, which is proof beyond a reasonable doubt. Clear and convincing proof leaves no substantial

3   doubt in your mind. It is proof that establishes in your mind, not only the proposition at issue is

4   probable, but also that it is highly probable. It is enough if Ms. Carroll establishes that Mr. Trump's

5   statement was false (Question 7) and that he made the statement with actual malice (Question 8)

6   beyond any "substantial doubt"; she does not have to dispel every "reasonable doubt."

7
8                       [Sand, 4 Modern Federal Jury Instructions-Civil P 73.01 (2023); *Waran v.*
9                       *Christie's Inc.*, 315 F. Supp. 3d 713, 718 (S.D.N.Y. 2018)].

10

11          **B.      Role of the Jury**

12                  You are the sole and exclusive judges of the facts. I do not mean to indicate any

13   opinion as to the facts or what your verdict should be. The rulings I have made during the trial are

14   not any indication of my views of what your decision ought to be or as to who should prevail here.

15                  You are expressly to understand that the Court expresses no opinion as to the verdict

16   you should render in this case.

17

18          **C.      Role of the Court**

19                  Now, as I have told you, it is my duty to instruct you as to the law, and it is your duty

20   to accept these instructions of law and apply them to the facts as you determine them.

21                  You are to draw no inferences from the fact that I may have asked questions of some

22   of the witnesses or made comments to counsel about the manner in which they made their

23   presentations. I did that to bring out the evidence more quickly, to save time, and to ensure the proper

1   conduct of the trial. I did not intend to suggest any view concerning the credibility of any witness or

2   as to which side should prevail here, and you must not take my comments or questions as doing so.

3   In addition, you must not draw any inferences or take into account any comments or remarks I made

4   to any of the lawyers in your deliberations. Nor should you consider the fact that I took notes and

5   from time to time made entries on my computer. Whatever I may have noted or any use by me of the

6   computer may have had nothing to do with what you are concerned with. You are to decide the case

7   fairly and impartially based solely on the evidence and these instructions.

8

9   **IV.    EVALUATION OF EVIDENCE**

10          **A.     What Is and Is Not Evidence**

11                  The evidence in this case is the sworn testimony of the witnesses, the exhibits

12  received in evidence, and the stipulations between counsel.

13                  What is not evidence, however, is questions, arguments, and objections by lawyers.

14  You are not to consider statements that I struck or told you to disregard.

15                  In deciding this case, I remind you that you are obliged to consider only the evidence

16  you have seen and heard in this courtroom. Anything that you may have learned elsewhere that has

17  a bearing on this case must be disregarded.

18

19          **B.     Evidence of Sexual Assault on Other Persons**

20                  Before moving on to instructions for your deliberations, I will discuss with you some

21  specific evidence that was presented during the trial.

22                  Evidence was received during the trial that plaintiff claims shows that Mr. Trump

1    sexually assaulted women other than Ms. Carroll. A sexual assault or an attempted sexual assault on

2    a person other than Ms. Carroll – in other words, on someone else – may be considered by you in

3    deciding whether Mr. Trump raped, sexually abused, or forcibly touched Ms. Carroll as she alleges

4    provided that Ms. Carroll has proved by a preponderance of the evidence that Mr. Trump sexually

5    assaulted or attempted to sexually assault the other person. To illustrate the point, if you find that Ms.

6    Carroll proved by a preponderance of the evidence that Mr. Trump sexually assaulted, or attempted

7    to sexually assault, Ms. Leeds, then you may consider that fact in deciding whether Ms. Carroll

8    proved also that Mr. Trump raped or sexually abused or forcibly touched Ms. Carroll – in other

9    words, in answering Questions 1, 2, and 3 on the verdict form. If you do not find that Ms. Carroll

10   proved by a preponderance of the evidence that Mr. Trump sexually assaulted, or attempted to

11   sexually assault, Ms. Leeds, then you may not consider the alleged incident involving Ms. Leeds in

12   deciding whether Ms. Carroll proved also that Mr. Trump raped or sexually abused or forcibly

13   touched Ms. Carroll – in other words, in answering Questions 1, 2, and 3 on the verdict form. That

14   same analysis would apply also to the testimony of Ms. Stoynoff.

15            Now, there are three points I need to make in relation to the evidence of alleged sexual

16   assaults or attempted sexual assaults on women other than Ms. Carroll.

17            First, the term "sexual assault," solely for purposes of considering whether Mr. Trump

18   sexually assaulted or attempted to sexually assault women other than Ms. Carroll, has a different

19   meaning than the other definitions of sex offenses throughout the rest of my instructions. In

20   determining whether Mr. Trump sexually assaulted or attempted to sexually assault Ms. Leeds or Ms.

21   Stoynoff, he must have brought himself into contact, or attempted to bring himself into contact,

22   without the other women's consent, with the sexual or reproductive organs of the other women – *i.e.*,

24

1    their genitalia – and not merely other parts of the body.

2          Second, the term "attempt" in this context means that Mr. Trump (1) intended to make

3    contact with a woman's genitalia and (2) did some act that was a substantial step in an effort to make

4    such contact. A substantial step is something more than mere preparation or planning.

5          Third, a sexual assault on a person other than Ms. Carroll on its own would not be

6    sufficient to prove that the defendant committed the alleged rape, sexual abuse or forcible touching

7    of Ms. Carroll. As you consider this evidence, bear in mind at all times that Ms. Carroll has the

8    burden of proving that Mr. Trump raped, sexually abused, or forcibly touched her.

9          Those are my instructions concerning your consideration of evidence of alleged sexual

10    assaults or attempted sexual assaults on women other than Ms. Carroll. But just to be sure that I am

11    clear, the definition of "sexual assault" that I have just given you applies only to your determination

12    of whether to consider the evidence concerning alleged assaults or attempted assaults on those

13    women. It has no application to anything else in these instructions.

14          [Sand, 4 Modern Federal Jury Instructions-Civil P 74.03, Instruction 74-8.1
15          (2023); Sand, 1 Modern Federal Jury Instructions-Criminal P 10.01 (2022);
16          *United States v. McHorse*, 179 F.3d 889, 903 (10th Cir. 1999); 3 Fed. Jury
17          Prac. & Instr. § 104:41 (6th ed.)].
18
19
20    **C.**    **Law & Order Exhibit and Testimony**

21          There is other specific evidence I now will address. During the cross-examination of

22    Ms. Carroll, you heard several questions directed to her concerning an email Ms. Carroll received

23    from another person in which the other person purported to describe an alleged episode of Law &

24    Order SVU and Ms. Carroll's response to that email. The email from the other person was not

25    offered for the truth of the statements made by that person. Hence, you may consider the email as

1    evidence that someone wrote to Ms. Carroll telling her that there was such an episode, but not as

2    evidence that there in fact was any such episode or what the episode may have contained. You may

3    also consider Ms. Carroll's response to that email to the extent, if any, that you believe Ms. Carroll's

4    response bears on her state of mind or credibility.

5

6        **D.**    **Direct and Circumstantial Evidence**

7            Now that I have covered the instructions for certain specific evidence, I now will give

8    you instructions with respect to the evidence more generally. There are two types of evidence which

9    you properly may use in reaching your verdict.

10          One type of evidence is direct evidence. Direct evidence is when a witness testifies

11    about something he or she knows by virtue of his or her own senses – something he or she has seen,

12    felt, touched, or heard. Direct evidence may also be in the form of an exhibit.

13          Circumstantial evidence is evidence which tends to prove a disputed fact by proof of

14    other facts. Circumstantial evidence is of no less value than direct evidence. It is a general rule that

15    the law makes no distinction between direct evidence and circumstantial evidence but simply requires

16    that your verdict must be based on a preponderance of *all* the evidence presented.

17

18        **E.**    **Witness Credibility**

19          You have had the opportunity to observe the witnesses. It is up to you to decide how

20    believable each witness was in his or her testimony. You are the sole judges of the credibility of each

21    witness and of the importance of each witness's testimony. In deciding the weight to give to the

22    testimony of a witness, you should use all the tests for truthfulness that you would use in determining

26

1    matters of importance to you in your everyday life.

2    Your decision whether or not to believe a witness may depend on how that witness

3    impressed you. You watched each witness testify. Everything a witness said or did on the witness

4    stand <u>or in depositions you saw</u> counts in your determination.  Did the witness appear to be frank,

5    forthright, and candid?  Or did the witness answer questions on direct examination in a responsive

6    and forthcoming manner but answer questions on cross-examination evasively or unresponsively?

7    You should consider the opportunity the witness had to see, hear, and know the things about which

8    he or she testified, the accuracy of the witness's memory, the reasonableness and probability of the

9    witness's testimony and its consistency or lack of consistency and its corroboration or lack of

10   corroboration with other credible testimony.

11   In evaluating a witness's credibility, always remember that you should use your

12   common sense, your good judgment, and your own life experience.  Further, you are to perform the

13   duty of evaluating witnesses without bias or prejudice as to any party, and you are to perform that

14   duty in an attitude of complete fairness and impartiality.

15   Finally, should you, in the course of your deliberations, conclude that any witness has

16   intentionally testified falsely to a material fact during the trial, you are at liberty to disregard all of

17   his or her testimony on the principle that one who testifies falsely as to one material fact may also

18   testify falsely to other facts. But credibility is not necessarily an all or nothing proposition. You may

19   accept so much of any witness's testimony as you believe to be true and accurate and reject only such

20   part, if any, that you conclude is false or inaccurate.

21   _____

22

1    **F.    Expert Witnesses**

2        You also have heard over the course of this trial from expert witnesses, specifically

3    Dr. Lebowitz and Professor Humphreys. An expert witness is a person who, by education and

4    experience, has become expert in some art, science, profession, or calling. Under the rules of

5    evidence, expert witnesses may state their opinions as to matters in which they profess to be an expert

6    and may also state the reasons for their opinions. The purpose of expert testimony is to assist you

7    in understanding the evidence and in reaching an independent decision.

8        In weighing an expert's testimony, you may consider the expert's qualifications, his

9    or her opinions, the bases for the expert's opinions, and all of the other considerations I described

10   to you above in evaluating a witness's credibility. You may give the expert testimony whatever

11   weight, if any, you find it deserves in light of all the evidence in this case. You should not accept the

12   expert witness's testimony just because he or she is an expert. Even with an expert witness, you

13   should use your common sense, your good judgment, and your own life experience.

14       You may give each expert's testimony as much weight, if any, you think it deserves

15   in light of all the evidence. You also may reject the testimony of any expert witness in whole or in

16   part if you conclude the reasons given in support of an opinion are unsound or if you for other

17   reasons do not believe the expert witness.

18

19   **V.    DELIBERATION OF THE JURY**

20       **A.    Duty to Deliberate / Unanimous Verdict**

21       You now will retire to decide the issues submitted for your consideration. It is your

22   duty as jurors to consult with one another and to deliberate with the goal of reaching an agreement.

28

1  Each of you must decide for yourself the answers to the questions I have posed, but you should do

2  so only after considering the case with your fellow jurors, and you should not hesitate to change an

3  opinion when convinced that it is mistaken. Your answers to each question must be unanimous, but

4  you are not required to give up your honest convictions concerning the effect or weight of the

5  evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors.

6  Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without

7  regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience

8  appears to be in accordance with the truth.

9

10  **B.     Notes**

11        Let me remind you, members of the jury, that any notes you may have taken during

12  the trial are for your personal use only. You each may consult your own notes during deliberations,

13  but any notes you may have taken are not to be relied upon during deliberations as a substitute for

14  your collective memory. Your notes should be used as memory aids but should not be given

15  precedence over your independent recollection of the evidence. If you did not take notes, you should

16  rely on your own independent recollection of the proceedings and you should not be influenced by

17  the notes of other jurors. I emphasize that notes are not entitled to any greater weight than the

18  recollection or impression of each juror as to what the testimony may have been.

19        Again, each of you must make your own decision about the proper answer to each

20  question based on your consideration of the evidence and your discussions with your fellow jurors.

21  No juror should surrender his or her conscientious beliefs solely for the purpose of returning a

22  unanimous verdict.

1 _____

2

3    **C.    Citations**

4        During your deliberations you will have access to a printed copy of the instructions

5    I am now reading to you. You will see that the printed copy of the instructions contains a number

6    of legal citations, which appear in brackets. Those citations were included to aid the lawyers and me

7    and you are to ignore them in your deliberations. I have instructed you on the principles of law

8    applicable to this case, and you must apply them in the manner that I have explained them to you.

9    I will describe in a moment what you should do if you require a further explanation of any of my

10    instructions.

11

12    **D.    All Jurors Required for Deliberation**

13        You are not to discuss the case until all jurors are present. Four or five jurors together

14    is only a gathering of individuals. Only when all jurors are present do you constitute a jury, and only

15    then may you deliberate.

16

17    **E.    Selection of Foreperson**

18        When you retire, you should elect one member of the jury as your foreperson. That

19    person will preside over the deliberations and speak for you here in open court.

20        The foreperson will send out any notes and, when the jury has reached a verdict, he

21    or she will notify the Officer that the jury has reached a verdict.

22

A-3021

30

1

2    **F.    Verdict Form**

3    As you have seen, the verdict form that each of you has consists of questions

4    concerning the important issues in this case. As I have explained, your answer to one question will

5    determine whether you answer a subsequent question, and the verdict form indicates how you should

6    proceed through the form. It is important to follow these instructions, because you should answer

7    every question except where the verdict form indicates otherwise. Further, please do not add

8    anything that is not called for by the verdict form.

9

10    **G.    Return of Verdict**

11    After a unanimous decision has been reached, you will record your answers on one

12    copy of the verdict form. The foreperson will fill in the form. Then each juror will write his or her

13    juror number -- no names, please! -- at the bottom of it and advise the Officer that a verdict has been

14    reached. Do not give the verdict form to the Officer. The foreperson should place it in an envelope

15    and bring it with him or her when you return to the courtroom.

16    I stress that each of you should be in agreement with the verdict which is announced

17    in court. Once your verdict is announced by the foreperson in open court and/or officially recorded,

18    it ordinarily cannot be revoked.

19

20    **H.    Media**

21    As you know, this case has attracted a great deal of media attention. Until a verdict

22    is released and you are discharged, you must insulate yourself from all information about this case,

31

1    except what has come to you in this courtroom. That means no reading, watching, or listening to

2    media coverage or commentary about the case or comments from your friends or loved ones. You

3    are sealed from other information. And if anything happens that results in some exposure to some

4    outside source, you are obligated to report it to the Court.

5

6    **I.    Communications Between Court and Jury**

7            If during your deliberations you want me to discuss further some of the instructions

8    on the law that I have given you, the foreperson should send out a note through the Officer in a sealed

9    envelope asking for anything you may wish to hear again.

10           If you wish to have testimony read to you, it can be done, but I ask you to do so only

11    when you have exhausted your collective recollection and are certain that you need it. If you do need

12    to have testimony read, then I ask you to state precisely in your note what you want.

13           We will be sending the exhibits into the jury room with you.

14           If you communicate with the Court before reaching a verdict, you must never indicate

15    in a note to the Court how you are divided.

16

17    **J.    Juror Oath**

18           You are reminded that you took an oath to render judgment impartially and fairly,

19    without prejudice or sympathy and without fear, solely upon the evidence in the case and the

20    applicable law. And I want to elaborate for a moment upon your obligation under that oath to render

21    judgment "solely upon the evidence in the case and the applicable law."

22           You, as jurors, are the judges of the facts. I remind you that nothing I have said or

1    done should be taken by you as indicating any view on my part as to what your conclusion should

2    be about the facts – about what actually happened.  But in determining what actually happened – that

3    is, in reaching your decision as to the facts – it is your sworn duty to follow all of the rules of law as

4    I have explained them to you. You have no right to disregard or to question the wisdom or

5    correctness of any rule I have stated to you. You must not substitute or follow your own notion or

6    opinion as to what the law is or ought to be. It is your duty to apply the law as I have explained it to

7    you, regardless of the consequences. And that applies to all of the law I have given you, including

8    the fact that all or most of the issues of fact that I have put to you must be decided according to the

9    preponderance of the evidence and the meaning of preponderance of the evidence.

10    I know that you will do ~~this~~your duty under your oath and ~~reach~~render a just and true

11    verdict according to the facts as you find them and the law that I have given you.

12    [Tenth Circuit Criminal Pattern Jury Instructions § 1.04 (2021) (modified)].

13

14    **K.**    **Exceptions**

15    Members of the jury, I ask you to remain seated for a moment while I confer with the

16    attorneys.

A-3024

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

May 1, 2023

**FILED BY ECF**
Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:   **Carroll v. Trump**, 22 Civ. 10016 (LAK)

Your Honor:

We respectfully submit this letter, on behalf of Defendant Donald J. Trump, to request that the Court grant a mistrial based upon pervasive unfair and prejudicial rulings by the Court; or in the alternative, (1) correct the record for each and every instance in which the Court has mischaracterized the facts of this case to the Jury and (2) allow Defendant's counsel to have greater latitude to cross-examine Plaintiff and her witnesses.

A mistrial should be granted because the Court has: (1) mischaracterized the evidence in favor of Plaintiff; (2) bolstered the testimony of Plaintiff; (3) allowed Plaintiff to testify that Defendant has two tables of lawyers at trial while prohibiting Defendant from fairly clarifying the record by showing that Plaintiff has a comparable amount of lawyers; (4) continuously sustained improper "argumentative" objections of Plaintiff's counsel as to questions using a well-established and accepted looping method of cross-examination; (5) permitted the testimony of the Natasha Stoynoff ("Stoynoff"), without any *voir dire* of the witness, when it is clear that her testimony does not fit within the requirements of Fed. R. Evid. 413(d)(2&5) and should be excluded under Fed. R. Evid. 403; (6) alluded to the potential use of relevant United States statutes as a form of remedy beyond that which might be available from the Court based on Defendant's son, Eric Trump, making completely truthful and non-prejudicial statements about Reid Hoffman's financing of Plaintiff's litigation; and (7) expressed distress with Defendant's counsel for bringing to its attention that someone from Plaintiff's side violated the Court's Protective Order, which led to the world-wide publication of Plaintiff's mock jury results – while not expressing *any* concern that its Protective Order was clearly violated.

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 2

**A.**  **The Court Mischaracterized the Evidence in Favor of Plaintiff**

1.    Bergdorf Goodman Surveillance Cameras

The Court clearly mischaracterized the evidence in favor of Plaintiff with respect to the surveillance cameras in Bergdorf Goodman, and did not permit Defendant to question Plaintiff as to whether she even attempted to ascertain whether there was footage showing the parties together. Notably, the Bergdorf Goodman store manager of the women's store during the relevant time period, Cheryl Beall ("Beall")(Ex. A; Tr.[1] at 114:16-21), testified that **she was "certain"** that Bergdorf Goodman had surveillance cameras at all of the entrance/exit doors at the store: "Q. Where did you have security cameras located in Bergdorf in general? | A. The only thing that I can tell you for certain, I know we had them at the -- at all of the doors ...." (*Id.* at 114:16-21).

Therefore, if Plaintiff's story is true, her interactions with Defendant on the ground floor near the entrance door would have been captured on video.  If such video existed, that would have significantly corroborated her story.  It is Defendant's position that Plaintiff's story is entirely false and that Plaintiff knows it is false.  Consequently, proof that Plaintiff never *attempted* to determine if such footage of the parties existed constitutes circumstantial evidence that her accusation is false. Simply put, Defendant maintains that Plaintiff did not seek footage of her alleged rape because no such alleged rape occurred.

Accordingly, Defendant's counsel asked Plaintiff if she made efforts to retrieve such footage. However, the Court shut down that proper line of questioning and alluded in front of the Jury to the possibility that no such surveillance cameras on the first/main floor existed, in direct contravention of the testimony elicited by Plaintiff's own witness, Bergdorf Goodman store manager Cheryl Beall:

Q. When you were allegedly assaulted in Bergdorf Goodman by Donald Trump and on the first floor with Donald Trump and on the escalators with Donald Trump, you never thereafter, that day, the next day, the next week or ever tried to get the videos that could have existed to support your claim?

MR. FERRARA: I object to the breadth of the question.

THE COURT: Sustained.

---

[1] "Tr." refers to pages of the Trial Transcripts, relevant pages of which are attached hereto as Exhibit A.

**A-3026**

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 3

> MR. TACOPINA: The breadth. OK.

Q. Did you go back the next day to get -- ask for the video camera footage?

> THE COURT: Sustained. **It assumes there is such a thing**.

> MR. TACOPINA: **Ms. Carroll in fact testified, as did the Bergdorf Goodman witness, that on the main floor there are security cameras, your Honor.**

> THE COURT: Ms. Carroll testified she guessed, and we have had the testimony from **the witness who was at Bergdorf at the time, and she said what she said. We are not going to ask questions based on this kind of statement**.

> MR. TACOPINA: Can I ask this question?

> THE COURT: I don't know yet. I have not heard it.

> MR. TACOPINA: I know you don't know it, so I am going to ask it, and you will let me know.

Q. Did you ever attempt to ascertain whether there is any video footage of you and Donald Trump at Bergdorf Goodman?

> MR. FERRARA: Objection.

> THE COURT: Sustained. I sustained the objection to that question within the last three minutes.

(Ex. A: Tr. at 452:2 - 453:4)(emphasis added).

    2.    <u>Bringing Criminal Charges</u>

The Court expressed to the jury that Carroll could not have Defendant prosecuted for rape because private individuals cannot bring criminal charges. However, the line of questioning related to this issue – and what the jury clearly would have understood from such questioning – was

**A-3027**

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 4

Defendant's position that: (1) Plaintiff could have gone to the police to make an accusation or report of rape, which could have led to the procurement of rape charges, and (2) Plaintiff did not do so because the rape never occurred. Thus, Defendant was not trying to confuse the jury by implying (as Plaintiff's counsel incorrectly asserts, *see* quote *infra*) that this is a "a criminal case." Rather, Defendant simply sought to establish that Plaintiff's comment to Lawrence O'Donnell ("O'Donnell") that she did not go to the police to seek a criminal charge because it would have been "disrespectful to women being raped by the border and around the world" was a false excuse designed to conceal her real reason for not doing so, namely that the alleged rape never occurred. The trial testimony on this issue is as follows:

> Q. But, according to you, you wouldn't bring a criminal charge against him because that would be disrespectful to women being raped by the border and around the world?
>
> > MR. FERRARA: Objection.
> >
> > THE COURT: You already asked that question.
> >
> > MR. TACOPINA: I did not ask this question. I read -- played what she said. I am asking a question about what she said.
> >
> > **MR. FERRARA: This is not a criminal case, your Honor.**
> >
> > **THE COURT: Sustained.**
>
> Q. Let me ask you this. How would you -- it's not a criminal case. How would you bringing criminal charges be disrespectful to some people at the border?
>
> > MR. FERRARA: Objection.
> >
> > THE COURT: Sustained. Correct me if I'm wrong, counsel, but I believe in the State of New York private individuals can't bring criminal charges and probably have not been able to do that in at least a century or two.
> >
> > MR. TACOPINA: No, they can't. They could go to the police department.
> >
> > THE COURT: That's not what you said, counselor. We have been up and

**A-3028**

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 5

> down the mountain on the question of whether she went to the police, so let's move on.
>
> MR. TACOPINA: We have not been up and down the mountain of what we just heard. Can I ask one question?
>
> THE COURT: Move on.
>
> MR. TACOPINA: I guess not.

(Ex. A: Tr. at 449:22 - 450:24)(emphasis added).

Importantly, the phrase "bringing a rape charge" (as opposed to making a report to the police) was used by Defense counsel, because Plaintiff, when interviewed by O'Donnell, discussed that exact phrase in the context of whether she "would consider bringing a rape charge against Donald Trump." (DX-AW in Evidence subject to redactions). And during the O'Donnell interview, clearly both O'Donnell and Plaintiff herself understood – as lay persons would – that the reference to "bringing a rape charge" meant going to the police to file a report. Non-lawyers customarily use the phrase "press charges" when referring to going to the police to get a defendant prosecuted.[2]

Therefore, the Court's hyper-technical interpretation of the phrase "bringing a rape charge" was made simply to protect Plaintiff from further cross-examination, resulting in unfairness to Defendant on a critical issue.

3.    The Jonathan Swift Reference

When Defendant's counsel elicited testimony from Plaintiff that her book contained reference to all men in this country being sent to Montana and retrained, the Court, in order to bolster the testimony of Plaintiff, chose to essentially testify himself as to why such commentary was a satire due to Jonathan Swift's work *A Modest Proposal*:

> Q. Okay. At one point I think in your book you propose we should dispose of all men?

_____

[2] *See, e.g.* https://www.merriam-webster.com/dictionary/press%20charges ("Press charges ... to take legal action against someone : to officially accuse someone of a crime").

**A-3029**

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 6

A. Into Montana.

Q. Into Montana?

A. Yeah, and retrain them.

Q. So retrain. So all the men here in this courtroom, in this country, all get shuffled off to Montana and get retrained.

A. You understand that that was said as a satire.

Q. Ah. Okay.

THE COURT: It comes from Jonathan Swift's A Modest Proposal 700 years ago, right?

THE WITNESS: Yes.

THE COURT: Let's move on.

MR. TACOPINA: Thank you, your Honor.

(Ex. A: Tr. at 360:4-17).

After Carroll testified that the above-referenced notion of disposing and retraining of all men was a satire, the Court interjected in a manner that corroborated such testimony by stating such notion derived from Swift's *A Modest Proposal*. Rather than addressing the subject of men, Swift's "proposal [was] to 'solve' the problem of Irish poverty by killing and eating Irish children. See Jonathan Swift, A Modest Proposal (1729)." *Farah v. Esquire Mag.*, 736 F.3d 528, 536 (D.C. Cir. 2013). That said, if Plaintiff wished to elicit testimony about a three-hundred year old book that did not address the subject matter of her own book, she could have done so on re-direct. It was not for the Court to provide evidence from the Bench to corroborate Plaintiff's position in a way that suggested to the Jury favoritism of any one party.

4.    There Was No One on the Sixth Floor

During defense counsel's cross-examination of Beall, the Court further bolstered Plaintiff's

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 7

position in this case by expressing a corroborative view to the jury that there was no one on the sixth
floor of Bergdorf Goodman at the time of the alleged rape:

> Q. Here's my question. Given the proximity from the fitting room to the main area,
> if somebody, let's say, screamed from inside a dressing room, would they be heard
> out in the main area?
>
> A. If they screamed, I guess, depending on the volume, sure.
>
> Q. And if somebody's head was -
>
> > THE COURT: **Counselor, if a tree falls in the forest and there is no one
> > there to hear, right? It depends whether somebody is there, doesn't it?**
> >
> > MR. BRANDT: I got an answer, your Honor.
> >
> > THE COURT: I know you did, but let's not play this kind of game.
> >
> > MR. BRANDT: I'm not playing a game, your Honor. I'm trying to ask the
> > witness questions.
> >
> > THE COURT: You know where I'm coming from.

(Ex. A: Tr. at 138:1-15)(emphasis added).

Whether the sixth floor of a popular New York City department store was empty of all human
presence at the time of the alleged rape is a key issue in dispute. Thus, it was proper for Defense
counsel to ask Beall about whether a scream emanating through a dressing room door of the lingerie
department could be detected in the main area. Indeed, Plaintiff herself subsequently testified on
direct that her laughter and her head hitting the wall was loud enough for persons nearby to hear: "Q.
Do you think – based on what you were experiencing, do you believe that if someone had been
nearby, they would have been able to hear what was happening in the dressing room? | A. They
would have heard the head hitting and definitely would have heard me laughing." (Ex. A: Tr. at
179:25-180:4).

Given these circumstances, the Court's harsh admonishment of counsel for asking such
questions was improper. As an initial point, opposing counsel did not object to defense counsel's

**A-3031**

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 8

questioning on this topic.  Additionally, the Jury could readily construe the Court's commentary about "a tree fall[ing] in the forest" as its view that no one was present on the sixth floor at that time. And lastly, to the extent the Court had any concern with the phraseology of a question posed, unjustifiably accusing defense counsel of playing "game[s]" in front of the Jury was an unfair means of addressing it.  The Court's doing so again suggested to the Jury a favoritism of one party over another.

**B.    Amount of Attorney's at the Counsel Tables**

The Court allowed Plaintiff to testify that Defendant has two tables of lawyers at trial while prohibiting Defendant from fairly clarifying the record by showing that Plaintiff has a comparable amount of lawyers:

> Q. But one of the reasons Carol Martin told you not to tell the story to anyone and one of the reasons you have testified that you never told the story to anyone was because of Donald Trump's power.
>
> A. I was afraid Donald Trump would retaliate, which exactly is what he did. That's exactly. One of my biggest fears came absolutely true.
>
> Q. Okay.
>
> A. He has two tables full of lawyers here today. It came absolutely true.
>
> Q. We have about the same amount of lawyers. Not everyone is a lawyer, Ms. Carroll, but regardless of that -
>
> THE COURT: Come on, Mr. Tacopina, let's move along.
>
> MR. TACOPINA: Yes, sir.

(Ex. A: Tr. at 435:3-16).

Plaintiff's testimony about Defendant having "two tables full of lawyers" conveyed to the Jury the wrongful impression that she is somehow disadvantaged in these legal proceedings by a lack of resources, which could not be further from the truth.  Plainly, testimony about Defendant's counsel at this trial is irrelevant and prejudicial, as it risks evoking unwarranted sympathy for

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 9

Plaintiff from the Jury. Yet, when defense counsel sought to minimize such prejudice, the Court interjected and expressed its dissatisfaction with that effort. In doing so, the Court inequitably conveyed to the Jury an apparent endorsement of Plaintiff's view.

## C.   **Baseless Argumentative Objections**

By way of continuously sustaining improper "argumentative" objections of Plaintiff's counsel, the Court has prohibited Defendant's counsel from using a well-established and accepted method of cross-examination, namely "looping." Simply put, looping is based on evidence in the record (*i.e.* answers to questions just prior to the looping question), while argumentative questions are not:

> Once you get an affirmation of a fact or phrase contained in your leading question, that new fact can then be reinforced by the rhetorical device of looping. The new fact is used in the next question, without re-asking the fact, by attaching the looped fact to a safe fact in the next question. While the who, what, when, where and how questions are still important at the deposition, these words should seldom be used during the cross-examination at trial.

*W. Russell Corker, Cross-Examination in the Modern Era*, N.Y. St. B.J., March 2019, at 28, 32; *see also Timothy B. Walthall, The Secrets of Cross-Examination How to Avoid the Pitfalls at Trial, Litigation*, Summer 2018, at 26, 29 ("Looping. Another tool used effectively with leading questions is the technique known as "looping." Looping is easy to describe, to explain, and to demonstrate. By looping, we merely repeat an important or operative term or theme elicited in the testimony in a number of follow-up questions. Cross-examiners want short storytelling statements from their witnesses. Trial lawyers know that not everything that is said is of equal importance; not all facts are created equal. Also, the jury has a short attention span and quickly forgets. Finally, we know there are themes that are extremely important to the story we are telling. These are the themes that we want the jurors to remember. We help them to remember what we deem important by looping questions."); *compare Phipps v. McDowell*, No. EDCV181302PAJEM, 2019 WL 4920961, at *21 (C.D. Cal. Aug. 16, 2019)("The prosecutor's questions were based on the testimony of prior witnesses and did not refer to matters not in the record. With a couple of possible exceptions, her questions did not constitute 'a speech to the jury masquerading as a question' and 'not seeking to elicit relevant testimony.' [*People v.*] *Chatman*, 38 Cal.4th [344] at 384 [(2006)] (defining 'argumentative question').").

In this regard, it should be noted that Defendant has a Seventh Amendment right to cross-

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 10

examination, and unjustified interference with Defendant's cross-examination should not be tolerated. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970)("The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases.")(Black, J., concurring); *see also Melvin v. Car-Freshener Corp.*, 453 F.3d 1000, 1004 (8th Cir. 2006)(holding same); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 128 (3d Cir. 1980)(holding same).

Some examples of the Court sustaining improper argumentative objections are below:

Q. And it's your sworn testimony that Donald Trump waved at you across traffic, even though he only met you briefly at a party eight or nine years earlier and hadn't had any interactions with you since, correct?[3]

MR. FERRARA: Objection.

THE COURT: Sustained. Argumentative.

\*\*\*

Q. According to you, after Donald Trump saw you through a door, stopped you, supposedly recognized you after speaking to you for a few minutes eight or nine years earlier, he asked you to help him buy a present?[4]

MR. FERRARA: Objection to the argumentative portion of the question, your Honor.

THE COURT: Sustained. Rephrase.

---

[3] This question was based upon facts in the record, namely that Plaintiff claims to have met Defendant at a party in 1987 (Ex. A: Tr. at 375:13 -379:4) and then had no interactions or communications with Defendant until 1994 or 1995 (Ex. A: Tr. 379:5-16), when she claims that he waved at her on the street (Ex. A: Tr. 380:5-381:17).

[4] This question was based upon facts in the record, namely that (1) Plaintiff claims that Defendant saw her through the glass door, and recognized her and stopped her with his hand (Ex. A: Tr. 387:10-388:20); and (2) according to Plaintiff, Defendant last spoke to her (for a few minutes) in 1987 (Ex. A: Tr. 375:13-379:4).

**A-3034**

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 11

\*\*\*

Q. It's your testimony that in one of New York's most prestigious department stores, there was not a salesperson or a customer or employee on the sixth floor?[5]

MR. FERRARA: I am going to object.

THE COURT: Objection sustained.

You get to make a closing argument in this case, counselor, and this isn't the time for it.

Q. Because Bergdorf Goodman is such an attentive, upscale store, you would agree it doesn't make sense that a sales attendant would not be present in the lingerie department when you were supposedly there with Donald Trump?[6]

MR. FERRARA: Objection.

THE COURT: Sustained.

MR. TACOPINA: Can I understand the basis of that, your Honor.

THE COURT: Yes. It's argumentative. It's repetitive and it's inappropriate.

\*\*\*

Q. So to be clear, it's your testimony that even though at the time she wasn't your closest friend and you never confided anything like this to her before, you thought

---

[5] This question was based upon facts in the record, namely that Bergdorf Goodman is a prestigious store. (Ex. A: Tr. 383:3-384:3).

[6] This question was based upon facts in the record, namely that Bergdorf Goodman is attentive and upscale. (Ex. A: Tr. 383:3-384:3).

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 12

> your first call when you left Bergdorf Goodman should be to her?[7]
>
> MR. FERRARA: Objection. Argumentative. Asked and answered.
>
> THE COURT: Sustained.
>
>               ***
>
> Q. And as a result, you have no medical records showing physical injuries from this colossal battle you have described?[8]
>
> A. I have –
>
> MR. FERRARA: Objection, your Honor.
>
> THE COURT: Sustained. Argumentative. The answer is stricken.

(Ex. A: Tr. at 382:3-8; 389:19-25; 394:16-395:7; 421:23 - 422:3; 436:13-18).

### D.    Natasha Stoynoff's Testimony

The preceding illustrations demonstrate an unfairness to Defendant that has plagued these proceedings to date.  Amongst the most glaring examples of such unfairness is the Court's willingness to admit the unduly prejudicial testimony of Natasha Stoynoff ("Stoynoff") pursuant to Fed. R. Evid. 413(d)(2&5), without any *voir dire* of the witness as sought by Defendant. (ECF No. 142). This is so because, as Defendant presented to the Court, Stoynoff told Plaintiff in an interview (conducted and recorded by Plaintiff) that Trump, during the alleged 2005 Mar-a-Lago incident (*i.e.* ten years after the alleged Bergdorf Goodman incident), never touched or attempted to touch her genitals or anus, which is required under Rule 413(d)(2&5)("contact, without consent, between any

---

[7] This question was based upon facts in the record, namely that Lisa Birnbach was not one of Plaintiff's closest friends, and Plaintiff never previously confided to her personal information such as Plaintiff being abused. (Ex. A: Tr. 421:1-16).

[8] This question was based upon facts in the record, namely that Plaintiff never went to a medical provider for purported injuries (Ex. A: Tr. 436:1-12) arising from the alleged struggle, which Plaintiff described as "colossal." (Ex. A: Tr. 414:12-15).

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 13

part of the defendant's body--or an object--and another person's genitals or anus."). Indeed, Plaintiff never even disputes those facts. *See* ECF Nos. 142, 143, 153.

Stoynoff's testimony amounts to extraordinarily prejudicial propensity evidence. Yet, in order to support its admission, the Court improperly resorted to bootstrapping other prejudicial propensity evidence, namely (1) Jessica Leeds's allegation (which predates the alleged Bergdorf Goodman incident by approximately 15 years), and (2) the Access Hollywood recording (constituting mere words and not conduct). To be clear, Stoynoff will testify only that Defendant kissed her, which, irrespective of the Court's bootstrapping, does not satisfy the requirements for her testimony under Fed. R. Evid. 413(d)(2&5). Moreover, the fact that the Court, in the first place, needed to engage in bootstrapping as a prerequisite for its decision to admit Stoynoff's testimony highlights such testimony's lack of probative value. That consideration becomes even more significant given that Stoynoff's claim is a far cry from a violent rape. Accordingly, such evidence should clearly be excluded under Fed. R. Evid. 403 ("probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury").

In light of the foregoing, the Court's unwillingness to conduct even a brief *voir dire* of Stoynoff only serves to further highlight the unjust manner in which Defendant is being treated throughout these proceedings.

### E.   **Alluding to the Use of Extra-Judicial Remedies**

On April 26, 2023, Plaintiff's counsel notified the Court that Eric Trump "put out a tweet" concerning Reid Hoffman's ("Hoffman") litigation funding of Plaintiff's lawsuit and stated that Plaintiff was considering requesting remedies for such tweet:

> Unfortunately, at 1:54 p.m. this afternoon, Mr. Trump's son, Eric Trump, put out a tweet -- this is not Truth Social. This is on Twitter -- that reads: Zoom out. *Jean Carroll's legal battle against my father is allegedly being funded, all caps funded, by political activist Reid Hoffman, cofounder of LinkedIn. A civil lawsuit being funded by a billionaire with no direct involvement in the case out of pure hatred, spite, or fear of a formidable candidate is an embarrassment to our country, should be illegal, and tells everything you need to know about the case at hand....*

> In light of the Truth Social posts, in light of this tweet by Mr. Trump's son, we obviously are considering whether any remedy here would be appropriate, your Honor.

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 14

(Ex. A: Tr. at 241:1-13)(emphasis added).

Initially, it must be noted that Eric's Trump's tweet was either factually accurate or pure protected opinion. For instance, days prior to Eric Trump's tweet, Hoffman admitted in his post on LinkedIn that: "[I]n addition to E. Jean Carroll, grantees I have supported include .... *** While Trump's legal team has characterized my support of Carroll's lawsuit as 'secret,' I want to be clear that I've never taken any steps to hide the financial support that I have provided to this lawsuit after it started." (Ex. B).

It also cannot be disputed that Hoffman has no "direct involvement in the case" and is adverse politically to Defendant. (Ex. C: "Amid the advertiser boycott of Facebook, one of the Democratic Party's biggest megadonors, Reid Hoffman, is exploring ways to launch a similar boycott of President Trump and his White House. *** 'Frankly, on the political side, one of the things I've been thinking about trying to go stimulate for the next month is an anti-Trump boycott,' Hoffman said in an interview on Tuesday with Anne-Marie Slaughter, the head of New America.").

Therefore, there was simply nothing wrong with Eric Trump's constitutionally protected free speech in the form of a tweet. Nonetheless, the Court expressed otherwise, warning of the potential use of certain Federal statutes to impose remedies that might be extra-judicial in nature:

> I said something this morning about **your client, perhaps now sailing in harm's way, conceivably with his son**, if the report I just heard is true.
>
> Remedies that might be available from this Court may not be the only relevant remedies. If I were in your shoes, I'd be having a conversation with the client.
>
> ***
>
> Eric Trump isn't before me, so you don't have to defend Eric Trump. I am simply suggesting to you that there are **some relevant United States statutes** here and somebody on your side ought to be thinking about them.

(Ex. A: Tr. at 242:6-10 and 243:2-5)(emphasis added).

Although the Court did not identify what "relevant United States statutes" to which it was referring, the notion that any statutes would be appropriate to impose a remedy for the tweet at issue is highly inappropriate and incendiary. Consequently, the Court's comments in this regard reflect

TACOPINA SEIGEL & DEOREO


Hon. Lewis A. Kaplan
May 1, 2023
Page 15

a predisposition which is underlying its unfair treatment of Defendant in this matter.

**F.      Violation of the Court's Protective Order**

Although the Court readily accused defense counsel of playing "game[s]" in front of the Jury based on a brief line of proper questioning, it expressed no concern, as set forth below, about "[s]omebody from the plaintiff's side" violating its Protective Order, despite the fact results of a mock trial relating thereto were leaked to the press.[9]  To the contrary, with respect to the violation of the Protective Order, the Court only expressed dissatisfaction with defense counsel for bringing it to the Court's attention:

> MR. TACOPINA: The jury has been instructed not to read any media or press in this case, right, your Honor, so we have to assume the jury is not going to violate the Court's order.
>
> I will do this. First of all, let's also just put things in context. A week ago, before this trial started, there was an article which I read again yesterday in reference to -- that was a leak -- not certainly Ms. Kaplan or her office, but somebody leaked the fact that two mock juries had come to a conclusion finding liability. You talk about prejudicial a week before a trial. I think that pretty much is the pinnacle of prejudicial.
>
> THE COURT: But you say you are not accusing the plaintiff's team of having done that.
>
> MR. TACOPINA: I'm not accusing Ms. Kaplan, Ms. Crowley, or any of the lawyers on that team. Somebody from the plaintiff's side did that, whether it was a jury consultant, one of the jurors that they use. Somebody from that side leaked it. Certainly it wasn't us. I'm being consistent with the Court's desires here, and I have a great deal of respect for Ms. Kaplan and I like Ms. Kaplan. I'm not suggesting she would have done that. But someone from that world leaked that.
>
> THE COURT: Someone from that world may have been somebody that was picked

---

[9]

https://www.dailymail.co.uk/news/article-11960889/Trump-rape-accuser-E-Jean-Carrolls-lawyers-secretly-staged-test-trial-Manhattan.html

A-3039

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 16

up off the street and offered whatever they offered these days to sit for a day and give an opinion and leave. Now, you know how those things work, **and you are trying to pin it on the plaintiff.**

MR. TACOPINA: No, your Honor. It's impossible because they knew about the other juries and the other juries. It was not a person that was on the jury who didn't sign a protective order, by the way, and just left. This individual, if you read the article, which I have read –

THE COURT: I have too. It says that there were 37, if I have the number right, people brought in and the 37 were all, as I understood the article, in one place at one time and then they were divided into three groups.

MR. TACOPINA: Correct.

THE COURT: Every person in there knew there were three groups.

MR. TACOPINA: Yes. But every person in there, if they were provided three groups, would have known what the other jurors came to as a conclusion, I would imagine. Hopefully, that was protected, right?

THE COURT: Mr. Tacopina, I have a good imagination too and I can imagine that you are right, and I can imagine the facts are entirely different.

(Ex. A: Tr. at 109:11 -111:2) (emphasis added).

As set forth in the above-quoted colloquy, instead of saying a single word to Plaintiff for her side's clear violation of the Protective Order, the Court only challenged Defendant's counsel on this subject, who had absolutely nothing to do with this violation. This circumstance speaks volumes about the Court's treatment of the respective parties in this case.

### G. Relief Sought

While Defendant recognizes that the Court has discretion with respect to evidentiary matters, there comes a point where the cumulative effect of its one-sided rulings manifests a deeper leaning towards one party over another. Moreover, such a finding is buttressed when the Court openly expresses favoritism in its remarks to the parties as described above. Here, despite the fact trial

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 17

testimony has been underway for only two days, the proceedings are already replete with numerous examples of Defendant's unfair treatment by the Court, most of which have been witnessed by the Jury. In light of these circumstances, Defendant requests a mistrial. Notably, such relief is appropriate "when a court finds there is 'manifest necessity' for such an order." *Stinson v. United States*, No. 3:13-CV-427 JBA, 2014 WL 6930974, at *3 (D. Conn. Dec. 8, 2014). "The types of situations that constitute 'manifest necessity' are too varied to be captured by a precise formula." *Ramchair v. Conway*, No. 04 CV 4241 (JG), 2005 WL 2786975, at *10 (E.D.N.Y. Oct. 26, 2005). "Indeed, the manifest necessity standard is certainly among those more general standards, the application of which over time demands a substantial element of judgment." *Id.* "There is no bright-line rule to determine what circumstances constitute manifest necessity. Instead, the inquiry is necessarily fact intensive." *Pearson v. Rock*, No. 12-CV-3505 NGG LB, 2015 WL 4509610, at *13 (E.D.N.Y. July 24, 2015).

Alternatively, in an effort to salvage these proceedings and level the landscape, we respectfully request that the Court correct the record in those instances outlined above during which the Court has mischaracterized the facts of this case and/or prevented defense counsel from doing so. Additionally, if this trial does proceed, Defendant requests that the Court allow defense counsel to have greater latitude to cross-examine Plaintiff and her witnesses.

In a similar vein, so as to enable Defendant to fairly defend against Plaintiff's accusations, defense counsel should be permitted to cross-examine her concerning third-party litigation funding now that she has opened the proverbial door during her direct examination. By way of background, Plaintiff's Complaint in this case did not allege that the October 12, 2022 Statement accused her of being a democratic operative (in fact she removed the "political operative" language of the October 12, 2022 statement from her Complaint) (Complaint [ECF No. 1] at ¶¶ 92, 96-98). However, following the Court's decision on the issue of third-party litigation funding (Ex. A:Tr. at 240:3-19), Plaintiff testified at trial that the October 12, 2022 Statement defamed her by calling her a "Democratic operative":

Q. What did you sue him for?

A. Defamation.

Q. Why?

A. Because he called me a liar, because he said I had accused other men of rape. He said **I was an operative or in a conspiracy with the democratic party**. He said I

A-3041

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 18

was trying to sell a book, so I made up this story. And he said I was too ugly to rape.
So I sued him.

\*\*\*

Q. How is Donald Trump different [than Les Moonves]?

A. Donald Trump called me a liar, said I was pulling a scam, said I was a con, I was
running a con, **that I was a democratic operative**, that I had accused other men of
rape, that I was in it for the money, that I was in it for the attention. And Les
Moonves stayed quiet.

(Ex. A: Tr. at 315:2-9; 310:6-11 )(emphasis added).

Given that Plaintiff – through her own direct testimony – has affirmatively accused
Defendant *in this case* of defaming her for being a "democratic operative," she has now opened the
door to the issue of litigation funding.  Consequently, in order to defend himself against that
accusation, Defendant should be permitted to confront Plaintiff about it during cross-examination.

**H.   Conclusion**

Based on the reasons set forth above, the defense respectfully requests that the Court grant
a mistrial; or in the alternative, (1) correct the record for each and every instance in which the Court
has mischaracterized the facts of this case to the Jury and (2) allow Defendant's counsel to have
greater latitude to cross-examine Plaintiff and her witnesses.

We thank the Court for its consideration.

Respectfully submitted,

Joseph Tacopina

cc:   All counsel by ECF

A-3042

# EXHIBIT A

1    The Court ruled on that.  DNA will not be uttered in this

2    courtroom.

3              THE COURT:  What seems to be the case is that your

4    client is basically endeavoring certainly to speak to his

5    "public," but, more troublesome, to the jury in this case about

6    stuff that has no business being spoken about.

7              MR. TACOPINA:  The jury has been instructed not to

8    read any media or press in this case, right, your Honor, so we

9    have to assume the jury is not going to violate the Court's

10   order.

11             I will do this.  First of all, let's also just put

12   things in context.  A week ago, before this trial started,

13   there was an article which I read again yesterday in reference

14   to -- that was a leak -- not certainly Ms. Kaplan or her

15   office, but somebody leaked the fact that two mock juries had

16   come to a conclusion finding liability.  You talk about

17   prejudicial a week before a trial.  I think that pretty much is

18   the pinnacle of prejudicial.

19             THE COURT:  But you say you are not accusing the

20   plaintiff's team of having done that.

21             MR. TACOPINA:  I'm not accusing Ms. Kaplan, Ms.

22   Crowley, or any of the lawyers on that team.  Somebody from the

23   plaintiff's side did that, whether it was a jury consultant,

24   one of the jurors that they use.  Somebody from that side

25   leaked it.  Certainly it wasn't us.  I'm being consistent with

1    the Court's desires here, and I have a great deal of respect

2    for Ms. Kaplan and I like Ms. Kaplan.  I'm not suggesting she

3    would have done that.  But someone from that world leaked that.

4         THE COURT:  Someone from that world may have been

5    somebody that was picked up off the street and offered whatever

6    they offered these days to sit for a day and give an opinion

7    and leave.  Now, you know how those things work, and you are

8    trying to pin it on the plaintiff.

9         MR. TACOPINA:  No, your Honor.  It's impossible

10   because they knew about the other juries and the other juries.

11   It was not a person that was on the jury who didn't sign a

12   protective order, by the way, and just left.  This individual,

13   if you read the article, which I have read --

14        THE COURT:  I have too.  It says that there were 37,

15   if I have the number right, people brought in and the 37 were

16   all, as I understood the article, in one place at one time and

17   then they were divided into three groups.

18        MR. TACOPINA:  Correct.

19        THE COURT:  Every person in there knew there were

20   three groups.

21        MR. TACOPINA:  Yes.  But every person in there, if

22   they were provided three groups, would have known what the

23   other jurors came to as a conclusion, I would imagine.

24   Hopefully, that was protected, right?

25        THE COURT:  Mr. Tacopina, I have a good imagination

A-3045

N4QMCAR1                                                                    111

1    too and I can imagine that you are right, and I can imagine the

2    facts are entirely different.

3            MR. TACOPINA:  OK.  I never complained about --

4            THE COURT:  What you are trying to do is to get away

5    from a statement by your client, a public statement that, on

6    the face of it, seems entirely inappropriate.

7            MR. TACOPINA:  Your Honor, I will address that with my

8    client today.  I will.  I assure you.  I will try and prevent,

9    to the degree I have the ability to, any posts regarding that.

10           I'm sorry, your Honor.  I just can't accept the fact

11   that that is inappropriate and a leak about results in a

12   confidential, protective-order, governed mock jury was leaked

13   to the press.

14           THE COURT:  You don't know that it was a leak by

15   anybody who had any obligation to anything in this case.  It

16   may have been, I acknowledge that.  But you could not put a

17   witness on the stand to establish what you are assuming is the

18   case, unless I don't know something.

19           MR. TACOPINA:  You are right.  I'm relying on common

20   sense.  There was information regarding exhibits in there and

21   everything else, but whatever.

22           Again, your Honor, I am just trying to say, there has

23   been things on both sides, if the jury wants to violate the

24   Court's order, that could affect their fair and impartial

25   deliberations.  I will assure you.  There was a protective

1   A.   At Bergdorf Goodman.

2   Q.   What is Bergdorf Goodman?

3   A.   Bergdorf Goodman with is a luxury retail specialty store.

4   Q.   Where is it located?

5   A.   57th and Fifth Avenue.

6   Q.   Now, Ms. Beall, you are testifying today in the case of E.

7   Jean Carroll v. Donald Trump?

8   A.   Yes.

9   Q.   Have you ever spoken with Ms. Carroll before?

10  A.   No.

11  Q.   Have you ever met her before?

12  A.   No.

13  Q.   What was the first time you heard her name?

14  A.   I probably read about it, but the first time I was aware of

15  it was when I was contacted by your office.

16  Q.   Going back to the spring of 1996, what was your job at that

17  point at Bergdorf Goodman?

18  A.   I was the store manager of the women's store.

19  Q.   Had you been working at Bergdorf for a long time by that

20  point?

21  A.   Yes.   Since 1988.

22  Q.   Could you describe, just generally for the jury, what your

23  responsibilities were as store manager?

24  A.   Sure.   As the store general manager, my responsibilities

25  were to operate the store.   It was a daily operations, oversee

N4q2Car2                          Beall - Cross                          138

1   Q.  Here's my question.  Given the proximity from the fitting

2   room to the main area, if somebody, let's say, screamed from

3   inside a dressing room, would they be heard out in the main

4   area?

5   A.  If they screamed, I guess, depending on the volume, sure.

6   Q.  And if somebody's head was --

7           THE COURT:  Counselor, if a tree falls in the forest

8   and there is no one there to hear, right?  It depends whether

9   somebody is there, doesn't it?

10          MR. BRANDT:  I got an answer, your Honor.

11          THE COURT:  I know you did, but let's not play this

12  kind of game.

13          MR. BRANDT:  I'm not playing a game, your Honor.  I'm

14  trying to ask the witness questions.

15          THE COURT:  You know where I'm coming from.

16  BY MR. BRANDT:

17  Q.  Let me ask you this question.

18  A.  Okay.

19  Q.  Where did you have security cameras located in Bergdorf in

20  general?

21  A.  The only thing that I can tell you for certain, I know we

22  had them at the -- at all of the doors, but I don't actually

23  know where they would have been in the store.

24  Q.  Let's start with the doors.  So talking about the main

25  entrances and exits to the store?

Case 23-793, Document 86, 11/20/2023, 3592073, Page268 of 300

A-3048

1  A.  I remember him being -- he was very large, and his whole

2  weight came against my chest and held me up there, and he

3  leaned down and pulled down my tights.

4  Q.  What, if anything, were you doing while that was happening?

5  A.  I was pushing him back.  It was quite clear that I was not

6  going -- I didn't want anything else to happen.  It was quite

7  clear.  I pushed him back.  This arm was pinned down.  This arm

8  had my purse.  Trying to get him back.

9  Q.  At any point during this encounter, do you recall saying

10  no?

11  A.  No, I don't recall saying it.  I may have said it.

12          MR. FERRARA:  Just one moment, your Honor.

13  Q.  At any point during this encounter did you scream?

14  A.  I don't remember screaming.  I'm not a screamer.  I'm a

15  fighter.  I'm much more physical than I am vocal.

16  Q.  What about his head?  What is happening?

17  A.  His head was beside mine breathing.  First, he put his

18  mouth against me.

19  Q.  Do you mean he kissed you?

20  A.  Yes.

21  Q.  Did you kiss him back?

22  A.  No.  I didn't consider it a kiss.  It was such -- it was a

23  shocking thing for him to suddenly put his mouth against mine.

24  I thought what.  What.  What.  No.

25  Q.  Do you think -- based on what you were experiencing, do you

Case 23-793, Document 86, 11/20/2023, 3592073, Page269 of 300

A-3049

1   believe that if someone had been nearby, they would have been

2   able to hear what was happening in the dressing room?

3   A.   They would have heard the head hitting and definitely would

4   have heard me laughing.

5   Q.   You described Mr. Trump as a -- you described Mr. Trump as

6   sort of, I think, larger than you?

7   A.   Yeah.

8   Q.   Do you recall approximately what the difference or how tall

9   are you?

10  A.   At the time I was five-nine.  Because I'm 79, I have sort

11  of all compacted down due to gravity, but at the time I was

12  five-nine.  I was wearing four-inch heels.  So it put me about

13  level with Donald Trump, who I think is six-two.  I was

14  six-one.  And I weighed at the time about 120, and I believe he

15  weighed about 100 more pounds.

16  Q.   Were you afraid while this was happening?

17  A.   I was in -- this is going to sound strange.  I was almost

18  too frightened to think if I was afraid or not.  I was

19  stamping.  My whole reason for being alive in that moment was

20  to get out of that room.

21  Q.   How were you trying to accomplish that?

22  A.   Stamping and trying to wiggle out from under him.  But he

23  had pulled down my tights and his hand went -- his fingers went

24  into my vagina, which was extremely painful, extremely painful.

25  It was a horrible feeling because he curved, he put his hand

1          (Jury not present)

2          THE COURT:  Give me one minute.

3          Before we bring the jury in, the whole subject of

4    litigation funding is precluded.  I'll make a brief remark

5    about it now.

6          In general, litigation funding is not relevant.  Here

7    I allowed very limited discovery against what seemed to me a

8    remote but plausible argument that maybe something to do with

9    litigation funding arguably was relevant to the credibility of

10   one or two answers by this witness in her deposition.  I gave

11   the defense an additional deposition of the plaintiff, and I

12   gave the defense limited document discovery.

13         On the basis of all that, I have concluded that there

14   is virtually nothing there as to credibility.  And even if

15   there were, the unfair prejudicial effect of going into the

16   subject would very substantially outweigh any probative value

17   whatsoever.

18         I may at some point write in more detail, but I don't

19   promise to do so.  That's the ruling.  The subject is closed.

20         MS. KAPLAN:  One quick matter, your Honor.

21         THE COURT:  Yes.

22         MS. KAPLAN:  It seems highly relevant to what your

23   Honor just said.  I had spoken this morning about the Truth

24   Social post from Mr. Trump.  There were actually at least two

25   of them which I will provide to your Honor after court.

1              Unfortunately, at 1:54 p.m. this afternoon,

2   Mr. Trump's son, Eric Trump, put out a tweet -- this is not

3   Truth Social.  This is on Twitter -- that reads:  Zoom out.

4   Jean Carroll's legal battle against my father is allegedly

5   being funded, all caps funded, by political activist Reid

6   Hoffman, cofounder of LinkedIn.  A civil lawsuit being funded

7   by a billionaire with no direct involvement in the case out of

8   pure hatred, spite, or fear of a formidable candidate is an

9   embarrassment to our country, should be illegal, and tells

10  everything you need to know about the case at hand....

11             In light of the Truth Social posts, in light of this

12  tweet by Mr. Trump's son, we obviously are considering whether

13  any remedy here would be appropriate, your Honor.  It seems to

14  us that would be true in any case for a party -- let me put it

15  this way.  If Mr. Trump were going to come in and testify, he

16  would not be able to testify about the topics like litigation

17  funding that your Honor has already excluded.  For him to be

18  able to do, effectively, the same thing or try to, effectively

19  do the same thing, on Truth Social or have his son do the same

20  thing on Twitter seems to us to be highly inappropriate.

21             We are going to do some research on this.  It's just a

22  warning.  We may ask your Honor for some form of relief.  We

23  have to try to figure out what would be most appropriate

24  overnight.

25             THE COURT:  That's up to you.

Case 23-793, Document 86, 11/20/2023, 3592073, Page272 of 300

N4QMCAR5                                                                    242

 1                Mr. Tacopina.

 2                MR. TACOPINA:  Your Honor --

 3                THE COURT:  I am not asking for a response.  I was

 4      addressing you.  I am not offended.  Don't worry.  I'm

 5      addressing you.

 6                I said something this morning about your client,

 7      perhaps now sailing in harm's way, conceivably with his son, if

 8      the report I just heard is true.

 9                Remedies that might be available from this Court may

10      not be the only relevant remedies.  If I were in your shoes,

11      I'd be having a conversation with the client.

12                MR. TACOPINA:  Can I just respond now.  You did

13      address me.  We discussed the earlier post this morning.  I

14      heard you and I made my response and my record on that.  I

15      don't need to expound on that further.

16                As far as the tweet from Eric Trump, his son, I will

17      address everything with the appropriate parties.

18                Let me just say this.  This was before your ruling

19      about five minutes ago.  In that tweet there is absolutely

20      nothing offensive or anything even remotely prejudicial.  It

21      was stating a fact that there is -- he actually used the word

22      alleged funding by Reid Hoffman, who hates his father.  That's

23      a fact.  All those things are a fact.  Reid Hoffman posted it

24      himself.  Eric Trump didn't do anything wrong.  Everything he

25      said was true.  I am just pointing out, it was before your

A-3053

N4QMCAR5                         Carroll - Direct                    243

1     ruling.

2              THE COURT:  Eric Trump isn't before me, so you don't

3     have to defend Eric Trump.  I am simply suggesting to you that

4     there are some relevant United States statutes here and

5     somebody on your side ought to be thinking about them.

6              MR. TACOPINA:  I've been thinking about them.

7              THE COURT:  Good.

8              MR. TACOPINA:  Since our chat this morning.

9              THE COURT:  Good.

10             Let's get the jury.

11             (Jury present)

12             THE COURT:  Thank you.  The witness is reminded she is

13    still under oath.

14             You may continue, counselor.

15             MR. FERRARA:  Thank you, your Honor.

16    Q.  We were talking before we broke, Ms. Carroll, about Donald

17    Trump winning the 2016 presidential race.

18             Do you recall where you were when you learned that he

19    had won?

20    A.  Yes.  I was at Lisa Birnbach's apartment.

21    Q.  That's the same Ms. Birnbach we spoke about earlier?

22    A.  Yes.

23    Q.  What, if anything, did the two of you discuss that night

24    regarding the assault?

25    A.  Well, she -- it was -- Lisa had thrown a big party, and

N4RMCAR2                         Carroll - Direct

1    Q.   Have you sued Mr. Moonves for defamation?

2    A.   No.

3    Q.   Why not?

4    A.   He didn't -- he did not defame me.  He did not call me a

5    liar.

6    Q.   How is Donald Trump different?

7    A.   Donald Trump called me a liar, said I was pulling a scam,

8    said I was a con, I was running a con, that I was a democratic

9    operative, that I had accused other men of rape, that I was in

10   it for the money, that I was in it for the attention.  And Les

11   Moonves stayed quiet.

12   Q.   Let's go back -- I was asking you about some work you've

13   done since *Elle* fired you.

14   A.   Yes.

15   Q.   We are talking about some articles that you had written for

16   the Atlantic.

17            Do you recall that line of questioning?

18   A.   Yes.

19   Q.   Let me ask you, was one of the articles about someone named

20   Natasha Stoynoff?

21   A.   Yes.

22   Q.   Who is Ms. Stoynoff?

23   A.   Ms. Stoynoff is a respected journalist.  She was a reporter

24   for *People* magazine.  And her beat was Donald Trump.

25   Q.   Why did you decide to write an article about Ms. Stoynoff?

N4RMCAR2                         Carroll - Direct

1    A.  Yes.

2    Q.  What did you sue him for?

3    A.  Defamation.

4    Q.  Why?

5    A.  Because he called me a liar, because he said I had accused

6    other men of rape.  He said I was an operative or in a

7    conspiracy with the democratic party.  He said I was trying to

8    sell a book, so I made up this story.  And he said I was too

9    ugly to rape.  So I sued him.

10   Q.  Did anyone tell you to sue him?

11   A.  No.

12   Q.  When did you get the idea of bringing a lawsuit?

13   A.  It was constant -- when I was doing interviews with

14   journalists, many journalists concluded their interviews by

15   asking me, are you going to sue him?  And I would say I'm

16   thinking about it, but probably not.

17   Q.  Was there any conversation that crystallized the idea for

18   you?

19   A.  Yes.

20   Q.  What was that?

21   A.  I had a conversation with George Conway.

22   Q.  Who is George Conway?

23   A.  George Conway is a republican lawyer.

24   Q.  If you know, do you know Mr. Conway's views on Donald

25   Trump?

N4r2Car3                        Carroll - Cross

1   a nuisance.  That's sort of the premise of your book, right?

2   A.  It's -- my premise is the women who write to me at Ask

3   E. Jean are finding men to be a nuisance.

4   Q.  Okay.  At one point I think in your book you propose we

5   should dispose of all men?

6   A.  Into Montana.

7   Q.  Into Montana?

8   A.  Yeah, and retrain them.

9   Q.  So retrain.  So all the men here in this courtroom, in this

10  country, all get shuffled off to Montana and get retrained.

11  A.  You understand that that was said as a satire.

12  Q.  Ah.  Okay.

13          THE COURT:  It comes from Jonathan Swift's *A Modest*

14  *Proposal* 700 years ago, right?

15          THE WITNESS:  Yes.

16          THE COURT:  Let's move on.

17          MR. TACOPINA:  Thank you, your Honor.

18  BY MR. TACOPINA:

19  Q.  So the book premise talks about the purpose of -- the

20  premise that in order to support your position you drove to

21  these towns that you said were named after women and you asked

22  people in each town what do we need men for, right?

23  A.  Yes, I had --

24  Q.  Okay.  As part of that road trip, you would only eat in

25  cafés named after women?

N4RMCAR4                     Carroll - Cross

```
 1                        AFTERNOON SESSION

 2                            2:10 p.m.

 3           (In open court)

 4           THE COURT:  Good afternoon, everybody.

 5           Please bring in the jury.

 6           (Jury present)

 7           THE COURT:  Ms. Carroll, you are still under oath.

 8           Members of the jury, I hope you enjoined your

 9   delicious repast.

10           Mr. Tacopina, you may proceed.

11           MR. TACOPINA:  Thank you, your Honor.

12   BY MR. TACOPINA:

13   Q.  Mr. Carroll, I left off with you by saying that I want to

14   discuss your story regarding Bergdorf Goodman and Donald Trump.

15           You met Donald Trump at that event briefly in 1987?

16   A.  Yes.

17   Q.  That was over 35 years ago, as we sit here today, correct?

18   It was a long time ago.

19   A.  Yeah, right.

20   Q.  When you met him at that event, you weren't alone at the

21   time, right?

22   A.  No.

23   Q.  That meeting happened --

24           THE COURT:  Just a second.  The question was:  You

25   weren't alone, right?  And you answered no, which raises the
```

Case 23-793, Document 86, 11/20/2023, 3592073, Page278 of 300

A-3058

376

N4RMCAR4                          Carroll - Cross

1   question of whether he is not right or whether you weren't

2   alone.

3   Q.  When you met him, Donald Trump, in 1987, you were not alone

4   at the time?

5   A.  That's correct.

6   Q.  That meeting happened within a group of people?

7   A.  There were four of us.

8   Q.  Right.

9        You, your husband, John Johnson; Donald Trump, and his

10  wife Ivana?

11  A.  Yes.

12  Q.  And you spoke for about five minutes, five or six minutes?

13  A.  Yes.

14  Q.  During that group conversation you spoke with Ivana?

15  A.  Yes.

16  Q.  And you actually had in your possession a photograph that

17  was snapped of that brief encounter, correct?

18  A.  Yes.

19  Q.  And you kept that photograph of you with Donald Trump for

20  two decades, right?

21  A.  It was in a scrapbook.

22  Q.  Whose scrapbook?

23  A.  My scrapbook.

24  Q.  I said, you kept that photograph of you with Donald Trump

25  for two decades?

N4RMCAR4                    Carroll — Cross

1   A.  Yes.

2   Q.  And because that photograph was taken before iPhones and

3   all these things, it was a physical photograph, like the

4   traditional?

5   A.  Yes.

6   Q.  You made it a point when submitting your book proposal that

7   we talked about to include within that book proposal the

8   photograph that we just discussed, correct, of Donald Trump?

9   A.  Yes.

10          MR. TACOPINA:  Could you put up PX-12, please.  It's

11   in evidence.

12   Q.  Just to be clear, this is the photograph we are talking

13   about, correct?

14   A.  Yes.

15   Q.  That's the encounter, right?

16   A.  Yes.

17   Q.  That, by the way, is your exhusband, John Johnson, who you

18   described strangled you three times, correct?

19   A.  Yes.

20   Q.  And that brief encounter happened either at one or two

21   parties, right?

22   A.  Yes.

23   Q.  I think it was maybe the NBC television party where you

24   worked or an ABC party where your exhusband, John Johnson,

25   worked?

N4RMCAR4                          Carroll - Cross

1    A.  Yes.

2    Q.  You don't remember for sure which one it was when you met

3    Donald Trump, right?

4    A.  No.

5    Q.  You also don't recall where the party was hosted?

6            THE COURT:  I'm sorry.  It's the same problem.

7            MR. TACOPINA:  I just realized that.  You're right,

8    your Honor, absolutely.

9    Q.  You also don't recall where the party was hosted?

10   A.  I can picture the room, but I don't remember where the room

11   was.

12   Q.  And you don't remember the subject matter that you

13   discussed?

14   A.  It was various subjects.  Quickly, it was a lilting, quick,

15   juicy, interesting conversation that I don't remember what the

16   topics were.

17   Q.  Do you remember that it was a juicy conversation, but you

18   don't remember what was juicy about it?

19   A.  That's right.

20   Q.  In fact, you don't even remember who else you spoke to at

21   the party.

22   A.  No.  I had memories of speaking to people, probably, at

23   this party, but I can't absolutely say for certain that it was

24   this party.

25   Q.  After that party where you had this quick conversation of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

379

N4RMCAR4                    Carroll - Cross

1    five minutes between the four of you -- and it seemed like a

2    bunch of people right behind you as well.

3            Is that right, Mr. Carroll?

4    A.  I think they are shoving through to go around us.

5    Q.  In any event, after that, you never had any phone calls or

6    communications with Donald Trump, correct?

7    A.  Correct.

8    Q.  I mean up until the time you say you met him in Bergdorf.

9    And you never exchanged any letters or anything with him,

10   correct?

11   A.  No.  You are right.

12           MR. TACOPINA:  You can take that down.  Thank you.

13   Q.  In fact, after the party and before the alleged incident at

14   Bergdorf Goodman, the only other interaction you claim to have

15   had with Donald Trump was in either '94 or '95, right?

16   A.  Yes.

17           MR. FERRARA:  Objection.

18           THE COURT:  Sustained.  '94, '95.

19           MR. TACOPINA:  Judge -- let me do that again.

20   Q.  Before the alleged incident at Bergdorf Goodman, the only

21   other interaction you claim to have had with Donald Trump was

22   in 1994 or 1995, before?

23           THE COURT:  I'll allow the question.  The witness

24   should listen to it.

25   A.  I thought I corrected '94 or '95 yesterday.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4RMCAR4                    Carroll - Cross

1    Q.  Ms. Carroll, I am not talking about the alleged incident at

2    Bergdorf Goodman.  You said that's '95, '96, right?  That's

3    where we're at.  Yes?

4    A.  OK.

5    Q.  I'm talking about a year before that, the other encounter

6    you had with Donald Trump.

7    A.  You mean the wave across the street?

8    Q.  Yeah, that's what I mean.

9    A.  I couldn't put it before '94 or '95.  I said sometime

10   between '87 and '95, '96.

11   Q.  '87.  OK.  Hold on one second.

12   A.  Possibly.  It had to be sometime within --

13   Q.  Give me one second.  I am just going to look at something,

14   Ms. Carroll.

15            MR. TACOPINA:  I am going to read -- direct everyone's

16   attention -- I will just read it, your Honor.  I am not going

17   to post it.  As soon everybody is ready.

18            Deposition, page 50 of Ms. Carroll from October 14,

19   2022, line 19 through line 9, for the purpose of this question:

20   Page 50, line 19 to page 51, line 9.

21            THE COURT:  Just give me a minute.

22            Go ahead.

23            MR. TACOPINA:  Counsel, are you ready?

24            MR. FERRARA:  Yes.  Thank you.

25   Q.  You testified under oath in a deposition, Ms. Carroll,

N4RMCAR4                       Carroll - Cross

1   that:

2   "Q. Following the conversation, can you please tell me any

3   other time you met with Donald Trump?

4   "A. He said hello to me one time on the street, waved.

5   "Q. When was that?

6   "A. '94 or '95.

7   "Q. When was that?  Was that in New York?

8   "A. Yes.

9   "Q. Do you remember where in New York?

10  "A. Yeah.  He was standing on the side of Fifth Avenue where

11  the Trump building is, and I was across the street on Fifth

12  Avenue."

13          You gave that answer to that question under oath,

14  correct, Ms. Carroll?

15  A.  Yes.

16  Q.  And that was truthful?

17  A.  Yes.

18  Q.  My question was, other than the party and before Bergdorf

19  Goodman, the only other time you claim to have interacted with

20  Donald Trump was in 1994 or 1995, right?

21  A.  Yes.

22  Q.  And that was this incident we just described where he's on

23  one side of Fifth, you're on the other, right?

24  A.  Yes.

25  Q.  And you think he may have waved to you from across the

Case 23-793, Document 86, 11/20/2023, 3592073, Page284 of 300

A-3064

382

N4RMCAR4                         Carroll – Cross

1   street in traffic?

2   A.  Yes.

3   Q.  And it's your sworn testimony that Donald Trump waved at

4   you across traffic, even though he only met you briefly at a

5   party eight or nine years earlier and hadn't had any

6   interactions with you since, correct?

7          MR. FERRARA:  Objection.

8          THE COURT:  Sustained.  Argumentative.

9   Q.  Well, you testified that the party was 1987, so that's

10  eight or nine years earlier than '94 or '95, right?

11         THE COURT:  We can all do the math.

12  A.  Yes.

13         Let's move it along.  Everybody can subtract 84 from

14  93, or whatever it is.

15         MR. TACOPINA:  Thanks, your Honor.

16  Q.  Other than that, math that we can all do, you hadn't any

17  other interactions with him since, correct?

18  A.  Yes.

19  Q.  And you are not even sure really if he was waving at you,

20  right, Ms. Carroll?

21  A.  I turned around to see if anyone was standing behind me.  I

22  didn't see anyone.  So I waved back.

23  Q.  It seemed to you that he was waving at you, but, as you

24  have said previously, you can't say with certainty whether he

25  was waving at you or someone else, right?

N4RMCAR4                        Carroll — Cross

1    A.  That's right.

2    Q.  Let's talk about Bergdorf Goodman for a minute.

3         You would agree that Bergdorf Goodman is a store of

4    perfections?

5    A.  Yes.

6    Q.  In fact, the store's perfections are well known?

7    A.  Yes.

8    Q.  You would agree that the store is also posh?

9    A.  Yes.

10   Q.  Meaning it's upscale, right.  OK.

11        The store is also gracious?

12   A.  Particularly gracious, yes.

13   Q.  Meaning its employees are courteous and attentive.  In

14   fact, in this regard you would agree that the store is novel?

15   A.  Many stores aim to have -- to be gracious.

16   Q.  When I asked you about gracious, I'm saying, when you said

17   gracious, you mean that its employees are courteous and

18   attentive, correct?

19   A.  By gracious I mean they are warm and inviting and conducive

20   to shopping.

21   Q.  And its level of service and attention to customers is

22   strikingly unique and resembles nothing else.

23        You said that, right?

24   A.  Yes.

25   Q.  In fact, it is your belief that because Bergdorf Goodman is

N4RMCAR4                    Carroll - Cross

1   such an upscale store, it even refers to its customers as

2   clients, right?

3   A.  I don't think I said that, but I certainly agree with it.

4   Q.  Is it your testimony that you have not used clients in

5   regards to Bergdorf Goodman's customers?

6   A.  I am not sure if I did or not.  I don't know.

7   Q.  On the day you claim to have seen Donald Trump at Bergdorf

8   Goodman you were alone when you went into the store, right?

9   A.  Yes.

10  Q.  And you don't recall with any clarity of what you went

11  there to buy that day, correct?

12  A.  No.

13          THE COURT:  No, it's not correct or --

14          THE WITNESS:  No.  That's correct.  I don't remember

15  what I was shopping for.

16          MR. TACOPINA:  Sorry, your Honor.

17  Q.  When you were leaving Bergdorf Goodman that day you

18  supposedly saw Donald Trump coming in?

19  A.  Yes.

20  Q.  And at the time you were separated by a door?

21  A.  Yes.

22  Q.  In your book, which you published in 2019, you don't recall

23  whether it was a revolving door or just a regular hinge door,

24  correct?  Is that correct?

25  A.  Yes.

N4RMCAR4                    Carroll — Cross

1    push-in-and-out door.

2    Q.  You wrote the book in 2019?

3    A.  I wrote it in 2018.

4    Q.  Again, my question is, you became sure that it was a

5    revolving door in 2019?

6    A.  Yes.

7    Q.  Because you went there 20 something years after the alleged

8    incident?

9    A.  Yes, I did.

10   Q.  According to you, as you were coming out of the store, he,

11   from the outside, held his hand up?

12   A.  Yes.

13   Q.  And he did that, obviously, while he was still outside and

14   on the other side of the door?

15   A.  Yes.

16   Q.  And you stayed inside the store?

17   A.  Yes.

18   Q.  You didn't come out at any particular point; you waited for

19   him?

20   A.  No.  He went like this, so I stopped.

21   Q.  OK.

22        And at the time of this supposed interaction, your

23   story is that Donald Trump didn't have any security with him at

24   all?

25   A.  None that I could see.

N4RMCAR4                    Carroll - Cross

1   Q.   In fact, according to you, just like yourself, he was

2   alone?

3   A.   I believe he was.

4   Q.   As far as you know, you can't identify anybody by name who

5   saw this supposed interaction between you and Mr. Trump?

6   A.   No.

7        THE COURT:   I'm sorry to interrupt again.  Does that

8   mean, Ms. Carroll, that the statement that you can't identify

9   anybody or saw it is not correct or that it is correct?

10       THE WITNESS:   I could not identify anyone who was in

11  the store at the time or outside with Donald Trump at the time.

12       THE COURT:   Mr. Tacopina, I would hope you would

13  phrase your questions in a way that we don't have to keep doing

14  this.

15       MR. TACOPINA:   Sure, your Honor.

16       THE COURT:   Thanks.

17  Q.   According to you, at that moment upon seeing -- the moment

18  he saw you in Bergdorf Goodman he said to you, hey, you're that

19  advice lady?

20  A.   Yes.

21  Q.   And you responded by saying, hey, you're that real estate

22  tycoon?

23  A.   Yes.

24  Q.   And around this period of time, from 1995 to 1996, Donald

25  Trump was a well-known public figure?

N4RMCAR4                     Carroll - Cross

1    A.  Yes.

2    Q.  He was a man about town who could make television

3    appearances and was entertaining?

4    A.  Yes.

5    Q.  And you yourself called him one of New York's most famous

6    men?

7    A.  Oh, absolutely.

8    Q.  It's your story that the people in the store recognized him

9    at the time?

10   A.  Yes.  Two people in the store.

11   Q.  One was a customer who was sort of gaping at him, correct?

12   A.  Yes.

13   Q.  And, according to you, a sales attendant recognized Donald

14   Trump also?

15   A.  Yes.

16   Q.  It's your story that no sales attendant at Bergdorf tried

17   to help him?

18   A.  No.  That is -- no sales assistant tried to help him.

19   Q.  According to you, after Donald Trump saw you through a

20   door, stopped you, supposedly recognized you after speaking to

21   you for a few minutes eight or nine years earlier, he asked you

22   to help him buy a present?

23          MR. FERRARA:  Objection to the argumentative portion

24   of the question, your Honor.

25          THE COURT:  Sustained.  Rephrase.

394

N4RMCAR4                         Carroll - Cross

1    A.  Yes.

2    Q.  And it's your story while on the sixth floor you didn't see

3    any customers there?

4    A.  No, I didn't see any customers.

5    Q.  It is your claim you didn't see a single person in any of

6    the departments you walked through on that floor?

7    A.  I didn't see anybody.  We went past cruise wear.  Could

8    have been bathing suits.  I think it was cruise wear.  I didn't

9    see any people.

10   Q.  It's your story that you didn't see any customers on the

11   entire sixth floor?

12   A.  Didn't see any.

13   Q.  Aside from customers, you also didn't see any sales

14   attendants?

15   A.  Did not see any.

16   Q.  It's your testimony that in one of New York's most

17   prestigious department stores, there was not a salesperson or a

18   customer or employee on the sixth floor?

19              MR. FERRARA:  I am going to object.

20              THE COURT:  Objection sustained.

21              You get to make a closing argument in this case,

22   counselor, and this isn't the time for it.

23   Q.  Because Bergdorf Goodman is such an attentive, upscale

24   store, you would agree it doesn't make sense that a sales

25   attendant would not be present in the lingerie department when

N4RMCAR4                        Carroll - Cross

1   you were supposedly there with Donald Trump?

2           MR. FERRARA:  Objection.

3           THE COURT:  Sustained.

4           MR. TACOPINA:  Can I understand the basis of that,

5   your Honor.

6           THE COURT:  Yes.  It's argumentative.  It's repetitive

7   and it's inappropriate.

8           MR. TACOPINA:  I never asked if she thought it ever

9   made sense.

10          THE COURT:  I'm sorry, Mr. Tacopina.  We are going to

11  move on.  In this courtroom, the ruling is the ruling, not the

12  start of an argument.

13  Q.  You'd agree that story about no one being on the sixth

14  floor is inconceivable, correct?

15  A.  It's hard to imagine that there would not be a sales

16  attendant in Bergdorf's.  It's surprising.

17  Q.  The word you used to describe that lack of sales attendants

18  or anyone close was inconceivable, correct?

19  A.  Yes.

20  Q.  Inconceivable --

21  A.  Cannot be imagined.

22  Q.  Unbelievable, correct?

23  A.  Yes, that's what it means.

24  Q.  Now, the quality of merchandise and the cost of merchandise

25  at Bergdorf Goodman is relatively expensive compared to a

N4r2Car5                    Carroll - Cross

1              You never hit him with your purse, did you?

2    A.   I went like this, yeah.

3    Q.   You did hit him with your purse.

4    A.   I believe I did.

5    Q.   Okay.  When did you recall that fact, Ms. Carroll, hitting

6    him with your purse?

7    A.   I've always recalled that fact.

8    Q.   And you mentioned that when you were giving your television

9    interviews about this case or your video deposition?

10   A.   I'm not sure if I did.

11   Q.   Okay.

12             You describe what was going on in there as a

13   colossal -- "in there" being in the locker room, changing room,

14   a colossal struggle.

15   A.   To me it was a colossal struggle.

16   Q.   And despite this colossal struggle while you were being

17   violently raped, you -- for as long as three minutes, you never

18   let go of your purse.

19   A.   No, I never did.

20   Q.   And at one point it's your testimony you managed to get

21   your knee up and push Donald Trump off of you by yourself.

22   A.   Yes.

23   Q.   And even though the tights or your panties were above your

24   knees?

25   A.   Yeah.  I could -- they are tights because they are

N4r2Car5                    Carroll – Cross

1   Q.  And at that time she certainly wasn't your closest friend.

2   A.  She was a close friend, not my closest.

3   Q.  Prior to this alleged incident at Bergdorf, you didn't

4   speak to her overly often.

5   A.  Not overly often, that is correct.

6   Q.  In fact, you can't even name another personal matter you

7   confided in with -- in with her prior to this alleged incident.

8   A.  Oh, no.  We had many conversations.  We discussed her

9   breaking up with a certain person.

10  Q.  That's her talking to you, confiding in you, right?

11  A.  Yes.

12  Q.  My question was, you can't name another personal matter of

13  yours that you confided in her prior to this alleged incident?

14  A.  Well, I believe when she was confiding in me, I would

15  return the confidence with -- confiding with her with whatever

16  I was going through.  I just don't remember it.

17  Q.  Okay.

18          You certainly can't say definitively that prior to

19  this alleged incident at Bergdorf you ever shared any other

20  instances with Ms. Birnbach in which you felt abused in your

21  past either sexually or otherwise?

22  A.  I don't think I did.

23  Q.  So to be clear, it's your testimony that even though at the

24  time she wasn't your closest friend and you never confided

25  anything like this to her before, you thought your first call

N4r2Car5                        Carroll - Cross

 1  when you left Bergdorf Goodman should be to her?

 2          MR. FERRARA:  Objection.  Argumentative.  Asked and

 3  answered.

 4          THE COURT:  Sustained.

 5  BY MR. TACOPINA:

 6  Q.  You thought your first call when you left Bergdorf Goodman

 7  should be to Ms. Birnbach?

 8  A.  She was exactly the person I needed to talk to.

 9  Q.  And in your story it's because Ms. Birnbach was supposedly

10  hilarious?

11  A.  And still is the funniest person I know.

12  Q.  Okay.  And according to you, if Lisa Birnbach had laughed

13  after you told her you had been sexual assaulted, you would be

14  okay, home free?

15  A.  I thought it would put -- I had thought it would let me

16  know it was not as bad as I probably knew it was.  I would feel

17  better if Lisa laughed and said, that is funny, then I would

18  have felt better.

19  Q.  So it was a possibility in your mind that you were going to

20  describe a violent sexual assault to your good friend against

21  you that had just taken place and Lisa would have laughed and

22  said, oh, that is funny?

23  A.  I was going to tell her the story, which I thought was

24  hilarious, and then I got to the point where I had to tell Lisa

25  that he pulled down my tights, and before I said that, Lisa had

N4r2Car5                    Carroll - Cross

1   A.  I don't -- no, I did not want to tell my story.  I did not

2   want to -- I was ashamed of myself.

3   Q.  But one of the reasons Carol Martin told you not to tell

4   the story to anyone and one of the reasons you have testified

5   that you never told the story to anyone was because of Donald

6   Trump's power.

7   A.  I was afraid Donald Trump would retaliate, which exactly is

8   what he did.  That's exactly.  One of my biggest fears came

9   absolutely true.

10  Q.  Okay.

11  A.  He has two tables full of lawyers here today.  It came

12  absolutely true.

13  Q.  We have about the same amount of lawyers.  Not everyone is

14  a lawyer, Ms. Carroll, but regardless of that --

15          THE COURT:  Come on, Mr. Tacopina, let's move along.

16          MR. TACOPINA:  Yes, sir.

17  BY MR. TACOPINA:

18  Q.  So instead you waited for Donald Trump to become arguably

19  the most powerful man in the world, president of the

20  United States of America, to tell your story to everybody.

21  A.  I waited until other women -- I was not a pioneer.  I'm a

22  follower.  I saw other women coming forward after Harvey

23  Weinstein and I thought who am I?  Who am I not to stay silent?

24  Also, I was 78 or 79.  I just thought I've been silent too

25  long.

Case 23-793, Document 86, 11/20/2023, 3592073, Page296 of 300

A-3076

436

N4r2Car5                    Carroll — Cross

1    Q.  In the decades preceding your lawsuit, you certainly never

2    told any doctors ever about the supposed incident?

3    A.  No.

4    Q.  And after supposedly being raped by Donald Trump you never

5    saw a medical doctor or got an evaluation?

6    A.  No, no.

7    Q.  Never went to a psychiatrist?

8    A.  No.

9    Q.  Never went to a psychologist?

10   A.  No.

11   Q.  No doctors whatsoever.

12   A.  No.

13   Q.  And as a result, you have no medical records showing

14   physical injuries from this colossal battle you have described?

15   A.  I have --

16           MR. FERRARA:  Objection, your Honor.

17           THE COURT:  Sustained.  Argumentative.  The answer is

18   stricken.

19   BY MR. TACOPINA:

20   Q.  As a result, do you have any medical records showing

21   physical injuries from the story?

22   A.  No.

23   Q.  You have no photographs of any physical injuries.

24   A.  No, I never took any photographs.

25   Q.  You are not aware of anyone who saw any physicals injuries

N4RMCAR6                          Carroll - Cross

1   A.  I am not sure what the context was.  Was I talking about

2   childhood events?

3           MR. TACOPINA:  You guys have that clip?

4           MR. FERRARA:  I don't think we do.  I apologize if I'm

5   wrong, but I don't have it here.

6           Apologies.  One moment, your Honor.

7           MR. TACOPINA:  We will come back to it, your Honor, if

8   need be.  We will straighten this out.

9   Q.  You said that you think about what Cam did every day?

10  A.  In some form it glances through my mind.  Maybe not

11  absolutely every day, but it's frequent.

12  Q.  And you acknowledged in that podcast that Cam, you came to

13  learn, was arrested years later?

14  A.  Yes.

15  Q.  And you recognize that after Cam supposedly abused you he

16  may have abused other girls prior to his arrest, correct?

17          MR. FERRARA:  Objection.

18          THE COURT:  Sustained.

19  Q.  According to you, Donald Trump is a brutal and dangerous

20  man?

21  A.  Yes, he is.

22  Q.  But, according to you, you wouldn't bring a criminal charge

23  against him because that would be disrespectful to women being

24  raped by the border and around the world?

25          MR. FERRARA:  Objection.

N4RMCAR6                          Carroll - Cross

 1              THE COURT:  You already asked that question.

 2              MR. TACOPINA:  I did not ask this question.  I read --

 3      played what she said.  I am asking a question about what she

 4      said.

 5              MR. FERRARA:  This is not a criminal case, your Honor.

 6              THE COURT:  Sustained.

 7      Q.  Let me ask you this.  How would you -- it's not a criminal

 8      case.  How would you bringing criminal charges be disrespectful

 9      to some people at the border?

10              MR. FERRARA:  Objection.

11              THE COURT:  Sustained.  Correct me if I'm wrong,

12      counsel, but I believe in the State of New York private

13      individuals can't bring criminal charges and probably have not

14      been able to do that in at least a century or two.

15              MR. TACOPINA:  No, they can't.  They could go to the

16      police department.

17              THE COURT:  That's not what you said, counselor.  We

18      have been up and down the mountain on the question of whether

19      she went to the police, so let's move on.

20              MR. TACOPINA:  We have not been up and down the

21      mountain of what we just heard.

22              Can I ask one question?

23              THE COURT:  Move on.

24              MR. TACOPINA:  I guess not.

25      Q.  According to you, security cameras must have picked you and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4RMCAR6                    Carroll - Cross

1           MR. TACOPINA:  Sure.

2    Q.  When you were allegedly assaulted in Bergdorf Goodman by

3    Donald Trump and on the first floor with Donald Trump and on

4    the escalators with Donald Trump, you never thereafter, that

5    day, the next day, the next week or ever tried to get the

6    videos that could have existed to support your claim?

7           MR. FERRARA:  I object to the breadth of the question.

8           THE COURT:  Sustained.

9           MR. TACOPINA:  The breadth.  OK.

10   Q.  Did you go back the next day to get -- ask for the video

11   camera footage?

12          THE COURT:  Sustained.  It assumes there is such a

13   thing.

14          MR. TACOPINA:  Ms. Carroll in fact testified, as did

15   the Bergdorf Goodman witness, that on the main floor there are

16   security cameras, your Honor.

17          THE COURT:  Ms. Carroll testified she guessed, and we

18   have had the testimony from the witness who was at Bergdorf at

19   the time, and she said what she said.  We are not going to ask

20   questions based on this kind of statement.

21          MR. TACOPINA:  Can I ask this question?

22          THE COURT:  I don't know yet.  I have not heard it.

23          MR. TACOPINA:  I know you don't know it, so I am going

24   to ask it, and you will let me know.

25   Q.  Did you ever attempt to ascertain whether there is any

N4RMCAR6                         Carroll - Cross

 1   video footage of you and Donald Trump at Bergdorf Goodman?
 2             MR. FERRARA:  Objection.
 3             THE COURT:  Sustained.  I sustained the objection to
 4   that question within the last three minutes.
 5   Q.  You are a writer, Ms. Carroll?
 6   A.  Yes.
 7   Q.  And you wrote every day for 18 years at a period of time
 8   when you were married to Steve Byers?
 9   A.  I was still in the -- I was pitching to magazines, and I
10   refused -- everybody said no, no, no, and nobody wanted my
11   work.  They didn't like my ideas.  And I kept at it until I got
12   my foot in the door.
13   Q.  You, early on in life, dedicated yourself to becoming a
14   writer?
15   A.  Yes.
16   Q.  And writing was important to you?
17   A.  Yes.  It's the way I process my life.
18   Q.  And you kept a diary?
19   A.  I've always diaries.
20   Q.  Despite the fact that you're clearly an avid writer who
21   kept a diary, you never made a diary entry contemporaneously
22   memorializing this alleged rape by Donald Trump in your diary?
23   A.  No.  I don't write about negative.
24   Q.  You would put in your diary things like, threw the ball for
25   the dog?