# 23-0793-cv

## United States Court of Appeals

*for the*

## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 12 of 12 (Pages A-3081 to A-3339)

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
    – and –
JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

i

## TABLE OF CONTENTS FOR JOINT APPENDIX

**Page**

District Court Docket Entries (20-cv-07311-LAK)
(hereinafter "*Carroll I*").......................................... A-1

District Court Docket Entries (22-cv-10016-LAK)
(hereinafter "*Carroll II*") ...................................... A-32

**<u>Documents Submitted in *Carroll I*</u>**

Exhibit Annexed to Declaration of Roberta A.
Kaplan, for Plaintiff, in Opposition to
Defendant's Motion to Substitute, dated
October 5, 2020
(Declaration omitted herein):

Exhibit A to Kaplan Declaration -
Letter from Roberta A. Kaplan to Marc E.
Kasowitz, dated August 10, 2020, with Enclosure      A-60

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 16, 2023.........      A-66

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 16, 2023 .......................................      A-87

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 16, 2023 .......................................      A-89

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Lisa
Birnbach, dated September 21, 2022 ....................      A-92

Exhibit 2 to Kaplan Declaration -
Excerpts from Deposition Transcript of Carol
Martin, dated October 18, 2022 ...........................      A-104

ii

**Page**

Exhibit 3 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-112

Exhibit 4 to Kaplan Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-140

Exhibit 5 to Kaplan Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-148

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-155

Exhibit 7 to Kaplan Declaration -
Email from Daniel Bucheli to Tim Murtaugh and
Others, dated July 8, 2019, with Attachment ......... A-158

Exhibit 8 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
October 14, 2022 .................................................... A-167

Exhibit 9 to Kaplan Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022 ................................................ A-308

Exhibit 10 to Kaplan Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022,
and December 20, 2022 ......................................... A-323

Exhibit 11 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated June 8, 2022 ................................................ A-405

iii

**Page**

Exhibit 12 to Kaplan Declaration -
Defendant's Supplemental Rule 26(a)(1) Initial
Disclosures, dated September 19, 2022 ................ A-410

Exhibit 13 to Kaplan Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures in
*Carroll II*, dated January 9, 2023 .......................... A-414

Exhibit 14 to Kaplan Declaration -
Defendant's Supplemental Responses to
Plaintiff's First Set of Interrogatories, dated
August 23, 2022 ...................................................... A-420

Exhibit 15 to Kaplan Declaration -
Email from Michael Madaio to Matthew Craig
and Others, dated August 24, 2022 ........................ A-424

Exhibit 16 to Kaplan Declaration -
Twitter Post, dated June 21, 2019 .......................... A-427

Exhibit 17 to Kaplan Declaration -
Excerpts from Deposition Transcript of Stephanie
Grisham, dated October 6, 2022 ............................ A-429

Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion *in
Limine*, February 23, 2023 .................................... A-439

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 .......................... A-441

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-445

iv

**Page**

Exhibit C to Habba Declaration -
Expert Rebuttal Report of Robert J. Fisher, dated
November 14, 2022
(Reproduced herein at pp. A-308-A-322)

Exhibit D to Habba Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 .................................................. A-449

Exhibit E to Habba Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-463

Exhibit F to Habba Declaration -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories, dated
June 27, 2022 ......................................................... A-470

Exhibit G to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022 .................... A-487

Exhibit H to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023 ...................... A-493

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 9, 2023 ........................... A-500

Exhibit 1 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of
Robert J. Fisher, dated December 14, 2022 ........... A-502

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-506

v

                                                                **Page**

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated March 17, 2023 ............... A-509

    Annexed to Letter -
    Proposed Order ...................................... A-511

### **Documents Submitted in *Carroll II***

Complaint and Demand for a Jury Trial, dated
    November 24, 2022 ................................. A-513

Answer, dated January 27, 2023 ............................... A-542

First Amended Answer, dated February 10, 2023...... A-556

Defendant's Letter Motion for Discovery, dated
    February 10, 2023 ................................. A-571

    Exhibit A to Defendant's Letter Motion -
    DNA Report, dated January 8, 2020 ..................... A-574

    Exhibit B to Defendant's Letter Motion -
    Twitter Post, dated February 25, 2021 ................. A-602

Plaintiff's Letter Response in Opposition to
    Defendant's Motion for Discovery, dated
    February 10, 2023 ................................. A-607

Defendant's Letter Reply in Further Support of
    Motion for Discovery, dated February 10, 2023.... A-612

Transcript of Conference, dated February 7, 2023 .... A-614

Notice of Motion, by Defendant, for an Order
    Granting Partial Summary Judgment, dated
    February 23, 2023 ................................. A-635

Declaration of Matthew G. DeOreo, for Defendant,
    in Support of Motion for Partial Summary
    Judgment, dated February 23, 2023...................... A-637

vi

**Page**

Exhibit A to DeOreo Declaration -
Complaint and Jury Demand filed in *Carroll I*,
dated November 4, 2019 ........................................ A-639

Exhibit B to DeOreo Declaration -
Answer filed in *Carroll I*, dated January 23, 2020.. A-668

Exhibit C to DeOreo Declaration -
Complaint and Demand for a Jury Trial filed in
*Carroll II*, dated November 24, 2022
(Reproduced herein at pp. A-513-A-541)

Exhibit D to DeOreo Declaration -
First Amended Answer filed in *Carroll II*, dated
February 10, 2023
(Reproduced herein at pp. A-556-A-570)

Exhibit E to DeOreo Declaration -
Transcript of Plaintiff's Interview with Anderson
Cooper, dated June 24, 2019 ................................. A-681

Exhibit F to DeOreo Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019) ...................................... A-707

Memorandum of Law, by Defendant, in Support of
Motion for Partial Summary Judgment, dated
February 23, 2023 ................................................. A-713

Defendant's Local Civil Rule 56.1 Statement, dated
February 23, 2023 ................................................. A-735

Defendant's Notice of Motions *in Limine*, dated
February 23, 2023 ................................................. A-745

Memorandum of Law, by Defendant, in Support of
Motions *in Limine*, dated February 23, 2023 ......... A-747

vii

**Page**

Declaration of Alina Habba, for Defendant,
in Support of Motions *in Limine*, dated
February 23, 2023 .................................................. A-773

Exhibit A to Habba Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 ......................... A-775

Exhibit B to Habba Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 .............................. A-779

Exhibit C to Habba Declaration -
Plaintiff's Second Supplemental Rule 26(a)(1)
Disclosures, dated October 14, 2022
(Reproduced herein at pp. A-487-A-492)

Exhibit D to Habba Declaration -
Plaintiff's Third Supplemental Rule 26(a)(1)
Disclosures, dated January 6, 2023
(Reproduced herein at pp. A-493-A-499)

Plaintiff's Notice of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-783

Declaration of Roberta A. Kaplan, for Plaintiff,
in Support of Omnibus Motion *in Limine*,
dated February 23, 2023 ........................................ A-785

Exhibit 1 to Kaplan Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-786

Exhibit 2 to Kaplan Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023 .................................................... A-863

viii

**Page**

Exhibit 3 to Kaplan Declaration -
Expert Report of Ashlee Humphreys, Ph.D, dated
January 9, 2023 .................................................... A-891

Declaration of Matthew G. DeOreo, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine*, dated March 9, 2023 ............................ A-1018

Exhibit 1 to DeOreo Declaration -
Memorandum of Law, by Defendant, in Support
of Motions *in Limine* filed in *Carroll I*, dated
February 16, 2023
(Reproduced herein at pp. A-66-A-86)

Exhibit 2 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant, in
Support of Motions *in Limine* filed in *Carroll I*,
dated February 16, 2023 ........................................ A-1020

Exhibit 3 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)................................................................ A-1023

Exhibit 4 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)................................................................ A-1027

Exhibit 5 to DeOreo Declaration -
Memorandum of Law, by Defendant, in
Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023 .................................................. A-1031

ix

Page

Exhibit 6 to DeOreo Declaration -
Declaration of Alina Habba, for Defendant,
in Opposition to Plaintiff's Omnibus Motion
*in Limine* filed in *Carroll I*, dated
February 23, 2023
(Reproduced herein at pp. A-439-A-440)

Exhibit 7 to DeOreo Declaration -
Excerpts from Deposition Transcript of Natasha
Stoynoff, dated October 13, 2022 (Habba
Exhibit A)
(Reproduced herein at pp. A-441-A-444)

Exhibit 8 to DeOreo Declaration -
Excerpts from Deposition Transcript of Jessica
Leeds, dated October 13, 2022 (Habba
Exhibit B)
(Reproduced herein at pp. A-445-A-448)

Exhibit 9 to DeOreo Declaration -
Excerpts from Deposition Transcripts of
Robert J. Fisher, dated December 14, 2022, and
December 20, 2022 (Habba Exhibit D)
(Reproduced herein at pp. A-449-A-462)

Exhibit 10 to DeOreo Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 (Habba
Exhibit E)
(Reproduced herein at pp. A-463-A-469)

Exhibit 11 to DeOreo Declaration -
Reply Memorandum of Law, by Defendant,
in Further Support of Motions *in Limine* filed
in *Carroll I*, dated March 2, 2023 .......................... A-1065

x

                                                                    **Page**

Declaration of Shawn G. Crowley, for Plaintiff, in
    Opposition to Defendant's Motions *in Limine*,
    dated March 9, 2023 ............................................. A-1080

Exhibit 1 to Crowley Declaration -
    Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
    January 9, 2023 ...................................................... A-1082

Exhibit 2 to Crowley Declaration -
    Video of Deposition of Natasha Stoynoff, taken
    October 13, 2022
    (All parties are already in possession of video
    exhibit) ................................................................... A-1089

Exhibit 3 to Crowley Declaration -
    Video of Deposition of Jessica Leeds, taken
    October 13, 2022
    (All parties are already in possession of video
    exhibit) ................................................................... A-1091

Plaintiff's Response to Defendant's Local Civil
    Rule 56.1 Statement, dated March 9, 2023 ............ A-1093

Declaration of Roberta A. Kaplan, for Plaintiff, in
    Opposition to Defendant's Motion for Partial
    Summary Judgment, dated March 9, 2023 ............ A-1108

Exhibit 1 to Kaplan Declaration -
    Excerpts from Deposition Transcript of Donald J.
    Trump, dated October 19, 2022 ............................. A-1110

Exhibit 2 to Kaplan Declaration -
    Truth Social Post, dated October 12, 2022 ............ A-1127

Exhibit 3 to Kaplan Declaration -
    Expert Report of Ashlee Humphreys, Ph.D, dated
    January 9, 2023
    (Reproduced herein at pp. A-891-A-1017)

xi

**Page**

Reply Declaration of Roberta A. Kaplan, for
Plaintiff, in Further Support of Omnibus Motion
*in Limine*, dated March 16, 2023 .......................... A-1130

Exhibit 1 to Kaplan Reply Declaration -
Defendant's Rule 26(a)(1) Initial Disclosures,
dated January 9, 2023
(Reproduced herein at pp. A-414-A-419)

Exhibit 2 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 .......................... A-1132

Exhibit 3 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated February 6, 2023 ............................. A-1136

Exhibit 4 to Kaplan Reply Declaration -
Expert Report of Robert J. Fisher, dated
January 30, 2023
(Reproduced herein at pp. A-863-A-890)

Exhibit 5 to Kaplan Reply Declaration -
Excerpts from Deposition Transcript of Robert J.
Fisher, dated December 20, 2022 ......................... A-1153

Reply Declaration of Alina Habba, for Defendant,
in Further Support of Motions *in Limine*, dated
March 16, 2023 ....................................... A-1160

Exhibit A to Habba Reply Declaration -
Joint Proposed Discovery Plan, dated
December 19, 2022 ................................... A-1162

Exhibit B to Habba Reply Declaration -
Plaintiff's Rule 26(a)(1) Initial Disclosures, dated
January 9, 2023
(Reproduced herein at pp. A-1082-A-1088)

xii

**Page**

Defendant's Letter Motion to Reopen Discovery,
dated April 13, 2023 ................................................ A-1175

Exhibit A to Letter Motion -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1185

Exhibit B to Letter Motion -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023 ................................................ A-1190

Exhibit C to Letter Motion -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023................................................ A-1193

Exhibit D to Letter Motion -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022 .............................. A-1196

Exhibit E to Letter Motion -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

Exhibit F to Letter Motion -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................ A-1207

Plaintiff's Letter Response to Defendant's Motion
to Reopen Discovery, dated April 13, 2023 ........... A-1213

Exhibit A to Letter Response -
Letter from Roberta A. Kaplan to Alina Habba,
dated April 10, 2023
(Reproduced herein at pp. A-1190-A-1192)

xiii

**Page**

Exhibit B to Letter Response -
Letter from Roberta A. Kaplan to Chad Seigel,
dated April 11, 2023
(Reproduced herein at pp. A-1193-A-1195)

Exhibit C to Letter Response -
Excerpts from Deposition Transcript of E. Jean
Carroll, dated October 14, 2022 ........................... A-1218

Exhibit D to Letter Response -
Defendant's Request for the Production of
Documents, dated August 21, 2020 ...................... A-1221

Exhibit E to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Request for Production of
Documents, dated September 8, 2020 .................. A-1237

Exhibit F to Letter Response -
Defendant's Request for the Production of
Documents filed in *Carroll I*, dated May 27, 2022   A-1263

Exhibit G to Letter Response -
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated May 27, 2022
(Reproduced herein at pp. A-1196-A-1206)

Exhibit H to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents filed in *Carroll I*, dated
June 27, 2022 ....................................................... A-1278

Exhibit I to Letter Response -
Plaintiff's Responses and Objections to
Defendant's First Set of Interrogatories filed in
*Carroll I*, dated June 27, 2022
(Reproduced herein at pp. A-470-A-486)

xiv

**Page**

Exhibit J to Letter Response -
Plaintiff's Responses and Objections to
Defendant's Request for Production of
Documents, dated January 23, 2023 ..................... A-1318

Exhibit K to Letter Response -
Excerpts from Deposition Transcript of Edgar P.
Nace, M.D., dated March 15, 2023....................... A-1359

Letter from Joseph Tacopina to the Honorable
Lewis A. Kaplan, dated April 22, 2023 ................. A-1367

Exhibit A to Letter -
Transcript of Plaintiff's Interview with Natasha
Stoynoff, dated June 22, 2020 ............................... A-1370

Letter from Roberta A. Kaplan to the Honorable
Lewis A. Kaplan, dated April 23, 2023 ................. A-1416

Trial Transcript, dated April 25, 2023....................... A-1420

Trial Transcript, dated April 26, 2023....................... A-1524

Trial Transcript, dated April 27, 2023....................... A-1697

Trial Transcript, dated May 1, 2023.......................... A-1851

Trial Transcript, dated May 2, 2023.......................... A-2036

Trial Transcript, dated May 3, 2023.......................... A-2210

Trial Transcript, dated May 4, 2023.......................... A-2375

Trial Transcript, dated May 8, 2023.......................... A-2567

Trial Transcript, dated May 9, 2023.......................... A-2771

Parties' Trial Exhibits:

PX-1        Twitter Post, dated June 21, 2019 ............ A-2839

xv

**Page**

PX-2        "Remarks by President Trump before
            Marine One Departure" (Office of the
            Press Secretary, June 22, 2019) ...............   A-2840

PX-3        "EXCLUSIVE: Trump vehemently
            denies E. Jean Carroll allegation, says
            'she's not my type'" (*The Hill*,
            June 24, 2019).........................................   A-2853

PX-4        Truth Social Post, dated
            October 12, 2022....................................   A-2858

PX-6        "Donald Trump assaulted me in a
            Bergdorf Goodman dressing room 23
            years ago. But he's not alone on the list
            of awful men in my life." (New York
            Magazine, June 21, 2019) .......................   A-2859

PX-12       Photograph ................................................   A-2879

PX-22       Sixth Floor Construction Plan of
            Bergdorf Goodman ..................................   A-2880

PX-24       Sixth Floor Construction Plan of
            Bergdorf Goodman ..................................   A-2881

PX-25       Video Excerpt from Defendant's
            Interview with Billy Bush
            (All parties are already in possession of
            video exhibit) ...........................................   A-2882

PX-25-T     Transcript of Video Excerpt from
            Defendant's Interview with Billy Bush ...   A-2883

PX-26       Video Excerpt from Presidential Debate
            (All parties are already in possession of
            video exhibit) ...........................................   A-2885

xvi

|  |  | **Page** |
|---|---|---|
| PX-26-T | Transcript of Video Excerpt from Presidential Debate ................................. | A-2886 |
| PX-29 | Video Excerpt from Defendant's Speech at Campaign Rally (All parties are already in possession of video exhibit) ........................................... | A-2887 |
| PX-29-T | Transcript of Video Excerpt from Defendant's Speech at Campaign Rally... | A-2888 |
| PX-31 | Video Excerpt from Defendant's Speech (All parties are already in possession of video exhibit) ........................................... | A-2889 |
| PX-31-T | Transcript of Video Excerpt from Defendant's Speech................................. | A-2890 |
| PX-46 | Twitter Post, dated November 15, 2022... | A-2891 |
| PX-48 | Twitter Post, dated December 12, 2022... | A-2893 |
| PX-51 | Twitter Post, dated January 29, 2023....... | A-2896 |
| PX-53 | Twitter Post, dated January 29, 2023....... | A-2898 |
| PX-57 | Email, dated October 13, 2022 ................ | A-2901 |
| PX-112 | Video Excerpt from Defendant's Interview with Roger Ailes (All parties are already in possession of video exhibit) ........................................... | A-2902 |
| PX-112-T | Transcript of Video Excerpt from Defendant's Interview with Roger Ailes.. | A-2903 |
| PX-200 | Video Excerpt from Deposition of Donald J. Trump, taken October 19, 2022 ......................................................... | A-2904 |

xvii

**Page**

PX-200-T    Transcript of Video Excerpt from
            Deposition of Donald J. Trump, taken
            October 19, 2022.................................... A-2905

DX-CK       Email Regarding Law & Order SVU,
            dated July 23, 2019 ................................. A-2986

Court Exhibits:

C           Timeline of Events.................................... A-2987

D           WordPerfect Document Compare
            Summary of Jury Instructions.................. A-2988

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 1, 2023 .................... A-3024

    Exhibit A to Letter -
    Excerpts of Trial Transcripts................................. A-3042

    Exhibit B to Letter -
    LinkedIn Post.......................................................... A-3081

    Exhibit C to Letter -
    "One of the Democratic Party's biggest donors is
    exploring a new anti-Trump boycott" (*Vox*,
    July 2, 2020) ........................................................... A-3083

Letter from Roberta A. Kaplan to the Honorable
    Lewis A. Kaplan, dated May 5, 2023 .................... A-3088

Letter from Joseph Tacopina to the Honorable
    Lewis A. Kaplan, dated May 6, 2023 .................... A-3091

Verdict Form, dated May 9, 2023 .............................. A-3095

Notice of Appeal, dated May 11, 2023 ...................... A-3099

Notice of Motion, by Defendant, for an Order
    Granting a New Trial or Remittitur, dated
    June 8, 2023 ............................................................ A-3101

xviii

**Page**

Memorandum of Law, by Defendant, in Support of
  Motion for a New Trial or Remittitur, dated
  June 8, 2023 ........................................................... A-3103

Declaration of Matthew G. DeOreo, for Defendant,
  in Support of Motion for a New Trial or
  Remittitur, dated June 8, 2023 .............................. A-3134

  Exhibit A to DeOreo Declaration -
  Complaint and Demand for a Jury Trial filed in
  *Carroll II*, dated November 24, 2022
  (Reproduced herein at pp. A-513-A-541)

  Exhibit B to DeOreo Declaration -
  Excerpts of Trial Transcripts.................................. A-3136

  Exhibit C to DeOreo Declaration -
  Complaint and Jury Demand filed in *Carroll I*,
  dated November 4, 2019
  (Reproduced herein at pp. A-639-A-667)

  Exhibit D to DeOreo Declaration -
  Verdict Form, dated May 9, 2023
  (Reproduced herein at pp. A-3095-A-3098)

Declaration of Roberta A. Kaplan, for Plaintiff, in
  Opposition to Defendant's Motion for a New
  Trial or Remittitur, dated June 22, 2023 ................ A-3219

  Exhibit 1 to Kaplan Declaration -
  Excerpts of Trial Transcripts.................................. A-3221

  Exhibit 2 to Kaplan Declaration -
  Twitter Post, dated June 21, 2019
  (Reproduced herein at p. A-2839)

xix

**Page**

Exhibit 3 to Kaplan Declaration -
"Remarks by President Trump before Marine
One Departure" (Office of the Press Secretary,
June 22, 2019)
(Reproduced herein at pp. A-2840-A-2852)

Exhibit 4 to Kaplan Declaration -
"EXCLUSIVE: Trump vehemently denies E.
Jean Carroll allegation, says 'she's not my type'"
(*The Hill*, June 24, 2019)
(Reproduced herein at pp. A-2853-A-2857)

Exhibit 5 to Kaplan Declaration -
Truth Social Post, dated October 12, 2022
(Reproduced herein at p. A-2858)

Exhibit 6 to Kaplan Declaration -
Excerpts from Deposition Transcript of Donald J.
Trump, dated October 19, 2022 ............................. A-3312

Exhibit 7 to Kaplan Declaration -
Excerpts of Trial Transcript, in *Breest v. Haggis*,
(Supreme Court of New York, County of
New York Index No. 161137/17), dated
October 19, 2022 ................................................... A-3315

Exhibit 8 to Kaplan Declaration -
Various Twitter Posts and Email, dated
October 13, 2022 ................................................... A-3323

Amended Notice of Appeal, dated July 19, 2023 ...... A-3337

Order of the United States Court of Appeals for the
Second Circuit, dated July 19, 2023 ..................... A-3339

A-3081

# EXHIBIT B

Case 23-793, Document 87, 11/20/2023, 3592074, Page22 of 279

A-3082

4/30/23, 5:28 PM                    Reid Hoffman on LinkedIn: Over the last couple of weeks, some of my philanthropy has received... | 76 comments

**Linked**in                                                    Join now        Sign in

## Reid Hoffman's Post



**Reid Hoffman** in
Entrepreneur. Product and Business Strategist. Investor. Podcaster.
1w

Over the last couple of weeks, some of my philanthropy has received increased attention. If that spotlight offers the chance to reinforce the importance of the rule of law, equality, and helping the disadvantaged, I'm compelled to take that opportunity. After all, these are not just my values, but American values—ones that are foundational to our democracy, our success, and our future.

In general, I prefer to talk about these values and ideas over commenting on specific gifts that I've made. But there is a theme to a number of them: protecting the rule of law from the threat posed by Donald Trump's scorched-earth legal methods.

In and out of court, women have been one of the main groups that Trump has singled out. As Franklin Foer has pointed out, Trump's hostility to women has been a dominant feature of his ideology for his entire adult life. Supporting women fighting for progress and justice in philanthropy, politics, and business has been a longstanding priority of mine, as is supporting America against the threat of Trump—a stance that I've not only made public, but also have prioritized over recent years.

I believe that the courts themselves, using facts and laws, should decide innocence and guilt. Trump has had many days in court; America and its citizens should have their say as well. And so I have been proud to help level the playing field in the courts for those whom Trump and his allies have attacked and bullied.

For instance, in addition to E. Jean Carroll, grantees I have supported include:
- Lisa Rosenberg, whose group Open the Government has helped train citizens on how to use Freedom of Information Act requests to expose government abuses against women and families;
- Third-party litigation support for clients of attorney Roberta Kaplan, who held the Charlottesville rioters accountable under the Ku Klux Klan Act, and who is now representing one of the many women who has credibly accused Trump of sexual violence; and
- Litigation under the Fourteenth Amendment to block insurrectionists from holding office.

While Trump's legal team has characterized my support of Carroll's lawsuit as "secret," I want to be clear that I've never taken any steps to hide the financial support that I have provided to this lawsuit after it started. Secondly, and more importantly, while media attention is focused on this specific story, let's not forget the overall point: the rule of law and the ideal that our courts are a mechanism of justice for all citizens, not just those with enough money and power to rig the game in their favor.

It's a mark of the dangers of our current politics when anyone tries to position the rule of law as an extreme political position. It's not. Rule of law is critical to justice, innovation, and human advancement—all of which make our country strong and are worth speaking up for.

A-3083

# EXHIBIT C

A-3084

4/24/23, 2:38 AM                         Reid Hoffman is exploring a new anti-Trump boycott - Vox





# One of the Democratic Party's biggest donors is exploring a new anti-Trump boycott

After the boycott of Facebook, Reid Hoffman thinks maybe it's time for a boycott of Trump.

By Theodore Schleifer | @teddyschleifer | Jul 2, 2020, 5:18pm EDT



Reid Hoffman is exploring a new anti-Trump boycott - Vox

Reid Hoffman, former executive chair of LinkedIn, on July 11, 2017, in Sun Valley, Idaho.   |   Drew Angerer/Getty Images

**Amid the advertiser boycott of Facebook,** one of the Democratic Party's biggest megadonors, Reid Hoffman, is exploring ways to launch a similar boycott of President Trump and his White House.

Hoffman, the billionaire founder of LinkedIn, **could spend as much as $100 million this election cycle** and has elbowed his way into becoming one of the most powerful players in Democratic politics. So what issues attract his attention — and, correspondingly, his money — matter because they can help explain where the progressive movement will focus over the summer.

Hoffman foreshadowed what may be his next political move this week when asked about the building protest movement against Facebook over **its unwillingness to aggressively moderate Trump's inflammatory posts**. Hoffman volunteered a revealing tidbit about his political thinking.

"Frankly, on the political side, one of the things I've been thinking about trying to go stimulate for the next month is an anti-Trump boycott," Hoffman said in an interview on Tuesday with Anne-Marie Slaughter, the head of New America. "The various forms of enrichment with Mar-a-Lago and all the rest should not be part of an American political system. It should be protested in economic ways, as well as political ways."

Hoffman didn't offer much detail about the idea, which is said to be in its early stages. But if companies are thinking about ways to stand up against racial hatred, Hoffman's team thinks they shouldn't just boycott Facebook, which broadcasts that hatred, but rather those who voice it, like Trump.

Based on some of his past conversations, the move by Hoffman could resemble an effort like Grab Your Wallet, **a campaign that convinced some retailers**, including Nordstrom and T.J. Maxx, to drop products associated with Trump and his family. According to Shannon Coulter, the campaign's leader, Hoffman's team reached out to Grab Your Wallet and has had extensive talks about a donation since 2017. Hoffman's team has declined to fund Grab Your Wallet because Coulter said they preferred to focus on electoral politics, and she hasn't heard from Hoffman's team in about a year.

Grab Your Wallet has now broadened its work to focus on boycotting companies with board members or executives that have supported Trump politically. **There are signs that**

**this type of organizing works** — the attendance at SoulCycle fell after a boycott sprang up to protest that the fitness company's majority investor, Stephen Ross, was hosting a fundraiser for Trump.

Another possibility is that Hoffman may try to organize some boycott of Trump properties, such as Mar-a-Lago, which he mentioned in the interview. The problem with that approach, though, is that now, five years after Trump announced his run for president, the brands and people that are willing to be associated with Trump properties, including his hotel in Washington, DC, **have already weathered much blowback and chosen to stick around**.

"Something focused on Mar-a-Lago is unlikely to work, in my opinion, for the same reason it doesn't work to boycott Trump's hotels," Coulter said. "The people who patronize those places are already very much on Team Trump."

The advertiser boycott of Facebook has perhaps proven a model for boycotts of brands. After Facebook repeatedly declined to moderate Trump's inflammatory posts about racial justice protests, a group of civil rights organizations **launched a campaign called Stop Hate for Profit** that has convinced some of the country's biggest brands to pause advertising on Facebook, even if it's unclear whether that will make a serious dent in Facebook's revenue. Facebook recently announced new plans to regulate hate speech.

One of Facebook's early investors was Hoffman's venture capital firm, Greylock, and Hoffman and Facebook founder Mark Zuckerberg remain close.

What Hoffman chooses to fund is closely watched in the Democratic Party. While he has had his share of stumbles and detractors in the world of politics, he and his team are the tip of the Silicon Valley spear as the **tech community marshals its considerable resources to boost presumptive Democratic presidential nominee Joe Biden**.

But there are some signs that the tech community and Biden still don't see totally eye to eye. Biden **has called for** the immediate revocation of Section 230, **the landmark law that protects publishers** like Facebook from liability over what third parties say or do on the platform.

Asked what Hoffman, **who has advised Biden on digital campaigning**, would say to Biden about Section 230, Hoffman drew some distance from his chosen candidate, saying that there should be "less-absolute-than-publisher liability, but more than no liability." A viewer of the session asked Hoffman **about a recent Washington Post editorial** saying

A-3087

4/24/23, 2:38 AM                                     Reid Hoffman is exploring a new anti-Trump boycott - Vox

that both Biden and Trump — who also wants to revoke Section 230, albeit for different reasons — were wrong.

"Both of those two positions seem to be badly put from an American values perspective," Hoffman said.

*You've read 2 articles in the last 30 days.*

**Help us celebrate nine years of Vox**

Since Vox launched in 2014, our audience has supported our mission in so many meaningful ways. More than 80,000 people have responded to requests to help with our reporting. Countless teachers have told us about how they're using our work in their classroom. And in the three years since we launched the Vox Contributions program, tens of thousands of people have chipped in to help keep our unique work free. We're committed to keeping our work free for all who need it, because we believe that high-quality explanatory journalism is a public good. We can't rely on ads alone to do that. **Will you help us keep Vox free for the next nine years by making a gift today?**

| One-Time | Monthly | **Annual** |
|----------|---------|------------|

○ $95/year              ● **$120/year**

○ $250/year            ○ $350/year

○ Other

### Yes, I'll give $120/year

We accept credit card, Apple Pay, and Google Pay. You can also contribute via

**P** PayPal

A-3088

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL        212.763.0883
DIRECT EMAIL      rkaplan@kaplanhecker.com

May 5, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:  *Carroll v. Trump*, 22 Civ. 10016 (LAK)

Dear Judge Kaplan:

    We write on behalf of Plaintiff E. Jean Carroll to respectfully propose a jury instruction (and to request a related limitation on closing argument) concerning a line of questioning about an episode of Law & Order SVU that occurred during Carroll's cross examination.

           *  *  *

    During Trump's cross examination of Carroll, he asked several questions (and introduced a single document) relating to a purported episode of Law & Order SVU. However, as we will demonstrate below, there is no evidence in the record that Trump could properly rely upon to make arguments to the jury about the existence or plot of this supposed Law & Order SVU episode. Neither the email Trump introduced, nor Carroll's testimony, provides such a basis.

    Starting with the email, Trump offered and the Court received DX-CK into evidence during Carroll's cross-examination. *See* Tr. at 575:23-576:1. DX-CK contained an email from someone named Grace Brophy to Carroll dated June 23, 2019—*i.e.*, after Carroll had publicized her account of the assault and brought her first lawsuit—in which Brophy purported to describe an episode of Law & Order SVU and asked Carroll if she was aware of it. Carroll replied to the email that same day and confirmed that she had never seen the episode. The only part of the email that discussed the existence and plot of the episode is the part written by Brophy. This part of the email is thus an out-of-court statement from a non-testifying third-party. Under a straightforward application of the Rules of Evidence, it constitutes hearsay and cannot be offered in court for the truth of its contents. *See* Fed. R. Evid. 801(c) & 802; *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 530 n.1121 (S.D.N.Y. 2014) (Kaplan, J.). That means Trump cannot rely on this hearsay to argue the existence or contents of this episode in his closing, and the jury cannot use the email for the truth

KAPLAN HECKER & FINK LLP                                                         2

of its contents (in other words, the jury cannot consider the email to be evidence of the existence or plot of the episode).

This leaves Carroll's testimony. When questioned about DX-CK and the purported episode of Law & Order SVU, Carroll testified that "I hadn't seen it and I have yet to see it." Tr. at 577:1. When questioned about the episode again during the re-direct examination, Carroll reiterated that she had never "seen it or heard of it before [she] wrote [her] book," had "no idea what actually happens in that episode of television," and that she was not "making up [her] accusation based on what happened in a popular TV show." Tr. at 627:1-15. As this testimony demonstrates, Carroll has no personal knowledge about the existence or plot of this episode. Of course, Carroll cannot testify as to the subject matter of a hearsay statement that she herself has no personal knowledge of. *See* Fed. R. Evid. 602, Advisory Committee Notes ("This rule would … prevent [a witness] from testifying to the subject matter of the hearsay statement, as [the witness] has no personal knowledge of it."); *accord* Wright & Miller, 27 Fed. Prac. & Proc. Evid. § 6023 n.10 (2d ed.) ("If the witness does not quote or paraphrase, but simply relies on another person's perception as described in that person's out-of-court statement, the proper objection is lack of personal knowledge."). As a result, the existence and plot of the Law & Order SVU episode did not become part of the record through Carroll's limited testimony concerning DX-CK. *Cf. United States v. Ghailani*, 761 F. Supp. 2d 114, 119, 125 (S.D.N.Y. 2011) (Kaplan, J.) (excluding evidence where the party lacked personal knowledge and relied on hearsay to fill the gaps).

To be sure, Trump was entitled to ask Carroll about her personal knowledge of the purported episode. And the jury is entitled to evaluate Carroll's answer in assessing her state of mind. But there is no proper evidentiary basis for Trump to make closing arguments concerning the existence or plot of this purported episode of Law & Order SVU, and, given the clear risk of prejudice to Carroll, the jury should be instructed regarding the proper use of DX-CK.

To clarify this issue, Carroll respectfully requests that the Court read the following instruction to the jury before deliberations begin:

> During the cross-examination of Ms. Carroll, you heard several questions directed to her concerning an episode of Law & Order SVU. What has been admitted into evidence in connection with those questions is an email to Ms. Carroll in which someone purported to describe that episode, and she responded to that claim. Ms. Carroll testified, among other things, that she has never seen the episode, that she had never previously heard of it, and that she does not watch that purported show. I instruct you that you may not consider the email you saw as evidence of whether the episode of Law & Order SVU described in the email actually exists or involved the plot described in the email. You may consider the email as evidence that someone wrote to Ms. Carroll telling her that there was such an episode, but not as evidence about whether there in fact is any such episode. Beyond that, you may consider the email only to the extent (if any) that you believe Ms. Carroll's response bears on her state of mind or credibility.

A-3090

KAPLAN HECKER & FINK LLP                                                3

      In addition to this proposed jury instruction, we further request a corresponding limitation on permissible closing argument by defense counsel.

Respectfully submitted,

Roberta A. Kaplan

cc:      Counsel of Record

A-3091

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

May 6, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *Carroll v. Trump*, 22 Civ. 10016 (LAK)

Your Honor:

On behalf of Defendant Donald J. Trump, we write to respond to Plaintiff's letter of May 5, 2023, requesting a special limiting jury instruction (and an accompanying limitation on closing argument) related to evidence that already has been received for all purposes. The request is untimely and unmeritorious, and thus should be denied.

During the cross-examination of Plaintiff on May 1st, Exhibit DX-CK was admitted into evidence without objection. That Exhibit begins with an email from a third party to Plaintiff, sent after Plaintiff had gone public with her allegations against Defendant, to "warn [her] that a Law & Order SVU episode . . . has a character, a judge, speaking of a fantasy that he rapes a woman in a Bergdorf Goodman dressing room in the Lingerie Dept." This television show apparently aired in 2012 and the plot, of course, is virtually identical to the claims made by Plaintiff in this case. In response, Plaintiff stated by email: "I haven't seen it, but this happens all the time with Law and Order stories. Also there are 200 scripted shows a year on tv, this kind of thing is bound to show up. Indeed, I'm surprised this sort of plot is not seen more often." (Exhibit DX-CK).

Before Exhibit DX-CK was introduced into evidence, Plaintiff's counsel requested a sidebar based upon a *question* concerning the Law & Order SVU episode, *not Exhibit DX-CK itself*. (Tr. 571:23-572:4). At sidebar, Defendant's counsel described Exhibit DX-CK to the Court, and in response, Plaintiff's counsel objected to the Exhibit DX-CK under FRE 402 (relevancy) and 403 (unfair prejudice) – not hearsay (FRE 801 & 802), which Plaintiff has now raised belatedly for the first time in her instant application (Tr. 573:5 – 574:14).

Regardless of the grounds underlying Plaintiff's objections, the Court overruled them:

"No, no, no. I will allow it."

A-3092

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 6, 2023
Page 2

(Tr. 574:15).

In sum, *by the end of the sidebar*, Plaintiff's counsel had only objected to a question concerning the Law & Order SVU episode (not to Exhibit DX-CK itself) and then only objected to Exhibit DX-CK itself on relevancy and unfair prejudice grounds (not hearsay, which is Plaintiff's current objection), which the Court overruled.

*After the sidebar*, Defendant's counsel asked Plaintiff whether she knew there was a Law & Order episode from 2012 that featured a woman getting raped in the Bergdorf Goodman lingerie dressing room, and she responded:

"I am aware, yes."

(Tr. 575:6-10).

Defendant's counsel then showed Exhibit DX-CK to the witness and she identified it, and said she recalled receiving it. (Tr. 575:11-22). Defendant's counsel then offered the exhibit into evidence, and Plaintiff's counsel, instead of objecting on hearsay grounds (or any other grounds) conceded to its admissibility:

"No objection, your Honor."

(Tr. 575:25). The Court then stated:

"It is received."

(Tr. 576:1).

Defendant's counsel then published the Exhibit to the jury and proceeded to ask Plaintiff questions about it. Plaintiff went on to say that she was a "big fan" of Law & Order, but not Law & Order SVU. (Tr. 576:20-21). She then stated that she had not seen the particular episode, but acknowledged that a frequent fantasy of television viewers is rape, thus explaining her comment that she was surprised that this kind of plot is not seen more often. (Tr. 576:24-577:7) She also acknowledged that this plot bore an "amazing coincidence" with her claims (Tr. 577:8-13). And, as referenced above, she confirmed that she was "aware" of the episode (Tr. 575:6-10), against which Plaintiff failed to make a motion to strike (the "aware" comment) based upon her purported lack of personal knowledge (FRE 602).

Now, days later, Plaintiff wishes to retract the prior "no objection" to Exhibit DX-CK and her lack of a motion to strike (as to the "aware" comment), requests a limiting instruction for the jury, and seeks to limit closing argument on the Exhibit and Plaintiff's testimony about it. The

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 6, 2023
Page 3

purported basis is that the document, and the information contained therein regarding a Law & Order SVU episode, is inadmissible hearsay, and that Plaintiff's testimony about the Exhibit lacks personal knowledge. However, Plaintiff's failure to make a contemporaneous objection as to hearsay grounds, and indeed stating on the record "No objection," waived any objection Plaintiff otherwise might have had, and also precluded Plaintiff from now arguing that the Exhibit be received for a limited purpose. The same holds true for Plaintiff's failure move to strike the "aware" comment.

In this regard, Federal Rule of Evidence 103 clearly provides that a party must make a *timely* objection or motion to strike in order to preserve any objection by "stat[ing] the specific ground" for such an objection. Fed. R. Evid. 103(A)(1)(B). Indeed, with regard to another piece of evidence, Your Honor already has made clear that "there is a contemporaneous objection rule for a reason and the plaintiff made a decision not to do it contemporaneously – not for me to judge whether it was a good idea or a bad idea." (Tr. 652:23-653:2).

Plaintiff's failure to make a contemporaneous hearsay objection, combined with Plaintiff's actual concession of "No objection," allowed the Exhibit to be introduced into evidence for all purposes, and any subsequent objection has been waived. *See DeBerry v. Brookdale Hosp. Med. Ctr.*, 699 F. App'x 72, 73 (2d Cir. 2017)("DeBerry primarily argues that the District Court improperly … relied on hearsay evidence. However, DeBerry (then counseled) waived this argument by failing to object in the District Court."); *Fahie v. Rivera*, 510 F. App'x 93, 95 (2d Cir. 2013)("In order to preserve a claim of error with respect to a district court's admission of evidence, the party must timely object to the admission and state **a specific ground** for the objection. *See* Fed.R.Evid. 103(a)(1); *see also United States v. Birbal*, 62 F.3d 456, 465 (2d Cir.1995).")(emphasis added); *United States v. McDermott*, 245 F.3d 133, 141 n. 3 (2d Cir. 2001)("Under Rule 103(a)(1) of the Federal Rules of Evidence, a party must make a timely and **specific objection** to a ruling of evidence.")(emphasis added); *United States v. Martinez*, 775 F.2d 31, 36 (2d Cir. 1985)("There was no objection on the ground that the evidence was hearsay or that its admission was unduly prejudicial. Martinez's present arguments thus have been waived. See Fed.R.Evid. 103(a)(1) ….); *Galanis v. Harmonie Club of City of New York*, No. 1:13-CV-4344-GHW, 2014 WL 4928962, at *3 (S.D.N.Y. Oct. 2, 2014)("To the extent Mr. Turoff's and Mr. Sipsas's accounts of Galanis's statements during the above conversation constitute hearsay, Galanis has waived any hearsay objection to this evidence by failing to raise such an objection in his motion papers. *See* Fed.R.Evid. 103(a)(1)."); *Boakye-Yiadom v. Laria*, No. 09 CV 622 DRH ARL, 2013 WL 3094943, at *4 (E.D.N.Y. June 18, 2013) ("To the extent that defendants claim that such testimony should not have been considered because it is hearsay, defendants did not raise any hearsay objection to this evidence … and therefore waived such an evidentiary challenge …. *See* Fed.R.Evid. 103(a)(1)."); *In re Litwok*, 246 B.R. 1, 5–6 (E.D.N.Y. 2000)("At no time did Litwok raise any of her current hearsay or best evidence objections to the receipt of Exhibit C. *See* Fed R. Evid. 103(a)(1)(**specific ground** for objection must be stated to preserve it) ….")(emphasis added), aff'd, 4 F. App'x 43 (2d Cir. 2001).

A-3094

**TACOPINA SEIGEL & DEOREO**

Hon. Lewis A. Kaplan
May 6, 2023
Page 4


Furthermore, as to the Law & Order SVU episode itself, Plaintiff conceded that she was "aware of it." Plaintiff failed to make a motion to strike the "aware of it" comment based upon her purported lack of personal knowledge, and thus the FRE 602 objection was waived. Thus, the supposed hearsay – that such an episode existed (because she was aware of it) – actually has been admitted by Plaintiff herself, which distinguishes the case she now cites, *United States v. Ghailani*, 761 F.Supp.2d 114 (S.D.N.Y. 2011).

Accordingly, her own testimony bolsters the admissibility of the Exhibit because it is her "aware[ness]" of the episode which is germane, *i.e.* whether she used such awareness (or was inspired by) this plot line in creating a false rape allegation against Defendant. Moreover, Plaintiff's awareness of the episode, juxtaposed against her claim not to have seen it, is relevant to the jury's assessment of her credibility.

Notably, Plaintiff's counsel could have cleared up any purported confusion on redirect examination but did not. Instead, through its instant request, Plaintiff is effectively asking that the Court do so now, which is inappropriate, especially after the close of evidence.

On a related note, countenancing Plaintiff's untimely request after the close of evidence would prevent Defendant from appropriately reacting *in real time* by exploring these issues further with Plaintiff or with other evidence. Defendant should be entitled to rely on the record as it stands today to make his case to the jury in summation, and Plaintiff should not be able to rewrite history to undercut Defendant.

Plaintiff's counsel is, of course, free to argue in closing argument their interpretation of the Exhibit and surrounding testimony, just as Defendant's counsel is free to argue the same. Given Plaintiff's waiver of any objection, no limiting instruction should be given and no restrictions should be placed on closing argument. Anything else would be inappropriate and confusing.

Respectfully submitted,

Joseph Tacopina

cc:      All counsel by ECF

A-3095

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED 5/9/23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                              Plaintiff,

            -against-                                                    22-cv-10016 (LAK)

DONALD J. TRUMP,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## VERDICT FORM

### Battery

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

   1.    Mr. Trump raped Ms. Carroll?

               YES _____          NO __✓__

               *[If you answered "Yes," skip to Question 4. If you answered "No," continue to
               Question 2.]*

   2.    Mr. Trump sexually abused Ms. Carroll?

               YES __✓__          NO _____

               *[If you answered "Yes," skip to Question 4.  If you answered "No," continue
               to Question 3.]*

   3.    Mr. Trump forcibly touched Ms. Carroll?

               YES _____          NO _____

               *[If you answered "Yes," continue to Question 4.  If you answered "No," skip
               to Question 6.]*

   4.    Ms. Carroll was injured as a result of Mr. Trump's conduct?

               YES __✓__          NO _____

               If "Yes," insert a dollar amount that would fairly and adequately compensate her
               for that injury or those injuries.

               $ __2,000,000 —__ (2 million)

If "No," insert $1.

$ _____

*[Continue to Question 5, whether you answered "Yes" or "No."]*

5.   Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to such disregard?

YES ✓          NO ____

If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$ 20,000 — (twenty thousand)

*[Continue to Question 6, whether you answered "Yes" or "No."]*

## Defamation

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

6.   Mr. Trump's statement was defamatory?

YES ✓          NO ____

*[If you answered "Yes," continue to Question 7. If you answered "No," stop here and return your verdict.]*

**Did Ms. Carroll prove, by clear and convincing evidence, that**

7.   Mr. Trump's statement was false?

YES ✓          NO ____

*[If you answered "Yes," continue to Question 8.  If you answered "No," stop here and return your verdict.]*

8.   Mr. Trump made the statement with actual malice?

YES ✓          NO ____

*[If you answered "Yes," continue to Question 9.  If you answered "No," stop here and return your verdict.]*

A-3097

3

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

9.　Ms. Carroll was injured as a result of Mr. Trump's publication of the October 12, 2022 statement?

YES  ✓　　　　NO _____

If "Yes," insert a dollar amount for any damages other than the reputation repair program.

$ 1,000,000. — ( 1 million)

If "Yes," insert a dollar amount for any damages for the reputation repair program only.

$ 1,700,000. — (1.7 million)

If "No," insert $1.

$ _____

*[Continue to Question 10, whether you answered "Yes" or "No."]*

10.　In making the statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another?

YES  ✓　　　　NO _____

If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$ 280,000. — (two hundred eighty thousand)

*[Please write your juror number (not you seat number or name) in the space provided below, fill in the date, and inform the officer that you have reached a verdict.]*

Dated: ___5/9___, 2023

A-3098

4

Juror numbers:

| | |
|---|---|
| 10 | 58 |
| 37 | 77 |
| 39 | 80 |
| 44 | 81 |
| 48 | |

A-3099

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

E. JEAN CARROLL,

                *Plaintiff,*

  – against –

DONALD J. TRUMP,

                *Defendant.*

------------------------------------------------------------------X

Civil Action No.:
22-cv-10016

**NOTICE OF APPEAL**

     Notice is hereby given that Defendant Donald J. Trump appeals to the United States Court

of Appeals for the Second Circuit from the judgment entered in this action on May 11, 2023 (Dkt.

No. 178) ("Final Judgment") awarding Plaintiff compensatory and punitive damages totaling

$5,000,000.00, and from all adverse orders, rulings, decrees, decisions, opinions, memoranda,

conclusions, or findings preceding, leading to, merged in, or included within the Final Judgment, by

the Honorable United States District Judge Lewis A. Kaplan.

A-3100

Dated: New York, New York
       May 11, 2023

                                    TACOPINA, SEIGEL & DeOREO

                              By:  _____
                                  Joseph Tacopina, Esq.
                                  Chad Seigel, Esq.
                                  Matthew G. DeOreo, Esq.
                                  275 Madison Ave., Fl. 35
                                  New York, New York 10016
                                  Tel: (212) 227-8877
                                  Fax: (212) 619-1028
                                  jtacopina@tacopinalaw.com
                                  cseigel@tacopinalaw.com
                                  mdeoreo@tacopinalaw.com

                                  Counsel for Defendant, Donald J. Trump

TO:    All counsel by ECF

A-3101

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

E. JEAN CARROLL,                                    Civil Action No.:
                                                    22-cv-10016
                           *Plaintiff*,

       – against –                                  **NOTICE OF MOTION**

DONALD J. TRUMP,

                           *Defendant*.
------------------------------------------------------------------X

    **PLEASE TAKE NOTICE** that upon the annexed Declaration of Matthew G. DeOreo with

exhibits and the accompanying Memorandum of Law, Defendant will move this Court, before the

Honorable Lewis A. Kaplan, U.S.D.J., in the United States Courthouse, Southern District of New

York, 500 Pearl Street, New York, N.Y. 10007, on such day when counsel may be heard, for an

Order, pursuant to Fed. R. Civ. P. 59, granting a new trial or remittitur, with such other and further

relief as the Court deems just and proper.

A-3102

Dated: New York, New York
June 8, 2023

TACOPINA, SEIGEL & DeOREO

By: _____
Joseph Tacopina, Esq.
Chad Seigel, Esq.
Matthew G. DeOreo, Esq.
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
mdeoreo@tacopinalaw.com
Counsel for Defendant Donald J. Trump

TO:    All counsel by ECF

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
E. JEAN CARROLL,                                    Civil Action No.:
                                                    22-cv-10016
                        *Plaintiff,*

        – against –

DONALD J. TRUMP,

                        *Defendant.*
------------------------------------------------------------------X

---

## DEFENDANT DONALD J. TRUMP'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION FOR A NEW TRIAL OR REMITTITUR

---

TACOPINA, SEIGEL & DeOREO
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
Counsel for Defendant Donald J. Trump

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

STATEMENT OF FACTS....................................................................................................3

    THE JURY FOUND THAT PLAINTIFF WAS NOT RAPED BY DEFENDANT..............3

    EMOTIONAL HARM FROM THE BERGDORF GOODMAN INCIDENT.......................5

    DEFAMATION DAMAGES................................................................................................6

ARGUMENT.......................................................................................................................12

    POINT I:     THE COURT SHOULD GRANT A NEW TRIAL OR REMITTITUR
              PURSUANT TO FED. R. CIV. P. 59....................................................12

          A.    COMPENSATORY DAMAGES FOR THE BATTERY CLAIM.................13

          B.    COMPENSATORY DAMAGES FOR THE DEFAMATION CLAIM........16

          C.    PUNITIVE DAMAGES FOR THE DEFAMATION CLAIM.......................22

CONCLUSION.....................................................................................................................25

i

## TABLE OF AUTHORITIES

**CASES:**

*A.B. v. Staropoli*, No. 08 CIV. 4585 (LMS), 2013 WL 12441525
(S.D.N.Y. Dec. 11, 2013).................................................................................15-16

*Abel v. Town Sports Int'l, LLC*, No. 09 CIV. 10388 DF, 2012 WL 6720919
(S.D.N.Y. Dec. 18, 2012)......................................................................................12

*Alla v. Verkay*, 979 F. Supp. 2d 349 (E.D.N.Y. 2013)..........................................17

*Allen v. CH Energy Grp., Inc.*, 58 A.D.3d 1102 (3d Dep't 2009)..........................17

*Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34 (2d Cir. 2015)............................17

*Azkour v. Little Rest Twelve*, No. 10-CV-4132 RJS, 2015 WL 1413620
(S.D.N.Y. Mar. 23, 2015).....................................................................................12

*Bender v. City of New York*, 78 F.3d 787 (2d Cir. 1996)......................................18

*BMW of North America v. Gore*, 517 U.S. 559 (1996)..........................................3, 22, 24

*Cash v. Cnty. of Erie*, 654 F.3d 324 (2d Cir. 2011)..............................................15

*Casmento v. Volmar Constr., Inc.*, No. 20-CV-00944 (LJL), 2022 WL 15773966
(S.D.N.Y. Oct. 28, 2022)......................................................................................12

*Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573
(S.D.N.Y. 2011)........................................................................................17-18, 24

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987)......................16

*Deborah S. v. Diorio*, 153 Misc. 2d 708 (Civ. Ct. 1992).....................................16

*Doe v. Green*, No. 17CV1765RAOTW, 2021 WL 2188534
(S.D.N.Y. Apr. 29, 2021)......................................................................................14

*Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306 (S.D.N.Y. 2018)......................13

*Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673
(KAM)(JO), 2020 WL 1083771 (E.D.N.Y. Mar. 6, 2020)......................................23

*Estevez-Yalcin v. The Children's Vill.*, No. 01-CV-8784 KMK, 2007 WL 2746807
(S.D.N.Y. Sept. 20, 2007)..............................................................................................16

*Evans v. Metro. Transportation Auth.*, No. 16CV4560FBVMS, 2018 WL 10466833
(E.D.N.Y. Sept. 25, 2018)..............................................................................................15

*Feldman v. Knack*, 56 Misc. 3d 1209(A), 63 N.Y.S.3d 305
(Sup. Ct. Westchester Co. 2017)....................................................................................16

*Feldman v. Knack*, 170 A.D.3d 667 (2d Dep't 2019)....................................................16

*Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-CV-3461 (WFK)(JO), 2016 WL
7330554 (E.D.N.Y. Dec. 16, 2016)..............................................................................23-24

*Grant v. City of Syracuse*, 357 F. Supp. 3d 180 (N.D.N.Y. 2019)............................13-14

*Heller v. Louis Provenzano, Inc.*, 303 A.D.2d 20 (1st Dep't 2003)...............................22

*Hurt v. City of New York*, No. 15-CV-7612 (PKC), 2019 WL 5781990
(S.D.N.Y. Nov. 6, 2019).................................................................................................12

*Jalal v. Shanahan*, No. 16-CV-281 (CBA) (LB), 2018 WL 10466837
(E.D.N.Y. May 10, 2018)...........................................................................................16-17

*Jester v. Hutt*, 937 F.3d 233 (3d Cir. 2019)..................................................................22

*Johnson v. White*, No. 06CIV2540LAPDF, 2010 WL 11586681
(S.D.N.Y. Nov. 18, 2010)...............................................................................................15

*Koehler v. Metro. Transportation Auth.*, No. 16-CV-03 (AYS), 2023 WL 2499117
(E.D.N.Y. Mar. 14, 2023)...............................................................................................12

*Komatsu v. Ramos*, No. 22-CV-6076 (LTS), 2022 WL 3656323
(S.D.N.Y. Aug. 25, 2022)...............................................................................................12

*Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52 (2d Dep't 1990),
aff'd, 77 N.Y.2d 981 (1991)............................................................................................15

*Lindsey v. Butler*, No. 11-CV-9102 (ER), 2022 WL 17849009
(S.D.N.Y. Dec. 22, 2022)................................................................................................23

*MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546
(S.D.N.Y. 2012)...............................................................................................................12

*Mathie v. Fries*, 121 F.3d 808 (2d Cir. 1997)..............................................................15

*Milfort v. Prevete*, 3 F. Supp. 3d 14 (E.D.N.Y. 2014)..................................................24

*Miller v. State*, 110 A.D.2d 627 (2d Dep't 1985)..........................................................16

*Nellis v. Miller*, 101 A.D.2d 1002 (4th Dep't 1984).....................................................17

*Nelson v. Cnty. of Suffolk*, No. 12CV5678DRHAKT, 2019 WL 3976526
(E.D.N.Y. Aug. 22, 2019)...............................................................................................23

*Norris v. New York City Coll. of Tech.*, No. 07-CV-853, 2009 WL 82556
(E.D.N.Y. Jan. 14, 2009).................................................................................................24

*Offei v. Omar*, No. 11 CIV. 4283 SAS MHD, 2012 WL 2086294
(S.D.N.Y. May 18, 2012)............................................................................................14-15

*Parkin v. Cornell Univ., Inc.*, 182 A.D.2d 850 (3d Dep't 1992)....................................17

*Patterson v. Kummer Dev. Corp.*, 302 A.D.2d 873 (4th Dep't 2003)............................14

*Perney v. Medical One New York, P.C.*, No. 159080/2019, 2020 WL 8613521
(Sup. Ct. NY Co. Feb. 17, 2020).....................................................................................15

*Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting
Indus. of U.S. & Canada*, 973 F.2d 1050 (2d Cir. 1992)................................................18

*Rossignol v. Silvernail*, 185 A.D.2d 497 (3d Dep't 1992).............................................17

*Small v. New York State Dep't of Corr. & Cmty. Supervision*, No. 12-CV-1236S, 2019 WL
1593923 (W.D.N.Y. Apr. 15, 2019).................................................................................23

*Smith v. City of New York*, No. 12 CIV. 8131 JGK, 2014 WL 2575778
(S.D.N.Y. June 9, 2014)...................................................................................................12

*Stampf v. Long Island R. Co.*, 761 F.3d 192 (2d Cir. 2014)...................................12-13, 17, 22-23

*Strader v. Ashley*, 61 A.D.3d 1244 (3d Dep't 2009)......................................................17

*Vargas v. Premiere Staff Agency*, No. 17CIV4280VSBHBP, 2019 WL 10632865
(S.D.N.Y. July 18, 2019).................................................................................................14

*Xiaokang Xu v. Xiaoling Shirley He*, 147 A.D.3d 1223 (3d Dep't 2017)......................17

iv

A-3108

**STATUTES/RULES**

C.P.L.R. § 5501(c)......................................................................................................13

Fed. R. App. P. 4......................................................................................................12

Fed. R. Civ. P. 59 ..............................................................................................1, 12, 25

v

## INTRODUCTION

Defendant Donald J. Trump ("Trump" or "Defendant"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in support of his Motion for a new trial or remittitur pursuant to Fed. R. Civ. P. 59.

## PRELIMINARY STATEMENT

As argued herein, the Court should order a new trial on damages or grant remittitur because contrary to Plaintiff's claim of rape, the Jury found that she was not raped but was sexually abused by Defendant during the 1995/1996 Bergdorf Goodman incident ("Bergdorf Goodman Incident"). Such abuse could have included groping of Plaintiff's breasts through clothing or similar conduct, which is a far cry from rape. Therefore, an award of $2 million for such conduct, which admittedly did not cause any diagnosed mental injury to Plaintiff, is grossly excessive under the applicable case law.

Furthermore, as set forth below, the $2.7 million compensatory damages award for Plaintiff's defamation claim for the October 12, 2022 Truth Social statement ("October 12, 2022 Statement") was based upon pure speculation. This is so because:

(a) Plaintiff did not prove that the damage to her reputation (if any) was caused by the October 12, 2022 Statement and not by Defendant's June 2019 statements about Plaintiff wherein he denied Plaintiff's allegations ("June 2019 Statements"), which are the subject of *Carroll I*– thus creating a double recovery for Plaintiff to the extent she is awarded any damages in *Carroll I*;

(b) Plaintiff's estimate of how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter was totally unreliable because it incredibly ranged from 1.5 million to 5.7 million times, which is an error rate of 74%;

(c) Plaintiff's evidence as to the amount of people who believed the October 12, 2022

1

Statement (and thus thought less of Plaintiff) was based upon pure conjecture, because (i) according to Plaintiff, the people who read and believed the October 12, 2022 Statement were republicans who consistently believed Defendant, and (ii) such individuals likely would have disbelieved Plaintiff's rape accusation regardless of the October 12, 2022 Statement, especially since Defendant already denied Plaintiff's accusations by way of his June 2019 Statements;

(d)     Plaintiff's proposed reputation repair campaign was based on a speculative premise that Trump supporters would have changed their minds about Plaintiff from such a campaign;

(e)     Readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement, because the people who believed the October 12, 2022 Statement would have already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements;

(f)     The cost estimate for Plaintiff's proposed reputation repair campaign was based upon pure conjecture in that Plaintiff's reputation expert estimated that it would cost anywhere from $368,000 to $2.7 million, which is an error rate of 86%;

(g)     Plaintiff's reputation expert also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff mitigated any reputational harm from Defendant denying the rape allegation or the vast amount of positive support that Plaintiff received from the public after making her accusation against Defendant; and

(h)     Plaintiff's income has only increased since Defendant denied Plaintiff's accusations, which establishes that she has suffered no financial harm.

Lastly, the punitive damages award for Plaintiff's defamation claim violates the due process

standards set forth in the United States Supreme Court case *BMW of North America v. Gore*, 517 U.S. 559 (1996).

## STATEMENT OF THE FACTS

### The Jury Found that Plaintiff Was Not Raped by Defendant

To Plaintiff, this case was always about Defendant allegedly raping her. Indeed, in her Complaint, Plaintiff refers to the incident with Defendant as a "rape" dozens of times. *See* Complaint (Exhibit A[1]) at ¶ 1 (Defendant "forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her."); ¶ 4 ("And she knew that while a woman who accused any man of rape was rarely believed, a woman who accused a rich, famous, violent man of rape would probably lose everything. She therefore reasonably concluded that if she accused Donald Trump of rape he would bury her in threats and lawsuits, and she would probably lose her reputation, not to mention everything she had worked for and achieved."); ¶ 9 ("She decided to describe Trump's rape in a book ...."); ¶ 10 ("He denied the rape."); *see also id.* at ¶¶ 44, 46, 49, 51, 53, 55, 59, 63-64, 68, 69, 70, 76, 78, 80, 87, 96-98, 102, 106-108, 110, 115, 118-119, 122-123, and 125.

Similarly, during trial, Carroll consistently referred to the Bergdorf Goodman Incident as nothing less than a "rape." *See, e.g.,* Tr.[2] at 148:8 ("I am here because Donald Trump raped me."); 216:2 ("Donald Trump raped me."); 233:1-2 ("Q. Why did you think he was evil? | A. Because he raped me."); 318:22-23 ("getting attention for being raped is not -- it's hard"); 334:10 ("Not supposedly. I was raped."); 334: 15-17 ("Q. That's your version, right, Ms. Carroll, that you were raped? | A. Those are the facts."); 408:9-10 ("I'm telling you, he raped me, whether I screamed or not.").

---

[1] All Exhibit references herein refer to the Exhibits attached to the accompanying Declaration of Matthew G. DeOreo.

[2] "Tr." refers to the Trial Transcript. Relevant portions of the Trial Transcript are attached to the DeOreo Declaration as Exhibit B.

The same holds true for Plaintiff's opening and summation. *See* Tr. 31:12-13 ("forced his penis inside her"); 34:22-23 ("You will hear that Ms. Birnbach told Ms. Carroll, in no uncertain terms, E. Jean, you have been raped."); 1242:8 ("Trump then removed his hand and shoved his penis inside her."); 1243:3-7 ("Ms. Birnbach told you that upon hearing what had happened, she left the kitchen so her kids wouldn't be able to overhear her, and told Ms. Carroll, in no uncertain terms, E. Jean you have been raped."); 1249:22-25 ("Remember when Mr. Trump's lawyers asked Dr. Lebowitz whether or not screaming would be consistent with a rape? Here is what she said. She said that not screaming would not only be absolutely consistent with being raped ...."); 1251:22-23 ("Dr. Lebowitz also testified to you about how Ms. Carroll processed the rape ...."); 1258:18-20 ("[D]id you see anything suggesting that they all agreed to come up with a lie that Donald Trump raped E. Jean Carroll."); 1283:3-6 ("And there is no greater service that a citizen can do in this country than what you are being asked to do now, consider whether an accusation as heinous as a claim of rape has merit."); 1389:19-21 ("It is weird that Ms. Carroll told her friend she had been raped and her friend never asked about it again for 20 years. The truth is often weird."); 1396:22-23 ("If someone accused you of rape and you didn't do it, you would run to the courtroom ...."); 1397:7-8 ("And you should draw the conclusion that that's because he did it, because he raped Ms. Carroll ...."); 1400:19-20 ("Ms. Birnbach wouldn't have interviewed Trump had she just been told that he had raped her friend ...."); 1405:19-20 ("Is the defense saying that because Ms. Carroll was raped she could never be happy again?"); 1407:1-2 ("[I]t feels like the defense has this idea of the perfect rape victim ....").

However, the Jury found that Defendant did not rape Plaintiff but that Defendant "sexually abuse[d]" Plaintiff, which, according to the Court's jury instructions, could have been a groping of her breasts through the clothes. (Tr. 1418:3 - 1419:8; 1472:17-18).

In other words, the Jury simply did not believe Plaintiff's rape accusation.

4

**Emotional Harm from the Bergdorf Goodman Incident**

Plaintiff testified that she has suffered no diagnosed injury from the Bergdorf Goodman Incident,

has been happy since the incident and described her life as "fabulous":

> Q. Have you ever been diagnosed with any mental health conditions such as PTSD or
> depression?
>
> A. No.
>
>                                         \*\*\*
>
> Q. Are you a happy person, Ms. Carroll?
>
> A. I am a happy person. I know it seems strange to hear me after today, but I'm basically
> a happy person.
>
>                                         \*\*\*
>
> Q. During that podcast, you confirmed or you stated that your life had been fabulous
> since the book came out.
>
> A. I always say my life is fabulous. No matter who asks me, what time of day, I will
> always reply it's fabulous.

(Tr. 225:8-16; 551:11-14; *see also* 270:20 - 271:2; 551:17 - 552:9; 645:20 - 646:12).

Plaintiff also testified that before publically accusing Defendant of rape in her book, she was

"as good as new. This is great. I'm fine. I rarely think of it. \*\*\* I'm fine. I rarely think of it." (Tr.

610:3-9; 610:17-611:1).

Plaintiff's emotional harm expert, Dr. Leslie Lebowitz, similarly testified that Plaintiff did not

suffer from any "thought disorder, character disorder, or major mental illness. She struck me as

unusually vivacious and extroverted." (Tr. 835:5-11). Dr. Lebowitz also did not diagnose Plaintiff with

post-traumatic stress disorder ("PTSD"), anxiety, or major depression and testified that Plaintiff is a

"extremely resilient person." (Tr. 853:8-10; 880:6-14; *see also* 907:15-20; 918:12 - 919:5; 946:14 -

947:5). Dr. Lebowitz also testified that Plaintiff's lack of romantic partners could have been caused by "something else other than the alleged Bergdorf Goodman incident ...." (Tr. 925:10-17).

**Defamation Damages**

      The crux of Plaintiff's defamation claim was that Trump allegedly defamed Plaintiff when he denied raping her. *See* Complaint (Exhibit A) at ¶¶ 96 & 98 ("In the October 12 statement, Trump falsely stated that he did not rape Carroll. *** In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales."); Tr. 320:21 - 321:21. As noted above, the Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim based upon an alleged rape failed.

      Plaintiff also testified that Trump defamed her when he denied the Bergdorf Goodman Incident in his June 2019 Statements, damages for which were not part of this trial as they are the subject of *Carroll I*. *See Carroll I* Complaint (Exhibit C); Tr. at pp. 262-270. However, Plaintiff testified that she was greatly harmed by the June 2019 Statements, including the loss of her reputation and job at Elle magazine, and also because she allegedly received death threats due to the June 2019 Statements, which caused her to purchase bullets for her gun for protection:

> Q. What happened after -- what happened to you after Mr. Trump made those statements?
>
> A. People have gone through much worse than being reviled by president Trump for three days, much worse. I understand that. But, boy, it hit me and it laid me low because I lost -- I lost my reputation. Nobody looked at me the same. It was gone. Even people who knew me would look at me with, you know, pity in their eyes and the people who had no opinion now thought I was a liar and hated me. Oh my God. The force of hatred coming at me was staggering.
>
> Q. How did it -- how did that hatred, how did it come at you? In what form?
>
> A. People telling me they are reading about it on the Internet, am I E. Jean Carroll; opening up my e-mail and seeing threats against my life; opening up my Ask E. Jean

6

letters which are generally -- you know, it's my lifeline, it gives me spirit, reading Ask E. Jean, and they are saying terrible things to me.

Q. .... How many messages sort of threatening you physically did you receive?

A. Not a lot, but serious threats, around ten.

Q. What was your reaction to receiving in particular those threatening messages?

A. I bought bullets for a gun that I owned.

*** 

Q. Okay. How, if at all, do you believe that Mr. Trump's June 2019 statements have affected your reputation?

A. I am no longer believed. I got fired. I lost my readers. I lost eight million readers. My magazine work has suffered. The number of letters I receive has gone down. I am still in their swinging. I've still got my Ask E. Jean column on Substack, and I have got 19,000 readers. But it's been a huge loss, and I'm slowly building it back.

(Tr. 268:20 - 269:19; 271:10-17; *see also* Tr. at 271:18 - 273:10).

However, Plaintiff never distinguished the harm caused by the June 2019 Statements and the October 12, 2022 Statement. Therefore, the jury award for the purported harm caused by the October 12, 2022 Statement is based upon pure speculation, and the jury very clearly must have awarded Plaintiff compensatory damages for the alleged harms caused by the June 2019 Statements, namely the alleged loss of reputation and her job, as well as receiving death threats.

Moreover, Plaintiff's reputation expert, Professor Ashlee Humphreys, testified about the purported harm caused by Defendant's June 2019 Statements:

Q. Why did you look at material that was published or written about Ms. Carroll prior to June 2019?

A. So, in June 2019 Mr. Trump made a series of statements that impacted her reputation and I felt it was important to account for some of that change prior to October 12th.

Q. Can you describe what you observed about Ms. Carroll's reputation prior to June 2019 as compared to after June 2019?

7

A. So, when I looked at the materials from before June 2019, that means I looked at reviews of her books, media coverage of her, even Amazon reviews of her books that were before that, just reader responses to it. I kind of first got a glimpse of that and found, you know, she was known as kind of like a sassy dating advice columnist, a real truth-teller a journalist, who gave trusted advice on dating and living in the city. And then after, I looked at the social media posts from June through October, and then I looked at media posts from after October.

Q. And you described Ms. Carroll's reputation prior to June 2019. How did that compare to the reputation that you observed after, immediately after June 2019?

A. So, after June 2019, you know, of course there was a lot more volume of statements about her and they contained pretty negative associations including that she was a liar, the perpetrator of a scam, a hoax. Things like that.

(Tr. 1129:15 - 1130:12).

Additionally, Professor Humphreys compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, and thus Professor Humphreys necessarily included the purported harm from the June 2019 Statements into her damages analysis:

So, one thing in my analysis that I noticed is, prior to the June 2019 statement, there were, of course, many positive associations of her but the volume was relatively small. After the October 12 statement there was a huge volume of associations associated with her, some of those were positive, but then a huge volume, a very large number, tens of thousands of those associations were really negative.

(Tr. 1135:2-8).

During summation, Plaintiff argued to the Jurors that they should look to Professor Humphreys's testimony when deciding the amount to award for reputational harm for Defendant's "public statements," which necessarily includes the June 2019 Statements for the reasons stated above:

So what is the level of damages? I'm not going to stand here and tell you exactly how much you should award E. Jean Carroll in damages, but there are a few things that you can consider in coming to that conclusion.

First of all, Professor Humphreys told you about the millions of people that heard and likely believed Donald Trump's public statements about E. Jean Carroll. What is the price for having to live your life in shame and to lose your good name because Donald Trump lied and told millions of people that you are a liar?

8

(Tr. 1272: 8-17). Consequently, the jury's speculative award for reputational harm created a double recovery for Plaintiff to the extent she is awarded any damages in *Carroll I.*

Professor Humphreys also testified that her analysis was so uncertain that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter to anything more specific than somewhere "between 1.5 million and 5.7 million times," which is an error rate of 74%. (Tr. 1125:17 - 1126:8).

Professor Humphreys then testified that the people who read and believed the October 12, 2022 Statement were "republicans [who] typically believe Mr. Trump." (Tr. 1133:18 - 1134:4). Those persons likely would not have had a high opinion of Plaintiff regardless of the October 12, 2022 Statement, because Plaintiff was attacking a political figure that they highly favored. Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of Trump's response to her rape accusation, and that Plaintiff's reputation with such supporters would not have changed due to the October 12, 2022 Statement. This is especially so because Defendant already denied Plaintiff's accusations by way of his June 2019 Statements.

Moreover, Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is "a campaign to put out positive messages about" Plaintiff. (Tr. 1136:1-13; 1136:25 - 1137:6). However, Professor Humphreys did not explain how existing Trump supporters would have changed their minds about Plaintiff due to positive messages about Plaintiff, especially since Defendant already denied Plaintiff's allegations in the June 2019 Statements. In fact, Professor Humphreys testified that she has never even done a reputation repair campaign before, so her analysis on this subject should be given little weight. (Tr. 1136:14-16).

9

Professor Humphreys further testified that the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement. (Tr. 1149:2 - 1150:3). She also testified that she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements. (Tr. 1150:4-19).

Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation. It is not surprising then that her cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million (Tr. 1139:20 - 1141:21), which is an error rate of 86 percent.

Professor Humphreys also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff mitigated any reputational harm from Defendant denying Plaintiff's allegations. (Tr. 1148:8 -19; 1152:13- 1153:11).

In this regard, Plaintiff herself testified that she received a vast amount of positive support from the public after making her accusation against Defendant:

Q: After your article appeared in The Cut, that's again the first time the story appeared publicly?

A: Yes.

Q: You received a lot of positive letters?

A: Yes.

(Tr. 568:21-25; *see also* Tr. 270:4-14; 552:15 - 553:2).

10

A-3119

Importantly, Professor Humphreys conceded the positive support that Plaintiff received on social media after the rape allegation but did not factor such support into her analysis of the harm allegedly caused by the October 12, 2022 Statement. (Tr. 1154:3-13).  Accordingly, if the positive social media posts about Plaintiff far outweighed the negative posts, Professor Humphreys did not measure that. (*Id.*).

Plaintiff also testified that her income increased since leaving Elle magazine due to her business with Substack[3]:

> Q:    Well, how would you compare financially. How much were you making your last year at Elle versus what you are making now at Substack?
>
> A:    Well, because I worked - because the Elle column was published once a month and I received $5,000 a month, I think it was $5,000? Yeah, $5,000 a month. And now I turn out three columns every week, so I am doing, I don't know, ten times the work and I still manage to have about the same income.
>
> Q:    Might it be a little more?
>
> A:    Slightly more, yeah

(Tr. 272:21 - 273:5; *see also* 317:12-21; 547:15-19; 550:2-5).  Furthermore, Plaintiff never argued lost income to the Jury.  Therefore, there can be no credible dispute that Plaintiff did not suffer any financial harm from the October 12, 2022 Statement, and Professor Humphreys did not factor that into her analysis.

---

[3] "Substack is a way for writers to reach their audience, their readers, directly through newsletters." (Tr. 272:11-13).

## ARGUMENT

### POINT I

### THE COURT SHOULD GRANT A NEW TRIAL OR REMITTITUR PURSUANT TO FED. R. CIV. P. 59[4]

Remittitur or a new trial is appropriate where a jury's award is "entirely out of proportion to the plaintiff's injury [and was] motivated by sympathy rather than by evidence of harm." *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560-61 (S.D.N.Y. 2012) (citing *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.,* 746 F. Supp. 2d 575 (S.D.N.Y. 2010)). Whether a jury's award is excessive is a question of law for the Court to decide. *See, e.g., Koehler v. Metro. Transportation Auth.*, No. 16-CV-03 (AYS), 2023 WL 2499117, at *15 (E.D.N.Y. Mar. 14, 2023).[5]

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014)

"'A federal court, in reviewing the amount of damages awarded on a state law claim, must apply New York law.'" *Hurt v. City of New York*, No. 15-CV-7612 (PKC), 2019 WL 5781990, at *11 (S.D.N.Y. Nov. 6, 2019)(quoting *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006)). "Under

---

[4] Even though Defendant already filed his Notice of Appeal, this Court still has jurisdiction to decide this motion. *See Komatsu v. Ramos*, No. 22-CV-6076 (LTS), 2022 WL 3656323, at *1 n. 1 (S.D.N.Y. Aug. 25, 2022)("Rule 4 of the Federal Rules of Appellate Procedure ... provides that, if a plaintiff files a Rule 59 or Rule 60 motion within 28 days after entry of judgment, a notice of appeal does not become effective until the district court disposes of the motion, even if the notice of appeal was filed first. *See* Fed. R. App. P. 4(a)(4)(B)(i). The Court therefore has jurisdiction to consider Plaintiff's motion."); *Azkour v. Little Rest Twelve*, No. 10-CV-4132 RJS, 2015 WL 1413620, at *1 (S.D.N.Y. Mar. 23, 2015)(holding same); *Smith v. City of New York*, No. 12 CIV. 8131 JGK, 2014 WL 2575778, at *1 n.1 (S.D.N.Y. June 9, 2014)(holding same).

[5] "Rule 59, not Rule 50, is the proper vehicle for motions to reduce damage awards ...." *Casmento v. Volmar Constr., Inc.*, No. 20-CV-00944 (LJL), 2022 WL 15773966, at *9 n. 5 (S.D.N.Y. Oct. 28, 2022)(citing cases); *see also Abel v. Town Sports Int'l, LLC*, No. 09 CIV. 10388 DF, 2012 WL 6720919, at *35 (S.D.N.Y. Dec. 18, 2012)("Defendant's further alternative motion under Rule 59(e) for remittitur is granted.").

New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'" *Stampf*, 761 F.3d at 204 (quoting C.P.L.R. § 5501(c)).

"This standard requires a more exacting review than the 'shocks the conscience' standard generally applied by federal courts, and is less deferential to a jury verdict." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018)(quotations omitted).  Moreover, in "determining whether an award deviates materially from what would be reasonable compensation, district courts compare the jury's award to awards allowed in analogous cases involving similar types of injuries." *Id.* (quotations omitted).

**A.**  <u>**Compensatory Damages for the Battery Claim**</u>

In summation, Plaintiff argued that she should be compensated for living a life since early 1996 without companionship: "What is the price for decades of living alone without companionship, for having no one to cook dinner with, no one to walk your dog with, no one to watch TV with, and for feeling for decades like you are dirty and unworthy?" (Tr. 1272:22 - 1273:1).

Therefore, Plaintiff was seeking damages for loss of consortium, which "includes such items as loss of support services, companionship, society, sexual relations, and solace." *Grant v. City of Syracuse*, 357 F. Supp. 3d 180, 195 (N.D.N.Y. 2019).  According to New York law, such awards should "fall within a 'low six-figure range'":

> A review of comparable awards shows that such awards often fall within a "low six-figure range". *Okraynets v. Metropolitan Transp. Authority*, 555 F.Supp.2d 420, 440 (S.D.N.Y. 2008); *see also Walsh v. State of New York*, 232 A.D.2d 939, 648 N.Y.S.2d 816 (1996) (upholding a $ 185,000 on a wife's derivative claim); *DeLeonibus v. Scognamillo*, 238 A.D.2d 301, 656 N.Y.S.2d 275 (1997) (upholding a $ 275,000 loss of consortium claim); *Kirby v. Turner Constr. Co.*, 286 A.D.2d 618, 730 N.Y.S.2d 314 (2001) (reducing a $700,000 jury award for loss of consortium to $300,000); *Kirschhoffer v. Van Dyke*, 173 A.D.2d 7, 577 N.Y.S.2d 512 (1991) (reducing a $ 1.8 million jury award for loss of consortium to $ 400,000).

Case 23-793, Document 87, 11/20/2023, 3592074, Page62 of 279

*Grant*, 357 F. Supp. 3d at 196; *see also Patterson v. Kummer Dev. Corp.*, 302 A.D.2d 873, 874 (4th Dep't 2003)(awarding plaintiff's wife $260,000 for loss of society and companionship).

An award in the "low six-figure range" is also consistent with awards in favor of plaintiffs whose intimate parts were groped by a defendant, which is what the jury decided happened in this case. *See Doe v. Green*, No. 17CV1765RAOTW, 2021 WL 2188534, at *2 (S.D.N.Y. Apr. 29, 2021)(Award of $350,000 for the following sexual assault: "Green entered Plaintiff's cell alone—the door had remained open—and assaulted her by grabbing, pushing, and restraining her against her cell wall; kissing, biting, and licking Plaintiff's upper body, including her exposed breasts; and putting his hand down Plaintiff's shorts and fondling her genitalia and groin."), report and recommendation adopted, 2021 WL 2188148 (S.D.N.Y. May 28, 2021); *Vargas v. Premiere Staff Agency*, No. 17CIV4280VSBHBP, 2019 WL 10632865, at *2 (S.D.N.Y. July 18, 2019)(Award of $30,000 for the following sexual assault: "As plaintiff was changing, Guzman came back into the locker room and put his hand down plaintiff's pants and groped her vagina and buttocks. When plaintiff pushed Guzman away, Guzman then grabbed her and forcefully groped her breasts and tried to kiss her."), report and recommendation adopted sub nom., 2020 WL 5663412 (S.D.N.Y. Sept. 23, 2020); *Offei v. Omar*, No. 11 CIV. 4283 SAS MHD, 2012 WL 2086294, at *1 (S.D.N.Y. May 18, 2012)(Award of $250,000 for the following sexual assault: "Mr. Omar announced 'oh Doris, I like you' and proceeded to seize her in a bear hug, kiss her on the lips and the neck, squeeze her breasts and rub his clothed penis against her. Ms. Offei asked him to stop, telling him that she was a married woman, and that she had come to the room only to deliver the tissue boxes. As she tried to escape, he blocked her way and grabbed her again from behind, once more kissing her and seizing her breasts. She pleaded with him to leave her alone, but he persisted for at least a brief period, urging her to give him her phone number so that they could 'text,' and squeezing her buttocks as she headed for the door."), report and recommendation

14

adopted, 2012 WL 2086356 (S.D.N.Y. June 8, 2012); *Johnson v. White*, No. 06CIV2540LAPDF, 2010 WL 11586681, at *1–2 (S.D.N.Y. Nov. 18, 2010)(Award of $25,000 for the following sexual assaults: "White placed her hands on Plaintiff's 'groin,' made derogatory comments about the size of Plaintiff's penis, and requested that they spend the weekend together and that Plaintiff have sex with her. **** White 'squeezed on Plaintiff's button' and stated that Plaintiff was going to be forced to have sex with her. *** White unzipped his pants, pulled out his penis, and asked him if she could suck on it. *** White allegedly fondled his 'button,' showed him her underwear, and told him to put his hand down her pants to smell her odor.*** White allegedly grabbed Plaintiff's 'groin area' and threatened to have him sent back to prison if he complained again to her supervisor."); *Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52, 54 (2d Dep't 1990), aff'd, 77 N.Y.2d 981 (1991)(Award of $100,000 for the following sexual assault: "The defendant admitted rubbing and touching the plaintiff's breasts and genital area and having her rub and touch his genitals."); *Evans v. Metro. Transportation Auth.*, No. 16CV4560FBVMS, 2018 WL 10466833, at *1 (E.D.N.Y. Sept. 25, 2018)($25,000 award for "unwelcome comments of a sexual nature, rubb[ing] [of] groin against [plaintiff's] leg, and grop[ing] [of] her breasts"); *Perney v. Medical One New York, P.C.*, No. 159080/2019, 2020 WL 8613521, at *4 (Sup. Ct. NY Co. Feb. 17, 2020)(award of $100,000 for the fondling of genitalia).

Furthermore, a $2 million award for the groping of intimate parts is far more than New York juries or courts have awarded victims of rape (including children raped by adults multiple times) who have suffered significant diagnosed injuries, such as PTSD. *See Cash v. Cnty. of Erie*, 654 F.3d 324, 328 (2d Cir. 2011)(Awarding $500,000 to plaintiff who was forcibly raped in confinement by sheriff's deputy); *Mathie v. Fries*, 121 F.3d 808, 810–11 (2d Cir. 1997)(Awarded $250,000 to a former inmate who was handcuffed to a pipe and forcibly raped by a corrections officer); *A.B. v. Staropoli*, No. 08 CIV. 4585 (LMS), 2013 WL 12441525, at *7 (S.D.N.Y. Dec. 11, 2013)(Awarding minor plaintiff

$600,000 for repeatedly being raped by soccer coach over for two years and suffering from anxiety, depression, and a severe eating disorder); *Estevez-Yalcin v. The Children's Vill.*, No. 01-CV-8784 KMK, 2007 WL 2746807, at *3 (S.D.N.Y. Sept. 20, 2007)(Awarding $500,000 each to two plaintiffs who were forcibly raped as young boys by an adult causing one plaintiff to have a "prognosis [that was] extremely poor with a high risk that he will harm others or will himself be incarcerated" and the other to suffer "significant psychological distress ... requiring intensive and long term psychotherapy with a mental health professional."); *Feldman v. Knack*, 170 A.D.3d 667, 667 (2d Dep't 2019)(Awarding $450,000 to plaintiff who was forcibly raped by her psychotherapist and suffered from post traumatic stress disorder and depressive disorder )[6]; *Miller v. State*, 110 A.D.2d 627 (2d Dep't 1985)(Awarding $400,000 to student who was raped in her dormitory); *Deborah S. v. Diorio*, 153 Misc. 2d 708, 716 (Civ. Ct. 1992)(Awarding $100,000 to plaintiff who was raped at knife point for one to two hours), aff'd, 160 Misc. 2d 210 (App. Term 1994).

Therefore, the Jury's $2 million award was clearly motivated by sympathy rather than by evidence of harm, and the Court should grant a new trial as to compensatory damages for the battery claim, or grant a remittitur of such award to an amount no more than $400,000.

**B.**   **Compensatory Damages for the Defamation Claim**

New York courts have consistently held that compensatory damages awards of $100,000 or less for defamation claims are appropriate. *See Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987)(affirming jury award of $15,000 for injury to reputation for magazine publishing a defamatory statement that plaintiff was offering sexual favors to the public); *Jalal v. Shanahan*, No. 16-CV-281 (CBA) (LB), 2018 WL 10466837, at *6 (E.D.N.Y. May 10, 2018)(Awarded $10,970 in compensatory damages for tenant making false accusations on television that landlord was promiscuous

---

[6] *See also Feldman v. Knack*, 56 Misc. 3d 1209(A), 63 N.Y.S.3d 305 (Sup. Ct. Westchester Co. 2017).

and unchaste and harassed tenant and stole $400,000 of tenant's property); *Xiaokang Xu v. Xiaoling Shirley He*, 147 A.D.3d 1223, 1224 (3d Dep't 2017)(Award of $5,000 in compensatory damages for defendant making online postings falsely accusing plaintiff of abuse, cruel and inhumane treatment, theft of trade secrets, fraud and perjury); *Allen v. CH Energy Grp., Inc.*, 58 A.D.3d 1102, 1104 (3d Dep't 2009)(Award of compensatory damages of $50,000 for defendant falsely accusing plaintiff of defecating on the sidewalk, which led to his loss of employment); *Strader v. Ashley*, 61 A.D.3d 1244, 1247 (3d Dep't 2009)(Award of $26,800 for defendant falsely accusing plaintiff of theft, which was reported in newspapers and caused Plaintiff to lose his job); *Parkin v. Cornell Univ., Inc.*, 182 A.D.2d 850, 852 (3d Dep't 1992)(Award of $10,000 for defendant falsely accusing plaintiff of theft, which was reported in the media); *Rossignol v. Silvernail*, 185 A.D.2d 497 (3d Dep't 1992)(Reducing compensatory damages from $800,000 to $85,000 for a plaintiff who was falsely accused of sexually abusing a child); *Nellis v. Miller*, 101 A.D.2d 1002, 1002 (4th Dep't 1984)(finding that a compensatory damages award of $150,000 [and reducing it to $5,000] was "shockingly excessive" for a defamatory news release stating that plaintiff was terminated as undersheriff for "unprofessional conduct causing internal strife within the Department").

Furthermore, a Court should grant remittitur when the jury award is based upon speculation. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015)("[O]ur detailed assessment of the trial evidence bearing on damages convinces us that the jury's inclusion in its award of $900,000 for the lost developer's fee was impermissibly speculative."); *Stampf v. Long Island R. Co.*, 761 F.3d 192, 208 (2d Cir. 2014)(Reducing $100,000 of compensatory damages to $20,000 because the $100,000 award was based upon speculation); *Alla v. Verkay*, 979 F. Supp. 2d 349, 376 (E.D.N.Y. 2013)(granting remittitur because the "damages award [was] rooted in speculation"); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 577 (S.D.N.Y. 2011)(granting remittitur because

17

the compensatory damages award was "unduly speculative and would arguably constitute a 'windfall'").

Remittitur is also appropriate when the jury award provides a plaintiff with a double recovery. *See Bender v. City of New York*, 78 F.3d 787, 795 (2d Cir. 1996)("[W]e deem the excessiveness of the aggregate award to be plain error, especially since it so likely results from impermissible duplication. \*\*\* [T]o remedy that excessiveness, at least down to the level of the amount unchallenged by appellants, we will reverse the judgment and order a new trial unless Bender agrees to remit $150,000. If the remittitur is not made, we leave to the District Court, on remand, the determination of whether the new trial should be limited to a retrial of the damages issues."); *Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050, 1063–64 (2d Cir. 1992)("A plaintiff may not recover twice for the same injury. \*\*\* [Plaintiff] has [not] directed us to any evidence that he did not fully recover in the NLRB proceeding for back pay damages between February 27, 1985 and June 3, 1985, the date on which the jury concluded damages ceased. Accordingly, the back pay award against Patrick Quinn should be set off in full to prevent a double recovery.").

Here, the general compensatory damages for the defamation claim should be no more than $100,000, and no more than $368,000 (the low estimate provided by Professor Humphreys) for the reputation repair campaign. This is so for multiple reasons as detailed above in the Statement of Facts, which establish that the jury awards in this case for these categories of damages were speculative and based upon alleged harms caused by the June 2019 Statements.

**First**, the overall essence of Plaintiff's defamation claim was that Defendant allegedly defamed Plaintiff when he denied her rape allegation. *See* Complaint (Exhibit A) at ¶¶ 96 & 98. As noted above, the Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim based upon an alleged rape failed. Accordingly, all that was left of Plaintiff's defamation claim was

18

A-3127

that Defendant defamed Plaintiff by stating that "he had no idea who Carroll was" (Complaint [Exhibit A] at ¶ 97), which is far less damaging to Plaintiff's reputation than accusing Plaintiff of lying about the alleged rape.

**Second**, Plaintiff testified that Defendant libeled her when he denied the Bergdorf Goodman Incident in his June 2019 Statements, and damages for such alleged defamation cannot be part of the jury award because they are the subject of *Carroll I*. *See Carrol I* Complaint (Exhibit C); Tr. at pp. 262-270. Specifically, Plaintiff testified that she suffered significant harm from the June 2019 Statements, including substantial damage to her reputation, losing her position at Elle magazine, and receiving death threats (causing her to purchase bullets for her gun for protection). (Tr. 268:20 - 269:19; 271:10 - 273:10). Importantly, Carroll did not even attempt to separate the harm caused by the June 2019 Statements and the October 12, 2022 Statement. While the Jury was not permitted to award compensatory damages for the June 2019 Statements, it clearly must have done so, which makes its award speculative and duplicative of any compensatory damages awarded in *Carroll I*.

**Third**, Professor Humphreys testified about the purported harm arising from the June 2019 Statements and even compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, but did not do a comparison between her reputational harm before and after the October 12, 2022 Statement. (Tr. 1129:15 - 1130:12; 1135:2-8). Therefore, Professor Humphreys must have included the alleged harm from the June 2019 Statements as part of her damages analysis.

**Fourth**, during summation, Plaintiff argued that the Jury should look at Professor Humphreys's testimony for determining an amount to award for reputation harm for Defendant's "public statements" in general, which must include the June 2019 Statements for the reasons set forth above. (Tr. 1272:8-17).

19

**Fifth**, Professor Humphreys testified that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter to anything more specific than somewhere "between 1.5 million and 5.7 million times," which is an error rate of 74%. (Tr. 1125:17 - 1126:8). Such an analysis is thus pure speculation.

**Sixth**, Professor Humphreys testified that the people who read and believed the October 12, 2022 Statement were "republicans [who] typically believe Mr. Trump." (Tr. 1133:18 - 1134:4). Plaintiff's reputation with such persons (people who typically believe Defendant) likely would not have been positive regardless of the October 12, 2022 Statement, because Defendant already denied Plaintiff's accusations in the June 2019 Statements and Plaintiff was attacking a political figure that such persons heavily supported. Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of the October 12, 2022 Statement, and that Plaintiff's reputation with such supporters would not have changed due to such statement.

**Seventh**, Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is "a campaign to put out positive messages about" Plaintiff. (Tr. 1136:1-13; 1136:25 - 1137:6). However, Professor Humphreys did not explain how existing Trump supporters would have changed their minds about Plaintiff from merely seeing positive messages about Plaintiff. Professor Humphreys also testified that she has never done a reputation repair campaign before, and thus, her opinion on this issue should be given little weight. (Tr. 1136:14-16).

**Eighth**, Professor Humphreys testified that (a) the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement (Tr. 1149:2

20

- 1150:3); and (b) she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements. (Tr. 1150:4-19).

Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation.  Additionally, her testimony only supports the argument that the October 2022 Statement did not cause Plaintiff any harm in addition to any harm that was caused by the June 2019 Statements, because people already had made up their minds as to the veracity of Plaintiff's accusations as of the June 2019 Statements.

**Ninth**, Professor Humphreys's cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million (Tr. 1139:20 - 1141:21), which is an error rate of 86 percent.  This is especially troublesome since Professor Humphreys testified that she has never done a reputation repair campaign before. (Tr. 1136:14-16).

**Tenth**, Professor Humphreys also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff enhanced her reputation with regard to her allegations against Defendant. (Tr. 1148:8 -19; 1152:13- 1153:11).  In fact, Plaintiff conceded that she received a vast amount of positive support from the public after making her accusation against Defendant. (Tr. 270:4-14; 552:15 - 553:2; 568:21-25).  Even though Professor Humphreys admitted that Plaintiff received positive support from the public after the rape allegation, she did not factor such support into her analysis of the harm allegedly caused by the October 12, 2022 Statement. (Tr. 1154:3-13).  Accordingly, her analysis of reputational harm is pure speculation. (*Id.*).

**Eleventh**, Plaintiff also testified that she has made more money after leaving Elle magazine because of her successful business with Substack. (Tr. 272:21 - 273:5; *see also* 317:12-21; 547:15-19;

21

550:2-5). Therefore, Plaintiff clearly has suffered no financial harm from the October 12, 2022

Statement, and Professor Humphreys did not factor that into her analysis.

Therefore, the Jury's $2.7 million award for Plaintiff's defamation claim was clearly motivated

by sympathy rather than by evidence of harm, and the Court should grant a new trial as to compensatory

damages for the defamation claim, or grant a remittitur of such award to an amount no more than

$100,000 for general compensatory damages and $368,000 for the reputation repair campaign (the low

end estimate for such a campaign according to Professor Humphreys).

## C.    <u>Punitive Damages for the Defamation Claim</u>

Under New York law, punitive damages must be reviewed by a court under the due process

standards set forth in the United States Supreme Court case *BMW of North America v. Gore*, 517 U.S.

559 (1996). *See, e.g., Heller v. Louis Provenzano, Inc.*, 303 A.D.2d 20, 23 (1ˢᵗ Dep't 2003).

The *Gore* due process standards are as follows:

> The Supreme Court outlined three "guideposts" to facilitate its review of state court
> punitive damage awards: (1) the degree of reprehensibility of the defendant's conduct,
> (2) the ratio of punitive damages to the actual harm inflicted, and (3) "the difference
> between this remedy and the civil penalties authorized or imposed in comparable cases."
> *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809
> (1996).

*Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014).

"The third guidepost—'the difference between the punitive damages awarded by the jury and

the civil penalties authorized or imposed in comparable cases'—is not instructive ... for defamation, a

common law tort." *Jester v. Hutt*, 937 F.3d 233, 241 n. 1 (3d Cir. 2019).

Furthermore, a ratio of 1:1 or less is appropriate here because there is a very low degree of

reprehensibility, if any. *See Stampf*, 761 F.3d at 211 ("In any event, the ratio of the jury's award of

punitive damages to the compensatory award (as reduced) is 1:1, which does not 'raise a suspicious

judicial eyebrow.'")(quoting *Gore*, 517 U.S. at 582).

This is so because Defendant's conduct with regard to the October 12, 2022 Statement is barely reprehensible, if at all, because he was defending himself against a false accusation of rape. Again, the Jury found that Defendant did not rape Plaintiff, and Plaintiff has always portrayed the Bergdorf Goodman Incident as nothing less than a rape.

Therefore, Defendant's conduct is clearly no worse than other defendants against whom punitive damages awards have been rendered in the amount of $50,000 or less. *See Lindsey v. Butler*, No. 11-CV-9102 (ER), 2022 WL 17849009 (S.D.N.Y. Dec. 22, 2022)(punitive damages award of $50,000 for an officer forcibly shaving plaintiff-arrestee's face which violated plaintiff's religious beliefs); *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673 (KAM)(JO), 2020 WL 1083771, at *24 (E.D.N.Y. Mar. 6, 2020)(awarding plaintiff-employee $10,000 each in punitive damages against defendant-employer for defendant subjecting plaintiff's to involuntary religious practices); *Nelson v. Cnty. of Suffolk*, No. 12CV5678DRHAKT, 2019 WL 3976526, at *18 (E.D.N.Y. Aug. 22, 2019)(awarding punitive damages totaling $21,000.00 against two detectives for allowing the prosecution of plaintiff to continue even though they knew that charges were false as early as the date of plaintiff's arraignment); *Small v. New York State Dep't of Corr. & Cmty. Supervision*, No. 12-CV-1236S, 2019 WL 1593923, at *14 (W.D.N.Y. Apr. 15, 2019)(awarding $50,000 in punitive damages for defendant's sexual harassment of plaintiff, including "unrebutted evidence of his harassing behavior, including leaving notes on Small's car, accusing Small of being with other men, filing false charges against her at work, and acting in a manner to cause the need for Small to obtain a protective order against him, all during the period when he claims to have minimized his contact with her"); *Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-CV-3461 (WFK)(JO), 2016 WL 7330554, at *1 (E.D.N.Y. Dec. 16, 2016)(award of $50,000 in punitive damages for defendant-employer using "an

23

A-3132

Instagram photo comparing Plaintiff[-employee], an African American Home Health Aid, to a fictional chimpanzee from the movie Planet of the Apes," otherwise creating a racially hostile work environment for plaintiff and retaliating against plaintiff after plaintiff complained); *Milfort v. Prevete*, 3 F. Supp. 3d 14, 26 (E.D.N.Y. 2014)(awarding $5,000 of punitive damages against police officer who "unjustly targeted and falsely arrested" plaintiff); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011)(awarding $50,000 in punitive damages for defendant's retaliatory conduct which violated federal and state discrimination statutes and "was certainly reprehensible"); *Norris v. New York City Coll. of Tech.*, No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y. Jan. 14, 2009)(award of $25,000 in punitive damages where defendant "acted intentionally and with knowledge that his conduct would violate [plaintiff's] rights").

Consequently, the Jury's $280,000 punitive damages award for Plaintiff's defamation claim clearly violated due process under *Gore*, and the Court should grant a new trial as to such punitive damages, or grant a remittitur of such award to an amount no more than $50,000.

A-3133

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant his Motion for

a new trial or remittitur pursuant to Fed. R. Civ. P. 59 to the amounts set forth above, with such further

and other relief as the Court deems just and equitable.

Dated: New York, New York
      June 8, 2023

<div style="margin-left:40%;">

TACOPINA, SEIGEL & DeOREO

By: _____

Joseph Tacopina, Esq.
Chad Seigel, Esq.
Matthew G. DeOreo, Esq.
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
mdeoreo@tacopinalaw.com
*Counsel for Defendant Donald J. Trump*

</div>

25

A-3134

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

E. JEAN CARROLL,                                          Civil Action No.:
                                                          22-cv-10016
                        *Plaint₍ᵢ₎f,*

    – against –

DONALD J. TRUMP,

                        *Dₑfendant.*
------------------------------------------------------------------X

## DECLARATION OF MATTHEW G. DeOREO

I, MATTHEW G. DeOREO, declare as follows under the penalty of perjury:

1.     I respectfully submit this Declaration in support of Defendant Donald J. Trump's

motion for an Order, pursuant to Fed. R. Civ. P. 59, granting a new trial or remittitur, with such other

and further relief as the Court deems just and proper.

2.     The sole purpose of this Declaration is to submit Exhibits to the Court. These exhibits

are as follows:

a.     **Exhibit A**: A true and accurate copy of Plaintiff's Complaint filed in this

        Action;

b.     **Exhibit B**: True and complete copies of relevant portions of the trial

        transcript for this case; and

c.     **Exhibit C**: A true and accurate copy of Plaintiff's Complaint filed in *Carroll*

        *I* (*Carroll v. Trump*, 1:20-cv-73 11-LAK).

d.     **Exhibit D**: A true and accurate copy of the Verdict Form filed in this Action

A-3135

3.      I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       June 8, 2023

                    /s/ Matthew G. DeOreo
                    MATTHEW G. DeOREO

2

A-3136

# EXHIBIT B

Case 23-793, Document 87, 11/20/2023, 3592074, Page77 of 279

A-3137

1    situation, to kill anything that he might think invited the

2    attack.

3            When Trump didn't stop, Ms. Carroll shoved him.  She

4    kicked at him.  She stomped her feet.  She struggled.  She hit

5    him with her purse, tried to knee him off her.  But she

6    couldn't.  He was a big man, had easily a hundred pounds on

7    her.  And he was determined.

8            Trump grabbed her arms with one hand and held her up

9    against the wall.  He took his other hand and jammed it up her

10   dress, pulling down her tights, grabbing her vagina, and

11   pushing his fingers inside her.  He kept his fingers there for

12   a few seconds and then removed his hands and forced his penis

13   inside her.

14           Eventually, Ms. Carroll was able to get her knee up

15   high enough to get Donald Trump off of her.  She pulled up her

16   tights, ran out the dressing room, and fled the store out onto

17   Fifth Avenue.  The whole attack lasted just a few minutes, but

18   it would stay with her forever.

19           During this trial you are going to hear from

20   Ms. Carroll, and she will describe in painstaking and painful

21   detail what happened that evening in Bergdorf.  I expect that

22   you will find her testimony credible and convincing, both

23   because of what she will say and what she will not say.  You

24   will not hear Ms. Carroll embellish her story or try to make it

25   sound better than it is.

Case 23-793, Document 87, 11/20/2023, 3592074, Page78 of 279

1          It was hardly a surprise that Donald Trump and

2     Ms. Carroll were the only people in this area of the sixth

3     floor of Bergdorf's that night, that no one saw them in the

4     minute or two it took them to walk from the escalators to

5     lingerie, and that no one heard, as Ms. Carroll struggled to

6     break free of Trump's brief brutal attack.

7          But there is more.  As I mentioned, Ms. Carroll told

8     two friends about the assault almost immediately after it

9     happened, and you are going to hear from them as well.

10         Ms. Carroll will testify that after she escaped the

11    dressing room, she ran out of the store onto Fifth Avenue.

12    Disoriented, shocked, and not knowing what to do, she pulled

13    out her cell phone -- yes, they had them in the '90s -- and

14    called her friend, Lisa Birnbach, another respected journalist.

15         Ms. Birnbach will testify that when she answered the

16    phone, Ms. Carroll was hyperventilating and was anxious as she

17    reported what just happened.  Ms. Carroll told Ms. Birnbach

18    that she had run into Donald Trump as she was leaving

19    Bergdorf's, that he asked her to help him pick out a gift, that

20    they ended up in the dressing room of the lingerie department,

21    and that Trump pulled down her tights and forced his penis

22    inside her.  You will hear that Ms. Birnbach told Ms. Carroll,

23    in no uncertain terms, E. Jean, you have been raped.  You have

24    to go to the police.  But Ms. Carroll said no.  She was ashamed

25    and she was afraid.  So she made Ms. Birnbach promise never to

1   Q.  How large a family?

2   A.  Mother, father, four children, and a dog and a cat.

3   Q.  Where do you fall in the children?

4   A.  I am the firstborn.

5   Q.  Are you currently married?

6   A.  No.

7   Q.  Why are you here today?

8   A.  I am here because Donald Trump raped me, and when I wrote

9   about it, he said it didn't happen.  He lied and shattered my

10  reputation, and I am here to try to get my life back.

11  Q.  We are going to talk at length about that in a few minutes,

12  but let's first cover a little bit more of your background.

13  Okay?

14  A.  Um-hmm.

15  Q.  Where did you go to college?

16  A.  Indiana University.

17  Q.  Can you give us a sense of what sorts of activities you

18  were involved in?

19  A.  I was in a sorority and I was a cheerleader.

20  Q.  How about beauty pageants?

21  A.  My sorority would nominate me to be in beauty pageants.

22  Q.  I want to show you what's been marked for identification as

23  Plaintiff Exhibit 13.

24          Do you recognize this?

25  A.  Yes.  That's Ms. America on the right and that's my

Case 23-793, Document 87, 11/20/2023, 3592074, Page80 of 279

A-3140

N4q2Car4                         Carroll - Direct                    216

1   Q.  Why not?

2   A.  I -- the short answer is because Donald Trump raped me.

3   Q.  How did that affect you in a way -- can you describe for

4   the jurors why that assault left you unable to form a romantic

5   connection?

6   A.  What I did was I flirted with Donald Trump.  I laughed with

7   him.  I tried to be -- tried to engage him.  I laughed at his

8   jokes.  I found him charming.  And what happened to me when I

9   was flirting?  I got into serious trouble.  And so I, after

10  that event, I found it's impossible for me -- if I meet a man

11  who is a possibility, it's impossible for me to even -- well,

12  to even look at him and smile.  And in order to fall in love or

13  have dinner with someone, you've got to at least look at them

14  in the eye and smile, and I couldn't -- I couldn't force myself

15  to show a man that I liked that I liked them.  I couldn't do

16  it.  It just led to terrible consequences, hence, I didn't meet

17  anybody.

18  Q.  I'm sorry to ask this so directly, but have you had sex

19  since Donald Trump assaulted you?

20  A.  No.

21  Q.  This person you just described to us as sort of having shut

22  down, is that how you portrayed yourself on television

23  following the assault or in public appearances?

24  A.  No, I have a, I have a, I have a public self, which is

25  vibrant and wanting to help everyone, and always, always upbeat

1    A.   Because he -- Cam didn't -- it was not violent.

2    Q.   Has -- sorry?

3    A.   The incident in Bergdorf's was very violent.

4    Q.   I want to -- for clarification, was the -- you mentioned

5    William Goldman.  Was your relationship with William Goldman

6    before or after Mr. Trump assaulted you?

7    A.   Before.

8    Q.   Have you ever been diagnosed with any mental health

9    conditions such as PTSD or depression?

10   A.   No.

11   Q.   Have you taken any medication for depression or anxiety?

12   A.   No.

13   Q.   Are you a happy person, Ms. Carroll?

14   A.   I am a happy person.  I know it seems strange to hear me

15   after today, but I'm basically a happy person.  But I think I

16   could work on a few things.

17   Q.   How often, if at all, do you think about the assault that

18   night at Bergdorf's?

19   A.   Well, that very night the visions would wash over me.  I

20   couldn't -- it was horrible.  Not only did it happen in

21   Bergdorf, but it happened over and over and over in my mind

22   because I did not have the ability to strike to get the visions

23   out of my head.

24        As I learned to deal with the sudden intrusions, I got

25   better and better at moving them aside.  And so they -- I've

Case 23-793, Document 87, 11/20/2023, 3592074, Page82 of 279

A-3142

N4q2Car4                     Carroll – Direct                     233

1   Q.   Why did you think he was evil?

2   A.   Because he raped me.

3   Q.   What about his politics?  Do you agree with those?

4   A.   I barely know what they are.

5   Q.   What did you think of him as a president?

6   A.   Oh, I thought he was terrible.

7   Q.   Why didn't you speak publicly about the assault when he

8   first started running for election?

9   A.   My mother was dying in Indiana.  I was at her side with my

10  brothers and sisters.  That was during October.  And I

11  noticed—and I'm sure I'm not the only one—that the more women

12  who came forward to accuse him, the better he did --

13           MR. TACOPINA:  Objection, your Honor.

14  A.   -- in the polls.

15           MR. FERRARA:  Apologies.  There was an objection, your

16  Honor.

17           THE COURT:  I'm sorry.  I didn't hear it at all.

18           MR. TACOPINA:  Sorry.

19           THE COURT:  I'm always listening for Mr. Tacopina's

20  very soft voice.

21           MR. TACOPINA:  It hasn't even been that often.

22           THE COURT:  That is true.

23           What is the objection, Mr. Tacopina.

24           MR. TACOPINA:  The reference, your Honor, on line 24,

25  end of line 24.

Case 23-793, Document 87, 11/20/2023, 3592074, Page83 of 279

Case 1:22-cv-10016-LAK   Document 206-2   Filed 06/21/23   Page 8 of 83

N4QMCAR5                          Carroll - Direct                          262

1    Q.  Sitting here today, do you recall what he said?

2    A.  Yes.

3    Q.  Can you describe, to the best of your recollection, what

4    you remember.

5    A.  It was surprising because I thought he would deny it

6    because Donald Trump generally denies.

7                MR. TACOPINA:  Objection, your Honor.

8                THE COURT:  Sustained.

9                Rephrase the question, counselor.

10   Q.  Let me do it this way.  Let me show you what has been

11   marked for identification as Plaintiff Exhibit 1.

12   A.  Oh.  Thank you.

13   Q.  Do you recognize this?

14   A.  Yes.

15   Q.  What is this?

16   A.  It's a statement from President Donald J. Trump.

17   Q.  What's the date?  It's at the bottom.

18   A.  June 21, 2019.

19   Q.  Without getting into the substance, is this statement

20   responding to your accusation?

21   A.  Yes.

22                MR. FERRARA:  Plaintiff offers Exhibit 1, your Honor.

23                MR. TACOPINA:  No objection.

24                THE COURT:  Received.

25                (Plaintiff's Exhibit 1 received in evidence)

Case 23-793, Document 87, 11/20/2023, 3592074, Page84 of 279

A-3144

1          MR. FERRARA:  If we could publish this, please, Mr.

2    Lam.

3          Mr. Lam, if we could zoom into the sort of box -- if

4    we could scroll down a little further.  I am not going to read

5    this, but I am just going to leave for the jury to look at.

6    Q.  I just want to call your attention, Ms. Carroll, to just a

7    few lines in this.

8    A.  Yes.

9    Q.  If we look at the second line down, do you see it says I

10   have never met this person in my life?

11   A.  Yes.

12   Q.  She is trying to sell a new book?

13   A.  Yes.

14   Q.  That should indicate her motivation.

15   A.  Right.

16   Q.  I'd like to call your attention to the bottom.  If anyone

17   has information that the democratic party is working with

18   Ms. Carroll and New York magazine, please notify us as soon as

19   possible.

20   A.  Um-hum.

21          MR. FERRARA:  We can bring that down, Mr. Lam.  Let's

22   bring up Plaintiff's 2.

23   Q.  Do you recognize this?

24   A.  Yes.

25   Q.  What is it?

1   A.   It's an impromptu press conference with President Trump

2   before Marine One, before the helicopter -- before he gets on

3   the helicopter.

4   Q.   What's the date in the front of this document?

5   A.   June 22, 2019.

6   Q.   Would this be the day after?

7   A.   Yes.

8   Q.   Would this be the day after the piece came out in the cut?

9   A.   Yes.

10  Q.   If we turn to --

11            MR. FERRARA:  Mr. Lam if we can turn to the page that

12  has the Bates stamp ending 1800.   That's the one.

13  A.   Um-hum.

14  Q.   On this page does then President Trump address a question

15  about you?

16  A.   Yes.

17            MR. FERRARA:  Your Honor, plaintiff offers 2 with the

18  same caveat that we will endeavor with defense to make sure

19  that we only have in the relevant portions of this exhibit.

20            MR. TACOPINA:  With that agreement, yes, your Honor.

21            THE COURT:  Received on that basis.

22            (Plaintiff's Exhibit 2 received in evidence)

23            MR. FERRARA:  If we could just show the front page,

24  Mr. Lam.   If we could zoom in on the middle, remarks by

25  President Trump, just so the jury can orient themselves, the

A-3146

N4QMCAR5                         Carroll – Direct                    265

1    middle of the page, the date.  If we could now flip to 1800,

2    the bottom question and that response.

3            Is there a way to pull that out?  Thank you so much,

4    sir.

5    A.  Um-hum.

6    Q.  Again, just, to flag a few portions, certainly not to read

7    this all, then President Trump says:  I have no idea who this

8    woman is.

9    A.  Yes.

10   Q.  That you have accused other men of things?

11   A.  Yes.

12   Q.  It's a totally false accusation?

13   A.  Yes.

14   Q.  You see that?

15   A.  Yes.

16           MR. FERRARA:  If we can flip the page to 1801 at the

17   top.

18   A.  Um-hum.

19           MR. FERRARA:  We can now take this down.  Thank you.

20           Why don't we put up, just for the witness.

21   Q.  If I could show you, Ms. Carroll, what's been marked for

22   identification as Plaintiff's Exhibit 3.

23   A.  Yeah.

24   Q.  What is this?

25   A.  This is June 24, 2019.  It is an interview with President

Case 23-793, Document 87, 11/20/2023, 3592074, Page87 of 279

A-3147

1   Trump by The Hill, the website The Hill.

2              MR. FERRARA:  Your Honor, plaintiff offers Exhibit 3.

3              MR. TACOPINA:  No objection.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 3 received in evidence)

6              MR. FERRARA:  If we could show this to the jurors,

7   please.

8              MR. TACOPINA:  Your Honor, there is no problem with it

9   going in.

10             MR. FERRARA:  If we can sort of minimize this, and we

11  can turn to the next page.

12  Q.  If we look at the top, calling your attention, Ms. Carroll,

13  there, President Trump is quoted as saying:  You are totally

14  lying.

15  A.  Yes.

16             MR. FERRARA:  If we could go to the third paragraph,

17  please, Mr. Lam, where he says:  I'll say it with great

18  respect.  Number 1, she's not my type.  Number 2, it never

19  happened.  It never happened, OK.

20  A.  Um-hum.

21             MR. FERRARA:  We could take that down.

22  Q.  What do you understand that to mean, Ms. Carroll, that

23  you're not his type?

24  A.  It means that besides me being a liar and a woman out to

25  sell books and an operative of the democratic party and a woman

Case 23-793, Document 87, 11/20/2023, 3592074, Page88 of 279

A-3148

N4QMCAR5                    Carroll - Direct                    267

1    who accuses all sorts of other men for rape.  I'm too ugly to

2    attack, too ugly to rape.

3            (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 87, 11/20/2023, 3592074, Page89 of 279

A-3149

1  Q.  I think before I showed you those exhibits, I think you may

2  have said you were surprised by how Mr. Trump reacted?

3  A.  Yeah.

4  Q.  And I will just ask you directly, Ms. Carroll, you had

5  related, you know, an account in which you said that he had

6  raped you.  How did you expect him to respond?

7  A.  I thought he was going to say it was consensual.

8  Q.  Why was what he actually said so much -- why was it worse

9  than him describing it as consensual?

10  A.  He said it didn't happen.  He said it didn't happen.  He

11  was there.  He knows it happened.

12  Q.  Did anyone from then-president Trump's staff reach out to

13  you about your allegations?

14  A.  No.

15  Q.  Did anyone on his behalf ask about your political

16  affiliations?

17  A.  No.

18  Q.  What about your financial situation?

19  A.  No.

20  Q.  What happened after -- what happened to you after Mr. Trump

21  made those statements?

22  A.  People have gone through much worse than being reviled by

23  president Trump for three days, much worse.  I understand that.

24  But, boy, it hit me and it laid me low because I lost -- I lost

25  my reputation.  Nobody looked at me the same.  It was gone.

N4q2Car6                    Carroll — Direct                    269

1   Even people who knew me would look at me with, you know, pity

2   in their eyes and the people who had no opinion now thought I

3   was a liar and hated me.  Oh my God.  The force of hatred

4   coming at me was staggering.

5   Q.  How did it -- how did that hatred, how did it come at you?

6   In what form?

7   A.  People telling me they are reading about it on the

8   Internet, am I E. Jean Carroll; opening up my e-mail and seeing

9   threats against my life; opening up my *Ask E. Jean* letters

10  which are generally -- you know, it's my lifeline, it gives me

11  spirit, reading Ask E. Jean, and they are saying terrible

12  things to me.

13  Q.  Did I hear -- I apologize.

14          How many messages sort of threatening you physically

15  did you receive?

16  A.  Not a lot, but serious threats, around ten.

17  Q.  What was your reaction to receiving in particular those

18  threatening messages?

19  A.  I bought bullets for a gun that I owned.

20  Q.  What did you do with the messages themselves?

21  A.  Oh, I deleted them immediately.

22  Q.  Why did you delete them?

23  A.  Well, they were on my computer.  I thought I could handle

24  it just by getting -- deleting them and never seeing them

25  again.

Case 23-793, Document 87, 11/20/2023, 3592074, Page91 of 279

A-3151

N4q2Car6                     Carroll - Direct                     270

1   Q.  To be clear, has anyone physically hurt or attacked you

2   since president Trump made those statements?

3   A.  No.

4   Q.  Did you also -- have you also received positive support

5   since --

6   A.  Yes.

7   Q.  Just for the court reporter's sake, I am just going to

8   repeat the question.

9          Have you received positive support since Mr. Trump

10  made those statements?

11  A.  Yes.

12  Q.  In what form has that -- did that take?

13  A.  Loving, heart-swelling letters coming from people all over

14  the country.  You know, it bore me up.  But here's the thing.

15  The vileness and the dirt and the seedy language and people

16  describing what they think I did and why nobody in the world

17  would touch me because of my enormous ugliness, it sort of

18  swamped the heartfelt letters that I was receiving on the other

19  hand.

20  Q.  Sitting here today, are you happy you have spoken publicly

21  about what Mr. Trump did to you or do you regret it?

22  A.  I have regretted this about a hundred times, but in the

23  end, in the end, being able to get my day in court finally is

24  everything to me, so I'm happy.

25  Q.  Are you okay to keep going?  Do you --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 23-793, Document 87, 11/20/2023, 3592074, Page92 of 279

N4q2Car6                        Carroll – Direct                         271

1    A.  I'm happy.  This is -- I'm happy.  I'm glad that I got to

2    tell my story in court.

3              MR. FERRARA:  Your Honor, I don't want --

4    Q.  Ms. Carroll, do you want to take a moment?

5    A.  Yes, I'm going to get myself together here in court.  This

6    is my moment.  I'm not going to sit here and cry and waste

7    everybody's time.

8    Q.  So shall I keep going?

9    A.  Yes.

10   Q.  Okay.  How, if at all, do you believe that Mr. Trump's June

11   2019 statements have affected your reputation?

12   A.  I am no longer believed.  I got fired.  I lost my readers.

13   I lost eight million readers.  My magazine work has suffered.

14   The number of letters I receive has gone down.  I am still in

15   their swinging.  I've still got my Ask E. Jean column on

16   Substack, and I have got 19,000 readers.  But it's been a huge

17   loss, and I'm slowly building it back.

18   Q.  If you don't mind, I'm going to unpack some of what you

19   just said.

20             So I think I heard you say you were fired.

21   A.  Yeah.

22   Q.  From where were you fired?

23   A.  *Elle* magazine.

24   Q.  When did they fire you?

25   A.  They fired me -- they came to my house, a five-member

1   photographic crew, to take my picture for the next two years,

2   and then at the end of the year they fired me.

3   Q.  Do you know why you were fired?

4   A.  Yes.

5   Q.  Why?

6   A.  Because I accused Donald Trump.

7   Q.  Were you able to obtain a new job?

8   A.  No.

9   Q.  What do you do now for work?

10  A.  I have a Substack.

11  Q.  And what is Substack?

12  A.  A Substack is a way for writers to reach their audience,

13  their readers, directly through newsletters.

14  Q.  What was the readership of your column in *Elle* towards the

15  end, sort of the end of the period you were writing that column

16  for *Elle*?

17  A.  Eight million.

18  Q.  What is the readership of your Substack now?

19  A.  It's probably gone down from -- I just said 19,000, it's

20  probably 18,098.  I don't know.  I haven't looked at it today.

21  Q.  Well, how would you compare financially.  How much were you

22  making your last year at *Elle* versus what you are making now at

23  Substack?

24  A.  Well, because I worked -- because the *Elle* column was

25  published once a month and I received $5,000 a month, I think

Case 23-793, Document 87, 11/20/2023, 3592074, Page94 of 279

A-3154

N4q2Car6                    Carroll - Direct                    273

1   it was $5,000?  Yeah, $5,000 a month.  And now I turn out three

2   columns every week, so I am doing, I don't know, ten times the

3   work, and I still manage to have about the same income.

4   Q.  Might it be a little more?

5   A.  Slightly more, yeah.

6   Q.  Do you pitch work to other publications?

7   A.  Yes.

8   Q.  What other publications have you written for since you left

9   *Elle*?

10  A.  Outside -- no, *Vanity Fair* and *Atlantic*.

11  Q.  I want to ask you a couple of questions about the articles

12  you wrote for *The Atlantic*.

13  A.  Yes.

14  Q.  Are you familiar with a woman named Jessica Leeds?

15  A.  Yes.

16  Q.  Who is Jessica Leeds?

17  A.  Jessica Leeds is a woman my age who came -- who told her

18  story to *The New York Times* about Donald Trump on an airplane

19  in 1980 or 1979.

20  Q.  Have you ever interviewed Ms. Leeds?

21  A.  Yes, I have.

22  Q.  Why?

23  A.  When I told my story, people started to compare me to the

24  other women who have come forward.  And as a journalist, I

25  realize that the other women's stories had not been told in

Case 23-793, Document 87, 11/20/2023, 3592074, Page95 of 279

A-3155

317

N4RMCAR2                           Carroll - Direct

1   Q.  Why?

2   A.  I'm a journalist.  From time to time, I report on the case.

3   It's something that I find interesting.  I think a few other

4   people might also.

5   Q.  For my next question, if you could remind the jurors, you

6   currently write for Substack?

7   A.  Yes.

8   Q.  Remind us quickly, what is Substack?  What do you write for

9   Substack?

10  A.  Substack is a way for writers, journalists to reach their

11  readers through newsletters.

12  Q.  Have you encouraged people to subscribe to your Substack in

13  order to get updates from you about this case?

14  A.  Yes.

15  Q.  Why have you done that?

16  A.  I thought people would be interested, and I certainly have

17  received the response that they are very, very interested in

18  this case.

19  Q.  How, if at all, does it help you financially to have

20  additional subscribers to your Substack?

21  A.  It would definitely help financially.

22  Q.  How did you feel when you first filed the case in 2019?

23  A.  Scared, but proud.

24  Q.  Fair to say this is -- would this be the fourth year that a

25  lawsuit has been going on?

Case 23-793, Document 87, 11/20/2023, 3592074, Page96 of 279

N4RMCAR2                         Carroll - Direct

1    A.   Yes.

2    Q.   From the time you filed it to now, have there been

3    important moments along the way?

4    A.   Yes.

5    Q.   How, if at all, have you celebrated some of those moments?

6    A.   I wouldn't call celebrating, but I would call it enjoying a

7    good moment.

8    Q.   How have you enjoyed those good moments?

9    A.   Meet with my friends.  We might have a toast.  And feel

10   that we were happy to be together.

11   Q.   Have some of those been what we think of as parties?

12   A.   Yes.

13   Q.   What sorts of folks would be at some of these parties?  Can

14   you give us a sense?

15   A.   Yes.  Journalists, podcasters, commentators.

16   Q.   How about folks we would think of as celebrities?

17   A.   Yes.

18   Q.   Have you enjoyed the attention you have received from this

19   case?

20   A.   I like attention.  There is no question, I like attention.

21   I don't particularly like attention because I'm suing Donald

22   Trump.  That is not -- getting attention for being raped is

23   not -- it's hard.  Getting attention for making a great

24   three-bean salad, that would be good.

25   Q.   Do you ever regret bringing this lawsuit?

N4RMCAR2                    Carroll - Direct

1   Q.   Why did you agree in the first place?

2   A.   I was a big admirer of Ivy's work.

3   Q.   Why did you stop filming?

4   A.   Because this lawsuit became very important, and Ivy and I

5   decided together, we should cease.

6   Q.   Have you received any payments for that documentary?

7   A.   No.

8   Q.   I want to call your attention -- I think this is sort of

9   the last topic.  I want to call your attention to October of

10  2022.

11  A.   Yes.

12  Q.   Do you recall, what, if any, additional relevant statements

13  did Donald Trump make at that time?

14  A.   Just when I had managed to get my Substack up and running,

15  get my career a little bit back and feeling that things were

16  going to be OK, Donald Trump posted on social media every

17  single thing that I was suing him for.  He repeated it on

18  October 12 and then added the fact that he thought the justice

19  system in America was broken, and one of the prime examples of

20  the justice system being broken was my suing him.

21  Q.   Let me show you what has been marked for identification as

22  Plaintiff's Exhibit 4.

23          Do you recognize this?

24  A.   Yes.

25  Q.   What is it?

N4RMCAR2                    Carroll - Direct

1   A.  This is Donald Trump's Truth Social piece.

2   Q.  Are you able to see the date?

3   A.  October 12, 2022.

4           MR. FERRARA:  Your Honor, plaintiff offers 4.

5           THE COURT:  Received.

6           (Plaintiff's Exhibit 4 received in evidence)

7           MR. FERRARA:  If we could show that to the jury, Mr.

8   Lam.

9           THE COURT:  Yes.

10          MR. FERRARA:  Thank you.

11          Mr. Lam, maybe we could scroll up and focus right

12  underneath where it says statement by Donald J. Trump.  That

13  probably works.

14  Q.  Is this the statement, Ms. Carroll, where Mr. Trump called

15  your case a con job?

16  A.  Yes.

17  Q.  Where he called the justice system a broken disgrace?

18  A.  Yes.

19  Q.  Just focusing on the middle, again, he says, this woman is

20  not my type?

21  A.  Yes.

22          MR. FERRARA:  I am just giving the jurors another

23  moment to read it, your Honor.  Of course, the jurors will have

24  this as a marked exhibit.

25          Mr. Lam, I will ask that you take this down and we can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4RMCAR2                    Carroll - Direct

1   keep moving.

2   Q.   Are you on Truth Social, Ms. Carroll?

3   A.   Yes.

4   Q.   How did you find out about this statement?

5   A.   I heard from several people that he had posted it.

6   Q.   How, if at all, do you believe this statement affected your

7   reputation?

8   A.   I really thought I was gaining back a bit of ground.   I

9   thought, it's starting to go and I felt, you know, happy that,

10  you know, I was back on my feet, had garnered some readers, and

11  feeling pretty good, and then, boom, he knocks me back down

12  again.

13  Q.   Were you surprised by the statement?

14  A.   Stunned.

15  Q.   Why?

16  A.   Because I'm suing him for saying these very things.

17  Q.   In light of Mr. Trump's October 22 statement, did you file

18  a second lawsuit?

19  A.   Yes.

20  Q.   Is that second lawsuit why we are here today?

21  A.   Yes.   This is why we are here.

22  Q.   What did you sue him for in the second lawsuit?

23  A.   I sued him for defamation of character.

24  Q.   Anything else?

25  A.   Yes.   I also sued him for assault.

N4r2Car3                    Carroll - Cross

1   *For,* the one that's up on the screen --

2           MR. TACOPINA:  Your Honor, is it on the screen for

3   everyone in this courtroom?  Could the Court inquire?

4           THE COURT:  Yes.

5           MR. TACOPINA:  The jury as well?  Okay.

6   BY MR. TACOPINA:

7   Q.   Now, that is your book in which you included the story

8   about your supposedly being raped by Donald Trump in a Bergdorf

9   Goodman changing room, right?

10  A.   Not supposedly.  I was raped --

11  Q.   Right.

12  A.   -- by Donald Trump.

13  Q.   That's your version, correct?

14  A.   In Bergdorf.

15  Q.   That's your version, right, Ms. Carroll, that you were

16  raped?

17  A.   Those are the facts.

18  Q.   Okay.  And that's what you included in this book, right?

19  A.   Yes.

20  Q.   And you said yesterday you didn't say anything about the

21  rape when he was running, Mr. Trump, that is, was running for

22  president because you were troubled by the fact he was running

23  for president, but you didn't say anything about it publicly

24  because your mother was dying.  That's what you said yesterday,

25  right?

N4RMCAR4                         Carroll - Cross

1   you were still trying to come up with an explanation for your
2   story as why you did not scream.
3   A.   I wasn't coming up with a story.  It's usually -- I would
4   say more than usually under discussion when a woman is raped
5   and she doesn't scream.  It's usually discussed, why didn't she
6   scream.  Why didn't you scream, E. Jean?  Why didn't you
7   scream?  It's what a woman -- you better have a good excuse why
8   you didn't scream.  Because if you didn't scream, you weren't
9   raped.  I'm telling you, he raped me, whether I screamed or
10  not.
11  Q.   You need a minute, Ms. Carroll?
12  A.   No.  You go right on.
13  Q.   Aside from you not being a screamer, another reason you
14  gave for possibly not screaming was because you were wondering
15  if the pressure Donald Trump's shoulder placed against your
16  chest interfered with your ability to scream, correct?
17  A.   It could be.  I don't need an excuse for not screaming.
18  Q.   OK.
19         Despite that, you certainly wish your story included
20  you having screamed?
21  A.   Of course I do.  More people would have believed me if I
22  had screamed.
23  Q.   Aside from not being a screamer, and perhaps his chest was
24  interfering with your ability to scream, along the same lines
25  at some point you prepared a list of questions -- list of

N512Car3                          Carroll - Cross

1    A.   I meant the story was so funny, shopping with Donald Trump

2    in Bergdorf's, it was such a meaty, juicy, hilarious story.  I

3    was looking forward to actually going out soon and telling

4    everybody the story, perhaps writing about it.  It was just --

5    it was such a New York story, and such a happy story, and then

6    of course it turned tragic.

7    BY MR. TACOPINA:

8    Q.   Now, you first you heard the judge describe the two

9    different lawsuits.  In the first lawsuit you sued Donald Trump

10   in November of 2019.

11   A.   Yes.

12   Q.   And during the course of that lawsuit, in 2021 you started

13   writing a blog on Substack.

14   A.   Yes.

15   Q.   And you make money from your blog based on your

16   subscribers?

17   A.   Yes.

18   Q.   In fact, from that blog you make $70,000 a year or did.

19   A.   Yes.

20   Q.   And you agree that's certainly successful for a Substack

21   blog.

22   A.   Yes.

23   Q.   You talked about a documentary with that famed documentary

24   producer Ivy, it's Meeropol, right?

25   A.   Yes.

N512Car3                    Carroll - Cross

1   BY MR. TACOPINA:

2   Q.  Okay.  So what you were saying was that obviously you were

3   making more money with your Substack podcast than you had done

4   previously?

5   A.  Yes.

6   Q.  Okay.  And the reason you were able to make more money with

7   your podcast following your accusations against Donald Trump is

8   because of the number of people who subscribed to your podcast.

9            MR. FERRARA:  Objection.

10           THE COURT:  Overruled.

11  A.  In part, yes.

12  Q.  Now, it would be fair to say, Ms. Carroll, that your life

13  has been fabulous since your book came out.

14  A.  That is what I like my life to appear to be.

15  Q.  Okay.  As a matter of fact, that's what you said, correct,

16  in the past?

17  A.  I say it quite a bit.  That is how I want people to

18  perceive me.  Underneath my private self is another thing

19  altogether.

20  Q.  Well, you were going on all these TV shows and podcasts

21  after the allegations came out and, for example, in December of

22  2019, you -- that was one month after you filed your initial

23  lawsuit against Donald Trump, right?  December 2019?

24  A.  Yes.

25  Q.  Yeah.  So you appeared on a podcast called the Maris

N512Car3                         Carroll - Cross

1    Review, BV.

2              Please show it to the witness.

3              Do you remember the Maris Review podcast?

4    A.  Yes.

5    Q.  We don't have to play that now.  It's okay.  Take it down.

6              During that podcast, you confirmed that your life had

7    been fabulous since the book came out, right?

8              THE COURT:  Sustained as to form.

9              MR. TACOPINA:  Yeah.

10   BY MR. TACOPINA:

11   Q.  During that podcast, you confirmed or you stated that your

12   life had been fabulous since the book came out.

13   A.  I always say my life is fabulous.  No matter who asks me,

14   what time of day, I will always reply it's fabulous.

15   Q.  Except in this courtroom in front of this jury?

16   A.  In this courtroom I am being forced to tell the truth.

17   Q.  So all these TV shows and all these podcasts and in your

18   book where you say how great your life is, that's all lies?

19   A.  No.  I want -- if I walked in the courtroom today and you

20   said:  Hi, E. Jean.  How are you?  I would have said:  Fine.

21   I'm fabulous.  It is my -- it is the way I present myself to

22   the world.  It's E. Jean the writer, E. Jean the advice

23   columnist.  I am the one, rightly or wrongly, I see myself as

24   solving other people's problems.  That is what my Substack is.

25   That is what I have done for almost 29 years.  So I always say

N512Car3                    Carroll - Cross

1    I'm fine.  The column is not called E. Jean Asks Other People

2    For Their Advice.  It's called Ask E. Jean.  I put up a front.

3    Q.  Right.  I'm not talking --

4    A.  That's what I said.

5    Q.  -- about your column, your advice column, Ms. Carroll, I'm

6    talking when you go on TV or radio or interviews or podcasts

7    and are asked about the incident with Donald Trump, you always

8    say that you are fabulous now.

9    A.  Of course I do.

10   Q.  Okay.

11   A.  I don't want anyone to know I suffered.  I did not and

12   still don't, unfortunately, during this trial I have to reveal

13   what is actually going on, but up until now, I would be ashamed

14   to know -- let people know what is actually going on.

15   Q.  You also explain on that podcast that you were receiving

16   lots of support --

17   A.  Um-hmm.

18   Q.  -- since your book came out?

19   A.  Um-hmm.

20   Q.  Yes?

21          THE COURT:  Please answer with words.

22   A.  Yes.

23   Q.  And you confirm you were receiving lots of love?

24   A.  Yes.

25   Q.  In fact, you were receiving several invitations to parties

N512Car3                         Carroll - Cross

1    relating to your litigation against Donald Trump.

2    A.   One or two parties, yes.

3    Q.   I am going to show you what's been marked as BW, a text

4    message -- well, just take a look at it, BW, please, for the

5    witness and counsel.

6          Before -- let me ask you this question first,

7    Ms. Carroll, before you read all that.

8          Do you recall sending a text message to Carol

9    Martin --

10   A.   Yes.

11   Q.   -- about invitations to parties.

12         Okay I'm going to offer BW, your Honor?

13         MR. FERRARA:  Just one moment, your Honor, please.

14   A.   Um-hmm, um-hmm, um-hmm, yes.

15         THE COURT:  There is no question yet, Ms. Carroll.

16         THE WITNESS:  Oh.

17         MR. FERRARA:  No objection.

18         MR. TACOPINA:  Okay.

19         THE COURT:  BW is received.

20         (Defendant's Exhibit BW received in evidence)

21   BY MR. TACOPINA:

22   Q.   Please display to the jury as well.

23         In a November text message to Carol Martin -- you

24   called her, by the way, Caroly?

25   A.   Caroly.

N515car4                    Carroll - Cross

1   42 West agency in July of 2019 discussing sort of a road trip?
2   Bookings?
3   A.   Oh no.   NPR is for radio interviews, it was not a road
4   trip.
5   Q.   OK, for the radio interviews?
6   A.   It was just from my cabin.   It was not a road trip, I was
7   going to sit in my cabin and talk to NPR stations.
8   Q.   In different cities?
9   A.   In different cities.   It didn't come off.
10   Q.   In any event, you had -- you were interested in doing NPR
11   interviews for all different cities, I guess?
12   A.   Yes, and it turned out it couldn't be done.
13   Q.   OK.   OK.
14          You can take that down, please.
15          You kept track of all the attention you were getting
16   regarding your story coming out, your book and what not, with
17   Google Alerts about yourself?
18   A.   Yes, I had Google Alerts; yes.
19   Q.   And that started out around June 21, 2019?
20   A.   No.   I've always had Google Alerts.
21   Q.   After your article appeared in *The Cut*, that's again the
22   first time the story appeared publicly?
23   A.   Yes.
24   Q.   You received a lot of positive letters?
25   A.   Yes.

N512Car5                    Carroll - Cross

1           MR. TACOPINA:  Okay.

2   BY MR. TACOPINA:

3   Q.  Question to you Ms. Carroll during your deposition:

4   "Q  During the two decades that followed, how would you say the

5   alleged attack impacted your life?

6   "A  Well, four or five years ago, I would have told you it had

7   no effect.  I'm as good as new.  This is great.  I'm fine.  I

8   rarely think of it.  But I've come to understand that the rape

9   changed my life, which is shocking for me."

10          THE COURT:  I'm sorry to interrupt, Mr. Tacopina, but

11  you misread a word.

12          MR. TACOPINA:  I did?

13          THE COURT:  Start from "I'm fine."

14          MR. TACOPINA:  Line 5, your Honor?

15          THE COURT:  No, "I'm fine."

16  BY MR. TACOPINA:

17  Q.  "I'm fine.  I rarely think of it.  But I've come to

18  understand that that rape changed my life, which is shocking

19  for me to now understand.

20  "Q  When you say four or five years ago, do you remember when

21  you started this lawsuit?

22  "A  No.  Before that.  Before that.  I'm talking about the time

23  before this.

24  "Q  Before the lawsuit?

25  "A  No, before I wrote the book, before anything.  I was just

N512Car5                    Carroll - Cross

1   living my life as a normal person."

2            THE COURT:  You skipped a word.

3   BY MR. TACOPINA:

4   "A  No, before I wrote the book, before anything.  When I was

5   just living my life as a normal person."

6            MR. TACOPINA:  What line am I going to, by the way?

7            THE COURT:  You finished.

8            MR. TACOPINA:  Mike, what line was that?

9            THE COURT:  4.

10           MR. TACOPINA:  That's it?  Okay.  That's it, then.

11           THE COURT:  Is there a question?

12           MR. TACOPINA:  Yes.

13  BY MR. TACOPINA:

14  Q.  So in the decades that followed the alleged attack, you

15  thought things were fine.

16  A.  No, I didn't.

17  Q.  Well, you just heard your testimony that --

18           THE COURT:  Sustained.

19           MR. TACOPINA:  Okay.

20  Q.  In fact, according to you, you rarely thought of this

21  supposed rape by Donald Trump?

22  A.  Well, I -- when I say the word "think," that is a process

23  that I believe when I plan, when I write, I'm thinking of

24  concepts.  I didn't mention that I have intrusions.  That's not

25  thinking to me.  I had the images coming into my head.  That's

645

N515car6                          Carroll — Recross

1   A.   Yes.

2   Q.   Is this similar to other communications you received after

3   Mr. Trump's October 2022 statement?

4   A.   Unfortunately.

5           MR. FERRARA:  May I have a moment, your Honor?

6           THE COURT:  Yes.

7           MR. FERRARA:  Nothing further.

8           THE COURT:  Is there going to be anything further,

9   Mr. Tacopina?

10          MR. TACOPINA:  Yes, your Honor.

11          THE COURT:  How long?

12          MR. TACOPINA:  Not too long.

13          THE COURT:  Define not too long.

14          MR. TACOPINA:  Like a third of the ground that

15  Mr. Ferrara covered, so 5, 10 minutes.

16          THE COURT:  OK.  Go ahead.

17          MR. TACOPINA:  Thank you.

18  RECROSS EXAMINATION

19  BY MR. TACOPINA:

20  Q.   You were asked by Mr. Ferrara just now, I think the first

21  question was you were asked about how you feel finding

22  happiness finally and you said that you feel good.  Do you

23  remember that question?

24  A.   Yes.

25  Q.   But, earlier you said that your happiness was just a public

Case 23-793, Document 87, 11/20/2023, 3592074, Page111 of 279

A-3171

```
     N515car6                    Carroll - Recross
```

1  persona.  So, are you happy or are you not happy now?

2  A.  I'm happy.

3  Q.  OK.

4  A.  With undertones.

5  Q.  Happy with undertones?

6  A.  Of -- of --

7  Q.  OK.  Shall I go on?

8  A.  Of unhappiness.

9  Q.  The answer is you are happy with undertones of unhappiness?

10 A.  Yes.  It goes up and down, it is not always totally buoyant

11 and gleeful and happy.  There are times when I feel unhappy, of

12 course.

13 Q.  You testified on redirect that you were astonished that in

14 2023 someone would ask you about not screaming.  Do you

15 remember saying that?

16 A.  Yes.

17 Q.  Do you understand, Ms. Carroll, that I'm not judging what

18 is the appropriate reaction for any true rape victim, I was

19 questioning the fact that you gave four different answers for

20 not screaming?

21         THE COURT:  Sustained.  The jury will disregard that

22 remark.

23 Q.  Well, the reason you gave for not screaming was, one, you

24 are not a screamer.

25 A.  Right.

N522Car4                         Lebowitz - Direct

1   her professional work, her intimate relationships, her dating

2   life, the adversity that she's encountered, and we talked about

3   what she alleges happened with Mr. Trump and what happened

4   after that.

5   Q.  Now, how would you -- after spending all that time with

6   Ms. Carroll, how would you describe her as a person?

7   A.  Well, in the interview I found her open and forthcoming,

8   very easy to engage, not particularly introspective.  I didn't

9   think she had any signs of thought disorder, character

10  disorder, or major mental illness.  She struck me as unusually

11  vivacious and extroverted.

12  Q.  Are you being paid for your work in this case, Doctor?

13  A.  I am.

14  Q.  And can you explain how much?

15  A.  I am being paid $600 an hour.

16  Q.  Now, I said I would come back to it, and I am coming back

17  to it already, Doctor.  What makes something traumatic?

18  A.  I think that the simplest overarching way to think about

19  this is it has to do with what it feels like and what it means

20  to us.  Those two things—what it feels like and what it

21  means—have the -- can initiate a whole cascade of

22  psychological and biological responses that shape our responses

23  to a traumatic event.  I think it will be clearer if I give you

24  an example.

25          So, for example, if you think about a potentially

853

N532Carl                    Lebowitz - Direct

1   categories, and those symptoms need to be intense and
2   disruptive.
3           So in order to meet full criteria for PTSD, you are
4   talking about a pretty severe mental illness, which is often
5   chronic.  It is also the case that people can have symptoms in
6   one or two categories and suffer a lot of negative consequences
7   from that as well.
8   Q.  And in this case, Doctor, did you diagnosis Ms. Carroll
9   with PTSD?
10  A.  I did not.
11  Q.  Did -- does Ms. Carroll have symptoms in any of the four
12  categories you talked about?
13  A.  She does.  She has avoidance symptoms, she has alterations
14  in her thoughts and feelings about herself, and she has
15  intrusions.
16  Q.  Now, Doctor, based on your experience as a psychologist and
17  your reading of the literature, what percentage of people who
18  have experienced trauma then have sufficient symptoms to be
19  diagnosed with PTSD?
20  A.  You know, the data is a little bit complicated because
21  there are so many different kinds of trauma, but it's
22  approximately 20 to 30 percent of people who meet full criteria
23  for posttraumatic stress disorder.
24  Q.  And what about the people in the other 70 to 80 percent,
25  Doctor?

N532Carl                    Lebowitz - Direct

1   was a kind of real-world exposure treatment.  Suddenly he was

2   everywhere.  She couldn't avoid him.  Her symptoms got much

3   worse initially, which is what happens in exposure treatment,

4   as well.  And then they got somewhat quieter, which also

5   happens in treatment.

6   Q.  What, if anything, Doctor, did you conclude about

7   Ms. Carroll's resiliency?

8   A.  I think she is an extremely resilient person.

9   Q.  And can you explain to the jury why you think she is so --

10  why you think she is so resilient.

11  A.  You know, she never hesitated to take on challenges.  She

12  did all kinds of things that were really remarkable and unusual

13  for a woman in that time, and she had prior adversity that she

14  overcame without any significant diminishment to her life.

15  Q.  And is there anything about her background that explains to

16  you, Doctor, some of that resiliency?

17  A.  Yeah.  She had a warm, loving family.  There was a lot of

18  independence in her childhood, a lot of rough-and-tumble play

19  in her childhood, and her family, her family's culture fostered

20  a lot of grit, a lot of not attending to feelings of

21  vulnerability but, rather, simply coping with them.  So, for

22  example, when kids got hurt or when somebody got bullied or had

23  some kind of an adverse experience, the message from her family

24  was very much take care of that and move on.  It was not

25  discussed.  It was not indulged in any way.

N535CAR2                          Lebowitz - Cross

1     it is still a series of questions that one person asks another.

2     Q.  Thank you, Dr. Lebowitz.

3           So you didn't use any psychological test to determine

4     whether or not Ms. Carroll's explanation to you for her

5     squirming was truthful; right?

6           MS. KAPLAN:  Objection.

7           THE COURT:  Sustained.

8     Q.  You just mentioned there is symptoms of PTSD?

9     A.  I do.

10    Q.  You agree that Ms. Carroll does not have PTSD; correct?

11          THE COURT:  I think the answer was actually quite a

12    bit more elaborate than your purported summary of it,

13    counselor.

14          MR. SIEGEL:  Then I will ask it this way.

15    Q.  You had testified in the midst of that statement that there

16    are tests available to assess PTSD; correct?

17    A.  I did.

18    Q.  OK.

19          Does Ms. Carroll have PTSD?

20    A.  No.  That's why I didn't give her that test.

21    Q.  OK.

22          Now, during your interview, Ms. Carroll told you she

23    has intrusive images that have been ongoing since the alleged

24    rape; correct?

25    A.  She did.

N535CAR2                        Lebowitz - Cross

1    her statements.

2    Q.  But she told you she didn't watch the show a lot, right?

3            MS. KAPLAN:  Objection, your Honor.  Asked and

4    answered.

5            THE COURT:  Sustained.

6    Q.  Now, in addition to not diagnosing Ms. Carroll with

7    post-traumatic stress disorder, you also didn't diagnose her as

8    having anxiety; correct?

9            THE COURT:  Rephrase the question, counselor.  Stop

10   making your argument as part of the question.

11           MR. SIEGEL:  OK.

12   Q.  Did you diagnose Ms. Carroll with post-traumatic stress

13   disorder?

14   A.  I did not.

15   Q.  Did you diagnose her as having anxiety?

16   A.  I did not.

17   Q.  Did you diagnose her with major depression?

18   A.  I did not.

19   Q.  There is absolutely no psychological, psychiatric, or

20   therapeutic diagnosis that Ms. Carroll suffers from which may

21   have been caused by her alleged Bergdorf Goodman incident; is

22   that right?

23           MS. KAPLAN:  Argumentative, your Honor.

24           THE COURT:  I will allow it.

25   A.  If I understand your question correctly, you are asking me

N535CAR2                    Lebowitz – Cross

1   does Ms. Carroll meet diagnostic criteria for a major mental
2   illness.  The answer to that is no.  She does have symptoms
3   that fit within the rubric of post-traumatic stress disorder
4   but she does not have enough to meet the full criteria for what
5   is essentially a disabling and a chronic mental illness.
6   Q.  OK, so my question was:  There is absolutely no
7   psychological psychiatric or therapeutic diagnosis that
8   Ms. Carroll suffers from which may have been caused by her
9   alleged Bergdorf Goodman incident; is that right?
10          MS. KAPLAN:  Asked and answered and argumentative,
11  your Honor.
12          THE COURT:  Sustained.
13  Q.  A separate question, Dr. Lebowitz.  Would you agree that
14  there is no clinical diagnosis to corroborate Ms. Carroll's
15  allegation in this case?
16          MS. KAPLAN:  Objection, your Honor.
17          THE COURT:  Sustained, at least as to form.
18          MR. SIEGEL:  All right.
19  Q.  Dr. Lebowitz, is there a clinical diagnosis to support
20  Ms. Carroll's allegation in this case?
21          MS. KAPLAN:  Objection, your Honor.
22          THE COURT:  Rephrase.
23          MR. SIEGEL:  I will do it one more time.
24          THE COURT:  The problem is the word "clinical."
25          MR. SIEGEL:  OK.  Fair enough.  Thank you.

925

N535CAR2                              Lebowitz - Cross

1              (In open court)

2              THE COURT:  Next question, please.

3              MR. SIEGEL:  Thank you very much.

4    BY MR. SIEGEL:

5    Q.  Dr. Lebowitz, based on what Ms. Carroll told you, you

6    concluded that the alleged incident at Bergdorf Goodman is the

7    cause of her inability to engage in romantic and sexual

8    partners; correct?

9    A.  I did.

10   Q.  But you would agree that it is possible something else

11   other than the alleged Bergdorf Goodman incident may have

12   caused Ms. Carroll's supposed inability to engage with

13   potential romantic partners, correct?

14   A.  In psychology it is -- it is always possible.  We can only

15   ever say that things are within a certain degree of certainty.

16   We can't even say the sun is definitely going to rise tomorrow

17   as a psychologist so of course there is always a possibility.

18   Q.  Are you aware that Ms. Carroll appeared on a podcast

19   entitled *UnStyled* in August of 2019 in which she said:  Well,

20   after the episode in Bergdorf's I never had sex again, but I

21   think it wasn't because of him.  I think it was just that I

22   didn't have the luck to meet that person that would cause me to

23   be desirous again.

24   A.  If I am remembering this material correctly, I think she

25   also at some point acknowledged that one creates one's own luck

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N532Car3                          Lebowitz - Redirect

1    whom were depressed and some who weren't.  The people who were

2    depressed were assessed using a clinical interview.  They were

3    then given a test.  The idea being that if a clinician thought

4    you were depressed and you came up depressed on this test, then

5    the test is a pretty good indication of being depressed.  But

6    the gold standard is typically an in-depth clinical interview.

7              THE COURT:  I will let the answer stand, but you can

8    recross on it if you wish.

9    BY MS. KAPLAN:

10   Q.  I take it from what you just said, Dr. Lebowitz, you tend

11   not to use these kinds of tests very often?

12   A.  I don't use them very often.  I use them on occasion, but

13   not very often.

14   Q.  And in this case, did you reach a conclusion as to whether

15   tests like that would have been helpful or not?

16   A.  I did.

17   Q.  And what was the conclusion you reached?

18   A.  I didn't feel like they were going to add any valuable

19   information in this situation.

20   Q.  And can you explain why, Doctor?

21   A.  Sure.  I have assessed for trauma and PTSD so many times

22   that I actually know what the questions would be.  And it was

23   my assessment that although Ms. Carroll had some of the

24   symptoms in pretty severe form, she didn't have enough symptoms

25   in enough category to meet criteria for a full diagnosis of

N532Car3                        Lebowitz – Redirect

1   PTSD.  On the basis of my interview, I also didn't think she

2   had a major depressive disorder, a major anxiety disorder, or

3   any other form of significant mental illness.  So there was no

4   reason to do a test.  It would have just told me what I already

5   knew.

6   Q.  And during your examination of Ms. Carroll, I take it you

7   asked her a lot of questions?

8   A.  I did.

9   Q.  And is there an overlap, Doctor, between the questions you

10  asked her and the kinds of questions you would find on the

11  tests that you have been talking about?

12  A.  Yeah.  The way I structure an interview is the first part

13  of it, and that can be quite a lengthy part, the questions are

14  very open-ended.  I just want someone to tell me about their

15  life and their experiences in their own words.  If I hear

16  things that make me think there is more information that needs

17  to be gotten on that particular issue, then I may ask some more

18  structured and some more specific questions.

19          So with Ms. Carroll, you know, I'm sure my opening

20  question about the alleged event was, you know, what happened

21  and how do you -- you know, how did it affect your life.  But

22  at some point I would have asked her more specific questions

23  about the quality of her intrusions, her avoidance behaviors.

24  I would have followed up with the kinds of questions that I

25  would be asking if I was doing a more structured exam.

N545car3                          Humphreys - Direct

1    A.   Sure.  So, for the people that you see in yellow here,

2    those are more just typical people and so I didn't use that

3    high a rate, I used a rate of 1 percent for them, just assuming

4    that they're going to have a 1 percent impression rate, and

5    everybody who saw their Tweets are just going to be typical

6    people, too, and so those people also will have a 1 percent

7    impression rate.

8    Q.   So you assume that for the average person only about 1

9    percent of their followers would see the Tweet in which they're

10   Retweeting Donald Trump's statement?

11   A.   That's correct.

12   Q.   Were you able to determine the total amount of impressions

13   of Donald Trump's statement on Twitter, on the 13 Twitter

14   accounts?

15   A.   Yes.  So I calculated the impressions for each account and

16   then I added those up.

17   Q.   And how did you calculate the number of TruthSocial

18   impressions from Donald Trump's post?

19   A.   So, for TruthSocial it's pretty much just like Twitter, and

20   yet it hasn't been studied quite as much.  We also didn't have

21   full access to the Retweeting information, and so because it is

22   structurally similar to Twitter, I used the same impression

23   rate, that 6 percent rate.

24   Q.   And what were the total number of social media impressions

25   of Twitter and TruthSocial from the statement?

N545car3                        Humphreys - Direct

1   A.  So, when you add those up, then you get a high estimate of

2   5.7 million impressions and a low estimate of 1.5 million

3   impressions.

4   Q.  So, just to be clear, that means that a total of between

5   1.5 -- or the statement, Donald Trump's October 12th statement,

6   was viewed between 1.5 million and 5.7 million times on Twitter

7   and TruthSocial?

8   A.  That's right, yes.

9   Q.  You also calculated television impressions from Donald

10  Trump's statement.  How did you do that?

11  A.  For that I needed to know what TV shows aired the statement

12  and there is a service where basically anything that is spoken

13  on television gets transcribed into text, and so you can search

14  that text for key portions of the statement.  And so, I

15  basically used that database to search for the statement to

16  find which programs aired the statement.

17  Q.  How many programs aired the statement?

18  A.  Five programs.

19  Q.  Which stations aired the statement?

20  A.  So the statement appeared on MSNBC and Fox News.

21  Q.  Once you identified the five programs that aired the

22  statements, what did you do next?

23  A.  After that I needed to know how many people were actually

24  watching the program when this statement was aired, and for

25  that I used a service called Neilsen that measures audiences,

N545car3                        Humphreys - Direct

1    The first part was the qualitative part where I went

2    through and I read a lot of the social media feedback that

3    occurred sort of directly in response to the statement, these

4    were kind of comments made on Tweets and Retweets of the

5    statement itself, to assess if there had been reputational harm

6    and to try to understand what that was.  And then I did a kind

7    of quantitative analysis where I wanted to understand how many

8    people, how many of those impressions were actually likely to

9    believe the statement or were receptive to it.

10   Q.  So I want to talk briefly about the first, the qualitative

11   analysis.  Can you explain how you did that?

12   A.  Sure.  So, I started by looking at material about

13   Ms. Carroll that was written and published about her prior to

14   June 2019.

15   Q.  Why did you look at material that was published or written

16   about Ms. Carroll prior to June 2019?

17   A.  So, in June 2019 Mr. Trump made a series of statements that

18   impacted her reputation and I felt it was important to account

19   for some of that change prior to October 12th.

20   Q.  Can you describe what you observed about Ms. Carroll's

21   reputation prior to June 2019 as compared to after June 2019?

22   A.  So, when I looked at the materials from before June 2019,

23   that means I looked at reviews of her books, media coverage of

24   her, even Amazon reviews of her books that were before that,

25   just reader responses to it.  I kind of first got a glimpse of

N545car3                         Humphreys — Direct

1    that and found, you know, she was known as kind of like a sassy
2    dating advice columnist, a real truth-teller a journalist, who
3    gave trusted advice on dating and living in the city.  And then
4    after, I looked at the social media posts from June through
5    October, and then I looked at media posts from after October.
6    Q.  And you described Ms. Carroll's reputation prior to June
7    2019.  How did that compare to the reputation that you observed
8    after, immediately after June 2019?
9    A.  So, after June 2019, you know, of course there was a lot
10   more volume of statements about her and they contained pretty
11   negative associations including that she was a liar, the
12   perpetrator of a scam, a hoax.  Things like that.
13   Q.  And how did you or what did you observe about Ms. Carroll's
14   reputation after June 2019 as compared to -- withdrawn.
15       What did you determine about Ms. Carroll's reputation
16   prior to the October 12, 2022 statement by Donald Trump as
17   compared to after October 12th?
18   A.  So, what I noticed is that those meetings existed after
19   June 2019, but the frequency of the posting with those
20   associations had started to decline.  However, after the
21   statement on October 12th, the frequency of the negative
22   associations, the volume of them again escalated.
23   Q.  What did you conclude about whether Donald Trump's October
24   12th statement affected Ms. Carroll's reputation?
25   A.  So, given the timing and the fact that they were in kind of

N545car3                          Humphreys - Direct

1   would believe them, who found, were receptive to some of those

2   claims.

3   Q.  And why is that a necessary step in your analysis?

4   A.  So that's really important because I need to figure out,

5   well, how much would it cost to repair the reputational damage.

6   And I only need to estimate the costs for those people who

7   likely believed the statement.

8   Q.  How did you go about figuring out the number of people who

9   saw Mr. Trump's October 12th statement who likely believed it?

10  A.  Right.  So, not all of those impressions believe the words

11  of Mr. Trump.  Right?  And so, it was kind of a two-step

12  process to figure that out.  There is a poll, a non-partisan

13  polling service that can tell you for every publication what

14  percent of the readers are a democrat or republican, but of

15  course not all republicans believe Mr. Trump.  And so, I used

16  another poll to understand, well, of those republicans, what

17  percent of those were likely to have believed him.

18  Q.  And what did you determine was the percent of republicans

19  for each publication who likely believed Mr. Trump's statement,

20  believed Mr. Trump?

21  A.  So, for each publication I took the percent of republicans,

22  and then of those republicans took how many republicans

23  typically believe Mr. Trump and then came up with the

24  percentages that you see here on the right.  And so, I used the

25  percentage for each publication.  Those came up to an average

N545car3                          Humphreys - Direct

1    of 21 percent.

2    Q.  So, to be clear, the 21 percent is the percentage of

3    republicans who viewed the statement who likely believed it?

4    A.  Yes.  I would call those receptive impressions.

5    Q.  What was the next step in your analysis?

6    A.  So, the next step was to take the number of impressions

7    that I had from that first step, which was a lot of

8    impressions, and then discount it by only the impressions where

9    people were receptive to the statement.  And so, that gives you

10   an estimate, a high and low estimate for each type of media,

11   and then you can add those up.

12   Q.  And what did you, when you alleged it up, what did you get?

13   A.  So, on the low end we have 3.7 million receptive

14   impressions and on the high end you have 5.6 million receptive

15   impressions.

16   Q.  And just to summarize, does that mean that between

17   3.7 million and 5.6 million people saw Mr. Trump's statement

18   and likely believed it?

19   A.  That's correct.

20   Q.  To your knowledge -- we saw some examples of negative

21   commentary that Ms. Carroll received after the October 12

22   statement.  To your knowledge, did Ms. Carroll receive any

23   positive response following Donald Trump's statement?

24   A.  Yes, she did.

25   Q.  How, if at all, did your analysis account for the positive

N545car3                    Humphreys - Direct

1    response that she received?

2    A.  So, one thing in my analysis that I noticed is, prior to

3    the June 2019 statement, there were, of course, many positive

4    associations of her but the volume was relatively small.  After

5    the October 12 statement there was a huge volume of

6    associations associated with her, some of those were positive,

7    but then a huge volume, a very large number, tens of thousands

8    of those associations were really negative.

9    Q.  How, if at all, do positive responses or comments offset

10   negative responses?

11   A.  I would say in terms of reputation, they don't.  So, if you

12   imagine, like, at the place where you work, if 20 percent of

13   your colleagues think that you stole money where you work,

14   let's say you have a hundred colleagues and 20 of them think

15   that you stole money, that still has an impact on your work

16   life and your day-to-day reputation, and so I think that

17   20 percent is still important.

18                  (Continued on next page)

19

20

21

22

23

24

25

N542Car4                          Humphreys - Direct

1    Q.  Now, in addition to analyzing how many people saw

2    Mr. Trump's statement and how many people who saw the statement

3    likely believed it, did you conduct any other analysis in your

4    work in this case?

5    A.  Yes.  So the last stage was to figure out, okay, for those

6    receptive impressions, those who might have believed the

7    statement, how much would it cost to repair Ms. Carroll's

8    reputation for those people?

9    Q.  How do you repair someone's reputation after a statement?

10   A.  Yeah, so you can run a campaign to put out positive

11   messages about that person.

12   Q.  Is that called a reputational repair campaign?

13   A.  Yes.

14   Q.  Have you ever yourself executed a reputational repair

15   campaign?

16   A.  No, I have not.

17   Q.  How do you know about it?

18   A.  So I teach them every quarter to my students who go on to

19   have jobs in executing reputational repair campaigns.

20   Q.  Can you explain how a reputational repair campaign works?

21   A.  Yes.  So first you need to identify where to place the

22   messages.  What media does your target audience, the people's

23   whose mind you want to change, what media do they use?  Where

24   do they get their information?

25   Q.  So to be clear, the target audience here is that 21 percent

Case 23-793, Document 87, 11/20/2023, 3592074, Page129 of 279

A-3189

N542Car4                        Humphreys - Direct

1    or the people that you determined saw Mr. Trump's statement and

2    likely believed it?

3    A.   That's right.

4    Q.   And your campaign sends positive messages or corrective

5    messages to those people to try to change their minds?

6    A.   That's correct.

7    Q.   Can you give -- did you design a particular reputational

8    repair campaign for Ms. Carroll in this case?

9    A.   Yes, I did.

10   Q.   Can you give us some examples of corrective messages that

11   you would use as part of a reputational repair campaign for

12   Ms. Carroll?

13   A.   Yes, so what the campaign would look like is it would place

14   these positive messages where people get their news, and it is

15   important that you place them with a trusted source because

16   this audience, almost any audience only believes information

17   coming from people they trust, right?  So it could look like a

18   social media influencer sharing a message about a great piece

19   Ms. Carroll wrote for *Harper's* and how much they liked it, how

20   funny or witty it was.  It would be positive messages like

21   that.

22   Q.   And how did you determine where those messages would be

23   placed?

24   A.   So here I used the same poll that I did in the second step

25   to learn where does this audience get their news.

N542Car4                    Humphreys - Direct

1  corrective messages there, were there any other considerations

2  in your analysis?

3  A.  Yes.  So the final consideration was how many times to show

4  people the message.  Nobody's mind is really changed from

5  seeing a message one time, especially if it is kind of counter

6  to what you already believe.  And so psychology tells us that

7  you need to show people a message three or five times in order

8  to change their beliefs.

9  Q.  Did you consider how much it would cost to run corrective

10  messages about Ms. Carroll one time?

11  A.  Yes, I did.

12  Q.  Why?

13  A.  So the one-time number would assume that a prior campaign

14  had been run.  You know, you don't want to hit people over the

15  head with the message if you have already shown them the

16  message.  And so I included the one-time in case a prior

17  campaign had been run.

18  Q.  To your knowledge had a prior reputational repair campaign

19  been run for Ms. Carroll?

20  A.  No.

21  Q.  So was the estimate for cost of only showing corrective

22  messages one time a realistic estimate in this case?

23  A.  I don't think that campaign would be effective in changing

24  attitudes.

25  Q.  Using the chart on this slide, can you walk us through how

N542Car4                    Humphreys - Direct

1  you calculated the cost to run positive messages about

2  Ms. Carroll on broadcast TV?

3  A.   Sure.  So on broadcast TV, as you can see here, you would

4  spend about 30 percent of your impressions, you would want to

5  get 30 percent of your impressions from broadcast TV.  And an

6  impression for a thousand impressions, it would cost you $16.

7  And so you basically do the math on that and that comes out to

8  spending a hundred and thirty-three hundred thousand dollars.

9            (Court reporter confers)

10  A.   A hundred and thirty-three hundred thousand dollars.

11            THE COURT:  133,000, right?

12            THE WITNESS:  A hundred and thirty-three hundred

13  thousand dollars.

14  Q.   I think $133,000, right?

15  A.   Oh, sorry, 133,000.

16  Q.   And how much would it cost to place corrective messages

17  about Ms. Carroll using Facebook insurance influencers?

18  A.   So for Facebook influencers, you want to get 7 percent of

19  your total impressions there.  But remember what I said about

20  impressions.  So, you know, the number of followers that

21  somebody has on Facebook, you have to take the impression rate

22  of like 5 percent of those people are going to see the post.

23  And so you would shoot to get, at the end of the day, 1.9

24  million impressions and it costs $25 per thousand impressions,

25  which would leave you with $988,000.

N542Car4                         Humphreys - Direct

1    Q.  After calculating the amount it would cost to place

2    corrective messages on each type of media, were you able to

3    determine how much it would cost to place corrective messages

4    on all these types of media?

5    A.  That's right.  So I calculated for each type of media how

6    much it would cost and I added that up.

7    Q.  And what was the number?

8    A.  So the final number at the high end was $2.7 million.

9    Q.  What was the next step in your analysis?

10   A.  So the final step was to apply this logic to kind of my

11   previous -- my low impressions estimate and my high impressions

12   estimate for each level of frequency—for one, three, and five

13   times.

14   Q.  And what was the range, the cost range to run a

15   reputational repair campaign for Ms. Carroll following the

16   October 12 statement?

17   A.  So at the low, low end it would be three hundred and

18   sixty-eight thousand dollars, hundred thousand dollars and on

19   the high end it would be $2.7 million but, again, I don't think

20   the low campaign would be effective if no campaign had been run

21   previously.

22   Q.  So to summarize, Professor Humphreys, what was your

23   conclusion about how far or how wide Mr. Trump's statements

24   spread?

25   A.  So my conclusion about how wide it spread in the

N542Car4                         Humphreys - Cross

1    BY MR. BRANDT:
2    Q.   Now, we have had some discussion about this previously, but
3    there are actually two cases, correct?
4    A.   That's right.
5    Q.   And you were retained as an expert by Ms. Carroll in two
6    cases, correct?
7    A.   Correct.
8    Q.   And the first case chronologically related to statements
9    made by Mr. Trump in June of 2019, correct?
10   A.   That's correct.
11   Q.   And as I recollect your first report, you said that those
12   statements were widely published at the time, correct?
13   A.   Yes.
14   Q.   And following that time, there were appearances by
15   Ms. Carroll and others on news shows and interviews and
16   podcasts and articles, is that correct?
17   A.   I did not study those as part of my report.
18   Q.   So you didn't look at any of that?
19   A.   I did not look at her activities, no.
20   Q.   Okay.  We will come to that in a little bit.
21        But did you at least come to the conclusion that there
22   had been widespread publication of the June 2019 statements?
23   A.   Yes.
24   Q.   And the statement that you looked at in the second case was
25   only the October 2022 statement, correct?

Case 23-793, Document 87, 11/20/2023, 3592074, Page134 of 279

A-3194

N542Car4                     Humphreys - Cross

1    A.   That's right.

2    Q.   To borrow a phrase, would you agree that the horse was kind

3    of out of the barn between 2019 and 2022 on these issues?

4    A.   Could you say what you mean by a horse being out of the

5    barn?  How do you mean?

6    Q.   Sure.  There had already been publication of Mr. Trump's

7    position on these issues for three and a half years prior to

8    October of 2022, correct?

9    A.   Correct.  Three statements had already been published.

10   Q.   So that was already out in the public domain, correct?

11   A.   That's correct.

12   Q.   And then one thing I understood you to say in your direct

13   testimony—and I wrote it down, and correct me if I am

14   wrong—that you said people's minds typically aren't changed by

15   a one-time statement.  Did I get that down correctly?

16   A.   That's true if they already hold an attitude.  If it's a

17   counter-attitudinal message, yes.

18   Q.   Okay.  And I think that's consistent with your deposition

19   testimony, that typically one statement is not going to change

20   somebody's mind, correct?

21   A.   Not -- yeah, if they have a prior attitude, it will not

22   change someone's mind.

23   Q.   And in this particular case, what you are focused on is a

24   single statement, which is Mr. Trump's statement in October of

25   2022, correct?

N542Car4                         Humphreys - Cross

1    A.  That's correct.

2    Q.  A single statement, correct?

3    A.  That's correct.

4    Q.  And to follow your logic, people aren't going to change

5    their minds over one statement.

6    A.  You know, we don't know if these are the same people.

7    That's underdetermined.  His statement might have been seen by

8    new people.

9    Q.  Okay.  You don't know, do you?

10   A.  I think it's very likely that this statement was seen by

11   some new people.

12   Q.  Okay, but you actually, going back to your testimony

13   previously, all of your numbers are estimates, are they not?

14   A.  They are estimates that are grounded in peer-reviewed

15   social science research.

16   Q.  Sure, but you don't know exactly who may have seen the

17   Truth Social post, correct?  You can't name the however many

18   million people that you talk about, correct?

19   A.  Correct.  That information is not available to me.

20   Q.  Right.  And similarly, you talked about the other media,

21   like the publish media, the television media, you don't know

22   who read those newspapers, who saw those TV shows, correct?

23   A.  That's correct.  That information is not available.

24   Q.  And again, you are not a mind reader, and so you don't know

25   whose mind was or wasn't influenced by anything they read,

N542Car4                        Humphreys - Cross

1    impressions to ones that quote that statement correctly on

2    Truth Social, correct?

3    A.   That's not correct.

4    Q.   Okay.  Would you agree with me that most of the people who

5    are on this Truth Social platform would be people favorable to

6    president Trump?

7    A.   That's likely true.

8    Q.   And someone who is predisposed to think well of Mr. Trump

9    would be more likely to believe something he said, and the flip

10   side is someone who is predisposed to believe Ms. Carroll would

11   be predisposed to believe what she said, correct?

12   A.   Yes, that's fair.

13   Q.   And I think you also said this a minute ago.  I want to

14   make sure I understand it.  You did not analyze the impact of

15   anything Ms. Carroll said following the June 2019 statements,

16   correct?

17   A.   That's correct.  I was focused on the damage of Mr. Trump's

18   statement.

19   Q.   Okay.  So, for example, she gave an interview on Anderson

20   Cooper one day.  You didn't assess what the impact of that

21   interview was to the viewing public, correct?

22            MS. CROWLEY:  Objection, your Honor.

23            THE COURT:  Overruled.

24   Q.   You may answer the question.  I can reask it if you would

25   like.

N542Car4                    Humphreys - Cross

1   A.   That would be great if you could.

2   Q.   There is evidence in the record that Ms. Carroll appeared

3   on the Anderson Cooper show on MSNBC.  As I understand what you

4   have told us, you did not analyze the impact of that message on

5   the public, correct?

6   A.   That was not in the -- that was prior to the October 12

7   statement, so no.

8   Q.   And then similarly, you did not assess the impact of

9   Ms. Carroll's book that was published out to the public,

10  correct?

11  A.   Correct.  It was not focused on Ms. Carroll's statements.

12  Q.   And then excerpts from that book were published in the *New*

13  *York* magazine and in The Cut.  As I understand your testimony,

14  you didn't try to estimate the impact of that publication,

15  correct?

16          MS. CROWLEY:  Objection, your Honor.  This is asked

17  and answered.

18          THE COURT:  Why not, counselor?

19          MR. BRANDT:  I was talking about a different

20  publication.

21          MS. CROWLEY:  I believe he asked whether she analyzed

22  any of Ms. Carroll's statements, and the witness testified that

23  she didn't.

24          THE COURT:  Sustained.

25          MR. BRANDT:  Okay.

N542Car4                          Humphreys - Cross

1    One other question on that line, your Honor, and I

2    don't mean to cross your boundary.

3    Q.  Is it correct that you didn't analyze any positive comments

4    on social media about Ms. Carroll that were made by others?

5    A.  That's not correct.

6    Q.  Okay.  Did you look at positive statements about her on

7    social media?

8    A.  Yes.  So I did see a number of positive statements during

9    my qualitative analysis.

10   Q.  Did you measure those?

11   A.  No.  My goal here was to measure the reputational harm.

12   Q.  Okay.  So you saw it, but you didn't measure it.

13   A.  Correct.

14   Q.  So as I understand your testimony, all you did was measure

15   the negative impact and you didn't look at any positive impact.

16   A.  So I did look at the positive impact in my qualitative

17   analysis.

18   Q.  Did you measure it?

19   A.  It didn't cause reputational harm and so those statements

20   didn't require correction.

21   Q.  Okay.  So fair enough.  Let me ask you this question.  Did

22   you undertake to see whether or not there had been any campaign

23   undertaken by Ms. Carroll to mitigate any alleged damage from

24   the October 2022 statement?

25   A.  No.  To my knowledge there wasn't one.

N585car2                    Summation - Ms. Kaplan

1   shoes with her 4-inch high heels.  She also tried to hit him

2   with her purse, trying to do anything to make him stop.  Trump

3   pinned her against the wall with his shoulder.  At the same

4   time he reached up under her dress and he pulled down her

5   tights.  He grabbed her by the pussy or vagina -- I apologize

6   for my language -- and then he shoved his fingers inside her.

7   You heard Ms. Carroll describe how incredibly painful that was.

8   Trump then removed his hand and shoved his penis inside her.

9   Continuing to fight, Ms. Carroll was finally able to get a knee

10  up high enough to push Trump off of her.  Terrified and

11  stunned, she opened the dressing room door and escaped.  She

12  fled through the store and out onto the Fifth Avenue exit.  The

13  whole attack happened quickly, a few minutes at most, but it

14  would stay with Ms. Carroll forever.

15          In the immediate aftermath of the attack, as you

16  heard, E. Jean Carroll told two separate people what happened.

17  She called her friend Lisa Birnbach from the sidewalk on Fifth

18  Avenue outside the Bergdorf Goodman and she told her friend

19  Carol Martin a day or two later.  You saw and heard both of

20  them in this courtroom.  Let's talk first about Ms. Birnbach.

21          She told you that she received a phone call from

22  Ms. Carroll in the spring of 1996 when she was giving her kids

23  dinner.  Ms. Birnbach said when she picked up the phone,

24  E. Jean Carroll sounded agitated like she was hyperventilating.

25  Lisa Birnbach told you that E. Jean proceeded to tell her that

N585car2                    Summation - Ms. Kaplan

1   she had gone into a dressing room with Donald Trump, that he

2   pushed her up against the wall, he hit her head and pulled down

3   her tights and forced himself inside her.  Ms. Birnbach told

4   you that upon hearing what had happened, she left the kitchen

5   so her kids wouldn't be able to overhear her, and told

6   Ms. Carroll, in no uncertain terms, E. Jean you have been

7   raped.  The fact that she left the kitchen, by the way, is a

8   very telling detail, it is the kind of detail that someone

9   doesn't make up.

10         Ms. Birnbach also told Ms. Carroll to tell the police,

11  to go to the police, she even offered to go with her.  But as

12  Lisa Birnbach testified, E. Jean Carroll said she didn't want

13  to go to the police and she made Lisa promise never to tell

14  anyone about it ever again.  Lisa Birnbach agreed to that.  As

15  she explained it to you, it was E. Jean Carroll's story, it was

16  her secret, it was not Lisa Birnbach's story or secret to tell,

17  so she promised not to tell anyone and she kept that secret for

18  two decades.  Let's now go to Carol Martin.

19         A day or two after the attack at Bergdorf Goodman,

20  E. Jean approached her good friend Carol Martin, who was

21  actually her closer friend at the time, at the America's

22  Talking offices in New Jersey.  They decided that they would

23  talk at Ms. Martin's house which is only 10 minutes away, by

24  car, from work.  After work they each drove their own cars to

25  Ms. Martin's house and they went in the house and sat down at

N585car2                    Summation - Ms. Kaplan

1    people forget how even to dial 911.  Dr. Lebowitz gave you a

2    great example of this.

3         Remember what she told you about her mother's friend

4    who was a child in Finland during World War II?  She told the

5    story that this woman was with her mother as a child and bombs

6    were falling.  The force of a bomb blew away the mother's hat.

7    Instead of grabbing her daughter's hand and running to safety,

8    the mother ran after her hat.  That mother loved her child.  In

9    that moment she didn't consciously choose to run after her hat,

10   she wouldn't have expected to do that and she probably wouldn't

11   be able to explain to you sitting here today why she did it.

12   That's the brain chemistry of a person experiencing trauma.

13        Now, you heard Donald Trump's lawyers repeatedly ask

14   Ms. Carroll why she was laughing when she got first pushed up

15   against the wall.  They repeatedly asked her why she didn't

16   scream.  They acted as if Ms. Carroll's response was unusual,

17   unheard of, implausible.  But you now understand why those

18   reactions are consistent with the behavior of someone who is

19   experiencing trauma.  Dr. Lebowitz explained it to you.  People

20   have really strange, really unexpected responses to traumatic

21   situations all the time.

22        Remember when Mr. Trump's lawyers asked Dr. Lebowitz

23   whether or not screaming would be consistent with a rape?  Here

24   is what she said.  She said that not screaming would not only

25   be absolutely consistent with being raped, but based on her

N585car2                    Summation - Ms. Kaplan

1   that too -- may later disagree about what exactly the date was

2   when that happened or even what house they were living in at

3   the time.

4        Think about how that explains E. Jean Carroll's

5   testimony here.  She remembers certain things from her

6   encounter with Donald Trump in vivid, technicolor detail.  She

7   remembers the back and forth about trying on the bodysuit in

8   the lead-up to the assault.  She remembers the gifts they were

9   talking about, the hat that she said Donald Trump petted and

10  the handbag that they looked at on the first floor.  She

11  remembers distinctly some of the exact words they exchanged.

12  *Hey, you're that advice lady.*  She remembers exactly how it

13  felt to have Trump's fingers inside her.  And -- I find this

14  part really telling -- she remembers the sound of Trump's heavy

15  breathing as he was facing the wall next to her neck.  But

16  Ms. Carroll does not remember exactly how she got out of the

17  store and she has made no secret of the fact she doesn't

18  remember the exact date.  She remembers -- just like

19  Dr. Lebowitz said, she remembers certain things vividly and

20  other things not so much.  Again, that's exactly what you would

21  expect to see in someone who has survived trauma.

22        Dr. Lebowitz also testified to you about how

23  Ms. Carroll processed the rape and how that contributed to her

24  decision not to talk about it for so many years.  She said

25  that -- Dr. Lebowitz said that E. Jean Carroll experienced what

N585car2                        Summation - Ms. Kaplan

1   using the word rape.  But as we heard Dr. Lebowitz explain,

2   E. Jean's refusal to call what happened to her rape or to

3   identify herself as a victim does not mean that she was not

4   sexually assaulted.

5          Now, another way that Donald Trump responds to all of

6   this is by trying to get you to believe in the big lie.  What

7   do I mean when I say the big lie?  I mean that Mr. Trump's

8   lawyers need you to find that not only E. Jean Carroll, but

9   also Lisa Birnbach and Carol Martin are all lying, that they

10  are all part of some part of coordinated conspiracy, that they

11  somehow joined forces and agreed to come up with a story about

12  an assault that happened nearly 30 years ago simply because

13  they hate Donald Trump.  I'm sorry.  Seriously?  That's just

14  ridiculous.

15         First of all, there is no evidence -- not a shred --

16  that any such conspiracy exists.  No testimony.  No documents.

17  Nowhere in all of those pages of e-mails and texts between

18  E. Jean Carroll, Lisa Birnbach, and Carol Martin did you see

19  anything suggesting that they all agreed to come up with a lie

20  that Donald Trump raped E. Jean Carroll.  In fact, you saw the

21  opposite of that.  You heard Ms. Martin read from a text she

22  sent to a friend in 2021 -- a friend, so it is not Lisa

23  Birnbach and she is not texting E. Jean Carroll -- another

24  friend, in which she expressed frustration that she was dealing

25  with the publicity from this case and she suggested that that

N582Car3                        Summation - Ms. Kaplan

1    At this point, I believe that my review of the

2    evidence has shown you that it is very clear that Donald Trump

3    did in fact sexually assault E. Jean Carroll in the spring of

4    1996 and that he defamed her in 2022 after she told the truth

5    about what he had done.

6    Because Donald Trump did both of these things, the law

7    allows you to compensate E. Jean Carroll for the harm that she

8    suffered.  So what is the level of damages?  I'm not going to

9    stand here and tell you exactly how much you should award

10   E. Jean Carroll in damages, but there are a few things that you

11   can consider in coming to that conclusion.

12   First of all, Professor Humphreys told you about the

13   millions of people that heard and likely believed Donald

14   Trump's public statements about E. Jean Carroll.  What is the

15   price for having to live your life in shame and to lose your

16   good name because Donald Trump lied and told millions of people

17   that you are a liar?

18   In addition, Dr. Lebowitz told you that the assault

19   caused E. Jean Carroll to lose something extremely important to

20   her and, frankly, to all of us, her ability to pursue romantic

21   relationships, her ability to pursue intimacy, and perhaps most

22   importantly, companionship.  What is the price for decades of

23   living alone without companionship, for having no one to cook

24   dinner with, no one to walk your dog with, no one to watch TV

25   with, and for feeling for decades like you are dirty and

N582Car3                    Summation - Ms. Kaplan

1   unworthy?  Once again, ladies and gentlemen, that's your issue

2   to decide.  I'm not going to put a number on that for you.

3           As the judge will instruct you, the law allows you to

4   award damages for these considerations and others that he will

5   read to you tomorrow.  Ultimately, you should consider the

6   evidence and pick the number you think is right.  But please

7   remember, for E. Jean Carroll, this lawsuit is not about the

8   money.  As she told you on the stand, this lawsuit is about

9   getting her name back.  That's why we all are here.

10          Ultimately, I know that you will deliver a verdict

11  based on the evidence you have seen and heard.  You watched

12  Ms. Carroll right here in this courtroom as she delivered

13  incredibly courageous, consistent, clear testimony over two

14  days.  You watched the other fact witnesses sit before you and

15  also provide compelling testimony that corroborated what

16  E. Jean Carroll had said, sometimes down to the smallest

17  detail.  Taken together, the overwhelming weight of the

18  evidence establishes two things:  One, Donald Trump sexually

19  assaulted E. Jean Carroll in a dressing room in the lingerie

20  department at Bergdorf Goodman in the early spring of 1996;

21  and, two, Donald Trump defamed E. Jean Carroll after she spoke

22  up publicly about what had happened.  That is what the evidence

23  in this case establishes.  But I think you already know that.

24          On behalf of our whole team, on behalf of my brave

25  client, E. Jean Carroll, for whom it has been such a privilege

N582Car3                      Summation - Mr. Tacopina

1    given yourself to this important, important case, and this

2    commitment.

3           And there is no greater service that a citizen can do

4    in this country than what you are being asked to do now,

5    consider whether an accusation as heinous as a claim of rape

6    has merit, to serve on a jury, to weigh the evidence fairly and

7    impartially, and to safeguard our rights and the legal process.

8           And with that in mind, I want to remind you what I

9    said in my opening.  I said that one thing in this country that

10   cannot be compromised, that cannot be bent, that must always be

11   absolute, that should not be wielded by the -- based on the

12   whims of someone who would seek to abuse it is the justice

13   system.  It's our defense against all tyranny.  It's what gives

14   you, the citizens of this country, the ability to defend

15   against oppression and defend yourselves.

16          People have very strong feelings about Donald Trump.

17   That's obvious.  One way or the other.  That's a fact.  And

18   however you feel about it is okay.  We didn't even ask you that

19   when we picked you as jurors.  It's okay however you feel about

20   him.  I said this before.  You could hate Donald Trump.  It's

21   okay.  But there is a time and a secret place to do that.  It's

22   called a ballot box during an election.  It's not here.

23   Because to do so in a court of law would make one no better

24   than those who would seek to bend the rule of law for their own

25   personal agendas.  We must all strive to be better than that,

N585car6                    Rebuttal - Mr. Ferrara

1    But I was telling you how the defense wants it both

2    ways and so they want you to believe that these three people

3    are in this conspiracy but at the same time Mr. Tacopina showed

4    Carol Martin all those texts where Ms. Martin said some mean

5    things about Ms. Carroll and you remember them, Mr. Tacopina

6    went over them.  Ms. Martin called Ms. Carroll narcissistic, a

7    little scary.  She wrote that Ms. Carroll's lawsuit had gone to

8    another level that she had she couldn't relate, she was just

9    not there for it.  You saw it.

10   So, the question is if Ms. Martin was in a secret

11   scheme with Ms. Carroll, why in the world is she complaining to

12   random friends about it?  Which is it?  Are they in grand

13   scheme to take down the president, or is Ms. Martin gossiping

14   to friend and calling E. Jean names?  The defense argument

15   doesn't pass the smell test.

16   Or, remember what Lisa Birnbach told you.  She said

17   that after Ms. Carroll told her about the assault she never

18   checked in with Ms. Carroll about it.  She worked not to think

19   about it.  It is weird, right?  It is weird that Ms. Carroll

20   told her friend she had been raped and her friend never asked

21   about it again for 20 years.  The truth is often weird.  But

22   here is my point:  No one lies like this.  If Ms. Birnbach was

23   in a conspiracy with Ms. Carroll and was willing to commit

24   perjury and lie to you, she would tell you she thought about

25   the assault often.  She would tell you that she frequently

N585car6                          Rebuttal - Mr. Ferrara

1   cross-examination of Ms. Carroll as evidence that she lied

2   because Mr. Tacopina's client, Donald Trump, never took the

3   witness stand at all. He didn't even show up in court. And in

4   his attempt to make an excuse for his client's decision not to

5   attend this trial, Mr. Tacopina pointed out that Mr. Trump was

6   deposed. And you saw that. You also saw that Ms. Carroll was

7   deposed, twice, by some of the same lawyers in this courtroom.

8         Mr. Tacopina claims that it was enough that Trump was

9   deposed once over seven months ago. But then why wasn't it

10  enough that Ms. Carroll was also asked questions at her

11  deposition? Why did Mr. Tacopina have to spend nearly two full

12  days asking her questions during this trial if her deposition

13  was enough? Because that's not how this works.

14        Respect for the justice system. It was Ms. Carroll

15  who respected the justice system enough to walk into this

16  courtroom, swear an oath, look all of you in the eye, and

17  subject herself to two days of cross-examination. Donald Trump

18  did not do that. He could not do that.

19        Mr. Tacopina said to you minutes ago that you need

20  cross examination in your search for the truth. And we

21  couldn't agree more. What does that tell you? What does your

22  common sense tell you? If someone accused you of rape and you

23  didn't do it, you would run to the courtroom, look the jurors

24  in the eye, and tell them it never happened. Mr. Trump didn't

25  do that. Ms. Carroll was here every day, testified for over

N585car6                        Rebuttal - Mr. Ferrara

1    two days, hour after hour of cross-examination.  Not Trump.

2    Didn't want to answer our questions.

3           Mr. Tacopina criticizes Ms. Carroll's testimony

4    because she showed up, she swore an oath, and told you what

5    happened, and meanwhile, Donald Trump was nowhere to be found;

6    didn't come into the courtroom, didn't take the witness stand.

7    And you should draw the conclusion that that's because he did

8    it, because he raped Ms. Carroll and he didn't want to testify

9    about it.

10          Now, I mentioned that Mr. Tacopina has, at times,

11   cherry-picked portions of the transcript to show you throughout

12   his summation and I gave you one example and I want to come

13   back to a couple more.

14          Again, he is a good lawyer, he has the transcript, and

15   he showed it to you when it suited him to do that but he, at

16   times, did not give you the full context because it would hurt

17   his case to show you that so I will do it.

18          He put up a slide with a line of testimony from page

19   605 of Ms. Carroll's testimony.  Here is what he showed you.

20   Ms. Carroll saying I never had sex again but I think it wasn't

21   because of him.  Here is what he left out, let's add in the

22   rest of it.

23          And then, he also didn't show you the rest of the

24   context Ms. Carroll gave on page 625.

25          Do we have that, Mr. Lam, too?

1400

N585car6                           Rebuttal - Mr. Ferrara

1   she's the first to admit she really isn't sure.  But I am

2   surprised that Mr. Tacopina made such a big deal of this in

3   both his opening and his closing.  It's no secret that

4   Ms. Carroll can't pin down the date this happened.  She told

5   you she wishes she could.  She understandably has been asked

6   when it happened over and over in interviews and in this

7   courtroom.  So, is it any wonder that she obsessively racks her

8   brain every day for any and every honest detail she has in her

9   memory about what happened, about when this happened?  That she

10  never gives up trying to remember that?  Of course not.

11          And that's what you saw on the witness stand, a woman

12  trying her best to tell you what she remembered and what she

13  didn't.  She shouldn't be criticized for that.

14          Ms. Kaplan walked you through the timing so I'm not

15  going to belabor it but just briefly, Ms. Carroll remembers the

16  assault happened in fall of '95 or spring of '96.  When you add

17  in the detail about Lisa Birnbach interviewing Donald Trump in

18  early 1996, it made sense that it was the spring of '96, both

19  because Ms. Birnbach wouldn't have interviewed Trump had she

20  just been told that he had raped her friend, and also because

21  it makes sense that Ms. Carroll called Ms. Birnbach because

22  Ms. Carroll was thinking about how Ms. Birnbach had just

23  interviewed Trump.  So that all makes sense.  And then you

24  factor in that Ms. Carroll going to Bergdorf's after she

25  finished her show and the time of day she called Ms. Birnbach,

N585car6                        Rebuttal - Mr. Ferrara

1   locker room talk but you know from the evidence in this case

2   that it's definitely not locker room talk when Donald Trump

3   says it because you heard from three witnesses who said he did

4   exactly that:  Ms. Carroll, Jessica Leeds, and Natasha

5   Stoynoff.  They all described Trump grabbing them and kissing

6   them without warning.  And he didn't deny what he said.

7          So, one last thing on this.  The *Access Hollywood*

8   video is from 2005.  The recording is from 2005 and it became

9   public in 2016.  2005, the year Trump talked about grabbing

10  women by their genitals, that was the same year he assaulted

11  Natasha Stoynoff.  That video is a confession.

12         Now, the defense spent some time talking about how

13  Ms. Carroll had said she's fine, or great, or fabulous, on many

14  occasions since the assault.  Ms. Kaplan talked about this, how

15  Ms. Carroll minimizes difficulties.  And you heard testimony

16  from Dr. Lebowitz and Ms. Carroll's sister Cande explaining why

17  Ms. Carroll does that, why she has such a hard time checking in

18  deeply with her own emotions.  But I also will admit I just

19  don't get the argument.  Is the defense saying that because

20  Ms. Carroll was raped she could never be happy again?  That she

21  can never shop in Bergdorf Goodman's again?  That can't be the

22  argument, right?  If I get mugged outside of my office, am I

23  supposed to never go to work again because it is too

24  triggering?  If a loved one passes away and you manage to get

25  on with your life and find happiness again, does that mean you

N585car6                    Rebuttal - Mr. Ferrara

1   herself, and it feels like the defense has this idea of the

2   perfect rape victim and in their version it goes something like

3   this:  The perfect rape victim doesn't flirt.  The perfect rape

4   victim screams.  The perfect rape victim never goes back to

5   where they were raped.  The perfect rape victim tells the

6   police but otherwise never discusses the rape publicly.  The

7   perfect rape victim burns whatever clothes they were wearing.

8   The perfect rape victim never laughs again, never jokes around.

9   The perfect rape victim never again has success in their

10  career.  The perfect rape victim never looks at their rapist

11  again.  The perfect rape victim never tries to hold their

12  rapist accountable, never gets their day in court.  And, the

13  perfect rape victim is never happy again.

14          That's the defense's out-of-date, out-of-touch view.

15  It is as wrong as it is offensive.  Dr. Lebowitz explained to

16  you why it is wrong.  For example, she talked about victims who

17  don't scream, even if they're being raped in the stacks of the

18  public library.  That's at page 857 of the transcript.  But you

19  also know it is wrong because you heard from three victims of

20  sexual assault in this case, three of Donald Trump's victims

21  and they told you the same thing.  Ms. Carroll couldn't process

22  what was happening and was extremely confused when Trump

23  attacked her.  That's what she told you, that's at page 177.

24  Jessica Leeds told you that when Trump started groping her on

25  the airplane she didn't scream or shout and to this day she

1418

N592Car1                     Charge

1   the second of the three alternative bases for the battery

2   claim.

3           The second theory of battery corresponds to something

4   called sexual abuse.  Sexual abuse has two elements.  In order

5   to establish that Mr. Trump sexually abused her, Ms. Carroll

6   must prove each of two elements by a preponderance of the

7   evidence.

8           The first element is that Mr. Trump subjected

9   Ms. Carroll to sexual contact.

10          The second element is that he did so without

11  Ms. Carroll's consent by the use of forcible compulsion.

12          So let me define "sexual contact" for you.  Sexual

13  contact for this purpose means any touching of the sexual or

14  other intimate parts of a person for the purpose of gratifying

15  the sexual desire of either person.  It includes the touching

16  of the actor by the victim, as well as the touching of the

17  victim by the actor, and the touching may be either directly or

18  through clothing.

19          Now, I just used the term or the phrase "sexual or

20  intimate part" in defining sexual contact.  For this purpose, a

21  "sexual part" is an organ of human reproduction.

22          So far as intimate part is concerned, the law does not

23  specifically define which parts of the body are intimate.

24  Intimacy, moreover, is a function of behavior and not just

25  anatomy.  Therefore, if any touching occurred, the manner and

N592Car1                    Charge

1   circumstances of the touching may inform your determination

2   whether Mr. Trump touched any of Ms. Carroll's intimate parts.

3   You should apply your common sense to determine whether, under

4   general societal norms and considering all the circumstances,

5   any area or areas that Mr. Trump touched, if he touched any,

6   were sufficiently personal or private that it would not have

7   been touched in the absence of a close relationship between the

8   parties.

9          I mentioned also that the touching, if any, of any

10  sexual or intimate parts must have been for the purpose of

11  gratifying the sexual desire of either party.  Sexual

12  gratification is a subjective determination that may be

13  inferred from the nature of the acts committed and the

14  circumstances in which they occurred.  There is no requirement

15  that actual gratification occur, but only that the touching, if

16  there was any, was for that purpose.

17         The second element of this theory is forcible

18  compulsion.  I defined that for you a couple of minutes ago

19  when I told you the elements of rape, and here, as there, it

20  means intentionally to compel by the use of physical force.

21         If you find that Ms. Carroll has proved by a

22  preponderance of the evidence both of the two elements that I

23  just referred to, the two elements of sexual abuse, then you

24  will answer "yes" to Question 2.  If you answer yes to Question

25  2, I instruct you that Mr. Trump thus committed battery against

1472

N592Car2

1    happen in that event.

2            All right.  Let's get the jury.

3            (Jury present; 3:04 p.m.)

4            THE COURT:  Jurors all present.

5            Members of the jury, who is the foreperson?

6            (Juror 81 stands)

7            THE COURT:  Yes, ma'am.  Has the jury in fact reached

8    a verdict?

9            THE FOREPERSON:  We have.

10           THE COURT:  Would you please pass the envelope to

11   Andy.  Thank you.

12           (Pause)

13           THE COURT:  The clerk will publish the verdict.

14           THE DEPUTY CLERK:  As to battery, did Ms. Carroll

15   prove, by a preponderance of the evidence, that (1) Mr. Trump

16   raped Ms. Carroll?  Answer:  No.

17           Question 2.  Did Mr. Trump sexually abuse Ms. Carroll?

18   Answer:  Yes.

19           Question 4.  Ms. Carroll was injured as a result of

20   Mr. Trump's conduct?  Answer:  Yes.

21           Dollar amount that would fairly and adequately

22   compensate her for injury --

23           THE COURT:  "For that injury."

24           THE DEPUTY CLERK:  For that injury or those injuries.

25   $2 million.

N592Car2

1        Question 5.  Mr. Trump's conduct was willfully or

2   wantonly negligent, reckless, or done with a conscious

3   disregard of the rights of Ms. Carroll, or was so reckless as

4   to amount to such disregard?  Answer:  Yes.

5        How much, if any, should Mr. Trump pay to Ms. Carroll

6   in punitive damages?  Answer:  $20,000.

7        As to defamation, did Ms. Carroll prove, by a

8   preponderance of the evidence, that, Question 6, Mr. Trump's

9   statement was defamatory?  Answer:  Yes.

10       Did Ms. Carroll prove, by clear and convincing

11  evidence, that, as to Question 7, Mr. Trump's statement was

12  false?  Answer:  Yes.

13       Question 8.  That Mr. Trump made the statement with

14  actual malice?  Answer:  Yes.

15       Did Ms. Carroll prove, by a preponderance of the

16  evidence, that, Question 9, Ms. Carroll was injured as a result

17  of Mr. Trump's publication of the October 12, 2022 statement?

18  Answer:  Yes.

19       If "yes," answer a dollar amount for any damages other

20  than reputation repair program.  $1 million.

21       If "yes," insert a dollar amount for any damages for

22  the reputation repair program only.  $1,700,000.

23       Question 10.  In making the statement, Mr. Trump acted

24  maliciously, out of hatred, ill will, spite, or wanton,

25  reckless, or willful disregard of the rights of another?

N592Car2

1    Answer:  Yes.

2            If "yes," how much, if any, should Mr. Trump pay to

3    Ms. Carroll in punitive damages?  $280,000.

4            THE COURT:  And it has affixed to it the juror

5    numbers.

6            Is there a request for a poll, Mr. Tacopina?

7            MR. TACOPINA:  Yes, your Honor.

8            THE COURT:  Poll the jury, please, Andy.

9            THE DEPUTY CLERK:  Juror No. 10, in seat no. 1, is

10   that your verdict?

11           JUROR 10:  Yes.

12           THE DEPUTY CLERK:  Juror No. 37, is that your verdict?

13           JUROR 37:  Yes.

14           THE DEPUTY CLERK:  Juror No. 39, is that your verdict?

15           JUROR 39:  Yes, it is.

16           THE DEPUTY CLERK:  Juror No. 44, is that your verdict?

17           JUROR 44:  Yes.

18           THE DEPUTY CLERK:  Juror No. 48, is that your verdict?

19           JUROR 48:  Yes.

20           THE DEPUTY CLERK:  Juror No. 58 --

21           JUROR 58:  Yes, it is.

22           THE DEPUTY CLERK:  -- is that your verdict?

23           JUROR 58:  Yes, it is.

24           THE DEPUTY CLERK:  Thank you.

25           Juror No. 77, is that your verdict?

N592Car2

1           JUROR 77:  Yes.

2           THE DEPUTY CLERK:  Juror No. 80, is that your verdict?

3           JUROR 80:  Yes.

4           THE DEPUTY CLERK:  Juror No. 81, is that your verdict?

5           JUROR 81:  Yes.

6           THE DEPUTY CLERK:  Verdict unanimous, your Honor.

7           THE COURT:  Thank you.

8           Is there any reason why the verdict should not be

9     filed and recorded and judgment entered?

10          Ms. Kaplan.

11          MS. KAPLAN:  None from our side, your Honor.

12          THE COURT:  Mr. Tacopina.

13          MR. TACOPINA:  No, your Honor.

14          THE COURT:  The judgment will be filed and recorded.

15          Any reason why the jury shouldn't be discharged at

16    this time?

17          MS. KAPLAN:  None for plaintiff, your Honor.

18          MR. TACOPINA:  No, your Honor.

19          THE COURT:  Members of the jury, you have done an

20    important and a hard task.  I never comment on jury verdicts

21    because I respect the role of the jury.  It is the bedrock of

22    the system.

23          When I first began practicing law in New York, there

24    was a then very elderly and distinguished judge of this Court

25    who at least two members of the United States Supreme Court

A-3219

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

---

E. JEAN CARROLL,

<div align="center"><em>Plaintiff,</em></div>

v.

DONALD J. TRUMP,

<div align="center"><em>Defendant.</em></div>

No. 22 Civ. 10016 (LAK)

---

### DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOR A NEW TRIAL OR REMITTITUR

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action.

2.      I respectfully submit this declaration in support of Carroll's memorandum of law in opposition to Defendant Donald J. Trump's motion for a new trial or remittitur.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the official transcript of the trial in this action.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of PX-1, which was entered into evidence during the trial in this action.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of PX-2, which was entered into evidence during the trial in this action.

A-3220

6.      Attached hereto as **Exhibit 4** is a true and correct copy of PX-3, which was entered into evidence during the trial in this action.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of PX-4, which was entered into evidence during the trial in this action.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of an excerpt from the Defendant's deposition designations, which were marked as PX-200-T and entered into evidence during the trial in this action.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpts from the official transcript of the trial in *Breest v. Haggis*, No. 161137/2017 (N.Y. Sup. Ct., N.Y. Cty. 2022).

10.      Attached hereto as **Exhibit 8** are true and correct copies of PX-45, 46, 48, 51, 53, 57, which were entered into evidence during the trial in this action.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:      New York, New York
            June 22, 2023                                    Roberta A. Kaplan

A-3221

# EXHIBIT 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                    Plaintiff,              New York, N.Y.
 4
              v.                            22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                    Defendant.
 7   ------------------------------x        Jury Trial

 8                                          April 26, 2023
                                            10:10 a.m.
 9
     Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                              and a Jury

13
                           APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant
```

1    to Bergdorf's?

2    A.  I am guessing that it was a sale.

3    Q.  Do you recall sitting here today?

4    A.  No.

5    Q.  Did you buy anything that day?

6    A.  I don't think I did because I didn't have carrier bags with

7    me.  I didn't have shopping bags.

8    Q.  Do you recall how long you were in the store?

9    A.  No.

10    Q.  When did you first see Mr. Trump that day?

11    A.  I was leaving the store, and I was exiting the 58th Street

12    entrance, and I was just about to go out the door.  He was

13    standing on the other side of it and put up his hand.

14    Q.  You're putting up your hand to indicate what, Ms. Carroll,

15    so it's clear?

16    A.  It's universal signal for stop.

17    Q.  What did you do?

18    A.  I stopped.

19    Q.  What happened next?

20    A.  And he came through the door and he said, hey, you are that

21    advice lady.

22    Q.  How did you respond?

23    A.  I said, hey, you're that real estate tycoon.

24    Q.  What was your impression of Donald Trump at that time when

25    you saw him at Bergdorf's?

1  A.  Very personable, engaging.

2  Q.  What happened after you said, hey, you're that real estate

3  tycoon?

4  A.  He said, I need to buy a gift, come help me.  Come help me.

5  Come advise me.

6  Q.  Did you agree?

7  A.  I was delighted.

8  Q.  Why?

9  A.  Well, it was such a funny New York scene.  I'm a born

10  advice columnist.  I love to give advice, and here was Donald

11  Trump asking me for advice about buying a present.  It was a

12  wonderful prospect for me.

13  Q.  Who was he shopping for, if you know?

14  A.  I asked him.  I said:  Who is it for?  He said:  A girl.

15  And then I asked him, trying to figure out who it would be:

16  How old is she?  And he replied with:  How old are you?

17  Q.  What did you say?

18  A.  I said 52.

19  Q.  How did he respond?

20  A.  He said:  You are so old.

21  Q.  Was that in a fresh way or in a sort of teasing way?

22  A.  No.  It was humorous the way he said it.

23  Q.  What did the two of you do next?

24  A.  At the time, in '96, the little circular alcove we were

25  standing in had displayed three or four handbags, which were so

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  beautiful and such works of art I thought, wow, any girl would

2  love one of these handbags.  But he didn't like the idea of a

3  handbag.  So we went -- we turned to the left, went walk

4  through the first floor to the hats.  I thought a hat would be

5  great, and she is going to love a hat.

6  Q.  As far as you were able to tell -- what floor of Bergdorf

7  were you on at this point?

8  A.  First floor.

9  Q.  As far as you were able to tell, did anyone recognize you

10  or Mr. Trump?

11  A.  There was a shopper.  She was tiny, because I remember her

12  staring up at him in awe.  She recognized him.  He was very

13  pleasant.

14  Q.  Anyone else?

15  A.  There was a sales attendant, and she was also very pleased

16  to see him.  He was pleased to see her.

17  Q.  What, if any, words did they exchange?

18  A.  I think he said hello, how are you doing, how are you.

19  Q.  What happened after hats?

20  A.  He was holding -- he picked up a hat that was a fur hat and

21  he was petting it like a little cat or a dog.  And as he was

22  petting it he said, I know, lingerie.

23  Q.  Lingerie meaning underwear?

24  A.  Yes.

25  Q.  Where was the lingerie -- the lingerie section, I guess, in

1    the store?  Where was that located?

2    A.  I didn't know where it was.  I do now know where it is.

3    But he led the way to the escalator, and we started to go up

4    the escalator.

5    Q.  What floor do you recall lingerie being on at that time?

6    A.  Six.

7    Q.  Was there anything sort of discomforting to you about the

8    fact that Mr. Trump had proposed the lingerie?

9    A.  No.  By this time -- first of all, he was very talkative.

10   In the escalator he talked about how great Bergdorf's was.  At

11   one time he was thinking of buying Bergdorf's.  I was

12   absolutely enchanted -- I could only think of it as a scene,

13   such a great story, so I was delighted to go to lingerie with

14   him.

15   Q.  Were you chatting --

16   A.  Yes.  He was very funny, yeah.

17   Q.  Do you recall what the two of you were discussing as you

18   made your way to the lingerie area?

19   A.  He was talking about Bergdorf's.  I don't remember

20   precisely.

21   Q.  What was the tone of the conversation?

22   A.  Very joshing and light.

23   Q.  Who, if anyone else, in the store did you see as you rode

24   up to the lingerie area?

25   A.  I wasn't looking.  I was watching him and watching that I

1    didn't fall when I went on the escalator -- when the escalator

2    hit the top.

3    Q.  When you arrived at the six floor on the escalator, do you

4    recall how you walked to the area where the lingerie was?

5    A.  Yeah.  We walked -- yeah.

6    Q.  Sort of walk us through how you remember moving through the

7    floor, which way you would turn, etc.

8    A.  Do you mind if I stand up?  Because I cannot -- I'm very,

9    very bad on direction.

10         MR. FERRARA:  Your Honor, may the witness stand up to

11   orient herself?

12         THE COURT:  Yes.

13   A.  We go to the top.  We turn to the left.

14   Q.  Then what?  Is the lingerie like right there?

15   A.  No, no.  If you just keep going, you will see lingerie a

16   little bit to the right, just slightly off to a little section.

17   Q.  What happened when the two of you arrived at that section?

18   A.  There is a glass covered sort of cabinet, very elegant

19   piece of furniture.  And on the top of this glass was a lovely

20   piece of see-through grayish blue bodysuit, and he snatched it

21   up.  He held it up and he said:  Go put this on.

22   Q.  Is a body suit a type of lingerie?

23   A.  Yes.  It's quite a lovely piece.  It looks like a swimsuit,

24   except this was see-through?  They used to be called teddies.

25   Q.  Who else was in the -- in that area when you -- with you

Case 23-793, Document 87, 11/20/2023, 3592074, Page168 of 279

1   and Mr. Trump?

2   A.  I didn't see anybody.

3   Q.  Was that surprising?

4   A.  It didn't surprise me, no.

5   Q.  What about sales attendants?

6   A.  Didn't see any.

7   Q.  Why didn't that surprise you?

8   A.  Bergdorf's was not busy in the evenings.

9   Q.  Have you written before that you were surprised by the lack

10  of people on the floor?

11  A.  Well -- I was not surprised and yet I was surprised.

12  Q.  How is that?

13  A.  The whole thing about going up in the escalators with

14  Donald Trump was surprising.  The fact that we didn't see any

15  salespeople, I think I noticed it.  I may have described it

16  before as being surprising.  I may have been surprised.  I

17  really can't say.  Now I find it surprising.

18  Q.  What happened after Mr. Trump picked up the piece of

19  lingerie?

20  A.  He said:  Go put this on.

21  Q.  Did you?

22  A.  No.  I had no intention of putting it on.

23  Q.  What was his demeanor when he said go put this on?

24  A.  Jesting, joshing.

25  Q.  How did you respond?

1   A.  I said:  You put it on.  It's your color.

2   Q.  What did he say?

3   A.  Then he held it up and he held it against me.  He said:

4   You're in shape.  Go put this on.  I said:  No.  It goes with

5   your eyes.  It's your size.  You put it on.

6   Q.  Why in the world would you think that Mr. Trump would put

7   on that piece of lingerie?

8   A.  Because his tone was -- he was having a very good time and

9   so was I.  The idea was very funny, and I could just picture it

10  in my mind, Donald Trump putting on this filmy see-through bit

11  of lingerie over his pants.  That's how I pictured it.

12  Q.  So what happened next?

13  A.  He said:  Go try this one -- no.  He said:  Let's try this

14  on.  And he motioned towards the dressing room.

15  Q.  What did you do?

16  A.  Well, I thought, hmm, and he had me by the arm -- he

17  motioned with his arm, he had me by the arm with this hand, and

18  the door was open and he went like this.  And I said OK.  I

19  sort of saw it as a Saturday Night Live sketch.  I had written

20  a sketch that was similar to this very scene I was entering.

21  And Donald Trump was being very light and it was very joshy and

22  pleasant and very funny.

23  Q.  Just to be clear, was he dragging you into the dressing

24  room?

25  A.  No.  He went like this.

1   Q.   In your mind, at the time, Ms. Carroll, had things --

2   withdrawn.

3           Had you been flirting sort of much this time with

4   Mr. Trump?

5   A.   Yeah.  I was flirting the whole time, probably.

6   Q.   At this point now, when Mr. Trump has proposed going to the

7   dressing room, have things escalated in your mind?

8   A.   The comedy was escalating, and I thought it was getting

9   funnier and funnier.

10  Q.   Did you ever think about saying, no, I'm not going in?

11  A.   No.  It didn't occur to me.  I didn't really think about

12  going into the dressing room.  I thought of it as sort of an

13  open area.  I thought the door was open, we walked in.  I

14  didn't picture anything about what was about to happen.  Didn't

15  picture it.

16  Q.   What happened once you -- first off, was the dressing room

17  open or closed?

18  A.   The door was opened.  That open door has plagued me for

19  years because I just walked into it, just walked in.

20  Q.   Let's take it one step at a time.  What happened once you

21  entered the dressing room?

22  A.   He immediately shut the door and shoved me up against the

23  wall and shoved me so hard my head banged.

24  Q.   What were you thinking at that moment?

25  A.   I was extremely confused and suddenly realizing that what I

1    thought was happening was not happening.

2    Q.  How did you react in that moment?

3    A.  I was laughing as we walked in, and I continued to laugh

4    because I thought -- I wasn't sure -- for a minute I thought

5    maybe it was a mistake, that he didn't mean to do that.  He

6    didn't mean to shut the door.  And just to make sure -- I

7    continued to laugh just in case he was thinking of something

8    intimate.  And so I'm very rapidly trying to figure out, what's

9    going on and trying to get out of it at the same time.

10   Q.  What did he do next?

11   A.  I pushed him back, and he thrust me back against the wall

12   again, banging my head again.

13   Q.  Were you still laughing at this point?

14   A.  I think I may have been.  I really -- here is the thing.  I

15   didn't -- just in case -- this is going to sound odd.  I didn't

16   want to make a scene.  I know that sounds strange.  I didn't

17   want to -- I didn't want to make him angry at me.  I didn't

18   want to stop what started out as something light and fun and

19   comedic and a great story to people I am having dinner with,

20   and it suddenly turned absolutely dark.

21   Q.  What did he do after he pushed you up against the wall the

22   second time?

23   A.  He put his shoulder against me and hold me against the

24   wall.

25   Q.  Then what happened?

1   A.  I remember him being -- he was very large, and his whole

2   weight came against my chest and held me up there, and he

3   leaned down and pulled down my tights.

4   Q.  What, if anything, were you doing while that was happening?

5   A.  I was pushing him back.  It was quite clear that I was not

6   going -- I didn't want anything else to happen.  It was quite

7   clear.  I pushed him back.  This arm was pinned down.  This arm

8   had my purse.  Trying to get him back.

9   Q.  At any point during this encounter, do you recall saying

10  no?

11  A.  No, I don't recall saying it.  I may have said it.

12          MR. FERRARA:  Just one moment, your Honor.

13  Q.  At any point during this encounter did you scream?

14  A.  I don't remember screaming.  I'm not a screamer.  I'm a

15  fighter.  I'm much more physical than I am vocal.

16  Q.  What about his head?  What is happening?

17  A.  His head was beside mine breathing.  First, he put his

18  mouth against me.

19  Q.  Do you mean he kissed you?

20  A.  Yes.

21  Q.  Did you kiss him back?

22  A.  No.  I didn't consider it a kiss.  It was such -- it was a

23  shocking thing for him to suddenly put his mouth against mine.

24  I thought what.  What.  What.  No.

25  Q.  Do you think -- based on what you were experiencing, do you

1   believe that if someone had been nearby, they would have been

2   able to hear what was happening in the dressing room?

3   A.  They would have heard the head hitting and definitely would

4   have heard me laughing.

5   Q.  You described Mr. Trump as a -- you described Mr. Trump as

6   sort of, I think, larger than you?

7   A.  Yeah.

8   Q.  Do you recall approximately what the difference or how tall

9   are you?

10  A.  At the time I was five-nine.  Because I'm 79, I have sort

11  of all compacted down due to gravity, but at the time I was

12  five-nine.  I was wearing four-inch heels.  So it put me about

13  level with Donald Trump, who I think is six-two.  I was

14  six-one.  And I weighed at the time about 120, and I believe he

15  weighed about 100 more pounds.

16  Q.  Were you afraid while this was happening?

17  A.  I was in -- this is going to sound strange.  I was almost

18  too frightened to think if I was afraid or not.  I was

19  stamping.  My whole reason for being alive in that moment was

20  to get out of that room.

21  Q.  How were you trying to accomplish that?

22  A.  Stamping and trying to wiggle out from under him.  But he

23  had pulled down my tights and his hand went -- his fingers went

24  into my vagina, which was extremely painful, extremely painful.

25  It was a horrible feeling because he curved, he put his hand

1   inside of me and curved his finger.  As I'm sitting here today,

2   I can still feel it.  It was --

3   Q.  Then what happened?

4   A.  Then he inserted his penis.

5   Q.  What did you do in that moment?

6   A.  I tried --

7   Q.  Do you need a moment, Ms. Carroll?

8   A.  You asked me what I did in that moment.  I always think

9   back to why I walked in there to get myself in that situation,

10  but I'm proud to say I did get out.  I got my knee up.  I got

11  my knee up and pushed him back.

12  Q.  Was anything in your hands?

13  A.  My handbag.

14  Q.  Why were you holding your handbag?

15  A.  I have no idea.

16  Q.  I want to be -- I want to make sure I understand it.

17          How were you able to -- were you able to see what

18  Mr. Trump was doing with his hand, or are you telling us what

19  you experienced sort of physically by feeling it?

20  A.  He was against me, his whole shoulder -- I couldn't see

21  anything.  I couldn't see anything that was happening.  But I

22  could certainly feel it.  I could certainly feel that pain in

23  the finger jamming up.

24  Q.  How long was your dress?

25  A.  Mid knee.  Mid knee.

1    Q.  Do you recall how far down he pushed your tights?

2    A.  Yeah.  A little bit below mid thigh.

3    Q.  Were you wearing underwear?

4    A.  No.  To me, tights are underwear.  I wouldn't wear two pair

5    of underwear, no.

6    Q.  Do you recall either of you saying anything as this was

7    happening?

8    A.  I can't say if I said -- I can't say -- I had so much

9    adrenaline pouring through me at this time, I can't tell you if

10   I said anything.

11   Q.  Do you know if he ejaculated?

12   A.  I don't think so.

13   Q.  You said you got your knee up.  What happened next?

14   A.  Once I could get my knee up, I could get him to back off.

15   I could actually move his body.  I was quite strong.  I was an

16   athlete.  I could push him back by putting that knee up.

17   Q.  What did you do after you were able to push him off?

18   A.  I exited the room, and I got out of the store as quickly as

19   I could.

20   Q.  How long do you believe the encounter, the assault in the

21   dressing room, do you recall how long that assault lasted?

22   A.  From walking in, from walking in?

23   Q.  Just in the dressing room.

24   A.  A very few minutes, very few.  That was another thing that

25   surprised me.

1   A.  Because I had done -- I thought it was -- I was ashamed.  I

2   thought it was my fault.

3   Q.  Why did you think it was your fault, Ms. Carroll?

4   A.  Because I was flirting with him and laughing and having one

5   of the great times.  It was high comedy.  It was funny.  And

6   then to have it turn into the --

7   Q.  Do you recall anything else about that conversation with

8   Ms. Birnbach?

9   A.  Yes.  After she told me to go to the police, I said no, no

10  way.  She said:  I'll go with you.  I said no.  I could not

11  talk about this with anyone.  And we are not going to talk

12  about it either.  I don't want to talk about it anymore.  And

13  that's it.

14  Q.  Then what did you do that night after the call ended?

15  A.  I walked to the garage and drove home.

16  Q.  That night, the night of the assault, do you recall whether

17  you had any physical signs of injury?

18  A.  My head hurt, my vagina felt pain, and --

19  Q.  Did you seek medical attention?

20  A.  No.

21  Q.  Was there any damage to your clothing?

22  A.  No.

23  Q.  What did you do with the dress you were wearing?

24  A.  I hung it in the closet.

25  Q.  Did you throw it out?

1   Q.  Where were Mr. Ailes' studios in relation to your studio --

2   or set?  Let me --

3   A.  Sets.  They kept Roger's set on the sets -- we -- many of

4   the shows use the same studio, so they break the sets between

5   shows and then put them up.  Roger had -- he did live shows in

6   New Jersey and he did live shows also in New York.  So we ran

7   into each other almost every day in Fort Lee.

8   Q.  When you say "we," who do you --

9   A.  Roger and I.

10  Q.  Do you recall ever seeing Mr. Trump on Mr. Ailes' set?

11  A.  No.

12  Q.  And do you recall -- sitting here today, Ms. Carroll, do

13  you know when exactly that interview was filmed or aired?

14  A.  I have a pretty good idea.

15  Q.  When do you think that was filmed or aired?

16  A.  Well, whenever that big parade was.

17  Q.  Okay.  So let's -- so thank you for just going back to

18  that.

19          Let's come back, though, now to where we were, sort of

20  where we had left off before lunch.

21          I think we had finished discussing the assault and

22  sort of your immediate steps that you took.  Looking sort of

23  further out, have you had a romantic relationship since the

24  assault?

25  A.  No.

1   Q.  Why not?

2   A.  I -- the short answer is because Donald Trump raped me.

3   Q.  How did that affect you in a way -- can you describe for

4   the jurors why that assault left you unable to form a romantic

5   connection?

6   A.  What I did was I flirted with Donald Trump.  I laughed with

7   him.  I tried to be -- tried to engage him.  I laughed at his

8   jokes.  I found him charming.  And what happened to me when I

9   was flirting?  I got into serious trouble.  And so I, after

10  that event, I found it's impossible for me -- if I meet a man

11  who is a possibility, it's impossible for me to even -- well,

12  to even look at him and smile.  And in order to fall in love or

13  have dinner with someone, you've got to at least look at them

14  in the eye and smile, and I couldn't -- I couldn't force myself

15  to show a man that I liked that I liked them.  I couldn't do

16  it.  It just led to terrible consequences, hence, I didn't meet

17  anybody.

18  Q.  I'm sorry to ask this so directly, but have you had sex

19  since Donald Trump assaulted you?

20  A.  No.

21  Q.  This person you just described to us as sort of having shut

22  down, is that how you portrayed yourself on television

23  following the assault or in public appearances?

24  A.  No, I have a, I have a, I have a public self, which is

25  vibrant and wanting to help everyone, and always, always upbeat

1    and always optimistic and always putting forth a strong front.

2    And then I have, you know, a private side, and that's the one

3    that can't admit out loud that there's been any suffering.

4              MR. FERRARA:  May I approach the witness, your Honor?

5              THE COURT:  You may.

6    A.  Thank you.

7    Q.  What is private E. Jean Carroll like?

8    A.  Well, I like her.  I like private E. Jean.  She gets to be

9    quiet and she doesn't have to be the invincible old lady that's

10   my front.  I'm invincible.  I solve other people's problems.  I

11   am the cheerleader.  I'm the one who says you can go on, pick

12   yourself up, you can do it, you can do it.  And when my

13   correspondents don't take my advice, I go right on and say you

14   can do it, you can do it, you can do it.

15             Private E. Jean is -- she -- she is not that

16   cheerleader.

17   Q.  Prior to the assault, had there been extended period of

18   time where you had not, let's say, dated?

19   A.  No.  I loved meeting men.  I loved going out.  I loved

20   conversations.  I loved dancing.  I loved meeting new people,

21   loved it.  I loved life.  I loved living in New York.  It's the

22   best place in the world.

23   Q.  Remind us how old you were when Mr. Trump assaulted you?

24   A.  52.

25   Q.  Could your age have been a reason why you never had sex

1    A.  May I see it?

2    Q.  Let's go to -- well, let me come back to it, Ms. Carroll.

3    Let me ask you a different way that I think will have it more

4    at my fingerprints.  Let me put it this way.  Do you recall

5    saying -- and just one moment, your Honor.

6              (Counsel confer)

7    BY MR. FERRARA:

8    Q.  Do you recall saying in August of 2019 or around then that

9    you think perhaps it -- your inability to find a romantic

10   connection was not because of Mr. Trump, that it may have been

11   luck?

12   A.  I have said that, specifically I remember saying that in my

13   book.  I thought it -- I thought luck -- I've always believed

14   that luck has a strong influence in everyone's life.

15   Q.  Have you tried to date since the assault?

16   A.  Well, yes.  I mean, I was not unaware that I was not in a

17   romantic relationship.  I was very aware of that and I knew

18   something was wrong.

19   Q.  Have you tried -- have you tried to use dating apps?

20   A.  Yes.

21   Q.  Which ones?

22   A.  Well, mainly I was on dating apps because I was studying

23   the competition because I had two -- I was a founder of two

24   dating sites.  So most of my activity on the dating sites were

25   to look at the competition.  But I confess I was also looking.

1    Q.  Were you able to find anyone, any match?

2    A.  No.

3    Q.  Were you set up on any dates after --

4    A.  Yes.

5    Q.  You are chuckling --

6    A.  My friends noticed that I'd been sitting at home, and so my

7    friends at Esquire, five or six guys, got together and found

8    the perfect man for me and they had a dinner and I was invited

9    and the man was invited.  He was perfect.  He was a journalist.

10   He was just so entertaining, and his conversation was

11   enthralling, and I took one look at him and I was so obnoxious.

12   I didn't laugh at his jokes, didn't look in his eyes, looked

13   away when he was talking because he was a possible.  He was

14   just about right.  Scared me to death.

15   Q.  Why?

16   A.  I -- well, I think it's because -- flirting, flirting ended

17   up as the worst decision of my life.

18   Q.  What is that -- just to be clear, what is that a reference

19   to, the worst decision?

20   A.  Flirting.

21   Q.  The worst decision of your life, what is that a reference

22   to?

23   A.  Going in that dressing room.

24   Q.  Sitting here today, do you believe you were afraid to be

25   around sort of a suitable potential partner?  Was it fear?

1          MR. TACOPINA:  I'm sorry.  I really just don't --

2          THE COURT:  Sustained.

3          MR. FERRARA:  I will withdraw that question.

4   BY MR. FERRARA:

5   Q.  How do you feel about not having been in a relationship

6   since the mid '90s?

7   A.  I feel I have lost out.  I'm sorry.  I am a happy person

8   basically, but I'm aware that I have lost out on one of the

9   glorious experiences of any human being.  Being in love with

10  somebody else, making dinner with them, walking the dog

11  together.  I don't have that.  I am -- and just cuddling on the

12  sofa, watching TV, and eating popcorn.  I am aware of how much

13  I have lost and I feel, here's the thing, I feel like I should

14  be able to overcome it.

15  Q.  I want to come back to your second marriage to Mr. Johnson,

16  John Johnson.  Was there violence in that relationship?

17  A.  Yes.

18  Q.  What kind of violence?

19  A.  Well, we were -- it was a very passionate marriage, very

20  passionate, very hot, very tempestuous, lots of fun, I mean, we

21  would laugh so hard I would literally fall out of my chair.

22          But on the flip side of that is we argued.  We were

23  dog and cat.

24  Q.  Was there violence?

25  A.  Yes.

1   A.  Because he -- Cam didn't -- it was not violent.

2   Q.  Has -- sorry?

3   A.  The incident in Bergdorf's was very violent.

4   Q.  I want to -- for clarification, was the -- you mentioned

5   William Goldman.  Was your relationship with William Goldman

6   before or after Mr. Trump assaulted you?

7   A.  Before.

8   Q.  Have you ever been diagnosed with any mental health

9   conditions such as PTSD or depression?

10  A.  No.

11  Q.  Have you taken any medication for depression or anxiety?

12  A.  No.

13  Q.  Are you a happy person, Ms. Carroll?

14  A.  I am a happy person.  I know it seems strange to hear me

15  after today, but I'm basically a happy person.  But I think I

16  could work on a few things.

17  Q.  How often, if at all, do you think about the assault that

18  night at Bergdorf's?

19  A.  Well, that very night the visions would wash over me.  I

20  couldn't -- it was horrible.  Not only did it happen in

21  Bergdorf, but it happened over and over and over in my mind

22  because I did not have the ability to strike to get the visions

23  out of my head.

24          As I learned to deal with the sudden intrusions, I got

25  better and better at moving them aside.  And so they -- I've

1   had them ever since the attack.  They were more frequent right

2   after the attack and they stayed about -- I had -- I would be

3   going about my normal day, I would be walking the dog, I would

4   be hiking on -- hiking, and suddenly up would come the vision.

5   Those types of intrusions happened regularly.  I didn't know

6   when they would come, I didn't know when to expect them, but

7   they would absolutely take over my brain.  I would move them

8   aside.  So that was fairly frequent.

9   Q.  Can you give the jurors a sense or examples of what -- what

10  would you see?  What does a vision sort of look like?

11  A.  Just recently, I pulled over to the side of the high -- of

12  the road on my way home because it was late and I thought I

13  would rest my eyes and just take a quick nap.  I closed my

14  eyes.  I must have fallen asleep.  Because when I woke, I felt

15  Donald Trump again on top of me, his huge -- I thought for a

16  minute I was going to die because I couldn't breathe.  That's

17  the sudden, horrible kind.

18          But normally I would be cooking pasta or just going

19  about my normal day, and in would slide just a picture of him

20  going like this into the dressing room or hitting my head or

21  feeling his fingers jammed up inside of me and then with effort

22  I could move those out of my mind.  I think everybody has

23  visions coming up.

24  Q.  Were there specific -- are there specific things, were

25  there specific things that triggered these visions?

1   Q.  What did you share with them?

2   A.  I shared nine pages of the draft that I was going to turn

3   in.

4   Q.  Were either of them ultimately named in the book?

5   A.  No.  Prior to publication, I took the names out and just

6   referred to them as two good friends, both journalists.

7   Q.  Did either of them provide any feedback on the excerpt?

8   A.  No.  They are both writers.

9   Q.  The first time that chapter about Donald Trump, do you

10  recall the first time that was sort of published or made

11  public, just maybe as an excerpt?

12  A.  Yes.

13  Q.  When was that?

14  A.  That was at the end of June 2019.

15  Q.  If you recall, in what form was that excerpt first

16  published?

17  A.  That was New York magazine ran an early excerpt of it, and

18  it hit the Internet before it hit the magazine came out in hard

19  copy.  So it ran three days on the Internet before it hit --

20  before the publishing form appeared.

21  Q.  Were you involved in pitching the excerpt to New York

22  magazine?

23  A.  Yes.

24  Q.  Let me show you what has been marked for identification as

25  Plaintiff's Exhibits 6 and 7.

N4RMCAR2

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      E. JEAN CARROLL,
 3
                      Plaintiff,                New York, N.Y.
 4
                 v.                             22 Civ.10016 (LAK)
 5
      DONALD J. TRUMP,
 6
                      Defendant.
 7    ------------------------------x           Jury Trial
 8                                              April 27, 2023
                                                10:50 a.m.
 9
      Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                               District Judge
12                                              and a Jury
13
                         APPEARANCES
14
      KAPLAN HECKER & FINK LLP
15         Attorneys for Plaintiff
      BY:  ROBERTA A. KAPLAN
16         MICHAEL J. FERRARA
           SHAWN G. CROWLEY
17         MATTHEW J. CRAIG
18
      TACOPINA SEIGEL & DeOREO
19         Attorneys for Defendant
      BY:  JOSEPH TACOPINA
20         CHAD D. SEIGEL
           MATTHEW G. DeOREO
21
22    HABBA MADAIO & ASSOCIATES, LLP
           Attorneys for Defendant
23    BY:  MICHAEL T. MADAIO
24
      W. PERRY BRANDT
25         Attorney for Defendant
```

N4RMCAR2                        Carroll - Direct

1   Q.  Why did you agree in the first place?

2   A.  I was a big admirer of Ivy's work.

3   Q.  Why did you stop filming?

4   A.  Because this lawsuit became very important, and Ivy and I

5   decided together, we should cease.

6   Q.  Have you received any payments for that documentary?

7   A.  No.

8   Q.  I want to call your attention -- I think this is sort of

9   the last topic.  I want to call your attention to October of

10  2022.

11  A.  Yes.

12  Q.  Do you recall, what, if any, additional relevant statements

13  did Donald Trump make at that time?

14  A.  Just when I had managed to get my Substack up and running,

15  get my career a little bit back and feeling that things were

16  going to be OK, Donald Trump posted on social media every

17  single thing that I was suing him for.  He repeated it on

18  October 12 and then added the fact that he thought the justice

19  system in America was broken, and one of the prime examples of

20  the justice system being broken was my suing him.

21  Q.  Let me show you what has been marked for identification as

22  Plaintiff's Exhibit 4.

23          Do you recognize this?

24  A.  Yes.

25  Q.  What is it?

N4RMCAR2                        Carroll - Direct

1    keep moving.

2    Q.  Are you on Truth Social, Ms. Carroll?

3    A.  Yes.

4    Q.  How did you find out about this statement?

5    A.  I heard from several people that he had posted it.

6    Q.  How, if at all, do you believe this statement affected your

7    reputation?

8    A.  I really thought I was gaining back a bit of ground.  I

9    thought, it's starting to go and I felt, you know, happy that,

10   you know, I was back on my feet, had garnered some readers, and

11   feeling pretty good, and then, boom, he knocks me back down

12   again.

13   Q.  Were you surprised by the statement?

14   A.  Stunned.

15   Q.  Why?

16   A.  Because I'm suing him for saying these very things.

17   Q.  In light of Mr. Trump's October 22 statement, did you file

18   a second lawsuit?

19   A.  Yes.

20   Q.  Is that second lawsuit why we are here today?

21   A.  Yes.  This is why we are here.

22   Q.  What did you sue him for in the second lawsuit?

23   A.  I sued him for defamation of character.

24   Q.  Anything else?

25   A.  Yes.  I also sued him for assault.

N4RMCAR2                          Carroll - Direct

1    Q.  Why didn't you sue him for assault in the first lawsuit?

2    A.  Because the time period allowed was -- it had passed, and I

3    could not do it.

4    Q.  What happened that allowed you to do it -- to sue him for

5    assault in the second lawsuit?

6    A.  The state assembly and the state senate passed what they

7    called the Adult Survivors Act, and it gave survivors of sexual

8    assault, sexual abuse, sexual harassment a one-year window to

9    come forward and bring suit against the people.

10   Q.  Had you advocated for passage of that law?

11   A.  Yes.

12   Q.  Why.

13   A.  Because I understand why women, particularly, and some men

14   do not come forward and tell what happened.  It takes sometimes

15   years to get the courage to face the person who hurt you, if at

16   all.  It takes years.  And some maturity and some age.  It

17   takes -- there are many people, reasons why people don't report

18   it, and this act gives us a chance to be heard.

19   Q.  What, if any, I'll call it sort of public response did you

20   experience after Mr. Trump made his October 2022 statement?

21   A.  It was not very nice.

22   Q.  What do you recall?

23   A.  Just a wave of slime.  It was very seedy comments, very

24   denigrating.  Almost an endless stream of people repeating what

25   Donald Trump says, I was a liar and I was in it for the money,

N4RMCAR2                          Carroll - Direct

1    can't wait for the payoff, working for the democrats, over and

2    over.  But the main thing was way too ugly.  It is very hard to

3    get up in the morning and face the fact that you're receiving

4    these messages you are just too ugly to go on living,

5    practically.

6    Q.  Let me show you what has been marked for identification as

7    Plaintiff's Exhibit 45.

8         Do you recognize this, Ms. Carroll?

9    A.  Yeah.  I think it was -- it appeared -- yeah.

10   Q.  What is it?

11   A.  It's a tweet.

12   Q.  What is the date?

13   A.  October 13.

14   Q.  Of what year?

15   A.  2022.

16   Q.  Is your name mentioned?

17   A.  I guess that is me.

18        MR. FERRARA:  Your Honor, plaintiff offers 45.

19        THE COURT:  Received.

20        (Plaintiff's Exhibit 45 received in evidence)

21        MR. FERRARA:  Mr. Lam, we can publish this for the

22   jurors.  Thank you.

23        If we just focus on the tweet in the upper left, the

24   sort of main tweet.

25   Q.  Ms. Carroll, this was the day after Mr. Trump's statement?

Case 23-793, Document 87, 11/20/2023, 3592074, Page191 of 279

N4r2Car3                          Carroll - Cross

1   A.  Yes.

2            MR. TACOPINA:  And, your Honor, this is a compilation

3   of some excerpts from that book.  We have turned it over to

4   counsel.  I'm going to offer this, subject to any redactions

5   that counsel needs, into evidence at this time.

6            MR. FERRARA:  With that caveat, no objection, your

7   Honor.

8            THE COURT:  All right.  On that basis, received.

9            (Defendant's Exhibit AA received in evidence)

10  BY MR. TACOPINA:

11  Q.  Ms. Carroll, using your own words, the facts you allege in

12  your story you have told here to this jury are odd, correct?

13  A.  Can you repeat that again?

14  Q.  Sure.  Using your own words, the facts you allege in the

15  story you have told here are odd, O-D-D?

16  A.  Ah, yes.  Odd.

17  Q.  In fact, you could agree that your story is inconceivable,

18  correct?

19  A.  Certain parts of this story are difficult to conceive of,

20  yes.

21  Q.  And we will talk about your story and your accusations in a

22  while, but before we get there, you were writing the Ask

23  E. Jean column in *Elle* magazine for 25 years, correct?

24  A.  26 years.

25  Q.  26.

N4r2Car3                        Carroll - Cross

1           And it's fair to say that gave you status in New York,

2    at least you believe that you gave you status in New York,

3    correct?

4    A.  Yes, it did.

5    Q.  And you were fired from *Elle* magazine on December 11, 2019,

6    right?

7    A.  Yes.

8    Q.  And after you lost your job at *Elle* magazine, you felt

9    small and diminished, right?

10   A.  Yes.

11   Q.  And at that point in 2019, you experienced a different way

12   of life, right?

13   A.  Yes.  It was the first time that I had lost something very

14   important to me.

15   Q.  And that's because, in your own words, you then felt like

16   just another person, right?

17   A.  I have never felt like another person, like just another,

18   never like that.

19   Q.  You never felt like that after you lost your job?

20   A.  I felt many things, perhaps for a moment I felt like -- I

21   don't think I feel like just another person.  I don't think

22   there is such a thing as just another person.

23   Q.  Well, you testified yesterday about your interview session

24   with Dr. Lebowitz, your expert witness in this case, right?

25   A.  Yes.

Case 23-793, Document 87, 11/20/2023, 3592074, Page193 of 279

 1   give you a specific date of the alleged incident, either,

 2   right?

 3   A.  No.

 4   Q.  They couldn't.

 5   A.  No.

 6   Q.  You couldn't.

 7   A.  No.

 8   Q.  No one.

 9   A.  I wish to heaven we could give you a date.  I wish we could

10   give you a date.

11   Q.  In fact, they couldn't even tell you the year, whether it

12   was 1995 or 1996?

13   A.  Oh, no, no.  Lisa believes that because she published a

14   sort of a bombshell *New York* magazine piece about Mar-a-Lago

15   being opened as a club and Donald Trump had personally invited

16   Lisa to come down to do the story of the opening of the club,

17   *New York* magazine published it February -- in February.  I'm

18   not quite sure of the date.  Lisa believes she never would have

19   accepted that assignment if it had happened before she went

20   down to Florida.  So that places it definitely in 1996.

21   Q.  Okay.  And certainly you or them couldn't tell you whether

22   it was the fall or the spring.  You have testified to that?

23   A.  No, Lisa believes that it was in the spring of '96 because

24   of the *New York* magazine articles.  She swears up and down that

25   she would never go if she had heard about what Trump did to me

N4RMCAR4                         Carroll - Cross

1   any erotic intention.

2   Q.  According to you, after Donald Trump had you against the

3   wall, he pulled your tights down?

4   A.  Yes.

5   Q.  It's your story that at some point you felt his penis

6   inside of you?

7   A.  Yes.

8   Q.  But before that, it's your sworn testimony that you felt

9   his fingers, what you said was rummaging around your vagina?

10  A.  It's an unforgettable feeling.

11  Q.  Now, when you say rummaging around your vagina, that's

12  different than inserting a finger inside your vagina.

13  A.  At first he rummaged around and then he put his finger

14  inside me.

15  Q.  In your book you wrote that he was forcing his fingers

16  around my private area and then thrust his penis halfway

17  completely, I'm not certain, inside me.  Is that accurate?

18  A.  Yes.

19  Q.  And this attack or this fight, based on your word, this

20  fight that you were in, could have taken as long as three

21  minutes?

22  A.  From entering the dressing room to my leaving it, I don't

23  think it could be any more than three minutes.  I may be wrong.

24  I didn't have a stopwatch, but it was about three minutes.

25  Q.  Even though you understood you were in the middle of this

N512car1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                    Plaintiff,              New York, N.Y.
4
               v.                           22 Civ.10016 (LAK)
5
     DONALD J. TRUMP,
6
                    Defendant.
7    ------------------------------x       Jury Trial

8                                           May 1, 2023
                                            9:30 a.m.
9
     Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                           and a Jury

13
                         APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21
22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24
25   W. PERRY BRANDT
          Attorney for Defendant
```

Case 23-793, Document 87, 11/20/2023, 3592074, Page196 of 279

N512Car3                          Carroll - Cross

1          THE COURT:  You know what I am talking about, number

2   one and number two.

3          MR. FERRARA:  In terms of an instruction, your Honor?

4          THE COURT:  In some way.

5          MR. TACOPINA:  Okay.  We will figure it out.  You want

6   us to get together to --

7          THE COURT:  No.  Maybe we can do it now.

8          MR. TACOPINA:  Okay, sure.

9          THE COURT:  Members of the jury -- and if counsel has

10   any objection to my doing it?

11          MR. TACOPINA:  It's okay.

12          THE COURT:  Okay.

13          Members of the jury, there are two lawsuits between

14   Ms. Carroll and Mr. Trump.  This is one of them.  The first

15   lawsuit was brought in 2019.  That's not the one we are dealing

16   with.  It's still alive, but you don't have to worry about why

17   or where or whatever.  That was brought solely for alleged

18   defamation that Mr. Trump allegedly committed in 2019.  At that

19   time, Ms. Carroll could not have sued him for allegedly raping

20   her for legal reasons.

21          The legal context changed.  It changed in November of

22   2022.  She at that time gained the right to sue him for the

23   rape, the alleged rape.

24          In addition, Mr. Trump had issued a statement that you

25   have already seen in October of 2022 in which Ms. Carroll

N512Car3                       Carroll - Cross

1    contends Mr. Trump libeled her or defamed her again.  That's

2    this case.  You are not concerned with the first case.  You

3    just need to know, for example, for the context of some

4    questions that it is out there, and it is not your job and

5    don't worry about that.

6              Any objection to that, Mr. Tacopina?

7              MR. TACOPINA:  That was perfect, your Honor.

8              THE COURT:  *Wunderbar.*

9              MR. FERRARA:  Agreed, your Honor.

10             THE COURT:  Okay.  Let's go.

11   BY MR. TACOPINA:

12   Q.  Before bringing this lawsuit, the one that's before the

13   jury against Donald Trump, you interviewed Natasha Stoynoff on

14   June 22, 2020.

15   A.  Yes.

16   Q.  And you prepared a transcript of that interview.

17   A.  Yes.

18   Q.  And during that interview, even though Natasha Stoynoff

19   repeatedly told you that she didn't recall Donald Trump

20   grinding against her, you repeatedly try to get her to say that

21   she did.

22   A.  I didn't get her to try to say that she did.  I just asked

23   her to try to think if it was a possibility.

24   Q.  Well, you asked Ms. Stoynoff at one point:  Do you recall

25   him grinding against you?

N512Car3                        Carroll - Cross

1    happened to --
2    A.  No.  I'm just -- I was talking about the culture in
3    general.  Anderson Cooper's audience, I was -- I assume a lot
4    of people think of rape as being sexy.
5    Q.  And you used the word "fight," not "rape" to describe what
6    happened to you in that interview because sexual violence is in
7    every country and every strata of society and you just feel
8    that so many women are undergoing sexual violence and that
9    yours was short, you got out, you are happy now, and you are
10   moving on.  Do you stand by that statement?
11   A.  I felt, I felt humble that I was aware of how much sexual
12   violence there is in the world.  I felt lucky to have gotten
13   out alive and was able to tell my story.  And at the time, when
14   I wrote the book, I don't think I used the word "rape."  I was
15   very -- I just very uncomfortable using the word because when I
16   use the word these intrusions and the visions would come up
17   into my head.  So I just -- I liked the word "fight" because it
18   gave -- it gave me action.  I felt I took action, and it wasn't
19   something done to me.  I got away.  So I used the word "fight."
20   Q.  Okay.  And after you made that comment that we discussed
21   about how you characterized rape being sexy, Anderson Cooper
22   said let's take a short break, and then you went to commercial
23   break, right?
24   A.  No.  I said "think of the fantasies."
25   Q.  Right, and then you said "you are fascinating to talk to"

N515car4                          Carroll - Cross

1   Q.  And you never told her anything about the Bergdorf Goodman

2   incident?

3   A.  No.  I told no one.

4   Q.  OK.  You can take that down.

5        You were fired from *Elle* magazine on December 11,

6   2019?

7   A.  Yes.

8   Q.  And it is your testimony that *Elle* magazine fired you

9   because Donald Trump called you a liar?

10  A.  Yes.

11  Q.  In fact, you don't blame *Elle* magazine for your

12  termination, according to you?

13  A.  I understood.  I was angry about it and hurt.  And I was

14  forlorn.  And I was going to miss my readers.  But, yes, they

15  let me go after 27 years.

16  Q.  And no one from *Elle* magazine told you that you were being

17  fired from *Elle* magazine because you were being branded a liar

18  by Donald Trump?

19  A.  No, they did not tell me that.

20  Q.  Did not tell you that.

21        In fact, you are aware that *Elle* magazine has publicly

22  stated that the decision not to renew your contract was a

23  business decision that had nothing to do with politics?

24  A.  Well, I think they're right when they say it is a business

25  decision, because when one of their --

Case 23-793, Document 87, 11/20/2023, 3592074, Page200 of 279

1          MR. FERRARA:  Your Honor, I object to this question.

2          THE COURT:  Sustained.  The jury will disregard the

3    question and the suggestion that *Elle* magazine issued a

4    statement or what it said.  There is no evidence of that.

5          MR. TACOPINA:  Your Honor, if I can direct the Court

6    attention and counsel's attention to the deposition of October

7    14, 2022, page 183, lines 10 to 21.

8          THE COURT:  Give me a minute.

9          MR. TACOPINA:  Yes, sir.

10         THE COURT:  You said 193?

11         MR. TACOPINA:  183, your Honor.

12         THE COURT:  OK.

13         MR. TACOPINA:  183, lines 10 to 21.

14         MR. FERRARA:  Same objection, your Honor.

15         THE COURT:  Same ruling.  Sustained.

16         MR. TACOPINA:  Yes.

17   BY MR. TACOPINA:

18   Q.  Regardless, you were very surprised by your termination in

19   December of 2019?

20   A.  I thought they were calling me to invite me to their

21   Christmas party.

22   Q.  Yet four months earlier, on August 1, 2019, you sent an

23   e-mail to your agent, Sarah Lazin?

24   A.  Yes.

25   Q.  Telling her that after Nina Garcia -- who I think you

N515car4                          Carroll - Cross

1   testified on direct is the head of *Elle* magazine?

2   A.  Yes, she was the editor in chief.

3   Q.  So you sent an e-mail to Sarah Lazin that after Nina Garcia

4   took over at *Elle*, the magazine cut your pay in half from

5   $10,000 a column to $5,000 a column?

6   A.  That was being done across the board at magazines, they

7   were cutting back on salaries and pages.

8   Q.  In fact, in August of 2019, before your firing in December,

9   you were looking to get out of your contract with *Elle*

10  magazine?

11  A.  I was looking for other work at other magazines as an

12  advice columnist, true.

13  Q.  OK, but you were looking for other work.  You were looking

14  to get out of your contract with *Elle* magazine?

15  A.  I had my contract checked by a lawyer, yes.

16  Q.  And you told your agent, Sarah, that *The Atlantic* was

17  interested in sort of stealing you and your advice column from

18  *Elle*?

19  A.  Yes.

20  Q.  And you were considering it?

21  A.  Yes, I was considering it.  Yes.

22  Q.  And that's because *Elle* cut your salary in half?

23  A.  Yes.

24  Q.  And left you without an editor?

25  A.  Yes.

1   Q.  And didn't run your column in July of 2019?

2   A.  Didn't run it, and they also cut my column pages from two

3   pages to one.

4   Q.  OK.

5   A.  They also hid the column in the magazine and kept -- in

6   magazines you get a pride of placement with the most

7   interesting piece of writing in what we call the "well".  The

8   well is where the beautiful pictures are and that's usually

9   where the Ask E. Jean column resided, but when the new folks

10  came in, the Ask E. Jean column was found in a different place

11  every month so nobody could find the column.  They also buried

12  me online.

13  Q.  And you complained to your agent that Nina Garcia, the

14  editor in chief at *Elle*, loathed or hated you because you

15  published your book excerpt in *New York* magazine?

16  A.  They were not happy.

17  Q.  And that's the book excerpt that obviously featured the

18  story about Donald Trump and Bergdorf Goodman?

19  A.  Yes.

20  Q.  And you agree that Nina Garcia, the editor in chief of

21  *Elle*, is a well respected editor in the magazine world?

22  A.  Nina is extremely respected.  And also, she was the star of

23  project run way.  Nina Garcia is a brilliant editor in chief.

24  Q.  And you told your agent that Nina really loathes you?

25  A.  Nina got very, very angry at me for publishing the excerpt

N515car4                        Carroll - Cross

1  in *New York* magazine.

2  Q.  OK, but did you use the word "loathe" in describing how

3  Nina felt about you to your agent?

4  A.  I am sure I did.

5  Q.  OK.

6          Now, you testified at trial on direct that you were

7  fired from *Elle* magazine because Donald Trump accused you or

8  defamed you?

9  A.  Because he called me a liar and my entire column rested on

10 the foundation that readers were able to trust that I would

11 tell them the truth.

12 Q.  OK.

13 A.  So, when the president of the United States called me a

14 liar for three straight days, I took a huge hit.  My

15 trustworthiness was exploded.  It was like -- just crumbled,

16 the foundation on which the whole column had rested for 27

17 years.

18 Q.  OK.  In your August e-mail, August 2019 e-mail to your

19 agent, you said that the reason that Nina hated or loathed you

20 was because you published your excerpt in *New York* magazine.

21 A.  Yes.

22 Q.  By that point Donald Trump, who had already called you a

23 liar, nearly a month and a half earlier on June 21, 2019?

24 A.  Yes.

25 Q.  When explaining -- withdrawn.

N512Car5                          Carroll - Cross

1   Q.  So, Ms. Carroll, you heard yourself say in that podcast
2   that you don't think the reason you have not had sex again
3   since the Bergdorf incident was because of him, meaning Donald
4   Trump.
5   A.  I heard myself say that, yes.
6   Q.  Okay.
7   A.  May I add?
8   Q.  No.  I'm not asking anymore questions on that.  We are
9   going to move right along.  Okay?  Did you want to say
10  something else, though?
11  A.  No.  Go ahead.
12  Q.  Okay.  Now, I'm going to move on.  All right.  Your
13  original lawsuit, the one that the judge said, the first
14  lawsuit was filed in November 2019, only sought damages for
15  your alleged defamation.
16  A.  Yes.
17  Q.  Okay.  And by contrast, your current lawsuit, the one
18  containing the battery, not only seeks damages for defamation,
19  but also seeks emotional damages for your alleged rape.
20  A.  Yes.
21  Q.  And the first edition of your book was July 2019.
22  A.  Yes.
23  Q.  Years before you could sue for emotional injuries stemming
24  from the alleged rape.
25  A.  Yes.

Case 23-793, Document 87, 11/20/2023, 3592074, Page205 of 279

N515car6                    Carroll - Redirect

1   prior piece, not for the truth of the matter, it is to rebut a

2   suggestion of recent fabrication.

3            MR. FERRARA:  If we can publish that?

4            THE COURT:  Yes.

5            MR. FERRARA:  Thank you, Mr. Lam.

6   Q.  Was that truthful testimony, Ms. Carroll?

7   A.  Yes.

8   Q.  To be clear -- I just want to be totally clear and fair --

9   you are not suggesting he was dragging you by the arm?

10  A.  No.  It was just a light tug on the elbow.

11           MR. FERRARA:  We can take that down.  Thank you.

12  Q.  Do you recall Mr. Tacopina asked you whether it had

13  occurred to you before your call with Lisa Birnbach that you

14  had been raped?  Just do you recall that line of questioning.

15  A.  I do recall the line of questioning, yes.

16  Q.  And he asked you about your statement when Lisa said he

17  raped you brought the reality to the forefront of your mind.

18  Do you remember saying that?

19  A.  Yes.

20  Q.  Ms. Carroll, was there ever a doubt in your mind about what

21  had happened in that dressing room?

22  A.  My -- oh.  Where I am sitting here today was there ever a

23  doubt?  No.  No doubt.  But the seconds, the minutes following

24  it I -- it was -- the floods through my body, I guess it is

25  adrenaline, my overwhelming thought was I had died and was

N515car6                          Carroll - Redirect

1   somehow still alive.  That was -- really.  It took me minutes,

2   well seconds, and then minutes.  And even when Lisa said it, it

3   took a real effort for me to take it in.

4   Q.  Was -- sorry.

5   A.  Yes.  Lisa is the one who focused my brain for that moment.

6   It was Lisa saying that.

7   Q.  Was there ever any doubt in your mind that Mr. Trump had

8   penetrated you with his fingers and penis?

9   A.  Oh, never a doubt about that.

10  Q.  Was there a doubt in your mind that you tried to shove him

11  away?

12  A.  Oh, no.  There was never a doubt about that.

13  Q.  Was there ever a doubt in your mind regarding whether you

14  had consented to this, to what he had done to you?

15  A.  Never.  The minute that door shut I -- there was no

16  consent.

17  Q.  Was there ever a doubt in your mind that you hit him in the

18  head with your purse?

19  A.  I believe I hit him in the head with my purse that year.

20  Q.  Was there ever a doubt in your mind that you tried to fight

21  him off?

22  A.  No.  Never.  That's how I got out.

23  Q.  Before you spoke to Ms. Birnbach how, if at all, have you

24  processed all of that information?

25  A.  Before I had?

N525car1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                    Plaintiff,              New York, N.Y.
 4
                    v.                      22 Civ. 10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                    Defendant.
 7   ------------------------------x        Jury Trial

 8                                          May 2, 2023
                                            9:50 a.m.
 9
     Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                            and a Jury

13
                        APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant
```

Case 23-793, Document 87, 11/20/2023, 3592074, Page208 of 279

A-3268

1   unstructured interview setting?

2   A.  I think altogether it was 20 to 22 hours.

3   Q.  And that sounds like a long time, Doctor.  How does that

4   compare to other cases in which you have been retained?

5   A.  I think that's about in the middle for me, actually.

6   Q.  And what topics, generally speaking, did you discuss with

7   Ms. Carroll during that interview?

8   A.  Well, we started with her --

9   Q.  Let me interrupt myself.  22 hours, you didn't do that in

10  one day, I take it.

11  A.  No.

12  Q.  Can you explain --

13  A.  Yeah.

14  Q.  -- what those hours entailed in terms of how you scheduled

15  it?

16  A.  Yeah.  We had three long in-person interviews and then a

17  few much shorter ones over Zoom.

18  Q.  And going back to my last question, what topics, generally

19  speaking, did you cover during those 22 hours?

20  A.  We covered, you know, everything that I thought would

21  inform my understanding of who she was and how she got to this

22  point.  So we talked about her childhood, her family, her

23  culture and socialization and upbringing, how emotions and

24  things like that were managed in her family.  We talked about

25  her development from early childhood until now, talked about

N554CAR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                   Plaintiff,                New York, N.Y.
 4
                 v.                          22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                   Defendant.
 7   ------------------------------x         Jury Trial

 8                                           May 3, 2023
                                             10:05 a.m.
 9
     Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                             District Judge
12                                            and a Jury

13                         APPEARANCES

14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant
```

N532Car1                        Lebowitz - Direct

1   categories, and those symptoms need to be intense and

2   disruptive.

3           So in order to meet full criteria for PTSD, you are

4   talking about a pretty severe mental illness, which is often

5   chronic.  It is also the case that people can have symptoms in

6   one or two categories and suffer a lot of negative consequences

7   from that as well.

8   Q.  And in this case, Doctor, did you diagnosis Ms. Carroll

9   with PTSD?

10  A.  I did not.

11  Q.  Did -- does Ms. Carroll have symptoms in any of the four

12  categories you talked about?

13  A.  She does.  She has avoidance symptoms, she has alterations

14  in her thoughts and feelings about herself, and she has

15  intrusions.

16  Q.  Now, Doctor, based on your experience as a psychologist and

17  your reading of the literature, what percentage of people who

18  have experienced trauma then have sufficient symptoms to be

19  diagnosed with PTSD?

20  A.  You know, the data is a little bit complicated because

21  there are so many different kinds of trauma, but it's

22  approximately 20 to 30 percent of people who meet full criteria

23  for posttraumatic stress disorder.

24  Q.  And what about the people in the other 70 to 80 percent,

25  Doctor?

N532Car1                    Lebowitz - Direct

1    A.   There is a larger category of people who have some enduring

2    and painful symptoms but who will never meet full criteria.  In

3    fact, there has been some -- there was some research done a

4    while ago where they looked at the impact of having a few very

5    severe symptoms versus meeting full criteria, and the research

6    was basically making the point that both are quite injurious to

7    a life.  However, we do think about PTSD as being a severe

8    illness.

9    Q.   Now, Mr. Lam, can you put up the second page of the

10   demonstrative.

11           Understanding that every person is different, Doctor,

12   are there broad categories of the ways in which a traumatic

13   effect -- withdrawn.

14           Are there broad categories of the ways in which a

15   traumatic event --

16           THE COURT:  Sorry.  Would you take that a little

17   slower?

18           MS. KAPLAN:  Sure.  I apologize, your Honor.

19   BY MS. KAPLAN:

20   Q.   Are there broad categories, Doctor, of the ways in which

21   trauma can affect a person?

22   A.   Yes.  I think the easiest way to think about it is that

23   what is remarkable about trauma is that it has a capacity to

24   affect all aspects of our functioning.  So it can affect us

25   emotionally, biologically, it can affect how we think about

N532Car1                    Lebowitz - Direct

1    independence of adolescence and into, if you will, adulthood.

2    And through all of those transitions, one of the things that is

3    happening is you are consolidating a sense of this is me and

4    that is you, and we are distinguished because I have a boundary

5    and you have a boundary.  I can invite you in and I can push

6    you away.  But we know ourselves as -- we recognize ourselves

7    as people, as fully human because we have boundaries and

8    autonomy.  We can take action.  And what rape does is it so

9    violates that sense of humanity and independence and selfhood

10   than people feel psychologically that they are being killed.

11   They feel at risk.  They feel like their personhood is being

12   murdered, even if they know at some level that they were never

13   in that kind of mortal, physical danger, if that makes sense.

14   Q.  Now, we have been talking about -- mostly about the brain

15   and about emotional reactions.  I want to pause for a second to

16   turn to actual reactions in other parts of the body.

17   A.  Okay.

18   Q.  Can people who have experienced trauma actually feel

19   physical symptoms in other parts of their body?

20   A.  Yes.  When I talk about a visceral remembering, it feels

21   like it's happening right then.  It feels like somebody's hands

22   are on you or in you or in some way it is literally being -- it

23   is literally -- it feels like it's happening in the present.

24   It's one of the hallmarks of trauma is that the past doesn't

25   stay past, it continues to revisit us now.

N532Car1                          Lebowitz - Direct

1   Q.  And in addition to feeling something, like, happening

2   again, Doctor, can people experience common physical pains

3   from --

4   A.  Sure, I mean, there is a couple ways in which this is

5   important, and it becomes very important over the lifespan,

6   which is when you -- you know, when you are intruded upon or

7   when you are struggling to avoid intrusive memories or in any

8   way being revisited by the trauma, it is common to have -- for

9   the stress hormones from that event to also revisit you.  So

10  people can have all kind of physical symptoms at the time, but

11  even if there is not an awareness that that is happening in the

12  present, it is well-documented at this point that there are

13  long-term consequences, specifically a history of serious

14  traumatic events, such as a sexual assault, is -- seems to

15  contribute substantially to the development of a wide range of

16  physical illnesses, including autoimmune diseases, diabetes,

17  cardiovascular problems, musculoskeletal problems.  So in other

18  words, a history of trauma is a risk factor for the development

19  of all kinds of illness down the road, and that's because of

20  the effect of stress hormones on the body.

21  Q.  In the time you spent with Ms. Carroll, Doctor, did you

22  observe her feeling any of these physical symptoms?

23  A.  At the very conclusion of our interview, where we had

24  really gone over everything, and I think she had, because of

25  the amount of time that we had spoken, she had gotten a kind of

N532Car1                          Lebowitz - Direct

1    bird's eye view of her life, she doubled over, holding her

2    stomach and just said I have a really bad stomachache.  And

3    after that, she got actually very sick with pneumonia, and so I

4    didn't speak with her for a while, and then we then met over

5    Zoom to complete the interview.  She mentioned that she still

6    had the stomach ache.

7    Q.  Could you put up, Mr. Lam, the second page of the

8    demonstrative again.

9              I want to turn now, Doctor, to the second category of

10   harm, which is -- responses to trauma, which is changes in

11   thinking.

12             You can take that down, Mr. Lam.

13             I am going to use kind of a fancy term, and I want, if

14   you can, if you can explain it to the jury, Doctor, that would

15   be great.

16             What does the term "schema" or the word "schema" mean

17   in the context of psychology?

18   A.  So we use the word "schema" as a shorthand way of

19   describing how our mind holds all of our knowledge and all of

20   our beliefs and all of our expectations.  And these schemas or

21   these mental maps or internal representations are all kind of

22   interchangeable terms.  They develop over the course of a

23   lifetime, so they kind of layer one on top of each other.  And

24   the thing about a schema, the role of a schema is to both help

25   you interpret what happens to you and respond to it adaptively

N532Car1                      Lebowitz - Direct

1   be very resilient for certain things and then that resiliency

2   might run out around something else.

3   Q.  And what explains -- what, if any, factors explain

4   differences in resiliency, Doctor?

5   A.  Well, that is still a matter to some extent of open debate,

6   but we know a few things that seem to facilitate the

7   development of resilience.  One is having a warm, supportive

8   family.  The other is being intelligent, attractive, and

9   sociable.  The third is having experiences which are

10  challenging and difficult, but not traumatic.  It sort of

11  builds strength.

12  Q.  I want to turn now to Ms. Carroll, and I know you said it

13  yesterday, but just to remind the jury, what are the ways that,

14  in your view, Ms. Carroll has been negatively impacted by the

15  incident at Bergdorf Goodman?

16  A.  She suffers from intrusions.  She suffered a diminishment

17  in her ability to feel positively about herself in certain

18  ways.  She experiences or manifests avoidance behaviors which

19  have led to an inability to maintain a romantic and intimate

20  life, which has led to deep feelings of loss.

21  Q.  Now, we spoke a bit about schemas in the way someone sees

22  themselves in the world.  How has the incident at Bergdorf

23  Goodman affected Ms. Carroll's schemas, the way she sees

24  herself in the world?

25  A.  Well, partly because she blamed herself for it.  She felt

N532Car1                          Lebowitz - Direct

1    like she was stupid in a way that was hard to shake.  But

2    perhaps even more fundamentally than that, it made her feel

3    like she was worth less than she had been before.  She felt

4    degraded and diminished.  She felt like she had been treated as

5    if she wasn't even a person.  And that, of course, made her

6    feel like she was worth less than a person -- than the person

7    she had been.

8    Q.  Is there any connection between what you just said, Doctor,

9    and Ms. Carroll's reluctance to use words like "rape" or

10   "victim"?

11   A.  Sure.  There is all the connection.  Ms. Carroll, you know,

12   like most of us in many ways, doesn't want to be a victim,

13   doesn't want to be pitied, but perhaps more than most people,

14   she has fiercely identified with being strong, being resilient,

15   being the person who can just march on and overcome thing, you

16   know, stiff upper lip, take an action and put it behind you.

17            And being raped meant, to her, being a victim, being

18   weak, being stupid, being vulnerable, being dirty.  And so

19   there is no part of her that wanted any part of that word to

20   apply to her, and so it was very hard to use it.  Using a word

21   like "fight" is much more attractive because it places her in

22   an active role.  Using a word like "rape victim" suggests that

23   the other person actually dominated in that fight, and that's

24   painful.

25   Q.  Doctor, we have talked about self-blame, but what, if any,

N532Car1                        Lebowitz - Direct

1    conclusions did you reach about whether Ms. Carroll experiences

2    self-blame?

3    A.  Absolutely.  I think for many years, for most of the years,

4    she just simply blamed herself for the assault, period.  She

5    just felt like she had done something stupid and that's why it

6    happened.  She was also afraid of other people blaming her,

7    which is an understandable fear.

8    Q.  And moving forward to more recent periods, does she still

9    at a conscious level believe that she is to blame?

10   A.  I think, you know, based on the advice she gave other

11   women, based on, you know, changes in the political landscape,

12   I think that if you asked her what she believes is true, she

13   would say, no, a woman can't be responsible.  If you asked her

14   what do you feel is true, I think she would probably still say,

15   well, it still feels like it's kind of true.  That's just one

16   of the ways that humans work.  We don't always feel what we

17   think.

18   Q.  Now, we have talked about intrusive memories, and I

19   apologize if this is slightly repetitive, but what, if

20   anything, Doctor, did you conclude with respect to whether

21   Ms. Carroll experiences intrusive memories?

22   A.  She does.  She experiences intrusive physical remembrances.

23   She can still feel aspects of the assault.  She can still hear

24   aspects of the assault.  She remembers the feelings in her

25   body.  She sometimes sees pieces or all of the experience kind

1    you want to do and doesn't make sense, the mind makes up

2    alternative explanations.  And so she decided she just hadn't

3    met the right guy yet, you know, she hadn't been lucky, she was

4    getting older.  I think she just -- and I think she just came

5    up with a bunch of explanations, and then I think she didn't

6    hold on to the connection, which is also incredibly common for

7    trauma, that the connection between your current problems and

8    the past traumatic experience, that connection gets buried and

9    people lose it.

10   Q.  And how does Ms. Carroll's avoidant behavior with respect

11   to eligible men her age compare to her romantic patterns before

12   the incident at Bergdorf Goodman?  And again, I don't want you

13   to give any specificity, just very general.

14   A.  It's a very sharp departure.  Actually, it's a complete

15   departure.  Her previous pattern had been to be in a long-term

16   partnership and, when that wasn't happening, to date pretty

17   avidly for a period of time until she found somebody else she

18   wanted to be in a long-term partnership with, and she was very,

19   very social and outgoing, and all of that changed afterwards.

20   Q.  Now, how do you reconcile what you have been saying about

21   avoidant behaviors, Doctor, with the fact that Ms. Carroll

22   continued to shop at Bergdorf Goodman?

23   A.  Well, she didn't feel that Bergdorf Goodman raped her was

24   the primary reason.  The store -- she didn't blame the store.

25   She blamed herself.  The store didn't feel threatening.  I also

N545car1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                    Plaintiff,              New York, N.Y.
4
                 v.                         22 Civ. 10016 (LAK)
5
     DONALD J. TRUMP,
6
                    Defendant.
7    ------------------------------x        Jury Trial

8                                           May 4, 2023
                                            10:00 a.m.
9
     Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                            and a Jury

13
                            APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant

N545car3                          Humphreys - Direct

1   TruthSocial?

2   A.  Yes.

3   Q.  What is it?

4   A.  So TruthSocial is a social networking site where people

5   have profiles.  It is a lot like Twitter, it has the same

6   structure as Twitter where somebody has a profile and people

7   can follow that person, and the followers or some of them see

8   the message that is posted.

9   Q.  Does Donald Trump have a profile on TruthSocial?

10  A.  Yes, he does.

11  Q.  Do you know about how many followers he has?

12  A.  I believe he has 4.7 million followers.

13  Q.  So, just in broad strokes, could you explain how you went

14  about figuring out how, if at all, Mr. Trump's October 12, 2022

15  statement affected Ms. Carroll's reputation?

16  A.  Sure.  So the first step in the process was to figure out

17  how widely was the statement seen, how many times did it appear

18  to people.  And that I call the impressions model.

19          The next step was to figure out, OK, people saw the

20  statement but did it have an impact on Ms. Carroll's

21  reputation?  So for that I first did a qualitative analysis

22  where I looked at what was the response on social media, what

23  did people say in response when they were Retweeting or

24  circulating the statement, and then I also wanted to know,

25  well, what percentage of those people likely believed the

N545car3                              Humphreys - Direct

1    statement, were they receptive to the statement.  And that I

2    call the impact analysis.

3              And then, finally, I needed to know, OK, for those

4    people who might have been receptive to the statement, how much

5    would it cost to repair Ms. Carroll's reputation.

6    Q.  And in your experience, is this a standard way -- fairly

7    standard way to measure reputational harm by experts in your

8    field?

9    A.  Yes, it is.

10   Q.  So, I would like to talk first about some basic concepts.

11   What is a reputation?

12   A.  So, a reputation, we all have a reputation, we develop it

13   through our life, our friendships, our work.  It allows us to

14   kind of be a member of society to build trust with people.  So,

15   we all have reputations and, of course, if we are more famous

16   or well known, that reputation can also exist amongst people we

17   don't know in the media and in the public sphere.

18   Q.  Explain how reputation can be damaged.

19   A.  So, a reputation can be damaged when there emerge negative

20   associations that kind of undermine that reputation that might

21   cause people to mistrust you or think you are a bad person or

22   things like that.

23   Q.  And how, if at all, can a reputation that's been damaged be

24   repaired?

25   A.  So, reputation can be repaired through sort of strategic

N545car3                         Humphreys - Direct

1   A.  The followers are the number of people who follow that

2   account on Twitter.

3   Q.  So using these 13 Tweets, how did you calculate the number

4   of impressions from Donald Trump's statements on Twitter?

5   A.  So, to calculate the number of impressions, you have to

6   keep in mind that not all of your followers see what you Tweet.

7   There are many reasons that people might not sign on that day,

8   they may subscribe to a lot of accounts, and that information

9   might be crowded out, so actually only a fraction of your

10  followers see what you Tweet and so you have to take a series

11  of deductions.  So, hypothetically, you know, if you have a

12  hundred followers, the first deduction you have to consider is

13  a bot.

14          So, a bot is an account or a follower who would follow

15  you and just kind of, it is in a computer, it Retweets what you

16  Tweet.  So if you are Fox News you could have a follower that

17  is just a bot that Retweets what you Tweet so I took those out.

18  And computer science research tells us that about 12 percent of

19  your followers are bots and so I subtracted those.  So, if you

20  subtract that, then that leaves you with, hypothetically, about

21  87 followers.  But then you need to make another cut for some

22  of the reasons that I mentioned because people may not sign on

23  that day, etc.  So, the benchmark in marketing is thought to be

24  20 percent, that 20 percent of your followers see what you

25  Tweet, so that would leave you with about 17 followers.

N545car3                        Humphreys - Direct

1          Alternatively, computer science gives us a formula or

2    a way to calculate how many people would see your Tweet if you

3    have other information about it.  So, if you know how many

4    times it has been Retweeted, how many followers those people

5    have, things like that, then you can basically use a formula to

6    calculate how many impressions your Tweet got using that

7    formula, and that comes out to anywhere from 6 percent of your

8    followers to as low as 1 percent of your followers, for a

9    typical person.

10   Q.  Turning to the slide on the screen, and if you could use

11   the first row, would you walk us through how you calculated the

12   number of impressions from Donald Trump's statement on the Fox

13   News account?

14   A.  Sure.  So, for Fox News, for example, they have

15   22.4 million followers.  The total followers includes the

16   followers who saw the original quote because it was Retweeted,

17   so you include those Retweets as well.  And then you take the

18   deductions that I mentioned:  The bots, the 12 percent, and the

19   impression rate which is either 6, 1, or 20 percent.  And so,

20   for Fox News that would leave you with a low estimate of

21   778,000 people impressions on the low end, or on the high end

22   3.9 million impressions.

23   Q.  It looks like you calculated high and low impressions for

24   the first four Twitter accounts on the chart but not for the

25   last nine.  Can you explain why you did that?

Case 23-793, Document 87, 11/20/2023, 3592074, Page224 of 279

N545car3                    Humphreys - Direct

1    A.  Sure.  So, for the people that you see in yellow here,

2    those are more just typical people and so I didn't use that

3    high a rate, I used a rate of 1 percent for them, just assuming

4    that they're going to have a 1 percent impression rate, and

5    everybody who saw their Tweets are just going to be typical

6    people, too, and so those people also will have a 1 percent

7    impression rate.

8    Q.  So you assume that for the average person only about 1

9    percent of their followers would see the Tweet in which they're

10   Retweeting Donald Trump's statement?

11   A.  That's correct.

12   Q.  Were you able to determine the total amount of impressions

13   of Donald Trump's statement on Twitter, on the 13 Twitter

14   accounts?

15   A.  Yes.  So I calculated the impressions for each account and

16   then I added those up.

17   Q.  And how did you calculate the number of TruthSocial

18   impressions from Donald Trump's post?

19   A.  So, for TruthSocial it's pretty much just like Twitter, and

20   yet it hasn't been studied quite as much.  We also didn't have

21   full access to the Retweeting information, and so because it is

22   structurally similar to Twitter, I used the same impression

23   rate, that 6 percent rate.

24   Q.  And what were the total number of social media impressions

25   of Twitter and TruthSocial from the statement?

N545car3                        Humphreys - Direct

1   that measures exactly how many people are watching the program

2   at that time.

3   Q.  And how many people watched Donald Trump's or viewed Donald

4   Trump's October 12th statement on television?

5   A.  So, if you add that up, that is 7 million impressions.

6   Q.  Finally, you testified that you also calculated print

7   impressions from Donald Trump's statement.  Can you explain how

8   you did that?

9   A.  Yes.  So, there is a database where you can search all

10  print news articles and so I, again, searched for the statement

11  and I found one print article.

12  Q.  Where was that article published?

13  A.  That was in the Washington Post.

14  Q.  And what was -- how did you determine the total number of

15  impressions from the Washington Post article?

16  A.  So, here there is a service that measures how many readers

17  every article has, and the circulation rate for the Washington

18  Post was 159,000 people.

19  Q.  After looking at all of these forms of media, were you able

20  to estimate the total number of impressions of Donald Trump's

21  October 12th statement?

22  A.  Yes, I was.

23  Q.  And what was your final estimate?

24  A.  So the final estimate, when you add up across all the

25  media, was between 13.7 million and 18 million impressions.

N545car3                          Humphreys - Direct

1    of 21 percent.

2    Q.  So, to be clear, the 21 percent is the percentage of

3    republicans who viewed the statement who likely believed it?

4    A.  Yes.  I would call those receptive impressions.

5    Q.  What was the next step in your analysis?

6    A.  So, the next step was to take the number of impressions

7    that I had from that first step, which was a lot of

8    impressions, and then discount it by only the impressions where

9    people were receptive to the statement.  And so, that gives you

10   an estimate, a high and low estimate for each type of media,

11   and then you can add those up.

12   Q.  And what did you, when you alleged it up, what did you get?

13   A.  So, on the low end we have 3.7 million receptive

14   impressions and on the high end you have 5.6 million receptive

15   impressions.

16   Q.  And just to summarize, does that mean that between

17   3.7 million and 5.6 million people saw Mr. Trump's statement

18   and likely believed it?

19   A.  That's correct.

20   Q.  To your knowledge -- we saw some examples of negative

21   commentary that Ms. Carroll received after the October 12

22   statement.  To your knowledge, did Ms. Carroll receive any

23   positive response following Donald Trump's statement?

24   A.  Yes, she did.

25   Q.  How, if at all, did your analysis account for the positive

A-3287

N545car3                          Humphreys - Direct

1   response that she received?

2   A.  So, one thing in my analysis that I noticed is, prior to

3   the June 2019 statement, there were, of course, many positive

4   associations of her but the volume was relatively small.  After

5   the October 12 statement there was a huge volume of

6   associations associated with her, some of those were positive,

7   but then a huge volume, a very large number, tens of thousands

8   of those associations were really negative.

9   Q.  How, if at all, do positive responses or comments offset

10  negative responses?

11  A.  I would say in terms of reputation, they don't.  So, if you

12  imagine, like, at the place where you work, if 20 percent of

13  your colleagues think that you stole money where you work,

14  let's say you have a hundred colleagues and 20 of them think

15  that you stole money, that still has an impact on your work

16  life and your day-to-day reputation, and so I think that

17  20 percent is still important.

18              (Continued on next page)

19

20

21

22

23

24

25

N542Car4                        Humphreys - Direct

1   Q.  After calculating the amount it would cost to place

2   corrective messages on each type of media, were you able to

3   determine how much it would cost to place corrective messages

4   on all these types of media?

5   A.  That's right.  So I calculated for each type of media how

6   much it would cost and I added that up.

7   Q.  And what was the number?

8   A.  So the final number at the high end was $2.7 million.

9   Q.  What was the next step in your analysis?

10  A.  So the final step was to apply this logic to kind of my

11  previous -- my low impressions estimate and my high impressions

12  estimate for each level of frequency—for one, three, and five

13  times.

14  Q.  And what was the range, the cost range to run a

15  reputational repair campaign for Ms. Carroll following the

16  October 12 statement?

17  A.  So at the low, low end it would be three hundred and

18  sixty-eight thousand dollars, hundred thousand dollars and on

19  the high end it would be $2.7 million but, again, I don't think

20  the low campaign would be effective if no campaign had been run

21  previously.

22  Q.  So to summarize, Professor Humphreys, what was your

23  conclusion about how far or how wide Mr. Trump's statements

24  spread?

25  A.  So my conclusion about how wide it spread in the

N542Car4                        Humphreys - Cross

1   BY MR. BRANDT:

2   Q.  Now, we have had some discussion about this previously, but

3   there are actually two cases, correct?

4   A.  That's right.

5   Q.  And you were retained as an expert by Ms. Carroll in two

6   cases, correct?

7   A.  Correct.

8   Q.  And the first case chronologically related to statements

9   made by Mr. Trump in June of 2019, correct?

10  A.  That's correct.

11  Q.  And as I recollect your first report, you said that those

12  statements were widely published at the time, correct?

13  A.  Yes.

14  Q.  And following that time, there were appearances by

15  Ms. Carroll and others on news shows and interviews and

16  podcasts and articles, is that correct?

17  A.  I did not study those as part of my report.

18  Q.  So you didn't look at any of that?

19  A.  I did not look at her activities, no.

20  Q.  Okay.  We will come to that in a little bit.

21          But did you at least come to the conclusion that there

22  had been widespread publication of the June 2019 statements?

23  A.  Yes.

24  Q.  And the statement that you looked at in the second case was

25  only the October 2022 statement, correct?

N542Car4                        Humphreys - Redirect

1      MR. BRANDT:  Well, I think even higher or lower is

2  getting a number out.

3      THE COURT:  Look, members of the jury, the question of

4  whether there was any adverse effect by virtue of the 2019

5  statements and, if there was, how much adverse effect is not at

6  issue in this case.  It is not for you to determine.

7      With that instruction, I will allow an answer to the

8  question as it was asked.

9      MS. CROWLEY:  May I ask it again?

10      THE COURT:  You may ask it again.

11  BY MS. CROWLEY:

12  Q.  Was the cost that you estimated to repair Ms. Carroll's

13  reputation following Trump's June 2019 statements higher or

14  lower than the cost that you estimated it would take to repair

15  her reputation following the October 12 statement?

16  A.  It was higher.

17  Q.  Why was it higher?

18  A.  So that statement generated considerably more impressions

19  and considerably more receptive impressions.

20  Q.  And how did that factor into the analysis that you did on

21  the cost following the October 12 statement?

22  A.  So here I only looked at the reputational harm from the

23  October 12 statement.

24      MS. CROWLEY:  Thank you, your Honor.  Nothing further.

25      THE COURT:  Thank you.

N582CAR1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    E. JEAN CARROLL,
3
                    Plaintiff,              New York, N.Y.
4
                    v.                      22 Civ.10016 (LAK)
5
    DONALD J. TRUMP,
6
                    Defendant.
7   ------------------------------x          Jury Trial

8                                            May 8, 2023
                                             9:10 a.m.
9
    Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                             District Judge
12                                             and a Jury

13
                          APPEARANCES
14
    KAPLAN HECKER & FINK LLP
15       Attorneys for Plaintiff
    BY:  ROBERTA A. KAPLAN
16       MICHAEL J. FERRARA
         SHAWN G. CROWLEY
17       MATTHEW J. CRAIG

18
    TACOPINA SEIGEL & DeOREO
19       Attorneys for Defendant
    BY:  JOSEPH TACOPINA
20       CHAD D. SEIGEL
         MATTHEW G. DeOREO
21
22  HABBA MADAIO & ASSOCIATES, LLP
         Attorneys for Defendant
23  BY:  ALINA HABBA
         MICHAEL T. MADAIO
24
25  W. PERRY BRANDT
         Attorney for Defendant
```

1211

N582CAR1

1     deposition that he was or could be regarded as a star, and I

2     believe that there are other references.

3               Overruled, Mr. Brandt.

4               Okay.  That takes care of the battery count.

5               Page 13/line 1 through page 16/line 5.

6               Mr. Matz.

7               MR. MATZ:  Yes, your Honor.  We did have just one

8     proposed modification to the instructions, specifically at the

9     top of page 13, the third line on the page, the second

10    sentence, where it says, "The next set of questions and the

11    verdict form questions 6 through 10 deal with Ms. Carroll's

12    defamation claim in relation to Mr. Trump's October 12, 2022

13    statement."  Because the statement as it's being given to the

14    jury in these instructions excludes portions of the original

15    statement that refer to tangential matters, like Peekaboo James

16    and all of that stuff, and because the original statement is in

17    evidence in full, we are just slightly concerned that the jury

18    may be a bit confused about the relationship between the full

19    statement and the portions that we are saying are defamatory.

20    So I would respectfully propose one very slight addition at the

21    beginning, which would be after the word "statement" at the end

22    of that sentence, it would say "specifically, the portions of

23    that statement either about or of and concerning Ms. Carroll,"

24    so that there is no confusion in their minds that this is about

25    the portions of the statement that don't have to do with her.

N582CAR1

1          THE COURT:  Okay.  Thank you.

2          Mr. Brandt.

3          MR. BRANDT:  I have a problem with the phraseology "of

4     and concerning Ms. Carroll," because that's one of the things

5     the jury is supposed to find is whether the statements were of

6     and concerning her.  So if there was some other way we could

7     phrase that, that would be fine.

8          MR. MATZ:  Your Honor, how about the phrase "about

9     Ms. Carroll"?

10          MR. BRANDT:  That's okay.

11          THE COURT:  Point me to where you would like the

12     language and give me the language.

13          MR. MATZ:  The court reporter probably knows it better

14     than I do at the moment.

15          THE COURT:  But we're not going to do that.

16          MR. MATZ:  So it's on the top of 13, at the end of the

17     first sentence of subsection D, following the word "statement,"

18     perhaps an em dash or a comma, "specifically the portions of

19     that statement about Ms. Carroll."

20          MR. BRANDT:  Again, I think that's fine, your Honor.

21          THE COURT:  Thank you, Mr. Brandt.  I will do that.

22          Anything else with respect to this section from the

23     plaintiff?

24          MR. MATZ:  No, your Honor.

25          THE COURT:  Mr. Brandt.

N582CAR1

```
 1              MR. BRANDT:  No.

 2              THE COURT:  Thank you.

 3              Page 16/line 8 through page 17/line 16.

 4              MR. MATZ:  Nothing from plaintiff, your Honor.

 5              MR. BRANDT:  And nothing from defendant.

 6              THE COURT:  Thank you.

 7              Page 17/line 18 through page 19/line 10.

 8              MR. MATZ:  Once again, nothing from plaintiff.

 9              MR. BRANDT:  Again, your Honor, just the bullet point

10    about Mr. Trump's financial condition, we would object on that,

11    but I understand the Court's prior ruling.

12              THE COURT:  Thank you.  I reiterate it.

13              Page 19/line 12 through page 22/line 7.

14              MR. MATZ:  No objections from plaintiff.

15              MR. BRANDT:  Nothing, your Honor.

16              THE COURT:  Thank you.

17              Page 22/line 9 through page 24/line 17.

18              MR. MATZ:  No objection from plaintiff, your Honor.

19              MR. BRANDT:  And, your Honor, on page -- starting on

20    page 22 and continuing on to page 23, under the subheading 4(b)

21    "Evidence of Sexual Assault on Other Persons," we have already

22    briefed this in detail, but I just wanted to note, under Rule

23    of Evidence 413(d), the evidence regarding other person is

24    supposed to involve genital contact, and that is not in these

25    instructions.  So we would object to the instruction unless it
```

N585car4                    Summation - Mr. Tacopina

1    was raped by the president of the United States.  That's when

2    she brought it out, when he was president.  She said she made

3    more money with Substack, said she got her revenge on *Elle* with

4    her own admission, and received lots of love and support.

5              Look at this.

6              (video played)

7              MR. TACOPINA:  Putting aside their reputational harm

8    expert, who is irrelevant if you find there was no sexual

9    assault, which there wasn't, but she comes in here,

10   Ms. Humphreys, and says she never measured the positive impact

11   of Ms. Carroll's accusation against Donald Trump, only the

12   negative.  Meaning she ruled out the fact that the positive

13   impact, which Ms. Carroll talked about when she was talking

14   about the support and love, she didn't measure that, whether it

15   far outweighed the negative impact she had.  But, more

16   importantly, the entire analysis is irrelevant here because,

17   again, Ms. Carroll was not defamed by Donald Trump when he

18   strongly denied the rape allegation.  She wasn't defamed

19   because it was false.  And remember, if there is no rape, there

20   is no defamation.  And you will see when you get the verdict

21   sheet all the different rapes and assault, it is all one.

22   There is no sexual assault and there is no defamation, they go

23   hand in hand.

24             You heard, among others reasons, Ms. Carroll's

25   political motivation for making a false accusation.  You heard

N592CAR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    E. JEAN CARROLL,
3
                    Plaintiff,              New York, N.Y.
4
                v.                          22 Civ.10016 (LAK)
5
    DONALD J. TRUMP,
6
                    Defendant.
7   ------------------------------x         Jury Trial

8                                           May 9, 2023
                                            10:05 a.m.
9
    Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                            and a Jury

13
                        APPEARANCES
14
    KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
    BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
    TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
    BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant

N592Car1                    Charge

1   crimes.  Ms. Carroll claims that Mr. Trump is liable to her for

2   battery on three different and alternative bases, each of which

3   corresponds to a criminal law definition of a different sex

4   crime.  Mr. Trump denies that he is liable to her for battery

5   on any of these three different and alternative bases.

6   Accordingly, the first set of questions in the verdict form has

7   to do with whether or not Ms. Carroll has established that

8   Mr. Trump's conduct, if any, came within any of those criminal

9   law definitions.  But I emphasize to you that this is a civil

10  case for damages.  It is not a criminal case.

11       Now, if you look on the verdict form, you will see the

12  first question is whether Ms. Carroll proved by a preponderance

13  of the evidence that Mr. Trump raped her.  It's a yes/no

14  question.  I am going to explain the preponderance of the

15  evidence standard, which is incorporated in that question,

16  later on.  But right now I am going to tell you the required

17  elements of rape under the New York law.

18       In order to establish that Mr. Trump raped her,

19  Ms. Carroll must prove each of two elements by a preponderance

20  of the evidence.

21       The first element is that Mr. Trump engaged in sexual

22  intercourse with her.

23       The second element is that Mr. Trump did so without

24  Ms. Carroll's consent by the use of forcible compulsion.  So

25  let me define each one of those terms.

1          "Sexual intercourse" means any penetration, however

2     slight, of the penis into the vaginal opening.  In other words,

3     any penetration of the penis into the vaginal opening,

4     regardless of the distance of penetration, constitutes an act

5     of sexual intercourse.  Sexual intercourse does not necessarily

6     require erection of the penis, emission, or an orgasm.

7          Now, of course, I hope you will forgive me for this

8     very explicit language, but I have no alternative—nobody has

9     in this case—in discussing the elements of the alleged

10    battery.

11         I also used the phrase "forcible compulsion," and what

12    that means is intentionally to compel by the use of physical

13    force.

14         If you find that Ms. Carroll has proved by a

15    preponderance of the evidence both of those two elements, you

16    will answer Question 1 "yes."  If you answer Question 1 "yes,"

17    I instruct you that Mr. Trump thus committed battery against

18    Ms. Carroll.  There would be no need to consider whether he

19    committed battery on either of the other two alternative bases.

20    Remember, I said there were three alternatives.  So if you

21    answer Question 1 "yes," you will skip question 2 and question

22    3 on the verdict form and go right on to question 4.  If you

23    find that Ms. Carroll has not proven either of the two elements

24    of rape by a preponderance of the evidence, you must answer

25    "no" to Question 1 and go on to Question 2, which deals with

N592Car1                        Charge

1    the second of the three alternative bases for the battery

2    claim.

3           The second theory of battery corresponds to something

4    called sexual abuse.  Sexual abuse has two elements.  In order

5    to establish that Mr. Trump sexually abused her, Ms. Carroll

6    must prove each of two elements by a preponderance of the

7    evidence.

8           The first element is that Mr. Trump subjected

9    Ms. Carroll to sexual contact.

10          The second element is that he did so without

11   Ms. Carroll's consent by the use of forcible compulsion.

12          So let me define "sexual contact" for you.  Sexual

13   contact for this purpose means any touching of the sexual or

14   other intimate parts of a person for the purpose of gratifying

15   the sexual desire of either person.  It includes the touching

16   of the actor by the victim, as well as the touching of the

17   victim by the actor, and the touching may be either directly or

18   through clothing.

19          Now, I just used the term or the phrase "sexual or

20   intimate part" in defining sexual contact.  For this purpose, a

21   "sexual part" is an organ of human reproduction.

22          So far as intimate part is concerned, the law does not

23   specifically define which parts of the body are intimate.

24   Intimacy, moreover, is a function of behavior and not just

25   anatomy.  Therefore, if any touching occurred, the manner and

N592Car1                          Charge

1    circumstances of the touching may inform your determination

2    whether Mr. Trump touched any of Ms. Carroll's intimate parts.

3    You should apply your common sense to determine whether, under

4    general societal norms and considering all the circumstances,

5    any area or areas that Mr. Trump touched, if he touched any,

6    were sufficiently personal or private that it would not have

7    been touched in the absence of a close relationship between the

8    parties.

9          I mentioned also that the touching, if any, of any

10   sexual or intimate parts must have been for the purpose of

11   gratifying the sexual desire of either party.  Sexual

12   gratification is a subjective determination that may be

13   inferred from the nature of the acts committed and the

14   circumstances in which they occurred.  There is no requirement

15   that actual gratification occur, but only that the touching, if

16   there was any, was for that purpose.

17         The second element of this theory is forcible

18   compulsion.  I defined that for you a couple of minutes ago

19   when I told you the elements of rape, and here, as there, it

20   means intentionally to compel by the use of physical force.

21         If you find that Ms. Carroll has proved by a

22   preponderance of the evidence both of the two elements that I

23   just referred to, the two elements of sexual abuse, then you

24   will answer "yes" to Question 2.  If you answer yes to Question

25   2, I instruct you that Mr. Trump thus committed battery against

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N592Car1                          Charge

1   Forcible touching takes place without a person's consent when

2   it results from any circumstances in which a person does not

3   expressly or impliedly acquiesce to the actor's conduct.

4            If you find that Ms. Carroll has proved by a

5   preponderance of the evidence all five of these elements, of

6   forcible touching, you will answer Question 3 "yes." If you

7   answer Question 3 "yes," I instruct you that Mr. Trump thus

8   committed battery against Ms. Carroll. In that event, you will

9   go on to Question 4. If you find that Ms. Carroll has not

10  proven one or more of the elements of forcible touching by a

11  preponderance of the evidence, you must answer "no" to

12  Question 3. You will skip Questions 4 and 5 and go on to

13  Question 6, which begins the questions relating to

14  Ms. Carroll's defamation claim.

15           But let me now instruct you on Questions 4 and 5.

16           Questions 4 and 5 deal with the subject of damages in

17  relation to Ms. Carroll's battery claim. My instructions to

18  you on the law of damages should not be taken by you as a hint

19  that you should find for the plaintiff. That is for you to

20  decide by answering the questions I have put to you based on

21  the evidence presented. But if you answer "yes" to any of

22  Question 1, Question 2, or Question 3, you will have determined

23  that Ms. Carroll has prevailed on her claim of battery. In

24  that event, it will be your task to determine from the evidence

25  a dollar amount, if any, that would justly and adequately

N592Car1                        Charge

1    compensate Ms. Carroll for any physical injury, pain and

2    suffering, and mental anguish, as well as emotional distress,

3    fear, personal humiliation, and indignation that she has

4    suffered, or will suffer in the future, as a result of

5    Mr. Trump's alleged rape, sexual abuse, or forcible touching as

6    the case may be.

7            You may award damages only for those injuries that you

8    find Ms. Carroll has proved by a preponderance of the evidence.

9    Compensatory damages may not be based on speculation or

10   sympathy.  They must be based on the evidence presented at

11   trial and only on that evidence.

12           Now, if you answer "yes" to Question 4—and here I

13   invite your attention to the verdict form—in other words, if

14   you conclude that Ms. Carroll has proved by a preponderance of

15   the evidence that she was injured as a result of any of the

16   three theories of battery by Mr. Trump that I have already

17   explained, she would be entitled to a dollar amount to

18   compensate her adequately and fairly for any physical injury,

19   pain and suffering, mental anguish, emotional distress, and the

20   other things I just mentioned a moment ago, that she suffered

21   by virtue of Mr. Trump's alleged battery, in other words, his

22   alleged rape, sexual abuse, or forcible touching, as the case

23   may be.  Damages may be awarded based on a plaintiff's

24   subjective testimony of pain, but the plaintiff's proof must

25   satisfactorily establish that the injury is more than minimal.

N592Car1                    Charge

1   So if you answer Question 4 "yes," you will determine the

2   amount that would fairly and adequately compensate Ms. Carroll

3   for the injuries she allegedly sustained as a result of

4   Mr. Trump's battery and enter that amount in the space provided

5   in Question 4 of the verdict form, which is right down at the

6   bottom of page 1.

7           On the other hand, if you answer "no" to Question

8   4—that is, if you decide that Ms. Carroll has not proved by a

9   preponderance of the evidence that she was injured as a result

10  of Mr. Trump's conduct, if any—you will write down in the

11  blank space provided on your form, and it appears at the top of

12  page 2, the figure $1.  That represents nominal damages.

13          Regardless of your answers to Question 4, you will go

14  on to Question 5.

15          Question 5 deals with the subject of punitive damages.

16          In the event you find Mr. Trump liable to Ms. Carroll

17  for battery—that is, for rape, sexual abuse, or forcible

18  touching—you may, but you are not required to, award

19  Ms. Carroll punitive damages in addition to any compensatory

20  damages that you may award.

21          You may award punitive damages if Ms. Carroll proved

22  by a preponderance of the evidence that Mr. Trump's conduct, if

23  any, that caused Ms. Carroll's alleged injury was wanton and

24  reckless or done with a conscious disregard for Ms. Carroll's

25  rights.  Punitive damages may be awarded for conduct that

N592Car1                      Charge

1   ever you wish.  I'm going to sit down in just a minute.  And we

2   are about 40 percent of the way through what I have to say to

3   you this morning.

4        So now we are going to go on to the questions in the

5   verdict form, which are Questions 6 through 10, which deal with

6   Ms. Carroll's defamation claim in relation to Mr. Trump's

7   October 12, 2022 statement, and more specifically to the parts

8   of that statement about Ms. Carroll.  Under New York law, there

9   are two categories of defamation.  One of them is called libel.

10  Written statements, like Mr. Trump's October 12, 2022

11  statement, the law regards as libel.  I'm telling you this only

12  because I may use the terms "defamation" and "libel"

13  interchangeably in my instructions, and it means the same thing

14  as far as you are concerned for purposes of this case.

15       Now, you have seen and heard Mr. Trump's October 12

16  statement at various points in the course of this trial.  And

17  if memory serves, you will have it in the jury room.  To remind

18  you, that statement, which Ms. Carroll alleges was defamatory,

19  read as follows:  "This 'Ms. Bergdorf Goodman case' is a

20  complete con job . . . She completely made up a story that I

21  met her at the doors of this crowded New York City department

22  store and, within minutes, 'swooned' her.  It is a Hoax and a

23  lie. . . .  She has no idea what day, what week, what month,

24  what year, or what decade this so-called 'event' supposedly

25  took place.  The reason she doesn't know is because it never

N592Car1                              Charge

1    happened, and she doesn't want to get caught up with details or

2    facts that can be proven wrong.  If you watch Anderson Cooper's

3    interview with her, where she was promoting a really crummy

4    book, you will see that it is a complete Scam.  She changed her

5    story from beginning to end, after the commercial break, to

6    suit the purposes of CNN and Andy Cooper. . . .  In the

7    meantime, and for the record, E. Jean Carroll is not telling

8    the truth, is a woman who I had nothing to do with, didn't

9    know, and would have no interest in knowing her if I ever had

10   the chance."

11          Now, there are several elements that Ms. Carroll has

12   the burden of proving for her to recover damages for libel, and

13   I'm going to instruct you on each one as we go through the

14   verdict form.

15          Question 6 asks whether Ms. Carroll has proved by a

16   preponderance of the evidence that Mr. Trump's statement was

17   defamatory.  A statement is defamatory if it tends to disparage

18   a person in the way of that person's business or office or

19   profession or trade.  It is also defamatory if it tends to

20   expose someone to hatred or contempt or aversion or to induce

21   an evil or an unsavory opinion of that person in the minds of a

22   substantial number of people in the community, even though it

23   may impute no moral turpitude to the person.

24          Now, not every unpleasant or uncomplimentary statement

25   is defamatory.  A statement that is merely unpleasant, or

N592Car1                     Charge

1    offensive, or embarrassing, or that hurts someone's feelings,

2    isn't necessarily defamatory.  Because language often has

3    different meanings, the law imposes on the plaintiff the burden

4    of proving that the October 12, 2022 statement about the

5    plaintiff in fact would have been understood by the average

6    person as defamatory, as I defined that word a minute ago.

7         If Ms. Carroll has proved by a preponderance of the

8    evidence that Mr. Trump's October 12, 2022 statement was

9    defamatory, you will answer "yes" to Question 6 and go on to

10   Question 7.  If you answer it "no," your task ends right there

11   and you will return your verdict in the manner that I am going

12   to describe later.

13        Question 7 asks whether Ms. Carroll has proved by

14   clear and convincing evidence that Mr. Trump's statements about

15   her were false.  I will explain later -- and I just want to

16   make sure.  I want to correct myself.  I misspoke.

17        Question 7, as you see on the verdict form, asks

18   whether Ms. Carroll has proved by something called clear and

19   convincing evidence that Mr. Trump's statement was false.  I am

20   going to explain clear and convincing evidence, which is

21   different from a preponderance of the evidence, in a short

22   while.  A statement is false if it is not substantially true.

23   You will determine from the evidence presented what the truth

24   was and then compare that with Mr. Trump's October 12

25   statement, taking that statement according to its ordinary

1   meaning, the ordinary meaning of its words.

2          As you probably already have guessed, whether

3   Mr. Trump's statement is false or true depends largely or

4   entirely on whether you find that Mr. Trump raped or sexually

5   abused or forcibly touched or otherwise sexually attacked

6   Ms. Carroll.

7          If Ms. Carroll has proved by clear and convincing

8   evidence that Mr. Trump's October 12, 2022 statement was false,

9   you will answer Question 7 "yes" and go on to Question 8.  If

10  you answer it "no," your task ends there, and you will return

11  your verdict as I will instruct you.

12         Question 8, in substance, asks you to determine

13  whether Ms. Carroll has proved by clear and convincing evidence

14  that Mr. Trump made the statement with what the law calls

15  actual malice.  Actual malice for this purpose——and I want to

16  alert you to the fact that it means something different from

17  malice in a different context that I am going to speak to you

18  about in a few minutes——means that Mr. Trump made the statement

19  knowing that it was false or acted in reckless disregard of

20  whether or not it was true.  Reckless disregard means that when

21  he made the October 12 statement, he had serious doubts as to

22  the truth of the statement or made the statement with a high

23  degree of awareness that it was probably false.  So Question 8

24  asks you to decide whether Ms. Carroll proved by clear and

25  convincing evidence that Mr. Trump, when he made his October 12

Case 23-793, Document 87, 11/20/2023, 3592074, Page248 of 279

1    will award an amount that, in the exercise of your good

2    judgment and common sense, you decide is fair and just

3    compensation for the injury to the plaintiff's reputation and

4    the humiliation and mental anguish in her public and private

5    life which you decide was caused by the defendant's statement.

6    In fixing that amount, if you fix one, you should consider the

7    plaintiff's standing in the community, the nature of

8    Mr. Trump's statement made about Ms. Carroll, the extent to

9    which the statement was circulated, the tendency of the

10   statement to injure a person such as Ms. Carroll, and all of

11   the other facts and circumstances in the case.  These damages

12   can't be proved with mathematical certainty.  Fair compensation

13   may vary, ranging from one dollar, if you decide that there was

14   no injury, to a substantial sum if you decide that there was

15   substantial injury.

16          Now, in this case, Question 9, I have divided the

17   damages determination into two parts, and you will see those on

18   page 3 of the verdict form in the parts below the yes/no

19   question.  The first of those two parts asks you whether or not

20   Ms. Carroll has proved by a preponderance of the evidence that

21   she was injured in any of the respects I have just described.

22   I misspoke about where on the form.  The first part of

23   Question 9, right at the top, the yes/no question asks you to

24   decide whether Ms. Carroll has proved by a preponderance of the

25   evidence that she was injured in any of the respects I just

1   play.  I previously instructed you about "actual malice" with

2   regard to Question 8.  With regard to Question 10, I'm using

3   the words "malice" or "maliciously," not the phrase "actual

4   malice," and the word "malice" and the word "maliciously" for

5   purposes of Question 10 means something different from "actual

6   malice."  A statement is made with malice or it's made

7   maliciously for the purpose of Question 10 if it's made with

8   deliberate intent to injure or made out of hatred or ill will

9   or spite or made with willful or wanton or reckless disregard

10  of another's rights.

11          If you answer "yes" to the first part of Question

12  10—in other words, if you find that Mr. Trump acted with

13  malice, as I have just defined that term for you, in making the

14  October 12 statement about Ms. Carroll—you will write down an

15  amount, if any, that you find Mr. Trump should pay to

16  Ms. Carroll in punitive damages for the defamation.  If you

17  answer "no" to that first part of Question 10—that is, you

18  find that Mr. Trump's statement was not made maliciously—you

19  may not award punitive damages.  Ms. Carroll bears the burden

20  of proving by a preponderance of the evidence that Mr. Trump

21  acted in accordance with this standard.

22          In arriving at your decision as to the amount of

23  punitive damages, you should consider here with respect to the

24  defamation punitive damage claim:

25          The nature and reprehensibility of what Mr. Trump did

N592Car1                          Charge

1    if he defamed her; that would include the character of the

2    wrongdoing and Mr. Trump's awareness of what harm the conduct

3    caused or was likely to cause.  In considering the amount of

4    punitive damages to award, you should weigh that factor

5    heavily;

6            You should consider the actual and potential harm

7    created by Mr. Trump's conduct; and

8            You should consider Mr. Trump's financial condition

9    and the impact of your award of punitive damages, if any, on

10   Mr. Trump.

11           Once you have answered Question 10, if you answer

12   Question 10, you will return your verdict, your task will be

13   over.

14           Those are my substantive instructions on the law, that

15   is, on battery, on defamation, and on damages.  Those are the

16   rules you must apply here to the facts as you find them.

17           Now, the remaining part of what I have to say, and it

18   is shorter, I promise, I know that you are probably ready to

19   get up and do your job, but I need -- ah, yes.  Andy, thank

20   you, or whoever passed the note.

21           In instructing you on punitive damages on the

22   defamation claim, I skipped over one sentence, and I will read

23   it to you now.

24           The amount of punitive damages that you award, if any,

25   must be reasonable and proportionate to the actual and

N592Car1                        Charge

1    the issues in Question 7, which is the falsity of the statement

2    of October 12 and Question 8, actual malice, by clear and

3    convincing evidence, you must decide against her on those

4    issues.  What does "clear and convincing evidence" mean?  Clear

5    and convincing evidence is a more exacting standard than proof

6    by a preponderance of the evidence, where you need believe only

7    that a party's claim is more likely true than not.  On the

8    other hand, clear and convincing evidence, clear and convincing

9    proof, is not as high a standard as the burden of proof applied

10   in criminal cases, beyond a reasonable doubt.  Clear and

11   convincing proof leaves no real substantial doubt in your mind.

12   It is proof that establishes in your mind not only the

13   proposition -- not only that the proposition at issue is

14   probable, but also that it is highly probable.  It is enough if

15   Ms. Carroll establishes that Mr. Trump's statement was

16   false—which is Question 7—and that he made the statement with

17   actual malice—that's Question 8—beyond any "substantial

18   doubt"; she does not have to dispel every "reasonable doubt."

19        Now, you folks, the nine of you, are the sole and

20   exclusive judges of the facts.  I certainly do not mean to

21   indicate any opinion as to the facts or as to what your verdict

22   ought to be.  The rulings I have made during this trial are not

23   any indication of any views on my part about what your decision

24   ought to be or as to who should prevail here.  I express no

25   such opinion with respect to what you ought to do here.

A-3312

# EXHIBIT 6

Confidential

Page 1

```
 1

 2                   UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
                   CASE No. 20 CIV. 7311 (LAK)(JLC)
 4

 5   E. JEAN CARROLL,

 6             Plaintiff,

 7   -vs-

 8   DONALD J. TRUMP,
     in his personal capacity,
 9
               Defendant.
10   _____/

11

12

13                        =   =   =

14                     CONFIDENTIAL

15                        =   =   =

16

17        VIDEOTAPED DEPOSITION OF DONALD J. TRUMP

18

                   Wednesday, October 19, 2022
19                   10:22 a.m. - 3:50 p.m.

20                    The Mar-a-Lago Club
                    1100 South Ocean Boulevard
21                  Palm Beach, Florida, Florida

22

23   Stenographically Reported By
     Pamela J. Pelino, RPR, FPR, CLR
24   Notary Public, State of Florida
     TSG REPORTING
25   JOB NO. 218342
                        -   -   -
```

PLAINTIFF'S
EXHIBIT

**PX-200-T**
22 Civ. 10016 (LAK)

A-3314

Page 127

```
 1                        D. J. TRUMP



 5        Q.    Okay.  Now, on October 12, just a few

 6   days ago, you issued a statement on Truth Social

 7   about Ms. Carroll and this case; correct?

 8        A.    I believe so, yes.

 9        Q.    And the statement that you posted, who

10   wrote that statement?

11        A.    I did.

12        Q.    You yourself?

13        A.    Yeah.

14        Q.    Did you post the statement yourself?

15        A.    Yes.

16        Q.    And in addition to posting the statement

17   on Truth Social, you also sent it to the press?

18        A.    Yes.  It's called truth and post.  We

19   post much like -- how would you say it?  We put out

20   a statement, and we also put it on Truth.
```

A-3315

# EXHIBIT 7

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:21 PM          INDEX NO. 161137/2017
NYSCEF DOC. NO. 740    Case 1:22-cv-10016-LAK   Document 208-7   Filed 06/22/23   Page 2 of 8    RECEIVED NYSCEF: 12/14/2022

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : CIVIL TERM : PART 57
------------------------------------------- X
HALEIGH BREEST,

                        Plaintiff,

                                       Index No.
        -against-                      161137/2017

PAUL HAGGIS,

                        Defendant.
------------------------------------------- X
                              Supreme Courthouse
                              60 Centre Street
                              New York, New York
                              October 19, 2022

B E F O R E:

HONORABLE SABRINA KRAUS,
                        Justice, Supreme Court


A P P E A R A N C E S:

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL, LLP
Attorneys for Plaintiff
600 Fifth Avenue
New York, New York  10020
BY  ZOE SALZMAN, ESQ.
        ILANN M. MAAZEL, ESQ.


CHAUDHRY LAW, PLLC
Attorneys for Defendant
45 West 29th Street - Suite 303
New York, New York  10001
BY:  PRIYA CHAUDHRY, ESQ.
BY:  SETH J. ZUCKERMAN,  ESQ.



                              NICOLE C. ROBINSON, CSR
                              BONNIE PICCIRILLO
                              Senior Court Reporters


                    ncr

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:21 PM          INDEX NO. 161137/2017
NYSCEF DOC. NO. 740          Case 1:22-cv-10016-LAK   Document 208-7   Filed 06/22/23   Page 3 of 8          RECEIVED NYSCEF: 12/14/2022

334

Direct-Breest-Salzman

1   therapist?

2        A    Yes.

3        Q    When was the first time you saw a therapist?

4        A    It was in 2015.

5        Q    Who was that therapist?

6        A    Dr. Mindy Zelen.

7        Q    How many sessions did you see Dr. Zelen for?

8        A    Two or three.

9        Q    Why just two or three?

10       A    I didn't connect with her.  So, it would be impossible

11   to build a trusting therapeutic relationship.

12       Q    Why did you seek out therapy with Dr. Zelen at that

13   time?

14       A    I wanted to be in a relationship, and I was having

15   difficulty going on dates and not finding them challenging and I

16   had a lot of anxiety.

17       Q    Before January 31st, 2013 had you ever had trouble

18   dating before?

19       A    No.

20       Q    After seeing Dr. Zelen for two or three sessions, did

21   you ever see any other therapist?

22       A    Yes, Dr. Baker-Pitts who you met yesterday.

23       Q    And when did you first see Dr. Baker-Pitts?

24       A    June of 2017.

25       Q    How did you find Dr. Baker-Pitts?

LAS

A-3318

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:21 PM          INDEX NO. 161137/2017
NYSCEF DOC. NO. 740                                        RECEIVED NYSCEF: 12/14/2022

Case 1:22-cv-10016-LAK   Document 208-7   Filed 06/22/23   Page 4 of 8

Direct-Breest-Salzman

364

1    Q    Can you tell us how they changed?

2    A    It felt hard.  It no longer felt carefree.  I could get

3    nervous being alone with guys.

4    Q    Have you had sex since January 31st, 2013?

5    A    Yes.

6    Q    How many times?

7    A    Once.

8    Q    When was that?

9    A    It was in 2015.

10   Q    Why did you do that?

11   A    I wanted to see if I could.

12   Q    How was that experience for you?

13   A    It was awkward and didn't feel comfortable and I had

14   flashbacks.

15   Q    What did you have flashbacks of?

16   A    Being assaulted.

17   Q    Since January 31st, 2013, Ms. Breest, have you ever

18   performed oral sex on a man?

19   A    No.  That was probably the worst part of that night.

20              MS. CHAUDHRY:  Objection.

21              THE COURT:  Basis?

22              MS. CHAUDHRY:  Nonresponsive.

23              THE COURT:  Overruled.  The question and answer can

24   stand.

25   Q    Have you ever been to South Africa, Ms. Breest?

A-3319

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:21 PM
INDEX NO. 161137/2017
NYSCEF DOC. NO. 740
RECEIVED NYSCEF: 12/14/2022

1210

L. ROCCHIO, M.D. - PLAINTIFF - DIRECT(MS. SALZMAN)

1  Q    And what is Criterion B and how is it relevant to an

2  assessment of PTSD?

3  A    So if you recall earlier, I said that when you're

4  making an assessment for posttraumatic stress disorder, you have

5  to have very specific symptoms.  So there are four symptom

6  clusters and you have to have a certain number of symptoms in

7  each symptom cluster in order to qualify for a diagnosis of

8  PTSD.  So it is not just measuring how severe or how many

9  symptoms you have.  It's also they have to be symptoms of a

10  particular type in order to meet criteria.

11       So this Criterion B, one of the first clusters, if you

12  will, is called the intrusive symptoms and you need to have a

13  minimum of one symptom at least at the moderate level in order

14  to count it towards a diagnosis of PTSD.

15  Q    So on the first one we're looking at, B1, what did you

16  find?

17  A    I found that Ms. Breest was experiencing unwanted

18  memories of the rape and in particular, she was having intrusive

19  meaning, it is not that she is sitting trying to think of

20  something.  It's thoughts that just pop into her head and for

21  her, it was recurrent and intrusive thoughts of Mr. Haggis

22  jamming his penis into her throat repeatedly and her gagging.

23       She described experiencing those thoughts both as just

24  randomly popping into her head or when reminded of something and

25  she said that they bother her a lot.  And I conducted further

ncr

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:21 PM    INDEX NO. 161137/2017
NYSCEF DOC. NO. 740                                  RECEIVED NYSCEF: 12/14/2022

L. ROCCHIO, M.D. - PLAINTIFF - DIRECT(MS. SALZMAN)

1   assessment to determine it is also something that's very

2   difficult for her to get out of her head and it is something

3   that she was experiencing at least daily in the past month.

4       Q   Let's go to the bottom of the screen, please, on this

5   page.  Item B2 asks about unpleasant dreams, right?

6       A   Yes.

7       Q   And was that something Ms. Breest scored on?

8       A   So this is a good example.  She said yes, she does have

9   dreams, but she couldn't remember the content.  So I wouldn't

10   link them in any specific way to the rape.  So I had to code

11   that symptom as absent.

12       Q   Let's go to the next page, page 30.  The top screen

13   asks if in the past month there have been times when you

14   suddenly acted or felt as if the event was actually happening

15   again and how did Ms. Breest score on that?

16       A   That was a zero.  That measure was flashback meaning

17   you're actually having a re-experiencing moment.  So you lose

18   touch with time in the present and that was not a symptom that

19   Ms. Breest reported experiencing.

20       Q   Next screen, item B4.

21       A   Item B4 is something called cues emotional distress.

22   What that means is it asks when you are reminded of something

23   similar to the traumatic event, do you experience emotional

24   distress and again, the person has to be quite specific in terms

25   of what are the kinds of things.  For Ms. Breest, in the past

A-3321

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:21 PM          INDEX NO. 161137/2017
NYSCEF DOC. NO. 740                                         RECEIVED NYSCEF: 12/14/2022

Case 1:22-cv-10016-LAK   Document 208-7   Filed 06/22/23   Page 7 of 8

1212

L. ROCCHIO, M.D. - PLAINTIFF - DIRECT(MS. SALZMAN)

1   month, had certainly been being asked a lot of highly personal

2   and violating questions, reading transcripts, seeing her name

3   on --  in the news, seeing or hearing, having to have

4   conversations with the lawyers, anything that reminded her of

5   the rape and how much did it bother her.

6          And then to tap the impact, I asked well, all right.

7   So you're saying it bothers you, but, you know, how long does it

8   take you to calm down, what kinds of things do you have to do in

9   order to alleviate that emotional distress.  And here, Ms.

10  Breest talked about at times requiring a lot of effort.  She

11  would play with her dog.  She would try to distract herself.

12  She would say --  try to sooth herself by reminding herself the

13  worst has already happened.  It's over.  She would try to read

14  if she could and really distract.

15         And then talking about the ways in which dealing with

16  that emotional distress interferes with daily life, so again,

17  Ms. Breest is a very high-functioning person overall, but when

18  you are constantly having to manage intense distress, it

19  requires a lot of emotional energy and a lot of effort.  If you

20  think, it's kind of similar if you think about a computer that's

21  running a program in the background.  You can still use the

22  computer, but it's not running at optimal efficiency.  So that's

23  kind of what --  the sense that I had here.

24         This was a particularly severe symptom for Ms. Breest,

25  meaning that not only was the reaction intense and required a

ncr

A-3322

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:21 PM          INDEX NO. 161137/2017
NYSCEF DOC. NO. 740                                        RECEIVED NYSCEF: 12/14/2022

1213

L. ROCCHIO, M.D. - PLAINTIFF - DIRECT(MS. SALZMAN)

1    lot of effort to alleviate her distress, but it was something

2    that happened multiple times a day.  When you score on the

3    right-hand side, those are my scorings, my professional scoring

4    of a combination of both frequency and intensity.

5      Q    Let's go to the next page, item B5.

6      A    Item five is very similar to the previous

7    event -- previous question only in the face of reminders.

8    Instead of asking about emotional distress, it asks about

9    physical reactions.  So for Ms. Breest, she reported physical

10    anxiety reactions like having a rush of anxiety that -- with

11    like a pit in her stomach or physical tension, feeling her heart

12    race, things like that in response to a reminder.

13      And again, sometimes she reported that it could take as

14    long as an hour to calm down or she's been prescribed Ativan to

15    take as-needed.  And at times, that will be an example of when

16    she would need to take an Ativan just to try to calm her body

17    down.

18      Q    So you looked at five items for Criterion B.

19      How many does a patient have to score in order to

20    qualify for a PTSD diagnosis?

21      A    Just one.

22      Q    How many did Ms. Breest score?

23      A    I think three.  Three.

24      Q    Go into Criterion C, the bottom portion of this page.

25    What is Criterion C assessing?

ncr

# EXHIBIT 8

A-3324

🔒 **Page Vault**

| | |
|---|---|
| Document title: | Max☐  ☐  ❤☐   on Twitter: "I know for a fact Mr. President wouldn't touch that ugly bitch with your dick." / Twitter |
| Capture URL: | https://twitter.com/mherndon23/status/1580592423042158592 |
| Page loaded at (UTC): | Tue, 15 Nov 2022 01:39:35 GMT |
| Capture timestamp (UTC): | Tue, 15 Nov 2022 01:40:09 GMT |
| Capture tool: | v7.15.1 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/96.0.4664.93 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 2 |
| Capture ID: | ea0200f6-cc7e-4155-94d1-b339f1413e62 |
| User: | gbe-bawesson |

PLAINTIFF'S
EXHIBIT

**PX-45**

22 Civ. 10016 (LAK)

PDF REFERENCE #:     czDkZu3EvZzGeJTcJJvTg1



Document title: Max☐  ☐   ☐☐   on ♥Tittewr r " uotlkf noT .owa .act MvPs vedi' ent Toul' nh toucg tgat uylb / itcg Titg bouw' icf R " uotl C♥Tittew
paUuve RL 2: gttUt:CTittwe/com@ngew' on31Cltatud5809843( 319( 3580843
paUuve timedtamU)R♥p,: ♥ueN58 v oG3933 95:( 9:94 7 M♥                                          s aye 5 o. 5

A-3326

🔒 **Page Vault**

| | |
|---|---|
| Document title: | Roy Keane on Twitter: "@SkyNews Really! Everybody and their mother knows that woman is a liar!" / Twitter |
| Capture URL: | https://twitter.com/RKeane4711/status/1582961054652321798 |
| Page loaded at (UTC): | Tue, 15 Nov 2022 01:42:34 GMT |
| Capture timestamp (UTC): | Tue, 15 Nov 2022 01:42:52 GMT |
| Capture tool: | v7.15.1 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/96.0.4664.93 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 2 |
| Capture ID: | c455ef2c-a678-4510-8fcc-756118439d34 |
| User: | gbe-bawesson |

PLAINTIFF'S
EXHIBIT
**PX-46**
22 Civ. 10016 (LAK)

PDF REFERENCE #:      xnJ8KAxoAwENJ6dJa2f7fj





 

A-3328

🔒 Page Vault

| | |
|---|---|
| Document title: | Ezekiel on Twitter: "@NYDailyNews Where the f was troll hiding at in the first place. Another bullshytter going after Trump" / Twitter |
| Capture URL: | https://twitter.com/Ezekill58/status/1582861665942765568 |
| Page loaded at (UTC): | Mon, 12 Dec 2022 00:39:41 GMT |
| Capture timestamp (UTC): | Mon, 12 Dec 2022 00:40:23 GMT |
| Capture tool: | 10.14.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/106.0.5249.199 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.16.0) |
| PDF length: | 3 |
| Capture ID: | wFckRv8azCdtWDJYJrC7mk |
| User: | gbe-bawesson |

PLAINTIFF'S
EXHIBIT

PX-48

22 Civ. 10016 (LAK)

PDF REFERENCE #:      gqCRGgY5WAHqL91Yt9W4cx





Tweet

New York Daily News @NYDailyNews · Oct 19
Official
Trump says the rape allegation is "a hoax and a lie."

The former president is set to undergo questioning today in the defamation suit by E. Jean Carroll, a columnist who claims he raped her 25 years ago.

It will give lawyers a chance to interrogate Trump

nydailynews.com
Former President Donald Trump deposed in E. Jean Carroll rape defam...
The only confirmation that the deposition took place was a brief statement made on Wednesday afternoon by a spokesperson for the ...

8 9 15

Ezekiel
@Ezekill58

Replying to @NYDailyNews

Where the f was troll hiding at in the first place.
Another bullshytter going after Trump

10:30 PM · Oct 19, 2022

**New to Twitter?**

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Sign up with phone or email

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

Ezekiel
@Ezekill58
Follow

New York Daily Ne...
@NYDailyNews
Official
NY's Hometown Paper 🍎 Breaking news, national, sports, politics, entertainment NYC & beyond / nydailynews.com / About bit.ly/nydnmedia1 bit.ly/nydnsubscribe
Follow

**What's happening**

NBA · LIVE
Bulls at Hawks

Trending in United States
Fauci
589K Tweets

Only on Twitter · Trending
#搞定要要個阿
163K Tweets

Sports · Trending
Pelicans
16.3K Tweets

Sports · Trending
Brady
Trending with 49ers, Brock Purdy

Show more

Terms of Service Privacy Policy Cookie Policy Accessibility Ads info More ...
© 2022 Twitter, Inc.

Don't miss what's happening
People on Twitter are the first to know.
Log in Sign up

**Ezekiel**
@Ezekill58

Replying to @NYDailyNews

Where the f was troll hiding at in the first place.
Another bullshytter going after Trump

10:30 PM · Oct 19, 2022

**New to Twitter?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

🍎  Sign up with Apple

Sign up with phone or email

By signing up, you agree to the Terms of Service and
Privacy Policy, including Cookie Use.

**Relevant people**

**Ezekiel**          [Follow]
@Ezekill58

**New York Daily Ne...** ✓   [Follow]
@NYDailyNews
⊘ Official
NY's Hometown Paper 🔴 Breaking
news, national, sports, politics,
entertainment NYC & beyond /
nydailynews.com / About
bit.ly/nydnmedia1 ➕
bit.ly/nydnsubscribe

**What's happening**

NBA · LIVE
**Bulls at Hawks**

Trending in United States
**Fauci**
589K Tweets

Only on Twitter · Trending
**#搞定要要個網**
183K Tweets

Sports · Trending
**Pelicans**
16.3K Tweets

Sports · Trending
**Brady**
Trending with 49ers, Brock Purdy

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···
© 2022 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.

[Log in]  [Sign up]

Document title: Ezekiel on Twitter: &quot;@NYDailyNews Where the f was troll hiding at in the first place. Another bullshytter going after Trump&quot; / Twitter
Capture URL: https://twitter.com/Ezekill58/status/1582861665942765568
Capture timestamp (UTC): Mon, 12 Dec 2022 00:40:23 GMT
Page 2 of 2

A-3331

🔒 **Page Vault**

| | |
|---|---|
| Document title: | The REAL Politically Savvy on Twitter: "@ejeancarroll How much were you paid and why now??? Yeah. I call bullshit." / Twitter |
| Capture URL: | https://twitter.com/patriot_savvy/status/1614750852454965251 |
| Page loaded at (UTC): | Sun, 29 Jan 2023 15:41:29 GMT |
| Capture timestamp (UTC): | Sun, 29 Jan 2023 15:42:01 GMT |
| Capture tool: | 10.20.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.179 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| PDF length: | 2 |
| Capture ID: | e9Eq3bH9yPHkCwKVRjkuHc |
| User: | kh-admin |

PLAINTIFF'S
EXHIBIT
**PX-51**
22 Civ. 10016 (LAK)

PDF REFERENCE #:     d4LbVhHMPdLbD8JbvoTRJh

CARROLL_031542



Tweet

**The REAL Politically Savvy**
@patriot_savvy

@ejeancarroll How much were you paid and why now??? Yeah. I call bullshit.

10:26 PM · Jan 15, 2023 · 5 Views

**New to Twitter?**

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

**The REAL Politicall...** @patriot_savvy Follow

"If the freedom of speech is taken away then dumb and silent we may be led, like sheep to the slaughter." ~ George Washington

**What's happening**

NHL · Last night
**Coyotes at Ducks**

Trending in United States
**Eagles -2.5**
77.2K Tweets

Sports · Trending
**Mitoma**
43.1K Tweets

Trending in United States
**#fearwomen**
6,071 Tweets

Politics · Trending
**Iran**
293K Tweets

Show more

Terms of Service Privacy Policy Cookie Policy Accessibility Ads info More ···
© 2023 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.
Log in Sign up

Document title: The REAL Politically Savvy on Twitter: "@ejeancarroll How much were you paid and why now??? Yeah. I call bullshit." / Twitter
Capture URL: https://twitter.com/patriot_savvy/status/1614750852454965251
Capture timestamp (UTC): Sun, 29 Jan 2023 15:42:01 GMT

**A-3333**

🔒 **Page Vault**

| | |
|---|---|
| Document title: | We Aren't For Sale on Twitter: "@ejeancarroll If this chic got layed by Trump it was likely the last time she was." / Twitter |
| Capture URL: | https://twitter.com/scottagain2/status/1588001000375263233 |
| Page loaded at (UTC): | Sun, 29 Jan 2023 17:10:08 GMT |
| Capture timestamp (UTC): | Sun, 29 Jan 2023 17:10:39 GMT |
| Capture tool: | 10.20.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.179 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| PDF length: | 3 |
| Capture ID: | eoDYqRwr8tBMvrAfmi1qie |
| User: | kh-admin |

PLAINTIFF'S
EXHIBIT
**PX-53**
22 Civ. 10016 (LAK)

PDF REFERENCE #:    xnPkVg1eoqiYzxPWM8ajNs

CARROLL_031622



Document title: We Aren&#39;t For Sale on Twitter: &quot;@ejeancarroll If this chic got layed by Trump it was likely the last time she was.&quot; / Twitter
Capture URL: https://twitter.com/scottagain2/status/1588001000375263233
Capture timestamp (UTC): Sun, 29 Jan 2023 17:10:39 GMT

CARROLL_031623



**We Aren't For Sale**
@scottagain2

Replying to @ejeancarroll

If this chic got layed by Trump it was likely the last time she was.

2:51 AM · Nov 3, 2022

1 Like

**New to Twitter?**

Sign up now to get your own personalized timeline!

G Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

**We Aren't For Sale**
@scottagain2    Follow
Patriot

**E. Jean Carroll** ✓
@ejeancarroll    Follow
Whipsawed by Confusion? ASK E. JEAN at e.jean@askejean.com Driven Witless? Read my Substack ejeancarroll.substack.com SNL, Atlantic, VF, NYmag

**What's happening**

NBA · Starts at 11:00 AM
**Heat at Hornets**

Politics · Trending
**Iran**
305K Tweets

Sports · Trending
**#ChiefsFootball**

Fitness · Trending
**Planet Fitness**
1,592 Tweets

Sports · Trending
**Mitoma**
77.7K Tweets

Show more

Terms of Service  Privacy Policy  Cookie Policy
Accessibility  Ads info  More
© 2023 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.

Log in   Sign up

Document title: We Aren&#39;t For Sale on Twitter: &quot;@ejeancarroll If this chic got layed by Trump it was likely the last time she was.&quot; / Twitter
Capture URL: https://twitter.com/scottagain2/status/1588001000375263233
Capture timestamp (UTC): Sun, 29 Jan 2023 17:10:39 GMT

Page 2 of 2

CARROLL_031624

**To:** E.Jean@askejean.com[E.Jean@askejean.com]
**From:** Steph C[jazzyasperkitty@gmail.com]
**Sent:** Thur 10/13/2022 7:07:21 AM (UTC)
**Subject:** SPECTACULAR!

You are obviously a narcissist the way that you brag about yourself & you think that you're all that & then some. When you worked with playboy you were "so jealous" over the beautiful playboy models because all men wanted them that you wanted people to think that you were beautiful & were wanted by men too (only you're "not" beautiful, you are just an old ugly skank whore!) No man wants to touch you (even your ex husbands dumped you!) So to convince the world that you are wanted by men (when you know damn good & well that you're not) you make up these lies that you were raped by two men! (You are a disgusting low life liar & you are going to get hurt "very badly" for the lies that you are telling! You are "very ugly" both inside & out & you are going to be even more uglier than you already are if you don't cease & desist with these false allegations of rape that you are telling!) Better end the bullshit quick bitch!



CARROLL_031518

A-3337

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

E. JEAN CARROLL,                                          Civil Action No.:
                                                         22-cv-10016
                        *Plaintiff,*

        – against –                                      **AMENDED NOTICE OF
                                                         APPEAL**

DONALD J. TRUMP,

                        *Defendant.*

-------------------------------------------------------------------X


        Notice (amended) is hereby given that Defendant Donald J. Trump appeals to the United

States Court of Appeals for the Second Circuit from the judgment entered in this action on May 11,

2023 (Dkt. No. 178) ("Final Judgment") awarding Plaintiff compensatory and punitive damages

totaling $5,000,000.00, and from all adverse orders, rulings, decrees, decisions, opinions,

memoranda, conclusions, or findings preceding, leading to, merged in, or included within the Final

Judgment, as well as the July 19, 2023 Memorandum Opinion Denying Defendant's Rule 59 Motion

(Dkt. No. 212), by the Honorable United States District Judge Lewis A. Kaplan.

A-3338

Dated: New York, New York
July 19, 2023

TACOPINA, SEIGEL & DeOREO

By: _____

Joseph Tacopina, Esq.
Chad Seigel, Esq.
Matthew G. DeOreo, Esq.
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
mdeoreo@tacopinalaw.com

Counsel for Defendant, Donald J. Trump

TO:     All counsel by ECF

2

A-3339

1:22-cv-10016-LAK

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of July, two thousand twenty-three.

_____

E. Jean Carroll,

          Plaintiff - Appellee,

v.

Donald J. Trump,

          Defendant - Appellant.

_____

**ORDER**

Docket No. 23-793

| USDC SDNY |
|---|
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 7/19/2023 |

On June 16, 2023, the Court issued a notice staying this appeal, pursuant to Fed. R. App. P. 4(a)(4), due to a pending motion in the district court. The district court having denied the motion in an order dated July 19, 2023,

IT IS ORDERED that the stay of this appeal is hereby lifted. Appellant must file a scheduling notification or transcript status update letter within 14 days of the date of this order.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

CERTIFIED COPY ISSUED ON 07/19/2023