# 23-0793-cv

## United States Court of Appeals
*for the*
## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**SEALED JOINT APPENDIX**
**(REDACTED)**

ROBERTA A. KAPLAN
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

– and –

JOSHUA A. MATZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS FOR SEALED APPENDIX

**Page**

Notice of Plaintiff's Motion *in Limine* [REDACTED] dated April 20, 2023 .............. SA-1

Declaration of Roberta A. Kaplan, for Plaintiff, in Support of Motion *in Limine* [REDACTED] dated April 20, 2023 .............. SA-3

Exhibit 1 to Kaplan Declaration - [REDACTED], dated April 19, 2023 .............. SA-5

Exhibit 2 to Kaplan Declaration - [REDACTED], dated September 3, 2020 .............. SA-100

Exhibit 3 to Kaplan Declaration - [REDACTED], dated September 22, 2020, [REDACTED] .............. SA-104

Exhibit 4 to Kaplan Declaration - [REDACTED] dated September 22, 2020, [REDACTED] .............. SA-106

Exhibit 5 to Kaplan Declaration - [REDACTED] dated September 23, 2020.............. SA-108

Exhibit 6 to Kaplan Declaration - [REDACTED] dated September 23, 2020, [REDACTED] .............. SA-110

**Page**

Exhibit 7 to Kaplan Declaration - [redacted], dated April 17, 2023 ............ SA-112

Exhibit 8 to Kaplan Declaration - Excerpts from Deposition Transcript of E. Jean Carroll, dated October 14, 2022 ............................ SA-114

Exhibit 9 to Kaplan Declaration - [redacted], dated April 18, 2023 ................. SA-117

Declaration of Matthew G. DeOreo, for Defendant, in Opposition to Plaintiff's Motion *in Limine* [redacted] dated April 24, 2023 ....................................................... SA-120

Exhibit A to DeOreo Declaration - [redacted] dated April 10, 2023 ............................................. SA-122

Exhibit B to DeOreo Declaration - [redacted] (*Vox*, [redacted]) ........................................................ SA-125

Exhibit C to DeOreo Declaration - Plaintiff's Website.................................................. SA-130

Exhibit D to DeOreo Declaration - Plaintiff's Tweets .................................................. SA-162

Exhibit E to DeOreo Declaration - [redacted] Order, [redacted] ................................................ SA-172

**Page**

Exhibit F to DeOreo Declaration - Email [redacted] ........................................ SA-180

Exhibit G to DeOreo Declaration - [redacted] dated April 15, 2023, [redacted] ........................................................ SA-187

Sealed Trial Transcript, dated April 27, 2023 ............ SA-190

Sealed Trial Transcript, dated May 1, 2023 ............... SA-220

Sealed Trial Transcript, dated May 2, 2023 ............... SA-231

Case 23-793, Document 89, 11/27/2023, 3593372, Page5 of 255

SA-1





SA-2



Case 1:22-cv-10016-LAK   Document 132   Filed 04/20/23   Page 2 of 2

Case 23-793, Document 89, 11/27/2023, 3593372, Page7 of 255

SA-3



Case 23-793, Document 89, 11/27/2023, 3593372, Page8 of 255

SA-4







Case 23-793, Document 89, 11/27/2023, 3593372, Page11 of 255
SA-7





Case 23-793, Document 89, 11/27/2023, 3593372, Page13 of 255
SA-9



Case 23-793, Document 89, 11/27/2023, 3593372, Page14 of 255
SA-10





Case 23-793, Document 89, 11/27/2023, 3593372, Page16 of 255

SA-12



Case 23-793, Document 89, 11/27/2023, 3593372, Page17 of 255
SA-13













































Case 23-793, Document 89, 11/27/2023, 3593372, Page39 of 255
SA-35













Case 23-793, Document 89, 11/27/2023, 3593372, Page45 of 255
SA-41























Case 23-793, Document 89, 11/27/2023, 3593372, Page56 of 255
SA-52





Case 23-793, Document 89, 11/27/2023, 3593372, Page58 of 255
SA-54



















Case 23-793, Document 89, 11/27/2023, 3593372, Page67 of 255
SA-63



















Case 23-793, Document 89, 11/27/2023, 3593372, Page76 of 255

SA-72









Case 23-793, Document 89, 11/27/2023, 3593372, Page80 of 255
SA-76











Case 23-793, Document 89, 11/27/2023, 3593372, Page85 of 255
SA-81

























Case 23-793, Document 89, 11/27/2023, 3593372, Page97 of 255
SA-93













Case 23-793, Document 89, 11/27/2023, 3593372, Page103 of 255

SA-99





Case 23-793, Document 89, 11/27/2023, 3593372, Page105 of 255

SA-101



Case 23-793, Document 89, 11/27/2023, 3593372, Page106 of 255

SA-102



SA-103

Case 1:22-cv-10016-LAK   Document 134-2   Filed 04/20/23   Page 4 of 4







Case 23-793, Document 89, 11/27/2023, 3593372, Page110 of 255

SA-106



Case 23-793, Document 89, 11/27/2023, 3593372, Page111 of 255
SA-107





Case 23-793, Document 89, 11/27/2023, 3593372, Page113 of 255

SA-109



Case 23-793, Document 89, 11/27/2023, 3593372, Page114 of 255

SA-110



Case 23-793, Document 89, 11/27/2023, 3593372, Page115 of 255
SA-111





Case 23-793, Document 89, 11/27/2023, 3593372, Page117 of 255

SA-113





Case 23-793, Document 89, 11/27/2023, 3593372, Page119 of 255
SA-115



Case 23-793, Document 89, 11/27/2023, 3593372, Page120 of 255
SA-116





Case 23-793, Document 89, 11/27/2023, 3593372, Page122 of 255
SA-118



Case 23-793, Document 89, 11/27/2023, 3593372, Page123 of 255

SA-119





Case 23-793, Document 89, 11/27/2023, 3593372, Page125 of 255

SA-121





Case 23-793, Document 89, 11/27/2023, 3593372, Page127 of 255
SA-123



Case 23-793, Document 89, 11/27/2023, 3593372, Page128 of 255

SA-124



Case 23-793, Document 89, 11/27/2023, 3593372, Page129 of 255

SA-125







[redacted]

Case 23-793, Document 89, 11/27/2023, 3593372, Page138 of 255
SA-134

[redacted]

About | Who Is E. Jean Carroll?

[redacted]



Case 23-793, Document 89, 11/27/2023, 3593372, Page139 of 255
SA-135
About | Who Is E. Jean Carroll?





Case 23-793, Document 89, 11/27/2023, 3593372, Page141 of 255

SA-137

Ask E. Jean | EJeanCarroll

Case 23-793, Document 89, 11/27/2023, 3593372, Page144 of 255
SA-140

Case 23-793, Document 89, 11/27/2023, 3593372, Page148 of 255
SA-144



Case 23-793, Document 89, 11/27/2023, 3593372, Page152 of 255
SA-148











Case 23-793, Document 89, 11/27/2023, 3593372, Page167 of 255
SA-163



Case 23-793, Document 89, 11/27/2023, 3593372, Page168 of 255
SA-164



Case 23-793, Document 89, 11/27/2023, 3593372, Page169 of 255
SA-165



Case 23-793, Document 89, 11/27/2023, 3593372, Page170 of 255
SA-166





Case 23-793, Document 89, 11/27/2023, 3593372, Page172 of 255
SA-168



Case 23-793, Document 89, 11/27/2023, 3593372, Page173 of 255
SA-169



Case 23-793, Document 89, 11/27/2023, 3593372, Page174 of 255

SA-170











Case 23-793, Document 89, 11/27/2023, 3593372, Page180 of 255

SA-176





Case 23-793, Document 89, 11/27/2023, 3593372, Page182 of 255

SA-178



Case 23-793, Document 89, 11/27/2023, 3593372, Page183 of 255

SA-179









Case 23-793, Document 89, 11/27/2023, 3593372, Page189 of 255
SA-185



Case 23-793, Document 89, 11/27/2023, 3593372, Page190 of 255
SA-186



Case 23-793, Document 89, 11/27/2023, 3593372, Page191 of 255

SA-187





Case 23-793, Document 89, 11/27/2023, 3593372, Page193 of 255

SA-189



XN4R2CAR1

S E A L E D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

Plaintiff,

v.

DONALD J. TRUMP,

Defendant.
------------------------------x

New York, N.Y.

22 Civ.10016 (LAK)

Jury Trial

April 27, 2023
9:50 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
and a Jury

APPEARANCES

KAPLAN HECKER & FINK LLP
Attorneys for Plaintiff
BY: ROBERTA A. KAPLAN
MICHAEL J. FERRARA
SHAWN G. CROWLEY
MATTHEW J. CRAIG

TACOPINA SEIGEL & DeOREO
Attorneys for Defendant
BY: JOSEPH TACOPINA
CHAD D. SEIGEL
MATTHEW G. DeOREO

HABBA MADAIO & ASSOCIATES, LLP
Attorneys for Defendant
BY: ALINA HABBA
MICHAEL T. MADAIO

W. PERRY BRANDT
Attorney for Defendant

S E A L E D

(Trial resumed; in the robing room; Ms. Kaplan and Mssrs. Matz, Tacopina, and Seigel present)

COUNSEL: Good morning, your Honor.

THE COURT: Good morning.

I have a letter dated today from plaintiffs, the burden of which is the contention that the transcript of a very tiny part of the *voir dire* of Juror No. 77 has an error, namely, that in describing what news he pays attention to, the transcript recites that his response, in relevant part, was, "News basically I tend to avoid, but every now and then podcasts, mainly independent like Temple"——T-E-M-P-L-E——"or some other people like that. Any questions?"

Plaintiff's counsel indicate that they were following the live transcript at the time which reported the word as Temple, T-E-M-P-L-E. That is certainly my memory of what he said or seemed to say, because it struck me that I had never heard of it, which is not an acid test of the names of podcast, I should tell you, but it struck me.

Plaintiff's counsel say that they have become aware of a number of public news reports, including apparently from journalists who were listening to the proceeding as it happened, that the word was not "Temple," it was "Tim Pool," T-I-M P-O-O-L, and the rest of the letter from plaintiff's counsel goes on to say quite a lot about Tim Pool, who seems allegedly to regularly take misogynistic and right-wing views

S E A L E D

on his podcast.

Now, Ms. Carroll, on account of this, you propose that I do what, and we will move from there?

MS. KAPLAN: We think the juror should be asked to elaborate as to whether in fact the journalists were right and we were all wrong that he actually said Tim Pool.

MR. TACOPINA: When you say journalists is it more -- I thought it was just one.

MS. KAPLAN: It came out in the *Daily Beast*, correct, and then it was picked up by several others.

MR. TACOPINA: I had not seen it, but okay.

MS. KAPLAN: I'm sorry, I got the text from -- someone texted me the *Daily Beast* as I was coming home --

MR. TACOPINA: I didn't see it --

MS. KAPLAN: -- from work last night.

MR. TACOPINA: -- reported, but I don't question it.

THE COURT: So the plaintiff wants me to question him about what he thinks he actually said and what else?

MS. KAPLAN: And then, depending on the answer, your Honor, either there could be a number -- and Joshua, I think, elaborates -- a number of questions as to whether he has been exposed to the kind of statements on the podcast that we elaborate on in this letter. To be honest, I'm not sure whether someone who says this is their source of news could properly be rehabilitated here, but I think that question would

S E A L E D

be appropriate.

THE COURT: Mr. Tacopina.

MR. TACOPINA: Your Honor, just briefly, I think, obviously, this is new to me. The one thing I will say about this juror, he did say that he had not heard of this case or Ms. Carroll. He did say he would be fair and impartial. And I didn't -- obviously, you know, I heard what the transcript reads. I'm not saying I'm right or wrong. That's what I heard, as well. I think we all heard that. Obviously we all heard that because they would have used one of their challenges had they --

THE COURT: Obviously.

MR. TACOPINA: So I'm not -- you know, I don't necessarily think because one journalist wrote something that got picked up by other journalists that should allow us to launch into an inquiry into this one particular juror, targeting. But, your Honor, I'm comfortable doing whatever your Honor feels is appropriate. I just don't think there is enough here because one person, who is not in the courtroom, but in the overflow room, may have heard something different than everyone else in the courtroom.

THE COURT: No, that's not --

MR. TACOPINA: What?

THE COURT: I see. The journalist says, whoever it is, he or she heard Tim Pool.

S E A L E D

MR. TACOPINA: Right.

THE COURT: And those of us in this room and the court reporter all remember Temple.

MR. TACOPINA: Yes, and all the journalists, I think, in the courtroom remember Temple, because no one reported this before, of course, because that would have stood out to some of them.

MS. KAPLAN: Carol said the report came out yesterday, but I wasn't made aware of it --

MR. TACOPINA: All right. Whatever.

THE COURT: What I propose to do is at least this, and then we will see. We are certainly going to bring him in and ask him what he said and whether he has ever listened to a podcast called Tim Pool and for him, if he has, to describe it. And then we will see where that goes. And it could go in a number of different branches.

Well, actually, there is one more thing that I think is called for. I think it appropriate, and I will certainly hear your views on it before I do it, to ask him what he meant by "some other people like that."

MR. TACOPINA: Sure, Judge. Judge, before you do that, being that we are back here, because I wanted to do this back here anyway, because you brought us back, can I just say one other thing on the record and address one thing to you?

MS. KAPLAN: Before that, let me say one more thing

SEALED

about Pool.

So, obviously, your Honor, I'm just going to be completely honest about what we were hearing, he was wearing, I don't know if you recall, like a black suit and white shirt

THE COURT: No.

MS. KAPLAN: We thought he was Orthodox, and he said Temple, and that's why we were like, okay, Temple. But obviously, we could have been very, very wrong in that.

THE COURT: Well, you know, that's one argument in favor of men sometimes.

We will take up whatever you want to take up later.

MR. TACOPINA: Can we do it back here, though?

THE COURT: I will find out what it's all about, and then we will decide whether we are going to do it back here.

MR. TACOPINA: Okay.

THE COURT: Okay? Let's get No. 77.

MR. TACOPINA: Actually it is a joint request to do it back here, just so you know.

THE COURT: That even makes it more likely that I will say yes, but let's find out after.

(Juror 77 present)

THE COURT: Hello. Come in. Have a seat. Good morning.

JUROR: Good morning.

THE COURT: When you were speaking in court before we

S E A L E D

selected the jury, we had gotten to the point in the proceedings where I was going around the room and each of you were saying something about your life and where you work and where you get your news.

JUROR: Um-hmm.

THE COURT: And the court stenographer, and in fact people in this room remember——and I'm only focused on a small part of it——you said, "Basically I tend to avoid" -- "news basically I tend to avoid, but every now and then podcasts, mainly independent like Temple," which is what everybody heard, "or some other people like that."

Did you say Temple or did you say something else?

JUROR: Tim Pool.

THE COURT: Tim Pool.

Okay. What sort of a podcast is Tim Pool? What is his --

JUROR: He is like middle. He gets different political figures from the right.

THE COURT: I'm sorry?

JUROR: He gets different, like, political figures or just celebrities like that, on the left, on the right, you know, balanced.

THE COURT: So it's a political podcast?

JUROR: Sometimes. Not always. Sometimes it is just like certain events going on. But, yeah, I haven't been in a

S E A L E D

while, just because of work. We are not allowed to, you know, use phones.

THE COURT: How often in the last six months have you listened to the show?

JUROR: Let me see. Six months.

THE COURT: More or less.

JUROR: About maybe three or four. It's hard to say, because work gets -- I've been doing doubles, so I don't have time to listen for anything longer than five minutes.

THE COURT: So three or four times you listened in the last six months?

JUROR: Yeah, about.

THE COURT: You talk about some other people like that. What are the other podcasts you listen to?

JUROR: Basically I left it on random.

THE COURT: I'm sorry?

JUROR: I left it on random. Like the YouTube, you can leave it on random.

THE COURT: You have much more electronics knowledge than I do. I don't know what that means.

JUROR: So basically when -- it will go, like, certain periods, like, five minutes, something like that, it will go to a random newsperson or something like that, and I just let it play.

THE COURT: In other words, the radio, the phone skips

S E A L E D

around.

JUROR: Yeah, the phone, once it finishes something, it just plays something else, and then vice versa. It's not really set. It's like randomized.

THE COURT: Okay. When you have had Tim Pool on, was it also randomized?

JUROR: Sometimes. Like I would just put it, but then, like, you pick one thing --

THE COURT: You pick something.

JUROR: -- um-hmm, and then the rest is randomized.

THE COURT: And randomized among other content like what you picked or randomized among everything?

JUROR: Basically it's -- so YouTube does this thing, I don't know how -- algorithm?

THE COURT: Yeah.

JUROR: Right, it just decides, okay, since you listened to this, maybe you will listen to that, pretty much that.

THE COURT: Okay. So it's other stuff kind of like what you were listening to.

JUROR: Um-hmm.

THE COURT: Is that a yes?

JUROR: Yeah.

THE COURT: And just to put it in terms that I understand, I have Apple Music, a lot of people have Apple

S E A L E D

Music, and I usually, very often, start to listen to Johann Sebastian Bach, a great classical composer, and since Apple Music changed, I find myself ten minutes later listening to some other classical composer usually from the same century. Is that sort of the way it works?

JUROR: Yes.

THE COURT: Okay. So when you have it on this randomized thing, you get other political content, yes?

JUROR: Yes.

THE COURT: Is it other political content from all across the right/left spectrum or is it all kind of on the right?

JUROR: Usually middle, but sometimes it leans left or right. The thing is, I have it in the background. That's the thing.

THE COURT: Sorry?

JUROR: I have it playing in the background --

THE COURT: In the background.

JUROR: -- as I'm getting ready for work.

THE COURT: Okay.

JUROR: So . . .

THE COURT: And what is the longest -- we are talking about the last six months, and I understand you have only had it on three or four times in the last six months, what's the longest you ever listened to Tim Pool for.

S E A L E D

JUROR: In the last --

THE COURT: In the last six months.

JUROR: Probably 14 or 15, and it was regarding something about the school with the kids.

THE COURT: Shootings?

JUROR: No, not the shootings, the gender thing.

THE COURT: Ah, yes, transgender --

JUROR: Yes.

THE COURT: -- kids.

So let's go back to what other podcasts can you remember listening to?

JUROR: The -- sorry, that's about it. Like I said, I don't really pay attention to the other ones. I just know once I'm done, you know, ready to get dressed, I turn it off and go straight to work.

THE COURT: Okay. Ms. Kaplan, do you want to suggest any other inquiry along these lines?

(Counsel confer)

MS. KAPLAN: Whether he follows or listens to Mr. Pool on any other platform other than YouTube.

THE COURT: Yes.

Do you listen to Tim Pool on any platforms other than YouTube?

JUROR: YouTube. I don't do social media. It's not my thing.

THE COURT: Okay.

MS. KAPLAN: One more question, Judge. Are these videos he is watching, I take it?

THE COURT: When this is playing, are you watching videos of Tim Pool?

JUROR: The video?

THE COURT: Yes.

JUROR: Sometimes. Like the news, it will go, like, some segments about certain events happen, like the shooting in the school, that was one he brought up or some gun rights or something like that, stuff like that.

THE COURT: Mr. Tacopina, any inquiry you want me to make?

MR. TACOPINA: Yes, your Honor, just one.

Had the juror heard anything about Ms. Carroll that would make -- in this podcast or anywhere else, for that matter, that would make it hard for him to be fair to both sides in this case?

THE COURT: All right. I will get to that.

MR. TACOPINA: Okay.

THE COURT: Have you ever heard anything on any podcasts about Jean Carroll?

JUROR: No. This is the first time I heard about her.

THE COURT: So is it correct that the first time you ever heard of her was when you came into court Monday?

S E A L E D

JUROR: Yes.

THE COURT: Have you ever heard anything on any of these podcasts about women bringing lawsuits about sexual harassment?

JUROR: No, not that I can think of.

THE COURT: Okay. Any other questions, counsel, that you want to ask?

MR. TACOPINA: No, your Honor.

(Counsel confer)

THE COURT: Are you confident that you can be fair and impartial to both sides?

JUROR: Um-hmm, yes, sir.

THE COURT: And decide the case solely on the basis of what you hear --

JUROR: Yes.

THE COURT: -- in this courtroom?

JUROR: Yes.

THE COURT: Okay. Would you step out, please? Thank you.

(Juror 77 not present)

THE COURT: Okay.

MS. KAPLAN: So, your Honor, this site, it's not like getting your news from Tucker Carlson, whatever one might think of Tucker Carlson. This is a cite that expresses really extremist views in our society, including that the election was

S E A L E D

stolen, really misogynist stuff about women. That is of great concern to us. I understand he can't recall, he is not particularly willing to divulge a bunch of details or maybe he doesn't remember them. But the fact that this is the only thing he can identify and this is what he listens to on YouTube for his news in the morning is extremely concerning to us. And I think it is similar to the kinds of questions your Honor asked. We didn't want to get into them, but that he -- this guy has had groups, Proud Boys, people, the kind of groups you asked about affiliation with, on his podcast, on his webcast, and it suggests to us -- I understand what he said, but to us an inability to fairly consider the issues in the case. He has recently praised Andrew Tate. I don't know if you know who that is.

THE COURT: Who has.

MS. KAPLAN: Andrew Tate is a guy --

THE COURT: No. Back up. Who has recently praised Andrew Tate?

MS. KAPLAN: Oh, Tim Pool.

THE COURT: Tim Pool.

MS. KAPLAN: Andrew Tate is a guy -- if I get it wrong, you will correct me.

MR. TACOPINA: I don't know who Andrew Tate it is.

MS. KAPLAN: -- who was arrested in Romania for raping and trafficking young women, and he's become a hero among these

S E A L E D

incel groups. I did a case in Charlottesville, so I am pretty familiar with how some of these groups work. Tim Pool has a very similar background to the Charlottesville guys. He started out as an Occupy Wall Street protester, and then he moved way to the right. He expresses similar views about black people, which is a problem with this jury, I believe. He expresses virulent misogynist views about women and men who either harass or do worse to women. And again, I'm not -- I don't know what is in this person's head, but he's obviously not a very sophisticated guy, and the fact that the one place he can identify that he goes to for his daily news when he listens to news is this really virulently extremist podcast is of great concern to us as a matter of for cause challenge. Obviously, had we known, we would have struck him if we heard him correctly.

MR. MATZ: One other point, which is, your Honor asked about his listening habits in the last six months, and he said, well, recently he's had to listen a bit less because he's been busy at work. The record that we have tried to assemble over night before the Court about what one would encounter if you listened to this podcast over the last couple of years shows that there is this clear, consistent, sustained focus on almost every major issue on which the Court sought to *voir dire* the jury during the jury selection process, and although he may have reason to have listened to it less recently, I think the

S E A L E D

fact that he has identified only a single source from which he gets news, like, at all is a sufficient reason to have substantial concern about whether his answers to the other *voir dire* questions were accurate and whether he in fact can decide this case fairly or impartially.

MR. TACOPINA: Your Honor.

THE COURT: Over to you.

MR. TACOPINA: Your Honor, look. I think, quite. Frankly, this juror is being incredibly candid and honest. First of all, he disclosed the fact that he listened to what we all thought was Temple but now is Tim Pool. And if he were trying to hide that or had some agenda here, he would never have done that.

You also asked him whether the election, anyone, not him, if anyone thought the election was stolen. He clearly did not say he thought it was. I think what you have here is an individual, and maybe I think Ms. Kaplan is right, not very sophisticated, but I think sort of credible and apparently seems like just a hard-working, nice fellow who basically is saying, in his receiving of the content, whether you found all these other things, he sees it as from the right, from the left, and some celebrities.

You know, he said he only listened to it three or four times in the last six months. He had never heard of this case. You know, he says the news comes from the middle, sometimes the

S E A L E D

right, sometimes from the left. He remembers only one thing specifically on the Tim Pool podcast, which was transgender kids, some issue in school about transgender kids, but nothing about sexual -- as the Court rightfully asked about sexual harassment or sex lawsuits at all.

And he said he could be fair and impartial, above all. I think that's a very candid response from a juror who was brought in here, who had initially disclosed something, you know, if he wanted to be on this jury as a stealth juror and had an agenda, he have said just podcasts in general. He disclosed it and he told you, most important, whatever you can find over the last several years on this guy, who I have never heard of before and I would never go on a website like, that his takeaway, his belief is that it is just political stuff from the right and from the left and sometimes he has celebrities on, whatever that means. And more importantly, he only listened to it three or four times in the last six months. He is working doubles. He just seemed very credible, without an agenda, and he just assured the Court again, despite who or what he listens to, he can be fair and impartial.

Now, the Court has already instructed the jury in general about not listening to media and whatnot about this case. I have no problem if the Court wants to instruct him not to listen to podcasts, political podcasts during the pendency of this case, which won't be much longer, but I just don't

S E A L E D

think that there is anything on this record that would cause us to remove him in the middle of the trial because at the end of the day, answering all of the questions candidly, he said, I could be fair and impartial.

MR. MATZ: Your Honor, just one further point? I think what I am struggling with here is he has identified only a single news source, despite multiple chances to identify others. He may subjectively believe that it is the left, the right, or the center. No objective observer in the world believes that to be the case. And my concern is that this is analogous to saying to somebody what news do you listen to in a race discrimination case, and they say, you know, David Duke, but only a few times in the last few months, but I don't get my news from anywhere else. And what we are being asked to credit here is the idea that he does not share the beliefs or have any feelings about the beliefs that are the overriding message of the only place from which he apparently gets news, despite the fact that your Honor asked many questions that ought to have evoked some reaction, I would think, on the topic.

And so it seems hard to -- I'm struggling to swallow the idea that he is only getting news from one source with a pronounced, consistent, relentless point of view on many issues at the heart of the *voir dire* in this case and yet we are being asked to believe that he hears it and it washes through him and leaves nothing in its wake.

S E A L E D

MR. TACOPINA: You say washing through. He says -- his intake of that content is that it is from the right, the left, and some celebrities. He doesn't say -- whatever they say just washes through, I don't know this person and I'm going to accept your word that he is one of these, you know, crazies out there, perhaps, but I don't know him. But I'm looking at one post. He said: "I don't care about 30-year-old allegations against Biden, Trump, or Cavanaugh." So he here he seems to be also supporting the lack of credibility against allegations against Joe Biden, as well. Again, I don't want to get into --

THE COURT: I don't know how that helps.

MR. MATZ: He is saying he doesn't believe women who make old allegations of sexual assault, which is the key issue in this case.

MR. TACOPINA: Well, you know, I don't know if that -- it may have to do with what happened in this podcast, but I think we can only go on this juror's answers here.

THE COURT: Well --

MR. TACOPINA: And did he say, your Honor, in the transcript -- what did -- can you read that part again, what he responded to when you asked about where he gets his news from?

MR. MATZ: Do you mean the original one or do you mean--

MR. TACOPINA: Yeah, the original one.

S E A L E D

MR. MATZ: I would think that someone who has an algorithm linked to this guy is not going to be turning up *The Rachel Maddow Show*.

THE COURT: All right. Let's hold it.

You remember the way in which this was all introduced. I gave a list of questions to all of them in writing, the last of which was where you get your news, in substance, and when we got to No. 77, he didn't need to be prompted. He said he was "31, security, live in the Bronx all my life, no kids that I know of" -- and he made a little joke -- "news basically I tend to avoid, but every now and then podcasts, mainly independent like Temple or evening news."

Now, that's -- I'm sorry. After "Temple" I jumped to the wrong page. "Temple or some other people like that. Any questions?" And I said, "No, thank you."

MR. TACOPINA: Your Honor, I will just point out one thing. The next question you asked, "Have you ever belonged or consider yourself to be a supporter of any of the following groups," and you went on to list a bunch of them.

THE COURT: That was not the next question. I did ask that question.

MR. TACOPINA: I'm just going on the trial --

THE COURT: I know what you are referring to.

MR. TACOPINA: Sorry, yeah. I don't have the transcript in front of me. I'm just going off the letter. But

SEALED

one of the questions, and he obviously did not --

THE COURT: Correct.

MR. TACOPINA: Okay.

THE COURT: Correct. I'm very well aware of that.

My tentative view, and I want to give this some more thought, is that we ought to proceed as follows: We will pick up where we left off yesterday afternoon, I will instruct the jury again at the beginning that they are not to discuss the case with each other until they go back to deliberate. So he will continue for the moment on the jury.

Both sides make a lot of sense about this problem, both sides. If the plaintiff wishes to make a motion to do something, we will set a quick schedule for that, and then I will get the benefit of learning from both sides. And in connection with doing that, where are we in terms of likely trial duration of what remains?

MR. TACOPINA: So Mike told me that he's got another maybe an hour, more or less, on direct. We compared outlines. His outline is 100 pages. Mine is -- after the Court's ruling, is significantly less, so I'm in the 90-page range. What that means, from my experience, your Honor, is it really, you know, it just depends on how often I have to impeach. Because I will tell you this, and this is no secret, every question I am going to ask is sourced. So, in other words, if the witness doesn't agree to something, I will impeach either way.

S E A L E D

And what I'm going to do to shorten this up, initially I was going to play a deposition video for every impeachment. I'm going to use that selectively and mostly go with transcript, which I will provide the Court every -- you will have every document I may use to impeach before I get up there. But I anticipate not finishing today with her but on Monday. Are we sitting Monday? Yes, Monday. Then I think the rest of the witnesses, because I know who they are, are relatively brief.

MS. KAPLAN: The only other witness, your Honor, that is, you know, maybe two hours on direct is our psychological expert, Dr. Lebowitz, but I agree with Mr. Tacopina that I think the other jurors are more similar --

THE COURT: Witnesses.

MS. KAPLAN: Witnesses, excuse me, are more similar to the Bergdorf witness, maybe a little longer, but that range of testimony.

THE COURT: So you are saying we are going to wind up resting, both sides, when?

MR. TACOPINA: Either the end of next week or the beginning of the following week.

MS. KAPLAN: That was our estimation last night at the office, your Honor.

MR. TACOPINA: It really depends, your Honor, I'm sorry to interrupt, but it depends on how long my cross goes.

S E A L E D

And I am not asking one question twice. I am more than happy if you ever want to have a review of my outline, it just really depends on how much I have to impeach, how much --

THE COURT: Got it.

MS. KAPLAN: As long as we are here any word on Dr. Nace?

MR. TACOPINA: He is -- do you know what happened?

THE COURT: No. I remember that there was something that was happening.

MR. TACOPINA: No, this has got worse. We got an e-mail on Friday, literally Friday, that he now has pancreatic cancer.

THE COURT: I remember being told that.

MR. TACOPINA: You do, okay, which is something that he just found out on Thursday apparently, and apparently it is advanced. So our expert witness is, you know, right now up in the air. It's in limbo.

THE COURT: He was deposed, right?

MR. TACOPINA: Yes, he was deposed. And then Robbie made a very nice suggestion where she said that if we had to, she would send one of the lawyers out to do a video, we would send one of ours, do a direct, and they can do a cross live on video and then we can play it. As long as he is, you know, okay. We are getting daily updates. He is in trouble, apparently, so I don't know where we are going to wind up with

this.

THE COURT: Where is he physically?

MR. SEIGEL: Texas.

MS. KAPLAN: Dallas.

THE COURT: Dallas.

MR. SEIGEL: Yes.

THE COURT: So he is presumably someplace where he is getting some advanced care.

MR. TACOPINA: He is.

THE COURT: So let's talk about a schedule for dealing with this matter. Are you going to make a motion?

MS. KAPLAN: We are, your Honor.

THE COURT: Propose a schedule.

MS. KAPLAN: I'm looking at my team. Monday morning?

MR. MATZ: I don't think any of our colleagues slept last night.

MR. TACOPINA: Join the club.

MS. KAPLAN: Is first thing Monday morning fast enough, your Honor or we could even do it over the weekend. I just want to give them a little bit of sleep tonight.

THE COURT: Well, you know, I look around the courtroom, and I think a lot of people need a little sleep.

MR. TACOPINA: As he looked right at me in my eyes.

THE COURT: You are getting more sleep than anybody.

MR. TACOPINA: Trust me.

S E A L E D

THE COURT: I can tell you. How does Monday work with you if they get it to you?

MR. TACOPINA: Fine, whatever.

THE COURT: So when do you respond to that?

MR. TACOPINA: Tuesday morning.

THE COURT: Okay.

MR. TACOPINA: Because we will in court all day Monday.

MS. KAPLAN: If we can endeavor to get it earlier on Sunday, we will, your Honor, so they have more time.

THE COURT: I appreciate that. I'm sure Mr. Tacopina does, too.

Now, if this case winds up by next Thursday, this doesn't give me any time. I am viewing it—and if anybody disagrees, you tell me—that as long as I decide the question relating to the juror before the jury starts to deliberate, it's time enough. Everybody agrees?

MR. TACOPINA: Yes.

THE COURT: The only thing we are dealing with I'm assuming—tell me if I am wrong—is whether to remove him or not.

MS. KAPLAN: Correct.

THE COURT: Yes?

MR. TACOPINA: Yes.

THE COURT: Okay.

S E A L E D

MR. MATZ: Given that your Honor is already instructing them today, I mean reminding them to not talk to each other, maybe reminding them of that again on maybe Monday --

THE COURT: Yeah, sure.

MR. MATZ: -- when they come back.

THE COURT: You can remind me of that, too.

Okay. I think that takes care of this.

I guess there is one other thing. I'm not telegraphing anything one way or the other by suggesting this to you, Mr. Tacopina, but in my very quick scan of the plaintiff's letter before I came down here, or up here, I think I came away with the impression that it's their view that I have pretty broad discretion with respect to this juror at this stage in the proceedings and that possibly—and I'm not even sure about this—possibly the central question for me to decide is whether I believe the rest -- I shouldn't say the rest of it, that's just too broad—whether I'm satisfied ultimately that his answer that he could be fair and impartial to both sides is credible to me. Anybody have a different view of that?

MR. TACOPINA: No.

MS. KAPLAN: No, your Honor.

THE COURT: Okay. I'm really not telegraphing one way or another.

SEALED

Okay. Update on Mr. Trump.

MR. TACOPINA: So there is that, which means I have to speak. . .

THE COURT: In fairness, before I ask you to answer that, again, I'm not telegraphing anything, I'm really not, but I am thinking further about the Rule 32(a)(6) question that I ruled on yesterday or the day before, and I may stay right where I am and I may change my mind.

MR. TACOPINA: Okay.

THE COURT: Now, that said, any update on Trump?

MR. TACOPINA: It's my current intention that I don't intend on calling him, okay? And your Honor, trust me when I am looking you dead square in the eye and trying to be as candid as possible when I tell you this --

THE COURT: Of course.

MR. TACOPINA: -- that that's my current intention. So that's -- I have been complete with them, too. I mean, I'm not going to -- I won't play games with them. It's not what this is about. It's about just dealing with my situation here, this matter and the client's --

THE COURT: I totally understand that problem. I do. At least I think I do.

MR. TACOPINA: Really? Because I think --

MS. KAPLAN: And I should say, Mr. Tacopina this morning graciously informed us that Mr. Trump is taking down

S E A L E D

both --

MR. TACOPINA: Yeah, I spoke -- I did that last night. I had those --

THE COURT: Well, good for you.

MR. TACOPINA: -- conversations last night. Yes, that will not be a recurring issue.

MS. KAPLAN: Of course, your Honor, all the things we said about the schedule are presuming that Mr. Trump is not testifying. That changes the game, obviously.

THE COURT: Without giving you an absolute deadline, which I'm not going to do, Mr. Tacopina, if there is going to be a change of mind --

MR. TACOPINA: Yes, I will give you --

THE COURT: -- it better be fast --

MR. TACOPINA: I understand.

THE COURT: -- relatively speaking, and I meant what I said in the order that I before I started. This is going to go from one witness to the next without I need a day off to get Mr. Trump here or whatever. If he is going to come, he's got to be ready to go.

MR. TACOPINA: Can you not pick up your books yet?

THE COURT: Oh, you have something else?

MR. TACOPINA: I saw you getting ready to leave.

There are two things. Mike gave me something -- Mr. Ferrara gave me something this morning about the cross, and

S E A L E D

it leads me -- and I wanted to front it with the Court, but it leads me to something from yesterday.

I just want to tell your Honor that I regret making a request to impeach the witness with her book where she said the cause of the fight with her husband was what she had called him. And I read the transcript last night, and you were right. You know, you were completely right, and I would withdraw the request, even though you overruled it anyway, but for the record I would withdraw that request. Because sometimes zealous advocacy, I think, clouds the judgment. I think that's what happened yesterday with me, and I apologize.

THE COURT: I appreciate that very much.

MS. KAPLAN: Me, too.

THE COURT: Mr. Ferrara gave me this. Ms. Carroll wrote this article entitled "The Return of the White Negro" and asked if I intended on using it, and the answer to that question is absolutely not.

MS. KAPLAN: Thank you, Mr. Tacopina.

MR. TACOPINA: And that's just what I wanted to say.

THE COURT: I appreciate it.

MR. TACOPINA: It bothered me yesterday.

THE COURT: Well, you know, it speaks very well of you. Thank you.

MR. TACOPINA: Thank you, your Honor.

THE COURT: Okay. I will be out in a couple of

S E A L E D

minutes.

MS. KAPLAN: Thank you, your Honor.

(Recess)

S E A L E D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

Plaintiff,

v.

DONALD J. TRUMP,

Defendant.
------------------------------x

New York, N.Y.

22 Civ.10016 (LAK)

Jury Trial

May 1, 2023
9:30 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge
and a Jury

APPEARANCES

KAPLAN HECKER & FINK LLP
Attorneys for Plaintiff
BY: ROBERTA A. KAPLAN
MICHAEL J. FERRARA
SHAWN G. CROWLEY
MATTHEW J. CRAIG

TACOPINA SEIGEL & DeOREO
Attorneys for Defendant
BY: JOSEPH TACOPINA
CHAD D. SEIGEL
MATTHEW G. DeOREO

HABBA MADAIO & ASSOCIATES, LLP
Attorneys for Defendant
BY: ALINA HABBA
MICHAEL T. MADAIO

W. PERRY BRANDT
Attorney for Defendant

S E A L E D

(Trial resumed; in the robing room)

THE COURT: First of all, I assume you still want this under seal?

MS. KAPLAN: This is about the juror, your Honor?

THE COURT: In part and in part about something else that came up in the sealed conference previously, which was the rulings on the deposition designations.

MS. KAPLAN: Yes, we would like it to be sealed.

MR. TACOPINA: Sure.

THE COURT: I have given a great deal of thought once again to the rulings on the deposition designations. I'm not altering the rulings.

MR. TACOPINA: Not altering the rulings, he said.

THE COURT: Yes. If anything, I'm surer that they were right than when I issued the initial order.

Secondly, I have given a lot of thought to Juror No. 77 in the course of the weekend. I can see further *voir dire* that might be helpful where he is concerned. I can also see the remote possibility that if you guys devote some thought and attention to what ought to be done in this circumstance, you might can conceivably -- I don't say likely, but you might conceivably come to some commonly acceptable solution. I don't know what that is, but I offer it to you. And so I will not do any additional *voir dire*, if I do any at all, before 2:00, but I would like a progress report at 2:00.

S E A L E D

MR. TACOPINA: Your Honor, could we -- we do intend on submitting a response to Robbie's --

THE COURT: You told me that would be by tomorrow.

MR. TACOPINA: Yes. We will get it to you by tomorrow morning. Could we wait until you get that before we do additional *voir dire*? Because I think there might be some relevant facts in that that might help.

THE COURT: Well, tell me, I know we went through this on Thursday, but tell me what the prospects of this case winding up this week is.

MR. TACOPINA: Robbie? What do you think?

MS. KAPLAN: It really depends on today.

MR. TACOPINA: So I think, your Honor -- I spent a lot of time this weekend really trying to condense a lot of the cross and really streamline it. Now, in all fairness to them, I told them I would be most of the day with Ms. Carroll and then maybe one other witness. I know they have another witness ready. I didn't indicate to them that there would be any likelihood that there would be a second witness. So if that happens, that's really -- I don't want them to be responsible for not having a witness ready, because we basically discussed it on Friday and I told them I would be most of the day with Ms. Carroll and then they would have one more witness.

I don't think -- I definitely think we will get to Ms. Birnbach. That's the next witness, your Honor. But a lot

SEALED

of the crosses after this -- this is obviously the bulk. A lot of them are going to be much shorter. Even some of the propensity witnesses, they will be much shorter. So I think -- how many witnesses do you have left?

MS. KAPLAN: Assuming that this is -- kind of what you said is consistent with what you said on Friday. Assuming -- I think the real issue is Nace. I think we could be done on Thursday with our case on the Court's schedule, but I don't know whether Nace's testimony --

MR. TACOPINA: Nace is still very much up in the air because of this chemotherapy thing. We are not going to seek any relief. Okay? Either he is able to testify or he is not able to testify. And if he is not able to testify, we will do the best we can do on cross of your witness and try and get out the points we were going to bring out on the cross. So we are not going to delay the trial. We are not going to ask for additional time next week for him. So either he is ready to go when you are done, either Thursday or Monday, and we are in daily communication with him and his doctor, actually. It's a really horrible situation. This guy a week ago was completely fine, and -- or, yeah, and now he doesn't have much time left apparently, which is -- and his wife --

MS. KAPLAN: It's terrible for his wife. His wife is on dialysis.

THE COURT: It is terrible, and I remember a similar

S E A L E D

situation arose with respect to one of my close friends on the court years ago, and he went from beach vacation to dead in no time.

MS. CROWLEY: Do you think -- when you say he will be ready to go, does that mean here or remotely?

MR. TACOPINA: Again, that's -- actually, believe it or not, he is saying if I can get through this week, I can come there.

MS. CROWLEY: Okay.

MR. TACOPINA: I know the alternative was we would do remotely and you would send someone there to examine him and we can do it on video.

MS. KAPLAN: Your Honor, just so you know, I don't think the deposition works because we asked -- they didn't ask any questions and we asked all the questions. So I don't think it would work to put him on by direct on a deposition video.

MR. TACOPINA: We'll work it out.

THE COURT: That's counsel call.

MR. TACOPINA: We'll work it out. We'll work it out. I don't -- let's not yet.

And then, your Honor, my intention today—we are under seal here anyway—just for scheduling purposes, is I'm not calling the defendant.

THE COURT: And I can bank on that?

MR. TACOPINA: So, your Honor --

SEALED

THE COURT: I withdraw the question. It is what it is.

MR. TACOPINA: Your Honor, I'm almost certain you could bank on that.

THE COURT: I read online that he is actually doing appearances in Ireland and Scotland this week.

MR. TACOPINA: Hmm.

MS. KAPLAN: He posted that yesterday, that he is going to Scotland.

MR. TACOPINA: What else did he post this weekend that I need to know. Robbie called me this weekend. There is a post. Okay. We dealt with it amongst ourselves very quickly. So that's basically -- one day when you are not here doing that, we will have a chat.

MS. KAPLAN: Just to be clear, I'm not on Truth Social. People tell me about that.

MR. TACOPINA: You sure?

MS. KAPLAN: I'm quite positive.

MS. CROWLEY: Judge, in terms of the a charge conference, I don't know if you have given any thought to it.

THE COURT: Gee, what do you think?

MR. TACOPINA: One thing I have to tell you, I have to interrupt you, because I'm losing my focus talking to you. Your cufflink is backwards on that side but not the other side, and it bothered me.

SEALED

THE COURT: Mr. Tacopina, thank you very much. This is the hazard of getting dressed in a hurry, you know? So I think I can manage this one.

MR. TACOPINA: Would you like help?

THE COURT: No, thank you. It's very kind of you to offer to help with my haberdashery, but there it is. Good.

MR. TACOPINA: So the issue that you said you had that kept me awake all last week was the Rule 32 basically, because we got an e-mail from Andrew, Andy, saying the judge has an issue he wants to discuss at 9:30. Was that the Rule 32?

THE COURT: Well, it was two things. It's what I raised with you.

MR. TACOPINA: Okay.

THE COURT: It's what I raised with you.

MS. CROWLEY: And just, sorry, to be clear on schedule for today, so based on Mr. Tacopina's estimate of how long he intends to cross Ms. Carroll, we have Lisa Birnbach here ready to testify. Our next three witnesses are traveling from out of town, and they are not -- they are getting in today, so we will have Birnbach and then no one else after that for today.

MR. TACOPINA: Yeah. What happens if this part of the cross is -- a lot of it is taken out, and of course the litigation finance is all out, so that was a nice chunk of it. But there is going to be some snippets of podcasts play, I identified for Mike and we gave it to them on Thursday, the

S E A L E D

Anderson Cooper video, the part we --

MS. KAPLAN: We talked about it.

MR. TACOPINA: A little thing she did.

And that's all for the -- I'll show her some of the articles, E. Jean articles that you guys brought up. So I don't think -- I mean, I will definitely go through lunch and probably a little after lunch.

And then how long is Lisa Birnbaum?

MS. CROWLEY: About an hour on direct --

MR. TACOPINA: Oh, yeah?

MS. CROWLEY: -- a little less than that.

MR. TACOPINA: Oh, well, then we are okay.

MS. KAPLAN: The one thing we could do if there is extra time at the end of the day, your Honor, because we didn't make any changes to the designations, we could probably play the Trump video, which is 40-ish minutes.

THE COURT: Getting back to the bottom line, is there a chance that everybody will rest this week or not?

MS. KAPLAN: I think so.

MR. TACOPINA: I think so.

THE COURT: Yes?

MR. TACOPINA: Monday, Tuesday, Wednesday, Thursday. You have directs.

MS. KAPLAN: All the directs are short other than Dr. Lebowitz, who is probably about an hour and a half.

S E A L E D

MS. CROWLEY: And our other expert will be about the same.

MR. TACOPINA: Oh, really the reputational will be that long?

MS. CROWLEY: Hour, hour and a half.

MR. TACOPINA: Okay. I don't think we are going to have many questions for her.

THE COURT: Obviously, this is just an indication, it is not binding at all. Any idea how long closings will be? Plaintiff first and last. You understand that, right? That's the way I do it.

MR. TACOPINA: First and last. They get a rebuttal even in a civil case? Are you open for discussion on that or --

THE COURT: No, no. I have done that for 28 years.

MR. TACOPINA: Even in civil matters.

THE COURT: Always.

MS. KAPLAN: I think we are a little bit over two hours for the initial closing, and then maybe 45 minutes on rebuttal, something like that, your Honor.

THE COURT: How about you, Mr. Tacopina?

MR. TACOPINA: It's a little early.

(Counsel confer)

MR. TACOPINA: Maybe two and a half.

THE COURT: Okay. So it's a whole day.

S E A L E D

MR. TACOPINA: That would probably be Monday, I would assume.

THE COURT: Probably, but no guarantees.

MR. TACOPINA: Oh, no, no.

THE COURT: I don't know where we are.

MR. TACOPINA: I'm saying if we are saying we rest this week, we could get there. We still have to have the charge conference.

THE COURT: I don't really expect the charge conference to be very controversial.

MS. KAPLAN: I keep saying that.

MR. TACOPINA: I don't either.

MS. KAPLAN: I don't think it's that complicated.

MR. TACOPINA: Right.

THE COURT: Okay.

MR. TACOPINA: Your Honor -- wait, Robbie. It's really more with Mike. Mike and I were talking with Shawn, you know, this issue. Your Honor, there has to be a correction to the record. We worked out a stipulation amongst ourselves this weekend. Ms. Carroll testified that she gave us the diaries. We don't have the diaries. Robbie and Shawn and us, we worked out a stipulation that's very fair. I think Mike wanted an instruction from the Court, though, because she had indicated she gave the diaries to us. She didn't. Not suggesting she was misleading anyone by saying she gave them to us. She

S E A L E D

probably thought --

MS. KAPLAN: She gave them to us.

MR. TACOPINA: -- you gave them to us. So Mike has some language, so we might just have to do one thing before --

THE COURT: Before you excuse her.

MR. TACOPINA: Before we excuse her, exactly. We could do it at any time.

THE COURT: All right. See you in a bit.

(Continued in open court)

(Trial resumed; In robing room)

THE COURT: I have received the defense submission related to Juror 77 and I have concluded the prudent thing at the moment is probably to ask him a few more questions.

MR. TACOPINA: OK.

THE COURT: In the absence of any objection to that, I will bring him in and it will be short.

MS. KAPLAN: We had two suggestions, your Honor.

THE COURT: Yes.

MS. KAPLAN: One is how did he come to, what brought him to --

THE COURT: That's question 1 on the list.

MS. KAPLAN: And question 2 is what is the basis for saying that it is moderate.

THE COURT: That's on the list.

MS. KAPLAN: Thank you, Judge.

THE COURT: OK.

THE DEPUTY CLERK: Bringing in 77.

THE COURT: Come on in. Have a seat.

(Juror 77 present)

THE COURT: First of all, I want to say I, at least, have noticed that you are paying absolute attention, taking notes like crazy, and everybody appreciates the fact that you are here and that you are taking it very seriously.

When we talked to you, I guess it was last week, I

hadn't really had enough time myself to think about what I should ask you so there are just a few other questions I wanted to ask you. The first question is: When and how did you first learn about Tim Pool and his podcast?

JUROR: When I was working at my job, before they switched the rules about the cell phone stuff.

THE COURT: I'm sorry. What?

JUROR: Before they switched the rules on cell phones.

THE COURT: Oh, OK. There was a period when you worked --

JUROR: Right.

THE COURT: -- when you could have your cell phones.

JUROR: So you could leave on radio or podcast, and I didn't pay attention, just let it run, and so it went to news and went to Tim pool's podcast.

THE COURT: How did you come to pick out his?

JUROR: Kind of like favored him because he is independent, he looks at both sides.

THE COURT: Well, before you picked him out, how did you know that about him?

JUROR: Basically listened in the background at the desk. Because the -- when I have the phone on the table it autoplays. I am at the computer, it is about 7:00 in the morning, paying attention to it, he is talking about the whole politics, you know. He is independent. Well, he is liberal,

but he does bring a guest so you hear, like, people talking about the different policies and stuff like that, some common ground in the middle. That's the thing that draw me.

THE COURT: Before the first time you ever turned it on, how did you know he even existed?

JUROR: It was right there, the autoplay, like --

THE COURT: I see. Let me see if I understand what you just said -- and it is me, it is not you.

You had your phone on the desk and you had it autoplaying some category of stuff; is that right?

JUROR: Yes.

THE COURT: And at some point, not because you picked it out but because the Tim Pool podcast came on, you heard him; is that right?

JUROR: Yes.

THE COURT: Then, after that when you listened, did you listen because he simply came on another time or were there times when you picked him to listen to?

JUROR: Just basically scrolled by, see something interesting like an article about -- what was it at the time -- Second Amendment stuff. What was the other stuff? Second Amendment, something else he said, I don't remember what it was, I think it was a journalist company, something like that. How independent -- basically, if you work at a company as a journalist, there are certain rules you have to apply to and

you are not allowed to -- because he used to be part of was it Vice Media or something like that?

THE COURT: Part of what?

JUROR: Vice Media.

THE COURT: Vice Media.

THE WITNESS: Yes, some organization.

THE COURT: I see.

JUROR: Basically, he said there were some things you couldn't cover. Like, true journalism is independent; you go out, see the stuff, and you compare the facts, and that's pretty much it.

THE COURT: And you said you saw an article, yes?

JUROR: On Tim Pool?

THE COURT: Oh no. I asked how you first got to listen to him you said an article.

JUROR: The second time when I picked it, I scrolled by and saw something interesting about the journalists.

THE COURT: What was you were scrolling by? A podcast or a website, for example?

JUROR: Oh. YouTube, the front page.

THE COURT: The front page of YouTube.

JUROR: It is right there before they updated the site. I don't know how it is now.

THE COURT: Have you ever visited the Tim Pool website?

JUROR: No.

THE COURT: Does he have anything, besides the YouTube channel, that you are aware of?

JUROR: I know he has a site but I never been to his site. I think it is a subscription, I believe.

THE COURT: Have you ever read anything about Tim Pool other than the fact that you have listened to his podcast?

JUROR: Oh, like an article? No.

THE COURT: No.

When you have the podcast on and Tim Pool is on, are you listening to it, or are you listening and watching, or are you doing some of both?

JUROR: Listening and interacting with whatever I am doing at the moment.

THE COURT: OK. Now, you said you are in security, can you just elaborate a little? Don't tell us an employer, but what kind of operation do you work for?

JUROR: Corporate, I guess, is the right way to say it.

THE COURT: So you are in some facility; is that right?

JUROR: Yes, yes.

THE COURT: And you have certain posts for certain hours? Is that the way it works?

JUROR: Yes. At that time I was desk role, only desk,

checking e-mails every hour. Fast-forward now, I am a rover which is going through the floors, checking to see everything is --

THE COURT: OK. I got it. Can you remember anything about the types of things you have listened to on his podcast in the last six, seven months?

JUROR: The trans schoolkids.

THE COURT: Meaning transgender?

JUROR: Yeah. Kids are too young. Basically, wait until they're 18, 21 when they are adults before they make that decision. You know, it is life-altering, you can't go back once you do that. And the other one was the school shooting one, Second Amendments, people want to repel the Constitution. Stuff like that.

THE COURT: Anything else you can remember?

JUROR: That's about the last two ones. There was one with the drag queen story. Yeah, it is satire, but people don't know satire nowadays.

THE COURT: People don't know satire nowadays.

JUROR: Yeah.

MR. TACOPINA: There is a book by Robert Swift.

MS. KAPLAN: Jackie Roberts.

THE COURT: I have somebody in mind, but.

You said the last time we talked to you that he was kind of in the middle or independent, and that he had left

things and right things and balanced things. Can you give us a couple of examples of balanced subjects that you have heard?

JUROR: I mean, I don't agree on some things but he does make a point about people's decision to their bodies. You know, if you are on dope, you choose what you do with it, you know. If you can pass certain, like, tests, then you should go for it.

THE COURT: If you can what?

JUROR: Basically, let's say you want the right to carry, right? If you pass the qualifications, then you should be able to go for it if you want it. You shouldn't be not -- banned because the state you live doesn't favor it even if you pass the test. Basically -- it is not making sense -- if you can pass the ability to carry a firearm, then go for it. But then, there are certain areas of New York that don't favor people who carry, even if you are legally stable, safe, not a -- how can I say it?

THE COURT: Not a convicted criminal.

JUROR: That, or unstable. Like, if you can pass it, go for it. Just, you know, because you did the test, you have proven that you are eligible or granted. Same thing as driving a car.

THE COURT: Driving a car?

JUROR: Because some people aren't allowed to drive because they don't follow the rules.

THE COURT: There is a certain amount of that in this town.

So that you would call what? Independent? Balanced? Right? Left?

JUROR: Tim Pool says, himself, he is liberal but he is traditional liberal. I mean, I am more in the middle. I believe in some rights, but I believe that you are responsible for your actions. I don't know that that's -- is it conservative? I don't know.

THE COURT: Not for me to say.

JUROR: I don't know. I believe if I do something, I pay for it, you know? That. I mean --

THE COURT: What, if anything, have you heard on his podcast that you thought was right? Not in the sense of correct, but the right end of the political spectrum.

JUROR: I guess his favoring guns, I guess. Because I know supposedly it's not a good thing to have guns in, like, left-leaning areas.

THE COURT: Not a good idea. Is that something that Tim Pool said? Something you heard?

JUROR: No. That's something that most people assume. Like, when you are, like, a democrat, you are not for guns, you see it as something that causes harm. You know? I mean, I see it as just a tool. Like any other thing, you just have to prove that you are qualified to handle it.

THE COURT: And what about anything you heard that you thought was left as opposed to right?

JUROR: The legalization of weed.

THE COURT: The legalization?

JUROR: Of marljuana, weed legalization.

THE COURT: Oh weed. Weed.

JUROR: Yes, that.

THE COURT: And when did you last listen or watch?

JUROR: Last month, I believe. Last month, I believe.

THE COURT: Last month. Do you remember what that one was about?

JUROR: It was the kids thing but not the same one. I don't know. In Florida? DeSantis or something like that with, like, getting rid of certain books. Something about kids are too young for those books.

THE COURT: And you thought that was left why?

JUROR: Huh?

THE COURT: What about that did you think was left?

JUROR: No, I don't think that was left, that's just the last thing I remember.

THE COURT: I see. OK. Thank you. All right.

Does either counsel want to suggest something to me to ask?

MS. KAPLAN: Before the cell phone rule was changed in his office.

THE COURT: All right.

Before the cell phone rule changed with your employer, how often did you listen?

JUROR: To Tim Pool? Maybe for, like, 30 minutes, then afterwards I just kind of fell asleep. So, basically I would call for the rover at the time for a bathroom break, wash up, and get a coffee to stay awake. And that's pretty much it.

THE COURT: Did you listen every day? Or once a week?

JUROR: No. Basically Friday to Saturday. Because usually, while Friday nights are busier because where I work there is a bunch of establishments and I would usually be awake because drunken people, property damage, incident report. It's a headache. But it is just sometimes Fridays, especially during the whole COVID thingy, dead town.

THE COURT: Mr. Tacopina, anything?

MR. TACOPINA: No, your Honor.

THE COURT: Anything else?

MR. FERRARA: No.

MS. KAPLAN: No.

THE COURT: OK. I thank you very much. I am sorry we had to ask you back for these questions but go on back into the jury room.

JUROR: Sorry about that.

THE COURT: Oh, it is not your fault.

(Juror not present)

THE COURT: Any closing thoughts about what to do about him?

MR. TACOPINA: Your Honor, you read our submission. I mean, I don't have it in front of me but I -- look. I think this is a very thorough juror. I agree with you; I was watching him yesterday, he takes notes like I don't think like anyone else on this jury. I think everything he said here does not meet any basis for disqualification. He seems like, you know, not the most sophisticated human being in the world but he is certainly very candid, very honest. You know, he -- as I said in the message, if he were trying to carry an agenda, the last thing he would do is reveal that. But his interpretation of what he heard on there, you know, is what it is. He focused again, he was consistent in what he said to you the other day regarding hearing about transgender kids and school shootings, never visited the Tim Pool website. He is not Tim Pool. Clearly, he is someone who, I don't think, has a bias very -- one way or another, except that if people have qualifications they should be able to carry firearms. Apparently, he got that. He is also not a proponent of the marijuana legalization laws but, again, this is -- I mean, it was an incredibly thorough voir dire of this one juror and there is nothing that he said, I think, that would qualify him to be excused for cause.

So I don't, you know, I just don't think -- based on

what we just heard today, it further solidifies the fact that he is a qualified juror, he will be fair. And, he even apologized about having to bring him back in here as he was leaving. So, it seems he is just a nice person who is taking this seriously. But, that's it.

MS. KAPLAN: Your Honor, our concern continues to be the same. I'm not going to suggest and I don't have any basis to suggest that he is intentionally lying, but the one thing that is clear from the questioning is that the one media source he is able to identify and the one media source he clearly, at some point -- it wasn't very clear -- but listened to frequently at work before they changed the cell phone rule and now listens to at home when he gets dressed for work, etc. is a pretty extremist, somewhat crazy -- excuse my language -- website that exposes him all the time to extremist beliefs. The fact that he can't really, you know, this Tim Pool, as we say in our papers, says he is moderate and balanced, there is nothing moderate or balanced or left wing about what he said on his website.

MR. TACOPINA: He didn't go on website.

MS. KAPLAN: I'm talking about in the podcast -- I apologize, thank you for correcting me -- in the YouTube podcast or video, and our concern is that we don't know what this -- he is listening to it, we don't know what he is absorbing, and given the frequency of anti-women speech and

anti-women views, you know, he started talking about the book banning in Florida. I have a feeling Tim Pool -- we can check -- is a big fan of book banning in Florida. It is of great concern to us that we just don't know what he is absorbing and he sees, incorrectly sees this very extremist site as being a source of balanced left and right news, which it most assuredly is not.

MR. TACOPINA: He didn't mention anything about hearing about book banning in Florida. He has listened to this three or four times over the last six months.

THE COURT: He did say something about book banning in Florida as being one of the subjects.

MR. TACOPINA: Oh. I didn't hear that.

THE COURT: I think this was a very responsible challenge. It is documented about as well as it could be given the nature of the juror and a kind of indefinite substance of what he had to say. I'm not saying that he was being dishonest but it was indefinite, in some respects. I think the case that's essentially right on the money is Judge Calabresi's opinion for the Second Circuit in *United States v. Torres*, and my conclusion here is that the record before me, as a matter of law, is not sufficient to push the question of removing this juror for cause as a matter of discretion on my part. I don't think I get to the point where I have discretion to let him go. I understand the concerns, they're real concerns, it's right to

raise them, but as a matter of law I don't think I have enough, even assuming that I would be inclined to exercise discretion in that way, as to which I make no suggestion.

MS. KAPLAN: I have an additional thought, your Honor.

So, essentially what has happened here is, to use an analogy from contract law, a case of mutual mistake. No one really -- none of us really heard what he said during voir dire correctly and, as your Honor knows well, often you try to put the parties back into their original position. And I can say, as an officer of the court, for sure we would have struck this individual had we known he said "Tim Pool." So, what we would ask you, as an alternative, your Honor, is give each side an additional strike.

THE COURT: I have thought of that and I don't have the legal authority to do that. I would have given it to you, both of you.

MR. TACOPINA: Yes, sir.

THE COURT: But we have spent a lot of time on this since this came up last week and I don't have the authority to do it.

MS. KAPLAN: I have someone looking at that right now, your Honor, so I have no basis to disagree with you, I have someone looking up case law.

THE COURT: If you think I am wrong, you can come back on that.

MS. KAPLAN: We will let you know.

THE COURT: But, we have looked at it.

Anything else?

MR. TACOPINA: No, your Honor.

MR. FERRARA: Two unrelated issues, your Honor.

One is on this episode of SVU that came in yesterday, the Law & Order episode.

THE COURT: Yes.

MR. FERRARA: We understand that Mr. Tacopina was entitled to ask questions and we understand your Honor's ruling on that. What we are asking for is a limiting instruction to the jury because there is no competent evidence in the record that there ever existed such a television show. The e-mail to Ms. Carroll is hearsay. It is someone purporting to describe a television show. It is not for the truth. Ms. Carroll responded and testified that she had never seen such a show. There is no evidence in the record that such a show existed, so the argument Ms. Carroll modeled her claim after a TV show is improper because there is no such show that is properly in the record. So, we would ask your Honor to instruct the jury that that evidence was used to assess Ms. Carroll's credibility but the e-mail from this unknown person to Ms. Carroll cannot be considered for its truth.

MR. TACOPINA: First of all, she wasn't an unknown person, she was Ms. Carroll's friend, and yes –

THE COURT: But that doesn't change the --

MR. TACOPINA: No, no, no. I just wanted to correct that. It was someone that she had a relationship with, right, it wasn't some lunatic sending her a message.

So, basically what they want to do is say everything that you heard yesterday and was admitted into evidence, ignore it. The e-mail was admitted into evidence, without objection. By the way, we came to side bar, I understand, and they objected to my line of questioning regarding it, but once you overruled that I introduced the e-mail. The e-mail, I think, gets introduced into evidence without limitation, without limiting instructions. They can argue that she claimed she didn't see it but that's a credibility question for the jury, because what she said in that e-mail --

THE COURT: Well --

MR. TACOPINA: -- what she said in the e-mail, your Honor --

THE COURT: Well, all right. Go ahead.

MR. TACOPINA: What she said in the e-mail is that she watched Law & Order, she didn't see that episode, but she heard of the existence of that episode, she testified to yesterday. She wasn't surprised by its existence. Matter of fact, she was shocked that there weren't more of these plots. And I think the fact that she said she has seen one Law & Order -- I don't have the e-mail in front of me, is that it? Can I see it

quickly? She said, I haven't seen it but it happens all the time with Law & Order stories, meaning she watches Law & Order.

THE COURT: That is one thing she might mean. I can think of some others.

MR T: Well, I don't know how she would know that it happened all the time with Law & Order.

THE COURT: It depends what the "it" is.

MR. TACOPINA: Well, the "it" is what?

THE COURT: Law & Order, in my experience, frequently puts on episodes, which I think they have promoted, on occasion, but in any event it would be accurate to say: Snatched from the headlines. They do shows that are based on recent news stories.

MR. TACOPINA: Right. This was pre-existing.

THE COURT: I understand it is pre-existing.

MR. TACOPINA: So anyway, I just don't think there is a need for limiting instruction. They can argue that, that Ms. Carroll said she didn't see it, there is no evidence that she saw it. There is -- aside from the fact that her friend said there was a writer who wrote this and maybe that's the person you told your story to, but there is a Law & Order episode that said this, it is called "Theater of Tricks," 2012. She didn't say anything other than it happens with Law & Order all the time, I'm surprised this sort of plot is not seen more often.

I mean, anyway, this is in evidence.

THE COURT: Look. If you want to brief this in connection with the charge and request a charge I'm not going to stop you but I'm not doing anything now.

MR. FERRARA: The last point, your Honor, is that yesterday when I used a prior consistent statement of Ms. Carroll's on redirect your Honor instructed the jury that it was not for the truth. I think that's -- and I am referring to -- well, I can find it if your Honor wants, it is here, it is at 632, line 24. 632, line 24. Would your Honor like me to read it?

THE COURT: Yes, please.

MR. FERRARA: Members of the jury, what you are about to see, according to counsel, is testimony that the witness gave in January 2023. It is not to be considered for the truth of what she said but the suggestion, as I recall it -- and you will remember and your memory will control -- the suggestion was made in opening statement and on cross-examination that Ms. Carroll came up with the assertion that she hit Mr. Trump with a purse only recently. This is offered to show that plaintiff claims that she said that on January 31, 2023, at least.

And I think there was another.

THE COURT: There was another and I thought you asked for the instruction.

MR. FERRARA: Sorry. I did, your Honor. And at 634, line 24: You may consider this bit of testimony you are about to be shown for the same purpose as the prior piece, not for the truth of the matter. It is to rebut a suggestion of recent fabrication.

I offered -- I did offer the evidence as a prior consistent statement, but under 801(d)(1)(B) it is defined as non-hearsay. We don't need anything done with respect to the prior instruction but if, to the extent going forward, we would -- our position is that that testimony can be considered for its truth, the prior consistent --

THE COURT: And that matters in this case at this point how?

MR. FERRARA: Well, because we may do this with other witnesses who also made prior statements.

THE COURT: All right. So if that happens with another witness, you need to make your position clear.

MR. FERRARA: Understood, your Honor. I just wanted your Honor to understand, just so we didn't have to do it at side bar.

THE COURT: Look. You know, I am receptive. I hear a good argument, I go with it.

MR. FERRARA: Fair enough.

THE COURT: OK.

MR. TACOPINA: Your Honor, there is one last thing.

I don't know if you remember yesterday we mentioned but we never finalized it, but we have a stipulation about these diaries because Ms. Carroll testified that she gave me the diaries. We don't have the diaries. We have agreed on language, Robbie and I have agreed on something.

MS. KAPLAN: We agree all the time.

MR. TACOPINA: We do agree a lot, Robbie. You and I do agree a lot, surprisingly, and I am not afraid to say I am very fond of you.

So when should we do that? I would have liked to have done it during her testimony. It is not that important, I don't want to slow the process today, but we do have to remember --

THE COURT: Look. It is their case. If they want to do it sometime in their case, no problem.

MR. TACOPINA: OK.

THE COURT: If we get to defense case and it is undone and you want to do it, you will have the opportunity.

MS. KAPLAN: Mr. Tacopina reminded me of something, your Honor, and that is when we get -- another issue, sorry. When we get to the point of Trump video designations, on the things you haven't ruled on yet we understand it is your intention to rule when it is being played?

THE COURT: Remind me what I haven't ruled on yet.

MS. KAPLAN: All the designation part of it is

resolved but I think there is some relevance and other objections that your Honor deferred on.

THE COURT: There were a couple.

MS. KAPLAN: Yes.

THE COURT: There were a couple.

MS. KAPLAN: Yes.

THE COURT: Yes, we will do it when we get to it.

MS. KAPLAN: So we will have the videographer stop it when we get there.

THE COURT: Right; and you will make sure I have a transcript, if I don't already.

MS. KAPLAN: Of course.

MR. TACOPINA: Your Honor, may I have one second to go to the restroom before you ring the bell?

THE COURT: Yes. Of course.

Sealed.

(Continued on next page)