# 23-793

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆-◆

E. JEAN CARROLL,

*Plaintiff-Appellee,*

—against—

DONALD J. TRUMP,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPELLEE'S SUPPLEMENTAL APPENDIX
## [REDACTED VERSION]

JOSHUA MATZ
KATE HARRIS
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

ROBERTA A. KAPLAN
MATTHEW J. CRAIG
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

*Attorneys for Plaintiff-Appellee*

**TABLE OF CONTENTS**

PAGE

*Carroll I*, Plaintiff E. Jean Carroll's Memorandum of Law in Support
  of Omnibus Motion *in Limine*, dated February 16, 2023 . . . . . . . . . . . ASA-1

*Carroll I*, Memorandum of Law in Opposition to Plaintiff's Omnibus
  Motion *in Limine*, dated February 23, 2023 . . . . . . . . . . . . . . . . . . . . ASA-47

*Carroll I*, Memorandum and Order on Plaintiff's *in Limine* Motion,
  dated January 9, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ASA-80

*Carroll I*, Verdict Form, dated January 26, 2024 . . . . . . . . . . . . . . . . . . ASA-107

*Carroll II*, Plaintiff E. Jean Carroll's Reply Memorandum of Law
  in Support of her Omnibus Motion *in Limine*,
  dated March 16, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ASA-109

*Carroll II*, Plaintiff E. Jean Carroll's Memorandum of Law ██████
  ██████████████████████████████████,
  dated April 20, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ASA-124

*Carroll II*, Defendant Donald J. Trump's Memorandum of Law ██
  ███████████████████,
  dated April 24, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ASA-143

*Carroll II*, Letter from Roberta A. Kaplan to the Honorable
  Lewis A. Kaplan, dated April 24, 2023 . . . . . . . . . . . . . . . . . . . . . . . . ASA-164

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

E. JEAN CARROLL,

             *Plaintiff*,

    v.

DONALD J. TRUMP, in his personal capacity,

             *Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

---

**PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN SUPPORT OF OMNIBUS MOTION IN LIMINE**

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**ASA-2**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STANDARD OF REVIEW .................................................................................................. 2

ARGUMENT ........................................................................................................................ 2

   I.  THE COURT SHOULD ADMIT CARROLL'S PRIOR STATEMENTS ABOUT
      THE ATTACK ................................................................................................. 2

   II.  THE COURT SHOULD ADMIT THE TESTIMONY OF STOYNOFF AND LEEDS
      REGARDING THEIR SIMILAR EXPERIENCES WITH TRUMP ............................... 4

      A.  Stoynoff's and Leeds' Testimony About Trump's Sexual Assault Are Admissible
           Under Rule 415 ................................................................................................. 5

      B.  Stoynoff's and Leeds' Testimony About Trump's Sexual Assault Are Admissible
           Under Rule 404(b)(2) as Evidence of Trump's *Modus Operandi* ............................. 9

   III.  THE COURT SHOULD PRECLUDE ROBERT J. FISHER FROM TESTIFYING
       AS A REBUTTAL EXPERT WITNESS ......................................................... 10

       A.  The Court Should Preclude Fisher's Testimony in its Entirety Because His
            Analysis Is Not Reliable ................................................................................. 12

       B.  Each Portion of Fisher's Testimony Should Be Precluded for Further Reasons........ 16

   IV.  THE COURT SHOULD EXCLUDE TESTIMONY OF WITNESSES NOT
       DISCLOSED IN DISCOVERY, TESTIMONY ADDUCING UNDISCLOSED
       INFORMATION, AND COMMENTARY OR TESTIMONY CONCERNING DNA .. 22

       A.  Trump Has Not Disclosed Witnesses Under Rules 26(a)(1) and (e) and Should
            Be Precluded from Calling Them to Support His Defenses ..................................... 24

       B.  Trump Should Be Precluded from Testifying as to Any Undisclosed Information,
            Including Testimony of Undisclosed Witnesses........................................................ 25

       C.  The Court Should Preclude Testimony or Commentary Concerning
            DNA Evidence................................................................................................... 27

   V.  THE COURT SHOULD PRECLUDE INQUIRY INTO A SERIES OF IRRELEVANT
       TOPICS IN CONNECTION WITH STEPHANIE GRISHAM'S TESTIMONY .......... 30

       A.  The Court Should Preclude Cross-Examination or the Presentation of Evidence
            Regarding Grisham's Prior Misdemeanor Convictions............................................. 30

       B.  The Court Should Preclude Cross-Examination of Grisham Regarding an
            Unrelated Lawsuit That Remains Pending ................................................................ 31

**ASA-3**

    C.   The Court Should Preclude the Presentation of Evidence or Cross-Examination of Grisham Regarding Her Past Use of a Pain Reliever ................................................. 33

  VI. THE COURT SHOULD PRECLUDE COMMENTS AND CROSS-EXAMINATION REGARDING CARROLL'S CHOICE OF COUNSEL ................................................. 34

CONCLUSION ................................................................................................................ 35

### TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*523 IP LLC v. CureMD.Com*,
   48 F. Supp. 3d 600 (S.D.N.Y. 2014)..................................................................... 24

*Alaniz v. Zamora-Quezada*,
   591 F.3d 761 (5th Cir. 2009) ............................................................................... 10

*Allen v. Royce*,
   No. 19 Civ. 3672, 2022 WL 125367 (E.D.N.Y. Jan. 13, 2022).............................. 34

*Am. Stock Exch., LLC v. Mopex, Inc.*,
   215 F.R.D. 87 (S.D.N.Y. 2002) ....................................................................... 24, 30

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)................................................................................... 21

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*,
   No. 11 Civ. 505, 2017 WL 715909 (S.D.N.Y. Feb. 10, 2017)................................. 18

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
   No. 98 Civ. 3287, 2000 WL 1805359 (E.D.N.Y. Dec. 11, 2000) ............................ 35

*Boyce v. Weber*,
   No. 19 Civ. 3825, 2021 WL 2821154 (S.D.N.Y. July 7, 2021) ........................ *passim*

*Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*,
   No. 06 Civ. 1584, 2009 WL 10674074 (S.D. Cal. Apr. 1, 2009) ............................ 29

*Capri Sun GmbH v. Am. Beverage Corp.*,
   595 F. Supp. 3d 83 (S.D.N.Y. 2022)................................................................. 17, 18

*Carroll v. Trump*,
   590 F. Supp. 3d 575 (S.D.N.Y. 2022).................................................................... 25

*Carroll v. Trump*,
   No. 22 Civ. 10016, 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023) .............. 27, 28, 30

*City of Almaty, Kazakhstan v. Ablyazov*,
   No. 15 Civ. 5345, 2021 WL 5154110 (S.D.N.Y. Nov. 5, 2021) ............................ 22

*Cordius Tr. v. Kummerfeld*,
   No. 99 Civ. 3200, 2008 WL 113683 (S.D.N.Y. Jan. 10, 2008)............................... 33

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579, 113 S. Ct. 2786 (1993)......................................................... 11, 12, 15

*Davis v. Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013) ........................................................................ 19

*Djangmah v. Falcione*,
    No. 08 Civ. 4027, 2013 WL 6388364 (S.D.N.Y. Dec. 5, 2013) ............................... 30

*Doe v. Lima*,
    No. 14 Civ. 2953, 2020 WL 728813 (S.D.N.Y. Feb. 13, 2020) ............................... 33

*Downey v. Adloox Inc.*,
    No. 16 Civ. 1689, 2018 WL 794592 (S.D.N.Y. Feb. 8, 2018) ................................. 30

*Eidos Display, LLC v. Chi Mei Innolux Corp.*,
    No. 11 Civ. 00201, 2017 WL 2773944 (E.D. Tex. May 26, 2017) ......................... 35

*Engler v. MTD Prod., Inc.*,
    304 F.R.D. 349 (N.D.N.Y. 2015) ...................................................................... 16, 17

*Estate of Jaquez v. Flores*,
    No. 10 Civ. 2881, 2016 WL 1060841 (S.D.N.Y. Mar. 17, 2016) ........................... 30

*Faulkner v. Arista Records LLC*,
    46 F. Supp. 3d 365 (S.D.N.Y. 2014) ................................................................. 14, 21

*Fears v. Keystone Petroleum Transp., LLC*,
    No. 10 Civ. 02789, 2014 WL 11517819 (N.D. Ga. Jan. 17, 2014) ......................... 35

*Gogol v. City of N.Y.*,
    No. 15 Civ. 5703, 2018 WL 4616047 (S.D.N.Y. Sept. 26, 2018) ........................... 32

*Gray v. Lamanna*,
    No. 17 Civ. 6324, 2021 WL 4844536 (E.D.N.Y. Oct. 18, 2021) ........................... 28

*Guidi v. Inter-Cont'l Hotels Corp.*,
    No. 95 Civ. 9006, 2003 WL 1907904 (S.D.N.Y. Apr. 16, 2003) ........................... 29

*Haas v. Delaware & Hudson Ry. Co.*,
    282 F. App'x 84 (2d Cir. 2008) ............................................................................. 29

*Hart v. RCI Hosp. Holdings, Inc.*,
    90 F. Supp. 3d 250 (S.D.N.Y. 2015) ...................................................................... 34

*Hartwig v. JDP, Inc.*,
    No. 19 Civ. 00008, 2021 WL 9440803 (S.D. Iowa Jan. 25, 2021) ......................... 35

*Highland Capital Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) ...................................................................... 2

iv

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14 M.D. 2543, 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) ........................................... 29

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14 M.D. 2543, 2017 WL 2880882 (S.D.N.Y. July 5, 2017) ........................................... 26

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
    No. 00 Civ. 1898, 2008 WL 1971538 (S.D.N.Y. May 7, 2008) ...................................... 12, 19

*In re Mirena IUD Prod. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) ....................................................................................... 15

*In re United States*,
    945 F.3d 616 (2d Cir. 2019) ........................................................................................................ 2

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288, 2005 WL 578109 (S.D.N.Y. Mar. 4, 2005) ............................................... 33

*Jean-Laurent v. Hennessy*,
    840 F. Supp. 2d 529 (E.D.N.Y. 2011) ...................................................................................... 31

*Kellogg v. Nike, Inc.*,
    No. 07 Civ. 70, 2008 WL 4216130 (D. Neb. Sept. 12, 2008) ................................................. 35

*Koppell v. N.Y. State Bd. of Elections*,
    97 F. Supp. 2d 477 (S.D.N.Y. 2000) ........................................................................................ 15

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137, 119 S. Ct. 1167 (1999) ................................................................................. 12, 13

*LaMarca v. United States*,
    31 F. Supp. 2d 110 (E.D.N.Y. 1998) .................................................................................... 16, 21

*Linde v. Arab Bank, PLC*,
    269 F.R.D. 186 (E.D.N.Y. 2010) .............................................................................................. 26

*LinkCo, Inc. v. Fujitsu Ltd.*,
    No. 00 Civ. 7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ............................................ 19

*Lippe v. Bairnco Corp.*,
    99 F. App'x 274 (2d Cir. 2004) ................................................................................................. 12

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003) ............................................................................................ 12, 13

*Luce v. United States*,
    469 U.S. 38, 105 S. Ct. 460 (1984) ............................................................................................. 2

**ASA-7**

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2016) ........................................................................ 15

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   720 F. App'x 24 (2d Cir. 2017) ................................................................................ 15

*Mango v. BuzzFeed, Inc.*,
   316 F. Supp. 3d 811 (S.D.N.Y. 2018) ........................................................................ 2

*Miller UK Ltd. v. Caterpillar, Inc.*,
   No. 10 Civ. 03770, 2015 WL 7351674 (N.D. Ill. Nov. 20, 2015) .......................... 29

*Mitchell v. City of Chicago*,
   862 F.3d 583 (7th Cir. 2017) ................................................................................... 28

*Montanez v. City of Syracuse*,
   No. 16 Civ. 00550, 2019 WL 4328872 (N.D.N.Y. Sept. 12, 2019) ........................ 10

*Nimely v. City of N.Y.*,
   414 F.3d 381 (2d Cir. 2005) .............................................................................. 17, 18

*Palmieri v. Defaria*,
   88 F.3d 136 (2d Cir. 1996) .................................................................................... 2, 4

*Patterson v. Balsamico*,
   440 F.3d 104 (2d Cir. 2006) ................................................................................... 25

*Rapp v. Fowler*,
   No. 20 Civ. 9586, 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022) ............................ 6, 7

*Sadler v. Moran Towing Corp.*,
   No. 01 Civ. 1666, 2002 WL 1977604 (S.D.N.Y. Aug. 28, 2002) .......................... 28

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................................ 11, 13

*Simon v. City of N.Y.*,
   No. 14 Civ. 8391, 2017 WL 57860 (S.D.N.Y. Jan. 5, 2017) ................................. 25

*Smith v. Toyota Motor Corp.*,
   No. 16 Civ. 24, 2018 WL 1806698 (E.D. Mo. Apr. 17, 2018) ............................... 35

*United States v. Araujo*,
   79 F.3d 7 (2d Cir. 1996) ......................................................................................... 10

*United States v. Barnason*,
   852 F. Supp. 2d 367 (S.D.N.Y. 2012) ................................................................... 6, 8

*United States v. Bowen*,
   511 F. Supp. 3d 441 (S.D.N.Y. 2021) ....................................................................... 31

*United States v. Cadet*,
   664 F.3d 27 (2d Cir. 2011) .............................................................................. 9, 10

*United States v. Caracappa*,
   614 F.3d 30 (2d Cir. 2010) .................................................................................... 3

*United States v. Donovan*,
   577 F. Supp. 3d 107 (E.D.N.Y. 2021) ................................................................... 32

*United States v. Flores*,
   945 F.3d 687 (2d Cir. 2019) ............................................................................. 3, 4

*United States v. Gabinskaya*,
   829 F.3d 127 (2d Cir. 2016) ........................................................................ 27, 28

*United States v. Graham*,
   No. 14 Cr. 500, 2015 WL 6161292 (S.D.N.Y. Oct. 20, 2015) ................................. 8

*United States v. Kaufman*,
   No. 19 Cr. 504, 2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021) ................................. 12

*United States v. LaFlam*,
   369 F.3d 153 (2d Cir. 2004) ............................................................................. 9, 10

*United States v. Larson*,
   112 F.3d 600 (2d Cir. 1997) .................................................................................... 8

*United States v. Mohamed*,
   148 F. Supp. 3d 232 (E.D.N.Y. 2015) ..................................................................... 9

*United States v. Moye*,
   793 F. App'x 19 (2d Cir. 2019) .............................................................................. 9

*United States v. Nelson*,
   365 F. Supp. 2d 381 (S.D.N.Y. 2005) .................................................................... 32

*United States v. O'Connor*,
   650 F.3d 839 (2d Cir. 2011) ............................................................................. 3, 4

*United States v. Potapova*,
   800 F. App'x 14 (2d Cir. 2020) ............................................................................ 31

*United States v. Ray*,
   583 F. Supp. 3d 518 (S.D.N.Y. 2022) .................................................................... 15

vii

*United States v. Ray*,
No. 20 Cr. 110, 2022 WL 558146 (S.D.N.Y. Feb. 24, 2022) ................................... 4

*United States v. Roldan-Zapata*,
916 F.2d 795 (2d Cir. 1990) ................................... 8

*United States v. Rutkoske*,
506 F.3d 170 (2d Cir. 2007) ................................... 9

*United States v. Schaffer*,
851 F.3d 166 (2d Cir. 2017) ................................... 6

*United States v. Sliker*,
751 F.2d 477 (2d Cir. 1984) ................................... 9

*United States v. Spoor*,
904 F.3d 141 (2d Cir. 2018) ................................... 6

*United States v. Whitley*,
No. 04 Cr. 1381, 2005 WL 2105535 (S.D.N.Y. Aug. 31, 2005) ........................... 31

*United States v. Whitmore*,
359 F.3d 609 (D.C. Cir. 2004) ................................... 32

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007) ................................... 11, 13, 14, 15

*United States v. Xiong*,
262 F.3d 672 (7th Cir. 2001) ................................... 34

**Statutes**

18 U.S.C. § 2241 ................................... 6

18 U.S.C. § 2242 ................................... 6, 7

18 U.S.C. § 2243 ................................... 6

18 U.S.C. § 2244 ................................... 6, 7

18 U.S.C. § 2246 ................................... 6, 7

A.R.S. § 28-693 ................................... 31

A.R.S. § 28-1381 ................................... 31

**ASA-10**

**Rules**

Fed. R. Civ. P. 26 ............................................................................................ *passim*

Fed. R. Civ. P. 37 ........................................................................ 23, 24, 26, 29

Fed. R. Evid. 401 ................................................................................... 33, 34

Fed. R. Evid. 403 ............................................................................... *passim*

Fed. R. Evid. 404 .................................................................................... 9, 10

Fed. R. Evid. 413 ........................................................................................ 6, 7

Fed. R. Evid. 415 ............................................................................... 5, 6, 7, 8

Fed. R. Evid. 608 ...................................................................... 30, 31, 32, 33

Fed. R. Evid. 609 .................................................................................. 30, 31

Fed. R. Evid. 702 ............................................................................... *passim*

Fed. R. Evid. 801 ......................................................................................... 2, 3

**Other Authorities**

Jose Pagliery, *Trump Says He'll Hand Over His DNA for E. Jean Carroll Case*, Daily Beast
(Feb. 9, 2023) .................................................................................................. 29

Robert J. Fisher, Expert Report, *Am. Society of Home Inspectors v. Int'l Ass'n of Certified
Home Inspectors*, No. 18 Civ. 001559 (D. Colo. May 14, 2020) ............................. 20

Robert J. Fisher, Expert Report, *100+ Animal Rescue, Inc. v. Butkus*, No. 17 Civ. 61893
(S.D. Fla. Feb. 14, 2020) .................................................................................... 20

Robert J. Fisher, Expert Report, *Zinn v. City of Scottsdale*, No. 2:17 Civ. 01813 (Super. Ct.
Ariz., Maricopa Cty. Jan. 16, 2020) ................................................................... 20

ASA-11

**PRELIMINARY STATEMENT**

The central question for the jury is whether Defendant Donald J. Trump lied when he denied sexually assaulting Plaintiff E. Jean Carroll in a Bergdorf Goodman dressing room. This case is not a complicated one, and the Court should make certain straightforward rulings to ensure an efficient and orderly trial.

The Court should first rule on the admissibility of two key parts of Carroll's evidence. It should admit Carroll's prior consistent statements about Trump's attack, which rebut Trump's repeated claim that Carroll fabricated her allegations. The Court should also admit the testimony of two other women whom Trump sexually assaulted in a similar way. Their testimony is admissible because a sexual assault is a "factual premise" of Carroll's claim, and because their testimony evidences Trump's *modus operandi* of forcing himself on nonconsenting women.

The Court should next rule on the inadmissibility of certain of Trump's evidence. It should exclude testimony by Trump's rebuttal expert because he offers only *ipse dixit* opinions regarding Carroll's damages—and also because he fails to respond to the bulk of Carroll's expert's report; dedicates much of his own report to impermissibly drawing legal and factual conclusions; and engages in data-less, conclusion-driven speculation. The Court should also bar Trump from calling previously undisclosed witnesses, as well as from testifying to information that he claims those undisclosed witnesses would provide on his behalf or addressing the issue of DNA evidence.

Finally, the Court should place limits on the prejudicial tactics that Trump has already previewed in this litigation. The Court should preclude Trump from inquiring into a witness's irrelevant and dated misdemeanor convictions, an unrelated pending lawsuit, and her treatment of a serious foot injury. The Court should also preclude Trump and his counsel from distracting the jury from the issues actually in dispute by attacking Carroll's choice of counsel.

1

**ASA-12**

## STANDARD OF REVIEW

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Mango v. BuzzFeed, Inc.*, 316 F. Supp. 3d 811, 812 (S.D.N.Y. 2018) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 463 n.4 (1984)). In ruling on evidentiary issues, trial courts enjoy significant discretion "within the bounds of the Federal Rules of Evidence." *In re United States*, 945 F.3d 616, 630 (2d Cir. 2019).

## ARGUMENT

### I.   THE COURT SHOULD ADMIT CARROLL'S PRIOR STATEMENTS ABOUT THE ATTACK

The core of Trump's defense in this case is that, in connection with her 2019 book, Carroll completely fabricated an account of him sexually assaulting her. But decades before she published her book, and within days of the attack at Bergdorf's, Carroll confided in two close friends—Lisa Birnbach and Carol Martin—that Trump had sexually assaulted her.[1] Those prior statements by Carroll are admissible under Rule 801(d)(1)(B), as the Court should confirm prior to trial.

A prior statement is excluded from the definition of hearsay, and thus permitted as substantive evidence, when that statement is "consistent with the declarant's testimony" and offered "to rebut an express or implied charge that the declarant recently fabricated [her testimony] or acted from a recent improper influence or motive in so testifying." Fed. R. Evid. 801(d)(1)(B);

---

[1] This motion incorporates by reference the factual presentation included in Carroll's opposition to Trump's summary judgment motion and in her Rule 56.1 response. ECF 113, 115.

*see also United States v. Flores*, 945 F.3d 687, 704–05 (2d Cir. 2019). A "prior consistent statement … may be proffered through any witness who has firsthand knowledge of the statement." *United States v. Caracappa*, 614 F.3d 30, 39 (2d Cir. 2010).

Carroll's prior statements to Birnbach and Martin regarding Trump's sexual assault clearly satisfy this Rule. *First*, the statements are consistent: Carroll's testimony at trial about how Trump raped her will match what she told Birnbach and Martin in the days after the attack occurred. Birnbach will testify that Carroll called immediately after leaving Bergdorf's and explained in detail what had happened to her minutes before, from Trump and Carroll's initial banter to his attack in the lingerie dressing room. Ex. 1 ("Birnbach Dep.") at 31:12–32:7, 34:6–39:20. Similarly, Martin will testify that Carroll told Martin that Trump had raped her at Bergdorf's just a day or two after the assault. Ex. 2 ("Martin Dep.") at 27:23–28:18, 32:6–12, 33:25–34:6. Both women will also testify that the account of the rape as described in Carroll's book aligns what she told the two of them at the time. *Id.* at 40:13–19; Birnbach Dep. at 51:25–52:12. *Second*, the statements rebut a charge of recent fabrication: Trump has claimed that Carroll fabricated her sexual assault allegation for a variety of nefarious reasons, including because she was "trying to sell a new book" (which, he has insisted, "should indicate her motivation"). Ex. 3 ("Trump Dep.") at 58:4–60:5; *see also id.* at 88:14–17 (claiming that Carroll "was trying to carry out a political agenda"). Carroll's prior statements are thus admissible under Rule 801(d)(1)(B)(i). *See United States v. O'Connor*, 650 F.3d 839, 862–63 (2d Cir. 2011) (upholding admission of prior statements about sexual abuse where defense claimed that victim had recently fabricated the abuse allegation).

The Court need not wait until trial to make this determination. The Second Circuit has rejected the argument that Rule 801(d)(1)(B) "is applicable only if the declarant's credibility or memory is challenged *during cross examination*." *Flores*, 945 F.3d at 706. Prior consistent

3

statements may be admitted where "it was clear that [the declarant] would be subject to cross-examination," and where the declarant's credibility or memory has been put at issue. *Id.*; *see also O'Connor*, 650 F.3d at 862–63; *United States v. Ray*, No. 20 Cr. 110, 2022 WL 558146, at *5 (S.D.N.Y. Feb. 24, 2022). Here, there is no question that Carroll will be subject to cross-examination, and Trump's statements themselves (not to mention his entire litigation strategy) explicitly call Carroll's credibility into question. The Court should determine now that testimony regarding Carroll's prior consistent statements to Birnbach and Martin are admissible.

## II.   THE COURT SHOULD ADMIT THE TESTIMONY OF STOYNOFF AND LEEDS REGARDING THEIR SIMILAR EXPERIENCES WITH TRUMP

At his deposition, Trump acknowledged past statements in which he boasted about sexually forcing himself on women without consent: "I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything, grab them by the pussy. You can do anything." Trump Dep. at 174:5–10; *see also id.* at 169:8–9. And when pressed on his claim that "you can do anything, grab them by the pussy. You can do anything," Trump doubled down: "Well, historically, that's true with stars." *Id.* at 174:9–13; *see also id.* at 174:20–21 ("Q. And you consider yourself to be a star? A. I think you can say that, yeah.").

It is unsurprising, then, that what happened to Carroll at Bergdorf's was not an isolated act. For this reason, Carroll seeks to admit the testimony of Natasha Stoynoff and Jessica Leeds, who, like Carroll, were sexually assaulted by Trump—and who (also like Carroll) later experienced additional shame and humiliation when Trump publicly denied their accusations and insulted their physical appearance as part of his explanation for why the alleged assault did not occur.

Stoynoff testified at her deposition in this case that Trump sexually assaulted her at Mar-a-Lago in 2005 when she was writing a story for People Magazine about Trump's upcoming one-year wedding anniversary. Ex. 4 ("Stoynoff Dep.") at 14:23–25. During their interview, Trump

led Stoynoff to an empty room, claiming that he wanted to show her a painting. *Id.* at 20:10–15. Once there, Trump closed the door behind them, grabbed Stoynoff's shoulders, pushed her against the wall, and started "kissing and groping [her] without consent." *Id.* at 21:2–8, 38:9–10. Stoynoff pushed him back twice, but Trump stopped attacking her only after a staff member walked in. *Id.* at 21:20–21, 22:3–6. After Stoynoff came forward with her allegations, Trump disparaged her at a rally, denying the attack and saying, "look at her, go take a look at her." *Id.* at 39:14–25.

Leeds testified that sometime around 1979, Trump sexually assaulted her on an airplane. Ex. 5 ("Leeds Dep.") at 17:20–22, 18:10–11. A stewardess unexpectedly invited Leeds to sit in first class in the seat next to Trump. *Id.* at 17:5–15. After they made small talk and finished their meals, Trump suddenly lunged at Leeds. *Id.* at 18:10–11. He tried to kiss her, grabbed her breasts, pulled himself onto her, and started to put his hand up her skirt. *Id.* at 19:3–15. When Leeds realized no one was going to help her, she escaped the seat and went to the back of the plane. *Id.* at 19:16–18. A few years later, when Trump saw her at a charity event, he stated, "you're the cunt from the airplane." *Id.* at 22:4–16. And after Leeds came forward with her allegations, Trump denied them and implied that she too "was not his type." *Id.* at 27:7–12.

### A.    Stoynoff's and Leeds' Testimony About Trump's Sexual Assault Are Admissible Under Rule 415

Stoynoff's and Leeds' accusations against Trump, and his responses denying those accusations, are relevant evidence that he committed additional sexual assaults.

Rule 415 provides that, "[i]n a civil case involving a claim for relief based on a party's alleged sexual assault … , the court may admit evidence that the party committed any other sexual assault." Such evidence "may be considered on any matter to which it is relevant," including a defendant's "propensity to commit the alleged acts," creating an exception to the common law's general prohibition on the use of propensity evidence. *Boyce v. Weber*, No. 19 Civ. 3825, 2021

5

WL 2821154, at *8 (S.D.N.Y. July 7, 2021) (discussing *United States v. Spoor*, 904 F.3d 141, 154 (2d Cir. 2018)). In creating that exception, Congress "considered knowledge that the defendant has committed [sexual assault] on other occasions to be critical in assessing the relative plausibility of sexual assault claims and accurately deciding cases." *Boyce*, 2021 WL 2821154, at *8 (quoting *United States v. Schaffer*, 851 F.3d 166, 178 (2d Cir. 2017)). For evidence to come in under Rule 415, two requirements must be satisfied: (1) the case at hand must be "based on" a "sexual assault," and (2) the conduct alleged by the nonparty accuser must meet the definition of "sexual assault." *United States v. Barnason*, 852 F. Supp. 2d 367, 372 (S.D.N.Y. 2012).

These requirements are both satisfied here. Starting with the first requirement, Carroll's claim against Trump is "based on" a sexual assault. As courts have recognized, the relevant question is "whether an alleged sexual assault constitutes a factual premise of the plaintiff's claim." *Boyce*, 2021 WL 2821154, at *9; *see Barnason*, 852 F. Supp. 2d at 373 (admitting Rule 415 evidence in connection with Fair Housing Act claim). This Court has already recognized that "whether Mr. Trump raped Ms. Carroll is the paramount issue" in this proceeding. ECF 96 at 15.

Turning to the second requirement, there is no doubt that Trump's misconduct toward Carroll, Stoynoff, and Leeds falls within the relevant definition of "sexual assault." That definition comes from Rule 413(d) and covers "'a crime under federal law or under state law … involving' any of five categories of conduct." *Rapp v. Fowler*, No. 20 Civ. 9586, 2022 WL 5243030, *1 (S.D.N.Y. Oct. 6, 2022) (omission in original) (quoting Fed. R. Evid. 413(d)). Of the five proscribed categories, the most directly applicable ones to this case are Rule 413(d)(1) and (d)(2). Rule 413(d)(1) captures "sexual conduct" and "sexual acts" that are criminalized under Chapter 109A, and as defined through 18 U.S.C. §§ 2241–2244, 2246. Separately, Rule 413(d)(2) captures crimes that involve the nonconsensual contact of another person's genitals.

ASA-17

This Court recently analyzed Rule 415 in *Rapp v. Fowler*. There, the plaintiff sought to introduce evidence from two nonparty accusers that the defendant had sexually assaulted them too. One accuser testified that the defendant had touched his leg two inches above his knee for 30 to 45 seconds. Since the incident was "not said to have involved any 'touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks,'" the Court found that the conduct did not qualify as "sexual contact"—as defined in 18 U.S.C. § 2246(3) and for the purposes of Chapter 109A—and therefore did not fall within the meaning of "sexual assault" under Rule 415. The second accuser testified that the defendant grabbed "him by his crotch and lifted him on to a desk" and "began 'grinding' and 'gyrating' his erection into [him] for several seconds." The Court found that this conduct "certainly involved 'sexual contact,'" and thus was admissible evidence of a prior sexual assault under Rule 415. *Rapp*, 2022 WL 5243030, at *2–*3.

The accounts of Carroll, Stoynoff, and Leeds all fit within the definition of "sexual assault," as interpreted by this Court and described above. Carroll will testify that Trump moved his fingers around her genitals and then forced his penis inside her. Ex. 6 at 123:6–13. Rape undoubtedly satisfies Rule 413(d). *See Boyce*, 2021 WL 2821154, at *9. Stoynoff alleges that Trump grabbed her shoulders, pushed her against the wall, and started "kissing and groping [her] without consent." Stoynoff Dep. at 21:2–8, 38:9–10. And Leeds alleges that Trump attacked her by "grabbing [her] breasts," "pulling himself onto [her]," and "putting his hand up [her] skirt." Leeds Dep. at 19:3– 15. Both accounts involve "touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks," and Trump's nonconsensual contact thus satisfies Rule 413(d) as well. *Rapp*, 2022 WL 5243030 at *2–*3; *see also, e.g.*, 18 U.S.C. §§ 2242(3), 2244(a)(2), 2246(3). If there were any doubt on this score, Stoynoff's and Leeds' allegations independently satisfy Rule 413(d)(5)—and can be properly admitted on that basis alone—because both women

7

indicate in their testimony that Trump would have continued his assault had he not been stopped, making it clear that Trump was "attempt[ing] … to engage" in further sexual contact.

There are no Rule 403 concerns in admitting Stoynoff's and Leeds' testimony. Not only is their testimony highly relevant, but there is little danger of unfair prejudice where, as here, the conduct they allege is not "any more sensational or disturbing" than the conduct already at issue in the case. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Graham*, No. 14 Cr. 500, 2015 WL 6161292, at *4 (S.D.N.Y Oct. 20, 2015) (holding that probative value of testimony about defendant's participation in other prostitution activities was no more sensational or disturbing than the sex trafficking crime he was charged with). There is little risk that the jury will be confused or misled by hearing the accounts of two nonparty accusers, as "[j]urors are frequently called upon to keep track of multiple events and people." *Boyce*, 2021 WL 2821154, at *6. And admitting the accounts of just two other accusers (of the 24 who have made similar allegations against Trump according to his own campaign) is not needlessly cumulative. Ex. 7; *see Boyce*, 2021 WL 2821154, at *5 (admitting the testimony of six nonparty accusers of sexual assault under Rule 404(b)); *Graham*, 2015 WL 6161292, at *2 (allowing testimony regarding defendant's prior dealings with multiple prostitutes).

In addition, the "Second Circuit has held that Rule 403 should be applied less rigorously in evaluating Rule 415 evidence to avoid Rule 403 from precluding evidence Congress intended to make admissible." *Barnason*, 852 F. Supp. 2d at 376. Thus, "[w]ith respect to the Rule 403 balancing, … '[t]he presumption is that the evidence admissible pursuant to [Rules 413–15] is typically relevant and probative, and that its probative value is not outweighed by any risk of prejudice.'" *United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) (citation omitted).

8

**ASA-19**

**B.      Stoynoff's and Leeds' Testimony About Trump's Sexual Assault Are Admissible Under Rule 404(b)(2) as Evidence of Trump's *Modus Operandi***

Stoynoff's and Leeds' testimony is separately admissible under Rule 404(b)(2), which provides that other wrongs or acts "may be admissible … [to] prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Second Circuit takes an "inclusionary" approach to other acts evidence under Rule 404(b). *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). It allows such evidence to be admitted for *any* purpose other than to demonstrate propensity, so long as the evidence is relevant to some disputed issue at trial and satisfies Rule 403. *Id.* Thus, a district court may admit evidence of uncharged acts if: "(1) [such evidence] is introduced for a proper purpose, (2) it is relevant to the [plaintiff's claim], (3) its prejudicial effect does not substantially outweigh its probative value, and (4) it is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007). Both Stoynoff's and Leeds' proposed testimony meet these requirements.

To start, Stoynoff's and Leeds' testimony is offered for a proper purpose and is relevant to a material issue in dispute. Here, the testimony establishes a *modus operandi*: Trump's pattern of suddenly and without warning lunging at a woman, pushing his body against her, grabbing at her, and kissing her, in what constitutes a knowing and intentional sexual assault, and later categorically denying the allegations and declaring that the accuser was too ugly for him to have sexually assaulted her. *See supra* at 4–5. Establishing *modus operandi* is a well-recognized proper purpose under Rule 404(b). *See United States v. Moye*, 793 F. App'x 19, 21 (2d Cir. 2019); *United States v. Mohamed*, 148 F. Supp. 3d 232, 240 (E.D.N.Y. 2015). Taken together, Stoynoff's and Leeds' testimony contain "characteristics [that] are sufficiently idiosyncratic to permit a fair inference of a pattern's existence." *Mohamed*, 148 F. Supp. 3d at 241 (quoting *United States v. Sliker*, 751 F.2d 477, 487 (2d Cir. 1984)); *see also United States v. Cadet*, 664 F.3d 27, 33 (2d Cir.

9

**ASA-20**

2011) ("There is no necessity for synonymity but there must be *substantial* relevancy."). Moreover, that *modus operandi* is directly relevant to a material issue in dispute here: it makes it *more likely* that Trump sexually assaulted Carroll and then lied when he denied having done so (since doing so would square with his *modus operandi*). Recognizing the highly probative nature of an established *modus operandi*, courts regularly admit such evidence in this context. *E.g.*, *Boyce*, 2021 WL 2821154, at *5; *Montanez v. City of Syracuse*, No. 16 Civ. 00550, 2019 WL 4328872, at *4 (N.D.N.Y. Sept. 12, 2019); *accord Alaniz v. Zamora-Quezada*, 591 F.3d 761, 774–75 (5th Cir. 2009).

In addition, the prejudicial effect of Stoynoff's and Leeds' testimony does not substantially outweigh the probative value, as explained above. *See supra* 8. And, to mitigate any possible concern, the jury can be instructed on the permissible uses of the other acts evidence admitted under Rule 404(b)(2), if necessary. *Montanez*, 2019 WL 4328872, at *4; *see LaFlam*, 369 F.3d at 157; *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996).

## III.  THE COURT SHOULD PRECLUDE ROBERT J. FISHER FROM TESTIFYING AS A REBUTTAL EXPERT WITNESS

As part of this action, Carroll engaged Professor Ashlee Humphreys to assess the effect of Trump's statements on Carroll's reputation. Professor Humphreys constructed quantitative models to analyze the dissemination of Trump's defamatory statements, their impact, and the cost to counteract the damage to Carroll's reputation through a reputation repair campaign. *See* Ex. 8 ("Humphreys Rep.") at 26–72 & Appxs. D, E, F, G, J, K. Those models confirmed that Trump's statements reached an immense audience, generating between 142,334,424 and 188,155,507 impressions, *id.* at 35, and harming Carroll's reputation and professional endeavors, with 25.25% of readers and listeners likely to believe Trump, *id.* at 61. Ultimately, Professor Humphreys

10

demonstrates that Trump's statements caused a "significant shift" in Carroll's reputation and that her reputation "has been, and continues to be harmed." *Id.* at 4, 72.

Trump engaged Robert J. Fisher as his rebuttal expert. Under Rule 26(a)(2)(D)(ii), a party may submit expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." But Fisher does not engage in any meaningful way with Professor Humphreys' report. Far from it: Fisher submitted a 12-page report, nine pages of which are dedicated to reciting his qualifications, casting suspicion on Humphreys' qualifications, and opining on the legal merits, facts, and credibility of the witnesses. See Ex. 9 ("Fisher Rep.") at 4–9; *see also id.* at 1–3, 10–12. At his deposition, Fisher conceded that he had failed to read large sections of Professor Humphreys' report, completed his research and analysis "overnight," and responded only—and partially—to Professor Humphreys' damages model (and nothing more). Ex. 10 ("Fisher Dep.") at 105:2–109:17, 183:2–3, 316:4–11.

Fisher's report is a textbook example of unreliable and patently impermissible rebuttal opinion, and he should be precluded from testifying. Although rebuttal experts have "no burden to produce models or methods of their own," they still "must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (citation omitted); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (burden on proponent of expert to establish that he meets these standards by a preponderance of the evidence). Here, Fisher cannot meet the necessary reliability standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), and Federal Rule of Evidence 702. Breaking his report down, there are additional grounds to exclude each of his purported areas of testimony, with the ultimate effect of leaving him nothing about which to testify.

11

A.     **The Court Should Preclude Fisher's Testimony in its Entirety Because His Analysis Is Not Reliable**

The district court is the gatekeeper of expert testimony and is charged with "ensur[ing] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *United States v. Kaufman*, No. 19 Cr. 504, 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (quoting *Daubert*, 509 U.S. at 597, 113 S. Ct. at 2788). Here, Fisher explicitly disclaims the use of data, methods, science, or any literature to inform his opinions. *E.g.*, Fisher Dep. at 304:16–310:14, 387:14–15, 397:6–7; *see also id.* at 127:6–8 ("I'm a little skeptical about—you know, academia people and their theories on how you should do things …."); *id.* at 310:25 ("Well, I don't particularly get into data …."); *see also id.* at 116:10–13. Instead, he says he relied solely on his personal knowledge informed by his experience in public relations. *See, e.g.*, *id.* at 313:4–9.[2]

It is possible for an expert to "draw a conclusion from a set of observations based on extensive and specialized experience," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S. Ct. 1167, 1178 (1999), in which case "the method is the application of experience to facts," *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 00 Civ. 1898, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008). But that method still requires an expert "do more than aver conclusorily that his experience led to his opinion." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). The expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702, advisory committee note). If the testimony is "speculative or conjectural," "based on assumptions

---

[2] Some of Fisher's "experience" is itself doubtful. For example, he repeatedly cites his experience as a "reporter" for the New York Times. *See* Fisher Rep. at 3; Fisher Dep. at 313:9. But he testified at his deposition that he worked at the Times for less than a year in the 1960s not long after college, and that he wrote articles that were "based on pirating something" from another newspaper, explaining the process as "basically plagiarism." Fisher Dep. at 16:5–7, 17:16–19.

that are 'so unrealistic and contradictory as to suggest bad faith,'" or "connected to existing data only by the *ipse dixit* of the expert," it must be excluded. *Id.* (citations omitted). At bottom, a court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S. Ct. at 1176.

Fisher's analysis fails this reliability test for at least three reasons: first, the report is the result of a hasty, last-minute effort; second, Fisher did not review Professor Humphreys' report or the underlying information as obviously would be necessary to rebut her opinions; and finally, he failed to tie his experience and personal knowledge to his conclusions in a non-speculative manner.

*First*, to say the report was the result of a rushed process is an understatement. Despite having several years' notice that Carroll intended to seek defamation damages (and thirty days from the issuance of Professor Humphreys' report), Trump hired Fisher five days before the rebuttal report was due. Fisher Dep. at 99:11–17. Fisher then wrote his report "overnight," *id.* at 183:2–3, with the entirety of his research consisting of "four or five" news articles about the case. *Id.* at 98:21–99:17. This lack of effort could not be more evident from the report itself, which is riddled with inaccuracies about Professor Humphreys' report. Fisher is keenly aware of his report's defects—and he repeatedly described problems and inaccuracies as byproducts of his own hasty drafting. *Id.* at 183:2–3, *see also id.* at 99:16–17, 103:4–7, 319:9–14. It is clear from the face of the report and confirmed by his deposition that Fisher did not employ the same level of "intellectual rigor that characterizes the practice" of his field. Fed. R. Evid. 702, advisory committee note.

*Second*, these reliability problems are compounded by the fact that Fisher failed to read Professor Humphreys' report closely or consider certain aspects of it at all. Professor Humphreys' report contained twelve appendices, and she supplied access to a separate drive containing the

materials she relied on. *See* Humphreys Rep. at 5 & Appxs. A–L. Those appendices and supplemental materials contained the information she considered, the models she created, and a large collection of the negative public and private messages that Carroll received. *See id.* Fisher did not read the appendices. Fisher Dep. at 105:2–109:17. Nor did he review a single article, book, or other source that Professor Humphreys relied on in her analyses. *Id*. at 385:23–386:4.

As a predictable consequence of that choice, Fisher offered assumptions about Carroll and Professor Humphreys' report that were plainly inaccurate.[3] This sheer sloppiness caused Fisher to recant many aspects of his report when confronted with the information that he had overlooked. *See, e.g.*, *id.* at 181:14–19, 182:19–183:7 (taking back his opinion that "Trump's implication" that Carroll had falsely accused other men of sexual assault "was true," stating "Okay, I erred there. I didn't factor in the word 'falsely,'" which "changes the context of this definitely"); *id.* at 200:22–207:11 (conceding that, contrary to the claim in his report, Professor Humphreys did account for the "he said" side of what he describes as a "he said, she said" case); *see also id.* at 322:12–6, 379:15–380:2, 389:7–14.[4] Fisher's failure to read any documents supporting the opinion he purports to rebut may alone be grounds for exclusion: "The reliability of [an expert's] analysis … is called into question by the fact that [he] disclosed at his deposition that he had failed to review all of the documents produced by the [opposing party] in the course of preparing his expert report."

*Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014).

---

[3] Take, for example, Fisher's comments that "I don't think anyone has a negative impression of Ms. Carroll," Fisher Dep. at 383:20–22, and that there was a "questionable negative impact on Carroll," Fisher Rep. at 11. Professor Humphreys had attached to her report hundreds of negative messages that Carroll has received since Trump's statements that repeated his insults and denials. Humphreys Rep. at 51–58.

[4] In addition to inaccuracies, Fisher's report also contained plagiarized material. After criticizing Professor Humphreys' definition of "reputation," Fisher supplied a supposedly distinct definition that he claimed he wrote specifically for purposes of his 2022 report. Fisher Dep. at 220:4–224:6. But he had no explanation when confronted with the fact that the definition appears verbatim in an article from 2018 that Fisher did not author. *Id.* at 225:12–229:7 ("Q. Can you read the first three sentences of the article. A. … Boy that sounds familiar. … I'm looking like I'm a plagiarist or something. … [M]y compliments to whoever found this though.").

14

*Finally* and most importantly, Fisher fails to supply the requisite foundation for his opinions. In fact, conclusory opinions are all that Fisher's report actually offers. He does not provide any analysis, does not show how his experience informs his opinions, and does not cite a single source. Instead, he claims to have relied on his so-called "common sense." *See* Fisher Dep. at 335:20–21 ("I'm a big believer in rhyme, reason, logic, and common sense."); *id.* at 310:13 (describing his methodology as an "educated feel"); *see also id.* at 170:24, 336:16–17.

Courts routinely exclude experts who offer nothing more than "a compendium of [their personal] opinions." *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 481 (S.D.N.Y. 2000); *see also, e.g.*, *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 648 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017). Courts rule this way because "subjective belief or unsupported speculation" are not themselves reliable methods, even when relying on personal knowledge and experience to testify. *Daubert*, 509 U.S. at 590, 113 S. Ct. at 2795. Nor are vague references to "common sense" enough: "If [an] opinion is based on simple common sense, it is not helpful; the jury does not need expert opinion because its common sense will suffice. And if the jury needs expert opinion because common sense will not suffice, it must come from an expert who is applying her expertise." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 484 (S.D.N.Y. 2016). Here, Fisher is not applying his expertise in any apparent respect; instead, he is merely "attribut[ing] [his] opinion to simple logic rather than any application of principles of [reputation repair]." *Id.* In the end, he offers nothing more than a "'because I said so' explanation," which "cannot satisfy the reliability prong of Rule 702 and *Daubert*." *United States v. Ray*, 583 F. Supp. 3d 518, 542 (S.D.N.Y. 2022).

For all these reasons, Fisher's testimony should be excluded in its entirety.

**ASA-26**

**B.      Each Portion of Fisher's Testimony Should Be Precluded for Further Reasons**

**1.      Fisher Should Not Be Permitted to Address Professor Humphreys'**
**Impressions Model or Impact Assessment**

An expert report "must contain a complete statement of all opinions the witness will

express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Of the three tasks that

Professor Humphreys' report addresses, Fisher's report includes the "opinions [he] will express"

in response to only one. Professor Humphreys' report sets forth: (1) an Impressions Model; (2) an

Impact Assessment; and (3) a Damages Model. Humphreys Rep. at 26–72 & Appxs. D, E, F, G, J,

K. But Fisher's report does not address the Impressions Model or the Impact Assessment at all.

Indeed, Fisher conceded at his deposition that he did not even review her data quantifying the

number of impressions of the defamatory statements or the ideological makeup of those who read

or heard them. Fisher Dep. at 316:4–11.

Instead of responding to Professor Humphreys' analysis or methodology, as would be his

role as a rebuttal witness, Fisher simply stated there was no point in doing those calculations at all.

*See id.* at 296:3–8 ("I don't think there is a need to figure out how many people [saw or heard the

statements].");  *id.* at 308:5–7 ("I don't feel the need to respond on [how many people believed the

statements.");  *id.* at 316:20–21 ("I don't need to see surveys to have a good feel on how many

people would believe what he said.");  *see also id.* at 315:13–320:1. Thus, Fisher should be

precluded from commenting on the Impressions Model or Impact Assessment for the first time in

front of the jury. *See Engler v. MTD Prod., Inc.*, 304 F.R.D. 349, 354 (N.D.N.Y. 2015).[5] That is,

---

[5] Indeed, "preclusion is automatic absent a determination of either substantial justification or harmlessness." *Engler*, 304 F.R.D. at 355 (cleaned up); *see also LaMarca v. United States*, 31 F. Supp. 2d 110, 122 (E.D.N.Y. 1998) ("[The] duty to disclose information concerning expert testimony is intended to allow 'opposing parties to have a reasonable opportunity [to] prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'"). Fisher's failure to set forth these opinions was hardly justified. His only excuse for an incomplete report was the lack of time he had to draft it, but Trump's delinquency in hiring an expert is no excuse for flouting Rule 26. *See, e.g.*, Fisher Dep. at 309:16–310:1 (Q. "[D]o you a agree it is important [] in order to understand the impact of

16

Fisher should be precluded from opining on Professor Humphreys' findings of how widely the statements were disseminated, where they were disseminated, the makeup of people to whom they were disseminated, or the percentage of people likely to have believed the statements.

> ## 2.    Fisher Should Not Be Permitted to Draw Legal or Factual Conclusions

Fisher devotes nearly half of his report to impermissible legal conclusions and factual determinations that fall far outside the bounds of permissible expert opinion. *See* Fisher Rep. at 4–9; *see also id.* at 2–4, 9–12. That impermissibility should be uncontroversial, as an expert may not usurp (1) "the role of the trial judge in instructing the jury as to the applicable law," *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005); (2) "the role of the jury in applying that law to the facts before it," *id.*; or (3) "the role of the trial court to act as gatekeepers to ensure the relevance and reliability of all expert testimony," *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 138–39 (S.D.N.Y. 2022). Fisher's report attempts to do all three.

*First*, in a section titled "Analysis of Statements," Fisher goes through each allegedly defamatory statement and offers his opinion on whether the statement meets the legal criteria for defamation. Fisher Rep. at 4–7. He then concludes: "It is my opinion that none of the statements she identified can be determined as being false and the negative implications are expressions of his opinions which constitute free speech and are protected under the First Amendment." *Id.* at 7; *see id.* at 8–9 (similar for defamation per se).[6]  It is hard to imagine anything that would more demonstrably constitute legal assertions.

---

alleged defamation to understand the percentage of people exposed to those statements that are likely to believe it or disbelieve it? A. Well, it's—it's a moot point, … because the bottom line is regardless of whether it's something that's worthwhile or not in this particular case, I did not have the ability to do so or … more specific, the time to do so."). Nor is this failure harmless, given that discovery long ago closed and trial is approaching. *Engler*, 304 F.R.D. at 355.

[6] The legal conclusions include statements like, "it is more of a defamatory statement for the Plaintiff to have made a statement that it did occur"; "Trump's comment was clearly an opinion and constitutes speculation and supposition"; "His statement can also be classified as conjecture, speculation and opinion"; "This can also be categorized as an opinion"; "This was clearly an opinion." Fisher Rep. at 5–7.

ASA-28

*Second*, Fisher's report provides his opinions on the facts of the case and the credibility of the witnesses—often relying on Trump's deposition to support his views on truth and falsity. *See* Fisher Rep. at 5–8. Indeed, he makes various factual assertions by crediting Trump's testimony, including that "[t]here is no evidence that the rape occurred," "Trump was parroting something that someone told him," and Trump's denial "cannot be a false statement" because it's an act that "hasn't been proven to have taken place."[7] *Id.* at 5–7, 11; *see also id* at 168:16–173:12.[8] Courts regularly preclude expert testimony that "usurps the province of the jury to make factual determinations," *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, No. 11 Civ. 505, 2017 WL 715909, at *2 (S.D.N.Y. Feb. 10, 2017), or "instruct[s] the jury as to an ultimate determination that was exclusively within its province, namely, the credibility of [witnesses]," *Nimely*, 414 F.3d at 398.

*Third*, throughout his report and deposition, Fisher demeans Professor Humphreys' qualifications because, according to him, she does not have the necessary experience. *See* Fisher Rep. at 2–4, 9–12; Fisher Dep. at 111:24–112:23, 117:12–25, 119:10–17, 241:11–22.[9] But it is solely the prerogative of the court to assess the reliability of expert testimony, including whether an expert is qualified to testify in the first place. *See Capri Sun GmbH*, 595 F. Supp. 3d at 13–39 (precluding an expert from testifying as to another expert's qualifications).

---

[7] Fisher also characterizes Trump's defamatory statements as "relative[ly] mild." Fisher Rep. at 11; *see also* Fisher Dep. at 391:10–16 ("Q. And is it your opinion that the President of the United States implying someone is too ugly to sexually assault is mild? A. Yes, yes, … given who it's coming from, yes. I mean, Trump doesn't think much of women.").

[8] At his deposition, Fisher went further, hypothesizing that a person can never prove a rape happened based on her testimony alone—not-so-subtly implying that Carroll cannot do so here. Fisher Dep. at 171:21–172:9.

[9] Fisher made his comments without even having read Professor Humphreys' CV, Fisher Dep. at 104:12–17, without realizing that she is a professor at Northwestern's School of Journalism (a fact listed in the first sentence of her report), *id.* at 121:4–20, and while admitting he does not know what people learn or teach in journalism school today, *id.* at 123:10–16; *see also id.* at 123:14–16 ("[W]hen I was going to journalism school, the internet didn't exist.").

18

    **3.**    **Fisher Should Not Be Permitted to Testify Regarding Professor Humphreys' Reputation Repair Damages Model**

In the section of his report titled "Reputation Repair Program," Fisher offers a series of inaccurate, unsupported conclusions that are not tied to his experience or any other methodology. Fisher Rep. 9–12. Even where an expert's "method" is the purported "application of experience to facts," the testimony must still be "grounded, well-reasoned, and not speculative," and must "show how his or her experience … led to his conclusion," *In re MTBE*, 2008 WL 1971538 at *6 (citations omitted). Moreover, the expert's assumptions must have "adequate factual bas[es]," *Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013). Applying those familiar criteria here, Fisher's response to Humphreys' damages model calculating what it would cost to counteract the negative impact of Trump's defamatory statements should be excluded in its entirety. His response is speculative and conjectural; it is untied to the record; and it completely "neglects to explain how his experience supports his conclusion[s]." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002); *see supra* at 12–13.

The unreliability of Fisher's analysis is most evident when taken paragraph by paragraph. To begin, Fisher launches into a critique of Humphreys' "Type of Program" by asserting she is proposing only a "social media campaign" and "not a diverse [m]ulti-faceted communications campaign," criticizing her for "[having] almost the entire program geared to online exposure," and insisting that "[t]he most successful type of communications program features dissemination of information through multiple communications channels." Fisher Rep. at 9–10. But Professor Humphreys' campaign does, in fact, feature "multiple communications channels"— the *majority* of her target impressions are for media types other than social media or internet sources, which is evident on the face of her report and thoroughly detailed in Appendix K. Humphreys' Rep. at 66– 67, 126–32. Fisher's statement that "[t]he vast majority of her program is linked to [the internet

**ASA-30**

and social media], at the near exclusion of other channels of communication" is blatantly erroneous—though perhaps unsurprisingly so, considering that Fisher admitted that he only skimmed Professor Humphreys' report and failed to read Appendix K altogether.[10]

Fisher next attacks Professor Humphreys' "Target Audiences," again incorrectly asserting that "she doesn't clearly define her audience" and "it would appear she is targeting the public in general." Fisher Rep. at 10. This assertion is blatantly wrong: Professor Humphreys' entire Impact Assessment is dedicated to discerning the readership demographics of the different media sources that disseminated the statements and determining the precise percentages of people who were likely to believe Trump's statements, and her damages analysis and reputation repair campaign are premised on targeting that specific audience. *See* Humphreys Rep. at 40–59, 66. Indeed, Fisher admitted as much at his deposition when confronted with Professor Humphreys' clear target audience, stating, "I will concede to you that that is a—a more targeted definition. … [Y]ou're right, that's a … more defined definition." Fisher Dep. at 379:15–380:2.

Fisher then launches into a series of unsupported factual assertions and opinions that he ties neither to his experience nor any other sources or methodology, as confirmed during his deposition. His report stated that, because Trump was a "highly visible, famous and well-known person who is also highly controversial," "you aren't going to change the negative comments or opinions [Trump] had about Carroll because recipients of them will have believed them or not when hey [sic] were first heard." Fisher Rep. at 10. But he admitted that his opinions of Trump

---

[10] *See* Fisher Dep. at 238:9–21 ("I can't even be sure I had the appendices, to be honest with you. But I didn't see [Appendix K] one way or the other."); *see also id.* 103:23–104:2. As if that were not enough, reports that Fisher has submitted in other cases reveal that he himself has proposed numerous campaigns that focus entirely on the internet, and include no reference to broadcast TV, cable TV, radio, podcasts, or print newspapers (unlike Professor Humphreys, who includes all these channels and more). *See, e.g.*, Robert J. Fisher, Expert Report, *Am. Society of Home Inspectors v. Int'l Ass'n of Certified Home Inspectors*, No. 18 Civ. 001559 (D. Colo. May 14, 2020), ECF 72-1; Robert J. Fisher, Expert Report, *100+ Animal Rescue, Inc. v. Butkus*, No. 17 Civ. 61893 (S.D. Fla. Feb. 14, 2020), ECF 76; Robert J. Fisher, Expert Report, *Zinn v. City of Scottsdale*, No. 2:17 Civ. 01813 (Super. Ct. Ariz., Maricopa Cty. Jan. 16, 2020), ECF 66-1.

and the effect of Trump's statements were based on his personal views and conversations with "friends, business[,] family, and business associates"—not on his own expertise or any data. Fisher Dep. at 394:12–395:2; *see also id.* at 316:20–22, 318:23–25. Fisher's other comments—that "Trump is controversial and often bombastic," which "make[s] it less likely some people would believe him" and that "Trump's previous admissions of sexual inappropriateness would also lessen people's belief in the negative statements, comments or opinions he had of Carroll"—are equally unsubstantiated opinions tied neither to his own expertise nor to any data. Fisher Rep. at 11; *see* Fisher Dep. at 319:23–320:1.

In addition, Fisher makes the unfounded assertion that "Carroll's long standing positive image would possibly offset most of his derogatory remarks," the implication of which is that Carroll did not incur much damage to her reputation from Trump's statements. Fisher Rep. at 11. Fisher admitted that this statement was not based on any data or his experience; rather, he thought it was "reasonable to assume." Fisher Dep. at 393:18. But this assumption is the opposite of what he thought it was "reasonable to assume" in other cases that he has testified in. As Fisher acknowledged, he has authored reports where he said, "It takes years to build a reputation and seconds to destroy it." *Id.* at 394:5–6. As for Fisher's failure to apply that principle here: "I usually do that in conjunction with the reputation damage repair programs I write … but in this case I'm representing the defendant, so I didn't …." *Id.* at 399:6–11. Under Rule 702, testimony may be excluded where the expert "failed to apply his own methodology reliably." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002); *see also Faulkner*, 46 F. Supp. 3d at 381 (where "methodology [is] aimed at achieving one result," an expert's "analysis is unreliable" and "must be excluded").

Finally, Fisher makes a series of statements based on percentages, stating that, "[i]f only

basically 25% would believe Trump, that leaves 75% of the public who could be impacted. If you reasonably assume that at least 50% wouldn't believe anything he said, you are left with a very small percentage that you would have to reach to counteract his negative comments about Carroll." Fisher Rep. at 11. But Fisher's report "provides no justification whatsoever for the numerical values" that he selected. *City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345, 2021 WL 5154110, at \*13 (S.D.N.Y. Nov. 5, 2021) (cleaned up). When asked how he determined these percentages, Fisher answered, "those are reasonable projections based on what polls and surveys have shown about what his support is"—but admitted that no polls or surveys were cited in his report. Fisher Dep. at 383:2–7. Here, too, his testimony violates core rules that govern expert testimony.

## IV.   THE COURT SHOULD EXCLUDE TESTIMONY OF WITNESSES NOT DISCLOSED IN DISCOVERY, TESTIMONY ADDUCING UNDISCLOSED INFORMATION, AND COMMENTARY OR TESTIMONY CONCERNING DNA

The Federal Rules impose on litigants a duty to disclose and timely supplement certain information as part of the discovery process. Yet, Trump admitted at his deposition that he and his counsel have taken a loose approach to these discovery obligations because none of them took Carroll's case "seriously." Trump Dep. at 205:9–18. Two elements of Trump's discovery conduct are of particular relevance here. First, in Trump's initial disclosures, he referred to groups of people with potentially relevant information in nonspecific, collective terms. Ex. 11 at 2–3. With one irrelevant exception, Trump did not identify a single individual who was likely to have information that he would use to support his defenses. When Trump supplemented his disclosures months later to add a reference a potentially relevant insurance agreement, he otherwise referred back to his prior disclosures. Ex. 12 at 2. Trump also made the same nonspecific references to witnesses in his January 9, 2023 initial disclosures in *Carroll II*. Ex. 13 at 2–3.

Second, in the one instance Trump offered names of potential witnesses, he made clear that his answer was neither serious nor accurate. Carroll's Interrogatory No. 2 sought the identity of "all individuals with whom [Defendant has] communicated, by any means, concerning Plaintiff or this Action." Ex. 14 at 2. After months of stalling, Trump eventually supplied a supplemental response to that interrogatory. He listed the names of only six individuals. *Id.* at 2–3. It was clear from the start that those six names had no real significance. Trump's counsel confirmed by email that Defendant "d[id] not intend to call any of the individuals identified in Interrogatory No. 2 as witnesses at trial." Ex. 15. And, then, at his deposition, Trump denied having spoken with five of the six individuals he had previously identified. *See* Trump Dep. at 108:18–110:9. He even went so far as to declare that "[t]he deposition rules" because his interrogatory responses were "not signed by" him. *Id.* at 111:15–17.

Trump's latest word on the matter represents yet another switch. In the Joint Pretrial Order, Trump included five new nonparty witnesses in his witness list: David Haskell, Elizabeth Dyssegaard, Erin Hobday, Laurie Abraham, and Sarah Lazin. ECF 128.[11] But under Rule 37(c), Trump cannot offer testimony from any undisclosed witnesses at trial absent circumstances that are not present here. The Court should thus preclude testimony from the five new witnesses identified in the Joint Pretrial Order and any other witness whom Trump has not disclosed. In addition, the Court should hold that Trump cannot testify—directly or by implication—to information that any undisclosed witnesses theoretically could have testified to if they had been properly disclosed (which has already been an issue with Trump in these proceedings). And in the

---

[11] The list also includes Birnbach, Fisher, and Anderson Cooper. Carroll obviously does not object to Birnbach, as her testimony is part of Carroll's case-in-chief. Carroll objects to Fisher's testimony on other grounds, as explained above. *See supra* 10–22. Cooper was the only individual identified in Trump's initial disclosures as potentially having "discoverable knowledge or information to support one or more of his defenses." Ex. 11 at 2. Trump did not depose or otherwise obtain discovery from Cooper, and it is not clear what relevant information Cooper could have.

23

same vein, given Trump's repeated failure to comply with the applicable discovery rules, the Court should preclude any testimony or commentary at trial concerning DNA evidence.

### A. Trump Has Not Disclosed Witnesses Under Rules 26(a)(1) and (e) and Should Be Precluded from Calling Them to Support His Defenses

The Federal Rules of Civil Procedure are designed to prevent "surprise" and "trial by ambush." *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002). To achieve that goal, Rule 26(a)(1) requires that a party, "without awaiting a discovery request," proceed to name "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). Rule 26(e) further instructs a party to "supplement or correct" a disclosure or response when necessary. *See* Fed. R. Civ. P. 26(e)(1)(A). Here, Trump's initial disclosures identified only one person. During discovery, when the identification of witnesses is a key aspect of the fact-finding process, Trump doubled—and tripled and quadrupled—down on his position that he has no witnesses to call as part of his defense. Now, however, long after discovery has closed, Trump apparently intends to call six nonparty witnesses. But his failure to identify all but one of those witnesses earlier in the process precludes him from using any of the five previously undisclosed witnesses, none of whom were deposed, at trial. *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 638 (S.D.N.Y. 2014).

The consequences for violating Rule 26 are clear: "the party is not allowed to use that information or witness to supply evidence … at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). That analysis is aided by four factors: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result

of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (cleaned up). Each factor favors preclusion here.

First, Trump's discovery conduct to date belies any argument that his failure to identify evidence or witnesses was justified. *See, e.g.*, *Simon v. City of N.Y.*, No. 14 Civ. 8391, 2017 WL 57860, at *6 (S.D.N.Y. Jan. 5, 2017). Indeed, Carroll identified Trump's new witnesses in her responses to Trump's sweeping interrogatories or even earlier in the litigation, but he did not list any of them in any of his disclosures in this action or in *Carroll II*.[12] Second, Trump has maintained the position throughout this case "that the underlying incident alleged in the Complaint did not occur," Ex. 11 at 2, and he testified at his deposition that he could not point to any documents or witnesses to corroborate his account, Trump Dep. 75:25–76:16. Third, disclosure of a new witness after the close of fact discovery and on the eve of trial is inherently prejudicial. *See, e.g.*, *Patterson*, 440 F.3d at 118. Finally, and for good reason, the Court has previously declined to allow Trump to continue delaying these proceedings based on a failure to follow the rules. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022). This situation is no different. Thus, preclusion is the appropriate sanction, and Trump cannot call any witness whom he did not properly disclose.

**B.    Trump Should Be Precluded from Testifying as to Any Undisclosed Information, Including Testimony of Undisclosed Witnesses**

As part of its decision precluding Trump from calling undisclosed witness, the Court should also make clear that Trump cannot suggest what any undisclosed witness would have said on his behalf. That issue has already arisen in these proceedings. For instance, Trump did not disclose any witness who provided him security services in the mid-1990s. Yet, at his deposition,

---

[12] As further evidence that Trump had knowledge of these individuals long ago, Trump sent Carroll notice of subpoenas to all five of them on August 9, 2022, but still elected not to list them in his disclosures. While it is not clear which of the subpoenas were served, no depositions of these individuals took place. As a result, we reasonably assumed that Trump had decided that they were no longer potential witnesses with relevant testimony for trial.

**ASA-36**

Trump testified that he "would [be able] to have somebody from security confirm a statement that [the assault] never happened," vaguely adding that he "pretty much to always" had security with him in that time period. Trump Dep. at 73:8–9, 73:18–19. But Trump failed to supplement or correct the silent record regarding the existence of any such witness—despite assuring that he would "check," "ask people," and "find out" who served in his security detail from the fall of 1995 through the spring of 1996. *Id.* at 75:8–16. Concocting but not disclosing "evidence" to support his side is a well-known pattern for Trump. Indeed, in his very first statement about Carroll, Trump "thank[ed] Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened." Ex. 16; Trump Dep. at 59:6–9. But Trump later admitted under oath that neither he nor anyone on his team ever spoke with Bergdorf's. *Id.* at 59:6–9, 78:6–10.

Testimony of this nature is not permissible and will confuse the trial. Trump cannot circumvent Rules 26 and 37 by, on the one hand, claiming that there is no information or witnesses to support his defense and then, on the other, testifying to the ways in which undisclosed information or witnesses would support him. In trying to have it both ways, Trump is effectively attempting to spare the undisclosed information and witnesses from the adversarial process by providing such information through his testimony alone. That is not how the Rules work. To the contrary, under Rule 37(b)(2)(A)(ii), Courts regularly preclude all evidence and testimony related to undisclosed information. *E.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14 M.D. 2543, 2017 WL 2880882, at *2 (S.D.N.Y. July 5, 2017). That safeguard is important here, since Trump's reliance on undisclosed information and the supposed knowledge of undisclosed witnesses to support his defense would "provide [the other side] with no means of effectively cross-examining whether that representation is credible." *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 204 (E.D.N.Y. 2010).

26

The Court should thus prohibit Trump from testifying—directly or by implication—about the ways in which undisclosed witnesses might have supported his defense if they had been called.

### C.   The Court Should Preclude Testimony or Commentary Concerning DNA Evidence

As this Court knows from a related decision made in *Carroll II*, Carroll sought for years to test Trump's DNA against a mixture of DNA found on the dress that she wore during the attack at Bergdorf's, but ultimately changed strategies after Trump adamantly refused to provide DNA. *See Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 2006312, at *1–*6 (S.D.N.Y. Feb. 15, 2023). As a result, discovery in *Carroll I* closed without any fact-finding or expert analysis relating to DNA, and discovery in *Carroll II* began and closed without even a mention of DNA. Last week, however, "three days after [Trump's] latest request for a multi-week trial postponement was substantially denied" and "one day after the parties filed a joint pretrial order in [*Carroll I*] that makes clear that neither [Carroll] nor [Trump] intends to call any DNA experts as witnesses in [that] trial," Trump proposed to provide his DNA sample if the Court would require Carroll to produce an undisclosed appendix to a years-old DNA report. *Id.* at *1. The Court rejected Trump's motion to reopen discovery, finding that there was "no justification for imposing [Trump's] proposal on [Carroll] now that she has prepared for trial on the entirely justified basis that there will be no DNA evidence." *Id.* at *2.

In light of this ruling, and by virtue of its reasoning, the Court should preclude testimony or commentary regarding any aspect of this DNA issue at the trial—including Trump's eleventh-hour "offer" to reopen discovery so he might provide a DNA sample and any inferences his counsel might ask the jury to draw about the lack of DNA evidence at trial. Under Rule 403, a court may exclude evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time." *United States*

27

**ASA-38**

*v. Gabinskaya*, 829 F.3d 127, 134 (2d Cir. 2016). That analysis weighs decisively in Carroll's favor.

To start, any testimony related to DNA evidence has no probative value in this case: "No one knows whether [Trump's] DNA is on the dress." *Carroll*, 2023 WL 2006312, at *8. Faced with a similar situation, where DNA evidence was not secured during discovery, the Seventh Circuit upheld not only the district court's decision to squash a tardy subpoena to secure such evidence, but also the preclusion of any "argument or questioning [of] witnesses regarding the lack of testing of DNA." *Mitchell v. City of Chicago*, 862 F.3d 583, 587 (7th Cir. 2017). As the Seventh Circuit explained, any "[a]rgument or evidence demonstrating unavailability of DNA evidence would not tend to make the existence of any fact that is of consequence 'more probable or less probable than it would be without the evidence,'" and thus had "no tendency to prove liability." *Id*. The same is true here.

The risks inherent in allowing nonprobative references to DNA are heightened given the outsized weight that juries tend to give to DNA evidence or the lack thereof. Courts have recognized a so-called "CSI effect" by which jurors who "have been exposed to legal proceedings in the media … have developed an expectation" related to DNA testing. *Gray v. Lamanna*, No. 17 Civ. 6324, 2021 WL 4844536, at *7 n.3 (E.D.N.Y. Oct. 18, 2021). Here, the jury could attach undue weight to DNA evidence that does not exist, including to the absence of any DNA "match," and could be prejudicially confused or deceived by a misleading suggestion that Trump was willing to provide DNA. *Cf. Sadler v. Moran Towing Corp.*, No. 01 Civ. 1666, 2002 WL 1977604, at *1 (S.D.N.Y. Aug. 28, 2002) (Kaplan, J.) (evidence that would "suggest, improperly, a willingness on defendants' part to settle," when no effort to settle had been made, is "misleading," "confusing" and its "probative value would be far outweighed by unfair prejudice").

Moreover, any mention of DNA at trial will force the parties to detail the ins and outs of the related discovery disputes, leading to significant jury confusion, wasted time, and prejudice. Indeed, there is no way to raise DNA before the jury without also requiring testimony and other evidence regarding the history of *Carroll I* and *Carroll II*; the differences and overlap between the two actions; Trump's broader pattern of discovery obstinance and dilatory tactics that Carroll responded to by abandoning her longstanding efforts to obtain Trump's DNA; the responses of Trump's counsel to Carroll's requests for DNA; and more. All this would undoubtedly create a "sideshow" at trial on collateral issues and push the jury into the improper function of relitigating the discovery dispute. *Cf. Guidi v. Inter-Cont'l Hotels Corp.*, No. 95 Civ. 9006, 2003 WL 1907904, at *1–*2 (S.D.N.Y. Apr. 16, 2003) (collecting similar cases of juror confusion). Courts have generally observed that evidence regarding discovery conduct has "limited or no probative value," and "the dangers of unfair prejudice, jury confusion, and waste of time are quite real." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14 M.D. 2543, 2015 WL 8130449, at *4–*5 (S.D.N.Y. Dec. 3, 2015); *accord Miller UK Ltd. v. Caterpillar, Inc.*, No. 10 Civ. 03770, 2015 WL 7351674, at *10 (N.D. Ill. Nov. 20, 2015); *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, No. 06 Civ. 1584, 2009 WL 10674074, at *3 (S.D. Cal. Apr. 1, 2009). That is certainly the case here.

Finally, the type of testimony that Trump or his lawyers apparently previewed for the press is *exactly* the sort of sandbagging that the Federal Rules are designed to prevent.[13] *See* Fed. R. Civ. P. 26 & 37(c)(1); *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) ("The purpose of [Rule 37] is to prevent the practice of 'sandbagging' an opposing party with new

---

[13] *See* Jose Pagliery, *Trump Says He'll Hand Over His DNA for E. Jean Carroll Case*, Daily Beast (Feb. 9, 2023) ("According to a source familiar with his defense team's new strategy, Trump's proposition has not yet been made to the opposing side. But if they follow through, it would position them to tell jurors his DNA was offered—just never tested."). Tipping his hand even further, Trump included the DNA analysts whom Carroll consulted years ago as part of his witness list in *Carroll II*, even though he had never disclosed them as witnesses before. *See* Proposed Joint Pretrial Order, *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y. Feb. 16, 2023), ECF 60.

evidence."). To ward off "surprise" and "trial by ambush," courts routinely preclude parties from introducing evidence that was disclosed for the first time only after the close of discovery, especially where, as here, the parties were aware of the issues well before. *Am. Stock Exch.*, 215 F.R.D. at 93; *Downey v. Adloox Inc.*, No. 16 Civ. 1689, 2018 WL 794592, at *1–*2 (S.D.N.Y. Feb. 8, 2018); *Estate of Jaquez v. Flores*, No. 10 Civ. 2881, 2016 WL 1060841, at *8 (S.D.N.Y. Mar. 17, 2016). Trump has had "years in which to make DNA an issue in this case." *Carroll*, 2023 WL 2006312, at *2. He did not. Now, on the eve of trial, he cannot change course by offering testimony on what the DNA evidence might show. *Cf. Djangmah v. Falcione*, No. 08 Civ. 4027, 2013 WL 6388364, at *2–*4 (S.D.N.Y. Dec. 5, 2013). The Court should not abide his gamesmanship and should preclude any testimony purportedly related to DNA.

## V.   THE COURT SHOULD PRECLUDE INQUIRY INTO A SERIES OF IRRELEVANT TOPICS IN CONNECTION WITH STEPHANIE GRISHAM'S TESTIMONY

Stephanie Grisham served in Trump's White House for nearly four years and was publicly announced as Trump's Press Secretary and Communications Director just one day after Trump's June 24, 2019 statement about Carroll. Trump Dep. at 114:2–5. At Grisham's deposition, Trump's counsel cross-examined her regarding two prior misdemeanor convictions and an unrelated pending lawsuit, and repeatedly objected to the deposition based on Grisham's use of a pain reliever following a serious foot injury. The Court should preclude cross-examination or the introduction of evidence regarding these topics as improper character evidence under Rules 608 and 609, and as unduly prejudicial under Rule 403.

### A.   The Court Should Preclude Cross-Examination or the Presentation of Evidence Regarding Grisham's Prior Misdemeanor Convictions

Grisham was arrested on two prior occasions, between 2013 and 2015 in Arizona, resulting in convictions for reckless driving and driving under the influence. Ex. 17 ("Grisham Dep.") at

88:13–89:3, 89:18–90:7. Rule 608 permits cross-examination regarding "specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness" *only* where the prior conduct is "probative of the character for truthfulness or untruthfulness." Rule 609 allows a party to attack a witness's character for truthfulness "by evidence of a criminal conviction" *only* where the conviction required proof of "a dishonest act or false statement."

Grisham's driving-related convictions do not fit within either Rule. The criminal statutes at issue do not have as an element falsity or dishonesty. *See* A.R.S. § 28-693 (reckless driving); A.R.S. § 28-1381 (driving or actual physical control while under the influence). And courts in this District have consistently held that convictions for driving while intoxicated do "not involve dishonest acts or false statements." *United States v. Bowen*, 511 F. Supp. 3d 441, 453 (S.D.N.Y. 2021); *United States v. Whitley*, No. 04 Cr. 1381, 2005 WL 2105535, at *3 (S.D.N.Y. Aug. 31, 2005) (similar). Because Grisham's prior misdemeanor convictions fall outside these rules, neither cross-examination nor the introduction of evidence regarding those convictions is permissible.

Even if it were, the probative value of Grisham's misdemeanor convictions is substantially outweighed by the prejudice of admitting them. *See* Fed. R. Evid. 403. The impeachment value of old misdemeanors that do not involve dishonesty or untruthfulness is low, and inquiry into Grisham's driving-related conduct would serve only to confuse the jury and prolong her testimony. *See United States v. Potapova*, 800 F. App'x 14, 16 (2d Cir. 2020); *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 544 (E.D.N.Y. 2011).

### B.   The Court Should Preclude Cross-Examination of Grisham Regarding an Unrelated Lawsuit That Remains Pending

Grisham is currently a defendant in a defamation suit brought in October 2021 by her ex-boyfriend (and current U.S. Representative) Max Miller, who claims that Grisham defamed him when she publicly stated that her relationship with another White House staff member had "turned

abusive." Compl., *Miller v. Grisham* ¶ 11, No. CV-21-953971 (Ohio Ct. Com. Pl., Cuyahoga Cty. Oct. 5, 2021). That case will be in discovery until at least April 6, 2023, with dispositive motions not due until May 8, 2023. Journal Entry, *Miller v. Grisham*, No. CV-21-953971 (Ohio Ct. Com. Pl., Cuyahoga Cty. Dec. 6, 2022).

Courts regularly prohibit cross-examination of a witness about pending litigation like this. Rule 608(b) does "not authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of truthfulness." *United States v. Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005). Where litigation remains pending, there will have been no "adverse credibility finding" that could come in under Rule 608(b). *Id.* at 389, 392; *accord United States v. Donovan*, 577 F. Supp. 3d 107, 122 (E.D.N.Y. 2021) (precluding cross-examination on pending litigation because there had been "no finding of any wrongdoing, and mere allegations are irrelevant to truthfulness"). There have been no findings against Grisham in the Ohio action, and therefore cross-examination about that action should not be permitted.

Such cross-examination should also be prohibited under Rule 403. Courts have had little difficulty finding that the probative value of "mere" allegations "is outweighed by the danger of unfair prejudice, confusion of the issues and considerations of undue delay." *Gogol v. City of N.Y.*, No. 15 Civ. 5703, 2018 WL 4616047, at *4 (S.D.N.Y. Sept. 26, 2018). For one, there is a significant risk that jurors will give undue weight to the unsubstantiated allegations from another lawsuit. *Cf. United States v. Whitmore*, 359 F.3d 609, 619 (D.C. Cir. 2004) (upholding exclusion of evidence regarding prior judicial finding which fell short of a perjury *conviction* because jury "might rely too heavily on the finding in making its own credibility determination"). Moreover, allowing Trump's counsel to cross-examine Grisham on the other lawsuit would force Carroll's counsel to pursue a confusing and time-consuming inquiry into the merits of Representative

**ASA-43**

Miller's defamation claim—the exact sort of "'trial within a trial' that Rule 403 disfavors." *E.g.*, *Doe v. Lima*, No. 14 Civ. 2953, 2020 WL 728813, at *8 (S.D.N.Y. Feb. 13, 2020); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 578109, at *2 (S.D.N.Y. Mar. 4, 2005).

      **C.**    **The Court Should Preclude the Presentation of Evidence or Cross-Examination of Grisham Regarding Her Past Use of a Pain Reliever**

A few weeks prior to her deposition, Grisham broke her foot, for which she was prescribed a pain reliever. Grisham Dep. at 9:15–25. At the beginning of her deposition, Grisham noted that she had taken a "very low dose" of her medication and explained that it had no effect on her ability to testify. *Id.* at 10:1–16. Trump's counsel interrupted Grisham's testimony and demanded that the deposition be ended. *Id.* at 12:1–13:20. Counsel then requested a conference before the Court and made repeated objections based on Grisham's "mental capacity." *E.g.*, *id.* at 29:9–22.

The Court has already made clear that Grisham's prescription medication is irrelevant. At the mid-deposition conference that Trump's counsel requested, the Court quickly put an end to these disruptive tactics:

> THE COURT: Do you understand the questions? And are you capable of testifying?
>
> MS. GRISHAM: Yes, your Honor.
>
> THE COURT: That's it, Mr. Madaio. Stop wasting time. [The deposition] goes forward.

Tr. of Oct. 6, 2022 Conf. at 5. If there was no reason to stop the deposition, there is no reason why Grisham's past use of her medication would have any relevance at trial. *See Cordius Tr. v. Kummerfeld*, No. 99 Civ. 3200, 2008 WL 113683, at *3 (S.D.N.Y. Jan. 10, 2008) ("The test [for mental capacity] is whether the prospective witness 'has sufficient intelligence to understand the nature of any oath and to give a reasonably accurate account of what he has seen and heard[.]'"). Cross-examination regarding Grisham's medication should be precluded as irrelevant under Rule 401, unduly prejudicial under Rule 403, and improper character evidence under Rule 608.

**ASA-44**

**VI.    THE COURT SHOULD PRECLUDE COMMENTS AND CROSS-EXAMINATION REGARDING CARROLL'S CHOICE OF COUNSEL**

At his deposition, Trump previewed a strategy of maligning Carroll's counsel to distract from the actual issues. Among other things:

- Trump claimed that Carroll's counsel was "doing this [lawsuit] for the Democrat party, … your friends over in the Democrat party," Trump Dep. at 202:10–12, even declaring at one point, "You're a political operative. … You're a disgrace," *id.* at 142:8–9; *see also, e.g.*, *id.* at 197:18 ("But the Democrat party. That's you."); *id.* at 88:25–89:2 ("I think you're aligned with [Hillary Clinton] too actually."); *id.* at 171:11 ("I beat your friend [Hillary Clinton] pretty badly.").

- Trump speculated that Carroll's counsel used unscrupulous means to obtain the time taken to depose him, stating, "I knew that we'd be wasting a day doing this, a whole day doing this. I don't know how you do it. You've got to be connected to get this kind of a time." *Id*. at 144:16–17. Those comments fit within Trump's broader comments about the supposed "broken" nature of the judicial system. *Id.* at 144:4–7, 24–25 ("The system in our country is broken, and the system in New York City is broken, in New York and New York State. It's a broken system. … [Judge Kaplan] is not a fan of mine, obviously.").

- Trump threatened to sue Carroll's counsel multiple times: "And I'll sue you too because this is—how many cases do you have? Many, many cases, and I know the statements that were made—that you made. Keep Trump busy because this is the way you defeat him, to keep him busy with litigation. So I will be suing you also, but I'll be suing her very strongly as soon as this case ends. But I'll be suing you also." *Id*. at 130:19–131:2.

- While discussing the appearance of a woman who had accused him of sexual impropriety, Trump disparaged Carroll's counsel in the same vein, stating, "You wouldn't be a choice of mine, either, to be honest with you. I hope you're not insulted. I wouldn't under any circumstances have any interest in you. I'm honest when I say it. … Even if you weren't suing me, I would have no interest. Okay?" *Id.* at 184:17–20, 185:6–7.

Trump should not be permitted to continue with this strategy at trial. Personal attacks on a party's counsel are "reprehensible" and "detract from the dignity of judicial proceedings." *United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001); *see also Allen v. Royce*, No. 19 Civ. 3672, 2022 WL 125367, at *9 (E.D.N.Y. Jan. 13, 2022) ("[A]ttacks on the credibility or motives of defense counsel are not permissible."). Courts regularly preclude testimony regarding opposing counsel under both Rules 401 and 403. *E.g.*, *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 273 (S.D.N.Y. 2015) (granting motion to exclude commentary or arguments related to "lawyer-driven

34

lawsuits" because "the jury's attitudes about … the business model, role, or ethics of [] counsel, have no bearing" on the merits of the case and "can serve only to confuse, inflame, and introduce unfair prejudice"); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, No. 98 Civ. 3287, 2000 WL 1805359, at *2 (E.D.N.Y. Dec. 11, 2000) (granting motion to exclude references to attorneys and firms representing defendants).[14] Carroll's choice of counsel—and Trump's opinion and speculation regarding her counsel—have no bearing on whether Trump raped and defamed Carroll. Any testimony or commentary regarding her counsel should be excluded in its entirety.

## CONCLUSION

For the foregoing reasons, the Court should:

- Admit Carroll's prior consistent statements about Trump's attack to Birnbach and Martin;

- Admit the testimony of Stoynoff and Leeds regarding their own experiences with Trump;

- Preclude Fisher from testifying as a rebuttal expert witness;

- Exclude testimony from witnesses whom Trump has not disclosed; preclude Trump from testifying to undisclosed information, including the testimony that undisclosed witnesses could theoretically offer in support of his defense; and preclude any testimony or commentary at trial concerning DNA evidence;

- Preclude cross-examination or evidence regarding Grisham's prior misdemeanor convictions, her unrelated pending lawsuit, and her use of a prescription medication; and

- Preclude comments and cross-examination regarding Carroll's choice of counsel.

---

[14] *See also, e.g., Hartwig v. JDP, Inc.*, No. 19 Civ. 00008, 2021 WL 9440803, at *2 (S.D. Iowa Jan. 25, 2021) (excluding "[a]ny statement disparaging ... Defendants' counsel [or] any Defendants' case or theory"); *Smith v. Toyota Motor Corp.*, No. 16 Civ. 24, 2018 WL 1806698, at *9 (E.D. Mo. Apr. 17, 2018) (excluding references to representation by defense counsel); *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 11 Civ. 00201, 2017 WL 2773944, at *1 (E.D. Tex. May 26, 2017) (excluding references to the litigation's funding); *Fears v. Keystone Petroleum Transp., LLC*, No. 10 Civ. 02789, 2014 WL 11517819, at *4 (N.D. Ga. Jan. 17, 2014) (excluding comments that "disparage Defendants or defense counsel, imply or infer that Defendants or defense counsel have bad characters, violated the law, [or] engaged in discovery abuse or fraud"); *Kellogg v. Nike, Inc.*, No. 07 Civ. 70, 2008 WL 4216130, at *3 (D. Neb. Sept. 12, 2008) (excluding comments about the "[defendant's] attorneys' law firm and size, type, names, and identities of other clients represented by the firm").

Dated: New York, New York              Respectfully submitted,
      February 16, 2023

                                    Roberta A. Kaplan
                                    Shawn G. Crowley
                                    Trevor W. Morrison (admitted *pro hac vice*)
                                    Matthew J. Craig
                                    Kaplan Hecker & Fink LLP
                                    350 Fifth Avenue, 63rd Floor
                                    New York, New York 10118
                                    Telephone: (212) 763-0883
                                    Fax: (212) 564-0883
                                    rkaplan@kaplanhecker.com
                                    scrowley@kaplanhecker.com
                                    tmorrison@kaplanhecker.com
                                    mcraig@kaplanhecker.com

                                    Joshua Matz
                                    Kaplan Hecker & Fink LLP
                                    1050 K Street NW, Suite 1040
                                    Washington, DC 20001
                                    Telephone: (212) 763-0883
                                    Fax: (212) 564-0883
                                    jmatz@kaplanhecker.com

                                    *Counsel for Plaintiff E. Jean Carroll*

**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
        -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL,<br><br>                    *Plaintiff,*<br><br>        v.<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>                    *Defendant.* | Civil Action No.: 1:20-cv-7311-LAK-JLC |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S OMNIBUS MOTION IN LIMINE**

                        Alina Habba, Esq.
                        Michael T. Madaio, Esq.
                        **HABBA MADAIO & ASSOCIATES LLP**
                        1430 U.S. Highway 206, Suite 240
                        Bedminster, New Jersey 07921
                            -and-
                        112 West 34th Street, 17th & 18th Floors
                        New York, New York 10120
                        Telephone: (908) 869-1188
                        Facsimile: (908) 450-1881
                        E-mail: ahabba@habbalaw.com

**ASA-48**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

LEGAL STANDARD.............................................................................................1

ARGUMENT .......................................................................................................1

    I.    The Court Should Preclude Natasha Stoynoff and Jessica Leeds From
           Testifying At Trial ........................................................................................1

           A.  The Witnesses' Testimony Does Not Qualify Under The Rule 415 Exception 3

           B.  The Proposed Testimony Is Not *Modus Operandi* Evidence .........................11

           C.  Even If Otherwise Admissible, The Testimony of Ms. Stoynoff and Ms. Leeds
               as *modus operandi* evidence must be denied ..................................................13

    II.   Plaintiff's Motion *in Limine* to Exclude the Expert Report and the Testimony of
           Robert Fisher as Defendant's Rebuttal Expert Witness Should be Denied ..........14

           A.  The Defendant's Expert Report of Robert Fisher Sufficiently Rebuts the
               Plaintiff's Expert Report of Professor Ashlee Humphreys.............................14

           B.  Defendant's Expert Report from Robert Fisher Should Not be Excluded as It
               Complies with Rule 702 and the *Daubert* Case...............................................16

    III.  There Is No Basis To Preclude Any Additional Information, Including Witnesses
           Identified In Defendant's Pre-Trial Order and References to DNA Evidence ......19

           A.  Reference to Plaintiff's Public Representations concerning DNA Evidence
               Must Be Permitted .........................................................................................19

            B.  All of Defendant's Trial Witnesses Should Be Permitted To Testify .............21

CONCLUSION....................................................................................................27

i

**ASA-49**

## TABLE OF AUTHORITIES

*Cases*

*Badolato v. Long Island R.R*,
   2016 WL 6236311 (E.D.N.Y. Oct. 25, 2016)........................................................25

*Beech Aircraft Corp. v. Rainey*,
   488 U.S. 153 (1988)...............................................................................................17

*Carroll v. Trump*,
   Lm, 00 Ag, / . . / 4*0. 01 UJ 0. . 41/ 0 &Q,B,L,W, Dc`, / 3*0. 01' ......................20

*Daubert v. Merrell v. Down Pharmaceuticals*,
   509 U.S. 579(1993)............................................................................14, 16, 17, 18

*Ebert v. Nassau County*,
   No. CV 05-5445, 2008 WL 4443238,(E.D.N.Y. Sept. 26, 2008). ........................15

*Ebewo v. Martinez*,
   309 F. Supp. 2d 600 (S.D.N.Y. 2004) ....................................................23, 24, 26

*Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*,
   2002 WL 31108380 (S.D.N.Y. Sept. 23, 2002) ...................................................24

*Harris v. Donohue*,
   2017 WL 3638452 (N.D.N.Y. Aug. 23, 2017) .........................................24, 25, 26

*Hewitt v. Metro-North Commuter Railroad*,
   14-CV-8052 (AJN), 2017 WL 1155068 (S.D.N.Y. Mar. 24, 2017)..............24, 25

*Highland Capitol Management LP v. Schneider*,
   370 F.Supp.2d 461 (S.D.N.Y. 2005) ......................................................................1

*Hinton v. Patnaude*,
   162 F.R.D. 435 (N.D.N.Y. 1995) .........................................................................23

*Howard University v. Borders*,
   20-CV-04716 (LJL), 2022 WL 3568477 (S.D.N.Y. Aug. 17, 2022) ..............23, 24

*Hynes v. Coughlin*,
   79 F.3d 285 (2d Cir.1996) .......................................................................................3

*In re Resuling Prod. Liab. Litig.*,
   309 F. Supp.2d 531 (S.D.N.Y. 2004) ...................................................................15

ii

**ASA-50**

*Johnson v. Elk Lake School Dist.*,
  283 F. 3d 138 (3d Cir. 2002) ...................................................................................10

*Kunstler v. City of New York*,
  242 F.R.D. 261 (S.D.N.Y. 2007) .........................................................................23, 24

*Laspata DeCaro Studio Coporation v. Rimowa GmbH*,
  16-cv-934 (LGS), 2018 WL 3059650 (S.D.N.Y. June 20, 2018)..........................23

*Marvel Worldwide, Inc. v. Kirby*,
  777 F. Supp. 2d 720 (S.D.N.Y. 2011) ..............................................................22, 23

*Mugavero v. Arms Acres, Inc.*,
  03-CV-5724, 2009 WL 1904548 (S.D.N.Y. July 1, 2009)....................................25

*Palmieri v. Defaria*,
  88 F.3d 136 (2d Cir. 1996) ......................................................................................1

*Rapp v. Fowler*,
  20-CV-9586 (LAK), 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022).............3, 5, 7, 8, 10, 13, 14

*United States v. Barnason*,
  825 F.Supp.2d 367 (S.D.N.Y. 2012) .....................................................................3, 4

*United States v. Benedetto*,
  571 F.2d 1246 (2d Cir. 1978) .............................................................................11, 12

*United States v. Brand*,
  467 F.3d 179 (2d Cir. 2006) ....................................................................................9

*United States v. Campbell*,
  300 F.3d 202 (2d Cir. 2002) ...................................................................................11

*United States v. Crowley*,
  318 F.3d 401 (2d Cir. 2003). ...................................................................................9

*United States v. Curley*,
  639 F.3d 50 (2d Cir. 2011) ......................................................................................3

*United States v. Danzey*,
  594 F.2d 905 (2d Cir.). ...........................................................................................12

*United States v. Downing*,
  297 F.3d 52 (2d Cir. 2001) ......................................................................................2

*United States v. Dupree,*
    706 F.3d 131 (2d Cir. 2013). .................................................................................1

*United States v. Dukagjini,*
    326 D.3d 45 (2d Cir. 2003).....................................................................................14

*United States v. Duncan,*
    42 F.2d 359 (2d Cir. 1992) .....................................................................................14

*United States v. Flam,*
    369 F.3d 154 (2d Cir. 2004) .....................................................................................2

*U.S. v. Frederick,*
    702 F. Supp. 2d 32 (E.D.N.Y. 2009) ....................................................................20

*United States v. Garcia,*
    291 F.3d 127 (2d Cir. 2002) ...................................................................................11

*United States v. Hourihan,*
    66 F.3d 458 (2d Cir. 1995) .......................................................................................9

*United States v. Livoti,*
    196 F.3d 322 (2d Cir.1999). .....................................................................................2

*United States v. Manley,*
    632 F.2d 978 (2d Cir.1980) .................................................................................9, 10

*United States v. McCallum,*
    584 F.3d 471 (2d. Cir. 2009) ..................................................................................11

*United States v. Mills,*
    895 F.2d 897 (2d Cir. 1990) ...................................................................................12

*United States v. Neary,*
    733 F.2d 210 (2d Cir. 1984) ...................................................................................12

*United States v. Porterfield,*
    20-CR-42-A, 2022 WL 17091256 (W.D.N.Y. Nov. 21, 2022)...............................8

*United States v. Pugh,*
    937 F.3d 108 (2d. Cir. 2019) ..................................................................................10

*United States v. Reese,*
    933 F.Supp.2d 579 (S.D.N.Y.2013) .......................................................................12

iv

*United States v. Rosa*,
   11 F.3d 315 (2d Cir. 1993) ........................................................................................9

*United States v. Schaffer*,
   851 F.3d 166 (2d Cir. 2017) ......................................................................................4

*United States v. Spoor*,
   904 F.3d 141 (2d Cir. 2018) ......................................................................................3

*United States v. Williams,*
   205 F.3d 23 (2d Cir.2000) .........................................................................................2

*Universe Antiques, Inc. v. Vareika*,
   10-cv-3629, 2011 WL 5117057 (S.D.N.Y. Oct. 21, 2011) ....................................25

*Ventra v. United States*,
   121 F. Supp. 2d 326 (S.D.N.Y. 2000) .....................................................................23

**Rules and Statutes**

Fed. R. Evid. 402 ....................................................................................................1, 13, 14

Fed. R. Evid. 403 ........................................................................................1, 2, 13, 14, 20

Fed. R. Evid. 404(b) .............................................................................2, 3, 11, 12, 13, 14,

Fed. R. Evid. 415(a) ...............................................................................3, 4, 9, 10, 11, 14,

Fed. R. Evid. 413(d) .................................................................................4, 5, 7, 8, 9, 10

Rule 26(a)(2)(D)(ii) ...............................................................15, 16, 21, 22, 24, 25, 26

Fed. R. Evid. 702 .............................................................................15, 16, 17, 18, 19, 20

18 U.S.C. chapter 109A ....................................................................................4, 5, 7

18 U.S.C. §§ 2241, 2242, 2243, and 2244 .................................................................5

18 U.S.C.A. § 7 .........................................................................................................7

Federal Practice and Procedure § 2049.1 (3d ed. 2010) ........................................22

Fed. R. Civ. P. 37(c) ...............................................................................................24

Federal Practice and Procedure § 26.27[2][d] at 26-93 .........................................24

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in opposition to the omnibus motion *in limine* filed by the plaintiff, E. Jean Carroll ("Plaintiff"), on February 2016, 2023 (the "Motion"). For the reasons set forth herein, the Motion should be denied.

## LEGAL STANDARD

It is well-established that a district court may determine evidentiary issues in motions *in limine* prior to the commencement of trial. *See, e.g.*, *United States v. Dupree*, 706 F.3d 131, 135 (2d Cir. 2013). "The purpose of an *in limine* motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). In deciding a motion *in limine*, the Court should exclude evidence that is clearly inadmissible on all potential grounds. *Highland Capitol Management LP v. Schneider*, 370 F.Supp.2d 461 (S.D.N.Y. 2005); *see also* Fed. R. Evid. 402. Further, under Rule 403, even otherwise relevant evidence should be found inadmissible where it "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Accordingly, for the reasons set forth herein, Plaintiff's omnibus motion *in limine* must be denied in its entirety.

## ARGUMENT

### I.  The Court Should Preclude Natasha Stoynoff and Jessica Leeds From Testifying At Trial.

In her Motion, Plaintiff attempts to argue that the Court should admit the testimony of two proposed witnesses, Natasha Stoynoff and Jessica Leeds, each of whom intend to offer testimony concerning alleged prior encounters they claim to have had with Defendant. Plaintiff's position,

1

however, is unavailing since the introduction of this type of propensity evidence is clearly foreclosed by the Rules of Evidence and governing case law.[1]

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Pursuant to this Rule, "[e]vidence of prior criminal conduct is admissible under Federal Rules of Evidence 404(b) and 403 if it is relevant to an issue at trial *other than the defendant's character*, and if its probative value is not substantially outweighed by the risk of unfair prejudice." *United States v. Williams,* 205 F.3d 23, 33 (2d Cir.2000) (citing *United States v. Livoti,* 196 F.3d 322, 326 (2d Cir.1999)) (emphasis added). The Second Circuit has clarified that, for 'other act' evidence to be properly admitted under Rule 404, the following requirements must be satisfied: "(1) it [is] offered for a proper purpose; (2) it [is] relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court [gives] an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. Flam*, 369 F.3d 154, 156 (2d Cir. 2004) (citing *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2001).

Here, Plaintiff readily admits that the proposed testimony of Ms. Stoynoff and Ms. Leeds qualifies as 'other act' evidence prohibited by Rule 404(b)(1). Indeed, there is no reasonable dispute that the testimony of these two witnesses, Ms. Stoynoff and Ms. Leeds, constitutes anything other than propensity evidence, since Plaintiff admittedly seeks to introduce their testimony to as a means of showing that it is "*more likely* that [Defendant] sexually assaulted [Plaintiff][.]" *See* Pl. Mem. at 10 (ECF No. 134). Therefore, absent an exception to Rule 404(b)(1),

---

[1] Additional argument explaining why the testimony of these two witnesses is improper—and must be deemed inadmissible—is set forth in Defendant's Memorandum of Law in support of Motions *in Limine* (ECF No. 131), which Defendant incorporates by reference herein.

this evidence is barred as a matter of law. *See*, *e.g.*, *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (citing Fed. R. Evid. 404(b)) ("Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense." *Curley*, 639 F.3d at 57 (citing Fed. R. Evid. 404(b)); *see also Hynes v. Coughlin,* 79 F.3d 285, 290 (2d Cir.1996) (character evidence inadmissible to show "propensity"); *United States v. Barnason*, 825 F.Supp.2d 367, 371 (S.D.N.Y. 2012) ("In general, 'propensity' evidence is inadmissible.") (citing Fed. R. Evid. 404(b)); *Rapp v. Fowler*, 20-CV-9586 (LAK), 2022 WL 5243030, at *1 (S.D.N.Y. Oct. 6, 2022) ("Evidence to show propensity in most circumstances is precluded by the Federal Rules of Evidence.").

Plaintiff, unsurprisingly, ventures to claim that two exceptions apply in the instant scenario. First, she contends that the testimony of Ms. Stoynoff and Ms. Leeds qualify as evidence of "other sexual assault," which is admissible pursuant to Rule 415. Second, Plaintiff argues that said testimony is admissible under Rule 404(b)(2) as evidence of an apparent *modus operandi*. Both arguments miss the mark and are predicated upon misapplied principles of law.

### A.  The Witnesses' Testimony Does Not Qualify Under The Rule 415 Exception

Plaintiff contends that the testimony of both Ms. Stoynoff and Ms. Leeds should be deemed admissible pursuant to Rule 415, which sets forth a narrow exception to the prohibition on propensity evidence. In straining to arrive at this conclusion, Plaintiff raises disingenuous arguments, distorts the applicable standard of law, and mischaracterizes operative case law – including prior decisions rendered by this Court.

Rule 415 "reflects an exception in prosecutions for sex crimes to the common law practice of excluding propensity evidence." *United States v. Spoor*, 904 F.3d 141, 154 (2d Cir. 2018) (citing *United States v. Schaffer*, 851 F.3d 166, 178-79 (2d Cir. 2017)).

3

Rule 415(a) provides, in relevant part:

> In a civil case involving a claim for relief based on a party's alleged sexual assault or child molestation, the court may admit evidence that the party committed any other sexual assault or child molestation. The evidence may be considered as provided in Rules 413 and 414.

Fed. R. Evid. 415(a).

As Plaintiff correctly acknowledges, for evidence to qualify under Rule 415, two requirements must be satisfied: (1) the subject action must be "based on" a "sexual assault"; and (2) the conduct alleged by the nonparty accuser must qualify as a "sexual assault" under Rule 413(d). *See* Pl. Mem. at 6 (ECF No. 134) (citing *Barnason*, 825 F. Supp. 2d at 372). Here, contrary to Plaintiff's contention, neither condition is satisfied.

*First*, as detailed at length in Defendant's Memorandum of Law in support of Motions *in Limine*, which is incorporated by reference herein, this Court should adopt the 'categorical approach' endorsed by the Wright & Miller treatise. Under this approach, the instant action is not "based on" a sexual assault since Plaintiff's sole claim sounds in defamation. *See* ECF No. 131 at 5-6.

*Second*, none of the conduct alleged by either proposed witness, Ms. Stoynoff or Ms. Leeds, meets the statutory definition of a "sexual assault" under Rule 415. The term "sexual assault" is derived from Rule 413(d), which defines it as conduct that is "a crime under federal law or under state law" and which also involves:

(1) any conduct prohibited by 18 U.S.C. chapter 109A;

(2) contact, without consent, between any part of the defendant's body — or an object — and another person's genitals or anus;

(3) contact, without consent, between the defendant's genitals or anus and any part of another person's body;

4

(4) deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or

(5) an attempt or conspiracy to engage in conduct described in subparagraphs (1)–(4).

Fed. R. Evid. 413(d).

Contrary to Plaintiff's claim that "[o]f the five proscribed categories, the most directly applicable ones to this case are Rule 413(d)(1) and (d)(2)," Pl. Mem. at 6 (ECF No. 134), neither provision is applicable here.

With respect to Rule 413(d)(1)—which encompasses "any conduct prohibited by 18 U.S.C. chapter 109A"—Plaintiff points to this Court's holding in *Rapp v. Fowler*, No. 20-cv-9586 (LAK), 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022) to claim that the proposed testimony need only meet the statutory definition of "sexual contact" contained in 18 U.S.C. chapter 109A. However, this position is based upon an incorrect reading of this Court's decision in *Rapp* because Plaintiff overlooks the jurisdictional requirement of 18 U.S.C. chapter 109A.

18 U.S.C. chapter 109A is comprised of eight sections, four of which are relevant to Rule 413(d)(1) since they criminalize various type of sexual conduct – 18 U.S.C. §§ 2241, 2242, 2243, and 2244.[2] Each of these sections contain a uniform limiting principle, namely that they only apply to conduct that occurs "*in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency*." *See* 18 U.S.C. §§ 2241(a)-(b), 2242, 2243(a)-(b)[3], and 2244(a)-(b) (emphasis added).

---

[2] Section 2245 also criminalizes certain conduct, but it is plainly inapplicable here since it requires an allegation of murder. *See* 18 U.S.C. § 2245.

[3] Section 2243(c) is the only provision which does not contain the identical territorial jurisdiction language, but it requires the actor to have been "acting in their capacity as a Federal law enforcement office" so it clearly has no application here.

5

The "special maritime and territorial jurisdiction of the United States," in turn, is confined to the following areas:

(1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

(2) Any vessel registered, licensed, or enrolled under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes, or any of the waters connecting them, or upon the Saint Lawrence River where the same constitutes the International Boundary Line.

(3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

(4) Any island, rock, or key containing deposits of guano, which may, at the discretion of the President, be considered as appertaining to the United States.

(5) Any aircraft belonging in whole or in part to the United States, or any citizen thereof, or to any corporation created by or under the laws of the United States, or any State, Territory, district, or possession thereof, while such aircraft is in flight over the high seas, or over any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

(6) Any vehicle used or designed for flight or navigation in space and on the registry of the United States pursuant to the Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies and the Convention on Registration of Objects Launched into Outer Space, while that vehicle is in flight, which is from the moment when all external doors are closed on Earth following embarkation until the moment when one such door is opened on Earth for disembarkation or in the case of a forced landing, until the competent authorities take over the responsibility for the vehicle and for persons and property aboard.

(7) Any place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States.

**ASA-59**

(8) To the extent permitted by international law, any foreign vessel during a voyage having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States.

(9) With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act . . . the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

18 U.S.C.A. § 7.

Notably, neither Ms. Stoynoff nor Ms. Leeds testified that their alleged encounters with Defendant took place in any of the above-enumerated locations considered to be within the "special maritime and territorial jurisdiction of the United States." Ms. Stoynoff claimed that her purported interaction with Defendant occurred at his Mar-a-Lago residence in Palm Beach, Florida, *see* Habba Decl., Ex. A , which is plainly not covered by 18 U.S.C.A. § 7. As for Ms. Leeds, although she claimed that her alleged experience with Defendant occurred on an aircraft, she stated that it was a *domestic* flight that was traveling from Dallas to New York. *See* Habba Decl., Ex. B. Thus, subsection (4) of 18 U.S.C.A. § 7 is not applicable to her claim, nor is any other subsection of the statute. As a result, since neither Ms. Stoynoff nor Ms. Leeds will testify about an event that occurred in the "special maritime and territorial jurisdiction of the United States," the subject matter of their testimony cannot possibly be concerning "conduct prohibited by 18 U.S.C. chapter 109A." Fed. R. Evid. 413(d)(1). Therefore, 413(d)(1) has no application here.

Further, contrary to Plaintiff's contention, this Court's decision in *Rapp* only solidifies this point. In *Rapp*, this Court noted that the definition of "sexual contact"—which Plaintiff so heavily relies upon—is only relevant "*if all of the other elements of Section 2244's predicates are*

7

*satisfied*." *Rapp*, 2022 WL 5243030, at *2 (emphasis added). One of those elements is the requirement that the conduct occur "in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency." 18 U.S.C. 2244; *see also United States v. Porterfield*, 20-CR-42-A, 2022 WL 17091256, at *8 (W.D.N.Y. Nov. 21, 2022) (noting that the "federal jurisdiction element [must] be met" to establish a violation of 18 U.S.C. § 2244(a)). Since that is clearly not the case in the instant matter, Rule 413(d)(1) does not apply.

As for Rule 413(d)(2)—as discussed at length in Defendant's Memorandum of Law in Support of his Motions *in Limine*—there is simply no testimony from either Ms. Stoynoff or Ms. Leeds which alleges that Defendant engaged in any conduct purportedly involving contact between any party of Defendant's body and the genitals or anus of either woman. Therefore, Rule 413(d)(2) has no relevance to the proposed testimony of either witness.

Plaintiff also makes a half-hearted attempt to argue that Rule 413(d)(5) applies because, according to Plaintiff, "both women indicate in their testimony that [Defendant] would have continued his assault had he not been stopped." *See* Pl. Mem. at 7-8 (ECF No. 134). This argument is unavailing because there is simply no support for Plaintiff's bald assertion; indeed, despite claiming that their position is supported by the witnesses' testimony, Plaintiff fails to cite to either deposition transcript in support of her claim that both women alleged that Defendant "would have continued his assault had he not been stopped." *Id.* This omission speaks volumes – neither transcript contains any such testimony.

Plaintiff's misleading assertion aside, Rule 413(d)(5) is irrelevant because neither of the witnesses' testimony are sufficient to show that Defendant attempted to commit any of the acts

enumerated in Rule 415(d)(1) through (d)(4). *See* Fed. R. Evid. 413(d)(5) (requiring a showing of "an attempt or conspiracy to engage in conduct described in subparagraphs (1)–(4)."). To establish that an individual attempted to commit a crime, it must be shown that said individual "intend[ed] to commit the crime and t[ook] a 'substantial step' towards its completion." *United States v. Hourihan*, 66 F.3d 458, 462 (2d Cir. 1995) (citing *United States v. Rosa,* 11 F.3d 315, 337 (2d Cir. 1993). Here, Plaintiff is unable to satisfy either element.

To establish intent, it is necessary to "prove that the defendant intended to engage in conduct constituting a crime." *United States v. Crowley*, 318 F.3d 401, 408 (2d Cir. 2003). Neither woman has offered any testimony to this effect. They both testified that there was no verbal communication between themselves and Defendant during the alleged encounters, and neither alleged any facts which tend to show that Defendant had intended to initiate non-consensual contact with their genitals or anus. *See* Habba Decl., Ex. A at tr. 21:9-13 (Q: And did he say anything when he started kissing you? A: No. Q: Did he say anything before? A: Not that I recall."); Habba Decl., Ex. B at tr. 19:19-25 ("Q: And did [Defendant] say anything while this was happening? A: Not a word. There was never any sound that I can recall. Q: Did you say anything while this was happening? A: Nope."). Therefore, the intent element fails cannot be satisfied with respect to either witness.

As for second element, "[a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime." *United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980). The step "must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *United States v. Brand*, 467 F.3d 179, 202 (2d Cir. 2006) (citing

*Manley*, 632 F.2d at 987-988. "In determining whether conduct constitutes the requisite 'substantial step,' 'the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished. . . .'" *United States v. Pugh*, 937 F.3d 108, 119 (2d. Cir. 2019) (quoting *Manley*, 632 F.2d at 987).

Here, neither Ms. Stoynoff nor Ms. Leeds have alleged that Defendant took any "substantial step" towards violating Rule 413(d)(1) through (d)(4). Ms. Stoynoff's testimony—which alleges that Defendant "grabb[ed] [her] shoulders and push[ed] [her] against [a] wall and start[ed] kissing [her]"—simply does not implicate that Defendant sought to initiate non-consensual contact with her genitals, or any other conduct that fits the statutory definitions of "other sexual assault" set forth in Rule 413(d). *See* Habba Decl., Ex. A at tr. 21:7-8. As for Ms. Leeds, she testified that her supposed encounter with Defendant lasted "just a few seconds" and did not involve any contact, or attempted contact, with either party's genitals. Habba Decl., Ex. B. at tr. 19:13. While she did claim that Defendant "started putting his hands up [her] skirt," this non-descript account, without more, is insufficient to establish that Defendant took a "substantial step" towards violating Rule 415(d), particularly since she failed to indicate whether Defendant's hands made any contact with her body and, if so, how far the contact was from her genitals, what direction his hands were moving, how quickly they were moving, or any other relevant details that would provide a basis to infer that Defendant intended to initiate non-consensual contact with her genitals. *See Rapp,* 2022 WL 5243030, at \*2 (finding that testimony that defendant placed his "'hand on [the deponent's] leg . . . about two inches above [his] knee' and remained there for 'maybe 30 to 45 seconds'" is "not evidence of an 'other sexual assault' within the meaning of Rule 415(a), regardless of the question of intent."); *see also Johnson v. Elk Lake School Dist.*, 283 F. 3d 138, 156 (3d Cir. 2002) ("Where a past act cannot be shown with reasonable certainty, its probative

value is reduced and it may prejudice the defendant unfairly, confuse the issues, mislead the jury, and result in undue delay and wasted time.").

Based on the foregoing, the testimony of Plaintiff's proposed witnesses, Ms. Stoynoff and Ms. Leeds, do not fall within the purview of Rule 415. Therefore, this evidence must be excluded from trial.

### B.  The Proposed Testimony Is Not *Modus Operandi* Evidence

While it is true that the Second Circuit takes an "inclusionary approach" to Rule 404(b)(2) evidence, this approach does not permit a party "to offer, carte blanche, any prior act of the defendant in the same category of [activity]." *United States v. McCallum*, 584 F.3d 471, 475 (2d. Cir. 2009) (quoting *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002)). The party seeking to introduce evidence under Rule 404(b)(2) "must do more than demonstrate that the evidence is not offered solely to show that the defendant is a bad person," *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir. 1978); she must show that one of the specifically enumerated exceptions to Rule 404(b)(2) applies.

Plaintiff contends that the testimony of Ms. Stoynoff and Ms. Leeds should be admitted as *modus operandi* evidence. The justification for permitting *modus operandi* evidence under Rule 404(b)(2) is "to prove the identity of the defendant as the person who committed the offense being prosecuted," which is established by demonstrating that the crime fits within a unique pattern of conduct attributable to the defendant. *United States v. Campbell*, 300 F.3d 202, 215 (2d Cir. 2002). As explained by the Second Circuit:

> Evidence of a person's prior similar acts is probative on the issue of identity, only when his commission of other acts tends to show that he had a design or plan to commit the act alleged. For the prior similar acts to be probative of identity there must be "a high degree of similarity ... [leading] to the logical inference, by virtue of the combination of common features, that a common plan or design was at the basis for all the [criminal acts] and hence that it was the [defendant] who committed

11

> this [criminal act]." *United States v. Danzey,* 594 F.2d 905, 913 (2d Cir.), *cert.
> denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). Indeed, as we have
> previously noted, "evidence of other crimes offered to prove identity or common
> plan or design must be more similar than when those crimes are offered to prove
> intent." *Id.* at 913 n. 6. The more unique and unusual are the common
> characteristics of the similar acts involved, the more probative become the prior
> acts, since they then are sufficiently distinctive to be viewed as "fingerprints" or
> "signatures" of the person charged. *United States v. Benedetto,* 571 F.2d 1246,
> 1249 (2d Cir.1978).

*United States v. Neary*, 733 F.2d 210, 216 (2d Cir. 1984).

To qualify as evidence of a *modus operandi*, the alleged conduct must "share enough characteristics with the charged offenses that they share the 'signature' required for use in establishing a modus operandi under Rule 404(b)," *United States v. Reese,* 933 F.Supp.2d 579, 582 (S.D.N.Y. 2013) (citing *United States v. Danzey,* 594 F.2d 905, 911 (2d Cir.1979)). In other words, the evidence sought to be introduced must show be that of a "signature crime,' *i.e.*, a *modus operandi* where the crimes are 'so nearly identical in method as to ear-mark them as the handiwork of the accused.'" *United States v. Mills*, 895 F.2d 897, 907 (2d Cir. 1990). "[M]uch more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts . . . *[t]he device used must be so unusual and distinctive as to be like a signature.*" *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir. 1978) (emphasis in original).

In the instant scenario, Plaintiff's position that the conduct alleged by Ms. Stoynoff and Ms. Leeds is so distinct that it should be viewed as a "signature crime" is plainly without merit. *Mills*, 895 F.2d at 907. Indeed, the purported *modus operandi* that Plaintiff seeks to attribute to Defendant—sexually assaulting a woman and then subsequently denying it—is (unfortunately) not conduct that can be considered unique in our society.[4] It certainly is not the type of distinct

---

[4] Plaintiff acknowledges as much in her Complaint by repeatedly stressing her belief that sexual assault is "pervasive" in modern society and that "powerful" men are often not held accountable for such acts. *See generally* Complaint (ECF No. 1).

and identifiable conduct that can be "ear-mark[ed] . . . as the handiwork" of Defendant to charge

him as the only perpetrator who could have possibly committed the act in question. *Id.* At most,

the testimony of the two witnesses would merely purport to show the "repeated commission of

crimes of the same class," which falls well short of qualifying as a *modus operandi*.

Further, Plaintiff's contention that she seeks to introduce the testimonial evidence because

"it makes it *more likely* that [Defendant] sexually assaulted [Plaintiff] and then lied when he denied

having done so," Pl. Mem. at 10 (ECF No. 134), reveals her true intention – to introduce the

evidence solely for the purpose of establishing propensity. As such, Plaintiff's request should be

rejected for the same reason this Court declined to admit propensity evidence in *Rapp v. Fowler*:

> Plaintiff here argues that the evidence . . . is pertinent to whether Mr. Fowler's
> interaction with Mr. Rapp was motivated by Mr. Fowler's desire to gratify either
> his own or Mr. Rapp's sexual desire or to degrade or abuse Mr. Rapp or,
> alternatively, to corroborate Mr. Rapp's testimony concerning his encounter with
> the Mr. Fowler. The second of these arguments really amounts to saying that the
> evidence is offered precisely for the prohibited purpose of showing Mr. Fowler's
> character in order to show that he acted in accordance with that character on a
> different occasion — is offered purely to show propensity. And the probative value
> of the first argument, if it has any, would be outweighed quite substantially by the
> risk that the jury would consider the evidence regarding Mr. Dawes purely or
> predominantly for the unfair, and prejudicial purpose foreclosed by Rule 404(b)(1).

*Rapp*, 2022 WL 5243030, at *2.

Therefore, Plaintiff's request to introduce the testimony of Ms. Stoynoff and Ms. Leeds

as *modus operandi* evidence must be denied.

### C. Even If Otherwise Admissible, The Testimony Of Ms. Stoynoff and Ms. Leeds Must Be Precluded Under Rules 402 and 403

Assuming *arguendo* that one or both of the proposed testimonies of Ms. Stoynoff and/or

Ms. Leeds qualify under either the Rule 415 or Rule 404(b)(2) exceptions—which they do not—

such evidence is nonetheless inadmissible under Rules 402, due to irrelevance, and under 403,

since the probative value of such evidence is substantially outweighed by its potential for unfair

**ASA-66**

prejudice. These arguments are fully set forth in Defendant's Memorandum of Law in support of

Motions *in Limine* (ECF No. 131), and Defendant fully incorporates them by reference herein. *See*

*also Rapp*, 2022 WL 5243030, at *2 (finding testimony of prior sexual assault, which was

inadmissible under Rule 415, was likewise inadmissible under Rule 404(d)(2) because it was

"offered purely to show propensity" and because its probative value was "quite substantially

outweighed by the risk that the jury would consider the evidence regarding [the witness] purely or

predominantly for the unfair, and prejudicial purpose foreclosed by Rule 404(b)(1).").

**II.    Plaintiff's Motion *in Limine* to Exclude the Expert Report and the Testimony of Robert Fisher as Defendant's Rebuttal Expert Witness Should Be Denied**

**A.    The Defendant's Expert Report of Robert Fisher Sufficiently Rebuts the Plaintiff's Expert Report of Professor Ashlee Humphreys**

Plaintiff seeks to exclude Robert Fisher ("Fisher") as an expert witness in this litigation

due to his purported failure to properly rebut the report of Plaintiff's proposed expert Professor

Ashlee Humphreys.  This argument is wholly without merit, as set forth more fully below.

A court maintains full discretion to determine whether expert testimony will be admitted.

*See United States v. Duncan,* 42 F.2d 359 (2d Cir. 1992) (internal citations omitted).  Further, the

Federal Rules of Evidence "provide a liberal standard for the admissibility of expert testimony."

*United States v. Dukagjini,* 326 D.3d 45, 52 (2d Cir. 2003) (citing *Daubert v. Merrell v. Down*

*Pharmaceuticals,* 509 U.S. 579, 588 (1993).

As such, "[o]ne of the fundamental requirements of Rule 702 is that the proposed testimony

'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *In re Resuling*

*Prod. Liab. Litig.,* 309 F. Supp.2d 531, 540 (S.D.N.Y. 2004) (quoting Rule 702).

As stated in Plaintiff's moving papers, under Rule 26(a)(2)(D)(ii), a party may submit

expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter

identified by another party." However, "[a] rebuttal report is not the proper 'place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice." *Ebert v. Nassau County,* No. CV 05-5445, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (citations omitted).

Despite Plaintiff's assertions to the contrary, the content of Fisher's expert report **does** proffer evidence that effectively "contradicts or rebuts evidence" provided by Professor Humphreys in her proposed expert report. With respect to her qualifications as a potential expert, Fisher emphasizes that Professor Humphreys "does not indicate that she has any professional background, experience or expertise in reputation management, damage or repair – which are the center of this case." *See* Habba Decl., Ex. C at 2.

Regarding Professor Humphreys' methodology in preparing her report, Fisher emphasizes:

It [is] also important to note that internet exposure (and even media exposure) is a form of 'indirect' communications meaning that the receiver is not getting the message directly from the sender. The most effective form of communications is "direct" contact. There are many ways to do this (e.g., direct verbal conversations, letters, emails, speaking engagements, appearances at events) and does not appear that any form of direct communications is in Humphreys' program.

Habba Decl., Ex. C at 10.

Additionally, on page eight of his expert report, Fisher rebuts Professor Humphreys' definition of "reputation" and counters by stating that "[a] more appropriate definition of reputation would be that a reputation is the sum of all our actions that is reflected by the people around us in the way they treat us or interact with us. It is an indirect result of anything and everything that we do. Successful people have always stressed on the building and maintaining of reputation as a fundamental ingredient to success. This distinction is important in relation to the claims made by Carroll against Trump." *Id.*

15

Further, with respect to the reputational repair program proffered by Professor Humphreys and the methodology to support her conclusions, Fisher opines that "[h]aving almost the entire program geared to online exposure is equivalent to 'putting all your eggs in one basket.' The most successful type of communications program features dissemination of information through multiple communications channels." *Id.*

On that point, Fisher further rebuts Humphreys' report by stating that "the most effective ways to do this (e.g., direct verbal conversations is 'direct' contact. There are many ways to do this (e.g., direct verbal conversations, letters, emails, speaking engagements, appearances at events) and it does not appear that any form of direct communications is in Humphreys' program." *Id.*

Based upon the foregoing, Plaintiff's argument is meritless. In compliance with Rule 26(a)(2)(D)(ii), Rule 702, and applicable and supporting case law, it is clear that the expert report of Robert Fisher effectively "contradicted or rebutted" the opinions set forth by Professor Humphreys. Furthermore, the rebuttal report set forth by Fisher is supported by sufficient and compelling evidence, as set forth above. Accordingly, Fisher's expert testimony should be admitted at the time of trial, and Plaintiff's Motion *in Limine* should be denied.

**B. Defendant's Expert Report from Robert Fisher Should Not be Excluded as It Complies with Rule 702 and the *Daubert* Case**

Plaintiff also seeks to preclude Robert Fisher from testifying as an expert at trial due to his purported failure to comply with the case of *Daubert v. Merrell v. Dow Pharmaceuticals,* 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence. Plaintiff's contentions in this regard are similarly unpersuasive and should be summarily dismissed by this Court.

As set forth above, the applicable Rule of Evidence governing expert testimony is Fed. R. Evid. 702. In applying Rule 702, "general acceptance" is not a prerequisite to admissibility. *See*

16

**ASA-69**

*Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169 (1988).  On that point, the Supreme Court of the United States held that a rigid "general acceptance" requirement would be contrary to the "liberal thrust" of the Federal Rules and the Court's "general approach of relaxing the traditional barriers or 'opinion' testimony."  *Beech Aircraft Corp,* 488 U.S. at 169 (citing Rules 701 to 705).

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. In analyzing the requirements set forth in Rule 702, it is essential to note that not all five elements need to be complied with in order to comply with Rule 702 – only one of the five elements need to be satisfied.  *See Daubert v. Merrell v. Dow Pharmaceuticals,* 509 U.S. 579 (1993).

Therefore, regarding the requirements set forth by Rule 702, it is respectfully submitted that Fisher meets three of these elements: knowledge, skill and experience.  As such, Robert Fisher clearly qualifies as an expert in this litigation and his expert testimony should be admitted.

With respect to the "skill element" set forth in Rule 702, Fisher testified during his deposition that he received several awards and honors throughout his career.  Specifically, he received awards from the Public Advisors Society of America and the Public Communicators of Los Angeles. *See* Habba Decl., Ex. D at tr. 41:5-42:4.

In particular, Fisher testified that one of the multiple awards he received in the reputational damage field was when he repaired the damaged reputation of the brothel industry in Nevada and rehabilitated its perception overall in the community. *Id.* at tr. 42:5 – 43:22.  Additionally, Fisher testified that he "managed to short-circuit the eviction of [tenants of an upscale condo complex,

Marina Del Verde] by creating a reputational damage program to repair the tenants' reputation and allow them to remain as tenants in this condo complex. *Id.* at tr. 43:23-44:9.

Regarding the "experience element" set forth in Rule 702, Fisher further testified to his extensive experience in public relations, which is essential when analyzing situations involving reputational harm and reputational damage repair. *Id.* at tr. 49:12-50:15. With respect to his expertise in public relations, Fisher's expert report states that he has 50 years of experience as a public relations professional and during that time period, "80 to 100 [of his clients] had issues relating to a damaged reputation crisis situation that negatively impacted their reputation.

Additionally, throughout his lengthy and extensive career, Fisher "acquired a significant national reputation with both the legal profession and the news media as a preeminent expert in crisis communications and reputation damage and repair…." *See* Habba Decl., Ex. C at 1.

Fisher also satisfied the "knowledge element" of Rule 702 through his deposition testimony. Specifically, Fisher testified to the following:

Q:    And – and what data do you rely upon to determine what the best media is for your target audience in terms of credibility and the other things you mentioned?

A:    Knowledge. I've been in this business 50 years. A reporter for "The New York Times", I was in journalism – I know the media, I know which media – who the media are, I know what they do, I know who they reach out to, I know who reads them or listens to them, I know that – for instance, if I had something from Mr. Trump back in the day, I wouldn't go to MSNBC for it,, I would go to FOX, you know or now Newsmax or America One [sic] or whatever..

But the bottom line is I – I have knowledge; that's why I'm an expert. I have 50 years of knowledge of working with the media. Most of them were around 50 years ago. "New York Times" was around 50 years ago, so was the Washington Post, so was ABC, so was AP, so was Wall Street Journal. I don't need to consult textbooks or media guides – again, we're just talking about news media at this point. I don't need to consult them to kno**?**w who – who the movers and shakers are or where I need to be.

*See* Habba Decl., Ex. D at tr. 313:4-314:3.

18

**ASA-71**

Thus, as set forth above, although only one out of five elements are required to be shown under Rule 702 to be permitted to provide expert testimony, Fisher clearly establishes three of those elements: knowledge, experience and skill. As such, it is respectfully requested that Fisher's expert testimony should be admitted at trial and Plaintiff's Motion *in Limine* should be denied.

Accordingly, as set forth herein and as evidenced by the contents of Robert Fisher's expert report and deposition testimony, Robert Fisher should be admitted as an expert rebuttal witness for this litigation, as his expert report clearly complies with Rule 702 and the *Daubert* case. Consequently, Plaintiff's Motion *in Limine* should be denied.

### III. There Is No Basis To Preclude Any Additional Information, Including Witnesses Identified In Defendant's Pre-Trial Order and References to DNA Evidence

#### A. Reference to Plaintiff's Public Representations concerning DNA Evidence Must Be Permitted.

Plaintiff's contention that this Court should preclude *any* testimony or commentary concerning DNA evidence is wholly unavailing. Contrary to Plaintiff's assertion, Defendant is entitled to cross-examine Plaintiff with respect to the fact that she publicly, and falsely, proclaimed that she was in possession of Defendant's DNA.

As previously stated, the Court may only exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, issue confusion, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. "Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *U.S. v. Frederick*, 702 F. Supp. 2d 32, 35 (E.D.N.Y. 2009).

In the instant matter, Defendant seeks to cross-examine Plaintiff on her prior representations to the public that she had somehow obtained Defendant's DNA. Indeed, during her deposition testimony, she candidly admitted that she publicly stated that she had his DNA. *See*

Habba Decl., Ex. E at tr. 217:24-218:22. The probative value of Plaintiff's testimony regarding her prior representations outweighs any nominal prejudice she may claim under the Rule 403 balancing test. The fact that Plaintiff was publicly representing that she was in possession of Defendant's DNA, when she in fact was not, goes towards her motivation and tends to show that she was seeking to attract media attention and bolster her story in the public eye. Indeed, a jury could view this evidence as a significant and probative factor in support of Defendant's argument that Plaintiff manufactured her defamation claim for the purpose of garnering publicity.

As for potential undue prejudice to Plaintiff, there simply is none. For the avoidance of doubt, Defendant is not seeking to introduce an expert to opine on Plaintiff's report, nor does he intend to introduce Plaintiff's DNA report on this subject. Instead, Defendant only seeks to cross-examine Plaintiff as to public statements that she made regarding Defendant's DNA, and her motivation for making such statements. Given the limited nature of this inquiry, such testimony could not conceivably unduly prejudice Plaintiff.

Nor would such a line of inquiry encroach upon any of the concerns that this Court raised in the Order dated February 15, 2023 in *Carroll II. See Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023). Despite Plaintiff's attempt to characterize the February 15, 2023 Order as a blanket ban on any and all evidence pertaining to DNA in *Carroll II* (and, presumably, this mater), this Court's ruling was narrow in scope and merely denied Defendant's application to obtain an appendix which was attached to a DNA report that Plaintiff filed in state court. *Id*. at *3. The denial was premised upon the Court's finding that pre-trial discovery has already concluded and that such a request may delay the trial date. *Id*. at *8. The Order does not, however, purport to preclude the parties from making *any* mention of DNA at trial, nor does it specifically exclude reference to Plaintiff's numerous public assertions that she obtained

20

Defendant's DNA, thereby prematurely condemning him of guilt[5]. Plaintiff has not argued, nor

can she, that Defendant's cross-examination of Plaintiff on her own prior statements would delay

this trial, nor force the parties to regale the entire history of Plaintiff's attempts to obtain

Defendant's DNA. As such, Plaintiff is entitled to introduce testimony and commentary regarding

this highly relevant issue.

**B. All of Defendant's Trial Witnesses Should Be Permitted To Testify**

In the Motion, Plaintiff contends that Defendant should be precluded from calling five non-

party witnesses identified by Defendant in the pre-trial order—namely, David Haskell, Elizabeth

Dyssegaard, Erin Hobday, Laurie Abraham, and Sarah Lazin—on the basis that Defendant

purportedly violated Rule 26(a)(1) by failing to amend his Initial Disclosures to identify said

witnesses. This position is flawed in its premise since Plaintiff did not have any obligation to

identify these witnesses because they were known to—in fact, disclosed by—Plaintiff. Further,

even if there were some technical violation of Rule 26, the omission of these witnesses from

Defendant's Initial Disclosures is "harmless" because their names were "known to all parties." *See*

Advisory Committee Notes, 146 F.R.D. 682, 691 (1993).

Rule 26 requires parties to provide "the name . . . of each individual likely to have

discoverable information . . . that the disclosing party may use to support its claims or defenses,

unless solely for impeachment, identifying the subjects of the information." Fed. R. Civ. P.

26(a)(1)(A). Further, Rule 26(e) requires that the parties supplement its initial disclosures "if the

party learns that in some material respect the information disclosed is incomplete or incorrect, and

---

[5] For instance, Plaintiff has made numerous posts on social media claiming that the DNA
evidence on "the dress" will purportedly serve as damning evidence against Defendant in this
case. *See, e.g., https://twitter.com/ejeancarroll/status/1400122740720480262;
https://twitter.com/ejeancarroll/status/1364995845439901700;
https://twitter.com/ejeancarroll/status/1256301599426785280.*

if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).

The key language Plaintiff has conveniently overlooked is that "additional or corrective information" need only be supplemented in an initial disclosure if it "***has not otherwise been made known to the other parties*** during the discovery process or in writing." *Id.* (emphasis added). Indeed, as memorialized in the Advisory Committee Notes to the 1993 Amendments, it is well established that Rule 26 imposes "***no obligation*** to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition[.]" Advisory Committee Notes, 146 F.R.D. 682, 691 (1993); *see also Marvel Worldwide, Inc. v. Kirby,* 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011), *aff'd in part, vacated in part on other grounds sub nom. Marvel Characters, Inc. v. Kirby,* 726 F.3d 119 (2d Cir. 2013) ("[T]he duty to supplement a Rule 26 disclosure is only necessary when the omitted or afteracquired information has not otherwise been made known to the other parties during the discovery process.") (*quoting* 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2049.1 (3d ed. 2010));

Consistent with this principle, it is evident that Defendant did not commit any violation of Rule 26. It is beyond dispute that Plaintiff was aware of the identities of the five witnesses and the scope of their knowledge. In fact, it was *Plaintiff* who disclosed four of those witnesses, Haskell, Dyssegaard, Abraham, and Lazin, as individuals who "have any knowledge or information about any of the allegations in the Complaint" in her answers to interrogatories. Pl. Mem. at 24 (ECF No. 134); *see also* Habba Decl., Ex. F. The fifth, Hobday, was discussed by Plaintiff in her deposition and identified as the managing editor of *Elle* and the individual who advised Plaintiff

of her termination.[6] *See* Habba Decl., Ex. E at tr. 178:12-19.  As a result, Defendant did not have any duty to supplement his Rule 26 initial disclosures to include the identities of any of these witnesses, since Plaintiff was the one who made their identities known in the first place. *See*, *e.g.*, *Laspata DeCaro Studio Coporation v. Rimowa GmbH*, 16-cv-934 (LGS), 2018 WL 3059650 at *9 (S.D.N.Y. June 20, 2018) (finding that plaintiff had "no duty to supplement its initial disclosures" to include a witness who the defendant had "list[ed] as an individual likely to possess knowledge relevant to th[e] action."); *Howard University v. Borders,* 20-CV-04716 (LJL), 2022 WL 3568477, at *2 (S.D.N.Y. Aug. 17, 2022) (finding that plaintiff had "no obligation to supplement its initial disclosures" to identify trial witness when defendant was "well aware of [the witness's] identity and her role from the beginning of the litigation and that it was possible that [the plaintiff] might choose to use her as a witness."); *Marvel Worldwide*, 777 F. Supp. 2d at 727 ("Because [plaintiff] became aware of [declarants] at . . . depositions, [defendants] did not have a duty to supplement their Rule 26 initial disclosures.").

Moreover, even assuming *arguendo* that Defendant did commit some technical violation of Rule 26, it does not follow that preclusion of Defendant's proposed witnesses is warranted under Rule 37. "The purpose of [Rule 37] is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004). "Imposition of sanctions under Rule 37 is a drastic remedy and should only be applied in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." *Hinton v. Patnaude*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (citation omitted); *see also*

---

[6] Plaintiff was also shown communications which revealed that Ms. Hobday was involved in the internal deliberations to terminate Plaintiff, for reasons that were "shocking" to Plaintiff and which directly contradict allegations contained in the Complaint. *See* Habba Decl., Ex. E at tr. 188:25-189:19.

**ASA-76**

*Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000) ("[P]reclusion is a drastic remedy and therefore [warrants] discretion and caution."); *Kunstler v. City of New York*, 242 F.R.D. 261, 265 (S.D.N.Y. 2007) (noting that preclusion is "disfavored"); *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y. 2004) ("Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution.").

Rule 37(c) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . at trial, *unless the failure was substantially justified or is harmless*." Fed. R. Civ. P. 37(c) (emphasis added). The 1993 Advisory Committee Notes to Rule 37 emphasizes that "the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties" and clarifies that situations where violation should be considered "harmless" include, among other things, "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties." *See* Advisory Committee Notes, 146 F.R.D. 682, 691 (1993); *see also Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) ("[A] failure to disclose witness information is 'harmless' if the other party was well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial.") (quoting 6 Moore's Federal Practice § 26.27[2][d] at 26-93).

Here, any violation of Rule 26 by Defendant would clearly qualify as a "harmless" one since Plaintiff was aware of the identities of Haskell, Dyssegaard, Hobday, Abraham, and Lazin, and fully understood their relevance to this case. As such, she has no basis for arguing that they should be precluded from testifying at trial. *See*, *e.g.*, *Harris v. Donohue*, 2017 WL 3638452 (N.D.N.Y. Aug. 23, 2017) (declining to preclude witnesses when "[p]laintiff was clearly aware

24

that both [witnesses] possessed relevant knowledge [and] could have taken the deposition of either individual at an appropriate time prior to trial and chose not to."); *Hewitt v. Metro-North Commuter Railroad*, 14-CV-8052 (AJN), 2017 WL 1155068, at *3 (S.D.N.Y. Mar. 24, 2017) ("Because [the plaintiff] 'was well aware of the identity of the undisclosed witness and the scope of knowledge well before the trial,' [the defendant's] 'failure to disclose . . . is 'harmless.'") (citations omitted); *Howard University*, 2022 WL 3568477, at *2 ("Defendants were well aware of Ms. Jones Gentry's identity and her role from the beginning of the litigation and that it was possible that Howard might choose to use her as a witness . . . [t]here thus was no obligation on Howard to supplement its initial disclosures . . . [a]nd, even if there were such a duty, the violation would be harmless."); *Mugavero v. Arms Acres, Inc.,* 03-CV-5724, 2009 WL 1904548, at *5 (S.D.N.Y. July 1, 2009) ("[B]ecause Defendants had reason to know during the discovery period that Peter Mugavero and Dr. Weinshel might have information relevant to Plaintiff's damages claims, her failure to disclose their identity in her discovery responses was harmless, and Defendants' motion to preclude them from testifying is denied."); *Universe Antiques, Inc. v. Vareika,* 10-cv-3629, 2011 WL 5117057, at *4 (S.D.N.Y. Oct. 21, 2011) ("The [plaintiffs] will suffer no prejudice if the Undisclosed Witnesses are called at trial because the Undisclosed Witnesses include individuals with whom the [plaintiffs] are very familiar . . . [i]n these circumstances, the Court finds no credible risk of unfair surprise or sandbagging with new evidence.")

Further, to the extent that Plaintiff argues that she has been prejudiced because she was unaware that Defendant intended to call these five individuals as trial witnesses, no such notice requirement exists under Rule 26. As the court in *Harris v. Donahue* explained:

> Plaintiff asserts that [he lacked notice] that the defendants intended to use either Nielson or Palumbo as witnesses. However, the purpose of Rule 26(a)(1)(A) is to "alert an opposing party of the need to take discovery of the named witness." *Badolato v. Long Island R.R.*, 2016 WL 6236311, at *4 (E.D.N.Y. Oct.

> 25, 2016). Plaintiff was clearly aware that both Nielson and Palumbo possessed relevant knowledge of underlying June 21, 2014 incident at issue in the case. As such, plaintiff could have taken the deposition of either individual at an appropriate time prior to trial and chose not to.
>
> As Harris was well aware of the identity and general scope of knowledge of both Nielson and Palumbo before trial, defendants' failure to include either Nielson or Palumbo in their Rule 26 disclosure was harmless. Therefore, plaintiff's motion to preclude the testimony of Nielson and Palumbo will be denied.

*Harris v. Donahue*, 1:15-CV-01274 (DNH) (CFH), 2017 WL 3638452, at *2(N.D.N.Y. Aug. 23, 2017). Thus, Plaintiff's argument is entirely unfounded in the law.

Lastly, Plaintiff's contention that Defendant's has engaged in conduct tantamount to "trial by ambush" is completely undermined by the manner in which Plaintiff identified her own trial witnesses throughout the course of discovery proceedings. For instance, Plaintiff identified Cheryl Lee Beall—who supposedly has knowledge of the Bergdorf Goodman store during the relevant time periods— as a potential witness for the first time in her Second Supplemental Rule 26(a)(1) Disclosures, which was served on October 14, 2022 – just *five days* before the fact discovery period ended on October 19, 2022. Habba Decl., Ex. G Similarly, Plaintiff identified another Bergdorf-related witness, Robert Salerno, for the first time in her Third Supplemental Rule 26(a)(1) Disclosure, which was served on January 6, 2023 – approximately *two and a half months* after the close of fact discovery. *See* Habba Decl., Ex. E. Prior to these disclosures, Defendant had no knowledge of these individuals, their knowledge, or the purported relevance to this action. Yet, due to Plaintiff's late disclosure, Defendant was not provided ample opportunity to depose either witness; as a result, to date Defendant lacks any understanding as to the subject matter of the testimony that either witness seeks to provide. This is precisely the type of "'sandbagging' an opposing counsel with new evidence" that is precluded under Rule 37, *Ebewo v. Martinez*, 309 F.

26

Supp. 2d 600, 607 (S.D.N.Y. 2004), and is, undoubtedly, significantly more prejudicial than Defendant's purported failure to disclose witnesses who Plaintiff was well aware of.

Therefore, Plaintiff's request to precluded Defendant from calling David Haskell, Elizabeth Dyssegaard, Laurie Abraham, Sarah Lazin, and Erin Hobday as witnesses at trial must be denied.

**CONCLUSION**

For the foregoing reasons, Defendant, Donald J. Trump, respectfully requests that the Court deny Plaintiff's omnibus motion *in limine* in its entirety.

Dated: February 23, 2023                    Respectfully submitted,
      New York, New York

Alina Habba, Esq.
Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP

## ASA-80

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-9-24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

Plaintiff,

-against-                                                    20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM AND ORDER ON
PLAINTIFF'S *IN LIMINE* MOTION**

Appearances:

Roberta Kaplan
Shawn Crowley
Matthew Craig
Trevor Morrison
KAPLAN HECKER & FINK LLP
*Attorneys for Plaintiff*

Alina Habba
Michael T. Madaio
HABBA MADAIO & ASSOCIATES LLP
*Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

This is a defamation case, frequently referred to as *Carroll I*, brought in November

2019 by writer E. Jean Carroll against Donald Trump for certain statements Mr. Trump made in June

2019 shortly after Ms. Carroll publicly accused him of sexually assaulting her in the mid-1990s.

2

While *Carroll I* was delayed by appellate proceedings relating to issues under the Westfall Act, Ms. Carroll brought a second, closely related action against Mr. Trump ("*Carroll II*") in November 2022 for damages for sexual assault under the then newly enacted New York Adult Survivors Act and for defamation by a statement Mr. Trump made in October 2022.

*Carroll II* was tried in this Court in April and May 2023 to a plaintiff's verdict on both claims.[1]  The jury in *Carroll II* found – as Ms. Carroll claimed – that Mr. Trump had sexually assaulted her and that his October 2022 statement defamed her, and awarded Ms. Carroll a total of $5 million of compensatory and punitive damages.[2]  After the verdict in *Carroll II* and the resolution of the appeal in *Carroll I,* the Court granted Ms. Carroll partial summary judgment on liability in this case, largely on the basis that Mr. Trump was collaterally estopped by *Carroll II* to deny that he

---

[1]

The Court assumes familiarity with its prior decisions in this case and in *Carroll II*, which detail the facts and procedural histories of both cases. *E.g.*, Dkt 32, *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022); Dkt 73, *Carroll v. Trump*, 590 F. Supp. 3d 575 (S.D.N.Y. 2022); Dkt 96, *Carroll v. Trump*, 635 F. Supp. 3d 229 (S.D.N.Y. 2022); Dkt 145, *Carroll v. Trump*, No. 20-CV-7311 (LAK) ("*Carroll I*"), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023); Dkt 173, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 4393067 (S.D.N.Y. July 5, 2023); Dkt 200, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 5017230, (S.D.N.Y. Aug. 7, 2023); Dkt 208, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 5312894, (S.D.N.Y. Aug. 18, 2023); Dkt 214, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 5731152, (S.D.N.Y. Sep. 6, 2023); Dkt 232, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2023 WL 7924698 (S.D.N.Y. Nov. 16, 2023); Dkt 38, *Carroll v. Trump*, No. 22-CV-10016 (LAK) ("*Carroll II*"), 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023); *Carroll II*, Dkt 56, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb, 15, 2023); *Carroll II*, Dkt 92, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 3000562 (S.D.N.Y. Mar. 20, 2023); *Carroll II*, Dkt 95, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023); *Carroll II*, Dkt 96, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2669790 (S.D.N.Y. Mar. 28, 2023), *Carroll II*, Dkt 212, *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 4612082, (S.D.N.Y. July 19, 2023).

Unless otherwise indicated, Dkt references are to the docket in this case.

[2]

*Carroll II*, No. 22-CV-10016, Dkt 174 (Verdict).

3

sexually assaulted and previously defamed Ms. Carroll.[3]  In other words, the material facts concerning the alleged sexual assault already have been determined, and this trial will not be a "do over" of the previous trial.  Accordingly, this case will be tried, commencing on January 16, 2024, on the issue of damages for the June 2019 statements.

The matter now before the Court is Ms. Carroll's motion with respect to various evidentiary issues in advance of the damages trial (Dkt 233).  Many of the questions raised by Ms. Carroll's present motion were the subjects of rulings or concern matters that arose in the trial of *Carroll II*, so the Court frequently refers to those sources.

*Analysis*

*Ms. Carroll's Choice of Her Counsel and Her Counsel's Other Activities*

Ms. Carroll seeks to preclude Mr. Trump from inquiring into Ms. Carroll's choice of counsel and the activities of her counsel apart from this case.  Mr. Trump contends that he should be permitted to cross-examine Ms. Carroll on the subject of her choice of counsel "to demonstrate that [she] has failed to mitigate her own damages."[4]  Specifically, he argues that:

> "Given that Plaintiff's theory of harm is largely focused on the negative public attention she has received since coming forward with her allegations against Defendant, one potential defense that Defendant may present at trial is to identify self-aggrandizing and/or attention-seeking behavior exhibited by Plaintiff which independently contributed to any negative public backlash. For instance, Plaintiff has

---

[3]  *Carroll I*, 2023 WL 5731152, at *2.

[4]  Dkt 235 (Def. Opp. Letter) at 2.

4

displayed a tendency to publicize any ongoing developments of the instant lawsuit
and to paint herself – *and her attorneys* – as champions against Defendant and his
political viewpoints. . . . As such, Defendant is entitled to present evidence which
tends to show that any damage that Plaintiff purportedly suffered should be offset by
the fame or notoriety that she garnered as a result of her own behavior, including her
choice of (and promotion of) her counsel."[5]

Mr. Trump's arguments are unpersuasive.  While New York law requires plaintiffs
to "use reasonable and proper efforts" to minimize the effects of a defamation,[6] Mr. Trump does not
explain how Ms. Carroll's *choice of counsel*, or her counsel's other professional or personal
activities, "independently contributed to" or ameliorated any impact of Mr. Trump's defamatory
statements on her reputation.  Nor is there any merit to Mr. Trump's argument that cross-
examination on Ms. Carroll's choice of counsel and her counsel's activities apart from this case
would "probe into [her] efforts to draw public support and attention for herself, her attorneys, and
this highly-publicized lawsuit."[7]  Mr. Trump is prohibited "from commenting upon or eliciting any
evidence regarding plaintiff's choice of counsel or her counsel's activities outside the litigation

---

[5]     *Id.* at 2-3 (emphasis in original) (footnote omitted).

[6]     *Williams v. Bright*, 230 A.D.2d 548, 550, 658 N.Y.S.2d 910, 911 (1st Dept. 1997) (quoting
*Blate v. Third Ave. R.R. Co.*, 44 A.D. 163, 167, 60 N.Y.S. 732, 734 (App. Div. 1899)); *see
also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 573 n.150
(S.D.N.Y. 2018); *Wachs v. Winter*, 569 F. Supp. 1438, 1446 (E.D.N.Y. 1983); 44 N.Y. Jur.,
2d DEFAMATION AND PRIVACY § 232 (2023); 1 Robert D. Sack, SACK ON DEFAMATION §
10:5.5 at 10-57-58 (4th ed. 2011); RESTATEMENT (SECOND) OF TORTS § 918 (1979).

[7]     Dkt 235 (Def. Opp. Letter) at 3.

5

between plaintiff and defendant," in each case in the presence of the jury.[8]

*Litigation Funding*

      Ms. Carroll seeks to preclude any evidence, argument, or testimony related to the subject of funding received by her or her counsel for pursuit of this litigation.  The lynchpin of Mr. Trump's argument supporting its admission is that Ms. Carroll testified at a deposition that no one else was paying her legal fees in this litigation as "this is a contingency [fee] case" and that she was not sure about expenses,[9] but that she later recalled and disclosed "that at some point her counsel secured additional funding from a nonprofit organization to offset certain expenses and legal fees."[10]  Mr. Trump has claimed that the donor organization was connected to a supporter of Democratic candidates or activities.[11]  Following the disclosure, the Court permitted discovery by "a brief and carefully circumscribed examination of that narrow question" based upon the Court's determination

---

[8]      *Carroll II*, 2023 WL 2652636, at *8.

      This does not foreclose Mr. Trump from eliciting testimony that the idea of suing Mr. Trump crystallized in Ms. Carroll's mind as a result of a conversation at a party with George Conway, a Republican lawyer who "does not like Mr. Trump," and that Mr. Conway then introduced her to a lawyer.  Such testimony was offered by both Ms. Carroll and Mr. Trump in *Carroll II*.  *Carroll II*, No. 22-CV-10016, Dkt 185 (Trial Tr.) at 68:5-21; Dkt 189 (Trial Tr.) at 315:12-316:12; Dkt 191 (Trial Tr.) at 506:4-508:3, 651:7-653:7; Dkt 199 (Trial Tr.) at 1278:11-1281:15, 1349:19-1350:24, 1364:9-1366:7, 1398:21-1399:12.

[9]      *Carroll II*, No. 22-CV-10016, Dkt 134-8 at 209:11-21.

[10]      *Carroll II*, No. 22-CV-10016, Dkt 108-2 at 1.

[11]      Dkt 235 (Def. Opp. Letter) at 3.

6

that "it perhaps might prove relevant to the question of plaintiff's credibility."[12]

After the parties completed additional discovery on this narrow issue, Mr. Trump

sought in *Carroll II* to offer evidence or make arguments with respect to litigation funding.  The

Court precluded him from doing so, stating:

> "In general, litigation funding is not relevant. Here I allowed very limited
>
> discovery against what seemed to me a remote but plausible argument that maybe
>
> something to do with litigation funding arguably was relevant to the credibility of
>
> one or two answers by this witness in her deposition. I gave the defense an additional
>
> deposition of the plaintiff, and I gave the defense limited document discovery.
>
> On the basis of all that, I have concluded that there is virtually nothing there
>
> as to credibility. And even if there were, the unfair prejudicial effect of going into
>
> the subject would very substantially outweigh any probative value whatsoever."[13]

Among the considerations relevant to the Rule 403 analysis was the fact Ms. Carroll already had

acknowledged her political opposition to and distaste for Mr. Trump before the Court ruled.[14]

Moreover, she expanded upon and was cross-examined on that testimony later in the trial, and all

of her principal witnesses testified to similar views.[15]   There accordingly was no evidence or

---

12

   *Carroll II*, No. 22-CV-10016, Dkt 110.

13

   *Carroll II*, No. 22–CV-10016, Dkt 187 (Trial Tr.) at 240:6-17.

14

   *Id.* at 232:18-233:6, 234:18-236:2, 237:3-238:20.

15

   *Carroll II,* No. 22-CV-10016, Dkt 189 (Trial Tr.) at 333:9-24, 340:1-343:4 (Carroll) (stating
   *inter alia* that she is a registered Democrat, hates Mr. Trump's politics, and that he was a bad
   president); Dkt 193 (Trial Tr.) at 694:8-695:16, 710:17-712:23, 715:13-718:4; 718:5-721:23
   (Birnbach) (stating *inter alia* that she is a registered Democrat, voted for Mrs. Clinton,

**ASA-86**

7

argument related to litigation funding in the *Carroll II* trial. But Mr. Trump had more than ample evidence before that jury to the political and personal views of Ms. Carroll and her principal fact witnesses and made that the centerpiece of his defense. Indeed, his counsel devoted nearly half of his entire summation to the argument that Ms. Carroll initially made up her accusation against Mr. Trump to sell books, that she sued him and testified as she did for political reasons, and that her principal witnesses were similarly motivated.[16]

Mr. Trump's position on this issue is no stronger now than it was in *Carroll II.* Given Ms. Carroll's frank acknowledgment of her personal and political distaste for Mr. Trump, he has an ample basis for challenging her credibility without getting into a collateral and time consuming dispute about what, if anything, she remembered during her deposition concerning any contribution by a non-profit organization toward the expense of the litigation, let alone the political views of whoever funded that organization. The prejudice inherent in such an exercise would outweigh substantially any probative value. Accordingly, Mr. Trump is precluded from offering any evidence or argument concerning litigation funding in the presence of the jury.

---

donates only to Democratic campaigns, and hates Mr. Trump); Dkt 193 (Trial Tr.) at 744:14-24, 760:7-761:12, 763:16-765:20 (Leeds) (stating *inter alia* that she hates Mr. Trump, did not want him to be president, registered Democrat, and donates to Democratic campaigns); Dkt 195 (Trial Tr.) at 999:16-1000:2, 1000:14-22 (Stoynoff) (stating that she voted for Obama, thought Mr. Trump was a bad president, and was happy when he was voted out); Dkt 197 (Trial Tr.) at 1039:15-1040:17, 1051:9-1052:8 (Martin) (stating *inter alia* that she is a registered Democrat, hates Mr. Trump's politics, was devastated when he was elected, and voted for Mrs. Clinton).

16  *Carroll II*, No. 22-CV-10016, Dkt 199 (Trial Tr.) at 1330:24-1372:3.

8

*DNA*

  Ms. Carroll seeks to preclude any evidence or argument concerning DNA.  Mr. Trump argues that "[p]laintiff's contention that *any* reference to DNA should be precluded is overly broad and ignores the nuances of this case."[17]  He contends that "[p]laintiff's repeated attempts to publicize the fact that she allegedly possessed Defendant's DNA may very well prove relevant to the issue of damages."[18]  "Defendant," he argues, "could certainly demonstrate that Plaintiff's claims played a role in gaining increased attention from the media, and as a result, amplifying the reaction, whether negative or positive, to her initial sexual assault allegation."[19]

  As an initial matter, and assuming *arguendo* that plaintiff made such claims, defendant's suggestion that such claims might have resulted in greater media attention than otherwise would have occurred and that any such increase would have benefitted plaintiff's reputation ultimately is purely speculative.  Even more basically, Mr. Trump's argument properly can be considered only in light of the long saga concerning DNA as it relates to this litigation, which the Court explained in *Carroll II.*[20]

  In brief, Ms. Carroll says that she still possesses the dress she claims she wore when Mr. Trump sexually abused her.[21]  Shortly after this case was commenced, unidentified male DNA

---

17  Dkt 235 (Def. Opp. Letter) at 4 (emphasis in original).

18  *Id.*

19  *Id.*

20  *Carroll II,* 2023 WL 2006312; *Carroll II,* 2023 WL 2652636, at *5-7.

21  *Carroll II,* 2023 WL 2006312, at *1.

reportedly was found on the garment.[22]  Plaintiff's counsel then requested that Mr. Trump provide a DNA sample for comparison.[23]  Mr. Trump refused for years to allow the taking of a sample of his DNA.[24]  Two months before the *Carroll II* trial and after discovery had concluded, he finally offered to provide a DNA sample, but only on the condition that Ms. Carroll first turn over to him a previously undisclosed appendix to the DNA testing report.[25]  The Court declined to impose Mr. Trump's bargain, finding "no reason to believe that pursuing that course would be likely to yield any admissible evidence" and that there was no persuasive reason to allow him to inject DNA into the case at such a late date given that his situation was the result of his own unjustified refusal to provide a sample of his own DNA on a timely basis.[26]  It subsequently excluded from *Carroll II* "any evidence or argument by either party concerning DNA."[27]

The argument for exclusion is even more compelling in this case.  The only issue at trial will be Ms. Carroll's damages from Mr. Trump's defamatory statements.  The jury's verdict in *Carroll II* has resolved the principal question for which a DNA comparison would have been relevant – whether it now can be said, years after the alleged incident, that Mr. Trump's DNA is now or ever was on the dress, a matter going to whether the alleged sexual attack occurred (and not even

---

[22]    *Id.* at *3.

[23]    *Id.*

[24]    *Id.* at *5.

[25]    *Id.* at *6.

[26]    *Id.* at *1-2, *9.

[27]    *Carroll II,* 2023 WL 2652636, at *7.

10

necessarily conclusive of that).  Introduction of any discussion of DNA at this trial nevertheless

would entail a substantial risk that Mr. Trump, overtly or by implication, would suggest that there

was no conclusive *scientific* proof that he committed the sexual attack that the jury found in *Carroll*

*II*.  Not only would such an argument obscure the fact that Mr. Trump *himself* is the primary reason

why there is no DNA comparison evidence in this case, but it would be fundamentally unfair and

substantially prejudicial to the plaintiff in view of the Court's collateral estoppel ruling, which

forecloses the issue of whether the sexual assault occurred.  As a result, the Court will not permit

any testimony, argument, commentary, or reference by either party concerning DNA evidence at

trial.


*Ms. Carroll's Prior Relationships and Sexual Assaults and Experiences*

Ms. Carroll moves to preclude any evidence related to Ms. Carroll's prior

relationships, sexual assaults on her, or her sexual history.  Mr. Trump contends that:

> "Here, evidence relating to Plaintiff's prior relationships could prove highly
>
> probative.  For instance, if Plaintiff attempts to demonstrate that the June 2019
>
> Statements caused her to fall into a state of depression, or otherwise caused her
>
> 'humiliation and mental anguish,' Defendant would be entitled to introduce other
>
> potential sources of trauma that could have affected Plaintiff's mental and emotional
>
> state, including abuse in her prior relationships."[28]

Mr. Trump's contentions fall short on several fronts.

First, some evidence of Ms. Carroll's prior relationships and assaults was admitted

---

[28]  Dkt 235 (Def. Opp. Letter) at 5.

11

in *Carroll II* because Mr. Trump's sexual assault of Ms. Carroll and the resulting damages were at issue *in that case*. As a result, evidence of Ms. Carroll's prior relationships and abuse carried at least minimal relevance to claims for damages that she suffered specifically due to Mr. Trump's *sexual assault*. In contrast, evidence of prior sexual assaults on Ms. Carroll or her sexual history is not related to the damages caused by Mr. Trump's June 2019 *defamatory statements*, which are the focus in this case and accused her of being a liar and financially and politically motivated.[29] Thus, such evidence is not significantly probative of the reputational harm that Ms. Carroll suffered as a result of that defamation.

Second, the other sexual assaults that Ms. Carroll has endured – and their potential impacts on her – are significantly remote in time and thus of even more limited probative value with respect to her "mental and emotional state" in the wake of Mr. Trump's June 2019 defamation.[30] The incidents that Ms. Carroll can recall occurred well over two decades before the events at issue here.[31] It would require too great a leap for Mr. Trump to attempt to substitute the harms that Ms. Carroll may have experienced from sexual assaults during her childhood or in the 1980s and 1990s for her alleged harms as a result of Mr. Trump's 2019 defamation.

Finally, Ms. Carroll's past sexual experiences and her prior relationships with or assaults on her by other individuals at most would have little probative value with respect to the remaining issues, and any such value would be outweighed substantially by the unfair prejudice that

---

[29]        Dkt 157-1 (Pl. Amend. Cpt.) at 15-16, 18-19.

[30]        Dkt 235 (Def. Opp. Letter) at 5.

[31]        Ms. Carroll has not provided a specific date for when the alleged sexual assault by her dentist occurred. *Carroll II*, No. 22-CV-10016, Dkt 187 (Trial Tr.) at 197:7-14.

12

would result from introducing such inflammatory topics at trial.[32]  Moreover, any such evidence

would confuse and distract the jury from the underlying issues by injecting into the case sensitive

and personal details about Ms. Carroll's life which are wholly unnecessary to resolving it.[33]

Accordingly, the Court precludes both parties from offering or mentioning before the jury any

evidence, argument, or reference to Ms. Carroll's past romantic relationships and prior sexual

experiences.


*Evidence Related to Mr. Trump's Sexual Assault and Ms. Carroll's Motives in Revealing It and*
*Suing Mr. Trump*

        Ms. Carroll seeks to preclude from trial "all testimony, evidence, examination, and

argument suggesting that the assault did not occur or seeking to undermine [Ms.] Carroll's account

by implication," along with "all evidence relating to whether [Ms.] Carroll fabricated her account

of the assault or had a motive to do so,"[34] all in consequence of the Court's collateral estoppel ruling.

Mr. Trump "does not dispute that both parties are estopped from relitigating issues that have already

been determined via partial summary judgment," but counters that "testimony relating to the

underlying [assault]" – and Ms. Carroll's alleged financial and political motivations in raising her

---

[32]
      Fed. R. Evid. 403.

[33]
      Indeed, when defense counsel attempted to admit some of the more salacious details
regarding Ms. Carroll and her ex-husband John Johnson in *Carroll II,* the Court found that
"the unfair prejudicial effect, outrageously, not substantially, outrageously outweighs any
probative value." *Carroll II*, No. 22-CV-10016, Dkt 187 (Trial Tr.) at 208:24-209:4.  After
a brief recess, defense counsel acknowledged to the judge that it had "heard the Court's
ruling" and understood it. *Id.* at 211:9-11.

[34]
      Dkt 233 (Pl. Letter) at 4.

13

assault allegations – "could prove relevant and necessary in several ways."[35]

The jury in *Carroll II* found by a preponderance of the evidence that (1) Mr. Trump sexually abused Ms. Carroll and injured her in doing so; (2) his conduct was willfully negligent or reckless in doing so, or he acted with a conscious disregard for Ms. Carroll's rights; and (3) Ms. Carroll was entitled to compensatory and punitive damages for sexual abuse of $2.02 million.[36] Consequently, the fact that Mr. Trump sexually abused – indeed, raped – Ms. Carroll has been conclusively established and is binding in this case.

In light of the foregoing, Mr. Trump is precluded by collateral estoppel and the Court's partial summary judgment ruling from contending in this trial that Ms. Carroll fabricated her charge against him. As the Court previously held, the *Carroll II* jury's verdict "that Mr. Trump's 2022 statement was false necessarily implies that it determined by clear and convincing evidence that Ms. Carroll did not fabricate her sexual assault accusation."[37] And because "[t]he truth or falsity of Mr. Trump's 2019 statements . . . depends – like the truth or falsity of his 2022 statement – on whether Ms. Carroll lied about Mr. Trump sexually assaulting her," the *Carroll II* "jury's finding that she did not [do so] is binding in this case" as well.[38]

Accordingly, neither party shall be permitted to introduce any evidence or argument concerning Mr. Trump's sexual assault of Ms. Carroll, undermining Ms. Carroll's account, or

---

[35]    Dkt 235 (Def. Opp. Letter) at 6.

[36]    *Carroll II*, No. 22-CV-10016, Dkt 174 (Verdict) at 1-2.

[37]    *Carroll I*, 2023 WL 5731152, at *7.

[38]    *Id.*

14

tending to suggest that the assault did not occur.

Mr. Trump nevertheless contends that he should be allowed to introduce evidence and argument of the alleged financial and political motivations for Ms. Carroll's assault allegations, arguing that they are relevant to the financial and reputational backlash that she suffered.[39]  Such evidence, however, falls squarely within the Court's prior decisions, as it tends to suggest that Ms. Carroll had impure and non-truthful motives in raising her allegations against Mr. Trump. Moreover, Ms. Carroll's personal *motivations* for speaking up are not probative of the harms that she *actually* suffered from Mr. Trump's defamation, shedding no light on her mental and emotional state and reputational damage after Mr. Trump issued his 2019 statements.  Indeed, regardless of the reasons why Ms. Carroll chose to come forward, she did not implicitly consent to whatever defamation Mr. Trump subsequently might commit.[40]  Thus, Mr. Trump is precluded from relitigating his charges of fabrication against Ms. Carroll and from introducing evidence and argument of her personal motivations for such purposes.[41]

Accordingly, Mr. Trump is precluded from offering any testimony, evidence, or argument suggesting or implying that he did not sexually assault Ms. Carroll, that she fabricated her account of the assault, or that she had any motive to do so.

---

[39]     Dkt 235 (Def. Opp. Letter) at 6.

[40]     *See Carroll I*, 2023 WL 4393067, at *18.

[41]     Mr. Trump is not precluded from introducing evidence of Ms. Carroll's public statements for the purpose of arguing that she contributed to the reputational and emotional harm that she claims, but he may not use such statements or related argument to suggest that she fabricated her account or to inquire about her motives in making such statements. The Court will decide at trial whether the public statements that Mr. Trump proposes to offer are admissible.

**ASA-94**

15

*Mr. Trump's Proposed Witnesses*

Mr. Trump's witness list includes Andrew Haskell, the editor-in-chief of *New York Magazine* at the time it published the excerpt from Ms. Carroll's book; Sarah Lazin, Ms. Carroll's agent; and Lisa Birnbach and Carol Martin, who were so-called "outcry witnesses" in *Carroll II* – persons in whom Ms. Carroll confided that she was sexual assaulted by Mr. Trump shortly after it allegedly occurred. Ms. Carroll seeks to preclude Mr. Trump from calling any of them at this trial on the theory that they have "nothing to offer on the issues remaining in this action."[42] Mr. Trump responds that he does not intend to question the witnesses regarding the underlying assault, but offers them "for the relevant purposes of determining the damages purportedly sustained by Plaintiff."[43]

Mr. Trump has not made clear the substance of the testimony that he expects to elicit from any of these witnesses. And it is entirely possible that none has personal knowledge of anything relevant to the damages issues that remain to be tried here. It perhaps is equally possible that Mr. Trump will not call any of them to testify. Nevertheless, the Court is not in a position to exclude them on the basis of the record before it. To the extent that Mr. Trump's proposed witnesses possess personal knowledge relevant to any damages Ms. Carroll suffered from the June 2019 defamation, they are not now precluded. In no event, however, shall Mr. Trump (or, for that matter, Ms. Carroll) be allowed to elicit testimony from any witness regarding the underlying sexual

---

[42]  Dkt 233 (Pl. Letter) at 4.

[43]  Dkt 235 (Def. Opp. Letter) at 7.

16

assault and alleged fabrication.[44]   Accordingly, this branch of Ms. Carroll's motion is denied.

*Defendant's Testimony and Behavior*

Mr. Trump has included himself on his list of potential witnesses, as he did in *Carroll II*. In the event, he did not testify in *Carroll II*. Nevertheless, Ms. Carroll contends as follows:

"While it is [Mr.] Trump's right to submit to questioning, he does not have the right to say whatever he pleases. [Mr.] Trump cannot, for instance, claim that he did not sexually assault [Ms.] Carroll; argue that he was telling the truth in his statements about her; suggest that [Ms.] Carroll fabricated her account due to a political agenda, financial interests, or mental illness; or offer any other testimony that would be inconsistent with the Court's collateral estoppel decision determining that [Mr.] Trump, with actual malice, lied about sexually assaulting [Ms.] Carroll. Nor can [Mr.] Trump be permitted to comment on the Court, the jury, or counsel in *Carroll II*, or suggest in any way . . . that he received an unfair trial."[45]

That is essentially correct. Mr. Trump's contention that he "must be permitted to testify" regarding "whether he believed [Ms. Carroll's] account" and "whether he personally questioned her motives"[46] is impermissible, as it goes to whether Mr. Trump "knew his statements

---

[44]
This is particularly true for the "outcry witnesses," Mss. Birnbach and Martin, as the bulk of their testimony from the *Carroll II* trial pertained to the underlying assault and the veracity of Ms. Carroll's allegations, rather than to damages for defamation.

[45]
Dkt 233 (Pl. Letter) at 5.

[46]
Dkt 235 (Def. Opp. Letter) at 8.

were false or acted with reckless disregard as to whether they were false."[47]  The Court, however,

already has granted partial summary judgment to Ms. Carroll on the issue of constitutional actual

malice, meaning that Mr. Trump is precluded from arguing that he believed his statements to have

been true when uttered (*i.e.*, whether he believed Ms. Carroll to be lying in her accusations).[48]

Indeed, the jury in *Carroll II* already found that Mr. Trump knew of the falsity of his statements

(accusing Ms. Carroll of lying), or at least that he made them with reckless disregard for their truth

or falsity or that he in fact entertained serious doubt as to the truth of his own statements.[49]

Accordingly, Mr. Trump and his counsel are precluded, in the presence of the jury, from claiming

that Mr. Trump did not sexually abuse ("rape") Ms. Carroll; that he did not make his June 21 and

22, 2019 statements concerning Ms. Carroll with actual malice in the constitutional sense of that

term; or that Ms. Carroll fabricated her account, whether in consequence of a political agenda,

financial interests, mental illness, or otherwise.  Mr. Trump and his counsel are precluded also from

offering testimony or advancing any argument inconsistent with the Court's collateral estoppel

decision determining that Mr. Trump, with constitutional malice, lied about sexually assaulting Ms.

Carroll.  This includes any evidence or argument concerning whether Mr. Trump believed Ms.

Carroll's allegations or questioned her motives, as these issues will not be before the jury in the

present case.

---

[47]     *Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021).

[48]     *Carroll I*, 2023 WL 5731152, at *8-9.

[49]     *Carroll II*, No. 22-CV-10016, Dkt 174 (Verdict) at 2.

18

*Testimony of Mss. Stoynoff and Leeds and Related Campaign Excerpts*

Both Natasha Stoynoff and Jessica Leeds testified in *Carroll II* that Mr. Trump had sexually assaulted them. The evidence was received under Federal Rules of Evidence 415 and 413, an exception to the usual rule restricting propensity evidence, pursuant to which evidence of similar acts of sexual assault by a party may be received against that party in civil cases "based on [the] party's sexual assault."[50] Ms. Carroll wishes to call them again in this trial, adding that she now seeks to elicit not only evidence that Mr. Trump attacked them, but also that he "denied their allegations in the exact manner in which he denied [Ms.] Carroll's."[51] Mr. Trump resists, arguing that this is not a case "based on sexual assault," as the only issue now to be tried is damages; that the evidence of these witnesses is not relevant to damages; and in any case that the unfair prejudicial effect of this testimony would outweigh substantially its probative value.[52] Mr. Trump seeks also to preclude statements that he made during the 2016 presidential campaign in which he denied and disparaged the allegations of sexual assault against him, including accusations by Mss. Stoynoff and Leeds, on a similar basis.[53]

---

[50]      Both at trial and in a post-trial ruling in *Carroll II*, the Court relied alternatively on Rule 404(b). *Carroll II*, No. 22-CV-10016, Dkt 193 (Trial Tr.) at 754:5-757:7. Contrary to Mr. Trump's suggestion in another place, the Court has not abandoned its reliance on Rules 415 and 413 for so ruling.

     In a pre-trial ruling earlier in this case, the Court indicated that related video excerpts of Mr. Trump denying Mss. Stoynoff and Leeds' allegations during his 2016 presidential campaign might be admissible at trial under Rule 404(b) but declined to rule at that time. *Carroll v. Trump*, 660 F. Supp. 3d 196, 208-09 (S.D.N.Y. 2023). It does not do so now.

[51]      Dkt 233 (Pl. Letter) at 7.

[52]      Dkt 235 (Def. Opp. Letter) at 9-11.

[53]      *Id.* at 12-13.

First, this Court previously has rejected Mr. Trump's claim that this is not a case "based on sexual assault" in an earlier decision in this very case.[54]  The fact that Mr. Trump is foreclosed by collateral estoppel from disputing his commission of the sexual assault does not alter the basis of the case – of which this damages trial is but one part.  Thus, the case as a whole remains one "based on sexual assault," as Ms. Carroll was required to prove that Mr. Trump sexually assaulted her in order to prove that he defamed her when he denied it and defamed her.[55]

Accordingly, Rules 415 and 413 have been satisfied, as they were in *Carroll II*.[56]

Second, the proposed testimony of Mss. Stoynoff and Leeds arguably remains relevant here despite the fact that Mr. Trump is precluded from denying, directly or indirectly, that he sexually assaulted Ms. Carroll, that he defamed her, and that he did so with constitutional actual malice, thus making it unnecessary for Ms. Carroll to prove up those facts.  She now contends that this testimony is admissible also under Rule 404(b) because it tends to prove that "when a woman accuses [Mr.] Trump of sexual assault, he unconditionally denies the allegations, accuses the woman of fabricating her story, and declares that she was too ugly for him to have sexually assaulted in the first place."[57]  In view of the Second Circuit's "'inclusionary' approach to other act evidence under

---

[54]      *Carroll*, 660 F. Supp. 3d at 201-02.

[55]      *See id.*

[56]      *Id.* at 203-06.

[57]      Dkt 233 (Pl. Letter) at 7.

Ms. Carroll utilizes the term *modus operandi* to categorize Mss. Stoynoff and Leeds' testimony under an exception to the rule barring character evidence, but ordinarily, *modus operandi* is applied when propensity evidence is used to prove identity, not intent.  *See, e.g.*, *United States v. Sappe*, 898 F.2d 878, 879-80 (2d Cir. 1990); *United States v. Carlton*, 534 F.3d 97, 101-02 (2d Cir. 2008).  Nonetheless, Mr. Trump's lengthy focus on Ms. Carroll's

20

Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate

. . . propensity,"[58] "[e]vidence of this pattern" at least arguably "is . . . relevant to proving [that Mr.]

Trump acted with [common law] malice in denying [Ms.] Carroll's allegations [and defaming her]

in the same way here."[59]  The testimony therefore appears to be somewhat probative, at least on the

issue of punitive damages, for which courts enjoy wide latitude to "examin[e] all of the relevant

circumstances surrounding the dispute."[60]

       That said, there are non-trivial Rule 403 issues in connection with this evidence.

These include the risk of unfair prejudice that could occur in the event this evidence affected the

jury's compensatory damages award; the prolongation of the trial to litigate the Stoynoff and Leeds

incidents; and possible jury confusion.  In all the circumstances, however, the Court declines to rule

---

potential misuse of the term is misplaced.  Dkt 235 (Def. Opp. Letter) at 10.  Rule 404(b) plainly states that character evidence may be admissible to prove "motive" or "intent" in addition to "identity," for which purpose Ms. Carroll truly seeks to admit Mss. Stoynoff and Leeds' testimony.  Fed. R. Evid. 404(b)(2).  The technical terms used by Ms. Carroll in her brief are thus irrelevant.

[58]   *United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012) (citing *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004)).

[59]   Dkt 233 (Pl. Letter) at 7.

[60]   *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 184 (2d Cir. 2000) (citing *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979)); *see also Herbert*, 441 U.S. at 164 n.12 ("The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, *including* threats, *prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties,* facts tending to show a reckless disregard of the plaintiff's rights, *and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration.*") (emphasis added) (internal quotation marks and citations omitted)); 25A Jill Gustafson et al. eds., C.J.S. DAMAGES § 308 (2023) ("Evidence of prior offenses may be admissible to support an award of exemplary damages.").

**ASA-100**

21

on the admissibility of this evidence in advance of trial.

*The* Access Hollywood *Video*

   Many readers will be familiar with the *Access Hollywood* video, as it was broadcast widely during the 2016 presidential campaign.  The relevant portions in any event are described in detail in earlier rulings, including one denying a previous *in limine* motion by Mr. Trump to exclude it here.[61]  Briefly stated, it records Mr. Trump stating that he previously had "moved on [a woman] like a bitch, but [he] couldn't get there."[62]  He said also:

  Trump: "Maybe it's a different one."

  Billy Bush: "It better not be the publicist. No, it's, it's her."

  Trump: "Yeah that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful -- I just start kissing them. It's like a magnet. Just kiss. I don't even wait. *And when you're a star they let you do it. You can do anything.*"

  Bush: "Whatever you want."

  Trump: "*Grab them by the pussy. You can do anything.*"[63]

In a part of his deposition that was played for the jury in *Carroll II*, Mr. Trump testified that:

  "*Q. And you say -- and again, this has become very famous -- in this video, 'I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're*

---

[61]   *Carroll,* 660 F. Supp. 3d at 200-03; *see also Carroll II,* 2023 WL 4612082, at *8-9 n.20.

[62]   *Carroll II,* 2023 WL 4612082, at *8.

[63]   *Id.* at *8-9.

**ASA-101**

22

*a star, they let you do it. You can do anything, grab them by the pussy. You can do*

*anything.' That's what you said; correct?*

*A. Well, historically, that's true with stars.*

*Q. True with stars that they can grab women by the pussy?*

*A. Well, that's what -- if you look over the last million years, I guess that's been*

*largely true. Not always, but largely true. Unfortunately or fortunately.*

*Q. And you consider yourself to be a star?*

*A. I think you can say that, yeah.*

Q. And -- now, you said before, a couple of minutes ago, that this was just locker

room talk?

A. It's locker room talk.

Q. And so does that mean that you didn't really mean it?

A No. It's locker room talk. I don't know. It's just the way people talk."[64]

The video was admitted in *Carroll II* at least under Rule 415 for, among other things, its probative value with respect to whether the alleged sexual assault on Ms. Carroll occurred.[65] And, as the Court has noted previously, it alternatively was admissible under Rule 404(b).[66]

Ms. Carroll seeks its admission here despite the fact that the occurrence of the sexual assault now has been established conclusively. She nevertheless contends that the *Access*

---

[64]
    *Carroll II,* No. 22-CV-10016, Dkt 138-1 (Dep. Designations) at 174:5-175:4 (emphasis added).

[65]
    *Carroll,* 660 F. Supp. 3d at 200-03.

[66]
    *Carroll II,* 2023 WL 4612082, at *8 n.20; *see supra* note 61.

23

*Hollywood* video is relevant to the issues that remain because it goes to Mr. Trump's "mental state and disposition – both toward women generally . . . and specifically toward [Ms.] Carroll . . . and thus [is] relevant to determining his common law malice."[67] She argues also that the video provides necessary context to comments Mr. Trump "made about Carroll on CNN after the *Carroll II* trial" and should be admitted for this purpose at trial as well.[68]

Mr. Trump responds, first, that the *Access Hollywood* video is not admissible under Rule 415, in substance for the same reason that he seeks to exclude the testimony of Mss. Stoynoff and Leeds[69] – that this is not a case "based on sexual assault." But that argument is without merit for reasons discussed above and in the Court's prior rulings in this case.[70]

Mr. Trump next argues that the video should be excluded because it is not relevant to the issue of damages, even to punitive damages, "because it does not inform Defendant's state of mind when he made the June 2019 Statements."[71] But he tellingly concedes that the *Access Hollywood* video was "made thirteen years prior to when [Ms. Carroll] came forward with her allegations,"[72] and thus thirteen years before he made the June 2019 defamatory statements about her. His *Access Video* statements, the jury could find, evidence misogyny – "[h]atred or dislike of,

---

[67]   Dkt 233 (Pl. Letter) at 6-7.

[68]   *Id.* at 7.

[69]   Dkt 235 (Def. Opp. Letter) at 9, 11-12.

[70]   *Carroll*, 660 F. Supp. 3d at 200-03.

[71]   Dkt 235 (Def. Opp. Letter) at 12.

[72]   *Id.*

24

or prejudice against women"[73] – and that this hatred or prejudice immediately focused on Ms. Carroll when her allegation of sexual assault became public. Thus, the jury could find Mr. Trump's statements in the video to be probative of his intent in making the June 21 and June 22 defamatory statements about Ms. Carroll.

The reasoning is not difficult. In the video, Mr. Trump bragged that he "moved on [another women] like a bitch" and that he "just starts[s] kissing" women without "even wait[ing]" for their consent. Stars – and he admitted that he is a "star" – can "grab [women] by the pussy" and "can do anything." A jury reasonably could conclude that this was not "locker room talk," but instead that it was truthful bragging by Mr. Trump of his exploits, that it manifested hatred of or prejudice against women, and that this hatred or prejudice fixed specifically on Ms. Carroll when she went public with her accusation and provoked his defamatory reaction. Hence, the jury could find that the *Access Hollywood* video is a relevant window into how Mr. Trump views women that he allegedly has assaulted – including women like Ms. Carroll – and that it therefore is relevant under Rule 401 as tending to prove his common law malice, which is essential to the punitive damages claim.[74]

Moreover, the acts that Mr. Trump arguably admitted committing in the *Access*

---

[73]    "Misogyny," OXFORD ENGLISH DICTIONARY (available at https://www.oed.com/search/dictionary/?scope=Entries&q=misogyny) (last visited Jan. 5, 2024).

[74]    As has been pointed out previously, the *Access Hollywood* video is admissible, under Rule 104(b), if the Court concludes that the jury could find facts making those statements relevant as the Court has done. It therefore is the function of the jury, not the Court, to determine the relevance of those statements. *See Carroll I*, 660 F. Supp.3d at 202-03. Accordingly, the Court expresses no view on how the jury should interpret Mr. Trump's statements in the video.

*Hollywood* video are almost the exact same acts that he then accuses Ms. Carroll of lying about in her assault allegations.  The jury could find that Mr. Trump was prepared to admit privately to sexual assaults eerily similar to that alleged by Ms. Carroll, making his *Access Hollywood* statements admissible on the issues of his intent and mental state when he in June 2019 denied her account as he did and disparaged her.  Thus, a jury could find that the *Access Hollywood* video is a useful insight into Mr. Trump's state of mind regarding how he viewed Ms. Carroll specifically, given the similarity between the behavior described in video's remarks and Ms. Carroll's sexual assault claim.[75]

Unsurprisingly, Mr. Trump argues that the *Access Hollywood* video nevertheless should be excluded under Rule 403 because it might cause the jury to "enhanc[e] the potential damages awarded in this case."[76]  And it is conceivable that it might do so.  But Rule 403 does not permit, much less require, exclusion of relevant evidence simply because it might hurt a defendant's case.  It provides instead that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[77]

Receipt of the video in evidence would not cause delay or waste time, as it would take only a minute or less to play.  It would not be cumulative because it could be found to be a

---

[75]    *See Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 480, 626 N.E.2d 34 (1993) ("common-law malice focuses on the defendant's mental state in relation to the plaintiff").

[76]    Dkt 235 (Def. Opp. Letter) at 12.

[77]    Fed. R. Evid. 403.

**ASA-105**

26

unique window into Mr. Trump's mind provided in his own words and his own voice. And so the key word for Rule 403 analysis is the word "unfair." "'Unfair prejudice' within its context means an undue tendency to suggest decision on an *improper basis*, commonly, though not necessarily, an emotional one.'"[78] But the question of whether Mr. Trump defamed Ms. Carroll with common law malice is essential to deciding whether she is entitled to punitive damages and important as well to determining the amount, if any. There would be nothing inherently "unfair" in receiving evidence that is uniquely probative on those questions. And while a jury might find Mr. Trump's statements on the video quite offensive, rather than being simply untruthful "locker room talk," that risk does not outweigh their probative value, let alone substantially. That is particularly so given the fact that the Court ultimately would have the ability to address a significantly excessive punitive damages award.[79]

The *Access Hollywood* video is admissible in evidence.

*Conclusion*

Plaintiff's letter motion (Dkt 233), which in substance seeks *in limine* rulings on a variety of evidentiary issues, is granted to the extent that:

1.    Defendant and his counsel are precluded, in the presence of the jury, from offering any evidence, argument, or comments:

---

[78] *Old Chief v. United States,* 519 U.S. 172, 180 (1997) (emphasis added) (quoting Fed. Rule Evid. 403 notes of advisory committee).

[79] *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (instructing courts on "three guideposts" to follow in reviewing punitive damages awards) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

      a.     Concerning plaintiff's choice of counsel or her counsel's activities outside the litigation between plaintiff and defendant;

      b.      Concerning litigation funding;

      c.     Concerning DNA;

      d.     Concerning Ms. Carroll's past romantic relationships, sexual disposition, and prior sexual experiences;

      e.     Suggesting or implying that Mr. Trump did not sexually abuse Carroll; that he did not make his June 21 and 22, 2019 statements concerning Ms. Carroll with actual malice in the constitutional sense of that term; that Ms. Carroll fabricated her account, whether in consequence of a political agenda, financial interests, mental illness, or otherwise; or offering testimony or advancing any argument inconsistent with the Court's collateral estoppel decision determining that Mr. Trump, with actual malice, lied about sexually assaulting Ms. Carroll; and

2.     The *Access Hollywood* video will be received in evidence.

The motion is denied in all other respects without prejudice to renewal during trial with regard to Mss. Stoynoff and Leeds and the related campaign excerpts.

      SO ORDERED.

Dated:     January 9, 2024

                                  Lewis A. Kaplan
                             United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                 Plaintiff,

       -against-                           20-cv-7311 (LAK)


DONALD J. TRUMP, in his personal capacity,

                 Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### VERDICT FORM

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

1.    Ms. Carroll suffered more than nominal damages as a result of Mr. Trump's publication of the June 21 and June 22, 2019 statements?

                 YES  X            NO _____

             If "Yes," insert the dollar amount for any compensatory damages you award *other than for the reputation repair program.*  If "No," write "$1."

             $ 7.3 m

             If "Yes," insert the dollar amount for any compensatory damages you award *for the reputation repair program only.*  If "No," leave blank.

             $ 11m

             *[Continue to Question 2, whether you answered "Yes" or "No."]*

2.    In making the June 21, 2019 statement, Mr. Trump acted maliciously, out of hatred, ill will, or spite, vindictively, or in wanton, reckless, or willful disregard of Ms. Carroll's rights?

                 YES  X            NO ____

             *[Continue to Question 3, regardless of whether you answered "Yes" or "No."]*

**ASA-108**

2

3.   In making the June 22, 2019 statement, Mr. Trump acted maliciously, out of hatred, ill will, or spite, vindictively, or in wanton, reckless, or willful disregard of Ms. Carroll's rights?

YES X                 NO _____

If you answered "Yes" to either Question 2 or Question 3 (or both), how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$ 65m

*[Please write your juror number (not your seat number or name) in the space provided below, fill in the date, and inform the officer that you have reached a verdict.]*

Dated: January 26, 2024

Juror numbers:

66                    34

23                    21

28                    10

56                    82

6

**ASA-109**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

          *Plaintiff*,

    v.

DONALD J. TRUMP,

          *Defendant*.

No. 22 Civ. 10016 (LAK) (JLC)

---

## PLAINTIFF E. JEAN CARROLL'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF HER OMNIBUS MOTION IN LIMINE

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 1

    I.    CARROLL'S MOTION IN LIMINE IS LARGELY UNCONTESTED ........................... 1

    II.   THE COURT SHOULD EXCLUDE ANY TESTIMONY FROM UNDISCLOSED
        WITNESSES, AND COMMENTARY OR TESTIMONY CONCERNING DNA ......... 2

        A.   The Court Should Exclude Trump's Undisclosed Witnesses.................................... 2

        B.   The Court Should Preclude Testimony Concerning DNA Evidence ......................... 4

    III.  THE COURT SHOULD PRECLUDE FISHER AS A REBUTTAL WITNESS ............. 7

        A.   Trump Fails to Address an Independent Ground for Excluding Fisher...................... 7

        B.   Fisher Is Not a Rebuttal Witness ............................................................................... 8

        C.   Fisher's Analysis Is Not Reliable .............................................................................. 9

CONCLUSION.................................................................................................................... 10

**ASA-111**

## TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Benavidez v. Burger Bros. Rest. Grp., Inc.*,
   No. 17 Civ. 200, 2019 WL 1459044 (E.D.N.Y. Mar. 29, 2019) ................................................ 4

*Cajero Torres v. Sushi Sushi Holdings Inc.*,
   No. 19 Civ. 2532, 2021 WL 2158017 (S.D.N.Y. May 27, 2021) ............................................. 4

*Capri Sun GmbH v. Am. Beverage Corp.*,
   595 F. Supp. 3d 83 (S.D.N.Y. 2022) ....................................................................................... 8

*Carroll v. Trump*,
   No. 20 Civ. 7311, 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023) ........................................... 1

*Carroll v. Trump*,
   No. 22 Civ. 10016, 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023) ......................................... 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579, 113 S. Ct. 2786 (1993) ................................................................................. 7, 9

*Design Strategy, Inc. v. Davis*,
   469 F.3d 284 (2d Cir. 2006) ................................................................................................... 4

*Feltenstein v. City of New Rochelle*,
   No. 14 Civ. 5434, 2018 WL 3752874 (S.D.N.Y. Aug. 8, 2018) ............................................ 4

*Harris v. Donohue*,
   No. 15 Civ. 1274, 2017 WL 3638452 (N.D.N.Y. Aug. 23, 2017) .......................................... 4

*Kullman v. New York*,
   No. 07 Civ. 716, 2009 WL 1562840 (N.D.N.Y. May 20, 2009) ............................................ 3

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167 (1999) ................................................................................. 10

*Lebada v. New York City Dep't of Educ.*,
   No. 14 Civ. 758, 2016 WL 8453417 (S.D.N.Y. May 16, 2016) ............................................. 2

*Lebada v. New York City Dep't of Educ.*,
   No. 14 Civ. 758, 2016 WL 626059 (S.D.N.Y. Feb. 8, 2016) .............................................. 2, 3

*Leong v. 127 Glen Head Inc.*,
   No. 13 Civ. 5528, 2016 WL 845325 (E.D.N.Y. Mar. 2, 2016) .............................................. 4

**ASA-112**

*Lujan v. Cabana Mgmt., Inc.*,
  284 F.R.D. 50 (E.D.N.Y. 2012) ............................................................... 2, 3

*Nimely v. City of N.Y.*,
  414 F.3d 381 (2d Cir. 2005) ...................................................................... 7

*Patterson v. Balsamico*,
  440 F.3d 104 (2d Cir. 2006) ................................................................... 3, 4

*Sadler v. Moran Towing Corp.*,
  No. 01 Civ. 1666, 2002 WL 1977604 (S.D.N.Y. Aug. 28, 2002) ......................... 6, 7

*Taylor v. N.Y. State Off. for People With Developmental Disabilities*,
  No. 13 Civ. 740, 2016 WL 2858856 (N.D.N.Y. May 13, 2016) ............................. 4

*United States v. Gatto*,
  No. 17 Cr. 686, 2019 WL 266944 (S.D.N.Y. Jan. 17, 2019) ................................ 7

*Williams v. Bethel Springvale Nursing Home, Inc.*,
  No. 14 Civ. 09383, 2018 WL 1662644 (S.D.N.Y. Apr. 5, 2018) ............................ 3

**Rules**

Fed. R. Civ. P. 26 ..................................................................................... 2, 3, 4, 9

Fed. R. Evid. 702 .................................................................................... 7, 9, 10

iii

## PRELIMINARY STATEMENT

Given that the evidence in *Carroll I* and *Carroll II* is almost identical, the parties have tailored their motions in limine to be nearly the same in both. *See* ECF 70, 73, 75, 77; *Carroll I*, ECF 131, 134, 136, 138, 140, 143. But even after five rounds of briefing across the two cases, Trump still has not responded to a significant portion of Carroll's omnibus motion. And the few arguments that Trump does make are inconsistent both with precedent and the factual record. Accordingly, for the reasons stated in her prior briefing and below, Carroll's motion should be granted in its entirety.

## ARGUMENT

### I.   CARROLL'S MOTION IN LIMINE IS LARGELY UNCONTESTED

Trump has explicitly incorporated the arguments from his *Carroll I* opposition. *See* ECF 75 ("Trump *Carroll II* Opp.") at 1 (incorporating *Carroll I*, ECF 136 ("Trump *Carroll I* Opp.")). But that opposition pointedly failed to address four of Carroll's requests, namely to: (1) admit her prior statements to Lisa Birnbach and Carol Martin, *see Carroll I*, ECF 134 ("*Carroll I* MIL") at 2–4; (2) preclude Trump from testifying to undisclosed information, including the testimony that non-testifying witnesses could theoretically offer in support of his defense, *id.* at 25–27; (3) preclude cross-examination or evidence regarding Stephanie Grisham on specific topics, *id.* at 30–33; or (4) preclude comments and cross-examination regarding Carroll's choice of counsel, *id.* at 34–35; *see also* ECF 73 ("*Carroll II* MIL") at 2–4 (incorporating *Carroll I* MIL). The Court should therefore grant those unopposed portions of Carroll's motion. *See Carroll I*, ECF 143 ("*Carroll I* Reply") at 2 (collecting cases).[1]

---

[1] One portion of Carroll's motion that Trump did oppose concerns the admissibility of Natasha Stoynoff's and Jessica Leeds' testimony. Trump *Carroll I* Opp. at 1–14. The Court already ruled this evidence to be admissible in *Carroll I*. *See Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 2441795, at *4–*8 (S.D.N.Y. Mar. 10, 2023). There is no reason

**ASA-114**

**II.    THE COURT SHOULD EXCLUDE ANY TESTIMONY FROM UNDISCLOSED WITNESSES, AND COMMENTARY OR TESTIMONY CONCERNING DNA**

**A.    The Court Should Exclude Trump's Undisclosed Witnesses**

Trump listed five witnesses on the joint pretrial order that he never disclosed previously. ECF 65. Trump insists that he did not violate Rule 26(a)(1) in doing so because, as he sees it, the identities of those witnesses were "made known" during the proceedings. *See* Trump *Carroll I* Opp. at 21–23.

This argument rests on a plain misunderstanding of well-settled law. The operative question is not whether the opposing party had "knowledge of the existence of a witness," but rather whether "[the disclosing party] informed [the opposing party] that it might call the witness" to "support its own case at trial." *Lebada v. New York City Dep't of Educ.*, No. 14 Civ. 758, 2016 WL 626059, at *5 (S.D.N.Y. Feb. 8, 2016) (citation omitted), *objections overruled*, 2016 WL 8453417 (S.D.N.Y. May 16, 2016) (Kaplan, J.); *see also Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 73 (E.D.N.Y. 2012) ("[T]o satisfy Rule 26, parties must make an *unequivocal statement* that they may rely upon an individual on a motion or at trial." (emphasis added) (collecting cases)).

Trump cannot (and does not) contest that he failed to comply with these requirements. In *Carroll I*, after Carroll listed four of the individuals who Trump now seeks to call as witnesses at trial in her response to Trump's interrogatories,[2] Trump failed to make "any simple, clear, unequivocal statement" that he intended to use any of them to support his defense at trial. *Lujan*, 284 F.R.D. at 73. Trump did not list them on his Rule 26(a) disclosures in that action, supplement his disclosures to include them, depose the witnesses, or indicate "either in a letter, electronic mail, on-the-record during another deposition or court proceeding" that he intended to call them at trial.

---

to treat that evidence differently here, so it should be admitted for the reasons set forth in Carroll's briefing and this Court's prior decision.

[2] She listed David Haskell, Elizabeth Dyssegaard, Laurie Abraham, and Sarah Lazin. *Carroll I*, ECF 137-6 at 5.

*Id.*; *see Carroll I* MIL at 24–25; *Carroll II* MIL at 3.

Then, in *Carroll II*, Trump continued to hide his strategic intentions by not listing the witnesses in his Rule 26(a) initial disclosures. Ex. 1. Taken together, Trump's actions left Carroll to "properly assume[] that [Trump would] not rely upon [those] witness[es]." *Lebada*, 2016 WL 626059, at *5; *cf. Patterson v. Balsamico*, 440 F.3d 104, 118 (2d Cir. 2006). As a matter of settled precedent—and under a straightforward reading of Rule 26(a)—the mention of one of the witnesses in a deposition and his notices of subpoenas to them in *Carroll I*, without any effort to actually serve those subpoenas or take the depositions, was not enough to provide the requisite notice. *See, e.g.*, *Kullman v. New York*, No. 07 Civ. 716, 2009 WL 1562840, at *6–*8 (N.D.N.Y. May 20, 2009) (precluding undisclosed witness even though witness' name had been mentioned in discovery and plaintiffs' counsel withdrew a notice of deposition for that witness); *Williams v. Bethel Springvale Nursing Home, Inc.*, No. 14 Civ. 09383, 2018 WL 1662644, at *5 (S.D.N.Y. Apr. 5, 2018) (same for undisclosed witness mentioned in a deposition).[3]

While Trump argues that preclusion is a "drastic remedy" reserved for "rare cases," Trump *Carroll I* Opp. at 23–24, this is *precisely* the type of case where Rule 37(c) should apply. Here, after discovery was complete in *Carroll I* and the Court directed the parties to consider carefully what additional discovery they needed in *Carroll II*, Trump failed to disclose that these witnesses were necessary to (or even a part of) his trial defense. *See* ECF 16 at 4–5; Conf. Tr. at 5–7 (Dec. 21, 2022). Then, Trump again made the deliberate choice to exclude these witnesses from his *Carroll II* disclosures. Ex. 1. Such callous disregard for Rule 26(a), accompanied by a pre-trial effort to sandbag an opposing party in pursuit of improper strategic advantage, is exactly when the

---

[3] Carroll noted in her motion that Trump had provided notices of subpoenas to all five of the at-issue witnesses on August 9, 2022, but it was "not clear which of the subpoenas were served." *Carroll I* MIL at 25 n.12. Trump has not addressed this point or provided any information suggesting that he diligently pursued those subpoenas of these witnesses.

# ASA-116

sanction of preclusion is appropriate. Indeed, courts have frequently precluded testimony from witnesses who were disclosed late in the process and shortly before trial, since such a tardy and irregular disclosure is inherently highly prejudicial. *See, e.g.*, *Patterson*, 440 F.3d at 117–18; *Cajero Torres v. Sushi Sushi Holdings Inc.*, No. 19 Civ. 2532, 2021 WL 2158017, at *4 (S.D.N.Y. May 27, 2021).[4]

Trump further attempts to resist this conclusion by asserting that his failure to disclose was harmless. Trump *Carroll II* Opp. at 24. He reasons that his violation of the rules caused no harm because Carroll "was aware of [the witnesses'] identities" and, according to him, "understood their relevance to this case." *Id.* But this position presupposes that Carroll should have conducted discovery of witnesses who she never intended to put on to build her own case, even as Trump hid his intention to call them. Courts routinely reject comparable efforts to excuse a failure to follow the rules. *See Cajero Torres*, 2021 WL 2158017, at *4; *see also Benavidez v. Burger Bros. Rest. Grp., Inc.*, No. 17 Civ. 200, 2019 WL 1459044, at *6 (E.D.N.Y. Mar. 29, 2019) ("Defendants' bald assertion … that Plaintiffs should have anticipated that Defendants would call the non-parties listed in [Plaintiffs'] interrogatory responses as witnesses is unpersuasive.").[5]

## B.    The Court Should Preclude Testimony Concerning DNA Evidence

---

[4] In contrast, where courts have allowed parties to call witnesses who were not previously disclosed, they have done so in circumstances entirely unlike those here: for instance, where a trial date had not yet been set, or where a discovery continuance allowed the prejudiced party to depose the previously undisclosed witnesses. *E.g.*, *Feltenstein v. City of New Rochelle*, No. 14 Civ. 5434, 2018 WL 3752874, at *9 (S.D.N.Y. Aug. 8, 2018); *Taylor v. N.Y. State Off. for People With Developmental Disabilities*, No. 13 Civ. 740, 2016 WL 2858856, at *15 (N.D.N.Y. May 13, 2016); *Leong v. 127 Glen Head Inc.*, No. 13 Civ. 5528, 2016 WL 845325, at *6 (E.D.N.Y. Mar. 2, 2016). Because Trump chose to list undisclosed witnesses for the first time in the joint pretrial order, measures like extending discovery deadlines are not available. In any event, under no circumstances should Trump be permitted to put witnesses on the stand at trial without Carroll first having an opportunity to depose them. *See Leong*, 2016 WL 845325, at *6 (collecting cases).

[5] In his reply, Trump invokes *Harris v. Donohue*, No. 15 Civ. 1274, 2017 WL 3638452 (N.D.N.Y. Aug. 23, 2017), to support his claim that his actions were harmless. In *Harris*, however, unlike in this case, the party seeking to exclude the undisclosed witnesses had listed them on her own Rule 26(a) as potential witnesses and then failed to depose them. *Id.* at *2. In addition, *Harris* incorrectly stated that Rule 37(c) requires a showing of bad faith, *id.* at *1—a standard that the Second Circuit has long rejected, *see Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006).

Trump does not actually dispute Carroll's position that testimony related to DNA evidence has no probative value in this case. *Carroll I* MIL at 27–28; Trump *Carroll I* Opp. at 19–21. Nor does he dispute that permitting questioning on DNA would require an airing of the discovery dispute related to it, leading to jury confusion, wasted time, and prejudice. *Carroll I* MIL at 29–30; Trump *Carroll I* Opp. at 19–21. Yet, Trump seeks to carve out a supposedly narrow exception to the inadmissibility of DNA evidence by arguing that he should be allowed to cross-examine Carroll about "the public statements that she made regarding [his] DNA, and her motivation for making such statements." Trump *Carroll I* Opp. at 20. This is a brazen attempt to present exactly the type of evidence that Trump concedes is not probative, not to mention distort the record as it relates to DNA and leave the jury with a misimpression that is both inaccurate and highly prejudicial.

Significantly, Trump seeks to justify his carve-out based on a clear mischaracterization of Carroll's "public statements." He erroneously asserts that she had "represent[ed] that she was in possession of [Trump's] DNA, when she in fact was not." *Id.* A review of Carroll's statements, however, confirms that this is incorrect. Two of the tweets that Trump seeks to use on cross-examination state only that Carroll possessed a dress containing DNA.[6] The other tweet explicitly states that Carroll did *not* have Trump's DNA because Trump had refused to provide it in discovery: "I am STILL waiting for Trump to provide his DNA sample to be tested against the dress I wore when he attacked me." @ejeancarroll, Twitter (May 1, 2020), https://twitter.com/ejeancarroll/status/1364995845439901700. None of these tweets is relevant to whether Carroll

---

[6] @ejeancarroll, Twitter (June 2, 2021), https://twitter.com/ejeancarroll/status/1400122740720480262 ("Didn't last as long as DNA on a dress."); @ejeancarroll, Twitter (Feb. 25, 2021), https://twitter.com/ejeancarroll/status/125630 1599426785280 ("Cyrus Vance, the Manhattan District Attorney, has Trump's taxes. Fani Willis, the Georgia Prosecutor, has Trump's phone call. Mary Trump has her grandfather's will. And I have the dress. Trump is basically in deep shit").

accurately reported Trump's assault in a book she wrote years prior. And none of them constitutes a public statement that she was actually in possession of Trump's DNA.[7]

Moreover, Trump's argument seems to presuppose that Trump's DNA is not present on the dress and that Carroll somehow knew this to be the case. A jury certainly could not draw that conclusion given the current record. Indeed, Carroll never obtained Trump's DNA and therefore was never able to test it.

Trump's proposed carve-out is also not feasible under the Rules of Evidence. He cannot ask Carroll about her public comments regarding the dress without also running straight into the fundamental Rule 403 concerns that Trump does not dispute. Trump's proposed cross-examination would inevitably lead to evidence and testimony regarding: (1) Trump's adamant refusals for more than three years to provide his DNA evidence to test; (2) Carroll's decision to pivot and conduct discovery while accepting that such evidence would not be available; (3) Trump's eleventh-hour "offer" to provide his DNA months after discovery had closed; and (4) this Court's order rejecting Trump's "offer" to provide his DNA in exchange for an undisclosed appendix that Trump knew about for years. *See Carroll I* MIL at 27. Indeed, to open this door an inch would be to blow it off its hinges, since Trump obviously cannot question Carroll about her statements regarding the DNA on her dress, but at the same time bar her from explaining the lack of DNA evidence in the case. That would be nonsensical and highly prejudicial to Carroll—and it would cause substantial jury confusion. This effort to freeze the DNA issue to capture Carroll's comments in isolation is thus misleading and seeks to paint an inaccurate picture. Rule 403 exists to ensure juries do not make decisions based on this kind of problematic presentation of evidence. *Cf. Sadler v. Moran Towing*

---

[7] The deposition testimony that Trump cites also includes mentions of the discovery dispute between the parties: "Q. … [Y]ou stated in the public that you had DNA from the former president; is that correct? A. Yes. Q. Why did you state that? A. Because we sent the dress to be examined and then we got back a report." Ex. 2 at 217:22–218:5.

ASA-119

*Corp.*, No. 01 Civ. 1666, 2002 WL 1977604, at *1 (S.D.N.Y. Aug. 28, 2002) (Kaplan, J.).

Trump made a considered choice to take DNA out of the conversation through his strategic decisions during the discovery process. And as this Court has recognized, Carroll "prepared for trial on the entirely justified basis that there will be no DNA evidence." *Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 2006312, at *2 (S.D.N.Y. Feb. 15, 2023). Trump's effort to avoid these consequences by insisting on an unrealistic and prejudicial carve-out would raise the very same concerns that led the Court to deny Trump's motion to re-open discovery. *Id.* at *7–*9.

**III.    THE COURT SHOULD PRECLUDE FISHER AS A REBUTTAL WITNESS**

**A.    Trump Fails to Address an Independent Ground for Excluding Fisher**

Across both of her cases, Carroll has engaged seriously with the caselaw governing the reliability of expert testimony and has applied those standards to each aspect of the two reports that Fisher submitted. *See Carroll I* MIL at 10–22; *Carroll II* MIL at 4–18. Trump has not. By continuing to evade Carroll's grounds for precluding Fisher, Trump all but concedes her points.

With respect to *Carroll II* specifically, Carroll offered three independent reasons for precluding Fisher from testifying: (1) he was not a proper rebuttal expert; (2) his methods did not satisfy the reliability standards of Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); and (3) each portion of his report provided additional grounds on which to exclude his testimony. *See Carroll II* MIL at 4–18. Despite every opportunity to do so, Trump does not respond to the third ground *at all*. But an expert's testimony must be "reliable at every step," *United States v. Gatto*, No. 17 Cr. 686, 2019 WL 266944, at *6 (S.D.N.Y. Jan. 17, 2019) (Kaplan, J.), and cannot contain impermissible legal or factual conclusions that usurp the role of the judge or jury, *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005). The individual portions of Fisher's report violate these well-established principles. *Carroll II* MIL at 10–18. That is reason alone to preclude him from testifying—and the Court need not go further.

**B.    Fisher Is Not a Rebuttal Witness**

But even if the Court reaches the question, Trump does not dispute that the only appropriate function of Fisher is as a rebuttal expert. And Fisher has admitted that he does not rebut or respond to Professor Ashlee Humphreys' *Carroll II* report; that he never considered himself to be a rebuttal expert in this action; and that he was not directed by Trump to perform that role. *Carroll II* MIL at 4–5; *see also, e.g.*, Ex. 3 ("Fisher *Carroll II* Dep.") at 10:1–5, 11:5–7, 12:5–7, 52:9–13. This testimony should be conclusive as to whether he is a rebuttal expert. Yet Trump bravely soldiers on, asserting that Fisher makes the cut despite Fisher's own sworn testimony to the contrary.

Principally, Trump seizes on two assertions in the last three and a half pages of Fisher's *Carroll II* report as evidence that Fisher offered rebuttal testimony. *Carroll II* Opp. at 2–4. The first assertion is that Fisher acknowledged that Professor Humphreys completed a second report and discussed her qualifications. Ex. 4 ("Fisher *Carroll II* Rep.) at 21–22. But Fisher clarified at his deposition that this reference does not "respond to that [second report] in any way." Fisher *Carroll II* Dep. at 54:10–15. Regardless, this discussion of Professor Humphreys' qualifications is not permissible as a matter of law, *see Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 142 (S.D.N.Y. 2022), and does not transform the rest of Fisher's report into rebuttal opinion.

The second assertion relates to Fisher's discussion of Professor Humphreys' purported "social media campaign" in the sub-section of his report entitled, "Reputation Repair Program." Fisher *Carroll II* Rep. at 22–24. But this is not rebuttal testimony for purposes of *Carroll II*. Fisher lifted this text from his *Carroll I* report, which discussed Professor Humphreys' *Carroll I* report alone. Fisher *Carroll II* Dep. at 206:23–207:8. Eliminating any doubt on this score, Fisher confirmed that the "citations in this section are to the pages in Professor Humphreys' first report," and this was an "excerpt" where he "just pulled out sort of the gist of, you know, the important

8

points from [his] first report." *Id.* at 207:13–208:5. In other words, the language Trump relies on

to show that Fisher rebuts Professor Humphreys' *Carroll II* report actually confirms the opposite.

Since Fisher failed to disclose any opinion regarding Professor Humphreys' *Carroll II* report, he

cannot offer such opinion for the first time at trial. *See* Fed. R. Civ. P. 26(a)(2)(B)(i).

**C.      Fisher's Analysis Is Not Reliable**

As Carroll detailed in her motion, Fisher cannot meet the governing reliability standards to

testify as an expert because "his work demonstrate[s] an utter lack of care or preparation" and "the

methodology that he applied—his so-called 'common sense'—was nothing more than his *ipse dixit*

opinions regarding Carroll's damages as derived from conclusion-driven speculation." *Carroll II*

MIL at 7. Trump's defense of Fisher only confirms these conclusions.

To start, Trump points to Fisher's experience. Trump *Carroll II* Opp. at 4–6. But as Carroll

detailed in her reply brief in *Carroll I*, this is beside the point: "[t]o 'satisfy the admissibility

standards set forth in Rule 702 and *Daubert*, the expert must not only be qualified, but his or her

testimony must also be *reliable*.'" *Carroll I* Reply at 3 (citation omitted).

This leaves only Trump's seemingly half-hearted reliability arguments, which do not fare

any better. Trump *Carroll II* Opp. at 6–10. Trump recites—but does not actually apply—legal

standards regarding expert testimony. *Id.* at 8–10. He also cherry-picks instances in Fisher's report

where Fisher says "experience," "methodology," or "method," as if Fisher can satisfy the

reliability standard with magic words. *Id.* at 6–8. But even those references fall apart upon scrutiny.

For example, Trump quotes Fisher's general disclaimer where he lists the "methodology"

that he supposedly applied to the case. *Id.* at 6–7. There, Fisher said he "[c]arefully reviewed all

documentation and information on the background of this dispute," Fisher *Carroll II* Rep. at 13—

which he later revealed to entail reading only six news articles and preparing for less than an hour.

Fisher *Carroll II* Dep. at 46:5–47:11, 149:6–13. Then, Fisher claims he "researched information as needed on the internet," which in reality involved unspecified "googling" that even Fisher had difficulty explaining. *Id.* at 148:9–11, 149:13–14, 197:1–3. Next, Fisher states that he "[f]ollowed peer accepted procedure in both the public relations and expert witness professions," Fisher *Carroll II* Rep. at 13, even though he admitted in his *Carroll I* deposition that "I don't need peer review" and doesn't review or use peer-reviewed methodologies, Ex. 5 at 299:3–301:2, 304:23–305:16; *see also* Fisher *Carroll II* Dep. at 28:11–14 ("Q. And would you say your methodology in Carroll II is similar to your methodology in Carroll I? A. I would say so yes."). Finally, Fisher asserts that he "reviewed and analyzed previous applicable experiences," Fisher *Carroll II* Rep. at 13, but admitted at his deposition that he did no such thing for purposes of this case, Fisher *Carroll II* Dep. at 49:12–15. The remaining examples Trump relies on are merely more of the same.[8]

At bottom, Trump's efforts cannot avoid or distract from the straightforward and natural conclusion that follows from Fisher's report and the caselaw governing expert testimony. Fisher fails to apply the "same level of 'intellectual rigor that characterizes the practice' of his field," Fed. R. Evid. 702, advisory committee note (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999)), and he should be precluded from testifying at trial.

## CONCLUSION

For the reasons set forth above, and in Carroll's omnibus motion in limine, the Court should grant Carroll's motion.

---

[8] Trump cites Fisher's general conclusion that "it is my professional assessment and opinion that [Carroll] benefitted from this public dispute" without also confronting the inputs that Fisher relied on to reach that conclusion. Trump *Carroll II* Opp. at 8. Carroll walked through those inputs in her omnibus motion in limine, demonstrating the utter unreliability that plagued each step of Fisher's analysis. *Carroll II* MIL at 12–17.

**ASA-123**

Dated:  New York, New York
       March 16, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

11

ASA-124













**ASA-130**















ASA-137



ASA-138



ASA-139









**ASA-143**



ASA-144





**ASA-146**





ASA-148







ASA-151













**ASA-157**





ASA-159



ASA-160









**ASA-164**





ASA-166

