# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

E. JEAN CARROLL,

        *Plaintiff-Appellee*,

    v.

DONALD J. TRUMP,

        *Defendant-Appellant*.

No. 23-793

## DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT
## OF PLAINTIFF E. JEAN CARROLL'S MOTION
## TO EXPEDITE ORAL ARGUMENT IN THIS APPEAL

I, Roberta A. Kaplan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am a member of the bar of the State of New York and am admitted to appear before this Court. I am a partner in the law firm Kaplan Hecker & Fink LLP, counsel for Plaintiff-Appellee E. Jean Carroll in the above-captioned action.

2.    I respectfully submit this declaration in support of Carroll's motion to expedite oral argument in this appeal.

3.    Attached hereto as **Exhibit A** is a true and correct copy of the Verdict Form, dated May 9, 2023, *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y.) ("*Carroll II*"), Dkt. 174.

4. Attached hereto as **Exhibit B** is a true and correct copy of the Verdict Form, dated January 26, 2024, *Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y) ("*Carroll I*"), Dkt. 280.

5. Attached hereto as **Exhibit C** is a true and correct copy of a letter from Lawrence S. Rosen to Justice Deborah A. Kaplan, dated December 5, 2019, *Carroll v. Trump*, No. 160694/2019 (N.Y. Sup. Ct.), NYSCEF No. 25.

6. Attached hereto as **Exhibit D** is a true and correct copy of the New York Supreme Court's Decision & Order on Trump's Motion to Stay, entered August 6, 2020, *Carroll v. Trump*, No. 160694/2019 (N.Y. Sup. Ct.), NYSCEF No. 110.

7. Attached hereto as **Exhibit E** is a true and correct copy of Trump's Notice of Motion to Substitute the United States as Defendant, dated September 8, 2020, *Carroll I*, Dkt. 3.

8. Attached hereto as **Exhibit F** is a true and correct copy of Judge Lewis A. Kaplan's Order Denying Trump's Letter Motion to Stay, dated September 15, 2021, *Carroll I*, Dkt. 56.

9. Attached hereto as **Exhibit G** is a true and correct copy of the Scheduling Order, entered May 5, 2022, *Carroll I*, Dkt. 76.

10. Attached hereto as **Exhibit H** is a true and correct copy of the Scheduling Order, entered July 19, 2022, *Carroll I*, Dkt. 77.

11.     Attached hereto as **Exhibit I** is a true and correct copy of Carroll's Opposition to Defendant's Letter Motion for a Stay, dated September 30, 2022, *Carroll I*, Dkt. 93.

12.     Attached hereto as **Exhibit J** is a true and correct copy of Trump's Letter Motion for a Stay, dated September 28, 2022, *Carroll I*, Dkt. 92.

13.     Attached hereto as **Exhibit K** is a true and correct copy of Judge Lewis A. Kaplan's Amendment to Pretrial and Scheduling Order, dated February 7, 2023, *Carroll II*, Dkt. 49.

14.     Attached hereto as **Exhibit L** is a true and correct copy of Trump's Letter Motion to Reopen Discovery, dated April 13, 2023, *Carroll II*, Dkt. 108.

15.     Attached hereto as **Exhibit M** is a true and correct copy of Judge Lewis A. Kaplan's Order on Trump's Letter Motion to Reopen Discovery, dated April 13, 2023, *Carroll II*, Dkt. 110.

16.     Attached hereto as **Exhibit N** is a true and correct copy of a letter from Joseph Tacopina to Judge Lewis A. Kaplan, dated April 17, 2023, *Carroll II*, Dkt. 115.

17.     Attached hereto as **Exhibit O** is a true and correct copy of a letter from Joseph Tacopina to Judge Lewis A. Kaplan, dated April 19, 2023, *Carroll II*, Dkt. 118.

18.     Attached hereto as **Exhibit P** is a true and correct copy of letter from Joseph Tacopina to Judge Lewis A. Kaplan, dated April 20, 2023, *Carroll II*, Dkt. 127.

19.     Attached hereto as **Exhibit Q** is a true and correct copy of a letter from Marc Kasowitz to Judge Verna L. Saunders, dated July 16, 2020, *Carroll v. Trump*, No. 160694/2019 (N.Y. Sup. Ct.), NYSCEF No. 103.

20.     Attached hereto as **Exhibit R** is a true and correct copy of a letter from Brian M. Boynton to Judge Lewis A. Kaplan, dated July 11, 2023, *Carroll I*, Dkt. 177.

21.     Attached hereto as **Exhibit S** is a true and correct copy of Trump's Emergency Motion for a Stay Pending Appeal, dated August 24, 2023, *Carroll v. Trump*, No. 23-1045, 23-1146 (2d Cir.), Dkt. 27.

22.     Attached hereto as **Exhibit T** is a true and correct copy of the Court's Denial of Trump's Emergency Motion for a Stay Pending Appeal, dated September 13, 2023, *Carroll v. Trump*, No. 23-1045, 23-1146 (2d Cir.), Dkt. 60.

23.     Attached hereto as **Exhibit U** is a true and correct copy of Carroll's Memorandum of Law in Opposition to Trump's Motion for a New Trial or Remittitur, dated March 26, 2024, *Carroll I*, Dkt. 330.

24.    Attached hereto as **Exhibit V** is a true and correct copy of an excerpt

from the official trial transcript in *Carroll I*.

Dated:    May 14, 2024                          */s/ Roberta A. Kaplan*
                                                        Roberta A. Kaplan

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

Plaintiff,

-against-                                        22-cv-10016 (LAK)

DONALD J. TRUMP,

Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## VERDICT FORM

### Battery

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

    1.    Mr. Trump raped Ms. Carroll?

        YES _____        NO __✓__

        *[If you answered "Yes," skip to Question 4. If you answered "No," continue to Question 2.]*

    2.    Mr. Trump sexually abused Ms. Carroll?

        YES __✓__        NO _____

        *[If you answered "Yes," skip to Question 4. If you answered "No," continue to Question 3.]*

    3.    Mr. Trump forcibly touched Ms. Carroll?

        YES _____        NO _____

        *[If you answered "Yes," continue to Question 4. If you answered "No," skip to Question 6.]*

    4.    Ms. Carroll was injured as a result of Mr. Trump's conduct?

        YES __✓__        NO _____

        If "Yes," insert a dollar amount that would fairly and adequately compensate her for that injury or those injuries.

        $ _2,000,000_ ( 2 million)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED 5/9/23

2

If "No," insert $1.

$ _____

*[Continue to Question 5, whether you answered "Yes" or "No."]*

5. Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to such disregard?

YES __✓__          NO ____

If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

$ _20,000 — (twenty thousand)_

*[Continue to Question 6, whether you answered "Yes" or "No."]*

**Defamation**

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

6. Mr. Trump's statement was defamatory?

YES __✓__          NO ____

*[If you answered "Yes," continue to Question 7. If you answered "No," stop here and return your verdict.]*

**Did Ms. Carroll prove, by clear and convincing evidence, that**

7. Mr. Trump's statement was false?

YES __✓__          NO ____

*[If you answered "Yes," continue to Question 8. If you answered "No," stop here and return your verdict.]*

8. Mr. Trump made the statement with actual malice?

YES __✓__          NO ____

*[If you answered "Yes," continue to Question 9. If you answered "No," stop here and return your verdict.]*

3

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

9.  Ms. Carroll was injured as a result of Mr. Trump's publication of the October 12, 2022 statement?

    YES ✓          NO _____

    If "Yes," insert a dollar amount for any damages other than the reputation repair program.

    $ 1,000,000. — (1 million)

    If "Yes," insert a dollar amount for any damages for the reputation repair program only.

    $ 1,700,000. — (1.7 million)

    If "No," insert $1.

    $ _____

    *[Continue to Question 10, whether you answered "Yes" or "No."]*

10. In making the statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another?

    YES ✓          NO _____

    If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

    $ 280,000. — (two hundred eighty thousand)

    *[Please write your juror number (not you seat number or name) in the space provided below, fill in the date, and inform the officer that you have reached a verdict.]*

Dated: _____5/9_____, 2023

4

Juror numbers:

| | |
|---|---|
| 10 | 58 |
| 37 | 77 |
| 39 | 80 |
| 44 | 81 |
| 48 | |

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

              Plaintiff,

    -against-                          20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## VERDICT FORM

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

1.    Ms. Carroll suffered more than nominal damages as a result of Mr. Trump's publication of the June 21 and June 22, 2019 statements?

          YES _X_         NO ____

        If "Yes," insert the dollar amount for any compensatory damages you award *other than for the reputation repair program.* If "No," write "$1."

        $ _7.3 m_

        If "Yes," insert the dollar amount for any compensatory damages you award *for the reputation repair program only.* If "No," leave blank.

        $ _11m_

        *[Continue to Question 2, whether you answered "Yes" or "No."]*

2.    In making the June 21, 2019 statement, Mr. Trump acted maliciously, out of hatred, ill will, or spite, vindictively, or in wanton, reckless, or willful disregard of Ms. Carroll's rights?

          YES _X_         NO ____

        *[Continue to Question 3, regardless of whether you answered "Yes" or "No."]*

2

3.  In making the June 22, 2019 statement, Mr. Trump acted maliciously, out of hatred, ill will, or spite, vindictively, or in wanton, reckless, or willful disregard of Ms. Carroll's rights?

    YES $\times$_____        NO _____

    If you answered "Yes" to either Question 2 or Question 3 (or both), how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

    $ 65m

    *[Please write your juror number (not your seat number or name) in the space provided below, fill in the date, and inform the officer that you have reached a verdict.]*

Dated: January 26, 2024

Juror numbers:

| | |
|---|---|
| 66 | 34 |
| 23 | 21 |
| 28 | 10 |
| 56 | 82 |
| 6 | |

# EXHIBIT C

# LaRocca Hornik Rosen
# & Greenberg LLP

## COUNSELORS AT LAW

The Trump Building
40 Wall Street
32nd Floor
New York, NY 10005
212.530.4823
212.530.4815 fax

lhrgb.com

FREEHOLD COMMONS
83 South Street
3RD Floor
Freehold, NJ 07728
732.409.1144
732.409.0350 fax

Frank J. LaRocca ᴅᴏ
Jonathan L. Hornik
Lawrence S. Rosen
Rose Greenberg ᴅ
Amy D. Carlin ᴅ
Patrick T. McPartland ᴅ
David N. Kittredge ᴅ
Jonathan F. Ball ᴅ
Jared E. Blumetti
Katelyn Canning
Florence R. Goffman ᴅᴏ
Sherry Hamilton ᴅ
Peter Kelegian ᴅ
Drew Tanner ᴅ
Lauren Weissman-Falk

ᴅ  New York Bar Only
ᴏ  New Jersey Bar Only
ᴅ  Of Counsel Attorneys
ᴏ  Certified Matrimonial Law Attorney

DIRECT DIAL: 212.530.4822
EMAIL: LROSEN@LHRGB.COM

December 5, 2019

**VIA NYSCEF & FEDEX**
Hon. Deborah A. Kaplan
Administrative Justice
Supreme Court of the State of New York
County of New York
60 Centre Street, Room 609
New York, New York 10007

> Re:     E. Jean Carroll v. Donald J. Trump
> Supreme Court, New York County, Index No. 160694/2019

Dear Justice Kaplan:

We represent defendant Donald J. Trump in the above-captioned action, and write to briefly respond to plaintiff's December 3, 2019 correspondence in which plaintiff seemingly appears— for the second time—to be engaging in improper judge-shopping. *See* NYSCEF Doc. Nos. 23-24.

In her initial RJI, filed November 8, 2019, plaintiff attempted to have this non-commercial case assigned to Justice Schecter of the Commercial Division on the purported grounds that it was "related to" the case entitled *Summer Zervos v. Donald J. Trump*, Index No. 150522/2017. That request by plaintiff was denied and, in accordance with this Court's IAS protocols, the instant case was randomly assigned to Justice Ling-Cohan. *See* 22 NYCRR § 202.3(b) ("[a]ssignments shall be made by the clerk of the court pursuant to a method of ***random selection***") (*emphasis added*).

Undeterred, on November 21, 2019, plaintiff curiously sent to Justices Schecter and Ling-Cohan an *ex parte* letter purportedly seeking to confirm whether her request to assign this case to Justice Schecter had been "processed," this despite the Court's electronic filing system clearly identifying Justice Ling-Cohan as the Justice assigned to this case.[1] This letter was ultimately

---

[1] Despite admittedly being in possession of President Trump's attorneys' contact information and e-mail addresses, plaintiff instead mailed a copy of her November 21, 2019 letter to President Trump at Trump Tower (where he no longer resides) and to the White House (where plaintiff presumably knew that there would be a significant delay in the letter reaching President Trump or his counsel, if ever).

forwarded to Your Honor's attention in connection with plaintiff's December 3, 2019 correspondence.

In point of fact, these separate defamation cases—which involve different plaintiffs, different alleged statements that were made in different places, at different times, and in different contexts—are "unrelated" in every respect, except that the defendant is President Trump and the claims are for defamation.

Indeed, by plaintiff's logic this case should be assigned not to Justice Schecter, but rather to Justice Jaffe, who dismissed a very similar defamation case that was brought against President Trump by Cheryl Jacobus (a dismissal that was upheld by the First Department and denied further review by the Court of Appeals). *See Jacobus v. Trump*, 55 Misc.3d 470, 51 N.Y.S.3d 330 (Sup. Ct. N.Y. Cty. 2017), *aff'd* 156 A.D.3d 452, 64 N.Y.S.3d 889 (1st Dept. 2017), *lv. denied* 31 N.Y.3d 903 (2018). The Uniform Civil Rules require, however, that cases be assigned according to a method of "***random selection***." It was presumably for this reason that the *Zervos* case was randomly assigned to Justice Schecter, not Justice Jaffe, and the instant case was randomly assigned to Justice Ling-Cohan, and not to Justice Schecter.

In light of the foregoing, plaintiff's instant request to reassign this case from Justice Ling-Cohan to Justice Schecter should be denied.

Respectfully submitted,

Lawrence S. Rosen

cc:     Counsel of record (*via NYSCEF*)

2

# EXHIBIT D

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| PRESENT: | HON. VERNA L. SAUNDERS | PART | IAS MOTION 36 |
|---|---|---|---|

_Justice_

-------------------------------------------------------------------------------X

E. JEAN CARROLL,

               Plaintiff,

         - v -

DONALD TRUMP,

               Defendant.

-------------------------------------------------------------------------------X

| INDEX NO. | 160694/2019 |
|---|---|
| MOTION SEQ. NO. | 002 |

### DECISION + ORDER ON MOTION

The following e-filed documents, listed by NYSCEF document number (Motion 002) 43, 44, 45, 46, 47, 48, 49, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 97, 98, 101, 102, 105, 106

were read on this motion to/for                       **STAY**                .

     Plaintiff, E. Jean Carroll, commenced this defamation action seeking damages stemming from defendant Donald Trump's alleged defamatory statements made in connection with plaintiff's allegations of sexual assault at the hands of defendant.

     Defendant, who is currently serving as President of the United States, moves the court pursuant to CPLR § 2201 seeking a stay of the proceedings pending the decision of the Court of Appeals on defendant's appeal from _Zervos v Trump_, 171 AD3d 110 ( 1st Dept 2019) wherein the Appellate Division, First Department affirmed an order of the Supreme Court, New York County denying defendant's motion seeking a dismissal of the defamation action. In the alternative, defendant seeks a stay of the action on the ground that he is currently sitting as President of the United States.

     Defendant, in sum and substance, argues that this action will not lie if it is barred by the Supremacy Clause of the United States Constitution prohibiting state court subject matter jurisdiction over a sitting United States President. Defendant asserts that this very issue is pending before the Court of Appeals in the _Zervos_ action and that when granting leave to appeal, the First Department also granted a stay of those proceedings.[1] Defendant thus claims a stay of the instant proceeding is warranted as the outcome of the _Zervos_ action will determine whether this court has jurisdiction over defendant while he is in office. Defendant further argues that New York courts often grant stays pending appeals in other actions where the decision on those appeals resolve a

---

[1] _Zervos v Trump_, 2020 WL 63397, 2020 NY Slip Op 60193(U).

**160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.**
Motion No.  002

Page 1 of 4

Case 23-793, Document 139-2, 05/14/2024, 3623256, Page19 of 205

dispositive issue, as is the case here.  Defendant contends that due to the unique role of the President under Article II of the Constitution, deference is required, and a stay mandated.

In opposition, plaintiff argues that defendant's motion serves as a further delaying tactic and that stays are reserved for extraordinary circumstances.  Plaintiff asserts that no such circumstances exist here where there is binding appellate precedent and the determination of the pending appeal is not imminent.  Furthermore, plaintiff contends that defendant's reliance upon case law where a stay was granted pending an appeal in the same action is misplaced.  Moreover, plaintiff argues that the constitutional immunity afforded to the President applies to official conduct, not personal or unofficial conduct as is alleged in this case.  Plaintiff avers that defendant's engagement in other personal litigation during his presidency undermines the argument that a stay in this action is necessary.

In support of plaintiff's primary contention that a stay is inappropriate where binding appellate authority exists, plaintiff cites to *Miller v Miller*, 109 Misc 2d 982 [Sup Ct, Suffolk County 1981], wherein the court declined to issue a stay pending the Court of Appeals decision as it was bound by the Appellate Court decision and the Court of Appeals decision was not imminent.  Plaintiff contends that the cases cited by defendant in support of a stay are easily distinguishable from this action as those matters either involved identical issues and parties; were fully briefed and awaiting oral argument at the time a stay was requested; or, there was no binding appellate authority on point.

In reply, defendant reiterates the arguments advanced in the moving papers and adds that as the *Zervos* appeal will be fully briefed by May 11, 2020 a stay of this action pending the appeal of the *Zervos* case is warranted as its decision will inform jurisdiction of this action.

In the *Zervos* case, this court held that:

"[n]othing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct that bears no relationship to any federal executive responsibility.  Significantly, when unofficial conduct is at issue, there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs federal functions.  There is no possibility that a state court will compel the President to take any official action or that it will compel the President to refrain from taking any official action…  [T]here is absolutely no authority for dismissing or staying a civil action related purely to unofficial conduct because defendant is the President of the United States.  Resolution of an action unrelated to the President's official conduct is the responsibility of a state court and is not impermissible direct control . . . over the President." (*Zervos v Trump*, 59 Misc 3d 790 [Sup Ct, NY County 2018], internal citations omitted).

160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.
Motion No.  002

Page 2 of 4

Case 23-793, Document 139-2, 05/14/2024, 3623256, Page20 of 205

On appeal, the Appellate Division, First Department noted that the *Zervos* action presented a constitutional issue of first impression: "whether the Supremacy Clause of the United States Constitution requires a state court to defer litigation of a defamation action against a sitting President until his terms end." (*Zervos,* supra). Ultimately, the Appellate Division's decision to affirm the Supreme Court's ruling unequivocally resolved this issue holding that pursuant to the United States Supreme Court's decision in *Clinton v Jones,* 520 US 681 [1997] "the presidency and the President are indeed separable" and thus, "the President is presumptively subject to civil liability for conduct that has taken place in his private capacity." (*Zervos,* supra at 124).

At issue here is whether this action should be stayed pending a decision from the Court of Appeals regarding the First Department's decision to affirm this court's ruling on *Zervos.*

Pursuant to CPLR § 2201, which authorizes the granting of a stay "in a proper case, upon such terms as may be just," stays are in the sound discretion of the trial court. However, the First Department has ruled that stays should be exercised "sparingly and only when other remedies are inadequate and the equities invoked apparent and strong." (See generally, *Croker v NY Trust Co.,* 206 AD 11 [1st Dept 1923]). Nevertheless, it is axiomatic that this court is bound by the decisions of the Appellate Division, First Department unless same has been overturned by the Court of Appeals.

In this instance, defendant implores the court to stay this action until the Court of Appeals has ruled on a separate action, arguing that the appeal is fully briefed and thus, imminent. Conversely, plaintiff objects avowing that there is no immediate date set for arguments or likelihood that a decision is imminent and thus, the court is bound by the binding appellate precedent which specifically addresses the issue in contention. While the arguments advanced by both parties are compelling, they have been rendered moot in light of the recent United States Supreme Court decision in *Trump v Vance,* 591 U.S. __, __, 140 S Ct 2412 [2020]. In *Trump v Vance,* the U.S. Supreme Court held that "Article II and the Supremacy Clause do not categorically preclude, or require a heightened standard for, the issuance of a state criminal subpoena to a sitting President." (Slip Op at 1.) The *Vance* Court reasoned that as the Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties, absolute immunity is not necessary or appropriate under Article II or the Supremacy Clause as state courts and prosecutors are expected to observe constitutional limitations and, if they fail to

160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.
Motion No. 002

Page 3 of 4

3 of 4

do so, federal law allows a President to challenge any constitutional influence. (Slip Op at 17.)
While the *Vance* Court's decision permits the issuance of a criminal subpoena to a sitting
President, it's analysis and conclusions address the same issues and questions raised by defendant
in this action, as well as, the *Zervos* action: whether the Supremacy Clause of the Constitution bars
a state court from exercising jurisdiction over a sitting President of the United States during his
term. No, it does not. Further, the holding in *Vance* is not limited solely to criminal proceedings.
In fact, the *Vance* Court concluded,

> Two hundred years ago, a great jurist of our Court established that no citizen, not even the
> President, is categorically above the common duty to produce evidence when called upon
> in a criminal proceeding. We reaffirm that principle today and hold that the President is
> neither absolutely immune from state criminal subpoenas seeking his private papers nor
> entitled to a heightened standard of need. The "guard[ ] furnished to this high officer" lies
> where it always has—in "the conduct of a court" applying established legal and
> constitutional principles to individual subpoenas in a manner that preserves both the
> independence of the Executive and the integrity of the criminal justice system. (Slip Op at
> 21, internal citations omitted.)

This court construes the holding in *Vance* applicable to all state court proceedings in which
a sitting President is involved, including those involving his or her unofficial/personal conduct.
Accordingly, the application for a stay is denied and it is hereby

ORDERED, defendant's motion is denied in accordance with the foregoing; and it is
further

ORDERED, that the parties are to appear for a telephonic compliance conference on
September 30, 2020 at 11:00 AM; and it is further

ORDERED, that any requested relief not expressly addressed herein has been considered
and is hereby denied.

This constitutes the decision and order of the court.

_____          _____
**August 3, 2020**                                    HON. VERNA L. SAUNDERS, JSC

| CHECK ONE: | | □ CASE DISPOSED | | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | | □ GRANTED | ☒ DENIED | □ GRANTED IN PART | □ OTHER |
| APPLICATION: | | □ SETTLE ORDER | | □ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | □ INCLUDES TRANSFER/REASSIGN | | □ FIDUCIARY APPOINTMENT | □ REFERENCE |

160694/2019   CARROLL, E. JEAN vs. TRUMP, DONALD J.          Page 4 of 4
Motion No. 002

# EXHIBIT E

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:      (202) 353-1651
Facsimile:      (202) 616-5200
Email:           stephen.terrell2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, <br><br> Plaintiff, <br><br> -against- <br><br> DONALD J. TRUMP, in his personal capacity, <br><br> Defendant. | **ECF Case** <br><br> No.  1:20-cv-7311 |

**NOTICE OF MOTION TO SUBSTITUTE THE UNITED STATES AS DEFENDANT**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEY OF RECORD, PLEASE

TAKE NOTICE that the United States hereby moves, pursuant to 28 U.S.C. § 2679(d)(2), Fed.

R. Civ. P. 21, and Local Civil Rule 7.1 for an order substituting the United States as defendant

for President Donald J. Trump.  This motion is supported by the attached memorandum of point

and authorities, the attached declaration of Stephen Terrell, any arguments or evidence presented

in reply, and all arguments and evidence presented at a hearing or with leave of Court.

Dated: September 8, 2020

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director

 S/ Stephen R. Terrell
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:     (202) 353-1651
Facsimile:      (202) 616-5200
Email: stephen.terrell2@usdoj.gov

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:      (202) 353-1651
Facsimile:      (202) 616-5200
Email:          stephen.terrell2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>              Plaintiff,<br><br>        -against-<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>              Defendant. | **ECF Case**<br><br>No.  1:20-cv-7311 |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUBSTITUTE THE UNITED STATES AS DEFENDANT

I.      **INTRODUCTION**

On November 4, 2019, Plaintiff instituted this action in the Supreme Court for the State of New York, New York County, against the President of the United States, Donald J. Trump, asserting a defamation claim based on a written statement issued to the press and two statements

the President made in interviews in June 2019,[1] in which the President vehemently denied accusations made in Plaintiff's then-forthcoming book.  The President explained that these accusations were false and that the incident she alleged never happened.  Acting pursuant to 28 C.F.R. § 15.4(a), the Attorney General's delegate has certified that President Trump was acting within the scope of his office as President of the United States when he publicly denied as false the allegations made by Plaintiff.[2]

On the basis of this certification, the United States removed the action to this Court pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2).  Notice of Removal, ECF No. 1.  Pursuant to the same statute, the United States hereby moves the Court to substitute the United States as the party defendant in place of the President.

## II.  APPLICABLE STATUTORY PROVISIONS

Under the Westfall Act, codified, in part, at 28 U.S.C. § 2679(b)(1), the remedy against the United States provided by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2672, "for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or

---

[1] The United States attaches the complaint hereto as Exhibit A to the Declaration of Stephen Terrell.

[2] The Attorney General has delegated the authority to execute such certifications to be exercised by either the United States Attorney for the district embracing the place where the civil action or proceeding is brought, or any Director of the Torts Branch, Civil Division, Department of Justice.  28 C.F.R. § 15.4(a).  Torts Branch Director James G. Touhey, Jr., executed the certification that President Trump was acting within the scope of his office as the President of the United States at the time of the incidents out of which the plaintiff's defamation claim arose.  Terrell Decl., Exhibit B.

omission gave rise to the claim."  The Westfall Act provides that upon certification by the

Attorney General that the defendant employee or officer was acting within the scope of his office

or employment at the time of the incidents out of which the plaintiff's claim arose, "any civil

action or proceeding commenced upon such claim in a State court shall be removed without

bond any time before trial by the Attorney General to the district court of the United States for

the district and division embracing the place in which the action or proceeding is pending."  *Id.* §

2679(d)(2).  The Westfall Act goes on to provide that "[s]uch action or proceeding shall be

deemed to be an action or proceeding brought against the United States," and that "the United

States shall be substituted as the party defendant."  *Id.*

## III.       PROCEDURAL BACKGROUND

Plaintiff filed her action in the Supreme Court for the State of New York on November 4,

2019.  Terrell Decl., Exhibit A.  The sole defendant named in Plaintiff's action was President

Trump.  *Id.*  On September 8, 2020, the United States removed the action to this Court upon

certification from James G, Touhey, Director, Torts Branch, Civil Division, United States

Department of Justice, that President Trump was acting within the scope of his office at the time

of the incidents out of which Plaintiff's claim arose.  Notice of Removal, ECF No. 1; Touhey

Certification, Terrell Decl., Exhibit B.

## IV.       ARGUMENT: THE COURT SHOULD SUBSTITUTE THE UNITED STATES
##           FOR THE PRESIDENT AS THE SOLE DEFENDANT.

As the Supreme Court has explained, "[w]hen a federal employee is sued for wrongful or

negligent conduct, the [Westfall] Act empowers the Attorney General to certify that the

employee 'was acting within the scope of his office or employment at the time of the incident out

of which the claim arose.'"  *Osborn v. Haley,* 549 U.S. 225, 229–30 (2007) (quoting 28 U.S.C. §

2679(d)(2)).  Once the Attorney General certifies that the defendant federal officer was acting

within the scope of his office at the relevant time, the statute itself provides that the United States "shall" be substituted as the sole defendant in the action.  28 U.S.C. § 2679(d)(2); *see also Osborn,* 549 U.S. at 230 ("Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee."); *id.* at 252 ("Upon certification, the action is 'deemed to be . . . brought against the United States,' unless and until the district court determines that the federal officer originally named as defendant was acting outside the scope of his employment." (quoting 28 U.S.C. § 2679(d)(2) (ellipsis in original)).  "[T]he Westfall Act certification must be respected unless and until the District Court determines that [the federal officer], in fact, engaged in conduct beyond the scope of his employment," *Osborn*, 549 U.S. at 251 (original italics omitted); *id.* at 231 ("The United States, we hold, must remain the federal defendant in the action unless and until the District Court determines that the employee in fact, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." (original italics omitted)).

Numerous courts have recognized that elected officials act within the scope of their office or employment when speaking with the press, including with respect to personal matters, and have therefore approved the substitution of the United States in defamation actions.  *See, e.g., Does 1-10 v. v. Haaland,* ___ F.3d ___, ___, 2020 WL 5242402, at *6, *8 (6th Cir. 2020) ("unsolicited comments by elected officials on an event of widespread public interest" within scope); *Wuterich v. Murtha*, 562 F.3d 375, 384–85 (D.C. Cir. 2009) (statements made during a series of interviews to the media within scope); *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659. 665 (D.C. Cir. 2006) (statement made to reporter during interview about his separation from his spouse within scope); *Williams v. United States,* 71 F.3d 502, 507 (5th Cir. 1995) (statements made during press interview within scope); *Operation Rescue Nat'l*

*v. United States,* 975 F. Supp. 92, 94–95, 106 (D. Mass. 1997), *aff'd,* 147 F.3d 68 (1st Cir. 1998) (same).

Here, acting pursuant to 28 C.F.R. § 15.4(a), the Attorney General's delegate has certified that President Trump was acting within the scope of his office as President of the United States at the time of the incidents out of which the Plaintiff's defamation claim arose.  Indeed, when providing the challenged statements, the President was speaking to or responding to inquiries from the press, much as the elected officials in the cases cited above were speaking to the press or making other public statements at the time of their challenged actions.  The Westfall Act accordingly requires the substitution of the United States as defendant in this action.

## V.      CONCLUSION

For the reasons stated herein, the United States respectfully requests that the Court substitute the United States for President Trump as defendant.

Dated: September 8, 2020              JEFFREY BOSSERT CLARK
                                     Acting Assistant Attorney General
                                     Civil Division

                                     JAMES G. TOUHEY, JR.
                                     Director

                                      S/ Stephen R. Terrell
                                     STEPHEN R. TERRELL (CA Bar No.
                                     210004)
                                     Attorney
                                     Torts Branch, Civil Division
                                     United States Department of Justice
                                     P.O. Box 888
                                     Washington, DC  20044
                                     Telephone:    (202) 353-1651
                                     Facsimile:    (202) 616-5200
                                     Email: stephen.terrell2@usdoj.gov

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC 20044
Telephone:     (202) 353-1651
Facsimile:     (202) 616-5200
Email:          stephen.terrell2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>               Plaintiff,<br><br>       -against-<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>           Defendant. | **ECF Case**<br><br>No. <u> 1:20-cv-7311 </u> |

## DECLARATION OF STEPHEN R. TERRELL

I, Stephen R. Terrell, pursuant to 28 U.S.C. § 1746 and Local Civil Rule 1.9, declare as

follows:

1.     I am an attorney at law, licensed to practice before the Supreme Court of

California, and an employee of the United States Department of Justice, Civil Division, Torts

Branch.

2.     Attached hereto as Exhibit A is a true and correct copy of the complaint filed in

*Carroll v. Trump*, Supreme Court of the State of New York, County of New York, Index No.

160694/2019.

3.      Attached hereto as Exhibit B is a true and correct copy of the Westfall Act

certification executed by James G. Touhey, Director, Torts Branch of the Civil Division of the

United States Department of Justice.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

September 8, 2020.


S/ Stephen R. Terrell
Stephen R. Terrell

EXHIBIT A

Case 1:20-cv-03311-LLS Document 53-13 Filed 05/08/20 Page 33 of 295

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

E. JEAN CARROLL,

                                    *Plaintiff*,

   -against-


DONALD J. TRUMP, in his personal capacity,

                                    *Defendant*.

---

Index No.  _____


**COMPLAINT AND
JURY DEMAND**

 

     Plaintiff E. Jean Carroll ("Plaintiff" or "Carroll"), by and through her attorneys at Kaplan Hecker & Fink LLP, alleges as follows:

### INTRODUCTION

    1.    Nobody in this nation is above the law. Nobody is entitled to conceal acts of sexual assault behind a wall of defamatory falsehoods and deflections. The rape of a woman is a violent crime; compounding that crime with acts of malicious libel is abhorrent. Yet that is what Defendant Donald J. Trump did to Plaintiff E. Jean Carroll.

    2.    Roughly 23 years ago, playful banter at the luxury department store Bergdorf Goodman on Fifth Avenue in New York City took a dark turn when Trump seized Carroll, forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her.

    3.    In the aftermath, Carroll confided in two close friends. One urged her to report the crime to the police, but the other warned that Trump would ruin her life and livelihood if she reported it.

    4.    Carroll chose silence—and remained silent for over two decades.

5.     Carroll knew then that sexual assault was pervasive. She also knew that men have been assaulting women and getting away with it since before she was born. And she knew that while a woman who accused *any* man of rape was rarely believed, a woman who accused a rich, famous, violent man of rape would probably lose everything. She therefore reasonably concluded that if she accused Donald Trump of rape he would bury her in threats and lawsuits, and she would probably lose her reputation, not to mention everything she had worked for and achieved.

6.     Near the end of the 2016 presidential election, Carroll watched in horror as numerous women offered highly credible (and painfully familiar) accounts of Trump assaulting them; Trump responded with insults and denials; the public fractured; and Trump not only won the election, but grew *more* popular with some supporters as a result of the controversy.

7.     Carroll's mother, a respected Republican official in Indiana, was dying during the last six weeks of the presidential election. Carroll, wanting to make her mother's last days as pleasant as possible and avoid causing her any pain, decided to remain silent about what Trump had done to her.

8.     But that all changed in late 2017, when the Harvey Weinstein scandal and its aftermath signaled a profound shift in how American society responds to accusations of sexual misconduct by powerful men. It suddenly seemed possible that even Trump could be held to account.

9.     For Carroll, that project grew more urgent—and more personal—as the #MeToo era prompted a flood of new letters to her advice column seeking her counsel about how to respond to sexual assault and abuse. In her column, Carroll encourages her readers to be brave, to think clearly, and to seek justice. When readers overcome with the doubt and anxiety have turned to her seeking advice, Carroll has always advised taking action. But she never confessed her own

2

experiences. She never revealed that she, too, had been a victim of sexual assault. Over time, as described below, the contradiction between Carroll's words and her actions became increasingly untenable.

10.     Carroll is a journalist. She watched as a throng of women came forward and accused Trump of sexual assault, only to be denigrated and then brushed aside. When she felt she should finally come forward herself, Carroll wanted to do it differently. She decided to describe Trump's rape in a book she had already begun to write about her experiences with various men. She did not want to tell her story to the police, a newspaper, an elected official, or a fellow journalist, and be treated as a "victim." In other words, she wanted to tell her own story on her own terms.

11.     When Carroll's account was published, Trump lashed out with a series of false and defamatory statements. He denied the rape. But there was more: he also denied ever having met Carroll or even knowing who she was. Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. He also deliberately implied that she had falsely accused other men of rape. For good measure, he insulted her physical appearance.

12.     Each of these statements was false. Each of them was defamatory.

13.     Trump knew that these statements were false; at a bare minimum, he acted with reckless disregard for their truth or falsity. Trump had recognized Carroll on sight at Bergdorf Goodman. He knew who she was when he raped her, and he knew who she was in 2019. He certainly knew that she was telling the truth. After he lied about attacking her, he surrounded that central lie with a swarm of related lies in an effort to explain why she would invent an accusation of rape. To do so, he smeared her integrity, honesty, and dignity—all in the national press.

3

14.     These lies were familiar to Trump. He had used them before, when other women stated that he had grabbed, groped, or raped them.

15.     Trump's defamatory statements injured Carroll. They inflicted emotional pain and suffering, they damaged her reputation, and they caused substantial professional harm.

16.     Carroll filed this lawsuit to obtain redress for those injuries and to demonstrate that even a man as powerful as Trump can be held accountable under the law.

## THE PARTIES

17.     Plaintiff E. Jean Carroll is a journalist, author, former writer for Saturday Night Live, and advice columnist for *Elle* magazine. She is a resident of the State of New York.

18.     Defendant Donald J. Trump is currently the President of the United States, although he is sued here only in his personal capacity. Since taking office, Trump has filed several lawsuits in his personal capacity, including *Trump v. Vance, Jr. et al.*, No. 19 Civ. 8694 (S.D.N.Y.), *Trump et al. v. Deutsche Bank AG et al.*, No. 19 Civ. 3826 (S.D.N.Y.), *Donald J. Trump for President, Inc. et al. v. Padilla et al.*, No. 19 Civ. 1501 (E.D. Cal.), *Trump v. Committee on Ways and Means of the U.S. House of Representatives et al.*, No. 19 Civ. 2173 (D.D.C.), and *Trump et al. v. Committee on Oversight and Reform of the U.S. House of Representatives et al.*, No. 19 Civ. 1136 (D.D.C.). Trump is also defending a related case pending in this Court. *See Zervos v. Trump*, No. 150522/2017 (N.Y. Sup. Ct., N.Y. Cty.). Trump is a resident of the State of New York.

## JURY DEMAND

19.     Plaintiff E. Jean Carroll hereby demands a trial by jury.

## JURISDICTION & VENUE

20.     This Court has jurisdiction pursuant to NY CPLR § 301.

21.     Venue is proper in this county pursuant to NY CPLR § 503 and § 509.

4

## FACTUAL ALLEGATIONS

### I.    TRUMP RAPES CARROLL AT BERGDORF GOODMAN

22.    One evening between the fall of 1995 and the spring of 1996, Carroll left work and went to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. She was and remains a regular shopper at Bergdorf's.

23.    That evening, Carroll did not find whatever she was looking for and prepared to leave Bergdorf's empty-handed. As she exited through Bergdorf's revolving side door on 58th Street, Trump arrived and entered through that very same door, which was cater-cornered across from the Plaza Hotel.

24.    Trump instantly recognized Carroll on sight. They had met at least once before and had long traveled in the same New York City media circles. In this period, Carroll was doing the daily *Ask E. Jean* TV show, a small hit on the "America's Talking" network started by Roger Ailes. She was also on a frequent guest and commentator on the widely watched *Today* show.

25.    Trump put up his hand to stop her from exiting and said, "Hey, you're that advice lady!" Carroll, struck by his boyish good looks, responded by saying, "Hey, you're that real estate tycoon!"

26.    Trump said that he was at Bergdorf's to buy a present for "a girl" and asked Carroll to come advise him. Carroll was surprised but thrilled that Trump would want her advice. She stuck around, imagining the funny stories that she might later recount.

27.    Trump and Carroll began searching for a gift that Trump could give to the unnamed girl. As they stood just inside the door, Carroll pointed to the handbags. Trump made a face; he did not like that idea. Carroll instead suggested a hat. Trump walked over, going straight for a fur hat, prompting Carroll to object that no woman would wear a dead animal on her head.

5

28.      As Trump cuddled the fur hat, Carroll asked how old "the girl" was. Trump did not

answer, instead asking Carroll how old she was. When Carroll replied that she was fifty-two years

old, he taunted her, "You're so *old*!"

29.      Trump then had an idea: He would buy lingerie instead.

30.      Trump and Carroll rode up the escalator to the lingerie department. When they

arrived, it was uncharacteristically empty, with no sales attendant in sight. Sitting on the counter

near them were two or three boxes and a see-through bodysuit in lilac gray.

31.      Snatching the bodysuit, Trump insisted that Carroll try it on. Bemused, Carroll

responded that *he* should try it on himself, adding that it was his color. Trump and Carroll went

back and forth, teasing each other about who should try on the bodysuit.

32.      Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on."

33.      Trump maneuvered Carroll to the dressing room. As they moved, Carroll laughed,

thinking to herself that she would make him put the bodysuit on over his pants.

34.      Strangely for Bergdorf's, the dressing room door was open and unlocked.

35.      Trump closed the door of the dressing room.

36.      Immediately, Trump lunged at Carroll, pushing her against the wall, bumping her

head quite badly, and putting his mouth on her lips.

37.      Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll

burst out in awkward laughter. She could hardly process the insanity of the situation. She also

hoped, at least at first, that laughter would bruise his ego and cause him to retreat.

38.      But Trump did not stop. He seized both of her arms and pushed her up against the

wall again, bumping her head a second time. While pinning Carroll against the wall with his

shoulder, Trump jammed his hand under her coatdress and pulled down her tights.

6

39.     Trump opened his overcoat and unzipped his pants. Trump then pushed his fingers around Carroll's genitals and forced his penis inside of her.

40.     Carroll resisted, struggling to break free. She tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other). Finally, she raised a knee up high enough to push him out and off her.

41.     Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.

42.     The whole attack lasted two to three minutes.

## II.     CARROLL CONFIDES IN TWO FRIENDS ABOUT THE RAPE

43.     As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, the author, journalist, and correspondent on TV morning shows.[1] Carroll was breathless and still reeling from the assault. She kept laughing, manically—her way of coping with the stress and trauma that she had just experienced.

44.     Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room. She told Birnbach how Trump had pulled down her tights and put his penis inside of her.

45.     "He raped you," Birnbach kept repeating. She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a rape victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.

46.     Carroll drove home and crawled straight into bed.

47.     Over the next few days, Carroll confided in a second friend, the New York City journalist and news anchor Carol Martin. They sat together in the kitchen as Carroll described the

---

[1] Birnbach wrote a story about Trump's Mar-a-Lago that was published in February 1996. *See* Lisa Birnbach, *Mi Casa Es Su Casa*, NEW YORK (Feb. 12, 1996). Birnbach has suggested that it was because of her work on that article that Carroll called her immediately after the assault.

7

rape. This time, Carroll did not laugh. Nobody laughed. The gravity of the assault had finally started to sink in.

48.     Martin solemnly advised Carroll to tell no one. Recognizing that Trump was a powerful man, Martin feared that if her friend came forward, disaster would ensue. Martin warned Carroll, in sum and substance: "Tell no one. Forget it! He has two hundred lawyers. He'll bury you."

49.     Carroll took Martin's advice. She knew how brutal and dangerous Trump could be.

50.     Carroll was also afraid of being dragged through the mud if she reported the rape. She was convinced that nobody would believe her if she came forward. And like so many other survivors of sexual assault, Carroll also blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had raped her because she had entered that Bergdorf dressing room.

51.     Fundamentally, Carroll was raised to believe that strong women get by in the world with a stiff upper lip—*i.e.*, by putting hardship and suffering behind them. She believed that strong women laugh at disasters because feeling sad only doubles the burden. To Carroll, laughter is how women have dealt with calamity for thousands of years. So Carroll put her chin up and tried to move on.

52.     Carroll thus chose silence.

53.     Carroll did not mention the rape again for over twenty years. She did not want to be seen—or to see herself—as a victim of sexual assault.

54.     Carroll has not had sex with anyone since that day when Trump raped her.

8

Case 23-209, Document 103-8, Filed 05/08/2025, Page 41 of 225

## III.    CARROLL REMAINS SILENT FOR TWENTY YEARS

55.    For the next twenty years, Carroll pursued her career as a writer and advice columnist. Over time, she built a loyal audience and enjoyed the support of her publisher. Her *Ask E. Jean* advice column in *Elle* magazine became the longest, still-active advice column in American publishing. Its success resulted in large part from the many letters sent to her by readers.

56.    Carroll's column in *Elle* was about life and love. Readers' questions ranged from the lighthearted to the deeply personal. From time to time, readers would ask questions about whether behavior that they experienced at work, at church, and in their relationships was appropriate. When Carroll detected sexism or abuse, she did her level best to call it out and to help women protect themselves.

57.    One reader, for example, despaired in 1994, "My boss is always rubbing up against me . . . . He scares me because he's very powerful and could ruin me." Carroll responded: "Darling, if the old snake has done so much to help your career, why are you still an assistant? Sex harassers are filthy yellow sneaking cowards and must be won over, or crushed . . . . If all else fails, next time the old waterhead touches you, give him a knee in the groin. You've got nowhere to go but up."[2]

58.    Another reader had been raped when thirteen years old and sought advice from Carroll because her rapist had just been hired as a co-worker. Carroll responded: "[T]he gentleness of your [letter] speaks strongly for your forgiving nature; however, it makes my duty *very* difficult. Because now I must harden your soul. I must twist a little bit of steel—I'd try a big block of metal

---

[2] *Reprinted in* E. JEAN CARROLL, A DOG IN HEAT IS A HOT DOG AND OTHER RULES TO LIVE BY 28-29 (1996).

9

Case 1:3:20-cv-00800-Lemon-Doc-00cv-03-84719, 03/08/2216, Page421 of 275

if I could—around your backbone, and persuade you to report your friend to the police."[3] Carroll added:

> "First, call your rape crisis center and speak with a counselor. Second, join a group of rape survivors—with their hardy support, you'll start constructing a world for *yourself* and leave the world the rapist built for you. And, third, find another job at once. (Do *not* tell your employer about the rape. Do *not* inform the rapist of these steps. Stay cool. He's dangerous.)"[4]

59.     In her advice columns, Carroll sought to offer witty, wise, and worldly guidance, and to address her readers in a clear, straightforward manner. She often urged readers to speak the truth and to recognize patterns of rationalization and abuse. Readers' perception of Carroll as honest, thoughtful, frank, and well-meaning were essential to Carroll's professional success.

60.     But in responding to her readers, Carroll did not confess her own life experiences, including the sexual assault by Trump described above.

61.     During the last month of the election of 2016, Carroll watched a multitude of women reveal that Trump had engaged in sexual misconduct. She saw Trump brutally attacking his accusers on a national stage—denying their accusations, while also savaging their reputations and insulting their appearance.

62.     And as Carroll sat at the bedside of her dying mother in a Bloomington, Indiana hospital, watching numerous, credible women stun the nation with their stories of Trump's sexual brutality, Carroll briefly considered whether she, too, should reveal that Trump had raped her.  But she feared—just as she had for decades—that Trump would lie his way out of it, while destroying her life and reputation. He had done it before to plenty of women and, it seemed to Carroll, he would readily do it again. And, worst of all, coming forward with her story would also cause a

---

[3] *Id.* at 141-42.

[4] *Id.* at 142.

media storm in Indiana and destroy her mother's last happy days on the planet. Carroll feared that

it would cost her and her family dearly without actually changing anything, especially since any

accusation made during the presidential campaign would be characterized by Trump and his allies

as a stunt to thwart his election.

63.    Indeed, Carroll worried that she might make Trump *more* popular in states like

Indiana by revealing the rape, since his electoral fortunes had steadily improved despite credible

allegations of sexual abuse. To Carroll, it appeared that some of Trump's political supporters

actually admired the fact that Trump was rich enough, macho enough, and powerful enough to be

sued by—and to pay off—all these women he had groped and penetrated (especially porn stars

and *Playboy* models).

64.    Carroll, in honor of her mother's remarkable life, many years of which were spent

as a local and loyal Republican elected official, and because she thought the publicity would help

Trump win the election, warily persisted in her decades-old silence.

65.    Carroll's mother died on October 11, 2016. In 2017, Carroll decided to write a book

drawing on her observations as an advice columnist, but focusing specifically on her own life and

trying to understand why so many *Ask E. Jean* letter-writers complained about men. On the

morning of October 5, 2017, Carroll set out on a road trip, traveling to towns named after women.

When she arrived in each town named after a woman (Angelica, New York, Tallulah, Louisiana,

Marianna, Arkansas, and so forth), she spoke to women from all walks of life about their

relationships with men. She asked many of her subjects about the roles that men play in their lives.

**IV.    CARROLL DECIDES TO SPEAK OUT**

66.    On the very day Carroll began her road trip for her book, October 5, 2017, the *New

York Times* revealed that Harvey Weinstein had sexually assaulted and harassed dozens of women

11

Case 23-cv-01184... Document... Filed 03/24/25... Page 44 of 275

in the film industry.[5] The news went off in Carroll's mind like a bomb. She could not stop reading. Painful memories of abuse at the hands of men, including Trump, swept over her.

67.     Days later, several women accused Weinstein of rape.[6] It soon became clear to Carroll, and to the American people, that Weinstein's abuses had been enabled for decades by a loose network of loyalists and lawyers, who had ensured that Weinstein evaded accountability for his exploitation of women—even though it was an open secret in Hollywood.

68.     As the Weinstein scandal persisted, Carroll saw society respond to the accusations with a seriousness and depth of self-reflection that she had never seen before; all too often, and as recently as the 2016 election, many Americans had brushed aside or marginalized accusations of sexual misconduct by powerful men. Carroll also saw other women suddenly feel emboldened to come forward with their own reports of harassment, exploitation, abuse, violence, and rape.

69.     Carroll was moved by this experience. The walls that she had erected in her mind— the fear that Trump would emerge unscathed, the wariness of allowing him and his allies to come after her, the doubt that speaking up would actually matter, and the nagging anxiety that she was somehow to blame for being raped—began to crumble. Decades of deflection, diversion, and denial dissolved, resurfacing memories and feelings that she had hidden away.

70.     Carroll was struck by the fact that Weinstein, for all his wealth and power, could still be held accountable for his sexual misconduct. She saw how women had at last changed the public conversation by saying "Me Too" and by demanding accountability.

---

[5] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017).

[6] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017).

12

71.     These observations lead Carroll to reflect again on her column in *Elle* magazine, and to ask whether she was a hypocrite. For decades, she had paired her trademarked wit with steely resolve in confronting the everyday unfairness—and, all too often, the abuse—that her (largely female) readers confessed. Carroll's written persona was brave. But she *still* had not confessed her own experiences of abuse, her fear of coming forward, or her creeping self-doubt.

72.     These internal reflections loomed larger in her mind—and became inescapable—as more readers of Carroll's advice column began asking, "Should I come forward with my account of surviving sexual abuse or harassment?"

73.     Carroll finally decided that she owed her readers the truth. She also owed them (and many other women) solidarity in their efforts to bring justice and accountability to powerful men who had engaged in sexual assault and gotten away with it. She knew that it would be painful to speak up. But she also knew that it was the right thing to do so.

74.     While Carroll was on the road trip across the country talking to women as research for her book, she started a list of the 21 most hideous men she had ever encountered—men who had, each in his own way, left indelible and ugly marks on her story. This list grew into a book, *What Do We Need Men For?: A Modest Proposal*. In that book, Carroll interspersed the stories of women she had met while traveling the country with the men on her "Most Hideous List."

75.     Two men on the Most Hideous List haunted Carroll the most. The first was Cam Parks, the Waterfront Director at her Girl Scout camp, a man who sexually abused her every day during a two-week period when she was twelve. The second was Donald Trump, the man who raped her when she was 52. Carroll described that attack in detail.

76.     Carroll knew a book was the right place for her to come forward about Trump's assault. Writing is Carroll's lifeblood; she writes to process the world around her and to reveal her

13

inner self. It's her normal way of living: she writes about what happens to her, often in a confessional, idiosyncratic manner. She also believed that a book would allow her to control her narrative and speak directly to her readers. This was important. Carroll did not want to be, or to act like, a victim. She wanted to tell her story on her terms, rather than as filtered through journalists or social media. Her language was specific.

77.     In her book, Carroll truthfully described, in meticulous detail, the rape in Bergdorf Goodman:

> "The next moment, still wearing correct business attire, shirt, tie, suit jacket, overcoat, he opens the overcoat, unzips his pants, and, forcing his fingers around my private area, then thrusts his penis halfway—or completely—I'm not certain—inside me."[7]

78.     She also explained why she had not come forward earlier:

> "Receiving death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them, never sounded like much fun. Also, I'm a coward."[8]

79.     At noon on June 21, 2019, *New York* magazine published Carroll's account of the rape on NYMag.com as an excerpt of her forthcoming book. The excerpt first appeared on *The Cut,* a vertical on NYMag.com. The excerpt appeared on newsstands three days later in the June 24-July 7 print edition.

80.     Carroll's book was released by St. Martin's Press on July 2, 2019.

---

[7] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL 248 (2019).

[8] *Id.* at 244.

14

## V.  TRUMP REPEATEDLY DENIES RAPING CARROLL AND MAKES A SLEW OF FALSE, INSULTING STATEMENTS ABOUT HER

81.     In three statements—published on June 21, 22, and 24 respectively—Trump responded to Carroll by publicly, falsely, and maliciously smearing her reputation.

82.     On June 21, 2019, Trump issued the following public statement:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

83.     Upon information and belief, Trump's June 21 statement was first given to the press, including Laura Litvan of *Bloomberg News*, who posted it on Twitter at 2:17 p.m.[9]

---

[9]  *See* Laura Litvan (@LauraLitvan), Twitter (June 21, 2019 2:17 PM), https://twitter.com/LauraLitvan/status/1142179819075121154.

15

Case 23-cv-00811 Document ... Filed 05/08/23 Page 48 of 235

84. Trump's June 21 statement was subsequently shared online by other journalists and covered by many leading news sources as Trump's statement in response to Carroll.[10]

85. In the June 21 statement, Trump falsely stated that he did not rape Carroll.

86. In the June 21 statement, Trump falsely stated that he had never met Carroll.

87. In the June 21 statement, Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.

---

[10] *See, e.g.*, AFP News Agency, *US Writer Says Trump Sexually Assaulted Her in Mid-1990s*, AL JAZEERA, (June 21, 2019); Alexandra Alter, *E. Jean Carroll Accuses Trump of Sexual Assault in Her Memoir*, N.Y. TIMES (June 21, 2019); Jenna Amatulli, *Trump on E. Jean Carroll Rape Allegation: "I've Never Met This Person in My Life"*, HUFFINGTON POST (June 21, 2019); Amber Athey, *Trump Responds to Rape Accuser: "People Should Pay Dearly for Such False Accusations"*, DAILY CALLER (June 21, 2019); Brian Bennet, *Trump Says He "Never Met" Author Who Has Accused Him of Sexual Assault*, TIME (June 21, 2019); Ellie Bufkin, *Trump Issues Blistering Denial of E. Jean Carroll's Rape Allegation*, WASH. EXAMINER (June 21, 2019); Adam Carlson, *Noted Advice Columnist Says Trump Raped Her in Manhattan Department Store in the '90s—"Never Happened," Trump Responds*, PEOPLE MAG. (June 21, 2019); Matthew Choi, *Trump Dismisses New Sexual Assault Allegation*, POLITICO (June 21, 2019); Casey Darnell, *Writer Says She Was Raped by Trump in 1990s*, YAHOO! NEWS (June 21, 2019); EJ Dickson, *E. Jean Carroll Alleges President Donald Trump Assaulted Her*, ROLLING STONE (June 21, 2019); Vivian Ho & Lauren Gambino, *Evening Summary: Trump Responds to E Jean Carroll's Allegations*, GUARDIAN (June 21, 2019); Colby Itkowitz, *Magazine Columnist Accuses Trump of Sexual Assault More than Two Decades Ago, an Allegation He Denies*, WASH. POST (June 21, 2019); Sarah Jones, *E. Jean Carroll: "Trump Attacked Me in the Dressing Room of Bergdorf Goodman."*, N.Y. MAG. (June 21, 2019); Hilary Lewis, *E. Jean Carroll Says Bringing Rape Charges Against Trump Would Be "Disrespectful" to Migrant Women*, HOLLYWOOD REP. (June 22, 2019); Caitlin Mac Neal, *Advice Columnist E. Jean Carroll Accuses Donald Trump Of Sexual Assault*, TALKING POINTS MEMO (June 21, 2019); Alex Pappas, *Longtime Advice Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FOX NEWS, (June 21, 2019); Daniel Politi, *Trump Goes on Tirade to Deny Latest Assault Allegation: Women Are "Paid Money" to Make False Claims*, SLATE (June 22, 2019); Christina Prignano, *Author E. Jean Carroll Accuses President Trump of Sexual Assault in 1990s*, BOS. GLOBE (June 21, 2019); Eliza Relman, *Trump Claims He's Never Met the Columnist Who Just Accused Him of Sexual Assault Despite Photo Evidence of Them Together*, BUS. INSIDER (June 21, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Jessica Taylor, *Trump Denies New Sexual Assault Allegation by Advice Columnist E. Jean Carroll*, NPR (June 21, 2019); Josh Wingrove, *Columnist E. Jean Carroll Accuses Trump of Sexual Assault in 1990s*, FORTUNE (June 21, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019); Josh Wingrove, *Woman Accuses Trump of Sexual Assault at New York Store in 1990s*, BLOOMBERG (June 21, 2019).

16

Case 23-cv-0083 Document 03-847 Filed 05/08/23 Page 49 of 205

88.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales.

89.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation to carry out a political agenda.

90.     In the June 21 statement, Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation as part of a conspiracy with the Democratic Party.

91.     On June 22, 2019, Trump made the following statement to reporters:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

17

Case 23-cv-00811 Document 03-8 Filed 05/08/26, Page 519 of 725

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[11]

92.     Like his first statement, Trump's June 22 statement regarding Carroll was widely reported in the national press.[12]

93.     In the June 22 statement, Trump falsely stated that he did not rape Carroll.

94.     In the June 22 statement, Trump falsely stated that he had no idea who Carroll was.

95.     In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.

96.     In the June 22 statement, Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent the rape accusation against him.

---

[11] *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019).

[12] *See, e.g.*, Matthew Chapman, *Trump Goes on Manic Tirade After Being Asked About New Rape Allegation: Women Get "Paid Money to Say Bad Things About Me"*, RAW STORY (June 22, 2019); William Cummings, *Writer E. Jean Carroll Made a Claim of Sexual Assault Against Trump. Here's What We Know*, USA TODAY (June 25, 2019); Gillian Edevane, *George Conway Says Trump's Credibility is "Annihilated" After President Denies Knowing Alleged Assault Victim*, NEWSWEEK (June 22, 2019); Lulu Garcia-Navarro, *"It Hurt. And It Was Against My Will": Trump Accuser Stands by Her Story*, NPR (June 22, 2019); Amanda Holpuch, *Trump Repeats Contested Claim He Does Not Know Latest Sexual Assault Accuser*, GUARDIAN (June 22, 2019); Colby Itkowitz et al., *Trump Compares Himself to Kavanaugh in Latest Sexual Assault Allegation*, WASH. POST (June 22, 2019); Darlene Superville, *Trump Denies Knowing E. Jean Carroll, Woman Accusing Him of Sexual Assault in Department Store*, ABC NEWS (June 22, 2019); Darlene Superville, *Trump Denies Knowing NY Woman Accusing Him of Sexual Assault*, ASSOCIATED PRESS (June 22, 2019); Mihir Zaveri, *Trump Emphatically Denies Sexual Assault Allegation by E. Jean Carroll*, N.Y. TIMES (June 22, 2019); *Trump Dismisses E. Jean Carroll Rape Allegation as "Fiction"*, BBC NEWS (June 22, 2019).

18

97.     Two days later, on June 24, 2019, *The Hill* released an interview in which Trump made the following statement in response to Carroll: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[13]

98.     Trump's statement in *The Hill* was widely reported by the national press.[14]

99.     This insulting statement was consistent with Trump's response to other accusations of sexual assault. About one woman who claimed he groped her and tried to put his hand up her skirt while they were seated next to each other on an airplane, Trump told crowds at a rally,

---

[13] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019).

[14] *See, e.g.*, Julia Arciga, *Trump on E. Jean Carroll's Assault Allegations: "She's Not My Type"*, DAILY BEAST (June 24, 2019); Associated Press, *Trump on E. Jean Carroll Sexual Assault Claim: "She's Not My Type"*, HOLLYWOOD REP. (June 25, 2019); Associated Press, *Trump Says Famed Advice Columnist Who Accused Him of Sexual Assault Is "Not My Type'*, CHI. TRIB. (June 24, 2019); Associated Press, *Trump: Woman Who Accused Him of Sexual Assault Not His Type*, DENVER POST (June 24, 2019); Amber Athey, *Trump Says Columnist Who Accused Him of Rape Is "Not My Type"*, DAILY CALLER (June 24, 2019); Peter Baker & Neil Vigdor, *Trump, Accused Again of Sexual Misconduct, Insults Woman Who Said He Assaulted Her*, BOS. GLOBE (June 25, 2019); Antonia Blumberg, *Trump on E. Jean Carroll Accusing Him of Rape: "She's Not My Type"*, HUFFINGTON POST (June 24, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, BUS. INSIDER (June 25, 2019); Doina Chiacu, *Trump Denies Woman's Sexual Assault Accusation: "She's Not My Type"*, REUTERS (June 25, 2019); Burgess Everett & Melanie Zanona, *"I Believe the President": GOP Stands by Trump on Sexual Assault Allegation*, POLITICO (June 25, 2019); Rebecca Falconer, *Trump Says He Didn't Rape Author E. Jean Carroll: "She's Not My Type"*, AXIOS (June 24, 2019); Megan Garber, *The Real Meaning of Trump's "She's Not My Type" Defense*, ATLANTIC (June 25, 2019); Rebecca Morin, *"She's Not My Type": Trump Again Denies E. Jean Carroll's Sexual Misconduct Allegation*, USA TODAY (June 24, 2019); Ari Shapiro, *A Look at President Trump's Pattern of Responding To Accusations Of Sexual Misconduct*, NPR (June 25, 2019); Matt Stieb, *Trump Responds to E. Jean Carroll Rape Allegation: "She's Not My Type"*, CUT (June 25, 2019); Jia Tolentino, *E. Jean Carroll's Accusation Against Donald Trump, and the Raising, and Lowering, of the Bar*, NEW YORKER (June 25, 2019); Jay Willis, *Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type"*, GQ (June 25, 2019); Anthony Zurcher, *Trump Says Sexual Assault Accuser E Jean Carroll "Not My Type"*, BBC NEWS (June 25, 2019).

19

Case 23-cv-00811-CLM Document 03-8471 Filed 05/08226, Page 521 of 225

"Believe me. She would not be my first choice. That I can tell you."[15] He reportedly called that same woman "the cunt on the airplane" when he ran into her at a charity gala years after the assault.[16] About a second woman, who claimed he forcibly pinned her to a wall and kissed her without consent while she was interviewing him for a magazine, Trump said to crowds at another rally, "Take a look. You take a look. Look at her, [then] look at her words. You tell me what you think. I don't think so. I don't think so."[17] Indeed, Trump often responds to claims that he has behaved inappropriately by simultaneously attacking the individual's credibility and attractiveness. When a female journalist quoted him as saying in a 1992 interview that "you have to treat women like shit," Trump insisted later, "The woman's a liar, extremely unattractive, lots of problems because of her looks."[18]

100.    In the June 24 statement, Trump falsely stated that he did not rape Carroll.

101.    On June 27, Birnbach and Martin went on the record to corroborate Carroll.[19]

102.    Speaking to Carroll, Martin, and a reporter, Birnbach said:

"I remember [Carroll] saying repeatedly, he pulled down my tights . . . . [Carroll] did say, he put his penis in me. And I said—my face just did it. What? He raped you? And [Carroll] said, eh, he kept pulling down—he pulled down my tights. He pulled down my tights . . . . It just—it was horrible. We fought. And I said, let's go to the police. No. Come to my house. No. I want to go home. I'll take you to the

---

[15] Jose A. DelReal, *Trump Mocks Sexual Assault Accusers: "She Would Not Be My First Choice"*, Wash. Post (Oct. 14, 2016).

[16] Barry Levine & Monique El-Faizy, All the President's Women: Donald Trump and the Making of a Predator 72 (2019).

[17] Naomi Lim, *Donald Trump on Accuser: "Take a Look at Her . . . I Don't Think So"*, CNN (Oct. 13, 2016).

[18] Nancy Collins, *Donald Trump Talks Family, Women in Unearthed Transcripts: "When I Come Home and Dinner's Not Ready, I Go Through the Roof"*, Hollywood Rep. (Oct. 13, 2016).

[19] Michael Barbaro et al., *Corroborating E. Jean Carroll*, N.Y. Times (June 27, 2019).

20

Case 1:23-cv-00811-LAK Document 103-8 Filed 05/08/25 Page 52 of 275

police. No. It was 15 minutes of my life, it's over. Don't ever tell anybody. I just had to tell you."[20]

103.    Responding to Carroll, Birnbach, and a reporter, Martin said:

"From what I could sense of you, you were, A, you were handling it, as you handle things. She doesn't break down easily on anything. And there was none of that, as you told me. It wasn't like she started crying, or nothing that was a frantic kind of response to it. It was like, I can't believe this happened."[21]

104.    Martin added: "I said, don't tell anybody. I wouldn't tell anybody this."[22]

105.    Separately, Birnbach observed, "I believe E. Jean in this episode that she recounted to me in 1996. Yes. Without hesitation. She's not a fabulist. She doesn't make things up."[23]

## VI.    TRUMP'S FALSE STATEMENTS ABOUT CARROLL WERE MADE WITH KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

106.    The false statements that Trump made about Carroll on June 21, 22, and 24, 2019, were published with knowledge of their falsity and/or with reckless disregard for the truth.

107.    Trump knew who Carroll was at the time he raped her.

108.    Trump identified Carroll on sight when they met at Bergdorf Goodman.

109.    In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Jessica Bennett et al., *Why E. Jean Carroll, "the Anti-Victim," Spoke Up About Trump*, N.Y. TIMES (June 27, 2019).

21

110.    In 1987, Trump and Carroll were photographed at a party together:



111.    Trump has stated that he possesses "one of the great memories of all time."[24]

112.    Trump has also described himself as a "very stable genius."[25]

113.    In June 2019, Trump knew it was false to state that he had never met Carroll.

114.    In June 2019, Trump knew it was false to state that he had no idea who Carroll was.

115.    In June 2019, Trump knew it was false to state that he had never raped Carroll.

116.    Trump's other defamatory statements about Carroll in June 2019—that she had fabricated the rape accusation to increase her book sales, to carry out a political agenda, as part of a conspiracy with the Democratic Party, or in exchange for payment—rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his other statements about Carroll were false.

117.    Moreover, Trump lacked any factual basis for these highly specific statements regarding why Carroll had revealed to the public that he raped her at Bergdorf Goodman. And since all of these statements about Carroll were made to impute motives for lying, when in fact he

---

[24] Foreign Staff, *Donald Trump: I Have "One of the Greatest Memories of All Time"*, TELEGRAPH (Oct. 26, 2017).

[25] Daniella Diaz, *Trump: I'm a "Very Stable Genius"*, CNN (Jan. 6, 2018).

22

knew that Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published these statements with reckless disregard for the truth.

118.    Trump also lacked any factual basis for stating (or affirmatively implying) that Carroll had falsely accused other men of sexual assault. And since he knew that her accusation against him was truthful, he had strong reason to doubt the veracity of his statement that she was lying about other men. Trump thus made this statement with reckless disregard for the truth.

119.    Carroll did not reveal Trump's rape for any of the reasons imputed to her by Trump. Each and every statement that he made about her motives for coming forward—and her supposed conspiracy with political actors to fabricate a rape accusation—was false.

120.    To the contrary, Carroll feared that revealing Trump's rape would cause terrible damage to her reputation, career, and personal life. That was especially true given Trump's famed litigiousness and public abuse of those who criticize him. Carroll made this decision to honor her values and to inspire other sexually abused women to seek justice and accountability.

121.    With respect to politics, to the extent Carroll considered such things at all, it was principally to worry that coming forward might *benefit* Trump by firing up his base and affording him another opportunity to play the victim on national television.

122.    Trump's series of false, insulting, and defamatory statements about Carroll—and his actual malice in making those statements—are fully consistent with his tried-and-true playbook for responding to credible public reports that he sexually assaulted women.

23

Case 23-793, Document 83, 03-847, Page 56 of 205

123.    In 2005, Trump admitted—on a hot mic—to repeatedly sexually assaulting women in almost exactly the same manner that he had raped Carroll:

> "I'd better use some Tic Tacs just in case I start kissing her [the woman Trump was looking at, whom he had never met before]. You know, I'm automatically attracted to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything. Grab them by the pussy. You can do anything. . . . Oh, [she has] nice legs, huh?"[26]

124.    Based on Carroll's own experiences, Trump's 2005 statement was not "locker room talk" or mere braggadocio. It was a true description of how Trump believes he can treat women—and of how he *has* treated them on many occasions, including at Bergdorf Goodman.

125.    Indeed, Trump has openly suggested that sexual assault is inevitable when men and women interact. In 2013, for instance, he tweeted: "26,000 unreported sexual assults [sic] in the military . . . . What did these geniuses expect when they put men & women together?"[27]

126.    In addition to Carroll, Trump has been accused publicly by over a dozen women of forcibly kissing them, groping them above or below the waist, or attempting to rape them—often upon meeting him for the very first time. Those women include Jill Harth, Jessica Leeds, Cathy Heller, Temple Taggart McDowell, Karena Virginia, Bridget Sullivan, Tasha Dixon, Mindy McGillivray, Rachel Crooks, Natasha Stoynoff, Summer Zervos, and Cassandra Searles. Trump has responded to their accusations in a manner eerily similar to the statements he made about Carroll in June 2019.

127.    A recently published book by Barry Levine and Monique El-Faizy documents 67 incidents of alleged inappropriate behavior by Trump toward women, including 26 allegations of unwanted sexual contact. Forty-three of the allegations of inappropriate behavior in the book had

---

[26] *Transcript: Donald Trump's Taped Comments About Women*, N.Y. TIMES (Oct. 8, 2016).

[27] Daniella Diaz, *Trump Defends Tweet on Military Sexual Assault*, CNN (Sept. 8, 2016).

24

Case 23-2090, Document 105-19, 03-84-2024, 3682256, Page526 of 725

not been previously reported.[28] The book traces "Trump's transformation from a kid from Queens to high school 'ladies' man' into a womanizing, model-chasing, porn-star-frequenting philanderer," who "repeatedly and systematically engaged in aggressive sexual pursuit of women over the course of many decades."[29] In one instance, Karen Johnson describes Trump hiding behind a tapestry at his Mar-a-Lago home during a party and, when she walked by to use the restroom, grabbing her by the genitals, pulling her toward him, and kissing her without consent.[30] In another, Kristin Anderson describes Trump putting his hands up her skirt and touching her vagina through her underwear in a Manhattan nightclub. Trump denied that could have happened because he never would have been at a nightclub alone.[31]

128.　Trump thus knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth. He knew she was telling the truth because he knew who she was and he knew that he had raped her, just as he had sexually assaulted many other women over many years.

## VII.　CARROLL SUFFERS REPUTATIONAL AND OTHER HARM

129.　Trump's false and insulting statements about Carroll were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

130.　Carroll has suffered harm as a direct result of Trump's false, defamatory statements.

131.　Carroll endured stoically when she kept secret the fact that Trump had raped her. But coming forward put her in the crosshairs of the most powerful man on the planet. He has since

---

[28] *See* LEVINE & EL-FAIZY, *supra* n.16, at 2.

[29] *Id.* at 2-3.

[30] *Id.* at 80-82, 88, 254.

[31] *Id.* at 250-51.

25

used that platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of conspiring with political operatives in a despicable lie.

132.    These defamatory statements have caused Carroll emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

133.    Carroll has suffered professional harm as a direct result of Trump's defamatory statements. Carroll's professional success is inextricably bound up with her *Ask E. Jean* advice column, where readers look to her for wisdom, wit, honesty, integrity, and courage. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood and attracts readers.

134.    Trump's defamatory statements caused Carroll to lose the support and goodwill of many of her readers. Many were turned off by even the idea of writing to a woman whom the President of the United States branded a "liar." Since Trump defamed her, some fans have stopped sending letters altogether—thus impairing Carroll's column, which requires a steady flood of compelling letters to which she can respond. In the months of July, August, and September 2019, Carroll received roughly 50% fewer letters than she received during the same period in 2018.

135.    Carroll is an advice columnist whose reputation is the very lifeblood of her trade, and Trump's defamatory statements have therefore inflicted wide-ranging and substantial harm.

136.    Carroll filed this lawsuit to obtain redress for those injuries.

## CAUSE OF ACTION: DEFAMATION

137.    Plaintiff Carroll incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

138.    Trump published statements to the media on June 21, 22, and 24, 2019.

139.    Each of those statements identified—and was "of or concerning"—Carroll.

26

140.    Each of those statements contained numerous falsehoods about Carroll, whether on their face and/or by virtue of a clear implication affirmatively intended by Trump.

141.    Trump's false statements regarding Carroll were defamatory *per se*.

142.    Trump's false and defamatory statements were published throughout New York State and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statements about Carroll would receive a wide circulation by making them to the national press.

143.    Trump made these false and defamatory statements knowing that they were false or with reckless disregard for their truth or falsity.

144.    Trump made these false statements with ill will and spite, and with wanton, reckless, or willful disregard for their injurious effects on Carroll and Carroll's rights.

145.    Trump's false and defamatory statements caused Carroll to suffer reputational, emotional, and professional harm, as alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, Carroll prays for relief as follows:

a.    Ordering Trump to retract any and all defamatory statements;

b.    Ordering Trump to pay compensatory damages in an amount to be determined at trial;

c.    Ordering Trump to pay punitive damages in an amount to be determined at trial; and

d.    Awarding pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

27

Case 23-1300, Document 103-8, Filed 08/08/23, Page 70 of 205

Dated: November 4, 2019

Respectfully submitted,

By:

Roberta A. Kaplan
Matthew J. Craig
Martha E. Fitzgerald
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
mcraig@kaplanhecker.com
mfitzgerald@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

28

# EXHIBIT B

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC 20044
Telephone:    (202) 353-1651
Facsimile:    (202) 616-5200
Email:        stephen.terrell2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>          Plaintiff,<br><br>     -against-<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>          Defendant. | **ECF Case**<br><br>No. _____ |

## CERTIFICATION OF THE DIRECTOR OF THE TORTS BRANCH
## CIVIL DIVISION, UNITED STATES DEPARTMENT OF JUSTICE

I, James G. Touhey, Jr., am the Director of the Torts Branch, Civil Division, United

States Department of Justice, responsible for most civil litigation under the Federal Tort Claims

Act. I have read the complaint dated November 4, 2019, in the above-captioned case. Pursuant

to 28 U.S.C. § 2679, and by virtue of the authority vested in me pursuant to 28 C.F.R. § 15.4, I

hereby certify, on the basis of the information now available with respect to the incidents alleged

in the complaint, that Defendant Donald J. Trump was acting within the scope of his office as the

President of the United States at the time of the alleged conduct.

Dated this 8th day of September, 2020.

JAMES G. TOUHEY, JR.
Director, Torts Branch
Civil Division, United States Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that, on September 8, 2020, I served the attached documents, pursuant to Local Civil Rule 5.3, by Federal Express, as well as by electronic mail, as follows:

Robert A. Kaplan
Matthew J. Craig
Martha E. Fitzgerald
Gabrielle E. Tenzer
Louis W. Fisher
Joshua A. Matz
KAPLAN, HECKER & FINK, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
*rkaplan@kaplanhecker.com*
*mcraig@kaplanhecker.com*
*mfitzgerals@kaplanhecker.com*
*gtenzer@kaplanhecker.com*
*lfisher@kaplanhecker.com*
*jmatz@kaplanhecker.com*

Attorneys for Plaintiff

Marc E. Kasowitz
Christine A. Montenegro
Paul J. Burgo
KASOWITZ, BENSON & TORRES, LLP
1633 Broadway
New York, NY 10019
*mkasowitz@kasowitz.com*
*cmontenegro@kasowitz.com*
*pburgo@kasowitz.com*

Attorneys for Donald J. Trump

   S/ Stephen R. Terrell
Stephen R. Terrell

# EXHIBIT F

| 56 | Filed & Entered: | 09/15/2021 | Order on Motion to Stay |
|----|------------------|------------|-------------------------|

Docket Text: ORDER denying without prejudice [47] Letter Motion to Stay re: [47] LETTER MOTION to Stay addressed to Judge Lewis A. Kaplan from Marc E. Kasowitz dated December 10, 2020. (HEREBY ORDERED by Judge Lewis A. Kaplan)(Text Only Order) (Kaplan, Lewis)

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-5-22

E. JEAN CARROLL,

        *Plaintiff,*

        v.

DONALD J. TRUMP, in his personal capacity,

        *Defendant.*

No. 20 Civ. 7311 (LAK) (JLC)

**[~~PROPOSED~~] SCHEDULING ORDER**

It is hereby ORDERED as follows:

1. The parties shall serve any and all written discovery requests on each other on or before May 27, 2022.

2. The parties shall substantially complete their productions of written discovery and requests for inspection or examination on or before August 3, 2022.

3. Depositions to take place between August 3, 2022, to October 19, 2022.

4. The parties shall make any and all expert disclosures under Rule 26(a)(2) on or before September 16, 2022.

5. The parties shall substantially complete any and all fact discovery on or before October 19, 2022.

6. The parties shall complete any and all expert discovery on or before November 16, 2022.

KAPLAN HECKER & FINK LLP

By: _____
Roberta A. Kaplan
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
rkaplan@kaplanhecker.com

Joshua Matz
1050 K Street, Suite 1040
Washington, DC 20001
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

HABBA MADAIO & ASSOCIATES LLP

By: _____
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
                     -and-
270 West 60th Street
New York, New York 10023
(908) 869-1188
ahabba@habbalaw.com

*Counsel for Defendant, Donald J. Trump*

SO ORDERED:

Dated: ___5/4/22___

_____
The Honorable Lewis A. Kaplan
United States District Court Judge

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                      Plaintiff,

          -against-                                20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____          │
│ DATE FILED: 7 | 19 | 2022        │
└─────────────────────────────────┘
```

## SUPPLEMENTAL SCHEDULNG ORDER

LEWIS A. KAPLAN, *District Judge*.

      The existing scheduling order (Dkt 76) is supplemented as follows:

      1.     All discovery shall be completed on or before November 16, 2022.

      2.     Any summary judgment motions and a joint pretrial order in the form attached as Annex A to the individual practices of the undersigned (which are posted on the Court's web site) shall be filed on or before December 1, 2022.

      3.     Absent prior disposition of the case by motion or otherwise, the trial will commence on February 6, 2023 at 9:30 a.m.

      4.     The parties shall exchange premarked trial exhibits no later than December 8, 2022.

      5.     Any motions *in limine* and oppositions thereto shall be filed no later than December 8 and December 15, 2022, respectively.

      SO ORDERED.

Dated:     July 19, 2022

                                           _____
                                             Lewis A. Kaplan
                                  United States District Judge

# EXHIBIT I

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL        212.763.0883

DIRECT EMAIL       rkaplan@kaplanhecker.com

September 30, 2022

**VIA ECF**

The Honorable Lewis A. Kaplan
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

     *Re:*  *Carroll v. Trump*, No. 20 Civ. 07311 (LAK) (JLC)

Dear Judge Kaplan:

   We write on behalf of Plaintiff E. Jean Carroll in opposition to Defendant Donald J. Trump's letter motion for a stay dated September 28, 2022. ECF 92. For the reasons below, we believe the motion should be denied.

   ***Defendant seeks to unilaterally reap the benefits of discovery by invoking an appeal that has been pending for twenty months.*** Defendant claims that discovery should be stayed because there is a "case-dispositive" appeal pending. But that has been true since November 2020, and current circumstances are not materially different now that the scope-of-employment issue has been certified to the D.C. Court of Appeals. In that time, Defendant has not hesitated to litigate in pursuit of his own advantage. On December 1, 2021, he moved to expand the scope of this action by adding an anti-SLAPP counterclaim against Plaintiff. ECF 59. And on April 1, 2022, after the Court denied that motion, Defendant affirmatively proposed to Plaintiff (and Plaintiff agreed) that the parties resume discovery. ECF 75. On May 5, the parties *jointly* stipulated to a schedule, which the Court adopted that same day. ECF 75-1, 76. Once again, all of this occurred while Defendant knew that a "case-dispositive" appeal was pending. *See* Letter from A. Habba, *Carroll v. Trump*, No. 20-3977 (2d Cir. July 20, 2022) (informing Second Circuit of ongoing discovery and acknowledging that "issues raised in this appeal are dispositive as to the underlying case").

   Moreover, Defendant has spent four months taking advantage of the very discovery process that he set in motion. He has obtained 30,469 pages of records from Plaintiff, obtained hundreds more pursuant to nonparty subpoenas, obtained 19 substantive interrogatory responses, and recently deposed a key nonparty witness. In contrast, Defendant produced just *eight* documents and four incomplete interrogatory responses; he otherwise stonewalled every document request and interrogatory, refused to turn over basic information about witnesses required by Local Civil

KAPLAN HECKER & FINK LLP                                                    2

Rule 26.3(c)(3),[1] and violated every deadline that applied to his discovery responses without any credible excuse for his failure. Throughout, Defendant has objected to discovery requests on the ground that it was "more practical" to obtain the information Plaintiff seeks at "a deposition"—and so Plaintiff finally had to schedule Defendant's deposition for the first half of October.[2]

Now that Defendant has benefited substantially from a discovery process that he actively set in motion—and now that he faces the prospect of his own deposition, having stonewalled every other discovery mechanism—he suddenly says that the continued pendency of a "case-dispositive" appeal changes everything. Nonsense. The Second Circuit's ruling changed hardly anything: it left open the ultimate question that has been on appeal for twenty months—namely, whether the United States should have been substituted for Defendant. Defendant initiated discovery while the scope-of-employment question was on appeal, he sought to add a counterclaim while it was on appeal, and he obtained documents and testimony while it was on appeal. He should not be permitted to assert at the last minute that he is entitled to avoid a deposition because it remains on appeal.

***The argument that the Second Circuit decision requires substitution and a stay is both self-defeating and legally flawed.*** Defendant does not address any of the factors that a party typically must satisfy to obtain a stay. *See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). Instead, he principally argues that because the Second Circuit vacated this Court's scope-of-employment decision and certified the scope-of-employment question to the D.C. Court of Appeals, the United States is now the proper defendant in this case. ECF 92 at 1  2.

As an initial matter, if Defendant were correct that the United States is now the defendant, then he would lack standing to seek a stay. Where a person "is not a party to [a] civil action," that person "does not have standing to move for a stay." *Doe v. Indyke*, No. 20 Civ. 00484, 2020 WL 5518384, at  2 (S.D.N.Y. Sept. 14, 2020). If the Court were to hold that the Second Circuit's decision somehow resulted in substitution of the United States, and if a party at that point were to seek a stay of proceedings, a different set of issues would arise. But for now, there is no basis for Defendant to seek both substitution and a stay of all proceedings in the case.

More fundamentally, Defendant is mistaken that substitution must occur "[b]y virtue of the Second Circuit's Decision." ECF 92 at 1. Although the language of the Westfall Act refers to what "shall" happen "[u]pon certification" by the Attorney General, 28 U.S.C. § 2679(d)(2), that language does not leave judges with the sole job of "rubber-stamp[ing]" the Attorney General's scope-of-employment certification. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429, 115 S. Ct. 2227, 2234 (1995). In holding that such certifications are subject to judicial review, the

---

[1] For example, Defendant identified his son-in-law Jared Kushner as one of only six people with whom Defendant has purportedly ever spoken about Plaintiff or this action. We have requested the address and employer of Mr. Kushner and the other five witnesses—information that Defendant must disclose under Local Civil Rule 26.3(c)(3)—on six occasions since August 23. Defendant's counsel have repeatedly dodged our request, writing recently that they "have reached out to the appropriate parties and are still working to obtain this information."

[2] The current schedule for confirmed depositions is as follows: Plaintiff's deposition of Cande Carroll (October 4), Plaintiff's deposition of Stephanie Grisham (October 6), Plaintiff's deposition of Roberta Myers (October 12), Defendant's deposition of Carol Martin (October 12), Plaintiff's deposition of Jessica Leeds (October 13), Plaintiff's deposition of Natasha Stoynoff (October 13), Defendant's deposition of Plaintiff (October 14), and Plaintiff's deposition of Defendant (October 19).

KAPLAN HECKER & FINK LLP

Supreme Court disagreed that "[u]pon certification . . . the United States would automatically become the defendant." *Id.* In so ruling, the Supreme Court emphasized that "shall" does not always mean "must," and it sometimes means "should, will, or even may." *Id.* at 432 n.9. Accounting for statutory text and purpose, the Supreme Court held that certification "does not conclusively establish as correct the substitution of the United States as defendant." *Id.* at 434.

Indeed, many cases (including several cited by Defendant on appeal) demonstrate that when certification is contested, it occurs *after* the United States prevails on a motion to substitute. In *Council on American Islamic Relations v. Ballenger*, for example, the D.C. Circuit stated that "[o]*nce a court determines* that the federal employee acted within the scope of employment, the case is, *inter alia*, restyled as an action against the United States that is governed by the Federal Tort Claims Act." 444 F.3d 659, 662 (D.C. Cir. 2006) (emphasis added). The D.C. Circuit similarly explained in *Wuterich v. Murtha* that "*where a plaintiff fails* to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant because the federal employee is absolutely immune from suit." 562 F.3d 375, 381 (D.C. Cir. 2009) (emphasis added).

Tellingly, the United States followed that exact procedure here. On September 8, 2020, the United States filed a motion requesting "an order substituting the United States as defendant for President Donald J. Trump." ECF 3 at 1. It reiterated its "request[]" in its reply, ECF 21 at 15, and, in seeking adjournment of oral argument, referred to its "pending motion to substitute," ECF 25.[3] In Defendant's view, the United States never had to file any motion at all, and apparently seasoned Department of Justice lawyers misunderstood Westfall Act procedure. But the record is clear: the United States still has not obtained the relief it expressly requested, and the Second Circuit has not resolved the motion in its favor. Instead, it vacated (rather than reversed) this Court's ruling on the United States' motion to substitute, which at most reverts the status of that motion to "pending." *See, e.g.*, *Halebian v. Berv*, 869 F. Supp. 2d 420, 424 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 641 (2d Cir. 2013) (upon vacatur of original decision, issues raised by underling motion remained to be decided). In these circumstances, the United States has not been substituted in lieu of Defendant.

The language that Defendant quotes from *Osborn v. Haley*, 549 U.S. 225, 127 S. Ct. 881 (2007), is not to the contrary. *See* ECF 92 at 2. *Osborn* concerned whether certification is proper when a federal officer denies the occurrence of the allegedly tortious conduct. *Id.* at 231. Although the Court stated that the United States remained the defendant "unless and until the District Court determines that the employee, *in fact*, . . . engaged in conduct beyond the scope of his employment," the Court was a drawing contrast with a situation in which the employee "simply as alleged by the plaintiff" engaged in such conduct. *Id.* In other words, the Court was focused on what it took to rebut the certification as an evidentiary matter, and it did not depart from its reasoning in *Gutierrez* (discussed above). *Accord Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017) (quoting *Osborn* in stating that certification "constitutes '*prima facie* evidence'").

---

[3] The United States and Defendant presented the same account on appeal. *E.g.*, U.S. Appellate Br. at 2 ("The district court rejected the United States' motion to be substituted as the defendant."); *id.* at 3 ("[T]he United States filed . . . a motion to have the United States substituted as the sole defendant."); *id.* at 23 ("In its opening motion papers, the United States sought substitution . . . ."); *id.* at 24 ("[T]he relevant claim is that the United Sates should properly be substituted . . . ."); Trump Appellate Br. at 2 ("[T]he United States moved in the District Court to substitute . . . ."); *id.* at 3 ("[T]he United States . . . filed a motion in that court to substitute the United States as defendant.").

***The traditional stay factors cut strongly against a stay.*** Defendant argues that because the D.C. Court of Appeals' "forthcoming ruling will be case-dispositive," it would be "highly prejudicial and inequitable for Defendant to engage in time-consuming and expensive pre-trial preparation—much less proceed to trial—until this issue has been conclusively resolved." ECF 92 at 2. That argument echoes many of the points that Defendant raised in his first motion to stay, which this Court denied, and for which Defendant did not seek reconsideration. ECF 47, 56; Text Order dated Sept. 15, 2021. Moreover, as explained above, it would be inequitable for Defendant now to obtain a stay based on the pendency of the same case-dispositive appeal that has been pending throughout his own efforts to add a counterclaim and engage in substantial discovery practice. A mere change in venue to D.C. for that ongoing appeal does not explain—and certainly does not justify—Defendant's about-face on whether discovery should continue while the appellate process unfolds.

The impracticality of cutting off discovery now that Defendant finally faces the prospect of satisfying his discovery obligations is only heightened by one more consideration: the relevance of the discovery here to the Adult Survivors Act case that Plaintiff will file in November. *See* ECF 89. The underlying dispute in both cases encompasses a single core disagreement—did Defendant sexually assault Plaintiff—and Defendant will have to testify under oath about his actions either way. To assuage concerns about duplicative discovery, and to the extent it wasn't already clear, Plaintiff agrees that any depositions in the present action may be used for Plaintiff's forthcoming action, thereby promoting efficiency and obviating the need for do-overs.

This case began on November 4, 2019, and it could hardly be clearer that Defendant hopes to "run out the clock" until he is elected president again. Defendant's motion to stay represents more of the same delay tactics he has long used, *see* ECF 16 at 7–8—and reflects his broader pattern of contorting the law and facts to avoid any legal repercussions for his misconduct. It also reflects his continued bad faith. Indeed, even as Defendant's lawyers insisted in this case that "Presidents plainly are employees of the Government," Trump Appellate Br. at 6, his lawyers told the Justice Department on May 25, 2022, that he could not face criminal liability for misappropriating classified documents to Mar-a-Lago because "an element of this offense . . . is that the accused is 'an officer, employee, contractor, or consultant of the United States" and "[t]he President is none of these," Ex. 1 to Unsealed Search Warrant at 2, *In re: Sealed Search Warrant*, No. 22 M.J. 8332 (S.D. Fla. Aug. 26, 2022), ECF 102-1. To hear Defendant tell it, he acted as an employee of the government in retaliating against Plaintiff for revealing that he had raped her decades earlier, and in declaring that she was too ugly to rape, but he could not possibly have been an employee of the government when he absconded from the White House with national security secrets.

Defendant's inconsistencies continue here. He cannot seek a stay based on a theory of substitution that would deprive him of standing to argue for a stay in the first place. He cannot obtain automatic substitution of the United States when the very cases he has previously cited describe a very different order of operations. And he cannot rely on the pendency of an appeal to block any further discovery when he has aggressively pursued counterclaims, document requests, and depositions during the pendency of that very same appeal.

KAPLAN HECKER & FINK LLP

Respectfully submitted,

Roberta A. Kaplan

cc:     Counsel of Record

# EXHIBIT J



Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

September 28, 2022

**VIA ECF**

The Honorable Lewis A. Kaplan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

      *Re:*    *Carroll v. Trump*
            *Civil Case No.: 1:20-cv-7311-LAK-JLC*

Dear Judge Kaplan:

This office represents the defendant, former President Donald J. Trump ("Defendant"), in the above-referenced action. By way of this letter, I respectfully request that this Honorable Court substitute the United States as the defendant in this action and immediately stay all proceedings.

On September 27, 2022, the Second Circuit rendered a decision (the "Decision") (*see* ECF No. 91), which reversed in part and vacated in part this Court's October 27, 2020 Opinion and Order (the "Order") (*see* ECF No. 32) denying the United States' motion, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), to substitute as the defendant in the place of Defendant Trump. Specifically, the Decision held that "the President is an employee of the government under the Westfall Act" and certified the question of whether Defendant acted within the scope of his employment when he publicly repudiated the allegations made by the plaintiff, E. Jean Carroll ("Plaintiff"), to the D.C. Court of Appeals. *See* Decision at 33.

By virtue of the Second Circuit's Decision, the United States must be substituted as the defendant in the instant action pending resolution of the proceedings before the D.C. Court of Appeals. The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). To invoke the Westfall Act, the Attorney General (or his delegate) must certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). Upon such certification, the statute expressly dictates that "any civil action or proceeding commenced upon such claim in a United States district court ***shall be deemed an action against the United States*** under the provisions of this title and all references thereto, and the ***United States shall be substituted as the party defendant***." *Id.* (emphasis added).

Here, on September 8, 2020, James G. Touhey, Jr., Director of the Torts Branch of the Civil Division of the U.S. Department of Justice, certified on behalf of the Attorney General that Defendant was acting within the scope of his office as President of the United States as the time of the alleged conduct. *See* ECF No. 6, Ex. B. Given that the Second Circuit has confirmed that Defendant is indeed an employee of the government for the purposes of the Westfall Act, the United States must automatically be "substituted as the party defendant" in this case. *Id.* This substitution is not discretionary; it occurs by operation of law. *See e.g., Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) ("Upon the Attorney General's certification, the federal employee is dismissed from the case and the United States is substituted as the defendant in place of the employee.") (citing 28 U.S.C. § 2679(d)(1)); *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990) ("Although . . . [the] scope certification is not dispositive for purposes of substitution, it indicates that the United States is substituted as an *automatic consequence* of the [Government's] certification.") (emphasis added). Indeed, "[t]he United States . . . must remain the federal defendant in the action ***unless and until*** the [court] determines that the employee, in fact, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn v. Haley,* 549 U.S. 225 231 (2007) (emphasis added). Therefore, the United States must be deemed, and remain, the defendant in the instant action—effectively staying all proceedings—until the scope of employment issue is resolved by the D.C. Court of Appeals.

Moreover, the D.C. Court of Appeals' forthcoming ruling will be case-dispositive and, therefore, it would be highly prejudicial and inequitable for Defendant to engage in time-consuming and expensive pre-trial preparation—much less proceed to trial—until this issue has been conclusively resolved. *See Behrens v. Pelletier*, 516 U.S. 299, 308, 116 S. Ct. 834, 839 (1996) (immunity "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery'" (emphasis in original)). As the Second Circuit properly stated, "[t]he FTCA, expressly, does not waive the sovereign immunity of the United States for the tort of defamation, *see* 28 U.S.C. § 2680(h) . . . *[s]o substituting the United States in place of Trump means the failure of Carroll's defamation lawsuit*. *See* Decision at 18 (emphasis added). Indeed, the "core purpose" of the Westfall Act "is to relieve covered employees from the cost and effort of defending the lawsuit, and to place those burdens on the Government's shoulders." *Osborn*, 549 U.S. at 252; *see also, e.g., Mitchell v. Carlson*, 896 F.2d 128, 133 (5th Cir. 1990) (Westfall immunity encompasses the right to avoid the "burden[s] of defending a suit"). Here, as with other immunity contexts, "if the defendant is correct that it has immunity, its right to be free of litigation is compromised, and lost to a degree, if the district court proceeds while the appeal is pending." *Goshtasby v. Bd. of Trs.*, 123 F.3d 427, 428 (7th Cir. 1997*); see also, e.g., Williams v. Brooks*, 996 F.2d 728, 730 n.2 (5th Cir. 1993) (immunity "'is effectively lost' if a case is erroneously permitted to proceed at the district court level while an interlocutory appeal of a denial of immunity is pending.") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)*; In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 42 F. Supp.3d 556, 558 (S.D.N.Y. 2014) (Sweet, J.) (holding that "[a]s a general rule, when an appeal of the denial of . . . immunity is under consideration, discovery should not proceed" and rejecting argument that divestiture is not automatic in the qualified immunity context); *Bradley v. Jusino*, No. 04 Civ. 8411, 2009 WL 1403891, at 2 (S.D.N.Y. May 18, 2009) (recognizing district court was divested of jurisdiction pending appeal of qualified immunity claim).

For the foregoing reasons, it is respectfully requested that this Court substitute the United States as the sole defendant in this action and immediately stay all proceedings pending resolution of the D.C. Court of Appeal's case-dispositive determination on the scope of employment issue.

Respectfully submitted,

Alina Habba, Esq.
For HABBA MADAIO & ASSOCIATES LLP

cc: All Counsel of Record (via ECF)

# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                Plaintiff,

      -against-                              22-cv-10016 (LAK)

DONALD J. TRUMP,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AMENDMENT TO PRETRIAL AND SCHEDULING ORDER**

LEWIS A. KAPLAN, *District Judge.*

        The defendant has requested adjustments to the Pretrial and Scheduling Order (Dkt 19) (the "PSO"). The Court has conducted a pretrial and scheduling conference with counsel for both parties. Accordingly,

        1.     Paragraph 7 of the PSO is amended in the following respects only:

        (a)     Notwithstanding the otherwise applicable January 30, 2023 and February 6, 2023 deadlines for service of defendant's new or supplemental rebuttal expert reports and the completion of expert discovery, respectively,

        (i)     Defendant's time to serve the report of Dr. Edgar Nace or any substitute expert in place of Dr. Nace is extended until February 28, 2023.

        (ii)     All discovery of and with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be completed on or before March 14, 2023.

        (b)     Notwithstanding the otherwise applicable February 23, 2023, March 9, 2023, and March 16, 2023 deadlines to file motions *in limine*, oppositions to

motions *in limine*, and replies in support of motions *in limine*, respectively,

> (i)     Any motions *in limine* with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before March 21, 2023.

> (ii)     Any oppositions to motions *in limine* with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before April 4, 2023.

> (iii)     Any replies in support of the motions *in limine* with respect to Dr. Nace or any substitute expert in place of Dr. Nace shall be filed on or before April 11, 2023.

> (c)     Trial will commence on April 25, 2023.

2.     The Court will resolve the question whether to consolidate or jointly try *Carroll I* with this case at a later date.

SO ORDERED.

Dated:          February 7, 2023

_____
Lewis A. Kaplan
United States District Judge

# EXHIBIT L



Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

April 13, 2023

**VIA ECF**
The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

Re:     *E. Jean Carroll v. Donald J. Trump*
        *1:22-cv-10016 (LAK)*

Dear Judge Kaplan:

We write on behalf of the defendant, Donald J. Trump ("Defendant"), with respect to the recent, belated disclosure of material information by the plaintiff, E. Jean Carroll ("Plaintiff"), which raises significant concerns as to Plaintiff's bias and motive in commencing the instant lawsuit, and necessitates that discovery be re-opened for the limited purpose of addressing this issue.

For background, on October 14, 2022, Plaintiff sat for her deposition in the parallel proceeding of *Carroll v. Trump*, No. 1:20-cv-7311 (LAK) ("*Carroll I*").[1] At that time, she was asked about a pertinent issue that looms large over this case – whether her legal fees are being funded by a third-party benefactor, particularly one with political ties. She answered, unequivocally, in the negative:

> Q: Are you presently paying your counsel's fees?
>
> A: This is a contingency case.
>
> Q: So you're not paying expenses or anything out of pocket to date; is that correct?
>
> A: I'm not sure about expenses. I have to look that up.
>
> Q. Is anyone else paying your legal fees, Ms. Carroll?
>
> A: No.

*See* **Exhibit A** at tr. 209:11-21.

---

[1] Pursuant to the Court's Order dated December 21, 2022 (ECF No. 19), Plaintiff's October 14, 2022 deposition has, for all intents and purposes, been incorporated into the instant action and serves as the operative deposition with respect to all substantive issues aside from a particular subset of Plaintiff's damages claim.

1430 U.S. Highway 206, Suite 240, Bedminster, NJ 07921 • Tel. 908.869.1188

Now, nearly six months later and a mere *two weeks* before trial is scheduled to commence, Plaintiff has acknowledged that the above statement was inaccurate. On April 10, 2023, defense counsel received a letter from Plaintiff's attorneys which stated, without elaboration, that Plaintiff "now recalls that at some point her counsel secured additional funding from a nonprofit organization to offset certain expenses and legal fees." *See* **Exhibit B** at 1.

Of course, the proposition that Plaintiff has suddenly "recollected" the source of her funding for this high-profile litigation—which has spanned four years, spawned two separate actions, and been before numerous state, federal, and appellate courts—is not only preposterous, it is demonstrably false. *Id.* Indeed, it simply defies logic to believe that Plaintiff's attorneys—four of whom were present at her deposition—were unaware that their *own firm* had "secured additional funding from a nonprofit organization" to bankroll their client's various lawsuits and ensure their bills were being paid. *Id.* It is equally inconceivable that neither Plaintiff nor her counsel have been aware of the identity of the third-party benefactor who was providing these payments. There is simply no justifiable excuse for Plaintiff's prolonged failure to disclose this information to Defendant in a timely manner. In short, Plaintiff apparently perjured herself during her deposition; her counsel sat by and allowed her to do so, knowing full well that her testimony was false[2]; and then they conspired to conceal the truth for nearly six months, only to disclose it on the eve of trial.

After receiving the April 10 letter, Defendant immediately scheduled a meet and confer with Plaintiff's counsel, which was held via conference call the next day, April 11, 2023. During the call, defense counsel: (i) inquired as to the identity of the "nonprofit organization" that was funding Plaintiff's lawsuits; (ii) requested that Plaintiff turn over documentation relating to the source of funding (i.e., payment history, retainer agreement with the third-party benefactor, communications with the third-party benefactor, etc.); (iii) requested that plaintiff appear for a supplemental deposition, limited in scope to the source of funding issue; and (iv) sought Plaintiff's consent to make a joint application to this Court seeking a brief adjournment of the trial date to allow sufficient time for the parties to engage in the additional discovery proceedings. In response, Plaintiff's counsel refused to disclose the identity of the "non-profit organization" and stated that they would advise as to their position on Defendant's remaining requests.

Later that evening, Plaintiff's lead counsel, Roberta Kaplan, submitted a letter to defense counsel, wherein she stated that she "would be willing to disclose the identity of the funder and agree not to object on relevance grounds to questions [defense counsel] might ask Ms. Carroll on cross-examination regarding her personal knowledge of the funding that her counsel secured" and suggested a follow-up meet and confer meeting. *See* **Exhibit C** at 2. Thereafter, pursuant to Ms. Kaplan's suggestion, a meet and confer was held via conference call the next morning, April 12, 2023. On the call, however, Plaintiff's counsel initially refused to disclose the identity of the third-party benefactor unless defense counsel first agreed to waive its ability to seek court intervention with respect to additional discovery surrounding the third-party benefactor. When defense counsel declined to do so, Plaintiff's counsel provided only the name of an individual, Reid Hoffman, who,

---

[2] *See* Rules of Professional Conduct, 22 NYCRR 1200.0, Rule 3.3(a)(3) ("If a . . . lawyer's client . . . has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures[.]"); Rule 3.4(a) ("A lawyer shall not . . . suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce [or] conceal or knowingly fail to disclose that which the lawyer is required by law to reveal[.]").

according to Plaintiff's counsel, is primary backer of the "non-profit organization." Plaintiff's counsel continued to refuse to disclose the identity of the "non-profit organization" itself, prompting the parties to have a follow-up meet and confer later that day, when Plaintiff's counsel ultimately disclosed that the "non-profit organization" is American Future Republic. Additional discussions took place between the sides, but no agreement was able to be reached with respect to additional discovery to be turned over.

The eleventh-hour disclosure that Plaintiff's legal fees are being subsidized by American Future Republic and Reid Hoffman is troubling and raises significant questions that require further investigation. Based upon defense counsel's initial research, there appears to be little to no publicly available information on American Future Republic, aside from the fact that it is a 501(c)(4) social welfare organization entity funded by Reid Hoffman, the billionaire founder of LinkedIn. Hoffman is one of the largest donors to the Democratic party—reportedly "one of the most influential Democratic donors of the Trump era"[3]—and a vocal critic of Defendant and his political policies. In fact, Hoffman is on record stating that he would "'spend as much as [he] possibly can' to avoid another Trump presidency, saying it would be 'destructive to our society,'"[4] and, since 2017, has reportedly been "funding groups to create a bulwark against Mr. Trump's agenda."[5] Previously, Hoffman contributed more than $600,000 to the legal defense fund of Bean LLC[6]—otherwise known as Fusion GPS, the company responsible for the creation of the Steele Dossier—and was the primary source of funding for an organization that launched an "elaborate false flag" operation which involved spreading misinformation about a Republican senatorial candidate in the hopes that it would cost him the senatorial election.[7]

This revelation raises significant questions as to Plaintiff's credibility, as well as her motive for commencing and/or continuing the instant action. It also strikes at the heart of one of the key aspects of Plaintiff's defamation claim – whether the instant action is a "hoax" that was commenced and/or continued to advance a political agenda. As such, this issue has a material bearing on Defendant's defense strategy and additional discovery is needed. Due to the belated nature of Plaintiff's disclosure, Defendant was deprived of an opportunity to investigate this information in the course of discovery proceedings. In fact, given that this information was concealed for numerous months, only to be abruptly divulged on the eve of trial, Plaintiff's conduct appears to be a deliberate attempt to cut-off Defendant's ability to investigate this matter. *See, e.g.*, *Haibo Jiang v. Town of Tonawanda*, No. 15-cv-898-A, 2018 WL 3215575, at \*4 (W.D.N.Y. July

---

[3] Theodore Schleifer, "This billionaire built a big-money machine to oust Trump. Why do some Democrats hate him?" *Vox*, September 23, 2020, available at https://www.vox.com/recode/21451481/linkedin-reid-hoffman-billionaire-democratic-party-tension-silicon-valley.

[4] Aaron Mok, "Reid Hoffman, LinkedIn cofounder, said he talks to his friend Peter Thiel less to avoid political discussions and feuding over Donald Trump," *Business Insider*, March 22, 2023, available at https://www.businessinsider.com/reid-hoffman-peter-thiel-politics-clash-dont-talk-trump-2023-3.

[5] Katie Benner, "Using Silicon Valley Tactics, LinkedIn's Founder Is Working to Blunt Trump," *The New York Times*, September 8, 2017, available at https://www.nytimes.com/2017/09/08/technology/reid-hoffman-silicon-valley-blunt-trump.html.

[6] https://projects.propublica.org/nonprofits/display_990/821110585/02_2020_prefixes_81-82%2F821110585_201812_990_2020021417149016

[7] Tony Romm, "Internet Billionaire Reid Hoffman Apologizes For Funding Group Tied to Disinformation In Alabama Race," *The Washington* Post, December 6, 2018, available at https://www.washingtonpost.com/technology/2018/12/26/internet-billionaire-reid-hoffman-apologizes-funding-group-behind-disinformation-alabama-race/?noredirect=on.

2, 2018) ("Given the timing of these disclosures—well after the discovery cutoff date, and on the eve of trial— the Defendant was unable to investigate these issues. The resulting prejudice to the Defendant was obvious.") (*citing Rienzi & Sons, Inc. v. N. Pugilisi & F. Industria Paste Alientari*, No. 80-cv-2540 (DLI), 2011 WL 1239867, at *3 (E.D.N.Y. Mar. 30, 2011)); *Res. Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 112 (2d Cir. 2002) (remanding and admonishing that "as a discovery deadline or trial date draws near, discovery conduct that might have been considered 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and to the court.").

Therefore, in view of the circumstances at hand, and for the reasons outlined below, Defendant respectfully seeks: (i) a limited re-opening of the discovery period restricted to investigation into the narrow source of funding issue, and (ii) a one-month continuance of the trial date, the need for which, with respect to this issue, stems solely from Plaintiff's failure to disclose the subject information in a timely manner; or (iii) in the alternative, that the Court permit an adverse inference instruction against Plaintiff with respect to her willful defiance of her discovery obligations.

\*     \*     \*

"A district court has broad discretion in deciding whether to re-open discovery." *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2006312, at *15 (S.D.N.Y. Feb. 15, 2023) (citing *Iacovacci v. Brevet Holdings, LLC*, No. 1:18-cv-08048 (MKV), 2022 WL 540658, at *1 (S.D.N.Y. Feb. 23, 2022); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004)). Pursuant to Federal Rule of Civil Procedure 16, discovery may be re-opened upon a showing of "good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).

"District courts in this Circuit generally consider six factors in deciding whether good cause to re-open discovery exists: '(1) whether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to relevant evidence.'" *Carroll*, 2022 WL 540658, at 16 (citing *Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011)). Here, all six factors weigh in Defendant's favor.

First, trial is currently scheduled to commence in less than two weeks, on April 25, 2023. Typically, such a close proximity to trial would weigh against Defendant, the moving party. However, given the circumstances at hand, this factor should be construed against Plaintiff, since it was Plaintiff's withholding of relevant information and then sudden disclosure on the eve of trial that created this dispute in the first place. Indeed, Plaintiff's counsel deliberately waited 178 days following their client's deposition to correct her materially false statement, clearly to gain a tactical advantage over Defendant in this proceeding. Had Plaintiff disclosed the source of her funding in a timely manner, Defendant would have been afforded ample opportunity to investigate the issue through routine discovery. Plaintiff should not be permitted to benefit from her failure to do so, nor the fact that she waited until the last possible moment.

Second, the request is opposed by Plaintiff. However, like the first factor, this consideration should not be weighed against Defendant. It is of no moment that Plaintiff opposes the instant motion, as she willfully neglected her discovery obligations. Thus, to consider this factor in her favor would be inequitable and unjust.

Third, Plaintiff would not be prejudiced by re-opening discovery for the purpose of allowing Defendant to engage in limited fact-finding surrounding the source of Plaintiff's funding. To the extent re-opening discovery causes any delay in the trial schedule, any such postponement would simply be the consequence of Plaintiff's own failure to timely abide by her discovery obligations. The resulting prejudice, if any, falls squarely upon Plaintiff's shoulders and should not be considered as a relevant factor by this Court.

Fourth, Defendant was diligent in obtaining discovery within the timeframe permitted by the Court. In his First Set of Interrogatories, served on May 27, 2022 in *Carroll I*, Defendant demanded that Plaintiff disclose the following information:

> 23. Identify all Persons who have made, provided, discussed, or offered to make or provide, any funds, payments, donations, gifts or consideration of any value, in connection with this Action . . . including but not limited to . . . attorneys' fees, and describe: (a) the nature of the contribution or provision of value or consideration; and (b) b. the dollar amount of the contribution or provision of value or consideration, if not financial in nature, the equivalent dollar amount of the contribution.

*See* **Exhibit D** at ¶ 23.[8] In her response, Plaintiff asserted that the information was protected by attorney-client privilege. *See* **Exhibit E** at 13. Thereafter, defense counsel questioned Plaintiff as to whether any third party was paying her legal fees, to which she unequivocally stated "No." *See* **Ex. A** at tr. 209:21.

Plaintiff's assertion of attorney-client privilege, coupled with her sworn denial that any third party was covering her legal expenses, provided Defendant with no reason to believe that any third-party benefactor was involved in the payment of Plaintiff's legal fees. It was only when Plaintiff corrected her false statement in her April 10, 2023 letter that Defendant was alerted to fact that a "nonprofit organization" has been funding her lawsuits. Since this information was not previously discoverable—and, in fact, was actively concealed by Plaintiff—Defendant never had *any* opportunity to engage in fact-finding on this issue within the confines of this Court's Scheduling Order. As such, this factor weighs heavily in favor of Defendant. *See, e.g., Sokol Holdings, Inc. v. BMD Munai, Inc.*, 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009) (stating that, to re-open discovery, a moving party "must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met."); Fed. R. Civ. P. 16 Advisory Comm. Notes to 1983 Amendment (noting that a court "may modify the [discovery] schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."); *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, No. 98-cv-861, 2005 WL 2132438,

---

[8] Defendant propounded a corresponding document request upon Plaintiff seeking related documents and communications, to which she made the same assertion of attorney-client privilege. *See* **Ex. C** at 1-2.

at *5 (S.D.N.Y. Sept. 6, 2005) ("[M]aterial events have occurred since the last discovery period, which justice requires that the parties have an opportunity to develop through discovery.").

Fifth, for the same reasons described above, it was entirely unforeseeable that Defendant would require additional discovery as to the source of Plaintiff's third-party funding, since Plaintiff actively concealed the existence of a third-party benefactor throughout the course of discovery. This fact only came to light within the past couple days, after Plaintiff suddenly reversed course and disclosed said information. As a result, it was impossible for Defendant to foresee the need for discovery into this area of inquiry. Therefore, this factor weighs in favor of Defendant.

Sixth, there is a significant likelihood that the information sought by Defendant will lead to the discovery of relevant evidence. Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 882 F.2d 682, 687 (2d Cir.1989) (holding that "the broad scope of discovery delimited by the Federal Rules of Civil Procedure is designed to achieve disclosure of all the evidence relevant to the merits of a controversy"). Indeed, the "right of litigants to discover and present relevant evidence in civil litigations is given great weight in federal courts," and there is a tendency "toward admitting as much evidence as possible so that the facts may be more accurately determined." *Apicella v. McNeil Labs.,* 66 F.R.D. 78, 82 (E.D.N.Y. 1975). "So long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." *United States v. Jones*, 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018).

Here, there is no question that information pertaining to the "nonprofit organization" that has been funding Plaintiff's attorneys' fees is relevant to this case. It is well established that "[c]ourts can require [a party] to produce ... documents indicating the source of third-party payment of its legal fees." *Alfadda v. Fenn*, 1994 WL 577002, at *1 (S.D.N.Y. Oct. 19, 1994); *see also United States v. Zarrab*, 15-cr-867 (RMB), 2017 WL 1753466 (S.D.N.Y. Apr. 5, 2017). Such disclosure does not implicate attorney-client privilege or the attorney work product doctrine. *Vingelli v. U.S., Drug Enf't Agency*, 992 F.2d 449, 452 (2d Cir. 1993) ("[I]n the absence of special circumstances client identity and fee arrangements do not fall within the attorney-client privilege because they are not the kinds of disclosures that would not have been made absent the privilege and their disclosure does not incapacitate the attorney from rendering legal advice.") (2d Cir. 1993); *E. Profit Corp. Ltd. v. Strategic Vision US, LLC*, 18-CV-2185 (LJL), 2020 WL 7490107, at *8 (S.D.N.Y. Dec. 18, 2020) ("The identity of a person providing litigation funding—whether a private individual or a corporation or an insurance company—is not protected by the attorney-client privilege or attorney work product doctrine."); *In re Shargel*, 742 F.2d 61, 64 n.2 (2d Cir. 1984) ("[T]he privilege does not protect the identity of a 'benefactor' so far as legal fees are concerned . . . [t]he payment of another's legal fees is an act independent of that explanation and should not be accorded more protection against disclosure under the attorney-client privilege than a payment directly to the person for purposes of his or her retaining a lawyer.").

In addition, the source of funding of Plaintiff's legal fees is particularly relevant in the instant matter given the political overtones of this case. This action was filed against Defendant while he was the sitting President of the United States, and it has continued into his candidacy for the 2024 Presidential Election where he is currently the leading Republican candidate. Plaintiff, for her part, has long been an outspoken critic of Defendant's political policies and, at or around the time *Carroll I* was commenced, she frequently expressed her desire to see him removed from office.[9] Perhaps most interestingly, Plaintiff admitted during her deposition that she initiated the instant lawsuit at the urging of George Conway, a well-known detractor of Defendant and his politics,[10] who referred her to her current counsel, Kaplan Hecker & Fink LLP, a firm with ties to the Democratic party which is engaged in numerous lawsuits against Defendant:[11]

> Q: At what point did you decide to file a lawsuit against the defendant?
>
> A: Well, wherever I went after the story went people said are you going to sue him, are you going to sue him and I would say no, no, no, not going to do it. I'm just not -- and then I had a conversation with someone who knew the ins and outs, an actual lawyer, and he said you should really seriously think about this.
>
> Q: Who was that lawyer without getting into the conversation?
>
> A: George Conway.
>
> [. . .]
>
> Q: So after you spoke to George, did you retain counsel?
>
> A: Yes.
>
> Q: How soon after?
>
> A: The day after. The day – two days later.
>
> Q: Did George recommend Ms. Kaplan?
>
> A: Yes, he did.

*See* **Ex. A** at tr. 205:4-16, 209:3-10.

---

[9] *See, e.g.*, @ejeancarroll, 12/17/19, 6:05pm, https://twitter.com/ejeancarroll/status/1207074320440315906 ("I am a woman, and I want to see Trump Impeached and Removed. I want to stop the damage he and his flunkies are inflicting on the rights of women to control our our destinies!"); @ejeancarroll, February 3, 2017, 1:54pm, https://twitter.com/ejeancarroll/status/827591111443782514 ("The greatest threat to America is Donald Trump!"); @ejeancarroll, June 30, 2018, 4:39pm, https://twitter.com/ejeancarroll/status/1013160235295494144 ("Each of us should find one Trump Woman THAT WE PERSONALLY KNOW and spend the next three months tenderly and intelligently convincing her to vote against the candidates of his party in November. THAT WOULD STOP HIM.").

[10] *See, e.g.*, Erik Larson, "Roberta Kaplan Builds Progressive Firm Suing Trump, Defending Wall Street," *Bloomberg News*, March 13, 2021, available at https://news.bloomberglaw.com/us-law-week/roberta-kaplan-builds-progressive-firm-suing-trump-defending-wall-street; Catherine Triomphe, "Roberta Kaplan, The Lawyer Taking On Donald Trump And Fighting the Far-Right," *Barron's*, February 6, 2021, available at https://www.barrons.com/news/roberta-kaplan-the-lawyer-taking-on-donald-trump-and-the-far-right-01612662609.

[11] *See, e.g.*, George Conway III, "Unfit for Office: Donald Trump's narcissism makes it impossible for him to carry out the duties of the presidency in the way the Constitution requires," *The Atlantic*, available at https://www.theatlantic.com/ideas/archive/2019/10/george-conway-trump-unfit-office/599128/ (11,000 word op-ed written by Conway claiming that Trump's is unfit for office).

Moreover, Plaintiff's counsel has admitted that Reid Hoffman was one of the underlying sources of her funding. Hoffman is one of the largest individual donors to the Democratic party, an outspoken critic of Defendant, and an active contributor to numerous "anti-Trump" initiatives. Given the political machinations which are at issue in this case, Mr. Hoffman's involvement is certainly noteworthy.

In *Eastern Profit Corporation Limited v. Strategic Vision US, LLC*, No. 18-cv-2185 (LJL), 2020 WL 7490107 (S.D.N.Y. Dec. 18, 2020), the court made a conditional ruling allowing the admission of evidence at trial concerning the identity and political leanings of a third-party benefactor that had been funding the litigation costs of the defendant. The court permitted testimony and questioning on the identity of the funder provided that plaintiff could show it had a "good faith belief" that the funder was affiliated with a foreign political party, accepting the plaintiff's argument that this fact, if shown, would "tend to establish a relationship between [the] [d]efendant and the [foreign political party] and its supporters" and therefore make it "less likely" that certain defenses raised by the defendant were valid. *Id.* at *8. In so ruling, the court observed that the defendant had put "its own political associations" in issue and, therefore, could not complain if the plaintiff sought to "probe those associations." *Id.*

Here, similarly, Plaintiff's potential political ties are pertinent to her motivation for filing her lawsuits, her potential bias against Defendant, and her credibility as a witness. Plaintiff waited until Defendant was a sitting President to come forward with her purported twenty-five-year-old allegation that he sexually assaulted her; and she chose to do so in a profoundly public manner – through the publication of a book detailing her claims. She has also admitted that she had no intention of filing *Carroll I* (or, by extension, the instant lawsuit), until she was urged to do so by an individual with well-documented disdain for Defendant's political leanings. Thus, Plaintiff has undoubtedly put her "political associations" in issue in this case, and Defendant is entitled to "probe those associations." *Id.*

Moreover, aside from its relevance to Plaintiff's bias, motive, and intent, the source of litigation funding bears on a material aspect of Plaintiff's defamation claim – namely, whether this action has been brought for the purpose of advancing a political agenda. Defendant has consistently claimed that Plaintiff's *Carroll I* and *Carroll II* lawsuits are a "con job" and a "hoax," *see* Compl. (ECF No. 1) at ¶ 92, and has questioned whether she is "push[ing] a political agenda" or being funded by a rival political party, *id.* at ¶ 83 ("Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda[.]"); ("If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."). Carroll has also brought this issue into question, having argued that Defendant "asserts a far broader conspiracy of malfeasance that encompasses Carroll, her lawyer, the justice system at large, and even this Court," *see* ECF No. 79 at 16, and repeatedly questioning Defendant on these theories, *see, e.g.,* **Exhibit F** at tr. 88 14:-23 ("Q: Another thing that you say in your June 21 statement is that Ms. Carroll was trying to carry out a political agenda? A: Yeah. Q: How did you know she had a political agenda if you didn't know who she was? A: Somebody told me early on that she was somehow aligned with Hillary Clinton[.]"); tr. 89:22-25 ("Q: Before you issued your June 21 statement, did you have any documents indicating that she was pursuing a political agenda? A: No."); tr. 197:6-16 ("Q: So in

8

that video, you're talking about the women who had accused you of sexual impropriety; correct? A: Yeah. Q: And you say, "These are lies being pushed by the media and the Clinton campaign"; correct? A: Yeah. Not in all cases, but in some, yeah. I think that's what's happening with you and your client. I don't know if it's Clinton or if it's the Democrat party. It's probably not Clinton anymore."). Thus, the question of whether American First Republic and/or Reid Hoffman funded Plaintiff's legal fees for the purpose of pushing a political agenda is a substantive issue that goes directly towards the merits of Plaintiff's defamation claim. As a result, discovery that sheds light on this issue is relevant as a matter of law.

Lastly, should this Court not be inclined to re-open discovery, Defendant respectfully requests that the Court permit an adverse inference instruction against Plaintiff for her failure to comply with her discovery obligations. "[D]istrict courts have broad discretion in fashioning an appropriate sanction for a party's failure to produce documents in breach [of] its discovery obligations . . ." *Bogosian v. All Am. Concessions*, No. 06-CV-1633 (RRM) (RML), 2011 U.S. Dist. LEXIS 109082, 2011 WL 4460362, at *7 n.4 (E.D.N.Y. Sept. 26, 2011); *accord Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) ("Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs."); *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."). An adverse inference may be drawn if (1) the party having control over the evidence had an obligation to timely produce it; (2) the party that failed to timely produce the evidence had a culpable state of mind; and (3) the missing evidence is relevant to a claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp.*, 306 F.3d at 107. As set forth at length above, Plaintiff, after receiving a written demand for discovery relating to third-party funding, failed to timely disclose responsive evidence and subsequently lied, under oath, when questioned about it. Further, Plaintiff and her counsel were fully aware that Reid Hoffman, through his non-profit, American Future Republic, was funding Plaintiff's litigation fees and yet consciously withheld this information. Finally, the sought after evidence is relevant to Plaintiff's credibility and bias, and it also relates directly to a substantive aspect of her defamation claim, namely, whether political considerations played into Plaintiff's decision to commence and/or continue the instant lawsuit. Therefore, permitting an adverse inference against Plaintiff is an appropriate sanction for Plaintiff's deliberate attempts to circumvent the discovery process.

For the reasons set forth above, Defendant respectfully seeks: (i) a limited re-opening of the discovery period restricted to fact-finding surrounding Plaintiff's litigation funding, including permitting Defendant to serve written discovery demands and re-depose Plaintiff on this singular issue, and (ii) a one month continuance of the trial date; or (iii) in the alternative, that the Court permit an adverse inference instruction against Plaintiff with respect to her willful defiance of her discovery obligations.

Respectfully submitted,

Dated: April 13, 2023
      New York, New York

Alina Habba, Esq.
Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP

1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188

-and-

Joseph Tacopina, Esq.
Chad Siegel, Esq.
Matthew DeOreo, Esq.
TACOPINA SEIGEL & DEOREO
275 Madison Avenue, 35th Floor,
New York, New York 10016
Telephone: (212) 227–8877

*Counsel for Defendant, Donald J. Trump*

# EXHIBIT M



MEMO ENDORSED

HABBA MADAIO
& Associates LLP

Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

April 13, 2023

**VIA ECF**
The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007



DC SDNY
CUMENT
CTRONICALLY FILED
OC #:
ATE FILED: 4-13-2023

   Re: *E. Jean Carroll v. Donald J. Trump*
     *1:22-cv-10016 (LAK)*

Dear Judge Kaplan:

  We write on behalf of the defendant, Donald J. Trump ("Defendant"), with respect to the recent, belated disclosure of material information by the plaintiff, E. Jean Carroll ("Plaintiff"), which raises significant concerns as to Plaintiff's bias and motive in commencing the instant lawsuit, and necessitates that discovery be re-opened for the limited purpose of addressing this issue.

  For background, on October 14, 2022, Plaintiff sat for her deposition in the parallel proceeding of *Carroll v. Trump*, No. 1:20-cv-7311 (LAK) ("*Carroll I*").[1] At that time, she was asked about a pertinent issue that looms large over this case – whether her legal fees are being funded by a third-party benefactor, particularly one with political ties. She answered, unequivocally, in the negative:

    Q: Are you presently paying your counsel's fees?

    A: This is a contingency case.

    Q: So you're not paying expenses or anything out of pocket to date;
    is that correct?

    A: I'm not sure about expenses. I have to look that up.

    Q. Is anyone else paying your legal fees, Ms. Carroll?

    A: No.

*See* **Exhibit A** at tr. 209:11-21.

---

[1] Pursuant to the Court's Order dated December 21, 2022 (ECF No. 19), Plaintiff's October 14, 2022 deposition has, for all intents and purposes, been incorporated into the instant action and serves as the operative deposition with respect to all substantive issues aside from a particular subset of Plaintiff's damages claim.

Memorandum Endorsement                                    Carroll v. Trump, 22-cr-10016 (LAK)

          On April 10, 2023, plaintiff's counsel disclosed to the defendant that plaintiff -- who had testified at her deposition on October 14, 2022 that (a) no one else was paying her legal fees as "[t]his is a contingency fee case," and that (b) she was "not sure about expenses" (Dkt 108-1, Dep. Tr., at 209: 11-21) -- "now [i.e., Apr. 10, 2023] recall[ed] that at some point her counsel secured additional funding from a nonprofit organization to offset certain expenses and legal fees." Dkt 108-2 at 1. Plaintiff's counsel now advises that this assistance was secured in September 2020, well after the commencement of the first to the two closely related actions of which this is the later.

          In subsequent discussions between the parties' respective counsel, plaintiff disclosed the identity of the financial backer, said to be a prominent funder of Democratic causes, and of the not-for-profit entity through which he apparently provided such funding. Plaintiff's counsel further represented that plaintiff "has never met and has never been party to any communications (written or oral) with anyone associated with the nonprofit." Dkt 108-3 at 1. On this basis, defendant moves for "(i) a limited re-opening of the discovery period restricted to investigation into the narrow source of funding issue, and (ii) a one-month continuance of the trial date . . . ; or (iii) in the alternative, that the Court permit an adverse inference instruction against Plaintiff with respect to her willful defiance of her discovery obligations." Dkt 108 at 4.

          The question whether and when plaintiff or her counsel have obtained financial support in this action has nothing directly to do with the ultimate merits of the case. *See, e.g., Benitez v. Lopez*, No. 7-CV-3827-SJ-SJB, 2019 WL 1578167, at \*1-\*2 (E.D.N.Y. Mar. 14, 2019). Although I do not now decide the question, it perhaps might prove relevant to the question of plaintiff's credibility, in view of the deposition testimony referred to above. Accordingly, I will permit a brief and carefully circumscribed examination of that narrow question without prejudging the question of whether and to what extent examination on this matter may be permitted at trial. Accordingly, defendant's application is granted, but only to the extent that (1) plaintiff shall furnish the defendant, no later than April 16, 2023, with documents sufficient to establish that the inception of the financing assistance for the Carroll litigation in fact occurred in or after mid-2020, (b) any documents concerning the state of plaintiff's knowledge, if any, of the financing assistance as of the date of her deposition and as of the present, and (2) defendant may conduct an additional deposition of Ms. Carroll not to exceed 60 minutes in duration, unless otherwise ordered by the Court, which shall be (1) limited to the subject of Ms. Carroll's knowledge of the financing assistance as of the date of her deposition and as of the present, and (2) completed no later than April 19, 2023. The motion is denied in all other respects save that the Court reserves for determination at trial the matter of any requested adverse inference instruction. Trial shall begin as scheduled on April 25, 2023 unless otherwise ordered.

          SO ORDERED.

Dated:       April 13, 2023

                                             Lewis A. Kaplan
                                       United States District Judge

# EXHIBIT N

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

April 17, 2023

The Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:    *E. Jean Carroll v. Donald J. Trump*, 22-cv-10016 (LAK)

Dear Judge Kaplan,

As counsel for Defendant Donald J. Trump, we write to inquire as to the Court's plan for conducting jury selection in this case. On March 29, 2023, counsel were generally advised by the Deputy Clerk that Your Honor planned to assemble approximately one hundred potential jurors in the Jury Assembly Room and then explain to them what this case is about. The Deputy Clerk then indicated that Your Honor would ask whether the jurors could be impartial, with a view that only about fifteen prospective jurors might be struck. The Deputy Clerk also indicated that Your Honor would not ask that many questions during the *voir dire* in the courtroom, and that the entire jury selection process would take only one to two hours.

It was unclear from this discussion whether counsel would be present during this jury selection process in the Jury Assembly Room, or would have any input into the Court's description of the case, or would have any input into the questions being asked, or would have their own opportunity to ask questions. Therefore, we seek clarification on these points. Also, given the parties involved in this case, the attendant publicity surrounding it, the sensitivity of the issues involved, as well as the possibility of political bias, we believe that a robust jury selection process — one in which counsel is involved at each step — is necessary in the interests of justice.

Rule 47 of the Federal Rules of Civil Procedure governs jury selection in civil cases. It is clear that counsel must be involved:

> Rule 47. Selecting Jurors.
>
> (a) Examining Jurors. The court may permit the parties or their attorneys to examine prospective jurors or may itself do so. If the court examines the jurors, it *must* permit the parties or their attorneys to make any further inquiry it considers proper, or *must* itself ask any of their additional questions it considers proper. (emphasis added)

**TACOPINA SEIGEL & DEOREO**

Hon. Lewis A. Kaplan
April 17, 2023
Page 2

      While understand that the Court has discretion over how to conduct jury selection in a civil case, we submit that counsel should be involved at all stages of the jury selection process (even in the Jury Assembly Room). We also submit that counsel should have input into the Court's description of the case as well as into the questions asked of potential jurors in the Jury Assembly Room. Rule 47 makes it clear that the parties and their counsel have that right, and further, a more robust jury selection process in this case will serve the interests of justice. We would note that, in this regard, we already have submitted to the Court proposed *voir dire* questions to be asked, which have yet to be ruled upon. However, for present purposes we do wish to inquire further as to the Court's planned process.

      Respectfully submitted,

Joseph Tacopina, Esq.
Alina Habba, Esq.
*Co-Counsel to Donald J. Trump*

cc: All Counsel (By ECF)

# EXHIBIT O

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

April 19, 2023

The Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:    *E. Jean Carroll v. Donald J. Trump*, 22-cv-10016 (LAK)

Your Honor:

      In light of the Court's Order requesting counsel to advise whether their respective clients intend to be present throughout the trial, we think it necessary to bring the following concern to Your Honor's attention given the unique status of our client, Defendant Donald J. Trump ("Trump"), as a former president.

      Specifically, as counsel who appeared with Defendant Trump during his recent arraignment in New York Supreme Court, in *People v. Trump*, Indictment No. 7145/2023, I have personal knowledge of the logistical burdens associated with his appearance in a courtroom, much of which was witnessed during televised broadcasts. As a former president, the defendant was always accompanied by approximately a dozen secret service agents, the FDR Drive was shut down for a significant amount of time while he traveled to the courthouse, the courthouse itself was frozen while he was present, and the streets, within a three block radius of the courthouse, were blocked off while he was there. Defendant Trump's appearance in the Southern District of New York in connection with this matter would result in similar logistical and financial burdens upon New York City, its residents, and the Court itself. With respect to the latter, in order for Defendant Trump to appear, his movement would need to be coordinated preliminarily by a Secret Service advance team hours beforehand each day that he is present, so that a tactical plan may be developed. As part of that plan, according to Secret Service, courthouse floors would need to be locked down, elevators shut down, courthouse personnel confined to their offices, and members of the public restricted from the area.

      Although Defendant Trump wishes to appear at trial, in order to avoid the burdens outlined above, if he does not do so, we respectfully request that the Court issue to the jury the following preliminary instruction: "While no litigant is required to appear at a civil trial, the absence of the defendant in this matter, by design, avoids the logistical burdens that his presence, as the former president, would cause the courthouse and New York City. Accordingly, his presence is excused unless and until he is called by either party to testify."

**TACOPINA SEIGEL & DEOREO**

Hon. Lewis A. Kaplan
April 19, 2023
Page 2

Your consideration is greatly appreciated.

Respectfully submitted,

Joseph Tacopina

cc: All Counsel (By ECF)

# EXHIBIT P

# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

April 20, 2023

**FILED BY ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   **Re: Carroll v. Trump**
     **Docket No. 22 Civ. 10016 (LAK)**

Your Honor:

   We write in response to the Court's request of April 10th that we advise whether our client, Defendant Donald J. Trump, intends to be present throughout the trial until completion and, if not, the dates on which he intends to be absent from the proceedings. Because the decision of the defendant, who is not required to appear as a civil litigant, will be made during the course of the trial, we are not yet in a position to advise the Court in this regard.

   However, we will inform the Court as soon as a decision is reached, particularly in light of the logistical concerns that will need to be addressed in coordination with the Secret Service, the Marshals Service, and the City of New York.

   Your consideration in this matter is greatly appreciated.

         Respectfully submitted,

         Joseph Tacopina

cc: All counsel by ECF

# EXHIBIT Q

# KASOWITZ BENSON TORRES LLP

MARC E. KASOWITZ
DIRECT DIAL: (212) 506-1710
DIRECT FAX: (212) 835-5010
MKASOWITZ@KASOWITZ.COM

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

July 16, 2020

<u>VIA NYSCEF</u>

The Honorable Verna L. Saunders
Supreme Court of the State of New York
New York County
111 Centre Street, Room 934
New York, New York 10013

      Re:    *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty).

Dear Justice Saunders:

    I write on behalf of defendant President Donald J. Trump to correct certain assertions in plaintiff's July 15, 2020 letter ("PL") to the Court.

    First, plaintiff asserts that the President's argument is based on a contention that state courts are "inferior" or "incapable" (PL at 1, 2). That is not so. The President's argument -- that under Article II and the Supremacy Clause, a President is temporarily immune while in office from being sued in state court -- is based on the federal structure of the Constitution, which every state ratified and by which every state is bound.[1] Ironically, it is plaintiff, not the President, who seems to believe that the Court could be "distract[ed]" by legal arguments. (PL at 2.)

    Second, plaintiff asserts that the President's argument is "desperate," "novel," and "extreme." (PL at 1, 2.) Even allowing for rhetorical flourish, that characterization is completely off base: the President's argument was raised in 1997 by the Supreme Court itself in *Clinton v. Jones* -- where the Supreme Court characterized that supposedly "desperate," "novel" and "extreme" argument as an "important constitutional issue[]," which it recognized could "present a more compelling case for immunity" than a "comparable claim" in federal court. 520 U.S. 681, 690-91, 691 n.13 (1997). And not only did nothing in the Supreme Court's decision in *Trump v. Vance*, No. 19-635, 2020 WL 3848062 (U.S. July 9, 2020), address that issue, but the

---

[1]     Under plaintiff's "logic," the U.S. Supreme Court's holding in *Trump v. Mazars USA, LLP*, No. 19-715, 2020 WL 3848061 (U.S. July 9, 2020), which vacated orders upholding Congressional subpoenas, must have been based on the Supreme Court's view that Congress is inferior to or less capable than the state prosecutor in its *Vance* decision, which affirmed an order upholding the prosecutor's criminal subpoena to the President. Such a conclusion would, of course, be as baseless as plaintiff's assertion concerning the President's argument here. *See also* Reply Brief for Defendant-Appellant in *Zervos v. Trump*, APL-2020-00009, attached hereto as Exhibit 1, at 1 ("No one questions the capability of state courts.").

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 2

Supreme Court the same day, in *Mazars*, made sure not to include the issue of state court civil cases in its description of its Presidential immunity jurisprudence -- it plainly did so because the important constitutional issue has not yet been decided. (*See* Defendant's July 14, 2020 Letter to the Court ("DL") at 1-2 (quoting *Mazars*, 2020 WL 3848061, at *4).)

Third, plaintiff grossly mischaracterizes the Supreme Court Presidential immunity cases she cites. (PL at 1.) Rather than dismiss or downplay, as plaintiff does, the unique status of the President under the Constitution, every case cited by plaintiff reaffirms that status. In *United States v. Nixon*, while the Supreme Court rejected an "absolute privilege of confidentiality for all Presidential communications," it adopted a "presumptive privilege for Presidential communications." 418 U.S. 683, 703, 708 (1974). In *Clinton v. Jones*, while the Supreme Court allowed civil damages suits against a President in federal courts, it specifically left unresolved not only the issue at stake here, but also whether any court -- state or federal -- "may compel the attendance of the President at a specific time or place," 520 U.S. at 690-91, and reaffirmed that courts may not "proceed against the President as against an ordinary individual." *Id.* at 704 n.39 (citation omitted).[2]

And, in *Mazars*, the Supreme Court in fact granted the President's appeal and -- after having earlier stayed the proceedings, *see Mazars*, 2020 WL 3848061, at *6 --- vacated the decisions below upholding the Congressional subpoenas, *id.* at *12. The Court agreed with the President that, because of the "President's unique constitutional position," Congressional subpoenas to the President "implicate special concerns" not applicable to other citizens -- regardless of whether the information sought is "personal or official." *Id.* at *11-12. Thus, contrary to plaintiff's assertion, *Mazars* did not reject the President's "argument that his private papers should . . . be treated the same as his official papers." (PL at 2.) In fact, the Supreme Court specifically pointed out that "a subpoena for personal papers may pose a heightened risk of . . . impermissible purposes," such as harassment. *Mazars*, 2020 WL 3848061, at *11.

Although the Supreme Court in *Mazars* did find, with respect to the Congressional subpoenas at issue, that "a categorical approach" to assessing the "distinctions between [among other things] official and personal information," was inappropriate, it did so because such an approach "would represent a significant departure from the longstanding way of doing business between the branches.'" *Mazars*, 2020 WL 3848061, at *9. However, there is no "longstanding way of doing business" between state courts and the President. Rather, as shown (DL at 2),

---

[2]     *See also Mazars*, 2020 WL 3848061, at *11 ("The President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation."); *Vance*, 2020 WL 3848062, at *7 (the "President 'occupies a unique position in the constitutional scheme'" and "Article II guarantees the independence of the Executive Branch" (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982))); *Clinton v. Jones*, 520 U.S. at 697-98 (the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties"); *Nixon v. Fitzgerald*, 457 U.S. at 749 ("immunity [is] a functionally mandated incident of the President's unique office"); *United States v. Nixon*, 418 U.S. at 710, 715 ("courts have traditionally shown the utmost deference to Presidential responsibilities" and the President has a "singularly unique role under Art. II").

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 3

while Congress, like the federal judiciary, is a coequal branch of government and may therefore exercise "*partial agency* in, or [] *controul* over," the Executive Branch, *Clinton v. Jones*, 520 U.S. at 702-03 (emphasis in original) (citation omitted), state courts, as *Vance* confirmed, are not coequal branches and may not do so. *See Vance*, 2020 WL 3848062, at *8.

Finally, no one is seeking to "escape accountability" here (PL at 2). Plaintiff is free to pursue this action when the President is no longer in office. Plaintiff's repetition of the assertion that a postponement of proceedings would place the President "above the law" (*id.* at 1) does not make it so, and has been squarely rejected by the Supreme Court (DL at 4).[3]

\*　　\*　　\*

The bottom line is that the issue of temporary Presidential immunity has not yet been decided by the Court of Appeals in *Zervos* -- which itself is stayed pending that decision -- or by the U.S. Supreme Court. Under these circumstances, there is every reason to stay this case, which raises the identical issue, as well.

Respectfully submitted,

Marc E. Kasowitz

cc:　Counsel of Record

---

[3]　That the Supremacy Clause mandates that civil cases in state court be postponed, does not make the President "above the law" any more than, say, the automatic stay granted bankruptcy debtors places them "above the law."

# EXHIBIT R



**U.S. Department of Justice**

Civil Division

---

*Torts Branch, Federal Tort Claims Office*
*P.O. Box 888*
*Washington, DC 20044*
JGT:JGTouhey/DJ# 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

*Telephone (202) 616-4400*
*Facsimile (202) 616-5200*

July 11, 2023

**By ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

     RE: *Carroll v. Trump*, No. 1:20-cv-7311-LAK

Dear Judge Kaplan:

     Attached please find a letter to the parties conveying the Department of Justice's determination not to certify under the Westfall Act.

                    Sincerely,

                    BRIAN M. BOYNTON
                    Principal Deputy Assistant Attorney General

          By:

                    JAMES G. TOUHEY, JR.
                    Director, Torts Branch

cc: Counsel of Record (by ECF)

Attachment



**U.S. Department of Justice**
Civil Division

_Office of the Assistant Attorney General_          _Washington, DC 20044_

July 11, 2023

Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
ahabba@habbalaw.com
mmadaio@habbalaw.com

Roberta Kaplan, Esq.
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
rkaplan@kaplanhecker.com

  Re: _Carroll v. Trump_, No. 20-cv-07311 (S.D.N.Y.)

Dear Counsel:

  I write to inform you that, in light of the D.C. Court of Appeals' clarification of the standard for _respondeat superior_ liability under D.C. law, _see Trump v. Carroll_, 292 A.3d 220 (D.C. 2023), as well as new factual developments, the Department of Justice is declining to certify under the Westfall Act, 28 U.S.C. § 2679(d), that defendant Donald J. Trump was acting within the scope of his office and employment as President of the United States when he made the statements that form the basis of the defamation claims in plaintiff's Amended Complaint in this action.

**The D.C. Court of Appeals Decision**

  Under the Westfall Act, federal employees are entitled to absolute immunity from personal tort liability for conduct occurring within the scope of their employment. _See_ 28 U.S.C. § 2679. State tort law governs the scope-of-employment inquiry under the Act. Here, the parties agree that D.C. _respondeat superior_ law governs. _Carroll v. Trump_, 49 F.4th 759, 766 & n.6 (2d Cir. 2022). The District of Columbia "generally adheres" to the Restatement (Second) of Agency's formulation of the _respondeat superior_ standard, as set forth in § 228. _See Carroll_, 292 A.3d at 225; _Moseley v. Second New St. Paul Baptist Church_, 534 A.2d 346, 348 n.4 (D.C. 1987).

The D.C. Court of Appeals clarified the meaning of this standard in response to the Second Circuit's certification in this case. The Court explained that the question under § 228(1)(c)—whether the conduct "is actuated, at least in part, by a purpose to serve" the employer—contains distinct components, two of which are relevant here: the "purpose" element and the "quantum" element. *Carroll*, 292 A.3d at 233-34.

The purpose element "is an inquiry into the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer." *Id.* at 234. This element focusses on the *subjective* state of mind of the employee, notwithstanding prior D.C. Court of Appeals decisions suggesting that the inquiry was an objective one. *E.g.*, *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986). The Court explained that any history between the employee and the victim may also be relevant to this determination of subjective intent: "Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance." *Carroll*, 292 A.3d at 235.

The quantum element requires that the employee be motivated "at least in part" by a purpose to serve the employer. The requirement "does not foreclose that an employee could be concurrently motivated by a personal purpose," nor that such personal purpose could be the employee's predominant motivation. *Id.* at 235-36. But "if the employee's conduct is 'too little actuated' by [a public] purpose, then the employee's conduct would be outside the scope of employment." *Id.* at 236. The Court declined to "parse out an exact threshold" at which an employee is "actuated at least in part" by a purpose to serve their employer but "too little actuated" by that purpose for their conduct to fall within the scope of employment, instead "entrust[ing] this question to the factfinder." *Id.* at 237. The Court explained: "In other words, the factfinder must determine that an employee's partial purpose to serve their employer was more than an insignificant interest. It is a balancing and weighing of the evidence, both direct and circumstantial, to determine whether the quantum of purpose is more than insignificant." *Id.*

Finally, with respect to the D.C. Circuit's decision in *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), the Court of Appeals made two observations: First, it noted that *Ballenger* did not adopt a categorical rule holding that "the conduct of elected officials speaking to the press is always within the scope of that official's employment," and the Court declined to itself adopt such a categorical rule. *Carroll*, 292 A.3d at 239-240 ("We have never adopted a rule that has determined that a certain type of conduct is per se within (or outside of) the scope of employment, and we decline to do so now."). Second, it noted that the *Ballenger* court's holding "rested on undisputed, affirmative evidence in the record that [Ballenger's] purpose behind making the allegedly defamatory statements was to serve his constituents and otherwise carry out his legislative responsibilities," *id.* at 239, and suggested that in this respect, the record before the *Ballenger* court was distinct from the record in this case, "which is disputed by the parties." *Id.* at 239 n.23.

## Analysis

Applying the clarified D.C. *respondeat superior* standard, the Department has determined that it lacks adequate evidence to conclude that the former President was sufficiently actuated by a purpose to serve the United States Government to support a determination that he was acting within the scope of his employment when he denied sexually assaulting Ms. Carroll and made the other statements regarding Ms. Carroll that she has challenged in this action.[1]  The evidence of Mr. Trump's state of mind, some of which has come to light only after the Department last made a certification decision, does not establish that he made the statements at issue with a "more than insignificant" purpose to serve the United States Government.  *Id.* at 237.

No direct evidence of the former President's state of mind in making these statements is available.  As the D.C. Court of Appeals noted, this case stands in contrast to *Ballenger*, in which the Congressman offered "undisputed, affirmative evidence," *id.* at 239, by way of his affidavit, on which the district court relied in finding that he was acting, at least in part, "for the purpose of preserving his effectiveness as a congressman."  *Ballenger*, 444 F.3d at 663 (quotation marks and citation omitted).

Moreover, the circumstantial evidence of Mr. Trump's *subjective* intent in making the allegedly defamatory statements does not support a determination in this case that he was sufficiently motivated by a desire to serve the United States Government.  There is some evidence that could, in some circumstances, support a certification.  The former President was responding to allegations that could have called into question his fitness to hold the office of the Presidency.  In addition, the statements at issue were drafted or made at the White House, in response to inquiries made to or at the White House, through official channels that Presidents often use to communicate with the media: a statement issued by the press office to a daily press pool, a press "gaggle" on the White House lawn, and an interview in the Oval Office.  *See, e.g.*, *Does 1-10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) ("Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and, as in the present case, through social media postings.").

The D.C. Court of Appeals, however, has now made clear that D.C. law does not hold that *any* statement, whatever its actual purpose, is by definition made for official purposes simply because it is made using official channels of communication.  *See Carroll*, 292 A.3d at 232 ("The employment must have created more than the mere opportunity to commit the tort; there must still be some relationship or nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy.").  Additionally, the Court of Appeals' clarification that *Ballenger* did not establish a "categorical" rule "that would hold that the conduct of elected officials speaking to the press is always within the scope of that official's employment," *id.* at 239, confirms that the context in which the former President made these statements does not end our inquiry even if it would, on its own, give rise to an inference that he was acting for an official purpose.

---

[1] In her Amended Complaint, Ms. Carroll no longer challenges Mr. Trump's denial of having raped her.

Instead, the Department must also consider whether the allegedly tortious action arose out of a work-related incident. *See id.* at 232 (explaining that "the District of Columbia case precedents have focused on whether the conduct was an 'outgrowth of a job-related controversy,'" which has been "framed as an inquiry into whether the conduct was the 'outgrowth of the employees' instructions or job assignments'" (citation omitted)).[2] The D.C. Court of Appeals explained that this inquiry may be informed by whether the alleged tortfeasor and the victim had a prior history that would suggest that the alleged tortfeasor was personally motivated. *See id.* at 234 ("Likewise, we have viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim."). Here, although the statements themselves were made in a work context, the allegations that prompted the statements related to a purely personal incident: an alleged sexual assault that occurred decades prior to Mr. Trump's Presidency. That sexual assault was obviously not job-related. As a general matter, an elected official's ability to retain the trust of his constituents—including by addressing their concerns and informing them of his views on issues that they care about, or by discussing personal matters that may pertain to the public's confidence in him—is an important part of his ability to effectively perform his job. But that background principle cannot overcome countervailing evidence that an official who made defamatory statements was insufficiently actuated by a public purpose, to justify a finding that he was acting within the scope of his employment. *See, e.g.*, *Lyons v. Brown*, 158 F.3d 605, 610 (1st Cir. 1998) (noting that "whatever justification [the defendant] might have for his actions could be overcome if his actual purpose was to retaliate"). The evidence of personal motivation that has been developed in this case outweighs any public-purpose inference one might draw in other circumstances.

*First*, Mr. Trump's statements regarding Ms. Carroll continued after the former President left office, as indicated by new allegations in the Amended Complaint. *See Carroll v. Trump*, No. 20-cv-07311, Dkt. No. 157, Ex. A (Amended Complaint), ¶ 152 (October 12, 2022 Truth Social post that the *Carroll II* jury found defamatory); ¶ 165 ("Mere minutes after the verdict [in *Carroll II*] became public, Trump repeated the defamatory lie that he had no idea who Carroll was" on his Truth Social account); *id.* ¶ 166-67 (two additional Truth Social posts the night after the jury verdict, calling Ms. Carroll's allegations a "Hoax" and suggesting that the accusations and subsequent trial were part of a political conspiracy); *id.* ¶ 168 (stating, during a CNN town hall on May 10, 2023, "I never saw this woman"; labelling Ms. Carroll's accusations a "fake story"; and calling her "a whack job"). The later statements are substantially similar to the three June 2019 statements at issue in this action, and because he was no longer the President when he made the later statements, Mr. Trump could not have been motivated by any interest in serving the United States Government. These post-Presidency statements, which were not before the Department during the original scope certification in this case, tend to undermine the claim that the former President made very similar statements at issue in *Carroll I* out of a desire to

---

[2] Although this language comes from the Court of Appeals' discussion of the first prong of its *respondeat superior* test—whether the allegedly tortious conduct was "of the kind" the person is employed to perform, *see Carroll*, 292 A.3d at 232—the Court also considered it relevant for purposes of determining the defendant's subjective state of mind under the third prong. *See id.* at 235 ("[I]nquiries into whether the tort was the outgrowth of a job-related controversy allow the factfinder to make inferences about whether the employee was in fact responding to an employment-related circumstance, despite the tortious conduct appearing as if it were personally motivated.").

serve the Government.

    *Second*, the prior history between Ms. Carroll and Mr. Trump supports a determination that the former President's statements were not sufficiently motivated by a purpose to serve the Government.  As noted above, the D.C. Court of Appeals "ha[s] viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim." *Carroll*, 292 A.3d at 234; *id.* at 235 ("Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance.").  And a jury has now found that Mr. Trump sexually assaulted Ms. Carroll long before he became President.  That history supports an inference that Mr. Trump was motivated by a "personal grievance" stemming from events that occurred many years prior to Mr. Trump's presidency. *Id.* at 235.[3]

    *Third*, certain aspects of the content of the statements at issue and subsequent statements by Mr. Trump go far beyond merely denying Ms. Carroll's accusation. *See, e.g.*, Amended Compl. ¶ 83 ("Shame on those who make up false stories of assault to try to get publicity for themselves or sell a book or carry out a political agenda."); *id.* ("It is a disgrace, and people should pay dearly for such false accusations."); *id.* ¶ 92 ("This is a woman who has also accused other men of things . . . she's made this charge against others. . . I was one of the many men that she wrote about."); *id.* ("I have no idea who she is, none whatsoever."); *id.* ("[T]here were numerous cases where women were paid money to say bad things about me . . . those women did wrong things . . . here's a case, it's an absolute disgrace that she's allowed to do that."); *id.* ¶ 98 & n. 10; Jordan Fabian & Saagar Enjeti, *Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type,"* The Hill (June 24, 2019), at 11 ("[S]he made this charge up.  And by the way, she's made it up about, or she's said it about other people too."); *id.* ("I'll say it with great respect, number one, she's not my type.").  In his deposition, Mr. Trump indicated that he "wanted people to know" that "she's . . . a very deranged, sick person[.]"  Deposition of Donald J. Trump, *Carroll v. Trump*, No. 20-cv-07311 (S.D.N.Y. Oct. 19, 2022), at 216:3-8.  The "tone of [the relevant statements] strongly suggests that [defendant's] motivation . . . did not spring from a desire to serve . . . the United States." *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 95 (D.D.C. 2011).

    The Department must "take a holistic approach to discerning an employee's purpose in engaging in the tortious conduct, considering any inferences from the circumstances of the relationship between the parties and the conduct," as is "appropriate under the facts presented," *Carroll*, 292 A.3d at 235.  After "balancing and weighing [] the evidence," *id.* at 237, from Mr. Trump's deposition, the jury verdict in *Carroll II*, and the new allegations in the Amended

---

[3] The Westfall Act affords the Attorney General or his designee broad latitude to make factual determinations relevant to applying the scope-of-employment standard. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429 (1995); *cf. Osborn v. Haley*, 549 U.S. 225, 247 (2007).  For this reason, the Department is not bound by the jury's findings.  At the same time, in this case, there does not appear to be a basis to disregard the jury's conclusions, which were made after weighing the relevant evidence presented by both parties in that case.

Complaint, the Department has determined that there is no longer a sufficient basis to conclude that the former President was motivated by "more than an insignificant" desire to serve the United States Government, *id.* Accordingly, the Department hereby declines to issue a new Westfall Act certification.

Sincerely,

Brian M. Boynton
Principal Deputy Assistant Attorney General

# EXHIBIT S

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

Docket Number(s): 23-1045; 23-1146 _____          _____ Caption [use short title] _____

Motion for: Stay Pending Appeal _____

_____

_____

Set forth below precise, complete statement of relief sought:

Defendant-Appellant respectfully requests a stay of the            **E. Jean Carroll v. Donald J. Trump**

underlying proceeding pending resolution of the consolidated

appeals, and, in particular, the viability of his presidential

immunity defense.

_____

_____

MOVING PARTY: Donald J. Trump _____     OPPOSING PARTY: E. Jean Carroll _____

☐ Plaintiff            ☑ Defendant

☐ Appellant/Petitioner     ☐ Appellee/Respondent

MOVING ATTORNEY: Michael T. Madaio _____     OPPOSING ATTORNEY: Roberta Kaplan _____

[name of attorney, with firm, address, phone number and e-mail]

Habba Madaio & Associates LLP                     Kaplan Hecker & Fink LLP

1430 US Highway 206, Ste. 240 Bedminster, New Jersey 07921   350 Fifth Avenue , 63rd Floor New York, New York 10118

T: (908) 869-1188; mmadaio@habbalaw.com            T: (212) 763.0883;  rkaplan@kaplanhecker.com

Court- Judge/ Agency appealed from: Hon. Lewis A. Kaplan _____

**Please check appropriate boxes:**                **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):   Has this request for relief been made below?     ☑ Yes ☐ No
☑ Yes ☐ No (explain):_____           Has this relief been previously sought in this court?  ☐ Yes ☑ No
_____                          Requested return date and explanation of emergency:
                                 Given that trial in this matter is scheduled for January 15, 2024, Appellant's immunity defense
Opposing counsel's position on motion:                 will be rendered moot and forever lost if he is forced to stand trial before this issue is resolved.
☐ Unopposed ☑ Opposed ☐ Don't Know            Accordingly, Appellant respectfully requests a return date of September 22, 2023, or as
Does opposing counsel intend to file a response:           soon as practicable.
☑ Yes ☐ No ☐ Don't Know

Is oral argument on motion requested?   ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No If yes, enter date:_____

**Signature of Moving Attorney:**

/s/ Michael T. Madaio _____ Date: 8/24/2024 _____  Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

# 23-1045
# 23-1146

## United States Court of Appeals
## For the Second Circuit

E. JEAN CARROLL,

*Plaintiff/Appellee,*

-against-

DONALD J. TRUMP,

*Defendant/Appellant.*

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT-APPELLANT'S
EMERGENCY MOTION FOR A STAY PENDING APPEAL**

MICHAEL T MADAIO, ESQ.
HABBA MADAIO & ASSOCIATES, LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York. New York 10120
mmadaio@habbalaw.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION AND SUMMARY ...................................................1

STATEMENT OF FACTS ...................................................................2

JURISDICTION...................................................................................4

LEGAL ARGUMENT.........................................................................5

   I.   The District Court Has Been Divested of Jurisdiction Pending Appeal .........5

   II.  The Stay Factors Weigh Heavily in Favor of Granting Defendant-Appellant Relief............................................................................................7

     A. Defendant-Appellant Has Shown Sufficient Probability of Success on the Merits ..........................................................................................7

        a. Standard for Probability of Success.........................................7

        b. Defendant-Appellant Has Shown Sufficient Probability of Success on the Issue of Waiver ..............................................................8

        c. Defendant-Appellant Has Shown Sufficient Probability of Success on the Issue of Leave to Amend ........................................................12

        d. Defendant-Appellant Has Shown Sufficient Probability Of Success On The Issue Of Timely Raising Presidential Immunity In His Answer To Plaintiff-Appellee's Amended Complaint ....................................................15

     B. Defendant-Appellant Will Suffer Irreparable Harm if No Stay is Granted.. 17

     C. Plaintiff-Appellee Will Not Suffer Harm from a Stay Pending Appeal...19

     D. The Public Interest Favors a Stay ...........................................21

CONCLUSION...................................................................................23

CERTIFICATE OF WORD COUNT……………………………………………..24

i

# TABLE OF AUTHORITIES

**Cases**

*Baker v. Carr,*
    69 U.S. 186 (1962)....................................................................10

*Barr v. Matteo,*
    360 U.S. 564 (1959)..................................................................13

*Behrens v. Pelletier,*
    516 U.S. 299 (1996)..................................................................17

*Blue Ridge v. Republic of Argentina,*
    735 F.3d 72 (2d Cir. 2013) ..........................................................3

*Carroll v Trump,*
    49 F.4th 759 (2d Cir. 2022) ...................................................7, 21

*CDX Diagnostics v. U.S. Endoscopy Group,*
    13-CV-05669 NSR, 2014 WL 2854656 (S.D.N.Y. June 20, 2014)..............19

*Citigroup Glob. Markets v. VCG.,*
    598 F.3d 30 (2d Cir. 2010) ........................................................6, 7

*Clapper v. Amnesty Int'l,*
    568 U.S. 398 (2013)....................................................................9

*Clinton v. Jones,*
    520 U.S. 681 (1997)..................................................................8, 9

*Cohen v. Beneficial Indus.,*
    337 U.S. 541 (1949)....................................................................3

*Deutsch v. Health Ins. Plan,*
    73 F. Supp. 1443 (S.D.N.Y. 1983) ...............................................15

ii

*District of Columbia v. Jones,*
    919 A.2d 604 (D.C. Cir. 2007) ....................................................................16

*EM Ltd. v Banco Cent. De La Republica,*
    800 F.3d 78 (2d Cir. 2015) ...........................................................................3

*Foman v. Davis,*
    371 U.S. 178 (1962)......................................................................................11

*Goodman v Samsung Elecs. Am.,*
    17-CV-5539 (JGK), 2017 WL 5636286 (S.D.N.Y. Nov. 22, 2017) ............19

*Goshtasby v. Bd. of Trs.,*
    123 F.3d 427 (7th Cir. 1997) .......................................................................17

*Griggs v. Provident Consumer Discount,*
    459 U.S. 56 (1982).........................................................................................4

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)...................................................................................5, 8

*In re Country Squire Assoc. of Carle Place,*
    203 B.R. 182 (2d Cir. 1996) ........................................................................17

*In re World Trade Ctr. Disaster Site Litig.,*
    503 F.3d 167 (2d Cir. 2007) ....................................................6, 18, 20, 21

*Ins. Corp. of Ireland v. Cie. des Bauxites,*
    456 U.S. 694 (1982)......................................................................................10

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
    478 U.S. 221 (1986)......................................................................................10

*Lujan v. Defenders of Wildlife,*
    504 U.S. 566 (1992)......................................................................................10

*McFadden v. Monroe Cty. Sheriff,*
    No. 00-cv-6034, 2002 WL 1348508 (W.D.N.Y. Apr. 16, 2002) .................15

*Mitchell v. Forsyth,*
>472 U.S. 511 (1985)..............................................................................1, 16, 18

*Mohammed v. Reno,*
>309 F.3d 95, 101 (2d Cir. 2002) ....................................................................6

*Molo Design v. Chanel,*
>21-CV-01578-VEC, 2022 WL 2135628 (S.D.N.Y. May 2, 2022) ..............19

*MyWebGrocer v. Hometown Info,*
>375 F.3d 1902 (2d Cir. 2004) .........................................................................6

*Nixon v. Fitzgerald,*
>457 U.S. 731(1982)...................................................................3, 7, 8, 12, 21

*Rinaldi v. City of New York,*
>756 F.Supp. 111 (S.D.N.Y. 1990) ...............................................................12

*Shields v. Citytrust Bancorp,*
>25 F.3d 1124 (2d Cir. 1994) ...................................................................15, 16

*Siegert v. Gilley,*
>500 U.S. 226 (1991)......................................................................................16

*Sorano v. Taggart,*
>642 F. Supp.2d 45 (S.D.N.Y. 2009) .............................................................12

*Stephenson v. Doe,*
>332 F.3d 68 (2d Cir. 2003) ...........................................................................12

*United States v. Rodgers,*
>101 F.3d 247 (2d Cir. 1996) ...........................................................................5

*Williams v. Brooks,*
>996 F.2d 728 (5th Cir.1993) ......................................................................5, 17

iv

*Rules and Statutes*

28 U.S.C. § 2679(d)(2)..............................................................................1

FRAP 8(a)(2)......................................................................................3, 4

FRCP 12(h)(3) ....................................................................................10

Rule 15(a) ..........................................................................................11

## INTRODUCTION AND SUMMARY

Defendant-Appellant, Donald J. Trump ("Defendant-Appellant"), seeks an emergent stay pending appeal of the underlying action brought by Plaintiff-Appellee E. Jean Carroll ("Plaintiff-Appellee").

The questions at issue are whether presidential immunity can be waived at all, and if so whether it was waived here; whether Defendant-Appellant should have been granted leave to amend his Answer to raise such immunity; and, finally, whether Defendant-Appellant properly raised the immunity in an Answer responding to Plaintiff-Appellee's Amended Complaint.

The instant appeal is meritorious because presidential immunity is an "essential Presidential prerogative" that is firmly "rooted in the constitutional tradition of the separation of powers." *See Nixon v. Fitzgerald*, 457 U.S. 731, 743 (1982). As such, it is a matter of subject matter jurisdiction that is inherently non-waivable. *See* FRCP 12(h)(3). Even assuming that it is waivable, the District Court erred in denying Defendant-Appellant's request to amend his Answer to assert presidential immunity as a defense, particularly in light of the liberal standard to amend, the strength of Defendant-Appellant's argument, and the important policy considerations at play. Finally, even assuming *arguendo* that the defense is waivable, was waived, and leave to amend was properly denied, Defendant-Appellant should still have been permitted to plead the defense of in his Answer to Plaintiff-Appellee's

Amended Complaint, which "supersede[d] the original [complaint], and render[ed] it of no legal effect." *Shields v. Citytrust Bancorp*, 25 F.3d 1125, 1128 (2d Cir. 1994).

Finally, presidential immunity is an "immunity from suit rather than a mere defense to liability" which is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Given that the underlying action is currently scheduled to proceed to trial on January 15, 2024, it is a foregone conclusion that, absent a stay, Defendant-Appellant would be required to proceed to trial without a final resolution of his presidential immunity defense, which has been properly asserted on multiple grounds. Therefore, a stay of proceedings is necessary to resolve the critical and dispositive issues raised in the instant appeal.

## STATEMENT OF FACTS

In June of 2019, Plaintiff-Appellee made public accusations against Defendant-Appellant, then-sitting President of the United States, claiming that he had raped her at some point in the mid-1990s. *See* Declaration of Michael T. Madaio, Exhibit A.[1] In response, Defendant-Appellant publicly refuted said allegations.

On November 4, 2019, Plaintiff-Appellee commenced an action in New York state court, entitled *Carroll v. Trump*, Index No. 160694/2019, asserting a single defamation claim against Defendant-Appellant. *Id.*

---

[1] All Exhibit references herein refer to the Exhibits attached to the Declaration of Michael T. Madaio.

The United States subsequently certified that Defendant-Appellant's conduct was within the scope of his presidential duties under the Westfall Act. *See* Ex. C. On this basis, the action was removed to the Southern District pursuant to 28 U.S.C. § 2679(d)(2).

This certification issue was the subject of a multi-year appeal before this Court that was ultimately remanded back to the District Court. *See* Ex. D. The issue ultimately became moot for reasons that are not relevant to the instant appeal.

On December 22, 2022, Defendant-Appellant moved for summary judgment dismissing this action on the basis of presidential immunity or, in the alternative and to the extent the District Court held such defense had been previously waived, for leave to amend his Answer to raise the defense. *See* Exs. E, F. The District Court denied the motion on July 5, 2023, and Defendant-Appellant appealed on July 19, 2023. *See* Exs. G, H.

Plaintiff-Appellee subsequently moved to amend her Complaint, Ex. I, which the District Court granted on June 13, 2023. *See* Ex. J. Defendant-Appellant timely filed his Answer to the Amended Complaint on June 27, 2023 and raised the defense of presidential immunity. *See* Ex. K. The District Court struck that defense on August 7, 2023. Ex. L. Thereafter, Defendant-Appellant filed the instant appeal which has since been consolidated with the previous appeal. *See* Exs. M, P.

On July 27, 2023, Defendant-Appellant moved before the District Court for a stay of proceedings pending resolution of this appeal. On August 18, 2023, the District Court denied Defendant-Appellant's motion. *See* Ex. N.

That same day, Defendant-Appellant's counsel emailed Plaintiff-Appellee's counsel to inform them that Defendant-Appellant intended to move before this Court for an emergency stay of proceedings. *See* Ex. O.

## **JURISDICTION**

This Court has appellate jurisdiction (1) over the District Court's denial of presidential immunity and (2) to stay litigation pending that determination pursuant to FRAP 8(a)(2). It is not meaningfully in dispute that rejection of a presidential immunity is immediately appealable, as the District Court "assumed without now deciding." *See* Ex. P at n.22; *see also Nixon*, 457 U.S. at 731 (denial of presidential immunity is immediately appealable).

Indeed, this Court has routinely held that denials of immunity based on a theory of *waiver* are immediately appealable just as any other denial of such immunity. *See*, *e.g.*, *EM Ltd. v Banco Cent. De La Republica*, 800 F.3d 78, 82 (2d Cir. 2015) (holding denial of foreign sovereign immunity as waived was immediately appealable); *Blue Ridge v. Republic of Argentina*, 735 F.3d 72, 79-81 (2d Cir. 2013) (holding denial of foreign sovereign immunity as waived was immediately appealable).

Thus, upon accepting jurisdiction for the appeal, FRAP 8(a)(2) specifically allows this Court to issue a stay of the underlying litigation pending appellate resolution.

## LEGAL ARGUMENT

The underlying litigation should be stayed pending appeal because the District Court has been divested of jurisdiction—as the questions on appeal go to Defendant-Appellant's immunity from the suit in its entirety—and because the traditional factors to be considered for such stays weigh staying litigation regardless of whether the District Court retains jurisdiction.

## I. THE DISTRICT COURT HAS BEEN DIVESTED OF JURISDICTION PENDING APPEAL

The underlying litigation must be stayed on the basis that the District Court is currently divested of jurisdiction.

Interlocutory appeals divest trial courts of jurisdiction "over those aspects of the case involved in the appeal"; presidential immunity confers immunity from suit in its entirety; and therefore appeals involving immunity from suit pertain to—and divest jurisdiction from the District Court over—the entirety of the litigation. *See Griggs v. Provident Consumer Discount*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal…confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.").

Because this appeal involves immunity from the suit in its entirety, the appeal divests the District Court of jurisdiction from the entirety of the suit while the appeal remains pending. *See*, *e.g.*, *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) ("A district court does not regain jurisdiction until the issuance of the mandate by the clerk of the court of appeals."); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("Until this threshold immunity question is resolved, discovery should not be allowed." ); *Williams v. Brooks*, 996 F.2d 728, 729 (5th Cir.1993) (the "rule that…filing []a notice of appeal divests a district court of jurisdiction…applies with particular force in the immunity context.").

As noted in the District Court's August 18, 2023 Order, the District Court would only retain jurisdiction over the action if this appeal were frivolous. *See* Ex. P at n.22. As set forth in greater detail below, Defendant-Appellant's arguments on appeal have a substantial likelihood of success and, at the very least, are not frivolous. This appeal raises questions for which there are no binding cases on point and which have therefore ***never been settled***, and which delineate the limits of the constitutional separation of powers. Moreover, as set forth below, Defendant-Appellant has numerous compelling and meritorious arguments that will be advanced on appeal.

Thus, the District Court's finding that the instant appeal is frivolous simply does not withstand scrutiny and the District Court has been divested of jurisdiction to proceed forward with the underlying action.

## II. THE STAY FACTORS WEIGH HEAVILY IN FAVOR OF GRANTING DEFENDANT-APPELLANT RELIEF

Regardless of whether the District Court retains any jurisdiction pending appeal, the general factors to be considered in issuing a stay pending appeal nonetheless support a stay in this case.

"The four factors to be considered in issuing a stay pending appeal are well known: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *World Trade Ctr. Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir. 2007).

### A. Defendant-Appellant Has Shown Sufficient Probability of Success on the Merits

#### a. Standard For Probability Of Success

While these four factors are relatively settled, ultimately, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002); *see*, *e.g*., *MyWebGrocer v. Hometown Info*, 375 F.3d 190, 192 (2d Cir. 2004)

7

(requiring "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation."); *Citigroup Glob. Markets v. VCG*., 598 F.3d 30, 37 (2d Cir. 2010) (affirming the "serious questions" standard).

Here, it is beyond dispute that a serious question exists, considering this is a fundamental question as to the separation of powers and the President's authority ***that have never been settled***, and this Court's previous acknowledgement that the related question of Westfall Act immunity presented "a question of extreme public importance" because "the question touches upon the duties of the President of the United States, and the personal tort liability he and his successors may (or may not) face under the Westfall Act." *Carroll v Trump*, 49 F.4th 759, 780 (2d Cir. 2022).

Regardless, under any standard, it is clear that Defendant has advanced several independent arguments that each have a very significant likelihood of success on appeal. Thus, for the reasons set forth below, this factor weighs heavily in Defendant-Appellant's favor.

### b. Defendant-Appellant Has Shown Sufficient Probability Of Success On The Issue Of Waiver

First, Defendant-Appellant's non-waiver argument is grounded in Supreme Court precedent which stands for the proposition that presidential immunity is an "essential Presidential prerogative" that is firmly "rooted in the constitutional tradition of the separation of powers," *Nixon v*, 457 U.S. at 743. As such, it is a

"functionally mandated incident of the President's unique office" which, when applicable, inherently precludes the judiciary from exercising jurisdiction over the head of the Executive Department for acts taken within the scope of his official duties. *Id.* at 743.

Indeed, the Supreme Court has recognized that presidential immunity stands apart from other forms of absolute immunity because it is "derive[d] in principal part from factors unique to [the President's] constitutional responsibilities and station," *Harlow*, 457 U.S. at 800, n.17, which is necessarily infringed upon when a President's official acts are subject to civil liability because this type of overreach by the judiciary "curtail[s] the scope of the official powers of the Executive Branch." *Clinton v. Jones*, 520 U.S. 681, 682 (1997); *see also Nixon*, 457 U.S. at 754 ("[t]he executive power is vested in [the] President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power.").

Consequently, presidential immunity, unlike "[s]uits against other officials [which]…generally do not invoke separation-of-powers considerations," *Harlow*, 457 U.S. at n. 17 (1982), implicates grave separation of powers concerns. The *Nixon* Court expressly noted that a court is divested of jurisdiction in cases where presidential immunity applies, as the separation of powers doctrine flatly prohibits a court from imposing civil liability upon a President for his official acts:

[O]ur cases [] have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance…or to vindicate the public interest in an ongoing criminal prosecution…the exercise of jurisdiction has been held warranted. ***In the case of [a] merely private suit for damages based on a President's official acts, we hold it is not.***

*Id.* at 754, 2703 (citations omitted) (emphasis added).

The interplay between presidential immunity and the separation of powers doctrine was further confirmed in *Clinton v. Jones*, when the Supreme Court clarified that the "dominant concern" in *Nixon* was that a President's "decisionmaking process" may be distorted due to "needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U.S. at 694. While the *Clinton* court concluded that President Clinton was not entitled to presidential immunity, the Court's decision found that the conduct at issue took place *before* President Clinton was in office; therefore, the Court reasoned, "[w]hatever the outcome of this case, there is *no possibility* that the decision will *curtail the scope of the official powers of the Executive Branch.*" *Clinton*, 520 U.S. at 682 (emphasis added).

The Supreme Court's holdings in *Nixon* and *Clinton* are consistent with the fundamental principle that the separation of powers doctrine is inherently tied to the question of Article III standing. *See*, *e.g.*, *Clapper v. Amnesty Int'l*, 568 U.S. 398,

408 (2013*) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."). Article III standing, in turn, implicates a court's subject matter jurisdiction, *see*, *e.g.*, *Ins. Corp. of Ireland v. Cie. des Bauxites*, 456 U.S. 694, 702 (1982) ("Subject-matter jurisdiction…is an Art. III…requirement."), which, critically, cannot be waived, *see* FRCP 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Further support for the proposition that presidential immunity is a non-waivable matter of subject matter jurisdiction is found in the well-established principle that "controversies which revolve around policy choices and value determinations constitutionally committed…[to] the confines of the Executive Branch" are "exclude[d] from judicial review." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986); *see also Baker v. Carr*, 369 U.S. 186, 210 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers."); *Lujan v. Defenders of Wildlife*, 504 U.S. 566, 577 (1992) (finding that the separation of powers doctrine is violated, and Article III standing is lacking, when the judiciary "'assume[s] a position of authority over the governmental acts of another and co-equal department' and [] become[]s 'virtually continuing monitors of the wisdom and soundness of Executive action.'") (citation omitted).

Based on the foregoing, it is readily apparent that presidential immunity is a non-waivable matter of subject matter jurisdiction. As such, the District Court erred in finding that Defendant-Appellant had waived this defense.

### c. Defendant-Appellant Has Shown Sufficient Probability Of Success On The Issue Of Leave To Amend

Assuming *arguendo* that presidential immunity is waivable, Defendant-Appellant should have been granted leave to amend his Answer to raise it as a defense.

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." FRCP 15(a). "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman v. Davis*, 371 U.S. 178, 181–82 (1962).

The District Court denied Defendant-Appellant leave to amend his Answer to raise presidential immunity based on his purported delay in raising that defense and the apparent futility of the argument. *See* Ex. G at 20. Defendant-Appellant respectfully submits that it was an abuse of discretion to deny leave to amend on either ground.

First, the stage in which Defendant-Appellant first raised his presidential immunity argument—in a motion for summary judgment—is neither remarkable nor uncommon. Indeed, New York courts routinely permit immunity defenses to be

raised at this stage in litigation, even when not previously pleaded. *See*, *e.g.*, *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (Finding that qualified immunity defense was not waived when it was not plead in answer but was "asserted…in other pretrial submissions."); *Rinaldi v. City of New York*, 756 F.Supp. 111, 115 n. 3 (S.D.N.Y. 1990) ("Defendants who do not assert qualified immunity in their answer can still raise qualified immunity…at summary judgment."); *Sorano v. Taggart*, 642 F. Supp.2d 45, 55-56 (S.D.N.Y. 2009) (permitting defendant to raise qualified immunity defense for the first time in motion for summary judgment). Thus, Defendant-Appellant properly asserted his presidential immunity in his motion for summary judgment.

Defendant-Appellant has a similarly meritorious argument that the District Court abused its discretion in denying leave to amend on the basis that Defendant-Defendant-Appellant's presidential immunity would be futile.

A President is entitled to wide-ranging immunity for conduct that occurs within the "outer perimeter" of his official responsibilities. *Nixon*, 457 U.S. at 749. In determining whether presidential immunity applies, the relevant inquiry is whether the liability in a civil lawsuit is "predicated on [the President's] official acts." *Nixon,* 457 U.S. at 749. A President's "sphere of protected action" is interpreted broadly and extends to conduct within the "outer perimeter of his official responsibilities." *Id.* at 756.

13

In finding Defendant-Appellant's immunity argument to be futile, the District Court accepting Defendant-Appellant's contention that he was "addressing a matter of public concern because the accusation [had] 'impugned his character and, in turn, threatened his ability to effectively govern the nation,' as well as the proposition that "the president's speech on a matter of public concern comes within the president's official responsibilities." Ex. G at 23. This should have been the end of the District Court's inquiry, as it is well settled that, in determining whether presidential immunity applies, courts are obligated to look towards the *objective* nature of the act in question, not perform a subjective "inquiry into the President's motives" because "[i]nquiries of this kind could be highly intrusive." *Nixon*, 457 U.S. at 756; *see also Barr v. Matteo*, 360 U.S. 564, 575 (1959) ("[T]he claim of an unworthy purpose does not defeat the privilege [of absolute immunity].").

The District Court proceeded to perform precisely the type of "highly intrusive inquiry" that the Supreme Court has prohibited, finding: "[e]ven assuming that [Defendant-Appellant's] decision publicly to deny an accusation of personal wrongdoing comes within the outer perimeter of his official duties, it does not follow that [Defendant-Appellant's] *own personal attacks* on his [] accuser equally fall within that boundary." Ex. H at 25 (emphasis added). In construing Defendant-Appellant's statements as a "personal attack" against Plaintiff-Appellee, the District

14

Court failed to utilize the objective approach that is required for presidential immunity.

The District Court also found that presidential immunity would not apply to Defendant-Appellant's statement that Plaintiff-Appellee had "fabricated" her claims and that she "did so for financial and personal gain." *See* Ex. G at p. 25. Yet, in so finding, the District Court failed to recognize that this was only a minor portion of Defendant's statement, which largely focused on the larger denial of the heinous allegations levied by Plaintiff-Appellee. Further, the Court's holding is arbitrary inasmuch as it determined that a President may deny that he committed a rape and never met the alleged victim, but somehow crossed the threshold into unprotected behavior by stating the logical and reasonable inference that the false accusation must have been "fabricated."

Therefore, Defendant-Appellant has a significant likelihood of overturning the District Court's decision to deny his leave to amend his Answer to assert presidential immunity.

### d. Defendant-Appellant Has Shown Sufficient Probability Of Success On The Issue Of Timely Raising Presidential Immunity In His Answer To Plaintiff-Appellee's Amended Complaint

Finally, Defendant-Appellant properly and timely raised the defense of presidential immunity in his Answer to the Amended Complaint.

15

It is well settled that an amended complaint "supersedes the original, and renders it of no legal effect." *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1128 (2d Cir. 1994) (citations omitted). Importantly, this means that affirmative defenses that could have been—but were not—raised in an original answer may be raised in an answer to an amended complaint. *See McFadden v. Monroe Cty. Sheriff*, No. 00-cv-6034, 2002 WL 1348508, at *3 (W.D.N.Y. Apr. 16, 2002) (explaining that defendants' response to the amended complaint **"**was not an amended answer, but merely an answer**"** and so defendants were permitted to raise previously unpled affirmative defenses."); *Deutsch v. Health Ins. Plan*, 573 F. Supp. 1443, 1445 (S.D.N.Y. 1983) ("An amended complaint represents a plaintiff's second bite at the apple, and a defendant should be accorded the same privilege.").

In this context, the only "defenses and objections that are irrevocably waived by answering an original complaint are those that 'involve the core issue of a party's willingness to submit a dispute to judicial resolution,' such as objections to 'lack of personal jurisdiction, improper venue, insufficiency of process and insufficiency of service.'" *Deutsch*, 573 F.Supp. at 1445 (citing *Shields*, 25 F.3d at 1124).

Defendant-Appellant timely raised presidential immunity in his Answer to Plaintiff-Appellee's Amended Complaint. *See* Exs. K, N. The District Court, however, overlooked the above-reference standard for reviving previously-waived affirmative defenses, as established in *Shields* and its progeny, and merely stated, in

16

conclusory fashion, that "[t]he opportunity to answer an amended complaint is not a free pass to correct past wrongs without justification or basis for doing so." Ex. L at 22. Further, considering the District Court's prior decision that presidential immunity is not a jurisdictional issue, *see* Ex. G at 16, revival of this defense should have been permitted under the *Shields* standard.

Defendant-Appellant has therefore set forth a likelihood of success on the merits with respect to the important and novel arguments that will be determined on appeal, sufficient to justify a stay pending appeal and certainly sufficient to meet the standard of being non-frivolous necessary to divest the District Court of jurisdiction.

## B. Defendant-Appellant Will Suffer Irreparable Harm If No Stay Is Granted

The risk of irreparable harm is patent. Immunity provisions, whether absolute or qualified, serve to spare officials from unwarranted liability as well as "demands customarily imposed upon those defending a long drawn-out lawsuit," and are "effectively lost if a case is erroneously permitted to go to trial." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (citation omitted).

"The purpose of conferring absolute immunity is to protect officials not only from ultimate liability but also from all the time-consuming, distracting, and unpleasant aspects of a lawsuit[.]" *District of Columbia v. Jones*, 919 A.2d 604, 611 (D.C. Cir. 2007); *see also Mitchell*, 472 U.S. at 525 ("[T]he essence of absolute

immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action.").

Assertions of immunity provide protection "not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). This purpose is inherently and unavoidably frustrated by acknowledging a President's immunity only *after* he is forced to stand trial. Applying presidential immunity only after the conclusion of litigation irreparably and indisputably forfeits the President's constitutional right to not suffer through conducting litigation based on his actions as sitting President. *See In re Country Squire Assoc. of Carle Place*, 203 B.R. 182, 183 (2d Cir. 1996) (noting that it is the "quintessential form of prejudice" when "absent a stay pending appeal…the appeal will be rendered moot.").

In this context, irreparable harm results when a defendant is forced to proceed with a matter while the issue of immunity has yet to be resolved. *Goshtasby v. Bd. of Trs.*, 123 F.3d 427, 428 (7th Cir. 1997) ("[I]f the defendant is correct that it has immunity, its right to be free of litigation is compromised…if the district court proceeds while the appeal is pending."); *see also, Williams v. Brooks*, 996 F.2d 728, 730 n.2 (5th Cir. 1993) (immunity "'is effectively lost' if a case is erroneously permitted to proceed…while an interlocutory appeal of a denial of immunity is pending.") (citation omitted).

Therefore, since the issue of whether Defendant-Appellant is immune from suit has yet to be determined, Defendant-Appellant would be irreparably injured without the imposition of a stay of the underlying action.

### C. Plaintiff-Appellee Will Not Suffer Harm from a Stay Pending Appeal

Where harm to the plaintiff is a factor to be considered before staying an appeal, the very existence of the stay, without more, cannot constitute that harm or it would otherwise be a meaningless factor. While no delay is ideal, here Plaintiff-Appellee will suffer no more harm than any other litigant, and less than many.

Plaintiffs must show significant and particularized hardship to outweigh the irreparable harm defendants will suffer when litigation is not stayed pending review of their claim for immunity, and Plaintiff-Appellee has made no such unique showing. *See e.g.*, *World Trade Ctr.*, 503 F.3d at 170. In the case of *World Trade Ctr.,* regarding toxic fumes inhaled by workers at the "ground zero site" of the World Trade Center disaster, the court recognized that the defendants faced irreparable harm if litigation was not stayed pending appeal of their claim of immunity. *Id.* In order to overcome that irreparable harm, it took a showing that the many of the plaintiffs faced life-threatening injuries and that other plaintiffs had already died while litigation was pending. *Id.* at 171.

Here, there is no reason to fear that Plaintiff-Appellee would suffer any greater harm than any other plaintiff whose litigation is stayed should this Court grant a stay.

While the District Court relied on Plaintiff-Appellee's "advanced age" as a basis for such harm, it ignored that Plaintiff-Appellee's waited more than twenty years *after* the alleged events occurred to raise her public accusations (that Defendant-Appellant was certain to refute). *See* Ex. I at ¶¶ 25, 67. Absent this delay, Appellee could have been two decades younger during the underlying litigation, and her delay should not weigh against the public's interests in staying litigation.

Moreover, to the extent Plaintiff-Appellee may argue that she will be prejudiced due to any delay in litigation, any such argument is not, on its own, a valid reason to deny a stay. New York courts consistently recognize that "'mere delay in the litigation does not establish undue prejudice' for purposes of a motion to stay." *Goodman v Samsung Elecs. Am*, 17-CV-5539 (JGK), 2017 WL 5636286, at *3 (S.D.N.Y. Nov. 22, 2017); *see also Molo Design v. Chanel*, 21-CV-01578-VEC, 2022 WL 2135628, at *3 (S.D.N.Y. May 2, 2022) ("Mere delay does not constitute prejudice."); *CDX Diagnostics v. U.S. Endoscopy Group*, 13-CV-05669 NSR, 2014 WL 2854656, at *4 (S.D.N.Y. June 20, 2014) (same).

Thus, any inconvenience Plaintiff-Appellee may endure as a result of a stay is considerably outweighed by the interest in "vindicating the immunity of a[] defendant[] who might be entitled to immunity from suit." *World Trade Ctr.*, 503 F.3d 167, 170 (2d Cir. 2007). This is especially true where there are important and novel questions involving the limits of the separation of powers doctrine, the extent

of protection afforded under presidential immunity, and the degree of autonomy afforded to the head of the Executive Branch. These considerations clearly outweigh the minor prejudice, if any, that Plaintiff-Appellee claims she will suffer if a stay is imposed.

### D. The Public Interest Favors a Stay

As an initial matter, any question involving presidential immunity is fundamentally unique because the results are effectively certain to guide the manner in which future Presidents carry out their presidential duties. As set forth herein, if a President is forced to engage in litigation involving his official acts *before* the immunity issue is resolved, every sitting President will be vulnerable to being dragged into unnecessary litigation, thereby hindering their efforts to effectively lead the Nation. It is therefore ***particularly*** inappropriate for litigation to progress while the question of presidential immunity remains unsettled.

As previously recognized by this Court, when an appeal to determine whether immunity applies remains pending generally, "there is a public interest in vindicating the immunity of any of the Defendants who might be entitled to immunity from suit" by staying litigation until the question of that immunity has been resolved. *World Trade Ctr.,* 503 F.3d at 170.

With respect to the interests involved in instant matter, this Court has already acknowledged that the related question of Westfall Act immunity presented "a

21

question of extreme public importance" because "the question touches upon the duties of the President of the United States, and the personal tort liability he and his successors may (or may not) face under the Westfall Act." *Carroll*, 49 F.4th at 780.

Indeed, the Supreme Court has recognized that there "exists the greatest public interest in providing" the President with wide-spanning immunity in the performance of his official acts, and that deprivation of such immunity would be to the "detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Nixon*, 457 U.S. at 752. In particular, the Supreme Court reasoned:

> Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government…[A] President must concern himself with matters most likely to 'arouse the most intense feelings"…Yet, as our decisions have recognized, it is in precisely such cases that there exists the greatest public interest in providing an official "the maximum ability to deal fearlessly and impartially with" the duties of his office…This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system. Nor can the sheer prominence of the President's office be ignored. In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages. Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

*Id.* at 752-753 (citations omitted).

Simply put, it strains credulity to argue any minor inconvenience that Plaintiff-Appellee would endure during a stay is remotely tantamount to the public's

interest in obtaining final resolution as to the question of whether presidential immunity is underpinned by the separation of powers doctrine, so as to provide the President a non-waivable immunity from civil liability in the execution of his presidential duties.

Based on the foregoing, it is incontrovertible that there are immense public interests at play, and that a stay pending resolution of these vital questions weighs heavily in Defendant-Appellant's favor.

## **CONCLUSION**

For these reasons, Defendant-Appellant respectfully requests that this Court grant a stay of all proceedings in the underlying case pending appeal.

Dated:  August 24, 2023                    Respectfully submitted,
      New York, New York

       _/s/ Michael T. Madaio_____
      Michael T. Madaio, Esq.
      HABBA MADAIO & ASSOCIATES LLP
      1430 U.S. Highway 206, Suite 240
      Bedminster, New Jersey 07921
            -and-
      112 West 34th Street, 17th & 18th Floors
      New York, New York 10120
      Phone: (908) 869-1188
      Fax: (908) 450-1881
      Email: mmadaio@habbalaw.com
      *Attorneys for Defendant-Appellant,*
      *Donald J. Trump*

## <u>WORD COUNT CERTIFICATION</u>

I certify that this brief complies with the word limit requirements in Second Circuit Local Rule 27.1 and Federal Rule of Appellate Procedure 27(d)(2) because this brief contains 5,200 words.

/s/ Michael T. Madaio___
MICHAEL T. MADAIO

# 23-1045
# 23-1146

## United States Court of Appeals
## For the Second Circuit

E. JEAN CARROLL,

*Plaintiff/Appellee,*

-against-

DONALD J. TRUMP,

*Defendant/Appellant.*

**DECLARATION OF MICHAEL T. MADAIO, ESQ. IN SUPPORT OF DEFENDANT-APPELLANT'S EMERGENCY MOTION FOR A STAY PENDING APPEAL**

MICHAEL T MADAIO, ESQ.
HABBA MADAIO & ASSOCIATES, LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York. New York 10120
*mmadaio@habbalaw.com*

1

Case 22-cv-10016, Document 227-1, 08/22/2023, Page 2 of 4

# DECLARATION

I, Michael T. Madaio, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am counsel for the defendant-appellant, Donald J. Trump ("Defendant-Appellant"). I submit this declaration in support of Defendant-Appellant's emergency motion for a stay pending appeal.

2. The following documents are attached as exhibits to this declaration:

   A. **Exhibit A**: Plaintiff-Appellant's State Court Complaint;

   B. **Exhibit B**: District Court Docket;

   C. **Exhibit C**: Westfall Act Certification;

   D. **Exhibit D**: April 21, 2023 Order Remanding Westfall Act Appeal;

   E. **Exhibit E**: Defendant-Appellant's December 22, 2022 Motion for Summary Judgment;

   F. **Exhibit F.** Defendant-Appellant's January 19, 2023 Memorandum of Law in Further Support of Motion for Summary Judgment

   G. **Exhibit G**: July 5, 2023 Order Denying Summary Judgment;

   H. **Exhibit H**: Notice of Appeal of July 5, 2023 Order Denying Summary Judgment;

   I. **Exhibit I:** Plaintiff-Appellee's Amended Complaint;

   J. **Exhibit J:** June 13, 2023 Order Granting Plaintiff-Appellee Leave to Amend;

   K. **Exhibit K:** Defendant-Appellant's Answer to the Amended Complaint;

   L. **Exhibit L:** August 7, 2023 Order Striking Presidential Immunity Defense;

   M: **Exhibit M:** Notice of Instant Appeal;

   N: **Exhibit N:** August 18, 2023 Order Denying Stay Pending Litigation:

   O. **Exhibit O:** Email Correspondence to Counsel for Plaintiff-Appellee E. Jean Carroll ("Plaintiff-Appellee");

P: **Exhibit P:** Order Consolidating Appeals.

3.     On August 18, 2023, I contacted counsel for the plaintiff-appellee, E. Jean Carroll ("Plaintiff-Appellee") by e-mail, to advise that Defendant-Appellee would be filing an emergent motion for a stay and inquired as to whether they consented to or opposed the relief sought. Counsel advised that they intended to oppose Defendant-Appellant's request for a stay. *See* **Exhibit O**.

4.     In addition, I have also had communications with Plaintiff-Appellee's counsel regarding the briefing schedule for the instant motion, and the parties intend to jointly submit a proposed schedule to this Court with mutually agreeable filing deadlines.

5.     In accordance with Local Rule 27.1(d)(1), I contacted the Clerk of the Second Circuit on August 23, 2023, via telephone, to advise of the instant application. I was unable to reach the Clerk and left a voicemail notifying of the intent to file the instant motion.

6.     This request is urgent and time-sensitive, and emergent relief is necessary, due to the upcoming trial in the underlying action which is currently scheduled to commence on January 15, 2024. Since this appeal goes directly to Defendant-Appellant's immunity from suit altogether—a particular concern for prominent political figures such as Defendant-Appellant—a decision applying such immunity ***after*** Defendant-Appellant is forced to stand trial will render his presidential immunity defense moot. In such a scenario, the defense will be forever lost and Defendant-Appellant will be irreparably harmed.

7.     Defendant-Appellant respectfully submits that his right to the requested relief will be irreparably lost if this Court does not grant a stay.

8.     For the reasons explained in the attached Memorandum of Law, and pursuant to Local Rule 27.1(d)(4), Defendant-Appellant respectfully requests that the Court enter an

3

emergency stay pending appeal of all proceedings and deadlines before the District Court, as the case should not proceed without resolution as to the question of presidential immunity.

9.    Given the emergent nature of Defendant-Appellant's request for a stay, Defendant-Appellant requests a return date of September 22, 2023, or as soon as is otherwise practicable.

Dated: August 24, 2023

Respectfully submitted,

_s/ Michael T. Madaio_____
Michael T. Madaio, Esq.
Habba Madaio & Associates, LLP
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
   -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: mmadaio@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

# EXHIBIT T

Case 23-1045, Document 180-1, 09/13/2023, 3565667, Page156 of 205

# United States Court of Appeals
## FOR THE
## SECOND CIRCUIT

_____

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 13th day of September, two thousand twenty-three.

Present:
> Reena Raggi,
> Raymond J. Lohier, Jr.,
> Susan L. Carney,
> *Circuit Judges.*

_____

E. Jean Carroll,

> *Plaintiff-Counter-*
> *Defendant-Appellee*,

        v.                                                23-1045, 23-1146

Donald J. Trump, in his personal capacity,

> *Defendant-Counter-*
> *Claimant-Appellant.*

_____

Absent any objection from the parties, the appeals docketed under 23-1045 and 23-1146 will be consolidated seven days from the date of this order. Appellant moves for a stay pending appeal on both dockets. Appellee opposes.

The decision to grant a stay pending appeal is "an exercise of judicial discretion" requiring a balancing of four factors: (1) likely success on the merits, (2) irreparable harm, (3) the effect of a stay on the other parties, and (4) a determination of where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). Upon due consideration of these factors, the parties' submissions, and our own careful and independent review of the record, it is hereby ORDERED that Appellant's motions for a stay pending appeal are DENIED.

Although we do not grant a stay pending appeal, it would be in the interest of the parties, as confirmed during oral argument, for the Court to resolve the issue of absolute presidential immunity as presented in the two appeals expeditiously. Moreover, the parties' extensive briefing thus far makes clear that they have already substantially developed their arguments on the merits of that and related issues. Accordingly, it is further ORDERED that these appeals be expedited. Appellant's brief on the merits will be due 15 days after the entry of this order; Appellee's response brief, 15 days after the filing of Appellant's brief on the merits; and Appellant's reply brief, if any, 5 days after the filing of Appellee's response brief. The appeals will be assigned to the first available panel to hear the cases on the merits.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

# EXHIBIT U

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E. JEAN CARROLL, | |
| *Plaintiff*, | |
| v. | No. 20 Civ. 7311 (LAK) |
| DONALD J. TRUMP, *in his individual capacity*, | |
| *Defendant*. | |

## PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOR A NEW TRIAL OR REMITTITUR

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

APPLICABLE STANDARD.............................................................................................. 2

ARGUMENT ...................................................................................................................... 2

I.   A NEW TRIAL IS NOT WARRANTED ................................................................... 2

    A.  The Court Properly Instructed the Jury on Punitive Damages ........................... 2

    B.  The Court Did Not Abuse Its Discretion in Limiting Trump's Testimony ........ 5

        1. Relevant Background................................................................................. 5

        2. To the Extent Reviewable, the Court's Actions Were Sound..................... 13

    C.  Trump's Substantial Rights Were Not Affected ............................................... 18

II.  THE JURY'S COMPENSATORY DAMAGES AWARD IS NOT EXCESSIVE .............. 21

    A.  Non-Reputational Repair Campaign Damages................................................... 22

    B.  Reputational Repair Campaign Damages .......................................................... 27

III. THE JURY'S PUNITIVE DAMAGES AWARD IS NOT EXCESSIVE EITHER ............. 32

CONCLUSION ................................................................................................................ 36

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Abascal v. Fleckenstein,*
    820 F.3d 561 (2d Cir. 2016) ................................................................................. 18

*Aquavit Pharms., Inc. v. U-Bio Med, Inc.,*
    No. 19 Civ. 3351, 2023 WL 2396511 (S.D.N.Y. Feb. 17, 2023) ........................................ 3

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559, 116 S. Ct. 1589 (1996) ................................................................... 32

*Boule v. Hutton,*
    328 F.3d 84 (2d Cir. 2003) ................................................................................. 21

*Bouveng v. NYG Cap. LLC,*
    175 F. Supp. 3d (S.D.N.Y. 2016) .............................................................. 21, 24, 26

*Bouveng v. NYG Cap. LLC,*
    No. 14 Civ. 5474 (S.D.N.Y. June 29, 2015) ............................................................ 4

*Calantonio v. Mercy Med. Ctr.,*
    135 A.D.3d 686 (2d Dep't 2016) ........................................................................ 3

*Cantu v. Flanigan,*
    705 F. Supp. 2d 220 (E.D.N.Y. 2010) ............................................................ 27, 31

*Carroll v. Trump,*
    No. 20 Civ. 7311, 2023  WL 5731152 (S.D.N.Y. Sept. 6, 2023) ............................... 1, 5, 17

*Carroll v. Trump,*
    No. 20 Civ. 7311, 2024 WL 97359 (S.D.N.Y. Jan. 9, 2024) .......................................... 5, 6

*Carroll v. Trump,*
    No. 22 Civ. 10016, 2023 WL 4612082 (S.D.N.Y. July 19, 2023) .............................. *passim*

*Celle v. Filipino Reporter Enterprises Inc.,*
    209 F.3d 163 (2d Cir. 2000) ....................................................................... 4, 20, 32

*Chandok v. Klessig,*
    632 F.3d 803 (2d Cir. 2011) ............................................................................... 3, 4

*Corrigan v. Bobbs-Merrill Co.,*
    228 N.Y. 58 (1920) ........................................................................................... 4

*Cusimano v. United Health Servs. Hosps., Inc.*,
    91 A.D.3d 1149 (3d Dep't 2012)..................................................................3

*Dalbec v. Gentleman's Companion, Inc.*,
    828 F.2d 921 (2d Cir. 1987)....................................................................31

*Daniels v. Kostreva*,
    No. 15 Civ. 3141, 2017 WL 823583 (E.D.N.Y. Jan. 12, 2017)..........................3

*Dattner v. Pokoik*,
    81 A.D.2d 572 (2d Dep't 1981)................................................................31

*DiBella v. Hopkins*,
    403 F.3d 102 (2d Cir. 2005)......................................................................3

*DiSorbo v. Hoy*,
    343 F.3d 172 (2d Cir. 2003)....................................................................33

*Duverge v. United States*,
    No. 3:10 Civ. 1922, 2018 WL 619497 (D. Conn. Jan. 30, 2018)......................15

*Ferri v. Berkowitz*,
    561 F. App'x 64 (2d Cir. 2014)...............................................................21

*Fischer v. OBG Cameron Banfill LLP*,
    No. 08 Civ. 7707, 2010 WL 3733882 (S.D.N.Y. Sept. 24, 2010)......................4

*Freeman v. Giuliani*,
    No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023) ....................................27, 31, 35

*Giuffre v. Dershowitz*,
    410 F. Supp. 3d 564 (S.D.N.Y. 2019)........................................................18

*Greenbaum v. Svenska Handelsbanken, N.Y.*,
    979 F. Supp. 973 (S.D.N.Y. 1997) ............................................................5

*Herbert v. Lando*,
    441 U.S. 153, 99 S. Ct. 1635 (1979)..........................................................20

*Hoesten v. Best*,
    34 A.D.3d 143 (1st Dep't 2006) ...............................................................3

*Jennings v. Yurkiw*,
    18 F.4th 383 (2d Cir. 2021) ..............................................................32, 34

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) ................................................................ 33

*Katt v. N.Y.C.*,
    151 F. Supp. 2d 313 (S.D.N.Y. 2001) .................................................. 30

*Lafferty v. Jones*,
    No. X06-UWY-CV18-6046436-S, 2022 WL 18110184 (Conn. Super. Ct. Nov. 10,
    2022) ..................................................................................................... 35

*Lee v. Edwards*,
    101 F.3d 805 (2d Cir. 1996) ................................................................ 34

*Lewis v. Newsday, Inc.*,
    246 A.D.2d 434 (1st Dep't 1998) .......................................................... 3

*Liberman v. Gelstein*,
    80 N.Y.2d 429 (1992) ............................................................................ 3

*LNC Invs., Inc. v. Nat'l Westminster Bank, N.J.*,
    308 F.3d 169 (2d Cir. 2002) ................................................................ 23

*Lynch v. N.Y. Times Co.*,
    171 A.D. 399 (1st Dep't 1916) ............................................................ 21

*Marcic v. Reinauer Transp. Cos.*,
    397 F.3d 120 (2d Cir. 2005) ................................................................ 18

*Massre v. Bibiyan*,
    No. 12 Civ. 6615, 2014 WL 2722849 (S.D.N.Y. June 16, 2014) .......... 30

*Mercado v. One Beacon Ins. Grp.*,
    356 F. App'x 553 (2d Cir. 2009) .......................................................... 15

*Morsette v. "The Final Call"*
    309 A.D.2d 249 (1st Dep't 2003) ........................................................... 3

*Nellis v. Miller*,
    477 N.Y.S.2d 72 (1984) ........................................................................ 31

*O'Neil v. Peekskill Fac. Ass'n Loc. No. 2916*,
    156 A.D.2d 514 (2d Dep't 1989) .......................................................... 31

*Osorio v. Source Enters., Inc.*,
    No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) .......... 27

iv

*Paravas v. Tran*,
    No. 21 Civ. 807, 2022 WL 718842 (S.D.N.Y. Feb. 22, 2022) .............................................. 4

*Patrolmen's Benevolent Ass'n. of N.Y.C. v. N.Y.C.*,
    310 F.3d 43 (2d Cir. 2002) ................................................................................................... 24

*Payne v. Jones*,
    711 F.3d 85 (2d Cir. 2013) ............................................................................................. 33, 35

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
    494 F. Supp. 505 (S.D.N.Y. 1980) ....................................................................................... 31

*Perry v. N.Y.C.*,
    552 F. Supp. 3d 433 (S.D.N.Y. 2021) .................................................................................. 28

*Present v. Avon Prod., Inc.*,
    253 A.D.2d 183 (1st Dep't 1999) ........................................................................................... 3

*Prozeralik v. Cap. Cities Commc'ns, Inc.*,
    82 N.Y.2d 466 (1993) ............................................................................................... 3, 19, 20

*Prozeralik v. Capital Cities Commc'ns, Inc.*,
    222 A.D.2d 1020 (4th Dep't 1995) ....................................................................................... 27

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir. 2017) ................................................................................................. 25

*Rogers v. Bradt*,
    No. 10 Civ. 2696, 2013 WL 3990777 (E.D.N.Y. Aug. 5, 2013) .......................................... 15

*Stampf v. Long Island R. Co.*,
    761 F.3d 192 (2d Cir. 2014) ................................................................................................... 2

*State Farm Mutual Automobile Ins. Co. v. Campbell*,
    538 U.S. 408, 123 S. Ct. 1519 (2003) ............................................................................. 33, 34

*Stukuls v. State*,
    42 N.Y.2d 272 (1977) ............................................................................................................. 3

*Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*,
    226 A.D.2d 227 (1st Dep't 1996) ........................................................................................... 3

*Thorsen v. Cnty. of Nassau*,
    722 F. Supp. 2d 277 (E.D.N.Y. 2010) .................................................................................. 24

*Turley v. ISG Lackawanna, Inc.*,
 774 F.3d 140 (2d Cir. 2014)..................................................................... 32, 34

*United States v. Bell*,
 584 F.3d 478 (2d Cir. 2009)........................................................................... 18

*United States v. Dowdell*,
 737 F. App'x 577 (2d Cir. 2018) ................................................................... 19

*United States v. Mokol*,
 646 F.3d 479 (7th Cir. 2011) ......................................................................... 15

*United States v. Nouri*,
 711 F.3d 129 (2d Cir. 2013)............................................................................. 2

*United States v. Quinones*,
 511 F.3d 289 (2d Cir. 2007)........................................................................... 15

*United States v. Spoor*,
 904 F.3d 141 (2d Cir. 2018)...................................................................... 17, 18

*United States v. Spruill*,
 808 F.3d 585 (2d Cir. 2015)...................................................................... 14, 15

*Van Buskirk v. The New York Times Co.*,
 325 F.3d 87 (2d Cir. 2003).............................................................................. 5

*In re Vivendi Universal, S.A. Sec. Litig.*,
 765 F. Supp. 2d 512 (S.D.N.Y. 2011)............................................................. 30

*Walia v. Vivek Purmasir & Assocs., Inc.*,
 160 F. Supp. 2d 380 (E.D.N.Y. 2000) ............................................................ 31

*Webber v. Dash*,
 607 F. Supp. 3d 407 (S.D.N.Y. 2022)............................................................... 4

*Wiener v. AXA Equitable Life Ins. Co.*,
 No. 16 Civ. 4019, 2022 WL 950979 (S.D.N.Y. Mar. 29, 2022) ...................... 28

*Yammine v. DeVita*,
 43 A.D.3d 520 (3d Dep't 2007) ..................................................................... 21

## FEDERAL RULES

Federal Rules of Civil Procedure Rule 59 ................................................................ 28

Federal Rules of Evidence Rule 403 ............................................................................ 6, 17, 18

Federal Rules of Evidence Rule 611 ............................................................................ 15

Federal Rules of Evidence Rule 702 ............................................................................ 28

## OTHER AUTHORITIES

2 Handbook of Fed. Evid. § 103:7 (9th ed.) ............................................................... 17

Aaron Blake, *Did Trump Just Defame E. Jean Carroll again?*, Wash. Post (Mar. 11, 2024) ..... 35

Aaron Katersky, et al., *Trump Butts Heads with Judge in Heated Courtroom Exchanges During E. Jean Carroll Case*, ABC News (Jan. 17, 2024) .................................... 10

Adam Reiss & Dareh Gregorian, *Trump Continues Blasting E. Jean Carroll as Damages Trial Postponed Amid Covid Concerns*, NBC News (Jan. 22, 2024) ........................... 10

Cailey Gleeson, *Trump Lashes Out About Legal Woes in Michigan Speech—Blasts 'Crooked Judge,' Swipes Again at Carroll*, Forbes (Feb. 18, 2024) ................................... 35

James Bickerton, *Donald Trump Goes on E. Jean Carroll Posting Binge*, Newsweek (Jan. 19, 2024) .................................................................................................. 10

Larry Neumeister, et al., *Trump Scowls as Jury Is Picked to Decide How Much He Owes for Defamation in E. Jean Carroll Case*, Los Angeles Times (Jan. 16, 2024) ........................ 7

Maggie Haberman & Kate Christobek, *At the Defense Table, Trump Uses the Courtroom as a Stage*, N.Y. Times (Jan. 28, 2024) .................................................................. 8, 10

Michael R. Sisak, *Trump Leaves Court Before Attorney Told Jury He Tried to Destroy Columnist's Reputation in Defamation Trial*, PBS Newshour (Jan. 16, 2024) .................... 7

Molly Crane-Newman & Kerry Burke, *Donald Trump Attends Jury Selection at NYC Trial Against E. Jean Carroll*, N.Y. Daily News (Jan. 16, 2024) .................................... 8

N.Y. Pattern Jury Instr. Civil 3:30 ............................................................................... 3

Sara Dorn, *Trump Posts About E. Jean Carroll More Than 35 Times—Ahead of Today's Potential Testimony*, Forbes (Jan. 25, 2024) ..................................................... 10

## PRELIMINARY STATEMENT

In June 2019, when Defendant Donald J. Trump was still president, he released two statements in less than 24 hours in which he denied sexually assaulting Plaintiff E. Jean Carroll, threatened her, and claimed that she had fabricated her accusation to make money, sell books, or as part of a political conspiracy. As the *Carroll II* jury found, those were all lies.

Due to the Court's earlier partial summary judgment ruling, the evidence presented during the *Carroll I* trial concerning the June 2019 statements was designed to answer only two questions: (1) whether the defamatory statements Trump made about Carroll damaged her, and if so, how much Trump should have to pay to compensate her for the harm he caused; and (2) whether Trump made the defamatory statements with common law malice, and if so, how much money he needed to pay to prevent him and others from acting similarly in the future. Carroll presented overwhelming evidence in support of her case. Trump took the stand for less than three minutes. And the jury returned a verdict entirely in favor of Carroll, awarding her $83.3 million in damages.

Here, Trump seeks to set that verdict aside, or, at a minimum, reduce the amount of money he now owes Carroll. His arguments are meritless. The Court's jury instructions were consistent with New York defamation law; the Court acted well within its discretion to limit and strike part of Trump's testimony; the compensatory damages award accurately reflects the evidence presented and does not deviate materially from reasonable compensation; and finally, the punitive damages award is not excessive. Quite the opposite. During the trial itself, the jury heard with their own ears and saw with their own eyes exactly how Trump has continued to defame Carroll since the *Carroll II* verdict and his mid-trial promise to defame her "a thousand times." And the jury watched Trump carry out this promise in real-time, treating the courtroom like a campaign event. For these reasons and others explained below, the Court should deny Trump's motion.

1

## APPLICABLE STANDARD

A court may grant a new trial due to non-harmless errors in "admitting or excluding evidence," *Stampf v. Long Island R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014), or in instructing the jury, *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013). An error is not harmless if it affected the defendant's "substantial rights," which means "that there must be a reasonable probability that the error affected the outcome of the trial." *Id.*

A "trial judge [also] enjoys discretion to grant a new trial if the verdict appears to the judge to be against the weight of the evidence, and this discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 4612082, at *17 (S.D.N.Y. July 19, 2023) (cleaned up). In considering such a motion, "[t]he role of the [judge] is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Id.* The judge must "bear in mind, however, that [he] should only grant such a motion when the jury's verdict is egregious" and "should rarely disturb a jury's evaluation of a witness's credibility." *Id.* In analyzing whether an award comes within the confines of state law, "the relevant standard is 'not whether an award deviates *at all* from past awards—it is whether an award deviates *materially* from *reasonable compensation*.'" *Id.* (cleaned up).

## ARGUMENT

## I.  A NEW TRIAL IS NOT WARRANTED

### A.  The Court Properly Instructed the Jury on Punitive Damages

Trump argues that the Court's jury instructions erred in two ways. First, he says the Court downplayed the necessary intent for common law malice. Mot. 2-5, 14. Second, he asserts that the

Court relaxed Carroll's burden to prove that requisite intent. *Id.* at 15-17. Both arguments can be easily discarded—the Court's jury instructions were fully consistent with New York law.

    ***Common law malice***. The Court instructed the jury that it could award punitive damages if it found that Trump had made the defamatory statements with a "deliberate intent to injure or out of hatred, ill will or spite, or in willful, wanton, or reckless disregard of another's rights." Ex. A ("Tr.") at 792. This language matches the New York Pattern Jury Instructions exactly. *See* N.Y. Pattern Jury Instr. Civil 3:30. Unsurprisingly, it is consistent with New York law. *See Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479-80 (1993); *Lewis v. Newsday, Inc.*, 246 A.D.2d 434, 437 (1st Dep't 1998). And it is also consistent with how courts have instructed juries in this Circuit, *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005), and have otherwise assessed and awarded punitive damages, *Aquavit Pharms., Inc. v. U-Bio Med, Inc.*, No. 19 Civ. 3351, 2023 WL 2396511, at *15 (S.D.N.Y. Feb. 17, 2023), *report and recommendation adopted*, 2023 WL 2584198 (Mar. 21, 2023); *Daniels v. Kostreva*, No. 15 Civ. 3141, 2017 WL 823583, at *13 (E.D.N.Y. Jan. 12, 2017), *report and recommendation adopted*, 2017 WL 519227 (Feb. 8, 2017).

    Against this wall of authority, Trump maintains that the district court should have instructed the jury that it could award punitive damages only if it found that Trump acted "solely" with this intent or motivation. Mot. 2-5. He is mistaken. All but one of the cases Trump relies on arose in the context of using common law malice to overcome a privilege defense, not to award punitive damages. *See id.* at 2-5.[1] Trump's citation to *Chandok v. Klessig* proves the point. There, the Second Circuit identified what it takes to defeat a common law privilege in a claim for

---

[1] *See Stukuls v. State*, 42 N.Y.2d 272, 281-82 (1977); *Present v. Avon Prod., Inc.*, 253 A.D.2d 183, 189 (1st Dep't 1999); *Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*, 226 A.D.2d 227, 229 (1st Dep't 1996); *Liberman v. Gelstein*, 80 N.Y.2d 429, 439 (1992); *Hoesten v. Best*, 34 A.D.3d 143, 158 (1st Dep't 2006); *Calantonio v. Mercy Med. Ctr.*, 135 A.D.3d 686, 691-922 (2d Dep't 2016); *Cusimano v. United Health Servs. Hosps.*, Inc., 91 A.D.3d 1149, 1150-51 (3d Dep't 2012); *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011). In the one case that did not, *Morsette v. "The Final Call"*, the dissenting opinion identified the majority's "misplaced" reliance on cases from the privilege context. 309 A.D.2d 249, 260-61 (1st Dep't 2003) (Marlow, J., dissenting) (collecting cases).

defamation under New York law. The Second Circuit explained that "while either actual malice or common-law malice will suffice to defeat a conditional privilege, common-law malice will defeat such a privilege … only if a jury could reasonably conclude that spite or ill will was the one and only cause for the publication." 632 F.3d 803, 815 (2d Cir. 2011) (cleaned up) (citation omitted). This presupposes that "spite or ill will" need not be the "one and only cause for the publication" when a privilege is not applicable, or there would be no reason to draw this distinction.

**Burden of proof**. The Court instructed the jury that it could award Carroll punitive damages only if it found "that [she] has proved by a preponderance of the evidence that [] Trump acted maliciously," as defined above. Tr. 792. Trump contends that the proper burden of proof is clear and convincing evidence, rather than preponderance. Mot. 15-17. Once again, he is wrong.

In *Corrigan v. Bobbs-Merrill Co.*, the New York Court of Appeals held that defamation plaintiffs must prove common law malice by a preponderance of the evidence. 228 N.Y. 58, 66 (1920). Consistent with this understanding, in *Celle v. Filipino Reporter Enterprises Inc.*, the Second Circuit explained that "[p]unitive damages may [] be assessed under New York law [only] if the plaintiff has established common law malice … by a preponderance of the evidence." 209 F.3d 163, 184 (2d Cir. 2000) (citation omitted). Trump ignores *Corrigan* and *Celle*, *see* Mot. 15-17, but courts in this Circuit have not: following their direction, these courts have regularly instructed juries and decided cases under a preponderance standard, *see Webber v. Dash*, 607 F. Supp. 3d 407, 412 (S.D.N.Y. 2022); *Bouveng v. NYG Cap. LLC*, No. 14 Civ. 5474 (S.D.N.Y. June 29, 2015), ECF 221 at 3; *Fischer v. OBG Cameron Banfill LLP*, No. 08 Civ. 7707, 2010 WL 3733882, at *3 (S.D.N.Y. Sept. 24, 2010); *see also Paravas v. Tran*, No. 21 Civ. 807, 2022 WL 718842, at *9 (S.D.N.Y. Feb. 22, 2022), *report and recommendation adopted*, 2022 WL 718587 (Mar. 10, 2022). Although state intermediate courts have sometimes applied the wrong standard,

*see* Mot. 16-17; *Greenbaum v. Svenska Handelsbanken, N.Y.*, 979 F. Supp. 973, 976 (S.D.N.Y. 1997) (collecting examples), those courts are neither binding on this Court nor the ultimate arbiters of New York law, *see Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003).

### B. The Court Did Not Abuse Its Discretion in Limiting Trump's Testimony

Trump also takes issue with this Court's handling of his testimony. Mot. 5-12. In making this argument, Trump mischaracterizes and excludes key parts of the record; those facts provide critical context, undercut his position, and support the Court's rulings.

#### 1. Relevant Background

*Pretrial rulings*. After the *Carroll II* verdict and receiving full briefing from the parties, this Court granted partial summary judgment in favor of Carroll. *See Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 5731152 (S.D.N.Y. Sept. 6, 2023). That order limited the trial in this action to "damages only." *Id.* at *2. As a result, Trump was barred from disputing issues of liability concerning his June 2019 statements because he had already lost those issues in *Carroll II*.

Trump had great difficulty with this directive. The parties met and conferred following the Court's order, and during those discussions, it became clear that Trump intended to introduce evidence at the upcoming trial that would run afoul of the Court's order (and previous evidentiary decisions). So Carroll moved *in limine* to exclude that evidence. *See* ECF 233. And Trump's response demonstrated all the ways in which he intended to circumvent the Court's prior orders at the upcoming trial. *See* ECF 235.

In response, the Court issued an order *in limine*. Here, it granted almost the entirety of Carroll's motion and precluded Trump and his counsel from "offering any evidence, argument, or comments" in the "presence of the jury" concerning certain topics. *Carroll v. Trump*, No. 20 Civ. 7311, 2024 WL 97359, at *11 (S.D.N.Y. Jan. 9, 2024). Most significantly, the Court barred Trump and his counsel from "[s]uggesting or implying that [] Trump did not sexually abuse Carroll; that

5

he did not make his June 21 and 22, 2019 statements concerning [] Carroll with actual malice in the constitutional sense of that term; that [] Carroll fabricated her account, whether in consequence of a political agenda, financial interests, mental illness, or otherwise; or offering testimony or advancing any argument inconsistent with the Court's collateral estoppel decision determining that [] Trump, with actual malice, lied about sexually assaulting [] Carroll." *Id.*

But Trump did not heed the Court's instruction. After the Court's order, the parties met and conferred over certain exhibits Trump included in the Joint Pretrial Order that were facially no longer permissible in light of the Court's ruling. Trump refused to exclude them. After letter briefing, *see* ECF 254, 261, 264, the Court observed that Trump's "proffer" in support of the relevance of some of those exhibits was "inconsistent with the Court's prior *in limine* ruling," ECF 267. For others, the Court ordered their exclusion under Rule 403, explaining that it "already ha[d] ruled that *Carroll II* collaterally estops [Trump] from contending, among other things, that he did not sexually assault [] Carroll and has precluded evidence on that issue. … The introduction of the [exhibits] needlessly and confusingly would invite the jury to decide this case on the basis of [Trump's] view that those issues are open to discussion or reconsideration. They are not." *Id.* at 3.

Given this pattern of behavior, Carroll understandably had serious concerns that Trump would continue in his attempts to cast into doubt whether he sexually assaulted and defamed Carroll, and would do so in front of the jury. That danger seemed particularly acute if Trump himself elected to testify—since the *Carroll II* verdict, Trump had repeated his defamatory statements about Carroll in multiple forums and included references to topics that this Court had ruled inadmissible in the upcoming trial. *See* Ex. B. And during this intervening period, Trump had also testified in a different lawsuit, where he repeatedly defied the judge's orders in that case. *See* ECF 256 at 2; *see also* ECF 233 at 5-6 (collecting examples). As Trump later explained, he

6

considered the courtroom as "part of the campaign."[2] Carroll expressed these concerns in a pretrial letter to the Court. *See* ECF 256. Trump disputed that Carroll had any reason to be concerned, *see* ECF 265, and the Court indicated to the parties that it will "take such measures as it finds appropriate to avoid circumvention of its rulings and of the law." ECF 267 at 3.

**Trump's and his counsel's trial conduct**. That brings us to trial itself. Trump did not attend the first trial. Tr. 628. He did attend most of this one. And when Trump did show up, as Carroll had warned, Trump paired his attendance with disruptive conduct.

This behavior began right at the outset. Before calling in the prospective jurors, the Court instructed both parties to not "say anything within the earshot of any juror or prospective juror and not to communicate attempt to communicate with any juror or prospective juror by any means, directly or indirectly." Tr. 3; *see also id.* at 10-11. The Court then reminded the parties that it "ha[d] made a number of rulings precluding evidence and argument on a number of subjects, and in some instances, particular kinds of pieces of evidence or argument," and asked the attorneys to confirm that they and their clients understood each of those restrictions. *Id.* at 4.

Despite Trump's lawyers indicating that Trump understood and would abide by those restrictions, and that they too understood and would abide by them, their trial conduct proved otherwise. During jury selection, the Court instructed the prospective jurors that they must accept that "Trump did sexually assault [] Carroll" and "that he knew when he made the statements about [] Carroll that the statements were false or he made them with reckless disregard as to whether they were true or false." Ex. C at 8. Upon hearing this instruction, Trump "shook his head in disgust."[3] When the Court described the way in which Trump assaulted Carroll, Trump "made a

---

[2] Michael R. Sisak, *Trump Leaves Court Before Attorney Told Jury He Tried to Destroy Columnist's Reputation in Defamation Trial*, PBS Newshour (Jan. 16, 2024).
[3] Larry Neumeister, et al., *Trump Scowls as Jury Is Picked to Decide How Much He Owes for Defamation in E. Jean Carroll Case*, Los Angeles Times (Jan. 16, 2024).

loud 'yech' sound."[4] Then, when the Court asked the prospective jurors to raise their hand if they thought "[] Trump is being treated unfairly by the court system," *id.* at 70, Trump raised his.[5]

Trump left before opening statements. Inside the courtroom, his counsel picked up the baton. During her opening statements, Trump's counsel repeatedly impugned Carroll's motives for revealing that he sexually assaulted her—and then suggested that Trump was "merely defending himself" when he defamed her. Tr. 52; *see also id.* at 56 (arguing that "before she came out with her allegation against Donald Trump," Carroll's "career was dwindling and it needed a spark"); *id.* at 54 (saying Carroll waited "for the opportune time" to expose Trump's misconduct because that "was the business she was in"). included similarly incorrect statements of law on the slide deck presented to the jury. *Id.* at 52. The unmistakable upshot of these arguments was that Carroll's motives for revealing that Trump assaulted her were suspect; that Carroll somehow assumed the risk or consented to Trump's June 2019 defamatory attacks by revealing that he had sexually assaulted her; and that Trump's defamation was somehow justified as a form of public self-defense. *See* ECF 275. These arguments were directly at odds with the Court's prior rulings and resulted in a curative instruction during the final charge. *See* Tr. 798.

The next day, Carroll took the stand. Trump was in attendance. And during her testimony, Trump and his counsel repeatedly defied the Court's orders. As Carroll's counsel noted before the morning recess, "Judge, Ms. Habba has now twice in front of the jury made comments about things that [Y]our Honor has ruled are clearly out of bounds," namely issues related to litigation funding and the fact that Carroll had accused other men of sexual assault. *Id.* at 118. Carroll's counsel also "put on the record that in light of [Y]our Honor's order and instructions to the parties yesterday,

---

[4] Maggie Haberman & Kate Christobek, *At the Defense Table, Trump Uses the Courtroom as a Stage*, N.Y. Times (Jan. 28, 2024).
[5] Molly Crane-Newman & Kerry Burke, *Donald Trump Attends Jury Selection at NYC Trial Against E. Jean Carroll*, N.Y. Daily News (Jan. 16, 2024).

Mr. Trump has been sitting at the back table and has been loudly saying things throughout Ms.

Carroll's testimony, including things that Ms. Carroll is saying are false and noting that she seems

to have now gotten her memory back. It's loud enough for us sitting up here to hear it. I assume

it's loud enough for the jury to hear it." *Id.* Trump's counsel did not acknowledge her client's

behavior. *Id.* at 118-19. After a short recess, the Court asked Trump to take "special care to keep

his voice down when he's conferring with counsel so that the jury does not overhear it." *Id.* at 120.

Trump nevertheless refused to comply. Later, before the afternoon recess—and after the

jury heard a video Trump posted on Truth Social the day after the *Carroll II* verdict, where he said,

"I have absolutely no idea who this woman is. The verdict is a disgrace. A continuation of the

greatest witch hunt of all time. Absolutely a shame," Ex. D—the following exchange occurred:

> MS. CROWLEY: Judge, I just want to place on the record, again,
> that notwithstanding your instruction right before we started, the
> defendant has been making statements that, again, we can hear at
> counsel table. Some of the jurors are sitting closer to him than we
> are. He said, It is a witch hunt. It really is a con job. And when you
> played the last video, he said, It's true. So we would just ask your
> Honor to remind the parties that they are not supposed to make
> statements to or indirectly to the jury.
>
> THE COURT: Mr. Trump has the right to be present here. That right
> can be forfeited, and it can be forfeited if he is disruptive, which
> what has been reported to me consists of, and if he disregards court
> orders. Mr. Trump, I hope I don't have to consider excluding you
> from the trial or at least from the presence. I understand you're
> probably very eager for me to do that.
>
> MR. TRUMP: I would love it.

Tr. 167. Despite this warning, Trump and his lawyers persisted in blatantly flouting the Court's

orders and rules of decorum throughout the remainder of trial. Trump's lawyers ignored rulings,

*id.* at 231, moved for a mistrial in front of the jury, *id.* at 236, included exhibits in their closing

slide deck that were not in evidence, *id.* at 684-88, and stated or implied to the jury that Carroll

was funded by democrats, *id.* at 553-55, 735, that she accused other men of sexual assault, *id.* at

92-93, and that she lied about when she bought her dress, *id.* at 357.[6] Trump himself even walked out of the courtroom during Carroll's closing argument. *Id.* at 695. And outside of the courtroom, practically every day he attended the trial Trump continued to make statement after statement about Carroll, both on his Truth Social page and in press conferences.[7] In those statements, Trump took special care to emphasize evidence and argument that the Court had explicitly precluded.

***Trump's offer of proof***. Unlike in *Carroll II*, Trump elected to testify in this action. The Court addressed the parties outside of the presence of the jury before Trump took the stand. Here, the Court clarified that Trump's testimony could not dispute that he "sexually abused [] Carroll by forcibly, and without her consent, inserting his fingers into her vagina," that his "June 21st and 22nd statements in 2019 were false," that "Carroll did not make up her claim of forcible sexual abuse," that his "statements were defamatory," and that he made those statements with actual malice. *Id.* at 613-14. The Court acknowledged the letters submitted by the parties concerning Trump's testimony. *Id.* at 614-15. It then explained that under Rule 103(d), "[t]o the extent practicable, the Court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means," and that, "[i]n all the circumstances of the case there is cause for concern as to whether [] Trump's examination and testimony will contain or suggest inadmissible evidence to the jury." *Id.* at 615. The Court sought an order of proof from Trump's counsel about the exact nature of the testimony she intended to solicit.

Trump's counsel began by explaining that she intended to ask only three questions but

---

[6] There are many other examples. *E.g.* Tr. 16, 116-17, 163, 228-29, 247, 252-53, 267, 277, 287-88, 296, 302, 303, 304-10, 311, 321, 323, 480, 490, 590-91, 688, 697, 734, 740, 744, 748, 749, 750, 752, 758, 759, 760; *see also* Haberman & Christobek, *At the Defense Table, Trump Uses the Courtroom as a Stage*; Aaron Katersky, et al., *Trump Butts Heads with Judge in Heated Courtroom Exchanges During E. Jean Carroll Case*, ABC News (Jan. 17, 2024).
[7] *See, e.g.*, James Bickerton, *Donald Trump Goes on E. Jean Carroll Posting Binge*, Newsweek (Jan. 19, 2024); Adam Reiss & Dareh Gregorian, *Trump Continues Blasting E. Jean Carroll as Damages Trial Postponed Amid Covid Concerns*, NBC News (Jan. 22, 2024); Sara Dorn, *Trump Posts About E. Jean Carroll More Than 35 Times—Ahead of Today's Potential Testimony*, Forbes (Jan. 25, 2024).

struggled to communicate them. The Court repeatedly asked her to articulate everything that Trump was going to say, considering she was "making an offer of proof and [her] client [was] bound by it." *Id.* at 616-17. Trump's counsel said, "what my client is going to say, is that he did not do it; at the time he denied it for the reason of having to deny it; that he was addressing them, the questions, because of his accusation; that he never instructed anyone to hurt [] Carroll. That is what he is going to say. And also, that he stands by the deposition[]," referring to the portions of Trump's deposition Carroll had played for the jury earlier in the trial. *Id.* at 617. The Court followed up—"And he will say nothing else?" to which Habba responded "That is my understanding, [Y]our Honor." *Id.* While his counsel was speaking, Trump remarked that he also intended to say, "that he never met her and had never seen her before," *id.* at 618, testimony that would clearly conflict with the Court's clear directives.

The Court asked for additional clarity regarding the three questions Habba was proposing to elicit that testimony. Trump's counsel said, "I would just like to confirm that he stands by all the testimony of his deposition, also that he made the statements in response to her accusations and what his state of mind was there, and that he ...." *Id.* at 619. Here, recognizing that these questions were inconsistent with the above, the Court interrupted Trump's counsel, asking "[w]hat will he say about his state of mind?", to which Trump's counsel explained that "he was defending himself." *Id.* at 619-20. Finally, Trump's counsel said she would ask Trump to confirm that "he never instructed anyone to hurt [] Carroll in his statements." *Id.* at 620. Carroll's counsel raised concerns that Trump would give testimony that would undermine the Court's collateral estoppel ruling, and said, "[w]e think there is certainly the risk of it being confusing to the jury but [Y]our Honor certainly knows how to give an instruction, and if it is limited to those three things, we understand where [Y]our Honor is going." *Id.* at 621.

Here, the Court said, "Look. You told me in your letters, I think, that Mr. Trump is well aware of the Court's rulings with respect to issue preclusion and the strict confines placed on his testimony. Do you confirm that?" *Id.* Trump's counsel responded, "Yes, your Honor." *Id.* At the same time, Trump then yelled out loud while sitting in the courtroom, in direct contrast to his counsel's representation: "I never met the woman. I don't know who the woman is. I do not know who the woman is. I wasn't at the trial. I don't know who the woman is. I never met this woman." *Id.*; *see also id.* at 622 ("Mr. Trump. You are interrupting these proceedings by talking loudly while your counsel is talking and that is not permitted."). The Court asked Trump's counsel whether she personally made him aware of the confines of his testimony and if he would comply with them. *Id.* at 622. She responded that she had, Trump was aware, and he would abide by them.

Trump's counsel then once again went through the three proposed questions. Like before, those three questions changed slightly. *Id.* at 622-23. The first question was "confirm[ing] that he stands by everything in the deposition testimony." *Id.* at 623. The Court authorized that question. *Id.* The second, this time posed as an open-ended question, was "why did you make the statements in response to her accusation." *Id.* The Court denied this question. *Id.* Trump's counsel protested, saying, "So how do they prove common law malice when I can't have my client defend himself and say he wasn't defaming her, he was defending himself at the time?" *Id.* at 624. The Court said, "Did he deny the allegation because an accusation had been made? That's it. … I take it the offer of proof is he did it because someone made an accusation. Is that right? Is that what you propose to do?" *Id.* Trump's counsel said, "I'm happy to ask it that way, why did you deny her accusations[?]" *Id.* But the Court reiterated that there would be no open-ended questions: "Let me put it a different way. If you were to ask that open-ended question, there is likely to be an objection,

and it is likely, in significant measure, to be sustained." *Id.* Last, the Court sanctioned the third question, "did you ever instruct anyone to hurt [] Carroll in your statements." *Id.* at 624-25.

From here, the Court asked to bring in the jury, but Trump's counsel quickly interjected, asking for clarity for the second question. *Id.* at 625. After the Court responded that the second question "keeps changing," it stated that Trump's counsel could "elicit the fact [Trump] made [his statements] in response" to Carroll's accusation. *Id.* Trump's counsel replied, "As long as we have the deposition, [Y]our Honor, I think we will be fine. Thank you." *Id.*

***Trump's testimony****.* When Trump took the stand, he provided testimony that went beyond the proffer. His counsel first asked Trump to confirm that he "viewed [his] deposition which was played by plaintiff's counsel at length during the trial. Didn't you?" *Id.* at 626. Trump responded "[y]es, I did." *Id.* She then asked if Trump stood by his testimony at the deposition. *Id.* He answered, "100 percent. Yes." *Id.* She then asked, "Did you deny the allegation because Ms. Carroll made an accusation?" *Id.* Trump responded, "That's exactly right. She said something, I considered it a false accusation. No difference." *Id.* at 626-27. Carroll objected and the Court struck the excess testimony. *Id.* at 627.[8] Finally, she asked, "Did you ever instruct anyone to hurt Ms. Carroll in your statements?" and Trump replied, "No. I just wanted to defend myself, my family, and frankly, the presidency." *Id.* Carroll objected and the Court struck everything after "no." *Id.*

### 2.  To the Extent Reviewable, the Court's Actions Were Sound

Trump argues that the Court abused its discretion during the sequencing outlined above. Trump seemingly focuses on the Court (1) not allowing his counsel to ask an open-ended questions

---

[8] Carroll objected to "that's exactly right. She said something, I considered it a false accusation. No difference." Tr. 627. According to the transcript, the Court said, "[e]verything after 'yes, I did,' is stricken. The jury will disregard it." *Id.* But "yes, I did" was Trump's answer to the first question, whether he had watched his deposition when Carroll played it. *Id.* at 626. A second question was also asked and answered after that response, and Carroll had not objected to either nor had Trump's testimony gone beyond the proffer at that point. *Id.* Giving these circumstances and the timing of the objection, Carroll believes the transcript contains an error and only "She said something, I considered it a false accusation. No difference" was stricken based on her objection.

13

about Trump's mental state and (2) striking "I just wanted to defend myself, my family, and frankly, the presidency" from Trump's testimony. Mot. 8, 11-12. He is wrong on both counts.

As an initial matter, Trump has waived these arguments. In *United States v. Spruill*, the Second Circuit identified circumstances where a litigant intentionally relinquishes or abandons a known right. 808 F.3d 585, 597 (2d Cir. 2015). As the Second Circuit explained, when a "defendant, through counsel, acted intentionally in pursuing, or not pursuing, a particular course of action," he cannot later secure review of it. *Id.* There are many different circumstances that satisfy this standard, *id.* at 596-97—and multiple are present here, dooming Trump's claim.

During the offer of proof, Trump's counsel consented to limiting Trump's testimony to three questions. Tr. 621-22. After a back-and-forth and initial protest over the structure of the second question, the Court stated, "I take the offer of proof is that he did it because someone made an accusation?" *Id.* at 624. Trump's counsel seemingly agreed, but then proposed an open-ended question to get at that answer. *Id.* Here, the Court explained that she could ask it that way, but it would likely lead to a sustained objection. *Id.* After asking for further clarification, Trump's counsel said: "*As long as we have the deposition*, [Y]our Honor, *I think we will be fine*," and subsequently asked the question in yes-or-no form. *Id.* at 625 (emphases added); *see also id.* at 626-27. But now Trump claims that he is not "fine," and the Court erred in not allowing his counsel to ask him an open-ended question about his mental state. Mot. 8-12. Because Trump agreed to this course of action to tactically benefit from asking about the deposition in exchange, he waived review of the arguments he now raises. *See Spruill*, 808 F.3d at 597.

Similarly, during the offer of proof, Trump's counsel described the third question as follows: "And the only other thing was that he never instructed anyone to hurt [] Carroll in his statements [which] is a simple yes or no question." Tr. 620. But Trump now claims that the Court

should have allowed him to go beyond a simple yes or no answer (and therefore erred in striking "I just wanted to defend myself, my family, and frankly, the presidency"). Mot. 8. Because Trump solicited and agreed to this limit on his testimony, he has also waived review of this argument. *Spruill*, 808 F.3d at 597; *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007).

But even if he had not waived them, Trump's arguments are meritless—the Court acted squarely within its discretion by placing limits on Trump's testimony. District courts "enjoy broad latitude in this realm, because '[q]uestions of trial management are quintessentially the[ir] province.'" *Duverge v. United States*, No. 3:10 Civ. 1922, 2018 WL 619497, at *2 (D. Conn. Jan. 30, 2018); *see* Fed. R. Evid. 611; *Mercado v. One Beacon Ins. Grp.*, 356 F. App'x 553, 554 (2d Cir. 2009); *United States v. Mokol*, 646 F.3d 479, 486 (7th Cir. 2011). As part of that discretion, they "may control the scope of examination of witnesses." *Rogers v. Bradt*, No. 10 Civ. 2696, 2013 WL 3990777, at *10 (E.D.N.Y. Aug. 5, 2013). And under Rule 103(d), a court must, "[t]o the extent practicable, … conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Put together, the Court had broad discretion to place limits on the mode of Trump's examination to ensure that he did not mention inadmissible evidence before the jury, and the limits it imposed do not demonstrate that it abused that discretion.

Indeed, the limits the Court imposed were necessary. The Court began the colloquy with counsel explaining that it had concerns that Trump's testimony would introduce inadmissible evidence; those concerns were well-founded. Trump had just testified in the New York Attorney General civil fraud trial, where "he repeatedly offered testimony contradicting the state court's earlier summary judgment ruling." *See* ECF 233 at 5. In addition, Trump had "continually flouted court orders by editorializing and providing non-responsive, repetitive answers, discrediting the court and the legitimacy of the proceeding, accusing the presiding judge of partiality, and attacking

opposing counsel." *See id.* at 5-6. Trump had also given a closing argument in that case where, despite "promis[ing] to just comment on the law and facts, application of one to the other and not go outside of that," Trump "immediately disregarded the court's instructions." ECF 256 at 2-3. Moreover, during this trial, Trump had flouted the Court's rulings and directives from the beginning, repeatedly making inappropriate comments about inadmissible evidence and questioning Carroll's accusation within earshot of the jury. *See supra* at 7-10. So too had his counsel. *See id.* And Trump had posted incessantly about Carroll during the trial outside of the courtroom, invoking topics that were off limits inside. *See supra* at 10. Open-ended questioning was all but assured to lead to Trump testifying to issues and topics that were barred by the Court's prior orders (and in many cases, were highly prejudicial).

The colloquy and his testimony proved the point. When Trump's counsel first disputed the Court's limitation on open-ended questions, the very open-ended question she proposed and the answer she sought to elicit was inadmissible: "So how do they prove common law malice when I can't have my client defend himself and say he wasn't *defaming her*, he was *defending himself* at the time." Tr. 624 (emphasis added). This answer questioned whether Trump defamed Carroll in responding to her accusation and therefore conflicted with the Court's collateral estoppel ruling and instructions to the lawyers, parties, and jury. *See supra* at 5-6, 10-11. And when his counsel assured the Court that Trump understood the strict confines on his testimony, Trump twice on his own interjected to make comments that demonstrated the opposite understanding. *See supra* at 11-12. Then, when Trump did take the stand, he immediately broke the Court's rules. He went beyond a yes-or-no answer to say, "I considered it a false accusation." Tr. 626-27. The truth or falsity of Carroll's accusation was not up for debate, the Court's had instructed Trump that he could not

dispute it, and Trump violated that directive anyway. Then, in response to the third question, Trump again went beyond a yes-or-no answer, again violating the Court's clear instructions.

The Court's solution thus struck a necessary balance: it allowed Trump to testify as to the topics included within his counsel's offer of proof without permitting him to go further and thereby implicate Rule 103(d). Considering these circumstances, the Court did not abuse its discretion.

Finally, the Court did not abuse its discretion in excluding Trump's proposed testimony as to his state of mind and striking Trump's excess answer under Rule 403. When presented with a Rule 403 objection, the Second Circuit will "sustain a district court's decision … so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, and will reverse only if the district court's decision is arbitrary or irrational." *United States v. Spoor*, 904 F.3d 141, 153 (2d Cir. 2018). Trump cannot satisfy this demanding standard.

Regarding Trump's proposed question about his state of mind, which he now insists the Court erred in precluding, his counsel represented that Trump would "say he wasn't *defaming her*, he was *defending himself* at the time." Tr. 624. The Court properly rejected this offer of proof under Rule 403 because the testimony facially conflicted with the Court's collateral estoppel ruling. *Carroll*, 2023 WL 5731152, *2. That Trump now says he would have responded differently to that question is of no consequence, Mot. 8-12—he is bound by his counsel's representations and reasons for admission as specified during the colloquy, *see* 2 Handbook of Fed. Evid. § 103:7 (9th ed.) ("A reviewing court will consider the propriety of an exclusionary ruling only in light of the stated purpose and legal basis for the offer actually made." (collecting cases)).

The Court also properly struck part of the testimony Trump did provide. The payoff of Trump's stricken testimony—"I just wanted to defend myself, my family, and frankly, the presidency"—is that Carroll's assault was dubious and Trump's statements were "somehow

justified as a form of public self-defense." *See* ECF 275 at 4. But this position is "meaningless as a legal matter: when a person commits sexual assault and their victim reveals what they did, the law confers no right of self-defense to make defamatory statements aimed at crushing or humiliating the accuser." *Id.* at 5; *see also Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 576 (S.D.N.Y. 2019) (explaining under New York law that a finding of constitutional actual malice defeats any self-defense privilege in defamation cases). And even if that testimony had some slight probative value, that value was substantially outweighed by the risk of prejudice and confusion concerning the truthfulness of Carroll's revelation that Trump had assaulted her. *See* Fed. R. Evid. 403. The Court's decision to strike this testimony, which went beyond the offer of proof, was not "arbitrary or irrational." *Spoor*, 904 F.3d at 153.

### C. Trump's Substantial Rights Were Not Affected

Even if the court erred in the ways Trump suggests, Trump fails to demonstrate that any alleged error (or combination of errors) requires a new trial. Mot. 8-12. To make that showing, he would need to establish errors that "affected [his] substantial rights." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005). Only if an error led the jury to "a seriously erroneous result" or a "miscarriage of justice" will the Court vacate the verdict. *United States v. Bell*, 584 F.3d 478, 486 (2d Cir. 2009); *see also Abascal v. Fleckenstein*, 820 F.3d 561, 567 (2d Cir. 2016) ("A party's substantial rights are affected only where a jury's judgment was likely swayed by the error."). Trump comes nowhere close to making such a showing for at least four reasons.

*First*, testimony of Trump's state of mind ultimately would have been cumulative. Trump's motion insists that the jury heard no evidence from Trump as to his state of mind. Mot. 8-14. But they did, in the designation depositions—there, Trump said that he was "very offended by" Carroll's accusation, that he did not know her, that he "told people there was a false, disgusting lie made about me," that there was "something wrong with [Carroll] … it's a false story," and that he

18

would "go around saying that to people." Ex. E. These comments, among others, are evidence of Trump's theory of self-defense: that he had to deny her accusation and say these things about Carroll because it was not true. The jury heard Trump reaffirm his deposition testimony at trial. Tr. 626-27. He thus provided evidence as to his mental state in the deposition played before the jury that he now says he was barred from offering evidence to support. Simply put, the jury did not buy it. That outcome does not demonstrate prejudice. *See United States v. Dowdell*, 737 F. App'x 577, 583 (2d Cir. 2018) (harmless error where "excluded evidence was cumulative").

*Second*, even if the precluded testimony was not cumulative, it cannot carry the weight Trump gives it. Trump does not dispute that, during the charge, the Court told the jury that "[y]ou may have heard argument or evidence suggesting that [] Carroll … authorized [] Trump to make [the defamatory statements] as a form of self-defense. I instruct you as a matter of law that [] Carroll did not … grant [Trump] lawful permission to defame her, by publicly stating in June 2019 that he had sexually assaulted her." Tr. 798. Here, the Court instructed the jury to ignore the part of Trump's defense that Trump now says he should have been able to testify to and was prejudiced by the Court's refusal. Trump takes no issue with this instruction.

*Third*, even if the Court was required to instruct the jury that it could only award punitive damages if Trump had acted solely out of common law malice in making his statements (and it was not, *see supra* at 3-4), Trump was not prejudiced by the exclusion of his testimony that he was defending himself (or his family or the presidency). When boiled down, Trump asserts that he published the two defamatory statements because he had concluded that destroying Carroll's reputation with falsehoods was politically desirable. But this "self-defense" claim is evidence of another malicious motive, not an innocent one. Malice captures the "wanton, reckless, or in willful disregard of another's rights," *Prozeralik*, 82 N.Y.2d at 479; here, even on his terms, Trump

19

willfully disregarded Carroll's rights by publishing lies about her, destroying her reputation, and saying she should "pay dearly" for coming forward—all in an effort to discredit Carroll and blunt any political blowback from the truth being revealed. His "motive in publishing the falsity" was to benefit politically from destroying Carroll—disregarding her rights was how he achieved it. *Id.* In this regard, what Trump represents as an innocent intent itself constitutes malice.

*Fourth*, the evidence at trial established Trump's common law malice under a clear and convincing evidence standard. That standard is satisfied when an assertion is "highly probable." *See* 4 Modern Federal Jury Instructions-Civil ¶ 73.01 (2022). It is well established that such malice can be demonstrated by "threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights." *Herbert v. Lando*, 441 U.S. 153, 164 n.12, 99 S. Ct. 1635, 1643 n.12 (1979); *accord Celle*, 209 F.3d at 184. Carroll presented overwhelming evidence of malice, including that Trump knew he had assaulted Carroll, threatened her in his statements, repeated the defamatory statements on his Truth Social account just *minutes* after being held liable for sexual battery and defamation in *Carroll II*, *see* ECF 304-14, Ex. D, had posted similar statements attacking Carroll no less than four times *during* the trial, and had publicly promised to never stop, ECF 304-28. All this evidence pointed in one direction— it was "highly probable" that Trump published the statements with a "willful, wanton, or reckless disregard of" Carroll's rights. Indeed, no reasonable jury could have concluded otherwise. Trump's contention that, against all of that evidence, his self-serving statements that he had acted out of a desire to defend himself, his family, and the country (which, although the Court struck them, the jury heard) would have swayed the jury into reaching a different result should be rejected outright.

\* \* \*

20

At bottom, the Court did not abuse its discretion, and even if it did, Trump cannot demonstrate that he was prejudiced. But it is worth emphasizing a theme to Trump's arguments: his regret about the choices he made at the first trial. His repeated suggestion that he was deprived of justice because he was unable to testify about the falsity of Carroll's allegations or the reasons he made his statements ignores reality—there was a two-week trial in which those issues were fully litigated, the Court gave him ample opportunity to speak in his own defense, and Trump elected not to show up, let alone testify. That he chose not to avail himself of that opportunity does not enable him to a do-over here. The Court should reject Trump's attempt to turn his regret about declining to testify at the first trial into prejudice sufficient to overturn this one.

## II.     THE JURY'S COMPENSATORY DAMAGES AWARD IS NOT EXCESSIVE

"In a libel case, more, perhaps, than in any other, the jury is generally considered to be the supreme arbiter on the question of damages." *Lynch v. N.Y. Times Co.*, 171 A.D. 399, 401 (1st Dep't 1916). "In actions for other torts there is generally some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part." *Yammine v. DeVita*, 43 A.D.3d 520, 521 (3d Dep't 2007) (cleaned up). Indeed, the law presumes damages arising from defamation *per se*, *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003), and juries are instructed that defamation damages cannot be proven with "mathematical accuracy," *Ferri v. Berkowitz*, 561 F. App'x 64, 65 (2d Cir. 2014) (quoting N.Y. Pattern Jury Instr., Civil 3:29). Because the assessment of damages is "peculiarly within the jury's province," a court "must use 'prudence and restraint … in the exercise of its discretion over these awards.'" *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 344 (S.D.N.Y. 2016) (omission in original).

Against this backdrop, the jury awarded Carroll $18.3 million in compensatory damages. ECF 280 at 1. Before reaching that number, the jury was instructed that Carroll was entitled "to

fair and just compensation for the injury to her reputation and for any humiliation and mental anguish in her public and private lives that was caused by the defamatory statement[s] in question." Tr. 788. The jury was further instructed that fair and just compensation should account for: (1) Carroll's "standing in the community"; (2) the "nature of [] Trump's statements made about her"; (3) "the extent to which those statements were circulated"; (4) "the tendency of those statements to injure [her]"; and (5) "all of the other facts and circumstances in the case." *Id.* at 789. While noting that "[f]air compensation" for those harms "may vary," the Court told the jury that it could award a "substantial sum if you decide that the injury was substantial." *Id.*

At that point, the jury was instructed to classify its damages into two separate buckets. The first involved "the amount you award for all defamation compensatory damages attributable to the June 21 and 22 statements, excluding the reputation repair program that was discussed during Professor Humphreys' testimony." *Id.* at 791. The second covered "the amount of damages, if any, that you award for the reputation repair program for" those two statements. *Id.* Ultimately, the jury allocated $7.3 million to the first and $11 million to the second. ECF 280 at 1.

## A.     Non-Reputational Repair Campaign Damages

Trump argues that the Court should remit the $7.3 million in damages that are unrelated to the reputation repair program. Mot. 19-25. But his challenge to that portion of the award continues to rest on two erroneous foundations: he incorrectly states that the $7.3 million award was only for "emotional distress," and further errs in claiming that Carroll's "claim of emotional distress" is "garden variety." *Id.* at 19-20. Examination of the actual record and governing caselaw confirms that the verdict here was not a material deviation from reasonable compensation.

*First*, the $7.3 million that the jury awarded went beyond damages solely for emotional distress. Neither the jury instructions nor the verdict form limited the first category of damages to emotional distress damages. Tr. 791; ECF 280 at 1. The only express limitation was "compensatory

damages … *other than for the reputation repair program*." ECF 280 at 1. Put simply, costs for the reputation repair program do not cover all the harms that Carroll endured as a result of Trump's defamation spree.[9] The jury heard evidence of Carroll's hard fought and well-respected career as an advice columnist, and how Trump—the man who sexually assaulted her—shattered that career in less than 72 hours, *see, e.g.*, Tr. 70-71, 179-80, 517-18. This resulted in both psychological injury and tangible, continuing economic harm, apart from her reputational injury. Carroll used to write the nation's leading advice column, read by millions of people; now, her Substack column has just 28,000 subscribers, only 1,800 of whom pay for their subscription. *Id.* at 181, 467-68. Carroll used to make $50,000 or more per year doing freelance work for other magazines on a wide range of topics; in 2023, she earned only $500 for freelance work. *Id.* at 183. Moreover, Carroll separately testified to the added steps that she now has to take to protect her security—and made clear that she could not afford to take additional steps. *Id.* at 137-39.[10] All this evidence, as well as further testimony about Carroll's public standing, the nature and circulation of Trump's statements, and the backlash provoked by Trump's attacks, went into the damages finding. In that respect, Trump is wrong to describe the $7.3 million award as just for emotional harm.

---

[9] Trump points to Carroll's closing argument for support that the first bucket was only for emotional harm. But it's the Court's instructions and the witness's testimony, not the parties' arguments, that control. *See LNC Invs., Inc. v. Nat'l Westminster Bank, N.J.*, 308 F.3d 169, 177 n.10 (2d Cir. 2002); Tr. 797. In any event, Carroll's counsel discussed these economic injuries in her closing argument. *See* Tr. 704-06. That the jury heard them presented in connection with a discussion of Professor Humphreys's testimony matters little—Professor Humphreys testified as to what it would cost to run a successful reputational repair campaign, not to address these economic harms. By definition, compensatory damages for the reputation repair program must have excluded them. *Cf. id.* at 777. This is not "double counting," as Trump suggests. Mot. 23.

[10] Trump also argues that Carroll could not receive damages for "economic harms" because she did not list those harms in the Joint Pretrial Order. Mot. 19, 23. As Trump sees it, he was allowed to argue that Carroll benefitted economically from being defamed by Trump, *see* Tr. 750-52, but she could not offer evidence demonstrating how Trump's defamation caused her economic harms. His position is baseless. Further, Carroll did not exclude economic harms from her Joint Pretrial Order. There, she stated that she sought "compensatory damages for injury to her reputation" and Trump interpreted that to include economic harm because he replied that, "[c]ontrary to Plaintiff's contention, she did not sustain any … *economic harm* as a result of the Statements." ECF 227 at 6 (emphasis added).

*Second*, this is not a case of "garden variety" emotional harm in any event. Mot. 20-22. Nothing about this case is garden variety, and that description of Carroll's injury blinks reality.

As courts have recognized, emotional harm can fall into several categories—and can be elevated into a more substantial bucket based on the nature of the defendant's conduct. "[M]ore offensive conduct" will support "significant" emotional distress awards. *Thorsen v. Cnty. of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010). And "outrageous or shocking" conduct will allow for even more. *Id.* (noting that "egregious emotional distress claims generally involve *either* outrageous or shocking discriminatory conduct *or* a significant impact on the physical health of the plaintiff" (emphases added)). That principle reflects how the jury was instructed. Tr. 789.

Trump, for his part, ignores the nature of his conduct entirely, and asserts that Carroll's damages must be categorized as "garden variety" because her injuries are supported by her testimony alone. Mot. 24. However, "[a] court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony." *Bouveng*, 175 F. Supp. 3d at 328; *see also Patrolmen's Benevolent Ass'n. of N.Y.C. v. N.Y.C.*, 310 F.3d 43, 55 (2d Cir. 2002) (explaining that more substantial emotional distress damages can be supported by plaintiff's testimony and "the objective circumstances of the violation itself").

Trump's conduct and the objective circumstances of the violation are fatal to his argument regarding garden variety harm. Trump made his two defamatory statements when he was President of the United States, ECF 304-4, -5; Tr.104. He maliciously lied and attacked the woman he knew he had sexually assaulted by calling her a liar, a fraud, a political hack, a paid political operative, and an enemy of all survivors of sexual assault. ECF 304-4, -5. He threatened her twice by warning that she should "pay dearly" and was playing in "dangerous territory." ECF 304-4, -5. On a conservative estimate, his statements generated at least 85 to 104 hundred million impressions

within days—and surely generated many more over time. Tr. 384-85. Those statements ruined Carroll's reputation and unleashed an onslaught of hateful (and at times terrifying) online attacks that have continued. *Id.* at 110, 132-35. Trump made these statements for the apparent purpose of making sure he got away with sexual abuse. Considering all this, it's difficult to imagine a more objectively extreme version of defamation. Labeling the resulting pain and mental anguish that Trump caused by committing this egregious conduct "garden variety" is as offensive as it is absurd.

Trump's conduct, coupled with Carroll's testimony of severe emotional distress, more than adequately supports the jury's damages award in this case. As Carroll testified, Trump's statements completely eliminated Carroll's sense of security and self. Carroll testified that because of Trump's statements she now "liv[es] in a new universe": "to have the president to have the president of the United States, one of the most powerful persons on earth, calling me a liar for three days and I'm a liar 26 times—I counted them—it ended the world I had been living in, and I [had] a new world." *Id.* at 104-05. Carroll further explained the onslaught of hateful and threatening messages that she received in the days following his statements and that she continues to receive today, many of which the jury saw throughout trial. *See, e.g.*, *id.* at 109-10, 114-15, 121-23. Those messages threated to kill and rape her, in addition to calling her a liar, a fraud, a political hack, a paid operative, ugly, too disgusting to touch or to rape. *E.g.*, ECF 304-6–12. These attacks echoed the lies that Trump spread about Carroll in his June 2019 statements. *See* ECF 304-04, -05. They copied his words and made good on his threats.

None of the comparator cases cited by Trump even remotely approaches this situation. Mot. 22, 24-25. "Although a review of comparable cases is appropriate," the ultimate question is simply "whether the verdict lies within the reasonable range." *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017). As this Court recognized in rejecting the comparator cases Trump cited

in his motion for a new trial in *Carroll II*, the facts and circumstances of the cases were "materially different from the facts and evidence in this case." *Carroll*, 2023 WL 4612082, at *25. Those cases, like these cases, did not "involve[] the scale of attention and influence commanded when the defendant in this case chooses to speak publicly." *Id.* Nor did they compare "in the slightest to being defamed by one of the loudest voices in the world, in a statement read by millions and millions of people, which described you as a liar, labeled your account of a forcible sexual assault a 'hoax,' and accused you of making up a horrific accusation to sell a 'really crummy book.'" *Id.*[11]

Nor does Trump's reliance on the verdict in the earlier trial in *Carroll II* help his cause. There, the jury awarded Carroll $1 million in non-reputation campaign damages and $1.7 million for a reputation repair campaign based on a single defamatory statement that generated 13 and 18 million impressions. *Carroll II*, ECF 174; ECF 304-13. Here, the jury awarded $7.3 million and $11 million for the same two categories of damages, based on two defamatory statements that were the first ones Trump made about Carroll and that generated at least *85 to 104 hundred million* impressions. Tr. 384-85. Comparing the relevant numbers, it becomes clear that the proportion of reputation repair damages to other compensatory damages was similar across both cases, and the compensatory damages in *Carroll I* increased (in part) in proportion to the greater impressions that Trump's June 2019 statements generated. Thus, even putting aside the many additional factors that would justify a higher award here—including the greater evidence of harm presented at the *Carroll I* trial and the greater reprehensibility of then-President Trump's 2019 conduct—the verdict in *Carroll II* supports the reasonableness of the verdict here. Notably, Trump has not challenged any aspect of the *Carroll II* damages award on appeal, *see Carroll v. Trump*, No. 23-

---

[11] To demonstrate the differences, in one case Trump cites, *Bouveng v. NYG Cap. LLC*, 500,000 people viewed the defamatory statements over the course of eight months. 175 F. Supp. 3d at 338. Here, Trump's two statements got upwards of 104 million or more views on the days the relevant articles were published alone. Tr. 384-85.

793 (2d Cir.), ECF 74, rendering laughable his continued assertion that Carroll's other compensatory damages in this case cannot exceed $125,000, Mot. 22.

The soundness of the jury's damages award in this case is further underscored by cases containing comparatively high compensatory damages awards (all of which Trump ignores). *See, e.g.*, *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 226-31 (E.D.N.Y. 2010) ($150 million in non-economic damages for injury to reputation and humiliation and mental anguish; defendant described plaintiff as an operations manager of a racketeering enterprise who was involved with drug cartels and at one point had conspired with Saddam Hussein); *Osorio v. Source Enters., Inc.*, No. 05 Civ. 10029, 2007 WL 683985, at *1, *5-6 (S.D.N.Y. Mar. 2, 2007) ($4 million in emotional distress damages for "intentional" retaliation; Editor-in-Chief of a prominent publication was "summarily dismissed in retaliation for filing a complaint of gender discrimination"); *Freeman v. Giuliani*, No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023), ECF 135 (two plaintiffs; $20 million each in emotional distress); *see also Prozeralik v. Capital Cities Commc'ns, Inc.*, 222 A.D.2d 1020 (4th Dep't 1995) ($6,000,000 for injury to reputation and $3,500,000 for noneconomic emotional harm for defamatory comment on a local radio and television station). These cases only support the conclusion that the jury verdict in this case fell within the reasonable range of awards for the kind of conduct Trump engaged in and the harms Carroll incurred. *Carroll*, 2023 WL 4612082, at *18.

### B. Reputational Repair Campaign Damages

The jury's award for defamation damages requires neither remittitur nor a new trial. Trump's challenges to Professor Humphreys's testimony and the jury's award misconstrue the law, evidence, and testimony at trial and fail to show that the award "deviates materially from what would be reasonable compensation." *Id.*

As an initial matter, Professor Humphreys testified extensively about her analysis of defamation damages, which comprised: an "impressions model" determining that between 85 and

104 million people saw Trump's June 2019 statements; an "impact assessment" finding that between 21 and 25 million of those people were likely to believe those statements; and a "damages model" calculating that it would cost between 7 and 12 million dollars to change those people's minds. Tr. 364-68, 400-01. On cross-examination, Trump's counsel questioned her about each of these analyses and drew out detailed testimony about what she did and did not consider, and why. Thus, any "purported weaknesses in Professor Humphreys's testimony" that he invokes were placed before the jury, and the jury surely took them "into account in awarding damages [] below the high end of Professor Humphreys's estimated range." *Carroll*, 2023 WL 4612082, at *23 n.91.

Trump also argues that because Professor Humphreys has not herself executed a reputation repair campaign, her testimony is "unfounded and speculative." Mot. 26-27. But this argument goes to the admissibility of Professor Humphreys's testimony and is therefore untimely. "[I]t is 'well-settled that Rule 59 is not a vehicle for relitigating old issues … or otherwise taking a second bite at the apple.'" *Wiener v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 4019, 2022 WL 950979, at *4 (S.D.N.Y. Mar. 29, 2022). Trump could have challenged Professor Humphreys's admissibility under Federal Rule of Evidence 702 but failed to do so in a timely fashion.[12] His attempt to exclude Professor Humphreys came "ten months too late," ECF 244 at 4, and a Rule 59 motion does not reset the clock, *see Perry v. N.Y.C.*, 552 F. Supp. 3d 433, 447 (S.D.N.Y. 2021) (denying Rule 59 motion as "untimely" where "Defendants failed to file a pre-trial *Daubert* motion").

Even if Trump's quibbles with Professor Humphreys's experience go to the weight of the evidence, Trump had the opportunity to—and did—explore those arguments on cross-examination. In addition to testifying that she had not executed a repair campaign, Professor Humphreys also confirmed that she "did not … obtain any estimates or quotes" from reputation

---

[12] Trump's counsel also stated at trial that they would like to "make a *Daubert* motion based on Professor Humphreys's testimony on Thursday," Tr. at 505-06, but he never filed one.

repair firms. Mot. 27 (citing Tr. 465-66). But the fact she used one methodology (calculating the cost of a repair campaign using established principles) as opposed to another (asking an outside firm to calculate the cost of a repair campaign using establish principles) does not render her calculations "unfounded and speculative." Nor does the fact that Professor Humphreys teaches instead of executes campaigns impair her opinions. A jury was certainly entitled to find that teaching a subject renders her testimony on that subject credible (no one would argue a constitutional law professor was not an expert in constitutional law merely because she teaches instead of practices). The jury was aware of Humphreys's experience and considered it when determining her credibility. *See Carroll*, 2023 WL 4612082, at *17 ("a court should rarely disturb a jury's evaluation of a witness's credibility").

Trump next argues that Professor Humphreys failed to "credibly testify as to how her proposed campaign would be carried out" because she did not speak with specific conservative influencers "to determine whether they would be willing to participate in a reputational repair campaign on Plaintiff's behalf." Mot. 27. This similarly does not render her testimony "entirely speculative." Professor Humphreys testified that influencers can be hired to spread positive messages, Tr. 396, 469, and she gave two examples of such influencers, *id.* at 471. The fact she did not contact these two influencers directly does not render her testimony about the possibility of hiring influencers speculative.[13] And to the extent a juror may have questioned the possibility of hiring a certain influencer, she could have taken that information into account when assessing the weight and credibility of Humphreys's testimony.

---

[13] Indeed, Professor Humphreys testified that influencers are routinely paid to participate in campaigns like this one, Tr. at 372, 396, 469, that she was familiar with several successful reputation repair campaigns, *id.* at 466, 494-95, and that she estimated the cost of executing a campaign based on the rates influencers charge, *id.* at 398-400.

From here, Trump argues that because some people were likely to believe Trump, they were unlikely to believe Carroll in the first place, and therefore Trump's statements caused no harm. Mot. 27-28. Trump brought this same argument in *Carroll II*, and as the Court held there, it does not provide any "grounds to minimize the weight of [Humphreys's] testimony." *Carroll*, 2023 WL 4612082, at *24. On cross, she clearly delineated what she did and did not consider; namely, the effect Trump's statements had on Carroll's reputation, and not how many people likely believed Carroll prior to his statements. Tr. 421. The jury considered this "purported flaw[] [] Trump's counsel attempted to draw out," and "determined that her testimony still was worthy of sufficient weight" to award $11 million. *Carroll*, 2023 WL 4612082, at *24; *see In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 575 (S.D.N.Y. 2011) ("[I]t is well-established that the computation of damages is a quintessential fact issue for the jury, and that a jury need not accept an expert's damage calculations wholesale."), *aff'd*, 838 F.3d 223 (2d Cir. 2016).[14]

In sum, "the methodology underlying [Professor Humphreys's] conclusions and opinions was clearly laid out for the jury, on both direct and cross-examination, enabling the jurors to decide what weight, if any, they deserved." *Katt v. N.Y.C.*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001). As in *Carroll II*, "[n]one of Mr. Trump's challenges to that testimony, considered separately or collectively, supports a determination that the jury's compensatory damages award was seriously erroneous, egregious, or against the weight of the evidence." *Carroll*, 2023 WL 4612082, at *24.

Finally, Trump's argument that the jury's $11 million award in *Carroll I* was excessive because the jury in *Carroll II* awarded $1.7 million misses the mark. Trump's only support for his argument is the fact that Carroll testified that the backlash from Trump's October 2022 was

---

[14] Trump cites *Massre v. Bibiyan*, Mot. 28, but in that case, there was no expert testimony, "no evidence regarding [plaintiff's] reputation prior to the [statement] or about the current status of his reputation," "no estimate of how many people viewed the [statement], or how viewers' opinions of him may have been altered." No. 12 Civ. 6615, 2014 WL 2722849, at *9, *11 (S.D.N.Y. June 16, 2014).

"equally disparaging and hurtful" as the backlash from the June 2019 statements. Mot. 28. But the fact that the messages she received after each statement qualitatively hurt and disparaged her in the same manner has no bearing on what it would cost to enact a repair campaign for those statements. The estimate, as Professor Humphreys thoroughly testified, is based on an evaluation of how many people likely believed Trump's June 2019 statements, and how much it would cost to change their minds, not on how badly the messages Carroll received after Trump's statements made her feel. Regardless, it makes perfect sense that the *Carroll II* award is smaller than the award in this case, which involved two statements Trump made about Carroll for the first time, when he was still the sitting President, from the White House, that were seen approximately eighty million more times than the statement at issue in *Carroll II. See supra* at 26.

Trump provides a series of inapposite cases in his attempt to show that the jury's award was excessive. And like the ones above, they are easily distinguished—none comes close to "the facts and evidence in this case," *Carroll*, 2023 WL 4612082, at *25; *see supra* at 25-26, or contain defamatory statements made "from the most prominent 'bully pulpit' in the world." ECF 251 at 2.[15] Indeed, there are cases with much higher awards compensating for defamatory statements made by much less prominent figures than the sitting president of the United States. *Cf. Cantu*, 705 F. Supp. 2d at 226-31 ($150 million); *see also Freeman v. Giuliani*, No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023), ECF 135 (between $16-$17 million per plaintiff for defamation by Rudy Giuliani). These cases further demonstrate the reasonableness of the jury's award in this case.

---

[15] *See Nellis v. Miller*, 477 N.Y.S.2d 72 (1984) (statement from a local police station stating plaintiff engaged in "unprofessional conduct" where the "only proof of injury" was the plaintiff's uncorroborated "self-serving testimony"); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 494 F. Supp. 505 (S.D.N.Y. 1980) (statement in letter from one manufacturer to another); *Walia v. Vivek Purmasir & Assocs., Inc.*, 160 F. Supp. 2d 380 (E.D.N.Y. 2000) (defamation claim against a boss for "telling 'other people' that she was a 'whore'"); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987) (statement in magazine); *O'Neil v. Peekskill Fac. Ass'n Loc. No. 2916*, 156 A.D.2d 514 (2d Dep't 1989) (actual damages for the amount of fees lost due to defamatory statement); *Dattner v. Pokoik*, 81 A.D.2d 572 (2d Dep't 1981) (statement in local newspaper with a circulation of 7,500 copies).

## III.    THE JURY'S PUNITIVE DAMAGES AWARD IS NOT EXCESSIVE EITHER

The jury's $65 million punitive damages award should not be reduced. In reviewing the reasonableness of punitive damages awards, courts consider three "guideposts": (1) "'the degree of reprehensibility' associated with the defendants' actions; (2) 'the disparity between the harm or potential harm suffered' and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 1598-99 (1996)). That analysis fully supports the punitive damages award here.

*First,* the degree of reprehensibility in this case is exceedingly high. This factor is the most important of the three. *Turley*, 774 F.3d at 167. In assessing it, courts have considered "whether a defendant's conduct was marked by violence or presented a threat of violence," or "evinced trickery or deceit as opposed to mere negligence," and whether "the record supports a finding of intentional malice." *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021). The evidence at trial here more than fits the bill and firmly established that Trump acted with substantial malice in defaming Carroll: Trump had sexually assaulted Carroll before he defamed her; he knew he had sexually assaulted her when he accused her of fabricating her accusations for a slew of nefarious purposes, ruining her career as a trusted advice columnist in the process; and in each of his defamatory statements, Trump threatened Carroll, warning that she would "pay dearly" and had entered "dangerous territory" by coming forward. ECF 304-4, 05; *Carroll*, 2023 WL 4612082, at *2. The degree of reprehensibility here is only exacerbated by the false and offensive statements that Trump continued to make about Carroll even after losing the *Carroll II* trial—as well as by the statements he made outside of the courtroom while standing trial in this very proceeding. *See* ECF 304-14–29; s*ee also Celle*, 209 F.3d at 184. Trump suggestion that his conduct was defensive, and therefore not malicious, is wrong for all the reasons mentioned above. *See supra* at 18-20.

*Second*, the disparity between the harm or potential harm suffered and the size of the punitive damages award is of no constitutional concern. This factor asks, "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *DiSorbo v. Hoy*, 343 F.3d 172, 187 (2d Cir. 2003). Here, the jury awarded a ratio of 3.6:1 in punitive to compensatory damages. Neither precedent nor logic support Trump's argument that the Court must reduce that ratio to 1:1. Mot. 31-32.

In *State Farm Mutual Automobile Insurance Co. v. Campbell*, the Supreme Court explained that "we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. … We decline again to impose a bright-line ratio which a punitive damages award cannot exceed." 538 U.S. 408, 424-25, 123 S. Ct. 1513, 1524 (2003) (citations omitted). But the Court identified a few principles to guide lower courts. For example, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* This established 9:1—not 1:1—as the presumptive outer limit for most cases. And while the Court noted that there may be instances involving large compensatory awards where a "lesser ratio, perhaps only equal to compensatory damages" may be the limit, the Court proceeded to emphasize the individualized nature of the inquiry in the next sentence: "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

The Second Circuit has heeded this guidance. Thus, it has repeatedly reaffirmed that "[t]here is no rigid upper limit on a ratio of punitive damages to compensatory damages," declining repeated invitations to impose such categorical rules. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 149 (2d Cir. 2015); *see also Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013). That is also true

of the Second Circuit's decision in *Turley*, on which Trump principally relies. Mot. 29-33. There, the court invoked a 2:1 ratio based on common law principles, but cautioned that "[w]e are not called upon to, at least at this time, and do not, decide whether a more sizable punitive award would be constitutionally permissible." 774 F.3d at 167. Finally, the Second Circuit has explained that "[e]ven where compensatory damages are substantial, punitive damages awards that are a multiple higher may be warranted because of the deterrent function of punitive damages." *Jennings v. Yurkiw*, 18 F.4th 383, 391-92 (2d Cir. 2021); *accord State Farm*, 538 U.S. at 416, 123 S. Ct. 1519. Trump ignores the deterrent function of punitive damages completely. Mot. 29-34.

Those principles support the punitive damages awarded in this case. The ultimate ratio is 3.6:1, well within *State Farm*'s general limits. Moreover, the size of the compensatory award does not require a reduction of the punitive damages: based on the evidence presented to the jury, the principal function of punitive damages in this case was not as a supplement to the compensatory award, but rather as specific deterrence to Trump from continuing to defame Carroll. For instance, the jury heard evidence that Trump had been held liable for sexual battery and defamation in *Carroll II*, and within minutes, he repeated the defamatory statements on his Truth Social account and, the next day, during a CNN town hall event broadcast to the world. ECF 304-14, -15. The jury also heard evidence that Trump posted similar statements attacking Carroll in the weeks leading up to this trial, and four times during the trial itself—once promising that he would "never stop." ECF 304-28. This conduct, together with the general evidence of Trump's wealth, ECF 304-2, -3, justified a higher punitive damages award, *Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) ("Deterrence is directly related to what people can afford to pay."). These facts further distinguish this case from *Turley*, which did not refer to deterrence even once as justifying the punitive award.

Of course, courts sometimes remit punitive damages awards because they go well beyond what is necessary for deterrence. *See Payne*, 711 F.3d at 93. But that concern is certainly not present in this case. Here, there was undisputed evidence that Trump's defamation of Carroll actually *increased* after a separate jury found him liable in *Carroll II*, and Trump publicly promised to defame Carroll "a thousand times" more during the trial in *Carroll I* (where liability had already been determined). ECF 304-28; ECF 214. On multiple of those occasions, Trump used his lies about Carroll to promote his political campaign. ECF 304-15, -20, -21. In fact, since the verdict, Trump has continued to falsely deny knowing Carroll and has called her account a "false accusation"—illustrating that, if anything, the $63 million punitive award may have been not high enough to deter Trump from further defamation.[16]

*Third*, and finally, the difference between the remedy in this case and the penalties imposed in comparable cases is no basis for remittitur. This brief has articulated the many ways in which the circumstances of this case are unique, even from the circumstances in *Carroll II*, which lacked similar evidence concerning the need for deterrence. In any event, other juries have awarded equal or greater punitive damages in reasonably comparable recent defamation cases. *See, e.g.*, *Freeman v. Giuliani*, No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023), ECF 135 (two plaintiffs; $75 million total in punitive damages); *Lafferty v. Jones*, No. X06-UWY-CV18-6046436-S, 2022 WL 18110184, at *10 (Conn. Super. Ct. Nov. 10, 2022) (awarding roughly $473 million in punitive damages resulting from repeated defamation and other torts committed by Alex Jones).

---

[16] *See* Aaron Blake, *Did Trump Just Defame E. Jean Carroll again?*, Wash. Post (Mar. 11, 2024); Cailey Gleeson, *Trump Lashes Out About Legal Woes in Michigan Speech—Blasts 'Crooked Judge,' Swipes Again at Carroll*, Forbes (Feb. 18, 2024).

**CONCLUSION**

The Court should deny Trump's motion for a new trial or remittitur.

Dated: New York, New York
March 26, 2023

Respectfully submitted,

_Roberta A. Kaplan_
Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# EXHIBIT V

O1HsCAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

E. JEAN CARROLL,

                    Plaintiff,

          v.                          20 CV 7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                    Defendant.          TRIAL

------------------------------x

                                    New York, N.Y.
                                    January 17, 2024
                                    10:00 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                    District Judge

                         APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA ANN KAPLAN
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG

HABBA MADAIO & ASSOCIATES LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO
     PETER SWIFT
     PETER GABRA

O1HsCAR3                          Carroll - Direct

1          (Jury not present)

2          THE COURT:  I understand there is an application.

3          MS. CROWLEY:  Judge, I just want to place on the

4    record, again, that notwithstanding your instruction right

5    before we started, the defendant has been making statements

6    that, again, we can hear at counsel table.  Some of the jurors

7    are sitting closer to him than we are.

8          He said, It is a witch hunt.  It really is a con job.

9    And when you played the last video, he said, It's true.  So we

10   would just ask your Honor to remind the parties that they are

11   not supposed to make statements to or indirectly to the jury.

12         THE COURT:  Mr. Trump has the right to be present

13   here.  That right can be forfeited, and it can be forfeited if

14   he is disruptive, which what has been reported to me consists

15   of, and if he disregards court orders.

16         Mr. Trump, I hope I don't have to consider excluding

17   you from the trial or at least from the presence.  I understand

18   you're probably very eager for me to do that.

19         MR. TRUMP:  I would love it.

20         THE COURT:  I know you would.  You just can't control

21   yourself in these circumstances, apparently.

22         Thank you.

23         (Recess)

24

25