UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2024

(Argued: September 6, 2024   Decided: December 30, 2024)

Docket No. 23-793-cv

---

E. JEAN CARROLL,

*Plaintiff-Appellee,*

*v.*

DONALD J. TRUMP,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

Before:      CHIN, CARNEY, and PÉREZ, *Circuit Judges.*

---

In this case, after a nine-day trial, a jury found that plaintiff-appellee

E. Jean Carroll was sexually abused by defendant-appellant Donald J. Trump at

the Bergdorf Goodman department store in Manhattan in 1996. The jury also found that Mr. Trump defamed her in statements he made in 2022. The jury awarded Ms. Carroll a total of $5 million in compensatory and punitive damages.

Mr. Trump now appeals, contending that the district court (Lewis A. Kaplan, *Judge*) erred in several of its evidentiary rulings. These include its decisions to admit the testimony of two women who alleged that Mr. Trump sexually assaulted them in the past and to admit a recording of part of a 2005 conversation in which Mr. Trump described to another man how he kissed and grabbed women without first obtaining their consent. Mr. Trump contends that these and other asserted errors entitle him to a new trial.

On review for abuse of discretion, we conclude that Mr. Trump has not demonstrated that the district court erred in any of the challenged rulings. Further, he has not carried his burden to show that any claimed error or combination of claimed errors affected his substantial rights as required to warrant a new trial.

AFFIRMED.

———————————————

ROBERTA A. KAPLAN (Matthew J. Craig, *on the brief*), Kaplan Martin LLP, New York, NY, and Joshua Matz and Kate Harris, *on the brief*, Hecker Fink LLP, Washington, DC, *for Plaintiff-Appellee.*

D. JOHN SAUER, James Otis Law Group, LLC, St. Louis, MO, and Todd Blanche and Emil Bove, Blanche Law, New York, NY, *on the brief, for Defendant-Appellant.*

---

PER CURIAM:

In this case, after a nine-day trial, a jury found that plaintiff-appellee E. Jean Carroll was sexually abused by defendant-appellant Donald J. Trump at the Bergdorf Goodman department store in Manhattan in 1996. The jury also found that Mr. Trump defamed her in statements he made in 2022. The jury awarded Ms. Carroll a total of $5 million in compensatory and punitive damages.

Mr. Trump now appeals, contending that the district court (Lewis A. Kaplan, *Judge*) erred in several of its evidentiary rulings. These include its decisions to admit the testimony of two women who alleged that Mr. Trump sexually assaulted them in the past and to admit a recording of part of a 2005 conversation in which Mr. Trump described to another man how he kissed and

3

grabbed women without first obtaining their consent.  Mr. Trump contends that

these and other asserted errors entitle him to a new trial.

On review for abuse of discretion, we conclude that Mr. Trump has

not demonstrated that the district court erred in any of the challenged rulings.

Further, he has not carried his burden to show that any claimed error or

combination of claimed errors affected his substantial rights as required to

warrant a new trial.

Accordingly, and for the reasons set forth more fully below, we

AFFIRM the judgment of the district court.

## BACKGROUND

On appeal from a jury verdict, the court of appeals is bound to

"construe all evidence, draw all inferences, and make all credibility

determinations in favor of the party [who] prevailed before the jury." *Jia Sheng v.

M&TBank Corp.*, 848 F.3d 78, 81 (2d Cir. 2017) (quoting *DiBella v. Hopkins*, 403

F.3d 102, 110 (2d Cir. 2005)).  Here, that party is Ms. Carroll.  We describe the

narrative heard by the jury accordingly.  Mr. Trump did not testify at trial but

has denied the allegations that he engaged in any sexual misconduct with Ms.

Carroll and that he defamed her.

4

**I.**    *The Evidence Presented at Trial*

We summarize the evidence presented to the jury regarding the

charged 1996 assault and 2022 defamation of Ms. Carroll.

**A.**    *The Bergdorf Goodman Assault*

In 1996, Ms. Carroll encountered Mr. Trump at the Bergdorf

Goodman department store in Manhattan.  At the time, Ms. Carroll was an

advice columnist for Elle Magazine and hosted a daily advice talk show called

"Ask E. Jean."  App'x at 1570-73.  Mr. Trump recognized Ms. Carroll and asked

her to stay and help him pick a gift for a girl.  Describing this as a "funny New

York scene" and a "wonderful prospect" for a "born advice columnist" to give

advice to Mr. Trump on buying a gift, Ms. Carroll said yes.  *Id.* at 1590.

After Ms. Carroll suggested that Mr. Trump purchase a handbag or

a hat, Mr. Trump proposed that they go to the lingerie department instead.  Ms.

Carroll and Mr. Trump went to the lingerie department on the sixth floor.  Mr.

Trump selected a piece of lingerie and insisted that Ms. Carroll try it on.  Ms.

Carroll jokingly responded, "You put it on.  It's your color."  *Id.* at 1595.  After

some playful banter, Mr. Trump took Ms. Carroll's arm and motioned for her to

go to the dressing room with him.  Because Mr. Trump was being "very light"

and "pleasant" and "funny," *id.* at 1595, Ms. Carroll walked with Mr. Trump into the open dressing room, which she described as "sort of an open area," *id.* at 1596. But as soon as she entered, Mr. Trump "immediately shut the door" and "shoved [her] against the wall . . . so hard [that] [her] head banged." *Id.*

Ms. Carroll pushed Mr. Trump back, but "he thrust [her] back against the wall again," causing her to "bang[] [her] head again." *Id.* at 1597. With his shoulder and the whole weight of his body against her, Mr. Trump held her against the wall, kissed her, pulled down her tights, and stuck his fingers into her vagina -- until Ms. Carroll managed to get a knee up and push him back off of her.[1] She immediately "exited the room" and left the store "as quickly as [she] could." *Id.* at 1601. The encounter lasted just a few minutes.

Within a day, Ms. Carroll told two friends, Lisa Birnbach and Carol Martin, about the sexual assault. She did not report the incident to the police, however, or share it publicly for over two decades. While conducting interviews for a book that she was writing in 2017, the accounts of assaults perpetrated by Harvey Weinstein came to light and received nationwide attention. As a

---

[1]      Ms. Carroll also testified that Mr. Trump inserted his penis into her vagina; the jury, however, found that she did not prove this part of her claim by a preponderance of the evidence.

consequence of the many women who came forward to report their experiences of sexual assault, Ms. Carroll finally decided to share more broadly what Mr. Trump had done to her in 1996.

**B.** *The Defamation*

In June 2019, *New York* magazine published an excerpt from Ms. Carroll's then-forthcoming book, in which Ms. Carroll wrote that Mr. Trump raped her at the Bergdorf Goodman store in 1996. Mr. Trump denied the allegations and made a series of public statements in which he claimed that Ms. Carroll lied about the sexual assault. Mr. Trump made these statements in 2019 while he was still President of the United States.[2]

---

[2]    Mr. Trump issued a public statement on June 21, 2019. It read in part:

I've never met this person in my life. She is trying to sell a new book -- that should indicate her motivation. It should be sold in the fiction section. Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda -- like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news -- it's an epidemic. . . . It is a disgrace and people should pay dearly for such false accusations.

App'x at 2839. Then-President Trump publicly denied the allegations two more times -- once to a reporter at the White House, and again in an interview with *The Hill*. In his interview with *The Hill*, he stated: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never

About three years later, on October 12, 2022, after he had left office and after Ms. Carroll announced her intentions to sue him for rape and sexual assault, Mr. Trump posted a statement on Truth Social, his social media outlet, under the heading "Statement by Donald J. Trump, 45th President of the United States of America." *Id.* at 2858. The statement read, in part:

> This "Ms. Bergdorf Goodman case" is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. . . . I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, "swooned" her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called "event" supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. . . . In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance.

---

happened, OK?" App'x at 2854. The statements Mr. Trump made while still President are the subject of the second trial, which is discussed *infra*.

*Id.* at 2858.

## II.     *The Proceedings Below*

### A.     *Carroll I*

In 2019, Ms. Carroll sued Mr. Trump in New York state court,

seeking to recover damages for defamation.  The case was removed to the U.S.

District Court for the Southern District of New York in September 2020.  *Carroll v.*

*Trump*, No. 20-cv-07311 (LAK) (S.D.N.Y. filed Sept. 8, 2020) ("*Carroll I*").  In

*Carroll I*, Ms. Carroll asserted defamation claims against Mr. Trump based on the

statements he made in June 2019, after Ms. Carroll published her account of the

alleged rape, when he was still President of the United States.  *Carroll I* did not

include any damages claim for the alleged rape or sexual assault itself.

*Carroll I* was delayed due to proceedings concerning Mr. Trump's

presidential immunity defense and whether the United States could be

substituted as a party for Mr. Trump.  *See Carroll v. Trump*, 49 F.4th 759, 761 (2d

Cir. 2022) (holding that the President is an "employee of the government" for

purposes of the Westfall Act, and certifying to the D.C. Court of Appeals the

question of whether Mr. Trump's statements were made within the scope of his

employment as President of the United States); *Carroll v. Trump*, 66 F.4th 91, 94

(2d Cir. 2023) (per curiam) (remanding to the district court for further proceedings based on guidance from the D.C. Court of Appeals); *Carroll v. Trump*, 88 F.4th 418, 432 (2d Cir. 2023) (finding no error in the district court's denial, on grounds of undue delay and prejudice, of Mr. Trump's request for leave to amend his answer to raise the defense of presidential immunity).

While *Carroll I* was pending, the State of New York passed the Adult Survivors Act (the "ASA"). N.Y. C.P.L.R. § 214-j (McKinney 2022). The ASA provided adult victims of sexual abuse with a new one-year window in which to sue their abusers, even if an otherwise applicable statute of limitations had previously expired. *Id.* In August 2022, Ms. Carroll advised the district court that she intended to sue Mr. Trump for damages for the alleged rape once the ASA's filing window opened, on November 24, 2022. Letter from Roberta A. Kaplan to Hon. Lewis A. Kaplan, *Carroll I*, Dkt. No. 89 at 3 (filed Sept. 20, 2022).

**B.** *Carroll II*

On November 24, 2022, three years after she initiated *Carroll I*, and minutes after the ASA's authorization to file new claims became effective, Ms. Carroll filed a second action against Mr. Trump -- the case now before us on appeal. *Carroll v. Trump*, No. 22-cv-10016 (LAK) (S.D.N.Y. filed Nov. 24, 2022)

10

("*Carroll II*").  Unlike the first action, which was based solely on Mr. Trump's statements made while he was still in office, *Carroll II* sought damages for the alleged rape itself as well as for the purportedly defamatory statements made by Mr. Trump on October 12, 2022, after he left office.

In *Carroll II*, the district court ruled on a number of evidentiary issues in a series of written opinions issued before trial.  Relevant to the instant appeal, the district court ruled that two witnesses, Jessica Leeds and Natasha Stoynoff, would be permitted to testify about other incidents of alleged sexual misconduct by Mr. Trump, and that the *Access Hollywood* tape -- a recording of a 2005 conversation involving Mr. Trump -- was admissible.  *Carroll v. Trump*, 660 F. Supp. 3d 196, 202-08 (S.D.N.Y. 2023) (ruling on other acts evidence in *Carroll I*); *see also Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 3000562, at *1 & n.4 (S.D.N.Y. Mar. 20, 2023) (incorporating *Carroll v. Trump*, 660 F. Supp. 3d 196 (S.D.N.Y. 2023)); *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2652636, at *8 (S.D.N.Y. Mar. 27, 2023) (making additional evidentiary rulings).  The district court also precluded any reference to DNA evidence or Ms. Carroll's choice of counsel.  *Carroll*, 2023 WL 2652636, at *5-8.

Trial in *Carroll II* commenced on April 25, 2023, and concluded on May 8, 2023.  Ms. Carroll testified for nearly three days -- almost two full days of which consisted of cross-examination.  Ms. Carroll called two "outcry witnesses" -- Lisa Birnbach and Carol Martin -- who each testified that Ms. Carroll told them about the attack by Mr. Trump shortly after it occurred.  Ms. Carroll also called Ms. Leeds and Ms. Stoynoff, who testified as set forth below, as well as two witnesses who were employed at Bergdorf Goodman at the time of the assault.  The latter testified as to the layout of the store and presence or absence of surveillance cameras and personnel.  The jury also watched the *Access Hollywood* tape twice.  Ms. Carroll also called a clinical psychologist and a professor of marketing.  Mr. Trump did not testify in person, and did not attend the trial.  The jury did, however, watch portions of Mr. Trump's videotaped October 2022 deposition testimony.

On May 9, 2023, the nine-person jury unanimously found that Mr. Trump had "sexually abused" Ms. Carroll in 1996.[3]  Jury Verdict Form, *Carroll II*, Dkt. 174.  *See also Carroll v. Trump*, 683 F. Supp. 3d 302, 307 (S.D.N.Y. 2023)

---

[3]     *See supra* n.1.  The jury also found that Ms. Carroll had not shown that Mr. Trump "raped" her.  Jury Verdict Form, *Carroll II*, Dkt. 174.

("[T]he jury implicitly found that Mr. Trump deliberately and forcibly penetrated Ms. Carroll's vagina with his fingers.").  The jury found that Ms. Carroll was injured as a result of Mr. Trump's conduct and awarded her $2 million in compensatory damages and $20,000 in punitive damages.  The jury also found that Mr. Trump defamed Ms. Carroll and awarded her $2.7 million in compensatory damages and $280,000 in punitive damages.  Accordingly, the jury awarded Ms. Carroll a total of $5 million.  Judgment was entered on May 11, 2023.  Mr. Trump filed a notice of appeal the same day.

Mr. Trump thereafter moved for a new trial.  In a fifty-nine-page memorandum opinion filed July 19, 2023, the district court denied the motion. *Carroll*, 683 F. Supp. 3d at 334.  Mr. Trump filed an amended notice of appeal the same day.[4]

---

[4]    *Carroll I* was not tried until January 16, 2024, that is, after the trial of *Carroll II* was completed.  *Carroll I* (January 16, 2024 Minute Entry).  In *Carroll I*, the jury found Mr. Trump liable for earlier instances of defamation and awarded Ms. Carroll $83 million in compensatory and punitive damages.  Judgment, *Carroll I*, Dkt. 285 (Feb. 8, 2024).

*DISCUSSION*

**I.**     *Applicable Law*

On appeal, Mr. Trump focuses on evidentiary rulings that he argues were erroneous.  We begin our review by summarizing the law with respect to (a) the admissibility under the Federal Rules of Evidence of evidence of other sexual assaults; (b) the proper application of Rule 404(b) of the Federal Rules of Evidence; and (c) the standard of review on appeal from a district court's evidentiary rulings.

**A.**     *Evidence of Other Sexual Assaults*

Rule 415 of the Federal Rules of Evidence provides that "[i]n a civil case involving a claim for relief based on a party's alleged sexual assault . . . the court may admit evidence that the party committed any other sexual assault." Fed. R. Evid. 415(a).  "The evidence may be considered as provided in Rules 413 and 414." *Id.*

In turn, Rule 413 defines "sexual assault" as a "crime under federal law or under state law" involving:

(1) any conduct prohibited by 18 U.S.C. chapter 109A;

14

(2) contact, without consent, between any part of the defendant's body -- or an object -- and another person's genitals or anus;

(3) contact, without consent, between the defendant's genitals or anus and any part of another person's body;

(4) deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or

(5) an attempt or conspiracy to engage in conduct described in subparagraphs (1)-(4).

Fed. R. Evid. 413(d).

Rules 413 and 415, together with Rule 414, are congressionally-enacted exceptions to the "general ban against propensity evidence." *United States v. Schaffer*, 851 F.3d 166, 177 (2d Cir. 2017) (internal quotation marks omitted). Thus, "[u]nlike Federal Rule of Evidence 404(b), which allows prior bad act evidence to be used for purposes *other than* to show a defendant's propensity to commit a particular crime," *id*. at 177 (emphasis in original), Rules 413 and 415 permit a jury to consider evidence of a different sexual assault "precisely to show that a defendant has a *pattern or propensity for committing sexual assault*," *id*. at 178 (emphasis added). *See also id*. at 177-78 ("Rule 413 permits the jury to consider the evidence 'on any matter to which it is relevant.'" (quoting Fed. R. Evid. 413(a))).

Congress "considered knowledge that the defendant has committed [sexual assault] on other occasions to be critical in assessing the relative plausibility of sexual assault claims and accurately deciding cases that would otherwise become unresolvable swearing matches." *Id.* at 178 (alterations adopted) (internal quotation marks omitted). "[T]he practical effect of Rule 413 [and Rules 414 and 415] is to create a presumption that evidence of prior sexual assaults is relevant and probative" in cases based on sexual assault. *Id.* at 180.[5]

Rule 403's protections apply to evidence being offered under Rule 415. *Id.* Accordingly, if the trial court finds that the other act evidence is admissible under Rules 413 and 415, it may still exclude the evidence if it finds that the probative value of the propensity evidence is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury,

---

[5]     Some have questioned whether allowing propensity evidence in sexual assault cases "could diminish significantly the protections that have safeguarded persons accused in criminal cases and parties in civil cases against undue prejudice." *Schaffer*, 851 F.3d at 180 & n.79 (quoting *Report of Judicial Conference on Admission of Character Evidence in Certain Sexual Misconduct Cases*, 159 F.R.D. 51, 53 (1995)). "[But t]he wisdom of an evidentiary rule permitting the use of propensity evidence in prosecutions for sexual assault is not 'the concern of the courts.'" *Id.* at 181. Absent some constitutional infirmity, "[d]eliberating the merits and demerits of Rule 413 is a matter for Congress alone." *Id.* (footnote omitted) (holding that Rule 413 does not violate due process).

undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Rules 413 and 415 are silent as to the standard that courts should apply in determining whether to admit evidence of past sexual assaults. Both parties accept the district court's legal conclusion that the standard articulated by the Supreme Court in *Huddleston v. United States*, 485 U.S. 681 (1988), to determine the admissibility of Rule 404(b) evidence is also the appropriate standard for admitting evidence under Rules 413-415. *Huddleston* teaches that "the trial court neither weighs credibility nor makes a finding that the [party seeking admission] has proved the conditional fact by a preponderance of the evidence." *Id*. at 690. Rather, the "court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact -- whether the defendant committed the prior act -- by a preponderance of the evidence." *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 152 (3d Cir. 2002) (alteration adopted) (quoting *Huddleston,* 485 U.S. at 690).

We have not had occasion to decide this question. Most of our sister circuits, including the Third, Fourth, Sixth, Eighth, Ninth, and Tenth, have employed the *Huddleston* standard as the standard for admitting evidence under

Rules 413, 414, or 415. *See Johnson*, 283 F.3d at 154-55; *United States v. Fitzgerald*, 80 F. App'x 857, 863 (4th Cir. 2003); *United States v. Hruby*, 19 F.4th 963, 966-67 (6th Cir. 2021); *United States v. Oldrock*, 867 F.3d 934, 938 (8th Cir. 2017); *United States v. Norris*, 428 F.3d 907, 913-14 (9th Cir. 2005); *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998).

We agree with our sister circuits and join them in holding that the *Huddleston* standard for admitting evidence applies to Rule 415. We reach this conclusion based on relevant textual similarities between Rule 404(b) and Rules 413-415 and their respective legislative histories. Rule 404(b) and Rules 413-415 all permit the introduction of evidence of other bad acts, including uncharged conduct.[6] Moreover, the text of Rules 413-415, like the text of Rule 404(b), "contains no intimation . . . that any preliminary showing is necessary before . . . evidence may be introduced for a proper purpose." *Huddleston*, 485 U.S. at 687-88 (holding that no preliminary finding is required under Rule 404(b)). The legislative history behind Rules 413-415, like that behind Rule 404(b), also weighs

---

[6]     *See* 140 Cong. Rec. 23,603 (1994) (statement of Rep. Molinari) ("The practical effect of the new rules is to put evidence of *uncharged offenses* in sexual assault and child molestation cases on the same footing as other types of relevant evidence that are not subject to a special exclusionary rule.") (emphasis added).

against requiring a preliminary preponderance finding by the court that the other sexual assault occurred.  *See id.* at 688-89.[7]  Accordingly, in determining whether to admit other sexual act evidence, the trial court need not itself find by a preponderance of the evidence that the other assault occurred.  Instead, the court must "ask whether a jury could reasonably make such a finding."  *Johnson*, 283 F.3d at 152 (internal quotation marks omitted).

In sum, in addition to other requirements not relevant here, the district court may admit evidence of other sexual assaults under Rule 415 when: (1) the civil case before it involves a claim for relief based on a party's alleged sexual assault; (2) the court determines that a jury could reasonably find by a

---

[7]     As the Third Circuit explained in *Johnson*:

> The principal sponsors of Rules 413-15, Representative Susan Molinari and Senator Robert Dole, declared . . . that an address delivered to the Evidence section of the Association of American Law Schools by David J. Karp -- . . . the drafter of Rules 413-15 -- was to serve as an "authoritative" part of the Rules' legislative history.  140 Cong. Rec. 23,602 (1994) (statement of Rep. Molinari); 140 Cong. Rec. 24,799 (1994) (statement of Sen. Dole).  In the referenced speech, Mr. Karp stated clearly that "the standard of proof with respect to uncharged offenses under the new rules would be governed by the Supreme Court's decision in *Huddleston v. United States*."  [David J. Karp,] *Evidence of Propensity [and Probability in Sex Offense Cases and Other Cases]*, 70 Chi.-Kent L. Rev. [15, 19 (1994)].

*Johnson*, 283 F.3d at 153-54.

preponderance of the evidence that the party committed the other sexual assault (as defined by Rule 413); and (3) applying Rule 403, the court further determines that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

**B.** *Rule 404(b)*

While Rules 413 and 415 permit propensity evidence in sexual assault cases, the usual rule is that propensity evidence is not allowed. Rule 404(b) of the Federal Rules of Evidence governs the admissibility of other act evidence -- that is, "any . . . crime, wrong, or act" other than those charged. Fed. R. Evid. 404(b)(1). Evidence of other acts is not admissible if offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id.* Such evidence may be admissible, however, if offered "for another purpose." *Id.* 404(b)(2). Acceptable purposes include, but are not limited to, showing "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*; *see also* 1 McCormick, Evidence § 190.1 (8th ed. 2020) (recognizing that evidence of other acts "may be used in numerous ways, and those enumerated [in Rule 404(b)] are neither mutually exclusive nor collectively exhaustive").

20

Other acceptable purposes include providing direct corroboration of other testimony, *see United States v. Everett*, 825 F.2d 658, 660-61 (2d Cir. 1987), and showing the existence of a pattern, or "*modus operandi*," which may be relevant "to prove that the actor possessed the required mental state (*mens rea*), or to prove the charged act occurred (*actus reus*)." David P. Leonard, *New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events* § 13.3 (2d ed. 2020).

This Court has long taken an "inclusionary" approach to Rule 404(b), under which other act evidence is admissible unless it is introduced for the sole purpose of showing a defendant's bad character, subject to the relevance and prejudice considerations set out in Rules 402 and 403. *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996); *Ismail v. Cohen*, 899 F.2d 183, 188 (2d Cir. 1990); *see also United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (evidence of uncharged criminal conduct that "is inextricably intertwined with the evidence regarding the charged offense, or . . . necessary to complete the story of the crime on trial," is not typically excluded under Rule 404(b) (citation omitted)).

"To determine whether a district court properly admitted other act evidence, the reviewing court considers whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value

is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004).

## C. *Review of Evidentiary Rulings*

We review a district court's evidentiary rulings for "abuse of discretion." *Schaffer*, 851 F.3d at 177. Abuse of discretion is a term of art that "merely signifies that a district court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 611 (2d Cir. 2016) (internal quotation marks omitted). A district court's legal interpretation of the Federal Rules of Evidence is reviewed *de novo*. *See United States v. Samet*, 466 F.3d 251, 254 (2d Cir. 2006). We accord "great deference" to a district court, however, in ruling "as to the relevancy and unfair prejudice of proffered evidence, mindful that it sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence." *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006) (internal quotation marks omitted).

We "will disturb an evidentiary ruling only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018) (internal quotation marks omitted). "To find such abuse [of discretion], we must conclude that the trial judge's evidentiary rulings were arbitrary and irrational." *Paulino*, 445 F.3d at 217 (internal quotation marks omitted).

Moreover, even if an evidentiary ruling is manifestly erroneous, we will affirm and not require a retrial if we conclude that the error was harmless. *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010); *see also United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). "[A]n erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.'" *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) (quoting *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)). Thus, "[a]n error is harmless if we can conclude with fair assurance that the evidence did not substantially influence the jury." *Cameron*, 598 F.3d at 61 (internal quotation marks omitted). "In civil cases, the burden falls on the appellant to show that the error was not harmless and that 'it is likely that in some material respect the factfinder's judgment was swayed by the error.'"

*Warren v. Pataki*, 823 F.3d 125, 138 (2d Cir. 2016) (quoting *Tesser v. Bd. of Educ. of City Sch. Dist.*, 370 F.3d 314, 319 (2d Cir. 2004)); *see also Tesser*, 370 F.3d at 319 ("An erroneous evidentiary ruling that does not affect a party's 'substantial right' is . . . harmless.").

Evidentiary objections not raised in the district court are reviewed for plain error only. *Cruz v. Jordan*, 357 F.3d 269, 271 (2d Cir. 2004). Under that standard, "there must be (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Gomez*, 705 F.3d 68, 75 (2d Cir. 2013) (alteration adopted) (internal quotation marks omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alteration adopted) (internal quotation marks omitted); *accord Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 237 (2d Cir. 2020).

## II.    *Application*

Mr. Trump's challenges to the district court's evidentiary rulings fall into two categories -- evidence that he contends was erroneously admitted on the one hand, and evidence that he asserts was erroneously precluded on the other. We address each category of evidence and then turn to the question of whether

Mr. Trump has carried his burden to show error of such impact that a new trial is warranted.

### A.    *Admitted Evidence*

We first address Mr. Trump's argument that the defamation claim is not "based on" an alleged sexual assault and that therefore Rule 415 does not apply.  We then consider the admissibility of the testimony of Jessica Leeds and Natasha Stoynoff, and the admissibility of the *Access Hollywood* tape.

### 1.    *The Basis of the Claims*

At the outset, on *de novo* review of this legal question, we reject Mr. Trump's assertion that the district court erred in admitting the other acts evidence because, he contends, Ms. Carroll's defamation claim was not "'based on' sexual assault."  Appellant's Br. at 20-21.  Mr. Trump's argument misconstrues Rule 415's text and ignores its plain meaning.  Again, Rule 415(a) permits evidence of other sexual assaults to be introduced in "civil *case[s]* involving a *claim* for relief *based on* a party's alleged sexual assault."  Fed. R. Evid. 415(a) (emphasis added).  It is beyond dispute that Ms. Carroll's first claim -- for recovery of damages arising from Mr. Trump's alleged rape of her in 1996 -- is "based on" a sexual assault.  *Id.*  Mr. Trump does not argue otherwise on appeal.

Thus, *Carroll II* is a civil case that involves a claim for relief based on a party's alleged sexual assault.

Instead, Mr. Trump argues that the jury should not have been permitted to consider evidence admitted pursuant to Rule 415(a) when considering Ms. Carroll's second claim, for recovery of damages arising from the alleged defamation. But he does not identify any case law holding that Rule 415 evidence is admissible *only* to prove sexual assault claims. Indeed, the text of the rule contains no such limitation.

Because Mr. Trump acknowledges that Ms. Carroll's sexual assault claim was "based on" a sexual assault, we understand his argument really to be that the evidence was not admissible to prove the defamation claim. In other words, Mr. Trump is arguing that the district court should have given the jury a limiting instruction, advising that it could consider the other sexual assault evidence only with respect to the sexual assault claim and not with respect to the defamation claim.

But Mr. Trump failed to raise this contention below.[8]  Therefore, we review the absence of a limiting instruction for plain error only.  We discern no plain error here.  The other act evidence was relevant to Ms. Carroll's defamation claim -- she had to show that she *was* sexually assaulted by Mr. Trump to prove that his assertion that she was engaging in a "[h]oax," App'x at 2858, was false and therefore defamatory.[9]  Hence, the evidence was relevant under Rule 401 because it was offered to prove a sexual assault, and it had a tendency to prove that Mr. Trump did sexually assault Ms. Carroll.  *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").  Moreover, as discussed, Mr. Trump does not cite any authority for the proposition that Rule 415 evidence is admissible only to prove a sexual assault claim, even where, as here, the evidence might otherwise be relevant.  *See*

---

[8]      In her brief on appeal, Ms. Carroll notes that Mr. Trump failed to raise this argument in his briefings below, despite having ample opportunity to do so.  Mr. Trump does not challenge this assertion, or make any further mention of his "based on" argument, in his reply brief.

[9]      "Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability."  *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

*United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) (observing that it is "exceedingly rare" to find plain error "in the absence of binding precedent").

For these reasons, we conclude that the district court did not err, much less plainly err, in permitting the jury to consider this evidence with respect to Ms. Carroll's defamation claim.

**2.       *The Admissibility of the Evidence of Other Sexual Assaults***

We next turn to whether the district court abused its discretion in admitting the other sexual assaults evidence -- the testimony of Jessica Leeds and Natasha Stoynoff and the *Access Hollywood* recording -- and we conclude that it did not.

**a.       *The Leeds Testimony***

Jessica Leeds testified that she was on an airplane flying to New York in 1978 or 1979 when a flight attendant came down the aisle to ask if she "would like to come up to first class."  App'x at 2098-99.  Welcoming the invitation, Ms. Leeds went up to first class where she sat down next to a man sitting at the window who introduced himself as Donald Trump.  The two chatted.  After their meal was served and cleared, however, Mr. Trump suddenly "decided to kiss [her] and grope [her]."  *Id.* at 2101.  Ms. Leeds testified at trial:

[I]t was like a tussle.  He was -- his hands and -- he was trying to kiss me, he was trying to pull me towards him.  He was grabbing my breasts, he was -- it's like he had 40 zillion hands, and it was a tussling match between the two of us.  And it was when he started putting his hand up my skirt that that kind of gave me a jolt of strength, and I managed to wiggle out of the seat and I went storming back to my seat in the coach.

*Id*. at 2101-02.

On cross-examination, Ms. Leeds further explained:

Q:      OK.  And then according to you he, at one point, put his hand on your knee?

A:      He started putting his hand up my skirt.

Q:      OK, on your leg and up your skirt?

A:      Correct.

*Id*. at 2132.  And on re-direct, she explained why she got so upset:

A:      [M]en . . . would frequently pat you on the shoulder and grab you or something like that and you just -- it is not that serious and you don't -- you don't -- *but when somebody starts to put their hand up your skirt, you know they're serious and this is not good*.

*Id*. at 2147 (emphasis added).

Mr. Trump argues that Rule 415 does not apply to Ms. Leeds's

testimony.  He contends that: (1) even if the jury were to credit Ms. Leeds's

testimony, she did not describe conduct that constituted a crime at the time the

29

conduct occurred, as Mr. Trump asserts is required under Rule 413(d); (2) no jury

could reasonably find that Mr. Trump attempted to bring his body into contact

with Ms. Leeds's genitals, as required for admission under Rule 413(d)(2) and

(d)(5); and (3) the conduct described by Ms. Leeds could not have been

"prohibited" by 18 U.S.C. chapter 109A, as required for admission under Rule

413(d)(1), because (he argues) it did not occur within the requisite federal

jurisdiction.

We conclude that the Leeds testimony was properly admitted. First,

Mr. Trump's alleged conduct toward Ms. Leeds was a federal crime at the time it

occurred. Second, the Leeds testimony was admissible on the ground that Ms.

Leeds testified to an "attempt" under Rule 413(d)(5) to engage in the conduct

described in Rule 413(d)(2). Fed. R. Evid. 413. And because we conclude that the

Leeds testimony was admissible under Rule 413(d)(2) and (d)(5), we do not reach

Mr. Trump's Rule 413(d)(1) jurisdiction-based argument here.[10]

We begin with the requirement that the other act be a crime under

federal or state law. Mr. Trump argues that the alleged act had to constitute a

---

[10] We do reach the argument, however, in our discussion below of the Stoynoff
testimony.

crime at the time it was committed to satisfy Rule 413(d).  We need not decide

the issue here because the alleged act clearly was a crime at the time.  In 1978 and

1979, just as it is now, it was a federal crime to commit a simple assault on an

airplane.  And on this record a jury could have reasonably found that Mr. Trump

committed a simple assault against Ms. Leeds.

In 1978 and 1979, the law provided, in relevant part:

> Whoever, while aboard an aircraft within the special aircraft jurisdiction of the United States, commits an act which, if committed within the special maritime and territorial jurisdiction of the United States, as defined in section 7 of title 18, would be in violation of section 113 . . . of such title 18 shall be punished as provided therein.

49 U.S.C. § 1472(k)(1) (1976).  Section 1472(k)(1) thus included as an offense

within the "special aircraft jurisdiction of the United States" the conduct

proscribed by 18 U.S.C. § 113(e) (1976) -- a simple assault.  In 1978 and 1979, the

"special aircraft jurisdiction" extended to any aircraft "within the United States"

"while that aircraft is in flight."  49 U.S.C. § 1301(34) (1976); *see also* 49 U.S.C.

§ 1301(38) (Supp. III 1980).[11]

---

[11]     The statute provided that an aircraft is "in flight . . . from the moment when all external doors are closed following embarkation until the moment when one such door is opened for disembarkation."  49 U.S.C. § 1301(34) (1976); *see also* 49 U.S.C. § 1301(38) (Supp. III 1980).

Ms. Leeds testified that the departure and arrival destinations of the flight in this case were both within the United States,[12] and that Mr. Trump's alleged conduct toward her occurred after the plane had departed, that is, while the plane was "in flight."  Moreover, a jury could reasonably find by a preponderance of the evidence that Mr. Trump committed a simple assault by grabbing Ms. Leeds's breasts, kissing her, and pulling her toward him, all without her consent.  *See United States v. Delis*, 558 F.3d 177, 184 (2d Cir. 2009) (concluding that simple assault, as governed by section 113 of Title 18, encompassed a "completed common-law battery," which included "offensive touching," and did not require a "specific intent to injure").[13]

---

[12]     Mr. Trump argues that because Ms. Leeds could not recall her embarkation point, the proof of jurisdiction is insufficient.  But Ms. Leeds definitively recalled that the plane departed from one of only two possible locations -- either "Atlanta" or "Dallas" -- and had its final destination at LaGuardia Airport in New York.  App'x at 2098, 2130. The alleged conduct therefore took place "within the United States" and thus within the "special aircraft jurisdiction of the United States" under either version of Ms. Leeds's testimony.  *See* 49 U.S.C. § 1301(34) (1976); *see also* 49 U.S.C. § 1301(38) (Supp. III 1980).

[13]     The district court did not base its decision to admit the Leeds testimony on these specific statutes, *Carroll*, 660 F. Supp. 3d at 203-04, in part because Mr. Trump did not make these arguments below.  But "[w]e are free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied." *Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machines Corp.*, 110 F.4th 106, 113 (2d Cir. 2024) (citation omitted).

Likewise, we find no error in the trial court's conclusion that a jury could reasonably find by a preponderance of the evidence that Mr. Trump's actions as described by Ms. Leeds qualified as an attempt under (d)(5) to engage in the conduct described in (d)(2). The term "attempt" is not defined in the text of Rule 413. Because Rule 413 deals specifically with "similar crimes in sexual-assault cases," we look to the meaning of the word "attempt" as it is used in federal criminal statutes. *Cf. United States v. Hansen*, 599 U.S. 762, 774-75 (2023) ("[W]hen a criminal-law term is used in a criminal-law statute, that -- in and of itself -- is a good clue that it takes its criminal-law meaning."). In that context, it means having "the intent to commit the crime and engag[ing] in conduct amounting to a substantial step towards the commission of the crime." *United States v. Pugh*, 945 F.3d 9, 20 (2d Cir. 2019) (internal quotation marks omitted). "A substantial step 'is conduct planned to culminate in the commission of the substantive crime being attempted.'" *Id.* (quoting *United States v. Farhane*, 634 F.3d 127, 147 (2d Cir. 2011)).

Attempt may be found "even where significant steps necessary to carry out the substantive crime are not completed." *Id.* (internal quotation marks omitted). "Because the substantial step need not be the 'last act necessary' before

commission of the crime, 'the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the substantive crime.'" *Id.* (quoting *United States v. Manley*, 632 F.2d 978, 987 (2d Cir. 1980)). The behavior "need not be incompatible with innocence, yet it must be necessary to the consummation of the crime . . . ." *Manley*, 632 F.2d at 987-88. The behavior must also "be of such a nature that a reasonable observer, viewing it in context[,] could conclude beyond a reasonable doubt" -- or in the case of other acts evidence admitted under Rule 415, by a preponderance of the evidence -- "that it was undertaken in accordance with a design to violate the statute." *Id.* at 988.

Ms. Leeds testified that Mr. Trump grabbed her breasts, and tried to kiss her and pull her toward him as she resisted. She also testified unequivocally that Mr. Trump put his hand up her skirt. On the basis of this testimony, a jury could have reasonably found by a preponderance of the evidence that Mr. Trump knowingly took a substantial step toward bringing part of his body -- his hand -- into contact with Ms. Leeds's genitals without her consent.[14]

---

[14] Mr. Trump argues that Ms. Leeds's testimony was insufficient, as a factual matter, to support an attempt theory. The cases he cites, however, involve readily

Other evidence in the case further supports the district court's decision to admit Ms. Leeds's testimony.  As discussed below, the jury could reasonably infer from Ms. Stoynoff's testimony and the *Access Hollywood* tape that Mr. Trump engaged in similar conduct with other women -- a pattern of abrupt, nonconsensual, and physical advances on women he barely knew.[15]  And, as discussed above, the standard for admitting testimony under Rule 415 -- whether a jury could reasonably find by a preponderance of the evidence that a

---

distinguishable conduct.  In *Rapp v. Fowler*, for example, the witness had testified that the defendant put his hand on his knee and left it there for about 30 to 45 seconds.  No. 20-cv-09586 (LAK), 2022 WL 5243030, at *2 (S.D.N.Y. Oct. 6, 2022).  By contrast, Ms. Leeds testified that Mr. Trump put his hand up her skirt, wholly rejecting defense counsel's characterization that Mr. Trump had merely placed his hand on her knee. Similarly, in *United States v. Blue Bird*, 372 F.3d 989, 993 (8th Cir. 2004), no attempt was found where defendant had touched and kissed the victim but "desisted and withdrew when she said that she was not interested." *Accord United States v. Hayward*, 359 F.3d 631, 640 (3d Cir. 2004) (finding act of pushing a victim's head toward one's *clothed* genitals was ambiguous and not a substantial step toward contact between the mouth and genitals).  Here, the jury could have reasonably found that Mr. Trump placed his hand underneath Ms. Leeds's clothing and did not withdraw it voluntarily.

[15]    "[P]ieces of evidence must be viewed not in isolation but in conjunction." *United States v. Carson*, 702 F.2d 351, 362 (2d Cir. 1983).  Indeed, we have often observed that "bits and pieces" of evidence, taken together, can create a fuller picture -- such as a "mosaic" of intentional discrimination.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015); *see also Palin v. New York Times Co.*, 113 F.4th 245, 272 (2d Cir. 2024) ("When conducting this examination [under Rule 104(b)], 'the trial court must consider all evidence presented to the jury' because '[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.'" (quoting *Huddleston*, 485 U.S. at 690-91)).

person committed the attempted assault -- is distinct from and less stringent than the standard for convicting a person criminally of assault or attempted assault, which would have required the jury to make this finding beyond a reasonable doubt.

In sum, the district court did not abuse its discretion in admitting the Leeds testimony at trial.

**b.** *The Stoynoff Testimony*

Natasha Stoynoff testified that, in December 2005, when she was a reporter for *People* magazine, she was on assignment at Mar-a-Lago, Mr. Trump's residence in Florida. She was there to do a story about the first anniversary of Mr. Trump's marriage to Melania Trump and the arrival of their son, Barron. Ms. Stoynoff was at Mar-a-Lago for most of the day, conducting interviews of Mr. Trump and his wife between photoshoots. During a break between interviews, Mr. Trump told her that he would like to show her a painting that he had in "this really great room" in the house. App'x at 2349. Mr. Trump then led her to a room in a different part of his residence. Once they arrived at the room, as Ms. Stoynoff described at trial:

> I went in first and I'm looking around, I'm thinking, wow, really nice room, wonder what he wants to show me, and he -- I hear the door shut behind me.  And by the time I turn around, he has his hands on my shoulders and he pushes me against the wall and starts kissing me, holding me against the wall.

*Id.* at 2350.  Ms. Stoynoff "tried to push him away," but Mr. Trump came toward her again and she "tried to shove him again."  *Id.* at 2350-51.  Mr. Trump "was kissing [her]" and "he was against [her] and just holding [her] shoulders back."  *Id.* at 2351.  The encounter ended when Mr. Trump's butler came into the room.  Immediately afterward (Ms. Stoynoff testified), Mr. Trump told her:

> Oh, you know we are going to have an affair, don't you?  You know, don't forget what -- don't forget what Marla said, best sex she ever had.  We are going to go for steak, we are going to go to Peter Luger's.  We're going to have an affair.

*Id.* at 2352.

Mr. Trump challenges the district court's admission of Ms. Stoynoff's testimony.  The district court based its decision to admit the Stoynoff testimony on its finding that it described (1) a crime under Florida law, a proposition that Mr. Trump does not challenge, and (2) an attempt, under Rule 413(d)(5), to engage in conduct described in Rule 413(d)(2).

The trial court did not abuse its discretion when it admitted, pursuant to Rule 413(d)(2) and (5), the evidence of Mr. Trump's alleged actions toward Ms. Stoynoff at Mar-a-Lago in 2005. It found that those actions -- inviting Ms. Stoynoff to an unoccupied room, closing the door behind her, and immediately engaging in nonconsensual kissing despite Ms. Stoynoff's resistance -- suggested a premeditated plan to "take advantage of [the] privacy and to do so without regard to Ms. Stoynoff's wishes." *Carroll*, 660 F. Supp. 3d at 206. We agree and further conclude that the jury could have reasonably found that Mr. Trump took a "substantial step" toward the completion of this premeditated plan when he allegedly closed the door, forcefully held Ms. Stoynoff against the wall while kissing her, and repeatedly came toward her despite being pushed back twice. Mr. Trump's comments to Ms. Stoynoff immediately after the encounter -- including "you know we are going to have an affair" and suggesting they would have the "best sex" -- also shed light on the intent behind his actions. App'x at 2352. That the alleged assault showed no signs of terminating until a third party interrupted it also supports the conclusion that a jury could have reasonably found that Mr. Trump intended to bring his body into contact with Ms. Stoynoff's genitals and that he took substantial steps toward doing so.

In addition, the evidence could have been admitted as an attempt under Rule 413(d)(5) to engage in the type of conduct under (d)(1): "any conduct prohibited by 18 U.S.C. chapter 109A." Fed. R. Evid. 413(d)(1). Conduct proscribed by chapter 109A includes to "knowingly engage[] in sexual contact with another person without that other person's permission." 18 U.S.C. § 2244(b). The chapter defines "sexual contact" as:

> the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

*Id.* § 2246(3). A jury could have reasonably found, upon consideration of the circumstances discussed above, that the actions alleged constituted an attempt to knowingly engage in conduct that falls within that definition of making "sexual contact," and to do so without Ms. Stoynoff's permission.

Mr. Trump argues (as he did with respect to the Leeds testimony) that, to be admissible under Rule 413(d)(1), the evidence must meet the jurisdictional requirement of 18 U.S.C. chapter 109A: he contends, in other words, that the conduct must have occurred within the "special maritime and territorial jurisdiction of the United States" or certain custodial facilities to qualify

as "conduct prohibited by" chapter 109A.[16]  Mr. Trump argues that an act that does not meet the jurisdictional requirement of chapter 109A cannot be "prohibited" by chapter 109A.  Appellant's Reply Br. at 2-3.  We are not persuaded that Rule 413(d)(1) is so constrained.

Mr. Trump's reading is wholly inconsistent with the rationale advanced in Congress in adopting Rules 413-415, which centered on the *nature* of the other conduct, not the specific location in which the conduct occurred.  As the text and structure of Rule 413 make clear, Congress did not intend for Rule 413(d)(1) to apply only to conduct occurring within the "special maritime and territorial jurisdiction of the United States" -- that is, among other places, the high seas, on federally controlled land, or in certain custodial facilities.  *See* 18 U.S.C. § 7 (defining "special maritime and territorial jurisdiction of the United States").  Rules 413 and 415 permit the admission of evidence that the defendant "committed any other sexual assault," and Rule 413(d) defines "sexual assault" to include "a crime under federal law or under state law . . . involving" any one of

---

[16]     Chapter 109A is entitled "Sexual Abuse" and includes, *inter alia*, sections 2241 through 2244, each of which criminalizes conduct "in the special maritime and territorial jurisdiction of the United States or in a Federal prison" or certain other custodial facilities.  18 U.S.C. §§ 2241, 2242, 2243, 2244.

five categories of conduct. Clearly, in Rule 413(d)(1), Congress was referring to the nature or types of conduct covered in chapter 109A -- such as aggravated sexual abuse, sexual abuse, sexual abuse of a minor, and abusive sexual contact, 18 U.S.C. §§ 2241, 2242, 2243, 2244 -- without limiting the applicability of Rule 413(d)(1) to the conduct occurring on the high seas, on federally-controlled lands, and in certain custodial facilities.

Several of our sister circuits read the statute as we do, stressing the nature of the conduct and disregarding any jurisdictional element. *See, e.g.*, *United States v. Batton*, 602 F.3d 1191, 1196-98 (10th Cir. 2010) (holding defendant's prior sexual assault of a boy "falls squarely under Rule 413's definition of sexual assault" because it involved conduct that was "clearly proscribe[d]" by chapter 109A, without regard to whether it occurred within the special maritime and territorial jurisdiction of the United States or a custodial facility); *Blind-Doan v. Sanders*, 291 F.3d 1079, 1082 (9th Cir. 2002) ("We understand Rule 413 to mean acts proscribed by [chapter 109A], whether or not the acts are committed by federal personnel in federal prisons . . . ."); *United States v. Blazek*, 431 F.3d 1104, 1109 (8th Cir. 2005) ("Rule 413 does not require that the defendant be charged with a chapter 109A offense, only that the instant

offense involve conduct proscribed by chapter 109A."). We fail to see any bearing that the jurisdiction of the offense would have on the probative value of the proffered evidence of sexual assault.

The legislative history of the rules also supports our conclusion. For example, the Congressional Record explains that the definition of sexual assault under Rule 413(d) is intended to "cover[] federal and state offenses involving *the types of conduct* prohibited by [chapter 109A]." 137 Cong. Rec. 6031 (1991) (emphasis added).[17] And Congress left no doubt that it adopted Rules 413-415 to allow courts to admit evidence that a "defendant has the motivation or disposition to commit sexual assaults." *Id*. The above legislative history confirms that Rule 413(d)(1) hinges on the "type of conduct" alleged, not where the conduct occurred. *See also United States v. Sturm*, 673 F.3d 1274, 1283 (10th Cir. 2012) (analyzing legislative history and holding that Rule 414's incorporation

---

[17]     Rules 413-415 were introduced in materially identical form as part of the proposed, but not enacted, Comprehensive Violent Crime Control Act of 1991. *See* 137 Cong. Rec. 6003-04. When the Rules were re-introduced and passed as part of the Violent Crime Control and Law Enforcement Act of 1994, the section-by-section analysis of the Rules that accompanied the 1991 legislation, 137 Cong. Rec. 6030-34, was described by the Rules' original co-sponsors as a key part of the Rules' legislative history that "deserve[s] particular attention." 140 Cong. Rec. 24,799 (statement of Sen. Dole); *see also* 140 Cong. Rec. 23,602 (statement of Rep. Molinari).

of conduct prohibited in a federal statute does not incorporate that statute's interstate-commerce element because "the interstate character of a defendant's prior crimes has no bearing on the evidence's probative value"); *United States v. Shaw*, No. 22-CR-00105-BLF-1, 2023 WL 2815360, at *7 (N.D. Cal. Apr. 5, 2023) (analyzing legislative history of Rules 413-415 and holding that "the Court should look at the type of conduct at issue, as opposed to its location"); Advisory Note, *Report of the Judicial Conference on the Admission of Character Evidence in Certain Sexual Misconduct Cases*, 159 F.R.D. 51, 57 (Feb. 9, 1995) (proposing amendments to Rules 413-415, including to clarify "with no change in meaning" that "[e]vidence offered [of another sexual assault] must relate to a form of conduct proscribed by . . . chapter 109A . . . of title 18, United States Code, regardless of whether the actor was subject to federal jurisdiction").

   In an analogous context, in *Torres v. Lynch*, the Supreme Court held that a New York state arson law was an "aggravated felony" under the Immigration and Nationality Act because it was an offense "described in" a federal arson statute, even though it lacked the federal statute's jurisdictional hook. 578 U.S. 452, 460, 473 (2016). The Court reasoned that state legislatures are "not limited to Congress's enumerated powers" and therefore would have "no

reason to tie their substantive offenses to those grants of authority." *Id.* at 458; *see also id*. at 457 (explaining that most federal criminal statutes include "substantive elements," which "primarily define[] the behavior that the statute calls a 'violation' of federal law," and a "jurisdictional element," which "ties the substantive offense . . . to one of Congress's constitutional powers").  Rules 413-415 do not contain a "jurisdictional hook," and the drafters of the rules would not have been concerned with the lack of police power or any jurisdictional requirement because the Federal Rules of Evidence, unlike the federal criminal code, do not authorize federal punishment.

Accordingly, we give Rule 413 a common-sense reading that is consistent with the structure and purpose of Rules 413-415.  We conclude that Rule 413(d)(1) applies to *conduct* that fits within chapter 109A -- such as aggravated sexual abuse, sexual abuse, sexual abuse of a minor, or abusive sexual contact -- without regard to whether chapter 109A's jurisdictional element is met.  Therefore, the Stoynoff testimony was admissible under Rule 413(d)(5) as evidence of an attempt to engage in the type of conduct covered by Rule 413(d)(1).

Our holding that Ms. Stoynoff's testimony was properly admitted is further supported by Ms. Leeds's testimony and the *Access Hollywood* tape and the fact that the sufficiency standard for admitting the evidence under Rule 415 is lower than what would be required to sustain a conviction. Accordingly, the district court did not abuse its discretion in admitting the Stoynoff testimony.[18]

### c.   The *Access Hollywood* Tape

Mr. Trump's final challenge to the district court's admission of other act evidence centers on a 2005 recording of a conversation among Mr. Trump,

---

[18]      In allowing Ms. Stoynoff to testify, the district court also relied on Ms. Stoynoff's deposition, where she stated that Mr. Trump groped her without her consent. *See* App'x at 146 ("I consider that he lied about kissing and groping me without consent."). While Ms. Stoynoff did not ultimately use the word "grope" at trial, the district court did not abuse its discretion in relying on the deposition testimony in deciding to admit the evidence. As the district court reasoned in denying Mr. Trump's motion *in limine* to exclude Ms. Stoynoff's testimony, "the circumstances of the alleged encounter are relevant," including that Mr. Trump invited Ms. Stoynoff "to an unoccupied room and closed the door behind her," and then "he immediately, and without her consent, began kissing Ms. Stoynoff and pressed on as she resisted his advances" -- actions the court found to be "suggestive of a plan, formed before Mr. Trump invited Ms. Stoynoff to the unoccupied room and closed the door behind her, to take advantage of that privacy and to do so without regard to Ms. Stoynoff's wishes." *Carroll*, 660 F. Supp. 3d at 206. The court noted that the *Access Hollywood* tape and Ms. Leeds's testimony "are additional evidence that a jury would be entitled to consider in deciding whether to infer that the ultimate goal of Mr. Trump's alleged actions" was to attempt to sexually assault Ms. Stoynoff. *Id*. We further conclude, based on the above discussion, that Ms. Carroll elicited sufficient evidence for the jury to reasonably find by a preponderance of the evidence that Mr. Trump attempted to sexually assault Ms. Stoynoff.

Billy Bush, and others as they arrived for the filming of a television show.  This recording, known as the *Access Hollywood* tape, aired nationally during the 2016 presidential election.  The tape, just under two minutes long, was played twice for the jury.  In the recording, Mr. Trump states that he "moved on" a woman named Nancy "like a bitch" and "did try and fuck her."  App'x at 2883.  As he described the encounter:

> I moved on her actually.  You know she was down on Palm Beach.  I moved on her, and I failed.  I'll admit it.  I did try and fuck her.  She was married. . . .  I moved on her very heavily in fact I took her out furniture shopping.  She wanted to get some furniture.  I said I'll show you where they have some nice furniture.  I moved on her like a bitch, but I couldn't get there.  And she was married.  Then all-of-a-sudden I see her, she's now got the big phony tits and everything.  She's totally changed her look.

*Id.*  He also stated, "You know I'm automatically attracted to beautiful -- I just start kissing them.  It's like a magnet.  Just kiss.  I don't even wait.  And when you're a star, they let you do it.  You can do anything. . . .  Grab them by the pussy.  You can do anything."  *Id.*

During his October 2022 deposition, Mr. Trump was questioned about his statements in the tape.  A portion of that testimony was played to the jury:

Q.      And you say -- and again, this has become very famous -- in this
video, 'I just start kissing them.  It's like a magnet.  Just kiss.  I don't even
wait.  And when you're a star, they let you do it.  You can do anything,
grab them by the pussy.  You can do anything.'  That's what you said;
correct?

A.      Well, historically, that's true with stars.

Q.      True with stars that they can grab women by the pussy?

A.      Well, that's what -- if you look over the last million years, I guess
that's been largely true.  Not always, but largely true.  Unfortunately or
fortunately.

Q.      And you consider yourself to be a star?

A.      I think you can say that, yeah.

*Id.* at 2973.

The district court concluded that the recording was admissible as

evidence of a prior sexual assault because it satisfied the requirements of Rule

413(d)(2) as well as (d)(5).  Thus, the district court ruled that a "jury reasonably

could find, even from the *Access Hollywood* tape alone, that Mr. Trump admitted

in the *Access Hollywood* tape that he in fact has had contact with women's

genitalia in the past without their consent, or that he has attempted to do so."

*Carroll*, 660 F. Supp. 3d at 203.  In its post-trial decision denying Mr. Trump's

motion for a new trial, however, the district court concluded that at trial "it

47

became clear that reliance on Rule 415 was unnecessary because the video was

offered for a purpose other than to show the defendant's propensity to commit

sexual assault." *Carroll*, 683 F. Supp. 3d at 302, 313 n.20. Instead, the court

concluded, the recording "could have been regarded by the jury as a sort of

personal confession as to his behavior." *Id.* at 326.

The district court concluded that the recording was relevant because

it "has the tendency to make [the] fact [of whether [Mr. Trump] sexually

assaulted Ms. Carroll] more or less probable than it would be without the

evidence because one of the women he referred to in the video could have been

Ms. Carroll." *Id.* at 313 n.20 (internal quotation marks omitted).

We are not fully persuaded by the district court's second basis for

admitting the recording -- that the tape captured a "confession." *Id.* at 326. But

the first rationale adopted by the district court -- that the recording was evidence

of one or more prior sexual assaults and therefore admissible under Rules 413

and 415 -- provided a proper basis for the district court's exercise of its broad

discretion. As discussed above, we may reverse the district court's ruling only if

we find it to have been "arbitrary and irrational." *Restivo v. Hessemann*, 846 F.3d

547, 573 (2d Cir. 2017) (quoting *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012)).

Applying this highly deferential standard of review, we conclude that the district court did not abuse its discretion in admitting the recording pursuant to Rules 413(d)(2), 413(d)(5), and 415. In the recording, Mr. Trump says, "I just start kissing them," "I don't even wait," and "You can do anything. . . . Grab them by the pussy." App'x at 2883. The jury could have reasonably concluded from those statements that, in the past, Mr. Trump had kissed women without their consent and then proceeded to touch their genitalia. While it is true, as Mr. Trump argues, that he also said, "[T]hey let you do it," the district court correctly observed that "[i]t simply is not the Court's function in ruling on the admissibility of this evidence to decide what Mr. Trump meant or how to interpret his statements." *Carroll*, 660 F. Supp. 3d at 203. Rather, the court's duty was simply to decide whether a jury could reasonably find by a preponderance of the evidence that Mr. Trump committed an act of sexual assault (as defined under Rule 413). If it could so find, the court had the discretion to admit the evidence.

We also conclude that the *Access Hollywood* tape was admissible pursuant to Rule 404(b) as evidence of a pattern, or *modus operandi*, that was relevant to prove that the alleged sexual assault actually occurred (the *actus reus*).[19] *See* Leonard, *supra*, § 13.1 (recognizing that evidence of *modus operandi* may be admissible for a variety of non-propensity purposes, including "to demonstrate that the act at issue actually was committed").

The existence of a pattern, or a "recurring *modus operandi*," can be proven by evidence of "characteristics . . . sufficiently idiosyncratic to permit a fair inference of a pattern's existence." *United States v. Sliker*, 751 F.2d 477, 487 (2d Cir. 1984); *see also Ismail v. Cohen*, 706 F. Supp. 243, 253 (S.D.N.Y. 1989) (admitting evidence under Rule 404(b) to show a "pattern of misconduct" involving defendant "applying handcuffs too tightly, falsely claiming injury from the citizen to cover up his own inappropriate use of physical force, and filing false charges for the same purpose"), *aff'd*, 899 F.2d 183, 188-89 (2d Cir. 1990) (no error

_____

[19]     To the extent that the district court's post-trial "confession" rationale for admitting the *Access Hollywood* tape -- that the tape "could have been regarded by the jury as a sort of personal confession as to his behavior," *Carroll*, 683 F. Supp. 3d at 326 -- is consistent with our above explanation that the tape was admissible under Rule 404(b) as evidence of a pattern of conduct, we identify no error.

in admitting other act evidence under Rule 404(b) for "pattern" purposes); *United States v. Carlton*, 534 F.3d 97, 101-02 (2d Cir. 2008) (holding that evidence of similarities between defendant's three prior bank robberies and the charged bank robbery -- "such as location, the takeover style of the robberies, or use of a getaway car" -- established "the existence of a pattern"). The similarities between the past acts and current allegations "need not be complete." *Sliker*, 751 F.2d at 487. It is enough for admissibility purposes that the acts be sufficiently similar as to "earmark them as the handiwork of the accused." *Id*. (quoting 1 McCormick, Evidence § 190, at 559 (3d ed. 1984)).

Courts have routinely admitted evidence of a pattern or *modus operandi* in sexual assault cases where, as here, the defendant is alleged to have engaged in a distinctive pattern of conduct related to non-consensual sexual contact. *See, e.g.*, *Roe v. Howard*, 917 F.3d 229, 245-46 (4th Cir. 2019) (no error in the admission of evidence of a pattern of prior sexual abuse under Rule 404(b) where the prior victim's testimony mirrored the plaintiff's allegations); *Montanez v. City of Syracuse*, No. 16-cv-00550, 2019 WL 4328872, at *4-7 (N.D.N.Y. Sept. 12, 2019) (admitting evidence of a prior sexual assault under Rule 404(b) as relevant to show, *inter alia*, a pattern because the previous victim and the plaintiff both

alleged that the defendant, a law enforcement officer, "exposed himself to them while on duty, responding to calls at their residences, and intimidated them into performing oral sex"); Leonard, *supra*, § 13.3 (explaining that evidence of *modus operandi* may be relevant and admissible under Rule 404(b) in "[s]exual assault and child molestation cases" where the "crimes are committed in the presence of fewer people and leave fewer traces").

Evidence of a pattern may also be relevant for the non-propensity purpose of corroborating witness testimony. *United States v. Everett*, 825 F.2d 658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony" so long as "corroboration is direct and the matter corroborated is significant.") (internal quotation marks omitted); *United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (noting that evidence of other acts may be admissible under Rule 404(b) "even if the trial court finds that such evidence is relevant only for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant"); *see also United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) (listing "corroboration of witnesses" as one of the acceptable "non-propensity purposes" for admitting other act evidence under Rule 404(b)); *United*

*States v. Oskowitz*, 294 F. Supp. 2d 379, 382 (E.D.N.Y. 2003) ("[C]orroboration is also an acceptable purpose to admit prior act evidence.").[20]  Its use in this fashion must be assessed as well under Rule 403, of course, for unfair prejudice, but in a proper case the district court may admit it.

We conclude that the *Access Hollywood* tape described conduct that was sufficiently similar in material respects to the conduct alleged by Ms. Carroll (and Ms. Leeds and Ms. Stoynoff) to show the existence of a pattern tending to prove the *actus reus*, and not mere propensity.  Mr. Trump's statements in the tape, together with the testimony of Ms. Leeds and Ms. Stoynoff (detailed above), establish a repeated, idiosyncratic pattern of conduct consistent with what Ms.

---

[20]     In the related context of Rules 413-415, courts have also upheld the admissibility of evidence that is challenged as unfairly prejudicial where such evidence shows a pattern of behavior that corroborates witness testimony.  *See United States v. Gaudet*, 933 F.3d 11, 18 (1st Cir. 2019) ("[The witness's] testimony was probative because it helped to establish the credibility of [the victim's] testimony" and "because the near identical account of abuse that she offered helped to corroborate [the victim's] allegations by illustrating that [the witness] had leveled nearly identical allegations against [the defendant] previously."); *United States v. Joubert*, 778 F.3d 247, 254-55 (1st Cir. 2015) ("[B]ecause [the defendant's] defense was that he did not commit the crimes against [the child victim], evidence bearing on [the child's] veracity was probative to determining whether [the defendant] indeed produced and possessed the illicit recording.  The uncharged child molestation testimony was probative of [the child]'s veracity because it corroborated aspects of [the child]'s testimony, particularly the nature of the abuse and [the defendant's] modus operandi in approaching his victims.").

Carroll alleged.[21]  In each of the three encounters, Mr. Trump engaged in an

ordinary conversation with a woman he barely knew, then abruptly lunged at

her in a semi-public place and proceeded to kiss and forcefully touch her without

her consent.  The acts are sufficiently similar to show a pattern or "recurring

*modus operandi*."  *Sliker*, 751 F.2d at 487.  Moreover, the tape was "directly

corroborative" of the testimony of Ms. Carroll, Ms. Leeds, and Ms. Stoynoff as to

the pattern of behavior each allegedly experienced, and "the matter

corroborated" was one of the most "significant" in the case -- whether the assault

of Ms. Carroll actually occurred.  *Everett*, 825 F.2d at 660-61 (noting that other act

evidence admissible for corroborative purposes must involve corroboration that

is "direct and the matter corroborated [must be] significant" (internal quotation

marks omitted)).  Therefore, the evidence of other conduct was relevant to show

a pattern tending to directly corroborate witness testimony and to confirm that

---

[21]     *Cf. United States v. Mohel*, 604 F.2d 748, 751 n.6 (2d Cir. 1979) ("The fact that the [other act] evidence is in the form of statements by the defendant himself does not change the applicable analysis.").

the alleged sexual assault actually occurred.[22]  The *Access Hollywood* tape was therefore properly admitted.

### d.    *Rule 403*

Mr. Trump's final argument with respect to the other acts evidence rests on Rule 403.  He contends that the district court abused its discretion in admitting the evidence because the risk of unfair prejudice substantially outweighed the evidence's probative value, which he characterizes as "extremely limited."  Appellant's Br. at 35.

We find no abuse of discretion in the district court's assessment of the other acts evidence under Rule 403.  The testimony of Ms. Leeds and Ms. Stoynoff and Mr. Trump's statements on the *Access Hollywood* tape were highly probative, and their probative value was not substantially outweighed by any unfair prejudice.

First, evidence admitted under Rule 415 is presumptively probative in a sexual assault case such as this, which centers on the parties' respective

---

[22]    As our discussion makes clear, while *modus operandi* evidence is often relevant to identify the unknown perpetrator of a crime, "[it] is not in fact synonymous with 'identity.'"  Leonard, *supra*, § 13.1.  It can be -- and in this case it is -- relevant for other non-propensity purposes as well.

credibility. *See Schaffer*, 851 F.3d at 178 ("In passing Rule 413, Congress considered '[k]nowledge that the defendant has committed rapes on other occasions [to be] critical in assessing the relative plausibility of [sexual assault] claims and accurately deciding cases that would otherwise become unresolvable swearing matches.'" (alterations in original) (quoting *United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir. 1998))).

Second, for the reasons we discussed above with regard to the admissibility of the *Access Hollywood* tape under Rule 404(b), the conduct described by the other act evidence is sufficiently similar in material respects to be probative. True, Mr. Trump's alleged assault of Ms. Leeds occurred on an airplane, and thus differed from the assaults described by Ms. Carroll and Ms. Stoynoff, but Ms. Leeds's testimony was not so dissimilar as to substantially outweigh its strong probative value.

Mr. Trump argues that the amount of time since the alleged acts, particularly with respect to Ms. Leeds's testimony, reduces their probative value. But we apply Rules 413-415 in a manner that effectuates Congress's intent. *See, e.g., Schaffer*, 851 F.3d at 178. As the district court observed, Congress intentionally did not restrict the timeframe within which the other sexual act

must have occurred to be admissible under Rules 413-415.  *Carroll*, 660 F. Supp. 3d at 208.  One of the original sponsors of the legislation proposing Rules 413-415 explained that "evidence of other sex offenses by the defendant is often probative and properly admitted, *notwithstanding very substantial lapses of time in relation to the charged offense or offenses*."  140 Cong. Rec. 23603 (1994) (remarks of Rep. Molinari) (emphasis added).  In consideration of this express intent, we conclude that the time lapse between the alleged acts does not negate the probative value of the evidence of those acts to the degree that would be required to find an abuse of discretion in admitting them for the jury's consideration.  *Accord, e.g.*, *United States v. O'Connor*, 650 F.3d 839, 853-54 (2d Cir. 2011) (no abuse of discretion in admission of evidence of sexual acts that occurred 30 years earlier); *United States v. Davis*, 624 F.3d 508, 511-12 (2d Cir. 2010) (evidence of molestation conviction 19 years earlier was properly admitted); *United States v. Larson,* 112 F.3d 600, 604-05 (2d Cir. 1997) (evidence of sexual acts occurring up to 20 years earlier was properly admitted).

Finally, we also find that the other act evidence was not unfairly prejudicial, as the incidents in question were "no more sensational or disturbing" than the acts that Ms. Carroll alleged Mr. Trump to have committed against her.

*United States v. Curley*, 639 F.3d 50, 59 (2d Cir. 2011) (internal quotation marks

omitted).[23]

**B.      *Excluded Evidence***

Mr. Trump's second category of challenges to the judgment below is

based on the district court's decision to exclude, rather than admit, certain

evidence.  Specifically, Mr. Trump argues that the district court unreasonably

restricted his defense by precluding (1) evidence that some of Ms. Carroll's legal

fees were being paid for by one of Mr. Trump's political opponents and (2)

portions of a transcript made by Ms. Carroll of a 2020 interview between Ms.

Carroll and Ms. Stoynoff that, Mr. Trump argues, suggests that Ms. Carroll

coached Ms. Stoynoff on her testimony.  Mr. Trump also asserts that the district

---

[23]      On appeal, Mr. Trump also offered brief challenges to the district court's
admission of certain other evidence, including: (1) excerpts from two 2016 campaign
videos in which Mr. Trump denied the allegations made by Ms. Leeds and Ms.
Stoynoff; (2) additional testimony from Ms. Leeds, including, for example, regarding
her reaction to statements made by Mr. Trump during the campaign; (3) additional
testimony from Ms. Stoynoff, including, for example, her testimony regarding her belief
that Mr. Trump engaged in this conduct with many women; and (4) evidence of certain
other comments made by Mr. Trump.  We discern no abuse of discretion in these
rulings.  Mr. Trump did not object to much of this additional evidence at trial, and he
was able to use some of the same testimony as impeachment material on cross-
examination.  Even assuming error in any of these rulings, Mr. Trump failed to carry his
burden to show that his "substantial rights" were affected.  *Tesser*, 370 F.3d at 319.

court erred in preventing him from cross-examining Ms. Carroll on three matters: her out-of-court claim that she possessed Mr. Trump's DNA; her decision not to file a police report; and her failure to seek surveillance video footage from Bergdorf Goodman.  We address each challenge in turn.

### 1.    *Litigation Funding*

The district court did not abuse its discretion in excluding evidence related to litigation funding.  Mr. Trump contends that this evidence was "proof that a billionaire critic of President Trump had paid [Ms. Carroll's] legal fees, and that [Ms. Carroll] lied about the funding during her deposition."  Appellant's Br. at 41.  Mr. Trump thus sought to offer this evidence to attack Ms. Carroll's credibility, and also as evidence of bias and motive.

### a.    *Ms. Carroll's Credibility*

"Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  Fed. R. Evid. 608(b). But the court "may, on cross-examination, allow [specific instances] to be inquired into if they are probative of [a witness's] character for truthfulness or untruthfulness."  *Id*.

At Ms. Carroll's October 2022 deposition, when *Carroll I* (but not this case) was pending, in response to a question asking whether she was "presently paying [her] counsel's fees," Ms. Carroll responded that hers was "a contingency case" and said that no one else was paying her legal fees. App'x at 1188. On April 10, 2023, however, Ms. Carroll's counsel disclosed to Mr. Trump's attorneys Ms. Carroll's refreshed recollection "that at some point her counsel secured additional funding from a nonprofit organization to offset certain expenses and legal fees." *Id.* at 1191. In response, the district court permitted defense counsel limited discovery into the litigation funding, and Ms. Carroll's knowledge of it, while reserving judgment on the relevancy of evidence relating to the issue.

The facts established during the ensuing discovery confirmed that Ms. Carroll's case was taken on a contingency fee basis, and that, in September 2020, Ms. Carroll's counsel received outside funding from a nonprofit to help offset costs. There was no evidence to suggest that Ms. Carroll was personally involved in securing the funding, interacted with the funder, received an invoice showing the arrangement before or after her counsel received the outside funding, or had discussed the arrangement with anyone between learning of it in September 2020 and being deposed in October 2022.

60

Upon consideration of this evidence, the district court granted Ms. Carroll's motion to preclude evidence and argument about the litigation funding in the case. The district court concluded:

> In general, litigation funding is not relevant. Here I allowed very limited discovery against what seemed to me a remote but plausible argument that maybe something to do with litigation funding arguably was relevant to the credibility of one or two answers by this witness in her deposition. I gave the defense an additional deposition of the plaintiff, and I gave the defense limited document discovery.
>
> On the basis of all that, I have concluded that there is virtually nothing there as to credibility. And even if there were, the unfair prejudicial effect of going into the subject would very substantially outweigh any probative value whatsoever.

App'x at 1659. We perceive no abuse of discretion here.

First, district courts regularly exclude evidence of litigation financing under Rule 401, finding it "irrelevant to credibility" and that it "does not assist the factfinder in determining whether or not the witness is telling the truth." *Benitez v. Lopez*, No. 17-cv-3827, 2019 WL 1578167, at *1 (E.D.N.Y. Mar. 14, 2019); *see also id.* at *2 (reviewing cases and noting that "[n]o case" of which the court was aware supports the claimed proposition that "litigation financing documents are generally probative of a plaintiff's credibility"); *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*, 405 F. Supp. 3d

612, 615 (D.N.J. 2019) (collecting cases); *cf. Kaplan v. S.A.C. Cap. Advisors, L.P.*, No. 12-cv-9350, 2015 WL 5730101, at *5 (S.D.N.Y. Sept. 10, 2015) (in class action context, denying defendants' request for production of documents relating to plaintiffs' litigation funding on ground that defendants failed to "show that the requested documents are relevant to any party's claim or defense").

Second, the district court did not abuse its discretion in precluding cross-examination on this point because, as the district court found, Ms. Carroll's prior statement on the litigation funding was not sufficiently probative of her credibility. Ms. Carroll plausibly represented that she had forgotten about the limited outside funding counsel obtained in September 2020 when this question was first posed to her in 2022, and the additional discovery did not indicate otherwise. Rather, it showed that Ms. Carroll simply was not involved in the matter of who was or was not funding her litigation costs. Ms. Carroll testified that, after her counsel informed her in September 2020 that they had received some outside funding, she did not speak with her counsel about this topic again until the spring of 2023 and did not even know the funder's political position or why they were partially funding her lawsuit. Therefore, by the time of her deposition in October 2022, Ms. Carroll had not spoken with her counsel about

the matter of outside funding for over two years.  It was not an abuse of the

district court's discretion to conclude that the available litigation-funding

evidence would have little probative value compared to its potential for unfair

prejudice.

### b.  *Bias and Motive*

For similar reasons, we conclude that extrinsic evidence of the

litigation funding had minimal, if any, probative value on the issue of Ms.

Carroll's bias and motive. [24]

Extrinsic evidence may be introduced to prove a witness's bias.

*United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976) ("[B]ias of a witness is not

a collateral issue and extrinsic evidence is admissible to prove that a witness has

a motive to testify falsely.").  The admissibility of evidence for this purpose

depends on whether it is "sufficiently probative of [the witness's asserted bias] to

warrant its admission into evidence."  *United States v. Abel*, 469 U.S. 45, 49 (1984).

---

[24]     "Bias is a term used . . . to describe the relationship between a party and a
witness which might lead the witness to slant, unconsciously or otherwise, his
testimony in favor of or against a party.  Bias may be induced by a witness'[s] like,
dislike, or fear of a party, or by the witness'[s] self-interest." *United States v. Abel*, 469
U.S. 45, 52 (1984).

To the extent Mr. Trump argues that the acceptance of outside

funding goes toward Ms. Carroll's motive in lodging these allegations at Mr.

Trump, the discovery also confirmed that Ms. Carroll publicly accused Mr.

Trump of sexual assault over a year before the outside litigation funding was

secured.  Moreover, whether the outside funder was politically opposed to Mr.

Trump was of little probative value because Ms. Carroll herself frankly admitted

her political opposition to Mr. Trump, and her key witnesses testified to their

opposition as well.  *See, e.g.*, App'x at 1653 (Ms. Carroll acknowledging she is "a

registered Democrat"); *id.* at 2120, 2123 (Ms. Leeds acknowledging she is a

Democrat and "passionate about politics"); *id.* at 2054 (Ms. Birnbach

acknowledging she is a Democrat and donated to Hillary Clinton); *id.* at 2411

(Ms. Martin acknowledging she is a Democrat and donated to Clinton).  On

multiple occasions, defense counsel was able to bring out the political opposition

and distaste for Mr. Trump held by Ms. Carroll and her witnesses.  *See United*

*States v. James*, 609 F.2d 36, 47-48 (2d Cir. 1979) (finding reversal not warranted

where defendant was given full opportunity to explore witness's apparent

bias).[25]

In light of the minimal probative value of the evidence, we conclude

that the district court did not abuse its discretion in excluding it under Rule 403.

## 2.    *The Stoynoff Transcript*

During trial, Mr. Trump moved to admit a redacted version of a

transcript made by Ms. Carroll of a conversation between Ms. Carroll and Ms.

Stoynoff to show Ms. Carroll's alleged "effort to influence Ms. Stoynoff's

testimony."  App'x at 1900.  The court devoted over thirty minutes of a sidebar

---

[25]    Mr. Trump separately argues that the district court also "improperly restricted questioning and argument regarding [an attorney, George] Conway."  Appellant's Br. at 43.  Ms. Carroll testified at trial that about one month after she publicly accused Mr. Trump of sexually assaulting her, she attended a party where she met a lawyer named George Conway.  Mr. Conway encouraged Ms. Carroll to seriously consider filing a lawsuit against Mr. Trump.  The district court sustained an objection to portions of Mr. Trump's opening statement that concerned Mr. Conway on the ground that counsel was impermissibly arguing to the jury that Mr. Conway had recommended Ms. Carroll's counsel.  Even if Mr. Conway's conversation with Ms. Carroll was somehow probative of bias, we find no error in the district court's ruling.  Argument related to Ms. Carroll's choice of counsel had been ruled inadmissible pursuant to Ms. Carroll's unopposed motion *in limine*.  *Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL 2652636, at *8 (S.D.N.Y. Mar. 27, 2023).  Further, contrary to Mr. Trump's representation on appeal, defense counsel was permitted to meaningfully cross-examine Ms. Carroll about Mr. Conway.  Ms. Carroll acknowledged that Mr. Conway had encouraged her to file the lawsuit, and defense counsel was able to argue these facts to the jury during summation.

conversation to "trying to figure out what it is [defense counsel was] trying to put in[to evidence]." App'x at 1907; *see also id.* at 1912.[26] The district court called defense counsel's rendition of his proposed presentation to the jury of the redacted transcript "tremendously confusing," *id.* at 1903, and commented that defense counsel did not have the slides of the redacted transcript "figured out" or "put together," *id.* at 1907. At the end of this lengthy conversation, the district court denied the motion to receive the proposed document into evidence, finding that Ms. Stoynoff's statements in the transcript constituted hearsay, and that the proposed document's use at trial would be confusing and unnecessarily time-consuming. The court requested that defense counsel determine how to elicit the information "[i]n a way that will not be confusing and take three times as much time." *Id.* at 1913.

The solution that the court accepted, and that Mr. Trump now challenges as insufficient, was to exclude the redacted transcript from presentation on direct examination but to permit defense counsel to cross-examine Ms. Carroll about the interview and to use the transcript to refresh and

---

[26] The "transcript" document included much extraneous material. *See* App'x at 1371-415.

impeach, if necessary. On cross-examination, defense counsel did in fact

confront Ms. Carroll with language from the transcript, reading portions of it

into the record. Defense counsel did not seek to question Ms. Stoynoff about the

transcript.

Mr. Trump argues that the district court's decision to preclude the

redacted Stoynoff transcript itself was erroneous: he submits that Ms. Carroll's

statements, as they were embodied in the redacted transcript, were admissible

for their truth as a party admission under Federal Rule of Evidence 801(d)(2)(A).

Mr. Trump also argues that the transcript itself was admissible as extrinsic

evidence of motive and bias.

We agree with Mr. Trump that, contrary to Ms. Carroll's argument,

the Stoynoff transcript did not contain inadmissible hearsay: Ms. Carroll's

statements were party admissions under Rule 801(d)(2)(A), and Ms. Stoynoff's

responses were being offered to place Ms. Carroll's statements into context and

were not being offered for their truth. *See United States v. Song*, 436 F.3d 137, 139

(2d Cir. 2006) (finding that it was error to exclude testimony not offered for the

truth of the matters asserted, "but rather[] to demonstrate the motivation behind

[a party's] actions"); *United States v. Ebens*, 800 F.2d 1422, 1430-32 (6th Cir. 1986)

(holding that trial court erred in not admitting recording of witnesses being prepared, where tapes were not offered for truth of statements contained therein, but to show, *inter alia*, that witnesses were being coached), *abrogated in other respects by Huddleston v. United States*, 485 U.S. 681 (1988).  The transcript was also arguably relevant as extrinsic evidence of Ms. Carroll's bias.  *See James*, 609 F.2d at 46; *Harvey*, 547 F.2d at 722.

But the district court did not err in refusing to admit the proposed redacted version of the transcript into evidence.  We accord great deference to a district court "in determining whether evidence is admissible, and in controlling the mode and order of its presentation to promote the effective ascertainment of the truth."  *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 119 (2d Cir. 2006) (internal quotation marks omitted).  As discussed above, a district court does not abuse its discretion in making an evidentiary ruling unless "the ruling was arbitrary and irrational."  *Restivo*, 846 F.3d at 573 (quoting *Coppola*, 671 F.3d at 244).  The district court's decision to exclude the Stoynoff transcript as prepared by counsel was far from arbitrary or irrational.

The district court's sidebar discussion with counsel illuminates that defense counsel sought to use the transcript in ways that risked confusion, undue

delay, and wasted time on cumulative evidence -- considerations that the district court was permitted to weigh, pursuant to Federal Rule of Evidence 403, when deciding whether to admit or exclude the evidence. Defense counsel provided no explanation as to how the transcript itself would have added anything of significance, and the transcript's admission would have been largely cumulative of the excerpts that were read verbatim into the record. *See Old Chief v. United States*, 519 U.S. 172, 184-85 (1997) ("[W]hen Rule 403 confers discretion by providing that evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives."). A trial judge has discretion to exclude cumulative proof of bias, including documentary evidence, when the witness admits to the "incidents from which any alleged bias . . . arose." *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991). Here, the district court permitted defense counsel to cross-examine Ms. Carroll using language drawn verbatim from the transcript, and Ms. Carroll admitted to all the relevant information. Moreover, the district court correctly instructed the jury to consider Ms. Stoynoff's statements not for their truth, but for "the fact that they were said to Ms. Carroll because they shed light on what

Ms. Carroll did and why she did it." App'x at 1920. Accordingly, we conclude

that the district court acted well within its discretion in excluding the Stoynoff

transcript.

**3.** *DNA Evidence*

Mr. Trump next argues that the district court erred when it

"precluded cross-examination of [Ms. Carroll] regarding her false, public claim

that she possessed President Trump's DNA" on the dress she was wearing the

day of the 1996 assault. Appellant's Br. at 48. In a written opinion issued pre-

trial, the district court concluded that although Ms. Carroll's statements

regarding DNA evidence were arguably relevant to Ms. Carroll's credibility,

their probative value was significantly outweighed by the reasons for preclusion

enumerated in Rule 403, including "unfair prejudice, confusing the issues,

misleading the jury, undue delay, [and] wasting time." *Carroll v. Trump*, No. 22-

cv-10016 (LAK), 2023 WL 2652636, at *7 (S.D.N.Y. Mar. 27, 2023). We see no

abuse of discretion here.

In a series of tweets on her public Twitter page in 2020 and 2021, Ms.

Carroll claimed that she still had the dress she was wearing when Mr. Trump

assaulted her, and she believed the dress had Mr. Trump's DNA on it.[27]  She had

had a DNA test performed on the dress, and the test showed, she said, that the

dress had male DNA on it.  *See* App'x at 599-601.  At the outset of *Carroll I*, Ms.

Carroll had requested a DNA sample from Mr. Trump for testing, seeking to

confirm her belief that it was his DNA, but Mr. Trump had refused to provide a

sample for over three years and did not offer to provide a sample until the eve of

trial in *Carroll II*.  *See generally Carroll v. Trump*, No. 22-cv-10016 (LAK), 2023 WL

2006312, at *3-6 (S.D.N.Y. Feb. 15, 2023).  The district court did not abuse its

discretion in precluding cross-examination of Ms. Carroll on this subject.

First, the district court determined that the probative value of this

line of questioning was low, as there was no credible evidence that Ms. Carroll

lied about believing that Mr. Trump's DNA was on the dress.  She was simply

---

[27]     @ejeancarroll, Twitter (June 2, 2021, 12:10 PM),
https://twitter.com/ejeancarroll/status/1400122740720480262 [https://perma.cc/W845-
73S2] ("Didn't last as long as DNA on a dress."); @ejeancarroll, Twitter (Feb. 25, 2021,
12:49 PM), https://twitter.com/ejeancarroll/status/1364995845439901700
[https://perma.cc/MCQ7-ZTHD] ("Cyrus Vance, the Manhattan District Attorney, has
Trump's taxes.  Fani Willis, the Georgia Prosecutor, has Trump's phone call.  Mary
Trump has her grandfather's will. And I have the dress.  Trump is basically in deep
shit."); @ejeancarroll, Twitter (May 1, 2020, 3:16 PM),
https://twitter.com/ejeancarroll/status/1256301599426785280 [https://perma.cc/PAR7-
HPYM] ("I am STILL waiting for Trump to provide his DNA sample to be tested against
the dress I wore when he attacked me.").

never able to confirm or negate the basis for her belief because she was never able to obtain a sample of Mr. Trump's DNA to compare to the DNA on the dress.

Second, the district court also recognized that cross-examination of Ms. Carroll on this basis would have opened the door to questions about why she never conducted a DNA test with Mr. Trump's sample, whether she had tried to get a DNA sample from Mr. Trump, and why she was unable to do so. Cross-examination in this area also could have required expert testimony on DNA testing. The parties indicated to the district court that if DNA became an issue, they would seek to reopen discovery, adduce expert testimony, and engage in a new round of motions *in limine* related to this topic.

We conclude that the district court did not abuse its discretion in determining that allowing further inquiry into this area created a substantial danger of unfair prejudice, confusion, and unnecessary delay. That danger substantially outweighed any possible probative value, especially considering that the pretrial discovery period had closed by the time Mr. Trump offered to provide a DNA sample, and both parties had had ample time to develop DNA as an issue, yet both had failed to do so. Permitting cross-examination on this issue

would have created a "trial within a trial" about why Ms. Carroll did not have

Mr. Trump's DNA sample.  *See, e.g.*, *Ricketts v. City of Hartford*, 74 F.3d 1397, 1414

(2d Cir. 1996) (no abuse of discretion "in determining that a trial within a trial . . .

would have been more confusing than helpfully probative"); *United States v.*

*Aboumoussallem*, 726 F.2d 906, 912-13 (2d Cir. 1984) (upholding exclusion of

evidence under Rule 403 where confusion and delay caused by trial within a trial

would substantially outweigh the evidence's probative value).

### 4.    *Failure to File Police Report*

Mr. Trump also contends that the district court erred in precluding

the following question to Ms. Carroll: "How would you bringing criminal

charges be disrespectful to some people at the border?"  App'x at 1840.  The

district court stated: "Correct me if I'm wrong, counsel, but I believe in the State

of New York private individuals can't bring criminal charges," and explained,

"We have been up and down the mountain on the question of whether she went

to the police, so let's move on."  *Id.*

Mr. Trump argues that he should have been permitted to pursue this

line of questioning to explore further her decision not to use formal options for

reporting her allegations.  Mr. Trump also argues that the district court's response improperly suggested that Ms. Carroll was powerless to file a report.

The district court did not abuse its discretion in limiting this line of questioning or in making these brief comments.  Mr. Trump's arguments on this point rely on a mischaracterization of the record.  The district court permitted extensive questioning on cross-examination of Ms. Carroll regarding her decision not to go to the police, and the court allowed the introduction of extrinsic evidence on this very point.  By the time Mr. Trump's counsel reached this question, Ms. Carroll had already responded to at least ten questions regarding her decision not to file a police report.  The federal rules instruct the district court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth [and] avoid wasting time."  Fed. R. Evid. 611(a).  The district court was well within its discretion to bar further cumulative questioning.

### 5. *Bergdorf Goodman Security Footage*

Finally, the district court did not abuse its discretion when it denied Mr. Trump's counsel the opportunity to ask Ms. Carroll whether she went back

to Bergdorf Goodman the "next day to . . . ask for the video camera footage." App'x at 1842.

It is well established in our circuit that "a question (which assumes a fact) may become improper on cross-examination, because it may by implication put into the mouth of an unwilling witness, a statement which he never intended to make, and thus incorrectly attribute to him testimony which is not his." *United States v. DeFillipo*, 590 F.2d 1228, 1239-40 (2d Cir. 1979) (quoting 3 Wigmore, Evidence § 780, at 171 (Chadbourn ed., rev. 1970)).

Right before this question was asked and objected to, Ms. Carroll had testified that she had "never . . . been able to verify if there were cameras in the dressing room or in the lingerie department." App'x at 1841. And not one of the witnesses who testified about the location of cameras within the store at the time in question had stated that there were cameras in either of these locations. The former store manager at Bergdorf Goodman, Cheryl Beall, testified that she thought that, at the time, there were cameras at the main entrances and exits and "in fine jewelry" but not around the escalators or in the lingerie department. *Id.* at 1557-58. Likewise, the former Senior Vice President of Administration at Bergdorf Goodman, Robert Salerno, testified that he thought there were only a

few cameras in the store in the mid-1990's -- at the employee entrance, at the

loading dock, and maybe in furs, and in fine jewelry.  Thus, by the time this

question was asked, defense counsel had elicited no proof that video cameras

were installed in the specific locations of the store where the incident occurred.

Accordingly, the district court correctly determined that defense counsel's

question to Ms. Carroll assumed a fact not in evidence.  Moreover,

notwithstanding the absence of evidence of cameras in the locations in question,

Mr. Trump's counsel still emphasized this point during his closing argument.  *Id.*

at 2681 ("[S]he even told you she never even went back to think about looking for

surveillance video at Bergdorf Goodman which would have proven her case.

She didn't think about it because it never happened.").

###    C.    *No New Trial Is Warranted*

Finally, Mr. Trump asserts that he is entitled to a new trial, arguing

that the cumulative effect of the claimed errors affected his substantial rights.

"[A]n erroneous evidentiary ruling warrants a new trial only when 'a

substantial right of a party is affected,' as when 'a jury's judgment would be

swayed in a material fashion by the error.'"  *Lore*, 670 F.3d at 155 (quoting *Arlio*,

474 F.3d at 51).  "We measure prejudice by assessing error in light of the record

as a whole." *Phillips v. Bowen*, 278 F.3d 103, 111 (2d Cir. 2002) (citation omitted).

And, even assuming evidentiary error, we will not grant a new trial if we find

that the error was "harmless." *Cameron*, 598 F.3d at 61.  We will deem an

evidentiary error harmless if we conclude that the proof at issue was

"unimportant in relation to everything else the jury considered on the issue in

question, as revealed in the record." *Yates v. Evatt*, 500 U.S. 391, 403 (1991).

As we have discussed, the district court did not abuse its discretion

in making any of the challenged evidentiary rulings.  The jury made its

assessment of the facts and claims on a properly developed record.  Even

assuming *arguendo* that the district court erred in some of these evidentiary

rulings -- a proposition that we have rejected -- taking the record as a whole and

considering the strength of Ms. Carroll's case, we are not persuaded that any

claimed error or combination of errors in the district court's evidentiary rulings

affected Mr. Trump's substantial rights.  *Lore*, 670 F.3d at 155.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is

AFFIRMED.